24



"Cochran, C. Malcolm          To: DSchimmel@Shearman com
IV"                           cc: GWade@Shearman com
<Cochran@RLF.com>        Subject: Re: Search results

02/23/2005 11:16 AM


You did not. There was a new list of key words that was developed and
submitted to the consultants. You are continuing to drag your feet on this,
Mr Schimmel. We will call it to the attention of the court if our requests are
not promptly addressed.
Please tell us whether you will review and produce the responsive e documents
identified in the limited search performed by your consultant-and when you
will do so. Alternatively, please tell us whether you will allow us to do so.
Further, when will we have the 105 boxes of hard copy documents to review?
You have to date failed to respond to my inquiries in this regard. As for the
Debtors hard copy documents, they are available to you in Reston.   -
C. Malcolm Cochran, IV
Richards, Layton & Finger, P.A.
One Rodney Square
Wilmington, DE  19801
Direct Ext.  302.651.7506


-----Original Message-----
From: Daniel Schimmel <DSchimmel@Shearman com>
To: Cochran, C. Malcolm IV <Cochran@RLF com>
CC: George J Wade <GWade@Shearman.com>
Sent: Wed Feb 23 11:04:43 2005
Subject: RE: Search results

Malcom:

We gave you that result last Friday.

Daniel

Daniel Schimmel
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022
Phone: (212) 848-4608
Fax:    (646) 848-4608


                       "Cochran, C.
                       Malcolm IV"           To:      "Daniel Schimmel"
<DSchimmel@Shearman com>
                       <Cochran@RLF com>     cc:      "George J Wade"
<GWade@Shearman com>
                                             Subject: RE: Search results
                       02/23/2005 09:57
                       AM



I am aware of the numbers of documents turned up in connection with your
consultant's request that an initial search be focused on just the terms
that he considers to be overly broad--i e., the list below  Frankly,
the numbers of documents turned up in a search of those terms do not

25

Daniel Schimmel                To: Cochran@RLF com
02/26/2005 07:47 PM            cc: George J Wade/NY/NA/ShS@ShSDOMAIN
                               Subject: analysis based on plaintiffs' new list of search terms

Malcolm:

On February 18, 2005. you submitted a new list of terms and asked that BCE and Commonwealth Legal
conduct another search to evaluate the number of documents that would be retrieved using those terms.
Commonwealth Legal conducted that analysis in two steps  First, Commonwealth Legal used a sample of
103,591 documents that were easily searchable  Of those 103,591 documents, 79,334 documents were
created between January 1, 2000 and December 31, 2002, the period with respect to which you had
requested an analysis   Using the proposed search terms. BCE would retrieve 71,857 documents created
in that time period, that is, 90 5% of all the documents created in that period

Second, Commonwealth Legal conducted a search based on all the available data (hard drives and
servers) in the period January 1, 2000 through December 31, 2002   We were again told that using the
proposed search terms does not appreciably reduce the total number of responsive documents in the time
period  We do acknowledge, however, that using date restrictions helps reduce the number of retrieved
documents

Commonwealth Legal has estimated that it would retrieve approximately 209.000 documents
(representing 1 4 to 1 6 million pages of documents) using the proposed search terms in the period
January 1, 2000 to December 31, 2002.

We reiterate that the parties should work on a more meaningful and logical method of searching   We
have suggested several possibilities, and we urge you to consider them or to propose logical alternatives
We are prepared to discuss this with you at your convenience

Daniel


Daniel Schimmel
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022
Phone: (212) 848-4608
Fax:    (646) 848-4608

**26**



**WILCOX & FETZER LTD.**

In The Matter Of:

# Teleglobe Communications Corporation, et al.

## Case No. 02-11518 (MFW)

Vinyard V. Cooke, Esquire

February 9, 2005

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497

Teleglobe Communications Corporation, et al.
Case No. 02-11518 (MFW)                Vinyard V. Cooke, Esquire                February 9, 2005

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

--------------------------------x
In re                            ) Chapter 11
                                 )
TELEGLOBE COMMUNICATIONS         ) Jointly Administered
CORPORATION, et al.,             ) Bankruptcy Case No.
                                 ) 02-11518 (MFW)
          Debtors.               )
--------------------------------x
TELEGLOBE COMMUNICATIONS          )
CORPORATION, et al.,              )
                                  )
          Plaintiffs,             )
v.                                ) C.A. No.
                                  )   04-CV-1266
BCE INC., MICHAEL T. BOYCHUK      )
MARC A. BOUCHARD, SERGE FORTIN,   )
TERENCE J. JARMAN, STEWART        )
VERGE, JEAN C. MONTY, RICHARD     )
J. CURRIE, THOMAS KIERANS,        )
STEPHEN P. SKINNER, and           )
H. ARNOLD STEINBERG,              )
                                  )
          Defendants.             )
--------------------------------x
          Deposition of the Debtors taken pursuant
to Federal Rule of Civil Procedure 30(b)(6) through
its designee VINYARD V. COOKE, ESQUIRE at the law
offices of Richards, Layton & Finger, One Rodney
Square, Third Floor, Wilmington, Delaware, beginning
at 10:00 a.m., on Wednesday, February 9, 2005, before
Kurt A. Fetzer, Registered Diplomate Reporter and
Notary Public.
APPEARANCES:
     C. MALCOLM COCHRAN, IV, ESQ.
     RICHARDS LAYTON & FINGER
        One Rodney Square - Third Floor
        Wilmington, Delaware  19801
     For the Debtors/Plaintiffs
               WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
               (302) 655-0477

Teleglobe Communications Corporation, et al
Case No. 02-11518 (MFW)             Vinyard V. Cooke, Esquire             February 9, 2005

Page 2

1   APPEARANCES: (Cont'd)
2       JOHN W. SHAW, ESQ.
        YOUNG CONAWAY STARGATT & TAYLOR, LLP
3       The Brandywine Building
        1000 West Street - 17th Floor
4       Wilmington, Delaware 19801
        - and -
5       DANIEL SCHIMMEL, ESQ.
        SHEARMAN & STERLING LLP
6       599 Lexington Avenue
        New York, New York 10022-6069
7       For the Defendants
8           - - - - -
9           MR. SCHIMMEL: Please mark this.
10          (Cooke Deposition Exhibit No. 1 was marked
11  for identification.)
12          - - - - -
13          VINYARD V. COOKE, ESQUIRE,
14      the deponent herein, having first been
15      duly sworn on oath, was examined and
16      testified as follows:
17          MR. COCHRAN: I would like to note at the
18      outset Mr. Cooke is a lawyer. He is assistant general
19      counsel to the debtor companies. As such, whenever
20      you take the deposition of a lawyer there can be
21      privilege issues that arise.
22          We intend to work with you to try to limit
23      those and to try to get you the information you're
24      entitled to, but I want to state at the outset that we

Page 3

1   have no intent to waive attorney-client or work
2   product privileges and to the extent Mr. Cooke
3   testifies here in a way that approaches those
4   concerns, we do not intend, he does not intend, nor do
5   his clients intend to waive
6           EXAMINATION
7   BY MR. SCHIMMEL:
8       Q.  Good morning, Mr. Cooke. We have met before.
9   I'm Daniel Schimmel of Shearman & Sterling. I'm here
10  to ask you a few questions today on the topics on this
11  notice of 30(b)(6) deposition.
12      A.  Okay.
13      Q.  Let me ask you first a preliminary question.
14      Is there anything this morning that would
15  prevent you from giving your best testimony today?
16      A.  Not as far as I'm aware.
17      Q.  Okay. Have you seen this notice of Rule
18  30(b)(6) before?
19      A.  This Exhibit No. 1?
20      Q.  Yes.
21      A.  Let me just take a look. (Reviewing document)
22      Yes, I have.
23      Q.  Do you understand that you've been designated
24  as a representative of the debtors to answer questions

Page 4

1   relating to the topics listed in Schedule A?
2       A.  Yes, I do.
3       Q.  And are you prepared to do so today?
4       A.  I believe I am.
5       Q.  Can you give me a brief description of your
6   education, Mr. Cooke, please?
7       A.  I would be happy to. I went to school at the
8   University of Virginia and graduated in 1982, went
9   back to law school at Washington & Lee, which is based
10  in Virginia, graduated in 1991.
11      Q.  Any other post-high school degrees that you
12  have?
13      A.  No.
14      Q.  Can you give me a brief description of your
15  employment history from the first job to the present?
16      A.  You mean after college?
17      Q.  Yes.
18      A.  After college I worked for Chemical Bank, which
19  is based in New York for three years, three-and-a-
20  half years, went to law school. came out of law school
21  in 1991, started working with Hazel & Thomas, which is
22  a law firm. left Hazel & Thomas and went to a firm by
23  the name of Tucker, Flyer & Lewis and then left
24  Tucker, Flyer & Lewis and went to the law firm Kelley,

Page 5

1   Drye & Warren and left Kelley, Drye & Warren to work
2   for Teleglobe. And I joined Teleglobe in 1999,
3   September 1999. and have worked there since
4       Q.  What kind of legal work were you doing at Hazel
5   & Thomas?
6       A.  I was a litigator
7       Q.  How many years did you stay there?
8       A.  Three, two or three. I have to say the older I
9   get the harder it is to remember
10      Q.  So that would be roughly from 1991 through what
11  year?
12      A.  '94.
13      Q.  What kind of legal work were you doing at
14  Tucker, Flyer & Lewis?
15      A.  Also litigation
16      Q.  And how long did you stay there?
17      A.  Until '98, 1998
18      Q.  So four years?
19      A.  Right. I might be off a year or two on each
20  one.
21      And then from '98 to '99 I was with
22  Kelley, Drye
23      Q.  Was Teleglobe a client of Kelley, Drye?
24      A.  Yes, it was

2 (Pages 2 to 5)

Teleglobe Communications Corporation, et al.

Case No. 02-11518 (MFW)        Vinyard V. Cooke, Esquire        February 9, 2005

Page 6

1    Q.  Were you a litigator at Kelley, Drye as well?
2    A.  Yes, I was.  Sorry.
3    Q.  And where were you based at Hazel & Thomas,
4    Tucker, Flyer & Lewis and Kelley, Drye?
5    A.  For Hazel & Thomas I was in Alexandria,
6    Virginia, Tucker, Flyer I was in Washington, D.C. and
7    Kelley, Drye I was in Washington, D.C.
8    Q.  At Teleglobe who did you report to?
9    A.  John Brunette.
10   Q.  And what was Mr. Brunette's titles and
11   responsibilities?
12   A.  When I joined he was general counsel.
13   Q.  Did you join Teleglobe as assistant general
14   counsel?
15   A.  No.
16   Q.  In what capacity?
17   A.  I was senior counsel, I believe, and I think it
18   was senior counsel-director, something like that.
19   Q.  Broadly speaking, what kind of legal work did
20   you do at Teleglobe over the years?
21   A.  I was hired to take over all of their
22   litigation worldwide, and that would be management of
23   their litigation.
24   Q.  You did this between I take it 1999 and April

Page 7

1    of 2002?  Would that be correct?
2    A.  Yes.
3    Q.  Did you do any kind of other legal work during
4    that time period?
5    A.  During the time at Teleglobe?
6    Q.  Yes.  Right, from 1999 through April of 2002.
7    A.  For a matter of months I also handled all of
8    the HR issues, employment law issues.  For a matter of
9    months I handled real estate issues, but principally I
10   was there for litigation purposes.
11   Q.  We've been talking about Teleglobe generally.
12   Was there a specific name of the entity that employed
13   you?
14   A.  Yes.
15   Q.  What was the name?
16   A.  Teleglobe USA, Inc.
17   Q.  What was the business of Teleglobe USA, Inc.?
18   A.  Teleglobe USA, Inc. was a FCC-licensed
19   telecommunications provider providing
20   telecommunication services in the United States.
21   Q.  Did you have any titles or responsibilities at
22   Teleglobe Communications Corporation?
23   A.  At any time?
24   Q.  At any time.

Page 8

1    A.  Specifically, no.  At TCC, the U.S. entity, no.
2    I.
3    Q.  Go ahead.
4    A.  Although -- look, let me just take a quick
5    second, which is TCC is part of the debtors' estate.
6    Q.  Right.
7    A.  And I also was coordinating all of the
8    bankruptcy proceedings.  So arguably I represent all
9    of the debtor estates, all of the debtor entities, but
10   TCC did not have litigation, per se.
11   Q.  TCC was the parent corporation, I take it, of
12   Teleglobe USA, Inc.?
13          MR. COCHRAN:  I'm sorry.  I didn't hear
14   the question.
15          (The reporter read back the last
16   question.)
17          THE WITNESS:  It is, I believe, the next
18   company up the Teleglobe chain.
19   BY MR. SCHIMMEL:
20   Q.  Would it be fair to say that Teleglobe USA,
21   Inc. was the company that was responsible for the
22   build-out and operation and maintenance of what is
23   called GlobeSystem?
24          MR. COCHRAN:  I object to form

Page 9

1    A.  It is one of the companies that was involved in
2    GlobeSystem to my understanding.
3    Q.  What other companies were involved in the
4    build-out, operations and maintenance of GlobeSystem?
5    A.  There were many.  I couldn't tell you whic'
6    ones specifically.
7    Q.  But the one you're aware of is Teleglobe USA,
8    Inc.?
9    A.  I know that Teleglobe USA, Inc. was part of the
10   entities that were building out the GlobeSystem.
11          MR. SCHIMMEL:  Let me mark an exhibit.
12          (Cooke Deposition Exhibit No. 2 was marked
13   for identification.)
14   BY MR. SCHIMMEL:
15   Q.  Mr. Cooke, just before I show you the next
16   exhibit, you said that you were responsible for
17   managing all of the litigation worldwide of Teleglobe?
18   A.  Yes.
19   Q.  Did that involve litigation relating to the
20   build-out, operation and maintenance of GlobeSystem?
21   A.  Yes.  In one case, yes.
22   Q.  And can you identify any company other than
23   let's call it TUSA, Teleglobe USA, Inc., that was
24   involved in those activities that I just described,

3 (Pages 6 to 9)

Teleglobe Communications Corporation, et al
Case No. 02-11518 (MFW)          Vinyard V. Cooke, Esquire          February 9, 2005

Page 10

1   the maintenance, operations and build-out of
2   GlobeSystem?
3           MR. COCHRAN: I object. I object to form.
4   A.  Just any other entity?
5   Q.  That to your knowledge were involved in those
6   three things.
7   A.  I'm sorry. The three things were?
8   Q.  The build-out, the operations and maintenance.
9           MR. COCHRAN: I object to form.
10  A.  I think Teleglobe Canada Limited Partnership
11  was also involved in that.
12  Q.  Any other one?
13  A.  There would be many, many more.
14  Q.  Can you identify any --
15          MR. COCHRAN: I object to form.
16  Q.  -- that to your knowledge were involved in
17  those three activities?
18  A.  The Netherlands affiliate of Teleglobe would
19  also be involved. I don't know the exact name of it.
20  Q.  Any other company?
21  A.  I can't think of any others.
22  Q.  What was the role of Teleglobe Canada Limited
23  Partnership in connection with those three things?
24          MR. COCHRAN: Objection. Scope.

Page 11

1   A.  I have no idea.
2   Q.  What was to your knowledge the role of the
3   Netherlands affiliate in connection with those three
4   things?
5           MR. COCHRAN: Objection. Beyond the
6   scope.
7   A.  I have no idea.
8   Q.  Mr. Cooke, I've just shown you what has been
9   marked as Cooke Exhibit 2. Do you recognize this
10  document?
11  A.  Yes, I do.
12  Q.  What is it?
13  A.  It's an affidavit from me.
14  Q.  Did you prepare this affidavit?
15  A.  No.
16  Q.  Who prepared this affidavit?
17  A.  My counsel.
18  Q.  Would that be the law firm of Richards, Layton
19  & Finger?
20  A.  I believe so.
21  Q.  Do you know who at that law firm prepared the
22  affidavit?
23  A.  I don't remember.
24  Q.  Was it sent to you for your review?

Page 12

1   A.  Yes, it was.
2   Q.  Did you, in fact, review it?
3   A.  Yes, I did.
4   Q.  To make sure that it was accurate?
5   A.  Yes.
6   Q.  And were you satisfied before you signed it
7   that it was accurate?
8   A.  Yes, I was.
9   Q.  And I take it it is your signature?
10  A.  Yes, it is.
11  Q.  I would like to direct your attention to
12  paragraph 7 of your affidavit which reads "Finally,
13  Teleglobe's electronic backup information prior to
14  2001 has largely been written over according to
15  company policies in place prior to April 2002 and is
16  no longer available for recovery."
17      Do you see this?
18  A.  Yes, I do.
19  Q.  What are the company policies that you were
20  describing in that paragraph?
21  A.  Teleglobe in the summer of 2002 I went up to go
22  to Montreal, specifically to meet with our IT
23  department and to direct them to stop -- or to
24  preserve all electronic records. And at that meeting

Page 13

1   they told me that for cost reasons they had been
2   writing over tapes that they no longer thought that
3   they needed and I told them to stop that.
4       And I think at the time when I went up
5   there they had written through up until sometime in
6   January of 2001.
7   Q.  I'll get back to what you just said.
8       But what are the policies that you were
9   talking about in your affidavit?
10  A.  Specifically, I don't know. All I know was at
11  the time the IT department was following whether you
12  call it a policy or whether you call it a procedure of
13  trying to save costs by writing over IT tapes.
14  Q.  Who is the person in the IT department that you
15  met?
16  A.  It was a fellow by the name -- I met with a
17  number of people, but the fellow that I specifically
18  remember was Roger Schodolowsky.
19  Q.  Can you spell that?
20  A.  I have no idea how to spell his name. Sorry.
21  Q.  Mr. Schodolowsky was to your knowledge an
22  employee of what company?
23  A.  I don't know. He was obviously an employee of
24  one of the Teleglobe entities, Canadian entities.

4 (Pages 10 to 13)

Teleglobe Communications Corporation, et al.

Case No. 02-11518 (MFW)                Vinyard V. Cooke, Esquire                February 9, 2005

Page 14

1    Q.  Did you meet with anyone else in the IT
2    department in Montreal?
3    A    Yes
4    Q.  Who?
5    A    I met with another gentleman  I want to say
6    his name was Alain, A-l-a-i-n  I have no idea what
7    his last name was, but he was also involved in this
8    electronic meeting that we had and then I met with
9    Roger's direct report
10   Q.  Who was that person?
11   A    It was a woman and I have no idea what her name
12   is
13   Q.  Was she responsible of the IT department for,
14   broadly speaking, Teleglobe?
15       MR  COCHRAN: I did not hear the question
16       MR  SCHIMMEL:  Let me rephrase the
17   question
18   BY MR  SCHIMMEL:
19   Q.  What was her role, to your knowledge?
20   A    I don't know if she was the head of IT or not,
21   but she was a more senior officer in the IT
22   department
23   Q.  Was it the first time you met that woman?
24   A    Yes

Page 15

1    Q.  When did you go to Montreal?
2    A    It was early summer
3    Q.  Apart from going to Montreal, did you send any
4    written instruction to anybody at the IT department of
5    Teleglobe on the subject you just discussed?
6        MR  COCHRAN: Objection
7    Q.  Which is the preservation of electronic
8    records.
9    A    Not before that meeting
10   Q.  How about after that meeting?
11   A    Yes  I believe I confirmed that with an
12   e-mail, once again confirming our understanding not to
13   override any more electronic records
14   Q.  Was that the extent of your understanding?
15       MR  COCHRAN: Objection to form
16   A    I'm not sure I understand your question now
17   Q.  Was your understanding that Teleglobe would
18   stop overwriting electronic records?
19   A    Yes
20   Q.  Did you instruct people in the IT department to
21   do anything else?
22   A    I told them to preserve all electronic tapes
23   Q.  Those would be backup tapes?
24   A    Yes

Page 16

1    Q.  Did you instruct them to do anything else?
2    A    Not that I remember
3    Q.  To your knowledge, prior to the summer of 2002
4    did Teleglobe have a document preservation policy?
5    A    I am not aware of one
6    Q.  So there was no document preservation policy
7    for paper documents?
8    A    I don't know if there was or not
9    Q.  But as a litigator involved in managing a
10   number of litigations for Teleglobe prior to April
11   2002 did you ever consider the issue of whether
12   Teleglobe had a document preservation policy?
13   A    I can't say if I considered it or not
14   Q.  Did the issue of preserving documents come up
15   in any litigation in which Teleglobe was involved?
16   A    No
17   Q.  You had one meeting with the IT department in
18   Montreal on the subject you described, which was to
19   stop overwriting electronic records and preserve
20   tapes?
21   A    I had one meeting that summer. yes
22   Q.  Did you have other meetings subsequently?
23   A    I did have discussions from time to time with
24   them

Page 17

1    Q.  On what subjects?
2    A    Making sure that they were continuing to comply
3    with my directions
4    Q.  When you say, "making sure that they were
5    complying with my directions," do you mean stop
6    overwriting backup tapes?
7    A    Yes  And preserving tapes
8    Q.  Did you mean anything else?
9    A    No
10   Q.  Do you recall roughly when you had those
11   discussions with people in the IT department in
12   Canada?
13   A    No  They would call occasionally because those
14   tapes are expensive and so what they would do is say,
15   "Do I still have to continue to preserve?"  And as you
16   know or may not know, Cerberus ultimately bought
17   Teleglobe as a going concern and so there was a period
18   when there was an interim management agreement and I
19   wanted to make sure that they were continuing to
20   follow the same procedures
21   Q.  What was the time period?
22   A    Cerberus took over control of Teleglobe in like
23   October, November of 2002 and that deal subsequently I
24   guess it closed in I want to say May of 2003, although

5 (Pages 14 to 17)

Teleglobe Communications Corporation, et al.
Vinyard V. Cooke, Esquire    February 9, 2005

Page 18

1  once again I may be a month or two off either way
2  Q.  So during the time period between the summer of
3  2002 and May of 2003 you had some discussions?
4  A.  Yes
5  Q.  With the people in the IT department of
6  Teleglobe?
7  A.  Yes
8  Q.  To make sure that they had stopped overwriting
9  backup tapes and preserved whatever backup tapes
10  existed?
11  A.  Yes
12  Q.  Did you have any other discussions with the
13  people in the IT department in Canada?
14  A.  At any time?  I mean, other than the standard
15  network problems with my computer from time to time,
16  no
17  Q.  And your instruction to them was always the
18  same, namely preserve whatever backup tapes you have
19  and stop overwriting?
20  A.  Yes
21  Q.  Why did you ask people in the IT department in
22  Montreal to stop overwriting backup tapes?
23      MR. COCHRAN:  That question may call for
24  attorney-client privileged information or work

Page 19

1  product  I caution the witness not to reveal such
2  A.  I'm not sure what -- I think it was done for a
3  couple of reasons.  One was we were going to have the
4  core sale and we wanted to figure out what documents
5  were available, both electronic and hard copy
6      And, two, I was directed at some point by
7  someone just to make sure that we kept our corporate
8  records intact for whatever reason
9  Q.  When you say that you were directed by someone
10  to preserve records intact, was that by a lawyer that
11  you were instructed to do that?
12  A.  Honestly, I can't remember  I can't remember
13  if it came from E & Y. who was the monitor in our
14  case, or my bankruptcy counsel or from John Brunette
15  I honestly cannot remember
16  Q.  Were there discussions after April 24 of 2002
17  between you and any person about the fact that the
18  debtors may have claims against BCE?
19      MR. COCHRAN:  I'm sorry  I didn't hear
20  the end of the question
21      (The reporter read back the last
22  question )
23      MR. COCHRAN:  Would you read it back
24  again?

