27

F 16-2002   04:36pm   From-OGILVY RENAULT                    +4169775259          T-335   P 004/023  F-152
                                                                                            '00 003

02-CV-232755 CM 3

Court File No.

## ONTARIO
### SUPERIOR COURT OF JUSTICE

B E T W E E N:

**ABN AMRO BANK N.V., BANK OF MONTREAL, BANK OF TOKYO-MITSUBISHI (CANADA), BAYERISCHE LANDESBANK GIROZENTRALE, BNP PARIBAS (CANADA), LA CAISSE CENTRALE DESJARDINS DU QUEBEC, CANADIAN IMPERIAL BANK OF COMMERCE, CANADIAN IMPERIAL BANK OF COMMERCE, N.Y. AGENCY, CITIBANK, N.A., CREDIT SUISSE FIRST BOSTON CANADA, CREDIT SUISSE FIRST BOSTON, EXPORT DEVELOPMENT CANADA, HSBC BANK CANADA, JPMORGAN CHASE BANK, LAURENTIAN BANK OF CANADA, MERRILL LYNCH CAPITAL (CANADA) INC., MERRILL LYNCH CAPITAL CORPORATION, NATIONAL BANK OF CANADA, ROYAL BANK OF CANADA, SOCIÉTÉ GÉNÉRALE, THE BANK OF NOVA SCOTIA, and THE TORONTO-DOMINION BANK**

Plaintiffs

- and -

**BCE INC.**

Defendant

## STATEMENT OF CLAIM

**TO THE DEFENDANT**

A LEGAL PROCEEDING HAS BEEN COMMENCED AGAINST YOU by the plaintiffs. The claim made against you is set out in the following pages.

IF YOU WISH TO DEFEND THIS PROCEEDING, you or an Ontario lawyer acting for you must prepare a statement of defence in Form 18A prescribed by the Rules of Civil Procedure, serve it on the plaintiffs' lawyer or, where the plaintiffs do not have a lawyer, serve it on the plaintiffs, and file it, with proof of service, in this court office, WITHIN TWENTY DAYS after this statement of claim is served on you, if you are served in Ontario.

If you are served in another province or territory of Canada or in the United States of America, the period for serving and filing your statement of defence is forty days. If you are served outside Canada and the United States of America, the period is sixty days.



EXHIBIT
Committee
36
FI 5/5/04

7-16-2002   04:36pm   From-OGILVY RENAULT                    +4169775239        T-835   P 005/029  F-152

- 2 -

Instead of serving and filing a statement of defence, you may serve and file a notice of intent to defend in Form 18B prescribed by the Rules of Civil Procedure. This will entitle you to ten more days within which to serve and file your statement of defence.

IF YOU FAIL TO DEFEND THIS PROCEEDING, JUDGMENT MAY BE GIVEN AGAINST YOU IN YOUR ABSENCE AND WITHOUT FURTHER NOTICE TO YOU. IF YOU WISH TO DEFEND THIS PROCEEDING BUT ARE UNABLE TO PAY LEGAL FEES, LEGAL AID MAY BE AVAILABLE TO YOU BY CONTACTING A LOCAL LEGAL AID OFFICE.

IF YOU PAY THE PLAINTIFFS' CLAIM, and $2,500.00 for costs, within the time for serving and filing your statement of defence, you may move to have this proceeding dismissed by the court. If you believe the amount claimed for costs is excessive, you may pay the plaintiff's claim and $400.00 for costs and have the costs assessed by the court.

Date    July 12, 2002

Issued by    _Sadegui_

Local registrar

Address of    393 University Avenue
court office   10th Floor
               Toronto, Ontario
               M5G 1E6

TO:    BCE INC.
       181 Bay Street, BCE Place
       P.O. Box 794, Suite 4700
       Toronto, Ontario
       M5J 2T3

PAGE 4/27 * RCVD AT 15/07/2002 2:45.54 PM [Eastern Daylight Time] * SVR:J2 * DNS:8079 * CSID: * DURATION (mm-ss):08-50

7-16-2002   04:36pm   From-OGILVY RENAULT                    +4169775239            T-835   P 606/029   F-152

## CLAIM

1.    The plaintiffs claim against the defendant, BCE Inc. ("BCE") damages, payment or compensation in the aggregate amount of U.S. $1,190,000,000, and further claim interest, costs, and other relief, all as follows:

a)    damages for breach of contract for each plaintiff in an amount equivalent to that plaintiff's proportionate share (as described herein) of the US $1.25 billion advanced by the members of the Lending Syndicate as described herein plus applicable facility fees;

b)    in the alternative, damages for misrepresentation for each plaintiff in an amount equivalent to that plaintiff's proportionate share of the said U.S. $1.25 billion;

c)    in the further alternative, repayment to each plaintiff of that plaintiff's proportionate share of U.S. $1.25 billion that was advanced to the defendant's alter ego, Teleglobe Inc. ("Teleglobe") plus applicable facility fees;

d)    in the further alternative, compensation for oppression for each plaintiff in an amount equivalent to that plaintiff's proportionate share of the said U.S. $1.25 billion;

e)    pre-judgment interest and post-judgment interest on the amounts claimed and awarded herein at a rate of interest equal to that prescribed under the July 2000 Loan as renewed (as defined herein), including compound interest as therein set out, or alternatively pre-judgment and post-judgment interest including compound interest pursuant to the *Courts of Justice Act*, R.S.O. 1990, c. 42, as amended;

f)    the costs of this action on a substantial indemnity basis; and

g)    such further and other relief as to this Honourable Court may seem just.

7-16-2002  04:36pm   From-OGILVY RENAULT                    +4169775239           T-835   P 007/028   F-152
                                                                                               旺0006

- 4 -

The Parties

*(a)*    *The Plaintiffs*

2     ABN AMRO Bank N.V. is a financial institution organized under the laws of the
Netherlands and is an authorized foreign bank named in Schedule III to the *Bank Act*, S.C.
1991, c. 46 (the "*Bank Act*"). It has a principal office in Toronto and carries on business
throughout Canada and elsewhere in the world, directly and by virtue of the activities of its
affiliates, including ABN AMRO Bank Canada named in Schedule II to the *Bank Act*
(collectively "ABN").

3.     Bank of Montreal is a chartered bank incorporated under the laws of Canada, named in
Schedule I to the *Bank Act*.  It has its head office in Montreal and carries on business
throughout Canada and elsewhere in the world

4.     Bank of Tokyo-Mitsubishi (Canada) is a chartered bank incorporated under the laws
of Canada, named in Schedule II to the *Bank Act*.  It has its head office in Toronto and carries
on business throughout Canada and elsewhere in the world.

5.     Bayerische Landesbank Girozentrale is an authorized foreign bank incorporated under
the laws of Germany, named in Schedule III to the *Bank Act*.  It has its principal Canadian
office in Toronto and carries on business throughout Canada and elsewhere in the world.

6.     BNP Paribas (Canada) is a chartered bank incorporated under the laws of Canada,
named in Schedule II to the *Bank Act*.   It has its head office in Montreal and carries on
business throughout Canada. It is a subsidiary of BNP Paribas, a bank incorporated in France
that carries on business in France and elsewhere in the world.

7.     La Caisse Centrale Desjardins du Quebec is a Quebec co-operative financial
institution.  It has its head office in Montreal and carries on business throughout Canada and
elsewhere in the world.

8.     Canadian Imperial Bank of Commerce is a chartered bank incorporated under the laws
of Canada, named in Schedule I to the *Bank Act*.  It has its head office in Toronto and it

- 07-16-2002  04:36pm  From-OGILVY RENAULT                              +4169775259          T-835  P 008/023  F-152

- 5 -

carries on business throughout Canada and elsewhere in the world, directly and by virtue of
the activities of its affiliates, including *Canadian Imperial Bank of Commerce, N.Y. Agency*
in New York (collectively "CIBC").

9.      Citibank, N.A. is an authorized foreign bank organized under the laws of the United
States of America, named in Schedule III to the *Bank Act*. It has a principal office in Toronto
and carries on business throughout Canada and elsewhere in the world directly and by virtue
of the activities of its affiliates.

10.     Credit Suisse First Boston Canada is a chartered bank *incorporated under the laws of
Canada*, named in Schedule II to the *Bank Act*. It has its head office in Toronto and carries
on business throughout Canada and elsewhere in the world, directly and by virtue of the
activities of its affiliates, including Credit Suisse First Boston (collectively, "Credit Suisse").

11.     Export Development Canada is a *federal Crown* corporation incorporated under the
laws of Canada. It carries on business from its head office in Ottawa, throughout Canada and
elsewhere in the world.

12.     HSBC Bank Canada is a chartered bank incorporated under the laws of Canada,
named in Schedule II to the *Bank Act*. It has its head office in Vancouver and carries on
business throughout Canada and elsewhere in the world.

13.     JPMorgan Chase Bank, formerly known as The Chase Manhattan Bank, is a financial
institution organized under the laws of the State of New York. JPMorgan Chase Bank is
successor by merger to Morgan Guaranty Trust Company of New York, and to J.P. Morgan
Canada which was a bank incorporated under the laws of Canada, named in Schedule II to the
*Bank Act*. It carries on business throughout Canada and elsewhere in the world.

14.     Laurentian Bank of Canada is a chartered bank incorporated under the laws of Canada,
named in Schedule I to the *Bank Act*. It has its head office in Montreal and carries on
business primarily throughout Canada.

