**1**

Peoples Department Stores Inc. (Trustee of) v. Wise

---

IN THE MATTER OF the Bankruptcy of Peoples Department Stores Inc./
Magasins à rayons Peoples inc.

Caron Bélanger Ernst & Young Inc., in its capacity as Trustee
to the bankruptcy of Peoples Department Stores Inc./
Magasins à rayons Peoples inc.    *Appellant*

*v.*

Lionel Wise, Ralph Wise and Harold Wise    *Respondents*

and

Chubb Insurance Company of Canada/
Compagnie d'assurance Chubb du Canada    *Respondent*

Indexed as: Peoples Department Stores Inc. (Trustee of) v. Wise

Neutral citation: 2004 SCC 68

File No.: 29682

2004: May 11; 2004: October 29.

Present: Iacobucci,[*][1] Major, Bastarache, Binnie, LeBel, Deschamps and Fish JJ.

ON APPEAL FROM THE COURT OF APPEAL FOR QUEBEC

*Corporations -- Directors and officers -- Fiduciary duty and duty of care -- Directors of bankrupt corporation being sued by trustee -- Trustee claiming that directors breached fiduciary duty and duty of care -- Whether directors owe fiduciary duty or duty of care to corporation's creditors -- Canada Business Corporations Act, R.S.C. 1985, c. C-44, s. 122(1)*

*Bankruptcy and insolvability -- Reviewable transactions -- Transfer of assets between wholly-owned subsidiary and parent corporation -- Wholly-owned subsidiary and parent corporation declaring bankruptcy -- Parent corporation's directors sued by trustee of wholly-owned subsidiary -- Trustee claiming that certain transactions were reviewable -- Whether consideration for impugned transactions conspicuously less than fair market value -- Whether directors "privy" to transactions -- Bankruptcy and Insolvency Act, R.S.C. 1985, c. B-3, s. 100.*

Wise Stores Inc. ("Wise") acquired Peoples Department Stores Inc. ("Peoples") from Marks and Spencer Canada Inc. ("M & S"). L.W., R.W. and H.W. (the "Wise brothers") were majority shareholders, officers and directors of Wise, and the only directors of Peoples. Because of covenants imposed by M & S, Peoples could not be merged with Wise until the purchase price had been paid. Almost from the outset, the joint operation of Wise and Peoples did not function smoothly. Parallel bookkeeping, combined with shared warehousing arrangements, caused serious problems for both companies. As a result, their inventory records were increasingly incorrect. The situation, already unsustainable, was worsening. L.W. consulted the vice-president of administration and finance of both Wise and Peoples in an attempt to find a solution. On his recommendation, the Wise brothers agreed to implement a joint inventory procurement policy whereby the two firms would divide responsibility for purchasing. Peoples would make all purchases from North American suppliers and Wise would, in turn, make all purchases from overseas suppliers. Peoples would then transfer to Wise what it had purchased for Wise, charging Wise accordingly, and vice versa. The new policy was implemented on February 1, 1994. Before the end of the year, both Wise and Peoples declared bankruptcy. Peoples' trustee filed a petition against the Wise brothers. The trustee claimed that they had favoured the interests of Wise over Peoples to the detriment of Peoples' creditors, in breach of

their duties as directors under s. 122(1) of the *Canada Business Corporations Act* ("CBCA"). In the alternative, the trustee claimed that the Wise brothers had in the year preceding the bankruptcy been privy to transactions in which Peoples' assets had been transferred to Wise for conspicuously less than fair market value within the meaning of s. 100 of the *Bankruptcy and Insolvency Act* ("BIA"). The trial judge found the Wise brothers liable on both grounds. The Court of Appeal set aside the trial judge's decision.

*Held*: The appeal should be dismissed. The Wise brothers did not breach their duties under s. 122(1) of the CBCA, nor were the impugned transactions in violation of s. 100 of the BIA.

The fiduciary duty under s. 122(1)(*a*) of the CBCA requires directors and officers to act in good faith and honestly *vis-à-vis* the corporation. Here, the trial judge found that there was no fraud or dishonesty in the Wise brothers' attempts to solve the mounting inventory problems of Peoples and Wise. The Wise brothers considered the serious inventory management problem and implemented a joint inventory procurement policy they hoped would solve it. In the absence of evidence of a personal interest or improper purpose in the new policy, and in light of the evidence of a desire to make both Wise and Peoples "better" corporations, the directors did not breach their fiduciary duty under s. 122(1)(*a*). An honest and good faith attempt to redress a corporation's financial problems does not, if unsuccessful, qualify as such a breach. The fiduciary duty does not change when a corporation is in the nebulous "vicinity of insolvency". At all times, they owe their fiduciary obligations to the corporation, and the corporations' interests are not to be confused with the interests of the creditors or those of any other stakeholder. There is no need to read the interests of creditors into the fiduciary duty set out in s. 122(1)(*a*) in light of the availability under the CBCA both of the oppression remedy (s. 241(2)(*c*)) and of an action based on the duty of care (s. 122(1)(*b*)).

Directors and officers will not be held to be in breach of the duty of care under s. 122(1)(*b*) of the CBCA if they act prudently and on a reasonably informed basis. The standard of care is an objective one. The decisions of directors and officers must be reasonable business decisions in light of all the circumstances, including the prevailing socio-economic conditions, about which they knew or ought to have known. While courts are ill-suited and should be reluctant to second-guess the application of business expertise to the considerations that are often involved in corporate decision-making, they are capable, on the facts of any case, of determining whether an appropriate degree of prudence and diligence was brought to bear in reaching what is claimed to be a reasonable business decision. In this case, in adopting the joint inventory procurement policy, the directors did not breach their duty of care in respect of Peoples' creditors. The implementation of the new policy was a reasonable business decision made with a view to rectifying a serious and urgent business problem in circumstances in which no solution may have been possible. The trial judge's conclusion that the new policy led inexorably to Peoples' failure and bankruptcy was factually incorrect and constituted a palpable and overriding error. Many factors other than the new policy contributed more directly to Peoples' bankruptcy.

Section 44(2) of the CBCA as it then read (the provision has since been repealed) cannot exempt directors and officers from potential liability under s. 122(1) for any financial assistance given by subsidiaries to the parent corporation. Nor can the Wise brothers successfully invoke good faith reliance on the opinion of the vice-president of administration and finance under s. 123(4)(*b*) of the CBCA. As a non-professional employee, the vice-president did not belong to any of the professional groups named in s. 123(4)(*b*). He was not an accountant, was not subject to the regulatory overview of any professional organization and did not carry independent insurance coverage for professional negligence.

The trustee's claim under s. 100 of the BIA must fail. The relevant transactions are those spanning the period from February to December 1994 when the new procurement policy was in effect. With regard to all the circumstances of this case, a disparity of slightly more than six percent between fair market value and the consideration received does not constitute a conspicuous difference.

While, in light of this conclusion, there is no need to consider whether the Wise brothers would have been "privy" to the transactions, the disagreement between the trial judge and the Court of Appeal on the interpretation of "privy" in s. 100(2) of the BIA warrants the following comments. Since the provision's remedial purpose is to reverse the effects of a transaction that

stripped value from the estate of a bankrupt person. the word "privy" should be given a broad reading to include those who benefit directly or indirectly from. and have knowledge of, a transaction occurring for less than fair market value. This rationale is particularly apt when those who benefit are the controlling minds behind the transaction

### Cases Cited

**Applied:** *373409 Alberta Ltd. v. (Receiver of) v. Bank of Montreal,* [2002] 4 S.C.R. 312. 2002 SCC 81; **approved:** *Re Olympia & York Enterprises Ltd. and Hiram Walker Resources Ltd.* (1986). 59 O.R. (2d) 254; *Standard Trustco Ltd. (Trustee of) v. Standard Trust Co.* (1995). 26 O.R. (3d) 1; **referred to:** *Automatic Self-Cleansing Filter Syndicate Co. v. Cuninghame,* [1906] 2 Ch. 34; *K.L.B. v. British Columbia,* [2003] 2 S.C.R. 403, 2003 SCC 51; *Canadian Aero Service Ltd. v. O'Malley,* [1974] S.C.R. 592; *820099 Ontario Inc. v. Harold E. Ballard Ltd.* (1991), 3 B.L.R. (2d) 123, aff'd (1991), 3 B.L.R. (2d) 113; *Teck Corp. v. Millar* (1972). 33 D.L.R. (3d) 288; *Brasserie Labatt ltée v. Lanoue,* [1999] Q.J. No. 1108; *Regent Taxi & Transport Co. v. Congrégation des Petits Frères de Marie,* [1929] S.C.R. 650, rev'd [1932] 2 D.L.R. 70; *Lister v. McAnulty,* [1944] S.C.R. 317; *Hôpital Notre-Dame de l'Espérance v. Laurent,* [1978] 1 S.C.R. 605; *Dovey v. Cory,* [1901] A.C. 477; *In re Brazilian Rubber Plantations and Estates, Ltd.,* [1911] 1 Ch. 425; *In re City Equitable Fire Insurance Co.,* [1925] 1 Ch. 407; *Soper v. Canada,* [1998] 1 F.C. 124; *Maple Leaf Foods Inc. v. Schneider Corp.* (1998), 42 O.R. (3d) 177; *Skalbania (Trustee of) v. Wedgewood Village Estates Ltd.* (1989), 37 B.C.L.R. (2d) 88.

### Statutes and Regulations Cited

*Bankruptcy and Insolvency Act,* R.S.C. 1985, c. B-3, s. 100(1) [repl. 1997, c. 12, s. 81], (2). *Canada Business Corporations Act,* R.S.C. 1985, c. C-44. ss. 44 [rep. 2001, c. 14, s. 26], (1), (2), 102(1) [repl. *idem,* s. 35], 121, 122(1) [repl. *idem.* s. 135 (Sch . item 43)], 123(4) [repl. *idem,* s. 50], (5) [repl. *idem*], 185, 238, 239, 240, 241.

*Civil Code of Québec,* S.Q. 1991, c. 64, arts. 300, 311, 1457, 2501.

*Interpretation Act,* R.S.C. 1985, c. I-21, s. 8.1.

### Authors Cited

Allen, William T., Jack B. Jacobs and Leo E. Strine, Jr. "Function Over Form: A Reassessment of Standards of Review in Delaware Corporation Law" (2001). 26 *Del. J. Corp. L.* 859

Beck, Stanley M. "Minority Shareholders' Rights in the 1980s" In *Corporate Law in the 80s.* Special Lectures of the Law Society of Upper Canada. Don Mills. Ont.: R. De Boo, 1982

Brock, Jason. "The Propriety of Profitmaking: Fiduciary Duty and Unjust Enrichment" (2000), 58 *U.T. Fac. L. Rev.* 185

Crête, Raymonde. et Stéphane Rousseau. *Droit des sociétés : principes fondamentaux* Montréal : Thémis, 2002.

Dickerson, Robert W. V., John L. Howard and Leon Getz. *Proposals for a New Business Corporations Law for Canada,* vols. I and II. Ottawa: Information Canada, 1971

Gray, Wayne D. "*Peoples v. Wise* and *Dylex:* Identifying Stakeholder Interests upon or near Corporate Insolvency -- Stasis or Pragmatism?" (2003). 39 *Can. Bus. L.J.* 242

Houlden, L.W., and G.B. Morawetz. *Bankruptcy and Insolvency Law of Canada.* vol. 2, 3rd ed. Toronto: Carswell. 1989 (loose-leaf updated 2003. release 9)

Iacobucci, Edward M. "Directors' Duties in Insolvency: Clarifying What Is at Stake" (2003). 39 *Can. Bus. L.J.* 398

Iacobucci. Edward M., and Kevin E. Davis. "Reconciling Derivative Claims and the Oppression

Remedy" (2000). 12 *S.C.L.R.* (2d) 87

Martel, Paul. "Le 'voile corporatif' -- l'attitude des tribunaux face à l'article 317 du Code civil du Québec" (1998), 58 *R. du B.* 95.

McGuinness, Kevin Patrick. *The Law and Practice of Canadian Business Corporations*. Toronto: Butterworths, 1999

Thomson, David. "Directors, Creditors and Insolvency: A Fiduciary Duty or a Duty Not to Oppress?" (2000), 58(1) *U.T. Fac. L. Rev.* 31

APPEAL from a judgment of the Quebec Court of Appeal. [2003] R.J.Q. 796, 224 D.L.R. (4th) 509, 41 C.B.R. (4th) 225, [2003] Q.J. No. 505 (QL), setting aside a decision of the Superior Court, [1999] R.R.A. 178, 23 C.B.R. (4th) 200, [1998] Q.J. No 3571 (QL). Appeal dismissed

*Gerald F. Kandestin, Gordon Kugler* and *Gordon Levine* for the appellant

*Éric Lalanne* and *Martin Tétreault*, for the respondents Lionel Wise, Ralph Wise and Harold Wise.

*Ian Rose* and *Odette Jobin-Laberge*, for the respondent Chubb Insurance Company of Canada

The judgment of the Court was delivered by

MAJOR AND DESCHAMPS JJ. --

I Introduction

1    The principal question raised by this appeal is whether directors of a corporation owe a fiduciary duty to the corporation's creditors comparable to the statutory duty owed to the corporation. For the reasons that follow, we conclude that directors owe a duty of care to creditors, but that duty does not rise to a fiduciary duty. We agree with the disposition of the Quebec Court of Appeal. The appeal is therefore dismissed.

2    As a result of the demise in the mid-1990s of two major retail chains in eastern Canada, Wise Stores Inc. ("Wise") and its wholly-owned subsidiary, Peoples Department Stores Inc. ("Peoples"), the indebtedness of a number of Peoples' creditors went unsatisfied. In the wake of the failure of the two chains, Caron Bélanger Ernst & Young Inc., Peoples' trustee in bankruptcy (the "trustee"), brought an action against the directors of Peoples. To address the trustee's claims, the extent of the duties imposed by s. 122(1) of the *Canada Business Corporations Act*, R.S.C. 1985, c. C-44 ("CBCA"), upon directors with respect to creditors must be determined; we must also identify the purpose and reach of s. 100 of the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3 ("BIA").

3    In our view, it has not been established that the directors of Peoples violated either the fiduciary duty or the duty of care imposed by s. 122(1) of the CBCA. As for the trustee's submission regarding s. 100 of the BIA, we agree with the Court of Appeal that the consideration received in the impugned transactions was not "conspicuously" less than fair market value. The BIA claim fails on that basis.

