**3**

Westlaw.

Not Reported in A.2d
2004 WL 1238443 (Del.Ch.)
(Cite as: 2004 WL 1238443 (Del.Ch.))

**H**
Only the Westlaw citation is currently available

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
CALIFORNIA PUBLIC EMPLOYEES'
RETIREMENT SYSTEM
v.
COULTER, et al.
No. Civ.A. 19191-NC.

Submitted Aug. 21, 2003
May 26, 2004

Dear Counsel:

NOBLE, Vice Chancellor.

*1 This letter opinion addresses three argued
motions: (1) Plaintiff's motion to compel; (2)
Defendants' cross-motion to compel; and (3)
Plaintiff's motion to amend.

In this action, Plaintiff California Public Employees'
Retirement System ("CalPERS") alleges that the
Individual Defendants, current and former directors
of Nominal Defendant Lone Star Steakhouse &
Saloon, Inc ("Lone Star"), breached their fiduciary
duties to the company and its shareholders. At issue
are certain repricings of options in 1998 and 2000,
allegations of efforts by the Individual Defendants to
entrench themselves in their comfortable positions as
directors of Lone Star, and a challenge to Lone Star's
acquisition of Coulter Enterprises, Inc ("CEI"), an
entity owned by Defendant Jamie Coulter. [FN1]

> FN1. For a more detailed description of this
> litigation, see *California Public Employees'
> Retirement System v. Coulter*, 2002 WL
> 31888343 (Del. Ch. Dec. 18, 2002), which
> granted in part and denied in part various
> Defendants' motions to dismiss.

*A. CalPERS' Motion to Compel*

The scope of discovery is framed by the familiar
words of Court of Chancery Rule 26(b)(1), which
provides in part:

Parties may obtain discovery regarding any matter,
not privileged, which is relevant to the subject
matter in the pending action.... It is not ground for
objection that the information sought will be
inadmissible at the trial if the information sought
appears reasonably calculated to lead to the
discovery of admissible evidence.

Thus, "[t]he scope of discovery pursuant to Court of
Chancery Rule 26(b) is broad and far-reaching
[and] renders discoverable any information that
'appears reasonably calculated to lead to the
discovery of admissible evidence.' Consequently,
absent injustice or privilege, the Rule instructs the
Court to grant discovery liberally...." [FN2] On the
other hand, the Court is empowered to limit
discovery if it is, for example, "unreasonably
cumulative or duplicative" or "unduly burdensome
and expensive, taking into account the needs of the
case, the amount in controversy, limitations on the
parties' resources, and the importance of the issues at
stake in the litigation." [FN3] This Court has
"recognized that considerations of subject matter,
time, and space are important to confine the scope of
discovery to those matters that are truly relevant and
to prevent discovery from evolving into a fishing
expedition or from furthering purposes ulterior to the
litigation." [FN4] In addition, "document discovery
is limited in scope to production of documents ...
relevant to the subject matter of the litigation...."
[FN5] With these broad principles in mind, I turn to
the specific discovery disputes at issue.

> FN2. *Pfizer, Inc. v. Warner-Lambert Co.*,
> 1999 WL 33236240, at *1 (Del. Ch. Dec. 8,
> 1999).

> FN3. Ct. Ch. R. 26(b)(1)

> FN4. *Plaza Sec. Co. v. Offit*, 1986 WL
> 14417, at *5 (Del. Ch. Dec. 15, 1986)

> FN5. *Frank v. Engle*, 1998 WL 155553, at
> *1 (Del. Ch. Mar. 30, 1998).

*1. Options Repricings*

CalPERS seeks far-ranging discovery into the
challenged option repricings. In the Amended
Complaint, as tested in the Court's Memorandum
Opinion [FN6] of December 18, 2002, these
repricings were attacked on a variety of grounds

Not Reported in A 2d
2004 WL 1238443 (Del Ch )
(Cite as: 2004 WL 1238443 (Del.Ch.))

Page 2

Only two attacks survived: (1) a challenge to the 1998 director options repricing based on the *ultra vires* doctrine, and (2) a challenge to the 2000 employee options based on an allegation that the board failed to exercise any business judgment. The scope of allowable discovery, of course, is tied to the issues presented in the litigation. An *ultra vires* claim is a narrow endeavor focusing on the governing documents and the grants of the options. Wide-ranging discovery that goes beyond that necessary to address an *ultra vires* claim would serve no useful purpose. Similarly, where the board's decision as to the 2000 employee options is questioned because of an alleged failure to exercise any business judgment, the inquiry must focus on those facts which are related to that issue. That might include, for example, what information was available to the board, what information did it consider, what guidance from experts did it receive, what process was followed. CalPERS certainly is entitled to discovery with respect to options repricing, including, but not necessarily limited to, the factors identified. However, the currently pending requests are far too broad and far too burdensome. Thus, CalPERS' motion to compel as to these issues is denied, but it may propound more focused discovery aimed at eliciting information pertaining to the surviving option claims.

> FN6. *Cal. Pub. Employees' Ret. Sys. v. Coulter*, 2002 WL 31888343 (Del. Ch. Dec. 18, 2002)

**2 *Request No 4--Purchase of CEI***

**\*2** Mr Coulter's sale of CEI to Lone Star appears to be the most fact-intensive claim remaining. Accordingly, there are several disputes regarding discovery as to CEI's valuation and Lone Star's acquisition of it

I start with the squabble regarding the scope of reasonable discovery requests and the scope of reasonable discovery responses. CalPERS seeks, for example, in Request No 4, "[a]ll documents referring or relating to Lone Star's purchase of CEI in the fall of 1998 "

Defendants have provided documents in response but have limited the production to those documents which the Defendants have deemed relevant to CalPERS' fiduciary duty allegations. CalPERS, in turn, responds that its discovery cannot be limited to those documents which the Individual Defendants "understand to bear a reasonable relationship" to the

claims it now asserts. A request to produce every document touching upon a complex transaction strains the limits of reasonableness. Yet, it is difficult to minimize the importance of the CEI acquisition in the context of this proceeding. In order to assess fairly the limitations which the Defendants seek to place on their duty to produce documents relating to the CEI transaction, they first must describe or categorize the documents which they seek to withhold. Given the breadth of discovery and the clear relevance of the CEI transaction to this matter, it is Defendants' obligation to demonstrate why certain classes of documents should not be produced.

**3 *Request No 7--ADP Proposal***

The fairness opinion supporting acquisition of CEI relied in part upon a bid submitted by ADP to perform services similar to those of CEI. Defendants do not resist CalPERS' inquiry with respect to any ADP proposal prior to consummation of the CEI transaction. They do, however, seek to limit the responses to the date of the CEI transaction. Evidence of subsequent ADP proposals for similar services may provide a basis for evaluating--albeit with the benefit of hindsight--the reasonableness of the proposal. It may not be a particularly revealing inquiry, but, at this time, it cannot be precluded. If certain Individual Defendants have no knowledge of the ADP proposal, then they should set that forth directly.

**4. *Interrogatory No 9--ADP***

If various Individual Defendants have information responsive to this inquiry (knowledge about ADP proposals), they should provide it within the temporal limits addressed with respect to Request No 7 Perhaps some of the Individual Defendants do not have knowledge; but, if they do, then that knowledge must be shared

**5 *Interrogatory No 7--Board Documents***

This interrogatory asks that the Defendants identify the documents reviewed by the board as part of the process of making its decision regarding the acquisition of CEI. If this has not been done, CalPERS is entitled to the identification of the documents considered

**6 *Request Nos 34 and 35--Adams Proxy Contest, etc***

**\*3** These requests seek documents relating to the

Not Reported in A 2d
2004 WL 1238443 (Del Ch )
(Cite as: 2004 WL 1238443 (Del.Ch.))

Guy Adams proxy contest and a shareholder proposal presented by CalPERS Defendants respond that all nonprivileged documents have been provided If not already provided, Defendants are to develop and supply a privilege log

### 7 Request No 23. etc --TENT

Request No. 23 asks for "all documents referring or relating to TENT [Total Entertainment Restaurant Corp ] " CalPERS' claims, as alleged in its Complaint, directly targeting TENT were dismissed. The underlying allegations retain some relevance because the benefits of the TENT transaction may have influenced certain directors to view Mr Coulter more favorably Thus, CalPERS' request, as framed, is far too broad and burdensome A more carefully tailored inquiry may be pursued with respect to the TENT transaction This is also the appropriate approach for those other matters about which CalPERS has complained but which it is not directly challenging in this action

### 8 Interrogatory No 5 and Request No 50--Olshan Grundman's Fees

By Interrogatory No 5 and Request No 50, CalPERS seeks information relating to payment of fees by Lone Star, CEI and the Individual Defendants to Olshan Grundman, a partner of which is alleged to have been a long-standing associate of Defendant Coulter

CalPERS summarizes its allegations regarding Olshan Grundman as follows:
> Steven Wolosky, Esq . as a named partner in Olshan Grundman. is a central figure in this case. Mr Wolosky was a long-time associate of Jamie Coulter, who has been instrumental in Lone Star's affairs and particularly in the acquisition of CEI Not only did Wolosky represent Coulter's personal interests, but he purported to represent the Company and the Special Committee in the transaction as well Wolosky advised the Board *not* to retain independent counsel to represent the Company in connection with the CEI deal because he-- and Coulter--had already drafted a sale agreement for the Board to approve . [FN7]

> [FN7. Mem in Supp of Pls ' Mot to Compel at 12 (citing Am Compl ¶ ¶ 50, 52)

Defendants. through Mr. Wolosky's affidavit, assert that. as a factual matter. Olshan Grundman did not represent either CEI or Mr. Coulter in the CEI

transaction However, for present purposes, I must assess the appropriateness of discovery in the context of the specific allegations of the Amended Complaint, drafted by CalPERS' counsel, subject *inter alia* to the standards of Court of Chancery Rule 11, that the firm had multiple roles in the CEI transaction. which lies at the core of the litigation as presently constituted Discovery cannot be avoided merely by filing an affidavit to the effect that the other side has its facts wrong. particularly where the discovery sought may reveal what those facts are

Thus. in general, CalPERS' request is calculated to lead to the discovery of admissible evidence The discovery request. as drafted, however. is unduly broad First. it seeks information about legal fees charged through the date of the filing of this action No reason exists for gaining access to Olshan Grundman's fees after the filing of this action and Defendants' discovery responses may be limited accordingly. Second, the current status of this proceeding does not support a general review of Olshan Grundman's fees. Thus, the description of the firm's efforts may be redacted except to the extent that they involve CEI or any work performed related to the CEI acquisition Third. discovery of a lawyer's invoices may implicate the attorney-client privilege A detailed review of legal bills, of course, can provide fascinating insights into the conduct of lawyer and client, and it can also give a careful and experienced reader an understanding of the strategies employed by counsel for the benefit of the client To accommodate any assertion of privilege, the invoices may be redacted to delete those portions which reflect the thought processes of counsel, but the bills may not be redacted in such a fashion as to deprive the reader of knowledge that the time entries involved CEI or work related to CEI. including Lone Star's acquisition of CEI

### 9 Interrogatory No 14. etc --Other Related Party Transactions

*4 CalPERS is entitled to inquire into the financial relationships between Defendant Coulter and the other Individual Defendants After all, these other interests are as alleged by CalPERS. the basis for its contention that the various directors were not independent However. the scope of CalPERS' request again is so broad as to be unduly burdensome A more narrowly focused set of discovery requests may properly inquire into these circumstances.

