**8**

Westlaw.

Not Reported in F Supp                                          Page 1
1991 WL 183842 (E D Pa )
(Cite as: 1991 WL 183842 (E.D.Pa.))

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E D Pennsylvania
RHONE-POULENC RORER INC , and Armour
Pharmaceutical Co
v.
The HOME INDEMNITY COMPANY
v
AETNA CASUALTY & SURETY CO , et al.
v
CITY INSURANCE COMPANY, et al.
**Civ.A. No. 88-9752.**

Sept 16, 1991
Jill A. Douthett, Nancy E. Stuart, Philadelphia, Pa ,
for plaintiff

Louis E. Bricklin, Illene G. Greenberg, Bennett
Bricklin & Saltzburg, Philadelphia, Pa., for John
Barrington Hume & INSCO, Ltd

Jeffrey B. Albert, Wendy Fleishman, Stephanie
Resnick, Timothy D. Mara, James W. Christie, Clark,
Ladner, Fortenbaugh & Young, Philadelphia, Pa., for
The Home Indemnity Company

Stephen A. Cozen, Susan M. Danielski, Richard C.
Bennett, Cozen and O'Connor, Philadelphia, Pa , for
Revlon, Inc , and Pantry Pride, Inc

Mark A. Dombroff, John K. Henderson, Jr Katten
Muchin, Zavis & Dombroff, Washington, D.C., B.
Alan Dash, Margolis, Edelstein, Scherlis Sarowitz
and Kraemer, Philadelphia, Pa., for Birmingham Fire
Insurance Company. AIU Insurance Company, New
Hampshire Insurance Company, Granite State
Insurance Company, National Union Insurance
Company, Lexington Insurance Company, the
Insurance Company of the State of Pennsylvania

Joseph M. Oberlies, Connor and Weber, P C ,
Philadelphia, Pa , for American Centenial Insurance
Company

James A. Young, Philadelphia, Pa , for Hartford
Insurance Company, Twin City Insurance Company,

First State Insurance Company and New England
Reinsurance Company.

Edward M. Dunham, Jr. Miller, Dunham, Doering &
Munson, Philadelphia, Pa , for Aetna Casualty &
Surety Insurance

*MEMORANDUM AND ORDER*

EDWIN E NAYTHONS, United States Magistrate
Judge

**\*1** Presently before the Court is the Motion of
Plaintiffs Rhone-Poulenc Rorer Inc., and Armour
Pharmaceutical Company, and third-Party defendant
and fourth-party plaintiff Revlon, Inc. (collectively
"the Policyholders") to Compel Production of
Documents from Republic Insurance Company
("Republic"), third-party defendant Republic's
Response, and the Policyholder's Reply thereto.
Specifically, the Policyholders request documents
which are presently in the possession of Republic
some of which pertain to the relationship between
Republic and Cravens, Dargan & Company
("Cravens"), the company which Republic hired as its
general managing agent to do its underwriting. In
addition, the Policyholders are requesting documents
which relate to other claims asserted against Cravens
for the unauthorized issuance of any insurance policy
or for the underwriting of unauthorized risk for
Republic or any other insurance company. Finally,
the Policyholders are requesting the production of
documents relating to any claims or coverage
defenses for fraud or nondisclosure asserted against
any Republic policyholder of coverages underwritten
or brokered by Cravens [FN1] The Policyholders
assert that the information contained in these
documents is relevant to the case at hand Republic
claims that not only is the information in the
documents sought irrelevant, but providing the
documents to the plaintiffs would be unduly
burdensome

Among Republic's allegations in the above-
captioned matter, Republic claims that Revlon and
Armour intentionally or negligently made material
misrepresentations to Republic during the
underwriting process. Republic, however, did not
actively participate in the underwriting process
Rather, Republic relied on Cravens, its managing
general agent. to perform its underwriting.

© 2005 Thomson/West. No Claim to Orig. U S Govt Works

Not Reported in F Supp
1991 WL 183842 (E D Pa )
(Cite as: 1991 WL 183842 (E.D.Pa.))

The Policyholders now seek the documents which comprise the agency agreement between Cravens and Republic in addition to other related documents The Policyholders contend the fact that Cravens rather than Republic underwrote the policy, makes the agreement by which Cravens became Republic's agent relevant in this matter   They also claim that the fact that Cravens underwrote the policy raises the issue of whether Republic's real dispute is with Cravens' underwriting, rather than with Revlon for anything it did in seeking insurance

Republic, on the other hand, contends that the agency relationship between Cravens and Republic is not at issue and therefore is not discoverable Moreover, Republic claims that providing the documents would be unduly burdensome to Republic and therefore should not be permitted

### DISCUSSION

The Policyholders request documents which describe the agency relationship between Craven and Republic   Republic, however, has not placed its agency relationship with Cravens at issue in this case. Rather, Republic clearly states that:

Cravens was its agent in the underwriting and issuance of the policy;   that Republic is bound by Cravens' actions with respect to the policy;   that with respect to its fraud and nondisclosure defenses, Republic is fully chargeable with any knowledge Cravens had when the policy was written; and that Republic asserts no claim or defense to coverage based upon any contention that Cravens lacked authority to issue the policy

*2 Republic's Response at 8

The Policyholders claim that they seek the documents pertaining to the agency agreement in order to learn the scope and nature of that agency relationship   Republic, however, has accepted full responsibility for the actions of its agent   While the scope of relevance in discovery is far broader than that allowed for evidentiary purposes, see *Bailey v. Meister Brau, Inc.*, 55 F.R.D. 211 (N.D.Ill.1972), it is not without limits   See *Broadway & Ninety-Sixth St. Realty Co. v. Loew's Inc.*, 21 F.R.D. 347 (S.D.N.Y.1958)   A party must be protected from discovery which is overly burdensome or irrelevant *National Organization for Women v. Sperry Rand Corp.*, 88 F.R.D. 272, 277 (D.Conn 1980)   Because Republic has accepted responsibility for the actions of its agents, further discovery into the issues

pertaining to the agency relationship between Cravens and Republic would serve no purpose but harassment. and is improper   Plaintiff's claim that the contract may reveal that Craven's may have failed to follow the agreement in issuing the policy is both speculative and baseless   That is true as between Craven's and Republic, and is irrelevant to the issue of whether Revlon concealed information, or otherwise committed the fraud alleged

The Policyholders also aver that the documents reflecting the agency relationship may demonstrate Republic's motive for bringing its fraud claims According to the Policyholders, "[b]ias and motive are always valid areas of inquiry and discovery". Policyholders' Memorandum in Support of Motion to Compel at 7-8   Although the Policyholders cite authority for its proposition, the cases cited are totally inapplicable and do not support a claim to allow discovery to determine the motive for the institution of an action   The cases cited by plaintiff's involve a party's motive in misleading a party to a suit, or in committing an act that is the basis of a suit.   None deal with the relevance of a party's motive to bring suit.    Courts which have dealt with this issue. however, have held that the motive behind the institution of an action has been deemed not relevant to the subject matter involved pursuant to Fed.R.Civ.P. 26(b)   *Digital Equipment Corp. v. System Industries, Inc.*, 108 F.R.D. 742, 743 (1986). "It is difficult to see how an inquiry into the circumstances of the action could affect the substance of the claim     The responses might lead to embarassing admissions ... but these excesses are not in any way relevant to the trial of the particular issue."   *Id* at 743, citing *Foremost Promotions v. Pabst Brewing Co.*, 15 F.R.D. 128, 130 (N.D.Ill.1953)   This reasoning has been consistently followed where discovery has been sought concerning a party's motives in filing suit   *Digital Equipment Corp.* 108 F.R.D. at 743

The Policyholders also claim that the contractual documents may shed light on the possible biases of Cravens' witnesses and Cravens' motive for writing these disputed policies   To support their contention that "bias and motive are always valid areas of inquiry and discovery", the Policyholders cite cases which are inapplicable to the facts of the case at hand.   The facts and circumstances of a case determine and limit the relevancy of information sought in discovery   *Continental Access Control Systems, Inc. v. Racal-Tikonics, Inc.*, 101 F.R.D. 418 (E.D.Pa.1983);   *McClain v. Mack Trucks, Inc*, 85 F.R.D. 53, 61 (E.D.Pa.1979).    Since the precise

Not Reported in F Supp.
1991 WL 183842 (E.D Pa )
(Cite as: 1991 WL 183842 (E.D.Pa.))

Page 3

boundaries of the Rule 26 relevance standard will depend on the context of the particular action, *see Mallinckrodt Chem. Works v. Goldman, Sachs & Co., 58 F.R.D. 348 (S.D.N.Y.1973)*, the determination of relevance is within the district court's discretion. *O'Neal v. Riceland Foods, 684 F.2d 577 (8th Cir.1982); Stewart v. Winter, 669 F.2d 328 (5th Cir.1982); Bowman v. General Motors Corp., 64 F.R.D. 62 (E.D.Pa.1974)*

*\*3* In response to these assertions that the requested documents may demonstrate bias and motive, Republic claims that "Plaintiffs hodgepodge of fantastic theories of 'relevance' mark these requests as a wideranging and aimless fishing expedition". Republic's Response at 7.    After reviewing the Policyholders' arguments, this Court would have to agree with Republic    In the absence of a fact-specific allegation showing a likelihood that the requested material would be relevant, a request for documents shall not be permitted.    *In Re One Bancorp Securities Litigation v. One Bancorp., 134 F.R.D. 4, 12 (D.Maine 1991)* The Policyholders seek to justify discovery into irrelevant material through speculation about potential bias or motive    In a case such as this, the Policyholders' request may properly be characterized as a fishing expedition based on an unsupported and nebulous allegation of bias and motive. *See Wu v. Keeney, 384 F.Supp. 1161, 1167 (D.D.C.1974)*. Although there is strong policy for liberal discovery, *Hickman v. Taylor, 329 U.S. 495 (1957)*, a potential for abuse exists in such discovery. *See Dart Industries Co. v. Westwood Chemical Co., 649 F.2d 646 (9th Cir.1980)*. It is this type of abuse that this Court seeks to prevent in refusing to grant the Policyholders' request for any documents related to the agency agreement between Cravens and Republic

The Policyholders also seek to discover documents relating to other claims asserted against Cravens by Republic or any other insurance company, in addition to documents related to claims or coverage defenses for fraud or nondisclosure asserted against any Republic policyholder of coverages underwritten or brokered by Cravens.    In asserting this claim, the Policyholders state that they "have a right to know" if Republic has asserted that Cravens defrauded in any other instance, and whether, if some breakdown in communications occurred between Republic and Cravens in those instances, such a breakdown was due to Cravens' underwriting practices. Policyholders' Memorandum in Support of their Motion to Compel at 12. The Policyholders fail to cite any case law for their position    Rather, they merely look to Rule 404

of the Federal Rules of Evidence to support their claim    The policyholders state in their reply memorandum that "Republic confuses what can be discovered with what may later prove to be admissible." Policyholder's Reply Memorandum at 10.    Instead, the confusion seems to lie with the policyholders    They state that the documents are relevant to show if Cravens had, in other situations, negligently underwritten policies.    Since, even if found, such evidence would be inadmissable, (*see* Federal Rule of Evidence 404), the discovery is not "reasonably calculated to lead to the discovery of admissible evidence"    Federal Rule of Evidence 26(b)(1), the request must be denied

When courts have been faced with this question, they have ruled that other lawsuits filed against a party are not reasonably calculated to lead to the discovery of admissible evidence and therefore are not discoverable *Prouty v. National R.R. Passenger Corp., 99 F.R.D. 545 (D.D.C.1983); see Moses v. State Farm Mut. Auto. Ins. Co., 104 F.R.D. 55 (N.D.Georgia 1984)* (Court held that insurance claims of others are not relevant to the issues of the case at hand, nor is discovery of those claims likely to lead to admissible evidence). In *Lawyers Title Insurance v. United States Fidelity & Guaranty Co., 122 F.R.D. 567 (N.D.Cal.1988)*, the plaintiff similarly sought information about claims made against the insurance carrier for the past five years. The *Lawyers* Court ruled that the information was "too marginal in utility to justify the burden". *Id* at 570.    The Policyholders in this case indicate that they seek to find evidence which will demonstrate that Cravens had an "imprudent attitude towards risk", or a pattern of claims which would "illuminate Republic's tactics for dealing with unwanted claims under policies that, in hindsight at least, should not have been issued".    Policyholder's Memorandum in Support of Motion to Compel at 12-13.    The Policyholders' reasons for obtaining this information are speculative.    Clearly the utility of the documents sought is too marginal to justify the burden which would be placed upon Republic if required to review the mass of documents which must be examined in order to provide the Policyholders with the documents requested.

*\*4* The policyholders strongly argue that such information as "[W]hat Cravens did in underwriting policies, how it did it, why it did it, when it did it, and what authority it had to perform those actions all became highly relevant." (Conclusion Policyholders Reply Memorandum at 10)

Not Reported in F Supp.
1991 WL 183842 (E D Pa )
(Cite as: 1991 WL 183842 (E.D.Pa.))

While relevancy is crucial to a determination of discoverability, I cannot be guided by this factor alone   Even were I to find some remote relevance in the policyholder's requests, the 1983 amendments to Rule 26(b)(1) of the Federal rules emphasized that discovery must be proportional, as well as relevant to the lawsuit and must be tailored to the case at hand. The Rule of Proportionality is intended to "guard against redundant or disproportionate discovery by giving the court authority to reduce the amount of discovery that may be directed to matters that are otherwise proper subjects of inquiry."

*Federal Rule of Civil Procedure 26* Advisory Committee Note

The information which policyholders seek concerning the files of other claims asserted against Cravens by Republic or any other insurance company, in addition to documents related to claims or coverage defenses for fraud or non-disclosure asserted against any Republic policyholder of coverages underwritten or brokered by Cravens is disproportionate to declaratory judgment action they have filed.   To compel the production of the files sought here not only involves enormous inconvenience and management difficulties, but also entails a frightening potential for spawning unbearable side litigation which, in my view, defeats the purpose of spirit of the discovery rules themselves   It has been held, in this Circuit, that the court may restrict discovery as long as the restriction does not foreclose "discovery that is reasonably necessary to afford a fair opportunity to develop and prepare the case." *See e g Robbins v. Camden Board of Education,* 105 F.R.D. 49, 61-63 (D.N.J.1985). The policyholders do not need to discovery the information contained in the files of other insureds in order to develop and prepare its case.   I hold, therefore, that the information sought by the policyholders regarding the files of other claims asserted against Cravens by Republic or any other insurance company is not discoverable because although it may be considered remotely relevant, its production would be unduly burdensome and disproportionate to this litigation

In light of the foregoing, this Court finds that the Policyholders have not demonstrated to this Court that the documents requested are relevant and therefore, their Motion to Compel is hereby Denied.

An appropriate Order follows.

*ORDER*

AND NOW, this 16th day of SEPTEMBER, 1991, upon consideration of the Motion of Plaintiffs, Rhone-Poulenc   Rorer,   Inc.   and   Armour Pharmaceutical Co and third-party defendant and fourth-party plaintiff Revlon, Inc to Compel Production of Documents from Republic Insurance Company, the Response of third-party defendant Republic, and the Memorandum in Reply to Republic's Response, it is hereby ORDERED that the Motion to Compel Production of Documents from Republic Insurance Company is DENIED.

> FN1. In their original requests, the Policyholders asked for each and every document pertaining to any claims or coverage defenses asserted against any Republic policyholder of coverage underwritten or brokered by Cravens with or on behalf of Republic   In their Motion to Compel, the Plaintiffs narrowed this request to instances where Republic denied coverage for alleged fraud or nondisclosure Policyholders' Memorandum in Support of their Motion to Compel at 5.

1991 WL 183842 (E D.Pa )

**Motions, Pleadings and Filings (Back to top)**

2:88CV09752                    (Docket) (Dec. 23, 1988)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig U S Govt. Works

**9**

## Westlaw.

Not Reported in F Supp 2d
2004 WL 875262 (S D N Y )
(Cite as: 2004 WL 875262 (S.D.N.Y.))

Page 1

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S D. New York
ROSELINK INVESTORS, L L C , a New Jersey
Limited Liability Company, Zigmunt
Wilf, Bne Associates, a New Jersey partnership,
David Halpern, Davanne Realty
Co , Inc , a corporation, and Andrew Abramson,
Plaintiffs,
v
Mark R. SHENKMAN and Charles R. Cumello,
Defendants
**No. 01CIV7176(MBM).**

May 19, 2004

Jeffrey M. Garrod, Orloff Lowenbach Stifelman &
Siegel, Roseland, NJ, for Plaintiffs

Thomas J. Fleming, Patrick L. Gibson, Olshan
Grundman Frome Rosenzweig & Wolosky, New
York, NY, for Defendants

OPINION AND ORDER

MUKASEY, J

*1 Plaintiffs Roselink Investors, L.L.C., Zigmunt
Wilf, BNE Associates, David Halpern, Davanne
Realty Co , Inc , and Andrew Abramson (collectively
"Creditors") purchased Units offered in a private
offering by Crown Books Corp ("Crown Books")
and Crownbooks com ("CB com"), a wholly-owned
subsidiary of Crown Books responsible for Crown
Books' Internet sales Creditors purchased the Units
in exchange for (i) a promissory note in a principal
value equal to the purchase price of each Unit, and
(ii) a warrant to purchase common stock in Crown
Books at a fixed exercise price Defendants Mark
Shenkman and Charles Cumello were directors of
CB.com Creditors have sued defendants for breaches
of fiduciary duties, fraudulent transfer, and tortious
interference with contractual relations Both parties
have moved for summary judgment For the reasons
stated below, defendants' motion is granted.

I

Plaintiff Roselink Investors, LLC is a New Jersey
limited liability company with its principal place of
business in New Jersey (Compl ¶ 4) Roselink's
members reside in New Jersey or Pennsylvania. (Id )
Plaintiff Zigmunt Wilf resides in New Jersey (Id at ¶
5) Plaintiff BNE Associates is a New Jersey
partnership, and all its partners are residents of New
Jersey. (Id at ¶ 6) Plaintiff David Halpern resides in
New Jersey. (Id at ¶ 7) Plaintiff Davanne Realty Co
is a New Jersey corporation with its principal place of
business in New Jersey (Id at ¶ 8) Plaintiff Andrew
Abramson resides in New Jersey (Id at ¶ 9)
Defendant Mark Shenkman resides in Connecticut
(Id at ¶ 10) Defendant Charles Cumello resides in
Maryland (Id. at ¶ 11) Therefore, subject matter
jurisdiction arises under 28 U.S.C. § 1332(a)(1)
Venue is proper in this district pursuant to 28 U.S.C.
§ 1391(a)(2) because a substantial part of the events
giving rise to this action occurred within this district

II.

