IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: Teleglobe Comm. *et al.*, | ) | Chapter 11 |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | Bankr. Case No. 02-11518 (MFW) |
| | ) | |
| Teleglobe USA Inc. *et al.*, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. Action No. 04-1266 (SLR) |
| | ) | |
| BCE Inc. *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' CORRECTED MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS
<u>WRONGFULLY WITHHELD BY DEFENDANTS</u>**

Counsel to Defendants BCE Inc. et al.:

YOUNG CONAWAY
STARGATT & TAYLOR, LLP
Pauline K. Morgan (No. 3650)
Maribeth Minella (No. 4185)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899
(302) 571-6600
pmorgan@ycst.com
mminella@ycst.com
bank@ycst.com

SHEARMAN & STERLING LLP
Stuart J. Baskin
George J. Wade
Daniel Schimmel
599 Lexington Avenue
New York, NY 10022
(212) 848-4000

March 1, 2005
Wilmington, Delaware

TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ iii

STATEMENT OF THE NATURE AND STAGE OF PROCEEDING ............................. 1

ARGUMENT SUMMARY ................................................................................. 2

FACTUAL BACKGROUND ............................................................................... 4

    A.   BCE's systematic efforts, in 2002, to preserve and collect all documents relating to Teleglobe ....................................................... 4

    B.   BCE's document production to the Committee .............................. 6

    C.   BCE's document production to the Debtors ................................. 8

    D.   BCE's Privilege Logs ................................................................... 15

ARGUMENT ................................................................................................. 16

  I.   DEFENDANTS HAVE COMPLIED IN GOOD FAITH WITH THEIR DISCOVERY OBLIGATIONS. ................................................. 16

    A.   Defendants' Document Production ............................................... 16

    B.   Defendants' Electronic Discovery ............................................... 18

    C.   Defendants Are Not Required To Produce BCE Board Materials In Their Entirety ....................................................... 20

    D.   BCE's Temporal Limitations Result From Plaintiffs' Allegations ................................................................................ 20

  II.   THE PLAINTIFFS' INEXCUSABLE FAILURE TO PRESERVE AND PRODUCE DOCUMENTS ................................................... 22

  III.   BCE APPROPRIATELY WITHHELD DOCUMENTS PROTECTED BY THE ATTORNEY-CLIENT PRIVILEGE AND WORK PRODUCT DOCTRINE ..................................................... 26

    A.   The Debtors Mistakenly Argue that BCE Cannot Assert a Privilege as to Any Documents Created, Received, or Reviewed by Seven Individuals ............................................... 27

B.   BCE Did Not Waive Any Privilege By Producing Documents that Did Not Reflect the provision of legal Advice and Documents Subject to a Common Interest.................................... 36

CONCLUSION.............................................................................................................39

## STATEMENT OF THE NATURE AND STAGE OF PROCEEDING

1.    On May 26, 2004, plaintiffs filed a complaint against BCE Inc. ("BCE"), the above-captioned Debtors' parent company, and ten individual defendants: Michael T. Boychuk, Marc A. Bouchard, Serge Fortin, Terence J. Jarman, Stewart Verge, Jean C. Monty, Richard J. Currie, Thomas Kierans, Stephen P. Skinner, and H. Arnold Steinberg. The complaint seeks damages arising from BCE's alleged wrongful failure to honor supposed funding commitments and breaches of fiduciary duties.

2.    Prior to the filing of the complaint, the Official Committee of Unsecured Creditors of Teleglobe Communications Corporation et al. (the "Committee") conducted a broad investigation, pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure. Plaintiffs have had access to that discovery.

3.    By order of the District Court dated September 8, 2004, the automatic reference of this proceeding to the Bankruptcy Court was withdrawn pursuant to 28 U.S.C. § 157(d).

4.    On September 15, 2004, defendants served their Motion to Dismiss and memorandum in support thereof, by which they seek to dismiss the entire action.

5.    On October 15, 2004, the Court denied defendants' motion to stay party discovery pending the resolution of defendants' motion to dismiss. Plaintiffs filed their memorandum in opposition to the motion to dismiss on December 15, 2004, and defendants replied on February 1, 2005. Oral argument on the motion was conducted on February 16, 2005.

6.    On February 11, 2005, plaintiffs served defendants with a Motion To Compel Production of Documents Wrongfully Withheld by Defendants.

1

## ARGUMENT SUMMARY

BCE has complied in good faith with its discovery obligations.

In 2002, BCE sent document preservation memoranda to approximately 100 individuals instructing them to preserve and provide all their documents relating to Teleglobe Inc. ("Teleglobe") or its subsidiaries. As a result, BCE collected approximately 250 boxes of documents as well as numerous computer hard drives and backup tapes. BCE produced over 105 of those boxes to the Committee and 13,788 pages of electronic documents. Following the filing of the Complaint, BCE made those documents available to the Debtors and supplemented its document production in response to the Debtors' document requests.

Plaintiffs' claims all arise from BCE's alleged "additional $2.5 billion commitment." Given the magnitude of that supposed funding commitment, BCE appropriately, and reasonably, elected to search the files of the individuals who were most likely to have responsive documents: senior officers of BCE and less senior employees who had an ongoing substantive relationship with Teleglobe and its subsidiaries. Subsequently, plaintiffs requested that BCE search for the hard-copy documents of 46 additional individuals and the electronic documents of 37 individuals. BCE agreed to do so, and in total has searched for documents of 65 individuals to the extent they were in its possession, custody, or control. Before this motion to compel was served and filed, BCE also agreed to produce a substantial portion of the information that plaintiffs seek in this motion, but BCE requested reciprocal disclosure from the plaintiffs, which they refused to provide until after the motion to compel was filed.

In short, BCE has complied with its obligations and simply objected to the plaintiffs' unreasonable and burdensome requests for "all documents within the possession, custody or control of BCE and its affiliates (regardless of location) that are responsive to our document requests . . . ." In light of plaintiffs' continued insistence on the production of all 250 boxes of documents, BCE has in fact engaged in the review of the remaining boxes and will

2

produce them, even though that document production is burdensome and represents an enormous waste of resources of the defendants and the Debtors' bankruptcy estates.

As briefly described below, BCE's efforts to preserve, collect, and produce documents stand in sharp contrast to plaintiffs' apparent carelessness in carrying out their own obligation to preserve evidence.

Plaintiffs also seek to compel the disclosure of privileged documents on the principal ground that current or former employees, officers, or directors of BCE (Messrs. Lalande, Masse, Ryan, Monty, Currie, Kierans, and Skinner) were also at some point officers or directors of Teleglobe or of its subsidiaries. Plaintiffs' argument has no basis for numerous reasons. Among other things, the documents that BCE withheld on the ground of privilege involve the provision of legal advice *solely* to BCE and, under Delaware law, they are protected by the attorney-client privilege. Indeed, the United States Supreme Court has held that directors and officers holding positions with a parent and its subsidiary "change hats" to represent the two corporations separately, and courts generally presume that the employees of the parent are wearing their "parent hat" when acting for the parent.

Furthermore, the cases on which plaintiffs primarily rely involve a radically different context. In those cases, minority shareholders of a company sued the controlling shareholders and sought privileged documents prepared by an individual who owed fiduciary duties to both the controlling shareholders and the minority shareholders. Here, such a conflict of interest did not exist because the Debtors were wholly owned subsidiaries of BCE; thus, under Delaware law, their directors and officers were obligated to manage the affairs of the subsidiary in the best interest only of the parent and its shareholders. Therefore, the fact that those seven BCE officials reviewed attorney-client communications prepared for BCE does not make them discoverable by the Debtors.

WP3:1089547 2                                                                                          59825 1001

## FACTUAL BACKGROUND

### A.   BCE's systematic efforts, in 2002, to preserve and collect all documents relating to Teleglobe

Beginning in June 2002, BCE took deliberate steps to preserve and collect <u>all</u> documents relating to Teleglobe and its subsidiaries from over 100 individuals. On June 12, 2002, BCE sent a document preservation memorandum to, <u>inter alia</u>, certain BCE department heads, advising that "[i]n anticipation of any potential lawsuit that could be launched against BCE in connection with the Teleglobe situation, it is required that we preserve any evidence that we currently have that might be related to Teleglobe. Since no lawsuit has been launched, we cannot predict in advance what would be the allegations. Accordingly, we must preserve the evidence in whatever form it may exist, including both paper (including personal notes) and electronic copies (including computer files and e-mail). It is very important that you not throw out or destroy any information that might relate to Teleglobe even if you would ordinarily have disposed of the information." (Morgan Decl. Ex. 1, at 1.)[1]  The memorandum further stated in bold type print and capital letters "do not attempt to clean any files." (<u>Id.</u> at 2.) Contrary to plaintiffs' allegation, BCE's efforts to preserve documents did not reflect any belief that BCE had breached a funding commitment. Indeed, the Third Circuit has held that prudent parties anticipate litigation and begin preparation in advance. <u>Infra</u> at 37.

On August 23, 2002, following the initiation of a lawsuit in Canada by members of the Teleglobe lending syndicate, BCE addressed a memorandum and a detailed questionnaire

---

[1]   "Morgan Decl. Ex." refers to the Exhibits attached to the Exhibit Declaration of Pauline K. Morgan, filed concurrently herewith. "Opening Br." refers to Plaintiffs' Opening Brief in Support of Their Motion to Compel Documents Wrongfully Withheld By Defendants, filed February 11, 2005. "Opp. Mem." refers to Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss, dated December 15, 2004. "Reply Mem." refers to Defendants' Reply Memorandum in Support of their Motion to Dismiss, filed February 1, 2005. "Wade Decl." Refers to the Declaration of George J. Wade attached herein. "Shandler Aff. Ex." refers to the Exhibits attached to the Transmittal Affidavit of Chad M. Shandler in Support of Plaintiffs' Opening Brief in Support of Their Motion to Compel Production of Documents Wrongfully Withheld By Defendants.

