# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------------- x

In re                                             )    Chapter 11
                                                  )
TELEGLOBE COMMUNICATIONS CORPORATION, *et al*,    )    Jointly Administered
                                                  )    Bankr. Case No. 02-11518 (MFW)
Debtors.                                          )
-------------------------------------------------------------------- x
TELEGLOBE COMMUNICATIONS CORPORATION, *et al*,    )
                                                  )    C.A. No. 04-CV-1266 (SLR)
Plaintiffs,                                       )
                                                  )
v.                                                )
                                                  )
BCE INC., *et al*,                                )
                                                  )
Defendants.                                       )
-------------------------------------------------------------------- x

## PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO COMPEL
## PRODUCTION OF DOCUMENTS WRONGFULLY WITHHELD BY DEFENDANTS

Gregory V. Varallo (No. 2242)                Kevin A. Gross (No. 209)
C. Malcolm Cochran, IV (No. 2377)            Joseph A. Rosenthal (No. 234)
Richards, Layton & Finger, P.A.              Rosenthal, Monhait, Gross & Goddess, P.A.
One Rodney Square                            1401 Mellon Bank Center
P.O. Box 551                                 P.O. Box 1070
Wilmington, Delaware  19801                  Wilmington, Delaware  19899-1070
(302) 651-7700                               (302) 656-4433
varallo@rlf.com                              kgross@rmgglaw.com
cochran@rlf.com                              rmgg@rmgglaw.com
Attorneys for Teleglobe Communications
Corporation, *et al*                                         and

                                             John P. Amato
                                             Mark S. Indelicato
                                             Zachary G. Newman
                                             Jeffrey L. Schwart
                                             Robert J. Malatak
                                             Hahn & Hessen LLP
                                             488 Madison Avenue
                                             New York, New York  10022
                                             (212) 478-7200
                                             Attorneys for Official Committee of
                                             Unsecured Creditors of Teleglobe
Dated:  March 9, 2005                        Communications Corporation, et al.

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT ................................................................................... 1

ARGUMENT ............................................................................................................... 3

   I.   BCE'S LACK OF GOOD FAITH IN RESPONDING TO DISCOVERY .......... 4

   II.   BCE'S UNILATERAL TIME LIMITATION IS UNJUSTIFIED ...................... 5

   III.   BCE MUST UNREDACT ITS BOARD MINUTES .......................................... 6

   IV.   BCE HAS FAILED TO COOPERATE IN PROVIDING E-DISCOVERY ........ 7

   V.   DEFENDANTS HAVE FAILED TO MEET THEIR BURDEN OF
       SUSTAINING THEIR ASSERTION OF PRIVILEGE ...................................... 9

       A.   Introduction ................................................................................................ 9

       B.   The Lawyers And Individual Defendants Are Fiduciaries Of The
           Debtors ...................................................................................................... 10

           1.   Lawyers Owe Fiduciary Duties To Their Clients ........................... 10

           2.   BCE And The Individual Defendants Owed Fiduciary Duties To
              The Debtors And Their Creditors Because The Debtors Were
              Insolvent Or In The Vicinity Of Insolvency ................................... 13

       C.   Defendants' Other Attempts To Distinguish Valente And Plaintiffs'
           Other Cases Fail ........................................................................................ 15

       D.   Defendants Cannot Withhold Documents That They Describe As
           "Prepared Solely For BCE." ..................................................................... 17

       F.   Defendants Waived Their Privilege Claims Through Partial Disclosure
           Of Allegedly Privileged Documents ......................................................... 19

       G.   Defendants Have Failed To Justify Their Work Product Designations ...... 19

CONCLUSION ............................................................................................................ 20

RLF1-2848589-3

# TABLE OF AUTHORITIES

## CASES

Aaronson v. Lewis,
473 A.2d 805 (Del. 1984), rev'd on other grounds, Brehm v. Eisner, 746 A.2d 244 (Del. 2000) .................................................................................................. 13

Anadarko Petroleum Corp. v. Panhandle E. Corp.,
545 A.2d 1171 (Del. 1988) ........................................................................ 13

Deutsch v. Cogan,
580 A.2d 100 (Del. Ch. 1990) ................................................................... 19

In re Freeport-McMoran Sulphur, Inc.,
2005 WL 225040 (Del. Ch. Jan. 26, 2005) ............................................... 19

Garner v. Wolfinbarger,
430 F.2d 1093 (5th Cir. 1970), cert. denied, 401 U.S. 974 (1971) ........... 18

In re Grand Jury Subpoena,
223 F.3d 213 (3d Cir. 2000) ...................................................................... 15

Grimes v. LCC Int'l., Inc.,
1999 WL 252381 (Del. Ch. Apr. 23, 1999) .............................................. 17

Groupe DMR Inc. v. K. Krnsa General Ins. Co. Ltd.,
[2003], REJB 2003-16291 (Quebec Ct. of Appeal) ............................. 11, 12

Guth v. Loft, Inc.,
5 A.2d 503 (Del. 1939) ............................................................................. 13

In re Kennedy,
442 A.2d 79 (Del. 1982) ........................................................................... 10

LaRocca v. State Farm Mut. Auto Ins. Co.,
47 F.R.D. 278 (W.D.Pa. 1969) ................................................................. 12

In re Loring,
374 A.2d 466 (N.J. 1977) .......................................................................... 11

Martin v. Bally's Park Place Hotel & Casino,
983 F.2d 1252 (3d Cir. 1993) .................................................................... 20

McCarthy v. Recordex Service, Inc.,
80 F.3d 842 (3d Cir. 1996) .................................................................. 10, 11

Official Committee of Unsecured Creditors of Hechinger Investment Co. of Del. Inc. v. Fleet
Retail Finance Group (In re Hechinger Investment Co. of Del. Inc.),
274 B.R. 71 (D. Del. 2002) ................................................................... 14

In re Olsen Indus. Inc.,
2000 WL 376398 (D. Del. Mar. 28, 2000) ............................................... 10

Prod. Res. Group L.L.C. v. NCT Group, Inc.,
863 A.2d 772 (Del. Ch. 2004) .............................................................. 14

Roselink Inv., LLC v. Shenkman,
2004 WL 875262 (S.D.N.Y. May 19, 2004) ............................................. 14

Simpson v. Motorists Mut. Ins. Co.,
494 F.2d 850 (7th Cir. 1974), cert. denied, 419 U.S. 901 (1974) .................. 12

U.S. v. Bestfoods,
524 U.S. 51 (1998) ............................................................................ 17

Valente v. Pepsico Inc.,
68 F.R.D. 361 (D. Del. 1975) ....................................................... *passim*

