# Exhibit C-F

# Exhibit C

FAX NUMBERS
(212) 848-7179
(212) 848-7180
(212) 848-7181

# SHEARMAN & STERLING LLP

**599 Lexington Avenue**
New York, New York 10022
Fax/Mail Center Telephone: (212) 848-7222

## FAX COVER SHEET

March 7, 2005

**Reference No.**

| | Fax Recipient(s) | | | |
|---|---|---|---|---|
| Name | Firm | Location | Fax Number | Office Phone |
| C. Malcolm Cochran, IV | Richards, Layton & Finger | Wilmington, DE | (302) 498-7772 | (302) 651-7772 |

**From**

| | |
|---|---|
| Name: | Linda C. Kao |
| Telephone: | (212) 848-7287 |
| Fax Number: | (646) 331-9489 |

Pages transmitted (including cover sheet): 3

**Comments:**

Please find attached a letter from Daniel Schimmel dated March 7, 2005.

**Confidentiality Note:** The information transmitted in this facsimile message is sent by an attorney or his/her agent, is intended to be confidential and for the use of only the individual or entity named above. If the recipient is a client, this message may also be for the purpose of rendering legal advice and thereby privileged. If the reader of this message is not the intended recipient, you are hereby notified that any retention, dissemination, distribution or copy of this telecopy is strictly prohibited. If you have received this facsimile in error, please immediately notify us by telephone and return the original message to us at the address above via the mail service (we will reimburse postage). Thank you.

Please note the total number of pages to be transmitted. If you do not receive
the number indicated, please call the Fax/Mail Center at (212) 848-7222

Shearman & Sterling LLP is a limited liability partnership organized in the United States under
the laws of the State of Delaware, which laws limit the personal liability of partners.

# SHEARMAN & STERLING LLP

FAX: 212-848-7179
TELEX: 667890 WUI
www.shearman.com

599 LEXINGTON AVENUE
NEW YORK, N.Y. 10022-6069
212 848-4000

ABU DHABI
BEIJING
BRUSSELS
DÜSSELDORF
FRANKFURT
HONG KONG
LONDON
MANNHEIM
MENLO PARK
MUNICH
NEW YORK
PARIS
ROME
SAN FRANCISCO
SÃO PAULO
SINGAPORE
TOKYO
TORONTO
WASHINGTON, D C.

WRITER'S DIRECT NUMBER:

212-848-4608

WRITER'S EMAIL ADDRESS:
dschimmel@shearman.com

March 7, 2005

Via Facsimile and Federal Express

C. Malcolm Cochran, IV
Richards, Layton & Finger, P.A.
One Rodney Square
920 N, King Street
Wilmington, DE 19801

Dear Malcolm:

This letter is in response to your letter to George J. Wade, dated March 4, 2005. For the last three weeks, we have repeatedly described to you the problems associated with the parties' proposed search terms to be used in the collection of electronic documents, and we suggested that the parties should agree on a more logical method of searching. You have ignored those suggestions until very recently as well as the process the parties agreed upon for the search of electronic documents.

On January 28, 2005, the parties agreed on a process regarding e-discovery: (1) BCE and the plaintiffs exchanged lists of proposed search terms, (2) we agreed to evaluate the number of documents created during the relevant time period that would likely be retrieved using those search terms, and (3) we agreed to share that information before any actual searches were conducted, in order to determine whether the proposed search terms effectively filtered out clearly irrelevant documents. For the next three weeks, Commonwealth Legal conducted those evaluations, and we promptly shared the results with you. In an e-mail dated February 18, 2005, we advised you that, using the search terms that the parties had identified, over 2 million pages of documents created during the period January 2000 through December 2002 would have to be reviewed, representing approximately 800 boxes of documents. We described to you that many of the search terms are far too common and do not filter out clearly irrelevant documents, and

that the search terms must be combined to obtain documents regarding the relevant context. On February 18, you submitted a revised list of terms and requested that Commonwealth Legal conduct a new evaluation based on those new terms. Even though we stated that the parties should avoid wasting time and should concentrate their efforts on agreeing on a more logical method of searching, we agreed to conduct that new evaluation. We subsequently described that, using the proposed search terms, BCE would retrieve 90.5% of all the documents created during the period January 2000 through December 2002. Thus, using the proposed search terms would lead to substantially the same result as not using any search terms at all, which would clearly not comply with the Court's Default Standard. At the time, we identified several examples of more meaningful searches that could be conducted, and we subsequently submitted a list of all the searches that we proposed to conduct. For the last three weeks, we also urged that the parties' respective IT consultants communicate directly with each other on those topics.

Until March 3, 2005, you dismissed out of hand BCE's suggestion that the parties should agree on a more logical method of searching. Instead, you improperly insisted that BCE should collect and review all the electronic documents that contained any of the proposed search terms on plaintiffs' revised list dated February 18. Alternatively, you requested that BCE produce all those documents to the plaintiffs without first reviewing them for responsiveness or privilege, subject to BCE's right to request the return of privileged documents at a later time, an alternative we promptly told you was not acceptable. On March 3, 2005, Ms. Barrasso for the first time agreed that search terms should be combined. In a telephone conversation with your colleague Anne Gaza, held on March 4, Ms. Gaza confirmed plaintiffs' agreement that the search terms must be combined in order to filter out irrelevant documents. Ms. Gaza stated that plaintiffs' agreement was a step forward in the right direction. We agree, and we are sorry that it took you three weeks to reach that conclusion.

BCE has followed the Court's Default Standard as well as the process the parties agreed upon for the search of electronic documents. Accordingly, once the parties agree on a more logical method of searching, BCE will search for, and produce, responsive non-privileged documents. At your request, BCE will search in priority the documents of the three individuals whom you described as "peripheral" and who are mentioned in your letter dated March 4, 2005. You are, however, responsible for the delay incurred thus far, and BCE cannot agree that the documents of those three individuals can or will be produced prior to their presently scheduled depositions.

