# Exhibit G-J

# Exhibit G

RICHARDS, LAYTON & FINGER

A PROFESSIONAL ASSOCIATION
ONE RODNEY SQUARE
920 NORTH KING STREET
WILMINGTON, DELAWARE 19801
(302) 651-7700
FAX (302) 651-7701
WWW.RLF.COM

C. MALCOLM COCHRAN, IV
DIRECTOR

DIRECT DIAL NUMBER
302-651-7506
COCHRAN@RLF.COM

January 31, 2005

**Via Telecopy and First Class Mail**

Daniel Schimmel, Esquire
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022

Re:    **Teleglobe v. BCE - Electronic Discovery**

Dear Daniel:

With regard to the meet and confer that we had regarding electronic discovery on Friday, January 28, I wish to confirm the following.

For the list of Defendants' custodians from whom Plaintiffs are seeking e-discovery at this time, you have advised us of the following.

1    Defendants do not have within their possession, custody or control electronic data (including, *inter alia,* e-mails or other electronic documents) generated, modified or received by Marc Bouchard.[1] Further, since he is an individual Defendant, you have confirmed that such data has been requested from, among other possible sources, Mr. Bouchard personally, and from his secretary or assistant, and that Mr. Bouchard has no responsive electronic data within his possession, custody or control. You have indicated that you will need an additional two-week period to confirm this. Absent contrary information by February 11, 2004, we will move forward in reliance upon your representation.

---

[1]  Throughout this letter, and in our ongoing dialogue in this matter, you should understand that our inquiries and requests apply not only to documents and electronic data within the direct possession or custody of BCE, but also to documents and electronic data within BCE's control, including such as may be within the possession, custody or control of subsidiaries and affiliates of BCE that are controlled by BCE. Similarly, our inquiries and requests should be understood to refer to documents and e-data within the possession, custody or control of the Individual Defendants, whom you also represent.

Daniel Schimmel, Esquire
January 31, 2005
Page 2

2    You have advised that Defendants have no electronic data (including, *inter alia*, e-mails or other electronic documents) generated, modified or received by Richard J. Currie, within their possession, custody or control. Further, since he is an individual Defendant, you have confirmed that such data has been sought from, among other possible sources, Mr. Currie personally, and from his secretary or assistant, and that Mr. Currie has no responsive electronic data in his possession, custody or control.

3.   You have advised that Defendants have no electronic data (e-mails or other electronic documents) within their possession, custody or control generated, modified or received by Terence J. Jarman. Further, since he is an individual Defendant, you have confirmed that such data has been sought from, among other possible sources, Mr. Jarman personally, and from his secretary or assistant, and that Mr. Jarman has no responsive electronic data within his possession, custody or control.

4    You have advised that Defendants have no electronic data (e-mails or other electronic documents) within their possession, custody or control generated, modified or received by Thomas Kierans. Further, since he is an individual Defendant, you have confirmed that such data has been sought from, among other possible sources, Mr. Kierans personally, and from his secretary or assistant, and that Mr. Kierans has no responsive electronic data within his possession, custody or control.

5    You have advised that Defendants have no electronic data (e-mails or documents) within their possession, custody or control generated, modified or received by H. Arnold Steinberg. Further, since he is an individual Defendant, you have confirmed that such data has been sought from, among other possible sources, Mr. Steinberg personally, and from his secretary or assistant, and that Mr. Steinberg has no responsive electronic data within his possession, custody or control.

6.   With regard to Patrick Pichette, you have advised that all responsive electronic data currently available to BCE (including all e-mails and other electronic documents) was produced among the documents produced in response to the Committee's Rule 2004 discovery. In particular, you have advised that this data was derived from twelve back up tapes that were restored at that time. You have further advised that if additional Pichette data is located in the course of the current review being undertaken in the Canadian redemption case, BCE will make that data available in

Daniel Schimmel, Esquire
January 31, 2005
Page 3

this case   In particular, I have alerted you to the information regarding Mr. Pichette's e-data set out in the 19th report of the Interim Receiver of Teleglobe, Inc. (dated December 17, 2004) filed in the Ontario Superior Court of Justice   As reflected in that report, the independent third party reviewer appointed by the Court (Digital Evidence International, Inc. or "DEI") has advised that electronic data for Mr. Pichette is stored on certain back up tapes currently in the possession of Commonwealth Legal ("Commonwealth"), a data processing firm contracted by BCE   You have advised that you will follow up on this information, and report when next we speak

7   You have advised that BCE currently has access to electronic data on various computer hard drives for the following individuals – and you have further advised that BCE is undertaking to search its servers for any additional data generated by, or sent to, these individuals.  Michael Boychuk, Carl Condon, Elie Daher, Yanick deGrandpre, Anthony Fell, Francois Gauvin, Michel Lalande, Andrea LeBlanc, Pierre Lessard, David Masse, David McGraw, Jean Monty, Peter Nicholson, Ildo Ricciuto, Frank Rodi, Michael Rosenhek, Marc Ryan, Michael Sabia, John Sheriden[2], Stephen Skinner, Martine Turcotte, Siim Vanaselja, Pierre VanGheluwe, George Walker

8   For the following individuals, you have indicated that no hard drive has been found, but that BCE is currently checking its servers for discoverable e-data.   Anna Coccia, Serge Fortin, Jerome Huret (BCE is also checking with him, in England), Martin Loranger, Wesley Scott, Jose Tetrault, Stewart Verge.

9   On the list of BCE custodians contained in your electronic disclosures, you have included Barry Pickford   Please provide information regarding available e-data for Mr. Pickford

10.   You have advised that BCE will consider further the matter of accessing its e-data back up tapes, after we have considered the matter of the data available through hard drives and servers.

11.   With regard to the individuals listed as potential custodians of e-data in the possession, custody or control of the Debtors, I have advised that server or hard drive data (or selected portions of hard

---

[2] During our discussion, we may have referred to a "Tom" Sheridan   The individual for whom we are seeking discovery is actually John Sheridan.

Daniel Schimmel, Esquire
January 31, 2005
Page 4

> drives, which have been imaged) is available for the following individuals: Brunette, Bustamante, Eakin, Milla, Mongrain, Morgan, Sciacciatano, Snyder. In addition, I have advised that for the following six individuals, mailbox data was imaged in the summer of 2004: Brunette, Mongrain, Morgan, Bustamante, Cooke, Sciacciatano. Back up tapes as of 1/1/04 containing mailbox data for these six individuals have also been restored.

Finally, I am informed that Kroll has available certain additional back up tape data, that it has previously restored. I believe this will include data from three additional individuals. I am attempting to develop further information on that at this time.

Additional data relating to some or all of the Debtor custodians we have identified may be available on back up tapes that are available to the Debtors. We are willing to make such available, but will reserve our rights regarding the costs of access.

We have agreed to speak again this Thursday, and to at that time exchange information regarding the volume of data available for each of the listed custodians, following application by each party of key words submitted by the other side. You have noted that the Defendants may not have concluded their searches by that time, and have agreed to advise me if additional time for those searches is required.

You have advised that the Defendants will not agree to produce documents or electronic data dated any later than May 28, 2002, unless we agree not to seek such for dates beyond July 12, 2002. We will not so agree, and reserve our rights in that regard.

Yours very truly,

C. Malcolm Cochran, IV

CMC:dqc
cc.    John P. Amato, Esquire (via e-mail)
       Gregory V. Varallo, Esquire
       George J. Wade, Esquire (via e-mail)

# Exhibit H

# SHEARMAN & STERLING LLP

FAX: 212-848-7179
TELEX: 667290 WUI
www.shearman.com

599 LEXINGTON AVENUE
NEW YORK, N.Y. 10022-6069
212 848-4000

ABU DHABI
BEIJING
BRUSSELS
DÜSSELDORF
FRANKFURT
HONG KONG
LONDON
MANNHEIM
MENLO PARK
MUNICH
NEW YORK
PARIS
ROME
SAN FRANCISCO
SÃO PAULO
SINGAPORE
TOKYO
TORONTO
WASHINGTON, D.C.

WRITER'S DIRECT NUMBER:

(212) 848-4190

WRITER'S EMAIL ADDRESS:
gwade@shearman.com

March 1, 2005

RECEIVED

MAR 0 2 2005

C. Malcolm Cochran, IV

Via Federal Express

C. Malcolm Cochran, IV
Richards, Layton & Finger
One Rodney Square
920 North King Street
Wilmington, Delaware 19801

Re: Teleglobe v. BCE

Dear Malcolm:

Reference is made to your letter dated February 16, 2005. I hereby respond to each of the issues you have raised in your letter with respect to any discovery to be undertaken by BCE Inc. ("BCE"), to the extent it requires a response.

E-discovery

On February 27, 2005, you indicated for the first time the number of electronic documents that would be retrieved using the proposed search terms. We understand based on subsequent discussions with Diane Barrasso, the Debtors' IT consultant, that the number of documents that contain the proposed search terms *and* were created in a specified date range represent 60% of the total number of electronic documents located on the Debtors' computer servers. The relevant question, however, is whether, once a party has isolated the universe of documents created within an agreed-upon date range, the use of the proposed search terms will filter out irrelevant documents. The information that you provided to us fails to respond to that question.

As we described to you, we have conducted the relevant analysis, based on a sample of 103,591 easily searchable documents, and we concluded that (1) 79,334 documents in

*Shearman & Sterling LLP is a limited liability partnership organized in the United States under
the laws of the State of Delaware, which laws limit the personal liability of partners*

C. Malcolm Cochran, IV
March 1, 2005
Page 2

that sample were created in the time period that plaintiffs had requested, and (2) using the proposed search terms, BCE would retrieve 71,857 documents, that is, 90.5% of all the documents. Thus, using the proposed search terms would lead to substantially the same result as not using any search terms at all. BCE again asked Commonwealth Legal to reach out to Diane Barrasso, and we understand that they are trying to work out a more effective method of filtering out irrelevant documents.

In your letter dated February 16, you state that "the 5.5 million pages of electronic documents that Mr. Cossette told the Court would need to be reviewed when BCE was seeking a stay of discovery, now turns out to be something less than 800,000 pages." This statement is misleading because the Debtors' First Request for Documents purported to require BCE to review "the text of each individual E-mail" and prohibited the use of an electronic search device. (See Instruction No. 22.) Mr. Cossette's statements in his declaration were based on the instructions contained in the Debtors' document requests. Those instructions did not meet the requirements of the Court's Default Standard regarding the conduct of electronic discovery, and Mr. Varallo subsequently agreed that the parties would have to use search terms. As described in our e-mail to you, dated February 26, 2002, Commonwealth Legal has estimated that it would retrieve approximately 209,000 documents (representing 1.4 to 1.6 million pages of documents) using the proposed search terms in the period January 1, 2000 to December 31, 2002.

We will work with you to prioritize the production of e-data so that it corresponds with the deposition schedule. We will strive to produce a witness's e-data timely before his or her deposition. In order to do that, however, we need to agree on a more logical method of searching, which what the parties' respective IT consultants are attempting to do.

As we discussed during our last "meet and confer," your suggestion that we turn over the electronic documents to you without reviewing them for privilege, subject to your agreement that we would not waive the attorney/client privilege or the work product doctrine by turning over those documents, is unacceptable to us. This approach raises a serious issue for BCE. As we described to you, BCE has created numerous privileged documents prior to May 28, 2002, and plaintiffs should not be provided an opportunity to learn their contents prior to returning them.

