# EXHIBIT K

Westlaw.

Not Reported in A.2d
2005 WL 225040 (Del.Ch.)
(Cite as: 2005 WL 225040 (Del.Ch.))

Page 1

**H**

Only the Westlaw citation is currently available

UNPUBLISHED OPINION CHECK COURT RULES BEFORE CITING

Court of Chancery of Delaware
In re FREEPORT-MCMORAN SULPHUR, INC
Shareholder Litigation
No. Civ.A. 16729.

Submitted Jan. 20, 2005.
Decided Jan. 26, 2005

Pamela S Tikellis, Robert J Kriner, Jr, Brian D Long, A Zachary Naylor, Robert R. Davis, Chimicles & Tikellis, LLP, Wilmington, Delaware, Lead Counsel for the Plaintiffs and Delaware Liaison Counsel

Norman M Monhait, Rosenthal, Monhait, Gross & Goddess, P A, Wilmington, Delaware, for the Plaintiffs

Lewis H Lazarus, Michael A Weidinger, Thomas E. Hanson, Jr, Morris, James, Hitchens & Williams, LLP, Wilmington, Delaware; Robert B Bieck, Jr., Amy L Glovinsky, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, L L P, New Orleans, Louisiana, for McMoRan Oil & Gas Co

Alan J Stone, Natalie J Haskins, Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; Benjamin S. Kaminetzky, Davis Polk & Wardwell, New York, New York, for Richard C Adkerson, James R Moffett, B M. Rankin, Jr, R M Wohleber, Rene L Latiolais, and Freeport-McMoRan Sulphur, Inc

Allen M. Terrell, Jr., Brock E Czeschin, Richards, Layton & Finger, P A, Wilmington, Delaware; Terance M. Murphy, Michael L. Rice, Greg L Weselka, Jones Day, Dallas, Texas, for J Terrell Brown and Thomas D Clark

*MEMORANDUM OPINION AND ORDER*

LAMB, Vice Chancellor

I

*1 The plaintiffs move to compel the production of certain documents contained on the defendants' privilege log The plaintiffs claim that the requested documents are subject to an exception to the attorney-client privilege due to the mutuality of interest that they share with the defendant corporation The defendant corporation denies that a mutuality of interest existed between the parties when the contested documents were created In addition, the defendant corporation claims that, even if a mutuality of interest existed, the plaintiffs cannot show the requisite good cause as to why they are entitled to the documents

For the reasons below, the motion to compel is granted in part and denied in part.

II.

A *Background* [FN1]

> FN1 For purposes of this motion, the court includes only the background necessary for this motion An extensive recounting of the facts is available in the previous opinions discussed in notes 2 and 3

In 1998, the plaintiffs, former shareholders of Freeport-McMoRan Sulphur, Inc ("FSC"), filed suit against the defendants, former FSC directors, FSC, and McMoRan Oil & Gas Co ("MOXY"), in connection with the 1998 merger between FSC and MOXY, two sister companies The plaintiffs allege that the former FSC directors breached fiduciary duties owed to FSC stockholders by approving the merger and that MOXY aided and abetted those breaches of duty The plaintiffs moved to dismiss the complaint and the Court of Chancery granted the motion [FN2] That decision was later reversed by the Delaware Supreme Court. [FN3] The parties have now returned to the Court of Chancery and are preparing for trial

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in A 2d
2005 WL 225040 (Del Ch )
(Cite as: 2005 WL 225040 (Del.Ch.))

Page 2

FN2. *See In re Freeport-McMoRan Sulphur, Inc S'holders Litig*, 2001 WL 50203 (Del Ch Jan 5, 2001) In the motion to dismiss, the court granted the plaintiffs leave to amend their complaint, which they did The amended complaint was also dismissed *See In re Freeport-McMoRan Sulphur, Inc S'holders Litig*, C A No 16729-NC, slip op. (Del Ch Sept 10, 2002), *rev'd, Krasner v Moffett*, 826 A 2d 277 (Del 2003)

FN3. *See Krasner*, 826 A 2d 277

**B *The Dispute***

The plaintiffs contend that certain documents on the defendants' privilege log were created when a mutuality of interest existed between FSC and its shareholders The plaintiffs argue that, as shareholders of FSC during the relevant time period, they are entitled to the production of these documents, even if the documents may otherwise be privileged from non-shareholders

In an effort to resolve the disagreement, the defendants produced several documents listed on the privilege log The plaintiffs are not satisfied by the defendants' selective production and now seek the production of 15 additional documents from the log The contested documents fall into two categories: those that relate to litigation with IMC Global, Inc ("IGL") and those that relate to the FSC shareholder repurchase plan

The IGL litigation arose out of a merger between IGL and Freeport-McMorRan, Inc ("FTX"), which was effectively FSC's parent company. After the merger, there was a dispute about the sale of a joint venture between MOXY and the subsidiary of FTX that spun off FSC into a separate publicly traded entity IGL brought suit against several FTX directors, some of whom are also defendants in this case, alleging breaches of fiduciary duty IGL also sued MOXY for aiding and abetting the breaches of those duties. The plaintiffs maintain they had a mutuality of interest with FSC, and they may therefore compel production of documents relating to the IGL litigation, up until the date that the proxy statement for the MOXY merger was issued,

October 9, 1998 [FN4] In response, the defendants claim that the mutuality of interest that existed between FSC and its shareholders ended when the MOXY merger was announced on August 3, 1998

FN4 The plaintiffs also argue that the production of the IGL litigation documents can be compelled because the defendants waived the attorney-client privilege by disclosing the documents to directors who served on multiple boards of directors, thereby exposing confidential communication to third parties, i e the other company on whose board the director sits The court does not need to reach this issue based on its ruling that mutuality of interest and good cause have been shown

*2 The share repurchase plan for FSC relates to odd-lot purchases of common stock The plaintiffs seek the production of one plan-related document that was created on October 10, 1997 They claim that this document should be treated as within the mutuality of interest time period despite it being created before FSC issued public stock The defendants argue that since FSC did not have stockholders when the document was created, there can be no mutuality of interest with FSC shareholders

The defendants have produced the contested documents *in camera* for the court, but the court finds that, based on its analysis, a review of the documents is unnecessary

**III**

**A *The IGL Documents***

**1. *Mutuality Of Interest***

"[Attorney-client] privilege, as reflected in Rule 502 of the Delaware Rules of Evidence, is not absolute and, if the legal advice relates to a matter which becomes the subject of a suit by a shareholder against the corporation, the invocation of the privilege may be restricted or denied entirely." [FN5] "Under the so-called fiduciary duty exception to the attorney-client privilege, shareholders who enjoy a 'mutuality of interest' with corporate management may obtain access to the

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in A.2d
2005 WL 225040 (Del.Ch.)
(Cite as: 2005 WL 225040 (Del.Ch.))

Page 3

corporation's confidential communications with counsel upon a showing of 'good cause.'" [FN6] "Although there is little Delaware case law on the subject, and no bright-line rule that identifies the point in time when mutuality of interest diverges in each case, that divergence must necessarily occur at the point in time when the parties can reasonably anticipate litigation over a particular action." [FN7] In order to succeed in their motion to compel, the plaintiffs bear the burden of demonstrating the mutuality of interest. [FN8]

> FN5 *Zirn v. VLI Corp.*, 621 A.2d 773, 781 (Del 1993).

> FN6 *Oliver v. Boston Univ.*, 2004 WL 944319, at *2 (Del.Ch. Apr. 26, 2004). *See also Kosachuk v. Harper*, 2000 WL 1946664, at *1 (Del.Ch. Dec. 19, 2000) ("Delaware courts recognize that a stockholder litigating against his or her corporation may be entitled to discover attorney-client privileged or attorney-work product privileged documents in the possession of the corporation or its counsel where 'good cause' is shown.")

> FN7 *In re Fuqua Indus., Inc. S'holder Litig.*, 2002 WL 991666, at *3 (Del.Ch. May 2, 2002).

> FN8 *Id.* ("[T]he litigant must first establish that a mutuality of interest existed between the parties.") (quoting *Continental Ins. Co. v. Rutledge & Co.*, 1999 WL 66528, at *2 (Del.Ch. Jan. 26, 1999)).

In this case, the plaintiffs claim that the divergence in interest did not occur until October 9, 1998, the day that the proxy statement was issued. They base their argument on the original complaint and the deposition of Daniel Krasner, the named plaintiff shareholder. In his deposition, Krasner repeatedly states that the proxy statement gave him the first indication that he should sue. [FN9] The plaintiffs assert that Krasner's deposition shows that before the proxy statement, "there was no identified dispute between the parties, and insufficient indication of a deal that would necessitate litigation." [FN10]

> FN9 Krasner Dep. at 65, line 22:
> Q: When did you become aware that the boards of the two companies had approved the merger?
> A: I don't recall the exact date I became aware. It was in the proxy statement, I believe.
> Krasner Dep. at 67, line 16:
> Q: And when did you form the opinion that you were opposed to the merger?
> A: When I read the merger proxy statement.

> FN10 Pls' Motion to Compel Mem. at 5.

In response, the defendants claim that the divergence in interest happened earlier, on August 3, 1998, the day of the merger announcement. The defendants argue that the plaintiffs conceded in a letter from A. Zachary Naylor, plaintiffs' counsel, that August 3rd is the correct date. [FN11] This argument is unsupportable for two reasons. First, Naylor did not waive any rights with regard to the privilege log, so any purported admission does not restrict the plaintiffs' right to assert claims against the log. At the beginning of his letter, Naylor clearly declared his intention not to waive any of his clients' rights. [FN12] Additionally, in the sentence immediately preceding, Naylor indicated that his letter covered only documents created before August 3rd. [FN13]

> FN11 Letter from A. Zachary Naylor to Lewis H. Lazarus of May 24, 2004 ("Naylor Letter").

> FN12 Naylor Letter at 1 (declaring that he was writing the letter "without waiving or intending to waive any of Plaintiff's rights with respect to any entry on Defendants' privilege logs.")

> FN13 Naylor Letter at 1 ("After a review of these privilege logs, it is apparent to Plaintiff that privilege has been claimed with respect to a number of documents dating from prior to the August 3, 1998 agreement for which no privilege is available.")

*3 Second, the purported admission is not an

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in A 2d
2005 WL 225040 (Del Ch )
(Cite as: 2005 WL 225040 (Del.Ch.))

Page 4

affirmative admission. The plaintiffs' letter stated only that communications made prior to August 3rd would be construed as generated during the period of mutuality. [FN14] Nowhere do the defendants demonstrate that this statement precludes the assertion that the mutuality continued beyond August 3rd

> FN14 Naylor Letter at 3 ("Plaintiff believes that attorney/client privilege is inapplicable to those documents generated prior to the execution of the August 3, 1998 merger agreement [that] were created at a time where mutuality of interest existed between Plaintiff, Freeport and its directors ").

Moreover, the defendants' substantive argument does not disprove the plaintiffs' position regarding the existence of a mutuality of interest. The defendants allege that because the merger announcement contained facts included in the complaint, the parties' interests diverged upon the announcement. The defendants maintain that the announcement of the merger exchange ratios provided a reasonable basis for them to anticipate litigation with any shareholders from either company. The defendants do not argue any facts beyond the merger exchange ratio. They rely on this solitary fact to support their claim that all corporate communication with counsel after the merger announcement should remain confidential Based on the facts before it, the court finds that the mere publication of merger exchange rations, without more, is not the point in time at which the divergence in the mutuality of interest occurred

The court reaches this conclusion mindful of the fact that the parties' mutuality of interest may diverge earlier than any potential work product protection begins, even though both doctrines direct the court to look to the phrase "in anticipation of litigation" in order to determine whether documents should be produced As the court found in *Continental,* "the lack of a mutuality of interest may preclude production of counsels' advice, legal memoranda, or other documents long before the work product doctrine is ever effective," [FN15] Here, however, the plaintiffs have met their burden They have established a mutuality of interest during the time leading up to August 3, 1998. Indeed, the

defendants concede as much in their brief The dispute over documents related to the IGL litigation concerns only the time period between August 3rd and October 9th The plaintiffs have introduced evidence from the named shareholder that he did not consider litigation before receiving the proxy, and the defendants have not produced any evidence to counter the plaintiffs' position Therefore, the court finds that there was a mutuality of interest between the parties from August 3, 1998 to October 9, 1998

> FN15 *Continental,* 1999 WL 66528, at *4

2 *Good Cause*

Next, the plaintiffs must show good cause for the court to allow them access to the contested documents Of the seven non-exclusive factors listed in *Garner,* [FN16] courts in Delaware have focused on these three factors as particularly salient: (i) "the nature of the shareholders' claim and whether it is obviously colorable;" (ii) "the apparent necessity or desirability of the shareholders having the information and the availability of it from other sources;" and (iii) "the extent to which the communication is identified versus the extent to which the shareholders are blindly fishing " [FN17] "Plaintiffs bear the burden of showing good cause as to why the attorney-client privilege should be set aside " [FN18]

> FN16 *Garner v Wolfinbarger,* 430 F 2d 1093, 1104 (5th Cir 1970) ( "There are many indicia that may contribute to a decision of presence or absence of good cause, among them the number of shareholders and the percentage of stock they represent; the bona fides of the shareholders; the nature of the shareholders' claim and whether it is obviously colorable; the apparent necessity or desirability of the shareholders having the information and the availability of it from other sources; whether, if the shareholders' claim is of wrongful action by the corporation, it is of action criminal, or illegal but not criminal, or of doubtful legality; whether the communication related to past or to prospective actions; whether the communication is of advice

© 2005 Thomson/West No Claim to Orig U S Govt Works.

Not Reported in A 2d
2005 WL 225040 (Del Ch )
(Cite as: 2005 WL 225040 (Del.Ch.))

Page 5

concerning the litigation itself; the extent to which the communication is identified versus the extent to which the shareholders are blindly fishing; the risk of revelation of trade secrets or other information in whose confidentiality the corporation has an interest for independent reasons.")

FN17 *Sealy Mattress Co of New Jersey v Sealy Inc*, 1987 WL 12500, at *4 (Del Ch June 19, 1987) (quoting *Garner*, 430 F 2d at 1104) *See also Kosachuk*. 2000 WL 1946664, at *1

FN18 *In re Fuqua Indus*, *Inc S'holder Litig*, 1999 WL 959182, at *3 (Del Ch Sept 17, 1999)

*4 After a review of the record, the court finds that the plaintiffs have met their burden of demonstrating good cause under Delaware's interpretation of *Garner* First, their claim for breaches of fiduciary duty is colorable, especially given the earlier litigation reversing the motion to dismiss Second, the documents requested are unavailable from other sources because they are communications between the defendants and their counsel Third, the plaintiffs are not blindly fishing. They have identified specific documents that relate to the IGL litigation. Additionally, the plaintiffs have explained how the documents relate to the merger between FSC and MOXY through the relationship between FSC and FTX, as well as the relationship between MOXY and IGL.

Although the defendants argue that the plaintiffs have failed to link the IGL litigation to the value of the merger between FSC and MOXY, the court finds that the documents requested may shed more light on the potential liability of the IGL litigation than the plaintiffs were able to discern from the depositions of the defendants This case is factually dissimilar to *Oliver*. in which the court found the plaintiffs did not identify specific documents that could overcome the deponents' lack of knowledge [FN19] Here, unlike in *Oliver*, the plaintiffs have identified specific documents that may be more informative than the depositions already conducted The plaintiffs seek a discrete set of documents that could arguably better inform them regarding the liability of the IGL litigation

FN19 *Oliver*, 2004 WL 944319, at *3 ("[T]he Plaintiffs have not identified what documents they believe would be helpful in remedying [the] knowledge shortfall [from the depositions of the individual defendants] ").

Thus, after weighing the factors for good cause, the court finds that the plaintiffs have met their burden for compelling the production of the IGL litigation documents

**B  *The Shareholder Repurchase Plan***

In addition to the IGL litigation documents, the plaintiffs seek the production of one document related to the shareholder repurchase plan of FSC As this court has previously held, "Delaware law is stingy about affording fiduciary protections to those who do not clearly qualify for them " [FN20] With regard to motions to compel, "the fiduciary duty exception will not apply absent a fiduciary relationship " [FN21]

FN20 *Continental*, 1999 WL 66528, at *5.

