IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: Teleglobe Comm. *et al.*, | ) | Chapter 11 |
| | ) | Jointly Administered |
| Debtors. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | Bankr. Case No. 02-11518 (MFW) |
| | ) | |
| Teleglobe USA Inc. *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. Action No. 04-1266 (SLR) |
| | ) | |
| BCE Inc. *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO VARTEC
TELECOM, INC.'S AMENDED MOTION FOR PROTECTIVE ORDER REGARDING
DEFENDANTS' SECOND REQUEST FOR PRODUCTION OF DOCUMENTS**

Counsel to Defendants BCE Inc. et al.:

SHEARMAN & STERLING LLP

Stuart J. Baskin
George J. Wade
Daniel Schimmel
599 Lexington Avenue
New York, NY 10022
(212) 848-4000

YOUNG CONAWAY
STARGATT & TAYLOR, LLP

Pauline K. Morgan (No. 3650)
John W. Shaw (No. 3362)
Maribeth L. Minella (No. 4185)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899
(302) 571-6600

May 24, 2005
Wilmington, Delaware

## Table of Contents

Pages

TABLE OF AUTHORITIES ...................................................................................................ii

STATEMENT OF NATURE AND STAGE OF THE PROCEEDING............................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................................2

STATEMENT OF FACTS .....................................................................................................4

ARGUMENT......................................................................................................................6

    I.     THE INFORMATION SOUGHT IN DEFENDANTS' REQUEST IS
          RELEVANT AND DISCOVERABLE IN THIS ACTION ......................................6

    II.    VARTEC HAS FAILED TO ESTABLISH THE REQUISITE
          GOOD CAUSE TO WARRANT A PROTECTIVE ORDER ..................................6

          A.    VarTec's Concern Regarding the Disclosure of Confidential and
                Proprietary Information Is Without any Basis ...............................................7

          B.    VarTec's Has Failed to Demonstrate the Existence of an
                Informational Disadvantage........................................................................8

CONCLUSION ...................................................................................................................9

## TABLE OF AUTHORITIES

### CASES

<u>Pages(s)</u>

<u>Cipollene v. Liggett Group, Inc.,</u> 785 F.2d 1108 (3d Cir. 1986) .................................................6, 7

<u>Corning Inc. v. SRU Biosystems, LLC,</u> 223 F.R.D. 191 (D. Del. 2004) .......................................6

<u>Hay Group, Inc. v. E.B.S. Acquisition Corp.,</u> 360 F.3d 404 (3d. Cir. 2004)..................................8

<u>Hickman v. Taylor,</u> 329 U.S. 495 (1947) ......................................................................................6

<u>Pacitti v. Macy's,</u> 193 F.3d 766 (3d Cir. 1999) ............................................................................6

<u>United States v. Dentsply Int'l, Inc.,</u> 2000 WL 654286 (D. Del. May 10, 2000)...........................6

<u>United States v. Garrett,</u> 571 F.2d 1323 (5th Cir. 1978)...............................................................6, 7

<u>United States v. Panhandle E. Corp.,</u> 118 F.R.D. 346 (D. Del. 1988)............................................8

### STATUTES

Fed. R. Civ. P. 26(c) ....................................................................................................................6

## STATEMENT OF NATURE AND STAGE OF THE PROCEEDING

1. On May 26, 2004, Plaintiffs commenced this action against BCE Inc. ("BCE"), the above-captioned Debtors' parent company, and ten individual defendants: Michael T. Boychuk, Marc A. Bouchard, Serge Fortin, Terence J. Jarman, Stuart Verge, Jean C. Monty, Richard J. Currie, Thomas Kierans, Stephen Skinner, and H. Arnold Steinberg.

2. Plaintiffs allege that BCE was contractually obligated to fund U.S. $2.5 billion into Teleglobe Inc. or its subsidiaries in addition to a U.S. $1 billion commitment duly expressed in writings, and that BCE failed to honor that supposed additional funding obligation. Plaintiffs have also asserted claims of estoppel and misrepresentation against BCE arising from its alleged legal obligation to fund Teleglobe Inc. and the Debtors. Plaintiffs also allege that BCE owed fiduciary duties to the Plaintiffs as a result of the "control" it supposedly exercised over Teleglobe Inc. and the Debtors, and that BCE breached those duties. Plaintiffs' claims against the individual defendants (former directors or officers of Teleglobe Inc. or the Debtors) allege that they owed fiduciary duties to the Debtors and breached those obligations.

3. On September 15, 2004, the Defendants moved to dismiss Plaintiffs' Complaint. By Order dated March 23, 2005 this Court denied Defendants' motion to dismiss. Discovery in this action is ongoing, and fact discovery is scheduled to be completed by September 30, 2005.

4. On December 22, 2004, Defendants served upon the Debtors a Second Request for Production of Documents (the "Request") seeking certain specific documents from the arbitration entitled *Teleglobe Telecom Corp., et at. v. VarTec Telecom, Inc.*, et al., No. 50 T 153 00025 04. The Request calls for documents actually submitted to the arbitrators in that

1

arbitration, transcripts of depositions and hearings, and arbitral awards. The issues in that arbitration bear on the claims against BCE and the individual Defendants in this action.

