IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: Teleglobe Comm. *et al.*, | ) | Chapter 11 |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | Bankr. Case No. 02-11518 (MFW) |
| ———————————— | ) | |
| Teleglobe USA Inc. *et al.*, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. Action No. 04-1266 (SLR) |
| | ) | |
| BCE Inc. *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

---

## DECLARATION OF WILLIAM D. ANDERSON IN SUPPORT OF DEFENDANTS' MEMORANDUM IN OPPOSITION TO VARTEC'S AMENDED MOTION FOR A PROTECTIVE ORDER

---

I, William D. Anderson, declare the following pursuant to 28 U.S.C. 1746:

1. I am President, BCE Ventures, of BCE Inc. My office is located at 1000, rue de la Gauchetière Ouest, Montreal (Québec) H3B 4Y7. I have personal knowledge of all statements contained herein. That knowledge is based either on my own work, or on my discussions with employees of BCE Inc. All statements contained herein are true and correct to the best of my knowledge.

2. BCE Inc. ("BCE") is not a competitor of VarTec Telecom, Inc. ("VarTec").

3. I understand that VarTec provides retail local and long distance services to residential and small business customers in the United States and select countries. (VarTec

Amended Complaint ¶ 16). A true and correct copy of VarTec's First Amended Complaint is attached hereto as Exhibit A.

4. BCE Inc. and BCE Ventures Inc. are not operating companies, but are holding companies with no operations. Bell Canada, BCE's wholly-owned subsidiary, provides local telephone, long distance, wireless, Internet access, video and other services to residential and business customers in Canada. Bell Canada does not provide any services in the U.S.

5. The customers of BCE's subsidiaries are almost all located in Canada. The only telecom operating subsidiary of BCE in the U.S. is BCE Nexxia Corporation ("BCE Nexxia"), which has no employees in the U.S. It owns network assets to interconnect with U.S. carriers. BCE Nexxia provides services in the U.S. to Canadian customers having requirements for telecom services in the U.S. BCE Nexxia also provides wholesale services to U.S. customers. BCE Nexxia does not provide retail services to U.S. customers.

6. In Canada, Excel Telecommunications (Canada) Inc. ("Excel Canada"), a reseller of long distance services, was VarTec's only subsidiary. Effective May 9, 2005, VarTec sold Excel Canada and it was merged into ACN, Inc., a privately held customer acquisition company headquartered in Farmington Hills, Michigan. Therefore, VarTec is not a competitor of BCE or any of its subsidiaries in Canada.

2

7. Given the very different markets and territories serviced by VarTec and the subsidiaries of BCE, there is no basis upon which BCE could be considered a competitor of VarTec.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 24, 2005.

William D. Anderson

3

# EXHIBIT A



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION



U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
F¹LED

FEB − 6 2003

CLERK, U.S. DISTRICT COURT
By _____
          Deputy

| | |
|---|---|
| VARTEC TELECOM, INC., and<br>VARTEC TELECOM HOLDING<br>COMPANY,<br><br>    Plaintiffs,<br><br>v.<br><br>BCE, INC.,<br>BCE VENTURES, INC., and<br>WILLIAM D. ANDERSON<br><br>    Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |

CASE NO. 3-02CV-2585-M

## PLAINTIFFS' FIRST AMENDED COMPLAINT

Plaintiffs VarTec Telecom, Inc. and VarTec Telecom Holding Company (collectively, "VarTec" or "Plaintiffs") in support of their First Amended Complaint against Defendants BCE, Inc., BCE Ventures, Inc. (collectively, "BCE") and William D. Anderson ("Anderson" or, collectively with BCE, the "Defendants") allege:

## SUMMARY OF CLAIMS

1.      The legal system is designed to redress and punish precisely the type of egregious conduct committed by BCE and Anderson in this case. BCE and Anderson fraudulently induced VarTec into purchasing one of BCE's financially struggling subsidiaries through a series of material and repeated misrepresentations and omissions. BCE and Anderson intentionally mislead VarTec into believing that BCE would continue to be responsible for substantial pre-existing and future liabilities of BCE's struggling subsidiary after VarTec's purchase was complete. All the while, BCE and Anderson knew the real truth – that BCE was not only planning to unload its struggling subsidiary on VarTec, but also to abandon its obligations to pay

009568.00017:672819.013

that subsidiary's substantial liabilities. BCE was motivated not only by its desire to protect its own pocketbook and streamline its ability to jettison Teleglobe, but also by a desire to financially cripple its competitor VarTec and leave VarTec with hundreds of millions of dollars of unexpected and not-bargained-for liabilities.

2.      More specifically, this lawsuit seeks redress from numerous fraudulent misrepresentations BCE and Anderson made to induce VarTec to purchase from BCE the outstanding stock of Excelcom, Inc., Excel Telecommunications (Canada) Inc., and Telco Communications Group, Inc. (the "Excel Purchase"). At the time, Excel was struggling financially and BCE wanted to either sell it or shut it down. VarTec and BCE fiercely negotiated the Excel Purchase for over a year and a half. One of the most material aspects of the transaction from the very outset of the negotiations was the assumption of the substantial existing and future liabilities of Excel, which was a financially struggling company at the time. Concern regarding the liabilities led to two fundamental aspects of the transaction. But for BCE's agreement with these two fundamental facets of the deal, VarTec would never have purchased Excel. First, BCE and VarTec agreed that the transaction would be governed by the "your watch, my watch" concept – liabilities incurred on BCE's watch were BCE's responsibility and liabilities incurred after the purchase were to be paid by VarTec.

3.      Second, BCE and VarTec agreed that the transaction had to be "cash positive" for VarTec, requiring no out-of-pocket cash from VarTec to either purchase Excel or to keep Excel operating post-closing. To achieve this, BCE agreed to essentially serve as the lender for VarTec's purchase, agreeing to take a five-year promissory note as consideration for the deal. Unfortunately, this gave BCE an excuse to delve deeply into VarTec's finances and provided BCE with intimate knowledge of VarTec's balance sheet, its agreements and covenants with its

**PLAINTIFFS' FIRST AMENDED COMPLAINT** – Page 2

major lender, its vendor agreements and relationships and its business models and objectives. BCE used this knowledge to defraud VarTec.

      4.      BCE and Anderson were well aware from the outset of negotiations that the "your watch, my watch" treatment of liabilities and the "cash positive" structure of the transaction were key and material aspects of the Excel Purchase. Further, they knew that if the financial commitments in the Stock Purchase Agreement became ineffective, VarTec faced substantial financial burdens that had the potential to cripple or even bankrupt VarTec itself. BCE used this knowledge to its advantage not only to avoid the liabilities, but to do financial damage to its competitor. In the middle of negotiations, BCE and Anderson suddenly did an "about-face" and requested that BCE's subsidiaries Teleglobe, Inc. and Teleglobe Holdings (US) Corporation (collectively, "Teleglobe") be named as the selling parties in the transaction. BCE and Anderson repeatedly reassured VarTec that the change was a technicality only and had no substantive or financial effect on the transaction.

      5.      VarTec was initially skeptical of BCE's efforts to make Teleglobe the named party because the financial structure of the transaction and the assumption of hundreds of millions of dollars of liabilities were highly material to VarTec. In response to VarTec's concerns, BCE and Anderson repeatedly assured and promised VarTec – both privately and publicly – that BCE was committed to supporting Teleglobe, financially and otherwise, and that Teleglobe was an integral piece of BCE's long-term strategic objectives. BCE and Anderson also repeatedly stated that Teleglobe was a significant investment-grade company with a good bond rating and that Teleglobe was financially stable and capable of meeting the significant financial commitments made on its behalf by BCE in connection with the Excel Purchase. BCE and Anderson confirmed these statements and their support of Teleglobe on BCE's website, in

numerous widely-distributed press releases, in BCE and Teleglobe's publicly-filed financial documents, and at BCE and Teleglobe annual meetings throughout the course of negotiations.

6.      Based on the numerous statements and representations made to VarTec by BCE and Anderson, on Friday, April 5, 2002, VarTec closed the Excel Purchase. On Monday, April 8, 2002 – the very next business day – BCE announced plans for a major financial restructuring of Teleglobe. Within days, BCE withdrew its promised financial backing to Teleglobe, and Teleglobe filed bankruptcy proceedings in Canada and the United States. In the initial days following the announcement of the restructuring and the bankruptcy, BCE made good on certain of its promises to pay, making several employee retention payments and other payments to third parties that were agreed upon prior to close. However, these initial efforts soon ceased. Thereafter, VarTec contacted BCE and Anderson on several occasions. Almost without exception, BCE and Anderson refused each time VarTec requested that BCE and Anderson make good on BCE's commitment to pay Excel's pre-close liabilities. In addition, BCE and Anderson refused outright to back up Teleglobe's financial commitments under the Stock Purchase Agreement.

