# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE: | § | |
| | § | |
| TELEGLOBE COMMUNICATIONS | § | **CASE NO. 02-11518 (MFW)** |
| CORPORATION, ET AL., | § | **(Jointly Administered)** |
| | § | |
| DEBTORS. | § | |
| | § | |
| | § | |
| Teleglobe USA Inc. et al., | § | |
| | § | |
| Plaintiff, | § | |
| | § | **CIV. ACTION NO. 04-1266 (SLR)** |
| v. | § | |
| | § | |
| BCE Inc. et al., | § | |
| | § | |
| Defendants. | § | |

## APPENDIX IN SUPPORT OF INTERVENOR VARTEC TELECOM, INC.'S REPLY BRIEF SUPPORTING ITS AMENDED MOTION FOR PROTECTIVE ORDER

**STEVENS & LEE P.C.**
Joseph H. Huston, Jr. (No. 4035)
Thomas G. Whalen, Jr. (No. 4034)
1105 North Market Street
Suite 700
Wilmington, DE 19801
Telephone: (302) 425-3310, -3304
Telecopy: (610)371-7972, -8512

AND

**HUGHES & LUCE L.L.P.**
Craig W. Budner
Beth W. Bivans
1717 Main Street, Ste. 2800
Dallas, Texas 75201
Telephone: (214) 939-5500
Telecopy: (214) 939-5849

**ATTORNEYS FOR INTERVENORS VARTEC TELECOM, INC. AND VARTEC TELECOM HOLDING COMPANY**

i

## TABLE OF CONTENTS

APP No.

Transcript of April 12, 2004 Telephonic Hearing
Before the Arbitration Panel ……………………………….…………………..…..C001

Motion of VarTec Telecom, Inc. and VarTec Telecom Holding Company
for an Order Requiring Assumption of Executory Contract or, Alternatively,
for Relief From Automatic Stay …......................................................................................C005

Order (I) Denying VarTec's Request to Compel Assumption of Stock
Purchase Agreement, (II) Granting VarTec Relief from the Automatic
Stay, and (III) Granting Debtors' Request to Stay Proceedings Related
to Debtors' Objections to VarTec's Amended Proofs of Claim………………….………......C018

Defendants' Opposition to Plaintiffs' Motion to Partially Lift the
PSLRA Discovery Stay and Statement of Authorities………………………………………..C020

009568.00017:904943.02

Hearing

McLean, VA

April 12, 2004

Page 1

```
1              IN THE AMERICAN ARBITRATION ASSOCIATION

2         INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION

3                     (Washington, D.C.)

4    - - - - - - - - - - - - - - - X

5    TELEGLOBE TELECOM CORPORATION, :

6    f/k/a EXCEL COMMUNICATIONS,    :

7    INC.,                          :

8          Claimant,               : No. 50 T 153 00025 04

9       v.                          :

10   VARTEC TELECOM HOLDING          :

11   COMPANY, VARTEC TELECOM, INC. :

12          Respondents.            :

13   - - - - - - - - - - - - - - - X

14                          McLean, Virginia

15                          Monday, April 12, 2004

16          Telephone Hearing in the above-entitled

17   matter, pursuant to notice, before SUSAN L.

18   CIMINELLI, a Notary Public in and for the

19   Commonwealth of Virginia, taken at the offices of

20   Arnold & Porter, LLP, Suite 900, 1600 Tysons

21   Boulevard, McLean, Virginia, at 1:10 p.m., Monday,

22   April 12, 2004, and the proceedings being taken down

23   by Stenotype by SUSAN L. CIMINELLI, CRR, RPR, and

24   transcribed under her direction.

25
```

**EXHIBIT**

**1**

Page 2

1   APPEARANCES:

2

3       On behalf of the Claimant: (Via telephone)
4           DOUGLAS LOBEL, ESQ.
5           RANDALL K. MILLER, ESQ.
6           SUSAN LEE, ESQ.
7           Arnold & Porter
8           Suite 900
9           1600 Tysons Boulevard
10          McLean, VA 22102-4865
11          (703) 720-7000

12

13      On behalf of the Respondents: (Via telephone)
14          BETH BIVANS, ESQ.
15          Hughes & Luce, LLP
16          1717 Main Street, Suite 2800
17          Dallas, TX 75201
18          (214) 939-5815

19

20      ALSO PRESENT: (Via telephone)
21          BRADLEY D. SOTO, International Case Manager
22          WILLIAM S. SESSIONS, ESQ., Arbitrator
23          ALVIN ZIMMERMAN, ESQ., Arbitrator
24          HONORABLE RODERICK McKELVIE, ESQ., Arbitrator
25          LISA D'ALESSIO

Page 3

1            PROCEEDINGS
2        MR. SOTO:  Good afternoon, everybody.
3    This is Brad, the administrator.  I hope you all had
4    a good weekend.  This is a status conference call.
5    I'll leave the floor now to the panel.  Judge
6    McKelvie, if you wish.
7        MR. McKELVIE:  How's everybody doing.  I'm
8    in the middle of meetings so I am taking a break so I
9    just as soon see if we could move forward.  We have
10   Doug Lobel with an agenda, and I'm wondering whether
11   or not it's acceptable to Vartec?
12       MS. BIVANS:  My understanding of the
13   things that were on the agenda, the things that were
14   on the agenda today were the motion to compel that
15   Vartec filed on the 8th of April, I believe, last
16   Thursday, and then I believe that the panel had
17   informed Mr. Soto that they had some issues about
18   prior hearings that they wanted to discuss.  That was
19   my understanding.
20       Mr. Lobel has a few additional things on
21   this agenda.  I'm not necessarily opposed to
22   addressing some of those things on this call, if the
23   panel has time to address all of the items that he
24   has indicated on here.  But my understanding of the
25   official items were limited to those two issues.

Page 4

1        MR. McKELVIE:  Why don't we start with the
2    motion to compel then?
3        MS. BIVANS:  Sure.  I think I can expedite
4    it slightly for you, as well.  As the panel is aware,
5    Vartec filed a motion to compel on the 8th.  We have
6    had -- essentially identified about 10 different
7    categories of documents or information that Vartec
8    had requested that TeleGlobe advise us whether they
9    would be producing.  And their response to that was
10   that we should wait and see what the production
11   contained.
12       Unfortunately, I think this is one of
13   those circumstances where we are going to need to
14   address before the end of discovery or the close of
15   document discovery some of the issues.  We did get a
16   production from TeleGlobe on Friday of last week that
17   I think will allow me to move more quickly through
18   this.
19       I think -- in fact, probably, I haven't
20   looked at every page of that, so I'm not waiving my
21   right to come back and maybe assert some of these
22   additional categories, but I can narrow down today
23   what I think we need to address with the panel.  And
24   the most substantial of those is in category 1 of my
25   letter of the documents related to the SPA.

Page 5

1        MR. LOBEL:  Of which letter?
2        MS. BIVANS:  My April 8th letter that
3    constitutes the motion to compel.
4        MR. SESSIONS:  I did not get such a
5    letter.  Is that one of the three that were forwarded
6    out by you?
7        MS. BIVANS:  Yes.  It was.
8        MR. SESSIONS:  I just walked into the
9    office five minutes before this began.  I have not
10   read those.  Forgive me for interrupting.
11       MS. BIVANS:  I will keep it in mind that
12   you may not have the letter in front of you.  I'll
13   try to be specific with regard to the category.  The
14   first category are what I have entitled in the letter
15   the documents related to the SPA.  We have asked
16   TeleGlobe to advise us whether they will or will not
17   be producing the documents or things that relate to
18   the SPA.  And it's important to understand the
19   transaction somewhat, and give the panel just a
20   little bit of background on this.
21       TeleGlobe was owned -- at the time Vartec
22   bought Excel from TeleGlobe, TeleGlobe was owned by
23   BCE, Inc. which is a Canadian company and was the
24   parent of TeleGlobe.  BCE actually negotiated the
25   transaction, and many of the BCE representatives who

Page 6

1   were involved significantly in the deal were also
2   officers of TeleGlobe, but didn't office out of the
3   TeleGlobe offices.
4          So what we have asked TeleGlobe to tell
5   us, in their various productions we have not seen any
6   documents related to either the drafting or the
7   negotiation of the SPA. We haven't seen any of their
8   attorney documents, and we think all of those are
9   relevant. We have produced from Vartec's side of the
10  table all of our attorney files related to the
11  negotiations of the SPA and all of the various
12  emails, et cetera, that relate to the negotiation of
13  that document.
14         We haven't seen productions from TeleGlobe
15  on that matter and I think that TeleGlobe's
16  responses, at least in the past, have been that those
17  documents are not in TeleGlobe's possession.
18         The April 8th letter as, Your Honor, you
19  are aware, we suggested that certain items are
20  actually within the custody and control of TeleGlobe,
21  even if they are in the possession of a third party.
22  So for example, any of the documents that relate to
23  the negotiation of the SPA to which TeleGlobe is a
24  party that are in the possession of TeleGlobe's
25  counsel that represented it in that underlying

Page 7

1   transaction are actually deemed to be within the
2   possession, custody and control of TeleGlobe for
3   purposes of discovery.
4          And so we have asked that TeleGlobe
5   confirm to us that they will be producing those
6   documents and they have not yet responded to that
7   request for confirmation.
8          Same goes with BCE and with the other
9   individuals that were related in the negotiation. If
10  BCE and its officers and representatives were
11  actually acting as agents and representatives of
12  TeleGlobe in negotiating the contract, which I think
13  it's probably undisputed that they were, the, those
14  people, individuals and entities also have documents
15  that would be under the constructive possession and
16  custody and control of TeleGlobe.
17         So what we have asked is that TeleGlobe
18  actually reach out to the third parties that may be
19  in possession of those documents and get those
20  documents to which they are entitled to have and
21  produce them to us in the discovery process.
22         That's item number 1 on the list of
23  things. I'm happy to let Mr. Lobel respond to that
24  or go on to the four or five categories that I think
25  we need to talk about today.

