EXHIBIT B

2005 Bankr LEXIS 1139, *

Page 1

LEXSEE 2005 BANKR LEXIS 1139

In re MIRANT CORPORATION, et al, Debtors

Chapter 11, Case No. 03-46590-DML (Jointly Administered)

UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, FORT WORTH DIVISION

2005 Bankr. LEXIS 1139

June 15, 2005, Decided

CASE SUMMARY:

PROCEDURAL POSTURE: Chapter 11 debtor filed a motion seeking examination of debtor's counsel pursuant to Fed R Bankr P 2004, production of documents by counsel, and turnover of records to debtor by counsel pursuant to 11 USCS § 542(e)

OVERVIEW: Debtor and its affiliate companies were part of a company's corporate family until the company divested itself of debtor Before and after divestiture, counsel represented both debtor and the parent company Counsel, debtor, and the parent company entered into a protocol agreement which provided that counsel would protect the confidences of each client and take whatever measures were necessary to assure that confidential information was not shared with the other client Counsel was authorized to give advice to debtor and the parent company regarding the divestiture even if the advice was adverse or perceived to be adverse to the interest of one of them Less than three years after divestiture, debtor and its affiliates sought Chapter 11 relief In granting debtor's motion, the court held that, in a case of a joint representation of two clients by counsel, one client could not invoke the privilege against the other client in litigation between them arising from the matter in which they were jointly represented The court also held that the protocol agreement did not provide either the parent or debtor with any privilege beyond that which existed in an ordinary joint representation

OUTCOME: The court granted debtors' motion

LexisNexis(R) Headnotes

Evidence > Privileges > Attorney-Client Privilege
Legal Ethics > Client Relations > Attorney-Client Privilege
[HN1] In a case of a joint representation of two clients by an attorney, one client may not invoke the privilege against the other client in litigation between them arising from the matter in which they were jointly represented

Evidence > Privileges > Attorney-Client Privilege
Legal Ethics > Client Relations > Attorney-Client Privilege
[HN2] Even in the case of joint defense agreements, attorney-client privilege may not be used to limit discovery in a subsequent dispute between the agreeing parties

Evidence > Privileges > Attorney-Client Privilege
Legal Ethics > Client Relations > Attorney-Client Privilege
[HN3] The attorney-client privilege is meant to foster open communications between attorney and client

COUNSEL: [*1] For Mirant Corporation, In Possession, aka, Southern Energy, Inc, aka, SEI Holdings, Inc, Debtor: Amy M Walters, Haynes & Boone, Dallas, TX; Bryan A Merryman, White & Case LLP, Miami, FL; Frances Anne Smith, Haynes & Boone, Dallas, TX; Ian T Peck, Haynes & Boone, Ft Worth, TX; J Robert Forshey, Forshey & Prostok, LLP, Ft Worth, TX; Jason B Binford, Haynes & Boone, LLP, Dallas, TX; Jeff P Prostok, Forshey and Prostok, Ft Worth, TX; John David Penn, Haynes & Boone,

LLP, Fort Worth, TX; John H Sturc, Gibson, Dunn & Crutcher, Washington, DC; Judith Elkin, Haynes & Boone, Dallas, TX; Maria K Pum, White & Case LLP, Miami, FL; Mark Joseph Elmore, Haynes & Boone, Dallas, TX; Michelle C Campbell, White & Case, Los Angeles, CA; Paul B Carberry, White & Case LLP, New York, NY; Robin Eric Phelan, Haynes & Boone, Dallas, TX; Stacey C Jernigan, Haynes & Boone, Dallas, TX; Thomas E Lauria, White & Case, LLP, Miami, FL; Vincent R FitzPatrick, Jr., White & Case, LLP, New York, NY

For UST U S Trustee, Dallas, TX, U S Trustee: Erin Marie Schmidt, United States Trustee, Dallas, TX; George McElreath, Office of The United States Trustee, Dallas, TX; William T Neary, United States [*2] Trustee, Dallas, TX

