IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: Teleglobe Comm. *et al.*, | ) | Chapter 11 |
| | ) | Jointly Administered |
| Debtors. | ) | |
| —————————————— | ) | Bankr. Case No. 02-11518 (MFW) |
| | ) | |
| Teleglobe USA Inc. *et al.*, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. Action No. 04-1266 (SLR) |
| | ) | |
| BCE Inc. *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**SUPPLEMENTAL DECLARATION OF MARTIN FELSKY, Ph.D., J.D. DESCRIBING
DEFENDANTS' E-DATA RETRIEVAL AND PRODUCTION PROCESS**

     I, MARTIN FELSKY, declare as follows:

**Introduction**

     1.  I submit this Supplemental Declaration to update the Court on the work I have

been performing in conjunction with the Defendants' e-data retrieval and production efforts since

the filing of my original Declaration on May 9, 2005.  A copy of my original Declaration is

attached hereto as Exhibit A for the Court's reference.

**Searches 1 and 2**

     2.  As previously stated, we conducted Search 1 (i.e. Teleglobe-related terms

AND Plaintiffs' revised search terms) on the Identifiable Data within the date range, excluding

the records in the 86 folders that had previously been produced to the Plaintiffs.  We also

conducted "Search 1 AND Custodian" in the Unidentifiable Data within the date range.  The

1

results of these searches were placed in a database and provided to Shearman & Sterling LLP on or about May 9, 2005. It is my understanding that Shearman & Sterling LLP has conducted a review of the documents retrieved from Search 1 and has produced all responsive, non-privileged documents to the Plaintiffs. I have been informed by Shearman & Sterling LLP that the rate of responsiveness (percentage of total documents responsive to Plaintiffs' document requests, whether produced or withheld as privileged) for the documents captured in Search 1 was approximately 69%.

3. After determining that the original Search 2 was too broadly framed for those documents not captured by Search 1, we devised a method by which to refine the search, namely, by applying proposed search phrases based on Plaintiffs' document requests to those documents retrieved in the original Search 2. When the search phrases were applied to the approximately 65,597 documents retrieved in the original Search 2, the total number of documents captured was approximately 32,064, including attachments.

4. Having determined that this refined Search 2 was the more effective approach, we created a database for the documents retrieved and provided the final results to Shearman & Sterling LLP for the attorney review on or about May 26, 2005. It is my understanding that the rate of responsiveness, even after using this more refined search method, was a mere 6% of the documents produced to Shearman & Sterling LLP. This suggests to me that the vast majority of responsive documents would have been captured in Search 1, which was limited to documents containing the word "Teleglobe" or another term related thereto.

**Additional Searches Requested by Plaintiffs**

5.   Shortly after conducting the Refined Search 2, I was informed by Shearman & Sterling LLP that the Plaintiffs had requested that we run additional searches. The Plaintiffs requested that we run the original Search 2, as modified by application of custodian identifying information (name, ID No., etc.), on some 3500 unidentifiable folders to which the 37 custodians had access ("Tab A"), 420 hard drive folders ("Tab B"), and close to 500 identifiable custodian folders ("Tab C"). In addition, the Plaintiffs requested that we run a search in the 721 folders bearing the word "Teleglobe" or some iteration thereof in the name, using the string of 147 search terms, but omitting the "but not" filter previously applied to exclude the unrelated projects listed at Exhibit 2 to my original Declaration.

6.   With respect to the requested 721-folder search, I advised Shearman & Sterling LLP that Search 1 was performed on the full text of the documents as well as on the folder names. Therefore, if the word "Teleglobe" (or any variants) appeared in a folder name and a document in that folder contained any of the 147 search terms, then that document would have been retrieved in the search. Thus, the results of the additional folder search requested by the Plaintiffs would already have been captured in Search 1 and consequently had already been produced to the Plaintiffs.

7.   As for the requested "modified" Search 2 on the approximately 4000 e-files that the Plaintiffs selected from the list of custodian hard drives and folders, I informed Shearman & Sterling LLP that this search would be impracticable, as it would require a manual retrieval of each individual folder selected. In other words, there was simply no way to run a search query simultaneously across randomly selected folders. I estimated that the required

manual retrieval process would take at least one week to complete, after which all documents previously flagged as responsive would have to be removed. Following this process, the retrieved documents would then have to undergo attorney review by Shearman & Sterling LLP prior to production to the Plaintiffs. The stated impracticability of the requested search, coupled with my previous observation that the modified Search 2 did not serve as an effective filter for irrelevant documents, led BCE to conclude that the requested additional search would not be a worthwhile endeavor. It is my understanding that BCE informed the Plaintiffs that it would not proceed with the search unless the Plaintiffs reduced the number of selected folders to a more manageable number.

8. In an attempt at compromise, BCE subsequently agreed to conduct the requested modified Search 2 on Tab B and Tab C (the selected hard drives and identifiable custodian folders). We provided Shearman & Sterling LLP with the results of the Tab B and Tab C searches on or about June 26, 2005 and July 1, 2005 respectively. It is my understanding that, following the attorney review, all responsive, non-privileged documents from Tab B will be produced to Plaintiffs. I have been informed by Shearman & Sterling LLP that the documents retrieved in the search of Tab B yielded a rate of responsiveness of approximately 10% of the documents produced to Shearman & Sterling LLP, or approximately 4% of the total documents in the folders (including those that were already flagged as responsive). In other words, out of a total of approximately 33,500 documents in the Tab B folders, approximately only 1400 were found to be responsive. It is my understanding that Shearman & Sterling LLP is still in the process of reviewing the documents retrieved from the search of the Tab C folders and will be producing any responsive, non-privileged documents to Plaintiffs once that review is completed.

