# EXHIBIT A

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------------x

In re

TELEGLOBE COMMUNICATIONS CORPORATION,
TELEGLOBE USA INC., OPTEL
TELECOMMUNICATIONS, INC., TELEGLOBE
HOLDINGS (U.S.) CORPORATION, TELEGLOBE
MARINE (U.S.) INC., TELEGLOBE HOLDING CORP.,
TELEGLOBE TELECOM CORPORATION,
TELEGLOBE INVESTMENT CORP., TELEGLOBE
LUXEMBOURG LLC, TELEGLOBE PUERTO RICO
INC. and TELEGLOBE SUBMARINE INC.,

Chapter 11
Case No. 02-11518 (MFW)
Jointly Administered

Debtors.

---------------------------------------------------------------------x

TELEGLOBE COMMUNICATIONS CORPORATION,
TELEGLOBE USA INC., OPTEL
TELECOMMUNICATIONS, INC., TELEGLOBE
HOLDINGS (U.S.) CORPORATION, TELEGLOBE
MARINE (U.S.) INC., TELEGLOBE HOLDING CORP.,
TELEGLOBE TELECOM CORPORATION,
TELEGLOBE INVESTMENT CORP., TELEGLOBE
LUXEMBOURG LLC, TELEGLOBE PUERTO RICO
INC., TELEGLOBE SUBMARINE INC., and the
OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF TELEGLOBE COMMUNICATIONS
CORPORATION, et al.,

C.A. No. 04-CV-1266 (SLR)

Plaintiffs,

v.

BCE INC., MICHAEL T. BOYCHUK, MARC A.
BOUCHARD, SERGE FORTIN, TERENCE J. JARMAN,
STEWART VERGE, JEAN C. MONTY, RICHARD J.
CURRIE, THOMAS KIERANS, STEPHEN P. SKINNER,
and H. ARNOLD STEINBERG,

Defendants.

---------------------------------------------------------------------x

## AMENDED COMPLAINT

Teleglobe Communications Corporation ("TCC") and its above-captioned affiliated

debtors and debtors in possession (collectively, "Debtors"), by their counsel, Richards Layton &

Finger, P.A., and the Official Committee of Unsecured Creditors of the Debtors (the

"Committee"), by its co-counsel, Rosenthal, Monhait, Gross & Goddess, P A and Hahn & Hessen LLP, as and for their amended complaint against the above-captioned defendants, allege as follows.

## INTRODUCTION

*Nature of the Action*

1.    This proceeding seeks to hold the Debtors' parent company, BCE Inc. ("BCE"), accountable for abandoning the Debtors after causing them to incur billions of dollars of debt. After repeatedly promising in public to fund the Debtors' construction of a worldwide communications network, BCE, Canada's largest telecommunications company, precipitously terminated its financial support for its subsidiaries' multi-billion dollar capital expenditure program. Left with only two weeks of operating cash, substantial debt, and an incomplete network, stripped of key personnel who had been installed by (and resigned at the behest of) BCE; and with no feasible business plan to continue operations in the absence of BCE's financial support, the Debtors filed for bankruptcy protection and began liquidating their assets. As demonstrated below, BCE committed to fund the Debtors' operations, and acknowledged its commitment to a number of third parties, including the Debtors' bankers and potential customers. The only reason that no formal written contract exists is because BCE installed its own personnel as directors and officers of the subsidiaries, and through them exerted complete domination and control over the Debtors' operations and finances for the benefit of BCE. These directors and officers, who implemented the capital expenditure program based upon BCE's directions and ultimately unfulfilled promise of financial support, abdicated and breached the fiduciary duties imposed upon them by Delaware law.

2.    This action seeks damages arising from, among other things: BCE's wrongful failure to honor its funding commitments to the Debtors; BCE's wrongful exercise of complete

domination and control over the Debtors solely for BCE's benefit; the abdication by members of the boards of directors of the Debtors, and by certain other individuals who assumed and exercised control over the Debtors, of their fiduciary duties in the face of BCE's unbridled exercise of control; and breaches of fiduciary duties by directors of the Debtors, and by certain other individuals who assumed and exercised control over the Debtors, many of whom simultaneously served as directors and/or officers of BCE, and whose divided loyalties caused great damage to the Debtors and their creditors.

*Teleglobe and BCE*

3.    Teleglobe, Inc. ("TI" or, as the context requires together with members of the TCC Group, "Teleglobe") and its various direct and indirect subsidiaries initially were in the business of providing long distance voice communications from Canada to the world. Formed in 1950 as the Canadian Overseas Telecommunications Corporation, TI originally was designated as the exclusive provider of telecommunications services to and from Canada, and was a traditional government owned monopoly. TI operated as a "carrier's carrier," that is, it provided cable and other long distance connections from Canada to the rest of the world through its subsidiaries and affiliates. As part of its business, TI and its subsidiaries and affiliates (including the Debtors) had business relationships with virtually every other large national telephone company, and had rights to route its calls through the cables and networks of virtually every major telephone consortium. By the late 1990s, TI had revenue in excess of $1 billion annually.

4.    BCE is a Montreal, Canada based holding company with 2004 revenues of Cdn$19.2 billion. BCE's holdings include Bell Canada, which provides local access, long distance, wireless services and high-speed internet access to its customers and is Canada's largest telephone company. BCE also owns or controls significant interests in a major satellite

television company; CTV, Canada's leading private broadcaster, *The Globe and Mail*, Canada's leading national newspaper, CGI, one of Canada's largest information technology service companies; and companies providing eBusiness solutions to the financial services industry in North America and the health industry in Canada.

*BCE Acquires Teleglobe And Pursues Its "Grand Vision"*

5.    In May 1987, BCE acquired a minority interest in TI. That interest thereafter was transferred to Bell Canada, then an 80% owned subsidiary of BCE. As of February 2000, Bell Canada owned 23% of TI and the remaining 77% was owned by the investing public.

6.    In February 2000, TI publicly announced an agreement pursuant to which BCE would acquire all of the outstanding common shares of TI that were not already owned by Bell Canada (the "Acquisition"). The Acquisition was a major strategic transaction for BCE, which eventually paid billions of dollars (primarily in shares of its common stock) for the 77% of TI then owned by the public.

7.    By the time of the Acquisition, which closed on November 1, 2000, the Debtors had commenced the build out of the "GlobeSystem," a state of the art worldwide network of fiber optic and satellite interlinks that allowed the simultaneous transmission of vast amounts of data, voice and other electronic traffic. The Debtors were responsible for the construction, operation and maintenance of the GlobeSystem. As conceived by TI in mid 1999, the buildout of the GlobeSystem was to be completed in five stand alone stages over five years. The fully completed GlobeSystem was intended to interconnect 160 cities around the world with scalable broadband service platforms that carriers and large commercial organizations could use for transmission of voice and data communications. Each of these cities would be integrated seamlessly into a global communications network. When fully completed in 2004, the

GlobeSystem would have allowed customers to connect from business centers worldwide, regardless of their underlying network technology

8      From its very conception, the GlobeSystem was understood to be an enormous undertaking. TI's directors, both before and after the Acquisition, were advised and expected that the system would take no less than $5 *billion* to build and an additional $1 billion to fund operating losses through to break-even operations.

