# EXHIBIT B

THE UNITED STATES ~~BANKRUPTCY~~DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------------x

In re

TELEGLOBE COMMUNICATIONS CORPORATION,
TELEGLOBE USA INC , OPTEL
TELECOMMUNICATIONS, INC , TELEGLOBE
HOLDINGS (U S ) CORPORATION, TELEGLOBE
MARINE (U S ) INC , TELEGLOBE HOLDING CORP ,
TELEGLOBE TELECOM CORPORATION,
TELEGLOBE INVESTMENT CORP , TELEGLOBE
LUXEMBOURG LLC, TELEGLOBE PUERTO RICO
INC  and TELEGLOBE SUBMARINE INC ,

Chapter 11
Case No. 02-11518 (MFW)
Jointly Administered

                                        Debtors.

-------------------------------------------------------------------x

TELEGLOBE COMMUNICATIONS CORPORATION,
TELEGLOBE USA INC , OPTEL
TELECOMMUNICATIONS, INC , TELEGLOBE
HOLDINGS (U S ) CORPORATION, TELEGLOBE
MARINE (U S ) INC., TELEGLOBE HOLDING CORP.,
TELEGLOBE TELECOM CORPORATION,
TELEGLOBE INVESTMENT CORP., TELEGLOBE
LUXEMBOURG LLC, TELEGLOBE PUERTO RICO
INC , TELEGLOBE SUBMARINE INC , and the
OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF TELEGLOBE COMMUNICATIONS
CORPORATION, et al.,

                                        Plaintiffs,

                        v.

BCE INC , MICHAEL T. BOYCHUK, MARC A.
BOUCHARD, SERGE FORTIN, TERENCE J. JARMAN,
STEWART VERGE, JEAN C. MONTY, RICHARD J.
CURRIE, THOMAS KIERANS, STEPHEN P  SKINNER,
and H  ARNOLD STEINBERG,

C.A. No. 04-CV-1266 (SLR)
~~Adv. Pro. No~~ _____

                                        Defendants.

-------------------------------------------------------------------x

**AMENDED COMPLAINT**

Teleglobe Communications Corporation ("TCC") and its above-captioned affiliated

debtors and debtors in possession (collectively, "Debtors"), by their counsel, Richards Layton &

Finger, P A , and the Official Committee of Unsecured Creditors of the Debtors (the

"Committee"), by its co-counsel, Rosenthal, Monhait, Gross & Goddess, P.A. and Hahn & Hessen LLP, as and for their amended complaint against the above-captioned defendants, allege as follows:

## INTRODUCTION

*Nature of the Action*

     1.     This proceeding seeks to hold the Debtors' parent company, BCE Inc. ("BCE"), accountable for abandoning the Debtors after causing them to incur billions of dollars of debt. After repeatedly promising in public to fund the Debtors' construction of a worldwide communications network, BCE, Canada's largest telecommunications company, precipitously terminated its financial support for its subsidiaries' multi-billion dollar capital expenditure program. Left with only two weeks of operating cash, substantial debt, and an incomplete network, stripped of key personnel who had been installed by (and resigned at the behest of) BCE; and with no feasible business plan to continue operations in the absence of BCE's financial support, the Debtors filed for bankruptcy protection and began liquidating their assets. As demonstrated below, BCE committed ~~both publicly and in writing~~ to fund the Debtors' operations, and ~~the~~acknowledged its commitment to a number of third parties, including the Debtors' bankers and potential customers. The only reason that no formal ~~bilateral~~written contract exists is because BCE installed its own personnel as directors and officers of the subsidiaries, and through them exerted complete domination and control over the Debtors' operations and finances for the benefit of BCE. These directors and officers, who implemented the capital expenditure program based upon BCE's directions and ultimately unfulfilled promise of financial support, abdicated and breached the fiduciary duties imposed upon them by Delaware law.

2.      This action seeks damages arising from, among other things: BCE's wrongful failure to honor its funding commitments to the Debtors; BCE's wrongful exercise of complete domination and control over the Debtors solely for BCE's benefit; the abdication by members of the boards of directors of the Debtors, and by certain other individuals who assumed and exercised control over the Debtors, of their fiduciary duties in the face of BCE's unbridled exercise of control; and breaches of fiduciary duties by directors of the Debtors, and by certain other individuals who assumed and exercised control over the Debtors, many of whom simultaneously served as directors and/or officers of BCE, and whose divided loyalties caused great damage to the Debtors and their creditors.

*Teleglobe and BCE*

3.      Teleglobe, Inc. ("TI" or, as the context requires together with members of the TCC Group, "Teleglobe") and its various direct and indirect subsidiaries initially were in the business of providing long distance voice communications from Canada to the world. Formed in 1950 as the Canadian Overseas Telecommunications Corporation, TI originally was designated as the exclusive provider of telecommunications services to and from Canada, and was a traditional government owned monopoly. TI operated as a "carrier's carrier," that is, it provided cable and other long distance connections from Canada to the rest of the world through its subsidiaries and affiliates. As part of its business, TI and its subsidiaries and affiliates (including the Debtors) had business relationships with virtually every other large national telephone company, and had rights to route its calls through the cables and networks of virtually every major telephone consortium. By the late 1990s, TI had revenue in excess of $1 billion annually.

4.      BCE is a Montreal, Canada based holding company with 20032004 revenues of Cdn$1919.2 billion. BCE's holdings include Bell Canada, which provides local access, long

distance, wireless services and high-speed internet access to its customers and is Canada's largest telephone company. BCE also owns or controls significant interests in a major satellite television company; CTV, Canada's leading private broadcaster; *The Globe and Mail*, Canada's leading national newspaper, CGI, one of Canada's largest information technology service companies; and companies providing eBusiness solutions to the financial services industry in North America and the health industry in Canada.

*BCE Acquires Teleglobe And Pursues Its "Grand Vision"*

5.    In May 1987, BCE acquired a minority interest in TI. That interest thereafter was transferred to Bell Canada, then an 80% owned subsidiary of BCE. As of February 2000, Bell Canada owned 23% of TI and the remaining 77% was owned by the investing public.

