92. On February 28, 2001, TI then caused TCC (and the other TI subsidiaries (including the Debtors) who are part of the Teleglobe Communications Group) to adopt a Policy of Authorizations. That Policy of Authorizations provides, with respect to TCC's budget, that:

> the allocation of TCC['s] or the Subsidiary Corporation's assets, credit or finances required to support the action proposed to be taken, or the decision proposed to be made, must be covered by the Corporation's budget for the fiscal period in which the allocation will be accrued, as approved from time to time by the Board of Directors of Teleglobe. ... **For the purpose of determining the level of authority required ... it is the aggregate expenditure over the term of the undertaking that must be taken into account and not merely the portion that will be spent in the current fiscal year.**

(Emphasis added.)

93. TI's and TCC's Revised Budgets, both of which contained a $2.5 billion shortfall, were approved by TI's Board of Directors on February 28, 2001.

94. The Schedule of Authorities system put in place by BCE requires budgets to be reported up the corporate chain from subsidiary to parent, and when approved, from parent to subsidiary, back down the chain.

95. Indeed, consistent with the Schedule of Authorities, and as the above-referenced January 24, 2001 TI Board meeting minutes reflect, "BCE Inc. has agreed ... to inject ... by way of equity or quasi equity sufficient funds ... to meet at all times cash operating shortfalls ... in funding its capital expenditure program as approved by BCE Inc and the Board of Directors of the Corporation."

96. Accordingly, unless they violated the corporate policies of BCE, TI, and TCC, defendants Monty, Currie, Jarman, Steinberg, and Kierans must have received BCE's additional $2.5 Billion Commitment on or before February 28, 2001 in order to have approved a TCC budget in accordance with the Schedule of Authorities quoted above.

*The Redemption of the Third Series Preferred Shares*

97.  ~~91.~~ In advance of the February 28, 2001 meeting, the TI directors (including Monty, Currie and Kierans) received a Purpose and Summary Statement regarding the proposed redemption of TI's Third Series Preferred Shares. Among other things, the Purpose and Summary Statement contained the following information for the directors:

    (a)    the total cost of the redemption of the Third Series Preferred Shares was approximately $126.1 million; and

    (b)    the redemption of the Third Series Preferred Shares was taken into account in TI's business plan and Revised TCC Budget requiring BCE to fund the $3.4 billion (inclusive of the remaining $900 million still available under BCE's original $1 billion commitment).

98.  ~~92.~~ The resolution was supported by a Solvency Certificate dated February 28, 2001, prepared by Boychuk, who, as alleged above, was then TI's CFO, BCE's Treasurer, and a director and officer of several of the Debtors. Boychuk attended the February 28, 2001 TI board meeting as an invited guest, and he was available to answer questions and comment upon the propriety of the proposed redemption. Also in attendance were defendants Bouchard and Verge, who, as noted, were directors of several of the Debtors.

99.  ~~93.~~ Boychuk's Solvency Certificate read as follows:

I, the undersigned, being the Executive Vice President, Finance and Chief Financial Officer of Teleglobe Inc. ("Teleglobe") hereby certify as follows:

    1.   I am familiar with the financial affairs of Teleglobe generally, including its assets, liabilities and stated capital as shown in its balance sheet for the year ended December 31, 2000.

    2.   I am aware of the redemption on April 2, 2001 of all of the 5,000,000 Third Series Preferred Shares of Teleglobe currently outstanding at a price of $25 per share, together with an amount equal to $0.2219 per share representing all preferential dividends payable thereon.

RLF1-~~2746253~~-12898323-4
RLF1-2916525-1

32

> 3. After making reasonable inquiries, I have no reasonable grounds for believing that, for the purposes of Section 36 of the Canada Business Corporations Act:
>
>    (a) Teleglobe is, and following the redemption, will be unable to pay its liabilities as they become due; or
>
>    (b) following the redemption, the realizable value of the assets of Teleglobe will be less than the aggregate of its liabilities and the amount that would be required to pay the holders of shares that have a right to be paid, on a redemption or in a liquidation, ~~rateably~~ratably with or prior to the holders of the Third Series Preferred Shares.

