September.    These internal projections concluded that BCE would be required to fund $432 million over and above its initial $1 Billion Commitment during the October through December 2001 time period alone.  In fact, the funding need materialized earlier than expected, in September 2001.  This projected $432 million funding shortfall was more than double the $214 million contained in the Revised TCC Budget approved in February.    In fact, BCE's estimate of the funding shortfall was growing by the time the lenders were induced to extend the New Bank Facility for another year and BCE knowingly provided incorrect projections to the lending syndicate representatives.

119.    In order to satisfy the undeniable funding gaps expected in 2002 and 2003, BCE represented to the lenders that it was considering bringing in an equity partner for Teleglobe. Indeed, the cash flow projections for Teleglobe included in the Bank Presentation indicate contributions by an equity partner of over $1.1 billion in 2002 and over $300 million in 2003. Nevertheless, as memorialized in the contemporaneous notes and internal correspondence of at least *ten* different lenders in attendance at the Bank Meeting, BCE made it clear to the lenders that BCE would make up any shortfall in Teleglobe funding regardless of whether a deal with an equity partner was ultimately consummated.

120.    For example, on a copy of the Bank Presentation produced from the files of Credit Suisse First Boston, handwritten annotations on the cash flow projections equate the contributions to be made by an "equity partner" to a "funding gap." The handwritten notes with respect to these amounts further reads: "just a plug [number].  [I]f it isn't a partner it will be BCE's [money]."  The document also quotes Boychuk reiterating that this information is just "as Jean Monty has clearly indicated in prior calls."  Similar notes were made on the Bank Presentation by ABN Amro, Bank of Nova Scotia, La Caisse Centrale Desjardins du Quebec,

Canadian Imperial Bank of Commerce, Export Development Canada, Laurentian Bank of Canada, and the Royal Bank of Canada.

| Bank | Comments | Source |
|---|---|---|
| ABN Amro | "[T]o extent no new ownership BCE will undertake" written next to expected equity partner contribution | Notes on June 2001 Bank Presentation, p. 38 |
| Bank of Nova Scotia | "Other sources will be sought, but Boychuk says that BCE will continue to support over the long term." "[TI] is fundamental to BCE's strategy short – mid – long term as confirmed by Boychuk → BCE is totally committed to [TI]." | Notes on June 2001 Bank Presentation, p. 34 |
| La Caisse Central Desjardins du Quebec | "New partner anticipate [sic], if not BCE support." | Notes on June 2001 Bank Presentation, p. 38 |
| Canadian Imperial Bank of Commerce | "BCE will fund if no partnerships done." | Notes on June 2001 Bank Presentation, p. 38 |
| Export Development Canada | Expected equity partner injections circled – nearby notes state "Discussions ongoing but nothing firm – if not, BCE will have to." | Notes on June 2001 Bank Presentation, p. 38 |
| Laurentian Bank of Canada | Asterisk added next to "Equity Partner," underneath, "or BCE otherwise" inserted | Notes on June 2001 Bank Presentation, p. 38 |
| Royal Bank of Canada | "If no equity partner, it would be BCE". | Notes on June 2001 Bank Presentation, p. 38 |

The many bankers' contemporaneous notes – most written on the exact same page of a lengthy presentation – provide irrefutable evidence that defendant Boychuk represented to the banks that BCE would provide financial support for Teleglobe (projected to be in excess of $1.4 billion more in 2002 and 2003) if a new equity partner could not be found. Indeed, Boychuk's own handwritten notes state: "How to address outlook for remainder of year? BCE support commitment." It appears that Boychuk intended to make these representations before the meeting started.

121.    BCE's statements to the Banks regarding its commitment to fund Teleglobe were also recorded in the internal documents of several of the lenders. For example, a Citibank representative present at the Bank Meeting, in an e-mail seeking approval of the facility renewal, writes that BCE management "has been intimately involved in this whole process and is committed to support Teleglobe," and that "[t]hey have also gone on record to say that in the event that they do not find another partner to complete the funding plan, they [BCE] will step in and fund Teleglobe themselves." Similarly, a J.P. Morgan Chase banker present at the Bank Meeting recognized that the "primary issue" facing the banks is that Teleglobe's business plan has a "$1.4 billion hole." This banker notes BCE's attempt to alleviate any concern raised by this issue. "BCE has made it clear that they will fully stand behind [Teleglobe] in the event that equity partners are not brought in to fill that gap." A National Bank of Canada report recommends approving the extension, in part because "Teleglobe's parent company has committed to supporting Teleglobe for an additional $860 million, and BCE has also agreed, albeit verbally, to additional funds if necessary above and beyond the U.S. $1 billion already committed."

*Statements Made In The Course Of The Sale Of Excel*

122.    BCE has been named as a defendant in two separate lawsuits arising out of the sale of the assets of TTC (formerly Excel Communications Inc.) to VarTec Telecom, Inc. That transaction closed on April 5, 2002, one business day before BCE announced on April 8 that it was reconsidering its strategic options with respect to Teleglobe. Both complaints include causes of action for fraud, asserting that BCE misrepresented its commitment to Teleglobe in order to close the sale.

123.    VarTec filed the first suit in the Northern District of Texas; the case was subsequently transferred to the District Court for the District of Columbia, where it is still

pending. VarTec Telecom, Inc. v. BCE Inc., C.A. No. ECF 03-2203 (RJL) (D.D.C.). VarTec's First Amended Complaint alleges that VarTec representatives first began discussing the possible acquisition of Excel with BCE representatives in February 2001. Because Excel's business was struggling, VarTec's primary condition for proceeding with the deal was that VarTec not be liable for (and, accordingly, BCE would provide funding for) all Excel liabilities incurred prior to the closing.

124.    The complaint further alleges that VarTec accepted the change in parties in reliance on a number of representations, both public and private, made by BCE representatives regarding BCE's commitment to Teleglobe, and Teleglobe's ability to assume the Excel liabilities. Once the deal closed, and BCE terminated funding to Teleglobe, VarTec was left "holding the Excel bag" and was forced to file its own bankruptcy case.

125.    Smith v. BCE Inc., Civ. Action No. SA 04 CA 03003 XR (W.D. Tex) was commenced in 2004 by Stephen R. Smith ("Smith"), a former Director, Officer, and Employee of Excel. According to Smith's affidavit in opposition to BCE's motion to dismiss, Smith entered into an agreement with Excel in 1989 pursuant to which he was to receive commissions based on revenues generated by a marketing system he developed. Smith left Excel and Teleglobe in November 2000 following the BCE acquisition, but continued to receive commissions based on the 1989 agreement. In March 2001, Smith met with Bill Anderson ("Anderson"), a former CFO of BCE and, at the time, President of BCE Ventures, a subsidiary of BCE. Anderson (who is also a named defendant in VarTec's suit) informed Smith that BCE was negotiating to sell Excel, and needed a release from Smith's 1989 agreement. Anderson and Smith negotiated a $22 million cash buyout. Smith's affidavit states:

> I wanted BCE to guarantee the deal, but Anderson said that BCE
> could not directly guarantee the deferrals because of some clauses

in other loan documents, but that it would have Teleglobe give the guaranty. I told him I was not sure I would take a Teleglobe guaranty since Teleglobe had to raise so much money for the [GlobeSystem]. Anderson then told me that, for no longer than it was going to take for BCE to pay me off, Teleglobe was as good as BCE. He said that although it was not public knowledge, BCE had decided that it was going to support Teleglobe for as long as it took to complete the new network and have it up and running. **He said that BCE had about $16 billion in stock and money in Teleglobe, that BCE was not going to walk away from that kind of investment, and that it was going to put up the money for the [GlobeSystem] even if it took more than the billion or so that it had already committed in writing.** Anderson, as a BCE insider, was certainly in a position to know what BCE's commitment to Teleglobe was at that time, and I accepted what he told me as true.

