# EXHIBIT 1

1

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

- - -

```
In re                            :      Chapter 11
                                 :
TELEGLOBE COMMUNICATIONS         :      Jointly Administered
CORPORATION, et al.              :      Bankruptcy Case No.
                                 :      No. 02-11518 (MFW)
          Debtors.               :
---------------------------------:
TELEGLOBE COMMUNICATIONS         :      CIVIL ACTION
CORPORATION, et al.,             :
                                 :
          Plaintiffs             :
                                 :
          v.                     :
                                 :
BCE INC., MICHAEL T. BOYCHUK,    :
MARC A. BOUCHARD, SERGE FORTIN,  :
TERENCE J. JARMAN, STEWART VERGE,:
JEAN C. MONTY, RICHARD J. CURRIE,:
THOMAS KIERANS, STEPHEN P.       :
SKINNER, and H. ARNDOLD          :
STEINBERG,                       :
                                 :
          Defendants             :      NO. 04-1266 (SLR)
```

- - -

Wilmington, Delaware
Wednesday, August 10, 2005
5:03 o'clock, p.m.

- - -

BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge

- - -

Valerie J. Gunning
Official Court Reporter

Multi-Page™

```
 1   APPEARANCES:

 2        RICHARDS, LAYTON & FINGER, P.A.
            BY:  GREGORY V. VARALLO, ESQ.,
 3               C. MALCOLM COCHRAN, IV, ESQ.,
                 ANNE SHEA GAZA, ESQ. and
 4               CHAD SHANDLER, ESQ.

 5        Counsel for Teleglobe Communications
            Corporation, et al.

 6

 7        ROSENTHAL, MONHAIT, GROSS & GODDESS, P.A.
            BY:  KEVIN A. GROSS, ESQ.
 8

 9             Counsel for the Official Committe
                  of Unsecured Creditors
10

11        YOUNG, CONAWAY, STARGATT & TAYLOR LLP
            BY:  JOHN W. SHAW, ESQ.
12

13             -and-

14        SHEARMAN & STERLING LLP
            BY:  GEORGE J. WADE, ESQ.,
15               JAQULIN AARON, ESQ.,
                 DANIEL SCHIMMEL, ESQ.
16               (New York, New York)

17             Counsel for Defendants

18   - - -

19   ALSO PRESENT:  DIANE BARRASSO, P.H. D.,
                     BARRASSO CONSULTING
20
               - - -
21

22

23

24

25
```

```
 1
 2        PROCeeDINGS
 3
 4        (Proceedings commenced in the courtroom,
 5   beginning at 5:03 p.m.)
 6
```

7    THE COURT: Good afternoon.

8    MR. VARALLO: Good afternoon, your Honor.

9    THE COURT: I guess the question is whether there
10   are issues other than the issues that you sent me papers
11   about. I'm ready to address those, but if there are others,
12   why don't we address those first.

13   MR. VARALLO: Certainly, your Honor. I
14   understand the papers' issues concerns privilege assertions.
15   We also have discrete e-document issues and a request for
16   assistance from the Court relating to a few narrow
17   depositions.

18   Is my understanding correct, your Honor?

19   THE COURT: Well, I have the electronic data
20   issue. I don't know whether I have the documents on the
21   privilege assertions or not. Maybe I do. What were those
22   documents?

23   MR. VARALLO: Perhaps I can be helpful, your
24   Honor.

25   THE COURT: Okay.

1    MR. VARALLO: There was a motion to compel briefs
2    back in February and March and at the July 7 conference
3    before the Court, which I unfortunately wasn't available to
4    make, I was in London at that time, your Honor, and I will
5    tell you I would have rather have been been here.

6    On July 7, at Page 52 of the transcript, your
7    Honor indicated you would be appointing a special master for
8    privilege issues. I come to that simply having having read
9    the transcript.

10   THE COURT: Right. And did that happen?

11   MR. VARALLO: It has not. However, which I do
12   have today, which perhaps will move things along, your Honor
13   may remember that some time ago we had made a stipulated
14   motion, both sides agreed to a form of order, put it before
15   your Honor to appoint a special master. Unfortunately, we
16   hadn't followed the correct procedures. Your Honor denied
17   the motion. But I do have a form of order today that has a
18   blank for the name and is otherwise the order that we had
19   stipulated to back in March.

20   THE COURT: Well, I think, you know, this was
21   right before I left on a trip, and I have been in trial since
22   I have been back. I could have sworn I crafted something to
23   file, so I will follow up on that.

24   MR. WADE: Your Honor, there was an order -- if
25   you don't mind.

1    MR. VARALLO: Please.

2    MR. WADE: There was an order dated July 18 in
3    which the plaintiffs' motion to compel is denied unless on or
4    before August 1st the plaintiffs identify with specificity
5    what's in dispute. And then we are supposed to respond by
6    August 15th.

7    MR. VARALLO: Your Honor, in response to that
8    order which had to do with apparently where the privilege
9    dispute was extant, we filed a pleading pointing your Honor
10   to the specific briefing pages. That pleading was filed I
11   believe on the 26th of July.

12   MR. WADE: That is correct.

13   THE COURT: All right. Well, somehow or other I
14   don't think that's in front of me. I don't suppose anyone
15   has any docket item numbers.

16   MR. VARALLO: I do, your Honor. In case you
17   asked, I happened to have those items for you.

18   THE COURT: All right.

19   MR. VARALLO: The briefing that we continue to
20   rely on is plaintiffs' opening brief, which was Docket Entry
21   76 at Pages 17 through 20 and 25 through 40. The defendants
22   addressed the issue in their response at Pages 26 through
23   40. And we put in a reply, Docket Item 91, at Pages 9
24   through 20.

25   THE COURT: Now, I have Docket Item 76, Docket

Page 6

1   Item 91, and defendants' was?
2          MR. VARALLO: Your Honor, I helpfully transcribed
3   76 both times. It's 87 is the defendants', your Honor.
4          THE COURT: All right.
5          MR. VARALLO: And, your Honor, that really frames
6   an issue of law as to whether it's possible to assert an
7   attorney/client where you're representing two clients on the
8   same matter. That's the issue of law that we've briefed up
9   for the Court.
10         But we also have before the Court issues relating
11  to privilege logs. We've got two privilege logs which
12  contain what we contend are several hundred improper entries
13  identified as privileged documents and we've been promised
14  a third privilege log, which we're told will have some 5,000
15  entries, and I think it was in response to that on July 7th
16  that your Honor said, Hey, we're going to get a special
17  master involved.
18         THE COURT: All right. I will go back and look.
19  I thought I had done that. Perhaps I hadn't.
20         MR. VARALLO: Would it be useful to your Honor to
21  have the formally agreed upon?
22         THE COURT: Yes.
23         MR. VARALLO: Okay. I will move on, then.
24         So that's the privilege issue, your Honor. Let
25  me step forward to talk about e data. There are three e data

Page 7

1   issues and I will cover them very quickly, understanding the
2   lateness of the hour.
3          One of those relates to production for specific
4   executives in the BCE executive corps. The second relates to
5   a new wave of documents just produced today. And the third
6   relates to refining and choosing search terms for a set of
7   identified folders.
8          Let me turn first to the executives. We have
9   taken a number of depositions of lower level people in
10  this case and we're now at the level of senior executive
11  depositions.
12         As of yesterday, we had 11 e docs for
13  John Monty, the former BCE chairman who decided to buy
14  Teleglobe, who decided to pull the plug on Teleglobe, and
15  who was simultaneously the Chairman of the Board of
16  Teleglobe.
17         We respectfully doubt there could be a more
18  central witness to this case, and this is a case where we're
19  talking about an electronic data company, a company that was
20  building a data highway. To have 11 e documents we
21  respectfully suggest just doesn't do it. We also have about
22  a hundred e-mails from or to Mr. Monty that we collected from
23  others that were in others' possession, so we know he had an
24  e-mail account.
25         We're told that a server on which resided the

Page 8

1   executives data was searched for Mr. Monty in 2005. However,
2   Mr. Monty resigned in 2002. And based on BCE practice, we
3   believe that his personal account was deleted from the
4   executive server at that point.
5          We need to go backup tapes for Mr. Monty,
6   although our friends haven't done that, although they
7   are doing it for two others I will talk about in just a
8   minute, Mr. Lessard and Mr. Pichette. Our first issue is
9   should we go to backup tapes for Monty. He's a key witness.
10  We have 11 e docs and we believe we need to get to the
11  backup tapes.
12         The other specific people issues, let me just
13  address them briefly. We were recently told another senior
14  executive, Mr. Pierre Lessard, had destroyed his documents
15  and we're told this after we took his deposition. We're told
16  that BCE is searching for Lessard docs on its backup tapes,
17  but we don't have a firm date yet by which we'll get these
18  and we need these, especially since we've already taken his
19  deposition. Obviously, we'll want to reopen the deposition
20  once we see the documents.
21         The next problem executive is a gentleman
22  by the name of Patrick Pichette. He was sent to Teleglobe
23  to work in early January 2002. He was there until it blew
24  up.
25         He went back to BCE and he worked on a laptop.

Page 9

1   We're told his laptop hard drive was simply wiped, wiped
2   clean when he went back at some point.
3          For him, we need to go to backup tapes. We're
4   told they are going to backup tapes, but, again, we're not
5   told when and his deposition is coming on very quickly. We
6   can no longer wait for BCE to take its time to get us this
7   information, your Honor.
8          Finally, an individual by the name of Mark Ryan.
9   Ryan was the corporate secretary who attended most, if not
10  all, keyboard meetings. We have zero e-mails from Mr. Ryan,
11  none. Once again, your Honor, for whatever reason, this is
12  an individual of senior status in the company for whom we
13  need backup tape searches.
14         On these individuals, we want a court order
15  requiring prompt production. These are documents we asked
16  for last year, and from our perspective it's simply
17  unacceptable that deep into the deposition track we still
18  don't have the documents.
19         Your Honor, the next e document issue is, relates
20  to documents received today. Literally today we received a
21  C.D. with 10,000 pages of new documents, apparently located
22  from the computers of some but not all of the secretaries of
23  the senior executive corps at the company.
24         The index we received also suggests that the C.D.
25  contains at least hundreds of pages of documents produced

