IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TELEGLOBE COMMUNICATIONS | ) | Jointly Administered |
| CORPORATION, *et al.*, | ) | Bank. Case No. 02-11518 (MFW) |
| | ) | |
| Debtors, | ) | |

---

| | | |
|---|---|---|
| TELEGLOBE COMMUNICATIONS | ) | |
| CORPORATION, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | C.A. No. 04-CV-1266 (SLR) |
| v. | ) | |
| | ) | |
| BCE, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

DECISION ON PLAINTIFFS' MOTION TO COMPEL
DEFENDANTS TO PRODUCE DOCUMENTS
<u>WITHHELD ON THE BASIS OF PRIVILEGE</u>

Gregory V. Varallo, Esquire, C. Malcolm Cochran, IV, Esquire, Russell C. Silberglied, Esquire, Chad M. Shandler, Esquire, and Evan O. Williford, Esquire, of RICHARDS LAYTON & FINGER, Attorneys for the Debtors

Kevin Gross, Esquire, of ROSENTHAL, MONHAIT, GROSS, & GODDESS, P.A., Attorneys for the Unsecured Creditors Committee

Pauline K. Morgan, Esquire, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Attorneys for the Defendants

Collins J. Seitz, Jr., Special Master

This lawsuit arises out of the decision by BCE, Inc. ("BCE"), a Canadian corporation, to cease long term funding of its wholly owned subsidiary, Teleglobe, Inc. ("Teleglobe"), another Canadian corporation. BCE's decision led Teleglobe's wholly-owned direct and indirect United States subsidiaries to seek protection under Chapter 11 of the United States Bankruptcy Code. The corporate plaintiffs, who are the U.S. subsidiary debtors and debtors in possession in the Chapter 11 proceedings, filed suit for damages and other relief.[1] Each of the Debtors is a Delaware corporation except Teleglobe Puerto Rico Inc., which is a Puerto Rican corporation.

The first defendant is BCE, Canada's largest communications company. BCE's subsidiary, Bell Canada, provides telecommunication services in Canada, and at one time owned approximately 23% of Teleglobe. In November, 2000, BCE purchased all the remaining shares of Teleglobe from the public. After the acquisition of Teleglobe, BCE either directly or indirectly through Bell Canada owned all of the stock of the Debtors.

---

[1] The plaintiffs are Teleglobe Communications Corporation, Teleglobe USA, Inc., Optel Telecommunications, Inc., Teleglobe Holdings (U.S.) Corporation, Teleglobe Marine (U.S.) Inc., Teleglobe Holding Corp., Teleglobe Telecom Corporation, Teleglobe Investment Corp., Teleglobe Luxembourg LLC, Teleglobe Puerto Rico Inc., Teleglobe Submarine Inc., and the Official Committee of Unsecured Creditors of Teleglobe Communications Corporation. Collectively, the corporate entities will be referred to as the "Debtors." On April 24, 2005, the District Court authorized the Creditors Committee to join with the Debtors to prosecute claims against the defendants in this action. The plaintiffs and the creditors' committee will both be referred to as the Debtors.

The next defendants are a group of the Debtors' directors and officers. Marc Bouchard, Serge Fortin, Terence Jarman, and Stewart Verge were officers or directors of several of the Debtors during the time that BCE first evaluated and then decided to cease funding of Teleglobe. Some of these individuals also held positions with BCE subsidiaries. Michael Boychuk was an officer or director of several of the Debtors during the same time frame. He also served as an officer or director of BCE, Bell Canada, and Teleglobe.

The next group of defendants are former Teleglobe directors and officers, who were also directors and officers of BCE or Bell Canada. Jean Monty was chairman of Teleglobe between 2000 and April, 2002, and was also chairman, president, and chief executive officer of BCE. Richard Currie served as a Teleglobe director from December 2000 through April, 2002. Currie was also a BCE director, and succeeded Monty as chairman of the board of BCE. Thomas Kierans was a member of the Teleglobe board of directors from December 2000 through April, 2002, and also served as a BCE director. Stephen Skinner served as vice president and controller of Teleglobe from July, 2001 through April, 2002 while he was also the corporate controller of BCE. Finally, H. Arnold Steinberg served as a Teleglobe director during the relevant time period, and previously served as a director of Bell Canada.

3

*The Claims of the Amended Complaint*

The amended complaint alleges seven theories of liability. In the first three causes of action, the Debtors have asserted claims against BCE for breach of contract, estoppel, and misrepresentation. They allege that BCE breached funding commitments made to the Debtors to underwrite the build out of the GlobeSystem – a worldwide data network that was supposed to connect 160 cities around the world. The amended complaint states that the GlobeSystem was expected to cost at least $5 billion to build, and an additional $1 billion to fund through break-even operations. Because the Debtors did not have the financial resources to support the GlobeSystem, the Debtors claim that they shouldered the monetary burden at the direction of the Defendants. The Debtors allege that they were led to believe that BCE would cover the GlobeSystem debt and the operation of Teleglobe through the build out period and beyond. When BCE decided to cease long term funding for the Debtors' GlobeSystem activities, the Debtors contend that BCE's decision breached a funding commitment and was inconsistent with representations to fund the Debtors' cash needs.

