IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TELEGLOBE COMMUNICATIONS | ) | Jointly Administered |
| CORPORATION, *et al.*, | ) | Bank. Case No. 02-11518 (MFW) |
| | ) | |
| | ) | |
| Debtors, | ) | |

---

| | | |
|---|---|---|
| TELEGLOBE COMMUNICATIONS | ) | |
| CORPORATION, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | C.A. No. 04-CV-1266 (SLR) |
| | ) | |
| v. | ) | |
| | ) | |
| BCE, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

FINAL DECISION ON PLAINTIFFS'
MOTION TO COMPEL DEFENDANTS TO PRODUCE
<u>DOCUMENTS WITHHELD ON THE BASIS OF PRIVILEGE</u>

Gregory V. Varallo, Esquire, C. Malcolm Cochran, IV, Esquire, Russell C. Silberglied, Esquire, Chad M. Shandler, Esquire, and Evan O. Williford, Esquire, of RICHARDS LAYTON & FINGER, Attorneys for the Debtors

Kevin Gross, Esquire, of ROSENTHAL, MONHAIT, GROSS, & GODDESS, P.A., Attorneys for the Unsecured Creditors Committee

Pauline K. Morgan, Esquire, of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Attorneys for the Defendants

# TABLE OF CONTENTS

**Page**

I.     PROCEDURAL BACKGROUND ........................................................ 4

    A.     The Parties ................................................................. 4

    B.     The Claims of the Amended Complaint ..................................... 6

    C.     The Motion to Compel Production ........................................... 9

    D.     The December 1, 2005 Preliminary Decision .......................... 11

    E.     The December 9, 2005 Supplemental Decision ....................... 14

    F.     The *In Camera* Review ...................................................... 16

        1.     Defendants' January 8, 2006 letter ................................ 16

        2.     Defendants' January 11, 2006 letter .............................. 17

        3.     Defendants' January 12, 2006 letter .............................. 17

        4.     Defendants' January 19, 2006 letter .............................. 18

    G.     The Current State Of Affairs ........................................... 19

II.    THE PARTIES' SUPPLEMENTAL LEGAL ARGUMENTS .......... 19

III.   THE GOVERNING LAW .................................................... 22

    A.     Choice of Law ............................................................. 22

    B.     Attorney-client Privilege ............................................... 24

IV.    DISCUSSION ................................................................. 28

    A.     Over-designation of Documents ........................................ 28

    B.     Joint Representation ..................................................... 29

        1.     BCE In-House Attorneys Joint Representation ............. 31

        2.     Davies Ward's Joint Representation .............................. 35

        3.     Stikeman Elliot ........................................................ 39

        4.     Osler, Hoskin & Harcourt LLP Joint Representation ....40

        5.     Shearman & Sterling LLP Joint Representation............41

V.    WORK PRODUCT DOCTRINE .......................................................44

VI.   CONCLUSION .................................................................................45

Collins J. Seitz, Jr., Special Master

After two rounds of briefing, two preliminary orders, and *in camera* review of over one thousand documents, the Special Master concludes that defendants cannot assert the attorney-client privilege or work product protection to shield from discovery any of the documents listed on their privilege log. Therefore, defendants are required to produce to plaintiffs all of the documents on their privilege logs from November 1, 2001, to April 23, 2002.

## I.    PROCEDURAL BACKGROUND

### A.    The Parties

This lawsuit arises out of the decision by BCE, Inc. ("BCE"), a Canadian corporation, to cease long term funding of its wholly owned subsidiary, Teleglobe, Inc. ("Teleglobe"), another Canadian corporation. BCE's decision led Teleglobe's wholly-owned direct and indirect United States subsidiaries to seek protection under Chapter 11 of the United States Bankruptcy Code. The corporate plaintiffs, who are the U.S. subsidiary debtors and debtors in possession in the Chapter 11 proceedings, filed suit for damages

and other relief.[1]  Each of the Debtors is a Delaware corporation except

Teleglobe Puerto Rico Inc., which is a Puerto Rican corporation.

The first defendant is BCE, Canada's largest communications com-

pany.  BCE's subsidiary, Bell Canada, provides telecommunication services

in Canada, and at one time owned approximately 23% of Teleglobe.  In No-

vember, 2000, BCE purchased all the remaining shares of Teleglobe from

the public.  After the acquisition of Teleglobe, BCE either directly or indi-

rectly through Bell Canada owned all of the stock of the Debtors.

The next defendants are a group of the Debtors' directors and officers.

Marc Bouchard, Serge Fortin, Terence Jarman, and Stewart Verge were offi-

cers or directors of several of the Debtors during the time that BCE first

evaluated and then decided to cease funding of Teleglobe.  Some of these

individuals also held positions with BCE subsidiaries.  Michael Boychuk

was an officer or director of several of the Debtors during the same time

frame.  He also served as an officer or director of BCE, Bell Canada, and

Teleglobe.

---

1. The plaintiffs are Teleglobe Communications Corporation, Teleglobe USA, Inc., Op-
tel Telecommunications, Inc., Teleglobe Holdings (U.S.) Corporation, Teleglobe Marine
(U.S.) Inc., Teleglobe Holding Corp., Teleglobe Telecom Corporation, Teleglobe In-
vestment Corp., Teleglobe Luxembourg LLC, Teleglobe Puerto Rico Inc., Teleglobe
Submarine Inc., and the Official Committee of Unsecured Creditors of Teleglobe Com-
munications Corporation.  Collectively, the corporate entities will be referred to as the
"Debtors."  On April 24, 2005, the District Court authorized the Creditors Committee to
join with the Debtors to prosecute claims against the defendants in this action.  The plain-
tiffs and the creditors' committee will both be referred to as the Debtors.

The next group of defendants are former Teleglobe directors and offi-
cers, who were also directors and officers of BCE or Bell Canada. Jean
Monty was chairman of Teleglobe between 2000 and April, 2002, and was
also chairman, president, and chief executive officer of BCE. Richard Cur-
rie served as a Teleglobe director from December, 2000, through April,
2002. Currie was also a BCE director, and succeeded Monty as chairman of
the board of BCE. Thomas Kierans was a member of the Teleglobe board of
directors from December, 2000, through April, 2002, and also served as a
BCE director. Stephen Skinner served as vice president and controller of
Teleglobe from July, 2001, through April, 2002, while he was also the cor-
porate controller of BCE. Finally, H. Arnold Steinberg served as a
Teleglobe director during the relevant time period, and previously served as
a director of Bell Canada.

## B.    The Claims of the Amended Complaint

The amended complaint alleges seven theories of liability. In the first
three causes of action, the Debtors have asserted claims against BCE for
breach of contract, estoppel, and misrepresentation. They allege that BCE
breached funding commitments made to the Debtors to underwrite the build
out of the GlobeSystem – a worldwide data network that was supposed to
connect 160 cities around the world. The amended complaint states that the

GlobeSystem was expected to cost at least $5 billion to build, and an additional $1 billion to fund through break-even operations. Because the Debtors did not have the financial resources to support the GlobeSystem, the Debtors claim that they shouldered the monetary burden at the direction of the defendants. The Debtors allege that they were led to believe that BCE would cover the GlobeSystem debt and the operation of Teleglobe through the build out period and beyond. When BCE decided to cease long term funding for the Debtors' GlobeSystem activities, the Debtors contend that BCE's decision breached a funding commitment and was inconsistent with representations to fund the Debtors' cash needs.

