IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| TELEGLOBE COMMUNICATIONS | ) Jointly Administered |
| CORPORATION, *et al.*, | ) Bankr. Case No. 02-11518 (MFW) |
| | ) |
| Debtors. | ) |
| TELEGLOBE COMMUNICATIONS | ) |
| CORPORATION, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) C.A. No. 04-CV-1266 (SLR) |
| | ) |
| BCE INC., *et al.*, | ) |
| | ) |
| Defendants. | ) |

## MOTION TO AFFIRM AND ADOPT
## SPECIAL MASTER'S REPORTS AND ORDERS

Pursuant to Fed. R. Civ. P. 53(g) the Plaintiffs move the Court for an order affirming and adopting the orders and reports of the Special Master dated December 9, 2005 and February 22, 2006 (collectively the "SM Reports"), which are attached hereto as Exhibits A and B, respectively. The Plaintiffs incorporate in this Motion the substance of the SM Reports, in their entirety. The grounds for this Motion are set out herein, in the SM Reports, and in the accompanying appendix (Volumes A-F) of record materials considered by the Special Master.[1]

---

[1] The Appendix of Record Materials consists of the record compiled by the Plaintiffs before the Special Master, and has been lodged with the Clerk's office. The Notice of Lodging has been filed contemporaneously herewith. Citations herein to the Appendix of Record Materials will be to the volume (printed on the cover page of each volume), and tab; i.e. "Vol. B, Tab 1" or "Vol. A, Tab A."

## I. Background.

Special Master Seitz properly described the parties and the claims at pages 4 though 9 of his Final Report of February 22, 2005 (the "February 22nd Report"). Suffice it to say here that the Plaintiffs in this case (the "U.S. Debtors") were, at all relevant times, the direct and indirect wholly owned U.S. operating subsidiaries of Teleglobe, Inc., a Canadian holding company. Teleglobe, Inc., in turn, was (at all relevant times) wholly owned by Defendant Bell Canada Enterprises ("BCE") and BCE's (then) 80 percent owned subsidiary, Bell Canada.    The remaining Defendants are certain of the individual officers and directors of BCE, Teleglobe, Inc., and the U.S. Debtors.

### A. The Claims.

Teleglobe was founded in 1950, as the national long distance telephone company for Canada. When it acquired the Teleglobe companies in 2000, BCE pledged specific financial and other support for Teleglobe's continued development of what was then called the "Globe System." That project was a 5 year, $5 billion plan to establish a world wide fiber optic network, capable of transporting wholesale and retail voice and data traffic between and among Teleglobe's thousand or so well established corporate, government and communications industry clients, and others around the world.

BCE repeated its specific pledges of financial and other support for Teleglobe throughout 2001, and in early 2002. BCE's expressions of financial commitment were intended to (and did) convince the banking and bondholding communities to extend credit to Teleglobe. On the strength of BCE's representations, Teleglobe incurred in excess of $2.4 billion (U.S.) of bank and bond indebtedness.

BCE controlled Teleglobe, Inc. and its direct and indirect subsidiaries. As we will show at trial, the Teleglobe companies were insolvent no later than year end 2000. Notwithstanding

2

that insolvency, neither BCE nor the BCE dominated directors of Teleglobe and its subsidiaries did anything to consider the interests of creditors.

On April 23, 2002, BCE withdrew its promised financial support for Teleglobe. Teleglobe, Inc. and the U.S. Debtors almost immediately filed bankruptcy proceedings, in Canada and the United States. BCE's withdrawal of funding ultimately forced the liquidation, and abandonment, of the Teleglobe enterprise and assets. Only pennies on the dollar were realized from the sale of the remaining business and assets. Teleglobe, its business and its prospects -- representing in excess of $1 billion dollars in enterprise value -- were wrongfully destroyed by BCE.

The claims asserted against BCE and the other Defendants include breach of contract, estoppel, misrepresentation, and breach of fiduciary duty. See February 22nd Report at 6-9 (Ex. B hereto).

### B. The Motion to Compel.

BCE has not been forthcoming in discovery. Specifically, the privilege dispute was brought to this Court's attention as part of Plaintiffs' Motion to Compel, filed on February 11, 2005.[2] In a series of discovery conferences, held between that date and August, 2005, the Court directed the production by BCE of substantial volumes of electronic data, and of dozens of boxes of hard copy documents, wrongfully withheld. By August, what remained of the Plaintiffs' Motion to Compel was the privilege dispute, which by then encompassed a BCE privilege log of

---

[2] In fact, the first round of this privilege dispute was brought before Judge Walrath on March 31, 2004 during the Rule 2004 proceedings. BCE's in-house counsel, Michel Lalande, gave testimony in the Bankruptcy Court, and Judge Walrath ordered the production of documents withheld by BCE involving matters of common interest between BCE and Teleglobe. (March 31, 2004 transcript at 77 (Vol. C, Tab M)).

