# EXHIBIT 39

## RICHARDS, LAYTON & FINGER

A PROFESSIONAL ASSOCIATION
ONE RODNEY SQUARE
920 NORTH KING STREET
WILMINGTON, DELAWARE 19801
(302) 651-7700
FAX (302) 651-7701
WWW.RLF.COM

C. MALCOLM COCHRAN, IV
DIRECTOR

DIRECT DIAL NUMBER
302-651-7506
COCHRAN@RLF.COM

November 1, 2005

**Via Hand Delivery**
Collins J. Seitz, Jr., Esquire
Connolly Bove Lodge & Hutz
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899

Re:    **Teleglobe Communications Corporation et al. v.
       BCE, Inc., et al.**

Dear Special Master Seitz:

During yesterday's hearing, you asked whether any case law subsequent to *Harriman v. E.I. Dupont de Nemours & Co.*, 372 F.Supp. 101 (D. Del. 1974), supports Plaintiffs' position that fiduciary duties are owed to the Debtors by BCE, Jean Monty, Richard Currie, Thomas Kierans and Stephen Skinner by virtue of the control that such persons exercised over the Debtors. In this regard, we respectfully direct your attention to *In re USACafes* (cited at page 18 of our reply brief) which, applying basic principles of fiduciary law, held that directors of a general partner owed fiduciary duties to the limited partners because of the directors' control over the partnership's property and business affairs. *In re USACafes, L.P. Litig.*, 600 A.2d 43, 48-49 (Del. Ch. 1991).

A question was also raised whether the holding in *Harriman* has been applied in the context of a privilege dispute. The answer to this question is yes. In *Deutsch v. Cogan*, minority stockholders of Knoll International, Inc. brought suit against, *inter alia*, GFI Nevada, Inc. (Knoll's majority stockholder), General Felt Industries and GFI/Knoll International Holding Corp (controlling entities of GFI Nevada) and Marshall Cogan. Prior to the disputed merger, Cogan owned a majority of the voting stock in GFI/Knoll; GFI/Knoll in turn owned 100% of the outstanding stock of General Felt; General Felt owned 100% of the outstanding stock of GFI Nevada, which in turn was the majority shareholder of Knoll. The Court determined that Cogan, GFI/Knoll and General Felt owed fiduciary duties to Knoll's minority shareholders because of the control Cogan exercised over GFI Nevada. *Deutsch v. Cogan*, 580 A.2d 100, 107 (Del. Ch. 1990). Upon determining that fiduciary duties were owed by these defendants to Knoll, the Court of Chancery, applying the *Valente/Garner* fiduciary analysis discussed at yesterday's hearing, determined that communications between the defendants and their conflicted counsel (who also represented Knoll) were not privileged and had to be produced. *Id.* at 108.

Collins J. Seitz, Jr., Esquire
November 1, 2005
Page 2


       If you have any questions with respect to this letter, counsel remain available at your convenience to discuss.

             Respectfully,

             C. Malcolm Cochran, IV

CMC,IV/dc
Enclosure
cc:    George J. Wade, Esquire (via Federal Express)
       Kevin Gross, Esquire (via hand delivery)
       Pauline K. Morgan, Esquire (via hand delivery)
       John P. Amato, Esquire (via Federal Express)
       Gregory V. Varallo, Esquire

RLF1-2940590-1

# EXHIBIT 40

RICHARDS, LAYTON & FINGER
A PROFESSIONAL ASSOCIATION
ONE RODNEY SQUARE
920 NORTH KING STREET
WILMINGTON, DELAWARE 19801
(302) 651-7700
FAX (302) 651-7701
WWW.RLF.COM

C MALCOLM COCHRAN, IV
DIRECTOR

DIRECT DIAL NUMBER
302-651-7506
COCHRAN@RLF.COM

November 16, 2005

**VIA HAND DELIVERY**
Collins J. Seitz, Jr., Esquire
Connolly Bove Lodge & Hutz
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899

Re:    **Teleglobe Communications Corporation et al. v. BCE, Inc., et al.**

Dear Special Master Seitz:

We have received today the Defendants' two letters to you of November 15, 2005. We are concerned with the Defendants' failure to submit the designated documents for *in camera* inspection until they were able to prepare and submit their four page letter memorandum of November 15, 2005, which seeks to re-brief the work product issue (attaching new exhibits) and the Harriman case.

Regardless, our work product argument remains unchanged. If the documents must be produced under Valente or Garner, then, in these circumstances, it is our position that "substantial need" exists for the materials, under Fed R Civ P. 26(b)(3); see Zirn v. VLI Corp., 621 A 2d 773, 782-83 (Del. Supr. 1993). We note also that we do not seek documents postdating April 24, 2002 – which is the date the resignations of the BCE-appointed (and controlled) officers and directors of the various Teleglobe entities became effective.

With regard to Harriman, we are confident that Your Honor will consider Harriman, Deutsch, and the rest, without further guidance from us. I would note, however, that the notion promoted by the Defendants to the effect that the Plaintiffs "do not allege, much less prove, facts showing that the directors or officers of Teleglobe, Inc. exercised such control over Plaintiffs" is badly mistaken. In that regard, we would simply refer you to the briefing on our Motion to Compel (with which we are confident you are familiar), and to our pending Amended Complaint at (for example) paragraphs 23 through 34, 62 through 70, and 71 through 79 (the latter entitled "BCE and the TI Directors and Officers Exercise Control over the Debtors ...." Indeed, the conduct of the individual Defendants constituting control is referenced in paragraphs throughout the Amended Complaint.

Perhaps no surprise here, the Defendants' control of the Debtors was directly admitted, in the public disclosure entitled "Control by BCE, Inc." that was initially approved by the

Collins J. Seitz, Jr., Esquire
November 16, 2005
Page 2

Teleglobe, Inc. Board of Directors on February 27, 2002 for inclusion in the Teleglobe annual report:

> **Control by BCE, Inc.** BCE, Inc. and its affiliates own all of the outstanding common shares of the Corporation and, subject only to applicable law in the terms of the Teleglobe, Inc. **group's** financial instruments, exercise control over and manage the affairs and operations of the Teleglobe, Inc. **group**.
>
> In particular, all of the officers of the Corporation are also BCE, Inc. employees, most of BCE Teleglobe's senior management is comprised of former employees of BCE, Inc. or its affiliates and all but one of the members of the Board of Directors of the Corporation are also members of the Board of Directors of BCE, Inc.

Sabia Dep. Ex. 7, p. 42-43 (emphasis added).

Of course, once it "anticipated litigation" (as is stated, emphatically, in its new "work product" arguments) BCE's lawyers, and BCE's controlled Teleglobe directors and officers, re-wrote (on April 12, 2002) this disclosure.

We think it is more than amply stated in the Amended Complaint, and demonstrated by the evidence called to your attention, that BCE acted through its BCE controlled appointees, the former officers and directors of Teleglobe and the Debtors, to control the affairs of the Debtors.

Finally, having admitted that they have produced (apparently recently, and without revising their logs) the documents collected under Tab B of Mr. Schimmel's November 15 letter, we pause only to note our wonderment that the Defendants continue to withhold hundreds (if not thousands) of documents relating to the very same subjects, sent or received by the very same recipients as those that are collected under Tab B. The selective production, and the selective waiver, warrant production of all the rest.

I regret that we have burdened you with this additional paper. We stand ready to answer any questions.

Respectfully,

C. Malcolm Cochran, IV

CMC/dqc
cc:    George J. Wade, Esq. (via Federal Express)
       Gregory V. Varallo, Esq.

Collins J. Seitz, Jr., Esquire
November 16, 2005
Page 3

bcc:    Chad Shandler, Esq
        Anne Shea Gaza, Esq
        Russell C. Silberglied, Esq.

