# EXHIBIT 43
# PART A

RICHARDS, LAYTON & FINGER

A PROFESSIONAL ASSOCIATION
ONE RODNEY SQUARE
920 NORTH KING STREET
WILMINGTON, DELAWARE 19801
(302) 651-7700
FAX (302) 651-7701
WWW.RLF.COM

CHAD M SHANDLER
DIRECTOR

DIRECT DIAL NUMBER
302-651-7836
SHANDLER@RLF.COM

October 28, 2005

**Via Hand Delivery**
Collins J. Seitz, Jr., Esquire
Connolly Bove Lodge & Hutz
1007 North Orange Street
P.O. Box 2207
Wilmington, DE  19899

Re:     **Teleglobe Communications Corporation et al. v. BCE, Inc., et al.**

Dear Special Master Seitz:

Enclosed please find the transcript from the second day of Martine Turcotte's deposition and the original version of the Rule 2004 privilege log produced by the defendants (the revised version of the Rule 2004 log is attached to my affidavit as Exhibit R).  We are forwarding these materials because we may refer to them during next Monday's oral argument. If you should have any questions, please contact me.

Respectfully,

Chad M. Shandler

CS:ps
Enclosure
cc:     George J. Wade. Esquire w/ enclosure (via Federal Express)
Kevin Gross, Esquire w/ enclosure (via hand delivery)
Pauline K. Morgan, Esquire w/ enclosure (via hand delivery)
John P. Amato, Esquire w/ enclosure (via Federal Express)
Gregory V. Varallo, Esquire
C. Malcolm Cochran, IV, Esquire

Page 331

(1)      UNITED STATES DISTRICT COURT
     IN AND FOR THE DISTRICT OF DELAWARE
(2) ------------------------------x
     In Re:
(3)
     TELEGLOBE COMMUNICATIONS CORPORATION, et al
(4)
          Debtors
(5) ------------------------------x
(6)  TELEGLOBE COMMUNICATIONS CORPORATION, et al

(7)          Plaintiffs,

(8)      -against-

(9)  BCE, INC. MICHAEL T. BOYCHUK, MARC A.
     BOUCHARD, SERGE FORTIN, TERENCE J. JARMAN,
     STEWART VERGE, JEAN C. MONTY, RICHARD J.
(10) CURRIE, THOMAS KIERANS. STEPHEN P. SKINNER
     and H. ARNOLD STEINBERG,
(11)
(12)         Defendants

(13) ------------------------------x
(14)     DEPOSITION of MARTINE TURCOTTE, taken
(15) pursuant to notice, held at the offices of Shearman
(16) & Sterling LLP, 599 Lexington Avenue, New York,
(17) New York, on October 14, 2005, at 10:03 a m,
(18) before Fran Insley, a Notary Public of the State of
(19) New York
(20)
(21)
(22) ...........................................
(23)     ELLEN GRAUER COURT REPORTING. CO LLC
          126 East 56th Street
(24)      New York, New York 10022
          212-750-6434
(25)      Reference No 78882

---

Page 332

(1)  A P P E A R A N C E S :
(2)
(3)  RICHARD, LAYTON & FINGER. LLP
          Attorneys for Plaintiff
(4)        One Rodney Square
          Wilmington. Delaware 19801
(5)
(6)  BY:  MICHAEL COCHRAN  ESQ
          (302) 651-7772
(7)
(8)
(9)  SHEARMAN & STERLING LLP
          Attorneys for Defendants
(10)      599 Lexington Avenue
          New York, New York 10022
(11)
(12) BY:  DANIEL SCHIMMEL. ESQ
(13)
(14) ALSO PRESENT:
(15)      VINCENZO PETULLO
          Videographer
(16)
(17)
(18)         xxxxx
(19)
(20)
(21)
(22)
(23)
(24)
(25)

---

Page 333

(1)           S T I P U L A T I O N S
(2)
(3)      IT IS HEREBY STIPULATED AND AGREED by
(4)  and between the attorneys for the respective
(5)  parties herein. that filing  sealing and
(6)  certification  and the same are  hereby
(7)  waived
(8)
(9)      IT IS FURTHER STIPULATED AND AGREED
(10) that all objections except as to the form of
(11) the question, shall be reserved to the time of
(12) the trial
(13)
(14)     IT IS FURTHER STIPULATED AND AGREED
(15) that the within deposition may be signed and
(16) sworn to by an officer authorized to
(17) administer an oath. with the same force and
(18) effect as if signed and sworn to before the
(19) Court
(20)
(21)
(22)         xxxxx
(23)
(24)
(25)

---

Page 334

(1)      THE VIDEOGRAPHER: This is tape 1
(2)  We are now on the record at 10:03
(3)  Friday, October 14, 2005  This is the
(4)  continuation of the deposition of Martine
(5)  Turcotte in the matter of Teleglobe
(6)  Communications versus BCE, Inc
(7)      This deposition is being held at
(8)  the offices of Shearman & Sterling
(9)  located at 599 Lexington, New York, New
(10) York  The court reporter is Fran Insley
(11) with Ellen Grauer reporting  I am the
(12) legal videographer. Vincenzo Petullo.
(13) also with Ellen Grauer Court Reporting
(14)     Would counsel please introduce
(15) themselves
(16)     MR. COCHRAN: My name is Mike
(17) Cochran  I'm a member of the firm of
(18) Richards Layton & Finger, and we are here
(19) representing plaintiffs today.
(20)     MR. SCHIMMEL: Daniel Schimmel
(21) Shearman & Sterling, LLP for the
(22) defendants
(23)     THE VIDEOGRAPHER:  Would the court
(24) reporter please swear in the witness
(25)

Page 335

(1)   M A R T I N E   T U R C O T T E,
(2)   having been first duly sworn before a
(3)   Notary Public of the State of New York,
(4)   was examined and testified as follows:
(5)
(6)       MR. COCHRAN: We are back
(7)   To try to move things more quickly,
(8)   I pulled together some documents and
(9)   bound them together as a composite
(10)  exhibit  I'm going to hand you that
(11)  collection.
(12)      These documents are marked as
(13)  Turcotte Exhibit 39A through 39J, and I
(14)  will represent to you that these are a
(15)  collection of drafts of the engagement
(16)  letter between Teleglobe and Lazard
(17)      (Whereupon a collection of drafts
(18)      of engagement letter between Teleglobe
(19)      and Lazard was marked as Turcotte Exhibit
(20)      39A through 39J for identification as of
(21)      this date.)
(22)
(23)  EXAMINATION BY
(24)  MR. COCHRAN:
(25)      Q    Let's take a moment and look, if

Page 336

(1)   you would, at Turcotte 39A  You'll see that
(2)   39A is a couple of e-mails. actually  one
(3)   from -- and I can't pronounce his name -- Said
(4)   Armutcuoglu  We will just call him Said of
(5)   Lazard to Jean Monty and you copied to Jim
(6)   Millstein, and he writes to you and
(7)   Mr Monty -- Said, that is, writes to you and
(8)   Mr Monty "As per your conversation with Jim,
(9)   please find the draft engagement and indemnity
(10)  letters  and it goes on  This is dated
(11)  March 21  2002
(12)      Do you recognize this?
(13)      A    I do, the first one. I don't --
(14)  the second e-mail I don't.
(15)      Q    The top e-mail appears to be from
(16)  Mr Drouin, D-R-O-U-I-N. of Lazard to
(17)  Mr Lalande, also forwarding the engagement
(18)  letter  Take a look at the attachments
(19)  You'll see the draft indemnity letter first
(20)  and then the second one is the draft
(21)  engagement letter between Teleglobe and
(22)  Lazard. Do you see those?
(23)      A    I do.
(24)      Q    Do you recognize those?
(25)      A    Yes.

Page 337

(1)       Q    Tell us what you did in -- what
(2)   your responsibilities were in connection with
(3)   negotiating the engagement letter with Lazard
(4)       A    Well, like I have explained the
(5)   last time, under the governance model that we
(6)   establish in 2001, basically the legal
(7)   department at BCE would review some in context
(8)   of financings, engagements of advisors and so
(9)   forth, even for subsidiaries.
(10)      We would review engagement letters,
(11)  and the reason for that is that we don't want
(12)  to create precedence that our venues bring
(13)  investment advisors against other subsidiaries
(14)  or against a parent companies in terms of
(15)  covenants. It's really for consistency and
(16)  not creating precedence.
(17)      Q    Why did you take responsibility for
(18)  reviewing and  indeed. negotiating the
(19)  engagement letter with Lazard as opposed to
(20)  signing it to someone else?
(21)      A    You mean myself as opposed to
(22)  another lawyer?
(23)      Q    Yes
(24)      A    Because I have expertise in doing
(25)  that, and that is something I can do very

Page 338

(1)   rapidly in the interests of the subsidiary as
(2)   well. I'm used to seeing all the engagement
(3)   letters in a group as well. This is not
(4)   unusual. This is something we do all the time
(5)   with many subsidiaries and even at the level
(6)   with BCE as well.
(7)       I did have one of my lawyers at
(8)   some point go into more of the further drafts,
(9)   but I would review this as a normal course as
(10)  well.
(11)      Q    Take a look at under Exhibit 39A
(12)  the page with production number BCE-AD0150072
(13)  You will see that this is the first page of
(14)  the draft engagement letter with Lazard
(15)      Why was this -- and you can read it
(16)  yourself  the introductory paragraph which
(17)  I'll ask you a question about  That's the one
(18)  that says that this is an agreement between
(19)  Lazard and Teleglobe  Are you with me?
(20)      A    Yes.
(21)      Q    Why was this engagement between
(22)  Lazard and Teleglobe structured as an
(23)  engagement between Lazard and Teleglobe?
(24)      MR. SCHIMMEL: Object to form
(25)      A    Because Lazard was representing

Page 339

(1) Teleglobe, Inc.

(2) Q    Why was BCE not listed as the

(3) client?

(4) A    Because we did not need their

(5) advice in terms of our own Project X, which

(6) was a determination of whether or not to

(7) continue financing.

(8) Q    Did BCE have its own independent

(9) financial advisor in the context of Project X?

(10)    MR. SCHIMMEL: Object to form

(11) A    Not as an investment banker, but we

(12) had an advisory committee composed of Pierre

(13) Lessard who is a financial executive, Wes

(14) Scott, who is formerly a CFO in the company

(15) who is also financial executive, and Jerome

(16) Huret. We also had Michael Sabia in the

(17) planning group reviewing the business plans of

(18) Teleglobe.

(19) Q    But these were all BCE employees?

(20)    MR. SCHIMMEL: Object to form

(21) A    That's correct  Well, sorry, not

(22) all, because Pierre Lessard was a BCE

(23) employee, but not Wes Scott nor Jerome Huret.

(24) Q    Wes Scott and Huret, they were

(25) former employees of BCE?

Page 340

(1) A    No.

(2) Q    Then tell me what they were

(3) A    Jerome Huret, I don't know what his

(4) former position was, but I understand he was

(5) at Nortel Networks at the time.  That's where

(6) Jean met him, but I don't know what his

(7) position was, so I don't believe he was an

(8) employee of BCE.

(9)    Wes Scott was formerly an employee,

(10) I believe, of Bell Canada, so in the finance

(11) group as head of finance, I believe.

(12) Q    But the fact remains BCE didn't

(13) hire an investment banking firm; is that

(14) right?

(15) A    That's correct

(16) Q    When I say it did not hire an

(17) investment banking firm, it did not hire one

(18) in connection with project X?

(19) A    It did not hire one in connection

(20) with Project X, which is not unusual. We

(21) don't always hire investment banking firms.

(22) Q    Why was it considered necessary for

(23) Teleglobe to have an investment banking firm

(24) like Lazard?

(25)    MR. SCHIMMEL: Object to form

Page 341

(1) A    I wouldn't know that answer.

(2) Q    What is your understanding?

(3) A    My understanding is basically that

(4) Mr. Monty, as chairman and CEO of Teleglobe,

(5) wanted a review, an independent review of the

(6) business plan of Teleglobe and its viability.

(7) Q    What do you mean, he wanted an

(8) independent review?

(9)    MR. SCHIMMEL: Object to form

(10) A    Independent of management itself of

(11) Teleglobe.

(12) Q    And not independent of BCE?

(13) A    Independent of BCE as well.  He was

(14) also looking at this.

(15) Q    What is your understanding of why

(16) he wanted a review that was independent of

(17) BCE?

(18) A    I don't know.  You would have to

(19) ask him.

(20) Q    Did he ever tell you?

(21) A    No.

(22) Q    Did you consider it to be a matter

(23) of good governance to have an investment

(24) banking firm independent of BCE conduct a

(25) review of Teleglobe?

Page 342

(1) A    Not necessarily, no

(2) Q    Why not?

(3) A    Because you don't always use

(4) investment bankers at the level of BCE

(5) depending on the transaction.

(6) Q    Did you consider that the matter of

(7) whether there would be further investment in

(8) Teleglobe by BCE would be a subject of arm's

(9) length negotiations between Teleglobe and BCE?

(10)    MR SCHIMMEL: Object to form

(11)    THE WITNESS: Can you repeat

(12) your -- I'm not sure I understand

(13)    MR COCHRAN: If you could read it

(14) back.

(15)    (Whereupon the record was read back

(16) by the reporter.)

(17) A    Well, I disagree on arm's length

(18) negotiation, because the question is for BCE.

(19) There is no need of negotiation. The decision

(20) is solely one of BCE whether to fund or not

(21) Teleglobe. It's not a negotiation.

