# EXHIBIT 43
# PART B

Page 435

(1) on BCE's comments, it begins at BCE-AD0407841
(2) Are you with me?
(3)    A    Yes.
(4)    Q    This is the draft of March 29
(5) 2002  If you would turn to the third page of
(6) that document
(7)    A    Which is 843?
(8)    Q    843  M, subparagraph M is that
(9) same subparagraph relating to presentations to
(10) the boards of directors, and it would now read
(11) as Lazard further modified it as follows:
(12)        "Advise and assist the Company in
(13) preparing presentations for, and attend
(14) meetings of. the Company's board of directors
(15) and, at the Company's direction, the BCE, Inc
(16) board of directors."
(17)        Why was that change suggested?
(18)        MR. SCHIMMEL: Object to form
(19)    Q    By Lazard?
(20)    A    I don't know.  You have to ask
(21) them.
(22)    Q    Was any explanation offered to you?
(23)    A    No.  I mean, we would receive this
(24) and so forth, so I don't know
(25)    Q    Did you have any discussion with

Page 436

(1) anyone about Lazard s request to include the
(2) language at the company s direction?
(3)    A    I don't recall specifically.
(4)    Q    You will see under information
(5) number 3 Lazard apparently reinserted the
(6) language that you look out to the effect that
(7) the company will provide Lazard with
(8) reasonable access -- are you with me?
(9)    A    Yes.
(10)    Q    -- to the company's officers
(11) directors  employees. appraiser, independent
(12) accountants. legal counsel and other
(13) consultants and advisors.
(14)    A    Yes.
(15)    Q    Did you have discussions with
(16) anyone about why Lazard wanted that language
(17) put back in?
(18)    A    Not -- I don't recall specifically.
(19)    Q    Do you have any general
(20) recollection?
(21)    A    I don't recollect. I don't know if
(22) they added the word "reasonable" actually from
(23) the last draft as opposed to having just
(24) access. If we go back to the information,
(25) they added the word "reasonable" in there.

Page 437

(1)    Q    Was that discussed with you?
(2)    A    It could very well be  I just
(3) don't specifically recall and I don't know
(4) what we did, which I'm sure you'll show me.
(5)    Q    Maybe
(6)    A    Maybe not.  It will be the suspense
(7) of the day.  Since I can't look at anything,
(8) you'll leave me with the question.
(9)    Q    Don t worry  It's really not that
(10) painful.
(11)    A    It is a suspense, though.
(12)    Q    It will be over soon
(13)    A    It's like building it up.
(14)        MR. COCHRAN: Let's go off the
(15) record.
(16)        THE VIDEOGRAPHER: We are now off
(17) the record at 12:05
(18)        (Whereupon a discussion was held
(19) off the record.)
(20)        THE VIDEOGRAPHER: We are now back
(21) on the record at 12:06
(22)        MR. COCHRAN: After our humorous
(23) interlude, and I will say on the record
(24) at some point Ms  Turcotte and I will
(25) make up over all of this. I promise you

Page 438

(1)        THE WITNESS: No problem
(2)    Q    In any event  under  Miscellaneous
(3) provisions --
(4)    A    Which is at the end?
(5)    Q    Yes
(6)    A    846.
(7)    Q    Number 8, 846  That same language
(8) relating to making available Lazard's work
(9) product to BCE is modified again to include at
(10) this point apparently Lazard s suggestion
(11) that, Such be at the direction of the
(12) Company ' meaning Teleglobe
(13)        Are you with me?
(14)    A    Yes.
(15)    Q    Was there discussion about why
(16) Lazard wanted that change?
(17)    A    Probably. I just can't recall
(18) specifically, but probably.
(19)    Q    Who on behalf of the company, that
(20) is Teleglobe, was it that would give such
(21) consent?
(22)        MR. SCHIMMEL: Object to form
(23)    Q    That is this provision number 8,
(24) miscellaneous provisions number 8  First
(25) paragraph talks about disclosing Lazard's work

Page 439

(1) product to third parties including at the
(2) direction of the company, that is --
(3)   A    The company being Teleglobe and its
(4) controlled subsidiaries, including TCC
(5)   Q    Correct
(6)   A    My view that would be -- it's not
(7) spelled out, but my view it would be Charles
(8) Childers, Patrick Pichette and John Burnett.
(9)   Q    Was John Burnett ever asked to
(10) consent to share Lazard's work product with
(11) BCE?
(12)     MR. SCHIMMEL: Object to form
(13)   A    I wouldn't know that.
(14)   Q    Do you know who, if anyone  at
(15) Teleglobe gave consent for Lazard to share or
(16) direction for Lazard to share its work product
(17) with BCE?
(18)     MR. SCHIMMEL: Object to form
(19)   A    I don't know  You would have to
(20) ask Lazard.
(21)   Q    Turcotte Exhibit 39G
(22)   A    That's the next one?
(23)   Q    Yes  This apparently handwritten
(24) markings on the March 29th draft forwarded by
(25) Lazard, only this one is in the copyright form

Page 440

(1) as opposed to the track change form, and it
(2) has the handwritten notes on it
(3)     Do you know whose handwriting this
(4) is?
(5)   A    No, I don't recognize it
(6)   Q    Mr Cossette?
(7)   A    I don't think so.
(8)   Q    How about Mr Lalande?
(9)   A    I don't think so. I don't know.
(10)   Q    At the top there it says --
(11)   A    I can't recognize it.
(12)   Q    If you look under information.
(13) page 3 of this draft, BCE-AD0025544
(14)   A    Yes.
(15)   Q    And if you want to read the
(16) language under the heading number 3
(17) information that follows that, you'll see that
(18) over on the next page the word "internal" is
(19) suggested to go in front of "legal counsel "
(20)   A    Yes.
(21)   Q    Do you know who made that
(22) suggestion?
(23)   A    I don't know
(24)   Q    Do you know why it was made?
(25)   A    Probably because -- it does make

Page 441

(1) sense to me as opposed to going to outside
(2) counsel, that it be -- that's where, if you
(3) say reasonable access, at least you know
(4) internal counsel is not going to charge. That
(5) is actually a good suggestion.
(6)   Q    Why wouldn't you give Lazard
(7) external legal counsel?
(8)     MR. SCHIMMEL: Objection to form
(9)   A    It's not that you don't give them
(10) access. It's a question of that first they
(11) have to ask the company  This is again
(12) something we would make on our own.
(13)   Q    Mr Swartz, Jay Swartz, if you look
(14) back at your handwritten markup of this which
(15) I think was D, 39D, and Mr Swartz responded
(16) to your inquiries, he's a member of the Davies
(17) Ward firm, right?
(18)   A    That's correct, yes.
(19)   Q    Who was he representing when
(20) responding to your inquiries?
(21)     MR. SCHIMMEL: Object to form
(22)   A    On March 25th, Davies was acting
(23) for BCE, Inc  at that time.
(24)   Q    Why were you asking BCE, Inc 's
(25) lawyers to give comments on the Teleglobe

Page 442

(1) Lazard engagement letter?
(2)   A    To assist us to answer specific
(3) questions essentially.
(4)   Q    On BCE s behalf?
(5)   A    On BCE's behalf, yes.
(6)   Q    If this was Teleglobe's -- if
(7) Teleglobe was engaging Lazard for Teleglobe,
(8) why was it necessary to involve BCE's lawyer
(9) to protect BCE's interests?
(10)     MR. SCHIMMEL: Object to form
(11)   A    It's not to protect BCE's interest,
(12) but we asked them -- again, from a governance
(13) point of view we had some specifics questions,
(14) especially as they relate to a restructuring
(15) engagement, and we had specific questions.
(16)   Q    Well, there are a number of
(17) comments here by Mr -- apparently by
(18) Mr Swartz that don't relate to specific
(19) questions
(20)     MR. SCHIMMEL: Object to form.
(21)   Q    I'm just looking at his
(22) handwriting  He inserts on the first page the
(23) reference to the Canada Business Corporations
(24) Act, but there is no question --
(25)   A    That's correct, but this was sent

TELEGLOBE COMMUNICATIONS
BSA XMAX(29/29)
MARTINE TURCOTTE - 10/14/05
VS. BCE. INC

---

Page 443

(1) to him, as you can see on the next page where
(2) I had asked him specific questions.
(3)     The fact that he commented on other
(4) things is -- I can't stop outside counsel from
(5) commenting, unfortunately.
(6)     Q    So you didn't ask him to comment?
(7)     A    Not that I recall. This looks more
(8) if I had specific questions. I may have asked
(9) him to review if there is anything missing,
(10) but in the context of a restructuring.
(11)    Q    Well, why would you do that?
(12)    MR. SCHIMMEL: Object to form
(13)    Q    If he was BCE's lawyer?
(14)    A    Because he's a restructuring
(15) expert. I'm not. In the context of
(16) engagement letters, I'm used to this, but am I
(17) missing something that we could pass on that
(18) would be important in our interest and in the
(19) interest of Teleglobe, Inc.?
(20)    Q    So you were seeking his advice for
(21) the benefit of Teleglobe?
(22)    A    No, for the benefit of BCE, Inc.
(23)    Q    Then I guess I'm confused
(24)    MR. SCHIMMEL: Object to form
(25)    A    The benefit to BCE, Inc., at the

---

Page 444

(1) end of the day when I'm reviewing this in the
(2) context of the engagement being in the context
(3) of a restructuring as a restructuring exert,
(4) and are we missing any elements that we should
(5) pass on. So it is a pure -- from a governance
(6) point of view, I think this is a good thing to
(7) do.
(8)     Q    But from a legal point of view, who
(9) was he representing?
(10)    A    BCE, Inc
(11)    Q    If you take a look at Turcotte
(12) 39H -- are you with me?
(13)    A    Yes.
(14)    Q    There was some gap in the back and
(15) forth of the drafts when we looked through the
(16) production at March 29th, and we didn't have
(17) anything until approximately April 11, 2002
(18)    Was there a period where this
(19) engagement letter sort of sat and people were
(20) on to other things and hadn't finalized it?
(21)    MR. SCHIMMEL: Object to form
(22)    A    I don't recall, but it could very
(23) well be
(24)    Q    Apparently on April 11, 2002
(25) Mr Cossette copied you on his e-mail to Marc

---

Page 445

(1) Drouin of Lazard attaching the latest comments
(2) to the engagement letter.
(3)     Do you recognize this?
(4)     A    Yes. I mean, I see it. I see it's
(5) addressed to me, so I probably saw it again.
(6)     Q    I'm sorry. Do you recognize it?
(7)     A    In the sense that I recognize it,
(8) it is the engagement letter. I don't know if
(9) I actually looked at it, but I am copied on it
(10) so I did receive it.
(11)    Q    Then he says, 'We should try to
(12) have a quick call" -- Mr. Cossette in his
(13) e-mail says. "We should try to have a quick
(14) call tomorrow in order to finalize this
(15)    Was there something happening at
(16) this point that brought the engagement letter
(17) back to everyone's attention?
(18)    MR. SCHIMMEL: Object to form
(19)    A    No, I think it's just a
(20) continuation of. At some point you need to
(21) sign. This -- I mean, they have been on this
(22) since March 20th.
(23)    Q    Take a look at page 2 of this
(24) draft It has the production number
(25) BCE-AD0169429 Are you with me?

---

Page 446

(1)     A    Yes.
(2)     Q    Under, Restructuring services ?
(3)     A    Yes.
(4)     Q    The draft letter would have Lazard
(5) agreeing to assist Teleglobe and its
(6) controlled subsidiaries in, and among other
(7) things. "E: Advise the company on tactics and
(8) strategies for negotiating with its various
(9) groups of creditors "
(10)    Do you see that?
(11)    A    Yes, I do.
(12)    Q    Was BCE a creditor of Lazard as at
(13) April 11, 2002?
(14)    MR SCHIMMEL: Object to form
(15)    A    A creditor of Lazard?
(16)    Q    Strike that A creditor of
(17) Teleglobe
(18)    Was BCE a creditor of Teleglobe
(19) either TI or any of the debtors?
(20)    A    It was a creditor in the sense of
(21) we had U.S, maybe a bit less than U.S.
(22) $300 million advance at the time, yes.
(23)    Q    How was it that Lazard was going to
(24) help Teleglobe and its controlled subsidiaries
(25) develop tactics and strategies for negotiating

---

Page 447

(1)  with BCE in BCE's capacity as a creditor?
(2)      MR. SCHIMMEL: Object to form
(3)      A    BCE is only one creditor. There
(4)  are many other creditors.
(5)      Q    I understand that, but how was it
(6)  anticipated that Lazard was going to help
(7)  Teleglobe develop tactics and strategies for
(8)  negotiating with BCE?
(9)      MR. SCHIMMEL: Object to form
(10)     A    I'm not sure I understand your
(11) question. How was it that it was going to
(12) help?
(13)     Q    Yes
(14)     A    Well, it was going to advise
(15) Teleglobe.
(16)     Q    How? In what respects?
(17)     MR. SCHIMMEL: Object to form
(18)     A    I don't know how.
(19)     Q    But in that same letter, and we can
(20) go back through those same provisions. BCE was
(21) reserving the right to have access to Lazard's
(22) work product?
(23)     A    That's correct, as the parent
(24) company of Teleglobe, Inc.
(25)     Q    And BCE did have access —

Page 448

(1)      A    That is correct, yes.
(2)      Q    -- to Lazard's work product?
(3)      A    That's correct.
(4)      Q    So I'm confused about how Lazard
(5)  could effectively help Teleglobe develop
(6)  tactics and strategies for negotiating with
(7)  BCE
(8)      MR. SCHIMMEL: Object to form
(9)      Q    If BCE had access to Lazard's
(10) information
(11)     A    Well, again, we had access to the
(12) information as the parent company and the
(13) 100 percent shareholder of that company.
(14) That's not unusual.
(15)     Q    You had access to Lazard's
(16) opinions?
(17)     MR. SCHIMMEL: Object to form
(18)     A    I don't know if we have access to
(19) everything. You would have to ask Teleglobe,
(20) Inc. and Lazard if we had access to
(21) everything.
(22)     Q    So you think there were some Lazard
(23) materials that you didn't have access to?
(24)     A    I don't have knowledge of that.
(25)     Q    But you had access to Lazard's

Page 449

(1)  views regarding the solvency of Teleglobe?
(2)      MR. SCHIMMEL: Object to form
(3)      A    We had access to Lazard's views as
(4)  to the financial and business plan of
(5)  Teleglobe
(6)      Q    And you had access to Lazard's
(7)  views as to whether a restructuring of
(8)  Teleglobe was viable?
(9)      A    We had access to those views, yes.
(10)     Q    You had access to Lazard's views as
(11) to whether Teleglobe had a viable business
(12) plan?
(13)     A    We had access to this in terms of
(14) they make presentation to both Teleglobe and
(15) BCE management.
(16)     Q    You had access to Lazard's views
(17) about how much additional capital Teleglobe
(18) might need in the context of a restructuring?
(19)     MR. SCHIMMEL: Object to form
(20)     A    They did make presentations in that
(21) context, yes.
(22)     Q    You had access to Lazard's views as
(23) to whether there could be a sale of Teleglobe?
(24)     A    We had access to that, yes, because
(25) we are, again, all in the context of us being

Page 450

(1)  the parent company and the 100 percent
(2)  shareholder of Teleglobe.
(3)      Q    Would you agree with me that all of
(4)  those things that you had access to would be
(5)  very valuable information for a creditor to
(6)  have in a negotiation with Teleglobe?
(7)      MR. SCHIMMEL: Object to form
(8)      A    I don't agree
(9)      Q    You don't agree? Why not?
(10)     A    Because we are not in a negotiation
(11) with Teleglobe at this point
(12)     Q    But you were a creditor?
(13)     A    We were both a creditor, but we
(14) were also the parent company and the
(15) 100 percent shareholder of Teleglobe, Inc.
(16)     Q    Did they owe you money or didn't
(17) they?
(18)     MR. SCHIMMEL: Object to form
(19)     A    They did owe us money, yes.
(20)     Q    Do you think they might have had a
(21) different view of why they owed you money?
(22)     MR. SCHIMMEL: Object to form
(23)     A    You would have to talk to
(24) Teleglobe.
(25)     Q    Apparently you did that through

Page 451

(1) Lazard?

