**Exhibit B**

**Defendants' Summary Response to**

**Plaintiffs' Additional Allegations**

**Regarding Joint Representation**

## DEFENDANTS' SUMMARY RESPONSE TO PLAINTIFFS' ADDITIONAL ALLEGATIONS REGARDING JOINT REPRESENTATION

|   | **Plaintiffs' Allegations**<br>(from Plaintiffs' Motion at 12-14) | **Defendants' Responses** |
|---|---|---|
| 1. | BCE closed down Teleglobe's law department when it acquired Teleglobe, in 2000 (Lalande at 113, Vol. B, Tab H); | • When the Teleglobe Inc. legal department was closed, many of the legal functions that had previously been performed by the legal department at Teleglobe were assumed by the TCC legal department in Reston, which consisted of non-BCE lawyers. (Lalande at 136, Vol. B, Tab H; *see also* Snyder at 18-20; Defendants' Brief in Opposition to Plaintiffs' Motion to Compel Documents Wrongfully Withheld Or Redacted For Privilege, Oct. 7, 2005, at 3.)<br><br>• "And upon the acquisition, what was determined that would be the best thing to do in conjunction with John Brunette who was the chief legal officer of Teleglobe Communications Corporation in Reston, Virginia, it was determined that John wanted to shut down the legal department of Teleglobe in Canada, because all the worldwide operations of Teleglobe would be led out of Reston, and he said, you know, we're going to take care of the legal services for the old Teleglobe Group." (Bankruptcy Ct. Tr. at 42, Vol. C, Tab M.) |
| 2. | BCE's general counsel (Turcotte) assigned assistant BCE general counsel (Lalande) to represent Teleglobe on a wide variety of matters, following BCE's acquisition of Teleglobe in 2000. (Lalande at 113-14; *see id.* at 42-43; 98-99; 136-139; 163-66; 170-74; 218; 222-28; 496-500, Vol. B, Tab H). Lalande had previously been Teleglobe's director, legal affairs (Lalande at 42, Vol. B, Tab H); | • TCC's general counsel (Brunette) and Turcotte reached an agreement prior to the acquisition that Lalande would provide certain legal services to Teleglobe Inc. after the acquisition, particularly during the transition period. (Lalande at 114, Vol. B, Tab H.) |

B-1

| 3. | Lalande was the lawyer primarily responsible for Teleglobe's public securities filings, including in particular Teleglobe's 2001 Annual Information Form ("AIF"). (Lalande 222-228, Vol. B, Tab H); | <ul><li>As a parent corporation, BCE had an interest in ensuring that its subsidiaries provide adequate disclosures in their public securities filings, including the annual information form.</li><li>To the extent Lalande provided advice to Teleglobe regarding its public securities filings, such documents have been produced to the plaintiffs.</li><li>Lawyers for the Debtors also reviewed these draft filings. (*See, e.g.,* Snyder at 75-76, 101.)</li></ul> |
|---|---|---|
| 4. | Lalande advised both BCE and Teleglobe on a variety of issues relating to whether and how BCE would fund, or restructure, Teleglobe, including advising both companies on certain April, 2002 amendments to their public filings (including Teleglobe's AIF) to describe BCE's commitment, (or lack thereof) to fund Teleglobe. (Lalande 366-83, Vol. B, Tab H (referring to Lalande Ex. 37, Vol. D, Tab 13)); (Lalande 393-396, Vol. B, Tab H (referring to Lalande Ex. 40, Vol. D, Tab 15)); (Turcotte 252-54, Vol. A, Tab C, Ex. 1); | <ul><li>Lalande did not advise Teleglobe on any matters relating to whether or how BCE would continue to fund Teleglobe, or restructure, Teleglobe in 2002.</li><li>All of the sources cited by plaintiffs for this point relate only to advice with respect to Teleglobe's public filings.</li><li>BCE's and Teleglobe's public filings were amended in April 2002 to clarify the nature of BCE's public statements regarding its intention to fund Teleglobe.</li><li>Lalande's advice to BCE and Teleglobe regarding these amendments did not relate to whether or how BCE would fund Teleglobe, but rather whether the disclosures in the public filings were as clear as possible.</li><li>Lalande's work in the area of securities compliance with respect to providing an accurate statement of BCE's intentions with regard to continued funding of Teleglobe does</li></ul> |

