IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------------------------x
In re:                                          :   Chapter 11
                                                :
TELEGLOBE COMMUNICATIONS                        :   Jointly Administered
CORPORATION, *et al.*,                          :   Case No. 02-11518 (MFW)
                                                :
                          Debtors.              :
-------------------------------------------------x
                                                :
TELEGLOBE COMMUNICATIONS                        :
CORPORATION, *et al.*                           :
                                                :
                          Plaintiffs,           :
                                                :
          v.                                    :   C.A. No. 04-CV-1266 (SLR)
                                                :
BCE INC., *et al.*,                             :
                          Defendants.           :
-------------------------------------------------x

**DECLARATION OF STEPHEN GILLERS**

I, Stephen Gillers, declare and say as follows:

**Qualifications and Scope of Opinion**

1.  I submit this declaration at the request of BCE, Inc. I am a chaired professor of
    law at New York University School of Law. I have been on the faculty since 1978
    and was vice dean from 1999 to 2004. I have taught Regulation of Lawyers
    ("legal ethics") at NYU and as a visitor elsewhere since 1978 and am the author
    of a leading casebook in the field, first published in 1985 and now in a seventh
    edition (published in 2005). I have written extensively on legal ethics in law
    journals and in the law and popular press. I have spoken on legal ethics at bar
    associations nationwide, at law firms, at law school conferences, and at corporate
    law offices. In New York, I have served on the ethics committee of the

1

Association of the Bar and on the Departmental Disciplinary Committee of the First Department Appellate Division. I chair the ABA's Joint Committee on Lawyer Regulation, whose charge is to promote adoption of the ABA's Model Rules of Professional Conduct nationwide. I annex my resume as Exhibit A.

2. I have read the Final Decision of the Special Master, dated February 22, 2006. I have been asked my opinion about two fact patterns that I am asked to assume. But despite the variations in these facts patterns, the core question is the same: What is the effect on a lawyer's duty of confidentiality and the professional privilege when a lawyer has inconsistent duties to two current clients?

3. *Question 1*: Assume lawyers undertake work solely for BCE while jointly representing BCE and Teleglobe, BCE's wholly owned subsidiary, in a related matter. Assume that the information gained in their work for BCE alone is also relevant to work the lawyers are doing for BCE and Teleglobe. Do these facts vitiate the duty of confidentiality or attorney-client privilege arising out of the work undertaken for BCE alone? My answer is no.

4. *Question 2*: Assume lawyers undertake work solely for BCE and that these lawyers do *not* also represent Teleglobe. But the lawyers send information gained in their work for BCE to in-house lawyers at BCE who concurrently represent BCE and Teleglobe on a related matter. What is the effect on the in-house lawyers' duty of confidentiality to BCE and on BCE's attorney-client privilege of the fact that the documents were sent to the in-house lawyers? My answer is that their duty to BCE and its privilege remain intact.

**Opinion**

5. Essentially, the two situations ask about the effect, if any, of a lawyer's joint representation on the lawyer's duty of confidentiality and also on the attorney-client privilege. In question 1, I assume that the lawyers jointly represent BCE

and Teleglobe. As a heuristic device, I will further assume hypothetically that the lawyers have a conflict of interest in accepting work for BCE that is relevant to work the lawyers are doing for BCE and Teleglobe jointly and that the lawyers should not have accepted that work without Teleglobe's informed consent. In question 2, I will assume hypothetically that once the in-house lawyers received BCE's confidential and privileged information, which was also relevant to their work for Teleglobe, they too had a conflict, though of a different kind. Their conflict would be between the duty of confidentiality to BCE and the duty to inform Teleglobe about the content of the documents.

6. In either situation, the lawyer's duty of confidentiality and the client's privilege survive the hypothetical conflict. That is, whatever the upshot of the conflict for the lawyers, it is a non-sequitur and incorrect to say that the client pays a price in the loss of secrecy for its information. The conflict rules in the Rules of Professional Conduct state professional duties that the courts, with participation of the bar, impose on lawyers. They state rules of conduct for lawyers. But these rules do not impose duties on clients or subject clients to loss of rights if lawyers transgress them.

7. I recognize that ordinarily, as an exception to privilege, if two clients retain one lawyer in a matter of common interest, neither client may assert the attorney-client privilege to prevent the other joint client from getting information regarding the matter even though the same information remains privileged as against the world. But that is not the situation I address. In the joint-client situation, the exception to the privilege presumes that the two clients have retained a single lawyer on the same matter.

8. The assumptions I have been asked to make, by contrast, posit that a lawyer is representing two clients on one matter while also representing only one of those two clients on a second, related matter (question 1); or that a lawyer who represents two clients on a matter receives privileged information of one of those

clients from another lawyer who represents only that client (question 2). In either of these situations the lawyer may have a conflict in accepting the second matter (question 1); or between the duty of confidentiality and to inform once having received the information (question 2). But a lawyer's conflict does not translate into a client's loss of the protection that the law otherwise grants to communications with its lawyer.

9.  Support for my view is found in *Eureka Investment Corporation, N.V. v. Chicago Title Insurance Company*, 743 F.2d 932, 938 (D.C. Cir. 1984), and cases citing it on this point. Fried Frank represented both Eureka and CTI against a common opponent, a tenant group. Separately, Fried Frank was counseling Eureka alone "about legal action against CTI," allegedly "in a closely related matter." *Id.* at 936, 938. CTI sought to defeat Eureka's claim of privilege for communications with Fried Frank in this separate representation.

