**TAB 2**

Westlaw.

Not Reported in A.2d

Not Reported in A.2d, 2002 WL 991666 (Del.Ch.)

(Cite as: 2002 WL 991666 (Del.Ch.))

Page 1

H
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
In re FUQUA INDUSTRIES, INC.,
SHAREHOLDER LITIGATION
No. CIV.A. 11974.

Submitted: Dec. 31, 2001.
Decided: May 2, 2002.

Pamela Tikellis, of Chimicles & Tikellis, Wilmington, Delaware; Joseph A. Rosenthal, Carmella P. Keener, of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware; of Counsel: Lowell E. Sachnoff, Duane F. Sigelko, of Sachnoff & Weaver, Ltd., Chicago, Illinois; David Schachman, of David Schachman & Associates, P.C., Chicago, Illinois, Attorneys for Plaintiffs.

Thomas R. Hunt, Jr., David J. Teklits, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; of Counsel: Oscar N. Persons, of Alston & Bird, Atlanta, Georgia, Attorneys for Defendant J.B. Fuqua.

R. Franklin Balotti, Anne C. Foster, Peter B. Ladig, of Richards,Layton & Finger, Wilmington, Delaware, Attorneys for Nominal Defendant Fuqua Industries, Inc.

MEMORANDUM OPINION

CHANDLER, Chancellor.

*1 Before me is plaintiffs' third motion to compel defendants Fuqua Industries, Inc. and J.B. Fuqua to produce documents claimed to be privileged. [FN1] The parties fully briefed this motion and I have conducted an *in camera* inspection of the documents in dispute. This is my decision on the plaintiffs' motion.

> FN1. The factual and procedural history of this case are set forth in this Court's 1999 opinion concerning the adequacy of representation, as mandated by Rule 23.1, of the named plaintiffs in this case. See *In re Fuqua Indus., Inc. Shareholder Litig.*, 752 A.2d 126 (Del. Ch.1999).

I. INTRODUCTION

The numerous claims originally asserted by the plaintiffs were whittled down to one by this Court's 1997 decision on defendants' motion to dismiss plaintiffs' second amended complaint. That decision resulted in the dismissal of all of the plaintiffs' class claims and all but one of their derivative claims. [FN2] The sole surviving derivative claim concerns the decisions of the defendant directors of Fuqua Industries, Inc. ("FII") to exempt its principal shareholder, Triton Group, Inc. ("Triton"), from 8 *Del. C.* § 203 and to repurchase 4.9 million Fuqua shares. These decisions were allegedly made for the purpose of increasing Triton's control over FII, entrenching the FII board and, consequently, denying FII shareholders a change of control premium. [FN3] The asserted purpose of the motion to compel currently before me is to gather evidence in furtherance of that claim.

> FN2. See *In re Fuqua Indus., Inc. Shareholder Litig.*, Del. Ch., C.A. No. 11974, mem. op., Chandler, V.C. (May 13, 1997).

> FN3. *In re Fuqua*, 752 A.2d at 128.

Specifically, the motion requests, pursuant to Rule 37(b) and this Court's September 17, 1999 letter opinion, [FN4] an order compelling defendants FII and J.B. Fuqua to produce 138 documents identified by the plaintiffs from the defendants' various

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2002 WL 991666 (Del.Ch.)

**(Cite as: 2002 WL 991666 (Del.Ch.))**

privilege logs. The bases for the plaintiffs' assertion that these documents should be produced are: (1) that no author or recipient is specified in the relevant privilege logs as required under this Court's Order to sustain a claim of privilege; (2) waiver of the attorney-client privilege; (3) that documents did not contain legal advice; and/or (4) that plaintiffs have shown good cause for the production of all of the specified documents.

> FN4. *In re Fuqua Industries, Inc. Shareholders Litig.,* Del. Ch., let. op., Chandler, C. (Sept. 17, 1999).

Because I find that the plaintiffs have demonstrated good cause why the attorney-client privilege should not apply, I grant the plaintiffs' motion with regard to all requested documents except for those I have determined, through *in camera* inspection, to be work product prepared in contemplation of this litigation and eight documents withheld from production by defendant J.B. Fuqua. [FN5]

> FN5. In their reply brief, the plaintiffs state that if the eight documents J.B. Fuqua has asserted are privileged "make no reference to Triton's proposed business combination with FII, to change-of-control or to the general context in which J.B. Fuqua's sale of stock to Triton was to take place (matters which Plaintiffs cannot determine from the log entries), Plaintiffs will concede that they do not require production of that document." Pls.' Reply Br. at 11. Those documents were provided to the Court for *in camera* inspection under cover of a letter dated November 6, 2001, from Thomas R. Hunt, Jr., Esquire, counsel for Mr. Fuqua, to the Court. After examination of those documents, I determined that none of the subjects listed by the plaintiffs are referenced in any of those documents and, therefore, by the plaintiffs' own admission, production of those eight documents is not required.

## II. APPLICABLE LEGAL STANDARDS
*A. Scope of Discovery and the Attorney-Client*

*Privilege*

The scope of discovery permitted in this Court is set forth in Court of Chancery Rule 26(b)(1). [FN6] The broad discovery permitted by Rule 26(b)(1) is limited to the extent that the party from whom discovery is demanded can properly assert a claim of privilege. The burden of establishing a privilege is on the party asserting that privilege. [FN7] Defendants assert that the documents subject to the plaintiffs' motion to compel are protected by the attorney-client privilege and produced privilege logs in support of that assertion. Rule 502(b) of the *Delaware Uniform Rules of Evidence* sets forth the scope of the attorney-client privilege in Delaware:

> FN6. Rule 26(b)(1) states:
> Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents or other tangible things and the identity and location of persons having knowledge of any discoverable matter. It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

> FN7. *Deutsch v. Cogan,* 580 A.2d 100,107 (Del. Ch.1990).

*2 A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client (1) between the client or the client's representative and the client's lawyer or the lawyer's representative, (2) between the lawyer and the lawyer's representative, (3) by the client or the client's representative or the client's lawyer or a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2002 WL 991666 (Del.Ch.)

(Cite as: 2002 WL 991666 (Del.Ch.))

Page 3

representative of the lawyer to a lawyer or a representative of a lawyer representing another in a matter of common interest, (4) between representatives of the client or between the client and a representative of the client, or (5) among lawyers and their representatives representing the same client.

The purpose of the attorney-client privilege is "to encourage full and frank communication between clients and their attorneys." [FN8] As others have noted, however, "an inevitable conflict arises" when a corporation asserts the attorney-client privilege in the context of a shareholder derivative action. [FN9] A claim of attorney-client privilege made on behalf of a corporation may only be asserted "through its agents, *i.e.*, its officers and directors, who must 'exercise the privilege in a manner consistent with their fiduciary duty to act in the best interests of the corporation and not of themselves as individuals." ' [FN10] The "inevitable conflict" develops when a shareholder, who is the intended beneficiary of the acts of his corporation's agents, claims those agents have acted inimically to the interest of the corporation and its shareholders. As the *Deutsch* Court explained:

> FN8. *Zirn v. VLI Corp.,* 621 A.2d 773, 781 (Del.1993).

> FN9. *Id.*

> FN10. *Id.* (quoting *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 349, 105 S.Ct. 1986, 1991, 85 L.Ed.2d 372 (1985)).

Where a fiduciary has conflicting interests, to allow the lawyer-client privilege to block access to the information and basis of its decisions as to the persons to whom the obligations are owed might allow the perpetration of frauds. A fiduciary owes an obligation to his beneficiaries to go about his duties without obscuring reasons from the legitimate inquiries of the beneficiaries. Moreover, "[t]he more general and important right of those who look to fiduciaries to safeguard their interests, to be able to determine the proper functioning of the fiduciary, outweighs the need

for the privilege and its base of attorney-client confidence." [FN11]

> FN11. *Deutsch,* 580 A.2d at 108 (quoting *Valente v. Pepsico, Inc.,* 68 F.R.D. 361, 369-70, n. 16 (D.Del.1975)) (alteration in original) (citations omitted).

Despite this reasoning, however, "discovery of lawyer-client confidential communications is not automatic." [FN12] The purpose of fostering full and frank communication between attorney and client is not lessened merely because the client is a corporation. In determining the scope of the attorney-client privilege available to a corporate client, the United States Supreme Court has noted:

> FN12. *Deutsch,* 580 A.2d at 106.

[I]f the purpose of the attorney-client privilege is to be served, the attorney and client must be able to predict with some degree of certainty whether particular discussions will be protected. An uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all. [FN13]

> FN13. *Upjohn Co. v. United States,* 449 U.S. 383, 393, 101 S.Ct. 677, 684, 66 L.Ed.2d 584 (1981); *see also, id.* at n. 2 (stating that in the absence of the privilege, "the depth and quality of [legal communications between corporations and legal counsel], to ensure compliance with the law would suffer").

*3 The need to balance the legitimate assertion of the attorney-client privilege by corporate fiduciaries in furtherance of full and frank communication with counsel, on the one hand, with the right of a derivative plaintiff to discover what advice was given to those fiduciaries when a breach of duty by those same fiduciaries is alleged, on the other, resulted in a doctrine whereby a plaintiff-shareholder can show "good cause" why a corporation's claimed attorney-client privilege does not attach to the contents of otherwise-protectable

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2002 WL 991666 (Del.Ch.)

(Cite as: 2002 WL 991666 (Del.Ch.))

communications.

### B. "Good Cause" and the Non-application of the Attorney-Client Privilege

The Court in *Garner v. Wolfinbarger* explained that in the face of an assertion of attorney-client privilege by a corporation, a shareholder who is bringing a derivative action may be able to demonstrate good cause why that privilege should not apply. [FN14] *Garner* identified a non-exclusive list of factors that a court may consider in determining whether good cause has been shown to permit discovery of documents to which the attorney-client privilege would otherwise attach. These factors are:

> FN14. 430 F.2d 1093, 1103-04 (5th Cir.1970), *cert. denied,* 401 U.S. 974 (1971).

[1] the number of shareholders and the percentage of stock they represent; [2] the bona fides of the shareholders; [3] the nature of the shareholders' claim and whether it is obviously colorable; [4] the apparent necessity or desirability of the shareholders having the information and the availability of it from other sources; [5] whether, if the shareholders' claim is of wrongful action by the corporation, it is of action criminal, or illegal but not criminal, or of doubtful legality; [6] whether the communication related to past or to prospective actions; [7] whether the communication is of advice concerning the litigation itself; [8] the extent to which the communication is identified versus the extent to which the shareholders are blindly fishing; [and 9] the risk of revelation of trade secrets or other information in whose confidentiality the corporation has an interest for independent reasons. [FN15]

> FN15. *Id.* at 1104.

In *Deutsch v. Cogan* this Court noted its approval of the *Garner* approach to determining the applicability of the attorney-client privilege in shareholder suits. [FN16] Before the Court considers whether a showing of good cause compels production of purportedly privileged documents, however, the "litigant [must] first establish that a mutuality of interest existed between the parties" [FN17] at the time the disputed communication was made. [FN18] This mutuality of interest exists when a fiduciary (such as a corporate director) seeks legal advice in connection with actions taken or contemplated in his role as a fiduciary. Because the director is obligated to act in the best interest of the corporation and its shareholders, there is a mutuality of interest among the director, the corporation, and the shareholders when such legal advice is sought. It is logical, therefore, that upon a showing of good cause, the attorney-client privilege does not attach to prevent a plaintiff-shareholder--for whose ultimate benefit that advice was sought--from discovering the contents of that communication. At the point in time when the interests of the fiduciary and the beneficiary diverge, however, there is no longer a mutuality of interest and a *Garner* analysis is not appropriate. Although there is little Delaware case law on the subject, and no bright-line rule that identifies the point in time when mutuality of interest diverges in each case, that divergence must necessarily occur at the point in time when the parties can reasonably anticipate litigation over a particular action. [FN19] During the period when there is a mutuality of interest, however, a plaintiff may attempt to establish that he has shown good cause why the attorney-client privilege should not be invoked.

> FN16. 580 A.2d 100, 106 (Del. Ch.1990) (noting that *Garner* provided a "workable and logical framework for analyzing claims of lawyer-client privilege in the context of shareholder suits").

