# EXHIBIT 4

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TELEGLOBE COMMUNICATIONS | ) | Case No. 02-11518 (MFW) |
| CORPORATION, a Delaware corporation, et al., | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | Hearing Date: April 28, 2004 at 11:30 a.m. |
| | ) | |
| | ) | RE: Docket No. 2169 |

### OPPOSITION TO MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR AN ORDER AUTHORIZING AND COMPELLING DISCOVERY PURSUANT TO BANKRUPTCY RULE 2004

BCE Inc. ("BCE"), through its counsel, Young Conaway Stargatt & Taylor, LLP and Shearman & Sterling LLP, submits this memorandum of law in opposition to the Application of the Official Committee of Unsecured Creditors (the "Committee") of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors")[1] for an Order Authorizing and Compelling Discovery Pursuant to Bankruptcy Rule 2004 (the "Application"). For the reasons set forth below, BCE respectfully requests that this Court deny the Committee's application.

### PRELIMINARY STATEMENT

1.    BCE has cooperated with the Committee in good faith and provided it with sufficient information to determine whether to file a litigation.

2.    In the first meeting between counsel to the Committee and counsel to BCE, held on September 8, 2003, counsel to BCE agreed to produce the files of nine individuals

---

[1]    The Debtors consist of the following entities: Teleglobe Communications Corporation, Teleglobe USA Inc., Optel Telecommunications, Inc., Teleglobe Holdings (U.S.) Corporation, Teleglobe Marine (U.S.) Inc., Teleglobe Holding Corp., Teleglobe Telecom Corporation, Teleglobe Investment Corp., Teleglobe Luxembourg LLC, Teleglobe Puerto Rico Inc. and Teleglobe Submarine Inc.

use these documents outside the scope of the investigation and the prosecution of claims in this case.

4.     On March 8, 2004, the parties agreed on the terms of a Confidentiality Stipulation, and BCE immediately produced its documents. Indeed, BCE exceeded its undertaking at the September 8 meeting and produced additional categories of documents, including the responsive, non privileged, electronic documents of the custodians to the extent BCE had access to these electronic files. At this time, BCE has produced to the Committee 105 boxes of documents and over 15,000 pages of electronic documents. BCE further consented to the depositions of three key present or former officials. Contrary to the Committee's misguided claim, BCE did not intersperse relevant documents with non-relevant documents "apparently to hide them." (Application ¶ 19.) Instead, the documents were produced in the order in which they were maintained.[2]

5.     In this Application, the Committee seeks to compel the disclosure of privileged documents on the principal ground that three current or former employees of BCE (Michel Lalande, David Masse, and Marc Ryan) were also at some point officers of Teleglobe Inc. or of its subsidiaries. The Committee's argument has no basis because many of these documents reflect the provision of legal advice solely to BCE, as described in detail in the accompanying Declaration of Michel Lalande, the Vice President – General Counsel of BCE. Other documents are protected by the common interest privilege, and the Committee has no control over such privilege at this time. Indeed, BCE believes that the Committee does not even have standing to make its Application to compel discovery. The Committee's and the Debtors'

---

[2]     BCE recently became aware that the last four boxes of the production were Bates stamped out of order. BCE advised the Committee that it would provide information identifying the custodians of the documents in these four boxes.

3

sensitive, and BCE will redact the non-responsive portions of the Board documents. The Committee has not articulated any reasons why it needs non-responsive documents in order to determine whether to initiate litigation. In light of the fact that the Committee intends to share these highly sensitive documents with litigants in Canada (that would not otherwise have access to them), there is no reason to circumvent the Canadian discovery process.

8.    Similarly, the Committee requests that BCE produce all other redacted documents in non-redacted form. The Committee has failed to articulate any reasons why it needs such non-responsive information to determine whether to sue and why such information should be provided to the litigating members of the Committee.

