# EXHIBIT 8

Court File No. O5-CL-6161



***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(Commercial List)**

B E T W E E N:

KATHY MORGAN,
in her Capacity as Court-Appointed Plan Administrator of Teleglobe Inc.

Plaintiff

and

BCE INC., JEAN C. MONTY, ARNOLD H. STEINBERG,
TERRENCE J. JARMAN, THOMAS E. KIERANS, MICHAEL J. SABIA,
ANTHONY S. FELL and RICHARD J. CURRIE

Defendants

**STATEMENT OF CLAIM**

TO THE DEFENDANTS:

A LEGAL PROCEEDING HAS BEEN COMMENCED AGAINST YOU by the plaintiff. The claim made against you is set out in the following pages.

IF YOU WISH TO DEFEND THIS PROCEEDING, you or an Ontario lawyer acting for you must prepare a statement of defence in Form 18A prescribed by the *Rules of Civil Procedure*, serve it on the plaintiff's lawyer or, or where the plaintiff does not have a lawyer, serve it on the plaintiff, and file it, with proof of service, in this court office, WITHIN TWENTY DAYS after this statement of claim is served on you, if you are served in Ontario.

If you are served in another province or territory of Canada or in the United States of America, the period for serving and filing your statement of defence is forty days. If you are served outside of Canada and the United States of America, the period is sixty days.

Instead of serving and filing a statement of defence, you may serve and file a notice of intent to defend in Form 18B prescribed by the Rules of Court. This will entitle you to ten more days within which to serve and file your statement of defence.

- 2 -

IF YOU FAIL TO DEFEND THIS PROCEEDING, JUDGMENT MAY BE GIVEN AGAINST YOU IN YOUR ABSENCE AND WITHOUT FURTHER NOTICE TO YOU. IF YOU WISH TO DEFEND THIS PROCEEDING BUT ARE UNABLE TO PAY LEGAL FEES, LEGAL AID MAY BE AVAILABLE TO YOU BY CONTACTING A LOCAL LEGAL AID OFFICE.

Date Issued:  November 16th, 2005          Issued by _____
Local Registrar

Address of Court office:
393 University Avenue
10th Floor
Toronto, Ontario  M5G 1E6


TO:          BCE INC.
             1000, de la Gauchetière Ouest
             Suite 3700
             Montreal, Quebec  H3B 4Y7

AND TO:      JEAN C. MONTY
             1000, rue de Sérigny
             Bur 600
             Longueuil, Quebec  J4K 5B1

AND TO:      H. ARNOLD STEINBERG
             4931 Glencaim Avenue
             Montreal, Quebec  H3W 2B1

AND TO:      TERRENCE J. JARMAN
             701 Evans Avenue, Suite 403
             Toronto, Ontario  M9C 1A3

AND TO:      THOMAS E. KIERANS
             4 Woodland Heights
             Toronto, Ontario  M5S 2W4

AND TO:      MICHAEL J. SABIA
             1000, de la Gauchetière ouest
             Suite 3700
             Montreal, Quebec  H3B 4Y7]

- 3 -

AND TO:    ANTHONY S. FELL
           RBC Dominion Securities Inc.
           Royal Bank Plaza
           200 Bay Street
           Toronto, Ontario  M5J 2W7

AND TO:    RICHARD J. CURRIE
           46A Chestnut Park Road
           Toronto, Ontario  M4W 1W8

- 4 -

## CLAIM

1.    The plaintiff Kathy Morgan ("Morgan" or the "Plan Administrator"), in her capacity as court-appointed Plan Administrator of Teleglobe Inc. ("Teleglobe"), claims:

      (a)    a declaration that Teleglobe and its creditors have been oppressed by the Directors (as defined below) and by Teleglobe's affiliate BCE Inc. ("BCE") within the meaning of s. 241 of the *Canada Business Corporations Act* ("*CBCA*");

      (b)    a declaration that the Directors breached their fiduciary duty to Teleglobe under s. 122(1)(*a*) of the *CBCA* and failed to act in accordance with the standard of care prescribed by s. 122(1)(*b*) of the *CBCA*;

      (c)    compensation for oppression in the sum of $3 billion, including damages for the loss of the enterprise value of Teleglobe;

      (d)    damages for breach of fiduciary duty in the sum of $3 billion;

      (e)    such further or other order under s. 241 of the *CBCA* as may be necessary to rectify the oppression complained of;

      (f)    an order, if necessary, under s. 238(*d*) of the *CBCA* granting the Plan Administrator standing as a complainant to bring this action;

      (g)    pre-judgment and post-judgment interest in accordance with the *Courts of Justice Act*, R.S.O., 1990, c. C-43, as amended;

      (h)    costs of this action on a substantial indemnity basis, plus GST; and

- 5 -

(i)     such further and other relief as seems just.

**The Parties**

*The Plaintiff*

2.      On May 15, 2002, Teleglobe and certain of its Canadian subsidiaries (collectively, the "Teleglobe Applicants") filed an application in Toronto under the *Companies' Creditors Arrangement Act* ("*CCAA*"). On May 15, 2002, an initial order was made under the *CCAA* in that application, Court File No. 02-CL-4528 (Commercial List - Toronto).

