# EXHIBIT 9

British Columbia >> Court of Appeal >>

**This document: 1997 CanLII 4121 (BC C.A.)**
**Citation:** *McRae v. Canada (Attorney General)*, 1997 CanLII 4121 (BC C.A.)
**Parallel citations:** (1997), [1998] 8 W.W.R. 574; (1997), 46 B.C.L.R. (3d) 137
**Date:** *1997-11-12*
**Docket:** *CA022777*

[Noteup] [Cited Decisions and Legislation]

                                          Date: 19971112
                                          Docket: CA022777
                                          Registry: Vancouver


### COURT OF APPEAL FOR BRITISH COLUMBIA


BETWEEN:


### MERREN ELAINE McRAE

                                               PLAINTIFF
                                               (APPELLANT)


AND:


### THE ATTORNEY-GENERAL OF CANADA

                                               DEFENDANT
                                               (RESPONDENT)


Before:   The Honourable Mr. Justice Hollinrake
          The Honourable Mr. Justice Finch
          The Honourable Mr. Justice Braidwood


H. Rubin                        Counsel for the Appellant

R.J. McDonell                   Counsel for the Respondent

Place and Date of Hearing       Vancouver, British Columbia

September 19, 1997

Place and Date of Judgment       Vancouver, British Columbia
                                 November 12, 1997

**Written Reasons by:**

The Honourable Mr. Justice Finch

**Concurred in by:**

The Honourable Mr. Justice Hollinrake

The Honourable Mr. Justice Braidwood

**Reasons for Judgment of the Honourable Mr. Justice Finch:**

I

[1]   The plaintiff appeals dismissal of her application to compel the defendant to provide discovery of documents over which the defendant claims solicitor-client privilege.  The learned chambers judge dismissed the application, effectively holding that the plaintiff had no cause of action against the defendant, and that her claim for damages for negligence and breach of fiduciary duty was bound to fail.  The documents for which discovery is sought, and privilege claimed, are those relating to the instructions given by the defendant to solicitors in the pursuit of a subrogated action brought by the defendant for injuries and losses suffered by the plaintiff, in the name of the Attorney General of Canada, against a negligent motorist, Emily Chen.

[2]   The defendant's rights to subrogation arose under the provisions of the *Government Employees Compensation Act*, R.S.C. 1985, G-5 (the "Act").  The plaintiff claims that the defendant was in breach of its duties to her in the eventual compromise of the subrogated action.

[3]   I emphasize at the outset that the issue in this case is the discoverability of documents, or their privilege, and not the merits of the underlying action.  However, because of the way in which the case was decided below, it is necessary to state or assume facts concerning the plaintiff's claim.  This is done only for the purpose of deciding the issues on this appeal, and not for any other purpose.

II

[4]   The plaintiff's claims against the tortfeasor Emily Chen arose from a motor vehicle accident in Vancouver on 14 February, 1992.  She alleged that she was injured, and suffered consequent losses, as a result of an accident in which the vehicle driven by Chen struck the plaintiff's vehicle from behind.  At the time of the accident, the plaintiff was employed by the Federal Government as a social worker in the Department of Veterans Affairs.  As a government employee, she had the right to claim compensation under the Act.  She did claim, and was paid for, her loss of income during the period of time she was disabled from work and recuperating from her injuries.

[5]   The plaintiff has deposed on this application that at about the time she elected to claim compensation, the Manager of Injury Compensation for Labour Canada told her that by claiming compensation she would do as well as or better than she would by suing on her own; that the government would pay her compensation under the Act for her time off work; and that in a subrogated action the government would include claims for her out-of-pocket expenses and general damages.

[6]   The Act confers on the Crown subrogation rights where an

employee has elected to claim compensation under the Act.  Section 9
provides:

**9.**    (1)   Where an accident happens to an employee in the
course of his employment under such circumstances as
entitle the employee or his dependants to an action against
a person other than Her Majesty, the employee or the
dependants, if entitled to compensation under this Act, may
claim compensation under this Act or may claim against that
other person.

(2)   Where a claim is made against a person other than Her
Majesty and less is recovered and collected, either on a
settlement approved by the Minister or under a judgment of
a court of competent jurisdiction, than the amount of
compensation to which the employee or dependants who made
the claim are entitled under this Act, the difference
between the amount so recovered and collected and the
amount of that compensation shall be paid as compensation
to the employee or dependants.

(3)   If the employee or the dependants referred to in
subsection (1) elect to claim compensation under this Act,
Her Majesty shall be subrogated to the rights of the
employee or dependants and may maintain an action in the
name of the employee or dependants or of Her Majesty
against the person against whom the action lies and any sum
recovered shall be paid into the Consolidated Revenue Fund.

(4)   Where an action is brought under subsection (3) and
the amount recovered and collected exceeds the amount of
compensation to which the employee or his dependants are
entitled under this Act, there may be paid out of the
Consolidated Revenue Fund to the employee or his dependants
such portion of the excess as the Minister with the
approval of the Treasury Board deems necessary, but if
after that payment has been made the employee becomes
entitled to an additional amount of compensation in respect
of the same accident, the amount paid under this subsection
may be deducted form the additional compensation.
                                    (my emphasis)

[7]   The government instructed a firm of lawyers to commence action
on its behalf in the name of the Attorney-General against the
negligent driver Chen.  A writ and statement of claim were filed and
served, in which the Attorney-General claimed general and special
damages suffered by the plaintiff, including the benefits paid to her
in respect of loss of income.  Chen's insurer, by its solicitors,
filed a defence on Chen's behalf, but did not dispute liability for
the rear-end accident.

[8]   The action proceeded to the point where the plaintiff was
examined for discovery by solicitors for Chen.  The plaintiff
cooperated with the government and its lawyers throughout in the
pursuit of the action brought in the name of the Attorney General.
After the plaintiff's examination for discovery she instructed the
law firm acting for the government to issue a second "protective"
writ against Chen, naming herself as the plaintiff personally.  This
second writ was issued on 11 February, 1994.

[9]   In August 1995 the government settled its action against Chen.
Chen's insurer paid to the government the amount the government had
paid in compensation to the plaintiff during the time she was off
work.  The settlement included no payment for any general damages or
other losses suffered by the plaintiff.  The settlement agreement
apparently included the dismissal of both actions commenced in the
names of the Attorney General of Canada and of the plaintiff
personally.  The plaintiff was not consulted in the settlement
process, nor advised as to why no recovery of damages was made on her
behalf personally.

