# RICHARDS, LAYTON & FINGER
A PROFESSIONAL ASSOCIATION
ONE RODNEY SQUARE
920 NORTH KING STREET
WILMINGTON, DELAWARE 19801
(302) 651-7700
FAX (302) 651-7701
WWW.RLF.COM

C. MALCOLM COCHRAN, IV
DIRECTOR

DIRECT DIAL NUMBER
302-651-7506
COCHRAN@RLF.COM

March 30, 2006

**VIA E-FILE**
The Honorable Sue L. Robinson
U.S. District Court for the District of Delaware
844 North King Street - Room 4209
Lock Box 18
Wilmington, DE 19801

Re: **Teleglobe v. BCE**
**Civil Action No. 04-CV-1266**

Dear Judge Robinson:

During the argument before the Court on Tuesday of this week, Mr. Marzen, for the Defendants (collectively "BCE"), asserted that the Court is not confronted with a "sword and shield" privilege assertion by BCE. I disagreed with that, citing one specific example involving Ms. Turcotte's (BCE's general counsel) advice to BCE and Teleglobe directors on April 11, 2002, relating to changes in the annual securities filings for both companies. Following discussion, Your Honor invited letter submissions addressing any other "selective waiver" issues raised in the record.

We will address herein in greater detail the example that I highlighted for the Court during the argument. But upon reflection, BCE's new "about face" on the common interest privilege raises a much more comprehensive selective waiver issue, to wit: For nearly two years, BCE conceded that it, Teleglobe, Inc. (a holding company) and Teleglobe's U.S. operating subsidiaries (the "U.S. Debtors"—the plaintiffs here) were advised by common BCE/Teleglobe counsel on matters of common interest. These related to whether the Teleglobe enterprise (including the U.S. Debtors) would be funded, restructured, or abandoned by BCE. In accordance with this concession, BCE has produced to the U.S. Debtors, both prior to and during this litigation, hundreds of documents that BCE says fell within this BCE/Teleglobe "joint" privilege, many of which relate precisely to those issues. In fact, by the time this matter got to the Special Master, BCE claimed (repeatedly) that *all* of its documents that related to advice by joint counsel on the matters of common interest had been produced to the U.S. Debtors. The Special Master disagreed—directly, starkly, and without equivocation, after reviewing each and every one of the more than 1000 documents still withheld by BCE. In sum, Special Master Seitz

The Honorable Sue L. Robinson
March 30, 2006
Page 2

ruled that hundreds more documents, generated by the same joint lawyers, relating to the same matters of common interest, have been (and continue to be) wrongfully withheld.

In short, it is obvious that we have been given only part of the story by BCE, in the form of only those common interest documents that BCE wants us to see—including only those few hundred it has produced since Judge Walrath's order of March 31, 2004. But having now been caught withholding other common interest documents, BCE wants to reverse course on appeal, to deny the existence of the common interest, to assert that Teleglobe, Inc. through its Plan Administrator or otherwise now can't waive this privilege in favor of its operating subsidiaries (the U.S. Debtors), and to claim that the latter do not fall within the ambit of the privilege in any event. In essence, BCE now is attempting to prefect an about face in order to deny us what Special Master Seitz plainly saw: The rest of the documents (and hence, the rest of the story) generated by our lawyers, on the issues of common interest to BCE, Teleglobe, Inc. and the U.S. Debtors.

BCE can't have it both ways. Either there was a common interest and the Plaintiffs are entitled to all of the documents relating to such generated or received by our joint counsel—as the Defendants have conceded for some two years in this case—or the repeated production of common interest documents by BCE, as combined with its recent about face (on appeal) is a classic "sword and shield"; an attempt to preclude us from access to the rest. BCE's reversal is a plain effort to effect a selective waiver.

In the sections that follow, we summarize: (i) BCE's original position on the production of common interest documents; (ii) BCE's recent effort to reverse course, and (iii) the nature and scope of the resulting selective waiver.

