# EXHIBIT A
# PART 1

REDACTED VERSION

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TELEGLOBE COMMUNICATIONS | ) | Case No. 02-11518 (MFW) |
| CORPORATION, a Delaware corporation, et al , | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Hearing Date: April 28, 2004 at 11:30 a.m.** |
| | ) | |
| | ) | **RE: Docket No. 2169** |

**OPPOSITION TO MOTION OF THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS FOR AN ORDER AUTHORIZING
AND COMPELLING DISCOVERY PURSUANT TO BANKRUPTCY RULE 2004**

BCE Inc. ("BCE"), through its counsel, Young Conaway Stargatt & Taylor, LLP

and Shearman & Sterling LLP, submits this memorandum of law in opposition to the

Application of the Official Committee of Unsecured Creditors (the "Committee") of the above-

captioned debtors and debtors-in-possession (collectively, the "Debtors")[1] for an Order

Authorizing and Compelling Discovery Pursuant to Bankruptcy Rule 2004 (the "Application").

For the reasons set forth below, BCE respectfully requests that this Court deny the Committee's

application.

**PRELIMINARY STATEMENT**

1.     BCE has cooperated with the Committee in good faith and provided it

with sufficient information to determine whether to file a litigation.

2.     In the first meeting between counsel to the Committee and counsel to

BCE, held on September 8, 2003, counsel to BCE agreed to produce the files of nine individuals

---

[1]     The Debtors consist of the following entities: Teleglobe Communications Corporation, Teleglobe USA
Inc., Optel Telecommunications, Inc , Teleglobe Holdings (U S ) Corporation, Teleglobe Marine (U S ) Inc ,
Teleglobe Holding Corp , Teleglobe Telecom Corporation, Teleglobe Investment Corp , Teleglobe Luxembourg
LLC, Teleglobe Puerto Rico Inc  and Teleglobe Submarine Inc.

who were most deeply involved in the relationship between BCE and Teleglobe Inc. or its subsidiaries. In that meeting, counsel to BCE stated that such production would amount to approximately 100 boxes of documents, and counsel to BCE made abundantly clear that the documents would only be produced once an agreement was reached on the terms of a suitable Confidentiality Stipulation. That Confidentiality Stipulation was critical to BCE because two members of the Committee (Citibank N.A. and Bank of Nova Scotia) are plaintiffs in a lawsuit pending in Canada, entitled <u>ABN Amro Bank N.V., et al. v. BCE Inc.</u>, No. 02-CV-0232755CM3, arising from the relationship between BCE and Teleglobe Inc. In the September 8 meeting, counsel for the Committee acknowledged that certain members of the Committee may seek to obtain access, through the Federal Rules of Bankruptcy Procedure 2004 investigation, to documents that would not be discoverable through the discovery process in Canada. At the time, counsel to BCE expressly stated that the Committee and its members should not be allowed to circumvent the Canadian discovery process through the Rule 2004 investigation, and counsel to BCE requested that the Committee insulate the Rule 2004 investigation from the Canadian litigation.

3. Over the next six months, counsel to BCE and counsel to the Committee negotiated the terms of the Confidentiality Stipulation – an extremely long period of time caused by interminable internal discussions among the Committee's members and presumably the plaintiffs in the Canadian litigation. By way of example, on January 6, 2004, counsel to BCE suggested that <u>one word</u> be added to the Committee's proposed terms of the Confidentiality Stipulation. It took counsel to the Committee approximately <u>five weeks</u> to respond, and on February 9, 2004, counsel to the Committee submitted a completely revised draft Confidentiality Stipulation, which made clear that the Committee wanted to share all of BCE's documents with many entities, including the plaintiffs in Canada, subject to the Committee's undertaking not to

2

use these documents outside the scope of the investigation and the prosecution of claims in this case.

4.     On March 8, 2004, the parties agreed on the terms of a Confidentiality Stipulation, and BCE immediately produced its documents. Indeed, BCE exceeded its undertaking at the September 8 meeting and produced additional categories of documents, including the responsive, non privileged, electronic documents of the custodians to the extent BCE had access to these electronic files. At this time, BCE has produced to the Committee 105 boxes of documents and over 15,000 pages of electronic documents. BCE further consented to the depositions of three key present or former officials. Contrary to the Committee's misguided claim, BCE did not intersperse relevant documents with non-relevant documents "apparently to hide them." (Application ¶ 19.) Instead, the documents were produced in the order in which they were maintained.[2]

5.     In this Application, the Committee seeks to compel the disclosure of privileged documents on the principal ground that three current or former employees of BCE (Michel Lalande, David Masse, and Marc Ryan) were also at some point officers of Teleglobe Inc. or of its subsidiaries. The Committee's argument has no basis because many of these documents reflect the provision of legal advice solely to BCE, as described in detail in the accompanying Declaration of Michel Lalande, the Vice President – General Counsel of BCE. Other documents are protected by the common interest privilege, and the Committee has no control over such privilege at this time. Indeed, BCE believes that the Committee does not even have standing to make its Application to compel discovery. The Committee's and the Debtors'

---

[2]     BCE recently became aware that the last four boxes of the production were Bates stamped out of order. BCE advised the Committee that it would provide information identifying the custodians of the documents in these four boxes.

joint motion for an order appointing the Committee as Estate Representative to prosecute certain causes of action demonstrate the Committee's understanding that it lacks standing.

6. The Committee also seeks an Order directing BCE to "produce all of the Project X checklist documents, neatly segregated, regardless of whose custody such documents are in." (Application ¶ 5.) As described above, BCE has produced its documents in the order in which they were maintained by the custodians. The document entitled Project X Issues and Activities List sets forth a list of issues, not a list or table of contents of documents, and to the extent documents were created in connection with those "issues," the documents were maintained by individual BCE employees without regard to the categories in the Issues and Activities List. BCE has satisfied its obligation by producing documents from the files of the nine custodians in the order in which they were maintained and "was not obligated to wrap up the volumes of data into neat little packages" for the Committee. Liddell v. Bd. of Educ. of City of St. Louis, 771 F. Supp. 1496, 1499 (E.D. Mo. 1991). BCE believes in good faith that the vast majority, if not all, the responsive documents listed on the Project X Issues and Activities List have been either (i) included on the privilege logs, (ii) produced to the Committee (except for non-annotated publicly filed documents, which may not have been produced), or (iii) were never created.

7. The Committee also seeks BCE's Board minutes and presentations for the period January 2000 through May 2002. The responsive portions of these documents have already been produced for the period February 15, 2000 (when BCE announced the acquisition of Teleglobe Inc.) through April 24, 2002 (when BCE announced that it would cease its long-term funding of Teleglobe Inc.) Even though we fail to understand why the Committee needs Board documents for the months of January 2000 and May 2002, BCE will accommodate the Committee and produce the responsive portions. BCE's Board documents are, however, highly

4

sensitive, and BCE will redact the non-responsive portions of the Board documents  The Committee has not articulated any reasons why it needs non-responsive documents in order to determine whether to initiate litigation  In light of the fact that the Committee intends to share these highly sensitive documents with litigants in Canada (that would not otherwise have access to them), there is no reason to circumvent the Canadian discovery process.

