# EXHIBIT A

# PART 2

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN THE MATTER OF:

TELEGLOBE COMMUNICATIONS
CORPORATION., *et al.*,

Debtors.

Chapter 11

Case No. 02-11518 (MFW)

Hearing Date: April 28, 2004 at
11:30 a.m.

## DECLARATION OF MICHEL LALANDE

I, Michel Lalande, declare and say as follows:

1.      I am a member of the Quebec bar and currently Vice President – General Counsel for BCE Inc. ("BCE"). My office is located at 1000, rue de la Gauchetière Ouest, Suite 3910, Montréal (Quebec) H3B 4Y7. I have personal knowledge of the facts set forth in this declaration, which I submit in support of BCE's memorandum of law opposing the Motion of the Official Committee of Unsecured Creditors (the "Committee") for an Order Authorizing And Compelling Discovery Pursuant to Bankruptcy Rule 2004. My personal knowledge is based, among other things, on my responsibilities at BCE and communications with employees of BCE in the legal department as well as my involvement in the documents collection process in the Canadian insolvency proceedings of Teleglobe Inc. ("Teleglobe") and certain of its subsidiaries and in the United States insolvency proceedings of the Debtors. As an executive of BCE, I also have knowledge of BCE's corporate structure.

2.      At all material times, Teleglobe was a corporation governed by the *Canada Business Corporations Act* ("CBCA") that had its principal office and registered head office in Montreal, Quebec. Teleglobe's predecessor was initially established in 1950 as a Federal Crown corporation to be Canada's exclusive provider of international

NYDOCS04/400580 2

telecommunications services. In 1987, Teleglobe's predecessor was privatized pursuant to the *Teleglobe Canada Reorganization and Divestiture Act*. Teleglobe carried on business directly or through subsidiaries in over 40 countries.

3.    In May 1987, BCE acquired a minority interest in Teleglobe by way of a private placement. On May 31, 1999 that minority interest was transferred to Bell Canada, which was then and until June 28, 2002 owned indirectly 80% by BCE and 20% by SBC Communications Inc. ("SBC"). Bell Canada's minority interest in Teleglobe stood at approximately 23% in February 2000.

4.    On February 15, 2000, BCE and Teleglobe publicly announced an agreement pursuant to which BCE would acquire all of the outstanding common shares of Teleglobe which were not already owned by Bell Canada (the "Acquisition").

5.    The Acquisition was completed by way of a plan of arrangement under the CBCA that was approved by the Quebec Superior Court on November 1, 2000. At that time, Teleglobe became a subsidiary of BCE, with an indirect approximate interest of 4.6% owned by SBC and therefore, at all relevant times, Teleglobe was never a wholly-owned subsidiary of BCE. Teleglobe was a holding company with approximately 65 subsidiaries.

6.    On May 15, 2002, Teleglobe and certain of its subsidiaries filed for protection under the *Canadian Companies' Creditors Arrangement Act*. On May 28, 2002, Teleglobe's United States subsidiaries commenced insolvency proceedings under Chapter 11 of the United States Code.