Page 20

1      (The reporter reread the last question.)
2      MR. COCHRAN:  I object to form.
3      THE WITNESS:  Yes
4  BY MR. SCHIMMEL:
5  Q.  When did you have those discussions for the
6  first time?
7      MR. COCHRAN:  That's beyond the scope of
8  the Rule 30(b)(6)
9      MR. SCHIMMEL:  No.  I disagree
10      MR. COCHRAN:  It is beyond the scope of
11  the Rule 30(b)(6) notice  He's not tendered for that
12  purpose
13      MR. SCHIMMEL:  You may answer
14      MR. COCHRAN:  I'm going to direct him not
15  to answer, unless you can tell me --
16      MR. SCHIMMEL:  You're instructing him not
17  to answer on the ground that it's beyond the scope?
18      MR. COCHRAN:  That's correct
19      MR. SCHIMMEL:  That is absolutely
20  improper.
21      MR. COCHRAN:  Sorry.
22      MR. SCHIMMEL:  And I do not agree that it
23  is beyond the scope of the deposition notice.
24      MR. COCHRAN:  Then tender an explanation.

Page 21

1  I'm happy to have the witness step out while you do
2  so
3      MR. SCHIMMEL:  We want to know what
4  efforts the debtors took to preserve documents after
5  they became on notice that they may have claims
6  against BCE  The question is within the scope of the
7  notice of deposition and I would like Mr. Cooke to
8  answer the question
9      MR. COCHRAN:  That topic is not listed as
10  one of those that you've noticed
11      MR. SCHIMMEL:  The efforts to preserve and
12  collect documents is listed
13      MR. COCHRAN:  But the topic that you just
14  expressed is not
15      MR. SCHIMMEL:  The topic is expressly
16  covered
17      Mr. Cooke
18      MR. COCHRAN:  Would you like to show me in
19  the notice?
20      MR. SCHIMMEL:  "Plaintiffs' efforts to
21  preserve or maintain documents since April 24, 2002,
22  including any hard copies of documents and electronic
23  documents."  That is subject No. 1.
24      Subject No. 2.  "Plaintiffs' efforts to

6 (Pages 18 to 21)

Teleglobe Communications Corporation, et al.

Case No. 02-11518 (MFW)             Vinyard V. Cooke, Esquire             February 9, 2005

Page 22

1  collect, review and produce documents prior to, or in
2  connection with, the Committee's investigation of
3  possible claims or causes of action pursuant to Rule
4  2004 of the Federal Rules of Bankruptcy Procedure, and
5  in connection with this litigation," and it includes a
6  number of topics.
7        MR. COCHRAN: I'm happy to tender him on
8  any of those issues. Maybe you would like to rephrase
9  your question.
10       MR. SCHIMMEL: No. I would like to know
11  when for the first time you had notice, you had
12  discussions -- let me rephrase the question.
13       Can you repeat Mr. Cooke's prior answer
14  and my question?
15       (The reporter read back the last two
16  questions and answers.)
17  BY MR. SCHIMMEL:
18  Q.  What I am asking is when for the first time did
19  you have discussions on that topic?
20       MR. COCHRAN: I'm going to direct him not
21  to answer that question. That's not within the scope.
22       It also intrudes on the work product and
23  attorney-client privilege.
24       MR. SCHIMMEL: No, it doesn't. And I

Page 23

1  think the instruction is improper.
2        MR. COCHRAN: That's fine.
3        MR. SCHIMMEL: I would like to mark the
4  complaint in this action.
5        (Cooke Deposition Exhibit No. 3 was marked
6  for identification.)
7        MR. SCHIMMEL: Mr. Cochran, so you
8  understand, our position is that your instruction is
9  improper and we will have to have Mr. Cooke again for
10  the continuation of this deposition.
11       MR. COCHRAN: You might like to proceed to
12  your next question.
13  BY MR. SCHIMMEL:
14  Q.  Mr. Cooke, I have just showed you the complaint
15  in this action and I would like you to take a look at
16  paragraph 125 and 127 of the complaint.
17       And before you do that, I will ask you the
18  following question: Have you seen this document
19  before?
20  A.  (Reviewing document). Yes, I have.
21  Q.  Did you see a draft of this complaint before it
22  was filed?
23  A.  Yes, I did.
24  Q.  Did you provide comments on the complaint

Page 24

1  before it was filed?
2  A.  Yes, I did.
3  Q.  Did you approve the statements in the complaint
4  before it was filed?
5        MR. COCHRAN: I object to the form.
6  A.  I'm not sure I would say I approved it.
7  Q.  What do you mean by that?
8  A.  I reviewed it.
9  Q.  Did you have any disagreement with anything
10  written in the complaint?
11  A.  I reviewed it, I made comments on it and the
12  complaint was filed.
13  Q.  And you were satisfied with the document when
14  it was filed?
15  A.  I would have to say honestly, since I'm running
16  this case this gets --
17       MR. COCHRAN: It's a yes or no.
18  A.  Well, I feel like it is invading -- as a
19  litigator running this case, I feel like you're asking
20  me a work product question. You're asking me did I
21  review the case and did I approve it and was I
22  satisfied with it? I think it's -- I don't think I
23  could answer you how did I feel about this complaint.
24       MR. COCHRAN: On that basis, I direct him

Page 25

1  not to answer the question.
2        It's also beyond the scope of the notice.
3  Q.  Mr. Cooke, I'm directing your attention to
4  paragraph 125.
5  A.  Yes.
6  Q.  Which is under count 1, breach of contract. I
7  will read you paragraph 125: "BCE made enforcible
8  agreements with the Debtors, or with TI with the
9  Debtors as third-party beneficiaries, to provide
10  sufficient funding to enable the Debtors to meet their
11  cash needs through 2003."
12       Do you see that?
13  A.  Yes, I do.
14  Q.  Under paragraph 127 the complaint reads "BCE
15  breached the agreements in a material way."
16       Do you see that?
17  A.  Yes, I do.
18  Q.  Mr. Cooke, when did you become aware that BCE
19  had breached the agreement that is described here?
20       MR. COCHRAN: I am going to direct the
21  witness not to answer unless you can tender to me an
22  explanation for how that relates to the topics that
23  are noticed here.
24       MR. SCHIMMEL: It is very simple. The

Wilcox & Fetzer, Ltd            Professional Court Reporters            (302)655-0477

Teleglobe Communications Corporation, et al

Case No. 02-11518 (MFW)          Vinyard V. Cooke, Esquire          February 9, 2005

Page 26

1  notice of the existence of claims triggers certain
2  obligations in terms of preserving and collecting
3  documents and the question of when Mr. Cooke and the
4  debtors became on notice of the existence of claims is
5  perfectly covered by the notice. I have said that
6  before. I will not repeat it.
7       I would like the question read again to
8  Mr. Cooke and I would like an answer.
9       MR. COCHRAN: Just a moment.
10      Having again reviewed the specific topics
11  listed in your Rule 30(b)(6) notice, we're happy to
12  have this witness testify about any of those topics
13  The question of when he became, Mr. Cooke became aware
14  that your clients had breached their agreement as
15  stated in the specific allegations of the complaint is
16  not listed as any of the topics in your Rule 30(b)(6)
17  notice.
18      Moreover, since Mr. Cooke is a litigator
19  or is associate general counsel charged with some
20  responsibility for this litigation, I am concerned
21  that you are attempting to invade work product
22      If you would like to rephrase your
23  question to address the topics that you've noticed,
24  I'm not going to have an objection.

Page 27

1       MR. SCHIMMEL: The question is fairly
2  within the topics that are noticed and my question
3  *does not seek to elicit communications with the*
4  *attorneys   It's a question about when. So let me*
5  *rephrase the question*
6  BY MR. SCHIMMEL:
7   **Q.  When did the debtors become aware that BCE**
8  **breached the agreements in a material way as described**
9  **in paragraph 127 of the complaint?**
10      MR. COCHRAN: Now your question is when
11  the debtors became aware?
12      MR. SCHIMMEL: Yes
13      MR. COCHRAN: I think the only information
14  this witness could have about that would have come
15  from attorney-client communications  Nor is that
16  within the scope of the topics that you've identified
17      MR. SCHIMMEL: Are you instructing the
18  witness not to answer?
19      MR. COCHRAN: Well, it is calling for
20  privileged information
21      Why don't we consult on the matter of
22  whether there's a privilege here to assert and then I
23  will tell you?
24      (The witness and Mr. Cochran left the

Page 28

1  deposition room for a brief period of time.)
2       MR. SCHIMMEL: I would like the question
3  read back to Mr. Cooke
4       (The reporter read back the pending
5  question.)
6       MR. COCHRAN: I will let him answer that
7  question
8       THE WITNESS: I don't know when the
9  debtors first became aware
10  BY MR. SCHIMMEL:
11   Q.  When did you become aware?
12      MR. COCHRAN: When did he become aware of
13  what?
14      MR. SCHIMMEL: That BCE had breached the
15  agreements in a material way as described in paragraph
16  127 of the complaint
17      MR. COCHRAN: I will let him answer that
18  question
19   A   I can't remember specifically
20   Q.  In what year?
21   A   It would have been in sometime May 2002 I want
22  to say
23   Q.  Is your answer complete?
24   A   I believe so

Page 29

1   Q.  I would like you to look at paragraph 131 of
2  the complaint under count 2, which reads "BCE made
3  promises to fund the Debtors' cash needs through the
4  completion of the GlobeSystem, upon which promises BCE
5  reasonably expected the Debtors to act in a definite
6  and substantial character."
7       Do you see that?
8   A   Yes, I do
9   Q.  In paragraph 133 under count 2 the complaint
10  reads "BCE broke its promises to the Debtors when it
11  precipitously terminated its ongoing funding, leaving
12  the Debtors with no alternative but to file for
13  bankruptcy."
14      Mr. Cooke, when did the debtors become
15  aware that BCE had broken the promises set forth in
16  paragraph 133 of the complaint?
17      MR. COCHRAN:   object to form
18   A   I don't know specifically
19   Q.  Generally?
20      MR. COCHRAN   object to form
21   A   No.
22   Q.  In what year?
23      MR. COCHRAN   object to form
24   A   Well, the year would be 2002

8 (Pages 26 to 29)

Teleglobe Communications Corporation, et al.

Case No. 02-11518 (MFW)    Vinyard V. Cooke, Esquire    February 9, 2005

Page 30

1   Q. Do you have any idea of what months in 2002?
2       MR. COCHRAN: The same objection.
3   A. No.
4   Q. I would like you to look at paragraph 139 under
5   count 3: "BCE represented that it would fund the
6   Debtors' cash needs through the completion of the
7   GlobeSystem."
8       Do you see that?
9   A. Yes, I do.
10  Q. Paragraph 140 of the complaint reads: "BCE
11  made untrue statements of material fact and failed to
12  state material facts in order to make its prior
13  statements not misleading."
14      Mr. Cooke, when did the debtors become
15  aware that BCE had made misrepresentations about the
16  funding of the debtors?
17      MR. COCHRAN: I object to form.
18  A. And my answer would be the same, which is I
19  don't know.
20  Q. Sometime in 2002?
21      MR. COCHRAN: I object to form.
22  A. Yes.
23  Q. But you don't remember at all when?
24  A. I have no information on that.

Page 31

1   Q. Is your answer complete?
2   A. Yes.
3   Q. Now, Mr. Cooke, after April 24 of 2002 did you
4   instruct any employees or officers of Teleglobe to
5   preserve and maintain the documents that they had in
6   their possession, custody or control?
7   A. Are you talking about hard copy documents?
8   Q. Any.
9   A. Did I personally do that? No.
10  Q. Did anyone after April 24 of 2002 instruct any
11  employees or officers of Teleglobe, and by that I
12  really mean all of the debtors, to preserve and
13  maintain the documents in their possession, custody
14  and control?
15      MR. COCHRAN: I object to form.
16  A. And let me actually go back because we had
17  continuing instruction. I don't know when. But I did
18  tell everyone in the legal department we had to
19  maintain all our documents. I can't remember when
20  that was said, but that was said repeatedly throughout
21  2002.
22      But specific communications? It could
23  have happened with numerous people. I don't
24  specifically remember any individual communication.

Page 32

1   Q. Did you personally instruct people in the legal
2   department to preserve their documents?
3   A. Yes, I did.
4   Q. Did you do it in writing?
5   A. I can't remember if I did or not. I know I did
6   it orally.
7   Q. Do you remember when you did it orally?
8   A. Probably sometime in May and then repeatedly
9   thereafter.
10  Q. Who did you instruct to preserve their
11  documents in the legal department?
12  A. Every lawyer, every admin.
13  Q. So who would be those lawyers?
14  A. There are I think a number of them. Do you
15  want me to list all of the ones I can remember?
16  Q. Yes. All the ones in the legal department of
17  Teleglobe and also all the ones that you instructed to
18  keep their documents.
19  A. All the ones that I can remember? It would
20  have been Chuck Tievsky.
21  Q. How do you spell that?
22  A. T-i-e-v-s-k-y. You would have Brian Cute,
23  C-u-t-e. Kieren Bustamante, B-u-s-t-a-m-a-n-t-e.
24  Kathy Morgan. Helen Fields.

Page 33

1   Q. Is that Helen Fields?
2   A. Helen Fields. Matt Nyman, N-y-m-a-n. Dan
3   Snyder, S-n-y-d-e-r. Lane Blackmer, B-l-a-c-k-m-e-r.
4   Probably others. It was the entire legal group at
5   that time.
6   Q. And those are the individuals that you
7   instructed orally to preserve their documents?
8   A. No. I believe I instructed them to preserve
9   Teleglobe documents. So, in other words -- I'll let
10  you ask the question.
11  Q. I would like to know exactly what instruction
12  you gave to people in the legal department of
13  Teleglobe.
14  A. Well, we were going through the bankruptcy
15  process. We were having team meetings and the legal
16  department was the face of Teleglobe in communications
17  with the company. We were explaining the bankruptcy,
18  what was going to happen.
19      And so what I told them in their
20  communications with others was that we had to maintain
21  our documents and control them, right, don't delete
22  tapes, don't throw materials out. So it was that
23  general, this is a time of turmoil; a lot of people
24  were leaving. And so the presumption was that as they

9 (Pages 30 to 33)

Teleglobe Communications Corporation, et a

Case No. 02-11518 (MFW)         Vinyard V. Cooke, Esquire         February 9, 2005

Page 34

1  went out and dealt with people, I mean we were
2  involved in drafting all the bankruptcy papers and all
3  the rest, was to make sure that documents were
4  preserved.
5  Q. Did you personally issue any memo or written
6  document to the people in the legal department
7  instructing them to do that?
8  A. I had a colleague, Chris Cihon, C-i-h-o-n, and
9  I had him draft an e-mail. And I can't remember if he
10 sent it out. I can't remember if I sent it out. I
11 can't remember if it was even sent out specifically,
12 but I know that we talked about sending out an e-mail
13 beyond the legal department to make sure that
14 documents and records were maintained.
15 Q. Is there any way to find out whether that
16 e-mail was, in fact, sent?
17 A. You could look on the backup tapes.
18 Q. Any other way to find out if the e-mail was
19 sent?
20 A. Not that I'm aware of.
21 Q. Is Mr. -- I'm going to misstate his name. But
22 Cihon?
23 A. Cihon.
24 Q. Is he still an employee of Teleglobe?

Page 35

1  A. No, he's not.
2  Q. When did he leave?
3  A. He left it was November. I can't remember if
4  it was November '02 or November '03. It was one of
5  the two.
6  Q. Do you have the hard drive of the computer of
7  Mr. Cihon?
8  A. No, I don't.
9  Q. What happened to it?
10 A. I don't know specifically.
11 Q. When I said do you have the hard drive, I meant
12 do the debtors have the hard drive of Mr. Cihon?
13 A. I don't know if the debtors do.
14 Q. Who would have that information?
15 A. It would probably be we have one remaining IT
16 person, David Wolfe.
17 Q. Would Mr. Wolfe be the best person to ask if
18 the debtors still have the personal computer and the
19 hard drive of Mr. Cihon?
20 A. He is the only person in charge of IT affairs.
21 I don't know if he's the best person or not.
22 Q. But there is no one else?
23 A. No one else in the IT group.
24 Q. No one else we could ask?

Page 36

1  A. No. I mean there are still ten employees at
2  the estate. I mean they're people that have left.
3  Q. No. Let me rephrase the question.
4  Is there any person other than Mr. Wolfe
5  that we could ask about the computer of Mr. Cihon?
6  A. Yes.
7  Q. Who?
8  A. Well, you could ask Mr. Cihon. I mean, you
9  could ask the people that were in the IT department at
10 the time he left. I'm sorry.
11 Q. The question is --
12 A. I'm not trying to play games.
13 Q. -- do the debtors have the computer and the
14 hard drive of Mr. Cihon?
15 A. I'm sorry? That the question?
16 Q. That is the question. How do we go about
17 finding out the answer to that question?
18 A. So you would have to ask either Mr. Cihon or
19 somebody at the estate.
20 Q. Mr. Cihon left. So how could he know what
21 happened to his computer?
22         MR. COCHRAN: I object to form.
23 A. Well, he might have taken it with him.
24 Q. Do you know where Mr. Cihon went to work after

Page 37

1  he left Teleglobe?
2  A. I believe he went to Dallas, Texas.
3  Q. Do you know where he works?
4  A. No, I don't.
5  Q. Was it a standard procedure for people at the
6  debtors to take their computer equipment with
7  after they left the employ of the debtors?
8  A. Teleglobe had a program that was approved by
9  the Bankruptcy Court so that as people left their
10 employment at Teleglobe they had to the right to
11 purchase their computer equipment from the estate.
12 Q. Would there be a log indicating whether
13 Mr. Cihon purchased his computer from the estate?
14 A. I don't know.
15 Q. Was any effort made to make a copy of the
16 computer of Mr. Cihon before he left?
17 A. Yes.
18 Q. What effort was made?
19 A. Well, this was, I believe the effort was that
20 when a person left Teleglobe they were kept on the
21 system for a period of 30 days and pursuant to the
22 disclosures that we made under the default e-discovery
23 standard that would have allowed backup tapes to be
24 made of that person's computer files.