15.     Merrill Lynch Capital (Canada) Inc. is a *Canadian* financial institution incorporated
under the laws of Canada with its head office in Toronto. It carries on business throughout

^7-16-2002   04:35pm   From-OGILVY RENAULT                    +4169775239          T-835   P 009/028   F-152
                                                                                             ☒ 008

- 6 -

Canada and elsewhere in the world, directly and by virtue of the activities of its affiliates, including Merrill Lynch Capital Corporation in New York (collectively, "Merrill Lynch").

16.    National Bank of Canada is a chartered bank incorporated under the laws of Canada, named in Schedule I to the *Bank Act*.    It has its head office in Montreal and carries on business throughout Canada and elsewhere in the world.

17.    Royal Bank of Canada is a chartered bank incorporated under the laws of Canada, named in Schedule I to the *Bank Act*.    It has its head office in Montreal and carries on business throughout Canada and elsewhere in the world, directly and by virtue of the activities of its affiliates, including Royal Bank of Canada New York Branch (collectively "RBC").

18.    Société Générale is a French banking corporation.    Its registered office is in France and it carries on business throughout North America and elsewhere in the world, directly and by virtue of the activities of its affiliates, including Société Générale New York Branch (collectively, Société Générale).

19.    The Bank of Nova Scotia is a chartered bank incorporated under the laws of Canada, named in Schedule I to the *Bank Act*. It has its head office in Halifax and carries on business throughout Canada and elsewhere in the world.

20.    The Toronto-Dominion Bank is a chartered bank incorporated under the laws of Canada, named in Schedule I to the *Bank Act*. It has its head office in Toronto and carries on business throughout Canada and elsewhere in the world.

*(b)*    *The Lending Syndicate*

21.    The plaintiffs are each financial institutions which became members of a lending syndicate (the "Lending Syndicate") formed at the request of BCE to make and renew loans requested by BCE for use in financing the activities of Teleglobo as described herein. Each of the plaintiffs was a member of the Lending Syndicate at the time of the renewal of the July 2000 Loan (as defined herein), except Société Générale which is an assignee of one of the original members of the Lending Syndicate. The plaintiffs advanced and hold the rights to be

17-16-2002  04:37pm  From-OGILVY RENAULT                    14169775239        T-335  P 010/028  F-152

- 7 -

repaid approximately 95.2% of the U.S. $1.25 billion advanced by the members of the Lending Syndicate.

22.    It was intended and understood that the rights of the members of the Lending Syndicate were in respect of their dealings with BCE and Teleglobe the same, except as to amount. BCE's dealings with the members of the Lending Syndicate as described herein, and specifically the promises, representations and statements referred to herein, were understood and intended by BCE to be for the benefit of the member(s) of the Lending Syndicate to whom they were made and all other members of the Lending Syndicate (including those who became members by assignment).

(c)    *The Defendant*

23.    BCE is a corporation governed by the *Canada Business Corporations Act* (the "CBCA"), which carries on business throughout Canada and elsewhere in the world. Known also as Bell Canada Enterprises, BCE is Canada's largest communications company, and is one of the largest companies of any type in Canada. Directly and through subsidiaries and affiliates, it carries on a variety of businesses including providing wireless and wireline communications (including telephone and cellular phone); internet access and services; high-speed data services; entertainment, satellite, broadcast and information services; and business-to-business e-commerce.

Teleglobe

24.    Teleglobe is a corporation governed by the CBCA.

25.    Teleglobe was originally founded in 1950, as a Crown corporation established to be Canada's exclusive provider of overseas telecommunications services. It subsequently was privatized and its business over time evolved as it became a provider in Canada and elsewhere of international communications and e-business services, and of international long distance voice and data communications between North America and the rest of the world, primarily through bilateral or multilateral agreements with telecommunications carriers worldwide.

07-16-2002   04:37pm   From-OGILVY RENAULT                    +4169775239        T-835   P 011/028   F-152

- 8 -

26.    Teleglobe formed or acquired a number of subsidiaries over the years, including Teleglobe Holdings (U.S.) Corporation through which Teleglobe controlled other subsidiaries in the United States of America, among which was EXCEL Communications Group.

27.    Substantial changes in the business environment and technology caused significant changes in Teleglobe's competitive position. In the 1980's, Teleglobe lost its favoured monopoly position and by the late 1990's it was a publicly held non-government company operating in a highly competitive sector of the economy.

BCE and Teleglobe

28.    Prior to February 2000, BCE was a minority shareholder in Teleglobe, holding about 23% of its shares. On or about February 15, 2000, BCE announced its intention to acquire the approximately 77% of Teleglobe shares it did not already own and thus make Teleglobe a wholly-owned and completely controlled subsidiary of BCE. When BCE announced its intended acquisition of Teleglobe in February 2000, it publicly stated that it was confident that it had the management expertise and financial depth to guide Teleglobe through its challenges.

29.    BCE's plan was to make Teleglobe and its business a segment of BCE's business, and to completely direct Teleglobe's activities and expansion as part of BCE's overall corporate strategy. This would require Teleglobe to implement a business strategy which called for it to build the GlobeSystem network, a globally integrated internet, voice, data and video network — an enormously capital-intensive endeavour — so that Teleglobe could serve as the global communications and e-business segment of BCE.

30.    After BCE announced its intention to acquire Teleglobe, BCE directly involved itself in, controlled and directed Teleglobe's business and activities, especially those concerned with Teleglobe's expenditure and receipt of funds, by doing, among other things the following:

a)    BCE's Chairman and Chief Executive Officer, Jean Monty ("Monty"), served as the Chairman of Teleglobe;

07-16-2002   04:37pm   From-OGILVY RENAULT                    +4166775239            T-935   P 012/029   F-152
                                                                                                      回011

- 9 -

b)    BCE caused some of its own directors, including Thomas Kierans and Richard Currie, to be elected as directors of Teleglobe;

c)    senior officers of BCE and its affiliates attended and participated in meetings of Teleglobe's board of directors;

d)    BCE reviewed, revised and redeveloped the business plan for Teleglobe, a business plan that would see Teleglobe develop in a manner that would fit with and benefit BCE's overall business and corporate strategy, by requiring Teleglobe to make substantial capital expenditures even though these could not be matched or funded by revenues generated from Teleglobe's own operations in the foreseeable future;

e)    in May 2000, BCE caused the removal of Teleglobe's Chief Financial Officer and replaced him with Michael Boychuk ("Boychuk"), BCE's Treasurer, so that BCE, primarily through Boychuk, could manage and direct Teleglobe's financial issues, including the dealings with lenders to Teleglobe and arrangements for financing for Teleglobe which BCE intended to be directly involved in;

f)    BCE caused the appointment of Terry Jarman (a former Vice Chairman of BCE's affiliate Bell Canada and President of BCE's affiliate Bell Nexxia) as Chief Executive Officer of Teleglobe; and

g)    BCE let it be publicly known that it was its intention in acquiring Teleglobe to have a strong influence over Teleglobe's operations, and to make BCE's financial and human resources available to Teleglobe.

**The July 2000 Loan**

31.    BCE's plans for Teleglobe would require Teleglobe, after the acquisition, to incur capital expenditures and operating expenses that Teleglobe's operating revenues could not fund. Accordingly, because Teleglobe's existing loan facilities from its then current bankers, although largely unused, were expiring in July 2000, BCE became involved in arranging financing for Teleglobe even before it had completed its share acquisition.

07-16-2002  04:37pm  From-OGILVY RENAULT                    +4169775239              T-835  P 013/029  F-152
                                                                                           ☞012

- 10 -

32.    In June 2000, after BCE publicly announced that it was committed to completing its acquisition of Teleglobe, BCE approached some of the plaintiffs herein who were already lenders to Teleglobe, together with other plaintiffs herein who were not already lenders to Teleglobe, with respect to loan facilities to refinance and replace Teleglobe's existing bank facilities. BCE advised these plaintiffs that BCE considered them to be among a select group of its "core relationship banks" and for that reason BCE was proposing a "club deal" for the refinancing of Teleglobe. BCE intended that these plaintiffs, and all of the other financial institutions who became the members of the Lending Syndicate, would consider their relationship with BCE, and BCE's anticipated 100% control of and involvement with Teleglobe, to be key factors in their determination of whether to participate in the loan refinancing proposed by BCE. Specifically, BCE intended the members of the Lending Syndicate to consider that, in making a loan to Teleglobe, they were dealing with, relying on and in a relationship with BCE, such that BCE would, at all times, stand behind the loan refinancing, on the basis that it was a "BCE risk".

33.    BCE, through Monty, Boychuk and others, proposed a 364 day revolving loan facility totalling U.S. $1.25 billion, which would be used to repay existing facilities and provide financing for Teleglobe's activities over the next year.

34.    BCE made it perfectly clear to the members of the Lending Syndicate that:

   a)    BCE intended to acquire 100% of Teleglobe;

   b)    BCE would provide Teleglobe's Chief Executive Officer, Chief Financial Officer and other key management personnel, would control its board of directors and would provide a Chairman to the board;

   c)    BCE would advance U.S. $1 billion to Teleglobe;

   d)    BCE considered Teleglobe to be a core asset and a key strategic component of BCE's business and operations; and

   e)    BCE contemplated a strategic partner for Teleglobe but BCE intended to fulfil this role strategically and financially, unless a strategic partner could be found.