II. Background

4    Wise was founded by Alex Wise in 1930 as a small clothing store on St-Hubert Street in Montreal. By 1992, through expansion effected by a mix of internal growth and acquisitions, it had become an enterprise operating at 50 locations with annual sales of approximately $100 million, and it had been listed on the Montreal Stock Exchange in 1986. The stores were, for the most part, located in urban areas in Quebec. The founder's three sons, Lionel, Ralph and Harold Wise (the "Wise brothers"), were majority shareholders, officers, and directors of Wise

Together, they controlled 75 percent of the firm's equity

5    In 1992, Peoples had been in business continuously in one form or another for 78 years. It had operated as an unincorporated division of Marks & Spencer Canada Inc. ("M & S") until 1991, when it was incorporated as a separate company. M & S itself was wholly owned by the large British firm, Marks & Spencer plc. ("M & S plc") Peoples' 81 stores were generally located in rural areas, from Ontario to Newfoundland. Peoples had annual sales of about $160 million, but was struggling financially. Its annual losses were in the neighbourhood of $10 million.

6    Wise and Peoples competed with other chains such as Canadian Tire, Greenberg, Hart, K-Mart, M-Stores, Metropolitan Stores, Rossy, Woolco and Zellers. Retail competition in eastern Canada was intense in the early 1990s. In 1992, M-Stores went bankrupt. In 1994, Greenberg and Metropolitan Stores followed M-Stores into bankruptcy. The 1994 entry of Wal-Mart into the Canadian market, with its acquisition of over 100 Woolco stores from Woolworth Canada Inc., exerted significant additional competitive pressure on retail stores.

7    Lionel Wise, the eldest of the three brothers and Wise's executive vice-president, had expressed an interest in acquiring the ailing Peoples chain from M & S as early as 1988. Initially, M & S did not share Wise's interest for the sale, but by late 1991, M & S plc., the British parent company of M & S, had decided to divest itself of all its Canadian operations. At this point, M & S incorporated each of its three Canadian divisions to facilitate the anticipated divestiture thereof.

8    The new-found desire to sell coincided with Wise's previously expressed interest in acquiring its larger rival. Although M & S had initially hoped to sell Peoples for cash to a large firm in a solid financial condition, it was unable to do so. Consequently, negotiations got underway with representatives of Wise. A formal share purchase agreement was drawn up in early 1992 and executed in June 1992, with July 16, 1992 as its closing date.

9    Wise incorporated a company, 2798832 Canada Inc., for the purpose of acquiring all of the issued and outstanding shares of Peoples from M & S. The $27- million share acquisition proceeded as a fully leveraged buyout. The portion of the purchase price attributable to inventory was discounted by 30 percent. The discount was designed to inject equity into Peoples in the fiscal year following the sale and to make use of some of the tax losses that had accumulated in prior years.

10    The amount of the down payment due to M & S at closing, $5 million, was borrowed from the Toronto Dominion Bank (the "TD Bank"). According to the terms of the share purchase agreement, the $22-million balance of the purchase price would be carried by M & S and would be repaid over a period of eight years. Wise guaranteed all of 2798832 Canada Inc.'s obligations pursuant to the terms of the share purchase agreement.

11    To protect its interests, M & S took the assets of Peoples as security (subject to a priority in favour of the TD Bank) and negotiated strict covenants concerning the financial management and operation of the company. Among other requirements, 2798832 Canada Inc. and Wise were obligated to maintain specific financial ratios, and Peoples was not permitted to provide financial assistance to Wise. In addition, the agreement provided that Peoples could not be amalgamated with Wise until the purchase price had been paid. This prohibition was presumably intended to induce Wise to refinance and pay the remainder of the purchase price as early as possible in order to overcome the strict conditions imposed upon it under the share purchase agreement.

12    On January 31, 1993, 2798832 Canada Inc. was amalgamated with Peoples. The new entity retained Peoples' corporate name. Since 2798832 Canada Inc. had been a wholly-owned subsidiary of Wise, upon amalgamation the new Peoples became a subsidiary directly owned and controlled by Wise. The three Wise brothers were Peoples' only directors.

13    Following the acquisition, Wise had attempted to rationalize its operations by consolidating the overlapping corporate functions of Wise and Peoples, and operating as a group. The consolidation of the administration, accounting, advertising and purchasing

departments of the two corporations was completed by the fall of 1993. As a consequence of the changes, many of Wise's employees worked for both firms but were paid solely by Wise. The evidence at trial was that because of the tax losses carried-forward by Peoples, it was advantageous for the group to have more expenses incurred by Wise, which, if the group was profitable as a whole, would increase its after-tax profits. Almost from the outset, the joint operation of Wise and Peoples did not function smoothly. Instead of the expected synergies, the consolidation resulted in dissonance.

14    After the acquisition, the total number of buyers for the two companies was nearly halved. The procurement system at that point required buyers to deal simultaneously with suppliers on behalf of both Peoples and Wise. For the buyers, this nearly doubled their administrative work. Separate invoices were required for purchases made on behalf of Wise and Peoples. These invoices had to be separately entered into the system, tracked and paid.

15    Inventory, too, was separately recorded and tracked in the system. However, the inventory of each company was handled and stored, often unsegregated, in shared warehouse facilities. The main warehouse for Peoples, on Cousens Street in Ville St-Laurent, was maintained for and used by both firms. The Cousens warehouse saw considerable activity, as it was the central distribution hub for both chains. The facility was open 18 hours a day and employed 150 people on two shifts who handled a total of approximately 30,000 cartons daily through 20 loading docks. It was abuzz with activity.

16    Before long, the parallel bookkeeping combined with the shared warehousing arrangements caused serious problems for both Wise and Peoples. The actual situation in the warehouse often did not mirror the reported state of the inventory in the system. The goods of one company were often inextricably commingled and confused with the goods of the other. As a result, the inventory records of both companies were increasingly incorrect. A physical inventory count was conducted to try to rectify the situation, to little avail. Both Wise and Peoples stores experienced numerous shipping disruptions and delays. The situation, already unsustainable, was worsening.

17    In October 1993, Lionel Wise consulted David Clément, Wise's (and, after the acquisition, Peoples') vice-president of administration and finance, in an attempt to find a solution. In January 1994, Clément recommended and the three Wise brothers agreed that they would implement a joint inventory procurement policy (the "new policy") whereby the two firms would divide responsibility for purchasing. Peoples would make all purchases from North American suppliers and Wise would, in turn, make all purchases from overseas suppliers. Peoples would then transfer to Wise what it had purchased for Wise, charging Wise accordingly, and vice versa. The new policy was implemented on February 1, 1994. It was this arrangement that was later criticized by certain creditors and by the trial judge.

18    Approximately 82 percent of the total inventory of Wise and Peoples was purchased from North American suppliers, which inevitably meant that Peoples would be extending a significant trade credit to Wise. The new policy was known to the directors, but was neither formally implemented in writing nor approved by a board meeting or resolution.

19    On April 27, 1994, Lionel Wise outlined the details of the new policy at a meeting of Wise's audit committee. A partner of Coopers & Lybrand was M & S's representative on Wise's board of directors and a member of the audit committee. He attended the April 27th meeting and raised no objection to the new policy when it was introduced.

20    By June 1994, financial statements prepared to reflect the financial position of Peoples as of April 30, 1994 revealed that Wise owed more than $18 million to Peoples. Approximately $14 million of this amount resulted from a notional transfer of inventory that was cancelled following the period's end. M & S was concerned about the situation and started an investigation, as a result of which M & S insisted that the new procurement policy be rescinded. Wise agreed to M & S's demand but took the position that the former procurement policy could not be reinstated immediately. An agreement was executed on September 27, 1994, effective July 21, 1994, and it provided that the new policy would be abandoned as of January 31, 1995. The agreement also specified that the inventory and records of the two companies would be kept separate, and that the amount owed to Peoples by Wise would not exceed $3 million.

21    Another result of the negotiations was that M & S accepted an increase in the amount of the TD Bank's priority to $15 million and a new repayment schedule for the balance of the purchase price owed to M & S. The parties agreed to revise the schedule to provide for 37 monthly payments beginning in July 1995. Each of the Wise brothers also provided a personal guarantee of $500,000 in favour of M & S.

22    In September 1994, in light of the fragile financial condition of the companies and the competitiveness of the retail market, the TD Bank announced its intention to cease doing business with Wise and Peoples as of the end of December 1994. Following negotiations, however, the bank extended its financial support until the end of July 1995. The Wise brothers promised to extend personal guarantees in favour of the TD Bank, but this did not occur.

23    In December 1994, three days after the Wise brothers presented financial statements showing disappointing results for Peoples in its third fiscal quarter, M & S initiated bankruptcy proceedings against both Wise and Peoples. A notice of intention to make a proposal was filed on behalf of Peoples the same day. Nonetheless, Peoples later consented to the petition by M & S, and both Wise and Peoples were declared bankrupt on January 13, 1995, effective December 9, 1994. The same day, M & S released each of the Wise brothers from their personal guarantees. M & S apparently preferred to proceed with an uncontested petition in bankruptcy rather than attempting to collect on the personal guarantees.

24    The assets of Wise and Peoples were sufficient to cover in full the outstanding debt owed to the TD Bank, satisfy the entire balance of the purchase price owed to M & S, and discharge almost all the landlords' lease claims. The bulk of the unsatisfied claims were those of trade creditors.

25    Following the bankruptcy, Peoples' trustee filed a petition against the Wise brothers. In the petition, the trustee claimed that they had favoured the interests of Wise over Peoples to the detriment of Peoples' creditors, in breach of their duties as directors under s. 122(1) of the CBCA. The trustee also claimed that the Wise brothers had, in the year preceding the bankruptcy, been privy to transactions in which property had been transferred for conspicuously less than fair market value within the meaning of s. 100 of the BIA.

26    Pursuant to art. 2501 of the *Civil Code of Québec*, S.Q. 1991, c. 64 ("C.C.Q."), the trustee named Chubb Insurance Company of Canada ("Chubb"), which had provided directors' insurance to Wise and its subsidiaries, as a defendant in addition to the Wise brothers.

27    The trial judge, Greenberg J., relying on decisions from the United Kingdom, Australia and New Zealand, held that the fiduciary duty and the duty of care under s. 122(1) of the CBCA extend to a company's creditors when a company is insolvent or in the vicinity of insolvency. Greenberg J. found that the implementation, by the Wise brothers *qua* directors of Peoples, of a corporate policy that affected both companies, had occurred while the corporation was in the vicinity of insolvency and was detrimental to the interests of the creditors of Peoples. The Wise brothers were therefore found liable and the trustee was awarded $4.44 million in damages. As Chubb had provided insurance coverage for directors, it was also held liable. Greenberg J. also considered the alternative grounds under the BIA advanced by the trustee and found the Wise brothers liable for the same $4.44 million amount on that ground as well. All the parties appealed.

28    The Quebec Court of Appeal, *per* Pelletier J.A., with Robert C.J.Q. and Nuss J.A. concurring, allowed the appeals by Chubb and the Wise brothers. The Court of Appeal expressed reluctance to follow Greenberg J. in equating the interests of creditors with the best interests of the corporation when the corporation was insolvent or in the vicinity of insolvency, stating that an innovation in the law such as this is a policy matter more appropriately dealt with by Parliament than the courts. In considering the trustee's claim under s. 100 of the BIA, Pelletier J.A. held that the trial judge had committed a palpable and overriding error in concluding that the amounts owed by Wise to Peoples in respect of inventory "were neither collected nor collectible". He found that the consideration received for the transactions had been approximately 94 percent of fair market value, and he was not convinced that this disparity could be characterized as being "conspicuously" less than fair market value. Moreover, he did not accept the broad meaning the trial judge gave to the word "privy". Pelletier J.A. declined to exercise his discretion under s. 100(2) of the BIA to make an order in favour of the trustee. In

view of his conclusion that the Wise brothers were not liable. Pelletier J A. allowed the appeal with respect to Chubb

III. Analysis

29    At the outset, it should be acknowledged that according to art. 300 of the C.C.Q. and s 8 1 of the *Interpretation Act*, R.S.C. 1985, c I-21, the civil law serves as a supplementary source of law to federal legislation such as the CBCA. Since the CBCA does not entitle creditors to sue directors directly for breach of their duties, it is appropriate to have recourse to the *Civil Code of Québec* to determine how rights grounded in a federal statute should be addressed in Quebec, and more specifically how s. 122(1) of the CBCA can be harmonized with the principles of civil liability: see R. Crête and S. Rousseau, *Droit des sociétés par actions principes fondamentaux* (2002), at p. 58

30    This case came before our Court on the issue of whether directors owe a duty to creditors. The creditors did *not* bring a derivative action or an oppression remedy application under the CBCA. Instead, the trustee, representing the interests of the creditors, sued the directors for an alleged breach of the duties imposed by s. 122(1) of the CBCA. The standing of the trustee to sue was not questioned

31    The primary role of directors is described in s. 102(1) of the CBCA:

**102.** (1) Subject to any unanimous shareholder agreement, the directors shall manage, or supervise the management of, the business and affairs of a corporation.

As for officers, s. 121 of the CBCA provides that their powers are delegated to them by the directors:

**121.** Subject to the articles, the by-laws or any unanimous shareholder agreement,

(*a*) the directors may designate the offices of the corporation, appoint as officers persons of full capacity, specify their duties and delegate to them powers to manage the business and affairs of the corporation, except powers to do anything referred to in subsection 115(3);

(*b*) a director may be appointed to any office of the corporation; and

(*c*) two or more offices of the corporation may be held by the same person.

Although the shareholders are commonly said to own the corporation, in the absence of a unanimous shareholder agreement to the contrary, s. 102 of the CBCA provides that it is not the shareholders, but the directors elected by the shareholders, who are responsible for managing it. This clear demarcation between the respective roles of shareholders and directors long predates the 1975 enactment of the CBCA: see *Automatic Self-Cleansing Filter Syndicate Co v. Cuninghame*, [1906] 2 Ch. 34 (C.A.); see also art. 311. C.C.Q.

32    Subsection 122(1) of the CBCA establishes two distinct duties to be discharged by directors and officers in managing, or supervising the management of, the corporation:

**122.** (1) Every director and officer of a corporation in exercising their powers and discharging their duties shall

(*a*) act honestly and in good faith with a view to the best interests of the corporation; and

(*b*) exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances

The first duty has been referred to in this case as the "fiduciary duty". It is better described as the "duty of loyalty". We will use the expression "statutory fiduciary duty" for purposes of clarity when referring to the duty under the CBCA. This duty requires directors and officers to act honestly and in good faith with a view to the best interests of the corporation. The second duty is commonly referred to as the "duty of care". Generally speaking, it imposes a legal

obligation upon directors and officers to be diligent in supervising and managing the corporation's affairs

33    The trial judge did not apply or consider separately the two duties imposed on directors by s. 122(1) As the Court of Appeal observed, the trial judge appears to have confused the two duties They are, in fact, distinct and are designed to secure different ends. For that reason, they will be addressed separately in these reasons.