The Individual Defendants initially placed their

Not Reported in A 2d
2004 WL 1238443 (Del Ch )
(Cite as: 2004 WL 1238443 (Del.Ch.))

personal financial conditions in play by arguing in support of their motions to dismiss that the various matters were not material in the context of their personal finances If they intend to continue to make such arguments, then inquiry into their personal finances by CalPERS is both appropriate and necessary If they now concede that the transactions should be considered material, then CalPERS need not address this issue during discovery Accordingly, the Individual Defendants must confirm promptly whether or not they intend to assert that the transactions were not material to them in light of their individual financial conditions [FN8]

> FN8. CalPERS has offered no cognizable basis for inquiring into Defendant Coulter's personal financial status

### 10 *Request No 17. etc --Stock Repurchases*

CalPERS' entrenchment claim, as described in its pleadings, depends upon the change in control provisions adopted in early 2000. These requests, however, are addressed to stock repurchase programs in 1998 and 1999 The Individual Defendants contend that CalPERS, except for a general argument regarding course of conduct, has not demonstrated why these earlier events are "directly connected and relevant" to its existing entrenchment claim [FN9] The stock repurchase programs were implemented only shortly before the change in control provision was adopted Thus, both subject matter and temporal linkages appear to exist, and a bar to discovery regarding these programs is not appropriate Such discovery, however, must be more focused than the overly broad formulation adopted by CalPERS.

> FN9. *See In re Fuqua Indus., Inc. S'holders Litig., 1999 WL 959182, at \*4 (Del. Ch. Sept. 17, 1999)*

### B *Defendants' Cross-Motion to Compel*

Certain Defendants have moved to compel CalPERS to provide documents which they contend will assist in the determination of whether CalPERS is an appropriate representative plaintiff for the derivative claims asserted in this action and an appropriate class representative for the class claims asserted in this action CalPERS does not dispute that its ability to serve as a representative plaintiff is an appropriate subject of discovery; the parties do join issue as to the appropriate scope of such discovery

The proper scope of discovery into the adequacy of a

putative class representative or derivative plaintiff is framed generally by the nature of the inquiry The class plaintiff must, of course. satisfy the Court of Chancery Rule 23 requirements of having claims typical of those of the class and having the capacity fairly and adequately to protect the interests of the class Among topics that may require consideration in assessing the adequacy of a representative plaintiff are when did the plaintiff acquire stock in the nominal defendant and whether it has held an equity position continuously since then; whether the plaintiff has some sort of personal agenda unrelated to either the claims raised in the proceedings or the best interests of the nominal defendant and its shareholders; and whether the plaintiff may be subject to any defenses not applicable to shareholders in general

\*5 The documents which the Defendants have requested may be broken into four categories.

### 1 *CalPERS' Ownership of Lone Star Stock*

By Request No 21, Defendants seek production of all documents relating or referring to "CalPERS' ownership, purchase or sale of or investment in any Lone Star stock, including . any Lone Star stock owned. purchased, sold, or invested in by any director, officer. manager, or agent of CalPERS." [FN10] Defendants first argue that they are entitled to CalPERS ownership and investment history with respect to Lone Star stock in order to determine whether CalPERS held stock as of the first event upon which the Amended Complaint is based and has held stock continuously since then CalPERS, of course, must provide sufficient documentation to demonstrate its standing as a shareholder CalPERS represents that it has provided that information and, thus, argues that this aspect of the motion to compel is moot The current problem appears to be one of interpreting the documents provided by CalPERS Counsel shall confer and determine what additional supporting documentation is necessary to interpret the documents provided. Following receipt of that material. Defendants may renew their application if they remain without adequate documentation for this purpose.

> FN10. Request No 22 seeks substantially the same information regarding stock funds

Defendants next argue that the history of CalPERS' investment in Lone Star may bring into question the good faith of CalPERS' allegations regarding the alleged breaches of fiduciary duty If Defendants

Not Reported in A 2d
2004 WL 1238443 (Del Ch )
(Cite as: 2004 WL 1238443 (Del.Ch.))

argue, CalPERS truly believed that Defendants were mismanaging Lone Star. it would not have continued to invest in the company I am not persuaded that the production of these documents could lead to the discovery of any admissible (or relevant) evidence Investment decisions are made for many reasons. Even if CalPERS believed that Lone Star had good prospects and. thus, was an appropriate investment, it would not follow (or would not tend to support the proposition) that wrongdoing was not occurring. It may be, for example, that the business has such a bright future that, even with suspect management whose deficiencies might be corrected, the company was a good investment Moreover, CalPERS' investments appear to have been the function of an index approach that would not have involved a separate analysis of Lone Star's investment appeal

In addition, the investment decisions made by directors, employees, and agents of CalPERS are so remote from any of those issues which might arise during an evaluation of whether CalPERS is an appropriate representative plaintiff that Defendants' inquiry fails to meet the relatively low threshold for proper discovery and unnecessarily invades the privacy of the individuals associated with CalPERS. Thus, except for those documents which are necessary to demonstrate continuous ownership of Lone Star stock throughout the applicable period, Defendants' motion to compel with respect to Request Nos. 21 and 22 is denied

2 *CalPERS' Litigation History*

*6 Request Nos. 35 and 36 seek documents relating or referring to all litigation in which CalPERS has been a plaintiff or a defendant since January 1995. In addition, Request No 37 requests documents relating to any claims asserted against any member of CalPERS' board since January 1995 The Defendants have subsequently limited their request to litigation involving corporate governance and control issues; that is, they concede that they have no legitimate cause for production of documents involving litigation relating to employment claims, personal injury claims, or the like Inquiry into a representative plaintiff's litigation history has been characterized, without some showing of wrongdoing as a party in a case unrelated to the pending case, as a "whim [in which the Defendants hope] that they may stumble upon something that would disqualify [the putative representative plaintiff] " [FN11]

FN11 *In re Dairy Mart Convenience Stores, Inc.,* 1997 WL 732467, at *4 (Del. Ch. Nov.

13, 1997)

I am satisfied that Defendants' requests are overly broad and unduly burdensome Even when restricted to corporate governance litigation, the Defendants' requests would, on their face, require what would amount to the production of entire litigation and ancillary files Absent some additional showing as to why other documents would be appropriate, I will deny Defendants' motions to compel with respect to Request Nos 35 and 36. except that I will direct CalPERS to provide to Defendants a list of all litigation in which it has been involved since January 1, 1995, and which relates to corporate governance matters This, of course, would include any derivative actions and any class actions brought on behalf of shareholders As to Request No 37. Defendants have made no showing of any purpose that might be served by requiring production of documents involving claims regarding members of CalPERS' board. Thus, with respect to Request No 37. Defendants' motion to compel is denied

3. *Corporate Governance Documents*

Request Nos 38 and 39 seek documents constituting or referring to communications between CalPERS and officers or stockholders of any public company where the communications involved corporate governance or corporate financial performance matters Request Nos. 42-46 seek documents regarding CalPERS' corporate governance and financial performance matters

CalPERS' pleadings tout its prominent role in corporate governance matters. This, Defendants argue, justifies a broad ranging inquiry into all of CalPERS' communications regarding corporate governance with any public company or its shareholders, as well as CalPERS' own internal governance practices. Defendants rely upon the fundamental precept that documents relating to a complaint's allegations are appropriate for discovery

Ordinarily, where a plaintiff makes allegations, even if they are self-congratulatory, in its complaint, it has subjected itself to the burdens of discovery with respect to those allegations Ordinarily, the simple answer is: if the party wanted to avoid discovery into those matters, it should not have made such allegations Notwithstanding those general principles, I deny Defendants' cross-motion to compel as to Request Nos. 38-39 and 42-46 First, they are so broad as to be unduly burdensome Second. implicit in Defendants' argument is the notion that CalPERS

Not Reported in A.2d
2004 WL 1238443 (Del.Ch.)
(Cite as: 2004 WL 1238443 (Del.Ch.))