The following facts are either undisputed or are
presented in the light most favorable to plaintiffs. See
Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
475 U.S. 574, 587-88, 106 S.Ct. 1348, 89 L.Ed.2d
538 (1986)

Crown Books is a Delaware corporation based in
Maryland (Id at ¶ 12) After becoming one of the
country's top discount retailers of books and book-
related products, Crown Books filed a voluntary
petition for bankruptcy relief under Chapter 11 of the
Bankruptcy Code, 11 U.S.C. § 101 (2000), in July
1998. (Id at ¶ 12-13) Crown Books emerged from
bankruptcy with two working capital loans provided
by Paragon Capital LLC ("Paragon") and Foothill
Capital Corporation ("Foothill") (Id. at ¶ 14)
Substantially all of Crown Books' assets were
pledged to Creditors (Id )

In December 1999, Crown Books formed CB com,
also a Delaware corporation, a wholly-owned
subsidiary that was to pursue an Internet retail sales
strategy (Id at ¶ 16) Crown Books estimated that its
total costs to implement this Internet strategy would
range from $3 million to $7 million, excluding
marketing expenses (Id at ¶ 17) To raise the
necessary funds, Crown Books and CB.com extended
a private offering to accredited investors on
December 14, 1999 (Id at ¶ 18) The private offering

Not Reported in F Supp 2d
2004 WL 875262 (S D N Y )
(Cite as: 2004 WL 875262 (S.D.N.Y.))

Page 2

was for a minimum of ten and a maximum of 20 Units, each of which consisted of a three-year 6% subordinated promissory note to CB com in the principal amount of $500,000, and a three-year warrant to purchase 183,824 shares of common stock of Crown Books at $2 72 per share (Defendants' Statement Pursuant to Local Civil Rule 56.1 ("Deft Stmt."), Ex. A at i)

*2 About February 23, 2000, Creditors entered into subscription agreements with Crown Books and CB com. (Compl ¶ 19) Creditors purchased Units with an aggregate principal amount of more than $1 million. (Id at ¶ 20) The private offering closed in March 2000 after raising approximately $4 million, $1 million of which was transferred immediately to Crown Books from CB com. (Id at ¶ 25) By January 2001, the functionality of CB.com's website was about 80% complete. (Id at ¶ 26)

In the latter part of 2000, Crown Books found itself with accelerated holiday inventory receipts, unplanned trade payments for these receipts, and sales trends that were lower than reflected in its business plan (Id at ¶ 27) On December 8, 2000, Crown Books entered into an agreement with Paragon and Foothill to seek capital to lower its debt (Id at ¶ 28) The agreement obligated Crown Books to pay $1 5 million on or before December 12, 2000, at least $2 million on or before January 10, 2001, and at least $1 5 million on or before February 15, 2001 (Deft Stmt , Ex. G at 2) About December 11, 2000, Shenkman and Cumello authorized a loan of $1 5 million from CB com to Crown Books ("the Loan"). (Compl ¶ 30) Two months later, Crown Books filed another voluntary petition for relief under Chapter 11 of the Bankruptcy Code (Id at ¶ 36)

Plaintiffs have brought seven claims for relief against Creditors. Claim One is for breach of fiduciary duty Claim Two is for breach of the duty of loyalty Claim Three is for breach of the duty of good faith Claim Four is for common law wrongful transfer of funds Claim Five is for violation of § 1304(a)(2) of the Delaware Uniform Fraudulent Transfer Act. Claim Six is for violation of § 1305(a) of the Delaware Uniform Fraudulent Transfer Act. Claim Seven is for tortious interference with contractual relations

III

A. Breach of Fiduciary Duty Claims

Creditors allege that defendants, as directors of CB.com, owed them fiduciary duties of due care,

loyalty and good faith. (Compl ¶ ¶ 38, 45, 52) According to Creditors, defendants owed them fiduciary duties because CB com was insolvent "when the Loan was made or was rendered insolvent by the Loan " (Id at ¶ 38) Creditors claim that by making the Loan defendants breached their fiduciary duties (Id at ¶ ¶ 39-42, 46-49, 53-56) The threshold question is whether defendants owed Creditors any fiduciary duties If so, the next question is whether defendants breached these duties Delaware law, upon which the parties have relied, controls. See Texaco A/S (Denmark) v. Commercial Ins. Co. of Newark, N.J, 160 F.3d 124, 128 (2d Cir.1998) (parties' consent to application of forum law completes choice of law inquiry); American Fuel Corp. v. Utah Energy Development Co., 122 F.3d 130, 134 (2d Cir.1997) (same)

1. Did defendants owe plaintiffs any fiduciary duties?

Under Delaware law, when one company wholly owns another, the directors of the parent and the subsidiary are obligated to manage the affairs of the subsidiary in the best interests only of the parent and its shareholders. See Anadarko Petroleum Corp. v. Panhandle Eastern Corp., 545 A.2d 1171, 1174 (Del.1988) (dismissing subsidiary's claim against parent corporation and three former directors of the subsidiary for breach of fiduciary duty by modifying contracts between subsidiary and parent); Dennis J. Block, Nancy E Barton & Stephen A. Radin, THE BUSINESS JUDGMENT RULE: FIDUCIARY DUTIES OF CORPORATE DIRECTORS 376 (5th ed.2002). However, "where a corporation is operating in the vicinity of insolvency, a board of directors is not merely the agent of the residue risk bearers, but owes its duty to the corporate enterprise." Credit Lyonnais Bank Nederland, N.I. v. Pathe Communications Corp., Civ. A. No. 12150, 1991 WL 277613, at *34 (Del.Ch. Dec.30, 1991) Delaware law requires that directors

*3 recognize that in managing the business affairs of a solvent corporation in the vicinity of insolvency, circumstances may arise when the right (both the efficient and the fair) course to follow for the corporation may diverge from the choice that the stockholders (or the creditors, or the employees, or any single group interested in the corporation) would make if given the opportunity to act

Id at n. 55. Once a corporation enters "the zone of insolvency," the directors owe fiduciary duties not only to the corporation's shareholders but to its creditors as well See Geyer v. Ingersoll Publications

*Co.*, 621 A.2d 784, 791 (Del.Ch.1992). This means that directors of a wholly-owned subsidiary, who otherwise would owe fiduciary duties only to the parent, also owe fiduciary duties to creditors of the subsidiary when the subsidiary enters "the zone of insolvency."

There is no dispute here that CB com was at least within "the zone of insolvency" when defendants made the Loan. Indeed, the facts show that CB.com was insolvent from the moment it was formed. All of its $4 million of capital was acquired through the private offering, in which promissory notes were issued in exchange for Units (Plaintiffs' Counterstatement of Undisputed Facts ("Pl Cstmt.") ¶ ¶ 18-23) Because Crown Books decided to raise the capital through loans rather than a stock offering, CB com's liabilities exceeded its assets when the Units were issued, which rendered CB com insolvent from inception. "[A]n entity is insolvent when it has liabilities in excess of a reasonable market value of assets held." *Geyer*, 621 A.2d at 789; *see also* BLACK'S LAW DICTIONARY 799 (7th ed 1999) (defining "insolvent" as "having liabilities that exceed the value of assets"). Therefore, CB.com owed Creditors fiduciary duties from the moment Creditors purchased the units. [FN1]

> FN1. Defendants make the implausible argument that plaintiffs are not creditors of CB com but rather investors, and that this distinction negates any fiduciary duties defendants might otherwise owe plaintiffs. (Defendants' Memorandum of Law in Support of their Motion for Summary Judgment ("Def Mem") 23-27) Defendants concede that plaintiffs made a loan to CB.com, and yet argue that the loan was effectively an equity investment because it was made when CB com had no assets, no revenue and no value capable of repaying the loan--i.e., when CB com was insolvent (*Id* at 24) However, the financial condition of CB com does not change the structure of the relationship between it and plaintiffs A creditor is simply "[o]ne to whom a debt is owed." BLACK'S LAW DICTIONARY 375 (7th ed 1999) Issuance of a promissory note to plaintiffs by CB.com demonstrates an express recognition of a debt owed by CB com to plaintiffs, and thus makes plaintiffs creditors of CB com.

2  Did defendants breach their fiduciary duties to creditors?

The fiduciary duties of directors of a corporation are twofold, "generally characterized as the duty of care and the duty of loyalty " *Norlin Corp. v. Rooney, Pace Inc.*, 744 F.2d 255, 264 (2d Cir.1984) "The duty of care refers to the responsibility of a corporate fiduciary to exercise, in the performance of his tasks, the care that a reasonably prudent person in a similar position would use under similar circumstances " *Id* "The second restriction traditionally imposed, the duty of loyalty, derives from the prohibition against self-dealing that inheres in the fiduciary relationship " *Id*

Under Delaware law, to establish a breach of fiduciary duty, a plaintiff first must prove facts sufficient to overcome the presumption inherent in the business judgment rule *See Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1162-64 (Del.1995); *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 360-61 (Del.1993); *Spiegel v. Buntrock*, 571 A.2d 767, 774 (Del.1990); *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 64 (Del.1989); *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del.1985). The business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in honest belief that the action taken was in the best interests of the company." *Orman*, 794 A 2d at 19-20 (quoting *Aronson v. Lewis*, 473 A.2d 805, 811 (Del.1984)) (internal quotation marks omitted) Four elements define the business judgment rule presumption: (1) a business decision; (2) disinterestedness and independence; (3) due care; and (4) good faith. *See Cinerama*, 663 A.2d at 1162-64; *Cede*, 634 A.2d at 360-61; *Spiegel*, 571 A.2d at 774; *Citron*, 569 A.2d at 64; *Van Gorkom*, 488 A.2d at 872; *Aronson*, 473 A.2d at 811-816; *see also* Dennis J. Block, Nancy E Barton & Stephen A Radin, THE BUSINESS JUDGMENT RULE: FIDUCIARY DUTIES OF CORPORATE DIRECTORS 39, 85-88 (5th ed 2002) The presumption of the business judgment rule is rebutted in those rare cases where a plaintiff establishes facts to show that any of the four elements was not present *See Parnes v. Bally Entertainment Corp.*, 722 A.2d 1243, 1246 (Del.1999) "While the Delaware cases use a variety of terms to describe the applicable standard of care, our analysis satisfies us that under the business judgment rule director liability is predicated upon concepts of gross negligence." *Aronson*, 473 A.2d at 812. Under Delaware law, a court should "reach conclusions as to the sufficiency of allegations regarding interest and independence only after considering all the facts alleged on a case-by-case

Not Reported in F.Supp.2d
2004 WL 875262 (S.D.N.Y.)
(Cite as: 2004 WL 875262 (S.D.N.Y.))

basis." *Orman,* 794 A.2d at 23

*4 Creditors claim that defendants owed them fiduciary duties "not to divert, dissipate or unduly risk assets of Crownbooks.com that would be necessary to satisfy Crownbooks.com's repayment obligation with respect to the monies due on Plaintiffs' Notes." (Compl.¶ ¶ 38, 45, 52) Creditors argue that defendants breached their fiduciary duties "by making the Loan without first ensuring that Crownbooks.com had retained sufficient assets to pay its debts as they became due," "by failing to obtain adequate security for the Loan as well as other protections for Crownbooks.com as a lender and for Plaintiffs as creditors," and "by causing Crownbooks.com to make the Loan without first obtaining any assurance that Crown Books Corp could obtain the other cash infusions required under its agreement with Paragon and Foothills." (*Id* at ¶ ¶ 40-42, 47-49, 54-56) However, Creditors have failed to establish sufficient facts to rebut the presumption of the business judgment rule.

a. Business Decision

It is not disputed that the Loan was the product of a business decision on the part of defendants. Cumello stated in a letter dated December 22, 2000--quoted by Creditors in the Complaint--that the Loan was made in answer to the problem Crown Books was having with raising cash needed to remain "in satisfactory standing with Paragon." (Compl ¶ 29) Cumello further explained in a letter to Creditors dated January 2, 2001--also quoted by Creditors in the Complaint-- that the Loan was made "for the working capital needs of the parent." (*Id* at ¶ 31) Therefore, defendants' decision to make the Loan constitutes a "business decision" for the purposes of the business judgment rule.

b. Disinterestedness and Independence

The Delaware Supreme Court has defined "interest" under a business judgment rule analysis as meaning "that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." *Aronson,* 473 A.2d at 812. Further, the benefit to a director must be material, *Cede,* 634 A.2d at 363, which means that it must be "significant enough, *in the context of the director's economic circumstances.* as to have made it improbable that the director could perform her fiduciary duties to the shareholders

without being influenced by her overriding personal interest." *Orman,* 794 A.2d at 23 (internal quotation marks and ellipsis omitted) (emphasis in original)

The Delaware Supreme Court has defined "independent" under a business judgment rule analysis as meaning "that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Aronson,* 473 A.2d at 816. "In assessing director independence, Delaware courts apply a subjective 'actual person' standard to determine whether a 'given' director was likely to be affected in the same or similar circumstances." *McMullin v. Beran,* 765 A.2d 910, 923 (Del.2000) "There must be coupled with the allegations of control such facts as would demonstrate that through personal or other relationships the directors are beholden to the controlling person." *Aronson,* 473 A.2d at 815. "To be disqualifying, the nature of the director interest must be substantial" and not merely "incidental." *Cinerama,* 663 A.2d at 1169. If a plaintiff successfully demonstrates facts sufficient to rebut the business judgment rule presumption, then the burden of proof shifts to the defendant directors to establish the "entire fairness" of the challenged transaction. *Kahn v. Lynch Communications Sys., Inc.,* 638 A.2d 1110, 1115 (Del.1994)

*5 Creditors argue here that both Cumello and Shenkman were personally interested in the Loan because "both Cumello and Shenkman had personal interests that were placed at grave risk by the prospect of a Crown Books' bankruptcy," and the Loan "enabled Crown Books to live for another day, and in turn, advanced their respective interests for their own personal benefit." (Pl.Mem 53) Creditors allege that defendants served as directors of both Crown Books and CB.com (Compl ¶ ¶ 10-11) Creditors also note that Shenkman held ownership interests in two companies that together owned 35% of the common stock of Crown Books, and that Cumello received a salary as President and Chief Executive Officer of Crown Books. (Pl. Mem at 53-54) In short, Creditors argue that defendants were not disinterested because they each had personal interests in Crown Books, thereby placing them on both sides of the transaction However, presence on both sides of the transaction does not automatically rebut the business judgment rule presumption *Cullman,* 794 A.2d at 20 n. 36. The interests attributed to defendants by Creditors do not deprive defendants of the protection of the business judgment rule because of one essential fact overlooked by Creditors: Crown Books was the sole shareholder of CB.com

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 5
2004 WL 875262 (S.D.N.Y.)
(Cite as: 2004 WL 875262 (S.D.N.Y.))

As already discussed, defendants, as directors of CB com, owed fiduciary duties to CB com's shareholders. CB com's only shareholder, however, was Crown Books, as CB.com was a wholly-owned subsidiary. Therefore, defendants owed fiduciary duties to Crown Books as the only shareholder. Under Delaware law, "in a parent and wholly-owned subsidiary context, the directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders." *Anadarko Petroleum Corp. v. Panhandle Eastern Corp.*, 545 A.2d 1171, 1174 (Del.1988) [FN2] This means that defendants were obligated to consider the interests of Crown Books in any business decision they made, such as the decision to make the Loan. As a result, the personal interests attributed to defendants by Creditors did not extend beyond those that defendants were already obliged to consider because defendants had a fiduciary duty to consider the interests of Crown Books as the sole shareholder of CB com. Indeed, given that Delaware law required defendants, as directors of a wholly-owned subsidiary, to consider the interests of the parent company, defendants would have been in breach of their fiduciary duties had they *not* considered the best interests of Crown Books in deciding whether to make the Loan. [FN3] Further, Creditors have not asserted any personal interests on the part of defendants relating specifically to the Loan. In fact, it is undisputed that the money CB.com loaned to Crown Books was transferred to Paragon, such that defendants did not receive any of the transferred funds nor any benefit from the funds other than some indirect, attenuated benefit from keeping Crown Books alive a bit longer, which they were legally obliged to try to do anyway.

FN2. As discussed above, defendants also owed fiduciary duties to Creditors because CB com was operating within the zone of insolvency.

FN3. Creditors, citing an unreported opinion from the Delaware Chancery Court, argue that defendants had a fiduciary duty to run CB com as a "stand-alone company" rather than managing it in the best interests of the parent company, Crown Books. However, the case cited by Creditors, *In re Student Loan Corp. Deriv. Litig.*, No. C.A. 17799, 2002 WL 75479 (Del.Chan.Ct.2002), is entirely inapposite because there the parent company owned 80% of the subsidiary, rather than owning 100%, as is the case

here. *Id* at *1. Where there are shareholders in addition to the parent company, both the directors of the subsidiary and the parent company, as controlling shareholder, have a duty to consider the interests of the minority shareholders. *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del.1971). However, where the subsidiary is wholly owned by the parent, the directors of the subsidiary owe the parent a fiduciary duty to manage the subsidiary in the best interests of the parent. *Anadarko*, 545 A.2d at 1174. Here, not only are Creditors not shareholders of CB.com-- an argument they have made at great length --but there are no shareholders besides Crown Books. Therefore, had defendants managed CB.com as a stand-alone company, disregarding the best interests of Crown Books, they likely would have been in breach of their fiduciary duties to Crown Books as the parent company.

*6 Even assuming *arguendo* that the interests attributed to defendants by Creditors were additional interests beyond those defendants were obligated to consider, Creditors must also establish that these particular interests were material. *Cede, 634 A.2d at 363.* As explained below, Creditors have failed to do so.

First. Shenkman's purported ownership interest in Crown Books is far too attenuated to constitute a material interest sufficient to rebut the business judgment rule presumption. Shenkman is the founder, President, Chief Investment Officer and managing member of Shenkman Capital Management, Inc. ("Shenkman Capital"). (Plaintiffs' Statement of Undisputed Material Facts ("Pl.Stmt") ¶ 8). Shenkman Capital is the managing member and 1% owner of Royalty Books Associates ("Royalty"). (*Id* at ¶ 9). Royalty owned approximately 35% of Crown Books' stock. (*Id*). Therefore, Shenkman's ownership interest in Crown Books is comprised of his unspecified ownership interest in Shenkman Capital, Shenkman Capital's 1% ownership interest in Royalty, and Royalty's 35% ownership interest in Crown Books--which makes Shenkman's ownership interest in Crown Books some percentage of 1% of 35%. Even assuming Shenkman owns 100% of Shenkman Capital, this would make his interest in Royalty only 0.35%. This is far too little to render Shenkman interested in the Loan or controlled by Crown Books under a business judgment rule analysis. "[S]tock ownership alone, at least when it amounts to less than a majority, is not sufficient

Not Reported in F Supp 2d
2004 WL 875262 (S D N Y )
(Cite as: 2004 WL 875262 (S.D.N.Y.))