4

to all present directors of BCE and to the persons who were directors of BCE between January 2000 and April 24, 2002. (Morgan Decl. Ex. 2, at 1.) The memorandum stated, among other things, that "a questionnaire entitled 'BCE/TELEGLOBE Document Questionnaire' has been produced to ensure that all Teleglobe-related documents have been located in order to be collected and reviewed. Given the broad scope of the allegations made by the plaintiffs in this lawsuit, **Teleglobe-related documents are all documents, in whatever form, which discuss or refer to Teleglobe Inc. or its subsidiaries.**" (Id. at 2 (emphasis in original).) The memorandum further stated that "[b]ecause a Statement of Claim has been filed in this matter, we must ensure that our collection of Teleglobe-related documents and electronic data is as broad as possible. When completing the questionnaire and during your interview, please **inform outside counsel about any Teleglobe-related documents or electronic data that you may have, from any time period whatsoever, wherever it may be located, including non-BCE premises.**" (Id. at 3 (emphasis in original).) The questionnaire was designed to identify the categories of documents that each individual had, understand how those documents were stored, and locate any additional individuals who may have documents; therefore, BCE complied with its duty to preserve documents.[2]

On September 16, 2002, BCE addressed a similar memorandum and questionnaire to a group of 85 employees and officers of BCE and its subsidiaries and again asked them to provide "all documents, in whatever form, which discuss or refer to Teleglobe Inc. and its subsidiaries." (Morgan Decl. Ex. 3, at 1.) As with the August 23 memorandum, the September 16 memorandum stated, "please **inform outside counsel about any Teleglobe-related documents or electronic data that you or your department may have, from any time period whatsoever, wherever it may be located, including non-BCE premises.**" (Id. at 2 (emphasis in original).)

---

[2]     The same questionnaire was distributed with both the August 23 and September 16 memoranda. (See Morgan Decl. Ex. 3, at 4-15.)

Outside counsel subsequently conducted interviews of most of those employees and officers "to ascertain what kind of Teleglobe-related documents and electronic data you and your group possess." (Id.) As a result of those extensive efforts to preserve and collect documents, BCE gathered approximately 250 boxes of paper documents.[3] Those boxes were the result of a comprehensive effort to collect the files of numerous individuals, from the Chief Executive Officer of BCE to junior employees, who had documents relating to Teleglobe and its subsidiaries.

### B.    BCE's document production to the Committee

In August 2003, the Committee submitted to BCE a broad document request seeking 26 categories of documents. (Shandler Aff. Ex. B.) In the first meeting between counsel to the Committee and counsel to BCE, held on September 8, 2003, counsel to BCE agreed to produce the files of the following six individuals who, according to the Interim Receiver appointed by the court in the Canadian bankruptcy proceedings of Teleglobe, were most deeply involved in the relationship between BCE and Teleglobe or its subsidiaries:

| | |
|---|---|
| Michael Boychuck | Current Senior Vice-President and Treasurer of BCE, Former Executive Vice President, and Chief Financial Officer of Teleglobe (from May 2000 to April 2002) |
| Francois Gauvin | Former Senior Director – Taxation of BCE (from November 2000 to June 2003) and Former Senior Director – Taxation of Teleglobe (until October 2000) |
| Michel Lalande | Current Vice-President – General Counsel of BCE, Former Assistant Corporate Secretary of Teleglobe (until April 2002), and Former Senior Director, Legal Affairs of Teleglobe (until October 2000) |
| David Masse | Former Assistant Corporate Secretary of BCE (until June 2003) and Former Assistant Corporate Secretary of Teleglobe (from November 2000 to April 2002) |
| Patrick Pichette | Current President, Operations of Bell Canada, Former Executive Vice-President – Planning and Performance of BCE (from January 2001 to January 2002), and Former Executive Vice-President – Finances and Operations of Teleglobe USA Inc. (from January 2002 to May 2002) |

---

[3]    Contrary to the allegations in plaintiffs' brief, those documents include the documents of BCE's lawyers such as Michel Lalande and Martin Cossette. (Opening Br. at 5.)

| Stephen Skinner | Current Senior Vice-President – Finance of Bell Canada and Former Vice-President – Controller of Teleglobe (from July 2001 to April 2002). |
|---|---|

At the request of Committee counsel, BCE also produced responsive documents from the files of three additional individuals: (i) Jean Monty, the former Chairman and Chief Executive Officer of BCE and former Chairman of Teleglobe (from February 2000 to April 2002) and Chief Executive Officer of Teleglobe (from November 2000 to April 2002); Michael Sabia, the present President and Chief Executive Officer of BCE; and Terence Jarman, the former Chief Executive Officer of Teleglobe Communications Corporation (from April 2000 to January 2002), one of the Debtors. Committee counsel also requested the minutes of BCE's board of directors (and documents presented to BCE's board) to the extent they were responsive to the Committee's document requests and not privileged. In order to assist the Committee in its investigation, BCE agreed to satisfy counsel's additional requests.[4] In total, in response to the Committee's document requests, BCE produced over 105 boxes of documents in hard copy (representing in excess of 500,000 pages of documents) and 13,788 pages of electronic documents on disks. The 105 boxes constitute a subset of the approximately 250 boxes that BCE had collected in 2002.

In their opening brief, plaintiffs claim that the "Committee accepted the production of documents from 9 custodians in the first round of discovery, with the understanding that the remaining responsive documents would be produced on a rolling basis." (Opening Br. at 6.) This is incorrect: in the September 8 meeting, BCE made clear that following the production of those documents, it would not agree to conduct a second broad search for additional documents from the files of other custodians less involved in the relationship with Teleglobe and its subsidiaries. Committee counsel's letter to BCE's counsel, dated February 9, 2004, indicates that

---

[4] Because of the manner in which BCE maintains its files, virtually all the documents responsive to the Committee's document requests were maintained in the files of individual custodians and were not maintained in central "corporate files," except for BCE's Board and Board committee minutes and certain other documents, including principally human resources documents.

7

the Committee fully understood and agreed with the scope of BCE's document production – in fact, Committee counsel's letter indicates that he was not expecting the production of documents from the files of Michael Sabia and Patrick Pichette, which BCE produced anyway for sake of completeness. (Morgan Decl. Ex. 4, at 2.)

In their Opening Brief, plaintiffs also misleadingly state that "BCE <u>never</u> informed the Committee of the unilaterally imposed April 24, 2002 discovery cutoff date." (Opening Br. at 7.) BCE's counsel wrote <u>twice</u> to Committee counsel to advise of BCE's position that documents created after April 24, 2002, the date on which BCE terminated its long-term funding of Teleglobe, were irrelevant and should not be produced. (Morgan Decl. Ex. 5, at 3; Ex. 6, at 1.) Indeed, in an e-mail dated March 31, 2004, BCE's counsel wrote that "[i]f you articulate a basis for the production of documents generated after April 24, 2002, we will consider your request in good faith." (Morgan Decl. Ex. 6, at 2.) In its motion to compel filed with the Bankruptcy Court on April 13, 2004, the Committee also expressly acknowledged that BCE had produced documents generated through April 24, 2002, and the Committee only sought to compel the extension of the cut-off date through May 2002, and then only with respect to Board minutes. (Morgan Decl. Ex. 7, at 4, 9.) BCE agreed to produce the responsive portions of its Board minutes and materials for May 2002. That the Committee did not seek to compel the production of any documents created after May 2002 simply further demonstrates that those documents have no bearing on this litigation, which is entirely based on BCE's alleged promise, in 2001, to inject $2.5 billion into Teleglobe.

## C.    BCE's document production to the Debtors

### 1.    BCE's production of hard-copy documents

On May 26, 2004, the Committee and the Debtors commenced this adversary proceeding against BCE and certain individual defendants. According to the plaintiffs, "[t]he Forty-Five page Complaint asserts seven causes of action arising out of and related to the breach

8

by the Debtors' parent, defendant BCE Inc. ("BCE") of its funding commitment to the Debtors."
(Opp. Mem., at 1.)

On August 30, 2004, the Debtors served twenty document requests on BCE (the "Debtors' Document Request"), in addition to the document requests the Committee had previously served. (Shandler Aff. Ex. F.) On September 23, 2004 BCE filed a motion to stay party discovery, which was denied on October 15, 2004.

In response to the Debtors' document requests, BCE agreed to search, and indeed searched, for responsive documents <u>from 65 individuals</u> and produced those documents to the extent they were in its possession, custody, or control. (Shandler Aff. Ex. K, at 1-2 (Issue 1-3); Ex. M, at 1 (Issue 1-3).) BCE produced documents created through May 28, 2002, the date on which the Debtors filed their Chapter 11 petitions, even though BCE reiterated its view that documents generated after April 24, 2002 were not relevant to the claims in the Complaint. BCE's document production to the Debtors was as follows:

<u>First</u>, BCE supplemented its prior document production by including documents that had been considered non-responsive to the Committee's document request, but that were responsive to the Debtors' requests. (Shandler Aff. Ex. K, at 3 (Issue 6).) Thus, BCE did not search only for documents responsive to the Committee's document requests, but also searched for documents responsive to the Debtors' document requests.[5]

<u>Second</u>, BCE produced to the Debtors responsive documents within its possession, custody, or control from the files of the eighteen custodians listed in Defendants' Rule 26(a) Disclosures. Those individuals, together with the nine individuals whose documents were produced to the Committee in the Rule 2004 investigation, were the individuals who had an ongoing substantive relationship with Teleglobe or its affiliates, or who were senior employees

---

[5]    Virtually all of those documents were produced to the Debtors prior to December 15, 2004. As a result of an oversight, a limited number of the documents created, between April 24, 2002 and May 28, 2002, were produced to the Debtors in February 2005. (Shandler Aff. Ex. M.)

9

and officers of BCE.[6]  (Shandler Aff. Ex. M, at 3 (Issue 6).)  Because of their seniority or their involvement with Teleglobe, they were the persons most likely to have any information regarding the Complaint's allegations regarding Debtors' funding needs or whether BCE had or had not made a $2.5 billion funding commitment to Teleglobe or to the Debtors.

Third, in a letter from Debtors' counsel to BCE's counsel, dated November 9, 2004, the Debtors requested that BCE also search the files of 46 individuals, in addition to the documents that BCE had already agreed to produce.  BCE agreed to search for documents of those individuals and indeed produced responsive, non privileged documents of those individuals to the extent they were in its possession, custody, or control.  BCE provided to the Debtors a detailed chart stating, with respect to each of the 65 individuals, whether they had an affiliation with BCE, and whether their documents were in BCE's possession, custody, or control. (Shandler Aff. Ex. M, at 1-2, attached chart; see also Ex. K, attached chart.)