Ward v. Succession of Freeman,
854 F.2d 780 (5th Cir. 1988), reh'g denied, 863 F.2d 882 (5th Cir. 1988) ....... 18

## STATUTES AND OTHER AUTHORITIES

Fed. R. Civ. P. 37 ............................................................................. 5

*Delaware Lawyer's Rules of Professional Conduct*, Rule 1.4(a) ..................... 11

## PRELIMINARY STATEMENT

The combined efforts of the Plaintiffs to secure production from BCE have now spanned more than a year. In that time, BCE has produced roughly 25 boxes of its own documents relating to Teleglobe, from the files of some 25 of its employees.[1]

We then discovered, on February 2, 2005, the existence of BCE's 250-box Teleglobe litigation archive. (D.I. 75, Ex. A at 78). BCE's document witness also revealed that BCE had failed to review for production more than half of the materials stored in that archive -- all of which had been collected in anticipation of litigation. When confronted with these deficiencies, BCE, to our surprise, stubbornly refused even to review these boxes. As recently as February 15, 2005 -- four days after our motion to compel was filed -- BCE rejected our requests that it do so. (See Ex. A at 3-4).

Then, on February 23, 2005, BCE reluctantly turned over the index for its Teleglobe litigation archive (See Ex. B). That index lists dozens of hard document files that BCE has failed to produce and was then refusing even to review. These include files generated by some of the named defendants, including BCE's CEO Michael Sabia; its former Chairman and CEO Jean Monty; and Michael Boychuck, BCE's Treasurer and Teleglobe's CFO. These previously unidentified (and as yet unproduced) files bear titles including, *inter alia*, "Teleglobe Inc. Major Upheaval," "Teleglobe Strategy and Direction," "TGO Inc. Segmented Valuation," "Ebitda/Cashflow Impact on BCE" and "TGO Inc. Financial Situation." (Id.)

BCE's index also lists some 78 files that BCE had failed to disclose, and refused to review, that were collected in 2002 from three BCE employees whom Plaintiffs seek to depose beginning on March 15, 2005. These include obviously relevant files from Yannick DeGrandpré and Elie Daher -- two BCE finance group witnesses who now appear to have been directly involved in matters central to this controversy. Among their files are documents directly related to the valuation and solvency of the

---

[1] The additional 95 boxes produced by BCE have consisted of copies of Teleglobe's own documents.

Teleglobe enterprise. BCE refused to expedite the electronic production necessary for these depositions. It has only just today offered to forward the hard documents.

In short, it is apparent that BCE (with its "guess the custodian" approach) has been engaged in a strategy of obstruction and delay. Having now been caught, BCE has augmented its strategy in two ways. It has sought to moot this motion by grudgingly agreeing to review and produce responsive documents from the other half of its Teleglobe litigation archive, on some as yet undefined schedule. It then launched (in its answering brief on this motion) an ill-conceived "spoliation" counter-attack on the Debtors. Since the latter tactic is unrelated to the Plaintiffs' pending motion, it will be dealt with summarily in this brief.

As for BCE's efforts to moot our motion, however, its frenetic attempt to produce now what it previously refused even to review fails to address several fundamental problems. First, Plaintiffs framed and brought this case nine months ago on the basis of what we now know was a grossly inadequate response by BCE to the Rule 2004 discovery. BCE's delay in providing proper discovery has been inordinate and has prejudiced our ability to conduct depositions in accordance with the current schedule. Second, the Plaintiffs have crafted their discovery around their claims as stated. With regard to the electronic discovery in particular, we have based our searches on names and terms extracted directly from the hard copy documents that have been produced to date. Through this process, we have spent hundreds of thousands of dollars on the basis of information that was apparently far less than complete and far less than that to which we were entitled. The Court's assistance is required to assure complete *and prompt* production by BCE. Pending that production, Plaintiffs must reserve their right to seek further relief to cure the prejudice that may well have accrued.

With regard to electronic data, BCE initially ignored, for nearly three months, our requests to meet and confer, as required by the local "Default Standards" for e-discovery. When it finally did respond, in late January of 2005, it simply stalled. BCE now flatly refuses to review and produce *any* electronic data *at all* -- even the limited subset necessary for the first three BCE employee depositions -- unless or until search "filters" of its liking are developed. (See Ex. C) The essence of BCE's complaint

2

is burdensomeness -- that the date and key word "filters" that it helped to develop are now producing too many "hits" (as applied to the 37 mutually agreed-upon BCE custodians) for BCE to review  And so, after months of delay, BCE has reviewed (and produced) nothing  Yet, the bankrupt Debtors have undertaken the very same search, using the very same filters  With only one Information Technology employee, a vendor and limited funds, the Debtors are diligently working to complete, with regard to the 29 mutually agreed-upon Debtor-side employees, the very same review that we have asked BCE to undertake  With its billions of dollars in resources and its "60,000 employees" (D.I  87 at 17), BCE's refusal even to expedite the electronic production necessary for the first three depositions more than illustrates its lack of good faith in this process  That same approach is apparently being employed by BCE in Canada, as evidenced by the recent report of a court-appointed independent e-data expert, discussed *infra*  (See Ex  D)

Finally, BCE's rejoinder on the privilege issues is misplaced  BCE's "we were not fiduciaries" argument is simply wrong  Among other things, Lalande, Ryan and Masse plainly acted as lawyers for (and hence were fiduciaries to) both the Debtors and BCE  BCE's argument, made in a footnote, that the Debtors were not "clients" of Turcotte, Ricciuto and Cossette is also unsupportable  Moreover, the Debtors and their immediate parent were by definition insolvent or in the zone of insolvency by the first quarter of 2002 (and we say far earlier) when the question of withdrawal of their funding was being considered by the common BCE/Debtor lawyers, directors and officers  There can be no privilege in these circumstances  The Plaintiffs are entitled to the documents we seek

## ARGUMENT

Our argument will address those issues that remain outstanding that are directly related to our motion to compel  While BCE's brief contains a variety of mischaracterizations relating to other matters, those that are not material to Plaintiffs' motion to compel will not be addressed  No inference should be drawn regarding the Debtors' position on matters not addressed herein