Very truly yours,

Daniel Schimmel

cc: John P. Amato

# Exhibit D



Computer Forensics, E-Discovery &
Internet Investigations Services

Digital Evidence International Inc
Royal Bank Tower
383 Richmond Street, Suite 501
London  ON
N6A 3C4
Telephone: 519.471 4120
Fax: 519 471 4150

www.digitalevidenceintl.com

February 21, 2005

PRIVATE AND CONFIDENTIAL  - INTERIM REPORT

Our file: 20040058

Kroll Restructuring Ltd.
One Financial Place
One Adelaide Street East
Toronto, ON
M5C 2V9

Attn: Paul Casey

BCE Inc
1000, de La Gauchetiere Ouest
Bureau 3700
Montreal, Quebec
H3B 4Y7

Attn: Martin Cossette

Dear Mr  Sirs:

**Re: Teleglobe Inc.**



## Request for Professional Services

On June 24, 2004 Digital Evidence International Incorporated ("DEI") was requested to act as an independent service provider for Kroll Restructuring Ltd. (the "Interim Receiver") and BCE Inc. in bankruptcy proceedings involving Teleglobe Inc ("Teleglobe"). More specifically, DEI was asked to investigate, collect and search certain electromagnetic storage media accessible to five custodians namely:

1  Michael Boychuk

2. Patrick Pichette

3  Terrence Jarman

● Page 2                                                    February 21, 2005

    4.  Thomas Kierans

    5  Pierre Van Gheluwe

In carrying out it's responsibilities DEI was instructed by Order of Justice Farley of the Ontario Superior Court of Justice dated June 15, 2004 (the "Order") to:

1. determine whether any of the five custodians did not have access to the BCE network during the Relevant Period;

2. identify any storage devices, including but not limited to hard drives, floppy diskettes, CD ROM discs or any other electromagnetic storage media, which may contain the email communications (sent and received) and data files for the five custodians for the Relevant Period,

3. conduct such keyword searches as may be requested by the Interim Receiver and provide to both BCE and the Interim Receiver a list of all documents, including but not limited to email communications (sent and received) and data files, disclosed as a result of these searches and if requested by BCE, provide BCE with copies of the documents listed

4. provide copies of data extracted from BCE backup tapes

The search parameters were defined as a Relevant Period between November 1, 2000 and May 15, 2002 Additionally, we were advised that we would receive key words from Mr Paul Casey acting on behalf of the Interim Receiver

As this assignment progressed we were instructed by Mr. Cossette, acting for BCE and Mr Casey to obtain a copy of the network shares of Mr Van Gheluwe, Mr Boychuck and Mr Pichette for comparison to the data on the backup tapes that will be identified as the assignment moves forward

On February 3, 2005 Mr Casey requested an interim report of the status of this investigation

**Definitions**

NONE

 Page 3

February 21, 2005

## Executive Summary

On August 16, 2004 the Engagement letter was signed by the participants to the assignment and Mr Stephane Bourbonniere was designated as DEI liaison with BCE. DEI has maintained continued contact with Mr. Bourbonniere, Mr. Cossette and Mr Casey throughout this process to ensure contentious issues were resolved, there was a continual flow of information and requests for clarification were communicated in a timely manner.

Investigation to date has determined:

Terrence Jarman:

1. was employed by Bell Canada between 1996 and May, 2000 during which time he had access to the BCE network;

2. on April 11, 2000 he was appointed the CEO of Teleglobe, a position he held up to and including May 15, 2002;

3. we have been advised by Mr. Bourbonniere that he did not have network access during the period he was employed with Teleglobe however we are attempting to confirm that his network access privileges during the Relevant Period had been suspended;

4. we have been advised that Corporate Security's secure i/d logbook does not cover the Relevant Period;

5. we are seeking direct contact with Bell Corporate Security to confirm the information we have been provided

Michael Boychuk:

1. was employed by BCE throughout the Relevant Period and by virtue of his employment had access to the BCE network;

2. his duties also included Interim Chief Financial Officer, Teleglobe Inc and EVP & Chief Financial Officer, Teleglobe Inc ;

3. his current network share data has been copied by CGI employee Mr. Denis St. Pierre and a copy will be provided to DEI;

4. his laptop hard drive was imaged during the fall, 2002, a copy of which has been obtained by DEI and searched with keywords

February 21, 2005

provided by Mr Casey; the resulting file list has been provided to BCE who has now asked that we provide them with the files for their review;

5. the backup tapes containing his email and file shares have been identified to the extent possible given limited documentation regarding the dates and content of the backup tapes; we are in the process of scheduling time to create a copy of the tapes and to process them

**Pierre Van Gheluwe:**

1. was employed as Associate Director, Banking of Bell Canada commencing September 25, 2000 for an undetermined period of time;

2. his duties also included Director, Banking of Bell Canada from an unknown start date until after the conclusion of the Relevant Period;

3. his employment with BCE was terminated on July 18, 2003 and his home network share was found to be empty; interviews conducted with BCE employees were inconclusive at determining if this personal share ever contained any data; a telephone interview of Mr Van Gheluwe confirmed he did not use his personal share and only rarely used other network shares as his work was saved on his local laptop computer, he advised he had recently received email communications from Mr. Cossette and Mr. Lalande regarding this matter, other shares accessible by Mr Van Gheluwe have been captured by Mr Bourbonniere and a copy will be provided to DEI;

4. his laptop hard drive was copied during the fall, 2002, a copy of which has been obtained by DEI and searched with keywords provided by Mr. Casey; the resulting file list was provided to BCE and Kroll; BCE has now asked that we provide them with the files for their review;

5. the backup tapes containing his email and file shares have been identified to the extent possible given limited documentation regarding the dates and content of the backup tapes; we are in the

February 21, 2005

process of scheduling time to create a copy of the tapes and to process them

**Patrick Pichette:**

1. was employed as the EVP Planning & Performance Management of BCE from January 15, 2001 to January 24, 2002 after which he was assigned the duties of EVP Operations & Finance of Teleglobe up to and including the end of the Relevant Period;

2. we have been advised that his current network shares are still available and were copied by CGI employee Mr Denis St.-Pierre who will provide DEI with a copy;

3. the backup tapes containing his email may be identified but efforts will continue to confirm this;

4. his original laptop hard drive was not previously copied; his current laptop hard drive was copied by DEI; efforts continue to try and confirm the disposition of his first laptop

5. DEI is in the process of searching the dataset with the keywords provided by Mr Casey

**Thomas Kierans:**

1. appears to have never been employed by BCE and by virtue of not having an employee i/d would not have had access to the BCE network; we are waiting for further information from BCE Corporate Security to confirm this.