Mr. Pichette's e-data
It is not correct that Mr. Pichette's electronic data "appears to largely be available only on backup tapes." Mr. Pichette's server data is available to be searched. As Mr. Pichette's e-mails were stored on BCE servers, not on Mr. Pichette's personal computer, those servers can be searched. Consistent with the Default Standard, we will consider your request regarding backup tapes once electronic documents from the servers and hard drives are produced.

Hard-copy documents
You have insisted on the production of 250 boxes of documents that BCE collected in 2002. As we already discussed, BCE produced over 105 boxes of documents to the Committee in connection with the Rule 2004 investigation, and additional documents have been

C. Malcolm Cochran, IV
March 1, 2005
Page 3

produced to the Debtors. As described in our prior e-mail to you, we have engaged in the review of the remaining boxes of BCE's hard-copy documents, and we will produce the responsive, non privileged documents, even though this production is unduly burdensome and represents an enormous waste of the resources of the defendants and the Debtors' bankruptcy estates. We will let you know when those documents will be made available for inspection.

Finally, we have already provided you with virtually all the additional information that you request in your letter, including (i) the list of custodians from whom BCE sought Teleglobe-related documents in 2002, (ii) the three memoranda sent by BCE to potential custodians of Teleglobe-related documents in 2002, (iii) the index of the over 200 boxes of Teleglobe-related documents archived by BCE, (iv) the list of the computer network servers used by the 37 individuals identified by the plaintiffs, and (v) for each server so identified, the names of all individuals whose electronic data is stored or is otherwise located on that particular server. We will provide you with a list of the individuals whose hard drives were collected in 2002.

Sincerely,

George J. Wade

cc:    John P. Amato, esq.

# Exhibit I

# KUGLER KANDESTIN

### ATTORNEYS
### L L P

1 Place Ville-Marie
Suite 2101
Montreal, Quebec
Canada H3B 2C6

Tel (514) 878-2861
Fax (514) 875-8424

GORDON KUGLER
MICHAEL H. KAY
GERALD F. KANDESTIN
ROBERT J. KANDESTIN
MARTINE L. TREMBLAY
CHANTAL CORRIVEAU
PIERRE BOIVIN
ARTHUR J. WECHSLER
ANNETTE LEFEBVRE
MICHAEL GAON
GORDON LEVINE
STUART KUGLER
ROBERT KUGLER
ALEXANDRE BROSSEAU-WERY
JEAN-FRANCOIS CARPENTIER
CONSEIL:
STANLEY KANDESTIN Q.C.
(1950 - 2000)

Montreal, March 9, 2005

**BY TELECOPIER**

Mr. Russell C. Silberglied
RICHARDS, LAYTON & FINGER
P.O. Box 551
Wilmington, DE 19899

Re:     Teleglobe
        Our File: 4062-001

Dear Mr Silberglied,

Further to our e-mail correspondence of yesterday, I enclose herewith a copy of the Judgment rendered in Groupe DMR Inc. v. Kansa General International Insurance Company Ltd., REJB 2003-46291.

I also enclose herewith a translation of the Judgment from French into English, which translation was effected by Me Jean-François Carpentier of our office and was verified by the undersigned.

Accordingly, under my oath of office I hereby attest that, to the best of my knowledge, the translation of the Judgment is a true, full and accurate translation thereof.

I trust the foregoing is satisfactory and remain,

Yours truly,

KUGLER KANDESTIN, L.L.P.
Per:

GORDON LEVINE

GL/am
Encl.

REJB 2003-46291 – Texte intégral

COUR D'APPEL

CANADA
PROVINCE DE QUÉBEC
DISTRICT DE MONTRÉAL

NO : 500-09-012340-022

DATE : 18 août 2003

DATE D'AUDITION : 25 octobre 2002

EN PRÉSENCE DE :
JOSEPH R. NUSS , J.C.A.
JACQUES CHAMBERLAND , J.C.A.
DANIELLE GRENIER , J.C.A. (AD HOC)

Dans l'affaire de la liquidation de: Kansa General International Insurance Company Ltd.:Groupe DMR inc.
Appelante-requérante
c.
Kansa General International Insurance Company Ltd.
Intimée-intimée
et
Gerdinand Alfieri, en sa qualité de liquidateur des biens et effets de Kansa General International Insurance Company Ltd. au Canada
Intimé-liquidateur-intimé
_____

Chamberland J.C.A., Grenier J.C.A. (ad hoc), Nuss J.C.A.:-

1 LA COUR; -Statuant sur l'appel d'un jugement interlocutoire rendu le 24 mai 2002 par la Cour supérieure, district de Montréal (l'honorable Roland Durand), accueillant une objection à la preuve formée en cours d'enquête par les intimés et refusant la communication et la production de certains documents parce que confidentiels en raison du secret professionnel de l'avocat;

2 Après avoir étudié le dossier, entendu les parties et délibéré;

3 Pour les motifs du juge Chamberland, auxquels souscrivent les juges Nuss et Grenier;

4 *ACCUEILLE* le pourvoi;

5 *INFIRME* le jugement rendu dont appel;

6 *REJETTE* l'objection formée par les intimés en cours d'enquête le 24 mai 2002; et

7 *AUTORISE* la communication et la production des lettres de Me John I.S. Nicholl à Kansa General International Insurance Company Ltd datées du 2 juillet 1992, du 23 décembre 1992 et du 19 avril 1993;

8 Avec dépens

CHAMBERLAND J.C.A., GRENIER J.C.A. (AD HOC), NUSS J.C.A.

Me Serge Gaudet, Me Élizabeth Laroche, pour l'appelante
Me Claude-Henri Grignon, pour les intimés

**Chamberland J.C.A.:—**

9 Le pourvoi soulève, sous deux aspects, la question du droit d'un assuré d'obtenir communication de documents concernant sa réclamation et faisant partie des dossiers de son assureur de responsabilité. Il s'agit tout d'abord de savoir si les rapports transmis à l'assureur par l'avocat chargé par ce dernier d'assumer la défense d'un assuré sont couverts par le secret professionnel à l'encontre de cet assuré. Il s'agit ensuite de savoir si l'assuré peut obtenir communication du dossier de réclamation de l'assureur lorsque ce dernier, après avoir pris son fait et cause, fait volte-face et nie couverture en affirmant ne pas avoir eu, en temps voulu, suffisamment d'information pour prendre une décision éclairée relativement à son obligation de défendre.

Les faits

10 L'appelante Groupe DMR Inc. (DMR) obtient en 1985 le mandat de développer et d'implanter chez Groupe Promutuel — Fédération de sociétés mutuelles d'assurance générale (Promutuel) un système informatique intégré et centralisé.

11 Le travail commence mais il s'avère vite plus complexe et plus difficile que prévu. Les relations entre DMR et sa cliente s'enveniment tant et si bien qu'à la fin de l'été 1987, les avocats de Promutuel mettent en demeure DMR de respecter intégralement ses obligations contractuelles.

12 Le 30 octobre 1987, DMR dénonce ses difficultés à ses courtiers d'assurance, ajoutant qu'elle entend poursuivre Promutuel en recouvrement de ses honoraires professionnels, ce qui risque d'entraîner, en réponse, une action en dommages de la part de celle-ci.

13 DMR est alors assurée pour sa responsabilité professionnelle auprès de l'intimée, Kansa General International Insurance Company Ltd. (Kansa).

14 Le 19 novembre 1987, Kansa confie l'enquête à l'expert en sinistre Michel Roy.

15 À la fin décembre 1987, DMR prend action contre Promutuel.

16 À la fin février 1988, Promutuel prend à son tour action contre DMR pour différents dommages liés au développement et à l'installation du système informatique. Le montant de la réclamation totalise plus de 4 millions de dollars.

17 Les avocats Kronstrom et Associés (Me Jean-Yves Desjardins) comparaissent au nom de leur cliente, DMR, puis avisent l'expert en sinistre Roy du recours intenté par Promutuel.

18 Le 3 mars 1988, Kansa retient les services de Me Pierre Cantin et celui-ci en avise Me Desjardins.

19 Le 30 juin 1988, Me Cantin écrit à DMR. Il affirme représenter son assureur de responsabilité et, selon ses instructions, «[avoir] produit une comparution pour votre compagnie dans cette affaire». Il informe aussi DMR que cette comparution est faite sans préjudice aux droits de l'assureur «de se retirer du dossier en tout temps même pendant les procédures, même pendant l'audition de l'affaire et/ou de ne pas satisfaire au jugement qui pourrait être rendu contre votre compagnie si l'enquête devait révéler une absence de couverture ou un défaut de vous conformer aux conditions du contrat»

20 De fait, Me Cantin ne dépose pas de comparution au dossier de la Cour supérieure.

21 Le 25 octobre 1989, il écrit de nouveau à DMR, l'informant que l'assureur «[est disposé] à prendre votre défense dans cette affaire». Il avise toutefois DMR qu'elle devra satisfaire personnellement au jugement qui pourrait être rendu contre elle advenant que la réclamation ne soit pas couverte, en totalité ou en partie, par le contrat d'assurance

22 Le même jour, Me Cantin transmet aux avocats Kronstrom et Associés, pour signature, un consentement à substitution de procureurs.

23 DMR demande toutefois à ses avocats de ne pas procéder à la substitution demandée jusqu'à ce qu'une rencontre puisse avoir lieu avec l'assureur. DMR estime en effet que la demande de Me Cantin arrive de façon imprévue et «bouleverse ( .) la stratégie en cours»; elle souhaite une rencontre pour faire le point et coordonner les efforts en vue d'assurer le succès de la défense

24 La rencontre se tient le 18 décembre 1989.

25 Le 8 janvier 1990, DMR écrit à Kansa et soulève deux points qui demeurent non résolus. Le premier concerne le choix et le mandat des avocats; DMR exige que ses avocats demeurent au dossier «comme procureurs responsables» et que Me Cantin soit mandaté «de votre part pour les seconder et voir à la protection de vos intérêts spécifiques». Le second point concerne le remboursement des frais; DMR estime avoir droit «au remboursement de tous les honoraires et frais encourus et à venir dans ce dossier».

26 Une autre réunion se tient le 29 mars 1990. Plusieurs sujets sont abordés en regard des obligations de Kansa, mais la question des frais encourus par DMR pour assumer sa défense à ce jour demeure en suspens quoique Kansa remette un chèque de 50 000 $ à DMR à titre d'acompte Une autre rencontre doit se tenir en août. Les parties concluent que Me Cantin sera substitué aux avocats Kronstrom et Associés «dans le dossier en défense»; ceux-ci déposeront toutefois une comparution «comme procureurs conjoints» dans le même dossier.

27 Selon le relevé du plumitif civil, la substitution de procureurs a été produite le 19 avril 1990 alors que la comparution des avocats Kronstrom et Associés, à titre de procureurs conjoints, date du 2 mai 1990

28 À compter de cette rencontre, Kansa acquitte les frais de Me Cantin et DMR, ceux de Kronstrom et Associés.

29 Une autre rencontre se tient le 1er novembre 1990. Les mêmes sujets sont abordés. Kansa confirme son engagement à défendre, à ses frais, l'ensemble de la réclamation de Promutuel et ce, malgré que le montant de la réclamation excède celui de la garantie d'assurance et que certains aspects de la réclamation ne semblent pas couverts Les avocats choisis par Kansa dirigeront le dossier et ils seront secondés dans cette tâche par les avocats de DMR, si celle-ci le juge à propos. Kansa s'engage à rembourser à DMR les frais raisonnables des avocats Kronstrom et Associés depuis l'ouverture du dossier jusqu'à la substitution de procureurs et ce, seulement dans l'action où Promutuel poursuit DMR.