FN21 *Id Continental* lists several cases that find *Garner* does not apply to communications between a defendant and its counsel before the establishment of a fiduciary relationship with a plaintiff

Looking to the shareholder repurchase plan document, the issue is not whether the mutuality of interest had ended, but whether it had begun The contested document was created before FSC issued public stock Thus, there was no fiduciary duty owed to the future FSC stockholders and there could not have been a mutuality of interest between FSC and its stockholders

The plaintiffs have not met their burden for compelling production of the shareholder repurchase document They cite several cases from other states that they claim have extended *Garner* to facts similar to those before this court, [FN22] but those cases do not directly address the issue as *Continental* does Therefore, the court declines to extend the mutuality of interest exception to communications that were created before the fiduciary relationship could have arisen, since there

© 2005 Thomson/West No Claim to Orig. U S. Govt Works

Not Reported in A 2d
2005 WL 225040 (Del Ch )
(Cite as: 2005 WL 225040 (Del.Ch.))

Page 6

was no public stock issued

> FN22 *See Cohen v Uniroyal, Inc*, 80
> F R D    480,    484    (E D Pa 1978)
> (differentiating between shareholders and
> subsequent purchasers in a situation where
> *the common stock had already been
> issued), Bairnco Corp Sec Litig v Keene
> Corp (In re Bairnco Corp Sec Litig)*,
> 148  F R D  91,  98-99  (S D N Y 1993)
> (same)

IV

*5 For the foregoing reasons, the motion to compel
is granted in part and denied in part  IT IS SO
ORDERED

2005 WL 225040 (Del Ch )

END OF DOCUMENT

© 2005 Thomson/West  No Claim to Orig  U S  Govt  Works

Westlaw.

Not Reported in A.2d
1999 WL 252381 (Del.Ch.)
(Cite as: 1999 WL 252381 (Del.Ch.))

Page 1

C

Only the Westlaw citation is currently available

UNPUBLISHED OPINION CHECK COURT
RULES BEFORE CITING

Court of Chancery of Delaware
Re: GRIMES, et al
v.
LCC INTERNATIONAL, INC , et al, Civil Action
No , 16957
No. CIV.A.16957.

April 23, 1999

Henry E Gallagher, Esquire, Connolly, Bove,
Lodge & Hutz, Wilmington

Peter B Ladig, Esquire, Richards, Layton &
Finger, Wilmington

JACOBS, Vice-Chancellor

*1 Counsel:

On April 22, 1999, I appointed a Special Master to
recommend the disposition of the plaintiffs' motion
to compel the production of approximately 140
documents being withheld by defendants on the
grounds of attorney-client privilege and/or work
product immunity To afford guidance to the
Special Master, the parties have asked the Court to
resolve certain threshold privilege-related issues.
This is the decision of the Court on those issues
Because of the shortness of time to complete
discovery before the May 6, 1999 hearing on
plaintiffs' motion to appoint a receiver, the Court's
treatment of these issues is necessarily summary and
abbreviated

I  Universe  of  Documents  Subject  to
Attorney-Client Privilege

The plaintiffs contend that many of the documents
described on the defendants' privilege log cannot be
subject to a claim of attorney-client privilege,

because on their face those documents do not satisfy
the criteria for a privileged communication. To be
protected under the attorney-client privilege, a
document must be or contain a confidential
communication made between a client and his
lawyer (or the representatives of the client and the
lawyer, or among the lawyers and their
representatives representing the same clients) for
the purpose of facilitating the rendition of legal
services to the client Del Unif R Evid 502(b);
*Deutsch v Cogan*. Del Ch , 580 A 2d 100, 105-6
(1990)

This Court has not independently reviewed the
privilege log or the disputed documents; that
unenviable task will be for the Master to perform
Nonetheless, some guidelines (although abstract)
may be derived from basic principles Thus, to the
extent the defendants are claiming attorney-client
privilege with respect to (1) correspondence or
other communications between lawyers for
Microcell and/or LCC (Microcell's controlling
stockholder) and non-client persons or entities (e g ,
Chase Manhattan Bank); or (2) correspondence or
other communications between or among
non-lawyers (and/or their representatives), these
communications are discoverable because they fall
outside the definition of a privileged
communication

II  *Communications To and From Peter DeLiso*

According to the plaintiffs, the great bulk of the
disputed documents are communications by or to
Peter DeLiso, who is the general counsel for both
LCC and Microcell, and is also the Chairman of
Microcell's Board of Directors  The plaintiffs
contend that Mr DeLiso represented both LCC and
Microcell during the events that give rise to their
claims, namely (1) when those companies
negotiated the revolving credit agreement that is the
subject of several breach of fiduciary duty claims,
(2) when Microcell negotiated, with companies in
several foreign countries, transactions that are the
subject of claims that LCC usurped corporate
opportunities of Microcell; (3) when Microcell's

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in A.2d
1999 WL 252381 (Del.Ch.)
(Cite as: 1999 WL 252381 (Del.Ch.))

Page 2

LCC-controlled board of directors improperly withheld funding from Microcell; (4) when Microcell agreed to guarantee LCC's credit facility with Chase Manhattan Bank, allegedly for no consideration; and (5) when LCC entered into credit agreements with Chase that prohibited LCC from funding Microcell, even though LCC was legally obligated to provide such funding.

*2 It appears that Mr. DeLiso generated and received many documents in connection with these events. Those documents, plaintiffs contend, are not privileged as a matter of law. Lamentably, any analysis of these claims is made difficult because of the multiple roles that Mr. DeLiso occupied. Whether or not a given communication to or from Mr. DeLiso is privileged will necessarily depend upon his capacity at the time he generated or received the communication. To resolve the privilege issue created by Mr. DeLiso's several and simultaneous fiduciary roles, those capacities must first be sorted out.

That proposition, applied to the present facts, results in the following analysis:

1. Any confidential communication [FN1] to or from Mr. DeLiso *solely* in his capacity as Chairman of Microcell's Board of Directors (which communication does not contain any legal advice to Mr. DeLiso *qua* client), would not be subject to claims of attorney-client privilege, since Mr. DeLiso would not have been acting in his lawyer capacity.

> FN1. It is assumed that all communications referred to in this analysis pertain to matters that are relevant to the claims asserted in this lawsuit.

2. Any confidential communication made by Mr. DeLiso--acting *solely* in his capacity as counsel for LCC--to LCC or its directors and/or officers; and any confidential communication made by those clients to Mr. DeLiso, again acting *solely* in that capacity, should be subject to the attorney-client privilege. Those communications would, therefore, be protected from disclosure to the plaintiffs, who are stockholders of Microcell, not LCC.

3. What remains are the confidential communications made by Mr. DeLiso acting *solely* in his third capacity--as counsel for Microcell--to Microcell and/or its officers or directors; and also confidential communications from those clients to Mr. DeLiso, again in that capacity. This category of documents is the apparent focus of much of the parties' legal dispute. The plaintiffs contend that because they are stockholders of Microcell who are suing derivatively on its behalf, Microcell and its directors may not invoke the attorney-client privilege against them. The defendants dispute that. They argue that the fact that plaintiffs are suing derivatively does not render the privilege inapplicable. They contend that the privilege does attach and that to defeat it, the plaintiffs must show good cause why the privilege should not apply. That issue is addressed in Part III, below. For the reasons set forth therein, I conclude that the defendants may claim privilege with respect to this category of documents, subject to the plaintiffs' right to defeat the privilege by showing good cause, as that concept was explicated by the Fifth Circuit in *Garner v. Wolfinbarger*, 430 F.2d 1093 (Th Cir.1970), and by this Court in *Deutsch v. Cogan*, *supra*, 580 A.2d at 105-6, and cases cited therein.

4. Although the disputed documents relating to Mr. DeLiso may be divided into the above three categories, in some cases the reality (as opposed to the theory) may not be so simple. Conceivably there may be documents that do not disclose in any clear-cut way which of Mr. DeLiso's three hats he was wearing at the time he generated or received the communication in question. Where Mr. DeLiso's capacity is not readily ascertainable from the document, it will be difficult to determine whether the document is subject to the privilege. To the extent the Special Master encounters such documents, the question becomes how they should be treated. In my view, any doubt about the status of this "indeterminate" category of documents should be resolved against the claim of privilege. I so conclude because it was the defendants who would have created the problem, by placing Mr. DeLiso in multiple--and potentially conflicting-- fiduciary roles. Having created that conflict and its resulting ambiguity, and having been in a position to prevent the conflict from arising in the first place, the defendants, as fiduciaries for Microcell's minority stockholders, cannot be allowed to benefit from the ambiguity by asserting a privilege that might not

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
1999 WL 252381 (Del.Ch.)
(Cite as: 1999 WL 252381 (Del.Ch.))

Page 3

otherwise have been available. *See Valente v Pepsico, Inc*, 68 F.R.D. 361, 368 (1975).

III The *Garner vs Valente* Debate

*3 The final issue concerns the plaintiffs' argument that the defendants may not assert the attorney-client privilege as to *any* communication to or from Mr DeLiso while he served simultaneously as general counsel for LCC and Microcell They contend that in such circumstances, *Valente v Pepsico* precludes the conflicted fiduciary altogether from asserting, in a derivative action brought against the fiduciary, the privilege against either of the clients to whom he owed (conflicting) fiduciary duties. The defendants argue that *Valente* does not represent the law of Delaware. Rather, they contend, Delaware has rejected *Valente* in favor of the approach adopted in *Garner v Wolfinbarger*, which allows the fiduciary to assert the privilege but permits the minority shareholder plaintiff to defeat the privilege by showing good cause.

On this issue the defendants are correct. In *Deutsch v Cogan*, *supra*, this Court, citing earlier Chancery decisions, held that *Garner v Wolfinbarger*, not *Valente v Pepsico*, represents the law of Delaware on this question. Accordingly, shareholder plaintiffs must show good cause to defeat the defendants' claim of attorney-client privilege. The Court in *Deutsch* did, however, make it clear that the fiduciary's conflicting roles are a factor that may be taken into account in determining whether there is good cause. Moreover, although this Court rejected the rationale of *Valente*, it did endorse the result reached on the facts before the court in that case.

Accordingly, in reviewing the disputed documents, the Master shall determine whether the plaintiffs have shown good cause why the attorney-client privilege should not attach to those documents that fall into the third category described in Part II, *supra*, of this Opinion. In so doing, the Master shall be guided by the good cause analysis employed in *Garner, Deutsch*, and subsequent Delaware authorities [FN2]

FN2  *See, e.g., AOC Limited Partnership v The Horsham Corporation*, Del. Ch., C.A. No. 12480, Chandler, V.C. (May 4, 1992); *Cole v Wilmington Materials, Inc*,

Del. Ch., C.A. No. 12649, Allen, C. (July 1, 1993); *Lee v Engle*, Del. Ch., C.A. No. 13223, 13284, Steele, V.C. (Dec 15, 1995)

The defendants have also claimed worked product immunity with respect to some of the disputed documents. The work product issue is not addressed here, because it was not addressed in the parties' briefs. Work product claims will be resolved *in camera* on a document-by-document basis.

1999 WL 252381 (Del.Ch.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F Supp 2d
2000 WL 376398 (D Del.)
(Cite as: 2000 WL 376398 (D.Del.))

Page 1

▷
Only the Westlaw citation is currently available

United States District Court, D Delaware
In re: OLSEN INDUSTRIES, INC and T
Frederick Jackson, Inc , Debtors
T FREDERICK JACKSON, INC , Plaintiff,
v
PEPPER, HAMILTON & SCHEETZ, LLP,
Defendant
No. 98-140-SLR.

March 28, 2000

Stephen W Spence, and Kathleen P Makowski, of
Phillips, Goldman & Spence, P A , Wilmington,
Delaware, Steven E Angstreich, Michael Coren,
and Amy R , Brandt, of Levy, Angstreich, Finney,
Baldante, Rubenstein & Coren, PC, of Philadelphia,
Pennsylvania, Pace Reich, Plymouth Meeting,
Pennsylvania, for plaintiff/debtor, of counsel

Allen M Terrell, Jr , Frederick L Cottrell, III, and
Jeffrey L Moyer, of Richards, Layton & Finger,
Wilmington, Delaware, for defendant

MEMORANDUM OPINION

ROBINSON, J

I INTRODUCTION

*1 Plaintiff-debtor T Frederick Jackson, Inc
("Jackson") initiated this adversary proceeding
against defendant Pepper, Hamilton & Scheetz,
LLP ("PHS") on or about November 4, 1997
(D I 1, ¶ 2) In its complaint, Jackson alleges that
PHS's representation of it during litigation of a
breach of contract action in the United States
District Court for the Southern District of New
York was inadequate (D I 1, ¶ 3) Specifically,
Jackson seeks damages flowing from PHS's alleged
breach of its fiduciary duty and legal malpractice
(D I 1, ¶ 3) Said claims arose before and during
the bankruptcy proceedings involving Jackson
(D I 1, ¶ 3) On April 20, 1998, this court granted

Jackson's motion for withdrawal of reference
(D I 1) The court has jurisdiction pursuant to 28
U S C § 1334

Currently before the court are the parties'
cross-motions for summary judgment (D I 33, 36)
For the following reasons, the court shall deny
Jackson's motion for summary judgment (D I 33)
and grant PHS's motion (D I 36)

II BACKGROUND

This case has a convoluted procedural and factual
background With respect to this adversary
proceeding, however, the focus is on the
representation PHS provided Jackson in an action
brought in the Southern District of New York
against Morse/Diesel, Inc. ("Morse/Diesel"), a
general construction contractor In that regard,
therefore, the court will begin its review of the facts
with the 1982 subcontract between Morse/Diesel
and Jackson The court notes that the facts
essentially are undisputed

A The 1982 Subcontract

In 1982, Morse/Diesel entered into an agreement to
act as the general contractor for the construction of
a large hotel in Manhattan (D I 34, Ex A at A011)
On or about November 4, 1982, Morse/Diesel
entered into a subcontract with Jackson, whereby
Jackson was retained as the electrical subcontractor
for the construction project (D I 34, Ex A at
A011) In addition to the subcontract, Jackson
provided a performance bond and a payment bond
through Fidelity and Deposit Company of Maryland
("Fidelity") with, inter alia, Morse/Diesel (D I 34,
Ex A at A012) The performance bond provided
that if Jackson defaulted under the contract or was
declared to be in fault by the obligees and the
obligees had performed their obligations under the
contract, then Fidelity as the surety could either (1)
remedy the default; (2) complete the contract itself;
or (3) seek bids and obtain a new contractor to
perform as required, subject to payment of any
damages incurred by the obligees (D I 34, Ex A at

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp 2d
2000 WL 376398 (D Del.)
(Cite as: 2000 WL 376398 (D.Del ))

Page 2

A012) Fidelity's liability under the performance bond was limited to those payments made to Jackson strictly in accordance with the subcontract; thus, Fidelity was not liable for any payments to Jackson that exceeded the subcontract price as adjusted for change orders (D I 34, Ex A at A012) The payment bond, on the other hand, provided that Fidelity would be liable for amounts due Jackson arising out of the contract (D I 34, Ex A at A012)

*2 Construction of the hotel was delayed from the beginning (D I 34, Ex A at A014) Because of these delays and the need to open the hotel on schedule, Morse/Diesel instituted an acceleration program, which program put "an incredible strain on all participants " (D I 34, Ex A at A015) Jackson agreed to the acceleration program on the condition that Morse/Diesel would fund Jackson's increased payroll (Jackson estimated that it would have to double its workforce and authorize extensive amounts of overtime to accommodate the change in schedule) while the parties negotiated a global settlement (D I 34, Ex A at A018-19)

Due to financial difficulties it had been experiencing since the start of the construction project, Jackson had sought, and received, advanced payments under the subcontract (D I 34, Ex A at A013) As a result of the acceleration program, Jackson requested additional advances to cover its rising costs (D I 34, Ex A at A013)