      5. On January 24, 2005, the Debtors objected to Defendants' Request and indicated that they would not produce any documents because VarTec had indicated its intention to move for a protective order. In a letter dated April 24, 2005, BCE pointed out that VarTec had still not moved for a protective order and reiterated its request that Teleglobe produce the documents called for by the Request. The Debtors did not respond to BCE's letter, and BCE raised the issue with the Court at the April 25, 2005 hearing. The Court directed the Debtors to produce documents responsive to the Defendants' Request by May 9, 2005, if VarTec did not move for a protective order by this date. On May 9, 2005, VarTec filed a Motion for Protective Order Regarding Defendants' Second Request for Production of Documents with Request for Oral Argument, and subsequently filed an Amended Motion for Protective Order Regarding Defendants' Second Request for Production of Documents with Request for Oral Argument Thereon on May 10, 2005 (the "Motion").

## INTRODUCTION AND SUMMARY OF ARGUMENT

      VarTec Telecom Inc. ("VarTec") improperly seeks to prevent BCE and the individual Defendants from gaining access to documents that are not only discoverable in this action, but to which the Plaintiffs already have access.

      Defendants served their Request to obtain documents relevant to the claims and defenses in this action, not to gain an advantage over VarTec in another lawsuit. In its motion for a protective order, VarTec erroneously alleged that Defendants seek "all of VarTec's documents" produced in the arbitration. (Motion at 7.) That is incorrect, and further, producing

those documents will not impose a burden on VarTec because the Request calls for the production of documents from the files of the Debtors, not VarTec.

Second, in the Motion, VarTec stated that some of the documents produced in the arbitration were subject to a common-interest privilege between VarTec and Teleglobe Inc. (or its affiliates), and that those documents should not be produced to BCE. (Motion at 5-6.) The categories of documents called for by the Request are not likely to be privileged, and to the extent some of those documents are indeed privileged, the Debtors can submit a privilege log. In addition, to the extent VarTec is concerned that the Debtors might not adequately review the documents prior to their production to the Defendants (Motion at 14), VarTec may participate in that review or submit a privilege log on behalf of the Debtors.

Third, equally without merit is VarTec's claim that some of its documents contain confidential business information and that VarTec would be harmed by the disclosure of such information to third parties, including BCE. (Motion at 6, 13.) Whatever concerns VarTec may have on this point are addressed by the fact that a Confidentiality Stipulation and Protective Order is in place in this action, which will protect the confidentiality of those documents and impose strict restrictions on their use. In any event, VarTec is now a bankrupt entity, BCE is not its competitor, and the information contained in those documents (which were apparently created at the latest in 2003), is likely stale.

VarTec has not only failed to establish "good cause" for the issuance of a protective order, but waited four months to file its motion for a protective order. The documents called for by the Request bear upon the allegations made in this action, and the Defendants will suffer continued prejudice if access to those documents is denied.

## STATEMENT OF FACTS

The plaintiffs in this action are the former indirect U.S. subsidiaries of Teleglobe Inc. (the "Debtors") and a committee of unsecured creditors of the Debtors. Presumably to support their contention that BCE "controlled" the Debtors, the Complaint in this action contains allegations regarding BCE's involvement in the negotiation of the sale of Excel to VarTec pursuant to the Stock Purchase Agreement and the consideration that Teleglobe and the Debtors obtained in connection with that transaction. (Compl. ¶ 73.) The Stock Purchase Agreement was entered into by Plaintiffs and Teleglobe Inc. and certain of its affiliates (collectively, "Teleglobe") and VarTec Telecom Inc. and VarTec Telecom Holding Co.

On December 22, 2004, BCE served a document request on the Debtors – not VarTec – seeking particularized categories of documents regarding the sale of Excel:

> documents concerning the arbitration proceeding before the American Arbitration Association, entitled In the Matter of the Arbitration Between Teleglobe Telecom Corporation and Teleglobe Inc. and VarTec Telecom, Inc. and VarTec Telecom Holding Company, 50 T 153 00025 04: (a) all arbitration awards and orders issued by the arbitral tribunal, (b) the transcripts from all the arbitration hearings, (c) the transcripts of all depositions of witnesses conducted in connection with the arbitration proceeding, (d) all exhibits introduced or marked at such depositions or at the arbitration hearings; and (e) the pleadings, briefs, memorials, letters, or other documents submitted to the arbitration tribunal by the parties to the arbitration proceeding.

(Shaw Decl., Ex. 1, Defendants' Second Request for Production of Documents Directed to the Debtors, Request No. 1.)

The Defendants requested those documents to obtain, on a timely basis, documents already available to the Debtors relating to the claims and defenses asserted in this action. Furthermore, the Defendants did not seek "over a million pages of documents" (Motion at 7), but narrow categories of documents filed with the arbitration tribunal, transcripts, and arbitral awards.

4

The documents called for by the Request are discoverable in this action. It is BCE's understanding that, in the arbitration between VarTec and Teleglobe, Teleglobe asserted claims of breach of contract against VarTec, arising from VarTec's failure to pay the consideration it owed under the Stock Purchase Agreement. VarTec apparently raised arguments relating, inter alia, to the assumption or rejection of the Stock Purchase Agreement by Teleglobe in its Chapter 11 case. (Shaw Decl., Ex. 2, Motion to Stay Arbitration, ¶¶ 15, 58.) Those matters are relevant to the consideration that Teleglobe received in the transaction, which is an issue raised by the plaintiffs in this action. (Compl. ¶ 73.) In addition, documents relating to the sale transaction are also likely to bear on the Debtors' allegation that BCE "controlled" the Debtors in connection with that sale. Indeed, on April 8, 2004, VarTec filed a motion to compel in the arbitration, in which VarTec sought an order directing Teleglobe to produce "documents relating to the negotiation of the SPA, any drafts of the agreement, or other related documents." VarTec also sought e-mails of current and former employees of Teleglobe who were involved in the negotiation of the Stock Purchase Agreement. (Shaw Decl., Ex. 3, VarTec's Motion to Compel at 1, 3-4.) Those matters are directly at issue in the Complaint filed in this action.