7.      Now, having relied on BCE and Anderson's false promises and representations regarding the financial stability of Teleglobe and BCE's financial backing, VarTec is left "holding the Excel bag". Indeed, as a result of BCE's misrepresentations and omissions, VarTec faces in excess of $250 million in damages and liabilities resulting from the Excel Purchase. It is now clear that BCE and Anderson successfully and fraudulently lured their competitor VarTec into closing a transaction that has had and will have a significant negative financial impact on VarTec. BCE and Anderson did so with knowledge that their statements and actions were fraudulent, that the promises and obligations made prior to the close of the transaction were

009568.00017:672819.013

meaningless, and that the financial results would be disastrous for VarTec. BCE and Anderson did so after they gained intimate knowledge of VarTec's financial condition and operations – information that would have otherwise been kept strictly confidential and would not have been provided to any competitor. At the end of the day, it is now obvious that BCE was pursuing an anti-competitive agenda and was planning all along to unload its struggling subsidiary on its competitor VarTec and walk away from the substantial liabilities associated with Excel.

### THE PARTIES

8.       Plaintiff VarTec Telecom, Inc. is a Texas corporation that maintains its principal place of business at 1600 Viceroy, Dallas, Dallas County, Texas, 75235.

9.       Plaintiff VarTec Telecom Holding Company is a Delaware corporation that maintains its principal place of business at 1600 Viceroy, Dallas, Dallas County, Texas, 75235.

10.       Defendant BCE, Inc. is a Canadian corporation that maintains its principal place of business at 1000, rue de La Gauchetiére Ovest, Suite 1240, Montréal, (Québec), Canada H3B4Y7. BCE has signed a waiver of service of summons and can be served through its attorney of record in this matter David J. Beck, Beck, Redden & Sechrest, One Houston Center, 1221 McKinney Street, Suite 4500, Houston, Texas 77010-2010. BCE regularly conducts business in Texas and has continuous and systematic contacts with Texas. BCE, Inc. also made numerous misrepresentations and omissions to VarTec in this State during the negotiations of the Excel Purchase.

11.       Defendant BCE Ventures is a Canadian corporation that maintains its principal place of business at 1000, rue de La Gauchetiére Ovest, Suite 1240, Montréal, (Québec), Canada H3B4Y7. BCE Ventures has signed a waiver of service of summons and can be served through its attorney of record in this matter David J. Beck, Beck, Redden & Sechrest, One Houston

Center, 1221 McKinney Street, Suite 4500, Houston, Texas 77010-2010. BCE Ventures regularly conducts business in Texas and has continuous and systematic contacts with Texas. BCE Ventures also committed numerous misrepresentations and omissions in this State during the negotiations of the Excel Purchase.

12.    Defendant William D. Anderson ("Anderson") is a citizen and resident of Canada. Anderson is the former CFO of BCE, Inc. and the President of BCE Ventures. Anderson has signed a waiver of service of summons and can be served through his attorney of record in this matter David J. Beck, Beck, Redden & Sechrest, One Houston Center, 1221 McKinney Street, Suite 4500, Houston, Texas 77010-2010. Anderson was the primary negotiator and decision maker for BCE on the Excel Purchase transaction, and, during the course of the negotiations made numerous trips to Dallas, Texas to negotiate and close the Excel Purchase. While in Dallas, Texas, Anderson made numerous misrepresentations and omissions during the negotiations of the Excel Purchase.

**JURISDICTION**

13.    This court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000, exclusive of interests and costs, and is between citizens of different countries.

14.    This court has personal jurisdiction over all of the Defendants because VarTec's claims against them are based on fraudulent misrepresentations that occurred, in whole or in part, in Texas. Additionally, all of the Defendants have regularly traveled to Texas to conduct business, out of which business Plaintiffs' claims arise.

009568 00017:672819 013

### VENUE

15.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) because a substantial part, if not all, of the events or omissions giving rise to VarTec's claims occurred in this district.

### FACTUAL BACKGROUND

16.     VarTec is a provider of local and long distance service and is considered a pioneer in "dial around" long distance service. VarTec offers services to both residential consumers and small business customers in the United States and select countries.

17.     BCE is Canada's largest communications company, providing residential and business customers in Canada with wireline, wireless and data communications products and services. BCE Ventures is BCE's equity investment subsidiary and is the entity through which BCE negotiates, monitors and consummates acquisitions, investments and other transactions.

### A.     BCE Pursues VarTec Regarding BCE's Desire To Sell Excel

18.     In January 2001, Miller Williams ("Williams"), then Senior Vice President of Williams Communications, became aware of BCE's desire to sell Excel. Williams mentioned this fact to Sherm Henderson ("Henderson"), a business associate of VarTec's President and CEO Joe Mitchell ("Mitchell"), and suggested that VarTec consider purchasing Excel. Williams also contacted Terry Jarmon ("Jarmon"), then CEO of Teleglobe, Inc., to suggest a deal with VarTec. Jarmon directed Williams to Anderson at BCE and informed Williams that Anderson was the appropriate person with whom to discuss an Excel transaction. Williams then set up a call between Henderson and Anderson to discuss a possible Excel deal. This call generated enough interest between the parties that the following week Henderson played golf with Jean Monty ("Monty"), the then-Chief Executive Officer of BCE Inc. During the golf outing, Monty

confirmed BCE's interest in selling Excel and related subsidiaries, and Henderson passed that information on to VarTec. Thus began a year and a half of extensive negotiations between VarTec and BCE that ended in the consummation of the sale of Excel to VarTec.

19. The first significant meeting between VarTec and BCE occurred at the Mansion restaurant in Dallas, Texas in February 2001. The meeting was attended by numerous representatives of both VarTec and BCE. Essentially, this first meeting was intended to let the parties get to know each other, to educate them on the respective businesses of VarTec, Excel and BCE, and to discuss the general parameters of a proposed transaction. There were no Teleglobe representatives present at this meeting and Teleglobe was not mentioned.

20. Following this meeting, BCE and VarTec entered into a Confidentiality Agreement dated February 2001. The Confidentiality Agreement allowed the parties to go forward with the contemplated due diligence for the transaction and to exchange certain confidential and proprietary information. Anderson executed the Confidentiality Agreement for BCE. In addition, Anderson executed a Consent of BCE permitting VarTec access to certain confidential and proprietary Excel information. There was no mention of Teleglobe in either the Confidentiality Agreement or the Consent. Unfortunately, this agreement allowed BCE to gain intimate knowledge of VarTec's balance sheet, its agreements and covenants with its major lender, its vendor agreements and relationships and its business models and objectives.

**B.    BCE And VarTec Execute A Letter Of Intent In Which BCE Agrees To Pay Pre-Existing and Future Liabilities of Excel**

21. In early March 2001, Mitchell and Anderson met in Snowmass, Colorado and began to discuss the terms of a proposed letter of intent between VarTec and BCE. The major deal points of the proposed transaction and a letter of intent memorializing those terms were agreed to in Snowmass. Immediately thereafter, on March 6, 2001, Anderson and VarTec's

Chief Legal Officer Michael Hoffman ("Hoffman") participated in a conference call to further discuss the structure of the proposed transaction and to finalize the terms of the letter of intent. On this call, Anderson represented, among other things, that BCE would (1) pay all of Excel's post-deal taxes; (2) pay to buy out a commission agreement with former Excel employee and head of marketing Steve Smith; (3) pay all liabilities associated with employment agreements at Excel, including retention bonuses and severance packages; and (4) pay Excel's transition team for 18 months to get the merger and integration of the companies accomplished. These issues, among others, were material to VarTec at the time and remained so throughout the negotiations.

22.    Based on these initial conversations, on March 7, 2001, Mitchell sent Anderson a proposed letter of intent detailing the terms of the transaction. BCE was identified as the "Seller" in this letter. On March 12, 2001, Anderson responded for BCE, modifying slightly the terms of the proposed letter. Anderson still identified BCE as the "Seller" and no mention was made of Teleglobe.

23.    Ultimately, on March 15, 2001, a Letter of Intent ("Letter of Intent") was agreed to and executed between the parties. The Letter of Intent was signed by Anderson on behalf of BCE and by Mitchell on behalf of VarTec. Again, BCE was identified as the "Seller" and no mention of Teleglobe was made. According to the terms of the Letter of Intent, BCE and VarTec agreed to begin immediate discussions regarding a definitive merger agreement whereby VarTec would assume a controlling interest in Excel. As originally contemplated, the transaction was to be an asset purchase deal whereby VarTec purchased, free of virtually all liabilities, the assets of Excel from BCE.

24.    The Letter of Intent expressly stated that once the final price was negotiated for the purchase, BCE could not make any material changes to its business plans without obtaining

VarTec's prior written consent. The letter further identified the following conditions as material to the transaction: (i) VarTec would not acquire any long-term liabilities of Excel; (ii) VarTec would not assume any liability for payment due to Steve Smith on any commission or employment agreement; (iii) BCE alone would remain financially responsible for any retention bonuses paid to Excel employees; and (iv) BCE would be permitted to place Anderson on VarTec's board of directors for a period of five years.

### C.   BCE And VarTec Agree To The "Your Watch, My Watch" Liability Concept And The Requirement That The Deal Be "Cash Positive" for VarTec

25.   On May 7, 2001, Hoffman, Mitchell, Anderson and BCE Ventures Senior Director Jim Leung ("Leung") met to discuss a number of important aspects of the deal structure. No Teleglobe representatives were present at this meeting.  By this time, the concept of a liability-free asset sale had become unworkable for a variety of reasons, and the parties began to discuss a stock sale that was structured more like an asset deal with all pre-closing liabilities of Excel being the responsibility of BCE and liabilities incurred post-closing going to VarTec. Throughout the negotiations, the parties referred to this division of the liability as the "your watch, my watch" structure.  Among other things, VarTec informed BCE that if VarTec were to do a stock purchase in this manner, an indemnification from BCE for pre-closing liabilities of Excel was a material aspect of the transaction.