Page 8

1          MR. LOBEL: Judge McKelvie, would you like
2   me to respond to that?
3          MR. McKELVIE: Sure. That's fine.
4          MR. LOBEL: Let me respond generally in
5   terms of the motion. We think that the motion is
6   premature in many aspects. It is a motion to compel
7   production of documents when the production is
8   ongoing and in fact, Vartec filed the motion knowing
9   that that very next day they would be getting the
10  second wave of the three waves of production which
11  they in fact did receive the day after they filed the
12  motion, 16,000 pages of documents which are not
13  accounted for in the motion.
14         And obviously, if they had waited to file
15  the motion one more day, that would have been
16  accounted for. And what they essentially did was to
17  send us a letter several days before they filed a
18  motion saying, tell us everything you are going to be
19  producing and take a position on each of these
20  categories. And we responded back by saying, you
21  know, we understand what our obligations are. We are
22  complying with them in every instance, and it's
23  premature to have motions to compel when we have
24  still got another two to three weeks to continue to
25  do our document review and seeking documents and

Page 9

1   making production.
2          So we filed a response to the motion
3   today. We only had one business day, by the way, to
4   address this, saying that we think this should all be
5   dealt with on April 26th, which is after the final
6   date for production when the parties are clear on
7   what has and has not been produced. We are simply
8   not in a position right now to commit to what there
9   is, since we are in the process of reaching out to
10  third parties and looking at, you know, what's
11  available and what is to be produced.
12         I do need to -- and I understand, Judge
13  McKelvie, you have got limited time. I'll try to
14  make this very brief. I think that the panel needs
15  to understand why there is a vast disparity in the
16  documents available to the two sides in this case.
17         I have said at a number of these hearings,
18  we have very little. But I never really explained
19  why that is and it's somewhat unusual that one side
20  would have almost all the discovery and one side
21  would have virtually nothing. But what the panel
22  needs to understand here is that before the sale of
23  the Excel Company that's the subject of this case,
24  Excel, although it was owned by TeleGlobe was
25  operated as an entirely separate business entity. It

3 (Pages 6 to 9)

Page 10

1    had a separate management team. It was at a separate
2    physical location. There were separate employees and
3    there was an entirely separate legal department.
4         And that even though TeleGlobe, the
5    claimant in this case, owned the stock of the Excel
6    Companies, the people at Excel and the management at
7    Excel reported to the ultimate parent company, BCE,
8    which is the Canadian parent, and BCE ran Excel as a
9    separate entity with no operational control on the
10   part of TeleGlobe.
11        So that explains why there would be a
12   dearth of documents in the possession of TeleGlobe
13   regarding the operation, the business plan, the
14   cases, legal cases that were filed against TeleGlobe,
15   and the various affairs of the Excel Companies. And
16   we have explained over and over to Vartec and they
17   just refuse to hear us, I think, that we have very
18   little.
19        Now, moving on to the negotiation of the
20   sale of the Excel Companies, BCE, the ultimate
21   parent, based in Canada, handled the sale of the
22   Excel Companies, again, even though TeleGlobe owned
23   the stock of the Excel Companies. And the
24   individuals at TeleGlobe, and there is only, I think
25   11 employees left at TeleGlobe now, had no

Page 11

1    involvement, oversight or control of the sale of the
2    Excel Companies.
3         And TeleGlobe was not involved in
4    structuring the deal. Was not involved in putting
5    the deal terms together. Was not involved in the
6    negotiations, and didn't select counsel, except for a
7    couple of very limited instances where BCE went to
8    individual nonmanagement TeleGlobe employees for
9    little bits of information. So again, that explains
10   why the TeleGlobe entity has very little information
11   in their possession, on the control, the negotiation
12   or the terms of this deal.
13        And one last point that needs to be made.
14   As of January 2003, TeleGlobe is no longer affiliated
15   with BCE. BCE sold the stock of TeleGlobe to Ernst &
16   Young and so there is no current relationship
17   whatsoever between BCE and TeleGlobe.
18        Now, with respect to the -- so I wanted
19   everyone to understand why it is we keep saying and
20   why it makes sense that we keep saying we have very
21   little. We have almost nothing, although we have
22   scoured the files to find what there is. And in
23   fact, Vartec filed a lawsuit against BCE where they
24   essentially alleged the very things that I just told
25   the panel, which is that BCE negotiated this deal

Page 12

1    entirely and that TeleGlobe had virtually nothing to
2    do with it, so Vartec is well aware of that. That
3    lawsuit is pending in the District Court of the
4    District of Columbia.
5         With respect to the complicated legal
6    issue of whether TeleGlobe has custody or control of
7    documents in the possession of BCE'S attorneys,
8    Sherman & Sterling in New York, and other counsel,
9    and whether TeleGlobe has legal right to get
10   documents from BCE, that is an issue that we would be
11   happy to brief out, but we have not done so, given
12   the shortness of time in which we had to address
13   this.
14        And we did ask in our response that that
15   issue be deferred until the 26th and we would be
16   happy to brief that and have that argued on the 26th
17   on the next scheduled call because we don't think
18   that Vartec is correct in their very broad assertion
19   of control.
20        MS. BIVANS: Let me respond briefly, if I
21   might, and then we'll move on to the next category.
22   First, that global broad brush argument that
23   Mr. Lobel has made with regard to document production
24   generally and the fact that we ought to just wait
25   until all the documents are produced and then make

Page 13

1    decisions about various categories. I don't think
2    that's workable in this case for several reasons.
3         First of all, obviously, we have been the
4    subject, Vartec has been the subject of four or five
5    motions to compel regarding document discovery from
6    TeleGlobe so it's ironic that they would argue we are
7    not entitled to rulings on our various things.
8         But especially with regard to this
9    particular category of documents, I would anticipate
10   if TeleGlobe is successful in obtaining possession of
11   these documents from BCE and the lawyers who were
12   involved in the underlying transaction, that it could
13   be an extremely voluminous amount of documents. And
14   if that's going to be dropped on us on the very last
15   day of document discovery, I would like to know about
16   that now, because that has significant impact upon
17   when I can schedule depositions of TeleGlobe
18   witnesses.
19        And if I'm not going to get the vast
20   majority and bulk of documents related to the
21   underlying transaction, if I'm not going to get them
22   at all, and what I hear Mr. Lobel saying is that they
23   are going to oppose our efforts to get this
24   information from BCE via TeleGlobe, but I think that
25   this is an issue that ought to be addressed up front

4 (Pages 10 to 13)

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| TELEGLOBE COMMUNICATIONS | § | CASE NO. 02-11518 (MFW) |
| CORPORATION, ET AL., | § | (Jointly Administered) |
| | § | |
| DEBTORS. | § | Objection Deadline: February 13, 2004 |
| | § | Hearing Date: February 20, 2004 |

### MOTION OF VARTEC TELECOM, INC. AND VARTEC TELECOM HOLDING COMPANY FOR AN ORDER REQUIRING ASSUMPTION OF EXECUTORY CONTRACT OR, ALTERNATIVELY, FOR RELIEF FROM AUTOMATIC STAY

VarTec Telecom, Inc. and VarTec Telecom Holding Company (together, "VarTec"), for their Motion for an Order Requiring Assumption of Executory Contract or, Alternatively, for Relief from Automatic Stay, state the following:

### SUMMARY OF ARGUMENT

1.       The time has come for Teleglobe to formally acknowledge its assumption of the SPA. For almost two years, Teleglobe has invoked the protections of the Bankruptcy Code to avoid its obligations under the SPA. Meanwhile, Teleglobe watched VarTec suffer under the burden of the millions of dollars of liabilities Teleglobe laid at VarTec's feet – liabilities that Teleglobe would have to immediately pay if the SPA were assumed. Ironically, Teleglobe has sought, at every available opportunity, to enforce the SPA's provisions against VarTec. Most recently, Teleglobe invoked the arbitration clause of the SPA and is pursuing a $30 million claim against VarTec in a separate proceeding. Despite its invocation of the SPA and without regard to its terms, Teleglobe suggests that VarTec should either be forced to continue to absorb Teleglobe's liabilities or should submit to Teleglobe's chosen forum. Under the circumstances, VarTec seeks an order from this Court requiring the Debtors to assume the SPA immediately or, at a minimum, by February 27, 2004.

SL1 416891v1/18574.001

**EXHIBIT**

**2**

tabbies

C005

2.      Alternatively, VarTec requests this Court permit it to enforce its rights under the SPA consistent with the provisions of that agreement and other applicable laws, as VarTec deems appropriate.  Specifically, VarTec requests an order, pursuant to either 11 U.S.C. § 362(d) or other applicable law, that would permit VarTec to pursue all remedies specified in the SPA and at law or equity, including but not limited to (i) its rights to immediate payment of indemnification claims under § 13.8(a); (ii) its rights of recoupment and/or setoff; (iii) its rights to pursue its Amended Proof of Claim in full in this Court; (iv) its rights to file all or some of its claims as counterclaims in the Arbitration; and/or (v) its rights, absent the Debtors' compliance with the SPA's provisions, to serve demands and initiate separate arbitration proceedings against the Debtors.

## JURISDICTION

3.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334 and 11 U.S.C. § 105.  This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(A), (B), (G) and (O).