For MAGI Committee, Creditor Committee: Gregory M Petrick, Cadwalader, Wickersham & Taft, New York, NY; Thomas Rice, Cox & Smith, San Antonio, TX

For Official Committee of Equity Security Holders, c/o Eric J Taube, Esq., Hohmann, Taube & Summers, LLP, Austin, TX, Creditor Committee: Edward S Weisfelner, Berlack, Israels & Liberman, New York, NY; Eric J Taube, Hohmann, Taube & Summers, L L P., Austin, TX; Mark Taylor, Hohmann, Taube and Summers LLP, Austin, TX

**JUDGES:** D Michael Lynn, United States Bankruptcy Judge

**OPINIONBY:** D Michael Lynn

**OPINION:**

### MEMORANDUM OPINION

Before the court is the issue of whether certain discovery sought by Debtors with respect to Troutman Sanders LLP ("Troutman") is barred by attorney-client privilege n1 This matter was initiated by a motion (the "Motion") filed by Debtors seeking (1) examination of Troutman pursuant to *Fed R Bankr P 2004*; (2) production of documents by Troutman; and (3) turnover of records to Debtors by Troutman pursuant to *section 542(e) of the Bankruptcy Code* n2 (the "Code") The Motion was joined by the Official Committee of Unsecured Creditors [*3] of Mirant Corp (The "Corp Committee") It was opposed by Troutman and The Southern Company ("TSC") n3 The court heard argument on the Motion on May 26, 2005, and granted Debtors some relief n4 The court also invited briefs from the parties on the issue of whether TSC's attorney-client privilege with Troutman prevents disclosure to Debtors by Troutman of certain confidences Troutman, TSC, Debtors and the Corp Committee have submitted post-hearing briefs

n1
> To the extent the Motion presents other issues (other than the requirement of a subpoena), the court has already addressed those issues in its Memorandum Opinion dated June 1, 2005, In re Mirant, identified as docket number 9977 on the docket report for case number 03-46590-DML-11 (the "Goldman Sachs Opinion"), the reasoning of which is adopted herein

n2 *11 USC §§ 101-1330 (2005), amended by 11 USC §§ 101-1532 (as enacted Apr 20, 2005)*

n3 The Official Committee of Equity Security Holders filed a limited objection to the Motion which is not germane to the issue now before the court

[*4]

n4 The court entered two orders on the Motion on June 6 and June 7 The June 6 Order appears to have been entered in error, and does not reflect the court's oral rulings See Transcript of Proceedings relating to the Motion, dated May 26, 2005 (hereafter "TR [page]:[lines]"), pp 37 et seq Accordingly, the June 6 order will be VACATED

This matter is a contested matter subject to the court's core jurisdiction *28 USC §§ 1334(a)* and *157(b)(2)(B)* This memorandum opinion represents the court's findings and conclusions *Fed R Bankr P 7052*

and *9014*

## I. Background

Prior to 2001, Debtors (with inconsequential exceptions) were part of the TSC corporate family On April 17, 2000, TSC announced publicly its intention to divest itself of Mirant Corp ("Mirant," at that time known as Southern Energy, Inc ), n5 parent of the other Debtors In November of 2000, in furtherance of that purpose, TSC offered 20% of the stock of Mirant to the public In April of 2001, TSC completed [*5] the divestiture by issuing the balance of Mirant's stock as a tax-free dividend to the shareholders of TSC

> n5
>
> The court will hereafter refer to this Debtor as Mirant even when discussing a time before the name change

Throughout this process, Troutman represented both Mirant and TSC (and continued to represent both corporate families generally following completion of the divestiture in April 2001) During the period beginning with TSC's formation of its intent and ending with its spin-off of Mirant stock, TSC and Mirant had a number of common officers and directors Although the overlap of boards of directors apparently ceased after April 2001, management of Mirant (and some board seats) continued to be controlled by persons who had served in management positions at TSC n6

> n6
>
> Former Troutman attorneys also served -- and continue to serve -- in in-house positions at both Mirant and TSC

[*6]