4

9.  I have been informed by Shearman & Sterling LLP that the Plaintiffs have reduced the number of unidentifiable Tab A folders for the requested modified Search 2 from 3509 to 2906.  Even with this slightly reduced number, we would still have to manually locate and copy some 2900 individual folders, a task that would not only be costly, but extremely time-consuming and subject to human error.  Given the demonstrated diminishing returns on the prior folder searches, I do not believe that the requested Tab A search would be a productive endeavor.

### Plaintiffs' New Proposed Tab A Folder Search

10. I was informed by Shearman & Sterling LLP that at the July 7, 2005 hearing before your Honor, the Plaintiffs proposed a method of searching the 2906 Tab A folders that would purportedly allow automatic searches to be run on those folders, and thus eliminate the need to conduct a manual search of each individual folder.  As I understand it, the Plaintiffs have suggested that we combine all 2906 folders into one large folder, and then run the new proposed search terms on the contents of that single combined folder.

11. Plaintiffs' suggested search method appears to be based upon the assumption that we apply searches to raw data, i.e. native files.  However, this is not the case.  The database that Commonwealth Legal created, upon which all the searches are being run, consists of processed data, not native files.  This processed data exists in a field structure, organized by a database management program, and therefore cannot be freely moved around in the way Plaintiffs propose.  While we could, theoretically, resort to the raw data in order to combine the folders – a process that would be both costly and time-consuming – we would still have to reprocess the data and rebuild the database once again in order to produce the responsive documents.

12. Moreover, even if we were to manipulate the raw data, the folder combination that the Plaintiffs' propose would still require that we manually retrieve each individual folder, and then copy its contents into a new central folder. Thus, while Plaintiffs' proposed approach would, under such circumstances, eliminate the need to conduct multiple searches in each of the folders, there would still remain the most burdensome part of the exercise, namely, the first step of having to manually locate and then retrieve each of the 2906 individual folders.

13. Further, the process is of questionable value in terms of focusing the scope of searches to a potentially relevant collection, due to the fact that, in many cases, the selected folders are root folders which themselves contain multiple sub-folders.

14. In addition, until we actually locate the folders and view their contents, there is no way of determining the total number of records contained in the subject folders. In fact, the selected folders could theoretically contain the bulk of the documents in the database. If this turns out to be the case, then we could end up with hundreds of thousands of hits, based on Plaintiffs' new, extremely broad, proposed search terms. The three-page list of Plaintiffs' new proposed search terms is attached as Exhibit B. As the Court will note, most of the proposed search terms consist merely of a string of terms located in certain proximity to each other and do not even include the word "Teleglobe." This proposed search is therefore much broader and far less contextual than the phrases that the parties previously agreed upon, and that this Court suggested would be a more effective search method.

15. Given the very broad proposed search terms, it is highly likely that the search will yield a large number of documents that ultimately will be determined to be non-responsive, in much the same way as the documents retrieved in the Refined Search 2. However, before that

determination may be made, it is my understanding that Shearman & Sterling LLP will have to engage in a costly and time-consuming attorney review of all the documents captured in the search in order to identify those that may be responsive. Given the impracticability of Plaintiffs' new suggested approach, and the likely ineffectiveness of the new proposed search terms in filtering out irrelevant documents, I do not believe that the requested 2906 folder search will be a productive exercise.

### Processing and Searching Assistant Data

16. We have conducted Search 1 and Refined Search 2 on the hard drives and server data of the following custodians' assistants: Patricia Raffaele (assistant to Stephen Skinner), Maria Buonamici (assistant to Jean Monty), Silvana Di Paolo (assistant to Marc Ryan), Line Patenaude (assistant to Michael Sabia), Diane Valade (assistant to Martine Turcotte), Bonnie MacMillan (assistant to Siim Vanaselja), and Louise Audet (assistant to Peter Nicholson). The first installment of documents captured by these searches was sent to Shearman & Sterling LLP on July 22, 2005. We shipped the second installment on July 27, 2005. It is my understanding that Shearman & Sterling LLP has begun its attorney review of this assistant data, and will produce any responsive, non-privileged documents to the Plaintiffs upon completion of that review.

17. In addition to the seven assistants identified above, we are currently processing the hard drives of five additional assistants: Ingrid Calabrese (assistant to Andrea LeBlanc), Franca Zappavigna (assistant to Pierre Lessard), Danielle Berrut (assistant to Patrick Pichette), Helen Davidson (assistant to Ildo Ricciuto), and Sandie Spackman (assistant to George

Walker). We expect to provide the results of those searches to Shearman & Sterling LLP by August 3, 2005.

### Restoration of BCE's Backup Tapes

18. We have also begun the process of restoring the backup tapes for server mtrlpqvm113 ("Executive Server") which, I have been informed by BCE, was accessed by Pierre Lessard and Patrick Pichette. We expect to complete the restoration and processing of this server by August 9, 2005. We will conduct Search 1 and Refined Search 2 on the processed data, and provide Shearman & Sterling LLP with all documents retrieved, minus any documents captured in previous searches.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 29th day of July 2005.

Martin Felsky

8

Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re:  Teleglobe Comm. *et al*., | ) | Chapter 11 |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | Bankr. Case No. 02-11518 (MFW) |
| | ) | |
| Teleglobe USA Inc. *et al*., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. Action No. 04-1266 (SLR) |
| | ) | |
| BCE Inc. *et al*., | ) | |
| | ) | |
| Defendants. | ) | |

**DECLARATION OF MARTIN FELSKY, Ph.D., J.D. DESCRIBING
DEFENDANTS' E-DATA RETRIEVAL AND PRODUCTION PROCESS**

I, MARTIN FELSKY, declare as follows:

**Background**

1.   I am CEO of Commonwealth Legal, Canada's largest litigation

support service bureau.  Commonwealth Legal was incorporated in February 2000.  We

have six offices across Canada and employ over 65 full time staff, and over 100 contract

coders.  We have worked with virtually all of the top 30 law firms in Canada, as well as

six of the largest law firms in the world.  We have also worked with the Federal

Department of Justice on major contracts and the provincial Attorneys General in Ontario

and Alberta.