9.      The Debtors, however, did not have the $6 billion needed to finance the GlobeSystem. Even before the November 2000 closing of the Acquisition, BCE and the BCE appointed directors and officers, some of whom were installed to run the Debtors before the closing of the Acquisition, realized that the bulk of the $6 billion cost of the GlobeSystem would have to be underwritten by BCE. Pending the closing, TI's independent directors sought to defer much of the GlobeSystem buildout, due to the lack of funds, but BCE objected. TI's independent directors then required written guarantees from BCE that it would finance the build out of the GlobeSystem, if it wished to continue the development through closing.

10      After the Acquisition closed, and with full knowledge of the Debtors' financial situation, the Defendants not only continued their direction that the Debtors incur the tremendous cost of the continued development of the GlobeSystem, but they accelerated the time table for the full GlobeSystem build out by as much as two years. The continued and accelerated development of the GlobeSystem quickly and substantially worsened the financial condition of the Debtors. By mid 2001, having exhausted their existing bank facilities, along with any real prospect of third party funding, the Debtors were only able to continue operations by virtue of the funding that BCE had agreed to provide.

11      But after taking control of the Debtors, authorizing the expenditures necessary for the GlobeSystem build out, and providing a fraction of the funding to which it had committed, BCE unilaterally and precipitously withdrew funding support for the Debtors' without any prior notice, thereby dooming the Debtors to bankruptcy and, ultimately, to liquidation. Alternatively, if no funding commitment was made by BCE, as the Defendants now apparently claim--or if the individual Defendants failed to secure such a commitment--the continued build out of the GlobeSystem (even as scaled back in later months) was not merely reckless, but given the insolvency of TI and the TCC Group at the time, it was a gross breach of the fiduciary duties of loyalty, care and good faith owed by the Defendants to the Plaintiffs and their stakeholders. Indeed, if they failed to secure a funding commitment from BCE, the conduct of the individual Defendants' was particularly egregious, given the rapid decline of the telecommunications market, and of available capital in that market, during the period.

12      This lawsuit is filed to address BCE's conduct, and that of the Debtors' and TI's directors and officers, as described in greater detail herein

## JURISDICTION AND VENUE

13.      On May 15, 2002, TI, Teleglobe Financial Holdings Ltd., Teleglobe Canada Limited Partnership and Teleglobe Canada Management Services Inc. (collectively, the "Canadian Debtors") and the eleven Debtors, commenced insolvency proceedings under the Canadian Companies' Creditors Arrangement Act in the Ontario Superior Court of Justice in Toronto, Canada. On the same date, the Canadian Debtors and the Debtors filed petitions with this Court pursuant to 11 U.S.C. § 304 seeking ancillary relief.

14      On May 28, 2002, after ancillary relief was refused for the Debtors, the Debtors filed petitions for relief in this Court (the "Chapter 11 Cases") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code")

15.     On May 29, 2002, this Court consolidated the Chapter 11 Cases for procedural purposes only and granted their joint administration.

16.     The Office of the United States Trustee appointed the Committee on June 11, 2002.

17.     By Order dated April 28, 2004, this Court, over the opposition of BCE, authorized the Committee to prosecute, inter alia, claims against the officers and directors of the Debtors and causes of action related thereto as may be agreed upon between the Debtors and the Committee.

18.     A Plan of Reorganization was confirmed on February 11, 2005, and became effective on March 2, 2005.

19.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a non-core proceeding pursuant to 28 U.S.C. § 157(b). Both the Debtors and the Committee consent to the entry of final orders and/or judgments by this Court. Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

## PARTIES

*The Debtors, TI and BCE*

20.     Each of the Debtors is a Delaware corporation (except for Teleglobe Puerto Rico Inc. ("TPR"), which is a Puerto Rico corporation), and is either a direct or indirect subsidiary of TI, a corporation governed by the Canada Business Corporations Act ("CBCA") which had its principal place of business in Montreal, Province of Quebec, Canada.

21.     Prior to commencing the GlobeSystem project, the Debtors provided international long-distance telecommunications services, on a largely wholesale basis, to other telecom carriers in the U.S., Canada and abroad. TCC, Teleglobe USA Inc. ("TUSA"), Optel Telecommunications, Inc. ("OTI") and certain other entities (collectively, the "TCC Group")

accounted for approximately 60% of TI's revenues and were headquartered in Reston, Virginia. The TCC Group was TI's principal world-wide operating division responsible for the construction and implementation of the GlobeSystem project.

22.    BCE is and was at all material times a corporation governed by the CBCA with its principal place of business in Montreal, Province of Quebec, Canada. BCE's stock is publicly traded and listed on the Toronto Stock Exchange and the New York Stock Exchange, among others. BCE has appeared and filed proofs of claim in the Chapter 11 Cases.

*The Debtors' Director and Officer Defendants*

23.    Upon information and belief, defendant Michael T. Boychuk ("Boychuk") is a citizen and resident of Canada. Boychuk was simultaneously a high-ranking officer or director of BCE, its Bell Canada subsidiary, TI, and several of the Debtors during material times relevant to this action.

24.    Upon information and belief, defendant Marc A. Bouchard ("Bouchard") is a citizen and resident of Canada and was a high-ranking officer or director of several of the Debtors during material times relevant to this action.

25.    Upon information and belief, defendant Serge Fortin ("Fortin") is a citizen and resident of Canada. He served as an officer or director of several of the Debtors during material times relevant to this action.

26.    Upon information and belief, defendant Terence Jarman ("Jarman") is a dual citizen of Great Britain and Canada, and resides in Toronto, Canada. Jarman was the Chief Executive Officer of, and/or a director of, several of the Debtors during material times relevant to this action.

27.     Upon information and belief, defendant Stewart Verge ("Verge") is a Canadian citizen and resides from time to time in Ponce Inlet, Florida. Verge was a director or officer of several of the Debtors and was responsible for overseeing the construction of the GlobeSystem during material times relevant to this action.

28.     Boychuk, Bouchard, Fortin, Jarman, and Verge are collectively referred to hereinafter as the "Debtors' Directors and Officers."

*The TI Director and Officer Defendants*

29.     Upon information and belief, defendant Jean C. Monty ("Monty") is a Canadian citizen who resides at various times throughout the year in North Palm Beach, Florida. Monty was the Chairman, President, and Chief Executive Officer of BCE and Chairman of TI between February 2000 and April 2002.

30.     Upon information and belief, defendant Richard Currie ("Currie") is a citizen and resident of Canada. Currie served as a director of TI from December 2000 until April 2002. During that period, Currie was also the "lead" director on BCE's board, meaning that Currie acted as Chairman when the BCE board met in executive session. In April 2002, Currie succeeded Monty as Chairman of the Board of BCE, a position he currently holds.

31.     Upon information and belief, defendant Thomas E. Kierans ("Kierans") is a citizen and resident of Canada. He was a member of BCE's board of directors while he served as a director of TI from December 2000 until April 2002. Kierans, like Currie, was present when the BCE board met in executive session.