6.    In February 2000, TI publicly announced an agreement pursuant to which BCE would acquire all of the outstanding common shares of TI that were not already owned by Bell Canada (the "Acquisition"). The Acquisition was a major strategic transaction for BCE, which eventually paid billions of dollars (primarily in shares of its common stock) for the 77% of TI then owned by the public.

7.    By the time of the Acquisition, which closed inon November 1, 2000, the Debtors had commenced the build out of the "GlobeSystem," a state of the art worldwide network of fiber optic and satellite interlinks that allowed the simultaneous transmission of vast amounts of data, voice and other electronic traffic. The Debtors were responsible for the construction, operation and maintenance of the GlobeSystem. As conceived, by TI in mid 1999, the buildout of the GlobeSystem was to be completed in five stand alone stages over five years. The fully completed GlobeSystem was intended to interconnect 160 cities around the world with scalable broadband service platforms that carriers and large commercial organizations could use for

transmission of voice and data communications. Each of these cities would be integrated seamlessly into a global communications network. When fully completed in 2004, the GlobeSystem would have allowed customers to connect from business centers worldwide, regardless of their underlying network technology.

8. From its very conception, the GlobeSystem was understood to be an enormous undertaking. TI's directors, both before and after the Acquisition, were advised and expected that the system would take no less than $5 *billion* to build and an additional $1 billion to fund operating losses through to break-even operations.

9. The Debtors, however, did not have the $6 billion needed to finance the GlobeSystem. Even before the November 2000 closing of the Acquisition, BCE and the BCE appointed directors and officers, some of whom were installed to run the Debtors before the closing of the Acquisition, realized that the bulk of the $6 billion cost of the GlobeSystem would have to be underwritten by BCE. ~~Notwithstanding this realization, BCE directed the Debtors to incur the tremendous cost of the continued development of the GlobeSystem. The development of the GlobeSystem financially strapped the Debtors and, by the end of 2001, the Debtors had exhausted all sources of existing bank facilities and other available third party funding and were required to seek an additional $850 million from BCE, which BCE agreed to provide~~Pending the closing, TI's independent directors sought to defer much of the GlobeSystem buildout, due to the lack of funds, but BCE objected. TI's independent directors then required written guarantees from BCE that it would finance the build out of the GlobeSystem, if it wished to continue the development through closing.

10. After the Acquisition closed, and with full knowledge of the Debtors' financial situation, the Defendants not only continued their direction that the Debtors incur the tremendous

cost of the continued development of the GlobeSystem, but they accelerated the time table for the full GlobeSystem build out by as much as two years. The continued and accelerated development of the GlobeSystem quickly and substantially worsened the financial condition of the Debtors. By mid 2001, having exhausted their existing bank facilities, along with any real prospect of third party funding, the Debtors were only able to continue operations by virtue of the funding that BCE had agreed to provide.

11.    ~~10. After~~But after taking control of the Debtors ~~and commencing to fund,~~ authorizing the expenditures necessary for the GlobeSystem build out, ~~but before it funded the additional $850 million~~and providing a fraction of the funding to which it had committed, BCE unilaterally and precipitously withdrew funding support for the Debtors' ~~operations~~ without any prior notice, thereby dooming the Debtors to bankruptcy and, ultimately, ~~liquidation. This lawsuit is filed to address BCE's conduct, and that of the Debtors' and TI's directors and officers, as described in greater detail herein.~~to liquidation. Alternatively, if no funding commitment was made by BCE, as the Defendants now apparently claim--or if the individual Defendants failed to secure such a commitment--the continued build out of the GlobeSystem (even as scaled back in later months) was not merely reckless, but given the insolvency of TI and the TCC Group at the time, it was a gross breach of the fiduciary duties of loyalty, care and good faith owed by the Defendants to the Plaintiffs and their stakeholders. Indeed, if they failed to secure a funding commitment from BCE, the conduct of the individual Defendants' was particularly egregious, given the rapid decline of the telecommunications market, and of available capital in that market, during the period.

12.    This lawsuit is filed to address BCE's conduct, and that of the Debtors' and TI's directors and officers, as described in greater detail herein.

## JURISDICTION AND VENUE

13.    11. On May 15, 2002, TI, Teleglobe Financial Holdings Ltd., Teleglobe Canada Limited Partnership and Teleglobe Canada Management Services Inc (collectively, the "Canadian Debtors") and the eleven Debtors, commenced insolvency proceedings under the Canadian Companies' Creditors Arrangement Act in the Ontario Superior Court of Justice in Toronto, Canada  On the same date, the Canadian Debtors and the Debtors filed petitions with this Court pursuant to 11 U.S.C. § 304 seeking ancillary relief.

14.    12. On May 28, 2002, after ancillary relief was refused for the Debtors, the Debtors filed petitions for relief in this Court (the "Chapter 11 Cases") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") — The Debtors are continuing in possession of their property and operating and managing their businesses as debtors in possession, pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

15.    13. On May 29, 2002, this Court consolidated the Chapter 11 Cases for procedural purposes only and granted their joint administration

16.    14. The Office of the United States Trustee appointed the Committee on June 11, 2002.

17.    15. By Order dated April 28, 2004, this Court, over the opposition of BCE, authorized the Committee to prosecute, inter alia, claims against the officers and directors of the Debtors and causes of action related thereto as may be agreed upon between the Debtors and the Committee.

18.    A Plan of Reorganization was confirmed on February 11, 2005, and became effective on March 2, 2005.

19.    16. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334  This is a non-core proceeding pursuant to 28 U.S.C. § 157(b)  Both the Debtors and the

Committee consent to the entry of final orders and/or judgments by this Court. Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

## PARTIES

*The Debtors, TI and BCE*

20.    17. Each of the Debtors is a Delaware corporation (except for Teleglobe Puerto Rico Inc. ("TPR"), which is a Puerto Rico corporation), and is either a direct or indirect subsidiary of TI, a corporation governed by the Canada Business Corporations Act ("CBCA") which had its principal place of business in Montreal, Province of Quebec, Canada.

21.    18. Prior to commencing the GlobeSystem project, the Debtors provided international long-distance telecommunications services, on a largely wholesale basis, to other telecom carriers in the U.S., Canada and abroad. TCC, Teleglobe USA Inc. ("TUSA"), Optel Telecommunications, Inc. ("OTI") and certain other entities (collectively, the "TCC Group") accounted for approximately 60% of TI's revenues and were headquartered in Reston, Virginia. The TCC Group was TI's principal world-wide operating division responsible for the construction and implementation of the GlobeSystem project.