100. ~~94.~~ Implicit in these statements was an acknowledgement that BCE had committed to provide the ~~$3.4~~additional $2.5 billion required to fund the Revised TCC Budget since, without such a commitment, TI would have been "unable to pay its liabilities as they became due." Indeed, the Revised TCC Budget showed that there was going to be a ~~cash-flow~~ funding deficit in 2001 of more than $214 million after full use of the New Bank Facility and the draw down of BCE's $1 Billion Commitment, even assuming that the New Bank Facility in the amount of $1.25 billion coming due in July 2001 could be refinanced or extended. Since the Revised TCC Budget required ~~$3.4~~an additional $2.5 billion of BCE support and the Revised TCC Budget had been approved contemporaneously with the issuance of the Solvency Certificate, either (a) BCE had committed to provide ~~a total of $3.4~~an additional $2.5 billion in support to the GlobeSystem project, or (b) the Solvency Certificate was inaccurate, Teleglobe and the Debtors were insolvent, and the best interests of creditors had to be taken into consideration. Without a committed equity or equity-like infusion of capital to cover build out of the GlobeSystem and operating losses, assets were worth less than liabilities at that time. No new debt was available and no third party had been identified to provide new equity funding.

*The ~~Fifth Series Preferred~~Nortel Shares Transactions*

101. ~~95.~~ The second item approved at the February 28, 2001 TI board meeting involved a transaction whereby BCE transferred ~~to TI~~ Nortel shares with a market value in excess of $500 million to TI in exchange for an allocation of Fifth Series Preferred shares to be issued by TI. After the transfer, TI was directed by BCE to sell the Nortel shares, ~~retract~~BCE requested that the Fifth Series Preferred ~~shares and repay BCE the value of the Nortel shares~~Shares be retracted and TI repurchased the Fifth Series Preferred Shares (hereinafter, collectively, the "Nortel Shares Transactions"). Upon information and belief, BCE's board ~~only could~~of directors should not have approved the Nortel ~~share transaction if it believed that~~Shares Transactions unless TI was solvent and able to pay its debts as they became due. TI only could ~~be~~have been solvent if BCE had committed ~~$3.4~~the additional $2.5 billion in funding described above.

102. ~~96.~~ Moreover, ~~this transaction was~~the Nortel Shares Transactions were undertaken to utilize tax credits that were not otherwise available to BCE. Although it used TI to shelter $50 million of actual tax exposure, BCE did not pay TI anything for this valuable accommodation, nor did the TI Directors and Officers demand reimbursement for the use of these valuable assets.

*~~BCE's Support for GlobeSystem Wanes~~*

~~97. Upon information and belief, while publicly declaring unwavering support for the GlobeSystem in early summer of 2001, BCE already had moved toward a formal decision to cease funding TI and the Debtors.~~

~~98. In its Management Discussion and Analysis for the year ended December 31, 2000 (which was released to the public on April 24, 2001, less than two months after BCE committed to provide $3.4 billion of financing), TI stated as follows:~~

> Management considers that it has sufficient sources of funds from operating activities, unused portions of existing credit facilities, financial support from BCE and access to capital markets to meet its working capital and capital investment requirements, debt repayments and other obligations in 2001 and future years although, without financial support from BCE, the Corporation [TI] would need to re-evaluate its planned capital expenditures and/or seek other sources of financing.

99. The day after that statement was released, Monty publicly stated that BCE was ready to finance the GlobeSystem's capital requirements in 2001 and put BCE's full resources behind TI and the Debtors. During an equity analysts conference call on April 25, 2001 to discuss BCE's quarterly results, the following dialogue took place:

> Q: By Richard Talbot of RBC Dominion Securities
>
> > "I'm wondering to what extent BCE is prepared to fund that [Teleglobe GlobeSystem CAPEX] commitment."
>
> A: By Jean Monty
>
> > "[T]here is no question that we are ready to finance the Teleglobe program.... We will put our resources behind the Teleglobe program.... we didn't come into this business for one or two year payback. We really fully realized all along that this was a long-term payback business."
>
> Q: By Dvai Ghose of CIBC World Markets
>
> > "[O]n a related point with the financing of Teleglobe Jean, are you committed that, should you not be able to find partners to help with the financing, to fund the full, 5 billion of CAPEX on a going forward basis...."
>
> A: By Jean Monty
>
> > "[L]et me reiterate, the capital program is 3.4 not 5 billion [reflecting the reduction directed by the BCE board after the January 24, 2001 board meeting]. ... [W]e are committed to help Teleglobe finance the whole thing. So there is no quivering about that, there's no misunderstanding I hope between all of us, we'll get it done...."

100. By mid-summer 2001, certain lenders under the New Bank Facility requested further confirmation of BCE's continuing commitment to fund the GlobeSystem. In separate letters dated July 12 and July 13, 2001 responding to the lenders' requests, Pierre Van Gheluwe, Bell Canada's Director – Banking, and Siim Vanaselja, Bell Canada's Chief Financial Officer, both reiterated BCE's commitment to GlobeSystem by attaching to the letters transcripts of the April 25, 2001 conference call quoted above.