(Emphasis added.)

126.    Smith's affidavit goes on to state that during the drafting of the guaranty agreement, he was again assured by Anderson that "BCE was 100% behind Teleglobe," and that he did not have to "worry about Teleglobe."

127.    Randall N. Williamson ("Williamson"), Smith's Chief Financial Advisor, was also involved in the negotiations over the guaranty with BCE, and likewise submitted an affidavit in opposition to BCE's motion to dismiss. Williamson states:

Anderson and [Jim] Leung [the senior director of BCE Ventures] knew that BCE's commitment to support Teleglobe was the key factor in the discussions, and they emphasized that Teleglobe had already borrowed billions of dollars from financial institutions predicated upon BCE's commitments for continued support of Teleglobe. They explained those arrangements to us in considerable detail and assured us that Teleglobe had been able to borrow huge sums of money based upon BCE's commitment of continuing support. They told us that the banks were deeply involved in both Teleglobe and BCE, and that they had taken a deep look at BCE's ongoing commitment before agreeing to make Teleglobe the billions of loans that had been made. The assurances that several large lenders had already explored BCE's commitment and found Teleglobe to be creditworthy, along with BCE and Teleglobe's public disclosures, ultimately persuaded me that BCE had committed to support Teleglobe....

128.    In an order dated December 9, 2004, the court denied BCE's motion to dismiss Smith's complaint.

*Statements Made to the Canadian Taxing Authorities*

129.    On March 7, 2002, the law firm of Osler, Hoskin & Harcourt wrote to the Canada Customs and Revenue Agency on behalf of BCE and Teleglobe seeking an advance income tax ruling on a transaction that would effectively permit BCE to use Teleglobe's tax losses to offset income earned by BCE.

130.    The letter, sent approximately one month before BCE announced its intention to reevaluate its options with respect to Teleglobe, acknowledged that "Teleglobe currently has no incremental third-party borrowing capacity, and relies on BCE to provide financial assistance to fund its capital expenditure, working capital and financing cost requirements."

131.    The letter states that "[i]t is anticipated that BCE will advance the Teleglobe Funding to Teleglobe in 2002. Further advances are expected to be made in 2003 and 2004." "Teleglobe Funding" is defined in the letter as "the approximately $850 million that BCE will provide (directly or indirectly) to Teleglobe in 2002 in order to fund its working capital, capital expenditure and financing cost requirements."

*Statements Made to the Quebec Securities Commission*

132.    After Teleglobe filed for bankruptcy protection, the Commission des valeurs mobilieres du Quebec (the "Quebec Securities Commission" or the "QSC"), the Quebec provincial securities regulator with jurisdiction over both BCE and Teleglobe, commenced an inquiry into, *inter alia,* BCE's accounting for Teleglobe's goodwill. The QSC asked BCE to "[p]lease identify the... source for the... injection of capital needed to cover the cash flow deficiencies from 2002 to 2004 on which the forecasts depend." BCE responded as follows:

the injection of capital needed to cover the cash flow deficiencies from 2002 to 2004 was to be in the form of additional equity injection by BCE, Inc. (U.S. $634 million) and additional debt (U.S. $567 million). The additional equity of U.S. $634 million represented an amount that BCE, Inc. had built into its internal budgets and plan, at the time, to support Teleglobe's working capital and debt service requirements in 2002.

133.    As it did with the banks, BCE displayed a willingness to express its commitment to fund in a clear and unambiguous manner, at times when it was in BCE's best interests to do so, even seven months after its termination of funding plunged TI and the Debtors into bankruptcy proceedings.

*Additional Statements Regarding BCE's Commitment*

134.    A number of other statements by TI and Debtor personnel were intended to demonstrate BCE's support to the Debtors' employees, trade vendors, and customers, as well as to the public at large, in order to encourage them to do business with Teleglobe at a time when the telecommunications industry was experiencing difficulties.

135.    For example, in a January 21, 2001 e-mail, Defendant Jarman told scores of the Debtors' increasingly nervous employees that "[f]or our employees and for our customers, BCE represents the stability, financial strength and commitment required to grow our company."

136.    On September 4, 2001, BCE spokesman Don Doucette told the Montreal Gazette that, with respect to Teleglobe's projected $750 million cash shortfall to complete GlobeSystem, "the parent firm will come through. We've been unequivocal in our support for Teleglobe and its strategy . . . despite losses that are not expected to stop until 2003."

137.    In an attempt to land a major new account with Fox Sports on March 1, 2002, Charles Childers, a former BCE employee who replaced Jarman as president of TI and the Debtors, tried to distinguish Teleglobe from financially troubled competitors like Global Crossing by writing that "[m]y company finds itself as one of the few, if not only, financially

strong, growing entities in our segment". To support that statement, he offered to bring BCE's then-second-in-command (now CEO), Michael Sabia, to a meeting with Fox Sports, explaining that "Michael, in effect, is my banker. He runs a $25 billion empire...."

138.    On March 5, 2002, Siim Vanaselja, BCE's Chief Financial Officer, while explaining that BCE would not formally guaranty the New Bank Facility, reiterated to the public that BCE made a Cdn$1 billion commitment (in addition to the earlier $1 Billion Commitment) and "with that incremental one billion Canadian, we should be able to bring Teleglobe to a free cash flow position in 2003."

*BCE's Support for GlobeSystem Wanes*

139.    Upon information and belief, despite repeatedly and publicly declaring unwavering support for the GlobeSystem until April 8, 2002, BCE's internal support for the GlobeSystem project had started to wane during the summer of 2001.

140.    TI's July 13, 2001 Summary Performance Review includes a section entitled "BCE LIQUIDITY OUTLOOK." It demonstrates that while BCE's high-ranking officers were reaffirming BCE's commitment to the GlobeSystem and accordingly causing the Debtors to incur substantial additional liabilities that they had no way to repay absent BCE's support, BCE had concluded that TI's funding shortfalls created stress on BCE's liquidity outlook. Among other things, the liquidity outlook indicates that,

- Without significant adjustments to TCC requested funding from BCE, BCE would,
  - Exhaust its own credit facilities;
  - Deteriorate its own consolidated and non-consolidated credit ratios;
  - Suffer a ratings downgrade thereby increasing its own debt service costs and possibly reducing access to the capital markets, and
  - Have to raise equity at an inopportune time, resulting in earnings per share dilution.

- TCC has to trim its 2002 CAPEX by much more and achieve network and growth objectives with far less BCE funding;
- There are other BCE investments that will require substantial funding by BCE; and
- SBC's "put" right to sell back Bell Canada shares directly to BCE at a 25% premium, at a cost of $7-8 billion, was coming due in July 2002.

141.    In a "Monte Carlo" analysis dated September 26, 2001, which was an analytical tool used to examine numerous future scenarios, two BCE employees (Patrick Pichette and Bernard LeDuc) concluded that "the probability that Teleglobe will generate any positive value by following its business plan is low," and concluded that "it is now prudent to assess ways to scale back Teleglobe growth plans in order to generate more cash, sooner." The analysis advocated "consolidating" Teleglobe's Legacy Voice Business, "scal[ing] back" capital expenditures on its data business, and "mothball[ing]" the e-business unit.

142.    In the fall of 2001, BCE solicited opinions on Teleglobe from several investment banking firms. A November 21, 2001 CSFB presentation concluded that Teleglobe "is not financeable stand alone". Indeed, at the November 21, 2001 meeting at which CSFB presented its conclusions, it recommended that BCE simply "walk away" from Teleglobe. Whether or not BCE should pay Teleglobe's creditors was an "issue" to be discussed. Upon reading this, defendant Boychuk suggested to BCE Chief Financial Officer Siim Vanaselja that "given all assessments maybe we should evaluate walking away from TGO."