Page 10

1   from certain key executives directly, including Mr. Lessard,
2   the general counsel of the company, whose two-day deposition
3   was taken last week.
4       Passing for the moment the issue of why BCE
5   didn't search for these documents months ago or the computers
6   months ago, as of today, BCE cannot tell us, notwithstanding
7   our repeated requests, when we'll have all of this data
8   completed or the so-called custodian data completed as well.
9   We ask the Court to put a stop to this. We need a hard date
10  by which BCE will have complied with its discovery
11  obligations.
12      We are deep into the discovery schedule. Your
13  Honor will recall that this case was originally set for a
14  discovery cutoff date of September 30, then amended to
15  October, I believe it was 17th the last time we were here.
16  But we've got a number of depositions to do and we simply
17  can't have substantial unproduced documents coming to us
18  after the depositions are done.
19      Finally, your Honor, an issue as to folders.
20  During the course of this litigation, we learned of a
21  population of approximately 30,000 folders on live servers at
22  BCE, which were not identified by custodian. They're
23  identified by other titles.
24      Many of these folders have Teleglobe in their
25  name or other indicia, indicating that they could be

Page 11

1   important to this case. In an effort to compromise and not
2   have to bring this to your Honor, we spent several days
3   reviewing the 30,000 folders, which, by the way, when you
4   print them out, is about 750 pages of folder titles.
5       We reviewed those and cut the 30,000 to about
6   3,500, about 10 percent of the total. BCE told us,
7   Well, that's too many, please try again. We did. We went
8   back and were able to winnow the 3500 titles to about 2900
9   titles.
10      We understand that BCE then did a search over all
11  the -- all of its folders, not merely those we identified,
12  which included the name Teleglobe, and then also did a
13  negative search to winnow out matters unrelated to issues of
14  this case. We're fine with that, your Honor, but we believe
15  it is underinclusive.
16      When we were here on July 7, we brought to your
17  Honor's attention the fact that we had a dispute as to an
18  intermediate search, and your Honor directed us to try to
19  work it out. You said if we couldn't work it out, you would
20  be making decisions yourself as to the proper scope of those
21  searches.
22      Notwithstanding the Court's direction, BCE simply
23  didn't engage with us in discussions regarding search terms
24  since July 7. Instead, recently, they filed the affidavit of
25  Dr. Felski, their e consultant or e-data consultant.

Page 12

1       We are prepared today to discuss with the Court,
2   should you want to hear us, why our proposed search is
3   appropriate. My colleague, Ms. Gaza, is prepared to address
4   that. I also have in court today Dr. Diane Barrasso, our
5   e-data consultant. Should the Court have any questions as to
6   methodology or technical questions you need answered, we've
7   got the source. We can bring her to the Court.
8       I can say as to the 2900 folders, that we know
9   that 450 of them have Teleglobe in the title. We know about
10  700 relate to finance and we know that about 1200 are board
11  of director related folders.
12      So, your Honor, just on that showing, this isn't
13  an idle exercise. We're not talking about folders that have
14  nothing to do with the case.
15      To summarize this issue, we want the Court to
16  order BCE to run our search terms on the 2900 folders we've
17  winnowed out of the 30,000 that we believed had previously
18  been unsearched.
19      Finally, your Honor, and I will conclude quickly,
20  this is the third issue, some help with specific
21  depositions.
22      We have subpoenaed, pursuant to letters rogatory,
23  three, and I'm focusing on three, there are actually more of
24  them, but for purposes of today, there are three that we want
25  to bring before the Court, three entities in Canada:

Page 13

1   Deloitte & Touche, a law firm called Osler, and a law firm
2   called Davies Warde. Each firm represented BCE, but also
3   represented Teleglobe during the course of important events
4   here. Although Osler claims it didn't, it did file documents
5   with the regulatory authority, holding itself out to be
6   counsel for Teleglobe.
7       Each firm has refused to comply with the
8   subpoenas and raised numerous privileges as to the subpoenas,
9   contending that they need not produce a response to the
10  subpoenas or give testimony.
11      We've attempted to deal with these by litigating
12  in Canada, but learned from Canadian counsel that the time
13  frame for Canadian litigation on these issues will long
14  overlap your Honor's discovery cutoff. That is to say we
15  will not have prompt and efficient justice in Canada to get
16  to the bottom of these issues. So instead of complaining, we
17  tried to work out practical approaches.
18      Our client, the plan administrator, stands under
19  the bankruptcy law and the plan, stands on issues of
20  Teleglobe for purposes of owning its privileges, and has
21  instructed the lawyers that represented Teleglobe and the
22  accountant to produce to her all Teleglobe owned documents
23  with only modest success, your Honor, I will report.
24      What we would like to do, we'd like to have the
25  Court involved in, is ask you, first of all, the Court

Page 14

1  usually, to suggest to BCE perhaps it could lean on some of
2  these outside providers to move forward in a constructive
3  way, but if that is not possible, what we'd like to do is
4  have an order running to BCE, asking it to demand its
5  documents back from its providers relating to this matter
6  that they could then produce to us so as to circumvent long
7  and involved Canadian litigation.
8      Alternatively, if these agents of BCE continue to
9  assert privileges against us, we want it clearly understood,
10 we want to say on the record today that we'll be seeking
11 preclusion orders against their testifying at trial and
12 against BCE attempting to adduce matters at trial through any
13 witness where we were blocked on the subject matter as to
14 privilege in Canada.
15     Let me say for the record very clearly and for my
16 friend, Mr. Wade, that this includes matters relating to
17 BCE's accounting. It cannot, we contend, and we will contend
18 at a later date in a formal motion, allow the accountant for
19 BCE, that is Deloitte & Touche, to assert privileges against
20 both producing documents and testifying and then attempt to
21 justify its accounting having blocked or having had its
22 auditors successfully block discovery in the case.
23     Your Honor, my voice is giving out. I'm happy
24 to answer any questions, but that's our presentation for
25 today.

Page 15

1      THE COURT: All right. Thank you.
2      MR. VARALLO: Thank you.
3      THE COURT: Let's hear from BCE's counsel.
4      MS. AARON: Good afternoon, your Honor. My
5  name is Jaculin Aaron. I'm with the law firm Sherman &
6  Stearling LLP, representing the defendants, and I will take
7  Mr. Varallo's points in order.
8      With regard to the specific executives and some
9  of the issues relating to the amount of e documents, we are
10 certainly willing to consider going back to the backup tapes
11 and specific instances where the number of e documents that
12 we've managed to obtain from them, from the readily
13 accessible sources has not been very high and so we will
14 certainly talk with them about some of those issues.
15     With regard to some of the -- a couple of those
16 executives, there have been additional documents that we have
17 gotten from looking at the e documents of their assistants
18 that we will be producing to them, but we are happy to
19 continue discussing it with them.
20     With regard to the issue of the so-called new
21 wave of documents that they produced today that they're
22 complaining about, there are basically -- that includes
23 documents of some of the assistants of the executives at BCE
24 that we determined that we should go back and get and produce
25 to the other side and we're producing those, and there are

Page 16

1  some more that we will continue to produce.
2      I would point out, however, that when we have
3  asked recently for documents from the assistants of the
4  executives of their clients, they've basically told them
5  that, for the most part, they've not attempted to gather
6  those documents and if we want them, we will have to pay to
7  have those documents restored and produced to us. So they
8  are being a little -- I don't want to say hypocritical, but
9  they are being a little cute in saying that there's some
10 outrageous conduct that we are engaging in because we're
11 producing the assistants' documents after some of the
12 executives' documents.
13     If there are -- there are good grounds for
14 reopening depositions, then, fine. I mean, often people make
15 that argument about documents that are produced after a
16 deposition. Then you go back and you find that there's not
17 really anything to reopen or there aren't any significant
18 issues, but if they can show some prejudice and if they want
19 to do that, we're happy to consider that.
20     With regard to the search on the 300,000 -- I'm
21 sorry -- this 30,000 folder, I think Mr. Varallo might be a
22 little late to the party on this one. This has been
23 extensively discussed in the papers filed with the Court,
24 including the supplemental declaration of Martin Felski, that
25 we filed on August 1st.

Page 17

1      And the basic story on that, which is set
2  out in Mr. Felski's declaration, is that these 30,000 folders
3  are not new documents. We have been conducting searches on
4  all -- all the data that's contained in all of these folders
5  and we have produced documents to them from the folders.
6  That includes documents that contain the term Teleglobe or
7  related Teleglobe terms, other names for the companies.
8      So that data has been subject to a number of
9  searches already and we have produced documents from those
10 searches. When we ran searches that included the word
11 Teleglobe in them or some variation on that, the
12 responsiveness rate on the documents captured was perfectly
13 reasonable.
14     When we've run searches on that data where
15 we don't include a variation of the word Teleglobe, we
16 capture very large amounts of data, but the responsiveness
17 rate has been very, very low. In some cases, four, six,
18 ten percent. And what we have maintained is that at this
19 point, we are really getting to the point of diminishing
20 returns on those documents. They've been searched for the
21 Teleglobe documents. We've done other searches to pick up
22 other documents that are related, but at this point, if we
23 conduct the searches that plaintiffs want us to conduct on
24 that group of documents, we are going to gather huge amounts
25 of data and only very small portions of it are potentially

Page 18

1 responsive.
2      I would like to clear up one point that is
3 explained I think at least a couple of times in our papers.
4 They have said that some of these folders that they have
5 selected have the word Teleglobe in the name of the folders
6 and they are outraged that we have not searched in those
7 folders. In fact, as we have told them and has been stated
8 in Dr. Felski's declaration, if the word Teleglobe appeared
9 in a folder, then the documents in that folder would have
10 been picked up by if they contained one of the other search
11 terms. So, in fact, those folders that have the word
12 Teleglobe in them have been picked up and are responsive to
13 the -- have been picked up and we've produced responsive
14 documents from them.
15      But with regard to their list of search terms, I
16 don't see how they can say that those search terms will
17 really pick up anything very interesting to the case.
18      For one thing, they have a number of search terms
19 that include the word Teleglobe and, frankly, those already
20 would have been picked up in the prior searches that we have
21 done. But they have searches such as employee within 40
22 words of leave. Those are the kinds of searches they are
23 proposing and those are just going to pick up ridiculously
24 large numbers of documents.
25      THE COURT: All right. This is my problem.