The fourth cause of action asserted by the Debtors is breach of fiduciary duty against BCE. It is alleged that as early as November 1, 2000, the Debtors were either insolvent or operating in the zone of insolvency. While operating under these conditions, Debtors claim that BCE assumed and exercised actual

control over the Debtors, and thereby owed fiduciary duties towards Debtors and their creditors. Because BCE had allegedly assumed control of Teleglobe and the Debtors, and the companies were either insolvent or operating in the zone of insolvency, the Debtors claim that BCE breached its fiduciary duties by acting only in BCE's interest, and not in the interests of the Debtors and their creditors.

The fifth cause of action is brought by the Creditors Committee for breach of fiduciary duty against the Debtors' directors and officers. The Committee alleges that as early as November 1, 2000, the Debtors were insolvent or operating within the zone of insolvency. It is alleged that the Debtors' directors and officers breached their fiduciary duties by acting only in the interest of BCE when the Debtors were either insolvent or operating within the zone of insolvency.

The sixth cause of action is also brought by the Committee against the Teleglobe directors and officers for breach of fiduciary duty. The Committee asserts that while the Debtors were either insolvent or operating within the zone of insolvency, the Teleglobe directors and officers assumed and exercised actual control over the Debtors. The Committee claims that, by assuming control of companies in precarious financial condition, the Teleglobe directors and officers breached fiduciary duties to the Debtors and creditors by acting only in the interest of BCE instead of in the interests of the Debtors and its creditors.

The last cause of action is brought by the Committee against the BCE and Teleglobe directors and officers. The Committee claims that BCE's directors and officers aided and abetted breaches of fiduciary duties committed by the Debtors' and Teleglobe's directors and officers. The Committee also claims that the Teleglobe directors and officers aided and abetted breaches of fiduciary duties committed by the Debtors' directors and officers.

*The Motion to Compel Production*

Pending is Debtors' February 11, 2005 motion to compel production of documents. As originally filed, the motion requested broad relief, including production of the redacted portions of documents, and production of thousands of documents withheld by defendants based on attorney client privilege and work product doctrine. Although the District Court initially denied the motion by order dated March 31, 2005, on August 25, 2005, the District Court referred to the Special Master Panel the task of addressing "issues relating to the plaintiffs' motion to compel (D.I. 74-76, 87, 91, 135, 137, 156) and the parties' privilege logs." (D.I. 157). In a further order, the Court directed the Special Master to "regulate all proceedings and take all measures necessary to manage the issues relating to plaintiffs' motion to compel ... and the parties' privilege logs, and rule on same." (D.I. 160).

After briefing and oral argument before the Special Master, both sides have narrowed the issues for decision. In their brief in opposition to Debtors' motion, defendants state that BCE has already produced all documents where any member of the BCE legal department acted as legal counsel to Teleglobe or any of the Debtors. *Id.* at 4. The defendants also state that BCE has produced all documents "generated as a result of the joint representation of BCE and Teleglobe by legal counsel, or with matters giving rise to a common interest privilege between Teleglobe and BCE." *Id.*[2]

With regard to Marc Bouchard, Serge Fortin, Terence Jarman, Patrick Pichette and Stewart Verge, if there were any documents reflecting communications between these individuals and BCE or Teleglobe counsel, BCE states that those documents have been or will be produced.[3] BCE also represents that it has already produced documents reflecting communications between or among any of Messrs. Boychuk, Kierans, Currie, or Sabia, and BCE or Teleglobe counsel, for advice rendered to or on behalf of Teleglobe. Therefore, according to defendants, the only documents that continue to be withheld from production and

---

[2] The Debtors submitted the affidavit of Kathy Morgan, the plan administrator for Teleglobe and Debtors. On behalf of Teleglobe and the Debtors, Ms. Morgan consented to the delivery to the Debtors of any communications prior to April 24, 2002 listed in the defendants' privilege logs. Aff. ¶ 3. The effect of this statement was to waive the privilege as to joint communications from BCE attorneys over which Teleglobe or BCE might assert attorney client privilege.

[3] At oral argument defendants' counsel stated that there were a limited number of documents still listed on the privilege logs relating to these people that will be produced. The same is true for documents for Mr. Pichette dated after January 23, 2002. Hearing Transcript, pp. 12-13.

are subject to this motion are documents that "involve the provision of legal advice *solely* to BCE." Answering Brief, p. 1 (emphasis in original). Finally, at oral argument, Debtors' counsel further narrowed the dispute by limiting the universe of challenged privilege log documents to the time period from November 1, 2001 to April 23, 2002. Hearing Transcript, pp. 10-11.

Debtors have asked for verification that the documents on defendants' privilege logs generated from November 1, 2001 to and including April 23, 2002, relate to legal advice provided exclusively to BCE. The Special Master allowed Debtors' counsel to select fifty documents from defendants' privilege logs for *in camera* review to confirm defendants' statement. The Special Master will issue a supplemental decision regarding this issue, which may include a modification of this decision. For purposes of this decision, the Special Master will assume that the defendants' privilege logs only list documents reflecting legal advice provided by BCE attorneys exclusively to BCE.