The fourth cause of action asserted by the Debtors is breach of fiduciary duty against BCE. It is alleged that as early as November 1, 2000, the Debtors were either insolvent or operating in the zone of insolvency. While operating under these conditions, Debtors claim that BCE assumed and exercised actual control over the Debtors, and thereby owed fiduciary duties towards Debtors and their creditors. Because BCE had allegedly assumed control of Teleglobe and the Debtors, and the companies were either insolvent or operating in the zone of insolvency, the Debtors claim that BCE breached its fiduciary duties by acting only in BCE's interest, and not in the interests of the Debtors and their creditors.

The fifth cause of action is brought by the Creditors Committee for breach of fiduciary duty against the Debtors' directors and officers. The Committee alleges that as early as November 1, 2000, the Debtors were insolvent or operating within the zone of insolvency. It is alleged that the Debtors' directors and officers breached their fiduciary duties by acting only in the interest of BCE when the Debtors were either insolvent or operating within the zone of insolvency.

The sixth cause of action is also brought by the Committee against the Teleglobe directors and officers for breach of fiduciary duty. The Committee asserts that while the Debtors were either insolvent or operating within the zone of insolvency, the Teleglobe directors and officers assumed and exercised actual control over the Debtors. The Committee claims that, by assuming control of companies in precarious financial condition, the Teleglobe directors and officers breached fiduciary duties to the Debtors and creditors by acting only in the interest of BCE instead of in the interests of the Debtors and their creditors.

The last cause of action is brought by the Committee against the BCE and Teleglobe directors and officers. The Committee claims that BCE's directors and officers aided and abetted breaches of fiduciary duties committed by the Debtors' and Teleglobe's directors and officers. The Committee also

8

claims that the Teleglobe directors and officers aided and abetted breaches of fiduciary duties committed by the Debtors' directors and officers.

### C.    The Motion to Compel Production

On February 11, 2005, the Debtors filed a motion to compel production of documents. As originally filed, the motion requested broad relief, including production of the redacted portions of documents, and production of thousands of documents withheld by defendants based on attorney-client privilege and the work product doctrine. Although the District Court initially denied the motion by order dated March 31, 2005, on August 25, 2005, the District Court referred to the Special Master Panel the task of addressing "issues relating to the plaintiffs' motion to compel (D.I. 74-76, 87, 91, 135, 137, 156) and the parties' privilege logs." (D.I. 157). In a further order, the Court directed the Special Master to "regulate all proceedings and take all measures necessary to manage the issues relating to plaintiffs' motion to compel ... and the parties' privilege logs, and rule on same." (D.I. 160).

After an initial round of briefing and oral argument before the Special Master, both sides narrowed the issues for decision. In their initial brief in opposition to Debtors' motion, defendants stated that BCE had produced all documents where any member of the BCE legal department acted as legal

counsel to Teleglobe or any of the Debtors. DIAB at 4.[2] The defendants also stated that BCE had produced all documents "generated as a result of the joint representation of BCE and Teleglobe by legal counsel, or with matters giving rise to a common interest privilege between Teleglobe and BCE." *Id.*[3]

With regard to Marc Bouchard, Serge Fortin, Terence Jarman, Patrick Pichette and Stewart Verge, if there were any documents reflecting communications between these individuals and BCE or Teleglobe counsel, BCE

---

2. The following abbreviations will be used throughout this decision:
   1) DAICI: Decision After *In Camera* Inspection;
   2) SD: Supplemental Decision;
   3) POBSM: Plaintiffs' Opening Brief to the Special Master;
   4) POSB: Plaintiffs' Opening Supplemental Brief;
   5) BCESB: BCE's Answering Supplemental Brief;
   6) PL-1/27/06: Plaintiffs' Letter 1/27/06;
   7) DL-12/7/05: Defendants' Letter 12/7/05;
   8) DL-12/16/05: Defendants' Letter 12/16/05;
   9) DL-1/13/06: Defendants' Letter 1/13/06;
   10) DIAB: Defendants' Initial Answering Brief;
   11) HT-10/31/05: October 31, 2005 Hearing Transcript;
   12) LD: Michel Lalande's deposition; and
   13) TD: Martine Turcotte's deposition.

For documents reviewed *in camera*, they will be referred to by the privilege log where the documents are listed, followed by the document number. For example, (7/04, 1) refers to document number one in the July of 2004 privilege log.

3. The Debtors submitted the affidavit of Kathy Morgan, the plan administrator for Teleglobe and Debtors. On behalf of Teleglobe and the Debtors, Ms. Morgan consented to the delivery to the Debtors of any communications prior to April 24, 2002 listed in the defendants' privilege logs. Aff. ¶ 3. The effect of this statement was to consent to the production of communications to and from BCE attorneys over which Teleglobe might assert attorney-client privilege.

stated that those documents have been or will be produced.[4]  BCE also

stated that it had already produced documents reflecting communications be-

tween or among any of Messrs. Boychuk, Kierans, Currie, or Sabia, and

BCE or Teleglobe counsel, for advice rendered to or on behalf of Teleglobe.

In summary, at the time of the initial briefing and argument, defen-

dants stated that the only documents that continue to be withheld are docu-

ments that "involve the provision of legal advice *solely* to BCE."  DIAB at 1

(emphasis in original).  At oral argument, Debtors' counsel also narrowed

the dispute by limiting the universe of challenged privilege log documents to

the time period from November 1, 2001, to April 23, 2002.  HT-10/31/05 at

10-11.

### D.    The December 1, 2005 Preliminary Decision

The Debtors challenged the defendants' assertion of attorney-client

privilege on three theories: (1) BCE's attorneys allegedly jointly represented

BCE, Teleglobe, and the Debtors regarding the decision to cease long term

funding of Teleglobe, and also served as officers of some of the Debtors.  As

a consequence of this joint representation, the BCE attorneys owed fiduciary

duties to each of their clients, and could not withhold from any of them

---

4. At oral argument defendants' counsel stated that there were a limited number of
documents still listed on the privilege logs relating to these people that will be produced.
The same is true for documents for Mr. Pichette dated after January 23, 2002.  HT-
10/31/05 at 12-13.

documents received during the representation; (2) BCE's directors and officers, who were also directors or officers of Teleglobe and some of the Debtors, were "conflicted fiduciaries" with duties owed to each and all of BCE, Teleglobe, and the Debtors, and therefore could not withhold from Teleglobe or the Debtors documents containing legal advice they received on behalf of BCE; and (3) BCE and the Teleglobe directors and officers exercised "control" over Debtors at a time when Debtors were insolvent or were operating within the zone of insolvency.  Therefore BCE and the directors and officers owed fiduciary duties to Debtors and their creditors, and could not withhold from Teleglobe or the Debtors documents containing legal advice provided to BCE.

Finally, Debtors also contested defendants' assertion of the work product doctrine for a limited number of documents, claiming that defendants have not made a specific showing of threatened litigation to invoke work product immunity.