RLF1-2990004-2

nearly seven hundred pages, and thousands of purportedly privileged documents withheld by BCE.

By order dated August 16, 2005, the Court referred to the Special Master Panel the task of addressing "issues relating to the plaintiffs' motion to compel (D.I. 74-76, 87, 91, 135, 137, 156) and the parties' privilege logs." (D.I. 157). By order dated August 26, 2005, the Court appointed Collins J. Seitz as Special Master.[3] (D.I. 160).

After briefing and oral argument to the Special Master, the issues were narrowed. Specifically; (i) Teleglobe Inc.'s administrator has waived that entities' privileges, so that the U.S. Debtors may have access to Teleglobe Inc.'s privileged materials[4] (ii) the Plaintiffs limited their request to those documents on the Defendants' logs that were dated on or between November 1, 2001 and April 23, 2002, and; (iii) the Defendants claimed to have removed from their logs and produced all documents that reflected advice on matters of common interest to Teleglobe and BCE. The Defendants further represented to the Court, through its Special Master, that the only documents still withheld were those that "involve the provision of legal advice *solely* to BCE." February 22nd Report at 11 (quoting Defendants' Initial Answering Brief) (emphasis in the original).[5]

---

[3] On March 15, 2005, the Defendants signed a stipulation in which they agreed that the standard of review for the Special Master's factual findings would be "clear error." (D.I. 95). Although the Court did not sign the stipulation and instead entered its *pro forma* order, the Defendants should be estopped from arguing that the Special Master's factual findings are reviewable under any other standard.

[4] Appendix of Record Materials, Vol. A, Tab C at Ex. 5.

[5] The Defendants also told the Special Master that all documents "generated as a result of the joint representation of BCE and Teleglobe by legal counsel, or with matters giving rise to a common interest privilege between Teleglobe and BCE" had been produced. See February 22nd Report at 10. This is not the first time BCE has made this assertion to this Court -- it did so in its (Continued)

RLF1-2990004-2

The Defendants' representations to the Special Master, this Court and the Bankruptcy Court were proven false.

### C. The SM Reports.

Specifically, at oral argument (held on October 31, 2005), the Special Master ordered the Defendants to submit, for *in camera* review, 50 documents selected by the Plaintiffs from the Defendants' privilege logs (Vol. A, Tab A). In his report of December 9, 2005, the Special Master ruled that the Defendants had failed that limited audit. In particular, almost immediately after the Plaintiffs had made their selections, the Defendants withdrew their privilege assertions for 6 of the 50 documents selected by the Plaintiffs for review. After *in camera* inspection, the Special Master determined that three of the selected documents did not involve any request for or provision of legal advice, and that several in fact supported the Plaintiffs' argument that BCE's in-house counsel had provided advice to both Teleglobe and BCE on matters related directly or indirectly to the consideration of funding alternatives for Teleglobe. See February 22nd Report at 14, 28-29 (Ex. B hereto). Because it failed to pass the more limited review, the Special Master then ordered BCE to submit *all* of its remaining withheld documents for *in camera* review, and directed that BCE bear the cost of his efforts. See, generally, December 9 Report (Ex. A hereto).

Following the December 9 Report, BCE submitted some 50 binders, consisting of more than 1000 documents, for review by the Special Master, *in camera*. In the interim, BCE conceded that a Canadian law firm (Davies Ward) had actually represented BCE and Teleglobe jointly, during the relevant time. See Cochran Transmittal Aff. at Ex. 21 (Letter, Dec. 7, 2005 P.

---

brief submitted to this Court last March (D.I. at 87 at p. 32), and during an in-person conference with the Court last year (3/31/05 Tr. at p.39)). It also did so in 2004, when Judge Walrath ordered BCE to produce all "common interest privilege" materials to the U.S. Debtors. See supra at n.2. Each of these representations, it now appears, was false.

Morgan to Special Master).[6] BCE also began, after issuance of the December 9 Report, to retreat
from its privilege assertions by removing from the Defendants' logs and producing, first in a
trickle and then in a flood, what ultimately became thousands of pages of documents that had
been wrongfully withheld. As put by the Special Master, by December 9, 2005, "the wheels
started coming off defendants' privilege log wagon." February 22 Report at 14 (Ex. B hereto).
Between February 11, 2005, the date on which the Plaintiffs first filed their Motion to Compel,
and February 22, 2006, BCE removed from its privilege logs and produced more than 56,000
pages of documents that had been wrongfully withheld.