# EXHIBIT 41

## RICHARDS, LAYTON & FINGER

A PROFESSIONAL ASSOCIATION
ONE RODNEY SQUARE
920 NORTH KING STREET
WILMINGTON, DELAWARE 19801
(302) 651-7700
FAX (302) 651-7701
WWW.RLF.COM

GREGORY V. VARALLO
DIRECTOR

DIRECT DIAL NUMBER
302-651-7772
Varallo@RLF.COM

December 7, 2005

**HAND DELIVERY**

Collins J. Seitz, Jr., Esquire
Connolly Bove Lodge & Hutz
1007 North Orange Street
P.O. Box 2207
Wilmington, DE  19899

Re:  Teleglobe Communications Corporation et al. v. BCE, Inc., et al

Dear Master Seitz:

We are in receipt of Ms. Pauline Morgan's letter of earlier today, which appears to be in the nature of a motion for reargument. We are currently preparing and intend to file a motion for reargument with respect to Your Honor's December 1, 2005 decision, and will do so by early next week at the latest. We would respectfully suggest that the interests of judicial economy would best be served by taking up both Ms. Morgan's filing and our forthcoming motion at the same time.

We did, however, wish to point out two things. First, Ms. Morgan's filing puts before Your Honor an affidavit given in a separate case that was apparently not before Your Honor at the time of argument of the motion decided on December 1. We would respectfully suggest that were Your Honor to consider it appropriate to receive such testimony, that Debtors should have the right to supplement the record with additional testimony of their choosing which was similarly not before the Court when it issued its first ruling.

Second, we are surprised to see Ms. Morgan's representation that "upon further review, a few documents may reflect work performed for Teleglobe...", given the fact that Your Honor's December 1, 2005 decision is expressly premised upon opposing counsel's representation that the only documents listed on the privilege logs reflected work done *solely* for BCE. (*See, e.g.* December 1 Decision, p. 7-8) ("... according to defendants, the only documents that continue to be withheld from production are ... documents that involve the provision of legal advice *solely* to BCE"). ("For purposes of this decision, the Special Master will assume that the defendants'

RLF1-2954489-1

Collins J. Seitz, Jr., Esquire
December 7, 2005
Page 2

privilege logs only list documents reflecting legal advice provided by BCE attorneys exclusively to BCE"). If a review of only a handful of Davies Ward entries on these extensive privilege logs leads opposing counsel to the conclusion that --at least with respect to that handful-- the key representation upon which Your Honor relied was simply not correct, one can only wonder what a more wide ranging review of BCE's extensive privilege logs will reveal. We point out that when we selected the original 50 documents Your Honor gave us leave to select, BCE responded by turning over several of the documents as incorrectly withheld, or otherwise not reflecting work solely for BCE. Now that Your Honor has ordered that another small category of documents be turned over, BCE has once again determined that at least some of those documents disprove its representation upon which the Court so critically relied. Put simply, since BCE has now twice called into question the accuracy and completeness of its own core representation, we have no choice but to ask the Court to conduct a more wide ranging and complete *in camera* inspection of documents listed on BCE's privilege logs. It is most emphatically *not* fair for BCE to make sweeping representations, have the Court rely on them, and then dribble out documents on a document by document basis when actual inspection of the documents demonstrates the incorrectness of its representations.

We are, of course, available should the Court wish to have a telephonic conference on this or any other point and, unless instructed otherwise, will submit our substantive response to Ms. Morgan's letter with the filing of our motion.

Respectfully,

Gregory V. Varallo

GVV:paj

cc:    George Wade, Esquire
       Pauline Morgan, Esquire
       John Amato, Esquire

Collins J. Seitz, Jr., Esquire
December 7, 2005
Page 3


bcc:    C. M. Cochran, Esquire
        R. Silberglied, Esquire
        Chad Shandler, Esquire

# EXHIBIT 42

# OSLER, HOSKIN & HARCOURT

Osler, Hoskin & Harcourt LLP
*Barristers & Solicitors*
Box 50, 1 First Canadian Place, Toronto, Ontario, Canada M5X 1B8
T 416-362-2111  F 416-862-6666  osler.com

TORONTO   OTTAWA   CALGARY   MONTRÉAL   NEW YORK

March 7, 2002

BY FACSIMILE & COURIER

Income Tax Rulings and Interpretations Directorate
Canada Customs and Revenue Agency
Place de Ville
16th Floor, Tower A
320 Queen Street
Ottawa, Ontario
K1A 0L5

Attention:   Mr. Mark Symes
             Reorganizations and International Division

Dear Sir:

Subject:     BCE Inc. ("BCE")
             Business No. 12161-0299RC

             Teleglobe Inc. ("Teleglobe")
             Business No. 10516-6466RC

             Request for Advance Income Tax Ruling

We are writing on behalf of our clients, BCE and Teleglobe, to request an advance income tax ruling with respect to the application of the *Income Tax Act* (Canada) to the implementation of certain proposed transactions involving BCE, Teleglobe and certain other entities described herein. In very general terms, the transactions described herein involve an internal loss-utilization transaction designed to permit the consolidation of income currently earned by BCE with the non-capital losses of Teleglobe, in such a manner as to minimize the risk of the relevant income-earning property (and the income that it will generate) being exposed to Teleglobe's creditors in the event that Teleglobe is at risk of experiencing financial distress. BCE and Teleglobe both file their corporate income tax returns at the Shawinigan Taxation Centre and deal with the Montreal Tax Services Office.

TOR_P22:447201.14 20020071259
1127999

R.2004-BCE 016266

R.2004-BCE016266

OSLER,
HOSKIN &
HARCOURT

We enclose the following:

    (a)    a cheque made payable to the Receiver General for Canada in the amount of $535.00 as a deposit. BCE and Teleglobe undertake to pay any additional fees as may become due in respect of this advance income tax ruling request;

    (b)    two copies of this advance income tax ruling request;

    (c)    a diskette containing this advance income tax ruling request in Word format; and

    (d)    the consent of BCE and Teleglobe to release a severed version of this ruling to the public. In connection with such consent, we would propose to identify the information to be deleted from the text of the ruling at such time as the ruling has been issued and submitted to us in severed form, for review and approval.

An authorization in favour of Osler, Hoskin & Harcourt LLP from BCE and Teleglobe (including an authorization to communicate with them and us by fax) was previously delivered to you at our meeting of February 7, 2002. To the best knowledge of both BCE and Teleglobe, none of the issues involved in this advance income tax ruling request are being considered by a Tax Services Office or Taxation Centre in connection with a tax return already filed, or are under objection or appeal, or are before the courts, or are in an earlier return of the taxpayers or persons related to them, or are the subject of a previously issued advance income tax ruling. The transactions described herein will not result in any taxpayer described herein being unable to pay its outstanding tax liabilities.

We are providing the information herein in confidence for the purposes of the Act. Disclosure of this information is restricted pursuant to section 241 of the Act and, as such, is exempt from disclosure under the *Access to Information Act* (Canada).

## DEFINITIONS

In this letter, the following terms have the meanings specified:

    (a)    "Act" means the *Income Tax Act*; R.S.C. 1985 (5th Supp.) c.1, as amended to the date hereof, and unless otherwise stated, every reference herein to a part,

TOR_P2Z:4472D1.14  20020071239
1022999

R.2004-BCE 016267

R.2004-BCE016267

OSLER,
HOSKIN &
HARCOURT

Page 3

section, subsection, paragraph, subparagraph or clause is a reference to the relevant provision of the Act;

(b)    "Ameritech" means Ameritech Canada, Inc., a corporation incorporated under the laws of Delaware and controlled by SBC;

(c)    "arm's length" has the meaning assigned by section 251;

(d)    "BCE" means BCE Inc., as described in Paragraph 1;

(e)    "BCE Common Shares" means the common shares in the capital stock of BCE so described in Paragraph 3;

(f)    "BCH" means Bell Canada Holdings Inc., as described in Paragraph 5;

(g)    "BCH Convertible Series A Preferred Securities" means the Series A preferred securities of BCH held by BCE so described in Paragraph 6(iii);

(h)    "BCH Loans" means collectively the BCH Convertible Series A Preferred Securities, the BCH Senior Note 2 and the BCH Senior Note 3;

(i)    "BCH Senior Note 2" means the debt of BCH owing to BCE so described in Paragraph 6(i);

(j)    "BCH Senior Note 3" means the debt of BCH owing to BCE so described in Paragraph 6(ii);

(k)    "Bell Canada" means Bell Canada, as described in Paragraph 8;