(22) Q    So you didn't think there was a

(23) negotiation that was going to take place here?

(24) A    No.

(25) Q    You thought BCE was going to fund

Page 343

(1) or not fund on a whim?

(2)      MR. SCHIMMEL: Object to form

(3)    A    BCE could decide -- it only stated

(4) its intention to fund, and BCE could decide at

(5) any point in time whether to fund or not fund

(6) Teleglobe.

(7)    Q    Well, then I'm trying to understand

(8) why you felt it necessary -- I'm trying to

(9) understand why it was believed to be necessary

(10) then if this was not going to be an arm's

(11) length negotiation, why it was believed to be

(12) necessary for Teleglobe to have an independent

(13) investment banker

(14)      MR. SCHIMMEL: Object to form

(15)    A    You don't necessarily need an

(16) investment banker for negotiations. The role

(17) of Lazard was to review the liability of the

(18) business plan for Teleglobe.

(19)    Q    For who?

(20)    A    For Teleglobe. They were hired for

(21) Teleglobe as you look at the engagement

(22) letter.

(23)    Q    I see what it says, and we are

(24) going to go through the drafts and we are

(25) going to talk a lot more about the

Page 344

(1) relationship

(2)    A    That's fine.

(3)    Q    But I want to understand now what

(4) your view is regarding why it was necessary to

(5) have an independent financial advisor for

(6) Teleglobe

(7)    A    I think I have answered that

(8) question to review --

(9)    Q    I don't think you have. Would you

(10) answer it?

(11)      MR. SCHIMMEL: Object to form.

(12) Argumentative

(13)    A    I answered the question and in my

(14) view, my understanding was to have an

(15) independent view of the viability of the

(16) Teleglobe business plan in light of what was

(17) happening in the industry at the time where

(18) many competitors of Teleglobe were either in

(19) restructuring or coming out of restructuring.

(20)    Q    When you say independent review, do

(21) you mean independent of BCE?

(22)    A    Independent of Teleglobe management

(23) on the one hand and independent of BCE in

(24) terms of BCE having its own view of its

(25) subsidiary, Teleglobe, Inc.'s business plan.

Page 345

(1)    Q    Why did BCE, to your understanding,

(2) want this review to be independent of BCE?

(3)    A    It just --

(4)      MR. SCHIMMEL: Object to form

(5)      THE WITNESS: It's not BCE

(6) Teleglobe hired Lazard from a BCE point

(7) of view, us being involved with Lazard in

(8) the meetings, is to understand what their

(9) view, an independent review of the

(10) business plan  Do they come to the same

(11) conclusion as management?  Do they have a

(12) different view?  I think that's important

(13) as a shareholder in the company with

(14) financing that company.

(15)    Q    How could it be independent if you

(16) were involved in the meetings with Lazard?

(17)      MR. SCHIMMEL: Object to form

(18)    A    I think it happens all the time

(19) when an investment banker acting for a

(20) subsidiary is also meeting with the management

(21) of that subsidiary and also meeting with the

(22) management of the parent company

(23)    Q    But this was a little different

(24) situation than all the time  This was a

(25) decision as to whether this subsidiary would

Page 346

(1) receive any further funding or not?

(2)      MR. SCHIMMEL: Object to form

(3)    Q    Right?

(4)    A    I disagree.

(5)    Q    You disagree?

(6)    A    I disagree.

(7)    Q    So the decision just to limit it to

(8) $100 million and cut off further funding, what

(9) was that?

(10)      MR. SCHIMMEL: Object to form.

(11)    A    I am not sure what your question

(12) is.

(13)    Q    I am trying to understand if you

(14) were involved in the meetings with Lazard, how

(15) BCE can contend that Lazard s review was

(16) independent of BCE

(17)      MR. SCHIMMEL: Object to form

(18)    Q    Can you tell me that?

(19)    A    Lazard was engaged for Teleglobe,

(20) and the reporting of its findings to BCE as a

(21) parent company of Teleglobe is not unusual.

(22)    Q    Is not unusual in what context?

(23)    A    In the context that as a parent

(24) company, it's normal to discuss the findings

(25) of an advisor that is representing the

## Page 347

(1) subsidiary  It's not unusual.
(2)    Q    How about in the context of a
(3) subsidiary which is insolvent or rendered to
(4) be insolvent by a decision to be made by its
(5) parent?  Do you have experience with
(6) independent negotiations in that context?
(7)        MR. SCHIMMEL:  Object to form
(8)    A    I disagree with your premise that
(9) Teleglobe was insolvent at the time.
(10)    Q    Do you disagree with the premise
(11) that the decision BCE made effectively put
(12) Teleglobe out of business?
(13)        MR. SCHIMMEL:  Object to form
(14)    A    I disagree with your conclusion.
(15)    Q    And put it right into bankruptcy?
(16)    A    Actually, there was no bankruptcy
(17) of Teleglobe.
(18)    Q    So what was the proceeding that was
(19) filed in the United States?
(20)    A    It was a Chapter 11.
(21)    Q    What was the proceeding that was
(22) filed in Canada?
(23)    A    CCAA.
(24)    Q    Insolvency proceedings?
(25)    A    Insovency proceedings in the

## Page 348

(1) context of a restructuring with the sale of an
(2) asset.
(3)    Q    I think our court is going to look
(4) at it a little differently than you do,
(5) Ms Turcotte
(6)        MR. SCHIMMEL:  Object to form
(7)    Argumentative
(8)    Q    Why don't we get back to my
(9) question
(10)    A    Sure.
(11)    Q    I want to know how many times you
(12) have been involved in a situation where a
(13) decision was being considered that would
(14) render a subsidiary of BCE insolvent  How
(15) many times have you been involved in a
(16) situation like that?
(17)        MR. SCHIMMEL:  Object to form
(18)    A    I disagree with your conclusion.
(19)    Q    I didn't draw a conclusion  I
(20) asked a question  I would appreciate it if
(21) you would answer it
(22)    A    Can you repeat your question?
(23)    Q    How many times have you been
(24) involved in a situation where BCE was making a
(25) decision that would render one of its

## Page 349

(1) subsidiaries insolvent?
(2)    A    BCE did not render any of its
(3) subsidiaries insolvent before.
(4)    Q    How about listening to my question
(5) and answering my question?
(6)        MR. SCHIMMEL:  Object to form
(7)    A    I thought I answered your question,
(8) Mr. Cochran.
(9)        MR. COCHRAN:  Could you read my
(10) question and her answer back?
(11)        (Whereupon the record was read back
(12) by the reporter.)
(13)    A    You have never been involved in a
(14) situation where BCE made a decision that
(15) rendered a subsidiary insolvent?
(16)    A    Never.
(17)    Q    Have you ever been involved in a
(18) situation where BCE made a decision to
(19) withdraw further funding from a subsidiary
(20) besides Teleglobe?
(21)    A    Yes
(22)    Q    How many times?
(23)    A    Once.
(24)    Q    What was that?
(25)    A    The BCE Development Corporation.

## Page 350

(1)    Q    When was that?
(2)    A    That was over fourteen, fifteen
(3) years ago in the real estate industry.
(4)    Q    Were you involved in engaging
(5) investment banking advice for the subsidiary
(6) in the context of that decision?
(7)    A    I don't recall.
(8)    Q    So apart from that  never?
(9)    A    Not that I recall at all.
(10)    Q    In what sense do you consider that
(11) Lazard was independent of BCE in advising
(12) Teleglobe?
(13)    A    They were hired for Teleglobe, and
(14) their engagement letter was to act for
(15) Teleglobe, Inc.
(16)    Q    Let me ask my question again  In
(17) what sense do you consider that Lazard was
(18) independent of BCE?
(19)        MR. SCHIMMEL:  Object to form
(20)    Q    In rendering its advice to
(21) Teleglobe?
(22)    A    They were hired to act on behalf of
(23) Teleglobe, so in my view, they were
(24) independent in acting for Teleglobe, Inc., so
(25) they were independent of BCE.

Page 351

(1)   Q   Why were you in the meetings with
(2)  Lazard?
(3)   A   Because, Mr. Cochran, in all these
(4)  kinds of situations where parent corporation
(5)  is a major shareholder or the 100 percent
(6)  shareholder of a subsidiary that is going
(7)  through a transaction, it's not unusual.  We
(8)  do that all the time.
(9)   Q   You wanted to have a say?
(10)      MR. SCHIMMEL:  Object to form
(11)   A   We wanted to have the information
(12)  provided to us.
(13)   Q   Well, why couldn't you get that
(14)  from the officers of the subsidiary?
(15)      MR. SCHIMMEL:  Object to form
(16)   A   You could at all times, but at the
(17)  end of the day you get it from the officers
(18)  and you also get it from the outside advisors.
(19)   Q   You wanted to get it straight from
(20)  Lazard and not from the officers of the
(21)  subsidiary?
(22)   A   I disagree.
(23)   Q   Why were you there?
(24)   A   Because I think I have already
(25)  answered that question, because Lazard was

Page 352

(1)  there in the meetings.  So were some of the
(2)  officers of Teleglobe making the
(3)  presentations.
(4)   Q   Only the ones that were also
(5)  directors or officers of BCE?
(6)      MR. SCHIMMEL:  Object to form.
(7)   A   I disagree.
(8)   Q   Maybe Mr Childers was in some and
(9)  Mr Pichette, who was also a former and then
(10)  soon to return to BCE officer?
(11)      MR. SCHIMMEL:  Object to form
(12)   A   Mr. Cochran, I disagree with your
(13)  premise because you're assuming these people
(14)  do not act in the best interest of the
(15)  subsidiary, and I disagree with you.
(16)   Q   Ms. Turcotte, why don't you just be
(17)  candid here?
(18)   A   I am candid, Mr Cochran
(19)   Q   You wanted to be in the meetings
(20)  with Lazard because you wanted to know
(21)  firsthand what Lazard was saying; isn't that
(22)  right?
(23)      MR. SCHIMMEL:  Object strongly to
(24)   the use of the word "candid."
(25)   Q   You can answer my question

Page 353

(1)   A   First of all, I'm always candid,
(2)  Mr. Cochran.
(3)   Q   I disagree.
(4)      MR. SCHIMMEL:  This is
(5)  argumentative
(6)   Q   I disagree. and I want you to
(7)  answer my question directly.
(8)      MR. SCHIMMEL:  This is wholly
(9)  inappropriate
(10)   Q   Why did you sit in the meetings
(11)  with Lazard, you?  Why did you sit in the
(12)  meetings?
(13)   A   Myself as CLO of the company.
(14)      MR. SCHIMMEL:  Object to form
(15)   Q   Of BCE?
(16)   A   Because I was part of the senior
(17)  management of BCE, Inc. acting on Project X
(18)  and getting information from the investment
(19)  bankers of Teleglobe on the viability of their
(20)  business plan which had the direct consequence
(21)  on whether or not we would continue funding at
(22)  the level of BCE of our subsidiary.  This is
(23)  not unusual, Mr. Cochran.
(24)   Q   You wanted to hear these things
(25)  directly from Lazard yourself correct?

Page 354

(1)      MR. SCHIMMEL:  Object to form
(2)   A   Lazard was there together with
(3)  senior managers of Teleglobe, Inc., and all
(4)  they were doing is providing us information on
(5)  their findings. Lazard, to my understanding,
(6)  was having its own meetings directly with
(7)  senior management of Teleglobe.
(8)   Q   Please answer my question
(9)   A   I just did, Mr. Cochran
(10)      MR. SCHIMMEL:  Object to form
(11)      MR. COCHRAN:  Would you read my
(12)   question back. Madam Court Reporter?
(13)      (Whereupon the record was read back
(14)   by the reporter.)
(15)   A   We wanted to hear directly from
(16)  Lazard as well as senior management of
(17)  Teleglobe
(18)   Q   You wanted to hear directly from —
(19)   A   Me as CLO?
(20)   Q   Yes
(21)   A   I could have been outside of the
(22)  meeting if I wanted to be or if I was asked to
(23)  be, but I was part of the senior management of
(24)  BCE, Inc., and as CLO and providing legal
(25)  advice to BCE, it was not unusual for me to be

Page 355

(1) present at those meetings.
(2) Q    Ms Turcotte, respectfully, we are
(3) not going to finish today if you do not listen
(4) to my question and answer my question
(5)      MR. SCHIMMEL: Mr Cochran, stop
(6)      badgering the witness.
(7) Q    Let me put the my question again
(8) and let's see if you can answer my question:
(9)      You were in the meetings with
(10) Lazard because you wanted to hear directly
(11) from Lazard what Lazard's views were, correct?
(12)      MR. SCHIMMEL: Object to form
(13) A    I was in a meeting with Lazard so I
(14) as CLO of the corporation and senior
(15) management of BCE, Inc could hear directly
(16) the findings that Lazard had on behalf of
(17) Teleglobe.
(18) Q    Why did you want to hear directly
(19) from Lazard?
(20) A    Because this is not unusual,
(21) Mr Cochran, to be there, present, and senior
(22) management was already there.
(23) Q    Ms Turcotte I'm not asking
(24) whether it's usual or unusual  I'm asking you
(25) why you wanted to hear directly from Lazard.