(2) MR. SCHIMMEL: Object to form.

(3) A  No, we did that through senior

(4) management of Teleglobe.

(5) Q  Look at the next page  page 3

(6) A  That's not 430?

(7) Q  Yes  39H, BCE-AD0169430,

(8) subparagraph L.

(9) Among the things that Lazard is

(10) going to do for Teleglobe is assist in

(11) arranging financing, including debtor in

(12) possession or exit financing for the company

(13) How is it contemplated that Lazard was going

(14) to do that?

(15) MR. SCHIMMEL: Object to form

(16) A  Again, I don't understand your

(17) question. You would have to ask Lazard and

(18) Teleglobe.

(19) Q  What was your view when you were

(20) negotiating this engagement letter with

(21) Lazard?

(22) A  At this point, by April 11th I

(23) think we sent that to -- John Burnett was

(24) finalizing this letter

(25) Q  When did you first send this letter

Page 452

(1) to Mr Burnett?

(2) A  I can't recall.

(3) Q  I mean Mr Burnett is not on this

(4) e-mail from Cossette. 39H?

(5) A  No, but I believe after April 8th

(6) we did sent this on to John Burnett

(7) Q  I'll represent to you I haven't

(8) seen any e-mail or any indication that this

(9) draft engagement letter was sent to

(10) Mr Burnett prior to April 11, 2002, the date

(11) of this e-mail.

(12) A  Like I said, I'm not sure if it is

(13) after April 8th. At some point this was sent

(14) to John Burnett to finalize.

(15) Q  The fact of the matter is that it

(16) was sent to John Burnett just to sign, wasn't

(17) it?

(18) MR. SCHIMMEL: Object to form

(19) A  I disagree with you.

(20) Q  This thing had been negotiated --

(21) A  I actually disagree with you,

(22) because I think -- I believe I sent it at some

(23) point to John Burnett. What I'm not sure is

(24) on which date, and it was not for signature

(25) because I made comments to him, but I don't

Page 453

(1) know what the date was so I don't recall.

(2) Q  I have ten drafts in this

(3) collection under Exhibit 39 of this engagement

(4) letter where a myriad of comments are made,

(5) and Mr. Burnett isn't copied on any of these

(6) A  I agreed, they are not copied on

(7) this.

(8) Q  Can you say why Mr Burnett wasn't

(9) copied?

(10) A  Because normally in the governance

(11) process prior to April 8th we would have

(12) normally taken care of the engagement letters

(13) on behalf -- for the benefit of the

(14) subsidiaries but also looking at our interest.

(15) After April 8th, and you don't have

(16) it here, but I believe after April 8th I would

(17) have sent it to John Burnett, actually

(18) Q  Looking back at Turcotte 39H  as of

(19) April 11, 2002  Mr  Burnett is not on this

(20) e-mail forwarding comments on the Lazard

(21) engagement letter  right?

(22) A  You're right  He's not on this

(23) e-mail.

(24) MR. SCHIMMEL: Object to form.

(25) Q  On April 11th Lazard already made

Page 454

(1) three presentations to Monty, right?

(2) A  By the end of the day the

(3) engagement letter are often finalized way into

(4) a transaction. This is not unusual.

(5) Q  Lazard had already largely rendered

(6) its services by the time Mr  Burnett was given

(7) the engagement letter to sign?

(8) MR. SCHIMMEL: Object to form

(9) A  I disagree with "largely." They

(10) were still very much involved in the

(11) transaction.

(12) Q  They had made three of the four

(13) presentations to Monty?

(14) MR. SCHIMMEL: Object to form

(15) A  Not to Mr. Monty only but to

(16) Mr. Pichette. Mr. Childers I believe was

(17) involved as well.

(18) Q  Sure  They had basically done

(19) three quarters of their work

(20) MR. SCHIMMEL: Object to form

(21) A  I disagree with "three quarters of

(22) the work." Work was done after that date, in

(23) fact, if not more.

(24) Q  Are you talking about work that was

(25) done after April 23, 2002?

TELEGLOBE COMMUNICATIONS

BSA XMAX(32/32)
MARTINE TURCOTTE - 10/14/05

VS BCÉ, INC

Page 455

(1)      MR. SCHIMMEL: Object to form
(2)      A    No, I'm talking about April 11th.
(3)      Q    Between April 11th and April 16th,
(4)  you're saying -- April 16th is the date of the
(5)  last Lazard presentation to Monty  Are you
(6)  saying the majority of Lazard's work was done
(7)  between April 11th and April 16th?
(8)      A    No, what I'm saying is you would
(9)  have to ask Lazard, but Lazard worked quite a
(10)  bit beyond even April 23rd, but a lot of the
(11)  work was done by Lazard from that date on.
(12)     Q    Lazard's opinions regarding
(13)  restructuring of Teleglobe, regarding
(14)  liquidation of Teleglobe. regarding sale of
(15)  Teleglobe were all rendered before Mr  Burnett
(16)  was ever asked to execute the engagement
(17)  letter; isn't that correct?
(18)     MR. SCHIMMEL: Object to form
(19)     A    I disagree, because you're assuming
(20)  that the only ones are the four that I have
(21)  seen, but Lazard may have well have had other
(22)  meetings.
(23)     Q    Give me your best explanation for
(24)  why Mr Burnett was not copied on any of the
(25)  ten or so drafts of the engagement letter that

Page 456

(1)  you exchanged with Lazard as contained in
(2)  Exhibit 39.
(3)      MR. SCHIMMEL: Object to form
(4)      A    Why he was not copied?
(5)      Q    Yes
(6)      A    Because we would have done this on
(7)  their behalf during that period of time for
(8)  their engagement letters as we do for a lot of
(9)  subsidiaries in the BCE group as á
(10)  conglomerate.
(11)     Q    During that period of time  I'll
(12)  represent to you the last exhibit in this
(13)  collection  39J is dated April 12  2002  He
(14)  is not on that one. either
(15)     A    He is not on that one, but I
(16)  believe I did send a copy to him later on and,
(17)  in fact, to his counsel, but I don't remember
(18)  the date
(19)     Q    Who was his counsel?
(20)     MR. SCHIMMEL: Object to form
(21)     A    Jones Day in the U S., and by that
(22)  time after April 8th, sometime after
(23)  April 8th, Davies Ward as Canadian counsel.
(24)     Q    Which counsel did you send a copy
(25)  to?

Page 457

(1)      A    I believe both Jones Day and Davies
(2)  as well as John Burnett were sent a copy of
(3)  the engagement letter.
(4)      Q    After April 12th sometime?
(5)      A    After April 8th sometime.  I just
(6)  don't know what the exact date is.
(7)      MR. SCHIMMEL: Mr Cochran, I think
(8)  it is time for our lunch break.
(9)      MR. COCHRAN: Yes  Give me one
(10)  moment and we will finish this exhibit
(11)     MR. SCHIMMEL: Sure
(12)     THE WITNESS: That's fine
(13)     MR. COCHRAN: It may take longer
(14)  than one moment  Why don't we take five
(15)  more minutes and we will add five more
(16)  minutes on the other end of the lunch
(17)  break and finish out this exhibit, and
(18)  then we are done with it.
(19)     Q    391  it is an e-mail from
(20)  Mr Millstein to Mr. Cossette  you and
(21)  Mr Lalande.  Do you see it?
(22)     A    Yes.
(23)     Q    It's April 11th also
(24)  Mr. Cossette's e-mail, which was 39H, was 4:56
(25)  in the morning and this one from Mr Millstein

Page 458

(1)  back is 7:27 in the morning  Very early folks
(2)  up there
(3)      A    People did not sleep much.
(4)      Q    I guess not
(5)      Mr Millstein writes to the three
(6)  of you, "I reviewed this quickly and think we
(7)  can work out most of the issues raised, but in
(8)  light of the direction this is taking or may
(9)  take (a sale transaction) I think we need to
(10)  make sure that the letter works to provide us
(11)  with an M&A per our normal fee schedule upon
(12)  the sale of all or substantially all of the
(13)  assets of the Company, payable upon the
(14)  closing thereof whether or not a restructuring
(15)  transaction is agreed simultaneously
(16)  therewith  Happy to credit that fee against
(17)  the restructuring transaction fee if. as and
(18)  when that is payable."
(19)     What was happening here?
(20)     MR SCHIMMEL: Object to form
(21)     Q    What is your memory?
(22)     A    Well, this was after April 8th
(23)  where we made the announcement that we could
(24)  reconsider the providing long-term funding to
(25)  Teleglobe and, therefore, the potential

BSA XMAX(33/33)

TELEGLOBE COMMUNICATIONS     MARTINE TURCOTTE - 10/14/05     VS BCE INC

---

Page 459

(1) consequences of that may be a restructuring in
(2) the sale transaction or liquidation.
(3)     I think they wanted to — my
(4) understanding is these guys wanted to cover
(5) the second portion which would be in the
(6) mergers and acquisition, if you want, type of
(7) fee in the sale of assets that this would
(8) cover, which I believe it didn't before.
(9)     Q   But he writes in particular, 'But
(10) in light of the direction this is taking or
(11) may take"?
(12)     A   Or may take.
(13)     Q   "(A sales transaction)"?
(14)     A   Yes
(15)     Q   He's not referring to a
(16) liquidation?
(17)     A   No, not specifically, but I think
(18) the fact that we announce that we may
(19) reconsider the long-term funding sends you in
(20) a different direction, and potentially
(21) liquidation may be very much more of a
(22) scenario.
(23)     Q   Did you have discussions with him
(24) on this point that is the transaction was
(25) taking or the project was taking a different

---

Page 460

(1) direction?
(2)     A   No, not per se.
(3)     Q   What do you mean by, 'Not per se'?
(4)     A   Well, I didn't have a discussion
(5) that a sale transaction would be the only
(6) alternative at this point. This was in light
(7) of the engagement letter, and I think that's
(8) about the time I sent it to John Burnett.
(9)     And if I remember, I made the
(10) comment, "Let's make sure you don't pay too
(11) much, because these guys may not be the guys
(12) you want to have in a liquidation scenario,"
(13) because by that time E&Y, I believe, was also
(14) involved at the time.
(15)     Q   39J, let's see if we have anything
(16) on this one
(17)     You'll see that on 39J, if you look
(18) at the page with the production number ending
(19) 169395. that's the first page
(20)     A   Yes
(21)     Q   "Now is included in the engagement
(22) the concept of a sale transaction "
(23)     Do you see that under "Assignment
(24) Scope'?
(25)     A   Yes, as defined below, yes.

---

Page 461

(1)     Q   Why was that inserted?
(2)     A   Because I think they wanted to be
(3) involved if there was a sale of some --
(4) although I think it was provided before, but a
(5) sales transaction is defined -- let me see
(6) Where is it defined? I just don't find it
(7) defined, but I believe this may be in a
(8) liquidation scenario.
(9)     Q   Well, it says sale transaction
(10)     A   But we need to look at the
(11) definition, and I just can't find the
(12) definition.
(13)     Q   Well, take a look at --
(14)     A   Because it's not in the first part.
(15) It must be somewhere else.
(16)     Q   Well, there is a sales transaction
(17) fee?
(18)     A   But where is the definition of sale
(19) transaction?
(20)     Q   I don't know.
(21)     A   It doesn't look like it is defined,
(22) but I think based on his comment before when
(23) he says an M&A fee, an M&A fee is normally a
(24) percentage of the value of the sale of assets
(25) or in a mini transaction, so they wanted more

---

Page 462

(1) money, essentially, and to be sure to cover
(2) that.
(3)     Q   Was it the case that in a sale or a
(4) liquidation Lazard would not be providing
(5) advice to BCE?
(6)     MR. SCHIMMEL: Object to form
(7)     A   Well, they never provided advice to
(8) BCE.
(9)     Q   Let me state it differently: Was
(10) it the case that in a sale or liquidation of
(11) Teleglobe Lazard was not going to provide its
(12) opinions to BCE?
(13)     MR. SCHIMMEL: Object to form
(14)     A   I am not sure I understand, provide
(15) its opinions to Teleglobe and to BCE. I just
(16) don't understand.
(17)     Q
(18)     MR. COCHRAN: Let's take the lunch
(19) break
(20)     THE VIDEOGRAPHER: We are now off
(21) the record at 12:34
(22)     (Luncheon recess.)
(23)     (Time noted: 12:34 p.m.)
(24)
(25)       * * *

---

Page 463

(1)
(2)    A F T E R N O O N   S E S S I O N
(3)    (Time noted: 1:10 p.m )
(4)
(5)    THE VIDEOGRAPHER: This is tape 3
(6) of the deposition of Martine Turcotte
(7) We are now on the record at 1:10
(8)
(9)    MR. COCHRAN: Ms. Turcotte, another
(10) composite exhibit I sort of put together
(11) in this form to try to save us some time
(12) It would be 40 -- Turcotte Exhibit 40A
(13) through 40F  This is a collection of
(14) drafts of the confidentiality agreement
(15) between Teleglobe and Lazard
(16)    (Whereupon a collection of drafts
(17) of confidentiality agreement between
(18) Teleglobe and Lazard was marked as
(19) Turcotte Exhibit 40A through 40F for
(20) identification as of this date.)
(21)
(22) EXAMINATION (CONTINUED)
(23) BY MR. COCHRAN:
(24)    Q    If you would turn to the tab A, you
(25) will see, one, an e-mail from Mr Lalande to

Page 464

(1) Marc Drouin of Lazard attaching an initial
(2) draft of the confidentiality agreement
(3)    My first question for you is for
(4) whom was Michel LaLande acting? Who did he
(5) represent in connection with the negotiation
(6) of the confidentiality agreement?
(7)    A   I believe in this case Teleglobe,
(8) Inc.
(9)    Q    The draft covers Teleglobe, Inc 's
(10) associated companies  I believe including the
(11) debtors, the U S  debtors  Do you mean to
(12) exclude them?
(13)    A    Sorry, I don't.  I don't follow.
(14)    Q    In other words  did Mr Lalande
(15) also represent the U S  subsidiaries of
(16) Teleglobe to the extent they were to be
(17) covered by this confidentiality agreement?
(18)    MR. SCHIMMEL: Object to form.
(19)    A    I believe they represented
(20) Teleglobe, Inc., which is the party to this
(21) and because information may come from
(22) affiliates of Teleglobe, Inc., as I see here,
(23) but that is not unusual to include affiliates
(24) here, but he would have represented Teleglobe,
(25) Inc. here.