B-2

| | | |
|---|---|---|
| | | not establish a joint representation with respect to BCE's internal analyses regarding its decision to cease funding Teleglobe. The latter was an entirely separate matter as to which the legal advice was expected to remain confidential to BCE. (Turcotte 60-61, 517, Vol. A, Tab C.) |
| 5. | Other BCE lawyers also advised Teleglobe on the disclosures it should make regarding BCE's position on future funding of Teleglobe (Lalande 378-79; 382-83, Vol. B, Tab H); Lalande frequently called on BCE in house lawyer Ricciuto in this regard. Id. See, supra, at 16; | • BCE's and Teleglobe's public filings were amended in April 2002 to clarify the nature of BCE's public statements regarding its intention to fund Teleglobe.<br><br>• The advice of other BCE lawyers regarding these amendments did not relate to whether or how BCE would fund Teleglobe, but rather whether the disclosures in the public filings were as clear as possible. |
| 6. | Lalande advised Teleglobe's chief executive (who was also BCE's chief executive) in April of 2002 regarding changes to Teleglobe's annual representation letter to its auditor, regarding whether BCE was committed to fund Teleglobe and subsequently drafted the changed language (Bankruptcy Ct. Tr. at 52-53, Vol. C, Tab M); | • Lalande provided advice to Teleglobe's chief executive regarding changes to Teleglobe's annual representation letter to its auditor in order to ensure that Teleglobe's statements regarding the financial support of its parent corporation were accurate. (Bankruptcy Ct. Tr. at 52-53, Vol. C, Tab M.) |
| 7. | Lalande advised both Teleglobe and BCE in connection with BCE's contributions of debt and equity funding to Teleglobe. (Lalande 349, 163-64, Vol. B, Tab H (discussing Lalande Ex. 14); 171-174, 184-187 (discussing Lalande Exs. 16-18, Vol. C, Tab N, Vol. D, Tabs 2, 3); Lalande 430-442 (discussing Lalande Exs. 46, 47, 48, 49, Vol. D, Tabs 18, 19, 20; see Lalande Ex 51, Vol. D, Tab 21)); Decl. of Lalande ¶ 13 (Vol. A, Tab D, Ex. E); | • Public documentation, e.g., securities filings: See Point 3 supra, regarding Lalande's advice with respect to the disclosures in Teleglobe's public securities filings.<br><br>• Drafts of Oct. 24 and Nov. 28 board resolutions: Lalande drafted these resolutions as part of general corporate governance advice he provided to Teleglobe. Moreover, BCE had an interest in ensuring that the funding resolutions and associated board materials were as clear as possible and were in sync. Lalande |

B-3

|  |  |  | did not represent Teleglobe as to the amount of funding or type of funding that it would receive. (*See* Lalande 164-174, Vol. B, Tab H. *See also* Point 8 *infra*.)<br><br>• Lalande Ex. 51, Jan. 21, 2002 memorandum, (Vol. D, Tab 21): Lalande wrote this memo as BCE lawyer, on a matter where BCE would be taking security on certain of Teleglobe's assets in order to facilitate a renewal of Teleglobe's credit facility in 2002. It was addressed to, among others, Rise Norman of Simpson Thatcher, who was representing Teleglobe in connection with the rollover of the credit facility. (*See* Lalande 448-453, Vol. B, Tab H. *See also* Point 9 *infra*.)<br><br>• Tax loss transaction: Most of the legal work for the "tax loss monetization" transaction was performed for BCE. Teleglobe was expected to benefit economically from the transaction (in that BCE would use the proceeds of the transaction to fund Teleglobe), but the fact that BCE had Teleglobe's economic interest in mind in structuring the transaction does not create a joint representation. Lalande's work with Teleglobe in connection with that transaction was limited to preparation of the resolution for the transaction, and ensuring that Teleglobe would be included in the ruling certificate. (Lalande 498, Vol. B, Tab H.)<br><br>• Lalande's post-acquisition financing work: Lalande represented Teleglobe and BCE with regards to the 2001 rollover of the credit facility. Representation of both entities in this |