10. The Court refused to do so because "Eureka and Mr. Singer [of Fried Frank]…expressly understood there to be an attorney-client relationship between them distinct from the one to which CTI was a party." *Id.* at 937. CTI argued that the privilege should be rejected because the law firm's representation of Eureka was a conflict of interest. Relying on Wigmore, the Court refused to hold that a lawyer's conflict defeats the client's privilege:

> Given Eureka's expectations of confidentiality and the
> absence of any policy favoring disclosure to CTI, Eureka should
> not be deprived of the privilege even if, as CTI suggests, the
> asserted attorney-client relationship should not have been created.
> We need not express any view on CTI's contention that Fried,
> Frank should not have simultaneously undertaken to represent
> Eureka in an interest adverse to CTI and continued to represent
> CTI in a closely related matter. As Wigmore's second principle
> expressly states, counsel's failure to avoid a conflict of interest

4

should not deprive the client of the privilege. The privilege, being the client's, should not be defeated solely because the attorney's conduct was ethically questionable. We conclude, therefore, that Eureka was privileged not to disclose the requested documents. 743 F.2d at 937-38.

That is also my opinion.

**Conclusion**

11. Even if it was a conflict of interest for the lawyers in question 1 to accept the BCE-only matter without consent (and I assume hypothetically for purposes of this opinion that it was); and even if a conflict between the duty of confidentiality and the duty to inform was created when the lawyers in question 2 received the BCE documents (and I assume hypothetically for purposes of this opinion that it did), still neither conflict would provide a basis for denying BCE the confidentiality and privilege protections that the law and professional conduct rules otherwise afford.

I declare under penalty of perjury that the foregoing is true and correct.

March 20, 2006

Stephen Gillers

# STEPHEN GILLERS

Emily Kempin Professor of Law
(vice dean 1999-2004)
New York University
School of Law
40 Washington Square South
New York, NY 10012

(212) 998-6264 (tel)
(212) 995-4658 (fax)
stephen.gillers@nyu.edu

**AREAS OF TEACHING**    Regulation of Lawyers and Professional Responsibility
Evidence; Law and Literature

**PRIOR COURSES**    Civil Procedure, Agency, Advocacy of Civil Claims, Federal Courts

**PUBLICATIONS**    BOOKS AND ANTHOLOGIES:

Regulation of Lawyers:  Problems of Law and Ethics (Aspen Law &
Business, 7th ed., April 2005).  The first edition of this book was
published in 1985.  Norman Dorsen was a co-author on the first two
editions.  Stephen Gillers is the sole author of the third through
seventh editions.  The first four editions were published by Little,
Brown & Co., which then sold its law book publishing to Aspen.

Regulation of Lawyers:  Statutes and Standards (with R. Simon)
(Aspen Law & Business) (This is a compilation with editorial
comment.  The first volume was published in 1989.  Updated versions
have been published annually thereafter.)

Getting Justice:  The Rights of People (Basic Books, 1971; revised
paperback, New American Library, May 1973).

Investigating the FBI (co-Editor with P. Watters)
(Doubleday, 1973; Ballantine, 1974)

None of Your Business:  Government Secrecy in America (co-Editor
with N. Dorsen) (Viking, 1974; Penguin, 1975).

1

**PUBLICATIONS**
(continued)

I'd Rather Do It Myself:  How to Set Up Your Own Law Firm (Law Journal Press, 1977).

Looking At Law School:  A Student Guide From the Society of American Law Teachers (editor and contributor) (Taplinger, 1977; NAL, 1977; revised ed., NAL, 1984; third ed., NAL, 1990).

The Rights of Lawyers and Clients (Avon, 1979).

"Four Policemen in London and Amsterdam," in R. Schrank (ed.) American Workers Abroad (MIT Press, 1979).

"Dispute Resolution in Prison:  The California Experience," and "New Faces in the Neighborhood Mediating the Forest Hills Housing Dispute," both in R. Goldmann (ed.) Roundtable Justice:  Case Studies in Conflict Resolution (Westview Press, 1980).

"The American Legal Profession," in A. Morrison (ed.), Fundamentals of American Law (Oxford University Press 1996).

The Elsinore Appeal: People v. Hamlet (St. Martin's Press 1996). This book contains the text of Hamlet together with briefs and oral argument for and against affirmance of Prince Hamlet's murder convictions.  The book arose out of a symposium sponsored by the Association of the Bar of the City of New York.

"In the Pink Room," in Legal Ethics: Law Stories (D. Rhode & D. Luban, eds.) (Foundation Press, 2006) (also published as a freestanding monograph).


ARTICLES:

Free the Lawyers:  A Proposal to Permit No-Sue Promises in Settlement Agreements, 18 Georgetown J. Legal Ethics 291 (2005) (with Richard W. Painter).

Lessons from the Multijurisdictional Practice Commission: The Art of Making Change, 44 Ariz. L. Rev. 685 (2002).

Speak No Evil:  Settlement Agreements Conditioned On Noncooperation Are Illegal and Unethical, 31 Hofstra L. Rev.  1 (2002) (reprinted at 52 Defense L.J. 769 (2003)).