> FN17. *The Continental Ins. Co. v. Rutledge & Co., Inc.,* 1999 WL 66528 at *2 (Del. Ch.).

> FN18. *Id.* at *2 n. 17; *see also, Metropolitan Bank & Trust Co. v. Dovenmuehle Mortgage, Inc.,* 2001 WL 167445 at *3 (Del. Ch.) (stating that "[i]n

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2002 WL 991666 (Del.Ch.)

(Cite as: 2002 WL 991666 (Del.Ch.))

order for the Plaintiffs to take advantage of the fiduciary duty exception, the documents which they seek must have been created while there was a mutuality of interest with [the fiduciary]").

FN19. See Metropolitan Bank, 2001 WL 1671445 at *3 (stating that mutuality of interest "will have lapsed by the time that the [fiduciary and beneficiary] can reasonably anticipate litigation about an identified dispute"); Continental Ins., 1999 WL 66528 at *2 (finding that mutuality of interest diverged "after each party was made aware of the limited partners' intent to withdraw" and that legal advice received after that point in time "is privileged and need not be produced") (applying corporate rules and notions of fairness in the limited partnership context).

The requirement of a mutuality of interest explains why there is no Garner-exception to the work product privilege.

*4 Although frequently referred to as an exception to the attorney-client privilege, this Court noted in Sealy Mattress Co. of New Jersey, Inc. v. Sealy Inc., that a showing of good cause under the Garner doctrine is "technically not an 'exception' to the privilege, [but] results in its nonapplication." [FN20] Therefore, when considering a motion to compel production of documents--in the context of a shareholder derivative action where discovery requests are met by a properly-supported claim of attorney-client privilege by the corporation concerning communications that took place while there was a mutuality of interest between a fiduciary and the shareholders--the Court should first determine whether the shareholder has made a sufficient showing of good cause. If the plaintiff has made that showing, the attorney-client privilege will not attach and otherwise privileged documents may be subject to discovery. If the plaintiff has not made a sufficient showing of good cause, the attorney-client privilege will attach and the Court must next determine whether the plaintiff has alleged facts which would satisfy one of the exceptions to the attorney-client privilege.

FN20. 1987 WL 12500 at *3 (Del. Ch.); see also Deutsch, 580 A.2d at 104 (noting that the "doctrine ... is not technically an 'exception' to the lawyer-client privilege under Delaware Evidence Rule 502, but nonetheless results in its not being applied"); Garner, 430 F.2d at 1103-04 (stating "where the corporation is in suit against its stockholders on charges of acting inimically to stockholder interests, protection of those interests as well as those of the corporation and of the public require that the availability of the privilege be subject to the right of the stockholders to show cause why it should not be invoked in the particular instance ") (emphasis added).

In its consideration of whether good cause has been shown, the Court may consider the Garner factors and conduct a "so-called 'balancing test' ... to determine whether the balance tips in favor of disclosure or non-disclosure." [FN21] Of those several factors, the Sealy Court identified three as having particular significance to the Court's analysis: (1) the colorability of the claim; (2) the extent to which the communication is identified versus the extent to which the shareholders are blindly fishing; and (3) the apparent necessity or desirability of shareholders having the information and the availability of it from other sources. [FN22]

FN21. Deutsch, 580 A.2d at 105.

FN22. Sealy, 1987 WL 12500 at *4; see also In re Fuqua Indus. Inc. Shareholders Litig., Del. Ch., C.A. No. 11974, let. op. at 6-7, Chandler, C. (Sept. 17, 1999) (noting the identification of the importance of these three factors by Sealy ).

III. ANALYSIS

The plaintiffs renew their argument--made in support of an earlier, unsuccessful, motion to compel the production of documents--that, even if the defendants make a prima facie showing that the disputed documents are subject to the attorney-client privilege, the plaintiffs have shown

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2002 WL 991666 (Del.Ch.)

(Cite as: 2002 WL 991666 (Del.Ch.))

Page 6

good cause for the production of those documents. In my decision on that earlier motion, I denied the plaintiffs' motion based on a failure to satisfy two of the three key factors cited by *Sealy* as being particularly important to a finding of good cause. Although the survival of one of the plaintiffs' derivative claims after the 1997 motion to dismiss decision [FN23] established that at least one colorable claim had been stated, I was not convinced that the plaintiffs had demonstrated that they were not blindly fishing or that the information sought was unavailable from other sources. To illustrate why the plaintiffs had not satisfied those good-cause factors I stated that, "[f]irst, [the plaintiffs] ha[d] not adequately identified the specific communication. Second, and more importantly, that I[was] not satisfied that plaintiffs ha[d] exhausted every available method of obtaining the information they seek." [FN24] I noted that, "further depositions may provide the answers they seek without infringing upon the attorney-client privilege." [FN25]

> FN23. *In re Fuqua Indus., Inc. Shareholder Litig.*, Del. Ch., C.A. No. 11974, mem. op., Chandler, V.C. (May 13, 1997).
>
> FN24. *In re Fuqua*, let. op. at 7.
>
> FN25. *Id.*

*5 The plaintiffs assert that they have cured these defects and that they are now able to satisfy the criteria necessary to show good cause. With respect to the question whether the plaintiffs are blindly fishing, they have now satisfied that factor by specifically identifying each of the documents that they seek and showing that they are relevant to the two components of their surviving claim--as instructed by the 1999 denial of plaintiffs' earlier motion to compel [FN26]--by using excerpts from the privilege logs prepared by FII for its own documents and those of Simpson, Thacher & Bartlett. Arguably, these documents are necessary to support plaintiffs' allegations that decisions of the FII board were made for entrenchment purposes and affected FII shareholders' ability to receive a change

of control premium. As evidenced by the survival of this claim, the plaintiffs have stated a plausible scenario that, if ultimately proven true, would support their claim. This more focused and adequately supported document request tips the balance in favor of a belief that the plaintiffs are not blindly fishing for information.

> FN26. *Id.* at 9.

With regard to my even greater concern that good cause had not previously been shown because the information sought by plaintiffs might be available via other avenues, such as depositions, rather than a court-ordered production of documents, the plaintiffs have since conducted depositions and report that they have still been unable to uncover information that would lead to a determination of whether or not their claim is meritorious. Plaintiffs contend that the deponents either did not recall information concerning the subject upon which they were being questioned or attempted to trivialize certain of the bases of the plaintiffs' claim.

Significantly, the defendants do not dispute that the plaintiffs have sought further discovery through deposition, nor do they contend that other sources of that information are available which would moot the necessity of the plaintiffs' motion to compel. Instead, they attempt to cast the plaintiffs' argument as one in which they purport to have shown good cause because plaintiffs believe the privileged documents will contradict evidence already in the record. I agree with the defendants' contention that record evidence which disproves plaintiffs' allegations does not create good cause for production of otherwise privileged information because of the hope that other information will contradict that which is already in evidence. That would surely be nothing more than a blind fishing expedition and would not support a showing of good cause. As I have already noted, however, the basis of the plaintiffs' request for production is not that evidence they have discovered so far is contrary to their assertions or that they hope to find new information that will support their claim. Rather, they contend that those who are alleged to have acted improperly have been either unable or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2002 WL 991666 (Del.Ch.)

(Cite as: 2002 WL 991666 (Del.Ch.))

unwilling to provide information, which the plaintiffs believe is contained in the disputed documents. Because I conclude that plaintiffs have demonstrated that information necessary to prove or disprove their allegations in this derivative litigation is unavailable (or not forthcoming from any other source), the third critical *Garner* factor also tips in favor of discovery.

*6 The infirmities that prevented the plaintiffs from establishing good cause in support of their earlier motion to compel have been cured. Plaintiffs are now able to demonstrate a colorable claim, lack of blind fishing and the apparent need for production of documents that might otherwise be protected by the attorney-client privilege. Therefore, I conclude that the attorney-client privilege does not attach to those documents as it relates to these plaintiffs and must be produced. [FN27] Because there is no *Garner* exception to the work product privilege, and because plaintiffs have failed to show a compelling need for those documents as is necessary to overcome that privilege, those portions of documents I have identified through *in camera* inspection to include work product need not be produced. [FN28]

FN27. This conclusion makes it unnecessary to consider the parties' arguments concerning waiver or any other possible exceptions to attorney-client privilege that I would have had to consider had I determined that good cause had not been established by the plaintiffs. I express no view on the merits of those arguments.

FN28. The portions of documents subject to work product protection on Fuqua Industries, Inc. Privilege Log are: Tab 10--FI005094 & FI005099; Tab 16--FI033873-74; Tab 18--FI034079-80; Tab 19--FI034104-05; Tab 25--FI034558-59, 61-64; Tab 48--FI037413; Tab 51-- FI037502; Tab 53--FI037735-36, 40; Tab 58--FI037901-02, 04-07; Tab 65--FI042869-71; Tab 67--FI042876; Tab 70--FI042886-88; Tab 71--042890-93;

Tab 74--FI042951-3104; and Tab 75--FI043117-44.
The portions of documents subject to work product protection on Simpson Thacher & Bartlett's Privilege Log are: Tab10--P00061-63; Tab 12--P00078-79; Tab 13--P00080-81; Tab 14--P00082-87; Tab 17--P00097-117; and Tab 18--P00118-38.

IV. CONCLUSION

For the reasons stated, plaintiffs' motion is GRANTED in part and DENIED in part.

IT IS SO ORDERED.

Not Reported in A.2d, 2002 WL 991666 (Del.Ch.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**TAB 3**

Westlaw.

Not Reported in A.2d

Not Reported in A.2d, 1999 WL 252381 (Del.Ch.)

(Cite as: 1999 WL 252381 (Del.Ch.))

Page 1

C

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
Re: GRIMES, et al.
v.
LCC INTERNATIONAL, INC., et al, Civil Action
No., 16957
**No. CIV.A.16957.**

April 23, 1999.

Henry E. Gallagher, Esquire, Connolly, Bove, Lodge & Hutz, Wilmington.

Peter B. Ladig, Esquire, Richards, Layton & Finger, Wilmington.

JACOBS, Vice-Chancellor.

**\*1 Counsel:**

On April 22, 1999, I appointed a Special Master to recommend the disposition of the plaintiffs' motion to compel the production of approximately 140 documents being withheld by defendants on the grounds of attorney-client privilege and/or work product immunity. To afford guidance to the Special Master, the parties have asked the Court to resolve certain threshold privilege-related issues. This is the decision of the Court on those issues. Because of the shortness of time to complete discovery before the May 6, 1999 hearing on plaintiffs' motion to appoint a receiver, the Court's treatment of these issues is necessarily summary and abbreviated.

I.  *Universe  of  Documents  Subject  to  Attorney-Client Privilege*

The plaintiffs contend that many of the documents described on the defendants' privilege log cannot be subject to a claim of attorney-client privilege, because on their face those documents do not satisfy the criteria for a privileged communication. To be protected under the attorney-client privilege, a document must be or contain a confidential communication made between a client and his lawyer (or the representatives of the client and the lawyer, or among the lawyers and their representatives representing the same clients) for the purpose of facilitating the rendition of legal services to the client. Del. Unif. R. Evid. 502(b); *Deutsch v. Cogan,* Del. Ch., 580 A.2d 100, 105-6 (1990).

This Court has not independently reviewed the privilege log or the disputed documents; that unenviable task will be for the Master to perform. Nonetheless, some guidelines (although abstract) may be derived from basic principles. Thus, to the extent the defendants are claiming attorney-client privilege with respect to (1) correspondence or other communications between lawyers for Microcell and/or LCC (Microcell's controlling stockholder) and non-client persons or entities (e.g., Chase Manhattan Bank); or (2) correspondence or other communications between or among non-lawyers (and/or their representatives), these communications are discoverable because they fall outside the definition of a privileged communication.

II.  *Communications To and From Peter DeLiso*

According to the plaintiffs, the great bulk of the disputed documents are communications by or to Peter DeLiso, who is the general counsel for both LCC and Microcell, and is also the Chairman of Microcell's Board of Directors. The plaintiffs contend that Mr. DeLiso represented both LCC and Microcell during the events that give rise to their claims, namely (1) when those companies

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 2

Not Reported in A.2d

Not Reported in A.2d, 1999 WL 252381 (Del.Ch.)