### FACTUAL BACKGROUND

9.    On July 31, 2003, counsel to the Committee contacted counsel for BCE and announced its intention to conduct discovery, pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure. (Application, Ex. B.) The Committee stated it sought discovery from BCE and four individuals: (i) Michael J. Sabia; (ii) Michael T. Boychuk; (iii) Patrick Pichette; and (iv) David G. Masse. On August 9, 2003, the Committee submitted to BCE's counsel a draft document request setting forth 26 broad requests for documents. (Committee's Application, Ex. D.)[3]

---

[3]    In its Application, the Committee misleadingly states that it drafted eighteen "narrowly tailored document requests" that were "aimed to identify documents relevant to the Committee'[s] investigation." (Application ¶¶ 1, 34.) As described above, the Committee's draft document request contained 26 broad requests. Six months later (on March 10, 2004), a few hours before the Committee commenced its inspection of BCE's documents, the Committee suddenly submitted a document request that contained eighteen requests. (See Ex. 1 attached hereto.) By that time, BCE had 105 boxes of documents available for inspection.

documents, including many documents reflecting the work performed by six custodians on

behalf of Teleglobe, and that some of these documents may be non-responsive.

11.    In the September 8 meeting, Committee counsel requested that BCE also

produce responsive documents from the files of three additional individuals:  (1) Terence

Jarman, (2) Jean Monty, and (3) Michael Sabia, and the minutes of BCE's Board of Directors

(and documents presented to BCE's Board) to the extent they were responsive to the

Committee's document requests and not privileged.  In order to assist the Committee in its

investigation, BCE agreed to satisfy counsel's additional requests.  BCE advised that it would

produce in total approximately 100 boxes of documents, and BCE explained that virtually all the

documents that the Committee sought to obtain would be contained in the files of these nine

custodians.

12.    As previously described to counsel for the Committee most of the

documents responsive to the Committee's document requests are maintained in the files of

individual custodians; they are not maintained in central "corporate files."  In the meeting,

counsel for the Committee also showed counsel for BCE a document entitled "Project X Issues

& Activities List."  The Committee 's counsel inquired about documents listed on pages 12 and

13 of the document.

13.    In the September 8 meeting, BCE's counsel advised the Committee with

specificity of the documents that would be made available for inspection in Montreal, and BCE

made clear that following the production of those 100 boxes of documents, BCE would not agree

to conduct a second broad search for additional documents from the files of other custodians less

involved in the relationship with Teleglobe.  At that meeting, counsel to BCE also made clear

that the production of documents would commence as soon as the Committee agreed to the terms

of a suitable confidentiality agreement in light of the presence on the Committee of Canadian

7

Committee fully understood and agreed with the scope of BCE's document production. Specifically, the letter from Committee counsel made clear that counsel expected to travel to Montreal to review approximately 100 boxes from the files of seven individuals and did not even refer to the production of any documents from the files of Michael Sabia and Patrick Pichette, which were produced by BCE for sake of completeness.

### c.    The Committee's review of the documents

16.    BCE substantially accepted the Committee's revised Confidentiality Stipulation. The Committee finally agreed to the terms of the Confidentiality Stipulation on March 8, 2004, and the parties also agreed that the Committee would begin the review of the documents on March 11, 2004. On the evening of March 10, 2004, without any prior notice, the Committee sent BCE a revised document request that purported to eliminate certain requests. (Ex. 1.) The following day, on March 11, 2004, BCE executed the Confidentiality Stipulation and made the documents available to the Committee for review.

17.    On March 11, the Committee reviewed 9 boxes of documents in New York from the files of Michel Lalande. At the time, BCE's counsel reiterated that virtually all the documents responsive to the Committee's document requests were maintained in the files of individual custodians and were not maintained in central "corporate files." A very limited number of responsive documents were maintained at BCE in "corporate files" – the Board and Board committee minutes and record books, bound volumes of corporate transactions, and the employment agreements and certain other human resources documentation – and they have been produced to the extent they were responsive and not privileged. On March 11, 2004, the Committee for the first time advised that, because of the applicable statute of limitation, it faced a deadline of May 13, 2004 to determine whether to sue.

9

that these documents represented files maintained in the ordinary course of business of the

custodians; that certain documents reflecting work performed for BCE had been removed from

those files when they were provided to the Interim Receiver; and that those documents would be

reinserted if they were non-privileged and responsive to the Committee's requests. Therefore,

BCE did not "intentionally interspers[e] any responsive documents." (Application ¶ 1.)