3.      A Plan of Compromise and Arrangement with respect to the Teleglobe Applicants (the "Plan") was approved by the Ontario Superior Court of Justice (Commercial List) on February 8, 2005

4.      The plaintiff Morgan resides in Vienna, Virginia. She was designated as the Plan Administrator pursuant to article 6.1 of the Plan. Her appointment was approved by this Court pursuant to paragraph 18 of its Sanction Order dated February 8, 2005, in accordance with the terms of the Plan Administration Agreement between the Plan Administrator, the U.S. and Canadian Debtors and the Plan Committee dated January 26, 2005 and made effective March 2, 2005, to administer the Plan as it relates to the Canadian Debtors (as defined therein) in accordance with the Plan Administration Agreement.

5.      Morgan was similarly appointed to serve as the Plan Administrator in accordance with the terms of the Plan Administration Agreement as part of the confirmation of the Plan of Liquidation of the U.S. Debtors pursuant to Chapter 11 of the U.S. Bankruptcy Code as set out in paragraph 16 of the Order of the U.S. Bankruptcy Court for the District of Delaware Confirming the First Amended Joint Chapter 11 Plan of Liquidation, dated February 10, 2005.

- 6 -

6.      Under the Plan, the Plan Administrator has the power to assert claims or commence

litigation on behalf of any of the Debtors (defined to include the Teleglobe Applicants) against

any person or entity, and is designated as the sole representative of the Debtors, instructed by the

Plan Committee.

7.      Teleglobe is a corporation governed by the *CBCA*. At all relevant times Teleglobe

carried on business as a provider of international transmission of voice and data communications,

operating primarily through bilateral or multilateral agreements with telecommunication carriers

worldwide.

***The Defendants***

8.      The defendant BCE is and was at all material times a corporation governed by the *CBCA*

with its principal place of business in Montreal, Quebec. At all material times it has carried on,

and it continues to carry on, business in Toronto and elsewhere in Canada. The shares in BCE's

capital stock are publicly traded, and are listed and posted for trading on the Toronto Stock

Exchange and the New York Stock Exchange.

9.      BCE is Canada's largest communications company and is one of the largest corporations

of any type in Canada. BCE carries on a variety of businesses, both directly and through

subsidiaries, including wireless and wire line telephone services, Internet services, high-speed

data services, entertainment, satellite, broadcast and information services, and business-to-

business e-commerce.

10.     The defendants Jean C. Monty, Terence J. Jarman, Thomas E. Kierans, Richard J. Currie,

Michael J. Sabia, Anthony Fell and H. Arnold Steinberg (collectively, the "Directors") were, at

relevant times, directors of Teleglobe. In addition, at relevant times, Monty, Kierans, Sabia, and

- 7 -

Currie (collectively, the "Common Directors") also were directors of BCE, and Steinberg was a director of another BCE affiliate, Bell Canada International.

11.    The defendant Monty is an individual resident in Montreal, Quebec. At all relevant times Monty was a director, the Chairman, President and Chief Executive Officer of BCE. At all relevant times Monty was also a director, the Chairman and Chief Executive Officer of Bell Canada, a subsidiary of BCE. At all relevant times Monty was also a director and the Chairman of Teleglobe. After BCE acquired 100% of the common shares of Teleglobe on November 1, 2000, Monty became the Chief Executive Officer of Teleglobe.

12.    The defendant Steinberg is an individual resident in Montreal, Quebec. At all relevant times, Steinberg was a director of Bell Canada International, Inc., an affiliate of BCE. At all relevant times Steinberg was also a director of Teleglobe.

13.    The defendant Jarman is an individual resident in Toronto, Ontario. At all relevant times until January 2002, Jarman was a director of Teleglobe and President and Chief Executive Officer of Teleglobe USA Inc., a subsidiary of Teleglobe, and the rest of the Teleglobe Communications operating group (the "TCC Group"). He was also vice-chairman of BCE's Bell Canada operation and president of BCE's affiliate, Bell Nexxia.

14.    The defendant Kierans is an individual resident in Toronto, Ontario. At all relevant times Kierans was a director of Teleglobe. At all relevant times Kierans was also a director of BCE.

15.    The defendant Sabia is an individual resident in Montreal, Quebec. From February 2002 Sabia was the president of BCE and director of Teleglobe. Sabia was also from February 2002 a

- 8 -

director and officer of Teleglobe Communications Corporation, a Delaware corporation that was a subsidiary of Teleglobe.

16.     The defendant Fell is an individual resident in Toronto, Ontario. From February 2002 Fell was a director of both BCE and Teleglobe.

17.     The defendant Currie is an individual resident in Toronto, Ontario. At all relevant times Currie was a director of Teleglobe. At all relevant times Currie was also a director of BCE. At all relevant times Currie served as the "lead" director of BCE, and acted as chairman of the board in Monty's absence.

18.     The defendants Jarman, Kierans and Currie became directors of Teleglobe effective December 15, 2000. BCE nominated Jarman, Kierans and Currie to be Teleglobe directors after BCE acquired all of the common shares of Teleglobe.