[10]  The plaintiff commenced this action against the Attorney General
for negligence and breach of fiduciary duty on 2 July, 1996 and she
applied on 3 December, 1996 for discovery of documents including
those relating to instructions from the government to the law firm
who acted in the subrogated action against Chen.

[11]  The learned chambers judge dismissed the plaintiff's application
in oral reasons pronounced 13 January, 1997.  He said in part:

    The plaintiff here elected to take the compensation
provided by the statute and so the state became subrogated
to her right to damages.  The Attorney General says that
the effect of what she did was to assign her interest in
her claim against Chen to her employer.

                            . . .

    With some regret I find myself obliged to dismiss this
motion.  It seems to me that when the plaintiff elected to
claim compensation under s.9 of the *Government Employees
Compensation Act*, she effectively assigned her right to sue
the original tortfeasor for damages and consequently had no
interest in the litigation which ensued at the instance of
the government.  That party had the unfettered right to do
all that the plaintiff might have done had she elected to
sue herself, including settling the action in any way and
on any terms which seemed good to it.  The solicitors
concerned were not then acting for the plaintiff but only
for the government and documents relating to their
instructions are in consequence privileged.

## III

[12] The plaintiff says the learned chambers judge erred in refusing to order production of documents because there was a joint retainer by the plaintiff and Attorney-General of the law firm which acted in pursuit of the subrogated action against Chen; or because that law firm was deemed in law to act for both of them; or because the plaintiff and Attorney-General had a joint interest in the subject matter of the communications over which privilege is claimed; or because no privilege can be claimed when the plaintiff has made out a *prima facie* breach of a fiduciary duty.

[13] The plaintiff also relies upon the oral representation she alleges the Manager of Injury Compensation made to her, and argues that the representation was either made negligently or subsequently disregarded in breach of the Crown's fiduciary duty to her.

[14] The Attorney-General says that the plaintiff had no interest in the subrogated action, and that its solicitor-client privilege is therefore intact. The Attorney-General's position is that the government became subrogated to all of the plaintiff's rights by operation of s.9(3) of the Act, and that when it did so, the plaintiff lost any and all interest in her right to claim in tort against Chen, and that consequently when the Attorney-General settled the subrogated action and agreed to the dismissal of both actions without consulting the plaintiff, and without making any recovery for her personally, the plaintiff lost nothing. The Attorney-General says that the plaintiff, having given up all her rights in exchange for government compensation benefits, had nothing left to lose at the time of the compromise, and therefore has no cause of action against the government. So the Attorney-General says the plaintiff's action against it is bound to fail.

[15] The first question then, is whether there is a *prima facie* or arguable case against the Attorney-General. If there is, then the next question is whether the defendant can successfully rely upon solicitor-client privilege to defeat the plaintiff's application for discovery of documents.

[16] Central to the first question is the true interpretation of s.9 of the Act, and, in particular, the meaning to be given to the word "subrogation" where it appears in that section.

## IV

[17] The modern rule for statutory interpretation is summarized in R. Sullivan, ed., <u>Driedger on The Construction of Statutes</u> 3rd ed. (Toronto: Butterworths, 1994) at 131:

> There is only one rule in modern interpretation, namely, courts are obliged to determine the meaning of legislation in its total context, having regard to the purpose of the

legislation, the consequences of proposed interpretations,
the presumptions and special rules of interpretation, as
well as admissible external aids. In other words, the
courts must consider and take into account all relevant and
admissible indicators of legislative meaning. After taking
these into account, the court must then adopt an
interpretation that is appropriate. An appropriate
interpretation is one that can be justified in terms of (a)
its plausibility, that is, its compliance with the
legislative text; (b) its efficacy, that is, its promotion
of the legislative purpose; and (c) its acceptability, that
is, the outcome is reasonable and just.

[18]     The parties' differing positions here focus on s.9(3) and
the words "... shall be subrogated to the rights of the employee..."
The Attorney-General contends that by this language the Crown, upon
the employee's election to claim compensation, became entitled
absolutely to <u>all</u> rights of the employee to recover her losses from
other sources. It would give to the word "subrogated" a meaning
identical to "assigned". The plaintiff contends that "subrogated"
should be given its usual legal meaning, and that the defendant would
therefore be limited to claiming from the tortfeasor only in respect
of the rights for which it paid compensation, and only up to the
amount of compensation paid, or agreed to be paid.

[19] "Subrogate" is a word used almost exclusively in a legal
context. It is a legal term with a technical meaning. <u>Driedger</u>
(*supra*) says at 22:

> Legal terms constitute a subcategory of technical terms and
> the governing principles are similar to those examined
> above. Legal terms that have no ordinary meaning must be
> given their technical meaning, but if a word or expression
> is ambiguous, unless there is something to suggest that the
> legal meaning was intended, the ordinary meaning is
> presumed.
>
>                      . . .
>
> Second, the presumption in favour of ordinary meaning
> appears to be more easily rebutted where the technical
> meaning is a legal one. Much legal terminology originates
> in the common law. Where common-law terms are used in
> legislation, the courts tend to regard them as terms of art
> and to give them their legal meaning. This tendency is
> perhaps fostered by the presumption that in the absence of
> clear and explicit language, Parliament does not intend to
> change the common law.

[20] I am therefore of the view that in construing this legislation,
"subrogated" should be given its usual meaning in a legal sense,

unless there is something in the context of the legislation, its purpose, or other guides to interpretation that would lead to a different conclusion.

[21] The Act can, I think, be fairly described as social welfare legislation.  At 376 <u>Driedger</u> says:
> Social welfare legislation is to be liberally construed so as to advance the benevolent purpose of the legislation.  Where reasonable doubts or ambiguities arise, they are to be resolved in favour of the claimant.  The courts' primary concern is ensuring that the legislative benefits reach the persons for whom they were designed.

[22] To the extent that the Act takes away rights from the employee upon her election to claim compensation, it is legislation to be construed strictly.  <u>Driedger</u> states at 370:
> It is presumed that the legislature does not intend to abolish, limit or otherwise interfere with the rights of subjects.