### A. BCE's Original Position on Production of Common Interest Documents.

BCE's original position on the production of "common interest" documents was set out in two places: (i) the Rule 2004 discovery dispute, and (ii) in response to Plaintiff's motion to compel in this case.

#### 1. The Bankruptcy Rule 2004 Discovery Dispute.

As we noted in our papers on appeal and during the argument on Tuesday, March 28, 2002, BCE first stated its position on the joint representation of BCE, Teleglobe, Inc. and the U.S. Debtors during the Bankruptcy Rule 2004 discovery process. There, BCE opposed discovery by the Creditors' Committee, citing its "common interest privilege" with Teleglobe, Inc. *and the U.S. Debtors*. See, e.g., Plaintiff's Response to Defendants' Objections (D.I. 237), Exs. A, B; see also Notice of Lodging (D.I. 222), Vol. C, Tab M (Bankruptcy Ct. Transcript). Dozens of documents were initially withheld on this basis, as reflected in BCE's privilege logs. Stuhlman Aff. (D.I. 238), Tabs 2, 3.

The Honorable Sue L. Robinson
March 30, 2006
Page 3

Specifically, in response to the Creditors Committee's Motion to Compel, BCE expressly asserted that its lawyers had also "consulted with" Teleglobe, Inc. or the U.S. Debtors on matters of common interest:

> As denoted on BCE's privilege log, BCE attorneys consulted with attorneys, officers, or employees *of Teleglobe, Inc. or its subsidiaries* to discuss or provide legal advice in matters where BCE *and Teleglobe, Inc. (or its subsidiaries)* shared a common legal interest. These documents are therefore protected under the common interest privilege.

Opposition to Motion of the Official Committee of Unsecured Creditors for an Order Authorizing and Compelling Discovery, ¶ 31 at 18. Plaintiffs' Response, (D.I. 237), Ex. B.

During oral argument on that motion (before Chief Judge Walrath) BCE relied upon this common interest privilege in order to shield documents from discovery by the creditors. (D.I. 222), Vol. C, Tab M at 72-77. But when the U.S. Debtors sought access, as one of the "holders" of the common interest privilege, BCE readily agreed—and Judge Walrath ordered production to the U.S. Debtors in reliance on that agreement:

> MR. STEARN: So, I just want to make it clear on behalf of the debtor, the debtor gets the privilege log and are we also going to get the common interest documents? I'm sorry, Your Honor, I'm addressing counsel. I apologize.
>
> MR. WADE: Yes, you can have access to those.
>
> \* \* \*
>
> THE COURT: All right . . . I will direct the common interest documents to be produced . . . .

Id. at 75, 77.

Thereafter, some 299 documents, characterized by BCE as "common interest privilege" documents were removed by BCE from its privilege logs, and produced to the U.S. Debtors and the Creditors Committee. Affidavit of Charles Loesner (filed contemporaneously herewith).[1] As discussed in Section C, below, many of these related to issues arising in connection with: (i) whether BCE was committed to provide funding to the Teleglobe enterprise (including, inter alia, the U.S. Debtors) and/or, (ii) whether (and how) the Teleglobe enterprise could be

---

[1] A schedule describing the common interest documents produced by BCE in the Rule 2004 discovery proceeding is attached as Exhibit A to the Loesner affidavit.

RLF1-2997610-1

The Honorable Sue L. Robinson
March 30, 2006
Page 4

restructured, or abandoned. See infra, Section C.[2] As a result, and given BCE's refusal to produce the remaining documents generated or received by our common lawyers on these subjects, there has been a selective waiver.