8.    Similarly, the Committee requests that BCE produce all other redacted documents in non-redacted form.  The Committee has failed to articulate any reasons why it needs such non-responsive information to determine whether to sue and why such information should be provided to the litigating members of the Committee.

### FACTUAL BACKGROUND

9.    On July 31, 2003, counsel to the Committee contacted counsel for BCE and announced its intention to conduct discovery, pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure.  (Application, Ex. B.)  The Committee stated it sought discovery from BCE and four individuals:  (i) Michael J. Sabia; (ii) Michael T. Boychuk; (iii) Patrick Pichette; and (iv) David G. Masse.  On August 9, 2003, the Committee submitted to BCE's counsel a draft document request setting forth 26 broad requests for documents  (Committee's Application, Ex. D.)[3]

---

[3]    In its Application, the Committee misleadingly states that it drafted eighteen "narrowly tailored document requests" that were "aimed to identify documents relevant to the Committee'[s] investigation "  (Application ¶¶ 1, 34 )  As described above, the Committee's draft document request contained 26 broad requests  Six months later (on March 10, 2004), a few hours before the Committee commenced its inspection of BCE's documents, the Committee suddenly submitted a document request that contained eighteen requests.  (See Ex. 1 attached hereto )  By that time, BCE had 105 boxes of documents available for inspection

### a.    The September 8, 2003 meeting

10.    On September 8, 2003, a meeting was held between counsel for BCE and the Committee. BCE's counsel advised the Committee's counsel that BCE would cooperate in good faith with its investigation. BCE agreed to produce documents from the files of six individuals who, according to the Interim Receiver in the Canadian bankruptcy proceedings of Teleglobe Inc., were deeply involved in the relationship with Teleglobe Inc. and its subsidiaries: (1) Michael Boychuk, the current Senior Vice-President and Treasurer of BCE and the former Executive Vice President and Chief Financial Officer of Teleglobe Inc (from May 2000 to April 2002.; (2) Patrick Pichette, the current Executive Vice-President of Bell Canada, the former Executive Vice-President – Planning and Performance of BCE (until January 2002) and the former Executive Vice-President – Finances and Operations of Teleglobe USA Inc. (from January 2002 to May 2002), (3) Francois Gauvin, the former Senior Director – Taxation of BCE (from November 2000 to June 2003) and the former Senior Director – Taxation of Teleglobe Inc. (until October 2000); (4) Michel Lalande, Vice-President – General Counsel of BCE, the former Assistant Corporate Secretary of Teleglobe Inc. (until April 2002), and the former Senior Director, Legal Affairs of Teleglobe Inc. (until October 2000); (5) David Masse, the former Assistant Corporate Secretary of BCE (until June 2003) and the former Assistant Corporate Secretary of Teleglobe, Inc. (until November 2000 to April 2002); and (6) Stephen Skinner, the current Senior Vice-President – Finance of Bell Canada and the former Vice-President – Controller of Teleglobe, Inc. (from July 2001 to April 2002)  Because the Committee sought the disclosure of Michel Lalande's files it is not at all surprising that the privilege logs contain numerous entries. Further, in the September 8 meeting, counsel for BCE made clear that, in light of the very broad scope of the document requests, BCE would produce a large volume of

6

documents, including many documents reflecting the work performed by six custodians on behalf of Teleglobe, and that some of these documents may be non-responsive.

11.    In the September 8 meeting, Committee counsel requested that BCE also produce responsive documents from the files of three additional individuals: (1) Terence Jarman, (2) Jean Monty, and (3) Michael Sabia, and the minutes of BCE's Board of Directors (and documents presented to BCE's Board) to the extent they were responsive to the Committee's document requests and not privileged. In order to assist the Committee in its investigation, BCE agreed to satisfy counsel's additional requests. BCE advised that it would produce in total approximately 100 boxes of documents, and BCE explained that virtually all the documents that the Committee sought to obtain would be contained in the files of these nine custodians.

12.    As previously described to counsel for the Committee most of the documents responsive to the Committee's document requests are maintained in the files of individual custodians; they are not maintained in central "corporate files." In the meeting, counsel for the Committee also showed counsel for BCE a document entitled "Project X Issues & Activities List." The Committee 's counsel inquired about documents listed on pages 12 and 13 of the document.

13.    In the September 8 meeting, BCE's counsel advised the Committee with specificity of the documents that would be made available for inspection in Montreal, and BCE made clear that following the production of those 100 boxes of documents, BCE would not agree to conduct a second broad search for additional documents from the files of other custodians less involved in the relationship with Teleglobe. At that meeting, counsel to BCE also made clear that the production of documents would commence as soon as the Committee agreed to the terms of a suitable confidentiality agreement in light of the presence on the Committee of Canadian

7

litigants against BCE. BCE's counsel stated that BCE's cooperation should not be used to circumvent the discovery process in Canada. Committee counsel agreed that the Rule 2004 investigation should not be used to circumvent the Canadian discovery process.

### b.  The Committee delays the negotiation of a Confidentiality Stipulation (October 2003-March 2004)

14    During the Fall of 2003, the two sides negotiated the terms of a confidentiality stipulation. The negotiation of the stipulation was significantly delayed by lengthy internal discussions by the members of the Committee and the syndicate of lenders that are suing BCE in Canada.

15.    By way of example, the Committee took over three weeks to review the first draft Confidentiality Stipulation that BCE submitted and took lengthy periods of time to review the subsequent drafts. On January 6, 2003, counsel for the Committee agreed to BCE's proposed terms, except for a proposed modification to paragraph 4 of the Agreement regarding the use of the documents obtained from BCE. BCE agreed to the Committee's proposed modification, but suggested the addition of one word to the new language.[4] On January 21, 2004, Committee counsel announced that the Committee had agreed to BCE's suggestion, and that the agreement was ready to be signed, but a few days later Committee counsel advised that the agreement could not be signed because the members of the Committee had certain unspecified problems regarding the insulation of individuals working on the Canadian litigation. BCE did not obtain substantive comments to its one-word change until February 9, 2004 – five weeks after BCE requested that change. (See Ex. 2 attached hereto.) On February 9, the Committee submitted a letter to BCE's counsel attaching a completely revised Confidentiality Stipulation. (Id.) The February 9, 2004 letter from Committee counsel also indicated that the

---

[4]      BCE sought to include the word "limited"

8

Committee fully understood and agreed with the scope of BCE's document production. Specifically, the letter from Committee counsel made clear that counsel expected to travel to Montreal to review approximately 100 boxes from the files of seven individuals and did not even refer to the production of any documents from the files of Michael Sabia and Patrick Pichette, which were produced by BCE for sake of completeness.