7.    Teleglobe is not a Debtor in the U.S. insolvency proceedings.

NYDOCS04/400580 2                                2

8.    The court in the Canadian insolvency proceedings appointed Kroll Restructuring Ltd. as the Interim Receiver and granted it authority to investigate, and if determined appropriate, institute and prosecute any and all Preserved Claims (as defined in such proceedings). In the course of its investigation, the Interim Receiver requested certain documents of BCE from the files of the six individuals who it determined were deeply involved in the Teleglobe relationship  Specifically, the Interim Receiver sought the production of all documents in the files of those six custodians that reflected work performed on behalf of Teleglobe and its subsidiaries. These six custodians were (1) Michael T. Boychuk, the current Senior Vice-President and Treasurer of BCE and the former Executive Vice-President and Chief Financial Officer of Teleglobe (from May 2000 to April 2002); (2) Patrick Pichette, the current Executive Vice-President of Bell Canada, the former Executive Vice-President – Planning and Performance of BCE (until January 2002) and the former Executive Vice-President – Finances and Operations of Teleglobe USA Inc. (from January 2002 to May 2002), (3) Francois Gauvin, the former Senior Director – Taxation of BCE (from November 2000 to June 2003) and the former Senior Director – Taxation of Teleglobe (until the Acquisition); (4) Michel Lalande, the current Vice-President – General Counsel of BCE, the former Assistant Corporate Secretary of Teleglobe (until April 2002) and the former Senior Director, Legal Affairs of Teleglobe (until the Acquisition); (5) David Masse, the former Assistant Corporate Secretary of BCE (until June 2003) and the former Assistant Corporate Secretary of Teleglobe (from November 2000 to April 2002); and (6) Stephen Skinner, the current Senior Vice-President – Finance of Bell Canada and the former Vice-President – Controller of Teleglobe (from July 2001 to April 2002).

9.    In response to the Interim Receiver's request, BCE produced 91 boxes of documents from the files of the six individuals identified by the Interim Receiver  Those boxes

comprised all of the files for work performed on behalf of Teleglobe or its subsidiaries, as maintained in the ordinary course of business, of the six individuals. In producing those documents to the Interim Receiver in Canada, BCE removed from the files certain documents that were prepared for BCE and not for Teleglobe. In the course of reviewing documents responsive to the Committee's requests in connection with the Rule 2004 investigation, attorneys for BCE reviewed the documents that had been removed from the files transmitted to the Interim Receiver. It is my understanding that, to the extent those documents were responsive to the Committee's draft document request, they were re-inserted in the files exactly where they belonged in order to produce these documents precisely in the order in which they were maintained by the six individuals. Thus, contrary to the Committee's argument, it is my understanding that BCE did not intersperse relevant documents with non-relevant documents in order to "hide them." (Application ¶ 19.)

10.    I also wish to take this opportunity to address the Committee's erroneous argument that BCE refused to search BCE's files and only agreed to produce documents from the files of individual custodians. (Application ¶ 4.) Virtually all the documents responsive to the Committee's document requests are maintained in the files of individual custodians and are not maintained in central "corporate files" of BCE. To my knowledge, a very limited number of responsive documents are maintained at BCE in "corporate files." They are the Board committee minutes and record books, the bound volumes of corporate transactions, and the employment agreements and certain other human resources documentation. These documents are maintained in BCE's Secretariat, Legal, and Human Resources departments, respectively, and the responsive portions of these documents have been produced to the Committee

NYDOCS04/400580 2                                4

11.    I am aware that certain documents requested by the Committee were withheld on the basis of the attorney-client privilege, the work product privilege, and the common interest privilege. I understand that these documents were designated on privilege logs provided to the Committee by BCE's outside counsel, Shearman & Sterling LLP. I understand that the Committee is challenging the privileged status of some of those documents. I wish to respond to certain erroneous factual statements in the Committee's Application regarding my responsibilities and the legal work I performed on behalf of BCE.

12.    The Committee erroneously states that I served simultaneously as BCE's general counsel and Director of Legal Affairs of Teleglobe. This statement is incorrect. During the period November 1, 2000 through May 15, 2002, I was Assistant General Counsel and later Vice-President – General Counsel of BCE. In my capacity as both Assistant General Counsel and Vice-President – General Counsel of BCE, I managed BCE's legal department, and I represented BCE on a variety of legal matters including, mergers and acquisitions, securities, compliance, financing and executive compensation activity.

13.    Prior to November 1, 2000, I was Senior Director – Legal Affairs and Assistant Corporate Secretary of Teleglobe. My position as Senior Director – Legal Affairs of Teleglobe ended upon my hiring by BCE on November 1, 2000. Due to a lack of staffing in the legal department of Teleglobe and some of its subsidiaries, I provided legal support to Teleglobe and certain of its subsidiaries on legal matters involving financing, mergers and acquisitions, compliance and reporting matters. Following my hiring by BCE, I retained the title of Assistant Corporate Secretary of Teleglobe. I was never a member of the Board of Teleglobe or of any of the Debtors, and I was not an employee of Teleglobe or its subsidiaries after November 1, 2000.