10 (Pages 34 to 37)

Wilcox & Fetzer, Ltd         Professional Court Reporters         (302)655-0477

Page 38

1   Q. So to the extent a copy of the computer exists,
2   it is on the backup tapes?
3   A  Yes
4   Q. Do the backup tapes copy the hard drive of a
5   person?
6   A  I'm not sure what you mean by "hard drive."
7   Q. Do they back up information contained on the
8   server?
9   A  Yes
10  Q. Do they backup information contained on the
11  hard drive of a person that would not be on the
12  server?
13  A. Well, I can explain it this way, which is I
14  have a mail system and then I had their corporate
15  drives  There's an H drive where we kept all of our
16  corporate documents  There's an I drive that I kept
17  my individual files  All of those would have been on
18  the server and they would have been backed up through
19  the electronic tapes
20  Q. Do you know if this is standard for all of the
21  employees and officers of the debtors?
22  A  I'm sorry? If what is standard?
23  Q. The process you just described, that people
24  would have an H drive for corporate documents and an I

Page 39

1   drive for individual files.
2   A  Yes  Everybody had access to -- well, the H
3   drive for legal  In other words, there are different
4   groups inside that and some had access into the
5   corporate documents and some had restricted access,
6   but there were servers to back up all of those various
7   drives and then everyone had an I drive.
8   Q. Do you know if people had the ability to store
9   documents or data on their hard drive that was not on
10  the server?
11  A  Specifically, no  I know that if they did,
12  just thinking -- I don't know specifically.
13  Q. Who would have the answer to that question?
14  A  David Wolfe.
15  Q. Let me go back to something you said before.
16  You said that Mr. Cihon may have drafted an e-mail
17  instructing people to preserve their documents.
18      Did you review his e-mail?
19  A  I remember reviewing it
20  Q. What did it say specifically?
21  A  Specifically, I can't remember.
22  Q. Did he send it to you by e-mail?
23  A  I can't remember
24  Q. Do you remember instructing him to send it out?

Page 40

1   A  No
2   Q. Is your answer complete?
3   A  Yes
4   Q. Would he have sent it out without your
5   instruction to do so?
6   A  Possibly
7   Q. Do you know?
8   A  I don't know
9   Q. Other than the possible e-mail from Mr. Cihon,
10  did anyone else on behalf of the debtors instruct any
11  person to preserve their documents after April 24,
12  2002?
13      MR. COCHRAN: I object to the form
14  A  Specifically, I don't know
15      Generally, I can tell you that all the
16  lawyers were effectively deputies telling other people
17  do not discard documents
18  Q. Did any of the lawyers that you mentioned in
19  your last answer to your knowledge send a written memo
20  to anyone instructing them to preserve their
21  documents?
22  A  And I don't know how they carried out that
23  mandate
24  Q. Did you ask them?

Page 41

1   A. No
2   Q. Why not?
3   A  We were in the middle of a bankruptcy filing.
4   I mean, I wasn't double-checking their performance
5   Q. Is your answer complete?
6   A  Yes, it is
7   Q. Is it a fact, Mr. Cooke, that a lot of people
8   either resigned from the debtors or were terminated
9   after April 24, 2002?
10  A  I would say that's true.
11  Q. How many employees, roughly speaking, were
12  there at the debtors on or about April 24, 2002?
13  A  I don't know specifically
14  Q. Generally speaking?
15      MR. COCHRAN: I object to form
16  A  I would say 2,000
17  Q. How many employees or officers are there at the
18  debtors today?
19  A  Ten.
20  Q. Before those individuals left the debtors did
21  the debtors make any effort to meet with them to
22  understand what documents they had, how they were
23  stored, who else may have documents?
24      MR. COCHRAN: I object to form

11 (Pages 38 to 41)

Teleglobe Communications Corporation, et al

Case No. 02-11518 (MFW)          Vinyard V. Cooke, Esquire          February 9, 2005

Page 42

1     A.   And now you're talking about hard copy
2   documents?
3     Q.   Any documents.
4          MR. COCHRAN:  I object to form
5     A.   Well, there was a, on May 15th there was a
6   substantial RIF when people were told to leave the
7   building, like the call was at 9:00 o'clock and you
8   had to leave by 10:00.  This was a worldwide call.
9   People left and they were told that they could leave
10  with their computers and their personal effects
11         And what happened was those people were
12  all kept up, as we talked about before, for 30 days
13  for the backup electronic data to be filed according
14  to the disclosures that we made in our default
15  standards.  And what happened with the paper documents
16  specifically in Reston where all of those documents
17  remained, what happened was that the facilities people
18  went through sometime in late June or July -- at some
19  point we moved, we were forced to move out of our
20  11480 corporate offices and the surrounding buildings
21  and we moved into this very small, one floor office
22  building directly across the parking lot.  But when
23  that happened the facilities people were charged with
24  boxing up all of the files and documents that remained

Page 43

1   and they were sent to a building that we owned in
2   Chantilly, Virginia
3          Those documents remained there until the
4   fall of 2002, when a team of lawyers and maybe some HR
5   people -- I don't know who specifically was deputized
6   to go out there.  But a group of lawyers definitely
7   went out there and pulled out all of the documents
8   that were going to be needed for the core sale to
9   Cerberus  So all of the service agreements, all of
10  the operational documents that would have gone with
11  the assets that were being sold, all of that material
12  was pulled out of the files  And I believe that
13  anything that didn't relate to the business of
14  Teleglobe was also, you know, if there were additional
15  personal effects or other things, those were also
16  removed
17         And then the remainder of those boxes were
18  sent back and stored on our single floor in the office
19  building at 11495 Commerce Park Drive with the
20  addition of all the boxes and materials that we
21  otherwise maintained in off-site storage in the United
22  States  And those boxes have remained there since,
23  once again, I don't know if that -- I think it was
24  contemporaneous with the Cerberus interim management

Page 44

1   agreement, October, November, but that process might
2   have gone through into the spring of 2003  I can't
3   remember specifically
4          So those documents have been maintained
5   and they exist today
6     Q.   First of all, how many, generally speaking, how
7   many people were told to leave TCC and its affiliates
8   on May 15th?
9     A.   I want to say it was like half the company, so
10  it was approximately a thousand people  It could have
11  been 60 percent  It could have been 40 percent
12    Q.   And before those people left was any effort
13  made to copy the information on their computer other
14  than the process of maintaining backup tapes that you
15  explained?
16    A.   No  We would have operated under the default
17  standards that were set forth in our disclosure
18  statements at all times
19    Q.   Meaning that to the extent there was a copy of
20  what was on their computer, that copy would have been
21  on the backup tapes?
22    A.   I'm not sure I understand your question now
23    Q.   Let me ask more specific questions.
24         Before those people left with their

Page 45

1   computers, I take it the debtors didn't make an effort
2   to copy the computer?
3          MR. COCHRAN:  I object to form
4     A.   No, that's not correct  In other words, at all
5   times Teleglobe had its backup system that was
6   working daily, weekly, monthly  It would have carried
7   through before they left  It would have carried
8   through 30 days  After they left so that you would have
9   had, on the electronic records you would have had a
10  full copy of what was on their computer on the H
11  drive, the I drive, the mail Outlook program
12    Q.   Was any effort made before those people left on
13  May 15 to confirm that whatever information they had
14  on their personal computer was, in fact, on the
15  server?
16         MR. COCHRAN  I object to form
17    A.   I'm not sure I understand, once again
18         MR. SCHIMMEL  Can you repeat the
19  question?
20         (The reporter read back the last
21  question.)
22         THE WITNESS  The only way I can answer
23  that question is by repeating that everybody had a
24  mail Outlook mail on and they had access to and could

Teleglobe Communications Corporation, et al.

Case No. 02-11518 (MFW)                    Vinyard V. Cooke, Esquire                    February 9, 2005

Page 46

1 interface with that H drives, the I drives. There may
2 be other drives. Those are the only two that I
3 specifically remember and that those were all being
4 backed up on the servers.
5        So I don't think any special effort was
6 maintained because as a matter of course everyone's
7 system's documents would have been copied
8 BY MR. SCHIMMEL:
9    Q. You have told me before that you don't know for
10 a fact whether people had on their hard drive
11 information that was not on the server.
12        MR. COCHRAN: I object to form
13    A. That is correct
14    Q. So my question is whether any effort was made
15 before those people left on May 15th with their
16 computers to confirm whether any data and documents on
17 their hard drives was also on the server?
18    A. I don't know
19    Q. Is your answer complete?
20    A. Yes
21    Q. Would Mr. Wolfe know?
22    A. I don't know if he would know or not.
23    Q. I take it that after May 15 roughly half the
24 company remained, right?

Page 47

1    A. That's my -- I don't know.
2        MR. COCHRAN: I object to form
3    A. Honestly, I don't know how many people were
4 left. A smaller number. Definitely a smaller number.
5    Q. It's not meant to be a trick question.
6        You told me that on May 15th either 40
7 percent, 60 percent, somewhere in the middle were
8 terminated?
9    A. Right.
10    Q. I take it that the remainder of the company
11 stayed for some period of time after May 15th?
12    A. Yes, they did
13    Q. Was any effort made to meet with these people
14 after May 15th, those who remained, to ascertain what
15 documents they had, how they were stored and who else
16 may have documents?
17        MR. COCHRAN: I object to form.
18    A. Well, I guess all of the hard copy documents
19 were handled in the way that I've described. As you
20 know, there's an off-site storage space in Montreal
21 and of that however many people that were left, the
22 majority of those people went with the core business
23 sale to Cerberus
24        So in that instance all those documents

Page 48

1 are still being cataloged and stored and kept either
2 at Cerberus's offices or at the Laval facility or in
3 Reston
4        In terms of the electronics, once again,
5 the backup tapes were working and we have those tapes.
6    Q. That doesn't really answer my question, which
7 is: What efforts, if any, did the debtors make after
8 May 15th to meet with these people to understand how
9 they stored their electronic documents, what
10 electronic documents they had, what other documents
11 they had and who else may have documents?
12        MR. COCHRAN: I object to form.
13    A. I don't know specifically
14    Q. Did you instruct anybody to do that, meet with
15 people to obtain that information?
16    A. Other than what I have already testified in
17 terms of telling people to maintain their records,
18 traveling up to Montreal to tell them not to destroy
19 or overwrite any tapes, constant discussions with our
20 legal staff to make sure that everything was done and
21 then overseeing all these documents as they moved
22 around and then came back to our facility, no
23    Q. So you don't know if anyone met with the
24 employees of the debtors to figure out what documents

Page 49

1 they had or how they were stored and who else may have
2 documents?
3        MR. COCHRAN: I object to form.
4    A. Other than what I have already testified, no
5    Q. Did you ever make any effort to find out
6    A. Find out what? I'm sorry.
7        MR. COCHRAN: I object to form.
8    Q. If that information was available.
9        MR. COCHRAN: I object to form.
10    A. I'm sorry? What information?
11    Q. The information is meeting with employees to
12 figure out what documents they have, how they're
13 stored and who else may have information.
14        MR. COCHRAN: I object to form
15    A. Okay
16    Q. Did you ever ask your subordinates to report to
17 you as to whether that information was available?
18        MR. COCHRAN: Same objections
19    A. Other than what I've already told you -- I
20 mean, I'm not trying to be difficult. I'm just trying
21 to say comprehensively I think we had all the
22 documentation between the hard copy documents and not
23 destroying the electronic tapes. Right?
24    Q. That's the extent of the efforts you made to

13 (Pages 46 to 49)

Teleglobe Communications Corporation, et al

Case No. 02-11518 (MFW)                Vinyard V. Cooke, Esquire                February 9, 2005

Page 50

1 preserve documents?
2        MR. COCHRAN: I object to form
3   A. As far as I -- that's efforts I made or the
4 debtors made?
5   Q. The debtors made.
6   A. I have no idea what other efforts the debtors
7 made
8   Q. Were you in charge of supervising the efforts
9 of the debtors to preserve and collect documents?
10       MR. COCHRAN: I object to form
11  A. In part, yes.
12  Q. Was anybody else in charge of supervising those
13 efforts?
14  A. I would say that, once again, the entire legal
15 team was instructed to maintain control, supervise
16 these documents, so collectively -- specifically I
17 can't tell you what directions or steps they took, but
18 we all were under this understanding that we were not
19 to destroy or lose control of the documents
20  Q. To the best of your recollection, is there any
21 written material, memo, document that would reflect
22 the efforts that your subordinates in the legal
23 department engaged in to preserve and collect
24 documents?

Page 51

1   A. I don't know
2   Q. And is your answer complete?
3   A. Yes.
4   Q. Mr. Cooke, is it correct that the debtors sold
5 a number of the servers that existed prior to April
6 24, 2002?
7        MR. COCHRAN: I'm sorry I lost the last
8 part of the question
9        MR. SCHIMMEL: Let me ask it differently
10 BY MR. SCHIMMEL:
11  Q. Mr. Cooke, if you would turn your attention to
12 paragraph 5 of your affidavit.
13  A. Yes
14  Q. You wrote "Since the time of the Debtors'
15 bankruptcy filing in May 2002, Teleglobe has sold
16 practically all of its IT equipment, including
17 servers, tape restore machines, and other computer
18 equipment formerly used to back up and store e-mail
19 and other electronic data."
20       Do you see that?
21  A. Yes, I do.
22  Q. Is it accurate?
23  A. Yes, I believe it's accurate.
24  Q. When were the servers sold?

Page 52

1   A. Well, some of the servers were sold as part of
2 what I call the core sale, but the sale to Cerberus
3   Q. Which would have closed on or about May of
4 2003?
5   A. Yes, sometime in that time frame.
6   Q. Right.
7   A. Some of the servers as we got smaller what
8 would happen is, like I say, we would back up these
9 individual's electronic files for the 30-day period
10 and then once they were all effectively backed up
11 according to the standards laid out in the disclosures
12 under the default standards, they would be taken off.
13 I don't know how you do that, but they would be taken
14 off our system and then all of the information for the
15 employees that remained would be migrated, like you
16 might be able to take three servers because of the
17 smaller number of data that we had to keep, it would
18 be migrated onto one and we would sell the other two
19       And in terms of when those sales occurred,
20 all of them were done in the United States pursuant to
21 miscellaneous asset sales that would be documented in
22 the Bankruptcy Court. Specifically, I don't know when
23 they were. I just know that over time there was a
24 migration of data and excess capacity was either sold

Page 53

1 to Cerberus or sold to third parties
2   Q. Do you need to take a break or can we continue?
3 It's up to you
4   A. (The witness shrugged )
5   Q. Good.
6        MR. COCHRAN: Why don't we take a rest
7 room break?
8        MR. SCHIMMEL: I take it the same caution
9 you gave me. Mr. -- can applies to you, right?
10       (A brief recess was taken.)
11       MR. SCHIMMEL: Can you mark this?
12       (Cooke Deposition Exhibit No. 4 was marked
13 for identification )
14 BY MR. SCHIMMEL:
15  Q. Mr. Cooke, I have just shown you what has been
16 marked as Cooke Exhibit 4. Do you recognize this
17 document?
18  A. Yes. I do
19  Q. What is it?
20  A. It's our default discovery disclosures
21  Q. Did you review this document before it was
22 served on the defendants?
23  A. I read through it
24  Q. Do you remember if you gave comments?

14 (Pages 50 to 53)

Teleglobe Communications Corporation, et al.

Case No. 02-11518 (MFW)        Vinyard V. Cooke, Esquire        February 9, 2005

Page 54

1   A.  I don't remember. I may have
2   Q.  Did you read through it for accuracy?
3   A.  Yes, I did
4   Q.  And were you satisfied that it was, in fact,
5   accurate?
6   A.  Yes
7   Q.  You see the date on the last page is January
8   20, 2005?
9   A.  Yes, I do
10  Q.  Do you remember when you gave comments or when
11  you reviewed it as compared to that date?
12  A.  No, I don't
13  Q.  Would it be shortly before that date or a long
14  time before that date?
15  A.  I don't remember
16  Q.  No idea?
17  A.  Well, within a month
18  Q.  I would like you to turn your attention to
19  point number 5.
20  A.  Yes.
21  Q.  Which reads "Debtors reasonably anticipate
22  problems to arise in connection with restoring e-mail
23  and/or other electronic documents from the backup
24  tapes listed above for the following reasons:" And

Page 55

1   then under e the disclosures read "There is not a
2   central, complete catalog or index tying the backup
3   tapes that are available to specific users and
4   servers. The Debtors thus are unable to verify
5   whether the collection of backup tapes to which they
6   have access is a full and complete collection of
7   tapes."
8       Do you see that?
9   A.  Yes, I do
10  Q.  Now, Mr. Cooke, before the servers of the
11  debtors were sold, as you just described before our
12  break, did the debtors restore all of the backup tapes
13  to make sure that the collection of backup tapes was
14  fully complete?
15  A.  Not that I'm aware.
16  Q.  Why not?
17  A.  I don't know.
18  Q.  Is your answer complete?
19  A.  Yes.
20  Q.  Did the debtors have consultations with any
21  person to make sure that the collection of backup
22  tapes was full and complete before the servers were
23  sold?
24  A.  I'm sorry  Would you repeat that?

Page 56

1       (The reporter read back the last
2   question )
3       THE WITNESS: I don't know what they did
4   specifically
5   BY MR. SCHIMMEL:
6   Q.  Is your answer complete?
7   A.  Yes
8   Q.  Who would have that information?
9   A.  It would probably be -- I don't know who
10  specifically would have that information
11  Q.  Well, who is the person we would have to talk
12  to to understand whether the debtors consulted with
13  any person before the servers were sold to ensure that
14  the backup tapes were, in fact, full and complete?
15      MR COCHRAN: I object to the form.
16  A.  The IT people that were handling the
17  consolidation, and specifically I don't know who they
18  are  I don't know when it was done, who was there at
19  the time
20  Q.  Is your answer complete?
21  A.  Yes
22  Q.  As of today do you know if you have a full and
23  complete collection of backup tapes?
24  A.  No, I don't know

Page 57

1   Q.  And I take it your answer is complete?
2   A.  Yes
3   Q.  Now I would like to read to you what is
4   under -- let me ask the last question on e. Did the
5   debtors make any effort to find out whether the
6   collection of backup tapes was full and complete
7   before the servers were sold?
8       MR COCHRAN: I object to form.
9       THE WITNESS: I'm sorry  Can you read that
10  again?
11      (The reporter read back the last
12  question )
13      THE WITNESS: I don't know
14  BY MR. SCHIMMEL:
15  Q.  I would like to read to you 5c, which says,
16  "The catalog" -- I'm sorry. 5b: "The backup tapes
17  are old and have been mounted several times. This has
18  caused excessive wear on the tapes resulting in
19  unrestorable data using existing hardware and software
20  systems."
21      Do you see that?
22  A.  Yes, I do
23  Q.  Before the servers were sold did the debtors
24  restore backup tapes to ensure that the data was, in

15 (Pages 54 to 57)

Teleglobe Communications Corporation, et al

Case No. 02-11518 (MFW)    Vinyard V. Cooke, Esquire    February 9, 2005

Page 58

1  fact, restorable?
2       THE WITNESS: I'm sorry. Would you read
3  that back?
4       (The reporter read back the last
5  question.)
6       THE WITNESS: We did restore backup tapes,
7  Teleglobe, all the time as a part of our operations.
8  So backup tapes were used every day up until the time
9  when we filed and they're still being done today.
10  BY MR. SCHIMMEL:
11  Q. Why did the debtors restore backup tapes in the
12  ordinary course of business before April 24, 2002?
13       MR. COCHRAN: I'm sorry. What was the
14  date?
15       MR. SCHIMMEL: April 24, 2002
16       MR. COCHRAN: Why did they restore before
17  April 24, 2002 is the question?
18       MR. SCHIMMEL: Yes
19  A   Specifically, my knowledge is I would
20  occasionally use it for litigation purposes. I know
21  there were also operational needs. Somebody had
22  departed and they wanted to see e-mail exchanges or
23  status of projects. Sometimes managers would want to
24  look at their subordinates' files after they had left,

Page 59

1  that type of thing. It's fairly common
2  Q. So it was fairly common to restore backup
3  tapes?
4  A   Yes
5  Q. After April 24, 2002 and before the servers
6  were sold, what specifically was done to confirm that
7  the data on the tapes was restorable?
8  A   Specifically, I don't know what was done
9  Q. Do you know if anything was done?
10  A   No
11  Q. Is your answer complete?
12  A   Yes
13  Q. Who should we ask to have the answer to that
14  question?
15  A   It would be the IT group that was using those
16  backups at various times from that time to date
17  Q. Are they all gone except for one person?
18  A   They are all gone except for one person
19  Q. Now, before the servers were sold, did you
20  personally consult with any person to ensure that the
21  data on the backup tapes was restorable?
22  A   In conjunction with the sale of the servers.
23  no
24       But in that meeting in Montreal, right, we

Page 60

1  wanted to make sure that there were backup tapes
2  available and they were going to be maintained
3  Q. Is your answer complete?
4  A   Yes
5  Q. Before the servers were sold did you or anybody
6  acting on behalf of the debtors make sure that you had
7  catalogs for the backup tapes?
8  A   I don't know
9  Q. Did you?
10  A   I specifically know we had a catalog for the
11  tapes that were located in Reston, which is addressed
12  in this default disclosure standard
13  Q. I know that. Did you know whether at the time
14  the servers were sold did. you know that there was a
15  catalog for the tapes located in Canada?
16  A   Yes
17  Q. At the time the servers were sold there was a
18  catalog for the tapes located in Canada?
19  A   I believe there was a catalog for some of
20  the tapes in Canada
21  Q. Before the servers were sold did you
22  specifically ask anyone whether there was a catalog
23  for all the tapes located in Canada?
24  A   For all of the tapes no

Page 61

1  Q. Why not?
2  A   I just was focused on the e-mail tapes
3  specifically
4  Q. Is your answer complete?
5  A   Yes.
6  Q. The e-mail tapes are in Reston?
7  A   There are e-mail tapes in Reston and there are
8  e-mail tapes in Montreal
9       MR. SCHIMMEL: I would like to mark the
10  following two exhibit
11       (Cooke Deposition Exhibit Nos. 5 and 6,
12  respectively, were marked for identification.)
13  BY MR. SCHIMMEL:
14  Q. Mr. Cooke, I have just shown you two exhibits,
15  Exhibit 5 and Exhibit 6
16       Exhibit 5 was sent to us by your counsel
17  and it is entitled "Selected directors, officers and
18  employees of the Debtors, or TI, who may have
19  generated discoverable e data."
20       Have you seen this document before?
21  A   Yes, I have
22  Q   When have you seen it?
23  A   Probably right before it was provided to you
24  Q. Did you make comments on it?