07-16-2002   04:37pm   From-OGILVY RENAULT                      +4169775239          T-835   P 014/028   F-152

- 11 -

35.   BCE was directly involved in the negotiation of the terms of the July 2000 Loan, and knew that its involvement was critical to the members of the Lending Syndicate. BCE agreed that it would be a condition precedent to any advance by the members of the Lending Syndicate that they review the revised 2000 outlook for Teleglobe which BCE had prepared, that they be satisfied that BCE was proceeding with its acquisition of Teleglobe, and that BCE had made a legally binding commitment to the members of the Lending Syndicate concerning its support for Teleglobe.

36.   In July 2000, the members of the Lending Syndicate agreed to make an aggregate advance of U.S. $1.25 billion to be made available to Teleglobe and certain of its United States subsidiaries (Teleglobe Holdings (U.S.) Corporation and EXCEL Communications Group) in two revolving lending facilities which were to be repaid in full within 364 days (the "July 2000 Loan"), as follows:

   A:  A Canadian facility ("Facility A") which was comprised of an aggregate of U.S. $500 million; and

   B:  A U.S. facility ("Facility B") which was comprised of U.S. $750 million.

The July 2000 Loan also called for the payment of interest and facility fees.

37.   BCE provided a letter dated June 29, 2000 (the "2000 Letter Agreement") which specifically stated that BCE was, by such letter, providing BCE's legally binding assurance directly to each of the members of the Lending Syndicate that:

   a)   BCE attached strategic importance to Teleglobe;

   b)   it was BCE's intention to move quickly once its acquisition of Teleglobe was completed to optimize Teleglobe's operations and to support Teleglobe as necessary;

   c)   BCE irrevocably undertook to complete its acquisition of Teleglobe pursuant to a Support Agreement between it and Teleglobe, and to provide the financial assistance that the Support Agreement contemplated would be provided,

07-16-2002   04:37pm   From-OGILVY RENAULT                    +4163775239        T-835   P 015/029   F-152
                                                                                                    旬011

- 12 -

including amounts committed to be provided before the closing of the acquisition;

d)    BCE would within 30 days of the end of each quarter during the term that the July 2000 Loan was outstanding (and up to and including the quarter ending on June 30, 2001) provide whatever financial assistance was required to ensure that Teleglobe would meet the 65% Total Debt to Total Capitalization covenant in the July 2000 Loan; and

e)    until the maturity date of the July 2000 Loan, BCE would, from time to time, inject into Teleglobe by way of equity or quasi-equity sufficient funds to enable Teleglobe to meet at all times any cash operating shortfalls, and any cash shortfalls in funding its capital expenditures, as approved by Teleglobe's board and BCE.

The financial commitment of BCE to Teleglobe pursuant to paragraphs (c), (d) and (e) above was limited to U.S. $1 billion (U.S. $900 million exclusive of U.S. $100 million that BCE had already contributed to Teleglobe on June 21, 2000). The 2000 Letter Agreement did not limit the obligations of BCE to the plaintiffs pursuant to paragraphs (a) and (b) above. The 2000 Letter Agreement was intended to be in addition to and not in substitution for the statements of BCE set forth in paragraphs 32 and 34 hereof.

38.    In November 2000, BCE completed its acquisition of the shares of Teleglobe. Thereafter, BCE totally controlled and directed Teleglobe, including by continuing or implementing the steps referred to in paragraphs 30 and 34 hereof. BCE's total domination of Teleglobe was such that BCE publicly referred to Teleglobe as "BCE Teleglobe", as one of BCE's "principal operating groups" and, indeed, as one of BCE's "four core operating segments". BCE publicly stated that "BCE Teleglobe" was "the global communications and e-business segment of BCE" and was "BCE's gateway to the world".

39.    BCE caused Teleglobe to draw substantially on the U.S. $1.25 billion Teleglobe loan facilities during the term of the July 2000 Loan.

07-15-2002  04:39pm   From-OGILVY RENAULT                    54159775239          T-935  P 016/028  F-152
                                                                                             W015

- 13 -

40.     During the term of the July 2000 Loan, BCE caused Teleglobe to follow the corporate strategy which BCE had set for it, which involved significant capital and increased operating expenditures, knowing that Teleglobe's ability to generate revenues during the term of the July 2000 Loan was completely inadequate to fund those expenditures.

### The July 2001 Renewal

41.     As the maturity of the July 2000 Loan approached, BCE made public statements that it intended to fully support Teleglobe and its program of capital expenditures, and that it was totally committed to doing so even though the program of capital expenditures would greatly exceed the U.S. $1 billion referred to in the 2000 Letter Agreement. For example, on April 25, 2001, BCE, through Monty, made the following public pronouncements describing BCE's commitment to the funding of Teleglobe:

   a)   Monty said there was no question that BCE was ready to finance the Teleglobe capital program and put its resources behind the Teleglobe capital program;

   b)   Monty said that BCE had entered into the business of Teleglobe for the long-term, and not for a one or two year pay-back; and

   c)   Monty said that BCE was ready to help Teleglobe finance the entirety of its U.S. $3.4 billion capital program if BCE could not find equity partners to help with the financing.

42.     By the beginning of June 2001 when discussions about the renewal began in earnest, BCE had advanced U.S. $40 million to Teleglobe which, combined with the U.S. $100 million that BCE had advanced on June 21, 2000, left at least U.S. $860 million still to be advanced by BCE under the 2000 Letter Agreement.

43.     According to its terms, the July 2000 Loan was initially due to be repaid on July 11, 2001, and such maturity date was extended by agreement of the parties to July 22, 2001.

44.     As the July 2000 Loan neared maturity, BCE wanted Teleglobe to continue with the business plan BCE had set for it, which included continuing the significant capital and

07-16-2002  04:39PM  From-OGILVY RENAULT                    +4169775239              T-935  P 017/028  F-152
                                                                                                      도018

- 14 -

increased operating expenditures that BCE intended would ultimately accrue to BCE's benefit. BCE knew that if the members of the Lending Syndicate did not renew or extend the July 2000 Loan, but instead required it to be repaid or reduced on its maturity – July 22, 2001 – Teleglobe's assets and resources, and at least U.S. $860 million of BCE's funds, would have to be used to repay or reduce the July 2000 Loan, rather than being used toward the planned capital program and increased operating expenditures of Teleglobe. BCE therefore wanted the members of the Lending Syndicate to extend the maturity of the July 2000 Loan for another year and not require re-payment or reduction of the July 2000 Loan in July 2001.

45.     BCE was also aware that if the maturity date of the July 2000 Loan was renewed for a further year and it advanced U.S. $860 million directly to Teleglobe to fund further capital and increased operating expenditures, Teleglobe would not have the projected resources within the next year to repay the July 2000 Loan at the time of the extended maturity date. Accordingly, BCE was aware that the members of the Lending Syndicate could only be persuaded to extend the maturity of the July 2000 Loan for a further year if BCE provided commitments and assurances to the members of the Lending Syndicate which the members of the Lending Syndicate could in every sense rely upon, over and above any commitment or assurance to provide a further U.S. $860 million for Teleglobe. BCE therefore set about to provide the members of the Lending Syndicate with such commitments and assurances so that they would extend the July 2000 Loan for a further 364 days.

46.     BCE solely and completely directed all discussions and correspondence with the members of the Lending Syndicate concerning the renewal of the July 2000 Loan. In such discussions and correspondence, BCE made, confirmed, memorialized in writing and re-affirmed a contract to provide such funding, and to govern Teleglobe as would be necessary, to ensure that Teleglobe would repay and fully indemnify the members of the Lending Syndicate for all of the principal and interest which would come due under the July 2000 Loan, as renewed to July 2002 (the "BCE Commitment"). Particulars of these discussions and correspondence include those set out in paragraphs 47 to 52 and 55 to 67 hereof.

47.     On June 11, 2001, BCE met with the Bank of Montreal, the arranger of the Lending Syndicate, in order to provide the necessary assurances to and in favour of all of the members

- 15 -

of the Lending Syndicate so that a 364 day renewal of the July 2000 Loan could be obtained. Michael Sabia ("Sabia"), the President and Chief Operating Officer of BCE, stated at that meeting on behalf of BCE that Teleglobe formed a very important part of BCE's strategy and that BCE would do whatever it had to do to ensure that Teleglobe's financial performance turned around so that it could repay the July 2000 Loan in July 2002. Sabia specifically stated that the members of the Lending Syndicate could take, as a BCE commitment in the strongest form possible, that BCE would deliver whatever support was necessary for that purpose.

48.     On June 21, 2001, BCE met with members of the Lending Syndicate and made a presentation to and for the benefit of all the members about the renewal of the July 2000 Loan. Boychuk, on behalf of BCE, stated that, as part of any renewal, BCE would continue to fulfill the support obligations under the 2000 Letter Agreement and under BCE's Support Agreement with Teleglobe, but beyond that, BCE was committed to the members of the Lending Syndicate to provide such support as was necessary to ensure the members of the Lending Syndicate would be repaid. Boychuk said that BCE was looking for an equity partner to participate in Teleglobe by the end of 2001, and that if it was not successful in finding such an equity partner, any funding gap between Teleglobe's resources and what would be provided by BCE under the 2000 Letter Agreement (or any extension thereof) on the one hand, and what would be necessary to ensure the members of the Lending Syndicate would be repaid on the other hand, would be a BCE responsibility.