### A. The Statutory Fiduciary Duty: Section 122(1)(a) of the CBCA

34    Considerable power over the deployment and management of financial, human, and material resources is vested in the directors and officers of corporations. For the directors of CBCA corporations, this power originates in s. 102 of the Act For officers, this power comes from the powers delegated to them by the directors In deciding to invest in, lend to or otherwise deal with a corporation, shareholders and creditors transfer control over their assets to the corporation, and hence to the directors and officers, in the expectation that the directors and officers will use the corporation's resources to make reasonable business decisions that are to the corporation's advantage

35    The statutory fiduciary duty requires directors and officers to act honestly and in good faith *vis-à-vis* the corporation They must respect the trust and confidence that have been reposed in them to manage the assets of the corporation in pursuit of the realization of the objects of the corporation. They must avoid conflicts of interest with the corporation They must avoid abusing their position to gain personal benefit They must maintain the confidentiality of information they acquire by virtue of their position. Directors and officers must serve the corporation selflessly, honestly and loyally: see K. P. McGuinness. *The Law and Practice of Canadian Business Corporations* (1999), at p 715.

36    The common law concept of fiduciary duty was considered in *K.L.B. v British Columbia*, [2003] 2 S.C.R. 403, 2003 SCC 51 In that case, which involved the relationship between the government and foster children, a majority of this Court agreed with McLachlin C.J. who stated, at paras. 40-41 and 49:

...Fiduciary duties arise in a number of different contexts, including express trusts, relationships marked by discretionary power and trust, and the special responsibilities of the Crown in dealing with aboriginal interests

What ... might the content of the fiduciary duty be if it is understood ... as a private law duty arising simply from the relationship of discretionary power and trust between the Superintendent and the foster children? In *Lac Minerals Ltd. v. International Corona Resources Ltd.*, [1989] 2 S.C.R. 574, at pp. 646-47, La Forest J. noted that there are certain common threads running through fiduciary duties that arise from relationships marked by discretionary power and trust, such as loyalty and "the avoidance of a conflict of duty and interest and a duty not to profit at the expense of the beneficiary". However, he also noted that "[t]he obligation imposed may vary in its specific substance depending on the relationship" (p. 646).

... concern for the best interests of the child informs the parental fiduciary relationship, as La Forest J. noted in *M. (K.) v. M. (H.)*, supra, at p. 65. But the duty imposed is to act loyally, and not to put one's own or others' interests ahead of the child's in a manner that abuses the child's trust ... The parent who exercises undue influence over the child in economic matters for his own gain has put his own interests ahead of the child's, in a manner that abuses the child's trust in him. The same may be said of the parent who uses a child for his sexual gratification or a parent who, wanting to avoid trouble for herself and her household, turns a blind eye to the abuse of a child by her spouse. The parent need not, as the Court of Appeal suggested in the case at bar, be consciously motivated by a desire for profit or personal advantage; nor does it have to be her own interests, rather than those of a third party, that she puts ahead of the child's. It is rather a question of disloyalty — of putting someone's interests ahead of the child's in a manner that abuses the child's trust. Negligence, even aggravated negligence, will not ground parental fiduciary liability unless it is associated with breach of trust in this sense. [Emphasis added ]

37    The issue to be considered here is the "specific substance" of the fiduciary duty based on the relationship of directors to corporations under the CBCA

38    It is settled law that the fiduciary duty owed by directors and officers imposes strict obligations: see *Canadian Aero Service Ltd. v. O'Malley*, [1974] S.C.R. 592, at pp. 609-10, *per* Laskin J. (as he then was), where it was decided that directors and officers may even have to account to the corporation for profits they make that do not come at the corporation's expense:

> The reaping of a profit by a person at a company's expense while a director thereof is, of course, an adequate ground upon which to hold the director accountable. Yet there may be situations where a profit must be disgorged, although not gained at the expense of the company, on the ground that a director must not be allowed to use his position as such to make a profit even if it was not open to the company, as for example, by reason of legal disability, to participate in the transaction. An analogous situation, albeit not involving a director, existed for all practical purposes in the case of *Phipps v. Boardman* [[1967] 2 A.C. 46], which also supports the view that liability to account does not depend on proof of an actual conflict of duty and self-interest. Another, quite recent, illustration of a liability to account where the company itself had failed to obtain a business contract and hence could not be regarded as having been deprived of a business opportunity is *Industrial Development Consultants Ltd. v. Cooley* [[1972] 2 All E.R. 162], a judgment of a Court of first instance. There, the managing director, who was allowed to resign his position on a false assertion of ill health, subsequently got the contract for himself. That case is thus also illustrative of the situation where a director's resignation is prompted by a decision to obtain for himself the business contract denied to his company and where he does obtain it without disclosing his intention. [Emphasis added.]

A compelling argument for making directors accountable for profits made as a result of their position. though not at the corporation's expense. is presented by J. Brock, "The Propriety of Profitmaking: Fiduciary Duty and Unjust Enrichment" (2000), 58 *U.T. Fac. L. Rev.* 185, at pp. 204-5

39    However. it is not required that directors and officers in all cases avoid personal gain as a direct or indirect result of their honest and good faith supervision or management of the corporation. In many cases the interests of directors and officers will innocently and genuinely coincide with those of the corporation. If directors and officers are also shareholders, as is often the case, their lot will automatically improve as the corporation's financial condition improves. Another example is the compensation that directors and officers usually draw from the corporations they serve. This benefit, though paid by the corporation. does not, if reasonable, ordinarily place them in breach of their fiduciary duty. Therefore, all the circumstances may be scrutinized to determine whether the directors and officers have acted honestly and in good faith with a view to the best interests of the corporation

40    In our opinion. the trial judge's determination that there was no fraud or dishonesty in the Wise brothers' attempts to solve the mounting inventory problems of Peoples and Wise stands in the way of a finding that they breached their fiduciary duty. Greenberg J. stated, at para. 180:

> We hasten to add that in the present case, the Wise Brothers derived no direct personal benefit from the new domestic inventory procurement policy, albeit that, as the controlling shareholders of Wise Stores, there was an indirect benefit to them. Moreover, as was conceded by the other parties herein, in deciding to implement the new domestic inventory procurement policy, there was no dishonesty or fraud on their part.

The Court of Appeal relied heavily on this finding by the trial judge. as do we. At para. 84, Pelletier J.A. stated that:

> [TRANSLATION] In regard to fiduciary duty, I would like to point out that the brothers were driven solely by the wish to resolve the problem of inventory procurement affecting both the operations of Peoples Inc. and those of Wise. [This is a] motivation that is in line with the pursuit of the interests of the corporation within the meaning of paragraph 122(1)(*a*) C.B.C.A. and that does not expose them to any justified criticism

41    As explained above, there is no doubt that both Peoples and Wise were struggling with a

serious inventory management problem. The Wise brothers considered the problem and implemented a policy they hoped would solve it. In the absence of evidence of a personal interest or improper purpose in the new policy, and in light of the evidence of a desire to make both Wise and Peoples "better" corporations. we find that the directors did not breach their fiduciary duty under s. 122(1)(a) of the CBCA. See *820099 Ontario Inc. v. Harold E. Ballard Ltd* (1991), 3 B.L.R. (2d) 123 (Ont. Gen. Div.) (aff'd (1991), 3 B.L.R. (2d) 113 (Ont. Div. Ct.)). in which Farley J. at p. 171. correctly observes that in resolving a conflict between majority and minority shareholders, it is safe for directors and officers to act to make the corporation a "better corporation".

42    This appeal does not relate to the non-statutory duty directors owe to shareholders. It is concerned only with the statutory duties owed under the CBCA. Insofar as the statutory fiduciary duty is concerned. it is clear that the phrase the "best interests of the corporation" should be read not simply as the "best interests of the shareholders". From an economic perspective, the "best interests of the corporation" means the maximization of the value of the corporation: see E. M. Iacobucci, "Directors' Duties in Insolvency: Clarifying What Is at Stake" (2003), 39(3) *Can. Bus. L.J.* 398, at pp 400-1. However, the courts have long recognized that various other factors may be relevant in determining what directors should consider in soundly managing with a view to the best interests of the corporation. For example, in *Teck Corp. v. Millar* (1972), 33 D.L.R. (3d) 288 (B.C.S.C.). Berger J. stated, at p. 314:

A classical theory that once was unchallengeable must yield to the facts of modern life. In fact, of course. it has. If today the directors of a company were to consider the interests of its employees no one would argue that in doing so they were not acting *bona fide* in the interests of the company itself. Similarly, if the directors were to consider the consequences to the community of any policy that the company intended to pursue, and were deflected in their commitment to that policy as a result, it could not be said that they had not considered *bona fide* the interests of the shareholders.

I appreciate that it would be a breach of their duty for directors to disregard entirely the interests of a company's shareholders in order to confer a benefit on its employees: *Parke v. Daily News Ltd* , [1962] Ch. 927. But if they observe a decent respect for other interests lying beyond those of the company's shareholders in the strict sense, that will not, in my view, leave directors open to the charge that they have failed in their fiduciary duty to the company.

The case of *Re Olympia & York Enterprises Ltd. and Hiram Walker Resources Ltd* (1986), 59 O.R. (2d) 254 (Div. Ct.), approved, at p. 271, the decision in *Teck, supra*. We accept as an accurate statement of law that in determining whether they are acting with a view to the best interests of the corporation it may be legitimate, given all the circumstances of a given case, for the board of directors to consider, *inter alia*, the interests of shareholders. employees. suppliers. creditors. consumers, governments and the environment.

43    The various shifts in interests that naturally occur as a corporation's fortunes rise and fall do not, however, affect the content of the fiduciary duty under s. 122(1)(a) of the CBCA. At all times, directors and officers owe their fiduciary obligation to the corporation. The interests of the corporation are not to be confused with the interests of the creditors or those of any other stakeholders.

44    The interests of shareholders, those of the creditors and those of the corporation may and will be consistent with each other if the corporation is profitable and well capitalized and has strong prospects. However, this can change if the corporation starts to struggle financially. The residual rights of the shareholders will generally become worthless if a corporation is declared bankrupt. Upon bankruptcy, the directors of the corporation transfer control to a trustee. who administers the corporation's assets for the benefit of creditors.

45    Short of bankruptcy, as the corporation approaches what has been described as the "vicinity of insolvency", the residual claims of shareholders will be nearly exhausted. While shareholders might well prefer that the directors pursue high-risk alternatives with a high potential payoff to maximize the shareholders' expected residual claim. creditors in the same circumstances might prefer that the directors steer a safer course so as to maximize the value of their claims against the assets of the corporation

46    The directors' fiduciary duty does not change when a corporation is in the nebulous "vicinity of insolvency". That phrase has not been defined; moreover, it is incapable of definition and has no legal meaning. What it is obviously intended to convey is a deterioration in the corporation's financial stability. In assessing the actions of directors it is evident that any honest and good faith attempt to redress the corporation's financial problems will, if successful, both retain value for shareholders and improve the position of creditors. If unsuccessful, it will not qualify as a breach of the statutory fiduciary duty.

47    For a discussion of the shifting interests and incentives of shareholders and creditors, see W. D. Gray, "*Peoples v Wise* and *Dylex*: Identifying Stakeholder Interests upon or near Corporate Insolvency -- Stasis or Pragmatism?" (2003), 39 *Can. Bus. L. J.* 242, at p 257; E M lacobucci & K E Davis, "Reconciling Derivative Claims and the Oppression Remedy" (2000), 12 *S.C.L.R* (2d) 87, at p 114. In resolving these competing interests, it is incumbent upon the directors to act honestly and in good faith with a view to the best interests of the corporation. In using their skills for the benefit of the corporation when it is in troubled waters financially, the directors must be careful to attempt to act in its best interests by creating a "better" corporation, and not to favour the interests of any one group of stakeholders. If the stakeholders cannot avail themselves of the statutory fiduciary duty (the duty of loyalty, *supra*) to sue the directors for failing to take care of their interests, they have other means at their disposal.

48    The Canadian legal landscape with respect to stakeholders is unique. Creditors are only one set of stakeholders, but their interests are protected in a number of ways. Some are specific, as in the case of amalgamation: s. 185 of the CBCA. Others cover a broad range of situations. The oppression remedy of s. 241(2)(*c*) of the CBCA and the similar provisions of provincial legislation regarding corporations grant the broadest rights to creditors of any common law jurisdiction: see D. Thomson, "Directors, Creditors and Insolvency: A Fiduciary Duty or a Duty Not to Oppress?" (2000), 58(1) *U.T Fac. L. Rev* 31, at p 48. One commentator describes the oppression remedy as "the broadest, most comprehensive and most open-ended shareholder remedy in the common law world": S M Beck, "Minority Shareholders' Rights in the 1980s" in *Corporate Law in the 80s* (1982), 311, at p 312. While Beck was concerned with shareholder remedies, his observation applies equally to those of creditors.

49    The fact that creditors' interests increase in relevancy as a corporation's finances deteriorate is apt to be relevant to, *inter alia*, the exercise of discretion by a court in granting standing to a party as a "complainant" under s. 238(*d*) of the CBCA as a "proper person" to bring a derivative action in the name of the corporation under ss 239 and 240 of the CBCA, or to bring an oppression remedy claim under s 241 of the CBCA.

50    Section 241(2)(*c*) authorizes a court to grant a remedy if

the powers of the directors of the corporation or any of its affiliates are or have been exercised in a manner

that is oppressive or unfairly prejudicial to or that unfairly disregards the interests of any security holder, creditor, director or officer

A person applying for the oppression remedy must, in the court's opinion, fall within the definition of "complainant" found in s 238 of the CBCA:
(*a*) a registered holder or beneficial owner, and a former registered holder or beneficial owner, of a security of a corporation or any of its affiliates,

(*b*) a director or an officer or a former director or officer of a corporation or any of its affiliates,

(*c*) the Director, or

(*d*) any other person who, in the discretion of a court, is a proper person to make an application under this Part.

Creditors, who are not security holders within the meaning of para. (*a*), may therefore apply for the oppression remedy under para. (*d*) by asking a court to exercise its discretion and grant

them status as a "complainant".