Page 6

(or any other entity that takes a strong position in the ongoing national debate about corporate governance) would necessarily be precluded from acting as a representative plaintiff because it suffers from some sort of split motivation or because its litigation constitutes an effort to "extort" corporate governance "reforms" as a price of reaching a resolution of the litigation. [FN12] Third, I am not persuaded that allowing the broad scope of discovery sought by Defendants would carry any potential for the eventual uncovering of admissible evidence. Despite their claims of CalPERS' "ulterior motives." Defendants have been unable to set forth what those motives may be, except for CalPERS' interest in corporate governance. Defendants have provided no basis for concern that these interests, to the extent that they may motivate CalPERS in this proceeding, will cause CalPERS to take positions adverse to the interests of the nominal defendant or its other shareholders. If Defendants have a basis for their belief that CalPERS' posture on corporate governance matters is pertinent to the inquiry into CalPERS' ability to function as a representative plaintiff, then that information can be garnered through a discovery effort that is both more focused and less burdensome than the one which Defendants have pursued. [FN13]

> FN12. Similarly, Defendants assert that CalPERS, through this litigation and similar litigation, may be seeking to "intimidate" other public companies to adopt the corporate governance practices advocated by CalPERS

> FN13. Defendants have failed to show how inquiry into CalPERS' internal management practices should be deemed to require the assistance of the Court. A pole, some line, and a little bait should suffice

### 4. *Timing of the Filing of the Complaint*

*7 Through Request No. 47, the Defendants seek, *inter alia*. all documents which refer to the reasons why CalPERS did not file its original complaint in this action until October 2000. Defendants argue that these documents are relevant to its time-bar defenses CalPERS asserts that there are no non-privileged documents that would be responsive to this request. There is no purpose here for ordering the production of that which does not exist, but CalPERS does need to supply a privilege log

### C. *CalPERS' Motion to Amend*

CalPERS seeks to add to its Complaint allegations (i) in the nature of usurpation of corporate opportunity involving the TENT transaction and (ii) relating to the Board's actions after the filing of this action in furtherance of, as CalPERS describes them, its entrenchment efforts The first set of allegations properly is viewed as an amendment of the pleadings under Court of Chancery Rule 15(a); the second set of allegations involving actions occurring after commencement of this proceeding is properly viewed as a supplementation of CalPERS' pleading under Court of Chancery Rule 15(d) Under Court of Chancery Rule 15(a), "leave [to amend] shall be freely given when justice so requires." Court of Chancery Rule 15(d) contains no similar instruction to the trial judge

Significantly, the proposed new complaint, whether amended or supplemented, sets forth no new claims [FN14] In general, the allegations regarding the TENT transaction, if true, would serve to question the independence of the Board and the allegations regarding entrenchment, if true, would serve to show a continuing pattern on the part of the Board and the consequences of its previous entrenchment efforts

> FN14. One assumes that no new claim was brought because, by the time of the post-complaint conduct, a majority of the board was independent.

The nature of the additional allegations avoids direct application of familiar principles employed to assess motions to amend. For example, futility analysis is not possible because there are no new claims to measure Considerations of prejudice are not easily evaluated because factual allegations that do not directly add to a substantive allegation can hardly be prejudicial (other than possibly expanding the scope of discovery unnecessarily) [FN15]

> FN15. A ruling on a motion to amend (or supplement) is not the best platform for anticipating discovery disputes It would, perhaps, be naive not to foresee discovery problems, but they are best addressed within the framework established by the Rules for resolving discovery disputes

In these unique circumstances. I have turned to Court of Chancery Rule 8(a) which teaches that a complaint is to contain, *inter alia*. "a short and plain statement of the claim showing that the pleader is entitled to relief." I will not dwell on whether our

Not Reported in A 2d                                                     Page 7
2004 WL 1238443 (Del Ch )
(Cite as: 2004 WL 1238443 (Del.Ch.))

pleadings can satisfy the goal of being "short and
plain," but I, nevertheless, will focus on the purpose
of articulating a "statement of the claim." The
allegations which CalPERS now seeks to incorporate
into its pleadings add nothing to define more clearly
the existing claims in the Complaint The Complaint
already alleges that the Board was dominated by Mr
Coulter, in part, because he had conferred financial
benefits upon them In addition, the events occurring
after the filing of this action involved a board with a
substantially different composition from the one that
engaged in the conduct challenged in this action

 *8 On the other hand. one cannot, at this stage of the
proceedings. say that the additional allegations are
irrelevant. Indeed, the factual allegations, if proved,
may well inform the resolution of the existing claims
For example, they may demonstrate the consequences
of the pre-litigation board's "entrenchment" actions
Perhaps the additional allegations will serve no useful
purpose, but that outcome cannot be predicted at this
time In light of the general policy favoring a party's
right to revise its pleadings to set forth fairly the
grounds for its claims. CalPERS' motion to amend
will be granted

 IT IS SO ORDERED

 2004 WL 1238443 (Del Ch )

 END OF DOCUMENT

c  2005 Thomson West  No Claim to Orig  U S  Govt  Works

**4**

Westlaw.

Not Reported in A 2d                                    Page 1
2002 WL 991666 (Del Ch )
**(Cite as: 2002 WL 991666 (Del.Ch.))**

**H**
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION   CHECK   COURT
RULES BEFORE CITING

Court of Chancery of Delaware
In re FUQUA INDUSTRIES, INC ,
SHAREHOLDER LITIGATION
No. CIV.A. 11974.

Submitted: Dec 31, 2001
Decided: May 2, 2002
Pamela   Tikellis,   of   Chimicles   &   Tikellis,
Wilmington, Delaware;   Joseph A. Rosenthal,
Carmella P. Keener, of Rosenthal, Monhait, Gross &
Goddess. P A . Wilmington, Delaware; of Counsel:
Lowell E. Sachnoff, Duane F. Sigelko, of Sachnoff &
Weaver, Ltd , Chicago, Illinois; David Schachman, of
David Schachman & Associates, P C . Chicago,
Illinois. Attorneys for Plaintiffs.

Thomas R. Hunt, Jr., David J. Teklits, of Morris,
Nichols, Arsht & Tunnell, Wilmington, Delaware; of
Counsel: Oscar N. Persons, of Alston & Bird,
Atlanta, Georgia  Attorneys for Defendant J.B.
Fuqua

R. Franklin Balotti, Anne C. Foster, Peter B. Ladig,
of Richards, Layton & Finger, Wilmington,
Delaware, Attorneys for Nominal Defendant Fuqua
Industries. Inc

MEMORANDUM OPINION

CHANDLER, Chancellor

*1 Before me is plaintiffs' third motion to compel
defendants Fuqua Industries. Inc and J.B. Fuqua to
produce documents claimed to be privileged. [FN1]
The parties fully briefed this motion and I have
conducted an *in camera* inspection of the documents
in dispute This is my decision on the plaintiffs'
motion

> FN1 The factual and procedural history of
> this case are set forth in this Court's 1999
> opinion concerning the adequacy of
> representation. as mandated by Rule 23 1, of
> the named plaintiffs in this case  See *In re*

*Fuqua Indus., Inc. Shareholder Litig.,* 752
A 2d 126 (Del. Ch 1999)

I INTRODUCTION
The numerous claims originally asserted by the
plaintiffs were whittled down to one by this Court's
1997 decision on defendants' motion to dismiss
plaintiffs' second amended complaint. That decision
resulted in the dismissal of all of the plaintiffs' class
claims and all but one of their derivative claims.
[FN2] The sole surviving derivative claim concerns
the decisions of the defendant directors of Fuqua
Industries. Inc ("FII") to exempt its principal
shareholder, Triton Group. Inc. ("Triton"), from §
*Del. C.* § 203 and to repurchase 4 9 million Fuqua
shares  These decisions were allegedly made for the
purpose of increasing Triton's control over FII,
entrenching the FII board and. consequently, denying
FII shareholders a change of control premium  [FN3]
The asserted purpose of the motion to compel
currently before me is to gather evidence in
furtherance of that claim

> FN2 See *In re Fuqua Indus. Inc
> Shareholder Litig.* Del Ch , C A No
> 11974. mem op . Chandler, V C (May 13,
> 1997)

> FN3 *In re Fuqua.* 752 A.2d at 128

Specifically, the motion requests. pursuant to Rule
37(b) and this Court's September 17, 1999 letter
opinion. [FN4] an order compelling defendants FII
and J.B Fuqua to produce 138 documents identified
by the plaintiffs from the defendants' various
privilege logs The bases for the plaintiffs' assertion
that these documents should be produced are: (1) that
no author or recipient is specified in the relevant
privilege logs as required under this Court's Order to
sustain a claim of privilege; (2) waiver of the
attorney-client privilege; (3) that documents did not
contain legal advice; and/or (4) that plaintiffs have
shown good cause for the production of all of the
specified documents

> FN4. *In re Fuqua Industries. Inc
> Shareholders Litig*  Del Ch , let op .
> Chandler. C (Sept 17. 1999)

Because I find that the plaintiffs have demonstrated
good cause why the attorney-client privilege should

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in A.2d                                                    Page 2
2002 WL 991666 (Del.Ch.)
(Cite as: 2002 WL 991666 (Del.Ch.))

not apply, I grant the plaintiffs' motion with regard to all requested documents except for those I have determined, through *in camera* inspection, to be work product prepared in contemplation of this litigation and eight documents withheld from production by defendant J.B. Fuqua [FN5].

> FN5. In their reply brief, the plaintiffs state that if the eight documents J.B. Fuqua has asserted are privileged "make no reference to Triton's proposed business combination with FII, to change-of-control or to the general context in which J.B. Fuqua's sale of stock to Triton was to take place (matters which Plaintiffs cannot determine from the log entries), Plaintiffs will concede that they do not require production of that document." Pls.' Reply Br. at 11. Those documents were provided to the Court for *in camera* inspection under cover of a letter dated November 6, 2001, from Thomas R. Hunt, Jr., Esquire, counsel for Mr. Fuqua, to the Court. After examination of those documents, I determined that none of the subjects listed by the plaintiffs are referenced in any of those documents and, therefore, by the plaintiffs' own admission, production of those eight documents is not required.

## II. APPLICABLE LEGAL STANDARDS
### A. Scope of Discovery and the Attorney-Client Privilege

The scope of discovery permitted in this Court is set forth in Court of Chancery Rule 26(b)(1) [FN6]. The broad discovery permitted by Rule 26(b)(1) is limited to the extent that the party from whom discovery is demanded can properly assert a claim of privilege. The burden of establishing a privilege is on the party asserting that privilege [FN7]. Defendants assert that the documents subject to the plaintiffs' motion to compel are protected by the attorney-client privilege and produced privilege logs in support of that assertion. Rule 502(b) of the *Delaware Uniform Rules of Evidence* sets forth the scope of the attorney-client privilege in Delaware:

> FN6. Rule 26(b)(1) states:
> Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party,

including the existence, description, nature, custody, condition and location of any books, documents or other tangible things and the identity and location of persons having knowledge of any discoverable matter. It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

> FN7. *Deutsch v. Cogan,* 580 A.2d 100,107 (Del. Ch.1990)

*2 A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client (1) between the client or the client's representative and the client's lawyer or the lawyer's representative, (2) between the lawyer and the lawyer's representative, (3) by the client or the client's representative or the client's lawyer or a representative of the lawyer to a lawyer or a representative of a lawyer representing another in a matter of common interest, (4) between representatives of the client or between the client and a representative of the client, or (5) among lawyers and their representatives representing the same client.