Page 6

proof of dominion or control " *Aronson*, 473 A.2d at 815 (holding that 47% stock ownership was not sufficient to rebut independence) (internal quotation marks omitted)

Cumello's employment as an officer of Crown Books also does not constitute a material interest under the particular circumstances here. Creditors argue that Cumello's employment with Crown Books gives him a personal interest in keeping Crown Books out of bankruptcy for as long as possible in order to protect his job. However, as already discussed above, regardless of his position as an officer of Crown Books, Cumello had a duty to Crown Books to manage CB com in the best interests of Crown Books, and certainly the best interests of Crown Books would include an interest in keeping Crown Books out of bankruptcy for as long as possible. As a result, any personal interest Cumello had in keeping Crown Books out of bankruptcy was consistent with the best interests of Crown Books, and thus any indirect benefit to Cumello from the Loan was immaterial. Therefore, Creditors have failed to establish that defendants were personally interested in or dependent on the business decision to make the Loan.

c. Due Care

"The duty of the directors of a company to act on an informed basis forms the duty of care element of the business judgment rule " *Cinerama*, 663 A.2d at 1164 n. 13 (internal quotation marks and ellipsis omitted) "[T]o invoke the rule's protection directors have a duty to inform themselves, prior to making a business decision, of all material information reasonably available to them " *Aronson*, 473 A.2d at 812 "[T]he standard for judging the informational component of the directors' decisionmaking does not mean that the Board must be informed of *every* fact. The Board is responsible for considering only *material* facts that are *reasonably available*, not those that are immaterial or out of the Board's reasonable reach." *Brehm v. Eisner*, 746 A.2d 244, 259 (Del.2000) (emphasis in original) "[T]he concept of gross negligence is [ ] the proper standard for determining whether a business judgment reached by a board of directors was an informed one." *Van Gorkam*, 488 A.2d at 873.

*7 Creditors have failed to present any facts sufficient to overcome the business judgment rule presumption of due care. According to defendants, they consulted counsel for CB com and Crown Books before making the Loan to discuss both legal and

strategic concerns (Cumello Dec ¶ ¶  22-26) Additionally, Cumello reports that as President and Chief Executive Officer of Crown Books, he "regularly received and reviewed financial reports and updates regarding Crown Books' finances," "reviewed Crown Books' monthly financial packages," and "had almost daily discussions with Crown Books CFO regarding Crown Books' credit facilities with Paragon and Ingram " (*Id* at ¶ 41) It is unreasonable to conclude that as directors of Crown Books and as an officer of Crown Books, defendants would be uninformed about the financial condition of the company. Indeed, Creditors have posited conflicting arguments for this very reason. First, claiming that defendants were uninformed, Creditors argue:

> It is undisputed that defendants did not engage in any credit risk assessment to determine whether Crownbooks com should have lent its cash assets to Crown Books to Crown Books and, in particular, Shenkman did not consider Crown Books' financial capacity to repay the Loan No independent financial consultants or advisors were retained by defendants for the purpose of evaluating Crown Books' creditworthiness and capacity for loan repayment

(Pl Mem 41) In short, Creditors argue that defendants were not adequately informed about the financial condition of Crown Books, the recipient of the Loan However, in the very next paragraph Creditors take a wholly contradictory position, arguing: "It is also undisputed that defendants *already knew, through their dual directorial status* that Crown Books did not possess the *financial wherewithal* to repay, secure or otherwise guaranty repayment of Crownbooks.com' s funds." (*Id* ) (emphasis added) Creditors then outline in detail the facts surrounding Crown Books' demise in late 2000 as defendants struggled to meet Paragon's demands. (*Id* at 41-42) It is beyond any reasonable dispute that defendants were well aware of Crown Books' financial condition when the Loan was made, and thus were adequately informed in reaching the business judgment to make the Loan

Creditors' allegations boil down to a single contention: defendants made a poor decision. Creditors argue that defendants should have ensured that CB.com "retained sufficient assets to pay its debts as they became due," obtained "adequate security for the Loan," and sought "assurance that Crown Books Corp. could obtain the other cash infusions required under its agreement with Paragon and Foothills." (Compl ¶ ¶  40-42) However, all of these arguments are factual claims directed at the wisdom of defendants' decision rather than at the

Not Reported in F Supp 2d
2004 WL 875262 (S D N Y )
(Cite as: 2004 WL 875262 (S.D.N.Y.))

level of information underlying the decision. Under the business judgment rule, courts do not "examine the wisdom of the decision itself." *Brazen v. Bell Atlantic Corp.*, 695 A.2d 43, 49 (Del.1997) "[T]he Court gives great deference to the substance of the directors' decision and will not invalidate the decision, will not examine its reasonableness, and will not substitute [its] views for those of the board if the latter's decision can be attributed to any rational business purpose " *Paramount Communications, Inc. v. QVC Network Inc.*, 637 A.2d 34, 45 (Del.1994); *see also Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del.1971) ("A court under such circumstances will not substitute its own notions of what is or is not sound business judgment"); *In re Caremark International Inc. Derivative Litigation*, 683 A.2d 1049, 1052 (Del.Ch.1996) ("[T]o allege that a corporation has suffered a loss as a result of a lawful transaction, within the corporation's powers, authorized by a corporate fiduciary acting in a good faith pursuit of corporate purposes, does not state a claim for relief against that fiduciary no matter how foolish the investment may appear in retrospect "). Therefore, Creditors have not demonstrated that defendants failed to exercise due care

d. Good Faith

**\*8** Delaware law does not recognize an independent duty of good faith. Under Delaware law,

[a]lthough corporate directors are unquestionably obligated to act in good faith, doctrinally that obligation does not exist separate and apart from the fiduciary duty of loyalty Rather, it is a subset or 'subsidiary requirement' that is subsumed within the duty of loyalty, as distinguished from being a compartmentally distinct fiduciary duty of equal dignity with the two bedrock fiduciary duties of loyalty and due care

*Orman v. Cullman*, 794 A.2d 5, 14 (Del.Ch.2002) (quoting *Emerald Partners v. Berlin*, No. Civ.A. 9700, 2001 WL 115340, at \*64 n. 63 (Del.Ch. Feb.7, 2001) (internal quotation marks omitted) Good faith is also subsumed within the duty of due care. *Id.* at 19-20. Accordingly, summary judgment is granted for defendants dismissing Claim Three for breach of the duty of good faith

Creditors have failed to present any facts demonstrating that defendants acted in bad faith so as to establish a basis for their claims for breach of the fiduciary duties of due care and loyalty. The Delaware Supreme Court has defined "bad faith" as "not simply bad judgement or negligence, but rather it implies the conscious doing of a wrong because of

dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will " *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1208 n. 16 (Del.1993). "[T]he absence of significant financial adverse interest creates a presumption of good faith, although the good faith requirement further demands an *ad hoc* determination of the board's motives in making the business decision " *See Estate of Detwiler v. Offenbecher*, 728 F.Supp. 103, 150 (S.D.N.Y.1989) (citing Delaware law). Bad faith may be found where a business decision "is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith " *In re J.P. Stevens & Co., Inc. Shareholders Litigation*, 542 A.2d 770, 780-81 (Del.Ch.1988). As already discussed, Creditors have not established any significant financial adverse interest on the part of defendants, so the only question is whether the decision to make the Loan is so far beyond the bounds of reasonable judgment that it must have been motivated by bad faith

According to Cumello, he "believed that if CB com did not make the Loan, CB com's assets would be consolidated into the assets of Crown Books, and the Unit Holders would lose their entire investment " (Cumello Dec. ¶ 42) Cumello further believed that structuring the transfer "as a loan, instead of a dividend, [would] balance the interests of CB com and Crown Books [because] the loan would entitle CB com to repayments when it needed funds to pursue its development program further " (*Id* at ¶ 43) Cumello also "believed CB com would have recourse in bankruptcy" if Crown Books went bankrupt after the Loan. (*Id*) Shenkman shared Cumello's beliefs, approving the Loan because he believed that "it was in the best interest of all the parties involved, including the Unit Holders, CB com and Crown Books." (Shenkman Dec ¶ 9) Defendants' expressed motivations for the Loan demonstrate that there was no bad faith towards Creditors or CB com in favor of Crown Books, and that defendants had a good faith belief that the Loan would not harm Creditors or CB com and could benefit them in the long run

**\*9** Further, it is undisputed that CB com could not survive without Crown Books According to Cumello,

without Crown Books. CB com would: 1) be unable to gain access to clients; 2) be unable to develop an effective product which displayed current and relevant books. periodicals and other

© 2005 Thomson/West. No Claim to Orig U S Govt Works

Not Reported in F.Supp.2d
2004 WL 875262 (S.D.N.Y.)
(Cite as: 2004 WL 875262 (S.D.N.Y.))

products; and 3) not have the back office infrastructure to operate as an independent entity. As a result, CB.com had no hope for success without Crown Books.

(Cumello Dec. ¶ 13) Shenkman also believed that "[i]t was essential to CB com's survival that Crown Books also continue in business." (Shenkman Dec. ¶ 9) Defendants' beliefs about the dependence of CB.com on Crown Books are bolstered by the Offering Memorandum governing Creditors' investment. The Offering Memorandum states that CB com intended "to attract significant online traffic and business" through Crown Books' "established name, reputation and value proposition." (Def. Stmt., Ex. A at 4) The Offering Memorandum further states that the purpose of CB com is to "permit *Crown Books customers* to shop online *at Crown Books* both from home and in the stores, and [ ] help to facilitate an online/offline community *for Crown Books* " (*Id.*) (emphasis added) The Offering Memorandum informed Creditors when they purchased the Units that CB com, as a wholly-owned subsidiary, existed for the benefit of Crown Books and would be entirely dependent on Crown Books for its customer base and its operations. In fact, the Offering Memorandum refers to the "Company" almost exclusively whenever discussing the new venture for which the Units were being offered, and the Offering Memorandum defines "Company" as *both* CB.com and Crown Books, leaving little doubt about the intimate, dependent relationship between these two entities. (*Id.* at Ex. A) Indeed, the Offering Memorandum effectively presents CB com and Crown Books as one entity--namely, the "Company" (*Id.*) Therefore, defendants' business judgment that the Loan would help save Crown Books and that preserving Crown Books would help save CB.com was not "so far beyond the bounds of reasonable judgment that it must have been motivated by bad faith." *See In re J.P. Stevens*, 542 A.2d at 780- 81. Indeed, all evidence is to the contrary--namely, that defendants acted in good faith to preserve both Crown Books and CB com.

Creditors argue also that defendants lacked discretion to use the proceeds from the Unit sales for the Loan, but this argument is belied by indisputable facts. The Offering Memorandum includes a provision entitled "Broad Discretion in Use of Proceeds," which reads:

Although the Company has generally provided the intended use of the net proceeds from the Offering as of the date of this Term Sheet, the Company cannot specify with certainty the amount of the net proceeds of the Offering that will be allocated for each purpose. In addition, the

Company reserves the right to reallocate the use of net proceeds it receives from the Offering in *any manner it deems advisable* Accordingly, the Company's management will have *broad discretion* in the application of the net proceeds See 'Use of Proceeds.'

*10 (Def Stmt, Ex. A, ii) (emphasis added) This language leaves no doubt about the "broad discretion" of defendants in their use of the proceeds generated by Creditors' purchase of the Units. Moreover, defendants' broad discretion over the use of the proceeds was further articulated in the Supplement to the Offering Memorandum, which states: "The Company reserves the right to reallocate the use of the net proceeds received in the Offering in *any manner it deems advisable* " (*Id* at Ex. B, at 1) (emphasis added) Creditors argue that "broad discretion" is not the same as "unabridged, unbridled and unchecked discretion," and that defendants would need "sole" or "absolute" discretion to permit the Loan (Pl Mem 30) However, this is not a case where directors transferred company funds into their personal bank accounts; rather, defendants transferred funds to the parent corporation with the purpose of assisting the parent, which was entirely in keeping with their fiduciary duty to consider the best interests of Crown Books. *See Anadarko*, 545 A.2d at 1174 Defendants did not need absolute discretion to authorize the Loan, only broad discretion over the use of the proceeds, which they had under the express terms of the Offering Memorandum

Further, the "Broad Discretion" provision of the Offering Memorandum refers to the "Use of Proceeds" provision, which states, in relevant part, for the third time: "The Company reserves the right to reallocate the use of the net proceeds it receives from the Offering in *any manner which it deems advisable* " (Deft Stmt, Ex A at ii) (emphasis added) This provision also expressly informed Creditors that among the purposes for which the proceeds could be used was "for working capital and general corporate purposes of Crown Books." (*Id*) Certainly, paying a debt owed by Crown Books in an attempt to avoid bankruptcy qualifies as "general corporate purposes " Therefore. defendants used the proceeds of the Unit sales for purposes expressly permitted under the terms of the Offering Memorandum. Indeed, it is entirely unclear for what purposes Creditors believe the proceeds could have been used. They challenge the purposes for which defendants used a portion of the proceeds--namely, the Loan--and yet offer no purpose for which they believe these proceeds should have been used. Creditors argue that at the time of the Loan CB com

Not Reported in F Supp 2d
2004 WL 875262 (S D N Y.)
(Cite as: 2004 WL 875262 (S.D.N.Y.))

"was already dead " (Reply Memorandum of Law in Further Support of Plaintiffs' Motion for Summary Judgment ("Pl Reply") 38) So Creditors' argument essentially boils down to the contention that defendants should have locked away CB com's funds and thrown away the key--funds for which CB com had absolutely no use as a "dead" entity and which could be reallocated for any purposes under the express terms of the Offering Memorandum--and simply watched idly as Crown Books went under However, this again ignores the fact that Crown Books was CB.com's parent company, and thus defendants owed Crown Books a fiduciary duty to manage CB com in the best interests of Crown Books. *Anadarko, 545 A.2d at 1174* In fact, doing as Creditors demand may have constituted a breach of the fiduciary duties defendants owed Crown Books Of course, defendants also had a fiduciary duty to consider Creditors' interests as well, but defendants believed--rightly or wrongly--that Creditors would lose the funds in bankruptcy anyway, in which case the Loan put Creditors in no worse position while possibly preserving Crown Books, and CB com with it. (Cumello Dec. ¶ 42) In sum, Creditors have not demonstrated that defendants acted in bad faith.

*11 As already discussed, Creditors' claims are essentially an attack on the wisdom of defendants' decision. But the business judgment rule is intended to protect directors against just such attacks because their decisions are not to be second-guessed by courts with the benefit of hindsight Creditors made high-risk loans for a high-risk venture by a high-risk company, and they lost the gamble They were informed of all the risks associated with CB com and Crown Books when they purchased the Units, and they were even afforded an opportunity to withdraw from their agreements with CB com when CB com failed to raise the desired funds in the time expected--yet Creditors chose not to walk away (Def Stmt , Ex B) Defendants cannot be held liable for a business decision made in good faith with due care and without any controlling influences or personal interests, and such is the case here

Creditors have failed "to make a showing sufficient to establish the existence of an element essential to [their] case, and on which [they] will bear the burden of proof at trial " See *Celotex v.. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)* They have failed to establish facts necessary to negate any element of the business judgment rule, and thus defendants are "entitled to judgment as a matter of law." See *Fed.R.Civ.P. 56* Accordingly, summary judgment is granted for defendants

dismissing Claim One for breach of fiduciary duty and Claim Two for breach of the duty of loyalty

**B Fraudulent Conveyance Claims**

Creditors have brought claims against defendants for common law wrongful transfer and statutory fraudulent transfer Creditors argue that defendants owed them "a duty not to wrongfully transfer or otherwise divert assets from Crownbooks.com for other purposes." (Compl¶ 59) Creditors further argue that defendants had a statutory duty "not to cause Crownbooks com, in its capacity as a debtor, to make any transfer or incur any obligation without receiving a reasonably equivalent value in exchange therefore, at a time when Crownbooks com was insolvent or became insolvent as a result of said transfer" or "under circumstances whereby the remaining assets of Crownbooks com would be unreasonably small in relation to the business or transaction." (Id at ¶ ¶ 64, 68) According to Creditors, defendants breached their common law and statutory duties by causing Crownbooks com "to transfer $1.5 million to Crown Books Corp. by way of an unsecured loan " (Id at ¶ ¶ 60, 65, 69)

**1. Choice of Law**

Creditors argue that Delaware law should apply to these claims; defendants argue that New York law should apply. "A federal court, sitting in diversity, must look to the choice-of-law rules of the state in which it sits--here New York--to resolve the conflict-of-law questions." *Arochem International, Inc. v Buirkle, 968 F.2d 266, 269-70 (2d Cir.1992)* (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.. 313 U.S. 487, 496. 61 S.Ct. 1020, 85 L.Ed. 1477 (1941))* The parties not only dispute which state's substantive law should apply, but also which test under New York law should be applied to resolve the choice-of-law question. According to Creditors, the Loan involved the internal affairs of CB com, and therefore the "internal affairs doctrine" should apply According to defendants, however, Creditors' claims do not fall within the "internal affairs doctrine," and therefore an "interest analysis" should apply

*12 "The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs--matters peculiar to the relationships among or between the corporation and its current officers, directors. and shareholders-- because otherwise a corporation could be faced with conflicting demands." *Edgar v MITE Corp.. 457*

Not Reported in F.Supp.2d
2004 WL 875262 (S.D.N.Y.)
(Cite as: 2004 WL 875262 (S.D.N.Y.))

U.S. 624, 645, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982). Under the internal affairs doctrine, "the law of the state of incorporation normally determines issues relating to the *internal* affairs of a corporation." *First National City Bank v. Banco para el Comercio Exterior de Cuba*, 462 U.S. 611, 621, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) (emphasis in original). "Different conflicts principles apply, however, where the rights of third parties *external* to the corporation are at issue." *Id* at 621 (emphasis in original). Creditors' claims at issue here are tort claims regarding the rights of "third parties *external* to the corporation" as they are not brought by shareholders, officers or directors, nor are they brought derivatively on behalf of the corporation Therefore, the "internal affairs doctrine" is inapplicable here.

New York law employs an "interest analysis" in tort actions that applies the law of the jurisdiction with the greatest interest in the litigation *See Arochem, 968 F.2d at 270* Under this analysis, the court should focus almost exclusively on the parties' domiciles and the locus of the tort *Id* "As part of the interest analysis, the New York Court of Appeals has distinguished between rules regulating conduct and rules governing loss allocation Generally, when the laws in conflict are conduct regulating, the law of the locus jurisdiction applies." *Id.* "A fraudulent conveyance statute is conduct regulating rather than loss allocating " *See GFL Advantage Fund, Ltd. v. Colkitt*, No. 03 Civ. 1256, 2003 WL 21459716, at *3 (S.D.N.Y. June 24, 2003).