Before plaintiffs moved to compel the production of BCE's documents, BCE had already agreed, subject to reciprocal disclosure, to provide a substantial portion of the information sought in this motion:  (i) the list of custodians from whom BCE sought Teleglobe-related documents in 2002, (ii) the three memoranda sent by BCE to potential custodians of Teleglobe-related documents in 2002, (iii) the list of all custodians who responded to any of the three memoranda sent by BCE in 2002 and indicated that they were in possession of Teleglobe-related documents and/or electronic data, and (iv) the index of all boxes of Teleglobe-related documents archived by BCE, which Mr. Cossette mentioned in his deposition, (v) the list of the computer network servers used by the 37 individuals identified by the plaintiffs, and (vi) for each server so identified, the names of all individuals whose electronic data is stored or is otherwise located on that particular server.  (Morgan Decl. Ex. 8.)  BCE has indeed produced that information. (Morgan Decl. Ex. 9.) Following the filing of their motion to compel, plaintiffs for the first time

---

[6]     Some of the individuals were included both in the list of nine individuals whose files were produced to the Committee and in Defendants' Rule 26(a) Disclosures.

agreed to produce reciprocal information. We have not received, however, any further information regarding the Debtors' efforts to preserve and collect documents.

### 2.    BCE's compliance with the Court's Default Standards regarding electronic discovery

The Court's Default Standards indicate that "[i]n order to avoid later accusations of spoliation, a Fed. R. Civ. P. 30(b)(6) deposition of each party's retention coordinator may be appropriate." (Default Standard for Discovery of Electronic Documents ("Default Standard"), ¶ 7.) On November 9, 2004, the Debtors served a notice of 30(b)(6) deposition on BCE. BCE made Mr. Cossette available for a deposition on December 8, 2004, a mutually agreeable date. Mr. Cossette made arrangements to travel from Montreal to New York for his deposition. The Debtors, however, canceled that deposition. (Morgan Decl. Ex. 10.) BCE similarly served a reciprocal notice of deposition on the Debtors pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, seeking a deposition on December 20, 2004. The Debtors also unilaterally canceled that deposition a few days before it was scheduled to take place. (Shandler Aff. Ex. J, at 4-5.)

Between January 20 and 26, 2005, plaintiffs and defendants served their disclosures under the Default Standard. (Morgan Decl. Ex. 11; Ex. 12; Ex. 13.)[7] BCE's disclosures under the Default Standards indicated that its electronic documents are stored in two types of devices: (i) the hard drives of each individual custodian's laptop or desktop computers, and (ii) the servers shared by all BCE employees and officers. (Morgan Decl. Ex. 12, at ¶ 2(a).) BCE also indicated that it has approximately 600 backup tapes consisting of monthly backups of BCE's servers for the period late 2001 through May 2002.[8] (Id., at ¶ 2(d).) Those backup tapes

---

[7]    Exhibit 13 consists of the Debtors' list of likely custodians of electronic data, required under Default Standard 2.

[8]    Backup tapes created prior to August (and in some cases November 2001) were overwritten in the ordinary course of business by CGI, the company that handled the backup of BCE's servers. The 600 backup tapes described above have not been restored.

11

are of limited accessibility within the meaning of the Default Standards. Among other things, they are designed to permit recovery from a disaster, not to archive data in searchable form. (Shandler Aff. Ex. A, at 40-41.) The Defendants' Disclosures pursuant to the Default Standard set forth the numerous problems foreseen in restoring those backup tapes. (Morgan Decl. Ex. 12, at ¶ 5.)

Plaintiffs advised that they seek electronic documents from a list of 37 individuals, and BCE agreed to search for them. (Morgan Decl. Ex. 13; Ex. 14; Ex. 15.) In turn, BCE requested that the Debtors search for electronic documents of 29 individuals, which the Debtors agreed to do. The parties then agreed on a clear process to conduct that search: BCE and the plaintiffs exchanged lists of proposed search terms and agreed to evaluate the number of documents that would likely be retrieved using those search terms and to share that information before any actual searches were conducted. (Morgan Decl. Ex. 16; Ex. 17; Ex. 18.) BCE advised plaintiffs that, once an agreement was reached on the terms to be used in the search for electronic documents (see Default Standard ¶ 5), BCE would search its servers and the computer hard drives of those 37 individuals if they were in its possession, custody, or control.[9] BCE also advised the plaintiffs that, consistent with the Default Standards, searches of data located on the backup tapes would "not be conducted until the initial electronic document search has been completed." (See Default Standard ¶ 4.)

On February 18, 2005, BCE's counsel advised plaintiffs' counsel that, using the search terms that the parties had identified, over 2 million pages of documents would have to be reviewed, representing approximately 800 boxes of documents. (Morgan Decl. Ex. 19.) Despite

---

BCE also has backup tapes that it was able to restore, and responsive data from those tapes was produced to the Committee in the Spring of 2004.

[9]    BCE had no electronic data for some individuals on plaintiffs' list. For instance, after receiving the document collection memorandum in 2002, the directors of BCE advised that they did not have any electronic data regarding Teleglobe or its subsidiaries, and BCE did not copy their computer hard drives. Some individuals on plaintiffs' list also did not work for BCE.

the process the parties had previously agreed upon, plaintiffs did not provide reciprocal information to BCE. Based on BCE's analysis, using the parties' proposed search terms would result in the retrieval of approximately 75% of all the documents located on the hard drives and servers. Because the individuals whose electronic data is on those hard drives and servers had job responsibilities much broader than dealing with Teleglobe, the search terms as drafted did not successfully filter out clearly irrelevant documents. BCE described to plaintiffs' counsel that the proposed search terms raised two problems. (Morgan Decl. Ex. 19; Ex. 20.) First, plaintiffs requested that BCE search for documents containing common terms, such as "Excel," "value," "cash," "line," "finance," "capital," "debt," "note," "notes," or "preferred." The search for documents containing the term "Excel" would, for instance, cause the retrieval of numerous unresponsive and irrelevant documents, such as Excel charts or documents referring to the Excel software. Second, BCE suggested that, instead of searching for all documents containing any of the search terms, those search terms should be placed in proximity of each other to obtain documents regarding the relevant context. For instance, a search for the term "value" by itself would result in a large number of irrelevant documents, but a combined search for the terms "value" and "Teleglobe" would eliminate many irrelevant documents. Similarly a search for all documents that include the term "preferred" would not be useful, but a search for documents that contain the term "preferred" in the vicinity of the term "stock" would result in a more meaningful and logical search regarding "preferred stock." BCE also suggested that, consistent with Default Standard 5, the parties could search for phrases to be searched, such as Teleglobe OR TGO OR Téléglobe AND a list of key words. Plaintiffs have thus far refused to do so. (Morgan Decl. Ex. 20.)

         BCE also strongly suggested that the parties' respective Information Technology consultants should communicate directly with each other and propose a more logical method of searching that would not require the parties to review 2 million pages of electronic documents. (Morgan Decl. Ex. 19; Ex. 21.) The plaintiffs initially consented to that approach, and the

13

parties' respective IT consultants engaged in consultations in which they both identified search terms that were too common. (Id.; Morgan Decl. Ex. 22.) Plaintiffs, however, quickly changed their mind about that approach and insisted that BCE search a new list of terms submitted on February 18, and collect and review all the electronic documents that contained any of the proposed search terms on plaintiffs' list. (Morgan Decl. Ex. 23; Ex. 24.) Alternatively, plaintiffs asked that BCE produce all those documents to the plaintiffs without first reviewing them for responsiveness or privilege.[10] (Id.)

To conduct the analysis of plaintiffs' new list of terms, BCE used a sample of 103,591 documents that were easily searchable. Of those 103,591 documents, 79,334 documents were created between January 1, 2000 and December 31, 2002, the date-range that plaintiffs had sought to analyze. (Morgan Decl. Ex. 25.) Using plaintiffs' search terms would result in the retrieval of 90.5% of all the documents created in that time period, which further demonstrated that the search terms did not eliminate clearly irrelevant documents. (Id.) Defendants again asked plaintiffs to consider a more logical method of searching. (Id.)

On February 27, 2005, one day before the defendants' opposition papers were due, plaintiffs finally provided some reciprocal information about their own electronic documents, but that information fails to shed light on whether the proposed search terms filter out irrelevant documents. Specifically, plaintiffs stated that the number of documents that contain the proposed search terms *and* were created in a specified date range represent 60% of the total number of electronic documents located on the Debtors' computer servers. Of course, using date restrictions helps reduce the number of retrieved documents. The only relevant question, however, is whether, once a party has isolated the universe of documents created within an

---

[10]    Plaintiffs' counsel indicated that, if BCE subsequently determined that those documents were protected by a privilege, BCE would be afforded the opportunity to request the return of the document. Of course, that did not take into account the fact that BCE created numerous privileged documents prior to May 28, 2002, and that the plaintiffs should not be provided an opportunity to learn their contents prior to returning them.

agreed-upon date range, the use of the proposed search terms will filter out irrelevant documents, and the plaintiffs' analysis fails to respond to that question.

As described above, the defendants did conduct the relevant analysis, based on a sample of 103,591 easily searchable documents, and concluded that using the proposed search terms, BCE would retrieve 90.5% of all the documents. Supra at 14. Thus, using the proposed search terms would lead to substantially the same result as not using any search terms at all. BCE again asked its IT consultant to reach out to the plaintiffs' IT consultant and attempt to suggest a more effective method of filtering out irrelevant documents. It is our understanding that the parties' IT consultants have resumed their discussions.

### D.    BCE's Privilege Logs

In the Rule 2004 investigation, BCE initially withheld from the Committee two categories of documents on the grounds that they were protected by the attorney-client privilege or the work product doctrine: (1) documents reflecting legal work performed solely for BCE, and (2) documents reflecting legal work in which BCE and Teleglobe had a common legal interest. At the hearing held on April 28, 2004, the Bankruptcy Court directed BCE to produce the "common interest" documents based on the Court's understanding that the Debtors would likely assert claims against BCE before the end of May 2002. (Shandler Aff. Ex. C. (Tr.), at 74:13-16; 77:4-12.) Following the Court's ruling, BCE produced to the Debtors all the documents that were protected by a common interest.