3

I.    **BCE'S LACK OF GOOD FAITH IN RESPONDING TO DISCOVERY.**

Read together, the depositions and briefing establish that BCE first carefully assembled, in the summer and early fall of 2002, a 250-box litigation archive of Teleglobe-related documents from as many as 100 BCE employees  Then, during the Rule 2004 discovery, BCE limited the Committee to responsive documents from a grand total of 9 of those employees -- totaling 10 boxes  BCE subsequently limited the Debtors to roughly 15 more boxes, from 16 more employees -- each of whom was identified *by the Debtors,* pursuant to BCE's "guess the custodian" game  It is wrong to suggest (as BCE does) that the files of 65 of BCE's employees were searched  Rather, BCE claims that some 40 of the "custodians" identified by the Debtors never worked for BCE and had no files there  (D I  75, Ex  M at 2)

During the February 2, 2005 Rule 30(b)(6) deposition of BCE on its document production, the witness presented, Martin Cossette, revealed the existence of the 250-box archive, along with the file-by-file index of the archive  When Plaintiffs demanded a copy of the index, BCE attached various conditions to its production  The index was only produced on February 23, 2002 -- 12 days after this motion was filed  (Ex  B)

Examination of BCE's index demonstrates the extent of BCE's failure to make proper discovery  Further, the fact that the index exists -- and that it lists dozens of specific files that on their face appear to be relevant, but still were not reviewed -- illustrates the extent to which BCE's good faith has been absent  For example, dozens of Teleglobe-related files for Jean Monty (a named defendant), including those listed in the attachment to this brief, were plainly identified and available to BCE, but not produced  (Ex  E)  Files for BCE's Maarika Paul entitled "Teleglobe Renegotiation,"  "Teleglobe Restructuring" and "Acquisition of Teleglobe" were not even reviewed by BCE, since Paul was not listed among the original 18 custodians BCE identified  (Id  at 2)  In light of our claims, and the specific document requests at issue here, it is more than surprising that files with such titles were not reviewed and produced

Files reflecting investor relations meetings, communications with lenders, analyst reports and Teleglobe's financial results all were apparently not reviewed nor produced  (See Ex  B at 3-4)  Files generated by Len Ruggins entitled "TGO, Inc  Debt Financing Option," "TGO Financing Alternatives"

4

and "Funding TGO: A BCE Perspective" apparently were never reviewed by BCE. (Ex. B at 6) As noted earlier, not one document has been reviewed or produced from the dozens of files in BCE's archive collected from BCE finance group employees Yannick DeGrandpré and Elie Daher, both of whom are among the very first group of substantive depositions scheduled by the Debtors in this case. Daher's as yet unreviewed and unproduced files apparently include a wide range of financial materials for the Teleglobe enterprise, including "Teleglobe US GAAP Back-Up," investor briefing materials and financial statements. (Id. at 70-71). DeGrandpré as yet unreviewed and unproduced files include materials on "TGO Strategy," "Teleglobe Goodwill Backup," "BCE Teleglobe Presentation," "Teleglobe Acquisition" and, ominously for this case, "Teleglobe Valuation." (Id. at 8) There are dozens of other examples.

How anyone with even a cursory understanding of the issues in this case could fail to review these files defies understanding. It is not correct to say (as BCE does) that this case involves only BCE's $2.4 billion commitment and the cancellation of that commitment on April 23, 2002. (D.I. 87 at 10, 20) Rather, this case involves claims for breach of fiduciary duty by BCE and by the individual defendants (D.I. 2, ¶¶ 144-165). The Debtors were controlled by the Defendants and were insolvent. (Id.). And BCE itself has placed Teleglobe's goodwill value at issue in this case. Among other things, the complaint alleges that TI and the Debtors were balance sheet insolvent. (Id., ¶ 81) BCE has moved to dismiss, and argued that the Plaintiffs are wrong because the full value carried on Teleglobe's balance sheets for goodwill must be considered. (D.I. 64 at 18) It appears, however, that Teleglobe's goodwill value was substantially impaired. Having itself joined issue on this point, BCE has no defense to its failure to provide the discovery. Plaintiffs require the assistance of the Court in compelling prompt and complete production. Plaintiffs further reserve their rights to seek remedies designed to cure the prejudice they are facing. (See Fed. R. Civ. P. 37 and n.2, *supra*)

## II.    BCE'S UNILATERAL TIME LIMITATION IS UNJUSTIFIED.

BCE still has failed to justify its effort to limit the Plaintiffs only to documents generated prior to May 28, 2002. The fact is, this case was not filed until May 24, 2004 -- two years after the arbitrary cut-off imposed by BCE. There were relevant and responsive documents generated well after BCE's cut-off

5

date. There has been no claim of privilege, no showing of lack of relevance, nor anything else that would justify BCE's failure to produce these documents.

BCE implicitly recognizes this by now agreeing to produce goodwill-related documents from its "accounting department files" for dates subsequent to May 28, 2002. (D.I. 87 at 22) Not good enough. Plaintiffs are entitled to production from all BCE employees who may have responsive documents relating to goodwill, without regard to BCE's arbitrary cut-off date -- including, in particular, goodwill-related documents from the files of the individual Defendants, upper level management and members of BCE's board.

Nor is BCE's temporal limitation justified by its overly narrow view of our claims. As noted earlier, this case is not solely based in contract, deriving from BCE's April 23, 2002 breach of its $2.4 billion commitment. Rather, Defendants breached their fiduciary duties by failing to fund TI and the Debtors -- or by continuing to cause those entities to incur debt in the absence of a committed funding source. Those duties arose from the Defendants' control of TI and the Debtors, and by virtue of the fact that those entities were insolvent, or in the zone of insolvency. Substantial value was destroyed as a result of the Defendants' misconduct. Plaintiffs are entitled to all nonprivileged documents, whenever generated, that bear in any way on these claims.[2]

## III. BCE MUST UNREDACT ITS BOARD MINUTES.

Judge Walrath did not deny the Committee's motion to compel the production of unredacted BCE board minutes. She instead declined to rule on the matter, preferring to have the demand considered after the filing of this adversary proceeding. (D.I. 75, Ex. C at 77) BCE's redactions, predicated on relevance or confidentiality, have been overly broad, as is illustrated by its redaction of the section of its April 23, 2002 board minutes, entitled "TGO Strategic and Funding Review." When confronted with this one example -- which was just that -- BCE immediately unredacted only that document, as if to moot the

---

[2] The cases cited by BCE (D.I. 87 at 21-22) are readily distinguishable, as every one of them cuts off discovery after the filing of the complaint *in that very case*, not some other suit filed by a different plaintiff in a different court seeking different relief.

issue.  Unfortunately, it does not.  A variety of other examples exist in, for example, the BCE board

minutes of April 19 and 22, 2002.  (See BCE-SUP 126796, BCE-SUP 126794-5 (Ex. F))