Investigation continues regarding the collection of share data, restore of backup tapes and interviews of various BCE employees / consultants

---



## Detailed Results of Professional Services

### General

In fulfilling our responsibilities under the Order to (1) collect and process data and (2) identify connectivity to the BCE network we consulted with Mr Bourbonniere on August 27, 2004 who advised that there is related data in Montreal, at Commonwealth Legal and at the Toronto office of BCE He

February 21, 2005

further advised that he required clarification on his role in this assignment
before we could proceed

On August 31, 2004 Mr Bourbonniere called to advise he has been
instructed to act as our liaison with BCE and to provide whatever assistance
is required to enable us to fulfill the courts Order. We immediately sent an
email to Mr Bourbonniere as a "start point" from which we would progress
and based on the answers to our questions we would continue until all the
information available to be collected has been so collected.    We
requested.

1   a contact in HR to provide us with information relating to the
    employment history of each of the related custodians for the
    purposes of establishing start dates for network connectivity

2   a contact in the IT department to assist us with researching
    network use / connectivity and issuance / disposition of
    computing devices by each of the related custodians

Once identified we would arrange to meet / interview the contact people
and make further decisions on the next steps based on their answers to
our questions. We received an automated email response advising that
Mr. Bourbonniere was out of the office until September 13, 2004.

We forwarded a follow-up email to Mr Bourbonniere on September 9,
2004 requesting results of our enquiry He responded the following day
that the contact for email related issues is Gary Ducharme and for HR is
Louise Gagné. He stated he would provide us with contact phone
numbers later this date. Mr. Bourbonniere called on September 15, 2004
and provided us with the requested information. Mr. Bourbonniere also
provided preliminary information regarding each of the related custodians
including:

1   Pierre Van Gheluwe – his laptop hard drive was copied and the
    backup tapes for his email and file server are with Commonwealth
    Legal

2   Michael Boychuck - same as Mr. Van Gheluwe

February 21, 2005

   3  Thomas Kierans - is a BCE board member, not a Teleglobe board
      member who never had access to the Bell Network at any time as
      he was not an employee of Bell; his hard drive was not copied at
      any time and there are no documents that show he was on the
      Network of Bell Canada

   4. Terence Jarman – is the same as Mr Kierans for data but may not
      have been on the board, he was not an employee so his hard
      drive was not copied as he did not have any access to the Bell
      Canada network

   5  Patrick Pichette - was working for Bell Canada, then Teleglobe
      and is now back with Bell Canada; during the Relevant Period he
      was an employee of Teleglobe, not BCE and therefore his hard
      drive was not previously copied, his backup tapes have been
      secured as he did have a shared drive on the network; his backup
      tapes are in the possession of Commonwealth Legal

The results of these preliminary enquiries resulted in insufficient
information to assist us with drawing any conclusions to our assignment.
With no disrespect intended, we believed it was necessary to seek
independent confirmation of the information provided by Mr
Bourbonniere After consultation with the current contacts with HR and IT
staff it led us to believe they did not possess the knowledge or
responsibilities to assist us with the conclusions we required We
identified two broad sources of information to assist us with reaching our
conclusions, (1) Commonwealth Legal, acting on behalf of BCE and (2)
various employees / contractors acting on behalf of BCE. The details of our
investigation follow below

**Human Resources**
On September 27, 2004 we left a voice message for Ms Louis Gagné,
Senior Consultant Executive Services, Montreal which she returned on
September 28, 2004 We discussed with her our requirement to
determine the validate the employment history of each of the related
custodians including from where each worked, their assistants names and

February 21, 2005

network access  She advised us that she required authorization from Mr
Michael Lalande before she could discuss with us the Teleglobe matter.
On September 29, 2004 Ms. Gagné called to advise us that Ms  Maude
Poliquin, Consultant, Executive Services and Talent Mobility would be
handling our request and will respond direct to us. On October 5, 2005 we
received an email from Ms. Poliquin with an attached spreadsheet that set out
the employment history of the related custodians including comments on
network connectivity  Discussions with Ms  Poliquin determined that much of
the information relating to Mr  Kierans, Mr  Van Gheluwe and Mr  Jarman
originated from Mr  Cossette or Mr. Bourbonniere therefore we continued to
seek corroborative information respecting each of the custodians

On January 26, 2005 we met with Ms  Poliquin, Ms. Sylvie Blake, Consultant,
Executive Payroll and Ms  Sylvie Tapin, Executive Services who advised:

1. Mr. Boychuck has been employed with BCE throughout the Relevant
   Period
2. Mr  Van Gheluwe was employed throughout the relevant period but
   has since been released effective July 18, 2003
3. Mr  Jarman was employed by BCE until June, 2000 after which he
   was transferred to Teleglobe; evidence of his move has been obtained
   from Ms  Poliquin in the form of an unsigned annual residential lease
   effective June 17, 2000 for property located in Washington, DC
   together with a letter from Teleglobe extending the lease for a one
   year term ending May 31, 2003 (the term ending May 31, 2002 is not
   referenced)
4. Mr. Kierans is an active member of the BCE Board of Directors but
   has never been employed with BCE and therefore has never been
   issued an employee i/d
5. Mr  Pichette was employed by BCE during the Relevant Period ending
   on January 24, 2002 after which he was transferred to Teleglobe

**Bell Corporate Security**
We attended BCE on January 25 – 27, 2005 and met with Mr  Bourbonniere
and other BCE employees / consultants  At this time we became aware that

February 21, 2005

Bell Corporate Security controls, to an extent yet determined, users connectivity to the BCE and Bell Canada network. We have asked for a contact at Bell Corporate Security so we can discuss their role in allowing / denying access to the network. This information will assist us with drawing conclusions respecting access to the BCE / Bell Canada Network for Mr Kierans, Mr Jarman and Mr Pichette. We still await the name of a contact.