30 En novembre 1990, Me John I.S. Nicholl remplace Me Cantin.

31 À cette époque, DMR et Kansa s'entendent de nouveau quant aux frais de défense; Kansa acquittera la totalité des frais de Me Nicholl de même qu'un tiers des frais des avocats Kronstrom et Associés.

32 Cette entente tient jusqu'en décembre 1992. Le 21 décembre 1992, les avocats Kronstrom et Associés informent Me Nicholl que l'entente doit être révisée. Ils proposent «d'affecter un associé au dossier en demande» et que Me Richard Ramsay, un autre avocat de la même étude, soit «affecté entièrement au dossier de la défense et que les frais relatifs à [sa] prestation soient entièrement assumés par l'assureur». Me Ramsay avise son confrère qu'il oeuvrera uniquement au niveau de la demande «jusqu'à ce qu'une nouvelle entente intervienne à la satisfaction de nos clientes respectives».

33  Une nouvelle rencontre se tient le 19 janvier 1993.

34  Le 31 mars 1993, Promutuel amende sa déclaration en fonction d'un rapport préparé par la firme de comptables Samson, Bélair, Deloitte & Touche. La réclamation est reformulée; elle passe maintenant à près de 6 millions de dollars.

35  Le 7 mai 1993, Kansa avise DMR que ces développements, qu'elle qualifie de «fait nouveau», l'amènent à conclure que les fautes qui sont reprochées à DMR par Promutuel et les dommages réclamés ne sont pas couverts par la police d'assurance. Il convient de citer au long le texte de cette lettre:

> Depuis plusieurs années, notre compagnie et DMR assument conjointement la défense de cette cause jusqu'à un certain point, le tout sans préjudice aux droits des parties et, en ce qui concerne l'assureur, sans admission de couverture.
>
> Depuis quelque temps, vous nous aviez demandé de vous faire connaître notre position finale en ce qui a trait à la question de couverture. Malheureusement, jusqu'à présent, les renseignements disponibles dans le dossier ne nous permettaient pas de formuler une opinion définitive sur le sujet.
>
> Au cours des derniers mois, la tierce partie a produit un rapport détaillé préparé par la firme de comptables Samson Bélair Deloitte Touche, fournissant le détail des dommages réclamés. Par contre ce n'est que le mois dernier que la tierce partie a produit une déclaration amendée profondément modifié(sic) qui contient plusieurs nouvelles allégations relativement à la conduite de DMR.
>
> En raison de ce fait nouveau nous sommes maintenant en mesure de vous informer si l'assurée bénéficie d'une couverture quelconque.
>
> Nous sommes d'opinion que les faits allégués à l'action amendée et les dommages réclamés selon le rapport d'expert ne constituent pas la matérialisation d'un risque couvert par la police d'assurance. Sans préjudice et sans renonciation à ce qui précède, au cas où il y aurait couverture (un fait vigoureusement nié), la perte serait exclue et la couverture refusée en vertu des termes, conditions et exclusions contenus à la police et en vertu des dispositions de la loi.
>
> La présente lettre vous est envoyée sans préjudice à tous autres droits et autres défenses que notre compagnie pourrait avoir.

36  En octobre 1993, DMR appelle Kansa en garantie pour que celle-ci prenne son fait et cause, lui rembourse tous les frais de défense encourus et enfin, l'indemnise advenant une condamnation en faveur de Promutuel.

37  En avril 1999, DMR paie à Promutuel 1 500 000 $ en capital, intérêts et frais en règlement complet et final du litige.

38  Le litige opposant DMR et Kansa a été continué par voie de requête sommaire aux termes de l'article 135 de la *Loi sur les liquidations et les restructurations,* L.R.C. (1985) c. W-11, Kansa faisant l'objet d'une liquidation aux termes de cette loi.

39  Les dommages réclamés par DMR s'établissent à plus de 4 millions de dollars et couvrent l'obligation d'indemniser, l'obligation de défense et le refus dit injustifié et abusif de l'assureur de prendre son fait et cause. DMR allègue que Kansa avait l'obligation de la défendre et qu'elle est en droit de demander le remboursement de tous les frais encourus à cet égard. Elle allègue de plus que la réclamation de Promutuel était couverte par la police d'assurance et que, par conséquent, Kansa a l'obligation de l'indemniser pour les montants versés à Promutuel dans le cadre du règlement intervenu.

40  En ce qui a trait à l'obligation de défendre, DMR soutient qu'au moment où Kansa a accepté de prendre son

fait et cause, celle-ci connaissait tous les faits entourant la réclamation de Promutuel et qu'elle a agi en toute connaissance de cause. L'amendement de mai 1993 n'a pas modifié la nature de l'action intentée par Promutuel et aucun «fait nouveau» n'est survenu justifiant la volte-face de l'assureur. Kansa aurait ainsi renoncé à invoquer les motifs qu'il soulève maintenant pour nier son obligation de défendre; l'amendement apporté à la réclamation de Promutuel ne serait qu'un prétexte pour tenter de justifier son retrait du dossier. DMR plaide qu'un tel comportement de la part de Kansa était abusif et empreint de mauvaise foi, ce qui la justifierait de réclamer le paiement des frais qu'elle doit encourir pour faire valoir ses droits dans le cadre du présent dossier.

41  En défense, Kansa plaide que la réclamation de Promutuel n'était pas couverte aux termes de la police émise en faveur de DMR. Bien qu'elle ait assumé la défense de DMR pendant plus de 3 ans (de 1990 à 1993), Kansa plaide ne pas avoir été en mesure de prendre position de façon éclairée sur la base de la déclaration initiale de Promutuel, les allégations de celle-ci ne lui ayant pas permis de déterminer clairement la portée de certaines exclusions. Kansa soutient que ce n'est qu'après avoir reçu copie de la déclaration amendée qu'elle a pu apprécier, pour la première fois, la nature véritable de la réclamation de Promutuel, d'où sa décision du 7 mai 1993 de nier couverture et de se retirer du dossier.

42  Le procès a lieu en mai et juin 2002.

Les jugements dont appel

43  Lors de l'enquête, DMR tente d'établir ce que Kansa savait quand la décision d'assumer de prendre son fait et cause a été prise; DMR veut ainsi mettre en preuve les documents et les informations dont Kansa disposait alors. Les avocats de DMR interrogent Me Nicholl, de même qu'un représentant de Kansa, monsieur Claude Fauré, au sujet des opinions et des rapports qui furent soumis à l'assureur entre 1988 et 1993 relativement à la réclamation de Promutuel.

44  Le 24 mai 2002, le juge accueille une objection à la preuve fondée sur le secret professionnel de l'avocat lors de l'interrogatoire de Me Nicholl au motif que Kansa – et non DMR – était son client et qu'il est lié par le secret professionnel. Il conclut aussi que les rapports de Me Nicholl contiennent des opinions juridiques et il refuse la communication et la production de ses lettres des 2 juillet 1992, 23 décembre 1992 et 19 avril 1993 à Kansa.

45  Le 12 juin 2002, lors de l'interrogatoire de monsieur Fauré, le juge accueille une objection à la preuve fondée sur le secret professionnel de l'avocat et sur le caractère privilégié des rapports préparés par Me Cantin lors de l'évaluation de la réclamation et dans le cadre de son mandat de défense de DMR, de même que des rapports préparés par l'expert en sinistre Michel Roy. Il s'agit des lettres de Me Cantin à Kansa du 8 mars 1988, 5 septembre 1989, 20 décembre 1989, 9 mars 1990, 26 juillet 1990 et 28 septembre 1990, d'une lettre de Me Nicholl à Kansa du 20 août 1990, d'un compte d'honoraires de Me Cantin du 22 avril 1991 et des rapports de Michel Roy des 14 décembre 1987, 19 mai 1988, 18 janvier 1989 et 26 mai 1989.

46  L'appelante se pourvoit contre ces deux jugements interlocutoires, avec l'autorisation d'un juge de la Cour (dossier 500-09-012340-022 en ce qui concerne le jugement du 24 mai 2002; dossier 500-09-012389-029 en ce qui concerne le jugement du 12 juin 2002). Les deux appels ont été joints aux fins de la préparation d'un seul mémoire et d'une seule audition et les procédures de première instance ont été suspendues jusqu'à ce que la Cour se prononce.

47  Les documents en litige ont été mis sous scellés par le juge de première instance afin que nous puissions, au besoin, en prendre connaissance[1].

48  Finalement, je souligne que la preuve a été déclarée close de part et d'autre, sous réserve des conséquences que notre décision pourrait avoir, et le juge de première instance a suspendu l'audition des plaidoiries jusqu'au prononcé de notre arrêt.

L'analyse

49 Les questions de l'appelante au procès visaient essentiellement deux catégories de documents: d'une part, les rapports transmis à l'assureur par les deux avocats chargés, successivement, par celui-ci d'assumer la défense de DMR: d'autre part, les rapports transmis à l'assureur par l'expert en sinistre chargé de l'enquête à compter du moment ou DMR a invoqué la possibilité que sa responsabilité professionnelle soit engagée. A ces documents, il faut ajouter le compte d'honoraires que Me Cantin a transmis à l'assureur après que Me Nicholl lui eut été substitué comme procureur *ad litem* de DMR.

50 DMR plaide que l'avocat chargé par un assureur de responsabilité d'assumer la défense d'un assuré est d'abord et avant tout l'avocat de cet assuré et non celui de l'assureur. C'est donc l'assuré qui serait le bénéficiaire du droit au secret professionnel et l'assureur ne pourrait pas lui défendre l'accès aux rapports émanant de son propre avocat. L'appelante plaide ensuite, à titre subsidiaire, que l'assureur qui, comme en l'espèce, après avoir pris fait et cause pour son assuré, se retire ensuite du dossier et nie couverture en soutenant ne pas avoir eu, à l'époque, suffisamment d'informations pour prendre une décision éclairée, renonce par le fait même à la confidentialité des documents qui sont en sa possession et qui permettent d'étayer, ou de réfuter, quel était son «état de connaissance» au moment où la décision initiale de défendre l'assuré était prise.

51 L'intimée répond que le client de l'avocat dont les services ont été retenus par un assureur de responsabilité pour défendre un assuré n'est nul autre que cet assureur; seul cet assureur pourrait donc prétendre aux droits et privilèges associés à la relation client-avocat. Dans ce contexte, l'assuré ne pourrait prétendre à aucun droit à quelque renseignement ou document associé de près ou de loin à la relation assureur-avocat, non plus qu'à quelque renseignement ou document associé de près ou de loin à l'enquête menée par l'assureur. Quant à l'argument subsidiaire soulevé par l'appelante, l'intimée plaide que le concept de l'état de connaissance (ou, en anglais, «state of mind») comme règle faisant exception au droit de la preuve est une création de la Common Law et est étranger au droit québécois de la preuve. En l'espèce, il n'y aurait pas eu renonciation de sa part à la confidentialité des communications qu'elle a eues avec son expert en sinistre et ses avocats. La simple allégation de mauvaise foi formulée par l'appelante ne suffirait pas pour priver l'assureur de la confidentialité des rapports qu'il a pu entretenir avec ses avocats et ses experts en sinistres.

L'avocat et le secret professionnel

52 Il est bien établi que l'avocat chargé par l'assureur de responsabilité d'assumer la défense de l'assuré est d'abord et avant tout l'avocat de cet assuré et non celui de l'assureur, même si c'est ce dernier qui le choisit et qui contrôle la conduite de la défense. L'assuré jouit ainsi de tous les droits se rattachant à la relation avocat-client, y compris le droit à la plus entière loyauté de l'avocat[2] et à la confidentialité de leurs échanges ( *Citadel General Assurance Co. c. Wolofsky*, [1984] C.A. 377).