Negotiations with regard to the settlement were contentious and, on January 25, 1985, Jackson submitted a request for a contract change order in which it sought an increase in the base contract price or an extension of time to complete the project (D I 34, Ex A at A019) By February 1985, negotiations between the parties had reached an impasse (D I 34, Ex A at A020) On February 20, 1985, Morse/Diesel revoked its agreement to fund Jackson's payroll costs (D I 34, Ex A at A020) In response, Jackson began to reduce its workforce back to the anticipated contract level (D I 34, Ex A at A020) On February 22, 1985, Morse/Diesel served both Jackson and Fidelity a notice of default and on February 25, 1985 sent a demand to Fidelity that it remedy Jackson's default as required by the performance bond (D I 34, Ex A at A020)

B The March Agreement

In response to Morse/Diesel's notice of default, Jackson instituted suit in New York State Court, seeking an injunction preventing Morse/Diesel from terminating Jackson's contract (D I 34, Ex A at A022) While the State Court entered an interim temporary restraining order, the court ultimately denied the preliminary injunction and the parties restarted settlement negotiations (D I 34, Ex A at A022)

On March 25, 1985, Jackson and Morse/Diesel entered into a settlement agreement memorialized in a written agreement of the same date ("the March agreement"), wherein Jackson stipulated to the suit's dismissal with prejudice (D I 34, Ex B; D I 38 at A564) The March agreement provided, *inter alia,* that the parties would meet to establish a revised construction schedule (D I 34, Ex B ¶ 3) It further provided that Jackson would be paid an additional $3 million as compensation for all cost increases attributable to the revised construction schedule from the start of the contract through the revised schedule [FN1] (D I 34, Ex B ¶ 1) Said increase was to be in addition to increases made for "outstanding scope changes " (D I 34, Ex B ¶ 1)

> FN1 The March agreement provided in relevant part that
> [t]he subcontract price shall be increased by $3,000,000 as compensation for all cost increases addressed in the Request for a Contract Change Order, Marriott Times Square Hotel, dated January 25, 1985 Specifically included within this adjustment is all compensation to be paid to Jackson as a result of any adjustments in construction schedules from the start of the contract through the revised schedule to be agreed upon in accordance with paragraph 3 of this Agreement
> (D I 34, Ex B ¶ 1)

*3 The March agreement also provided for an exchange of releases between the parties Specifically, the agreement stated:
(A) Concurrent with the execution of this agreement, Jackson and Morse/Diesel shall execute a stipulation of dismissal with prejudice, with respect to all claims and counterclaims asserted in *T Frederick Jackson Inc v Morse/Diesel, Inc ,* Index No 4622/85

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp 2d
2000 WL 376398 (D.Del.)
(Cite as: 2000 WL 376398 (D.Del.))

Page 3

(B) Concurrent with the execution of this agreement, Jackson will execute a release surrendering any and all claims that it might have against Morse/Diesel with respect to additional compensation for work performed at the Hotel up to the date of this Agreement and with respect to any claim for "compression" or "acceleration" costs arising from the revised schedule to be agreed upon pursuant to paragraph 3, of this Agreement, exempting only such claims as may arise with respect to such outstanding scope changes and to such overtime charges as may be presented in the ordinary course for work already performed

(C) Concurrent with the execution of this agreement, Morse/Diesel will execute a release surrendering any and all claims that it might have against Jackson with respect to compensation paid to Jackson up to the date of this agreement; and with respect to any claims that it might have against Jackson with respect to Jackson's performance under the subcontract up to the date of this agreement, exempting only such claims as may arise from any defect in materials or workmanship

(D I. 34, Ex B ¶ 7)

Due to the increased costs associated with the acceleration program, Jackson continued to experience financial difficulties (D I. 34, Ex A at A041) In late June 1985, Morse/Diesel agreed to advance Jackson all payroll and material costs on a weekly basis. (D I. 34, Ex A at A041) Due to Morse/Diesel's concerns that it might overpay Jackson, and thereby cause a waiver of the surety bond Fidelity issued on the project, representatives of Morse/Diesel, Fidelity, and Jackson met on August 6, 1985, to discuss Jackson's continuing financial difficulties (D I 34, Ex A at A042) As a result of this meeting and others, on August 8, 1985, Fidelity entered into a reimbursement agreement whereby Morse/Diesel would continue to make advances to Jackson, but if Jackson were to receive more than the adjusted subcontract price, Fidelity would reimburse Morse/Diesel for the difference ("the August 8, 1985 agreement") (D I. 34, Ex. A at A045) Jackson also signed a reimbursement agreement whereby it agreed to return to Fidelity any funds paid it in excess of the adjusted subcontract prices (D I 34, Ex A at A045)

C The Federal Litigation

On February 19, 1986, Morse/Diesel filed suit against Jackson in the United States District Court for the Southern District of New York ("the Morse/Diesel litigation") (D I 34, Ex A at A046) Morse/Diesel sought to recover over $5 million, plus interest, "based on breach of contract and seeking reimbursement of funds paid to Jackson [in excess of that to which Jackson was entitled] and recoverable from Fidelity under the August 8, 1995 agreement" [FN2] (D I 34, Ex A at A006) Fidelity in turn filed a third party complaint against Jackson, seeking indemnity for any damages recovered from Fidelity by Morse/Diesel (D I. 34, Ex A at A008) In response, Jackson asserted a counterclaim against Morse/Diesel for damages in excess of $11 million arising out of Morse/Diesel's alleged breach of the expressed and implied provisions of the March agreement with Morse/Diesel. (D I. 34, Ex. A at A007; D I 38 at A44- 82) Jackson also asserted counterclaims for lost business damages and damages for confiscation of property by Morse/Diesel (D I 38 at A44-82)

> FN2  On August 8, 1989, Morse/Diesel filed an amended complaint, adding claims against Fidelity for fraud (specifically, that Fidelity had fraudulently induced Morse/Diesel to enter the August 8, 1985 agreement) and for breach of the duty of good faith and fair dealing (D I 34, Ex A at A006) Morse/Diesel withdrew both claims at the beginning of trial (D I 34, Ex A at A006)

D. Jackson's Search for Representation

*4  For approximately six years, Jackson was represented in the Morse/Diesel litigation by the law firm of Kornstein, Veisz & Wesler ("KVW") (D I 34, Ex D ¶ 15) In the spring of 1992, however, Fred Olsen, Jackson's president, began to seek alternative representation (D I 34, Ex D ¶ 15) Specifically, Olsen began discussing with PHS attorney "A", [FN3] *inter alia*, Jackson's retention of PHS in connection with the Morse/Diesel litigation (D I 34, Ex D ¶ 15; D I 35, Ex FF at A476)

> FN3  The court does not believe it is

© 2005 Thomson/West No Claim to Orig U S Govt Works

Page 4

Not Reported in F Supp 2d
2000 WL 376398 (D.Del.)
(Cite as: 2000 WL 376398 (D.Del.))

appropriate or necessary to specifically identify any of PHS's attorneys They will be referred to as "PHS attorney 'A' or 'B'," abbreviated as "PHSA-A," or "PHSA-B," etc

Olsen ultimately retained PHS to represent it in the Morse/Diesel litigation At the time it was retained, PHS was aware that Fidelity would be funding Jackson's litigation efforts by "voluntarily lending money to Jackson," thereby ensuring that Jackson would adequately defend and prosecute the Morse/Diesel litigation as Jackson was not in a position to be paying for legal services (D I 35, Ex FF at A473, A475) PHS also knew that Fidelity had the right per its agreement with Jackson to stop funding at any time (D I 35, Ex FF at A543) Because of this funding arrangement and PHS's desire to avoid a contingency fee arrangement, PHSA-A informed Olsen as early as November 1992 that, despite Olsen's desire to do so, PHS would not file a "bad faith claim" against Fidelity on behalf of Jackson (D I 35, Ex FF at A472, A475, A476, A486)

On January 19, 1993, PHSA-B sent Olsen a letter containing a written retainer agreement The letter reflected PHSA-B's earlier discussions with Olsen regarding the funding of PHS's legal services:

As we have discussed in the past, Jackson does not currently have funds available to pay our fees We generally do not enter into contingency fee agreements, but rather expect our normal hourly rates and disbursements to be paid in a timely fashion If we can not reach an arrangement whereby this firm is paid by Fidelity  under your financing agreement, we will have the right to terminate our representation unless other arrangements can be worked out. In the interim, we will perform services that cannot be deferred over the next month or so, in conjunction with [KVW], in the expectation of prompt payment by [Fidelity]  We expect eventual payment by Jackson of these interim charges once funds become available, whether or not we go forward with the representation We will formally enter our appearance in the action once current settlement efforts play out, and once this payment issue is resolved
(D I. 34, Ex E at A137) The retainer letter did not note PHS's refusal to pursue a "bad faith claim"

against Fidelity

On April 19, 1993, Olsen contacted PHSA-A, informing him that Jackson would be "going its own way" as Olsen did not anticipate he would be able to strike a funding arrangement with Fidelity that would be acceptable to PHS (D I 34, Ex I) Despite this pronouncement, Olsen continued to discuss with PHSA-A the possibility of going forward with Fidelity if "Fidelity would make payments to [him] in the requested amount, and [if he] would ha[ve] the right to object to 'unreasonable'  billings, and to paying [Fidelity's attorneys'] fees for the fraud claim against [Fidelity]" (D I 34, Ex L at A166) PHSA-A in turn contacted the attorney representing Fidelity in the Morse/Diesel litigation, who expressed that Fidelity's

*5 continued interest in funding the case was attributable in large part to [PHS's] involvement .. [and] raise[d] a possible [Fidelity] concern: that any claim with Fred Olsen in charge might be risky in that he has shown the propensity to sabotage his own case to get personal funding, and might do it again [FN4]

FN4. At the time, Olsen was experiencing personal financial difficulties and seeking advances from Fidelity to help him with this situation

(D I 34, Ex L at A167; see also D I 34, Ex K)

On May 20, 1993, the Fidelity's attorney contacted PHSA-A regarding PHS's representation of Jackson According to a memorandum authored by PHSA-A documenting the call, Fidelity's attorney indicated that

he was exploring the possibility of going forward with [PHS] with a new set up whereby when the newly-to-be-agreed funding runs out, [Olsen] cannot halt the progress of the litigation to hold [Fidelity] hostage for more money by directing [PHS]  to stop work He thought it might be possible to do this by creating a joint venture or some other entity which would be [PHS's] client, and ensuring, as a matter of corporate governance, that [PHS] could not be fired or directed to stop without [Fidelity's] approval, thereby permitting [PHS] ethically to continue prosecuting the claim without [Olsen's] cooperation

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp 2d
2000 WL 376398 (D Del.)
(Cite as: 2000 WL 376398 (D. Del.))

Page 5

(D.I 34, Ex J at A162) PHSA-A, who did "not see an ethical impediment to such an arrangement so long as appropriate disclosures [were] made and appropriate waivers procured," indicated that he "would explore the idea with [PHS's] ethical advisers " (D I 34, Ex J at A162-63)

Olsen subsequently retained another law firm, Braude & Margulies, P.C ("Braude"), to represent Jackson in the Morse/Diesel litigation Braude was willing not only to pursue the bad faith claim but also to take the case on a contingency fee basis Retention of this firm fell through, however, in or about September 1993, in part because Fidelity was unwilling to provide funding for and subordinate its claim to the firm's legal fee (D I 35, Ex HH at A790-91; D I. 34, Ex. M)

The retention of Braude having fallen through, Olsen considered re-retaining PHS (D I 34, Ex M) In that regard, Olsen inquired through his counsel, KVW, whether Fidelity would be willing to provide funding for PHS's representation of Jackson (D I 34, Ex. N) On October 11, 1993, Olsen, on behalf of Olsen Industries, [FN5] Jackson, and himself, executed an agreement with Fidelity whereby Fidelity would provide funding for the retention of PHS (D I 34, Ex R) In light of the funding agreement, PHSA-C wrote to Olsen in order to clarify PHS's "thoughts and some conditions" concerning its representation of Jackson:

> FN5. At the time of the Morse/Diesel litigation, Olsen Industries owned all of the stock of Jackson, and Olsen held 62% of the stock of Olsen Industries

So that there is no misunderstanding as to the scope of [PHS's] engagement .. [PHS] will be representing [Jackson] in connection only with its claim against Morse/Diesel, and Morse/Diesel's claim against [Jackson] [PHS] will not represent [Jackson], yourself, or any of the indemnitors in connection with any matter where [Jackson], yourself or any indemnitor may be adverse to [Fidelity]

* * *

*6 Again, while it is remote that Jackson and the indemnitors will fail to cooperate as contemplated ·, any dispute as to this issue shall not be

grounds for withholding payment of attorneys fees to [PHS]. In addition, inasmuch as [defendant] will be working closely with [Fidelity] and [Fidelity's] attorneys, Jackson agrees that [PHS] can share attorney/client confidences with [Fidelity] and [its] attorneys with respect to the prosecution and defense of the Morse/Diesel action

* * *

Finally, we want to make it clear that [Jackson] agrees that in the event that [PHS's] invoices are not paid in a timely fashion, [PHS] has a right to withdraw as counsel in the Morse/Diesel action without regard to whether an appearance for replacement counsel is entered
(D I 34, Ex S)

E Litigation Strategy

Even before a funding arrangement had been reached between Jackson and Fidelity, defendant had begun working with Fidelity's attorneys who represented Fidelity in the Morse/Diesel action to develop a litigation strategy Specifically, PHS began to formulate a strategy with respect to the damages to be sought, keeping in mind that Jackson's pleading had been directed to a breach of the March agreement and damages incurred subsequent to that breach (D I 38 at A44-82) Two different theories were considered The first established the baseline for damages as the original subcontract date ("Day One damages"), while the second set the baseline as the date of the March agreement ("Day 465 damages") (D.I. 34, Ex O; D I. 35, Ex. GG at A725) The strategy issue was discussed at meetings held on or about March 19 and March 24, 1993, which meetings were not attended by Olsen, and ultimately a decision was made to seek Day 465 damages as such a strategy eliminated the need to overcome the facially valid March agreement (D I. 34, Exs F, G, H, O; D I 35, Ex FF at A492) Accordingly, at a meeting on April 7, 1993, which was attended by Olsen, Fidelity and its counsel, and several experts, PHSA-C advised that the working theory of the case would be premised on a Day 465 damages strategy [FN6] (D I 34, Exs F, G, H, O; D I 35, Ex FF at A492, A504, Ex GG at A628; D I 38 at A119-30)

    FN6 According to PHS, the maximum

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp 2d
2000 WL 376398 (D Del.)
(Cite as: 2000 WL 376398 (D.Del.))