On January 24, 2005, the Debtors objected to the Request "on the grounds that most, if not all, of the responsive documents are (a) subject to a Confidentiality Agreement between [VarTec] and the Debtors, and VarTec has refused to waive confidentiality by letter dated January 18, 2005 and (b) attorney client privilege and/or attorney work product." (Shaw Decl., Exh. 4, Debtors' Response to Defendants' Second Document Request at 5.) In their objection, the Debtors stated that "we understand VarTec to be in the process of moving for a protective order." (Id.)

5

In a letter dated April 24, 2005, BCE pointed out that VarTec had still not moved for a protective order and reiterated its request that Teleglobe produce the documents called for by the Request. (Shaw Decl., Ex. 5.) At the April 25, 2005 hearing, the Court directed the Debtors to produce documents responsive to the Defendants' Request by May 9, 2005, if VarTec did not move for a protective order by this date. VarTec filed its motion for a protective order on May 9, 2005 and subsequently filed an amended motion on May 10, 2005. (Shaw Decl., Ex. 6.)

## ARGUMENT

### I.    THE INFORMATION SOUGHT IN DEFENDANTS' REQUEST IS RELEVANT AND DISCOVERABLE IN THIS ACTION

The documents called for by the Defendants' Request fit squarely within the definition of discoverable information. See Corning Inc. v. SRU Biosystems, LLC, 223 F.R.D. 191, 193 (D. Del. 2004); Hickman v. Taylor, 329 U.S. 495, 507 (1947). Pacitti v. Macy's, 193 F.3d 766, 777 (3d Cir. 1999) (citing F.R.C.P. 26(b)(1)); United States v. Dentsply Int'l, Inc., No. Civ. A. 99-5, 2000 WL 654286, at *4 (D. Del. May 10, 2000).[1]

### II.    VARTEC HAS FAILED TO ESTABLISH THE REQUISITE GOOD CAUSE TO WARRANT A PROTECTIVE ORDER

VarTec cannot establish "good cause" for the issuance of a protective order. See Fed. R. Civ. P. 26(c); Cipollene v. Liggett Group, Inc., 785 F.2d 1108, 1121 (3d Cir. 1986) (party seeking protective order bears the burden of demonstrating the "good cause" required to support such an order). To establish such "good cause," VarTec must show a "particular need" for protection. Id. "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule...." Id. (citing United States v. Garrett, 571 F.2d

---

[1]      A copy of this case is attached hereto as Exhibit 1.

1323, 1326 n.3 (5th Cir. 1978). Not only must VarTec provide a "concrete example of the type

of harm [it] would suffer," such claimed harm "must be significant, not a mere trifle." Id.

### A.    VarTec's Concern Regarding the Disclosure of Confidential and Proprietary Information Is Without any Basis

VarTec's claim that it will be harmed from the disclosure of confidential and

proprietary business information to competitors is also without basis. First, the Debtors may

designate as confidential the documents produced to Defendants in response to the Request.

Once the materials are so designated, the Confidentiality Stipulation and Protective Order

provides that they may be used only in this action and specific proceedings pending in Canada.

(See Shaw Decl., Ex. 7, Stipulation and Protective Order at 3, ¶ 1.) The Confidentiality

Stipulation and Protective Order provides that such materials "shall not be used or disclosed ...

for any other purpose, including, but not limited to, any business or commercial purpose." (Id.)

Second, BCE is not a competitor of VarTec, and those two companies service

different markets: VarTec primarily provides retail services to residential and small business

customers in the United States, while the customers of BCE's subsidiaries are almost all located

in Canada, and the operations of those subsidiaries in the United States are limited to the

provision of wholesale services to carriers, not retail services. (See Anderson Decl. ¶¶ 3,5,

Ex. A, VarTec First Amended Compl. ¶ 16.)[2] Thus, given the very different markets serviced by

VarTec and BCE, there is simply no basis upon which BCE could be considered a competitor of

VarTec.

VarTec has also failed to provide any "specific examples of the harm that will be

suffered because of the disclosure of the information," choosing to rely instead on "broad-

---

[2]    BCE is a holding company that does not have customers. The only operating subsidiary of BCE which provides telecommunications services in the United States is a company called BCE Nexxia Corporation, which has no employees in the United States and does not compete with VarTec. (See Anderson Decl. ¶¶ 4, 5.)

sweeping allegations" that disclosure is likely to harm it in the telecom industry. See United States v. Panhandle E. Corp., 118 F.R.D. 346, 349 (D. Del. 1988). Such vague, unsubstantiated allegations of harm are insufficient for the issuance of a protective order. Id.

**B.    VarTec Has Failed to Demonstrate the Existence of an Informational Disadvantage**

VarTec makes the unsupported conclusion that BCE will "gain a significant informational advantage over VarTec in the stayed case. " (Motion at 12.) BCE served the Request to defend the claims in this action, not to gain an informational advantage in another action that is subject to the discovery stay of the Private Securities Litigation Reform Act. Supra at 5-6. In addition, because fact discovery in this action is scheduled to be completed by September 30, 2005, the Court should not accept VarTec's suggestion to await a ruling on VarTec's motion to lift the mandatory stay before allowing the Debtors to produce to the Defendants documents responsive to the Request. (Motion at 14-15.)[3]

---

[3]    VarTec states that, in the arbitration, BCE did not produce documents in response to a subpoena for pre-hearing discovery. (Motion at 12 n.12.) The Third Circuit has held, however, that the unambiguous language of the Federal Arbitration Act prohibits pre-hearing discovery subpoenas of nonparties. Hay Group, Inc. v. E.B.S. Acquisition Corp., 360 F.3d 404 (3d. Cir. 2004). Furthermore, whether BCE responded to a subpoena issued in an arbitration proceeding has no bearing on whether Teleglobe should produce documents in response to the Defendants' Request in this action.