26.   Moreover, the transaction was to be structured as a "cash positive" transaction for VarTec, meaning that VarTec would purchase Excel by executing promissory notes in favor of BCE and that no out-of-pocket cash outlay would be required by VarTec.  In fact, the parties fiercely negotiated the requirement and amount of positive cash flow that was to remain with Excel post-closing, so that VarTec could insure it had sufficient funds available to fund Excel's

ongoing operations and other expenses without impacting VarTec's own cash flow. BCE and Anderson understood that this was a material facet of the transaction in light of VarTec's cash flow position. In fact, in connection with this transaction BCE and Anderson requested access to financial information at VarTec that, under normal circumstances, no competitor would receive. Thus, the concept of a "cash positive" transaction was understood and agreed to by the parties early in the negotiations and was an underlying theme in many of the later discussions.

27.    On May 24, 2001, BCE issued a press release confirming that BCE and VarTec had entered into discussions regarding strategic options for combining VarTec and Excel's businesses. BCE publicly posted this and other press releases regarding the Excel Purchase on BCE's website at www.bce.ca. Teleglobe was not mentioned as a party to the transaction in this press release.

28.    On June 15, 2001, Anderson, along with Excel's general counsel, confirmed in writing that VarTec was authorized to conduct due diligence "in connection with the proposed transaction between VarTec Telecom, Inc. and BCE, Inc." This confirmation was directed to BCE and its accountants and consultants and instructed them to provide to VarTec information regarding Excel. It was not sent to or directed to Teleglobe.

**D.    BCE Suddenly Changes The Named Party To The Agreement, But Assures VarTec The Change Has No Financial Impact**

29.    On or about June 22, 2001, BCE representatives mentioned to VarTec for the first time that BCE might not be the appropriate selling party under the definitive documents. Instead, BCE suggested that BCE's subsidiary Teleglobe Inc. and several of Teleglobe's subsidiaries be identified as the selling parties. BCE and VarTec discussed this concept on June 26, 2001, during a conference call between one of VarTec's in-house counsel and BCE's General Counsel Michel Lalande ("Lalande") and Leung. Lalande and Leung represented that the

suggested change in parties was merely a technicality to insure the correct parties were present from a corporate organizational standpoint, but that it would have no negative or material financial impact on the transaction at all. At this meeting, Lalande and Leung assured VarTec that Teleglobe was a financially sound investment-grade company with a good bond rating that was financially backed by BCE.

30.    On June 28, 2001, counsel for VarTec circulated an initial draft of the Stock Purchase Agreement naming BCE, Inc. as the selling party. On July 9, 2001, Hoffman and Anderson had a conference call in which they discussed at length the "your watch, my watch" concept and related issues. On that call, Anderson represented, among other things, that BCE would commit to fund all approved and currently underway capital expenditures at Excel, whether those costs were incurred prior to or after closing. In addition, Hoffman emphasized to Anderson that VarTec was concerned about certain unknown liabilities, including possible class action lawsuits and regulatory investigations against Excel. BCE and VarTec realized that these types of unknown pre-closing liabilities potentially had an apocalyptic impact and were not liabilities that VarTec was willing or able to assume. VarTec reiterated this financial reality to BCE and repeated its view that BCE's assumption of certain pre-closing liabilities was a material aspect of the transaction.

### E.    BCE Assures VarTec That It Financially Supports Teleglobe To The Tune of C$1 Billion

31.    On July 9, 2001, as a follow-up to the parties' June 22 meeting at which Leung had assured VarTec that Teleglobe was a financially sound and backed by BCE, Leung sent various VarTec representatives an email attaching the most recent Teleglobe financial reports, including the 2000 Annual Report and the 2001 First Quarter Report dated May 22, 2001. Consistent with the statements being made by Anderson, Leung, Lalande and other BCE

PLAINTIFFS' FIRST AMENDED COMPLAINT – Page 12

representatives, Teleglobe's 2000 Annual Report specifically stated that BCE would provide "continued financial assistance" to Teleglobe and had committed to support Teleglobe in an amount totaling C$1 billion. Of the C$1 billion of promised financial support, BCE had only funded approximately C$100 million when the Annual Report was issued, leaving an extremely significant amount of remaining financial commitment. The 2001 First Quarter Report also reiterated that BCE was committed to financially supporting Teleglobe.

32.    During negotiations, BCE retained the law firm of Simpson Thacher to act as outside counsel in connection with the Excel Purchase. Simpson Thacher's correspondence with VarTec's counsel identifies BCE as their client in the transaction. For example, a July 10, 2001, memo to VarTec's outside counsel indicates they had not yet reviewed the draft agreement "with BCE" and refers to the "BCE working group." No mention of Teleglobe was made, thereby bolstering VarTec's understanding that it was doing a deal with BCE and that BCE was ultimately behind Teleglobe.

33.    On July 11, 2001, an all-hands meeting was held in Dallas at Excel's headquarters to discuss the remaining outstanding issues related to the transaction. Hoffman, Mitchell, Bruce Widener, and Leo Whitt attended for VarTec. BCE's representatives included Anderson, Leung, BCE's Senior Legal Counsel Eric Paul-Hus ("Paul-Hus"), and BCE's Chief Legal Officer Martine Turcotte ("Turcotte"). Again, no Teleglobe representatives were present. At this meeting, BCE again requested that it not be listed as the selling party or obligor on the Stock Purchase Agreement. In connection with this request, Anderson, Leung, Paul-Hus, and Turcotte again reiterated to VarTec's representatives that Teleglobe was a financially sound investment-grade company with a good bond rating that was fully supported by BCE – financially and otherwise. Specifically, BCE's representatives stated that Teleglobe was a significant

009568.00017:672819.013

investment-grade company with outstanding public debt and the support of numerous lenders. At this meeting, VarTec's representatives again emphasized and reinforced the materiality of these financial representations regarding Teleglobe. Among the specific financial obligations that were discussed were (1) employee retention payments and liabilities required under Excel employment contracts that were not to be assumed by VarTec; and (2) BCE funding of capital expenditures currently underway or planned at Excel. In addition, Anderson, Leung, Paul-Hus and Turcotte emphasized that, although the planning for the day-to-day implementation of the merger and integration of the companies was to be VarTec's responsibility, all action plans and major decisions made before closing would have to be specifically approved by BCE through Anderson. Again, no Teleglobe representatives were involved and VarTec understood that BCE was providing the financial and decision-making support for the deal.

34.      Virtually every day (and often multiple times a day) during the next month and a half, representatives of BCE, including primarily Anderson, Lalande, Paul-Hus and Leung, met at VarTec's offices in Dallas or conducted conference calls to discuss various aspects of the transaction. No Teleglobe representatives were present in Dallas or participated on the calls.

**F.      BCE And Anderson Continue To Assure VarTec That Teleglobe Had The Financial Ability to Perform And Was Supported By BCE**

35.      On July 18, 2001, several members of VarTec's legal team, including Hoffman, met in Dallas with BCE's legal team, including Leung, Turcotte and Paul-Hus, and BCE and VarTec's respective outside counsel. Although not in attendance at the meeting, Anderson was available by phone and was repeatedly consulted by BCE's legal team regarding various aspects of the negotiations. Again, the parties discussed the concept of BCE acting as a seller or indemnitor under the Stock Purchase Agreement. In connection with this discussion, VarTec again voiced its concerns about assuming the financial liabilities of Excel and emphasized the

materiality of the financial terms of the transaction. In response, BCE's representatives yet again assured VarTec that Teleglobe was (i) the proper contracting party; (ii) was a financially sound investment-grade company; (3) had a good bond rating; and (4) had BCE's ongoing financial support. VarTec continually emphasized the materiality of these representations in determining whether VarTec would go forward with the transaction.

36.     Consistent with these private representations, BCE also continued to publicly pledge its unconditional financial support for Teleglobe in press releases and public filings. Indeed, throughout the course of the negotiations, BCE continually stated in widely distributed public documents that Teleglobe was an integral part of BCE's future strategic plans and that BCE was strongly committed to financially supporting Teleglobe.

37.     During the July 18, 2001 meeting, representatives of VarTec also identified and discussed the various financial obligations noted in the draft Stock Purchase Agreement that were material to VarTec, emphasizing that BCE's financial backing of Teleglobe on these matters was key and material to the transaction. Among the significant financial obligations discussed in great detail was a working capital contribution that required a positive fixed amount of working capital in Excel at the time of closing. Because BCE and VarTec intended the transaction to be a "cash positive" transaction for VarTec, this working capital contribution was repeatedly discussed by the parties as a material aspect of the transaction.

38.     In addition, at this meeting, various BCE representatives emphasized again that Anderson was to be consulted on all major pre-closing decisions regarding Excel, and that Anderson must give specific approval for any changes in how Excel funds were to be expended in the month prior to closing.

### G.    BCE And Anderson Continue To Assure VarTec of BCE's Financial Commitment to Support Teleglobe

39.    On July 26, 2001, Anderson sent to VarTec a memo on BCE letterhead entitled "Excel/VarTec Proposed Settlement of Financial Issues." The memo detailed outstanding negotiation issues between the parties. The issues were then discussed by Anderson and representatives of VarTec, including Mitchell and Hoffman. This memo yet again solidified VarTec's understanding that BCE was the financial backer in the transaction.