## BACKGROUND FACTS RELEVANT TO THE MOTION

### I.      The Excel Transaction and the SPA

4.      As this Court is aware, on April 5, 2002, certain of the Debtors, including Teleglobe Communications Corporation ("Teleglobe") and VarTec executed the Amended and Restated Stock Purchase Agreement (together with the Ancillary Agreements, the "SPA"), pursuant to which VarTec agreed to purchase the outstanding shares of the Excel companies from Teleglobe for the total purchase price of $227.5 million, represented by two Promissory Notes (the "Notes") executed by VarTec in connection with the SPA.  As the Court is also aware, the SPA contains specific and detailed provisions wherein the Debtors agreed to indemnify VarTec for payment of specified liabilities of Excel that arose prior to April 5, 2002.

5.    The indemnification provisions are varied and extensive.  In order to pursue immediate payment of indemnified expenses, VarTec is required to serve a notice of claim and demand on Teleglobe – a requirement that, under the current circumstances, VarTec cannot satisfy in light of the automatic stay.  After a notice of claim is served, Teleglobe and VarTec are required to "negotiate in good faith" and Teleglobe cannot "dispute the payment of any claim" that "would be clear to a prudent person."  SPA § 13.8(a).[1]

6.    In the event Teleglobe disputes the claim, VarTec is permitted to separately bring its claims in an arbitration consistent with the arbitration clause in Section 13.8 of the SPA.  The clause clearly contemplates separate arbitration proceedings on each individual notice of claim. Once an award is rendered in the arbitration, Teleglobe must pay VarTec within five days.

7.    Importantly, the SPA alters the arbitration procedures if Teleglobe's failure to pay a claim would result in "significant financial hardship" to VarTec.  In that event, Teleglobe is required to pay the full amount of the claim within five business days without need for initiation of an arbitration or the entry of an arbitration award.  SPA § 13.8(a).  If, after payment of the claim, Teleglobe still disputes the claim or amount, Teleglobe can then bring an arbitration to recover the disputed amounts paid.

8.    The SPA also expressly permits VarTec to exercise its rights of offset and recoupment against the interest due under the Notes.  SPA §§ 13.5(b) and 13.6.  Where Teleglobe shall "refuse or fail to timely pay in full" amounts due under the indemnification procedure, VarTec is entitled to use "any legal or equitable remedy to collect . . . including without limitation, offset and recoupment."  SPA § 13.6.  Because an arbitration award is a

---

[1]    The relevant portions of the SPA are attached hereto as Exhibit A.

SL1 416891v1/18574.001

prerequisite of such offsets, such relief has also been unavailable to VarTec due to the automatic stay.

## II.    VarTec's Original Motion to Set Deadline for Assumption/Rejection

9.    Less than two weeks after the Debtors filed their bankruptcy cases, VarTec sought a meeting with the Debtors' representatives to address the treatment of the Debtors' SPA obligations in light of their bankruptcy filing.  When Teleglobe failed to respond to VarTec's request, VarTec filed a motion on June 20, 2002, requesting that the Court set an expedited deadline for assumption or rejection of the SPA (the "Original Motion").  In the Original Motion, VarTec stated that it intended to exercise its post-petition offset and recoupment rights pursuant to the SPA.  Original Motion at 14, n.15.[2]  A ruling on the Original Motion was indefinitely postponed in light of the ongoing 2004 process.

## III.    Teleglobe's Demand for Arbitration and VarTec's Motion to Stay

10.    As this Court is also aware, on January 12, 2004, Teleglobe filed a Demand for Arbitration and Statement of Claim against VarTec (the "Arbitration Demand") and commenced arbitration proceedings (the "Arbitration").  In its Arbitration Demand, Teleglobe seeks relief on three limited areas in dispute between the parties:  (i) quarterly interest payments pursuant to the Notes; (ii) the division of certain state and federal tax refunds under the SPA; and (iii) the collectibility of certain accounts receivables.

11.    On January 20, 2004, VarTec requested that this Court stay the Arbitration, arguing that it should not be forced to litigate its claims in separate proceedings and that the three limited areas asserted by the Debtors in the Arbitration were part of the larger dispute between

---

[2]    The Original Motion (without exhibits) is attached as Exhibit B, and all factual allegations and arguments made pursuant thereto and are incorporated into this Motion.

Page 4

the parties. VarTec further asserted that this Court was the proper forum for the resolution of the entire dispute.

12.    At the January 29, 2004 Omnibus Hearing (the "January 29 Hearing"), the Court denied VarTec's request for a stay and ordered the Arbitration to proceed. At that hearing, Teleglobe made several critical admissions. First, Teleglobe conceded that the SPA was an executory contract and argued the applicability of § 365(e)(1) of the Bankruptcy Code to the SPA's arbitration clause.

13.    Second, Teleglobe repeatedly emphasized that it had initiated the Arbitration due to its concerns about VarTec's financial condition, thereby admitting that in the absence of the automatic stay or in the event of assumption of the SPA, the requirement for immediate indemnification payment under § 13.8(a) would be met. As noted, where failure to immediately pay indemnification claims would expose VarTec to financial burden, Teleglobe has agreed to remit payment of claims immediately and, if Teleglobe disputes those claims it can file an arbitration to request repayment of amounts from VarTec.

14.    Third, at the Court's urging, Teleglobe was forced to concede that if VarTec sought to bring its claims pursuant to the SPA as counterclaims in the Arbitration, Teleglobe would not assert that the automatic stay applied. While this concession is helpful, the terms of the SPA actually require much more of Teleglobe and permit various other remedies to be pursued by VarTec. Indeed, as noted, certain indemnification claims must be paid immediately by Teleglobe. Moreover, VarTec may bring its claims as separate arbitration proceedings or otherwise offset, recoup or collect monies owed by the Debtors – there is no basis to require the claims to be brought only as counterclaims in Teleglobe's chosen forum.[3] Thus, Teleglobe's

---

[3]    As this Court is aware, the Arbitration is on a fast track of 90 days. The agreement clearly did not contemplate that a lump sum of $244 million of claims would be brought in one 90-day arbitration proceeding. Quite to the

SL1 416891v1/18574.001

agreement not to assert the automatic stay should not be limited to assertion of counterclaims, but should permit VarTec to exercise all of its various remedies in the SPA.

15.    In addition, VarTec believes that it is entitled to continue to pursue its rights in this Court pursuant to its Amended Proof of Claim.  The Debtors, however, have indicated to VarTec that they believe the Court has ruled that the claims objection process is **stayed** and that VarTec cannot proceed in this Court.  This is inconsistent with the Court's ruling, the law, and the express provisions of the very contract that Teleglobe is seeking to enforce in the Arbitration.  Until the Debtors filed their Objection to VarTec's Amended Proof of Claim (the "Objection"), VarTec had no clear directive as to which claims the Debtors would dispute and thus no clear basis on which to conduct discovery.  VarTec did not anticipate the Debtors' blanket objection to absolutely every dollar asserted in the Amended Proof of Claim, especially in light of the "good faith" requirement in the SPA.  Many of Teleglobe's objections were simply that VarTec had not served Teleglobe with the appropriate notices of claims or pursued final arbitration awards to recover amounts due.  Of course, the objection to the claim ignores the realities of the automatic stay and the circumstances of the parties.  VarTec must now investigate the Debtors' broad stroke Objection and simultaneously participate in the Arbitration.  To do so, VarTec will serve discovery on the Debtors regarding the Objection and intends to pursue that discovery.

## SUMMARY OF SPECIFIC RELIEF REQUESTED

16.    First, VarTec seeks an order from this Court requiring the Debtors to assume the SPA.  Alternatively, VarTec seeks an order pursuant to 11 U.S.C. § 362(d) for relief from the automatic stay or other applicable law that would permit VarTec to pursue all remedies in the SPA and at law or equity, including but not limited to (i) its rights to immediate payment of

---

contrary, the SPA clearly envisions multiple arbitration procedures on various notices of claims.  To force VarTec to litigate all of its claims in one 90-day proceeding would be prejudicial and inconsistent with the express provisions of the SPA.

SL1 416891v1/18574.001

indemnification claims under § 13.8(a); (ii) its rights of recoupment and/or setoff; (iii) its rights to pursue its Amended Proof of Claim in full in this Court; (iv) its rights to file all or some of its claims as counterclaims in the Arbitration; and/or (v) its rights, absent the Debtors' compliance with the SPA's provisions, to serve demands and initiate separate arbitration proceedings against the Debtors, as VarTec deems necessary.

## ARGUMENT

### I.   The Court Should Set an Immediate Deadline for Assumption of the SPA

17.    One factor that complicates the current circumstances is that the SPA remains an unassumed executory contract.  As a result, Teleglobe is in the unique position of being permitted to seek enforcement of the SPA against VarTec, yet using the unassumed status of the contract and the automatic stay as shields to avoid its own obligations.  This creates a substantial inequity and places a significant financial burden on VarTec.  Under the circumstances, it is appropriate for this Court to order the Debtors to assume the contract.

18.    As noted above, Teleglobe acknowledged that the SPA is an executory contract when it argued the applicability of § 365(e)(1) to the SPA's arbitration clause.  There is no basis now for Teleglobe to refuse to assume the contract.[4]  In response to VarTec's Original Motion filed shortly after the bankruptcy was commenced, the Debtors resisted assumption of the contract on grounds that are no longer valid concerns.  The Debtors called the Original Motion "premature" because the Debtors (i) had not yet entered into the agreement to sell its core assets, and (ii) had not had adequate time to "complete their review of the SPA."  Objection to Original Motion ¶¶ 13-14, at 6.[5]  Obviously, both of these arguments are wholly inapplicable now.

---

[4]    Teleglobe is not in a position to reject the SPA.  The Notes are the largest asset of the Debtors' estates.  Rejection of the SPA would not only moot the ongoing Arbitration, it would be detrimental to the estates.