In anticipation of divestiture, Steve Wakefield ("Wakefield"), general (in-house) counsel for TSC, issued a memorandum on March 24, 2000, directing that both TSC and Mirant would use Troutman as their law firm advising on the divestiture In November 2000, Troutman, TSC and Mirant entered into a Protocol for Legal Representation (the "Protocol") n7 The Protocol provides in part (at p 2), "as to all matters and at all times, [Troutman] will protect the confidences of each Client and take whatever measures are necessary to assure that confidential information is not shared with the other Client " Troutman is also authorized in the next paragraph of the Protocol to give advice to each of TSC and Mirant regarding the divestiture "even if the advice is adverse or perceived to be adverse to the interest of one of them " TSC and Mirant also entered into separation agreements, but these have not been presented to the court, and it is not clear when they were executed or became effective See Troutman's post-hearing brief, p 7, n 5 (contrary to Debtors' position, the separation agreements "were signed and became effective before the" public offering of Mirant stock; emphasis omitted) [*7] n8

> n7
>
> The Protocol was executed by Troutman on November 3, by TSC (through Wakefield) on November 3 or 6 and by Mirant Corp by Douglas Hill, its general counsel, on November 15
>
> n8 If the agreements effected the separation of Mirant and TSC, then it clearly would be true that, thereafter, disclosures to TSC's board of directors (including some of Mirant's directors) would not be subject to any special rule governing the relationship of parent and subsidiary

In July of 2002, Mirant entered into an engagement letter with Troutman The engagement letter (in Attachment C) recognizes Troutman's conflicts with Mirant Corp in the divestiture (item 5) and "all other matters covered by" the Protocol (item 8) Pursuant to the engagement letter, Troutman continued to serve as principal outside counsel for Mirant n9 It also continued (and continues) to act as TSC's principal outside counsel

> n9
>
> Though Troutman stated otherwise on May 26, its representation of Debtors (for transitional purposes) continued

post-petition, and this court entered its order on November 13, 2003, authorizing payment to Troutman in the amount of $205,681 23

[*8]

Following divestiture, Mirant encountered financial difficulties By late 2002, it was clear that Mirant would have to restructure its debt to survive as a going concern When an out-of-court restructuring failed, on July 14 and 15, 2003, Mirant and 74 of its subsidiaries filed Chapter 11 petitions in this court Eight additional subsidiaries have since filed Chapter 11 petitions

From early in these Chapter 11 cases there has been controversy over transactions entered into between TSC and Mirant prior to and during the divestiture Because limitations stand to run for some causes of action in Debtors' cases on the second anniversary of the Chapter 11 filings (see Code §§ *108(b)* and *546(a)(1)*), the court, concerned that Debtors' investigation of potential claims against TSC not run up against limitations, referred to Hon Steven A Felsenthal, Chief Judge, determinations respecting standing to investigate and prosecute claims against TSC The court's action was apparently timely, as a flurry of discovery on the eve of limitations has led to the court hearing two motions to compel in addition to the Motion n10

n10

See Goldman Sachs Opinion, which addressed Debtors' request for discovery from Morgan Stanley & Co Incorporated, as well as Goldman Sachs Group, Inc An additional motion to compel directed to Arthur Andersen & Co was not actively contested

[*9]

II. Issue

It is in this context that the court must determine what documents and what testimony are not discoverable from Troutman by Debtors by reason of any assertion of attorney-client privilege by TSC n11 To the extent TSC or Troutman has raised other objections to production or testimony by Troutman, except for Troutman's assertion that it must be subpoenaed, n12

the objections are overruled for the reasons stated on the record on May 26 or given in the Goldman Sachs Opinion

n11

In reviewing the May 26 transcript, it appears the court may have left the impression that there would be a further hearing on the privilege issue (TR 40:7-13) Having reviewed the briefs of TSC, Troutman, Debtors and the Corp Committee; having studied the documents; and having read the authorities, the court does not believe a further hearing is necessary or would be productive

n12 The court does not express an opinion regarding the need for issuance of a subpoena prior to Troutman's compliance with the court's orders