2.   We are a full-service litigation support provider: we do consulting,

software sales and support, and training, in addition to scanning, coding and electronic

discovery.  We were instrumental in pioneering electronic appeal books in various courts across the country, including the Supreme Court of Canada.

3.   We are the leading Summation software reseller in Canada (having won the Pinnacle Award for being in the top five resellers worldwide), the master IPRO Distributor (Platinum Partner and Silver Reseller), the exclusive Concordance and iCONECT dealers, and the leading Ringtail Alliance Partner.

4.   As CEO of Commonwealth Legal, I advise major law firm and government clients in Canada, the United States and abroad on the deployment of litigation support document management tools and resources.  Prior to founding Commonwealth Legal, I was Director of integer.actif, Canada's leading legal technology consulting firm.  Integer.actif worked with more than 60 law firms and law departments to provide advice, training and support on strategic technology planning, large litigation cases, information systems implementation and training.  Before founding integer.actif, I was Legal Technology Counsel and a research lawyer at McCarthy Tétrault, one of Canada's national law firms.

5.   I obtained two doctorates from the University of Toronto (English and Law) and was called to the Ontario Bar in 1985.  For the last three years I taught a course in Business Law and Ethics in the Executive MBA program at Concordia University.

6.   I have written extensively on the subject of legal technology and am frequently quoted in Law Times, The Canadian Bar Association National, Canadian Lawyer and other legal publications.  For almost fifteen years, I was the Chairman of the Legal Research Network.  I am a member of both the Judges Technology Advisory

2

Committee of the Canadian Judicial Council and the Special Committee of the Task

Force on the Discovery Process in Ontario.  I have spoken at dozens of conferences

throughout North America, in Europe and New Zealand, including the ABA TechShow

in Chicago, and Legal Tech in Toronto, New York and Los Angeles.

       7.  Commonwealth Legal began working on electronic discovery matters

in the Fall of 2002. We acquired one of the leading e-discovery family of applications,

"Discover-E" from Pacific Legal and three of our staff were certified on the program. We

are currently a Discover-E Premier Business Partner. In addition to Discover-E, we use

HardCopy Pro Plus™ software from Extractiva (formerly Mobious Solutons Inc.).  More

information about this software is found at the Extractiva website:

> *HardCopy Pro Plus™ is the most complete and robust professional-grade EDD solution, allowing service bureaus to provide rapid, enterprise-level electronic data discovery services to their clients. Easily make large batches of electronic documents and e-mails accessible to end-users for searching and review.  Create images, capture document-specific metadata, deduplicate, bates stamp and export to your retrieval and indexing system.*

> *As the pioneer in this field, HardCopy Pro Plus™ has grown to be incredibly feature-rich.  Litigation support service bureaus throughout the world have based their electronic data discovery services on our integrated solution.  It's faster and more cost-effective than hiring programmers to write complicated and error-prone custom tools.*

> *HardCopy Pro Plus™ has flexible workflow, with years of EDD processing experience built-in. Mobious Solutions keeps up with industry trends and continually adds capabilities.  We listen to the requests and feedback of the service bureaus we work with.  It's no wonder that service bureaus use HardCopy Pro Plus™ to produce millions of pages each month.*

> *Trust your e-discovery to the solution of choice for large corporations and government agencies, including such key players as Pitney Bowes and the United States Department of Justice.*

8.     We have processed millions of pages of documents for large law firms and corporate clients in the manufacturing industry, financial services industry, and various other industries. Once data is processed, we often integrate the e-data with scanned images and provide clients with databases for their internal use, or a hosted web-based application for document review.

## Processing of BCE's E-Data

9.     Starting in January 2005 and continuing through the months of February and March, BCE shipped to Commonwealth Legal a total of some 230Gb of data stored on hard drive media and CDs, relating to the Teleglobe USA matter.

10.     The 230 Gb consisted of:

    a.    Hard drive data for certain custodians
    b.    Server data that is identifiable for certain custodians (by surname or employee ID number appearing in the folder name)
    c.    Unidentifiable server data – data in folders to which the custodians had access, but were shared by non-custodians.

11.     We were requested to restore, index and search selected portions of the data. In addition we extracted previously processed hard drive data for relevant custodians from a Canadian litigation database in order to expedite the review process. Approximately 85,000 records were extracted. In late January or early February 2005, Shearman & Sterling LLP requested that I help evaluate whether the parties' search terms would efficiently filter out clearly irrelevant documents. I had discussions with Diane Barrasso, Plaintiffs' IT consultant, about the effectiveness of using a long list of general

terms as a search strategy, and over a period of weeks we discussed various approaches to conducting the search of e-data in a more efficient way.

12.    In February 2005, I ran searches using some of the search terms proposed by the Plaintiffs on a sample collection of BCE documents containing 103,591 records.  More than fifty percent of all the records in the collection were captured with only nine search terms:  "value," "capital," "cash," "debt," "line," "finance," "Excel," "note," or "notes."  That demonstrated to me that the proposed search terms were far too general.  I sent an e-mail to Ms. Barrasso on February 22, 2005, which indicated that more than half of the documents were retrieved using only nine terms.  In my e-mail, I also indicated the number of documents that were retrieved when certain search terms were used.