32.     Upon information and belief, defendant Stephen P. Skinner ("Skinner") is a citizen and resident of Canada. He served as Vice President and Controller of TI from July 2001 to April 2002 while he was also the Corporate Controller of BCE.

33.    Upon information and belief, defendant H. Arnold Steinberg ("Steinberg") is a citizen and resident of Canada. He was a director of TI during material times relevant to this action, and previously served as a director of Bell Canada International, Inc., a BCE subsidiary.

34.    Monty, Currie, Kierans, Skinner and Steinberg are collectively referred to hereinafter as the "TI Directors and Officers." Charts showing the various roles filled by Boychuk and the other individuals named as defendants herein are contained in Exhibit "A" annexed hereto and incorporated by reference herein.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION
### (Incorporating All Previous Allegations)

*TI Prior to the BCE Acquisition*

35.    By 1999, TI and its subsidiaries and affiliates owned or operated capacity on nearly every sub-sea fiber optic cable system and resold that capacity primarily on a wholesale basis. Although TI was profitable as a result of its voice revenues, given the termination of its long distance monopoly by the Canadian government in October 1998, it projected declining revenues from that business segment. Accordingly, it was searching for a new strategy to transform itself into a growth company.

36.    In May 1999, TI announced its intention to build the GlobeSystem. When completed in 2004, the GlobeSystem would have allowed customers to connect with each other worldwide, regardless of their underlying network technology.

37.    In July 1999, TI raised $1 billion through the sale of debentures (the "Debentures"). TI was the obligor on the Debentures, with Debtor Teleglobe Holdings (U.S.) Corporation ("THUS") acting as guarantor. THUS is the United States parent of the other Debtors (except for TPR and Teleglobe Luxembourg LLC). A corporate chart of the Debtors is annexed hereto as Exhibit "B" and incorporated by reference herein.

38.    To obtain further financing for the GlobeSystem project, TI decided to search for a strategic investor. BCE, which already held a 23% ownership stake in TI through Bell Canada, was a logical buyer. Acquiring TI also was consistent with BCE's need to reinvigorate its own lackluster growth, and its purchase of TI would serve to block competitors from gaining control of TI and entering the Canadian market.

*BCE's Desire to Grow Beyond Canada*

39.    In the late 1990s, BCE was struggling with the equity market's perception of BCE as a purely Canadian company, with very little – if not negative – growth potential.

40    Although BCE is and was Canada's leading communications company, with interests in a wide range of communication products and services, its principal holding was Bell Canada, which many industry analysts believed to be undervalued by the public markets. Specifically, Bell Canada was viewed as a traditional local wired telephone provider, with little chance of expanding beyond Canadian borders  In addition, because Canada had lifted Bell Canada's monopoly on local and regional telephone services, its market share was expected to erode  Thus, BCE was viewed as a stagnant, slowly declining enterprise.

41.    To change this view, BCE elected to make a series of investments  BCE first raised $5.1 billion in June 1999 by selling 20% of Bell Canada's common stock to Ameritech (which subsequently merged with SBC Communications, Inc. ("SBC")).  BCE also spun off its interest in Nortel Networks Inc. ("Nortel"), thereby raising another $2.9 billion  As a result of these transactions, BCE raised about $8 billion in cash to proceed with its investment strategy. Its sale of a minority interest in Bell Canada was not necessarily final, however.  As part of that transaction, Ameritech was given a "put" right which, if exercised, would force BCE to repurchase the shares at a 25% premium to the then–prevailing market price of the stock.

42.     On February 15, 2000, BCE and TI executed an agreement (the "Acquisition Agreement") pursuant to which BCE would acquire all of the shares of TI that were not already owned by Bell Canada. The Acquisition was a major strategic transaction for BCE. At that time, Monty (then BCE's Chairman and CEO) publicly described BCE's strategy as follows: "The acquisition of Teleglobe provides BCE with a key asset to be an important international player in the Internet data communications service business." Monty also said "BCE is willing to commit significant resources to building up of GlobeSystem – initially as much as $1 billion for the new venture – from an estimated $7 billion war chest..."

43.     Thus, from the moment the Acquisition was announced, the entire point of the Acquisition – from the perspective of both parties – was for BCE to provide the funding required to complete the GlobeSystem and to reap the resulting benefits of being, as Monty said, "an important international player in the Internet data communications service business."

44.     Moreover, there was little doubt that BCE would in fact be required to fund TI and the Debtors for some time. At a meeting held on February 14, 2000, the day before the Acquisition Agreement was announced, TI's Chief Financial Officer reported that TI's profit margins were "decreasing at levels never before experienced," that "important" capital expenditures were needed, and that financing would be "more challenging" in the future given that TI was close to being out of compliance with various financial covenants in its debt instruments.

*BCE Makes its Pre-Closing Commitment to GlobeSystem*

45.     When announcing the Acquisition Agreement, BCE made clear to the public debt and equity markets that BCE would provide the financial support necessary to complete the GlobeSystem. Monty stated on February 15, 2000, "[a]s part of the BCE group of communications companies, Teleglobe's position will be strengthened and it will be better

placed to realize its goal of becoming a global data/Internet company. Teleglobe is already well under way with ... GlobeSystem, which BCE will continue to support."

46.     But by the spring of 2000 (after the Acquisition Agreement was announced but prior to its closing (the "Closing") in November 2000 (the "Gap Period")), TI had spent the proceeds of the sale of the Debentures, was close to exhausting the available funding under its existing bank facility (the "Existing Bank Facility"), and was nearly out of cash with which to fund the continued development of the GlobeSystem. At the time, TI's ability to access the debt markets was virtually non-existent, as a result of its already highly leveraged balance sheet and its deteriorating financial performance. The Existing Bank Facility was coming due in July, 2000, requiring the repayment of some $612 million. Given prevailing market conditions, there was apparently no other funding available to continue to pay for the construction of the GlobeSystem.

47.     During the Gap Period TI's board of directors was still independent, since BCE held only a minority voting position on the board. Under the circumstances, the independent directors of TI, operating as a special committee of the board (the "TI Special Committee"), proposed to defer construction of the more capital intensive aspects of the GlobeSystem, pending improvement in TI's financial situation. BCE objected to that proposal, however. BCE insisted that TI continue with the GlobeSystem build out. BCE threatened to declare that Teleglobe had suffered a "material adverse change", entitling BCE to escape the transaction, if TI did not continue the GlobeSystem build out, unabated.

48.     The independent TI directors did not unconditionally grant BCE's request to continue building the GlobeSystem, however. Instead, the Special Committee informed BCE that TI would cease construction unless BCE made a substantial funding commitment, in an

unequivocal and irrevocable written form, to assure the TI board that sufficient funding would be made available to pay the ongoing construction expenses.

49.    In this regard, the minutes of the May 16, 2000 meeting of the Special Committee of the TI board state:

> The Committee was of the opinion that if the Corporation was to continue with the capital expenditure program and that such program could not realistically be funded out of the Corporation's available resources, then BCE should be asked to commit to the necessary funding.

50.    Before irrevocably committing to TI's request for funding during the Gap Period, BCE requested and received the right from TI to install BCE-affiliated high-level management at the Debtors even though the Acquisition had not yet closed. BCE replaced Paolo Guidi as Chief Executive Officer of TCC with Jarman, who was then Vice Chairman of Bell Canada. Jarman was charged with the responsibility of overseeing the entire TCC Group, which was building the GlobeSystem and incurring its substantial costs and expenses.