22.    19. BCE is and was at all material times a corporation governed by the CBCA with its principal place of business in Montreal, Province of Quebec, Canada. BCE's stock is publicly traded and listed on the Toronto Stock Exchange and the New York Stock Exchange, among others. BCE has appeared and filed proofs of claim in the Chapter 11 Cases.

*The Debtors' Director and Officer Defendants*

23.    20. Upon information and belief, defendant Michael T. Boychuk ("Boychuk") is a citizen and resident of Canada. Boychuk was simultaneously a high-ranking officer or director of BCE, its Bell Canada subsidiary, TI, and several of the Debtors during material times relevant to this action.

24.    ~~21.~~ Upon information and belief, defendant Marc A. Bouchard ("Bouchard") is a citizen and resident of Canada and was a high-ranking officer or director of several of the Debtors during material times relevant to this action.

25.    ~~22.~~ Upon information and belief, defendant Serge Fortin ("Fortin") is a citizen and resident of Canada. He served as an officer or director of several of the Debtors during material times relevant to this action.

26.    ~~23.~~ Upon information and belief, defendant Terence Jarman ("Jarman") is a dual citizen of Great Britain and Canada, and resides in Toronto, Canada. Jarman was the Chief Executive Officer of, and/or a director of, several of the Debtors during material times relevant to this action.

27.    ~~24.~~ Upon information and belief, defendant Stewart Verge ("Verge") is a Canadian citizen and resides from time to time in Ponce Inlet, Florida. Verge was a director or officer of several of the Debtors and was responsible for overseeing the construction of the GlobeSystem during material times relevant to this action.

28.    ~~25.~~ Boychuk, Bouchard, Fortin, Jarman, and Verge are collectively referred to hereinafter as the "Debtors' Directors and Officers."

*The TI Director and Officer Defendants*

29.    ~~26.~~ Upon information and belief, defendant Jean C. Monty ("Monty") is a Canadian citizen who resides at various times throughout the year in North Palm Beach, Florida. Monty was the Chairman, President, and Chief Executive Officer of BCE and Chairman of TI between February 2000 and April 2002.

30.    ~~27.~~ Upon information and belief, defendant Richard Currie ("Currie") is a citizen and resident of Canada. Currie served as a director of TI from December 2000 until April 2002.

During that period, Currie was also the "lead" director on BCE's board, meaning that Currie acted as Chairman when the BCE board met in executive session. In April 2002, Currie succeeded Monty as Chairman of the Board of BCE, a position he currently holds.

31. 28.—Upon information and belief, defendant Thomas E. Kierans ("Kierans") is a citizen and resident of Canada. He was a member of BCE's board of directors while he served as a director of TI from December 2000 until April 2002. Kierans, like Currie, was present when the BCE board met in executive session.

32. 29.—Upon information and belief, defendant Stephen P. Skinner ("Skinner") is a citizen and resident of Canada. He served as Vice President and Controller of TI from July 2001 to April 2002 while he was also the Corporate Controller of BCE.

33. 30.—Upon information and belief, defendant H. Arnold Steinberg ("Steinberg") is a citizen and resident of Canada. He was a director of TI during material times relevant to this action, and previously served as a director of Bell Canada International, Inc., a BCE subsidiary.

34. 31.—Monty, Currie, Kierans, Skinner and Steinberg are collectively referred to hereinafter as the "TI Directors and Officers." Charts showing the various roles filled by Boychuk and the other individuals named as defendants herein are contained in Exhibit "A" annexed hereto and incorporated by reference herein.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION
### (Incorporating All Previous Allegations)

*TI Prior to the BCE Acquisition*

35. 32.—By 1999, TI and its subsidiaries and affiliates owned or operated capacity on nearly every sub-sea fiber optic cable system and resold that capacity primarily on a wholesale basis. Although TI was profitable as a result of its voice revenues, given the termination of its long distance monopoly by the Canadian government in October 1998, it projected declining

revenues from that business segment. Accordingly, it was searching for a new strategy to transform itself into a growth company

36. 33. In May 1999, TI announced its intention to build the GlobeSystem. When completed in 2004, the GlobeSystem would have allowed customers to connect with each other worldwide, regardless of their underlying network technology

37. 34. In July 1999, TI raised $1 billion through the sale of debentures (the "Debentures") TI was the obligor on the Debentures, with Debtor Teleglobe Holdings (U S.) Corporation ("THUS") acting as guarantor. THUS is the United States parent of the other Debtors (except for TPR and Teleglobe Luxembourg LLC) A corporate chart of the Debtors is annexed hereto as Exhibit "B" and incorporated by reference herein.

38. 35. To obtain further financing for the GlobeSystem project, TI decided to search for a strategic investor. BCE, which already held a 23% ownership stake in TI through Bell Canada, was a logical buyer. Acquiring TI also was consistent with BCE's need to revitalizereinvigorate its own stagnantlackluster growth, and its purchase of TI also servedwould serve to block competitors from gaining control of TI and entering the Canadian market.

*BCE's Desire to Grow Beyond Canada*

39. 36. In the late 1990s, BCE was struggling with the equity market's perception of BCE as a purely Canadian company, with very little – if not negative – growth potential

40. 37. Although BCE is and was Canada's leading communications company, with interests in a wide range of communication products and services, its majorprincipal holding was Bell Canada, which was, on information and belief;many industry analysts believed to be undervalued by the public markets. Specifically, Bell Canada was viewed as a traditional local wired telephone provider, with little chance of expanding beyond Canadian borders. In addition,

because Canada had lifted Bell Canada's monopoly on local and regional telephone services, its market share was expected to erode  Thus, BCE was viewed as a stagnant, slowly declining enterprise.