101. However, upon information and belief, BCE's internal commitment to the GlobeSystem project had started to wane during the summer of 2001. TI's July 13, 2001 Summary Performance Review includes a section entitled "BCE LIQUIDITY OUTLOOK." This liquidity outlook demonstrates that while BCE's high-ranking officers were reaffirming BCE's commitment to the GlobeSystem and accordingly causing the Debtors to incur substantial additional liabilities that they had no way to repay absent BCE's support, BCE had concluded that TI's funding shortfalls created stress on BCE's liquidity outlook. Among other things, the liquidity outlook indicates that:

- Without significant adjustments to TCC requested funding from BCE, BCE will:
  - Exhaust its own credit facilities;
  - Deteriorate its own consolidated and non-consolidated credit ratios;
  - Suffer a ratings downgrade thereby increasing its own debt service costs and possibly reducing access to the capital markets; and
  - Have to raise equity at an inopportune time, resulting in earnings dilution.
- TCC has to trim its 2002 CAPEX by much more and achieve network and growth objectives with far less BCE funding;
- There are other BCE investments that will require substantial funding by BCE; and
- SBC's "put" right to sell back Bell Canada shares directly to BCE at a 25% premium, at a cost of $7-8 billion, was coming due in July 2002.

~~102.   Nevertheless, in late June 2001, BCE made several specific representations to the lenders under the New Bank Facility that were consistent with its public expressions of support and that induced them to extend the New Bank Facility to July 2002.~~

~~103.   For example, upon information and belief, in late June 2001, BCE sent information to the lenders in which it represented that its $1 billion original commitment would not be fully exhausted until the first quarter of 2002. That representation was not consistent with the existing cash flow analyses done by TI or BCE at that time. Indeed, TI's July 13, 2001 Summary Financial & Performance Review reported that based upon TI's cash requirements, remaining BCE committed funding of $526M (under the $1 billion commitment) would be exhausted by the third week in September. These internal projections concluded that BCE would be required to fund $432 million over and above its prior $1 billion commitment during the October through December 2001 time period alone. This was more than double the projected funding shortfall of $214 million contained in the Revised TCC Budget. Accordingly, the shortfall had grown by the time the lenders were induced to extend the New Bank Facility for another year.~~

*~~By November 2001,~~ Low on Cash, TI ~~and~~ and the Debtors ~~are Almost Out of Cash and They~~ Begin to Draw Down ~~on the Additional~~ $2.5 Billion Commitment in November 2001*

103.   ~~104.~~ On October 24, 2001, TI's board formally decided to draw down $75 million of the additional $2.5 ~~billion committed by BCE on February 28, 2001.~~ Billion Commitment. BCE's board authorized the $75 million advance on that same day  By this time, Teleglobe's New Bank Facility ~~was~~ and BCE's initial $1 Billion Commitment were completely drawn down ~~so~~. The $2.5 Billion Commitment was the only source of funds ~~left~~ available to TI and the Debtors ~~was BCE~~

104. ~~105.~~ TI's board of directors reconvened on November 28, 2001 because that additional $75 million advance had been exhausted and TI and the Debtors needed as much as $828 million more to pay for the remainder of TI's and the Debtors' 2001 and 2002 business plans On that same day, BCE's board of directors approved TI's business and financial plan and budget for 2002 and authorized BCE to provide $850 million to TI and its subsidiaries (including the Debtors), approximately $350 million of which was to be spent in December 2001.

105. ~~106.~~ Resolution No. 7 adopted by the BCE board on November 28, 2001 provides, in part:

> THAT, the Corporation be and it is hereby authorized, from time to time on or prior to December 31, 2002, to make investments in and to provide financial assistance to Teleglobe Inc. <u>or any subsidiary thereof</u> ("Teleglobe") (including investments to fund debt service pertaining to Excel Communications, Inc.) or to Bell Expressvu Limited Partnership or any subsidiary thereof ("Expressvu") in amounts not to exceed in the aggregate U S. $850 million in the case of Teleglobe and $400 million in the case of Expressvu (the "Additional Financial Assistance"), the whole as set forth below:
>
> (a) such Additional Financial Assistance may be made by way of acquisition of debt securities, share or partnership units, loans, guarantees, indemnities or any combination of the foregoing, for general corporate purposes including for purposes contemplated by the Budget;
>
> (b) the Corporation be and it is hereby authorized to provide the Additional Financial Assistance directly or through one or more subsidiaries;
>
> (c) if Additional Financial Assistance is provided through a subsidiary or subsidiaries, the Corporation be and it is hereby authorized to purchase shares or debt securities of, to make a loan to or otherwise to provide financial assistance to the said subsidiary or subsidiaries to enable the said subsidiary or subsidiaries to provide the Additional Financial Assistance to Teleglobe or Expressvu; and

   (d) all advances of funds hereunder shall be at such time and upon such terms and conditions as the Chairman and Chief Executive Officer of the Corporation (or any officer designated by such person) may in his/her discretion determine.