143.    A November 26, 2001 Merrill Lynch presentation concluded that "cash flow from operations is not sufficient to cover interest expenses before 2005" and "without continued support of BCE, even the theoretical pro forma capital structure cannot support Teleglobe's business plan." It concluded that "Teleglobe has little or no equity value." Based on Merrill's work, Teleglobe was insolvent or likely so under each of its valuation analyses at that time.

144. When presented with a request for the authorization of $850 million in funding to Teleglobe on November 28, 2001, BCE's board of directors was explicitly told that Teleglobe "[c]annot deliver our longer term (2004+) aspirations" and that "[m]arket conditions dictate that BCE's strategy towards Teleglobe must be focused on risk minimisation [sic], not growth." Nevertheless, BCE's board authorized the $850 million in funding.

*BCE's Attempt Attempts to Rewrite History and Turn the $850 MillionAdditional $2.5 Billion Commitment Into an Unenforceable "Intention"*

145. ~~110.~~ In representation letters dated January 23, 2002 and February 27, 2002 that were provided to Deloitte & Touche LLP ("D&T" or "Deloitte" or "Deloitte & Touche") in connection with its audit of BCE's and TI's 2001 financial statements, TI stated as follows: "In addition, at the CEO conference held December 12, 2001, BCE committed to contribute up to an additional Cdn$1.0 billion to support the working capital and debt repayment requirements of the Company over the next twelve months" (emphasis added). These letters, which were not labeled as drafts, were signed by Messrs. Monty, Boychuk and Skinner (all of whom at the time were senior officers and directors of the Debtors, TI and/or BCE). Skinner explained to Monty that this sentence in the representation letters was necessary because D&T expressed concern over the cash flow situation at TI and asked for representations relating to BCE's financial support of TI. According to D&T, in the absence of such representations, TI financial statements could require a going concern note.

~~111. On March 5, 2002, Siim Vanaselja, BCE's Chief Financial Officer, while explaining that BCE would not formally guaranty the New Bank Facility, reiterated to the public that BCE made a Cdn$1 billion commitment (in addition to the earlier $1 billion commitment) and "with that incremental one billion Canadian, we should be able to bring Teleglobe to a free cash flow position in 2003."~~

146. 112. Some time prior to April 8, 2002, BCE changed its mind regarding the additional $850 million funding commitment  On or about April 8, 2002, BCE negotiated changes to the previously provided representation letters with D&T  On April 8, 2002, the same day that BCE first announced that it would reevaluate its strategic options regarding the TI companiesTeleglobe and its subsidiary, BCE and D&T agreed to make changes to the representation letters in order to make it appear that BCE's $850 million (Cdn$1 billion)additional funding obligation was contingent, rather than firm  The underlined language on the right represents the changes made by BCE:

| Original Section | Revised Section |
|---|---|
| In addition, at the CEO conference held December 12, 2001, BCE committed to contribute up to an additional Cdn$1 0 billion to support the working capital and debt repayment requirements of the Company over the next twelve months. | In addition, at the CEO conference held December 12, 2001, BCE announced its intention to contribute up to an additional Cdn$1 0 billion to support the working capital and debt service requirements of the Company over the next twelve months on the basis that with such support the Company will be able to meet its current business plan. BCE Inc. is not obliged to provide such funding and BCE Inc.'s future funding decisions will be based on the facts and circumstances prevailing at such time. |

147. 113. Similar changes were made by or at the direction of BCE to TI's 2001 Financial Information report, which was originally approved by TI's board on February 28, 2002  Under the heading "Financing Activities," the language underlined in the following passage was added:

> Given that the Corporation's credit facilities are currently fully drawn and that the Corporation is currently generating negative operating cash flows ($39 million in 2001), it relies on BCE, Inc. to provide it additional funding in order to meet its obligations although BCE is not obligated to provide such funding.  The Corporation's obligations consist of capital expenditures

(including, but not limited to, approximately $300 million in 2002 to complete the GlobeSystem network) and the <u>financing of</u> negative operating cash flows <u>which are expected to be significant. On December 12, 2001, BCE Inc. indicated its intention to contribute up to an additional CDN $1 billion to support BCE Teleglobe's working capital and debt service requirements over the next twelve months on the basis that with such support BCE Teleglobe will be able to meet its current business plan. However, any funding decisions by BCE Inc. will be based on the facts and circumstances prevailing at the relevant time.</u> The Corporation's management <u>currently</u> expects that it will be able to renegotiate the extension of the credit facilities that mature in July 2002.

Under the heading "Liquidity, Indebtedness and Dependence on Additional Financing from BCE Inc.," the following underlined language was inserted:  "The Teleglobe Inc. group currently relies on BCE Inc. to provide funding in order to meet its obligations <u>although BCE Inc. is not obligated to provide such funding.</u>"  In addition, one section was renamed and substantially revised.

| Original Section | Revised Section |
|---|---|
| **CONTROL BY BCE INC.** | **PARENT COMPANY** |
| BCE Inc. and its affiliates own all of the outstanding common shares of the Corporation and, subject only to applicable law and the terms of the Teleglobe Inc. group's financial instruments, exercise control over and manage the affairs and operations of the Teleglobe Inc. group | BCE Inc. and its affiliates own all of the outstanding common shares of the Corporation and, subject only to applicable law and the terms of the Teleglobe Inc. group's financial instruments, has the power to exercise control over and to manage the affairs and operations of the Teleglobe Inc. group |
| In particular, all of the officers of the Corporation are also BCE Inc. employees, most of BCE Teleglobe's senior management is comprised of former employees of BCE Inc. or its affiliates and all but one of the members of the Board of Directors of the Corporation are also members of the Board of Directors of BCE Inc. | ~~Through other affiliates, BCE Inc. owns telecommunications assets which can be used to compete with the Teleglobe Inc. group and the interests of any such affiliates may be in conflict with those of the Teleglobe Inc. group.~~ |
| ~~Through other affiliates, BCE Inc. owns telecommunications assets which can be used to compete with the Teleglobe Inc. group and the interests of any such affiliates may be in~~ | |

| ~~conflict with those of the Teleglobe Inc. group.~~ | |

The fact that BCE changed this section by deleting the statement that ~~it~~BCE and its affiliates "exercise~~[d]~~ control over and manage~~[d]~~ the affairs and operations of the Teleglobe Inc. group," ~~because~~is evidence that BCE knew that it would be admitting publicly that it owed fiduciary duties to each member of the group, including the Debtors.

148. ~~114.~~ BCE had decided to cease financing the Debtors and was trying to retreat from ~~previously publicly declared acknowledgements that it had made a~~its acknowledged and legally binding obligation to provide at least $~~850 million~~ (Cdn $1 billion) in additional funding to the Debtors over and above the $1 Billion Commitment, as well as the $2.5 billion committed ~~previously~~by virtue of its actions on February 28, 2001 and thereafter.

149. ~~115.~~ At the same time that BCE decided to "pull the plug" on the Debtors, the Debtors were beginning to achieve significant client acceptance of the GlobeSystem in the marketplace. For example, during late 2001 and early 2002, the Debtors had succeeded in signing important new contracts with, among others, Baker & McKenzie, China Telecom, Cisco, Halliburton and Paramount Pictures.

*Absent An Additional Commitment From BCE, Teleglobe's Fiduciaries Breached Their Duties By Continuing The GlobeSystem Build Out*

150. In violation of their fiduciary duties to consider the best interests of the Debtors' entire body of stakeholders, including their creditors, the Debtors' Directors and Officers, as well as BCE and the TI Directors and Officers who assumed control of, and fiduciary duties to, the Debtors, never performed any independent analysis to determine what was in the Debtors' creditors – not BCE's – best interests. Instead, they made no decisions, took no actions, and abdicated their duties and followed BCE's directions without question or comment. As a

January 24, 2001 presentation to the TI board confirmed, "[a]ll financing and Corporate functions, including reporting, have been integrated within BCE."