Page 19

1 Well, you can move on from this point and on to the last
2 point and then I will give you my concern about the way BCE
3 has reacted to my instructions at the last discovery
4 conference, the depositions, letters rogatory, the two legal
5 firms and the accountants who have failed to cooperate in
6 getting documents into the case.
7      MS. AARON: Okay. Your Honor, I would actually
8 like to let my colleague, Mr. Schimmell, address those
9 issues.
10      THE COURT: Well, then, before you sit down, I
11 will address my concern.
12      MS. AARON: All right.
13      THE COURT: My concern is this: Document
14 production was supposed to be done before we take the
15 depositions. It's the way it's done in all complex cases in
16 my court for the purpose, for the singular purpose of not
17 having to go back and redepose someone every time a new wave
18 of documents has come in.
19      So when you use words like we will consider going
20 back, we will continue discussing, that is not what I want to
21 hear. Document production is supposed to be done. If there
22 are reasons why there have been no documents produced for
23 critical people, then you will review the backup tapes, you
24 will do the searches.
25      So the language that you use isn't consistent

Page 20

1 with where we are in this case and does not bode well for
2 your positions in this case. With respect to the new
3 documents, on the one hand, you know, you've got a party
4 who's complaining about the lack of documents and also
5 complaining about the production of documents, so there's
6 some inconsistency in there and I don't know which they
7 prefer, but we will talk about what happens when document
8 production when we're done our whole discussion.
9      With respect to the searches, now, I don't
10 believe I asked BCE to give me an expert report on why these
11 search terms were not reasonable. What I asked was for the
12 parties to talk and to reach agreement if they could, and if
13 not, then I would hear discussion about it. From what I
14 understand, there was no discussion. BCE has taken the
15 position and has simply given me an affidavit, which isn't
16 what I asked for without some attempt at compromise.
17      So, again, I am not happy with BCE's approach to
18 what I say and I will have to put everything in writing to
19 make sure that it is all understood, although lawyers don't
20 seem to understand what I write either.
21      So this is the thing. With respect to the backup
22 tapes, they will be searched. They will be found. They will
23 be reconstructed. They will be searched for these four
24 executives.
25      With respect to these last searches, I will give

Page 21

1 BCE a choice. It seems to me as though some of these
2 searches are very broad, and so I have identified some that
3 seem appropriately narrow to me, and I will give BCE the
4 choice of either doing the narrow search that I've just
5 randomly selected on the 645 folders that have Teleglobe or
6 some derivation thereof in the folder title, the narrow
7 search on all 2900 folders or the broader search on the 645
8 folders.
9      That's your choice, and if we need to, I will
10 have counsel for Teleglobe tell me if they had to choose --
11 well, I will give you what I think, and if they had to choose
12 a few more, I will give them the opportunity to pick a few
13 more. But that's where we are with that.
14      All right.
15      MS. AARON: Okay. Your Honor, if I may, on some
16 of these issues, it's a two-way street. I mean, I'm not sure
17 that plaintiffs understood the Court's direction at the last
18 hearing, which, unfortunately, I did not attend, because they
19 basically sent us a list of search terms and said the Court
20 ordered you to run all of these searches, please tell us when
21 you're going to be done, which I don't think is quite right
22 either, so I think there might have been some failure to
23 communicate between the parties.
24      THE COURT: Well, neither party is going to get
25 exactly what they want.

Page 22

1    MS. AARON: I understand.
2    THE COURT: I don't know what it is that will
3  take you all to --
4    MS. AARON: The other part of the two-way street
5  on terms of late-produced documents, we're waiting for
6  documents from their live server data that we don't have yet
7  and we asked them, when are we going to get it, and they
8  said, When we know, we'll tell you. And they have a long
9  story about how we didn't ask for them until the beginning of
10  July, but there's a story behind that as well.
11    THE COURT: All right. Well, the late production
12  of documents is something we'll discuss generally. I think
13  it's a problem on both sides, so I don't think I want to hear
14  anything more about that right now.
15    All right. Let's hear about the depositions and
16  the letters rogatory and then we'll get down to the
17  nitty-gritty on search terms and talk about how in the world
18  we're going to conclude document production so we can go
19  forward efficiently with depositions and get this case to a
20  point where it can be resolved.
21    MR. SCHIMMELL: Good afternoon, your Honor.
22    THE COURT: Good afternoon.
23    MR. SCHIMMELL: With respect to Deloitte, we
24  wrote to them months ago, to ask that Deloitte return to BCE
25  documents that BCE had previously made available to

Page 23

1  Deloitte. So what Mr. Varallo is asking us to do, we've
2  already done.
3    We've been told and Deloitte had a number of
4  discussions with BCE directly about that request. We've been
5  told this week that Deloitte does not believe that they have
6  the obligation under Canadian law to return any documents and
7  they don't want to do it. I'm not sure what else we can do
8  at this point.
9    THE COURT: I take it you're not a client of
10  Deloitte anymore?
11    MR. SCHIMMELL: BCE is a client of Deloitte.
12    THE COURT: Well, in that case, I'm not really
13  convinced. It seems to me that if you -- if asking nicely
14  doesn't work in a case, then, truly, you will be precluded
15  from using any of their documents, any of their witnesses,
16  any of their evidence if you can't manage to get these
17  documents produced so that they can see the light of
18  day and be tested through discovery. I mean, that's the
19  bottom line. Nice letters exchanged. They are your client.
20  You pay them. It seems to me if that does not give you
21  leverage, then you should find another accounting firm to
22  work with.
23    MR. SCHIMMELL: We will tell them that.
24    With respect to Osler, we made the same request
25  of Osler the same time when the plaintiffs asked. Osler

Page 24

1  returned to us documents that they believed were not
2  privileged and that reflected communications that BCE
3  had made to Osler, which is what we had asked for.
4  We've reviewed those documents. We've produced them to
5  the plaintiffs. I'm not sure what else at this point we
6  can do.
7    The plaintiffs have made an application regarding
8  Osler in Canada. I understand that there are depositions
9  that are being taken of Osler lawyers. I'm not sure what
10  else BCE can do at this point because we've asked, we've
11  received some documents, we've reviewed them, we've produced
12  them.
13    What I forgot to say with respect to Deloitte a
14  second ago is that the plaintiffs also went to the Canadian
15  courts to seek an order directing Deloitte to produce
16  documents and directing Deloitte to produce a witness. The
17  Canadian courts rejected that application. They viewed what
18  the plaintiffs were asking for as a fishing expedition and
19  they said that under Canadian law, they --
20    THE COURT: But this is the whole point. I mean,
21  if, in fact, you don't intend to use any of these documents,
22  any of these witnesses, any of the information through these
23  third parties, then I'm not sure if there's a privilege that
24  can be asserted in Canada that I have any power. All I am
25  saying is that certainly, if you intend to use any of this

Page 25

1  information, obviously, you can't use it unless it has been
2  produced.
3    And even with respect to -- I mean, even if they
4  give you all nonprivileged documents, that's better than
5  nothing, but, again, my feeling is that the privileged
6  documents ought to be listed so at least we know what the
7  universe of information is and see where we go from there.
8    There was another law firm, I think?
9    MR. SCHIMMELL: Davies. My best recollection is
10  that until very recently, the plaintiffs did not ask that we
11  contact Davies. I understand that there's also an
12  application in the Canadian courts regarding Davies. If the
13  plaintiffs agree, we'll talk about it. We don't view them as
14  particularly relevant.
15    THE COURT: All right. Thank you very much. I
16  appreciate it.
17    MR. VARALLO: Your Honor, may I be heard for 30
18  seconds?
19    THE COURT: Sure.
20    MR. VARALLO: Just for the record, my friend
21  apparently doesn't understand we really want Davies, so I
22  will say it. We really want Davies documents. We went
23  through the process of asking your Honor for letters
24  rogatory. We hired Canadian counsel. We served them. We
25  really want them. We weren't kidding. So if my friend would

Multi-Page™

**Page 26**

1 take steps to see what could be done there, that would be
2 appreciated.
3        Your Honor, Ms. Aaron, I think your Honor has all
4 my points. I'm not going to make the points your Honor has
5 already stated. But I do want to make of record one point,
6 and that is Ms. Aaron pointed out that she is still waiting
7 for live server data from us. BCE asked for live server data
8 from us on August 1st, 2005. Let me repeat that: August
9 1st, 2005.
10       We offered the data by letter in February. We
11 followed up and offered the data by letter again in May. On
12 August 1st, my friends said we want you to copy, effectively
13 copy your servers, give them to us. We're in the process of
14 doing that. That is not, with all due respect, your Honor,
15 late production.
16       I don't have anything to add on this unless your
17 Honor has questions.
18       THE COURT: All right. I do not at this point.
19       MR. VARALLO: Thank you.
20       THE COURT: Refresh my recollection as to where
21 we are in the discovery schedule.
22       MR. VARALLO: Your Honor, we've got an October 17
23 cutoff date. We have almost -- I believe all of the
24 witnesses are now scheduled.
25       MR. WADE: I believe that is true except that

**Page 27**

1 there are -- we have heard noises that there may be other
2 witnesses that plaintiffs, third-party witnesses that
3 plaintiffs may want to depose. They have nothing done about
4 that yet.
5        And then, secondly, we add three or four --
6 we may add a few more witnesses to our list. But so
7 far I believe the ones that have been named have been
8 scheduled.
9        MR. VARALLO: I think that's right, your Honor.
10 We've got good cooperation in scheduling. We've got them
11 scheduled up and they are lined up like airplanes coming into
12 San Francisco.
13       There are quite a few of them, and without having
14 complete document production, of course it's hard to
15 effectively do those.
16       We've got an October 17 cutoff date. We've got
17 about, I will hazard a guess, 10 to 12 BCE witnesses of the
18 25 or so we'll have to take done and now we're moving to the
19 meat of it. We're moving to the senior executive corps.
20       THE COURT: All right.
21       MS. AARON: Your Honor, if I may, Mr. Varallo
22 repeated twice something that was incorrect. We made the
23 request for the live server data in early July. The reason
24 that happened that way is that we have been basically the
25 victims of a bait and switch on what they were going to do.

**Page 28**

1 They told us in March that they had a full set of backup
2 tapes for all of their e data as of a certain date in April
3 2002. They represented in this court that they would make
4 all of that e data available to us. They represented that in
5 writing several times.
6        We said, fine. Let's do that. Then it turns out
7 over the course of several weeks we find out in May that it's
8 not all of the e data, it's just e-mails.
9        Then over further weeks, it turns out that it's
10 not all of the e-mails, it's only the e-mails for
11 custodians. Then, when we finally get it, we learn that it's
12 only the e data for some of the custodians.
13       So we've had some real issues with trying to
14 figure out from them what they have and what they're willing
15 to give us. We still don't know what that live server data
16 consists of or doesn't consist of. I'm not sure that they
17 know that. But that was the reason why that has been the
18 particular history of what the requests have been.
19       THE COURT: All right. It seems to me -- I,
20 frankly, am not sure how long it will take you all to follow
21 up on what I ordered today. I'm going to say by the end of
22 the month, August 31. That is not helpful with respect to
23 the depositions that are still scheduled this month. On the
24 other hand, I'm not sure ordering something shorter than that
25 is actually going to be meaningful if it can't be done.