The Debtors challenge the defendants' assertion of the attorney client privilege based on three theories: (1) When BCE's attorneys allegedly represented BCE, Teleglobe, and the Debtors at the same time on the decision to cease long term funding, and also served as officers of some of the Debtors, they owed fiduciary duties to each of their clients, and cannot withhold from any of them documents containing legal advice provided during the joint representation; (2)

8

BCE's directors and officers, who were also directors or officers of Teleglobe and some of the Debtors, were "conflicted fiduciaries" with duties owed to each and all of BCE, Teleglobe, and the Debtors, and cannot withhold from Teleglobe or the Debtors documents containing legal advice they received on behalf of BCE; and (3) BCE and the Teleglobe directors and officers exercised "control" over Debtors at a time when Debtors were insolvent or were operating within the zone of insolvency, and therefore owed fiduciary duties to Debtors and their creditors, and cannot withhold from Teleglobe or the Debtors documents containing legal advice to BCE. Debtors also contest defendants' assertion of work product immunity, claiming that defendants have not made a specific showing of threatened litigation to invoke work product immunity.

## I.

Both sides have relied on a number of federal and state decisions to support their positions. Neither side, however, has been clear on whether federal or state law should govern the privilege analysis.[4] This is a non-core proceeding in District Court brought under 28 U.S.C. § 157(b) of the Bankruptcy Code. The Debtors have raised claims that are exclusively state law causes of action -- breach of

---

[4] At page 13 of their answering brief, defendants refer to Federal Rule of Evidence 501 and claim that state law governs the privilege issue. At oral argument, the Debtors stated that federal law applies, but thought that state and federal law were consistent. Hearing Transcript pp. 19-20.

contract, estoppel, misrepresentation, and breach of fiduciary duty. Rule 501 of

the Federal Rules of Evidence provides that:

> [I]n civil actions and proceedings, with respect to an element of a
> claim or defense as to which State law supplies the rule of decision,
> the privilege of a witness, person, government, State, or political
> subdivision thereof shall be determined in accordance with State law.

Under Rule 501, the privilege inquiry is governed by state law. *See G-I Holdings,*

*Inv. v. Baron & Budd*, 2005 WL 1653623 at *2 (S.D.N.Y.) (applying New York

state law to determination of attorney client privilege); *Remington Arms Comp. v.*

*Liberty Mutual Ins. Comp.*, 142 F.R.D. 408 (D. Del. 1992) (applying Connecticut

state law to determination of attorney client privilege); *Bailey v. Meister Brau,*

*Inc.*, 55 F.R.D. 211 (N.D. Ill. 1972) (applying state attorney client privilege law);

*In re Diasonics Sec. Litig.*, 110 F.R.D. 570 (D. Col. 1986) (applying state law

attorney client privilege in a dual fiduciary inquiry).

To determine which state law applies, a court must apply the choice-of-law

rules prevailing in the state in which the court sits. *Klaxon Co. v. Stentor Elec.*

*Mfg. Co.*, 313 U.S. 487, 496 (1941).  With regard to choice-of-law questions for

privilege issues, Delaware has relied on Restatement (Second) of Conflicts of Law

and its "most significant relationship" test. *Lee v. Engle*, 1995 WL 761222 (most

significant relationship test applied to accountant-client privilege); *Danklef v.*

*Wilmington Medical Center*, 429 A.2d 509 (Del. Super. 1981) (applying

Restatement test to determine evidentiary privilege choice-of-law decision).  One

10

commentator believes that Delaware law should govern by default because privilege determinations are procedural in nature and are therefore governed by Delaware's rules of evidence. John E. James, *Privileged Communications and the Delaware Corporation*, § 7.03 at 136-37 (2000). There are other views on the issue as well. *See* Restatement (Second) Conflict of Laws § 139(2).

Thankfully, the Special Master need not untangle this analytical thicket to make a decision in the instant case. The parties did not raise the conflicts of laws issue, and instead have both relied extensively on Delaware law. The Special Master will give primacy to Delaware state law, as opposed to the law of another state, to decide the privilege and work product issues raised in this case.[5]

## II.

The attorney client privilege "protects the communications between a client and an attorney acting in his professional capacity where the communications are intended to be confidential, and the confidentiality is not waived." *Riggs Nat. Bank of Washington, D.C. v. Zimmer*, 355 A.2d 709, 713 (Del.Ch. 1976). The privilege serves "to foster the confidence of the client and enables him to communicate without fear in order to seek legal advice." *Id. See also Moyer v. Moyer*, 602 A.2d 68, 72 (Del. 1992).

---

[5] One of the Debtors is a Puerto Rican corporation. Neither party claims that Puerto Rican law should apply, or is any different from the analysis to be applied under Delaware law. The Special Master will therefore apply Delaware law to the claims raised by all Debtors.