In a preliminary decision, I found that, based on the record as it stood at the time of oral argument, the Debtors failed to demonstrate that BCE attorneys jointly represented BCE and Teleglobe or the Debtors relating to the funding decision.  I also ruled that the fact that BCE officers and directors held overlapping positions with BCE, Teleglobe, or the Debtors was insuffi-

cient to pierce the attorney-client privilege. I also held that the Debtors had failed to show on the present record that Teleglobe or the Debtors were within the "zone of insolvency" at the time of the funding decision, which might have expanded the scope of the fiduciary duties owed by BCE and certain directors and officers to constituents beyond the corporations and their shareholder(s). Finally, I required defendants to produce to Debtors all documents reflecting work performed by Davies Ward Phillips & Vineberg, LLP ("Davies Ward") after April 8, 2002 – the date that Davies Ward pur-portedly began to represent separately Teleglobe's interests.[5]

To complete the record and before issuing a final decision, I estab-lished a procedure to verify that the only documents that BCE continued to withhold from production were documents that "involve the provision of le-gal advice *solely* to BCE." I allowed the Debtors to select from BCE's privi-lege log fifty documents for *in camera* review. This "random audit" was in-tended to test defendants' statement in a cost-effective manner, thereby sav-

---

5. In defendants' answering brief in the first round of briefing (page 5), defendants stated that "[o]n April 8, 2002, BCE issued a public statement that it was reconsidering its op-tions with respect to the continued funding of Teleglobe. Following that announcement, Teleglobe was represented by its own separate outside legal counsel. This separate legal representation consisted of both Canadian counsel for Teleglobe (Davies Ward Phillips & Vineberg, LLP) as well as U.S. counsel (Jones Day) to advise on matters affecting the U.S. subsidiaries." From this statement the Special Master assumed that Davies Ward's BCE representation terminated on April 8, and Davies Ward thereafter "separately" rep-resented Teleglobe after April 8, 2002. As will be noted later, that statement turned out to be inaccurate.

ing the parties the time and expense of a full-blown review of over one thousand documents.

### E.    The December 9, 2005 Supplemental Decision

Shortly after the Debtors made their selection of documents for *in camera* review, the wheels started coming off defendants' privilege log wagon. Almost immediately after selection of documents by the Debtors, the defendants retreated from their privilege assertions for some of the selected documents. Specifically, before *in camera* inspection took place, the defendants withdrew their privilege assertion for six of the fifty documents selected for review.[6] After *in camera* inspection, the Special Master determined that three of the selected documents did not involve any request for, or provision of, legal advice,[7] and several of the documents submitted for *in camera* review supported Debtors' argument that BCE's in-house counsel provided advice to both Teleglobe and to BCE on matters related directly or indirectly to consideration of funding alternatives for Teleglobe.[8] Finally,

---

6. (7/04, 1; 7/04, 24; 7/04, 87; 7/04 110, 7/04, 161; 9/05, 2883).

7. (7/04, 457) (cover page withheld, no legal advice); (7/04, 458) (cover page withheld, no legal advice); (7/04, 735) (no legal advice).

8. (7/04, 82) (advice provided to both BCE and Teleglobe regarding timing of release of annual reports); (7/04, 130) (advice regarding release of Teleglobe's 2001 MD&A's); (7/04, 464) (legal advice provided to both Teleglobe and BCE directors regarding fiduciary duties). *See also* (7/04, 145) (originally withheld and then produced on May 16, 2005

defendants also withdrew their privilege assertion for documents on the privilege log generated by BCE's outside Canadian counsel, Davies Ward, between April 10 to May 10, 2002, relating to advice Davies Ward provided to Teleglobe.[9]

On December 9, 2005, I issued a supplemental decision.  I found that the defendants' change of heart on privilege for some of the selected documents, and the *in camera* review of a limited number of documents raised serious questions about:

> (1) the reliability of defendants' privilege log, and whether there has been substantial over-designation of documents as privileged; (2) whether BCE's in-house and outside counsel represented both BCE and Teleglobe relating to the decision to cease long term funding of Teleglobe; (3) whether the documents withheld from production qualify as privileged; and (4) whether the withheld documents reflect the provision of legal advice solely to BCE.

SD at 4-5.

I required the defendants to review the existing privilege logs and to produce all documents that should have been produced under the standards set forth in the December 1, 2005, opinion; to provide an updated privilege log for documents withheld for the period from November 1, 2001, to April

---

as BCE-AD 0221263 – Michel Lalande, BCE in-house counsel memo to file entitled "Proposal for Teleglobe Inc. Financing.").

9.  As stated in defendants' December 7, 2005 letter: "[u]pon further review, a few documents may reflect work performed for Teleglobe, some may well have been shared with Teleglobe, and a few should not have been withheld."  DL-12/7/05 at 2.

23, 2002; and to produce for *in camera* review all documents that continue to be withheld for the same period.[10]  *Id.* at 5-6.

## F.    The *In Camera* Review

On December 23, 2005, defendants provided the updated privilege logs with over one thousand documents for *in camera* review.  The documents were contained in over fifty large binders spread out over three privilege logs.  Following the initial submission of revised privilege logs and the actual documents, the defendants withdrew the privilege assertion for over one hundred additional documents listed on the revised privilege logs.

### 1.    Defendants' January 8, 2006 letter

In this letter the defendants stated that they decided to produce drafts of BCE's 2001 annual report that had initially been claimed as privileged. Defendants changed their position because they determined that drafts of those reports had been shared with Deloitte & Touche, BCE's auditors.[11]

---

10.  As noted previously, the selection and review of a limited number of documents from the extensive privilege log was intended to save the parties the time and expense of a full-blown review of over one thousand documents.  Unfortunately, once the selected documents were reviewed *in camera*, the serious concerns expressed in the supplemental decision required a time-consuming and costly review of all of the documents.  Because the extensive review was caused by defendants' over-designations, the Special Master required that the defendants pay all of the Special Master's fees and expenses for conducting the *in camera* review and issuing this final decision. SD at 5.

11.  *See* (9/05, 553; 9/05, 554; 9/05, 945; 9/05, 1299; 9/05, 1337; 9/05,1338; 9/05, 1339; 9/05, 1340; 9/05, 1341; 9/05, 1342; 9/05, 1343; 9/05, 1344; 9/05, 1345; 9/05, 1346; 9/05, 1347; 9/05, 1348; 9/05, 1364; 9/05, 1365; 9/05, 1366; 9/05, 1367; 9/05, 1368; 9/05, 1369; 9/05, 1370; 9/05, 1371; 9/05, 1372; 9/05, 1373; 9/05, 1374; 9/05, 1375; 9/05, 1376; 9/05,

### 2.     Defendants' January 11, 2006 letter

In their January 11, 2006, letter to the Special Master, the defendants withdrew their privilege claims over drafts of "additional annual reports, financial statements, quarterly reports and proxy circulars" because such documents had been shared with Deloitte & Touche.[12]

### 3.     Defendants' January 12, 2006 letter

In their January 12 letter, the defendants stated that they learned in early January 2006 that over ninety additional documents listed on the privilege logs had also been or may have been disclosed to Deloitte & Touche. As a result, these documents, consisting of BCE's 2001 annual report, Bell Canada's 2001 annual report, BCE's quarterly reports and proxy statements, and other financial reports were produced to the Debtors.[13]  For undisclosed

---

1377; 9/05, 1378; 9/05, 1379; 9/05, 1380; 9/05, 1381; 9/05, 1382; 9/05, 1383; 9/05, 1384; 9/05, 1387; 9/05, 1410; 9/05, 1430; 9/05, 3018; 9/05, 3019; 9/05, 3020; 9/05, 3023; 9/05, 3024; 9/05, 3025; 9/05, 3026; 9/05, 3520; 9/05, 3988; 9/05, 4787; 9/05, 4789).

12. *See* (7/04, 135; 7/04, 232; 7/04, 541; 2/05, 96; 2/05, 97; 2/05, 187; 2/05, 207; 2/05, 237; 2/05, 240; 9/05, 1360; 9/05, 1362; 9/05, 2597; 9/05, 3029; 9/05, 3030; 9/05, 3031; 9/05, 3032; 9/05, 3036; 9/05, 3072; 9/05, 3442; 9/05, 3989; 9/05, 4601; 9/05, 4694; 9/05, 5113). The documents listed in the January 11, 2006, letter do not match the documents listed in the chart attached to the letter.  Because it appears that the error is in the text of the letter, the Special Master will refer to the chart.