   In his February 22nd Report, the Special Master concluded, "[a]ter two rounds of briefing,
two preliminary orders, and *in camera* review of over one thousand documents," that the
defendants "cannot assert the attorney client privilege or work product protection to shield from
discovery any of the documents listed on their privilege log." Id. at 4. (Ex. B hereto). As a
result, the Special Master required the Defendants to produce all documents from their logs
falling within the date range specified by the Plaintiffs -- November 1, 2001 to April 23, 2002.

   The bases of the Special Masters' final decision were three fold: (i) the Defendants' over-
designation of documents as privileged, when they were not, as demonstrated by the massive de-
designations and production, was found sufficient alone to warrant production of all documents
listed on their logs, under this Court's decision in Pfizer Inc. v. Ranbaxy Labs. Ltd., C.A. No. 03-
209 JJF, 2004 WL 2323135 (D. Del Oct. 7, 2004); (ii) the documents demonstrated that BCE's in
house and outside counsel represented BCE and Teleglobe, Inc. jointly, on matters of common
interest -- specifically, on matters relating to whether BCE would continue to fund, or

---

   [6] The Transmittal Affidavit of C. Malcolm Cochran, IV has been filed simultaneously
herewith.

restructure, the Teleglobe enterprise; and (iii) BCE's lawyers, in certain cases, shared listed documents with lawyers who represented BCE and Teleglobe jointly, precluding the assertion of privilege as to those documents.

The Special Master's findings were correct and should be affirmed.[7]

## II.    Argument.

### A.    Under **Pfizer**, The Defendants' Overdesignations and Misrepresentations Warrant the Production of All Documents.

Under Judge Farnan's decision in Pfizer, this Court, without more, should affirm the Special Master's final order requiring the Defendants to produce all documents on their logs, dated between November 1, 2001 and April 23, 2003.

The Special Master discussed the Pfizer decision and its applicability to the case at bar on page 29 of the February 22nd Report. See February 22nd Report at 29. In Pfizer, the plaintiff attempted to withhold several hundred documents on privilege grounds. 2004 WL 2323135, at *1. The defendant filed a motion to compel, and in connection therewith was permitted to select from plaintiff's privilege log 15 documents for *in camera* review by the Court. Id. After concluding its *in camera* review, the Court found that the plaintiff had "improperly used the attorney-client privilege and work product doctrine to shield discoverable documents" and had improperly "evade[d] discovery." Id. at *2-3. As a result of the plaintiff's wrongful over-designation of documents as privileged, Judge Farnan ordered the plaintiff to produce to the defendant all of the documents sought by the defendant, and further ordered the plaintiff to pay the defendant's costs and fees incurred in bringing the motion to compel. Id. See also United States v. KPMG LLP, 316 F.Supp.2d 30, 44 (D.D.C. 2004) (ordering, with one limited

---

[7] The Special Master's findings of law, on the issues of choice of law and the attorney client privilege, are accurate statements of the law and of the parties' positions, and should be affirmed. See February 22nd Report at 22 through 28.

exception, the production of all documents on defendant's privilege log because "the Court has lost confidence in [defendant's] privilege log since it has been shown to be inaccurate, incomplete and even misleading regarding a very large percentage of the documents").

The facts warrant the same relief here. Despite BCE's repeated representations to the Court that they were withholding only those documents that related "solely" to the provision of legal advice to BCE, the Special Master held, in convincing fashion, to the contrary. As discussed in detail below, the Special Master has in effect concluded that the Defendants misled the Court when they represented that all documents relating to matters of common interest had been produced. See infra, at 9-10; see also February 22 Report at 14-19, 28-29, 31.

Further, the Special Master has reviewed in his final report many of the Defendants' various letters withdrawing, reasserting, and then withdrawing again their privilege claims -- providing conclusive evidence that tens of thousands of pages of documents never should have been withheld in the first place. See February 22nd Report at 16-19 (Ex. B hereto). The extent to which the Defendants de-designated documents and withdrew their privilege claims, however, was far greater than even the Special Master realized, and continued until the day the Special Master issued his February 22nd Report. Significantly, most of the Defendants' "de-designations" came only after the Special Master's December 9 Report, in which he ordered the submission for *in camera* review of all documents still being withheld by the Defendants as privileged. But the Defendants de-designated still thousands of pages more in the weeks that followed the December 22, 2005 deadline for the submission of their "privileged" documents to the Special Master. At the same time, the Defendants produced redacted versions of dozens of documents to which