(l)    "Bell Canada Junior Notes" means the debt of Bell Canada owing to BCH so described in Paragraph 9;

(m)    "CBCA" means the *Canada Business Corporations Act*;

(n)    "Coupon Payment Date" means each of August 31, November 30, the last day of February and May 31, or if any such date occurs on a Saturday, Sunday,

TOR_P2Z:447201.14 20020703159
1027999

R.2004-BCE 016268

R.2004-BCE016268

OSLER,
HOSKIN &
HARCOURT

statutory holiday or day on which banks in Montreal are closed for business (a "Holiday"), the next succeeding day that is not a Holiday;

(o)     "fair market value" means the highest price available in an open and unrestricted market between informed prudent parties acting at arm's length;

(p)     "Financial Distress" means any circumstance in which Newco is of the view that Teleglobe is or may be or may become either insolvent or on the eve of insolvency;

(q)     "Finco" means the new corporation to be incorporated under the CBCA, as described in Paragraph 11;

(r)     "Finco Loan" means the loan made by the Limited Partnership to Finco so described in Paragraph 21;

(s)     "GPco" means the new corporation to be incorporated under the CBCA, as described in Paragraph 13;

(t)     "Interest Waiver Date" means, in respect of any particular calendar year, each Coupon Payment Date occurring in such year and December 31 of that year, and where any principal amount of the Newco Loan is repaid within such year other than on a Coupon Payment Date, shall include the date of any such principal repayment to the extent of and with reference only to any interest on such repaid principal amount accrued and unpaid to such principal repayment date;

(u)     "Limited Partnership" means the limited partnership established under the *Limited Partnerships Act* (Ontario) described in Paragraph 17, of which GPco is the general partner and of which Teleglobe is the limited partner;

(v)     "Newco" means the new corporation to be incorporated under the CBCA, as described in Paragraph 12;

TOR_P22:447220\.14  20080307\1139
1821999 .

R.2004-BCE 016269

R.2004-BCE016269

OSLER,
HOSKIN &
HARCOURT

(w)     "Newco Loan" means the loan made by Newco to the Limited Partnership so described in Paragraph 20;

(x)     "Paragraph" means a paragraph in this advance income tax ruling request;

(y)     "Pre-Funded Amount" has the meaning described in Paragraph 24;

(z)     "principal amount" has the meaning assigned by subsection 248(1);

(aa)    "Proposed Transactions" means collectively the transactions described in Paragraphs 17 to 29;

(bb)    "public corporation" has the meaning assigned by subsection 89(1);

(cc)    "SBC" means SBC Communications Inc.;

(dd)    "series of transactions or events" has the meaning assigned by subsection 248(10);

(ee)    "taxable Canadian corporation" has the meaning assigned by subsection 89(1);

(ff)    "Teleglobe Funding" means the approximately $850 million that BCE will provide (directly or indirectly) to Teleglobe in 2002 in order to fund its working capital, capital expenditure and financing cost requirements; and

(gg)    "Trust" means the trust so described in Paragraph 5.

## STATEMENT OF FACTS

### Facts Relating to BCE

1.   BCE is the corporation resulting from the amalgamation of BCE Inc. (which was originally incorporated under the CBCA in 1970), 146367 Canada Inc., 3056082 Canada Inc. and 3018083 Canada Inc., which amalgamation was effective on December 1, 2000. BCE is governed by the CBCA and is a public corporation and a taxable Canadian corporation.

OSLER,
HOSKIN &
HARCOURT

2.    BCE is a strategic management and holding corporation. BCE reorganized its
      management structure as of December 1, 2000 into the following five lines of business:

      (a)    Canadian connectivity (primarily Bell Canada, Bell Mobility Inc., Bell ActiMedia
             Inc., BCE Nexxia Inc., Bell ExpressVu, and Aliant Inc., amongst others);

      (b)    Global connectivity (BCE Teleglobe);

      (c)    Content (Bell Globemedia Inc., created in the transactions described in advance
             income tax ruling 2000-005654, dated December 22, 2000, as amended by
             advance income tax ruling 2000-006369, dated January 9, 2001, as further
             amended by advance income tax ruling 2000-008760, dated August 21, 2001,
             which holds CTV Inc., certain shares in Sympatico-Lycos Inc., the assets of the
             Globe & Mail and certain properties formerly held by BCE Media Inc.);

      (d)    E-commerce (BCE Emergis Inc.); and

      (e)    Other ventures (primarily Bell Canada International Inc., Telesat Canada, and
             CGI Group Inc., amongst others).

3.    As at January 31, 2002, BCE had 808,533,888 common shares issued and outstanding,
      representing all of its issued voting shares (the "BCE Common Shares"). The BCE
      Common Shares are listed on The Toronto Stock Exchange and other stock exchanges in
      the United States and Europe.

4.    BCE also has outstanding Cumulative Redeemable First Preferred Shares issued in
      various series. The Cumulative Redeemable First Preferred Shares are listed on The
      Toronto Stock Exchange.

The BCE Group

5.    BCH is a taxable Canadian corporation that was incorporated in 1988 under the CBCA.
      BCH is a holding corporation which holds common shares and debt of Bell Canada. As
      at January 31, 2002, BCH had outstanding 800,000,000 Class A1 common shares,

TOR_P32:44720LM 2002:0007:12:59
02/1799

R.2004-BCE 016271

R.2004-BCE016271

OSLER,
HOSKIN&
HARCOURT

200,000,000 Class B common shares and 4,935,408 Series 1 Class P Shares. The Class A1 voting common shares are all held by BCE. The Class B voting common shares are all held by a trust (the "Trust"), the beneficiaries of which are affiliates of SBC and the trustee of which is Ameritech. The Series 1 Class P Shares are all held by BCE and are non-voting.

6.    BCE also holds the following indebtedness of BCH:

      (i)    a Senior Note 2 (the "BCH Senior Note 2") with a principal amount of $1,700 million and maturity date of May 31, 2009. The BCH Senior Note 2 is assignable by BCE, is unsecured, and bears interest at the rate of 5.94% per annum, payable quarterly on each Coupon Payment Date. Commencing on June 1, 2002 and on each June 1 thereafter prior to maturity, BCH must make a principal repayment in respect of the BCH Senior Note 2 in the amount of $212.5 million, plus accrued and unpaid interest. Commencing on June 1, 2004 and on each June 1 thereafter prior to maturity, BCH may (without the consent of Ameritech) make additional principal repayments in respect of the BCH Senior Note 2 up to a maximum of $50 million per year, plus accrued and unpaid interest. BCH may at any time (with the consent of Ameritech) prepay all or any portion of the BCH Senior Note 2 without notice or penalty;

      (ii)    a Senior Note 3 (the "BCH Senior Note 3") with a principal amount of $497.6 million and a maturity date of May 31, 2009. The BCH Senior Note 3 is assignable by BCE, is unsecured, and bears interest at the rate of 6.00% per annum, payable quarterly on each Coupon Payment Date. BCH may at any time prepay all or any portion of the BCH Senior Note 3 without notice or penalty. BCH is obliged to repay BCE under the BCH Senior Note 3 to the extent that Bell Canada repays any of the Bell Canada Junior Notes (issued by Bell and held by BCH, as described below in Paragraph 9(i)) and BCH does not use the repayment proceeds to subscribe for equity of Bell Canada; and

TOR_P2Z:447201.14 20032001239
1027999

R.2004-BCE 016272

R.2004-BCE016272

OSLER,
HOSKIN &
HARCOURT

Page 8

(iii)  Series A non-voting preferred securities (the "BCH Convertible Series A
Preferred Securities") with a principal amount of $1,256 million and a
maturity date of October 22, 2098. The BCH Convertible Series A
Preferred Securities are assignable by BCE, are unsecured, and bear
interest at the rate of 6.00% per annum, payable quarterly on each Coupon
Payment Date.  Interest on the BCH Convertible Series A Preferred
Securities is (at BCH's option) payable in cash, in additional BCH
Convertible Series A Preferred Securities, or in BCH Class A1 common
shares, and unpaid interest is itself subject to interest at the rate of 6.00%
per annum.  BCH may, at any time after October 23, 2004, prepay all or
any portion of the BCH Convertible Series A Preferred Securities in cash
or through the issuance of BCH Class A1 common shares.
Notwithstanding the foregoing, if BCH elects to prepay all or any portion
of the Series B non-voting preferred securities issued by BCH to the Trust
(as described below), then BCH must prepay all or an equivalent portion
of the BCH Convertible Series A Preferred Securities.  The BCH
Convertible Series A Preferred Securities are convertible into Class A1
common shares of BCH at any time after a failure by BCH to pay any
quarterly interest amounts due thereunder or at any time after October 23,
2004.