Page 356

(1)      MR. SCHIMMEL: Object to form and
(2)      argumentative
(3) Q    You
(4) A    Because I was part of senior
(5) management of BCE, Inc. having to make a
(6) indication on what we would do, which was
(7) based on the viability of a business plan
(8) which Lazard was tasked on behalf of Teleglobe
(9) to look at its own business plan and come
(10) back.
(11) Q    But Lazard was tasked on behalf of
(12) Teleglobe?
(13) A    Of Teleglobe, that's correct.
(14) Q    And not BCE. right?
(15) A    And not BCE  That's correct.
(16) Q    And Lazard was to be independent of
(17) BCE?
(18) A    That's correct
(19) Q    But yet you wanted to sit in and
(20) hear directly from Lazard.
(21) A    Yes, but again, not unusual,
(22) Mr Cochran
(23) Q    Is it fair of us to understand that
(24) you didn't trust Teleglobe's management to
(25) report to you accurately what Lazard's views

Page 357

(1) were?
(2)      MR. SCHIMMEL: Object to form
(3) A    I disagree with you.
(4) Q    So you trusted them?
(5) A    Yes
(6) Q    Is it fair of us to understand that
(7) you thought Teleglobe's management might
(8) inadvertently misrepresent Lazard's views?
(9)      MR. SCHIMMEL: Object to form
(10) A    I would not have that view.
(11) Q    Is it fair of us to understand that
(12) you thought somehow Teleglobe management. in
(13) an effort to get continued funding. might spin
(14) or otherwise mischaracterize Lazard's views?
(15)      MR. SCHIMMEL: Object to form.
(16) A    I would not have that view.
(17) Q    When you go into a negotiation
(18) with -- any negotiation trying to reach
(19) agreement in a deal  do you tell your
(20) adversary on the other side of the table what
(21) your bottom line is?
(22)      MR. SCHIMMEL: Object to form
(23) A    I mean, I don't know what you're
(24) trying to get at, the question.  First of all,
(25) adversary, I don't view that they are

Page 358

(1) adversaries in negotiations.
(2) Q    Let's say you go into a negotiation
(3) to sell a business
(4) A    Yes.
(5) Q    Do you tell the buyer  the
(6) potential buyer what you think the business is
(7) worth  what you really think it's worth  right
(8) up front?
(9)      MR. SCHIMMEL: Object to form
(10) A    In due diligence you would have to
(11) answer the questions appropriately, so I don't
(12) know what you are trying to get at
(13) Q    I understand due diligence  What
(14) I'm trying to get at is whether you in
(15) negotiating for the sale of a business tell
(16) the buyer what you really think it's worth
(17)      MR. SCHIMMEL: Object to form
(18) A    I just don't understand what you
(19) are trying to get at  Normally you don't tell
(20) them, "Here is my bottom line price at which I
(21) would sell, otherwise not sell."  You don't
(22) tell them that.
(23) Q    Why not?
(24) A    Because it's a negotiation in that
(25) case.

Page 359

(1)    Q    If you tell them the bottom line
(2)    price  can you have a negotiation?
(3)        MR. SCHIMMEL: Object to form
(4)    A    You could always have a negotiation
(5)    in my view.
(6)    Q    But you're not going -- it's not
(7)    going to be a very productive one
(8)        MR. SCHIMMEL: Object to form
(9)    A    That may not be the only term,
(10)   Mr. Cochran.
(11)   Q    Would you agree with me?
(12)       MR. SCHIMMEL: Object to form
(13)   A    Price might not be the only term.
(14)   Q    If you tell somebody out of the box
(15)   what you think the business you're trying to
(16)   sell is really worth  you're not going to get
(17)   a higher price than that  are you?
(18)       MR. SCHIMMEL: Object to form
(19)   A    Mr. Cochran, I don't know what we
(20)   are trying to achieve here in a hypothetical
(21)   transaction.
(22)   Q    Can you answer my question?
(23)       THE WITNESS: Can you repeat it,
(24)   please?
(25)       MR  COCHRAN: Can you read it back?

Page 360

(1)        (Whereupon the record was read back
(2)    by the reporter )
(3)    A    Unlikely, I agree with you.
(4)    Q    Did you think that if you didn't
(5)    have access, direct access to Lazard's
(6)    information  that the Teleglobe management
(7)    might characterize Teleglobe's business as in
(8)    better shape?
(9)    A    Personally, no.
(10)   Q    You didn t think that? Did anyone
(11)   you talked to within BCE management think
(12)   that?
(13)       MR. SCHIMMEL: Object to form
(14)   A    No, not to my knowledge.
(15)   Q    Well  if BCE wanted Lazard s views
(16)   why didn't BCE hire Lazard?
(17)       MR. SCHIMMEL: Object to form
(18)   A    You would have to ask Mr. Monty.
(19)   Q    Was he the one who decided that
(20)   Teleglobe would hire Lazard and not BCE?
(21)       MR. SCHIMMEL: Object to form
(22)   A    Well, I disagree with you on who --
(23)   for who they would be hired, but the decision
(24)   to use Lazard, I believe, to my understanding
(25)   is that of Mr. Monty.

Page 361

(1)    Q    You structured the engagement so
(2)    that Teleglobe hired Lazard and not BCE,
(3)    right?
(4)        MR. SCHIMMEL: Object to form.
(5)    A    I disagree with you.
(6)    Q    You do?
(7)    A    I disagree with you.
(8)    Q    Then we are going to go through
(9)    your drafts
(10)   A    Just so you understand, from the
(11)   very beginning Lazard knew they were acting
(12)   for Teleglobe  I mean, the first draft,
(13)   Mr. Cochran, shows Teleglobe, Inc., and that
(14)   comes from Lazard. It's not our draft. It's
(15)   their draft.
(16)   Q    What was this, an unsolicited
(17)   draft?
(18)       MR. SCHIMMEL: Object to form
(19)   A    No, but let's start -- Mr. Cochran,
(20)   investment bankers, as you know, are the ones
(21)   sending you the draft because they like their
(22)   own format, and from the first draft it's
(23)   written both on the indemnity and on the
(24)   engagement letter that the client is
(25)   Teleglobe, Inc.

Page 362

(1)    Q    Is it your testimony that this was
(2)    an unsolicited draft sent out of the blue by
(3)    Lazard?
(4)        MR. SCHIMMEL: Object to form
(5)    A    No, Mr. Cochran.
(6)    Q    Do you think somebody might have
(7)    had discussion with Lazard in advance about
(8)    who their client would be, BCE or Teleglobe?
(9)    A    We had a meeting on March 20th, so
(10)   I'm sure there was a discussion between
(11)   Mr. Monty and Lazard.
(12)   Q    You were there?
(13)   A    On March 20th, yes, but that was
(14)   the first meeting.
(15)   Q    There was a discussion about who
(16)   was going to hire Lazard at that meeting
(17)   wasn't there?
(18)   A    I don't recall that. I think it
(19)   was very clear that it was Teleglobe  Again,
(20)   I think it was very clear it was Teleglobe.
(21)   If you look at the engagement letter, it's
(22)   addressed to Teleglobe, Inc.
(23)   Q    I'm still confused  If BCE wanted
(24)   Lazard's opinion, why didn't BCE hire Lazard?
(25)       MR. SCHIMMEL: Object to form

Page 363

(1) A  We -- it's not a question of BCE,
(2) Inc. wanted Lazard's opinion. Teleglobe
(3) needed a review of its business plan. It was
(4) for its own protection, and at the end of the
(5) day BCE benefited. What we wanted to make
(6) sure, that we had the information available to
(7) us which, again, we do every single time in a
(8) transaction with a subsidiary.
(9) Q  I guess my question is a little
(10) different. I want to understand why, if BCE
(11) wanted Lazard's opinion in order for BCE to
(12) decide whether to continue to fund or under
(13) what circumstances, why didn't BCE hire
(14) Lazard?
(15)     MR. SCHIMMEL: Object to form.
(16) A  We did not need to hire Lazard,
(17) because we were doing our own work on our own
(18) view of Teleglobe's business plan.
(19) Q  Then why was Lazard necessary at
(20) all?
(21)     MR. SCHIMMEL: Object to form.
(22) Q  If you were going to make your
(23) decision, BCE was going to make its decision
(24) based on its analysis, why was Lazard
(25) necessary at all?

Page 364

(1)     MR. SCHIMMEL: Object to form.
(2) A  Lazard was providing for Teleglobe,
(3) Inc. an independent review of its business
(4) plan.
(5) Q  Who contacted Lazard and asked for
(6) that?
(7)     MR. SCHIMMEL: Object to form.
(8) Q  The very beginning, who contacted
(9) Lazard and asked them for that?
(10)     MR. SCHIMMEL: Object to form.
(11) A  I don't know, but my understanding,
(12) it's Mr. Monty.
(13) Q  How was it the case or how did it
(14) come about that Mr Said sent the draft
(15) engagement letter to you and Monty?
(16) A  Well, he sent it to Mr. Monty and
(17) because I was present at the March 20th
(18) meeting, he also sent it to me for review
(19) because this, again, is not unusual as a
(20) parent company. We look at all the engagement
(21) letters.
(22) Q  Let's take a look at the draft
(23) engagement letter. page 3. BCE-AD0150074
(24) Take a look at M. One of the services that
(25) Lazard was to provide was to advise and attend

Page 365

(1) meetings of the company's board of directors.
(2) right?
(3) A  Yes
(4) Q  Do you see that?
(5) A  Yes, I do.
(6) Q  This was in the draft letter
(7) company being defined as Teleglobe?
(8) A  Teleglobe, that's correct.
(9) Q  Let's take a look at -- under the
(10) miscellaneous provisions
(11) A  Which page?
(12) Q  Page BCE-AD0150077.
(13) A  Yes.
(14) Q  That first paragraph, if you would
(15) read it to yourself, it starts, "Any financial
(16) advice written or oral rendered by Lazard '
(17)     (Witness reading document.)
(18) A  Yes.
(19) Q  That one precludes Teleglobe from
(20) sharing Lazard s opinions or advice with
(21) anyone other than Teleglobe absent Lazard s
(22) consent, right?
(23)     MR. SCHIMMEL: Object to form
(24) A  That's correct here
(25) Q  Let's take a look at 39B which is

Page 366

(1) the next exhibit  You sent Lazard s draft
(2) engagement letter to Siim Vanaselja, right?
(3) A  Yes.
(4) Q  Why?
(5) A  Because he's the CFO, and as the
(6) CFO, he reviews all the engagement letters.
(7) Q  CFO for whom?
(8) A  BCE, Inc.
(9) Q  Why didn't you send it to
(10) Teleglobe?
(11) A  I believe at some point it did get
(12) to Teleglobe, but again --
(13) Q  Why didn't you send it to
(14) Teleglobe's CFO?
(15) A  Number 1, Mr Monty is chairman of
(16) Teleglobe. Number 2, under our governance
(17) model, we always look at the engagement letter
(18) of the parent company level.
(19) Q  But Siim Vanaselja is the CFO of
(20) BCE He's not going to pay for this is he?
(21) A  That's correct, but he will comment
(22) on it, as we do all the time on the parent
(23) company level.
(24) Q  Your testimony is that every
(25) investment banking letter executed by any

BSA XMAX(10/10)
MARTINE TURCOTTE - 10/14/05

Page 367

(1) subsidiary direct or indirect of Teleglobe is
(2) reviewed by Siim Vanaselja?
(3)    A    Direct or indirect of Teleglobe or
(4) any other subsidiary of BCE, Inc., if they
(5) follow the governance model, yes.
(6)    Q    Is reviewed by Siim Vanaselja?
(7)    A    And myself.
(8)    Q    Let's take a look at Turcotte
(9) Exhibit 39C
(10)       Why was this draft engagement
(11) letter, Lazard draft engagement letter sent to
(12) Michel Lalande?
(13)       MR. SCHIMMEL: Object to form
(14)    Q    He has it and he sends it to Martin
(15) Cossette, so why was it sent to him?
(16)       MR. SCHIMMEL: Object to form
(17)    A    I don't know why it was sent to
(18) him
(19)    Q    Why was it sent to Martin Cossette?
(20)    A    Probably because he was helping
(21) Michel, as a lawyer reporting to Michel, so he
(22) could review it as well.
(23)    Q    For who?
(24)       MR. SCHIMMEL: Object to form
(25)    A    We would have to ask Michel.

Page 368

(1)    Q    For what client?
(2)    A    It could have been for Teleglobe,
(3) Inc , like Michel was acting on another basis
(4) for Teleglobe, Inc
(5)    Q    You have no idea whether Michel was
(6) reading this for Teleglobe or for BCE?
(7)       MR. SCHIMMEL: Object to form
(8)    A    I didn't send it to him.
(9)    Q    Would you answer my question?
(10)       MR. SCHIMMEL: Object to form
(11) argumentative
(12)    Q    My question is you have no idea
(13) whether Michel was reviewing this for
(14) Teleglobe or BCE, do you?
(15)    A    Michel was acting on an ad hoc
(16) basis for Teleglobe.
(17)    Q    Let me try my question again  You
(18) have no idea whether Michel was reviewing the
(19) proposed Lazard engagement letter for
(20) Teleglobe or BCE, do you?
(21)       MR. SCHIMMEL: Object to form
(22)    A    I don't
(23)    Q    And you have no idea whether Martin
(24) Cossette was reviewing this draft engagement
(25) letter for Teleglobe or BCE, do you?

Page 369

(1)    A    I don't, except the one thing I
(2) will tell you is we always act under our
(3) governance model in the best interest of the
(4) subsidiary when we look at engagement letters.
(5)    Q    How about when you make funding
(6) decisions?
(7)    A    We also act --
(8)       MR. SCHIMMEL: Object to form
(9)       THE WITNESS: And looking -- if
(10)   it's our decision to fund. we will look
(11)   at acting in the best interest of our
(12)   company but taking everything and every
(13)   element into account
(14)    Q    How about whenever you make
(15) decisions to withdraw funding?  Do you always
(16) do that in the best interest of the
(17) subsidiary?
(18)       MR. SCHIMMEL: Object to form
(19)    Q    At BCE?
(20)    A    We do it in the context of all the
(21) elements, taking into account every single
(22) element.
(23)    Q    How is it in the best interest of
(24) Teleglobe for BCE to stop long-term funding?
(25)       MR. SCHIMMEL: Object to form.