Page 465

(1)    Q    You will see under 40B, if you turn
(2) to 40B, another copy of the e-mail that
(3) Mr Lalande sent to Marc Drouin on March 21,
(4) 2002 attaching the draft confidentiality
(5) agreement  but this draft has handwritten
(6) markings on it
(7)    Do you see that?
(8)    A  Yes.
(9)    Q    Do you know whose handwriting that
(10) is?
(11)    A    No, I don't know.  No, I can't say.
(12)    Q    Turn to page, the page with the
(13) production number BCE-SUPP120112
(14)    A    Yes.
(15)    Q    There is a -- if you look down
(16) under heading number 2, "Confidentiality and
(17) Restricted Use.  the subparagraph C,
(18) subsidiary paragraph Romanette II, summarizing
(19) this, as I read it. it would preclude Lazard
(20) from disclosing the information as defined in
(21) the agreement to any other person without the
(22) written consent of the disclosing party.
(23) meaning Teleglobe and it's affiliates, and the
(24) word "written" is stricken here
(25)    Do you know -- were you involved in

Page 466

(1) discussions regarding the decision to strike
(2) the word  written" before consenting?
(3)    MR. SCHIMMEL: Object to form to
(4)    the preamble
(5)    A    Not that I recall.
(6)    Q    Do you know why it was stricken?
(7)    A    I don't know.
(8)    Q    Take a look at Turcotte 40C.  You
(9) will see this is an e-mail from Mr  Drouin to
(10) you dated March the 25th regarding the
(11) confidentiality agreement
(12)    Do you recognize it as such?
(13)    A    I recognize that I was sent -- I
(14) was the recipient, yes.
(15)    Q    Pardon?
(16)    A    I was the recipient.
(17)    Q    In this e-mail Mr Drouin is
(18) communicating with you about changes to the
(19) confidentiality agreement with respect to the
(20) word "hereunder." If you want to look back at
(21) the earlier draft with the handwritten notes
(22) on it  you will see in one of the paragraphs
(23) the word "hereunder."  It's the warranty
(24) paragraph. number 8.
(25)    Look back at 40B, paragraph 8 in

Page 467

(1) the draft, the word "hereunder " Do you see
(2) that?
(3)     A    That is slashed here?
(4)     Q    Yes  In Exhibit C, 40C his
(5) e-mail Mr Drouin is apparently commenting on
(6) that change to you  Do you see that?
(7)     A    Well, he is sending me the comment,
(8) yes.
(9)     Q    Who are you representing in the
(10) context of --
(11)    A    BCE.
(12)    Q    Why was BCE involved in negotiating
(13) the confidentiality --
(14)    A    I don't think it's negotiating, but
(15) again, it's in the governance model.  This
(16) type of thing is not setting precedence in
(17) terms of the covenants and so forth, but I
(18) don't know who made the comment "hereunder."
(19)    Q    We can skip 40D actually   I think
(20) we did that before
(21)         40E, Mr Drouin, this is an e-mail
(22) from Mr Drouin to you dated March the 26th,
(23) 2002 attaching the marked-up confidentiality
(24) agreement  Do you recognize it as such?
(25)    A    I see that it was addressed to me,

Page 468

(1) yes.
(2)     Q    You were acting on behalf of BCE
(3) here?
(4)     A    Of BCE, yes
(5)     Q    And then if you take a look at
(6) Turcotte Exhibit 40F, you will see this is the
(7) executed confidentiality agreement between
(8) Lazard and BCE – I'm sorry  Teleglobe
(9) You'll see Mr LaLande executes this
(10) apparently on behalf of Teleglobe
(11)         I take it he was acting for
(12) Teleglobe there?
(13)    A    As assistant corp. secretary, yes.
(14)    Q    He was authorized to execute this
(15) document?
(16)    A    Yes, confidentiality agreements,
(17) yes.
(18)    Q    Take a look under heading 2,
(19) 'Confidentiality and Restrictive Use,' in this
(20) final confidentiality agreement
(21)    A    On page 223?
(22)    Q    Yes  Are you with me?
(23)    A    Yes.
(24)         MR. COCHRAN:  I'll strike that
(25) Let's start ahead of that just to set

Page 469

(1)     some context
(2)     Q    If you look at under definitions,
(3) 1C "Information," you'll see that the
(4) definition of information includes  and I ll
(5) paraphrase  information sent by the disclosing
(6) party, Teleglobe or its associated companies
(7) to the receiving party and its affiliates,
(8) Lazard
(9)     A    Yes
(10)    Q    And then it goes down; if you read
(11) on  you will see about midway down this
(12) definition two words, "Associated Companies "
(13)    A    Yes.
(14)    Q    And after the words, 'Associated
(15) Companies," there is a comma, and it goes on
(16) to read. "Together with notes, analyses  work
(17) papers, compilations, comparisons  studies or
(18) other documents in tangible or intangible form
(19) prepared by any of the Receiving Party and/or
(20) its affiliates and/or their respective
(21) Representatives which contain  reflect or are
(22) based on or generated, in whole or in part,
(23) from such information."
(24)         Did you understand that Lazard's
(25) work product was covered by this

Page 470

(1) confidentiality agreement?
(2)         MR. SCHIMMEL:  Object to form as to
(3)     the partial reading and preamble
(4)         MR. COCHRAN:  Just object to form
(5)     That's enough  You put me on notice
(6)     That's all you need to do, and I won t
(7)     argue otherwise
(8)     A    Can I have the question again?
(9) Sorry.  It only says to the extent that it
(10) contains confidential information, they need
(11) to keep the confidentiality of that
(12) information in accordance with this agreement.
(13) That's what it says.
(14)    Q    Confidential information shared by
(15) Teleglobe, to the extent Lazard s work product
(16) was based on that, would you agree with me
(17) that Lazard's work product was confidential?
(18)         MR. SCHIMMEL: Object to form.
(19)    A    Only to the extent that it
(20) contained or reflected what is the finest
(21) confidential information vis-a-vis Teleglobe
(22) or any of its affiliates or its subsidiaries.
(23)    Q    Turning now to, with that
(24) definition in mind, heading number 2
(25) "Confidentiality and Restricted Use," are you

BSA XMAX(36/36)

TELEGLOBE COMMUNICATIONS                                    VS BCE, INC

MARTINE TURCOTTE - 10/14/05

---

Page 471

(1) with me?

(2)    A   Yes.

(3)    Q   Under this provision the receiving

(4) party agrees, if you look at B, that "The

(5) Information." it's a capital I, the definition

(6) we just looked at, "shall be kept confidential

(7) by the Receiving Party, its Affiliates and

(8) their respective Representatives."

(9)        Then under C, the receiving party

(10) agrees that it shall not in any manner

(11) whatsoever disclose or disseminate the

(12) information, and it goes on

(13)        Under Romanette II, it then adds,

(14) "To any other person upon the prior consent of

(15) the disclosing party."

(16)        Did anyone from Teleglobe, to your

(17) knowledge give consent to Lazard to share its

(18) work product with BCE?

(19)        MR. SCHIMMEL:  Object to the

(20)    preamble in the question

(21)    A   I don't know formally, but it was

(22) understood that we would be present and would

(23) have access to the information.

(24)    Q   Why do you say that? Why do you

(25) say it was understood?

---

Page 472

(1)    A   Because both the presentations that

(2) Lazard made were made to Teleglobe senior

(3) management and BCE senior management.

(4)    Q   Who from Teleglobe consented to the

(5) presentation of the Lazard material to BCE

(6) senior management?

(7)        MR. SCHIMMEL:  Object to form

(8)    A   I'm sure Patrick Pichette, Charles

(9) Childers, Jean Monty, Micheal Sabia in their

(10) capacity as Teleglobe as well.

(11)    Q   So you're sure Patrick Pichette and

(12) Charles Childers?

(13)    A   In the sense they were present when

(14) Teleglobe -- in most of the cases they were

(15) present when Lazard made presentations, so

(16) they could have objected, if you want, at that

(17) point in time

(18)    Q   Can you testify with any -- from

(19) your personal knowledge. with any personal

(20) knowledge, can you testify that Childers or

(21) Pichette gave Lazard consent?

(22)        MR. SCHIMMEL:  Object to form

(23)    A   I can only testify to the extent

(24) that Mr. Pichette or Mr. Childers were very

(25) well aware that Lazard was making

---

Page 473

(1) presentations because they were there at the

(2) same time in most cases; maybe not all cases,

(3) but in most cases.

(4)    Q   That's all you can say; is that

(5) right?

(6)    A   That's correct.

(7)    Q   In other words, you can't say that

(8) Pichette or Childers ever signed a piece of

(9) paper saying, "We consent"?

(10)    A   That's correct. I agree.

(11)    Q   You can't say that Pichette or

(12) Childers ever said to Lazard we consent?

(13)    A   I agree.

(14)    Q   You can say that the presentations

(15) were made and the two didn't object?

(16)    A   That's correct.

(17)    Q   Same questions regard to Monty and

(18) Sabia: Can you say whether Monty or Sabia

(19) ever said to Lazard 'We consent, you can

(20) share this with BCE ?

(21)    A   I would have the same answer.

(22)    Q   Can you say whether any of those

(23) four, Monty, Sabia, Pichette or Childers,

(24) directed Lazard to assist in preparing the

(25) April 23, 2002 presentation for the BCE board?

---

Page 474

(1)        MR. SCHIMMEL: Object to form

(2)    A   I don't believe that Lazard was

(3) there to prepare for the BCE, Inc.

(4) presentation.

(5)    Q   Then let me ask it differently

(6)    A   To my knowledge.

(7)    Q   Can you say whether any of the four

(8) that we mentioned, Monty, Sabia, Pichette or

(9) Childers gave expressed consent to Lazard?

(10)    A   I don't have that personal

(11) knowledge.

(12)    Q   Let me ask it differently: Can you

(13) say whether any of those four gave consent to

(14) BCE to use Lazard's materials in preparing the

(15) April 23, 2002 presentation for the BCE board?

(16)        MR. SCHIMMEL: Object to form

(17)        THE WITNESS: Can you repeat the

(18)    question? You lost me along the way

(19) Sorry

(20)        (Whereupon the record was read back

(21)    by the reporter.)

(22)    A   I can't say that they gave

(23) expressed consent, but a portion of the BCE

(24) board presentation contained a similar part of

(25) the presentation as Teleglobe board

---

Page 475

(1) presentation.

(2) Q   Well, the BCE board presentation

(3) also footnoted the source in many places as

(4) Lazard; do you recall that?

(5) A   I don't recall that.

(6) Q   You don't recall that?

(7) A   I don't recall that.

(8) Q   We can show it to you another time,

(9) but for now you don't recall there being

(10) expressed consent given by any of those four?

(11) Your testimony is --

(12) A   I don't have personal knowledge of

(13) that.

(14) Q   Have you ever heard of Project

(15) Saving Grace?

(16) A   I have seen the name in my

(17) calendar, but I don't remember what it refers

(18) to.

(19)     (Whereupon a document bearing

(20) production numbers BCE-AD0068965 through

(21) 66 was marked as Turcotte Exhibit 41 for

(22) identification as of this date.)

(23)     MR. COCHRAN: Let me show you

(24) Turcotte 41  This is a document

(25) entitled "Project Saving Grace

Page 476

(1) Documents " with production numbers

(2) BCE-AD0068965 through 66

(3) Q   Take a look at that and see if you

(4) can tell us what Project Saving Grace was

(5)     (Witness reviewing document.)

(6) A   I'm actually not sure. This looks

(7) like a list of documents for a data room or

(8) for -- not a data room, but for a due

(9) diligence, but I'm not sure what it is.

(10) Q   Well, it looks like a -- I mean

(11) the document is entitled "Project Saving

(12) Grace Documents," and then it looks like a

(13) listing almost as if it were the contents page

(14) of a binder or binders or something

(15)     MR. SCHIMMEL: Object to form

(16)     MR. COCHRAN: My interpretation

(17) A   I don't know

(18) Q   Many of these deal with proposals

(19) for Teleglobe financing  Teleglobe board

(20) presentation date for tax loss monetization,

(21) Davies Ward memorandum regarding CCAA and

(22) related issues  Simpson Thatcher memorandum

(23) regarding overview of the bankruptcy process?

(24) A   I'm surprised Simpson Thatcher.  I

(25) don't remember them.

Page 477

(1) Q   The Teleglobe and the BCE business

(2) plans?

(3) A   I mean BCE/Teleglobe business plan.

(4) Q   It is  You're right about that

(5) BCE/Teleglobe

(6) A   I am reading this and it seems to

(7) predate Project X, but I don't know what it

(8) is.

(9)     MR. COCHRAN: Let's take a look at

(10) what we will mark as Turcotte 42

(11)     (Whereupon a document was marked as

(12) Turcotte Exhibit 42 for identification as

(13) of this date.)

(14) Q   Take a look at this for a moment

(15) Turcotte 42

(16) Can you tell me what this is?

(17)     (Witness reviewing document.)

(18) A   It says at the bottom footnote,

(19) "Q&A financial flexibility," but Stuart, I

(20) have no idea who Stuart is.

(21) Q   They are talking about rolling

(22) forward the 2 billion in Canadian debt that

(23) matured at Teleglobe?

(24) A   Yes. It looks like an analyst

(25) question. It looks like the transcript of an

Page 478

(1) analyst meeting, and this is dated March 8th.

(2) Well, actually, March 8th is more the

(3) production, so I don't know if it's a cut and

(4) paste

(5) Q   March 8th is the date that -- I

(6) have no idea  It's on the document that was

(7) produced to us.

(8) A   I don't know what -- this looks

(9) like a transcript of an analyst meeting.

(10) Q   Was Project Saving Grace the

(11) project name for the extension of the credit

(12) facilities, the Teleglobe credit facilities?

(13)     MR. SCHIMMEL: Object to the form

(14) A   That's what I can't remember.  I

(15) can't remember.  We have too many projects'

(16) names.

(17) Q   Mr Monty states here apparently,

(18) according to this transcript "We are working

(19) Teleglobe to a cash flow breakeven, a free

(20) cash flow breakeven position in 2003  That's

(21) earlier than previously stipulated  We will

(22) have a requirement $500 million to inject new

(23) money into Teleglobe in 2002 " and it goes on

(24) Does that help?