| | | |
|---|---|---|
| | | specific instance where they had a common interest does not create joint representation as to all funding matters. For example, Lalande provided advice solely to BCE with regard to a letter to be provided by BCE to the banks, an issue where BCE had an independent legal interest. (*See* Lalande 293-294, Vol. B, Tab H.) |
| 8. | Lalande advised both Teleglobe and BCE in preparing board resolutions providing for some $850 million in financing to Teleglobe, and then advised BCE's chief executive and Teleglobe's chairman (Monty), as he made the decision not to provide that funding to Teleglobe, during "Project X". (Lalande 170-185 (discussing Lalande Exs. 16, 17, Vol. C, Tab N, Vol. D, Tab 2)); Lalande 484-553 (discussing Lalande Ex. 56 (Vol. D, Tab 23)); | • In October and November 2001, Lalande drafted BCE's board resolutions authorizing BCE to provide additional funding to Teleglobe and Teleglobe's board resolutions authorizing Teleglobe to accept such funding.<br><br>• The Special Master rejected the argument that this work created a joint representation. (Special Master's decision dated December 1, 2005 at 15). The final decision of the Special Master did not address these documents, which were created several months before BCE decided to cease long-term funding.<br><br>• Lalande advised Monty in his capacity as BCE chief executive as he assessed whether BCE should continue to provide long-term funding to Teleglobe. In giving this advice to a BCE executive in his BCE capacity, Lalande was acting as counsel to BCE. |
| 9. | Lalande developed a funding plan in January, 2002, that would have allowed BCE to finance Teleglobe while transferring security to Teleglobe's third party lenders (Lalande 458-462 (discussing Lalande Ex. 51,52, Vol. D, Tab 21)); | • Lalande performed this work for BCE. (Lalande 324, Vol. B, Tab H; Turcotte 75-76, Vol. A, Tab C.)<br><br>• The objectives of implementing a viable capital structure for Teleglobe and providing liquidity to Teleglobe |

B-5

| | | |
|---|---|---|
| | | would have benefited BCE, which had invested over U.S.$1B into Teleglobe and had an interest in its economic success.<br><br>• Lalande's consideration of Teleglobe's economic interest does not make his legal work a joint representation.<br><br>• Documents relating to this subject were produced because they were shared with third parties, such as Merrill Lynch. (*See* Lalande at 452, Vol. B, Tab H.) |
| 10. | Lalande provided advice on how to characterize BCE's contributions to Teleglobe--whether equity, or debt. (Lalande Ex. 54, Vol. D, Tab 22.); | • Lalande drafted a loan agreement and promissory notes on behalf of BCE which contemplated that BCE would extend further funding to Teleglobe. (Lalande 327-29, Vol. B, Tab H.)<br><br>• Lalande executed the loan agreement on behalf of Teleglobe in his capacity as Assistant Corporate Secretary of Teleglobe.<br><br>• Even if his work constituted a joint representation with respect to that transaction, such work would not create a joint representation with respect to BCE's decision to cease funding. |
| 11. | Lalande represented Teleglobe in connection with efforts to restructure its bank debt, in 2000, 2001 and as late as mid March, 2002. (Lalande 218-20; 283-99; 326, 329 (Vol. B, Tab H)); (Bankruptcy Ct. Trans. 49-52, Vol. C, Tab M); | • Lalande represented Teleglobe and BCE in the negotiations of the Credit Facilities, and he solely represented BCE in the negotiations of BCE's letter of support to the banks. (Lalande 293-94, Vol. B, Tab H.) The letter of support was a contractual undertaking of BCE to the banks, and Teleglobe was not a party to that document.<br><br>• In 2000 and 2001, BCE executed a letter of support addressed to the |