"If Elected, I Promise [_____]"–What Should Judicial Candidates Be Allowed to Say?  35 Ind. L. Rev. 735 (2002).

Stephen Gillers

**PUBLICATIONS**
(continued)

Legal Ethics: Art or Theory?, 58 Annual Survey Am. L. 49 (2001).

The Anxiety of Influence, 27 Fla. St. L. Rev. 123 (1999) (discussing rules that restrict multidisciplinary practice.

Can a Good Lawyer Be a Bad Person? 2 J. Inst. Study of Legal Ethics 131 (1999) (paper delivered at conference "Legal Ethics: Access to Justice" at Hofstra University School of Law, April 5-7, 1998).

More About Us: Another Take on the Abusive Use of Legal Ethics Rules, 11 Geo. J. Legal Ethics 843 (1998).

Caveat Client: How the Proposed Final Draft of the Restatement of the Law Governing Lawyers Fails to Protect Unsophisticated Consumers in Fee Agreements With Lawyers, 10 Geo. J. Legal Ethics 581 (1997).

Participant, Ethical Issues Arising From Congressional Limitations on Legal Services Lawyers, 25 Fordham Urban Law Journal 357 (1998) (panel discussion).

The Year: 2075, the Product: Law, 1 J. Inst. Study of Legal Ethics 285 (1996) (paper delivered on the future of the legal profession at Hofstra University Law School's conference "Legal Ethics: The Core Issues").

Getting Personal, 58 Law & Contemp. Probs. 61 (Summer/Autumn 1995) (contribution to symposium on teaching legal ethics).

Against the Wall, 43 J. Legal Ed. 405 (1993) (ethical considerations for the scholar as advocate).

Participant, Disqualification of Judges (The Sarokin Matter): Is It a Threat to Judicial Independence?, 58 Brooklyn L. Rev. 1063 (1993) (panel discussion).

The New Old Idea of Professionalism, 47 The Record of the Assoc. Bar of the City of N.Y. 147 (March 1992).

The Case of Jane Loring-Kraft: Parent, Lawyer, 4 Geo. J. Legal Ethics 115 (1990).

Taking L.A. Law More Seriously, 98 Yale L.J. 1607 (1989) (contribution to symposium on popular legal culture).

Stephen Gillers

**PUBLICATIONS**
(continued)

Protecting Lawyers Who Just Say No, 5 Ga. St. L. Rev. 1 (1988) (article based on Henry J. Miller Distinguished Lecture delivered at Georgia State University College of Law).

Model Rule 1.13(c) Gives the Wrong Answer to the Question of Corporate Counsel Disclosure, 1 Geo. J. Legal Ethics 289 (1987).

The Compelling Case Against Robert H. Bork, 9 Cardozo L. Rev. 33 (1987).

Ethics That Bite:  Lawyers' Liability to Third Parties, 13 Litigation 8 (Winter 1987).

Can a Good Lawyer Be a Bad Person?, 84 Mich. L. Rev. 1011 (1986).

Proving the Prejudice of Death-Qualified Juries After Adams v. Texas:  An Essay Review of Life in the Balance, 47 Pitt. L. Rev. 219 (1985), cited in Lockhart v. McCree, 476 U.S. 162, 197, 201 (1986) (Marshall, J., dissenting).

What We Talked About When We Talked About Ethics: A Critical View of the Model Rules, 46 Ohio St. L.J. 243 (1985).

The Quality of Mercy:  Constitutional Accuracy at the Selection Stage of Capital Sentencing, 18 U.C. Davis L. Rev. 1037 (1985).

Berger Redux, 92 Yale L.J. 731 (1983) (Review of Death Penalties by Raoul Berger).

Selective Incapacitation:  Does It Offer More or Less?, 38 The Record of the Assoc. Bar City of N.Y. 379 (1983).

Great Expectations:  Conceptions of Lawyers at the Angle of Entry, 33 J. Legal Ed. 662 (1983).

Perspectives on the Judicial Function in Criminal Justice (Monograph, Assoc. Bar City of N.Y., 1982).

Deciding Who Dies, 129 U. Pa. L. Rev. 1 (1980) (quoted and cited as "valuable" in Spaziano v. Florida, 468 U.S. 447, 487 n.33 (1984) (Stevens, J., dissenting); also cited in Zant v. Stephens, 462 U.S. 862, 878 n.17, 879 n.19 (1983); Lockhart v. McCree, 476 U.S. 162, 191 (1986) (Marshall, J., dissenting); Callins v. Collins, 114 S.Ct. 1127, 1134 n.4 (1994) (Blackmun, J., dissenting); and Harris v. Alabama, 115 S.Ct. 1031, 1038-39 (1995) (Stevens, J., dissenting).

4

Stephen Gillers

Numerous articles in various publications, including <u>The New York Times</u>, <u>The Nation</u>, <u>American Lawyer</u>, <u>The New York Law Journal</u>, <u>The National Law Journal</u>, <u>Newsday</u>, and the <u>ABA Journal</u>.  See below for selected bibliography.