(Cite as: 1999 WL 252381 (Del.Ch.))

negotiated the revolving credit agreement that is the subject of several breach of fiduciary duty claims, (2) when Microcell negotiated, with companies in several foreign countries, transactions that are the subject of claims that LCC usurped corporate opportunities of Microcell; (3) when Microcell's LCC-controlled board of directors improperly withheld funding from Microcell; (4) when Microcell agreed to guarantee LCC's credit facility with Chase Manhattan Bank, allegedly for no consideration; and (5) when LCC entered into credit agreements with Chase that prohibited LCC from funding Microcell, even though LCC was legally obligated to provide such funding.

\*2 It appears that Mr. DeLiso generated and received many documents in connection with these events. Those documents, plaintiffs contend, are not privileged as a matter of law. Lamentably, any analysis of these claims is made difficult because of the multiple roles that Mr. DeLiso occupied. Whether or not a given communication to or from Mr. DeLiso is privileged will necessarily depend upon his capacity at the time he generated or received the communication. To resolve the privilege issue created by Mr. DeLiso's several and simultaneous fiduciary roles, those capacities must first be sorted out.

That proposition, applied to the present facts, results in the following analysis:

1. Any confidential communication [FN1] to or from Mr. DeLiso *solely* in his capacity as Chairman of Microcell's Board of Directors (which communication does not contain any legal advice to Mr. DeLiso *qua* client), would not be subject to claims of attorney-client privilege, since Mr. DeLiso would not have been acting in his lawyer capacity.

> FN1. It is assumed that all communications referred to in this analysis pertain to matters that are relevant to the claims asserted in this lawsuit.

2. Any confidential communication made by Mr. DeLiso--acting *solely* in his capacity as counsel for

LCC--to LCC or its directors and/or officers; and any confidential communication made by those clients to Mr. DeLiso, again acting *solely* in that capacity, should be subject to the attorney-client privilege. Those communications would, therefore, be protected from disclosure to the plaintiffs, who are stockholders of Microcell, not LCC.

3. What remains are the confidential communications made by Mr. DeLiso acting *solely* in his third capacity--as counsel for Microcell--to Microcell and/or its officers or directors; and also confidential communications from those clients to Mr. DeLiso, again in that capacity, This category of documents is the apparent focus of much of the parties' legal dispute. The plaintiffs contend that because they are stockholders of Microcell who are suing derivatively on its behalf, Microcell and its directors may not invoke the attorney-client privilege against them. The defendants dispute that. They argue that the fact that plaintiffs are suing derivatively does not render the privilege inapplicable. They contend that the privilege does attach and that to defeat it, the plaintiffs must show good cause why the privilege should not apply. That issue is addressed in Part III, below. For the reasons set forth therein, I conclude that the defendants may claim privilege with respect to this category of documents, subject to the plaintiffs' right to defeat the privilege by showing good cause, as that concept was explicated by the Fifth Circuit in *Garner v. Wolfinbarger*, 430 F.2d 1093 (Th Cir.1970), and by this Court in *Deutsch v. Cogan*, *supra*, 580 A.2d at 105-6, and cases cited therein.

4. Although the disputed documents relating to Mr. DeLiso may be divided into the above three categories, in some cases the reality (as opposed to the theory) may not be so simple. Conceivably there may be documents that do not disclose in any clear-cut way which of Mr. DeLiso's three hats he was wearing at the time he generated or received the communication in question. Where Mr. DeLiso's capacity is not readily ascertainable from the document, it will be difficult to determine whether the document is subject to the privilege. To the extent the Special Master encounters such documents, the question becomes how they should

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1999 WL 252381 (Del.Ch.)

**(Cite as: 1999 WL 252381 (Del.Ch.))**

be treated. In my view, any doubt about the status of this "indeterminate" category of documents should be resolved against the claim of privilege. I so conclude because it was the defendants who would have created the problem, by placing Mr. DeLiso in multiple--and potentially conflicting-- fiduciary roles. Having created that conflict and its resulting ambiguity, and having been in a position to prevent the conflict from arising in the first place, the defendants, as fiduciaries for Microcell's minority stockholders, cannot be allowed to benefit from the ambiguity by asserting a privilege that might not otherwise have been available. *See Valente v. Pepsico, Inc.*, 68 F.R.D. 361, 368 (1975).

III. The *Garner vs. Valente* Debate

**\*3** The final issue concerns the plaintiffs' argument that the defendants may not assert the attorney-client privilege as to *any* communication to or from Mr. DeLiso while he served simultaneously as general counsel for LCC and Microcell. They contend that in such circumstances, *Valente v. Pepsico* precludes the conflicted fiduciary altogether from asserting, in a derivative action brought against the fiduciary, the privilege against either of the clients to whom he owed (conflicting) fiduciary duties. The defendants argue that *Valente* does not represent the law of Delaware. Rather, they contend, Delaware has rejected *Valente* in favor of the approach adopted in *Garner v. Wolfinbarger*, which allows the fiduciary to assert the privilege but permits the minority shareholder plaintiff to defeat the privilege by showing good cause.

On this issue the defendants are correct. In *Deutsch v. Cogan, supra*, this Court, citing earlier Chancery decisions, held that *Garner v. Wolfinbarger*, not *Valente v. Pepsico*, represents the law of Delaware on this question. Accordingly, shareholder plaintiffs must show good cause to defeat the defendants' claim of attorney-client privilege. The Court in *Deutsch* did, however, make it clear that the fiduciary's conflicting roles are a factor that may be taken into account in determining whether there is good cause. Moreover, although this Court rejected the rationale of *Valente*, it did endorse the result reached on the facts before the court in that case.

Accordingly, in reviewing the disputed documents, the Master shall determine whether the plaintiffs have shown good cause why the attorney-client privilege should not attach to those documents that fall into the third category described in Part II, *supra*, of this Opinion. In so doing, the Master shall be guided by the good cause analysis employed in *Garner, Deutsch,* and subsequent Delaware authorities. [FN2]

> FN2. *See, e.g., AOC Limited Partnership v. The Horsham Corporation*, Del. Ch., C.A. No. 12480, Chandler, V.C. (May 4, 1992); *Cole v. Wilmington Materials, Inc.*, Del. Ch., C.A. No. 12649, Allen, C. (July 1, 1993); *Lee v. Engle*, Del. Ch., C.A. No. 13223, 13284, Steele, V.C. (Dec. 15, 1995).

The defendants have also claimed worked product immunity with respect to some of the disputed documents. The work product issue is not addressed here, because it was not addressed in the parties' briefs. Work product claims will be resolved *in camera* on a document-by-document basis.

Not Reported in A.2d, 1999 WL 252381 (Del.Ch.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**TAB 4**

Westlaw.

Not Reported in A.2d

Not Reported in A.2d, 2000 WL 1946664 (Del.Ch.)

(Cite as: 2000 WL 1946664 (Del.Ch.))

Page 1

**H**
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
Christopher KOSACHUK, Plaintiff,
v.
Henry E. HARPER, Violy McCausland, and Contrasena, S.A., Defendants,
and
LATINADVISOR.COM, INC., a Delaware Corporation, Nominal Defendant,
Henry E. HARPER and LatinAdvisor.com, Inc., Counterclaim-plaintiffs,
v.
Christopher KOSACHUK, Counterclaim-defendant.
No. Civ.A. 17958.

Submitted Nov. 8, 2000.
Decided Dec. 19, 2000.

Dear Counsel:

LAMB, Vice-Chancellor.

*1 I understand from Mr. Walsh's letter of November 8, 2000, that the parties have been unable to agree upon a discontinuance of this litigation. In light of this development, I have reviewed the parties' submissions and the transcript of the October 23, 2000 hearing, and am prepared to rule on the pending motion to compel. For the following reasons, that motion will be denied.

Plaintiff, Christopher Kosachuk, moved to compel the production of all documents identified on defendants' privilege log. Before argument, the defendants produced all documents identified on that log that were dated on or before March 14, 2000, the date on which Kosachuk was discharged

as an employee and removed as a director of the defendant corporation, LatinAdvisor.com, Inc. At oral argument, defendants also agreed to produce all documents identified on that log for which the only claim of privilege is "business strategy." Kosachuk continues to press for the production of all of the documents identified on the log as attorney/client privileged or work product privileged, dated after March 14, 2000. These documents all contain communications between LatinAdvisor.com and its present counsel, the firm of Wachtell, Lipton, Rosen & Katz ("WLR & K").

Delaware courts recognize that a stockholder litigating against his or her corporation may be entitled to discover attorney-client privileged or attorney-work product privileged documents in the possession of the corporation or its counsel where "good cause" is shown. [FN1] For present purposes, "good cause" is judged under the standard established in *Garner v. Wolfinbarger.* [FN2] Three factors are particularly salient: (i) the colorability of the claim, (ii) the availability of the information from some other source, and (iii) the specificity with which the communications are identified. [FN3]

FN1. *Zirn v. VLI Corp.,* Del.Super., 621 A.2d 773, 781 (1993).

FN2. (5 th Cir.) 430 F.2d 1093 (1970).

FN3. *Sealy Mattress Co. of New Jersey, Inc. v. Sealy, Inc.,* Del. Ch., C.A. No. 8853, Jacobs, V.C. (June 19, 1987), mem. op. at 9; *In re Fuqua Indus. Inc. Shareholders Litig.,* Del. Ch., C.A. No. 11974, Chandler, C. (Sept. 17, 1999).

In the context of this motion as limited by the defendants' supplemental production, I am persuaded that Kosachuk has not shown "good cause" to justify the wholesale invasion of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2000 WL 1946664 (Del.Ch.)

(Cite as: 2000 WL 1946664 (Del.Ch.))

remaining areas of privilege between LatinAdvisor.com and WLR & K. I reach this conclusion for two reasons. First, there is no showing that, by pursuing other avenues of discovery, Kosachuk will be unable to obtain substantially the same information he argues he will discover in these privileged documents. In particular, his claims about the dilutive conversion by noteholders in June and July 2000, and the related failure on the part of LatinAdvisor.com to have raised $2.0 million in equity should first be discovered through other, non-privileged means. Second, I agree with LatinAdvisor.com that Kosachuk's demand does not adequately identify the specific communication at issue; rather, his demand is broad and all-encompassing, covering a multitude of topics and communications. It seems likely that, after exhausting other avenues of discovery, Kosachuk will be able to limit any renewed application to a small subset of those documents he now seeks. This result is fully consistent with the decision of Chancellor Chandler in *In re Fuqua Indus., Inc. Shareholders Litig.* [FN4]

     FN4. *See* n. 4, *supra.*

*2 Kosachuk also argues that LatinAdvisor.com has waived its claim of privilege. On the record before me, I am satisfied that the company has not waived any claim of privilege.

In resolving this aspect of the dispute, I first conclude that WLR & K was not acting as attorney to the company until shortly after March 14, 2000. WLR & K rendered services to LatinAdvisor.com in the fall of 1999, but the company then employed other counsel until WLR & K was retained. In February and early March 2000, WLR & K rendered legal services to defendant Henry Harper and others, but not to the company. [FN5] It follows from this that the defendants' decision to produce communications dated up until March 14, 2000 did not operate as a waiver of LatinAdvisor.com's privilege with respect to later-dated communications. [FN6]

     FN5. A review of the subject matters covered by the communications identified

on the privilege log confirms that the nature and scope of WLR & K's duties changed significantly after March 14, 2000.

     FN6. It may, of course, have operated as a waiver of privilege by Harper or others represented by WLR & K before March 15, 2000, as to the subject matter of the Shareholders Agreement and related issues.