20.    Further, between March 25, 2004 and April 16, 2004, BCE produced

15,000 pages of electronic documents from the files of the custodians as well as certain

additional documents that the Committee requested on March 26, 2004, such as certain non-

privileged portions of the minutes from BCE's Audit Committee.  Documents withheld and

redacted on the basis of privilege were noted on three privilege logs provided to the Committee.

21.    Not only has BCE produced 105 boxes of documents and over 15,000

pages of electronic documents in response to the Committee's request, but BCE has agreed to

make available for a deposition Messrs. Monty, Boychuk, and Pichette, three high-ranking

present or former officials with personal knowledge of the relationship between BCE and

Teleglobe Inc. and its affiliates (including the U.S. debtors).  In order to accommodate the

Committee, BCE agreed that these depositions would be conducted at the offices of Hahn &

Hessen in New York.

22.    On April 6, 2004, the Committee's counsel submitted a letter to BCE's

counsel raising discovery issues.  (Application, Ex. E.)  On April 9, 2004, BCE's counsel

submitted a detailed response to each of those issues.  (Id., Ex. F.)  Counsel to BCE expressly

noted that, in response to the Committee's document requests, BCE had produced 105 boxes of

documents and 13,787 pages of electronic documents.  (Id., Ex. F at 1.)  Counsel to BCE

described the search it had performed for responsive documents and offered to work in good

faith with the Committee to the extent it had any specific questions or requests.  (Id., Ex. F at

11

Court in <u>Grimes v. LCC Int'l, Inc.</u>, No. Civ. A 16957, 1999 WL 252381 (Del. Ch. Apr. 23, 1999), they are privileged, and the Committee's motion should be denied.[6]

25.     A communication is protected from disclosure under the attorney-client privilege if it is "(1) a communication, (2) which is confidential, (3) which was made for the purpose of facilitating the rendition of professional legal services to the client, (4) between the client and it's attorney." <u>Ramada Inns, Inc. v. Dow Jones & Co.</u>, 523 A.2d 968, 970 (Del. Super. Ct. 1986). In <u>Grimes</u>, the Delaware Chancery Court held that, to the extent the general counsel of a corporation is performing work solely on behalf of that corporation, such work is protected by the attorney-client privilege, even though that attorney is also the general counsel of another affiliated corporation, and the legal work performed related to the relationship between the two corporations. <u>Grimes</u>, 1999 WL 252381, at *2.

26.     In <u>Grimes</u>, the shareholders of Microcell brought a derivative action against LCC International, Inc. ("LCC"), Microcell's controlling stockholder, alleging that LCC usurped corporate opportunities, improperly withheld funding from Microcell, and breached fiduciary duties owed to Microcell. <u>Id.</u> at *1. Plaintiffs sought to compel the production of documents authored or received by Peter DeLiso, the general counsel of both Microcell and LCC and Chairman of the Board of Directors of Microcell. <u>Id.</u> Those documents allegedly involved legal work pertaining to the relationship between LCC and Microcell, including with respect to transactions that formed the subject matter of the lawsuit: (1) the negotiation of a credit agreement that was the subject of plaintiffs' breach of fiduciary duty claims, (2) documents relating to LCC's usurpation of corporate opportunities of Microcell, (3) documents regarding the withholding of funding from Microcell, (4) documents regarding Microcell's guarantee of

---

of Teleglobe Inc. and some performed legal work on behalf of Teleglobe Inc. or its subsidiaries, but Mr. Lalande was not an employee of Teleglobe Inc. or its subsidiaries. (Lalande Decl. ¶¶ 3, 7, 8.)

[6]     These documents are denoted on the privilege log as "AC" or "AC/WP."

restructuring and financing alternatives for Teleglobe. For instance, in early 2002, he

analyzed certain Credit Facilities (entered into by Teleglobe and a syndicate of lenders)

and other contracts to determine whether BCE could continue funding Teleglobe and

obtain security in connection with such funding. He also analyzed the legal

consequences for BCE of providing such funding to Teleglobe. In addition, he was

involved in negotiating and drafting certain letters of support and contracts on behalf of

BCE, such as the letter of support that BCE was asked to provide to Teleglobe's lenders

in connection with the renewal of the Credit Facilities in 2001 and 2002. (Lalande Decl.