**BCE'S Acquisition of 100% of Teleglobe's Common Shares**

19.     Prior to February 2000, BCE held approximately 23% of the issued and outstanding common shares of Teleglobe.

20.     On February 15, 2000, BCE announced that it had entered into agreements with Teleglobe and Teleglobe's two other principal shareholders, pursuant to which BCE would, through a plan of arrangement under the *CBCA,* acquire all of the common shares of Teleglobe not then held by BCE or its affiliates.

21.     At the time of this announcement, BCE publicly stated that it was confident that it had the management expertise and financial depth to guide Teleglobe through its challenges.

- 9 -

22.    Following approval of the *CBCA* plan of arrangement, on November 1, 2000, BCE completed its acquisition of all of the common shares of Teleglobe.

**BCE'S Control Over Management and the Board of Teleglobe**

23.    After BCE announced its intention to acquire all of Teleglobe, BCE exercised control over and directly involved itself in the management and governance of Teleglobe's business activities. Among other things,

      (a)    BCE's Chairman and Chief Executive Officer, Monty, served as the Chairman of Teleglobe and as a director;

      (b)    some of BCE's own directors, including the Common Directors, became directors of Teleglobe;

      (c)    Jarman was appointed as the Chief Executive Officer of the TCC Group; and

      (d)    in May 2000, Teleglobe's Chief Financial Officer was replaced with Michael Boychuk, BCE's treasurer.

24.    Upon acquiring 100% of Teleglobe's common shares on November 1, 2000, BCE functionally integrated Teleglobe as an operating division of BCE. BCE exercised actual and immediate control over Teleglobe. Treasury, investor relations, legal affairs and public securities reporting functions were assumed by, and were under the control of, BCE. BCE appointed Teleglobe's senior management, many of whom were drawn from other business units of BCE. As set out in detail below, three of the five directors of Teleglobe were directors of BCE, including BCE's CEO and "lead director", and a fourth director was a director of another BCE subsidiary, Bell Canada International. BCE effectively integrated the management of

- 10 -

Teleglobe with the management of BCE and it managed Teleglobe as if it were an integrated part of BCE's business, without regard to the separate interests of Teleglobe and its stakeholders.

25.     From the time it acquired 100% of Teleglobe's common shares, and indeed, even in the six month period before, and notwithstanding that Teleglobe and its subsidiaries had substantial obligations of their own to banks and to holders of debt securities, with the knowledge and concurrence of the defendants, BCE exercised control over and managed the affairs and operations of Teleglobe and its subsidiaries.

26.     From the time BCE acquired 100% of Teleglobe's common shares, all of the officers of Teleglobe were also BCE employees, and most of Teleglobe's senior management was comprised of current, seconded and former employees of BCE or its affiliates. The majority of the members of the board of directors of Teleglobe also were members of the board of directors of BCE.

27.     From the time BCE acquired 100% of Teleglobe's common shares, the Directors acted solely in the best interests of BCE and in pursuit of BCE's goals and objectives for Teleglobe, and without regard for the interests of Teleglobe's other stakeholders, including the creditors of Teleglobe and its subsidiaries.

28.     BCE and its nominees acknowledged BCE's control over Teleglobe. Teleglobe's Financial Information Report for 2001 was initially approved by the BCE-dominated Board of Teleglobe on February 27, 2002. The initial approved version of the Financial Information Report said that "BCE Inc. and its affiliates ... exercise control over and manage the affairs and operations of the Teleglobe Inc. group."

- 11 -

29.    Starting in late February or early March 2002, BCE commenced work on what it termed

"Project X", which was a project to study contingent plans to deal with the insolvency of

Teleglobe and which eventually led to the decision to place Teleglobe under CCAA protection,.

The immediate catalyst for "Project X" was the receipt by Monty of information from two

directors on the board of Bell Canada representing Southwestern Bell Corporation ("SBC") that

SBC had decided to exercise its option to put to BCE the 20% of Bell Canada owned by SBC.

BCE estimated that its exposure to SBC's put was more than $7 billion, an amount that BCE

estimated would reduce its credit rating and place severe strains on its liquidity.  BCE decided to

renege on its commitment to Teleglobe in order to conserve cash.

30.    On April 12, 2002, as a direct result of BCE's "Project X", BCE presented the Teleglobe

Board with a form of resolution rescinding its prior approval of the Financial Information

Report, and approving new 2002 financial information, which had been sterilized to remove

references considered by BCE to be potentially harmful to it.  At the instance of BCE, the

Teleglobe Board passed the resolution.

**BCE's Plan for Teleglobe**

31.    In seeking to acquire and in acquiring the balance of Teleglobe's common shares that it

did not yet own, BCE's plan was to integrate Teleglobe into BCE and make Teleglobe and its

international business a key segment of BCE's communications business, and to direct

Teleglobe's activities and expansion as part of BCE's overall corporate strategy.

32.    As part of this plan, Teleglobe was to construct the GlobeSystem Network

("GlobeSystem"), a worldwide network of fibre optic and satellite interlinks that would allow the

simultaneous transmission of vast amounts of data, voice and other electronic traffic.

- 12 -

GlobeSystem would permit Teleglobe to act as the global communications and e-business operation of BCE.

33.     From its conception, the GlobeSystem was understood to be an enormous undertaking, both technically and financially. BCE and the Directors were advised and expected that the system would take no less than US$5 billion to build and an additional US$1 billion to fund through to break-even operations. To the knowledge of all concerned, Teleglobe, however, did not have the resources necessary at the time of the merger to finance the GlobeSystem.