[23]     In ***Morguard Properties Ltd. et al v. City of Winnipeg*** <u>1983 CanLII 33 (S.C.C.)</u>, [1983], 2 S.C.R. 493, 3 D.L.R. (4th) 1, 50 N.R. 204, [1984] 2 W.W.R. 97, 29 Man.R. (2d) 302, 6 Admin. L.R. 206, 24 M.P.L.R. 219 Estey, J. said (at S.C.R. 509):
> ... the courts require that, in order to adversely affect a citizen's right, whether as a taxpayer or otherwise, the Legislature must do so expressly .... The resources at hand in the preparation and enactment of legislation are such that a court must be slow to presume oversight or inarticulate intentions when the rights of the citizen are involved.

[24] I come then to the meaning of "subrogated to the rights of the employee" in s.9(3).

[25] Subrogation is the substitution of one person for another with respect to a claim or legal right.  The doctrine of subrogation developed both in law and in equity, and is based upon principles of natural justice.  The purpose of the doctrine is to prevent double recovery by, or unjust enrichment of, one who has suffered a loss, and who may be entitled in law in respect of that loss to recover from more than one person: see Goff & Jones, <u>The Law of Restitution</u>, 4th ed. by G. Jones (London: Sweet & Maxwell, 1993); P. D. Maddaugh & J. D. McCamus, <u>The Law of Restitution</u> (Aurora, Ont: Canada Law Book, 1990); and G. H. L. Fridman and J. G. McLeod, <u>Restitution</u> (Toronto: Carswell, 1982).

McRae v. Canada (Attorney General), 1997 CanLII 1442 (BC C...

Case 1:04-cv-01366-SLR    Document 242-18    Filed 03/28/2006    Page 10 of 14

Page 9 of 30

[26] While much of the law concerning subrogation has been developed
in the field of insurance, it is a doctrine of general application.
In addition to insurance law, subrogation has also been applied in
the law of suretyships, bills of exchange, and trusts. In all areas
of the law the doctrine has always been applied to prevent the unjust
enrichment of one whose loss is compensable from more than one
source.

[27] In insurance law, it is well settled that the insurer's right of
subrogation does not arise until the insured has been fully
compensated for the loss he has sustained: see, for example,

*Confederation Life Insurance Co. v. Causton* reflex, (1989),
60 D.L.R. (4th) 372, [1989] 6 W.W.R. 82, 38 B.C.L.R. (2d) 69, 38
C.C.L.I. 1, [1989] 1 L.R. para. 1-2474 at 9573, (B.C.C.A.) and
*Farrell Estates Ltd. v. Canadian Indemnity Co. et al.* 1990 CanLII 721
(BC C.A.), (1990), 69 D.L.R. (4th) 735, 44 C.C.L.I. 173 (B.C.C.A.).
And until the insured has been fully indemnified he is entitled to
control the litigation: see *Farrell Estates*, *supra*; *Goff & Jones*,
*supra*, at 611; *Maddaugh & McCamus*, *supra*, at 165; and *Fridman &
McLeod*, *supra*, at 399. In exercising his rights of recovery, the
insured must act with due regard for the interests of the insurer:
*Goff & Jones* at 611. In attempting to prevent an unjust enrichment,
the insurer can exercise his rights of subrogation against either the
insured or a third party liable to make good the insured's loss. But
the insurer's rights of subrogation are limited to recovering no more
than it has paid out to the insured: see *Goff & Jones* at 613; and
*Maddaugh & McCamus* at 165.

[28] These basic principles of subrogation assist in construing s.9
of the Act. Although the government does not stand in exactly the
same position to its employee as would an insurer to its insured, the
situations are analogous. The Act provides a compensation scheme for
employees who are injured, *inter alia*, in the course of their
employment (s.4). Compensation is awarded to employees in accordance
with provincial laws in respect of workers compensation (s.4(2)).
The employee has an option (s.9(1)) whether to claim compensation
under the scheme or not. If the employee claims compensation under
the Act the employer is subrogated to her rights.

[29] Section 9(1) provides that the employee "may claim compensation
under this Act _or_ may claim against [the tortfeasor]". The
defendant's submissions, and the learned chambers judge's reasons,
are based on the premise that those two options are mutually
exclusive - that is that the employee can claim compensation from the
government, or claim compensation from the tortfeasor, but that she
cannot do both.

[30] It would have been open to Parliament to extinguish entirely all
of the employee's rights to sue upon the employee's election for

compensation, and to have transferred all those rights to the Crown
by the use of apt language.  However, in my view, the word
"subrogated" does not appear apt for that purpose.

[31] For example, if the plaintiff's wage loss had been paid by an
insurer under a contract of accident insurance, the plaintiff would
have had a contractual claim to the compensation from the insurer, as
well as the right to sue the wrongdoer who caused her disability.  If
she sued and obtained a full recovery from the wrongdoer, including
compensation for the loss paid by the insurer, the law of subrogation
would permit the insurer to recoup from the plaintiff the amount of
its payment.  The fact that she accepted payment from the insurer
would not prevent her from pursuing her claims, including the loss
paid by the insurer, from the wrongdoer.  Moreover, under the general
law of subrogation, the plaintiff would have been entitled to control
the litigation against the wrongdoer, unless and until she was fully
indemnified by the insurer.

[32] The words "subrogated to the rights of the employee" are, of
course, to be read in the context of s.9, and of the Act as a whole.
I therefore consider whether viewed in that context, the phrase
should be given the broad meaning for which the defendant contends.

[33] Section 9(1) says that the employee may claim compensation or
may claim against a third party.  It creates an option for the
employee, but the section does not provide that the choice of one
option excludes choice of the other.  In my view, if an employee were
required to give up all her rights in exchange for part payment,
express language to that effect would be required.

[34] Section 9(4) provides that where the Crown brings a subrogated
action and recovers more than the compensation paid to its employee,
the Crown has a discretion whether to keep the surplus or pay it out
to the employee.  This appears to be an alteration of what the
Crown's rights as subrogee would have been at common law.  But from
the fact that the Crown might receive damages in excess of the
compensation it has paid out under the Act, it does not necessarily
follow that the employee has lost her common law right to claim from
the wrongdoer losses in excess of the compensation she has received
under the Act.  Abrogation of the plaintiff's common law rights would
require express language.

[35] I am therefore of the view that the learned chambers judge fell
into error when he equated the statutory right of subrogation with
assignment.

[36] In arguing for an expanded definition of subrogation, counsel
for the defendant referred to *MacIntosh v. Gzowski et al* (1979), 27
O.R. (2d) 151, 105 D.L.R. (3rd) 721, 15 C.P.C. 14 (C.A.) and to *The
Queen v. P.B. Ready-Mix Concrete & Excavator Ltd.* (1956), 5 D.L.R.