### 2. The Motion to Compel in This Case

The second time BCE stated its position on the common interest privilege was in response to the Plaintiffs' motion to compel the production of many of the remaining documents listed on BCE's privilege logs, which was filed following the initiation of this lawsuit. In its briefing, and in its argument—both to this Court and to the Special Master—BCE was consistent. It denied any intention to withhold from the U.S. Debtors documents relating to matters of common interest that were generated or received by joint BCE/Teleglobe counsel. BCE further agreed to produce to the U.S. Debtors any "common interest" documents it had mistakenly withheld—and claimed (repeatedly) to have done so:

> SPECIAL MASTER: You're saying that as far as BCE and TI are concerned, as long as the lawyers were acting for those two entities that doesn't get the plaintiffs where they need to be, because we have to get down to the Debtor level. . . .
>
> MR. WADE: Not quite. We're quite – we're cognizant of the fact that Ms. Morgan has waived any privilege TI might have had. So we're not saying that they – that a TI-only privileged document can't be produced. Those have been and will be.
>
> SPECIAL MASTER: You say "will be". Does that mean they are somewhere?
>
> MR. WADE: There are about ten of them.
>
> SPECIAL MASTER: Okay.
>
> MR. WADE: And those were mistakes. There was never any intention, after the common interest decision a year or plus ago, to withhold any of those documents. A year and a half ago.

Transcript, Oct 31, 2005 Hearing at 92-93 (D.I. 222), Vol. A, Tab A; see also Plaintiffs' Response (D.I. 237), Ex. D (same representation to this Court).

---

[2] We pause to note that these matters are at the center of the contract and fiduciary duty issues raised in this case. There is no dispute that the documents on the log are responsive to Plaintiffs discovery, as it relates to these issues—indeed, it is assumed that unresponsive or irrelevant documents would never have been listed on BCE's privilege logs in the first place. BCE has not taken issue with this assertion previously, before the Special Master or elsewhere.

RLF1-2997610-1

The Honorable Sue L. Robinson
March 30, 2006
Page 5

BCE's representations that it had produced all common interest documents to the U.S. Debtors were repeated, and relied upon by the Special Master. See Final Decision (D.I. 213), at 11, 13, 28, 31 (reiterating BCE's representations that all common interest documents were produced). After promising the Special Master during the October 31, 2005 oral argument that it would cleanse its log by producing an additional "10 or so" common interest documents it had withheld by "mistake" from the U.S. Debtors, BCE produced many more than 10 documents from its logs. See Plaintiffs' Motion to Affirm (D.I. 223), at 7-10. Many of these related directly to the common interest issues identified above.

In his February, 22, 2006 final report, however, the Special Master determined that BCE's representations that it had produced all common interest documents were not accurate. Among other things, the Special Master found that BCE could not assert the attorney client privilege or work product protection to withhold from the U.S. Debtors any of the documents listed on their privilege log within the relevant date range because they *all* related to the common interest issues, and were generated or received by counsel who had advised both BCE and Teleglobe, Inc. on those matters. Final Decision (D.I. 213), at 4, 31. Notably, BCE never asserted in proceedings before the Special Master that there was no common interest, no joint representation and no ability for Kathy Morgan, as Plan Administrator of Teleglobe, Inc., to waive privilege. But having lost before the Special Master, BCE decided to change course on appeal.

### B. BCE's Recent Effort to Reverse Course.

As the Court is aware fully, despite its earlier, unequivocal representations and conduct, BCE now claims that (i) there was no joint representation of BCE and the Teleglobe entities; (ii) even if there was, it was not on matters of common interest; (iii) that Kathy Morgan cannot waive Teleglobe, Inc.'s privilege, and (iv) that the U.S. Debtors do not fall within the ambit of any joint BCE/Teleglobe privilege, in any event. The first time any of these arguments were made was in BCE's Objections to the Special Master's Final Report, filed with this Court on March 14, 2006. The substance of our response to these arguments was addressed in our papers, and in oral argument, and will not be repeated here.

Apart from their lack of substance, however, the problem these belated BCE arguments now raise is selective waiver. Specifically, when it conceded the existence of common interest privilege BCE produced to the U.S. Debtors several hundred documents that it previously claimed were protected from production to the creditors, under the BCE/Teleglobe "common interest privilege". Many of the common interest documents that were produced to us by BCE deal directly with the matters of funding, and/or restructuring, of Teleglobe and the U.S. Debtors—and many have been used in the depositions. See, e.g., Stuhlman Aff. (D.I. 238), Tab 1, Exhibits B, C, D, E, I, J; Notice of Lodging (D.I. 222), Vol. D, Tabs 2, 3, 8, 14, 15; Loesner Aff. Ex. B.