### c.    The Committee's review of the documents

16.    BCE substantially accepted the Committee's revised Confidentiality Stipulation. The Committee finally agreed to the terms of the Confidentiality Stipulation on March 8, 2004, and the parties also agreed that the Committee would begin the review of the documents on March 11, 2004. On the evening of March 10, 2004, without any prior notice, the Committee sent BCE a revised document request that purported to eliminate certain requests. (Ex. 1.) The following day, on March 11, 2004, BCE executed the Confidentiality Stipulation and made the documents available to the Committee for review.

17.    On March 11, the Committee reviewed 9 boxes of documents in New York from the files of Michel Lalande. At the time, BCE's counsel reiterated that virtually all the documents responsive to the Committee's document requests were maintained in the files of individual custodians and were not maintained in central "corporate files." A very limited number of responsive documents were maintained at BCE in "corporate files" – the Board and Board committee minutes and record books, bound volumes of corporate transactions, and the employment agreements and certain other human resources documentation – and they have been produced to the extent they were responsive and not privileged. On March 11, 2004, the Committee for the first time advised that, because of the applicable statute of limitation, it faced a deadline of May 13, 2004 to determine whether to sue

9

18.    The following week, a team of eight lawyers from Hahn & Hessen LLP traveled to Montreal to review 96 boxes of documents. After five days of review in Montreal, the Committee requested that 198,239 pages of documents deemed relevant by counsel for the Committee from among the 96 boxes be copied. At no time during the eight months since the Committee instituted its investigation did the Committee object to the production of these documents, and the Committee was well aware of the documents that BCE had undertaken to produce. In its Application, the Committee baselessly states that "BCE has determined to withhold some of the most critical information requested, or obscure it from view by intentionally interspersing responsive documents in the mounds of produced paper . . ." (Application ¶ 1.) The Committee apparently believes that "relevant documents were interspersed with the non-relevant documents apparently to hide them." (Id. ¶ 19.) This is nonsense.

19.    As BCE's counsel described to Committee counsel on September 8, 2003, 91 boxes of documents were produced to the Interim Receiver in Canada. Specifically, BCE produced to the Interim Receiver documents reflecting work performed by six custodians on behalf of Teleglobe Inc. In producing these documents to the Interim Receiver, BCE removed from the 91 boxes documents that did not reflect such work. At the September 8, 2003 meeting, counsel to BCE informed the Committee that documents withheld from the Interim Receiver responsive to the Committee's document requests would be returned to their proper location in the files and produced to the Committee. The Committee's argument that BCE attempted to "hide" responsive documents has simply no basis. (Application ¶ 19.) The Committee at the September 8, 2003 was fully informed of the nature of the documents contained in the 91 boxes, in particular that these boxes reflected work performed by the six custodians on behalf of Teleglobe Inc. and its subsidiaries, and that some of these documents may be non-responsive;

10

that these documents represented files maintained in the ordinary course of business of the custodians; that certain documents reflecting work performed for BCE had been removed from those files when they were provided to the Interim Receiver; and that those documents would be reinserted if they were non-privileged and responsive to the Committee's requests. Therefore, BCE did not "intentionally interspers[e] any responsive documents." (Application ¶ 1.)

20      Further, between March 25, 2004 and April 16, 2004, BCE produced 15,000 pages of electronic documents from the files of the custodians as well as certain additional documents that the Committee requested on March 26, 2004, such as certain non-privileged portions of the minutes from BCE's Audit Committee. Documents withheld and redacted on the basis of privilege were noted on three privilege logs provided to the Committee.

21      Not only has BCE produced 105 boxes of documents and over 15,000 pages of electronic documents in response to the Committee's request, but BCE has agreed to make available for a deposition Messrs. Monty, Boychuk, and Pichette, three high-ranking present or former officials with personal knowledge of the relationship between BCE and Teleglobe Inc. and its affiliates (including the U.S. debtors). In order to accommodate the Committee, BCE agreed that these depositions would be conducted at the offices of Hahn & Hessen in New York.

22.     On April 6, 2004, the Committee's counsel submitted a letter to BCE's counsel raising discovery issues. (Application, Ex. E.) On April 9, 2004, BCE's counsel submitted a detailed response to each of those issues. (Id., Ex. F.) Counsel to BCE expressly noted that, in response to the Committee's document requests, BCE had produced 105 boxes of documents and 13,787 pages of electronic documents. (Id., Ex. F at 1.) Counsel to BCE described the search it had performed for responsive documents and offered to work in good faith with the Committee to the extent it had any specific questions or requests (Id., Ex. F at

11

2-6 ) BCE noted that the Committee had failed to articulate any reasons why it needed any

additional documents in order to complete the Rule 2004 investigation   (Id., Ex. F at 2.)

## ARGUMENT

### I.    BCE is Entitled to Maintain the Attorney Client Privilege Over Its Documents

23.    The Committee seeks to compel the disclosure of 327 documents on the

erroneous ground that they are not protected by a privilege.  (Application ¶ 20.)  The

Committee's arguments have no basis

#### A.    BCE Properly Withheld Documents Relating to Legal Work Performed Solely for BCE

24.    The Committee seeks to compel the production of 327 documents on the

sole ground that these documents "were authored or received by individuals who were serving as

officers or directors of the Debtors at the time the documents were created and disseminated.

For example, Michel Lalande, who is listed as an author and/or recipient of 283 of the 349

allegedly privileged documents, was an officer of the Debtors and the Director of Legal Affairs

for TINC at the same time that he was an attorney for BCE." (Id. ¶ 21.)[5]  The Committee

erroneously relies on Valente v. Pepsico, Inc., 68 F.R.D. 361 (D. Del. 1975), and argues that

"there simply is no privilege concerning them." (Application ¶ 22.)  The Committee's argument

has no basis and ignores that legal work performed for BCE is protected by the attorney-client

privilege and the work product doctrine regardless of whether Michel Lalande, David Masse, and

Marc Ryan were also officers of Teleglobe Inc. or its subsidiaries.  These 239 documents reflect

the provision of legal advice solely to BCE, and under the decision of the Delaware Chancery

---

[5]    The Committee's statement is factually incorrect because Michel Lalande was never simultaneously an employee of BCE and Teleglobe Inc  (Lalande Decl. ¶ 1.)  Mr. Lalande ceased being the Senior Director, Legal Affairs of Teleglobe Inc  on October 31, 2000, when BCE acquired 77 percent of the shares of common stock of Teleglobe Inc  On November 1, 2000, Mr. Lalande became an employee of BCE with the title of Assistant General Counsel  Following November 1, 2000 and until April 23, 2002, Mr. Lalande was the Assistant Corporate Secretary

59825 1001

Court in <u>Grimes v. LCC Int'l, Inc.</u>, No. Civ. A 16957, 1999 WL 252381 (Del. Ch. Apr. 23, 1999), they are privileged, and the Committee's motion should be denied.[6]

25.     A communication is protected from disclosure under the attorney-client privilege if it is "(1) a communication, (2) which is confidential, (3) which was made for the purpose of facilitating the rendition of professional legal services to the client, (4) between the client and it's attorney." <u>Ramada Inns. Inc. v. Dow Jones & Co.</u>, 523 A.2d 968, 970 (Del. Super. Ct. 1986). In <u>Grimes</u>, the Delaware Chancery Court held that, to the extent the general counsel of a corporation is performing work solely on behalf of that corporation, such work is protected by the attorney-client privilege, even though that attorney is also the general counsel of another affiliated corporation, and the legal work performed related to the relationship between the two corporations. <u>Grimes</u>, 1999 WL 252381, at *2.