14.    From November 1, 2000 through May 15, 2002, the work I performed in my capacity as an attorney at BCE can be divided into three categories. The first category relates to work I performed related to BCE corporate matters where BCE possessed its own legal interest. In some instances, I performed work where BCE shared a common legal interest with one of its subsidiaries and would therefore consult with employees or attorneys of the subsidiary. The third category of work relates to legal support I provided solely to Teleglobe or to one of its subsidiaries.

15.    Documents denoted as "AC" or "AC/WP" on the privilege log attached as Exhibit G to the Committee's motion, reflect legal advice provided by me, my colleagues in BCE's legal department, or BCE's outside counsel to other BCE employees or representatives; legal advice provided to me or my colleagues in BCE's legal department by outside counsel; and other confidential communications involving legal advice between myself and BCE employees or representatives or outside counsel in areas solely involving BCE corporate matters or in areas where BCE retained a separate legal interest from Teleglobe or its subsidiaries. As a general proposition, these communications were not intended to be widely disseminated and were intended to remain in the confidence of BCE employees and representatives of BCE. In paragraphs 16 to 21 of this Declaration, I have attempted to describe in further detail the nature of the legal work performed on behalf of BCE I performed a substantial portion of that legal work.

16.    Attorneys for BCE, including myself, analyzed the legal consequences for BCE and provided legal advice to BCE regarding legal issues surrounding restructuring and financing alternatives for Teleglobe. For instance, in early 2002, we analyzed certain Credit Facilities (entered into by Teleglobe and a syndicate of lenders) and other documents to

determine whether BCE could continue funding Teleglobe and obtain security in connection with such funding. We also analyzed the legal consequences for BCE of providing such funding to Teleglobe. In addition, we were involved in negotiating and drafting certain letters of support and contracts on behalf of BCE, such as the letter of support that BCE was asked to provide to Teleglobe's lenders in connection with the renewal of the Credit Facilities in 2001 and 2002. Some of these documents were created by attorneys for BCE. Other documents reflect the advice of attorneys.

17.     Another area of responsibility of attorneys working for BCE, including myself, was to provide legal advice and comments to BCE's Secretariat and members of BCE's compliance and accounting groups regarding BCE's annual reports, its public filings, and its reporting obligations. In addition, we provided legal advice regarding the legal consequences to BCE of reporting obligations required by its subsidiaries. Some of these documents were created by attorneys for BCE. Other documents reflect the advice of attorneys.

18.     Attorneys working for BCE, including myself, also provided legal advice regarding resolutions presented to BCE's Board of Directors on matters for which BCE Board approval was required, and drafted and commented on presentations provided to the BCE Board involving matters of legal concern. Some of these documents were created by attorneys for BCE. Other documents reflect the advice of attorneys.

19.     A fourth area where attorneys for BCE, including myself, provided legal advice to BCE regarded the analysis of legal issues and assessment of the legal impact to BCE of entering into certain transactions with Teleglobe or its subsidiaries and the legal impact to BCE of transactions Teleglobe or its subsidiaries might undertake with third parties, and drafting

agreements on behalf of Bell Canada, BCE's subsidiary. Some of these documents were created by attorneys for BCE. Other documents reflect the advice of attorneys

20.    A fifth area where attorneys for BCE, including myself, provided legal advice to BCE involved BCE's legal obligations with respect to certain issues pertaining to BCE's subsidiaries, such as changes in corporate logos. Some of these documents were created by attorneys for BCE. Other documents reflect the advice of attorneys.