16 (Pages 58 to 61)

Teleglobe Communications Corporation, et al.

Case No. 02-11518 (MFW)                 Vinyard V. Cooke, Esquire                 February 9, 2005

Page 62

1    A.   Yes, I did.
2    Q.   What comments did you make?
3    A.   I don't remember specifically.
4    Q.   Generally speaking?
5    A.   Well, generally, we were looking for people
6    that would have discoverable e-data.
7    Q.   And did you provide this list to your counsel?
8    A.   This list was generated by people at Teleglobe
9    and given to our counsel.
10   Q.   Who generated the list at Teleglobe?
11   A.   It would have been John Brunette, Andre
12   Mongrain.
13        I can't remember anyone else specifically.
14   Q.   What were they asked to do?
15        MR. COCHRAN: I'm sorry? Could you
16   restate that?
17   Q.   In connection with the preparation of the list,
18   what were they asked to do?
19        MR. COCHRAN:  That question may call for
20   privileged communication and I don't know whether it
21   does or it doesn't. But to the extent that your
22   answer would reveal conversations with the debtors'
23   counsel, you're cautioned not to reveal privileged
24   information.

Page 63

1    Q.   Let me rephrase maybe the question in order to
2    simplify it.
3         What were the criteria that Mr. Brunette
4    and Mr. Mongrain applied in preparing this list?
5    A.   Well, I think we were doing exactly what we
6    said, which was we were trying to identify people at
7    Teleglobe who might have discoverable e-data. It was
8    really that simple.
9    Q.   You told me before that before April 24, 2002
10   there were maybe 2,000 employees at TCC and its
11   affiliates.
12        Do you remember that?
13   A.   Not of TCC. There would have been 2,000
14   worldwide Teleglobe employees.
15   Q.   Fair enough.
16        What criteria were used to determine that
17   those 28 people may have discoverable e-data?
18        MR. COCHRAN: I object to form.
19   A    I have no idea what John or Andre; I don't know
20   how they sifted through it. I don't know. I know
21   that I would look at these people and say they are
22   principal officers and directors.
23   Q.   What do you mean by "principal officers and
24   directors"?

Page 64

1    A    Well, these are largely VP's and above at
2    Teleglobe, just looking at this list.
3    Q.   And so based on their seniority you determined
4    that if people were going to have e-data, those people
5    would be likely the 28 individuals on the list?
6    A    I think that's probably one criteria, yes.
7    Q.   Do you know of any other criteria other than
8    seniority?
9    A    Not that I remember.
10   Q.   Do you know of any person who may have e-data
11   that's not listed on this list?
12   A    Specifically? No.
13        MR. COCHRAN: I object to form.
14   Q.   Let me ask a more precise question maybe.
15        Do you know of any person who may have
16   discoverable e-data in this case that is not on this
17   list?
18        MR. COCHRAN: I object to form.
19   A    Specifically, no.
20   Q.   Exhibit 6 is a letter from your counsel to me
21   dated January 31, 2005. Did you see this letter
22   before it was sent?
23   A    I believe I did.
24   Q.   Did you make comments on the letter?

Page 65

1    A    I can't remember if I did or not.
2    Q.   But you looked at it for accuracy?
3    A    Yes.
4    Q.   Under paragraph 11 Mr. Cochran states "With
5    regard to the individuals listed as potential
6    custodians of e-data in the possession, custody or
7    control of the Debtors, I have advised that server or
8    hard drive data (or selected portions of hard drives,
9    which have been imaged) is available for the following
10   individuals: Brunette, Bustamante, Eakin, Milla,
11   Mongrain, Morgan"...
12        MR. COCHRAN: Sciacciatano.
13   A    "Sciacciatano, Snyder."
14        Do you see that?
15   A    Yes.
16   Q.   Do the debtors have in their possession,
17   custody or control the hard drive of Mr. Brunette?
18   A    Yes, they do.
19   Q.   And does that hard drive contain the data
20   generated between February 2000 and April 2002?
21        MR. COCHRAN: Between when?
22        MR. SCHIMMEL: February 2000 and April
23   2002
24   A    Well, once again, just to make sure we're on

17 (Pages 62 to 65)

Teleglobe Communications Corporation, et al

Page 66

1    the same page, everything that's on his computer would
2    be backed up. Specifically what's on his computer
3    now, I don't know how much -- I just don't know enough
4    about how he kept his documents and his electronic
5    information, if he would say he's going to rely on the
6    backups and he's a double deleter like I am or if he
7    saves it all. I honestly have not looked at his
8    computer.
9        So what's physically on his computer, I
10   don't know.
11   Q.  Do you know if anybody has looked at his
12   computer to determine what data is available?
13   A   I don't think so.
14   Q.  Do the debtors have in their possession,
15   custody or control the hard drive of Kieren
16   Bustamante?
17   A   Yes, we do.
18   Q.  Do you know if Mr. Bustamante or Mr. Brunette
19   switched computers after April 2002?
20   A   Not that I'm aware of.
21   Q.  Do the debtors have in their possession,
22   custody or control the hard drive of Cynthia Eakin?
23   A   Yes, we do.
24   Q.  Do you know if Ms. Eakin has changed computers

Page 67

1    since April 2002?
2    A   No, I don't. I don't know.
3    Q.  Do the debtors have in their possession,
4    custody or control the hard drive of Mr. Milla?
5    A   Yes, we do.
6    Q.  Do the debtors have in their possession,
7    custody or control the computer of Mr. Mongrain?
8    A   Yes, we do.
9    Q.  Do you know if Mr. Milla or Mr. Mongrain
10   switched computers after April 2002?
11   A   I'm sorry. I have to say I have completely
12   misunderstood your question. I thought you're saying
13   exchanged between themselves.
14       Is that what you mean?
15   Q.  No. It's a simple question.
16   A   I'm very sorry. I'm sorry.
17   Q.  I may have misspoken.
18       I want to know whether -- I want to make
19   sure that whatever information was on their hard drive
20   as of April 24, 2002 was transposed onto a new
21   computer.
22   A   I'm with you now. For all of those -- I know,
23   for example, John has a non-standard computer. I
24   don't know when he got it. John Brunette

Page 68

1    Q.  Do you know if
2    A   Sorry about that.
3    Q.  That's okay.
4        Do you know if at the time Mr. Brunette
5    got a new computer whatever data was on the old one
6    was automatically transposed into the new one?
7    A   That is the typical process.
8    Q.  Do you know whether it happened with respect to
9    Mr. Brunette?
10   A   No.
11   Q.  Do you know -- let me ask then again the
12   question for Kieren Bustamante.
13   A   Right. As far as I know, Kieren has got the
14   same as me, which is he's got the same computer he's
15   always had.
16   Q.  How about Cynthia Eakin?
17   A   I don't know specifically for Cindy.
18   Q.  How about Bruce Milla?
19   A   I don't know for Bruce.
20   Q.  How about Andre Mongrain?
21   A   I'm not sure for Andre.
22   Q.  Do the debtors have in their possession,
23   custody or control the computer of Kathy Morgan?
24   A   Yes, we do.

Page 69

1    Q.  And would you know whether Ms. Morgan changed
2    her computer after April 2002?
3    A   I don't know.
4    Q.  Do the debtors have in their possession,
5    custody or control the computer of Ms. --
6    A   Sciacciatano.
7    Q.  -- Sciacciatano?
8        MR. COCHRAN    Sciacciatano.
9    A   And that's S-c-i-a-c-c-i-a-t-a-n-o.
10       MR. COCHRAN    Off the record.
11       (Discussion off the record.)
12   BY MR. SCHIMMEL:
13   Q.  So do the debtors have in their possession,
14   custody or control the hard drive of Ms. Sciacciatano?
15   A   Yes, we do.
16       MR. COCHRAN    Off the record again.
17       (Discussion off the record.)
18   BY MR. SCHIMMEL:
19   Q.  Do the debtors have in their possession,
20   custody or control the hard drive of Mr. Snyder?
21   A   Yes, we do.
22   Q.  Do you know if Ms. Sciacciatano changed her
23   computer after April 24?
24   A   I don't know if she did or not.

18 (Pages 66 to 69)

Teleglobe Communications Corporation, et al.

Case No. 02-11518 (MFW)         Vinyard V. Cooke, Esquire         February 9, 2005

Page 70

1   Q.  Do you know if Mr. Snyder changed his computer?
2   A   I'm almost sure that Mr. Snyder has not.
3   Q.  I take it you have your hard drive?
4   A   Yes, I do.
5   Q.  And you have not changed your computer?
6   A   No
7   Q.  Now, with respect to the other individuals on
8   that list, do the debtors have in their possession,
9   custody or control the hard drives of those
10  individuals?
11       MR. COCHRAN:  Individuals on what list?
12       MR. SCHIMMEL:  On Exhibit 5.
13  A   Oh, Exhibit 5?  No, we do not have all of
14  these.
15  Q.  Do you have any of them?
16  A   Well, just going down the list, Brunette we
17  have, Bustamante we have, Eakin we have, Milla we
18  have, we have Mongrain, we have Morgan, we have
19  Sciacciatano, we have Snyder.  I think that's
20  everyone.
21  Q.  Why don't you have the other hard drives?
22  A   Well, some of these people are at the Cerberus
23  entity, so they would have taken their hard drives
24  with them

Page 71

1   Q.  Who would those be?
2   A   Well, I'll just say the ones that I know.
3   Daniel Bergeron I know is at Cerberus.  Daniel
4   Cinq-Mars is at Cerberus.
5       Those are the only two that I see
6   Q.  Before Mr. Bergeron or Mr. Cinq-Mars left to go
7   to Cerberus, did the debtors make any effort to copy
8   their hard drive?
9   A   And other than the standard procedure that we
10  annunciate in our disclosures and in the e-mail
11  default standards?
12  Q.  And by that you mean backup tapes?
13  A   Yes.
14  Q.  Other than the backup tapes, did the debtors
15  make any effort to make a copy of those hard drives
16  before those people left?
17  A   Not that I'm aware of.
18  Q.  Why not?
19  A   I don't know.
20  Q.  Is your answer complete?
21  A   Yes
22  Q.  How about the other individuals on the list for
23  whom you don't have hard drives?
24  A   Well, some of these individuals are former

Page 72

1   employees of Teleglobe  So, for example. a good
2   example is Mark VanDoorn  I'm not sure when Mark
3   left. but whenever he did the standard procedure would
4   be he would back up his tapes and then his computer
5   would be returned to the IT department and I don't
6   know specifically what they did with it, other than it
7   would be redeployed back out into the Teleglobe work
8   force
9       I don't know  We could go name by name,
10  but that's just an example
11       MR. COCHRAN:  Off the record.
12       (Discussion off the record.)
13       (Mr. Shaw left the deposition room at
14  11:55 a m )
15  BY MR SCHIMMEL:
16  Q.  When the computer was redeployed, was the hard
17  drive wiped out?
18  A   I don't know
19  Q.  Was there a standard procedure in writing about
20  what would happen when the computer was returned to
21  the IT department?
22  A   I don't know
23  Q.  Who would know that?
24  A   Someone in the IT department

Page 73

1   Q.  And that would be Mr. Wolfe or no one?
2   A   Maybe Mr. Wolfe
3   Q.  Well, who else in the IT department can we ask?
4   A   If you're talking about present employees, yes,
5   Mr Wolfe is the only IT employee.
6   Q.  Is there any other person that you can think of
7   who would know whether there was a written procedure
8   regarding what happens to a computer when it's
9   returned to the IT department?
10  A   None off -- no.
11  Q.  Would the standard procedure be when you return
12  the computer to the IT department it's redeployed to
13  someone else with the old information in the computer
14  or something happens to it?
15  A   I don't know specifically
16  Q.  You have no idea as you sit here today?
17  A   No.
18  Q.  When the computer of Mr. VanDoorn was returned
19  to the IT department, what efforts did the debtors
20  make to copy the information on the hard drive?
21  A   I don't know
22  Q.  Do you know if any effort was made?
23  A   Well, he left in 2001, sometime in 2001, so
24  whatever the standard procedure was

19 (Pages 70 to 73)

Teleglobe Communications Corporation, et al

Case No. 02-11518 (MFW)          Vinyard V. Cooke, Esquire          February 9, 2005

Page 74

1  Q.  Do you have the hard drive of Mr. Pichette?
2  A  As far as I know, no
3  Q.  Why not?
4  A  I don't know why not
5  Q.  Do you know what happened to the computer of
6  Mr. Pichette when he left Teleglobe?
7  A.  No, I don't know
8  Q.  Has there been any investigation of what
9  happened to his computer when he left Teleglobe?
10  A  I know that we looked for it
11  Q  Where did you look?
12  A  We looked in his offices
13  Q  Did you look anywhere else?
14  A  I know we looked on the sixth floor of
15  Teleglobe
16  Q.  Was any instruction given to Mr. Pichette as to
17  what he was supposed to do with his computer when he
18  left Teleglobe?
19  A  I don't know
20  Q.  Who would know that?
21  A  John Brunette
22  Q.  Have you ever discussed with Mr. Brunette
23  whether Mr. Pichette was given any instruction about
24  his computer?

Page 75

1  A  No, I don't know if we have ever talked about
2  that.
3  Q.  Have you ever talked to Mr. Brunette about
4  Mr. Pichette's computer?
5  A.  That I'm not sure I can answer because I
6  believe that gets into my work product problem
7  Q.  Have you --
8  MR. COCHRAN:  I guess that's an objection
9  with regard to work product.
10  Would you like to consult to determine
11  whether you can answer Mr. Schimmel's question
12  THE WITNESS:  Do you mind if we go outside
13  just for --
14  MR. COCHRAN:  Let me finish my statement
15  If you would like to consult to determine
16  whether you can indeed answer Mr Schimmel's question
17  without revealing work product, I'm happy to talk to
18  you about that
19  THE WITNESS:  Okay
20  MR. SCHIMMEL:  Sure
21  (The witness and Mr. Cochran left the
22  deposition room for a brief period of time.)
23  MR. COCHRAN:  Having reviewed the matter
24  with Mr Cooke and having considered your question, we

Page 76

1  don't think that question calls for work product, nor
2  do we think the response will tend to reveal work
3  product, so I will let him answer.
4  THE WITNESS:  Okay.  I'm sorry.  Could you
5  read the question back to me?
6  (The reporter read back the pending
7  question.)
8  MR. COCHRAN:  So the question is have you
9  ever talked to Mr. Brunette about Mr. Pichette's
10  computer?
11  THE WITNESS:  And the answer is yes
12  BY MR. SCHIMMEL
13  Q.  When?
14  A  It would have been after Patrick left
15  Q.  Do you know how long after he left?
16  A  It would have been shortly after he left
17  because we were looking for his computer
18  Q.  Before Mr. Pichette left, was anybody
19  instructed to make a copy of the computer?
20  A  Specifically other than the general backup
21  procedures that we would be using for all employees at
22  Teleglobe as set out in the default standards
23  Q.  Why would you be looking for his computer if
24  all the information was on the backup tapes?

Page 77

1  A  Well, this was a common deal where people would
2  leave with their equipment and so we were trying to
3  make sure that I think we had the same problem with
4  Serge Fortin  The computers typically had more
5  expensive computers and I think we just wanted to make
6  sure they didn't get in other hands, quite candidly
7  Q  That's the reason you were looking for it?
8  A  Yes
9  Q.  Before Mr. Pichette left, was any effort made
10  to confirm that whatever was on his computer was on
11  the backup tapes?
12  A  I don't know
13  Q.  Did you ever instruct anybody to check that?
14  A  I did not
15  Q  Why?
16  MR. COCHRAN:  I object to form
17  A  Specifically to me I wasn't aware Patrick
18  Pichette was going to leave
19  MR. SCHIMMEL:  Do you want to take a lunch
20  break until 1:00 o'clock
21  MR. COCHRAN:  Whatever you would like to
22  do
23  MR. SCHIMMEL:  That's fine
24  MR. COCHRAN:  Stay on the record for one

20 (Pages 74 to 77)

Page 78

1   moment.
2        You're moving on from the January 31, 2005
3   letter, I guess. I sent you an e-mail last night with
4   reference to the January 31, 2005 letter and I don't
5   know if you have seen it.
6        MR. SCHIMMEL: I have seen your e-mail.
7        MR. COCHRAN: You have.
8        MR. SCHIMMEL: I have not seen the
9   follow-up list of --
10        MR. COCHRAN: I just want to make sure you
11   have seen my e-mail of last night with reference to
12   the January 31, 2005 letter.
13        MR. SCHIMMEL: Do you have, and I would
14   like to be on the record, do you have a list of
15   additional individuals for whom you have --
16        MR. COCHRAN: I have no further
17   information at this time, but I just want to make sure
18   you got that e-mail.
19        MR. SCHIMMEL: Before we leave, I would
20   like to understand the scope of the investigation that
21   was conducted that prompted you --
22        MR. COCHRAN: You're free to ask
23   Mr. Cooke.
24        MR. SCHIMMEL: Well, let me ask Mr. Cooke

Page 79

1   right now.
2        MR. COCHRAN: Okay.
3   BY MR. SCHIMMEL:
4   Q.  Can you explain to me the investigation that
5   was conducted that led your counsel yesterday night
6   late to send me an e-mail saying there may be
7   individuals who have either hard drive or server data?
8        MR. COCHRAN: I object to form.
9   A.  Yes, which is Mr. Wolfe and I were speaking
10   yesterday and in looking at this response we realized
11   that everyone who remains at the estate obviously has
12   information that's available on the server and that
13   there are additional, I'm not sure how many, other
14   individuals where partial information or backup
15   information has been stored -- I'm sorry -- has been
16   restored and put back up on the server. And I asked
17   Mr Wolfe to tell me how many additional people that
18   would be
19   Q.  Okay. So let me make sure I understand.
20        There are about ten people at the estate
21   today, right?
22   A.  Correct
23   Q.  So those individuals obviously have data on the
24   server?

Page 80

1   A.  Correct
2   Q.  And are those the individuals that you listed
3   before for whom you have hard drives, namely John
4   Brunette, Kieren Bustamante, Cynthia Eakin --
5   A.  Correct  A subset of that group is listed
6   here. In other words, there are additional people
7   that are at the estate. I think this group ties back
8   into people that have potentially information.
9   Q.  When you say, "this group," you're referring to
10   Mr. Cochran's letter to me. What sentence exactly are
11   you looking at in paragraph 11?
12   A.  I'm sorry. On Exhibit 6, page 4 where in the
13   second line it says, "Brunette, Bustamante, Eakin,
14   Milla, Mongrain, Morgan, Sciacciatano, Snyder," if you
15   look over to Cooke Exhibit 5, I think with the
16   exception of Ms. Sciacciatano -- no. She's on here as
17   well. There's an identity.
18   Q.  Meaning those people are employed by the estate
19   today?
20   A.  Employed by the estate and also have the
21   potential to have discoverable e-data relating to this
22   case
23   Q.  Fine. And because they're employed by the
24   estate today, they have server data available for

Page 81

1   them?
2   A.  Still up on the server, correct.
3   Q.  So you don't have to go to backup tapes for
4   those individuals?
5   A.  Correct
6   Q.  Fine.
7        And what you're saying is in your
8   discussion with Mr. Wolfe yesterday, you realized that
9   there are additional individuals who are still
10   employed by the estate and who may have server data?
11   A.  Correct. Like, for example, myself, right, I
12   would be included in regard to 11
13   Q.  Anybody else that you believe should be
14   included in that group?
15   A.  In the group of people that are still on the
16   server?
17   Q.  And have discoverable e-data information.
18   A.  Just because I'm on the server doesn't mean I'm
19   over here (indicating)
20   Q.  That's why I am asking the question. Right. I
21   understand. I understand. I'm not trying to be
22   difficult.
23   A.  Right
24   Q.  People who are employed at the estate today

21 (Pages 78 to 81)

Teleglobe Communications Corporation, et al

Case No 02-11518 (MFW)    Vinyard V. Cooke, Esquire    February 9, 2005

Page 82

1  have server data?
2  A  Correct
3  Q  Fine.
4      A subset of those people are on Exhibit 5
5  because you believe that they're senior enough to be
6  on Exhibit 5?
7  A  Right, or otherwise have information for
8  whatever criteria other than seniority might put them
9  on the list.
10  Q  Right. But do you remember any other criteria
11  other than seniority?
12  A  I don't specifically, no.
13  Q  Fine.
14      So who else is still employed at the
15  estate and to your knowledge are to be on Exhibit 5?
16  A  I'm not aware of anyone else at the estate.
17  Q  Other than you --
18  A  I don't even think I would meet this
19  (indicating). In other words, I was --
20      MR. COCHRAN: The record should reflect
21  the witness was indicating Exhibit 5 when he said.
22  "this "
23  A  Right. I don't believe in terms of the issues
24  that are raised by the body of this (indicating)

Page 83

1  complaint I would be included in discoverable e-data
2  Q  Right. And because discoverable e-data would
3  go to people who are senior enough or who had an
4  ongoing relationship with BCE, for instance?
5  A  Or were involved in the transactions referenced
6  in the complaint
7      MR. COCHRAN: Let me cut through it for
8  you  Mr. Wolfe is investigating at our request to
9  give us the identities of additional people who may be
10  on the server  Again, we're going to review that list
11  and if we need to supplement our representation in
12  paragraph 11 we are going to do that
13  Q  Now, there was a second piece in the
14  information that Mr. Wolfe gave you yesterday which is
15  that there's some individuals whose data was on backup
16  tapes that was restored and is today on the server?
17  A  Still live on the server, correct
18  Q  Who are those individuals?
19  A  That's what he's checking
20  Q  Do you know of any?
21  A  Specifically? No, not specifically  I can't
22  think of -- let me think if I can think of one
23      I can't because I don't want to misspeak
24      MR. COCHRAN  I make the same

Page 84

1  representations to you  Mr. Wolfe is going to dig out
2  the information and I we can supplement our prior
3  disclosures we will do that for you
4  Q  Now, on Exhibit 5 we have established that
5  there's a certain number of individuals who have
6  currently data on Teleglobe servers, and those are
7  Mr. Brunette, Bustamonte, Eakin, Milla, Mongrain,
8  Morgan, Sciacciatano  Snyder and you have also data on
9  the server, even though you are not listed on Exhibit
10  5?
11  A  Correct
12  Q  Do the other individuals on Exhibit 5 have data
13  on the server?
14  A  They may
15  Q  Because the backup tapes would have been
16  restored?
17  A  Correct
18  Q  But other than that, would they have data on
19  the server?
20  A  Unless they have been restored, they should not
21  be on the server, just because of the procedures that
22  we follow pursuant to the disclosures we made under
23  the default standard
24  Q  Is your answer complete?