49.     Boychuk also said at the June 21, 2001 meeting that a renewed July 2000 Loan should be viewed by the members of the Lending Syndicate as a BCE risk and that Teleglobe's operation was really the operation of BCE. Boychuk stressed that Teleglobe was a member of the BCE family; that there was convergence and synergy between BCE and Teleglobe since BCE viewed Teleglobe's global broadband and IT Network infrastructure as the enabling force for achieving BCE's international broadband content distribution vision; that BCE viewed Teleglobe's global customer base and network as establishing BCE as a global player and an attractive global partner; and that BCE viewed Teleglobe's global network as allowing BCE customers to reach out to the rest of the world. Boychuk reconfirmed that Teleglobe was fundamental to BCE's strategic short, mid and long-term plans and that BCE was totally committed to Teleglobe.

07-16-2002   04:39pm   From-OGILVY RENAULT                    +4169775239        T-335   P 019/023   F-152
                                                                                        0/018

- 16 -

50.     In the weeks following the June 21, 2001 meeting, Boychuk and others on behalf of
BCE reiterated to members of the Lending Syndicate (including the Toronto-Dominion Bank,
Laurentian Bank of Canada, HSBC Bank of Canada and Citibank, N.A.) that BCE understood
the credit facilities made available by the members of the Lending Syndicate to Teleglobe
under the July 2000 Loan as renewed were a "relationship deal", based on the members'
relationships with BCE. Boychuk emphasized that BCE would "take care of its banks", by
which expression he included and was understood to include all of the plaintiffs, and he
acknowledged that the members of the Lending Syndicate were looking at the renewed July
2000 Loan as a BCE credit or risk, and that they were entitled to do so. He reiterated that
BCE would continue to fund Teleglobe as needed. He specifically confirmed that the BCE
Commitment was one of a long-term nature and extended beyond the scope of the U.S. $900
million referred to in the 2000 Letter Agreement which he confirmed would also continue in
effect. Pierre Van Gheluwe acknowledged on behalf of BCE to CIBC that BCE understood
that the members of the Lending Syndicate viewed the July 2000 Loan and its renewal as a
"BCE risk".

51.     Siim Vanaselja ("Vanaselja"), the Chief Financial Officer of BCE, in the weeks
following the June 21, 2001 meeting, also emphasized on behalf of BCE to the Bank of Nova
Scotia for the benefit of all of the members of the Lending Syndicate, the importance of
Teleglobe to BCE, stating that BCE considered it critical that BCE have a component of its
growth strategy focused outside Canada and that Teleglobe was that international component.
He confirmed on behalf of BCE that BCE was fully behind Teleglobe and that, in addition to
the financial support that BCE would provide as described in the 2000 Letter Agreement and
any extension of it, BCE was fully committed to Teleglobe, and to ensuring that it was
strategically focused and properly capitalized. He confirmed that BCE was supportive of
Teleglobe not only in the short-term, but also was firmly committed to Teleglobe strategically
and financially in the medium and long term. He said that BCE would see Teleglobe properly
capitalized in mid 2002, the extended date for repayment of the July 2000 Loan as renewed.

52.     In letters addressed to HSBC Bank Canada and to Bank of Tokyo-Mitsubishi (Canada)
dated July 12 and 13, 2001 and signed on behalf of BCE, BCE confirmed and memorialized
in writing for the benefit of all of the members of the Lending Syndicate its commitments to

07-16-2002  04:38pm  From-OGILVY RENAULT                    +4169775239                7-635  P 020/028  F-152

- 17 -

fund Teleglobe's capital program, as referred to in paragraph 41 hereof, and specifically BCE's commitment to finance and put its resources behind the Teleglobe capital program to the extent of the entirety of U.S. $3.4 billion required for it, and confirmed and memorialized in writing that these were an accurate description of its commitments to the members of the Lending Syndicate. In the letter dated July 13, 2001 addressed to HSBC Bank Canada BCE further confirmed that it was committed to the members of the Lending Syndicate in the following terms:

> "please be *assured* that BCE intends to govern Teleglobe in a manner that best *ensures* Teleglobe will be in a position to meet its obligations, including those to its lenders as they come due."(emphasis added)

In the letter dated July 12, 2001 addressed to Bank of Tokyo-Mitsubishi (Canada) BCE further stated that:

> "[BCE] really cannot foresee any harm stemming from your continued participation in the [renewed July 2000 Loan]".

Such letters memorialized in writing essential terms of the BCE Commitment.

53.    Based on the BCE Commitment, the members of the Lending Syndicate agreed to extend the July 2000 Loan for a further 364 days to July 22, 2002 rather than requiring it to be paid on July 23, 2001, and agreed to extend the 2000 Letter Agreement by permitting it to be substituted for by the 2001 Letter Agreement described below rather than requiring the immediate fulfillment of the commitment contained in the 2000 Letter Agreement.

54.    As part of the renewal, BCE provided a letter dated July 23, 2001 (the "2001 Letter Agreement") to the members of the Lending Syndicate, which BCE acknowledged to be legally binding, and which confirmed, *inter alia*, the extension of the 2000 Letter Agreement to correspond to the extended repayment date. The 2001 Letter Agreement provided that BCE would inject or cause to be injected into Teleglobe sufficient funds as required to enable Teleglobe to meet any cash operating shortfalls in funding its capital expenditure program as approved by Teleglobe's Board of Directors and BCE, and that BCE would provide whatever financial assistance was required so that Teleglobe would meet the prescribed Total Debt to Total Capitalization covenant, provided that the aggregate financial commitments of BCE

07-16-2002  04:38pm   From-OGILVY RENAULT                    +4169775239          T-855   P 021/029  F-152

- 18 -

pursuant to the 2001 Letter Agreement was limited to an aggregate of U.S. $900 million less all amounts injected into Teleglobe since July 24, 2000. The 2001 Letter Agreement was, and was intended to be, in addition to and not in substitution for the BCE Commitment. The substitution of the 2001 Letter Agreement for the 2000 Letter Agreement allowed BCE to inject the balance of the U.S. $900 million committed under the 2000 Letter Agreement into Teleglobe for capital expenditures during the balance of 2001, instead of using those funds to repay the members of the Lending Syndicate.

55.     In August 2001, BCE acknowledged to Citibank, N.A. for the benefit of all of the members of the Lending Syndicate that it was well aware that the members of the Lending Syndicate had renewed the July 2000 Loan on the basis of the BCE relationship, and BCE acknowledged and confirmed that it had verbally assured the members of the Lending Syndicate that it remained fully committed to Teleglobe and would "take care of the banks in the Teleglobe facility", by which it meant, and was understood, to include all of the plaintiffs.

56.     In October 2001, on a call with Vanaselja and Boychuk, it was confirmed by them on behalf of BCE to Citibank, N.A. for the benefit of all of the members of the Lending Syndicate that it was BCE's view that the loan facilities that the members of the Lending Syndicate had provided for Teleglobe (that is, the July 2000 Loan, as renewed) were considered to be guaranteed by BCE.

57.     In October 2001, in response to a specific question about BCE's commitment and intentions regarding further funding beyond the U.S. $1 billion described in the 2000 Letter Agreement and the 2001 Letter Agreement, Monty, on behalf of BCE, reiterated that BCE was committed to fund beyond that amount:

> *We have committed $1 billion U.S. if you remember these were two numbers $100 million just prior to closing and $900 million after our closing and we will use all these funds this year and there is a slight requirement to go a little beyond that that we will outline on December 12.*

07-15-2002   04:39pm   From-OGILVY RENAULT                    +4163775239              T-835   P 022/029  F-152

- 19 -

> *With regard to the amounts of financing required by Teleglobe,*
> *there is no question we will stand behind the requirements. We*
> *believe that, as you have said, there is going to be a couple of*
> *years of tough slugging and we will be a survivor coming out of*
> *that and there will be a significant growth even though it is two*
> *to three years further out than we would have liked when we did*
> *the initial transaction but, be that as it may, we think that we*
> *have a solid financing plan backed up by BCE to support*
> *Teleglobe's expansion.*

58.      BCE in fact did advance U.S. $300 million to Teleglobe over and above the U.S.
$1 billion amount between December 2001 and April 2002, in partial performance of the BCE
Commitment but far short of the U.S. $3.4 billion referred to above.  BCE also caused
Teleglobe to draw remaining amounts available under the July 2000 Loan, as renewed.  BCE
caused Teleglobe to expend its funds, including any provided by BCE, on operating expenses
or capital expenditures even though doing so did not enhance or ensure the ability of
Teleglobe to meet its obligations to the members of the Lending Syndicate as they would
come due.

59.      At no time prior to April 24, 2002 did BCE ever advise the members of the Lending
Syndicate that it did not intend to fulfill the BCE Commitment.