51    Section 241 of the CBCA provides a possible mechanism for creditors to protect their interests from the prejudicial conduct of directors. In our view, the availability of such a broad oppression remedy undermines any perceived need to extend the fiduciary duty imposed on directors by s. 122(1)(a) of the CBCA to include creditors

52    The Court of Appeal, at paras. 99-100, referred to *373409 Alberta Ltd. (Receiver of) v Bank of Montreal*, [2002] 4 S.C.R. 312, 2002 SCC 81, as an indication by this Court that the interests of creditors do not have any bearing on the assessment of the conduct of directors. However, the receiver in that case was representing the corporation's rights and not the creditors' rights; therefore, the case has no application in this appeal. *373409 Alberta Ltd* involved an action taken by the receiver on behalf of the corporation against a bank for the tort of conversion. The sole shareholder, director and officer of 373409 Alberta Ltd., who was also the sole shareholder, director and officer of another corporation, Legacy Holdings Ltd., had deposited a cheque payable to 373409 Alberta Ltd. into the account of Legacy. While it was recognized, at para. 22, that the diversion of money from 373409 Alberta Ltd. to Legacy "may very well have been wrongful *vis-à-vis* [373409 Alberta Ltd ]'s creditors" (none of whom were involved in the action), no fraud had been committed against the corporation itself and the bank, acting on proper authority, had not wrongfully interfered with the cheque by carrying out the deposit instructions. The statutory duties of the directors were not at issue, nor were they considered, and no assessment of the creditors' rights was made. With respect, Pelletier J A 's broad reading of *373409 Alberta Ltd* was misplaced

53    In light of the availability both of the oppression remedy and of an action based on the duty of care, which will be discussed below, stakeholders have viable remedies at their disposal. There is no need to read the interests of creditors into the duty set out in s. 122(1)(a) of the CBCA. Moreover, in the circumstances of this case, the Wise brothers did not breach the statutory fiduciary duty owed to the corporation

    B. *The Statutory Duty of Care: Section 122(1)(b) of the CBCA*

54    As mentioned above, the CBCA does not provide for a direct remedy for creditors against directors for breach of their duties and the C.C.Q. is used as suppletive law.

55    In Quebec, directors have been held liable to creditors in respect of either contractual or extra-contractual obligations. Contractual liability arises where the director personally guarantees a contractual obligation of the company. Liability also arises where the director personally acts in a manner that triggers his or her extra-contractual liability. See P. Martel, "Le 'voile corporatif' -- l'attitude des tribunaux face à l'article 317 du Code civil du Québec" (1998), 58 *R. du B.* 95, at pp. 135-36; *Brasserie Labatt ltée v Lanoue*, [1999] Q.J. No. 1108, *per* Forget J.A., at para. 29. It is clear that the Wise brothers cannot be held contractually liable as they did not guarantee the debts at issue here. Extra-contractual liability is the remaining possibility.

56    To determine the applicability of extra-contractual liability in this appeal, it is necessary to refer to art. 1457 of the C.C.Q.:

    <u>Every person</u> has a duty to abide by the <u>rules of conduct</u> which lie upon him, according to the circumstances, usage or law, so as not to cause injury to <u>another</u>

    Where he is endowed with reason and fails in this duty, he is responsible for any injury he causes to another person by such fault and is liable to reparation for the injury, whether it be bodily, moral or material in nature.

    He is also liable, in certain cases, to reparation for injury caused to another by the act or fault of another person or by the act of things in his custody. [Emphasis added]

    Three elements of art. 1457 of the C.C.Q. are relevant to the integration of the director's duty of care into the principles of extra-contractual liability: who has the duty ("every person"), to whom is the duty owed ("another") and what breach will trigger liability ("rules of conduct"). It is clear that directors and officers come within the expression "every person". It is equally clear

that the word "another" can include the creditors. The reach of art. 1457 of the C.C.Q. is broad and it has been given an open and inclusive meaning. See *Regent Taxi & Transport Co. v Congrégation des Petits Frères de Marie*, [1929] S.C.R. 650, *per* Anglin C.J. at p. 655 (rev'd on other grounds. [1932] 2 D.L.R. 70 (J.C.P.C.)):

> ...to narrow the *prima facie* scope of art. 1053 C.C. [now art. 1457] is highly dangerous and would necessarily result in most meritorious claims being rejected; many a wrong would be without a remedy.

This liberal interpretation was also affirmed and treated as settled by this Court in *Lister v. McAnulty*, [1944] S.C.R. 317, and *Hôpital Notre-Dame de l'Espérance v. Laurent*, [1978] 1 S.C.R. 605.

57    This interpretation can be harmoniously integrated with the wording of the CBCA. Indeed, unlike the statement of the fiduciary duty in s. 122(1)(*a*) of the CBCA, which specifies that directors and officers must act with a view to the best interests of the corporation, the statement of the duty of care in s. 122(1)(*b*) of the CBCA does not specifically refer to an identifiable party as the beneficiary of the duty. Instead, it provides that "[e]very director and officer of a corporation in exercising his powers and discharging his duties shall . . . exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances." Thus, the identity of the beneficiary of the duty of care is much more open-ended, and it appears obvious that it must include creditors. This result is clearly consistent with the civil law interpretation of the word "another". Therefore, if breach of the standard of care, causation and damages are established, creditors can resort to art. 1457 to have their rights vindicated. The only issue thus remaining is the determination of the "rules of conduct" likely to trigger extracontractual liability. On this issue, art. 1457 is explicit.

58    The first paragraph of art. 1457 does not set the standard of conduct. Instead, it incorporates by reference s. 122(1)(*b*) of the CBCA. The statutory duty of care is a "duty to abide by [a rule] of conduct which lie[s] upon [them], according to the . . . law, so as not to cause injury to another". Thus, for the purpose of determining whether the Wise brothers can be held liable, only the CBCA is relevant. It is therefore necessary to outline the requirements of the duty of care embodied in s. 122(1)(*b*) of the CBCA.

59    That directors must satisfy a duty of care is a long-standing principle of the common law, although the duty of care has been reinforced by statute to become more more demanding. Among the earliest English cases establishing the duty of care were *Dovey v. Cory*, [1901] A.C. 477 (H.L.); *In re Brazilian Rubber Plantations and Estates, Ltd.*, [1911] 1 Ch. 425 (C.A.); and *In re City Equitable Fire Insurance Co.*, [1925] 1 Ch. 407 (C.A.). In substance, these cases held that the standard of care was a reasonably relaxed, subjective standard. The common law required directors to avoid being grossly negligent with respect to the affairs of the corporation and judged them according to their own personal skills, knowledge, abilities and capacities. See McGuinness, *supra*, at p. 776: "Given the history of case law in this area, and the prevailing standards of competence displayed in commerce generally, it is quite clear that directors were not expected at common law to have any particular business skill or judgment".

60    The 1971 report entitled *Proposals for a New Business Corporations Law for Canada* (1971) ("Dickerson Report") culminated the work of a committee headed by R.W.V. Dickerson which had been appointed by the federal government to study the need for new federal business corporations legislation. This report preceded the enactment of the CBCA by four years and influenced the eventual structure of the CBCA.

61    The standard recommended by the Dickerson Report was objective, requiring directors and officers to meet the standard of a "reasonably prudent person" (vol. II, at p. 74):

9.19

(1) Every director and officer of a corporation in exercising his powers and discharging his duties shall

. . .

(b) exercise the care. diligence and skill of a reasonably prudent person

The report described how this proposed duty of care differed from the prevailing common law duty of care (vol. I. at p. 83):

> 242 The formulation of the duty of care, diligence and skill owed by directors represents an attempt to upgrade the standard presently required of them. The principal change here is that whereas at present the law seems to be that a director is only required to demonstrate the degree of care. skill and diligence that could reasonably be expected from him. having regard to his knowledge and experience -- *Re City Equitable Fire Insurance Co*., [1925] Ch. 425 -- under s. 9 19(1)(b) he is required to conform to the standard of a reasonably prudent man <u>Recent experience has demonstrated how low the prevailing legal</u> standard <u>of care for directors is, and we have sought to raise it significantly.</u> We are aware of the argument that raising the standard of conduct for directors may deter people from accepting directorships. The truth of that argument has not been demonstrated and we think it is specious. The duty of care imposed by s. 9 19(1)(b) is exactly the same as that which the common law imposes on every professional person, for example, and there is no evidence that this has dried up the supply of lawyers, accountants. architects. surgeons or anyone else. It is in any event cold comfort to a shareholder to know that there is a steady supply of marginally competent people available under present law to manage his investment. [Emphasis added ]

62    The statutory duty of care in s. 122(1)(*b*) of the CBCA emulates but does not replicate the language proposed by the Dickerson Report. The main difference is that the enacted version includes the words "*in comparable circumstances*". which modifies the statutory standard by requiring the context in which a given decision was made to be taken into account. This is not the introduction of a subjective element relating to the competence of the director, but rather the introduction of a contextual element into the statutory standard of care. It is clear that s. 122(1) (*b*) requires more of directors and officers than the traditional common law duty of care outlined in, for example, *Re City Equitable Fire Insurance Co*. *supra*

63    The standard of care embodied in s. 122(1)(*b*) of the CBCA was described by Robertson J.A. of the Federal Court of Appeal in *Soper v. Canada*, [1998] 1 F.C. 124, at para. 41, as being "objective subjective". Although that case concerned the interpretation of a provision of the *Income Tax Act*, it is relevant here because the language of the provision establishing the standard of care was identical to that of s. 122(1)(*b*) of the CBCA. With respect. we feel that Robertson J.A.'s characterization of the standard as an "objective subjective" one could lead to confusion. We prefer to describe it as an objective standard. To say that the standard is objective makes it clear that the factual aspects of the circumstances surrounding the actions of the director or officer are important in the case of the s. 122(1)(*b*) duty of care. as opposed to the subjective motivation of the director or officer, which is the central focus of the statutory fiduciary duty of s. 122(1)(*a*) of the CBCA.

64    The contextual approach dictated by s. 122(1)(*b*) of the CBCA not only emphasizes the primary facts but also permits prevailing socio-economic conditions to be taken into consideration. The emergence of stricter standards puts pressure on corporations to improve the quality of board decisions. The establishment of *good corporate governance rules* should be a shield that protects directors from allegations that they have breached their duty of care. However, even with good corporate governance rules. directors' decisions can still be open to criticism from outsiders. Canadian courts, like their counterparts in the United States, the United Kingdom. Australia and New Zealand, have tended to take an approach with respect to the enforcement of the duty of care that respects the fact that directors and officers often have business expertise that courts do not. Many decisions made in the course of business, although ultimately unsuccessful, are reasonable and defensible at the time they are made. Business decisions must sometimes be made, with high stakes and under considerable time pressure, in circumstances in which detailed information is not available. It might be tempting for some to see unsuccessful business decisions as unreasonable or imprudent in light of information that becomes available *ex post facto*. Because of this risk of hindsight bias. Canadian courts have developed a rule of deference to business decisions called the "business judgment rule", adopting the American name for the rule.

65    In *Maple Leaf Foods Inc. v. Schneider Corp*. (1998), 42 O.R. (3d) 177, Weiler J.A. stated. at p. 192:

The law as it has evolved in Ontario and Delaware has the common requirements that the court must be satisfied that the directors have acted reasonably and fairly. The court looks to see that the directors made a *reasonable* decision *not a perfect* decision. Provided the decision taken is within a range of reasonableness, the court ought not to substitute its opinion for that of the board even though subsequent events may have cast doubt on the board's determination. As long as the directors have selected one of several reasonable alternatives, deference is accorded to the board's decision [references omitted]. This formulation of deference to the decision of the Board is known as the "business judgment rule". The fact that alternative transactions were rejected by the directors is irrelevant unless it can be shown that a particular alternative was definitely available and clearly more beneficial to the company than the chosen transaction [reference omitted]. [Emphasis added; italics in original.]

66   In order for a plaintiff to succeed in challenging a business decision he or she has to establish that the directors acted (i) in breach of the duty of care and (ii) in a way that caused injury to the plaintiff: W. T. Allen, J. B. Jacobs, and L. E. Strine, Jr., "Function Over Form: A Reassessment of Standards of Review in Delaware Corporation Law" (2001), 26 *Del. J. Corp. L.* 859, at p. 892.

67   Directors and officers will not be held to be in breach of the duty of care under s. 122(1)(*b*) of the CBCA if they act prudently and on a reasonably informed basis. The decisions they make must be reasonable business decisions in light of all the circumstances about which the directors or officers knew or ought to have known. In determining whether directors have acted in a manner that breached the duty of care, it is worth repeating that perfection is not demanded. Courts are ill-suited and should be reluctant to second-guess the application of business expertise to the considerations that are involved in corporate decision making, but they are capable, on the facts of any case, of determining whether an appropriate degree of prudence and diligence was brought to bear in reaching what is claimed to be a reasonable business decision at the time it was made.

68   The trustee alleges that the Wise brothers breached their duty of care under s. 122(1)(*b*) of the CBCA by implementing the new procurement policy to the detriment of Peoples' creditors. After considering all the evidence, we agree with the Court of Appeal that the implementation of the new policy was a reasonable business decision that was made with a view to rectifying a serious and urgent business problem in circumstances in which no solution may have been possible. The trial judge's conclusion that the new policy led inexorably to Peoples' failure and bankruptcy was factually incorrect and constituted a palpable and overriding error.

69   In fact, as noted by Pelletier J.A., there were many factors other than the new policy that contributed more directly to Peoples' bankruptcy. Peoples had lost $10 million annually while being operated by M & S Wise, which was only marginally profitable and solvent with annual sales of $100 million (versus $160 million for Peoples), had hoped to improve the performance of its new acquisition. Given that the transaction was a fully leveraged buyout, for Wise and Peoples to succeed, Peoples' performance needed to improve dramatically. Unfortunately for both Wise and Peoples, the retail market in eastern Canada had become very competitive in the early 1990s, and this trend continued with the arrival of Wal-Mart in 1994. At paras. 153 and 155, Pelletier J.A. stated:

> [TRANSLATION] In reality, it was that particularly unfavourable financial situation in which the two corporations found themselves that caused their downfall, and it was M. & S. that, to protect its own interests, sounded the charge in December, rightly or wrongly judging that Peoples Inc.'s situation would only worsen over time. It is crystal-clear that the bankruptcy occurred at the most propitious time for M. & S.'s interests, when inventories were high and suppliers were unpaid. In fact, M. & S. recovered the entire balance due on the selling price and almost all of the other debts it was owed.

> ...the trial judge did not take into account the fact that the brothers derived no direct benefit from the transaction impugned, that they acted in good faith and that their true intention was to find a solution to the serious inventory management problem that each of the two corporations was facing. Because of an assessment error, he also ignored the fact that Peoples Inc. received a sizable [*sic*]consideration for the goods it delivered to Wise. Lastly, I note that the act for

which the brothers were found liable, i.e. the adoption of a new joint inventory procurement policy, is not as serious as the trial judge made it out to be and that, in opposition to his view, the act was also not the true cause of the bankruptcy of Peoples Inc. [Emphasis added.]