The purpose of the attorney-client privilege is "to encourage full and frank communication between clients and their attorneys." [FN8] As others have noted, however, "an inevitable conflict arises" when a corporation asserts the attorney-client privilege in the context of a shareholder derivative action. [FN9] A claim of attorney-client privilege made on behalf of a corporation may only be asserted "through its agents, *i.e.,* its officers and directors, who must 'exercise the privilege in a manner consistent with their fiduciary duty to act in the best interests of the corporation and not of themselves as individuals.' " [FN10] The "inevitable conflict" develops when a shareholder, who is the intended beneficiary of the acts of his corporation's agents, claims those agents have acted inimically to the interest of the corporation and its shareholders. As the *Deutsch* Court explained:

> FN8. *Zirn v. VLI Corp.,* 621 A.2d 773, 781 (Del.1993)

> FN9. *Id.*

> FN10. *Id.* (quoting *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S.

343, 349, 105 S.Ct 1986, 1991, 85 L.Ed.2d 372 (1985))

Where a fiduciary has conflicting interests, to allow the lawyer-client privilege to block access to the information and basis of its decisions as to the persons to whom the obligations are owed might allow the perpetration of frauds A fiduciary owes an obligation to his beneficiaries to go about his duties without obscuring reasons from the legitimate inquiries of the beneficiaries Moreover, "[t]he more general and important right of those who look to fiduciaries to safeguard their interests, to be able to determine the proper functioning of the fiduciary. outweighs the need for the privilege and its base of attorney-client confidence " [FN11]

> FN11. *Deutsch* 580 A 2d at 108 (quoting *Valente v. Pepsico, Inc.,* 68 F.R.D. 361, 369-70, n. 16 (D.Del.1975)) (alteration in original) (citations omitted)

Despite this reasoning, however, "discovery of lawyer-client confidential communications is not automatic " [FN12] The purpose of fostering full and frank communication between attorney and client is not lessened merely because the client is a corporation In determining the scope of the attorney-client privilege available to a corporate client, the United States Supreme Court has noted:

> FN12. *Deutsch.* 580 A 2d at 106

[I]f the purpose of the attorney-client privilege is to be served, the attorney and client must be able to predict with some degree of certainty whether particular discussions will be protected An uncertain privilege. or one which purports to be certain but results in widely varying applications by the courts. is little better than no privilege at all [FN13]

> FN13. *Upjohn Co. v. United States,* 449 U.S. 383, 393, 101 S.Ct. 677, 684, 66 L.Ed.2d 584 (1981); *see also. id* at n 2 (stating that in the absence of the privilege, "the depth and quality of [legal communications between corporations and legal counsel], to ensure compliance with the law would suffer")

*3 The need to balance the legitimate assertion of the attorney-client privilege by corporate fiduciaries in furtherance of full and frank communication with counsel. on the one hand. with the right of a derivative plaintiff to discover what advice was given to those fiduciaries when a breach of duty by those same fiduciaries is alleged. on the other, resulted in a doctrine whereby a plaintiff-shareholder can show "good cause" why a corporation's claimed attorney-client privilege does not attach to the contents of otherwise-protectable communications

### B "Good Cause" and the Non-application of the Attorney-Client Privilege

The Court in *Garner v. Wolfinbarger* explained that in the face of an assertion of attorney-client privilege by a corporation, a shareholder who is bringing a derivative action may be able to demonstrate good cause why that privilege should not apply [FN14] *Garner* identified a non-exclusive list of factors that a court may consider in determining whether good cause has been shown to permit discovery of documents to which the attorney-client privilege would otherwise attach These factors are:

> FN14. 430 F.2d 1093, 1103-04 (5th Cir.1970). *cert denied.* 401 U.S. 974 (1971)

[1] the number of shareholders and the percentage of stock they represent; [2] the bona fides of the shareholders; [3] the nature of the shareholders' claim and whether it is obviously colorable; [4] the apparent necessity or desirability of the shareholders having the information and the availability of it from other sources; [5] whether, if the shareholders' claim is of wrongful action by the corporation, it is of action criminal, or illegal but not criminal, or of doubtful legality; [6] whether the communication related to past or to prospective actions; [7] whether the communication is of advice concerning the litigation itself; [8] the extent to which the communication is identified versus the extent to which the shareholders are blindly fishing; [and 9] the risk of revelation of trade secrets or other information in whose confidentiality the corporation has an interest for independent reasons [FN15]

> FN15. *Id* at 1104

In *Deutsch v Cogan* this Court noted its approval of the *Garner* approach to determining the applicability of the attorney-client privilege in shareholder suits. [FN16] Before the Court considers whether a showing of good cause compels production of purportedly privileged documents however, the "litigant [must] first establish that a mutuality of

Not Reported in A 2d
2002 WL 991666 (Del Ch )
(Cite as: 2002 WL 991666 (Del.Ch.))

Page 4

interest existed between the parties" [FN17] at the time the disputed communication was made [FN18] This mutuality of interest exists when a fiduciary (such as a corporate director) seeks legal advice in connection with actions taken or contemplated in his role as a fiduciary Because the director is obligated to act in the best interest of the corporation and its shareholders, there is a mutuality of interest among the director. the corporation, and the shareholders when such legal advice is sought It is logical, therefore. that upon a showing of good cause, the attorney-client privilege does not attach to prevent a plaintiff-shareholder--for whose ultimate benefit that advice was sought--from discovering the contents of that communication At the point in time when the interests of the fiduciary and the beneficiary diverge, however, there is no longer a mutuality of interest and a Garner analysis is not appropriate Although there is little Delaware case law on the subject, and no bright-line rule that identifies the point in time when mutuality of interest diverges in each case, that divergence must necessarily occur at the point in time when the parties can reasonably anticipate litigation over a particular action [FN19] During the period when there is a mutuality of interest. however, a plaintiff may attempt to establish that he has shown good cause why the attorney-client privilege should not be invoked

> FN16. 580 A.2d 100. 106 (Del. Ch.1990) (noting that Garner provided a "workable and logical framework for analyzing claims of lawyer-client privilege in the context of shareholder suits")

> FN17. The Continental Ins. Co. v. Rutledge & Co., Inc., 1999 WL 66528 at *2 (Del. Ch.)

> FN18 Id. at *2 n 17; see also. Metropolitan Bank & Trust Co. v. Dovenmuehle Mortgage, Inc., 2001 WL 167445 at *3 (Del. Ch.) (stating that "[i]n order for the Plaintiffs to take advantage of the fiduciary duty exception. the documents which they seek must have been created while there was a mutuality of interest with [the fiduciary]")

> FN19 See Metropolitan Bank, 2001 WL 167445 at *3 (stating that mutuality of interest "will have lapsed by the time that the [fiduciary and beneficiary] can reasonably anticipate litigation about an identified dispute"); Continental Ins. 1999 WL 66528 at *2 (finding that mutuality of

interest diverged "after each party was made aware of the limited partners' intent to withdraw" and that legal advice received after that point in time "is privileged and need not be produced") (applying corporate rules and notions of fairness in the limited partnership context)

The requirement of a mutuality of interest explains why there is no Garner-exception to the work product privilege

*4 Although frequently referred to as an exception to the attorney-client privilege, this Court noted in Sealy Mattress Co of New Jersey Inc v Sealy Inc . that a showing of good cause under the Garner doctrine is "technically not an 'exception' to the privilege, [but] results in its nonapplication." [FN20] Therefore, when considering a motion to compel production of documents--in the context of a shareholder derivative action where discovery requests are met by a properly-supported claim of attorney-client privilege by the corporation concerning communications that took place while there was a mutuality of interest between a fiduciary and the shareholders--the Court should first determine whether the shareholder has made a sufficient showing of good cause If the plaintiff has made that showing. the attorney-client privilege will not attach and otherwise privileged documents may be subject to discovery If the plaintiff has not made a sufficient showing of good cause. the attorney-client privilege will attach and the Court must next determine whether the plaintiff has alleged facts which would satisfy one of the exceptions to the attorney-client privilege.

> FN20. 1987 WL 12500 at *3 (Del. Ch.); see also Deutsch, 580 A 2d at 104 (noting that the "doctrine . is not technically an 'exception' to the lawyer-client privilege under Delaware Evidence Rule 502, but nonetheless results in its not being applied"); Garner, 430 F.2d at 1103-04 (stating "where the corporation is in suit against its stockholders on charges of acting inimically to stockholder interests protection of those interests as well as those of the corporation and of the public require that the availability of the privilege be subject to the right of the stockholders to show cause why it should not be invoked in the particular instance ") (emphasis added)

In its consideration of whether good cause has been shown, the Court may consider the Garner factors and conduct a "so-called 'balancing test'        to

Not Reported in A 2d                                                    Page 5
2002 WL 991666 (Del Ch )
(Cite as: 2002 WL 991666 (Del.Ch.))

determine whether the balance tips in favor of disclosure or non-disclosure " [FN21] Of those several factors, the *Sealy* Court identified three as having particular significance to the Court's analysis: (1) the colorability of the claim; (2) the extent to which the communication is identified versus the extent to which the shareholders are blindly fishing; and (3) the apparent necessity or desirability of shareholders having the information and the availability of it from other sources [FN22]

FN21. *Deutsch*, 580 A.2d at 105

FN22. *Sealy*, 1987 WL 12500 at *4; *see also In re Fuqua Indus Inc Shareholders Litig* , Del Ch , C A No 11974, let op at 6-7, Chandler, C (Sept. 17 1999) (noting the identification of the importance of these three factors by *Sealy* )

### III. ANALYSIS

The plaintiffs renew their argument--made in support of an earlier, unsuccessful, motion to compel the production of documents--that, even if the defendants make a *prima facie* showing that the disputed documents are subject to the attorney-client privilege, the plaintiffs have shown good cause for the production of those documents In my decision on that earlier motion, I denied the plaintiffs' motion based on a failure to satisfy two of the three key factors cited by *Sealy* as being particularly important to a finding of good cause. Although the survival of one of the plaintiffs' derivative claims after the 1997 motion to dismiss decision [FN23] established that at least one colorable claim had been stated, I was not convinced that the plaintiffs had demonstrated that they were not blindly fishing or that the information sought was unavailable from other sources To illustrate why the plaintiffs had not satisfied those good-cause factors I stated that, "[f]irst, [the plaintiffs] ha [d] not adequately identified the specific communication. Second, and more importantly, that I[was] not satisfied that plaintiffs ha[d] exhausted every available method of obtaining the information they seek " [FN24] I noted that, "further depositions may provide the answers they seek without infringing upon the attorney-client privilege " [FN25]

FN23. *In re Fuqua Indus , Inc Shareholder Litig* Del Ch , C A No 11974, mem op , Chandler, V C (May 13. 1997).