The only two states at issue here are New York and Delaware None of the parties are domiciled in Delaware or New York, and the locus of the alleged tort is New York In order to lay venue in the Southern District of New York, plaintiffs have alleged that "a substantial part of the events and actions of Defendants giving rise to the claims asserted [by plaintiffs] occurred within" New York (Compl ¶ 3) Additionally, the private placement under which Creditors purchased the Units giving rise to this litigation was supervised by a law firm located in New York. (Def Stmt , Ex B) Creditors have not alleged any facts showing any actions related to this litigation that occurred in Delaware

Further, New York recognizes the right of contracting parties to agree to the choice of law. *See Turtur v. Rothschild Registry International, Inc.*, 26 F.3d 304, 310 (2d Cir.1994). The Subordinated Note issued to Creditors here contains a provision entitled "Governing Law," which states: "This Note shall be

governed by and construed in accordance with the laws of the State of New York." (Def Stmt . Ex D, ¶ 7(B)) Further, the Subscription Agreements entered into by the parties include a forum selection clause which states:

*13 Notwithstanding the place where this Subscription Agreement may be executed by any of the parties hereto, the parties expressly agree that all the terms and provisions hereof shall be construed in accordance with and governed by the laws of the State of New York The parties hereby agree that any dispute which may arise between them *arising out of or in connection with this Subscription Agreement* shall be adjudicated before a court located in New York City and *they hereby submit to the exclusive jurisdiction of the courts of the State of New York* located in New York, New York and of the federal courts in the Southern District of New York with respect to any action or legal proceeding commenced by any party.

(*Id* at Ex. C, ¶ 4 4) (emphasis added) In *Turtur,* the Court of Appeals affirmed summary judgment against securities brokers who brought an action for common law fraud after purchasing units in a limited partnership 26 F.3d at 305 The subscription note by which the plaintiffs purchased the units contained a forum selection clause nearly identical to the clause here. *Id. at 309.* The Court held that the plaintiffs' fraud claim clearly arose out of or was related to their investment, which was governed by the subscription note containing the forum selection clause, and thus the forum selection clause applied to their fraud claim *Id. at 310.* The Court concluded that under the forum selection clause New York law applied. *Id* Likewise, under the forum selection clause in Creditors' Subscription Agreements, New York law is the applicable law here. (Def Stmt , Ex C, ¶ 4.4)

Creditors, in keeping with their argument that Delaware law applies, have brought their fraud claims under Delaware law. (Compl ¶ ¶ 64, 68; Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pl Mem.") 46-47) Defendants have moved for summary judgment on the ground, among others, that Creditors have invoked the wrong law, given that New York law actually applies. (Def Mem.28) However, "the failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim. Factual allegations alone are what matters." *Northrop v. Hoffman of Simsbury, Inc.*, 134 F.3d 41, 45-46 (2d Cir.1997) (internal quotation marks omitted); *see also Brandon v. Holt*, 469 U.S. 464, 47 L. 105 S.Ct. 873, 83 L.Ed.2d 878 (1985) (holding that a court should decide the legal issues

without requiring a formal amendment of the complaint where the allegations plainly identify a claim; Fed.R.Civ.P. 8 ("All pleadings shall be so construed as to do substantial justice."). Further, both parties have argued the merits of Creditors' fraud claims *arguendo* under New York law. Therefore, these claims will be considered under New York law.

### 2. Applying New York Law

New York law does not recognize "a creditor's remedy for money damages against parties who, like defendants here, were neither transferees of the assets nor beneficiaries of the conveyance." *F .D.I.C. v. Porco*, 75 N.Y.2d 840, 842, 552 N.Y.S.2d 910, 910, 552 N.E.2d 158 (1990); *see also Gallant v. Kanterman*, 198 A.D.2d 76, 80, 603 N.Y.S.2d 315, 318 (1st Dep't 1993) (affirming dismissal of action for fraudulent conveyance where defendants were neither transferees or beneficiaries). This is because "[t]he creditor's remedy in a fraudulent conveyance action is limited to reaching the property which would have been available to satisfy the judgment had there been no conveyance ...." *Geren v. Quantum Chemical Corp.*, 832 F.Supp. 728, 736 (S.D.N.Y.1993), *aff'd*, 99 F.3d 401 (2d Cir.1995). Therefore, there can be no action for damages against a party who did not receive any of the property sought by the creditors.

\*14 Creditors argue here that both Cumello and Shenkman benefited from the Loan, as already discussed, because "both Cumello and Shenkman had personal interests that were placed at grave risk by the prospect of a Crown Books' bankruptcy," and the Loan "enabled Crown Books to live for another day, and in turn, advanced their respective interests for their own personal benefit." (Pl Mem.53) Creditors note that Shenkman held ownership interests in two companies that together owned 35% of the common stock of Crown Books, and that Cumello served a salary as President and Chief Executive Officer of Crown Books. (*Id* at 53-54) However, receipt of a salary from the transferee corporation as an officer of the corporation is not sufficient to render the officer a transferee or beneficiary of the transfer. *See T.L.C. Merchant Bankers, Inc. v. Brauser*, No. 01 Civ. 3044, 2003 WL 1090280, at \*7 (S.D.N.Y. March 11, 2003) (holding that payment of a salary to an officer of a corporation receiving a transfer of assets did not render the officer a transferee or beneficiary of the transfer). Crown Books was entitled to pay Cumello a salary. and there is no evidence that his salary was in any way derived from the transferred property. Indeed. the undisputed evidence is that the property

transferred in the Loan, namely $1.5 million. was transferred to Paragon. Further. Shenkman's ownership in two companies holding stock in Crown Books is too attenuated a relationship to render Shenkman a transferee or beneficiary of the Loan. In *Brenner v. Phlips, Appel & Walden, Inc.*, No. 95 Civ. 7838, 1997 WL 33471053 (S.D.N.Y. July 22, 1997), the Court found no evidence that defendants benefited from a transfer of $500,000 to a company in which one of the defendants owned 35% of the shares. *Id* at \*1, \*5. There, the defendant had direct ownership of more than one-third of the transferee corporation's stock, and the Court nevertheless found no benefit to the defendant from the transfer. *Id* Here, Shenkman has some unspecified ownership interest in two companies that together own 35% of the Crown Books' common stock, leaving Shenkman with no direct ownership interest in Crown Books and even further removed from the transfer property than the defendant was in *Brenner*. Therefore, Creditors have failed to present any evidence demonstrating a benefit to defendants from the Loan, "an element essential to [their] case, and on which [they] will bear the burden of proof at trial." *See Celotex*, 477 U.S. at 322. Accordingly, summary judgment is granted for defendants dismissing Claim Four for common law wrongful transfer of funds, Claim Five for violation of § 1304(a)(2) of the Delaware Uniform Fraudulent Transfer Act, and Claim Six for violation of § 1305(a) of the Delaware Uniform Fraudulent Transfer Act.

### C. Tortious Interference Claim

Creditors allege that they and CB com "were parties to Subordinated Notes, which were binding and enforceable contracts at law." (Compl ¶ 72) According to Creditors, defendants caused CB com to breach these contracts by rendering CB com insolvent after transferring "all or substantially all of its assets to another entity." (*Id* at 74) Creditors have brought this claim mistakenly under Delaware law, just as they did their fraudulent conveyance claims. For the same reasons discussed above, New York law controls this claim.

\*15 "Under New York law, the elements of a tortious interference claim are: (a) that a valid contract exists; (b) that a 'third party' had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff." *Albert v. Loksen*, 239 F.3d 256, 274 (2d Cir.2001). A "third party" for the purposes of a tortious interference claim is someone who is not a

Not Reported in F.Supp.2d
2004 WL 875262 (S.D.N.Y.)
(Cite as: 2004 WL 875262 (S.D.N.Y.))

party to the contract at issue. *Finley v. Giacobbe, 79 F.3d 1285, 1295 (2d Cir.1996).* For an agent of a party to the contract to qualify as a "third party," the plaintiff must demonstrate that the agent acted outside the scope of his authority, *id.,* or "committed an independent tortious act against the plaintiff." *Albert, 239 F.3d at 275.* "A corporate officer or director generally cannot be liable for tortiously interfering with a contract between the corporation and a third party." *See Chardin v. Turkie, No. 97 CIV. 4643, 1998 WL 886986, at *1 (S.D.N.Y. Dec.18, 1998)* (citing *Murtha v. Yonkers Child Care Assn., 45 N.Y.2d 913, 915, 411 N.Y.S.2d 219, 220, 383 N.E.2d 865 (1978)).* "Where the corporate officer/director is acting within the scope of his or her authority, the officer/director is not a third party vis-a-vis the corporation and as such cannot interfere with its own contract." *Id.*

The parties do not dispute that a valid contract exists between Creditors and CB.com. However, defendants do dispute the allegation that they are "third parties" given their positions as directors of CB.com and CB.com's status as a party to the contract with Creditors. Creditors argue, on the other hand, that defendants are "third parties" because they acted outside the scope of their authority when they made the Loan, "promoting their own self-interests adversely to the interests of Crownbooks.com." (Pl.Memo.58) Citing the same personal interests underlying their other claims--namely, Shenkman's attenuated ownership interest in Crown Books and Cumello's salaried position as an officer of Crown Books--Creditors once again argue that defendants sought "to keep Crown Books alive" for their own personal gain. (*Id.* at 59, 411 N.Y.S.2d 219, 383 N.E.2d 865.) But just as these interests were insufficient to support their other claims, so are they insufficient to support this claim. As already discussed, these interests were consistent with the best interests of Crown Books, which defendants had a fiduciary duty to consider as directors of CB.com, a subsidiary wholly owned by Crown Books. *See Anadarko, 545 A.2d at 1174.* Therefore, defendants acted well within the scope of their authority by trying "to keep Crown Books alive." Moreover, Creditors have not alleged any independent torts committed by defendants toward Creditors, and thus defendants cannot be deemed "third parties" for the purposes of Creditors' tortious interference claim.

Creditors have failed to present any evidence establishing "an element essential to [their] case, and on which [they] will bear the burden of proof at trial." *See Celotex, 477 U.S. at 322.* Accordingly, summary judgment is granted for defendants on Claim Seven for tortious interference with contractual relations.

* * *

**\*16** Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. Therefore, for the reasons stated above, summary judgment is granted for defendants, and the complaint is dismissed.

SO ORDERED.

2004 WL 875262 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

1:01CV07176                (Docket)
(Aug. 02, 2001)

END OF DOCUMENT

**10**

Westlaw.

1988 WL 70013
1988 WL 70013 (D.Del.)
(Cite as: 1988 WL 70013 (D.Del.))

Page 1

H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available

United States District Court, D. Delaware
SCRIPPS CLINIC AND RESEARCH
FOUNDATION, and Rorer Group Inc., Plaintiffs,
v.
BAXTER TRAVENOL LABORATORIES, INC.,
and Travenol Laboratories, Inc.,
Defendants
CIV.A. No. 87-140-CMW.

June 21, 1988

Gregory A. Inskip, Potter, Anderson & Corroon,
Wilmington, Delaware (Eugene Moroz, Esquire,
Kurt E. Richter, Esquire and William S. Feiler,
Morgan & Finnegan, New York City, of counsel),
for plaintiffs

Allen M. Terrell, Jr., Richards, Layton & Finger,
Wilmington (Granger Cook, Jr., Esquire and Dean
A. Monco, Cook, Wetzel & Egan, Ltd., Chicago,
Ill., and Paul C. Flattery, and Robert E.
Hartenberger, Baxter Travenol Laboratories, Inc.,
Deerfield, Ill., of counsel), for defendants

*OPINION*

CALEB M. WRIGHT, Senior District Judge

*1 This discovery dispute arises out of a patent infringement suit brought by Scripps Clinic and Research Foundation and Rorer Group, Inc. ("Scripps") against Baxter Travenol, Inc., and Travenol Laboratories, Inc. ("Baxter") The dispute centers on alleged deficiencies in the discovery responses of both parties during an exchange of responses on February 6, 1988. Baxter filed a motion under Federal Rule of Civil Procedure 37 to compel supplemental responses to its interrogatories and requests for documents, and to compel the production of certain deposition transcripts and exhibits generated in other ongoing patent infringement suits filed by Scripps to enforce the patent at issue. Scripps then filed a motion to compel Baxter to index more than 45,000 documents which Baxter had produced in response to Scripps' document requests.

*1. Baxter's Motion to Compel Supplemental Responses to Its Interrogatories*

Baxter moves the Court to compel Scripps to supplement its responses to interrogatories numbers 1-2, 4-5, 11-12, 22-23, 27-29, 37-39, 46, 48-49, and 51-52. Scripps declined to offer any specific answer to any of these interrogatories and instead stated in each case some form of the statement, "Without waiving any objection plaintiffs will produce documents pursuant to Fed.R.Civ.P. 33(c) in lieu of identification." See, e.g., Plaintiffs' Response to Interr. No. 2.

In support of its answers, Scripps relies on Federal Rule of Civil Procedure 33(c), which gives a responding party the option of producing business records in answer to an interrogatory. Specifically, Rule 33(c) states:

Where the answer to an interrogatory may be derived or ascertained from the business records of the party . . . and the burden of ascertaining the answer is substantially the same for the party serving the interrogatory as for the party served, it is a sufficient answer to such interrogatory to *specify the records from which the answer may be derived or ascertained . . . A specification shall be in sufficient detail to permit the interrogating party to locate and to identify, as readily as can the party served, the records* from which the answer may be obtained.

(emphasis added) Scripps' responses are insufficient under this rule because they contain no specification of records at all.

Scripps produced approximately 6,700 documents in response to Baxter's requests. In the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

1988 WL 70013
1988 WL 70013 (D.Del.)
(Cite as: 1988 WL 70013 (D.Del.))

interrogatory answers at issue. Scripps offered no specific answers to the disputed questions; rather, it just referred to the boxes of documents. Referring to 6,700 documents does not constitute "specify[ing] the records," and is insufficient to allow Baxter "to locate and to identify, as readily as can [Scripps[ the records from which the answer may be obtained." Fed.R.Civ.P. 33(c). Scripps clearly did not meet its "duty to specify" the records. Fed.R.Civ.P. 33(c) advisory committee's note. It did not even affirmatively state that the answers to the interrogatories could be found in the documents. As the Advisory Committee to the Federal Rules has noted: "respond[ing] by directing the interrogating party to a mass of business records ... [is an] abuse of the option." Id. As such, Scripps' answers are clearly insufficient and must be supplemented.

In addition, the Court notes that Scripps attempted to use its ability to answer the interrogatories as a bargaining chip in its attempts to convince Baxter to index the document production that is the subject of Scripps' Motion to Compel. In correspondence between counsel, Scripps stated, "Plaintiffs are in the process of completing a list indicating which production documents are responsive to Baxter's various document requests and stand ready to exchange our list with Baxter should Baxter reconsider its position." Letter to Baxter counsel, Feb. 18, 1988. Discovery is not a game in which one party's answers are balanced against the other party's answers. There are rules that govern discovery. Rule 33(c) allows parties to opt to produce business records to aid in answering the interrogatories, not to avoid answering them. Scripps must specify the documents that contain the answers to the interrogatories irrespective of Baxter's behavior. Finally, since it appears from this correspondence that some sort of index exists, it should be produced. L.R. 4.1C.

*2 Baxter also moves the Court to compel Scripps to answer interrogatories 51 and 52, in which Baxter seeks the names of everyone who was consulted in order to answer the interrogatories, as well as everyone who had control or custody of any documents produced in response to the interrogatories. Scripps objects to these interrogatories as being unduly broad and as seeking irrelevant information burdensome, and as seeking irrelevant information.

The Court will grant Baxter's motion to compel responses to these interrogatories. Rule 26(b) specifies as discoverable subject matter "the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter." Baxter's requests fall squarely within the scope of this Rule and must be answered by Scripps.

Baxter also moves the Court to compel responses to interrogatories numbers 3(c), 3(d), 8-10, 16-18(b), 20, 25-26, and 42-44. Scripps objected to these interrogatories on various grounds, including their being unduly broad and burdensome and not calculated to lead to admissible evidence. Because the parties did not address these issues in their briefs, however, the Court is without sufficient knowledge to rule on the propriety of the interrogatories. Consequently, the Court will deny Baxter's motion without prejudice with respect to those interrogatories.

II. *Baxter's Motion to Compel Supplemental Responses to Its Document Requests*

Baxter seeks to compel Scripps to supplement its answers to document request numbers 1, 4, 7, 14, 17-18, 20-21, 23, 37-38, 45, 47-49, 51, 54-55, 58, 60, and 64-66. The only grounds addressed in the briefs was that Scripps "artificically" limited many of its responses to documents produced on or before December 14, 1981, the date of application of the original patent.

Rule 26(b) limits the scope of document discovery to documents that are relevant to a claim or defense or that appear "reasonably calculated to lead to the discovery of admissible evidence." Scripps limited its responses to document requests numbers 4, 7, 14, 38, 45, 48-49, 54, and 60 to documents generated before December 14, 1981 claiming that documents created after that date are irrelevant. Scripps also limited its response to request number 20 to documents created prior to October 22, 1985, the date of application for the reissue patent. These limitations are improper because Baxter has asserted many defenses concerning the validity of the patent, including inequitable conduct, that may be influenced by events which occurred after the date of application. Therefore, Scripps' responses

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1988 WL 70013
1988 WL 70013 (D.Del.)
(Cite as: 1988 WL 70013 (D.Del.))

to these requests are insufficient and must be supplemented. Baxter also objected to Scripps' limiting its responses to requests numbers 21 and 23 to documents created before October 14, 1981. Baxter limited its requests to that time frame however, and thus Scripps correctly limited its response.

Baxter also moves the Court to compel further responses to document requests numbers 1, 17-18, 37, 47, 51, 55, 58, and 64-66. Request number 1 covers the documents necessary to answer Baxter's interrogatories. Because the procedures for producing documents under Rule 33(c) and Rule 34 are the same under Local Rule 4.1C, all documents will be produced under the interrogatories in the same fashion as they would be under the document request, thus making this document request not necessary. Because the parties did not specifically address the remaining disputed requests in their briefs, the Court is without sufficient knowledge to rule on their propriety, and will consequently deny Baxter's motion without prejudice with respect to those requests.

### III. *Baxter's Motion to Compel the Production of Deposition Transcripts and Exhibits From Other Suits*

**\*3** In 1983, Scripps filed several other patent infringement suits in the Northern District of California against Genentech, Inc., Chiron Corp., and Miles Laboratories, Inc. Baxter seeks to obtain the transcripts of and exhibits produced during the deposition of certain Scripps employees and other witnesses. Scripps objects to the production of these documents on several grounds, all of which are insufficient.

Scripps first alleges that because Baxter refused to cooperate in coordinating discovery with the other defendants it should not be permitted to now obtain the fruits of such discovery. Baxter correctly points out that the instant suit was filed more than three years after the California suits, and consequently has a much different procedural posture than the other suits. Furthermore, pretrial rulings in the other suits altered the scope of discovery in those actions. These different circumstances indicate that Baxter did not engage in bad faith by refusing to coordinate its discovery and

that its action should not influence the requested production.

Scripps next argues that if Baxter is permitted to discover the transcripts and exhibits, it should not be permitted to redepose the same witnesses because Rule 26 prohibits cumulative, duplicative, and burdensome depositions. Baxter has a right to take the depositions itself in order to develop its case properly. Possessing prior transcripts may actually enable Baxter to shorten the depositions by addressing only more important areas. Thus, because the depositions will be taken by a new party, Rule 26 does not prevent their being taken.