In order to produce those documents, BCE carefully reviewed all the documents on its privilege log with a view to narrowly construe those that were privileged as to BCE: to the extent a document reflected the provision of legal work solely to BCE, it remained designated as privileged; to the extent a document was subject only to the common interest privilege, it was produced, and doubts were resolved against the claim of privilege. (Wade Decl., at ¶ 4.) BCE followed that approach to comport with the guidelines set out in the Delaware Chancery Court's opinion in Grimes v. LLC Int'l, Inc., No. Civ. A. 16957, 1999 WL 252381, at *2 (Del. Ch. Apr.

15

23, 1999). In reviewing the documents on the privilege log, we became aware that those logs contained numerous entries for the same documents and those duplicate entries were eliminated. (Wade Decl., at ¶ 4.) We also became aware that the description of certain documents had to be clarified. (Id.)

BCE and Committee counsel conducted a "meet and confer" on May 26, 2004, a few hours before the Complaint was filed. In that "meet and confer," Committee counsel stated that privilege issues would be addressed at a later date, consistent with the statements of the Bankruptcy Court at the hearing on April 27. On May 28, 2004, BCE's counsel submitted a revised privilege log, which reflected the review BCE had performed as well as an effort to accommodate some of the Committee's suggestions in the "meet and confer." BCE did not, as plaintiffs allege, change designations on the privilege log and there was never any effort to hide documents. On February 18, 2005, BCE produced a supplemental privilege log with respect to the additional documents that have been withheld on the ground of the attorney-client privilege and attorney work product in connection with the Debtors' document request. BCE's privilege logs, dated May 28, 2004, and February 18, 2005, set forth all the documents that BCE has withheld on the ground of privilege.

## ARGUMENT

## I.    DEFENDANTS HAVE COMPLIED IN GOOD FAITH WITH THEIR DISCOVERY OBLIGATIONS.

### A.    Defendants' Document Production

"It has been held, in this Circuit, that the court may restrict discovery as long as the restriction does not foreclose 'discovery that is reasonably necessary to afford a fair opportunity to develop and prepare the case.'" Rhone-Poulenc Rorer, Inc. v. Home Indemnity Co., No. Civ. A. 88-9752, 1991 WL 183842, at *4 (E.D.Pa. Sept. 16, 1991). Documents should not be produced if "the utility of the documents sought is too marginal to justify the burden which would be placed upon [a party] if required to review the mass of documents which must be

16

examined in order to provide the [plaintiffs] with the documents requested." <u>Id.</u> at *3.

Furthermore, a plaintiff "'is not automatically entitled to company-wide discovery, absent a

showing of particularized need and relevance for the requested discovery.'" <u>Siller v. Unisys</u>

<u>Corp.</u>, No. Civ. A. 92-4870, 1993 WL 460804, at *3 (E.D.Pa. Nov. 3, 1993) (quotation omitted);

<u>J.T. Baker, Inc. v. Aetna Cas. & Sur. Co.</u>, 135 F.R.D. 86, 93 (D.N.J. 1989) ("Discovery of

identities of Baker's employees and former employees with knowledge of the above relevant

items is appropriate if confined to managerial and supervisory persons.")

   BCE conducted a more than reasonable search of its files for documents

responsive to the plaintiffs' document requests. BCE collected all responsive documents from the

files of the individuals who were most likely to possess documents relevant to the claims in this

action, and BCE produced those documents. BCE also searched for the documents of many other

individuals at the request of the plaintiffs. <u>Supra</u> at 2, 9-10. BCE never refused to produce the

files of any specific individuals.

   BCE objected to the plaintiffs' extraordinarily burdensome and repeated requests

for "all documents within the possession, custody or control of BCE and its affiliates (regardless

of location) that are responsive to our document requests . . ."— in other words, to search for the

documents relating to Teleglobe from every single employee of BCE (approximately 60,000 in

total), regardless of whether those employees had, or were likely to have, any substantive

relationship with Teleglobe. (Shandler Aff. Ex. J.) Instead, BCE legitimately targeted the files of

individuals who were likely to have knowledge regarding the claims in the Complaint. <u>See</u> <u>Siller</u>,

1993 WL 460804, at *3; <u>California Public Employees' Ret. Sys. v. Coulter</u>, No. Civ. A. 19191-

NC, 2004 WL 1238443, at * 1 (Del. Ch. May 26, 2004) ("Wide-ranging discovery that goes

beyond that necessary to address an *ultra vires* claim would serve no useful purpose. Similarly,

where the board's decision . . . is questioned because of an alleged failure to exercise any

business judgment, the inquiry must focus on the facts which are related to that issue. That might

include, for example, what information was available to the board, what information did it

17

consider, what guidance from experts did it receive, and what process was followed."). In a "meet and confer" conducted on January 28, 2005, plaintiffs' counsel indeed described that the Debtors adopted similar criteria in identifying the Debtors' 28 likely custodians of electronic data, pursuant to Default Standard 2. Plaintiffs' counsel stated that those 28 individuals were selected on the basis of their seniority, or the fact that they had a "substantive" involvement in the facts that form the basis of this action. In the Debtors' deposition conducted pursuant to Rule 30(b)(6), the Debtors' representative, Mr. V. V. Cooke, testified that the Debtors' likely custodians of electronic data were selected based on their seniority. (Morgan Decl. Ex. 26 at 63-64.) Mr. Cooke could not recall any other criteria. (Id.)

In any event, plaintiffs' request that the Court order the production of certain documents is in large part moot. The only outstanding issues regarding the hard-copy documents are addressed below: (1) whether the plaintiffs should have access to documents generated months after BCE terminated its long-term funding of Teleglobe; and (2) whether, as the Bankruptcy Court held, BCE properly redacted irrelevant portions of the BCE Board minutes. Infra at 20-22.

### B.    Defendants' Electronic Discovery

BCE also fully complied with its obligations under the Default Standard. Supra at 11-15. The parties identified the relevant custodians of electronic data and agreed on a process for the search of those data. Supra at 12. BCE complied with that process. Throughout that process, BCE also recommended that the parties' IT consultants communicate directly to make recommendations on a more logical method of searching. Supra at 13, 15.

Plaintiffs' Opening Brief erroneously states that BCE made no effort to check its servers for responsive information and did not offer an estimate as to when it will begin producing electronic data. (Opening Br. at 15-16.) BCE has captured all available hard drives and server data of the 37 individuals identified by the plaintiffs and is processing them. Those servers will be searched for responsive electronic data once the parties agree on a meaningful

18

method of searching. Mr. Cooke testified on behalf of the Debtors that they are precisely in the
same posture. (Morgan Decl. Ex. 26 (Tr.), at 234.)

Plaintiffs also erroneously claim that "for those custodians for whom BCE
attempted to obtain hard drives, its efforts have been far from exhaustive. There is no clearer
example of this than Patrick Pichette's 'missing' hard drive." (Opening Br. at 22.)[11]  This
accusation is meritless. At the time Mr. Pichette left BCE in January 2002, his computer was
recycled as was typically done for computers of the executive employees who left the company.[12]
Furthermore, Mr. Pichette's e-mails were stored on BCE servers, not on Mr. Pichette's personal
computer, and those servers are available to be searched. Moreover, it is BCE's understanding
that the backup tapes containing Mr. Pichette's data have already been restored for specific dates
(unlike the more than 600 tapes which could not be restored), and responsive electronic
documents were produced to the Committee months ago. Restoring those 600 other backup tapes
would not elicit Mr. Pichette's electronic data, which plaintiffs in large measure already have.

There are two outstanding issues in this motion to compel: plaintiffs have
requested that Defendants provide a list of all the servers within BCE's possession, custody, or
control, and the names of all the custodians whose information is stored on a particular server.
(Opening Br. at 24.) BCE has already provided that information with respect to the 37 custodians
whose electronic data plaintiffs seek, but it is impracticable to provide that information for
approximately 60,000 employees, and we do not believe that plaintiffs seriously seek that
information. In addition, plaintiffs request that BCE search backup tapes. Consistent with the
Default Standard, BCE has agreed to consider that request once the electronic data from the hard
drives and servers are produced.

---

[11]    Mr. Pichette was Executive Vice-President, Planning and Performance Management of
BCE from January 2001 through January 23, 2002, and subsequently became employed
by Teleglobe Communications Corporation.

[12]    As an exception, employees who transferred between Bell Canada and BCE retained their
computers because BCE and Bell Canada used the same computer servers.

19

**C.    Defendants Are Not Required To Produce BCE Board Materials In Their Entirety**

Plaintiffs seek to compel the production of BCE's Board minutes and Board presentations for the period January 2000 through December 2002. (Opening Br. at 24.) BCE has already produced all responsive portions of the minutes of the meetings of the Board of Directors, and all other Board presentations, for the period January 2000 through May 2002. BCE redacted the portions of its Board minutes and presentations to the extent they did not relate to Teleglobe: they were irrelevant and contained highly sensitive information regarding issues such as compensation, strategic planning, and potential M&A transactions. (Shandler Aff. Ex. C (Tr.), at 63:10-64:6.)[13]

In their motion to compel, plaintiffs argue that "BCE has not advanced a legally cognizable reason for redacting or refusing to produce BCE's board minutes." (Opening Br. at 24.) They ignore, however, that this issue was expressly addressed by the Bankruptcy Court at the hearing on April 28, 2004, which refused to order the production of unredacted minutes and held that "I will not direct those at this time. I think redaction, or the ability to redact non-responsive information is not so clearly inappropriate." (Shandler Aff. Ex. C (Tr.), at 77:14-16.) The Bankruptcy Court left open the possibility that, at a later time, a special master could review the Board minutes to ensure that only non-responsive information was redacted. (Id. at 68:12-23.)