The fact that the now unredacted April 23 minutes were even redacted to begin with serves to

demonstrate our point.  Given the games BCE has played in discovery and the significance of the actions

taken by the BCE board at the time, *in camera* review of the full, unredacted BCE board minutes is amply

warranted to determine whether the redactions are appropriate.[3]

## IV.    BCE HAS FAILED TO COOPERATE IN PROVIDING E-DISCOVERY.

As was the case with its hard document discovery, BCE is playing games with its electronic

discovery.  The fact is, we are currently seeking about three years' worth of electronic data for a grand

total of 37 of the 60,000 employees of BCE.  It is asserted by BCE that no electronic data exists at all for

at least 5 of the employees identified by Plaintiffs.  (Ex. G).  BCE's data has already been "captured"

from the "available" hard drives and servers.  It has been further filtered using 170 key words -- nearly

half of which were chosen *by BCE* (and, yes, the word "Excel" has long ago been dropped from the list).[4]

Notably, using the purported "results" of BCE's search of a "sample" of 103,591 "easily searchable"

documents, the currently agreed "filters" reduce the e-documents that would need to be manually

reviewed for responsiveness by more than 30 percent -- to approximately 71,000.[5]  (Ex. H).  But BCE

refuses even to review this "easily searchable" sample for responsiveness.  (See Ex. C).  And

notwithstanding that it has been on notice for nearly a month, BCE refused even to search the electronic

files of the three witnesses Plaintiffs seek to depose beginning next week.  (Id.)

BCE's tactic here is reminiscent of that which it has employed in similar litigation in Canada.

There, the court has appointed an independent third-party e-data vendor, Digital Evidence International

---

[3] Moreover, BCE still has failed to address why a confidentiality stipulation would not solve the issue it raises.  (See D.I. 76 at 24)

[4] BCE fails to note that the parties originally agreed to use upwards of 250 keys words and that it was that list that BCE claims produced "over 2 million pages of documents."

[5] As noted *supra*, Debtors are using the same list of key words to search their own data and are currently running at a "hit rate" of approximately 60% -- meaning we are reducing the number of e-documents that need to be reviewed for any given custodian by an average of 40%.

Inc ("DEI"), to obtain relevant data from BCE  DEI's interim report is, in a word, striking  After nearly eight months of work, DEI is apparently not even close to securing the production of BCE's e-data, notwithstanding that DEI's efforts there have been limited to only five BCE custodians and 131 key terms  Rather, as reflected in DEI's report of February 21, 2005, BCE and its agents have repeatedly obstructed (Ex D at 6, 9-11), delayed (Id at 6, 10-12, 17) and failed to respond to (Id at 9, 15, 17) DEI's inquiries  At certain points, BCE appears to have affirmatively misled DEI (Id at 7 (responses 4 and 5), 13 (responses a vi and b i)), and DEI has been openly skeptical of BCE's responses to its inquiries (Id at 7)

BCE's responses concerning the e-data of its employee Patrick Pichette (a key witness in this case) are among the best examples of its approach  In its answering brief, BCE asserts that Mr Pichette's missing hard drive was "recycled" when he left BCE for Teleglobe in January 2002 "as was typically done " (D.I 87 at 19)  But it was understood all along that Mr Pichette would return to BCE following his stint at Teleglobe  And DEI interviewed the vendor that apparently erased Mr Pichette's hard drive -- Connexim  That vendor states that Mr Pichette's hard drive was "only recently decommissioned " (Ex D at 10)  The DEI report also documents the conflicting reports from within BCE itself regarding Mr Pichette's data  (Id at 13)

The DEI report further documents the availability of a substantial quantity of e-data from back-up tapes for several of the identified custodians that is apparently ready for review.  These include data for Messrs Boychuk, Van Gheluwe and Pichette  (Id at 11-13, 15-17)  These three witnesses are listed among the 37 we have identified  None of this data, however, has yet been reviewed, or produced, by BCE

The Debtors are now diligently engaged in restoring, reviewing and producing electronic data using precisely the same key words we have asked BCE to apply, for the date range and custodians identified by BCE  (See Ex A)  By contrast, BCE has stalled, dissembled, temporized -- and apparently

8

done nothing  It is time for BCE to engage a few of its 60,000 employees in the process of reviewing e-data for production [6]

## V.    DEFENDANTS HAVE FAILED TO MEET THEIR BURDEN OF SUSTAINING THEIR ASSERTION OF PRIVILEGE.

### A.    Introduction.

Defendants' concessions regarding the privilege issues leave little for the Court to decide.  The Defendants do not dispute that it is their burden to establish privilege  They do not dispute that Lalande, Masse and Ryan provided legal advice to the Debtors and/or TI from November 2000 until April 2002, when BCE pulled the plug on its funding commitment to the Debtors  Defendants do not dispute that the TI Director and Officer Defendants (Monty, Currie, Kierans and Skinner), by virtue of their positions as directors and officers of TI, exercised actual control over the Debtors  They also do not dispute that BCE lawyers Turcotte, Cossette and Ricciuto provided legal advice to the Debtors   And significantly, Defendants do not dispute that under this Court's holding in <u>Valente v. Pepsico Inc.</u>, 68 F R D  361 (D Del  1975), fiduciaries cannot shield information from their beneficiaries by asserting privilege.

Defendants have instead pinned virtually their entire argument on the assertion that Lalande, Masse and Ryan, along with the Debtors' and TI's other directors and officers, were not fiduciaries of the Debtors  This "we were not fiduciaries" argument is patently incorrect for two reasons, described in section B below

In the alternative, Defendants argue that the documents that they have withheld were prepared "solely for BCE "  As discussed below, even if this were true, it is irrelevant as it ignores the fiduciary

---

[6] The notion that Plaintiffs have failed to preserve and produce documents (D.I. 87 at 22-27) is neither relevant to this motion to compel production from the Defendants nor based in fact  When BCE cut off Teleglobe's funding in late April of 2002, approximately 1000 of the Debtors' employees had to be terminated immediately  (D I  84, Ex  29 at 41, 44)  They were given two hours notice, and directed to leave all documents in place upon their departure  (Id  at 42)  Those documents -- amounting to approximately 1000 boxes -- were collected, catalogued and preserved  (Id  at 47-8)  Those boxes have been reviewed by the Debtors for responsiveness to BCE's requests, and some 300 boxes have been made available to BCE  Similarly, beginning in May of 2002, Mr  Cooke directed certain of the Debtors' employees to preserve all electronic back-up tapes for all of the Debtors' e-data  That data still exists and is now being restored and searched  (See Ex  A)  BCE has identified nothing (and can identify nothing) that has been lost  Presumably, that is why, for all of its sophistry, it has not filed a cross-motion

duties owed by BCE and the individual Defendants to the Debtors. Moreover, the law provides that so-called "privileged documents" still must be disclosed if the moving party establishes good cause. The Debtors established good cause in their opening brief. (D.I. 76 at 33-35). Defendants, who relegated their discussion of good cause to a footnote in their answering brief, have failed to prove otherwise.