### Issuance and Disposition of Computer Hardware

On Nov 15, 2004 we spoke with Ms Berrut, personal assistant to Mr. Pichette. She stated that she has no recollection of what happened to Mr Pichette's first laptop and that CGI handles all the equipment. She said that he would not have taken the laptop with him to Teleglobe as it belonged to BCE, not Teleglobe although this comment is from a conceptual perspective not factual recollection.

On November 3, 2004 we asked Mr Bourbonneire to identify for us a contact regarding issuance and disposition of computing devices. He responded on November 4, 2004 stating there could be several people involved in this and that he would provide us with this information in a few days. We have not yet received this information.

On November 29, 2004 we asked Mr Bourbonniere again about obtaining a name of a network person with whom we could speak with regarding issuance of the physical devices and we were advised by Mr Bourbonniere that he could provide all that information as he has been working there since early 2000. He advised that he will also provide any other names to enable us to verify his information. We have not yet been provided with this information.

On January 25, 2005 we attended BCE and asked Mr Bourbonniere to provide us with Mr. Pichette's current laptop so we could obtain a copy of the hard drive. We were permitted to begin the acquisition on January 27, 2005 however the process did not proceed quickly and we had to terminate it to return the laptop to Mr Pichette. This acquisition was rescheduled and on

February 21, 2005

● Page 10

February 10, 2005 we successfully obtained a copy of Mr Pichette's current laptop

On January 26, 2005 we met with Mr Denis St-Pierre, Team Leader, Executive Support who explained his role in delivering network services to the executive staff of BCE It was learned that an new client (Executive) will come to his attention either by simply showing up for work, where upon Mr. St-Pierre will consult with HR to confirm their status or HR would have given him advance notice of the new client Once the new client is confirmed as having authority to connect to the executive network they are, among other things, provided with computer resources which are purchased and configured by Mr St-Pierre or someone on his team For Mr. Pichette, Mr St.-Pierre recalls purchasing a new laptop computer for him that was ordered through "purchasing" When a computer is no longer required by the executive the computer is "wiped" and recycled by a company named Connexim Mr St-Pierre recalls that Mr. Pichette's first laptop was only recently decommissioned, however, he could not provide specifics A search of his records did not provide any further information on the ultimate disposition of Mr. Pichette's original laptop We have requested a contact at "purchasing" and at Connexim to enable us to validate the disposition of Mr. Pichette's original laptop and to potentially identify other sources of data on devices issued to the relevant custodians We have not yet been provided with this information.

## Commonwealth Legal

On October 7, 2004 we initiated contact with Mr Martin Felsky, CWL and arranged a meeting for October 14, 2004 to take into our possession any hard drive or backup tapes in their possession that contained data of any of the relevant custodians This meeting was cancelled on October 12, 2004 when Mr. Bourbonniere advised that we would not be permitted to take possession of the hard drives and backup tapes. He advised that it was his understanding that our role was to conduct an audit of the discovery processes undertaken by CWL and if validated receive their subset search results as containing any relevant output of data. This issue was not resolved

February 21, 2005

until Mr Cossette returned from vacation on October 21, 2004 after which he and Mr Casey agreed that we should continue with our investigation and a compromise would be reached in the near future on the hard drive data and backup tapes held by CWL.

On November 4, 2004 we sent an email to Mr Felsky to arrange another meeting. We included a list of questions to assist him with preparing for the meeting to enable efficient use of our time Mr Felsky responded on November 6 requesting confirmation of our authority to ask him questions on his role in this matter. This issue was resolved by Mr Cossette and we arranged a meeting for November 17, 2004. At this meeting we were advised:

1  they act for BCE;

2. the hard drive images were obtained by H&A Computer Forensics during the fall of 2002 and subsequently transferred to CWL who has maintained possession;

3. the hard drive images were assigned control numbers but CWL does not have a cross reference between the control numbers and a user;

4  they have processed the hard drives used by Mr. Boychuk and Mr Van Gheluwe based on keywords provided by counsel for BCE,

5  many of the backup tapes were originally in the possession of H&A Computer Forensics but are now in the possession of CWL,

6. CWL has received many backup tapes from CGI that are not numbered or identified as to source or content

7  they have processed nine (9) backup tapes restoring user share data and email as identified on a list of related custodians provided to them by BCE including Mr. Boychuk, Mr Pichette and Mr. Van Gheluwe from servers named MTRLPQXD121 (2 tape set) and MTRLPQVM113

8. the tape MTRLPQVM113 is user specific and all data was restored from this tape; it contains data for, among others, Mr Pichette, and Mr Boychuck;

9. these tapes resulted in keyword hits on 268,497 files

10 they have processed 13 backup tapes of Netscape email and conducted keyword searches

February 21, 2005

11  they have restored 6 backup tapes whose identifying label begins with "DD" ; these backup tapes allegedly have corrupt or deleted headers / catalogues (the pointers to the files on the backup tape); a restore of these tapes with the software that created them was not possible; using alternative methods of restoring the data they have identified user shares as PEIN numbers but cannot say who owns the data

12  CWL has found instances where the tape number relating to a particular share on a particular server is not always accurate

13  CWL believes the naming convention for the tapes indicates the type of backup software used as in AK = HP Omniback, DD = Veritas and MTRL is ArcServ - revision numbers of software is not known,