53 Dans *Norbert c. Lavoie* [1990] R.J.Q. 55 , la Cour rappelle, sous la plume de mon collègue le juge Baudouin, à la page 59:

(…) que l'avocat qui produit une comparution pour une partie au litige est bel et bien en droit le procureur *ad litem* de celle-ci. Dans notre espèce donc, l'avocat qui a produit la comparution et la première défense n'est pas, en droit, le représentant ou le porte-parole de l'assureur, mais celui du défendeur lui-même. Certes, comme le laisse soupçonner le dossier, l'assureur ici aurait pris fait et cause pour l'intimée. La chose, cependant, ne nous concerne pas. Le procureur *ad litem*, dans l'instance, représente juridiquement l'intimé et seulement l'intimé [3]

54 Dans *Zurich du Canada, compagnie d'indemnité c. Renaud & Jacob* [1996] R.J.Q. 2160 , la Cour reconnaît le double mandat de l'avocat chargé par un assureur de responsabilité de défendre un assuré et le lien qui continue à unir cet avocat à l'assureur, même après qu'il est devenu le procureur *ad litem* de l'assuré. En effet, l'exécution de l'obligation de défense confère aussi des droits à l'assureur, dont celui de conduire la défense comme il l'entend; l'assureur choisit les avocats et les experts, définit l'orientation de la défense et même, éventuellement, décide de l'opportunité de régler ou non l'affaire (p. 2165).

55  Le juge LeBel traite ainsi du rôle de l'avocat (p. 2166):

> Il [l'avocat] joue un double rôle vis-à-vis l'assureur et l'assuré, et détient nécessairement, à ce titre, un double mandat.

> La jurisprudence récente de la Cour a refusé, dans cette relation, de reconnaître une priorité aux intérêts de l'assureur. L'avocat désigné et payé par celui-ci est tenu d'assumer loyalement la défense de l'assuré et de préserver intégralement ses intérêts. L'arrêt *Citadel General Assurance Co.* fait d'ailleurs ressortir qu'il peut arriver que le secret professionnel de la relation entre l'assuré et l'avocat soit opposable à l'assureur. Les conflits d'intérêts ne sauraient se régler d'abord par le sacrifice des intérêts de l'assuré.

56  et, un peu plus loin, à la page 2169:

> (...) en vertu d'une police d'assurance-responsabilité la conduite de la défense appartient à l'assureur. On lui confère ce droit en contrepartie d'assurer le paiement de celle-ci. Ce droit lui est reconnu contractuellement par l'assuré dès le départ, cette distinction nette entre l'obligation de défense et l'obligation d'indemnisation. Elle crée une situation où, dès l'origine du débat, l'assuré accepte que son avocat détienne une forme de double mandat. À l'intérieur de celui-ci, il reste tenu envers l'assuré de toutes les obligations déontologiques normales (...)

57  L'avocat chargé par un assureur de responsabilité de défendre un assuré est, à bien des égards, dans une situation unique. Il est tenu d'assurer loyalement la défense de l'assuré et de préserver intégralement ses intérêts tout en se rappelant que la conduite de la défense appartient à l'assureur.

58  L'assuré accepte ainsi que son avocat détienne une forme de double mandat. La situation, bien qu'inhabituelle dans les relations avocat-client, ne pose pas de difficultés réelles dans la mesure où les objectifs poursuivis par l'assureur et l'assuré coïncident parfaitement, ce qui est le cas quand les deux conjuguent leurs efforts pour amener le rejet de la poursuite ou son règlement. Toutefois, la possibilité même de double mandat s'évanouit quand les intérêts de l'assureur et de l'assuré divergent, par exemple quand l'assureur veut régler l'affaire alors que l'assuré tient à se rendre à procès «pour défendre sa réputation», quand l'assureur refuse d'engager la totalité de la couverture d'assurance dans un règlement que l'assuré sait possible et souhaite ou encore, quand l'assureur sollicite l'avis de l'avocat concernant la garantie d'assurance. L'avocat est alors placé au cœur d'un insoluble conflit de loyauté et la poursuite du double mandat n'est tout simplement plus possible.

59  Tant que le double mandat existe, l'avocat est tenu de toutes les obligations déontologiques normales envers ses mandants. Ainsi, les déclarations qui lui seront faites par l'assuré sous le secret de la relation avocat-client ne devront pas être dévoilées à l'assureur et, s'il advenait qu'elles le soient, pour une raison ou une autre, elles ne pourront pas être utilisées par celui-ci contre l'assuré dans le cadre d'un litige les opposant. Le secret professionnel de la relation entre l'assuré et l'avocat est alors opposable à l'assureur (voir *Citadel General Assurance Co. c. Wolofsky*, précité)

60  Il en découle aussi que l'assuré a droit à tous les documents qui concernent l'affaire dans laquelle l'avocat agit pour lui (*In Re Crocker* [1936] 2 All E.R. 899 Ch. D.,

61  Ces documents comprennent, bien évidemment, tous ceux que l'assureur et l'avocat échangent en regard de la défense du recours intenté par le tiers, ou de son règlement. En théorie, ces documents sont les seuls que l'assureur et l'avocat mandaté pour défendre l'assuré devraient s'échanger puisque, de nos jours du moins, les avocats qui se trouvent dans une telle situation comprennent bien leur rôle, et le devoir de loyauté qu'ils ont envers l'assuré, et ils s'abstiennent systématiquement de conseiller l'assureur en regard de quelque question que ce soit concernant le contrat d'assurance. Me Nicholl revient d'ailleurs sur cette question plusieurs fois au cours de son témoignage:

> Une fois qu'on agit pour la défense, si vous voulez, on porte le chapeau de l'assuré puis on met des œillères à l'égard des questions de couverture, ce que j'ai essayé de faire.

62  Qu'en est-il toutefois si l'avocat, par inadvertance ou autrement, transmet à l'assureur un rapport dans lequel il exprime son avis sur une question qui concerne l'application ou l'étendue de la garantie d'assurance?

63  Deux thèses s'affrontent ici. D'une part, il y a celle voulant que l'assuré n'ait droit qu'aux documents pertinents au mandat pour lequel l'avocat agit pour lui, mais pas aux autres. Selon cette thèse, l'assuré n'aurait pas accès aux avis que l'avocat pourrait avoir donnés à l'assureur en regard de l'application et de la portée de la garantie d'assurance ( *Chersinoff c. Allstate Insurance Co.* , (1969) 3 D.L.R. (3$^d$) 560 (C.A. Colombie-Britannique)) D'autre part, il y a la thèse voulant que, puisque l'avocat ne peut pas servir en même temps deux maîtres ayant des intérêts contraires ou potentiellement contraires, il n'y a aucun secret professionnel qui puisse tenir advenant la transgression de ce devoir de loyauté. Selon les tenants de cette thèse, l'assuré a droit à tous les documents dont son avocat est l'auteur à compter du moment où celui-ci devient son procureur *ad litem* et ce, même si l'un ou l'autre des documents en question porte sur un sujet qui dépasse le cadre strict du mandat pour lequel l'avocat agit pour lui.

64  À la réflexion, j'opte pour la seconde thèse.

65  La loyauté dont l'avocat doit faire preuve envers son client lui interdit absolument de servir en même temps deux maîtres ayant des intérêts contraires ou potentiellement contraires. Lorsqu'un avocat devient, à la demande d'un assureur responsabilité, le procureur *ad litem* d'un assuré, il devient, à tous égards, l'avocat de ce dernier. Il lui doit une loyauté absolue.

66  Lorsque ce même avocat transgresse son devoir de loyauté en conseillant un deuxième maître – en l'espèce, l'assureur – sur un point au sujet duquel celui-ci a des intérêts contraires ou potentiellement contraires à ceux de l'assuré – par exemple, au sujet de l'application et de la portée de la garantie d'assurance, - il n'y a pas de secret professionnel qui puisse s'appliquer. L'assureur de responsabilité ne peut tout simplement pas être le client de cet avocat quand le sujet abordé par celui-ci en est un au sujet duquel l'assureur et l'assuré ont des intérêts contraires ou potentiellement contraires. Il importe peu, à mon avis, que la transgression du devoir de loyauté soit le fait d'une négligence de la part de l'avocat ou le fait d'une action concertée de ce dernier et de l'assureur.

67  Ces principes étant posés, il reste à examiner les documents auxquels l'appelant veut avoir accès.

68  Les services de M$^e$ Cantin ont été retenus par Kansa dès le mois de mars 1988 mais ce n'est qu'à la fin mars 1990, au terme de la réunion tenue le 29 mars 1990, qu'il sera substitué aux avocats Kronstrom et Associés comme avocat de l'appelante. Il demeurera le procureur *ad litem* de DMR jusqu'à ce que M$^e$ Nicholl lui soit substitué en novembre 1990.

69  Les lettres du 8 mars 1988, du 5 septembre 1989, du 20 décembre 1989 et du 9 mars 1990 sont donc confidentielles, protégées par le secret professionnel liant alors l'avocat et son client (l'assureur), puisque à cette époque M$^e$ Cantin – contrairement même à ce qu'il écrivait le 30 juin 1988 – n'avait pas encore comparu au nom de DMR et que plusieurs questions se posaient quant à l'obligation de défense de l'assureur et quant aux rôles respectifs des deux cabinets d'avocats.

70  Je ne vois aucune raison permettant à DMR, dans les circonstances de l'espèce, d'avoir accès à ces lettres. Quant aux rapports de M$^e$ Cantin postérieurs à sa comparution au nom de DMR, je suis d'avis que l'appelante y a droit et ce, même s'il advenait que les sujets abordés par M$^e$ Cantin dans ces communications dépassent le cadre strict du mandat pour lequel il agissait pour DMR.

71  Quant au compte que M$^e$ Cantin transmettait à l'assureur le 22 avril 1991, je suis d'avis que l'appelante a droit d'avoir accès à la portion de ce compte qui couvre le travail fait par l'avocat à compter du moment où il est devenu le procureur *ad litem* de DMR, soit à compter du 29 mars 1990.

72  Quant à M$^e$ Nicholl, le dossier indique qu'il a été substitué à M$^e$ Cantin en novembre 1990 et qu'il a été

l'avocat de l'appelante jusqu'en mai 1993. Je suis donc d'avis que l'appelante a droit à une copie de ses rapports des 2 juillet 1992, 23 décembre 1992 et 19 avril 1993, sans égard au contenu de ceux-ci.

73  Par ailleurs, je ne crois pas que l'appelante devrait avoir communication du rapport du 20 août 1990 puisqu'à cette époque, M[e] Nicholl n'était toujours pas son avocat.

L'état de connaissance de l'assureur et l'allégation de mauvaise foi

74  À titre subsidiaire, DMR plaide que, si la Cour devait conclure que les rapports transmis à Kansa par les procureurs chargés d'assumer sa défense font l'objet, en tout ou en partie, d'un secret professionnel qui lui est opposable, il y a eu, dans les circonstances de l'espèce, perte de ce privilège. D'une part, l'intimée ne pourrait pas affirmer ne pas avoir été en mesure de prendre position de façon éclairée sur la question de couverture avant que Promutuel ne modifie sa déclaration en 1993, pour se retranchant derrière le secret professionnel de l'avocat ou le privilège relatif aux communications échangées en vue d'un litige afin d'empêcher l'appelante de vérifier quelles étaient les informations dont elle disposait alors[4]; d'autre part, la nature particulière du contrat d'assurance ferait en sorte que les tribunaux ne devraient pas permettre à l'assureur de se retrancher derrière le secret professionnel de l'avocat ou le privilège de confidentialité attaché aux documents préparés dans le cadre d'un litige actuel ou à venir[5], lorsque sa bonne foi dans le traitement de la réclamation est légitimement mise en doute, comme c'est le cas en l'espèce.