Page 6

benefit the Day One theory would add to Jackson's overall claim was outweighed by the risks inherent in attempting to overcome a facially valid release under the circumstances at bar (D I. 35, Ex FF at A492) Specifically, PHS was concerned that presentation of a Day One damages claim would undermine Jackson's credibility and thereby weaken its entire case (D I 35, Ex FF at A495- 97) PHS believed that to assert a claim for Day One damages, Jackson would have to contend that both it and Morse/Diesel were mistaken as to the state of the project at the time the release was signed (D I 35, Ex GG at A643) Yet to prevail on its breach of contract claim against Morse/Diesel, Jackson would have to demonstrate that the costs incurred were not the result of its own mistakes or inefficiency, i e , that its employees were skilled and knowledgeable artisans who knew the state of the project (D I 35, Ex GG at A643) Moreover, PHS felt that assertion of a claim for Day One damages would implicate the financial and managerial problems Jackson was experiencing prior to March 1985, problems that Morse/Diesel would capitalize on at trial (D I 35, Ex GG at A643) In addition, PHS believed that to prevail on a Day One damages claim Jackson would have to overcome the testimony of Mr DePaul, Jackson's former president, who stated in his deposition that he did not rely upon Morse/Diesel's representations when he signed the March agreement (D I 35, Ex GG at A643)

Once PHS was re-retained as Jackson's counsel, it resumed litigation efforts, focusing on the Day 465 strategy (D.I 34, Ex T) In May 1994, at Olsen's request, PHSA-A directed that research be done as to the effect of the March agreement on Jackson's ability to pursue Day I damages (D I 35, Ex FF at A565) In a letter dated June 7, 1994, PHSA-C responded to Olsen's inquiry regarding PHS's ongoing research as to the "legal theory" of the Morse/Diesel litigation. (D I 34, Ex. W) In the letter, PHSA-C indicated that there were difficulties in pursuing Day One damages that needed to be more thoroughly researched before a decision could

be made as to "whether the baseline for damages [could] be the entire contract or just the post-March 1985 damages." (D I 34, Ex W at A377) In the same letter, PHSA-C reiterated the scope of the representation PHS would provide Jackson:

*7 I am sorry that you now disagree with the scope of the representation that [PHS] has undertaken on behalf of [Jackson] We have however been absolutely clear with you that our role was limited to pursuing Jackson's claim, with your cooperation, and cooperation with [Fidelity's] counsel to the extent necessary in our judgment to maximize this claim [W]e need to move on to a working relationship where we are given the cooperation and information necessary on a timely basis

* * *

We will continue not to advise you in your relationship with [Fidelity] and we assume now that you have advised us that you are consulting other counsel about these issues, that you will no longer attempt to circumvent this limitation of our representation agreement
(D I 34, Ex W at A378)

On July 27, 1994, PHSA-C wrote to Olsen, summarizing the results of the research to date and enclosing copies of three legal memoranda that had been prepared in the course of that research [FN7] (D I 34, Exs. X, Z, T; D I 35, Ex AA) Based upon the research, PHSA-C "concluded while it [is] by no means clear, there is a possibility that Jackson will be able to present a *quantum meruit* case from the beginning of the project Our best theory to achieve such a result is the 'equitable estoppel' theory " (D I 35, Ex AA at A410) After setting out the proof Jackson would need to demonstrate that Morse/Diesel is estopped from asserting the release as a bar to its damages claim and the counter arguments Morse/Diesel was likely to raise, PHSA-C concluded that

> FN7 The memoranda discussed the general parameters of the *quantum meruit* measure of damages, New York law concerning releases, and the theory of equitable estoppel under New York law (D I 34, Exs X, Z, T)

[PHS] view[s] as not substantial the down-side

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp 2d
2000 WL 376398 (D Del.)
(Cite as: 2000 WL 376398 (D.Del.))

Page 7

risks that making this claim will detract from Jackson's overall creditability [sic] The same types of evidence that will support Jackson's breach of contract claim after March 1985 would also support the equitable estoppel theory which would permit damages prior to March of 1985 (D I 35, Ex AA at A412)

Subsequent to the July 27, 1994 letter, an associate at PHS prepared two legal memoranda [FN8] concerning Jackson's ability to "circumvent the March [ ] agreement and pursue the antecedent claim " (D I 35, Ex CC at A417) The first of these memoranda, dated August 29, 1994 ("the August 29, 1994 memorandum"), discussed whether an accord and satisfaction theory would allow Jackson to overcome the release and seek Day One damages (D I 35, Ex CC at A418-32) According to the memorandum, in order for Jackson to recover Day One damages, it would have to show that the March agreement was an executory accord (D I 35, Ex CC at A418) The memorandum notes, however, that the concurrent execution of the release (for work already performed and for all claims in the February 1985 litigation) and the March agreement would support an argument that the "agreement manifests an intention to discharge [Morse/Diesel's] liability immediately and substitute a new liability." (D I 35, Ex CC at A431) The August 29, 1994 memorandum concludes

> FN8 A third legal memorandum was a request to perform the research recorded in the subsequent memoranda (D I 35, Ex CC at A417)

*8 that the District Court will review the record to determine whether [Jackson] intended to discharge its original claim immediately or after receiving the satisfaction of [Morse/Diesel's] performance Citing the release terms of the agreement, the Court will still characterize the [March] Agreement as a settlement which substituted a new liability for [Jackson's] claim of 25 January 1985 unless we can point to counter-veiling circumstances which manifest [Jackson's] intent to enter into an accord At this point, we probably lack a basis to make this argument (D I 35, Ex CC at A432; *see also* D I 35, Ex CC at A418: "My research, therefore, concludes that

[Jackson] probably cannot escape the legal effect of its release to recover those damages which pre-date 25 March 1985 ")

The second memorandum, dated September 29, 1994 ("the September 29, 1994 memoranda"), discussed the need to amend Jackson's pleading should it choose to seek Day One damages (D I 35, Ex CC at A433-34) According to the memorandum, under New York law Jackson could not "plead both a breach of the accord and the original subcontract in the alternative " (D I 35, Ex CC at A434) Since at that time the pleading only alleged entitlement to damages incurred after March 25, 1985, the memorandum advised that, if Day One damages were to be sought, PHS should "completely redraft the Counterclaim and allege breaches of the original subcontract with damages dating back to the formation of [the] agreement " (D I 35, Ex CC at A434) The parties do not dispute that these memoranda were not forwarded to Olsen for review

On or about December 8, 1994, a meeting attended by attorneys for both Jackson and Fidelity, a Fidelity representative, and Olsen was held to discuss litigation strategy (D I 35, Ex EE) A letter to Olsen from PHSA-A confirming the decisions reached at the meeting, indicates that PHS
recommended to [Jackson] that the claim against Morse Diesel proceed on its currently pleaded course, i e , th[at] damages only be sought for breaches of contract after the March 1985 settlement agreement While we considered carefully the benefits of going back to the beginning of the contract for the purposes of damages, such as the increased potential damage, and the simplicity of the damage calculation, we find them outweighed by the considerations supporting proceeding in the fashion outlined above These include the current state of the pleadings and the need to seek an amendment if [we] were to proceed otherwise, the statements and representations made in discovery, the fact that many of the complaints Morse Diesel has about Jackson's performance were prior to the March 1985 release, and most significantly the difficulties of overcoming a facially valid settlement agreement and release under New York law
After discussion of these factors, you concurred

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp 2d
2000 WL 376398 (D Del.)
(Cite as: 2000 WL 376398 (D.Del.))

Page 8

with our judgment, based on all of the circumstances that are present at this time, and directed us to proceed accordingly.
*9 (D I 35, Ex EE at A465) Olsen concedes that at no time did he object to the chosen course or direct PHS to proceed otherwise (D I 35, Ex IJ at A961)

F Motion to Amend

In February 1995, PHS on behalf of Jackson filed a motion to amend its pleading to add a claim for loss of business incurred beyond March 1986 [FN9] See Morse/Diesel, Inc v Fidelity & Deposit Co of Maryland, 86 Civ 1494 (DLC), 1995 U S Dist LEXIS 8264,*1 (S D N Y June 15, 1995) In considering the motion to amend, Judge Cote noted the liberal standard of Fed R Civ P 15(a) but went on to deny the amendment citing four separate grounds See id at *16-17 First, Judge Cote found that Jackson "ha[d] considerably delayed its decision to amend the counterclaim," filing it almost nine (9) years after the original counterclaim was pled and seven (7) years after Jackson had been forced to sell its business, without setting forth any justification for the delay See id at *17-18 The court found such "delay alone . sufficient to bar the amendment" Id at *18 Second, the court found that grant of the motion would result in undue prejudice to Morse/Diesel:

> FN9 The original counterclaim for lost business was limited not only to damages incurred from the period between March 1985 and March 1986 but also to the cause of those injuries, i e, the fact that Jackson had been forced to remain on the job, thereby foregoing other jobs (D I 38 at A57- 58)

This action is currently scheduled to go to trial on July 10, 1995 Permitting the amendment at this point would require reopening discovery on the damages issue, [FN10] possibly permitting the parties (at least Morse/Diesel) to obtain an additional expert on this issue, and delaying the trial date Under no circumstances will the Court permit the trial date in this action to move The undue prejudice to Morse/Diesel if the amendment were permitted, by itself, requires denial of the amendment

> FN10 Although expert discovery was still ongoing at this point in the litigation, fact discovery, which had been limited to the period from November 4, 1982 through March 31, 1986, had closed.

Id at *18-19 Third, Judge Cote found that the amendment was time barred as it did not relate back to the original pleading "given the dramatic change in the scope of the damage claim" Id at *21 Finally, the court found that the amendment failed to state a viable legal theory of recovery and thus was futile See id at *22-27

G The Morse/Diesel Litigation

The Morse/Diesel action was tried before Judge Cote in the Southern District of New York from July 10, 1995 through July 27, 1995 At trial, PHS on behalf of Jackson presented a damage claim premised upon the Day 465 damages theory On August 1, 1995, Judge Cote rendered an oral decision in which she concluded that Morse/Diesel had breached the March agreement (D I 34, Ex. A at A055) She further concluded that Morse/Diesel could not take refuge in the March agreement as a final settlement of all disputes:

> None of these contractual provisions, however, provides Morse/Diesel with an escape from the undisputed fact that the March agreement settled the outstanding disputes between the parties, based on their mutual commitment to an August 1 TCO [ (temporary certificate of occupancy) ] date When Morse/Diesel prevented the parties from achieving that TCO date, it breached the March agreement, and can no longer rely on it as a settlement of all Jackson's known, anticipated and unanticipated injuries

* * *

*10 Morse/Diesel's primary argument is that, through the March 25th Agreement, Jackson, released all past and future claims
There is no question that Jackson has settled various claims to this agreement Specifically, the release paragraph provides that "concurrent with the execution of this agreement, Jackson will execute a release surrendering any and all claims

> for compression or acceleration costs arising from the revised schedule to be agreed upon pursuant to Paragraph 3 of this agreement "

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp 2d
2000 WL 376398 (D Del.)
(Cite as: 2000 WL 376398 (D.Del.))

Page 9

* * *

[R]eleases are typically construed narrowly, and therefore, "if from the recitals therein or otherwise, it appears that the release is to be limited to only particular claims, demands or obligations, the instrument will not release other claims, demands, or obligations *Topat Equipment Co v Porter*, 377 N Y S 2d 339, 341 (App Div 1975)

Reading the release signed by Jackson in light of this standard, I do not find that Jackson has waived all of its claims for damages arising out of the March agreement Quite to the contrary, setting aside claims related to the period prior to the agreement, Jackson released only those claims "for compression or acceleration costs arising from the revised schedule to be agreed upon pursuant to Paragraph 3 of this agreement "

Thus, Jackson would be barred from recovering only if the March agreement had been adhered to, that is, if the entire hotel had received a TCO on August 1, and if the contract continued on the course contemplated in the schedule attached to the April agreement There is nothing in the March agreement to indicate that Jackson intended to or in fact did release Morse/Diesel from claims that would arise if Morse/Diesel failed to comply with the schedule that contemplated an August 1, 1985, substantial completion and TCO date for the entire hotel

Because, as is undisputed, the project was not completed as contemplated by the April schedule, Jackson may seek to recover from Morse/Diesel any damages that were proximately caused by Morse/Diesel's breach of any express or implied duties contained in the subcontract and which delayed the job past the schedule which the parties adopted in the April agreement (D I 34, Ex A at A056-57, A063-66) On August 10, 1995, Judge Cote entered judgment in favor of Jackson with respect to all claims against it and with respect to its counterclaim for damages against Morse/Diesel in the amount of $2,598,071 plus interest [FN11] (D I 38 at A155-57)

> FN11  Both Morse/Diesel and Jackson filed appeals; the trial court's decision was affirmed in August 1996

H Bankruptcy Litigation

While the Morse/Diesel litigation was pending, PHS on behalf of Jackson filed a Chapter 11 bankruptcy petition on October 31, 1994 in the United States Bankruptcy Court for the District of Delaware [FN12] (D I 35, Ex DD at A439) PHS's role as counsel for Jackson in the bankruptcy action was funded by Fidelity [FN13] (D I 35, Ex DD at A438)

> FN12  That same day Olsen Industries also filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the District of Delaware (D I 35, Ex DD at A439, A436) PHS did not represent Olsen Industries in the bankruptcy proceeding Olsen also filed for Chapter 11 bankruptcy on October 11, but he did so in another jurisdiction (D I 35, Ex DD at A439, A436)

> FN13  Fidelity also agreed to fund bankruptcy counsel for Olsen Industries and Olsen (D I 35, Ex DD at A438)

Disagreements between Olsen and PHS as to how to proceed in the bankruptcy proceedings resulted in PHS's withdrawal as counsel on November 22, 1996 (D I 35, Ex EE at A439) In response to PHS's application for fees and expenses, Jackson filed an objection as well as a cross-motion for disgorgement of all fees and costs previously approved and paid to PHS (D I 35, Ex EE at A440) On November 13, 1997, the Bankruptcy Court disallowed PHS's final fee application and ordered PHS to disgorge fees for abuse of discretion, which decision was affirmed on appeal in September 1999 (D.I 35, Ex DD)

III STANDARD OF REVIEW

*11 This case is properly in this court pursuant to 28 U S C § 1334(b), "related to" jurisdiction Procedural matters, therefore, are governed by Part VII of the Bankruptcy Rules *See Phar-Mor, Inc v Coopers & Lybrand*, 22 F 3d 1228, 1236-37 (3d Cir.1994) Accordingly, Fed R Bankr P 7056 supplies the applicable standard of review This rule incorporates Fed R Civ P 56(c), which provides that summary judgment should be granted only if the court concludes that "there is no genuine issue as to any material fact and that the moving party is

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp 2d
2000 WL 376398 (D Del.)
(Cite as: 2000 WL 376398 (D.Del.))

Page 10

entitled to judgment as a matter of law "
Fed R Civ P. 56(c) The moving party bears the
burden of proving that no genuine issue of material
fact is in dispute See *Matsushita Elec Indus Co ,
Ltd v Zenith Radio Corp*, 475 U S 574, 586 n 10
(1986) Once the moving party has carried its initial
burden, the nonmoving party "must come forward
with 'specific facts showing that there is a genuine
issue for trial " ' *Id* at 587 (quoting Fed R Civ P
56(e)). "Facts that could alter the outcome are
'material,' and disputes are 'genuine' if evidence
exists from which a rational person could conclude
that the position of the person with the burden of
proof on the disputed issue is correct " *Horowitz v
Federal Kemper Life Assurance Co*, 57 F 3d 300,
302 n 1 (3d Cir 1995) (citations omitted) If the
nonmoving party fails to make a sufficient showing
on an essential element of his case with respect to
which he has the burden of proof, the moving party
is entitled to judgment as a matter of law *See
Celotex Corp v Catrett* 477 U S 317, 322 (1986)
The mere existence of some evidence in support of
the nonmoving party will not be sufficient for denial
of a motion for summary judgment; there must be
enough evidence to enable a jury reasonable to find
for the nonmoving party on that factual issue *See
Anderson v Liberty Lobby, Inc* , 477 U S 242, 249
(1986). This court, however, must "view the
underlying facts and all reasonable inferences
therefrom in the light most favorable to the party
opposing the motion " *Pennsylvania Coal Ass'n v
Babbitt*, 63 F 3d 231, 236 (3d Cir 1995) (citation
omitted)

IV DISCUSSION

A Choice of Law

There is substantial disagreement among the courts
as to whether or not a federal court exercising
bankruptcy jurisdiction must follow the
choice-of-law rules of the state in which it sits or
the federal common law choice-of-law rules
*Compare Kalb, Voorhis & Co v American Fin
Corp* , 8 F 3d 130 (2d Cir 1993); *In re Nantahala
Village Inc* , 976 F 2d 876 (4th Cir 1992); *Askanase
v Fatjo*, 130 F 3d 657 (5th Cir 1997); *Elgin
Sweeper Co v Melson Inc* , 884 F.Supp 641
(N D N Y.1995) *with In re Lindsay*, 59 F 3d 942
(9th Cir 1995); *In re SMEC Inc* , 160 B R 86 (M D
Tenn 1993); *In re Gibson.* 234 B R 776

(Bankr N D Cal 1999); *In re McCorhill Publ'g Inc* ,
86 B R 783 (Bankr S D N Y 1988); *In re Prof'l
Investors Ins Group v United Overseas Bank*, 232
B.R 870 (Bankr N D Tex 1999) Although the
Third Circuit has not ruled explicitly on the matter,
in *Robeson Indus v Hartford Accident & Indem
Co* , 178 F 3d 160 (3d Cir.1999), an appeal of the
district court's affirmance of the bankruptcy court's
grant of summary judgment in an adversary
proceeding, the Circuit Court, which sat in
diversity, applied the choice-of-law rules of the
forum state *See id* ("Because we sit in diversity in
the present case, we are bound to follow the
substantive law of the forum, including the forum's
choice-of-law rules " (internal citations omitted)) In
the instant action, it matters not which
choice-of-law rule is applied, as both federal
common law and the forum state (Delaware) follow
the approach of the *Restatement (Second) of
Conflict of Law's* ("the *Restatement*" ) "most
significant relationship" test for choice-of-law
questions sounding in tort *See Pig Improvement
Co v Middle States Holding Co* , 943 F Supp 392,
396 (D Del 1996); *see also Travelers Indem Co v
Lake*, 594 A 2d 38, 41, 47 (Del 1991)

*12 The parties generally are in agreement that
New York substantive law governs Jackson's claims
at bar [FN14] Pursuant to § 145 of the *Restatement*.
the court in determining the local law of the state
that "has the most significant relationship" to the
occurrence and the parties" should first consider:

> FN14    PHS asserts that either
> Pennsylvania or New York law governs
> the action but that the court "need not
> decide whether New York or Pennsylvania
> controls since the law of both states is the
> same " (D 1 37 at 21-22) Jackson makes
> no argument for application of New York
> law but premises all of its legal assertions
> on the law of that state In light of this, the
> court will assume that the parties do not
> dispute the application of New York law to
> the elements of Jackson's claims against
> PHS

(a) the needs of the interstate and international
systems,
(b) the relevant policies of the forum,
(c) the relevant policies of other interested states

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp 2d
2000 WL 376398 (D.Del.)
(Cite as: 2000 WL 376398 (D.Del.))