## CONCLUSION

For all of the foregoing reasons, Defendants respectfully ask that this Court deny

VarTec's Amended Motion for Protective Order and direct the Debtors to produce all documents

responsive to Defendants' Second Request for Production of Documents.


Dated: May 24, 2005
      Wilmington, Delaware

                  YOUNG CONAWAY STARGATT & TAYLOR, LLP

                  _____
                  John W. Shaw (No. 3362)
                  Pauline K. Morgan (No. 3650)
                  Maribeth L. Minella (No. 4185)
                  The Brandywine Building
                  1000 West Street, 17th Floor
                  P.O. Box 391
                  Wilmington, DE 19899
                  (302) 571-6600

                          -and-

                  SHEARMAN & STERLING LLP
                  Stuart J. Baskin
                  George J. Wade
                  Daniel Schimmel
                  599 Lexington Avenue
                  New York, NY 10022
                  (212) 848-4000

                  Attorneys for Defendants

9

# EXHIBIT 1



Not Reported in F.Supp.2d                                    Page 1

2000 WL 654286 (D.Del.), 2000-1 Trade Cases P 72,919

**(Cite as: 2000 WL 654286 (D.Del.))**

▷

**Motions, Pleadings and Filings**

United States District Court, D. Delaware.
UNITED STATES OF AMERICA, Plaintiff,
v.
**DENTSPLY INTERNATIONAL, INC., Defendant.**
**No. Civ.A. 99-5 MMS.**

May 10, 2000.

Carl Schnee, United States Attorney, and Judith M.
Kinney, Assistant United States Attorney, United
States Department of Justice, Wilmington,
Delaware, Mark J. Botti, William E. Berlin, Jon B.
Jacobs, Sanford M. Adler, Frederick S. Young,
Dionne C. Lomax, and Eliza T. Platts-Mills, United
States Department of Justice, Antitrust Division,
Washington, D.C., for plaintiff, of counsel.

James P. Hughes, Jr., and John W. Shaw, of
Young, Conaway, Stargatt & Taylor, Wilmington,
Delaware, Margaret M. Zwisler, Richard A. Ripley,
Kelly A. Clement, and Eric J. McCarthy, of Howrey
& Simon, Washington, D.C., for defendant
Dentsply International, Inc. , of counsel.

*MEMORANDUM OPINION ON PLAINTIFF'S
MOTION TO COMPEL*

SCHWARTZ, Senior J.

I. Introduction
**\*1** On January 5, 1999, the United States
Department of Justice ("United States" or
"government") filed a complaint against Dentsply
International, Inc. ("Dentsply"), seeking equitable
and other relief for Dentsply's alleged violations of §
§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2,
and § 3 of the Clayton Act, 15 U.S.C. § 14, *inter
alia*, through exclusive dealing arrangements that
effectively deny effective distribution outlets to
competing manufacturers of prefabricated artificial
teeth. Docket Item (D.I.) 1. Pursuant to
Fed.R.Civ.P. 37(a) and D. Del. L.R. 7.1.1, the
United States filed a motion to compel Dentsply to
produce requested information related to its
competitive position in foreign markets. D.I. 176
("Motion to Compel"). The United States contends
this information is directly relevant to the action
and, therefore, is discoverable under Fed.R.Civ.P.
26(b)(1). Dentsply counters that its foreign market
position is not relevant to the claims and defenses in
this case and that the burden and expense of the
foreign market discovery will outweigh its likely
benefit. Although the Court has some concern about
the ultimate admissibility and weight of the
information the United States seeks to discover, the
information has the potential to be relevant to the
intent of the exclusive dealer criteria and its impact
in the United States market place. In light of the
liberal thrust of the discovery rules, limited foreign
discovery by the United States will be permitted.

II. Factual and Procedural Background
The United States' complaint alleges Dentsply has
engaged, and continues to engage, in various
actions to unlawfully maintain monopoly power in
the market for prefabricated artificial teeth. The
government alleges Dentsply denies competing
manufacturers of artificial teeth access to
independent distributors (known in the industry as
"dealers") of artificial teeth in the United States, in
violation of §§ 1 and 2 of the Sherman Act and § 3
of the Clayton Act. The government alleges the
dealers are an essential link in the existing
distribution network if manufacturers of artificial
teeth are to effectively distribute their products in
the United States. It further complains that Dentsply
has entered into restrictive agreements and taken
other actions to induce and compel dealers not to
carry certain competing lines of artificial teeth. As a
result of Dentsply's actions, particularly "Dealer
Criterion Number 6," [FN1] the United States
contends rival manufacturers of artificial teeth have

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2000 WL 654286 (D.Del.), 2000-1 Trade Cases P 72,919

**(Cite as: 2000 WL 654286 (D.Del.))**

been foreclosed from selling their teeth through the large majority of outlets that carry artificial teeth. [FN2] The United States asserts this reduces competition among artificial teeth manufacturers and results in higher prices, fewer choices, less market information, and lower quality artificial teeth. In its complaint, the United States alleges that both domestic and foreign artificial tooth manufacturers compete with Dentsply more successfully outside the United States, D.I. 1, ¶¶ 11-13, where, the United States contends, their access to dealers is not restricted by Dentsply.