40.    Conference calls and other meetings between Hoffman and other VarTec representatives and BCE representatives, including Anderson, Leung, Paul-Hus and Lalande, continued throughout July and August 2001. At these meetings, BCE representatives repeatedly stated that Teleglobe was a financially sound investment-grade company with a good bond rating that was funded and supported by BCE. Anderson and others further represented that based on Teleglobe's financial statements, which contained repeated assurances of BCE's continued financial support, Teleglobe would be able to perform on all financial obligations in the Stock Purchase Agreement. Based on these material representations, VarTec eventually consented to listing Teleglobe and its various subsidiaries as the selling parties on the Stock Purchase Agreement. However, BCE's role in the transaction remained critical to VarTec, as well as to BCE, as BCE was to obtain warrants for VarTec stock and a seat on VarTec's board of directors as a result of the transaction. From the outset, BCE led VarTec to believe that VarTec was gaining a strategic partner in BCE. BCE's promises and representations throughout the negotiations confirmed that they viewed the transaction in the same way.

41.    The reasonableness of VarTec's view of the transaction as a form of strategic partnering with BCE was supported by the fact that BCE and Anderson made all decisions regarding the negotiations, and representatives of Teleglobe were not present at any of these

meetings or conference calls. Only in the rare instance where particular and specialized information was needed from Teleglobe were employees or representatives of Teleglobe contacted or consulted on matters relating to the transaction, and such consultation occurred only at the specific request and instruction of BCE. Indeed, there were only a few instances in over a year and a half of negotiations where VarTec dealt with Teleglobe employees. In-house tax counsel at Teleglobe was briefly consulted regarding tax aspects of the transaction, and, during the final days before closing, certain Teleglobe employees participated in discussions regarding the technical aspects of the traffic commitments in the telecommunications services agreement that was an ancillary part of the Stock Purchase Agreement. Certain Teleglobe employees also were consulted regarding regulatory issues. Nonetheless, even when representatives of Teleglobe were involved, BCE and Anderson made all the decisions. For example, BCE agreed to the traffic commitments in the telecommunications services agreement without consulting anyone at Teleglobe until the agreement was ready to sign. This course of conduct gave VarTec every reason to believe that having Teleglobe replace BCE as the named party to the agreement was a mere technicality and that BCE's representations regarding its financial support of Teleglobe were truthful.

42.    On August 22, 2001, another high-level meeting was held between Mitchell and Anderson in an effort to finalize critical terms of the agreement. At that meeting, Anderson stated that BCE would be responsible for pre-closing liabilities of Excel, again affirming the "your watch, my watch" concept previously discussed. Mitchell again emphasized that the financial guarantees and indemnities in the Stock Purchase Agreement were material and key components of VarTec's willingness to go forward with the transaction. Mitchell again stressed to Anderson the need for the transaction to be "cash positive" to VarTec.

**H.**    **The Parties Execute the Original Stock Purchase Agreement And BCE Issues A Press Release Praising The Proposed Sale**

43.    On August 26, 2001, VarTec Telecom, Inc., VarTec Telecom Holding Company, Excel Communications, Inc., Excelcom, Inc., Telco Communications Group, Inc., Excel Telecommunications (Canada) Inc., Teleglobe Holdings (US) Corporation and Teleglobe Inc. executed a Stock Purchase Agreement (the "Original Stock Purchase Agreement"). The Original Stock Purchase Agreement was subject to a number of significant conditions that were to occur before closing. It was signed by Anderson on behalf of Teleglobe Holdings and by Lalande for Teleglobe.

44.    That same day, BCE and VarTec issued a joint press release announcing the signing of these definitive documents. The press release refers only to BCE and VarTec and contains background information on both companies. As president of BCE Ventures, Anderson is quoted as praising the transaction and is identified as the person who was managing the Excel "investment" for BCE. Teleglobe is not identified as a party to the transaction or otherwise mentioned. No Teleglobe representatives are quoted or identified. Like other press releases issued by BCE regarding the Excel Purchase, BCE posted this release on its website and widely distributed it throughout Canada and the US.

**I.**    **BCE And VarTec Begin To Obtain Regulatory Approvals For the Deal**

45.    Upon execution of the Original Stock Purchase Agreement, both BCE and VarTec began the significant task of making the necessary regulatory filings and seeking regulatory approvals to allow the transaction to close. This effort required the in-house legal staff at both VarTec and BCE to work cooperatively to make filings and seek approvals in all fifty states, the District of Columbia and in Canada, and also required Hart-Scott-Rodino filings and FCC approvals in the US and similar filings before the Canadian regulatory authorities. BCE and

VarTec agreed to share the significant costs of undertaking this effort and, in fact, did so throughout the many months before closing. BCE's in-house legal staff, including Lalande and others, did the vast majority of the Canadian work and assisted VarTec's in-house counsel with the regulatory effort in the US. BCE also was required to negotiate directly with numerous bonding companies that had posted regulatory bonds in certain states to have those bond guarantees released. Again, these negotiations were undertaken by BCE's in-house legal staff.

46.    During the fall of 2001, while this substantial regulatory effort was underway, the parties also continued to negotiate various significant aspects of the deal. BCE representatives Anderson, Lalande, Paul-Hus and Leung remained VarTec's primary contacts and the primary negotiators and decision makers on all aspects of transaction. No Teleglobe representatives participated in the lengthy and substantial efforts required to make the regulatory filings and obtain the required approvals. Anderson, Lalande, Paul-Hus and Leung continued to make all decisions regarding the Excel Purchase and continued to represent to VarTec that BCE supported Teleglobe and the substitution of Teleglobe as a party to the Stock Purchase Agreement had no financial consequence for VarTec. BCE and Anderson remained aware of the importance of these financial assurances to VarTec and of the requirement that the transaction be a "cash positive" one for VarTec. BCE and Anderson also were aware that VarTec could only close the transaction if BCE were willing to finance the purchase by taking promissory notes as consideration instead of cash and by assuming financial responsibility for the numerous pre-close liabilities discussed at length between the parties.

## J.    BCE And VarTec Continue To Negotiate Key Terms Of The Final Agreements

47.    During the course of negotiations even after Teleglobe replaced BCE as the selling party, BCE and VarTec often discussed various financial obligations that were

009568.00017:672819 013

consistently identified and referred to by the parties as ultimate financial obligations of BCE. For example, on September 7, 2001, BCE's Paul-Hus committed that BCE would fund Excel's regulatory expenses for the Excel Purchase. This concept was again discussed in a November 20, 2001 conference call, where the parties discussed BCE's payment of certain legal counsel fees associated with the regulatory aspects of the transaction. Leung, Lalande and other members of BCE's legal team remained intimately involved in the regulatory aspects of the transaction and consulted on a regular basis with members of VarTec's legal department regarding the status of these efforts.

48.    During this time period, Anderson held monthly operational meetings for Excel and remained the sole decision maker for BCE on the transaction. No Teleglobe representatives were present at these operational meetings.

49.    During the fall of 2001 and early spring of 2002, BCE and Anderson committed Excel to a number of new contracts, including certain employment contracts and severance obligations, without consulting VarTec. When eventually confronted about these new contracts, Anderson and others at BCE, including Lalande and Leung, repeatedly assured VarTec that because the contracts would be considered pre-closing liabilities, VarTec had no need to be concerned about them and would not be financially impacted. Instead, Anderson and other BCE representatives reiterated to VarTec that BCE would insure that the pre-close liabilities were paid, especially those related to employee severance payments, which had been a key term of the deal since the initial letter of intent.

50.    On October 23, 2001, Mitchell, Henderson and Anderson met to discuss a number of issues related to the transaction, and in the next few months, Anderson remained actively involved in negotiating each and every aspect of the deal. Final decisions regarding numerous

key aspects of the transaction were often reached in conference calls or meetings between Anderson for BCE and Mitchell and/or Hoffman for VarTec.

51.    As the closing date approached, representatives of VarTec continued to discuss certain financial obligations of the transaction both pre- and post-closing directly with BCE representatives, including primarily Anderson.    Anderson and other representatives of BCE continued to either authorize and make payments or assure VarTec that such financial commitments would be met post-closing.    In response to direct inquiries, BCE yet again affirmatively represented that it would financially support Teleglobe, which BCE stated was a financially sound investment-grade company with a good bond rating.

**K.    BCE Makes Numerous Public Statements Confirming Its C$1 Billion Financial Commitment To Teleglobe**

52.    After it purchased Teleglobe and Excel in 2000, BCE began to make regular public statements detailing its financial support of Teleglobe and emphasizing that Teleglobe was a key strategic part of BCE's businesses plan.    BCE reiterated this point even in the face of declining financial results at Teleglobe.    These public statements continued throughout the pendency of BCE's negotiations with VarTec regarding the Excel Purchase.    Indeed, in the fall of 2001 and spring of 2002, BCE repeatedly and publicly pledged its financial support for Teleglobe.    For example, on October 24, 2001, Monty stated, "We will definitely be there for Teleglobe . . . .    We believe Teleglobe is a long-term property for us and we have a good financial plan to go forward with."    On October 25, 2001, Monty stated, "We're not going to sell Teleglobe; it's part of our core activities. . . . We're not the type of people that are going to just give up at the first instance of a problem."    On November 5, 2001, Teleglobe's then-Chief Executive Officer and a 20-year veteran of BCE, Terry Jarmon, stated that BCE was "wedded to Teleglobe as a strategic initiative."