[5]    Teleglobe's Objection to the Original Motion (without exhibits) is attached as Exhibit C.

SL1 416891v1/18574.001

19.     Not only have the Debtors completed the sale of their core assets, they have taken over eight months of broad-ranging discovery and have filed an extensive Objection to VarTec's Amended Proof of Claim.  Because they have invoked the provisions of the executory contract as it suited them, the Debtors have clearly determined that assumption of the contract is in the best interests of the estate.

20.     Furthermore, the factors supporting an accelerated deadline to assume or reject weigh even more heavily in VarTec's favor now than when the Original Motion was filed.  In deciding whether to accelerate a debtor's decision to assume or reject an executory contract, a court must "balance the interests of the contracting party against the interests of the debtor and its estate." *In re Physician Health Corp.*, 262 B.R. 290, 292 (Bankr. D. Del. 2001) (Walrath, J.). When performing this balancing test, courts often utilize a variety of factors, including (1) the nature of the interests at stake; (2) the balance of hardships to the litigants; (3) the safeguards afforded to the litigants; (4) compliance with post petition obligations; (5) importance of contract to debtor's business and reorganization; and (6) sufficient time to appraise financial situation. *E.g., In re Adelphia Comm. Corp.*, 291 B.R. 283 (Bankr. S.D.N.Y. 2003) (granting the creditor's motion to expedite the time within which the debtor must assume or reject executory contract); *In re Beker Indus. Corp.*, 64 B.R. 890 (Bankr. S.D.N.Y. 1986) (same).

21.     Each of these factors unquestionably favors requiring Teleglobe to assume or reject the SPA.  As noted above, Teleglobe has carved out what it perceives to be a procedural windfall for itself by initiating the Arbitration.  Teleglobe has relied on the SPA to its benefit to dictate the terms of the expedited Arbitration, yet it refuses to accept the burdens of the contract by assuming its numerous indemnification obligations.  VarTec will therefore be harmed if it is

forced to pay a judgment for its obligations under the SPA without adequate assurance that the Debtors will fulfill their mutually-owing obligations.

22.    The Debtors have displayed a complete unwillingness to assure VarTec that they will comply with any of their post-petition obligations.  In fact, the Debtors have objected to every dollar of every claim in the Amended Proof of Claim even in the face of liabilities already liquidated by VarTec that are unquestionably due.[6]  Without any indication whatsoever that the Debtors ever intend to comply with their express obligations, VarTec should not be forced to blindly litigate its own obligations in a non-bankruptcy forum.  *Cf. In re Adelphia*, 291 B.R. at 298 (setting a deadline to assume or reject even when the debtors had complied with some of their post-petition obligations).

23.    Furthermore, the Debtors have conceded on numerous occasions that the SPA is the largest asset of the estate.  Resolution of the mutual obligations under this contract will play a significant role in formulating the Debtors' plan of reorganization.  The Unsecured Creditors' Committee has likewise acknowledged the importance of the SPA to the rights of the other creditors.  Therefore, the SPA's importance to the Debtors' business and reorganization also favors immediate assumption of the contract.

24.    Finally, the Debtors have had over nineteen months to consider the consequences of assuming or rejecting the SPA since VarTec filed its Original Motion.  Like the debtors in *Adelphia*, the Debtors here were able to postpone assumption or rejection during the early

---

[6]    The *Gergen* arbitration award is one clear example.  The Gergen case was a Scheduled Liability in the SPA and, as such, is expressly identified as a matter that Teleglobe had to indemnify VarTec for within 5 days of receiving a demand for indemnification.  There is no dispute that an arbitration award was rendered in this matter.  Teleglobe, however, refuses to comply with its obligation to pay VarTec for this loss.  The only basis upon which Teleglobe objects is the allegation that VarTec did not make appropriate demand – of course, VarTec could not serve formal demand in light of the automatic stay, but instead was forced to put Teleglobe on notice via its Proof of Claim and through the 2004 process.  Assumption of the SPA would obviously alleviate this inequity.

SL1 416891v1/18574.001

months following their Chapter 11 filing. *In re Adelphia*, 291 B.R. at 299. However, the court in *Adelphia* found that the grace period for the debtors was not unending. *Id.* Here, the Debtors are in an even better position than the *Adelphia* debtor to assume or reject the SPA. The Debtors are over twenty months into the Chapter 11 proceedings and have taken eight months of broad discovery on the SPA alone. The Court should find that any grace period once afforded to the Debtors to assess the contract has now passed.

25.    The court in *Adelphia* weighed a number of factors including each of those listed above, but determined that the factors warranting the most weight were "those relating to the inability of the Debtors to make a decision up to this point in time, . . . and the fact that over the longer term, fairness requires that [the creditor] not be kept in limbo." *Id.* at 300. Relief from this kind of "limbo" is precisely what VarTec seeks by this Motion.

26.    In sum, the Court should order the Debtors to assume the SPA immediately or, at a minimum, by February 27, 2004, to ensure that VarTec is given a level playing field with respect to its rights to enforce or offset the Debtors' obligations pursuant to the SPA.

**II.    Alternatively, The Court Should Grant VarTec Relief From the Automatic Stay to Enforce Its Rights Under the SPA**

27.    In the alternative, VarTec seeks relief from the automatic stay to permit VarTec to pursue all remedies in the SPA and at law or equity, including but not limited to (i) its rights for immediate payment of indemnification claims under § 13.8(a); (ii) its rights of recoupment and/or setoff; (iii) its rights to pursue its Amended Proof of Claim in full in this Court; (iv) its rights to file all or some of its claims as counterclaims in the Arbitration if it deems necessary; and/or (v) its rights, absent the Debtors' compliance with the SPA's provisions to serve demands and initiate separate arbitration proceedings against the Debtors.

SL1 416891v1/18574.001

C014

28.    Pursuant to § 362(d)(1), this Court may lift the automatic stay for "cause." Because the Bankruptcy Code does not define "cause," the Third Circuit has held that courts are left "to consider what constitutes cause based on the totality of the circumstances in each particular case." *In re Wilson*, 116 F.3d 87, 90 (3d Cir. 1997).

29.    This Court has stated that "relief from the stay is an equitable remedy and [the Court is] required to balance the harms to the debtor and the movant in considering whether such relief should be granted." *In re Integrated Health Svcs., Inc.*, 2000 Bankr. LEXIS 1319, at *9 (Bankr. D. Del. Aug. 11, 2000) (Walrath, J.).    The Debtors will not be harmed by VarTec's ability to exercise its remedies under the SPA by initiating arbitration or raising counterclaims in the ongoing Arbitration.

30.    In fact, the Debtors expressly stated in opposition to VarTec's request for a stay that they "will consent to limited relief of the automatic stay if Vartec [sic] wishes to raise its indemnification claims in the Arbitration Proceeding." Opposition ¶ 62, at 28.  Of course, this misses the point – VarTec's rights under the SPA are far greater than merely the ability to pursue counterclaims in the Arbitration.  Although VarTec could certainly choose to do so, it also would be permitted to exercise its rights of recoupment, to initiate separate arbitration demands, to pursue its claims in this Court through its Amended Proof of Claim, or to pursue other legal remedies.  Under the circumstances, VarTec should be permitted to choose its remedy and to choose its forum – just as Teleglobe has been permitted to do.

31.    If the automatic stay were to remain in place, VarTec would suffer significant harm.  VarTec would be forced to proceed with the Arbitration and, possibly, have a judgment rendered against it without having the opportunity to assert its own claims against the Debtors. Forcing VarTec to return to this Court to effect its rights to offset mutually-owing obligations

SL1 416891v1/18574.001

C015

only after a judgment has been entered against it is inequitable, inefficient and expensive. *See In re Countryside Manor, Inc.*, 188 B.R. 489, 491 (Bankr. D. Conn. 1995) (giving weight to factors such as "administration of justice, convenience of the parties and judicial economy" in deciding to lift the stay).

32.     Numerous courts have granted relief from the automatic stay without hesitation to creditors in VarTec's position. *See e.g., id.* ("Where a debtor institutes a lawsuit and then invokes the protection of the automatic stay on a counterclaim, the situation warrants a very thoughtful scrutiny . . . The court has an equitable duty to grant a setoff when a debtor moves outside the confines of a bankruptcy court in an attempt to reap the benefits but circumvent the burdens in another forum.") (quoting *In re Bohack Corp.*, 599 F.2d 1160, 1165 (2d Cir. 1979)); *In re Millsap*, 141 B.R. 732, 733 (Bankr. D. Idaho 1992) (granting a creditor relief from the automatic stay "as a matter of right" to assert its counterclaim in a non-bankruptcy suit initiated by the debtor). Because granting relief from the stay would balance the equities between the parties in the Arbitration and because the Debtors have consented to such relief, the Court should grant VarTec relief from the automatic stay.

**WHEREFORE,** VarTec Telecom, Inc. and VarTec Telecom Holding Company request that the Court (1) grant the Motion; (2) enter an order requiring the Debtors to assume the SPA immediately or, at a minimum, by February 27, 2004; (3) enter an order pursuant to 11 U.S.C. § 362(d) for relief from the automatic stay or other applicable law that would permit VarTec to pursue all remedies in the SPA and at law or equity, including but not limited to (i) its rights for immediate payment of indemnification claims under § 13.8(a) of the SPA; (ii) its rights of recoupment and/or setoff; (iii) its rights to pursue its Amended Proof of Claim in full in this Court; (iv) its rights to file all or some of its claims as counterclaims in the Arbitration; and/or

SL1 416891v1/18574.001

C016

(v) its rights, absent the Debtors' compliance with the SPA's provisions to serve demands and

initiate separate arbitration proceedings against the Debtors, as VarTec deems necessary; and (4)

grant such other and further relief to which VarTec may be entitled.