[*10]

III. Discussion

It is well established that, [HN1] in a case of a joint representation of two clients by an attorney, one client may not invoke the privilege against the other client in litigation between them arising from the matter in which they were jointly represented See *Official Comm of Unsecured Creditors v Fleet Retail Fin Group (In re Hechinger Inv Co of Del ), 285 B R 601, 612 (D Del 2002)*("Generally, where the same lawyer jointly represents two clients with respect to the same matter, the clients have no expectation that their confidences will remain secret from each other, and those confidential communication [sic] are not within the privilege in subsequent adverse proceedings between the co-clients ") (quoting *Tekni-Plex, Inc v Meyner & Landis, 89 N Y 2d 123, 674 N E 2d 663, 670, 651 N Y S 2d 954 (N Y 1996)*); *Bass Pub Ltd Co v Promus Cos Inc , 868 F Supp 615, 620 (S D N Y 1994)*("Where there is a joint attorney-client privilege, there is no expectation that confidential information will be withheld from joint clients as there is no privilege between them "); *E F Hutton & Co , Inc v Brown, 305 F Supp 371, 393 (S D Tex 1969)* [*11] ("Information imparted to the common attorney relating to the subject

of the joint representation is imparted for the mutual benefit of all the joint clients and is therefore not privileged against any of them "); *SIPA Prot. Corp. v. R.D. Kushnir & Co.*, 246 B.R. 582, 588 (Bankr. N.D. Ill. 2000)("According to some decisions, because co-clients cannot reasonably expect that their common lawyer will withhold information from other co-clients . . . : those confidential client communications are not privileged in subsequent litigation in which the interests of the former co-parties become adverse    "); *Yorke v. Santa Fe Indus., Inc. (In re Santa Fe Trail Transp. Co.)*, 121 B.R. 794 (Bankr. N.D. Ill. 1990)(former parent corporation could not use claim of privilege to prevent discovery by former subsidiary corporation where former parent corporation's in-house legal department represented both parties in sale of stock of former subsidiary corporation)

The Court of Appeals for the Fifth Circuit has spoken clearly to the issue before the court, if not on identical facts. *See Brennan's, Inc. v. Brennan's Rests., Inc.*, 590 F.2d 168, 172 (5th Cir. 1979) [*12] ("Assuming the prior representation was joint, defendants are quite correct that neither of the parties to this suit can assert the attorney-client privilege against the other as to matters comprehended by that joint representation"); *Garner v. Wolfinbarger*, 430 F.2d 1093, 1103 (5th Cir. 1970), cert. denied 401 U.S. 974, 28 L. Ed. 2d 323, 91 S. Ct. 1191 (1971), ("In many situations in which the same attorney acts for two or more parties having a common interest, neither party may exercise the privilege in a subsequent controversy with the other.")

In the case at bar, the law of Georgia would apply to define the relationship between Debtors and Troutman and between Troutman and TSC. n13 The lawyers -- so far as this court can tell -- were licensed in and rendered their services and advice largely in Georgia. Thus, if TSC is entitled to invoke with Troutman the attorney-client privilege as to Debtors' discovery, it must do so under Georgia law. n14

n13

TSC argues that federal common law governs privilege. TSC post-hearing brief, p. 5. The court disagrees but would reach the same conclusion if federal common law controls.

[*13]

n14 *See Resolution Trust Corp. v. H---, P.C.*, 128 F.R.D. 647 (N.D. Tex. 1989), in which the court so applied Texas Law. But see *Glidden Co. v. Jandernoa*, 173 F.R.D. 459 (W.D. Mich. 1997), in which the Magistrate Judge applied Delaware law in determining whether to grant a motion to compel directed against the Grand Rapids, Michigan attorneys.