13.    After restricting the searches to those documents in the collection that were within the plaintiffs' proposed date range (January 2000 through December 2002), Commonwealth Legal concluded that almost 90% of the documents created during that time period were retrieved when we used the proposed search terms.  Therefore, we concluded that the search terms did not effectively filter out irrelevant documents, and that they should be combined in order to have the relevant context.

14.    In her response to my February 22, 2005 e-mail, Ms. Barrasso thanked me for my "detailed" report.  The next day, however, I received a new list of search terms from the Plaintiffs in which only one word had been eliminated ("Excel"), certain words had been added, no effort had been made to combine words, and the list contained many general terms, such as "line" and "note" which are far too common to be

meaningful without a combination. The Plaintiffs had essentially ignored my suggestion concerning the combination of terms.

15.     I continued to have discussions with Ms. Barrasso in an effort to achieve a more logical method of searching, but the Plaintiffs did not engage in a meaningful effort to combine terms. One of the most basic suggestions I made to limit the number of retrieved documents was to combine the listed search terms with "Teleglobe" and related terms. Even though the proposed search terms were still far too common (the list contained terms, such as "third," "share," or "note"), the use of the "Teleglobe" restriction would filter out some irrelevant documents. The Plaintiffs did not agree to my suggestion. They raised the possibility that this approach might be too narrow since in their view not every Teleglobe-related document necessarily contains the word "Teleglobe" (or a variation). In order to accommodate the plaintiffs, I suggested considering a search that would exclude non-Teleglobe related documents by using a two-stage search process:

    a.    Search 1 on all data in the date range = Teleglobe, etc. AND search terms

    b.    Search 2 on the remaining data = Search terms BUT NOT "Project A" (where Project A is an unrelated project).

16.     While I made that suggestion, I was concerned that Search 2 would not necessarily be effective if (a) there were only a few non-Teleglobe projects or (b) there were many documents that contained references to Teleglobe and non-Teleglobe-related projects. At that stage, our discussion was theoretical. It was therefore not proven that the use of non-Teleglobe related transactions would actually filter out many

documents.  Nevertheless, I suggested that we run Search 2 in an attempt to move forward.

17.     Even though no agreement was reached on the searches, Shearman & Sterling LLP requested that Commonwealth Legal process data for certain custodians in an effort to produce their electronic documents prior to their depositions.  Accordingly, we processed such data on an expedited basis and provided to Shearman & Sterling LLP the e-data of three deponents, Elizabeth Kavanaugh, Elie Daher, and Yanick DeGrandpre. It is my understanding that documents resulting from a search for "Teleglobe (or a variation) and search terms" were produced to the Plaintiffs prior to those depositions.

18.     By mid-March it appeared that there was no agreement on the appropriate search terms, and Commonwealth Legal was instructed by Shearman & Sterling LLP to process the e-data and create a complete repository of all the documents that could be extracted for the relevant custodians.  The purpose of that approach was to ensure that, as the negotiation on search terms proceeded, BCE would be able to respond quickly to different scenarios.  On March 20, 2005, we began full processing of the data. That is not the same as restoring and indexing.  Processing includes the following steps:

       a.  Extracting all native files from hard drive media that had not already been restored

       b.  Loading all data into our Extractiva servers

       c.  De-duplicating all data so exact duplicates are not processed more than once

       d.  Extracting any zipped files or other "container" files into their constituents

       e.  Converting Netscape e-mail to PST format

      f.   Extracting all metadata and e-mail header information into a database

      g.   Extracting all full text from native files and convert to ASCII format

      h.   Converting all files to TIFF image format

      19.    In a letter dated March 30, 2005, BCE reiterated that using the Plaintiffs' proposed search terms with "or" connectors would result in retrieving approximately 90% of the documents created in the period of January 2000 to December 2002, based on a sample of easily accessible data.  BCE also indicated in the letter that it had regularly updated the Plaintiffs on the progress of its evaluation regarding the documents that would be retrieved using those search terms, but that Plaintiffs had not provided reciprocal disclosure.  BCE stated its belief that too much time had been spent in this process, and that it intended to conduct Search 1 and Search 2.  BCE attached to its March 30 letter a list of 147 search terms.  In light of Plaintiffs' reluctance to combine search terms, the list attached to BCE's March 30 letter only reflected an effort to combine the most obvious terms.  For instance, I understand that one of the issues in this case involves Third Series Preferred shares.  Plaintiffs had sought the review of all documents that contained the word "third."  In its March 30 letter, BCE indicated that it would not agree to search for the individual word "third," but for the combination "third series preferred."

      20.    I was told that, on the very next day, the Court held a hearing to address, among other things, the search of e-documents.  At the March 31 hearing, the Court indicated that it had always assumed the parties would use phrases with connectors, not individual words, in conducting searches in order to put words in context.  That was precisely the approach that I had recommended over a period of several weeks.  After

8

learning about the Court's remarks, I was hopeful that the parties would be able to agree on a more logical method of searching for electronic documents.

21.     The parties convened a "meet and confer" on April 6 in New York, which I attended. At that meeting I was informed by the Plaintiffs that they had finally agreed to combine lists of search terms with "Teleglobe" and related names. I thought that was an important breakthrough. The Plaintiffs also restricted some of the terms on their original list by combining terms with Boolean "and" "or" proximity connectors, but they refused to consider any phrases other than the few, most obvious, combination of words that BCE had suggested before hearing from the Court and a few additional modifications that Plaintiffs made at the meeting. As a result, BCE would still have to review in Search 1 all documents that contained "Teleglobe" (or a variation) AND one or more of 147 search terms, most of which were quite general, such as "share," "shares," "line," "dilut*," "projected," "value," or "treatment." In an effort to move the process along, BCE stated that it would run Search 1 on the hard drives of the custodians and the identifiable portions of their server folders. With respect to the contents of the unidentifiable portion of the server folders, BCE stated that it would conduct the following search: Surname or employee ID number and Search 1. The Plaintiffs also requested that a search be conducted involving Mr. DeGrandpre, which BCE agreed to conduct.