51.    BCE also removed Claude Seguin as TI's Chief Financial Officer and in his place appointed Boychuk, then Treasurer of BCE. When Monty introduced Boychuk to the TI board he stated that Boychuk was "well positioned to manage the financial issues of Teleglobe over the next few months, more particularly in light of the increased participation of BCE in the refinancing discussions."

52.    Further, BCE appointed (a) Verge, as President of Global Operations of TCC, (b) Bouchard, as President, North American Markets and Corporate Development of TCC, and (c) Fortin, as President of Global Markets of TCC. By the summer of 2000, BCE had replaced no less than seven senior executives of TI and the Debtors – almost the entire top officer group. Likewise, Monty himself took over the Chairmanship of TI in February 2000, almost nine months before the Closing.

53    Finally, BCE retained outside experts to assist with the assessment process and determined that a total of $6 billion would have to be committed to the GlobeSystem through 2004, at which time the project was expected to become cash flow positive and self-financing

54    TI's board minutes for June 18, 2000 reveal that BCE knew that there were insufficient funds to continue building the GlobeSystem without BCE funding:

> BCE advised Teleglobe that it believed that an adjustment [to the purchase price for the Acquisition] was appropriate in light of the fact that financial support from BCE would likely be required prior to closing of the transaction in order for Teleglobe to maintain, among other things, the timely development of the GlobeSystem program  BCE's position was that financial support of this nature was not contemplated by the [Acquisition] Agreement.

55    The minutes of that meeting also state that during the discussions with BCE the "Independent Committee [of the TI board] determined to continue negotiations with BCE provided that certain minimum terms and conditions would be agreed to by BCE, including … the provision of any financial assistance required by Teleglobe prior to the closing of the transaction."

56    During the Gap Period, BCE pursued a four-part financing plan to obtain the $6 billion needed to fund the GlobeSystem through completion and start-up, each component of which would require BCE's financial backing and support  First, BCE would agree to the demand by the Independent Committee of the TI board to fund the Debtors' needs through Closing in an uncapped amount  Second, BCE would deliver to the lenders under the Existing Bank Facility a support letter in which it irrevocably agreed to fund GlobeSystem costs up to $1 billion through the end of June 2001 to induce them to refinance the Existing Bank Facility and increase its size from $750 million to $1.25 billion  Third, BCE sought to induce suppliers and other trade creditors to extend favorable credit terms by making public statements of unequivocal support for Teleglobe and the development of the GlobeSystem  Finally, BCE

indicated that it would cause TI to access the public debt markets for an additional $2.3 billion when conditions warranted.

57      On June 18, 2000, the Acquisition Agreement was amended (the "Amendment") to, among other things, obligate BCE to fund all obligations of TI and its operating division, the TCC Group, through the Closing. The Amendment provided:

> BCE agrees irrevocably to provide any financial assistance required by the Company on or prior to the Closing of the Acquisition with respect to all of the Company's spending needs or to agree to reduce such needs upon the reasonable [request] of the board of directors of the Company (whether or not the BCE nominees to the Board of Directors have voted against the making of such request). For greater certainty, any breach of the Company's covenants under its existing debt obligations shall not entitle BCE to terminate the [Acquisition] Agreement.

58      With that commitment in place, BCE convinced TI's lenders to replace the Existing Bank Facility with a new facility (the "New Bank Facility") and increase the total borrowings to $1.25 billion. This New Bank Facility, which was due and payable on July 23, 2001, resulted in approximately $500 million of new, additional credit availability for the GlobeSystem. THUS was either the obligor or guarantor of the entire New Bank Facility.

59.     With the BCE funding commitment in place and the Existing Bank Facility replaced by the New Bank Facility, TI and the Debtors carried out BCE's mandate to continue to build the GlobeSystem.

*BCE's Long Term Support of the GlobeSystem is Reconfirmed*

60.     On August 9, 2000, Boychuk, who then was BCE's Treasurer and TI's CFO, reported that during the second quarter of 2000 "Teleglobe operated at a loss of $236 million", with a negative EBITDA of approximately $28 million.

61.     During public meetings held on August 9, 2000 specifically to discuss TI's second quarter 2000 results, Monty, in Boychuk's presence, stated:

Let me say at the outset that although it will take a little longer than we had originally anticipated to turn around Teleglobe, BCE is totally committed to the strategic value of this acquisition. We believe that the investment we are making in the company will build a stronger Teleglobe with even greater prospects for growth and consequently greater value to our shareholders and to BCE strategic intent....

BCE has the resources to take the challenge [of Teleglobe] on and succeed.... BCE's consolidated EBITDA is moving towards the eight billion dollar level... Our business face can withstand the short term rebuilding of Teleglobe

Teleglobe's contribution to BCE's growth in the coming two to three years will be material, attractive and in line with the value we have invested to conclude the transaction. So in conclusion we have the management team, the financial resources and the proper strategic intent to succeed.

*The Acquisition Closes and BCE Takes Complete Control Over TI and the Debtors*

62.    After the Closing on November 1, 2000, BCE completed the replacement of the independent directors of TI and the Debtors with its own designees, and BCE assumed total control of its new investment. The new board configurations of TI and the Debtors effectuated by BCE are set forth in Exhibit "C" and incorporated herein by reference.

63.    BCE also continued to install BCE–affiliated operating management at various key positions in the TCC Group, in addition to those installed during the Gap Period, to control all treasury and merger and acquisition functions, as well as network operations.

64.    The principal control people installed by BCE after the Closing or whose Gap Period appointments were ratified are as follows:

65.    Michael Boychuk

(a)    Boychuk was appointed TI's Chief Financial Officer and Executive Vice President – Finance on May 31, 2000, positions that he maintained through April 23, 2002, the day before BCE publicly announced that it would cease funding the Debtors

(b)     On or before November 1, 2000, BCE caused Boychuk to become and remain through April 23, 2002 (1) a director of THUS, Teleglobe Holding Corp. ("THC"), Teleglobe Marine (U.S.) Inc. ("TMI"), Teleglobe Submarine, Inc. ("TSI") and Teleglobe Investment Corp. ("TIC"); (2) President and Treasurer of THUS, THC and TIC; and (3) President and Chief Executive Officer of TMI and TSI.

(c)     Boychuk was not an independent director or officer of the Debtors. Boychuk's principal loyalties were to BCE. On or about January 17, 2001, Boychuk became (and he remained at all relevant times) BCE's Treasurer and Bell Canada's Vice President and Treasurer. Upon information and belief, Boychuk's compensation was at all times determined by BCE and included a salary and perquisites in excess of $300,000/year, as well as participation in BCE's stock option program and pension plan, all of which, upon information and belief, were material to Boychuk's personal lifestyle.