41.   38. To change this view, BCE elected to make a series of investments  BCE first raised $5 1 billion in June 1999 by selling 20% of Bell Canada's common stock to Ameritech (which subsequently merged with SBC Communications, Inc ("SBC"))  BCE also spun off its interest in Nortel Networks Inc ("Nortel"), thereby raising another $2 9 billion  As a result of these transactions, BCE raised about $8 billion in cash to proceed with its investment strategy Its sale of a minority interest in Bell Canada was not necessarily final, however  As part of that transaction, Ameritech was given a "put" right which, if exercised, would force BCE to repurchase the shares at a 25% premium to the then – prevailing market price of the stock

42.   39. On February 15, 2000, BCE and TI executed an agreement (the "Acquisition Agreement") pursuant to which BCE would acquire all of the shares of TI that were not already owned by Bell Canada  The Acquisition was a major strategic transaction for BCE  At that time, Monty (then BCE's Chairman and CEO) publicly described BCE's strategy as follows: "The acquisition of Teleglobe provides BCE with a key asset to be an important international player in the Internet data communications service business "  Monty also said "BCE is willing to commit significant resources to building up of GlobeSystem – initially as much as $1 billion for the new venture – from an estimated $7 billion war chest "

43.   40. Thus, from the moment the Acquisition was announced, the entire point of the Acquisition – from the perspective of both parties – was for BCE to provide the funding required to complete the GlobeSystem and to reap the resulting benefits of being, as Monty said, "an important international player in the Internet data communications service business "

44. 41. Moreover, there was little doubt that BCE would in fact be required to fund TI and the Debtors for some time. At a meeting held on February 14, 2000, the day before the Acquisition Agreement was announced, TI's Chief Financial Officer reported that TI's profit margins were "decreasing at levels never before experienced," that "important" capital expenditures were needed, and that financing would be "more challenging" in the future given that TI was close to being out of compliance with various financial covenants in its debt instruments.

*BCE Makes its Pre-Closing Commitment to GlobeSystem*

45. 42. When announcing the Acquisition Agreement, BCE made clear to the public debt and equity markets that BCE would provide the financial support necessary to complete the GlobeSystem. Monty stated on February 15, 2000, "[a]s part of the BCE group of communications companies, Teleglobe's position will be strengthened and it will be better placed to realize its goal of becoming a global data/Internet company. Teleglobe is already well under way with    GlobeSystem, which BCE will continue to support."

43.    By the spring of 2000 (several months after the Acquisition Agreement was announced but prior to its closing in November 2000 (the "Closing")), access to the public debt and equity markets became more difficult for telecom and internet companies. At the same time, TI's financial performance was disappointing. Notwithstanding deteriorating market conditions, BCE announced its resolve to close the Acquisition Agreement and complete the GlobeSystem project, and publicly ascribed TI's poor financial performance to macroeconomic factors.

46. 44. Consistent with BCE's long-term vision, shortly after the Acquisition Agreement was executed but prior to the Closing (But by the spring of 2000 (after the Acquisition Agreement was announced but prior to its closing (the "Closing") in November 2000 (the ""Gap Period")), BCE requested that the TI board proceed expeditiously with the completion

of the GlobeSystem project.  By that time, however, TI and the Debtors had exhausted most of")), TI had spent the proceeds of the sale of the Debentures, was close to exhausting the available funding under their~~its~~ existing bank facility (the "~~"~~Existing Bank Facility"~~")~~ and had spent the proceeds of the Debentures.  Cash flow projections also were negative since, among other things, the"), and was nearly out of cash with which to fund the continued development of the GlobeSystem.  At the time, TI's ability to access the debt markets was virtually non-existent, as a result of its already highly leveraged balance sheet and its deteriorating financial performance.  The Existing Bank Facility was coming due in July, 2000, requiring the repayment of about~~some~~ $6~~20~~612 million  Given prevailing market conditions, there was apparently no other funding available to continue to pay for the construction of the GlobeSystem project

47.    ~~45.  During the Gap Period, TI's~~ board of directors was still independent, since ~~BCE only held a minority voting position on the board.  Thus, in May 2000, the TI board~~During the Gap Period TI's board of directors was still independent, since BCE held only a minority voting position on the board.  Under the circumstances, the independent directors of TI, operating as a special committee of the board (the "TI Special Committee"), proposed to defer construction of the more capital intensive aspects of the GlobeSystem, pending improvement in TI's financial situation.  BCE objected to that proposal, however.  BCE insisted that TI continue with the GlobeSystem build out.  BCE threatened to declare that Teleglobe had suffered a "material adverse change", entitling BCE to escape the transaction, if TI did not continue the GlobeSystem build out, unabated

48.    The independent TI directors did not unconditionally grant BCE's request to continue building the GlobeSystem, ~~but instead~~however.  Instead, the Special Committee informed BCE that TI would cease construction unless BCE made a substantial funding

commitment, in an unequivocal and irrevocable written form, to assure the TI board that sufficient funding would be made available to pay the ongoing construction expenses.

49.    46.—In this regard, the minutes of the May 16, 2000 meeting of the Special Committee of the TI board state:

> The Committee was of the opinion that if the Corporation was to continue with the capital expenditure program and that such program could not realistically be funded out of the Corporation's available resources, then BCE should be asked to commit to the necessary funding.

50.    47.—Before irrevocably committing to TI's request for funding during the Gap Period, BCE requested and received the right from TI to install BCE-affiliated high-level management at the Debtors even though the Acquisition had not yet closed. BCE replaced Paolo Guidi as Chief Executive Officer of TCC with Jarman, who was then Vice Chairman of Bell Canada. Jarman was charged with the responsibility of overseeing the entire TCC Group, which was building the GlobeSystem and incurring its substantial costs and expenses.

51.    48.—BCE also removed Claude Seguin as TI's Chief Financial Officer and in his place appointed Boychuk, then Treasurer of BCE. When Monty introduced Boychuk to the TI board he stated that Boychuk was "well positioned to manage the financial issues of Teleglobe over the next few months, more particularly in light of the increased participation of BCE in the refinancing discussions."

52.    49.—Further, BCE appointed (a) Verge, as President of Global Operations of TCC, (b) Bouchard, as President, North American Markets and Corporate Development of TCC, and (c) Fortin, as President of Global Markets of TCC. By the summer of 2000, BCE had replaced no less than seven senior executives of TI and the Debtors – almost the entire top officer group. Likewise, Monty himself took over the Chairmanship of TI in February 2000, almost nine months before the Closing.