(Emphasis supplied).

106. A binding commitment was made, as evidenced by, among other things, BCE's own board minutes approving the $850 million allocation and various reported public statements that admitted this fact, by the Debtors' continued construction of the GlobeSystem in reliance on BCE's commitment, and by TI and the Debtors receiving the first of the committed funds.

*The Failure Of The Debtors' Directors And Officers To Consider Alternatives To The Continuation Of The GlobeSystem Build Out Is Consistent With An Additional Commitment From BCE*

107. ~~(Emphasis supplied). Once again, although BCE unequivocally authorized the $850 million advance to TI and the Debtors, the Debtors' Directors and Officers and the TI~~ The Debtors' Directors ~~and~~ and Officers and the TI Directors and Officers again failed to cause BCE's additional commitment to be reduced to a comprehensive written agreement ~~as~~. By contrast, the independent TI board ~~had required in the summer of 2000. The failure to obtain this type of conclusive commitment was even more egregious in the face of known BCE reservations regarding continued financial support. The~~ required that the Acquisition transaction documents be amended to include BCE's agreement to fund the TCC Group's spending needs through the closing during the summer of 2000. This failure to obtain a written agreement ~~that unequivocally and irrevocably obligated~~, after the closing of the Acquisition and again after November 28, 2001, that documented the unequivocal and irrevocable obligation of BCE to provide the funding necessary for the Debtors' survival constituted a breach of fiduciary duties by the Debtors' Directors and Officers and the TI Directors and Officers, who were in a position of hopeless conflict between their ~~loyalties~~ fiduciary duty of loyalty to the Debtors and their duty

of loyalty to BCE, which for all practical purposes was their real employer; and whose interests were paramount

~~107.   Notwithstanding these breaches of fiduciary duty, a binding commitment was made, as evidenced by, among other things, BCE's own board minutes approving the $850 million allocation and various reported public statements that admitted this fact, and by the Debtors' reliance on BCE's commitment.~~

108.   Not only did the Debtors' Directors and Officers fail to act, in fact, some of the Defendants actively prevented other employees of the Debtors from considering alternatives. For example, in an e-mail dated January 11, 2001, Marc Bouchard castigated a Teleglobe employee who had been investigating the availability of contractor financing for certain GlobeSystem components: "I do not want anyone to be investigating any financing options for Teleglobe. We are financed by BCE. Only Andre Mongrain is authorized to explore financing alternatives. Thanks for you [sic] recommendation. Make sure that we disengage from any further discussions with contractors."

*Public Statements Regarding BCE's Additional $2.5 Billion Commitment*

109.   Like their actions, the words of BCE, TI, the Debtors, and their officers, directors, and employees demonstrate that BCE committed to provide funding to TI and the Debtors through 2003.

*Statements by Jean Monty*

110.   TI's Management Discussion and Analysis for the year ended December 31, 2000 (which was released to the public on April 24, 2001, less than two months after BCE committed to provide the additional $2.5 billion), contains the following boilerplate cautionary language:

> Management considers that it has sufficient sources of funds from
> operating activities, unused portions of existing credit facilities,
> financial support from BCE and access to capital markets to meet

its working capital and capital investment requirements, debt repayments and other obligations in 2001 and future years although, without financial support from BCE, the Corporation [TI] would need to re-evaluate its planned capital expenditures and/or seek other sources of financing.

111. The day after that statement was released, Monty publicly stated that BCE was ready to finance the GlobeSystem's capital requirements in the amount of $3.4 billion (i.e., $2.5 billion more than the $900 million outstanding on BCE's initial $1 Billion Commitment) and put BCE's full resources behind TI and the Debtors. During an equity analysts' conference call on April 25, 2001 to discuss BCE's quarterly results, the following dialogue took place.