151.    While the Debtors' Directors' and Officers' failure to act is consistent with the existence of an additional funding commitment from BCE, BCE's subsequent disavowal of the commitment means that the Debtors' fiduciaries breached their duties in one of two ways. If, as the facts demonstrate, BCE did commit to provide funding, the Debtors' Directors and Officers should have obtained unequivocal written proof of such commitment. On the other hand, if there was no commitment from BCE, as defendants presently contend, then the Debtors' fiduciaries (a group consisting of BCE, the TI Directors and Officers, and the Debtors' Directors and Officers) had, at a minimum, a duty to honestly evaluate the solvency of the Teleglobe group of companies and to consider other options rather than blindly continue to build the GlobeSystem and incur additional indebtedness without identifying a source of financing that would see the construction of the GlobeSystem, and the project, through to completion.

*Teleglobe Was Insolvent or in the "Zone of Insolvency" At All Relevant Times*

152.    At all times pertinent hereto, the Debtors were insolvent or in the zone of insolvency. The Debtors' obligations were mounting, their operating losses and negative cash flow were growing, and there was a clear and growing risk that the Debtors' creditors would not be paid – all factors that would have caused any reasonable person who owed fiduciary duties to the Debtors to recognize that the interests of the Debtors' creditors were part of the community of interests that had to be considered. TI's consolidated balance sheet for the period ending December 31, 2000 showed $7.7 billion of total assets, but $5.1 billion of that sum was assigned to goodwill, which allegedly was recorded on a GAAP basis and did not purport to reflect a fair market valuation, and the Debtors' assets lacked liquidity. More than $1.8 billion of debt was due to creditors within one year and, as the January 24, 2001 budget showed, the GlobeSystem

had a projected cash flow shortfall of $682 million through the end of 2001 with additional financial support required thereafter. If this indebtedness could not be refinanced or extended or if the cash flow deficits for 2001 were not covered, the Debtors would be unable to pay their debts as they became due.

*The Goodwill Overvaluation*

153.   Moreover, even on a GAAP (as opposed to fair market) basis, the $5.1 billion goodwill "asset" originally booked on the Teleglobe, Inc. balance sheet should have been, and was in fact required to have been, written down substantially, if not written off entirely, by no later than February 2001, for at least two reasons.

154.   First, if, as Defendants now contend, there was no commitment by BCE to fund TI's and the Debtors' cash shortfalls, the New Bank Facility would not have been extended in June 2001. Having no way to repay the $1.25 billion that would have been due at the time, TI and the Debtors would undoubtedly have been forced immediately into liquidation, rendering any goodwill on their books worthless. As detailed above, however, BCE understood this, and represented to the banks that it would fund any cash shortfalls, thus inducing the banks to extend the New Bank Facility for another year.

155.   Second, as demonstrated in the following paragraphs, BCE, directly and through its appointees (referred to by BCE as "secundees") at Teleglobe, took extraordinary steps to avoid writing down Teleglobe's goodwill until 2002, when new accounting regulations would permit the charge to be accounted for in a favorable manner. The desire to avoid writing down the goodwill created by BCE's "bubble era" purchase price paid in connection with the Acquisition, constitutes an acknowledgement of BCE's embarrassing overpayment to Teleglobe's former public stockholders. In seeking to avoid embarrassment, the defendant fiduciaries ignored the plaintiffs' solvency, and their duties to creditors. As demonstrated below,

BCE's deception in this regard ran so deep that it was required to make repeated false statements to its local securities regulators after the fact to deflect an investigation into its conclusion that Teleglobe's goodwill should be carried at billions on December 31, 2001, but was practically worthless the next day, January 1, 2002. Any fair analysis of these facts show that Teleglobe was in fact insolvent long before it declared bankruptcy.

156. BCE's acquisition of Teleglobe led to the creation of roughly $5.1 billion (U.S.D.) in goodwill on Teleglobe's financial statements. That amount, in turn, was approximately one half the total amount of goodwill carried on BCE's financial statements for the year ended December 31, 2000.

157. Under applicable accounting principles in force at the time of the Acquisition, BCE was required to assess its goodwill for impairment upon the happening of any one of a number of events which suggested potential impairment of the asset.

158. As early as February 2001, three months after the closing of the Acquisition, BCE's internal accounting staff evaluated Teleglobe's goodwill, and determined that no impairment existed at that time. As discussed above, this conclusion could not have been reasonably reached unless BCE committed to provide additional funding.

159. Thereafter, Anna Coccia, the BCE staff accountant charged by defendant Steven Skinner with assessing Teleglobe's goodwill, appears to have circulated a memorandum internally at BCE identifying six different practical factors which would trigger a further evaluation and potential write down of the goodwill asset on Teleglobe's financial statements (which would, in turn, affect BCE's consolidated financial statements). This memorandum, circulated under an e-mail dated April 6, 2001, stated:

> Examples or circumstances that require goodwill to be reviewed for impairment include, but are not limited to.

1.    A current period cash flow loss combined with a forecast of cash flow losses greater than initially anticipated. In addition, the duration of such cash flow losses will be longer than originally anticipated;

2.    Revenue being significantly lower than previously expected due to changes in technology, loss of customers, increased competition, slower than anticipated deployment of GlobeSystem Network;

3.    Decline in the "voice" margin in consumer long distance due to decreases in rate charges and decrease in volume of traffic greater than originally anticipated,

4.    A deterioration in the market for data and data-related services greater than originally anticipated;

5.    A more likely than not expectation that a reporting unit will be sold. This is in process as we are searching for a minority or majority shareholder for Teleglobe. *Current valuations indicate that a significant loss would be realized,*

6.    Any other than temporary decline in the market value of BCE shares related to Teleglobe.

(emphasis supplied).

160.    By late summer or early fall 2001, virtually every one of the six factors identified by BCE as events which should lead to an immediate review of goodwill for impairment were present at Teleglobe. As the aforementioned memorandum itself recognized, BCE was in the process of searching for a "minority or majority shareholder for Teleglobe" and valuations being performed internally at BCE "indicate[d] that a significant loss would be realized." In addition, then-current market factors made plain that the market for data and data-related services had deteriorated, margins in the Teleglobe "voice" business had declined more than originally anticipated, and revenue and cash flow were sharply lower than had been expected.

161.    As BCE clearly recognized, the accounting rules dictated that the presence of any of these factors should have led to a further evaluation of the goodwill reflected on the financial

statements of Teleglobe and BCE. Notwithstanding that BCE clearly knew of the existence of these factors throughout 2001, and especially by the Fall of 2001, it did not initiate a further evaluation for impairment of the goodwill relating to Teleglobe, as required by U.S. and Canadian Generally Accepted Accounting Principles ("GAAP").

162.    Any impairment to Teleglobe's goodwill during 2001 would have been recorded as a charge to Teleglobe's – and BCE's – net earnings, a result which BCE sought to avoid.

163.    On August 30, 2001, Teleglobe's senior executives conducted a meeting to assess corporate strategy, apparently as part of a larger BCE strategic planning exercise. As part of that exercise, defendant Marc Bouchard, the President, North American Markets & Corporate Development of Teleglobe, who had been "seconded" to Teleglobe by BCE and who had previously served as President and CEO of Bell Nexxia, a BCE subsidiary, made a presentation which valued Teleglobe, on an "enterprise value" basis, based on the then "current outlook" at $2.5 billion (USD) – or substantially less than 1/2 of the enterprise value implied by the goodwill then on Teleglobe's books – effectively signaling that the Company's goodwill needed to be written down dramatically, with a concomitant reduction in BCE's reported net earnings. Even Bouchard's evaluation of enterprise value was inflated and could not be supported absent a commitment by BCE to finance and support the development of the GlobeSystem.