**Page 29**

1        So by August 31, 2005, number one, BCE shall do
2 what it has to do to get the backup tapes up and moving, to
3 search those four executives, to search for documents related
4 to these four executives that were named: Monty, Lessard,
5 Pichette and Ryan.
6        By August 31, 2005, plaintiff shall make
7 available its live server data, whatever. You all know
8 better what that comprises, but I assume you know what I'm
9 talking about.
10       By August 31, 2005, BCE shall file an affidavit
11 with the Court and obviously serve on counsel all of its
12 efforts to get the relevant documents from the three Canadian
13 entities. And I will say that if the three Canadian entities
14 are not willing to cooperate, BCE will be precluded from
15 using any of that evidence in trial.
16       With respect to the last search, the option for
17 BCE is to either take a narrow swipe at 2900 folders or the
18 whole deal of the 645 folders that have Teleglobe.
19       Now, the search terms that I have tentatively
20 identified, and I will allow a few more to be added to that
21 by Teleglobe, but the ones that I have selected initially,
22 and it's hard for me to -- well, let me go through them. On
23 the first page, it's one, two, three, four, five, it's the
24 sixth, seventh and eighth one down, starting with Teleglobe
25 or TG or TGO, 40, et cetera.

Page 30

1    MR. WADE: Support?
2    THE COURT: Yes. The one that follows, Deloitte
3  or DT or D near 3, et cetera, and the next one down:
4  Deloitte or DT or D near 3, et cetera.
5    So those are the three on that page. And, again,
6  after I've gone through this, I will allow the Teleglobe
7  parties to add a few more. I don't know how many more, but
8  not -- certainly not more than six.
9    On the second page, I'm looking at one, two,
10  three, four, the fifth one down. Bell or BCE or Bell Canada
11  near 40, et cetera.
12    The seventh one down, Synergy Project or Project
13  X.
14    The 12th one down, Solvent or liquidate or
15  insolvent or restruct near 99, et cetera.
16    I've lost count. And then 14, 15 and 16. Commit
17  or commitment or committed or promised or planned or intend
18  or intention to propose near 20 Teleglobe, and the two that
19  follow that.
20    And on the final page, I just have one
21  highlighted, and that's the independent committee near 20,
22  Teleglobe or TG or TGO or more.
23    Now, if there are others for -- if there
24  are others that Teleglobe believes, a few others that
25  Teleglobe believes are more likely than others to come

Page 31

1  up with relevant documents and not be as broad as they
2  seem to be, I'm happy to entertain a few more. And if you
3  need a moment to discuss that with your expert there, I'm
4  happy to let you do that.
5    MR. VARALLO: Thank you, your Honor.
6    THE COURT: And I might take a break. I want to
7  go out and find out. I swear I remember doing something
8  about the special master. I'm going to try to track down
9  what I did. So I will be back momentarily.
10    (Short recess taken.)
11    THE COURT: My staff person who helps me left for
12  the day left long ago, so I will have to follow up on that
13  special master. I can remember writing it. I don't know
14  what happened to it. All right.
15    MR. VARALLO: Thank you, your Honor.
16    Your Honor invited us to take a look at the
17  search terms in light of your Honor's ruling and propose up
18  to six. I'm happy to say I'm going to propose up to four, if
19  that would be acceptable.
20    THE COURT: All right.
21    MR. VARALLO: Your Honor, the additional terms
22  we'd like searched are on the first page, above the first
23  one, your Honor indicated Teleglobe or TG or TGO. There's
24  one that says Monty near 40 support continues. We'd like
25  that one searched because Mr. Monty is the one who was

Page 32

1  publicly reiterating support and commitment for Teleglobe's
2  funding and financing, so that's important to us.
3    Two below the last one your Honor chose on Page
4  1, it begins, A-n-a-l-y star. That's analyze or assess. It
5  is a brood one. However, your Honor it picks up analysis of
6  good will, going concern, which are both very key, we think,
7  for proving solvency or lack thereof in this case. That's
8  two, your Honor.
9    The third is the very first one at the top of the
10  next page. Again, this relates to infusing money into the
11  enterprise, which winds up often in documents being
12  associated with commitments based on our review.
13    And finally, your Honor, the second to last
14  one --
15    MR. WADE: Excuse me. What number on the second
16  page is that?
17    MR. VARALLO: The very first one.
18    THE COURT: The first one.
19    MR. WADE: Sorry. Didn't hear that.
20    MR. VARALLO: That's all right. I will try to
21  speak up a little bit.
22    The second to last one on the second page, your
23  Honor, the one that's good will or good will or write-down,
24  near 40 value or impair. Again, that's similar to what your
25  Honor chose immediately above it, but the one your Honor

Page 33

1  chose specifically relates to Teleglobe. This is more
2  broader.
3    THE COURT: All right.
4    MR. VARALLO: Thank you, your Honor.
5    Your Honor, without troubling you any more, my
6  friend, my colleague, indicates to me that when I addressed
7  the four witnesses, we had actually been corresponding about
8  a number of additional ones. I would like to inquire through
9  counsel, through the Court of counsel whether, if there are
10  other senior executives that have a small number of
11  documents, we could work together to get those searched in
12  some appropriate way.
13    THE COURT: Well, again, it's all a matter of
14  balancing burden with benefit. If we're talking about one or
15  two more, yes. If you are talking about 12 more, no.
16    MR. VARALLO: Your Honor, I was talking about
17  three more, actually.
18    THE COURT: Three more. Do you want to name
19  them?
20    MR. VARALLO: Certainly, you. Sabia, Vanaselja
21  and Skinner. Vanaselja, apparently we have 23 e docs.
22  Skinner, 336. Sabia, we have 496. There are more docs, but
23  they're very senior executives and simply not that many for
24  senior executive corps.
25    THE COURT: Well, they seem to be not in the same

Multi-Page™

Page 34

1 group as the four. I think maybe we'll leave them off the
2 list at this point.
3          MR. VARALLO: Thank you, your Honor.
4          MR. WADE: Could we have just one second, your
5 Honor?
6          THE COURT: Certainly.
7          (Pause while counsel conferred.)
8          MR. VARALLO: Your Honor, while my colleague is
9 conferring, to the extent you wanted our input as to the
10 choice between the narrower search and the broader search on
11 the folders, we'd prefer the narrower search on the broader
12 number of folders, if that matters.
13          THE COURT: You probably shouldn't have said that
14 because they'll probably choose to do the other just out of
15 spite.
16          MR. WADE: Your Honor, two things. Let me go
17 reverse on that and say so do we.
18          THE COURT: Okay.
19          MS. AARON: Well, no.
20          THE COURT: Maybe not.
21          MS. AARON: We need to talk about that.
22          MR. WADE: We will talk about it.
23          THE COURT: All right.
24          MR. WADE: With respect to the second one that
25 Mr. Varallo mentioned, which is on the first page,

Page 35

1 we're -- it looks, if you just think of Teleglobe, it
2 looks reasonable. But what's on these folders, what's in
3 these folders applies across the board to a conglomerate
4 company, and the amount of -- for our purposes in this
5 case, junk will be extremely high, because it will all be
6 about Vanaselja's budgets and express views budgets and all
7 the rest of it.
8          THE COURT: Well, I wish you had sat down and
9 talked about these a little bit more carefully. It is down
10 to 2900 folders, not 30,000. I basically made my decision,
11 so it's a little late to be discussing it now.
12          MR. WADE: Okay. I just wanted to note an
13 objection to that one.
14          THE COURT: All right. Your objection is duly
15 noted.
16          MR. WADE: Thank you.
17          THE COURT: All right. Are there any other
18 issues that we should be addressing?
19          MR. VARALLO: Not from this side of the table,
20 your Honor.
21          THE COURT: All right. Let's hear from defense
22 counsel.
23          MS. AARON: On the backup tapes, your Honor,
24 we've been looking into what's available and what's
25 accessible.

Page 36

1          With respect to Mr. Lessard, there are lots of
2 witnesses. He's not among the most important. We think
3 we can identify the backup tape with his e-mails. With
4 respect to other electronic documents, we think that they're
5 on another server where the backup tape situation is much
6 more confused and we're going to look into it to see if
7 perhaps there's a way around it, but we're dubious, so I just
8 wanted to alert the plaintiffs that we might be making some
9 request for a little indulgence and mercy as to those.
10          THE COURT: All right. And if there are
11 technical issues, then -- oh, that your technical people,
12 your affiants who, you know, are talking to us about e data
13 retrieval and the expert who came with plaintiffs' counsel,
14 it seems to me sometimes I think the lawyers should leave the
15 room and let those folks work it out to see if the technical
16 problems can be resolved. So I hope that you take advantage
17 of the expertise. All right?
18          MS. AARON: Thank you, your Honor.
19          THE COURT: All right. Any issues from
20 defendants' side of the table that we should address before
21 we disengage this evening?
22          MR. WADE: Not that we have not already talked
23 about.
24          THE COURT: All right. So there's an August 31
25 deadline. I will make sure that I address the privilege

Page 37

1 issues within the next week, and if there are other issues
2 that need to be addressed, I don't know that we have another
3 discovery conference scheduled. I don't know that I want to
4 do that in the absence of an e-mail from you all saying
5 there's something you can't work out.
6          I truly hope we can manage to get through the
7 rest of August without a discovery dispute, though. All
8 right?
9          All right. Thank you very much, counsel.
10          (Counsel respond, "Thank you, your Honor.")
11          (Court recessed at 6:00 p.m.)
12              - - -

# EXHIBIT 2

P. 02/05

# Deloitte.

Deloitte & Touche USA LLP
1633 Broadway
New York, NY 10019-6754
USA

Tel: +1 212 492 4000
Fax: +1 212 492 4201
www.deloitte.com

August 23, 2004

**By Facsimile and Mail**

John P. Amato, Esq.
Hahn & Hessen LLP
488 Madison Avenue, 14th Floor
New York, New York 10022

        Re: In Re Teleglobe Communications Corporation, et al.
           Subpoena addressed to Custodian of Records/ Deloitte & Touche LLP

Dear Mr. Amato:

As a follow-up to your telephone conversation on August 18, 2004, with my colleague, Irene Cannon-Geary, I write regarding the subpoena addressed to Deloitte & Touche LLP ("Deloitte & Touche") in the above referenced matter. As Ms. Cannon-Geary indicated to you, while we believe that the United States firm of Deloitte & Touche did not perform services relevant to the issues in the instant litigation, Deloitte & Touche is prepared to discuss the scope of the subpoena and other concerns with you. In the interim, however, Deloitte & Touche is objecting pursuant to Rule 45 of the Federal Rules of Civil Procedure, as incorporated into the Federal Rules of Bankruptcy Procedure by Rule 9016, in order to preserve its rights pending such discussions.