Delaware Rule of Evidence 502 captures the elements of the attorney client privilege in Delaware.  The Rule states that a communication is privileged when made in confidence and:

> for the purpose of facilitating the rendition of professional legal services to the client (1) between himself or his representative and his lawyer or his lawyer's representative, (2) between his lawyer and the lawyer's representative, (3) by him or his representative or his lawyer or a representative of the lawyer to a lawyer or a representative of a lawyer representing another in a matter of common interest, (4) between representatives of the client or between the client and a representative of the client, or (5) among lawyers and their representatives representing the same client.

Rule 502(d) sets forth the exceptions.  There is no privilege under the rule where:

> ...
> (6) Joint clients.  As to a communication relevant to a matter of common interest between or among 2 or more clients if the communication was made by any of them to a lawyer retained or consulted in common, when offered in an action between or among any of the clients.

Delaware Rule of Evidence 510 addresses waiver of the privilege:

> A person upon whom these rules confer a privilege against disclosure waives the privilege if he or his predecessor while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the privileged matter.  This rule does not apply if the disclosure itself is privileged.

The party asserting the privilege bears the burden of demonstrating that the privilege applies.  *Moyer*, 602 A.2d at 72; *Lemelson v. Bendix Corp.*,

104 F.R.D. 13, 16 (D. Del. 1984). Once a party has met its burden of

establishing privilege, the burden shifts to the other party to demonstrate an

exception to, or waiver of, the privilege. *Tackett v. State Farm Fire & Cas.*

*Ins. Co.*, 653 A.2d 254, 259 (Del. 1995); *Lemelson*, 104 F.R.D. at 16-17.

Because the privilege interferes with the truth finding process, the privilege

is narrowly construed and limited in scope only to those disclosures

necessary to obtain legal advice that would not have been disclosed absent

the privilege. *Balin v. Amerimar Realty Co.*, 1995 WL 170421 (Del.Ch.);

*Hercules, Inc. v. Exxon Corp.*, 434 F. Supp. 136, 152 n. 11 (D. Del. 1977).

The Debtors do not appear to contest that the documents subject to a

claim of privilege were confidential communications that would ordinarily

be protected by attorney client privilege. Instead, the Debtors have sought to

abrogate the privilege on the grounds that follow.

III.

The Debtors argue that Martin Turcotte, BCE's Chief Legal Officer, and

Michel Lalande, David Masse, and Marc Ryan, who also served as BCE attorneys,

jointly represented BCE, Teleglobe, and the Debtors in the same matter – the

decision to cease long term funding of Debtors' operations. Therefore, according

to Debtors, BCE cannot claim privilege for documents resulting from a joint or

common representation of all of the parties by BCE attorneys. Opening Brief, p.

13

11. The Debtors also argue that Lalande, Masse, and Ryan simultaneously were either directors or officers of Teleglobe and some of the Debtors, and as conflicted fiduciaries who owed duties to all of the entities, cannot assert attorney client privilege on behalf of BCE in a dispute between the Debtors and BCE.

To establish their joint representation argument, the Debtors rely heavily on *In re Mirant Corp.*, 326 B.R. 646 (Bankr. N.D. Tex. 2005). In *Mirant*, the debtors were for the most part subsidiary corporations of The Southern Company ("TSC"). TSC decided to divest itself of Mirant Corporation, and, after initially offering 20% of Mirant to the public, divested Mirant by issuing the balance of Mirant stock to TSC shareholders as a tax free dividend. After divestiture Mirant had financial troubles, and eventually filed for protection under the bankruptcy laws. 326 B.R. at 648-49.

In *Mirant*, Troutman Sanders LLP ("Troutman") had represented both Mirant and TSC during the divestiture, and advised both corporations on divestiture-related issues. The debtors moved to compel production of the communications between TSC and Troutman regarding the divestiture. The bankruptcy court held that TSC and Troutman could not invoke the attorney client privilege because the law was well settled that "counsel who represents two clients in the same matter cannot keep confidences of one respecting the matter from the

14

other." *Id.* at 651 (applying Georgia law).[6] Because Troutman represented both

Mirant and TSC in the challenged transaction, privilege could not be asserted to

block an inquiry into the divestiture related legal advice.[7]

The Debtors argue that BCE's in house attorneys jointly represented BCE,

Teleglobe, and the Debtors "in the same matter" and therefore the Debtors are

entitled to the advice provided to any of the clients. They point to several facts in

an attempt to establish this conclusion:

- BCE centralized legal functions for BCE, Teleglobe, and the Debtors with the BCE legal department. *See* Exhibit L to Opening Brief.

- Michel Lalande, BCE's general counsel, was formerly Teleglobe's general counsel, and as BCE's counsel also provided legal advice to Teleglobe regarding corporate governance matters, schedules of authorities, sale of assets, board resolutions, annual reports, credit facilities, and appointment of officers. Opening Brief pp. 7-8.

- David Masse and Marc Ryan, BCE's in house attorneys, also provided advice to Teleglobe and the Debtors "on a variety of matters." Opening Brief p. 9.