13. *See* (9/05, 553; 9/05, 554; 9/05, 898; 9/05, 945; 9/05, 1299; 9/05,  1337; 9/05,1338; 9/05, 1339; 9/05, 1340; 9/05, 1341; 9/05, 1342; 9/05, 1343; 9/05, 1344; 9/05, 1345; 9/05, 1346; 9/05, 1347; 9/05, 1348; 09/05, 1360; 09/05, 1362; 09/05, 1364; 9/05, 1365; 9/05, 1366; 9/05, 1367; 9/05, 1368; 9/05, 1369; 9/05, 1370; 9/05, 1371; 9/05, 1372; 9/05, 1373; 9/05, 1374; 9/05, 1375; 9/05, 1376; 9/05, 1377; 9/05, 1378; 9/05, 1379; 9/05, 1380; 9/05, 1381; 9/05, 1382; 9/05, 1383; 9/05, 1384; 9/05, 1387; 9/05, 1410; 9/05, 1430; 09/05,

reasons, the defendants also withdrew their privilege assertion for a document that had initially been claimed as privileged but was later produced in its entirety.[14]

### 4.    Defendants' January 19, 2006 letter

The final letter to the Special Master from defendants withdrew the privilege assertion for other draft annual and quarterly reports that were shared with Deloitte & Touche.[15]  Defendants also withdrew the privilege assertion for four other documents without stating the reason.[16]

---

1752; 09/05, 2155; 09/05, 2161; 09/05, 2162; 09/05, 2168; 09/05, 2189; 09/05, 2227; 09/05; 2228; 09/05, 2229; 09/05, 2293; 09/05, 2301; 09/05, 2337; 09/05, 2338; 09/05, 2597; 9/05, 3018; 9/05, 3019; 9/05, 3020; 9/05, 3023; 9/05, 3024; 9/05, 3025; 9/05, 3026; 9/05, 3029; 9/05, 3030; 9/05, 3031; 9/05, 3032; 9/05, 3036; 9/05, 3072; 9/05, 3441; 9/05, 3442; 9/05, 3443; 9/05, 3444; 9/05, 3445; 9/05, 3468; 9/05, 3471; 9/05, 3520; 9/05, 3549; 9/05, 3988; 9/05, 3989; 9/05, 4093; 9/05, 4094; 9/05, 4095; 9/05, 4097; 9/05, 4105; 9/05, 4168; 9/05, 4169; 9/05, 4601; 9/05, 4694; 9/05, 4789; 9/05, 5113; 2/05, 96; 2/05, 97; 2/05, 187; 2/05, 237; 7/04, 232; 7/04, 541).  The defendants also redacted handwriting on certain documents.  The handwritten versions had not been shared with the auditors, but the original version had been.  The redacted versions without the handwriting were produced.  *See* (9/05, 4787; 2/05, 207; 2/05, 240; 7/04, 135).

14.  *See* (9/05, 3101).

15.  *See* (7/04, 124; 2/05, 213; 9/05, 838; 9/05, 1214; 9/05, 1317; 9/05, 1764; 9/05, 2158; 9/05, 2168; 9/05, 2247; 9/05, 2327; 9/05, 2566; 9/05, 3437; 9/05, 3438; 9/05, 3596; 9/05, 3886; 9/05, 4540; 9/05, 4598).

16.  *See* (9/05, 303; 9/05, 883; 9/05, 1204; 9/05, 2897).

### G.    The Current State Of Affairs

The Special Master has not been copied on all correspondence be-
tween the parties and it appears that defendants may have withdrawn their
privilege assertion over further documents, and re-asserted privilege as to
others.  DL-1/13/06.  This has left some uncertainty about the current state
of defendants' privilege logs.  Rather than impose on the parties any more
delay and the further expense of straightening out the privilege logs, how-
ever, I have decided that it is time to decide, and will rely on the record as I
understand it.

## II.    THE PARTIES' SUPPLEMENTAL LEGAL ARGUMENTS

Following the submission of documents for *in camera* review, the par-
ties requested leave to submit supplemental briefs on the privilege issues.
The Debtors focused their supplemental arguments on two issues – defen-
dants' general over-designation of documents and the joint representation
issue.

First, with regard to over-designation, the Debtors claim that, from the
beginning of this process, the defendants withheld far more documents than
the law reasonably supports, including documents that do not contain any
attorney-client communications and documents that were disclosed to third
parties.  POSB at 5-8.  The consequence of over-designation, and improper

designation, according to the Debtors, is that defendants' privilege assertions are all suspect.  Therefore, according to the Debtors, the appropriate remedy for over-designation is to require all documents on the privilege logs to be produced.

Second, regarding the joint representation issue, the Debtors contend that under Delaware law (and the law of most jurisdictions), where an attorney represents multiple clients for the same subject matter, the attorneys and their clients cannot withhold communications received by the attorneys relating to the matters of common interest.  From the documents that they have been able to review, the Debtors argue that BCE's in-house and outside counsel represented both BCE and Teleglobe in matters related to BCE's decision to cease long term funding of Teleglobe.  *Id.* at 9-24.

Specifically, the Debtors point to attorney advice provided by Michel Lalande, BCE's in-house attorney, and other attorneys within BCE, as well as attorneys at outside counsel Davies Ward, offering advice on the amendment of Teleglobe's 2001 Annual Information Form (the "AIF").  The Debtors also point to documents where Lalande appears to have worn not just the BCE hat, but the Teleglobe hat as well, and offered advice to both BCE and Teleglobe.  According to the Debtors, Lalande advised Teleglobe in connection with BCE's financing issues, and also advised Teleglobe regarding the

restructuring of its debt. *Id.* At the very least, the plaintiffs contend that the documents on the privilege log "that relate to matters of common interest between Teleglobe and BCE … should be produced …." *Id.* at 26.

The defendants argue that the Debtors have not established a joint representation on matters of common interest of BCE and Teleglobe by either the BCE in-house attorneys or BCE's outside attorneys. As to Lalande, the defendants claim that his advice on amendments to BCE's and Teleglobe's AIFs was offered to state accurately in Teleglobe's disclosures BCE's position on Teleglobe funding issues. BCE's interest was being represented with regard to securities law and disclosure issues, according to defendants, and therefore the BCE attorneys' involvement with amendments to Teleglobe's AIFs did not involve a joint representation of BCE and Teleglobe with respect to the funding issue. BCESB at 5. As for Davies Ward's advice relating to the AIFs, the defendants state that Davies Ward continued to represent BCE following April 10, 2002, but that the representation was limited to "discrete legal work for BCE principally to wind up work initiated prior to April 10." *Id.*

Regarding BCE's decision to cease funding of Teleglobe, the defendants offer a different interpretation of events which, according to them, leads to the conclusion that BCE's attorneys were representing only BCE's

interests in the funding decision.  The defendants claim that documents evidencing Lalande's involvement with securities issues, BCE board resolutions addressing funding, tax loss monetization (which would benefit Teleglobe), loan agreements, and promissory notes, can all be explained as Lalande representing BCE's interests in these events.  Defendants also claim that most of Lalande's legal activities identified by the Debtors were not related the Teleglobe funding issue.  *Id.* at 9-11.