8

privileges obviously cannot apply. The chronology completely undermines the Defendants'
privilege claims:[8]

- December 16, 2005 -- Defendants produced one box of paper documents and one
  CD containing 2829 pages of documents that were "initially withheld on the
  grounds of privilege" (Cochran Trans. Aff. at Ex. 23);

- December 22, 2005 -- One day before submitting the bulk of their "privileged"
  documents to the Special Master for *in camera* review, Defendants produced six
  boxes of documents, totaling 18,707 pages, that were previously withheld on
  privilege grounds (Id. at 26);

- December 22, 2005 -- Defendants sent updated privilege logs and 5 binders of
  documents to Special Master for *in camera* review and represented to the Special
  Master that they were producing to the Plaintiffs "all the documents on the log
  that should have been produced earlier or should now be produced" (Id. at 27);

- December 23, 2005 -- One day after producing 18,707 pages of documents that
  were erroneously withheld for privilege, Defendants produced a CD containing
  889 pages of additional documents initially withheld for privilege and four other
  documents that "should not have been redacted or withheld" (Id. at 28);

- December 23, 2005 -- Defendants sent another revised privilege log and 38
  binders of documents to the Special Master for *in camera* review (Id. at 29);

- January 8, 2006 -- Defendants produced, for the first time, drafts of BCE's 2001
  annual report that they initially claimed were privileged; these documents total
  another 1,902 pages of documents (Id. at 31);

- January 11, 2006 -- Defendants snapped back a document that they allege was
  inadvertently produced (Id. at 32);

- January 11, 2006 -- Defendants informed the Plaintiffs that in addition to the
  1,902 pages of documents that they produced on January 8, they were producing
  241 pages of additional paper documents that had been withheld for privilege, and
  another 888 pages of formerly withheld documents on a CD; according to the
  Defendants, these documents included drafts of "additional annual reports,
  financial statements, quarterly reports and proxy circulars" (Id. at 33);

---

[8] A chart describing in summary fashion many of the occasions on which the Defendants
de-designated documents since the Plaintiffs filed their Motion to Compel in February 2005 is
attached hereto at Exhibit C. The chart also includes the several occasions on which the
Defendants re-designated, redacted, re-redacted and snapped back documents, further
demonstrating the inconsistency of the Defendants' privilege position.

- January 11, 2006 -- In a third letter sent to the Plaintiffs on this date, Defendants informed the Plaintiffs that certain documents produced on December 23, 2005 were incorrectly redacted (Id. at 34);

- January 12, 2006 -- Defendants informed the Special Master that they have withdrawn their claim of privilege for over 90 additional documents; Defendants also informed the Special Master of incorrect and improper redactions (Id. at 35);

- January 19, 2006 -- Defendants produced another 499 pages of documents previous withheld for privilege; documents consist of draft annual and quarterly reports (Id. at 36);

- February 21, 2006 -- On the eve of the Special Master's Final Report, Defendants produced another 7,123 pages of documents that were previously withheld for privilege; Special Master was unaware of this belated production when he issued his Report (Id. at 38); and

- Since December 9, 2005 the Defendants have produced thousands of pages of documents consisting of cover e-mails forwarding attachments that are fully redacted under circumstances indicating that the redactions are improper. See Vol. A, Tab D at pp. 5-8, and Exhibit D hereto.

The number of documents for which the Defendants have withdrawn their privilege assertions since the Plaintiffs' filed their motion to compel in February 2005 is astonishing -- and fully supports the Special Master's conclusion that the Defendants wrongfully overdesignated documents as privileged when they were not. Indeed, since the Defendants represented to this Court in March of 2005 that the only documents they continued to withhold for privilege were those related "solely" to the provision of legal advice to BCE, the Defendants have produced in excess of *56,000 pages* of documents to the Plaintiffs from their logs.[9] In addition, the Plaintiffs have received from the Defendants no fewer than 25 different versions of a total of 7 privilege logs, the last of which remains inaccurate given the Defendants' mass de-designations and snap backs. (See Vol. A, Tab E at Ex. A) If not for the Special Master's *in camera* review, which

---

[9] See Exhibit E.

fully exposed the extent of Defendants' misstatements to the Court, the Defendants would likely have succeeded in their attempts to withhold discoverable evidence and hinder the search for the truth. Under Pfizer, the result should be the immediate production of all documents on their logs for the period from November 1, 2001 through April 23, 2002. See also KPMG, 316 F.Supp.2d at 44; Fed. R. Civ. P. 37(a) and (b).