7.  The Trust owns Series B non-voting preferred securities issued by BCH with a principal
amount of $314 million.  The Series B non-voting preferred securities will mature on
October 22, 2098.  BCH may, at any time, prepay all or any portion of the Series B non-
voting preferred securities in cash or through the issuance of Class B common shares of
BCH. The Series B non-voting preferred securities are convertible into Class B common
shares of BCH at any time after a failure by BCH to pay any quarterly interest amounts
due thereunder or at any time after October 23, 2004.

8.  Bell Canada was incorporated by Special Act of the Parliament of Canada in 1880 and
continued under the CBCA effective April 21, 1982.  Bell Canada is a public corporation

TOR_P2Z:447231.14  200702007132E9
1071909

R.2004-BCE 016273

R.2004-BCE016273

OSLER,
HOSKIN &
HARCOURT

and a taxable Canadian corporation. As at January 31, 2002, Bell Canada had outstanding 348,316,829 common shares, representing all of the voting shares of the company, all of which are owned directly by BCH. Bell Canada also has outstanding preference shares, all of which are non-voting, fixed value, non-participating and not convertible into common shares. Such shares are held by persons who are not related to BCE.

9.     BCH also holds the following indebtedness of Bell Canada:

(i)     Junior Notes (the "Bell Canada Junior Notes") with a principal amount of $497.6 million bearing interest at a fixed rate of 8.22%. The Bell Canada Junior Notes will mature on May 31, 2034. Bell Canada may at any time prepay any or all of the Bell Canada Junior Notes without notice or penalty provided that any such repayment does not result in a reduction in the credit rating of any debt securities of Bell Canada ranking senior to the Bell Canada Junior Notes. Bell Canada may elect to make any repayment of principal under the Bell Canada Junior Notes through the issuance of such number of common shares of Bell Canada as have an aggregate fair market value equal to the amount of principal thereby repaid; and

(ii)     a Demand Note with a principal amount of $1,570 million bearing interest at a floating rate set each December 1 for the following twelve months, which for 2002 is 2.77%. Upon demand of payment by BCH, Bell Canada may repay in cash all or any portion of the Demand Note only to the extent that such cash payment does not result in a reduction in the credit rating of any debt securities of Bell Canada ranking senior to the Demand Note. Bell Canada may at any time prepay all or any portion of the Demand Note without notice or penalty provided that any such repayment does not result in a reduction in the credit rating of any debt securities of Bell Canada ranking senior to the Demand Note. Bell Canada may make any repayment or prepayment of principal owing under the Note through the issuance of such number of common shares of Bell Canada as have an

R.2004-BCE 016274

R.2004-BCE016274

OSLER,
HOSKIN &
HARCOURT

aggregate fair market value equal to the amount of principal thereby repaid.

10. Teleglobe is a taxable Canadian corporation that is the corporation resulting from the January 1, 1999 amalgamation under the CBCA of Teleglobe Inc. (which was originally incorporated in 1958 under the CBCA, and changed its name to Teleglobe Inc. in 1991) and Teleglobe Canada Inc. (which was incorporated under the CBCA on April 2, 1987 and subsequently purchased by Teleglobe Inc). Teleglobe is a leading provider of global broadband and Internet services. Its outstanding shares consist of common shares and Fourth Series Preferred Shares. BCE owns 68.15% of the common shares of Teleglobe directly, and a further 8.87% through a wholly-owned taxable Canadian corporation (total of 77.02%). The other 22.98% of the common shares of Teleglobe are owned by Bell Canada through two wholly-owned taxable Canadian corporations (see diagram at Appendix A). BCE owns all of the Teleglobe Fourth Series Preferred Shares, which were issued for U.S. $1 billion. Teleglobe also owes BCE U.S. $238 million as of December 31, 2001, and the Teleglobe Group of companies also owes various arm's-length third parties approximately $3.9 billion, with varying maturity dates. Approximately $2 billion of the Teleglobe Group's credit facilities matures in July 2002, and must be renegotiated by then. A further $125 million in debt matures in each of November 2002 and June 2003. Teleglobe currently has no incremental third-party borrowing capacity, and relies on BCE to provide financial assistance to fund its capital expenditure, working capital and financing cost requirements.

Corporations Incorporated for Proposed Transactions

11. Prior to the implementation of the Proposed Transactions, BCE will incorporate a new taxable Canadian corporation ("Finco") under the CBCA, subscribing for a single common share in exchange for $1, and holding the only issued share of Finco immediately after Finco's incorporation. The authorized share capital of Finco will consist of an unlimited number of voting common shares.

TOR_P2Z:447200.14  20[01/01]1259
1027/999

OSLER,
HOSKIN &
HARCOURT

12.   Prior to the implementation of the Proposed Transactions, BCE will incorporate a new taxable Canadian corporation ("Newco") under the CBCA, subscribing for a single common share in exchange for $1, and holding the only issued share of Newco immediately after Newco's incorporation. The authorized share capital of Newco will consist of an unlimited number of voting common shares.

13.   Prior to the implementation of the Proposed Transactions, BCE will incorporate a new taxable Canadian corporation ("GPco") under the CBCA, subscribing for 100 common shares in exchange for $100, and holding the only issued shares of GPco immediately after GPco's incorporation. The authorized share capital of GPco will consist of an unlimited number of voting common shares.

### Background to Proposed Transactions

14.   As of June 1, 2002, the BCH Loans will generate approximately $48 million of interest income per quarter for BCE. At the time of the Proposed Transactions, Teleglobe will have post-acquisition-of-control non-capital loss carryforwards from pre-2002 taxation years of approximately $200 million after the carryback and application of net capital losses from 2002 against capital gains realized in 2001. Teleglobe currently expects to generate further non-capital losses in the range of $190 million for its 2002 taxation year and $100 million for its 2003 taxation year in the absence of the Proposed Transactions. In 2001 BCE had taxable income of approximately $680 million and paid tax of approximately $290 million, but expects to generate losses in 2002-2004 (which will be increased if the Proposed Transactions are undertaken) that it anticipates carrying back to reduce tax payable in 2001.

### Other Information

15.   It is anticipated that BCE will advance the Teleglobe Funding to Teleglobe in 2002. Further advances are expected to be made in 2003 and 2004 for the same purposes. Most or all of such advances are expected to take the form of loans and/or equity investments from BCE to Teleglobe. As discussed below, in the event that the Proposed Transactions

OSLER,
HOSKIN &
HARCOURT

are undertaken, a portion of this funding to Teleglobe would be made through the income
Teleglobe would earn from the Limited Partnership.

16.    The taxation year-end of all of the entities described in the Proposed Transactions is
       December 31, except for the Limited Partnership (whose fiscal period will end on
       November 30).

PROPOSED TRANSACTIONS

The transactions described in Paragraphs 17 to 23 will be undertaken in the order described
below.

17.    GPco and Teleglobe will form the Limited Partnership, with GPco contributing $100 as a
       general partnership capital contribution and Teleglobe contributing $99,900 as a limited
       partnership capital contribution. The Limited Partnership will use these funds to actively
       make and trade in short-term liquid investments such as money market instruments. The
       Limited Partnership will also use the funds it receives as interest on the Finco Loan to
       carry on a business of making short-term loans to members of the BCE Group who are
       from time to time in need of cash, or if there is no such need at any particular time (or in
       addition to making such loans), to invest such funds in or trade in short-term liquid
       investments such as money market instruments. Accordingly, the Limited Partnership
       will undertake some or all of the following activities:

       (a)    making the Finco Loan and incurring the Newco Loan (described below);

       (b)    monitoring and assessing the cash needs of prospective borrowers within the BCE
              Group (e.g., reviewing cash projections, tracking expected funding needs,
              monitoring debt servicing and principal repayment dates, etc.);

       (c)    monitoring the ongoing solvency of its debtors under such loans;

       (d)    making short-term (i.e., week-to-week, month-to-month) interest-bearing funding
              loans to various members of the BCE Group; and

TOR_P2Z:447201:14  20022205071259
1027999

R.2004-BCE 016277

R.2004-BCE016277

OSLER,
HOSKIN &
HARCOURT

(e)    investing surplus funds in short-term interest-bearing arm's length investments (e.g., money market instruments, treasury bills, etc.).