Page 370

(1)    A    The decision to stop long-term
(2) funding was a decision at the BCE level in the
(3) interest of BCE because there was no
(4) contractual or other obligation vis-a-vis
(5) Teleglobe.
(6)    Q    I understand your legal position in
(7) this litigation which is inconsistent with any
(8) number of representations that were made prior
(9) to the time this litigation was filed  and
(10) that s not what I m asking you
(11)       MR. SCHIMMEL: Object to form
(12)       MR. COCHRAN: Would you read my
(13)   question back that led to her answer?
(14)       (Whereupon the record was read back
(15)   by the reporter.)
(16)       MR. SCHIMMEL: Object to form
(17)    A    Well, the decision to stop funding
(18) is a decision at the level of BCE, Inc. taking
(19) into account all the elements it has to look
(20) at.
(21)       In this question, in this instance,
(22) there was no obligation to fund, so the
(23) decision was one of BCE taking all the
(24) elements into account
(25)    Q    Was one of the elements took into

TELEGLOBE COMMUNICATIONS

BSA XMAX(11/11)

MARTINE TURCOTTE - 10/14/05

VS BCE, INC

## Page 371

(1) account whether it was in Teleglobe's best
(2) interest to discontinue funding?
(3)    MR. SCHIMMEL: Object to form
(4)    A    We looked at the situation at
(5) Teleglobe and remember, we had invested
(6) $7.4 billion Canadian in Teleglobe. So we
(7) took that into consideration very much so in
(8) whether to cease or not and the consequences
(9) of ceasing to fund long-term Teleglobe,
(10) Mr. Cochran.
(11)    Q    The 7.4 billion you're talking
(12) about was the purchase price for the stock?
(13)    MR. SCHIMMEL: Object to form
(14)    A    Was the purchase price --
(15) 7.4 billion is a lot of money, Mr. Cochran.
(16)    Q    You bought the stock. You didn't
(17) invest 7.4 billion in the business of
(18) Teleglobe. You bought the stock
(19)    MR. SCHIMMEL: Object to form
(20)    A    Mr. Cochran, after buying
(21) 7.4 billion we invested $1.3 billion U.S. in
(22) Teleglobe, Inc. I think by any measure that
(23) is a big amount of money that you don't walk
(24) away on the simple whim, as you mentioned
(25) earlier in the questions.

## Page 372

(1)    Q    You convinced the banks to put up
(2) 1.25 billion, didn't you?
(3)    MR. SCHIMMEL: Object to form
(4)    A    I disagree with you.
(5)    Q    You convinced the bondholders to
(6) hold on to their bonds?
(7)    MR. SCHIMMEL: Object to form
(8)    A    I disagree with you
(9)    Q    Was one of the things that BCE
(10) considered when it was considering all of
(11) these factors in the context of making the
(12) decision to withdraw funding the best
(13) interests of Teleglobe?
(14)    MR. SCHIMMEL: Object to form
(15)    A    We looked at all the elements to
(16) conclude that we would cease long-term funding
(17) of Teleglobe, Inc
(18)    Q    Was one of those elements of the
(19) best interest of Teleglobe?
(20)    MR. SCHIMMEL: Object to form
(21)    A    We did not have to look at the best
(22) interest of Teleglobe. That was not the duty
(23) or responsibility of BCE, Inc.
(24)    Q    So we agree. are agreed that BCE,
(25) Inc did not look at that element; is that

## Page 373

(1) right?
(2)    MR. SCHIMMEL: Object to form
(3)    A    It did not have to look at that.
(4)    Q    Listen to my question  We are
(5) agreed that BCE. Inc did not look at that
(6) element, right?
(7)    MR. SCHIMMEL: Object to form
(8)    A    I disagree, because you're having a
(9) premise that we did not look at the
(10) consequences of what that would have, the
(11) long-term cessation of funding, and we did
(12) look at all those elements.
(13)    Q    So you did look at whether it was
(14) in the best interest of Teleglobe to
(15) discontinue funding; is that what you are
(16) saying?
(17)    MR. SCHIMMEL: Object to form
(18)    A    You're trying to have me say that
(19) we had an obligation to look at the best
(20) interest. We had no such obligation, but we
(21) looked at the consequences of cessation of
(22) funding. And to me it's irrelevant, because
(23) the duties that BCE had first and foremost
(24) were to its own shareholders in that decision.
(25)    Q    Listen to my question  Was one of

## Page 374

(1) the factors that BCE considered in deciding to
(2) cease long-term funding. to your observation.
(3) was one of the factors the best interests of
(4) Teleglobe?
(5)    MR. SCHIMMEL: Object to form
(6)    A    I'll answer this way: We did not
(7) have to look at what was in the best interest
(8) of Teleglobe. I already answered,
(9) Mr Cochran.
(10)    Q    Ma'am respectfully  it s a yes or
(11) no  If you want to explain after you give me
(12) the yes or no. I m happy to hear the
(13) explanation
(14)    A    I disagree. I already answered
(15) that question.
(16)    Q    I'm going to put it one more time.
(17) and eventually we will present this transcript
(18) to our judge
(19)    A    I don't have a problem with that.
(20)    Q    So here is my question
(21)    MR. SCHIMMEL: Please stop
(22)    badgering the witness
(23)    Q    To your observation, did BCE
(24) consider the best interests of Teleglobe when
(25) it made the decision to withdraw long-term

Page 375

(1) funding from Teleglobe?

(2)    A    Again, I'm going to answer we took

(3) all the elements into consideration, including

(4) the consequences that our decision to cease

(5) long-term funding would have on all the

(6) stakeholders of Teleglobe, and number 2, no,

(7) we did not have to look at the best interests

(8) of Teleglobe.

(9)    Q    Was one of the elements that you

(10) took into consideration those elements that

(11) all the factors or elements you're talking

(12) about, was one of those elements the best

(13) interest of Teleglobe?

(14)        MR. SCHIMMEL: Object to form

(15)    A    I just answered that question that

(16) was asked ten times. I did answer the

(17) question.

(18)    Q    Ma'am, it's a yes or no  If the

(19) answer is no  that's fine

(20)        MR. SCHIMMEL: Object to form

(21)    A    I just answered the question

(22) before.

(23)    Q    Let me ask another question  Did

(24) BCE take into consideration in deciding to

(25) withdraw long-term funding from Teleglobe the

Page 376

(1) interests of Teleglobe's creditors?

(2)        MR. SCHIMMEL: Object to form

(3)    A    We looked at the consequences that

(4) the cessation of long-term funding would have

(5) on all the creditors, and it was irrelevant at

(6) the end of the day because the BCE decision

(7) had to be taken in interest of BCE.

(8)    Q    So at the end of the day the reason

(9) the decision was as it was, was driven by the

(10) fact that it was in the best interest of BCE;

(11) is that fair?

(12)        MR. SCHIMMEL: Object to form

(13)    A    The decision at the end of the day

(14) was taking into account the interest of BCE,

(15) Inc.

(16)    Q    And not the creditors of Teleglobe

(17) or the U S  debtors?

(18)        MR. SCHIMMEL: Object to form

(19)    A    I answered that question.

(20)    Q    Is that right?

(21)        MR. SCHIMMEL: Object to form

(22)    A    I answered that question. I said

(23) we looked at the consequences that ceasing

(24) long-term funding on Teleglobe would have on

(25) all these investors. We looked at it, we

Page 377

(1) considered it and then took a decision

(2) considering a number of elements including

(3) those and decided in the best interests of BCE

(4) which was the decision to cease long-term

(5) funding of Teleglobe.

(6)    Q    All right  Thank you

(7)        Let's take a look at Turcotte 39D

(8) Do you recognize this?

(9)    A    I don't recognize it. I recognize

(10) some handwriting, yes  Some of it is mine

(11)    Q    Sure, it's your handwriting, isn't

(12) it?

(13)    A    Not all, but some of it is mine.

(14)    Q    Some of it is Jay Schwartz's

(15) handwriting, too, isn t it?

(16)        MR. SCHIMMEL: Object to form

(17)    A    I don't know. I don't recognize

(18) it.

(19)    Q    Why don't you take a look at

(20) page -- the page with the production number

(21) GEN046728  Take a look at your note at the

(22) top of the page to Jay Swartz, colon: "Is it

(23) possible that this would be required in a

(24) fairness opinion or otherwise?" Did I read

(25) that correctly?

Page 378

(1)    A    Yes.

(2)    Q    And the handwriting next to it

(3) which is not your handwriting reads  Unlikely

(4) but possible "  Do you see that?

(5)    A    Yes.

(6)    Q    This is a draft of the Lazard

(7) engagement letter that you marked on and sent

(8) to Mr Swartz, right?

(9)    A    Yes.

(10)    Q    And Mr Swartz got back to you with

(11) his comments, right?

(12)    A    Yes.

(13)    Q    And these are -- the handwriting

(14) that is not yours are his comments, correct?

(15)    A    Yes.

(16)    Q    Go back to the first page, if you

(17) would, please, of the Exhibit 39D

(18)    A    Yes

(19)    Q    You struck out under, 'Assignment

(20) and scope ' the words, "The company " and put

(21) in, "Teleglobe "  Why?

(22)    A    Because it's -- Teleglobe, Inc.

(23) retains Lazard as opposed to the company,

(24) which is -- which defines both Teleglobe, Inc.

(25) and its controlled subsidiaries

BSA XMAX(13/13)

TELEGLOBE COMMUNICATIONS                    MARTINE TURCOTTE · 10/14/05                    VS  BCE  INC

## Page 379

(1)    Q    That suggested change was later
(2)  rejected  Do you know that?
(3)    A    I can't recall.
(4)    Q    We will come to it.
(5)        If you look on the next change in
(6)  that line "The company  where you hand
(7)  write, "Teleglobe.' `hereby retains Lazard to
(8)  act as its," and then you strike out "sole"
(9)  and put in, "nonexclusive investment banker"?
(10)    A    That's correct.
(11)    Q    Why did you suggest that change?
(12)    A    Because we always do that because
(13)  investment bankers want to act on their own,
(14)  and for companies you have to assess that
(15)  sometimes you may need a second investment
(16)  banker. So it's only a precedent issue, but
(17)  we always refuse the sole investment banker.
(18)  So this, in fact, is in the best interest of
(19)  Teleglobe should it need to have a second one
(20)  for any reason.
(21)    Q    Were you representing Teleglobe in
(22)  making the change?
(23)    A    I was representing BCE, Inc. but at
(24)  the same time acting under the governance
(25)  model and helping Teleglobe, Inc. to the best

## Page 380

(1)  of its interest and reviewing the engagement
(2)  letter.
(3)    Q    I guess I'm confused  Who were you
(4)  representing in making these comments on the
(5)  engagement letter?
(6)        MR. SCHIMMEL:  Object to form
(7)    A    I was acting for BCE, Inc., but at
(8)  the same time under the governance model we
(9)  provide support to subsidiaries on such things
(10)  as engagement letters. So I was acting in the
(11)  best interest of Teleglobe and providing
(12)  advice if you want to Teleglobe, which is --
(13)    Q    Were you acting as legal counsel
(14)  for Teleglobe in this regard?
(15)    A    In this regard, yes, because I was
(16)  giving them support and advice on the
(17)  engagement letter but at the same time looking
(18)  at interest from the parent company point of
(19)  view under the governance model, which we do
(20)  all the time.
(21)    Q    Take a look at the next page.
(22)  page 2  It has the production number
(23)  GEN046427.
(24)    A    Yes.
(25)    Q    The heading is  number 2.

## Page 381

(1)  Restructuring Services " Do you see that?
(2)    A    Yes.
(3)    Q    Hang on just a minute  Let me see
(4)  what I need to ask you about that
(5)        You hand wrote in the introductory
(6)  language which begins.  Lazard agrees in
(7)  consideration of the compensation," and it
(8)  goes on  you hand wrote the words, "In
(9)  connection with a proposed restructuring
(10)  transaction " Do you see that?
(11)    A    Yes.
(12)    Q    Why did you put those words in?
(13)    A    Because we wanted to limit the
(14)  services, and I think restructuring
(15)  transaction is why they were engaged, which is
(16)  defined on the first page under assignment
(17)  scope
(18)        Again, all this is is to make sure
(19)  it may reasonably request, and as directed by
(20)  the company, we always put in connection with
(21)  what. So this is, again, a precedence  It's
(22)  nothing more in the definition.
(23)    Q    They were, at least the initial
(24)  concept was that they were being hired to
(25)  assess a restructuring transaction as defined

## Page 382

(1)  here; is that right, a restructuring
(2)  transaction for Teleglobe. I should say?
(3)    A    For Teleglobe in a comprehensive
(4)  financial restructuring reorganization or any
(5)  similar reorganization which may be
(6)  implemented by means of, for example, sole
(7)  standing, waivers and consents. So it's a
(8)  general thing.
(9)    Q    General what? I'm sorry
(10)    A    It's a general restructuring
(11)  definition
(12)    Q    And not liquidation?
(13)    A    No.
(14)    Q    Or sale, correct?
(15)    A    Well, no, it does say the sale,
(16)  merger or consolidation of.
(17)    Q    Well  they later, and we will see
(18)  it shortly --
(19)    A    It's very all-encompassing. It
(20)  also talks about, if you look at the second
(21)  line, "The sale or disposition of all or a
(22)  portion of the company's assets." So
(23)  basically this covers everything
(24)    Q    But later there was inserted
(25)  language that directly related to a sale; do

BSA XMAX(14/14)

MARTINE TURCOTTE - 10/14/05

---

Page 383

(1) you recall that?