(25)     MR. SCHIMMEL: Object to form

TELEGLOBE COMMUNICATIONS

BSA XMAX(30/38)

VS. BCE, INC

MARTINE TURCOTTE - 10/14/05

---

Page 479

(1) A  This looks like a transcript from
(2) an analyst meeting.
(3) Q  But does it help you understand —
(4) A  Of Saving Grace is, no
(5) Q  — what Project Saving Grace was?
(6) A  No.
(7)    (Whereupon table of contents of
(8) binders on Project X was marked as
(9) Turcotte Exhibit 43 for identification as
(10) of this date.)
(11) Q  Turcotte 43, could you identify
(12) this, please?
(13) A  This would look like my own list,
(14) table of contents of my binder on Project X.
(15) Q  Is it one binder or multiple
(16) binders?
(17) A  I would think multiple binders
(18) given where we are at the end, and there were
(19) multiple binders.
(20) Q  Can you say how many is each letter
(21) of the alphabet?
(22) A  No, it doesn't go that way. I
(23) wish, but it doesn't go that way. It would be
(24) easier to find my documents, but it's probably
(25) over fifteen binders.

Page 480

(1) Q  Fifteen?
(2) A  Yes. I don't know when this is,
(3) July -- this is July 2005?
(4) Q  I don't know
(5) A  It's probably not. It's probably
(6) just when it was for some reason printed. I
(7) don't know why it's 2005. That is strange.
(8) Why is it July 12, 2005?
(9) Q  I can't make a representation one
(10) way or the other. I'm asking you
(11) A  I have no idea, but it's over
(12) fifteen binders
(13) Q  Have all of the materials in these
(14) Project X binders been produced in this
(15) litigation?
(16) A  I would say other than those that
(17) are privileged would have been produced
(18) Q  Which do you consider to be
(19) privileged?
(20)    MR. SCHIMMEL: Object to form
(21) Q  Can you identify on this list
(22) which --
(23) A  I can't, because I would have to
(24) check with Shearman & Sterling, who has gone
(25) through that. Obviously a lot of my own notes

Page 481

(1) were in the context of providing legal advice,
(2) so a lot of this would have been privileged.
(3)    MR. COCHRAN: Mr Schimmel, I would
(4) ask that your firm tell us whether these
(5) binders have been produced if they have
(6) been produced as they are maintained in
(7) the ordinary course of business, that is
(8) in the binders or in the same order in
(9) which they are in the binders, and if
(10) not, provide us with the production
(11) numbers for them, and then finally,
(12) which, if any, of these things have been
(13) withheld as privileged
(14)    MR. SCHIMMEL: We will take that
(15) under advisement
(16) INSERT
(17)    MR. COCHRAN: I'll hand you
(18) Turcotte 44
(19)    (Whereupon a collection of calendar
(20) pages from February 4, 2002 through
(21) April 10, 2002 was marked as Turcotte
(22) Exhibit 44 for identification as of this
(23) date.)
(24) Q  Do you recognize this as a
(25) collection of your calendar pages?

Page 482

(1) A  My calendar, yes
(2) Q  I believe these to be your calendar
(3) pages from February 4, 2002 up to April 10,
(4) 2002
(5) A  It looks like it.
(6) Q  Let me ask you to turn with me to
(7) the page of your calendar for Monday,
(8) March 11 2002  Are you with me?
(9) A  Yes.
(10) Q  Let's go back one page to
(11) March 10th
(12)    Sunday, March 10, 2002, there was a
(13) meeting that you had that day with Mr Sabia
(14) and Siim Vanaselja; is that right?
(15) A  It looks like it.
(16) Q  It was on a Sunday, and the next
(17) day you had a meeting with Jean Monty, Michael
(18) Sabia, Siim Vanaselja  I don't know who PB
(19) is
(20) A  Maybe Pierre Blouin, B-L-O-U-I-N.
(21) Q  And you had also spoken with
(22) Mr Swartz at Davies Ward in the morning on
(23) that day, right?
(24) A  Yes.
(25) Q  There was a presentation that you

---

Page 483

(1) testified about last time that was made to
(2) Mr Monty that day or shortly before that day
(3) by Mr Pichette, and Mr Monty had disagreed
(4) with some of the underlying assumptions; do
(5) you recall that?
(6)    A    I'm not sure if it was that day or
(7) that week of March 11th.
(8)    Q    Is this the meeting where you heard
(9) about that presentation from Mr Monty?
(10)    A    It may, but I don't remember and
(11) because Pierre Blouin's involvement may be in
(12) connection with another file, so I'm not sure
(13) if that is the meeting.
(14)    Q    What file?
(15)    A    Emerjis.
(16)    Q    BCE Emerjis?
(17)    A    BCE Emerjis, so it may be. I just
(18) can't remember.
(19)    Q    Did you have contact with Mr Monty
(20) outside of meetings in which he might have
(21) mentioned it to you?
(22)    MR. SCHIMMEL: Object to form
(23)    A    It could very well be, yes.
(24)    Q    You think sometime that week
(25) Mr Monty had the presentation from

Page 484

(1) Mr Pichette or sometime that week you heard
(2) about it?
(3)    A    Sometime that week I heard about
(4) it. That's correct.
(5)    Q    I'll represent to you there is a
(6) document that has been the subject of some
(7) examination in this case dated March 11, 2002,
(8) called roughly, "BCE state of the nation," or
(9) something like that
(10)    Have you ever seen that?
(11)    A    I was shown it by my lawyers, but I
(12) had never seen it before
(13)    Q    It focuses on, among other things,
(14) the Teleglobe situation dated March 11th   Was
(15) that presented in this meeting?
(16)    MR. SCHIMMEL: Object to form.
(17)    A    No, I did not see it. I never saw
(18) that presentation.
(19)    Q    What was discussed at the meeting
(20) with Mr Monty on this day?
(21)    A    I don't recall.
(22)    Q    Did you undertake to prepare to
(23) give testimonies today?
(24)    A    What do you mean by undertake to
(25) prepare?

Page 485

(1)    Q    Did you prepare yourself to give
(2) testimonies today?
(3)    A    Well, I was shown my agenda.
(4)    Q    Your calendar?
(5)    A    My calendar, sorry, but I didn't
(6) recall what was discussed.
(7)    Q    How long did you spend preparing to
(8) give testimony today?
(9)    A    Not much. I have just been shown
(10) this very quickly on Tuesday.
(11)    Q    How long?
(12)    A    On Tuesday? Between 10:00 and
(13) about 4:30, with quite a long break for
(14) launch.
(15)    Q    In between Tuesday and today was
(16) there any additional preparation you did?
(17)    A    Like I mentioned before, the two
(18) other days.
(19)    Q    Given all that preparation, you
(20) don't have any memory what was discussed at
(21) this meeting?
(22)    A    No, because all I was asked to look
(23) at it and asked whether I recollected what it
(24) was.
(25)    Q    That's fine

Page 486

(1)    Tuesday, March 12th you've got a
(2) meeting at 4:00 in the afternoon regarding
(3) Teleglobe debt issues with Michael Sabia and
(4) Siim Vanaselja in Jean Monty's conference
(5) room  What was discussed?
(6)    A    I can't remember
(7)    Q    Given all the preparation you've
(8) done, you have no memory of it?
(9)    A    No.
(10)    Q    Monday, March 18 2002 at 2:15, you
(11) and Michel Lalande had a telephone call with
(12) Jay Swartz?
(13)    A    Yes.
(14)    Q    Do you have a memory of the subject
(15) of the call?
(16)    A    I don't remember, but Jay is on the
(17) insolvency, so it may have been on what is a
(18) CCAA, how does it work, the mechanics, but
(19) again, I can't recall specifically at that
(20) time
(21)    Q    What was his advice in that regard?
(22)    A    It's legal response to BCE, so it's
(23) privileged.
(24)    Q    But this was the lawyer who
(25) expressly represented Teleglobe?

Page 487

(1)  A    No, that's March 18th. He
(2)  represented BCE, Inc.
(3)  Q    But your position, as I understand
(4)  it, is this very same lawyer on or about
(5)  April 8th was assigned to represent Teleglobe;
(6)  isn't that right?
(7)  A    After April 8th, sometime after the
(8)  8th, he was assigned after John Burnett, and I
(9)  discussed that Davies Ward represented solely
(10) at that point in time Teleglobe, Inc.
(11) Q    He is a solvency expert?
(12) A    He is a solvency expert, yes
(13) Q    And he was to represent Teleglobe
(14) on matters regarding CCAA?
(15) A    After April 8th.
(16) Q    He was giving BCE advice on the
(17) same subject matter before April 8th?
(18) A    All we were asking from a BCE point
(19) of view was --
(20)       MR SCHIMMEL: Ms Turcotte, to the
(21)   extent Davies Ward represented only BCE
(22)   I would instruct you not to disclose the
(23)   contents of discussions with BCE's
(24)   lawyers
(25)       MR. COCHRAN: Is that an

Page 488

(1)  instruction for her not to answer my
(2)  question?
(3)       MR. SCHIMMEL: If she is going to
(4)   testify about simply subject matter. it's
(5)   fine  Contents of discusssions is not
(6)   fine.
(7)  A    The subject matter is essentially
(8)  for us to get a better understanding of what
(9)  is a restructuring under CCAA.
(10) Q    What did he tell you?
(11)      MR. SCHIMMEL: I'm instructing you
(12)  not to answer
(13) A    That's legal advice to BCE, Inc.
(14) Q    Did John Burnett, when you say you
(15) talked to him about Davies Ward, tell you that
(16) he waived any conflict that might exist by
(17) virtue of Davies Ward's prior representation
(18) of BCE?
(19) A    John was very well aware that
(20) Davies Ward Phillips & Vineberg represented
(21) BCE before.
(22) Q    Let's answer my question  Did John
(23) Burnett tell you that he waived any conflict
(24) that might exist?
(25) A    He did not tell me specifically

Page 489

(1)  that.
(2)  Q    Did he ever give Davies Ward, to
(3)  your knowledge, such a waiver?
(4)       MR. SCHIMMEL: Objection to form
(5)  A    You would have to ask him, but he
(6)  agreed that Davies Ward would represent him
(7)  Teleglobe, Inc. going forward.
(8)  Q    Did you tell John Burnett that BCE
(9)  had engaged Davies Ward to advise BCE
(10) regarding Teleglobe, and in particular,
(11) solvency?
(12) A    Yes.
(13) Q    Did you tell him that?
(14) A    Yes.
(15) Q    Did you tell him what Davies Ward's
(16) advice had been?
(17) A    No.
(18) Q    Why not?
(19) A    Because it was advice to BCE, Inc.
(20) Q    Did you expect Davies Ward's advice
(21) would be different when they gave itb to
(22) Teleglobe?
(23)      MR. SCHIMMEL: Object to form.
(24) A    I don't understand what you --
(25) different, it depends on the questions being

Page 490

(1)  asked. It's different in the sense that
(2)  Davies represents Teleglobe after April 8th
(3)  and they represented BCE, Inc. before.
(4)  Q    Did Davies tell you before
(5)  April 8th what it would recommend for
(6)  Teleglobe?
(7)  A    Davies was not --
(8)       MR. SCHIMMEL: Again. I'm
(9)   instructing you not to disclose the
(10)  subject of legal conversations
(11) Q    I'm asking you directly  Did
(12) Dave's tell you prior to April 8th what it
(13) would recommend for Teleglobe?
(14)      MR. SCHIMMEL: You can answer yes
(15)  or no
(16) A    Your question is very vague
(17) Davies was not there to recommend anything
(18) Davies was there to assist us on questions we
(19) had.
(20) Q    Were you asking Davies questions
(21) about your rights as a creditor in a Teleglobe
(22) insolvency proceeding?
(23) A    That was not the question we had at
(24) the time.
(25) Q    Then what was the question?

Page 491

(1)      MR. SCHIMMEL: Ms Turcotte, again,
(2)   I'm stricting you not to disclose the
(3)   contents of your legal discussions with
(4)   BCE's outside counsel
(5)      Q    What was the question that you
(6)   asked Davies?
(7)      A    It was generally to understand the
(8)   mechanics of a CCAA restructuring subject we
(9)   are not familiar with.
(10)     Q    Then what did Davies tell you?
(11)     MR. SCHIMMEL: I'm instructing you
(12)   not to answer.
(13)     A    That was legal advice to us
(14)     Q    Did you tell Mr Burnett that
(15)   Davies was advising BCE on the matter of SBC's
(16)   potential exercise of the put option for the
(17)   Bell Canada shares?
(18)     A    I don't recall if I mentioned that
(19)     Q    So that's something that -- is that
(20)   something to your knowledge, that John
(21)   Burnett knew?
(22)     A    He may very well have been aware of
(23)   that.
(24)     Q    How would he have been aware of
(25)   that?

Page 492

(1)      MR. SCHIMMEL: Objection to form
(2)      A    If I told him, but I don't remember
(3)   if I told him or not, but the SBC put option
(4)   exercise was a matter of public record as
(5)   well.
(6)      Q    But was it a matter of public
(7)   record that Davies Ward was your lawyer
(8)   counseling you as to legal matters relating to
(9)   SBC's potential exercise of the put?
(10)     MR. SCHIMMEL: Objection to form
(11)     A    I don't know. I don't know.
(12)     Q    Did you ever discuss with John
(13)   Burnett the SBC potential exercise by SBC of
(14)   the put?
(15)     A    No, because that would not have
(16)   been a question that arises between the two of
(17)   us.
(18)     Q    Did you ever discuss with John
(19)   Burnett the potential liquidity issues for BCE
(20)   arising in the context of SBC's exercise of
(21)   the put?
(22)     MR. SCHIMMEL: Object to form
(23)     A    No, because we have no liquidity
(24)   issues.
(25)     Q    Did you ever see the May 28, 2002

Page 493

(1)   presentation to the BCE board?
(2)      MR. SCHIMMEL: Object to form
(3)      A    No.
(4)      Q    Have you ever seen the June 28
(5)   2002 presentation on the SBC put to the BCE
(6)   board?
(7)      MR. SCHIMMEL: Object to form
(8)      A    I might have seen it.
(9)      Q    And with regard to the May 28, 2002
(10)   presentation, I'm talking about on the SBC put
(11)   to the BCE board
(12)     A    I may have seen it in advance, but
(13)   I was not in the board meetings.
(14)     Q    Was there any discussion that you
(15)   had with Mr Burnett about how it was that BCE
(16)   was going to go about raising the money to pay
(17)   the SBC the price of the SBC put if SBC
(18)   exercised it?
(19)     MR. SCHIMMEL: Object to form
(20)     A    No.
(21)     Q    Now looking at your calendar for
(22)   March 18 2002, you say that Mr Swartz and
(23)   Davies were advising on the matter of CCAA
(24)   restructurings or proceeds?
(25)     MR. SCHIMMEL: Object to form

Page 494

(1)      A    CCAA, generally -- which a
(2)   restructuring statute in Canada, Canada
(3)   creditors -- I can't remember the long name,
(4)   actually.
(5)      Q    Is this the same Jay Swartz of
(6)   Davies Ward who gave you advice on the Lazard
(7)   engagement letter in response to your fax of
(8)   March 25th, seven days after this calendar
(9)   entry?
(10)     A    That would be the same person.
(11)     Q    So did the scope of his engagement
(12)   change from CCAA to Lazard engagement?
(13)     MR. SCHIMMEL: Object to form
(14)     A    No, he was reviewing the engagement
(15)   letter and the questions we asked thereon in
(16)   the context of is there anything in the
(17)   context of a potential restructuring that we
(18)   should have in the engagement letter, so it
(19)   would be normal that he would see this.
(20)   Otherwise he would not be the person that
(21)   would otherwise ask.
(22)     Q    What else did you consult Davies
(23)   Ward and Jay Schwartz about with regard to
(24)   BCE's --
(25)     MR SCHIMMEL: You can answer as to

Page 495

(1)    subject matter
(2)    A    They were giving us generally
(3)  advice on the subject of Project X on
(4)  questions we may have from time to time
(5)    Q    Such as what?
(6)    A    Such as on alternatives for -- on
(7)  alternatives that we were looking at being a
(8)  strategic partner in Teleglobe and the impact
(9)  it would have on us and so forth.
(10)    Q    Anything else?  Can you be more
(11)  specific at all?
(12)    A    I can't remember.  Again, the
(13)  Project X was to review a number of
(14)  alternatives.  Whether on a consensual --
(15)  prior to this we were looking at many
(16)  alternatives starting from March 20th on which
(17)  could include introducing a strategic partner,
(18)  consensual debt restructuring.  It was just
(19)  the beginning at looking at those
(20)  alternatives.
(21)    Q    Can you tell me with reference to
(22)  Turcotte 43, which is your Project X binder
(23)  table of contents, can you tell me with
(24)  reference to that what memoranda Davies Ward
(25)  prepared  what issues they advised on?