B-6

| | | |
|---|---|---|
| | | Bank of Montreal, as arranger under Teleglobe's credit facilities, in which BCE undertook to inject up to U.S.$900 million into Teleglobe.<br><br>• In early 2002, BCE engaged in negotiations with the Bank of Montreal regarding the preparation of a new letter of support in which BCE would convert its intention to fund an additional C$1B into a binding obligation. Lalande represented BCE in those negotiations. (Lalande 293, Vol. B, Tab H.)<br><br>• BCE has produced to the plaintiffs in this lawsuit the documents reflecting Lalande's work in connection with the negotiation of the Credit Facilities (including all draft term sheets of the Credit Facilities), and BCE has withheld drafts of the letter of support, which reflect work performed solely for BCE. (*See, e.g.*, entries 106, 316 on the July 2004 log and entries 15, 42, 719, 1112 on the September 2005 log.)<br><br>• Lalande's work in connection with that transaction was separate from BCE's analyses of whether to cease funding Teleglobe. |
| 12. | Lalande was involved in rendering advice to BCE and Teleglobe on the matter of restructuring Teleglobe, through late April of 2002. See, e.g. April 15, 2002 e-mail and memo, Davies Ward (Hong) to Lalande (BCE-AD 056 3322-32, Vol. E, Tab 70); | • There is no broad "restructuring" matter. Martine Turcotte Declaration ¶¶ 2-13 (March 14, 2006).<br><br>• This document does not show Lalande rendering advice. It shows that a Teleglobe lawyer sent to Lalande a memorandum that he thought would be relevant to BCE's analysis. |
| 13. | Lalande received advice directly from Davies Ward on the matter of tax restructuring of Teleglobe's debt, and the | • The memorandum in question was sent to Lalande as "Michel Lalande (BCE Inc.)." BCE had its own |

B-7

| | | |
|---|---|---|
| | implications thereof. Id.; Lalande 555-56 (discussing Lalande Ex. 58)); | interest in understanding Teleglobe's alternatives.<br><br>• Receipt of advice does not establish a joint representation. In particular, it does not involve a joint representation regarding BCE's decision to cease funding. |
| 14. | Lalande advised Teleglobe's Chairman (Monty) and board Member/COO Sabia on issues relating directly to restructuring and funding options for Teleglobe, throughout Project X (the code name for that project, which ran from February 28, 2002 through April 23, 2002), though Lalande claims he was counseling Monty only in his capacity as Chairman and CEO of BCE. See Lalande Ex. 56, (Vol. D, Tab 23 (discussed at Lalande 484-521)); | • Lalande communicated with Messrs. Monty and Sabia exclusively in their capacity as BCE executives in connection with the decision to cease long-term funding to Teleglobe. |
| 15. | Turcotte advised Teleglobe's Chairman (Monty) and its board member and COO Sabia, on legal issues directly relating to restructuring and funding options for Teleglobe, throughout Project X. See e.g., Lalande Ex. 56, (Lodge Ex. D, Tab 23) Lalande 484-553); | • Turcotte advised Monty and Sabia in their capacities as BCE executives in connection with BCE's consideration of its options for funding or restructuring Teleglobe. (Turcotte 57-61, Vol. A, Tab C.)<br><br>• Turcotte acted in her capacity as Chief Legal Officer of BCE in rendering this advice. (*Id.*)<br><br>• Turcotte testified that she intended those communications to remain confidential to BCE. (Turcotte 60, Vol. A, Tab C.) |
| 16. | Turcotte coordinated Project X for both Teleglobe and BCE, participating in identifying the issues to be researched and addressed, arranging for the staffing, and establishing the timelines for both companies. (Turcotte 270-72, Vol. A, Tab C, Ex. 1 (discussing Turcotte Ex. 30, Vol. D, Tab 30)); | • Turcotte coordinated the division of labor and staffing because one person had to make those organizational arrangements, but she did not provide legal advice to Teleglobe<br><br>• Turcotte arranged for Teleglobe's own separate legal representation during this time. Teleglobe rejected Turcotte's recommendation of Davies Ward and retained Ogilvy to |