**VIDEOTAPES**   "Adventures in Legal Ethics and Further Adventures in Legal Ethics": videotape of thirteen dramatic vignettes professionally produced and directed and raising issues of legal ethics.  Author, Producer.  (1994)

"Dinner at Sharswood's Café," a videotape raising legal ethics issues. Author,  Producer. (1996)

"Amanda Kumar's Case," a 38-minute story raising more than two dozen legal ethics issues.  Author. (1998)

**TRIBUTES**   To Honorable Gus J. Solomon, printed at 749 Federal Supplement LXXXI and XCII (1991).

<u>Truth, Justice, and White Paper</u>, 27 Harv. Civ. R. Civ. Lib. L. Rev. 315 (1992) (to Norman Dorsen).

<u>Irving Younger: Scenes from the Public Life</u>, 73 Minn. L. Rev. 797 (1989).

**OTHER TEACHING**   Visiting Professor of Law, Harvard Law School, Winter 1988 Semester; Adjunct Professor of Law, Yeshiva University, Cardozo Law School, Spring 1986, Spring 1987, and Fall 1988 Semesters. Course:  The Legal Profession.

Adjunct Associate Professor of Law, Brooklyn Law School, 1976-78. Course:  Constitutional Law.

Stephen Gillers

| | |
|---|---|
| **PRIOR EMPLOYMENT** | <u>1973 - 1978</u><br>Private practice of law<br>Warner and Gillers, P.C. (1975-78)<br><br><u>1974 - 1978</u><br>Executive Director<br>Society of American Law Teachers, Inc.<br><br><u>1971 - 1973</u><br>Executive Director, Committee for<br>Public Justice<br><br><u>1969 - 1971</u><br>Associate, Paul, Weiss, Rifkind,<br>Wharton & Garrison<br><br><u>1968 - 1969</u><br>Judicial Clerk to Chief Judge<br>Gus J. Solomon, Federal District Court<br>for the District of Oregon, Portland, Oregon |
| **SELECTED TESTIMONY** | Testimony on "Nomination of Sandra Day O'Connor to the Supreme Court of the United States", Hearings, before the Senate Committee on the Judiciary, 97th Congress, 1st Sess., Sept. 11, 1981.<br><br>Testimony on S. 2216, "Habeas Corpus Reform Act of 1982", Hearings, before the Senate Committee on the Judiciary, 97th Congress, 2d Sess., April 1, 1982.<br><br>Testimony on H.R. 5679, "Criminal Code Revision Act of 1981", Hearings, before the House of Representatives, Committee on the Judiciary, 97th Congress, 2d Sess., April 22, 1982.<br><br>Testimony on S. 653, "Habeas Corpus Procedures Amendment Act of 1981", Hearings, before the Senate Committee on the Judiciary, 97th Congress, 1st Sess., November 13, 1981.<br><br>Testimony on S. 8875 and A. 11279, "A Proposed Code of Evidence for the State of New York", before Senate and Assembly Codes and Judiciary Committees, February 25, 1983.<br><br>Testimony before A.B.A. Commission on Women in the Profession, Philadelphia, February 6, 1988. |

Stephen Gillers

| | |
|---|---|
| SELECTED<br>Testimony<br>(continued) | Testimony on the nomination of William Lucas to be Assistant Attorney General for Civil Rights, before the Senate Committee on the Judiciary, 101st Congress, 1st Sess., July 20, 1989. |
| | Testimony on the nomination of Vaughn Walker to be United States District Judge for the Northern District of California, before the Senate Committee on the Judiciary, 101st Congress, 1st Sess., November 9, 1989. |
| **PUBLIC<br>LECTURES**<br>(partial list) | Paul M. Van Arsdell, Jr., Memorial Lecture, University of Illinois, College of Law, March 7, 2005:  "Do Lawyers Share Moral Responsibility for Torture at Guantanamo and Abu Ghraib?" |
| | Howard Lichtenstein Distinguished Professorship of Legal Ethics Lecture Series, "In Praise of Confidentiality (and Its Exceptions)," delivered at Hofstra University School of Law, November 12, 2003. |
| | Henry J. Miller Distinguished Lecture, Georgia State University College of Law, May 11, 1988.  "Protecting Lawyers Who Just Say No." |
| | First Annual South Carolina Bar Foundation Lecture, April 9, 1992, University of South Carolina Law School, Columbia, South Carolina.  "Is the Legal Profession Dead?  Yearning to Be Special in an Ordinary Age." |
| | Philip B. Blank Memorial Forum on Attorney Ethics, Pace University School of Law, April 8, 1992.  "The Owl and the Fox: The Transformation of Legal Work in a Commodity Culture." |
| | Speaker on Judicial Ethics, ABA Appellate Judges' Seminar and Flaschner Judicial Institute, September 29, 1993, Boston, Massachusetts. |
| | Baker-McKenzie Ethics Lecture, Loyola University Chicago School of Law, October 13, 1993, Chicago, Illinois ("Bias Issues in Legal Ethics:  Two Unfinished Dramas"). |
| | The Sibley Lecture, University of Georgia School of Law, Athens, Georgia, November 10, 1993 ("Telling Stories in School: The Pedagogy of Legal Ethics"). |
| | Participant, "Ethics in America" series, broadcast on PBS February and March 1989, produced by Columbia University Seminars on Media and Society. |

**PUBLIC
LECTURES**
(continued)

Participant, "The Constitution: That Delicate Balance, Part II" series, broadcast on PBS February and March 1992, produced by Columbia University Seminars on Media and Society.