As to those later-dated communications, I am satisfied that the privilege log adequately identifies their subject matter. Moreover, the Harper and Emmerich affidavits provide an adequate basis for me to conclude that the communications are entitled to the protection of the attorney-client or work product privileges. There also is no reason to conclude that any of the privileged communications were disseminated so broadly as to destroy the privilege. Kosachuk complains that copies of documents were sent to persons who were neither WLR & K attorneys nor directors of the company. But this is not the appropriate test. In this context, the privilege can extend to the confidential communication of information or advice between attorneys representing the corporation and corporate employees, agents and representatives. [FN7]

     FN7. *Deutsch v. Cogan,* Del. Ch., 580 A.2d 100, 106 (1990); *Tabas v. Bowden,* Del. Ch., C.A. No. 6619, Hartnett, V.C. (Feb. 16, 1982).

For all these reasons, the motion to compel will be denied. An order to that effect has been entered and is enclosed herein.

*ORDER*

NOW, this 19 th day of December, 2000, for the reasons stated in the Letter Opinion of this date in the above-captioned case, Plaintiff's Motion to Compel is DENIED. IT IS SO ORDERED.

Not Reported in A.2d, 2000 WL 1946664 (Del.Ch.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**TAB 5**

Westlaw.

Not Reported in A.2d

Not Reported in A.2d, 1995 WL 761222 (Del.Ch.), 64 USLW 2479, 21 Del. J. Corp. L. 709

(Cite as: 1995 WL 761222 (Del.Ch.))

Page 1

**H**
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.
Robert A. LEE, as owner of account Guarantee Trust and Trust F/B/O Robert
Alton Lee Jeremiah O'Connor and Harry Lewis, Plaintiffs,
v.
Clyde Wm. ENGLE, et al., Defendants.
Richard N. FRANK, Plaintiff,
v.
Clyde Wm. ENGLE, et al., Defendants.
Nos. Civ. A. 13323, Civ. A. 13284.

Submitted: Aug. 21, 1995.
Decided: Dec. 15, 1995.
Kevin Gross of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Robert D. Goldberg of Biggs & Battaglia, Wilmington, for Plaintiffs.

OF COUNSEL: Stephen Lowey, Sherrie Brown of Lowey, Dannenberg, Bemporad & Selinger, P.C., New York, City; Lawrence A. Sucharow, Linda P. Nussbaum, Barbara Hart of Goodkind Labaton Rudoff & Sucharow, New York, City, for Robert A. Lee, as owner of account Guarantee Trustee and Trust FBO Robert Alton Lee.

OF COUNSEL: Michael Fuchs, Roy Jacobs of Wolf Popper Ross Wolf & Jones, New York, City, for John C. Boland.

Clark W. Furlow, Joanne Marie H. Shalk of Smith Katzenstein & Furlow, Wilmington, Delaware. OF COUNSEL: Zwerling, Schachter & Zwerling, New York City for Defendant Sunstates Corporation.

Jesse A. Finkelstein, Matthew J. Ferretti, Lisa A. Schmidt of Richards, Layton & Finger, Wilmington, for Individual Defendants.

Michael D. Goldman, Stephen C. Norman, Kevin R. Shannon of Potter Anderson & Corroon, Wilmington, for Defendants Hickory Furniture Co., Telco Capital Corp., and RDIS Corp.

MEMORANDUM OPINION

STEELE, Vice Chancellor.

CONTENTIONS OF PARTIES
*1 On March 10, 1995, Plaintiffs brought a Motion to Compel Production of Documents they requested in the course of a shareholder derivative suit and class action. Defendants refused to produce the requested documents. Defendants assert the attorney-client privilege, work product doctrine, and accountant-client privilege protect these documents. This is the opinion deciding that motion to compel.

FINDINGS OF FACT
Plaintiff, Richard N. Frank, filed a shareholders' derivative suit and class action ("the Frank Action") on December 8, 1993 against Clyde Wm. Engle ("Engle"), William D. Schubert, Robert J. Spiller, Jr., Howard Friedman, Lee N. Mortenson, Harold Sampson (collectively "the Individual Defendants"), Hickory Furniture Company ("Hickory"), Telco Capital Corporation ("Telco"), and Acton (now Sunstates) Corporation ("Sunstates" or "the Company"). The Frank Action alleges breaches of fiduciary duty, waste of corporate assets, failure to pay dividends on $3.75 cumulative Preferred Stock, and violation of the duty of disclosure with regard to the December 3, 1993 proxy statement. The Frank Action seeks injunctive, declaratory, and monetary relief.

Plaintiffs, Robert A. Lee, John C. Boland, Jeremiah O'Connor, and Harry Lewis filed a shareholders' derivative action ("the Lee Action") against the Individual Defendants, Hickory, Telco, and RDIS

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1995 WL 761222 (Del.Ch.), 64 USLW 2479, 21 Del. J. Corp. L. 709

**(Cite as: 1995 WL 761222 (Del.Ch.))**

Corporation ("RDIS"), naming Sunstates as a nominal defendant. Engle is Chairman of the Board and Chief Executive Officer of Sunstates. The Lee Action alleges waste and breach of fiduciary duty. It also seeks declaratory and monetary relief. Plaintiffs in the Lee Action served a request for production of documents on February 2, 1994.

Sometime thereafter, the parties entered into a confidentiality stipulation and agreed to arrange discovery in both the Frank and Lee actions. Defendants have produced nearly 30,000 pages of documents to Plaintiffs. On August 19, 1994, Defendants provided Plaintiffs with a detailed privilege list. This list identified all documents which Defendants withheld or produced in redacted form on the basis of privilege. The list provided the date, author, recipient, copy, summary description, and privilege Defendants asserted. Defendants have refused to produce 731 documents based on attorney-client, accountant-client, and work product privilege.

On October 12, 1994, Plaintiffs responded with a letter voicing objections to the privilege list. The Individual Defendants responded to these objections in a letter dated December 2, 1994. Plaintiffs filed a motion to compel production of documents on March 10, 1995. The motion seeks production of every document Defendants withheld on the basis of privilege.

CONCLUSIONS OF LAW
1. Attorney-Client and Work Product Privilege

The attorney-client privilege is "to foster the confidence of the client and enable [him] to communicate without fear in order to seek legal advice." *Valente v. Pepsico, Inc.,* 68 F.R.D. 361, 367-68 (D. Del. 1975). The attorney-client privilege protects legal advice, as opposed to business or personal advice. *Securities and Exch. Comm. v. Gulf & Western Indus., Inc.,* 518 F. Supp. 675, 681 (D.D.C. 1981). This privilege only protects advice which a person gives within "a professional legal capacity." *In re Sealed Case,* 737 F.2d 94, 99 (D.C. Cir. 1984).

*2 Plaintiffs urge this Court to apply the *Valente* standard for attorney-client privilege protection. Absent some special cause, the attorney-client privilege does not protect a corporation's attorney's communications to the client corporation which relate to the subject of a later suit. *Valente,* 68 F.R.D. at 367; *see also Deutsch v. Cogan,* Del. Ch., 580 A.2d 100, 104-05 (1990). This Court has been reluctant to apply *Valente* broadly. *See Giola v. Texas Air Corp.,* Del. Ch., C.A. No. 9500, Allen, C. (Mar. 3, 1988) Mem. op. at 6; *In the Matter of Heizer Corp.,* Del. Ch., C.A. No. 7949, Berger, V.C. (Nov. 9, 1987); *Sealy Mattress Co. of N.J., Inc. v. Sealy, Inc.,* Del. Ch., C.A. No. 8853, Jacobs, V.C. (Jun. 19, 1987) Mem. op. at 7; *Tabas v. Bowden,* Del. Ch., C.A. No. 6619, Hartnett, V.C. (Feb. 16, 1982) Mem. op. at 6. In *Deutsch,* this Court announced parties could not discover attorney-client confidential communications automatically in shareholder derivative suits. 580 A.2d at 106.

Although not a binding case, this Court adopted and consistently has followed *Garner v. Wolfinbarger* as opposed to *Valente.* [FN1] *Garner v. Wolfinbarger,* 430 F.2d 1093 (5th. Cir. 1970), cert denied, 401 U.S. 974 (1971); *see Deutsch,* 580 A.2d at 106; *Matter of Heizer Corp.,* C.A. No. 7949; *Sealy Mattress Co. of N.J,* C.A. No. 8853 at 7; *Tabas,* C.A. No. 6619 at 6. Under *Garner,* a suing shareholder may overcome corporate claims of attorney-client privilege only if he or she shows "good cause" motivates the discovery. 430 F.2d at 1103. According to the *Garner* court,

FN1. Even though *Valente* and *Garner* are facially at odds, Vice-Chancellor Hartnett harmonized the two in *Deutsch v. Cogan,* Del. Ch., 580 A.2d 100, 106 (1990). The Vice-Chancellor explained,
In *Garner* the court was not faced with a clear conflict of interest on the part of the attorneys as existed in *Valente.* The *Valente* court therefore may have just been applying the *Garner* balancing test to a clear conflict of interest and thereby arrived at the conclusion that the plaintiff had shown good cause.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1995 WL 761222 (Del.Ch.), 64 USLW 2479, 21 Del. J. Corp. L. 709

**(Cite as: 1995 WL 761222 (Del.Ch.))**

The attorney-client privilege still has viability for the corporate client. The corporation is not barred from asserting it merely because those demanding information enjoy the status of stockholders. But where the corporation is in suit against its stockholders on charges of acting inimically to stockholder interests, protection of those interests as well as those of the corporation and of the public require that the availability of the privilege be subject to the right of the stockholders *to show cause* why it should not be invoked in the particular instance. (emphasis added).
*Garner*, 430 F.2d at 1103-04. This Court will not diverge from this established line of reasoning. The *Garner* analysis is appropriate. [FN2]

> FN2. Although I cannot embrace Plaintiffs' *Valente* argument which would automatically make the attorney-client privilege unavailable to directors, I agree directors owe a strict fiduciary duty to shareholders. They are responsible to minority shareholders. *Valente v. PepsiCo., Inc.*, 68 F.D.R. 361 (1975). This responsibility does not apply *per se*, thereby superseding the burden *Garner* attaches to discovery. *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970).

In *Sealy Mattress Co.*, Vice-Chancellor Jacobs noted three factors of paramount importance to consider when determining whether the requisite good cause is present precluding invocation of the privilege:
(i) 'the nature of the shareholders' claim and whether it is obviously colorable;' (2) 'the apparent necessity or desirability of the shareholders having the information and the availability of it from other sources;' (3) 'the extent to which the communication is identified versus the extent to which the shareholders are blindly fishing.' C.A. No. 8853, at 7 (citing *Garner*, 430 F.2d at 1104).

*3 Defendants attempt to use the attorney-client privilege to insulate specific documents - the ones which Secretary and Vice President Leonard

authorized or received ("the Leonard documents"). True, Leonard is an attorney. True, Leonard could use both confidentiality protections *if* he were acting as legal counsel to Sunstates. However, Leonard did *not* act in the capacity of Sunstates' in-house counsel. The record does not indicate Leonard prepared or reviewed meeting minutes or documents as an *attorney*. There was no attorney-client relationship between Leonard and Sunstates. Therefore, Leonard cannot avail himself of the protection associated with the attorney-client privilege or the work product doctrine. Accordingly, the attorney-client privilege cannot shield production of the Leonard documents.

Assuming *arguendo*, Leonard acted in the attorney-client capacity, applying the *Garner* criteria to the facts here, I find Plaintiffs have shown good cause necessitating production of certain withheld documents. First, Plaintiffs are minority shareholders of Sunstates seeking information related to transactions they challenge as breaches of fiduciary responsibility. They clearly have the right to bring a shareholder derivative action under Delaware law. *See Kramer v. Western Pac. Indus., Inc.*, Del. Supr., 546 A.2d 348, 351 (1988). A minority shareholder brings a shareholder derivative action "to enforce a *corporate* cause of action against officers, directors, and third parties." Dennis J. Block, Nancy E. Barton, and Stephen A. Radin, *The Business Judgment Rule: Fiduciary Duties of Corporate Directors*, (Fourth ed. 1993), p. 709 (citing *Kamen v. Kemper Fin. Servs., Inc.*, 111 S. Ct. 1711, 1716 (1991) (emphasis in original, and quoting *Ross v. Bernhard*, 396 U.S. 531, 534 (1970))). The fact the Frank action and the Lee Action have progressed this far indicates viability. Otherwise, they may not have survived a motion to dismiss had one been presented. Plaintiffs' suit is, therefore, a "colorable claim."