¶ 16.) Documents 1, 4-7, 25-26, 32, 38-40, 42-5, 47-9, 59-61, 63-4, 67, 75, 81, 85, 87-9,

100, 102, 104, 108-11, 113-14, 145, 162, 166, 189, 191, 198-99, 205, 209-10, 216, 221,

223-25, 254, 269, 303, 307-08, 310-12, 316-18, 320-26, 330-31, 335, 338-39, 341, 346-

47, and 349 noted on the privilege log reflect legal communications regarding these

subject matters.

- Another area of responsibility as an attorney for BCE was to provide legal advice and

  comments to BCE's Secretariat and members of BCE's compliance and accounting

  groups regarding BCE's annual reports, its public filings, and its reporting obligations. In

  addition, Michel Lalande provided legal advice regarding the legal consequences to BCE

  of reporting obligations required by its subsidiaries. (Lalande Decl. ¶ 17.) Documents

  14, 56, 65-6, 70, 92, 98, 118, 120-22, 133-35, 232, 236, 266-67, 278, 279, 280-85, 309,

  313-15, 337, 344, and 348 noted on the privilege log reflect communications regarding

  these subject matters.

- Michel Lalande also provided legal advice regarding resolutions presented to BCE's

  Board of Directors on matters for which BCE Board approval was required, and drafted

  and commented on presentations provided to the BCE Board involving matters of legal

15

190, 194-5, 197, 200-04, 207-08, 211-14, 219-20, 222, 227-29, 231, 235, 239-41, 243-45, 247-50, 256-57, 259, 271-72, 275, and 277.

29.    All these documents were meant to be kept in confidence and not to be disseminated outside of BCE. (Lalande Decl. ¶ 15.) Therefore, there is no basis to eliminate the protection of the attorney-client privilege and the work product doctrine as to legal work performed for BCE. Furthermore, under the Committee's restrictive view of the attorney-client privilege, legal advice provided to a parent corporation by a lawyer working for that corporation, and transmitted to other employees of the parent, would never be protected by the attorney-client privilege if that lawyer also was an officer of a subsidiary as is the usual case. This approach would not be consistent with the goal of encouraging "full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." Upjohn Co. v. United States, 449 U.S. 383, 389 (1981). Such a position is untenable and ignores the practical realities of the workings of corporations.[8]

---

[8]    The Committee erroneously relies on Valente, Simpson v. Motorist Mut. Ins. Co., 494 F.2d 850 (7th Cir. 1974), and LaRocca v. State Farm Mut. Auto. Ins. Co., 47 F.R.D. 278 (W.D. Pa. 1969), to support its misguided argument. This reliance, however, is misplaced for five reasons. First, Valente and Simpson merely hold that "where the same attorney represents two parties having a common interest, and each party communicates with the attorney, the communications are privileged from disclosure at the instance of a third person. Those communications are not privileged, however, in a subsequent controversy between the two original parties." Simpson, 494 F.2d at 855; see also Valente, 68 F.R.D. at 368. These cases are irrelevant where, as here, 246 documents reflect legal work performed solely for BCE. Second, Valente and Simpson stand for the proposition that communications are not privileged "in a subsequent controversy between the two [clients]." Id. But no such litigation has commenced between BCE and the Debtors. Third, the Committee does not stand in the shoes of the Debtors for purposes of controlling the privilege. See infra at 18-19. Instead, at this time the Committee is a mere third party for purposes of the exercise of the privilege. Id. Therefore, under Valente and Simpson, the documents that the Committee seeks are privileged as to it. Simpson, 494 F.2d at 855 (documents are privileged from disclosure to third persons); see also Valente, 68 F.R.D. at 368 (citing Simpson). Fourth, Valente specifically addressed the scope of discovery in shareholder derivative actions, and that case has been subsequently criticized by the Delaware Courts. See Deutsch v. Cogan, 580 A.2d 100, 105-06 (Del. Ch. 1990) (stating that "Delaware courts have consistently followed Garner and declined to broadly apply Valente . . . Nor has the broad rule espoused in Valente been widely accepted and at least one commentator has described it as an 'aberrant' decision."). Fifth, the Committee's reliance on LaRocca is misguided because that case does not address the Committee's arguments in the Application and holds, instead, that "we cannot order the production of an entire file of an attorney on the representation that there may be some evidence therein contained which might assist a party in preparation of its case." LaRocca, 47 F.R.D. at 282.