34.     Before the completion of the acquisition, BCE and the Directors realized that the bulk of the US$6 billion cost of the GlobeSystem would have to be underwritten by BCE. Knowing this, BCE and the Directors nevertheless caused Teleglobe to incur the tremendous cost of the continued development of the GlobeSystem. The development of the GlobeSystem financially strapped Teleglobe and its subsidiaries and, by the end of 2001, Teleglobe and its subsidiaries had exhausted all of its sources of existing bank facilities and other available third party funding.

35.     Ultimately, as discussed in greater detail below, in 2002 BCE unilaterally and precipitately withdrew funding support for Teleglobe's operations without any prior notice, thereby forcing Teleglobe to file for protection under the *CCAA,* ultimately leading to the prompt liquidation of Teleglobe in the *CCAA* process. Prior to doing so, BCE sought to arrange its affairs relative to Teleglobe so as to minimize its exposure to a Teleglobe insolvency, and to increase its leverage in relation to Teleglobe's creditors and other stakeholders.

36.     Before BCE used its complete control over Teleglobe to utilize all of Teleglobe's financial resources to cause the build-out of GlobeSystem as the vehicle for the fulfillment of

- 13 -

BCE's international aspirations, Teleglobe carried on a viable and sustainable business as a provider of international transmission of voice and data communications.

37.    But for BCE's interference with and control over Teleglobe, Teleglobe would have been able to carry on business as a going concern and would have been able to satisfy its pre-takeover debt obligations to its banks and bondholders, among others.

**Decline in the Telecommunications and Technology Sector in 2000**

38.    Almost immediately after BCE announced its intention to acquire the balance of Teleglobe's common shares that it did not own, the telecommunications and technology sector peaked and began a lengthy and precipitate decline.

39.    In the telecommunications industry in particular, economic and market conditions had worsened:

   (a)    stock prices for some telecommunications companies had fallen by as much as 80% from their peak;

   (b)    major companies had issued warnings of losses in 2000 and lowered earnings and revenue forecasts for 2001; and

   (c)    infrastructure providers performed worse than large telecommunications companies because of large capital expenditures, weak demand for broadband services, and rapidly declining prices.

- 14 -

**Impact of Market Conditions on Teleglobe**

40.     The market and economic conditions in and affecting the technology industry and the

telecommunications sector pointed to problems with Teleglobe's business. By 2000, these

market forces began to affect Teleglobe.

41.     By December 31, 2000, there were many signs that Teleglobe itself had weakened

financially, including:

(a)     the projected demand for broadband had not materialized and industry-wide

revenues were declining as a result of pricing pressures;

(b)     in August 2000, Teleglobe had announced plans to restructure and to cut its work

force by 17%;

(c)     Teleglobe had drawn down more than half of its credit facility, having borrowed

US$742 million out of the total US$1.25 billion available;

(d)     Teleglobe had significantly under-performed its budget for the year ending

December 31, 2000, in terms of revenue and profits;

(e)     Teleglobe's revenue, after increasing from 1997 to 1998, had dropped

significantly since 1998; and

(f)     Teleglobe had sustained net losses in five consecutive quarters.

42.     By March 31, 2001, Teleglobe's financial performance had weakened even further:

(a)     Teleglobe announced a plan to dispose of Excel Communications, which

accounted for approximately 50% of Teleglobe's revenue in 2000;

- 15 -

    (b)    Teleglobe had sustained net losses in six consecutive quarters, having recorded a

loss of US$218 million in the first quarter of 2001; and

    (c)    Teleglobe had borrowed US$1.034 billion out of the total US$1.25 billion

available in its credit facility.

43.    To the knowledge of the defendants, and as the defendants anticipated or should have

anticipated, Teleglobe's financial position was deteriorating and was likely to continue to

deteriorate materially throughout 2001.

44.    Entering 2001 and continuing through 2001 and for the foreseeable future, it was not

possible for Teleglobe to continue to carry on business, including the build-out of the

GlobeSystem, without the financial support of BCE, which had repeatedly and publicly

committed to support Teleglobe through at least 2003 and had approved a budget and a multi-

year financial plan for Teleglobe for that period and beyond.

45.    By mid-July 2001 BCE concluded that Teleglobe's funding shortfalls would create stress

on BCE's liquidity. By not later than July 13, 2001 BCE had internally concluded and recorded

that, without significant adjustments to Teleglobe's cap-ex requirements, BCE would exhaust its

own credit facilities, suffer deterioration of its credit ratios, suffer a ratings downgrade and have

to raise equity at an inopportune time.

**Further Unsatisfied Commitment by BCE to Fund Teleglobe**

46.    When announcing its agreements to acquire Teleglobe on February 15, 2000, BCE

represented to the public debt and equity markets that BCE would provide the financial support

necessary to complete the GlobeSystem. However, by the Spring of 2000, after the acquisition

- 16 -

had been announced, but before the closing in November 2000 (the "Gap Period"), Teleglobe had spent the proceeds of the sale of debentures in July 1999, and was close to exhausting the funding available under its existing bank facility. Teleglobe was thus nearly out of cash with which to fund the continued development of the GlobeSystem. Teleglobe had virtually no ability to access the public debt markets, given its already highly leveraged balance sheet. Teleglobe's existing bank facility was coming due in July 2000, requiring the repayment of some US$612 million. Given then prevailing market conditions, there was apparently no other funding available to continue to pay for the construction of the GlobeSystem.