(2d) 268 (Ex.Ct.). In *MacIntosh* two actions were commenced against an alleged wrongdoer for losses suffered by a workman - one action by the Ontario Workmen's Compensation Board, and the second one by the workman himself. The Court held that only one action could be maintained, and that the second action commenced by the workman should be dismissed (or stayed). The language of s.8 of the *Workmen's Compensation Act* in Ontario at that time is substantially the same as s.9 of the *Government Employees Compensation Act* before us.

[37] Giving the judgment of the Court, Arnup J.A. said at O.R. 153-4:

> In our view, the combined effect of the various provisions of s.8 [of the *Ontario Workmen's Compensation Act*] is that where a workman has elected to claim compensation pursuant to the Act, the Board is *dominus litis*. It, and it alone, has the right to decide whether it will take proceedings, and if it does take proceedings it has complete control of the litigation. It may choose the solicitors who are to bring it. It can compromise the claim or proceed to trial and judgment.
>
> We are, therefore, all of the opinion that Anderson, J., was right in holding that the second-named action, instituted on the instructions of the plaintiff personally, should be dismissed, but as already indicated, we do not put it on the same basis as Anderson, J., did.

[38] The question before us is the extent to which s.9 alters the general principles of subrogation set out above. In my view those principles are altered to the extent set out in the *MacIntosh* case, the ratio of which I agree with. The effect of s.9 is that in exercising its subrogated rights the government has first call on the funds recovered up to what it has paid its employee under the scheme or may have to pay its employee in the future and it has control of the litigation because of this right. What s.9 does not do, in my opinion, is to take from the employee all of his or her rights to claim against the wrongdoer as would be the case if the legislation said that the employee's rights would be deemed to be assigned to the government on electing compensation. The appellant still has her personal interest in this claim over and above that part of it to which the government is subrogated.

[39] In *The Queen v. P.B. Ready-Mix*, (*supra*), an early case concerning the *Government Employees Compensation Act*, the issues were the amount to which the employee would have been entitled if he had sued the wrongdoer, and the extent of the Crown's subrogation to those rights.

[40] On the facts of the case there was no issue between the employer

and the employee. The latter was presumably content with the
payments, past and future, which the Crown agreed to pay him. The
dispute between the Crown and the negligent third party was whether
the third party could be held liable to pay the Crown for future
compensation which it had not yet paid to its employee.

[41] In giving judgment Thorson, P. said at 270:
The right of subrogation conferred by s.9(3) of the
*Government Employees Compensation Act*, 1947, is not limited
to the amount of compensation that the Government has paid
under it to its injured employee. It is co-extensive with
the right which he would have had against the person
responsible for his injury if he had brought an action
against him instead of claiming compensation under the
Act. <u>On his claiming compensation under the Act his rights
against the person responsible for his injury pass in their
entirety to the Government and are completely vested in
it.</u> Consequently, the amount to which it is entitled is
the amount which he would have recovered, regardless of the
amount of compensation paid to him. It follows that if he
would have recovered less than the amount of compensation
paid the Government stands the loss, whereas if he would
have recovered more it stands to gain, unless as a matter
of grace it grants the balance to the injured employee.
Moreover, the Canadian Act differs from some of the similar
provincial enactments in that the action under the right of
subrogation conferred by it may be brought, as in the
present case, in the name of Her Majesty and need not
necessarily be brought in the name of the injured employee
or his dependants.

(my emphasis)

[42] In my respectful view, the emphasized sentence is inconsistent
with the general law of subrogation. The employer's rights against
the third party would only "pass to" or "vest in" the employer if the
employee had made a full assignment of all his rights against the
wrongdoer.

[43] I am therefore of the view that in electing to accept
compensation payable under the Act, the plaintiff did not give up any
rights for which she had not been compensated.

[44] In my respectful view, such an interpretation of s.9 of the Act
complies with the legislative text, promotes the legislative purpose,
and leads to an outcome that is just and reasonable. It conforms to
the basic modern rule of statutory interpretation, and respects the
other principles to which reference was made earlier in these
reasons.

[45] It would appear, on the face of it, therefore, that in settling

its claim against Chen and her insurers, the government compromised the plaintiff's rights without compensating her, and without consulting her. Nothing in the law of subrogation would have permitted this, and I do not understand the Act to have conferred any right to do so. In settling the litigation without taking into account the plaintiff's rights, the government held and exercised powers over the plaintiff, who was vulnerable if not in law, then at least in fact. There appears to be a subsisting claim by the plaintiff against the Attorney-General for breach of a fiduciary duty. The government could not bargain away the plaintiff's rights without being required by equity to account to her for any loss she may have suffered as a result. She may, in addition, have a claim arising from the oral representation of the Manager of Injury Compensation.

[46] By reason of her personal interest in the claim against the wrongdoer the appellant must be viewed as a matter of law, and in particular the law as it relates to the discovery of documents, as a joint claimant along with the government.

V

[47] Having concluded that there is an arguable case for breach of fiduciary duty or negligence against the defendant, it remains to be seen whether the defendant can claim solicitor-client privilege over the documents of instruction between itself and its solicitors regarding the claim which was settled to the exclusion of the plaintiff.

[48] Solicitor-client privilege is indispensable to the structure of our justice system. It is not to be lightly disregarded. Nevertheless, the defendant cannot claim privilege over communications in whose subject matter the plaintiff has a joint interest. If parties have a joint interest in the action there is no privilege between them at all: see *Hicks v. Rothermel and Burrows*,

[1949] 2 W.W.R. 705 (Sask.K.B.); *Re Ballard Estate* [x] (reflex-logo) reflex, (1994), 20 O.R. (3d) 350 (Gen.Div.); and Sopinka et al., Law of Evidence in Canada at 638-9.

[49] On my analysis of s.9, the plaintiff did not lose all of her rights against the third party upon electing compensation, and therefore retained an interest in the original action. As the Crown effectively controlled the litigation, it held her rights within its power. The Crown bargained with both its own subrogated rights and with the plaintiff's residual rights - hence the plaintiff and the Crown had a joint interest in the action and there can be no privilege as between them.

VI

[50] I would allow the appeal and order that the defendant produce all documents of instructions to the law firm relating to its action against Emily Chen. The appellant is entitled to her costs, both here and below.