The Special Master's Final Decision, however, directly explains that the documents that have been produced fail to tell the full story. The rest is found in the documents that have been

The Honorable Sue L. Robinson
March 30, 2006
Page 6

withheld. These address the same issues, and were generated or received by the same lawyers who had undertaken to advise both Teleglobe, and BCE, as discussed below.

### C. The Nature and Scope of the Selective Waiver.

The nature and scope of the selective waiver may be illustrated by examining the "common interest" documents that have been produced to the U.S. Debtors, BCE's privilege log descriptions, and the Special Master's descriptions of what has been withheld.

A dozen of the "common interest" documents produced by BCE have been attached to the transmittal affidavit of Gregory E. Stuhlman, Esquire, (D.I. 238), at Tab 1, Exhibits A through L. Others have been included in the record that has been lodged with the Clerk. Each of these relates to: (i) BCE's funding of Teleglobe, (ii) the restructuring of Teleglobe, or (iii) both.

For example, the documents under Tabs 1 B, C and D of the Stuhlman Affidavit all relate to the advice BCE lawyers gave to Teleglobe regarding whether BCE was committed to fund Teleglobe, in the context of amending BCE's, and Teleglobe's, annual filings. As originally approved by Teleglobe's board on February 28, 2002, Teleglobe's annual filing reflected BCE's intention to inject $1 billion (CDN) in funding into Teleglobe, in 2002. See Complaint (D.I. 2), ¶ 113; Stuhlman Aff. Tab 1, D. Following, however, SBC's February 28, 2002 revelation that it was considering exercising a put option that could cost BCE in excess of $7 billion, BCE initiated "Project X"—to consider whether to continue to fund, restructure, or abandon Teleglobe. During Project X, the same BCE lawyers who had drafted the February 28, 2002 Teleglobe annual filing (principally Lalande, Ricciuto, Ryan and Turcotte) undertook to "scrub" it—to remove language that might be held to evidence BCE's commitment to fund. See, e.g., Notice of Lodging (D.I. 222), Vol. D, Tabs 14, 15; Stuhlman Aff. (D.I. 238), Tab 1, B, D. The amended language was then re-adopted by the Teleglobe board on April 12, 2002. Notice of Lodging Vol. D, Tab 17.

On April 11, 2002, Martine Turcotte, BCE's general counsel, attended an advance telephone conference for BCE and Teleglobe directors—as the only lawyer present on the call. Turcotte at 249-50 (D.I. 222), Vol. A, Tab C; Turcotte Ex. 28 (D.I. 222), Vol. D, Tab 29. There, Turcotte was asked (and she advised) as to the reasons for the changes to Teleglobe's prior board approved public filing. Id. Turcotte testified that she advised the directors that the changes were necessary in order to clarify that BCE was not committed to fund Teleglobe. Turcotte 256-260 (D.I. 222), Vol. A, Tab C, Ex. 1. Lalande testified that the changes were intended to make the filing "crystal clear" in this regard. Lalande 378, 396-97, 410, 519. (D.I. 222), Vol. B, Tab H.

But there are many documents on the BCE logs that appear to address these very same changes to the Teleglobe public filing that BCE will not produce. Most (if not all) of these were transmitted to or generated by Turcotte or Lalande--or by outside counsel (such as Davies Ward, or Shearman & Stearling) who had undertaken to advise Teleglobe on various matters relating to whether BCE would fund or restructure the enterprise—and then transmitted to Turcotte or Lalande. See, e.g., (D.I. 222), Vol. F, Tab A, Doc. Nos. 1094, 3598, 3600, 4174, 4175, 4249, 4250, 4360; id., Tab B, Doc. Nos. 124, 130. The language in BCE's annual public filing was

RLF1-2997610-1

identical to Teleglobe's and was amended by the same lawyers, in identical fashion. See, e.g. id. Doc. Nos. 14, 66, 124 Vol. F, Tab A, Doc. Nos. 00274, 00288. To withhold these documents, in the face of the Turcotte and Lalande testimony, and the production of other documents from BCE's logs on the same subject, is simply unfair. It gives rise to a selective waiver.