26.     In <u>Grimes</u>, the shareholders of Microcell brought a derivative action against LCC International, Inc. ("LCC"), Microcell's controlling stockholder, alleging that LCC usurped corporate opportunities, improperly withheld funding from Microcell, and breached fiduciary duties owed to Microcell. <u>Id.</u> at *1. Plaintiffs sought to compel the production of documents authored or received by Peter DeLiso, the general counsel of both Microcell and LCC and Chairman of the Board of Directors of Microcell. <u>Id.</u> Those documents allegedly involved legal work pertaining to the relationship between LCC and Microcell, including with respect to transactions that formed the subject matter of the lawsuit: (1) the negotiation of a credit agreement that was the subject of plaintiffs' breach of fiduciary duty claims, (2) documents relating to LCC's usurpation of corporate opportunities of Microcell, (3) documents regarding the withholding of funding from Microcell, (4) documents regarding Microcell's guarantee of

---

of Teleglobe Inc. and some performed legal work on behalf of Teleglobe Inc. or its subsidiaries, but Mr. Lalande was not an employee of Teleglobe Inc. or its subsidiaries. (Lalande Decl. ¶¶ 3, 7, 8.)

[6]     These documents are denoted on the privilege log as "AC" or "AC/WP."

13

LCC's credit facilities with Chase Manhattan Bank, and (5) documents relating to LCC's execution of a contract that prohibited it from further funding Microcell, "even though LCC was legallly obligated to provide such funding " Id.

27.    LCC opposed the production of these documents on the grounds that they were protected by the attorney-client privilege and the work-product doctrine. Id. As here, plaintiffs argued that no privilege existed with respect to the documents received and authored by DeLiso because he served as an attorney for both corporations. Id. at *2. The Delaware Chancery Court rejected the plaintiffs' claim and held that "[w]hether or not a given communication to or from Mr. DeLiso is privileged *will necessarily depend upon his capacity at the time he generated or received the communication.*" Id. (emphasis added). The court further held that "[a]ny confidential communication made by Mr. DeLiso – acting *solely* in his capacity as counsel for LCC – to LCC or its directors and/or officers; and any confidential communication made by those clients to Mr. DeLiso, again acting *solely* in that capacity, should be subject to the attorney-client privilege. Those communications would, therefore, be protected from disclosure to the plaintiffs, who are stockholders of Microcell, not LCC." Id. (emphasis in original).[7] The same result should follow here.

28.    The 246 documents that BCE has withheld on the ground of attorney-client privilege or work product reflect legal advice provided solely to BCE. Such legal work includes the following:

- In his capacity as an attorney for BCE, Michel Lalande analyzed the legal consequences for BCE and provided legal advice to BCE regarding legal issues surrounding

---

[7]    To determine whether or not these communications involving the attorney were properly withheld by LCC on the basis of privilege, the Court divided the documents into three categories – (1) communications where the attorney acted solely in his capacity as Chairman of Microcell's Board of Directors; (2) communications where the attorney was solely acting in his capacity as general counsel to LCC; and (3) communications where the attorney was solely acting in his capacity as general counsel to Microcell. Id. at *2

14

restructuring and financing alternatives for Teleglobe. For instance, in early 2002, he analyzed certain Credit Facilities (entered into by Teleglobe and a syndicate of lenders) and other contracts to determine whether BCE could continue funding Teleglobe and obtain security in connection with such funding. He also analyzed the legal consequences for BCE of providing such funding to Teleglobe. In addition, he was involved in negotiating and drafting certain letters of support and contracts on behalf of BCE, such as the letter of support that BCE was asked to provide to Teleglobe's lenders in connection with the renewal of the Credit Facilities in 2001 and 2002. (Lalande Decl. ¶ 16.) Documents 1, 4-7, 25-26, 32, 38-40, 42-5, 47-9, 59-61, 63-4, 67, 75, 81, 85, 87-9, 100, 102, 104, 108-11, 113-14, 145, 162, 166, 189, 191, 198-99, 205, 209-10, 216, 221, 223-25, 254, 269, 303, 307-08, 310-12, 316-18, 320-26, 330-31, 335, 338-39, 341, 346-47, and 349 noted on the privilege log reflect legal communications regarding these subject matters.

- Another area of responsibility as an attorney for BCE was to provide legal advice and comments to BCE's Secretariat and members of BCE's compliance and accounting groups regarding BCE's annual reports, its public filings, and its reporting obligations. In addition, Michel Lalande provided legal advice regarding the legal consequences to BCE of reporting obligations required by its subsidiaries. (Lalande Decl. ¶ 17.) Documents 14, 56, 65-6, 70, 92, 98, 118, 120-22, 133-35, 232, 236, 266-67, 278, 279, 280-85, 309, 313-15, 337, 344, and 348 noted on the privilege log reflect communications regarding these subject matters

- Michel Lalande also provided legal advice regarding resolutions presented to BCE's Board of Directors on matters for which BCE Board approval was required, and drafted and commented on presentations provided to the BCE Board involving matters of legal

15

concern. (Lalande Decl. ¶ 18.) Documents 58, 73-4, 78, 112, 140, 217, 226, 265, 287, 302, and 345 noted on the privilege log reflect communications regarding these subject matters

- A fourth area regarded the analysis of legal issues and assessment of the legal impact to BCE of entering into certain transactions with Teleglobe or its subsidiaries and the legal impact to BCE of transactions Teleglobe or its subsidiaries might undertake with third parties. (Lalande Decl. ¶ 19.) Documents 8, 62, 90, 93, 136, 139, 144, 150, 152-54, 156, 253, 258, 270, 291-94, 298-300, and 340 noted on the privilege log reflect communications regarding these subject matters.

- A fifth area involved BCE's legal obligations with respect to certain issues pertaining to BCE's subsidiaries, such as changes in corporate logos. (Lalande Decl. ¶ 20.) Documents 137 noted on the privilege log reflect communications regarding these subject matters.