21.    Beginning in late March 2002, the BCE legal department, along with the assistance of BCE's outside counsel, began to analyze the legal issues arising from BCE's continued support of Teleglobe. Some of that legal work was shared with Teleglobe attorneys or executives to the extent it involved matters of common interest. Indeed, a significant portion of that legal work was performed solely for BCE by either internal BCE attorneys or outside counsel for BCE and was not intended to be shared with Teleglobe. Some of these documents were created by attorneys for BCE. Other documents reflect the advice of attorneys.

22.    The Committee has objected to the claim of privilege with respect to several documents created prior to November 1, 2000 involving BCE's legal analysis of the Acquisition and of BCE's legal obligations regarding the Acquisition. Although I was not employed by BCE at the time, I understand that these documents provided or incorporated legal advice provided by BCE attorneys and were meant to be kept in confidence amongst BCE employees.

23.    I understand that the Committee claims that BCE has waived the right to assert any privilege as to all documents contained in my files because 42 boxes of documents over which I was a custodian were provided to the Interim Receiver in Canada. BCE did not

intend to waive any privilege in connection with the production of documents to the Interim Receiver or to the Committee. Many documents in my files do not reflect the provision of legal advice and were provided to the Committee and the Interim Receiver for that reason. Other documents only reflect work performed solely on behalf of Teleglobe or one of its subsidiaries as described in paragraph 14 of this Declaration. To the best of my knowledge, none of these documents involved legal work performed solely for BCE, or legal work performed jointly for BCE and one of its subsidiaries of the kind involved here. Thus, the documents made available to the Interim Receiver were substantively different from the documents withheld from the Committee on the ground of privilege. To the extent any disclosure of privileged documents occurred, such disclosure was inadvertent, and BCE did not intend to disclose these documents.

The Committee has raised an issue with respect to a document entitled "Project X Issues and Activities List." The letter from BCE's counsel to the Committee's counsel dated April 9, 2004 describes BCE's responses to these issues. The Issues and Activities List is a list of issues, not a list of documents or a table of contents of existing documents. The documents responsive to the issues on the Issues and Activities List were not maintained by the custodians in the order in which these issues appear on the List.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 21th day of April, 2004, in Montreal, Quebec.

/s/
Michel Lalande

# EXHIBIT 1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE
------------------------------------------------------x

In re                                          Chapter 11

TELEGLOBE COMMUNICATIONS              Jointly Administered
CORPORATION, a Delaware                Case No. 02-11518 (MFW)
corporation, et al.,[1]

         Debtors.

------------------------------------------------------x


## NOTICE OF PRODUCTION OF DOCUMENTS

PLEASE TAKE NOTICE that commencing on March 11, 2004 at 2:00 p.m., and

continuing thereafter until completed, the Official Committee of the Unsecured Creditors of the

above-captioned Debtors (the "Committee") by its attorneys, Rosenthal, Monhait, Gross &

Goddess, P.A. and Hahn & Hessen LLP, will review documents voluntarily produced by BCE,

Inc. ("BCE") at the offices of BCE's counsel in New York, New York, and at other places and

times to be designated by BCE's and the Committee's counsel, pursuant to Bankruptcy Rule

2004, Local Bankruptcy Rule 2004, and a confidentiality agreement dated March 8, 2004. BCE

has agreed to provide documents responsive to the Committee's document request, a copy of

which is annexed hereto.

---

[1]    The Debtors are the following eleven entities:  Teleglobe Communications Corporation,
Teleglobe USA Inc., Optel Telecommunications, Inc., Teleglobe Holdings (U.S.) Corporation, Teleglobe
Marine (U.S.) Inc., Teleglobe Holding Corp., Teleglobe Telecom Corporation, Teleglobe Investment
Corp., Teleglobe Luxembourg LLC, Teleglobe Puerto Rico Inc , and Teleglobe Submarine Inc.

ROSENTHAL MONHAIT        → HAHN HESSEN        ☒003/008

Dated: Wilmington, Delaware
        March 10, 2004

                    ROSENTHAL, MONHAIT,
                    GROSS & GODDESS, P.A.