Page 85

1  A  Yes
2      MR. SCHIMMEL  so let's break for lunch
3  And do you want to come back at 1:00?
4      MR. COCHRAN  1:00 is fine
5      (Recessed for lunch at 12:10 p.m.)
6
7      AFTERNOON SESSION
8      1:35 p.m.
9      MR. SCHIMMEL  Malcolm, do you object to
10  the position of continuing without local counsel
11  present?
12      MR. COCHRAN  No. No objection
13  BY MR. SCHIMMEL
14  Q  Mr. Cooke, just going back to some things that
15  we discussed before  In 2003 or 2004 did the debtors
16  or anyone acting on their behalf issue a memo to any
17  person instructing them to preserve documents?
18      MR. COCHRAN  Time frame?
19      MR. SCHIMMEL  2003-2004
20      MR. COCHRAN  Thank you
21  A  You mean other than what I have testified to in
22  terms of contacting IT department?
23  Q  Yes
24  A  And to the extent that this e-mail

22 (Pages 82 to 85)

Teleglobe Communications Corporation, et al.

Case No. 02-11518 (MFW)　　　Vinyard V. Cooke, Esquire　　　February 9, 2005

Page 86

1　　　　2003-2004? Yes  2004? No, not that I'm
2　aware of
3　　　　(Mr. Shaw reentered the deposition room at
4　1:06 p.m.)
5　BY MR. SCHIMMEL:
6　　Q.　At any point in time, other than what you have
7　described before, did the debtors or anybody acting on
8　behalf of the debtors issue a document preservation
9　memo to employees, officers?
10　　A.　Yes
11　　Q.　What was issued?
12　　A.　We got when the document request came out --
13　and I'm not exactly sure what the timing was -- we got
14　a memo from counsel directed to all the estate
15　employees regarding compliance with the document
16　request.
17　　Q.　What did the memo say?
18　　　　MR. COCHRAN: If you will agree that his
19　answer does not waive any attorney-client or work
20　product privileges that may apply, I will allow him to
21　answer.
22　　　　MR. SCHIMMEL: Yes.  We're not interested
23　in waiving the privilege.
24　　　　MR. COCHRAN: Pardon?

Page 87

1　　　　MR. SCHIMMEL: We're not interested in
2　waiving the privilege.
3　　　　MR. COCHRAN: So you are in agreement that
4　the answer to this question will not waive the
5　privilege?
6　　　　MR. SCHIMMEL: Yes.
7　　　　MR. COCHRAN: Then you can answer.
8　　A.　It was just delineating the documents that were
9　requested and obviously asking people to search and to
10　make sure that obviously anything that was responsive
11　or any other documents were not otherwise discarded or
12　altered.
13　　Q.　There are a couple of things in what you said.
14　Was there in the memo an instruction to preserve
15　documents?
16　　A.　I don't remember specifically.
17　　　　MR. SCHIMMEL: I would like you to read
18　Mr Cooke's prior answer, not this one, the one before
19　that.
20　　　　(The reporter read back as requested.)
21　BY MR. SCHIMMEL:
22　　Q.　And that instruction that any other documents
23　not be discarded, did it apply to existing documents
24　and documents to be created on a going-forward basis?

Page 88

1　　A.　Once again, I don't have it in front of me, but
2　I think the general import was, you know, we have got
3　to be responsive to these requests and these documents
4　are important and they should be maintained and
5　compiled because we're going to produce them to the
6　other side.
7　　Q.　When was that memo sent to employees and
8　officers?
9　　A.　I can't remember  It was obviously after the
10　document request was served and it was sometime before
11　today.
12　　Q.　So sometime in late 2004 or early 2005?
13　　A.　Yes
14　　Q.　To whom was it addressed?
15　　A.　Specifically, I don't know to whom it was
16　addressed, but I know that every member of the estate
17　received a copy.
18　　Q.　What do you mean by "every member of the
19　estate"?
20　　A.　Every employee that remains at Teleglobe got a
21　copy of the memo.
22　　Q.　So that's about ten people?
23　　A.　Yes, roughly  It might have been a little more
24　because we had people that left at the end of the

Page 89

1　year  Ten to fifteen.
2　　Q.　And from who was the memo?
3　　A.　I can't remember, other than I believe it was
4　from someone at Richards, Layton
5　　Q.　Why was such a memo not sent before?
6　　　　MR COCHRAN: I object to form
7　　A.　I don't know
8　　Q.　Is your answer complete?
9　　A.　Yes.
10　　Q.　Were there any discussions in 2002-2003 about
11　the need to send a document preservation memo to
12　employees of the estate?
13　　　　MR. COCHRAN: I object to the form
14　　A.　You mean outside of discussions with counsel?
15　　Q.　Were there any discussions in 2003 or 2004
16　about the need to issue a document preservation memo?
17　　A.　I don't remember  None that come to mind, but
18　I don't remember  We might have
19　　Q.　Would there be any record of those discussions
20　anywhere with the debtors?
21　　A.　I don't know
22　　Q.　Can you describe to me what your
23　responsibilities were at the debtors after April 24,
24　2002?

23 (Pages 86 to 89)

Teleglobe Communications Corporation, et al.

Case No. 02-11518 (MFW)                  Vinyard V. Cooke, Esquire                  February 9, 2005

Page 90

1    A.  At some point I was informed we were going to
2    file for creditor protection in the United States and
3    Canada and worldwide.  And then basically I was given
4    the task or the mandate to deal with Canadian and U.S.
5    bankruptcy counsel to prepare for first day pleadings.
6    Q.  And after that?
7    A.  I continued to manage the bankruptcy
8    proceedings.  You know, I was involved in some of the
9    business affairs of the debtors in terms of
10   liquidating assets, involved in various litigations
11   for collection matters.  It was, believe me, a myriad
12   of things.  That's a small tip of the iceberg in terms
13   of what was going on because we had a small number of
14   bodies trying to do a great amount of work.
15   Q.  Any other categories of things that you did
16   that you can remember?
17       MR. COCHRAN:  I'm sorry.  Would you read
18   that back?
19       (The reporter read back the last
20   question.)
21       THE WITNESS:  I had dealings with many of
22   the receivers overseas.  I traveled overseas to have
23   discussions with them.  I'm just trying to think of
24   some of the extraneous stuff.

Page 91

1        That's largely it that I can think of
2    right as I sit here today.
3    BY MR. SCHIMMEL:
4    Q.  Is it fair to say that all of the efforts to
5    collect and preserve documents and maintain documents
6    after April 24 of 2002 were under your supervision,
7    directly or indirectly?
8    A.  No, not necessarily.  There were a number of
9    people doing very different things.  My task was the
10   bankruptcy.  Kathy and John were working on the sale
11   of the core.
12   Q.  Kathy is Kathy Morgan?
13   A.  Kathy Morgan.
14   Q.  And John is?
15   A.  John Brunette.  So I think there were a number
16   of people that had vested interests in maintaining
17   documents and controlling the documents.
18   Q.  Who other than Kathy Morgan, John Brunette and
19   you were involved in making sure -- I'm talking at a
20   supervisory level -- making sure that documents of the
21   debtors were preserved and maintained?
22       MR. COCHRAN:  I object to form.
23   A.  I don't know.
24   Q.  Can you think of anyone?

Page 92

1        MR. COCHRAN:  I object to form.
2    A.  No, not specifically.
3    Q.  Now, Kathy Morgan reported to you, correct?
4    A.  No.  No, she did not.
5    Q.  To whom did she report?
6    A.  John.
7    Q.  You've described the efforts that you made to
8    tell the people who worked in the legal department to
9    collect and maintain documents?
10   A.  Yes.
11   Q.  You have described that before, right.  What
12   separate efforts did Ms. Morgan or John Brunette do to
13   collect or maintain documents of the debtors?
14   A.  I don't know what they did.
15   Q.  Did you ever discuss with them what they did?
16   A.  No.
17   Q.  So as you sit here today, you have no idea
18   whatsoever?
19   A.  No.
20   Q.  But is it fair to say that whatever they did
21   involved documents pertaining to the sale of the
22   estate to Cerberus?
23   A.  I'm sorry.  Repeat your question.
24   Q.  Is it fair to say that what they were involved

Page 93

1    in involved the sale of the workable part of the
2    business to a purchaser?
3    A.  That is one of -- probably one of the primary
4    functions, but I can't speak to specifically what they
5    were doing and whether it was that limited or not.  I
6    mean, their work would have come after my discussions,
7    so whether they -- I would have been pursuing my
8    mandate of preserving and controlling.  And whether
9    they did or not, I know.  But they were aware
10   that we were told -- handling and preserving those
11   documents.
12   Q.  How were they aware?
13   A.  Because of the meetings that we had.
14   Q.  You and them?
15   A.  Yes.  They were in the large meeting.
16   Q.  When did these large meetings occur?
17   A.  They occurred daily through the bulk of May of
18   2002.
19   Q.  And in those meetings you orally told people
20   "We need to preserve and maintain documents,
21   electronic documents"?
22   A.  Not at every meeting, but there was discussions
23   on that issue.
24   Q.  On the issue that you described at the

24 (Pages 90 to 93)

Page 94

1  beginning of this deposition?
2  A  Yes
3  Q.  Did you provide that instruction to people,
4  what you called a mandate, after May of 2002 or in May
5  of 2002?
6  A  It was continuing  Right  Everyone has short
7  memories, so I can't tell you how often it was done
8  But people would call and say, "Is now the time?"
9  Facilities would call and say, "Is now the time?"  I
10  would be "No  Keep holding everything  Retain
11  everything "
12  Q.  Why didn't you issue a written mandate to those
13  employees?
14      MR. COCHRAN:  I object to the form
15  Q.  With respect to the preservation of documents.
16  A  I'm not sure if we did or not
17  Q.  Do you have any file reflecting you did?
18  A  I do not have a file that reflects that I did
19  or did not
20  Q.  To your knowledge, is there any file at the
21  debtors that would reflect whether you did?
22  A  I don't know
23  Q.  Is your answer complete?
24  A  Yes

Page 95

1  Q.  Would someone know better than you?
2  A  I don't know  If somebody has a file, maybe,
3  but I'm not aware of anyone that has something like
4  that, no
5  Q.  Why didn't you ask the employees who were
6  working in the legal department to report to you in
7  writing about their efforts to collect and preserve
8  documents?
9      MR. COCHRAN:  I object to form
10  A  It was a function of the things that were
11  happening  It was a very hectic time  And it's also
12  based on my knowledge of their individual
13  characteristics that I wasn't in a situation where I
14  felt I needed to write memos and get memos back
15  I felt like I could trust them, that they would
16  understand what I was saying and ensure compliance
17  Q.  But you have no idea as you sit here today of
18  what they did?
19  A  No
20      MR. COCHRAN:  I object to form
21  Q.  Is your answer complete?
22  A  Yes
23  Q.  Let's go back to Exhibit 5, if you would.
24  A  Sure

Page 96

1  Q.  I would like to go down the list of the people
2  for whom you don't have a hard drive
3  A  Okay
4  Q.  Randy Bloxsome.  Do you know why you don't have
5  a hard drive for Mr. Bloxsome?
6  A  I have to say I do not know who Randy Bloxsome
7  is, so I have no personal knowledge of who he was or
8  what he did
9  Q.  Is your answer complete?
10  A  If it was responsive, yes
11  Q.  Why don't you have the hard drive for Marc
12  Bouchard?
13  A  I'm not sure I know if we have -- I don't
14  believe we have a hard drive for Marc Bouchard  I
15  don't know why we do not
16  Q.  Did you ever investigate?
17  A  No
18  Q.  To your knowledge, did anybody ever investigate
19  why you don't have a hard drive?
20  A  I don't know if anyone investigated Marc
21  Bouchard's hard drive or computer
22  Q.  Why don't you have a hard drive for Michael
23  Boychuk?
24  A  Once again, as I sit here today, I don't know

Page 97

1  if we have a computer for Michael Boychuk or not
2  Q.  Well, your counsel provided us with a list of
3  seven individuals for whom you have a hard drive.
4  A  Correct
5  Q.  So I take it some effort was made to determine
6  who has and who doesn't have a hard drive at the
7  debtors?  Let me rephrase this question.
8      I take it some investigation was conducted
9  to determine who are the individuals with respect to
10  whom you have a hard drive?
11  A  And I'm not -- that did not run through me
12  The only reason I'm caveating is because we do have a
13  number of laptops that are left over and we can go
14  back and check and see if we can determine whose they
15  are  You can add that
16  Q.  Where are those laptops?
17  A  They're in Reston
18  Q.  Was any investigation ever conducted to see who
19  were the prior owners of those laptops?
20  A  I don't know if there was
21  Q.  Why not?
22      MR COCHRAN:  Why doesn't he know?
23      MR SCHIMMEL:  Yes
24      MR. COCHRAN:  I object to form

25 (Pages 94 to 97)

Teleglobe Communications Corporation, et al

Case No. 02-11518 (MFW)                    Vinyard V. Cooke, Esquire                    February 9, 2005

Page 98

1    A.  No one asked me to conduct that, but that
2    doesn't mean it hasn't been done
3    Q.  Who would be the point person to conduct such
4    an investigation, and the investigation being who is
5    the prior owner of that laptop?
6    A.  Those are all held by David Wolfe and I don't
7    even know how many there are.  I just know there are
8    some
9    Q.  Did anybody at the debtors ever ask Mr. Wolfe
10   "David, find out who is the prior owner"?
11   A.  I don't know if they did or not
12   Q.  Did anybody ask Mr. Wolfe whether there was any
13   data on those hard drives, on those laptops?
14   A.  I don't know
15   Q.  Who would know that?
16   A.  David Wolfe.
17   Q.  And you don't know if there is any data on
18   those laptops?
19   A.  No, I don't know if there's any data on those
20   laptops
21   Q.  And you don't know if there was data on April
22   24, 2002 on those laptops?
23   A.  No. I don't know
24       MR. COCHRAN: I object to form

Page 99

1    Q.  You don't know if any data was subsequently
2    erased from those laptops?
3    A.  No, I don't.
4    Q.  Would Mr. Wolfe know?
5    A.  He may know
6    Q.  You just have no idea?
7    A.  I have no idea
8    Q.  Have those laptops been with Mr. Wolfe since
9    April of 2002?
10   A.  No
11   Q.  Can you describe to me how they came to be in
12   his possession?
13   A.  Well, Mr. Wolfe has not continuously been
14   employed by Teleglobe since April of 2002  There was
15   a period of time when he left and then he came back
16   sometime last year
17   Q.  That's 2004?
18   A.  Yes
19   Q.  So really as you sit here today you have no
20   idea what happened to those laptops between April 2002
21   and the present?
22   A.  No. I have no idea
23   Q.  Do you know if the debtors ever had the laptop
24   for Michael Boychuk?

Page 100

1    A.  No, I don't
2    Q.  Do you know why there's no laptop for Barry
3    Bunin?
4        MR. COCHRAN:  I object to form.
5        MR. SCHIMMEL:  Let me rephrase the
6    question, actually
7    BY MR. SCHIMMEL:
8    Q.  Do you know why there's no computer or hard
9    drive for Barry Bunin?
10       MR. COCHRAN:  I object to form
11   A.  I know Barry had a computer when he left.
12   Q.  Where did he go?
13   A.  I think he left by guessing
14   Q.  You have no idea where he is?
15   A.  I know he's somewhere in the Mid-Atlantic
16   region, but I don't know if he retired or if he has
17   got a new job
18   Q.  Is there a record at the debtors of where he
19   might be?
20   A.  We would probably have a last known address
21   I'm not sure if it's current
22   Q.  What efforts were made, if any, before he left
23   to confirm that any data on his computer was actually
24   on the server?

Page 101

1    A.  Other than what I've testified to as being the
2    default standard?
3    Q.  The default standard being the backup?
4    A.  Right
5    Q.  The backup tapes?
6    A.  Correct
7    Q.  So other than relying on the backup tapes what
8    efforts, if any, were made to confirm that the data on
9    his hard drive was actually preserved on the servers
10   or the backup tapes?
11   A.  I'm not aware of any efforts specifically
12   Q.  And I take it your answer is complete?
13   A.  Yes
14   Q.  How about Mr Childers, why don't you have a
15   computer for him?
16       MR. COCHRAN:  Childers
17   A.  I don't know, I don't know what the status
18   of his computer is
19   Q.  Has there been any investigation?
20   A.  Not by me
21   Q.  By anybody?
22   A.  I don't know
23   Q.  Did you ever instruct anyone to try to locate
24   the computer of Mr Childers?

26 (Pages 98 to 101)

Teleglobe Communications Corporation, et al.

Case No. 02-11518 (MFW)          Vinyard V. Cooke, Esquire          February 9, 2005

Page 102

1    A.  I did not, no
2    Q.  To your knowledge, did any person on behalf of
3    the debtors instruct any other person to try to locate
4    the computer of Mr. Childers?
5    A.  Not to my knowledge
6    Q.  Would there be a log at the debtors of what
7    happened to all of those computers?
8    A.  There may be.
9    Q.  Who would be in charge of that log?
10   A.  Well, the only person who is left who might
11   know about the log is more than likely David Wolfe.
12   Q.  But you as you sit here today have no idea
13   whether a log was maintained to identify where the
14   computers of all of those custodians are?
15   A.  I don't know.
16   Q.  Did you give any instruction to anybody to
17   create such a log, maintain such a log?
18   A.  I did not, no.
19   Q.  Did anybody working for you to your knowledge
20   give that instruction?
21   A.  Are you talking about specifically for
22   Mr. Childers or are you talking generally?
23   Q.  No.  For any person whose computer has
24   disappeared --

Page 103

1    A.  I told you they haven't disappeared
2         MR. COCHRAN:  I object to form.
3    A.  I will say there should be a record somewhere
4    of people who bought their computers, should be, but
5    I'm not sure specifically, but I know that as
6    employees left they tendered cash and typically got a
7    receipt.  Whether we have that available, I don't
8    know.
9    Q.  Who would have the record of who bought their
10   computers when they left?
11   A.  I don't know who would hold that now.
12   Q.  You don't know if the record exists?
13   A.  I don't know specifically if the record
14   exists
15   Q.  But as you sit here today, you cannot confirm
16   whether anybody took any steps to confirm that the
17   data on those computers that were taken by the
18   employees was actually located on the backup tapes or
19   the server?
20        MR. COCHRAN:  Could you read that back?
21        (The reporter read back the last
22   question.)
23        MR. COCHRAN:  I object to the form.
24        THE WITNESS:  Correct.