60.      As at April 24, 2002, each of the plaintiffs had advanced or, through assignments held,
the following proportionate shares (individually, "proportionate share") of the July 2000 Loan
as renewed:

|   |   |   |
|---|---|---|
| a) | ABN | 8.3314% |
| b) | Bank of Montreal: | 8.3314% |
| c) | Bank of Tokyo-Mitsubishi (Canada): | 1.2000% |
| d) | Bayerische Landesbank: | 2.0000% |
| e) | BNP Paribas (Canada): | 4.0000% |
| f) | La Caisse Centrale Desjardins: | 2.0000% |

- 20 -

| | | |
|---|---|---|
| g) | CIBC: | 8.3314% |
| h) | Citibank, N.A.: | 8.3314% |
| i) | Credit Suisse: | 2.0000% |
| j) | Export Development Canada: | 2.0000% |
| k) | HSBC Bank Canada: | 4.0000% |
| l) | JPMorgan Chase Bank: | 8.3314% |
| m) | Laurentian Bank of Canada: | 2.0000% |
| n) | Merrill Lynch: | 4.0000% |
| o) | National Bank of Canada: | 6.7314% |
| p) | RBC | 7.2400% |
| q) | Société Générale: | 0.8000% |
| r) | The Bank of Nova Scotia: | 8.3314% |
| s) | The Toronto-Dominion Bank: | 7.2400% |
| | TOTAL: | 95.1998% |

## BCE Ceases to Fund and Teleglobe Fails

61.   On April 24, 2002, in breach of the BCE Commitment and notwithstanding that the July 2000 Loan, as renewed, was outstanding and unpaid, BCE announced that it would cease providing any funding to Teleglobe and that its future strategic plan would not include Teleglobe. BCE thereafter ceased to provide the funding to Teleglobe which is required to permit Teleglobe to repay the plaintiffs, and failed in any way to govern Teleglobe in a manner that ensures the plaintiffs would be repaid. In conjunction with this announcement,

- 21 -

all but one of the members of Teleglobe's Board of Directors who were affiliated with BCE resigned.

62.     Shortly thereafter, with BCE's active support and involvement, Teleglobe filed an Application under the *Companies' Creditors Arrangements Act* ("CCAA") and filed for bankruptcy protection in the United States, in the context of which filings Teleglobe has indicated that it is insolvent. Teleglobe has ceased servicing even interest payments and facility fees to the plaintiffs, and has given every indication that it is unlikely that the plaintiffs will receive, from Teleglobe, any material payment on account of the indebtedness arising from the July 2000 Loan as renewed, which, as of the date hereof, stands at U.S. $1.25 billion plus interest and penalty from April 26, 2002 of U.S. $15,534,027.78.

**Breach of Contract**

63.     The BCE Commitment was a legally binding contract. The BCE Commitment was intended and understood to affect the legal relations between BCE and the members of the Lending Syndicate. BCE, in making the BCE Commitment, gave promises and assurances which were expressed in contractual language. BCE intended the BCE Commitment to be legally binding. In the alternative, having made commercial promises in contractual language in the circumstances described, if BCE harboured any secret intention not to be bound legally, it failed to disclose such and is estopped from now asserting that it lacked any contractual intention in giving the BCE Commitment. The members of the Lending Syndicate would not have renewed the July 2000 Loan or extended the 2000 Letter Agreement on the terms that they did, or at all, if the BCE Commitment had not been made. An objective person, knowing of all of the promises, commitments and assurances made by BCE as described herein, would have ascribed meaning and effect to the BCE Commitment.

64.     BCE has not fulfilled, but has breached the BCE Commitment. BCE did not govern and has not governed Teleglobe in a manner that has ensured that the members of the Lending Syndicate would be repaid; it has not provided the funding to ensure that the members of the Lending Syndicate are fully repaid and indemnified; nor did it cause Teleglobe to use its funds for that purpose. By virtue of BCE's breach of the BCE Commitment, the plaintiffs

- 22 -

have suffered damages equal to the amounts that each of them has not, and will not, recover under the July 2000 Loan, as renewed, together with interest at the rate provided for therein. The plaintiffs state that BCE is fully responsible for such losses as a direct consequence of BCE's breach of contract.

### Misrepresentation

65.    By virtue of the relationship between BCE and members of the Lending Syndicate, which relationship was specifically invoked by BCE to induce the members of the Lending Syndicate to make and renew the July 2000 Loan, BCE and members of the Lending Syndicate were in a special relationship. Accordingly, BCE owed a duty of care to the plaintiffs not to be negligent or careless in making statements to members of the Lending Syndicate. It was reasonably foreseeable that members of the Lending Syndicate would rely on BCE's statements and that those statements would be relied on by them in deciding to make available the facilities under the July 2000 Loan as renewed, and it was reasonably foreseeable that, if BCE were negligent in making statements and they were inaccurate, the members of the Lending Syndicate would be harmed.

66.    BCE made statements to the plaintiffs in 2001, including those described in paragraphs 41, 46 to 52 and 55 to 57. BCE intended the members of the Lending Syndicate to rely on those statements, and the plaintiffs, after having received the BCE Commitment, renewed the July 2000 Loan. If the statements were not legally binding contractual obligations (which is not admitted but which is denied), they were misrepresentations. BCE was under a duty to use reasonable care in describing and forecasting its future funding of, and involvement with, Teleglobe, and the implications and potential harm for the continued participation of members of the Lending Syndicate in the renewal of the July 2000 Loan. BCE's statements, which in essence were that it was totally committed to and would not waver from any funding requirements necessary to ensure the success of Teleglobe and the repayment to the members of the Lending Syndicate of the advances to Teleglobe under the July 2000 Loan, as renewed, were not accurate, and BCE made such misrepresentations without reasonable care. Members of the Lending Syndicate relied on such statements in agreeing to renew the July 2000 Loan in July 2001 and in agreeing that the 2001 Letter

07-16-2002  04:39pm  From-OGILVY RENAULT                +4169775239         T-835   P 026/028   F-152

- 23 -

Agreement could be substituted for the 2000 Letter Agreement – but for BCE's statements, the July 2000 Loan and the 2000 Letter Agreement would not have been renewed or extended either at all, or on the terms that they were, but would have been called for repayment. The plaintiffs have suffered the damages claimed as a result and BCE is liable for those damages.

### Alter Ego

67.    By reason of the facts referred to above, BCE was, to members of the Lending Syndicate, the alter ego of Teleglobe. BCE was, in all material respects and insofar as dealings with members of the Lending Syndicate were concerned, Teleglobe, and Teleglobe was BCE. BCE wanted the members of the Lending Syndicate to deal with Teleglobe on the basis of the loan being a BCE risk, a BCE credit and based on a BCE relationship. BCE negotiated the terms of the July 2000 Loan and its renewal, and its in-house counsel, directors, officers and agents in all respects, spoke and made decisions, for Teleglobe and signed the documents for the renewal of the July 2000 Loan for Teleglobe. BCE represented and treated Teleglobe as a segment of BCE.

68.    BCE controlled the expenditure by Teleglobe of its funds, including of any funds advanced by BCE to Teleglobe which could have been devoted to repayment of the members of the Lending Syndicate but were instead devoted, on BCE's instructions, to capital and increased operating expenditures. By reason of the total dependency of Teleglobe on BCE and BCE's complete domination of Teleglobe, and BCE's dealings on behalf of Teleglobe with the members of the Lending Syndicate, the true contracting party who received the funds of the members of the Lending Syndicate and who covenanted to repay them was BCE, whether or not such covenant was made in the name of Teleglobe, and BCE is responsible for the repayment of all such funds. It would be manifestly unjust for BCE, who induced the July 2000 Loan and its renewal to be made for its own benefit, to be able to take advantage of any technical corporate distinctions which it itself ignored and abused.

-16-2002   04:39pm   From-OGILVY RENAULT                        +4169775239              T-835   P 027/029   F-152

- 24 -

## Oppression

69.     BCE created, by its commitments and assurances to members of the Lending
Syndicate, a reasonable expectation that it would provide funding to Teleglobe to the extent
necessary to ensure that the members of the Lending Syndicate were repaid and that it would
govern Teleglobe in a manner that would ensure that each of the members of the Lending
Syndicate were repaid and that they were involved in a transaction in which BCE, because of
its funding, would ensure would not result in any harm to the members of the Lending
Syndicate. Members of the Lending Syndicate were at all material times creditors of BCE
and Teleglobe by virtue of the 2000 Letter Agreement, the 2001 Letter Agreement and their
other dealings with BCE, and the July 2000 Loan, originally and as renewed. By conducting
itself so as to defeat the reasonable expectations of members of the Lending Syndicate, BCE's
affairs have been conducted, and BCE caused Teleglobe's affairs to be conducted, in a manner
that is oppressive, unfairly prejudicial to and which unfairly disregards the plaintiffs' interests,
and they are entitled to be compensated for defeated expectations, by payment of an amount
equal to the amounts which they have lost or will lose by virtue of making and renewing the
July 2000 Loan. The plaintiffs plead and rely upon the CBCA, Section 241.