70    The Wise brothers treated the implementation of the new policy as a decision made in the ordinary course of business and, while no formal agreement evidenced the arrangement, a monthly record was made of the inventory transfers. Although this may appear to be a loose business practice, by the autumn of 1993, Wise had already consolidated several aspects of the operations of the two companies. Legally they were two separate entities. However, the financial fate of the two companies had become intertwined. In these circumstances, there was little or no economic incentive for the Wise brothers to jeopardize the interests of Peoples in favour of the interests of Wise. In fact, given the tax losses that Peoples had carried forward, the companies had every incentive to keep Peoples profitable in order to reduce their combined tax liabilities.

71    Arguably, the Wise brothers could have been more precise in pursuing a resolution to the intractable inventory management problems, having regard to all the troublesome circumstances involved at the time the new policy was implemented. But we, like the Court of Appeal, are not satisfied that the adoption of the new policy breached the duty of care under s. 122(1)(*b*) of the CBCA. The directors cannot be held liable for a breach of their duty of care in respect of the creditors of Peoples.

72    The Court of Appeal relied on two additional provisions of the CBCA that in its view could rescue the Wise brothers from a finding that they breached the duty of care: ss. 44(2) and 123(4).

73    Section 44 of the CBCA, which was in force at the time of the impugned transactions but has since been repealed, permitted a wholly-owned subsidiary to give financial assistance to its holding body corporate:

    **44.** (1) Subject to subsection (2), a corporation or any corporation with which it is affiliated shall not, directly or indirectly, give financial assistance by means of a loan, guarantee or otherwise

          . . .

    (2) A corporation may give financial assistance by means of a loan, guarantee or otherwise

          . . .

    (c) to a holding body corporate if the corporation is a wholly-owned subsidiary of the holding body corporate;

74    While s. 44(2) as it then read qualified the prohibition under s. 44(1), it did not serve to supplant the duties of the directors under s. 122(1) of the CBCA. The Court of Appeal erred in concluding that s. 44(2) served as a blanket legitimization of financial assistance given by wholly-owned subsidiaries to parent corporations. In our opinion, it is incumbent upon directors and officers to exercise their powers in conformity with the duties of s. 122(1).

75    Although s. 44(2) authorized certain forms of financial assistance between corporations, this cannot exempt directors and officers from potential liability under s. 122(1) for any financial assistance given by subsidiaries to the parent corporation.

76    When faced with the serious inventory management problem, the Wise brothers sought the advice of the vice-president of finance, David Clément. The Wise brothers claimed as an additional argument that in adopting the solution proposed by Clément, they were relying in good faith on the judgment of a person whose profession lent credibility to his statement, in accordance with the defence provided for in s. 123(4)(*b*) (now s. 123(5)) of the CBCA. The Court of Appeal accepted the argument. We disagree.

77    The reality that directors cannot be experts in all aspects of the corporations they manage or supervise shows the relevancy of a provision such as s. 123(4)(*b*). At the relevant time, the

text of s. 123(4) read:

123

(4) A director is not liable under section 118, 119 or 122 if he relies in good faith on

(a) financial statements of the corporation represented to him by an officer of the corporation or in a written report of the auditor of the corporation fairly to reflect the financial condition of the corporation; or

(b) a report of a lawyer, accountant, engineer, appraiser or other person whose profession lends credibility to a statement made by him.

78    Although Clément did have a bachelor's degree in commerce and 15 years of experience in administration and finance with Wise, this experience does not correspond to the level of professionalism required to allow the directors to rely on his advice as a bar to a suit under the duty of care  The named professional groups in s. 123(4)(b) were lawyers, accountants, engineers, and appraisers  Clément was not an accountant, was not subject to the regulatory overview of any professional organization and did not carry independent insurance coverage for professional negligence  The title of vice-president of finance should not automatically lead to a conclusion that Clément was a person "whose profession lends credibility to a statement made by him." It is noteworthy that the word "profession" is used, not "position".  Clément was simply a non-professional employee of Wise  His judgment on the appropriateness of the solution to the inventory management problem must be regarded in that light. Although we might accept for the sake of argument that Clément was better equipped and positioned than the Wise brothers to devise a plan to solve the inventory management problems, this is not enough  Therefore, in our opinion, the Wise brothers cannot successfully invoke the defence provided by s. 123(4)(b) of the CBCA but must rely on the other defences raised.

      C  *The Claim under Section 100 of the BIA*

79    The trustee also claimed against the Wise brothers under s. 100 of the BIA  That section reads:

    100. (1) Where a bankrupt sold, purchased, leased, hired, supplied or received property or services in a reviewable transaction within the period beginning on the day that is one year before the date of the initial bankruptcy event and ending on the date of the bankruptcy, both dates included, the court may, on the application of the trustee, inquire into whether the bankrupt gave or received, as the case may be, fair market value in consideration for the property or services concerned in the transaction.

    (2) Where the court in proceedings under this section finds that the consideration given or received by the bankrupt in the reviewable transaction was conspicuously greater or less than the fair market value of the property or services concerned in the transaction, the court may give judgment to the trustee against the other party to the transaction, against any other person being privy to the transaction with the bankrupt or against all those persons for the difference between the actual consideration given or received by the bankrupt and the fair market value, as determined by the court, of the property or services concerned in the transaction.

80    The provision has two principal elements  First, subs. (1) requires the transaction to have been conducted within the year preceding the date of bankruptcy  Second, subs. (2) requires that the consideration given or received by the bankrupt be "conspicuously greater or less" than the fair market value of the property concerned

81    The word "may" is found in both ss. 100(1) and 100(2) of the BIA with respect to the jurisdiction of the court  In *Standard Trustco Ltd. (Trustee of) v. Standard Trust Co.* (1995), 26 O.R. (3d) 1, a majority of the Ontario Court of Appeal held that, even if the necessary preconditions are present, the exercise of jurisdiction under s. 100(1) to inquire into the transaction, and under s. 100(2) to grant judgment, is discretionary  Equitable principles guide

Case 1:04-cv-01266-SLR    Document 85-2    Filed 03/01/2005    Page 20 of 34

the exercise of discretion. We agree

82     Referring to s. 100(2) of the BIA, in *Standard Trustco, supra,* at p. 23, Weiler J.A. explained that:

> When a contextual approach is adopted it is apparent that although the conditions of the section have been satisfied the court is not obliged to grant judgment. The court has a residual discretion to exercise. The contextual approach indicates that the good faith of the parties, the intention with which the transaction took place, and whether fair value was given and received in the transaction are important considerations as to whether that discretion should be exercised.

We agree with Weiler J.A. and adopt her position; however, this appeal does not turn on the discretion to ultimately impose liability. In our view, the Court of Appeal did not interfere with the trial judge's exercise of discretion in reviewing the facts and finding a palpable and overriding error.

83     Within the year preceding the date of bankruptcy, Peoples had transferred inventory to Wise for which the trustee claimed Peoples had not received fair market value in consideration. The relevant transactions involved, for the most part, transfers completed in anticipation of the busy holiday season. Given the non-arm's length relationship between Wise and its wholly-owned subsidiary Peoples, there is no question that these inventory transfers could have constituted reviewable transactions.

84     We share the view of the Court of Appeal that it is not only the final transfers that should be considered. In fairness, the inventory transactions should be considered over the entire period from February to December 1994, which was the period when the new policy was in effect.

85     In *Skalbania (Trustee of) v. Wedgewood Village Estates Ltd.* (1989), 37 B.C.L.R. (2d) 88 (C.A.), the test for determining whether the difference in consideration is "conspicuously greater or less" was held to be not whether it is conspicuous to the parties at the time of the transaction, but whether it is conspicuous to the court having regard to all the relevant factors. This is a sound approach. In that case, a difference of $1.18 million between fair market value and the consideration received by the bankrupt was seen as conspicuous, where the fair market value was $6.6 million, leaving a discrepancy of more than 17 percent. While there is no particular percentage that definitively sets the threshold for a conspicuous difference, the percentage difference is a factor.

86     As for the factors that would be relevant to this determination, the court might consider, *inter alia*: evidence of the margin of error in valuing the types of assets in question; any appraisals made of the assets in question and evidence of the parties' honestly held beliefs regarding the value of the assets in question; and other circumstances adduced in evidence by the parties to explain the difference between the consideration received and fair market value: see L. W. Houlden and G. B. Morawetz, *Bankruptcy and Insolvency Law of Canada* (3rd ed. (loose-leaf)), vol. 2, at p. 4-114.1.

87     Over the lifespan of the new policy, Peoples transferred to Wise inventory valued at $71.54 million. As of the date of bankruptcy, it had received $59.50 million in property or money from Wise. As explained earlier, the trial judge adjusted the outstanding difference down to a balance of $4.44 million after taking into account, *inter alia*, the reallocation of general and administrative expenses, and adjustments necessitated by imported inventory transferred from Wise to Peoples. Neither party disputed these figures before this Court. We agree with the Court of Appeal's observation that these findings directly conflict with the trial judge's assertion that Peoples had received no consideration for the inventory transfers on the basis that the outstanding accounts were "neither collected nor collectible" from Wise. Like Pelletier J.A., we conclude that the trial judge's finding in this regard was a palpable and overriding error, and we adopt the view of the Court of Appeal.

88     We are not satisfied that, with regard to all the circumstances of this case, a disparity of slightly more than six percent between fair market value and the consideration received

constitutes a "conspicuous" difference within the meaning of s 100(2) of the BIA  Accordingly, we hold that the trustee's claim under the BIA also fails

89   In addition to permitting the court to give judgment against the other party to the transaction, s 100(2) of the BIA also permits it to give judgment against someone who was not a party but was "privy" to the transaction  Given our finding that the consideration for the impugned transactions was not "conspicuously less" than fair market value, there is no need to consider whether the Wise brothers would have been "privy" to the transaction for the purpose of holding them liable under s 100(2)  Nonetheless, the disagreement between the trial judge and the Court of Appeal on the interpretation of "privy" in s 100(2) of the BIA warrants the following observations

90   The trial judge in this appeal had little difficulty finding that the Wise brothers were privy to the transaction within the meaning of s 100(2)  Pelletier J A , however, preferred a narrow construction in finding that the Wise brothers were not privy to the transactions  He held, at para  136, that:

[TRANSLATION] . . . the legislator wanted to provide for the case in which a person other than the co-contracting party of the bankrupt actually received all or part of the benefit resulting from the lack of equality between the respective considerations

To support this direct benefit requirement, Pelletier J A  also referred to the French version which uses the term *ayant intérêt*  While he conceded that the respondent brothers received an indirect benefit from the inventory transfers as shareholders of Wise, Pelletier J A  found this too remote to be considered "privy" to the transactions (paras  140-41)

91   The primary purpose of s  100 of the BIA is to reverse the effects of a transaction that stripped value from the estate of a bankrupt person  It makes sense to adopt a more inclusive understanding of the word "privy" to prevent someone who might receive indirect benefits to the detriment of a bankrupt's unsatisfied creditors from frustrating the provision's remedial purpose  The word "privy" should be given a broad reading to include those who benefit directly or indirectly from and have knowledge of a transaction occurring for less than fair market value  In our opinion, this rationale is particularly apt when those who benefit are the controlling minds behind the transaction

92   A finding that a person was "privy" to a reviewable transaction does not of course necessarily mean that the court will exercise its discretion to make a remedial order against that person  For liability to be imposed, it must be established that the transaction occurred: (a) within the past year; (b) for consideration conspicuously greater or less than fair market value; (c) with the person's knowledge; and (d) in a way that directly or indirectly benefited the person  In addition, after having considered the context and all the above factors, the judge must conclude that the case is a proper one for holding the person liable  In light of these conditions and of the discretion exercised by the judge, we find that a broad reading of "privy" is appropriate

IV. Disposition

93   For the foregoing reasons, we would dismiss the appeal with costs to the respondents.

*Appeal dismissed with costs to the respondents.*

*Solicitors for the appellant: Kugler Kandestin, Montréal.*

*Solicitors for the respondents Lionel Wise, Ralph Wise and Harold Wise: de Grandpré Chait, Montréal.*

*Solicitors for the respondent Chubb Insurance Company of Canada Lavery, de Billy, Montréal.*

1: Iacobucci J  took no part in the judgment.

Peoples Department Stores Inc. (Trustee of) v. Wise

The official versions of decisions and reasons for decision by the Supreme
Court of Canada are published in the Supreme Court Reports (S C R )  This site is
prepared and published by LexUM in partnership with Supreme Court of Canada

**2**

Westlaw.

Not Reported in F.Supp.2d
2000 WL 28266 (N.D.Ill.), 43 Collier Bankr.Cas.2d 9
(Cite as: 2000 WL 28266 (N.D.Ill.))

Page 1

**H**

Motions, Pleadings and Filings

United States District Court. N.D. Illinois, Eastern
Division.
BEN FRANKLIN RETAIL STORES, INC., et al
Debtors,
Jay A. STEINBERG, et al, Plaintiffs,
v.
Robert A. KENDIG, et al. Defendants,
JACKSON NATIONAL LIFE INSURANCE
COMPANY & FOOTHILL CAPITAL, CORP.,
Plaintiffs,
v.
Robert A. KENDIG, David Brainard, Abbey J
Butler, Melvyn J Estrin, Harvey A
Fain. Alfred H Kingon, William A. Lemer, Robert
Spencer, Richard T. Krubeck, &
Curtis Wayne Pyrant, Defendants.
No. 97C7934, 97C6043.