FN24. *In re Fuqua* let op at 7

FN25. *Id*

*5 The plaintiffs assert that they have cured these defects and that they are now able to satisfy the criteria necessary to show good cause. With respect to the question whether the plaintiffs are blindly fishing, they have now satisfied that factor by specifically identifying each of the documents that they seek and showing that they are relevant to the two components of their surviving claim--as instructed by the 1999 denial of plaintiffs' earlier motion to compel [FN26]--by using excerpts from the privilege logs prepared by FII for its own documents and those of Simpson, Thacher & Bartlett Arguably, these documents are necessary to support plaintiffs' allegations that decisions of the FII board were made for entrenchment purposes and affected FII shareholders' ability to receive a change of control premium As evidenced by the survival of this claim, the plaintiffs have stated a plausible scenario that, if ultimately proven true, would support their claim This more focused and adequately supported document request tips the balance in favor of a belief that the plaintiffs are not blindly fishing for information

FN26. *Id* at 9

With regard to my even greater concern that good cause had not previously been shown because the information sought by plaintiffs might be available via other avenues, such as depositions, rather than a court-ordered production of documents, the plaintiffs have since conducted depositions and report that they have still been unable to uncover information that would lead to a determination of whether or not their claim is meritorious Plaintiffs contend that the deponents either did not recall information concerning the subject upon which they were being questioned or attempted to trivialize certain of the bases of the plaintiffs' claim

Significantly, the defendants do not dispute that the plaintiffs have sought further discovery through deposition, nor do they contend that other sources of that information are available which would moot the necessity of the plaintiffs' motion to compel Instead, they attempt to cast the plaintiffs' argument as one in which they purport to have shown good cause because plaintiffs believe the privileged documents will contradict evidence already in the record I agree with the defendants' contention that record evidence which disproves plaintiffs' allegations does not create good cause for production of otherwise privileged information because of the hope that other information will contradict that which is already in

Not Reported in A.2d
2002 WL 991666 (Del.Ch.)
(Cite as: 2002 WL 991666 (Del.Ch.))

Page 6

evidence. That would surely be nothing more than a blind fishing expedition and would not support a showing of good cause. As I have already noted, however, the basis of the plaintiffs' request for production is not that evidence they have discovered so far is contrary to their assertions or that they hope to find new information that will support their claim. Rather, they contend that those who are alleged to have acted improperly have been either unable or unwilling to provide information, which the plaintiffs believe is contained in the disputed documents. Because I conclude that plaintiffs have demonstrated that information necessary to prove or disprove their allegations in this derivative litigation is unavailable (or not forthcoming from any other source), the third critical *Garner* factor also tips in favor of discovery.

*6 The infirmities that prevented the plaintiffs from establishing good cause in support of their earlier motion to compel have been cured. Plaintiffs are now able to demonstrate a colorable claim, lack of blind fishing and the apparent need for production of documents that might otherwise be protected by the attorney-client privilege. Therefore, I conclude that the attorney-client privilege does not attach to those documents as it relates to these plaintiffs and must be produced. [FN27] Because there is no *Garner* exception to the work product privilege, and because plaintiffs have failed to show a compelling need for those documents as is necessary to overcome that privilege, those portions of documents I have identified through *in camera* inspection to include work product need not be produced. [FN28]

FN27. This conclusion makes it unnecessary to consider the parties' arguments concerning waiver or any other possible exceptions to attorney-client privilege that I would have had to consider had I determined that good cause had not been established by the plaintiffs. I express no view on the merits of those arguments.

FN28. The portions of documents subject to work product protection on Fuqua Industries, Inc. Privilege Log are:
Tab 10--FI005094 & FI005099; Tab 16--FI033873-74; Tab 18--FI034079-80; Tab 19--FI034104-05; Tab 25--FI034558-59, 61-64; Tab 48--FI037413; Tab 51-- FI037502; Tab 53--FI037735-36, 40; Tab 58--FI037901-02, 04-07; Tab 65-- FI042869-71; Tab 67--FI042876; Tab 70--FI042886-88; Tab 71--042890-93; Tab 74--FI042951-3104; and Tab 75--FI043117-44.

The portions of documents subject to work product protection on Simpson Thacher & Bartlett's Privilege Log are:
Tab10--P00061-63; Tab 12--P00078-79; Tab 13--P00080-81; Tab 14--P00082-87; Tab 17--P00097-117; and Tab 18--P00118-38

IV. CONCLUSION
For the reasons stated, plaintiffs' motion is GRANTED in part and DENIED in part.

IT IS SO ORDERED.

2002 WL 991666 (Del.Ch.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**5**

Westlaw.

Not Reported in A.2d
1999 WL 252381 (Del.Ch.)
(Cite as: 1999 WL 252381 (Del.Ch.))

Page 1

**C**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION    CHECK    COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
Re: GRIMES, et al.
v.
LCC INTERNATIONAL, INC., et al, Civil Action
No., 16957
**No. CIV.A.16957.**

April 23, 1999.
Henry E. Gallagher, Esquire, Connolly, Bove, Lodge
& Hutz, Wilmington.

Peter B. Ladig, Esquire, Richards, Layton & Finger,
Wilmington

JACOBS, Vice-Chancellor.

*1 Counsel:

On April 22, 1999, I appointed a Special Master to
recommend the disposition of the plaintiffs' motion to
compel the production of approximately 140
documents being withheld by defendants on the
grounds of attorney-client privilege and/or work
product immunity. To afford guidance to the Special
Master, the parties have asked the Court to resolve
certain threshold privilege-related issues. This is the
decision of the Court on those issues. Because of the
shortness of time to complete discovery before the
May 6, 1999 hearing on plaintiffs' motion to appoint
a receiver, the Court's treatment of these issues is
necessarily summary and abbreviated.

**I. Universe of Documents Subject to Attorney-Client
Privilege**

The plaintiffs contend that many of the documents
described on the defendants' privilege log cannot be
subject to a claim of attorney-client privilege,
because on their face those documents do not satisfy
the criteria for a privileged communication. To be
protected under the attorney-client privilege, a
document must be or contain a confidential
communication made between a client and his lawyer
(or the representatives of the client and the lawyer, or

among the lawyers and their representatives
representing the same clients) for the purpose of
facilitating the rendition of legal services to the
client. Del. Unif. R. Evid. 502(b); Deutsch v. Cogan,
Del. Ch., 580 A.2d 100, 105-6 (1990)

This Court has not independently reviewed the
privilege log or the disputed documents; that
unenviable task will be for the Master to perform.
Nonetheless, some guidelines (although abstract)
may be derived from basic principles. Thus, to the
extent the defendants are claiming attorney-client
privilege with respect to (1) correspondence or other
communications between lawyers for Microcell
and/or LCC (Microcell's controlling stockholder) and
non-client persons or entities (e.g., Chase Manhattan
Bank); or (2) correspondence or other
communications between or among non-lawyers
(and/or their representatives), these communications
are discoverable because they fall outside the
definition of a privileged communication.

**II. Communications To and From Peter DeLiso**

According to the plaintiffs, the great bulk of the
disputed documents are communications by or to
Peter DeLiso, who is the general counsel for both
LCC and Microcell, and is also the Chairman of
Microcell's Board of Directors. The plaintiffs contend
that Mr DeLiso represented both LCC and Microcell
during the events that give rise to their claims,
namely (1) when those companies negotiated the
revolving credit agreement that is the subject of
several breach of fiduciary duty claims, (2) when
Microcell negotiated with companies in several
foreign countries, transactions that are the subject of
claims that LCC usurped corporate opportunities of
Microcell; (3) when Microcell's LCC-controlled
board of directors improperly withheld funding from
Microcell; (4) when Mirocell agreed to guarantee
LCC's credit facility with Chase Manhattan Bank,
allegedly for no consideration; and (5) when LCC
entered into credit agreements with Chase that
prohibited LCC from funding Microcell, even though
LCC was legally obligated to provide such funding.

*2 It appears that Mr DeLiso generated and received
many documents in connection with these events.
Those documents, plaintiffs contend, are not
privileged as a matter of law. Lamentably, any
analysis of these claims is made difficult because of

Not Reported in A.2d
1999 WL 252381 (Del.Ch.)
(Cite as: 1999 WL 252381 (Del.Ch.))

Page 2

the multiple roles that Mr. DeLiso occupied. Whether or not a given communication to or from Mr. DeLiso is privileged will necessarily depend upon his capacity at the time it generated or received the communication. To resolve the privilege issue created by Mr. DeLiso's several and simultaneous fiduciary roles, those capacities must first be sorted out.

That proposition, applied to the present facts, results in the following analysis:

1. Any confidential communication _[FN1] to or from Mr. DeLiso *solely* in his capacity as Chairman of Microcell's Board of Directors (which communication does not contain any legal advice to Mr. DeLiso *qua* client), would not be subject to claims of attorney-client privilege, since Mr. DeLiso would not have been acting in his lawyer capacity.

> FN1. It is assumed that all communications referred to in this analysis pertain to matters that are relevant to the claims asserted in this lawsuit.

2. Any confidential communication made by Mr. DeLiso--acting *solely* in his capacity as counsel for LCC--to LCC or its directors and/or officers; and any confidential communication made by those clients to Mr. DeLiso, again acting *solely* in that capacity, should be subject to the attorney-client privilege. Those communications would, therefore, be protected from disclosure to the plaintiffs, who are stockholders of Microcell, not LCC.

3. What remains are the confidential communications made by Mr. DeLiso acting *solely* in his third capacity--as counsel for Microcell--to Microcell and/or its officers or directors; and also confidential communications from those clients to Mr. DeLiso, again in that capacity. This category of documents is the apparent focus of much of the parties' legal dispute. The plaintiffs contend that because they are stockholders of Microcell who are suing derivatively on its behalf, Microcell and its directors may not invoke the attorney-client privilege against them. The defendants dispute that. They argue that the fact that plaintiffs are suing derivatively does not render the privilege inapplicable. They contend that the privilege does attach and that to defeat it, the plaintiffs must show good cause why the privilege should not apply. That issue is addressed in Part III, below. For the reasons set forth therein, I conclude that the defendants may claim privilege with respect to this category of

documents, subject to the plaintiffs' right to defeat the privilege by showing good cause, as that concept was explicated by the Fifth Circuit in *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir.1970), and by this Court in *Deutsch v. Cogan, supra*, 580 A.2d at 105-6, and cases cited therein.