Scripps further argues that many documents fall under protective orders entered in the other actions. This would be a serious problem had not Baxter agreed to limit its discovery to depositions of certain Scripps' witnesses, such as Dr. Zimmerman, the inventor of the patented process. Thus, Baxter will not be exposed to any confidential information concerning the defendants in the other suits.

Scripps' final point concerns the time and effort expended by counsel for Scripps and the other defendants in taking the depositions. The Court agrees that Baxter should not be a "free rider," benefiting from the past work done by the other parties. Therefore, the Court will grant Baxter's motion to compel but will order that Baxter shall pay for the transcripts and exhibits at a rate greater than that for the normal production of documents. The Court will be available for consultation if the parties cannot work out an agreement.

### IV. *Scripps' Motion to Compel Baxter to Index its Responses*

Baxter produced more than 45,000 documents in response to Scripps' document requests. The documents originated in two facilities and were gathered from several departments. Affidavit of Michael J. Griffith. All responsive non-privileged documents were produced, with the exception of marketing and research documents pertaining to plasma-derived Factor VIII:C and recombinant DNA-produced Factor VIII:C. Baxter claims to have produced the documents " as they are kept in the usual course of business." Fed.R.Civ.P. 34(b)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1988 WL 70013
1988 WL 70013 (D Del.)
(Cite as: 1988 WL 70013 (D.Del.))

*4 Scripps seeks to compel Baxter to index the documents It claims that although the documents were arranged in bundles within each of the 15 boxes, most of the bundles contained no designation as to the origin of the file, the name of the file, or whether the bundle contained documents from multiple files It also alleges that the subject matter of documents in any one bundle was often varied As such, Scripps contends that the files were not presented in a way that would allow it to make a reasonable use of them, and that they were not produced as actually kept in the ordinary course of business Scripps requests the Court to order Baxter to provide an index between the documents and individual files, the title of each file, and the custodial source of each file

Rule 34(b) gives Baxter the option of either producing documents as they are ordinarily kept or of organizing and labeling them to correspond to the request It is obvious that Baxter did not organize the documents to correspond to the individual requests Baxter also failed, however, to produce the documents as they were kept in the ordinary course of business The documents were gathered from many people and transferred to Scripps in an unintelligible manner. This is insufficient under Rule 34(b), which has the same requirements of organization in producing documents as does Rule 33(c) Fed.R.Civ.P 34(b) advisory committee's note; L R 4.1C Therefore, Scripps' motion is granted.

An Order will issue in accordance with this Opinion

1988 WL 70013 (D Del )

**Motions, Pleadings and Filings (Back to top)**

. 1:87CV00140 (Docket)
(Mar 20, 1987)

END OF DOCUMENT

c 2005 Thomson/West No Claim to Orig U S Govt Works

**11**

Westlaw.

Not Reported in F Supp.
1993 WL 460804 (E D Pa )
(Cite as: 1993 WL 460804 (E.D.Pa.))

Page 1

**H**

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
Harry R. SILLER, Curtis A. Rittenhouse, and Cletus
A. Koehler

v.

UNISYS CORPORATION.
Civ. A. No. 92-4870.

Nov. 3, 1993.
Michelle L. Washington, William H. Ewing,
Hangley, Connolly, Epstein, Chicco, Foxman &
Ewing, Philadelphia, for plaintiffs.

John J. Bogan, Blue Bell, PA, for defendant

*MEMORANDUM*

ANGELL, United States Magistrate Judge.

*1 This age discrimination suit, filed on or about
August 21, 1992, alleges that Unisys' decision to
terminate the plaintiffs' employment in December
1991 and its subsequent refusal to rehire them for
positions for which they were qualified violated the
Age Discrimination Employment Act, 29 U.S.C. §
622 *et seq.* On August 10, 1993, the Honorable
Thomas N. O'Neill, Jr. referred the plaintiffs' Motion
To Compel Full And Complete Discovery Responses
to me for decision pursuant to 28 U.S.C. §
636(b)(1)(A) [FN1] Unisys filed a response in
opposition to the plaintiffs' Motion on or about
August 6, 1993 Additionally, the plaintiffs filed a
reply to the defendant's response on or about August
17, 1993. For the reasons stated below, the
plaintiffs' Motion is grant in part and deny in part.

*BACKGROUND*

The defendant, a manufacturer and seller of
computer products, employed the plaintiffs [FN2] in
its Demand Planning Department, Computer
Operations Group ("COG") in Blue Bell, PA from
1985 until December 1991 [FN3] In August 1991,
defendant announced plans to relocate this
department to Roseville, Minnesota and asked that
the individuals employed here state whether they

would accept a transfer to Minnesota [FN4] Each
plaintiff stated their willingness to relocate to
Minnesota to continue their employment with Unisys.
On or about October 1, 1991, the defendant advised
the plaintiffs that they would be laid off effective
December 6, 1991 Plaintiff Koehler elected to retire
early (effective October 31, 1991) rather than be laid
off. Mr. Koehler alleges that he would not have
retired if the defendant had been willing to continue
his employment. On August 21, 1992, the plaintiffs
filed a complaint alleging, *inter alia* that their
termination was the result of deliberate and wilful
age discrimination.

The motion before the Court concerns the plaintiffs'
Third Set of Interrogatories and Third Request for
Production of Documents to the defendant.
Generally, the plaintiffs seek to discover additional
information relating to the defendant's replacement of
the plaintiffs with younger workers, the decision-
making process in relocating the Demand Planning
Department to Roseville, Minnesota and the refusal
to rehire the plaintiffs for positions for which they
were qualified [FN5]

The defendant states that it has responded to all but
seventeen of plaintiffs' seventy-one interrogatories
and to all but five of the plaintiffs' document
requests, which includes over 5500 pages of
documents [FN6] Additionally, defendant states that
it has provided supplemental responses relating to the
relocation issues in interrogatories 2, 3. 14, 15, 26,
27, 28, 29, 30, 32, 33, 34, 35, 36, 37, 55, 68, 72 and
75 [FN7]

The defendant states that the documents disclosed to
the plaintiffs include the following: documents
relating to the decision to consolidate and relocate the
Blue Bell and Detroit Demand Planning
Departments; documents concerning the selection of
employees to staff the consolidated department;
documents relating to plaintiffs' layoffs; personnel
files for each member of the Blue Bell, Detroit and
Roseville Demand Planning Departments, as well as
personnel files for additional Unisys employees who
were considered for a position in the consolidated
department, but were not selected; documents
relating to Unisys jobs held by other Demand
Planners subsequent to their employment in Demand
Planning; documents concerning Unisys' benefits
programs; documents describing defendant's

© 2005 Thomson/West No Claim to Orig. U S Govt Works

Not Reported in F.Supp.
1993 WL 460804 (E.D.Pa.)
(Cite as: 1993 WL 460804 (E.D.Pa.))

corporate-wide policies on employment; documents concerning the charges that plaintiffs filed against Unisys; documents relating to the de-emphasis of the System 80 product line; documents explaining plaintiffs efforts to find jobs within Unisys; documents delineating the expenses incurred by COG due to the training of Demand Planning employees hired in Roseville; documents reporting the expenses incurred by COG due to the relocation of the Demand Planning Department; and documents describing the expenses incurred by COG due to other COG consolidations and plant closings.  Moreover, the defendant has cooperated in producing out-of-state deponents and in agreeing to telephonic depositions [FN8]

*2 Plaintiffs allege that the defendant has not provided full and complete answers to interrogatories numbers 52, 53, 54, 56, 57, 58, 59, 60, 62, 63, 65, 66, 68, 69, 71, 74 and 75 of Plaintiffs' Third Set of Interrogatories to Defendant.  Furthermore, plaintiffs contend that the defendant has not compiled with plaintiffs' requests for documents numbers 2, 4, 7, 8 and 15 of Plaintiffs' Third Request for Production of Documents to Defendant.  Thus, plaintiffs move pursuant to Fed.R.Civ.P. 37(a)(4) [FN9] for an order that the defendant produce the requested information and reimburse the plaintiffs for the costs of filing this motion. [FN10]  I will consider the groups of interrogatories and document requests as presented in the plaintiffs' Motion.

### THE INTERROGATORIES AND DOCUMENT REQUESTS
#### I. Interrogatories 75 and 68 and Document Request 15

A. Interrogatory 75: In this interrogatory plaintiffs seek information, defined in eight subsections [FN11], regarding each job function or unit that the defendant has relocated since January 1, 1988. Defendant objects to this interrogatory as being vague, ambiguous, overly broad, burdensome, irrelevant to the subject matter of the lawsuit and not reasonably calculated to lead to the discovery of admissible evidence.  Nonetheless, defendant supplemented this response by referring plaintiffs to the COG business case analyses provided in response to document request number 9 of Plaintiffs' Third Request for Production.

Specifically, the defendant has produced the following documents dealing with relocation: Unisys' corporate-wide relocation policies; memoranda relating to the decision to consolidate Demand Planning and to relocate the consolidated

department in Roseville;  a chart listing all COG employees in job levels 12 through 19 inclusive for whom relocation monies were expended during the time period from July 1, 1991 through December 31, 1992; and business case analyses prepared for each COG consolidation or plant closing that has occurred since the current COG controller assumed his position. [FN12]

In this interrogatory the plaintiffs seek company-wide evidence of the relocation of units and personnel, which might reveal patterns or policies of age discrimination in the decision-making process involved in selecting individuals and/or units for relocation.  Clearly, this information is relevant to showing pretext.  [FN13]  In _McDonnell Douglas Corp. v. Green_, 411 U.S. 792, 804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) the Supreme Court suggested that evidence relevant to any showing of pretext might include, _inter alia_, facts regarding the employer's treatment of the complainant during her employment, as well as the employer's general policy and practice with respect to the protected class  411 U.S. at 804

While the scope of discovery is indeed broad, Federal Rule of Civil Procedure 26(c)(4) does permit a court to limit discovery in various ways when " . justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense . "  Fed.R.Civ.P.  26(c)(4) Further, this provision " . might be appropriate when discovery would burden the party from whom it is sought unduly, in comparison with any advantage it would provide to the discovering party,  because it has already been thoroughly gone into and further inquiry would be repetitious." Similarly. a court has discretion " . to limit discovery to matters occurring in a particular period of time or to otherwise limit the scope of the inquiry."  8 CHARLES A. WRIGHT & ARTHUR A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2040 (1970)

*3  In _Sied v. Director, Federal Bureau of Investigation_, No. 90-1801, 1990 WL 259734, 1991 U.S.Dist. LEXIS 1163 (E.D.Pa. Jan. 30, 1991) (citing _Robbins v. Camden City Bd. of Education_, 105 F.R.D. 49 (D.N.J.1985)), the court stated that " . the scope of discovery is not without limits   The responses sought . must not impose an undue burden on the responding party."  1990 WL 259734, *2, 1991 U.S.Dist. LEXIS  *2.  Moreover. in _Welker v. SmithKline Beckman [FN14]_, No. 89-866 (E.D.Pa. Oct. 12, 1989), 1989 WL 121894, 1989 U.S.Dist. LEXIS 12207, the court stated that a party

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.                                                    Page 3
1993 WL 460804 (E.D.Pa.)
(Cite as: 1993 WL 460804 (E.D.Pa.))

"   is not automatically entitled to company-wide
discovery, absent a showing of particularized need
and relevance for the requested discovery." 1989 WL
121894, *1, 1989 U.S.Dist. LEXIS 12207, *2.

Given the breadth of the information already
provided to the plaintiffs, including the above listed
documents as well as deposition testimony [FN15], I
find that to require the defendant to provide further
information on this issue would be burdensome. My
review of the record reveals that even though the
defendant limited the scope of the interrogatory in
time and to the COG unit, this limitation is
permissible since it simply targeted employees who
were similarly situated to the plaintiffs and to the unit
responsible for the relocation decisions. See Texas
Dept. of Community Affairs v. Burdine, 450 U.S. 248,
258, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); Dunn v.
Pennsylvania Hospital, No. 91-4169, 1992 WL
328897, *1, 1992 U.S.Dist. LEXIS 16425, *1
(E.D.Pa. Oct. 26, 1992); and, Earley v. Champion
Intern. Corp., 907 F.2d 1077, 1084 (11th Cir.1990)
Consequently, I find that the defendant has
thoroughly responded to this interrogatory.

B  Interrogatory 68:    Plaintiffs seek similar
information in this interrogatory, which is delineated
in ten subsections, [FN16] namely, a list of the
individuals employed within CSPG whom the
defendant relocated after January 1, 1990.

Defendant objected on the grounds that this
interrogatory is vague, ambiguous, overly broad,
burdensome, irrelevant to the subject matter of the
lawsuit and not reasonably calculated to lead to the
discovery of admissible evidence  However, the
defendant supplemented this response by agreeing to
produce a list of all COG employees at levels 12
through 19 inclusive who were relocated during the
time period July 1, 1991 through December 31, 1992.
[FN17] Further, defendant stated that each of these
employees were chosen for relocation because their
qualifications, skills, and experience best met the
requirements of the relocated position.

In addition, the defendant referred plaintiffs to the
business case analyses attached to the response to
document request number 9 of Plaintiffs' Third
Request for Production of Documents for information
relating to the costs of relocations  For information
concerning any job changes which occurred
subsequent to the employee's relocation defendant
referred the plaintiffs to its response to document
request number 1 of Plaintiffs' Third Request for
Production

*4 Likewise, and for the reasons set forth above, I
find that the defendant fully responded to this
interrogatory    Moreover, while the defendant
limited its response to this interrogatory to the COG,
or the decision-making unit, the plaintiffs did have an
opportunity to depose the head of the larger CSPG
unit, Frank George Brandenberg, who testified that
the head of the COG unit orchestrated the selection of
individuals for relocation  See N.T. Frank George
Brandenberg, 1/8/93. 70, Exhibit L, Defendant's
Opposition

C  Document Request Number 15:  In this request
plaintiffs seeks each and every document relating to
the employee relocations described in response to
Interrogatory Nos. 75 and 68  Defendant objects to
this request as being vague, ambiguous, overly broad
and burdensome, seeking information that is neither
relevant to the subject matter nor reasonably
calculated to lead to admissible evidence.

For the aforementioned reasons I find that the
defendant has fully responded to this request.

II Interrogatory 63
In this interrogatory the plaintiffs request that the
defendant identify each and every category or skill
requirement that was ever incorporated or considered
for use but not ultimately used in the skills matrix
utilized to select Demand Planning employees for
relocation    Defendant states that it has produced
copies of all existing drafts and final versions of the
matrices used in the selection process   In addition,
four of the defendant's employees who were
involved, to some extent, in the decision-making
process to relocate or to lay off an employee testified
in deposition as to the selection process  [FN18]

Accordingly, I find that the defendant has fully
responded to this interrogatory.

III Interrogatories 56, 57, 71 and 65, 66 and
Document Request 7
A. Interrogatory 56:  Plaintiffs ask the defendant to
fully describe, as delineated in ten subsections
[FN19], the manner in which Judy Spurlock, Yolanda
Patino-Huizar, Steven Deters and Anthony Schneider
were selected for the positions they held after being
termination from their positions in the Demand
Planning Department.

Defendant objects to this interrogatory on the
grounds that it is vague, ambiguous, overly broad,
and burdensome, seeking information that is neither

Not Reported in F Supp.
1993 WL 460804 (E.D.Pa.)
(Cite as: 1993 WL 460804 (E.D.Pa.))

Page 4

relevant to the subject matter nor reasonably calculated to lead to admissible evidence. Defendant supplemented this response by stating that Spurlock, Patino-Huizar, Deters and Schneider each heard about, applied for, and obtained these positions due to their networking within the company and due to the contacts that they initiated with company Human Resources representatives

Furthermore, the defendant produced documents relating to the jobs held by Patino-Huizar, Deters and Schneider immediately following their employment in Demand Planning    Plaintiffs also deposed Ms. Spurlock who testified as to the positions she has held after her employment in Demand Planning. Moreover, the defendant offered to allow the plaintiffs to depose Patino-Huizar, Deters and Schneider but plaintiffs declined.    And finally, defendant responded by stating that the plaintiffs were not considered for the positions held by these employees because either they did not apply for the positions or were not considered to be the best qualified candidate for the position

*5 After reviewing the defendant's response to this interrogatory, including the list of documents produced relating to this issue found at Exhibit S of the Defendant's Opposition [FN20], I find that the defendant has fully responded to this interrogatory [FN21]

B. Interrogatory 57: This interrogatory is a follow-up to the preceding interrogatory.  Here the plaintiffs ask the defendant to state every reason any individual named in Interrogatory 56 no longer holds the position described in the answer. [FN22]

Defendant objects on the grounds that this interrogatory is vague, ambiguous, overly broad, and burdensome, seeking information that is neither relevant to the subject matter nor reasonably calculated to lead to admissible evidence. Nonetheless, the defendant supplemented its response by stating that Spurlock and Patino-Huizar now hold the positions described in Unisys' response to Interrogatory 56.   Defendant states that Spurlock testified as to the positions she has held since leaving the Demand Planning Department Furthermore, defendant states that Ms. Patino-Huizar assumed a permanent position as a Commodity Analyst in the Plymouth Commodity Management Department in February, 1992 at the yearly salary of $41,844 after leaving Demand Planning and that she has received two merit increases since joining that group.

Likewise, after reviewing the defendant's response to this interrogatory I find that it has fully responded to this interrogatory

C Interrogatory 71:  In this question plaintiffs ask the defendant to state whether Ms. Patino-Huizar and Messrs. Schneider and Deters were rejected for any positions for which they applied prior to obtaining the positions into which they transferred after their termination from Demand Planning. [FN23]

Defendant objects to this interrogatory as being vague, ambiguous, overly broad and burdensome, seeking information that is neither relevant to the subject matter nor reasonably calculated to lead to admissible evidence. Defendant supplemented its response by stating that Ms. Patino-Huizar interviewed for the job that Mr Schneider now holds, but was not selected. Further, Messrs. Schneider and Deters each interviewed for one job other than that which each currently holds, and that in both cases, they were advised that the position would not be filled

Defendant's response to this interrogatory is minimal, at best   It identifies only that the named individuals applied for "positions" or that they currently hold "positions."   This imprecise response is not sufficient, even in light of the documents produced to the plaintiffs.   "Evasive or cryptic answers are ordinarily insufficient but each answer must be read in the light of the question in deciding its sufficiency."   8 CHARLES A. WRIGHT & ARTHUR A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2177 (1970)

Furthermore, in *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981), the Court stated that "[T]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  In accord. *Duffy v. Wheeling Pittsburgh Steel Co.*, 738 F.2d 1393, 1395 (3d Cir.1984), cert denied. 469 U.S. 1087, 105 S.Ct. 592, 83 L.Ed.2d 702 (1984).   For this reason, the defendant shall fully respond to subsections (a), (e), (f) and (g) or state why it cannot after reasonable inquiry.