**D.    BCE's Temporal Limitations Result From Plaintiffs' Allegations**

This case arises from BCE's alleged promise to fund Teleglobe through the completion of GlobeSystem. BCE has agreed to produce documents generated through May 28, 2002, more than a month after BCE publicly announced the termination of its long-term funding

---

[13]    In their Opening Brief, plaintiffs pointed out that BCE redacted a portion of its April 23, 2002 Board minutes entitled "TGO Strategic and Funding Review." (Opening Br. at 24.) We have reviewed that section and determined that it should not be redacted. Therefore, it was produced to the plaintiffs.

of Teleglobe. Despite BCE's repeated request that plaintiffs describe the relevance of documents created several months after BCE announced the termination of its long-term funding, plaintiffs have failed to do so. They have merely stated that BCE "must have" non-privileged documents created after May 28, 2002, discussing BCE's funding of Teleglobe. The remote likelihood of locating such a document "is too marginal to justify the burden which would be placed upon [a party] if required to review the mass of documents which must be examined in order to provide the [plaintiffs] with the documents requested." Rhone-Poulenc Rorer, Inc., 1991 WL 183842, at *3. In any event, even if such a document existed, it could not amount to a post-facto binding agreement to fund Teleglobe.

Moreover, on July 12, 2002, Teleglobe's lending syndicate commenced an action against BCE based on substantially the same facts as those alleged in this lawsuit. (Morgan Decl. Ex. 27.) Any documents generated after that date should not be produced. See California Public Employees' Ret. Sys., 2004 WL 1238443, at * 3 ("No reason exists for gaining access to [files] after the filing of this action, and Defendants' discovery responses may be limited accordingly.") To the extent that courts in this Circuit have permitted discovery of post-complaint, post-incident documents, they have done so in only limited circumstances where the plaintiff was able to articulate how the requested discovery was relevant to the specific claim at issue and such demonstrated relevance was not outweighed by any attendant burden on the defendant. See, e.g., Robbins v. Camden City Board of Education, 105 F.R.D. 49, 63 (D.N.J. 1985) (holding that Title VII plaintiff permitted discovery for period after alleged act of discrimination to prove defendant's pattern of misconduct but was limited to reasonable period "unless she can demonstrate clear relevance" for extended, post-incident discovery); Educational Testing Service v. Katzman, 631 F. Supp. 550, 556 (D.N.J. 1986) (post-complaint discovery relating to defendant's minimum contacts with forum permitted as relevant to jurisdictional inquiry); U.S. v. Federation of Physicians and Dentists, Inc., 63 F. Supp. 2d 475, 478 (D. Del. 1999) (granting post-complaint discovery where plaintiff demonstrated relevance of information sought and

21

defendant "made no showing of the burden or expense it [would] bear to meet the [plaintiff's] request" and failed to demonstrate how previously produced materials rendered plaintiff's requests "duplicative or cumulative."). Such circumstances are not present here. Much to the contrary, plaintiffs here have failed to articulate any "clear relevance" of the post-complaint discovery sought. Moreover, even if some marginal relevance could be gleaned from the information requested, plaintiffs' request is both duplicative and "excessive and would impose too great a burden on defendant[s] compared to the minimal relevance of such information." Robbins, 105 F.R.D. at 63.

In their motion to compel, Plaintiffs also seek the production of "documents created in connection with BCE year end financials that relate to, inter alia, the write-down of good will of TI and/or its affiliates during the course of 2002." (Opening Br. at 25). Those documents are not relevant to plaintiffs' claims, and some of them were generated in early 2003. In order to put that issue to rest, however, BCE agreed to produce the documents from the files of employees in its accounting department who were involved in BCE's analyses leading to that write-off and the preparation of BCE's 2002 annual report (including BCE's 2002 annual audited financial statements). BCE agreed to do so because that information is contained in a fairly discrete and identifiable set of files and because documents related to such write-down (which occurred in the second quarter of 2002) may reasonably have been created after May 28, 2002. (Morgan Decl. Ex. 28.)

## II.     THE PLAINTIFFS' INEXCUSABLE FAILURE TO PRESERVE AND PRODUCE DOCUMENTS

While plaintiffs complain about BCE's objection to the production of 250 boxes of documents, the deposition of the Debtors' corporate representatives strongly suggests that the plaintiffs have engaged in spoliation. Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d

22

Cir. 1999). "A party who has reason to anticipate litigation has an affirmative duty to preserve evidence which might be relevant to the issues in the lawsuit." In re Wechsler, 121 F. Supp. 2d 404, 415 (D. Del. 2000); Fujitsu Ltd. v. Fed. Express Corp., 247 F.3d 423, 436 (2d Cir. 2001) ("The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation."); Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 72 (S.D.N.Y. 1991) (quoting William T. Thompson Co. v. Gen. Nutrition Corp., 593 F. Supp. 1443, 1455 (C.D. Cal. 1984). Application of these standards to the facts of this case clearly demonstrates that Debtors did not even try to comply with their evidence preservation obligations.

Counts I through IV of the Debtors' complaint are based entirely on BCE's purported breach of an alleged promise to provide additional funding to Teleglobe to meet its cash needs through the completion of the GlobeSystem. According to the Complaint, that breach occurred on April 24, 2002, when BCE announced its decision to terminate its long-term funding of Teleglobe. Thus, if the Debtors seriously believed that BCE had an obligation to fund "an additional $2.5 billion," they surely knew that BCE had breached that supposed obligation as soon as BCE announced the termination of its long-term funding of Teleglobe, on April 24, 2002. Consequently, from this point onward, Debtors had an obligation to preserve any evidence that was potentially relevant to their claim of breach of a $2.5 billion contract, or any evidence that was reasonably likely to be requested during discovery in this action.

On February 9, 2005, the Defendants conducted the deposition of Mr. V. V. Cooke, the Debtors' corporate representative, regarding issues of document spoliation and preservation, pursuant to Fed. R. Civ. P. 30(b)(6). (Morgan Decl. Ex. 29.) As the Senior Counsel of the Debtors, and a litigator by training and practice, Mr. Cooke had the primary responsibility to ensure that any potentially relevant documents were properly collected and preserved following April 24, 2002. (Morgan Decl. Ex. 26 (Tr.), at 5-7, 12-13, 33-34.) Mr. Cooke testified

23

that he was aware of the Debtors' obligation to preserve paper and electronic documents. (Id., at 134.)

Mr. Cooke could not say whether a document preservation memorandum was ever distributed to the officers and employees of the Debtors after April 24, 2002. (Id., at 40-41, 50-51.), and none has been found. Nor did he know whether a draft document preservation e-mail that he purportedly instructed one of his colleagues to draft was ever distributed to anyone, (Id., at 34, 39-40), even though in April and early May 2002, Teleglobe still had over a thousand employees. (Id., at 44, 63.)[14] Mr. Cooke testified that he orally instructed certain members of the legal department to arrange for the collection of the Debtors' documents, but he does not know what steps, if any, they took to satisfy his instruction. (Id., at 50-51, 93-95.) When asked what steps he took to enable the Debtors to be able to demonstrate that they had satisfied their obligation to preserve documents, he testified that "I wasn't trying to prove anything," and that the Debtors were in the middle of a bankruptcy and did not have time to ensure evidence was preserved regarding their claims. (Id., at 40-41, 95, 138.)

Indeed, according to Mr. Cooke's testimony, following a mass exodus of employees of the Debtors beginning on May 15, 2002, numerous employees left with their computers, and no effort was made to preserve the information stored on their personal computers, other than to stop the overwriting of back-up tapes. (Id., at 39, 42, 44-46, 101, 134-35.)[15] The Debtors' disclosures pursuant to the Court's Default Standards, served on January 20, 2005, expressly state, however, that the back-up tapes are not complete, and that some data on the tapes cannot be restored. (Morgan Decl. Ex. 11, at ¶ 5(b) and (e).) Moreover, Mr. Cooke was

---

[14]    Debtors' counsel distributed a document preservation memorandum in late 2004 or early 2005. By that time, however, the Debtors only had ten to fifteen employees or officers left. (Id., at 41, 88-89.)

[15]    The only written instruction that Mr. Cooke "believed" he gave involved the overwriting of back-up tapes. (Id. at 15.)

24

unaware of any efforts to confirm that the electronic documents located on the computers that disappeared were also stored on the backup tapes. (Morgan Decl. Ex. 26 (Tr.), at 103-04.)

Following April 24, 2002, the Debtors also sold some of their computer servers. Prior to the sale, no effort was made to confirm that all the information located on the servers was also stored on the back-up tapes. (Id., at 55-57, 59, 134-35.) As described above, among other things, the Debtors have advised that the collection of tapes is incomplete and some of the data is corrupt. (Morgan Decl. Ex. 11, at ¶ 5(b) and (e).)

Mr. Cooke also testified that "a number of laptops there are left over" in the IT department of the Debtors in Reston, but no efforts were apparently made to determine whose computers they were, and Mr. Cooke did not know whether any steps were taken to preserve the information stored on those computers, and whether additional personal computers were entrusted to the IT department in 2002 and subsequently disappeared. (Morgan Decl. Ex. 26 (Tr.), at 97-99; 103-05).

As for the hard-copy documents, the Debtors have produced an index of the documents now stored in Reston, Virginia. Mr. Cooke, however, could not represent that those documents were collected or kept by the Debtors in the order in which they were maintained. Indeed, according to his testimony, following the mass employee exodus in May 2002, "facilities" people were left in charge of boxing the documents and sending them to storage facilities in Chantilly, Virginia. (Id., at 42-43.) Mr. Cooke did not instruct anyone to make sure that those documents were collected and boxed in the order in which they were maintained, and he testified on behalf of the Debtors that he does not know whether they were. (Id., at 206-08.) Many of those documents were later removed in preparation for the sale of part of the Debtors' business, and other "personal" documents were removed, but no effort was apparently made to keep track of the documents that were removed. (Id., at 43, 200-03.) Thus, what remains is essentially an unorganized collection of vaguely identified documents, with little or no custodian

or file information.[16]  Production of materials in this manner does not properly comply with a party's obligation under Rule 34(b).  See Govas v. Chalmers, 965 F.2d 298, 301-02 (7th Cir. 1992); see also Scripps Clinic & Research Found. v. Baxter Travenol Labs., Inc., No. Civ. A. 87-140-CMW, 1988 WL 70013, at *1 (D. Del. June 21, 1988) (holding that party had failed to meet its duty to specify records under Rule 33(c) where it simply referred the other party to a mass of 6,700 business records).