### B.    The Lawyers And Individual Defendants Are Fiduciaries Of The Debtors.

#### 1.    Lawyers Owe Fiduciary Duties To Their Clients.

Defendants acknowledge that fiduciaries are obligated to share material information with their beneficiaries. Defendants allege, however, that Lalande, Masse and Ryan did not owe fiduciary duties to the Debtors because the Debtors are wholly-owned subsidiaries of BCE. (D.I. 87 at 29-30). In making this argument, Defendants completely disregard the attorney-client relationship that existed between these lawyers and the Debtors and the duties attendant with that relationship.

According to this Court, it is "axiomatic" that lawyers owe fiduciary duties to their clients. See In re Olsen Indus. Inc., 2000 WL 376398, at *12 (D. Del. Mar. 28, 2000) ("It is axiomatic that an attorney stands in a fiduciary relationship to the client.")[7] The fiduciary relationship between a lawyer and his client is based on fundamental agency principles *vis a vis the lawyer and the client* and is not at all dependent on whether the client (in this case the Debtors) is a wholly owned, a partially owned, or a completely independent subsidiary of a parent corporation -- or, for that matter, not a corporation at all. See McCarthy v. Recordex Service, Inc., 80 F.3d 842, 857-58 (3d Cir. 1996). Defendants' attempt to distinguish Valente thus fails, because as lawyers for the Debtors, Lalande, Masse and Ryan *as a matter of law* owed fiduciary duties to the Debtors.

The same holds true for lawyers Turcotte, Ricciuto and Cossette. The only conceivable difference with respect to these lawyers is that they were not directly employed by the Debtors and/or TI. However, as explained in detail in Plaintiffs' opening brief, BCE's written corporate policy dictated that

---

[7] In Olson, this Court applied the law of New York (opinion attached hereto at Ex. K with other unreported decisions). However, Delaware law is identical on this point. See, e.g., In re Kennedy, 442 A.2d 79, 89 (Del. 1982) ("It is well settled in Delaware that an attorney is bound by a fiduciary duty in his dealings with his client"); (see also D.I. 76 at 26, n 22).

10

these and other BCE lawyers would handle for the Debtors virtually all legal matters relevant to this case. (See D.I. 76 at 19, 35-36) Defendants' carefully worded footnote never denies that Turcotte, Ricciuto and Cossette provided legal advice to the Debtors because Defendants cannot make such a statement.[8] Turcotte, Ricciuto and Cossette, as lawyers providing advice to the Debtors, owed the Debtors fiduciary duties.

As lawyers, Lalande, Masse, Ryan, Turcotte, Ricciuto and Cossette[9] owed their clients a duty of care, obedience and loyalty. McCarthy, 80 F.3d at 857-58; see also In re Olsen Indus. Inc., 2000 WL 376398, at *14 ("As a fiduciary, an attorney 'is charged with a high degree of undivided loyalty to his client '") (citation omitted). Included as part of a lawyer's fiduciary duty is an obligation to provide his clients with all material information. See In re Olsen Indus. Inc., 2000 WL 376398; see also In re Loring, 374 A.2d 466, 470 (N.J. 1977).[10] While the Court need not, on this motion, decide whether the Debtors' lawyers breached their fiduciary duties, the case law unquestionably demonstrates that these lawyers have an affirmative duty to provide the Debtors with all material or relevant information. And, as made clear by this Court in Valente, the needs of those who look to attorneys/fiduciaries to safeguard their interests (i.e., the Debtors) outweigh the need for any assertion of privilege, even in circumstances where an attorney simultaneously represents the interests of two clients. See Valente, 68 F.R.D. at 368 (a

---

[8] Defendants' footnoted argument only raises two points of contention. First, they argue that BCE was the employer of these individuals, which is totally irrelevant, just like the employer of outside counsel is irrelevant to privilege issues. Rather, what matters is that they provided legal advice to the Debtors. Second, Defendants weakly protest that the document relied upon by Plaintiffs which demonstrates that Turcotte, Ricciuto and Cossette provided legal advice to the Debtors should be discounted because it "apparently" was prepared by an "outside consultant" for BCE. (Id.) This totally unsupported argument, whatever it is intended to mean, certainly falls short of meeting BCE's burden to establish privilege for the Turcotte, Ricciuto and Cossette documents.

[9] All references herein to these 6 attorneys are intended also to include any other BCE in-house counsel identified on the privilege log produced for the first time by BCE on February 18, 2005 -- 7 days after the motion to compel was filed.

[10] Accord, Delaware Lawyer's Rules of Professional Conduct, Rule 1.4(a) (a lawyer shall "keep the client reasonably informed about the status of the matter" and "promptly comply with reasonable requests for information"). Similarly, under Quebec law, attorneys are agents for their clients and owe their clients a duty of loyalty, which includes an obligation to provide clients with all material information. See, e.g., Groupe DMR inc. v. K. Krnsa General Ins. Co. Ltd., [2003] REJB 2003-16291 (Quebec Ct. of Appeal) (Copy and certified translation attached hereto at Ex. I).

fiduciary's "knowledge in one capacity cannot be separated from the other, nor can his duties as a fiduciary be lessened or increased because of a professional relationship")

Moreover, as noted in the opening brief, in <u>Valente</u> itself, this Court held that an attorney who represents the interests of both the minority and controlling shareholders could not shield information from the minority shareholder because the lawyer owed fiduciary duties to both parties. <u>Id</u> at 368. The Court reasoned that where "an attorney serves two clients having common interests and each party communicates to the attorney, the communications are not privileged between the two." <u>Id</u>. Importantly, the Court did not reject the defendant's privilege assertions based on any principle of corporate law.[11] Rather, in ordering the production of the withheld documents, the Court relied on the fiduciary obligations owed by an attorney to his clients. <u>Id</u> ("the fiduciary obligations of an attorney are not served by [the attorney's] selection of the interests of one client over another").