14  CWL has a list of all the tapes in their possession and at our request, provided us with a full list indicating which backup tapes had been restored, what data is on each tape that has been restored, how many tapes are included in each tape set (minimal information in this regard) and the dates associated with each tape / tape set,

On December 13, 2004 we attended CWL and obtained working copies of the hard drives for Mr. Boychuck and Mr. Van Gheluwe. As instructed in the Order, we searched these hard drives and identified files containing "hits". On January 7, 2005 we provided Mr Casey and Mr Cossette with a report that listed the search terms and the number of hits per term. On January 14, 2005 we provided a spreadsheet named after each search term a list of the files containing the hits

On January 25, 2005 Mr Cossette instructed that we provide Mr Casey with a segment of text consisting of a reasonable number of words before and after each hit so as to place the hit into context. The results were to be sent to Mr Casey for his review. Mr Casey, however objected to not being able to review the full contents of each file resulting in instructions from Mr Cossette on January 26, 2005 to provide the full set of files to Mr Cossette for review by his team. We also asked for instructions on dealing with hits in file slack

⊙ Page 13

February 21, 2005

and unallocated space We were instructed to extract this data and provide it to Mr. Cossette as well

## Network Connectivity

During our investigation of network connectivity we were provided with information from various sources including:

    a  Mr. Bourbonniere advised that.

           i.  The network is managed in three segments based on a "class" of employee including the executives, middle management and "regular" employees

          ii  Mr Boychuck was connected to the BCE network throughout the Relevant Period and is an executive

          iii  Mr Jarman was not an employee of BCE and was therefore not connected to the network

          iv  Mr Kierans was not an employee of BCE and was therefore unable to connect to the BCE network

          v.  Mr Van Gheluwe was employed with BCE throughout the Relevant Period, was therefore on the network and was middle management

          vi  Mr Pichette was not employed with BCE during the Relevant Period and therefore was not connected to the BCE network

    b.  Ms Maude Poliquin advised that.

           i.  Mr Pichette was employed with BCE ending January 24, 2002 and therefore would have been connected to the BCE network during the Related Period,

          ii.  she contact Corporate Security who informed her that their log files for use of the Secure i/d device was not available for the Relevant Period and therefore could not offer any further information respecting Mr. Jarman's connectivity to the network during the Relevant Period;

          iii  she did not believe that Mr Pichette moved to the United States when he was transferred to Teleglobe on January 24, 2002 but that he instead worked in the US through the week and stayed in Montreal on the weekends;

February 21, 2005

      iv.  she provided a contact name of Tony Vassallo with CGI who is responsible for connecting all executives to the BCE network.

  c   Ms. Sylvie Tapin advised that

      i.   when an employee begins work they are given an employee i/d number which, when created, also creates the employee NT logon i/d giving them access to the BCE network;

      ii.  Bell Corporate Security is notified once the NT logon is identified who provides further network connectivity;

      iii. Mr. Kierans did not have an employee i/d and therefore did not have an NT Logon i/d which means he did not have access to the BCE network;

## BCE Backup tapes

On September 15, 2004 we received a phone call from Mr. Bourbonniere who provided us with the contact name of Mr. Gary Ducharme for backup tapes of email communications. On September 28, 2004 we spoke with Mr. Ducharme who advised us that he is responsible for email for all BCE employees. He advised us that BCE has three email systems including Netscape (BESI Mail), Exchange and Lotus Notes (nearly eliminated). He also stated that there are no paper records indicating when a user has an email account created and that anyone on the BCE network can contact the Help Desk and request an email account. Additionally he advised that they only keep backup tapes for one year so feels that there will not be anything available for review. Mr. Ducharme confirmed that he had received an email from Mr. Bourbonniere some time ago requesting all backup tapes be preserved and not be overwritten. We requested Mr. Ducharme to pursue Help Desk tickets to identify any occurrences related to the custodians of interest and we are following up on what action Mr. Ducharme took as a result of Mr. Bourbonnieres request to preserve the backup tapes.

On October 4, 2004 Mr. Ducharme responded to our request and advised that they have no email backup tapes in their possession for the Relevant

○ Page 15                                                        February 21, 2005

Period. He also advised that there are no Help Desk tickets available for the Netscape mail during the Relevant Period. The Help Desk tickets for Exchange did not include any references during the Relevant Period but did provide PEIN numbers (employee identifiers) for Mr. Boychuck P008128 and BCE9029 and Mr. Pichette P020890. The Help Desk tickets for Mr. Pichette included an entry for migration of his Netscape Mail to Exchange in October, 2002. There were no entries for Mr. Van Gheluwe, Mr. Kierans or Mr. Jarman.

We followed up on this information with a further request on November 3, 2004 to provide us with (1) a control list that specifies what users and their matching i/d had access to which email servers; (2) a control list that specifies what accounts were backed up on which dates; (3) a control list that would indicate where the backup tapes are stored and their current disposition, (4) policies and procedures setting out management of users connecting to the email servers ie. when they are made a user, when they were removed as a user, (5) is there any other method of archving besides backup tape. We have no record of a response to this enquiry.

Further enquiries with Mr. Ducharme on January 27, 2005 resulted in:

1.  the identification of Exchange email servers during the Relevant Period included TOROONDC755, TOROONDC756, DM1CYO (AKA Mail1, Mail2, Mail3);

2.  the identification of Netscape mail servers during the Relevant Period included bascd2 on bell ca (besimail101), bascd3.on.bell.ca (besimail102), bt5c69.on bell ca (besimail103), bc2cm6 on bell.ca (besimail201), bc2cmj on bell ca (besimail202), blmc2w.qc.bell.ca (besimail301), blmc32.qc.bell ca (besimail302) and blxcqo.qc bell.ca (besimail303);

3.  the Exchange backup schedule during the Relevant Period was 7 days of daily backups, 4 weeks of weekly backups, 3 months of monthly backups. After each schedule the tapes were recycled.