75  À mon avis, l'appelante a raison, en partie du moins. Je lui permettrais d'avoir accès aux rapports de l'expert en sinistre Michel Roy mais pas aux lettres des avocats Cantin et Nicholl avant que ceux-ci ne deviennent ses procureurs ad litem.

76  Il est établi qu'il y a renonciation tacite à la confidentialité du dossier médical lorsque le demandeur met lui-même en cause son état de santé dans le contexte d'une action en responsabilité médicale ( *Frenette c. Métropolitaine (La)* [1992] 1 R.C.S. 647 ).

77  DMR plaide que la règle posée dans l'arrêt *Frenette* s'applique également au cas de la personne qui, comme l'intimée, met en cause l'état de ses connaissances à un moment donné pour justifier les gestes posés à cette époque. L'«état de sa connaissance» constituerait un fait que l'autre partie au litige aurait le droit de contrôler, tout comme le défendeur a le droit de contrôler l'état de santé de la présumée victime dans le cadre d'une action en responsabilité médicale.

78  Je suis d'accord. Une partie ne peut pas affirmer avoir eu connaissance, ou ne pas avoir eu connaissance, de quelque chose sans permettre à l'autre de vérifier le bien-fondé de cette allégation dont elle a choisi de faire un objet du débat judiciaire[6]. L'état de sa connaissance devient alors un fait dont l'autre partie a le droit absolu de vérifier la véracité; cette allégation entraîne implicitement la renonciation à la confidentialité des documents qui sont en sa possession et qui permettent d'étayer ou de réfuter ce fait.

79  Dès sa lettre du 7 mai 1993, Kansa affirme ne pas avoir été en mesure de prendre position de façon éclairée sur la question de couverture avant que Promutuel ne modifie sa déclaration dans la foulée du rapport d'expertise comptable obtenu de la firme Samson Bélair Deloitte et Touche «(...) jusqu'à présent, *les renseignements disponibles dans le dossier* ne nous permettent pas de formuler une opinion définitive sur le sujet.»; «(...) une déclaration amendée profondément modifié(sic) qui contient plusieurs nouvelles allégations (...)»; «[en] raison de ce *fait nouveau* nous sommes *maintenant* en mesure (...)» (je souligne). Kansa met ainsi clairement en cause l'état de sa connaissance dans la période 1990-1993 pour expliquer sa décision d'assumer, conjointement avec DMR, la défense de celle-ci[7].

80  Cette question sera de nouveau mise en cause dans les procédures judiciaires que les parties ont échangées en marge du litige.

81  Dans sa requête, DMR plaide que l'intimée avait l'obligation légale et contractuelle de la défendre et de

l'indemniser (paragraphe 57 de la requête) et ajoute que, de toute manière, «par ses faits et gestes», posés «après enquête *et en possession de toute l'information utile*» (je souligne), elle a «renoncé» à invoquer les motifs mentionnés pour refuser de la défendre et de l'indemniser (paragraphe 58 de la requête).

82  Dans sa contestation, l'intimée nie expressément les paragraphes 57 et 58 de la requête de DMR (paragraphe 28 de la contestation). Elle plaide ensuite avoir identifié dès le départ de nombreuses difficultés au niveau de la couverture d'assurance et avoir pris en compte la question de l'obligation de défendre et sa portée (paragraphes 74 et 75 de la contestation). Elle indique toutefois ne pas avoir été en mesure de prendre position relativement à la défense de DMR puisque «les [allégations] de la déclaration et la position prise par les procureurs de DMR n'ont pas permis de dégager un consensus quant aux exclusions applicables et quant à leur portée» (paragraphe 82 de la contestation). L'intimée explique enfin avoir décidé, en mai 1993, de ne plus assumer la défense de DMR en raison de l'amendement apporté par Promutuel à sa déclaration quelques semaines plus tôt; cet amendement «venait éclairer et préciser de façon déterminante les bases factuelles des chapitres de réclamation de départ et les fondements des chapitres additionnels» (paragraphe 107 de la contestation).

83  À la lumière des allégations de la procédure écrite et des pièces au dossier, il ne fait pas de doute que la question des informations dont Kansa disposait quand elle a accepté de prendre fait et cause pour son assuré, en 1990, est contestée; Kansa affirme n'avoir vraiment su ce qu'il en était qu'en mai 1993, DMR le nie alléguant que Kansa était en possession de toute l'information utile à sa prise de décision dès 1990.

84  Dans ce contexte, je crois que l'appelante a droit d'avoir accès aux rapports de l'expert en sinistre Michel Roy puisqu'ils font partie des renseignements dont Kansa disposait au moment de décider d'assumer sa défense. Par contre, je ne crois pas que l'appelante devrait avoir accès aux opinions que les avocats Cantin et Nicholl transmettaient à l'assureur avant de devenir ses avocats *ad litem*. En effet, le simple fait qu'une personne allègue l'état de sa connaissance à une date donnée ne suffit pas, à mon avis, pour constituer une renonciation suffisamment claire et précise à la confidentialité de ses communications avec son conseiller juridique ( *Sabbah c Batica Inc.* [1994] R.D.J. 163 ). Le droit au secret professionnel de l'avocat est trop important et fondamental pour permettre de conclure aussi facilement à une renonciation ( *Descôteaux c Mierzwinski* [1982] 1 R.C.S. 860 ).

85  Il en va différemment lorsqu'une personne affirme avoir posé un geste en raison précisément de l'opinion juridique reçue; l'opinion devient alors elle-même un objet de litige et l'allégation constitue alors renonciation expresse au secret professionnel de l'avocat ou du notaire ( *St-Alban (Municipalité de) c. Récupération Portneuf Inc* [1999] R.J.Q. 2268 ). Tel n'est pas le cas ici; Kansa n'allègue pas expressément s'être appuyée sur l'opinion de ses avocats pour justifier sa décision de 1990 de prendre fait et cause pour l'assuré.

86  L'appelante plaide enfin qu'indépendamment de toute renonciation, expresse ou tacite, à la confidentialité, l'assuré devrait avoir accès au dossier d'enquête de son assureur dès que la bonne foi de celui-ci dans le traitement de la réclamation est légitimement mise en doute, ce dossier étant en quelque sorte l'unique moyen de savoir si l'assureur a ou non géré la réclamation en toute bonne foi. Je ne suis pas d'accord, du moins dans le contexte de ce dossier où l'assureur nie expressément avoir été de mauvaise foi. Il me semblerait incongru que la confidentialité d'un document en possession d'une partie – fût-elle un assureur de responsabilité – dépende d'une simple allégation de mauvaise foi avancée par l'autre partie.

87  Pour ces raisons, je propose donc d'accueillir le pourvoi en partie, avec dépens, d'infirmer les jugements rendus par le juge de première instance sur les objections à la preuve des 24 mai et 12 juin 2002 afin d'autoriser la production des documents suivants:

les lettres de M$^e$ Cantin à Kansa datées du 26 juillet 1990 et du 28 septembre 1990;

la partie du compte que M$^e$ Cantin transmettait à Kansa le 22 avril 1991, couvrant le travail fait à compter du 29 mars 1990;

les lettres de M$^e$ Nicholl à Kansa datées du 2 juillet 1992, du 23 décembre 1992 et du 19 avril 1993;

les rapports de l'expert en sinistre Michel Roy datés du 14 décembre 1987, du 19 mai 1988, du 18 janvier 1989 et du 26 mai 1989.

CHAMBERLAND J.C.A.

Me Serge Gaudet, Me Élizabeth Laroche, pour l'appelante
Me Claude-Henri Grignon, pour les intimés

1. Les listes de documents mentionnés aux paragraphes [36] et [37] ont été établies à partir des documents mis sous scellés par le juge de première instance. L'enveloppe contenant ces documents lui sera retournée par le greffier de la Cour lorsque nos arrêts auront été déposés.

2. Sur le devoir de loyauté de l'avocat, voir les motifs du juge Binnie dans *R. c. Neil* 2002 C.S.C. 70 (le 1<sup>er</sup> novembre 2002).

3. Voir également, au même effet, *Boréal Assurances Inc. c. Réno-Dépôt Inc.* [1996] R.J.Q. 46 C.A. et *Ville de Fermont c. Pelletier* [1998] R.J.Q. 736 C.A.

4. L'appelante plaide en effet, à titre subsidiaire, que l'intimée savait très bien ce qu'elle faisait quand elle a accepté de prendre son fait et cause de 1990 à 1993 et qu'elle a ainsi renoncé à invoquer les motifs sur lesquels elle s'est appuyée subséquemment pour refuser de la défendre et de l'indemniser. Cet argument s'appuie sur la jurisprudence traditionnelle concernant l'application de la doctrine des fins de non-recevoir (en droit civil, ou de l'*estoppel* en Common Law) en assurance-responsabilité. Dans l'arrêt *Zurich du Canada, compagnie d'indemnité*, précité, le juge LeBel soulignait les difficultés que cette jurisprudence causait aux assureurs et concluait que «[la] redéfinition des relations entre l'obligation de défense et l'obligation d'indemnisation à la suite de l'arrêt *Nichols c. American House Assurance Co.*, [1990] 1 R.C.S. 801 ] et la modernisation de la rédaction des polices d'assurance exigeraient peut-être un réexamen de cette règle traditionnelle (...)».

5. Au sujet du privilège de confidentialité attaché aux documents préparés dans le cadre d'un litige actuel ou à venir, voir *Sous-ministre du Revenu du Québec c. Fava* [1984] R.D.J. 486 C.A. ; *Federal Insurance Company c. Lasalle* [1985] R.D.J. 230 C.A. ; *Gerling Global Cie d'assurance générale c. Sanguinet Express Inc.* [1989] R.D.J. 93 C.A.

6. Voir, par exemple, *ABN Amro Bank Canada c. Performance Guarantees (Québec) Inc.*, C.S. Montréal, N°500-05-018942-928, 2 juillet 1996, j. Julien, confirmé par J.E. 98-176 (C.A.).

7. Kansa affirme que tout cela s'est fait «sans préjudice aux droits des parties et, en ce qui concerne l'assureur, sans admission de couverture». Il s'agit là d'une question qui a sûrement été débattue devant le juge de première instance et sur laquelle il ne convient pas de nous arrêter plus longuement dans le cadre de ce pourvoi.

Date de mise à jour : 9 janvier 2005
Date de dépôt : 5 septembre 2003

Copyright © Les Éditions Yvon Blais Inc., le Barreau du Québec
et leurs concédants de licence. Tous droits réservés.