Page 11

and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectation,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied

*Restatement* § 6 The court then should evaluate these factors in light of particular geographic contacts that are relevant to tort claims, specifically

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered

*Restatement* § 145(2) The *Restatement* directs that "[t]hese contacts are to be evaluated according to their relative importance with respect to the particular issue " *Id* Applying this standard to the case at bar, the court concurs with the parties that New York substantive law applies to this action since, although PHS's advice was formulated and accepted in Pennsylvania, the crux of the action concerns litigation which took place in New York and centered on a New York construction project

B Breach of Fiduciary Duty

It is axiomatic that an attorney stands in a fiduciary relationship to the client. *See Cinema 5 Ltd v Cinerama, Inc*, 528 F 2d 1384, 1386 (2d Cir 1976)

As a fiduciary, an attorney "is obliged to exercise the highest degree of good faith, honesty, integrity, fairness, and fidelity " *Condren v Grace,* 783 F Supp 178, 182 (S D N Y 1982). In its complaint, Jackson alleges that PHS breached its fiduciary duty to it in two aspects: (1) by withholding material information and (2) by proceeding in a relationship with it that was tainted by a conflict of interest

In order to prevail on a claim for breach of fiduciary duty, a plaintiff must demonstrate by a preponderance of the evidence that the defendant's conduct proximately caused its injury *See LNC Invs, Inc v First Fidelity Bank, N A N J*, 173 F 3d 454, 465 (2d Cir 1999) (stating that in a

breach of fiduciary case where the plaintiff seeks compensatory damages, the level of causation required is proximate causation; where the remedy sought is a " 'restitutionary one to prevent the fiduciary's unjust enrichment," ' the less stringent substantial factor standard is more appropriate); *see also DuPont v Brady.* 646 F Supp 1067, 1076 (S D N Y 1986) (finding that plaintiff had failed to prove by a preponderance of the evidence that his loss was caused by counsel's omission); *Keywell Corp v Piper & Marbury L L P* No 96-CV-0660E (SC), 1999 WL 66700, at *6 (W.D N Y Feb 11, 1999) (stating that "[t]o be entitled to an award of damages, a plaintiff must show with certainty that its damages were caused by the defendant's actions") " 'In the absence of a causal link between [the defendant's] alleged wrongful conduct and [the] plaintiff's alleged damages, the complaint must be dismissed " ' *LNC Investments,* 173 F 3d at 465-66 (quoting *R M Newell Co v Rice,* 653 N Y S 2d 1004, 1005 (N Y App Div 1997)) Moreover, in order to be entitled to damages, plaintiff must demonstrate that the resultant loss is capable of proof with reasonable certainty *See Keywell Corp*, 1999 WL 66700, at *6; *Treasure Lake Assocs v Oppenheim,* 993 F Supp 217, 220 (S D N Y 1998) A plaintiff, therefore, in order to demonstrate a defendant's breach of fiduciary duty, must establish both causation and damages *See Keywell Corp*. 1999 WL 66700, at *6

1 Withholding of material information

*13 In the case at bar, Jackson alleges that PHS breached its duty to provide Jackson all information material to its claim against Morse/Diesel Specifically, Jackson points to two internal legal memoranda, the August 29, 1994 and September 29, 1994 memoranda, that were not provided to Olsen for review Under New York law, as part of his or her fiduciary duty, an attorney must provide the client with all information material to the client's decision to pursue a given course of action or to abstain therefrom *See Spector v Mermelstein*, 361 F Supp 30, 39-40 (S D N Y 1972); *accord DuPont v Brady,* 646 F Supp 1067, 1076 (S D N Y 1986); *Heine v. Newman, Tannenbaum, Helpern, Syracuse & Hirschtritt,* 856 F Supp 190, 194-95 (S D N Y 1994) "Material facts are those which, if known to the client, might well have caused him,

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp 2d
2000 WL 376398 (D Del.)
(Cite as: 2000 WL 376398 (D.Del.))

Page 12

acting as a reasonable man, to alter his proposed course of conduct " *Spector,* 361 F Supp at 40 "If an attorney negligently or willfully withholds from his client [material information] then the attorney is liable for the client's losses suffered as a result of action taken without benefit of the undisclosed material facts " *Id* at 39-40

Accepting as true that Jackson was not afforded an opportunity to review the memoranda at issue, Jackson has failed to establish that these documents are "material" under New York law The record is devoid of any testimony from Olsen indicating that had he received the documents he would have pursued a different course of action [FN15] Nor does the record support a finding that a reasonable man in Olsen's position having reviewed the memoranda would have pursued Day One damages The August 29, 1994 memorandum concludes that the accord and satisfaction theory discussed therein would not have been successful at trial given the circumstances at bar Faced with that negative appraisal there is no basis for finding that a reasonable person would have altered his conduct In fact, when presented with PHS's assessment of the two damage theories (which was consistent with the recommendation set forth in the August 29, 2994 memorandum), Olsen opted to forego Day One damages in favor of Day 465 damages Accordingly, the court concludes that Jackson has failed to establish the materiality of the withheld memoranda

> FN15 The only support in the record for such an inference is a footnote in Jackson's reply brief in support of its motion for summary judgment, which reads in relevant part that "the undisputed facts show that had [Olsen] been told of a viable theory upon which to proceed with Day One damages, he would have proceeded " (D 1 43 at 6 n 5)

Even if the court were to assume that the memoranda were material, Jackson has failed to establish by a preponderance of the evidence that but for PHS's withholding of the memoranda, Jackson would have prevailed at trial on its Day One damages claim Despite Jackson's tortured interpretation of Judge Cote's decision, there is no support in her opinion for concluding that, had

Jackson presented a claim for Day One damages, she would have awarded such damages In fact, a more likely interpretation of her decision would lead to the conclusion that such damages were barred by the release Jackson executed as part of the March agreement Such a finding is consistent with the evidence at bar, which indicates that no viable legal theory existed that would allow Jackson to overcome the clear and unambiguous release set forth in the executed March agreement Moreover, although Jackson contends that the language of Judge Cote's decision reflects a finding that Jackson regarded Morse/Diesel's performance under the March agreement as legal satisfaction of an accord, the court finds that such is not the case Rather, Judge Cote found that Jackson could recover damages incurred only as a result of Morse/Diesel's breach of the March agreement as amended Accordingly, the court finds that Jackson has failed to establish with certainty that PHS's omission caused its loss In the absence of evidence that would enable a jury reasonably to find for Jackson on this factual issue, the court concludes that PHS is entitled to summary judgment as to this claim

2 Conflict of interest

*14 As a fiduciary, an attorney " 'is charged with a high degree of undivided loyalty to his client " ' *Estate of Re v Kornstein Veisz & Wexler.* 958 F Supp. 907, 924 (S D N Y 1997) (quoting *Kelly v Greason,* 23 N Y 2d 368, 375 (N Y App Div 1968) ) The unique nature of the attorney-client relationship requires that an attorney "not place himself in a position where a conflicting interest may, even inadvertently, affect, or give the appearance of affecting, the obligations of the professional relationship " *Kelly,* 23 N Y 2d at 376 The nature of this relationship is reflected further in Ethical Consideration 5-21 of Canon 5 of New York's Code of Professional Responsibility:
  The obligation of a lawyer to exercise professional judgment solely on behalf of his client requires that he disregard the desires of others that might impair his free judgment The desires of a third person will seldom adversely affect a lawyer unless that person is in a position to exert strong economic, political, or social pressures upon the lawyer These influences are often subtle, and a lawyer must be alert to their existence A lawyer subjected to outside pressures

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp 2d
2000 WL 376398 (D Del.)
(Cite as: 2000 WL 376398 (D.Del.))

should make full disclosure of them to his client

In the case at bar, Jackson argues that the "financial pressure" Fidelity exerted over PHS posed a conflict of interest that materially limited PHS's responsibility to plaintiff Specifically, Jackson argues that PHS, as a result of its desire to retain Fidelity's funding, compromised Jackson's claims by foregoing the Day One damages theory

In light of the factual record in this matter, a possible conflict of interest existed vis a vis PHS's representation of Jackson Fidelity funded PHS's handling of the Morse/Diesel litigation on behalf of Jackson Such funding on its own does not pose a conflict of interest as long as the client has been consulted and consented to the relationship, which Olsen in the instant action did It is clear, however, that at all times during its representation of Jackson, PHS was concerned that the funding arrangement continue uninterrupted As a consequence, PHS imposed on itself a restriction as to the scope of its representation of Jackson--it would not represent Jackson in any matter where its position might be adverse to that of Fidelity--a restriction of which

Jackson's claim against Morse/Diesel Accordingly, the court finds that Jackson has failed to present enough evidence from which a jury reasonably could infer that a conflict actually materialized

*15 Even assuming that Jackson had presented evidence from which a jury could conclude that PHS's representation constituted professional misconduct, Jackson has failed to establish that its alleged loss was proximately caused by the actions of PHS As discussed above, Jackson has failed to demonstrate by a preponderance of the evidence that it would have prevailed at trial on its claim for Day One damages In the absence of evidence indicating that Jackson can prove such a causal link, summary judgment in favor of PHS is warranted

C  Legal Malpractice

Jackson asserts that PHS's failure to file a motion to amend the complaint to add a claim for Day One damages constitutes legal malpractice It is well settled under New York law, that a claim of legal malpractice requires proof of
    (1)    the    existence    of    an    attorney-client

Not Reported in F.Supp.2d
2000 WL 376398 (D.Del.)
(Cite as: 2000 WL 376398 (D.Del.))

Page 14

there was no need to file an amended complaint. *See Hwang v. Bierman,* 614 N.Y.S.2d 51, 52-53 (N.Y.App.Div.1994) ("Even where there may be several alternatives, the selection of one of many reasonable defenses does not constitute malpractice.") PHS's decision to pursue Day 465 damages and, thus, not file a motion to amend, is not so egregious as to sustain a claim for malpractice.

Even if PHS's failure to file a motion to amend were negligent, with respect to the third and fourth prongs, Jackson's allegation of legal malpractice is even more attenuated than its allegations of breach of fiduciary duty. In order to establish that PHS's conduct was the but-for cause of its loss, Jackson must demonstrate not only that Judge Cote would have granted the motion to amend to add the Day One damages claim but also that it would have prevailed at trial on that claim. As previously discussed, Jackson has failed to establish the latter. Jackson's proof is equally as deficient as regards the former.

*16 Jackson correctly notes that Fed.R.Civ.P. 15(a) directs the courts that leave to amend "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). While such leave is left to the sound discretion of the trial court, the Supreme Court has identified several factors a court should consider when applying Rule 15(a):

In the absence of any apparent or declared reason--such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.--the leave sought should, as the rules require, be 'freely given.'
*Foman v. Davis,* 371 U.S. 178, 182 (1962).

Jackson asserts that in light of this liberal standard it is probable that Judge Cote would have granted a motion to amend to seek Day One damages had it been asserted in August 1994, following presentation of the August 29, 1994 memorandum. Given Judge Cotes' denial of Jackson's February 1995 motion to amend, however, Jackson's assertion is less than persuasive. The same considerations that led Judge Cotes to deny that motion are applicable to the amendment Jackson

asserts PHS should have filed: the significant delay in filing the amendment, the need to reopen discovery on the new theory of damages, and the possibility that the amendment was both time barred and/or futile. Judge Cote's unambiguous declaration that "[u]nder no circumstances will the Court permit the trial date in this action to move" makes grant of the Day One amendment even more improbable. Under the circumstances, the court finds that Jackson has failed to provide enough evidence to enable a jury reasonably to find for it on this factual issue. [FN16] Accordingly, summary judgment in favor of defendant with respect to this claim is appropriate. [FN17]

> FN16. Even if the court were to assume that Jackson could establish that Judge Cote would have granted the Day One damages amendment, as noted earlier, Jackson has failed to establish that it would have prevailed on that claim. Consequently, Jackson has failed to demonstrate causation with respect to its legal malpractice claim.

> FN17. Having found that Jackson failed to establish that PHS breached its ethical obligations to Jackson with respect to the claims at bar, the court need not address Jackson's assertion in its belatedly filed "Supplemental Memorandum of Law" that it is entitled to the forfeiture of attorneys' fees paid PHS if the court finds Jackson "has not suffered actual damages." (D.I.47, 49.) The court notes that Jackson's supplemental memorandum was filed without leave of the court and asserts a damages theory not presented in any of its prior pleadings.

V. CONCLUSION

For the reasons stated above, the court finds that New York law applies to the merits of Jackson's claims for breach of fiduciary duty, conflict of interest, and negligence. The court further finds that there are no genuine issues of material fact relating to these claims and that Jackson has failed to provide enough evidence from which a reasonable jury could conclude that its positions as to the disputed issues is correct. PHS, therefore, is entitled

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F Supp 2d
2000 WL 376398 (D Del.)
(Cite as: 2000 WL 376398 (D.Del.))

Page 15

to judgment as a matter of law  Accordingly, the court will deny Jackson's motion for summary judgment (D I 33) and grant PHS's motion for the same (D I 36)  An appropriate order shall issue

2000 WL 376398 (D Del )

END OF DOCUMENT

© 2005 Thomson/West  No Claim to Orig  U S  Govt  Works

Westlaw.

Not Reported in F.Supp.2d
2004 WL 875262 (S.D.N.Y.)
(Cite as: 2004 WL 875262 (S.D.N.Y.))

Page 1

C

Motions, Pleadings and Filings

Only the Westlaw citation is currently available

United States District Court,
S.D. New York.
ROSELINK INVESTORS, L.L.C., a New Jersey
Limited Liability Company, Zigmunt
Wilf, Bne Associates, a New Jersey partnership,
David Halpern, Davanne Realty
Co., Inc., a corporation, and Andrew Abramson,
Plaintiffs,
v.
Mark R. SHENKMAN and Charles R. Cumello,
Defendants
No. 01CIV7176(MBM).