> FN1. "Dealer Criterion Number 6" is Dentsply's requirement that dealers carrying its artificial teeth "may not add further tooth lines to their product offering." D.I. 1, ¶ 22.

> FN2. The United States' complaint states that almost all artificial teeth sold in this country are used by dental laboratories to make dentures. Although some manufacturers of artificial teeth sell their product directly to dental laboratories, dealers (also referred to in the complaint as "dental laboratory dealers," "independent dealers," and "independent distributors") are the primary channel through which dental laboratories purchase artificial teeth.

**\*2** The United States has sought to obtain information and documents that Dentsply possesses regarding its competitive position and business strategy in foreign markets in a variety of ways at several different times. Dentsply has objected to production of such information, but has produced limited documents and permitted questioning of some of its officers and employees on these issues at their depositions.

First, on March 2, 1999, the United States served on Dentsply its First Request for Production of Documents ("First Document Request"), which included document requests 22 and 23 pertaining to Dentsply's competitive position in foreign markets. [FN3] D.I. 178 at A-16. In Dentsply's April 1, 1999 Objections and Responses to Plaintiff's First

Document Request, Dentsply asserted a general objection to the United States' document request definition of "Dentsply" as including all domestic and foreign subsidiaries and affiliates. The ground of the objection was that such entities had no relation to the litigation. *Id.* at A-23. Dentsply also objected to Requests No. 22 and 23 on the grounds that the United States should have requested documents pursuant to the discovery procedures of the forum countries where the documents were located. However, Dentsply further stated that, subject to its general objections, it would "produce responsive documents maintained in the United States located after a reasonable search." [FN4] *Id.* at A-40-41. Subsequently, by letter dated April 27, 1999, Dentsply informed the United States it would not produce any documents responsive to Request Nos. 22 or 23, whether maintained inside or outside the United States on the ground that Dentsply's foreign activities were not relevant to this action and the requested discovery would therefore be unduly burdensome. D.I. 190, Exhibit (Ex.) A.

> FN3. The pertinent requests sought:
> 22. All documents that report, describe, summarize, analyze, discuss or comment on competition from, or the marketing or sales strategies, marked shares o[r] projected market shares, market conditions or the profitability of, any company, including your company, in the supply, manufacture, distribution or sale of prefabricated artificial teeth or dentures in any country other than the United States, including all strategic plans, long-range plans and business plans of any such company.
> 23. All documents that report, describe, summarize, analyze, discuss or comment on the following for any country outside of the United States:
> a. the methods, channels, strategies, means, or policies of distributing prefabricated artificial teeth;
> b. the selection, retention, monitoring, supervision or termination of dealers or dental laboratories generally or any specific dealer or dental laboratory;

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2000 WL 654286 (D.Del.), 2000-1 Trade Cases P 72,919

(Cite as: 2000 WL 654286 (D.Del.))

Page 3

c. exclusive arrangements with dealers, dental laboratories, or dentists; or
d. the utility, advantages, or disadvantages of distributing teeth through dealers, including the various services dealers provide to dental laboratories or their suppliers of dental products, including your company.
D.I. 178 at A-16.

FN4. The Court disagrees with the United States' assertion that Dentsply waived its relevance objections to interrogatories 22 and 23 in its April 1, 1999 response. Dentsply's general objection to providing any information regarding Dentsply's foreign affiliates or subsidiaries, incorporated by reference in the specific objections to interrogatories 22 and 23, was a sufficient assertion of a relevance objection. See id. at A-23, 40-41.

After various attempts by the parties to resolve the dispute, the United States, by letter dated May 3, 1999, informed Dentsply that it would ask the Court to compel production of documents responsive to Requests No. 22 and 23 regarding international matters, as well as to certain other requests, if the parties were unable to reach an agreement. D.I. 178, at A-52-53. Dentsply responded that it "maintain[ed] its objections" to the international discovery. D.I. 190, Ex. C. During a meet and confer between the parties on May 20, 1999, Dentsply agreed "that if [its] search of Dentsply's active files located documents from the international divisions that were responsive to an outstanding request," Dentsply would produce those documents. Id., Ex. D. "Dentsply's active files" encompassed "files from Dentsply's corporate offices, excluding the warehouse archives, that [Dentsply had] reason to believe might contain documents responsive to document requests to the extent they pertain to Dentsply's domestic artificial tooth business operations." Id., Ex. E. The United States agreed to review those documents to see whether they contained the information the United States was seeking before deciding whether it was necessary to compel production of additional

documents. See D.I. 178, at A-54-56.

*3 Contemporaneous with the parties' dispute over documents, on April 16, 1999, the United States served its First Set of Interrogatories on Dentsply, which included one interrogatory seeking Dentsply's annual unit and dollar sales of artificial teeth in countries other than the United States. [FN5] Id. at A-65. On May 17, 1999, Dentsply refused to answer this interrogatory on the ground that such information is beyond the scope of the subject matter of this antitrust litigation, and would impose an undue burden and expense on Dentsply. Id. at A-73.

FN5. The relevant interrogatory requested:
2. State your company's annual unit and dollar sales, separately for each type or line of prefabricated artificial teeth your company sold or manufactured in any country other than the United States, separately for each country, and separately for 1985 and each subsequent year. Id. at A-65.