009568.00017 672819.013

53.    On December 12, 2001, BCE held a press conference and hosted a live webcast to outline its financial plans for 2002.   At this conference and in related publicly-issued press releases, BCE's Chairman and CEO stated that Teleglobe was strategically important to BCE's growth plans and announced BCE's commitment to investing C$1 billion in Teleglobe over the next twelve months.   In the days that followed, BCE's financial commitment was widely reported in the US and Canadian press.   BCE's 2001 Annual Report dated February 27, 2002, also states, "On December 12, 2001, BCE Inc. indicated its intention to contribute up to an additional C$1 billion to support BCE Teleglobe's working capital and debt service requirements over the next twelve months."

54.    BCE again publicly restated its public financial support for Teleglobe on March 18, 2002.   A mere eighteen days before the close of the Excel Purchase, BCE spokesperson Don Couchette stated that BCE "remained committed to Teleglobe."   He further stated that BCE wanted to keep Teleglobe and that BCE's "commitment to Teleglobe remains as strong as it's ever been."   Even as late as March 29, 2002, the Canadian press – quoting from and relying on numerous public statements made by Monty – commented on BCE's continued support of Teleglobe as a strategic component of its overall plan.

55.    These public statements by BCE and their temporal proximity to the Excel Purchase confirmed the various statements that Anderson and other BCE representatives had made to VarTec and further strengthened VarTec's reliance on those statements in proceeding with the Excel Purchase.   These representations reassured VarTec that Teleglobe was financially backed by BCE and could, therefore, unquestionably meet all of the material financial obligations in the Stock Purchase Agreement.   The statements further reassured VarTec that it could rely on BCE's statements that having Teleglobe as the named party to the agreement

would have no negative financial impact on VarTec and that there was no need for a separate BCE guarantee in the Stock Purchase Agreement.

### L.    The Excel Purchase Closes On April 5, 2002

56.    After many months of negotiations and extensive efforts to finalize the regulatory aspects of the transaction and meet other required closing conditions, the Excel Purchase finally closed on Friday, April 5, 2002.  VarTec Telecom, Inc., VarTec Telecom Holding Company, Excel Communications, Inc., Excelcom, Inc., Telco Communications Group, Inc., Excel Telecommunications (Canada) Inc., Teleglobe Holdings (US) Corporation and Teleglobe Inc. executed an Amended and Restated Stock Purchase Agreement dated April 5, 2002 and the Ancillary Agreements as defined therein (the "Amended Stock Purchase Agreement").

57.    Pursuant to the Amended Stock Purchase Agreement, VarTec purchased all of the outstanding shares of capital stock of Excelcom, Inc., Excel Telecommunications (Canada), Inc. and Telco Communications Group, Inc. (the "Excel Entities") for a total aggregate purchase price equal to $227,500,000.  As contemplated, VarTec's purchase price was payable through five-year promissory notes, making the transaction a "cash positive" one for VarTec.

58.    As had been the concept all along, the Amended Stock Purchase Agreement implemented the "your watch, my watch" concept regarding liabilities, requiring Teleglobe, with the financial backing of BCE, to retain financial responsibility for all existing and future liabilities arising from activities pre-closing.    In addition, the Amended Stock Purchase Agreement insured that the transaction would be a "cash positive" one for VarTec by requiring that Excel have at least $10 million of positive working capital (with $6 million in cash) as of the date of close.  The Amended Stock Purchase Agreement was signed by Lalande on behalf of Teleglobe and Teleglobe Holdings, with the knowledge and approval of Anderson and BCE.

009568.00017:672819 013

59.    In the days just prior to closing, BCE and Anderson had negotiated delayed payments to VarTec for a number of expenses that BCE had committed to back, including employee retention payments. The import of these delayed payment dates would not become obvious until later. Even more surprisingly, in the hours before closing, Anderson ordered over $5 million of cash transferred out of Excel upstream to BCE. Anderson did so with full knowledge that such transfer would negatively impact the working capital position of Excel. Indeed, Anderson and Leung specifically discussed how to maximize the amount of cash that BCE could take out of Excel, ignoring months of negotiations regarding the import of Excel's working capital. Amazingly, no mention was made at closing of any potential financial problems at Teleglobe or any plans on the part of BCE to restructure Teleglobe's finances or withdraw financial support.

### M.    BCE Shocks VarTec On Monday, April 8, 2002, By Announcing A Plan To Withdraw Financial Support To Teleglobe

60.    On Monday, April 8, 2002, the first business day after the closing of the transaction, BCE publicly announced for the first time that it had undertaken a review of its strategic alternatives regarding Teleglobe. Prior to this announcement, BCE had completely failed to disclose to VarTec the fact of this review, which apparently had been ongoing prior to the signing of the Amended Stock Purchase Agreement, or any similar related information. This is true despite all of the discussions and representations made to VarTec regarding BCE's financial support of Teleglobe, even in the face of VarTec's numerous express questions regarding that very topic throughout the previous year and a half of negotiations.

61.    Surprisingly, even as BCE announced its withdrawal of support to Teleglobe, it sought to take advantage of the positive media impact of the Excel Purchase, issuing a press release on April 8, 2002, announcing that "BCE" – not Teleglobe – had closed the Excel

Purchase transaction with VarTec. On April 24, 2002, only thirteen business days after the Excel Purchase closed, BCE publicly announced its intent to cut off all financial support to Teleglobe.

> **N.   BCE's Withdrawal Of Support Leads To Teleglobe's Bankruptcy Just 40 Days After The Excel Purchase Closes**

62.    As a result of BCE's actions, on May 15, 2002, Teleglobe and certain of its US and Canadian subsidiaries, including Teleglobe Holdings and Teleglobe USA sought the protection of Canada's Companies' Creditors Arrangement Act ("CCAA") and announced the intention to pursue a range of financial reorganization alternatives.  On May 28, 2002, Teleglobe's US subsidiaries, including Teleglobe Holdings and Teleglobe USA, filed for protection under Chapter 11 of the United States Bankruptcy Code in the District of Delaware.

63.    Teleglobe's pending bankruptcy proceedings call into question the significant financial obligations of Teleglobe pursuant to the Amended Stock Purchase Agreement. Because BCE representatives had repeatedly assured VarTec that the obligations of Teleglobe in the Amended Stock Purchase Agreement were financially backed by BCE and because BCE was the only party with whom VarTec had negotiated, VarTec immediately contacted BCE after the bankruptcy filing.

64.    Specifically, Hoffman spoke with Anderson, who had just weeks before been making each and every decision regarding the Excel Purchase, and asked what BCE's intent was regarding the backing of Teleglobe's financial commitments in the Amended Stock Purchase Agreement.   Anderson indicated that BCE had completely severed its relationship with Teleglobe and that it had no obligation to back Teleglobe's financial commitments to VarTec. Anderson also resigned from the VarTec board of directors and backdated his resignation to some time in early April 2002. In response to VarTec's letter requesting a confirmation of BCE's position, Anderson told Hoffman that BCE "needed to separate" itself from VarTec.

PLAINTIFFS' FIRST AMENDED COMPLAINT – Page 25

009568.00017:672819 013

Shortly thereafter, despite intimate, almost daily, involvement in the transaction for over a year and a half, Anderson told VarTec that he was no longer permitted to talk to Hoffman. Subsequently, in response to written inquiries directly to BCE, BCE stated that it had no obligation to VarTec whatsoever and referred VarTec to Teleglobe – a now bankrupt entity with no ability to satisfy the financial conditions in the Amended Stock Purchase Agreement or to pay expenses of Excel that had been incurred pre-closing.

### O. BCE's Withdrawal Of Support Guts The Material Financial Terms Of The Stock Purchase Agreement And Saddles VarTec With Substantial Liabilities

65.    The mere negation of Teleglobe's indemnity obligations for pre-closing liabilities under the Amended Stock Purchase Agreement significantly damages VarTec by causing VarTec to assume liabilities that BCE repeatedly represented it would timely pay. Had BCE disclosed to VarTec the significant financial problems at Teleglobe or the fact that BCE was reviewing its options and considering a withdrawal of its financial support to Teleglobe, the Excel Purchase would likely have been structured as an asset purchase, and VarTec would have insisted on a parental guarantee and indemnity from BCE itself. Indeed, as a result of BCE's misrepresentations and omissions, VarTec is left without a solvent entity to cover at a minimum the following significant liabilities:

- **Working Capital:** Under the Amended Stock Purchase Agreement, there was an obligation to fund a Working Capital Adjustment described in Section 2.5, including the payment of the Working Capital Adjustment Amount totaling approximately $10.0 million. This working capital contribution was discussed at great length with Anderson, Leung, Lalande and other representatives of BCE, and BCE was aware of the materiality of this financial requirement to VarTec. One significant issue discussed regarding working capital was the concept of

excluding certain deferred revenues from the definition of working capital, thereby insuring that the working capital contribution meant real money to VarTec. Despite these extensive negotiations, on the day of closing, Anderson ordered the transfer of approximately $5 million of cash out of Excel. In doing so, Anderson completely ignored the negotiated definition of working capital, including deferred revenues in his calculations. Anderson knew that this transfer would negatively impact the working capital amount. In fact, following the close of the deal, there was a working capital shortfall of approximately $15.3 million. With Teleglobe's bankruptcy filing it is unlikely that VarTec will receive this substantial working capital amount. Indeed, the Amended Stock Purchase Agreement requires that an audit be conducted by Deloitte & Touche to determine the amount of the Working Capital Adjustment. The audit was to be completed by July 5, 2002, and presented to the parties. Although BCE had been paying Deloitte to conduct the audit, it stopped doing so in April 2002, and, as a result, the audit was not completed or provided to VarTec. The outstanding fees owed to Deloitte total over $125,000. To date, Teleglobe has refused to fund the required $15.3 million working capital amount;

- **Capital Expenditures:**  Under the Amended Stock Purchase Agreement, Teleglobe was required to complete and fund certain pre-closing capital expenditures required by Section 2.5(c). These expenditures were repeatedly discussed with Anderson and other representatives of BCE and the vast majority of the expenses (approximately $36 million) were authorized and funded by BCE

009568.00017 672819.013

prior to the closing. However, at least $1.4 million of these expenses remain unpaid;

• **Employment Liabilities:**    Under the Amended Stock Purchase Agreement, Teleglobe is required to fund Pre-Closing Employment Liabilities described in Section 6.4, including, but not limited to, severance payments to terminated Excel executives required by pre-close employment contracts and various other claims filed by employees related to pre-close termination. VarTec had insisted since the initial letter of intent was signed that it not be responsible for the payment of any employee retention bonuses or severance payments. These pre-close employment liabilities were the subject of numerous discussions and representations by BCE representatives, who repeatedly represented that BCE would pay these liabilities. A significant amount of these required payments relate to contracts that were entered into after the Original Stock Purchase Agreement, but prior to closing without the knowledge and consent of VarTec. These were payments that Anderson and other BCE representatives repeatedly assured VarTec that Teleglobe, backed by BCE, would make. In fact, a number of these types of employee-related expenses were paid by BCE both pre- and post-closing. The vast majority of these payments were due to be paid on August 30, 2002, and BCE and Teleglobe refused to fund the payments, despite numerous and repeated assurances by Anderson and others that BCE would do so. As a result, to retain these critical employees, on August 30, 2002, VarTec was forced to make over $1.1 million in retention bonus payments. In addition, pre-closing severance payments totaled approximately $250,000. It is now clear that BCE and

009568.00017:672819 013

Anderson intentionally negotiated the August 30 payment date so that such severance payments would be due well after BCE intended to abandoned its financial support for Teleglobe. BCE and Anderson did so at a time when they knew that VarTec had limited access to capital and would be financially harmed if the Excel Purchase required outlays of cash from VarTec;

- **Steve Smith Settlement:** Prior to closing, BCE negotiated and entered into a settlement with Steve Smith, a former Excel executive and a top-level independent representative, whereby BCE promised to pay Smith a multi-million dollar settlement over a period of several years. BCE representatives repeatedly stated that the obligation was that of BCE; and, in fact, BCE made an initial payment under that settlement directly to Smith. Despite this, because of an assignment and assumption agreement signed the day before the closing of the Excel Purchase, BCE now claims the obligation belongs to now-bankrupt Teleglobe;

- **Litigation:** The payment of losses, judgments, fees and expenses related to pre-close litigation against Excel is estimated to be very substantial. The Amended Stock Purchase Agreement was specifically designed to prevent VarTec from having to bear any of the burden of these substantial costs and provided that VarTec would act essentially as an administrative agent on the pre-close litigation liabilities. VarTec would begin to administer the claims after closing, but Teleglobe's consent was required to settle or dispose of any claims. At present, there are approximately $140 million of total known claims against Excel and any number of unknown, yet-to-be-filed claims. These claims were also the basis of

numerous conversations and representations from BCE representatives. VarTec consistently stated that it would not pay these liabilities, and BCE consistently agreed that VarTec would not be responsible for them. In addition, the estimated legal fees associated with the litigation are approximately $3 million; approximately $1.1 million of pre-close litigation costs are still owed and the costs continue to rise. BCE representatives also stated that these fees were the responsibility of Teleglobe, backed by BCE, and a number of them were actually paid, pre-closing, directly by BCE;

- **Taxes:** The payment of pre-closing tax liabilities of Excel was also negotiated at length with BCE representatives, who assured VarTec that BCE would financially back the requirement that the taxes be paid. Based only on those tax liabilities that are currently known to VarTec, these taxes are already substantial and could total in excess of $40 million;

- **IRC 338(h)(10) Election:** Under the Amended Stock Purchase Agreement, VarTec is entitled to make an election pursuant to Section 338(h)(10) of the Internal Revenue Code. If made, this election would entitle VarTec to an approximate tax savings of $17.3 million (net present value). Throughout negotiations, BCE was aware that this election was material to VarTec and that it was a significant factor in VarTec's structuring the transaction to be able to make the election. Teleglobe's bankruptcy filing eliminated the benefit of making the election;

- **MTSAs:** The Master Telecommunications Services Agreements between Teleglobe USA and eMeritus Communications Inc. was also a significant part of

009568 00017:672819.013

the consideration for the Stock Purchase Agreement, designed to ensure that VarTec would have a virtually guaranteed revenue stream to fund the operational expenses associated with Excel. Representatives of BCE committed that Teleglobe would direct certain minimum traffic commitments to VarTec's network. This commitment was made by BCE's representatives at the last minute before the agreement was signed on April 5, 2002, when BCE undoubtedly knew that it would be withdrawing financial support from Teleglobe and that Teleglobe would be unlikely thereafter to perform the commitments in the MTSA. The lost value of this commitment to VarTec totals could be in excess of $35 million.

P.    **BCE And Anderson's Misrepresentations And Omissions Were Numerous**

66.    In connection with the Excel Purchase, BCE and Anderson made numerous intentional or knowing misrepresentations and omissions to VarTec in an effort to induce VarTec to complete the transaction. BCE's misrepresentations and omissions include, but are not limited to, the following:

- BCE stated that Teleglobe was a sound, significant, investment-grade company with a good bond rating;
- BCE represented that Teleglobe would be able to meet its obligations under the Stock Purchase Agreement;
- BCE stated that it fully backed Teleglobe financially;
- BCE stated that its commitment to supporting Teleglobe financially would continue;
- BCE stated that it would fund all pre-close capital expenditures and liabilities of Excel;
- BCE represented that it would pay for certain employee liabilities including, but not limited to, severance payments and employee claims related to pre-close termination;
- BCE specifically stated on numerous occasions that it would invest an additional C$1 billion in Teleglobe over the next 12 months;
- BCE assured VarTec that Teleglobe was an important part of BCE's strategic plan for the future;
- BCE specifically stated that the transaction was structured as a stock purchase for tax purposes only;
- BCE represented that it would pay Steve Smith millions of dollars in settlement payments;

009568.00017:672819.013

- BCE stated that all losses, judgments, fees and expenses related to pre-close matters against Excel would be paid;
- BCE stated that all pre-closing tax liabilities of Excel would be paid;
- BCE committed that Teleglobe or related companies would direct certain minimum traffic commitments to VarTec's network;
- BCE failed to disclose that it was considering a drastic restructuring of Teleglobe or that it was considering "strategic alternatives" regarding its financial support of Teleglobe;
- Contrary to its private and public representations, BCE failed to disclose that it planned to withdraw its financial support of Teleglobe;
- BCE failed to disclose that Teleglobe would be unable to meet its obligations under the Stock Purchase Agreement without BCE's financial support.

67.    Anderson's misrepresentations and omissions include, but are not limited to, the

following:

- Anderson repeatedly stated that Teleglobe was a sound, significant, investment-grade company with a good bond rating;
- Anderson represented that Teleglobe would be able to meet its obligations under the Stock Purchase Agreement;
- Anderson stated that BCE fully backed Teleglobe financially;
- Anderson represented that BCE's commitment to supporting Teleglobe financially would continue;
- Anderson stated that BCE would fund all pre-close capital expenditures and liabilities of Excel;
- Anderson represented that BCE would pay for certain employee liabilities including, but not limited to, severance payments and employee claims related to pre-close termination;
- Anderson assured VarTec that Teleglobe was an important part of BCE's strategic plan for the future;
- Anderson specifically stated that the transaction was structured as a stock purchase for tax purposes only;
- Anderson represented that BCE would pay Steve Smith millions of dollars in settlement payments;
- Anderson stated that all losses, judgments, fees and expenses related to pre-close litigation against Excel would be paid;
- Anderson stated that all pre-closing tax liabilities of Excel would be paid;
- Anderson committed that Teleglobe or related companies would direct certain minimum traffic commitments to VarTec's network;
- Anderson failed to disclose that BCE was considering a drastic restructuring of Teleglobe or that BCE was considering "strategic alternatives" regarding BCE's financial support of Teleglobe;
- Contrary to BCE's private and public representations, Anderson failed to disclose that BCE planned to withdraw its financial support of Teleglobe;
- Anderson failed to disclose that Teleglobe would be unable to meet its obligations under the Stock Purchase Agreement without BCE's financial support.