DATED:        February 5, 2004

Respectfully submitted,

**STEVENS & LEE P.C.**


_____/s/ Joseph H. Huston, Jr._____
Joseph Huston (No. 4035)
Thomas G. Whalen, Jr. (No. 4034)
300 Delaware Ave., Ste. 800
Wilmington, DE 19801
Telephone: (302) 425-3310; -3304
Telecopy:    (610) 371-7972; -8512

AND

**HUGHES & LUCE L.L.P.**
Craig W. Budner
Beth W. Bivans
Thomas W. Paxton
1717 Main Street, Ste. 2800
Dallas, Texas 75201
Telephone: (214) 939-5500
Telecopy:   (214) 939-5849

*Attorneys for VarTec Telecom, Inc. and
VarTec Telecom Holding Company*

SL1 416891v1/18574.001

C017

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| TELEGLOBE COMMUNICATIONS | § | CASE NO. 02-11518 (MFW) |
| CORPORATION, ET AL., | § | (Jointly Administered) |
| | § | |
| DEBTORS. | § | Re: Docket No. 2110 |
| | § | |

### ORDER (I) DENYING VARTEC'S REQUEST TO COMPEL ASSUMPTION OF STOCK PURCHASE AGREEMENT, (II) GRANTING VARTEC RELIEF FROM THE AUTOMATIC STAY, AND (III) GRANTING DEBTORS' REQUEST TO STAY PROCEEDINGS RELATED TO DEBTORS' OBJECTIONS TO VARTEC'S AMENDED PROOFS OF CLAIM

This matter having come before the Court on the *Motion for Order Requiring Assumption of Executory Contract or, Alternatively, For Relief from the Automatic Stay* filed by VarTec Telecom, Inc. and VarTec Telecom Holdings Company (the "VarTec Motion"); the above-captioned debtors and debtors in possession (collectively, the "Debtors") having filed the Debtors' Objection to VarTec's Motion for Order Requiring Assumption of Executory Contract, or, Alternatively, for Relief from Automatic Stay (the "Objection"); the Court having reviewed the VarTec Motion, the Objection and all pleadings related thereto and having heard argument at a hearing before the Court on February 20, 2004; the Court, finding that (a) the VarTec Motion has been properly served on all parties; (b) the Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and (c) this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and after due deliberation and sufficient cause appearing therefore,

**EXHIBIT**
tabbies
**3**

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.     VarTec's request to compel the Debtors' assumption or rejection of the Stock Purchase Agreement ("SPA"), pursuant to section 365 of the Bankruptcy Code, is hereby DENIED;

2.     The automatic stay imposed by section 362 of the Bankruptcy Code is hereby lifted to permit VarTec to pursue all of its claims ~~and defenses~~ set forth in VarTec's Amended Proofs of Claim (Claim Nos. 784-787) and ~~all remedies~~ available to VarTec under the SPA ~~with respect to such claims and defenses;~~

3.     The Debtors' request to stay the proceedings in this Court related to VarTec's Amended Proofs of Claim and Debtors' Objection to VarTec's Amended Proofs of Claim (the "Claims Objection Proceedings") is GRANTED, and the Claims Objection Proceedings are hereby stayed;

4.     The Court defers ruling at this time on the Debtors' request to compel disputes concerning the working capital determination being performed by PriceWaterhouseCoopers ("PWC") to the Arbitration Panel and leaves the Debtors, VarTec and PWC to their rights with respect to such disputes; and

5.     This Court retains jurisdiction to interpret, implement, and enforce the provisions of this Order.

Dated:     Feb 24     , 2004
       Wilmington, Delaware

THE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY JUDGE

RLF1-2708971-2

C019

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| VARTEC TELECOM, INC. and VARTEC TELECOM HOLDING COMPANY, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | CASE NO. 1:03-cv-02203 (RJL) |
| BCE INC., BCE VENTURES INC., and WILLIAM D. ANDERSON, | § § § | |
| Defendants. | § § | |

---

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO PARTIALLY LIFT THE PSLRA DISCOVERY STAY AND <u>STATEMENT OF POINTS AND AUTHORITIES</u>



EXHIBIT

4

C020

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF POINTS AND AUTHORITIES ......................................................... 2

    A.    The Relevant Facts and Procedural Posture of This Case ...................................... 2

    B.    Other lawsuits mentioned in VarTec's Motion ...................................................... 4

        1.    The Delaware Action ...................................................................... 4

        2.    The Smith Action ............................................................................ 5

        3.    The Canadian Proceedings ............................................................. 6

ARGUMENT AND AUTHORITIES ................................................................................ 10

    A.    Plaintiffs Cannot Demonstrate Undue Prejudice .................................................. 10

    B.    Plaintiffs' Broad Document Requests Will Impose Significant Burden on Defendants ...................................................................................... 12

    C.    Plaintiffs Have Not Demonstrated That Lift of the Stay Is Necessary To Preserve Evidence ......................................................................................... 13

    D.    Plaintiffs' Request Is Not Particularized ............................................................... 14

CONCLUSION ................................................................................................................. 15

# TABLE OF AUTHORITIES

## CASES

**Page(s)**

*In re AOL Time Warner, Inc. Sec. Litig.*, 2003 WL 715752 (S.D.N.Y. Feb. 28, 2003)..............................................................................................10, 11, 12

*In re AOL Time Warner, Inc. Sec. Litig.*, No. 1500, 02 Civ. 5575, 2003 WL 21729842 (S.D.N.Y. July 25, 2003) ............................................................................11

*In re CFS-Related Sec. Fraud Litig.*, 179 F. Supp. 2d 1260 (N.D. Okla. 2001) ...............13,14, 15

*In re Carnegie Int'l Corp. Secs. Litig.*, 107 F. Supp. 2d 676 (D. Md. 2000)...............................14

*In re Fannie Mae Sec. Litig.*, No. 04-1639, 2005 WL 525970 (D.D.C. Feb. 23, 2005) ..................................................................................*passim*

*Faulkner v. Verizon Communications, LLC*, 156 F. Supp. 2d 384 (S.D.N.Y. 2001) ........10, 12, 15

*In re Fluor Corp. Sec. Litig.*, SA CV 97-734, 1999 U.S. Dist. LEXIS 22128 (C.D. Cal. Jan. 15, 1999)..........................................................................13

*Kaempe v. Myers*, 367 F.3d 958 (D.C. Cir. 2004) ...........................................................3

*In re Labranche Sec. Litig.*, No. 03 Civ. 8201, 2004 WL 1924541 (S.D.N.Y. Aug. 27, 2004) .........................................................................10

*Medhekar v. U.S. Ct. for the N. Dist. of Cal.*, 99 F.3d 325 (9th Cir. 1996)..................................................................................10

*Mishkin v. Ageloff*, 220 B.R. 784 (S.D.N.Y. 1998) ..........................................................14

*One-O-One Enters., Inc. v. Caruso*, 848 F.2d 1283 (D.C. Cir. 1988) ...................................3

*Rampersad v. Deutsche Bank Sec., Inc.*, No. 02 Civ. 7311, 2003 WL 21074094 (S.D.N.Y. May 9, 2003)................................................................................12,15

*Sarantakis v. Gruttaduaria*, No. 02 Civ. 160, 2002 WL 1803750 (N.D. Ill. Aug. 5, 2002).........................................................................11, 12, 13

*VarTec Telecom, Inc. v. BCE Inc.*, No. 3:02-CV-2585-M, 2003 WL 22364302 (N.D. Tex. Oct. 9, 2003) ..............................................................................3

*In re Vivendi Universal, S.A, Sec. Litig.*, No. 02 Civ. 5571, 2003 WL 21035383 (S.D.N.Y. May 6, 2003)..........................................................................*passim*

ii

**Page(s)**

*Winer Family Trust v.* Queen No. Civ. A.03-4318, 2004 WL 350181
(E.D. Pa. Feb. 6, 2004)..........................................................................................12

*In re WorldCom Inc. Sec. Litig.*, 234 F. Supp. 2d 301 (S.D.N.Y. 2003) ................................11, 12

*In re Xerox Corp. Sec. Litig.*, 165 F. Supp. 2d 208 (D. Conn. 2001) ............................................10


**STATUTES**

15 U.S.C. § 77z-1(b)(1) .................................................................................................................1

iii

C023

Defendants BCE Inc., BCE Ventures Inc. (collectively, "BCE"), and William D. Anderson ("Anderson") respectfully submit this opposition to Plaintiffs' Motion To Partially Lift the PSLRA Discovery Stay and Statement of Points and Authorities, dated April 29, 2005 (the "Motion" or "Mot.").

## PRELIMINARY STATEMENT

The Private Securities Litigation Reform Act (the "PSLRA") imposes a mandatory stay of discovery during the pendency of any motion to dismiss:

> In any private action arising under this subchapter, all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds, upon the motion of any party, that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party.

15 U.S.C. § 77z-1(b)(1).

This Court recently held that "[a]lthough the D.C. Circuit has not addressed this issue, other courts have found that 'unless exceptional circumstances are present, discovery in a securities action is permitted only after the Court has sustained the legal sufficiency of the complaint.'" *In re Fannie Mae Sec. Litig.*, No. 04-1639, 2005 WL 525970 at *1 (D.D.C. Feb. 23, 2005) (citation omitted). The burden of showing such exceptional circumstances "is a heavy one." *Id.*

The Defendants' motion to dismiss the action is fully briefed, and Plaintiffs VarTec Telecom, Inc. and VarTec Telecom Holding Co. (collectively "VarTec" or "Plaintiffs") cannot establish the existence of exceptional circumstances that would justify a partial lifting of the discovery stay during the pendency of that motion.