The Georgia courts have consistently taken the same view as the other authorities cited: that counsel who represents two clients in the same matter cannot keep confidences of one respecting the matter from the other. *Scoggins v. Powell, Goldstein, Frazer & Murphy (In re Kaleidoscope, Inc.)*, 15 B.R. 232, 244 (Bankr. N.D. Ga. 1981)("The court believes that with regard to legal files created    during the course of joint representation . . .; the entire contents of those legal files belong jointly to the clients in question, with each having an undivided ownership interest in, and equal right of access to, all of those files.") rev'd on other grounds 25 B.R. 729 (N.D. Ga. 1982); [*14] *Gearhart v. Etheridge*, 232 Ga. 638, 208 S.E.2d 460, 462 (Ga. 1974)("If two or more persons jointly consult an attorney for the purpose of having him prepare a deed or contract for them, the communications which either makes to the attorney are not privileged in the event of any subsequent litigation between the parties ")(quoting Green, Georgia Law of Evidence, § 185 (1957)); *Peterson v. Baumwell*, 202 Ga. App. 283, 414 S.E.2d 278, 280 (Ga. Ct. App. 1991)(same); see also *Atwood v. Sipple*, 182 Ga. App. 831, 357 S.E.2d 273, 276 (Ga. Ct. App. 1987).

Troutman responds to this wealth of authority, first, by arguing a subsidiary (Mirant) and its officers and directors must act for the sole benefit of the parent (TSC). Since this rule, according to Troutman, means any and all duties were owed to TSC alone by Mirant and its officers and directors until the sale of 20% of Mirant Corp stock, Troutman reasons "there can be no lawful or permissible adverse interest between a wholly-owned subsidiary and its parent." (Troutman's post-hearing brief, p. 3)

For this proposition, Troutman cites *Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171

(Del 1988) Leaving [*15] aside Troutman's overly-broad reading of *Anadarko* (the court held that directors of a parent owed no fiduciary duty to prospective shareholders of the subsidiary prior to a spinoff, not that the subsidiary's directors owed, no duty to the subsidiary), and even assuming that Troutman's reading is correct (*See*, however *Valente v Pepsico, Inc, 68 FRD 361 (D Del 1975)*), n15 the decision is wholly inapposite to the case at bar First, the very types of action against TSC that are contemplated are in the nature of fraudulent transfers, fraud and *alter ego* The first and, for some purposes, the others, presuppose or implicate the insolvency of Debtors at the time of (and before) the spin-off If Debtors were insolvent, the duty of directors to the shareholder was superceded by a duty to creditors *See Official Comm of Unsecured Creditors v Fleet Retail Fin Group (In re Hechinger Inv Co of Del), 280 BR 90, 92 (D Del 2002)*("It is well-established that creditors are owed fiduciary duties in the zone of insolvency ")(citations omitted); *Official Comm of Unsecured Creditors v Lozinski (In re High Strength Steel, Inc), 269 BR 560, 569 (Bankr D Del 2001)* [*16] ("Under Delaware law, once a corporation becomes insolvent, its officers and directors owe unsecured creditors a fiduciary duty That fiduciary duty requires that the controlling shareholder(s) and director(s) of the debtor maximize the value of the assets for payment of unsecured creditors ")(citations omitted); *Prod Res Group, LLC v NCI Group, Inc, 863 A 2d 772, 790-91 (Del Ch 2004)*("When a firm has reached the point of insolvency, it is settled that under Delaware law, the firm's directors are said to owe fiduciary duties to the company's creditors ")

n15

Troutman's argument also appears inconsistent with the existence of separation agreements Once Mirant and TSC agreed to be "separate," it is questionable whether the normal rules of parent-subsidiary relations should apply

Second, *Anadarko* is easily distinguishable from the case at bar The issue before the court in *Anadarko* was whether the contracts by which the subsidiary was separated from its parents were [*17] to be tested on the basis that the parent's directors owed a fiduciary duty to the subsidiary's prospective shareholders Had such a duty existed, the contracts would have to have been "entirely fair" to the subsidiary for the parent to escape liability -- a virtually impossible standard according to the court *Anadarko, 545 A 2d at 1174*