22.     At the April 6 meeting, however, BCE indicated that, with respect to Search 2, it could not agree to ignore the Court's views that the search should be conducted by phrases rather than words. BCE's position, which it subsequently reiterated in a letter dated April 15, was that once Search 1 was conducted (and the volume of

9

documents that is not retrieved in Search 1 was known), Commonwealth Legal would run the "negative" search to determine the extent to which that search functions as an effective filter. If Search 2 did not effectively filter out documents, the parties would have to search phrases as the Court had suggested at the hearing.

23.     At the April 6 meeting, the Plaintiffs also asked for lists of the following folders located on hard drives and servers, which BCE agreed to produce: (i) a list of folders generated from a search of the identifiable data of the custodians, using the following folder names: Teleglobe, TGO, TCC, THC, THUS, THUSC, TI, TINC, TTC, TUSA, Globesystem, Globe System, and TCLP (86 folders); (ii) a list of folders located on the unidentifiable areas of the servers (i.e., folders that cannot be readily attributed to a particular custodian), but to which one or more of the custodians had access and that contain in their folder names one of the thirteen "Teleglobe" terms mentioned above (721 folders); (iii) a list of folders, which consists of all folders on the BCE network to which one or more of the custodians had access (30,901 folders); and (iv) a list of identifiable folders, which represent all identifiable folders of the 37 custodians (2,063 folders).[1]  The Plaintiffs asked whether BCE could indicate the amount of data contained in each folder.  BCE undertook to provide that information only if it could be generated easily and automatically.  Commonwealth Legal subsequently determined that it could not be.

24.     On April 12, 2005, Plaintiffs' counsel wrote to BCE's counsel to submit a revised version of the list of search terms reflecting Plaintiffs' proposed changes

---

[1]     The lists of 86 and 721 folders were provided to the plaintiffs on April 15, 2005.  The lists of 30,901 and 2,063 folders were provided to the Plaintiffs on April 20, 2005.  A final list of custodian hard drive folders was provided to the Plaintiffs on May 7, 2005.

on April 6 (attached hereto at Exhibit A) and to make additional requests, such as a

request that BCE provide lists of additional folders.  Commonwealth Legal agreed to the

following deliverables:

    a.  Re-do the folder search in the IDENTIFIABLE data (hard drive and server) by adding the strings "TCLP" and "globesystem," which Plaintiffs requested on April 12.  If the search string "globe system" worked, include it.  Provide a Concordance database of all the documents in those folders (which amounted to 86 folders).

    b.  Re-do the folder search in the UNIDENTIFIABLE data (hard drive and server) by adding the strings "TCLP" and "globesystem."  If the search string "globe system" worked, include it.

    c.  In the IDENTIFIABLE data WITHIN the date range  (excluding all records in the 86 folders previously provided), perform Search 1.  Provide the number of responsive records.

    d.  In the IDENTIFIABLE data WITHIN the date range that is NOT responsive to Search 1, and excluding all records in the 86 folders previously provided, search using the search terms in the April 12 letter but EXCLUDE documents containing the non-Teleglobe project terms and provide the resulting numbers to indicate how many documents have been excluded.

    e.  In the UNIDENTIFIABLE data WITHIN the date range, use Search 1 AND Custodian (i.e. custodian surnames, employee numbers, assistants' surnames and assistants' employee numbers IN the document full text and the extracted metadata) and provide the resulting numbers.

    f.  In the UNIDENTIFIABLE data WITHIN the date range that is NOT responsive to "Search 1 AND Custodian", search using the search terms in the April 12 letter and provide the resulting numbers.

    g.  In the UNIDENTIFIABLE data WITHIN the date range that is NOT responsive to "Search 1 AND Custodian," search using one of the search terms in the April 12 letter but EXCLUDE documents

containing the non-Teleglobe project terms and provide the resulting numbers to indicate how many documents have been excluded.

h. In the entire repository unrestricted by any other terms, search WITHIN the date range for "degrandpre or de grandpre or degrandpré or de grandpré and commit*" and provide the resulting numbers.

25.    The processing of data by Commonwealth Legal was conducted simultaneously on five servers all dedicated to the project.  The servers were running 24 hours a day, 7 days a week.  The automated computer processes involved took some time, as they generated various dialog boxes, queries and anomalies that had to be manually attended to by our e-discovery specialists.  After the processing was complete, various steps were required to create a searchable database, including Bates numbering, restructuring of file and folder contents, indexing of the data, and loading into Concordance.

26.    By April 24, we had a searchable database of all the potentially responsive documents.  The complete repository contains approximately 6,000,000 pages.

**86 folders of Identifiable Data**

27.    On April 15, 2005, Commonwealth Legal provided to Shearman & Sterling LLP a database containing the documents located in the 86 folders that were created by one of the 37 custodians and contained "Teleglobe" or a variation in their title. There were 16,715 documents in those folders (counting each parent document and each attachment as separate documents), representing approximately 87,248 pages.  It is my understanding that Shearman & Sterling LLP has offered to review all the documents

12

contained in those folders without resorting to an automated search, and that the responsive non-privileged documents will be produced by May 16.

## Search 1

28.     We conducted Search 1 (i.e. Teleglobe-related terms AND Plaintiffs' revised search terms) on the Identifiable Data within the date range.  This search yielded approximately 26,468 documents.  We created a database of those documents (excluding all records in the 86 folders previously provided to Shearman & Sterling LLP) and provided them to Shearman & Sterling LLP on April 25, 2005.