66.     Marc Bouchard

(a)     On or about May 17, 2000, Bouchard became President, North American Markets & Corporate Development at TCC. On August 1, 2000, Bouchard became, and remained through at least January 23, 2002, a director of OTI, TPR, TUSA, THUS, THC and TIC. Bouchard also was TUSA's Executive Vice President and President-North American Markets & Corporate Development during the period August 1, 2001 through February 25, 2002. Prior to joining the Debtors, Bouchard was the President and CEO of Bell Nexxia, another BCE subsidiary.

(b)     Bouchard was not an independent director or officer of the Debtors. His compensation during all relevant times was determined by BCE, and included a salary and perquisites in excess of $300,000/year, as well as participation in BCE's stock option

program and pension plan, all of which, upon information and belief, were material to Bouchard's lifestyle.

67.    Boychuk and Bouchard constituted the entire boards of directors of THUS, THC and TIC between November 1, 2000 and January 23, 2002.

68.    Terence Jarman

(a)    Prior to May 2000, Jarman was the Vice Chair of Bell Canada and President of Bell Nexxia. At that time he was tapped by BCE to run the TCC Group, he was appointed President and Chief Executive Officer of TCC and TUSA and continued in those positions through January 23, 2002. Jarman also served as a director of TI between December 2000 and January 23, 2002.

(b)    Jarman was not an independent officer of the Debtors. His compensation during all relevant times was determined by BCE, and included a salary and perquisites in excess of $600,000/year, as well as participation in BCE's stock option program and pension plan, all of which, upon information and belief, were material to Jarman's lifestyle.

69.    Serge Fortin

(a)    Fortin was President of Bell Acti Media, a BCE indirect subsidiary, until May 2000, at which time he became TCC's President, Global Markets. BCE caused him to serve as a director of TCC, TUSA and OTI from August 1, 2000 through February 16, 2002. He also served as a director of THUS, THC, TIC, TMI, TPR, TSI and Teleglobe Telecom Corp. ("TTC") in May 2002, upon information and belief in order to influence how these Debtors were to be liquidated in a manner consistent with BCE's best interests.

(b)    Fortin was not an independent officer or director of the Debtors. His compensation during all relevant times was determined by BCE, and included a salary and perquisites in excess of $300,000/year, as well as participation in BCE's stock option program and pension plan, all of which, upon information and belief, were material to Fortin's lifestyle.

70.    Stewart Verge

(a)    Verge was a director and officer of TCC and TUSA from August 2000 until January 2002. Upon information and belief, as President – Global Operations, and later Executive Vice President of TCC and TUSA, Verge was responsible for overseeing the construction of the GlobeSystem. He also served as an officer and director of OTI between August 2000 and March 2002, and as a director of TPR beginning in August 2001. Verge began his career in telecommunications with Bell Canada in 1973. He was appointed Group Vice President at Bell Ontario in 1991, and was Vice President-Networks at Bell Canada in 1992.

(b)    Verge was not an independent officer or director of the Debtors. His compensation during all relevant times was determined by BCE, and included a salary and perquisites in excess of $300,000/year, as well as participation in BCE's stock option program and pension plan, all of which, upon information and belief, were material to Verge's lifestyle.

*BCE and the TI Directors and Officers Exercise Control Over the Debtors, and the Debtors' Directors and Officers Abdicate Their Responsibilities*

71.    BCE's purpose in purchasing that portion of TI that it did not already own is not in dispute. As BCE advised TI's public shareholders in the Management Information Circular circulated in connection with the Acquisition, BCE rejected alternatives to owning all of TI and

the Debtors because such alternatives "would have made it more difficult for BCE to be *in full control* of the evolution and development of Teleglobe as a global expansion tool." (emphasis added)

72.    Through (among other things) its appointment of key officers and directors to positions on the boards of TI and the Debtors, BCE – and the TI Directors and Officers at the behest of BCE – exercised actual control over the Debtors for the sole benefit of BCE.

73.    For example, in January 2002, prior to the time that BCE withdrew its financial support for the GlobeSystem, BCE caused TI, which held the registered name and mark "Teleglobe" on behalf of all the Debtors, to assign all of its registered U.S. and Canadian trademarks to BCE for consideration of $1.    Defendant Boychuk signed several of the assignments on behalf of TI. Although the transaction was reversed after the Chapter 11 Cases were commenced when the Debtors' management discovered what had happened, the fact that BCE did, in fact, strip the TI entities of their valuable trademark rights for no consideration is a clear example of an actual exercise of control over these entities

74.    Another clear example of the exercise of actual control by BCE of TI and the Debtors is the issuance and then redemption of the Fifth Series Preferred Shares, described herein. As alleged in greater detail below, BCE caused TI to utilize TI's tax losses to shelter a BCE tax gain on the shares of Nortel Networks owned by BCE, at a tax savings to BCE of approximately $50 million. BCE paid nothing to TI for the use of these tax losses, even though BCE derived tens of millions of dollars of benefit from the utilization of this very asset.

75.    BCE's actual control over TI and the Debtors extended beyond attempts to strip away intellectual property and utilization of tax losses for no consideration; BCE went so far as to cause TI and the Debtors to purchase software of another BCE affiliate, BCE Emergis, for

approximately $7 million. TI and the Debtors did not need or use this software – indeed, TUSA spent Cdn$5 million on software that it never even removed from the boxes – and the transaction eventually was unwound after the Chapter 11 Cases were commenced, but not before BCE had enjoyed the benefit of higher revenues in its software unit as a result of this exercise of actual control over TI and the Debtors.

76.    In a similar vein, when BCE determined to sell the holdings in the Excel Companies principally owned by TTC to VarTec, not only did BCE exclusively negotiate the entire transaction, but negotiated for itself, not for TTC, the right to a board seat on the VarTec board of directors as well as a warrant for VarTec common stock. Further, BCE caused THUS to forgive intra-company debts due from Excel and to make VarTec TUSA's exclusive carrier for domestic termination of calls for a three year period, even though TUSA was not a party to the sale agreement with VarTec and did not receive any consideration for doing so.

77.    Perhaps most importantly, after taking control of TI and the Debtors, BCE took control of all central corporate functions, such as treasury, investor relations, and public securities reporting – all functions that previously resided at TI or the Debtors. When BCE determined to terminate its funding, therefore, it did so knowing that the Debtors lacked independent managerial talent, since BCE had transferred or fired virtually all of the Debtors' senior officers.

78.    Through these and numerous other non-arm's length transactions, BCE and the TI Directors and Officers exercised actual control over the Debtors and their property.

79.    While BCE and the TI Directors and Officers assumed and exercised control over the Debtors, each of the Debtors' Directors and Officers breached his fiduciary duties to the Debtors by abdicating his responsibilities with respect to the business and operations of the

Debtors, including the funding and continuing build out of the GlobeSystem  For example, the Debtors' corporate minute books reveal that from November 1, 2000, the day BCE took de jure control of the Debtors, through April 24, 2002, the day BCE announced that it would cease its funding, there was only one actual meeting of the board of directors of only one Debtor, with all other board action taken by written resolution.  None of those perfunctory resolutions reveal that the Debtors' boards ever investigated, analyzed, or considered the significant issues confronting the Debtors during this period including solvency issues and funding requirements

*BCE's Additional $2.5 Billion Commitment*

80.    On November 1, 2000, the date of the Closing, the written commitment by BCE to fund all of TI's spending needs expired.  However, the need for such funding did not disappear with the Closing  As the TI board had recognized several months earlier, the completion of the GlobeSystem project was dependent upon continued funding from BCE – especially after BCE had directed the full draw down of the bank lines available to TI and the Debtors.