53.    50. Finally, BCE retained outside experts to assist with the assessment process and determined that a total of $6 billion would have to be committed to the GlobeSystem through 2004, at which time the project was expected to become cash flow positive and self-financing.

54.    51. TI's board minutes for June 18, 2000 reveal that BCE knew that there were insufficient funds to continue building the GlobeSystem without BCE funding:

> BCE advised Teleglobe that it believed that an adjustment [to the purchase price for the Acquisition] was appropriate in light of the fact that financial support from BCE would likely be required prior to closing of the transaction in order for Teleglobe to maintain, among other things, the timely development of the GlobeSystem program. BCE's position was that financial support of this nature was not contemplated by the [Acquisition] Agreement.

55.    52. The minutes of that meeting also state that during the discussions with BCE the "Independent Committee [of the TI board] determined to continue negotiations with BCE provided that certain minimum terms and conditions would be agreed to by BCE, including the provision of any financial assistance required by Teleglobe prior to the closing of the transaction."

56.    53. During the Gap Period, BCE considered and adopted pursued a four-part financing plan to obtain the $6 billion needed to fund the GlobeSystem through completion and start-up, each component of which would require BCE's financial backing and support. First, BCE would agree to the demand by the Independent Committee of the TI board to fund the Debtors' needs through Closing in an uncapped amount. Second, BCE would deliver to the lenders under the Existing Bank Facility a support letter in which it irrevocably would agree agreed to fund GlobeSystem costs up to $1 billion through the end of June 2001 to induce them to refinance the Existing Bank Facility and increase its size from $750 million to $1.25 billion. Third, BCE would sought to induce suppliers and other trade creditors to extend favorable credit terms by making public statements of unequivocal support for Teleglobe and the

development of the GlobeSystem. Finally, BCE indicated that it would cause TI to access the

public debt markets for an additional $2.3 billion when conditions warranted.

57. 54. After BCE disclosed its funding plan to the TI board, On June 18, 2000, the

Acquisition Agreement was amended (the "Amendment"). BCE now was obligated to, among

other things, obligate BCE to fund all obligations of TI and its operating division, the TCC

Group, through the Closing. The Amendment provided:

> BCE agrees irrevocably to provide any financial assistance
> required by the Company on or prior to the Closing of the
> Acquisition with respect to all of the Company's spending needs or
> to agree to reduce such needs upon the reasonable [request] of the
> board of directors of the Company (whether or not the BCE
> nominees to the Board of Directors have voted against the making
> of such request). For greater certainty, any breach of the
> Company's covenants under its existing debt obligations shall not
> entitle BCE to terminate the [Acquisition] Agreement.

58. 55. With that commitment in place, BCE convinced TI's lenders to replace the

Existing Bank Facility with a new facility (the "New Bank Facility") and increase the total

borrowings to $1.25 billion. This New Bank Facility, which was due and payable on July 23,

2001, resulted in approximately $500 million of new, additional credit availability for the

GlobeSystem. THUS was either the obligor or guarantor of the entire New Bank Facility.

59. 56. With the BCE funding commitment in place and the Existing Bank Facility

replaced by the New Bank Facility, TI and the Debtors carried out BCE's mandate to continue to

build the GlobeSystem.

*BCE's Long Term Support of the GlobeSystem is Reconfirmed*

60. 57. On August 9, 2000, Boychuk, who then was BCE's Treasurer and TI's CFO,

reported that TI had during the second quarter of 2000 "Teleglobe operated at a loss of $236

million", with a negative EBITDA of approximately $28 million for the second quarter of 2000.

61.    58.—During public meetings held on August 9, 2000 specifically to discuss TI's

second quarter 2000 results, Monty, in Boychuk's presence, stated:

> Let me say at the outset that although it will take a little longer
> thenthan we had originally anticipated to turn around Teleglobe,
> BCE is totally committed to the strategic value of this acquisition.
> We believe that the investment we are making in the company will
> build a stronger Teleglobe with even greater prospects for growth
> and consequently greater value to our shareholders and to BCE
> strategic intent. ...
>
> BCE has the resources to take the challenge [of Teleglobe] on and
> succeed. ...  BCE's consolidated EBITDA is moving towards the
> eight billion dollar level. ...  Our business face can withstand the
> short term rebuilding of Teleglobe.
>
> Teleglobe's contribution to BCE's growth in the coming two to
> three years will be material, attractive and in line with the value we
> have invested to conclude the transaction.  So in conclusion we
> have the management team, the financial resources and the proper
> strategic intent to succeed.

*The Acquisition Closes and BCE Takes Complete Control Over TI and the Debtors*

62.    59.— After the Closing on November 1, 2000, BCE completed the replacement of

the independent directors of TI and the Debtors with its own designees, and BCE assumed total

control of its new investment.  The new board configurations of TI and the Debtors effectuated

by BCE are set forth in Exhibit "C" and incorporated herein by reference.

63.    60—BCE also continued to install BCE–affiliated operating management at

various key positions in the TCC Group, in addition to those installed during the Gap Period, to

control all treasury and merger and acquisition functions, as well as network operations.

64.    61.—The principal control people installed by BCE after the Closing or whose Gap

Period appointments were ratified are as follows:

65.    62.—Michael Boychuk

(a)     Boychuk was appointed TI's Chief Financial Officer and Executive Vice President – Finance on May 31, 2000, positions that he maintained through April 23, 2002, the day before BCE publicly announced that it would cease funding the Debtors.

(b)     On or before November 1, 2000, BCE caused Boychuk to become and remain through April 23, 2002 (1) a director of THUS, Teleglobe Holding Corp. ("THC"), Teleglobe Marine (U.S.) Inc. ("TMI"), Teleglobe Submarine, Inc. ("TSI") and Teleglobe Investment Corp. ("TIC"); (2) President and Treasurer of THUS, THC and TIC, and (3) President and Chief Executive Officer of TMI and TSI

(c)     Boychuk was not an independent director or officer of the Debtors. Boychuk's principal loyalties were to BCE.  On or about January 17, 2001, Boychuk became (and he remained at all relevant times) BCE's Treasurer and Bell Canada's Vice President and Treasurer  Upon information and belief, Boychuk's compensation was at all times determined by BCE and included a salary and perquisites in excess of $300,000/year, as well as participation in BCE's stock option program and pension plan, all of which, upon information and belief, were material to Boychuk's personal lifestyle.