> Q. By Richard Talbot of RBC Dominion Securities
>
> "I'm wondering to what extent BCE is prepared to fund that [Teleglobe GlobeSystem CAPEX] commitment."
>
> A. By Jean Monty
>
> "[T]here is no question that we are ready to finance the Teleglobe program.... We will put our resources behind the Teleglobe program ... we didn't come into this business for one or two year payback. We really fully realized all along that this was a long-term payback business."
>
> Q. By Dvai Ghose of CIBC World Markets
>
> "[O]n a related point with the financing of Teleglobe Jean, are you committed that, should you not be able to find partners to help with the financing, to fund the full, 5 billion of CAPEX on a going forward basis...."
>
> A. By Jean Monty
>
> "**[L]et me reiterate, the capital program is 3.4 not 5 billion. ... [W]e are committed to help Teleglobe finance the whole thing.** So there is no quivering about that, there's no misunderstanding I hope between all of us, we'll get it done...."

(Emphasis added.)

112. ~~108. Following the adoption of the funding resolution, Monty stated~~ <u>Even after BCE's support for the GlobeSystem began to wane, as discussed below, and after the Debtors began drawing down funds from the additional $2.5 Billion Commitment, Monty made</u> the following <u>statement</u> at a December 12, 2001 analysts meeting:

> We will have a requirement, 500 million dollars to inject new money into BC – excuse me, into Teleglobe in 2002. It's not 2 billion or 2 ½ billion dollars, as some people have written, but we will have to put some money in the fourth quarter this year, probably about 500 million dollars, over and above the 900 million dollars US that we had talked about... We're talking about 500 this year in the fourth quarter and 500 next year, and 0 thereafter.

113. ~~109. These statements~~ <u>This statement</u> by Monty ~~were~~<u>was</u> well-publicized, as a Merrill Lynch & Co Global Securities Research & Economics Group, High Grade Credit Research Report dated January 18, 2002 stated that "BCE at their analysts meeting in December 2001 reiterated its view that TGO is a long-term strategic operation and <u>committed an additional C$1 bn to finance the completion of TGO's GlobeSystem</u> ~~buildout~~<u>build out</u>" (emphasis added).

114. <u>Monty also wrote to all TCC Group employees, among others, on January 25, 2002, commenting on "Terry Jarman's decision to leave the company." Seeking to reassure the TCC Group employees, Monty wrote:</u>

> <u>BCE's commitment to the success of Teleglobe is no secret. Not only have we allocated the financial resources required to build a leading-edge IP/data network, we have added our name to that of Teleglobe's to further demonstrate the strategic, long-term value of our investment.</u>

*Statements Made In Connection With The Renewal of the New Bank Facility*

115. <u>By mid-summer 2001 (before BCE's support for GlobeSystem started to wane), certain lenders under the New Bank Facility requested further confirmation of BCE's continuing commitment to fund the GlobeSystem. BCE was fully aware that without its unequivocal commitment, the lenders would refuse to renew the New Bank Facility, and TI and THUS would</u>

have to repay $1.25 billion dollars in July 2001. Accordingly, BCE reinforced its public statements by making several specific representations to the lenders under the New Bank Facility for the express purpose of inducing them to extend the New Bank Facility to July 2002.

116. In separate letters dated July 12 and July 13, 2001 responding to the lenders' requests for assurances, Pierre Van Gheluwe, Bell Canada's Director – Banking, and Siim Vanaselja, Bell Canada's Chief Financial Officer, both reiterated BCE's unequivocal $3.4 billion total commitment to GlobeSystem by attaching to the letters transcripts of the April 25, 2001 conference call quoted, in which defendant Monty clearly described BCE's commitment. "[L]et me reiterate, the capital program is 3.4 not 5 billion . . . . [W]e are committed to help Teleglobe finance the whole thing."

117. On June 11, 2001, Michael Sabia, acting in his capacity as President of BCE, met with the Bank of Montreal, the lead bank and arranger of the New Bank Facility. During that meeting, Mr. Sabia told the Bank of Montreal representative that BCE was in Teleglobe "for the long run and [would] deliver on whatever support [was] necessary."

118. Later that month, BCE represented to many of the lenders under the New Bank Facility that its original $1 Billion Commitment would not be fully exhausted until the first quarter of 2002. This representation was made in a document entitled "Teleglobe Bank Syndicate Review – June, 2001" (the "Bank Presentation") which was circulated to the lenders present at a meeting held on June 21, 2001 in Montreal (the "Bank Meeting"). BCE did not inform the banks that this representation was inconsistent with previous and current cash flow analyses done by TI or BCE. Indeed, TI's July 13, 2001 Summary Financial & Performance Review reported that based upon TI's cash requirements, remaining BCE committed funding of $526M (under the initial $1 Billion Commitment) would be exhausted by the third week in