164.    The following week, on September 5, 2001, Bouchard sent a follow up e-mail to defendant Monty and several other of BCE's highest ranking officers, including Michael Sabia (now CEO) and Siim Vanaselja (BCE's CFO). In that e-mail, Bouchard extended the 5 year financial forecast used in connection with the August 30 presentation to 10 years, and arrived at an enterprise value of $3.9 billion (USD) – almost the same amount carried on Teleglobe's books for goodwill alone by year end 2001, after a write down for the failed Excel business unit to

$3.84 billion (USD). Bouchard's presentation on August 30, 2001 and his September 5, 2001 e-mail show that the very highest levels of BCE management certainly knew, by early September 2001, of the need to write down Teleglobe's goodwill by a substantial amount and that the BCE installed management was more than willing to manipulate Teleglobe's numbers to please BCE.

165.    Rather than conduct a formal assessment of goodwill at the time – and despite the obvious "red flags – BCE and BCE's secundees did nothing and continued to allow the Company's financial statements, and those of BCE, to be published showing a massively inflated goodwill asset.

166.    Thereafter, in connection with seeking a Deloitte & Touche "comfort letter" on BCE's fourth quarter 2001 financial statements, BCE's Elie Daher, acting on the instructions of defendant Skinner (Corporate Controller of BCE and TI's Vice President and Controller at the time), had one or more conversations with BCE's outside auditors at Deloitte to determine how best to "prove that an impairment charge is not necessary for 2001" i.e., that Teleglobe's goodwill was not impaired at all.

167.    As a result of those conversations, Daher sent an e-mail memo to certain Teleglobe staff accountants outlining how BCE would "prove" Teleglobe's goodwill in accordance with the techniques pre-cleared by Deloitte.

168.    Specifically, Daher's memo reports that he had discussed with Deloitte & Touche an analysis that would be acceptable to that firm, which relied on management projections over an "industry cycle." Daher, apparently with the concurrence of Deloitte, identified the "industry cycle" as "5 years."

169.    Moreover, although GAAP standards for evaluation of possible goodwill impairment were to change effective January 1, 2002, BCE proposed, and Deloitte accepted, the

most liberal method of evaluating goodwill. Specifically, BCE proceeded by evaluating the asset on an *un*discounted basis. Although GAAP in effect as of January 1, 2002 required discounting projections to present value, and although discounting was permitted under pre January 1, 2002 practice, BCE instead chose simply to sum future cash flows – without discounting – and then add an assumed "terminal value" 10 years into the future, again without discounting to present value.

170.    Using this technique enabled BCE to achieve 'better' results – i.e., higher valuations – simply by increasing the number of years included in the projections. Likewise, the result of using *un*discounted values vastly inflated the then-current value of the asset, since it in no way adjusted for the fact that the cash flow projected to be earned (even if the projection was reasonable, which it was not), would be earned in the future, not currently.

171.    Moreover, the projections used in Daher's year end 2001 goodwill evaluation exercise were *not* the product of Teleglobe management. Instead, these projections were imposed on Teleglobe by BCE. Teleglobe's operating management viewed the BCE imposed "budget" for 2002 as entirely unrealistic and unreachable.

172.    For example, while the BCE imposed "budget" for 2002 called for EBITDA of $150 million, Teleglobe operating personnel had concluded that no more than $60 million in EBITDA was achievable, and repeatedly advised BCE of that conclusion, to no avail.

173.    By mid-September 2001, senior executives at Teleglobe were expressing serious concerns to Bouchard, Jarman and potentially others, that the "budget" for 2002, the same budget later utilized by Bouchard to convince the auditors that no write-down of goodwill was necessary, was unrealistic and not validated with a "bottom up sales forecast."

174.    In the bluntest terms, Teleglobe's Michael Neuman advised Bouchard in September 2001 that early "bottom up" work suggested that Teleglobe would miss its projected 2002 numbers "by a country mile" and that "[E]very manager on the planet will know it [the 2002 budget] is horse[expletive deleted]."

175.    Bouchard's rejection of Neuman's criticism of the 2002 numbers makes clear just how far away from a "bottom up" budget the projections actually were.  He wrote, "[T]he forecasts are heavily haircutted numbers that were extracted from our triangulation exercises" and scolded his colleagues for not expressing dissent in the meeting at which the numbers were "triangulated."

176.    Teleglobe's Neuman responded that he "DID speak up at the point of triangulation" and pointed out, inter alia, that the process being followed was neither ordinary nor appropriate.  Neuman wrote.

> I am not advocating some business approach that is off the wall.  I am advocating an approach wherein we forecast from the ground up instead of top down.  This is a fundamental, normal and widely accepted thing to do...

177.    Indeed, before Christmas, 2001, Teleglobe's senior accounting personnel confronted defendant Jarman, then the CEO of TCC, and explained to him that the 2002 EBITDA projection imposed by BCE was not realistic, and that the "likely" EBITDA target should be $60 million -- 40% of the BCE imposed $150 million EBITDA "budget."  Jarman, who had been copied in September on Neuman's e-mails calling into question the 2002 numbers, was at the time planning to return to his home in Montreal for the Christmas holidays.  He responded to his financial staff's concerns by stating that he planned to visit with Jean Monty (the Chairman and CEO of both BCE and Teleglobe) over the holidays and that he would brief

defendant Monty personally with respect to the likely financial performance of Teleglobe for 2002, and the likely material negative variances expected from the budget.

178. Notwithstanding the foregoing, however, BCE allowed (or directed) Daher to conduct his goodwill impairment evaluation exercise using entirely unrealistic – indeed knowingly bogus – "projections" which were based upon the 2002 EBITDA "budget" of $150 million. Thus, rather than projecting out from a "likely" EBITDA target of $60 million, the numbers Daher used projected from an EBITDA target of $150 million, leading to vastly inaccurate and unreliable results.

179. Even though he used numbers which BCE knew to be greatly inflated and unrealistic, Daher's first attempt to "prove" that Teleglobe's goodwill for 2001 was not impaired failed. When the numbers were run using the 5 year projections that Daher, acting on behalf of BCE, and Deloitte had agreed upon, the result was that Teleglobe's goodwill asset failed the goodwill impairment test, thus necessitating an immediate write down or write off, and a necessary charge to fourth quarter earnings at both BCE and Teleglobe.

180. Undeterred by the facts and unconstrained by any realistic projections, when faced with a failed goodwill impairment evaluation and a necessary write-down or write-off of goodwill, Daher and BCE came up with a facile way around the problem: they simply doubled the period of undiscounted projections that were used to "prove" the value of the goodwill asset from 5 to 10 years. The result, predictably, was that Teleglobe and BCE passed the goodwill impairment test when the inflated 10 year undiscounted numbers were substituted for the inflated 5 year undiscounted numbers.

*Defendant Monty Instructs That Goodwill Not Be Written Down Until Q2 '02*

181.    As noted earlier, by Christmas, 2001, CEO Jarman had planned to visit his superior, Jean Monty, in Montreal to brief him concerning the impossibility of meeting the BCE imposed EBITDA projections for the 2002 calendar year.

182.    Upon information and belief, Jarman did meet with Monty over the 2001 Christmas holiday and advised Monty that the 2002 projections were simply not realistic.

183.    Within days of his return to the U.S. following his meeting with Monty, Jarman "resigned" as an officer of the TCC Group of companies.