Deloitte & Touche's objections are as follows:

1.    Deloitte & Touche objects to the subpoena in its entirety as being overbroad, unduly burdensome and oppressive, including, without limitation, to the extent that it seeks to compel the production of voluminous documents generated during an extended and open-ended period of time ("between January 1, 2000 and December 31, 2002, or which otherwise relate to this period regardless of when created") (Definition G), or insofar as ("[e]ach request in this Subpoena shall be deemed continuing so as to require prompt, supplemental production of additional responsive documents that are received, generated or discovered after the time of original production") (Instruction N).

Member of
Deloitte Touche Tohmatsu

Further, although one might interpret the subpoena as calling for the production of not only existing documents, but also documents that Deloitte & Touche might obtain or prepare on a going-forward basis in providing services for Teleglobe, Inc., BCE Inc., or any other of their respective related entities, Deloitte & Touche will proceed on the basis that documents hereafter obtained or ones prepared subsequent to the date of receipt of the subpoena in connection with ongoing or future services, if any, for Teleglobe, Inc., BCE, Inc., or other of their respective related entities, or for other clients, are not responsive. Deloitte & Touche will proceed on the basis that plaintiffs are instead seeking documents in existence at the time Deloitte & Touche received the subpoena. Nor does Deloitte & Touche believe that any documents obtained or prepared subsequent to the date of receipt of the subpoena could be relevant to any issues in the lawsuit.

Moreover, the preservation of, and any obligation to produce, documents obtained and prepared in providing services subsequent to the receipt of the subpoena would be unreasonable and unduly burdensome and would impermissibly and unnecessarily interfere with and inhibit Deloitte & Touche in providing future services to its clients.

2. Upon information and belief, by virtue of its overbroad nature, the subpoena calls for the production of documents that are neither relevant to the subject matter involved in the pending litigation nor reasonably calculated to lead to the discovery of admissible evidence. Deloitte & Touche therefore objects to the subpoena to the extent it calls for the production of such irrelevant documents. For example, the subpoena attempts to request virtually every scrap of paper regarding Teleglobe, Inc., i.e., "[a]ny documents concerning TI or the Debtors" (Request No. 24). The subpoena is likewise unduly vague, precluding Deloitte & Touche from determining with sufficient precision the identity of the documents for which plaintiffs seek production. By way of illustration and not limitation, the subpoena's definitions of "concerning" and "relate" are vague, ambiguous, and overbroad. For example, Request No. 24 seeks "[a]ny documents concerning TI or the Debtors," and Definition G describes "production of all documents created between January 1, 2000 and December 31, 2002, or which otherwise relate to this period regardless of when created" (emphasis supplied).

3. Further, Deloitte & Touche objects to the subpoena to the extent that it purports to require Deloitte & Touche to produce documents (1) related to individuals, entities and/or Deloitte & Touche clients that are not at issue in the instant action and/or who are not parties to the action, or (2) documents related to engagements unrelated to the subject matter of the action, or (3) documents relating to other litigation or actions.

4.   Many of the documents are available from the parties, and Deloitte & Touche, a non-party, should not be put to the time and expense of producing such documents where the parties could obtain the information from each other or from their own files.

5.   Deloitte & Touche objects to the subpoena to the extent that it seeks production of documents that are confidential and/or competitively sensitive information to Deloitte & Touche, and/or proprietary information, internal information, trade secret or other confidential, research, development or commercial information of Deloitte & Touche. Such latter information has been developed at great expense to and effort by Deloitte & Touche and its disclosure would be competitively harmful to Deloitte & Touche. No confidentiality stipulation provides adequate protection for production of proprietary materials. As noted above, such documents are neither relevant to the subject matter of the pending action nor reasonably calculated to lead to the discovery of admissible evidence.

6.   Deloitte & Touche objects to the subpoena to the extent that it seeks the production of tax returns or tax return information, which Deloitte & Touche is precluded from disclosing under Section 7216 of title 26 of the United States Code, or any other information that Deloitte & Touche is precluded from disclosing under other applicable statutes or regulations.

7.   Deloitte & Touche objects to the subpoena to the extent that it purports to require the production of documents that are protected by the accountant-client privilege, the attorney-client privilege, the work product doctrine, or any other applicable privilege, rule or duty of confidentiality that precludes or limits production or disclosure of information therein.

8.   Deloitte & Touche objects to the Definitions to the extent that they are overly broad and purport to encompass more than just the entities or persons themselves. As such, the purported definitions are so ambiguous and vague that it would make any search for documents effectively impossible. For instance, references to unspecific, undefined or unnamed ""subsidiaries, affiliates, divisions, directors, officers, employees, agents, and representatives, and all those who act or have acted on their behalf" (as set forth in Definitions A – D) place an undue burden upon Deloitte & Touche to know the unspecified, undefined or unnamed persons or entities referred to. This is beyond what is required of Deloitte & Touche under the Federal Rules of Civil Procedure.

John Amato, Esq.
In re: Teleglobe Communications
August 24, 2004
Page 4

9.    Deloitte & Touche objects to the subpoena to the extent that it calls for the production of documents that are not within the possession, custody or control of the United States partnership entity Deloitte & Touche.

10.   Deloitte & Touche objects to the Definitions and Instructions to the extent that they purport to impose any obligations upon Deloitte & Touche beyond those required by the Federal Rules of Civil Procedure.

11.   Deloitte & Touche objects to the subpoena to the extent that it calls for information that was not generated in the form of written or printed records, on the ground that it would be unduly burdensome and oppressive to require that Deloitte & Touche search through computer records or other means of electronic or magnetic data storage or compilation.

12.   The subpoena requests confidential information of Deloitte & Touche's client(s) and/or Deloitte & Touche. Therefore, Deloitte & Touche objects to the subpoena absent entry of a confidentiality order protecting the confidentiality of the documents. No documents will be produced absent such a confidentiality order.

In making the above objections, Deloitte & Touche is not suggesting or implying in any way that it has documents responsive to a particular Request.

Given the above objections, no documents will be produced at this time nor will a witness appear. However, Deloitte & Touche would like to resolve these objections amicably and without burdening the Court with motion practice, and I am willing to discuss the subpoena with you. It would be helpful if you would provide me with a copy of the pleadings, a copy of any confidentiality order in place in the matter, and a service list of counsel. If you would like to discuss the subpoena, please do not hesitate to contact me at (212) 492-3857 or my colleague, Irene Cannon-Geary at (212) 492-4395.

Very truly yours,

Annica H. Jin
Counsel

# EXHIBIT 3

# HAHN&HESSEN LLP
## ATTORNEYS

Robert J. Malatak

Direct Dial: (212) 478-7316
*Email: rmalatak@hahnhessen.com*

January 12, 2005

**Via Facsimile and**
**First Class Mail**

Daniel Schimmel, Esq.
Shearman & Sterling
599 Lexington Avenue
New York, NY 10022-6069

Re: *Teleglobe Communications Corp., et al. v. BCE Inc., et al.*
C.A. No. 04-CV-1266

Dear Mr. Schimmel:

As you know, we served subpoenas on the New York offices of Deloitte & Touche LLP ("Deloitte") and Osler, Hoskin & Harcourt LLP ("Osler") demanding their respective depositions and the production of certain documents. Both Deloitte and Osler have objected to the subpoenas on the grounds that the documents and information plaintiffs seek is not within their possession, custody or control, but rather, within the possession, custody or control of their respective Canadian affiliates.

We believe that Deloitte's and Osler's objections are without merit, and were raised solely to obstruct the discovery to which plaintiffs are entitled, and we intend to directly address the issue in due course. In the interim, we request that BCE contact Deloitte and Osler in the United States and/or Canada to facilitate the discovery plaintiffs seek. As you are aware, Deloitte was BCE's auditor during the relevant time period, and was, therefore, BCE's agent. Osler similarly acted as BCE's agent in connection with its legal counsel concerning a March 7, 2002 request for a certain advance income tax ruling. In light of BCE principal/agency relationship with Deloitte and Osler, BCE has the authority to direct them to comply, in all respects, with the Committee's subpoenas. The Committee hereby requests that BCE exercise said authority forthwith. We suggest that you contact the following, with whom we communicated: Ken Fredeen, Esq., Deloitte's General Counsel, at 1-416-874-3940, and George Wailand, Esq., of Cahill Gordon & Reindell LLP, Osler's outside attorneys, at 212-701-3212.

The documents the Committee seeks from Deloitte and Osler are, in any event, subsumed by the document requests set forth in the Debtors' First Request for Production of Documents Directed to Defendant BCE, Inc., dated August 30, 2004 (the "Debtors' Discovery Demands").

Case 1:04-cv-01266-SLR   Document 164-2   Filed 08/31/2005   Page 19 of 38



January 12, 2005
Page 2

Moreover, the Debtors' Discovery Demands, as amplified by Brock E. Czeschin's, of Richards, Layton & Finger ("RLF"), November 9, 2004 letter to George Wade, of your office, broadly defined "BCE" to include its "agents and representatives, and all persons acting or who have acted on their behalf", which necessarily includes Deloitte and Osler. Moreover, the Debtors' Discovery Demands require BCE to produce all documents in its possession, custody or control, which is defined as "actual possession by [BCE], actual possession by [BCE] with another or constructive possession by [BCE] in that [BCE is] legally entitled or able to obtain actual possession from another person," for example, Deloitte and Osler. Thus, in responding to the Debtors' Discovery Demands, BCE should have produced responsive documents from Deloitte's and Osler's files. Please confirm whether BCE has indeed produced such documents. If not, we request that you immediately do so.

We also request that you provide us with information concerning the whereabouts of the Canadian repository for Arthur Anderson LLP's ("AA") files, and that you similarly direct the administrator of the repository to produce, or otherwise make available to us, documents responsive to the request set forth on the rider to the attached subpoena. As you know, AA was Teleglobe's auditor prior to Deloitte's taking over the engagement in 2001.

Please call me if you should have any questions.

Sincerely,

Robert J. Malatak

RJM/asm
cc:    Gregory V. Varallo, Esq.

# EXHIBIT 4

# SHEARMAN & STERLING LLP

FAX: 212-848-7179
TELEX: 667290 WUI
www.shearman.com

**599 LEXINGTON AVENUE**
**NEW YORK, N.Y. 10022-6069**
**212 848-4000**

ABU DHABI
BEIJING
BRUSSELS
DÜSSELDORF
FRANKFURT
HONG KONG
LONDON
MANNHEIM
MENLO PARK
MUNICH
NEW YORK
PARIS
ROME
SAN FRANCISCO
SÃO PAULO
SINGAPORE
TOKYO
TORONTO
WASHINGTON, D.C.