None of these facts show any joint representation by any of the BCE in

house attorneys regarding the specific dispute in this case. Unlike *Mirant*, where

---

[6] TSC's general counsel directed TSC and Mirant to use Troutman for advice regarding the divestiture, and required both entities to enter into a "Protocol for Legal Representation." The Protocol provided that Troutman would protect the confidences of each client, and would not share confidential information between the two clients. Troutman was authorized to give advice to both clients regarding the divestiture "'even if the advice is adverse or perceived to be adverse to the interest of one of them.'" *Id.* at 648, quoting the Protocol. The bankruptcy court found that the Protocol did not "provide either Mirant or TSC with any privilege beyond that which exists in an ordinary joint representation." *Id.* at 652.

[7] Delaware Rule of Evidence 502(d)(6) recognizes the same joint representation exception when the joint or common representation covers the same subject matter.

the Debtor subsidiary and parent were jointly represented by the same law firm regarding the divestiture of the subsidiary, there is no present record of BCE in house attorney joint representation of all the entities regarding the decision in April of 2002 to cease funding for Debtors.

It is common in parent/subsidiary corporation relationships that all entities rely upon a central in house counsel to provide legal services. Under Delaware law, it is only where in house attorneys jointly represent and provide advice to both the parent and the subsidiary on the same subject matter that joint representation precludes one client from withholding communications from the other.

Along with their reply brief, the Debtors submitted the affidavit of Kathy Morgan, the plan administrator for Teleglobe. Ms. Morgan states that BCE's in house attorneys "served as counsel on behalf of [Teleglobe] and certain of the debtors for such matters as … "board related activities; and including matters relating to the decision by BCE, Inc. ("BCE") to terminate funding for [Teleglobe] and the Debtors, sometimes referred to as "Project X." Aff. 7.

Ms. Morgan states a conclusion, but does set forth any details about the supposed joint Project X representation. Without any substance behind the conclusion, the affidavit is of no assistance in determining whether BCE's attorneys jointly represented Teleglobe and the Debtors on Project X.

16

On the present record before the Special Master, none of the BCE in house attorneys jointly represented BCE, Teleglobe, or the Debtors regarding Project X and the eventual decision by BCE to cease long term funding of Teleglobe and the Debtors. Where there is no joint representation for the same subject matter, the privilege remains intact, and BCE need not produce documents reflecting legal advice provided exclusively to BCE on the decision to cease long term funding of the Debtors. This decision, however, is subject to modification depending on the review of documents submitted by BCE for in camera inspection.[8]

## IV.

Even though BCE's in house attorneys did not on the present record jointly represent BCE, Teleglobe, or the Debtors for Project X and the funding issues, BCE attorneys Lalande, Masse, and Ryan also served as officers of Teleglobe and some of the Debtors.[9] Although defendants attempt to trivialize the positions they held and the duties they performed, the substantive nature or importance of an

---

[8]  Outside counsel was involved in the events leading up to the April 23, 2002 decision to cease long term funding of Teleglobe. Prior to April 8, 2002, BCE retained the Canadian law firm Davies Ward Phillips & Vineberg, LLP ("Davies Ward") as outside counsel for BCE on Project X (Ex. 6 to Debtors' reply brief). On April 8, 2002, Davies Ward started to represent Teleglobe on Project X and possible funding alternatives (9/21/05 Turcotte Dep. 67-68; 119-20). Although Davies Ward represented both BCE and Teleglobe for the same subject matter, there is no evidence of a joint representation by Davies Ward of both BCE and Teleglobe. Any communications from Davies Ward on or after April 8, 2002 should be produced, because the firm was exclusively representing Teleglobe on funding issues.

[9]  Martine Turcotte was not a director or officer of Teleglobe or the Debtors, and there is no evidence of record that she jointly represented any of the entities on Project X.

officer's duties should not be the test. As officers, they owed fiduciary duties to the Debtors they served.

Relying on *Valente v. Pepsico, Inc.*, 68 F.R.D. 361 (D.Del. 1975), the Debtors claim that these attorney/officers were conflicted fiduciaries, whose fiduciary duty to the Debtors precludes reliance on the privilege to shield advice they provided to BCE regarding Project X and the decision to cease long term funding for Debtors. In *Valente*, this Court, applying federal law, required production of documents withheld from production based on the attorney client privilege.

The plaintiffs in *Valente*, representing a class of minority shareholders and warrant holders of Wilson Sporting Goods, Inc. ("Wilson"), filed suit to challenge the eventual merger of Wilson into PepsiCo, Inc. ("PepsiCo"). PepsiCo purchased a majority interest in Wilson, and through a series of additional purchases, eventually cashed out the minority shareholders through a short form merger under Delaware law. The class plaintiffs alleged that PepsiCo engaged in fraud, made misrepresentations, and otherwise failed to comply with the Securities Act of 1934 in conducting the merger. Plaintiffs sought to compel production of documents prepared by PepsiCo's in house counsel, outside counsel, and others, to determine the tax consequences of various alternative forms of merger.

The District Court in *Valente* started with the proposition that legal advice provided by in house attorneys should be treated no differently than advice from outside counsel. *Id.* at 367. Looking at the specific facts of the case, the Court noted that unlike the situation addressed in *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970), where a corporation in some situations cannot claim privilege against its own shareholders for advice related to the subject matter of the suit, the plaintiffs in *Valente* were seeking information from a separate controlling parent corporation of the corporation in which the minority held their stake.