## III.   THE GOVERNING LAW

### A.     Choice of Law

In the briefing leading up to the preliminary decision, the parties relied on a number of federal and state decisions to support their positions. Neither side has committed to whether federal or state law should govern the privilege analysis.[17]  This is a non-core proceeding in District Court brought under 28 U.S.C. § 157(b) of the Bankruptcy Code.  The Debtors have raised claims that are exclusively state law causes of action -- breach of contract, estoppel, misrepresentation, and breach of fiduciary duty.  Rule 501 of the Federal Rules of Evidence provides that:

---

17.  At page 13 of their initial answering brief, defendants refer to Federal Rule of Evidence 501 and claim that state law governs the privilege issue.  At oral argument, the Debtors stated that federal law applies, but thought that federal and state law were consistent.  HT-10/31/05 at 19-21.

> [I]n civil actions and proceedings, with respect to an element of
> a claim or defense as to which State law supplies the rule of de-
> cision, the privilege of a witness, person, government, State, or
> political subdivision thereof shall be determined in accordance
> with State law.

FED. R. EVID. 501. Under Rule 501, the privilege inquiry is governed by state law. *See G-I Holdings, Inv. v. Baron & Budd*, 2005 WL 1653623, at *2 (S.D.N.Y.) (applying New York state law to determination of attorney-client privilege); *Remington Arms Comp. v. Liberty Mutual Ins. Comp.*, 142 F.R.D. 408 (D. Del. 1992) (applying Connecticut state law to determination of at-torney-client privilege); *Bailey v. Meister Brau, Inc.*, 55 F.R.D. 211 (N.D. Ill. 1972) (applying state attorney-client privilege law); *In re Diasonics Sec. Litig.*, 110 F.R.D. 570 (D. Col. 1986) (applying state law attorney-client privilege in a dual fiduciary inquiry).

To determine which state law applies, a court must apply the choice-of-law rules prevailing in the state in which the court sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). With regard to choice-of-law questions for privilege issues, Delaware has relied on Restatement (Sec-ond) of Conflicts of Law and its "most significant relationship" test. *Lee v. Engle*, 1995 WL 761222 (Del. Ch.) (most significant relationship test ap-plied to accountant-client privilege); *Danklef v. Wilmington Med. Center*, 429 A.2d 509 (Del. Super. 1981) (applying Restatement test to determine

evidentiary privilege choice-of-law decision). One commentator believes that Delaware law should govern by default because privilege determinations are procedural in nature and are therefore governed by Delaware's rules of evidence. JOHN JAMES, PRIVILEGED COMMUNICATIONS AND THE DELAWARE CORPORATION, § 7.03 at 136-37 (2000). There are other views on the issue as well. *See* RESTATEMENT (SECOND) CONFLICT OF LAWS § 139(2).

The parties have not raised the conflicts of laws issue, and instead have both relied extensively on Delaware law. The Special Master will give primacy to Delaware state law, as opposed to the law of another state, to decide the privilege and work product issues raised in the parties' supplemental submissions, and will consider decisions from other jurisdictions where appropriate.[18]

### B.    Attorney-client Privilege

The attorney-client privilege "protects the communications between a client and an attorney acting in his professional capacity where the communications are intended to be confidential, and the confidentiality is not waived." *Riggs Nat'l Bank of Washington, D.C. v. Zimmer*, 355 A.2d 709,

---

18. One of the Debtors is a Puerto Rican corporation. Neither party claims that Puerto Rican law should apply, or is any different from the analysis to be applied under Delaware law.

713 (Del.Ch. 1976). The privilege serves "to foster the confidence of the client and enables him to communicate without fear in order to seek legal advice." *Id. See also Moyer v. Moyer*, 602 A.2d 68, 72 (Del. 1992).

Delaware Rule of Evidence 502 captures the elements of the attorney-client privilege in Delaware. The Rule states that a communication is privileged when made in confidence and:

> for the purpose of facilitating the rendition of professional legal services to the client (1) between himself or his representative and his lawyer or his lawyer's representative, (2) between his lawyer and the lawyer's representative, (3) by him or his representative or his lawyer or a representative of the lawyer to a lawyer or a representative of a lawyer representing another in a matter of common interest, (4) between representatives of the client or between the client and a representative of the client, or (5) among lawyers and their representatives representing the same client.

The statements sought to be protected must also be made "for the purpose of facilitating the rendition of professional legal services to the client ...." DEL. R. EVID. 502(b). *See United States v. Vehicular Parking*, 52 F.Supp. 751, 753-54 (D. Del. 1943) (privilege does not exist where communications made by an attorney who acted as director of the corporation and not as an advocate). Furthermore, the privilege can be waived by disclosure of the privileged advice to third parties. DEL. R. EVID. 502(a)(2); *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 825 (Del. 1992) (citing DEL. R.

EVID. 510); *Texaco, Inc. v. Phoenix Steel Corp.*, 264 A.2d 523 (Del. Ch. 1970)).

Under Rule 502(d)(6), where an attorney represents more than one client in the same transaction or a matter of common interest, neither the attorney nor the recipient of the advice can withhold documents relating to the same subject matter from the other client:

> (6) Joint clients. As to a communication relevant to a matter of common interest between or among 2 or more clients if the communication was made by any of them to a lawyer retained or consulted in common, when offered in an action between or among any of the clients.

DEL. R. EVID. 502(d)(6).

The "common interest" doctrine reflects the ethical duties owed by attorneys when they represent multiple clients in the same transaction or provide advice to multiple clients related to the same subject matter. In the bankruptcy context, the attorneys' duties in the joint representation context were specifically addressed in *In re Mirant Corp.*, 326 B.R. 646 (Bankr. N.D. Tex. 2005).

In *Mirant*, the debtors were for the most part subsidiary corporations of The Southern Company ("TSC"). TSC decided to divest itself of Mirant Corporation, and, after initially offering 20% of Mirant to the public, divested Mirant by issuing the balance of Mirant stock to TSC shareholders as

a tax free dividend.  After divestiture Mirant had financial troubles, and eventually filed for protection under the bankruptcy laws.  326 B.R. at 648-49.

Troutman Sanders LLP ("Troutman") had represented both Mirant and TSC during the divestiture, and advised both corporations on divestiture-related issues.  The debtors moved to compel production of the communications between TSC and Troutman regarding the divestiture.  The bankruptcy court held that TSC and Troutman could not invoke the attorney-client privilege because the law was well settled that "counsel who represents two clients in the same matter cannot keep confidences of one respecting the matter from the other."  *Id.* at 651 (applying Georgia law).[19]  Because Troutman represented both Mirant and TSC in the challenged transaction, privilege could not be asserted to block an inquiry into the divestiture-related legal advice.

Turning to the procedural aspects of the attorney-client privilege, the party asserting the privilege bears the burden of demonstrating that the privi-

---

19. TSC's general counsel directed TSC and Mirant to use Troutman for advice regarding the divestiture, and required both entities to enter into a "Protocol for Legal Representation."  The Protocol provided that Troutman would protect the confidences of each client, and would not share confidential information between the two clients.  Troutman was authorized to give advice to both clients regarding the divestiture "even if the advice is adverse or perceived to be adverse to the interest of one of them." *Id.* at 648, quoting the Protocol.  The bankruptcy court found that the Protocol did not "provide either Mirant or TSC with any privilege beyond that which exists in an ordinary joint representation." *Id.* at 652.

lege applies. *Moyer*, 602 A.2d at 72; *Lemelson v. Bendix Corp.*, 104 F.R.D. 13, 16 (D. Del. 1984). Once a party has met its burden of establishing privilege, the burden shifts to the other party to demonstrate an exception to, or waiver of, the privilege. *Tackett v. State Farm Fire & Cas. Ins. Co.*, 653 A.2d 254, 259 (Del. 1995); *Lemelson,* 104 F.R.D. at 16-17. Because the privilege interferes with the truth finding process, the privilege is narrowly construed and limited in scope only to those disclosures necessary to obtain legal advice that would not have been disclosed absent the privilege. *Balin v. Amerimar Realty Co.*, 1995 WL 170421 (Del. Ch.); *Hercules, Inc. v. Exxon Corp.*, 434 F. Supp. 136, 152 n. 11 (D. Del. 1977).