**B.   Joint Representation.**

The Special Master properly held that Delaware Rule of Evidence 502(d)(6) sets out the parameters of the "common interest" doctrine. Specifically, "[u]nder Rule 502(d)(6), where an attorney represents more than one client in the same transaction or a matter of common interest, neither the attorney nor the recipient of the advice can withhold documents relating to the same subject matter from the other client . . . ." February 22nd Report at 26. The doctrine reflects the ethical and fiduciary duties owed by attorneys when they represent multiple clients in the same transaction, or provide advice to multiple clients related to the same subject matter. Id. (discussing In re Mirant Corp., 326 B.R. 646 (Bankr. N.D. Tex 2005)).

Applying the law, the Special Master properly found that; (i) BCE's in house attorneys advised both BCE and Teleglobe on a broad range of issues relating to Teleglobe's funding and restructuring alternatives; (ii) the Davies Ward law firm represented BCE and Teleglobe jointly on issues relating to the continued funding of Teleglobe; (iii) all of the documents authored by another Canadian law firm, Stikeman Elliot, were provided to attorneys who represented BCE and Teleglobe jointly; (iv) Osler, Hoskin, a third Canadian law firm, represented BCE and Teleglobe jointly on tax issues relating to Teleglobe funding alternatives, and; (v) Shearman & Sterling represented both BCE and Teleglobe on issues related to Teleglobe funding, and also shared documents it generated with other counsel that represented BCE and Teleglobe jointly.

11

Each of these findings is reviewed in the sections that follow, and is amply supported by the record.

### 1.    BCE In-House Attorneys' Joint Representation.

Beginning at page 31 of his February 22nd Report, the Special Master held that his review of privilege log documents "revealed a broad legal representation of both BCE and Teleglobe by BCE's in-house attorneys" relating to funding and restructuring alternatives for Teleglobe. The record supports the finding, even without resort to the documents reviewed *in camera*:

> BCE closed down Teleglobe's law department when it acquired Teleglobe, in 2000 (Lalande at 113, Vol. B, Tab H);
>
> BCE's general counsel (Turcotte) assigned assistant BCE general counsel (Lalande) to represent Teleglobe on a wide variety of matters, following BCE's acquisition of Teleglobe in 2000. (Lalande at 113-14; see id at 42-43; 98-99; 136-139; 163-66; 170-74; 218; 222-28; 496-500, Vol. B, Tab H). Lalande had previously been Teleglobe's director, legal affairs (Lalande at 42, Vol. B, Tab H);
>
> Lalande was the lawyer primarily responsible for Teleglobe's public securities filings, including in particular Teleglobe's 2001 Annual Information Form ("AIF"). (LaLande 222-228, Vol. B, Tab H);
>
> Lalande advised both BCE and Teleglobe on a variety of issues relating to whether and how BCE would fund, or restructure, Teleglobe, including advising both companies on certain April, 2002 amendments to their public filings (including Teleglobe's AIF) to describe BCE's commitment, (or lack thereof) to fund Teleglobe. (Lalande 366-83, Vol. B, Tab H (referring to LaLande Ex. 37, Vol. D, Tab 13)); (Lalande 393-396, Vol. B, Tab H (referring to Lalande Ex. 40, Vol. D, Tab 15)); (Turcotte 252-54, Vol. A, Tab C, Ex. 1);
>
> Other BCE lawyers also advised Teleglobe on the disclosures it should make regarding BCE's position on future funding of Teleglobe (LaLande 378-79; 382-83, Vol. B, Tab H); Lalande frequently called on BCE in house lawyer Ricciuto in this regard. Id. See, supra, at 16;

Lalande advised Teleglobe's chief executive (who was also BCE's chief executive) in April of 2002 regarding changes to Teleglobe's annual representation letter to its auditor, regarding whether BCE was committed to fund Teleglobe and subsequently drafted the changed language (Bankruptcy Ct. Tr. at 52-53, Vol. C, Tab M);

Lalande advised both Teleglobe and BCE in connection with BCE's contributions of debt and equity funding to Teleglobe. (Lalande 349, 163-64, Vol. B, Tab H (discussing Lalande Ex. 14); 171-174, 184-187 (discussing Lalande Exs. 16-18, Vol. C, Tab N; Vol. D, Tabs 2, 3); Lalande 430-442 (discussing Lalande Exs. 46, 47, 48, 49, Vol. D, Tabs 18, 19, 20; see Lalande Ex 51, Vol. D, Tab 21)); Decl. of Lalande ¶ 13 (Vol. A, Tab D, Ex. E);