It is expected that the Limited Partnership will on average undertake three or four transactions per month of the type described above in (d) and (e). As noted in Paragraph 26, the Limited Partnership will also make non-interest-bearing loans to Teleglobe from time to time. The Limited Partnership's loans and investments (other than the Finco Loan, which will be funded with the Newco Loan) will be funded with cash it will receive as, (i) interest on the Finco Loan; (ii) income earned on its other loans and investments described above; and (iii) capital contributions from its partners. In its lending and related activities, the Limited Partnership would expect to be employing assets in the millions of dollars on a frequent basis. The Limited Partnership will contract with a member of the BCE group for the services of BCE group treasury personnel for the purpose of carrying on its day-to-day activities, and an agreement formalizing this arrangement on a fee-for-service basis will be prepared. In addition to its liabilities under the Newco Loan, the Limited Partnership would also incur liabilities (i.e., liability to pay a service fee) to the entity with whom it would contract for such use of its employees, as well as liabilities for other services (e.g., accounting, legal, etc). The Limited Partnership would be exposed to various risks in its business, including debtor risk (i.e., non-repayment of principal) and interest-rate risk (changes in interest rates). The board of directors of the general partner of the Limited Partnership will meet quarterly to oversee its activities, ratify actions taken, and review its loan and investment portfolio, and minutes will be kept of such board meetings.

18.    BCE will borrow an amount equal to the aggregate principal amounts of the BCH Loans from an arm's-length financial institution on a "daylight loan" basis.

19.    BCE will use most of the funds borrowed in Paragraph 18 to subscribe for common shares of Newco, and use the balance of these funds to make non-interest-bearing demand loans to Newco.

R.2004-BCE 016278

OSLER,
HOSKIN &
HARCOURT

20.    Newco will use the funds received from BCE to make a loan to the Limited Partnership. This loan (the "Newco Loan") will have the following terms:

- the maturity date will be May 31, 2009, subject to the proviso that any principal repayment made under the BCH Loans (in particular the annual principal repayments of $212.5 million under the BCH Senior Note 2) will require a contemporaneous and corresponding principal repayment under the Newco Loan;

- in addition to the usual events of default or acceleration, there will be an additional event of default or acceleration permitting Newco to demand immediate repayment in the event that Newco is of the view that Teleglobe may experience Financial Distress;

- there will be a provision expressly permitting Newco to amalgamate with Finco;

- there will be a provision allowing (at either party's option) interest and principal owing on the Newco Loan to be set off against a corresponding amount of interest and principal of the Finco Loan in the event that these obligations are (or become) mutual between two parties (i.e., each of two parties is the creditor under one loan and the debtor under the other);

- there will be a provision allowing the debtor to repay all or any part of the Newco Loan prior to maturity (or upon maturity), either in cash or by assigning a portion of the Finco Loan of equivalent fair market value;

- on any principal repayment date, there will be a provision allowing the creditor to require payment of the relevant amount of the Newco Loan to be made in the form of an assignment of a corresponding amount of the Finco Loan; and

- the Newco Loan will be secured by all of the assets of the Limited Partnership, including the Finco Loan, and will be interest-bearing at a rate one basis point less than the rate of interest on the Finco Loan (see Paragraph 21), such interest being payable on each Coupon Payment Date.

The terms of the Newco Loan will also provide that before each Interest Waiver Date, Newco (or its successor or assignee) may in its sole discretion by notice in writing waive any interest that would otherwise accrue to it to that Interest Waiver Date. As noted below, shortly before each Interest Waiver Date, Newco intends (but is not obligated) to exercise its discretionary right under the Newco Loan to waive its legal entitlement to the interest otherwise payable to it under the Newco Loan on such date (or in the case of a waiver made on December 31, interest that would otherwise accrue to it to that date since December 1 of the same year), unless Newco is of the view that Teleglobe may experience Financial Distress.

TOR_P22:4472SL14 200207J07I239
1627J999

R.2004-BCE_016279

R.2004-BCE016279



OSLER,
HOSKIN &
HARCOURT

Page 15

21. The Limited Partnership will use the proceeds of the Newco Loan to make a loan of the same amount to Finco. This loan (the "Finco Loan") will have the following terms:

- the maturity date will be May 31, 2009, subject to the proviso that any principal repayment made under the BCH Loans (in particular the annual principal repayments of $212.5 million under the BCH Senior Note 2) will require a contemporaneous and corresponding principal repayment under the Finco Loan;

- in addition to the usual events of default or acceleration, there will be an additional event of default or acceleration permitting the Limited Partnership to demand immediate repayment in the event that it is of the view that Teleglobe may experience Financial Distress;

- there will be a provision expressly permitting Newco to amalgamate with Finco;

- there will be a provision expressly allowing (at either party's option) interest and principal owing on the Finco Loan to be set off against a corresponding amount of interest and principal of the Newco Loan in the event that these obligations are (or become) mutual between two parties;

- there will be a provision allowing the debtor to repay all or any part of the Finco Loan prior to maturity;

- there will be an express acknowledgement of the circumstances described in Paragraph 20 under which Newco has the right to require that some or all of the Finco Loan be assigned to it in payment of a corresponding portion of the Newco Loan or under which the Limited Partnership has the right to set off the Finco Loan against the Newco Loan or assign the Finco Loan in payment of the Newco Loan; and

- the Finco Loan will be interest-bearing at a rate of interest that is marginally less than the blended rate of interest on the BCH Loans and one basis point greater than the rate of interest on the Newco Loan, such interest being payable on each Coupon Payment Date.

22. Finco will purchase the BCH Loans from BCE, in exchange for the cash received from the Finco Loan and a Finco common share. BCE and Finco will elect jointly under subsection 85(1) (in prescribed form and within the time permitted in subsection 85(6)) at an amount equal to the aggregate principal amount of the BCH Loans. To simplify the treatment of interest on the BCH Loans accrued and unpaid to the date of the sale to Finco, on the date of sale that amount will be paid to BCE in satisfaction of accrued and unpaid interest on the BCH Loans up to the date of the sale.

TOR_P2Z:4472L14 2XXEXXXX71259
IGT/999

R.2004-BCE 016280

R.2004-BCE016280

OSLER,
HOSKIN &
HARCOURT

23. Using the proceeds from the sale of the BCH Loans, BCE will fully repay the daylight loan described in Paragraph 18.

24. Because Teleglobe requires most of the Teleglobe Funding by September 2002, and because Teleglobe will earn income from the Limited Partnership only over time as interest accrues on the Finco Loan, it is anticipated that BCE will need to make loans to Teleglobe in 2002 that Teleglobe would later repay to BCE out of funds received from the Limited Partnership. In this manner, BCE's funding contribution to Teleglobe, whether direct or as a result of 2002 Limited Partnership income, will be limited to $850 million. In order to accomplish this, before the end of November 2002 BCE will advance an additional $50 million to $100 million (the "Pre-Funded Amount") to Teleglobe, likely in the form of a non-interest-bearing demand loan secured by Teleglobe's interest as a limited partner in the Limited Partnership, which Teleglobe will repay to BCE using cash received from the Limited Partnership over time.