(2)  A   I don't recall it.

(3)  Q   We will come to it  It's in this

(4) chronology

(5)  A   This is all-encompassing.

(6) essentially.

(7)  Q   Under 2D, "Restructuring Services,"

(8) 2D, same page GEN046727

(9)  A   Yes.

(10)  Q   You add to that the words, "And

(11) provide a formal valuation of assets" —

(12)  A   "Where required."

(13)  Q   — "where required," and Mr Swartz

(14) adds, 'of the company or parts thereof"?

(15)  A   Yes.

(16)  Q   Why were you adding that?

(17)  A   Because I always add that because

(18) my experience is investment bankers, if you

(19) don't include that and if -- should you ever

(20) need a formal valuation of the assets, then

(21) come back and charge you more.

(22)     So having lived through that

(23) experience, I now put that in in any

(24) engagement letter so it's very clear up front

(25) that we are not going to have to pay more

---

Page 384

(1) money for this, and if they have an issue in

(2) doing formal valuation, they should tell us up

(3) front because we are not going to be

(4) renegotiating this. Again, this goes to the

(5) precedence, I think, issue.

(6)  Q   Why did -- after he received the

(7) authority, the 850 million in authority on

(8) November 28. 2001 from the BCE board  can you

(9) tell me why Mr Monty didn't document in a

(10) commitment letter to Teleglobe the

(11) contribution of that funding to Teleglobe?

(12)     MR. SCHIMMEL: Object to form

(13)  A   Because it was purely a statement

(14) of intention  There was no legal obligation

(15) to provide it to Teleglobe. It was adopted in

(16) the context of the adoption of the BCE

(17) business plan.

(18)  Q   I have the November 28, 2001

(19) resolution and we can look at it, but it

(20) doesn't say anything about a statement of

(21) intention

(22)  A   Nor does it say anything about a

(23) legal requirement, and if there had been a

(24) legal requirement, it would have been stated

(25) as such under the resolutions.

---

Page 385

(1)  Q   How about letting me finish my

(2) questions and I will let you finish your

(3) answers  If we can have that agreement  I

(4) think we will make out okay

(5)  A   No problem.  I apologize.  No

(6) problem.

(7)  Q   It says in the resolution that

(8) Mr Monty has the authority up to 850 million

(9) U S  It gives him authority?

(10)     MR. SCHIMMEL: Object to form

(11)  Q   Is that right?  Is that consistent

(12) with your memory?

(13)     MR. SCHIMMEL: The document speaks

(14)  for itself

(15)  A   Number 1, it gives him authority in

(16) the context of the adoption of the BCE

(17) business plan and budget to basically advance

(18) funding at such time and on such terms and

(19) conditions and is discretionary -- I would

(20) like to finish -- and the authority for

(21) investment in the context of business plan

(22) does not give you the authority to spend it

(23) all, because business plan gets revised from

(24) time to time.

(25)  Q   Well, the resolution doesn't say

---

Page 386

(1) anything -- the resolution doesn't condition

(2) the authority in any way?

(3)     MR. SCHIMMEL: Object to form

(4)  Q   Let me show you Lalande Exhibit 19,

(5) which are the minutes of the November 28, 2001

(6) BCE board meeting  I'll direct you to the

(7) page with the production number BCE-SUP

(8) 124991. and you'll see resolution number 7 and

(9) then you'll see at paragraph 4  which is the

(10) next page  the portion of the resolution

(11) approving the 850 million in authority to

(12) Mr Monty.

(13)     Show me where it says that

(14) Mr Monty's authority to contribute up to

(15) 850 million was in some way conditioned upon

(16) the content of the business plan.

(17)  A   Well, number 1, the title of the

(18) resolution is, "2002 Business Plan and

(19) Financial Plan," which relates to BCE business

(20) and financial plan, so the resolution is there

(21) adopted

(22)  Q   Where do you see the title of the

(23) resolution?

(24)  A   "2002 Business and Financial Plan "

(25)  Q   You're directing me to the heading

---

Page 387

(1) at the top of that page?
(2)    A   That's correct, which is normally
(3) the heading we have for sections introducing
(4) the resolutions
(5)       The second thing is here. It talks
(6) about business and financial plans and budget
(7) which, again, refers -- since this is a BCE,
(8) Inc. resolution, it refers to the BCE business
(9) and financial plans and budget.
(10)      Third, if you look at the second
(11) "Whereas," "Whereas such plans contemplate
(12) investments and/or the providing of financial
(13) assistance to certain subsidiaries," so,
(14) again, that is in the context of the plan.
(15)      Then I would also say here nowhere
(16) does it talk about the entering into an
(17) agreement as we did for the support agreement
(18) with Teleglobe which provided that we would
(19) advance the first 100 million and then with
(20) the banks, the support letter with the banks
(21) itself which would introduce whereby we had
(22) agreed to enter into with the banks of a
(23) support letter providing for the $900 million
(24) financing. Here it doesn't say anything. It
(25) talks about the authority to advance and

Page 388

(1) provide financial assistance in the context of
(2) a plan having been adopted.
(3)       Then if you turn to the next page
(4) in 4D, "All advances of funds hereunder shall
(5) be at such time and upon such terms and
(6) conditions as a chairman and CEO of a
(7) corporation or any officer designated by such
(8) person may his or her discretion determine,"
(9) so discretion, it's not an obligation
(10)    Q   Well, let me ask it this way: Can
(11) you point out anything else that would support
(12) the contention that Mr. Monty could only
(13) contribute the funding, the up to $850 million
(14) conditioned upon in some way the 2002 to 2004
(15) business plan to Teleglobe?
(16)       MR. SCHIMMEL: Object to form
(17)    A   Again, I'm going to repeat. I have
(18) given you all the elements where this is not
(19) an obligation to advance the funds
(20)    Q   I understand what you have given
(21) me. My question is can you point out anything
(22) else --
(23)    A   In writing, no.
(24)    Q   You can't point to anything else in
(25) this resolution that stands for the

Page 389

(1) proposition that Mr Monty's authority to
(2) contribute the money was somehow conditioned
(3) on the business plan; is that right?
(4)       MR. SCHIMMEL: Object to form
(5)    A   I think the resolution speaks for
(6) itself, Mr Cochran, and I pointed to you all
(7) the evidence if you want that shows that this
(8) was in the discretion of the chairman and CEO
(9) of BCE, Inc. on whether or not to advance the
(10) money, and in the context of the adoption of
(11) the business plan is an authority up to which
(12) means that you don't have to spend all that
(13) money because budgets do change along the
(14) year, and sometimes the environment is dynamic
(15) and you don't need all the money sometimes.
(16)    Q   But you can spend all the money if
(17) you want is what you are saying?
(18)       MR. SCHIMMEL: Objection to form
(19)    A   In the discretion you could
(20) advance. It does give you the authority in
(21) the context of a business plan to advance the
(22) money. It does give you the authority.
(23)    Q   Business plans change. too, don't
(24) they?
(25)    A   They do.

Page 390

(1)       MR. SCHIMMEL: Object to form
(2)    Q   Sometimes you're ahead of a plan
(3) and sometimes you're behind?
(4)       MR. SCHIMMEL: Object to form
(5)    A   That's correct.
(6)    Q   Where does this say that Mr Monty
(7) did not have the discretion to advance up to
(8) 850 million if Teleglobe was behind its
(9) business plan?
(10)       MR. SCHIMMEL: Object to form
(11)    Q   In your opinion. where does it say
(12) that?
(13)    A   It doesn't say that in the context
(14) of it's the discretion of the CEO to decide
(15) whether he should advance those monies, and
(16) Mr. Monty made it very clear on December 12th
(17) following this to the analysts and the public
(18) who were very well aware, who could listen in
(19) to the web casts and be present, that he was
(20) going to advance a billion dollars Canadian
(21) based on two principles; that the business
(22) plan of Teleglobe would see it free cash flow
(23) positive by 2003, and any additional money,
(24) that would be value recovery of any additional
(25) money invested into Teleglobe.

Page 391

(1)    Q    So I guess to go back to my
(2)    question -- and I appreciate all this
(3)    additional information  It will be helpful to
(4)    us eventually come time of your
(5)    cross-examination
(6)        MR. SCHIMMEL: Object to form and
(7)        argumentative
(8)    A    No problem
(9)    Q    Going back to my question, are we
(10)   agreed that Mr  Monty had the discretion to
(11)   decide when and whether and under what terms
(12)   and conditions to advance the $850 million?
(13)       MR. SCHIMMEL: Object to form, and
(14)       document speaks for itself
(15)   A    Yes.
(16)   Q    Are we agreed that Mr  Monty could
(17)   decide if Teleglobe was behind on its business
(18)   plan to contribute less than 850 million?
(19)       MR SCHIMMEL: Object to form
(20)   A    Mr. Monty, as chairman and CEO of
(21)   BCE, Inc., had the discretion of whether or
(22)   not to advance the funds at any point in time
(23)   to Teleglobe
(24)   Q    I just want to make sure we are
(25)   agreed on the way I'm saying it. Are we

Page 392

(1)    agreed that if Teleglobe was behind on its
(2)    business plan  that Mr  Monty had the
(3)    discretion to contribute less than
(4)    850 million?
(5)        MR. SCHIMMEL: Object to form
(6)    A    I disagree with the premise that
(7)    you have that whether or not Teleglobe
(8)    followed its business plan that we had an
(9)    obligation to advance, which we had no
(10)   obligation to advance.
(11)   Q    No. I'm trying to say it
(12)   differently
(13)   A    But it's just that I disagree with
(14)   your premise in your question.
(15)   Q    There is no premise in my question
(16)   A    There was a premise in your
(17)   question.
(18)   Q    It is a simple question. and all you
(19)   have to do is answer it
(20)       MR. SCHIMMEL: Object to form and
(21)       argumentative
(22)   Q    Are we agreed that if Teleglobe was
(23)   behind on its business plan, Mr  Monty had the
(24)   discretion if he wanted to contribute less
(25)   than 850 million?

Page 393

(1)        MR. SCHIMMEL: Object to form
(2)    A    My answer is no, we don't agree,
(3)    because Mr. Monty always had the discretion at
(4)    any point in time whether or not to advance
(5)    the funds.
(6)    Q    I think we are saying the same
(7)    thing
(8)    A    I disagree
(9)    Q    You disagree?
(10)   A    I disagree.
(11)   Q    How are we not saying the same
(12)   thing?
(13)   A    Because you had the premise in your
(14)   question. All I'm saying is no condition
(15)   Mr. Monty, as chairman and CEO of BCE, Inc.,
(16)   pursuant to this resolution could decide at
(17)   any point in time not to advance further funds
(18)   to Teleglobe, Inc.
(19)   Q    Then let me see if I understand
(20)   what you are saying
(21)       Mr  Monty had complete authority to
(22)   decide at any point in time how much, if any,
(23)   of the 850 million to contribute; is that
(24)   right?
(25)       MR. SCHIMMEL: Object to form

Page 394

(1)    A    That's correct.
(2)    Q    And there were no conditions on his
(3)    discretion; is that right?
(4)        MR. SCHIMMEL: Object to form
(5)    A    There were no conditions other than
(6)    this was adopted in the context of a business
(7)    plan of BCE.
(8)    Q    Then if that is your testimony
(9)    then listen to my question:  If BCE was behind
(10)   on its -- I'm sorry -- if Teleglobe was behind
(11)   on its business plan, the one you are talking
(12)   about -- strike that
(13)       You're talking about the BCE
(14)   business plan?
(15)   A    I'm talking about the BCE business
(16)   plan.
(17)   Q    You're not talking about the
(18)   Teleglobe business plan; is that right?
(19)   A    I'm talking about the BCE business
(20)   plan which is consolidated into which a
(21)   Teleglobe business plan finds its way on a
(22)   consolidated basis so it does include the
(23)   element of Teleglobe.
(24)   Q    So that you're saying that
(25)   Mr Monty's authority to contribute up to

TELEGLOBE COMMUNICATIONS

BSA XMAX(17/17)

VS BCE. INC

MARTINE TURCOTTE - 10/14/05

Page 395

(1)  850 million was conditioned upon in some way

(2)  whether the corporation. that is BCE itself,

(3)  was meeting its business plan for 2002 to

(4)  2004?

(5)      MR. SCHIMMEL:  Object to form

(6)  A   I'm not saying -- there is no

(7)  condition other than this was adopted in the

(8)  context of the adoption of the BCE business

(9)  and financial plan, which includes an element

(10)  of the Teleglobe business plan because it's on

(11)  the consolidated basis, and it does say that

(12)  that plan provides and contemplates for

(13)  financial assistance to certain subsidiaries,

(14)  but there is no condition per se because it's

(15)  only an intention to advance the funds.

(16)  Q   What do you mean, ma'am. when you

(17)  say that this $850 million authority was

(18)  adopted in the context of the BCE business

(19)  plan?

(20)      MR. SCHIMMEL:  Object to form

(21)  Q   What do you mean by that?