Page 496

(1)    A    Well, if I look, memos on
(2)  restructuring issues, review of Chapter 11 and
(3)  CCAA, they may very well have done a memo on
(4)  it.  I can't remember all the memos that they
(5)  have done for us.
(6)    Q    But you still have these memos,
(7)  right?
(8)    A    I do have these memos, yes.
(9)        MR. COCHRAN:  I'm going to ask that
(10)    these memos all be made available for
(11)    review by the Special Master in the
(12)    context of our motion to compel
(13)        MR. SCHIMMEL:  We will take that
(14)    under advisement
(15)        MR. COCHRAN:  I would ask that they
(16)    be made available in the form in which
(17)    they are organized in this table of
(18)    contents
(19)    Q    If you turn to the next day,
(20)  Tuesday, March 19  2002 in your calendar,
(21)  Turcotte 44, you'll see in the middle there
(22)  was at 2:00 o'clock a meeting regarding update
(23)  from D&T, Deloitte & Touche, on accounting
(24)  opinion
(25)        What was that about?

Page 497

(1)    A    That was in relation to the VFS
(2)  activity.  Ken Mutter was involved with that
(3)  and also Ed Kavanagh, which is an
(4)  off-balance-sheet structure transaction which
(5)  we didn't do at all in the end.
(6)    Q    Then understand that at the end of
(7)  the day between 5:00 and 6:00 you had another
(8)  call with Mr  Swartz you and Michel LaLande
(9)  What was that about?
(10)    A    I can't remember,
(11)    Q    Next day, March the 20th,
(12)  Wednesday, 2:00 in the afternoon, meeting with
(13)  Jean Monty, MS, Michael Sabia, et cetera,
(14)  regarding restructuring of Teleglobe?
(15)    A    Yes.
(16)    Q    What was that about?
(17)    A    That probably was the Lazard
(18)  meeting for -- because it was set for a long
(19)  time.  It doesn't mean it was that one, but
(20)  that was on March 20th, was the Lazard
(21)  meeting.
(22)    Q    In preparing to give testimony
(23)  today, did you read your prior testimony
(24)  regarding the March 20th meeting with Lazard?
(25)    A    I did read my testimony, yes

Page 498

(1)    Q    Is there anything else you can
(2)  recall about that meeting that you didn't
(3)  already tell us about?
(4)    A    No.
(5)    Q    Who was present from Lazard at the
(6)  March 20th meeting?
(7)    A    I believe Jim Millstein was there.
(8)  I believe -- while he was there, Marc Drouin
(9)  and probably some other people from Lazard,
(10)  but I can't remember.
(11)    Q    Was Said Armulcuoglu there?
(12)    A    He may have been there, but I can't
(13)  remember.
(14)    Q    And then two days later there is a
(15)  conference call, this time with Jay Swartz and
(16)  Jim Millstein of Lazard  Do you see that?
(17)    A    Yes.
(18)    Q    March 22nd?
(19)    A    Yes.
(20)    Q    What was that about?
(21)    A    Well, I know about that time Jim
(22)  wanted -- was preparing his due diligence
(23)  request list for Teleglobe, and he may have
(24)  had some questions regarding the Canadian
(25)  situation, and I would have said, "Let's talk

TELEGLOBE COMMUNICATIONS

BSA XMAX(4)(43)

MARTINE TURCOTTE - 10/14/05

VS  BCE, INC.

---

Page 499

(1) to Jay," generally, but I don't know. I can't
(2) recall.
(3)    Q    Who was Jay Swartz representing in
(4) this call?
(5)    A    At the time, BCE, Inc.
(6)    Q    The following Monday, March the
(7) 25th, it looks like most of the afternoon is
(8) spent on Project X.
(9)        MR SCHIMMEL:  Object to form
(10)    Q    There is a 1:00 o'clock conference
(11) call with Mr Lalande on Project X, there is a
(12) 2:00 o'clock conference call on Project X,
(13) there is a meeting between 3:00 and 6:00 with
(14) Mr Vanaselja, P Lazard  That's probably P
(15) Lessard.
(16)    A    It probably would be Pierre
(17) Lessard, it would make sense, with Jerome
(18) Huret.
(19)    Q    Jerome Huret?
(20)    A    Yes
(21)    Q    And between 5:00 and 6:00 it looks
(22) like you're doing something regarding VFS?
(23)    A    That is the off-balance-sheet
(24) structure.
(25)    Q    And then 6:00 o'clock, again,

---

Page 500

(1) you've got another conference call with
(2) Lazard?
(3)    A    Yes.
(4)    Q    Tell me what was happening on
(5) March 25th
(6)    A    I can't remember.
(7)    Q    You don't have any memory at all?
(8)    A    Other than generally looking at
(9) different alternatives -- Lazard was doing
(10) it's due diligence at the time, but I can't
(11) recall specifically on that day.
(12)    Q    In what capacity were you speaking
(13) with Lazard?
(14)    A    I was CLO at BCE, Inc.
(15)    Q    Why were you talking to Lazard?
(16)    A    Because I was involved with senior
(17) management of BCE, Inc. and Project X.
(18)    Q    Was Lazard asking you questions
(19) about Project X?
(20)    A    It could very well be, or it could
(21) be I was present and they were asking other
(22) people questions.
(23)    Q    Why were you present for their
(24) questions to other people?
(25)    A    If they were asking questions,

---

Page 501

(1) generally for us to have the information since
(2) we were on a tight time line.
(3)    Q    But why was it necessary for you to
(4) be there?
(5)        MR. SCHIMMEL:  Object to form
(6)    A    Not necessarily necessary, but I
(7) was there.
(8)    Q    Why?
(9)    A    I can't recall what the subject was
(10) of it, but for me, if I get information that's
(11) helpful to us in assessing the situation on
(12) BCE, Inc.
(13)    Q    Did you attend of the interviews
(14) conducted by Lazard in which Lazard sought
(15) information regarding Teleglobe?
(16)        MR. SCHIMMEL:  Object to form
(17)    Q    From whom?
(18)    Q    From anyone
(19)    A    Yes, I did attend some meetings,
(20) but not every meeting.
(21)    Q    What meetings?
(22)    A    I could have been on a call with
(23) them, with Patrick Pichette, for example, on
(24) the due diligence, or if they were requesting
(25) on the due diligence request list, if they ask

---

Page 502

(1) for some information and so forth.
(2)    Q    Why were you on the calls with
(3) Patrick Pichette?
(4)    A    I was not on every call with
(5) Patrick Pichette, but maybe one or two calls.
(6)    Q    Why were you on those?
(7)    A    It's just a question of sharing of
(8) the information.
(9)    Q    So that you could have the
(10) information that Lazard got?
(11)    A    At the same time.  At the same
(12) time, yes, so we could be more efficient.
(13)    Q    Why did you want the information at
(14) the same time?
(15)    A    Well, because that's usually when
(16) you are looking at a problem with a
(17) subsidiary, you try work with the subsidiary
(18) at the same time so you're more efficient
(19) It's not unusual.
(20)    Q    But I thought Lazard was supposed
(21) to be independent
(22)        MR. SCHIMMEL:  Object to form
(23)    A    Even if they are independent; I'm
(24) not directing their work.
(25)    Q    You're just monitoring it?

---

## Page 503

(1)    MR. SCHIMMEL: Object to form
(2)    A    I disagree with that, no.
(3)    Q    Why were you on the phone?
(4)    A    Because I'm getting the information
(5) the same time as other people. That's all.
(6)    Q    If you look at Wednesday, March 27
(7) 2002, you've got a meeting with Mr Monty,
(8) Pierre Lessard. Jerome Huret and Slim
(9) Vanaselja
(10)    What was that about?
(11)    A    That could be one of the strategic
(12) meetings with Jerome Huret. Wes Scott may
(13) have been there and Pierre Lessard, because
(14) usually, myself and Slim -- well, not usually,
(15) but in some cases we would have been there to
(16) hear what these people are saying on other
(17) subjects and Teleglobe as well.
(18)    Q    What were they saying about
(19) Teleglobe Lessard Huret and Scott?
(20)    A    I can't remember.
(21)    Q    What were they saying -- without
(22) reference to this date of March 27th, what
(23) were they saying about Teleglobe in these
(24) meetings where you and Mr Vanaselja were
(25) there?

## Page 504

(1)    A    Generally they were looking at what
(2) is the strategic importance of Teleglobe that
(3) I remember to BCE.
(4)    Q    Strategic importance to BCE?
(5)    A    Yes. Was it because Teleglobe was
(6) strategically important? The question is
(7) going forward, was that the same view?
(8)    Q    Did Mr Monty express to them a
(9) view on that subject the strategic importance
(10) of Teleglobe to BCE?
(11)    A    Probably. I can't remember.
(12)    Q    Can you remember anything that was
(13) discussed at March 27th?
(14)    A    On that date, I can't remember.
(15)    Q    Can you without regard to a date,
(16) can you remember anything more about any
(17) discussions with Lessard Huret Wes Scott?
(18)    A    What they were tasked to do was to
(19) look at basically three issues One was the
(20) holding company discount of BCE, Inc., how
(21) high it was. I think it was in the 30 percent
(22) or so.
(23)    The second thing was the potential
(24) exercise of the SBC put in the summer, the
(25) first window, by the end of the summer, and

## Page 505

(1) the third thing was to look at Teleglobe.
(2)    Q    What do you recall them saying --
(3) what do you recall the discussions with them
(4) being about Teleglobe? What were they asked
(5) to look at with regard to Teleglobe? What
(6) were they asked to do?
(7)    A    I don't know everything that they
(8) were asked by Jean to do because I was not
(9) there when Jean gave them the mandate, but
(10) they were looking generally at Teleglobe and
(11) their independent view of where I believe the
(12) business plan was and the viability, but also
(13) at the same time whether we should continue
(14) funding or not of Teleglobe, generally, but I
(15) was not at all the meetings with these people.
(16)    Q    Did you ever receive a report from
(17) any of them or from the group regarding any of
(18) those subjects as they related to Teleglobe?
(19)    MR. SCHIMMEL: Object to form
(20)    A    I may have seen a report later on,
(21) but I was not receiving reports from them.
(22)    Q    Did anybody ever tell you what they
(23) thought ought to happen with Teleglobe or on
(24) the issues that you've mentioned relating to
(25) Teleglobe?

## Page 506

(1)    MR SCHIMMEL: Object to form.
(2)    A    I don't recall.
(3)    Q    You don't have any memory at all of
(4) having been told what they thought?
(5)    A    No. I was there more to assist
(6) them if they had questions. That was my role.
(7)    Q    So that I am clear, after all the
(8) preparation you've done to testify at
(9) deposition. you have no memory of what the
(10) views were of the Lazard. Huret Scott group
(11) on issues relating to Teleglobe; is that
(12) correct?
(13)    A    That's correct.
(14)    Q    You can t testify about that; is
(15) that right?
(16)    A    I can't testify about that.
(17)    Q    What was -- if you take a look at
(18) the next day, Thursday, March 28th on your
(19) calendar, Turcotte 44, what was Project
(20) Special?
(21)    A    I don't know. I don't recall.
(22)    Q    That was the SBC matter, correct?
(23)    MR. SCHIMMEL: Object to form
(24)    A    It could have been, but I'm not
(25) sure.

Page 507

(1)　Q   There was a meeting that morning
(2) with Davies Ward regarding Project Special.
(3) Who is BP?
(4)　A   That would be Barry Pickford.  That
(5) is the tax person.
(6)　Q   Who is IR?
(7)　A   That is Ildo Ricciuto,
(8) R-I-C-C-I-U-T-O.
(9)　Q   What was discussed at this meeting?
(10)　A   I don't recall.
(11)　Q   You have no memory of that
(12) whatsoever?
(13)　A   No.
(14)　Q   And there was a conference call
(15) between 11:00 that day and 12:30 --
(16)　A   Yes.
(17)　Q   -- in the afternoon about Project
(18) X
(19)　　　What was discussed on that call?
(20)　A   I don't recall.
(21)　Q   Do you have any memory of the call
(22) at all?
(23)　A   No.
(24)　Q   Would you turn with me to Monday,
(25) April 1st. on your calendar  Between 2:30 and

Page 508

(1) 4:00 you were preparing a summary regarding
(2) Project X alternatives financing  To what
(3) does that refer?
(4)　A   I actually can't recall
(5)　Q   No memory at all?
(6)　A   No.
(7)　Q   Between 4:00 and 5:00 there was a
(8) meeting with Siim Vanaselja  Michel LaLande
(9) and Michael Sabia regarding Project X  What
(10) was that about?
(11)　A   I can't recall.
(12)　Q   What was the discussion?
(13)　A   I can't recall.
(14)　Q   Do you have any memory at all?
(15)　A   No.
(16)　Q   Then at 5:00 o'clock, between 5:00
(17) and 7:00 it says, "Prepare litigation
(18) presentation "  To what does that refer?
(19)　A   I don't think it's Teleglobe  It
(20) could be my -- again, I'm speculating.  It
(21) could be the annual presentation I do on major
(22) litigation for the audit committee.
(23)　Q   The next day, Tuesday, April 2nd,
(24) you're involved in a meeting regarding Project
(25) X with Michel LaLande and MC  Who is MC?