B-8

|  |  | represent them in Canada. Teleglobe thus acted independently of Turcotte in receiving legal advice on Project X issues, despite Turcotte's organizational role. |
|---|---|---|
| 17. | Turcotte advised BCE and Teleglobe directors, during an April 11, 2002 teleconference, on the meaning and purpose of the revisions to BCE and Teleglobe's AIFs, which addressed whether BCE was committed to fund, and controlled, Teleglobe. (Turcotte 249-250 (discussing Turcotte Ex. 28, Vol. D, Tab 29)); | • Turcotte participated in an April 11, 2002 teleconference regarding revisions to BCE's and Teleglobe's public securities filings in her capacity as counsel to BCE Inc. (Turcotte 260, Vol. A, Tab C.)<br><br>• Turcotte's work in ensuring that the disclosures were correct does not establish a joint representation with respect to BCE's internal analyses regarding its decision to cease funding Teleglobe. The latter was an entirely separate matter as to which the legal advice was expected to remain confidential to BCE. (Turcotte 60-61, 517, Vol. A, Tab C.) |
| 18. | Turcotte advised BCE and Teleglobe on amendments to their AIFs relating to BCE's funding position. Lalande Ex. 40 (Vol. D, Tab 15); | • BCE's and Teleglobe's public filings were amended in April 2002 to clarify the nature of BCE's public statements regarding its intention to fund Teleglobe.<br><br>• Turcotte advised BCE in order to ensure the disclosures in the public filings were as clear as possible.<br><br>• Turcotte received copies of the revisions to both BCE's and Teleglobe's annual reports. She reviewed Teleglobe's revised annual report in her capacity as counsel to BCE, to ensure that its disclosures were correct.<br><br>• Turcotte's work in ensuring that the disclosures were correct does not establish a joint representation with respect to BCE's internal analyses regarding its decision to cease |

|  |  |  |
|---|---|---|
|  |  | funding Teleglobe. The latter was an entirely separate matter as to which the legal advice was expected to remain confidential to BCE. (Turcotte 60-61, 517, Vol. A, Tab C.) |
| 19. | Turcotte advised BCE and Teleglobe in connection with proposals for BCE to provide funding to Teleglobe. Lalande Ex. 47 (Vol. D, Tab 19); *see* 9/05 Log, 00262, 00263, 00270, 00271 (Vol. F, Tab A); and | • Turcotte provided legal advice solely to BCE in connection with its review of alternatives to provide funding to Teleglobe.<br><br>• None of the documents cited by plaintiffs represent instances in which Turcotte advised Teleglobe.<br><br>• Lalande Ex. 47 (Vol. D, Tab 19): Turcotte did not provide advice regarding the tax loss transaction, but advised as to whether, as a matter of good corporate governance, that transaction should be brought to the Teleglobe board.<br><br>• 9/05 log 00263: Turcotte provided advice to BCE regarding the impact of BCE's evaluation of Teleglobe on the tax loss monetization transaction.<br><br>• 9/05 log 00262, 00270 and 00271: Turcotte provided legal advice to BCE regarding potential structures through which BCE might provide additional funding to Teleglobe. |
| 20. | Turcotte reviewed and negotiated the engagement of Lazard Freres, Teleglobe's restructuring advisor during Project X. Turcotte 335-383 (Cochran Aff. Ex. 43). | • Turcotte reviewed and commented on the Lazard engagement letter as a matter of good corporate governance, in part because she had considerable experience with such letters. Teleglobe's own counsel reviewed the letter as well, and it was a Teleglobe in-house lawyer with no connection to BCE (John Brunette) that ultimately approved and signed the Lazard engagement letter. (Turcotte 131-132, 139:5-16, Vol. A, |

|  |  | Tab C.) |
|--|--|--|
|  |  |  |

B-11