Lecturer on legal ethics and allied subjects at dozens of seminars and conferences organized by District of Columbia, Second, Fourth, Sixth, Ninth and Federal Circuit Judicial Conferences; American Bar Association; Federal Bar Council; New York State Judiciary; Practicing Law Institute; Law Journal Seminars; state, local and specialty bar associations (including in Oregon, Nebraska, Illinois, New York, New Jersey, Pennsylvania, Rhode Island, Vermont, and Georgia); corporate law departments; law schools; and law firm retreats.

**LEGAL AND
PUBLIC SERVICE
ACTIVITIES**

Chair, American Bar Association Joint Committee on Lawyer Regulation, 2005- ____ (Member 2002-____).

Member, American Bar Association Commission on Multijurisdictional Practice, 2000-2002.

Retained by the New Jersey Supreme Court, in connection with the Court's review of the lawyer disciplinary system in New Jersey, to provide an "analysis of the strengths and weaknesses of California's 'centralized' disciplinary system" and to "report on the quality, efficiency, timeliness, and cost effectiveness of the California system...both on its own and compared with the system recommended for New Jersey by the Ethics Commission." Report filed December 1993. Oral presentation to the Court, March 1994.

Reporter, Appellate Judges Conference, Commission on Judicial participation in the American Bar Association, (October 1990 -August 1991).

Member, David Dinkins Mayoral Transition Search Committee (Legal and Law Enforcement, 1989).

Member, Committee on the Profession, Association of the Bar of the City of New York (1989-1992).

Member, Executive Committee of Professional Responsibility Section, Association of American Law Schools (1985-1991); Chair, 1989-90 (organized and moderated Section presentation at 1990 AALS Convention on proposals to change the ABA Code of Judicial Conduct).

8

Stephen Gillers

| | |
|---|---|
| **LEGAL AND PUBLIC SERVICE** (continued) | Counsel, New York State Blue Ribbon Commission to Review Legislative Practices in Relation to Political Campaign Activities of Legislative Employees (1987-88). |
| | Member, Departmental Disciplinary Committee, First Judicial Department  (1980 - 1983). |
| | Member, Committee on Professional and Judicial Ethics, Association of the Bar of the City of New York  (1979 - 1982). |
| | Member, Criminal Law Committee, Association of the Bar of the City of New York (1992-1995). |
| **BAR MEMBERSHIPS** | STATE: |
| | New York (1968) |
| | FEDERAL: |
| | United States Supreme Court (1972); Second Circuit (1970); Southern District of New York (1970); Eastern District of New York (1970) |
| **LEGAL EDUCATION** | J.D. cum laude, NYU Law School, 1968 Order of the Coif (1968) Dean's List (1966-68) University Honors Scholar (1967-68) |
| **PRELEGAL EDUCATION** | B.A. June 1964, City University of New York (Brooklyn College) |
| **DATE OF BIRTH** | November 3, 1943 |

9

Stephen Gillers

**OTHER ARTICLES**   (Selected Bibliography 1978-present)

1.      Carter and the Lawyers, The Nation, July 22-29, 1978.

2.       Standing Before the Bar, Bearing Gifts, New York Times, July 30, 1978.

3.       Judgeships on the Merits, The Nation, September 22, 1979.

4.       Entrapment, Where Is Thy Sting?, The Nation, February 23, 1980.

5.       Advice and Consent, New York Times, September 12, 1981.

6.       Lawyers' Silence: Wrong . . . , New York Times, February 14, 1983.

7.       The Warren Court - It Still Lives, The Nation, September 17, 1983.

8.       Burger's Warren Court, New York Times, September 25, 1983.

9.       "I Will Never Forget His Face!", New York Times, April 21, 1984.

10.      Warren Court's Landmarks Still Stand, Newsday, July 29, 1984.

11.      Von Bulow, And Other Soap Operas, New York Times, May 5, 1985.

12.      Statewide Study of Sanctions Needed for Lawyers' Misconduct, New York Law Journal, June 6, 1985.
13.      Preventing Unethical Behavior - Something New in Model Rules, New York Law Journal, August 30, 1985.

14.      Proposed Model Rules Superior to State's Code, New York Law Journal, October 21, 1985.

15.      Five Ways Proposed to Improve Lawyer Discipline in New York, New York Law Journal, January 8, 1986.

16.      Poor Man, Poor Lawyer, New York Times, February 28, 1986.

17.      Proposals To Repair Cracks in Ethical Legal Behavior, New York Law Journal, April 17, 1986.

18.      Unethical Conduct: How to Deter It Through Education, Bar Leader (May/June 1986).

19.      The New Negotiation Ethics - Or Did Herb's Lawyer Do Wrong? New York Law Journal, June 2, 1986.

20.      The Real Stakes in Tort Reform, The Nation, July 19-26, 1986.

21.      Bernhardt Goetz: Vigilante Or Victim?, Toronto Star, September 10, 1986.

10

22.     The Message That the Goetz Trial Will Send, Newsday, August 31, 1986.

23.     Amending the Ethics Code - Solicitation, Pre-Paid Plans, Fees, New York Law Journal, November 10, 1986.

24.     Amending the Ethics Code - Conflicts of Interest, Screening, New York Law Journal, November 12, 1986.

25.     Amending the Ethics Code - Confidentiality and Other Matters, New York Law Journal, November 13, 1986.

26.     No-Risk Arbs Meet Risk Justice, New York Times, November 23, 1986.

27.     The Meese Lie, The Nation, February 21, 1987.

28.     Amending State Ethics Code - Conflicts of Interest Gone Awry, New York Law Journal, May 18, 1987.

29.     "The Lawyers Said It Was Legal," New York Times, June 1, 1987.