Second, after careful scrutiny of the record, I find Plaintiffs have genuine cause for seeking production of the documents in question. It is both necessary and desirable for the plaintiff-shareholders to have the information. The withheld documents may lead to the discovery of information relevant to the transactions Plaintiffs contest as breaches of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 4

Not Reported in A.2d

Not Reported in A.2d, 1995 WL 761222 (Del.Ch.), 64 USLW 2479, 21 Del. J. Corp. L. 709

(Cite as: 1995 WL 761222 (Del.Ch.))

fiduciary duty. Furthermore, these documents may be the best evidence of the facts they contain which otherwise would be unavailable from any other practical source. The only *possible* alternative to this information may be an avoidable, unnecessarily cumbersome and expensive route of deposing in detail the individual directors.

Third, the record does not leave me with the impression Plaintiffs' request for document production constitutes a blind "fishing expedition." The record indicates Plaintiffs' desired documents are related to pursuit of their claims, even if they ultimately prove unsuccessful.

*4 Furthermore, a fiduciary owes an obligation of complete candor and openness to its beneficiary. *See, e.g., Riggs Nat'l Bank of Washington, D.C. v. Zimmer,* Del. Ch., 355 A.2d 709 (1976). A corporation and its directors are fiduciaries. *Valente,* 68 F.R.D. at 367-68. The Board of Directors, as fiduciaries, owe Frank, a stockholder, complete candor and openness.

Alternatively, Defendants attempt to shield documents which Leonard prepared or reviewed behind the work product doctrine. The work product doctrine only applies to materials assembled and brought into being in anticipation of litigation. *United States v. El Paso Co.,* 682 F.2d 530, 542 (5th Cir. 1982), *cert denied,* 466 U.S. 944 (1984). The work product doctrine protects "'the privacy of lawyers in their work and encourages ... freedom ... from interference in the task of preparing their clients' cases for trial.'" *E.I. DuPont de Nemours & Co. v. Admiral Ins. Co.,* Del. Super., C.A. No. 89C-AU-99, Steele, J. (Dec. 23, 1992) Mem. op. at 6 (citing *Riggs Nat'l Bank of Washington, D.C. v. Zimmer,* Del. Ch., 355 A.2d 709, 715 (1976)), *interlocutory appeal denied,* Del. Super., 622 A.2d 1095 (1993). "It protects factual material gathered in preparation of a case and specifically shelters 'opinion' work product which includes attorneys' mental impressions, conclusions, opinion, and legal theories." *Id.* (citing *Hickman v. Taylor,* 329 U.S. 495, 510-11 (1947).

The work product doctrine is broader than the

attorney-client privilege which protects only communications between the attorney and client. *Id.* at 7 (citing *In re Grand Jury Proceedings,* 604 F.2d 798, 801 (3d. Cir. 1979)). The work product doctrine consists of "factual" information and "opinion" information. *Id.*

Factual or "ordinary" work product includes "written witness statements and all other trial preparation material not involving an attorney's thought processes...." 4 James W. Moore, et al., *Moore's Federal Practice* ¶ 26,15[3.- 2], at 26-316 (2d ed. 1994). The party seeking discovery must show substantial need and inability to obtain the substantial equivalent without undue hardship. *E.I. DuPont de Nemours & Co.,* C.A. No. 89C-AU-99 at 7-8. Even if a party sufficiently demonstrates his or her need to obtain the draft work product, the work product doctrine protects "opinion" work product. *Id.* at 7. Opinion work includes "attorneys' mental impressions, conclusions, opinions, and legal theories." *Id.* (citing *Hickman,* 329 U.S. at 510-11). The policy behind this theory encourages lawyers to maintain their freedom to express and to record mental impressions and opinions for the benefit of their clients without fear of their impressions and opinions being used against their clients. *Id.* at 8.

The work product doctrine cannot shield the Leonard documents from production. The record shows no evidence Leonard interacted with Sunstates as an attorney until after this litigation began. By Defendants' own admission, the word "Counsel" does not appear in Leonard's title. Therefore, Leonard could not have been an attorney assembling and bringing into being materials in anticipation of litigation. Although he had his legal degree, his relationship with Sunstates did not relate to delivery of legal services.

*5 Plaintiffs urge the above privilege protections do not apply to documents intended for public disclosure. *See In re Micropro Sec. Litig.,* 1988 WL 109973 [[[1988-89 Transfer Binder] *Fed. Sec. L. Rep.* (CCH) ¶ 93,986 (N.D. Cal. 1988). According to Plaintiffs, "handwritten notations on preliminary drafts are generally for the purpose of conveying

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                        Page 5

Not Reported in A.2d, 1995 WL 761222 (Del.Ch.), 64 USLW 2479, 21 Del. J. Corp. L. 709

(Cite as: 1995 WL 761222 (Del.Ch.))

factual data, not seeking legal advice." Their insistence seems consistent with the *Micropro Sec.* court who wrote,

[T]hese communications, consisting as they do of factual information, do not call for a legal opinion or analysis. Such a communication does not constitute legal advice or a request for legal advice. Rather, the purpose of the communication is to furnish the information necessary to compile the offering materials required by the federal securities laws. Thus, the principle purpose for making the communication is not to secure legal advice but to secure what is essentially a business service (that, is to compile business data for disclosure in order to comply with the requirements of the federal securities laws). In receiving this information, the attorney herein were essentially serving as a conduit for factual data, and were not acting primarily as lawyers. *Hercules, Inc. v. Exxon Corp.,* 434 F.Supp. 136, 147 (D.Del. 1977); *Hewlett Packard Co. v. Bausch & Lomb, Inc.,* 116 F.R.D. 533, 542 (N.D. Cal. 1987).

*MicroPro,* at 90,593. The *MicroPro* court also emphasized,

the information given the [attorney] was to assist in preparing such prospectus which was to be published to others and was not intended to be kept in confidence. That is the critical circumstance, to wit, the absence of any intent that the information was to be kept in confidence. (citation omitted).

*Id.*

Although *MicroPro* is compelling, it is not binding on this Court. Chancellor Allen articulated this Court's position on the issue of producing draft documents in *Jedwab v. MGM Grand Hotels, Inc.,* 1986 WL 3426, Del. Ch., C.A. No. 8077, Allen, C. (Mar. 20,1986) Mem. op. at 6-7. Defendants, following the Chancellor's reasoning, argue the attorney-client privilege and work product doctrine protect the preliminary drafts of the board meeting documents and the publicly-filed documents they withheld. I agree.

In *Jedwab,* this Court held preliminary drafts, of documents a company later files with the Securities

and Exchange Commission "are the proper subject of a claim of privilege and thus need not be produced." *Id.* at 6. Chancellor Allen based his decision on the fact that a plaintiff has available to it the publicly-filed documents. *Id.* Chancellor Allen wrote,

[T]he only information available from prior drafts relates to matters appearing in prior drafts that were deleted, augmented or otherwise modified in the final product. ... [S]uch modifications are made as a result of communications between a client or its representatives and lawyers. Thus, new information disclosed from comparing drafts of SEC filings with the filed documents themselves necessarily relates to and may inferentially disclose communications between a client and its lawyers charged with preparing the final documents. Communications of this kind are clearly made "for the purpose of facilitating the rendition of professional legal services" and lie at the heart of the confidential communications that the lawyer-client privilege seeks to protect.

*6 ... [W]here... the document itself is prepared by a lawyer in a setting in which it is intended to remain confidential until a final version is deemed appropriate for public disclosure and where the only pertinence of the document to the discovery process is the inferential disclosure of the communication from a client to its lawyer, it strikes me that the underlying policies of the lawyer-client privilege are properly implicated and that discovery of such a document would inappropriately permit access by third parties to privileged communications.

*Id.* at 6-7.

Similarly, the work product doctrine protects the draft documents from production. Chancery Court Rule 26(b)(3) specifies,

[A] party may obtain discovery of [relevant] documents and tangible things ... prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative... only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1995 WL 761222 (Del.Ch.), 64 USLW 2479, 21 Del. J. Corp. L. 709

(Cite as: 1995 WL 761222 (Del.Ch.))

the materials by other means. In ordering discovery of such materials when the required showing has been made, the Court shall protect against disclosure of the mental impressions, conclusions, opinions, or other theories of an attorney or other representative of a party concerning the litigation.
Ch. Ct. R. 26(b)(3).

Here, the draft documents consist of both factual and opinion work product. As for the factual ones, Plaintiffs have not sufficiently shown why they would be unable to discover the same information without undue hardship. Our Courts have held a party may only compel production of opinion work product when a party puts that privileged information directly "at issue." *E.I. DuPont de Nemours & Co.,* C.A. No. 89C-AU-99 at 7-8. At this time, the record does not indicate whether the party seeking the protection of the work product doctrine put opinion work, in fact, "in issue." A more careful analysis is unnecessary in any event. The attorney-client privilege shields the draft documents which Defendants intended for public disclosure. Defendants properly withheld the draft documents from Plaintiffs' scrutiny.

2. Accountant-Client Privilege

Finally, I turn to Plaintiffs' request for the 110 documents which Defendants claim the Illinois Accountant-Client privilege protects. Delaware does not recognize the accountant-client privilege; nor do the Federal Courts. *State of Del. v. Wright,* Del. Super., C.A. No. K94-02-0196I-0201I, Goldstein, J. (Jul. 20, 1994) (citing *U.S. v. Arthur Young & Co.,* 464 U.S. 805, 817 (1984), *Couch v. United States,* 409 U.S. 322, 335 (1973)).

Nevertheless, Defendants argue this Court should apply Illinois law which does recognize the accountant-client privilege, because "[Illinois] is the state with the most significant relationship to the communications in issue." I disagree.

*7 According to the Restatement of Conflicts, [FN3] a court should weigh four factors when determining whether it should apply law other than

that of the forum state: (1) the number and nature of the contacts that the forum state has with the parties and the transaction involved; (2) the relative materiality of the evidence that is sought to be excluded; (3) the kind of privilege involved; and (4) fairness to the parties. *Restatement (Second) of Conflicts,* § 139(2), Comment. Applying these factors to the factual record, I find Delaware law applies.

> FN3. Delaware follows the Restatement's choice of law principles and the Restatement's "most significant relationship" test. *Certain Underwriters at Lloyd's, London and London Market Insurance Cos.,* Del. Supr., 1994 LEXIS 355, Veasey, C.J. (Nov. 10, 1994) Slip op. (citing *Oliver B. Cannon & Son v. Dorr-Oliver, Inc.,* Del. Supr., 394 A.2d 1160, 1166 (1978).

First, Sunstates is a Delaware corporation. Incorporation in Delaware constitutes a knowing and voluntary request for the widely recognized benefits and advantages flowing from the application of Delaware general corporate law to the governance of the incorporator's business entity. Sunstates' principal place of business is in North Carolina, not in Illinois. Apparently, Illinois's only connection with Sunstates is that Illinois accountants originally generated or received the documents Defendants attempt to protect behind the accountant-client privilege. However, as Plaintiffs highlight in their Reply Memorandum in Support of Plaintiffs' Motion to Compel the Production of Documents, Sunstates' 1990 and 1991 Annual Reports state Ernst & Young, Raleigh, North Carolina are actually Sunstates' accountants. The Company's 1993 and 1994 SEC filings list Greensboro, North Carolina accountants as Sunstates accountants. [FN4] It seems, second only to Delaware, North Carolina, not Illinois, has the most significant relationship to the communications which Defendants claim the accountant-client privilege protects. [FN5] That circumstance is irrelevant, however. Delaware has the most significant contacts with the Sunstates documents in question. Second, Defendants have not refuted

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                      Page 7

Not Reported in A.2d, 1995 WL 761222 (Del.Ch.), 64 USLW 2479, 21 Del. J. Corp. L. 709

**(Cite as: 1995 WL 761222 (Del.Ch.))**

Plaintiffs' argument these documents are material to Plaintiffs' case. I see no reason why they are not material. Third, while I can readily understand why some find the accountant-client privilege an important one, it is not the determining factor. Fourth, I see no reason why it is unfair to apply the law of the forum state - Delaware - here. If Sunstates did not intend to abide by Delaware law and anticipate Delaware law governing the conduct of its affairs, the Company would have incorporated elsewhere.