WP3:994944 2                                                                                          59825 1001

33.     <u>Second</u>, at this time, the Committee has no standing to make this Application because it does not stand in the Debtors' shoes. <u>In re Tenn. Valley Steel Corp.</u>, 183 B.R. 795, 799-800 (Bankr. E.D Tenn. 1995). "Numerous courts in applying § 1109(b) qualify a creditors' committee's standing by applying the following three-part test: (1) the creditors' committee must assert a colorable claim; (2) the debtor must have unjustifiably refused to pursue the claim; and (3) the creditors' committee must have obtained the permission of the bankruptcy court to initiate the action on behalf of the debtor." <u>Id.</u> None of these requirements has been met.

a.     **The Committee has failed to identify any colorable claims**

34.     First, the Committee has failed to assert or even clearly identify any claims it might assert. The only statement in the Application that remotely resembles a possible claim is that BCE had allegedly "committed" to fund the completion of GlobeSystem, that the Debtors relied on such a "commitment" and incurred "billions of dollars of debt to build or . . . fund GlobeSystem," and that the Debtors incurred damages when BCE announced that it would cease its long-term support of Teleglobe Inc., on April 24, 2002. (Application ¶ 14.) Such a claim is not colorable.[10]

35.     In May 1999 (over a year prior to BCE's acquisition of 77 percent of Teleglobe Inc.), Teleglobe Inc. announced the development of the GlobeSystem network and that the completion of GlobeSystem would require US$5 billion. In June 1999, Teleglobe Inc. raised approximately US$1.75B for that purpose, with US$3.25B still needed to complete the network. Since that time, all securities filings of Teleglobe Inc. in the United States and Canada

---

[10]     Alternatively, a creditors' committee may also sue on behalf of debtors where the trustee or the debtor in possession consents to such an action, but the suit must be necessary and beneficial to the resolution of bankruptcy proceedings. <u>In re Commodore Int'l Ltd.</u>, 262 F.3d 96 (2d Cir. 2001) (holding that action had to be dismissed since creditors' committee's suit was neither necessary nor beneficial). For the reasons described in this section, the Committee has not, and cannot, make a showing that such a lawsuit would be necessary and beneficial.

WP3:994944.2                                                                    59825 1001

July 22, 2002. In connection with that extension, BCE reconfirmed its commitment to provide, under certain circumstances, financial assistance *up to $900 million*, of which $374 million had been provided as of June 30, 2001. Thus, it was a matter of public record that (a) BCE was not committed to fund Teleglobe Inc. for more than $526 million ($900 million less $374 million provided as of June 30, 2001), and that (b) without BCE's funding, Teleglobe Inc. could not meet its obligations.

38.    By the end of the third quarter of 2001, BCE had provided $714 million into Teleglobe Inc. out of its original commitment of $900 million. BCE also warned in its SEC filings that:

> Given that Teleglobe Inc.'s credit facilities are fully drawn and that
> . . . Teleglobe Inc. does not have sufficient funds available from its
> cash flow to meet these obligations, to make necessary capital
> expenditures . . . [it] relies on BCE Inc. to provide [additional]
> funding . . . to meet [these] obligations. [The failure by BCE Inc.
> to continue to provide this additional funding] would have a
> material adverse effect on Teleglobe Inc.'s results of operations
> and financial condition. . . .