47.    During the Gap Period, Teleglobe's Board was still independent, since BCE held only a minority voting position on the Board. The independent directors of Teleglobe, operating as a special committee of the Board, proposed to defer construction of the more capital-intensive aspects of the GlobeSystem pending improvement in Teleglobe's financial situation. But BCE objected to this proposal, and insisted that Teleglobe continue with the build out of the GlobeSystem. Indeed, BCE threatened to declare the Teleglobe had suffered a "material adverse change", entitling BCE to escape the acquisition, if Teleglobe did not continue the build out of the GlobeSystem unabated.

48.    The independent directors of Teleglobe agreed to BCE's demand to continue building the GlobeSystem, but made their consent conditional upon BCE making a substantial funding commitment, in an unequivocal and irrevocable written form, to assure the Teleglobe Board that sufficient funding would be made available to pay the ongoing construction expenses.

49.    BCE agreed. Before irrevocably committing to Teleglobe's request for funding during the Gap Period, BCE requested and received the right from Teleglobe to install BCE-affiliated

high-level management at Teleglobe and its subsidiaries even though its acquisition of Teleglobe

had not yet closed. BCE proceeded to replace most of Teleglobe's senior executives with its

own appointees. On June 18, 2000, the acquisition agreements were amended to, among other

things, obligate BCE to fund Teleglobe's obligations through to closing.

50.    By November 2001, Teleglobe's bank facility was fully drawn, leaving BCE as

Teleglobe's only source of funds for Teleglobe's continued operations.

51.    Teleglobe's Board met on November 28, 2001. At that time, committed advances from

BCE had been fully drawn, and Teleglobe needed a further US$850 million to fund Teleglobe's

business plans for 2001 and 2002.

52.    On November 28, 2001, BCE's Board approved Teleglobe's business and financial plan

and budget for 2002 and authorized BCE to provide US$850 million to Teleglobe and its

subsidiaries. BCE's Board placed the timing and conditions for the funding, if any, in the hands

of the conflicted fiduciary Monty. Specifically, Monty, the Chairman and CEO of BCE, was

given a delegation by the BCE Board to determine the terms and conditions of such funding to

Teleglobe—where he was also Chairman and CEO.

53.    After BCE approved this additional financial commitment to Teleglobe, BCE's CEO, the

defendant Monty, publicly stated, at a meeting with analysts on December 12, 2001, that

Teleglobe would have financial "requirements" to be funded and BCE's Chief Financial Officer

made reference to the "additional *equity* commitment that BCE *is* putting into Teleglobe"

(emphasis added), amounting to $500 million by the end of 2001. On January 8, 2002, at a

Salomon Smith Barney conference, Monty referred to a further $500 million BCE

"commitment" to Teleglobe for 2002. These statements and others amounted to, and were

- 18 -

understood as, a statement that BCE was committed to injecting a further approximately $1 billion into Teleglobe.

54.    Monty's statements were made with the intention that they be widely reported and with the intention to enhance confidence in Teleglobe on the part of Teleglobe's stakeholders and the public generally.

55.    Teleglobe and Teleglobe's stakeholders, including its creditors, were reasonably entitled to expect that BCE would honour its public commitment to Teleglobe and would continue to fund Teleglobe and its business plan, at least through 2002.

56.    The Directors failed to take adequate or any steps to require BCE to memorialize its promises and representations to fund Teleglobe and its business plan, even though the funding was crucial to Teleglobe's survival.

57.    In representation letters dated January 23, 2002 and February 27, 2002 that were provided to Deloitte & Touche LLP ("Deloitte") in connection with its audit of BCE's and Teleglobe's 2001 financial statements, Teleglobe represented that:

> "In addition, at the CEO conference held December 12, 2001, BCE committed to contribute up to an additional Cdn$1.0 billion to support the working capital and debt repayment requirements of the Company [Teleglobe] over the next twelve months".

The representation letters were signed by, among others, Boychuk and the defendant Monty.

58.    On or about April 8, 2002, shortly before Teleglobe filed for protection under the *CCAA*, BCE sent and caused Teleglobe to send revised representation letters to Deloitte, the relevant portion of which was amended to read:

- 19 -

> "In addition, at the CEO conference held December 12, 2001, BCE announced its intention to contribute up to an additional Cdn$1.0 billion to support the working capital and debt service requirements of the Company over the next twelve months on the basis that with such support the Company will be able to meet its current business plan.
>
> BCE Inc. is not obliged to provide such funding and BCE Inc.'s future funding decisions will be based on the facts and circumstances prevailing at such time."

59.     On March 5, 2002, Siim Vanaselja, BCE's Chief Financial Officer, reiterated to the public that BCE made a $1 billion commitment to fund Teleglobe and "with that incremental one billion Canadian, we should be able to bring Teleglobe to a free cash flow position in 2003."

60.     Notwithstanding these representations, ultimately BCE advanced only approximately C$400 million of the US$850 million it committed to advance to Teleglobe to fund its operations.