"The Honourable Mr. Justice Finch"


I AGREE:  "The Honourable Mr. Justice Hollinrake"


I AGREE:  "The Honourable Mr. Justice Braidwood"

# EXHIBIT 10

☒ ☒ ☒

Manitoba >> Court of Queen's Bench of Manitoba >>

**This document: 2002 MBQB 307 (CanLII)**
**Citation:** *Divinsky v. Bethania Mennonite Personal Care Home Inc.*, 2002 MBQB 307 (CanLII)
**Parallel citations:** (2002), [2003] 3 W.W.R. 674; (2002), 169 Man. R. (2d) 215
**Date:** *2002-12-05*
**Docket:** *CI01-01-22888*

[Noteup]

Date: 20021205
Docket: CI 01-01-22888
Indexed as: Divinsky et al. v. Bethania
Mennonite Personal Care Home Inc. et al.
Cited as: 2002 MBQB 307
(Winnipeg Centre)

# COURT OF QUEEN'S BENCH OF MANITOBA

BETWEEN:

| | | |
|---|---|---|
| PAUL DIVINSKY and 2330831 MANITOBA INC., | ) | For the Plaintiffs:<br>Martin S. Corne, Q.C. |
| | ) | |
| Plaintiffs, | ) | For the Defendants<br>Bethania Mennonite Personal Care |
| | ) | Home Inc. and Helmut Epp: |
| - and - | ) | Kelly L. Dixon |
| | ) | |
| BETHANIA MENNONITE PERSONAL CARE HOME INC., HELMUT EPP, BRADFORD MacCLENNAN, AUTUMN GROUP INC., PITBLADO BUCHWALD ASPER, and ROGER WIGHT, | ) | For the Defendants<br>Pitblado Buchwald Asper and<br>Roger Wight:<br>G. Patrick S. Riley |
| | ) | |
| Defendants. | ) | For the Defendants<br>Bradford MacClennan and<br>Autumn Group Inc.:<br>No appearance |
| | ) | |
| | ) | Judgment delivered:<br>December 5, 2002 |

# MONNIN, J.

[1]     The plaintiffs move for production and disclosure of documents listed in Schedule "B" of the affidavit of documents of the defendant Bethania Mennonite Personal Care Home Inc. ("Bethania"); more particularly, the notes taken by Roger Wight, a member of the firm formerly known as Pitblado Buchwald Asper ("Pitblado"), both defendants in this action. Bethania argues that these notes are the subject of solicitor-client privilege arising from the relationship between Bethania and Mr. Wight with his firm. Pitblado does not oppose the disclosure of the documents.

[2]     The pleadings allege that in or about 1999, the plaintiffs and the defendant Helmut Epp, Chief Operating Officer of Bethania, had discussions towards the creation of a business venture involving a medical monitoring network. In mid August 2000, the business discussions were at the stage that the plaintiffs were advised by Mr. Epp that Bethania was prepared to proceed with the monitoring, set up a monitoring centre, purchase the units for its own use, and monitor the units for and participate in a company to be set up for that purpose with the plaintiffs.

[3]     In furtherance of the business plan, Mr. Epp had meetings in the United States with a company by the name of Guardian Medical Monitoring ("Guardian"), which had done extensive marketing in the United States. Bethania received a proposal directly from Guardian in September 2000, which was turned over to the plaintiffs for the purpose of preparing a modified business plan using the figures supplied by Guardian.

[4]     At some point, although the exact date is not in the evidence, both the plaintiffs and Bethania consulted counsel. Bethania turned to its counsel of long date, Mr. Wight, who had been providing the services to Bethania since 1988. In the affidavit of the plaintiff Paul Divinsky, sworn September 17, 2002, it indicates that he consulted Harold Buchwald, Q.C., who at that time was also with the Pitblado firm.

[5]     The evidence surrounding the nature of the retainer of each counsel with respect to the matters at issue can be obtained from the affidavits filed by Mr. Divinsky and Mr. Wight. Neither Bethania nor Mr. Epp filed affidavits.

[6]     Mr. Divinsky's affidavit indicates that he advised Mr. Buchwald that he had the interest of Bethania and Mr. Epp to join into a joint venture in marketing devices to be obtained from Guardian. When learning from Mr. Epp that he and Bethania were also clients of the Pitblado firm, Mr. Divinsky discussed the issue of possible conflict with Mr. Buchwald. He was advised that Mr. Wight was to have conduct of the matter and that Mr. Buchwald was confident that Mr. Wight could represent the plaintiffs' interest adequately. Mr. Wight was to keep Mr. Buchwald advised as was necessary.

[7]     There is also uncontradicted evidence that Mr. Buchwald would have had discussions with Mr. Wight both as to the nature of the agreement between Guardian and Bethania and any development. It was anticipated that once that agreement with Guardian had been completed, then further agreements between Bethania and Mr. Divinsky and his corporation

would be finalized. Mr. Divinsky's evidence is that he would also have directed and instructed Mr. Wight in the manner in which the venture should proceed.

[8]     Mr. Wight's evidence is somewhat different. In his estimate, he understood throughout that his client was Bethania and not Mr. Divinsky or his corporation. He considered that he was to take instructions from Bethania only through Mr. Epp and that while he did communicate with Mr. Divinsky, he did not consider he was taking instructions from Mr. Divinsky. He was aware that Mr. Divinsky and his company were clients of Mr. Buchwald and would have had conversations with Mr. Buchwald on the progress of the matter. He would, as a matter of course, have provided Mr. Buchwald with any documents that were being considered as well as re-drafts of the agreement. Mr. Wight was the only party cross-examined on his affidavit. Mr. Wight indicated upon his cross-examination that had Mr. Buchwald asked to review anything on his file, it would have been provided.

[9]     The agreement with Guardian did not materialize for reasons I need not go into at this stage. Suffice it to say that a dispute arose between Mr. Divinsky and the defendants as a result of which the lawsuit has been commenced.

[10]     The plaintiffs' position, in short, is that they and Bethania were involved in a joint venture and had jointly retained the Pitblado firm to represent their interests in pursuing an agreement with Guardian. As a result, they say that there can be no privilege asserted against them with respect to any of Mr. Wight's file and documents.