Moreover, the subject that was dealt with in the amendment to Teleglobe's public filing was whether, or to what extent, BCE was committed to fund Teleglobe. When these lawyers testified that the amendments were necessary to make clear what BCE intended, they put at issue their knowledge on that subject, in its entirety—however and wherever developed. Stated differently, it is unfair for these lawyers to testify that they advised Teleglobe that BCE was not committed to fund Teleglobe without exposing to discovery everything relating to that subject that forms or relates to the basis of that knowledge. See Tackett v. State Farm, 653 A.2d 254, 259-261 (Del. Supr. 1995).

Another example relates to the amendment of Teleglobe's annual representation letter to its auditors, Deloitte & Touche. That letter, as originally approved and signed in February of 2002 by Teleglobe's senior officers (including the overlapping BCE/Teleglobe Chairman and CEO, Monty) expressly advised Deloitte that BCE was committed to fund Teleglobe. Turcotte Ex 5, ¶ 30 (attached to the Loesner Affidavit as Ex. D). But on April 8, 2002, BCE lawyers Ricciuto, Ryan, Lalande and Turcotte crafted language amending the Teleglobe letter to qualify the representation regarding BCE's commitment to fund. See Lalande Ex 74 (Loesner Aff., Ex. F). During the Rule 2004 Motion to Compel hearing Lalande took the stand to explain the change. Lalande testified that the change came about when he was asked by Teleglobe Inc.'s vice president and controller to review the letter. Bankruptcy Transcript at 52 (D.I. 222), Vol. C, Tab M. Lalande further testified that he advised Teleglobe, Inc. that the statement in the letter regarding BCE's commitment to fund Teleglobe was incorrect. Id. at 53. Lalande then admitted that *he drafted* the amended language for Teleglobe's representation letter, which as changed now indicated that BCE was not committed to fund Teleglobe. Id.

Presumably, BCE permitted Lalande to testify in conformity with its waiver of the common interest privilege. But BCE has refused to permit Lalande to testify regarding what he advised or learned in the context of counseling his other joint client, BCE, on the very same issue, i.e.; BCE's commitment to provide funding to Teleglobe. See, e.g., Lalande at 495-509. And BCE has refused to produce the dozens of documents that were generated by, or transmitted to, Lalande that bear directly on the subject matter of the advice, *viz*: Whether BCE was committed to fund Teleglobe.[3] See generally, Stuhlman Aff. (D.I. 238), Tabs 2, 3.

---

[3] Significantly, it appears that the episode involving the letter to Deloitte did not happen as Lalande suggests. Turcotte's April 2002 Project X "task list" directly assigned to the internal "Bravo/Tango" legal team the task of reviewing the "Auditor Representation Letters" for "Bravo" and "Tango" (ie, BCE and Teleglobe)--apparently, for the purpose of scrubbing any BCE "has committed" language from those documents. (D.I. 222), Vol. D, Tab 30 at BCE-AD0271260. Notably, this "BCE/Teleglobe" internal legal team included (among others) the lawyers directly
(Continued)

RLF1-2997610-1

The Honorable Sue L. Robinson
March 30, 2006
Page 8

The Special Master described in his Final Decision still other examples of documents relating directly to the matter of whether BCE was committed to fund Teleglobe that have been withheld, notwithstanding the selective disclosures described above. For example, Master Seitz noted an email and rider generated by in house BCE/Teleglobe lawyers discussing the effect of BCE's funding decision on Teleglobe's ability to continue operations. Final Decision (D.I. 213), at 32. The Special Master also noted an April 12, 2002 presentation to Teleglobe CEO Monty, addressing how a decision to terminate funding would affect Teleglobe's banks, bondholders, customers and employees--and found that the document was distributed to other Teleglobe officers. Id. at 33.