- Beginning in late March 2002, the BCE legal department, along with the assistance of BCE's outside counsel, began to analyze the legal issues arising from BCE's continued support of Teleglobe Inc. Some of that legal work was shared with attorneys or executives of Teleglobe Inc. and its subsidiaries to the extent it involved matters of common interest. Indeed, a significant portion of that legal work was performed solely for BCE by either internal BCE attorneys or outside counsel for BCE and was not intended to be shared with Teleglobe Inc. or its subsidiaries. (Lalande Decl. ¶ 21.) The following documents noted on the privilege log relate to such legal work performed solely on behalf of BCE: 13, 15, 24, 30, 33, 35, 37, 50-4, 76-7, 79-80, 82-3, 119, 141-43, 146-7, 149, 151, 157, 158-61, 164-5, 167, 169-70, 172-3, 175, 178, 180, 182-84, 186-88,

16

190, 194-5, 197, 200-04, 207-08, 211-14, 219-20, 222, 227-29, 231, 235, 239-41, 243-45, 247-50, 256-57, 259, 271-72, 275, and 277.

29.    All these documents were meant to be kept in confidence and not to be disseminated outside of BCE. (Lalande Decl. ¶ 15.) Therefore, there is no basis to eliminate the protection of the attorney-client privilege and the work product doctrine as to legal work performed for BCE. Furthermore, under the Committee's restrictive view of the attorney-client privilege, legal advice provided to a parent corporation by a lawyer working for that corporation, and transmitted to other employees of the parent, would never be protected by the attorney-client privilege if that lawyer also was an officer of a subsidiary as is the usual case. This approach would not be consistent with the goal of encouraging "full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." Upjohn Co. v. United States, 449 U.S. 383, 389 (1981). Such a position is untenable and ignores the practical realities of the workings of corporations.[8]

---

[8]    The Committee erroneously relies on Valente, Simpson v. Motorist Mut. Ins. Co., 494 F.2d 850 (7th Cir. 1974), and LaRocca v. State Farm Mut. Auto. Ins. Co., 47 F.R.D. 278 (W.D. Pa. 1969), to support its misguided argument. This reliance, however, is misplaced for five reasons. First, Valente and Simpson merely hold that "where the same attorney represents two parties having a common interest, and each party communicates with the attorney, the communications are privileged from disclosure at the instance of a third person. Those communications are not privileged, however, in a subsequent controversy between the two original parties." Simpson, 494 F.2d at 855; see also Valente, 68 F.R.D. at 368. These cases are irrelevant where, as here, 246 documents reflect legal work performed solely for BCE. Second, Valente and Simpson stand for the proposition that communications are not privileged "in a subsequent controversy between the two [clients]." Id. But no such litigation has commenced between BCE and the Debtors. Third, the Committee does not stand in the shoes of the Debtors for purposes of controlling the privilege. See infra at 18-19. Instead, at this time the Committee is a mere third party for purposes of the exercise of the privilege. Id. Therefore, under Valente and Simpson, the documents that the Committee seeks are privileged as to it. Simpson, 494 F.2d at 855 (documents are privileged from disclosure to third persons); see also Valente, 68 F.R.D. at 368 (citing Simpson). Fourth, Valente specifically addressed the scope of discovery in shareholder derivative actions, and that case has been subsequently criticized by the Delaware Courts. See Deutsch v. Cogan, 580 A.2d 100, 105-06 (Del. Ch. 1990) (stating that "Delaware courts have consistently followed Garner and declined to broadly apply Valente... Nor has the broad rule espoused in Valente been widely accepted and at least one commentator has described it as an 'aberrant' decision.") Fifth, the Committee's reliance on LaRocca is misguided because that case does not address the Committee's arguments in the Application and holds, instead, that "we cannot order the production of an entire file of an attorney on the representation that there may be some evidence therein contained which might assist a party in preparation of its case." LaRocca, 47 F.R.D. at 282.

**B.    BCE Properly Withheld Documents Protected under the Common Interest Privilege**

30.    The Committee improperly seeks to compel the production of 98 documents designated by BCE as protected under the common interest privilege.[9]  The Committee argues that, because Messrs. Lalande, Masse, and Ryan were also corporate officers of the Debtors, the privilege does not exist.  (Application ¶¶ 20-23.)  This argument has no basis for two reasons.

31.    First, the Committee's application is not ripe.  The common interest privilege protects legal advice where the parties are "linked by a common legal interest and are jointly consulting an attorney concerning a mutual concern."  Purizer Corp. v. Battelle Mem'l Ins., No. 01 C 6360, 2002 WL 1400263, at *1 (N.D. Ill. June 27, 2002) (quotation omitted).  As denoted on BCE's privilege log, BCE attorneys consulted with attorneys, officers, or employees of Teleglobe Inc. or its subsidiaries to discuss or provide legal advice in matters where BCE and Teleglobe Inc. (or its subsidiaries) shared a common legal interest.  These documents are therefore protected under the common interest privilege.

32.    The Committee's own cases demonstrate that such common interest privilege will continue to exist until the Debtors file a litigation against BCE: "where the same attorney represents two parties having a common interest, and each party communicates with the attorney, the communications are privileged from disclosure at the instance of a third person. Those communications are not privileged, however, in a subsequent controversy between the two original parties."  Simpson, 494 F.2d at 855; see also Valente, 68 F.R.D. at 368.  As described above, supra at n.8, the Debtors have not filed such a litigation.

---

[9]    These documents are denoted as "AC/CI" on the privilege log

18

33.    Second, at this time, the Committee has no standing to make this Application because it does not stand in the Debtors' shoes. In re Tenn. Valley Steel Corp., 183 B.R. 795, 799-800 (Bankr. E.D. Tenn. 1995). "Numerous courts in applying § 1109(b) qualify a creditors' committee's standing by applying the following three-part test: (1) the creditors' committee must assert a colorable claim; (2) the debtor must have unjustifiably refused to pursue the claim; and (3) the creditors' committee must have obtained the permission of the bankruptcy court to initiate the action on behalf of the debtor." Id. None of these requirements has been met.

a.    The Committee has failed to identify any colorable claims

34.    First, the Committee has failed to assert or even clearly identify any claims it might assert. The only statement in the Application that remotely resembles a possible claim is that BCE had allegedly "committed" to fund the completion of GlobeSystem, that the Debtors relied on such a "commitment" and incurred "billions of dollars of debt to build or . . . fund GlobeSystem," and that the Debtors incurred damages when BCE announced that it would cease its long-term support of Teleglobe Inc., on April 24, 2002   (Application ¶ 14.) Such a claim is not colorable.[10]

35.    In May 1999 (over a year prior to BCE's acquisition of 77 percent of Teleglobe Inc.), Teleglobe Inc. announced the development of the GlobeSystem network and that the completion of GlobeSystem would require US$5 billion. In June 1999, Teleglobe Inc. raised approximately US$1.75B for that purpose, with US$3.25B still needed to complete the network. Since that time, all securities filings of Teleglobe Inc. in the United States and Canada

---

[10]    Alternatively, a creditors' committee may also sue on behalf of debtors where the trustee or the debtor in possession consents to such an action, but the suit must be necessary and beneficial to the resolution of bankruptcy proceedings. In re Commodore Int'l Ltd., 262 F.3d 96 (2d Cir. 2001) (holding that action had to be dismissed since creditors' committee's suit was neither necessary nor beneficial). For the reasons described in this section, the Committee has not, and cannot, make a showing that such a lawsuit would be necessary and beneficial.