                    By: _____
                         Kevin Gross, Esq. (DSBA#209)

                    919 Market Street, Suite 1401
                    P.O. Box 1070
                    Wilmington, Delaware 19899
                    (302) 656-4433

                    HAHN & HESSEN LLP
                    488 Madison Avenue
                    New York, New York 10022
                    (212) 478-2400

                    Attorneys for the Official Committee
                    of Unsecured Creditors of Teleglobe
                    Communications Corporation, et al.

TO:    Mark D. Collins, Esq.
       Michael J. Merchant, Esq.
       RICHARDS, LAYTON & FINGER, P.A.
       Attorneys for the Debtors
       One Rodney Square
       P.O. Box 551
       Wilmington, DE 19899

       Frank Perch, Esq.
       OFFICE OF THE UNITED STATES TRUSTEE
       844 King Street, Suite 2313, Lockbox 35
       Wilmington, DE 19801-3519

       George J. Wade, Esq.
       Daniel Schimmel, Esq.
       SHEARMAN & STERLING LLP
       Attorneys for BCE, Inc.
       599 Lexington Avenue
       New York, New York 10022-6069

U3/1U/2UU4  14:55 FAX  3026587567         ROSENTHAL MONHAIT        → HAHN HESSEN       ☒004/008

## DOCUMENT REQUEST

### Definitions and Instructions

A.    "BCE" means BCE Inc., its former and present subsidiaries, affiliates, divisions, directors, officers, employees, agents and representatives and all those who act or have acted on their behalf (with the exception of TINC and the Debtors).

B.    "TINC" means Teleglobe Inc., its former and present directors, officers, employees, agents, and representatives, and all those who act or have acted on their behalf (with the exception of BCE and the Debtors).

C.    The term "Debtors" means, collectively and individually, Teleglobe Holdings (U.S.) Corp., Teleglobe Holding Corp., Teleglobe Marine (U.S.) Inc., Teleglobe Submarine Inc., Teleglobe Investment Corp., Teleglobe Communications Corp., Optel Telecommunications, Inc., Teleglobe USA Inc., Teleglobe Telecom Corp., Teleglobe Luxembourg LLC, and Teleglobe Puerto Rico Inc., their predecessors, subsidiaries, affiliates, divisions, former and present directors, officers, employees, agents, and representatives, and all those who act or have acted on their behalf (with the exception of BCE and TINC).

D.    "GlobeSystem" means the capital expenditure program devised and/or deployed by TINC and the Debtors between about 1999 and 2002.

E.    This rider applies to all documents in your possession, custody and/or control, regardless of the location of such documents, and includes documents in the possession, custody and/or control of your employees, agents, representatives and all others who act or have acted on your behalf.

F.    The definitions and rules of construction set forth in Fed. R. Bankr. P. Rule 7034 (and F. R. Civ. P. 34) shall govern and apply to this Subpoena. The term "documents," as used below, means all written, recorded, graphic materials and computer files of every kind. "Documents" include, but are not limited to, letters, e-mails, telegrams, telexes, teletransmissions, cables, internal and interoffice memoranda, reports, presentations, agreements, financial statements, notebooks, hand written notes, drafts of documents, copies of documents that are not identical duplicates of the originals, and copies of documents the originals of which are not in your possession, custody or control. The term "computer files" includes information stored in, or accessible through, computer or other information retrieval systems. You should produce documents that exist in machine-readable form, including documents stored in personal computers, portable computers, personal display assistants, workstations, minicomputers, mainframes, servers, backup disks and tapes, archive disks and tapes, and any other forms of online or offline storage, whether physically located on your premises or at any other facility.

G.    As used below, the term "relating to" means in whole or in part constituting, containing, concerning, discussing, describing, analyzing, identifying and/or stating.

- 3 -

H.    The terms "and" and "or" have both conjunctive and disjunctive meanings.  The use of the singular of any word includes the plural of that word, and vice versa.