Page 104

1    BY MR. SCHIMMEL:
2    Q.  And your answer is complete?
3    A.  Yes
4    Q.  Mr. Ashwin Chitamun, do you know why you don't
5    have a computer for him?
6         MR. COCHRAN:  I object to form
7    A.  I believe Ashwin left on May 15th.  I don't
8    know if he took his computer with him or not
9    Q.  How about Mr. Condon, do you know why you don't
10   have a computer for him?
11        MR. COCHRAN:  I object to form
12   A.  I don't know if we do or not.  I know he went
13   back to Bell Canada
14   Q.  Just so that we're clear, you have identified
15   in Mr. Cochran's letter to me and before in your
16   deposition the individuals for whom you know you have
17   a computer?
18   A.  Correct
19   Q.  Right.  With respect to all of the other
20   individuals on that list, as you sit here today you
21   have no reason to believe you have a computer?
22        MR. COCHRAN:  I object to form
23   A.  I don't have a belief one way or the other.  I
24   do know we have additional laptop computers in Reston

Page 105

1    Q.  With Mr. Wolfe?
2    A.  With Mr. Wolfe.
3    Q.  So would it be fair to say that if it happens
4    that the computer of those individuals on Exhibit 5
5    are with Mr. Wolfe, you have them but if they are not
6    with Mr. Wolfe in that stack of additional laptops,
7    you don't have them?
8         MR. COCHRAN:  I object to form
9    A.  I think we either have them or we don't  And
10   if they are not with Mr. Wolfe, there are no other
11   offices that they would be located in
12   Q.  Do you know how many computers Mr. Wolfe has?
13   A.  No, I don't.  I know it's some number.
14   Q.  By "some number," are we talking about five,
15   ten, a hundred?
16   A.  It would be definitely less than a hundred,
17   probably less than twenty.  I don't know specifically
18   Q.  Bill Enns, do you know why you don't have a
19   computer for him?
20        MR. COCHRAN:  I object to form
21   A.  No, I don't know
22   Q.  Mr. Fortin, do you know why you don't have a
23   computer for him?
24   A.  Serge was another one where we went looking for

27 (Pages 102 to 105)

Teleglobe Communications Corporation, et al
Case No  02-11518 (MFW)                Vinyard V  Cooke, Esquire                February 9, 2005

Page 106

1   his computer  He specifically -- there was some
2   confusion about where he left it or who he left it
3   with, but I know that it was disappeared  But where
4   that went, I have no idea  I know that he's another
5   one that was on the sixth floor where we made a review
6   for his computer and could not find it
7   Q.  When you said disappeared, you annunciated that
8   term fairly mysteriously.  So could you tell me the
9   circumstances under which --
10          MR. COCHRAN: I object to that
11  Q.  -- you discovered that the computer of
12  Mr. Fortin disappeared?
13  A   It was just a situation where I think he said
14  he left it on the sixth floor and we couldn't find it
15  Q.  And the sixth floor would be in Reston,
16  Virginia?
17  A   Correct  The executive offices
18  Q.  Your understanding as you sit here today is
19  Mr. Fortin's computer disappeared in Reston, Virginia?
20  A.  That's what we were -- we were told that Serge
21  left his computer in Reston
22  Q.  When you say, "we were told," who was told?
23  A   I don't know who came to me, but somebody came
24  to me and said, "We can't find Serge's computer "

Page 107

1   Q.  Do you remember when that was?
2   A   It was shortly after he left
3   Q.  Which would be?
4   A   I can't remember when he left specifically  He
5   might have left with -- this might be a computer that
6   he had and then he got another one  I don't know  I
7   can't remember specifically the timing
8   Q.  You don't remember who told you that his
9   computer had disappeared?
10  A   No
11  Q.  Is there any record anyplace of discussions
12  about Mr. Fortin's computer at the debtors ?
13  A   I don't know
14  Q.  Is there in the legal department to your
15  knowledge any memo or written document describing the
16  situation with respect to his computer?
17  A   Not to my knowledge
18  Q.  To your knowledge, is there a memo or a
19  document anywhere else at the debtors' that would
20  discuss the situation of his computer?
21  A.  Not that I'm aware of
22  Q.  Mr. Guidi, do you know why you don't have a
23  computer for him?
24          MR. COCHRAN: I object to form

Page 108

1   A   No, I don't
2   Q.  Mr Guidi left Teleglobe in May 2000.  Is that
3   right?
4   A   Probably  Somewhere in 2000 sometime
5   Q.  So why do you believe you have e-data for him?
6   A   We may not  I don't know
7   Q.  Mr Jarman  do you know why you don't have a
8   computer for him?
9          MR COCHRAN   object to form
10  A   No  I do not
11  Q.  Was any investigation ever made?
12  A   Not to my knowledge  And by that I mean I
13  don't know  I don't know one way or the other
14  Q.  If someone was looking for the computer of
15  Mr. Jarman and an investigation was conducted to try
16  to find out where it is, who typically would be
17  conducting that investigation?
18          MR COCHRAN   object to form
19  Q.  If you know
20  A   I don't know  It would typically be the IT
21  department's responsibility to maintain control over
22  the computers
23  Q.  Do you remember who was the woman who was the
24  head of the IT department at Teleglobe?

Page 109

1   A   No
2   Q.  But that's the woman you met in Canada?
3   A.  The head of the IT department was actually Bob
4   Callahan, who was in  in Reston
5   Q.  And he was the head of the IT department from
6   what time to what time?
7   A   I don't know  when he joined Teleglobe and I
8   know he was there through the spring of 2002  I don't
9   know if he was there all  time when we -- I don't
10  know specifically when he left
11  Q.  Is there any written document or log that would
12  describe to us who were the people working in the IT
13  department in 2002 ?
14  A   I don't know
15  Q.  Is there a human resources department at the
16  debtors today which would have that information?
17  A   No  Well, there no human resources
18  department at Teleglobe any longer
19  Q.  Are there human resources files at the debtors'
20  that could reflect who was working in the IT
21  department in 2002 ?
22  A   There are definitely files  I don't know --
23  I've never looked at them one way or the other, so I
24  don't know how they maintained or what they would

Teleglobe Communications Corporation, et al.

Case No. 02-11518 (MFW)          Vinyard V. Cooke, Esquire          February 9, 2005

Page 110

1  say
2  Q.  Do you know if the debtors ever had a computer
3  from Michel Lalande?
4    A   And when you say, "the debtors," are you
5  talking about the U.S. debtors?
6  Q.  Yes, the U.S. debtors.
7    A   The U.S. debtors?  I don't believe the U.S.
8  debtors would have ever had a computer for Michel
9  Lalande
10  Q.  Why not?
11    A.  Because he was employed in Canada
12  Q.  By whom?
13    A.  Well, originally he was employed by Teleglobe
14  and then at some point he began work for BCE.
15  Q.  Do you know if the Canadian debtors would have
16  a computer for Mr. Lalande?
17    A  I don't know  Presently?  Presently, no, I
18  don't believe they would.
19  Q.  So if I understand correctly, what you mean is
20  before BCE acquired the controlling interest in
21  Teleglobe in November 2000 Mr. Lalande was working at
22  Teleglobe, Inc.  So what you are saying is perhaps he
23  had a computer at Teleglobe at that time.  Is that
24  correct?

Page 111

1    A  I don't know what Teleglobe entity he was
2  working for specifically and I'm not sure when his
3  affiliation changed.  And I don't know when or what he
4  did in terms of -- I don't know  You would have to
5  talk to Michel
6  Q.  How about Michael Neuman, do you know why you
7  don't have a computer for him?
8    A.  No, I don't know.
9  Q.  With respect to Mr. Pichette, is there to your
10  knowledge any memo or written document that would
11  describe the situation with his computer?
12        MR. COCHRAN:  The what of his computer?
13        MR. SCHIMMEL:  The situation with his
14  computer  Let me clarify.
15  BY MR. SCHIMMEL:
16  Q.  You described before that the computer of
17  Mr. Pichette disappeared at some point in time.
18    A  I don't know if it disappeared or if that was
19  his BCE computer that he took back to BCE.  I don't
20  know.
21  Q.  But you described before that you looked for
22  Mr. Pichette's computer and you couldn't find it?
23    A  Yes
24  Q.  And you described also that it was an expensive

Page 112

1  computer so you wanted to be able to track it down.
2    A   I believe all of the six floor executives had
3  upgraded computers
4  Q.  And Mr. Pichette was one of them?
5    A.  Yes.
6  Q.  Was there any memo or any written document that
7  would describe what the situation was with respect to
8  Mr. Pichette's computer?
9        MR. COCHRAN:  I object to the form
10    A  Again by "the situation" you're talking about
11  the looking?  I'm not sure what --
12  Q.  Very, very broadly, looking for the computer,
13  understanding what happened to it.
14    A  Not that I'm aware of
15  Q.  How about Tip Powers, do you know why the
16  debtors don't have a computer for that person?
17        MR. COCHRAN:  I object to form
18    A  No, I don't know
19  Q.  How about Miss Runion?
20    A  Yes, Ms. Runion  No, I have no idea
21        MR. COCHRAN:  I object to form
22  Q.  How about Mr. Verge?
23        MR. COCHRAN:  The same objection
24    A  I do not know.

Page 113

1  Q.  Why you don't have a computer for him?
2        MR. COCHRAN:  Same objection
3    A  Correct
4  Q.  And Mr. VanDoorn, you explained earlier that
5  his computer was returned to the IT department and
6  redeployed, to the best of your understanding?
7    A  That's what would typically have happened for
8  the people that left back in 2001  Whether that
9  specifically happened for him, I don't know
10  Q.  Do you have a computer for Christina Gold?
11    A.  No
12  Q.  Why not?
13    A.  Christina Gold worked for Excel, which was
14  not -- which was a separate entity
15  Q.  So she would have no connection and no
16  information relevant to this case?
17    A  I don't know about that.
18  Q.  Do you have any reason to believe she may have
19  discoverable information relevant to this case?
20        MR. COCHRAN:  I'm sorry  Could you read
21  that back?  Mr. Schimmel dropped his voice and I
22  didn't hear the last half of the question
23        (The reporter read back the last
24  question.)

29 (Pages 110 to 113)

Teleglobe Communications Corporation, et al

Case No  02-11518 (MFW)              Vinyard V  Cooke, Esquire              February 9, 2005

Page 114

1      MR COCHRAN: I think you can answer that
2   question with a yes or a no, but other than that there
3   may be a work product issue
4      THE WITNESS:  Right
5      I don't know.  It's possible.
6   BY MR  SCHIMMEL:
7   Q.  Do you know if she had access to any Teleglobe
8   server while she was working at Excel?
9   A  I don't know.  I don't know.
10  Q.  Who would know that?
11  A  Well, I don't know who would know   David Wolfe
12  is a likely source
13  Q.  That would be the only person who would know
14  today?
15  A  Today or someone who was managing her account
16  at Excel  I don't know if she was on the Montreal
17  servers or not.
18  Q.  How about Mr. Seguin, do you have a computer
19  for him?
20  A  I don't know.
21  Q.  Do you have any reason to believe you have a
22  computer for him?
23  A  I have to say I don't know who he is, sadly, so
24  he's one who I have no knowledge of

Page 115

1   Q.  How about Mr. Bourbannais, do you have a
2   computer for him?
3      MR COCHRAN:  Who?
4      THE WITNESS:  That's Andre Bourbonnais
5   A  Andre is another one who left at or about the
6   time of the merger
7   Q.  What merger?
8   A  The merger with BCE.
9   Q.  That's November 2000?
10  A  Approximately  He left I believe right in that
11  time frame.
12  Q.  So --
13  A  I don't know what they did with his computer
14  Q.  Do you know if you have a computer for Derek
15  Burney?
16  A  I don't know who he is
17      If you don't mind, can I just take a quick
18  break?  Is that all right?
19  Q.  Sure.
20      (A brief recess was taken.)
21      MR SCHIMMEL:  Mark this
22      (Cooke Deposition Exhibit No  7 was marked
23  for identification.)
24      MR SCHIMMEL:  This is going to be 8

Page 116

1      (Cooke Deposition Exhibit No  8 was marked
2   for identification.
3   BY MR  SCHIMMEL
4   Q.  I am showing you what's been marked as Exhibit
5   8 and Exhibit 7  Exhibit 8 is the debtors' initial
6   disclosures pursuant to Federal Rule of Bankruptcy
7   Procedure 7026 and  Federal Rules of Civil Procedure
8   26(a).
9      Mr. Cooke, have you seen this document
10  before?
11  A  I'm sorry are you talking about Exhibit
12  No 8?
13  Q.  Yes
14  A  Yes, I have
15  Q.  Did you review this document before it was
16  served?
17  A  This one?  yes
18  Q.  Did you review it for accuracy?
19  A  Yes
20  Q.  If you look at page 7 of this document.
21  A  Yes
22  Q.  It talks about Claude Seguin, CFO of TI,
23  Director of TUSA, TMI, TSI and TTC
24      Do you see that?

Page 117

1   A  Yes
2   Q.  Does it refresh your recollection as to who
3   Mr. Seguin is?
4   A  Yes, although I  I knew him
5   Q.  Do you know whether the debtors ever had a
6   computer for Mr  Seguin?
7   A  I do not know
8   Q.  Now if you will look at Exhibit 7, it is a
9   letter from Brock Creschin of Richards, Layton to
10  George Wade and I'm directing your attention to
11  footnote 1 of that letter on page 2.
12      And I would like to ask you whether you
13  have computers with respect to some of these
14  individuals and if you don't, why.
15  A  Okay  I'm looking at footnote 1  I know we
16  have computers for
17      MR  COCHRAN  Why don't you let him ask
18  the question
19  Q.  Why don't you tell me who you have computers
20  for?  That might be easier
21  A  Kathy Morgan  I  Brunette, Kieren Bustamante,
22  Cindy Eakin, Dan  la
23      As to the other  I don't know one way or
24  the other

30 (Pages 114 to 117)

Teleglobe Communications Corporation, et al.
Vinyard V. Cooke, Esquire

Case No. 02-11518 (MFW)                                    February 9, 2005

Page 118

1  Q.  If you don't have a computer for them, you have
2  no idea why?
3  A  I do not, no.
4       MR. COCHRAN:  I object to the form of the
5  last question.
6  Q.  Do you know who at the debtors would know why
7  you don't have a computer for any of these
8  individuals?
9       MR. COCHRAN:  Same objection.
10       THE WITNESS: I'm sorry. What was the
11  question?
12       (The reporter read back the last
13  question.)
14       THE WITNESS:  No, I don't know who would
15  know.
16  BY MR. SCHIMMEL:
17  Q.  Let me just go down the list to be a little bit
18  more specific.
19       I take it you don't know whether you have
20  a computer for Derek Burney?
21       MR. COCHRAN:  Who?
22  A.  I'm trying to find his name here. Where is it?
23  Can you direct me to a line?
24       Oh, Derek Burney?

Page 119

1  Q.  Yes.
2  A.  I personally do not know who Derek Burney is.
3  Q.  Do you know whether the debtors have in their
4  possession, custody or control the computer of
5  Mr. Deforges, D-e-f-o-r-g-e-s?
6  A  Jacques Deforges? Is it on the same -- the
7  next line down? I do not know who Jacques Deforges
8  is, personally.
9  Q.  Do you know if the debtors have in their
10  possession, custody or control a computer for
11  Mr. Ducharme, D-u-c-h-a-r-m-e?
12  A.  I did not know.
13  Q.  Do you know who he is?
14  A  No, I don't.
15  Q.  Do you know if the debtors have in their
16  possession, custody or control a computer for Helen
17  Fields?
18  A  No, I don't
19  Q.  Do you know who she is?
20  A  Yes, I do.
21  Q.  Who is she?
22  A.  She worked in the legal department. She's an
23  attorney.
24  Q.  Of?

Page 120

1  A.  Of Teleglobe.
2  Q.  Did she report to you?
3  A  No. She reported to Kathy Morgan
4  Q.  How would we go about figuring out whether the
5  debtors have a computer for her?
6       MR. COCHRAN:  What's the question again?
7       (The reporter read back the last
8  question.)
9       MR. COCHRAN:  Do you need to consult
10  regarding a matter of privilege?
11       I object to form
12       THE WITNESS:  We would ask David Wolfe.
13  You know, I think we will go back and look at the
14  computers that are left and see if any of them relate
15  to any of these people. I'm happy to do that.
16  BY MR. SCHIMMEL:
17  Q.  Do you know if the debtors have the computer
18  for Michael Hainsfurther, H-a-i-n-s-f-u-r-t-h-e-r?
19  A  I do not know.
20  Q.  Do you know who he is?
21  A  No
22  Q.  Do you know if the debtors have in their
23  possession, custody or control the computer of Tom
24  Hope?

Page 121

1  A  No, I don't
2  Q.  Do you know who he is?
3  A  Yes, I do
4  Q.  Who is he?
5  A  He's with Bell Canada
6  Q.  Was he employed by the debtors at any point
7  between 2000 and April of 2002?
8  A  I know he was doing work for Teleglobe
9  Q.  In Reston?
10  A  I know specifically I think he did work in
11  Reston but other places as well
12  Q.  What kind of work did he do for Teleglobe?
13  A  Well, specifically I dealt with him in The
14  Netherlands regarding the European build-out, the
15  status of the European network
16  Q.  Why did you deal with him?
17  A  It was a litigation issue
18  Q.  In connection with the litigations that you
19  handled for Teleglobe worldwide before April 24, 2002
20  did the issue of a document retention policy ever come
21  up?
22  A  I think you asked me that but, no, it did not.
23  Q.  Did anybody mention to you in form or substance
24  the term document retention policy before April 24,

31 (Pages 118 to 121)

Teleglobe Communications Corporation, et al.

Case No. 02-11518 (MFW)    Vinyard V. Cooke, Esquire    February 9, 2005

Page 122

```
1    2002?
2          MR COCHRAN: I object to the form
3    A   Yes
4    Q.  Who?
5    A   John Brunette
6    Q.  What did he say?
7    A   He said we need to develop one
8    Q.  When did he say that?
9    A   We were doing a book of corporate policies at
10   the time, spring of 2002
11   Q.  Spring of 2002 meaning what?  Before April 24,
12   2002 or after?
13   A   I don't remember when we sat down and had that
14   meeting, but everyone was given the task of coming up
15   with corporate policies
16   Q.  Do you know if it was before BCE announced the
17   termination of its long-term funding?
18   A   Yes  It would have been before that
19   Q.  So Mr. Brunette instructed you to prepare a
20   document retention policy, right?
21   A   I don't know if we were preparing it or
22   updating it, but we discussed a document, you know,
23   coming up with a document retention policy
24   Q.  When you say, "updating it," was there a
```

Page 123

```
1    document retention policy before that?
2    A   I don't know
3    Q.  Did you, in fact, develop a document retention
4    policy per Mr. Brunette's instruction?
5    A   I did not specifically
6    Q.  Did anybody?
7    A   I don't know if there was one or not
8    Q.  Is your answer complete?
9    A   Yes.
10   Q.  You have never seen one?
11   A   I don't believe I ever saw it, no
12   Q.  In that meeting where Mr. Brunette said we need
13   to develop a document retention policy, who else was
14   present?
15   A   All of the Reston direct reports of
16   Mr Brunette
17   Q.  So who would they be?
18   A   You would have had Chuck Tievsky  You would
19   have had Victoria Fortuna  You would have had Kieren
20   Bustamante  And you would have had Kathy Morgan and
21   myself
22         That's I believe the list that I can
23   remember
24   Q.  And what was the title and responsibilities of
```

Page 124

```
1    Chuck...
2    A   Tievsky
3    Q.  Tievsky?
4    A   He's regular cr  and legal affairs
5    Q.  Did he work in the legal group?
6    A   Yes, he did
7    Q.  Under your supervision?
8    A   No  These are all direct reports of John's
9    Q.  What was the title and responsibilities of
10   Victoria Fortuna?
11   A   Yes.  She was employment, labor law.
12   Q.  What was the title and responsibilities of
13   Kieren Bustamante?
14   A   He was corporate  No  No  Or commercial or
15   both  I'm not sure  I have that right
16   Q.  What does that mean?
17   A   He would have handled the sales contracts and
18   large transactions
19   Q.  What was the title and responsibilities of
20   Kathy Morgan?
21   A   She was corporate
22   Q.  Specifically what in corporate?
23   A   M & A, securities  corporate control, all of
24   those issues
```

Page 125

```
1    Q.  And you were in charge of litigation worldwide?
2    A   Yes
3    Q.  Who of those people would have been the point
4    person to prepare a document preservation policy?
5          MR COCHRAN  I object to the form
6    Q.  During the ordinary course of business who
7    would have prepared it?
8          MR COCHRAN  I object to form
9    A   You mean  are you talking about at
10   that meeting?
11   Q.  Either way
12         MR COCHRAN  I object to form
13   A   I don't know  If anybody had formally come up
14   with a policy but I  asked all of us to come up
15   with various policies  procedures and we were
16   working on that collectively  So ultimately all of
17   us were responsible  reviewing all of the policies
18   Q.  Did you ever see a draft of a document
19   preservation policy after that meeting with
20   Mr Brunette?
21   A   I can remember  being done that before, but I
22   don't know if I did it for Teleglobe or not  I don't
23   know in what state the policies were at the time
24   Q.  Of the individuals that you've listed here,
```

32 (Pages 122 to 125)

Teleglobe Communications Corporation, et al.
Case No. 02-11518 (MFW)          Vinyard V. Cooke, Esquire          February 9, 2005