70.     The plaintiffs propose that this action be tried at Toronto.

July 12, 2002                              GOODMANS LLP
                                           Barristers & Solicitors
                                           250 Yonge Street, Suite 2400
                                           Toronto, Canada  M5B 2M6

                                           Benjamin Zarnett  LSUC#: 17247M
                                           Jessica Kimmel  LSUC#: 32312W
                                           Peninah Brickman  LSUC#: 45603L
                                           Tel: 416.597-4219
                                           Fax: 416-979-1234

                                           Solicitors for the Plaintiffs

07:-i6-2002    04:40pm    From-OGILVY RENAULT    +4169775230    T-835    P 028/028    F-152

Court File No:
02-CL-032755 CM3

ABN AMRO BANK CANADA ET AL    and    BCE INC.
Plaintiffs    Defendant

*ONTARIO*
SUPERIOR COURT OF JUSTICE

Proceeding commenced at Toronto

STATEMENT OF CLAIM

GOODMANS LLP
Barristers & Solicitors
250 Yonge Street, Suite 2400
Toronto, Canada M5B 2M6

Benjamin Zarnett LSUC#: 17247M
Jessica Kimmel LSUC#: 32312W
Peninah Brickman LSUC#: 45603L
Tel: 416-597-4219
Fax: 416-979-1234

Solicitors for the Plaintiffs

GDSDOCS\1049160\1;1

**28**

Daniel Schimmel

02/24/2005 10:32 AM

To: "Cochran. C  Malcolm IV" <Cochran@RLF com>
cc: George J Wade/NY/NA/ShS@ShSDOMAIN
Subject: Information regarding good will

In our meet and confer. you asked for good will information created in 2002 and the first quarter of 2003
BCE would agree to produce the
documents from the files of employees in its accounting department related to BCE's analysis or
evaluation of the value of TI's Goodwill in
2002 and in connection with the preparation of BCE's 2002 annual report and financial statements. We
understand that this information is
contained in a fairly discrete set of files, which is why BCE is prepared to work with you in good faith and
produce those documents,
even though we reiterate that those documents are not relevant to your claims

Daniel Schimmel

Daniel Schimmel
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022
Phone: (212) 848-4608
Fax:    (646) 848-4608