Jan. 12. 2000

AMENDED MEMORANDUM AND ORDER

HIBBLER, District J

PREFACE

*1 This Court has before it the parties' motions to
amend or clarify the Court's November 20, 1999
Memorandum and Order ("November 20th Order").
The parties assert that this Court's November 20th
Order failed to address Plaintiff's objections to
bankruptcy court orders. In *Steinberg v Kendig*, No
97 C 7934, the Trustee asks this Court to amend its
November 20th Order remanding this case the
Bankruptcy Court for further proceedings on the
Trustee's breach of fiduciary duty claim against
Defendants consistent with the November 20th Order
(doc # 7934-27); that request is granted

With regards to *Jackson National Life Insurance Co
v Kendig* No 97 C 6043, Plaintiffs have asked this
Court to amend its November 20th Order because (1)
no reference is made to the Plaintiffs' objections to
the Bankruptcy Judge's Memorandum Opinion and
(2) no discussion appears in the Order of Plaintiffs'
fraud claims (doc # 6043-82) Because this Court did
not specifically address Plaintiffs' objections. it will

take the opportunity to do so within this Amended
Memorandum and Order Defendants Kendig. Butler,
Estrin, Fain, Kingon, Lemer, and Spencer (the "D &
O Defendants"), ask this Court to clarify its
November 20th Order stating those claims which
survive the Trustee's objections in *Steinberg* and
Plaintiffs' objections in *Jackson National Life* (doc #
6043-85) This request is granted as well Finally,
Defendant Pyrant ("Pyrant") has filed a motion to
amend the November 20th Order pursuant to Rule
54(b) of the Federal Rules of Civil Procedure
entering judgment in his favor in both proceedings
(doc # 6043-86) Pyrant's motion is also granted All
confusion which previously existed should be cleared
up, especially in light of the fact that this Court will
not entertain any additional motions to alter. amend.
reconsider. or reverse this amended order
Accordingly. these cases are remanded to the
bankruptcy court

*The Trustee's Objections in Steinberg. No. 97 C
7934*

This Court has before it the parties Objections to
Certain Proposed Findings of Fact and Conclusions
of Law The parties object to Judge Barliant's
Memorandum Opinion dated November 17. 1998 and
his Supplemental Opinion entered on December 1.
1998 The Trustee has four objections to Judge
Barliant's findings (Doc. # 97C7934-9). First. the
Trustee objects to the finding that he lacks standing
to bring claims on behalf of the Debtor's Estates
Next. the Trustee argues that Judge Barliant's finding
that he failed to allege a fiduciary duty to the
unsecured creditors is erroneous. Third. the Trustee
states that Judge Barliant misapplied the *Moorman*
doctrine Finally, the Trustee asserts that Defendant
Pyrant owed fiduciary duties to Ben Franklin,
contrary to Judge Barliant's Order Defendants raise
two objections to Judge Barliant's Memorandum and
Opinion (Doc # 's 97C7934-11,12. & 19) The
Defendants state that it was an error to find that the
Trustee had standing to raise individual claims on
behalf of third party creditors Also the defendants
claim Judge Barliant failed to address the
significance of the certificate of incorporations as a
bar to the Trustee's claims. This Court finds that
Judge Barliant's holdings should be upheld except his
finding that the Trustee failed to state a legally
cognizable claim

Not Reported in F.Supp.2d
2000 WL 28266 (N.D.Ill.), 43 Collier Bankr.Cas.2d 9
(Cite as: 2000 WL 28266 (N.D.Ill.))

## I. BACKGROUND

*2 This Court has jurisdiction over the parties objections under 28 U.S.C. § 158(a)(3). Because Judge Barliant submitted his proposed findings of fact and conclusions of law to the district court, this Court will enter its final order pursuant to 28 U.S.C. § 157(c)(1). Pursuant to Bankruptcy Rule 9033(d), this Court "shall make a de novo review upon the record, or after additional evidence, of any portion of the bankruptcy judge's findings of fact or conclusions of law... The district court may accept, reject, or modify the proposed findings of fact and conclusions of law." With this in mind, this Court now adopts Judge Barliant's factual findings.

### A. FACTS

Judge Barliant's October 13, 1998 Memorandum Opinion stated,

The Debtors are Delaware corporations formerly in the wholesale and retail variety and craft business. They are a holding company (Ben Franklin Retail Stores, Inc.) and its operating subsidiaries that either owned and operated, or franchised and supplied, Ben Franklin and similar stores around the country. The Defendants were the Debtor's officers and directors, except C. Wayne Pyrant, who was an officer, but not a director. They are accused of wrongfully prolonging the Debtor's corporate lives beyond the point of insolvency by misrepresenting the true value of the Debtor's accounts receivable. Specifically, they "refreshed" or redated the due dates of millions of dollars of receivables to make it appear that they were current when, in fact, they were seriously past due. As a result, receivables that should have been written down were recorded at full value. Based on that overvaluation, the Defendants induced creditors to lend money and supply inventory and other value to the Debtors, even after the Debtors were insolvent. Creditors were harmed because the Debtors sank deeper into insolvency as their liabilities grew.

The Debtors filed for chapter 11 bankruptcy relief on July 26, 1996, but the attempted reorganization failed and the Debtors converted their cases to chapter 7 on June 24, 1997. After the conversion, certain unsecured creditors assigned their claims against the Defendants to the Chapter 7 Trustee. Mem. Op. Of 10/13/98 at 2-3 (footnote omitted)

### B. PROCEDURAL HISTORY

This proceeding was originally filed in the United States District Court for the Northern District of Illinois, and was assigned to the Honorable Judge Andersen. Judge Andersen found that the bankruptcy

court had jurisdiction over the case in accordance with 28 U.S.C. § § 1334(b) and 157(a). Judge Andersen based this finding on Local Rule 2.33A and Title 11 of the United States Code, in that other cases then pending in bankruptcy court were related to the case at bar which was then pending in district court [FN1]

> FN1. Specifically, Judge Andersen held that Case Number 97C7934 was related to Case Number 97C6043, *Jackson National Life Insurance Comp. v. Kendig et al.* Case Number 97C6043 was then assigned to Judge Barliant for all pretrial matters, in a Minute Order dated April 29, 1998.

In a Memorandum Opinion dated October 13, 1998, Judge Barliant found that the Trustee had standing to assert the assigned claims. He further stated that the claims were not barred by the certificate of incorporation. However, Judge Barliant ultimately held that the Trustee failed to state a claim upon which relief may be granted, and therefore, he recommended the complaint be dismissed. In a Memorandum Opinion dated December 1, 1998, Judge Barliant dismissed the Trustee's claims because he failed to allege an injury which conferred standing to sue the defendants for damages incurred by the Debtors. Both the Trustee and the defendants filed objections to these findings which were addressed in the November 20th Order. Because this Court failed to clarify certain aspects of the Order, the Trustee and Defendants filed motions to amend.

## II. ANALYSIS

### A. TRUSTEE'S OBJECTIONS

1. Failure to allege a legally cognizable claim
*3 In the Memorandum Opinion entered on December 1, 1998, Judge Barliant held that absent allegations of looting of Ben Franklin's corporate assets, the Trustee was without standing to bring claims on behalf of the Debtor's estates. *Mem. Op. of 12/1/98* at 2. Therefore, Judge Barliant held that the Trustee failed to state a claim upon which relief may be granted. In Judge Barliant's view, because the Trustee does not have rights greater than the Debtors, he "failed to allege any injury that confers standing on him to sue the defendants for damages incurred by the Debtors." *Id.* Needless to say, the Trustee objects to this finding. The Trustee claims that Judge Barliant erred in relying on the absence of looting to determine whether the Trustee had stated a claim upon which relief may be granted. Defendants maintain that Judge Barliant's finding that the Trustee had failed to state a legally cognizable claim was

Not Reported in F.Supp.2d                                                      Page 3
2000 WL 28266 (N.D.Ill.), 43 Collier Bankr.Cas.2d 9
(Cite as: 2000 WL 28266 (N.D.Ill.))

correct.

The distinction between fraud on behalf of the
corporation and fraud against the corporation was
critical to Judge Barliant's decision.

> Fraud on behalf of a corporation is not the same
> theory as fraud against it. Fraud against the
> corporation usually hurts just the corporation; the
> stockholders are the principal if not only victims...
> But the stockholders of a corporation whose
> officers commit fraud for the benefit of the
> corporation are the beneficiaries of the fraud... The
> primary costs of a fraud on the corporation's behalf
> are borne not by the stockholders but by outsiders
> to the corporation, and the stockholders should not
> be allowed to escape all responsibility for such
> fraud.

*Cenco Inc. v. Seidman & Seidman,* 686 F.2d 449,
456 (7th Cir.1982). In *Cenco,* managerial employees
inflated the inventories to raise the Cenco stock and
secure loans at low rates on behalf of Cenco
Incorporated. The Seventh Circuit found that the
fraud was committed on behalf of the corporation,
and that finding may be analogized to this case. In
this case, no looting has been alleged, however,
redating of accounts did take place. These acts were
committed on behalf of the corporation, and it would
be inequitable to require the creditors to bear the
costs of the defendants' actions. Therefore, this Court
finds that the Trustee has stated a legally cognizable
claim, even absent claims of looting by Ben Franklin's
directors.

### 2. Failure to allege a fiduciary duty to the unsecured creditors

In his October 13, 1998 Memorandum Opinion,
Judge Barliant held that directors do not owe a duty
to liquidate and pay their creditors when the
corporation is near insolvency, provided the directors
have a good faith belief that an alternative to
maximize the corporation's long term wealth exists.
*Mem. Op. of 10/13/98* at 13. Judge Barliant's
reasoning was based on the fact that the available
precedent holds directors liable to creditors for
breaches of fiduciary duties where the director
diverted corporate assets for the benefit of insiders or
preferred creditors. *Id.* Judge Barliant found that
"appropriate scope of a [fiduciary] duty... exists only
to protect the contractual and priority rights of
creditors." *Id.* at 14. Because the Trustee failed to
allege fraud and instead alleged a breach of fiduciary
duty, Judge Barliant held that the Trustee's claim
could not stand. The Trustee, in turn, objects to Judge
Barliant's interpretation of the scope of Defendants'
fiduciary duty to the creditors. It is the Trustee's

contention that Defendants' redating of their accounts
was a bad faith effort, and in effect a looting of the
corporate assets.

*4 Generally, "directors do not owe duties to
creditors beyond the relevant contractual terms
absent 'special circumstances.' " *Geyer v. Ingersoll
Publications Comp.,* 621 A.2d 784, 787 (Del.
Ch.1992). Special circumstances may arise in the
case of fraud, insolvency, or a violation of a statute.
*Id.* Further, "when the insolvency exception does
arise, it creates fiduciary duties for directors for the
benefit of creditors." *Id.* The most notable finding in
*Geyer* as it relates to this case, is that "it is the fact of
insolvency and not the institution of statutory
proceeding which causes fiduciary duties to creditors
to arise." *Id.* at 791. *Geyer* may be distinguished from
this case though, because in *Geyer,* there was clearly
an instance of self-dealing and bad faith on the part
of the defendant. Although the Trustee maintains that
Defendants' actions were in bad faith, this Court
agrees with Judge Barliant and his reliance on *Credit
Lyonnais Bank Nederland v. Pathe Communications
Corp.,* Civ.A.No.12150, 1991 WL 277613 (Del. Ch.
Dec. 30, 1991). "[W]here a corporation is operating
in the vicinity of insolvency, a board of directors is
not merely the agent of the residue risk bearers, but
owes its duty to the corporate enterprise." *Id.* In
managing the business affairs of a corporation, the
directors' supervening loyalty is to the corporation,
and the board has "an obligation to the community of
interest that sustained the corporation, to exercise
judgment in an informed, good faith effort to
maximize the corporation's long-term wealth creating
capacity." *Id.* This is especially true when a
corporation is in the vicinity of insolvency because
"[t]he possibility of insolvency can do curious things
to incentives, exposing creditors to risks of
opportunistic behavior and creating complexities for
directors." *Id.* at n. 55. Directors who conceive of
their corporations as legal and economic entities will
recognize that "in managing the business affairs of a
solvent corporation in the vicinity of insolvency,
circumstances may arise when the right (both
efficient and the fair) course to follow for the
corporation may diverge from the choice that the
stockholders (or the creditors, or the employees, or
any single group interested in the corporation) would
make if given the opportunity to act." *Id.*

To buttress his position, the Trustee asserts that
because the allegations of a complaint are taken as
true for purposes of a motion to dismiss, he has
sufficiently pled that Defendants owed a fiduciary
duty to the creditors. Were it only that simple. It is

Not Reported in F Supp 2d
2000 WL 28266 (N D Ill ). 43 Collier Bankr Cas 2d 9
(Cite as: 2000 WL 28266 (N.D.Ill.))

not only incumbent for the Trustee to allege a fiduciary duty but under Rule 8 of the Federal Rules of Civil Procedure, he must also show that he is entitled to relief The Trustee's reliance on *Geyer* to stand for the proposition that he has sufficiently pled an existence of a fiduciary duty is misguided As stated in Judge Barliant's Memorandum Opinion, the reasoning in *Geyer* was based on the fact the defendant in that case had engaged in self-dealing. It is important to note the dicta in *Geyer* suggests that "the fiduciary duties at the moment of insolvency may cause directors to choose a course of action that best serves the entire corporate enterprise rather than any single group interested in the corporation at a point in time when shareholders' wishes should not be the directors only concern." *Odyssey Partners, L.P. v. Fleming Companies, Inc.,* Civ.A.No. 14770, 1999 WL 316903, at *30 (Del. Ch. May 13, 1999). Therefore, this Court holds that Judge Barliant was correct in his finding that the Trustee's Complaint failed to state a claim for breach of fiduciary duty.

3 *Moorman* doctrine as a bar to negligence claim
*5 In Judge Barliant's Memorandum Opinion, he found that the *Moorman* doctrine, or economic loss doctrine, precluded recovery on the negligence claim The Trustee disagrees with this finding and states that he does not seek to recover any economic loss, and in this case, the alleged duty was extra-contractual. Because this Court finds that the *Moorman* doctrine applies to this case, it upholds Judge Barliant's finding

The *Moorman* doctrine generally holds that solely economic losses may not be recovered in tort actions *Moorman Manufacturing Co. v. National Tank Co.,* 435 N.E.2d 443, 448 (1982). The purpose of the doctrine is to guarantee that "claims which are grounded solely in the breach of contractual duties should be pursued in contract, rather than tort" *Federal Deposit Insurance Corp. v. Miller,* 781 F.Supp. 1271, 1277 (N.D.Ill.1991). "[T]he basic principle of *Moorman* is that the type of loss, not the defendant's conduct, is critical. When only economic loss is incurred, the plaintiff may only raise contract theories even if the defendant's alleged conduct constituted a tort as well as breach of contract." *Talenti v. Quales, Inc.,* 970 F.2d 363, 369 (7th Cir.1992) (quoting *Bethlehem Steel Corp. v. Chicago Eastern Corp.,* 863 F.2d 508, 523 (7th Cir.1988)). Where it is clear that the relationship between the parties is commercial because the alleged transactions and damages are financial in nature, the Trustee's negligence claim may not be asserted under Illinois law because of the *Moorman* doctrine *Great*

*Lakes Higher Education Corp. v. Austin Bank of Chicago,* 837 F.Supp. 892, 896 (N.D.Ill 1993)

The Trustee's assertion that the defendants owed extra-contractual fiduciary duties fails as well "[I]n the absence of dominance and influence there is no fiduciary relationship regardless of the level of trust between the parties." *Lagen v. Balcor Co.,* 653 N.E.2d 968, 975 (Ill.App.Ct.1995). and where the requisite dominance and influence is absent between contracting parties. Illinois law will not acknowledge a fiduciary relationship. *See Original Great American Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.,* 970 F.2d 273, 280 (7th Cir.1992)