4. Although the disputed documents relating to Mr. DeLiso may be divided into the above three categories, in some cases the reality (as opposed to the theory) may not be so simple. Conceivably there may be documents that do not disclose in any clear-cut way which of Mr. DeLiso's three hats he was wearing at the time he generated or received the communication in question. Where Mr. DeLiso's capacity is not readily ascertainable from the document, it will be difficult to determine whether the document is subject to the privilege. To the extent the Special Master encounters such documents, the question becomes how they should be treated. In my view, any doubt about the status of this "indeterminate" category of documents should be resolved against the claim of privilege. I so conclude because it was the defendants who would have created the problem, by placing Mr. DeLiso in multiple--and potentially conflicting-- fiduciary roles. Having created that conflict and its resulting ambiguity, and having been in a position to prevent the conflict from arising in the first place, the defendants, as fiduciaries for Microcell's minority stockholders, cannot be allowed to benefit from the ambiguity by asserting a privilege that might not otherwise have been available. *See Valente v. Pepsico, Inc.*, 68 F.R.D. 361, 368 (1975).

III. The *Garner vs. Valente* Debate

*3 The final issue concerns the plaintiffs' argument that the defendants may not assert the attorney-client privilege as to *any* communication to or from Mr. DeLiso while he served simultaneously as general counsel for LCC and Microcell. They contend that in such circumstances, *Valente v. Pepsico* precludes the conflicted fiduciary altogether from asserting, in a derivative action brought against the fiduciary, the privilege against either of the clients to whom he owed (conflicting) fiduciary duties. The defendants argue that *Valente* does not represent the law of Delaware. Rather, they contend, Delaware has rejected *Valente* in favor of the approach adopted in *Garner v. Wolfinbarger*, which allows the fiduciary to assert the privilege but permits the minority shareholder plaintiff to defeat the privilege by showing good cause.

Not Reported in A.2d
1999 WL 252381 (Del.Ch.)
(Cite as: 1999 WL 252381 (Del.Ch.))

Page 3

On this issue the defendants are correct. In *Deutsch v. Cogan, supra,* this Court, citing earlier Chancery decisions, held that *Garner v. Wolfinbarger,* not *Valente v. Pepsico,* represents the law of Delaware on this question. Accordingly, shareholder plaintiffs must show good cause to defeat the defendants' claim of attorney-client privilege. The Court in *Deutsch* did, however, make it clear that the fiduciary's conflicting roles are a factor that may be taken into account in determining whether there is good cause. Moreover, although this Court rejected the rationale of *Valente,* it did endorse the result reached on the facts before the court in that case.

Accordingly, in reviewing the disputed documents, the Master shall determine whether the plaintiffs have shown good cause why the attorney-client privilege should not attach to those documents that fall into the third category described in Part II, *supra,* of this Opinion. In so doing, the Master shall be guided by the good cause analysis employed in *Garner, Deutsch,* and subsequent Delaware authorities. [FN2]

> FN2. *See, e.g., AOC Limited Partnership v. The Horsham Corporation,* Del. Ch., C.A. No. 12480, Chandler, V.C. (May 4, 1992); *Cole v. Wilmington Materials, Inc.,* Del. Ch., C.A. No. 12649, Allen, C. (July 1, 1993); *Lee v. Engle,* Del. Ch., C.A. No. 13223, 13284, Steele, V.C. (Dec. 15, 1995). The defendants have also claimed work product immunity with respect to some of the disputed documents. The work product issue is not addressed here, because it was not addressed in the parties' briefs. Work product claims will be resolved *in camera* on a document-by-document basis.

1999 WL 252381 (Del.Ch.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**6**

Westlaw.

Not Reported in A.2d
2000 WL 1946664 (Del.Ch.)
(Cite as: 2000 WL 1946664 (Del.Ch.))

Page 1

**H**
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware
Christopher KOSACHUK, Plaintiff,
v.
Henry E. HARPER, Violy McCausland, and
Contrasena, S.A., Defendants,
and
LATINADVISOR.COM, INC., a Delaware
Corporation, Nominal Defendant
Henry E. HARPER and LatinAdvisor.com, Inc.,
Counterclaim-plaintiffs,
v.
Christopher KOSACHUK, Counterclaim-defendant
**No. Civ.A. 17958.**

Submitted Nov. 8, 2000.
Decided Dec. 19, 2000.

Dear Counsel:

LAMB, Vice-Chancellor.

*1 I understand from Mr. Walsh's letter of
November 8, 2000, that the parties have been unable
to agree upon a discontinuance of this litigation. In
light of this development, I have reviewed the parties'
submissions and the transcript of the October 23,
2000 hearing, and am prepared to rule on the pending
motion to compel. For the following reasons, that
motion will be denied.

Plaintiff, Christopher Kosachuk, moved to compel
the production of all documents identified on
defendants' privilege log. Before argument, the
defendants produced all documents identified on that
log that were dated on or before March 14, 2000, the
date on which Kosachuk was discharged as an
employee and removed as a director of the defendant
corporation, LatinAdvisor.com, Inc. At oral
argument, defendants also agreed to produce all
documents identified on that log for which the only
claim of privilege is "business strategy." Kosachuk
continues to press for the production of all of the
documents identified on the log as attorney/client
privileged or work product privileged, dated after

March 14, 2000. These documents all contain
communications between LatinAdvisor.com and its
present counsel, the firm of Wachtell, Lipton, Rosen
& Katz ("WLR & K.")

Delaware courts recognize that a stockholder
litigating against his or her corporation may be
entitled to discover attorney-client privileged or
attorney-work product privileged documents in the
possession of the corporation or its counsel where
"good cause" is shown. [FN1] For present purposes,
"good cause" is judged under the standard established
in *Garner v. Wolfinbarger.* [FN2] Three factors are
particularly salient: (i) the colorability of the claim,
(ii) the availability of the information from some
other source, and (iii) the specificity with which the
communications are identified. [FN3]

> FN1. *Zirn v. VLI Corp.,* Del.Super., 621
> A.2d 773, 781 (1993).

> FN2. (5th Cir.) 430 F.2d 1093 (1970).

> FN3. *Sealy Mattress Co. of New Jersey, Inc.
> v. Sealy, Inc.,* Del. Ch., C.A. No. 8853,
> Jacobs, V.C. (June 19, 1987), mem. op. at 9;
> *In re Fuqua Indus. Inc. Shareholders Litig.,*
> Del. Ch., C.A. No. 11974, Chandler, C.
> (Sept. 17, 1999).

In the context of this motion as limited by the
defendants' supplemental production, I am persuaded
that Kosachuk has not shown "good cause" to justify
the wholesale invasion of the remaining areas of
privilege between LatinAdvisor.com and WLR & K.
I reach this conclusion for two reasons. First, there is
no showing that, by pursuing other avenues of
discovery, Kosachuk will be unable to obtain
substantially the same information he argues he will
discover in these privileged documents. In particular,
his claims about the dilutive conversion by
noteholders in June and July 2000, and the related
failure on the part of LatinAdvisor.com to have raised
$2.0 million in equity should first be discovered
through other, non-privileged means. Second, I agree
with LatinAdvisor.com that Kosachuk's demand does
not adequately identify the specific communication at
issue; rather, his demand is broad and all-
encompassing, covering a multitude of topics and
communications. It seems likely that, after
exhausting other avenues of discovery, Kosachuk

Not Reported in A 2d                                              Page 2
2000 WL 1946664 (Del Ch )
(Cite as: 2000 WL 1946664 (Del.Ch.))

will be able to limit any renewed application to a small subset of those documents he now seeks. This result is fully consistent with the decision of Chancellor Chandler in *In re Fuqua Indus., Inc. Shareholders Litig* [FN4]

> FN4. *See* n 4, *supra*

*2 Kosachuk also argues that LatinAdvisor.com has waived its claim of privilege On the record before me, I am satisfied that the company has not waived any claim of privilege

In resolving this aspect of the dispute, I first conclude that WLR & K was not acting as attorney to the company until shortly after March 14, 2000. WLR & K rendered services to LatinAdvisor.com in the fall of 1999, but the company then employed other counsel until WLR & K was retained. In February and early March 2000, WLR & K rendered legal services to defendant Henry Harper and others, but not to the company [FN5] It follows from this that the defendants' decision to produce communications dated up until March 14, 2000 did not operate as a waiver of LatinAdvisor.com's privilege with respect to later-dated communications. [FN6]

> FN5. A review of the subject matters covered by the communications identified on the privilege log confirms that the nature and scope of WLR & K's duties changed significantly after March 14, 2000.

> FN6. It may, of course, have operated as a waiver of privilege by Harper or others represented by WLR & K before March 15, 2000, as to the subject matter of the Shareholders Agreement and related issues

As to those later-dated communications, I am satisfied that the privilege log adequately identifies their subject matter Moreover, the Harper and Emmerich affidavits provide an adequate basis for me to conclude that the communications are entitled to the protection of the attorney-client or work product privileges There also is no reason to conclude that any of the privileged communications were disseminated so broadly as to destroy the privilege Kosachuk complains that copies of documents were sent to persons who were neither WLR & K attorneys nor directors of the company But this is not the appropriate test In this context, the privilege can extend to the confidential communication of information or advice between attorneys representing the corporation and corporate employees, agents and representatives [FN7]

> FN7. *Deutsch v. Cogan*, Del. Ch., 580 A.2d 100, 106 (1990); *Tabas v Bowden*, Del. Ch., C A No 6619, Hartnett, V.C (Feb. 16, 1982)

For all these reasons, the motion to compel will be denied. An order to that effect has been entered and is enclosed herein

### ORDER

NOW, this 19 th day of December, 2000, for the reasons stated in the Letter Opinion of this date in the above-captioned case, Plaintiff's Motion to Compel is DENIED IT IS SO ORDERED.

2000 WL 1946664 (Del Ch )

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig U S Govt Works

7

Westlaw.