*6 D  Interrogatory 65: This interrogatory requests that the defendant state each and every reason defendant gave a temporary transfer and/or assignment to Tom Hartburger pending the availability of a permanent slot. [FN24]

Defendant objects to this interrogatory on the

Not Reported in F Supp.
1993 WL 460804 (E D Pa )
(Cite as: 1993 WL 460804 (E.D.Pa.))

Page 5

grounds that it is vague, ambiguous, overly broad and burdensome, seeking information that is neither relevant to the subject matter nor reasonably calculated to lead to admissible evidence. Unisys further objects to the use of the phrase, "pending the availability of a permanent slot" as being a mischaracterization of the evidence submitted to date in this case. Finally, defendant states that a review of its records failed to reveal an employee by the name of "Tom Hartburger." Subsequently, defendant explained that there is an employee by the name of Thomas Hartberger on its database who is currently on a foreign assignment, and not temporarily assigned [FN25]

In light of the above, I find that the defendant has fully responded to this interrogatory.

E Interrogatory 66: This interrogatory seeks information relating to the number of employees in CSPG who, since January 1, 1990, have held the employment status of temporary assignment [FN26] Defendant objects to this interrogatory on the basis that it is vague, ambiguous, overly broad and burdensome, seeking information that is neither relevant to the subject matter nor reasonably calculated to lead to admissible evidence.

I might agree that this interrogatory is vague, in that the term "temporary assignment" is somewhat indeterminate, but for the fact that this very designation appears on one of the documents produced to the plaintiffs, specifically, that entitled "Layoff letter to Y Patino-Huizar, with notation, 'Temporary assignment w/COG through 3/31/92'." See Exhibit S of Defendant's Opposition Moreover, this interrogatory is clearly relevant to showing pretext since it might uncover evidence that certain employees who were not selected for relocation, were instead, placed on a temporary assignment in lieu of being laid off.

In Webb v. Westinghouse Elec. Corp., 81 F.R.D. 431 (E.D.Pa.1978), the court held that the complainant in an employment discrimination suit must be permitted access to information sufficient to establish discrimination where she alleges it exists. Consequently, the parameters of discovery must be allowed to go beyond the specific individual facts of the plaintiff's claim (Clarke v. Mellon Bank, No. 92-4823, 1993 WL 170950, 1993 U.S.Dist. LEXIS 6680 (E.D.Pa. May 11, 1993) (citing Robbins v. Camden City Bd. of Educ., 105 F.R.D. 49 (D.N.J.1985)).

Accordingly, since the defendant generated this

document revealing this employment status designation, [FN27] it shall fully respond to this interrogatory with the following limitation. The scope of the interrogatory shall be narrowed to the COG unit Furthermore, the defendant shall be careful to fully respond to the individual subsections of this interrogatory or to state why it cannot after reasonable inquiry

*7 F Document Request No 7: Plaintiffs request that the defendant produce each and every Position Description and/or Requisition relating to each and every position and/or temporary assignment described in the Interrogatories

Defendant objects on the grounds that this request is vague, ambiguous, overly broad and burdensome, and seeks information that is neither relevant to the subject matter involved nor reasonably calculated to lead to the discovery of admissible evidence. In addition, the defendant referred the plaintiffs to its responses to Request Nos 1 and 2

For the reasons stated above, the defendant shall produce all documents relating to this response to Interrogatory 66, as limited above

*IV. INTERROGATORIES 52, 53, 54, 59, 60, 62 69, and 74 and DOCUMENT REQUESTS 2 AND 8*
A. Interrogatories 52, 53 and 54 and Document Requests 8 and 2.

1. *Interrogatory 52* Plaintiffs seek information regarding the individuals who have, since June 30, 1991, been promoted, transferred, demoted or hired by the defendant into any position, at pay levels 12 through 19 inclusive, which has, as its primary or exclusive responsibilities, duties in the areas of program management, financial management, auditing management, account management, product control, material control, inventory control, transportation management, import and/or export, or contracts and pricing [FN28]

Defendant objects to this interrogatory on the grounds that it is vague, ambiguous, overly broad and burdensome, seeking information that is neither relevant to the subject matter nor reasonably calculated to lead to admissible evidence. Defendant supplemented its response by referring plaintiffs to the COG workforce listings, batch numbers D0004875-4889, which defendant previously produced to the plaintiffs In addition, defendant stated that as part of its supplemental response to

Not Reported in F Supp
1993 WL 460804 (E D Pa )
(Cite as: 1993 WL 460804 (E.D.Pa.))

Request for Production No 1 to Plaintiffs' Third
Request for Production, it produced a list showing the
following changes in these listings for the time period
July 1, 1991 through December 31, 1992: COG
employees whose job titles have changed and whose
grade levels have increased; COG employees whose
job titles have changed and whose grade levels have
remained the same; and COG employees whose job
titles have changed and whose grade levels have been
reduced. [FN29]

As stated above, the defendant's limited response to
this interrogatory is permitted as it merely targets
those employees who are similarly situated to the
plaintiffs; however, this response is not complete.
This information might highlight any internal
discriminatory pattern or practice of the defendant,
and thus, is discoverable. In McDonnell Douglas
Corp. v. Green, 411 U.S. 792, 804 (1973) the Court
stated that statistics as to employment policy and
practice may be helpful to a determination of whether
the employer's treatment of the complainant
conformed to a general pattern of discrimination.
[FN30] In accord Bruno v. W.B. Saunders Corp.,
882 F.2d 760, 766-767 (3d Cir.1989), cert denied,
493 U.S. 1062, 110 S.Ct. 880, 107 L.Ed.2d 962
(1990).

*8 Consequently, the defendant shall further respond
to this interrogatory with the following limitation.
The defendant shall provide similar information
(including the same time frame) concerning only
CSPG positions located in Blue Bell, PA and Detroit,
MI or state why it cannot after reasonable inquiry

2. Interrogatory 53   This interrogatory is a follow-
up to the answer to Interrogatory 52, that is, it asks
the defendant to identify, for each individual named
in No. 52, (a) each and every position described in
No. 52 into which the person was promoted,
transferred, demoted or hired by the defendant and
the physical location of such position;   (b) the
position held by the individual immediately prior
thereto;   and, (c) the department from which that
individual was transferred, promoted or demoted, and
the name, address, age and position of all other
employees in such department at the time the
individual was transferred. [FN31]

Defendant objects to this interrogatory on the
grounds that it is vague, ambiguous, overly broad and
burdensome, seeking information that is neither
relevant to the subject matter nor reasonably
calculated to lead to admissible evidence.   However,
the defendant did refer the plaintiff to its

supplemental response to Interrogatory 52 in lieu of
supplementing this interrogatory

For the reasons set forth above, the defendant shall
provide similar information (including the same time
frame) concerning only CSPG positions located in
Blue Bell, PA and Detroit, MI or state why it cannot
after reasonable inquiry

3. Interrogatory 54   Again, this interrogatory
expands on Nos. 52 & 53.  Here the plaintiffs seek
information concerning each and every position
identified in the No 53.   Specifically, it asks the
defendant to identify, for the period since June 30,
1991: (a) each and every individual who approved
in, concurred with, participated in or who possesses
knowledge of the selection of individuals to fill that
position;   (b) each and every individual who was
considered for the position;  (c) each and every fact
considered in the process of selecting individuals to
fill that position;   (d) each and every document
considered in selecting individuals to fill that
position; (e) each and every document setting forth
or referring to any criteria or any procedure for the
selection of individuals to fill that position;  and, (f)
each and every document setting forth or referring to
reasons for selecting the individuals who were
selected. [FN32]

Defendant objects to this interrogatory as being
vague, ambiguous, overly broad and burdensome,
seeking information that is neither relevant to the
subject matter nor reasonably calculated to lead to
admissible evidence.  Again the defendant refers the
plaintiffs to its supplemental response to No. 52 in
lieu of supplementing this answer

For the reasons already stated, the defendant shall
fully respond to this interrogatory, as limited above,
or state why it cannot after reasonable inquiry

*9 4. Document Request 8   Plaintiffs seek copies of
any written materials submitted by candidates when
applying for any of the jobs or positions identified in
the Interrogatories   Defendant objects to this request
on the grounds that it is vague, ambiguous, overly
broad and burdensome, seeking information that is
neither relevant to the subject matter nor reasonably
calculated to lead to admissible evidence.

I agree that this request is vague and overbroad
The term "written materials" is indefinite  Adding to
this shortcoming is the reach of this request, namely,
to all candidates who applied for every position
identified in all of the interrogatories  Nevertheless,

Not Reported in F Supp
1993 WL 460804 (E D Pa )
(Cite as: 1993 WL 460804 (E.D.Pa.))

since the information contained in such documents, if they exist, may be relevant to proving pretext I will allow the plaintiffs to resubmit a more precisely written request. That is, the plaintiffs may seek the production of documents as to a specific candidate who is similarly situated to the plaintiffs and to a specific position for which the plaintiffs applied. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)

*5. Document Request 2*: Plaintiffs ask that the defendant produce each and every document relied upon or consulted by defendant in connection with the preparation of defendant's responses to the Interrogatories. The plaintiffs do not present argument on this request; however, it is listed in the heading for section D of Plaintiffs' Motion, page 17

Defendant objects to this request on the grounds that it exceeds the scope of permissible discovery under Fed.R.Civ.P. 26 and 33 and would require Unisys to reveal attorney work-product. Additionally, defendant referred the plaintiffs to its responses to Request Nos. 1 and 16, as well as to the following documents: (1) Unisys' responses and supplemental responses to Plaintiffs' Second Set of Interrogatories; (2) Unisys' responses and supplemental responses to Plaintiffs' Second Request for Production of Documents; (3) Siller Deposition Exhibit 20; (4) Documents numbered: D0001606, D0001613, D0002486; D0002663-2666, D0003764, D0004863-4867, D0004893-4905, D0004913-4944, and D0005253-5273; (5) Deposition transcripts of Christopher Gilmer, Judith Spurlock, Kenneth Piekarski, John Galatzer, Frank Brandenburg, and David DeVinney.

The attorney work-product doctrine is embodied in Fed.R.Civ.P. 26(b)(3) To show that communications are protected by the work-product doctrine a party must demonstrate that the work-product was " 'prepared or obtained because of the prospect of litigation' " *Stabilus v. Haynsworth, Baldwin, Johnson & Greaves, P.A.*, 144 F.R.D. 258, 263 (E.D.Pa.1992) Moreover, the party should identify the specific documents that are protected, which the defendant has failed to do. The objecting party has the burden of establishing the existence of the doctrine *Stabilus*, 144 F.R.D. at 267 (citing *In re Arthur Treacher's Franchise Litigation*, 92 F.R.D. 429 (E.D.Pa.1981)). The determination that the claimed privilege is proper is made on a case-by-case basis and not on the basis of a blanket assertion *Id* To attack a claim of privilege a party must, at least, establish a substantial need for the documents and

that they will suffer an undue hardship attempting to obtain the documents by other means. which the plaintiffs have not done *Id*

*10 In this case, the plaintiffs have not argued that the defendant has improperly asserted the work-product doctrine with respect to any particular document and/or interrogatory Consequently, I will not consider this assertion of the doctrine at this time. The plaintiffs are free to describe with particularity the document request or the interrogatory which has not been answered pursuant to a claim of privilege. Until such time, the defendant's objection is sustained

B INTERROGATORIES 60, 62 AND 69
1. *Interrogatory 60* Plaintiffs ask the defendant to fully describe the employment history and the qualifications of William Gwynn. Kevin Waterford, Kathleen Donovan Chalovich and Maureen Homewood, identified in response to Interrogatory 46 [FN33]

Defendant objects to this request on the grounds that it is vague, ambiguous, overly broad and burdensome, seeking information that is neither relevant to the subject matter nor reasonably calculated to lead to admissible evidence Defendant supplemented this response by stating that each and every individual named in response to this question was selected for the positions they currently hold because their qualifications and experience made them the best candidates for their jobs

Additionally, the defendant provided General Employee Data and Compensation [FN34] screens for each of the individuals named in Interrogatory 60 with the understanding that these documents are covered by the parties' Confidentiality Stipulation. The defendant also referred the plaintiffs to its response to Interrogatory 47 and Request No 13 of Plaintiffs' Second Request For Production of Documents for further information concerning these individuals and the jobs that they currently hold [FN35]

After reviewing the defendant's responses to the three interrogatories numbered 47, contained in Plaintiffs' Exhibit L, I find that the defendant has not fully responded to this interrogatory The information provided merely lists these individuals as having been selected for certain positions Since plaintiff Siller applied for the positions filled by these employees. the question is relevant to proving his discrimination claim Accordingly. the defendant

Not Reported in F Supp
1993 WL 460804 (E D Pa )
(Cite as: 1993 WL 460804 (E.D.Pa.))

shall supplement this response by fully responding to subsections (f) and (j)

2. *Interrogatory 62* In this question plaintiffs ask the defendant to state the current ages of John Schulte, John Merlo and Joe Zielinski, identified in the deposition of Ken Piekarski, as well as to respond to ten areas of related information. [FN36] Defendant objects to this request on the grounds that it is vague, ambiguous, overly broad and burdensome, seeking information that is neither relevant to the subject matter nor reasonably calculated to lead to admissible evidence. Furthermore, defendant objects to this question in that the "position" for which this information is sought is not clearly identified

In addition, defendant stated that it terminated the employment of Messrs Schulte and Merlo during a reduction in force. And finally, the defendant provided General Employee Data and Compensation screens for each of the individuals named in this interrogatory, subject to the parties' Confidentiality Stipulation

*11 After reviewing the defendant's documents and answer to this interrogatory, I find that the defendant's objection as to the unidentified "position" is unfounded since the interrogatory targets the individual's current position. *See* Plaintiffs' Motion, at 22, n. 22. Consequently, the defendant shall provide responsive information as to Mr Zielinski's *current* position. Specifically, the defendant shall respond to subsections (c), (e), (f), (h) and (j) or state why it cannot after reasonable inquiry.

3. *Interrogatory 69* Here the plaintiffs ask the defendant to identify every person who has been promoted, transferred, demoted or hired by the defendant into any position in Software Program Management since January 1, 1991 [FN37]

Defendant objects to this interrogatory on the grounds that it is vague, ambiguous, overly broad and burdensome, seeking information that is neither relevant to the subject matter nor reasonably calculated to lead to admissible evidence. Defendant states that it has previously provided information and produced documents to plaintiffs relating to inquiries made by plaintiffs Siller and Koehler about available jobs in the Software Products Group, which includes Software Program Management, in relation to its responses and supplemental responses to Interrogatory Nos 46 and 47 and in its response to Request No 13 to Plaintiffs' Second Request for

Production of Documents In addition, Ms Spurlock testified at her deposition about the Software Program Management job for which both she and plaintiff Siller interviewed, and about another Software Program Management job into which she was subsequently hired.

After reviewing the defendant's responses, including those made to Interrogatory Nos 46 and 47, I find that it fully responded to this interrogatory.

### C. INTERROGATORY 59
In this interrogatory plaintiffs ask the defendant to describe the manner in which Kim Crackel, Joseph McGeeney and Susan Hunter, identified in response to Interrogatory No. 47 of plaintiffs' Second Set of Interrogatories, were recalled from layoff to fill the positions identified in that response [FN38]

Defendant objects to this question on the grounds that it is vague, ambiguous, overly broad and burdensome, seeking information that is neither relevant to the subject matter nor reasonably calculated to lead to admissible evidence Further, defendant states that it did not identify Susan Hunter as being recalled from layoff, but rather, Kim Crackel and Joseph McGeeney were identified as having been recalled from layoff. In addition, both employees were selected for the positions that they currently hold because they were the best candidates for their jobs And finally, defendant provided General Employee Data and Compensation screens for these employees, subject to the parties' Confidentiality Stipulation Defendant also referred plaintiffs to its response to Interrogatory No 47 for more information concerning these individuals.

*12 For reasons stated above as to relevancy. and after a review of the defendant's responses and the documents produced to the plaintiffs, I find that the defendant has not fully responded to this interrogatory. Accordingly, the defendant shall answer the following subsections: (b), (c), (d), (e), (f) and (g) with regard to the rehire of Kim Crackel and Joseph McGeeney since plaintiff Koehler had applied for the positions filled by these two employees *See Burbine, 450 U.S. 248, 253 (1981); McDonnell Douglas, 411 U.S. 792, 802 (1973)*

### D. INTERROGATORY 74
This question seeks a description of each and every job opening or position currently listed or advertised on defendant's HRPN System [FN39] Defendant objects to this question on the grounds that it is vague, ambiguous, overly broad and burdensome,

© 2005 Thomson/West No Claim to Orig U.S. Govt Works

Not Reported in F Supp.
1993 WL 460804 (E.D.Pa.)
(Cite as: 1993 WL 460804 (E.D.Pa.))

Page 9

seeking information that is neither relevant to the subject matter nor reasonably calculated to lead to admissible evidence By way of supplementing, the defendant refers plaintiffs to the HRPN listing which is attached to its response to Request for Production No. 16 of Plaintiffs' Third Request for Production.

I agree that this interrogatory is overly broad because it encompasses every open position existing within Unisys, only a few of which plaintiffs might be qualified to fill After a review of the defendant's response to this interrogatory, as well as to Interrogatory Nos. 46, 47 and 48, all of which relate to this issue, I find that the defendant has fully responded to this interrogatory.

### V INTERROGATORY 58
Plaintiffs ask the defendant to fully respond to Interrogatory Nos. 44 and 45 of the Plaintiffs' Second Interrogatories. [FN40] Defendant objects to this interrogatory as being vague, ambiguous, overly broad and burdensome, seeking information that is neither relevant to the subject matter nor reasonably calculated to lead to admissible evidence. However, defendant referred plaintiffs to its responses and supplemental responses to Request No. 13 of Plaintiffs' Second Request for Production of Documents. Furthermore, defendant states that it has completed the investigation into this interrogatory, as well as to Nos. 44 through 48 inclusive, and has provided to plaintiffs the information uncovered in the investigation

I find that the defendant has fully responded to this interrogatory for the following reasons. Defendant stated that it considered plaintiffs only for those jobs for which they made application; information pertaining to those positions for which plaintiffs made application was provided in response to Interrogatory Nos. 44 through 48; and finally, the plaintiffs have not moved to compel a response to Interrogatory Nos. 44 and 45; thus, *a fortiori*, the defendant's responses thereto must be sufficient. [FN41]

An appropriate Order follows.