In addition, the Committee has refused to produce any documents in response to the Defendants' document requests.  The Committee acknowledges that it has had access to the files of third parties (including apparently those of the Interim Receiver of Teleglobe in Canada), but Committee counsel makes the astounding claim that, because it selected certain documents for copying, they are all protected by the work product doctrine.

Therefore, the plaintiffs' "efforts" to preserve and produce documents do not begin to compare with BCE's efforts.  Given the nature of their claim, the Debtors were under an obligation to preserve documents as early as April 24, 2002.  Indeed, if they seriously believed that BCE had made an "additional $2.5 billion commitment," the Debtors would have engaged in significant efforts to preserve and review documents in their files to locate such supposed promise.  Their scorched-earth discovery approach simply reflects that their files (or what remains of them) do not contain any evidence of a funding commitment in addition to the $1 billion commitment duly expressed in writing.

III.    **BCE APPROPRIATELY WITHHELD DOCUMENTS PROTECTED BY THE ATTORNEY-CLIENT PRIVILEGE AND WORK PRODUCT DOCTRINE**

---

[16]    The Debtors also provided an index of documents located in Canada.  That index consists of eight boxes of documents.  Based on the testimony of Mr. Cooke, it is impossible to know whether those documents are stored in the order in which they were maintained.  Indeed, Mr. Cooke did not instruct anyone to make sure the documents in Canada would be collected in the order in which they were maintained.  (Morgan Decl. Ex. 26 (Tr.) at 212-13.)  Mr. Cooke suggested that those documents are "commingled" with the documents of other affiliates.  (Id. at 210.)

Plaintiffs make three erroneous allegations: <u>First</u>, they allege that any documents created, received, or reviewed by seven present or former BCE employees, officers, or directors are not protected by the attorney-client privilege because those individuals allegedly owed fiduciary duties to the Debtors in addition to their responsibilities at BCE. <u>Second</u>, the defendants have waived any claim of privilege through partial disclosure. <u>Third</u>, the defendants cannot invoke the work product doctrine with respect to documents created because of the prospect of litigation, in April 2002. (Opening Br. at 25-39.) None of those allegations has any basis.

### A.    The Debtors Mistakenly Argue that BCE Cannot Assert a Privilege as to Any Documents Created, Received, or Reviewed by Seven Individuals

Plaintiffs seek to compel the production of hundreds of attorney-client communications between BCE and its lawyers on the ground that those documents were "created, received, or reviewed" by individuals who had responsibilities at BCE and were also serving as officers or directors of Teleglobe or the Debtors at the time the documents were created. (<u>Id.</u>, at 26-35.)

### 1.    Plaintiffs rely upon cases involving fiduciary duties owed to minority shareholders that have no bearing here

Plaintiffs argue that, because Lalande and Masse were simultaneously employees of BCE and officers of some of the Debtors, BCE cannot invoke the attorney-client privilege with respect to any documents that they created, received, or reviewed.[17] (<u>Id.</u>, at 26.) Plaintiffs

---

[17]    Lalande was the Assistant General Counsel of BCE from November 2000 through February 2001 and the Vice-President General Counsel of BCE from February 2001 through April 2002. He was also Assistant Corporate Secretary of some of the Debtors. Masse is an attorney. He was the Assistant Corporate Secretary of BCE and Corporate Secretary of some of the Debtors. Ryan is an attorney. Plaintiffs state that he was neither an officer nor director of the Debtors during the relevant time period, from February 2000 through April 2002. <u>See</u> Plaintiffs' List of Debtors' and/or TI' Fiduciaries Associated with BCE, Appended to Opening Br., at 2. It is not at all clear that, in their capacity as Secretary, or Assistant Secretary, those individuals owed any fiduciary duty: no fiduciary duty governing the management of a corporation's affairs

primarily rely on <u>Valente v. Pepsico, Inc.</u>, 68 F.R.D. 361 (D. Del. 1975), and <u>Deutsch v. Cogan</u>, 580 A.2d 100 (Del. Ch. 1990), but such reliance is misguided because the fiduciary duty in <u>Valente</u> and <u>Deutsch</u> was imposed to protect the minority shareholders of subsidiaries against the overreaching of controlling shareholders. The analysis that the courts followed in <u>Valente</u> and <u>Deutsch</u> is simply not applicable here because the Debtors had no minority shareholders and were wholly-owned by BCE.

<u>Valente</u> involved a shareholder class action suit brought by the minority shareholders of Wilson Sporting Goods against Pepsico, which owned approximately 74% of the stock of Wilson. <u>Valente</u>, 68 F.R.D. at 363-64. The minority shareholders of Wilson sought to compel Pepsico's production of privileged documents on the ground that they had been reviewed by the general counsel of Pepsico, who was at the same time a board member of Wilson. <u>Id.</u> at 364, 366. This Court held that the fiduciary duties owed by Wilson's directors were designed to protect the interest of its minority shareholders: "[s]uch a fiduciary obligation runs necessarily to protect the interests of the minority from domination and overreaching by the controlling shareholder." <u>Id.</u> (emphasis added). This Court held that Pepsico could not assert the attorney-client privilege with respect to the documents that the general counsel had prepared for Pepsico because "as a director of Wilson, his obligations ran to the shareholders of Wilson, and the protection of their best interests." <u>Id.</u> at 368.

Similarly, in <u>Deutsch v. Cogan</u>, an action was brought by the former minority shareholders of a subsidiary against its controlling shareholders, challenging the fairness of a cash out merger. <u>Deutsch</u>, 580 A.2d at 102. A partner of the law firm which had advised the controlling shareholder in connection with the merger was at the same time a board member of the subsidiary. <u>Id.</u> at 107-08. In the lawsuit, the minority shareholders alleged that the attorney-

---

can be imposed on persons who have no authority to manage those affairs. <u>See</u> <u>Ben Franklin Retail Stores, Inc. v. Kendig</u>, No. 97C7934, 97C6043, 2000 WL 28266, *6 (N.D. Ill. Jan. 12, 2000).

WP3:1089547 2                                                                                           59825 1001

client privilege could not be used to shield documents that had been reviewed by that attorney prior to the merger. Id. This Court agreed and held that the lawyer/board member owed fiduciary duties that "run 'necessarily to protect the interests of the minority from domination and overreaching by the controlling shareholder.'" Id. (citing Valente, 68 F.R.D. at 364.) This Court concluded that the lawyer member had a conflict of interest because he could not have ignored the fiduciary obligations he owed to the subsidiary and his minority shareholders. Id. at 108.

Plaintiffs also rely on Harriman, a case in which minority shareholders of DuPont brought a lawsuit against, inter alia, the Wilmington Trust Company arising from a proposed merger of a company into DuPont. Harriman v. E.I. DuPont de Nemours & Co., 373 F. Supp. 101, 104 (D. Del. 1974). The shareholders of DuPont alleged that a proposed merger was unfair, and that the Wilmington Trust Company (which held in trust 50% of the stock of the company to be merged into DuPont) had breached its fiduciary duty to protect the interest of DuPont's shareholders. Id. at 103. This Court rejected the minority shareholders' claim of breach of fiduciary duty:

> The allegations . . . do not, without more, state facts which under Delaware law impose upon Wilmington Trust a fiduciary duty to protect the interests of DuPont stockholders.

Harriman, 372 F. Supp. at 106.

Those cases simply demonstrate that the attorney-client privilege cannot be asserted to shield attorney-client communications from the minority shareholders of a subsidiary corporation when those communications were prepared or reviewed by a person who owed a fiduciary duty to those minority shareholders. Those cases have no bearing here because the Debtors were wholly-owned subsidiaries of BCE.[18] Under Delaware law, the directors and

---

[18] At the hearing conducted by this Court on the defendants' motion to dismiss, on February 16, 2005, plaintiffs did not dispute that the Debtors were wholly owned subsidiary of BCE. In over 80 briefs and pleadings filed with the Delaware Bankruptcy Court, plaintiffs have indeed repeatedly stated that the Debtors were wholly-owned subsidiaries

29

officers of a wholly-owned subsidiary "are obligated to manage the affairs of the subsidiary in the best interest only of the parent and its shareholders." Roselink Investors L.L.C. v. Shenkman, No. 01Civ7176 (MBM), 2004 WL 875262, at *2 (S.D.N.Y. Aug. 2, 2001) (citing Anadarko Petroleum Corp. v. Panhandle E. Corp., 545 A.2d 1171, 1174 (Del. 1988)). Therefore, the fact that Messrs. Lalande or Masse created, received, or reviewed attorney-client communications between BCE and its lawyers did not create any conflict of interest with the obligations they may have owed in their capacity as Corporate Secretary or Assistant Corporate Secretary of the Debtors. The conflict of interest that that arose in Valente and Deutsch simply did not exist.[19]

Furthermore, the United States Supreme Court has rejected plaintiffs' argument in United States v. Bestfoods, 524 U.S. 51, 69 (1998). The Supreme Court held that it is a "'well established principle [of corporate law] that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership.'" Id., at 69 (citations omitted). Courts generally presume that the employees of the parent are wearing their "parent hat" when acting for the parent and their "subsidiary hat" when acting for the subsidiary. See id. Therefore, a presumption exists that

---

of BCE. See Exhibit B attached to the Defendants' Reply Memorandum in Support of their Motion to Dismiss.