In addition, to the extent that Defendants' argument is that <u>Valente</u> is distinguishable because their lawyers were working for only BCE and *against* the Debtors, the documents must be turned over as a matter of Quebec law.[12] For example, in the <u>Groupe DMR</u> case, a lawyer was hired by an insurer to represent the insurer and an insured. While providing legal advice to the insured in the litigation, the lawyer also rendered an opinion, otherwise protected by the solicitor-client privilege, to the insurer as to whether the litigation was covered under the policy. The Quebec Court of Appeals held that the lawyer had violated his duty of loyalty to the insured and ordered production of the document. <u>See</u> <u>Groupe DMR</u>, REJB 2003 - 16291 at ¶¶ 63-66. The result in our case should be no different.

---

[11] This is evident by the two cases the <u>Valente</u> Court cited in support of its holding that a lawyer's fiduciary duties require a lawyer to share all communications with both its clients, both of which were decided in the context of an insurance coverage dispute. <u>See</u> <u>Simpson v. Motorists Mut. Ins. Co.</u>, 494 F 2d 850 (7th Cir 1974), <u>cert. denied</u>, 419 U S 901 (1974); <u>LaRocca v. State Farm Mut. Auto Ins. Co.</u>, 47 F R D. 278 (W D Pa 1969)

[12] At least Lalande and Cossette, and presumably Turcotte, Ryan Masse and Ricciuto, are admitted to practice law in Quebec

12

2.    **BCE And The Individual Defendants Owed Fiduciary Duties To The Debtors And Their Creditors Because The Debtors Were Insolvent Or In The Vicinity Of Insolvency.**

Defendants' argument that they owed no fiduciary duties to the Debtors (See D I 87 at 27-30) is misguided for a second independent reason: the Debtors were insolvent or operating in the vicinity of insolvency at all relevant times.

BCE's position that not even the Debtors' *own* directors and officers, let alone those who controlled the Debtors, owed fiduciary duties to the Debtors, turns nearly three quarters of a century of Delaware corporate law on its head based upon two sentences of *dicta* from one opinion. The Delaware Supreme Court long ago held that directors and officers owe fiduciary duties not only to the stockholders but to the corporation itself. See Guth v. Loft. Inc., 5 A 2d 503, 510 (Del 1939). Their duty is "not only affirmatively to protect the interests *of the corporation* committed to [their] charge, but also to refrain from doing anything that would work injury *to the corporation*." Id (emphasis supplied). This basic tenet of Delaware law has been upheld through the years. See, e.g., Aaronson v. Lewis, 473 A 2d 805, 811 (Del 1984), rev'd on other grounds, Brehm v. Eisner, 746 A 2d 244 (Del 2000). Thus, Defendants are simply wrong to argue that they never owed fiduciary duties to the Debtors -- Delaware law is clear that they did.

Defendants, however, rely upon the statement in Anadarko that "in a parent and wholly-owned subsidiary context, the directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders." Anadarko Petroleum Corp. v. Panhandle E. Corp., 545 A 2d 1171, 1174 (Del 1988). That one sentence -- which the Delaware Supreme Court noted was conceded and therefore not an issue decided by the court -- cannot have been meant to overrule Guth v. Loft and does not state that the directors owe no fiduciary duties; it merely suggests how they ordinarily should be exercised. And in that context, it is crucial that the company in Anadarko, unlike Teleglobe, was solvent.

Defendants correctly concede (D I 87 at 30) that where a corporation is insolvent or operating in the vicinity of insolvency, the corporation's directors owe fiduciary duties not only to the corporation and

13

its shareholders, but also to its creditors and to the "corporate enterprise" See, e.g., Roselink Inv., LLC v. Shenkman, 2004 WL 875262, at *3 (S D N Y May 19, 2004) (applying Delaware law); Prod. Res. Group L.L.C. v. NCT Group, Inc., 863 A 2d 772, 790-791 (Del Ch 2004) Controlling stockholders and officers likewise owe fiduciary duties to creditors once a company enters the zone of insolvency [13] Official Committee of Unsecured Creditors of Hechinger Investment Co. of Del. Inc. v. Fleet Retail Finance Group (In re Hechinger Investment Co. of Del. Inc ), 274 B R 71, 92 (D Del 2002)

Notably, Production Resources confirms that the expansion of fiduciary duties to include creditors does not change the fundamental nature of these fiduciary duties: "The directors continue to have the task of attempting to maximize the economic value of the firm That much of their job does not change But the fact of insolvency does necessarily affect the constituency on whose behalf the directors [are] pursuing that end " Prod. Res., 863 A 2d at 791 Thus, the Debtors' fiduciaries -- including BCE and the named defendants -- were always charged with acting in the best interests of the Debtors and maximizing their value.

Here, it simply is not credible to suggest that the Debtors were *never* even in the zone of insolvency until moments before they filed bankruptcy cases listing billions of dollars of debt and sold all of their assets for $150 million  Moreover, if the Defendants are correct that BCE really had no commitment to fund the Debtors, they were spending money they did not have -- billions of dollars of it The Debtors had no way to pay their debts as they came due if BCE failed to fund for any reason, which is ultimately what happened  Further, even if the Debtors were only in the "zone" of insolvency, the fiduciaries were plainly required, when they examined whether to pull the plug on funding, to consider what was in the best interest of the enterprise as a whole, including the creditors

---

[13] Defendants argue that the directors and officers of TI who exercised control over the Debtors (Messrs Monty, Currie, Kierans and Skinner; *i e*, the TI Director and Officer Fiduciaries) owed no fiduciary duties to the Debtors because TI is a Canadian corporation and under Canadian law directors and officers do not owe fiduciary duties to subsidiaries or to subsidiaries' creditors  (See D.I. 87 at 31-32)  This argument is a red herring  We *did not* sue the TI Directors and Officers *qua* officers and directors of TI, but as individuals who control Delaware corporations  It is well-recognized Delaware law that those who exercise control over Delaware corporations -- as the TI Directors and Officers did over the Debtors -- owe fiduciary duties to those subject to their control  (See D I 76 at 26-27)

14

Finally, without citing any legal authority, Defendants suggest that the Debtors cannot access documents withheld as privileged based on "unsupported allegations of insolvency in the Complaint." (D.I. 87 at 30, n.19) Apparently, Defendants believe that a party's only recourse would be to prove insolvency at trial. This illogical assertion would prevent a moving party from ever obtaining any documents withheld for privilege on this ground until *after* the trial. But, Plaintiffs, as described above, have done more than merely allege insolvency. They have come forth with specific evidence of insolvency and have certainly made a *prima facie* showing that the Debtors were insolvent or within the vicinity of insolvency, well before BCE withdrew its funding commitment -- and particularly as it was deciding to pull the plug. All that is required to overcome a privilege question is such a *prima facie* showing, not proof at trial. See, e.g., In re Grand Jury Subpoena, 223 F.3d 213, 217 (3d Cir. 2000).