February 21, 2005

4. the Netscape backup schedule during the Relevant Period was 6 daily incrementals, 1 weekly (Saturday) full, the backup tapes for the specified period are no longer available;

5. Mr. Pichette's email is currently on TOROONDC912; on July 27, 2003 he was on DM1CYO (Mail3) and on Wed October 2, 2002 he was migrated from Netscape to Exchange, Mr Ducharme believes Mr. Pichette's Netscape mail I\d was deployed on blmc2w (beslmail301) but he is not sure if it was migrated to another server for load balancing;

6. Mr Pichette's migration of Netscape mail to Exchange would not have taken place on the same server as his Netscape mail

To reach a compromise of restoring all backup tapes currently in the possession of CWL, we received instructions on November 18, 2004 from Mr Casey and Mr Cossette to collect current share data from the BCE servers for Mr Van Gheluwe, Mr Pichette and Mr. Boychuck and compare it with the data from three sample backup tape sets. The sample set is to be identified by us after conducting our background investigation into the BCE network. Once the tape sets are identified they will be copied at CWL, the relevant custodian email / file data restored and then compared to the data still available on the network. Any variances are to be reported to Mr Cossette and Mr. Casey. The resulting population of data will then be keyword searched and the results reported to Mr. Cossette. The backup tape subset is to include a time frame before and after September 16, 2002, the date on which Mr Cossette instructed Mr. Boychuck, Mr Van Gheluwe and Mr Pichette to not destroy any data relating to the Teleglobe matter

On November 26, 2004 Mr Bourbonniere sent an email advising he was aware of the collection of the server data and on November 29, 2004 he called with further information. Mr Bourbonniere advised that the shares we are interested in are all located on the network in Montreal. He was currently waiting for authorization from Bell Security for authorization to permit our access to collect the data. He advised he would contact us as soon as he receives clearance from Bell Security We followed up on this

February 21, 2005

request on January 5, 2005 which eventually led to our attendance in
Montreal on January 25 – 27, 2005. Unfortunately we were unable to
receive the required authorization to connect to the BCE network and
copy the requested data as it had not been prearranged and could not be
arranged quickly during this visit. We rescheduled for February 10 / 11,
2005. We again did not obtain the data from the shares and learned that
Mr. St.-Pierre and Mr. Bourbonniere were collecting this data and would
provide us with a copy when they have completed capturing all the data.
We will assess the procedure implemented to validate the shares
available to each custodian and the subsequent collection of data to
confirm it meets the requirements of the Order.

During our visit to BCE on January 25 – 27, 2005 we also became aware
that Mr. Eric Brien, CGI is the person responsible for file server backup
tapes and that he would be the person to speak with about identifying the
unmarked tapes held by CWL. We forwarded an email request to Mr.
Brien on January 27, 2005 which remains unanswered.

An analysis of the data we have collected has identified Netscape email
servers besimail301 and besimail303 as the most likely servers storing
email for Mr. Pichette, Mr. Boychuck and Mr. Van Gheluwe. CWL has
backup tapes in it's possession for these servers and has restored email
for Mr. Boychuck from besimail303. They have not restored any email for
Mr. Van Gheluwe or Mr. Pichette. The backup tapes for besimail
(Netscape) are not dated however correspondence from CWL suggests
they are from August, 2001 and April, 2002. There appears to be two
backup tapes related to besimail303 and four backup tapes related to
besimail301.

An analysis of the data we have collected for file servers has identified a
number of servers potentially holding data of the custodians of interest
including  mtrlpqcm300,  mtrlpqcm301,  mtrlpqcm302,  mrtlpqcm311,
mtrlpqcm312, mtrlpqcm321, mtrlpqcm322, mtrlpqvm113, mtrlpqzm300,
mtrlpqxd121, mtrlpqdc000, mtrlpqdc301 and otwaonbc300. Of these

February 21, 2005

servers, backup tapes have not been secured for mtrlpqzm300, mtrlpqdc000 and otwaonbc300

Our analysis indicates the most likely repository of file server data for the relevant custodians are on servers mtrlpqcm300, mtrlpqcm301, mtrlpqcm302, mrtlpqcm311, mtrlpqcm321, mtrlpqcm322, mtrlpqvm113, mtrlpqxd121 and mtrlpqdc000  The backup tapes currently in the possession of CWL indicate dates of the backup sessions ranging from August 31, 2001 to July 5, 2002  From the information we have available to us, none of the dates of these backup tapes is subsequent to September 16, 2002  CWL has restored data from mtrlpqvm113 and mtrlpqxd121

 **5**

## Restriction

This Report is not intended for general circulation  It is not authorized for reproduction or to be used for any purpose other than that outlined above without our written permission in each specific instance   We reserve the right to revise our comments and calculations, if any, referred to in this Report if we consider it necessary in light of any facts which become known to us subsequent to the date of this Report

 **4**

## Outstanding Requirements

To complete our investigation regarding network connectivity, issuance and disposition of computer devices and collection and analysis of data we require further information / devices from BCE including:

1   a contact at Bell Corporate Security,
2   a contact at "purchasing",
3   a contact at Connexim;
4   interview Tony Vassallo for executive connectivity;
5   interview Eric Brien for identification of backup tapes;
6   backup tapes for mtrlpqdc000;

February 21, 2005

      7   receive backup tapes for Exchange and besimail related to the
relevant custodians for a time period after September 16, 2002;

      8.   confirmation of the date of the backup and the associated server
for the unmarked tapes held by CWL;

      9.   further information from Mr. Ducharme regarding his actions after
receipt of Mr Bourbonniere's request to cease overwriting backup
tapes and other related questions;

      10   receive a copy of the current network share data for Mr
Boychuck, Mr Pichette and Mr. Van Gheluwe;

We have started to process the data for Mr. Pichette's current laptop  The
results will be reported to Mr. Cossette and Mr. Casey immediately upon
completion.