REJB 2003-46291 -    Full Text

## COURT OF APPEAL

CANADA
PROVINCE OF QUEBEC
DISTRICT OF MONTREAL

NO: 500-09-012340-022

DATE: August 18, 2003

DATE OF HEARING: October 25, 2002

BEFORE:

JOSEPH R. NUSS, J.A.
JACQUES CHAMBERLAND, J.A.
DANIELLE GRENIER, J.A. (Ad hoc)

**In the matter of the liquidation of: Kansa General International
Insurance Company Ltd.: Groupe DMR Inc.
Appellant-Petitioner**
**v.**
**Kansa General International Company Ltd.
Respondent-Respondent
and
Gerdinand Alfieri, in his quality of liquidator of the property of Kansa
General International Company Ltd. in Canada
Respondent-Liquidator-Respondent**

---

**Chamberland, J.A., Grenier, J.A. (Ad hoc), Nuss J.A.:-**

1    THE COURT: Ruling on the appeal of an interlocutory judgment rendered on
May 24, 2002 by the Superior Court, District of Montreal (the honorable Roland
Durand), which maintained an objection made by the Respondents at trial and
refused the communication and the production of certain documents because
they were confidential and by virtue of attorney's professional secrecy;

2    Having examined the file, heard the parties and taken the matter under
advisement;

3  For the reasons given in the opinion of Chamberland, J.A., filed herewith, Nuss, J.A. and Grenier, J.A. (ad hoc) concurring;

4  *GRANTS* the appeal;

5  *SETS ASIDE* the judgment of the Superior Court;

6  *OVERULES* the objection of the Respondents made at trial on May 24, 2002; and

7  *AUTHORIZES* the communication and the production of the letters of Me John I.S. Nicholl addressed to Kansa General International Insurance Company Ltd. dated July 2, 1992, December 23, 1992 and April 19, 1993;

8  With costs.

CHAMBERLAND, J.A., GRENIER, J.A. (AD HOC), NUSS J.A.:-

Me Serge Gaudet, Me Élizabeth Laroche, for the Appellant
Me Claude-Henri Grignon, for the Respondents

## Chamberland J.A.:-

9  This appeal raises, on two levels, the question of the right of an insured to obtain the communication of documents which relate to its claim and which form part of the files of its liability insurer. Firstly, it is necessary to determine if the reports transmitted to the insurer by the attorney instructed to assume the defence of an insured are covered by professional secrecy *vis-à-vis* the insured. Secondly, we need to establish if the insured can obtain communication of its insurance file when the insurer, after assuming its defence, turns around and denies coverage, claiming that it did not have, at the relevant time, enough information to make an enlightened decision in connection with its obligation to defend.

The facts

10 The Appellant Groupe DMR Inc. (DMR) obtained in 1985 a contract to develop and establish at Groupe Promutuel – Fédération des sociétés mutuelles d'assurance générale (Promutuel) an integrated and centralized computer system.

11 The work begun but it quickly became more difficult and complex than originally planned. The relationship between DMR and its client worsened and by

the end of the summer of 1987, Promutuel's attorneys put DMR on formal notice to fully respect its contractual obligations.

12 On October 30, 1987, DMR discussed its difficulties with its insurance brokers, adding that it wanted to sue Promutuel to recover its professional fees, which might lead Promutuel to initiate, in response, a claim for damages.

13 DMR was at the time insured for its professional liability by the Respondent, Kansa General International Company Ltd (Kansa).

14 On November 19, 1987, Kansa engaged Michel Roy, a claims adjuster, to lead the investigation.

15 At the end of December 1987, DMR instituted proceedings against Promutuel.

16 At the end of February 1988, Promutuel sued DMR for various damages associated with the development and installation of the computer system. The amount of the claim was for more than 4 million dollars.

17 The attorneys Kronstrom et Associés (Me Jean-Yves Desjardins) filed an appearance in the name of their client, DMR, and informed the claims adjuster Roy of the suit brought by Promutuel.

18 On March 3, 1988, Kansa retained Me Pierre Cantin, who then notified Me Desjardins.

19 On June 30, 1988, Me Cantin writes to DMR. He asserts that he represents DMR's liability insurer and, following its instructions, "he had filed an appearance for your company in this matter". He also informs DMR that this appearance was made without prejudice of the rights of the insurer to "withdraw from the file at any time during the course of the proceedings, even at trial, and/or not to be bound the judgment that could be rendered against your company if the trial reveals that there was no coverage or that the conditions of the contract were not respected".

20 In fact, Me Cantin had never filed an appearance in the record of the Superior Court.

21 On October 25, 1989, he writes again to DMR, mentioning that the insurer "is willing to take your defence in this matter". However, he advises DMR that it will be personally responsible for the judgment that could be rendered against the company if the claim is not covered, in whole or in part, by the insurance contract.

22 On the same day, Me Cantin sent to Kronstrom et Associés, for signature, a consent to the substitution of attorneys.

23 However, DMR asked to its attorneys not to go forward with the substitution until a meeting could be arranged with the insurer. DMR considers that the demand of Me Cantin was unforeseen and "disrupted (...) the ongoing strategy"; it wanted a meeting to take stock of the matter and coordinate the efforts to ensure the success of the defence.

24 The meeting took place on December 18, 1989.

25 On January 8, 1990, DMR wrote to Kansa and raised two issues that were left unresolved. The first one concerned the choice and the mandate of the attorneys; DMR requested that its attorneys stay in the file as "attorneys in charge" and that Me Cantin be mandated "to assist them and see to the protection of the insurer's specific interests". The second point concerned the reimbursement of the fees; DMR considered that it had the right to be reimbursed for "all the fees already incurred and to be incurred in this file".

26 Another meeting was held on March 29, 1990. Many issues were dealt with regarding the obligations of Kansa, but the question of the fees incurred by DMR to assume its defence up to that day was still unresolved, although Kansa gave DMR a $50,000.00 cheque as an advance. Another meeting was to take place in August. The parties agreed that Me Cantin would substitute Kronstrom et Associés "in the matter of the defence"; however, Kronstrom et Associés would file an appearance as "co-counsel" in the same file.

27 According to the docket, the substitution of attorneys was filed on April 19, 1990 and the appearance of Kronstrom et Associés as co-counsel is dated May 2, 1990.

28 After this meeting, Kansa paid the fees of Me Cantin and of Kronstrom et Associés.

29 Another meeting occurred on November 1, 1990. The same issues were discussed. Kansa confirmed that it undertook to defend, at its own expense, the whole claim of Promutuel, even if the amount claimed exceeded what was provided by the insurance coverage and if certain aspects of the claim appeared not to be covered. The attorneys chosen by Kansa would take charge of the file and would be supported by the attorneys of DMR, if DMR considered it necessary. Kansa undertook to reimburse DMR for the reasonable fees of Kronstrom et Associés for the period between the commencement of the file and the substitution of attorneys, but only in the proceedings in which Promutuel was suing DMR.

30 In November 1990, Me John I.S. Nicholl replaced Me Cantin.

31 At that time, DMR and Kansa had reached another agreement on the payment of fees associated with the defence; Kansa would pay for all of Me Nicholl's fees and for a third of the fees of Kronstrom et Associés.

32 This agreement worked until December 1992. On December 1992, Kronstrom et Associés informed Me Nicholl that the agreement had to be revised. They proposed "to appoint a partner to the file in demand" and that Me Richard Ramsay, another attorney of the same law firm, be "appointed exclusively to the file in defence and that his fees be entirely paid by the insurer". Me Ramsay advised his colleague that he would only work in demand "until a new agreement is reached to the satisfaction of our respective clients".

33 A new meeting took place on January 19, 1993.

34 On March 31, 1993, Promutuel amended its declaration pursuant to a report prepared by the accounting firm Samson, Bélair, Deloitte & Touche. The claim was recalculated; it now approaches 6 million dollars.

35. On May 7, 1993, Kansa informed DMR that these developments, qualified as "new facts", led Kansa to the conclusion that the faults alleged by Promutuel to have been committed by DMR and the damages claimed were not covered by the insurance policy. It is relevant to quote this letter at length:

For many years, our company and DMR jointly assumed y the defence in this file up to a certain extent, the whole without prejudice to the rights of the parties and, with respect to the insurer, without admission of coverage.

Recently, you have asked us to provide you with our final position regarding coverage. Unfortunately, up until now, the information available in the file did not allow us to formulate a definitive opinion on the matter.

In the last few months, the third party has produced a comprehensive report prepared by the accounting firm Samson Bélair Deloitte Touche, which detailed the damages claimed. However, it is only last month that the third party filed an amended declaration greatly modified (sic) which contained many new allegations regarding DMR's conduct.

Because of this new fact, we are now in a position to inform you whether or not the insured can benefit from any coverage.

It is our opinion that the facts alleged in the amended declaration and the damages claimed pursuant to the expert report do not constitute the materialization of a risk covered by the insurance policy. Without prejudice to the foregoing, in the event that there was any coverage (a fact that is vigorously denied), the loss would be excluded and the coverage denied pursuant to the terms, conditions and exclusions contained in the policy and the provisions of law.

The present letter is sent to you without prejudice to all the other rights and defences that our company may have.

36 In October 1993, DMR sued Kansa in warranty in order to take up its defence, reimburse all the costs associated with the defence and indemnify it should Promutuel win its case;

37 In April 1993, DMR paid Promutuel $1,500,000.00 in capital, interest and costs in full and final settlement of the case.

38 The dispute between DMR and Kansa was continued by way of a summary petition pursuant to article 135 of the *Winding-up and Restructuring Act,* R.S.C. 1985, c. W-11, Kansa being the object of a winding-up under this law.

39 The damages claimed by DMR amount to more than 4 million dollars and cover the obligation to indemnify, the obligation to defend and the so-called unjustified and abusive refusal of the insurer to take up its defence. DMR asserts that Kansa had the obligation to defend and that DMR has the right to claim the reimbursement of all the fees incurred in this regard. It also states that the claim of Promutuel was covered by the insurance policy and that accordingly, Kansa has the obligation to indemnify DMR for the amounts paid to Promutuel pursuant to the settlement.

40 With respect to the obligation to defend, DMR claims that at the time Kansa agreed to take up its defence, it knew all the facts surrounding Promutuel's claim. The amendment of May 1993 did not modify the nature of the claim of Promutuel and no "new fact" had occurred that could justify the new position of the insurer. Accordingly, Kansa had renounced invoking the reasons that it now raises to deny its obligation to defend; the amendment to the declaration of Promutuel is only an excuse to justify its withdrawal from the file. DMR asserts that such behavior was abusive and tainted with bad faith, which justifies the claim it now makes for payment of the fees it must incur to avail itself of its rights in the present file.

41 In defence, Kansa declares that the claim of Promutuel was not covered by the terms of the policy issued in favor of DMR. Even though it assumed the

defence of DMR for more than 3 years (from 1990 to 1993), Kansa claims that it was not in a position to make an enlightened decision on the basis of the initial declaration of Promutuel, since the allegations were not precise enough to clearly determine the scope of certain exclusions. Kansa asserts that it is only after receiving a copy of the amended declaration that it was in a position to understand, for the first time, the real nature of the claim of Promutuel, which explains its decision of May 7, 1993 to deny coverage and to withdraw from the file.

42 The trial took place in May and June 2002.

The judgments under appeal

43 During the trial, DMR tried to establish what Kansa knew when it made the decision to take up its defencet; DMR wants to produce the documents and use as evidence the information that Kansa had at the time. The attorneys of DMR examined Me Nicholl and a representative of Kansa, Mr. Claude Fauré, regarding the opinions and the reports that were submitted to the insurer between 1988 and 1993 in connection with the claim of Promutuel.

44 On May 24, 2002, the judge maintained an objection based on attorney's professional secrecy during the examination of Me Nicholl because Kansa — and not DMR — was his client and accordingly, he was bound by professional secrecy. He also concluded that the reports of Me Nicholl contained some legal opinions and he refused the communication and the production of his letters addressed to Kansa dated July 2, 1992, December 23, 1992 and April 19, 1993.