May 19, 2004

Jeffrey M. Garrod, Orloff Lowenbach Stifelman &
Siegel, Roseland, NJ, for Plaintiffs

Thomas J. Fleming, Patrick I. Gibson, Olshan
Grundman Frome Rosenzweig & Wolosky, New
York, NY, for Defendants

OPINION AND ORDER

MUKASEY, J.

*1 Plaintiffs Roselink Investors, L.L.C., Zigmunt
Wilf, BNE Associates, David Halpern, Davanne
Realty Co., Inc., and Andrew Abramson
(collectively "Creditors") purchased Units offered
in a private offering by Crown Books Corp
("Crown Books") and Crownbooks.com
("CB.com"), a wholly-owned subsidiary of Crown
Books responsible for Crown Books' Internet sales
Creditors purchased the Units in exchange for (i) a
promissory note in a principal value equal to the
purchase price of each Unit, and (ii) a warrant to
purchase common stock in Crown Books at a fixed
exercise price Defendants Mark Shenkman and
Charles Cumello were directors of CB.com.

Creditors have sued defendants for breaches of
fiduciary duties, fraudulent transfer, and tortious
interference with contractual relations Both parties
have moved for summary judgment For the reasons
stated below, defendants' motion is granted

I

Plaintiff Roselink Investors, LLC is a New Jersey
limited liability company with its principal place of
business in New Jersey (Compl ¶ 4) Roselink's
members reside in New Jersey or Pennsylvania (Id
) Plaintiff Zigmunt Wilf resides in New Jersey (Id
at ¶ 5) Plaintiff BNE Associates is a New Jersey
partnership, and all its partners are residents of New
Jersey (Id at ¶ 6) Plaintiff David Halpern resides
in New Jersey (Id at ¶ 7) Plaintiff Davanne
Realty Co. is a New Jersey corporation with its
principal place of business in New Jersey (Id at ¶
8) Plaintiff Andrew Abramson resides in New
Jersey (Id at ¶ 9) Defendant Mark Shenkman
resides in Connecticut (Id at ¶ 10) Defendant
Charles Cumello resides in Maryland (Id at ¶ 11)
Therefore, subject matter jurisdiction arises under
28 U.S.C. § 1332(a)(1) Venue is proper in this
district pursuant to 28 U.S.C. § 1391(a)(2) because
a substantial part of the events giving rise to this
action occurred within this district

II

The following facts are either undisputed or are
presented in the light most favorable to plaintiffs
See Matsushita Elec Indus Co v Zenith Radio
Corp, 475 U.S. 574, 587-88, 106 S Ct 1348, 89
L Ed 2d 538 (1986)

Crown Books is a Delaware corporation based in
Maryland (Id at ¶ 12) After becoming one of the
country's top discount retailers of books and
book-related products, Crown Books filed a
voluntary petition for bankruptcy relief under
Chapter 11 of the Bankruptcy Code, 11 U.S.C. §
101 (2000), in July 1998 (Id at ¶ 12-13) Crown
Books emerged from bankruptcy with two working
capital loans provided by Paragon Capital LLC
("Paragon") and Foothill Capital Corporation
("Foothill") (Id at ¶ 14) Substantially all of

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp 2d
2004 WL 875262 (S.D.N.Y )
(Cite as: 2004 WL 875262 (S.D.N.Y.))

Page 2

Crown Books' assets were pledged to Creditors (*Id*)

In December 1999, Crown Books formed CB com, also a Delaware corporation, a wholly-owned subsidiary that was to pursue an Internet retail sales strategy (*Id* at ¶ 16) Crown Books estimated that its total costs to implement this Internet strategy would range from $3 million to $7 million, excluding marketing expenses (*Id* at ¶ 17) To raise the necessary funds, Crown Books and CB com extended a private offering to accredited investors on December 14, 1999 (*Id* at ¶ 18) The private offering was for a minimum of ten and a maximum of 20 Units, each of which consisted of a three-year 6% subordinated promissory note to CB.com in the principal amount of $500,000, and a three-year warrant to purchase 183,824 shares of common stock of Crown Books at $2 72 per share (Defendants' Statement Pursuant to Local Civil Rule 56.1 ("Deft Stmt "), Ex A at i)

*2 About February 23, 2000, Creditors entered into subscription agreements with Crown Books and CB.com. (Compl ¶ 19) Creditors purchased Units with an aggregate principal amount of more than $1 million (*Id* at ¶ 20) The private offering closed in March 2000 after raising approximately $4 million, $1 million of which was transferred immediately to Crown Books from CB com (*Id* at ¶ 25) By January 2001, the functionality of CB com's website was about 80% complete (*Id* at ¶ 26)

In the latter part of 2000, Crown Books found itself with accelerated holiday inventory receipts, unplanned trade payments for these receipts, and sales trends that were lower than reflected in its business plan (*Id* at ¶ 27) On December 8, 2000, Crown Books entered into an agreement with Paragon and Foothill to seek capital to lower its debt (*Id* at ¶ 28) The agreement obligated Crown Books to pay $1 5 million on or before December 12, 2000, at least $2 million on or before January 10, 2001, and at least $1 5 million on or before February 15, 2001 (Deft Stmt, Ex G at 2) About December 11, 2000, Shenkman and Cumello authorized a loan of $1 5 million from CB com to Crown Books ("the Loan") (Compl ¶ 30) Two months later, Crown Books filed another voluntary petition for relief under Chapter 11 of the Bankruptcy Code (*Id* at ¶ 36)

Plaintiffs have brought seven claims for relief against Creditors Claim One is for breach of fiduciary duty Claim Two is for breach of the duty of loyalty Claim Three is for breach of the duty of good faith Claim Four is for common law wrongful transfer of funds Claim Five is for violation of § 1304(a)(2) of the Delaware Uniform Fraudulent Transfer Act Claim Six is for violation of § 1305(a) of the Delaware Uniform Fraudulent Transfer Act Claim Seven is for tortious interference with contractual relations

III
A Breach of Fiduciary Duty Claims

Creditors allege that defendants, as directors of CB com, owed them fiduciary duties of due care, loyalty and good faith (Compl ¶¶ 38, 45, 52) According to Creditors, defendants owed them fiduciary duties because CB com was insolvent "when the Loan was made or was rendered insolvent by the Loan " (*Id* at ¶ 38) Creditors claim that by making the Loan defendants breached their fiduciary duties (*Id* at ¶¶ 39-42, 46-49, 53-56) The threshold question is whether defendants owed Creditors any fiduciary duties If so, the next question is whether defendants breached these duties. Delaware law, upon which the parties have relied, controls *See Texaco A/S (Denmark) v Commercial Ins Co of Newark, NJ*, 160 F 3d 124, 128 (2d Cir 1998) (parties' consent to application of forum law completes choice of law inquiry); *American Fuel Corp v Utah Energy Development Co*, 122 F 3d 130, 134 (2d Cir 1997) (same)

1 Did defendants owe plaintiffs any fiduciary duties?

Under Delaware law, when one company wholly owns another, the directors of the parent and the subsidiary are obligated to manage the affairs of the subsidiary in the best interests only of the parent and its shareholders *See Anadarko Petroleum Corp v Panhandle Eastern Corp*, 545 A 2d 1171, 1174 (Del 1988) (dismissing subsidiary's claim against parent corporation and three former directors of the subsidiary for breach of fiduciary duty by modifying contracts between subsidiary and parent); Dennis J Block, Nancy E Barton & Stephen A Radin, THE BUSINESS JUDGMENT

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F.Supp.2d
2004 WL 875262 (S.D.N.Y.)
(Cite as: 2004 WL 875262 (S.D.N.Y.))

Page 3

RULE: FIDUCIARY DUTIES OF CORPORATE DIRECTORS 376 (5th ed 2002) However, "where a corporation is operating in the vicinity of insolvency, a board of directors is not merely the agent of the residue risk bearers, but owes its duty to the corporate enterprise." *Credit Lyonnais Bank Nederland, N V v Pathe Communications Corp*, Civ A No 12150, 1991 WL 277613, at *34 (Del Ch Dec 30, 1991) Delaware law requires that directors

*3 recognize that in managing the business affairs of a solvent corporation in the vicinity of insolvency, circumstances may arise when the right (both the efficient and the fair) course to follow for the corporation may diverge from the choice the stockholders (or the creditors, or the employees, or any single group interested in the corporation) would make if given the opportunity to act

*Id* at n 55 Once a corporation enters "the zone of insolvency," the directors owe fiduciary duties not only to the corporation's shareholders but to its creditors as well *See Geyer v Ingersoll Publications Co*. 621 A.2d 784, 791 (Del Ch 1992) . This means that directors of a wholly-owned subsidiary, who otherwise would owe fiduciary duties only to the parent, also owe fiduciary duties to creditors of the subsidiary when the subsidiary enters "the zone of insolvency "

There is no dispute here that CB com was at least within "the zone of insolvency" when defendants made the Loan. Indeed, the facts show that CB com was insolvent from the moment it was formed All of its $4 million of capital was acquired through the private offering, in which promissory notes were issued in exchange for Units. (Plaintiffs' Counterstatement of Undisputed Facts ("Pl Cstmt") ¶¶ 18-23) Because Crown Books decided to raise the capital through loans rather than a stock offering, CB com's liabilities exceeded its assets when the Units were issued, which rendered CB com insolvent from inception "[A]n entity is insolvent when it has liabilities in excess of a reasonable market value of assets held " *Geyer*, 621 A.2d at 789; *see also* BLACK'S LAW DICTIONARY 799 (7th ed.1999) (defining "insolvent" as "having liabilities that exceed the value of assets") Therefore, CB com owed Creditors fiduciary duties from the moment Creditors purchased the units [FN1]

FN1 Defendants make the implausible argument that plaintiffs are not creditors of CB com but rather investors, and that this distinction negates any fiduciary duties defendants might otherwise owe plaintiffs (Defendants' Memorandum of Law in Support of their Motion for Summary Judgment ("Def Mem ") 23-27) Defendants concede that plaintiffs made a loan to CB com, and yet argue that the loan was effectively an equity investment because it was made when CB com had no assets, no revenue and no value capable of repaying the loan--i e , when CB com was insolvent (*Id* at 24) However, the financial condition of CB com does not change the structure of the relationship between it and plaintiffs A creditor is simply "[o]ne to whom a debt is owed " BLACK'S LAW DICTIONARY 375 (7th ed 1999) Issuance of a promissory note to plaintiffs by CB com demonstrates an express recognition of a debt owed by CB com to plaintiffs, and thus makes plaintiffs creditors of CB com

2 Did defendants breach their fiduciary duties to creditors?

The fiduciary duties of directors of a corporation are twofold, "generally characterized as the duty of care and the duty of loyalty " *Norlin Corp v Rooney, Pace Inc*, 744 F 2d 255, 264 (2d Cir 1984) "The duty of care refers to the responsibility of a corporate fiduciary to exercise, in the performance of his tasks, the care that a reasonably prudent person in a similar position would use under similar circumstances " *Id* "The second restriction traditionally imposed, the duty of loyalty, derives from the prohibition against self-dealing that inheres in the fiduciary relationship " *Id*

Under Delaware law, to establish a breach of fiduciary duty, a plaintiff first must prove facts sufficient to overcome the presumption inherent in the business judgment rule *See Cinerama, Inc v Technicolor, Inc*, 663 A.2d 1156, 1162-64 (Del.1995); *Cede & Co v Technicolor, Inc*. 634 A.2d 345, 360-61 (Del 1993); *Spiegel v Buntrock*, 571 A 2d 767, 774 (Del 1990); *Citron v Fairchild Camera & Instrument Corp*, 569 A 2d 53, 64

© 2005 Thomson/West No Claim to Orig U.S Govt Works

Not Reported in F Supp 2d
2004 WL 875262 (S.D.N.Y.)
(Cite as: 2004 WL 875262 (S.D.N.Y.))

Page 4

(Del 1989); *Smith v Van Gorkam*, 488 A 2d 858, 872 (Del 1985) The business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in honest belief that the action taken was in the best interests of the company" *Orman*, 794 A 2d at 19-20 (quoting *Aronson v Lewis*, 473 A 2d 805, 811 (Del 1984)) (internal quotation marks omitted) Four elements define the business judgment rule presumption: (1) a business decision; (2) disinterestedness and independence; (3) due care; and (4) good faith *See Cinerama*, 663 A 2d at 1162-64; *Cede*, 634 A 2d at 360-61; *Spiegel*, 571 A 2d at 774; *Citron*, 569 A 2d at 64; *Van Gorkam*, 488 A 2d at 872; *Aronson*, 473 A 2d at 811-816; *see also* Dennis J Block, Nancy E Barton & Stephen A Radin, THE BUSINESS JUDGMENT RULE: FIDUCIARY DUTIES OF CORPORATE DIRECTORS 39, 85-88 (5th ed 2002) The presumption of the business judgment rule is rebutted in those rare cases where a plaintiff establishes facts to show that any of the four elements was not present *See Panes v Bally Entertainment Corp*, 722 A 2d 1243, 1246 (Del 1999) "While the Delaware cases use a variety of terms to describe the applicable standard of care, our analysis satisfies us that under the business judgment rule director liability is predicated upon concepts of gross negligence" *Aronson*, 473 A 2d at 812 Under Delaware law, a court should "reach conclusions as to the sufficiency of allegations regarding interest and independence only after considering all the facts alleged on a case-by-case basis" *Orman*, 794 A 2d at 23

*4 Creditors claim that defendants owed them fiduciary duties "not to divert, dissipate or unduly risk assets of Crownbooks com that would be necessary to satisfy Crownbooks com's repayment obligation with respect to the monies due on Plaintiffs' Notes" (Compl ¶¶ 38, 45, 52) Creditors argue that defendants breached their fiduciary duties "by making the Loan without first ensuring that Crownbooks com had retained sufficient assets to pay its debts as they became due," "by failing to obtain adequate security for the Loan as well as other protections for Crownbooks com as a lender and for Plaintiffs as creditors," and "by causing Crownbooks com to make the Loan without first obtaining any assurance that Crown Books Corp could obtain the other cash

infusions required under its agreement with Paragon and Foothills" (*Id* at ¶¶ 40-42, 47-49, 54-56) However, Creditors have failed to establish sufficient facts to rebut the presumption of the business judgment rule

a Business Decision

It is not disputed that the Loan was the product of a business decision on the part of defendants Cumello stated in a letter dated December 22, 2000--quoted by Creditors in the Complaint--that the Loan was made in answer to the problem Crown Books was having with raising cash needed to remain "in satisfactory standing with Paragon" (Compl ¶ 29) Cumello further explained in a letter to Creditors dated January 2, 2001--also quoted by Creditors in the Complaint-- that the Loan was made "for the working capital needs of the parent " (*Id* at ¶ 31) Therefore, defendants' decision to make the Loan constitutes a "business decision" for the purposes of the business judgment rule

b Disinterestedness and Independence

The Delaware Supreme Court has defined "interest" under a business judgment rule analysis as meaning "that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally " *Aronson*, 473 A 2d at 812 Further, the benefit to a director must be material, *Cede*, 634 A 2d at 363, which means that it must be "significant enough, *in the context of the director's economic circumstances*, as to have made it improbable that the director could perform her fiduciary duties to the shareholders without being influenced by her overriding personal interest." *Orman*, 794 A 2d at 23 (internal quotation marks and ellipsis omitted) (emphasis in original)

The Delaware Supreme Court has defined "independent" under a business judgment rule analysis as meaning "that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences" *Aronson*, 473 A 2d at 816 "In assessing director independence, Delaware courts apply a subjective 'actual person' standard to

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F.Supp.2d
2004 WL 875262 (S.D.N.Y.)
(Cite as: 2004 WL 875262 (S.D.N.Y.))