During the depositions of at least six Dentsply employees, taken by the United States over a period from August 19, 1999 to November 5, 1999, the United States asked questions regarding Dentsply's market shares and means of distribution in other countries, as well as other international issues. Dentsply did not object to the relevance of any question on international facts at any of these depositions, and its employees and officers provided answers to those questions. [FN6] Subsequently, Dentsply asserted its relevancy objection to international discovery during the deposition of Chris Clark, former Vice President and General Manager of Dentsply's Trubyte division, on December 15, 1999. When the topic of Dentsply's international operations was broached, counsel for Dentsply indicated Mr. Clark would not be permitted to answer any questions regarding international issues.

FN6. The United States argues that Dentsply did not make a relevancy objection to any of the above-cited

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 4

2000 WL 654286 (D.Del.), 2000-1 Trade Cases P 72,919

**(Cite as: 2000 WL 654286 (D.Del.))**

deposition testimony and that the United States is entitled to discovery requesting information regarding these issues "to clarify, confirm, or supplement the selected information Dentsply has produced." D.I. 177, at 11. This argument is not persuasive, because relevancy objections need not be raised at depositions. *See* Fed.R.Civ.P. 32(d)(3)(A).

Pursuant to Fed.R.Civ.P. 30(b)(6), on December 7, 1999, the United States noticed a deposition requesting Dentsply to produce a witness to testify on Dentsply's competitive position in Canada, Australia, and several European countries. D.I. 161. Dentsply informed the United States on December 17, 1999, that it would not produce any witness to testify about international facts based on its standing objection to international discovery. During the parties' meet and confer, the United States offered to narrow the information sought. Dentsply maintained its relevancy objection. The United States' Motion to Compel international discovery followed.

### III. Discussion

The United States requests the Court to enter an order compelling Dentsply to produce the following information relating to its competitive position in the prefabricated artificial teeth market in Canada, Australia, England, France, and Germany:

(1) [Dentsply's] market share in each of its two most recent, complete fiscal years, along with any estimates of the market shares of its competitors;

(2) annual strategic or business plans of each of its two most recent, complete fiscal years;

(3) a statement of whether it has a policy that is the same as, or similar to, its Dealer Criteria # 6 in the United States, which provides that its dealers "may not add further tooth lines to their product offering," and, if not, a full and complete description of why it does not have such a policy; and

(4) any documents created since January 1, 1990 discussing any plan or proposal to adopt a policy that is the same as, or similar to, its Dealer Criteria # 6 in the United States.

*4 D.I. 176 (attached proposed Order). Each of

the above items is encompassed by one of the discovery requests already served by the United States. [FN7] Aside from the documents requested in item number 4, the United States will accept production of the requested information in the form most convenient to Dentsply, be it as an interrogatory answer, responsive documents, or the deposition testimony of a person who can provide the information requested. *Id.*

> FN7. The foreign discovery requested in the Motion to Compel is more limited than the original discovery requests.

### A. Legal Standard

Pursuant to Rule 26(b)(1) of the Federal Rules of Civil Procedure, parties may obtain discovery of "any matter, not privileged, which is relevant to the subject matter involved in the pending action." Fed.R.Civ.P. 26(b)(1). Discoverable material is not limited to that which would be admissible at trial, but also includes any non-privileged information that "appears reasonably calculated to lead to the discovery of admissible evidence." *Id.* Relevance is a fact-specific inquiry and, therefore, the determination of relevance lies within the trial court's broad discretion. *See, e.g., Watson v. Lowcountry Red Cross,* 974 F.2d 482, 489 (4th Cir.1992); 6 James Wm. Moore et al., Moore's Federal Practice § 26.41[2] (3d ed. 1999) ("Moore's"). Relevance has been construed liberally under Rule 26(b)(1), to "encompass any matter that bears on, or that reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351 (1978); *see also In re ML-Lee Acquisition Fund II,* 151 F.R.D. 37, 39 (D.Del.1993) ("[D]iscovery should ordinarily be allowed under the concept of relevancy unless it is clear that the information sought can have no possible bearing upon the subject matter of the action." (quotation omitted)); *Pennwalt Corp v. Plough, Inc.,* 85 F.R.D. 257, 259 (D.Del.1979); Moore's § 26.41[2], at 26-89. Liberal discovery is particularly appropriate in a government antitrust suit because of the important public interest involved. *See* Moore's § 26.46[1]; *see also id.* §

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 5

2000 WL 654286 (D.Del.), 2000-1 Trade Cases P 72,919

(Cite as: 2000 WL 654286 (D.Del.))

26.41[1] ("[I]n antitrust and other complex litigation, discovery is expected to be somewhat of a 'fishing expedition.' ' (citation omitted)).

Although courts should liberally construe relevancy in the discovery context, discovery is not without bounds. The Federal Rules of Civil Procedure allow a court to limit discovery that would otherwise be permissible under Rule 26(b)(1) on a showing that the burden or expense associated with producing the information outweighs the likely benefit to the requesting party in obtaining the discovery. *See* Fed.R.Civ.P. 26(b)(2)(iii). [FN8] This provision was added to Rule 26(b) to "guard against redundant or disproportionate discovery." *Id.* (Advisory Committee Notes to the 1983 Amendment). Rule 26 vests the district courts with broad discretion to tailor discovery. *See Crawford--El v. Britton,* 523 U.S. 574, 118 S.Ct. 1584, 1597 (1998).

> FN8. Fed.R.Civ.P. 26(b) states in relevant part:
> (2) Limitations.... The frequency or extent of use of the discovery methods otherwise permitted under these rules and by any local rules shall be limited by the court if it determines that:
> ...
> (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.