68.    In addition to making fraudulent misrepresentations and omissions, BCE and Anderson participated in affirmative acts of fraud in an effort to induce VarTec to complete the transaction. The fraudulent acts, which provided VarTec with evidence of BCE's intent to fully back Teleglobe's financial obligations, include, but are not limited to, the following:

- Anderson attended and ran all operational meetings of Excel pre-closing and was the primary decision maker on all decisions pre-closing;
- BCE, through Anderson and others, was the sole negotiator of the Stock Purchase Agreement;
- BCE and Teleglobe shared common officers and directors and two of these common officers – Lalande and Anderson – signed the Stock Purchase Agreement on behalf of Teleglobe;
- All Teleglobe and Excel action plans and major decisions had to be approved by BCE;
- BCE, and, specifically, Anderson, controlled how and where Excel funds were to be used;
- BCE paid all expenses relating to the Excel Purchase including attorney's fees, accountant fees, regulatory costs, executive travel expenses, and other costs associated with the transaction;
- BCE continued to either pay post-closing payments or ensured that such payments were met;
- BCE, through Anderson, caused Teleglobe to divert funds away from its obligations under the Stock Purchase Agreement to be used for other BCE growth-related schemes;
- BCE received significant benefits as a result of their conduct because their competitor, VarTec, was financially damaged as a result. In particular, under the guise of being a "lender" or "creditor" of VarTec, BCE obtained extensive confidential and proprietary information regarding VarTec including its plans to do business in Canada through its own dial-around plan and through Excel.

### Q.    BCE's Fraud Damaged And Continues To Damage VarTec Substantially

69.    As a result of BCE and Anderson's misrepresentations and omissions, the "your watch, my watch" treatment of liabilities has been completed gutted. Creditors of Excel are now looking to VarTec for payment of their liabilities. The "cash positive" transaction that VarTec and BCE had so carefully negotiated is also a fiction now. Every day, as a direct result of BCE and Anderson's fraudulent conduct, VarTec is required to pay additional cash outlays for Excel liabilities. The financial damage suffered by VarTec has already been significant and continues to mount.

009568.00017:672819.013

70.    Specifically, VarTec has already incurred expenses and fees in excess of $25 million in Excel liabilities that it would not otherwise have had to pay. These were liabilities that BCE repeatedly promised it would be financially responsible for, yet now refuses to pay. VarTec faces hundreds of millions dollars of additional liabilities in the future – all of which it did not bargain for.

71.    Moreover, VarTec has incurred various other types of financial damage as a result of BCE and Anderson's conduct. First, VarTec has suffered the loss of opportunities to pursue competing deals with other companies like Excel. Had BCE not so greatly misrepresented the financial aspects of the Excel Purchase, VarTec would certainly have considered and pursued other options to purchase similar companies. Second, VarTec has been forced to divert millions of dollars in cash from other areas of VarTec's business in order to pay unbargained for Excel liabilities. The financial impact on VarTec of this unexpected diversion of capital has been significant. Third, VarTec's ability to consummate an ongoing transaction to buy out the shares of one of its shareholders has been impaired as a direct result of BCE and Anderson's fraudulent conduct in the Excel Purchase. Fourth, VarTec's ability to obtain receivables financing or other financing alternatives from its current lender or other financing sources has been curtailed due to the negative financial impact on the Excel Purchase on VarTec.

72.    In short, BCE and Anderson's conduct has caused and will continue to cause VarTec significant financial hardship. BCE negotiated a transaction with VarTec that was structured to have Teleglobe meet significant financial and legal commitments (possibly exceeding hundreds of millions of dollars) at a time when BCE knew it was seriously contemplating withdrawing its financial support for Teleglobe. In fact, BCE began to pull its financial support the very next business day after closing the transaction with VarTec.

009568.00017:672819 013

73.    If BCE had disclosed these material facts regarding its intentions with respect to Teleglobe, VarTec would have negotiated a dramatically different purchase price and the parties, terms and conditions would have been drastically altered.  Had BCE raised the possibility of a Teleglobe restructuring, VarTec would undoubtedly have structured the transaction as an asset sale in bankruptcy without any expectation of future Teleglobe financial support – a result that would have compromised and impaired BCE's plan to eliminate Teleglobe as a subsidiary. Alternatively, VarTec would have insisted on a parental guarantee or indemnity from BCE. Instead, BCE and Anderson withheld these material facts so they could deceive and induce VarTec into paying a higher price for Excel.  BCE did so after it had received access to VarTec's confidential financial information and at a time when BCE was in competition with VarTec and knew, based on receipt of this information, that burdening its competitor with the substantial financial obligations of Excel without the financial support required by the Amended Stock Purchase Agreement could be financially disastrous to VarTec.

## CAUSES OF ACTION

### COUNT I – COMMON LAW FRAUD

74.    VarTec realleges the allegations in all of the preceding paragraphs, and incorporates those paragraphs herein by reference.

75.    Defendants made material misrepresentations and omissions to VarTec in the course of negotiations between the parties.  Defendants knew the representations were false when made or were made recklessly without any regard for the truth.  The false, material representations and omissions made by Defendants on which VarTec relied include but are not limited to (1) the financial condition of Teleglobe; (2) the financial ability of Teleglobe to perform all obligations required by the Stock Purchase Agreement; (3) the necessity, in light of

009568.00017:672819 013

the foregoing, for VarTec to obtain additional financial guaranties and/or indemnities from BCE Ventures or BCE; (4) the fact that BCE intended to provide ongoing financial support and backing to Teleglobe and its subsidiaries, thereby ensuring VarTec that the financial obligations of Teleglobe in the Stock Purchase Agreement would be fully performed; and (5) the fact that Teleglobe was strategically important to BCE's growth plans and that BCE had committed to invest an additional C\$1 billion in Teleglobe over the next 12 months. Moreover, Defendants failed and omitted to disclose the fact that BCE was considering and intending to withdraw its financial support of Teleglobe.

76.    BCE's fraudulent statements and omissions were material facts solely within BCE's knowledge, and Defendants knew that VarTec (i) was ignorant of these facts and (ii) did not have an equal opportunity to discover these facts.

77.    Defendants' fraudulent promises and omissions were material and made with the intention of not fulfilling the promises.

78.    In making the fraudulent statements, promises, and nondisclosures, Defendants knew and intended that VarTec would rely on Defendants' fraudulent promises and nondisclosures, to VarTec's detriment.

79.    As a direct and proximate result of Defendants' fraudulent statements, promises, and nondisclosures, VarTec suffered injury and actual damages in an amount in excess of the minimum jurisdictional limits of this Court.

80.    Furthermore, Defendants' fraudulent statements, promises, and nondisclosures were made with malice and the intent to defraud, entitling VarTec to exemplary damages in an amount in excess of the minimum jurisdictional limits of this Court.

009568.00017:672819.013

## COUNT II – STATUTORY FRAUD PURSUANT TO SECTION 27.01 OF THE TEXAS BUSINESS AND COMMERCE CODE

81.    VarTec realleges the allegations in all of the preceding paragraphs, and incorporates those paragraphs herein by reference.

82.    Defendants made material representations and omissions to VarTec in the course of negotiations of the transaction. Defendants knew the representations were false when made or were made recklessly without any regard for the truth. The false, material representations and omissions made by Defendants on which VarTec relied include but are not limited to (1) the financial condition of Teleglobe; (2) the financial ability of Teleglobe to perform all obligations required by the Stock Purchase Agreement; (3) the necessity, in light of the foregoing, for VarTec to obtain additional financial guaranties and/or indemnities from BCE Ventures or BCE; (4) the fact that BCE intended to provide ongoing financial support and backing to Teleglobe and its subsidiaries, thereby ensuring VarTec that the financial obligations of Teleglobe in the Stock Purchase Agreement would be fully performed; and (5) the fact that Teleglobe was strategically important to BCE's growth plans and that BCE had committed to invest an additional C$1 billion in Teleglobe over the next 12 months. Moreover, Defendants failed and omitted to disclose the fact that BCE was considering and intending to withdraw its financial support of Teleglobe.

83.    Defendants' fraudulent statements and omissions were material facts solely within Defendants' knowledge, and Defendants knew that VarTec (i) was ignorant of these facts and (ii) did not have an equal opportunity to discover these facts.

84.    In making the fraudulent statements, promises, and nondisclosures, Defendants knew and intended that VarTec would rely on Defendants' fraudulent promises and nondisclosures, to VarTec's detriment.

009568.00017:672819.013

85.    Defendants' fraudulent promises and omissions were material and made with the intention of not fulfilling the promises.

86.    As a direct and proximate result of Defendants' false statements and omissions, VarTec suffered injury and actual damages in an amount in excess of the minimum jurisdictional limits of this Court.

## COUNT III -- VIOLATIONS OF § 10(b) OF THE SECURITIES EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER

87.    VarTec realleges the allegations in all of the preceding paragraphs, and incorporates those paragraphs herein by reference.

88.    This count is asserted against Defendants based on section 10(b) of Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder.

89.    Defendants, individually and in concert, directly and indirectly, and using the means or instrumentalities of interstate commerce or the mails, engaged in a continuous course of conduct to defraud VarTec. Defendants employed devices, schemes, and artifices to defraud, and engaged in acts, practices, and a course of conduct designed to induce VarTec to enter into the Excel Purchase. Such actions included the making of untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in transactions, practices, and courses of business that operated as a fraud and deceit upon VarTec. The purpose and effect of Defendants' scheme, plan, and unlawful course of conduct were, among other things, to induce VarTec to enter into the Excel Purchase.