First, lifting the mandatory stay is not necessary to preserve evidence because BCE has already made efforts to collect and preserve the relevant materials. BCE has collected the hard copy documents of approximately 100 individuals who were involved in the relationship

between BCE and Teleglobe Inc. ("Teleglobe") and its subsidiaries, which represents approximately 250 boxes of documents. In addition, BCE has collected and processed approximately six million pages of electronic documents, has taken steps to preserve additional electronic documents on its servers, and has also stopped the overwriting of back up tapes. Therefore, BCE's document collection efforts were extremely broad and are expected to encompass, among other things, the documents sought by Plaintiffs. (*See* Declaration of Martin Cossette, dated May 17, 2005 ("Cossette Decl.") ¶¶ 3-10.)

Second, lifting the mandatory stay is not necessary to prevent unfair prejudice. "To demonstrate unfair prejudice, the plaintiff must show that either the defendant will be unfairly shielded from liability without the requested discovery, or the plaintiff will be at an informational disadvantage during settlement negotiations." (*Id.*) The parties have not engaged in any settlement discussions. Further, VarTec has not argued, let alone demonstrated, that the Defendants will be shielded from liability in the absence of a lifting of the mandatory stay.

Third, the discovery that VarTec seeks is far from particularized. VarTec seeks documents responsive to six broad categories. Producing those documents would require BCE to search millions of pages of documents in order to identify those that are non-privileged and responsive to VarTec's requests.

## STATEMENT OF POINTS AND AUTHORITIES

### A.    The Relevant Facts and Procedural Posture of This Case

On August 26, 2001, Plaintiffs and Teleglobe Inc. and certain of its affiliates (collectively, "Teleglobe") entered into a Stock Purchase Agreement (as amended, the "SPA") to purchase companies collectively known as "Excel." During the negotiations of the Stock Purchase Agreement, Plaintiffs requested that BCE guarantee Teleglobe's obligations under the

2

Stock Purchase Agreement, which BCE refused to do. (First Am. Compl. ¶ 35.) The Stock Purchase Agreement contains an express disclaimer providing that neither Teleglobe nor any other person had made any representations outside the contract. (Koslowe Decl. Ex. A, Stock Purchase Agreement ¶ 4.7).[1] Notwithstanding that disclaimer, Plaintiffs brought this action in which they allege that defendants orally agreed that BCE would guarantee Teleglobe's obligations under the Stock Purchase Agreement, but then failed to honor that guarantee. This action is thus premised on the alleged existence of promises directly contradicted by the express terms of the relevant contract.[2]

At the oral argument on the motion to dismiss for improper venue, the Hon. Barbara M. G. Lynn pointed out that the contract "says that VarTec did not rely on anything or any person other than what is in this document." (Koslowe Decl. Ex. C, Transcript of oral argument at 19:21-22)[3] Judge Lynn also questioned the basis of Plaintiffs' action since the disclaimer in the Stock Purchase Agreement "says the direct converse" of the fraudulent promises alleged by Plaintiffs. (Id. at 19.) Furthermore, Judge Lynn noted that Plaintiffs were "big corporations" that had made an "informed" decision to enter into the SPA. (Id.) Accordingly, under the decision in *One-O-One Enters., Inc. v. Caruso*, 848 F.2d 1283, 1284-87 (D.C. Cir. 1988), Plaintiffs cannot state a claim. The Defendants have filed a motion to dismiss

---

[1] The term "Ex." Refers to the exhibits attached to the Declaration of Neil H. Koslowe.

[2] The parties entered into an Amended Stock Purchase Agreement on April 5, 2002. The Amended Stock Purchase Agreement contains a virtually identical contractual disclaimer. (Koslowe Decl. Ex. B, ¶ 4.7.)

[3] Only one document is relevant to the Court's analysis of the contractual disclaimer: the Stock Purchase Agreement. That document is properly before the Court. The Stock Purchase Agreement is "referred to in the complaint and [is] integral to" plaintiffs' claims. *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004). Indeed, the Complaint refers to the Stock Purchase Agreement no fewer than 100 times, and Judge Lynn has already held that Plaintiffs' claims are premised on Teleglobe's breach of that agreement. *VarTec Telecom, Inc. v. BCE Inc.*, No. 3:02-CV-2585-M, 2003 WL 22364302, at *3 (N.D. Tex. Oct. 9, 2003).

3

the action, which is fully briefed. The parties have not agreed to mediate their dispute and have not engaged in any settlement discussions.[4]

In the Motion, Plaintiffs inaccurately state that, at the status conference held on April 11, 2005, "when the Court asked Defendants when they could reasonably begin discovery, Defendants responded 'immediately.'" (Mot. at 5.) Plaintiffs fail to point out that when the Court asked BCE's counsel "what's your perspective on when we are likely to be in a position to resume Discovery, assuming the Motion to Dismiss is not granted," BCE's counsel responded that BCE "would go into Discovery right away if it is not granted." (Koslowe Decl. Ex. D at 10.)

**B.        Other lawsuits mentioned in VarTec's Motion**

In an effort to persuade the Court to lift the statutory stay, Plaintiffs argue that there are three related cases against BCE in which discovery is ongoing. Plaintiffs paint an inaccurate picture of the discovery that BCE sought in those other lawsuits. BCE did not request any discovery from VarTec in any of those actions. Furthermore, to the extent BCE sought documents relating to the sale of Excel to VarTec, those documents were relevant to the specific allegations made in those lawsuits, not to gain any advantage over VarTec in this case.

**1.        The Delaware Action**

The plaintiffs in the Delaware Action are the former U.S. subsidiaries of Teleglobe (the "Debtors") and a committee of unsecured creditors of the Debtors. Presumably to support their contention that BCE "controlled" the Debtors, the Debtors' Complaint in the Delaware Action contained allegations regarding BCE's involvement in the sale of Excel to VarTec and the consideration that Teleglobe and the Debtors obtained in connection with that

---

[4] The papers filed by the Defendants in support of their motion to dismiss this action raise other arguments, but the Court does not need to reach those issues in order to dismiss this case.

4

transaction. (Compl. ¶ 73.) BCE served a document request on the Debtors – not VarTec – seeking particularized categories of documents regarding the sale of Excel:

> documents concerning the arbitration proceeding before the American Arbitration Association, entitled In the Matter of the Arbitration Between Teleglobe Telecom Corporation and Teleglobe Inc. and VarTec Telecom, Inc. and VarTec Telecom Holding Company, 50 T 153 00025 04: (a) all arbitration awards and orders issued by the arbitral tribunal, (b) the transcripts from all the arbitration hearings, (c) the transcripts of all depositions of witnesses conducted in connection with the arbitration proceeding, (d) all exhibits introduced or marked at such depositions or at the arbitration hearings; and (e) the pleadings, briefs, memorials, letters, or other documents submitted to the arbitration tribunal by the parties to the arbitration proceeding.

(Koslowe Decl., Ex. E, Defendants' Second Request for Production of Documents Directed to the Debtors, Request 1.)[5]

BCE did not request those documents to obtain an informational advantage over VarTec, but in order to obtain, on a timely basis, documents already available to its adversaries relating to the claims and defenses asserted in the Delaware Action, in which the Court has imposed a discovery cut-off date of September 30, 2005. Furthermore, BCE also did not seek "hundreds of thousands of pages" (Mot. at 7), but narrow categories of documents filed with the arbitration tribunal, and the Debtors have yet to produce to BCE any documents responsive to the request.

## 2. The Smith Action

This action was brought by Steven R. Smith against BCE in connection with agreements between Smith, Excel, and Teleglobe. In the Motion, VarTec has overstated the

---

[5] It is BCE's understanding that, in the arbitration between VarTec and Teleglobe, Teleglobe asserted claims of breach of contract against VarTec, arising from VarTec's failure to pay the consideration it owed under the Stock Purchase Agreement. VarTec apparently raised arguments relating, inter alia, to the assumption or rejection of the Stock Purchase Agreement by Teleglobe in its Chapter 11 case. (Koslowe Decl., Ex. F, Motion to Stay Arbitration, ¶¶ 15, 58). Those matters are relevant to the consideration that Teleglobe received in the transaction, which is an issue raised by the plaintiffs in the Delaware Action. In addition, documents relating to the sale transaction are also likely to bear on the Debtors' allegation that BCE "controlled" the Debtors in connection with that sale.

C028

scope of the discovery conducted in the Smith Action. On March 1, 2005, Smith – not BCE – served a subpoena on Excel, a subsidiary of VarTec. Smith subsequently narrowed the scope of his subpoena. (Mot. at 8). Excel has only produced approximately 100 pages of documents in response to the subpoena, which consist of (1) copies of the original and amended Stock Purchase Agreement between Teleglobe and VarTec; (2) certain written communications between BCE and VarTec regarding the sale of Excel; and (3) copies of Smith's contracts with Excel. Those documents either had no relevance to this case or were already known to BCE.

BCE also served a subpoena on Excel requesting specific documents relating to Smith's alleged damages arising from Smith's contract with Excel. (Koslowe Decl., Ex. G, BCE Subpoena to Excel.) The documents that BCE requested from Excel are not relevant to this action, which does not involve Smith's contract. BCE has requested the documents from Excel not to gain an informational advantage over VarTec, but to complete its discovery in a timely manner, in order to comply with the discovery cut-off date of June 1, 2005. Thus far, Excel has failed to produce to BCE any documents responsive to the subpoena.

### 3.    The Canadian Proceedings

The Motion also refers to two proceedings pending in Ontario, neither of which involves VarTec. (Mot. at 9-10.) The lawsuit filed by the lending syndicate of Teleglobe against BCE has nothing to do with the sale of Excel to VarTec. Similarly, the action initiated by the Interim Receiver of Teleglobe against certain former directors of Teleglobe Inc. has nothing to do with the sale of Excel.