Troutman next argues that, under *Glidden*, TSC's privilege may be asserted to block Debtors' discovery *Glidden*, however, does not support Troutman *Glidden* involved a management buyout of a subsidiary which the parent thereafter attacked The parent sought discovery from counsel who had represented management in the buyout and was general counsel to the subsidiary *Glidden* does not stand for the proposition that a subsidiary jointly represented with a parent may be denied access to confidences between the parent and counsel Indeed, the Magistrate Judge (applying Delaware law to construe the attorney-client relationship) noted (*173 FRD at 473*), "numerous courts have recognized that, for purposes of the attorney-client privilege, the subsidiary and the parent are joint clients, each of whom has an interest [*18] in the privileged communications " Even if the court were bound by *Glidden*, there is nothing in *Glidden* that would require that the court deny the Motion on the basis of attorney-client privilege

Next, Troutman points to the Protocol This document, Troutman claims, is an agreement to limit the right of each of Mirant and TSC to see confidential documents of the other However, even assuming such an agreement would be effective in the present situation, there is nothing in the Protocol that speaks to attorney-client privilege [HN2] Even in the case of joint defense agreements, attorney-client privilege may not be used to limit discovery in a subsequent dispute between the agreeing parties *See Beneficial Franchise Co, Inc v Bank One, NA, 205 FRD 212, 216 (ND Ill 2001)*("The joint defense privilege cannot be waived without the consent of all parties to the defense, except in the situation where one of the joint defendants becomes an adverse party in a litigation ")(quoting *Ohio-Sealy Mattress Mfg Co v Kaplan, 90 FRD 21, 29 (ND Ill 1980)*); *Sec Investor Prot Corp v Stratton Oakmont, Inc, 213 BR 433, 440 (Bankr SDNY 1997)* [*19] (granting trustee's request for discovery under *Rule 2004* against party asserting privilege pursuant to alleged prior joint defense agreement with debtor because "the trustee should not be stymied in uncovering the facts by the existence of a joint defense privilege which would evaporate were he or she only to file a complaint "); *In re Mich Boiler & Eng'g Co, 87 BR 465, 471 (Bankr ED Mich 1988)*("The joint defense privilege protects the statements from disclosure to third parties The statements, however, are not

protected from disclosure in a subsequent dispute between the clients ")(citations omitted)

The court previously had also expressed concern that the Protocol, whatever its facial value, was entered into when Mirant was still under the control of TSC Troutman argues, however, that Mirant ratified the Protocol in the engagement letter of July 1, 2002 The court does not find any specific ratification of the Protocol in the engagement letter Moreover, Mirant's in-house general counsel had ties to TSC and Troutman and, at least arguably, an interest in maintaining the validity of the transactions involved in the divestiture The court will not speculate [*20] on these (and other n16) motives that may have led to the engagement letter Rather, the court holds that, in any case, the Protocol does not provide either Mirant or TSC with any privilege beyond that which exists in an ordinary joint representation; to extend special protection to TSC by reason of either the Protocol or the engagement letter would be contrary to the public policy considerations discussed below

n16

For example, the engagement letter may have been a necessary precondition to Mirant's continued retention of Troutman or the special rates reflected in the engagement letter The court does not suggest that any of these motives would be necessarily actionable or wrongful

Finally, Troutman includes (Troutman's post-hearing brief, pp 10-11) a list of matters as to which it might provide testimony or documents It suggests that this list demonstrates how innocuous was the firm's relationship with Mirant The court cannot accept this list as conclusive of anything Even if accurate, the [*21] list does not present an independent reason for denying the Motion