29.     We also conducted "Search 1 AND Custodian" in the Unidentifiable Data within the date range.  That search yielded approximately 7,994 documents.  We created a database of these documents and provided them to Shearman & Sterling LLP on May 5, 2005.  It is my understanding that the documents retrieved in Search 1 (both the identifiable and unidentifiable data) are currently being reviewed by Shearman & Sterling LLP and will be produced to Plaintiffs by May 16.

## DeGrandpre search

30.     On May 5, 2005, Commonwealth Legal provided to Shearman & Sterling LLP a database containing the 121 documents resulting from the search Plaintiffs had requested.  It is my understanding that the documents are currently being reviewed by Shearman & Sterling LLP and will be produced to Plaintiffs by May 16.

**<u>Search 2</u>**

31.     We conducted Search 2 in the universe of documents not captured by Search 1.  Specifically, we conducted Search 2 in the Identifiable Data that was not responsive to Search 1, and excluding all records in the 86 folders previously provided. In conducting Search 2, we used search terms that denoted irrelevant transactions in an attempt to filter out irrelevant documents.[2]  That search yielded a total of 51,562 documents created in the period January 1, 2000 through December 31, 2002, representing approximately 350,000 pages of documents.

32.     We then conducted Search 2 in the Unidentifiable Data within that date range that was not responsive to "Search 1."  That search initially yielded 77,763 documents.  At the April 25, 2005 hearing, Plaintiffs' counsel suggested that Search 2 in the Unidentifiable Data should be restricted by limiting the results to documents that contained custodian information in the document itself (i.e., surname or employee ID number).  That revised Search 2 generated 13,620 documents.  In the last few days, Commonwealth Legal obtained from BCE a more complete list of employee ID numbers and surnames for the custodians' assistants, and we determined that the number of documents generated by using those ID numbers and surnames is 14,035, amounting to approximately 98,000 pages of documents.  As more employee ID numbers and assistant surnames and numbers become available, further searches will be performed and the results provided to Shearman & Sterling LLP.

---

[2]     Attached hereto as Exhibit B is a list of non-Teleglobe related transactions that was used in conducting Search 2.

33.    Thus, the total number of responsive documents generated after conducting Search 2 on the Identifiable and Unidentifiable Data is approximately 65,597 (approximately 460,000 pages of documents), which amounts to almost twice the number of documents retrieved in Search 1.  We were asked by Shearman & Sterling LLP to provide a random sample of 25 records from the Search 2 results and these were provided on May 5, 2005.  It is my understanding that none of the documents in this sample related to Teleglobe and that they consisted mainly of non-responsive board minutes and corporate materials of non-Teleglobe entities.

34.    In March 2005, I had suggested that one way of trying to improve the precision of Search 2 would be to exclude documents relating to irrelevant projects. Once we were able to actually perform that search, it was clear that the strategy was somewhat successful in focusing the results to a more relevant collection, insofar as 48,562 unidentifiable and 30,045 identifiable documents were excluded (total 78,607). However, the disproportionately large amount of remaining documents generated in Search 2 demonstrates that an additional, or alternative, narrowing search strategy is needed to bring the collection to a more manageable and more responsive size.

**<u>Alternative Search 2</u>**

35.    One method to further cull the documents captured in Search 2 is to use phrases, as the Court had suggested at the March 31 hearing, in order to put words in the proper context.  While it is very likely that most of the responsive documents will refer to "Teleglobe," to the extent those documents might relate to Teleglobe without specifically naming it, I believe that a more logical way of capturing such responsive

documents would be to put the search terms in relevant context by using phrases.
Attached as Exhibit C is a list of search phrases that have been proposed by BCE to
further narrow the results of Search 2. Those search phrases were formulated from, and
track closely, the language used in the Debtors' document requests. It is my
understanding that a list of these proposed search phrases has been provided to the
Plaintiffs for their review. Used as an alternative to the "negative" search, the proposed
phrases capture 40,925 documents out of a total of 326,502 documents not captured in
Search 1. That number of documents is significantly lower than the 65,597 documents
captured using Plaintiffs' proposed Search 2, demonstrating that the use of phrases may
be more effective in targeting responsive documents.

### Refined Search 2

36.     I believe that an even more effective approach would be to use the
proposed phrases in addition to Search 2, namely, by applying the phrases to the 65,597
documents retrieved in Search 2. Such a refinement of Search 2 through the use of
phrases ensures that the search terms are placed in relevant context, and therefore serves
as a logical tool for filtering out irrelevant documents.

37.     When the proposed phrases are applied to the 65,597 documents
retrieved in Search 2, the total number of documents captured (exclusive of the parents
and attachments that were not responsive to the search terms) is 19,933. Thus, by
refining Search 2 in this manner, the number of responsive documents is reduced by
approximately 70%. I believe that this refined Search 2 method is significantly more
effective at targeting potentially responsive documents than merely conducting Search 2

alone. I would therefore recommend that instead of conducting Search 2 as previously proposed, it should be refined in the manner described.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 9th day of May 2005.