81.    In a January 24, 2001 presentation to TI's new BCE–controlled board, it was reported that more than $4.33 billion would be required to continue building the GlobeSystem in the years 2001 through 2003 – approximately $3 billion for TCC Group's capital expenditures for network build out and the balance to fund negative operating cash flows principally attributable to substantial recurring losses   In 2000 and each quarter of 2001, Teleglobe had substantial losses  More than $682 million in additional funds would be needed in 2001 even after TI and the Debtors fully drew down both the New Bank Facility and the $1 billion previously committed in writing by BCE (the "$1 Billion Commitment"), as described above  The financing plan presentation revealed, however, that, "given current market conditions,

Teleglobe would have difficulty accessing the capital markets this year" and that "[a]ny cash needs in excess of the [New Bank Facility] for 2001 will likely need to be funded by BCE."

82.    To make matters worse, the New Bank Facility was due to mature in July 2001. Unless it could be refinanced or extended, TI and THUS would require an additional $1.25 billion to repay the New Bank Facility.

83.    Three TI directors who also were BCE board members – Monty, Currie and Kierans – attended the January 24, 2001 TI board meeting (these three directors, in addition to Jarman and Steinberg, comprised the entire TI board of directors). During that meeting, these joint BCE/TI board members were presented with a budget that clearly and unequivocally stated that TI and the Debtors required an additional $2.5 billion in funding through 2003 and that they expected such funding to come from BCE. Upon information and belief, neither the Debtors' Directors and Officers, nor the TI Directors and Officers (who had assumed fiduciary duties to the Debtors), questioned BCE's funding obligation or considered options other than continuing to build the GlobeSystem for TI and the Debtors. However, since the Excel portion of the budget was apparently "not yet finalized," the approval of the budget for TI and the Debtors was postponed until the next board meeting.

84    Upon information and belief, that same day (January 24, 2001), there was considerable discussion at a subsequent BCE board meeting among the same individuals concerning the financial assistance that TI and the Debtors would need and whether BCE truly was willing to provide it (as BCE publicly was declaring at the time). After discussion, the BCE board agreed merely to eliminate a pre-existing restriction in the then-existing $1 Billion Commitment relating to the period of time during which such commitment could be drawn. In reality, however, the change was not meaningful, as the TCC Group consumed the funds at a

rapid rate as they continued the build out of the GlobeSystem. Based on the minutes from the January 24, 2001 TI board meeting (later approved by defendants Monty, Currie, Jarman, and Steinberg on February 28, 2001), by such time or shortly thereafter, the BCE board also "agreed . . . to inject . . . by way of equity or quasi-equity sufficient funds [in addition to the balance remaining on the initial $1 Billion Commitment] . . . to meet at all times cash operating shortfalls . . . in funding [the TCC Group's] capital expenditure program . . . ." (the "$2.5 Billion Commitment").

85.     On February 28, 2001, a revised budget for Teleglobe, including a revised budget for the TCC Group (the "Revised TCC Budget"), was presented to the TI board. The Revised TCC Budget did not materially alter the projected cash requirements for Teleglobe or GlobeSystem. Moreover, it still indicated that the requisite funding would come from TI's parent corporation, BCE. In any event, approval and funding of this Revised TCC Budget would still require an additional $2.5 billion from BCE over and above the $1 Billion Commitment.

86.     The TI board, which included Monty, Currie and Kierans, approved the Revised TCC Budget. Upon information and belief, Monty, Currie and Kierans would not have approved a Revised TCC Budget requiring $2.5 billion in additional support over and above the previously committed $1 billion absent approval by BCE of the $2.5 Billion Commitment. As was previously noted, Monty chaired the BCE board and Currie was the BCE "lead" director.

87.     When the Revised TCC Budget was approved, the Debtors' Directors and Officers did not express any concerns as to BCE's willingness to fund the Revised TCC Budget. If BCE had conditioned the funding on some basis, then such conditions should have been articulated by Monty and Currie to TI and the Debtors. Any such conditions presumably would have triggered a discussion as to whether the Debtors should continue with the GlobeSystem, or

explore other options. Since no such discussions were noted or explored, the only reasonable inference is that BCE had committed to fund an additional $2.5 billion over and above the $1 billion previously committed.

88.     When BCE committed to fund the GlobeSystem, that commitment was made both to TI and to the Debtors. The Debtors were responsible for the construction, operation and maintenance of the GlobeSystem, and the Debtors incurred substantial liabilities carrying out BCE's mandate. Moreover, the November 28, 2001 BCE board resolution authorizing $850 million in funding to TI and the Debtors, described below, specifically provided for investment in and financial assistance to TI or any subsidiary thereof. The Debtors were direct parties to the funding agreements with BCE or, at a minimum, the Debtors were intended third party beneficiaries for whose benefit BCE's commitments were made.

*The Actions of BCE, the TI Directors and Officers, and the Debtors' Directors and Officers Demonstrate the Existence Of The Additional $2.5 Billion Commitment By BCE*

89     A series of actions taken in 2001 by BCE, TI, and the Debtors, together with their respective directors, officers and employees are wholly consistent with and clearly demonstrate the existence of a commitment by BCE to fund TI's and the Debtors' operations through 2003. A number of these actions could have been taken only if the $2.5 Billion Commitment was already in place.

*The Budget Approval Process*

90.     After the closing of the Acquisition, BCE caused TI and TCC to adopt certain "Schedules of Authorities" pursuant to which their budgets were first to be approved by BCE, then implemented. TI's Schedule of Authorities, for instance, was passed and adopted at the January 24, 2001 TI Board meeting (by which time BCE had agreed to provide the necessary funding for GlobeSystem, as reflected in the January 24, 2001 TI board meeting minutes). The

TI Schedule of Authorities provides that only the TI Board of Directors had the right to approve the "respective business plans and annual budgets and any modifications thereof (including write-offs and write-downs)" of the Debtors.

91. This reservation of budgetary power mirrors BCE's Schedule of Authorities, which grants to BCE's Board of Directors the exclusive right to approve business plans and an annual budget for BCE and all of its subsidiaries (including both TI and the Debtors).

92. On February 28, 2001, TI then caused TCC (and the other TI subsidiaries (including the Debtors) who are part of the Teleglobe Communications Group) to adopt a Policy of Authorizations. That Policy of Authorizations provides, with respect to TCC's budget, that:

> the allocation of TCC['s] or the Subsidiary Corporation's assets, credit or finances required to support the action proposed to be taken, or the decision proposed to be made, must be covered by the Corporation's budget for the fiscal period in which the allocation will be accrued, as approved from time to time by the Board of Directors of Teleglobe ... **For the purpose of determining the level of authority required ... it is the aggregate expenditure over the term of the undertaking that must be taken into account and not merely the portion that will be spent in the current fiscal year.**

(Emphasis added.)

93. TI's and TCC's Revised Budgets, both of which contained a $2.5 billion shortfall, were approved by TI's Board of Directors on February 28, 2001.