66.    63. Marc Bouchard

(a)     On or about May 17, 2000, Bouchard became President, North American Markets & Corporate Development at TCC.  On August 1, 2000, Bouchard became, and remained through at least January 23, 2002, a director of OTI, TPR, TUSA, THUS, THC and TIC  Bouchard also was TUSA's Executive Vice President and President-North American Markets & Corporate Development during the period August 1, 2001 through February 25, 2002  Prior to joining the Debtors, Bouchard was the President and CEO of Bell Nexxia, another BCE subsidiary.

(b)     Bouchard was not an independent director or officer of the Debtors. His compensation during all relevant times was determined by BCE, and included a salary and perquisites in excess of $300,000/year, as well as participation in BCE's stock option program and pension plan, all of which, upon information and belief, were material to Bouchard's lifestyle.

67.     64.-Boychuk and Bouchard constituted the entire boards of directors of THUS, THC and TIC between November 1, 2000 and January 23, 2002.

68.     65.-Terence Jarman

(a)     Prior to May 2000, Jarman was the Vice Chair of Bell Canada and President of Bell Nexxia. At that time he was tapped by BCE to run TI, TCC and TUSA as theirthe TCC Group, he was appointed President and Chief Executive Officer of TCC and TUSA and continued in those positions through January 23, 2002. Jarman also served as a director of TI between December 2000 and January 23, 2002.

(b)     Jarman was not an independent officer of the Debtors. His compensation during all relevant times was determined by BCE, and included a salary and perquisites in excess of $600,000/year, as well as participation in BCE's stock option program and pension plan, all of which, upon information and belief, were material to Jarman's lifestyle.

69.     66.-Serge Fortin

(a)     Fortin was President of Bell Acti Media, a BCE indirect subsidiary, until May 2000, at which time he became TCC's President, Global Markets. BCE caused him to serve as a director of TCC, TUSA and OTI from August 1, 2000 through February 16, 2002. He also served as a director of THUS, THC, TIC, TMI, TPR, TSI and Teleglobe

Telecom Corp ("TTC") in May 2002, upon information and belief in order to influence how these Debtors were to be liquidated in a manner consistent with BCE's best interests.

(b)    Fortin was not an independent officer or director of the Debtors. His compensation during all relevant times was determined by BCE, and included a salary and perquisites in excess of $300,000/year, as well as participation in BCE's stock option program and pension plan, all of which, upon information and belief, were material to Fortin's lifestyle

70.    67. Stewart Verge

(a)    Verge was a director and officer of TCC and TUSA from August 2000 until January 2002. Upon information and belief, as President – Global Operations, and later Executive Vice President of TCC and TUSA, Verge was responsible for overseeing the construction of the GlobeSystem. He also served as an officer and director of OTI between August 2000 and March 2002, and as a director of TPR beginning in August 2001. Verge began his career in telecommunications with Bell Canada in 1973. He was appointed Group Vice President at Bell Ontario in 1991, and was Vice President-Networks at Bell Canada in 1992

(b)    Verge was not an independent officer or director of the Debtors. His compensation during all relevant times was determined by BCE, and included a salary and perquisites in excess of $300,000/year, as well as participation in BCE's stock option program and pension plan, all of which, upon information and belief, were material to Verge's lifestyle

*BCE and the TI Directors and Officers Exercise Control Over the Debtors, and the Debtors'
Directors and Officers Abdicate Their Responsibilities*

71.    68. BCE''s purpose in purchasing that portion of TI that it did not already own is

not in dispute.  As BCE advised TI's public shareholders in the Management Information

Circular circulated in connection with the Acquisition, BCE rejected alternatives to owning all of

TI and the Debtors because such alternatives "would have made it more difficult for BCE to be

*in full control* of the evolution and development of Teleglobe as a global expansion tool,"

(emphasis supplied added).

72.    69. Through (among other things) its appointment of key officers and directors to

positions on the boards of TI and the Debtors, BCE – and the TI Directors and Officers at the

behest of BCE – exercised actual control over the Debtors for the sole benefit of BCE.

73.    70. For example, in January 2002, prior to the time that BCE withdrew its

financial support for the GlobeSystem, BCE caused TI, which held the registered name and mark

"Teleglobe" on behalf of all the Debtors, to assign all of its registered U.S. and Canadian

trademarks to BCE for consideration of $1.  Defendant Boychuk signed several of the

assignments on behalf of TI.  Although the transaction was reversed after the Chapter 11 Cases

were commenced when the Debtors' management discovered what had happened, the fact that

BCE did, in fact, strip the TI entities of their valuable trademark rights for no consideration is a

clear example of an actual exercise of control over these entities.

74.    71. Another clear example of the exercise of actual control by BCE of TI and the

Debtors is the issuance and then redemption of the Fifth Series Preferred Shares, described

herein.  As alleged in greater detail below, BCE caused TI to utilize TI's tax losses to shelter a

BCE tax gain on the shares of Nortel Networks owned by BCE, at a tax savings to BCE of

approximately $50 million  BCE paid nothing to TI for the use of these tax losses, even though BCE derived tens of millions of dollars of benefit from the utilization of this very asset

75.    72. BCE",s actual control over TI and the Debtors extended not only to beyond attempts to strip away intellectual property and utilization of tax losses for no consideration, but, BCE went so far as to force cause TI and the Debtors to purchase software of another BCE affiliate, BCE Emergis, for approximately $7 million  TI and the Debtors did not need or use this software – indeed, TUSA spent Cdn$5 million on software that it never even removed from the boxes – and the transaction eventually was unwound after the Chapter 11 Cases were commenced, but not before BCE had enjoyed the benefit of higher revenues in its software unit as a result of this exercise of actual control over TI and the Debtors

76.    73. In a similar vein, when BCE determined to sell the holdings in the Excel Companies principally owned by TTC to VarTec, not only did BCE exclusively negotiate the entire transaction, but negotiated for itself, not for TTC, the right to a board seat on the VarTec board of directors as well as a warrant for VarTec common stock  Further, BCE forced caused THUS to forgive intra-company debts due from Excel and to make VarTec TUSA's exclusive carrier for domestic termination of calls for a three year period, even though TUSA was not a party to the sale agreement with VarTec and did not receive any consideration for doing so

77.    74. Perhaps most importantly, after taking control of TI and the Debtors, BCE took control of all central corporate functions, such as treasury, investor relations, and public securities reporting – all functions that previously resided at TI or the Debtors  When BCE determined to terminate its funding, therefore, it did so knowing that the Debtors lacked independent managerial talent, since BCE had transferred or fired virtually all of the Debtors' senior officers

78, 75. Through these and numerous other non-arm's length transactions, BCE and the TI Directors and Officers exercised actual control over the Debtors and their property.