184.    At the same time, Daher of BCE was communicating frequently with one or more senior staff accountants at Teleglobe.  When a senior Teleglobe accountant asked Daher what BCE intended to do about writing down Teleglobe's goodwill in connection with the review of BCE's fourth quarter 2001 financial statements by Deloitte & Touche, Daher responded that the account would be written down, but that Monty "didn't want to deal with this until the second quarter of 2002."

185.    Upon information and belief, Monty, or other members of BCE senior management acting on his behest having learned that Teleglobe's goodwill would have to be written down, instructed BCE personnel to avoid a write down of goodwill at year end 2001. Daher, who was ultimately responsible for performing the accounting analysis, complied with senior management's direction, even though it meant relying on patently unreasonable and unachievable projections and, eventually, doubling the period of projections upon which he agreed with Deloitte.

186.    BCE's instruction to defer recognizing the immediately required write down of Teleglobe's goodwill until mid-2002 was highly improper.  BCE, however, had a clear motive to give this instruction:  if Teleglobe's goodwill was written down as a result of year end 2001

analysis, the charge would negatively impact BCE's reported earnings. If Teleglobe's goodwill was left intact and then written down under the new accounting regulations which went into effect on January 1, 2002, however, the charge could be recorded to retained earnings and accounted for as a "change in accounting policy" under Canadian GAAP (where BCE was incorporated) and would be reportable as a non-recurring one-time charge under U.S. GAAP, which is precisely what happened.

*Bouchard Covers Up The Truth, Then Meets With Deloitte and "Sells" Them The 10 Year Projections*

187.    BCE's scheme to avoid a charge to its net earnings as a result of a massive write down of Teleglobe's goodwill account still had to clear one hurdle – the outside auditors at Deloitte.

188.    Overcoming that hurdle fell to defendant Bouchard, whose task was to convince the auditors that Teleglobe was worth more than its $3.84 billion goodwill asset – even though he had reported to his colleagues and superiors at BCE that *months* before, the entire company was worth only $2.5 billion based on the outlook for the company that existed at August 30, 2001.

189.    Bouchard was not the only one who knew just how difficult a task it would be to convince the auditors not to require an immediate write down of Teleglobe's goodwill. Indeed, one of the Teleglobe accounting staff, in transmitting by e-mail the projections that Bouchard would use with the auditors, wrote (in French) to his colleague that Bouchard would "play" with the numbers and attempt to get them "as high as possible" prior to his meeting with the auditors.

190.    Apparently recognizing just how difficult his task would be, Bouchard took the extraordinary step prior to his January, 2002 meeting with the auditors of putting a stop to a customary "bottom up" budgeting exercise which was at first requested and then directed by

Andre Mongrain, the Senior Vice President – Finance at TCC. In short, knowing that a "bottom up" budget built around the projections of each operating unit in the field would not come anywhere near the BCE - imposed "top down" budget, Bouchard attempted to stop the "bottom up" budgeting process from going forward, although – as pointed out months before by other Teleglobe executives – it was both appropriate and customary for Teleglobe's budget to be validated through such a process.

191.    When Mongrain learned that Bouchard was refusing to allow his staff to conduct a "bottom up" budgeting process, he nonetheless instructed his staff accountants to proceed to gather the data necessary to create such a budget. Mongrain directed the employees to proceed in a manner which did not alert Bouchard to the fact that they were proceeding with the budgeting process which Bouchard had attempted to halt.

192.    Bouchard, however, learned of Teleglobe's continuing attempts to validate the BCE imposed numbers with "real" projections when a field operative advised him that Mongrain's staff was collecting such data. Aware that a "bottom up" analysis would destroy his attempt to sell the auditors on the BCE - imposed "top down" numbers, Bouchard reacted in anger and threatened to fire one of the employees who was carrying out Mongrain's directive.

193.    Bouchard's heavy-handed threats were effective. Mongrain and the internal accounting staff at Teleglobe put on hold attempting to validate the BCE imposed budget for fear of losing their jobs. Having squelched the attempt to create actual projections, and apparently having "played" with the numbers to get them as high as possible before his meeting with the auditors, Bouchard went about carrying out his task by presenting to Deloitte a 10 year series of projections which were not only wrong, but lacked management support at Teleglobe.

194.    Bouchard was persuasive:  he "sold" the auditors on the idea that Teleglobe's goodwill was not impaired, notwithstanding his prior, less inflated analysis of more than four months earlier clearly signaling that a massive write down – in the billions of dollars – was necessary.  Bouchard's manipulations and deception achieved the desired objective.  BCE was not required to "take the hit" to earnings in 2001 and continued to report $3.84 billion of goodwill attributable to Teleglobe on both BCE's and Teleglobe's financial statements.

195.    BCE then rushed to publicize its 2001 fourth quarter and year-end results, announcing both in a detailed press release dated January 23, 2002, the day after Bouchard's presentation to the auditors.

*Having Avoided The Write Down of Teleglobe's Goodwill for 2001, Teleglobe Then Concludes That Its Goodwill Is Impaired By Billions Of Dollars*

196.    BCE, at its highest levels, was well aware that implementing the new accounting rules related to goodwill was likely to result in a significant, indeed, massive write off of Teleglobe's goodwill.  As early as September 25, 2001, in a memo to various officers and employees of BCE and several key BCE subsidiaries, Stephen Skinner, who became BCE's Corporate Controller just a few days later, wrote that the "implementation of the new accounting rules relating to goodwill…impacts almost every business segment of BCE and could potentially have a material impact for those units, *as well as for BCE.*"  (emphasis supplied).

197.    The goodwill impairment evaluation that Bouchard sold the Deloitte auditors in early January, 2002 regarding Teleglobe's goodwill for 2001 was conducted, as explained above, by combining vastly inflated projections with the most liberal possible interpretation of the accounting rules then in effect.  Effective January 1, 2002, however, both U.S. and Canadian accounting rules changed to require a "transitional impairment" test of goodwill, utilizing *discounted* cash flow methodology, rather than the previously sanctioned *un*discounted method.

Thus, rather than simply sum Teleglobe's undiscounted future cash flows, Teleglobe was now required to discount those cash flows to present value utilizing an appropriate discount rate, a commonly accepted corporate valuation technique.

198. Utilizing this methodology as at January 1, 2002, BCE concluded that Teleglobe's goodwill was almost entirely worthless, requiring a write-off of the entire asset. Thus, BCE took the position that as of December 31, 2001, Teleglobe's goodwill was properly accounted for at $3.84 billion (USD) and that the very next day, January 1, 2002, it was virtually worthless.

199. In an effort to save trouble and expense, Daher determined to use the *same* projections for both the 2001 goodwill impairment evaluation and the "transitional impairment" exercise conducted as of January 1, 2002. However, rather than consistently use the 10 year projections used to "sell" Deloitte on the idea that goodwill was not impaired as of December 31, 2001, when the exercise was performed under the accounting rules in effect on the following day, Daher and his BCE team utilized only 7 years of projections. Thus, when the goal was to inflate the indicated value of the goodwill asset to avoid a write down, BCE sold its auditors on doubling the period of undiscounted projections it would use. A day later, when it was clear that a write-down would be required, BCE determined to shorten the period of projections used, apparently to increase the size of the write-down necessary, thus enabling them to argue that the massive loss resulting from that write down was attributable to a "change in accounting policy."

200. Since the projections on which the goodwill impairment evaluation was based were in existence by the third quarter of 2001, the only other data point necessary to perform the discounted cash flow analysis on Teleglobe was the "discount rate", which was derived using a customary "weighted average cost of capital" approach. By late 2001 or early 2002, Daher of BCE knew that the discount rate to be used in performing the discounted cash flow analysis was

to be somewhere between 15% and 17%. In fact, the discount rate that was eventually chosen to perform the calculation was at the highest end of the range, i.e., 17%, again consistent with the idea that BCE would take the largest possible "hit" as a result of the transitional impairment test.