WRITER'S DIRECT NUMBER:

212-848-4608

WRITER'S EMAIL ADDRESS:
dschimmel@shearman.com

March 4, 2005

<u>Via email, facsimile and U.S. mail</u>

Robert J. Malatak
Hahn & Hessen LLP
488 Madison Avenue
New York, New York 10022

Re:     Teleglobe Communications Corp., et al., v. BCE Inc., et al.

Dear Mr. Malatak:

We are in receipt of your letter dated March 3, 2005, regarding the discovery you seek to obtain from Deloitte and Touche and Osler, Hoskin & Harcourt LLP ("Osler"). BCE Inc. ("BCE") has not objected to your efforts to obtain letters of request. BCE will also direct Deloitte and Touche to provide any documents it received from BCE that are responsive to the subpoena and were created during the relevant time period, subject to any applicable Canadian privileges. The remaining documents in Deloitte and Touche's files are not within BCE's possession, custody, or control. BCE similarly will direct Osler to produce non-privileged documents submitted by BCE to Osler that are responsive to the subpoena and were created during the relevant time period, subject to any applicable privileges. We will also ask that Osler provide other responsive non privileged documents created during the relevant time period, subject to all applicable privileges. Furthermore, in an effort to assist you in the discovery process in good faith, we will ask BCE for the address of the Canadian repository for Arthur Andersen, if it is known.

Very truly yours,

Daniel Schimmel

cc:     C. Malcolm Cochran, IV
        Gregory V. Varallo

*Shearman & Sterling LLP is a limited liability partnership organized in the United States under the laws of the State of Delaware, which laws limit the personal liability of partners.*

# EXHIBIT 5

## Cossette, Martin (6011706)

| | |
|---|---|
| **From:** | Cossette, Martin (6011706) |
| **Sent:** | March 9, 2005 6:11 PM |
| **To:** | 'pbrodeur@deloitte.ca' |
| **Cc:** | 'Daniel Schimmel' |
| **Subject:** | Teleglobe U.S. Unsecured Creditors Lawsuit |

Dear Pierre:

I write to you in connection with the above referenced action. We are hereby instructing Deloitte & Touche (D&T) to forward to my attention a copy of any documents that D&T received from BCE that are responsive to the attached subpoena that the Official Committee of Creditors of Teleglobe Communications Corporation and other debtors (Committee) served on D&T to the extent those documents were created in the period January 1, 2000 through May 28, 2002, subject to any applicable Canadian privileges. We also instruct D&T to forward to my attention a copy of any documents that BCE previously provided to D&T relating to BCE's write-down of the value of Teleglobe Inc.'s Goodwill in 2002, and the documents that BCE provided to D&T in connection with the preparation of its 2002 annual report and financial statements, filed on April 10, 2003.

Although it is my understanding from previous discussions with you and members of your team that you are taking the position that you will not provide us with a copy of your entire files regarding these matters, I reiterate my request to receive a copy of those files. Please indicate to me in writing whether or not you now agree to comply with that request and if not, the reasons thereof.

Call me should you wish to discuss.

Regards,

Martin

Martin Cossette
Conseiller Juridique/Legal Counsel
Bell Canada
Bureau 3700
1000, rue de La Gauchetière Ouest
Montréal, Québec  H3B 4Y7
(514) 391-5213
Fax: (514) 391-3768

# EXHIBIT 6

# COUR SUPÉRIEURE

CANADA
PROVINCE DE QUÉBEC
DISTRICT DE MONTRÉAL


N° :       500-17-024842-059


DATE :    7 JUILLET 2005

---

**SOUS LA PRÉSIDENCE DE : L'HONORABLE HÉLÈNE POULIN, J.C.S.**

---

**TELEGLOBE COMMUNICATIONS,
CORPORATION, TELEGLOBE USA INC.,
OPTEL TELECOMMUNICATIONS, INC.,
TELEGLOBE HOLDINGS (US),
CORPORATION, TELEGLOBE MARIEN,
(US) INC., TELEGLOBE HOLDING CORP.,
TELEGLOBE TELECOM CORPORATION,
TELEGLOBE INVESTMENT CORP.,
TELEGLOBE LUXEMBOURG LLC,
TELEGLOBE PUERTO RICO INC., and
TELEGLOBE SUBMARINE INC.,**

      Débiteurs
-et-

**TELEGLOBE COMMUNICATIONS
CORPORATION et al.,**
      Demandeurs
c.
**BCE INC. et al.,**
      Défendeurs
-et-
**SAMSON BÉLAIR/DELOITTE & TOUCHE LLP,**
      Requérante

JP1504

500-17-024842-059                                                    PAGE : 2

---

## JUGEMENT

---

[1]    Invoquant que le jugement prononcé par madame la juge Diane Marcelin, j.c.s., le 17 mars 2005, accueillant une requête pour interrogatoire hors de cour de tiers au litige et production de documents, affecterait ses droits, Deloitte & Touche LLP (**Deloitte**) demande au Tribunal de le rétracter.

[2]    Teleglobe Communications Corporation et al. (**Teleglobe**) conteste la requête.

### *LES FAITS, LES PRÉTENTIONS DES PARTIES ET LA QUESTION EN LITIGE*

[3]    Dans le cadre d'une poursuite que Teleglobe intente aux États-Unis contre BCE inc. (**BCE**), madame la juge Sue H. Robinson, juge en chef de la Cour de district pour le district du Delaware, délivre une «Letter of Request» le 11 février 2005. Par le biais de cet écrit, cette dernière vise principalement, comme lui permet de le faire l'article 9 de la *Loi sur certaines procédures*[1], à obtenir la collaboration de la Cour supérieure du Québec afin de forcer Deloitte, de même que sa représentante Ginette Nantel, à se soumettre à un interrogatoire hors de cour et à produire des documents qui pourront par la suite être utilisés aux États-Unis dans le cadre de l'affaire plus haut citée.

[4]    Forte de la lettre rogatoire, le 17 mars suivant, Teleglobe présente une «Motion for an Order to Appear for Examination and to Produce Documents» que madame la juge Diane Marcelin entend et accueille le jour même[2]. C'est de ce jugement que Deloitte demande maintenant la rétractation.

[5]    Pour appuyer son argumentation, Deloitte plaide principalement que:

-    le jugement prononcé le 17 mars 2005 va au-delà de ce que la «Letter of Request» lui permet d'accorder, contrevenant ainsi à l'article 9 de la *Loi sur certaines procédures*[3] qui prévoit que:

> «9. Lorsque, sur requête à cette fin, il est prouvé à la Cour supérieure ou à l'un des juges de cette cour, chargé d'administrer la justice dans le district, qu'un tribunal de toute autre province du Canada, ou de toute autre possession britannique, ou d'un pays

---

[1]    *Loi sur certaines* procédures, L.R.Q., c. P-27.
[2]    Voir le jugement daté du 17 mars 2005.
[3]    Supra, note 1.

500-17-024842-059                                                    PAGE : 3

étranger, devant lequel est pendante une cause civile ou commerciale, désire avoir le témoignage de quelque partie ou témoin qui se trouve dans le district, le tribunal ou ce juge peut ordonner que la partie ou le témoin soit interrogé sous serment, par questions écrites ou autrement, devant toute personne dénommée au dit ordre, <u>et peut assigner</u>, par le même ordre ou par un ordre subséquent, <u>cette partie ou ce témoin à comparaître pour rendre témoignage et lui enjoindre de produire tous écrits ou documents mentionnés dans l'ordre, ou tous autres écrits ou documents relatifs à l'affaire et qui sont en sa possession.</u>»

(La soussignée souligne);

-   cette décision va à l'encontre de la *Loi sur les dossiers d'entreprises*[4] dont l'article 2 prohibe le transport des documents relatifs à une entreprise et qui se lit comme suit:

«**2.** Sous réserve de l'article 3, nul ne peut, à la suite ou en vertu d'une réquisition émanant d'une autorité législative, judiciaire ou administrative extérieure au Québec, transporter ou faire transporter, ou envoyer ou faire envoyer, d'un endroit quelconque au Québec à un endroit situé hors de celui-ci, aucun document ou résumé ou sommaire d'un document relatif à une entreprise.»

-   la description des documents est vague et imprécise, ce qui constituerait une demande abusive et déraisonnable conduisant à une véritable partie de pêche;

-   ses comptables, qui sont tenus au secret professionnel, ne peuvent pas témoigner relativement aux questions soulevées dans la lettre rogatoire.

[6]   Pour contrer les prétentions de Deloitte, Teleglobe allègue au contraire que:

-   la «Letter of Request» a été obtenue en vertu d'une disposition légale ayant pour but de demander la collaboration d'un tribunal québécois;

-   Deloitte n'est pas justifiée de s'opposer au témoignage de Ginette Nantel puisqu'il lui sera toujours loisible de formuler en temps et lieu des objections quant aux questions qui lui seront posées;

-   Kathy Morgan, mandataire autorisée de Teleglobe, a renoncé au secret professionnel par lequel était liée Deloitte.  En conséquence elle ne peut plus prétendre devoir le respecter;

---

[4]   *Loi sur les dossiers d'entreprises*, L.R.Q., c. D-12.

-       quoiqu'il en soit, Deloitte ne peut pas refuser de remettre son dossier à son client qui lui en fait la demande.

[7]     Qu'en est-il ?

## *LA DISCUSSION ET LA DÉCISION*

[8]     Dans le cadre de la présente affaire, comme Deloitte n'était pas partie aux procédures intentées en première instance, la requête ne lui a pas été signifiée.  Son absence n'est toutefois pas sans remède, nous apprend la jurisprudence, puisqu'elle peut se pourvoir contre le jugement par voie de tierce opposition[5] afin d'en obtenir la rétractation, ce qu'elle a décidé de faire.

[9]     Son recours est-il fondé ?

-       l'étendue du jugement prononcé le 17 mars 2005

[10]    La preuve a révélé que ce jugement accorde plus que ce que la lettre rogatoire ne lui permet de faire.  En effet, alors que ni la requête présentée à madame la juge Robinson ni la «Letter of Request» que cette dernière délivre le 11 février 2005 ne font référence à Kathy Morgan, madame la juge Marcelin donne acte à la renonciation au secret professionnel que cette dernière aurait formulée à l'égard des dossiers de Deloitte le 15 mars 2005 (P-2), ce qu'elle n'avait pas la compétence de faire.

[11]    Plus précisément, il appert du dossier que la conclusion qui cerne l'étendue des témoignages et l'identification des documents et qui constitue l'élément-clé de son jugement précise ce qui suit:

>       «(...) as long as these questions relate to matters included in the Waiver of Privilege and professional secrecy of Kathy Morgan to Deloitte & Touche dated March 15, 2005 (...)»