PepsiCo's general counsel, who authored documents providing legal advice to PepsiCo, was also a member of the Wilson board of directors. The Court reasoned that when documents are withheld in situations where attorneys assume dual roles as legal advisor and corporate fiduciary, "the applicability of the privilege must be determined in light of the obligations and policies to be served." *Id.* The Court looked to the policy underpinnings of cases such as *Garner*, and determined that "a corporation is, at least in part, the association of its shareholders, and it owes to them a fiduciary obligation which is stronger than the societal policy favoring privileged communications." *Id.* at 368. For documents authored by the general counsel/director, the Court held that the general counsel was a conflicted fiduciary:

> In those positions, he owed separate fiduciary obligations to two
> separate entities and their interests. He could not subordinate the

fiduciary obligations which he owed to Wilson and the minority
shareholders of Wilson to those of his client PepsiCo. The fact that
Wilson may not have had an attorney-client relationship with him is
of no import. His knowledge in one capacity cannot be separated
from the other, nor can his duties as a fiduciary be lessened or
increased because of professional relationship.

*Id.*

Although the general counsel in *Valente* had not represented both the parent

and the subsidiary in the merger, the Court determined that "just as importantly as

a director of Wilson, his obligations ran to the shareholders of Wilson, and the

protection of their best interests." *Id.* at 368. Therefore, the Court ordered that

documents be produced containing legal advice authored by him. For the same

reasons, the Court also ordered outside counsel to produce documents relating to

merger advice, where a member of outside counsel's law firm replaced the general

counsel on Wilson's board of directors.

Finally, the Court in *Valente* required PepsiCo to produce documents

containing legal advice from PepsiCo's in house counsel to PepsiCo, as well as an

opinion from Delaware counsel to PepsiCo's in house counsel. The Court

explained that in both situations, "the recipient of the advice or the client whose

interest is being ascertained, had fiduciary obligations which ran to Wilson and the

Wilson minority." *Id.* Because PepsiCo as a controlling shareholder owed

fiduciary obligations to Wilson and its minority shareholders, documents

containing legal advice regarding treatment of minority shareholders in the merger

20

were ordered produced.  To hold otherwise "would allow the perpetration of
frauds" against the beneficiaries of the duty.  *Id.* at 370.

   *Valente*, decided under federal common law, is distinguishable from this
case.  Where fiduciary relationships are at issue, the initial question must be asked
-- to whom is the duty owed?  Although some of the BCE attorneys were also
officers of the Debtors, the Debtors were all wholly-owned subsidiaries of BCE.
Under Delaware law, absent a solvency issue, "in a parent and wholly-owned
subsidiary context, the directors of the subsidiary are obligated only to manage the
affairs of the subsidiary in the best interests of the parent and its shareholders."
*Anandarko Petroleum Corp. v. Panhandle Eastern Corp.*, 545 A.2d 1171, 1174
(1988), citing *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1977), and
*Goodman v. Futrovsky*, 213 A.2d 899, 902 (Del. 1965).

   BCE's attorneys, who also served as directors and officers of the Debtors,
ultimately owed their fiduciary duties to BCE and its shareholders.  Unlike
*Valente*, where the attorney/director was conflicted and had to subordinate the
interest of the minority shareholders of the subsidiary to his legal representation of
the parent, the fiduciary duties of the BCE attorneys who are also officers of the
Debtors were aligned.  The duties ultimately ran to the same place – BCE and its

shareholders.[10]  In the context of this case, there is no minority equity interest to be protected from the divided loyalties of conflicted fiduciaries.[11]

The Delaware courts have stated that *Valente* does not necessarily reflect the law of Delaware.  *Grimes v. LCC Int'l, Inc.*, 1999 WL 252381 at *3 (Del. Ch.), citing *Deutsch v. Cogan*, 580 A.2d 100, 105-06 (Del. Ch. 1990).  In *Grimes*, the general counsel of LLC International, Inc. ("LCC"), DeLiso, simultaneously served as general counsel and chairman of the board of directors for LCC's subsidiary, Microcell.  Plaintiffs brought a derivative action on behalf of Mircocell against LCC as Microcell's controlling shareholder.  They sought to compel production of the general counsel's communications because of his positions with both corporations.

The Court of Chancery sustained the privilege assertion for legal work performed by the general counsel exclusively for the parent LCC, and required an

---

[10]  The Delaware state court decisions have "declined to broadly apply" the *Valente* decision. *Grimes v. LCC Int'l, Inc.*, 1999 WL 252381 (Del. Ch.); *Deutsch v. Cogan*, 580 A.2d 100 (Del. Ch. 1990).  Instead of adopting an absolute rule that minority shareholders are entitled to access to legal opinions relating to the subject of a later suit between the minority shareholder and the corporation, the Court of Chancery requires a stockholder plaintiff to demonstrate "good cause" under the factors set forth in *Garner v. Wolfinbarger*, 430 F.2d 1903 (5th Cir. 1970), *cert. denied*, 401 U.S. 974 (1971), before disclosure will be required.  In this case there is no need to analyze the "good cause" requirement because there are no disaffected minority shareholders seeking access to a parent's or controlling shareholder's legal advice.