## IV.   DISCUSSION

### A.     Over-designation of Documents

As noted previously, the Special Master asked the Debtors to select fifty documents from defendants' privilege log to test defendants' statement that the only documents remaining on the privilege logs are documents reflecting legal advice provided exclusively to BCE. The defendants failed the audit in multiple ways -- withdrawing documents from the logs before *in camera* review, claiming privilege over documents that did not reflect legal advice, and claiming privilege over documents where it appeared that BCE

28

in-house attorneys and outside counsel jointly represented BCE, Teleglobe, or the Debtors on matters of common interest.

Under this Court's decision in *Pfizer, Inc. v. Ranbaxy Labs. Ltd.,* 2004 WL 2323135, at *3 (D. Del.), the Special Master would have been justified in ordering the production of all documents on the privilege logs. I have, however, caused a review of all the documents on the privilege logs to reach a final decision on the privilege issue. Because I find that the joint representation issue is dispositive of the privilege issues, I do not address the Debtors' other bases for relief.

**B.    Joint Representation**

Like many large corporations, BCE had subsidiaries, including Teleglobe and the Debtors. Also, like many large corporations with wholly-owned or controlled subsidiaries, BCE centralized with the parent corporation overlapping functions, including some of the legal functions. POBSP, Exhibit 1. Although at one time Teleglobe had a separate legal department, it ceased operation on or about November 1, 2001. BCE's legal department thereafter provided advice when needed by Teleglobe. The Debtors also centralized some of their legal functions with BCE's legal department, although the Debtors maintained a legal department in Reston, Virginia for commercial issues and other issues addressed on an *ad hoc* basis such as se-

curities compliance, capital markets and mergers and acquisition. LD at

136.

The Delaware courts will not abrogate the attorney-client privilege

based solely upon an attorney's joint representation of a parent and its sub-

sidiaries. *Grimes v. LCC Int'l, Inc.*, 1999 WL 252381, at *3 (Del. Ch.). *See*

*also In re Financial Corp.*, 119 B.R. 728, 737 (Bankr. C.D. Cal. 1990) (even

where parent and subsidiary shared officers, directors, and counsel, trustee

for parent debtor was not permitted access to privileged communications of

its former subsidiary).[20]

Unlike the consolidation of common, overlapping operations, such as

human resources, however, the law function has legal and ethical duties

regulating the attorney-client relationship. In the ordinary course of legal

representation, the interests of the parent and its wholly owned subsidiaries

are, for the most part, aligned. This case vividly demonstrates, however,

how continued legal representation of the parent and its wholly owned sub-

sidiaries in the shadow of bankruptcy proceedings risks abrogation of the at-

torney-client privilege.[21]

---

20. The Delaware Court of Chancery has recognized the same principle for cross-directorships. *In re Fuqua Ind. Inc. S'holders Litig.*, 1999 WL 959182, at *2 (Del.Ch.) (attorney-client privilege not *per se* waived when advice provided to cross-directors).

21. The attorney-client privilege is not "waived" or "abrogated" where an attorney jointly represents more than one client. The privilege would still be intact as to third par-

In the instant case, in-house counsel continued to represent BCE and its subsidiaries, including Teleglobe, on restructuring issues when the parent was considering shutting off funding for its subsidiaries.  Counsel did not attempt, until late in the game, to clarify who was representing whom and on what subject matter.  Even where separate representation supposedly occurred, the lines of representation continued to be blurred.

I find that the defendants have not demonstrated that the documents on the privilege log reflect advice from BCE's in-house and outside counsel provided exclusively to BCE on matters relating to the funding issue.  Instead, the withheld documents demonstrate that there was a joint representation by BCE's attorneys of BCE and Teleglobe relating to a matter of common interest.  The Debtors, who are the beneficiaries of Teleglobe's consent to production of documents,[22] are entitled to all of the documents on the privilege logs from November 1, 2001, to April 23, 2002.

### 1.    BCE In-House Attorneys Joint Representation

The *in camera* review of the privilege log documents revealed a broad legal representation of both BCE and Teleglobe by BCE's in-house attor-

---

ties.  Where parties are jointly represented by the same attorney in a matter of common interest, however, the attorney, as a fiduciary to each of her jointly represented clients, cannot withhold from one client advice provided to the other related to the common representation, or confidences shared with the attorney.

22.  *See* footnote 3, *supra*.

neys relating to Teleglobe's restructuring alternatives. BCE in-house attorneys reviewed and provided comments on draft BCE and Teleglobe annual reports, MD&A's, and financial documents, which contained statements about Teleglobe funding and restructuring. BCE in-house attorneys also forwarded draft Teleglobe documents for review by outside counsel.[23] By reviewing and proposing changes to Teleglobe's reports and financial statements related to BCE's funding commitment, BCE's attorneys were providing advice to Teleglobe on what disclosures it should make regarding BCE's position on future funding of Teleglobe.

BCE's in-house attorneys continued to review Teleglobe reports and financial statements continued through the April 23, 2002, press release announcing BCE's decision to cease funding to Teleglobe. By way of example, on April 22, 2002, BCE's in-house attorney and corporate secretary, Mark Ryan, sent Ildo Ricciuto, another BCE in-house attorney, an e-mail with a proposed rider to attach to Teleglobe's first quarter report.[24] The rider discusses the effect of BCE's funding decision on Teleglobe's ability to continue operations. The rider was specifically prepared for Teleglobe's

---

23. (2/05, 213, 215, 236; 9/05, 4540) (in-house counsel changes to annual report, MD&A's, and Teleglobe financial statements). BCE in-house attorneys sent their comments on BCE's and Teleglobe's annual reports and financial statements to attorneys at Shearman & Sterling. *See* (2/05, 215).

24. (9/05, 4334).

press release, yet it was being drafted and reviewed internally by BCE's in-house counsel. This is directly contrary to BCE's position that, after April 8, 2002, when Teleglobe allegedly engaged its own outside counsel, "the only legal work that continued to be performed by BCE's lawyers on behalf of Teleglobe was the work done by Michel Lalande in reviewing Teleglobe's public disclosures in connection with the filing of its 2001 Annual Information Form." BCESB at 5. What is clear after reviewing the privilege log documents is that BCE's in-house attorneys advised Teleglobe on what disclosures Teleglobe should make about BCE's funding commitment.

Lalande reviewed and assisted in drafting a presentation to be made on April 23, 2002, to the Board of Directors of BCE entitled "Teleglobe Legal Review."[25] The presentation included a section entitled "Risks and Exposure – Teleglobe Director Requirements." The draft slides were being circulated by attorneys as late as April 19, 2002.[26]

There was also an April 12, 2002, presentation to Jean Monty, the chairman of BCE and Teleglobe.[27] The presentation contained a slide entitled "Acting in a Responsible Fashion" directed at BCE and Teleglobe. This

---

25. (7/04, 222). *See also* (7/04, 241; 2/05, 8; 9/05, 299).

26. (9/05, 1056).

27. (7/04, 725). *See also* (2/05, 80; 9/05, 3677).

overall presentation addressed how each of BCE's and Teleglobe's various

constituencies would be affected once Teleglobe funding was terminated,

and considered the duties owed to shareholders, banks, bondholders, cus-

tomers, suppliers and employees. Turcotte, BCE's chief legal officer, dis-

seminated copies of this presentation to various BCE officials who were in

attendance at the presentation, including those with interests in BCE and

Teleglobe such as Michael Boychuck (Vice President and Treasurer of BCE;

Chief Financial Officer of Teleglobe) and Lalande.