Lalande advised both Teleglobe and BCE in preparing board resolutions providing for some $850 million in financing to Teleglobe, and then advised BCE's chief executive and Teleglobe's chairman (Monty), as he made the decision not to provide that funding to Teleglobe, during "Project X". (Lalande 170-185 (discussing Lalande Exs. 16, 17, Vol. C, Tab N; Vol. D, Tab 2)); Lalande 484-553 (discussing Lalande Ex. 56 (Vol. D, Tab 23));

Lalande developed a funding plan in January, 2002, that would have allowed BCE to finance Teleglobe while transferring security to Teleglobe's third party lenders (Lalande 458-462 (discussing Lalande Ex. 51, 52, Vol. D, Tab 21));

Lalande provided advice on how to characterize BCE's contributions to Teleglobe--whether equity, or debt. (Lalande Ex. 54, Vol. D, Tab 22.);

Lalande represented Teleglobe in connection with efforts to restructure its bank debt, in 2000, 2001 and as late as mid March, 2002. (Lalande 218-20; 283-99; 326, 329 (Vol. B, Tab H)); (Bankruptcy Ct. Trans. 49-52, Vol. C, Tab M);

Lalande was involved in rendering advice to BCE and Teleglobe on the matter of restructuring Teleglobe, through late April of 2002. See, e.g. April 15, 2002 e-mail and memo, Davies Ward (Hong) to Lalande (BCE-AD 056 3322-32, Vol. E, Tab 70);

Lalande received advice directly from Davies Ward on the matter of tax restructuring of Teleglobe's debt, and the implications thereof. Id.; Lalande 555-56 (discussing Lalande Ex. 58));

Lalande advised Teleglobe's Chairman (Monty) and board member/COO Sabia on issues relating directly to restructuring and funding options for Teleglobe, throughout Project X (the code

name for that project, which ran from February 28, 2002 through April 23, 2002), though Lalande claims he was counseling Monty only in his capacity as Chairman and CEO of BCE. <u>See</u> Lalande Ex. 56, (Vol. D, Tab 23 (discussed at Lalande 484-521));

Turcotte advised Teleglobe's Chairman (Monty) and its board member and COO Sabia, on legal issues directly relating to restructuring and funding options for Teleglobe, throughout Project X. <u>See</u> <u>e.g.</u>, Lalande Ex. 56, (Lodge Ex. D, Tab 23) Lalande 484-553);

Turcotte coordinated Project X for both Teleglobe and BCE, participating in identifying the issues to be researched and addressed, arranging for the staffing, and establishing the timelines for both companies. (Turcotte 270-72, Vol. A, Tab C, Ex. 1 (discussing Turcotte Ex. 30, Vol. D, Tab 30));

Turcotte advised BCE and Teleglobe directors, during an April 11, 2002 teleconference, on the meaning and purpose of the revisions to BCE and Teleglobe's AIFs, which addressed whether BCE was committed to fund, and controlled, Teleglobe. (Turcotte 249-250 (discussing Turcotte Ex. 28, Vol. D, Tab 29));

Turcotte advised BCE and Teleglobe on amendments to their AIFs relating to BCE's finding position. Lelande Ex. 40 (Vol. D, Tab 15);

Turcotte advised BCE and Teleglobe in connection with proposals for BCE to provide funding to Teleglobe. Lelande Ex. 47 (Vol. D, Tab 19); <u>see</u> 9/05 Log, 00262, 00263, 00270, 00271 (Vol. F, Tab A); and

Turcotte reviewed and negotiated the engagement of Lazard Freres, Teleglobe's restructuring advisor during Project X. Turcotte 335-383 (Cochran Aff. Ex. 43).

Emblematic of the failure of BCE's lawyers to observe privilege boundaries is Turcotte's April 11, 2002 draft of the list by which she kept track of the various matters assigned to different law firms, staff, and lawyers in "Project X" (the so-called "Project X Task List"). Not only does this document reflect Turcotte's central coordination of all legal and financial issues relating to the matter of whether Teleglobe would be funded, restructured or liquidated, it directly reflects purported BCE lawyers being assigned to handle legal issues for <u>both</u> BCE and

14

Teleglobe. For example, at pages 13 and 14 (BCE-AD 0271258-59) Michel Lalande ("ML") is shown has having been assigned, under "Litigation Risk Analysis" as the in house contact for Teleglobe's lawyers on the matter of "disclosure issues" while, at the same time, serving as the in house contact for BCE's purported lawyers on "Corporate Veil-Single Enterprise Theory." Vol. D, Tab 30.