25. In the taxation year that includes the implementation of the Proposed Transactions and in subsequent taxation years, Finco will earn interest income from the BCH Loans. Finco will in turn owe to the Limited Partnership an amount corresponding to substantially all of the amount of such interest income, as interest owing on the Finco Loan. Assuming that Newco waives interest on the Finco Loan, such interest income of the Limited Partnership will be allocated amongst the partners thereof in proportion to their respective capital contributions, viz., 99.9% to Teleglobe and 0.1% to GPco. In any particular taxation year, before each Interest Waiver Date it is expected that Newco will waive interest otherwise payable to it under the Newco Loan on that date (or in the case of a waiver made on December 31, interest that would otherwise accrue to it to that date since December 1 of the same year), unless on that date Newco is of the view that Teleglobe may experience Financial Distress. Thus, Finco will earn interest income but also incur interest expense equal to substantially all of its interest income, while the Limited Partnership will earn income and (so long as Newco continues to waive interest on the Newco Loan) have no interest expense, resulting in Teleglobe earning income from the Limited Partnership equal in amount to substantially all of the interest income from the

R.2004-BCE 016281

R.2004-BCE016281

OSLER,
HOSKIN &
HARCOURT

Page 17

BCH Loans (less any applicable operating expenses). Teleglobe's current year loss and/or non-capital losses would be applied against such income for purposes of the Act.

26. In 2002 and beyond, to the extent that Teleglobe needs further ongoing funding, it is expected that most of the cash interest received by the Limited Partnership as interest paid on the Finco Loan during any particular taxation year will be loaned to Teleglobe during the year on a non-interest-bearing basis. These loans will provide that the Limited Partnership may set off against these obligations any amounts of any nature whatever (including partnership distributions) that the Limited Partnership may otherwise be required to pay to Teleglobe, on a dollar-for-dollar basis. The remainder of the Limited Partnership's cash income (such remainder being an amount in the millions of dollars) will be retained and used in the activities described in Paragraph 17(d) and (e). Shortly following the end of the Limited Partnership's year when the final computation of the year's income (or loss) of the Limited Partnership is made, the Limited Partnership will distribute to its partners as a distribution of profits the net cash available from the previous year's activities (or to the extent of amounts owing by Teleglobe to the Limited Partnership set off such amounts against amounts that the Limited Partnership would otherwise distribute to Teleglobe).

27. In the event that Newco is of the view that Teleglobe may experience Financial Distress, to the extent permissible under applicable debtor-creditor and corporate/commercial law, the parties will immediately seek to unwind the structure created by the Proposed Transactions by,

- Newco declaring an event of default on the Newco Loan and demanding immediate repayment of the Newco Loan;
- Newco amalgamating with Finco; and
- the amalgamated entity claiming set-off of the Finco Loan against the Newco Loan (alternatively, if set-off was not legally available, the amalgamated entity would insist on repayment of the Newco Loan in the form of an assignment of the Finco Loan, as provided for under the terms of those loans).

It is anticipated that the amalgamated entity would eventually wind up into or otherwise combine with BCE.

TOR_P2Z:4472011.14 20020701239
1025999

R.2004-BCE 016282

R.2004-BCE016282

OSLER,
HOSKIN &
HARCOURT

In addition, Newco (or its successor, the amalgamated entity) would not waive any further interest owing to it by the Limited Partnership under the Newco Loan. As a result, for the current interest accrual period where the Finco Loan and the Newco Loan were outstanding (and any future interest accrual period, if as a matter of debtor/creditor law the set-off or repayment of the Finco Loan against the Newco Loan was not immediately recognized), the Limited Partnership would owe an amount of interest to Newco (or its successor, the amalgamated corporation) equal in amount to substantially all of the interest income owing to the Limited Partnership on the Finco Loan, leaving the Limited Partnership with only a small net income from this source.

28. Assuming that the loss utilization structure has not been terminated prematurely as described in Paragraph 27, at a mutually agreed time the parties will effectively unwind the structure created by the Proposed Transactions, by,

- Newco waiving its entitlement to any desired amount of the interest for the current interest accrual period owing to it on the Newco Loan (e.g., enough to use up any remaining Teleglobe losses);

- Newco amalgamating with Finco; and

- the amalgamated entity claiming set-off of the Finco Loan against the Newco Loan (alternatively, if set-off was not legally available, the amalgamated entity would insist on repayment of the Newco Loan in the form of an assignment of the Finco Loan, as provided for under the terms of those loans).

For any interest for the current year to that date owing to Newco under the Newco Loan that Newco does not waive, the Limited Partnership would also assign to Newco the Limited Partnership's rights to a corresponding dollar amount of interest to that date accruing to the Limited Partnership under the Finco Loan. It is anticipated that the amalgamated corporation would eventually wind up into or otherwise combine with BCE.

29. As noted in Paragraph 6(i), there are scheduled annual principal payments of $212.5 million on the BCH Loans starting on June 1, 2002. As a result, it is anticipated that on that date and each anniversary thereafter until the loss consolidation structure is unwound, BCH will make a principal repayment of this amount of the BCH Loans to

OSLER,
HOSKIN &
HARCOURT

Finco, Finco will make a corresponding principal payment on the Finco Loan to the Limited Partnership, and the Limited Partnership will make a corresponding principal payment on the Newco Loan to Newco. Newco will use these funds to make a corresponding payment to BCE of the principal of the non-interest-bearing demand loans described in Paragraph 19 made by BCE to Newco. The same actions would occur in the event of any other principal repayment on the BCH Loans occurring before the unwind of the loss utilization structure.

## PURPOSE OF THE PROPOSED TRANSACTIONS

30.    The overall purpose of the Proposed Transactions is to cause the interest income that will be generated by the BCH Loans over the next few taxation years to be included in Teleglobe's income for purposes of the Act rather than BCE's, allowing such income to be consolidated with the non-capital losses of Teleglobe (past and future). In addition, the movement of the interest on the BCH Loans out of BCE will increase the losses that BCE expects to realize in 2002-2004, which losses BCE will carry back to reduce its tax payable in 2001. This consolidation of income and losses within the BCE group is consistent with the scheme of the Act permitting the consolidation of income and losses of affiliated persons where undertaken through legally effective transactions that are properly implemented and do not result directly or indirectly in a misuse of the provisions of the Act or an abuse having regard to the provisions of the Act (other than section 245) read as a whole.

31.    At the same time, it is crucial to ensure that in the event that Newco is of the view that Teleglobe may experience Financial Distress, the BCH Loans (and the income that they generate) do not become exposed to Teleglobe's creditors. For this reason, the Proposed Transactions have been structured in a manner that limits BCE's exposure to Teleglobe's creditors and permits the loss utilization structure to be unwound and the BCH Loans to be returned to BCE quickly and with the minimum possible exposure to Teleglobe's creditors in the event that Newco is of the view that Teleglobe may experience Financial Distress, to the extent permissible under Canadian debtor-creditor and insolvency law. In particular, the interest-waiver and payment-by-assignment features of the Newco Loan

R.2004-BCE 016284

R.2004-BCE016284

OSLER,
HOSKIN &
HARCOURT                                                    Page 20

and the potential amalgamation of Finco and Newco are elements of the Proposed
Transactions that are necessary for this purpose. The purpose of the Limited Partnership
is specifically to protect the Newco Loan and the Finco Loan from the implications of
Teleglobe experiencing Financial Distress: the Limited Partnership will at all times be
solvent irrespective of Teleglobe's financial situation, with a view to protecting the Finco
Loan from Teleglobe's creditors. Achieving the maximum protection of the capital of
and income generated by the BCH Loans, in the event that there is risk that Teleglobe
may experience Financial Distress, is the only reason why a more typical loss
consolidation structure is not being used.