(22)  A   Because the BCE business plan

(23)  includes elements of the Teleglobe business

(24)  plan that provides that Teleglobe will need

(25)  some financing to achieve its business plan,

Page 396

(1)  and basically BCE is saying: I'm looking at

(2)  this and I will advance. I intend to advance

(3)  the $850 million or up to that amount.

(4)      It doesn't mean the full amount and

(5)  I'm leaving you to Jean Monty the discretion

(6)  of the company whether or not to advance those

(7)  funds at any point in time, but it's a

(8)  planning exercise and an authority. So if

(9)  Jean decides throughout in his discretion as

(10)  CEO of BCE that the money should be advanced,

(11)  that is his decision and it's in his

(12)  discretion.

(13)  Q   You're a lawyer  You know what a

(14)  condition is  right?

(15)  A   I know what a condition is.

(16)  Q   What is a condition?

(17)      MR. SCHIMMEL:  Object to form

(18)  A   That's a vague question.

(19)      MR. SCHIMMEL:  You're asking for a

(20)  legal conclusion

(21)  Q   What do you consider a condition to

(22)  be?

(23)  A   In the context of a legal

(24)  obligation?

(25)  Q   Sure

Page 397

(1)  A   In the context of a legal

(2)  obligation a condition precedent is you have

(3)  meet the condition in order to provide this,

(4)  but this is not a legal obligation,

(5)  Mr. Cochran.

(6)  Q   Was there any condition precedent?

(7)  A   It is said in here it's not a

(8)  condition precedent. This is adopted simply

(9)  in the context of a business plan. That's all

(10)  I'm saying.

(11)  Q   That's all you're saying?

(12)  A   That's all I'm saying.

(13)  Q   You're not saying the business plan

(14)  is a condition precedent?

(15)  A   I am not saying it's a condition

(16)  precedent, no.

(17)      MR. SCHIMMEL:  We have been going

(18)  more than an hour  We should take a

(19)  break now

(20)      MR. COCHRAN:  If you need to

(21)  that's fine  You're cutting me off.

(22)  frankly. in the middle of my examination

(23)  on this

(24)      THE WITNESS:  If you want to

(25)  continue for ten minutes, I can hold for

Page 398

(1)  ten minutes

(2)      MR COCHRAN:  I don t mean to make

(3)  you uncomfortable, but I would like to

(4)  finish this

(5)      THE WITNESS:  That's fine

(6)  Q   Before Mr Schimmel's interruption.

(7)  let me make sure I understand where you are on

(8)  this issue

(9)      Is it correct that you are not

(10)  saying that the BCE business plan or that the

(11)  Teleglobe business plan were conditions

(12)  precedent on the exercise by Mr Monty of his

(13)  discretion?

(14)      MR. SCHIMMEL:  Object to form

(15)  Q   To contribute some or all of this

(16)  850 million to Teleglobe?

(17)      MR. SCHIMMEL:  Object to form

(18)  A   It's not a condition precedent, but

(19)  it's adopted in the context of the Teleglobe

(20)  business plan.

(21)  Q   That's fair  I understand what you

(22)  are saying now

(23)      Is it fair of me to understand that

(24)  you are not saying that if Teleglobe was

(25)  behind on its business plan, that Mr Monty

BSA XMAX(10/10)
MARTINE TURCOTTE - 10/14/05

---

Page 399

(1)  did not have the discretion to contribute some
(2)  or all of this 850 million?
(3)       MR. SCHIMMEL: Object to form
(4)       MR. COCHRAN: Do you want that read
(5)  back?
(6)       THE WITNESS: Yes
(7)       (Whereupon the record was read back
(8)  by the reporter.)
(9)       MR. COCHRAN: Let me rephrase it
(10)      Q    Is it fair of me to understand that
(11) you are not saying that Mr. Monty didn't have
(12) the discretion to contribute some or all of
(13) the 850 million to Teleglobe if Teleglobe was
(14) behind on its business plan?
(15)      A    That's correct. It was not a
(16) condition precedent, but he would have a lot
(17) of explaining to do at the board.
(18)      Q    Now, can you tell me why there was
(19) no written commitment letter or other document
(20) memorializing an agreement between BCE and
(21) Teleglobe or the debtors?
(22)      A    Because we would not have
(23) entered —
(24)      Q    Let me finish
(25)      A    I'm sorry.

---

Page 400

(1)      Q    — for BCE to provide some or all
(2)  of this 850 million?
(3)       MR. SCHIMMEL: Object to form
(4)      A    Because we would not have given the
(5)  written commitment.
(6)       In fact, I remember in the context
(7)  of a private placement in the fall of 2001, in
(8)  order to do that private placement, the
(9)  investors came back and said: We would like
(10) something similar to what BCE had provided at
(11) the time to the banks in the form of a support
(12) letter, and we were not prepared to do that
(13)      Q    This resolution says as you
(14) pointed out under 4D, that, "All advances of
(15) funds hereunder shall be at such time and upon
(16) such terms and conditions as the chairman and
(17) chief executive officer of the corporation" —
(18) Mr. Monty?
(19)      A    And corporation being BCE, Inc.
(20)      Q    "may in his or her discretion
(21) determine."
(22)      Are you saying that Mr. Monty did
(23) not have the authority to execute such a
(24) commitment letter?
(25)      MR. SCHIMMEL: Object to form

---

Page 401

(1)      A    He did not have the authority,
(2)  because otherwise we would have needed to make
(3)  that very clear in this resolution as we did
(4)  in the past for the support letter to the
(5)  banks.
(6)      Q    Take a look at A. Make sure you
(7)  look at A
(8)       (Witness reading document.)
(9)      A    Yes, but in the context of this, it
(10) is still for purposes contemplated by the
(11) budget. It does not refer to an agreement
(12) being entered into with Teleglobe.
(13)      Q    The day this resolution was adopted
(14) Mr. Monty had the discretion, was given the
(15) discretion to sign subscription agreements for
(16) Teleglobe stock or stock in the debtors,
(17) right?
(18)      MR. SCHIMMEL: Object to form
(19)      Q    Right?
(20)      MR. SCHIMMEL: The document speaks
(21) for itself
(22)      A    He was, but we always provide for
(23) the flexibility should it need be so we don't
(24) go back to the board every single time, but
(25) this was not presented to the board of BCE,

---

Page 402

(1)  Inc. in the context of a legal obligation
(2)  towards Teleglobe, Inc. because if it had
(3)  been, we would have had to refer to it at the
(4)  beginning of the resolution
(5)       MR. COCHRAN: Last couple of
(6)  questions and we can take that break
(7)      Q    Can you say why Mr. Monty didn't
(8)  execute in his discretion under this
(9)  resolution subscription agreements to buy
(10) stock in Teleglobe up to the 850 million, for
(11) any amount up to the 850 million?
(12)      A    I am not sure I understood. He did
(13) enter — for example, we did advance about
(14) U.S. $300 million under — we had notes signed
(15) with Teleglobe.
(16)      Q    Those notes weren't signed until
(17) late March of 2002?
(18)      MR. SCHIMMEL: Object to form
(19)      A    I don't know that
(20)      Q    They are of record. Can you tell
(21) me why Mr. Monty didn't sign subscription
(22) agreements for stock?
(23)      A    As opposed to notes?
(24)      Q    As opposed to notes
(25)      A    I don't know that.

---

BSA XMAX(19/19)

TELEGLOBE COMMUNICATIONS        MARTINE TURCOTTE - 10/14/05        VS BCE, INC.

## Page 403

(1)    Q   Can you tell me why Mr Monty
(2) didn't sign subscription agreements for stock
(3) in Teleglobe or the debtors for more than the
(4) roughly 300, 350 million?
(5)      MR. SCHIMMEL: Object to form
(6)    A   Because Mr Monty basically did not
(7) commit on behalf of BCE, Inc. to advance all
(8) of the U.S. $850 million. He only had the
(9) authority in his discretion to do so.
(10)    Q   It was Mr Monty's discretion?
(11)      MR. SCHIMMEL: Object to form
(12)    A   It was Mr. Monty's discretion as
(13) delegated by the board of BCE.
(14)    Q   And it was his decision?
(15)    A   As chairman and CEO of BCE, Inc.
(16)      MR. COCHRAN: Last question and
(17) then let's take that nature break Two
(18) questions here:
(19)    Q   Did you ever tell anyone from
(20) Lazard about the existence of this
(21) November 28 2001 resolution that we are
(22) focusing on in Lalande 19, the funding
(23) resolution that Mr Monty had discretion up
(24) to $850 million? Did you ever tell anyone
(25) from Lazard that?

## Page 404

(1)    A   I don't remember if I specifically
(2) said U.S. 850 million, but like I have
(3) mentioned before, at the March 20th meeting
(4) Jean told Lazard that he was prepared under
(5) certain circumstances to potentially advance
(6) more money in the context of a restructuring.
(7)    Q   My question is pretty direct
(8)    A   I don't recall if we made or showed
(9) them this resolution?
(10)    Q   Or may have had them otherwise
(11) aware of it?
(12)    A   I don't recall.
(13)      MR. SCHIMMEL: Object to form
(14)    Q   You don't know one way or the
(15) other?
(16)    A   I don't recall.
(17)    Q   You don't have a recollection?
(18)    A   I don't recall specifically if we
(19) mentioned the 800, but Lazard was aware --
(20) just looking at the documents, there was
(21) common knowledge because it was all in the
(22) file documents that we had the intention to
(23) advance up to Canadian $1 billion.
(24)    Q   Did you or anyone else from BCE, to
(25) your knowledge, make Lazard aware of how much

## Page 405

(1) additional authority remained -- how much
(2) authority remained under this resolution, this
(3) $850 million resolution as at the beginning of
(4) April 2002?
(5)      MR. SCHIMMEL: Object to form
(6)    A   I don't recall. It may be, but I
(7) don't recall.
(8)      MR. SCHIMMEL: We spent more than
(9) ten minutes. Mr Cochran
(10)      MR. COCHRAN: I apologize if I made
(11) you uncomfortable
(12)      THE WITNESS: I can survive
(13)      MR. COCHRAN: Let's take that
(14) break
(15)      THE VIDEOGRAPHER: We are now off
(16) the record at 11:14
(17)      (Whereupon the record was read back
(18) by the reporter.)
(19)      THE VIDEOGRAPHER: This is tape 2
(20) of the deposition of Martine Turcotte
(21) We are now on the record at 11:22
(22)      MR. SCHIMMEL: Ms Turcotte has
(23) expressed a preference to have a break at
(24) every hour, so I will continue to remind
(25) everybody when we get to that point

## Page 406

(1)      MR. COCHRAN: That's agreeable to
(2) me.
(3)    Q   Referring back to this November 28,
(4) 2001 resolution Lalande 19 the page that has
(5) BCE-SUP 124992 at the bottom right-hand corner
(6) the so-called what I'll call the funding
(7) resolution, I am confused about one thing,
(8) Ms. Turcotte, that you may be able to help me
(9) with:
(10)      If Mr Monty had the discretion not
(11) to fund Teleglobe and the debtors, its
(12) subsidiaries. Teleglobe's subsidiaries if
(13) Mr Monty had the discretion not to fund the
(14) 850 million up to 850 million, why was it
(15) necessary to go back to the board on April
(16) the 23rd, 2002 for the board decision that was
(17) made on that date the BCE board?
(18)      MR. SCHIMMEL: Object to form
(19)    Q   In your view
(20)    A   Because this was a major decision
(21) that would have a consequence on Teleglobe,
(22) Inc., and given the massive -- I won't call it
(23) it investment since you don't like that, but
(24) the massive purchase price of 7.4 billion as
(25) well as the U.S. 1.3 billion we had already

Page 407

(1) invested in Teleglobe, this is something that
(2) needed to go back to the board.
(3)   Q   Help me understand that The board
(4) had given Mr Monty the discretion on
(5) November 28, 2001 to contribute zero or to
(6) contribute $850 million or anything in
(7) between, correct?
(8)   A   In the context of the BCE business
(9) plan which incorporated Teleglobe business
(10) plan.
(11)   Q   So the answer to my question is yes
(12) with that explanation?
(13)   A   In that context, yes.
(14)   Q   Then are we agreed that Mr Monty
(15) did not need to go back to the board if he
(16) didn't want to provide any more funding to
(17) Teleglobe?
(18)   MR. SCHIMMEL:  Object to form.
(19)   Q   He had the ability to simply stop
(20) funding Teleglobe, didn't he?
(21)   A   He had the ability to stop funding
(22) Teleglobe, yes.
(23)   Q   Then I am -- I remain confused
(24) about why he went back to the BCE board on
(25) April 23. 2002

Page 408

(1)   MR. SCHIMMEL:  Object to form
(2)   A   My answer to that is essentially
(3) that the consequences of ceasing funding would
(4) be material on Teleglobe and our investment in
(5) Teleglobe and needed -- he needed to apprise
(6) the board of that and the status of Teleglobe.
(7)   Q   In other words, the 7 4 billion
(8) purchase price would effectively have to be
(9) written off by BCE; is that right?
(10)   MR. SCHIMMEL:  Object to form
(11)   A   That is one possibility, yes.
(12)   Q   Is that why -- there was a material
(13) prospect of that; is that right?
(14)   MR. SCHIMMEL:  Object to form
(15)   A   Well, I think, as a result of
(16) ceasing to the funding, yes. There was a
(17) material prospect of that, yes.
(18)   Q   Mr. Monly recognized that when he
(19) went back to the board on April 3rd?
(20)   MR. SCHIMMEL:  Object to form
(21)   A   I can't speak for Mr. Monty.
(22)   Q   And the board recognized that?
(23)   MR. SCHIMMEL:  Object to form
(24)   Q   On April 23rd?
(25)   A   I would assume so, yes.