Page 509

(1)　A   Mark Cossette.
(2)　Q   That is between 8:00 and 10:00 in
(3) the morning  What was discussed?
(4)　A   I can't recall.
(5)　Q   Do you have any memory at all?
(6)　A   No.
(7)　Q   10:00 o'clock, it looks like you've
(8) got another meeting regarding Project X
(9) between 10:00 and noon, and then from noon to
(10) 1:00 you review Project X and special
(11) checklists?
(12)　A   That could be the issues and
(13) activities checklist.
(14)　Q   Project X and special checklists?
(15)　A   Project X and special checklists.
(16) I'm not sure.
(17)　Q   Special being the SBC?
(18)　A   I'm not sure exactly if it's SBC,
(19) so I don't want to speculate there.
(20)　Q   If you take a look at the next day,
(21) Wednesday, April 3  2002. between 10:00 in the
(22) morning and 11:30 in the morning  there is a
(23) conference call regarding Project X with
(24) Davies and with Shearman & Sterling, and it's
(25) on the subject of the AIF and the corporate

Page 510

(1) veil
(2)　　　What was that conference call
(3) about?
(4)　A   I can't remember the AIF.
(5) Corporate veil, the only thing I remember is
(6) an issue --
(7)　　　MR. SCHIMMEL: Ms. Turcotte  I am
(8)　　cautioning you you cannot disclose legal
(9)　　discussions with your outside counsel
(10)　　You can describe subject matter
(11)　　　THE WITNESS: The subject matter
(12)　　was a U S  issue relating to corporate
(13)　　veil that we discussed with Shearman
(14)　Q   What was the nature of the issue?
(15) Can you give me anything more than that?
(16)　A   In the context of whether in a
(17) restructuring, corporate veil in a
(18) restructuring under a U S. issue  I understand
(19) is different than in Canada, and we wanted to
(20) understand that.
(21)　Q   Was there a concern that the
(22) corporate existence of the U S  -- what are
(23) now the U S  debtors might be disregarded so
(24) that TI or potentially BCE could be liable for
(25) the debts?

Page 511

(1)  A   No, it's not a concern.
(2)       MR. SCHIMMEL:  I'm instructing you
(3)   not to answer about that, about the
(4)   specific discussion
(5)  Q   Who gave the advice on the issue of
(6)  corporate veil in this call?
(7)  A   Only Shearman.
(8)  Q   Was Davies Ward on the phone?
(9)  A   I don't know if they were there
(10)  during the whole conversation.  I don't
(11)  recall
(12)  Q   Who from Davies Ward?
(13)  A   I can't recall.
(14)  Q   Now, this is April 3rd, and within
(15)  a few days everyone is hard at work regarding
(16)  the changes to the previously approved AIF or
(17)  Teleglobe.  Do you recall that?
(18)       MR. SCHIMMEL:  Object to form  and
(19)   also misstates the record
(20)  A   It's incorrect, because the AIF is
(21)  a different document   The AIF actually had to
(22)  be filed only much later in the year.
(23)  Q   The AIF still had the MD&A language
(24)  in this, right?
(25)  A   No, actually that's the annual

Page 512

(1)  report.
(2)  Q   The AIF didn't contain any MD&A?
(3)  A   It contains some similar language,
(4)  but it does not contain MD&A  It's the annual
(5)  report.
(6)  Q   It contained the same disclosures
(7)  relating to BCE's intent to fund Teleglobe?
(8)  A   Not that I recall except in the
(9)  risk factor section.
(10)  Q   Right.  That wasn't discussed on
(11)  this call?
(12)  A   I can't recall.
(13)  Q   Who from Shearman was on the phone?
(14)  A   Again, I'm speculating.  It could
(15)  be JP Bisnaire and Jay Swartz.
(16)  Q   Same people assigned to represent
(17)  Teleglobe after April 8th?
(18)  A   After April 8th, after our
(19)  announcement that we were reconsidering our
(20)  willingness to fund.
(21)  Q   Who was on the phone from Shearman?
(22)  A   From Shearman, probably Mark
(23)  Shapiro.
(24)  Q   Who else on your end?
(25)  A   I can't recall.

Page 513

(1)  Q   Thirty minutes after you apparently
(2)  finished that conference call you were
(3)  scheduled for a meeting with Jean Monty
(4)  regarding Project X status; do you see that?
(5)  A   Yes.
(6)  Q   What was discussed in that meeting?
(7)  A   I can't recall.
(8)  Q   Do you have any recollection at all
(9)  of what you told Mr Monty regarding Project X
(10)  issues or status issues?
(11)  A   On that day, I don't recall at that
(12)  meeting.  I don't recall
(13)  Q   How about without regard to that
(14)  date?
(15)       MR. SCHIMMEL:  I'm cautioning you
(16)   to the extent you conveyed legal advice
(17)   to Mr Monty in his capacity as CEO of
(18)   BCE, I instruct you not to answer
(19)  A   That is what I would have done,
(20)  provide legal advice to Mr. Monty as CEO of
(21)  BCE.
(22)  Q   Now, Project X, you understood at
(23)  all times it involved the matter of
(24)  restructuring or continuing to fund Teleglobe,
(25)  right?

Page 514

(1)  A   Well, it involved our – the
(2)  question of determining whether BCE, Inc.
(3)  would continue to fund in one form or another
(4)  Teleglobe, Inc. in light of what was happening
(5)  in the industry and to look at various
(6)  alternatives.
(7)  Q   And you gave Mr Monty legal advice
(8)  with regard to that general area?
(9)  A   As CLO of BCE, Inc. and to him as a
(10)  senior machinement and CLO of BCE, Inc
(11)  Q   You understood fully he was an
(12)  officer and director of TI, right?
(13)  A   I knew he was also an officer of
(14)  TI, yes.
(15)  Q   Gave me all the legal advice you
(16)  gave Mr Monty on Project X
(17)       MR. SCHIMMEL:  I'm instructing you
(18)   not to answer to the extent this is legal
(19)   advice to Mr Monty in his capacity as a
(20)   BCE officer
(21)  A   I gave legal advice to Mr. Monty in
(22)  his capacity as BCE CEO.
(23)  Q   Let me ask you this question: How
(24)  do you know when he was taking that advice as
(25)  a BCE officer as opposed to when he was taking

Page 515

(1) it as a TI officer?
(2)    A    Because I think it's very clear
(3) when you're acting on which company's behalf
(4) you're acting.  It was very clear in my mind
(5) and I believe it was very clear in his mind
(6) that we were both talking for BCE, Inc.,
(7) because the questions he was asking me were on
(8) behalf of BCE, Inc , not Teleglobe, Inc.
(9)    Q    You believe it was very clear in
(10) his mind?  Could you read his mind?
(11)    MR. SCHIMMEL:  Object to form.
(12)    A    Mr. Cochran, this happens many
(13) times in a conglomerate, and we know very well
(14) on which behalf we are giving the advice and
(15) which role we have in these instances.  It's
(16) not very difficult.
(17)    Q    Do you know whether Mr Monty
(18) considered that advice when he was acting for
(19) Teleglobe?
(20)    MR. SCHIMMEL:  Object to form
(21)    A    Mr. Monty, when he was asking me a
(22) question, knew very well that I was advising
(23) him in my capacity as CLO of BCE, Inc., to him
(24) as CEO of BCE, Inc.
(25)    Q    When you gave this advice, did you

Page 516

(1) think he was just going to forget it when he
(2) went to do something for Teleglobe?
(3)    MR. SCHIMMEL:  Object to form
(4)    A    I don't understand your question.
(5)    Q    Did you think he could -- he had a
(6) switch or he could sort of turn that advice
(7) off and forget about it or block it out when
(8) he was dealing with Teleglobe?
(9)    MR. SCHIMMEL:  Object to form.
(10)    A    I believe that as in his capacity
(11) he understands in which capacity he is
(12) receiving the information.
(13)    Q    But what about the capacity in
(14) which he is using the information?  Did that
(15) ever occur to you?
(16)    MR. SCHIMMEL:  Object to form
(17)    A    Mr. Monty knows in which capacity
(18) he is acting when he is receiving the
(19) information and understands it is not unusual
(20) for directors and wholly-owned subsidiary and
(21) officers in wholly-owned subsidiaries to have
(22) a dual role
(23)    Q    Was there some signal you two gave
(24) to each other that he was to listen only with
(25) his BCE ear?

Page 517

(1)    MR. SCHIMMEL:  Object to form
(2)    A    Mr. Cochran, it's very easy in a
(3) sense that you know the advice on sale of BCE,
(4) Inc.  The question was addressed to me in that
(5) capacity, and I was responding in that
(6) capacity to the CEO of BCE, Inc
(7)    Q    What I'm trying to get at  and not
(8) to be facetious about it. but what I am really
(9) trying to get at is you are an experienced and
(10) obviously sophisticated lawyer  What I'm
(11) trying to get at is what you were thinking
(12) when you were giving him advice as BCE s chief
(13) legal officer, knowing that he had duties to
(14) TI and possibly to its creditors, what you
(15) were thinking when you were giving him that
(16) advice
(17)    MR. SCHIMMEL:  Object to form
(18)    A    I was giving him advice in his
(19) capacity as CEO of BCE, Inc. on behalf of BCE,
(20) and he has a duty of confidentiality to BCE,
(21) Inc.
(22)    Q    But he also has a duty of candor to
(23) TI?
(24)    MR. SCHIMMEL:  Object to form
(25)    A    I'm sorry.  You're getting into

Page 518

(1) legal advice here.
(2)    Q    Did you just miss the issue?
(3)    MR. SCHIMMEL:  Object to form and
(4) argumentative
(5)    Q    You didn't see any problem, any
(6) issue because BCE controlled TI?
(7)    MR. SCHIMMEL:  Object to form
(8)    A    That's not the issue.  I was clear
(9) in my mind and he was clear the advice he was
(10) requesting from me was on behalf of BCE, Inc.
(11)    Q    You didn't see any problem with him
(12) receiving that advice, notwithstanding that he
(13) was also a TI officer because the two were one
(14) and the same?
(15)    MR. SCHIMMEL:  Object to form
(16)    A    I did not see any issue with
(17) talking to him and giving him advice on
(18) Project X in my role as BCE.
(19)    Q    When you got into Project X
(20) problems of restructuring or discontinuing
(21) funding for Teleglobe. did you ever think
(22) about whether a special independent committee
(23) ought to be appointed to consider those issues
(24) independent of Mr  Monty who was on both
(25) sides?

Page 519

(1)      MR. SCHIMMEL: Object to form
(2)   A   It was not required in this case
(3)   Q   Why not?
(4)   A   It was not required.
(5)   Q   Well, I appreciate the ipse dixit
(6)   assertion, but I would like to know if you
(7)   have any reasons for that.
(8)      MR. SCHIMMEL: Object to form
(9)   A   It was not required. I don't have
(10)  to get into the legal arguments why it was not
(11)  required.
(12)  Q   You don't have any reasons, do you?
(13)  A   There is no legal requirements to
(14)  have a special committee.
(15)     MR. SCHIMMEL: Mr Cochran, we have
(16)  been going more than an hour
(17)     MR. COCHRAN: Last question on this
(18)  line and then we will take a break
(19)  Q   I'm just trying to understand if
(20)  you have any rationale any rationale at all
(21)  for your opinion that it was not required in
(22)  this circumstance or this instance
(23)  A   There is no legal requirement to
(24)  have a special committee, officers and
(25)  directors.

Page 520

(1)   Q   Or anything to address the fact
(2)   that Mr Monty was an officer of both
(3)   companies? Do you think --
(4)   A   There is no requirement because
(5)   Mr. Monty is very well aware in which capacity
(6)   he is acting. There is no requirement.
(7)   Q   He owes a duty of confidentiality
(8)   and loyalty to BCE and a duty of loyalty and
(9)   candor to TI; you understood that, right?
(10)     MR. SCHIMMEL: Object to form
(11)  A   I understand he has duties
(12)  depending on his role, yes.
(13)  Q   When does he turn one off and turn
(14)  the other one on?
(15)     MR. SCHIMMEL: Object to form
(16)  A   Senior executives do that all the
(17)  time, especially in the context of a parent
(18)  company and a wholly-owned subsidiary or a
(19)  subsidiary where they act in one capacity and
(20)  then the other, and they know their duties and
(21)  they know in which capacity they are acting at
(22)  that moment. They are changing acts.
(23)  Q   But didn't you have an
(24)  understanding that the interests of the two,
(25)  the parent and the subsidiary in this

Page 521

(1)   circumstance, potentially diverged?
(2)      MR. SCHIMMEL: Object to form
(3)   A   Not at this point in time, and I
(4)   disagree with you.
(5)   Q   Not in this point in time?
(6)   A   Not at this point in time.
(7)      MR. COCHRAN: Let's take the break
(8)      THE VIDEOGRAPHER: We are now off
(9)   the record at 2:14 p m
(10)     (Whereupon the record was read back
(11)  by the reporter.)
(12)     THE VIDEOGRAPHER: This is tape 4
(13)  of the deposition of Martine Turcotte
(14)  We are now on the record at 2:23
(15)     MR. COCHRAN: I forgot what the
(16)  last question and answer were. I'm
(17)  sorry
(18)     (Whereupon the record was read back
(19)  by the reporter.)
(20)  Q   My next question is when you say
(21)  not in this point in time do you mean not as
(22)  at April 4, 2002?
(23)  A   That's correct.
(24)  Q   So you didn't understand as of
(25)  April 4, 2002 that the interests of the parent

Page 522

(1)   BCE and the subsidiaries here, TI and the
(2)   debtors, might have diverged; is that what you
(3)   are saying?
(4)      MR. SCHIMMEL: Object to form
(5)   A   My view is that the interest had
(6)   not diverged as of April 4th.
(7)   Q   Did you understand that there was a
(8)   potential that they would?
(9)      MR. SCHIMMEL: Object to form
(10)  A   At that point in time, no.
(11)  Q   You had no understanding at all?
(12)  A   I did not believe at that time that
(13)  they would diverge.
(14)  Q   Is that why then you structured the
(15)  Lazard engagement so that BCE had access to
(16)  Lazard's information?
(17)     MR. SCHIMMEL: Object to form
(18)  A   No.
(19)  Q   No?
(20)  A   No.
(21)  Q   Then why did you do that?
(22)     MR. SCHIMMEL: Object to form
(23)  A   Because we always do that between a
(24)  parent and its subsidiary.
(25)  Q   Friday April 5, 2002 there is a

Page 523

(1) meeting at 8:00 in the morning regarding a
(2) press release with Siim Vanaselja and Michael
(3) Boychuk, I guess that is; is that right?
(4)    A    Yes.
(5)    Q    Is that the press release relating
(6) to the credit rating downgrade?
(7)    A    Of Moody's, yes.
(8)    Q    What was discussed at this meeting?
(9)    A    The contents of the press release.
(10)    Q    What were the discussions regarding
(11) the content?
(12)        MR. SCHIMMEL: To the extent you
(13)    are asked for legal advice you are
(14)    instructed not to answer, but otherwise
(15)    you can answer
(16)    A    Basically to review the content as
(17) requested by Moody's, but you can't make very
(18) many changes, and for us my presence was more
(19) to see this was a material event for
(20) Teleglobe, a material event for BCE, so to
(21) understand the context in which this was
(22) coming about.
(23)    Q    Was this considered a material
(24) event for BCE?
(25)    A    In the sense of — not a material

Page 524

(1) event in the sense of disclosure, but it was
(2) important for us on the consequences of a
(3) downgrade below investment grade status.
(4)    Q    Teleglobe's downgrade?
(5)    A    Teleglobe's downgrade, yes.
(6)    Q    What were the consequences for BCE
(7) as you saw them at that time?
(8)    A    Well, at the time for us as below
(9) investment grade, that will trigger a number
(10) of questions as to our continued willingness
(11) to fund Teleglobe going forward.
(12)    Q    Did you express that to
(13) Mr Vanaselja and Mr Boychuk?
(14)    A    I did not have to express that.
(15) They were fully aware of it.
(16)    Q    What did they say to you in this
(17) meeting?
(18)    A    I can't recall specifically.
(19)    Q    How about generally?
(20)    A    All we discussed was the content of
(21) the press release.
(22)    Q    What was the general gist of the
(23) conversation?
(24)    A    Can't make very much changes, here
(25) is the press release, is there anything wrong

Page 525

(1) that is factually in there, and that's it.
(2)    Q    And they said what? No, nothing
(3) wrong factually?
(4)    A    I don't think we made any changes,
(5) as far as I recall personally. They may have
(6) made changes themselves, but I don't recall.
(7)    Q    Do you know what triggered the
(8) Moody's press release?
(9)    A    I believe there was a meeting with
(10) the Moody's people, I think, between BCE and
(11) Moody's.
(12)    Q    Do you know who was at the meeting?
(13)    A    I believe Siim Vanaselja.
(14)    Q    Do you know what was said?
(15)    A    No.
(16)    Q    Mr Vanaselja didn't tell you?
(17)    A    No.
(18)    Q    He didn't tell you that Moody's
(19) asked him whether or not that BCE would stand
(20) behind Teleglobe?
(21)        MR. SCHIMMEL: Object to form
(22)    A    I can't recall.
(23)    Q    You have no memory of that? You
(24) have no memory of what Siim Vanaselja told you
(25) triggered this press release?