30.  Feminists vs. Civil Libertarians, New York Times, November 8, 1987.

31.     Lessons for the Next Round in Picking a Justice, Newsday, November 11, 1987.

32.     We've Winked For Too Long, National Law Journal, December 21, 1987 (judicial membership in exclusionary clubs).

33.     No More Meeses, New York Times, May 1, 1988.

34.     In Search of Roy Cohn, ABA Journal, June 1, 1988 (book review).

35.      Do Brawley Lawyers Risk Serious Discipline?, New York Law Journal, June 22, 1988.

36.     Have the Brawley Lawyers Broken the Law?, New York Times, July 2, 1988.

37.     Report Demonstrates Why Meese is Unfit to Be Attorney General, Atlanta Journal and Constitution, July 24, 1988.

38.     Ethical Questions for Prosecutors in Corporate-Crime Investigations, New York Law Journal, September 6, 1988.

39.     Restoring Faith at Justice, National Law Journal, November 21, 1988.

40.     Is Bush Repeating Rockefeller's Folly?, New York Times, September 11, 1989.

41.     Standards Time, The Nation, January 29, 1990 (on the subject of legislative ethics).

42.     Abused Children vs. The Bill of Rights, New York Times, August 3, 1990.

43.     Words Into Deeds: Counselor, Can You Spare a Buck?, ABA Journal, November 1990.

44.     Bad Apples, ABA Journal at 96 (March 1991) (book review).

45.     The Gotti Lawyers and the Sixth Amendment, New York Law Journal, August 12, 1991.

46.     Justice or Just Us?  The Door to Dan Quayle's Courthouse Only Swings One Way, ABA Journal (June 1992) at 109.

47.     Fighting Words (What was once comical is now costly), ABA Journal (August 1992) at 102.

48.     Sensitivity Training: A New Way to Sharpen Your Skills At Spotting Ethics Conflicts, ABA Journal (October 1992) at 107.

49.     Under Color of Law:  Second Circuit Expands Section 1983 Liability for Government Lawyers, ABA Journal (December 1992) at 121.

50.     Cleaning Up the S&L Mess: Courts Are Taking the Duty to Investigate Seriously, ABA Journal (February 1993) at 93.

51.     All Non-Refundable Fee Agreements Are Not Created Equal, New York Law Journal (February 3, 1993) at 1.  (Analyzing appellate decision prohibiting non-refundable fees.)

52.     The Packwood Case: The Senate Is Also on Trial, The Nation (March 29, 1993) at 404.

53.     Conflict of Laws: Real-World Rules for Interstate Regulation of Practice, ABA Journal (April 1993) at 111.

54.     Packwood II, The Nation (May 10, 1993) at 617.

55.     Generation Gap, ABA Journal (June 1993) at 101.  (On the use of a boycott in response to the Colorado anti-gay initiative.)

56.     Future Shocks, ABA Journal (August 1993) at 104.  (Looking back on the practice of law in the 21st century from the year 2103.)

57.     A Rule Without a Reason, ABA Journal (October 1993) at 118.  (Criticism of the prohibition in Rule 5.6(b) against a lawyer agreeing not to restrict future practice in connection with a settlement.)

58.     Too Old to Judge?, ABA Journal (December 1993) at 94.  (Supreme Court justices have life tenure.  Maybe they should not.)

59.     Truth or Consequences, ABA Journal (February 1994) at 103.  (Discovery obligations.)

Stephen Gillers

60.     "Ethical Cannons," in Symposium - Twenty Years of Change, Litigation (Fall 1993).

61.     Stretched Beyond the Limit, Legal Times (March 21, 1994) at 37.  (Analysis of the office of Counsel to the President in light of Bernard Nussbaum's resignation.)  [Same article was reprinted in the Connecticut Law Tribune, the Fulton County (Atlanta) Daily Report, and the Recorder (San Francisco).]

62.     Putting Clients First, ABA Journal (April 1994) at 111. (Discussing cases on lawyers' fiduciary duty.)

63.     Grisham's Law, The Nation (April 18, 1994) at 509.  (The effect of popular culture on Whitewater reporting.)

64.     The Elsinore Appeal: "People v. Hamlet", New York Law Journal (October 11, 1994) at 3. (Brief for Appellee, State of Denmark).  (This was a mock appeal from Hamlet's conviction for the murder of Claudius, Polonius, Ophelia, Laertes, Rosencrantz & Gildenstern, held at the Association of the Bar of the City of New York on October 11, 1994.)

65.     Billing for Costs and Disbursements: What Law Firms Can Charge and Clients Can Expect, monograph published 1995 by Pitney Bowes Management Services.