> FN4. Not surprisingly, an entity called "Sunstates" would necessarily be hard pressed to identify with Illinois.

> FN5. North Carolina does not recognize the accountant-client privilege. *State v. Agnew,* 241 S.E.2d 684, 692 (N.C. 1978), *cert. denied, Agnew v. N.C.,* 439 U.S. 830 (1978).

After weighing the evidence and applying it to the Restatement's four criteria, Delaware, not Illinois, is the state with the most significant relationship to the communications for which Defendants assert the accountant-client privilege. Since Delaware law recognizes no such privilege, there is no need to decide whether the privilege inures solely to the accountant or otherwise.

Accordingly, I grant in part and deny in part Plaintiffs' Motion to Compel Production of Documents. Plaintiffs are entitled to production of all documents they have specified in their Motion to Compel Production of Documents *excluding* the drafts of documents the Company intended for public disclosure. A separate order will follow reflecting this opinion.

*ORDER*

\*8 For the reasons set forth in the Court's Memorandum Opinion dated December 15, 1995:

This Court grants in part and denies in part Plaintiffs' Motion to Compel the Production of Documents -

Defendants are to produce, at their own expense, those documents Plaintiffs demanded as part of its request for documents *excluding* the preliminary drafts of the board meeting documents and the publicly-filed documents they withheld.

Defendants are to produce these documents within seven working days of receipt of this order.

IT IS SO ORDERED.

Not Reported in A.2d, 1995 WL 761222 (Del.Ch.), 64 USLW 2479, 21 Del. J. Corp. L. 709

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**TAB 6**

Westlaw.

Not Reported in A.2d

Not Reported in A.2d, 2004 WL 944319 (Del.Ch.)

(Cite as: 2004 WL 944319 (Del.Ch.))

**H**
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
Sergio M. OLIVER, et al.
v.
BOSTON UNIVERSITY, et al.
No. Civ.A. 16570-NC.

April 7, 2004.
April 26, 2004.

Dear Counsel:

NOBLE, Vice Chancellor.

*1 Before the Court is the Plaintiffs' motion to compel production of documents withheld by Seragen, Inc. ("Seragen") and Defendant Boston University ("BU") under claims of attorney-client privilege . [FN1]

> FN1. BU's privilege log contains slightly more than twenty entries. In contrast, Seragen's privilege log spans four volumes.

This is a class action brought by former shareholders of Seragen to challenge a series of transactions between Seragen and BU (or persons closely affiliated by BU) leading up to Seragen's merger with Ligand Pharmaceuticals Incorporated. These transactions are said to have occurred as the result of various breaches of fiduciary duties by BU and its affiliates. During the time period of the challenged transactions, [FN2] the law firm of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. ("Mintz Levin") simultaneously represented both Seragen and BU. Significantly, Mintz Levin, with two possible exceptions, did not represent both

Seragen and BU (or its related parties) in any of the transactions. [FN3] The Plaintiffs seek documents exchanged between Mintz Levin and BU and between Mintz Levin and Seragen.

> FN2. For a description of the various transactions, *see Oliver v. Boston University*, 2000 WL 1091480 (Del.Ch. July 18, 2000).

> FN3. Mintz Levin represented Seragen in the Series B transaction and the Series C transaction. It was not Seragen's transactional counsel for any of the subsequent transactions at issue. However, it continued to provide other legal services to Seragen.

The Plaintiffs argue: (1) as the result of Mintz Levin's joint representation of Seragen and BU, the attorney-client privilege never attached to the documents or was waived; (2) Mintz Levin's transmittal of privileged documents to the Massachusetts Attorney General also waived the attorney-client privilege; (3) business advice (and not legal advice) was given and, thus, it cannot be protected by the attorney-client privilege; and (4) good cause to allow Plaintiffs access to the documents exists under the so-called fiduciary duty exception to the attorney-client privilege. [FN4]

> FN4. *See Garner v. Wolfinbarger*, 430 F.2d 1093, 1101-04 (5th Cir.1970), *cert. denied*, 401 U.S. 974, 91 S.Ct. 1191, 28 L.Ed.2d 323 (1971); *Deutsch v. Cogan*, 580 A.2d 100, 108 (Del.Ch.1990).

1. *Formation of the Privilege and Waiver in General*

Under Delaware's Rules of Evidence,
    A client has a privilege to refuse to disclose and to prevent any other person from disclosing

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2004 WL 944319 (Del.Ch.)

(Cite as: 2004 WL 944319 (Del.Ch.))

confidential communications made for the purpose of facilitating the rendition of professional legal services to the client (1) between the client or the client's representative and the client's lawyer or the lawyer's representative, ... (3) by the client or the client's representative or the client's lawyer or a representative of the lawyer to a lawyer or representative of a lawyer representing another in a matter of common interest.... [FN5]

FN5. DRE Rule 502(b).

Representatives of both BU and Seragen, during the same time period, sought legal advice from Mintz Levin; both BU and Seragen had established attorney-client relationships with that firm. They consulted with Mintz Levin and, from the rather limited record before me, [FN6] I conclude that they did so with a reasonable understanding that they were communicating with their lawyers with a client's typical expectation of confidentiality. [FN7] At times, Mintz Levin communicated with both BU and Seragen regarding the same matters. I reject Plaintiffs' apparent notion that simultaneous representation alone by the same law firm deprives both clients of the benefit of the attorney-client privilege. [FN8]

FN6. A frequent difficulty in assessing challenges to the assertion of the attorney-client privilege is present here in full force. The Plaintiffs' arguments are set forth generally; Seragen and BU, in their papers, have not supplied much detail. Thus, the Court is left with the general impressions and somewhat conclusory allegations. The Plaintiffs are hamstrung by their lack of knowledge regarding the documents for which privilege has been asserted. Nonetheless, the conclusory nature of their presentation, coupled with its broad scope, makes detailed analysis problematic.

FN7. Merely because it was not directly representing Seragen (or BU) in a specific transaction does not require the conclusion

that its communications with Seragen (or BU) regarding the transaction were not privileged. An understanding of what other lawyers are doing for a shared client may help a lawyer in her broader representation of the same client.

FN8. Simultaneous representation may, however, be a factor in evaluating the fiduciary duty exception. See Deutsch, 580 A.2d at 107- 08.

In sum, I find that the documents are subject to the attorney-client privilege and that the privilege has not been waived by the simultaneous representation of BU and Seragen by the Mintz Levin firm. [FN9]

FN9. During argument of this motion, counsel for Seragen conceded that redactions of one or more documents were not properly grounded in the attorney-client privilege. The unnecessary redactions should be corrected.

2. Communications with the Massachusetts Attorney General

*2 BU was deeply entangled financially with Seragen in the early 1990s. The Massachusetts Attorney General, which had certain oversight authority in light of BU's charitable status, was concerned about the financial risks associated with BU's investment in, loans to, and loan guarantees for Seragen. In 1992, BU and the Massachusetts Attorney General entered into a consent agreement that, inter alia, required certain reporting by BU on a regular basis. [FN10] Although it appears that the reporting obligations were neither meticulously honored nor vigorously enforced, Mintz Levin did submit reports on behalf of BU; the information was usually provided to Mintz Levin by Seragen. One of those reports involved an assessment by other attorneys representing Seragen of the consequences of a potential Seragen bankruptcy filing. No privilege is now claimed for that memorandum and, indeed, no privilege is claimed for any communications to the Massachusetts Attorney General. Mintz Levin, on behalf of BU, may have

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2004 WL 944319 (Del.Ch.)

(Cite as: 2004 WL 944319 (Del.Ch.))

transmitted a document to the Massachusetts Attorney General for which the privilege otherwise could have been claimed. That limited disclosure does not support a claim that all privilege as to all documents provided by Seragen to Mintz Levin has been waived. In short, the question of how to handle documents submitted to the Massachusetts Attorney General for which a claim of privilege is now asserted is not presented by this application.

> FN10. The Court has separately ordered the production of these reports.

### 3. Business Advice

The Plaintiffs argue that Mintz Levin at that time provided business, and not legal, advice. The attorney-client privilege attaches to communications regarding legal services, but there is no basis for any conclusion that any of the documents contain business advice. Thus, this contention fails.

### 4. Fiduciary Duty Exception

Under the so-called fiduciary duty exception to the attorney-client privilege, shareholders who enjoy a "mutuality of interest" with corporate management may obtain access to the corporation's confidential communications with counsel upon a showing of "good cause."

> [The fiduciary duty] exception ... is generally traced back to *Garner v. Wolfinbarger*, which set forth a framework under which shareholders ... can gain access to privileged communications of the corporation.... The court in *Garner* balanced the harm from disclosure of confidential communications against the benefits to be gained from access to reliable information involving activities of the corporation ... which are of particular interest to the shareholders.... *Garner* recognized that the management function includes communications with counsel and that management has a legitimate concern that its confidential communications should be allowed to remain confidential. *Garner* also acknowledged the "fact that management has duties which run to the benefit ultimately of the stockholders." [FN11]

> FN11. *Metro. Bank & Trust Co. v. Dovenmuehle Mortgage, Inc.*, 2001 WL 1671445, at *2 (Del.Ch. Dec.20, 2001) (citations omitted) (quoting *Garner*, 430 F.2d at 1101).

Seragen concedes that the Plaintiffs, as former shareholders of Seragen at the time of the subject communications, and Seragen's management shared a "mutuality of interest." Among the factors which the Court may balance in determining whether good cause exists for rejection of the privilege in a specific context are:

*3 1. whether a colorable claim has been asserted;

2. whether the information is necessary and whether it is available from another source;

3. whether the request is reasonably focused or whether the shareholder is merely "fishing" for information; and

4. whether litigation strategies relating to the defense of the suit in which the application is presented may be disclosed. [FN12]

> FN12. *Continental Ins. Co. v. Rutledge & Co.*, 1999 WL 66528 Del. Ch. Jan. 26, 1999).

The Plaintiffs have a colorable claim. [FN13] The documents which Plaintiffs seek were not generated in the defense of this action and would not disclose defense strategies. [FN14] The Plaintiffs, however, have not demonstrated why any particular document or class of documents identified in Seragen's privilege log is necessary to their prosecution of this action. Their application appears to be for all documents. [FN15] Thus, the conclusory and general nature of Plaintiffs' argument is more consistent with a fishing expedition than with a serious effort to identify necessary information. Furthermore, Plaintiffs correctly point out the documents which they seek are not otherwise available because either Seragen or their attorneys (or possibly BU) hold the documents and they are not releasing them. That, however, is not the test.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2004 WL 944319 (Del.Ch.)

**(Cite as: 2004 WL 944319 (Del.Ch.))**

Instead, the focus is on whether the Plaintiffs otherwise can gain access to the information that may be contained in the documents. The Plaintiffs, more to the point, recite that "in the depositions of the individual defendants those defendants consistently lack any recollection or information regarding the events leading up to and the reasons for the complained-of transactions as well as the information known by the Board at the time of such transactions." [FN16] Yet, the Plaintiffs have not identified what documents they believe would be helpful in remedying this knowledge shortfall. Thus, after balancing the various factors, I am persuaded, except as set forth below, that the Plaintiffs have failed to demonstrate good cause for avoiding the attorney-client privilege as asserted by Seragen. It may well be that Plaintiffs have a reasonable need for the documents and cannot obtain the information contained in the documents from other available sources, but, during the course of presentation of this motion, they have not met their burden.

> FN13. *See Oliver v. Boston University,* 2000 WL 1091480, at *7-*11 (denying motion to dismiss).

> FN14. Other factors supporting the Plaintiffs' position include the number of shareholders and percentage of ownership of stock (4% by the named plaintiffs and perhaps approaching 50% if the interests of the class are considered); their *bona fides,* which are not questioned; and the absence of trade secrets (or other information entitled otherwise to confidentiality). *See Deutsch,* 580 A.2d at 104-05.

> FN15. Even a cursory review of Seragen's privilege log reveals that not all of the documents would likely be helpful.