39.    As the public documents of BCE indicate, by December 31, 2001, BCE had provided a total of $1.1 billion for Teleglobe Inc. ($200 million in excess of its commitment of $900 million); those documents also show that BCE continued to provide Teleglobe Inc. with millions of dollars through April 24, 2002, which far exceeded BCE's commitment under the revolving credit facilities. Thus, BCE's financial reports accurately stated that, although Teleglobe Inc. was dependent "on BCE to provide funding in order to meet [Teleglobe's Inc.] obligations . . . *BCE Inc. [was] not obligated to provide such funding.*" Id. (emphasis added.) The Committee's statement in paragraph 14 of its Application ignores these unambiguous statements in numerous publicly filed documents.

---

[11]    Unless otherwise indicated, all dollars are stated in U.S. dollars

WP3:994944.2                                                                                              59825.1001

     c.     **The Committee has not obtained an Order from this Court allowing it to initiate an action on behalf of the Debtors**

42.    The Committee has no standing to make this Application in the absence of an order of the Court allowing it to pursue an action on behalf of the Debtors. In re Tenn. Valley Steel Corp., 183 B.R. at 799-800. The Committee has not obtained such an Order and has no standing.

**C.**    **BCE Did Not Waive Any Privilege**

43.    The Committee further argues that it should be entitled to receive all privileged documents because 42 boxes of documents from the files of Michel Lalande were produced to the Committee by BCE. This argument misstates the law of waiver and ignores the terms of the parties' own Confidentiality Stipulation.

44.    First, there is no waiver because virtually all the documents that the Committee reviewed from the files of Michel Lalande either did not involve the provision of any legal advice, or involved legal work performed solely on behalf of Teleglobe Inc. or its subsidiaries. Indeed, BCE would have had no right to assert a privilege on behalf of Teleglobe Inc. There is a substantive difference between the documents that BCE withheld on the ground of privilege and those that were produced to the Committee.

45.    The Committee has attached to its Application a limited number of privileged documents that were, however, inadvertently disclosed to it. (Application, Ex. I, Items 1-2, 8-9, and 17). BCE believes that these documents are protected by the attorney-client privilege or the common interest privilege and should not have been produced, and BCE did not intend to produce these documents. Their production does not amount to a waiver for two reasons. First, while the attorney-client privilege may be waived if communications deemed to be privileged are disclosed to third parties, "the mere inadvertent production of documents by

23

                          

were withheld based on a good faith belief that they were protected by the attorney-client privilege, the common-interest privilege, or the work product doctrine.

**E.    Designations of Documents As Work Product**

49.    In its letter dated April 6, 2004, counsel for the Committee did not raise the objections to the assertion of the work product doctrine that are set forth in the Application. (Application, Ex. E at 2-3.) Instead, the Committee solely argued that the assertion of the work product doctrine was inappropriate for the same reason as the assertion of the attorney-client privilege: the documents were created or received by individuals, such as Michel Lalande, who were also officers of certain of the Debtors. (Id.)

50.    In its Application, the Committee argues for the first time that certain documents are not privileged because BCE did not expressly indicate that these documents were prepared "in anticipation of litigation" on its privilege log. (Application ¶ 26.) The Committee's failure to raise this issue in its April 6 letter did not constitute a good faith effort to resolve this discovery dispute and to satisfy the conference requirement under the Local Rules of this Court in connection with Rule 2004 investigations. First Savs. Bank v. First Bank Sys., Inc., 902 F. Supp. 1356, 1364-65 (D. Kan 1995), reversed on other grounds, 101 F.3d 645 ("If this rule is to work, the conference requirement must be treated 'as a substitute for, and not simply a formalistic prerequisite to, judicial resolution of discovery disputes.' . . . Towards that end, the parties should confer with the same detail and candor expected in the memoranda they would file with the court on the discovery dispute") (citation omitted). BCE meaningfully considered and responded in good faith to all the arguments set forth on the Committee's April 6 letter and would have meaningfully considered the Committee's arguments regarding the assertion of the work product doctrine had the Committee raised them.

pending before another tribunal").[15]  BCE did not redact, however, the portion of the documents that were responsive to the Committee's 26 document requests.

        53.    In the letter dated April 6, 2004, Committee counsel stated that "several of the redacted documents have been rendered incomprehensible" as a result of the redactions. (Application, Ex.E at 3.)  In the response dated April 9, 2004, BCE's counsel stated that BCE had made a significant effort to avoid that result, but that to the extent the Committee believed that several specific documents are difficult to understand in their redacted form, the Committee should identify them, and BCE would make a good faith effort to assist the Committee and revise the redactions if necessary.  (Id., Ex.F at 5-6.)  The Committee failed to identify such documents and instead made this application to compel discovery.