**BCE Seeks to Protect Itself Against Teleglobe's Insolvency and Increases Its Leverage**

61.     In 2001, BCE continued to publicly state its commitment to fund Teleglobe and Teleglobe's build-out of the GlobeSystem, which could be financed only with the financial support of BCE.

62.     Through 2001, BCE continued to publicly state its commitment to fund Teleglobe. However, BCE and the Directors, including the Common Directors, analyzed Teleglobe and its prospects and reconsidered BCE's prospective commitment to and relationship with Teleglobe.

63.     Beginning in 2001, BCE took steps to attempt to protect itself in the event that BCE elected to resile from its public commitment to fund BCE. Specific steps taken by BCE to protect itself are described below.

- 20 -

**Improper Assignment of Customer Contracts**

64.     In or about April 2001, under the direction of BCE, Teleglobe and two BCE subsidiaries,

Bell Canada and BCE Nexxia Inc. ("Nexxia"), entered into an undated, non-binding

"Memorandum of Understanding" pursuant to which, among other things, it was agreed that:

> (a)     Teleglobe would cease selling voice, data and broadcast services in Canada;

> (b)     Bell Canada would acquire from Teleglobe an assignment of contracts between
>          Teleglobe and its customers under which Teleglobe provided these services in
>          Canada;

> (c)     Bell Canada would use Teleglobe as exclusive supplier of certain international
>          voice and data services; and

> (d)     Bell Canada would pay to Teleglobe a "management fee", to be phased out by the
>          end of 2002, to compensate Teleglobe for the value of the customers and
>          customer contracts assigned to Bell Canada.

65.     The Memorandum of Understanding contemplated that Teleglobe, Bell Canada and

Nexxia would enter into further formal agreements to give effect to the terms of the

Memorandum of Understanding.

66.     In early 2002, when BCE was reconsidering its future commitment to Teleglobe and the

insolvency of Teleglobe was contemplated within BCE, BCE and the Directors caused

Teleglobe, Bell Canada and Nexxia to enter into an "Assignment Agreement" effective January

1, 2001. Pursuant to the Assignment Agreement, Teleglobe and its subsidiaries agreed to assign

- 21 -

certain customer contracts to Bell Canada and Nexxia. The actual date of execution was not and is not apparent on the face of the Assignment Agreement.

67.     During 2001, as contemplated by the Memorandum of Understanding and formalized by the Assignment Agreement, Teleglobe assigned to affiliates of BCE over 300 contracts for domestic Canadian retail, broadcasting and wholesale customers. Most of the contracts had a one-year term, but renewed automatically for a further year unless terminated. These contracts generated $58 million in revenue in the third and fourth quarters of 2001.

68.     The net recovery to Teleglobe on account of the management fee that it received in return for the assignment of the contracts was $1.4 million in 2001 and $1.8 million in the first quarter of 2002.

69.     The assigned contracts were fundamental components of the business of Teleglobe and their loss diminished substantially the value of the "core business" that was sold in 2003 under the authority of Teleglobe's *CCAA* proceeding.

70.     As contemplated by the Memorandum of Understanding, Teleglobe, Bell Canada and Nexxia also entered into a "Master Wholesale Pricing and Services Coordinating Agreement" (the "Master Wholesale Agreement"), also made effective as of January 1, 2001. The Master Wholesale Agreement was for a five-year term commencing January 1, 2001.

71.     Like the Assignment Agreement, the Master Wholesale Agreement was executed under the direction of BCE and the Directors in late 2001, when BCE was considering its future commitment to Teleglobe and contemplating the insolvency of Teleglobe, if it had not already determined internally to abandon Teleglobe.

- 22 -

72.    The Master Wholesale Agreement provided, among other things, for Bell Canada and Nexxia to purchase from Teleglobe, on an exclusive basis, their requirements of certain telecommunications services outside of Canada.  The requirement that Bell Canada and Nexxia acquire these services from Teleglobe on an exclusive basis was part of the overall consideration for the assignment of customer contracts from Teleglobe contemplated by the Memorandum of Understanding.

73.    The Master Wholesale Agreement, which was executed shortly before BCE withdrew its public support for Teleglobe, contained clauses making the contract terminable in certain circumstances, including the insolvency of Teleglobe or upon a change of control of Teleglobe. Both events were within the contemplation of BCE and the Directors at the time the Master Wholesale Agreement was executed in late 2001.

74.    The change of control and insolvency default provisions included in the Master Wholesale Agreement were not contemplated by the terms of the Memorandum of Understanding executed earlier in 2001.

75.    It was contrary to Teleglobe's interests to agree to assign valuable customer contracts to affiliates of BCE in return for a time limited management fee and an exclusivity arrangement with affiliates of BCE that was terminable upon the insolvency or change of control of Teleglobe.

76.    By permitting Teleglobe to agree to assign valuable customer contracts to affiliates of BCE in return for a time limited management fee and an exclusivity arrangement with affiliates of BCE that was terminable upon the insolvency or change of control of Teleglobe, the Directors breached their fiduciary duties to Teleglobe.