[11]     I was referred to the decision in ***Chersinoff v. Allstate Insurance Co.*** (1968), 69 D.L.R. (2d) 653 (B.C. S.C.). That case dealt with a situation where an insured, under a motor vehicle accident policy, was defended by his insurance company. Following a judgment against him for damages, he brought an action against that insurance company claiming a right to indemnification. The insurance company had defended the action for the insured using a certain set of solicitors. In the second action, the new solicitors claimed privilege over some of the documents obtained by the previous solicitors in anticipation of litigation as well as communications between the insurer and the first set of solicitors. The new solicitors argued that there existed a solicitor-client relationship between the insurer and the previous solicitors, although the latter were representing the interests of the plaintiff at that time as well. Aikins J. quoted from ***Phipson on Evidence***, 10th ed. by M. Argyle (London: Sweet & Maxwell, 1963) at p. 253, para. 589, which states:

> *Joint Retainer.* When two parties employ the *same solicitor*, the rule is that communications passing between either of them and the solicitor, in his *joint capacity*, must be disclosed in favour of the other — *e.g.*, a proposition made by one, to be communicated to the other; or instructions given to the solicitor in the presence of the other; though it is otherwise as to communications made to the solicitor in his *exclusive* capacity.

> (Italics in the text.)

[12]     Aikins J. found that the communications passing between the solicitors and the insurer in regard to liability of the insured to pay damages, and in regard to the amount of damages and to settlement, were within the ambit of the joint employment of the solicitors and could not be considered confidential as between the solicitors and the insurer. They had to be

produced. He did limit the ambit of the joint employment and excluded questions relating to whether or not the insured had failed to comply and had been in breach of the terms of the policy.

[13]   The **_Phipson_** quote is referred to in Chapter 4 of the Manitoba Code of Professional Conduct on the issue of confidential information. (See footnote 6 at p. 14.)

[14]   The position taken by Bethania on the motion was that Mr. Wight's notes are precisely the kind of information which the solicitor-client privilege was meant to cover. Bethania referred me to the case of **_Gower v. Tolko Manitoba Inc.,_** [2001] M.J. No. 39 (C.A.), where Steel J.A., on behalf of the court, accepted the following as principles from Supreme Court of Canada jurisprudence:

(a)     The establishment of solicitor-client privilege with respect to a particular document is fact specific and, consequently, will vary from case to case.

(b)     The onus is on the person seeking to claim the privilege to establish three factors in connection with any particular document:

   (i)     that the document was the giving or obtaining of legal advice;
   (ii)    the presence of a solicitor and the presence of a client; and
   (iii)   the existence of the solicitor-client relationship.

[15]   Steel J.A. states, at para. 19:
> With respect to the first factor, the communication must be connected to obtaining legal advice, but legal advice is not confined to merely telling the client the state of the law. It includes advice as to what should be done in the relevant legal context. It must, as a necessity, include ascertaining or investigating the facts upon which the advice will be rendered. Courts have consistently recognized that investigation may be an important part of a lawyer's legal services to a client so long as they are connected to the provision of those legal services.

[16]   Counsel for Pitblado suggests that the notes are not necessarily documents indicating the giving or obtaining of legal advice, but merely notations of communications between the solicitor and his client and sometimes third parties, including some of the parties to this action, and of discussions at various meetings held with respect to the agreement. He suggests, therefore, that they do not fall under the second criteria as set out above.

[17]   In my view, that would be too limited a view of the type of information which can be protected by solicitor-client privilege. The notes taken by a solicitor in the course of meetings held where his client is present or for the purposes of advancing his client's claim should bear the same privilege as notes made when the client is speaking to him. Those notes are part of the lawyer's investigation or fact-gathering for the purposes of giving advice ultimately. They may well contain the solicitor's views as to how the facts he had obtained may be a benefit or a detriment to his client. In my view, they should not be parceled out of the privilege in such a fashion.

[18]   However, one must determine whether the privilege does exist in this case. Bethania's

position is that no specific joint retainer was agreed to and that in fact each party had retained its own solicitor, albeit from the same firm, in order to protect its interests. Counsel for Bethania argues that her client's rights cannot be lost as a result of the plaintiffs' counsel's view of the role of the respective counsel.

[19]    While I agree with counsel's suggestion that this is not in the nature of a common joint retainer where the same lawyer was retained by two parties, both being equally at risk for the lawyer's fees and both being able to provide instructions, the nature of the relationship in this case is more akin to that of a joint retainer than that of individual retainers.

[20]    Mr. Wight's evidence is clear that all documents were exchanged with Mr. Buchwald and all matters were open to be discussed with him. In fact, the file would have been provided where there was such a necessity to do so. There is no suggestion that Mr. Wight's discussions with his client were not part of his conversations with Mr. Buchwald.

[21]    While I recognize that a number of cases have disputed the question of whether information provided to one member of the firm is deemed to be provided to all members, on the facts of this case it would appear that there was an open communication between Mr. Buchwald and Mr. Wight with respect to the matters in this transaction. If there was an ability to rebut a presumption of communication to all members, it was not rebutted on the facts of this case. While ultimately Mr. Wight looked to Bethania for final instructions and for payment, it is also clear that he was involved in pursuing the joint interests of Bethania and Mr. Divinsky in discussions or modifications to the agreement with Guardian.

[22]    On the facts of this case, I am of the view that the retaining of the Pitblado firm by Bethania and by Mr. Divinsky was of such a nature as to lead to the conclusion that the Pitblado firm was retained to represent the interests of both parties. In my view, that was the nature of the joint retainers contemplated by the Manitoba Code of Professional Conduct, which would render any information received by Mr. Wight with respect to the joint venture and agreement as something which could not be the subject of solicitor-client privilege to the exclusion of Mr. Divinsky.

[23]    The parties have agreed that I may review the notes of Mr. Wight to assist me in formulating my decision. While I have reviewed them, I cannot confirm that in all aspects they deal with matters arising from the joint venture and/or agreement. I assume that they must by virtue of the fact that they were included in Schedule "B" and, therefore, must be of relevance to the matters in dispute. However, if Mr. Wight, after review, concludes that the notes, or some portions thereof, do not relate to the matters in dispute but to other advice he was providing to Bethania, then the notes should be excluded.

[24]    The question has been raised as to whether the notes dealing with conversations or meetings from February 22 to 27, 2001, being a time when the dispute had arisen between the parties, should be treated differently. The question arises as to whether, if there was a joint venture and joint retainer, it was dissipated at that time. In my view, the evidence does not satisfy me of the specific date when the relationship would have ruptured. In any event, I do not believe that Mr. Wight could, under the circumstances, have communications with Bethania to the exclusion of Mr. Divinsky on this matter. This was not a separate or new

matter. It remained a continuation of the matter for which he had been retained and whereby his firm had a duty to Mr. Divinsky. In the circumstances, I would not treat the notes from February 22nd to 27th any differently than the other documents.