There are other examples of selective disclosure that relate to restructuring. Monty has testified that Turcotte advised him regarding his responsibilities as Teleglobe, Inc.'s CEO in connection with hiring the Lazard firm, to consider restructuring issues. Plaintiffs' Response (D.I. 237), at 6-7. Turcotte herself negotiated the scope and terms of Lazard's engagement. Turcotte at 337-38, 364-367, 377-380 (Cochran Aff. (D.I. 224), Tab 43). BCE initially refused to disclose Lazard's work product to the creditors, claiming common interest privilege with Teleglobe, Inc. See e.g. Stuhlman Aff., (D.I. 238), Tab 2, Doc. No. 288. Following the Rule 2004 motion to compel, however, BCE produced to the U.S. Debtors (inter alia) Lazard's April 16, 2002 restructuring analyses. Stuhlman Aff. (D.I. 238), Tab 1, Ex. J.[4] That document sets out a variety of opinions regarding whether, and how, Teleglobe might be restructured. Id. Turcotte then testified at her deposition that based on Lazard's advice, the conclusion was that Teleglobe's then existing business plan was not viable--and that Monty based his decision to abandon Teleglobe, in part, on that advice. Turcotte 192-199 (D.I. 222), Vol. A, Tab C, Ex.1.

Yet dozens of other communications on the subject of the restructuring of Teleglobe have been withheld by BCE as privileged--and we have had no opportunity to address with Lazard whether Monty, or Turcotte, informed it of the matters reflected in those communications. For example, throughout Project X Lalande and Turcotte repeatedly advised Teleglobe Inc.'s chairman and CEO Monty, and its director and officer Michael Sabia, on Teleglobe restructuring and funding issues. See, e.g. Lalande Ex 56 (D.I. 222), Vol. D, Tab 23 (schedule of meetings, with summaries reflecting attendees and subjects discussed). Lalande 484-554 (D.I. 222), Vol. B, Tab H (Discussing same). Yet Turcotte and Lalande were repeatedly directed not to answer questions on the substance of all of those discussions--notwithstanding that nothing was done by them to protect from disclosure to Teleglobe (since they were advising its CEO) of what they now claim was "BCE only" advice. Id.; Turcotte 57-69 (D.I. 222), Vol. A, Tab C Ex. 1. The BCE privilege log is replete with documents directly relating to the potential restructuring of

---

involved in the joint BCE/Teleglobe representation: Lalande and Turcotte. Id. at BCE-AD0271247.

[4] Since Lazard purported to be representing Teleglobe, the fact that BCE had this document and initially tried to withhold it (in whole or in part) from the Creditors Committee is ample evidence of the extent of the BCE/Teleglobe overlap.

The Honorable Sue L. Robinson
March 30, 2006
Page 9

Teleglobe, all (or most) of which went directly to, or were generated by, Turcotte and Lalande. See generally, (D.I. 222), Vol. F. The Special Master's Final Decision describes still more. Final Decision (D.I. 213) at 35-39.

The selective disclosure issue raised by BCE's recent about face on common interest privilege also infects the Davies Ward and Shearman & Stearling documents listed on BCE's log. The Special Master makes the point well: Davies and Shearman provided Teleglobe restructuring advice to Lalande and Turcotte, among others. See Final Decision (D.I. 213), at 35-39; 41-43. As for Davies, while it was advising Teleglobe on restructuring issues during Project X it was also advising BCE on the impact to it of a Teleglobe restructuring. Id. at 35-39. A number of Davies Ward documents, for which "common interest" privilege was previously claimed, have been produced from BCE's logs. But still others, addressing the same issues (purportedly from BCE's perspective) have been retained. See, e.g., (D.I. 222), Vol. F, Tab A, Doc. Nos. 00267, 00268, 00316, 0094, 03483, 03484, 03490-95; Tab B, Doc. Nos. 143, 160, 181, 203, 212. As for Shearman, the privilege log descriptions demonstrate that the advice to Lalande and Turcotte related directly to the Teleglobe/BCE common interest issues. See, e.g., id Tab A, Doc. Nos. 00278, 00281, 00356, 00377; see also (D.I. 222), Vol. F, Tab B, Doc. Nos. 083, 211, 212, 213.