19

have expressly indicated that the unavailability of financing to complete GlobeSystem was a

major risk factor for Teleglobe Inc.

36.    For example, Teleglobe's Annual Report for the year 2000, filed with the

SEC on April 26, 2001, states:

> In March 2000, [Teleglobe Inc.] determined that . . . [Teleglobe
> Inc.] would be unable to comply with certain financial covenants
> in [its] then existing term and revolving credit facilities . . . . On
> July 24, 2000, [Teleglobe Inc.] entered into new 364-day revolving
> credit facilities for an aggregate amount of $1.25 billion.[11] At the
> same time, BCE confirmed to the lenders . . . that it would under
> certain circumstances provide continued financial assistance to
> [Teleglobe] including that, until the maturity of these facilities,
> BCE would from time to time inject . . . into [Teleglobe Inc.] . . .
> sufficient funds, as required, to enable [Teleglobe Inc.] to meet at
> all times cash shortfalls, if any, in funding its capital expenditures
> program; *provided, however, that the financial commitment of*
> *BCE to [Teleglobe Inc.] is limited to $900.0 million,* exclusive of
> the $100.0 million BCE advanced to [Teleglobe Inc.] on June 21,
> 2000 . . .
>
> Going forward, [Teleglobe Inc.] may not have sufficient funds
> available from its existing cash flow and credit facilities in order to
> meet its obligations to make necessary capital expenditures . . . and
> pay other operating expenses . . . . The failure of BCE . . . to
> continue to provide this funding would have a material adverse
> financial effect on [Teleglobe Inc.].

37.    BCE and Teleglobe Inc. reiterated that warning in their first quarter 2001

financial reports filed with the SEC. In numerous subsequent securities filings with the SEC and

with regulatory authorities in Canada, BCE reiterated that its financial assistance to Teleglobe

Inc. was expressly limited to US$900 million, exclusive of the US$100 million it had already

provided to Teleglobe Inc. in 2000. BCE's financial assistance was only directed to Teleglobe

Inc., a Canadian corporation that is not a Debtor in this bankruptcy case. BCE did not commit to

provide funding to the Debtors. In their second quarter 2001 financial reports, BCE and

Teleglobe Inc. announced that Teleglobe Inc.'s revolving credit facilities had been extended to

20

July 22, 2002. In connection with that extension, BCE reconfirmed its commitment to provide, under certain circumstances, financial assistance *up to $900 million*, of which $374 million had been provided as of June 30, 2001. Thus, it was a matter of public record that (a) BCE was not committed to fund Teleglobe Inc. for more than $526 million ($900 million less $374 million provided as of June 30, 2001), and that (b) without BCE's funding, Teleglobe Inc. could not meet its obligations.

38.    By the end of the third quarter of 2001, BCE had provided $714 million into Teleglobe Inc. out of its original commitment of $900 million. BCE also warned in its SEC filings that:

> Given that Teleglobe Inc.'s credit facilities are fully drawn and that
> . . . Teleglobe Inc. does not have sufficient funds available from its
> cash flow to meet these obligations, to make necessary capital
> expenditures . . . [it] relies on BCE Inc. to provide [additional]
> funding . . . to meet [these] obligations. [The failure by BCE Inc.
> to continue to provide this additional funding] would have a
> material adverse effect on Teleglobe Inc.'s results of operations
> and financial condition. . . .

39.    As the public documents of BCE indicate, by December 31, 2001, BCE had provided a total of $1.1 billion for Teleglobe Inc. ($200 million in excess of its commitment of $900 million); those documents also show that BCE continued to provide Teleglobe Inc. with millions of dollars through April 24, 2002, which far exceeded BCE's commitment under the revolving credit facilities. Thus, BCE's financial reports accurately stated that, although Teleglobe Inc. was dependent "on BCE to provide funding in order to meet [Teleglobe's Inc.] obligations . . . *BCE Inc. [was] not obligated to provide such funding*." Id. (emphasis added.) The Committee's statement in paragraph 14 of its Application ignores these unambiguous statements in numerous publicly filed documents.

---

[11]    Unless otherwise indicated, all dollars are stated in U.S. dollars

WP3:994944 1                                                                59825 1001

40.    On April 8, 2002, BCE announced, among other things, that "in light of the expected continued weakness in the global data and long distance telecommunications sector for the foreseeable future and the general turmoil in the industry as evidenced by the restructuring of many of Teleglobe's competitors, BCE has undertaken a full review of all of its strategic alternatives regarding Teleglobe."  Subsequently, on April 24, 2002, BCE announced that since December 2001, it had provided further funding to Teleglobe Inc. but that, based among other things on "a pragmatic assessment of Teleglobe's prospects [and] a comprehensive analysis of the state of the industry," it would cease further long-term funding of Teleglobe Inc. Therefore, any claim that BCE promised to fund the completion of GlobeSystem and suddenly changed its mind less than a year later is not colorable.[12]

b.    **The Debtors have not unjustifiably refused to pursue the claim**

41.    The Application does not state that the Debtors have unjustifiably refused to pursue these claims. A Joint Motion of the Debtors and the Committee, filed April 13, 2004 Docket No 2167, contains the statement that "Debtors' management, however, may have a conflict" of interest that might affect their ability to pursue certain claims against the former directors and officers of BCE and Teleglobe Inc. Joint Motion of the Debtors and Debtors-in-Possession and the Official Committee of Unsecured Creditors for an Order Appointing the Committee as Estate Representative with respect to the Prosecution of Certain Causes of Action, dated April 13, 2004, at 5  The Debtors have failed to identify the nature of that supposed conflict.

---

[12]    The Application contains numerous other factual errors, such as the statement that "BCE arranged an umrella directors and officers liability policy" at the time it decided to terminate funding of Teleglobe Inc. (Application at 7 n 5 )  That policy was put in place significantly prior to that time

**c.    The Committee has not obtained an Order from this Court allowing it to initiate an action on behalf of the Debtors**

42.    The Committee has no standing to make this Application in the absence of an order of the Court allowing it to pursue an action on behalf of the Debtors. In re Tenn. Valley Steel Corp., 183 B.R. at 799-800. The Committee has not obtained such an Order and has no standing.