I.    Each document is to be produced in its entirety, without abbreviation or redaction. In the event that a copy of a document, the production of which is requested, is not identical to any other copy thereof, by reason of any alterations, marginal notes, comments, or material contained therein or attached thereto, or otherwise, all such non-identical copies shall be produced separately.

J.    Documents that are stapled, clipped, or otherwise attached or fastened together in their original condition shall be produced in such form.  Documents that are segregated or separated from other documents by use of binders, files, subfiles, dividers, tabs, or any other method, shall be left so segregated or separated.  Documents shall be produced in the order in which they are maintained in your files, and shall not be shuffled or otherwise rearranged.

K.    In the event that any document called for by this Subpoena is withheld on the basis of a claim of privilege, each such document is to be described with sufficient particularity to allow the issuing party to review and the Bankruptcy Court to rule on the claim of privilege, by identifying, without limitation: (i) all authors and addressees; (ii) any indicated or blind copies; (iii) the document's date, subject matter, number of pages, and attachments or appendices thereto; (iv) all persons to whom the document was sent or distributed; (v) its present custodian; (vi) the paragraph of this Subpoena to which the document relates; and (vii) the nature of the privilege asserted.

L.    In the event that any document called for by this Subpoena has been destroyed, discarded or otherwise lost, the following information shall be provided for each such document: (i) all authors and addressees; (ii) any indicated or blind copies; (iii) the document's date, subject matter and number of pages; (iv) the date of the document's destruction or discard and the reason therefore; and (v) whether any copies of the document presently exist, and if so, the name of the custodian of each copy.

M.    If no documents exist that are responsive to a particular request listed below, the recipient shall so state in writing.

N.    Each request in this Subpoena shall be deemed continuing so as to require prompt, supplemental production of additional responsive documents that are received, generated or discovered after the time of original production.

O.    Each request in this Subpoena shall be answered separately and fully.

### Requested Documents

Kindly produce documents relating to the following matters:

1.    The employment of any director, officer, employee, agent, or representative by TINC or the Debtors who was employed by or served as a director of BCE, including, but not

03/10/2004  14:55 FAX  3026587567          ROSENTHAL MONHAIT          → HAHN HESSEN          ☑ 006/008

limited to, employment agreements and all other related agreements such as severance agreements.

2.     The terms of compensation, incentives, benefits and/or all other perquisites that were offered by and/or are available from BCE to persons who served as an employee, officer or director of TINC and/or any of the Debtors after February 2000, including but not limited to salaries, bonuses, stock options, warrants, grants, pensions, retirement benefits, severance benefits, use of automobiles, travel allowances, relocation benefits, computer devices, and/or life, health, disability, or medical insurance.

3.     The duties, responsibilities and/or job descriptions of all persons employed by BCE between February 2000 and the present who served as an employee, officer or director of TINC and/or the Debtors.

4.     The propriety and/or purpose of having persons serve as an employee, officer or director of any of the Debtors while simultaneously serving as an employee, director or officer of BCE or TINC.

5.     The assumption, adoption and/or integration by BCE of TINC's and/or the Debtors' operations, management and/or business functions after February 2000.

6.     The financing and/or funding of GlobeSystem, including, but not limited to, budgets, forecasts, and management presentations.

7.     The effects on BCE's, TINC's and/or the Debtors' creditors of (a) BCE's November 2000 acquisition of all outstanding TINC stock; (b) any adjustment or reduction to the GlobeSystem capital expenditure plan; and (c) BCE's April 2002 decision to cease funding TINC's and/or the Debtors' operations.

8.     BCE's financial support, financial commitment and/or financing of (a) TINC, (b) the Debtors and/or (c) GlobeSystem.

9.     TINC's and/or the Debtors' reliance on BCE for funding and/or financial support.

10.     All capital infusions, equity infusions, loans and/or advances made by BCE to TINC and/or the Debtors, including, but not limited to (a) the date of each infusion, loan or advance, (b) the amount thereof, (c) the purpose thereof, and (d) the recipient thereof.