Page 126

1  Chuck Tievsky, Ms. Fortuna, Kieren Bustamante, Kathy
2  Morgan and yourself, who to your knowledge would have
3  been the natural person to do the first draft of the
4  document preservation policy?
5          MR. COCHRAN: I object to form.
6    A   I believe John asked me to do the initial
7  draft
8    Q   That's your recollection?
9    A   That's my recollection
10   Q   Did you do it?
11   A   I can't remember if I did it or not. I have
12  done quite a few of them
13   Q   Sorry?
14   A   I have done many of those.
15   Q   Of those what?
16   A   Document retention policies
17   Q   In your --
18   A   Private practice.
19   Q   -- prior life as a lawyer?
20   A   Yes.
21   Q   The policies that you worked on when you were
22  an attorney, what did they require people to do,
23  generally?
24          MR. COCHRAN: First I object to the form

Page 127

1          You can answer to the extent that you are
2  able to do so without revealing attorney-client
3  privileged information
4    Q   I'm not asking you to reveal attorney-client
5  information and I'm not asking about any client in
6  particular that you represented at that time.
7          I'm trying to understand you said that in
8  your private practice you worked on document retention
9  policies, right?
10   A   Mm-hmm
11   Q   So what I am trying to figure out is what was
12  under those policies the expectation when a company
13  becomes on notice of the existence of a claim, what
14  are you supposed to do with documents?
15          MR. COCHRAN: I object to form.
16          And to the extent that the question calls
17  for you to divulge client confidences, you are advised
18  that there's a potential attorney-client privilege
19  issue
20   A   Right. And for each client obviously each
21  assignment is different and largely what you're really
22  talking about in terms of document retention policies,
23  the ones that I worked on were how long you keep
24  different documents and how you go about destroying

Page 128

1  the documents or not destroying the documents
2          So I can't think that there's a model
3  Each one is different and it depended on the company
4  and the type of business they were in and many, many
5  alternatives
6    Q   Did those policies address the obligation to
7  preserve documents once a lawsuit is filed?
8          MR. COCHRAN: Objection to the form. The
9  same instruction
10   A   I can't remember if they did or not
11   Q   Do you remember if those policies addressed
12  what should happen once a company became on notice of
13  a claim?
14          MR. COCHRAN: Same objections
15   A   I don't remember
16   Q   But you do remember working on a number of
17  document retention policies in your private practice?
18   A   Yes
19   Q   And you never did one for Teleglobe?
20   A   I can't remember if I did or not. I can't
21  remember what the status was at the time
22   Q   Would it be in your file if you had one, if you
23  had prepared one?
24   A   In like a hard copy file? Maybe

Page 129

1    Q   Would it be in your computer?
2    A   Possibly
3    Q   Do you know one way or the other whether you
4  have in your computer or your paper files a copy of
5  any document retention policy you prepared
6  Teleglobe?
7    A   No, I don't know
8    Q   You never looked after April 24, 2002?
9    A   Not specifically, no
10   Q   And why not?
11          MR. COCHRAN: I object to the form
12   A   I don't know.
13   Q   Is the answer complete?
14   A   Yes
15   Q   Did any of the document retention policies you
16  worked on in your private practice describe that it's
17  okay to have oral communications with people about
18  their retention of documents?
19          MR. COCHRAN: The same objection and same
20  caution
21   A   I don't specifically remember any of those
22  policies
23   Q   Did you have any understanding when you were in
24  private practice of a litigant's legal obligation to

33 (Pages 126 to 129)

Teleglobe Communications Corporation, et al

Case No. 02-11518 (MFW)    Vinyard V. Cooke, Esquire    February 9, 2005

Page 130

1    preserve documents after notice of a claim?
2    A.  Yes, I have seen that.
3    Q.  And what was your understanding?
4    A.  Generally, once you're in the situation of
5    litigation you want to make sure that documents that
6    are relevant are not going to be discarded or
7    destroyed.
8    Q.  Explain to me how you satisfied that obligation
9    after April 24th, 2002.
10    MR. COCHRAN: I object to form.
11    A.  It would be the same that I testified before.
12    Q.  Which is?
13    A.  On the electronic, I went up and determined how
14    we were storing and compiling our electronic backup
15    systems and instructed them not to delete or to
16    destroy any of those tapes or overwrite them.
17    And on the documents, specifically other
18    than instructing our legal group to make sure that
19    everyone was maintaining the files I can't think of
20    anything else.
21    Q.  Is your answer complete?
22    A.  Yes.
23    Q.  And when you were in private practice did you
24    have an understanding of what the law required in

Page 131

1    terms of how to communicate to employees the legal
2    obligation to preserve documents?
3    MR. COCHRAN: I object to the form.
4    A.  No, not specifically.
5    Q.  Is your answer complete?
6    A.  Yes.
7    Q.  I would like to continue going down that list.
8    Do you know who Francois Laurin is,
9    L-a-u-r-i-n?
10    A.  No, I don't specifically know who he is.
11    Q.  Do you know who Andrea LeBlanc is?
12    A.  No, I don't know.
13    Q.  Do you know who Bernard LeDuc is?
14    A.  No.
15    Q.  Do you know who T. Allen McArtor is?
16    A.  No, I don't.
17    Q.  Do you know who C. Edward Medland is,
18    M-e-d-l-a-n-d?
19    A.  No, I don't.
20    Q.  Do you know who Marvin Moses is?
21    A.  No, I don't.
22    Q.  Do you know who Robert Mowat is, M-o-w-a-t?
23    MR. COCHRAN: That's not a name on the
24    list so far as I see it.

Page 132

1    A.  Oh, there it is.
2    A.  Where is it?
3    MR. COCHRAN: It's underneath Helen Fields.
4    A.  No, I don't.
5    Q.  Do you know who C. Normand is, N-o-r-m-a-n-d?
6    A.  I'm sorry. Where —— is he on this list?
7    Q.  Carmand Normand C a-r-m-a-n-d, and then the
8    family name is N-o-r m-a-n-d. He's on the list three
9    lines from the bottom.
10    A.  Oh. I'm sorry —— it's not.
11    Q.  Do you know who Gregory S. Oliver is?
12    A.  No, I don't.
13    Q.  Do you know who Charles Sirois is?
14    A.  Generally.
15    I'm sorry —— it there a pending question?
16    Q.  Do you know if you have a computer for
17    Mr. Sirois?
18    A.  I do not know.
19    Q.  And I take it either it's in the stack of
20    computers that happens to be with Mr. Wolfe or there
21    is none?
22    A.  Yeah. I would to that unlikely because, again,
23    he's a Canadian —— —— —— if he was even an
24    employee.

Page 133

1    Q.  Do you know who Dave Southwell is?
2    A.  Yes, I do.
3    Q.  Who is he?
4    A.  He works at ——
5    Q.  Did he have any involvement with Teleglobe?
6    A.  Yes, he did.
7    Q.  What was his involvement?
8    A.  He was working with Mr. Hope.
9    Q.  Do you know if the debtors have a computer for
10    Mr. Southwell?
11    A.  No, I don't know.
12    Q.  Stewart Guthrie, do you know who that person
13    is?
14    A.  You mean Guthrie Stewart?
15    Q.  Yes.
16    A.  Yes, I do.
17    Q.  Who is that person?
18    A.  He is a former Teleglobe employee.
19    Q.  Do you know if the debtors have in their
20    possession, custody, or control a computer for him?
21    A.  I do not, although —— once again, I would be
22    surprised because it's —— on the Canadian side.
23    Q.  Do you know Kenny Troutt?
24    A.  Yes, I do.

34 (Pages 130 to 133)

Teleglobe Communications Corporation, et al

Case No. 02-11518 (MFW)          Vinyard V. Cooke, Esquire          February 9, 2005

Page 134

1  Q. Do you know if the debtors have in their
2  possession, custody or control a computer for him?
3  A  No, I do not.
4  Q. And the last one, John and his last name is
5  Z-r-n-o, do you know that person?
6  A  I do not.
7      MR SCHIMMEL: Why don't we take a
8  five-minute break?
9      (A brief recess was taken.)
10  BY MR. SCHIMMEL:
11  Q. Mr. Cooke, from what you said before you
12  understood that as of May 15, 2002 a lot of employees
13  were leaving Teleglobe, right?
14  A  Yes  That's correct.
15  Q. And you understood the obligation to preserve
16  paper and electronic documents, right?
17  A  Yes
18  Q. So tell me all the steps that you took to make
19  sure that any data on the hard drive would be
20  preserved other than asking that backup tapes be
21  maintained.
22  A  Right  I specifically took no steps other than
23  what I have already described to you
24  Q. And what you have described to me involved the

Page 135

1  backup tapes, correct?
2      MR. COCHRAN: Objection to form.
3  A  Yes  On the electronic side, yes
4  Q. What steps did you take to ensure that the
5  documents on the servers, both e-mail and file
6  servers, were preserved other than the backup tapes
7  that you described?
8  A  Other than the backup tapes, I believe those
9  are the only steps that I took.
10  Q. And did the debtors, apart from you, take any
11  steps?
12  A  I don't know what steps, if any, were taken
13  other than the ones that I personally took care of
14  Q. Were you ever engaged in litigation either in
15  private practice or at Teleglobe where document
16  preservation became an issue?
17  A  Not that I can remember.
18  Q. Do you remember in the litigations that you
19  were involved in in private practice or at Teleglobe
20  how the obligation to preserve documents was
21  communicated to people, employees, officers,
22  directors?
23      THE WITNESS: I'm sorry  Could you repeat
24  that question?

Page 136

1      (The reporter read back the last
2  question.)
3      MR COCHRAN: To the extent that the
4  question -- well, first of all, it's objectionable as
5  to form
6      Secondly, the response to the question
7  could involve attorney-client confidences and to the
8  extent that it does, you're advised that there's a
9  privilege that may apply.
10      THE WITNESS: I guess in terms of my
11  simple answer it would be preservation of documents
12  per se I'm not sure -- when you say, "preservation,"
13  it's as if they are going to disappear  And I guess
14  at Teleglobe I mean typically I would contact the
15  relevant people in a case and say I want all of your
16  documents
17      So in terms of preservation, I mean it
18  would really be more an effort at collection and
19  retrieval.
20  BY MR. SCHIMMEL:
21  Q. And on other litigations that you were involved
22  in in private practice how was the obligation to
23  preserve documents conveyed, if it was?
24      MR. COCHRAN: Same objection and same

Page 137

1  instruction
2  Q. If it was.
3      MR. COCHRAN: It's objectionable as to
4  form, number one
5      Number two, to the extent that it involv :s
6  confidential attorney-client communications, there u u
7  be a privilege that applies
8  A  I'm just trying to think of a case specifically
9  where that arose  I mean, typically we would just be
10  in contact with a contact at the company and we would
11  go out and either we would pull or they would pull the
12  relevant documents and we would review them.
13      So, once again, I guess it presumes
14  preservation was an issue  And I'm not sure that I
15  ever specifically remember a situation where I was
16  focused on preservation in that sense
17  Q. You don't remember in your practice, either
18  private practice or at Teleglobe ever telling people
19  to preserve documents as opposed to collect documents?
20      MR COCHRAN: I object to form
21  A  No, not specifically.
22  Q. Is your answer complete?
23  A  Yes
24  Q. What, if anything, did you do to be able to

35 (Pages 134 to 137)

Teleglobe Communications Corporation, et al
Case No. 02-11518 (MFW)          Vinyard V. Cooke, Esquire          February 9, 2005

Page 138

1 prove that your instructions to people at Teleglobe
2 were followed with respect to the collection of
3 electronic documents and paper documents?
4        MR. COCHRAN: I object to form
5    A   I wasn't trying to prove anything, but I did
6 send when I had the meeting with the IT people. I sent
7 the follow-up e-mails  And, like I say, whether Chris
8 sent an e-mail or not or I sent it out. I can't
9 remember.
10   Q.  Your answer is complete?
11   A   That's the best of my memory
12   Q.  And the e-mails that you were just referring
13 to, the one that went to the IT department in Canada,
14 those were following your meeting in the summer of
15 2002?
16   A   Yes  It would have been after I came back
17   Q.  Do you remember if it was one one e-mail or several
18 e-mails?
19   A   I think it was a couple because we had some
20 questions about backup and how it was going to work
21   Q.  Do you still have those?
22   A   I don't know if I do or not
23   Q.  Do you remember this morning I showed you
24 paragraph 7 of your affidavit which talked about the

Page 139

1 company policies in place prior to April 2002?
2    A   Correct.
3    Q.  Was anybody in charge of monitoring compliance
4 with those policies?
5        MR. COCHRAN: Is there humor here
6 Mr Schimmel?
7        MR SCHIMMEL: No
8        MR COCHRAN: Then why are you laughing
9 Maybe we could approach this in a more regular way
10 BY MR SCHIMMEL:
11   Q.  Mr. Cooke, was anything done to monitor
12 compliance with the policies that are described in
13 paragraph 7 of your affidavit?
14       MR. COCHRAN: Objection to form
15   A   I'm not sure what people did in terms of
16 complying with company policies
17   Q.  Was any person to your knowledge in charge of
18 monitoring compliance?
19   A   Not specifically, no
20   Q.  Based on your knowledge of Teleglobe, do you
21 have any sense of who would have been responsible for
22 monitoring compliance with company policies, if anyone
23 ever was?
24       MR. COCHRAN: I object to form

Page 140

1    A   Well, I think just the way it worked is
2 different stations or the company had policies that
3 they were accountable or responsible for and those
4 division heads would  It really be held accountable
5 And legal would have the specific policies that were
6 legal obligations that would be in their bailiwick
7 So it just depended on the specific policy you're
8 speaking about
9    Q.  The one that is referred to in paragraph 7 of
10 your affidavit which I believe refers to the backup of
11 server data, correct?
12   A   Yes  Well, I had to deal really with retention
13 of backup tapes
14   Q.  That's what's covered by paragraph 7 of your
15 affidavit?
16   A   That's what I was thinking of as I looked at
17 this
18   Q.  And in terms of the retention of backup tapes,
19 was any person responsible for monitoring compliance?
20       MR. COCHRAN  I object to form
21   A   I don't know who would have been responsible.
22   Q.  Were you?
23   A   Well, this would have been an IT — when I look
24 at this, this is an IT department policy, which I

Page 141

1 didn't formulate  It was a  That's the way
2 they were operating  absolutely when I changed
3 that policy I would  you would say that I was
4 responsible. But other  in recording the e-mails, I
5 wasn't up there every period of days checking to make
6 sure they were doing it  I just assumed it would be
7 done
8    Q.  And other than sending those e-mails in the
9 summer of 2002, did you do anything between February
10 2000 and the present to monitor compliance with
11 Teleglobe's or the debtors' policy with respect to the
12 retention of backup tapes?
13       MR. COCHRAN  I object to form
14   A   Yes  Yes
15   Q.  What did you do?
16   A   Well, I would  or we get calls from the IT
17 group asking me if it was to continue  I will say
18 there was a period when I discovered that after
19 Cerberus had taken over but before they had
20 completed the acquisition they had started again to
21 overwrite the tapes  and at the time I again instructed
22 them that they were not  it was not to do that  And then
23 we put the Rexall tape directly under my control
24 along with L & Y also  not in control

Teleglobe Communications Corporation, et al.

Case No. 02-11518 (MFW)          Vinyard V. Cooke, Esquire          February 9, 2005

Page 142

1    Q.  When did Cerberus restart the overwriting of
2    backup tapes?
3    A.  I don't know when it was.  Sometime in the fall
4    of 2002.
5    Q.  And when did the overwriting stop again?
6    A.  I don't know how long it went on.  But I can
7    tell you within a matter of days after learning it we
8    had taken control of the Recall account, "we" the
9    estate.
10   Q.  Do you know roughly for how long the backup
11   tapes were being overwritten before you became aware
12   of it?
13   A.  I do not, no.
14   Q.  Are we talking about several months, several
15   weeks?
16   A.  Honestly, I don't know.  But I don't believe it
17   was more than a month because they had not taken
18   control of the enterprise.  If they took control in
19   late October, November, I knew I learned about it in
20   2003 -- I'm sorry -- 2002.
21   Q.  You learned in 2002 that for some time the
22   practice of overwriting backup tapes had resumed?
23   A.  I learned that after Cerberus had taken control
24   of the operating Teleglobe company that they had for

Page 143

1    cost reasons I understood started to overwrite the
2    tapes again.
3    Q.  How did you learn that?
4    A.  Somebody called me, I believe.
5    Q.  Do you remember who?
6    A.  No, I don't.
7    Q.  Do you remember whether there's any e-mail or
8    paper trace indicating that somebody had told you that
9    the practice of overwriting backup tapes had resumed?
10   A.  I don't know if there would be a record or not.
11   Q.  Did you send an e-mail back to any person
12   instructing them not to overwrite backup tapes?
13   A.  I don't know how they did it, but I know I
14   responded immediately.
15   Q.  How did you respond?
16   A.  In the same day.  It's one where I would likely
17   call the people.
18   Q.  Did you follow up with a written instruction?
19   A.  I may have.  But I know what did follow
20   immediately was we rebooked the Recall account like
21   within two days or less into the estate's name solely.
22   Q.  And we're talking about the backup tapes that
23   were located in Canada?
24   A.  Yes.

Page 144

1    Q.  Are we also talking about the backup tapes that
2    were located in the United States?
3    A.  We had control over -- there were two sets of
4    tapes.  Some were in the United States.  Some were in
5    Montreal.  We had already taken control of the U.S.
6    tapes and they are today physically located in our
7    offices.  There are additional tapes that are located
8    in Baltimore, but these were tapes that were
9    maintained in Montreal at Recall, which is a company.
10   Q.  Recall is a company?
11   A.  Yes.
12   Q.  What is the company called Recall?  What work
13   does it perform for the debtors?
14   A.  It's like an Iron Mountain.  It maintains
15   documents and electronic tapes typically.  Like Iron
16   Mountain, they're all over.
17       And I believe in Montreal they only held
18   electronic tapes.  I'm not sure in the U.S. if they
19   had tapes plus documents for us.
20   Q.  The debtors used the company called Recall both
21   in Canada and the United States?
22   A.  Yes, we did.
23   Q.  When was Recall retained?
24   A.  I don't know when.

Page 145

1    Q.  Was it prior to April 24th, 2002?
2    A.  Yes.
3    Q.  Is there a contract?
4    A.  Yes, there is.
5    Q.  A contract that reflects the retention of
6    Recall?
7       MR. COCHRAN:  Could you repeat the
8    question or read back the question?
9       MR. SCHIMMEL:  Let me just rephrase the
10   question.
11   BY MR. SCHIMMEL:
12   Q.  Is there a contract between Recall and
13   Teleglobe?
14       MR. COCHRAN:  You mean the debtors?
15   Q.  Mr. Cooke, I understand that Recall was hired
16   before the bankruptcy.
17   A.  Recall had a preexisting relationship with I
18   believe it was in the name of the Canadian entities.
19   When we learned about this development with Cerberus
20   we retitled, we executed a new contract with them for
21   tapes both in Montreal and in the U.S. and I believe
22   that was in the debtors' name.
23   Q.  Was Recall prior to April 24, 2002 the company
24   that was in charge of storing backup tapes for the

37 (Pages 142 to 145)

Teleglobe Communications Corporation, et al

Case No. 02-11518 (MFW)     Vinyard V. Cooke, Esquire     February 9, 2005

Page 146

1  Teleglobe entities in Canada?
2  A  Yes.
3  Q  So to the extent there were backup tapes in
4  Canada, they were stored with a company called Recall?
5  A  That's very common, yes. You don't store them
6  on site. There's large amounts of data and they have
7  to be maintained at a certain temperature.
8  Q  With respect to the tapes that were stored in
9  the United States, were they also stored by the
10  company called Recall?
11  A  Yes
12  Q  Where were they stored in the United States?
13  A  There's a repository, a facility in Maryland
14  somewhere
15  Q  Is that the facility in Baltimore that you just
16  talked about?
17  A  I don't know if both sets were in Baltimore. I
18  don't know
19  Q  Did the Teleglobe entities keep backup tapes on
20  site, either in Canada or the United States?
21  A  There would be some number of tapes that would
22  be on site until they were shipped to Recall
23  Q  I would like you, Mr. Cooke, to look at the
24  debtors' disclosure. I would like to focus your

Page 147

1  attention on paragraph 3a.
2  I take it that paragraph 3a of Cooke
3  Exhibit 4 describes, among other things, the retention
4  practice for backup tapes of e-mail servers, right?
5  A  That is correct
6  Q  And very generally speaking, I understand that
7  at any given point in time the procedure or the
8  practice was to have a year's worth of monthly backup
9  tapes.
10  A  (The witness nodded )
11  Q  Is that a yes?
12  A  That is correct.
13  Q  Six months worth of weekly backup tapes?
14  A  Yes
15  Q  And two weeks worth of daily backup tapes?
16  A  Yes
17  Q  So as of April 24, 2002 can you describe as
18  best you can what backup tapes of the e-mail server
19  should have existed?
20  MR. COCHRAN: I object to the form
21  A  I can only respond that it should be in
22  accordance with this provision set forth in 3a
23  Q  I understand that. I'm just trying to figure
24  out what should have been under the policy

Page 148

1  existence as of April 24, 2002.
2  A  Right. Specifically, I have no knowledge,
3  other than I have been informed this was our policy
4  Q  By whom were you informed?
5  A  Most recently it I evol Wolfe
6  Q  And before that?
7  A  I don't know the person. I don't know if it
8  was at that meeting or some before. I don't
9  remember
10  Q  June of 2002?
11  A  Yes
12  Q  So you're talking about the meeting in Canada?
13  A  Yes
14  Q  Reading the policy that's described in
15  paragraph 3a of the disclosures, is it fair to say
16  that as of April 24, 2002 the debtors should have had
17  monthly backup tapes for the period April 2001 through
18  April 2002?
19  MR. COCHRAN: I object to the form
20  THE WITNESS: I'm sorry. Would you repeat
21  that question?
22  (The reporter read back the last
23  question )
24  THE WITNESS: I don't know specifically.