**29**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
---------------------------------------------------------x
```
In re                                              :    Chapter 11
                                                   :
TELEGLOBE COMMUNICATIONS                           :    Jointly Administered
CORPORATION, et al [1]                              :    Bankruptcy Case No. 02-11518 (MFW)
                                                   :
                        Debtors.                   :
```
---------------------------------------------------------x
```
                                                   :
TELEGLOBE COMMUNICATIONS                           :
CORPORATION, et al,                                :
                                                   :
                        Plaintiffs,                :
                                                   :
              v.                                   :    C.A. No. 04-CV-1266
                                                   :
BCE INC., MICHAEL T. BOYCHUK,                       :
MARC A. BOUCHARD, SERGE FORTIN,                     :
TERENCE J. JARMAN, STEWART VERGE,                  :
JEAN C. MONTY, RICHARD J. CURRIE,                  :
THOMAS KIERANS, STEPHEN P. SKINNER,                :
and H. ARNOLD STEINBERG,                           :
                                                   :
                        Defendants.                :
```
---------------------------------------------------------x
```

## NOTICE OF RULE 30(b)(6) DEPOSITION OF DEBTORS

To:      Gregory V. Varallo                        John P. Amato
         Mark D. Collins                           Mark S. Indelicto
         Robert J. Stearn, Jr.                     Zachary G. Newman
         RICHARDS, LAYTON & FINGER, P A            HAHN & HESSEN LLP
         One Rodney Square                         488 Madison Avenue
         920 N King Street                         New York, NY 10022
         Wilmington, DE 19801                      Tel    (212) 478-7200
         Tel    (302) 651-7700                     Fax    (212) 478-7400
         Fax    (302) 651-7701

---

[1]      The Debtors are the following eleven entities: Teleglobe Communications Corporation, Teleglobe USA
         Inc, Optel Telecommunications, Inc, Teleglobe Holdings (U S) Corporation, Teleglobe Marine (U S)
         Inc, Teleglobe Holding Corp, Teleglobe Telecom Corporation, Teleglobe Investment Corp, Teleglobe
         Luxembourg LLC, Teleglobe Puerto Rico Inc. and Teleglobe Submarine Inc

PLEASE TAKE NOTICE that Defendants BCE Inc., Michael T Boychuk, Marc A.
Bouchard, Serge Fortin, Terence J. Jarman, Stewart Verge, Jean C Monty, Richard J. Currie,
Thomas Kierans, Stephen P Skinner, and H. Arnold Steinberg (the "Defendants"), by and
through their undersigned counsel, will take the deposition upon oral examination of the Debtors,
commencing on December 20, 2004, at 9:00 a.m. at the offices of Shearman & Sterling LLP, 599
Lexington Ave, New York, New York, or at such other time and place as may be mutually
agreed upon by the parties, and continuing from day to day thereafter until completed  The
deposition will be taken before a notary public or other officer duly authorized to administer
oaths and take testimony, and will be recorded by stenographic means

Pursuant to Federal Rule of Civil Procedure 30(b)(6), the Debtors are required to
designate one or more appropriate persons to testify on their behalf with respect to each of the
matters set forth on the attached Schedule A, and the person(s) so designated shall be required to
testify as to each of those matters known or reasonably available to the Debtors

Dated:  December 6, 2004

SHEARMAN & STERLING LLP
George J. Wade
Daniel Schimmel
Piret Loone
599 Lexington Avenue
New York, NY 10022-6069
Telephone:  (212) 848-4000
Facsimile:  (212) 848-7179

-and-

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Pauline K. Morgan (No. 3650)
The Brandywine Building
1000 West Street, 17th Floor
P O Box 391
Wilmington, DE 19899
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel for Defendants

## SCHEDULE A

### Definitions and Instructions

1        The term "Debtors" means, individually and collectively, plaintiffs Teleglobe Communications Corporation, Teleglobe USA Inc , Optel Telecommunications, Inc , Teleglobe Holdings (U S ) Corporation, Teleglobe Marine (U S ) Inc , Teleglobe Holding Corp , Teleglobe Telecom Corporation, Teleglobe Investment Corp , Teleglobe Luxembourg LLC, Teleglobe Puerto Rico Inc. and Teleglobe Submarine Inc., their predecessors or successors in interest, and their present or former subsidiaries, affiliates, divisions, business units, directors, officers, employees, attorneys, agents and representatives, and all persons acting or who have acted on their behalf

2        The term "Teleglobe" means Teleglobe Inc , its predecessors or successors in interest, and its present or former subsidiaries, affiliates, divisions, business units, directors, officers, employees, attorneys, agents and representatives, and all persons acting or who have acted on their behalf

3.        The term "Committee" means the Official Committee of Unsecured Creditors of Teleglobe Communications Corporation, et al., and each member thereof

4        The terms "Plaintiffs," "you" and "your" mean the Debtors

5        The term "BCE" means defendant BCE Inc , its predecessors or successors in interest, and its present or former subsidiaries, affiliates, divisions, business units, directors, officers, employees, attorneys, agents and representatives, and all persons acting or who have acted on their behalf.

6.    The terms "person" or "persons" means natural persons, proprietorships,

corporations, partnerships, trusts, joint ventures, groups, associations, organizations, and all other

entities.

7    The term "document" shall have the broadest meaning permitted by Fed. R.

Bankr. P. 7034 and Fed. R. Civ. P. 34(a) and includes without limitation all originals, copies (if

the originals are not available), non-identical copies (whether different from the original because

of underlining, editing marks, notes made on or attached to such copy, or otherwise) and drafts

of the following items, whether printed or recorded (through a sound, video or other electronic,

magnetic or digital recording system) or reproduced by hand, including but not limited to letters,

correspondence, telegrams, telexes, memoranda, records, summaries of personal conversations or

interviews, minutes or records or notes of meetings or conferences, note pads, notebooks,

postcards, "Post-It" notes, stenographic notes, notes, notebooks, opinions or reports of financial

advisors or consultants, opinions or reports of experts, projections, financial or statistical

statements or compilations, contracts, agreements, appraisals, analyses, purchase orders,

confirmations, publications, articles, books, pamphlets, circulars, microfilm, microfiche, reports,

studies, logs, surveys, diaries, calendars, appointment books. maps, charts, graphs, bulletins,

photostats, speeches, data sheets, pictures, photographs, illustrations, blueprints, films, drawings,

plans, tape recordings, videotapes, disks, diskettes, data tapes or readable computer-produced

interpretations or transcriptions thereof, electronically transmitted messages ("E-mail"), voice

mail messages, interoffice communications, advertising, packaging and promotional materials

and any other writings, papers and tangible things of whatever description whatsoever, including

but not limited to any information contained in any computer, server, mainframe, or other

storage device (including (i) information on or in computer memory, (ii) information on or in

computer or network backup files, and (iii) information which has been "deleted" or "erased" but

is recoverable) whether located on-site or at an off-site facility, within your possession, custody or control.

8. As the terms "possession" and "document" pertain to E-mail these terms include but are not limited to E-mail contained in your electronic E-mail directories containing:

(a) "deleted" E-mails which have not been permanently deleted, including all subdirectories irrespective of the title of such subdirectories;

(b) "sent" E-mails, including all subdirectories irrespective of the title of such subdirectories; and

(c) "received" E-mails, including all subdirectories irrespective of the title of such subdirectories.

9. The term "Requests" refers to Defendants' First Request for Production of Documents, served on the counsel for the Debtors, on November 22, 2004

10. The use of the singular shall be deemed to include the plural, and the use of masculine, feminine or neutral gender shall include each gender, as appropriate in context.

11. The terms "all," "any," "each," and "every" shall each be construed as all, any, each and every to bring within the scope of the Topic all information that might otherwise be construed to be outside of its scope

12. The terms "and" and "or" shall be construed disjunctively or conjunctively as necessary to bring within the scope of the Topic all information that might otherwise be construed to be outside of its scope.

13. Each Topic shall be construed independently and not with reference to any other Topic for the purpose of limitation

## TOPICS

1. Plaintiffs' efforts to preserve or maintain documents since April 24, 2002, including any hard copies of documents and electronic documents.

2. Plaintiff's efforts to collect, review and produce documents prior to, or in connection with, the Committee's investigation of possible claims or causes of action pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure, and in connection with this litigation, including the following:

   (a) Plaintiffs' preservation, maintenance, collection, review, and production of hard copy documents;

   (b) Plaintiffs' preservation, maintenance, collection, review, and production of electronic documents;

   (c) Plaintiffs' employment of any outside vendors or consultants with respect to the preservation, maintenance, collection, and review process of documents;

   (d) Plaintiffs' document retention policies and practices, including Plaintiffs' policies and procedures for backing up files and data on their computer system(s) from January 1, 2000 to the present, and Plaintiffs' policies and procedures regarding the preservation and/or disposition of IT equipment, including but not limited to servers, tape restore machines, and other computer equipment during that time period;

   (e) The location of any documents believed to be responsive to the Requests or any other discovery requests in this litigation.

3. Plaintiffs' information technology systems, including its computers, servers, back-up systems, software and networks, as such may be related to the generation and/or storage of any data that is relevant to any of the claims or defenses asserted in this matter, or otherwise reasonably calculated to lead to the discovery of admissible evidence. For example, this Topic shall include, but not be limited to:

   (a) Any information technology systems, computers, network, software or storage media utilized by any person identified in the disclosures served by the parties pursuant to Rule 26(a) of the Federal Rules of Civil Procedure (the "Rule 26 Disclosures");

   (b) The current location of hard drives, discs, hand-held devices (such as Blackberry or Palm Pilot devices), or storage media utilized by any of the persons identified in the Rule 26 Disclosures.

4. The specific circumstances under which any of the Debtors, following April 24, 2002, "sold practically all of [their] IT equipment, including servers, tape restore machines, and other computer equipment formerly used to back up and store e-mail and other electronic data," as described in the Affidavit of V. V. Cooke,

sworn to October 6, 2004, and efforts to preserve or make copies of those materials.

5    The specific circumstances under which the Debtors' "electronic backup information prior to 2001 has largely been written over according to company policies in place prior to April 2002 and is no longer available for recovery," as described in the Affidavit of V. V. Cooke, sworn to October 6, 2004.

**30**

TO 11889H888/2H0001 P.04/14

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN THE MATTER OF:

TELEGLOBE COMMUNICATIONS
CORPORATION, et al.,

                                    Debtors.

Chapter 11

Case No. 02 11518 (MFW)

## CONFIDENTIALITY STIPULATION

IT IS HEREBY STIPULATED AND AGREED AS FOLLOWS:

1.    This Stipulation is entered into by BCE Inc. ("BCE") and the Official Committee of Unsecured Creditors of Teleglobe Communications Corporation, Teleglobe USA Inc., Optel Telecommunications, Inc., Teleglobe Holdings (U.S.) Corporation, Teleglobe Marine (U.S.) Inc., Teleglobe Holding Corp., Teleglobe Telecom Corporation, Teleglobe Investment Corp., Teleglobe Luxembourg LLC, Teleglobe Puerto Rico Inc., and Teleglobe Submarine Inc. This Stipulation shall be applicable to and govern the handling of all documents, including any information contained therein and copies thereof, testimony, and any other materials or information made available for inspection, or produced, by BCE to counsel for the Committee in connection with the Committee's investigation and prosecution of potential claims and causes of action for the benefit of and arising in, under, related to or in connection with the Debtors' estates (the "BCE Materials").

2.    In this Stipulation, "Committee" refers to the Official Committee of Unsecured Creditors of Teleglobe Communications Corporation, Teleglobe USA Inc., Optel Telecommunications, Inc., Teleglobe Holdings (U.S.) Corporation, Teleglobe Marine (U.S.) Inc., Teleglobe Holding Corp., Teleglobe Telecom Corporation, Teleglobe Investment Corp.,

TO 11889702872#0001 P.05/14

Teleglobe Luxembourg LLC, Teleglobe Puerto Rico Inc., and Teleglobe Submarine Inc. and to any successor, including a successor committee or other person or entity, vested with the right or responsibility for investigating, prosecuting and disposing of the Debtors' potential claims and causes of action for the benefit of, and arising under, related to, or in connection with the Debtors' estates

        3.    In this Stipulation, "Debtors" refers collectively to Teleglobe Communications Corporation, Teleglobe USA Inc., Optel Telecommunications, Inc., Teleglobe Holdings (U.S.) Corporation, Teleglobe Marine (U.S.) Inc., Teleglobe Holding Corp., Teleglobe Telecom Corporation, Teleglobe Investment Corp., Teleglobe Luxembourg LLC, Teleglobe Puerto Rico Inc., and Teleglobe Submarine Inc., provided, however, that in the event that a single committee, person or entity is appointed by or under an order made by this court and by or under an order made by the Ontario Superior Court of Justice – Commercial List, Court file no. 02-CL-4528, with the right or responsibility for investigating, prosecuting and disposing of the Debtors' potential claims and causes of action for the benefit of, and arising under, related to, or in connection with the Debtors' estates, and with responsibility for investigating, prosecuting and disposing of the potential claims and causes of action for the benefit of, and arising under, related to, or in connection with the estates of the Teleglobe Inc. and the entities listed on Schedule "A" to the Notice of Application in Court file no. 02-CL-4528 (collectively, the "Canadian Debtors"), then "Debtors" also shall include the Canadian Debtors.

        4.    "Confidential BCE Materials" consist of BCE Materials for which the Court would grant protection from public access under 11 USCS §107(b)(1) and Rule 9018 of the Federal Rules of Bankruptcy Procedure. All information derived from Confidential BCE Materials, including but not limited to extracts, summaries, descriptions, and characterizations of

such Confidential BCE Materials shall be treated as Confidential BCE Materials in accordance with the provisions of this Stipulation.