> The essence of a fiduciary relationship is that one party is dominated by the other The fact that one party trusts the other is insufficient We trust most people with whom we choose to do business The dominant party must accept responsibility, accept the trust of the other before a court can find a fiduciary relationship "[A] slightly dominant business position [does] not operate to turn a formal contractual relationship into a confidential or fiduciary relationship "

*Pommier v. Peoples Bank Marycrest,* 967 F.2d 1115, 1119 (7th Cir.1992) (quoting *Carey Elec. Contracting, Inc. v. First National Bank of Elgin,* 392 N.E.2d 759, 763 (Ill.App.Ct.1979)) This being the case, Judge Barliant was correct in finding that not only did the *Moorman* doctrine apply, but it acted as a bar to the Trustee's negligence claims

4 *No Fiduciary duty owed by Defendant Pyrant to Ben Franklin*
*6 In a footnote to his Memorandum Opinion, Judge Barliant stated that Defendant Pyrant owed no fiduciary duties to the Ben Franklin entities. The reasoning behind this finding was that Delaware law imposes management responsibility to directors, but not to officers 8 Del.Code § 141(a). The exception to this rule is that "the business and affairs of every corporation shall be managed by or under the direction of a board of directors, except as may be otherwise provided in its certificate of incorporation " *Id* Judge Barliant held that "[n]o fiduciary duty governing the management of a corporation's affairs can be imposed on persons who have no authority to manage those affairs." *Mem Op* at 8 n 10 In other words, Judge Barliant found that because the certificate of incorporation failed to invest management responsibility with the officers of the Ben Franklin entities, the Trustee may not now hold Defendant Pyrant to that strict standard. The Trustee argues that this finding was erroneous and points to Delaware case law to support his

© 2005 Thomson/West. No Claim to Orig U S Govt. Works

Not Reported in F.Supp.2d                                                Page 5
2000 WL 28266 (N.D.Ill.), 43 Collier Bankr.Cas.2d 9
(Cite as: 2000 WL 28266 (N.D.Ill.))

proposition that officers owe fiduciary duties to their corporations, and these duties include oversight responsibilities

Under Delaware law, "the board of directors has the ultimate responsibility for managing the business affairs of a corporation. *Mills Acquisition Co. v. MacMillan, Inc.,* 559 A.2d 1261, 1280 (Del.1989) Although the Trustee concedes that directors have ultimate management authority, he states that directors may delegate or share that authority At no point in the Trustee's Second Amended Complaint does he allege that the directors of the Ben Franklin entities delegated management authority to Defendant Pyrant The Trustee undoubtedly alleges that Defendant Pyrant redated or directed others to redate the accounts receivable, but this allegation alone is insufficient to impugn a fiduciary duty. "Unquestionably, the directors and officers of a corporation must use due care and are liable for their negligence in conducting the affairs of the corporation; but what constitutes negligence varies with the circumstances of each case " *South Penn Collieries Co. v. Sproul,* 52 F.2d 557 (3rd Cir.1931) "Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests " *Guth v. Loft,* 5 A.2d 503, 510 (Del.1939) Although Delaware courts have found that officers owe fiduciary duties to the corporation, this Court has found that the only instances where such a duty is found are where the circumstances involved self-dealing. *See Guth v. Loft,* 5 A.2d 503 (Del.1939); *Mills Acquisition Co. v. MacMillan, Inc.,* 559 A.2d 1261 (Del.1989) "Negligence cannot be constructed out of the failure to use unerring judgment nor out of sympathy for the plight of unfortunate creditors and investors." *South Penn,* 52 F.2d at 561

In this case, Defendant Pyrant did not derive a personal interest in prolonging the life of the Ben Franklin entities Defendant Pyrant maintains, and this Court agrees, that the Trustee has failed to allege a basis for finding a breach of fiduciary duty on Defendant Pyrant's part Judge Barliant correctly stated that claims of fiduciary duties necessarily imply a corresponding responsibility The Delaware legislature has specifically vested that responsibility with the directors of corporations. The Trustee has failed to allege that Defendant Pyrant; as National Finance Director, Vice President of Franchise Sales, and National Manager of Credit for Stores; breached any fiduciary trust Therefore, absent specific allegations to the contrary, Judge Barliant's holding that in this instance Defendant Pyrant did not owe a

fiduciary duty to the Ben Franklin entities stands

### B DEFENDANTS' OBJECTIONS
### 1 Trustee has standing to raise third party creditor claims
*7 The Trustee is vested with the power to bring suit which represents the interests of the creditors as a class. *Fisher v. Apostolou,* 155 F.3d 876, 879 (7th Cir.1998); *Koch Refining v. Farmers Union Central Exchange, Inc.,* 831 F.2d 1339, 1342-43 (7th Cir.1987) However, the Trustee does not have standing to bring the personal claims, those claims that allege the creditor has suffered a unique harm, of individual creditors. *Koch,* 831 F.2d at 1348. The Trustee's role "as a defender of the unsecured creditors' interests" is a limited on, in that he may only bring general claims *Heyman v. Beatrice Comp.,* No. 89C7381, 1995 WL 151872, at *9 (N.D. Ill. April 3, 1995)

[A]llegations that could be asserted by any creditor could be brought by the trustee as a representative of all creditors. If the liability is to all creditors of the corporation without regard to the personal dealings between such officers and such creditors, it is a general claim

A trustee may maintain only a general claim. His right to bring a claim depends on whether the action vests in the trustee as an assignee for the benefit of creditors or, on the other hand, accrues to specific creditors

*Id.* at 1348-49 (internal citations and punctuation omitted) "[R]ights of action against officers, directors and shareholders of a corporation for breaches of fiduciary duties which can be enforced by the corporation directly before bankruptcy, become property of the estate which the trustee alone has the right to pursue after the filing of a bankruptcy petition " *Id* at 1343 (citing *Pepper v. Litton,* 308 U.S. 295, 306-07 (1939))

In this case, Judge Barliant was correct in holding that the Trustee has standing to assert the unsecured creditors' claims Although the defendants cite to the case law of other circuits to support their objection, the well established case law in this Circuit is that "[t]he trustee represents not only the rights of the debtor but also the interests of the creditors of the debtor." *Koch,* 831 F.2d at 1342 Further "[p]ursuant to 11 U.S.C. § 544 the trustee, in his capacity as a creditor, may bring suit to reach property or choses in action belonging to the estate that will then be distributed to the creditors " *Id* This Court has found no authority in this Circuit which supports the defendants' objection This being the case, Judge Barliant was correct in holding that the Trustee may

assert the claims of the unsecured creditors
However. this Court will clarify that holding by
stating that only general. not personal or independent
claims. may be brought by the Trustee on the
creditors' behalf

### 2 Certificate of Incorporation as a bar to Trustee's claims

In his Memorandum Opinion, Judge Barliant held
that the Ben Franklin certificate of incorporation did
not preclude the Trustee's claims. The defendants
maintain that Judge Barliant erred in concluding the
exculpatory provision in Ben Franklin's certificate of
incorporation was not a bar to the plaintiffs' breach of
fiduciary claims. The Trustee argues that the
certificate of incorporation's exculpatory provision is
applicable in limited circumstances which are not
presented here. The Trustee states that the
exculpatory provision provides no protection for the
defendants

*8 The reasoning behind Judge Barliant's finding
was that creditors should not be bound by the
exculpatory provision because they were not parties
to the contract. Rather. it was within the shareholders'
power to determine the liability of the directors for
breaches of fiduciary duties. In fact, the provision
explicitly states that "[a] director of the Corporation
shall not be personally liable to the *Corporation* or its
*stockholders* for monetary damages." *Ben Franklin
Retail Stores. Inc 's Restated Certificate of
Incorporation* (emphasis added). No mention is made
of the potential liability to creditors that directors
may incur. In fact. under *Koch* the Trustee represents
the creditors' interests and may bring suit to marshal
the corporation's assets on the creditors' behalf. *Koch,
831 F.2d at 1342-43* Nothing in the exculpatory
provision prevents suits brought by the creditors or
those acting on their behalf. Therefore, Judge
Barliant's holding that the certificate of incorporation
is inapplicable to the Trustee's claims is correct

*Plaintiff's Objections in Jackson National Life. No
97 C 6034*

### I BACKGROUND

This Court has jurisdiction over the parties
objections under 28 U S C s 158(a)(3) Because
Judge Barliant submitted his proposed findings of
fact and conclusions of law to the district court, this
Court will enter its final order pursuant to 28 U.S.C.
s 157(c)(1). Pursuant to Bankruptcy Rule 9033(d),
this Court "shall make a de novo review upon the
record. or after additional evidence. of any portion of
the bankruptcy judge's findings of fact or conclusions

of law ... The district judge may accept. reject, or
modify the proposed findings of fact and conclusions
of law." [FN2] Upon review of the record in this
case, this Court finds it prudent to adopt Judge
Barliant's factual findings

> FN2. Although it is true that this Court does
> not sit as an appellate court in these
> proceedings because these actions were non-
> core matters under 28 U.S.C. s 157(c)(1),
> this Court is free to accept the Judge
> Barliant's proposed findings of fact and
> conclusions of law Bankruptcy Rule 9033.
> This is true even in light of the fact that this
> Court reviews Judge Barliant's
> Memorandum Opinion de novo

### A FACTS

Judge Barliant's October 13, 1998 Memorandum
Opinion stated,

The plaintiffs in this adversary proceeding are
institutional lenders who are asserting claims of
fraud, negligence and breach of fiduciary duty
against the former officers and directors of Ben
Franklin Retail Stores, Inc ("Retail"). Ben franklin
Stores, Inc ("Stores") and Ben Franklin Crafts. Inc
("Crafts"). Retail is a holding company and parent
of its operating subsidiaries. Stores and Crafts.
Pursuant to a Revolving Credit Facility with Stores
and Crafts. the plaintiffs lent money to those
companies. secured by their assets. including
accounts receivable that met eligibility standards
set out in the Revolving Credit Facility. (Stores and
Crafts may be jointly referred to as the
"Borrowers.") the allegations relate to a practice by
"Ben Franklin" of "freshening" or "redating" the
due dates of accounts receivable. This practice of
"freshening" allegedly misstated the due date of
accounts receivables, thereby allowing an
otherwise out of date or ineligible account to be
included in the eligible accounts. which were then
used to determine the amount of credit available
under the Revolving Credit Facility
*9 Plaintiffs have alleged that this practice of
"freshening" or "re-dating" took place in 1995, but
increased substantially in February, 1996, shortly
before the loan was made. Plaintiff discovered the
practice during an audit conducted in July 1996.
Retail. Stores and Crafts filed for Chapter 11
bankruptcy relief on July 16, 1996. At that time the
Borrowers were in default on the Revolving Credit
Facility.
Plaintiffs contend that they extended the Borrowers
$24.9 million more than they would have if the
redating had not occurred and the accounts

c 2005 Thomson/West. No Claim to Orig. U S. Govt Works

Not Reported in F Supp 2d
2000 WL 28266 (N D Ill ), 43 Collier Bankr Cas 2d 9
(Cite as: 2000 WL 28266 (N.D.Ill.))

receivable agings had been accurate. There remains approximately $9.5 million unpaid under the Revolving Credit Facility. Plaintiffs have brought this action to recover the unpaid amounts from the former officers and directors of Retail, Stores and Craft. Plaintiffs have alleged four theories of liability: Count I--common law fraud; Count II--common law fraudulent concealment; Count III--negligent misrepresentation; count IV--breach of fiduciary duty.

All defendants have filed motions to dismiss under either Rule 9(b) or 12(b)(6) of the Federal Rules of Civil Procedure. The motions of all defendant except Brainard will be granted. The motion of Brainard with respect to Count I will be denied, but his motion to dismiss counts II, III. and IV will be granted.

*Mem. Op* of 10/13/98 at 2-3 (footnotes omitted).

### B. PROCEDURAL HISTORY

Plaintiffs commenced this action in the United States District Court for the Northern District of Illinois, No. 97 C 6043. The case was originally assigned to Judge Andersen, however, Judge Andersen found that the bankruptcy court had jurisdiction pursuant to 28 U.S.C. § § 1334(b) and 157(a) that this case is related to Ben Franklin litigation. which was then pending in bankruptcy court

In a Memorandum Opinion dated October 13, 1998, Bankruptcy Judge Barliant dismissed Plaintiffs' common law fraud, fraudulent concealment, negligence, and breach of fiduciary duty claims against all of the defendants pursuant to Rules 9(b) and 12(b)(6). The only claim which remained after the Memorandum Opinion was a common law fraud claim asserted against Defendant Brainard. Plaintiffs filed eight objections to the bankruptcy court's proposed findings of fact and conclusions of law. As stated before. this Court reviewed the objections filed in connection with Judge Barliant's decisions, yet it failed to specifically delineate specific holdings in Plaintiffs' case. Accordingly, the Court will now address Plaintiffs' objections

In accordance with Rule 9033, this Court modifies Judge Barliant's proposed findings of fact and conclusions of law. At this time, the Court will dispose of a preliminary matter, Plaintiffs assert that it is incumbent upon this Court to discuss, analyze, or rule upon arguments set forth in letters submitted at Judge Andersen's request in April and May 1999 This Court rejects that assertion and flatly refuses to consider any letters submitted to the Court which are not included within the docket. Upon review of the

docket. this Court is satisfied that the letters should not be considered, analyzed, discussed. or ruled upon contrary to Plaintiffs' contention *St. Mary's Hosp. Medical Center v. Heckler*, 753 F.2d 1362, 1367 n 8 (7th Cir.1985)

### II. ANALYSIS

#### A. Dismissal of D & O Defendants Pursuant to Rule 9(b)

*10 Plaintiffs contend that Judge Barliant erred when he held that Rule 9(b)'s pleading requirements applied to the fraud and fraudulent concealment claims in Counts I and II of the Amended Complaint Plaintiffs maintain that the D & O Defendants and Defendant Krubeck were corporate insiders, and their status as corporate insiders renders Rule 9's pleading requirements relaxed. Plaintiffs claim that Defendants are in exclusive possession of relevant facts which are dispositive of their involvement in the fraudulent scheme. Defendants counter that not only did Plaintiffs fail to make specific allegations of fraud with regard to Defendants Fain. Kingon. and Lemer. the only mention of the remaining defendants is in a paragraph alleging a practice of freshening accounts. Further. Defendants allege that Plaintiffs have misapplied the corporate insider exception, and therefore, Counts I and II were properly dismissed

Rule 9(b) states that "[i]n all averments of fraud or mistake. the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P 9(b) "The rule is said to serve three main purposes: (1) protecting a defendant's reputation from harm: (2) minimizing 'strike suits' and 'fishing expeditions': and (3) providing notice of the claim to the adverse party." *Vicom. Inc. v. Harbridge Merchant Services, Inc.*, 20 F.3d 771, 777 (7th Cir.1994) (citation omitted). In cases involving multiple defendants. "the complaint should inform each defendant of the nature of his alleged participation in the fraud." *Id. at 778*

To meet the standards of Fed.R.Civ.P. 9(b), a complaint alleging fraudulent misrepresentation must specifically identify 'the person making the misrepresentation. the time. place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff A complaint that attributes misrepresentations to all defendants. lumped together for pleading purposes generally is insufficient'

*Sears v. Likens*, 912 F.2d 889, 893 (7th Cir 1990) (citations omitted). However. this requirement is relaxed in instances where facts which the plaintiff is required to plead is in the exclusive control of the

Not Reported in F Supp 2d
2000 WL 28266 (N D Ill ), 43 Collier Bankr Cas 2d 9
(Cite as: 2000 WL 28266 (N.D.Ill.))