Slip Copy
2004 WL 2151336 (N.D.Cal.)
(Cite as: 2004 WL 2151336 (N.D.Cal.))

Page 1

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

NOT FOR CITATION

United States District Court,
N.D. California.
THE OFFICIAL COMMITTEE OF BOND
HOLDERS OF METRICOM, INC. et al. and the
Official Committee of Unsecured Trade Creditors of
Metricom, Inc. et al.,
Plaintiffs,
v.
Ralph C. DERRICKSON et al., Defendants.
No. C 02-04756 JF.

Feb. 25, 2004

Paul N. Silverstein, Law Offices of Andrews and
Kurth, New York, NY, John D. Fiero, Pachulski
Stang Ziehl Young & Jones PC, San Francisco, CA,
for Plaintiffs.

Elizabeth Walsh Walker, Lisa Hill Fenning, Dewey
Ballantine LLP, Daniel P. Lefler, David Siegel,
Richard H. Zelichov, Irell & Manella LLP, Los
Angeles, CA, Charles C. Robinson, Christian A.
Hatfield, Mark E. Friedman, Garvey Shubert &
Barer, Portland, OR, Samuel Ray Miller, Folger
Levin & Kahn LLP, Darryl P. Rains, Morrison &
Foerster LLP, San Francisco, CA, Patrick T. Nash,
Grippo & Elden, Chicago, IL, for Defendants.

Arthur S. Weissbrodt, U.S. Bankruptcy Court, San
Jose, CA, pro se.

USBC Manager, U.S. Bankruptcy Court, San Jose,
CA, pro se.

ORDER GRANTING MOTIONS TO DISMISS
SECOND AMENDED COMPLAINT

FOGEL, J.

>Docket Nos. 83, 84, & 87]
*1 Defendants move to dismiss Plaintiffs' second
amended complaint ("SAC"). Plaintiffs, creditors of
Metricom, Inc ("Metricom"), a bankrupt corporation,
allege that Defendants, all of whom were directors of
Metricom, were influenced inappropriately by a

controlling shareholder whose interests were adverse
to the interests of the creditors. Plaintiffs contend that
this controlling shareholder encouraged the
Defendant directors to deplete Metricom's resources
in an effort to carry out the company's business plan
at a time when the directors should have conserved
cash so that Metricom could pay its debts, thus
breaching fiduciary duties owed to the creditors. The
Court has read the moving and responding papers and
has considered the oral arguments of counsel
presented on January 29, 2004. For the reasons set
forth below, the motions will be granted.

I. BACKGROUND
Plaintiffs, who commenced this action on July 31,
2001, seek compensation in the amount of $500
million. On November 15, 2002, the Court withdrew
its reference to the bankruptcy court. Defendants
moved to dismiss Plaintiffs' first amended complaint
on February 19, 2003. The Court granted the motion
with leave to amend, and Plaintiffs filed the operative
SAC on September 26, 2003. By the instant motion,
Defendants again ask the Court to dismiss the claims
against them

Plaintiffs allege that Defendants, three outside
directors and two inside directors of Metricom, took
"reckless, wasteful, irrational and futile actions" in a
bad faith effort to prolong the life of the company
and thus breached their fiduciary duties of loyalty,
care, and good faith, as well as their duty not to waste
the company's assets. Opposition, p. 10. Plaintiffs'
version of the facts is as follows: First, Metricom
continued spending to build a telecommunications
infrastructure ("the Network") specified by
Metricom's business plan, see SAC, ¶ 15, even after
the directors knew that Metricom would become
insolvent. Defendants "pointlessly continue[d] the
expansion buildout regardless of the cost to the
company." Id. Second, because it was obvious that
Metricom's business plan no longer made sense,
Defendants must have had a duplicitous reason for
continuing to pursue it. Third, Paul Allen, owner of
the controlling shareholder, Vulcan Ventures, Inc.
("Vulcan"), wanted Metricom to spend wastefully
because he "was known to have a deep personal
interest in the technology and development of the
Network." Id. Fourth, Defendants personally were
interested in indulging Allen. They wanted "to
protect [their] position[s] and preserve [their] own
relationships with an influential shareholder." Id.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Finally, Defendants owed fiduciary duties to the creditors, in addition to the company and its shareholders, because the company was in a "zone of insolvency "

## II APPLICABLE LAW

A complaint may be dismissed as a matter of law for only two reasons: (1) lack of a cognizable legal theory or (2) insufficient facts under a cognizable legal theory. *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 533-34 (9th Cir.1984) (citing 2A J MOORE, ET AL, MOORE'S FEDERAL PRACTICE ¶ 12 08 at 2271 (2d ed 1982)) "A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations " *Hishon v. King & Spaulding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *see also Argabright v. United States*, 35 F.3d 472, 474 (9th Cir.1994). Motions to dismiss generally are viewed with disfavor under this liberal standard and are granted rarely. *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir.1997)

*2 For purposes of a motion to dismiss, the plaintiff's allegations are taken as true, and the Court must construe the complaint in the light most favorable to the plaintiff. *Jenkins v. McKeithen*, 395 U.S. 411, 421, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969); *Argabright*, 35 F.3d at 474 However, the Court "is not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged " *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir.1994) Indeed, pursuant to Delaware law, which the parties agree is applicable here, "conclusory statements--those unsupported by well-pled factual allegations--are not accepted as true " *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d 961, 970 (Del.Ch.2003). A court's review is limited to the face of the complaint, documents referenced by the complaint, and matters of which the court may take judicial notice. *Levine v. Diamanthuset, Inc.*, 950 F.2d 1478, 1483 (9th Cir.1991); *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 n. 4 (9th Cir.1996).

Under Delaware law, directors owe the company and its shareholders fiduciary duties of care, loyalty, and good faith, and may not waste the company's assets. The duty of care is one of procedural due care, *Smith v. Van Gorkom*, 488 A.2d 858, 872-73 (Del.1985); *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del.Ch.1996). not of substantive due care, which, in

the decision-making context, is foreign to the business judgment rule. *Brehm v. Eisner*, 746 A.2d 244, 264 (Del.2000) The standard for finding a breach of procedural due care is gross negligence. *Van Gorkom*, 488 A.2d at 872-73. A fiduciary's decision is considered wasteful only if it egregiously served no corporate purpose: if "there is *any substantial* consideration received by the corporation, and if there is a *good faith judgment* that in the circumstances the transaction is worthwhile, there should be no finding of waste, even if the fact finder would conclude *ex post* that the transaction was unreasonably risky " *Brehm*, 746 A.2d at 263 A director breaches the duty of loyalty when the director uses a position of trust and confidence to further the director's own interests to the detriment of the company. *See Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del.1993); *Guth v. Loft, Inc.*, 5 A.2d 503 (Del.1939).

When assessing whether fiduciary duties have been breached, the Court applies the business judgment rule, which is a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company " *Aronson v Lewis*, 476 A 2d 805, 812 (Del 1984). "The burden is on the party challenging the decision to establish facts rebutting the presumption " *Id*.

> [W]hether a judge or jury considering the matter after the fact, believes a decision substantively wrong, or degrees of wrong extending through 'stupid' to 'egregious' or 'irrational', provides no ground for director liability, so long as the court determines that the process employed was either rational or employed in *a good faith* effort to advance corporate interests

*3 *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d at 967.

Typically, directors do not owe fiduciary duties to creditors because the relationship between debtor and creditor is contractual in nature. "At the moment a corporation becomes insolvent, however, the insolvency triggers fiduciary duties for directors for the benefit of creditors " *In re Hechinger Investment Co. of Delaware*, 274 B.R. 71, 89 (D.Del.2002) Such duties exist when a company becomes "insolvent in fact"; that is, when it is within the "zone" or "vicinity" or insolvency, a poorly defined state that may exist when "the corporation cannot generate and/or obtain enough cash to pay for its projected obligations and fund its business requirements for working capital and capital expenditures with a

© 2005 Thomson/West No Claim to Orig U S Govt Works

Slip Copy                                                                    Page 3
2004 WL 2151336 (N.D.Cal.)
(Cite as: 2004 WL 2151336 (N.D.Cal.))

reasonable cushion to cover the variability of its business needs over time." *Pereira v. Cogan*, 294 B.R. 449, 521 (S.D.N.Y.2003) "[C]reditors have a right to expect that directors will not divert, dissipate or unduly risk assets necessary to satisfy their claims." *In re Ben Franklin Retail Stores, Inc.*, 225 B.R. 646, 655 (Bankr.N.D.Ill.1998) (amended and superseded by *In re Ben Franklin Retail Stores, Inc.*, 2000 WL 28266). Notably, "in insolvency the duty runs not directly to the creditors but to the 'community of interest.'" *In re Hechinger Investment Co. of Delaware*, 274 B.R. at 89 Thus, "while this duty does not necessarily place creditor interests ahead of the interests of stockholders, it requires the board to maximize the corporation's long-term wealth creating capacity" *Id*

### III. DISCUSSION
#### A. Defendants Dilworth, Jaschke, and Johnson

"[U]nder Delaware law, conclusory assertions that directors breached their fiduciary duty of care are inadequate; rather, the complaint must contain well-pleaded allegations to overcome the presumption that the directors' decisions were informed and reached in good faith." *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F.Supp.2d 1248, 1278 (N.D.Cal.2000). Plaintiffs's SAC does not contain well pleaded allegations demonstrating that the outside directors-- Defendants Robert P. Dilworth ("Dilworth"), Justin C. Jaschke ("Jaschke"), and Bram B. Johnson ("Johnson")--failed to act on an informed basis, in good faith, unwastefully, and in the honest belief that the action taken was in the best interests of the company. In fact, Plaintiffs plead no facts at all alleging a breach of the duty of care by these individuals. At most, Plaintiffs *conclude* that

> [t]hrough their actions, in irrationally and recklessly bleeding Metricom of its cash reserves at the rate of $50-70 million per month for expenses that were of no use to the company when the company was not only in the zone of insolvency but in a hopeless condition, Defendants breached their fiduciary duties to the company and its creditors,

SAC, ¶ 28, and that "[t]he acts and omissions of Defendants, which were indicative of gross mismanagement and/or motivated by bad faith and self-interest, were clearly not in the best interest of Metricom and its creditors and indeed, were to their clear detriment," SAC, ¶ 31 Viewing these allegations in the light most favorable to Plaintiffs, they suggest nothing more than that the directors followed through with the company's business plan, *see* SAC. ¶ 15--hardly a basis for overcoming the presumption of the business judgment rule