### ORDER
AND NOW, this 3rd day of November, 1993, upon consideration of the Motion of Plaintiffs Harry A. Siller, Curtis A Rittenhouse and Cletus A Koehler To Compel Full and Complete Discovery Responses and the Opposition of Defendant Unisys Corporation, and for reasons set forth in the attached Memorandum, it is ORDERED that the Plaintiffs'

Motion is GRANTED IN PART and DENIED IN PART IT IS HEREBY ORDERED that:

*13 1 The defendant shall advise the Court whether it has produced the list of all COG employees at levels 12 through 19 inclusive who were relocated during the time period July 1, 1991 through December 31, 1992 within ten (10) days of the date of this Order

2. The defendant shall provide full and complete answers to:

(a) Interrogatory 71, subsections (a), (e), (f) and (g);

(b) Interrogatory 66 as it relates to the COG unit;

(c) Interrogatories 52, 53 and 54, as modified in the foregoing opinion;

(d) Interrogatory 60, subsections (f) and (j);

(f) Interrogatory 62, subsections (c), (e), (f), (h) and (j);

(g) Interrogatory 59, subsections (b), (c), (d), (e), (f) and (g), as limited in the foregoing opinion.

3. Defendant shall produce all responsive documents relating to Request No 7.

4 The plaintiffs may resubmit Document Request No. 8 written in conformity with the concerns set forth in this opinion.

5. The parties shall bear their own costs and expenses

> FN1. See Judge O'Neill's August 10, 1993 Order, docket entry 10

> FN2. At the time of termination, plaintiffs Siller and Rittenhouse had worked for the defendant, or one of its predecessor corporations, for thirty years Likewise, Plaintiff Koehler worked for the defendant, or one of its predecessor corporations, for twenty-five years. At the time of their termination each plaintiff was over fifty years of age. See Plaintiffs' Motion, at 2

> FN3. The Demand Planning Department forecasts customer demand for Unisys products and generates a manufacturing and allocation schedule to meet this proposed

Not Reported in F Supp
1993 WL 460804 (E D Pa )
(Cite as: 1993 WL 460804 (E.D.Pa.))

demand  *See* plaintiffs' Motion To Compel Full and Complete Discovery Responses (hereinafter "Plaintiffs' Motion"), at page 2, n 1. filed on or about July 23, 1993, docket entry 7

FN4. At this time the defendant employed nine persons in the Demand Planning Department in Blue Bell, PA and five persons in this department in Detroit, MI. *See* Plaintiffs' Motion, at page 3.

FN5. Plaintiffs Rittenhouse and Koehler are currently employed with Unisys in entry level administrative positions  *See* Plaintiffs' Motion, at page 25, n  28

FN6. Specifically, the defendant has not responded to interrogatories numbers 52-54, 56-60, 62, 63, 65, 66, 68, 69, 71, 74 and 75 In addition, the defendant has not responded to document requests numbers 2, 4, 7, 8 and 15.  *See* Opposition of Defendant Unisys Corporation to Motion of Plaintiffs Rittenhouse, Siller and Koehler To Compel Full and Complete Discovery Responses (hereinafter "Defendant's Opposition"), at page 7, filed on or about August 6, 1993, docket entry 9.

FN7. *See* Defendant's Opposition, at page 10.

FN8. *See* Defendant's Opposition, at page 7-8

FN9. Fed.R.Civ.P. 37(a)(4) provides in part that if the motion to compel discovery is granted, "  the court shall, after opportunity for hearing, require the party or deponent whose conduct necessitated the motion   pay to the moving party the reasonable expenses incurred in obtaining the order, including attorney's fees, unless the court finds that the opposition to the motion was substantially justified or that other circumstances make an award of expenses unjust "
Furthermore, if the motion is granted in part and denied in part, the court may apportion the reasonable expenses incurred in relation to the motion among the parties and persons in a just manner." Fed.R.Civ.P. 37(a)(4).

FN10. *See* Plaintiffs' Motion, at page 2.

Plaintiffs also move under Local Rules 24(b) and (f)
Local Rule 24(b) provides that:
Every motion pursuant to the Federal Rules of Civil Procedure governing discovery shall identify and set forth, verbatim, the relevant parts of the interrogatory, request, answer, response, objection, notice, subpoena, or depositions  Any party responding to the motion shall set forth, verbatim, in any other party's memorandum any other part that the party believes necessary to the court's consideration of the motion  L.R  24(b)
Local Rule 24(f) provides that:
No motion or other application pursuant to the Federal Rules of Civil Procedure governing discovery or pursuant to this rule shall be made unless it contains a certification of counsel that the parties, after reasonable effort, are unable to resolve the dispute  L.R  24(f). (*See* Plaintiffs' Motion, at page 29)

FN11. These subsections ask the defendant to identify or describe the following:
(a) the number of employees relocated;
(b) the name, age, gender, race and years of service with the defendant of each employee relocated;
(c) the name, age, gender, race and years of service with the defendant of each employee in the unit not selected for relocation;
(d) all persons who initiated, approved, concurred with or participated in or who possess knowledge of the decision to relocate the unit and the individuals selected for relocation;
(e) the number of people laid off or terminated as a result of the relocation;
(f) the name, age, gender, race and years of service with the defendant of every person laid off or terminated as a result of the relocation;
(g) the number and type of relocation packages offered in conjunction with the relocation; and
(h) state whether any employee of each relocated unit inquired of or was advised by defendant's management that the employee might be offered a position in the relocated unit if the employee was willing to relocate at their own expense.
*See* Plaintiffs' Motion, at 7, n  5

FN12. *See* Defendant's Opposition, at page

Not Reported in F Supp
1993 WL 460804 (E D Pa )
(Cite as: 1993 WL 460804 (E.D.Pa.))

10 and Exhibit J

FN13. The relevance of information sought in discovery is broadly construed to include not only information that is directly relevant to the subject matter involved, but also to information that appears reasonably calculated to lead to the discovery of admissible evidence. Fed.R.Civ.P. 26(b)(1) See *Dunn v. Pennsylvania Hospital,* No. 91-4169, 1992 WL 328897. *4, 1992 U.S.Dist. LEXIS 16425, *9 (E.D.Pa. Oct. 26, 1992). See also *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978) (relevancy is to be broadly construed for discovery purposes and is not limited to the precise issues set out in the pleadings or to the merits of the case)

FN14 SmithKline Beckman's name changed to SmithKline Beecham following a merger transaction shortly after Ms. Welker filed suit   See 1989 WL 121894, *1 n. 1, 1989 U.S.Dist. LEXIS 12207, *1, n. 1.

FN15. The deposition testimony of Frank George Brandenberg, Vice President and General Manager of the Computer Systems Product Group ("CSPG"), reveals that he played no part in the selection of individuals for relocation or severance   Instead, the head of the employing unit, David DeVinney, made this decision   See N T. Frank George Brandenberg, 1/8/93, at 70 and marked as Exhibit L to the Defendant's Opposition

FN16. These subsections ask the defendant to identify or describe:
(a) the age of the employee;
(b) the date of the relocation;
(c) the position from which and to which the employee was relocated;
(d) the department from which and to which the employee was relocated;
(e) each and every individual who approved in. concurred with, participated in or who possesses knowledge of the selection of the individual to be relocated;
(f) each and every individual who was considered for the position to which the employee was relocated;
(g) the total cost of such relocation;
(h) each and every fact considered in the

process of selecting the individual for relocation;
(i) each and every document considered in selecting the individual for relocation; and
(j) any positions held by the employee subsequent to the position to which they were relocated *See* Plaintiffs' Motion, at 8, n 6.

FN17. There appears to be confusion regarding whether the defendant has produced this list   Plaintiffs assert that the defendant has yet to produce this list   See Plaintiffs' Motion. at 8.   However, defendant states that it has produced this list. See Defendant's Opposition, at 10   The defendant shall verify to the court that it produced this list to the plaintiffs on a date certain, or do so within ten (10) days.

FN18. *See* Defendant's Opposition, at 15

FN19. These subsections ask that the defendant state or identify:
(a) the manner in which the employee was targeted, identified or recruited for the position;
(b) all persons to whom the employee made application for the position;
(c) all persons with whom the employee interviewed for the position;
(d) any other steps, if any, the employee took to find or apply for the position;
(e) all other persons considered for the position;
(f) each and every reason the employee was selected for the position;
(g) the employee's responsibilities, grade level and salary; (h) the identity of each and every individual who approved in, concurred with, participated in or possesses knowledge of the decision to select the individual for the position;
(i) the dates during which the employee held the position; and
(j) each and every document relating to the selection
*See* Plaintiffs' Motion, at 12, n 11

FN20. Some of the documents produced to the plaintiffs in connection with this interrogatory include:
(1) EDS transfer authorization for S Deters;
(2) Offer letter to S Deters;
(3) EDS organization change authorization

Not Reported in F Supp.
1993 WL 460804 (E.D.Pa.)
(Cite as: 1993 WL 460804 (E.D.Pa.))

for Y. Patino-Huizar;
(4) Layoff letter to Y. Patino-Huizar, with notation, "Temporary assignment w/COG through 3/31/92;"
(5) EDS organization change authorization for A. Schneider;
(6) EDS transfer authorization for A. Schneider;
(7) Offer letter request re: A. Schneider;
(8) Offer letter to A. Schneider; and
(9) Employment Requisition for job into which A. Schneider transferred;
*See* Exhibit S, attached to Defendant's Opposition

FN21. Many of the subsections contained within this interrogatory go to the individual employee's strategy in seeking other employment within Unisys. It would appear that plaintiffs could best derive the sought after additional information from the employees themselves. As noted above, and for unstated reasons, the plaintiffs declined to depose three of the four named employees in this series of interrogatories. *See* Fed.R.Civ.P. 26(b)(1), which provides that "[T]he frequency or extent of use of the discovery methods set forth in subdivision (a) shall be limited by the court if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source ...". Fed.R.Civ.P. 26(b)(1)

FN22. This interrogatory contains the following subsections which asks that the defendant describe:
(a) each and every position subsequently held by the individual and the dates during which the individual held the subsequent position(s);
(b) the manner in which each employee was targeted, identified or recruited for the subsequent position(s);
(c) all persons to whom the employee made application for the subsequent position(s);
(d) all persons with whom the employee interviewed for the subsequent position(s);
(e) any other steps, if any, the employee took to find or apply for the subsequent position(s);
(f) all other persons considered for the subsequent position(s);
(g) each and every reason the employee was selected for the subsequent position(s);

(h) the responsibilities, grade level and salary of the subsequent position(s);
(i) the identity of each and every individual who approved in, concurred with, participated in or possesses knowledge of the decision to select the individual for the subsequent position(s); and
(j) each and every document relating to the selection.
*See* Plaintiffs' Motion, at 13, n. 12.

FN23. The following subsections appear in this interrogatory and ask the defendant to identify or describe:
(a) the title and department of each such position;
(b) all persons to whom the employee made application for the position;
(c) all persons with whom the employee interviewed for the position;
(d) any other steps, if any, the employee took to find or apply for the position; (e) all other persons considered for the position;
(f) whether requisitions were posted for the position; and,
(g) each and every reason the employee was not selected for the position.
*See* Plaintiffs' Motion, at 14, n. 12.

FN24. Plaintiffs also ask the defendant to respond to the following subsections:
(a) identify each and every person who initiated, concurred in or approved the creation of the temporary assignment;
(b) describe the grade, salary and responsibilities of such position; and
(c) state the date on which his temporary assignment became a permanent position, and describe the title, grade, salary and responsibilities of such permanent position.
*See* Plaintiffs' Motion, at 15, n. 13.

FN25. *See* Defendant's Opposition, at 17, n. 3.

FN26. The following subsections seek more specific information, such as:
(a) the title, is any, and responsibilities of each temporary assignment;
(b) the manager to whom the employee reports or reported; (c) the salary and grade level of the temporary assignment;
(d) the manner in which the employee was selected, targeted or recruited for the position:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in F Supp
1993 WL 460804 (E D Pa )
(Cite as: 1993 WL 460804 (E.D.Pa.))

Page 13

(e) all persons to whom the employee made application for the position;
(f) all persons with whom the employee interviewed for the position;
(g) any other steps, if any, the employee took to find or apply for the position;
(h) all other persons considered for the position;
(i) each and every reason the employee was selected for the position;
(j) the number of years the employee was employed with the defendant prior to receiving the temporary assignment;
(k) all positions the employee held with defendant prior to receiving the temporary assignment;
(l) all reasons the employee ceased to fill the position in which they were employed with defendant immediately prior to the temporary assignment;
(m) the position(s), if any, the employee has held subsequent to the temporary assignment;
(n) each and every person who initiated, concurred in or approved the decision to offer the employee a temporary assignment; and
(o) each and every fact relief on in deciding to offer the employee a temporary assignment *See Plaintiffs' Motion. at 15, n 13*

FN27. Additionally, the defendant has produced the following documents which might, in some way, relate to this issue: (1) Unisys Internal Selection Policy; (2) Unisys Employment & Staffing Policy; (3) Unisys Corporate Procedure on Internal Placement Service; and, (4) Unisys-Roseville Procedure on Internal Placement Service. *See* Defendant's Opposition, Exhibit S

FN28. The scope of this interrogatory includes some thirty departments or organizations, ranging from Corporate Marketing to Finance to COG *See* Plaintiffs' Motion, at 18, n 17

FN29. Plaintiffs argue that these supplemental responses are not responsive to their discovery requests in that they provided only minimal data *See* Plaintiffs' Motion, at 19

FN30. In *Massarsky, v. General Motors*

*Corp., 706 F.2d 111, 119 (3d Cir.1983), cert denied. 464 U.S. 937, 104 S.Ct. 348, 78 L.Ed.2d 314,* the Court stated that it has expressly applied the *McDonnell Douglas* approach to ADEA cases *See also Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252 (1981)* (*McDonnell Douglas* set forth the allocation of burdens and order of presentation of proof in Title VII cases alleging discriminatory treatment)

FN31. *See* Plaintiffs' Motion, at 19, n. 17.

FN32. *See* Plaintiffs' Motion, at 19, n 17

FN33. In addition, plaintiffs ask the defendant to describe the following:
(a) the manner in which the employee was targeted or identified for the position;
(b) all persons to whom the employee made application for the position;
(c) all persons with whom the employee interviewed for the position;
(d) any other steps, if any, taken to find or apply for the position;
(e) all other persons considered for the position;
(f) each and every reason the employee was selected for the position;
(g) the responsibilities, grade level and salary of the position;
(h) each and every individual who approved in, concurred with, participated in or possesses knowledge of the decision to select the employee for the position; (i) each and every document relating to that selection; and
(j) the job the employee held immediately prior thereto
*See* Plaintiffs' Motion, at 21, n. 20

FN34. Defendant's General Employee Data and Compensation screens contain the following information:  the employee's name, address, social security number, date of birth, marital status, employee number, division/organization, date of hire, payroll location, work location, employment status, status date, previous status, title, pay level. previous position title and pay level, certain tax classifications, racial classification, whether disabled and/or a veteran, bargaining unit; language proficiency; educational data; citizenship; and various items relating to the employee's base

Not Reported in F. Supp.
1993 WL 460804 (E.D.Pa.)
(Cite as: 1993 WL 460804 (E.D.Pa.))

compensation     *See* Plaintiffs' Motion, Exhibit N.

FN35. A review of plaintiffs' Exhibit L reveals that there are three separate interrogatories numbered 47 (most likely propounded in conjunction with the plaintiffs' three distinct sets of interrogatories), the responses to which do not contain the names of the individuals listed in this interrogatory. *See* Plaintiffs' Exhibit L, at 18, 9 and 7. However, these employees names do appear in the defendant's response to Interrogatory No 46. *See* Plaintiffs' Exhibit L, at 6

FN36. In addition, the plaintiffs ask the defendant to describe:
(a) the manner in which the employee was targeted or identified for the position that they currently hold;
(b) all persons to whom the employee made application for the position;
(c) all persons with whom the employee interviewed for the position;
(d) any other steps, if any, taken to find or apply for the position;
(e) all other persons considered for the position;
(f) each and every reason the employee was selected for the position;
(g) the responsibilities, grade level and salary of the position;
(h) each and every individual who approved in, concurred with, participated in or possesses knowledge of the decision to select the employee for the position; and,
(i) each and every document relating to that selection; and
(j) the position the employee held immediately prior thereto.
*See* Plaintiffs' Motion, at 22, n 22

FN37. In addition, plaintiffs ask the defendant to identify:
(a) the dates on which the employee began and ceased employment in the unit; (b) each and every position in the unit which the employee has held;
(c) the position held by the employee immediately prior to the position held in Software Program Management;
(d) each and every individual who approved in, concurred with, participated in or who possesses knowledge of the selection of the

employee to fill the Software Program Management position;
(e) each and every individual who was considered for the position;
(f) each and every fact considered in selecting the employee to fill the position; and,
(g) the salary, grade level and responsibilities of the position held by the employee
*See* Plaintiffs' Motion, at 21, n. 21.

FN38. Plaintiffs also ask defendant to describe:
(a) the position the employee held immediately prior to recall from layoff;
(b) the manner in which the employee was targeted or identified for the position;
(c) all persons to whom the employee made application for the position;
(d) all persons with whom the employee interviewed for the position;
(e) any other steps, if any, taken to find or apply for the position;
(f) all other persons considered for the position; (g) each and every reason the employee was selected for the position;
(h) the responsibilities, grade level and salary of the position;
(i) each and every individual who approved in, concurred with, participated in or possesses knowledge of the decision to select the employee for the position; and,
(j) each and every document relating to that selection
*See* Plaintiffs' Motion, at 22-23, n 23.

FN39. In addition, plaintiffs ask that the defendant include:
(a) the manager filling the position;
(b) the grade level, salary and responsibilities of the position;
(c) all qualifications required of candidates or selection criteria used to fill the position;
(d) the date on which the position was first listed;
(e) all persons considered, interviewed or hired for the position; and,
(f) if the position has been filled, each and every fact relied upon in deciding to offer the position to the selected employee(s)
*See* Plaintiffs' Motion, at 24, n 25

FN40. Additionally, plaintiffs ask that the defendant state:

Not Reported in F Supp                                   Page 15
1993 WL 460804 (E.D.Pa.)
(Cite as: 1993 WL 460804 (E.D.Pa.))

(a) the name and title of all persons who considered plaintiffs for such position;
(b) the dates on which plaintiffs were considered for such positions;
(c) the identity and age(s) of any person(s) chosen to fill such positions;
(d) the criteria used to select the person(s) chosen to fill such positions; and,
(e) all reasons why plaintiffs were not hired to fill the positions
*See* Plaintiffs' Motion, at 26, n. 29.

FN41. A review of the plaintiffs' Motion failed to locate any argument on the matter of Document Request No 4.   Except for Exhibit E, which contains all of plaintiffs' document requests, there is no mention of this request in the Motion
Request No 4 asks the defendant to produce each and every document reviewed, considered or generated by defendant in making each of the personnel decisions described in the Interrogatories
Defendant objects to this request as being vague, ambiguous, overly broad and burdensome, seeking information that is neither relevant to the subject matter nor reasonably calculated to lead to admissible evidence and refers the plaintiffs to its responses to Request Nos. 1 and 2.
Since the plaintiffs have not presented argument on this request I will sustain the defendant's objection.   Of course, the plaintiffs are free to submit specific argument on this request, identifying the interrogatories involved and the documents which defendant has not produced.