[19]   It is only where a corporation is insolvent or is in the vicinity of insolvency that "'a board of directors is not merely the agent of the residue risk bearers, but owes its duty to the corporate enterprise.'" Roselink Investors, 2004 WL 875262, at *2 (citation omitted). This Court cannot pierce BCE's attorney-client privilege based on the unsupported allegations of insolvency in the Complaint. (Compl. ¶ 81.) As described in the Defendants' Reply Memorandum in Support of their Motion to Dismiss ("Reply Mem."), a federal court has indeed dismissed an entire action based on a similarly unsupported conclusion of insolvency. Reply Mem. at 17; Official Comm. of Bond Holders of Metricom, Inc. v. Derrickson, No. C 02-04756 JF, 2004 WL 2151336, at *5-7 (N.D. Cal. Feb. 25, 2004). In any event, the documents on BCE's privilege log were properly withheld for the independent reason that they reflect the provision of legal advice *solely* to BCE. Infra at 32.

when Lalande or Masse reviewed documents privileged as to BCE, they were wearing their BCE "hat."[20]

Plaintiffs also argue that, because Messrs. Monty, Currie, Kierans, Skinner, and Ryan were directors or officers of Teleglobe, they owed a fiduciary duty to the Debtors and that, under Valente, BCE cannot invoke the attorney-client privilege with respect to any documents that they "authored, transmitted, or received."[21] This argument is wrong. First, Teleglobe is a Canadian corporation. It is undisputed that, under Canadian law, the directors and officers of a Canadian corporation cannot owe fiduciary duties to subsidiaries and to subsidiaries' creditors. Peoples Dep't Stores, Inc. v. Wise, [2004] SCC 68 (Can.). The Supreme Court of Canada has

---

[20]    Under Garner v. Wolfinbarger, plaintiffs may only overcome an assertion of attorney-client privilege upon a showing of "good cause." 430 F.2d 1093, 1104 (5th Cir. 1970). "The better rule, therefore, is that discovery of lawyer-client confidential communications is not automatic in shareholder suits," and that "[t]he approach espoused in Garner...offers a more workable and logical framework for analyzing claims of lawyer-client privilege in the context of shareholder suits than does Valente." Deutch, 580 A.2d at 106; Grimes, 1999 WL 252381, at *3. Plaintiffs have failed to show good cause. As a preliminary matter, plaintiffs must first establish a mutuality of interest, which exists when a fiduciary "seeks legal advice in connection with *actions taken or contemplated in his role as a fiduciary*." In re Fuqua Indus. Inc., No. Civ. A. 11974, 2002 WL 991666, at *3 (Del. Ch. Ct. May 2, 2002) (emphasis added). Here, plaintiffs would have to show that the Debtors were *the beneficiaries* of the attorney-client communications set forth on BCE's privilege logs, which cannot be the case because the documents on BCE's privilege log reflect legal work performed *for BCE*. Id. Indeed, all documents subject to the common interest privilege have already been previously produced to the plaintiffs. Further, the factors relevant to the "good cause" analysis weigh in favor of maintaining the attorney-client privilege: (1) plaintiffs are not minority shareholders to whom a fiduciary duty was owed. (2) they make the unsupported conclusion that the "colorability of Plaintiffs' claims is evident from the face of the Complaint." (3) Plaintiffs have failed to show that the substance of the information they seek is unavailable from other sources, including depositions, without infringing on the attorney-client privilege. See In re Fuqua, 2002 WL 991666, at *3; Kosachuck v. Latinadvisor.com, No. Civ. A. 17958, 2000 WL 1946664, *1 (Del. Ch. Dec. 19, 2000). (4) they are "blindly fishing" for all the documents located on the privilege logs. (5) Plaintiffs' have alleged breaches of contract and fiduciary duties, but not criminal or illegal conduct. Further, the documents on BCE's log protected by the work product doctrine should not be produced, regardless of good cause. In re Fuqua, 2002 WL 991666, at *6.

[21]    Plaintiffs allege that Ryan was the Corporate Secretary of Teleglobe and of BCE between November 2000 and April 2002. See Plaintiffs' List of Debtors' and/or TI's Fiduciaries Associated with BCE, at 2.

now expressly held that "[t]he directors' fiduciary duty does not change when a corporation is in the nebulous 'vicinity of insolvency.'" Peoples Dep't Stores, Inc., [2004] SCC 68, ¶ 46. Plaintiffs simply ignore controlling Canadian law on this issue.[22] Second, plaintiffs' reliance on Valente and Harriman is misguided. Those cases involved fiduciary duties designed to protect minority shareholders. Supra at 27-30.[23]

## 2. In any event, BCE appropriately withheld attorney-client communications prepared solely for BCE

The only documents set forth on BCE's privilege logs reflect the provision of legal advice solely to BCE. Under the decision of the Delaware Chancery Court in Grimes v. LCC Int'l, Inc., 1999 WL 252381, at *2, they are privileged, and plaintiffs' motion should be denied. In Grimes, the Delaware Chancery Court held that, to the extent the general counsel of a corporation is performing work *solely* in his capacity as attorney for that corporation, such work is protected by the attorney-client privilege, regardless of whether he also served as the Chairman of the Board of Directors and general counsel of a subsidiary, and the legal work performed related to the relationship between the two corporations. Id.

Grimes involved a derivative action brought by Microcell's minority shareholders against its controlling shareholder, LCC International, Inc. ("LCC"). Id. at *1. Plaintiffs sought to compel production of attorney-client communications relating to the subject matter of the lawsuit authored by DeLiso, the general counsel of LCC, who simultaneously served as general counsel of Microcell and Chairman of Microcell's Board of Directors. Id. As here, plaintiffs argued that the attorney-client privilege should not apply to documents authored or viewed by DeLiso. Id. at *2. The Court rejected plaintiffs' arguments, finding that "[w]hether or not a given communication from Mr. DeLiso is privileged will necessarily depend upon his

---

[22]    The same result obtains under Delaware law. The Delaware Supreme Court has held that, under Delaware law, "a parent does not owe a fiduciary duty to its wholly owned subsidiary." Anadarko Petroleum Corp., 545 A.2d at 1174.

[23]    Harriman also did not involve the attorney-client privilege.

capacity at the time he generated or received the communication." Id. The Grimes court further held that "[a]ny confidential communication made by Mr. DeLiso—acting *solely* in his capacity as counsel for LCC—to LCC or its directors and/or officers; and any confidential communication made by those clients to Mr. DeLiso, acting again *solely* in that capacity, should be subject to the attorney-client privilege. Those communications would, therefore, be protected from disclosure to the plaintffs, who are stockholders of Microcell, not LCC." Id. (emphasis in original). The same analysis should apply here. That analysis is consistent with the holding of the United States Supreme Court in Bestfoods. Supra, at 30.

The documents that BCE has withheld on the ground of attorney-client privilege or work product reflect legal advice provided solely to BCE.[24] Such legal work includes the following:

- BCE attorneys analyzed the legal consequences for BCE and provided legal advice to BCE regarding legal issues surrounding restructuring and financing alternatives for Teleglobe. BCE attorneys also provided legal advice to BCE regarding the analysis of legal issues and assessment of the legal impact to BCE of entering into certain transactions with Teleglobe or its subsidiaries and the legal impact to BCE of transactions Teleglobe or its subsidiaries might undertake with third parties. For instance, in early 2002, BCE attorneys analyzed certain Credit Facilities (entered into by Teleglobe and a syndicate of lenders) and other documents to determine whether BCE could continue funding Teleglobe and obtain security in connection with such funding. They also analyzed the legal consequences for BCE of providing such funding to Teleglobe. In addition, they were involved in negotiating and drafting certain letters of support and contracts on behalf of BCE, such as the letter of support that BCE was asked to provide

---

[24]  The voluminous number of entries on the privilege logs reflects that plaintiffs have sought the files of several attorneys in BCE's Law Department, including the Chief Legal Officer and the General Counsel of BCE.

59825 1001

to Teleglobe's lenders in connection with the renewal of the Credit Facilities in 2001 and 2002. Documents 2, 4-7, 25-26, 32, 43-44, 47-48, 59-62, 64, 75, 81, 87-8, 93, 97, 101, 104, 106, 108-11, 114, 142-44, 150, 152-54, 155-57, 162, 166, 174, 189, 198, 210, 218, 221, 224-25, 244-45, 253-54, 269-70, 274, 276, 291-94, 303, 311, 316-18, 321-24, 326, 331, 346-47, 353, 369, 371, 376, 383, 405, 415, 439, 458, 486, 491, 512, 546, 552, 558, 564-67, 570, 578-581, 589, 592, 596, 598, 600, 617, 628-29, 633, 653, 659-60, 670, 675, 684, 690, 698, 711-12, 716-17, 753, 791 and 794 noted on the privilege log reflect legal communications regarding these subject matters.[25]

- Another area of responsibility of attorneys working for BCE was to provide legal advice and comments to BCE's Secretariat and members of BCE's compliance and accounting groups regarding BCE's annual reports, its public filings, and its reporting obligations. In addition, they provided legal advice regarding the legal consequences to BCE of reporting obligations required by its subsidiaries. Documents 13, 14, 57, 65-6, 118, 121, 124, 126-27, 131, 133-35, 161, 232, 236, 281, 284-85, 313-14, 337, 344, 348, 402, 425, 427, 479, 511, 540-43, 545, 633, 638, and 700 noted on the privilege log reflect communications regarding these subject matters.

- Attorneys for BCE also provided legal advice regarding resolutions presented to BCE's Board of Directors on matters for which BCE Board approval was required, and drafted and commented on presentations provided to the BCE Board involving matters of legal concern. Some of these documents were created by BCE. Other documents reflect the advice of attorneys. Documents 58, 71, 74, 78, 112, 140, 215-17, 265, 287, 345, 448, 577, 625, 706 and 795 noted on the privilege log reflect communications regarding these subject matters.

---

[25]    Document number 312 is set forth on the privilege log dated May 28, 2004, but it has been produced in non-redacted form.

- BCE's attorneys also analyzed BCE's legal obligations with respect to certain issues pertaining to BCE's subsidiaries, such as changes in corporate logos. Document 137 noted on the privilege log reflects communications regarding these subject matters.

- Beginning in late March 2002, the BCE legal department, along with the assistance of BCE's outside counsel, began to analyze the legal issues arising from BCE's continued support of Teleglobe. A significant portion of that legal work was performed solely for BCE by either internal BCE attorneys or outside counsel for BCE and was not intended to be shared with Teleglobe or its subsidiaries. Documents 15, 24, 30-31, 33, 50-52, 76-77, 79-80, 82-83, 119, 130, 141, 149, 151, 157, 158-61, 165, 167, 169-70, 172-73, 175, 178, 180-85, 187-88, 195, 197, 201-03, 208, 211-14, 219-20, 222, 226, 228-29, 235, 239-41, 247-50, 255-57, 271, 273, 275, 302, 310, 457, 462-65, 467-68, 474, 476, 480, 483, 494-97, 499-500, 502, 505-6, 593, 693, 696, 705-710, 713, 718, 725, 727-29, 731-33, 735, 741, 743, 745, 747, and 749-51 noted on the privilege log reflect communications regarding those subject matters.