In sum, because the Debtors were insolvent or within the zone of insolvency, *all* of the Debtors' directors and officers and those who otherwise exercised control over the Debtors owed fiduciary duties to the Debtors.

C. **Defendants' Other Attempts To Distinguish *Valente* And Plaintiffs' Other Cases Fail.**

Having failed to distinguish Valente on fiduciary grounds, Defendants next assert that a conflict of interest the likes of which arose in Valente and Deutsch did not exist with respect to Lalande's and Masse's dual representation of the Debtors and BCE. (See D.I. 87 at 30: "The conflict of interest that arose in Valente ... simply did not exist.") This argument is divorced from reality.

Defendants admit that BCE, the individual Defendants and the BCE/Debtor dual lawyers were all involved in the decision to withdraw funding from TI -- a decision that they all recognized would have the effect of rendering the Debtors, and their immediate parent, TI, insolvent. This is the epitome of a conflict. Yet, the conflicted fiduciaries and lawyers, who represented the Debtors' interests *at the very same time* they were scheming to pull the plug on their funding commitment to the Debtors, have refused to share relevant communications with the Debtors, instead choosing to hide behind a veil of secrecy that they call the attorney-client privilege. If, as Defendants suggest, a conflict of interest was the reason that

15

the Valente Court ordered the production of otherwise privileged documents, then, by definition, substantially all of the documents Defendants have withheld in this case must be produced.

On pages 33 through 35 of their answering brief, Defendants identify five categories of documents they withheld from Plaintiffs on privilege grounds. They then list the documents identified on the Rule 2004 privilege log that they believe relate to each category. This exercise is helpful, as it graphically demonstrates the inherent conflict arising from the dual representation of the Debtors and BCE.

- Category one: In this category, BCE lumps together documents allegedly related to (i) legal advice concerning restructuring and financing alternatives for TI, (ii) the legal impact of BCE entering into transactions with TI, and (iii) the legal impact of TI entering into transactions with third parties. (D.I. 87 at 33). The document descriptions, on their face, reflect the conflict these fiduciaries faced.

- Category two: Here, BCE combines documents purportedly related to (i) legal advice to BCE's Secretariat and BCE's accounting and compliance groups regarding BCE's annual reports, public filings and reporting obligations, and (ii) legal advice regarding the legal consequences to BCE of the reporting obligations of its subsidiaries. (Id. at 34) Communications within this category invariably would include those documents concerning the failure to write down TI's intangible assets such as goodwill.

- Category three: This category purports to concern legal advice regarding resolutions presented to BCE's board of directors and presentations provided to the BCE board involving legal matters. (Id. at 34). Logically, there can only be three subcategories here: (a) advice to the BCE board that has nothing to do with Teleglobe; (b) advice to the BCE board given by these dual fiduciaries that was meant to benefit both of their clients, BCE and Teleglobe, and (c) advice to the BCE board that was meant to aid BCE to the detriment of Teleglobe.[14] Category (a) might well simply be nonresponsive to Plaintiffs' document requests, and since that argument has not been advanced, we assume that no documents fall into category (a). Documents that fall into Category (b) appear to be documents in which Teleglobe *shares* the attorney-client privilege and that Judge Walrath has already ordered to be produced. That leaves Category (c), which presents a clear conflict. And we know that there are such documents. As an example, now that BCE has finally (in response to our motion) unredacted the April 23 board minutes, we know that Ms. Turcotte, together with outside counsel Stuart Baskin, provided legal advice at the April 23 meeting to BCE's board -- some members of which owed fiduciary duties to the Debtors -- related directly to "limiting or discontinuing entirely [BCE's] financial support of Teleglobe Inc.'s operations, focusing on the risks and exposure to

---

[14] It is difficult to conceive of any documents that could fall into a fourth category: documents pertaining to legal advice *about* Teleglobe, but which neither benefit nor harm Teleglobe. To the extent that Defendants contend that any documents in this "Category (d)" exist, it is their burden, as the proponents of privilege, to prove it.

16

liability on the part of [BCE] and its directors and officers " (See BCE-AD 0032189 (Ex J)) That board meeting ultimately culminated in a resolution by BCE's board to withdraw all financial support to TI. (Id.) Ms. Turcotte's conflict with her other client, the Debtors, could not be more evident.

- <u>Category four</u>: This "category" is but one document related to the change in corporate logos. Plaintiffs cannot tell, based upon this vague description, whether a conflict exists. Defendants should be required to explain this in further detail.

- <u>Category five</u>: This category involves communications concerning BCE's analysis of its continued financial support of TI. (D.I. 87 at 35). That analysis, of course, resulted in BCE's decision to terminate all financial support for TI and the Debtors. This decision was directly adverse to the Debtors, driving them straight into bankruptcy. No privilege exists for any of these documents.

### D.   Defendants Cannot Withhold Documents That They Describe As "Prepared Solely For BCE."

Relying primarily on the Delaware Court of Chancery's unreported decision in See <u>Grimes v. LCC Int'l., Inc.</u>, 1999 WL 252381 (Del. Ch. Apr. 23, 1999). Defendants argue that they can withhold documents that they claim were "prepared solely for BCE."[15] (D.I. 87 at 32-33). Defendants' argument ignores the law regarding the duties owed by fiduciaries (especially attorneys) to their beneficiaries. It also ignores the fact that the documents withheld from the Debtors, whether or not prepared for BCE, relate -- often directly -- to the interests of the Debtors.[16] Thus, the Debtors' fiduciaries, irrespective of who the documents were allegedly prepared for, have a duty to disclose these communications to the Debtors. (See *supra* at 10-15).

Moreover, <u>Grimes</u> recognized that documents prepared or reviewed by attorneys simultaneously representing the interests of two clients must be produced upon a showing of good cause. <u>Grimes</u>, 1999 WL 252381, at *3. Defendants acknowledge in their answering brief that the Debtors may overcome assertions of privilege upon such a showing. (See D.I. 87 at 31, n.20). Tellingly, Defendants confined

---

[15] Defendants also cite <u>U.S. v. Bestfoods</u>, 524 U.S. 51 (1998), in support of this argument. However, this case has absolutely nothing to with the attorney-client privilege, nor did it discuss the fiduciary duties owed by a dual fiduciary to his beneficiaries.

[16] Ironically, Defendants rely on <u>Grimes</u> even though that case, in Defendants' own words, "involved a derivative action brought by Microcell's minority shareholders against its controlling shareholder, LCC International, Inc." (D.I. 87 at 32). This is precisely the factual situation the Defendants deemed inapposite to the present case and the primary basis on which Defendants have distinguished <u>Valente</u> and <u>Deutsch</u>. Defendants cannot have it both ways.