We require access to the following backup tapes in the possession of
CWL to copy and process them with keywords:

1.   besimail301 -- tapes identified as AK9490, AK9491, AK9492 and
AK9498

2.   besimail303 – tapes identified as AK9706 and AK9708

3.   mtrlpqcm300 – tapes identified as DD0133, DD0134, DD0153,
DD0159, DD0361, DD0530, DD0548, DD0577 and DD0612 for
the date October 6, 2001

4.   mtrlpqcm301 – tapes identified as DD0105, DD0246, DD0386,
DD0516, DD0524, DD0564, DD0610 for the date February 16,
2002

5.   mtrlpqcm302 – tapes identified as DD0115, DD0254 and DD0257
for the date March 1, 2002

6.   mrtlpqcm311 – tapes identified as DD0182, DD0291, DD0340,
DD0342, DD0343, DD0351, DD0731, DD0732 and DD0734 for
the date January 12, 2002

7.   mtrlpqcm321 – tapes identified as DD0184, DD0188, DD0296,
DD0341, DD0342, DD0351, DD0354, DD0613, DD0689, DD0731,
DD0733 and DD0734 for the date January 12, 2002

February 21, 2005

       8  mtrlpqcm322 – tapes identified as DD0364, DD0375, DD0647,
          DD0678 and DD0680 for the date May 24, 2002

       9  mtrlpqvm113 – tapes identified as Main for the date September
          28, 2001 and DLTIII for the date March 28, 2002

      10  mtrlpqxd121 – tapes identified as XD121 for the date August 31,
          2001 and XD121 for the date displayed as "04/00/02"

The outstanding issues will continue to be addressed as timely as possible. Should you have any questions or concerns please do not hesitate to contact us.

Yours very truly,

**Digital Evidence International Inc.**

Per:

Steven L. Rogers, EnCE, A+, CNA

# Exhibit E

**Boxes from Relevant Custodians not produced to the Committee in Montreal, March 2004**

Box 138972612 – Jean Monty
- Teleglobe 2nd Quarter 1997
- Teleglobe Inc. Major Upheaval
- Teleglobe Strategy & Direction
- Teleglobe Second Quarter 2000
- Teleglobe 2000 Second Quarter
- Financial Review & Outlook
- Positioned for renewed growth
- 2000 Update & Direction
- Evolution II – TCC Value Based
- Financial Executives Conferenc
- TGO Inc. Segmented Valuation
- BCE Inc Monty's Next Challenge
- Ebitda/Cashflow Impact on BCE
- Teleglobe First Quarter 2000
- Teleglobe Outlook 2000 Board
- TGO Inc. Financial Situation
- BCE Reaction to Results&Price
- Excel Communications Inc.
- Key Messages
- TGO Inc. Annual & Special Mtg
- TGO Network Competitive Analysis
- JCMtoBill Anderson P. Nicholson

Box 138972635 – Patrick Pichette
- 2002-2004 Targets
- 2002 Business Plan-BCEBoardDir
- Converging on High-potential
- Projet Wide (Binder 1)
- Projet Wide (Binder 2)

Box 138972636 – Patrick Pichette
- Teleglobe - doc. Misc.
- BCE Inc. - Financial-Strategic
- Bell Globemedia-doc. Misc.
- Aliant 2001 Business Plan
- Bell ExpressVu-Strategic Plan
- Bell Canada-2001 StrategicPlan
- Bell Mobility-Plan & Strategy
- BCE Emergis-Strategic Vision
- Bell Actimedia-Plan&Strategic
- TGO-Infonet,Geametry,Wide,
- Bell Nexxia-Plan, Strategy
- Bell Quebec-Strategic Plan

Box 138972637 – Patrick Pichette
- Mek Project - Document
- Globemedia-Strategy Plan
- Mek-BCG-.]PMorgan-Presentation

Box 138972638 – Patrick Pichette
- Different doc, presentation
- Different doc, presentation
- Different doc, presentation

Box 138972639 – Patrick Pichette
- Different doc, presentation
- Different doc, presentation
- Different doc, presentation

Box 138972640 – Patrick Pichette
- Different doc, presentation
- Different doc, presentation

- Telesat Canada Strategic Plan
- Aliant Business Plan
- Emergis-Ventures-Telesat Strat

Box 138972641 – Patrick Pichette
- Project Frosty
- Different doc, presentation
- Different doc, presentation
- Different doc, presentation

Box 138972642 – Patrick Pichette
- Cable Companies
- Convergence
- Convergence Strat.-emptyfolder
- Execution - BCE
- BCE
- Acquisition - Europe
- AOL
- Externals Speeches
- Guidance
- Infrastructure (Common Intrast
- Mercury
- Portals
- Q1 Reviews Docs - 2001
- BCH - 01 - 2002

Box 138972643 – Patrick Pichette
- 01 - 2001
- 02 - 2001
- Operating Plans

Box 138972644 – Patrick Pichette

- 2001 Marketing Plan
- Product Center WeeklyHighlight
- BCE Financial Results
- BCE Strategic Planning Process
- BCE Inc.
- BCE Ventures
- Bell Nexxia
- Bell Quebec
- Aliant - Empty folder
- Expressvu
- Telebec - Empty folder
- Teleglobe Communications
- BCE Emergis
- Bell Globemedia
- Bell Mobility
- Bell Actimedia - Empty folder
- Bell Canada

Box 138972645 – Patrick Pichette

- Grey Hanging Folder,Unlabelled
- Grey Hanging Folder,Unlabe led
- Grey Hanging Folder,Unlabelled
- Grey Hanging Folder,Unlabelled
- People
- Grey Hanging Folder,Unlabelled
- Grey Hanging Folder,Unlabelled
- Grey Hanging Folder,Unlabelled
- Grey Hanging Folder,Unlabelled
- Grey Hanging Folder,Unlabelled
- Grey Hanging Folder,Unlabelled