45 On July 12, 2002, during the examination of Mr. Fauré, the judge maintained an objection based on professional secrecy and on the privileged nature of the reports prepared by Me Cantin during the evaluation of the claim in the scope of his mandate to defend DMR, and of the reports prepared by the claims adjuster Michel Roy. The documents in question are the letters of Me Cantin addressed to Kansa on March 8, 1988, September 5, 1989, December 20, 1989, March 9, 1990 and September 28, 1990, a letter of Me Nicholl addressed to Kansa on August 20, 1990, an invoice for the professional fees of Me Cantin dated April 22, 1991 and the reports of Michel Roy dated December 14, 1987, May 19, 1988, January 18, 1989 and May 26, 1989.

46 The Appellant lodged an appeal against those two interlocutory judgments, with the authorization of a judge of this Court (file no 500-09-012340-022 with regard to the judgment of May 24, 2002; file no 500-09-012389-029 with regard to the judgment of June 12, 2002). The two appeals had been joined for the purposes of filing one factum, a single hearing being sufficient, and the trial proceedings were suspended until this Court renders its decision.

47 The documents in question had been placed under seal by the trial judge so we could, if necessary, consult them[1].

48 Finally, I point out that both sides have finished presenting their evidence, subject to the consequences that the present judgment might have, and the trial judge has suspended the hearing until this Court renders judgment.

Analysis

49 The questions of the Appellant at trial were essentially concerned with two categories of documents: firstly, the reports sent to the Insurer by the two attorneys that it successively mandated to assume the defence of DMR; secondly, the reports transmitted to the Insurer by the claims adjuster in charge of the investigation after the moment DMR had raised the possibility that its professional liability could be engaged. To those documents, we must add the invoice for professional fees that Me Cantin sent to the insurer after Me Nicholl was substituted as attorney *ad litem* of DMR.

50 DMR claims that the attorney mandated by a liability insurer to assume the defence of an insured is first and foremost the attorney of this insured and not that of the insurer. It is therefore the insured that is the beneficiary of the professional secrecy and the insurer cannot restrict access to reports emanating from its own attorney. Subsidiarily, the Appellant also asserts that an insurer that accepts, as in the present case, to take up the defence of its insured before withdrawing from the case and denying coverage, asserting that it did not have, at the time, enough information to make an enlightened decision, has simply renounced to the confidentiality of the documents that are in its possession and which can be useful to establish, or deny, what was its "state of mind" at the time the initial decision to defend the insured was made.

51 The Respondent replies that the client of the attorney mandated by a liability insurer to defend an insured is this insurer itself; only the insurer could therefore benefit from the privileges associated with the solicitor-client relationship. In this context, the insured cannot claim to have any right to any information or document closely or remotely associated with this solicitor-client relationship, nor to any information or document closely or remotely associated with the investigation led by the insurer. Regarding the subsidiary argument raised by the Appellant, the Respondent claims that the concept of "state of mind" as an exception to the ordinary rules of evidence is a Common Law creation that is foreign to Quebec evidence law. In the present case, there was no renunciation to the confidentiality of the communications it had with its claims adjuster and its attorneys. The bold assertion of bad faith formulated by the Appellant is not

sufficient to deprive the insurer of the confidential nature of the relationship it had with its attorneys and its claims adjusters.

The attorney and professional secrecy

52 It is well established that the attorney mandated by the liability insurer to assume the defence of the insured is first and foremost the attorney of this insured and not that of the insurer, even though it is the insurer that selects him and that controls the conduct of the defence. The insured benefits from all of the rights associated to the solicitor-client relationship, including the right to the complete loyalty of the attorney[2] and the right to the confidentiality of their communications (*Citadel General Assurance Co.* v. *Wolofsky*, [1984] C.A. 377).

53 In *Norbert* v. *Lavoie* [1990] R.J.Q. 55, my colleague Baudouin J.A., writing for the Court, put emphasis on the following:

(...) that the lawyer filing an appearance for a party is really under the law its *ad litem* attorney. In the present case, the attorney who had filed the appearance and the first plea is not, under the law, the representative or the spokesperson of the insurer, but rather that of the insured itself. It is true, as the proceedings seem to suggest, that the insurer would have taken up the defence of the insured. However, we are not concerned with this question. The *ad litem* attorney, in the present case, legally represents the respondent, and the respondent only.[3]

54 In *Zurich du Canada, compagnie d'indemnité* v. *Renaud & Jacob* [1996] R.J.Q. 2160, this Court recognized the double mandate of the attorney instructed by a liability insurer to defend an insured and the connection that continues to unite this attorney to the insurer, even after he became the *ad litem* attorney of the insured. In fact, the execution of the obligation to defend also confers some rights to the insurer, including the right to conduct the defence as it wishes; the insurer selects the attorneys and the experts, defines the orientation of the defence and even, eventually, decides whether or not to settle the case (p. 2165).

55 Lebel J.A. describes the role of the attorney in the following way (p. 2166):

He [the attorney] plays a double role vis-à-vis the insurer and the insured and necessarily has, as such, a double mandate.

The recent jurisprudence of the Court has refused, in this relationship, to recognize a priority to the interests of the insurer. The attorney chosen and paid by the insurer must loyally assume the defence of the insured and integrally preserve its interests. The case *Citadel General Assurance*

*Co.* put emphasis on the fact that the professional secrecy of the relationship between the insured and the attorney can be invoked against the insurer. Conflicts of interests cannot be settled at the outset by the sacrifice of the interests of the insured.

56 and a little bit further, at page 2169:

(...) pursuant to a liability insurance policy, the conduct of the defence belongs to the insurer. It has this right as a counterpart of its obligation to insure the payment of the defence. This right is recognized contractually by the insured from the start, this clear distinction between the obligation to defend and the obligation to indemnify. It creates a situation where, right from the beginning of the debate, the insured accepts that its attorney has sort of a double mandate. Inside of this double mandate, the attorney remains obligated towards the insured for all of the usual ethical obligations (...).

57 The attorney mandated by a liability insurer to defend an insured is, in many respects, in a unique situation. It must loyally assume the defence of the insured and preserve integrally its interests, while keeping in mind that the conduct of the defence remains a prerogative of the insurer.

58 The insured thus accepts that its attorney holds a form of double mandate. The situation, although unusual in solicitor-client relationships, does not create any real difficulties if the respective objectives of the insurer and the insured perfectly coincide, which is the case when both combine their efforts to obtain the dismissal of the claim or its settlement. However, the possibility of a double mandate no longer exists when the interests of the insurer and of the insured diverge, for example when the insurer wants to settle the claim while the insured desires to go to trial to "defend its reputation", when the insurer refuses to engage the totality of the insurance coverage in a settlement that the insured wishes for or again, when the insurer asks for the attorney's opinion on the insurance coveage. The attorney is then at the heart of an unresolvable conflict of loyalty and the pursuit of a double mandate is simply no longer possible.

59 As long as the double mandate exists, the attorney needs to respect its normal ethical obligations towards its principals. Hence, the declarations made by the insured under the secrecy of the solicitor-client relationship must not be disclosed to the insurer, and if they were disclosed for a reason or for another, they cannot be used by the insurer against the insured in a dispute between them. The professional secrecy in the relationship between the insured and the attorney is thus opposable to the insurer (see *Citadel General Assurance Co* v. *Wolofsky*, supra).

60 It also results from these principles that the insured has a right of access to all the documents associated with the matter in which the attorney is acting on its behalf (*In Re: Crocker* [1936] 2 All E.R. 899 Ch. D.).

61 These documents include, of course, all those that the insurer and the attorney exchange in connection with the defence of the proceedings initiated by the third party, or its settlement. In theory, these documents are the only ones that the insurer and the attorney mandated to defend the insured should be exchanging since, at least nowadays, the attorneys that are in such a situation understand their role and the duty of loyalty they have towards the insured, and they systematically refuse to advise the insurer with respect to any question concerning the insurance contract. Me Nicholl often comes back to this issue during his testimony:

Once we act for the defence, if you want, we wear the hat of the insured and we wear blinders in connection with coverage matters, which is what I have tried to do.

62 But what happens if the attorney, by mistake or otherwise, sends to the insurer a report in which he gives an opinion on a question that concerns the application or the scope of the insurance coverage?

63 Here, two theses clash. On one hand, there is that which asserts that the insured has only the right to access the documents relevant to the mandate for which it is represented by the attorney. According to this thesis, the insured would not have access to the opinion that the attorney might have given to the insurer with respect to the application or the scope of the insurance coverage (*Chersinoff* v. *Allstate Insurance Co.*, (1969) 3 D.L.R. (3$^d$) 560 (Court of Appeal of British Columbia). On the other hand, there is the thesis stating that since the attorney cannot serve two masters at the same time with conflicting or potentially conflicting interests, there is simply no professional secrecy that can be invoked if this duty of loyalty is breached. According to the defenders of this thesis, the insured has the right to access all the documents that emanate from its attorney, starting from the moment he became its *ad litem* attorney, even if one or many of the documents in question deal with an issue that goes beyond the strict boundaries of the mandate for which it is represented by the attorney.

64 After giving the problem some thought, I choose to adopt the second thesis.

65 The loyalty that an attorney must show towards a client absolutely prohibits him to serve two masters at the same time having conflicting or potentially conflicting interests. When an attorney becomes, at the request of

a liability insurer, the *ad litem* attorney of an insured, he becomes, in all respects, the attorney of the insured. He owes the insured absolute loyalty.

66 When this same attorney breaches his duty of loyalty by giving advice to a second master – in the present case, the insurer – regarding an issue on which the insurer has conflicting or potentially conflicting interests with those of the insured – for example, in relation with the application or the scope of the insurance cover –, there is no professional secrecy that can apply. The liability insurer simply cannot be the client of this attorney when the issue that is dealt with is an issue upon which the insurer and the insured have conflicting or potentially conflicting interests. I think that it doesn't really matter whether the breach of the duty of loyalty resulted from the negligence of the attorney or from a concerted action between the attorney and the insurer.

67 These principles being established, we must now examine the documents the Appellant wishes to obtain.

68 The services of Me Cantin were retained by Kansa in March 1988, but it is only at the end of March 1990, following the meeting held on March 29, 1990, that he replaced Kronstrom et Associés as attorney of the Appellant. He remained the *ad litem* attorney until Me Nicholl was substituted to him in November 1990.

69 The letters of March 8, 1988, September 5, 1989, December 20, 1989 and March 9, 1990 are therefore confidential and protected by the professional secrecy existing between the attorney and its client (the insurer), since at that time, Me Cantin – unlike what he wrote on June 30, 1988 – had not appeared on behalf of DMR and many questions remained unresolved in connection with the insurer's obligation to defend and with the respective roles of the two law firms.

70 I do not see any reason why DMR, in the present circumstances, should have access to these letters. As to the reports of Me Cantin that are subsequent to his appearance on behalf of DMR, I believe that the Appellant should have access to them, even if the issues addressed by Me Cantin in these communications go beyond the strict boundaries of the mandate for which he represented DMR.

71 As to the bill that Me Cantin sent to the insurer on April 22, 1991, I think that the Appellant has the right to access the portion of this bill that covers the work done after he became the *ad litem* attorney of DMR, that is to say March 29, 1990.

72 As to Me Nicholl, the record indicates that he was substituted to Me Cantin in November 1990 and that was the attorney of the Appellant until May 1993. I therefore consider that the Appellant has the right to receive a copy of the reports of July 2, 1992, December 23, 1992, April 19, 1993, without consideration to the content of the said reports.

73 In other respects, I do not believe that the Appellant should receive communication of the report dated August 20, 1990 since Me Nicholl, at that time, was not yet its attorney.