Page 5

determine whether a 'given' director was likely to be affected in the same or similar circumstances." *McMullin v. Beran*, 765 A.2d 910, 923 (Del.2000) "There must be coupled with the allegations of control such facts as would demonstrate that through personal or other relationships the directors ~~...holden to the controlling person." *Aronson.*

duties to Crown Books as the only shareholder Under Delaware law, "in a parent and wholly-owned subsidiary context, the directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders." *Anadarko Petroleum Corp. v. Panhandle Eastern Corp.*, 545 A.2d 1171,



Not Reported in F.Supp.2d
2004 WL 875262 (S.D.N.Y.)
(Cite as: 2004 WL 875262 (S.D.N.Y.))

here. *Id* at *1 Where there are shareholders in addition to the parent company, both the directors of the subsidiary and the parent company, as controlling shareholder, have a duty to consider the interests of the minority shareholders *Sinclair Oil Corp v Levien*, 280 A.2d 717, 720 (Del 1971) However, where the subsidiary is wholly owned by the parent, the directors of the subsidiary owe the parent a fiduciary duty to manage the subsidiary in the best interests of the parent *Anadarko*, 545 A 2d at 1174 Here, not only are Creditors not shareholders of CB com--an argument they have made at great length--but there are no shareholders besides Crown Books Therefore, had defendants managed CB com as a stand-alone company, disregarding the best interests of Crown Books, they likely would have been in breach of their fiduciary duties to Crown Books as the parent company

*6 Even assuming *arguendo* that the interests attributed to defendants by Creditors were additional interests beyond those defendants were obligated to consider, Creditors must also establish that these particular interests were material *Cede*, 634 A.2d at 363 As explained below, Creditors have failed to do so

First, Shenkman's purported ownership interest in Crown Books is far too attenuated to constitute a material interest sufficient to rebut the business judgment rule presumption Shenkman is the founder, President, Chief Investment Officer and managing member of Shenkman Capital Management, Inc ("Shenkman Capital") (Plaintiffs' Statement of Undisputed Material Facts ("Pl Stmt.") ¶ 8) Shenkman Capital is the managing member and 1% owner of Royalty Books Associates ("Royalty") (*Id* at ¶ 9) Royalty owned approximately 35% of Crown Books' stock (*Id*) Therefore, Shenkman's ownership interest in Crown Books is comprised of his unspecified ownership interest in Shenkman Capital, Shenkman Capital's 1% ownership interest in Royalty, and Royalty's 35% ownership interest in Crown Books--which makes Shenkman's ownership interest in Crown Books some percentage of 1% of 35% Even

assuming Shenkman owns 100% of Shenkman Capital, this would make his interest in Royalty only 0 35% This is far too little to render Shenkman interested in the Loan or controlled by Crown Books under a business judgment rule analysis "[S]tock ownership alone, at least when it amounts to less than a majority, is not sufficient proof of dominion or control " *Aronson*. 473 A 2d at 815 (holding that 47% stock ownership was not sufficient to rebut independence) (internal quotation marks omitted)

Cumello's employment as an officer of Crown Books also does not constitute a material interest under the particular circumstances here Creditors argue that Cumello's employment with Crown Books gives him a personal interest in keeping Crown Books out of bankruptcy for as long as possible in order to protect his job However, as already discussed above, regardless of his position as an officer of Crown Books, Cumello had a duty to Crown Books to manage CB com in the best interests of Crown Books, and certainly the best interests of Crown Books would include an interest in keeping Crown Books out of bankruptcy for as long as possible As a result, any personal interest Cumello had in keeping Crown Books out of bankruptcy was consistent with the best interests of Crown Books, and thus any indirect benefit to Cumello from the Loan was immaterial Therefore, Creditors have failed to establish that defendants were personally interested in or dependent on the business decision to make the Loan

c. Due Care

"The duty of the directors of a company to act on an informed basis forms the duty of care element of the business judgment rule " *Cinerama*, 663 A 2d at 1164 n 13 (internal quotation marks and ellipsis omitted) "[T]o invoke the rule's protection directors have a duty to inform themselves, prior to making a business decision, of all material information reasonably available to them " *Aronson*, 473 A 2d at 812 "[T]he standard for judging the informational component of the directors' decisionmaking does not mean that the Board must be informed of *every* fact The Board is responsible for considering only *material* facts that are *reasonably available*, not those that are immaterial or out of the Board's reasonable reach " *Brehm v*

© 2005 Thomson/West No Claim to Orig U S Govt Works

Page 7

Not Reported in F Supp 2d
2004 WL 875262 (S.D.N.Y )
(Cite as: 2004 WL 875262 (S.D.N.Y.))

*Eisner*, 746 A 2d 244, 259 (Del 2000) (emphasis in original) "[T]he concept of gross negligence is [ ] the proper standard for determining whether a business judgment reached by a board of directors was an informed one " *Van Gorkam*, 488 A 2d at 873

*7 Creditors have failed to present any facts sufficient to overcome the business judgment rule presumption of due care According to defendants, they consulted counsel for CB com and Crown Books before making the Loan to discuss both legal and strategic concerns (Cumello Dec ¶¶ 22-26) Additionally, Cumello reports that as President and Chief Executive Officer of Crown Books, he "regularly received and reviewed financial reports and updates regarding Crown Books' finances," "reviewed Crown Books' monthly financial packages," and "had almost daily discussions with Crown Books CFO regarding Crown Books' credit facilities with Paragon and Ingram " (*Id* at ¶ 41) It is unreasonable to conclude that as directors of Crown Books and as an officer of Crown Books, defendants would be uninformed about the financial condition of the company Indeed, Creditors have posited conflicting arguments for this very reason First, claiming that defendants were uninformed, Creditors argue:

> It is undisputed that defendants did not engage in any credit risk assessment to determine whether Crownbooks com should have lent its cash assets to Crown Books and, in particular, Shenkman did not consider Crown Books' financial capacity to repay the Loan No independent financial consultants or advisors were retained by defendants for the purpose of evaluating Crown Books' creditworthiness and capacity for loan repayment

(Pl Mem 41) In short, Creditors argue that defendants were not adequately informed about the financial condition of Crown Books, the recipient of the Loan However, in the very next paragraph Creditors take a wholly contradictory position, arguing: "It is also undisputed that defendants *already knew, through their dual directorial status,* that Crown Books did not possess the *financial wherewithal* to repay, secure or otherwise guaranty repayment of Crownbooks com' s funds " (*Id*) (emphasis added) Creditors then outline in detail the facts surrounding Crown Books' demise in late 2000 as defendants struggled to meet Paragon's

demands. (*Id* at 41-42) It is beyond any reasonable dispute that defendants were well aware of Crown Books' financial condition when the Loan was made, and thus were adequately informed in reaching the business judgment to make the Loan

Creditors' allegations boil down to a single contention: defendants made a poor decision Creditors argue that defendants should have ensured that CB com "retained sufficient assets to pay its debts as they became due," obtained "adequate security for the Loan," and sought "assurance that Crown Books Corp could obtain the other cash infusions required under its agreement with Paragon and Foothills " (Compl ¶¶ 40-42) However, all of these arguments are factual claims directed at the wisdom of defendants' decision rather than at the level of information underlying the decision Under the business judgment rule, courts do not "examine the wisdom of the decision itself " *Brazen v Bell Atlantic Corp*, 695 A 2d 43, 49 (Del 1997) "[T]he Court gives great deference to the substance of the directors' decision and will not invalidate the decision, will not examine its reasonableness, and will not substitute [its] views for those of the board if the latter's decision can be attributed to any rational business purpose " *Paramount Communications, Inc v QVC Network Inc*, 637 A 2d 34, 45 (Del 1994); *see also Sinclair Oil Corp v Levien*, 280 A 2d 717, 720 (Del 1971) ("A court under such circumstances will not substitute its own notions of what is or is not sound business judgment "); *In re Caremark International Inc Derivative Litigation*, 683 A 2d 1049, 1052 (Del Ch 1996) ("[T]o allege that a corporation has suffered a loss as a result of a lawful transaction, within the corporation's powers, authorized by a corporate fiduciary acting in a good faith pursuit of corporate purposes, does not state a claim for relief against that fiduciary no matter how foolish the investment may appear in retrospect ") Therefore, Creditors have not demonstrated that defendants failed to exercise due care

d. Good Faith

*8 Delaware law does not recognize an independent duty of good faith Under Delaware law,

> [a]lthough corporate directors are unquestionably obligated to act in good faith, doctrinally that

© 2005 Thomson/West. No Claim to Orig U.S Govt Works

Not Reported in F Supp.2d
2004 WL 875262 (S.D.N.Y)
(Cite as: 2004 WL 875262 (S.D.N.Y.))

Page 8

obligation does not exist separate and apart from the fiduciary duty of loyalty Rather, it is a subset or 'subsidiary requirement' that is subsumed within the duty of loyalty, as distinguished from being a compartmentally distinct fiduciary duty of equal dignity with the two bedrock fiduciary duties of loyalty and due care *Orman v Cullman*, 794 A 2d 5, 14 (Del Ch 2002) (quoting *Emerald Partners v Berlin*, No Civ A 9700, 2001 WL 115340, at *64 n 63 (Del Ch Feb 7, 2001) (internal quotation marks omitted) Good faith is also subsumed within the duty of due care *Id* at 19-20 Accordingly, summary judgment is granted for defendants dismissing Claim Three for breach of the duty of good faith

Creditors have failed to present any facts demonstrating that defendants acted in bad faith so as to establish a basis for their claims for breach of the fiduciary duties of due care and loyalty The Delaware Supreme Court has defined "bad faith" as "not simply bad judgement or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will " *Desert Equities, Inc v Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A 2d 1199, 1208 n 16 (Del 1993) "[T]he absence of significant financial adverse interest creates a presumption of good faith, although the good faith requirement further demands an *ad hoc* determination of the board's motives in making the business decision " *See Estate of Detwiler v Offenbecher*, 728 F Supp 103, 150 (S D N Y 1989) (citing Delaware law) Bad faith may be found where a business decision "is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith " *In re J P Stevens & Co, Inc Shareholders Litigation*, 542 A 2d 770, 780-81 (Del Ch 1988) As already discussed, Creditors have not established any significant financial adverse interest on the part of defendants, so the only question is whether the decision to make the Loan is so far beyond the bounds of reasonable judgment that it must have been motivated by bad faith

According to Cumello, he "believed that if CB com did not make the Loan, CB com's assets would be

consolidated into the assets of Crown Books, and the Unit Holders would lose their entire investment " (Cumello Dec ¶ 42) Cumello further believed that structuring the transfer "as a loan, instead of a dividend, [would] balance the interests of CB com and Crown Books [because] the loan would entitle CB com to repayments when it needed funds to pursue its development program further " (*Id* at ¶ 43) Cumello also "believed CB com would have recourse in bankruptcy" if Crown Books went bankrupt after the Loan (*Id*) Shenkman shared Cumello's beliefs, approving the Loan because he believed that "it was in the best interest of all the parties involved, including the Unit Holders, CB com and Crown Books " (Shenkman Dec ¶ 9) Defendants' expressed motivations for the Loan demonstrate that there was no bad faith towards Creditors or CB com in favor of Crown Books, and that defendants had a good faith belief that the Loan would not harm Creditors or CB com and could benefit them in the long run

*9 Further, it is undisputed that CB com could not survive without Crown Books According to Cumello,

> without Crown Books, CB com would: 1) be unable to gain access to clients; 2) be unable to develop an effective product which displayed current and relevant books, periodicals and other products; and 3) not have the back office infrastructure to operate as an independent entity As a result, CB com had no hope for success without Crown Books

(Cumello Dec ¶ 13) Shenkman also believed that "[i]t was essential to CB com's survival that Crown Books also continue in business " (Shenkman Dec ¶ 9) Defendants' beliefs about the dependence of CB com on Crown Books are bolstered by the Offering Memorandum governing Creditors' investment The Offering Memorandum states that CB com intended "to attract significant online traffic and business" through Crown Books' "established name, reputation and value proposition." (Def Stmt, Ex A at 4) The Offering Memorandum further states that the purpose of CB com is to "permit *Crown Books customers* to shop online *at Crown Books* both from home and in the stores, and [ ] help to facilitate an online/offline community *for Crown Books* " (*Id*) (emphasis added) The Offering Memorandum informed Creditors when they purchased the Units that

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp 2d
2004 WL 875262 (S.D.N.Y )
(Cite as: 2004 WL 875262 (S.D.N.Y.))

Page 9

CB com, as a wholly-owned subsidiary, existed for the benefit of Crown Books and would be entirely dependent on Crown Books for its customer base and its operations In fact, the Offering Memorandum refers to the "Company" almost exclusively whenever discussing the new venture for which the Units were being offered, and the Offering Memorandum defines "Company" as *both* CB com and Crown Books, leaving little doubt about the intimate, dependent relationship between these two entities. (*Id* at Ex A) Indeed, the Offering Memorandum effectively presents CB com and Crown Books as one entity--namely, the "Company " (*Id*) Therefore, defendants' business judgment that the Loan would help save Crown Books and that preserving Crown Books would help save CB com was not "so far beyond the bounds of reasonable judgment that it must have been motivated by bad faith " *See In re J P Stevens*, 542 A 2d at 780- 81 Indeed, all evidence is to the contrary--namely, that defendants acted in good faith to preserve both Crown Books and CB com

Creditors argue also that defendants lacked discretion to use the proceeds from the Unit sales for the Loan, but this argument is belied by indisputable facts The Offering Memorandum includes a provision entitled "Broad Discretion in Use of Proceeds," which reads:

Although the Company has generally provided for the intended use of the net proceeds from the Offering as of the date of this Term Sheet, the Company cannot specify with certainty the amount of the net proceeds of the Offering that will be allocated for each purpose In addition, the Company reserves the right to reallocate the use of net proceeds it receives from the Offering in *any manner it deems advisable* Accordingly, the Company's management will have *broad discretion* in the application of the net proceeds See 'Use of Proceeds '

*10 (Def.Stmt, Ex A, ii) (emphasis added) This language leaves no doubt about the "broad discretion" of defendants in their use of the proceeds generated by Creditors' purchase of the Units Moreover, defendants' broad discretion over the use of the proceeds was further articulated in the Supplement to the Offering Memorandum, which states: "The Company reserves the right to reallocate the use of the net proceeds received in the Offering in *any manner it deems advisable* " (*Id* at

Ex B, at 1) (emphasis added) Creditors argue that "broad discretion" is not the same as "unabridged, unbridled and unchecked discretion," and that defendants would need "sole" or "absolute" discretion to permit the Loan (Pl Mem 30) However, this is not a case where directors transferred company funds into their personal bank accounts; rather, defendants transferred funds to the parent corporation with the purpose of assisting the parent, which was entirely in keeping with their fiduciary duty to consider the best interests of Crown Books *See Anadarko*, 545 A 2d at 1174 Defendants did not need absolute discretion to authorize the Loan, only broad discretion over the use of the proceeds, which they had under the express terms of the Offering Memorandum

Further, the "Broad Discretion" provision of the Offering Memorandum refers to the "Use of Proceeds" provision, which states, in relevant part, for the third time: "The Company reserves the right to reallocate the use of the net proceeds it receives from the Offering in *any manner which it deems advisable* " (Deft Stmt, Ex A at ii) (emphasis added) This provision also expressly informed Creditors that among the purposes for which the proceeds could be used was "for working capital and general corporate purposes of Crown Books " (*Id* ) Certainly, paying a debt owed by Crown Books in an attempt to avoid bankruptcy qualifies as "general corporate purposes " Therefore, defendants used the proceeds of the Unit sales for purposes expressly permitted under the terms of the Offering Memorandum Indeed, it is entirely unclear for what purposes Creditors believe the proceeds could have been used They challenge the purposes for which defendants used a portion of the proceeds--namely, the Loan--and yet offer no purpose for which they believe these proceeds should have been used Creditors argue that at the time of the Loan CB com "was already dead " (Reply Memorandum of Law in Further Support of Plaintiffs' Motion for Summary Judgment ("Pl Reply") 38) So Creditors' argument essentially boils down to the contention that defendants should have locked away CB com's funds and thrown away the key--funds for which CB com had absolutely no use as a "dead" entity and which could be reallocated for any purposes under the express terms of the Offering Memorandum--and simply watched idly as Crown Books went under However, this again ignores the

© 2005 Thomson/West No Claim to Orig. U S Govt Works

Not Reported in F.Supp.2d
2004 WL 875262 (S.D.N.Y.)
(Cite as: 2004 WL 875262 (S.D.N.Y.))