B. Relevance of Discovery Sought by the United States

*5 The United States asserts the information it seeks to compel is relevant to a comparison between Dentsply's market share in the United States and in five other countries that have "mature markets" like the United States and where it believes Dentsply does not restrict its dealers from carrying or adding competing tooth lines. The

United States has obtained through third party discovery information supporting its belief that Dentsply does not use any restrictive dealer criteria akin to Dealer Criteria No. 6 in other countries, D.I. 178, at 82-83, 84-87, 88-89, 96, and that Dentsply's market share in these countries is lower, sometimes substantially lower, than its market share in the United States. *Id.* at 90-92, 93-96. D.I. 205, at 4. In its discovery requests for foreign market information, the United States seeks confirmatory and supplemental information on these issues. The government maintains the information it seeks is relevant because it is probative of the intent and competitive effects of Dentsply's Dealer Criteria No. 6 in the United States.

Dentsply counters the foreign market data is irrelevant in this litigation where the relevant market has been defined as the United States. Dentsply argues that the facts relevant to the United States' claim that Dentsply has violated antitrust laws by imposing a condition on its United States dealers that has foreclosed competitors from entering the artificial tooth market in the United States, are whether and to what extent competitive artificial teeth entered the United States market and what effect, if any, Dentsply's United States distribution policy has had on the ability of competitive artificial teeth to enter the United States market. Dentsply contends that the success of competitors in foreign markets, even if true, is simply not a fact of consequence in determining whether there is a causal relationship between Dentsply's distribution policy and competitors' performance in the United States. D.I. 190, at 8. [FN9] Given the Court's duty to construe relevancy broadly at the discovery stage, *see, e.g., Oppenheimer Fund, Inc.,* 437 U.S. at 351; *In re ML-Lee Acquisition Fund II,* 151 F.R.D. at 39; *Pennwalt Corp,* 85 F.R.D. at 259, it disagrees.

> FN9. In support of its argument, Dentsply cites Fed R. Evid. 402 (presumably Dentsply intended to cite Fed.R.Evid. 401) for the definition of relevance. D.I. 190, at 8. However, as discussed *supra,* section III. A., relevance is construed more broadly at the discovery stage than at trial.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 6

2000 WL 654286 (D.Del.), 2000-1 Trade Cases P 72,919

**(Cite as: 2000 WL 654286 (D.Del.))**

The fact that the United States is the relevant market in this case does not necessarily limit discovery to the United States. *See generally Kellam Energy, Inc. v. Duncan,* 616 F.Supp. 215, 219 (D.Del.1985) (antitrust case stating that "regardless of how [the] geographic market is eventually defined in this action, the boundaries of that market do not set the geographic limit of discovery"). A "general policy of allowing liberal discovery in antitrust cases" has been observed by this Court because "broad discovery may be needed to uncover evidence of invidious design, pattern, or intent." *Id.* at 217 (citations omitted).

Dentsply's intent in adopting Dealer Criteria No. 6 is relevant to assessing the legality of Dentsply's conduct under sections 1 and 2 of the Sherman Act. *See, e.g., Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 602 (1985) (section 2); *Orson, Inc. v. Mirimax Film Corp.,* 79 F.3d 1358, 1367 (3d Cir.1996) (section 1). In this case, a comparison between Dentsply's distribution policies in this country and in other markets could be probative of the purpose and significance of Dealer Criteria No. 6 in the United States. *Cf. Aspen Skiing Co.,* 472 U.S. at 603-04 & n. 30 (Without engaging in an exhaustive comparative analysis, the Court looked to other geographic markets and defendant's conduct in other markets in determining whether the defendant's conduct was "a decision of a monopolist to make an important change in the character of the market."). Moreover any discussions surrounding consideration by Dentsply of whether to employ distribution criteria similar to Criteria No. 6 in other countries clearly could be probative of the intent of Criteria No. 6 in the United States. Therefore, the Court concludes that items two through four of the United States' proposed Order accompanying its Motion to Compel may produce information relevant to the issue of Dentsply's purpose in adopting Dealer Criteria No. 6.

*6 The United States in this case desires that the Court assess the competitive effects of Dealer Criteria No. 6 by comparing the market shares of Dentsply and its primary competitors in countries where the allegedly restrictive Dealer Criteria No. 6 is not imposed with market shares in the United

States where Dentsply employs that dealer criteria. The United States seeks to use the foreign market share comparisons to show the competitive effects of Criteria No. 6 in part because it has been unable to parse the effects of that dealer criteria geographically within the United States or time-wise . [FN10] D.I. 205, at 15. The parties have not cited, and the Court has not found, any cases on point as to whether comparative foreign market data is relevant to prove the effects of an alleged anti-competitive company policy imposed in this country. However, use of comparative market data in an analogous context suggests that comparing Dentsply's market share in the United States to its market share in the named five countries may be relevant in assessing the competitive effects of Dentsply's allegedly restrictive dealer criteria. *Cf. Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 116 n. 11, 124-25 (1969) (district court calculated damages resulting from Zenith's exclusion from the Canadian television market by assuming that, absent the conspiracy, its market share in Canada would have been roughly equal to its market share in the United States during the same period). [FN11] Therefore, at this discovery stage, there is sufficient relevance of the comparative market data sought by the first item of the proposed order accompanying the Motion to Compel so as to preclude shielding it from discovery. [FN12]

> FN10. Dealer Criteria No. 6 appears to have been applied nation-wide and, although it was not memorialized in writing until 1993, the United States believes that it existed informally within the company since the 1980s. D.I. 205, at 15.