90.    Defendants are liable for each of the fraudulently misleading statements and omissions set forth above in that they directly or indirectly made such statements or omissions.

009568.00017:672819.013

91.    With knowledge of the falsity and/or misleading nature of the statements and omissions contained herein, and in reckless disregard of the truth of such statements and omissions, Defendants also caused public statements to contain material misstatements and omissions of material facts as alleged above, in violation of the federal securities laws.

92.    More specifically, Defendants made material representations and omissions to VarTec in the course of the negotiations of the transaction. Defendants knew the representations were false when made or were made recklessly without any knowledge of the truth. The false, material representations made by Defendants on which VarTec relied include but are not limited to (1) the financial condition of Teleglobe; (2) the financial ability of Teleglobe to perform all obligations required by the Stock Purchase Agreement; (3) the necessity, in light of the foregoing, for VarTec to obtain additional financial guaranties and/or indemnities from BCE Ventures or BCE; (4) the fact that BCE intended to provide ongoing financial support and backing to Teleglobe and its subsidiaries, thereby ensuring VarTec that the financial obligations of Teleglobe in the Stock Purchase Agreement would be fully performed; and (5) the fact that Teleglobe was strategically important to BCE's growth plans and that BCE had committed to invest an additional C$1 billion in Teleglobe over the next 12 months. Moreover, Defendants failed and omitted to disclose the fact that BCE was considering and intending to withdraw its financial support of Teleglobe.

93.    As a direct and proximate result of Defendants' false statements and omissions, VarTec suffered injury and actual damages in an amount in excess of the minimum jurisdictional limits of this Court.

009568.00017:672819.013

## COUNT IV – AGAINST DEFENDANT ANDERSON FOR VIOLATIONS OF § 20(a) OF THE EXCHANGE ACT WITH RESPECT TO THE § 10(b) AND RULE 10b-5 VIOLATIONS

94.     VarTec realleges the allegations in all of the preceding paragraphs, and incorporates those paragraphs herein by reference.

95.     This count is asserted against Defendant Anderson as a control person based on § 20(a) of the Securities Exchange Act, 15 U.S.C. §78t(a).

96.     Anderson had the power and influence to control and did cause BCE to engage in the unlawful acts and conduct alleged herein.  Because of his executive and managerial positions at BCE and his extensive knowledge of BCE's finances, Anderson had access to non-public information regarding BCE's intentions with regard to Teleglobe, and acted to conceal and/or omitted to disclose such information to VarTec when he knew that such non-disclosure would have a devastating impact on VarTec.

97.     By reason of his conduct, Anderson is liable for the wrongful conduct as alleged herein, and is liable to VarTec for the substantial damages that VarTec suffered in connection with the transaction.

## COUNT V – TEXAS SECURITIES ACT

98.     VarTec realleges the allegations in all of the preceding paragraphs, and incorporates those paragraphs herein by reference.

99.     Alternatively, Defendants, individually and in concert with others, violated section 33(A)(2) of the Texas Securities Act in that they or a person or entity they controlled offered or sold stock by means of an untrue statement of material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

009568.00017:672819.013

100.    Specifically, Defendants had a duty to make only true, fair and accurate statements and to disclose material facts. Instead of doing so, Defendants made materially false and misleading statements and omissions including but not limited to (1) the financial condition of Teleglobe; (2) the financial ability of Teleglobe to perform all obligations required by the Stock Purchase Agreements; (3) the necessity, in light of the foregoing, for VarTec to obtain additional financial guaranties and/or indemnities from BCE; (4) the fact that BCE intended to provide ongoing financial support and backing to Teleglobe and its subsidiaries, thereby ensuring VarTec that the financial obligations of Teleglobe in the Stock Purchase Agreement would be fully performed; and (5) the fact that Teleglobe was strategically important to BCE's growth plans and the BCE had committee to invest an additional C$1 billion in Teleglobe over the next 12 months, and to disclose information, the omission of which would make Defendants' statements materially false and misleading.

101.    As a result of Defendants fraudulent action and inaction, Defendants made materially false and misleading statements and omissions including but not limited to (1) the financial condition of Teleglobe, Teleglobe Holdings and other Teleglobe subsidiaries and affiliates; (2) the financial ability of Teleglobe and Teleglobe Holdings to perform all obligations required by the Stock Purchase Agreements; (3) the necessity, in light of the foregoing, for VarTec to obtain additional financial guaranties and/or indemnities from BCE ventures or BCE; (4) the fact that BCE intended to provide ongoing financial support and backing to Teleglobe and its subsidiaries, thereby ensuring VarTec that the Financial obligations of Teleglobe and Teleglobe Holdings in the Stock Purchase Agreement would be fully performed; and (5) the fact that Teleglobe was strategically important to BCE's growth plans and the BCE had committee to invest an additional C$1 billion in Teleglobe over the next 12 months.

009568.00017:672819.013

102.   VarTec reasonably relied upon Defendants' statements as described in the preceding paragraphs, in participating in the Excel Purchase.   VarTec would not have participated in the Excel Purchase had they known the truth behind Defendants misrepresentations and omissions.

103.   The fraudulent conduct of Defendants caused VarTec to participate in the Excel Purchase.   VarTec sustained losses and other damages due to the acts and omissions of Defendants.

104.   The fraudulent conduct of Defendants proximately caused the losses and other damages sustained by VarTec.

105.   VarTec suffered substantial damages as a result of the wrongs alleged herein in an amount in excess of the jurisdictional limits of this Court to be proved at trial.

## COUNT VI – ATTORNEYS FEES AND COSTS

106.   VarTec realleges the allegations in all of the preceding paragraphs, and incorporates those paragraphs herein by reference.

107.   VarTec retained the undersigned attorneys to prosecute this action and is entitled to recover their reasonable and necessary attorneys fees in this action, pursuant to section 27.01(e) of the Texas Business and Commerce Code.

## COUNT VII – PUNITIVE DAMAGES

108.   VarTec realleges the allegations in all of the preceding paragraphs, and incorporates those paragraphs herein by reference.

109.   Defendants' fraudulent statements, promises, nondisclosures and other actions were committed with malice and the intent to defraud, entitling VarTec to punitive damages in an amount in excess of the minimum jurisdictional limits of this Court.

009568.00017:672819.013

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff VarTec requests that this Court grant it judgment against the Defendants, jointly and severally, and award to VarTec:

a.    all applicable and appropriate actual, consequential, statutory and exemplary damages permitted by law;

b.    its attorneys' fees and costs as allowed by law, including any appellate costs allowed;

c.    pre-judgment and post-judgment interest at the maximum rate(s) permitted by law; and

d.    all other relief, at law or in equity, to which VarTec is justly entitled.

## JURY TRIAL DEMANDED

Plaintiffs demand a jury trial of all triable issues.

009568.00017:672819.013

Dated: February 6, 2003

Respectfully submitted,

**HUGHES & LUCE, L.L.P.**

_[signature]_

Craig W. Budner
Texas State Bar No. 03313730
Beth W. Bivans
Texas State Bar No. 00797664
Andrew B. Russell
Texas State Bar No. 24034661
Ashley C. Vaught
Texas State Bar No. 24037636
1717 Main Street
Suite 2800
Dallas, Texas 75201
Phone: (214) 939-5500
Fax:    (214) 939-6100

**ATTORNEYS FOR PLAINTIFFS
VARTEC TELECOM, INC. AND
VARTEC TELECOM HOLDING COMPANY**

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing instrument was served upon the

attorneys of record of all parties to the above cause in accordance with the Federal Rules of Civil

Procedure, on this 6thday of February, 2003.

_[signature]_

Beth W. Bivans

009568.00017:672819.013

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 24, 2005, I electronically filed a true and correct copy of the

Declaration of William D. Anderson in Support of Defendants' Memorandum in Opposition to

VarTec's Amended Motion for a Protective Order with the Clerk of the Court using CM/ECF,

which will send notification that such filing is available for viewing and downloading to the

following counsel of record:

Gregory V. Varallo, Esq.
Mark D. Collins, Esq.
C. Malcolm Cochran, IV, Esq.
Robert J. Stern, Jr., Esq.
Richards, Layton & Finger, P.A.
920 N. King Street
Wilmington, DE 19801

Kevin A. Gross, Esq.
Joseph A. Rosenthal, Esq.
Rosenthal, Monhait, Gross & Goddess, P.A.
1401 Mellon Bank Center
P.O. Box 1070
Wilmington, DE 19899-1070

I further certify that on May 24, 2005, I served the Declaration of William D. Anderson

in Support of Defendants' Memorandum in Opposition to VarTec's Amended Motion for a

Protective Order upon the following non-registered participants in the manner indicated below:

BY EMAIL
John P. Amato, Esq.
Mark S. Indelicato, Esq.
Zachary G. Newman, Esq.
Jeffrey L. Schwartz, Esq.
Hahn & Hessen LLP
488 Madison Avenue
New York, NY  10022

Pauline K. Morgan (No. 3650)
Maribeth Minella (No. 4185)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
P.O. Box 391
Wilmington, DE 19899-0391
(302) 571-6681
pmorgan@ycst.com
mminella@ycst.com
bank@ycst.com

*Attorneys for Defendants*