In the Motion, VarTec makes the unsupported assertion that "according to Teleglobe's Canadian Interim Receiver, BCE's own information and electronic storage systems may be in disarray, requiring extensive, electronic forensic discovery to recover and restore much of the information relevant to VarTec's causes of action." (Mem. at 15.) First, it should

6

be noted that the Interim Receiver of Teleglobe is not a disinterested third party but rather a plaintiff in a lawsuit filed in Canada against certain former directors of Teleglobe. Furthermore, the Interim Receiver has not alleged that BCE's electronic storage systems are in "disarray," and it cannot do so in light of BCE's document preservation efforts. (*See* Koslowe Decl., Ex. H, Nineteenth Report of Kroll Restructuring Ltd., dated December 17, 2004 at ¶¶ 6-12.)

Beginning in June 2002, BCE took deliberate steps to preserve and collect all documents relating to Teleglobe and its subsidiaries from over 100 individuals who were involved in the relationship between BCE and Teleglobe. On June 12, 2002, BCE sent a document preservation memorandum to, inter alia, certain BCE department heads, advising that "[i]n anticipation of any potential lawsuit that could be launched against BCE in connection with the Teleglobe situation, it is required that we preserve any evidence that we currently have that might be related to Teleglobe. Since no lawsuit has been launched, we cannot predict in advance what would be the allegations. Accordingly, we must preserve the evidence in whatever form it may exist, including both paper (including personal notes) and electronic copies (including computer files and e-mail). It is very important that you not throw out or destroy any information that might relate to Teleglobe even if you would ordinarily have disposed of the information." (Koslowe Decl. Ex. I at 1.) The memorandum further stated in bold type print and capital letters "do not attempt to clean any files." (*Id.* at 2.)

On August 23, 2002, following the initiation of a lawsuit in Canada by members of the Teleglobe lending syndicate, BCE addressed a memorandum to all present directors of BCE and to the persons who were directors of BCE between January 2000 and April 24, 2002. (Koslowe Decl. Ex. J at 1.) The memorandum stated, among other things, that all Teleglobe-related documents should be collected, and that "[g]iven the broad scope of the allegations made by the plaintiffs in this lawsuit, **Teleglobe-related documents are all documents, in whatever**

7

**form, which discuss or refer to Teleglobe Inc. or its subsidiaries."** (*Id.* at 2 (emphasis in original).) The memorandum further stated that "[b]ecause a Statement of Claim has been filed in this matter, we must ensure that our collection of Teleglobe-related documents and electronic data is as broad as possible." (*Id.* at 3 (emphasis in original).) On September 16, 2002, BCE addressed a similar memorandum to a group of 85 employees and officers of BCE and its subsidiaries and again asked them to provide "all documents, in whatever form, which discuss or refer to Teleglobe Inc. and its subsidiaries." (Koslowe Decl. Ex. K at 1.)

As a result of those efforts, BCE collected the hard-copy documents of over 100 custodians. Those hard-copy documents amount to approximately 250 boxes of documents. (*See* Cossette Decl. ¶ 7.)

BCE also collected and processed approximately six million pages of electronic documents from computer hard drives and server shares of custodians whose electronic documents were requested by the plaintiffs in the Delaware Action. That data is in the custody of Commonwealth Legal, an outside litigation support firm engaged to preserve and process BCE's electronic data. According to the complaint filed by plaintiffs in the action before this Court, two of those custodians, Michel Lalande and Martine Turcotte, were involved in the negotiation of the Stock Purchase Agreement that forms the basis of this lawsuit. (*See* Cossette Decl. ¶8.) In addition, BCE has preserved the hard drives of over 75 BCE employees and officers, including all the other BCE employees and officers identified in plaintiffs' First Amended Complaint as having been involved in the negotiation of the Stock Purchase Agreement. Those hard drives are in the custody of Commonwealth Legal. (*See id.* ¶9)

The backup of BCE's servers is the responsibility of a company called CGI Group Inc. (or one of its affiliates). On August 27, 2002, BCE instructed CGI to stop overwriting monthly back-up tapes that backed up the servers used by the over 100 custodians. As a result over 600

C031

backup tapes were collected and are in the custody of Commonwealth Legal. Those tapes backed up servers on the Bell Canada network, which were also used by BCE and certain subsidiaries of BCE, such as BCI and BCE Ventures. (*See id.* ¶ 10.)[6] Therefore, there is no risk that "much of this information could be spoiled and unrecoverable." (Mot. at 10.)[7]

The report of the Interim Receiver attached to VarTec's motion papers (the "Report") acknowledged that, in September 2002, BCE issued a directive to its employees to "preserve any potential evidence in whatever form it may exist." (Koslowe Decl. Ex. H ¶ 10; APP.049-APP.055.) While the Report stated that some electronic back up tapes had not yet been restored, that does not translate into a failure by BCE to preserve its electronic data. (*Id.* ¶ 9.) Indeed, the Report stated that DEI, the independent third party consultant retained in the insolvency proceeding of Teleglobe in Canada, had undertaken to restore some of the backup tapes in order "to evaluate the completeness of the archival data stored on the BCE servers by comparing the population of records from the servers against the population of records recovered from the restored sample set of backup tapes." (*Id.* ¶ 12.) Nowhere in the Report is it alleged that BCE's electronic data has been destroyed or has otherwise disappeared.[8]

---

[6] VarTec erroneously alleges that Teleglobe's electronic data is in the possession of BCE because certain Teleglobe officers had a "bell.ca" e-mail account during a portion of the period November 1, 2000 to May 15, 2002. (Report, ¶ 6.) The general practice at BCE was that a BCE or Bell Canada employee had an e-mail inbox created for him or her at the time of joining BCE or Bell Canada, and that the account was closed at the time the employee left. Thus, to the extent such a BCE employee or officer also was a director or officer of Teleglobe (as would be typical of a relationship between a parent corporation and a subsidiary), he would have an e-mail account at BCE. BCE, however, did not maintain the electronic data or backup tapes of Teleglobe. (Cossette Decl. at ¶ 13.)

[7] Consistent with the Default Standard for Discovery of Electronic Documents adopted by the United States District Court for the District of Delaware, most of the backup tapes have not been restored because they contain data of limited accessibility.

[8] The Report refers to an investigation by DEI into the whereabouts of the personal computer that Mr. Pichette used prior to his departure from BCE in January 2002. First, VarTec's complaint does not contain any allegations regarding Mr. Pichette. Second, Patrick Pichette left BCE on or about January 24, 2002 to become EVP Operations & Finance of Teleglobe Communications Corporation. Following Mr. Pichette's departure, his computer was re-used in the ordinary course of business. A forensic copy of the old hard drive of Mr. Pichette has been provided to DEI, the third party forensic consultant used in the proceedings pending in Canada, and the hard drive will be examined. (Cossette Decl. ¶ 14.)

C032

## ARGUMENT AND AUTHORITIES

Discovery should be permitted "*only after the court has sustained the legal sufficiency of the complaint.*" *See Faulkner v. Verizon Communications, LLC*, 156 F. Supp. 2d 384, 402-03 (S.D.N.Y. 2001); *Medhekar v. United States Dist. Court for the N. Dist. of Cal.*, 99 F.3d 325, 328 (9th Cir. 1996) ("Congress clearly intended that complaints in these securities actions should stand or fall based on the actual knowledge of the plaintiffs rather than information produced by defendants after the action has been filed."); *see also In re Xerox Corp. Sec. Litig.*, 165 F. Supp. 2d 208, 214 (D. Conn. 2001); *In re Labranche Sec. Litig.*, No. 03 Civ. 8201, 2004 WL 1924541, at *2 (S.D.N.Y. Aug. 27, 2004) (citing H.R. Conf. Rep. No. 104-369 (1995) and quoting S. Rep. No. 104-98, at 14 (1998) respectively) (internal quotations and other citations omitted). Plaintiffs have failed to meet their burden of showing that the statutory stay should be lifted.

### A.    Plaintiffs Cannot Demonstrate Undue Prejudice

A plaintiff must demonstrate that there are "exceptional circumstances" that render discovery necessary. *In re AOL Time Warner, Inc. Sec. Litig.*, No. 1500, 02 Civ. 5575, WL 21729842, at *1 (S.D.N.Y. Jul. 25, 2003) ("[U]nless exceptional circumstances are present, discovery in securities actions is permitted only after the court has sustained the legal sufficiency of the complaint.") (citations and internal quotations omitted); *In re Fannie Mae*, 2005 WL 525970, at *1; *In re Vivendi Universal, S.A, Sec. Litig.*, No. 02 Civ. 5571, 2003 WL 21035383, at *1 (S.D.N.Y. May 6, 2003). "The sole example proffered by Congress as to what justifies lifting the stay is 'the terminal illness of an important witness,' which might 'necessitate the deposition of the witness prior to ruling on the motion to dismiss.'" *Faulkner*, 156 F. Supp. 2d at 402 (citation omitted). No such circumstance is alleged here.