For its part, TSC argues that Troutman's representation relating to the public offering and spin-off in no way constituted a joint representation of TSC and Mirant TSC points to the Protocol as providing implicit evidence that no joint representation occurred However, as the court has already noted, the Protocol specifically provided for the rendering of advice by Troutman to both TSC and Mirant, even when such advice might be adverse to one or the other Furthermore, TSC's argument is undermined by the March 24, 2000 Wakefield memorandum in which Wakefield directed Troutman be used as counsel by both Mirant and TSC In that memorandum, Wakefield also states that Troutman attorneys "are representing the enterprise and understand that their role is not to be an advocate for either side, but rather to provide objective legal advice and to document agreements reached between executives " The words of TSC's own in-house counsel indicate that Troutman did not act on behalf of TSC and Mirant separately, but rather acted as counsel to both in the transactions between them The court thus finds that Troutman's participation [*22] in the transactions constituted joint representation of TSC and Mirant, and nothing contained in the Protocol dictates a contrary finding n17

n17

The court also notes that much of the discovery sought by Debtors relates to matters and transactions (some concerning the divestiture of Mirant) which occurred prior to execution of the Protocol in November 2000 Even assuming the Protocol were effective to prevent certain discovery by Debtors, it would not be proper to deny Debtors comprehensive discovery concerning the many transactions which occurred prior to the time at which the relationship between Troutman, TSC and Mirant became governed by the Protocol

TSC also argues that Debtors are incorrect in their assertion that no attorney client privilege exists because knowledge gained by certain TSC directors in dealing with Troutman was imputed to Mirant where such directors also acted as directors for Mirant TSC cites the court to *United States v Bestfoods, 524 US 51, 141 L Ed 2d 43, 118 S Ct 1876 (1998)* for [*23] the proposition that corporate law recognizes that directors sitting on the boards of a parent and a subsidiary represent the corporations separately Although *Bestfoods* has nothing to do with issues of privilege, TSC argues that the reasoning of *Bestfoods* requires the court to draw the conclusion that a corporation does not

lose its ability to assert a privilege simply because one or more directors acts as such for another entity in the corporate family. TSC cites the court to three other decisions in support of its conclusion: *Seltzer v. I.C. Optics, Ltd.*, 339 F. Supp. 2d 601 (D.N.J. 2004); *Weintraub v. Texasgulf, Inc.*, 564 F. Supp. 1466 (S.D.N.Y. 1983); *In re Fin. Corp. of Am.*, 119 B.R. 728 (Bankr. C.D. Cal. 1990). None of these cases effectively rebuts Debtors' arguments.

*Seltzer* dealt with the issue of whether the mere existence of overlapping directors is sufficient to establish domination of a subsidiary by a parent for purposes of an *alter ego* analysis, not whether the presence of overlapping directors has any impact on a privilege analysis. *Weintraub v. Texasgulf Inc.* addressed whether, in a *Rule 10b-5* action, [*24] knowledge of plans for a takeover of a corporation could be imputed to that corporation (for purposes of establishing liability to a plaintiff shareholder) because some of its directors sat on the boards of the entities which purchased it. Again, this case does not address the issue of imputation of knowledge and its effect on privilege in the context of overlapping directors within the same corporate family. *In re Fin Corp. of Am.* is off point as well. This case holds that at a parent corporation's meeting of officers or directors, at which officers or directors are present who also serve as officers or directors for subsidiaries, such overlapping directors are not "relegated to the status of third parties" (*119 B.R. at 737*) such that a waiver of privileged communications results. *In re Fin Corp of Am* does not address Debtors' argument that any privilege that may exist is rendered unenforceable by the presence of overlapping directors working on intercorporate family transactions for which there is joint representation by one law firm.

Even were there merit in the arguments of Troutman and TSC, the court would be most reluctant to deny Debtors the requested [*25] discovery for reasons of public policy. It is black-letter law that [HN3] the attorney-client privilege is meant to foster open communications between attorney and client. *Swidler & Berlin v. United States*, 524 U.S. 399, 403, 141 L. Ed. 2d 379, 118 S. Ct. 2081 (1998)("The privilege is intended to encourage 'full and frank communication between attorneys and their clients . . .'")(*quoting Upjohn Co. v. United States*, 449 U.S. 383, 389, 66 L. Ed. 2d 584, 101 S. Ct. 677 (1981)); *United States v. Robinson*, 121 F.3d 971, 974 (5th Cir. 1997)(same). Neither Troutman nor TSC can show any reasonable basis for supposing enforcement of TSC's privilege in the case at bar would advance that goal. In a bankruptcy case, the need for investigation is far more acute than is any concern for attorney-client communications. *Compare Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 85 L. Ed. 2d 372, 105 S. Ct. 1986 (1985) n18. Whatever the facts involving TSC's ownership and divestiture of Mirant are, and the court has certainly reached no conclusions, it would be a bad precedent to carve in the case at bar a limitation on the usual rule respecting assertion of privilege in investigation of claims arising from transactions where common [*26] counsel was used.