_____
Martin Felsky

Revised Proposed Terms Schedule 1
(Each line to be used with OR connector)

141

142

2001 plan

2002 plan

360 networks

((3d or third or 4th or fourth or 5th or fifth) near5 (preferred or share or shares or series or stock))

(advance near5 (fund* or cash or financing or capital or equity))

Ameritech

(analy* near5 conference* or call* or meeting* or statement* or presentation* or report*)

Annual Report

Assignment and Assumption Agreement

audit*

Bank of Montreal

bankrupt*

letter near5 support

BCE or factor* near5 risk

board*

BOM

bond*

breach

budget

build* near5 GlobeSystem or Globe System

buildout

business plan

capex

capital expenditure*

capx

carry forward

carryforward

cashflow

cash* near5 (flow or advance))

CICA 3062

((commit or commitment* or committed) and fund or money or equity or loan or letter or formal or informal or finance or written or oral or verbal)

control* near5 (BCE or stock* or share* or interest or person or exert or exercise)

core

(credit* or bank near5 (facilit* or rating*))

D&T

debt*

declin*

default*

deficit

Deloitte

depreciat*

derisk

de-risk

dilut*

discontinu*

distressed

dividend

earnings

EBIT

EBITDA

enterprise

EPS

equity

finance

financial assistance

financial plan

financial review

financial statement

financing

forecast*

fund*

GAAP

Ginette

global crossing

globesystem

globe system

going concern

good will

guarantee*

guaranty

illiquid*

impair*

implement*

(Independent Committee near5 (Teleglobe or Board))

insolven*

intangible

intracompany balance

intra-company balance

Jones near5 Day or Bennett

Lazard

level3

line

liquid*

loss*

M & A or M near5 A or "M & A"

M&A or "M&A"

Management* Discussion

margin

MD&A or MD near5 A or "MD&A"

Nantel

Nortel

notes near50 the or bank or promissory

((one time or one-time) near5 pick* or transaction or charge or revenue* or loss)

OTI

overcapacity

partner* near10 equity or strategic or invest*

proforma*

pro forma*

projext x

projected

projection*

promis*

((redeem* or redemption*) near5 (preferred or share or shares))

refinanc*

resign*

restructur*

revenue shortfall

revised

SBC

setoff

shakeout

share

shares

short fall

shortfall

solven*

Southwestern Bell

support*

sustain*

syndicate near5 lending or bank

tax and monetization

tax* and gain or loss

term near5 sheet

trademark near5 assign*

treatment

TSInet

valuation*

value

write down

writedown

XO

YEE

OMB

Operation Management Board

EMB

Executive Management Board

Flash Report

Push down accounting

Asset valuation

Restructuring charge

Asset Impairment

Cash Flow

merge*

acquisition

fox

expos*

McGregor

McKinsey

CSFB

Goldman

Montgomery near5 Ward

synergy

capital

Exhibit B

(Project Near5 (Springboard or Secureco or Light or ART or McKenna or Hadfield or BCI Recap or Eleva or Roots or North or Matrix or Quebec or Directories or Manitoba)) or (Project Near5 (Pioneer or Geometry or Energizer or F or M or Holliwood or Sunrise or MSN or Roosevelt or Banana or Liberty or Totem)) or Globemedia or CTV or Globe & Mail or Woodbridge or Telesat or CGI or Emergis or Sympatico or Lycos or Aliant or Manitoba Telecom Services or MTS or Telebec or Expressvu or Yellow Pages or Jazz or MTN Debenture or Sun Media or Skydome or BCE Place or Japanese Disclosure or Bimcor or Actimedia or BCI or Bell Canada International or Call-Net or Income Trust or Nordiq or YPG

Exhibit C

(decid* or decision or agree* or propos* or will or won't or shall) near20 (provid* or give or
supply or inject or provision or stop* or cease or discontinue* or suspend* or terminat* or
withdraw*) or
(provid* or give or supply or inject or provision or stop* or cease or discontinue* or suspend* or
terminat* or withdraw*) near20 (fund* or financ* or support* or capital or equity or money or
loan) or
(Commitment or committed or promis* or plan* or intend or intention or propos*) near20
(provid* or give or supply or inject or provision) or
(provid* or give or supply or inject or provision) near20 (fund* or financ* or support* or capital
or equity or money or loan) or
BCE near99 support or commitment or committed or
Monty near40 (commitment or committed or promis* or plan* or intend or intention or propos*)
near40 (provid* or give or supply or inject or provision) or
(provid* or give or supply or inject or provision) near20 (fund* or financ* or support* or capital
or equity or money or loan) or
(Deloitte or DT or D&T and BCE or Bell Canada) near20 (provid* or provision or give or inject
or supply) or
(provid* or provision or give or inject or supply) near20 (fund* or financ* or support* or capital
or equity or money or "going concern" or good will or goodwill) or
(analy* or evaluat* or exam* or review* or report*) near20 (business* or financ* or budget* or
fund* or "cash flow" or "pro forma" or forecast or projection or projected) or
(request* or demand* or analy* or report) near20 (BCE or Bell Canada) near20 (fund* or financ*
or support* or capital or equity or money or loan or provid* or give or supply or inject or
provision) or
(analy* or evaluat* or exam* or review* or report) near20 (BCE or Bell Canada) near20 (invest*
or capital* or equity or injection or support or commitment or committed) or
(invest* or capital* or equity or injection or support or commitment or committed) near20 (funds
or finance* or support* or capital or loan or equity or money) or
(arrange* or agree* or understanding or deal or contract) near20 (BCE or Bell Canada) near20
(employee or officer or personnel or worker or staff) or
(employee or officer or personnel or worker or staff) near20 (seconded or secondment or
transfer* or leave) or
(BCE or Bell Canada) near20 (control* or manage* or operate or dictate or decide or instruct)
near20 (affairs or business or operations) or
(transfer* or replace*) near20 (job or function or reporting or position or employ*) near20 (BCE
or Bell Canada) or
"Synergy Project" or "Project X"  or
(agreement or contract or propos* or offer or transaction or deal) near20 (BCE or Bell Canada)
near20 (purchas* or sell or sale or transfer*) or
(purchas* or sell or sale or transfer*) near20 (product or service or property or fund or asset or
obligation) or
(BCE or Bell Canada) near20 (setoff or offset or "set off" or "off set" or deduct) near20 (debt or
owe or owing or due or payable) or
BCE near99 (brand* or rebrand* or rename or trademark) or
solven* or liquidat* or insolven* or restruct* or
(pay* or repay*) near20 (debt or loan or funds or money  or obligation*) near20 due