94. The Schedule of Authorities system put in place by BCE requires budgets to be reported up the corporate chain from subsidiary to parent, and when approved, from parent to subsidiary, back down the chain.

95. Indeed, consistent with the Schedule of Authorities, and as the above-referenced January 24, 2001 TI Board meeting minutes reflect, "BCE Inc. has agreed ... to inject ... by way of equity or quasi equity sufficient funds ... to meet at all times cash operating shortfalls ... in

funding its capital expenditure program as approved by BCE Inc and the Board of Directors of the Corporation "

96    Accordingly, unless they violated the corporate policies of BCE, TI, and TCC, defendants Monty, Currie, Jarman, Steinberg, and Kierans must have received BCE's additional $2.5 Billion Commitment on or before February 28, 2001 in order to have approved a TCC budget in accordance with the Schedule of Authorities quoted above.

*The Redemption of the Third Series Preferred Shares*

97.    In advance of the February 28, 2001 meeting, the TI directors (including Monty, Currie and Kierans) received a Purpose and Summary Statement regarding the proposed redemption of TI's Third Series Preferred Shares.  Among other things, the Purpose and Summary Statement contained the following information for the directors:

> (a)    the total cost of the redemption of the Third Series Preferred Shares was approximately $126.1 million; and
>
> (b)    the redemption of the Third Series Preferred Shares was taken into account in TI's business plan and Revised TCC Budget requiring BCE to fund the $3.4 billion (inclusive of the remaining $900 million still available under BCE's original $1 billion commitment)

98.    The resolution was supported by a Solvency Certificate dated February 28, 2001, prepared by Boychuk, who, as alleged above, was then TI's CFO, BCE's Treasurer, and a director and officer of several of the Debtors.  Boychuk attended the February 28, 2001 TI board meeting as an invited guest, and he was available to answer questions and comment upon the propriety of the proposed redemption.  Also in attendance were defendants Bouchard and Verge, who, as noted, were directors of several of the Debtors.

99.    Boychuk's Solvency Certificate read as follows:

> I, the undersigned, being the Executive Vice President, Finance and Chief Financial Officer of Teleglobe Inc. ("Teleglobe") hereby certify as follows.

1. I am familiar with the financial affairs of Teleglobe generally, including its assets, liabilities and stated capital as shown in its balance sheet for the year ended December 31, 2000.

2. I am aware of the redemption on April 2, 2001 of all of the 5,000,000 Third Series Preferred Shares of Teleglobe currently outstanding at a price of $25 per share, together with an amount equal to $0.2219 per share representing all preferential dividends payable thereon.

3. After making reasonable inquiries, I have no reasonable grounds for believing that, for the purposes of Section 36 of the Canada Business Corporations Act:

   (a) Teleglobe is, and following the redemption, will be unable to pay its liabilities as they become due, or

   (b) following the redemption, the realizable value of the assets of Teleglobe will be less than the aggregate of its liabilities and the amount that would be required to pay the holders of shares that have a right to be paid, on a redemption or in a liquidation, ratably with or prior to the holders of the Third Series Preferred Shares.

100. Implicit in these statements was an acknowledgement that BCE had committed to provide the additional $2.5 billion required to fund the Revised TCC Budget since, without such a commitment, TI would have been "unable to pay its liabilities as they became due." Indeed, the Revised TCC Budget showed that there was going to be a funding deficit in 2001 of more than $214 million after full use of the New Bank Facility and the draw down of BCE's $1 Billion Commitment, even assuming that the New Bank Facility in the amount of $1.25 billion coming due in July 2001 could be refinanced or extended. Since the Revised TCC Budget required an additional $2.5 billion of BCE support and the Revised TCC Budget had been approved contemporaneously with the issuance of the Solvency Certificate, either (a) BCE had committed to provide an additional $2.5 billion in support to the GlobeSystem project, or (b) the Solvency

Certificate was inaccurate, Teleglobe and the Debtors were insolvent, and the best interests of creditors had to be taken into consideration  Without a committed equity or equity-like infusion of capital to cover build out of the GlobeSystem and operating losses, assets were worth less than liabilities at that time.  No new debt was available and no third party had been identified to provide new equity funding

*The Nortel Shares Transactions*

101.    The second item approved at the February 28, 2001 TI board meeting involved a transaction whereby BCE transferred Nortel shares with a market value in excess of $500 million to TI in exchange for an allocation of Fifth Series Preferred shares to be issued by TI.  After the transfer, TI was directed by BCE to sell the Nortel shares, BCE requested that the Fifth Series Preferred Shares be retracted and TI repurchased the Fifth Series Preferred Shares (hereinafter, collectively, the "Nortel Shares Transactions").  Upon information and belief, BCE's board of directors should not have approved the Nortel Shares Transactions unless TI was solvent and able to pay its debts as they became due.  TI only could have been solvent if BCE had committed the additional $2.5 billion in funding described above

102.    Moreover, the Nortel Shares Transactions were undertaken to utilize tax credits that were not otherwise available to BCE   Although it used TI to shelter $50 million of actual tax exposure, BCE did not pay TI anything for this valuable accommodation, nor did the TI Directors and Officers demand reimbursement for the use of these valuable assets

*Low on Cash, TI and the Debtors Begin to Draw Down the $2.5 Billion Commitment in November 2001*

103.    On October 24, 2001, TI's board formally decided to draw down $75 million of the additional $2.5 Billion Commitment   BCE's board authorized the $75 million advance on that same day   By this time, Teleglobe's New Bank Facility and BCE's initial $1Billion

Commitment were completely drawn down  The $2 5 Billion Commitment was the only source

of funds available to TI and the Debtors

104    TI's board of directors reconvened on November 28, 2001 because that additional

$75 million advance had been exhausted and TI and the Debtors needed as much as $828 million

more to pay for the remainder of TI's and the Debtors' 2001 and 2002 business plans  On that

same day, BCE's board of directors approved TI's business and financial plan and budget for

2002 and authorized BCE to provide $850 million to TI and its subsidiaries (including the

Debtors), approximately $350 million of which was to be spent in December 2001

105    Resolution No 7 adopted by the BCE board on November 28, 2001 provides, in

part:

> THAT, the Corporation be and it is hereby authorized, from time
> to time on or prior to December 31, 2002, to make investments in
> and to provide financial assistance to Teleglobe Inc or any
> subsidiary thereof ("Teleglobe") (including investments to fund
> debt service pertaining to Excel Communications, Inc) or to Bell
> Expressvu Limited Partnership or any subsidiary thereof
> ("Expressvu") in amounts not to exceed in the aggregate U S $850
> million in the case of Teleglobe and $400 million in the case of
> Expressvu (the "Additional Financial Assistance"), the whole as
> set forth below:
>
> (a)    such Additional Financial Assistance may be made
> by way of acquisition of debt securities, share or
> partnership units, loans, guarantees, indemnities or
> any combination of the foregoing, for general
> corporate    purposes    including    for    purposes
> contemplated by the Budget;
>
> (b)    the Corporation be and it is hereby authorized to
> provide the Additional Financial Assistance directly
> or through one or more subsidiaries;
>
> (c)    if Additional Financial Assistance is provided
> through    a    subsidiary    or    subsidiaries,    the
> Corporation be and it is hereby authorized to
> purchase shares or debt securities of, to make a loan
> to or otherwise to provide financial assistance to the

> said subsidiary or subsidiaries to enable the said subsidiary or subsidiaries to provide the Additional Financial Assistance to Teleglobe or Expressvu; and
>
> (d)  all advances of funds hereunder shall be at such time and upon such terms and conditions as the Chairman and Chief Executive Officer of the Corporation (or any officer designated by such person) may in his/her discretion determine.