79, 76. While BCE and the TI Directors and Officers assumed and exercised control over the Debtors, each of the Debtors' Directors and Officers breached his fiduciary duties to the Debtors by abdicating his responsibilities with respect to the business and operations of the Debtors, including the funding and continuing build out of the GlobeSystem. For example, the Debtors' corporate minute books reveal that from November 1, 2000, the day BCE took de jure control of the Debtors, through April 24, 2002, the day BCE announced that it would cease its funding, there was only one actual meeting of the board of directors of only one Debtor, with all other board action taken by written resolution. None of those perfunctory resolutions reveal that the Debtors' boards ever investigated, analyzed, or considered the significant issues confronting the Debtors during this period including solvency issues and funding requirements

The Debtors' Directors and Officers and the TI Directors and Officers Fail to Consider Other Options

BCE's Additional $2.5 Billion Commitment

80, 77. On November 1, 2000, the date of the Closing, BCE'sthe written commitment contained in the Amendmentby BCE to fund all of TI's spending needs expired. However, the need for such funding did not disappear with the Closing. As the TI board had recognized several months earlier, the completion of the GlobeSystem project was dependent upon continued funding from BCE – especially after BCE had directed the full draw down of the bank lines available to TI and the Debtors.

78. Nevertheless, the Debtors' Directors and Officers and the TI Directors and Officers continued to cause the Debtors to build the GlobeSystem and incur indebtedness without obtaining an unequivocal written commitment by BCE to see the project through

financially. Moreover, no options other than continuing the build out were ever explored even though the TI and BCE boards had become fully aware that BCE was the only available financing source and BCE had reservations about continuing to fund the project.

81. ~~79.~~ In a January 24, 2001 presentation to TI's new BCE–controlled board, it was reported that more than $4.33 billion would be required to continue building the GlobeSystem in the years 2001 through 2003 – approximately $3 billion for TCC Group's capital expenditures for network build out and the balance to ~~satisfy operating cash flow deficiencies~~fund negative operating cash flows principally attributable to substantial recurring losses.  In 2000 and each quarter of 2001, Teleglobe had substantial losses  More than $682 million in additional funds would be needed in 2001 even after TI and the Debtors fully drew down both the New Bank Facility and the $1 billion previously committed ~~by BCE.~~in writing by BCE (the "$1 Billion Commitment"), as described above.  The financing plan presentation revealed, however, that, "given current market conditions, ... Teleglobe would have difficulty accessing the capital markets this year" and that "[a]ny cash needs in excess of the [New Bank Facility] for 2001 will likely need to be funded by BCE "

82. ~~80.~~ To make matters worse, ~~since~~the New Bank Facility ~~would~~was due to mature in July ~~2001 if~~2001.  Unless it could ~~not~~ be refinanced or extended, TI and THUS ~~potentially would require $1.25 billion to repay the New Bank Facility in addition to the $682 million needed to continue the GlobeSystem.~~ would require an additional $1.25 billion to repay the New Bank Facility.

~~81.     As of November 1, 2000, the Debtors were insolvent or in the zone of insolvency. The Debtors' obligations were mounting, their cash flow was deteriorating, and there was a clear and growing risk that the Debtors' creditors would not be paid  all factors that would have~~

caused any reasonable person who owed fiduciary duties to the Debtors to recognize that the interests of the Debtors' creditors were part of the community of interests that had to be considered. TI's consolidated balance sheet for the period ending December 31, 2000 showed $7.7 billion of total assets, but $5.1 billion of that sum was assigned to goodwill, and the Debtors' assets lacked liquidity. More than $1.8 billion of debt was due to creditors within one year and, as the January 24, 2001 budget showed, the GlobeSystem had a projected cash flow shortfall of $682 million through the end of 2001 with additional financial support required thereafter. If this indebtedness could not be refinanced or extended or if the cash flow deficits for 2001 were not covered, the Debtors would be unable to pay their debts as they became due.

82.    TI's financial performance was not improving and the ability of telecom and internet companies to borrow money was getting worse by the day. Based upon then-current projections, in order to discharge their fiduciary duties to the Debtors, the Debtors' Directors and Officers, and the TI Directors and Officers who assumed control of, and fiduciary duties to, the Debtors, either had to (a) obtain the unequivocal commitment of BCE to fund the GlobeSystem, requiring at least $2.9 billion through 2003 ($4.3 billion less $1.4 billion available under the New Bank Facility and BCE's original $1 billion commitment), plus another $1.25 billion to repay the New Bank Facility if it could not be refinanced in July 2001, or (b) at least develop contingency plans in the event there was insufficient funding from BCE to complete the GlobeSystem.

83.    In violation of their fiduciary duties to consider the best interests of the Debtors' entire body of stakeholders, including their creditors, the Debtors' Directors and Officers, and the TI Directors and Officers who assumed control of, and fiduciary duties to, the Debtors, never performed any independent analysis to determine what was in the Debtors' creditors - not BCE's - best interests. Instead, they made no decisions, took no actions, and abdicated their

duties and followed BCE's directions without question or comment. As a January 24, 2001 presentation to the TI board confirms, "[a]ll financing and Corporate functions, including reporting, have been integrated within BCE."