201.    Curiously, however, even though BCE was aware of at least the narrow range of discount rates that would be used to run the Teleglobe goodwill transitional impairment test, and could have disclosed publicly a range of potential write-downs from early January 2002 at the latest, BCE instead determined to represent to the market that it "has not yet completed the assessment of the quantitative impact" of the test on its financial statements.

*BCE's Goodwill Accounting Is Investigated By The Quebec Securities Commission, And BCE Thwarts The Investigation With False Representations*

202.    REDACTED

203.    REDACTED

204.    REDACTED

205.    REDACTED

206.    REDACTED

207.    REDACTED

208.    REDACTED

209.    REDACTED

*Monty Appoints A "Kitchen Cabinet" To Get An Unbiased Look At Teleglobe--Then Proceeds To Ignore His Advisors' Conclusion*

210.    In early March, 2002, it was rapidly becoming clear within BCE that BCE was moving inexorably towards a decision to abandon its investment in Teleglobe.

211.    In an effort to secure a last, unbiased look at the situation from seasoned executives, each of whom harbored no particular prejudice as to what should be done, Defendant

Monty sought out the advice of three senior retired or semi-retired BCE executives on how best to proceed.

212.    These three senior executives, led by BCE's Pierre Lessard, and described by Monty as his "kitchen cabinet", had many years of experience in network building, finance and operations. The three began work immediately upon their appointment and met frequently as a group and with defendants Monty and Sabia to discuss Teleglobe, learn about financial and other parameters circumscribing their work, and to present their views.

213.    Although Monty appointed the "kitchen cabinet" he never told Lessard and his colleagues of the BCE board action of just a few months earlier, which had authorized an additional $850 million for Teleglobe, or that more than $500 million was still available to Teleglobe under that resolution.

214.    Instead, Monty's "kitchen cabinet" worked under the incorrect assumption that only $100 million -- not the $500 million left of the $850 million previously committed by BCE -- was available to Teleglobe.

215.    Notwithstanding this incorrect assumption, which severely handicapped their work, the "kitchen cabinet" came to a unanimous conclusion and submitted that conclusion, in writing, to Monty. BCE should *not* walk away from Teleglobe because, among other things, doing so would dispose of the asset at the very bottom of the market.

216.    Monty received the Lessard group's written report, thanked Lessard for the group's hard work, then proceeded to ignore the advice that his hand-picked group of industry experts had delivered.

*The Directors' and Officers' Fiduciary Duties Are Finally Are Discussed*

217.    116. On April 23, 2002, the TI and BCE boards held a series of late day meetings In the presentation materials for the 4:30 p.m. TI meeting, the subject of fiduciary duties of the

TI Directors and Officers finally was raised – nearly a year and a half after the closing of the Acquisition and on the eve of bankruptcy. The TI Directors and Officers were provided with a tutorial as to their duties and liabilities. The presentation materials questioned whether individuals should be serving on more than one board:

> At this _early_ state, all Directors should participate in the process, although they must be careful to act only in the best interest of the Company and without regard to interests they may have in other capacities ... [and] continued participation of cross-directors should be reconsidered going forward.

(~~emphasis~~Emphasis added.)~~.~~

Five of TI's six directors immediately resigned from the TI board. The resigning directors – Currie, Kierans, Monty, Michael Sabia, and Anthony Fell – all were serving concurrently as officers and/or directors of BCE. Simultaneously, Boychuk (who attended the presentation on fiduciary duties) resigned his positions with TI and the Debtors.

218.    ~~117.~~ BCE's board then convened at 6.30 p.m. in the very same room and Monty immediately resigned from BCE. The board accepted the resignations of TI's directors and two new TI directors were appointed. Finally, the BCE board "determined that it is no longer in the Corporation's interest to provide long term support to Teleglobe, but that it is appropriate to provide for a limited amount of weekly funding to assist Teleglobe in providing continuing customer service while it reviews its options for the future," and approved a press release to that effect. Even this limited funding was an act of self-interest, as BCE conditioned the funding on its ability to control the wind down of the Debtors' network for BCE's benefit.

219.    ~~118.~~ TI's new board then met at 11:00 p.m. to discuss options. They approved a funding request to BCE and a press release stating that "the Company is now pursuing a range of financial restructuring alternatives, potential partnerships and business combinations." Upon

information and belief, one of the conditions for BCE's continued short term support was the commencement of the Canadian insolvency proceedings, which was undertaken in short order.

220. 119. BCE's press release announcing the abandonment of the GlobeSystem and the termination of funding was issued on April 24, 2002. In an interview published by the *Globe and Mail*, Monty was reported to have said that he was swept away by the pervasive excitement about the global potential of data transmission, and by overexuberance in wanting to deliver long term growth to BCE. This, of course, explains BCE's purchase price for Teleglobe and the enormous balance sheet goodwill created by that purchase.

221. 120. While Monty and BCE were bemoaning their supposed irrational exuberance, the Debtors were drowning in the debt that BCE had forced them to incur in order to carry out BCE's grand vision. The inevitable result – bankruptcy – came quickly, and the Debtors promptly were dismantled in a forced sale of assets. After the dust had settled, all that BCE had accomplished was to substantially cause and/or deepen the Debtors' insolvency.

222. 121. Ironically, although BCE's precipitous and unexpected decision to back out of its funding commitment guaranteed the swift and sudden demise of the Debtors, BCE was able to benefit from its own wrongdoing. As reported at page 44 of BCE's 2003 Annual Report:

> On December 31, 2002 ... we sold all of our common and preferred shares in Teleglobe to the court-appointed monitor for a nominal amount. The sale triggered approximately $10 billion of capital losses for tax purposes. We recorded a gain of $1,042 million, relating mainly to the tax benefit from:
>
> - reinstating non-capital loss carryforwards that were previously used to offset gains incurred on the transactions related to the disposition of the Nortel common shares in 2001
>
> - applying a portion of the capital losses against the gain on the sale of the directories business in 2002.

In addition, by selling its stock to reap these advantages, BCE also deprived Teleglobe of any value in its net operating loss carryforwards ("NOLs"), which could have been a source of value to creditors if BCE took steps to help Teleglobe preserve that value.

223.    ~~122.~~ Thus, at the same time that BCE"s decision to walk away from its funding commitment to the Debtors led to the loss of more than 1,800 jobs and the wholesale destruction of a business which was gaining market acceptance and momentum, BCE, for its part, actually was able to book a billion dollar gain to its accounts

224.    ~~123.~~ The Debtors are pursuing the claims asserted herein against BCE (except for the aiding and abetting claim against BCE, which is being pursued by the Committee) and the Committee is pursuing the claims asserted herein against the TI Directors and Officers and the Debtors' Directors and Officers   To the extent that there is any inconsistency in the causes of action alleged below, those causes of action are alleged in the alternative

## AS AND FOR A FIRST CAUSE OF ACTION
### (Breach of Funding Commitments Against BCE)

225.    ~~124.~~ The Debtors repeat and reallege the allegations set forth above

226.    ~~125.~~ BCE made enforceable agreements with the Debtors, or with TI with the Debtors as third party beneficiaries, to provide sufficient funding to enable the Debtors to meet their cash needs through 2003

227.    ~~126.~~ The Debtors (and TI) performed all of their obligations under the agreements

228.    ~~127.~~ BCE breached the agreements in a material way

229.    ~~128.~~ The Debtors were harmed by BCE's breach of the agreements

230.    ~~129.~~ By reason of the foregoing, the Debtors are entitled to judgment against BCE in an amount to be proven at trial

## AS AND FOR A SECOND CAUSE OF ACTION
### (Estoppel Against BCE)

231.    ~~130.~~ The Debtors repeat and reallege the allegations set forth above.