[12]    Dans l'affaire *Asbestos*[6], le juge Beauregard écrit ce qui suit:

>       «(...) Le tribunal québécois ne pouvait pas rendre un jugement qui accordait plus que ce qui avait été ordonné par le tribunal étranger.»

---

[5]    *Nesmith c. Benesh*, [1983] R.J.Q. 549 (C.A.), *Ram Laminating Products inc. c. Unit Structures inc.*, [1990] R.D.J. 330 (C.A.), p. 33 et *Osborne c. Spokane (Cité de)*, J.E. 86-509 (C.S.).

[6]    *Asbestos Corporation ltd. c. Eagle-Picher Industries inc.*, [1984] R.D.J. 253 (C.A.), p.259.

500-17-024842-059                                                    PAGE : 5

[13]    À lui seul, cet argument serait suffisant pour rétracter le jugement.  Le Tribunal analysera cependant les autres moyens soulevés par Deloitte.

-       l'article 2 de la *Loi sur les dossiers d'entreprises*

[14]    Tel qu'il appert de l'article 2 plus haut cité et des dispositions de la même loi qui définissait les mots «document» et «entreprise»[7], nul ne peut, entre autres à la suite d'une lettre rogatoire, transporter ou envoyer hors du Québec des documents relatifs à une entreprise.

[15]    La jurisprudence enseigne que:

-       est prohibée la production de dépositions et de documents s'ils sont recueillis à la suite de la délivrance de lettres rogatoires dans le but d'être utilisés dans une instance judiciaire pendante devant un tribunal étranger[8], cette interdiction s'adressant à tous;

-       cette prohibition vise également tout document, résumé ou sommaire de document relatifs à une entreprise d'affaires au Québec qui ne peuvent servir hors du Québec de même que tout ce qui s'y rapporte[9];

-       de plus l'interdiction couvre non seulement les documents de nature comptable et financière mais tout rapport, tout écrit et toute pièce faisant partie des dossiers et archives d'une entreprise et réfère autant aux documents internes qu'à ceux ayant fait l'objet d'une circulation externe[10];

        Le contenu de tels documents ne saurait davantage être révélé par un interrogatoire ou par un autre moyen[11];

---

[7]  «1. Dans la présente loi, les mots suivants désignent:
     «document»;
     a) «document»: un compte, un bilan financier, un état des recettes et des dépenses, un état des profits et pertes, un état de l'actif et du passif, un inventaire, un rapport et tout autre écrit ou pièce faisant partie des dossiers ou archives d'une entreprise d'affaires;
     «entreprise»;
     b) «entreprise»: toute entreprise d'affaires au Québec;»
[8]  *Ram Laminating Products inc. c. Unit Structures inc.*, [1990] R.D.J. 330 (C.A.), p. 33 et *Osborne c. Spokane (Cité de)*, J.E. 86-509 (C.S.)
[9]  *Pelnar c. Insurance Company of North America*, [1985] R.D.I. 354 (C.A.).
[10] Supra, note 9.
[11] Supra, note 9.

- ne peuvent non plus être divulgués la date d'un document, le lieu où il a été fait, la signature qu'il porte et le sujet dont il traite puisqu'il s'agit là d'informations qui font partie de son contenu[12].

[16]    En conséquence, le Tribunal conclut que l'article 9 de la *Loi sur certaines procédures* doit céder le pas à l'article 2 de la *Loi sur les dossiers d'entreprises*. «Avant d'exercer sa discrétion en vertu de l'article 9 de la *Loi sur certaines procédures* et de venir en aide au tribunal étranger, le tribunal québécois doit s'assurer que l'aide au tribunal étranger n'est pas défendue par une loi de son pays[13]».

[17]    Vu ce qui précède, le Tribunal est d'avis que l'article 2 de la *Loi sur les dossiers d'entreprises* s'applique à l'Annexe A jointe à la «Letter of Request».

[18]    Puisque les documents qui y sont nommés de même que leur contenu ne peuvent être ni produits ni communiqués ni exhibés ni copiés[14] ni d'aucune façon révélés, l'ordonnance rendue le 17 mars 2005 va à l'encontre de l'article 2 plus haut cité et doit être rétractée.

- les documents sont vagues et imprécis

[19]    Deloitte allègue subsidiairement que les documents mentionnés dans l'ordonnance sont vagues et imprécis. Selon elle, demander de les obtenir équivaudrait à pratiquer une expédition de pêche. Le Tribunal partage cette opinion[15]. Comme l'écrivait le juge Chevalier dans l'affaire *Nacan*[16]:

> «[...] la façon extrêmement générale et globale dont est rédigée la liste des écrits dont on veut prendre connaissance me paraît indiquer clairement qu'il s'agit pour l'appelante d'aller à la pêche et de pratiquer une fouille exhaustive dans la documentation interne de l'intimée,... pour le cas où elle pourrait y trouver matière à servir sa cause.»

[20]    En l'espèce, l'ordonnance vise la production de tous les documents mentionnés à l'Annexe A et plus précisément ceux auxquels réfère Kathy Morgan dans la lettre qu'elle signe le 15 mars 2005. Cette demande concerne en somme tous les documents qui ont été remis à Deloitte bien qu'elle ne précise ni le sujet ni l'objet ni le lien qu'ils pourraient avoir avec les allégations des procédures intentées aux États-Unis. Cette

---

[12]    Supra, note 9.
[13]    Supra, note 6.
[14]    *Walsh c. Gaitan & Cusack*, [1993] R.D.J. 621 (C.A.).
[15]    *Polaris Industries inc. c. Rasidescu*, J.E. 99-471 (C.S.).
[16]    *Commercial Union Assurance Company of Canada c. Nacan Products Limited*, [1991] R.D.J. 399 (C.A.).

500-17-024842-059                                                        PAGE : 7

demande est abusive[17]. «On ne peut forcer un témoin à passer au travers de toutes les archives d'une compagnie, pour y retracer des documents qui pourraient ressembler à ceux dont on réclame la production[18]».

[21]    En conséquence de ce qui précède, le Tribunal est d'avis que le jugement prononcé le 17 mars 2005 par madame la juge Marcelin doit être rétracté, d'autant plus que Teleglobe demande de recevoir les documents pertinents 25 jours ouvrables avant la date fixée pour l'interrogatoire, ce qui laisse supposer qu'elle devra elle-même effectuer un exercice de triage.  Il serait dans les circonstances déraisonnable d'obliger Deloitte à consacrer un nombre imposant d'heures de travail à ce dossier afin de trouver et de produire des documents qui pourraient ne pas avoir la moindre pertinence avec le litige  et, qui plus est, alors que Teleglobe a vraisemblablement déjà en sa possession la grande majorité des documents qu'elle réclame.

-       le secret professionnel

[22]    Deloitte plaide enfin que comme les comptables sont tenus au secret professionnel[19] et que ce droit, qui appartient au domaine extrapatrimonial[20], ne peut pas être cédé, Kathy Morgan ne pouvait pas y renoncer pour Teleglobe.  De plus, insiste-t-elle, comme cette question n'a pas été soumise au tribunal américain, la Cour supérieure n'avait donc pas la juridiction pour l'aborder et en décider dans le cadre de l'article 9 de la *Loi sur certaines procédures*.

[23]    Sans décider si madame Morgan avait la capacité de renoncer au privilège de confidentialité au nom de Teleglobe, compte tenu de l'ensemble des éléments plus haut présentés, le Tribunal, qui estime qu'il n'y a pas lieu de discuter de cet argument, réitère cependant que le jugement dont Deloitte demande la rétractation n'aurait pas dû trancher cette question puisque la lettre rogatoire n'en faisait pas mention.

**POUR CES MOTIFS, LE TRIBUNAL:**

[24]    **ACCUEILLE** la requête en rétractation;

[25]    **RÉTRACTE** le jugement prononcé par madame la juge Diane Marcelin, j.c.s., le 17 mars 2005 et **REJETTE** en conséquence la «Motion of the Official Committee of Unsecured Creditors of Teleglobe Communications Corporation et al. for an Order to Appear for Examination and to Produce Documents»;

---

[17]   Supra, note 15.
[18]   Supra, note 15.
[19]   Article 9 de la *Charte des droits et libertés de la personne*, L.R.Q., c. C-12 et 48 du *Code de déontologie des comptables agréés*, R.R.Q. c. C-48, r. 2.01.
[20]   *Laprairie Shopping Ltd. (Syndic de)*, [1998] R.J.Q. 448 (C.A.).

500-17-024842-059                                                    PAGE : 8

[26]    **Avec dépens**.

HÉLÈNE POULIN, J.C.S.

Me Gordon Levine
Me Gérald Kadestin
KUGLER KANDESTIN
Procureurs des demandeurs

Me Martin Desrosiers
Me Karim Renno
OSLER, HOSKIN & HARCOURT
Procureurs de la requérante

Date d'audience :   4 JUILLET 2005

# SUPERIOR COURT

CANADA
PROVINCE OF QUÉBEC
DISTRICT OF MONTRÉAL
"

N° :       500-17-024842-059


DATE :   July 7, 2005

---

**PRESIDING JUDGE :     THE HONOURABLE  HÉLÈNE POULIN, J.C.S.**

---

**TELEGLOBE COMMUNICATIONS CORPORATION, TELEGLOBE USA INC., OPTEL TELECOMMUNICATIONS INC., TELEGLOBE HOLDINGS (US) CORPORATION, TELEGLOBE MARINE (US) INC., TELEGLOBE HOLDING CORP., TELEGLOBE TELECOM CORPORATION, TELEGLOBE INVESTMENT CORP., TELEGLOBE LUXEMBOURG LLC, TELEGLOBE PUERTO RICO INC., and TELEGLOBE SUBMARINE INC.**

> Debtors

and

**TELEGLOBE COMMUNICATIONS CORPORATION et al.**

> Plaintiffs

v.

**BCE INC. et al.**

> Defendants

and

**SAMSON BÉLAIR/DELOITTE TOUCHE LLP**

> Petitioner

---

## JUDGMENT

---

[1]     Deloitte & Touche LLP (**Deloitte**) seeks to have the Court revoke the judgment rendered against it by Madame Justice Diane Marcelin, J.C.S., on March 17, 2005, granting a motion to examine a third party to the litigation out of court and to produce documents on the grounds that it affects its rights.

[2]     Teleglobe Communications Corporation et al. (**Teleglobe**) are contesting this motion.

### THE FACTS, THE PARTIES' ARGUMENTS AND THE ISSUE

[3]     On February 11, 2005, Madame Justice Sue H. Robinson, Chief Justice of the Delaware District Court, issued a "Letter of Request" in the context of proceedings instituted by Teleglobe

in the United States against BCE inc. (**BCE**). With this letter, Madame Justice Robinson is seeking the collaboration of the Superior Court of Québec, in accordance with Section 9 of the *Special Procedure Act*[1], in order to force Deloitte, and its representative, Ginette Nantel, to submit to an out of court examination and to produce documents that can then be used in the United States in the context of the proceedings mentioned above.