[11]  Undoubtedly the BCE attorneys who were also officers of Debtors, owed fiduciary duties to each corporation they served.  *See Emerald Partners v. Berlin*, 726 A.2d 1215, 1221 (Del. 1999). The duty these officers owed to the corporation, absent a solvency question, nonetheless flowed to BCE and its shareholders.

analysis of the capacity in which the general counsel was acting when he provided
advice:

> Whether or not a given communication…from Mr. DeLiso is
> privileged will necessarily depend upon his capacity at the time he
> generated or received the communication….Any confidential
> communication made by Mr. DeLiso – acting solely in his capacity as
> counsel for LCC – to LCC or its directors and/or officers; and any
> confidential communication made by those clients to Mr. DeLiso,
> acting again solely in that capacity, should be subject to the attorney
> client privilege.

*Grimes* at *2.  *See also In re Financial Corporation*, 119 B.R. 728, 737 (Bankr.

C.D. Cal. 1990) (even where parent and subsidiary shared officers, directors, and

counsel, trustee for parent debtor was not permitted access to privileged

communications of its former subsidiary).

   Under Delaware law, and specifically the *Grimes* decision, the fact that

attorneys are also officers and directors of parent and subsidiary corporations does

not necessarily negate the attorney client privilege.  On the present record, the

defendants have withheld communications between BCE and its attorneys to

facilitate legal advice solely on behalf of BCE.  Under *Grimes*, those

communications remain protected.

V.

   The same analysis applies to Messrs. Monty, Boychuk, and Sabia, who were

directors or officers of BCE, Teleglobe, and some of the Debtors.  Like the

attorneys who were also officers of some of the Debtors, as directors or officers of

23

wholly owned subsidiaries, their fiduciary duties were owed to BCE and its

shareholders. On the present record, and absent special circumstances such as

insolvency considerations, the fiduciary duties owed to the subsidiary corporation

were ultimately owed to Teleglobe and the Debtors, and the arguments directed to

conflicting fiduciaries do not apply. The Court of Chancery's decision in *Grimes*

*v. LCC Int'l, Inc.*, 1999 WL 252381 (Del. Ch.), also leads to continued protection

of communications reflecting advice provided solely to BCE.

## VI.

Martin Turcotte, BCE's chief legal officer, provided legal advice to Jean

Monty and Michael Sabia regarding Project X and funding alternatives for

Teleglobe. At the time of the advice, Monty was chief executive officer of BCE,

and simultaneously served as chairman and chief executive officer of Teleglobe.

Sabia was executive vice president and president of BCE, and simultaneously

served as a director and president of Teleglobe.

The Debtors argue that BCE waived the attorney client privilege by

disclosing confidential advice to individuals with fiduciary duties to two different

corporations. Opening Brief p. 9. Defendants contend that privilege is not waived

by disclosure of privileged communications to recipients who are officers or

directors of other corporations so long as the parties expected the privileged

communications to remain confidential.

The Delaware Court of Chancery has rejected a waiver argument in this

situation. In *In re Fuqua Ind. Inc. Shareholders Litigation*, 1999 WL 959182 at *2

(Del.Ch.), the Court of Chancery held that advice disclosed for the benefit of a

director who also sits on multiple related boards does not waive the privilege:

> I do not believe that the presence of several directors on both the FII
> and Triton boards means the attorney-client privilege is waived as to
> communications involving those directors. Such a ruling could have
> disastrous effects on cross-directorships. A director who sits on
> multiple boards might have to excuse herself from the room anytime a
> document is shown that the company wishes to protect via its attorney
> client privilege-surely this cannot be the result.

This result is also equitable where a wholly owned subsidiary is concerned.

As noted previously, absent special circumstances such as insolvency

considerations, overlapping directors and officers of wholly owned subsidiaries

owe their fiduciary duties to the parent and its shareholders. Abrogating the

privilege here does not serve the goal of protecting different constituencies from

the conflicted actions of their fiduciaries. The communications were made with an

expectation that they would remain confidential, and therefore there is no waiver of

the attorney client privilege.

## VIII.

Relying upon *Deutsch v. Cogan*, 580 A.2d 100 (Del. Ch. 1990), the Debtors

argue that Monty, Currie, Kierans, and Skinner, as Teleglobe directors and

officers, "controlled" the Debtors, and therefore assumed fiduciary duties to the

Debtors. *Deutsch* was decided in the context of a controlling shareholder that owed a fiduciary duty to minority shareholders in non-wholly owned subsidiary corporations. The fiduciary obligations were imposed on the controlling stockholder because it was "necessary to protect the interests of the minority from domination and overreaching by the controlling shareholder." 580 A.2d at 107, quoting *Valente*, 68 F.R.D. at 364.