BCE argues that the BCE board received this legal advice exclusively

for BCE's benefit, including the advice relating to Teleglobe's potential li-

ability. After all, Teleglobe was a subsidiary of BCE, and BCE not surpris-

ingly wanted to assess its potential liability through indemnity or otherwise

from any Teleglobe liability.

The problem with this argument, however, is two-fold. First, the

April 12, 2002, presentation to Jean Monty, a BCE and Teleglobe director, is

far from clear about whether the advice was intended exclusively for BCE's

benefit. Second, even if the advice was intended exclusively for BCE's

benefit, the BCE in-house attorneys were clearly jointly representing BCE

and Teleglobe as late as April 19 related to funding issues. The BCE in-

house attorneys' joint representation of BCE and Teleglobe does not allow

them to withhold BCE documents from their client Teleglobe. As stated in
*Mirant*, "counsel who represents two clients in the same matter cannot keep
confidences of one respecting the matter from the other." 326 B.R. at 651.
*See also* DEL. R. EVID. 502(d)(6).

### 2.    Davies Ward's Joint Representation

Prior to April 8, 2002, Davies Ward Phillips & Vineberg LLP offered
legal advice to BCE and Teleglobe regarding how to time the release of
BCE's and Teleglobe's annual reports with the announcement of BCE's re-
structuring intentions regarding Teleglobe.[28] Davies Ward also offered ad-
vice to BCE regarding BCE's sale of all or substantially all of Teleglobe's
assets.[29]

The defendants claim that as of April 10, 2002,[30] Davies Ward began
separate representation of Teleglobe. BCESB at 6-7. The defendants further
claim that after April 10, 2002, "[v]irtually all of Davies Ward work was
performed for Teleglobe with the mandate to 'help Teleglobe and support
them and assist them in looking at various alternatives at the time which may

---

28. (7/04, 82).

29. (7/04, 245; 7/04, 247; 7/04, 249; 7/04, 462; 9/05, 266).

30. As noted previously, in defendants' first answering brief, they stated that after April
8, 2002, Teleglobe was represented by Davies Ward Phillips & Vineberg, LLP as well as
U.S. counsel (Jones Day). Defendants have submitted an affidavit of Davies Ward filed
in the Teleglobe Canadian reorganization proceedings where Davies Ward states that its
joint representation of BCE and Teleglobe ceased as of April 10, 2002.

involve a number of alternative restructurings for Teleglobe.'" BCESB, at 7 (citing TD at 70). According to defendants, any work that Davies Ward continued to perform for BCE was done "to wind up work initiated prior to April 10," BCESB at 7, and was therefore unrelated to BCE's decision to cease funding to Teleglobe. SD at 3 n.2.

The defendants' arguments are directly contradicted by documents reviewed by the Special Master. Davies Ward's work with BCE never "wound up." As will be seen, the law firm continued to provide advice to BCE on Project X and Project Special – the internal code names for consideration of Teleglobe restructuring issues.

For instance, on April 12, 2002, Melanie Shishler, a Davies Ward attorney, circulated a memorandum to three members of BCE's legal department: Turcotte, Ricciuto and Lalande. The memorandum focused on Project X and the consequences of a proposed write-off of Bell Canada's and BCE's interest in Teleglobe, particularly whether the write-off "will trigger any negative consequences under the Bell Credit Facility or the BCE Credit Facility ...."[31] The legal memorandum was addressed to the attorneys at "BCE Inc." On the same day, Davies Ward distributed to BCE's counsel a

---

31. (2/05, 260).

draft memorandum entitled "Duties and Responsibilities of the Board."[32] The draft memorandum contained legal advice directed to the duties and responsibilities of both BCE directors, in general, and BCE/Teleglobe cross directors, in particular. The draft memorandum was addressed to "The Board of Directors of BCE Inc."

Even if the defendants were correct that any lingering legal advice was intended to "wind up" Davies Ward's prior representation, other documents reveal that Davies Ward continued to provide legal advice to BCE on Project X. On April 18, 2002, Melanie Shishler sent an e-mail requesting further information from BCE's in-house counsel so Shishler could provide BCE with an analysis of whether one option being considered, a sale of Teleglobe, would qualify as a "substantial portion" of Bell Canada's or BCE's property.[33] Three days later, Shishler sent Turcotte slides for a presentation that contained her BCE credit instrument analysis relating to the sale of Teleglobe assets.[34]

Davies Ward provided similar legal advice to BCE on Project Special, which, as noted previously, addresses the fall out from the Teleglobe fund-

---

32. (7/04, 185; 7/04, 272; 9/05, 4605; 9/05, 4649).

33. (9/05, 2254).

34. (9/05, 4337).

ing decision described as Project X. As early as April 12, 2002, and up to at least April 20, 2002, Davies Ward submitted various drafts of a memorandum on Project Special.[35] The memorandum, entitled "Project Special" provides a thorough review of Bell Canada's and BCE's debt instruments, with a particular focus on the impact of Teleglobe's restructuring on BCE's financial structure. These Davies Ward documents demonstrate that during the time period in which the defendants allege that Davies Ward was representing Teleglobe with its restructuring alternatives, Davies Ward was providing simultaneous representation to BCE on the decision to cease funding for Teleglobe and the consequences to BCE of the funding decision.

Although defendants try to distinguish Project X from Project Special, the two projects were inextricably intertwined – one addresses the decision to cease funding for Teleglobe, the other the consequences of the funding decision. Even the attorneys acknowledged that the two projects were related. The April 12, 2002, memorandum entitled "Project X" was sent by Shishler to Turcotte, Lalande and Ricciuto in an e-mail with the subject line reading "Project Special."[36] A slightly similar e-mail and memorandum

---

35. (7/04, 181; 7/04, 708; 7/04; 713; 9/05, 3483; 9/05, 3484; 9/05, 3490; 9/05, 3491; 9/05, 3494; 9/05, 3503; 9/05, 3504; 9/05, 4784).

36. (2/05, 260).

were sent by Shishler to the same parties on April 10, 2002.[37] The debt instrument analysis in the Project X memoranda is substantively similar to the debt instrument analysis in the Project Special memoranda. The reason for the overlap is quite simple: BCE would not consider the funding issue without considering the consequences resulting from the funding decision.

Finally, the Davies Ward documents were shared with BCE's in-house attorneys, who jointly represented BCE and Teleglobe on restructuring issues. Under Delaware Rule of Evidence 502(d)(6) and the *Mirant* decision, the BCE attorneys cannot withhold confidences shared with them during the joint representation.

Davies Ward jointly represented BCE and Teleglobe on issues relating to the continued funding of Teleglobe. Therefore, neither Davies Ward nor BCE can withhold documents from Teleglobe – Davies Ward's joint client on Teleglobe restructuring issues.

### 3.    Stikeman Elliot

Stikeman Elliot ("Stikeman") was another Canadian law firm acting as outside counsel for BCE. Whether Stikeman jointly represented both BCE and Teleglobe related to the Teleglobe restructuring is unclear. For instance, on February 27, 2002, attorney Jean Marc Huot of Stikeman sent

---

37. (9/05, 4354).