BCE's in house lawyers, and particularly Lalande and Turcotte, were plainly on both sides. They sought to control the process, and to monitor and shape the result. Other BCE lawyers similarly provided advice to BCE and Teleglobe, on matters of common interest, consisting of issues directly or indirectly relating to the funding, or restructuring, of Teleglobe. See, e.g., Lalande 17 (Ryan) (Vol. D, Tab 2); Lalande 18 (Ryan) (Vol. D, Tab 3); Lalande 24 (Ricciuto) (Vol. D, Tab 5); Lalande 26 (Ricciuto, Turcotte) (Vol. D, Tab 7); Lalande 37 (Ricciuto) (Vol. D, Tab 13); Lalande 39 (Turcotte, Ryan) (Vol. D, Tab 14); Lalande 40 (Turcotte, Ryan) (Vol. D, Tab 15; Lalande 47 (Turcotte, Ryan) (Vol. D, Tab 19); Lalande 67 (Turcott) (Vol. D, Tab 25); Lalande 68 (Ryan) (Vol D, Tab 26); BCE-AD0546089 (Turcotte, Cossette) (Vol. E, Tab 35).

The descriptions of withheld documents set out in Special Master Seitz's February 22nd Report, and the description of such set out on the Defendants' logs (footnoted in the Special Master's report) confirm that BCE lawyers advised Teleglobe on matters relating to BCE's decision to cease funding (or restructure) Teleglobe. See February 22nd Report at 31-35. [10]

---

[10] There is and can be no suggestion by the Defendants that the Special Master's descriptions of documents reviewed *in camera*, as reflected in the February 22nd Report are inaccurate.

### 2.    Davies Ward's Joint Representation.

The Special Master has found that prior to April 8, 2002, Davies Ward Phillips &
Vineberg, LLP, offered legal advice both to Teleglobe and to BCE regarding how to time the
release of BCE's and Teleglobe's annual reports with the announcement of BCE's restructuring
intentions regarding Teleglobe. February 22nd Report at 35. The Special Master has further
found that Davies Ward offered advice to BCE regarding its sale of all or substantially all of
Teleglobe's assets. Id. The document descriptions on Defendants' logs (to which the Special
Master cites in his footnotes) support these findings. See, e.g. 7/04 Log., 82, 245, 247, 249 (Vol.
F, Tab B).

The Special Master properly rejected the Defendants' claim that Davies Ward effectively
discontinued its work for BCE on April 10, 2002, in order to provide restructuring and other
advice solely to Teleglobe. February 22nd Report at 35-39. The Special Master found that
Davies Ward lawyers continued to advise BCE after April 10, 2002, and through April 23, 2002,
on Project X and the consequences to BCE of a write off of Teleglobe (id. at 36); on the duties of
the BCE board (while advising the Teleglobe board on the same day, on the same subject) (id. at
37; Lalande Ex. 68 (Vol. D, Tab 26)); in preparing slides for Turcotte of Davies Wards' analysis
of BCE credit instruments relating to a sale of Teleglobe assets (id. at 37); and on "Project
Special", which addressed the consequences to BCE of a Teleglobe restructuring (id. at 37-38).
The privilege log descriptions of these documents are ample confirmation of the Special Master's
findings. See, e.g., 7/04 Log., 181, 708, 713; 9/05 Log., 3483, 3484 (Vol. F, Tabs B, A). There
is and can be no suggestion that the Special Master was incorrect in his descriptions.

Davies Ward also advised both Teleglobe and BCE on the April 2002 amendments to the
Teleglobe and BCE public filings, addressing BCE's intent to fund Teleglobe. See, e.g., Lalande

16

379, 381-82, 394-95, 415 (referring to Lalande 37 (Vol. D, Tab 13)); 9/05 Log, 03598, 04174, 04175, 04249, 04250 (Vol. F, Tab A).

Finally, the withheld Davies Ward documents were shared with BCE's in house attorneys, including Lalande and Turcotte, who jointly represented Teleglobe. For that reason too, they must be produced. February 22nd Report at 39; see e.g., 9/05 Log, 00265, 00267, 00287, 00306, 00316, 00401, 3483, 3491, 4174, 4249, 4354, 4609. (Vol. F, Tab A).

In short, as the Special Master aptly observed, "during the time period in which the defendants allege that Davies Ward was representing Teleglobe with its restructuring alternatives, Davies Ward was providing simultaneous representation to BCE on the decision to cease funding for Teleglobe and the consequences to BCE of the funding decision." Id. at 38. "Davies Ward jointly represented BCE and Teleglobe on issues relating to the continued funding of Teleglobe." Id. at 39; see generally April 11, 2002 Project X Task List at 13-33 (listing Teleglobe and BCE legal issues addressed by Davies Ward. (Vol. D, Tab 30).