32.    As noted, it is expected that Teleglobe will require the Teleglobe Funding prior to the end
of November 2002 whether or not the Proposed Transactions are undertaken. In the
event that the Proposed Transactions are undertaken, BCE wishes to ensure that its total
incremental exposure to Teleglobe's creditors is never more than the amount of the
Teleglobe Funding plus future funding beyond 2002 that BCE anticipates having to
provide Teleglobe in any event, rather than those amounts *plus* Teleglobe's share of the
interest income that will be generated by the BCH Loans. Because Teleglobe requires
most of the Teleglobe Funding by the end of September 2002, to supply part of the
Teleglobe Funding BCE proposes to lend Teleglobe part of the Teleglobe Funding as
described in Paragraph 24, and to be repaid by Teleglobe from Teleglobe's share of the
interest income from the BCH Loans payable after that time. This ensures that while
Teleglobe receives the Teleglobe Funding, it does not also receive and retain (and expose
to its creditors) the Pre-Funded Amount of cash from the interest generated by the BCH
Loans. By causing Teleglobe to repay the Pre-Funded Amount as soon as it receives
available funds from the Limited Partnership, BCE's incremental financial exposure to
Teleglobe is the total amount of the Teleglobe Funding for 2002, *viz.*, $850 million, not
$850 million plus the Pre-Funded Amount. It is anticipated that the income that
Teleglobe will earn from the Limited Partnership in 2003 and 2004 will be retained by
Teleglobe to fund cash uses that, but for the Proposed Transaction, BCE would have had
to advance funds to Teleglobe for in any event.

R.2004-BCE 016285


R.2004-BCE016285

OSLER,
HOSKIN &
HARCOURT

## RULINGS REQUESTED

Assuming that the preceding statements constitute a complete and accurate disclosure of all the relevant facts and proposed transactions, please confirm the following:

A.    Provided that joint elections are filed pursuant to subsection 85(1) in the prescribed form and within the prescribed time, the provisions of subsection 85(1) will apply to the transfer of the BCH Loans by BCE to Finco as described in Paragraph 22, such that, (1) both BCE's proceeds of disposition of the BCH Loans and Finco's cost of the BCH Loans will be deemed by paragraph 85(1)(a) to be the agreed amount in respect thereof, and (2) the provisions of paragraph 85(1)(e.2) will not apply to such transfer.

B.    Provided that Finco has a legal obligation to pay interest on the Finco Loan, in computing its income for a particular taxation year, Finco will be entitled pursuant to paragraph 20(1)(c) to deduct the lesser of the interest paid or payable (depending on the method regularly followed by it in computing its income for purposes of the Act) in respect of that year on the Finco Loan or a reasonable amount in respect thereof, to the extent that Finco continues to hold the BCH Loans for the purpose of gaining or producing income.

C.    For any particular taxation year of Newco, provided that before each Interest Waiver Date Newco waives (in the manner provided for in the Newco Loan) its entitlement to interest under the Newco Loan that accrues to such Interest Waiver Date, no amount will be included in computing the income of any person or partnership in respect of such waived interest, nor will section 80 apply in respect thereof.

D.    In the event that before a particular Interest Waiver Date Newco does not waive (in the manner described in Ruling C) its entitlement to the interest on the Newco Loan that would otherwise accrue to it to that Interest Waiver Date, then provided that the Limited Partnership has a legal obligation to pay such interest, in computing its income for a particular taxation year, the Limited Partnership will be entitled pursuant to paragraph 20(1)(c) to deduct the lesser of such interest paid or payable (depending on the method regularly followed by it in computing its income for purposes of the Act) in respect of that year or a reasonable amount in respect thereof, to the extent that the Limited

OSLER,
HOSKIN &
HARCOURT                                                        Page 22

Partnership continues to hold the Finco Loan for the purpose of gaining or producing
income, and for greater certainty where Newco has not waived (in the manner described
in Ruling C) a particular amount of interest and has thereby included such interest in its
income, the fact that Newco could have (but did not) waive its entitlement to such interest
will not, in and by itself, cause the Limited Partnership to fail to have a legal obligation to
pay such unwaived interest.

E.      Provided that the allocation of income or loss of the Limited Partnership is made as
        described above *pro rata* to the capital contributions of the partners (i.e., 99.9% and
        0.1%), subsection 103(1) and subsection 103(1.1) will not apply to redetermine such
        allocations of income or loss.

F.      Subparagraph 53(2)(c)(v) will not apply in respect of amounts loaned by the Limited
        Partnership to Teleglobe as described in Paragraph 26.

G.      In the event of the set-off of the Newco Loan against the Finco Loan as described in
        Paragraphs 27 and 28, in respect of each such loan section 80 will not apply to the debtor
        or creditor, and neither the debtor nor the creditor will realize any income, gain or loss.

H.      The provisions of paragraph 12(1)(x) and subsections 15(1), 56(2), 56(4), 69(11) and
        246(1) will not be applied as a result of the Proposed Transactions, in and by themselves.

I.      The provisions of subsection 245(2) will not be applied as a result of the Proposed
        Transactions, in and by themselves, to redetermine the tax consequences confirmed in the
        rulings given.

OPINIONS REQUESTED

Assuming that the preceding statements constitute a complete and accurate disclosure of all the
relevant facts and proposed transactions, we wish to confirm your opinion that each of Teleglobe
and GPco will include in their respective incomes for any particular taxation year under
subsection 96(1) the amount respectively allocated to them by the Limited Partnership for the
fiscal period of the Limited Partnership ending in the particular taxation year, as their respective
shares of the Limited Partnership's income for such period.

TOR_PZZ:447201.14  20030307|1139
MZ2099

R.2004-BCE 016287

R.2004-BCE016287

OSLER,
HOSKIN &
HARCOURT

## REASONS IN SUPPORT OF REQUESTED RULINGS

In accordance with paragraph 16 of Information Circular 70-6R4 dated January 29, 2001, the following discussion sets out certain income tax concerns pertaining to the rulings requested and our interpretation of the provisions of the Act which support the specific rulings requested.

### Loss Utilization

The fundamental purpose of the Proposed Transactions is to effect a consolidation of the income of BCE from the BCH Loans with the non-capital losses of Teleglobe, and to do so in a manner that provides the optimal degree of protection possible under relevant Canadian debtor/creditor and insolvency laws. Because BCE has *de jure* control of Teleglobe, these two parties are "affiliated", and the consolidation of the income of one with the losses of the other is therefore consistent with the scheme of the Act.

We understand that the CCRA is concerned about the extent to which the Proposed Transactions could be adapted for use by parties seeking to effect a consolidation of losses and income of non-affiliated persons, which would clearly be inconsistent with the scheme of the Act. In this regard, we would point out that under the Proposed Transactions, the funds generated from the income-producing property (the BCH Loans) end up with the loss entity (Teleglobe), and are not returned to the profitable entity (BCE). This feature of the Proposed Transactions makes it highly improbable that it could be adapted for use by non-affiliated parties, since the economic result is to leave a profitable entity $1 poorer for each approximately $0.40 or so of taxes saved by having the income earned in a loss entity. This fundamental element of the Proposed Transactions makes them significantly less likely to be adapted for use by non-affiliated parties than the basic existing loss consolidation structure favourably ruled upon by the CCRA on many occasions (which returns the funds from the income-producing property to the profitable entity as preferred share dividends).

### Interest Deduction

The blended rate of interest to be earned by Finco on the BCH Loans will exceed the rate of interest it must pay to the Limited Partnership under the Finco Loan, such that Finco's holding of

R.2004-BCE 016288

R.2004-BCE016288

OSLER,
HOSKIN &
HARCOURT

the BCH Loans will have a reasonable expectation of profit and hence constitute a "source" of income that is a business or property for purposes of subdivision b of Division B of Part I of the Act. Finco's direct use of the funds borrowed under the Finco Loan is the acquisition of the income-generating asset that is the BCH Loans, the income from which is not exempt from tax under Part I of the Act. As such, interest payable by Finco on the Finco Loan will meet the requirements of paragraph 20(1)(c). The same analysis applies to any interest that actually becomes payable by the Limited Partnership on the Newco Loan (i.e., interest not waived by Newco), the income-earning property in such case being the Finco Loan.

Interest Waiver

The provision of the Newco Loan allowing Newco to waive interest accruing before any Interest Waiver Date will be included in the original loan agreement creating the Newco Loan, and as such will be a contractually enforceable element of the Newco Loan given and received for consideration, not something added to the loan after its creation. Any actual waiver of such interest will occur before the end of each interest payment period, and as such will occur before any such amount becomes received or receivable within the meaning of paragraph 12(1)(c). Similarly, any such waiver of interest will occur before such amounts have accrued to Newco to the end of the relevant year, within the meaning of subsection 12(3). As such, a legally effective waiver of such interest will occur before any amount in respect thereof has been included in Newco's income for purposes of the Act, as described in Ruling C. Once waived, such amounts will not be received by Newco, be receivable by Newco, or accrue to Newco to the end of the year, and as such there will be no statutory basis for including such amounts in Newco's income. This conclusion is consistent with CCRA technical interpretations 913304A, dated January 3, 1992, and 9213535, dated August 17, 1992.