Page 409

(1)   Q   And Mr Sabia recognized that on
(2) April 23rd?
(3)   MR. SCHIMMEL:  Object to form
(4)   A   I can't answer for Mr. Sabia.
(5)   Q   Who drafted this resolution of
(6) November 28, 2001, the funding piece?
(7)   MR. SCHIMMEL:  Object to form
(8)   A   I can't recall.
(9)   Q   Were you involved in drafting?
(10)   A   I would have been involved in
(11) reviewing it for sure.
(12)   Q   Did Mr Lalande draft it?
(13)   MR. SCHIMMEL:  Object to form
(14)   A   He could be. I just don't remember
(15) who drafted it, but it would have been a
(16) lawyer drafting it, yes.
(17)   Q   Why was the adoption -- why was the
(18) BCE s board's adoption of this funding
(19) resolution, this November 28 2001 funding
(20) resolution why was the board s adoption of
(21) this not described and reported publicly in
(22) the AIF or in the annual report or in any
(23) other public filing for BCE or Teleglobe?
(24)   MR. SCHIMMEL:  Object to form
(25)   A   Because we never published the

Page 410

(1) authorizations of the board. What we did
(2) publish, or if you want to make public, is the
(3) statement of intention to contribute up to
(4) Canadian $1 billion.
(5)   Q   But that statement doesn t say
(6) anything about the fact that the board had
(7) approved this authorization up to 850 million
(8) U S ?
(9)   A   Because there is no need to.
(10)   Q   It doesn t say anything about the
(11) fact that the board had placed discretion in
(12) Mr Monty's hands?
(13)   A   I agree. It doesn't say that.
(14)   Q   Why not?
(15)   MR. SCHIMMEL:  Object to form
(16)   A   Because it doesn't need to.
(17)   Q   You think that's not material?
(18)   MR. SCHIMMEL:  Object to form
(19)   A   What is material is the fact that
(20) we said we have a statement of intent -- we
(21) intend to fund up to Canadian $1 billion, and
(22) that was disclosed.
(23)   Q   And you put the discretion in the
(24) hands of Mr Monty? BCE put the discretion in
(25) the hands of Mr Monty; is that correct?

BSA XMAX(21/21)
TELEGLOBE COMMUNICATIONS                                    VS BCE, INC
MARTINE TURCOTTE - 10/14/05

Page 411

(1)        MR. SCHIMMEL: Objection to form
(2)    A    That's correct, as CEO of BCE, Inc.
(3)    Q    Is it your testimony that the fact
(4)  that Mr Monty had that discretion was not
(5)  material?
(6)        MR. SCHIMMEL: Object to form
(7)    Q    For purposes of disclosure in
(8)  the --
(9)    A    Are you asking me for legal advice?
(10)   Q    I'm asking you for your view
(11)   A    I think it's embedded in the
(12)  statement of intention that the company tends
(13)  to contribute up to Canadian $1 billion.
(14)  There is no obligation set within that.
(15)   Q    Mr Monty was also chairman and CEO
(16)  of TI?
(17)   A    That's correct.
(18)   Q    Of Teleglobe Inc ?
(19)   A    That's correct.
(20)   Q    It was not disclosed in the AIF or
(21)  in any other public filing that BCE had vested
(22)  Mr Monty, the same gentleman who was TI's
(23)  chairman and CEO, with this authority, was it?
(24)   A    It was not disclosed because it did
(25)  not need to be disclosed.

Page 412

(1)    Q    Why not?
(2)    A    Because, number 1, it was common
(3)  knowledge that Mr. Monty was both the CEO of
(4)  BCE, Inc. and the chairman of Teleglobe, and I
(5)  think that was reported in both sets of public
(6)  documents and it was common knowledge.
(7)        It's common knowledge also that
(8)  basically a company acts through its senior
(9)  management. It's the board who delegates to
(10)  senior management.
(11)   Q    But it wasn't common knowledge that
(12)  the BCE board on November 28, 2001 had given
(13)  Mr Monty, who was also the chair and CEO of
(14)  TI. the discretion that is set out in
(15)  paragraph 4D of the funding resolution  was
(16)  it?
(17)       MR. SCHIMMEL: Object to form
(18)   A    Where I disagree with you is it did
(19)  not need to be disclosed, because what we
(20)  disclosed was that BCE intended to fund
(21)  Teleglobe, Inc. up to Canadian $1 billion.
(22)   Q    But it wasn't disclosed that the
(23)  discretion, unfettered discretion, was given
(24)  to the gentleman who was also the chairman and
(25)  CEO of TI; is that right?

Page 413

(1)        MR. SCHIMMEL: Object to form.
(2)    A    You're right. It was not, and you
(3)  can read the documents. It is a public
(4)  document.
(5)    Q    Is it your view that that just was
(6)  not material?
(7)    A    I agree it's not material because
(8)  there is no obligation. The statement of
(9)  funding, the intention to fund, was set out in
(10)  the public securities documents.
(11)   Q    So you don't think that the
(12)  bondholders, the publicly traded debt,
(13)  Teleglobe's publicly traded debt, you don't
(14)  think the owners of the bonds would have found
(15)  it significant to know that BCE had given the
(16)  chairman and chief executive officer of TI the
(17)  discretion stated in 4D of this November 28th
(18)  resolution?
(19)   A    No
(20)       MR. SCHIMMEL: Object to form
(21)   Q    You don't think that's important?
(22)   A    No.
(23)   Q    You don't think that it would be
(24)  important for those bondholders to know that
(25)  Mr Monty had the discretion to contribute up

Page 414

(1)  to 850 million but hadn't committed it all?
(2)        MR. SCHIMMEL: Object to form
(3)    A    I disagree with you in the sense
(4)  that the bondholders could read the securities
(5)  filings which stated that BCE had an intention
(6)  to contribute up to $1 billion, and before
(7)  making that statement of intention you would
(8)  have assumed that the company had the
(9)  authority to do so. We are not in the habit
(10)  of publicizing board authorizations.
(11)   Q    I'm not talking about the company.
(12)  I'm talking about the man who was also
(13)  chairman and CEO of TI
(14)       MR. SCHIMMEL: Object to form
(15)   A    And your question is?
(16)   Q    And my question is you don't think
(17)  it would be important to the market to know
(18)  that Mr. Monty who was also chairman and CEO
(19)  of TI had this authority?
(20)   A    No, because it was common knowledge
(21)  that Mr. Monty was the CEO of BCE, Inc. and
(22)  the chairman of Teleglobe. It was common
(23)  knowledge.
(24)   Q    We have been down this road before
(25)   A    Yes.

Page 415

(1)    Q    And I think we will come back to
(2)    it —
(3)    A    That's fine.
(4)    Q    — in the trial
(5)    A    That's fine
(6)    Q    Do you think it would have been
(7)    material to Lazard to know that Mr Monty, who
(8)    was also chairman and CEO of TI. had been
(9)    given the authority by BCE's board to
(10)   contribute up to 850 million to Teleglobe?
(11)        MR. SCHIMMEL: Object to form
(12)    A    You're presuming they weren't
(13)   aware, which as I have told you, I don't
(14)   recall whether they were told or not up to
(15)   what the authorization was, but they certainly
(16)   were aware of the statement of intention to
(17)   fund to – up to Canadian $1 billion.
(18)    Q    I m not presuming anything  I'm
(19)   simply asking the question: Do you think it
(20)   would have been important for Lazard to know?
(21)    A    To me it's irrelevant.
(22)        MR. SCHIMMEL: Object to form
(23)        THE WITNESS: Because all this is
(24)    is a statement of intention which was
(25)    public that we were prepared as BCE to

Page 416

(1)    advance  and we had the intention to
(2)    advance up to $1 billion Canadian
(3)    Q    In considering restructuring
(4)    alternatives, in considering the interests of
(5)    the different constituencies that were present
(6)    and all the things that Lazard was
(7)    considering  do you think that – would it
(8)    have been or was it important for Lazard to
(9)    know that Mr Monty had been given this
(10)   authority?
(11)        MR. SCHIMMEL: Object to form
(12)    A    Where I disagree with you again is
(13)   I think you're making a premise that there was
(14)   an obligation to advance, and you're making
(15)   the premise that Lazard did not know about the
(16)   statement to fund a further -- the additional
(17)   $1 billion Canadian which they were aware of.
(18)    Q    Ma'am. I am not asserting a premise
(19)   at all  I am simply asking a question
(20)        MR. COCHRAN: I would ask the court
(21)    reporter to please read my question back
(22)        (Whereupon the record was read back
(23)    by the reporter.)
(24)        MR. SCHIMMEL: Object to form
(25)    A    I think that's speculative. You

Page 417

(1)    should ask Lazard.
(2)    Q    Perhaps we will
(3)    A    No problem.
(4)    Q    Let's go back to Exhibit 39D, your
(5)    markup of the Lazard engagement letter
(6)    A    Yes.
(7)    Q    In particular the page with the
(8)    production number GEN046728  Are you with me?
(9)    A    Yes.
(10)    Q    If you look at subparagraph M in
(11)   the original Lazard draft, it reads, "Advise
(12)   and attend meetings of the company's board of
(13)   directors "
(14)        You suggested changes to that in
(15)   your handwriting; is that right?
(16)    A    That's correct.
(17)    Q    That line?
(18)    A    Yes.
(19)    Q    And you wrote, "And assist the
(20)   company in preparing presentations for ' and
(21)   then you also wrote  "And the BCE, Inc  board
(22)   of directors," right?
(23)    A    Yes.
(24)    Q    With your changes. this provision
(25)   of the Lazard engagement letter would read,

Page 418

(1)    "M  advise and assist the company in preparing
(2)    presentations for and attend meetings of the
(3)    company s board of directors and the BCE board
(4)    of directors '?
(5)    A    Yes.
(6)    Q    Why did you suggest those changes?
(7)    A    Because as the parent company BCE,
(8)    Inc., we may have needed Lazard to come to the
(9)    BCE, Inc  board of directors to make a
(10)   presentation on the status of Teleglobe's
(11)   restructuring and business plan, so this is
(12)   not unusual  This is a precedent. We do
(13)   that, again, all the time on major
(14)   transactions
(15)    Q    If BCE needed that, why didn t BCE
(16)   engage Lazard?
(17)        MR. SCHIMMEL: Object to form
(18)    A    Because this is something we put as
(19)   a precedent, because the company first and
(20)   foremost acts for Teleglobe, Inc. and normally
(21)   it has covenants, as you have showed me, that
(22)   you can't talk to anybody without the consent
(23)   of Lazard.
(24)        So we say that we want in advance
(25)   for you to agree that it should be needed that

BSA XMAX(23/23)

TELEGLOBE COMMUNICATIONS                                VS BCE, INC

MARTINE TURCOTTE - 10/14/05

---

Page 419

(1) we would like you to be present at the BCE,
(2) Inc. board of directors as the parent company.
(3) This is again --
(4)    Q    Why wouldn't you simply go to
(5) Teleglobe's management and say. Would you
(6) please ask your BCE investment banker to come
(7) to the BCE board meeting?"
(8)        MR. SCHIMMEL: Object to form
(9)    A    Because the at end of the day they
(10) can say, "It's not under the engagement letter
(11) and we are going to charge you more for that."
(12)    Q    So?
(13)        MR. SCHIMMEL: Object to form
(14)    A    Why would Teleglobe pay more for
(15) that?
(16)    Q    Why wouldn't BCE pay for that?
(17)        MR. SCHIMMEL: Object to form
(18)    A    Mr. Cochran, this is something that
(19) we put in all the engagement letters because
(20) it makes sense.
(21)    Q    So you would want for Teleglobe to
(22) pay Lazard to make -- to assist in preparing
(23) presentations for the BCE board of directors?
(24)    A    That's not what I'm saying
(25)    Q    Then what are you saying?

---

Page 420

(1)    A    Lazard was not there to prepare and
(2) assist in the presentation. It's really more
(3) to attend the meetings. If it's required at
(4) the BCE board of directors. This is not
(5) unusual for a wholly-owned subsidiary and, in
(6) fact, if you look at, "Presentations for,"
(7) there is a comma after.
(8)    Q    But again, this wholly-owned
(9) subsidiary, BCE, was in the process of
(10) considering whether to discontinue funding for
(11) it, right?
(12)        MR. SCHIMMEL: Object to form
(13)    A    I disagree. At the time of March
(14) we were looking at potentially still putting
(15) some money into the company when Lazard was
(16) hired.
(17)    Q    Who decided not to?
(18)        MR. SCHIMMEL: Object to form
(19)    Q    Who decided to recommend not to?
(20)        MR. SCHIMMEL: Object to form
(21)    A    Not to what?
(22)    Q    Not to put money into the company.
(23)    A    The board of directors of BCE, Inc.
(24)    Q    Who decided to recommend that to
(25) the board?