Page 526

(1)    A    Other than that he met, he met on a
(2) normal basis with Moody's, on an ongoing
(3) basis.
(4)    Q    Your subsidiary is about to be
(5) downgraded below investment grade; you didn't
(6) ask Siim Vanaselja why?
(7)        MR. SCHIMMEL: Object to form
(8)    A    Well, I think it was coming out
(9) from the Moody press release itself.
(10)    Q    Siim Vanaselja didn't tell you
(11) about the meeting he had with Moody's and what
(12) happened?
(13)    A    We didn't go into details, this
(14) meeting. The reality is that Moody made the
(15) decision. You can't reverse a decision of
(16) Moody's.
(17)    Q    So you didn't discuss with Siim
(18) Vanaselja anything about what he told Moody's,
(19) what Moody's had asked and what he wouldn't
(20) tell them?
(21)    A    No, because the fact it's
(22) irrelevant. The fact is you're going forward,
(23) and Moody's made its own determination.
(24)    Q    Noon, you had a meeting regarding
(25) the BCE annual report and the Teleglobe

## Page 527

(1) disclosure contained therein
(2)     The 38th floor of EVP, what is EVP?
(3)     A    Executive vice president. It's the
(4) name of a conference room.
(5)     Q    EVP 38?
(6)     A    38.
(7)     Q    MT, that's -- the next one is MJR
(8) That's Ryan?
(9)     A    Marc Ryan.
(10)    Q    Ildo?
(11)    A    Ildo Ricciuto.
(12)    Q    Slim?
(13)    A    Yes.
(14)    Q    Pierre Lessard?
(15)    A    Yes.
(16)    Q    Who is SK?
(17)    A    I don't know. Unless its Steve
(18) Skinner, I don't know
(19)    Q    And JP Bisnaire was there; is that
(20) right?
(21)    A    That's correct
(22)    Q    Mr Bisnaire is who?
(23)    A    He is at Davies Ward.
(24)    Q    What was his area?
(25)    A    Corporate.

## Page 528

(1)     Q    What was discussed at this meeting
(2) regarding the Teleglobe disclosure?
(3)     A    I believe that says a follow-up of
(4) the Moody's press release and whether any
(5) changes are required.
(6)     Q    What was the discussion on that
(7) matter?
(8)     A    I can't remember.
(9)     Q    You have absolutely no memory of
(10) it?
(11)    A    Other than the subject matter which
(12) I mentioned to you.
(13)    Q    Why is Mr. Bisnaire there?
(14)    A    Because he was advising BCE at the
(15) time on disclosure matters
(16)    Q    On disclosure matters relating to
(17) Teleglobe?
(18)    A    On disclosure matters relating to
(19) Teleglobe in the BCE annual report in light of
(20) the Moody's press release.
(21)    Q    Did Mr Bisnaire give you any
(22) advice?
(23)    A    He probably did, yes.
(24)    Q    What was the advice?
(25)    A    The subject matter was whether we

## Page 529

(1) should bring any changes to the BCE annual
(2) report.
(3)     Q    What specific legal advice did
(4) Mr Bisnaire render at this meeting?
(5)         MR. SCHIMMEL: If he provided legal
(6)     advice solely to BCE, I will instruct her
(7)     not to answer
(8)         MR. COCHRAN: I couldn't hear what
(9)     Mr Schimmel said
(10)        MR. SCHIMMEL: I said to the extent
(11)    he provided legal advice solely to BCE,
(12)    you're instructed not to answer
(13)    Q    And your answer is?
(14)    A    He provided legal advice to BCE,
(15) Inc. It was in relation to the BCE annual
(16) report.
(17)    Q    On the subject of the Teleglobe
(18) disclosure?
(19)    A    On the BCE annual report, yes.
(20)    Q    And the BCE annual report?
(21)    A    In reference to the
(22) Teleglobe-related disclosure in the BCE annual
(23) report.
(24)    Q    That Teleglobe-related disclosure
(25) was the same one that was contained in the

## Page 530

(1) Teleglobe annual report, right?
(2)     A    It was almost similar, yes.
(3)     Q    It was identical?
(4)         MR. SCHIMMEL: Object to form
(5)     A    In terms of the BCE statement,
(6) you're right.
(7)     Q    And the statement of BCE's
(8) intention to fund?
(9)     A    That's correct, yes.
(10)    Q    That is what was reviewed in this
(11) meeting  correct?
(12)    A    That's correct.
(13)    Q    Mr Bisnaire gave you advice on
(14) that portion?
(15)    A    On that portion, yes.
(16)    Q    What was his advice?
(17)    A    It was legal advice to BCE, Inc.
(18)    Q    What was?
(19)    A    I won't get into it. It's
(20) privileged.
(21)    Q    Mr Bisnaire, roughly three days
(22) later, was representing Teleglobe, correct?
(23)    A    That's correct.
(24)    Q    And he was representing Teleglobe
(25) on its disclosure issues; is that right?

BSA XMAX(51/51)

TELEGLOBE COMMUNICATIONS

MARTINE TURCOTTE - 10/14/05

VS BCE, INC

Page 531

(1) A    After April 8th.
(2) Q    And he was representing Teleglobe
(3) on its disclosures as they related to BCE's
(4) willingness to fund?
(5) A    After April 8th.
(6) Q    And indeed he was representing
(7) Teleglobe on exactly the same disclosure
(8) relating to BCE's willingness to fund; that
(9) was the subject of this meeting of April 5th,
(10) correct?
(11) A    But all of this is —
(12) Q    Correct?
(13) A    Can you repeat?
(14)     MR. COCHRAN:  Please read it back.
(15)     (Whereupon the record was read back
(16)   by the reporter.)
(17) Q    Correct?
(18) A    No.
(19) Q    It wasn't the same —
(20) A    It's the same disclosure, but he
(21) was providing legal advice to BCE, Inc. on
(22) April 5th.
(23) Q    Not just the same subject matter
(24) but exactly the same disclosure that he was
(25) providing legal advice to Teleglobe on roughly

Page 532

(1) three days later, right?
(2) A    Correct.
(3)     MR. SCHIMMEL:  Mr Cochran —
(4)     MR. COCHRAN:  Will you now let her
(5)   answer the question of what his legal
(6)   advice was?
(7) Q    Please answer me
(8)     MR. SCHIMMEL:  I'm going to answer
(9)   you  If you agree this is not a waiver
(10)   of the attorney/client privilege
(11)     MR. COCHRAN:  No, I do not agree
(12)   There was a clear waiver here
(13)     MR. SCHIMMEL:  No, you don't
(14)   understand what I'm saying  If you agree
(15)   that Ms. Turcotte's response will not
(16)   constitute a waiver of the
(17)   attorney/client privilege
(18)     MR. COCHRAN:  There is a clear
(19)   waiver here  I won't enter into a
(20)   nonwaiver agreement with you  There is
(21)   already a waiver  It's wide open
(22)     MR. SCHIMMEL:  Let me make it very,
(23)   very clear  If you agree that by
(24)   answering your question Ms  Turcotte will
(25)   not waive the attorney/client privilege,

Page 533

(1) I will let her answer the questions
(2)     MR. COCHRAN:  No  My answer is I
(3) will not enter into that agreement
(4) because there is no privilege here.  The
(5) privilege was waived long ago, and your
(6) side should have produced everything on
(7) this subject matter to us at the outset
(8) of this case  I will not enter into such
(9) an agreement with you.  There is no
(10) privilege here
(11)     Will you let her answer the
(12)   question?
(13)     MR. SCHIMMEL:  I told you you can
(14) reserve whatever rights you have.  If you
(15) agree that by letting Ms. Turcotte answer
(16) the question — Ms  Turcotte answer the
(17) question, she will not waive the
(18) attorney/client privilege, we will let
(19) her answer the question
(20)     MR. COCHRAN:  You take the position
(21) you either instruct her not to answer or
(22) you recognize there is no privilege here,
(23) one or the other.
(24)     MR SCHIMMEL:  No, Mr  Cochran
(25)     MR. COCHRAN:  We are not going to

Page 534

(1) let you off the hook that easily
(2)     MR. SCHIMMEL:  Mr Cochran, there
(3) is a third alternative
(4)     MR. COCHRAN:  There is not
(5)     MR. SCHIMMEL:  There is
(6)     MR  COCHRAN:  Your instruction not
(7) to answer stands?
(8)     MR. SCHIMMEL:  To the extent that
(9) you're not willing to agree that by
(10) answering the question she would not
(11) waive the attorney/client privilege
(12)     MR. COCHRAN:  It is our position
(13) there is no privilege here, so I will not
(14) enter into that agreement
(15)     Moreover  we have been prejudiced
(16) because we have not been given access to
(17) any of the documents relating to this
(18) advice  I can't ask her intelligent
(19) questions about it  The answer is no
(20)     MR. SCHIMMEL:  If you can't ask
(21) intelligent questions  then —
(22)     MR. COCHRAN:  Because you withheld
(23) the documents
(24)     MR. SCHIMMEL:  We withheld
(25) documents on the grounds of privilege

Page 535

(1) MR. COCHRAN: Absolutely, you did
(2) and they are not privileged. Not even
(3) close.
(4) Q Are you going to follow your
(5) counsel's instruction not to answer my
(6) question about what Mr. Bisnaire's advice was
(7) at the April 5th meeting?
(8) A Yes.
(9) Q Monday, April 8th, there is a
(10) a.m. conference call regarding Teleglobe
(11) Then at 11:30 there is a meeting with
(12) Mr. Monty and Mr. Ryan
(13) At 2:00 o'clock there is a
(14) Teleglobe compliance committee meeting
(15) regarding the AIF. Also at 2:00 o'clock there
(16) is a conference call going on regarding the
(17) Teleglobe press release
(18) What was happening on Monday,
(19) April 8th?
(20) A We were preparing our own press
(21) release, the BCI press release that was issued
(22) on April 8th
(23) Q Who was on the conference call at
(24) 10:00 a.m.?
(25) A I can't remember.

Page 536

(1) Q What was it about?
(2) A I can't remember.
(3) Q You had the meeting then right
(4) around lunchtime with Mr. Monty and Mr. Ryan
(5) What was discussed?
(6) A I can't remember.
(7) Q Any memory at all?
(8) A No.
(9) Q 2:00 o'clock, compliance committee
(10) meeting regarding the AIF?
(11) A Yes.
(12) Q Who was there?
(13) A I can't remember.
(14) Q What was discussed?
(15) A I can't remember.
(16) Q Do you have any memory at all of
(17) the discussions with the compliance committee
(18) regarding the AIF in this context?
(19) A No, no.
(20) Q The context of the press release?
(21) A No. This may have been the regular
(22) compliance committee meeting, but I don't
(23) know.
(24) Q I'll represent to you that over the
(25) next few days there were a series of

Page 537

(1) communications to the Teleglobe board
(2) regarding the disclosures relating to BCE's
(3) intention to fund, approved on February 27th.
(4) Having made that representation,
(5) does that help you at all understand what the
(6) compliance committee meeting was about?
(7) MR. SCHIMMEL: Object to form
(8) A No. Here it talks about the AIF
(9) like we had a Bell compliance meeting on the
(10) AIF which is the annual information form which
(11) is not the MD&A annual report, so it may have
(12) been in the normal context of the AIF
(13) compliance meetings. Nothing to do with the
(14) MD&A and the annual report changes.
(15) Q But you don't know one way or the
(16) other?
(17) A No, I couldn't testify one way or
(18) another.
(19) Q What did Mr -- did you have any
(20) discussions with Mr. Monty about the press
(21) release of April 8th? This is the one where
(22) you are announcing that BCE is going to
(23) reconsider
(24) A We have reviewed the press release.
(25) Q Did you talk to him about it?

Page 538

(1) A I believe I would have talked to
(2) him about the content and reviewed the content
(3) of the press release
(4) Q What were the discussions you had
(5) with Mr. Monty?
(6) A Well, any discussions I would have
(7) would have been in the context of legal advice
(8) to him if he had any questions as CEO of BCE.
(9) MR. SCHIMMEL: Then you're
(10) instructed not to disclose those
(11) discussions if it's legal advice to BCE
(12) Q This was the press release in which
(13) BCE announces that it's reconsidering -- it
(14) says what it says
(15) A It says what it says.
(16) Q It is reconsidering its position
(17) and recognizes -- that is my paraphrase, not
(18) yours -- regarding Teleglobe. and you gave
(19) Mr Monty advice on that press release knowing
(20) he was a Teleglobe officer and director,
(21) correct?
(22) A I knew he was a Teleglobe officer
(23) and director, yes.
(24) Q Please tell me you all the advice
(25) you gave to Mr Monty on that press release

Page 539

(1)    MR. SCHIMMEL: You're instructed
(2)    not to answer in the extent it's legal
(3)    advice to Mr. Monty.
(4)    A   That was the case.
(5)    Q   When you provided that advice, did
(6)    you and Mr. Monty at the outset of the
(7)    discussion have a discussion that you were
(8)    only telling him these things in his capacity
(9)    as a BCE member?
(10)   A   I did not specifically mention
(11)   that.
(12)   Q   Did you and he discuss that he
(13)   should not disclose what you were telling him
(14)   to TI?
(15)   A   No.
(16)   Q   April 9th. meeting regarding
(17)   changes to BCE Teleglobe annual documents?
(18)   A   Yes.
(19)   Q   At 1:00 o'clock?
(20)   A   Yes.
(21)   Q   Who was there?
(22)   A   I can't remember myself. I can't
(23)   remember the other people.
(24)   Q   What was discussed?
(25)   A   Probably the changes to the MD&A

Page 540

(1)    and the annual report at that time.
(2)    Q   These would be changes to both the
(3)    BCE and Teleglobe documents?
(4)    A   That's what it says here, which
(5)    were similar changes.
(6)    Q   Did you speak?
(7)    A   Probably, yes.
(8)    Q   What did you say?
(9)    A   I can't remember.
(10)   Q   Do you have any memory at all?
(11)   A   Other than we discussed making the
(12)   changes that we discussed last time.
(13)   Q   Did you express a legal view or
(14)   legal opinion regarding the need to make the
(15)   changes?
(16)      MR. SCHIMMEL: Object to form.
(17)   A   We would have discussed that, yes.
(18)   Q   What were the discussions?
(19)   A   That's privileged.
(20)   Q   So you will not tell us what advice
(21)   you gave on the subject of the changes to the
(22)   BCE/Teleglobe annual documents?
(23)   A   Correct
(24)   Q   Now, these were Teleglobe annual
(25)   documents as well as BCE?