66.     Clinton Has A Right To Privacy, N.Y. Times, 12/21/95, at 29.

67.     "'Filegate' Was Bad Enough.  Now This?," N.Y. Times, 7/5/96, at A23. (Article criticizing proposal to privatize certain security investigations of government personnel.)

68.     "Whitewater: How to Build a Case Using a Tainted Witness,"  Los Angeles Times, 2/16/97, at M1.

69.     "Hillary Clinton Loses Her Rights," New York Times, 5/4/97, at E15.

70.     "Shakespeare on Trials," IV Federal Bar Council News 16 (June 1997).

71.     "Florida Backs Out On a Deal," New York Times, 10/10/97, at A23.

72.     "The Perjury Loophole," New York Times, 2/18/98, at A21 (discussion of perjury in connection with Kenneth Starr's investigation of President Clinton).

73.     "Any Method to Ginsburg's Madness?" Los Angeles Times, 3/15/98, at M1 (discussion of William Ginsburg's public defense of Monica Lewinsky).

74.     "Whitewater Made Easy," The Nation, 6/1/98, at 8.

75.     "A Highly Strategic Legal Chess Game," Los Angeles Times, June 7, 1998,  at M1 (Starr-Clinton legal maneuvers).

13

Stephen Gillers

76. "To Sleep . . . Perchance, to Dream," New York Law Journal, July 8, 1998, at 2. (Humorous article about bored jurors.)

77. "Clinton Is No Ordinary Witness," New York Times, 7/28/98, at A15.

78. "The High Cost of an Ethical Bar," The American Lawyer, July/August 1998, at 87.

79. "Clinton's Choice: Tell Truth or Dare to Gamble," Los Angeles Times, August 2, 1998, at M1.

80. "Accurate Lies: The Legal World of Oxymorons," Los Angeles Times, August 30, 1998, at M1.

81. "A Fool For a Client?" The American Lawyer, October 1998, at 74. (President Clinton's legal representation in the Lewinsky representation.)

82. "The Presidency: Out to End Clinton's Mess and Be Happy," Los Angeles Times, October 4, 1998, at M1.

83. "Protecting Their Own," The American Lawyer, November 1998, at 118.

84. "Can't We All Just Practice Together: Taking Down 'Trade Barriers' on Lawyers Here and Abroad," Legal Times, November 9, 1998, at 32.

85. "Beyond the Impeachment Spectacle," Los Angeles Times, November 22, 1998, at M1.

86. "The Perjury Precedent," New York Times, December 28, 1998, at A27.

87. "From the Same Set of Facts: A Tale of Two Stories," Los Angeles Times, January 17, 1999, at M1 (about the Clinton impeachment trial).

88. "The Decline and Fall of Kenneth Starr," Los Angeles Times, February 7, 1999, at M1.

89. "The Truth About Impeachment," The American Lawyer, March 1999, p. 131.

90. "The Double Standard," New York Times Book Review, March 21, 1999, at 13 (review of *No Equal Justice* by David Cole).

91. "Four Officers, One Likely Strategy," New York Times, Saturday, April 3, 1999, at A15.

92. "The Man in the Middle: Did George Ventura Step Over the Ethical Line?" The American Lawyer, May 1999, p. 80 (discussion of lawyer whistleblowing in light of *State v. George Ventura*). (Reprinted as "Whistleblower, Esq." in New York Law Journal, May 26, 1999 at page 2.)

93. "Your Client Is A Corporation – Are Its Affiliates Clients Too?" The New York Professional Responsibility Report, May 1999 , at 1.

14

Stephen Gillers

94.     "Job Talk (Scenes from the Academic Life)," The American Lawyer, July 1999, at 161. (Satire about law school hiring.)

95.     "The Other Y2K Crisis," The Nation, July 26/August 2, 1999, at 4 (editorial about the year 2000 electoral races).

96.     "Walking the Confidentiality Tightrope," ACCA Docket 20 (September/October 1999) (remarks at ACCA's national conference in 1998).

97.     "Things Old & New – The Code Amendments," New York Professional Responsibility Report (September 1999), at 1.

98.     "Clinton's Chance to Play the King," New York Times,  Sept. 20, 1999 at A17.

99.     "Overprivileged," American Lawyer, October 1999 at 37.  (Discussion of First Amendment protection for journalists.)

100.    "Controlling Conflicts Between Old and New Clients,"  New York Professional Responsibility Report, January 2000 at 3.

101.    "How To Spank Bad Lawyers," American Lawyer, February 2000 at 41.

102.    "A Weak Case, But a Brave Prosecution," New York Times, Wednesday, March 1, 2000 at A23 (the Diallo case).

103.    "Conflicts of Interest in Malpractice Cases," New York Professional Responsibility Report, March 2000 at 1.

104.    "The Court's Picayune Power," New York Times, Thursday, April 20, 2000 at A29.

105.    "Some Misrepresentations Among Corporate Lawyers," New York Professional Responsibility Report, June 2000 at 1.

106.    "Was Hubbell Case About Getting Justice or Getting Even?" Los Angeles Times, June 18, 2000 at M2 (comment on the U.S. Supreme Court's decision in *United States v. Hubbell*, decided June 5, 2000).

107.    "Who Owns the Privilege After a Merger?" New York Professional Responsibility Report, July 2000 at 1.

108.    "Fighting the Future," The American Lawyer, July 2000 at 55.