> FN16. Plfs.' Consol. Reply Mem. in Further Supp. of Mot. to Compel Produc. of Docs. Withheld at 15.

I conclude, however, that with respect to two sets

of documents involving communications with Seragen, the Plaintiffs have demonstrated good cause. I refer to those documents involving the Series C transaction and the Series B transaction. In all of the other transactions challenged in this litigation, Seragen and BU had separate transactional counsel. Although the record is less than precise, it appears that Mintz Levin represented Seragen in the Series C and the Series B transactions and that it represented the interests of BU (or its related parties) in those transactions, although BU's in-house counsel may have represented BU. However, given the relationship between BU and Mintz Levin, the better inference from this limited record, [FN17] which may not be the correct inference, is that the legal services for BU and Seragen for these two transactions were not truly independent. The existence of such a potential conflict on the part of counsel whose advice supports a transaction which is challenged on fiduciary duty grounds is, as set forth in *Deutsch,* a significant factor in assessing a good cause showing. Here, I am satisfied that the potential for conflicting advice and conflicting loyalties is sufficient to tip the balance of the various factors in favor of the Plaintiffs. Thus, the assertion of the attorney-client privilege as to Seragen's documents related to the Series C and Series B transactions is, pursuant to the fiduciary duty exception, overruled. [FN18]

> FN17. Most of this is drawn from the representations of counsel.

> FN18. BU and the Plaintiffs (and those represented by the Plaintiffs) did not share a "mutuality of interest" with respect to these matters. Thus, the fiduciary duty exception is not applicable to BU's separate communications.

*4 In conclusion, those documents relating to the Series C and Series B transactions are not subject to an attorney-client privilege claim by Seragen. Otherwise, Plaintiffs' motion to compel is denied. [FN19]

> FN19. To the extent that communications

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Page 5

Not Reported in A.2d, 2004 WL 944319 (Del.Ch.)

**(Cite as: 2004 WL 944319 (Del.Ch.))**

involving the 1995 restructuring transaction are involved, the record on this motion does not disclose whether Mintz Levin may have then represented BU's interests in that transaction.

IT IS SO ORDERED.

Not Reported in A.2d, 2004 WL 944319 (Del.Ch.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**TAB 7**

Westlaw.

2004 SCC 68, 244 D.L.R. (4th) 564, 326 N.R. 267 (Eng.), 326 N.R. 267 (Fr.), 4
C.B.R. (5th) 215, 49 B.L.R. (3d) 165, [2004] 3 S.C.R. 461

**H**

2004 CarswellQue 2862

People's Department Stores Ltd. (1992) Inc., Re

In the Matter of the Bankruptcy of **Peoples Department Stores** Inc./Magasins à
rayons Peoples inc.

Caron Bélanger Ernst & Young Inc., in its capacity as Trustee to the
bankruptcy of **Peoples Department Stores** Inc./Magasins à rayons Peoples inc.
(Appellant) v. Lionel Wise, Ralph Wise and Harold Wise (Respondents) and Chubb
Insurance Company of Canada/Compagnie d'assurance Chubb du Canada (Respondent)

Supreme Court of Canada

Iacobucci,[FN*] Major, Bastarache, Binnie, LeBel, Deschamps, Fish JJ.

Heard: May 11, 2004
Judgment: October 29, 2004
Docket: 29682

Copyright © CARSWELL,

a Division of Thomson Canada Ltd. or its Licensors. All rights reserved.

Proceedings: affirming *People's Department Stores Ltd. (1992) Inc., Re* (2003), 2003 CarswellQue 145, (sub nom.
*Peoples Department Stores Inc. (Trustees of) v. Wise*) 224 D.L.R. (4th) 509, [2003] R.J.Q. 796, 41 C.B.R. (4th) 225
(Que. C.A.); reversing *People's Department Stores Ltd. (1992) Inc., Re* (1998), (sub nom. *Peoples Department
Stores Inc./Magasin à rayons Peoples inc. (Syndic de))* [1999] R.R.A. 178, 1998 CarswellQue 3442, 23 C.B.R. (4th)
200 (Que. S.C.)

Counsel: Gerald F. Kandestin, Gordon Kugler, Gordon Levine for Appellant

Éric Lalanne, Martin Tétreault for Respondents, Lionel Wise, Ralph Wise, Harold Wise

Ian Rose, Odette Jobin-Laberge for Respondent, Chubb Insurance Company of Canada

Subject: Corporate and Commercial; Insolvency; Income Tax (Federal)

Business associations --- Specific corporate organization matters -- Directors and officers -- Fiduciary duties --
General principles

Copr. © West 2005 No Claim to Orig. Govt. Works

2004 SCC 68, 244 D.L.R. (4th) 564, 326 N.R. 267 (Eng.), 326 N.R. 267 (Fr.), 4
C.B.R. (5th) 215, 49 B.L.R. (3d) 165, [2004] 3 S.C.R. 461

Even though directors implemented new inventory procurement policy that played part in corporation's bankruptcy, directors did not breach fiduciary duty under s. 122(1)(a) of Canada Business Corporations Act, which duty is not owed to creditors, in view of lack of personal interest or illegal purpose of new policy and directors' desire to make corporation better business -- Duty of care under s. 122(1)(b) of Act can be owed to creditors by way of art. 1457 of Civil Code of Québec, but in case at bar evidence established directors had not breached duty of care towards corporation's creditors because implementation of new policy was reasonable business decision made in order to remedy serious and pressing commercial problem -- Several other factors contributed in more direct manner to corporation's bankruptcy.

Bankruptcy and insolvency --- Avoidance of transactions prior to bankruptcy -- Fraudulent and illegal transactions -- Reviewable transactions under Act

Test for determining whether difference in consideration is "conspicuously greater or less" is whether difference is conspicuous to court having regard to all relevant factors, such as percentage difference -- Disparity slightly over 6 per cent between fair market value and consideration received by bankrupt corporation did not constitute conspicuous difference within meaning of s. 100(2) of Bankruptcy and Insolvency Act.

Associations d'affaires --- Questions spécifiques relatives à l'organisation de la société -- Administrateurs et dirigeants -- Obligations fiduciaires -- Principes généraux

En instaurant une nouvelle politique d'approvisionnement ayant joué un rôle dans la faillite d'une société, les administrateurs de celle-ci n'ont pas manqué à leur obligation fiduciaire en vertu de l'art. 122(1)a) de la Loi canadienne sur les sociétés par actions, obligation qui ne vise pas les créanciers, vu l'absence d'un intérêt personnel ou d'une fin illégitime dans cette nouvelle politique et vu leur volonté de faire de la société une meilleure entreprise -- Obligation de diligence de l'art. 122(1)b) de la Loi peut viser les créanciers par le biais de l'art. 1457 du Code civil du Québec, mais, en l'espèce, la preuve démontrait que les administrateurs n'avaient pas manqué à leur obligation de diligence envers les créanciers de la société puisque l'instauration de la nouvelle politique constituait une décision d'affaires raisonnable prise dans le but de remédier à un problème commercial grave et urgent -- Plusieurs autres facteurs avaient contribué de façon plus directe à la faillite de la société.

Faillite et insolvabilité --- Annulation de transactions antérieures à la faillite -- Transactions frauduleuses et illégales -- Transactions révisables en vertu de la Loi

Critère applicable pour déterminer si la différence entre la contrepartie et sa juste valeur marchande est « manifestement supérieure ou inférieure » est celui de savoir si la différence est manifeste pour le tribunal eu égard à tous les facteurs pertinents, le pourcentage de différence étant un tel facteur -- Écart d'un peu plus de 6 pour cent entre la juste valeur du marché et la contrepartie reçue par la société en faillite ne constituait pas une différence manifeste au sens de l'art. 100(2) de la Loi sur la faillite et l'insolvabilité.

Three brothers were directors of W Inc., a chain of stores. W Inc. purchased from M & S Inc. its chain of stores, P. Prior to the purchase, P. had annual losses of about $10 million. W Inc. guaranteed solidarily the purchase in favour of M & S Inc. and paid about a sixth of the purchase price. To guarantee the balance, M & S Inc. included security measures and restrictive clauses in the contract of sale: W Inc. had to maintain strict financial ratios and P could not provide any financial assistance to W Inc. P became P Inc. after being merged with the W Inc. subsidiary that had bought it.

To solve the logistic and administrative problems that had followed the extension of W Inc.'s accounting systems to P Inc., the brothers implemented a domestic inventory procurement policy for both corporations, which became effective on February 1, 1994. Both corporations' warehouses were merged. P Inc. made the continental purchases for both corporations and transferred and charged out to W Inc. all the domestic merchandise shipped to its stores. W Inc. made the overseas purchases and transferred and charged the merchandise out to P Inc. and entered the merchandise immediately into P Inc.'s warehouse records as if they had been received. P Inc. charged W Inc. for the transfers of imported merchandise to W Inc.'s stores. In autumn 1994, W Inc. had not paid P Inc. for the merchandise, which increased the inter-company charge owed by W Inc. to over $18 million. W Inc. lost its

Copr. © West 2005 No Claim to Orig. Govt. Works

2004 SCC 68, 244 D.L.R. (4th) 564, 326 N.R. 267 (Eng.), 326 N.R. 267 (Fr.), 4
C.B.R. (5th) 215, 49 B.L.R. (3d) 165, [2004] 3 S.C.R. 461

financing and both corporations filed notices of intent to file a proposal. P Inc. and W Inc. were retroactively declared bankrupt following a petition filed by M & S Inc. The brothers all had directors' liability insurance.

P Inc.'s bankruptcy trustee brought a motion based on s. 122 of the Canada Business Corporations Act (CBCA) and s. 100 of the Bankruptcy and Insolvency Act (BIA). The trial judge found the three brothers to be liable and that the procurement policy was a reviewable transaction and ordered the brothers to personally pay about $4.5 million to the trustee. The brothers, their insurer and the trustee appealed. The Court of Appeal found the brothers were not liable. The trustee appealed.

**Held:** The appeal was dismissed.

Per Major, Deschamps JJ.: The trial judge neither applied nor examined separately the two duties imposed by s. 122(1) to directors, the fiduciary duty and the duty of care. As for the fiduciary duty, the directors and officers must act with integrity and good faith in the best interest of the corporation. They must serve the corporation in a disinterested manner, with loyalty and integrity. Since the trial judge in this case found lack of fraud and dishonesty on the part of the brothers, one could not conclude that the brothers had breached their fiduciary duty. The brothers implemented a policy to deal with the serious inventory management problem they were facing. Absent any proof of personal interest or an illegitimate purpose of the new policy, and considering the desire to make the corporations better businesses, one could only conclude the brothers had not breached their fiduciary duty stated in s. 122(1)(a) of the CBCA. The expression "best interests of the corporation" should be read as meaning the maximization of the corporation's value. The interest of the corporation should not be confused with that of the shareholders, the creditors or any other stakeholder. The directors' fiduciary duty remains the same, even if the corporation is in the "vicinity of insolvency". In assessing the actions of the directors, any honest and good faith attempt to redress the corporation's problem situation will, if successful, retain value for the shareholders while improving the creditors' position. Should the attempt fail, it would not qualify as a breach of the statutory fiduciary duty. There was no need to read the interests of creditors into the fiduciary duty. Creditors are stakeholders and their interest are protected in several ways. Stakeholders have viable remedies at their disposal, such as the oppression remedy provided by s. 241 of the CBCA and an action based on the duty of care.

Since the CBCA did not provide a specific remedy for creditors, art. 1457 of the Civil Code of Québec could be used as suppletive so as to include creditors in the expression "every person" found in s. 122(1)(b) of the CBCA. But the standard of conduct to apply was the one stated in s. 122(1)(b). It is an objective standard, since it is not the subjective reasons of the directors and officers that are important, but rather the factual elements of the context in which they operate. Directors and officers are not considered to have not done their fiduciary duty under s. 122(1)(b) of the CBCA if they acted with caution and based on the information they had. Business decisions must be reasonable given what directors knew or should have known. Directors are not required to act perfectly. Courts should not substitute their opinion for that of the directors who used their business expertise to assess factors that are considered by corporations in making decisions. Courts must determine, with the facts of each case, whether the directors used the necessary degree of caution and diligence in making what is alleged to be a reasonable decision at the time it was made. In this case, a review of the evidence as a whole led to the conclusion that the implementation of the new procurement policy was a reasonable business decision made for the purpose of remedying a serious and pressing commercial problem in a situation where there might be no solution whatsoever. By concluding the new policy had inexorably led to P Inc.'s decline and bankruptcy, the trial judge misinterpreted the facts and made a palpable and overriding error. Many other factors contributed more directly to P Inc.'s bankruptcy. Consequently, the brothers did not breach the duty of care they owed to P Inc.'s creditors by implementing the procurement policy.