        54.    BCE believes in good faith that it has provided more than ample information to allow the Committee to determine whether to institute litigation by its deadline of May 13, 2004.  Indeed, in its Application, the Committee has failed to set forth any reasons why it needs the redacted information in order to form its conclusions.  See, e.g., In re Bakalis, 199 B.R. 443, 450 (Bankr. E.D.N.Y. 1996) (discovery denied where the Trustee had failed to explain why the information was necessary to decide whether to initiate an adversary proceeding).  The Committee points to a presentation to the Board of Directors, dated April 23, 2002 produced to the Committee in both redacted and unredacted form. (See Application, Exs. J, K.)  The presentation contains five separate sections, including a section entitled "BCE strategy-Teleglobe," and a separate section entitled "Managing the SBC put." (Application, Ex. J at 7.)  The Committee speculates that "documents concerning the SBC put right are relevant to the Committee's investigation as they may discuss or otherwise explain the reasons why BCE

---

[15]    BCE redacted a small number of documents on the basis of privilege.  In the April 6, 2004 letter, Committee counsel inquired as to the redactions on two specific documents.  BCE responded that these documents should have been included on BCE's privilege log, and they were subsequently included on the log.

> Its chief complaint is that it could not find what it wanted to
> find. This is not any fault of the City Board. Rule 34, Fed. R.
> Civ. P., directs that 'any party who produces documents for
> inspection shall produce them as they are kept in the usual
> course of business or shall organize and label them to
> correspond with the categories in the request.' . . . The City
> board was not obligated to wrap up the volumes of data into
> neat little packages for the State

Id. at 1499; see also Butler v. Portland Gen. Elec. Co., Civ. No. 88-455, 1990 U.S. Dist. LEXIS

1630, at **6-7 (D. Or. Feb. 9, 1990); Dangler v. N. Y. City Off Track Betting Corp., 95 Civ.

8495, 2000 U.S. Dist. LEXIS 14938, at **3-4 (S.D.N.Y. Oct. 10, 2000).

     57.    This is exactly what BCE has done. First BCE has produced all

responsive portions of the minutes of the meetings of the Board of Directors, and all other Board

presentations, for the period February 15, 2000 through April 24, 2002. The BCE Board

Minutes are maintained in the files of the BCE Corporate Secretariat, and they were produced to

the Committee in the order in which they were maintained. BCE will supplement its production

and produce to the Committee the responsive sections of the Board minutes and presentations for

the months of January 2000 and May 2002 to the extent they are not privileged.

     58.    Second, the Committee's argument with respect to the Issues and

Activities List has no basis. At the September 8, 2003 meeting, Committee counsel asked

whether any memoranda regarding the subjects set forth on pages 12 and 13 of the Project X

Issues and Activities List were in fact prepared, and whether these documents would be

produced to the Committee or alternatively included on a privilege log.

     59.    The Issues and Activities List is a list of issues, not a list of documents or

a table of contents of existing documents. The documents responsive to the issues on the Issues

and Activities List were never maintained in the order in which these issues appear on the List.

Lalande Decl. ¶ 24.

## CONCLUSION

For the reasons set forth above, BCE respectfully requests that the Court deny the

Application of the Committee.

Dated: April 21, 2004
        Wilmington, Delaware


                        YOUNG CONAWAY STARGATT & TAYLOR, LLP


                        _____
                        Pauline K. Morgan (No. 3650)
                        The Brandywine Building
                        1000 West Street, 17th Floor
                        P.O. Box 391
                        Wilmington, DE  19899
                        (302) 571-6600

                                and-

                        SHEARMAN & STERLING LLP
                        Stuart J. Baskin
                        George J. Wade
                        Daniel Schimmel
                        599 Lexington Avenue
                        New York, New York 10022
                        (212) 848-4000

                        Attorneys for BCE Inc.

WP3:994944.2                                                            59825 1001