- 23 -

77.     The effect of the transactions effected by the Assignment Agreement and the Master

Wholesale Agreement was to confer value and an enhanced degree of leverage and control upon

BCE and its affiliates for no or inadequate consideration and to diminish the value of Teleglobe

in any insolvency restructuring by enabling its most substantial customers, Bell Canada and

Nexxia, to terminate their exclusive arrangements with Teleglobe upon the insolvency or change

of control of Teleglobe.

78.     This arrangement, which was undertaken at the instance of BCE and under the

supervision of or with the concurrence of the Directors, was oppressive to Teleglobe and its third

party stakeholders.

**Disposition of 1000 de la Gauchetière Ouest**

79.     In May 1989, Prodevco Immobiliere Inc. ("Prodevco") acquired an interest in the real

property located at 1000 de la Gauchetiere Ouest in Montreal by entering into a 99-year lease

with the Roman Catholic Archdiocese of Montreal. Teleglobe, BCE's subsidiary BCE

Development Corp. and Prodevco entered into an agreement to develop the land and in 1992 the

building at 1000 de la Gauchetiere Ouest (the "Building") was completed. The Building was

owned 30% by Teleglobe and 70% by BCE. Teleglobe's head office was located in the

Building.

80.     At BCE's instance, the Building was listed for sale in October 2001. An agreement of

purchase and sale was entered into on December 21, 2001 to sell the Building for $187 million.

The sale closed on February 22, 2002. Teleglobe's 30% share, after adjustments and closing

cots, was approximately $50 million. The law firm that represented BCE on the sale was later

retained, upon the direction of BCE, to represent Teleglobe in its *CCAA* proceeding.

- 24 -

81.     Rather than BCE honouring its US$850 million funding commitment to Teleglobe, the sale liquidated Teleglobe's interests in the Building and BCE caused the proceeds of sale to be spent by Teleglobe to fund its cash flow requirements.

**Improper Assignment of Trade-Marks**

82.     Further, BCE exercised its control over Teleglobe and continued its practices of self-dealing in contemplation of Teleglobe's anticipated insolvency, when effective January 23, 2002, it caused Teleglobe to assign to BCE certain trademarks registered in the United States, Canada and Israel without payment to Teleglobe.

83.     The trade-marks assigned by Teleglobe to BCE included the word "Teleglobe" standing alone and together with other words and various logos owned and used by Teleglobe.

84.     These assignments, which were not publicly disclosed at the time nor in Teleglobe's initial filing under the *CCAA,* were discovered in the course of due diligence in connection with the sale in the *CCAA* of the Teleglobe's "Core Telecom Business".

85.     After such discovery , Teleglobe requested that BCE re-assign these trade-marks to Teleglobe. In August 2002, an agreement assigning these trade-marks back to Teleglobe was executed.

86.     On February 28, 2001, the BCE-controlled Teleglobe Board approved a transaction whereby BCE transferred Nortel shares with a market value of more than $500 million to Teleglobe in exchange for an allocation of Fifth Series Preferred Shares to be issued by Teleglobe  After the transfer of the Nortel shares to Teleglobe, BCE directed Teleglobe to sell the Nortel shares, and BCE directed that Teleglobe retract and repurchase the Fifth Series

- 25 -

Preferred Shares from BCE (collectively, the "Nortel Shares Transactions". Neither BCE's

Board nor Teleglobe's Board should have approved the Nortel Shares Transactions unless

Teleglobe was solvent and able to pay its debts as they became due. Teleglobe could have been

solvent only if BCE had committed the additional funding described above.

87.     BCE used the Nortel Shares Transactions to utilize tax credits that were not otherwise

available to it. BCE used Teleglobe to shelter $50 million of tax exposure, but did not pay

Teleglobe anything for this valuable accommodation. The BCE-controlled Teleglobe Board did

not demand reimbursement for BCE's use of these valuable assets.

**BCE Unilaterally Withdraws Financial Support to Teleglobe**

88.     On April 24, 2002, the Board of BCE, including the Common Directors, announced that

BCE would no longer support Teleglobe beyond $100 million in short term debtor in possession

funding, and $25 million in severance payments. BCE provided this financing only on a

"superpriority" basis, and only on the condition that BCE be provided with access to Teleglobe's

network plan, so that BCE could protect itself and its customers.

89.     BCE unilaterally withdrew funding support for Teleglobe without prior notice and

withdrew many key personnel to return to BCE.

90.     At the time of this announcement, owing in part to BCE's failure to honour its

commitment to advance a further US$850 million to Teleglobe, Teleglobe had the financial

resources to continue in operation only for a few weeks.

91.     The loss of BCE's support led to the financial collapse of Teleglobe, ultimately leading it

to file for protection from its creditors under the *CCAA* on May 15, 2002.

- 26 -

92.    BCE's precipitate withdrawal of committed financial support prevented Teleglobe from exploring and pursuing options to restructure its business or sell its operations in whole or in part to a third party other than on a fire-sale, liquidation basis. This prevented Teleglobe and its other stakeholders from seeking to realize value from Teleglobe on an orderly non-liquidation basis.

93.    At the same time, BCE's unilateral withdrawal, which led Teleglobe to file for protection under the *CCAA*, gave BCE a forum in which to ensure that, among other things, it and its customers would not be disadvantaged by Teleglobe's failure.

94.    As a result, within approximately four months of Teleglobe's filing for *CCAA* protection, Teleglobe's core business was sold for an approximately $125 million, before adjustments.