[25]    I would, therefore, order disclosure to the plaintiffs of the documents found at items (a) to (aa) of paragraph 2 to Schedule "B" of the affidavit of documents of Bethania.

_____ J.

[About CanLII] [Conditions of Use] [Advanced search] [Help] [Français]
[Privacy Policy] [Mailing Lists] [Technical Library]
[Contact CanLII]

file://C:\Documents%20and%20Settings\cmc\Local%20Settings\Temporary%20Internet%...   3/21/2006

# EXHIBIT 11

Teleglobe Inc. (Re)                                                              Page 1 of 4

↵ Tag for delivery
[ ]

Case Name:
⊕ **Teleglobe Inc. (Re)** ⊕

Between
IN THE MATTER OF The Companies' Creditors Arrangement Act,
R.S.C. 1885, c. C-36
AND IN THE MATTER OF a plan of compromise or arrangement
of Teleglobe Inc. and the other applicants listed on
Schedule "A"

[2004] O.J. No. 2905
Court File No.: 02-CL-4528

**Ontario Superior Court of Justice**
**Commercial List**
**J.M. Farley J.**

Heard: June 1, 2004.
Judgment: June 15, 2004.
(9 paras.)

*Creditors and debtors — Debtors' relief legislation — Companies' creditors arrangement*
*legislation — Practice — Discovery — Production and inspection of documents — Confidentiality*
*orders — What documents must be produced — Privileged documents, solicitor's files, notes, etc.*

Application by the interim receiver of Teleglobe for disclosure of certain documents. Teleglobe was
subject to protection under the Companies' Creditors Arrangement Act. The interim receiver sought
back up tapes that contained email communications and data files of various officers and directors of
Teleglobe. These records were contained in the servers of an affiliated company named BCE. The
records were mingled with BCE's own materials. BCE wanted to deny access. It claimed that the records
were its property. The interim receiver also sought Teleglobe documents in the possession of a law firm.
The law firm asserted solicitor-client privilege.

HELD: Application allowed. BCE was to provide access to the independent company to extract the
communications and data files, provided that the independent company signed a confidentiality
agreement that protected any BCE interest in non-Teleglobe matters. BCE was to pay for the reasonable
costs of such extraction. The documents in the possession of the law firm were to be delivered. This
included documents that the law firm claimed were duplicates so that the interim receiver could satisfy
himself that they were duplicates. As for solicitor-client privilege the court ordered that the monitor and
interim administrator should continue waiving it.

**Statutes, Regulations and Rules Cited:**

Companies' Creditors Arrangement Act, R.S.C. 1985, c C-36.

Teleglobe Inc. (Re)                                                                    Page 2 of 4

Counsel:

Harvey Chaiton, for the interim receiver.

Jim Bunting, former solicitors for Teleglobe.

Fred Myers, for Secured Banking Syndicate.

Julia Barss, for the defendant Directors in the related action against the Teleglobe Directors.

Robert Staley, for the Bondholders of Teleglobe.

Glenn Zacher, for BCE Inc.

Peter J. Osborne, for the Monitor and Interim Administrator.


¶ 1    J.M. FARLEY J.:— With respect to the motion of the Interim Receiver ("IR") for the back up tapes containing email communications and data files of various officers and directors of Teleglobe that resided on a BCE or BCE related company (collectively "BCE") servers for the period November 1, 2000 to May 15, 2002. BCE is to allow access to such servers by an independent company with the requisite expertise to extract same, subject to the proviso that such company give BCE an executed confidentiality agreement which reasonably protects any BCE interest in non-Teleglobe matters. That company may then provide copies of the extracted materials to the IR. It apparently was the choice of BCE to intermingle this requested Teleglobe material with other BCE material. The process above will adequately protect BCE from its failure to appropriately segregate such material in the first place. The reasonable cost of such extraction by the independent company is to be borne by BCE. Clearly, the IR of Teleglobe is entitled to Teleglobe "documentation" including material of this nature by virtue of its appointment to the office of Interim Receiver and its power and authority to conduct an investigation.

¶ 2    With respect to Pierre Van Gheluwe, it is asserted by BCE that he was not an officer or employee of Teleglobe (or Teleglobe affiliate or subsidiary) during the relevant period. notwithstanding that identification of relationship for a period of time in respect of office communications. That identification was said to be an inadvertent "carry-over" error. I would assume that that issue can be sorted out without any difficulty - but that if there is any difficulty then I would assume that this would be sorted out by checking corporate minutes and other records plus of course the material required to be filed with the Corporations Branch.

¶ 3    Of course if there were in fact no storage of materials for one or more of such officers or directors then that is the end of that for that individual. However, that fact will be verified by the independent company.

¶ 4    I do not understand the logic, rationale, practicality, or legality of "BCE's position that the emails and data files on its servers are BCE property, not Teleglobe property, and that the Interim Receiver is not entitled to this information". That in my view confuses "physical" material with "intellectual" material which is owned by one party but located in storage on the server of a third party. See also my views above as to this being the choice of BCE.

¶ 5    Thus there is to be an order to give effect to the foregoing.

Teleglobe Inc. (Re)                                                                                      Page 3 of 4

¶ 6    That leaves the question of the request for Davies Ward Phillips & Vineberg LLP ("Davies") to deliver to the IR the Davies Teleglobe Documents. These were said to be approximately 270 documents in Davies files as to which Davies asserts that there is solicitor-client privilege. There may be some confusion which I am certain counsel will be able to sort out as to the number – as apparently Davies indicates that there are duplicates, but as well some BCE documents, mistakenly included in the 270. Davies indicates now that there are only 194 documents. Assuming for the moment that there are duplicates and that there is an order for delivery to the IR, it seems to me that the duplicates should be delivered as well so that the IR could satisfy itself as to there being true duplication (as opposed to similar documents as would be the case where the same typed document was in various forms being commented on by handwritten notes by various individuals). With respect to the BCE mistakenly included files, it would probably be desirable for there to be some independent verification that such were not Davies Teleglobe Documents in fact.

¶ 7    The solicitor-client privilege is something which is for the benefit of the client – not the lawyer. However, the lawyer (as Davies is appropriately doing here) must assert that privilege for the benefit of the client. The client here is Teleglobe. It no longer has a board of directors to deal with a question of waiver. Davies asserts that Kroll as IR does not have the power and authority to waive the privilege. However, there seems to be acknowledgment that in the circumstances, E&Y as Monitor and Interim Administrator would have.