These selective disclosures raise a number of questions: What did Teleglobe's outside lawyers (Davies) tell Teleglobe's in house lawyers (Lalande and Turcotte) about the impact of Teleglobe's restructuring on BCE? And what did the overlapping Teleglobe/BCE officers and directors (Monty and Sabia, among others) know about the impact of such on BCE? Moreover, how did that potential conflict of interest effect their decision to withdraw funding from Teleglobe? These issues are at the center of the breach of fiduciary duty claims in this case.

In these circumstances, having produced part of the Davies and Shearman advice relating to restructuring the rest must be disclosed as well.

Finally, it is important to note that we do not seek the production of documents from BCE's log dated post April 23, 2002. As noted in our papers, it was on that date that BCE's board voted to withdraw funding from the Teleglobe enterprise, and the BCE officers (and directors) who then served as the majority of Teleglobe's board resigned as Teleglobe directors.

### D. Conclusion

The attorney-client privilege cannot be used as both a shield and a sword. *Tracinda Corp. v. Daimler Chrysler AG*, 362 F. Supp. 2d 487, 513 (D. Del. 2005). "The non-legal equivalent of that truism is equally to the point: You can't have it both ways." *CP Kelco US, Inc. v. Pharmacia Corp.*, 213 F.R.D. 176, 179 (D. Del. 2003) (internal quotation omitted). It is fundamentally unfair to allow a party to "disclose only those facts beneficial to its case and refuse to disclose, on the grounds of privilege, related facts" that may be adverse to its position. *Tracinda Corp.*, 362 F. Supp. 2d at 513 (citing *Hercules, Inc. v. Exxon Corp.*, 434 F. Supp. 136, 156 (D. Del. 1977)). The Delaware Supreme Court has put it crisply: An implied waiver will be found when "the partial disclosure place[s] the party seeking discovery at a distinct disadvantage

RLF1-2997610-1

The Honorable Sue L. Robinson
March 30, 2006
Page 10

due to an inability to examine the full context of the partially disclosed information. . . . In the usual situation, the opposing party will have no alternative source for obtaining the concealed information if the privilege is upheld." *Tackett v. State Farm Fire and Casualty Ins. Co.*, 653 A.2d 254, 260 (Del. 1995).

This is precisely the situation in which the Teleglobe plaintiffs will be placed here, if BCE's about face on its waiver of common interest privilege is sustained. At this point, the only proper remedy is full disclosure, as ordered by the Special Master. *See In re Hechinger Investment Co. of Delaware*, 303 B.R. 18, 26 (D. Del. 2003) (noting the general rule that a disclosure waives not only the specific communication but also the subject matter of it in other communications); *Standard Chartered Bank PLC v. Ayala Intern. Holdings, Inc.*, 111 F.R.D. 76, 85 (S.D.N.Y. 1986) ("[T]he voluntary production of a privileged document effects a waiver of the privilege as to all other privileged communications concerning the same subject matter. This is so because fairness and full disclosure cannot permit a party to selectively choose to produce only those communications which may be favorable to him and withhold on grounds of privilege others which may be favorable to his adversary").

Respectfully,

C. Malcolm Cochran, IV (#2377)

CMC/dqc
cc:   Clerk of the Court (via hand delivery)
      Pauline K. Morgan, Esq. (via hand delivery)
      Stephen J. Marzen, Esq. (via electronic mail)
      George J. Wade, Esq. (via electronic mail)
      Joseph A. Rosenthal, Esq. (via hand delivery)
      Gregory V. Varallo, Esq.

RLF1-2997610-1