**C.    BCE Did Not Waive Any Privilege**

43.    The Committee further argues that it should be entitled to receive all privileged documents because 42 boxes of documents from the files of Michel Lalande were produced to the Committee by BCE. This argument misstates the law of waiver and ignores the terms of the parties' own Confidentiality Stipulation.

44.    First, there is no waiver because virtually all the documents that the Committee reviewed from the files of Michel Lalande either did not involve the provision of any legal advice, or involved legal work performed solely on behalf of Teleglobe Inc. or its subsidiaries. Indeed, BCE would have had no right to assert a privilege on behalf of Teleglobe Inc. There is a substantive difference between the documents that BCE withheld on the ground of privilege and those that were produced to the Committee.

45.    The Committee has attached to its Application a limited number of privileged documents that were, however, inadvertently disclosed to it. (Application, Ex. I, Items 1-2, 8-9, and 17). BCE believes that these documents are protected by the attorney-client privilege or the common interest privilege and should not have been produced, and BCE did not intend to produce these documents. Their production does not amount to a waiver for two reasons. First, while the attorney-client privilege may be waived if communications deemed to be privileged are disclosed to third parties, "the mere inadvertent production of documents by

23

counsel does not waive the privilege." <u>Berg Elecs., Inc. v. Molex, Inc.</u>, 875 F. Supp. 261, 263 (D. Del. 1995).

46.     Second, paragraph 21 of the Confidentiality Stipulation between BCE and the Committee expressly states that "[t]he inadvertent production of any document claimed to be privileged shall not constitute a waiver of such privilege." (Committee's Application, Ex. A, ¶ 21.) Therefore, the Committee has no basis to argue that a waiver has occurred.[13]  On April 21, 2004, BCE's counsel sent a letter to the Committee's counsel requesting that these documents be returned. (<u>See</u> Ex. 3 attached hereto.)

47.     Even if the Court determines that a waiver has occurred, this waiver would only apply to the specific documents annexed to Exhibit I of the Committee's Application. <u>In re Hechinger Inv. Co.</u>, 303 B.R. 18, 26 (D. Del. 2003) (holding that inadvertent disclosure of privileged communications waives privilege only as to those communications actually disclosed and not communications relating to the entire subject matter).

**D.      The Documents Deemed Privileged Contained Legal Advice**

48.     The Committee argues that 135 out of 349 documents on BCE's privilege log contain business advice and therefore are not privileged. Other than a blanket statement that certain of the documents on BCE's privilege log contain business advice, the Committee fails to articulate why that is the case. In many instances, the Committee claims a document contains business advice when BCE's description of that document clearly indicates the document contains legal advice. (<u>See, e.g.</u>, Application, Ex. G, entries 38 and 102.) The documents withheld from the Committee on the basis of privilege were carefully reviewed by counsel and

---

[13]     Most of the documents included in Exhibit I to the Committee's Application were procured by the Committee from the Debtors. BCE does not know how the Debtors came into possession of these documents and the Committee offers no details in its Application as to how they were obtained. Accordingly, there is no evidence to support any claim that these documents were voluntarily disclosed.

59825.1001

were withheld based on a good faith belief that they were protected by the attorney-client privilege, the common-interest privilege, or the work product doctrine.

### E.    Designations of Documents As Work Product

49.    In its letter dated April 6, 2004, counsel for the Committee did not raise the objections to the assertion of the work product doctrine that are set forth in the Application. (Application, Ex. E at 2-3.) Instead, the Committee solely argued that the assertion of the work product doctrine was inappropriate for the same reason as the assertion of the attorney-client privilege: the documents were created or received by individuals, such as Michel Lalande, who were also officers of certain of the Debtors. (Id.)

50.    In its Application, the Committee argues for the first time that certain documents are not privileged because BCE did not expressly indicate that these documents were prepared "in anticipation of litigation" on its privilege log. (Application ¶ 26.) The Committee's failure to raise this issue in its April 6 letter did not constitute a good faith effort to resolve this discovery dispute and to satisfy the conference requirement under the Local Rules of this Court in connection with Rule 2004 investigations. First Savs. Bank v. First Bank Sys., Inc., 902 F. Supp. 1356, 1364-65 (D. Kan 1995), reversed on other grounds, 101 F.3d 645 ("If this rule is to work, the conference requirement must be treated 'as a substitute for, and not simply a formalistic prerequisite to, judicial resolution of discovery disputes.' . . . Towards that end, the parties should confer with the same detail and candor expected in the memoranda they would file with the court on the discovery dispute") (citation omitted). BCE meaningfully considered and responded in good faith to all the arguments set forth on the Committee's April 6 letter and would have meaningfully considered the Committee's arguments regarding the assertion of the work product doctrine had the Committee raised them

25

51.    Documents Nos. 15, 51, 53-4, 83, 158-60, 164, 167, 169, 172-74, 178,

182-83, 185, 202, 208 212-14, 219-20, 222, 241 257, 271, 302 were prepared in the anticipation

of litigation in April 2002, shortly prior to BCE's announcement that it would cease its long-term

funding of Teleglobe Inc., and the privilege log provides details regarding the author, recipient,

date, and contents of the document.[14]  These documents are protected by the work product

doctrine. See, e.g., First Savs. Bank, 902 F. Supp. at 1362; see also Wolhar v. Gen.Motors

Corp., 712 A.2d 457, 464 (Del. Super. Ct. 1997) (privilege log was sufficiently detailed as to

allow parties to "ascertain the basic nature" of the documents).

F.    **BCE Redacted Unresponsive Documents to Prevent their Use in the Canadian Litigation**

52    The Confidentiality Stipulation, as the Committee insisted, allows counsel

for the Committee to show documents to a very large number of entities, including certain parties

in the litigation pending against BCE in Canada. Through the normal discovery process in

Canada, those parties (including two members of the Committee) may not otherwise have access

to those documents. In the September 8, 2003 meeting, Committee counsel expressly

acknowledged that such members would like to have access to documents that they would not be

entitled to obtain under the Canadian discovery rules. Accordingly, BCE produced certain

documents in redacted form, and in particular BCE redacted unresponsive information. See, e.g.,

In re Coffee Cupboard, Inc., 128 B.R. 509, 516 (Bankr. E.D N.Y. 1991) ("Rule 2004

examinations should not be used to obtain information for use in an unrelated case or proceeding

---

[14]    BCE withdraws its claim of work product with respect to the other documents previously designated as protected by the work product doctrine.

WP3:994944 1

59825 1001

pending before another tribunal").[15] BCE did not redact, however, the portion of the documents that were responsive to the Committee's 26 document requests.