11.     All actual and projected sources of funding for GlobeSystem, TINC, and/or the Debtors, including, but not limited to, public and private debt and equity markets, contributions from BCE, income from TINC's and/or the Debtors' operations, strategic partnering and vendor financing.

03/10/2004  14:55 FAX  3026587567          ROSENTHAL MONHAIT          → HAHN HESSEN          ☑ 007/008

12.     BCE's role or involvement in and/or discussion of any of the following:

      a.     the preparation of TINC's 2000 and 2001 financial statements;

      b.     the negotiations and/or procurement of the Facility A 364-Day Revolving Credit Agreement among TINC, Bank of Montreal and certain lenders dated as of July 24, 2000, the Facility B 364-Day Revolving Agreement among Teleglobe Holdings (U.S.) Corporation, Excel Communications, Inc. and certain lenders, any and all amendments and renewals thereof and all agreements related thereto including, without limitation, guaranties thereof; and

      c.     TINC's and/or the Debtors' efforts (i) to secure funding and/or financing and/or (ii) to locate a strategic investment partner.

13.     The departure, resignation and/or termination of Terence J. Jarman and Jean C. Monty from the employment and/or board of directors of BCE, TINC and/or the Debtors.

14.     BCE's decision to cease funding TINC's and the Debtors' operations.

15.     BCE's guaranty of any of TINC's and/or the Debtors' obligations, and/or any consideration or refusal by BCE to guaranty any of TINC's or the Debtors' obligations.

16.     Whether the "spin off" of Nortel or the sale of about 20% of Bell Canada would sufficiently fund BCE's purchase of TINC and/or the deployment of GlobeSystem.

17.     Meetings of board of directors, audit committees, corporate governance committees, and any other meetings relating to any of the aforementioned topic areas, along with copies of all documents circulated in conjunction with each such meeting.

18.     The BCE initiative known as "Project X," which appears to have involved the withdrawal of funding to TINC, the Debtors, and/or GlobeSystem.

# EXHIBIT 2

FEB-09-04   06:58PM   FROM-HAHN & HESSEN LLP                   212 594 7167              T-262  P 002/028  F-969



### HAHN&HESSEN LLP
#### ATTORNEYS

John P. Amato
Member of the Firm

Direct Dial: (212) 478-7380
Email: jamato@hahnhessen.com

February 9, 2004

<u>Via Facsimile and Hand Delivery</u>

George J. Wade, Esq.
Daniel Schimmel, Esq.
Shearman & Sterling LLP
599 Lexington Avenue
New York, New York 10022-6069

     Re:   *In re* Teleglobe Communications Corp., *et al.*
            Case No. 02-11518 (MFW)

Dear Counsel:

    On behalf of the Official Committee of the Unsecured Creditors (the "Committee"), we approached your firm to determine whether BCE, Inc. ("BCE") and certain individuals, all of whom are or were under BCE's control or employment, would submit voluntarily to the Committee's request for discovery under Bankruptcy Rule 2004.

    We forwarded a copy of the Committee's document request and identified the individuals the Committee is interested in deposing. We were encouraged when you agreed, on BCE's and the individuals' behalf, to produce documents responsive to the Committee's requests and to produce a number of the individuals for depositions, without the need for judicial intervention.

    Over the past few months, we have been discussing the parameters of the discovery and the terms of a confidentiality agreement, which agreement BCE asked the Committee to consider. The confidentiality agreement was intended to address BCE's concerns that discovery obtained in the Rule 2004 context could be disseminated to third-parties and in other pending actions involving BCE.

    We have endeavored to address BCE's concerns, but, regrettably, there are a number of obstacles we must overcome before executing any such agreement. For instance, BCE is permitted to shield documents from disclosure to third-parties provided that the document is "confidential, proprietary, or commercially sensitive." While the latter two designations have a fairly limited and understood meaning, the "confidential" designation provides considerable leeway to BCE. Although the Committee may challenge any designation, we do not want to create collateral and potentially costly litigation to address whether any particular document truly is confidential. Thus, a more precise definition of "confidential" is required.