Page 149

1  but I mean the disclosure set forth
2  BY MR. SCHEINE
3  Q  I'm trying to understand what the disclosure
4  means in practice of of a particular date.
5  A  And as of a set date, I honestly can't
6  tell you, other than set forth here in the
7  disclosure. I don't prepare this
8  Q  Well, do you have an understanding, forgetting
9  for a second what's written in 3a, do you have an
10  understanding of, placing yourself at a point in time,
11  what monthly backup tapes should have been available
12  under the policy?
13  MR. COCHRAN: object to the form
14  A  I do not have an understanding, other than
15  what's set forth here. I would be guessing as to
16  whether in order which we have those January 2001
17  tapes. I don't know if they are daily, monthly or
18  weekly backup. I don't know
19  All I know I can ask them to go back to
20  2001 and they can provide me that. My level of
21  knowledge is not that level of detail
22  Q  Understood.
23  Now, tell me then as of April 24, 2002
24  what was, in fact available.

38 (Pages 146 to 149)

Teleglobe Communications Corporation, et al.
Case No. 02-11518 (MFW)                Vinyard V. Cooke, Esquire                February 9, 2005

Page 150

1    A   I can't tell you that because I don't know how
2    far back they went before January 2001 at that time
3    I don't know the speed at which they were writing over
4    old data, but clearly it went back before January 2001
5    at that time
6    Q.  So what you're saying is as of April 24, 2002
7    you had backup tapes for at least the period January
8    2001 through April 24, 2002?
9    A   Yes  That's my understanding
10   Q.  And as you sit here today, you don't know if
11   those are monthly backup tapes, weekly backup tapes or
12   daily backup tapes?
13   A   Or maybe a combination of all three.  I do not
14   know
15   Q.  Is there a log that would reflect what the
16   debtors have in their possession?  Let me rephrase.
17       Is there any document that would indicate
18   to us what the debtors had in their possession,
19   custody or control in terms of backup tapes as of
20   April 24, 2002?
21       MR COCHRAN:  2002?
22       MR SCHIMMEL:  Yes
23   A   I don't know
24   Q.  Who should we ask to find that out?

Page 151

1    A   I believe it would have to be David Wolfe
2    Q.  Do you know why the policy that is described in
3    3a was, in fact, not followed?
4        MR COCHRAN:  I object to form
5    A   I don't know if it was followed or not
6    Q.  Well, 3a states "The retention period for
7    e-mail backups was six months for end-of-week backups,
8    12 months for end-of-month backups, and 2 weeks for
9    end-of-day backups.  As a matter of practice (and not
10   policy) many e-mail backup tapes were not reused,
11   resulting in the current availability of a substantial
12   volume of backup tapes."
13       Do you see that?
14   A   Yes, I do
15   Q.  So my question is:  I understand that as of
16   April 24, 2002 there should have been a year's worth
17   of monthly backup tapes, six months worth of weekly
18   backup tapes and two weeks worth of daily backup
19   tapes.  And I understand your disclosure says as a
20   matter of practice that policy was not followed.
21       So my question is why?
22       MR COCHRAN:  I object to form
23   A   Okay  I'm sorry
24       THE WITNESS:  Would you repeat that

Page 152

1    question?
2        (The reporter read back the last
3    question )
4        THE WITNESS:  Okay.  And I think I've
5    talked about this before, but I'll go back, which was
6    my understanding originally was that Teleglobe never
7    ever overwrote electronic tapes  And there was a
8    period in the fall of 2001, and I don't know when, it
9    might have been earlier, it might have been later, but
10   there were cost controls that were put on Teleglobe
11   And these tapes are -- I don't know -- $600 each or
12   something and you need many, many, many tapes every
13   day to back up daily, weekly, monthly
14       And so there was a change where the IT
15   department began to overwrite old tapes and my
16   understanding was they went back to whenever they had
17   the last tapes and started to rewrite over them  And
18   that occurred from sometime in 2001, late 2001 until
19   the time in 2002 when I sat down with the Montreal
20   people and told them to stop, which would account for
21   the reason why we had tapes that go back more than
22   twelve months, if that's what you're asking
23   BY MR. SCHIMMEL:
24   Q.  Yes, that's exactly what I was asking.

Page 153

1        So the policy that is described in 3a was
2    a policy that was put in place in late 2001?
3        MR. COCHRAN:  I object to form
4    Q.  The policy of overwriting backup tapes?
5    A   The policy of overwriting old backup tap⸱⸱⸱
6    have occurred before then. but my understanding, was it
7    did start to occur more regularly at that time
8    Q.  In late 2001?
9    A   Late 2001.
10   Q.  Now, I understand from the disclosures  and now
11   I'm asking you to look at 3b, 3b suggests that the
12   same schedule existed with respect to file servers,
13   but the last sentence of 3b says, "File Server backup
14   tapes were re-used upon expiration."
15       Does that suggest that in fact, the
16   schedule was followed with respect to the file
17   servers?
18   A   I don't know
19   Q.  Do you know why the debtors' disclosure
20   indicates a different practice with respect to the
21   retention of backup tapes of e-mail servers and file
22   servers?
23   A   I don't know if it's different or not
24   Q.  Who would know that?

39 (Pages 150 to 153)

Teleglobe Communications Corporation, et al
Case No. 02-11518 (MFW)          Vinyard V. Cooke, Esquire          February 9, 2005

Page 154

1  A  I believe the people who worked on the
2  primarily were David Wolfe and Diane Barrasso, so I
3  would have to probably go back to one of the two of
4  them and ask them specifically because this is
5  slightly beyond my technical expertise
6  Q.  Do you know how many backup tapes of e-mail
7  servers existed as of April 24, 2002?
8  A  No, I don't
9  Q.  Is there any document or log that could provide
10  that information?
11  A  I don't know
12  Q  Who would we ask?
13  A  We could talk to the IT people that were there,
14  once again David Wolfe
15  Q.  You believe Mr. Wolfe would have that
16  information?
17  A.  I don't know if he would or not
18  Q.  And if he doesn't have the information, do you
19  know who would have it?
20  A  No, I don't
21  Q.  And I take it you don't know how many backup
22  tapes of the e-mail servers were available as of May
23  28, 2002?
24  A  No

Page 155

1  Q.  Do you know how many backup tapes of e-mail
2  servers exist today for the period let's say early
3  2001 through May 28, 2002?
4      THE WITNESS:  Okay  Can you read that
5  back to me?
6      (The reporter read back the last
7  question )
8      THE WITNESS:  That I believe we could
9  determine at least for the U S  servers
10  BY MR SCHIMMEL:
11  Q.  How could you determine that?
12  A  We have an index that's date by date that
13  correlates to the tape
14  Q.  Is that the catalog?
15  A  Yes  I think it's referred to in here
16  Q.  Would you look at 5c?
17  A  Thank you.
18  Q.  Is that what you're referring to?
19  A  Yes  That is what I am referring to
20  Q.  5c states "The catalog of data for what tapes
21  were used for which backups was lost, except with
22  respect to e-mail servers in the USA," right?
23  A  Correct
24  Q.  So what you are saying is with respect to the

Page 156

1  e-mail servers in the USA, you could tell us how many
2  backup tapes you have for the period let's say --
3  A  From January 2001 to
4  Q.  How about with respect to the backup tapes of
5  the file servers, could you tell us how many tapes you
6  have covering the period February 2000 through May
7  2002?
8  A  For the file servers I don't believe we can
9  Q.  Why?
10  A  Because I think we lost the data or it's not
11  accessible
12  Q.  What data have you lost?
13  A  The data of the catalog is
14  electronic  It's just the file servers we
15  have a hard copy of it
16  Q.  Of the catalog?
17  A  Of the catalog
18  Q.  So you're saying that it is not possible to
19  determine how many backup tapes you have with respect
20  to the file servers for the period of time let's say
21  February 2000 through May 2002?
22      MR. COOK:  Object to form
23  A  I don't believe I can tell you how many
24  total tapes we have  can't do it in slices

Page 157

1  Q  How many tapes do you have?
2  A  Oh, I'm sorry  of  Of the file servers
3  in total?
4  Q.  Yes
5  A  I don't know very specifically  It's at least
6  9,000
7  Q.  And as you sit here today, your testimony is
8  there's no way to figure out the period of time to
9  which those tapes correspond?
10      MR. COOK:  Object to form
11  A  No  My testimony is that I could not tell you
12  inside a specific range not how many tapes I have.
13  Q.  So you would have to restore all of the tapes
14  to figure out how many tapes you have that correspond
15  to that period of time, February 2000 to May 2002?
16      MR. COOK:  Object to form
17  A  I don't know if it would do it specifically
18  Q.  Is there any person who would know?
19  A  I'm sure that even on that one I don't know
20  who that would be
21  Q.  How many tapes of the e-mail servers do you
22  have for the period let's say February 2000 through
23  May 2002?
24  A  I would have to go back and see  I don't know

40 (Pages 154 to 157)

Teleglobe Communications Corporation, et al.

Case No. 02-11518 (MFW)    Vinyard V. Cooke, Esquire    February 9, 2005

Page 158

1  how many off the top of my head.
2      Q.  Can you find out that information?
3      A.  I don't know if -- that's not how our catalog
4  is kept. I know that we have approximately 2,000
5  tapes, electronic tapes in Reston and, once again, I
6  believe those are 2001 to date. So it would be some
7  subset of that.
8      Q.  And for those you have a catalog?
9      A.  Yes.
10     Q.  Who was in charge of preserving the catalog
11  with respect to the tapes here in Reston?
12     A.  I don't remember who it was. It was one of our
13  IT guys as we shrunk.
14     Q.  Who was in charge of preserving the catalog
15  with respect to the tapes in Canada?
16     A.  That was maintained by our IT group in
17  Montreal.
18     Q.  Under the supervision of the woman whose name
19  you don't remember?
20     A.  I don't know if it was a woman or if it was
21  Roger or if it was someone else. I don't know.
22     Q.  What steps did you take to ensure that the
23  catalogs of backup tapes would be preserved?
24        MR. COCHRAN: I object to form.

Page 159

1      A.  I personally? I personally didn't take any
2  steps to maintain the catalogs.
3      Q.  What steps did the debtors take to preserve,
4  make sure that the catalogs were preserved?
5      A.  I don't know. But clearly somebody took that
6  action in the e-mail servers for the U.S. It wasn't
7  me. I don't know who did that.
8      Q.  And you have no idea of what steps, if any, the
9  debtors took to preserve the catalogs that are in
10  Canada?
11        MR. COCHRAN: I object to form.
12     A.  No, I don't.
13     Q.  Do you know if any steps were taken?
14        MR. COCHRAN: Same objection.
15     A.  No, I don't.
16     Q.  Do you know who would know?
17     A.  Not as I sit here today, no.
18     Q.  Do you know when the catalogs were lost?
19        MR. COCHRAN: I object to form.
20     A.  No, I don't.
21     Q.  When you met with the IT people in Canada, did
22  you have any discussions about the catalog of backup
23  tapes?
24     A.  No. I have to say I did not talk about

Page 160

1  catalogs.
2      Q.  Did you have any discussion with them to make
3  sure that you would be able to know what tapes were
4  available?
5      A.  No, not specifically.
6      Q.  Why not?
7      A.  I don't know why not.
8        MR. COCHRAN: I object to form.
9      A.  I didn't. I just told them stop, you know,
10  stop overwriting.
11     Q.  I believe you mentioned that there are about
12  9,000 tapes in Canada?
13     A.  No. There's more than that.
14     Q.  How many tapes are there in Canada?
15     A.  In Canada I would say sixteen to 20,000 tapes.
16     Q.  Is it possible for you to determine which tapes
17  correspond to the period February 2000 through May
18  2002?
19     A.  I don't know if it's possible. I do know that
20  the catalog for that data is not currently available.
21  You would have to ask someone else in terms of whether
22  it could be reconstituted.
23     Q.  Who would we ask to determine whether it could
24  be reconstituted?

Page 161

1      A.  I don't know who you would talk to.
2      Q.  Who would you talk to?
3      A.  I would talk to somebody who does that.
4      Q.  Have you talked to anybody who does that?
5      A.  Well, I do know that as part of the interim
6  receiver role Kroll has used some of those tapes, so I
7  don't know how they did it.
8      Q.  When you say Kroll has used some of the tapes,
9  do you mean restored some of the tapes?
10     A.  Yes, they have restored some of the tapes.
11     Q.  Is that Kroll in Canada?
12     A.  Kroll in Canada.
13     Q.  So that's the interim receiver of Teleglobe,
14  Inc.?
15     A.  Yes, it is.
16     Q.  Do you know which tapes Kroll has restored?
17     A.  I do not.
18     Q.  Who has that information?
19     A.  Kroll.
20     Q.  Who is the person at Kroll who would have that
21  information?
22     A.  I don't know who it would be.
23     Q.  Do you know the data of which tapes Kroll has
24  restored?

41 (Pages 158 to 161)

Teleglobe Communications Corporation, et al
Vinyard V. Cooke, Esquire

Case No  02-11518 (MFW)                                   February 9, 2005

Page 162

1   A   I do not
2   Q.  Do you know when the tapes were restored?
3   A   It was sometime after Kroll was appointed as
4   interim receiver, sometime before 2005
5   Q.  Do you know how many tapes Kroll restored?
6   A   No
7   Q.  Do you know the period of time for which Kroll
8   has restored tapes?
9   A   No
10  Q.  In other words, whether Kroll restored tapes
11  generated between let's say February 2000 and May 2002
12  or some other dates?
13  A   I do not know the dates that they have
14  reviewed
15  Q.  Do you know if any search for documents was
16  conducted after the restoration of those tapes?
17  A   I'm not sure I understand your question
18  Q.  Do you know, do you have any idea of what Kroll
19  did with the tapes once they were restored?
20  A   No  I have no communications with Kroll  I
21  have spoken to them once when they came down to review
22  materials and have not spoken with them since
23  Q.  And I take it that the debtors have restored
24  some e-mail backup tapes?

Page 163

1   A   Yes
2   Q.  Can you describe to me what e-mail backup tapes
3   have been restored by the debtors?
4   A   Specifically?  No  I know that different
5   people have requested backup tapes to be restored for
6   various reasons.  And we will provide the list of
7   who's on those servers, who has been restored
8   hopefully sometime very shortly
9   Q.  I would like you to take a look at the letter
10  written by your counsel on January 31, 2005, again
11  paragraph 11.
12  A   I'm sorry  Is that Exhibit 6?
13  Q.  Yes.
14  A   Okay.
15  Q.  The last sentence of paragraph 11 says, "Backup
16  tapes as of January 1, 2004 containing mailbox data
17  for these six individuals have also been restored."
18      Do you see that?
19  A   Yes
20  Q.  And I believe that the six individuals
21  mentioned in paragraph 11 are Brunette, Mongrain,
22  Morgan, Bustamante, Cooke and Sciacciatano?
23  A   Yes
24  Q.  Why were those individuals selected for the

Page 164

1   restoration of tapes?
2       MR. COCHRAN:  That question goes beyond
3   the scope of the agreement in the Rule 30(b)(6).
4   number one
5       And number two, to the extent that your
6   answer would call to you to reveal work product.
7   there's a privilege that I can apply
8   A   I don't know how these six names got picked
9   Q.  Did you have anything to do with selecting
10  those names?
11  A   No, I did not
12  Q.  As you sit here today, you don't know why those
13  six individuals were selected?
14      MR. COCHRAN:  The same instruction and
15  same objection
16  A   No  Other than privileged information, no
17  Q.  Well, are you saying that you don't know why
18  those six people were selected or that you do know but
19  it's privileged?
20  A   I know how she picked these six people, but
21  that's because of communications with my counsel
22  Q.  Do you know why those six people were selected?
23      MR. COCHRAN:  Well I'm happy, since this
24  is the third time you've asked, to consult with him

Page 165

1   to determine whether you need to assert a privilege, if
2   you would like for us to do that
3       MR. SCHIMMEL:  Sure, if you think you need
4   to do so.)
5       (The witness and Mr. Cochran left the
6   deposition room for a brief period of time.)
7       MR. COCHRAN:  The witness's specific
8   information comes through counsel and for that reason
9   we will assert attorney-client and work product
10  objection
11      MR. SCHIMMEL:  Okay
12  BY MR. SCHIMMEL:
13  Q   Do you know why the date January 1, 2004 was
14  selected?
15  A   No
16  Q   Do you know the criteria upon which those six
17  individuals were selected?
18      MR. COCHRAN:  The same caution as before
19  with regard to privilege
20  A   No
21  Q   Do you know if any data of Mr. Pichette has
22  been restored by the debtors?
23  A   At one time  Mr Brunette asked to look at some
24  of Patrick Pichette's  Whether those are still

42 (Pages 162 to 165)

Teleglobe Communications Corporation, et al.
Case No. 02-11518 (MFW)    Vinyard V. Cooke, Esquire    February 9, 2005

Page 166

1  up or not, I don't know.
2  Q. What did Mr. Brunette specifically ask?
3  A  I don't know anything more than that
4  Q. Who did he ask?
5  A  He would have asked someone in the IT
6  department.
7  Q. Do you know who?
8  A. No
9  Q. Do you know why he asked?
10  A. No
11  Q. Do you know when he asked?
12  A. No.
13  Q. Do you know if any server data of Mr. Pichette
14  was restored as a result?
15      MR. COCHRAN: Was it restored? Was that
16  your question?
17      MR. SCHIMMEL: Yes.
18  A  I know at the time, whenever that happened, he
19  did look through, because he came in and told me, he
20  had seen some Pichette e-mails.
21  Q. Do you know if all of Mr. Pichette's available
22  data was restored or simply a portion?
23  A. I do not know.
24  Q. Do you know what data of Mr. Pichette was

Page 167

1  restored?
2  A  No.
3  Q. Have the debtors asked that the data of
4  Mr. Pichette be restored systematically?
5      MR. COCHRAN: To the extent that the
6  question calls for you to reveal discussions or work
7  product, discussions with counsel or work product, you
8  are counseled that there may be privileges that would
9  apply
10      MR. SCHIMMEL: It's a yes or no question
11      MR. COCHRAN: It's the same instruction.
12      THE WITNESS: I'm sorry. What's the
13  question?
14      Would you read it back to me?
15      (The reporter read back the last
16  question.)
17      THE WITNESS: Systematically? No. The
18  only -- John Brunette is the only one that I knew who
19  has asked for Pichette to be restored.
20  BY MR. SCHIMMEL:
21  Q. For some of Pichette's data to be restored?
22  A. Some or all  I don't know.
23  Q. Well, do you know if all of Mr. Pichette's data
24  has been restored?

Page 168

1  A. I do not know.
2  Q. Do you know if a portion of Mr. Patrick
3  Pichette's data has been restored?
4  A. I know at least some portion of his data was
5  restored.
6  Q. Do you know if it comes from the e-mail servers
7  or the file servers?
8  A. I do not know.
9  Q. Do you know if the data, Mr. Pichette's data
10  from the file server is available?
11  A. All I can say is that we are checking.  I do
12  not know today if it is or not.
13  Q. Do you know if any server data of Mr. Fortin
14  has been restored?
15  A. No.
16  Q. Why not?
17      MR. COCHRAN: Why doesn't he know?
18      MR. SCHIMMEL: No
19  BY MR. SCHIMMEL:
20  Q. Why hasn't it been restored?
21  A. I don't know if it has or not.
22  Q. If it has been restored or not?
23  A. I do not know
24  Q. You have no knowledge whatsoever?

Page 169

1  A. No.
2  Q. Do you know if any data of Mr. Verge has been
3  restored?
4  A  No  I can't remember if it was
5  Q. Who would know?
6  A  I don't know specifically who would know
7  Q. Is there any log or document that would reflect
8  whether and the extent to which the data of Pichette,
9  Fortin or Verge has been restored?
10  A  I don't know  I mean, obviously if they are on
11  the server they have been restored, but beyond that,
12  don't know
13  Q. Do you know if they are on the server?
14  A  No. I don't know.
15  Q. Do you know if any server data of Terry Jarman
16  has been restored?
17  A  No, I don't  I know that John did ask for some
18  people to be restored  The only one I specifically
19  know he restored was Patrick Pichette. There may have
20  been others
21  Q. Who are the other individuals that Brunette
22  asked that their data be restored?
23  A  I don't know
24  Q. Do you know how many people there were?

43 (Pages 166 to 169)