    5.    The following shall be deemed not to be Confidential BCE Materials: (a) any information or documents the Committee already possesses; (b) information or documents already in the public domain or that come into the public domain after the date of this Stipulation, unless the reason why the information or documents are in the public domain is because the Committee or the Debtors disseminated it in contravention of this Stipulation; (c) information or documents that the Committee has obtained or obtains after the date of this Stipulation from sources other than BCE, except if these materials are covered by and protected from disclosure under a separate confidentiality agreement; (d) information or documents produced by BCE to any adverse party in any pending litigations involving the Debtors or their parent or its affiliates and subsidiaries, except if these materials are covered by and protected from disclosure under a separate confidentiality obligation or agreement; and (e) any information or documents that otherwise cease to be confidential for any reason.

    6.    BCE may designate BCE Materials as Confidential BCE Materials under the terms of this Stipulation only if BCE in good faith believes that the Court would grant protection from public access of such BCE Materials under 11 USCS §107(b)(1) and Rule 9018 of the Federal Rules of Bankruptcy Procedure and that such BCE Materials require the protections provided in this Stipulation.

    7.    Counsel for the Committee may raise a good faith objection to the designation of any materials designated as Confidential BCE Materials and shall confer with BCE regarding the basis of any such objection. If counsel for the Committee and BCE cannot in good faith resolve any such objection, then the Committee may make a motion to the Court in

TO 11005H0807ZH0001 P.07/14

this case, upon reasonable notice to BCE, for an order determining that certain BCE Materials do not constitute Confidential BCE Materials. Materials subject to any such Objection shall continue to be treated as "Confidential BCE Materials" pursuant to this Stipulation during the pendency of any such motion.

8.      No Confidential BCE Materials shall be disclosed, divulged, revealed, described, characterized, transmitted or otherwise communicated or summarized by counsel for the Committee, or any other person, to any person other than (a) a member of the Committee for the purpose of investigating, prosecuting and disposing of the Committee's or the Debtors' potential claims and causes of action for the benefit of, and arising under, related to, or in connection with the Debtors' estates, provided, however, such Committee member executes the Acknowledgement of Confidentiality Stipulation attached hereto as Exhibit A (the "Acknowledgement"); (b) a member or employee of counsel for the Committee for the purposes of the investigation and prosecution of the Committee's or Debtors' potential claims and causes of action for the benefit of and arising in, under, related to or in connection with the Debtors' estates (the "Claims"); (c) experts or consultants retained by counsel for the Committee to the extent necessary for, and solely for the purposes of, the investigation and prosecution of the Claims; (d) the Court, including the Judge, law clerks assigned to this case or to any other case or cases in which the Claims of the Debtors' estates are being advanced, prosecuted or supervised, and other court personnel in connection with the investigation and prosecution of the Claims and such other case or cases to the extent these materials are filed under seal, provided, however, nothing shall prohibit the filing of any information or document which the Court refuses to be filed under seal; (e) court reporters; (f) as provided for in Article 11 below; and (g) any other

ГОВ СО ЕСОН ТО-НЭ ГЛ ЭГЭ ССГ 4ГН ГС Т                    TO 11899#00872#0001 P-09/14

persons upon order of the Court in the above-styled case or upon written consent of BCE to the extent such persons execute the Acknowledgement.

        9.    The entities that have commenced an action against BCE in Canada entitled ABN Amro Bank N.V. et al. v. BCE, Inc., Court File No. 02-CV-232755CM3, and their affiliates, subsidiaries, divisions, or employees, directors, or officers, may not be engaged by the Committee as experts or consultants mentioned in Article 8(c), above.

        10.    Any persons permitted access to the Confidential BCE Materials pursuant to this Stipulation (i) shall not disclose such documents, the contents thereof, summarize or otherwise characterize these documents, or disclose that they have been made available by BCE to counsel for the Committee except to other persons who have been permitted access to said documents under the terms of this Stipulation; and (ii) shall make no use whatsoever of such documents or information other than as described in Articles 8 and 12.

        11.    Nothing in this Stipulation shall prevent the Committee or counsel for the Committee from making a report or reports from time to time to unsecured creditors of the Debtors about the status of the Debtors' estates, the prosecution of claims in relation to the Debtors' estates and the Committee's and counsel for the Committee's observations and analysis about the merits of the Claims against any person or entity, including against BCE and any of its present or former affiliates or entities controlled by BCE, and their present or former directors or officers, provided however that if in any such report or reports disclose any Confidential BCE Materials, the contents thereof, or summarize or otherwise characterize the Confidential BCE Materials, before any such disclosure is made, such person to whom the disclosure is made must execute the Acknowledgement.

12.    Any Confidential BCE Materials shall be used solely in connection with the investigation and prosecution of the Claims and not for any commercial, business, competitive, or other purpose, nor in any other judicial or administrative proceedings, disputes, actions, or cases or in connection with any other claims. Confidential BCE Materials that are made available to the public as a result of a disclosure in breach of this Stipulation shall not render this Stipulation inapplicable to any such Confidential BCE Materials. Nothing in this Stipulation shall affect BCE's right to use or disclose the Confidential BCE Materials as it sees fit, except that BCE may lose the right to enforce this Stipulation as to those Confidential BCE Materials that BCE discloses to parties that are not affiliates or subsidiaries of BCE. BCE shall not lose such right, among other things, if such disclosure is made pursuant to a separate confidentiality obligation or agreement. Among other things, the members of the Committee (and any person(s), entity, or entities acting on behalf of such members) are prohibited from engaging in any discussions or communications with any persons regarding any Confidential BCE Materials, unless such discussion or communication is conducted solely for the permitted purpose described in this Article 12.

13.    Prior to disclosing or giving access to the Confidential BCE Materials or copies thereof pursuant to Article 8 above, the person being granted access shall first be advised of the existence and contents of this Stipulation, and, except in respect of Article 8(d), acknowledge receipt of such advice, agree to be bound by the jurisdiction of the Court in this case and the terms of this Stipulation, and sign the Acknowledgement of Confidentiality Stipulation in the form annexed hereto as Exhibit A. The signed Acknowledgement of Confidentiality Stipulation is to be retained by counsel for the party making the disclosure and shall be made available to BCE upon demand.

14.    BCE shall designate BCE Materials as Confidential BCE Materials in the following manner:

a.    in the case of documents or other materials, by affixing the legend "Confidential – Attorneys' Eyes Only" to each page of a document, or to the first page in the case of multi-page documents, containing any Confidential BCE Materials; and

b.    in the case of depositions or other testimony, (i) by a statement on the record at the time of its disclosure; or (ii) by written notice to counsel for the Committee, sent within twenty days after BCE receives a copy of the transcript thereof; and in both of the foregoing instances by directing the court reporter that the appropriate confidentiality legend be affixed to the first page and all portions of the original and all copies of any transcript containing the Confidential BCE Materials. The entire transcript of any such deposition or other testimony shall be treated as Confidential BCE Materials until the expiration of the twentieth day after counsel for BCE has received a copy of the transcript thereof. Following the identification of the portions of the transcript that contain Confidential BCE Materials by BCE, only those portions of the transcript designated as Confidential BCE Materials shall continue to be treated as Confidential BCE Materials hereunder. BCE and the Committee may modify this procedure for any particular deposition, through agreement on the record at the deposition.

15.    Inadvertent failure to designate BCE Materials referring, containing, or constituting Confidential BCE Materials as "Confidential – Attorneys' Eyes Only" at the time of production may be remedied by supplemental written notice. If such notice is given, all BCE Materials so designated shall constitute Confidential BCE Materials and be fully subject to the provisions of this Stipulation.

16.   Unless otherwise agreed in writing in advance by counsel for BCE, in the event the Committee files with the Court any pleading, motion, exhibit, or other submission containing, describing, affixing, or reflecting Confidential BCE Materials or excerpts or information derived from such Confidential BCE Materials or testimony consisting of, referring to, or relating to Confidential BCE Materials, such pleading, motion, exhibit or other submission shall be filed under seal and bear the following legend:

THIS DOCUMENT IS FILED UNDER SEAL AND IS SUBJECT TO A
STIPULATION REGARDING CONFIDENTIAL INFORMATION

and a copy thereof shall be served upon BCE at the same time and in the same manner as service is made upon the parties to this action. Nothing in this provision requires any party to this case to provide to BCE any confidential information that is not Confidential BCE Materials or that is not derived from Confidential BCE Materials.

17.   If any person who has received Confidential BCE Materials is served with a document request or subpoena, or is otherwise requested to disclose or allow access to such Confidential BCE Materials, that person and the Committee shall (i) give immediate written notice of that request to BCE by delivering by hand or by telecopier a copy of such request, subpoena, or order to BCE; (ii) object to the production of the Confidential BCE Materials on the grounds of the existence of this Stipulation; (iii) notify the person serving the request, subpoena, or order, that the Confidential BCE materials are covered by this Stipulation; and (iv) decline to produce the Confidential BCE Materials unless otherwise required by a court order. If BCE applies for an order precluding the person on whom the request, subpoena, or order was served from complying with that request, subpoena, or order, that person shall not produce the Confidential BCE Materials until after the court rules on such application. Nothing herein shall be construed as requiring anyone covered by this Stipulation to challenge or appeal any order

requiring production of the Confidential BCE Materials, or subject herself, himself, or itself to any penalties for non-compliance with any legal process or order, or seek any relief from the Court in this case.

18.    Entering into this Stipulation, otherwise complying with this Stipulation, or producing the Confidential BCE Materials pursuant to this Stipulation shall not constitute a waiver of the right of BCE to raise or assert any objections heretofore or hereafter raised or asserted including, but not limited to, defenses or objections with respect to the uses, relevance, or admissibility of any documents or their contents. Among other things, complying with this Stipulation shall not:

a.    prejudice in any way the rights of BCE to object to the authenticity or admissibility into evidence of any documents, materials, testimony, or other evidence subject to this Stipulation;

b.    prejudice in any way the rights of BCE to object to any use of the Confidential BCE Materials;

c.    prejudice in any way the rights of BCE to petition the Court for a protective order relating to any purportedly confidential materials;

d.    prevent the parties to this Stipulation from agreeing to alter or waive the provisions or protections provided for herein with respect to any particular Confidential BCE Materials; or

e.    constitute or be construed as a waiver by BCE of any privileges or immunities as to any production of documents or evidence in response to a future discovery request

APR 28 2004 13:46 FR S*S LLP 4TH FL 1                TO 11889RGGS72R0001 P.13/14

19.        This Stipulation shall remain in force and effect until modified, superseded, or terminated, by consent of the parties to this Stipulation, in a writing signed by the signatories hereto, or by further order of the Court in this case.

20.        The provisions of this Stipulation shall survive the conclusion of the investigation and prosecution of the Committee's potential claims and causes of action and shall remain in full force and effect. The parties agree that the Court in this case shall retain jurisdiction over the Committee and any other person bound by this Stipulation to enforce this Stipulation, including following the final disposition of this case.

21.        In the event BCE inadvertently produces documents claimed to be privileged, such documents shall be returned by the receiving person(s) to BCE within two (2) days of any written request therefor, unless the receiving person(s) challenge the privileged nature of the document(s), in which case BCE shall make application to the Court for return of the document(s). While such application is pending, the receiving persons shall not use or divulge the contents of such document(s) except to the Court under seal. The inadvertent production of any document claimed to be privileged shall not constitute a waiver of such privilege.

22.        Within thirty (30) days after receiving notice of the final disposition of the investigation and prosecution of the Claims, all persons having received Confidential BCE Materials shall (i) return all such materials and all copies thereof to counsel for BCE, to the extent BCE requests their return; or (ii) destroy all such materials and all copies thereof, and certify that fact to counsel for BCE. The reasonable costs to return such documents at BCE's request (including without limitation, reasonable attorneys' fees) shall be paid by BCE.

23.    Any breach of the obligations under this Stipulation may cause BCE irreparable harm, for which monetary damages would not provide an adequate remedy. In the event of a violation of this Stipulation, BCE, in addition to any and all remedies at law, will be entitled to seek specific performance or temporary or permanent injunctive relief as any court of competent jurisdiction may find appropriate under the circumstances. Nothing contained in this Stipulation will be construed as prohibiting BCE from pursuing any other remedies available for such breach or any threatened breach.

Dated: March 8, 2004

AGREED TO AS TO FORM AND SUBSTANCE:

HAHN & HESSEN LLP

By: _____
    John P. Amato
    488 Madison Avenue
    New York, NY 10022
    (212) 736-1000 (telephone)
    (212) 478-7400 (facsimile)

*Counsel for the Unsecured Creditors' Committee*

SHEARMAN & STERLING LLP

By: _____
    George J. Wade
    599 Lexington Ave.
    New York, NY 10022
    Telephone: 212-848-4000

*Counsel for BCE Inc.*

\*\* TOTAL PAGE.14 \*\*