Page 8

defendants *Koehler v. Nationsbank Corp.*, No. 96 C
2050, 1997 WL 80928, *1 (N.D.Ill. Feb. 20, 1997)
In other words, where multiple defendants are
corporate insiders, the conduct of those individuals
"need not be specified and the fraudulent acts
complained of need not be attributed to certain
persons if the complaint sufficiently describes the
fraudulent acts and provides the individuals with
sufficient information to answer the allegations "
*Shields v. Erickson*, 710 F.Supp. 686, 690
(N.D.Ill.1989) (citing *Banowitz v. State Exchange
Bank*, 600 F.Supp. 1466, 1469 (N.D.Ill.1985)
However, "[w]hen the plaintiff alleges that factual
information is exclusively within the knowledge or
control of the defendant, plaintiffs must accompany
their allegations with facts indicating why the charges
against defendants are not baseless and why
additional information lies exclusively within
defendants' control " *Goldsmith v. Technology
Solutions Co .*, No. 92 WL 4374, 1993 WL 150035,
*5 (N.D.Ill. May 7, 1993)

*11 While it is true that Plaintiffs allege that the
relaxed pleading requirements should apply to their
Amended Complaint, this Court is of the opinion that
Judge Barliant was correct in his analysis In
*Koehler* suit was brought on behalf of a class of
plaintiffs of individual mortgagees who discovered
that their mortgage servicers retained escrow
amounts in excess of the mortgage agreement. There
can be no doubt that the plaintiffs in *Koehler* did not
have access to those fraudulent practices Likewise,
in *Shields*, the plaintiffs brought a shareholder
derivative action after indictments were brought
against the defendants and guilty pleas were
tendered The shareholders in *Shields* brought action
against the officer and director defendants for their
wrongful conduct

This case is distinguishable from *Koehler* and
*Shields* in that the plaintiffs in *Koehler* were
obviously not in a position to discover that their
mortgagors were hoarding escrow payments until
after they entered the contracts; likewise in *Shields*
the plaintiffs had no way of knowing the defendant
was overcharging for defense contracts before they
invested, this Court finds that Plaintiffs cannot make
the same allegations here. There can be no doubt that
Plaintiffs, unlike those in *Koehler* or *Shields* are in
the business of making loans These were not naive
borrowers or investors, Plaintiffs had auditors at their
disposal This case is distinguishable from those
relied on by Plaintiffs because Plaintiffs conducted an
audit of the Borrowers' accounts That audit revealed
the existence of the redating practices Because

Plaintiffs discovered the refreshened accounts after
making the loans, this Court believes that the
Plaintiffs could have done so before making the
loans Either way, the Plaintiffs discovered the
refreshening scheme, therefore, some information is
clearly within the ambit of Plaintiffs' possession.
Additionally, this Court finds it hard to believe that
Plaintiffs cannot determine which role some, if not
all, defendants played in the alleged fraud, or the
extent that the defendants played Plaintiffs certainly
have copies of any documents which were signed,
and their failure to specifically plead the information
which is within their possession aids this Court in its
ultimate decision of finding that dismissal was
proper

Furthermore, Plaintiff's allegation that Judge
Barliant's factual findings exceed the scope of the
motions to dismiss is incorrect in light of case law
allowing bankruptcy courts to consider public
documents in making their decisions *Henson v. CSC
Credit Services*, 29 F.3d 280, 284 (7th Cir.1994)
Therefore, this Court accepts Judge Barliant's
dismissal of Counts I and II of the Amended
Complaint and finds that his ruling on the matter was
the correct one

B. Dismissal of Defendant Pyrant Pursuant to <u>Rule
9(b)</u>
Plaintiffs claim that the fraud claims against
Defendant Pyrant were dismissed erroneously
Plaintiffs maintain that Defendant Pyrant should be
held liable for the fraud claims because he had
knowledge of the fraud and either participated or
assisted in it Defendant Pyrant counters that
Plaintiffs have failed to allege with any specificity
Counts I and II Defendant Pyrant contends that
Plaintiffs have failed to allege that he was a member
of the Board who was involved in negotiations with
Plaintiffs, he participated in any pre-loan
negotiations, that he prepared or provided the
misleading documents, that he was a signatory to the
loan agreement, that he participated in any post-loan
audits, nor that he admitted to participating in the
refreshening conduct In short, Plaintiffs have utterly
failed to allege facts which would support a finding
that Defendant Pyrant knew of the fraud, much less
participated and assisted in it As Judge Barliant
stated in his Memorandum Opinion, Plaintiffs have
failed to specifically allege fraud on Defendant
Pyrant's part. Any allegations in the Amended
Complaint are too general to withstand Defendant
<u>Rule 9</u> motion For the reasons set forth in the
previous section, as well as those mentioned in
specific reference to Defendant Pyrant. Plaintiffs

Not Reported in F.Supp.2d
2000 WL 28266 (N.D.Ill.), 43 Collier Bankr.Cas.2d 9
(Cite as: 2000 WL 28266 (N.D.Ill.))

allegations of fraud fail under the specificity requirements  FN3 Because this Court has found that the corporate insider exception does not apply, dismissal of Counts I and II with respect to Defendant Pyrant were proper

> FN3. Even in the case where this holding would be improper, because Plaintiffs have not provided any facts indicating why their charges are not baseless, dismissal would still be proper *Goldsmith,* 1993 WL at *5

C. Dismissal of Count IV Pursuant to Rule 9(b)
*12 Judge Barliant held that because Count IV is a breach of fiduciary duty claim involving a scheme to defraud claim, it must be pled with particularity Judge Barliant went on to state that Plaintiffs failed to set out a breach of fiduciary duty claim with particularity Because Count IV, like Counts I and II, have fails to set out the who, what, when, and where of the fraud, relaxed pleading requirements are inappropriate, dismissal of Count IV is proper For the reasons set out above, this Court finds that dismissal of Count IV as to all defendants was proper in light of the specificity requirements of Rule 9(b) Therefore, this Court accepts Judge Barliant's findings in his October 13, 1998 Memorandum and Opinion

D  Dismissal of Counts I and II Pursuant to Rule 12(b)(6)
Plaintiffs also object to Judge Barliant's finding that the Counts I and II of the Amended Complaint failed to state a claim upon which relief may be granted Judge Barliant held that because Plaintiffs had failed to state a claim of fraud under Illinois law, Counts I and II should be dismissed under Rule 12(b)(6) As further support for this ruling, Judge Barliant also found that Plaintiffs had failed to allege intent on the defendants' part. Additionally, Judge Barliant stated that because Plaintiffs had not established a duty to disclose on Defendants' part, dismissal was proper. Finally, because Plaintiffs did not establish that they could not have discovered the fraud through reasonable inquiry, Defendants Rule 12(b)(6) motion was proper Plaintiffs object to these findings stating that the general rule is whoever participated in the fraud is guilty of the fraud, and if any defendant participated, assisted, or authorized the fraud, they are as liable as Defendants Brainard and Ben Franklin Plaintiffs also claim that they adequately alleged a duty to disclose and that the fraud could have been discovered during the course of reasonable inquiry  FN4

> FN4. Although this Court has stated that for Rule 9 purposes, Plaintiffs have failed that they could not have discovered the fraud in the course of reasonable inquiry, under the liberal pleading requirements of Rule 12, this Court cannot say that Plaintiffs can plea no set of facts which would prove that they could not have discovered the fraud during reasonable inquiry

A motion to dismiss should not be granted unless it appears beyond a reasonable doubt that Plaintiffs can prove no set of facts which would entitle them to relief *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957) In considering a motion to dismiss under Fed.R.Civ.P. 12(b)(6) for failure to state a claim, this Court accepts all well pled factual allegations in the complaint as true and draw all reasonable inferences from these facts in favor of the plaintiff *Travel All Over the World, Inc. v. The Kingdom of Saudi Arabia,* 73 F.3d 1423, 1429 (7th Cir.1996) This Court must construe those pleadings liberally in compliance with the notice pleading provision of the federal rules *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* --U.S.--, ----, 113 S.Ct. 1160, 1163 (1993)

In light of the liberal pleading requirements embodied in the Federal Rules of Civil Procedure, this Court would be remiss in holding that Plaintiffs can state no set of facts which would entitle them to relief This Court is of the opinion that even though the Amended Complaint fell far short of alleging fraud on the defendants part, Plaintiffs can produce no set of facts which would support their claim of fraud In light of a hard and fast rule from the Seventh Circuit guiding this Court as to when dismissal for failure to state a claim is proper, the more prudent course of action is to deny Rule 12 motions where there is any set of facts which, if proven, would entitle Plaintiffs to relief *Burton v. Sheahan,* 68 F.Supp.2d 974 (N.D.Ill.1999) Therefore, this Court is of the opinion that Judge Barliant's dismissal for failure to state a claim was in error

E  Dismissal of Defendant Brainard in Count II Pursuant to Rule 12(b)(6)
*13 For the reasons set forth in the preceding section, this Court finds that dismissal for failure to state a claim was in error. Therefore, this Court rejects Judge Barliant's dismissal of Count II against Defendant Brainard with regard to Rule 12(b)(6)

F  Dismissal of Count IV Pursuant to Rule 12(b)(6)

Not Reported in F Supp 2d
2000 WL 28266 (N D Ill ), 43 Collier Bankr Cas 2d 9
(Cite as: 2000 WL 28266 (N D.Ill.))

Plaintiffs concede that the basis for dismissal in Count IV of their Amended Complaint was the same as the basis for dismissal in the Trustee's Objection Therefore, because this Court has already engaged in an extensive discussion regarding that claim, a bottom line approach is appropriate here Accordingly, Count IV of Plaintiffs' Amended Complaint fails to state a claim for breach of fiduciary duty

G Application of Illinois Law

Plaintiffs also allege that the bankruptcy judge erred in applying Illinois law to this case Plaintiffs assert that California, not Illinois law should apply to the negligent misrepresentation claim As support for this assertion, Plaintiffs offer the fact that the loan and security agreement contained a choice of law provision [FN5]

> FN5. The Loan and Security Agreement provides that "All matters arising hereunder or related hereto shall be determined under, governed by, and construed in accordance with the laws of the state of California " Pls 'Am Compl Ex 1

In his Memorandum Opinion, Judge Barliant reasoned that because only parties to a contract are governed by its terms, and none of the defendants were parties to the Revolving Credit Facility, the California choice of law provision is inapplicable to this action Judge Barliant found that because Plaintiffs entered into the Revolving Credit facility with Stores and Crafts, Stores and Crafts, not the defendants are bound by its terms Judge Barliant went on to state that Delaware law governs any breach of fiduciary allegations because the Borrowers were incorporated under Delaware law. However, Judge Barliant went on to hold that allegations of common law fraud, concealment, and negligence are governed by Illinois law, the law of the forum state

Judge Barliant's interpretation of the choice of law rules was correct While it is true that a choice of law provision explicitly stated that California law is applicable to all actions arising under the contract, this Court's inquiry does not stop because that choice of law provision was in effect In this case, even though the choice of law provision explicitly states that California law should apply, Defendants are not bound by that language Only those parties who sign the contracts are bound by them. *Stromberg Metal Works v Press Mechanical*, 77 F.3d 928, 933 (7th Cir 1996) "Corporate officers decisions may be imputed to the corporation; things do not work the

other way 'round '" Id Instead, Plaintiffs must also establish that the contracts bind the Borrowers to California law and that the Defendants intended that California law be the choice for their personal liability Id Although there can be no question that California law applies to the Borrowers, this Court is of the opinion that Plaintiffs have failed to allege that the defendants intended to be bound by California law themselves Without such a showing, this Court accepts Judge Barliant's decision

H Dismissal of Count III Pursuant to Rule 12(b)(6)

*14 Because this Court has held that Illinois law applies to the negligent misrepresentation claim, the discussion of the *Moorman* doctrine's applicability from *Steinberg* is appropriate here As mentioned in the *Steinberg* discussion, the *Moorman* doctrine is not only applicable to the negligence claim, but it also acts as a bar to it Accordingly, Judge Barliant's decision was correct and this Court accepts his finding

III CONCLUSION

Accordingly, in *Steinberg*, this Court finds that Judge Barliant's conclusions were correct, with the exception of the Trustee's failure to state a legally cognizable claim Therefore, the Trustee's Second, Third, and Fourth Objections are dismissed Likewise, both of the defendants' Objections are dismissed Additionally, Defendant Pyrant is dismissed from that cause of action pursuant to Rule 54(b) of the Federal Rules of Civil Procedure

In *Jackson National Life*, this Court finds that Judge Barliant's conclusions were correct, with the exception of Plaintiffs' failure to state a legally cognizable claim Therefore, Plaintiffs' Objections with respect to Counts I, II and IV withstand Defendants' motion to dismiss, insofar as they state a claim under Rule 12(b)(6) All other Objections are dismissed for the reasons stated within this Opinion

This Court will now take a moment to impress upon the parties the implications of this Order This Court has engaged in an in depth analysis of the parties pleadings twice and gives fair warning that it will not do so again At this juncture, any dissatisfaction the parties may have with the Court's holdings should either be dealt with in the bankruptcy court or at the appellate level This Court has rendered its decision to the best of its ability and will not reinvent the wheel yet a third time Accordingly, this case is remanded to the Bankruptcy Court to proceed on the viable claims consistent with this Court's Order

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp 2d
2000 WL 28266 (N D Ill ) 43 Collier Bankr Cas 2d 9
(Cite as: 2000 WL 28266 (N.D.Ill.))

Page 11

IT IS SO ORDERED

2000 WL 28266 (N D Ill ) 43 Collier Bankr Cas 2d
9

**Motions, Pleadings and Filings (Back to top)**

        1:97CV06043_____(Docket)
(Aug 26, 1997)

END OF DOCUMENT

c 2005 Thomson/West No Claim to Orig U S Govt Works