*4 Plaintiffs' claims necessarily depend upon their ability to prove that Defendants had a conflict of interest stemming from their connection to Allen and Vulcan. However, Plaintiffs do not plead any facts supporting their conclusion that Defendants Dilworth, Jaschke, and Johnson had such a connection or had any reason or motivation to please Allen or Vulcan Plaintiffs allege only that Defendants William D. Savoy ("Savoy") and Ralph C Derrickson ("Derrickson") were associated with Vulcan SAC, ¶ 24

The present action was commenced over two years ago. The complaint has been amended twice. Plaintiffs still have not articulated a cognizable claim against the outside directors. Accordingly, Plaintiffs' claims against Defendants Dilworth, Jaschke, and Johnson will be dismissed without leave to amend

#### B Defendants Derrickson and Savoy

1. There are no well pleaded facts supporting Plaintiffs' theory of breach of fiduciary duty.

Although they do allege that Defendants Derrickson and Savoy were associated with Vulcan, Plaintiffs do not plead particularized facts that would support a finding that these Defendants breached their duty of care There is no allegation that any Defendant failed to make an informed business judgment. Rather, Plaintiffs set forth a description of Metricom's demise and the unfortunate market conditions that existed in 2001, *see. e g.* SAC, ¶ 17, and claim that Defendants "refused to confront reality," SAC, ¶ 25. Plaintiffs appear to be claiming a lack of *substantive* due care, an impermissible allegation in the decision-making context. *See Brehm*, 746 A.2d at 264; *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d at 967. Even if their argument were permissible, Plaintiffs provide no facts from which the Court could reach the conclusion that Derrickson and Savoy did not exercise informed business judgment

The heart of Plaintiffs' claims appears to be the assertion that Derrickson and Savoy breached their duty of loyalty. According to Plaintiffs' theory of the case, Derrickson and Savoy were connected to Allen. who sought to promote the development of Metricom's Network. Allegedly, Allen so desired the development of the Network that he convinced Derrickson and Savoy to continue Metricom's pursuit of the program until the company had no remaining cash. even though Derrickson and Savoy knew that

© 2005 Thomson/West. No Claim to Orig. U S Govt. Works

Slip Copy
2004 WL 2151336 (N.D.Cal.)
(Cite as: 2004 WL 2151336 (N.D.Cal.))

there would be no money left to satisfy the creditors and that the company could not succeed

Derrickson points to undisputed evidence that he was employed not by Vulcan itself, but by Vulcan Northwest, Inc., a Vulcan affiliate, and that such employment ended in September 1998 In their opposition brief, Plaintiffs respond that a "majority of the board had ties, to varying degrees, with Vulcan and/or Allen such that one can infer that it was their influence, and not a good faith attempt to act in the company's interest, that led them to act irrationally " Opposition, p 13. The SAC itself merely contains a conclusory statement that Derrickson was connected to a Vulcan affiliate. SAC, ¶ 24. Plaintiffs have not pleaded specific facts supporting their theory, but instead ask the Court to infer that the inside directors' ties to Allen and Vulcan were so strong as to cause them to abandon their fiduciary duties The Court may not do this under Delaware law

2. Plaintiffs have not pleaded facts suggesting that the board was interested.

*5 "[T]o rebut the presumption [of the business judgment rule], a shareholder plaintiff assumes the burden of providing evidence that the *board* of directors, in reaching *its* challenged decision, breached any *one* of *its* triad of fiduciary duties: good faith, loyalty, or due care." *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1164 (Del.1995). Thus, Plaintiffs must plead facts supporting the conclusion either that a *majority* of directors breached fiduciary duties or that an

> interested director *control[led]* or *dominate[d]* the board as a whole or [that] the interested director *fail[ed] to disclose his interest* in the transaction to the board *and* a reasonable board member would have regarded the existence of the material interest as a significant fact in the evaluation of the proposed transaction.

*Id* at 1168 It is undisputed that Plaintiffs have not pleaded facts suggesting that the outside directors were interested. Moreover, they have made only conclusory statements that Derrickson was interested. They have not pleaded any facts specifying the composition of the board--whether interested or not--of the board at the time that any allegedly improper decision was made. In particular, they have not pleaded facts suggesting that the board--that is, a majority of the directors--was (1) connected to Allen or Vulcan or (2) controlled or dominated by any director connected to Allen or Vulcan when it decided to continue developing the Network. Thus, there is no factual basis for rebutting the presumption of the

business judgment rule with respect to the board's decision to follow through with Metricom's business plan.

3. There are no well pleaded facts indicating when Metricom entered into a "zone of insolvency."

In *Geyer v. Ingersoll Publications Co.*, 621 A.2d 784 (Del.Ch.1992), the defendant argued that the plaintiff had not pleaded sufficient facts suggesting that there was a "zone" of insolvency The court disagreed, concluding that the plaintiff had pleaded specific enough facts to suggest that the court might later find such a zone In that case, Plaintiff pleaded the following specific facts: "substantial assets [of defendant corporation] were so liquidated [for two years] that its liabilities probably were greater than the value of its assets"; a fiduciary, Ingersoll, had "caused [defendant corporation] to give up an asset worth approximately $50 million for consideration primarily paid to Mr Ingersoll and Warburg" (another fiduciary); that "Ingersoll caused [defendant corporation] to cancel valuable management agreements with the domestic newspapers retained by Warburg in return for consideration paid to Mr Ingersoll"; and that, "as a result of the transactions, [defendant corporation] failed to make payments due to plaintiff because it was unable." *Id.* at 791. Here, Plaintiffs allege no such specific facts, and their conclusory allegations are unsupported by the available facts Plaintiffs simply conclude in the SAC that "upon information and belief, by mid-2000, Metricom was insolvent or had entered the "zone of insolvency " SAC, ¶ 18 They base this conclusion on the "facts" that: (1) the financial markets, in particular those relating to telecommunications, were "deteriorating badly," (2) Metricom could not secure additional funding, and (3) Metricom did not generate significant revenues in the markets in which it had deployed the Network at that time SAC, ¶ 17

*6 However, Plaintiffs plead no facts suggesting that Metricom was not operating appropriately according to its business plan, *see* SAC, ¶ 15, in mid-2000. Plaintiffs also admit that Metricom did not file for bankruptcy until July 2, 2001 SAC, ¶ 22. As late as February 28, 2001, Metricom had a net cash deficit of only $19 million, which resulted from "working capital of approximately $327 million and outstanding purchase commitments for capital, equipment, network construction labor and modems of approximately $346 million." SAC, ¶ 21. While it is true that Metricom admitted in February 2001 that it was experiencing difficulties and that it was "looking at all alternatives" to remedy them, *see*

Lefler Decl., Ex. C (Form 8-K, p. 2, of which the Court takes judicial notice), there nonetheless is no basis for suggesting that the board did not believe that, with adequate alterations, Metricom could generate and/or obtain enough cash to pay for its projected obligations and fund its business requirements for working capital and capital expenditures with a reasonable cushion to cover the variability of its business needs over time. In fact, prior to the February 2001 announcement, this state of affairs appears to have been typical for Metricom and, according to Defendants, "was well-stated and publicly disclosed in Metr[i]com's SEC filings." Derrickson's Reply, p. 5. For example, in the Management's Discussion and Analysis section of Metricom's June 30, 2000 Form 10-Q SEC filing, management states:

As we deploy our high-speed network and launch our high-speed service, we expect our operating expenses to increase significantly from historical levels and to exceed revenues for the foreseeable future. We expect to generate substantial net losses to common stockholders for the foreseeable future.

Lefler Decl., Ex. B (Form 10-Q, p. 11, of which the Court takes judicial notice). In the same section, management states: "In the future, after we launch our high-speed service, we ... expect to derive substantially all of our future revenues from subscription fees paid to us by channel partners." *Id.* at 12. Metricom's business plan thus involved incurring increased operating expenses in the short term in order to build the Network, with the goal of deriving future revenues from it. Not only do Plaintiffs not dispute that this was Metricom's business plan, but they plead no facts that would tend to prove that Metricom was insolvent or had entered a zone of insolvency by mid-2000.

The only allegation in the SAC that comes close to providing tenable support for Plaintiffs' theory is that Defendants "irrationally and recklessly bl[ed] Metricom of its cash reserves at the rate of $50-70 million per month for expenses that were of no use to the company when the company was not only in the zone of insolvency but in a hopeless condition." SAC, ¶ 28. At the outset, the Court notes that this conclusory statement does not support Plaintiffs' assertion that Metricom was in a zone of insolvency in mid-2000. Instead, it simply makes the point that money should not have been spent after Metricom entered a zone of insolvency--merely a restatement of the applicable law. Additionally, while one might infer from this allegation that Defendants knew that they would never be able to raise cash in the future to offset these expenditures, no facts are pleaded that

support such an inference. Plaintiffs have not pleaded any particularized facts suggesting that such expenditures were wasteful at the time that they were made. Instead, looking in hindsight from Metricom's bankruptcy filing in July 2001, Plaintiffs have concluded that expenditures *should* have ceased in mid-2000, a full year earlier, at which time Metricom had over $1.3 billion in assets, *see* Lefler Decl., Ex. B (Form 10-Q, p. 4).

*7 Because Plaintiffs have not pleaded facts supporting their conclusion that Metricom was in a zone of insolvency at the time of the alleged wasteful expenditures, they have not adequately supported their theory that Defendants owed them fiduciary duties. Moreover, even if Metricom was in a zone of insolvency beginning in mid-2000, Defendants' fiduciary duties would not have shifted completely to Plaintiffs. Instead, fiduciary duties would be owed to the community of interests. As described above, Plaintiffs have not set forth well pleaded facts supporting their theory that Defendants breached their fiduciary duties to the company, shareholders, and creditors combined. At any level of analysis, Plaintiffs have not stated a cognizable claim for relief under Delaware corporate law. Accordingly, the claims will be dismissed without leave to amend.

### IV. ORDER

Good cause therefore appearing, IT IS HEREBY ORDERED that Defendants' motions are GRANTED. The second amended complaint is dismissed without leave to amend.

2004 WL 2151336 (N.D.Cal.)

**Motions, Pleadings and Filings** (Back to top)

5:02C V04756 _____ (Docket) (Oct. 02, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.