1993 WL 460804 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

2:92CV04870_____(Docket)
(Aug 21, 1992)

END OF DOCUMENT

© 2005 Thomson/West No Claim to Orig U S Govt Works

**12**

Westlaw.

Not Reported in F.Supp.                                    Page 1
1998 WL 175933 (S.D.N.Y.)
(Cite as: 1998 WL 175933 (S.D.N.Y.))

**H**

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
TRIBUNE COMPANY and TRIBUNE NEW YORK
HOLDINGS, INC., Plaintiff,
v.
Purcigliotti, et al., Defendants.
No. 93 CIV. 7222.

April 14, 1998

MEMORANDUM AND ORDER

PRESKA, District J.

*1 This Order addresses pending Rule 72(a)
objections to discovery rulings by Magistrate Judge
Katz.

I. STANDARD OF REVIEW

Under Rule 72(a), a district court judge may modify
or set aside any portion of a magistrate judge's order
on a non-dispositive matter only to the extent that the
order is "clearly erroneous or contrary to law."
Fed.R.Civ.P. 72(a).    An order is contrary to law
when it fails to apply or misapplies relevant statutes,
case law or rules of procedure. *Pisacane v. Enichem
America. Inc.*, No. 94 Civ. 7843(JFK)(NRB), 1996
WL 391865 (S.D.N.Y. July 12, 1996).    An order
should be found clearly erroneous when "the
reviewing court on the entire evidence is left with the
definite and firm conviction that a mistake has been
committed." *Id.* (citing *Litton Indus. v. Lehman Bros.
Kuhn Loeb Inc.*, 734 F.Supp. 1071, 1080
(S.D.N.Y.1990) (citation omitted)); *Magee v. Paul
Revere Life Ins. Co.*, --- F.R.D ----, No. Civ. 95-4574
(ADS), 1998 WL 59004, at *4 (E.D.N.Y. Feb. 10,
1998).

The discovery orders in question were issued on
January 3, 1997, January 10, 1997, and September 3,
1997; each is discussed in turn below.

II. THE JANUARY 3 MEMO ENDORSEMENT

The CC & P Defendants filed a Rule 72(a) objection
to a January 3, 1997. memo endorsement in which
Judge Katz denied their letter motion to compel
production of an undated statement by Fleischman
(Bates No. 6537) which is described in Tribune's
privilege log as "Re:    Conversation w/ R
Purcigliotti."   Plaintiffs are to submit this document
to this Court for *in camera* inspection no later than
Wednesday, April 22, 1998.

III. THE JANUARY 10, 1997 ORDER

On January 10, 1997, Magistrate Judge Katz issued
an order (the "January 10 Order") which granted in
part and denied in part a motion by defendant/third-
party plaintiff Dr. Walter Stingle to compel
production of documents and disclosure of
information.  *See Tribune Co. v. Purcigliotti*, No. 93
Civ. 7222(LAP)(THK), 1997 WL 10924 (S.D.N.Y.
Jan. 10, 1997).  The documents and information had
been withheld, on the basis of attorney-client
privilege and work product doctrine, by plaintiffs The
Tribune Company and related entities (the "Tribune")
and the law firm of Weiss & Wexler, which had
represented Tribune in defending cases before the
Workmen's Compensation Board.  Defendants Robert
A. Purcigliotti ("Purcigliotti"), the law firm of
Cascione, Chechanover & Purcigliotti, P.C ("CC &
P") (collectively, the "CC & P Defendants"), and
those individual pressmen defendants represented by
the law firm of Gordon & Gordon (the "G & G
Defendants") joined Stingle in his motion to compel.

Pursuant to Fed.R.Civ.P. 72(a), Tribune, Stingle, and
the G & G Defendants filed timely objections to the
January 10 Order.  Neither Purcigliotti nor CC & P
filed objections to the January 10 Order or otherwise
attempted to join in the objections of Stingle or the G
& G defendants. [FN1]

> FN1. By letters dated March 16, 1998, and
> March 24, 1998, the CC & P Defendants
> have asked me to consider the objections
> filed by Stingle and the G & G defendants.
> Tribune objected to this request on March
> 23, 1998.  The plain language of Rule 72(a)
> prevents me from considering those
> objections on the CC & P Defendants'
> behalf.  Specifically, that Rule provides that
> a party may file objections to a magistrate
> judge's ruling on a non-dispositive pre-trial

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in F Supp
1998 WL 175933 (S D N Y )
(Cite as: 1998 WL 175933 (S.D.N.Y.))

Page 2

matter within ten days after being served with a copy of the order and that "a party may not thereafter assign as error a defect in the magistrate judge's order to which objection was not timely made". *See* Fed.R.Civ.P. 72(a). Because they failed to object independently or join in the objections of any other defendant, the CC & P Defendants have no standing under Rule 72(a) to contest the January 10 Order.

Subsequently, Tribune settled its claims against Stingle and the G & G Defendants, entering into Stipulations of Dismissal with those defendants on February 11 and February 27, 1998, respectively. On March 16, 1998, Stingle officially withdrew his Rule 72(a) objections, and the G & G defendants did the same on April 6, 1998.    The only pending objections to the January 10 Order are those filed by Tribune on January 27, 1997, and they are discussed below.

A. The Document Request

*2 Relevant to this decision is the motion by defendants to compel Tribune's production of "any file notes and memoranda in plaintiffs' claims files relating to each of the defendant-employees, to the extent that they contain evidence of [Leonard] Fleischman's, or any Weiss & Wexler attorney's, contemporaneous analysis of the individual claims, investigation of the claims, record of settlement-related information that had been secured, and notes on settlement of the claims, as well as any notes made by Mr. Fleischman during his settlement negotiations of the claims with Mr. Purcigliotti."

Various documents meet this description, and Magistrate Judge Katz's decisions concerning the various document requests are discussed below.

B. Contemporaneous Handwritten Notes

1. *Contemporaneous Handwritten Notes of Leonard Fleischman*

I agree completely with Magistrate Judge Katz's thoughtful analysis and reasoned conclusion concerning the "at issue" waiver of work product protection of the notes Leonard Fleischman took during the workmen's compensation hearings and settlement conferences with Purcigliotti. Magistrate Judge Katz's opinion on this score speaks for itself, and plaintiff's objections are overruled.

2. *Contemporaneous Handwritten Notes of Weiss & Wexler Attorneys*

Magistrate Judge Katz similarly ordered disclosure of the contemporaneous handwritten notes of Weiss & Wexler attorneys. As explained below, I find that because the defendants failed to satisfy the third prong of the test for "at issue" waiver, the contemporaneous handwritten notes of Weiss & Wexler attorneys are not properly discoverable at this time.

Under the third prong of the test for "at issue" waiver, the information sought must not be obtainable elsewhere. *Hearn v. Rhay*, 68 F.R.D. 574 (E.D.Wash.1975) (noting that "at issue" waiver occurs where application of the attorney-client privilege "would have denied the opposing party access to information vital to his defense"); *see Asset Value Fund Ltd. Partnership v. The Care Group. Inc*. No. 97 Civ. 1487(DLC)(JCF), 1997 WL 706320, at *3, 4 (S.D.N.Y. Nov. 12, 1997) (noting moving party's failure to meet third prong of *Hearn* test where "information at issue could be obtained directly from the opposing party"). As Judge Katz himself noted, in this regard the standard for "at issue" waiver is similar to the standard in Fed.R.Civ.P. 26(b)(3), which permits discovery of work product upon a showing of "substantial need" and an inability to obtain equivalent materials by other means. 1997 WL 10924, at *7.

In this connection, Magistrate Judge Katz's finding that Fleischman waived work product protection with regard to his contemporaneous handwritten notes was justified, in part, on defendants' satisfaction of the third-prong of the "at issue" test, *i e*. on defendants' showing that "there was no other source of direct proof on the issue." *Bank Brussels Lambert v Credit Lyonnais (Suisse) S.A*. Nos 93 Civ. 6876, 94 Civ 1317(KMW)(JCF), 1995 WL 598971, at *5. In particular, defendants demonstrated that Fleischman, who claimed to have settled all claims individually, was unable or unwilling to provide specific information as to the details of and processes involved in those settlements. The same cannot be said, however, as to the Weiss & Wexler attorneys who were present at the settlement hearings. Indeed, those attorneys have been and are available for deposition and should be able to provide "equivalent information" concerning facts related to the settlements, as well as information on what they knew at the time of the settlement. In this regard, as plaintiffs note, "substantial need" and an cannot be shown where persons with equivalent *information* are

Not Reported in F Supp.
1998 WL 175933 (S D N Y )
(Cite as: 1998 WL 175933 (S.D.N.Y.))

Page 3

available for deposition. *Horn & Hardart Co. v. Pillsbury Co.*, 888 F.2d 8, 12 (2d Cir.1989); *Hendrick v. Avis Rent-A-Car System, Inc.*, 944 F.Supp. 187, 191 (W.D.N.Y.1996)

*3 As a result I find that Magistrate Judge Katz's decision ordering disclosure of Weiss & Wexler attorneys' contemporaneous notes was contrary to law. The plaintiffs need not disclose those handwritten notes at this time. [FN2]

> FN2. If they so choose, defendants may renew their motion to compel after they have deposed the Weiss & Wexler attorneys.

C. Memoranda of Hearing

Magistrate Judge Katz ordered plaintiffs to produce so-called "Memoranda of Hearing" ("Memoranda") that were prepared by Weiss & Wexler attorneys and placed in each claim file after the claim was settled. Judge Katz articulated a number of bases for this holding, each of which plaintiffs attack   As discussed below, I find that Magistrate Judge Katz erred when he determined that the Memoranda did not constitute opinion work product and in holding that to the extent the Memoranda constituted fact work product, defendants had overcome the burden against disclosure established by Rule 26 [FN3]

> FN3. Magistrate Judge Katz found that the Memoranda of Hearing prepared by Weiss & Wexler attorneys were not protected by attorney-client privilege because Tribune had failed to demonstrate that the Memoranda were "attorney-client communications exchanged for the purpose of giving or receiving legal advice " 1997 WL 10924, at *11  Because I find that the Memoranda are protectable work product, I will not address the attorney-client privilege arguments advanced by plaintiffs

1 *The Work Product Doctrine*

The work product doctrine is set forth in Rule 26(b)(3) of the Federal Rules of Civil Procedure  It restricts a party's access to documents and things "prepared in anticipation of litigation or for trial" by another party or that party's attorneys or agents Significantly here, given the role of non-attorney Fleischman from Weiss & Wexler, the rule can protect materials and information possessed or prepared by the agent of an attorney, such as a claims adjuster, particularly where disclosure of the

information in question might reveal the attorney's thought process or strategy  *United States v. Nobles*, 422 U.S. 225, 238-39, 95 S.Ct. 2160, 2170, 45 L.Ed.2d 141 (1975)  Work product is discoverable only upon a showing that the requesting party has "substantial need" of the materials to prepare his case and that the party "is unable without undue hardship to obtain the substantial equivalent of the materials by other means." Fed.R.Civ.P. 26(b)(3)    Courts ordering disclosure under the rule are instructed to "protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation " *Id* This provision affords heightened protection to what is known as "opinion work product " *Upjohn Co. v. United States*, 449 U.S. 383, 398-402, 101 S.Ct. 677, 687-89, 66 L.Ed.2d 584 (1981) (opinion work product "cannot be disclosed simply on a showing of substantial need and inability to obtain the equivalent without undue hardship"); *United States v. Adlman*, 134 F.3d 1194, 1197 (2d Cir.1998) (noting that "opinion work product" receives "special protection not accorded to factual material"); *In re Leslie Fay Companies, Inc. Securities Litigation*, 161 F.R.D. 274, 279 (S.D.N.Y.1995)

a *Memoranda are Opinion Work Product*

Judge Katz wrote that it was unlikely that the Memoranda could be considered work product because "they were largely prepared after individual claims were resolved." 1997 WL 10924, at *10  Placing aside his skepticism, however, Judge Katz in any event found, after reviewing the Memoranda *in camera*, that their disclosure was justified because the "memoranda are straight factual recitations of the positions taken and procedures followed at the workmen's compensation hearing" and "reflect facts available to Weiss & Wexler when they decided to settle the claims " *Id* Because he found that these Memoranda contained primarily "factual" information, Judge Katz justified their production under the work product doctrine found in Fed.R.Civ.P. 26(b)(3) because defendants made an adequate showing of "substantial need " *Id*

*4 Plaintiffs argue initially that disclosure is improper because the Memoranda contain opinion work product   As noted above, opinion work product receives heightened protection and may be disclosed only if the mental impressions of the attorney in question are directly at issue in the case and the party seeking the material demonstrates compelling need   *Holmgren v. State Farm Mut.*

Not Reported in F.Supp
1998 WL 175933 (S.D.N.Y.)
(Cite as: 1998 WL 175933 (S.D.N.Y.))

*Auto. Ins. Co., 976 F.2d 573, 577 (9th Cir.1992).* Judge Katz did not dispute that this heightened standard applies to opinion work product. 1997 WL 10924, at 4. Rather, Judge Katz reviewed sample Memoranda *in camera* and concluded that they were "factual recitations" not entitled to the heightened level of protection accorded opinion work product.

Plaintiffs contend that Judge Katz's finding is mistaken and "clearly erroneous." They allege that the Memoranda contained the Weiss & Wexler attorneys' opinions and analysis on each claim as well recommendations for future action, if necessary.

After reviewing the Memoranda *in camera,* I find that Memoranda do, in fact, contain opinion work product, and as such are not properly discoverable. While the Memoranda in question do convey facts-- they recount what occurred during hearings before the board--those facts are intertwined with and colored by the attorneys' perceptions of and opinions on those facts, and in many instances make recommendations to the Tribune on how to proceed with the claim. Because disclosing these Memoranda would reveal the attorneys' thought processes and strategy, the Memoranda are properly classified "opinion work product" and hence are entitled to heightened protection and should not be disclosed.

*b Even if the Memoranda Constitute Fact Work Product, Defendants Have Not Demonstrated "Substantial Need"*

Moreover, the Memoranda are entitled to protection even to the extent that they are deemed factual, rather than opinion, work product. As noted above, factual work product may be disclosed when the moving party demonstrates a "substantial need" of the materials to prepare his case and "is unable without undue hardship to obtain the substantial equivalent of the materials by other means." Fed.R.Civ.P. 26(b)(3). Defendants cannot make such a showing here.

As I noted above in connection with the contemporaneous handwritten notes, the Weiss & Wexler attorneys have been and remain available to be deposed. "Substantial need" cannot be shown where persons with equivalent information are available for deposition. *Horn & Hardart,* 888 F.2d at 12; *Hendrick v. Avis,* 944 F.Supp. at 191. Accordingly, the Memoranda are not properly discoverable because they are protected by work product privilege.

D. January 18, 1993, Fleischman Memorandum

Judge Katz noted that he had insufficient information on which to base a conclusion as to a January 18, 1993, memorandum authored by Fleischman (Bates No 02841-02842). *See Tribune,* 1997 WL 10924, at *11 n. 6. As a result, he ordered plaintiffs to "submit an affidavit by Fleischman setting forth the addressee of the document as well as additional information necessary to establish that the document is privileged." If they have not already done so, plaintiffs are to submit that affidavit to Magistrate Judge Katz for his review no later than Wednesday, April 22, 1998.

E. Discovery of Redacted Notes from Weiss & Wexler Files on Zero Hearing Loss Defendants

*5 As noted in the January 10 Order, the CC & P Defendants and Purcigliotti also requested information redacted from Weiss & Wexler claims files for those employee-defendants whose claims were settled even though Dr. Stingle found zero hearing loss. Plaintiffs have withdrawn any claims regarding settlement of the zero hearing loss claims, but defendants contend that the discovery is nonetheless relevant to an anticipated motion under Rule 11. As I have decided to defer consideration of any Rule 11 motions until after the conclusion of the case, any discovery pertaining to Rule 11 motions will be deferred as well; plaintiffs need not produce the information redacted from zero hearing loss files at this time.

IV. THE SEPTEMBER 3, 1997 ORDER

Plaintiffs have filed Rule 72(a) objections to Magistrate Judge Katz's September 3, 1997, order in which, *inter alia,* he ordered plaintiffs to produce videotapes and audiotapes of G & G defendants, as well as a standstill agreement entered into between Tribune and Weiss & Wexler.

A. Audiotapes and Videotapes

As they have already agreed to do, plaintiffs shall produce those audiotapes and videotapes that they intend to introduce at trial. As to production of audiotapes and videotapes that plaintiffs do not intend to use at trial, I note that plaintiffs currently have pending before Magistrate Judge Katz a request that he reconsider that portion of his September 3 Order such tapes. On this front, I will defer consideration of plaintiffs' Rule 72(a) objections until Magistrate Judge Katz rules on plaintiffs' pending

Not Reported in F.Supp
1998 WL 175933 (S.D.N.Y.)
(Cite as: 1998 WL 175933 (S.D.N.Y.))

request.

B. Standstill Agreement

Plaintiffs also have objected to Magistrate Judge
Katz's decision ordering plaintiffs to produce a
standstill agreement entered into by plaintiffs and
Weiss & Wexler    After considering plaintiffs'
objections, I find that Magistrate Judge Katz's order
is neither contrary to law nor clearly erroneous, and
plaintiffs' objections are overruled

CONCLUSION
After considering plaintiffs' Rule 72(a) objections,
Magistrate Judge Katz's January 10, 1997, Order is
modified as follows:
  plaintiffs need not produce the contemporaneous
  handwritten notes of Weiss & Wexler attorneys
  (they must, however, produce the contemporaneous
  notes of Leonard Fleischman);
  defendants may renew their motion to compel
  production of the contemporaneous notes of the
  Weiss & Wexler attorneys after they have
  completed the depositions of those attorneys;
  plaintiffs need not produce Memoranda of Hearing
  created by Weiss & Wexler attorneys;
  with regard to the January 18, 1993, memorandum
  authored by Fleischman, plaintiffs must by April
  22, 1998, submit an affidavit to Magistrate Judge
  Katz setting forth the addressee of the document as
  well as any additional information necessary to
  establish that the document is privileged.

With regard to Magistrate Judge Katz's January 3,
1997, memo endorsement, plaintiffs must by April
22, 1998, submit for *in camera* review by this Court a
copy of an undated statement by Fleischman, Bates
No. 6537, described in Tribune's privilege log as "Re:
Conversation w/ R. Purcigliotti."

 *6 With regard to Magistrate Judge Katz's
September 3, 1997, Order:
  plaintiffs shall produce the standstill agreement
  between plaintiffs and Weiss & Wexler;
  plaintiffs shall produce those audiotapes and
  videotapes that they intend to introduce at trial;
  and
  I will defer consideration of plaintiffs' Rule 72(a)
  objections concerning other audiotapes and
  videotapes until Magistrate Judge Katz rules on
  plaintiffs' pending request for reconsideration of
  the September 3 Order.

SO ORDERED

1998 WL 175933 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

      1:93CV07222 _____ (Docket)
(Oct 19, 1993)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.