All these documents were meant to be kept in confidence and not to be disseminated outside of BCE, and they are available for *in camera* review by a special master or mediator, as the Bankruptcy Court contemplated. (Shandler Aff. Ex. C (Tr.), at 77:6-10); Grimes, 1999 WL 252381, at *1.[26] Therefore, there is no basis to eliminate the protection of the attorney-client privilege and the work product doctrine as to legal work performed for BCE. Furthermore, under plaintiffs' restrictive view of the attorney-client privilege, legal advice provided to a parent corporation by a lawyer working for that corporation, and transmitted to other employees of the

---

[26] BCE's privilege log adequately describes the nature of the documents and the sections withheld on the ground of privilege, in order to enable the parties and the Court or a special discovery master, to assess the applicability of the privilege. Rossi v. Standard Roofing, Inc., 156 F.3d 452, 477 n.16 (3d Cir. 1998) (upholding district court's denial of plaintiff's motion to compel the name of the entity discussed and other additional information concerning the "subject matter" of the attorney-client conversation noted on defendant's privilege log.)

35

parent, would never be protected by the attorney-client privilege if that lawyer also was an officer of a subsidiary as is the usual case. This approach would not be consistent with the goal of encouraging "full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." Upjohn Co. v. United States, 449 U.S. 383, 389 (1981). Such a position is untenable and ignores the practical realities of the workings of corporations.[27]

### B. BCE Did Not Waive Any Privilege By Producing Documents that Did Not Reflect the provision of legal Advice and Documents Subject to a Common Interest

Plaintiffs point to several documents that BCE produced and argue that BCE waived its attorney-client privilege when it produced them. (Opening Br. at 36-38.) As described above, BCE narrowly construed the documents that should be withheld on the ground of privilege. Supra at 15. Many of the documents that plaintiffs mention on page 37 of their brief were produced because they did not reflect the provision of legal advice. See e.g., BCE SUP. 120486-94; R. 2004 BCE 126509-36; BCE E 10446, R. 2004 077093-94; BCE SUP 125955; BCE SUP 121881-883; BCE SUP 123428-29. To the extent portions of those documents reflected legal advice, they were redacted, and reflected on the privilege log. See, e.g., BCE SUP. 120494. Other documents were produced pursuant to the Bankruptcy Court's Order because they were subject to the common interest privilege. Those include documents shared with Lazard Freres (an investment bank retained by Teleglobe), Jones Day Ravis & Pogue (a law firm representing Teleglobe), Simpson Thatcher & Bartlett (another law firm representing Teleglobe),

---

[27] Plaintiffs also argue, without citing any authority, that they are entitled to all the privileged documents of Martine Turcotte, the Chief Legal Officer of BCE, and Messrs Cossette and Riciutto, two lawyers who work in BCE's Law Department. (Opening Br. at 35-36.) Plaintiffs do not point to any legal work that those individuals performed for Teleglobe or the Debtors, but rely on a power point presentation apparently prepared by an outside consultant stating that BCE's Law Department performed certain typical functions for its subsidiaries, such as securities compliance. In short, Turcotte, Ricciuto, and Cossette were employees of BCE, and the legal work they performed for BCE is privileged. Supra at 32-33.

or employees or directors of Teleglobe. See, e.g., BCE SUP 120484-85; BCE SUP 120713-14; BCE SUP 122027-33; BCE SUP 122356-81; BCE SUP. 120705-712; BCE SUP 121407; BCE SUP 121432-33; BCE SUP 123530-123563; BCE SUP 121841-850. Furthermore, the parties' Confidentiality Stipulation states that the "inadvertent production of any document claimed to be privileged shall not constitute a waiver of such privilege." (Morgan Decl. Ex. 30, at ¶ 21.) BCE has not voluntarily produced any privileged documents, and the Debtors have no grounds to claim that a waiver of privilege has taken place.

## I.    BCE Properly Invoked the Work Product Doctrine

The United States Supreme Court has stated that "a strong public policy" underlies the work product doctrine: enabling the protection of an attorney's "mental impressions, conclusions, opinions, or legal theories," prepared in anticipation of litigation. Upjohn, 449 U.S. at 398 (citations omitted). BCE withheld certain documents created, in April and May 2002, on the ground that they were protected by the work product doctrine. Those documents were prepared because of the prospect of litigation and are protected by work product doctrine, regardless of whether the Debtors elected to file their lawsuit in 2004. Martin v. Bally's Park Place Hotel & Casino, 983 F.2d 1252, 1261 n. 7 (3d Cir. 1993). Furthermore, contrary to plaintiffs' argument, the fact that those analyses were conducted does not amount to an acknowledgment of liability. In Martin, the Third Circuit has indeed held that "[p]rudent parties anticipate litigation and begin preparation prior to the time suit is formally commenced." Martin v. Bally's Park Place Hotel & Casino, 983 F.2d at 1260.

Plaintiffs illogically argue that, because they have supposedly met the "good cause" standard regarding the production of attorney-client communications, they have necessarily established a "substantial need" for those documents. (Opening Br. at 39.) First, plaintiffs have cited a case in their own brief, which demonstrates that the evaluation of the "good cause" exception is separate from the work product analysis. In re Fuqua, 2002 WL 991666, at *6. Second, Rule 26(b)(3) permits the discovery of work product only upon a showing that the

37

party seeking discovery has demonstrated "a substantial need" for the document and that it "'is unable without undue hardship to obtain the substantial equivalent of the [document] by other means.'" Martin, 983 F.2d at 1262 (citing Fed. R. Civ. P. 26(b)(3)). Debtors have failed to demonstrate a "substantial need" for the BCE documents protected by the work product doctrine. Further, some of the information plaintiffs seek may be obtained through the oral testimony of the individuals who provided the information recorded in the documents. See Tribune Co. v. Purcigliotti, No. 93 Civ. 7222, 1998 WL 175933 at *4 (S.D.N.Y. Apr. 14, 1998) ("'Substantial need' cannot be shown where persons with equivalent information are available for deposition.") (citations omitted); Gay v. P.K. Lindsay Co., 666 F.2d 710. 713 (1st Cir. 1981). Moreover, as previously indicated, Debtors cannot demonstrate a need for work product materials based on legal research conducted by counsel for BCE, when such research resources are equally available to the Debtors.

WP3:1089547 2

59825 1001

CONCLUSION

For the foregoing reasons, defendants respectfully request that plaintiffs' motion

be denied.

Dated: March 1, 2005
        Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Pauline K. Morgan (No. 3650)
Maribeth Minella (No. 4185)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899
(302) 571-6600
pmorgan@ycst.com
mminella@ycst.com
bank@ycst.com


-and-

SHEARMAN & STERLING LLP
Stuart J. Baskin
George J. Wade
Daniel Schimmel
599 Lexington Avenue
New York, NY 10022
(212) 848-4000

Attorneys for Defendants

WP3:1089547.2                                                          59825.1001

## CERTIFICATE OF SERVICE

I hereby certify that on **March 1, 2005,** I electronically filed a true and correct copy of

**Defendants' Corrected Memorandum in Opposition to Plaintiffs' Motion to Compel**

**Production of Documents Wrongfully Withheld by Defendants** with the Clerk of the Court

using CM/ECF, which will send notification that such filing is available for viewing and

downloading to the following counsel of record:

| | |
|---|---|
| Gregory V. Varallo, Esq.<br>Mark D. Collins, Esq.<br>Robert J. Stern, Jr., Esq.<br>Richards, Layton & Finger, P.A.<br>920 N. King Street<br>Wilmington, DE 19801 | Kevin A. Gross, Esq.<br>Joseph A. Rosenthal, Esq.<br>Rosenthal, Monhait, Gross & Goddess, P.A.<br>1401 Mellon Bank Center<br>P.O. Box 1070<br>Wilmington, DE 19899-1070 |
| US Trustee<br>Office of the US Trustee<br>844 King Street, Suite 2313<br>Lock Box 35<br>Wilmington, DE 19801 | John P. Amato, Esq.<br>Mark S. Indelicato, Esq.<br>Zachary G. Newman, Esq.<br>Jeffrey L. Schwartz, Esq.<br>Hahn & Hessen LLP<br>488 Madison Avenue<br>New York, NY 10022 |

I further certify that on March 1, 2005, I caused a copy of **Defendants' Corrected**

**Memorandum in Opposition to Plaintiffs' Motion to Compel Production of Documents**

**Wrongfully Withheld by Defendants** to be served by hand-delivery on the following counsel of

record:

| | |
|---|---|
| Gregory V. Varallo, Esq.<br>Mark D. Collins, Esq.<br>Robert J. Stern, Jr., Esq.<br>Richards, Layton & Finger, P.A.<br>920 N. King Street<br>Wilmington, DE 19801 | Kevin A. Gross, Esq.<br>Joseph A. Rosenthal, Esq.<br>Rosenthal, Monhait, Gross & Goddess, P.A.<br>1401 Mellon Bank Center<br>P.O. Box 1070<br>Wilmington, DE 19899-1070 |
| US Trustee<br>Office of the US Trustee<br>844 King Street, Suite 2313<br>Lock Box 35<br>Wilmington, DE 19801 | |

I further certify that on **March 1, 2005,** I served **Defendants' Corrected Memorandum**

**in Opposition to Plaintiffs' Motion to Compel Production of Documents Wrongfully**

**Withheld by Defendants** of the following non-registered participants in the manner indicated

below:

BY FEDERAL EXPRESS:
John P. Amato, Esq.
Mark S. Indelicato, Esq.
Zachary G. Newman, Esq.
Jeffrey L. Schwartz, Esq.
Hahn & Hessen LLP
488 Madison Avenue
New York, NY  10022

 

Pauline K. Morgan (No. 3650)
Maribeth Minella (No. 4185)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
P.O. Box 391
Wilmington, DE 19899-0391
(302) 571-6681
pmorgan@ycst.com
mminella@ycst.com
bank@ycst.com

*Attorneys for Defendants*