17

their entire discussion of the good cause standard to a single footnote, leaving unrebutted many of the Debtors' arguments. Accordingly, Plaintiffs will limit their discussion of the good cause standard to the following two points, and otherwise rely on their opening brief. (See D.I. 76 at 33-35).

First, Defendants incorrectly extrapolate from the mutuality of interest requirement set forth under Garner v. Wolfinbarger, 430 F.2d 1093 (5th Cir. 1970), cert. denied, 401 U.S. 974 (1971), a requirement on the part of Plaintiffs to show that they were the beneficiaries of the allegedly privileged communications. Garner does not support such an argument. In Garner, the Fifth Circuit did not intend to prevent a beneficiary from gaining access to documents that were adverse to their interests. This would frustrate the very purpose of the good cause standard. Indeed, in a later case, the same court held that "[i]n Garner, we specifically elected       to open up to shareholders (who demonstrate good cause) communications between management and counsel where some pecuniary interests are necessarily adverse." Ward v. Succession of Freeman, 854 F.2d 780, 785 (5th Cir. 1988), reh'g denied, 863 F.2d 882 (5th Cir. 1988). Moreover, in explaining the mutuality requirement, the court in Garner reasoned:

> There may be many situations in which the corporate entity or its management, or both, have interests adverse to those of some or all of stockholders. But when all is said and done management is not managing for itself. The representative and the represented have a mutuality of interest in the representative's freely seeking advice when needed and putting it to use when received.       *[M]anagement's judgment must stand on its merits, not behind an ironclad veil of secrecy which under all circumstances preserves it from being questioned by those for whom it is, at least in part, exercised.*

Garner, 430 F.2d at 1101 (emphasis added). In the present case, the Debtors, TI and BCE all had a mutuality of interest in acting in the best interests of the corporate enterprise and maximizing the value of Teleglobe. In fact, during the Rule 2004 Proceedings, BCE asserted that a joint or common interest privilege existed between the Debtors and TI, all but conceding a mutuality of interest between these parties. Unfortunately, Defendants and the dual lawyers did not act in a manner consistent with that joint

18

interest; rather, they acted in a way that subjugated TI's interests to those of BCE.[17]

Second, Plaintiffs established good cause in their opening brief. (See D.I. 76 at 33-35) Defendants have done next to nothing to prove otherwise, and therefore, Plaintiffs are content to rest on the arguments made in their opening brief, with this additional observation. The Delaware Court of Chancery has held that "the existence of conflicts of interest and alleged breach of fiduciary duties (like those in Valente) should be particularly indicative that "good cause" exists to prevent assertion of the privilege." Deutsch v. Cogan, 580 A 2d 100, 107 (Del. Ch. 1990). Accordingly, not only do the conflicts of interest discussed above provide a basis to order the disclosure of the withheld documents under Valente (supra at 15-17), they provide compelling evidence that disclosure should be ordered if the Court chooses to apply the good cause standard.

F.     **Defendants Waived Their Privilege Claims Through Partial Disclosure Of Allegedly Privileged Documents.**

Plaintiffs demonstrated in their opening brief that Defendants waived their privilege claim through their disclosure of allegedly privileged information. (See D.I. 76 at 36-37). In response, Defendants suggest that "many of the documents" mentioned by Plaintiffs did not reflect the provision of legal advice. (See D.I 87 at p. 36). However, as reflected by the chart and documents attached to the opening brief, Defendants are wrong. (See, D.I 76, Ex. 3 and D.I. 75, Ex. S). Defendants also argue that "[o]ther documents were produced pursuant to the Bankruptcy Court's Order because they were subject to the common interest privilege." Again, the chart and documents attached to the opening brief clearly demonstrate that Defendants' argument is wrong. (See id.)

G.     **Defendants Have Failed To Justify Their Work Product Designations.**

The work product doctrine only applies if by looking at the "nature of the document and the factual situation *in a particular case*, the document can fairly be said to have been prepared or obtained

---

[17] At a certain point a mutuality of interest may no longer exist between parties whose interests were once aligned. See In re Freeport-McMoran Sulphur, Inc., 2005 WL 225040, at *2 (Del. Ch. Jan. 26, 2005). In the present case, it is not credible to suggest that a lack of mutuality existed at any point prior to BCE's decision to renege on its funding commitment to the Debtors and TI.

*because* of the prospect of litigation " <u>Martin v. Bally's Park Place Hotel & Casino.</u> 983 F 2d 1252, 1260 (3d Cir 1993) (emphasis added)  Unfortunately, Defendants never answered the obvious question -- the one that must be satisfactorily addressed before the work product doctrine can apply:  why, in early 2002, *before* they determined to terminate funding for TI and the Debtors, did Defendants "reasonably anticipate" that litigation between themselves and the Debtors would ensue?   BCE instead offers as its lone response the conclusory statement that documents created in April and May of 2002 "were prepared because of the prospect of litigation " (D I  87 at 37)  This statement establishes nothing  At a minimum, BCE's failure to demonstrate that its work product designations are appropriate requires *in camera* inspection of all documents withheld by Defendants on such grounds  Moreover, the work product designations can be upheld only if the withheld documents were prepared because of *this* litigation  This distinction is critical because BCE's Rule 2004 privilege log demonstrates that its work product designations were likely based on its anticipation that TI's banks would sue BCE in Canada, which is legally irrelevant in this Court  (<u>See</u> D I  76 at 39)

## CONCLUSION

For all of the reasons stated herein, Plaintiffs respectfully request that the Court grant the relief requested in Plaintiffs' motion to compel and enter the Order attached thereto

<table>
<tr><td>

_____
Gregory V Varallo (No 2242)
C  Malcolm Cochran, IV (No 2337)
Richards, Layton & Finger, P A
One Rodney Square
P O  Box 551
Wilmington, Delaware  19810
(302) 651-7700
varallo@rlf com
cochran@rlf com
Attorneys for Teleglobe Comm Corporation, *et al*

Dated:  March 9, 2005

</td><td>

/s/ Kevin A. Gross
_____
Kevin A  Gross (No  209)
Joseph A  Rosenthal (No  234)
Rosenthal, Monhait, Gross & Goddess, P A
1401 Mellon Bank Center
P O  Box 1070
Wilmington, Delaware  19801
(302) 656-4433
kgross@rmgglaw com
rmgg@rmgglaw com
Attorneys for Official Committee of Unsecured
Creditors of Teleglobe Comm  Corporation, *et al*

</td></tr>
</table>

20