Box 138972646 – Patrick Pichette

- Grey Hanging Folder,Unlabelled
- Grey Hanging Folder,Unlabelled
- Grey Hanging Folder,Unlabelled
- Grey Hanging Folder,Unlabelled
- Grey Hanging Folder,Unlabelled
- Grey Hanging Folder,Unlabelled
- EWB
- Personnel

Box 138972647 – Patrick Pichette

- 2002-2004 StrategicPlanKickoff
- HS-Capturing Convergence
- LS-HighPotential Convergence
- BellCanadaHold-Strategic Plan
- BellGlobemedia-FinancialResult
- BellCanadaHold-Business Plan
- BellGlobemedia-Strategic Plan
- BCE-Communications Svr Today
- People Forum
- BCE-Executing for Growth

Box 138972650 – Michael Sabia

- Teleglobe
- Teleglobe Updates
- TGO Rationalization PlanDoc
- Teleglobe
- Teleglobe (US Filing)
- Acquisition of Teleglobe
- Teleglobe

- Teleglobe
- Teleglobe
- Teleglobe
- (No name)

Box 203592505 – Michael Boychuk

- Project Evolution

Box 203592506 – Michael Boychuk

- Project Evolution
- Evolution - Background info

# Exhibit F

**Minutes of the meetings of the Board of Directors of BCE Inc.**
**Volume 5, page 583**                                     **Toronto, April 19, 2002**

This special meeting of the Board of Directors of BCE Inc. was held in Toronto at the Four Seasons Hotel, at 21 Avenue Road, in Room 407, on Friday, April 19, 2002 at 12:00 p.m.

ATTENDANCE:      Jean C. Monty, Chairman
                 Richard J. Currie
                 Anthony S. Fell
                 Donna S. Kaufman
                 Thomas E. Kierans*
                 Brian M. Levitt
                 Judith Maxwell
                 John H. McArthur
                 J. Edward Newall
                 Robert C. Pozen
                 Guy Saint-Pierre
                 Paul M. Tellier*
                 Victor L. Young*

* by means of telecommunications facilities

BY INVITATION:

Michael J. Sabia, President and Chief Operating Officer

Mr. J.C. Monty, Chairman and Chief Executive Officer, presided and Mr. M.J. Ryan, Corporate Secretary, acted as secretary of the meeting.

**INTRODUCTORY REMARKS**

The Chairman thanked the directors for having made themselves available for the meeting on short notice.

Mr. R.J. Currie, Lead Director, indicated to the directors that this was an informal meeting held at his request and an opportunity for Messrs. J.C. Monty, Chairman and Chief Executive Officer, and M.J. Sabia, President and Chief Operating Officer, to discuss the challenges facing the Corporation with respect to the financial situation of Teleglobe Inc.:                                                    **REDACTED**
     as well as the avenues that might be taken to meet them.

In view of the business relationship that existed between the Royal Bank of Canada and Teleglobe Inc., though it was not believed to be material to the directors who were also directors of the Royal Bank of Canada, that is to say Messrs. J.E. Newall, G. Saint-Pierre, A.S. Fell and V.L. Young, the four individuals chose to withdraw from the meeting and not participate in the discussions with respect to Teleglobe Inc.

**Minutes of the meetings of the Board of Directors of BCE Inc.**
**Volume 5, page 584**                                      **Toronto, April 19, 2002**

## STRATEGIC CONSIDERATIONS

Mr. J.C. Monty, Chairman and Chief Executive Officer, commented generally on the current status of the business and financial affairs of Teleglobe Inc. and as well as the overall climate of the industry and prospects for economic recovery. Mr. M.J. Sabia, President and Chief Operating Officer, then commented in greater depth on the current operations of Teleglobe Inc. Messrs. Monty and Sabia concluded that their remarks constituted a description of the current status of management's review but that no recommendations were being made at this time. Each of them responded to questions and comments throughout the course of their presentations.

Messrs. J.E. Newall, G. Saint-Pierre, A.S. Fell and V.L. Young rejoined the meeting.

REDACTED

There being no further business, the meeting terminated.

_____          _____
          Chairman                           Secretary

**Minutes of the meetings of the Board of Directors of BCE Inc.**
**Volume 5, page 586** _____ **Montreal, April 22, 2002**

This special informal meeting of the Board of Directors of BCE Inc. was held, by order of the Lead Director, by means of telephone facilities, on Monday, April 22, 2002 at 5:00 p.m.

ATTENDANCE:      Richard J. Currie, Lead Director
                 Anthony S. Fell
                 Donna S. Kaufman
                 Thomas E. Kierans
                 Brian M. Levitt
                 Judith Maxwell
                 John H. McArthur
                 J. Edward Newall
                 Robert C. Pozen
                 Guy Saint-Pierre
                 Victor L. Young

BY INVITATION:

Michael J. Sabia, President and Chief Operating Officer
Siim A. Vanaselja, Chief Financial Officer

Mr. R.J. Currie, Lead Director, presided and Mr. M.J. Ryan, Corporate Secretary, acted as secretary of the meeting.

**ORDER TO SECRETARY AND NOTICE OF MEETING**

Pursuant to an order of the Lead Director to call this meeting, notice had been given to all directors on April 20, 2002 in conformity with Section 2.02 of By-Law No. 1.

**INTRODUCTORY REMARKS**

The Lead Director thanked the directors for having made themselves available for this meeting which was intended to follow up on the discussions held earlier today and to provide an opportunity for the directors to discuss certain of the financial material included in the board material distributed for review at the Board meeting of the following day.

**STRATEGIC CONSIDERATIONS**

Referring to documents that were sent to the directors in advance of the meeting, Messrs. M.J. Sabia, President and Chief Operating Officer, and S.A. Vanaselja, Chief Financial Officer, reviewed with the directors three financial models that responded to the challenges facing the Corporation as regards Teleglobe Inc.



**Minutes of the meetings of the Board of Directors of BCE Inc.**
**Volume 5, page 587**                          **Montreal, April 22, 2002**

There being no further business, the meeting terminated.

_____                              _____
Lead Director                                                    Secretary

BCE-SUP     126797