The state of the mind of the insurer and the allegations of bad faith

74 Subsidiarily, DMR claims that if the Court comes to the conclusion that the reports sent to Kansa by the attorneys mandated to assume its defence were covered, in whole or in part, by a professional secrecy that could be invoked against DMR, there had been, in the present circumstances, a renunciation to this privilege. On one hand, the Respondent could not assert that it was not in a position to make an enlightened decision on the question of coverage before Promutuel modified its declaration in 1993, while invoking at the same time professional secrecy or the privilege relating to communications exchanged for the purpose of preparing litigation, in order to prevent the Appellant from verifying what was the information it had at the time[4]; on the other hand, the particular nature of an insurance contract should encourage the Courts not to give an insurer the possibility of hiding behind professional secrecy or the confidentiality privilege relating to documents prepared in the context of actual or upcoming litigation[5], when its good faith in the treatment of the claim was legitimately put into doubt, as in the present case.

75 I believe that the Appellant is right, at least partially. I would grant the Appellant access to the reports of the claim adjuster Michel Roy, but not to the letters of the lawyers Cantin and Nicholl that were sent before they became its *ad litem* attorneys.

76 It is established that there is a tacit renunciation to the confidentiality of a medical file when the plaintiff puts his health status into question in the context of a medical malpractice case (*Frenette* v. *Métropolitaine* (La) [1992] 1 R.C.S. 647).

77 DMR claims that the rule adopted in the *Frenette* case also applies in the case of a person, like the Respondent, that put its state of mind into question at a certain time to justify acts carried out at that time. The "state of mind" would constitute a fact that the other party to the dispute would have the right to verify, just like the defendant has the right to verify the health status of the alleged victim in a medical malpractice case.

78 I agree. A party cannot assert that it had knowledge, or did not have knowledge, of a certain thing without giving the other party the opportunity to verify the merit of an allegation it chose to make the object of a judicial debate. The state of mind then becomes a fact that the other party has the absolute right to verify the merit of; this allegation leads implicitly to the renunciation to the confidential nature of the documents in its possession that can be used to demonstrate or deny this fact.

79 As early as in its letter dated May 7, 1993, Kansa asserts that it had not been in a position to make an enlightened decision on the question of the coverage before Promutuel had modified its declaration, pursuant to the report prepared by the firm Samson, Bélair, Deloitte & Touche. "(...) up until now, *the information available in the file* did not allow us to formulate a definitive opinion on the matter"; "(...) an amended declaration greatly modified which contained many new allegations (...)"; "Because of this *new fact*, we are *now* in a position (...)" (my emphasis). Kansa clearly put into question its state of mind for the period 1990-1993 to explain its decision to assume, jointly with DMR, the defence of DMR.[7]

80 This question will again be dealt with in the proceedings that the parties exchanged ancillary to this dispute.

81 In its motion, DMR claims that the Respondent had the legal and contractual obligation to defend and to indemnify (paragraph 57 of the motion) and adds that, in any event, "through its acts and dealings" done "after having investigated *and in possession of all relevant information*" (my emphasis), it "renounced" its right to invoke the aforementioned reasons to justify refusing to defend and indemnify DMR (paragraph 58 of the motion).

82 In its contestation, the Respondent expressly denies paragraphs 57 and 58 of DMR's motion (paragraph 28 of the contestation). It later claims that it had identified right from the beginning numerous difficulties associated with the insurance coverage and that it had considered the question of the obligation to defend and its scope (paragraphs 74 and 75 of the contestation). However, it indicates that it was not in a position to make a decision with regard to the defence of DMR since "the [allegations] of the declaration and the position taken at the time by the attorneys of DMR did not lead to a consensus on the question of the applicable exclusions and their scope" (paragraph 82 of the contestation). The Respondent finally explains that it decided, in May 1993, that it would no longer assume the defence of DMR in virtue of the amendment made by Promutuel to its declaration a few weeks earlier; this amendment "shed light on and clarified in a decisive way

the factual basis of the damages initially claimed and the ones that were claimed at a later stage" (paragraph 107 of the contestation).

83 In light of the allegations of the written proceedings and the exhibits that have been filed, there is no doubt that the question of the information in possession of Kansa at the time it agreed to assume the defence of its insured, in 1990, is contested; Kansa claims that it had learned the relevant information only in May 1993, while DMR asserts that Kansa was in possession of everything it needed to take its decision as early as in 1990.

84 In this context, I believe that the Appellant has the right to have access to the reports of the claim adjuster Michel Roy since they are part of the information Kansa had at the time it decided to assume its defence. However, I do not believe that the Appellant should have access to the opinions that the lawyers Cantin and Nicholl sent to the insurer before they became its attorneys *ad litem*. The mere fact that a person alleges the state of its mind at a given date is not sufficient, in my opinion, to constitute a renunciation sufficiently clear and precise to the confidentiality of its communications with its legal adviser (*Sabbah* v. *Batica Inc.* [1994] R.D.J. 163). The right to attorney professional secrecy is too important and fundamental to reach so easily the conclusion that there was a renunciation (*Descôteaux* v. *Mierzwinski* [1982] 1 R.C.S. 860).

85 It is different when a person maintains that it acted precisely in a certain manner by reason of a legal opinion it obtained; the opinion in itself then becomes an object of the dispute and the allegation constitutes an express renunciation to the professional secrecy of the attorney or the notary (*St Alban (Municipalité de)* v. *Récupération Portneuf Inc.* [1999] R.J.Q. 2268). That is not the case here; Kansa does not expressly allege that it used the opinion of its attorneys to justify its decision of 1990 to assume the defence of its insured.

86 Finally, the Appellant claims that independently from any renunciation, express or tacit, to confidentiality, the insured should have access to the investigation file of its insurer as soon as its good faith in the treatment of the claim had been legitimately put into doubt, this file being at a certain level the only way to determine whether or not the insurer had managed the claim in good faith. I do not agree, at least in the context of this file, where the insurer expressly denies having acted with bad faith. It would appear incongruous for the confidentiality of a document in possession of a party — even a liability insurer — to depend upon a simple allegation of bad faith put forward by the other party.

87 For these reasons, I therefore propose to maintain the appeal in part, with costs, to set aside the judgments rendered by the trial judge on the objections made on May 24 and June 12, 2002 in order to authorize the production of the following documents:

the letters of Me Cantin to Kansa dated July 26, 1990 and September 28, 1990;

the portion of the bill that Me Cantin sent to Kansa on April 22, 1991, covering the work he had done starting from March 29, 1990;

the letters of Me Nicholl to Kansa dated July 2, 1992, December 23, 1992 and April 19, 1993;

the reports of the claim adjuster Michel Roy dated December 14, 1987, May 19, 1988, January 18, 1989 and May 26, 1989.

CHAMBERLAND J.A.

Me Serge Gaudet, Me Élizabeth Laroche, for the Appellant
Me Claude-Henri Grignon, for the Respondents

1. The lists of the documents mentioned in paragraphs [36] and [37] had been established from documents put under seal by the trial judge. The clerk of the Court will return the envelope containing those documents to him after the filing of our judgments.

2. On the duty of loyalty of the attorney, see the reasons of judge Binnie in *R. v. Neil* 2002 C.S.C. 70 (November 1, 2002).

3. See also, to the same effect, *Boréal Assurances Inc.* v. *Réno-Dépôt Inc.* [1996] R.J.Q. 46 (C.A.) and *Ville de Fermont* v. *Pelletier* [1998] R.J.Q. 736 (C.A.).

4. Subsidiarily, the Appellant claims that the Respondent knew very well what it was doing when it accepted to take up its interest between 1990 and 1993 and by doing so, it renounced to invoke the motives on which it subsequently relied to refuse the defend and indemnify the Appellant. This argument relies on the traditional jurisprudence that dealt with the application of the doctrine of *fins de non-recevoir* (in civil law, or the estoppel in Common Law) in liability insurance. In the case *Zurich du Canada, compagnie d'indemnité*, above-mentioned, judge Lebel had emphasised the difficulties that this jurisprudence was causing to insurers and concluded that "[the] redefinition of the relationship between the obligation to defend and

the obligation to indemnify pursuant to the case *Nichols* v. *American House Assurance Co.*, [1990] 1 R.C.S. 801 and the modernization of the drafting of insurance policies might necessitate a re-examination of this traditional rule (...)".

5. Regarding the confidentiality privilege relating to communications exchanged for the purpose of preparing actual or upcoming litigation, see *Sous-ministre du Revenu du Québec* v. *Fava* [1984] R.D.J. 486 (C.A.); *Federal insurance Company* v. *Lasalle* [1985] R.D.J. 230 (C.A.); *Gerling Ghlobal Cie d'assurance générale* v. *Sanguinet Express Inc.* [1989] R.D.J. 93 (C.A.).

6. See, for example, *ABN Amro Bank Canada* v. *Performance Guarantees (Québec) Inc.*, C.S. Montreal, No 500-05-018942-928, July 2, 1996, judge Julien, confirmed by J.E. 98-176 (C.A.).

7. Kansa maintains that everything was made "without prejudice to the rights of the parties and, in relation with the insurer, without admission on the coverage". This is a question that was surely debated in front of the trial judge and which does not seem to necessitate further analysis in the course of this appeal.

Date of the update: January 9, 2005
Date of filing: September 5, 2003

# Exhibit J

Minutes of the meetings of the Board of Directors of BCE Inc.
Volume 5, page 593                                                                    Toronto, April 23, 2002

# REDACTED

The four Royal Bank of Canada directors, Messrs. J.E. Newall, G. Saint-Pierre, A.S. Fell and V.L. Young withdrew from the meeting, and the American and Canadian outside counsel, Messrs. S. Baskin, M. Shapiro and Mrs. M. Warren from Shearman & Sterling, and Messrs. M. Yontef and S. Dunphy from Stikeman Elliott, joined the meeting.

## TGO STRATEGIC AND FUNDING REVIEW

Referring to documents that were sent to the directors in advance of the meeting, copies of which are filed with the records of the meeting, Mrs. M. Turcotte, Chief Legal Officer, provided to the directors an in-depth legal analysis with respect to the Corporation's strategic options related to limiting or discontinuing entirely its financial support of Teleglobe Inc.'s operations, focusing on the risks and exposure to liability on the part of the Corporation and its directors and officers. During the course of Ms. Turcotte's presentation, Mr. S. Baskin, of Shearman & Sterling, commented on certain American securities, bankruptcy and corporate law issues and potential litigation. Mr. S. Dunphy, of Stikeman Elliott, provided similar comments from the perspective of the law applicable in Canada.

Whereupon, after discussion, the following resolution was adopted.

Investment in Teleglobe Inc.

WHEREAS the Corporation directly or indirectly owns a majority of the shares of Teleglobe Inc. ("Teleglobe");

WHEREAS the Corporation's management has carried out an extensive review of Teleglobe's current business plan and outlook and associated funding requirements, and has reported its findings and recommendations to the Board of Directors;

WHEREAS in light of management's report and recommendations, the Board of Directors has determined that it is no longer in the Corporation's interest to provide long term support to Teleglobe, but that it is appropriate to provide for a limited amount of weekly funding to assist Teleglobe in providing continuing customer service while it reviews its options for the future;

WHEREAS all of the directors and officers of the Corporation who were directors and officers of Teleglobe or any of its subsidiaries have resigned prior to this meeting and it is appropriate for the Corporation to request that Mr. A. Steinberg continue to serve and that

CONFIDENTIAL FOR ATTORNEYS' EYES ONLY

BCE-AD  0032189