Page 10

fact that Crown Books was CB com's parent company, and thus defendants owed Crown Books a fiduciary duty to manage CB com in the best interests of Crown Books *Anadarko*, 545 A 2d at 1174 In fact, doing as Creditors demand may have constituted a breach of the fiduciary duties defendants owed Crown Books Of course, defendants also had a fiduciary duty to consider Creditors' interests as well, but defendants believed--rightly or wrongly--that Creditors would lose the funds in bankruptcy anyway, in which case the Loan put Creditors in no worse position while possibly preserving Crown Books, and CB com with it (Cumello Dec ¶ 42) In sum, Creditors have not demonstrated that defendants acted in bad faith

*11 As already discussed, Creditors' claims are essentially an attack on the wisdom of defendants' decision But the business judgment rule is intended to protect directors against just such attacks because their decisions are not to be second-guessed by courts with the benefit of hindsight. Creditors made high-risk loans for a high-risk venture by a high-risk company, and they lost the gamble They were informed of all the risks associated with CB com and Crown Books when they purchased the Units, and they were even afforded an opportunity to withdraw from their agreements with CB com when CB.com failed to raise the desired funds in the time expected--yet Creditors chose not to walk away (Def.Stmt, Ex B) Defendants cannot be held liable for a business decision made in good faith with due care and without any controlling influences or personal interests, and such is the case here

Creditors have failed "to make a showing sufficient to establish the existence of an element essential to [their] case, and on which [they] will bear the burden of proof at trial" *See Celotex v Catrett*, 477 U S 317, 322, 106 S Ct 2548, 91 L Ed 2d 265 (1986) They have failed to establish facts necessary to negate any element of the business judgment rule, and thus defendants are "entitled to judgment as a matter of law." *See* Fed R Civ P. 56 Accordingly, summary judgment is granted for defendants dismissing Claim One for breach of fiduciary duty and Claim Two for breach of the duty of loyalty

B Fraudulent Conveyance Claims

Creditors have brought claims against defendants for common law wrongful transfer and statutory fraudulent transfer Creditors argue that defendants owed them "a duty not to wrongfully transfer or otherwise divert assets from Crownbooks com for other purposes " (Compl ¶ 59) Creditors further argue that defendants had a statutory duty "not to cause Crownbooks com, in its capacity as a debtor, to make any transfer or incur any obligation without receiving a reasonably equivalent value in exchange therefore, at a time when Crownbooks.com was insolvent or became insolvent as a result of said transfer" or "under circumstances whereby the remaining assets of Crownbooks com would be unreasonably small in relation to the business or transaction " (*Id* at ¶¶ 64, 68) According to Creditors, defendants breached their common law and statutory duties by causing Crownbooks com "to transfer $1 5 million to Crown Books Corp by way of an unsecured loan " (*Id* at ¶¶ 60, 65, 69)

1 Choice of Law

Creditors argue that Delaware law should apply to these claims; defendants argue that New York law should apply "A federal court, sitting in diversity, must look to the choice-of-law rules of the state in which it sits--here New York--to resolve the conflict-of-law questions " *Arochem International, Inc v Buirkle*, 968 F 2d 266, 269-70 (2d Cir 1992) (citing *Klaxon Co v Stentor Elec Mfg Co*, 313 U S 487, 496, 61 S Ct 1020, 85 L Ed 1477 (1941) ) The parties not only dispute which state's substantive law should apply, but also which test under New York law should be applied to resolve the choice-of-law question According to Creditors, the Loan involved the internal affairs of CB com, and therefore the "internal affairs doctrine" should apply According to defendants, however, Creditors' claims do not fall within the "internal affairs doctrine," and therefore an "interest analysis" should apply

*12 "The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs--matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders-- because otherwise a corporation could be faced with conflicting demands " *Edgar v MITE Corp*, 457

Not Reported in F.Supp.2d
2004 WL 875262 (S.D.N.Y.)
(Cite as: 2004 WL 875262 (S.D.N.Y.))

Page 11

U.S. 624, 645, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982). Under the internal affairs doctrine, "the law of the state of incorporation normally determines issues relating to the *internal* affairs of a corporation." *First National City Bank v. Banco para el Comercio Exterior de Cuba,* 462 U.S. 611, 621, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) (emphasis in original). "Different conflicts principles apply, however, where the rights of third parties *external* to the corporation are at issue." *Id.* at 621 (emphasis in original). Creditors' claims at issue here are tort claims regarding the rights of "third parties *external* to the corporation" as they are not brought by shareholders, officers or directors, nor are they brought derivatively on behalf of the corporation. Therefore, the "internal affairs doctrine" is inapplicable here.

New York law employs an "interest analysis" in tort actions that applies the law of the jurisdiction with the greatest interest in the litigation. *See Arochem,* 968 F.2d at 270. Under this analysis, the court should focus almost exclusively on the parties' domiciles and the locus of the tort. *Id.* "As part of the interest analysis, the New York Court of Appeals has distinguished between rules regulating conduct and rules governing loss allocation. Generally, when the laws in conflict are conduct regulating, the law of the locus jurisdiction applies." *Id.* "A fraudulent conveyance statute is conduct regulating rather than loss allocating." *See GFL Advantage Fund, Ltd. v. Colkitt,* No. 03 Civ. 1256, 2003 WL. 21459716, at *3 (S.D.N.Y. June 24, 2003)

The only two states at issue here are New York and Delaware. None of the parties are domiciled in Delaware or New York, and the locus of the alleged tort is New York. In order to lay venue in the Southern District of New York, plaintiffs have alleged that "a substantial part of the events and actions of Defendants giving rise to the claims asserted [by plaintiffs] occurred within" New York (Compl.¶ 3). Additionally, the private placement under which Creditors purchased the Units giving rise to this litigation was supervised by a law firm located in New York (Def.Stmt., Ex. B). Creditors have not alleged any facts showing any actions related to this litigation that occurred in Delaware.

Further, New York recognizes the right of

contracting parties to agree to the choice of law. *See Turtur v. Rothschild Registry International, Inc.,* 26 F.3d 304, 310 (2d Cir.1994). The Subordinated Note issued to Creditors here contains a provision entitled "Governing Law," which states: "This Note shall be governed by and construed in accordance with the laws of the State of New York." (Def.Stmt., Ex. D, ¶ 7(B)). Further, the Subscription Agreements entered into by the parties include a forum selection clause which states:

*13 Notwithstanding the place where this Subscription Agreement may be executed by any of the parties hereto, the parties expressly agree that all the terms and provisions hereof shall be construed in accordance with and governed by the laws of the State of New York. The parties hereby agree that any dispute which may arise between them *arising out of or in connection with this Subscription Agreement* shall be adjudicated before a court located in New York City and *they hereby submit to the exclusive jurisdiction of the courts of the State of New York* located in New York, New York and of the federal courts in the Southern District of New York with respect to any action or legal proceeding commenced by any party

(*Id.* at Ex. C, ¶ 4.4) (emphasis added) In *Turtur,* the Court of Appeals affirmed summary judgment against securities brokers who brought an action for common law fraud after purchasing units in a limited partnership. 26 F.3d at 305. The subscription note by which the plaintiffs purchased the units contained a forum selection clause nearly identical to the clause here. *Id.* at 309. The Court held that the plaintiffs' fraud claim clearly arose out of or was related to their investment, which was governed by the subscription note containing the forum selection clause, and thus the forum selection clause applied to their fraud claim. *Id.* at 310. The Court concluded that under the forum selection clause New York law applied. *Id.* Likewise, under the forum selection clause in Creditors' Subscription Agreements, New York law is the applicable law here (Def.Stmt., Ex. C, ¶ 4.4).

Creditors, in keeping with their argument that Delaware law applies, have brought their fraud claims under Delaware law. (Compl. ¶¶ 64, 68; Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pl.Mem.") 46-47). Defendants have moved for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in F Supp 2d
2004 WL 875262 (S.D.N.Y.)
(Cite as: 2004 WL 875262 (S.D.N.Y.))

summary judgment on the ground, among others, that Creditors have invoked the wrong law, given that New York law actually applies (Def Mem 28) However, "the failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim Factual allegations alone are what matters " *Northrop v Hoffman of Simsbury, Inc*, 134 F 3d 41, 45-46 (2d Cir 1997) (internal quotation marks omitted); *see also Brandon v Holt*, 469 U.S 464, 471, 105 S Ct 873, 83 L Ed 2d 878 (1985) (holding that a court should decide the legal issues without requiring a formal amendment of the complaint where the allegations plainly identify a claim); Fed R Civ P 8 ("All pleadings shall be so construed as to do substantial justice ") Further, both parties have argued the merits of Creditors' fraud claims *arguendo* under New York law Therefore, these claims will be considered under New York law

### 2. Applying New York Law

New York law does not recognize "a creditor's remedy for money damages against parties who, like defendants here, were neither transferees of the assets nor beneficiaries of the conveyance " *FDIC v Porco*, 75 N Y 2d 840, 842, 552 N Y S 2d 910, 910, 552 N E 2d 158 (1990); *see also Gallant v Kanterman*, 198 A D 2d 76, 80, 603 N Y S.2d 315, 318 (1st Dep't 1993) (affirming dismissal of action for fraudulent conveyance where defendants were neither transferees or beneficiaries) This is because "[t]he creditor's remedy in a fraudulent conveyance action is limited to reaching the property which would have been available to satisfy the judgment had there been no conveyance " *Geren v Quantum Chemical Corp*, 832 F Supp 728, 736 (S D N Y 1993), *aff'd*, 99 F 3d 401 (2d Cir 1995). Therefore, there can be no action for damages against a party who did not receive any of the property sought by the creditors

interests in two companies that together owned 35% of the common stock of Crown Books, and that Cumello received a salary as President and Chief Executive Officer of Crown Books (*Id* at 53-54) However, receipt of a salary from the transferee corporation as an officer of the corporation is not sufficient to render the officer a transferee or beneficiary of the transfer *See TLC Merchant Bankers, Inc v Brauser*, No 01 Civ 3044, 2003 WL 1090280, at *7 (S.D N Y March 11, 2003) (holding that payment of a salary to an officer of a corporation receiving a transfer of assets did not render the officer a transferee or beneficiary of the transfer) Crown Books was entitled to pay Cumello a salary, and there is no evidence that his salary was in any way derived from the transferred property Indeed, the undisputed evidence is that the property transferred in the Loan, namely $1 5 million, was transferred to Paragon Further, Shenkman's ownership in two companies holding stock in Crown Books is too attenuated a relationship to render Shenkman a transferee or beneficiary of the Loan In *Brenner v Philips, Appel & Walden, Inc*, No 93 Civ 7838, 1997 WL 33471053 (S D N Y July 22, 1997), the Court found no evidence that defendants benefited from a transfer of $500,000 to a company in which one of the defendants owned 35% of the shares *Id* at *1, *5 There, the defendant had direct ownership of more than one-third of the transferee corporation's stock, and the Court nevertheless found no benefit to the defendant from the transfer *Id* Here, Shenkman has some unspecified ownership interest in two companies that together own 35% of the Crown Books' common stock, leaving Shenkman with no direct ownership interest in Crown Books and even further removed from the transfer property than the defendant was in *Brenner* Therefore, Creditors have failed to present any evidence demonstrating a benefit to defendants from the Loan, "an element essential to [their] case, and on which [they] will bear the burden of proof at trial " *See Celotex*, 477

Not Reported in F Supp 2d
2004 WL 875262 (S.D.N.Y )
(Cite as: 2004 WL 875262 (S.D.N.Y.))

Page 13

Creditors allege that they and CB.com "were parties to Subordinated Notes, which were binding and enforceable contracts at law " (Compl ¶ 72) According to Creditors, defendants caused CB com to breach these contracts by rendering CB com insolvent after transferring "all or substantially all of its assets to another entity " (Id at 74) Creditors have brought this claim mistakenly under Delaware law, just as they did their fraudulent conveyance claims For the same reasons discussed above, New York law controls this claim

*15 "Under New York law, the elements of a tortious interference claim are: (a) that a valid contract exists; (b) that a 'third party' had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff " *Albert v Loksen*, 239 F 3d 256, 274 (2d Cir 2001) A "third party" for the purposes of a tortious interference claim is someone who is not a party to the contract at issue *Finley v Giacobbe*, 79 F 3d 1285, 1295 (2d Cir 1996) For an agent of a party to the contract to qualify as a "third party," the plaintiff must demonstrate that the agent acted outside the scope of his authority, *id*, or "committed an independent tortious act against the plaintiff." *Albert*, 239 F 3d at 275 "A corporate officer or director generally cannot be liable for tortiously interfering with a contract between the corporation and a third party " *See Chardin v Turkie*, No 97 CIV 4643, 1998 WL 886986, at *1 (S D N Y Dec 18, 1998) (citing *Murtha v Yonkers Child Care Assn*, 45 N Y 2d 913, 915, 411 N Y S 2d 219, 220, 383 N E 2d 865 (1978)) "Where the corporate officer/director is acting within the scope of his or her authority, the officer/director is not a third party vis-a-vis the corporation and as such cannot interfere with its own contract " *Id*

The parties do not dispute that a valid contract exists between Creditors and CB com However, defendants do dispute the allegation that they are "third parties" given their positions as directors of CB com and CB.com's status as a party to the contract with Creditors Creditors argue, on the other hand, that defendants are "third parties" because they acted outside the scope of their authority when they made the Loan, "promoting their own self-interests adversely to the interests of

Crownbooks.com " (Pl Memo 58) Citing the same personal interests underlying their other claims--namely, Shenkman's attenuated ownership interest in Crown Books and Cumello's salaried position as an officer of Crown Books--Creditors once again argue that defendants sought "to keep Crown Books alive" for their own personal gain (Id at 59, 411 N Y S 2d 219, 383 N E 2d 865) But just as these interests were insufficient to support their other claims, so are they insufficient to support this claim As already discussed, these interests were consistent with the best interests of Crown Books, which defendants had a fiduciary duty to consider as directors of CB.com, a subsidiary wholly owned by Crown Books *See Anadarko*, 545 A 2d at 1174 Therefore, defendants acted well within the scope of their authority by trying "to keep Crown Books alive " Moreover, Creditors have not alleged any independent torts committed by defendants toward Creditors, and thus defendants cannot be deemed "third parties" for the purposes of Creditors' tortious interference claim

Creditors have failed to present any evidence establishing "an element essential to [their] case, and on which [they] will bear the burden of proof at trial " *See Celotex*, 477 U.S at 322 Accordingly, summary judgment is granted for defendants on Claim Seven for tortious interference with contractual relations

*  *  *

*16 Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law " Fed R Civ P 56 Therefore, for the reasons stated above, summary judgment is granted for defendants, and the complaint is dismissed
  SO ORDERED:

2004 WL 875262 (S D N Y )

  **Motions, Pleadings and Filings (Back to top)**

. 1:01CV07176 (Docket)
                              (Aug 02, 2001)

END OF DOCUMENT

© 2005 Thomson/West No Claim to Orig U S Govt Works

## CERTIFICATE OF SERVICE

I hereby certify that on March 9, 2005, I electronically filed the foregoing document with

the Clerk of Court using CM/ECF which will send notification of such filing(s) and Hand

Delivered to the following

Pauline K. Morgan, Esquire (No. 3650)
YOUNG CONAWAY STARGATT &
TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899

Kevin Gross, Esquire(No. 299)
Joseph A. Rosenthal (No. 234)
ROSENTHAL, MONHAIT, GROSS &
GODDESS, P.A.
1401 Mellon Bank Center
P.O. Box 1070
Wilmington, DE 19801

I hereby certify that on March 9, 2005, I have sent by Federal Express, the foregoing

document to the following non-registered participant

George J. Wade, Esquire
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022

C. Malcolm Cochran, IV (No. 2377)
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700
cochran@rlf.com