> FN11. The type of evidence relied upon included testimony that, had Zenith been free from the unlawful activity, it would have had the same proportion of the Canadian market as it did in the United States; that the principal competitors in Canada were counterparts of the principal competitors in the United States; that promotion and advertising flowed back

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 7

2000 WL 654286 (D.Del.), 2000-1 Trade Cases P 72,919

(Cite as: 2000 WL 654286 (D.Del.))

and forth between the two countries; and that distributors were available in Canada but were frightened off by the illegal activities and threats in Canada. *See Hazeltine Research, Inc. v. Zenith Radio Corp.*, 418 F.2d 21, 25-26 (7th Cir.1969). The United States seeks to present similar kinds of evidence in this case.

The Court disagrees with Dentsply's blanket assertion that *Zenith Radio Corp.* is entirely different from this case. Moreover, there are companion private treble damages actions accompanying the government complaint. Under *Zenith Radio Corp.*, the comparative market data may be discoverable at the damages phase of those actions.

> FN12. The Court cautions, although evidence on Dentsply's foreign market position and distribution policy in foreign markets is relevant for discovery purposes, the Court is not passing on the ultimate admissibility of such evidence for trial.

C. Whether the Burden and Expense of the Requested Discovery Will Outweigh its Likely Benefit

Dentsply asserts that, even assuming the requested foreign discovery is relevant, the burden and expense of granting the United States' request will outweigh the likely utility of the information and, therefore, the request should be denied. *See* Fed.R.Civ.P. 26(b)(2)(iii). Dentsply does not contend that the specific information and documents sought by the United States' motion to compel would be burdensome to produce. Rather, Dentsply asserts that if the Court permits the foreign discovery, it will be compelled to undertake burdensome and expensive third party discovery to rebut any comparative market evidence presented by the United States. More precisely, Dentsply contends that a market comparison is probative only if the markets involved are not dissimilar in any material respect, and that the limited information the United States seeks will not provide a basis for concluding that the markets in the five identified

countries are comparable to the United States market. Thus, Dentsply maintains, because it will be entitled to respond to the United States' evidence by demonstrating that the idiosyncrasies of those markets preclude meaningful comparisons, granting the motion to compel will generate a whole separate phase of discovery on the markets for the distribution and sale of artificial teeth in these five countries. Therefore, Dentsply argues, the Court should exercise its discretion to deny the motion to compel because permitting the requested discovery will require it to undertake a disproportionate burden to rebut the foreign market information. D.I. 190 at 11.

*7 Although Dentsply may need to conduct some additional discovery on the attributes of the artificial tooth market in the five specified countries in order to show that these markets are not comparable to the United States, the "precise extent of this discovery is unknown." D.I. 190, at 10. The Court believes the extent of rebuttal discovery is likely not as substantial as Dentsply asserts. Because Dentsply competes in these markets, its employees should be able to speak to salient market differences. Additionally, Dentsply has already received some discovery on these issues and, at the time of briefing, was in the process of deposing additional witnesses with discoverable information on these issues. [FN13] D.I. 195 at 5.

> FN13. The deposition testimony of Brian F. Bremer, Vice Chairman of Austenal, Inc., a Dentsply competitor with European tooth operations, provides a case in point. *See* D.I. 222, at A2-A4 (explaining that one must look beyond changes in sales volume, to other factors, for example, changes in government health care reimbursement schedules in Germany, to determine impact on relative market shares). Such testimony appears to be the type of evidence already available to Dentsply that could be used to rebut the United States' theory.

Moreover, at the hearing on this motion, the United States represented that, irrespective of whether the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 8

2000 WL 654286 (D.Del.), 2000-1 Trade Cases P 72,919

**(Cite as: 2000 WL 654286 (D.Del.))**

Court grants its Motion to Compel, it intends to present what evidence it has on relative market shares and Dentsply's distribution policies in other countries in support of its theory that Dealer Criteria No. 6 restricts competition in the United States. D.I. 205, at 7. The United States points out that it has already obtained evidence, mostly from third parties, that Dealer Criteria No. 6 is unique to the United States and that Dentsply's market share in this country is higher that its market share in other "mature markets." [FN14] The United States seeks through this Motion to Compel corroborative and supplemental information and documents from Dentsply. D.I. 195, at 1. Because the United States at this juncture intends to present foreign market evidence at trial, Dentsply at this point in time has no choice but to gather whatever additional information on these foreign markets it deems necessary to rebut the United States' argument, no matter how the Court decides this motion. It follows that the foreign discovery requested in the Motion to Compel will not in of itself generate burden and expense that will outweigh its likely benefit. Accordingly, the Court in its discretion will grant the Motion to Compel limited to Australia, Canada, England, France, and Germany.

> FN14. The Court is in no position to determine the extent of such evidence; however, apparently interviews with executives of third party competitors who the United States has identified as likely trial witnesses included discussions of market shares and distribution relationships in other countries. Additionally, some of the documents produced by these companies reflect market shares and other information about foreign artificial tooth markets. D.I. 195, at 5; D.I. 196, at C-3-5. Apparently, Dentsply's own documents characterize these countries as "mature markets" like the United States. D.I. 195, at 1.

V. Conclusion
For the foregoing reasons, the Court concludes the information and documents sought by the United States' motion to compel are relevant under

Fed.R.Civ.P. 26(b)(1) and that the burden and expense of the proposed discovery does not outweigh its likely benefits. An order will be entered granting the Motion to Compel.

2000 WL 654286 (D.Del.), 2000-1 Trade Cases P 72,919

**Motions, Pleadings and Filings (Back to top)**

• 1:99CV00005  (Docket)

(Jan. 05, 1999)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.