10

C033

Courts have also held that exceptional circumstances exist where one of the parties would be at an "informational disadvantage" during settlement negotiations if the stay was maintained. *See In re Vivendi*, 2003 WL 21035383, at *1; *In re Fannie Mae*, 2005 WL 525970, at *1; *In re WorldCom Inc. Sec. Litig.*, 234 F. Supp. 2d 301, 305-06 (S.D.N.Y. 2003). But courts have denied motions to lift the statutory stay where, as here, no actual emergency exists, and no settlement is imminent. *See, e.g., In re AOL Time Warner*, 2003 WL 21729842, at *1; *In re Vivendi*, 2003 WL 21035383, at *1 (refusing to partially lift stay where there were no settlement discussions or other intervening events); *In re Fannie Mae*, 2005 WL 525970, at *1. Plaintiffs' reliance on *In re AOL Time Warner*, 2003 WL 715752, at *1 (S.D.N.Y. Feb. 28, 2003), is particularly misguided because that decision was subsequently vacated and the stay was later imposed since "assertions of an impending settlement that could prejudice plaintiffs' possible recovery are premature." *In re AOL Time Warner*, 2003 WL 21729842, at *1. In this case, the parties have not engaged in any settlement discussions, and Plaintiffs' speculation that the parties might do so in the future does not amount to "exceptional circumstances" or "'improper and unfair treatment amounting to something less than irreparable harm'" that would require a lift of the statutory stay. *In re Vivendi*, 2003 WL 21035383, at *1.

Plaintiffs also complain that they are "forced to design [their] litigation … strategies in the dark" and that "a ruling on Defendants' motion to dismiss may be many months away." (Mot. at 14, 2.) This Court has already rejected that argument because it "fails to demonstrate that the defendants will be either unfairly shielded from liability, or that the plaintiffs would be disadvantaged during possible settlement negotiations." *See In re Fannie Mae*, 2005 WL 525970, at *1; *see also Sarantakis v. Gruttaduaria*, No. 02 Civ. 1609, 2002 WL 1803750, at *4 (N.D. Ill. Aug. 5, 2002) (motion to lift stay denied because "[t]he plaintiffs do not

11

allege any prejudice other than that inherent in litigation, e.g., the delay in ruling on the motion to dismiss").

Plaintiffs claim that courts have lifted the discovery stay where documents "have already been produced to other parties." (Mot. at 13.) The fact that BCE produced some of its documents in other lawsuits does not excuse Plaintiffs from demonstrating undue prejudice if the stay is maintained. *See In re Fannie Mae,* 2005 WL 525970, at *1; *Rampersad v. Deutsche Bank Sec. Inc.,* No. 02 Civ. 7311, 2003 WL 21074095, at *1 (S.D.N.Y. May 9, 2003) ("[t]he plaintiffs' argument that lifting the stay will not prejudice the defendants is irrelevant and does not relieve the plaintiffs of their burden to establish that they will suffer undue prejudice if the stay is not lifted." *Sarantakis,* 2002 WL 1803750, at *4; *In re AOL Time Warner,* 2003 WL 21729842, at *5-6; *In re Vivendi,* 2003 WL 21035383 (same); *In re Worldcom,* 234 F. Supp. 2d at 306 (court engaged in analysis of the burden of having to produce documents only after holding that plaintiffs would suffer undue prejudice if the stay was maintained).[9]

**B.    Plaintiffs' Broad Document Requests Will Impose a Significant Burden on Defendants**

Plaintiffs have requested the production of six broad categories of hard-copy documents. (Mot. at 3.) BCE has already spent a substantial amount of money in processing and reviewing approximately 250 boxes of hard-copy documents and approximately six million pages of electronic documents from computer hard drives and server shares of custodians whose electronic documents were requested by the plaintiffs in the Delaware Action, and producing the non-privileged documents responsive to the Debtors' document requests. (*See* Cossette Decl. ¶

---

[9] Plaintiffs also seek the deposition of a document custodian "to identify how and where BCE's documents and electronic data are maintained." (Mot. at 3.) Plaintiffs have failed to demonstrate the existence of any exceptional circumstances justifying that a deposition be conducted. *Faulkner,* 156 F. Supp. 2d at 402 ("'the terminal illness of an important witness' ... might 'necessitate the deposition of the witness prior to ruling on the motion to dismiss'" (citation omitted); *see also Winer Family Trust v. Queen,* No. Civ. A. 03-4318, 2004 WL 350181, at *5 (E.D. Pa. Feb. 6, 2004) (stay lifted only for the narrow purpose of deposing a witness with late-stage brain cancer).

C035

11.) Those documents were maintained by individual BCE employees, directors, or officers without regard to the categories set forth in VarTec's Motion. (Cossette Decl. ¶ 11.)[10] Thus, requiring BCE to identify the documents responsive to VarTec's six categories of documents would involve a new review of the 250 boxes and thus would substantially increase the costs that BCE has incurred in producing its documents.

Nor can BCE simply make available to VarTec the documents that it produced to the plaintiffs in the Delaware Action. Nothing would justify enlarging the scope of discovery to documents that are not responsive to VarTec's document requests, but are subject to discovery in the Delaware Action. Furthermore, many of those documents are protected by a common-interest privilege because they reflect legal work performed for both Teleglobe and BCE. Other documents reflect legal work performed solely for Teleglobe. Those documents were produced to Teleglobe and the Debtors, but are privileged as to VarTec. (Cossette Decl. ¶ 11.)

VarTec's request for electronic documents is even more burdensome. VarTec seeks documents regardless of whether they were previously produced in the other lawsuits. BCE would have to review a significant portion of the 6 million pages of electronic documents that were processed in order to identify those that are responsive to VarTec's demands.

**C.    Plaintiffs Have Not Demonstrated That a Lift of the Stay Is Necessary To Preserve Evidence**

A "party alleging that discovery is 'necessary to preserve evidence' must present more than mere 'generalizations of fading memories and allegations of possible loss or destruction.'" *Sarantakis*, 2002 WL 1803750, at *4 (quoting *In re Fluor Corp. Sec. Litig.*, SA CV 97-734, 1999 U.S. Dist. LEXIS 22128, at *3, *7 (C.D. Cal. Jan. 15, 1999)). Plaintiffs cannot show that "the loss of evidence is imminent as opposed to merely speculative." *In re CFS-*

---

[10] A limited number of documents were maintained in "central files."

13

*Related Sec. Fraud Litig.,* 179 F. Supp. 2d 1260, 1265 (N.D. Okla. 2001); *In re Vivendi,* 2003 WL 21035383, at *1-2. First, lifting the statutory stay is unnecessary to preserve documents relating to Teleglobe that are in BCE's possession, custody, or control because BCE has taken steps to preserve those documents. *Supra* at 7-9. *See In re Vivendi,* 2003 WL 21035383, at *2 (motion for partial lifting of stay denied when plaintiffs make no showing of imminent loss of evidence, and defendants represent that it will not happen); *In re Carnegie Int'l Corp. Sec. Litig.,* 107 F. Supp. 2d 676, 684 (D. Md. 2000) (lifting the stay is not necessary to preserve evidence when the party from whom discovery was sought has represented to the court that it will preserve the evidence).

Second, Plaintiffs seek to confuse the issues by arguing that lifting the stay is necessary to preserve Teleglobe's books, records, and electronic data because "Teleglobe filed for bankruptcy protection, liquidated its core business along with voluminous books and records, and suffered massive layoffs." (Mot. at 14.) BCE does not have control over Teleglobe's books, records, and e-data, and lifting the stay as to BCE will not help preserve those documents. Moreover, since Teleglobe and Vartec were engaged in an arbitration proceeding, Teleglobe was under an obligation to preserve discoverable documents, which would include documents relevant to the action before this Court.

Third, Teleglobe filed for bankruptcy on May 28, 2002, and Plaintiffs have waited three years to raise a supposed concern that documents may disappear. Such delay negates any serious contention that loss of evidence is imminent.

## D.    Plaintiffs' Request Is Not Particularized

Under the PSLRA, Plaintiffs not only bear the burden of showing that they will suffer undue prejudice if the stay is not lifted, but they must identify particularized discovery that is necessary in order to prevent such undue prejudice. *See Mishkin v. Ageloff,* 220 B.R. 784, 793

14

(S.D.N.Y. 1998) (denying request to lift stay where discovery requests encompass "an open-ended boundless universe of discovery"); *see also Faulkner*, 156 F. Supp. 2d at 404-05; *In re Fannie Mae*, 2005 WL 525970, at *1. Requesting a large number of documents that have already been produced in another lawsuit does not meet that requirement. *See Faulkner*, 156 F. Supp. 2d at 401.

Without reviewing BCE's 250 boxes of hard-copy documents, it is not practicable to identify the documents that are responsive to the six broad categories of documents that VarTec seeks. *Supra* at 13. With respect to the electronic documents, BCE would have to search and review a large portion of the six million pages of documents that were recently processed. That is precisely the kind of overly burdensome request that has been rejected by the courts. *See In re CFS-Related Sec. Fraud Litig.*, 179 F. Supp. 2d at 1268 ("requests seeking documents relating to all aspects of CSI's relationship with CFS and the underlying securities transactions" are not "particularized" discovery requests); *Rampersad*, 2003 WL 21074094, at *1 (request for documents previously produced regarding certain transactions were not sufficiently particularized); *In re Vivendi*, 2003 WL 21035383, at *1 (request for "copies of documents already produced by defendants... in connection with civil and criminal investigations for misconduct by defendants" was insufficiently particularized).

## CONCLUSION

For the foregoing reasons, plaintiffs' Motion to Partially Lift the PSLRA Discovery Stay should be denied.

Respectfully submitted,

SHEARMAN & STERLING LLP

By: */s/ Neil H. Koslowe*
     Neil H. Koslowe

15

Neil H. Koslowe
801 Pennsylvania Avenue, N.W.
Suite 900
Washington, D.C. 20004
Tel: (202) 508-8000
Fax : (202) 508-8100
E-mail: nkoslowe@shearman.com

Stuart J. Baskin
George J. Wade
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
Tel: (212) 848-4000
Fax: (212) 848-7179

David J. Beck
BECK, REDDEN & SECREST, LLP
One Houston Center
1221 McKinney, Suite 4500
Houston, Texas 77010-2010
Tel: (713) 951-3700
Fax: (713) 951-3720

Attorneys for Defendants

Date:   May 17, 2005

16