n18

> In *Weintraub*, the Supreme Court found that an important goal of the bankruptcy laws -- the uncovering of insider fraud through investigation by a trustee -- would be frustrated if former officers and directors of a bankrupt corporation were allowed to retain control of the corporation's attorney-client privilege and use the same to prevent a trustee from gaining access to the corporation's legal files. *Id. at 353*. And, it has long been recognized that situations exist in which compelling reasons, such as the promotion of important public policy, require that a privilege give way in favor of disclosure. For example, in *Clark v. United States*, 289 U.S. 1, 77 L. Ed. 993, 53 S. Ct. 465 (1933), the Supreme Court stated:
>
>> But the recognition of a privilege does not mean that it is without conditions or exceptions. The social policy that will prevail in many situations may run foul in others of a different social policy, competing for supremacy. It is then the function of a court to mediate

between them, assigning, so far as possible, a proper value to each, and summoning to its aid all the distinctions and analogies that are the tools of the judicial process

*Id at 13 See also United States v Goldberger & Dubin, P C, 935 F 2d 501, 504 (2d Cir 1991)*("The privilege cannot stand in the face of countervailing law or strong public policy and should be strictly confined within the narrowest possible limits underlying its purpose"); *United States v Skeddle, 989 F Supp 890, 900 (N D Ohio 1997)*(same)

[*27]

Debtors, acting as fiduciaries for the benefit of their creditors, are pursuing an investigation which is important not only to those who may have lost money as a result of Debtors' demise It is critical that both those who purchased Mirant's (and its subsidiaries') securities and the public have confidence that potential liability of TSC (and Troutman) has been thoroughly explored That Debtors sought chapter 11 relief less than two and one half years after TSC completed their divestiture is reason enough to raise concern that all might not have been right in the transactions between TSC and Mirant Debtors' disputes with, *inter alia*, various California parties, n19 Potomac Electric Power Company ("Pepco") n20 and New York taxing authorities n21 all antedated divestiture or had their genesis in the period prior to divestiture Given the short time between divestiture and commencement of these chapter 11 cases and given the pre-divestiture history of Debtors' problems, it is essential to the integrity of the chapter 11 process that no stone be left unturned in ensuring satisfactory completion of Debtors' investigation

n19

Debtors have been involved in litigation with a number of public, private and regulatory entities regarding Debtors' conduct in California during the periods in 2000 and 2001 when exceptionally high prices for wholesale electricity and natural gas prevailed in western power markets See Mirant Form 10-K filed March 15, 2005, available online at www mirant com

[*28]

n20 Debtors have been involved in litigation with Pepco regarding Debtors' efforts to reject certain agreements entered into with Pepco in connection with Mirant's purchase of certain assets from Pepco in 2000 See Mirant Form 10-K filed March 15, 2005, available online at www mirant com

n21 Debtors have been involved in litigation in various courts in New York regarding the proper assessment value and tax liability for certain power generation facilities located in New York These proceedings involve disputes as to the proper assessment value and tax liability for years dating as far back as 1995 See Mirant Form 10-K filed March 15, 2005, available online at www mirant com

## IV. Conclusion

For the foregoing reasons, (1) this court's order of June 6, 2005 is VACATED; and (2) subject to the argument that a subpoena must be issued to Troutman, Debtors' Motion is hereby GRANTED as to (a) production of all documents and (b) oral examination of Troutman pursuant to *Fed R Bankr P 2004*

It is so ORDERED

Signed [*29] June 15, 2005

D Michael Lynn

United States Bankruptcy Judge