Exhibit B

## Teleglobe 2900 Folders Search Phrases

(decid* or decision or agree* or propos* or will or won near5 t or shall) near20 (provid* or give or supply or inject or infuse or provision or stop* or cease or discontinue* or suspend* or terminat* or withdraw*)

(provid* or give or supply or inject or infuse or provision or stop* or cease or discontinu* or suspend* or terminat* or withdraw* or debt) near20 (fund* or financ* or support* or capital or equity or money or cashflow or debt or cash)

(commit or commitment or committed or promis* or plan* or intend or intent* or propos*) near20 (provid* or give or supply or inject or infuse or provision)

(we or Bell or BCE or "Bell Canada") near40 (support or commit or commitment or committed or promis* or plan* or intend or intent* or propos*)

Monty near40 (support* or commit or commitment or committed or promis* or plan* or intend or intent* or propos* or fund or supply or give or infuse or inject)

(Teleglobe or TG or TGO) near40 (support* or commit or commitment or committed or promis* or plan* or intend or intention or provid* or give or supply or inject or infuse or provision or support* or fund*)

(Deloitte or DT or D near3 T) near99 (provid* or fund* or support or provision or give or inject or infuse or supply or financ*)

(Deloitte or DT or D near3 T) near99 (Teleglobe or TG or TGO or globe*)

(provid* or provision or give or inject or infuse or supply) near20 (fund* or financ* or support* or capital or equity or money or "going concern" or good will or goodwill or cash or advance or cashflow or debt)

(analy* or assess or set or establish* or determin* or evaluat* or exam* or review* or report*) near40 (business* or financ* or budget* or cash or advance or debt or cashflow or capital or investment or equity or fund* or "cash flow" or "pro forma" or forecast or projection or projected or "good will" or goodwill or "going concern")

(request* or demand* or analy* or report or provid*) near40 (we or BCE or Bell Canada or Bell) near40 (fund* or financ* or support* or capital or equity or money or loan or provid* or give or supply or inject or infuse or provision)

(analy* or assess or set or establish or determin* or evaluat* or exam* or review* or report*) near40 (we or BCE or Bell or Bell Canada") near40 (invest* or capital* or equity or inject* or infuse* or support or fund* or commit or commitment or committed or debt or cash or advance or cashflow or "cashflow" or goodwill or "good will" or going concern)

(invest* or capital* or equity or inject or infuse or support or fund* or commit or commitment or committed) near40 (funds or finance* or support* or fund* or capital or loan or equity or money or debt or cash or advance or cashflow)

(arrange* or agree* or understand* or deal or contract or assess*) near40 (we or BCE or "Bell Canada" or Bell) near40 (employee or officer or personnel or worker or staff)

(employee or officer or personnel or worker or staff) near40 (second* or transfer* or leave or move or transition or secund*)

(second* or transfer* or leave or move or transition or secund*) near40 (arrange or arrangements or plan or scheme or propos*)

(we or Bell or BCE or Bell Canada) near40 (control* or manag* or operate or dictate or decide or instruct) near40 (affairs or business or operations or Teleglobe or TG or TGO)

(transfer* or replace* or transition or shift or assess or move) near40 (job or function or reporting or position or employ*) near20 (we or BCE or "Bell Canada" or Bell)

"Synergy Project" or "Project X"

(agree* or contract or propos* or offer or transaction or deal) near20 (we or BCE or "Bell Canada" or Bell) near20 (purchas* or sell or sale or transfer*)

(purchas* or sell or sale or transfer*) near20 (product or service or property or fund or asset or interest or share* or debt or equity or obligation)

(we or BCE or "Bell Canada" or Bell) near20 (setoff or offset or "set off" or "off set" or deduct) near20 (debt or owe or owing or due or payable or credit or claim)

(we or BCE or "Bell Canada" or Bell) near99 (brand* or rebrand* or rename or trademark or mark or name or tradename or "trade name")

(solven* or liquidat* or insolven* or restruct*) near99 (Teleglobe or TG or TGO or subsid*)

(pay* or repay* or satis* or cure or meet or fund*) near20 (debt or loan or fund* or money or obligation*)

(commit or commitment or committed or promis* or plan* or intend or intention or propos*) near20 (Teleglobe or TG or TGO)

(provid* or give or supply or inject* or infus* or provision or support* or fund* or stop or cease or discontinue or suspend or terminat* or withdraw) near40 (Teleglobe or TG or TGO)

("good will" or goodwill or writedown or "write down") near99 (Teleglobe or TG or TGO)

("good will" or goodwill or writedown or "write down") near40 (value or valuat* or impair*)

(3d or third or 4th or fourth or 5th or fifth) near20 (preferred or share or shares or series or stock)

RLF1-2899494-1

analy* near5 (confer* or call* or meet* or statement* or presentation* or report*)

(BCE or factor*) near20 risk

build* near20 (GlobeSystem or "Globe System" or Globe)

(commit or commitment* or committed) near20 (fund or money or equity or loan or letter or formal or informal or finance or written or oral or verbal)

control* near20 (BCE or stock* or share* or interest or person or exert or exercise)

(credit* or bank) near20 (facilit* or rat*)

("Independent Committee") near20 (Teleglobe or TG or TGO or Board)

note* near50 (bank or promissory)

("one time" or one-time) near20 (pick* or transact* or charge or revenue* or loss)

partner* near20 (equity or strategic or invest*)

(redeem* or redemption*) near20 (preferred or share*)

syndicate near20 (lending or bank)