(Emphasis supplied).

106.  A binding commitment was made, as evidenced by, among other things, BCE's own board minutes approving the $850 million allocation and various reported public statements that admitted this fact, by the Debtors' continued construction of the GlobeSystem in reliance on BCE's commitment, and by TI and the Debtors receiving the first of the committed funds.

*The Failure Of The Debtors' Directors And Officers To Consider Alternatives To The Continuation Of The GlobeSystem Build Out Is Consistent With An Additional Commitment From BCE*

107.  The Debtors' Directors and Officers and the TI Directors and Officers again failed to cause BCE's additional commitment to be reduced to a comprehensive written agreement. By contrast, the independent TI board required that the Acquisition transaction documents be amended to include BCE's agreement to fund the TCC Group's spending needs through the closing during the summer of 2000. This failure to obtain a written agreement, after the closing of the Acquisition and again after November 28, 2001, that documented the unequivocal and irrevocable obligation of BCE to provide the funding necessary for the Debtors' survival constituted a breach of fiduciary duties by the Debtors' Directors and Officers and the TI Directors and Officers, who were in a position of hopeless conflict between their fiduciary duty of loyalty to the Debtors and their duty of loyalty to BCE, which for all practical purposes was their real employer and whose interests were paramount.

108.    Not only did the Debtors' Directors and Officers fail to act, in fact, some of the

Defendants actively prevented other employees of the Debtors from considering alternatives.

For example, in an e-mail dated January 11, 2001, Marc Bouchard castigated a Teleglobe

employee who had been investigating the availability of contractor financing for certain

GlobeSystem components: "I do not want anyone to be investigating any financing options for

Teleglobe. We are financed by BCE. Only Andre Mongrain is authorized to explore financing

alternatives. Thanks for you [sic] recommendation. Make sure that we disengage from any

further discussions with contractors."

*Public Statements Regarding BCE's Additional $2.5 Billion Commitment*

109.    Like their actions, the words of BCE, TI, the Debtors, and their officers, directors,

and employees demonstrate that BCE committed to provide funding to TI and the Debtors

through 2003.

*Statements by Jean Monty*

110.    TI's Management Discussion and Analysis for the year ended December 31, 2000

(which was released to the public on April 24, 2001, less than two months after BCE committed

to provide the additional $2.5 billion), contains the following boilerplate cautionary language:

> Management considers that it has sufficient sources of funds from
> operating activities, unused portions of existing credit facilities,
> financial support from BCE and access to capital markets to meet
> its working capital and capital investment requirements, debt
> repayments and other obligations in 2001 and future years
> although, without financial support from BCE, the Corporation
> [TI] would need to re-evaluate its planned capital expenditures
> and/or seek other sources of financing.

111    The day after that statement was released, Monty publicly stated that BCE was

ready to finance the GlobeSystem's capital requirements in the amount of $3.4 billion (i.e., $2.5

billion more than the $900 million outstanding on BCE's initial $1 Billion Commitment) and put

BCE's full resources behind TI and the Debtors. During an equity analysts' conference call on April 25, 2001 to discuss BCE's quarterly results, the following dialogue took place:

> Q.    By Richard Talbot of RBC Dominion Securities
>
> "I'm wondering to what extent BCE is prepared to fund that [Teleglobe GlobeSystem CAPEX] commitment."
>
> A.    By Jean Monty
>
> "[T]here is no question that we are ready to finance the Teleglobe program ... We will put our resources behind the Teleglobe program ... we didn't come into this business for one or two year payback. We really fully realized all along that this was a long-term payback business."
>
> Q.    By Dvai Ghose of CIBC World Markets
>
> "[O]n a related point with the financing of Teleglobe Jean, are you committed that, should you not be able to find partners to help with the financing, to fund the full, 5 billion of CAPEX on a going forward basis ... "
>
> A.    By Jean Monty
>
> **"[L]et me reiterate, the capital program is 3.4 not 5 billion. ... [W]e are committed to help Teleglobe finance the whole thing.** So there is no quivering about that, there's no misunderstanding I hope between all of us, we'll get it done ... "

(Emphasis added.)

112.    Even after BCE's support for the GlobeSystem began to wane, as discussed below, and after the Debtors began drawing down funds from the additional $2.5 Billion Commitment, Monty made the following statement at a December 12, 2001 analysts meeting:

> We will have a requirement, 500 million dollars to inject new money into BC – excuse me, into Teleglobe in 2002. It's not 2 billion or 2 ½ billion dollars, as some people have written, but we will have to put some money in the fourth quarter this year, probably about 500 million dollars, over and above the 900 million dollars US that we had talked about ... We're talking about 500 this year in the fourth quarter and 500 next year, and 0 thereafter.

Case 1:04-cv-01266-SLR    Document 162-3    Filed 08/30/2005    Page 36 of 36

113    This statement by Monty was well-publicized, as a Merrill Lynch & Co. Global Securities Research & Economics Group, High Grade Credit Research Report dated January 18, 2002 stated that "BCE at their analysts meeting in December 2001 reiterated its view that TGO is a long-term strategic operation and <u>committed an additional C$1 bn to finance the completion of TGO's GlobeSystem build out</u>" (emphasis added).

114    Monty also wrote to all TCC Group employees, among others, on January 25, 2002, commenting on "Terry Jarman's decision to leave the company." Seeking to reassure the TCC Group employees, Monty wrote:

> BCE's commitment to the success of Teleglobe is no secret. Not only have we allocated the financial resources required to build a leading-edge IP/data network, we have added our name to that of Teleglobe's to further demonstrate the strategic, long-term value of our investment

*Statements Made In Connection With The Renewal of the New Bank Facility*

115    By mid-summer 2001 (before BCE's support for GlobeSystem started to wane), certain lenders under the New Bank Facility requested further confirmation of BCE's continuing commitment to fund the GlobeSystem. BCE was fully aware that without its unequivocal commitment, the lenders would refuse to renew the New Bank Facility, and TI and THUS would have to repay $1.25 billion dollars in July 2001. Accordingly, BCE reinforced its public statements by making several specific representations to the lenders under the New Bank Facility for the express purpose of inducing them to extend the New Bank Facility to July 2002.

116    In separate letters dated July 12 and July 13, 2001 responding to the lenders' requests for assurances, Pierre Van Gheluwe, Bell Canada's Director – Banking, and Siim Vanaselja, Bell Canada's Chief Financial Officer, both reiterated BCE's unequivocal $3.4 billion total commitment to GlobeSystem by attaching to the letters transcripts of the April 25, 2001 conference call quoted, in which defendant Monty clearly described BCE's commitment. "[L]et