*BCE's Additional $2.5 Billion Commitment*

83. 84. Three TI directors who also were BCE board members – Monty, Currie and Kierans – attended the January 24, 2001 TI board meeting (these three directors, in addition to Jarman and Steinberg, comprised the entire TI board of directors). Upon information and belief, upon hearingDuring that meeting, these joint BCE/TI board members were presented with a budget that clearly and unequivocally stated that TI and the Debtors required BCE to fund $2.9 billion through 2003 (in addition to the $900 million balance still available under BCE's previous commitment of $1 billion), some or all of these joint BCE/TI board members became increasingly concerned that BCE would not provide that level of funding. These concerns should have, but did not, causean additional $2.5 billion in funding through 2003 and that they expected such funding to come from BCE. Upon information and belief, neither the Debtors' Directors and Officers (and, nor the TI Directors and Officers, (who had assumed fiduciary duties to the Debtors) to at least consider, questioned BCE's funding obligation or considered options other than continuing to build the GlobeSystem for TI and the Debtors. However, since the Excel portion of the budget was apparently "not yet finalized," the approval of the budget for TI and the Debtors was postponed until the next board meeting.

84. 85. Upon information and belief, that same day (January 24, 2001), there was considerable discussion at a subsequent BCE board meeting among the same individuals concerning the financial assistance that TI and the Debtors would need and whether BCE truly was willing to provide it (as BCE publicly was declaring at the time). After discussion, the BCE

board agreed merely to eliminate a pre-existing restriction in the then-existing $1 ~~billion commitment~~ Billion Commitment relating to the period of time during which such commitment could be drawn   ~~No further funding was authorized.  Upon information and belief, at this same BCE board meeting, the BCE board directed that ways be found to minimize BCE's risk regarding the GlobeSystem by reducing the Debtors' cash needs to a level that BCE was willing to support.~~In reality, however, the change was not meaningful, as the TCC Group consumed the funds at a rapid rate as they continued the build out of the GlobeSystem.  Based on the minutes from the January 24, 2001 TI board meeting (later approved by defendants Monty, Currie, Jarman, and Steinberg on February 28, 2001), by such time or shortly thereafter, the BCE board also "agreed . . . to inject . . . by way of equity or quasi-equity sufficient funds [in addition to the balance remaining on the initial $1 Billion Commitment] . . . to meet at all times cash operating shortfalls . . . in funding [the TCC Group's] capital expenditure program . . . ." (the "$2.5 Billion Commitment").

85. ~~86. Upon information and belief, this direction resulted in~~On February 28, 2001, a revised ~~GlobeSystem budget being~~ budget for Teleglobe, including a revised budget for the TCC Group (the "Revised TCC Budget"), was presented to the TI board ~~on February 28, 2001 by the TCC Group (the ".  The~~ Revised TCC Budget") ~~reducing the amount of projected additional support by BCE to $2.5 billion from the $2.9 billion presented just one month earlier.  In all events~~ did not materially alter the projected cash requirements for Teleglobe or GlobeSystem. Moreover, it still indicated that the requisite funding would come from TI's parent corporation, BCE.  In any event, approval and funding of ~~even~~ this Revised TCC Budget would still require an additional $2.5 billion from BCE over and above the $1 ~~billion previously committed by BCE~~ Billion Commitment

86. 87. The TI board, which included Monty and, Currie and Kierans, approved the Revised TCC Budget. Upon information and belief, Monty and, Currie and Kierans would not have approved a Revised TCC Budget requiring $2.5 billion in additional support over and above the previously committed $1 billion absent approval of by BCE of the $2.5 Billion Commitment. As was previously noted, Monty chaired the BCE board and Currie was the BCE "lead" director.

87. 88. When the Revised TCC Budget was approved, the Debtors' Directors and Officers did not express any concerns as to BCE's willingness to fund the Revised TCC Budget. If BCE had conditioned the funding on some basis, then such conditions should have been articulated by Monty and Currie to TI and the Debtors. Any such conditions presumably would have triggered a discussion as to whether the Debtors should continue with the GlobeSystem, or explore other options. Since no such discussions were noted or explored, the only reasonable inference is that BCE had committed to fund an additional $2.5 billion over and above the $1 billion previously committed.

88. 89. When BCE committed to fund the GlobeSystem, that commitment was made both to TI and to the Debtors. The Debtors were responsible for the construction, operation and maintenance of the GlobeSystem, and the Debtors incurred substantial liabilities carrying out BCE's mandate. Moreover, the November 28, 2001 BCE board resolution authorizing the $850 million commitment (see paragraph 106 below)in funding to TI and the Debtors, described below, specifically provided for investment in and financial assistance to TI or any subsidiary thereof. The Debtors were direct parties to the funding agreements with BCE or, at a minimum, the Debtors were intended third party beneficiaries for whose benefit BCE's commitments were made.

The ~~TI Board Takes Further Action Consistent With The Existence Of A BCE~~Actions of BCE, the TI Directors and Officers, and the Debtors' Directors and Officers Demonstrate the Existence Of The Additional $2.5 Billion Commitment By BCE

89.    ~~90.  The TI Directors and Officers' actions were~~A series of actions taken in 2001 by BCE, TI, and the Debtors, together with their respective directors, officers and employees are wholly consistent with and clearly demonstrate the existence of an ~~unequivocal~~a commitment by BCE to fund ~~a total of $2.5 billion through 2003~~ above the $900 million still available under ~~BCE's original $1 billion commitment.  Support for this position is evidenced by the passage of two proposals at the February 28, 2001 TI board meeting.~~TI's and the Debtors' operations through 2003.  A number of these actions could have been taken only if the $2.5 Billion Commitment was already in place.

*The Budget Approval Process*

90.    After the closing of the Acquisition, BCE caused TI and TCC to adopt certain "Schedules of Authorities" pursuant to which their budgets were first to be approved by BCE, then implemented.  TI's Schedule of Authorities, for instance, was passed and adopted at the January 24, 2001 TI Board meeting (by which time BCE had agreed to provide the necessary funding for GlobeSystem, as reflected in the January 24, 2001 TI board meeting minutes).  The TI Schedule of Authorities provides that only the TI Board of Directors had the right to approve the "respective business plans and annual budgets and any modifications thereof (including write-offs and write-downs)" of the Debtors.

91.    This reservation of budgetary power mirrors BCE's Schedule of Authorities, which grants to BCE's Board of Directors the exclusive right to approve business plans and an annual budget for BCE and all of its subsidiaries (including both TI and the Debtors).