232.    ~~131.~~ BCE made promises to fund the Debtors' cash needs through the completion of the GlobeSystem, upon which promises BCE reasonably expected the Debtors to act in reliance on and in a definite and substantial character.

233.    ~~132.~~ From June 2000 through April 2002, the Debtors irrevocably changed their positions in reliance upon BCE's promises. BCE's promises induced the Debtors to continue to build the GlobeSystem at substantial cost and expense, to incur substantial debts, and irrevocably to change their business model to the exclusion of other options, making them totally dependent on BCE until the completion of the GlobeSystem.

234.    ~~133.~~ BCE broke its promises to the Debtors when it precipitously terminated its ongoing funding, leaving the Debtors with no alternative but to file for bankruptcy.

235.    ~~134.~~ Injustice only can be avoided by the enforcement of BCE's promises.

236.    ~~135.~~ By reason of the foregoing, BCE is estopped to deny that it committed to fund the Debtors through the completion of the GlobeSystem.

237.    ~~136.~~ The Debtors were harmed by BCE's conduct.

238.    ~~137.~~ By reason of the foregoing, the Debtors are entitled to judgment against BCE in an amount to be proven at trial.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Misrepresentation Against BCE)

239.    ~~138.~~ The Debtors repeat and reallege the allegations set forth above.

240.    ~~139.~~ BCE represented that it would fund the Debtors' cash needs through the completion of the GlobeSystem. BCE intended that the Debtors would act on those representations.

241. ~~140.~~ BCE made untrue statements of material fact and failed to state material facts in order to make its prior statements not misleading. BCE made these statements with the intent to mislead the Debtors or with reckless indifference as to the truth thereof, or in a negligent manner.

242. ~~141.~~ The Debtors justifiably relied on BCE's misrepresentations to their detriment.

243. ~~142.~~ The Debtors were harmed by BCE's misrepresentations.

244. ~~143.~~ By reason of the foregoing, the Debtors are entitled to judgment against BCE in an amount to be proven at trial.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Breach of Fiduciary Duty Against BCE)

245. ~~144.~~ The Debtors repeat and reallege the allegations set forth above.

246. ~~145.~~ As ~~of no later than~~ early as November 1, 2000 and at all times thereafter, the Debtors were insolvent and/or in the vicinity of insolvency.

247. ~~146.~~ As of no later than November 1, 2000, BCE assumed and exercised actual control over the Debtors. By doing so, BCE assumed fiduciary duties to the Debtors and their creditors.

248. ~~147.~~ BCE breached its fiduciary duties by acting only in the interest of BCE at a time when the Debtors were insolvent and/or in the vicinity or zone of insolvency.

249. ~~148.~~ The Debtors and their creditors were harmed by BCE's breaches of fiduciary duty.

250. ~~149.~~ By reason of the foregoing, the Debtors are entitled to judgment against BCE in an amount to be proven at trial.

### AS AND FOR A FIFTH CAUSE OF ACTION
### (Breach of Fiduciary Duty Against the Debtors' Directors and Officers)

251. ~~150.~~ The Committee repeats and realleges the allegations set forth above.

252. ~~151.~~ As ~~of no later than~~ early as November 1, 2000 and at all times thereafter, the Debtors were insolvent and/or in the vicinity of insolvency.

253. ~~152.~~ The Debtors' Directors and Officers owed fiduciary duties to the Debtors and their creditors

254. ~~153.~~ The Debtors' Directors and Officers breached their fiduciary duties by consciously and intentionally abdicating their duties and by acting only in the interest of BCE at a time when the Debtors were insolvent and/or in the vicinity or zone of insolvency.

255. ~~154.~~ The Debtors and their creditors were harmed by the Debtors' Directors and Officers' breaches of fiduciary duty.

256. ~~155.~~ By reason of the foregoing, the Committee is entitled to judgment against the Debtors' Directors and Officers in an amount to be proven at trial

### AS AND FOR A SIXTH CAUSE OF ACTION
### (Breach of Fiduciary Duty Against the TI Directors and Officers)

257. ~~156.~~ The Committee repeats and realleges the allegations set forth above.

258. ~~157.~~ As ~~of no later than~~ early as November 1, 2000 and at all times thereafter, the Debtors were insolvent and/or in the vicinity of insolvency.

259. ~~158.~~ As of no later than November 1, 2000, the TI Directors and Officers assumed and exercised actual control over the Debtors  By doing so, the TI Directors and Officers assumed fiduciary duties to the Debtors and their creditors

260. ~~159.~~ The TI Directors and Officers breached their fiduciary duties by consciously and intentionally abdicating their duties and by acting only in the interest of BCE at a time when the Debtors were insolvent and/or in the vicinity or zone of insolvency.

261.    160.  The Debtors and their creditors were harmed by the TI Directors and Officers' breaches of fiduciary duty

262.    161.  By reason of the foregoing, the Committee is entitled to judgment against the TI Directors and Officers in an amount to be proven at trial.

### AS AND FOR A SEVENTH CAUSE OF ACTION
### (Aiding and Abetting Breaches of Fiduciary Duty Against
### BCE and the TI Directors and Officers)

263.    162.  The Committee repeats and realleges the allegations set forth above.

264.    163.  BCE knowingly aided and abetted the breaches of fiduciary duty committed by the Debtors' Directors and Officers and the TI Directors and Officers   In addition, the TI Directors and Officers themselves knowingly aided and abetted the breaches of fiduciary duty committed by the Debtors' Directors and Officers.

265.    164.  The Debtors and their creditors were harmed by BCE's and the TI Directors and Officers' conduct

266.    165.  By reason of the foregoing, the Committee is entitled to judgment against BCE and the TI Directors and Officers in an amount to be proven at trial.

**WHEREFORE,** Plaintiffs demand judgment against defendants as follows:

    a.    for damages in such amount as may be proven at trial;

    b.    for the costs and attorneys' fees of prosecuting this action;

    c.    for pre -and post -judgment interest; and

    d.    for such other and further relief as may be just and equitable in the circumstances

Dated:   Wilmington, Delaware
        May 26, 2004August_____, 2005

AS TO THE FIRST, SECOND, THIRD AND
FOURTH CAUSES OF ACTION

**RICHARDS, LAYTON & FINGER, P.A.**

By:_____
Gregory V. Varallo (No. 2242)
~~Mark D. Collins (No. 2981)~~
~~Robert J. Stearn, Jr. (No. 2915~~C. Malcolm
Cochran IV (No. 2377)
Russell C. Silberglied (No. 3462)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701
Attorneys for Teleglobe Communications
Corporation, et al.

AS TO THE FIFTH, SIXTH AND SEVENTH
CAUSES OF ACTION

**ROSENTHAL, MONHAIT, GROSS &
GODDESS, P.A.**

By:_____
Kevin A. Gross (No. 209)
Joseph A. Rosenthal (No. 234)
1401 Mellon Bank Center
P.O. Box 1070
Wilmington, Delaware 19899-1070
Telephone:  (302) 656-4433
Facsimile:  (302) 658-7567

- and -

**HAHN & HESSEN LLP**
John P. Amato
Mark S. Indelicato
Zachary G. Newman
Jeffrey L. Schwartz
488 Madison Avenue
New York, New York 10022
Telephone:  (212) 478-7200
Facsimile:  (212) 478-7400
Attorneys for the Official Committee of
Unsecured Creditors of Teleglobe
Communication Corporation, et al.

Document comparison done by DeltaView on Tuesday, August 02, 2005 12:40:08 PM

| Input: | |
|---|---|
| Document 1 | iManageDeskSite://IM-DMS1/RLF1/2746253/1 |
| Document 2 | iManageDeskSite://IM-DMS1/RLF1/2898323/4 |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 505 |
| Deletions | 333 |
| Moved from | 63 |
| Moved to | 63 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 964 |