[4]    On March 17, 2005, on the basis of the rogatory letter, Teleglobe presented a "Motion for an Order to Appear for Examination and to Produce Documents" which was heard and granted by Madame Justice Diane Marcelin that same day.[2] Deloitte is now seeking the revocation of this judgment.

[5]    In support of its motion, Deloitte's principal arguments are:

-      The judgment dated March 17, 2005 goes beyond the scope of what the "Letter of Request" allowed it to grant, in violation of Section 9 of the *Special Procedure Act*[3], which provides:

> "**9.** When, upon petition to that effect, it is shown to the Superior Court or to one of the judges thereof, charged with the administration of justice in the district, that a court of any other Province of Canada, or of any other British possession, or of a foreign country, before which any civil or commercial case is pending, desires to have the evidence of any party or witness in the district, such court or judge may order that such party or witness may be examined under oath, either by means of question in writing or otherwise, before any person mentioned in the said order, <u>and may summon</u>, by the same or by a subsequent order, <u>such party or witness to appear for examination, and may order him to produce any writing or document mentioned in the order, or any other writing or document relating to the matter, and which may be in his possession.</u>"

(Underlined by the Undersigned);

-      This judgment contravenes the *Business Concerns Records Act*[4], Section 2 of which prohibits the transfer of documents relating to any business concern. Section 2 reads as follows:

> "**2.** Subject to section 3, no person shall, pursuant to or under any requirement issued by any legislative, judicial or administrative authority outside Québec, remove or cause to be removed, or send or cause to be sent, from any place in Québec to a place outside Québec, any document or résumé or digest of any document relating to any concern."

-      The documents sought are vaguely and imprecisely described, which renders the request abusive and would lead to a veritable fishing expedition;

-      Deloitte's accountants, who are bound to professional secrecy, cannot testify regarding the questions raised in the rogatory letter.

[6]    To counter Deloitte's arguments, Teleglobe alleges:

-      The "Letter of Request" was obtained pursuant to a legal disposition, the goal of which was to seek the collaboration of a Québec court;

-      Deloitte is not justified in opposing to the testimony of Ginette Nantel because when the examination actually takes place, it will always be possible for them to formulate objections to the questions that will actually be asked;

---

[1] *Special Procedure Act*, R.S.Q., c. P-27.

[2] See the judgment, dated March 17, 2005.

[3] *Special Procedure Act*, R.S.Q., c. P-27.

[4] *Business Concerns Records Act*, R.S.Q., c. D-12.

- Kathy Morgan, Teleglobe's authorized mandatary, renounced the professional secrecy which bound Deloitte. As such, Deloitte can no longer claim the obligation to respect its professional secrecy;

- Whatever the case may be, when a client asks for its file, Deloitte cannot refuse to return it.

[7]    So, where do we stand?

### DISCUSSION AND DECISION

[8]    In the context of this case, the motion was not served upon Deloitte since it was not a party to the proceedings in first instance. Deloitte's absence is not, however, irremediable, because, according to the jurisprudence, it can contest the judgment by means of a third party opposition[5] in order to obtain the retraction of the judgment, which is what it decided to do.

[9]    Is Deloitte's motion well-founded?

- The Scope of the judgment rendered on March 17, 2005

[10]    The evidence shows that the judgment grants more than what the rogatory letter permits it to. In effect, even though neither the motion presented to Madame Justice Robinson, nor the "Letter of Request" which was issued by her on February 11, 2005, refer to Kathy Morgan, Madame Justice Marcelin gave effect to Ms. Morgan's renunciation of professional secrecy with regard to Deloitte's files, given on March 15, 2002 (P-2), which she had no jurisdiction to do.

[11]    Specifically, it appears from the file that the conclusion which indicates the scope of the testimony and of the documents sought, and which constitutes the key element of the judgment states:

> "(…) as long as these questions relate to matters included in the Waiver of Privilege and Professional secrecy of Kathy Morgan to Deloitte & Touche dated March 15, 2005 (…)"

[12]    In *Asbestos Corporation Ltd. v. Eagle-Picher Industries Inc.*[6], Justice Beauregard wrote:

> "(…) The Québec Court could not render a judgment that granted more than what was ordered by the foreign court ."

[13]    On its own, this argument is sufficient to revoke the judgment. The Court will, however, analyze the other arguments raised by Deloitte.

- Section 2 of the *Business Concerns Records Act*

[14]    As it appears from Section 2, cited above, and from the provisions of the same act which define the words "document" and "concern"[7], no one may, including pursuant to a rogatory letter, transport or send out of Québec, documents relating to a business concern.

[15]    The jurisprudence provides that:

---

[5] *Nesmith v. Benesh*, [1983] R.J.Q. 549 (C.A.), *Ram Laminating Products inc. v. Unit Structures inc.*, [1990] R.D.J. 330 (C.A.), p.33 and *Osborne v. Spokane (Cité de)*, J.E. 86-509 (S.C.).

[6] [1984] R.D.J. 253 (C.A.), p.259.

[7] 1. In this act, the following words mean:

"document";

(a) "document": any account, balance sheet, statement of receipts and expenditure, profit and loss statement, statement of assets and liabilities, inventory, report and any other writing or material forming part of the records or archives of a business concern;

"concern";

(b) "concern": any business concern in Québec;

-    The production of depositions and documents is prohibited if they are gathered following the issuance of rogatory letters for the purpose of being used in litigation pending before a foreign court[8], this prohibition being applicable to all;

-    This prohibition also targets any document, or summary of a document, relating to a Québec business concern, that cannot be used outside of Québec, and to anything related[9];

-    What's more, the prohibition covers, in addition to financial and accounting documents, all reports, writings and exhibits that are a part of the files and archives of the business concern, and includes both internal documents as well as documents that were circulated outside of the business concern[10];

The contents of such documents cannot be revealed by an examination or by any other means[11];

-    Neither the date of a document, the place where it was created, the signature upon it, nor its subject matter can be divulged, because this information forms part of the content of the documents[12].

[16]    As a result, the Court concludes that s.9 of the *Special Procedure Act* must give way to Section 2 of the *Business Concerns Records Act*. "Prior to exercising its discretion under Section 9 of the *Special Procedure Act*, and coming to the aid of a foreign court, the Québec Court must be assured that such help is not prohibited by a local law[13]".

[17]    In light of the foregoing, the Court is of the opinion that Section 2 of the *Business Concerns Records Act* applies to Annexe A of the "Letter of Request".

[18]    Since the documents named therein, as well as their contents cannot be produced, communicated, exhibited or copied[14] or in any other way revealed, the order rendered on March 17, 2005 violates Section 2, cited above, and must be revoked.

-    The Documents are Vague and Imprecise

[19]    Deloitte alleges, subsidiarily, that the documents mentioned in the order are vague and imprecise. According to Deloitte, attempting to obtain these documents amounts to a fishing expedition. The Court shares this opinion.[15] As Justice Chevalier wrote in *Commercial Union Assurance Company of Canada v. Nacan Products Limited*[16]:

> "[…] the broad and general manner in which the list of writings sought is drafted clearly appears to me to be an attempt by the appellant to go fishing and to do an exhaustive search in the respondent's internal documents…in the hope to find materials to help its case."

[20]    In fact, the order seeks the production of all documents mentioned in Annexe A, specifically those referred to by Kathy Morgan in a letter that she signed on March 15, 2005. This request concerns essentially all of the documents that were given to Deloitte, though it does not specify the subject or object, nor does it specify what connection there might be to the proceedings instituted in the United States. This request is abusive[17]. "A witness cannot be

---

[8] *Ram Laminating Products inc. v. Unit Structures inc.*, [1990] R.D.J. 330 (C.A.), p.33 and *Osborne v. Spokane (Cité de)*, J.E. 86-509 (S.C.).

[9] *Pelnar v. Insurance Company of North America*, [1985] R.D.I. 354 (C.A.).

[10] *Supra*, note 9.

[11] *Supra*, note 9.

[12] *Supra*, note 9.

[13] *Supra*, note 6.

[14] *Walsh v. Gaitan & Cusack*, [1993] R.D.J. 621 (C.A.).

[15] *Polaris Industries Inc. v. Rasidescu*, J.E. 99-471 (S.C.).

[16] [1991] R.D.J. 399 (C.A.).

[17] *Supra*, note 15.

forced to go through all of a company's archives in order to find documents that might resemble those whose production is sought[18]."

[21]    In light of the foregoing, the Court is of the opinion that the judgment rendered on March 17, 2005, by Madame Justice Marcelin must be revoked, especially considering that Teleglobe has asked to receive the pertinent documents 25 working days before the date of the examination, which leads one to believe that Teleglobe will have to sort through all of these documents itself. It would be unreasonable in the circumstances to oblige Deloitte to devote a significant amount of labour hours to this file in order to find and produce documents that might not have the slightest relevance to the litigation, especially given that Teleglobe probably has the overwhelming majority of the documents that it is claiming in its possession.

-        Professional Secrecy

[22]    Deloitte argues, as well, that since accountants are bound to professional secrecy[19] and this right, which is extra-patrimonial[20], cannot be assigned, Kathy Morgan could not renounce it for Teleglobe.  In addition, since this question was not submitted to the American Court, the Superior Court did not have jurisdiction to consider and decide it pursuant to Section 9 of the Special Procedure Act.

[23]    Without deciding whether Ms. Morgan had the capacity to renounce privilege on behalf of Teleglobe, given all of the elements presented above, the Court is of the opinion that it should not discuss this argument, but reiterates, however, that the judgment which Deloitte seeks revocation of should not have considered this issue because the rogatory letter did not mention it.

**FOR THESE REASONS, THE COURT:**

[24]    **GRANTS** the motion for revocation;

[25]    **REVOKES** the judgment rendered on March 17, 2005, by Madame Justice Diane Marcelin j.c.s., and **DISMISSES,** as a result, the "Motion of the Official Committee of Unsecured Creditors of Teleglobe Communications Corporation et al. for an Order to Appear for Examination and to Produce Documents";

[26]    **With Costs.**

**HÉLÈNE POULIN, J.C.S.**

---

[18] Supra, note 15.

[19] Section 9 of the Charter of Human Rights and Freedoms, R.S.Q., c. C-12., and Section 48 of the Code of Ethics of Chartered Accountants, R.R.Q., c. C-48, r. 2.01.

[20] Laprairie Shopping Ltd. (Syndic de), [1998] R.J.Q. 448 (C.A.).