Here, the Debtors were wholly owned subsidiaries, as distinguished from the minority owned subsidiary in *Deutsch*. Unlike in *Deutsch*, the need to protect the minority from a conflicted fiduciary is not present in this case, and the attorney client privilege need not be abrogated to prevent a conflicted fiduciary from disadvantaging one beneficiary over another.[12]

The Debtors also allege that they were operating within the vicinity of insolvency or were insolvent sometime before April 23, 2002 (when BCE decided not to continue funding), and therefore BCE, as a controlling shareholder of Teleglobe and the Debtors, and the directors of Teleglobe, assumed fiduciary duties to the Debtors' creditors and the "corporate enterprise." Opening Brief, pp. 13-14. From this proposition the Debtors argue that BCE and the Teleglobe

---

[12] The Debtors also cite *Harriman v. E.I. DuPont de Nemours & Co.*, 372 F. Supp. 101, 106 (D. Del. 1974), and claim that the Teleglobe directors "dictated the destiny" of the Debtors and therefore owed fiduciary duties to them. This argument suffers from the same infirmity as applying *Deutsch* in a wholly owned subsidiary context. Even if these individuals controlled the destiny of the Debtors, and therefore assumed fiduciary duties, the fiduciary duties were ultimately owed to BCE and its shareholders. The privilege is not being asserted by fiduciaries with conflicting duties to different constituencies.

directors cannot withhold privileged documents because they owed duties not only to BCE and Teleglobe, but to the Debtors as subsidiaries of Teleglobe.

Although each of Debtors' directors and officers may have owed duties to creditors once the Debtors entered the vicinity of insolvency, it is not apparent how BCE, or the directors and officers of Teleglobe, would owe those same duties to the Debtors' creditors. Under Delaware law, "a parent does not owe a fiduciary duty to its wholly owned subsidiary." *Anadarko Petroleum Corp. v. Panhandle Eastern Corp.*, 545 A.2d 1171, 1174 (Del. 1988). If the parent corporation does not owe duties to the subsidiary, then the directors and officers of the parent would also not owe duties to any wholly owned subsidiaries. Absent a fiduciary duty owed to the creditors by BCE or Teleglobe's directors, there is no basis for abrogating the attorney client privilege.[13]

## IX.

The work product doctrine protects "the privacy of lawyers in their work and encourage[s] the freedom of lawyers from interference in the task of preparing

---

[13] It is uncertain under Delaware law whether crossing into the "zone of insolvency," as opposed to insolvency itself, requires directors to assume fiduciary duties for the benefit of creditors. Instead of assuming new duties to a different class of stakeholders, directors of corporations that are teetering on the edge of bankruptcy may simply have a duty to maximize the value of the enterprise, as opposed to favoring the lenders over the owners. *Production Resources Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772, 790-91 (Del. Ch. 2004). Whatever the viability of this theory of recovery against controlling shareholders and directors of nearly insolvent corporations, it does not advance Debtors' challenge to BCE's privilege assertion. Debtors have only offered argument that shortly before the decision to cease funding, the Debtors were operating within the "zone of insolvency." There is nothing in the present record about the actual condition of the Debtors' finances regarding actual insolvency, unrelated to termination of funding, before BCE decided to cease long term funding of Teleglobe.

27

their clients' cases for trial." *Tackett v. State Farm Fire & Cas. Ins. Co.*, 653 A.2d

254, 260 (Del. 1995), quoting *United States v. Nobles*, 422 U.S. 225, 238 (1975).

To qualify for work product protection, the information must be prepared in

anticipation of litigation. *See* Chancery Court Rule 26(b)(3). The immunity is not

absolute, and can be overcome where the requesting party has a substantial need

for the information to prepare its case, and it is unable to secure the same

information through other means. *Tackett*, 653 A.2d at 261. Mental impressions,

opinions, and conclusions of an attorney are entitled to a heightened level of work

product immunity. *Id.* at 262. *See* John E. James, Privileged Communications and

the Delaware Corporation § 2.02 at 43-44 (2000).

Whether communications were prepared in anticipation of litigation is a case

specific inquiry. The work product doctrine is intended to protect "materials an

attorney assembled and brought into being in anticipation of litigation." *Lee v.

Engle*, 1995 WL 761222 (Del. Ch.), citing *United States v. El Paso Co.*, 682 F.2d

530, 542 (5th Cir.1982), *cert. denied*, 466 U.S. 944 (1984). Documents which

directly address litigation strategy are clearly protected, but communications that

reflect legal advice in creating a transactional structure that might lead to litigation

will not qualify. *Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.*, 1996

WL 535407 at *2.

In this case, the documents in question were created several years prior to institution of this suit.  If defendants can demonstrate that the documents disclose strategies or theories relating to the defense of the suit, those documents are protected from discovery.  If the documents do not disclose advice about the conduct of future litigation but instead simply relate to the transaction under consideration and that the transaction may be challenged, they are not privileged.  To make this determination, the Special Master will have to review the documents *in camera*.  At this time, BCE need only submit those documents within the time frame at issue where work product immunity is claimed.  Documents subject to both work product immunity and attorney client privilege need not be submitted at this time.

Special Master

Dated:  December 1, 2005