BCE in-house attorney Ricciuto comments on BCE's and Teleglobe's 2001 Financial Information. On the other hand, most of the documents authored by Stikeman appear to be prepared exclusively for BCE's benefit, even where Teleglobe issues were addressed within the documents.[38]

Even though the joint representation issue is unclear, all of the Stikeman documents must be produced to the Debtors. All of the documents authored by Stikeman were shared with BCE's in-house attorneys, who jointly represented BCE and Teleglobe. Having shared the documents with BCE's in-house attorneys, BCE's in-house attorneys cannot withhold the information from their joint client Teleglobe. DEL. R. EVID. 502(d)(6); *Mirant*, 326 B.R. at 651.

### 4.    Osler, Hoskin & Harcourt LLP Joint Representation

Osler, Hoskin & Harcourt LLP ("Osler"), a Canadian law firm, appears to have represented BCE and Teleglobe on tax issues relating to funding alternatives. In a February 15, 2002, draft memorandum addressed to BCE and Teleglobe, Osler attorneys identified and assessed the risks to BCE and Teleglobe in the event that BCE and Teleglobe implemented a "tax loss monetization structure involving Tax losses of Teleglobe."[39] On February

---

38. (2/05, 238; 9/05, 4791; 9/05, 4338). *See also* (2/05, 24; 9/05, 4177; 9/05, 4253; 9/05, 4260; 9/05, 4263; (9/05, 4343; 9/05, 4344; 9/04, 4345; 9/05, 4346; 9/05, 4347; 9/05, 4421; 7/04, 464; 9/05, 290).

24, 2002, Osler circulated a revised draft of the February 15, 2002, memo-randum where it deleted the references to Teleglobe representation.[40]

The attorneys continued to be unclear about who Osler represented on the tax loss monetization issue. In a February 26, 2002, draft letter to the Canada Customs and Revenue, the Osler attorneys sought an advance income tax ruling with respect to the tax loss monetization proposal "on behalf of our clients, BCE and Teleglobe …."[41]  There is sufficient evidence in the record to conclude that a joint representation existed relating to restructuring issues.

Finally, having shared the documents with BCE's in-house attorneys, BCE's in-house attorneys cannot withhold the information from their joint client Teleglobe. DEL. R. EVID. 502(d)(6); *Mirant*, 326 B.R. at 651.

### 5.    Shearman & Sterling LLP Joint Representation

Shearman & Sterling also represented BCE and Teleglobe on issues related to Teleglobe funding. The documents reviewed *in camera* reveal joint representation through most of the month of April of 2002. On April 3, 2002, Shearman & Sterling attorneys sent a draft memorandum to Davies

---

39. (9/05, 1113; 9/05 3817).

40. (9/05, 4581; 9/05, 4579). On February 26, 2002, BCE's in-house attorneys marked up a copy of Osler's first memorandum and deleted the references to a joint representation of BCE and Teleglobe. (9/05, 4580).

41. (9/05, 2102; 9/05, 4781).

Ward attorneys and BCE in-house attorneys, specifically addressed to Teleglobe. The draft memorandum provided an "overview of the U.S. insolvency laws as they may apply to Teleglobe Inc. ... and its subsidiaries, as well as certain preliminary strategic considerations related to any restructuring or liquidation of these entities."[42] Another memorandum of bullet points was also specifically addressed to Teleglobe and prepared for a meeting scheduled for April 4, 2002.[43] Similar to the other draft memorandum, this document reviewed the consequences to Teleglobe and its subsidiaries of bankruptcy proceedings in the United States.

Two other documents confirm that Shearman & Sterling was providing joint representation to BCE and Teleglobe on issues related to Teleglobe's restructuring. In response to a request by BCE's in-house attorney Ricciuto to provide comments on BCE's Annual Report and Teleglobe's MD&A and financial statements, a Shearman & Sterling attorney responded with his comments.[44] The second document is undated but appears on the privilege log as an April, 2002, document.[45] The privilege log states that it

---

42. (9/05, 278; 9/05, 5125).

43. (9/05, 281; 9/05, 5124).

44. (7/04, 700).

45. (7/04, 213).

was drafted by Shearman & Sterling, without designating a specific person, and was received by Lalande. The document's header is "Teleglobe, Inc." and addresses the options available to Teleglobe for restructuring.

Even where Shearman & Sterling offered advice which appears exclusively for BCE's benefit, its joint representation of BCE and Teleglobe, and the fact that the documents were shared with BCE's in-house counsel, require that such documents be produced to the Debtors. For instance, on April 19, 2002, Shearman & Sterling forwarded to Turcotte and Lalande a revised draft memorandum dated April 16, 2002.[46] The draft memorandum was addressed to Turcotte as the Chief Legal Officer of BCE, regarding "Teleglobe, Inc." The Shearman & Sterling attorneys provided far-ranging advice about the potential liability BCE could face because of its "ownership of, dealings with and public statements regarding Teleglobe Inc." Although the legal advice was prepared for BCE, both Shearman & Sterling and BCE's in-house attorneys jointly represented BCE and Teleglobe on the restructuring issues, and therefore cannot withhold confidences of one client from the other.

---

46. (7/04, 496).

## V.    WORK PRODUCT DOCTRINE

The defendants have also asserted the work product doctrine in an attempt to shield approximately seventy-five documents from production to the Debtors.  Even where the attorney-client privilege cannot be interposed, it does not automatically require abrogation of the work product doctrine. *Tackett v. State Farm Fire and Casualty Ins.*, 653 A.2d 254, 260 (Del. 1995) (citing *Hercules, Inc. v. Exxon, Corp.*, 434 F.Supp. 136, 156 (D. Del. 1977)).

The work product doctrine was meant to protect the adversarial system of truth finding.  That is, the doctrine protects an attorney's work product from being disclosed to the opposing party, but not from the client.  *See Saito v. McKesson HBOC, Inc.*, 2002 WL 31657622, at *3 (Del. Ch.) (Stating that "[t]he purpose behind the protection of work product is 'to promote the adversary system by safeguarding the fruits of an attorney's trial preparations from the discovery attempts of the opponent.' ... Thus, the focus of the doctrine is upon preventing discovery of the work product from an '*opposing party in litigation,* not necessarily from the rest of the world generally.'") (citation omitted).

Because work product is created for the benefit of the client, the interest in protecting documents from an adversary is not present in this case. *See Spivey v. Zant*, 683 F.2d 881, 885 (5th Cir. 1992) ("the work product

doctrine does not apply to the situation in which a client seeks access to documents or other tangible things created or amassed by his attorney during the course of the representation."); *see also In re Am. Metrocomm Corp.*, 274 B.R. 641, 655-56 (Bankr. D. Del. 2002); *In re Lomas Fin. Corp.*, 1999 WL 33495524, at *4 (Bankr. D. Del.). The work product doctrine therefore does not shield from disclosure the documents on defendants' privilege logs that were created as a result of a joint representation of BCE and Teleglobe where the clients shared a common interest – restructuring of Teleglobe.

## VI. CONCLUSION

The BCE restructuring decision involved many related business entities and a complicated legal and financial analysis. It is understandable how the roles and responsibilities of all of the attorneys involved were constantly changing, as were the requests for legal advice from BCE, Teleglobe, and the Debtors. In the heat of the restructuring debate, and with so many attorneys responding to so many issues, the lines of representation were unclear.

After reviewing *in camera* the documents on BCE's privilege log, and with no fault attributable to the attorneys who were attempting to respond to requests for advice under difficult circumstances, I find that the in-house attorneys and outside counsel jointly represented BCE and Teleglobe on its restructuring alternatives, or shared information with BCE's in-house attor-

neys who were jointly representing BCE and Teleglobe. Therefore, BCE

cannot assert either the attorney-client privilege or work product doctrine to

preclude discovery of the documents on defendants' privilege log from No-

vember 1, 2001, to April 23, 2002.

 

_____
Special Master

Dated:  February 22, 2006