### 3.    Stikeman Elliot.

The Special Master found that all of the documents authored by Stikeman were shared with BCE's in house attorneys, who jointly represented BCE and Teleglobe. The record as reviewed above, and the descriptions of the Stikeman documents on the Defendants' privilege logs, confirm the finding. See, e.g., 9/05 Log. 00275, 00291, 00352, 00361, 00363, 00365, 00366, 00373, 00379, 00380, 00381, 00383, 00393, 00396, 00400, 01082 (Vol. F, Tab A).

### 4.    Osler Hoskin & Harcourt LLP Joint Representation.

The February 26, 2002 draft letter to Canadian Customs, quoted by the Special Master is dispositive of the issue. See id. at 41. Osler represented to the Canadian government that it represented both "BCE and Teleglobe. . . " with respect to its effort to seek a ruling with respect to the tax loss monetization proposal, by which funding would be provided to Teleglobe. Id.

17

The final letter from Osler to Canadian Customs demonstrates this. Cochran Trans. Aff. at Ex. 42. Further, having shared the documents with BCE's in house attorneys, they cannot be withheld from Teleglobe. February 22nd Report at 41; see e.g., 9/05 Log. 04589 (Vol. F, Tab A).

### 5.    Shearman & Sterling's Joint Representation.

The Special Master found that Shearman & Sterling represented both BCE and Teleglobe through most of the month of April 2002. The privilege log descriptions of the documents relied upon by the Special Master directly bear him out. See, e.g., 7/04 Log, 083, 211, 212, 213, 214, 256 (Vol. F, Tab B); Shearman & Sterling provided advice to Davies Ward attorneys and BCE in house attorneys on the application of insolvency laws to Teleglobe (9/05 Log, 278, 5125 Vol. F, Tab A); on the consequence to Teleglobe and its subsidiaries of U.S. bankruptcy proceedings (9/05 Log 281, 5124); on the substance of the BCE and Teleglobe's annual reports and MD&A's for 2001 (apparently with reference to BCE's commitment to fund Teleglobe) (7/04 Log, 700); and on options available to Teleglobe for restructuring (7/04 Log, 213).

Shearman also shared its documents with in house BCE counsel, and Davies, when both represented BCE and Teleglobe jointly. As such, the Shearman documents (through April 23, 2002) cannot be withheld. See, e.g., 7/04 Log. 256, 494, 495, 734 (Vol. F, Tab B); 9/05 Log. 00374, 00377 (Vol. F, Tab A); 2/05 Log 61, 62, 64 (Vol. F, Tab A).

And having jointly represented both Teleglobe and BCE, Shearman cannot withhold documents reflecting even BCE only advice, where such relate (directly or indirectly) to the matter of common interest in which it advised Teleglobe, such as BCE funding, or restructuring. February 22nd Report at 43.

The Special Master's findings should be affirmed.

18

## C.    Work Product.

The Special Master's statements of the law of work product are non-controversial, and plainly correct. His application of that law to his findings -- that Teleglobe and BCE were jointly represented by in house BCE lawyers, Davies Ward, Stikeman Elliot, Olser Haskins, and Shearman & Sterling, precludes application of the work product doctrine here.

## III.    Conclusion

The Special Master's reports of December 9, 2005 and February 22, 2006, should be affirmed and adopted as the opinions and orders of this Court.

_(signature)_ C#3796)

Gregory V. Varallo (No. 2242)
varallo@rlf.com
C. Malcolm Cochran, IV (No. 2377)
cochran@rlf.com
Russell C. Silberglied (No. 3462)
rcs@rlf.com
Chad M. Shandler (No. 3796)
cs@rlf.com
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
Telephone: (302) 651-7700
ATTORNEYS FOR THE DEBTORS

Dated: March 14, 2006

19

## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2006, I hand delivered and electronically filed the foregoing document with the Clerk of Court using CM/ECF, which will send notification of such filing(s) to the following:

Pauline K. Morgan, Esq.
YOUNG CONAWAY STARGATT &
TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899

Joseph A. Rosenthal , Esq.
ROSENTHAL, MONHAIT, GROSS &
GODDESS, P.A.
1401 Mellon Bank Center
P.O. Box 1070
Wilmington, DE 19801

I hereby certify that on March 14, 2006, I have sent by Federal Express the foregoing document to the following non-registered participants:

John Amato, Esq.
Hahn & Hessen LLP
488 Madison Avenue
New York, NY 10022

George J. Wade, Esq.
Daniel Schimmel, Esq.
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022

Chad M. Shandler (#3796)
Shandler@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

RLF1-2973482-1