Similarly, none of the various anti-avoidance provisions of the Act in respect of which rulings have been requested should apply to the waiver of interest by Newco. Such waiver of interest is economically identical to a non-interest-bearing loan the interest on which becomes payable in the event that the debtor experiences financial distress. In fact, but for debtor/creditor and insolvency law considerations, the Newco Loan would be such a non-interest-bearing loan: making interest payable unless waived rather than making the Newco Loan non-interest-bearing

R:2004-BCE 016289

R.2004-BCE016289

OSLER,
HOSKIN &
HARCOURT

at the outset and having it become interest-bearing only in the event Teleglobe may experience financial difficulty is motivated solely by the fact that the interest-waivable loan is materially superior from a debtor/creditor and insolvency law perspective. Thus, the appropriate basis of comparison to use in considering whether an anti-avoidance provision of the Act should apply is the treatment of interest-free loans.

The primary provision in the Act directed at interest-free loans in these circumstances is subsection 80.4(2), which has a specific exemption for loans to a partnership (such as the Limited Partnership) each member of which is a Canadian-resident corporation. Thus, it is reasonable to infer that the Act did not intend to tax or impute a benefit to interest-free loans to a partnership of Canadian-resident corporations. This conclusion is consistent with the views of the Federal Court of Canada in *Cooper v. The Queen*, 88 DTC 6525, to the effect that section 80.4 taxed interest-free loans where they had not previously been taxable (and particularly that subsection 15(1) would not otherwise encompass interest-free loans), and that in that context an interest-free loan could not be considered to be a "benefit". Because such an interest-free loan does not constitute a "benefit" (there being no legal obligation to charge interest), and because subsection 80.4(2) demonstrates that an interest-free loan to a partnership of Canadian-resident corporations is not intended to produce an imputed benefit, there is similarly no statutory or tax policy basis for applying subsection 246(1), even assuming it could otherwise be said to apply on its terms (which it does not since no "benefit" exists and the amount would not otherwise be included in the debtor's income if paid directly to it). The conclusion that subsection 246(1) would not apply to the interest-waiver mechanism described herein is consistent with past CCRA practice. In particular, we note that in CCRA document 9807063, dated December 17, 1998, the CCRA ruled that a cancellation of interest owing between related corporations would not attract the application of subsection 246(1). The same ruling appears to be a common feature of the many distress preferred share rulings issued by the CCRA (see for example CCRA document 3M05481, dated April 7, 1993). Similar conclusions were drawn by the CCRA in the analogous context of interest-free loans between related entities in CCRA documents 9830143, dated October 12, 1999, and 9826443, dated September 1, 1999.

TOR_P22:447201.14 200252G671239
1027999

R.2004-BCE 016290

R.2004-BCE016290

OSLER,
HOSKIN &
HARCOURT

Finally, paragraph 12(1)(x) would similarly be inapplicable in the context of an interest-free loan, as acknowledged by the CCRA in the 1989 Corporate Management Tax Conference at 8:6 and in paragraph 16 of Interpretation Bulletin IT-273R2. First of all, the non-charging of interest or the waiver of accrued interest does not result in any amount becoming "received" by the Limited Partnership within the meaning of the pre-amble of that paragraph, and in the absence of any amount "received" there is simply no basis upon which to apply paragraph 12(1)(x). Furthermore, there is no "cost of property" or "outlay or expense" to which the waived interest relates within the meaning of subparagraph (iv) of the provision. In this regard, we understand that the CCRA's 1993 refusal to rule that you described in our earlier conversations may involve a situation where the provision for waiver of interest was not part of the original agreement between the parties but was rather a unilateral attempt to change that agreement after the fact, such that it is quite distinguishable from the Proposed Transactions. Finally, the waiver of interest does not result in a misuse or abuse of the Act within the meaning of subsection 245(4), given its non-tax purpose and the scope of permitted loss utilization transactions.

Partnership Status

Please note that a separate submission will follow on the status of the Limited Partnership as a partnership.

Partnership Allocation

The reason that the Newco Loan is made to and the Finco Loan is made by the Limited Partnership rather than Teleglobe directly is because of the insolvency law issues described in Paragraph 31. Thus, the interposition of an entity between Teleglobe and Finco/Newco has a purely non-tax purpose. Given the insolvency law need for such an entity, the flow-through characteristics of a limited partnership for purposes of the Act and the limited role afforded to Teleglobe as a limited partner under provincial limited partnership law make a limited partnership the logical form of entity. The activities of the Limited Partnership will generate a significant amount of income, and the allocation of that income to the partners in direct proportion to their capital interests in the partnership is a reasonable allocation of income within the meaning of subsections 103(1) and 103(1.1), such that neither such provision should apply to

R.2004-BCE 016291

R.2004-BCE016291

OSLER,
HOSKIN &
HARCOURT

Page 27

alter the allocation of the Limited Partnership's income from such *pro rata* allocation provided for in the Limited Partnership partnership agreement.

## Set-Off

The principal amounts of the Finco Loan and the Newco Loan will be the same at all times, and their terms are almost identical, with the rate of interest on one being one basis point higher than the rate of interest on the other. Moreover, since these debts will only be set-off in circumstances where the debts are mutual (i.e., each of two parties is the creditor of one loan and the debtor of the other), and since the ability to set off the debts in these circumstances will be a term of each loan, the fair market value of each such loan must necessarily reflect the fact that it can be repaid in full with a corresponding principal amount of the other loan via the set-off mechanism. As a result, there is no basis for either party to realize a gain, income or loss in the event that the two loans are set off against one another, nor any basis for the application of section 80.

## Subparagraph 53(2)(c)(v)

Subparagraph 53(2)(c)(v) requires the taxpayer to reduce the adjusted cost base of its partnership interest by the amount of any distribution of partnership profits or partnership capital made to the partner by the partnership. Neither subsection 53(2) nor the anti-avoidance rules supporting subsection 40(3.1) include loans made by a partnership to a partner amongst the transactions that result in a reduction of the adjusted cost base of a partnership interest. In this case the loans described in Paragraph 26 that the Limited Partnership will make to Teleglobe are *bona fide* loans that will be documented and treated as such, and there is therefore no legal basis for treating such loans as something else.

We note in this regard the CCRA's previous administrative policy on distinguishing loans from advances to employees in former Interpretation Bulletin IT-222R (as reiterated in CCRA document 9815507, dated September 25, 1998), in which the CCRA draws a distinction between advances on account of future earnings and *bona fide* loans. The loans to be made by the Limited Partnership to Teleglobe will have the characteristics of the *bona fide* loans described in paragraph 2 of IT-222R, *viz.*, documented as a loan, repayment within a reasonable time,

TOR_P22:1472B1.14  1002/20071259
1072599

R.2004-BCE 016292

OSLER,
HOSKIN &
HARCOURT

obligation to repay the entire amount in all circumstances, etc.. For these reasons, the loans described in Paragraph 26 should be treated as such and should not be treated as distributions of partnership profits or capital, and hence should not result in a reduction of the adjusted cost base of Teleglobe's interest in the Limited Partnership under subparagraph 53(2)(c)(v).

## CONCLUSION

If you should require any additional information or if you think it would be helpful, we would be pleased to further discuss this matter with you at your convenience. In this regard, please contact Andrew Kingissepp ((416) 862-6507) or Steve Suárez ((416) 862-5905) of *Osler, Hoskin & Harcourt LLP*. If you believe you may be unable to grant the rulings and opinions requested, we would appreciate an opportunity to discuss them with you before you have made your final decisions.

Yours very truly,

Andrew Kingissepp/Steve Suarez

Enclosures

TOR_P2Z:4472DL14 20020907T239
1027999

R.2004-BCE 016293

R.2004-BCE016293



APPENDIX A

BCE – Teleglobe Loss Consolidation

R.2004-BCE 016294

R.2004-BCE016294