---

Page 421

(1)        MR. SCHIMMEL: Object to form
(2)    A    The senior management of BCE, Inc.
(3)    Q    Mr Monty?
(4)    A    Mr. Monty, as CEO of BCE, Inc.,
(5) made the recommendation to the board of BCE,
(6) Inc.
(7)    Q    When was it that he -- you say at
(8) this point. This would be mid -- this would
(9) be the end of March, March 25, 2002?
(10)    A    Well, actually it refers to the
(11) engagement of Lazard at the beginning of
(12) March 21.
(13)    Q    But your handwritten comments are
(14) on a fax dated March 25 2002, Ms Turcotte?
(15) Stick with me. Do you see that?
(16)        MR. SCHIMMEL: Object to form and
(17)    argumentative
(18)    A    I do see that.
(19)    Q    At this point you say you were
(20) still -- it was still being considered that
(21) BCE would put money in; is that right?
(22)    A    That's correct, yes.
(23)    Q    Well, when was that taken off the
(24) table?
(25)        MR. SCHIMMEL: Object to form

---

Page 422

(1)    A    Probably towards the end -- towards
(2) mid April.
(3)    Q    It was Mr Monty ultimate who made
(4) that decision?
(5)        MR. SCHIMMEL: Object to form
(6)    A    No.
(7)    Q    Made that recommendation?
(8)    A    Made that recommendation.
(9)        MR. SCHIMMEL: Object to form
(10)    THE WITNESS: That's my
(11)    understanding, yes
(12)    Q    Take a look under information
(13) number 3
(14)    A    Yes
(15)    Q    Again, on this page. on 39D
(16) GEN046728 The first sentence there would
(17) have read or did read in Lazard's initial
(18) draft, and you can follow with me, "In
(19) connection with Lazard's activities on the
(20) Company's behalf, the Company will cooperate
(21) with Lazard and will furnish to, or cause to
(22) be furnished to Lazard, any and all
(23) information and data concerning the Company
(24) (the Information') which Lazard deems
(25) appropriate and will provide Lazard with

---

Page 423

(1) access to the Company's officers, directors,
(2) employees, appraisers, independent
(3) accountants, legal counsel and other
(4) consultants and advisors '
(5)       In your markup of that draft, you
(6) would start -- you suggested striking the
(7) latter part, portion. That is the portion
(8) that reads, "And will provide Lazard with
(9) access to the company's officers, directors
(10) employees, appraisers, independent
(11) accountants, legal counsel and other
(12) consultants and advisors."
(13)      Do you see that?
(14) A    Yes.
(15) Q    Why did you suggest striking that
(16) language?
(17) A    Because, again, as a precedent, we
(18) always do that because we don't want Lazard
(19) representative to go talk on a fishing -- not
(20) on a fishing expedition, but to disrupt the
(21) operation at all levels, so they have to talk
(22) to senior management of Teleglobe, Inc. who
(23) will decide who they have access to, because
(24) otherwise they go all over the place. Legal
(25) counsel then starts to charge Teleglobe. The

Page 424

(1) accountants start to charge Teleglobe, other
(2) consultants. It s too vague. We don't allow
(3) that in engagement letters.
(4)       It doesn't mean they don't have
(5) access, but they have to ask Teleglobe, Inc
(6) for that access, and Teleglobe, Inc. will
(7) decide who they meet or not meet.
(8) Q    This is not what this says  This
(9) says --
(10) A    "And will provide Lazard with
(11) access.' As soon as you say that, what it
(12) means is that Lazard representative can call
(13) anyone directly and talk to them and so forth
(14) without senior management of Teleglobe, Inc
(15) knowing.
(16) Q    Why didn't you simply write. "And
(17) such access shall be arranged through senior
(18) management of Teleglobe"?
(19)      MR. SCHIMMEL: Object to form
(20) A    Between you and I -- this Is
(21) something, we take it it out as a standard in
(22) our engagement letters because it does say,
(23) "Will furnish to," or, "Cause to be furnished
(24) to any and all information," and Teleglobe,
(25) inc. can always decide on its own who Lazard

Page 425

(1) has access. It doesn't stop Teleglobe, Inc.
(2) from deciding who has access, who Lazard has
(3) access to.
(4) Q    Who was going to decide that on
(5) behalf of Teleglobe Inc ?
(6) A    Teleglobe, Inc. senior management.
(7) Q    Who was that?
(8) A    It could be Mr. Monty, as chairman
(9) and CEO of Teleglobe, Inc  It could be
(10) Mr. Pichette. It could be John Burnett.
(11) Those are the people involved with Lazard.
(12) Q    John Burnett was not Teleglobe's
(13) senior management?
(14)      MR. SCHIMMEL: Object to form
(15) A    John Burnett was very much
(16) Teleglobe's senior management.
(17) Q    He was at TCC?
(18) A    TCC was the principal operating
(19) arms of Teleglobe. John Burnett was very much
(20) involved in this project.
(21) Q    So senior management of TI
(22) wasn't — you say TCC was the principal
(23) operating arm of Teleglobe?
(24) A    Of Teleglobe, Inc , yes.
(25) Q    Effectively Teleglobe. Inc 's

Page 426

(1) business was through TCC; is that right?
(2)      MR. SCHIMMEL: Object to form.
(3) A    As a principal operating
(4) subsidiary, that's correct
(5) Q    Teleglobe, Inc  was effectively the
(6) holding company, right?
(7) A    It was  You're correct, yes.
(8) Q    And Teleglobe, Inc.. the function
(9) of the board there was ultimately to approve
(10) the budgets; is that right?
(11)      MR. SCHIMMEL: Object to form
(12) A    And the financing for GlobeSystems
(13) and a number of other things
(14) Q    And to approve the strategies?
(15) A    The planning, exercise, yes, but it
(16) all came from the principal operating
(17) subsidiary. You can't separate that.
(18) Q    You can't separate the principal
(19) operating subsidiary from Teleglobe, Inc
(20) effectively?
(21) A    No. What I mean is on a
(22) consolidated basis the information comes --
(23) you're talking about a planning -- the
(24) information comes from the operating
(25) subsidiaries into Teleglobe, Inc.

TELEGLOBE COMMUNICATIONS

BSA XMAX(25/25)
MARTINE TURCOTTE - 10/14/05

VS BCE. INC

Page 427

(1)    Q    And Teleglobe, Inc. then makes the
(2) decision based on the information?
(3)    A    Based on the information. That's
(4) correct.
(5)    Q    Thank you
(6)        It makes Teleglobe -- Teleglobe,
(7) Inc. makes the decision on what the strategy
(8) will be, what the budget will be, what the
(9) spending will be; is that right?
(10)        MR. SCHIMMEL:  Object to form
(11)    A    In conjunction -- yes, in
(12) conjunction with its senior management and the
(13) principal operating subsidiaries, of which TCC
(14) is the major operating subsidiary.
(15)    Q    But TCC couldn't just run off and
(16) if it wanted to open a new initiative, could
(17) it have, without TI's permission?
(18)        MR. SCHIMMEL:  Object to form
(19)    A    Yes, it could have.
(20)    Q    If TI didn't pass a budget that
(21) provided for that, what authority did TCC
(22) have?
(23)        MR. SCHIMMEL:  Object to form
(24)    A    Budgets can be amended all the
(25) time.

Page 428

(1)    Q    With TI's consent?
(2)    A    Not necessarily. If they had it
(3) within the schedule of authority and if it was
(4) within the overall budget, TCC could do with
(5) any overall budget
(6)    Q    The schedule of authorities that
(7) was approved by TI, right?
(8)        MR. SCHIMMEL:  Object to form
(9)    A    I believe there was one approved by
(10) TI that would be normal.
(11)    Q    And the budget that was approved by
(12) TI right?
(13)    A    Approved by TI but taking into
(14) account the operating budgets required by TCC
(15) and all the operating subsidiaries.
(16)    Q    Sure  But if it wasn't in that
(17) approved budget, that TI approved budget, or
(18) if it wasn't done pursuant to the TI-approved,
(19) scheduled authorities. TCC couldn't do it; is
(20) that right?
(21)        MR. SCHIMMEL:  Object to form
(22)    A    Normally it could not do something
(23) that was outside of the budget or outside the
(24) schedule of authority in a normal fashion
(25) without going back to the board of directors

Page 429

(1) of TI.
(2)    Q    Thank you
(3)        Taking a look at, back at
(4) GEN046728, this is Exhibit 39D  Let me see if
(5) there is anything else on this page we need to
(6) talk about  No  Let's see if there is
(7) anything else in this document  Just a
(8) moment
(9)        If you take a look at the page with
(10) the production number GEN046731, paragraph
(11) number 7, "Term.' there is a reference there
(12) to rider B  Do you see that?
(13)    A    Yes.
(14)        MR. COCHRAN:  Rider B was not
(15) attached to this document  I request,
(16) Mr Schimmel. that you provide us with
(17) rider B
(18)        MR. SCHIMMEL:  I'll take it under
(19) advisement
(20) REQUEST NOTED:
(21)    Q    If you take a look at heading
(22) number 8, "Miscellaneous Provisions "
(23)    A    Yes.
(24)    Q    The very first sentence we looked
(25) at it in the original draft provided by

Page 430

(1) Lazard. it begins, "Any financial advice,
(2) written or oral." Let me just read the whole
(3) thing  It's easier if I do it that way
(4)        "Any financial advice, written or
(5) oral. rendered by Lazard pursuant to this
(6) Agreement is intended solely for the benefit
(7) and use of the management and board of
(8) directors of the Company in considering the
(9) matters to which this Agreement relates, and
(10) the Company agrees that such advice may not be
(11) disclosed publicly or made available to third
(12) parties (other than management and the board
(13) of directors of BCE, Inc.) "
(14)        You added that  right?
(15)    A    I added that, right.
(16)    Q    And then Mr Swartz added, 'And the
(17) Company's legal and other advisors"; is that
(18) right? Am I reading that correctly?
(19)    A    Well, I'm not sure if you put it
(20) there or the other one.  Yes, you probably put
(21) it up there, yes.
(22)    Q    Why did you add the language,
(23) "Other than management and the board of
(24) directors of BCE"?
(25)    A    Because we always do that in the

Page 431

(1) context of a wholly-owned subsidiary or even a
(2) subsidiary in a transaction. We need
(3) information to go up as the parent company.
(4)    Q    You didn't want Lazard to be able
(5) to say no; is that right?
(6)       MR. SCHIMMEL: Object to form
(7)    A    I disagree.
(8)    Q    Then why would you add this?
(9)       MR. SCHIMMEL: Object to form
(10)   A    Because we always do, because we
(11) want information to flow up. It's normal
(12) between a subsidiary and the parent company to
(13) have information flow up on the major
(14) transaction.
(15)   Q    But this is a subsidiary company
(16) for which BCE was considering withdrawing
(17) funding?
(18)       MR. SCHIMMEL: Object to form
(19)   A    Mr. Cochran, this is not abnormal
(20) for a subsidiary to even include that language
(21) so it doesn't have -- basically it can tell
(22) Lazard: You will come with me to make a
(23) presentation or to provide the information to
(24) BCE, Inc.
(25)   Q    What you wanted in here was an

Page 432

(1) unfettered right to have access to the Lazard
(2) information; is that right?
(3)       MR. SCHIMMEL: Object to form
(4)    A    We wanted to have access to the
(5) Lazard information. That's correct.
(6)    Q    Just so I'm clear and we have it in
(7) one place in the transcript, why, why did you
(8) want access to the Lazard information, "you"
(9) being BCE?
(10)   A    Because we are the parent company
(11) of Teleglobe, Inc., and we want to have access
(12) to the information because it makes it more
(13) efficient at the end of the day as well. This
(14) is not unusual.
(15)   Q    So that you could make an informed
(16) decision so that BCE could make an informed
(17) decision as to whether that subsidiary should
(18) continue in business?
(19)       MR. SCHIMMEL: Object to form.
(20)   A    I think -- so we can make an
(21) informed decision as to the status and the
(22) viability of Teleglobe's business plan and
(23) restructuring alternatives so we can make a
(24) better informed decision as to whether or not
(25) to continue with long-term support of

Page 433

(1) Teleglobe in that context. This is not
(2) unusual.
(3)       THE WITNESS: I'm going to need a
(4) break.
(5)       MR. COCHRAN: Let's do it
(6)       THE VIDEOGRAPHER: We are now off
(7) the record at 11:53
(8)       (Whereupon a discussion was held
(9) off the record.)
(10)       THE VIDEOGRAPHER: We are now back
(11) on the record at 11:58
(12)   Q    Turcotte 39E, if you would. You'll
(13) see this is an e-mail from Mr Cossette to Jim
(14) Millstein. Marc Drouin and a copy to you and
(15) Michel Lalande dated March 25 2002
(16)       If you look within the document,
(17) you'll see this was apparently a collection of
(18) the comments on the Lazard letter from the BCE
(19) side and it was sent back to Lazard Do you
(20) see that?
(21)   A    I see that, yes.
(22)   Q    Do you recognize it?
(23)       MR. SCHIMMEL: Object to form
(24)   A    I probably saw it since I'm copied
(25) on it

Page 434

(1)    Q    A couple of minor things here
(2) Under "Assignment scope," are you with me?
(3)    A    Yes.
(4)    Q    In the draft production number
(5) BCE-AD0169441, "Assignment scope, it looks
(6) like the decision was made to stay with the
(7) company; do you see that, and not go to
(8) Teleglobe which is what you had suggested?
(9)    A    Yes.
(10)   Q    Can you say why that was?
(11)   A    I don't recall.
(12)   Q    I think that's it for that one
(13)       Let's take a look at the next one
(14) roughly four days later, Mr Drouin,
(15) D-R-O-U-I-N?
(16)   A    It's a difficult name even in
(17) French.
(18)   Q    Mr Drouin. Marc Drouin apparently
(19) sent to you Lazard's comments on BCE's
(20) comments Do you recognize this?
(21)       MR. SCHIMMEL: Object to form
(22)   A    I probably saw it since it was sent
(23) to me, yes
(24)   Q    If you take a look at the draft, it
(25) begins -- the draft bearing Lazard's comments