Page 541

(1)    A   As well, yes, but we were looking
(2)    at them from a BCE point of view, not from a
(3)    Teleglobe point of view.
(4)    Q   Why were you looking at them
(5)    from -- why were you looking at changes to the
(6)    Teleglobe annual documents from a BCE point of
(7)    view?
(8)    A   Because as the parent company,
(9)    there is two reasons; one, to insure
(10)   consistency between documents. As you very
(11)   well, put most of the language is -- how do
(12)   you say -- not subsumed but finds its way into
(13)   the consolidated version of BCE, and number 2,
(14)   parent control liability under U.S. Securities
(15)   laws. So we always review all the documents
(16)   of public subsidiaries.
(17)   Q   You were reviewing the Teleglobe
(18)   documents to insure they were accurate; is
(19)   that right?
(20)   A   That's correct, but from a BCE,
(21)   Inc. point of view
(22)   Q   Was Mr. Monty present?
(23)   A   I don't believe so. Not in these
(24)   types of meetings.
(25)   Q   Mr. Pichette?

Page 542

(1)    A   I don't believe so. I think that
(2)    was a purely BCE meeting
(3)    Q   Siim Vanaselja?
(4)    A   He could have very well been, yes.
(5)    Q   Skinner?
(6)    A   He could have been. I don't
(7)    recall.
(8)    Q   Lalande?
(9)    A   He could have been. I don't
(10)   recall.
(11)   Q   If he was there, who was he
(12)   representing?
(13)      MR. SCHIMMEL: Object to form
(14)   A   In that context I would say BCE,
(15)   Inc.
(16)   Q   At 4:15 there is a weekly telephone
(17)   call that is mentioned there?
(18)   A   Yes.
(19)   Q   Involving Monty. Sabia, Lessard
(20)   Who is WC?
(21)   A   Wes Scott.
(22)   Q   What was this call about?
(23)   A   That would be the strategic review
(24)   group composed of Pierre Lessard, Wes Scott
(25)   and Jerome Huret.

Page 543

(1)    Q    On April 10th we talked about the
(2)  Lessard meeting of that day    There was a 3:00
(3)  o'clock meeting then after the Lazard -- I'm
(4)  sorry -- the 10:30 meeting was, "Regarding
(5)  Lazard and E&Y engagement letters (Martin) "
(6)  What is Martin?
(7)    A    Probably Martin Cossette.
(8)    Q    So he was working on those letters?
(9)    A    Well, as we have seen, he was
(10)  looking at those letters.
(11)    Q    And then there was a meeting at
(12)  noon regarding the annual report    What was
(13)  that about?
(14)    A    Probably again the changes to the
(15)  annual report.
(16)    Q    At 3:00 o'clock there was a meeting
(17)  regarding the Project X update in Mr Monty's
(18)  conference room?
(19)    A    I believe that is a Lazard
(20)  presentation at 3:00 by conference call, I
(21)  believe.
(22)    Q    Then at 5:00 o'clock you had a
(23)  meeting regarding the Project X issues and
(24)  activities; that's the list we looked at
(25)  before?

Page 544

(1)    A    That's it.
(2)    Q    Who was at that meeting?
(3)    A    I can't recall.
(4)    Q    It was held in the board room
(5)  Large group?
(6)    A    Yeah. I'm not sure it was held in
(7)  the board room, though.
(8)    Q    Or scheduled for there?
(9)    A    It could have been scheduled for
(10)  there, lack of rooms at some point.
(11)    MR. COCHRAN: This exhibit will be
(12)  45.
(13)    (Whereupon a portion of an agenda
(14)    was marked as Turcotte Exhibit 45 for
(15)    identification as of this date.)
(16)    Q    Turcotte Exhibit 45, can you tell
(17)  us what this is?
(18)    A    It looks like my calendar or
(19)  agenda. I can't remember how we call it
(20)  anymore.
(21)    Q    This portion is from April 10th on
(22)  up to April 30th    Let's just take a minute
(23)  and look at this    We just finished April 10th
(24)  on the last exhibit
(25)    The next day, April 11th, there was

Page 545

(1)  a meeting, it looks make maybe a telephone
(2)  conference with Mr Childers?
(3)    A    Yes.
(4)    Q    Was present at the Lazard
(5)  presentation of April 10th, the day before?
(6)    A    That's what I can't recall. I know
(7)  Charles was at one at least, but I can't
(8)  remember where, but I know he was at one, but
(9)  I thought it was on a conference call.
(10)    Q    What did you talk to Mr Childers
(11)  about the next day?
(12)    A    I can't recall. I think it was at
(13)  his request, as I remember, but I can't
(14)  recall.
(15)    Q    Do you have any recollection at all
(16)  about why he asked for a call with you?
(17)    A    No.
(18)    Q    Or what you talked about?
(19)    A    No.
(20)    Q    The next day beginning at 9:00
(21)  you've got a meeting with Mr. Ryan on
(22)  Teleglobe, and then at 9:30 you're double
(23)  booked?
(24)    A    It happens often, unfortunately.
(25)  That's why it doesn't mean that I actually

Page 546

(1)  made those meetings.
(2)    Q    You got a 9:30 scheduled with
(3)  Michel LaLande on Project X?
(4)    A    I'm almost triple booked.
(5)    Q    Then at 3:00 it looks like BCE
(6)  compliance committee, the first thirty
(7)  minutes. the new structure, the impact of
(8)  Teleglobe on the AIF    What was the meeting
(9)  about with Mr Ryan?
(10)    A    Sorry. Which one?
(11)    Q    The first one
(12)    A    The only thing I can think of is we
(13)  were -- I think Jean had asked for, and we saw
(14)  that last time, a draft schedule of board
(15)  meetings. So that may very well be that,
(16)  because Mark is a corporate secretary of BCE,
(17)  Inc., so it could be that. Again, I'm not a
(18)  hundred percent sure.
(19)    Q    Or schedule of meetings with
(20)  Lazard?
(21)    A    No, for board meetings of BCE.
(22)    Q    I understand    I do remember
(23)    A    Because we did say in the April 8th
(24)  announcement we would update the market.
(25)    Q    Then your meeting with Mr Lalande,

BSA XMAX(55/55)

TELEGLOBE COMMUNICATIONS                                                                VS BCE, INC

MARTINE TURCOTTE - 10/14/05

---

Page 547

(1) assuming you attended that one and not the one
(2) with S Lee?
(3)     MR. SCHIMMEL: Object to form
(4)     Q     Any memory of any meeting with
(5) Mr Lalande?
(6)     A     I don't.
(7)     Q     Finally, the 3:00 o'clock, "The BCE
(8) compliance committee the first thirty
(9) minutes, "The new structure: The impact of
(10) Teleglobe on the AIF "
(11)     A     I don't know what that is.
(12)     Q     We left off at the end of the last
(13) deposition on these pages, and I wanted to
(14) come back to them
(15)         April 15th, 16th and 17th, take a
(16) look at those calendar pages for me  Just
(17) read them to yourselves
(18)     MR. SCHIMMEL: Which pages? I'm
(19) sorry
(20)     MR. COCHRAN: BCE-AD0543117  118
(21) and 119
(22)         (Witness reviewing documents.)
(23)     Q     You're ready?
(24)     A     Yes.
(25)     Q     On April 17, 2002 there was a

---

Page 548

(1) meeting at 10:00 in the morning with Mr Monty
(2) regarding Project X and this is the one that
(3) was redacted the last time, and your counsel
(4) produced the unredacted version which we
(5) marked as Turcotte 35  I'll show you that
(6)         Would you read your calendar entry
(7) for the 10:00 a m  meeting to us?
(8)     A     Aloud?
(9)     Q     Please?
(10)     A     (Reading)  Meeting with GCM, re:
(11) Project X decision and communications plan
(12)     Q     Who was in attendance at the
(13) meeting?
(14)     A     Well, what is indicated here, but I
(15) don't recall. I'm assuming Jean Monty,
(16) Michael Sabia, Siim Vanaselja, myself, Wes
(17) Scott, Pierre Lessard, Jerome Huret and Ida
(18) Teoli -- the other one I believe is I-D-A,
(19) T-E-O-L-I, who is our chief communications
(20) officer.
(21)     Q     Who called this meeting?
(22)     MR. SCHIMMEL: I object to form
(23)     A     My understanding would be Jean
(24) Monty.
(25)     Q     What is your understanding of the

---

Page 549

(1) reason he called the meeting?
(2)     A     It says here, "Decision and
(3) completions plan."
(4)     Q     Did you speak with him in advance
(5) of the meeting regarding what was going to
(6) happen at the meeting?
(7)     A     I don't believe so, no
(8)     Q     What happened at the meeting?
(9)     A     I can't recall specifically, but it
(10) says, "Decision," so it may very well be at
(11) the time he communicated to us what he was
(12) going to recommend, but I can't recall.
(13)     Q     Wouldn't this be ultimately his
(14) decision on how Project X would proceed?
(15)     MR. SCHIMMEL: Object to form
(16)     Q     Or how he would recommend it would
(17) proceed?
(18)     A     I think it is more his view of
(19) where he would go on the recommendation prior
(20) to the board meeting of April 23rd.
(21)     Q     Well, it's his decision on where he
(22) would go; is that fair?
(23)     MR. SCHIMMEL: Object to form
(24)     A     No, I think Jean would consult with
(25) all the people there on the decision to go

---

Page 550

(1) ahead, but you're right.  He, as CEO of BCE,
(2) Inc would make the ultimate recommendation to
(3) the board.
(4)     Q     I guess what I'm trying to figure
(5) out is why you don't have any memory of this
(6) meeting
(7)     MR. SCHIMMEL: Object to form
(8)     A     There is so many meetings.
(9)     Q     This one is not just like every
(10) other meeting  This is one where he is now
(11) ultimately charting the course.
(12)     MR. SCHIMMEL: Object to form
(13)     A     I don't remember what was
(14) specifically asked at the meeting other than
(15) the ultimate recommendation was to cease
(16) long-term funding.
(17)     Q     Tell me everything that you
(18) remember that Mr Monty said, everything
(19)     A     I don't remember the meeting.
(20)     Q     Do you have any general memory of
(21) anything he said?
(22)     A     I don't remember on that day what
(23) he said.
(24)     Q     You don't remember at that meeting
(25) what he said?

---

Page 551

(1)  A    Other than the conclusion at the
(2) end of the day after that meeting that the
(3) recommendation was to cease long-term funding.
(4)  Q    How did he express that conclusion?
(5)  A    I can't remember.
(6)  Q    Did you say anything at the
(7) meeting?
(8)  A    I could have said something, but I
(9) can't remember.
(10)  Q    You have no memory at all?
(11)  A    I just don't remember specifically
(12) what was discussed at the meeting.
(13)  Q    How about generally?
(14)  A    Again, I said this meeting relates
(15) to the decision where we ended up concluding
(16) to cease long-term funding. That's the
(17) subject matter.
(18)  Q    Can you provide any more testimony
(19) at all about what happened, who said what?
(20)  A    I can't. I can't.
(21)  Q    At this meeting?
(22)  A    I can't.
(23)  Q    After all of your preparation, all
(24) of your consideration?
(25)  A    All I have done is I was shown this

Page 552

(1) and asked if I remember it.
(2)  Q    You have been chief legal officer
(3) for BCE. You have been -- you have known
(4) about all this litigation. You've done your
(5) job in monitoring it and everything else, and
(6) there is nothing more you can tell us about
(7) what happened on April 17th at this meeting?
(8)  A    That's correct. I don't remember.
(9)    MR. SCHIMMEL: Argumentative
(10)  Q    If you come to trial and say
(11) something else, you know we are going to be
(12) looking at this testimony?
(13)    MR. SCHIMMEL: And this is
(14) argumentative also
(15)  A    No problem.
(16)  Q    No problem?
(17)  A    No problem.
(18)    MR. SCHIMMEL: You should stop
(19) badgering the witness, Mr. Cochran.
(20)    MR. COCHRAN: I will say she
(21) doesn't look too badgered. She seems to
(22) be holding her own quite well,
(23) Mr. Schimmel
(24)    THE WITNESS: Could I have a nature
(25) break soon?

Page 553

(1)    MR. COCHRAN: This is a good time
(2)    THE VIDEOGRAPHER: We are now off
(3) the record at 2:54
(4)    (Whereupon a discussion was held
(5) off the record.)
(6)    THE VIDEOGRAPHER: We are now back
(7) on the record at 2:58
(8)  Q    Now, the day before this April 17th
(9) meeting on April 16, 2002, there are two
(10) entries on your calendar There is an 8:00
(11) a m project weekly call. and then there is a
(12) 3:30 p m meeting regarding Project X with
(13) Mr Monty in the board room
(14)    This April 16th we talked about is
(15) the day of the -- I was going to say
(16) penultimate but I guess was the ultimate
(17) Lazard presentation, the final Lazard
(18) presentation?
(19)  A    Where BCE, Inc. was present.
(20)  Q    Was there no presentation after
(21) April 16th where BCE was present?
(22)    MR. SCHIMMEL: Object to form
(23)  A    Not to my knowledge. By Lazard,
(24) not to my knowledge
(25)  Q    I may have said April 6th I meant

Page 554

(1) April 16th
(2)  A    That's what I understand.
(3)  Q    Which of these two was the one?
(4)    MR. SCHIMMEL: Object to form
(5)  A    I believe it's 3:30, because it
(6) says board room.
(7)  Q    What happened at the 8:00 a.m ?
(8)  A    I can't recall.
(9)  Q    The 3:30 Lazard meeting, who was
(10) present?
(11)  A    I believe there were quite a few
(12) people from BCE as well as Teleglobe. I can't
(13) recall the whole list of people.
(14)  Q    How did the meeting go?
(15)  A    In what sense?
(16)  Q    Who said what? Who did what?
(17)  A    I think it was mostly Lazard making
(18) a presentation.
(19)  Q    Who spoke for Lazard?
(20)  A    I believe Jim Millstein, and the
(21) others I can't remember.
(22)  Q    Did Mr Monty have any comments or
(23) questions for Lazard?
(24)  A    He probably did. I can't recall
(25) what he said.