109.    "Campus Visits Deconstructed," Newsweek: How To Get Into College, 2001 Edition at 46.

110.    "The Court Should Boldly Take Charge," New York Times, Tuesday, November 21, 2000 at A25 (Florida's presidential election recount).

15

111.   "Who Says the Election Has a Dec. 12 Deadline?"  New York Times, Saturday, December 2, 2000 at A19.

112.   "Motive Is Everything in the Marc Rich Pardon," New York Times, Saturday, February 17, 2001.

113.   "For Justice To Be Blind, Must Judges Be Mute?"  New York Times, Sunday, March 4, 2001 at Section 4, page 3.

114.   "Should Supreme Court Justices Have Life Tenure?"  Reprinted in *The Supreme Court and Its Justices* (Choper J., ed.) (ABA 2001).

115.   Professionalism Symposium, 52 South Carolina L. Rev. 55 (2001) (closing remarks).

116.   "No Lawyers To Call," New York Times, Monday, December 3, 2001 at A19 (ethical and constitutional obligations that will prevent lawyers from participating in military tribunals).

117.   "Let Judicial Candidates Speak," New York Times, Thursday, March 28, 2002 at A31.

118.   "The Flaw in the Andersen Verdict," New York Times, Tuesday, June 18, 2002 at A23.

119.   "Why Judges Should Make Court Documents Public," New York Times, Saturday, November 30, 2002 at A17.

120.   "It's an MJP World," ABA Journal, December 2002 at 51.

121.   "Upholding the Law as Pretrial Publicity Goes Global," New York Times, Sunday, April 27, 2003,  Sec. 4 at 14.

122.   "Court-Sanctioned Secrets Can Kill," Los Angeles Times, Wednesday, May 14, 2003 (reprinted May 15, 2003 in Newsday).

123.   "Make a List," New York Times, June 11, 2003 at 31 (advocating changes in the methods of judicial selection).

124.   "Conflicted About Martha?" American Lawyer (September 2003) (analysis of Martha Stewart indictment).

125.   "The Prudent Jurist," Legal Affairs, January/February 2004.

126.   "On Knowing the Basic Rules of Advocacy," New York Times, February 8, 2004, Sec. 4 at 2 (cross-examination in the Martha Stewart trial).

127.   "The Prudent Jurist," Legal Affairs, March/April 2004.

128.  "Scalia's Flawed Judgment," The Nation, April 19, 2004 at 21.

Stephen Gillers

129.    "Scholars, Hucksters, Copycats, Frauds," Washington Post, April 25, 2004 at B3  (Outlook) (discussion of ethics of academics who put their names on newspaper opinion pieces written by industry).

130.      "The Prudent Jurist," Legal Affairs, May/June 2004 at 17.

131.    "Multijurisdictional Practice of Law:  Merging Theory With Practice," 73 The Bar Examiner 28 (May 2004).

132.    "Tortured Reasoning," American Lawyer (July 2004) (analysis of government lawyer memos addressing the application of various treaties and laws to the treatment of Afghan prisoners).

133.    "Paying the Price of a Good Defense," New York Times, August 13, 2004.

134.    "Improper Advances:  Talking Dream Jobs with the Judge Out of Court," Slate.com, August17, 2005 (with D. Luban and S. Lubet).

135.    "Roberts' Bad Decision," Los Angeles Times, September. 13, 2005 (with D. Luban and S. Lubet).

136.    "No Privilege for Miers," The Nation, November 7, 2005

137.    "Senators, Don't Rubber-Stamp," USA Today, January 5, 2006 at 13A (discussing the Senate's advise and consent responsibility in connection with Alito nomination).

138.    Ethics Column, American Lawyer, page 61 (January 2006) (with Deborah Rhode).

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 21, 2006, I electronically filed a true and correct copy of

foregoing document was filed with the Clerk of the Court using CM/ECF, which will send

notification that such filing is available for viewing and downloading to the following counsel of

record:

Gregory V. Varallo, Esq.                Joseph A. Rosenthal, Esq.
Mark D. Collins, Esq.                   Rosenthal, Monhait, Gross & Goddess, P.A.
C. Malcolm Cochran, IV, Esq.            1401 Mellon Bank Center
Robert J. Stern, Jr., Esq.              P.O. Box 1070
Kelly E. Farnan, Esq.                   Wilmington, DE  19899-1070
Anne S. Gaza, Esq.
Richards, Layton & Finger, P.A.
920 N. King Street
Wilmington, DE  19801

I further certify that on March 21, 2006, I caused a copy of the foregoing document on

the to be served upon the following non-registered participants in the manner indicated below:


BY EMAIL
John P. Amato, Esq.
Mark S. Indelicato, Esq.
Zachary G. Newman, Esq.
Jeffrey L. Schwartz, Esq.
Hahn & Hessen LLP
488 Madison Avenue
New York, NY  10022


*/s/ Margaret B. Whiteman*
Pauline K. Morgan (No. 3650)
Maribeth Minella (No. 4185)
Margaret B. Whiteman (No. 4652)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
P.O. Box 391
Wilmington, DE 19899-0391
(302) 571-6681
pmorgan@ycst.com
mminella@ycst.com
mwhiteman@ycst.com
bank@ycst.com

*Attorneys for Defendants*