The Court of Appeal wrongly concluded s. 44(2) of the CBCA could serve to generally legitimize financial aid provided by a wholly-owned subsidiary to its parent corporation. Even if s. 44(2) did authorize some financial aid formulas between corporations, that section did not remove directors and officers from possible liability under s. 122(1) for any financial aid provided by a subsidiary to a parent corporation. Moreover, the brothers could not invoke the defence provided by s. 123(4)(b) of the CBCA. They could not claim to have relied on the judgment of a professional when they accepted the procurement policy proposed as solution by the vice-president of finance. That vice-president was an employee of W Inc., not a professional. He was not an accountant, his actions were not regulated by a professional corporation and he had no professional liability insurance.

Copr. © West 2005 No Claim to Orig. Govt. Works

2004 SCC 68, 244 D.L.R. (4th) 564, 326 N.R. 267 (Eng.), 326 N.R. 267 (Fr.), 4
C.B.R. (5th) 215, 49 B.L.R. (3d) 165, [2004] 3 S.C.R. 461

As for s. 100(1) of the BIA, the test for determining whether the difference in consideration is "conspicuously greater or less" is whether the difference is conspicuous to the court having regard to all the relevant factors, and the percentage difference is such a factor. The transactions made during the whole time the policy was applied had to be examined. The trial judge concluded P Inc. had not received anything in exchange for the transferred inventory since the accounts receivable had not been collected and could not be collected, but he then reduced the difference to 6 per cent after taking into consideration, among other things, the transfers from W Inc. to P Inc. His findings were contradictory and the Court of Appeal properly found the judge had committed a palpable and overriding error in that respect. A disparity of slightly more than 6 per cent between fair market value and consideration received did not constitute a conspicuous difference within the meaning of s. 100(2) of the BIA. In that respect, the trustee's claim had to fail.

The disagreement between the trial judge and the Court of Appeal on the interpretation of "privy" in s. 100(2) of the BIA warranted some observations. Section 100 of the BIA mainly seeks to cancel the effects of a transaction, which reduced the value of the bankrupt's assets. The word "privy" should be given a broad meaning so as to include those who benefit directly or indirectly from and have knowledge of a transaction occurring for less than fair market value, and mostly when the persons who benefit are the controlling minds behind the transaction. Concluding that a person is privy to a reviewable transaction does not mean that the court will necessarily exercise its discretion to order a remedy against that person, since some conditions must be complied with.

Trois frères étaient les administrateurs de W inc., une chaîne de magasins. Ils ont acheté la chaîne de magasins P de M & S inc. Avant l'acquisition, P subissait des pertes d'à peu près 10 millions de dollars par année. W inc. a garanti solidairement l'achat en faveur de M & S inc. et n'a payé qu'environ le sixième du prix de vente. Afin de garantir le solde du prix de vente, M & S inc. a inclus dans le contrat de vente des mesures de sécurité et des clauses restrictives: W inc. devait maintenir des ratios financiers stricts et P ne devait fournir aucune assitance financière à W inc. P est devenue P inc. après avoir été fusionnée avec la filiale de W inc. qui l'avait achetée.

Afin de résoudre les problèmes de logistique et d'administration découlant de l'extension des systèmes informatiques de W inc. à P inc, les frères ont instauré un système d'approvisionnement commun pour les deux sociétés qui a pris effet le 1er février 1994. Les entrepôts des deux sociétés ont été fusionnés. P inc. faisait les achats à sur le continent pour les deux sociétés, puis transférait et facturait à W inc. tous les biens expédiés aux magasins de W inc. Quant à elle, W inc. faisait les achats outre-mer, puis transférait et facturait à P inc. la marchandise, qui était immédiatement inscrite dans les livres d'entrepôt de P inc. comme si elle avait été reçue. P inc. facturait à W inc. les transferts de marchandises importées aux magasins de W inc. À l'automne 1994, W inc. n'avait pas encore payé à P inc. la marchandise, faisant ainsi que les sommes qu'elle devait à P inc. dépassaient 18 millions de dollars. W inc. a perdu son financement et les deux sociétés ont dû déposer un avis d'intention. W inc. et P inc. ont été déclarées faillies rétroactivement à la suite d'une requête présentée par M & S inc. Les frères détenaient une assurance-responsabilité à titre d'administrateurs.

Le syndic de faillite de P inc. a présenté, contre les frères et leur assureur, une requête fondée sur l'art. 122 de la Loi canadienne sur les sociétés par action et sur l'art. 100 de la Loi sur la faillite et l'insolvabilité.

Le premier juge a conclu à la responsabilité des frères, que le système d'approvisionnement commun constituait une transaction révisable et les a condamnés à payer au syndic environ 4,5 millions de dollars. Les frères, leur assureur et le syndic ont interjeté appel. La Cour d'appel a conclu à la non-responsabilité des frères. Le syndic a interjeté appel.

**Arrêt:** Le pourvoi a été rejeté.

Major, Deschamps, JJ.: Le premier juge n'a pas appliqué ni examiné séparément les deux obligations imposées par l'art. 122(1) aux administrateurs, soit l'obligation fiduciaire et l'obligation de diligence. En ce qui concerne l'obligation fiduciaire, les administrateurs et les dirigeants sont tenus d'agir avec intégrité et bonne foi aux mieux des intérêts de la société. Ils doivent servir la société de manière désintéressée, avec loyauté et intégrité. Dans ce cas-ci, on ne pouvait conclure que les frères avaient manqué à leur obligation fiduciaire, puisque le premier juge a conclu à

Copr. © West 2005 No Claim to Orig. Govt. Works

2004 SCC 68, 244 D.L.R. (4th) 564, 326 N.R. 267 (Eng.), 326 N.R. 267 (Fr.), 4
C.B.R. (5th) 215, 49 B.L.R. (3d) 165, [2004] 3 S.C.R. 461

l'absence de fraude et de malhonnêteté de leur part. Au prise avec un grave problème de gestion des stocks, les frères ont mis en application une politique visant à le régler. En l'absence de preuve de l'existence d'un intérêt personnel ou d'une fin illégitime de la nouvelle politique, et vu la volonté de faire des sociétés de meilleures entreprise, il fallait conclure que les administrateurs n'avaient pas manqué à leur obligation fiduciaire énoncée à l'art. 122(1)a) LCSA. L'expression « au mieux des intérêts de la société » doit être interprétée comme signifiant la maximisation de la valeur de l'entreprise. Les intérêts de la société ne doivent pas se confondre avec ceux des actionnaires, des créanciers ou ceux de toute autre partie intéressée. L'obligation fiduciaire des administrateurs reste la même, même si la société est « au bord de l'insolvabilité ». Dans l'évaluation des mesures prises par les administrateurs, toute tentative faite avec intégrité et bonne foi pour redresser la situation financière de la société aura, si elle réussit, conservé une valeur pour les actionnaires tout en améliorant la situation des créanciers. En cas d'échec, on ne pourrait y voir un manquement à l'obligation fiduciaire prévue par la loi. Il n'était pas nécessaire d'interpréter les intérêts des créanciers comme étant visés par l'obligation fiduciaire. Les créanciers sont une partie intéressée et leurs intérêts sont protégés de plusieurs manières. Les parties intéressées ont la possibilité d'exercer des recours efficaces, soit le recours en cas d'abus de droit prévu par l'art. 241 LCSA ainsi que l'action fondée sur l'obligation de diligence.

Puisque la LCSA ne prévoyait aucun recours exprès pour les créanciers, l'art. 1457 du Code civil du Québec pouvait servir à titre supplétif afin d'intégrer les créanciers dans l'expression « toute personne » de l'art. 122(1)b) LCSA. Par ailleurs, la norme de conduite à respecter était celle énoncée à l'art. 122(1)b). Il s'agit d'une norme objective, puisque ce sont les éléments factuels du contexte dans lequel agissent l'administrateur ou le dirigeant qui sont importants plutôt que leurs motifs subjectifs. Les administrateurs et les dirigeants ne sont pas considérés comme ayant manqué à leur obligation de diligence en vertu de l'art. 122(1)b) LCSA s'ils ont agi avec prudence et en s'appuyant sur les renseignements dont ils disposaient. Les décisions d'affaires doivent être raisonnables compte tenu de ce que les administrateurs savaient ou auraient dû savoir. La perfection n'est pas exigée des administrateurs. Les tribunaux ne doivent pas substituer leur opinion à celle des administrateurs qui ont utilisé leur expertise commerciale pour évaluer des considérations qui entrent dans la prise de décisions des sociétés. Ils doivent déterminer, à partir des faits de chaque cas, si les administrateurs ont exercé le degré de prudence et de diligence nécessaire pour en arriver à ce qu'on prétend être une décision d'affaires raisonnable au moment où elle a été prise. Dans ce cas-ci, l'examen de l'ensemble de la preuve menait à la conclusion que l'instauration de la nouvelle politique d'approvisionnement était une décision d'affaires raisonnable prise en vue de corriger un problème d'ordre commercial grave et urgent dans un cas où il n'y avait peut-être aucune solution. En concluant que la nouvelle politique avait inexorablement entraîné le déclin et la faillite de P inc., le premier juge a mal interprété les faits et a commis une erreur manifeste et dominante. Plusieurs autres facteurs avaient contribué de façon plus directe à la faillite de P inc. Ainsi, en adoptant la politique d'approvisionnement, les frères n'ont pas manqué à leur obligation de diligence à l'égard des créanciers de P inc.

Par ailleurs, la Cour d'appel a conclu à tort que l'art. 44(2) LCSA servait à légitimer de façon générale l'aide financière fournie par une filiale à part entière à sa société mère. Même si l'art. 44(2) autorisait certaines formules d'aide financière entre sociétés, il ne soustrayait cependant pas les administrateurs et les dirigeants à leur responsabilité éventuelle en vertu de l'art. 122(1) pour toute aide financière fournie par une filiale à sa société-mère. De plus, les frères ne pouvaient se servir du moyen de défense prévu à l'art. 123(4)b). Ils ne pouvaient faire valoir qu'ils s'étaient fiés au jugement d'un professionnel en retenant la solution proposée par le vice-président aux finances, soit la politique d'approvisionnement. Ce vice-président était un employé de W inc. et non un professionnel. Il n'était pas comptable, ses activités n'étaient pas réglementées par un ordre professionnel et il n'avait pas souscrit à une assurance-responsabilité professionnelle.

En ce qui concerne l'art. 100(1) LFI, le critère applicable pour déterminer si la différence entre la contrepartie et sa juste valeur marchande est « manifestement supérieure ou inférieure » est celui de savoir si la différence est manifeste pour le tribunal eu égard à tous les facteurs pertinents, le pourcentage de différence en étant un. Dans ce cas-ci, il fallait analyser les transactions effectuées au cours de toute la période d'application de la nouvelle politique. Le premier juge a conclu que P inc. n'avait reçu aucune contrepartie pour les transferts de stock puisque les comptes recevables n'avaient pas été recouvrés et n'étaient pas recouvrables, mais il a ramené la différence à environ 6 pour cent après avoir notamment tenu compte des transferts de W inc. à P inc. Ses conclusions se contredisaient et la Cour d'appel a eu raison de conclure que le juge avait commis à cet égard une erreur manifeste et dominante. Un écart d'un peu plus de 6 pour cent entre la juste valeur du marché et la contrepartie reçue ne constituait pas une différence « manifeste » au sens de l'art. 100(2) LFI. La réclamation du syndic à cet égard devait

Copr. © West 2005 No Claim to Orig. Govt. Works