**Breach of Duty by the Directors at the Instance of BCE**

95.    In the circumstances described above, the Common Directors, as directors of both Teleglobe and BCE, were in an irreconcilable conflict of interest. The Common Directors caused Teleglobe to be governed in a manner consistent with the interests of BCE and without regard, or due regard, for the independent interests of Teleglobe and its other stakeholders. This resulted in BCE and its stakeholders being advantaged over Teleglobe and its stakeholders.

96.    The Common Directors also were hopelessly conflicted to the extent that they were, through BCE, privy to confidential information about BCE's plans for Teleglobe, including BCE's reconsideration of its public commitment to Teleglobe. The Common Directors were under a duty to disclose this information to the board of Teleglobe and to cause Teleglobe to take appropriate steps to protect Teleglobe in the interests of all stakeholders.

- 27 -

97.    In the circumstances described above, the Directors, other than the Common Directors, allowed the Common Directors and BCE's directors and management to dominate Teleglobe and to improperly influence their decisions with respect to Teleglobe, such that the Directors also favoured the interests of BCE and its stakeholders over the interests of Teleglobe and its stakeholders.

98.    At all relevant times the Directors, under the direction of BCE, caused Teleglobe to be managed as an operating unit of BCE, only with regard to the interests of BCE and without regard for the interests of Teleglobe or of its stakeholders, including the creditors of Teleglobe and its subsidiaries. They effectively abdicated to BCE the responsibility for management, the strategic direction and future of Teleglobe.

99.    In so doing, the Directors, including the Common Directors, breached their fiduciary duty to Teleglobe under s. 122(1)(a) of the *CBCA* and failed to act in accordance with the standard of care prescribed by s. 122(1)(b) of the *CBCA*.

100.    Monty had an express delegation from the BCE Board to determine the conditions on which the US$850 million would be injected into Teleglobe. As a dual fiduciary, he owed a duty to Teleglobe to ensure that those funds were injected into Teleglobe.

**Oppression by BCE and the Directors**

101.    The misconduct of Teleglobe's affiliate BCE and the Directors, as described above, was oppressive to Teleglobe and its stakeholders within the meaning of s. 241 of the *CBCA*.

- 28 -

**Damages**

102.    As a result of the misconduct of the defendants, described above, Teleglobe and its

stakeholders have suffered substantial damages, including:

(a)    loss of the balance of BCE's US$850 million funding commitment;

(b)    loss of an ability or opportunity to seek to restructure or rationalize or sell

Teleglobe operations other than on a liquidation basis, thereby depriving

stakeholders of an opportunity to recover some or all of Teleglobe's obligations to

them;

(c)    loss of an ability or opportunity to maximize the proceeds on the orderly sale or

liquidation of Teleglobe attributable to BCE's self-dealing in the period prior to

Teleglobe's *CCAA* filing by, among other things, the execution of the Assignment

Agreement (and assignment of customer contracts provided thereby) and the

Master Wholesale Agreement and sale of the Building;

(d)    loss of money wasted on building GlobeSystem without committed and

continuing funding; and

(e)    loss of the enterprise value of Teleglobe, which but for BCE's decision to use

Teleglobe as the vehicle to build GlobeSystem, would have been preserved.

103.    Had BCE honoured its funding commitment to Teleglobe, and had BCE and the Common

Directors afforded Teleglobe adequate notice of the private reconsideration of its public

commitment to Teleglobe, Teleglobe could have ceased or limited the build-out of the

- 29 -

GlobeSystem and retrenched in its Core Telecom Business, thereby enabling or facilitating Teleglobe's ability to continue in operation as a going concern.

104.    The orders requested in paragraph 1(c) and (e), are necessary and appropriate to rectify the oppression complained of.

**Service Outside of Ontario**

105.    The plaintiff relies on Rule 17.02 to serve this originating process outside of Ontario.  In particular, the plaintiff relies on the damage sustained by Teleglobe and its creditors in Ontario (Rule 17.02(h)), or that the claim is made against persons outside Ontario who are necessary or proper parties to this proceeding properly brought against another person served in Ontario (Rule 17.02(o)).

**Place of Trial**

106.    The plaintiff proposes that this action be tried at Toronto.

November 16, 2005

**LAX O'SULLIVAN SCOTT LLP**
Counsel
Suite 1920
145 King Street West
Toronto, Ontario
M5H 1J8

Charles F. Scott  (14534N)
M. Paul Michell (39196J)
Tel: 416.598.1744
Fax: 416.598.3730

Solicitors for the Plaintiff

KATHY MORGAN, in her Capacity as
Court-Appointed Plan Administrator of Teleglobe Inc.

Plaintiff

and

BCE INC., et al.

Defendants

Court File No.: CS-CI-l6l6l

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(Commercial List)

Proceeding commenced at Toronto

STATEMENT OF CLAIM

LAX O'SULLIVAN SCOTT LLP
Counsel
Suite 1920
145 King Street West
Toronto, Ontario
M5H 1J8

Charles F. Scott (14534N) 416.646.7997
M. Paul Michell (39196I) 416. 644.5359
Tel: 416.598.1744
Fax: 416.598.3730

Solicitors for the plaintiff