¶ 8    Davies relies on Pritchard v. Ontario (Human Rights Commission), [2004] S.C.J. No. 16 (SCC) at paragraph 33 that "solicitor-client privilege cannot be abrogated by inference." One may reasonably wonder about the breadth of such a sweeping statement by the Supreme Court of Canada, particularly where there did not appear to be any contextual analysis of the facts of that case. However, it seems to me that the appropriate way of proceeding and in the interests of having Kroll as IR complete an appropriate investigation is for E&Y to appropriately consider waiving the privilege.

¶ 9    There is therefore to be an Order that E&Y consider waiving the privilege.

J.M. FARLEY J.

* * * * *

SCHEDULE "A"

Teleglobe Financial Holdings Ltd. (C)
Teleglobe Canada Limited Partnership (C)
Teleglobe Management Services Inc. (C)
Teleglobe Marine, Inc. (C)
Teleglobe Marine, L.P. (C)
Teleglobe Holdings (U.S.) Corporation (US)
Teleglobe Telecom Corporation (US)
Teleglobe Luxembourg LLC (US)
Teleglobe Holding Corp. (US)
Teleglobe Investment Corp. (US)
Teleglobe Communications Corporation (US)
Teleglobe USA Inc. (US)
Optel Telecommunications Inc. (US)
Teleglobe Marine (US) Inc. (US)
Teleglobe Puerto Rico Inc. (US)

Teleglobe Inc. (Re)

.

Teleglobe Canada Management Services Inc.
3692795 Canada Inc.
Teleglobe Vision Call Center Services, General Partnership
Teleglobe Submarine Inc. (US)

QL UPDATE: 20040716
cp/e/nc/qw/qlllc

# EXHIBIT 12

TELEGLOBE COMMUNICATIONS CORP VS. BCE INC.

JEAN MONTY - 10/24/05

CONCORDANCE AND CONDENSED TRANSCRIPT
PREPARED BY:



TOWER 56, 126 EAST 56TH STREET, FIFTH FLOOR, NEW YORK, NEW YORK 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
WWW.ELLENGRAUER.COM

## Page 273

(1) it out to be.
(2)    Q    What other people were making it out
(3) to be material?
(4)    A    The analysts.
(5)    Q    Did you have discussions prior to
(6) these meetings with either Mr. Boychuk or
(7) Mr. Vaaselja about the effect on your debt
(8) convenance?
(9)    MS. AARON:  Object to the form.
(10)    A    No, I did not.
(11)    Q    Did you have any knowledge concerning
(12) the Teleglobe debt convenance at this point in
(13) time?
(14)    A    No, I did not.  The only reference
(15) that I had in my mind was our original comfort
(16) letter to the banks, and that was the only --
(17) to my knowledge, the only one aspect that I...
(18)    Q    Under subject matter reviews, you've
(19) got Lassard, Scott and Huret doing an overall
(20) assessment, that is what I call your kitchen
(21) cabinet, right?
(22)    A    Correct.
(23)    Q    Then there's financial modeling going
(24) on by Mr. Vanaselja and his finance team,
(25) right?

## Page 274

(1)    A    Yes.
(2)    Q    And the third point, hiring of Lazard
(3) mid March for TGO restructuring process, MT
(4) What does MT refer to?
(5)    A    Martine Turcotte was involved in that
(6) process to help me understand my
(7) responsibilities as TGO's CEO because Lazard
(8) was hired by Teleglobe.
(9)    Q    What did Miss Turcotte tell you about
(10) your responsibilities?
(11)    A    I asked her, as a lawyer, what -- she
(12) wasn't representing anybody at that stage.  She
(13) was helping me to understand my
(14) responsibilities and how I should deal with
(15) Lazard.
(16)    Q    And when she was helping you deal
(17) and -- understand and deal with your
(18) responsibilities, she wasn't giving you legal
(19) advice; is that your testimony?
(20)    A    I don't know how -- you're the expert
(21) in that.
(22)    MS. AARON:  Object to the form.
(23)    A    So I can't -- my request to Martine
(24) was how should I deal with this from your
(25) understanding of the law and my

## Page 275

(1) responsibilities, and that's all I asked her to
(2) do.
(3)    Q    What did she tell you?
(4)    A    Hire Lazard for Teleglobe.
(5)    Q    What did she tell you about your
(6) responsibilities as CEO of Teleglobe?
(7)    A    That I was working for all
(8) constituents of the company and to make sure
(9) that I considered all constituents of the
(10) company, something to that effect, not in those
(11) words necessarily, but that was pretty well
(12) what I remember from the conversation.
(13)    Q    How did you consider all constituents
(14) of Teleglobe when you chose to recommend not
(15) continuing to fund Teleglobe?
(16)    MS. AARON:  Object to the form.
(17)    A    Basically in my capacity as CEO of
(18) BCE, I made the recommendation to BCE that it
(19) wasn't in their interest to continue to fund
(20) Teleglobe because an additional dollar would
(21) not provide the return and the recovery of the
(22) capital or the likelihood was not that it would
(23) be provided.
(24)    Q    How was that considerate of the best
(25) interests of the constituencies of Teleglobe?

## Page 276

(1)    A    With the knowledge --
(2)    MS. AARON:  Object to the form.
(3)    A    With the knowledge that I had with
(4) regards to my recommendation to the board of
(5) BCE, I had to take under advisement that the
(6) shareholder, BCE would not be providing more
(7) funds to finance Teleglobe, and therefore, as
(8) a -- as an executive of Teleglobe, I had to
(9) consider that in discussing these matters with
(10) the Teleglobe board.
(11)    Q    Let me get this one straight because
(12) I'm just a lawyer from Delaware, Mr. Monty.
(13) Who wasn't going to provide funding, you
(14) weren't going to provide funding, you had the
(15) delegation of the board to decide whether or
(16) not to provide funding; isn't that right, sir?
(17)    A    I had the delegations at my capacity
(18) of BCE CEO, correct.
(19)    Q    Okay.  So when you decided in your
(20) own mind not to provide funding to the company
(21) you were a fiduciary for, how did that act in
(22) the best interest of the various constituencies
(23) of Teleglobe?
(24)    MS. AARON:  Object to the form.
(25)    A    That's not what I said.  I said that