53.    In the letter dated April 6, 2004, Committee counsel stated that "several of the redacted documents have been rendered incomprehensible" as a result of the redactions. (Application, Ex.E at 3.) In the response dated April 9, 2004, BCE's counsel stated that BCE had made a significant effort to avoid that result, but that to the extent the Committee believed that several specific documents are difficult to understand in their redacted form, the Committee should identify them, and BCE would make a good faith effort to assist the Committee and revise the redactions if necessary. (Id., Ex F at 5-6.) The Committee failed to identify such documents and instead made this application to compel discovery.

54.    BCE believes in good faith that it has provided more than ample information to allow the Committee to determine whether to institute litigation by its deadline of May 13, 2004. Indeed, in its Application, the Committee has failed to set forth any reasons why it needs the redacted information in order to form its conclusions. See, e.g., In re Bakalis, 199 B.R. 443, 450 (Bankr. E.D.N.Y. 1996) (discovery denied where the Trustee had failed to explain why the information was necessary to decide whether to initiate an adversary proceeding). The Committee points to a presentation to the Board of Directors, dated April 23, 2002 produced to the Committee in both redacted and unredacted form. (See Application, Exs. J, K.)


REDACTED


---

15      BCE redacted a small number of documents on the basis of privilege. In the April 6, 2004 letter, Committee counsel inquired as to the redactions on two specific documents. BCE responded that these documents should have been included on BCE's privilege log, and they were subsequently included on the log.

59825 1001

REDACTED

In cooperation with the Committee's investigation, BCE has produced hundreds of thousands of pages of documents and is making senior employees available for a deposition. BCE is not required, however, to provide the Committee with non-responsive internal BCE documents or information dealing with BCE subsidiaries that are completely unrelated to Teleglobe.

## II.    BCE Produced Documents to The Committee In the Order They Were Maintained in the Ordinary Course of Business – It is Not Required to Do More

55.    Finally, the Committee claims that it is entitled to the production of "all of the Project X checklist documents, neatly segregated, regardless of whose custody such documents are in." (Application ¶ 5.) The Committee also seeks Board minutes and presentations for the period January 2000 through May 2002. BCE has satisfied its obligations with respect to the production of documents responsive to the issues set forth on the Issues and Activities List, and BCE has produced its Board minutes and presentations.

56.    Under the Federal Rules of Civil Procedure, a party is required to produce documents as they are kept in the ordinary course of business. See In re G-I Holdings, Inc., 218 F.R.D. 428, 439 (D.N.J. 2003) ("Rule 34(b) reveals that the producing party has the option of presenting information in one of two ways. If the producing party produces documents in the order in which they were kept in the usual course of business, the Rule imposes no duty to organize and label the documents"). In Liddell v. Bd. of Educ. of St. Louis, 771 F. Supp. 1496 (E.D. Mo. 1991), the court held that:

> The City board did not violate any rules regarding discovery.
> By the State's own account, it had continual access to
> numerous boxes and file cabinets of documents and records.

> Its chief complaint is that it could not find what it wanted to find. This is not any fault of the City Board. Rule 34, Fed. R. Civ. P., directs that 'any party who produces documents for inspection shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the request.' . . . The City board was not obligated to wrap up the volumes of data into neat little packages for the State

Id. at 1499; see also Butler v. Portland Gen. Elec. Co., Civ. No. 88-455, 1990 U.S. Dist. LEXIS 1630, at **6-7 (D. Or. Feb. 9, 1990); Dangler v. N. Y. City Off Track Betting Corp., 95 Civ. 8495, 2000 U.S. Dist. LEXIS 14938, at **3-4 (S.D.N.Y. Oct. 10, 2000).

57.    This is exactly what BCE has done. First BCE has produced all responsive portions of the minutes of the meetings of the Board of Directors, and all other Board presentations, for the period February 15, 2000 through April 24, 2002. The BCE Board Minutes are maintained in the files of the BCE Corporate Secretariat, and they were produced to the Committee in the order in which they were maintained. BCE will supplement its production and produce to the Committee the responsive sections of the Board minutes and presentations for the months of January 2000 and May 2002 to the extent they are not privileged.

58.    Second, the Committee's argument with respect to the Issues and Activities List has no basis. At the September 8, 2003 meeting, Committee counsel asked whether any memoranda regarding the subjects set forth on pages 12 and 13 of the Project X Issues and Activities List were in fact prepared, and whether these documents would be produced to the Committee or alternatively included on a privilege log.

59.    The Issues and Activities List is a list of issues, not a list of documents or a table of contents of existing documents. The documents responsive to the issues on the Issues and Activities List were never maintained in the order in which these issues appear on the List Lalande Decl ¶ 24.

60      Many documents relating to the subject matter of the Project X Issues and

Activities List were in fact produced to the Committee as part of the files and electronic

documents of the nine custodians described above, in the order in which these documents were

maintained. Further, BCE's privilege log set forth documents listed in the Project X Issues and

Activities List. Indeed, to the extent any documents listed on pages 12 and 13 of the Project X

Issues and Activities List (under Section 8.2 that Committee counsel pointed out to BCE at the

meeting) exist, BCE believes in good faith that they are either (i) set forth on BCE's privilege

log; (ii) were produced to the Committee; or (iii) were never created.

61.     When the Committee reviewed the documents in Montreal, it asked

Martin Cossette, a member of BCE's legal department, whether all the documents listed on the

Project X Issues and Activities List were included in the 96 boxes of documents that were made

available to the Committee for inspection. That request was significantly broader than, and

different from, the Committee's request on September 8, 2003. Mr. Cossette responded that

responsive non-privileged documents would likely be in the boxes of documents made available,

in particular the files of Michel Lalande who was actively involved in the Project X file. He also

suggested that, if the Committee could identify any documents that appeared to be missing, BCE

would make an effort to locate and produce them. The Committee did not object to Mr.

Cossette's suggestion at the time, and has failed to identify any specific documents it was unable

to locate. (Application, Ex. F at 4-5.) BCE was not required to do more, and in particular BCE

was not required to "wrap up the volumes of data into neat little packages" for the Committee.

Liddell v. Bd. of Educ. of of St. Louis, 771 F. Supp. at 1499.

30

## CONCLUSION

For the reasons set forth above, BCE respectfully requests that the Court deny the

Application of the Committee.

Dated: April 21, 2004
      Wilmington, Delaware

                    YOUNG CONAWAY STARGATT & TAYLOR, LLP

                    *Pauline K. Morgan*

                    Pauline K. Morgan (No. 3650)
                    The Brandywine Building
                    1000 West Street, 17th Floor
                    P.O. Box 391
                    Wilmington, DE  19899
                    (302) 571-6600

                          and-

                    SHEARMAN & STERLING LLP
                    Stuart J. Baskin
                    George J. Wade
                    Daniel Schimmel
                    599 Lexington Avenue
                    New York, New York 10022
                    (212) 848-4000

                    Attorneys for BCE Inc.