*488 Madison Avenue ● New York, N.Y. 10022 ● Phone (212) 736-1000 ● (212) 478-7200*
*Fax (212) 478-7400 ● Email: thefirm@hahnhessen.com*

FEB-08-04   06:59PM   FROM-HAHN & HESSEN LLP                    212 594 7167              T-262   P 003/028   F-369

HH

February 9, 2004
Page 2

Furthermore, under the proposed agreement, individual Committee members' ability to share information with their institutions or other counsel for use in Teleglobe related proceedings is prohibited. The agreement, if signed in its present form, surely will spawn collateral litigation concerning the proper identification and use of confidential information. For instance, we see too many opportunities for potentially intractable conflict issues to arise.

We nevertheless would like to continue working with you to reach a workable agreement. We have revised the confidentiality agreement, which should address both the Committee's and BCE's concerns. The agreement is enclosed for your review. In the interim, we would like to begin reviewing documents that BCE does not consider confidential, commercially sensitive or proprietary. We do not believe this would inconvenience BCE given Mr. Schimmel's indication that documents are ready for the Committee's review.

We understand your firm has identified approximately 100 boxes of documents belonging to Messrs. Michael Boychuk, Francois Gauvin, Terence Jarman, Michel Lalande, David Masse, Jean Monty, and Stephen Skinner (the "Individuals"), which documents either concern the Teleglobe entities or are responsive to the Committee's document requests and are located in New York and Canada. We have personnel available to review the documents in New York the week of February 9th and in Montreal beginning the following week.

Also, to the extent you have prepared a log identifying the "confidential" documents, we would ask for that to be produced as well. We would like to proceed expeditiously as it is our intent to begin the Rule 2004 examinations of the Individuals in March 2004.

Because the next omnibus hearing in Teleglobe is scheduled for February 20, 2004, we will proceed to file an application tomorrow seeking Rule 2004 discovery from BCE in order to comply with the Court's notice rules. It is our intention, however, to resolve the discovery issues with you before the hearing date and to withdraw the application. If we are unable to resolve these issues, we will proceed with the application. Proceeding in this manner will also obviate expending additional time working to resolve issues that cannot be resolved without court guidance. We appreciate your continued cooperation and look forward to a prompt response.

Very truly yours,

John P. Amato

Enclosure

# EXHIBIT 3

# SHEARMAN & STERLING LLP

FAX: 212-848-7179
TELEX: 667290 WUI
www.shearman.com

599 LEXINGTON AVENUE
NEW YORK, N.Y. 10022-6069
212 848-4000

ABU DHABI
BEIJING
BRUSSELS
DÜSSELDORF
FRANKFURT
HONG KONG
LONDON
MANNHEIM
MENLO PARK
MUNICH
NEW YORK
PARIS
ROME
SAN FRANCISCO
SINGAPORE
TOKYO
TORONTO
WASHINGTON, D C.

WRITER'S DIRECT NUMBER:

(646) 848-4608

WRITER'S EMAIL ADDRESS:
DSchimmel@shearman.com

April 21, 2004

By Facsimile and U.S. Mail

Zachary G. Newman, Esq.
Hahn & Hessen LLP
488 Madison Avenue
New York, NY 10022

Dear Zachary:

        We have become aware that certain privileged documents were inadvertently produced to you. The documents bear bates numbers R. 2004-BCE 072643-48. Pursuant to paragraph 21 of the Confidentiality Stipulation, we request that these documents and any copies made of those documents be returned to us within two days from receipt of this letter.

        In addition, it appears that Exhibits 8, 9, and 17, attached as Exhibit I to the Committee's motion to compel, contain privileged information and are the property of BCE. We ask that they also be immediately returned to us.

Sincerely,

Daniel Schimmel

*Shearman & Sterling LLP is a limited liability partnership organized in the United States under the laws of the State of Delaware, which laws limit the personal liability of partners*

NYDOCS04/400812 1