## IN THE UNITED STATE DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: Teleglobe Comm. *et al.*, | ) | Chapter 11 |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | Bankr. Case No. 02-11518 (MFW) |
| ──────────────────────── | ) | |
| | ) | |
| Teleglobe USA Inc. *et al.*, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. Action No. 04-1266 (SLR) |
| | ) | |
| BCE Inc. *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

### ANSWER OF DEFENDANTS TO THE AMENDED COMPLAINT

Defendants BCE Inc. and Michael T. Boychuk, Marc A. Bouchard, Serge Fortin, Terence J. Jarman, Stewart Verge, Jean C. Monty, Richard J. Currie, Thomas Kierans, Stephen P. Skinner, and H. Arnold Steinberg (hereinafter referred to collectively as the "Defendants" unless referenced individually) submit their Answer to the Amended Complaint filed on April 3, 2006 by Plaintiffs Teleglobe Communications Corporation et al. (collectively the "Debtors") and the Official Committee of Unsecured Creditors of the Debtors (the "Committee"), and hereby respond to the allegations in the Amended Complaint as follows (where paragraph numbers correspond to the paragraph numbers in the Amended Complaint):

### Introduction

1.    Deny the averments of paragraph 1, except state that the Amended Complaint speaks for itself.

2.    Deny the averments of paragraph 2, except state that the Amended Complaint speaks for itself.

3.    Admit the averments of sentence three of paragraph 3, except state that Teleglobe Inc. ("TI") was involved in various other businesses from time to time; and deny the

averments of sentence four, except state that TI and its Canadian affiliates had business relationships worldwide.

4.    Admit the averments of paragraph 4, except state that BCE Inc. ("BCE") disposed of its interests in BCE Emergis in May 2004 and most of its interests in CGI in January 2006.

5.    Deny the averments of sentence three of paragraph 5, except state that as of August 31, 2000, Bell Canada owned 23% of TI, Kenny A. Troutt and related entities owned 18%, Charles Sirois and Telesystem Telecom Ltd. owned 9%, and the remainder of TI was owned by public shareholders.

6.    Deny the averments of sentence two of paragraph 6, except state that the acquisition of TI by BCE was a strategic transaction; and that BCE paid billions of dollars (primarily in shares of its common stock) for the 77% of TI that it did not own.

7.    Deny the averments of paragraph 7, except state that the Debtors were involved in the construction, operation and maintenance of the GlobeSystem.

8.    Deny the averments of paragraph 8, except state that, in 1999, TI's directors were advised that the estimated cost to build GlobeSystem was $5 billion.

9.    Deny the averments of paragraph 9, except admit that the Debtors did not possess $6 billion in cash.

10.    Deny the averments of paragraph 10.

11.    Deny the averments of paragraph 11.

12.    Deny the averments of paragraph 12, except state that the Amended Complaint speaks for itself.

## JURISDICTION AND VENUE

13.    Admit the averments of paragraph 13.

14.    Admit the averments of paragraph 14.

DB01:2077483.1                                    059825.1001

15.     Admit the averments of paragraph 15.

16.     Admit the averments of paragraph 16.

17.     Admit the averments of paragraph 17.

18.     Admit the averments of paragraph 18.

19.     State, with respect to the averments of paragraph 19, that Defendants consent to the entry of final orders and/or judgments by the United States District Court for the District of Delaware with respect to this adversary proceeding, the references to the bankruptcy court hearing having been withdrawn.

## PARTIES

20.     Admit the averments of paragraph 20.

21.     Deny the averments of the first sentence of paragraph 21; state that Defendants are without knowledge or information sufficient to form a belief as to the truth of sentence two of paragraph 21, except state that Teleglobe Communications Corporation ("TCC"), Teleglobe USA Inc. ("TUSA"), Optel Telecommunications, Inc. ("OTI") were headquartered in Reston, Virginia; and deny the averments of sentence three, except state that TCC and certain other of its affiliates were subsidiaries of TI and were involved in the construction of GlobeSystem.

22.     Admit the averments of paragraph 22.

23.     Deny the averments of sentence two of paragraph 23, except state that Michael T. Boychuk ("Boychuk") was an officer or director of BCE, TI, or certain of the Debtors during various times relevant to this action.

24.     Deny the averments of paragraph 24, except state that Marc A. Bouchard ("Bouchard") is a citizen and resident of Canada and was an officer or director of certain of the Debtors during various times relevant to this action.

DB01:2077483.1

059825.1001

25.     Deny the averments of sentence two of paragraph 25, except state that Serge Fortin ("Fortin") was an officer or director of certain of the Debtors during various times relevant to this action.

26.     Deny the averments of sentence two of paragraph 26, except state that Terence Jarman ("Jarman") was an officer or director of certain of the Debtors during various times relevant to this action.

27.     Deny the averments of sentence two of paragraph 27, except state that Stewart Verge ("Verge") was an officer or director of certain of the Debtors during various times relevant to this action.

28.     State, with respect to the averments of paragraph 28, that the Amended Complaint speaks for itself.

29.     Deny the averments of paragraph 29, except state that Jean C. Monty ("Monty") is a resident of Canada who also spends some time in North Palm Beach; that Monty was Chairman of BCE from April 26, 2000 through April 23, 2002; that Monty was Chief Executive Officer of BCE from May 6, 1998 through April 23, 2002; that Monty was President of BCE from October 1, 1997 through December 1, 2000; that Monty was Chairman of TI from February 15, 2000 through April 23, 2002; and that Monty was Chief Executive Officer of TI from November 1, 2000 through April 23, 2002.

30.     Deny the averments of sentence four of paragraph 30, except state that in April 2002, Richard Currie ("Currie") was appointed Non-Executive Chairman of the Board of BCE; that he was a director of TI from December 2000 to April 23, 2002; and that he was a director of BCE at various times relevant to this action.

31.     Admit the averments of paragraph 31.

32.     Admit the averments of paragraph 32.

33.     Deny the averments of sentence two of paragraph 33, except state that H. Arnold Steinberg ("Steinberg") was a director of TI during various times relevant to this action; and that for certain periods of time he served as a director of Bell Canada International Inc.

34.     State that the Amended Complaint speaks for itself; and further deny the averments of paragraph 34, including the accuracy of Exhibit "A" referenced therein.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

35.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 35, except state that by 1999, TI and certain of its subsidiaries and affiliates owned or operated capacity on a large number of sub-sea fiber optic cable systems and resold that capacity.

36.     Deny the averments of the second sentence of paragraph 36.

37.     Admit the averments of paragraph 37, except state that Exhibit "B" referenced therein is an incomplete corporate organization chart.

38.     Deny the averments of paragraph 38.

39.     Deny the averments of paragraph 39.

40.     Admit the averments of sentence one of paragraph 40, but deny the averments of sentences two through four.

41.     Deny the averments of paragraph 41, except state that BCE raised $5.1 billion in June 1999 by selling 20% of Bell Canada's common stock to Ameritech (which subsequently merged with SBC Communications ("SBC")); that the agreement included put-call rights regarding SBC's 20% interest in Bell Canada Holdings Inc. ("BCH"); and that BCE spun off most its interest in Nortel Networks Inc. ("Nortel").

42.    Deny the averments of sentences three and four of paragraph 42, except state that Monty made statements at a news conference on February 15, 2000, and refer to the videotape or audiotape of such news conference for the contents therein.

43.    Deny the averments of paragraph 43, except state that Monty made statements on February 15, 2000, and refer to the videotape or audiotape of such news conference for the contents therein.

44.    Deny the averments of paragraph 44, and further state that Defendants are without knowledge or information regarding statements made by TI's Chief Financial Officer on February 14, 2000.

45.    Deny the averments of paragraph 45, except state that Monty made statements on February 15, 2000, and refer to the videotape or audiotape of such news conference for the contents therein.

46.    Deny the averments of paragraph 46.

47.    Deny the averments of paragraph 47, except state that TI's board was independent and that the TI Special Committee proposed to defer construction of the more capital intensive aspects of the GlobeSystem, pending improvement in TI's situation.

48.    Deny the averments of paragraph 48, except state that TI's board was independent.

49.    Deny the averments of paragraph 49, except state that the TI board met on May 16, 2000, and refer to the minutes of that meeting for the contents therein.

50.    Deny the averments of paragraph 50, except state that on or about April 11, 2000, Jarman was appointed Chief Executive Officer of TCC by the Board of TCC and replaced Paolo Guidi; that prior to his appointment, Jarman was Vice-Chairman, Corporate at Bell Canada; and that Paolo Guidi remained Chairman of TCC subsequent to April 11, 2000.

51.     Deny the averments of paragraph 51, except state that Boychuk, Treasurer of BCE and
        Bell Canada, was appointed by the Board of TI to replace Claude Seguin as TI's Chief
        Financial Officer on or about May 31, 2000; and that Monty made statements at TI's
        board meeting on May 31, 2000 and refer to the minutes of that meeting for the
        contents therein.

52.     Deny the averments of paragraph 52, except state that Monty became Chairman of TI
        during February 2000; and that on or about May 17, 2000, (a) Verge became President
        of Global Operations of TCC, (b) Bouchard became President, North American
        Markets and Corporate Development of TCC, and (c) Fortin became President of
        Global Markets of TCC.

53.     Deny the averments of paragraph 53.

54.     Deny the averments of paragraph 54, except refer to TI's June 18, 2000 board minutes
        for the contents therein.

55.     Deny the averments of paragraph 55, except refer to TI's June 18, 2000 board minutes
        for the contents therein.

56.     Deny the averments of paragraph 56, except state that BCE agreed to an amendment to
        the Support Agreement, and refer to such document for the contents therein; that BCE
        submitted a support letter to the lenders under the July 2000 Facility A and Facility B
        Credit Agreements (the "New Bank Facility"); and refer to the support letter sent to
        such lenders under the New Bank Facility dated June 29, 2000 for the contents therein.

57.     Deny the averments of paragraph 57, except state that the acquisition agreement
        entered into on February 15, 2000 (the "Acquisition Agreement") was amended on
        June 18, 2000 (the "Amendment"), and refer to that agreement for the contents
        therein.

58.  Deny the averments of paragraph 58, except state that the bank facility in place in the spring of 2000 was replaced with the New Bank Facility of an amount of $1.25 billion; and refer to the terms of the New Bank Facility for the terms contained therein.

59.  Deny the averments of paragraph 59.

60.  Deny the averments of paragraph 60, except state that TI issued its second quarter report for the period ended June 30, 2000 and refer to such document for the contents therein.

61.  Deny the averments of paragraph 61, except state that Monty made statements on August 9, 2000 regarding the 2000 second quarter results for TI, and refer to the transcript of that call for the contents therein.

62.  Deny the averments of paragraph 62, including the accuracy of Exhibit "C" referenced therein.

63.  Deny the averments of paragraph 63.

64.  Deny the averments of paragraph 64.

65.  Deny the averments of paragraph 65, except state that Boychuk was appointed TI's Chief Financial Officer and Executive Vice President – Finance on May 31, 2000 and resigned from his positions of Chief Financial Officer and Executive Vice President on April 23, 2002; that from September 29, 2000 through April 23, 2002, Boychuk was a director of Teleglobe Holdings (U.S.) Corporation ("THUS"), Teleglobe Holding Corp. ("THC"), Teleglobe Marine (U.S.) Inc. ("TMI"), Teleglobe Submarine, Inc. ("TSI") and Teleglobe Investment Corp. ("TIC"); that from September 29, 2000 through April 23, 2002, Boychuk was President and Treasurer of THC; that from November 1, 2000 through April 23, 2002, Boychuk was President and Treasurer of THUS and TIC; that Boychuk was Chairman, President and Chief Executive Officer

8

of TMI; and that Boychuk was Chief Executive Officer of TSI from September 29, 2000 through April 23, 2002.

66.    Deny the averments of paragraph 66, except state that Bouchard became President, North American Markets & Corporate Development of TCC on or about May 17, 2000; that he became a director of THUS, THC and TIC on November 1, 2000 and remained in such positions through January 23, 2002; that he was a director of OTI and TUSA for a period of time until January 23, 2002; that he was TUSA's President-North American Markets & Corporate Development for a period of time until February 16, 2002; and that prior to May 17, 2000, Bouchard was President and CEO of Bell Nexxia, a BCE subsidiary.

67.    Admit the averments of paragraph 67.

68.    Deny the averments of paragraph 68, except state that Jarman was Vice-Chairman, Corporate of Bell Canada from January 2000 through approximately April 11, 2000; that Jarman was President and Chief Executive Officer of Bell Nexxia from June 7, 1999 until January 26, 2000; that Jarman was appointed Chief Executive Officer of TCC on or about April 11, 2000 and remained in such position through January 23, 2002; and that Jarman served as a director of TI between December 15, 2000 and January 23, 2002.

69.    Deny the averments of paragraph 69, expect state that Fortin was President of Bell Actimedia from approximately January 2000 until approximately May 17, 2000, at which time he was appointed President, Global Markets of TCC; and that he served as a director of TCC, TUSA, THUS, THC, TIC, TMI, TSI and Teleglobe Telecom Corp. ("TTC") in May 2002.

DB01:2077483.1                                                                                           059825.1001

70. Deny the averments of paragraph 70, except state that on or about May 17, 2000, Verge was appointed President, Global Operations of TCC; and that Verge was an officer of TCC, TUSA and OTI for various periods of time.

71. Deny the averments of paragraph 71, except state that a Notice of Special Meeting and Management Information Circular of Teleglobe Inc. regarding the arrangement involving BCE Inc. and Teleglobe Inc. dated September 27, 2000 was issued, and refer to such document for the contents therein.

72. Deny the averments of paragraph 72.

73. Deny the averments of paragraph 73, except state that Boychuk signed several trademark assignments on behalf of TI, and refer to such assignments for the contents therein.

74. Deny the averments of paragraph 74, except state that TI utilized tax losses against gains resulting from the sale by TI of shares of stock of Nortel Networks, which was consistent with common practices in Canada.

75. Deny the averments of paragraph 75.

76. Deny the averments of paragraph 76, except state that a Stock Purchase Agreement dated August 26, 2001, was entered into by Vartec Telecom Holding Company, Teleglobe Inc., and Teleglobe Holdings (U.S.) Corporation; and an Amended and Restated Stock Purchase Agreement dated as of April 5, 2002 was entered into by Vartec Telecom, Inc., Vartec Telecom Holding Company, Excel Communications, Inc., Excelcom, Inc., Telco Communications Group, Inc., Excel Telecommunications (Canada) Inc., TI and THUS regarding the sale of Excel and refer to such document for the contents therein.

77. Deny the averments of paragraph 77.

78. Deny the averments of paragraph 78.

10

79.    Deny the averments of paragraph 79.

80.    Deny the averments of paragraph 80, except state that on November 1, 2000, BCE

completed its acquisition of TI's outstanding shares pursuant to the Acquisition

Agreement and the terms of the Amendment; that BCE's funding commitments under

the Amendment expired upon completion of the acquisition; and that Defendants refer

to such agreements for the contents therein.

81.    Deny the averments of paragraph 81, except state that on January 24, 2001 a TI board

meeting was held and refer to the TI board materials for the contents therein.

82.    Deny the averments of paragraph 82, except state that Defendants refer to the New

Bank Facility for the contents therein.

83.    Deny the averments of paragraph 83, except state that Monty, Currie, and Thomas

Kierans ("Kierans") attended the TI board meeting held on January 24, 2001; that the

members of TI's board were Monty, Currie, Kierans, Jarman and Steinberg at the

time; and refer to the materials of the January 24, 2001 TI board meeting for the

contents therein.

84.    Deny the averments of paragraph 84, except state that BCE held a board meeting on

January 24, 2001 and refer to such BCE board materials for the contents therein; and

refer to the board materials of the January 24, 2001 TI board meeting for the contents

therein.

85.    Deny the averments of paragraph 85, except state that at its meeting on February 28,

2001, the board of directors of TI considered board materials and refer to such board

materials for the contents therein.

86.    Deny the averments of paragraph 86, except state that on February 28, 2001, the TI

board approved the 2001 budget of TI; that Monty and Currie attended that meeting in

11

their capacity as directors of TI; and refer to the TI board materials for the contents therein.

87.    Deny the averments of paragraph 87.

88.    Deny the averments of the first sentence of paragraph 88; deny the averments of the second sentence, except state that the Debtors were involved in the construction, operation and maintenance of the GlobeSystem; deny the averments of the third sentence, except state that on November 28, 2001, the BCE board adopted a resolution regarding TI giving discretion to the Chairman and Chief Executive Officer of BCE concerning whether and when to fund TI and refer to the resolution for the contents therein; and deny the averments of the fourth sentence.

89.    Deny the averments of paragraph 89.

90.    Deny the averments of paragraph 90, except state that TI held a board meeting on January 24, 2001, and that the materials prepared for that meeting contained a Schedule of Authorities, which was adopted by the TI Board of Directors, and refer to such Schedule of Authorities and the January 24, 2001 TI board meeting minutes for the contents therein.

91.    Deny the averments of paragraph 91, except state that  BCE had in place a board-approved Schedule of Authorities and refer to such Schedule of Authorities for the contents therein.

92.    Deny the averments of paragraph 92, except state that on February 28, 2001 TCC adopted a Policy of Authorizations and refer to such Policy of Authorizations for the contents therein.

93.    Deny the averments of paragraph 93, except state that on February 28, 2001 TI's Board of Directors approved the budget of TI and refer to the TI board materials for the contents therein.

12

059825.1001

94. Deny the averments of paragraph 94, except state that Defendants refer to the TI and BCE Schedules of Authorities and the January 24, 2001 TI Board materials for the contents therein.

95. Deny the averments of paragraph 95, except state that Defendants refer to the TI Schedule of Authorities and the January 24, 2001 TI Board materials for the contents therein.

96. Deny the averments of paragraph 96.

97. Deny the averments of sentence two (including (a) and (b)) of paragraph 97, except state that Defendants refer to the Purpose and Summary Statement dated February 28, 2001 for the contents therein.

98. Deny the averments of paragraph 98, except state that TI held a board meeting on February 28, 2001, and that the materials prepared for that meeting contained a Solvency Certificate, and refer to such Solvency Certificate and board materials for the contents therein.

99. Deny the averments of paragraph 99, except state that there is a Solvency Certificate dated February 28, 2001 and refer to such certificate for the contents therein.

100. Deny the averments of paragraph 100, except refer to the February 28, 2001 TI Board materials, including the TI budget, for the contents therein.

101. Deny the averments of paragraph 101, except state that the transfer of Nortel shares from BCE to TI was approved at the February 28, 2001 TI board meeting and refer to the board materials of that meeting for the contents therein; and that TI sold the Nortel shares and paid for the retracted Fifth Series Preferred shares held by BCE with the proceeds from the sale of the Nortel shares.

102. Deny the averments of paragraph 102.

103.    Deny the averments of paragraph 103, except state that the TI board adopted a board resolution on October 24, 2001, and refer to that resolution for the contents therein.

104.    Deny the averments of paragraph 104, except state that on November 28, 2001 the TI board adopted a resolution; that BCE's board adopted a resolution; and refer to those resolutions for the contents therein.

105.    Deny the averments of paragraph 105, except state that on November 28, 2001 BCE's board adopted Resolution No. 7 and refer to that Resolution for the contents therein.

106.    Deny the averments of paragraph 106.

107.    Deny the averments of paragraph 107.

108.    Deny the averments of paragraph 108, except state that the Defendants refer to the January 11, 2001 e-mail referenced therein for the contents thereof.

109.    Deny the averments of paragraph 109.

110.    Deny averments of paragraph 110, except state that the Defendants refer to TI's Financial Information dated April 24, 2001 for the contents therein.

111.    Deny the averments of paragraph 111, except state that Monty made statements on BCE's first quarter 2001 conference call, held on April 25, 2001, and refer to the transcript of such call for the contents therein.

112.    Deny the averments of paragraph 112, except state that Monty made statements at the December 12, 2001 annual investor conference, and refer to the transcript of such conference for the contents therein.

113.    Deny the averments of paragraph 113, and refer to the document mentioned in paragraph 113 for the contents therein.

114.    Deny the averments of paragraph 114, except state that Monty did issue a written statement to TCC employees on January 25, 2002, and refer to such written statement for the contents therein.

14

115.    Deny the averments of paragraph 115, except state that BCE sent a letter of support to BMO Nesbitt Burns, as arranger for the lending syndicate of TI, dated July 23, 2001, and refer to such letter for the contents therein.

116.    Deny the averments of paragraph 116, except state that prior to BCE's letter of support to BMO Nesbitt Burns dated July 23, 2001, Pierre Van Gheluwe and Siim Vanaselja sent letters to certain lenders in the TI syndicate; that those letters attached a portion of the transcript from BCE's first quarter 2001 conference call held on April 25, 2001; and refer to such letters for the contents therein.

117.    Deny the averments of paragraph 117, except state that on June 11, 2001 Michael Sabia met with a representative of Bank of Montreal, lead bank and arranger for the lending syndicate of TI.

118.    Deny the averments of paragraph 118, except state that TI made an oral and written power point presentation to the lenders of the New Bank Facility on June 21, 2001, and refer to the written presentation for the contents therein.

119.    Deny the averments of paragraph 119 and refer to the written power point presentation made by TI to the lenders of the New Bank Facility on June 21, 2001 for the contents therein.

120.    Defendants are without knowledge or information sufficient to form a belief as to the source of the information contained in the documents cited in paragraph 120 or the meaning of the handwritten notes on such documents; Defendants deny the remaining averments of paragraph 120.

121.    Defendants are without knowledge or information sufficient to form a belief as to the source of the information contained in the documents cited in paragraph 121 or the interpretation thereof; Defendants deny the remaining averments of paragraph 121.

15

122.    Deny the averments of paragraph 122, except state that BCE has been named as a
defendant in two separate lawsuits relating to the sale of the assets of Excel
Communications, Inc. to VarTec Telecom Inc.; that that transaction closed on April 5,
2002; and that on April 8, 2002, BCE issued a press release regarding Teleglobe; and
refer to that press release and the two complaints for the contents therein.

123.    Admit the averments of the first sentence of paragraph 123; deny the remaining
averments of paragraph 123, except refer to the VarTec complaint for the contents
therein.

124.    Deny the averments of paragraph 124, except refer to the VarTec complaint for the
contents therein.

125.    Admit the averments of the first sentence of paragraph 125, and state that the court in
the Smith action granted BCE's motion for summary judgment by order dated
November 29, 2005; deny the remaining averments of paragraph 125, except refer to
Smith's submission and to the court's November 29, 2005 summary judgment order
for the contents therein.

126.    Deny the averments of paragraph 126, except refer to Smith's affidavit and to the
court's order dated November 29, 2005 granting BCE's motion for summary judgment
for the contents therein.

127.    Deny the averments of paragraph 127, except refer to Williamson's affidavit in that
action and to the court's order dated November 29, 2005 granting BCE's motion for
summary judgment for the contents therein.

128.    Admit the averments of paragraph 128, and state that the court in the Smith action
subsequently granted BCE's motion for summary judgment by order dated November
29, 2005 and refer to such order for the contents therein.

DB01:2077483.1                                                                    059825.1001

129.   Deny the averments of paragraph 129, except state that on March 7, 2002, the law firm of Osler, Hoskin & Harcourt ("Osler") wrote to the Canada Customs and Revenue Agency and refer to the March 7, 2002 Osler letter for the contents therein.

130.   Deny the averments of paragraph 130, except state that Defendants refer to the March 7, 2002 Osler letter for the contents therein.

131.   Deny the averments of paragraph 131, except state that Defendants refer to the March 7, 2002 Osler letter for the contents therein.

132.   Deny the averments of paragraph 132, except state that Defendants provided responses to the referenced inquiries and refer to the inquiries and responses for the contents therein.

133.   Deny the averments of paragraph 133.

134.   Deny the averments of paragraph 134.

135.   Deny the averments of paragraph 135 and refer to the January 21, 2001 e-mail referenced therein for the contents thereof.

136.   Deny the averments of paragraph 136 and refer to the referenced statement for the contents therein.

137.   Deny the averments of paragraph 137, except state that on March 1, 2002 Charles Childers, then president of BCE Teleglobe, wrote to John Honeycutt at Fox Sports regarding a potential business opportunity, and refer to Mr. Childers' letter to Mr. Honeycutt for the contents therein.

138.   Deny the averments of paragraph 138, except state that Mr. Vanaselja spoke at a meeting on March 5, 2002, and refer to the transcript of such meeting for the contents therein.

139.   Deny the averments of paragraph 139.

059825.1001

140. Deny the averments of paragraph 140, except state that a document dated July 13, 2001 entitled Summary Performance Review included a section entitled "BCE LIQUIDITY OUTLOOK" and refer to such document for the contents therein.

141. Deny the averments of paragraph 141, except state that on or about September 26, 2001, a Monte Carlo simulation was performed by Patrick Pichette and Bernard LeDuc, and refer to the document referenced in paragraph 141 for the contents therein.

142. Deny the averments of paragraph 142, except state that on November 21, 2001, CSFB made an oral and written presentation to BCE, and refer to the written presentation and the other documents cited in this paragraph for the contents therein.

143. Deny the averments of paragraph 143, except state that on November 26, 2001, Merrill Lynch made an oral and written presentation to BCE, and refer to the written presentation for the contents therein.

144. Deny the averments of paragraph 144, except state that on November 28, 2001, BCE's board of directors adopted a resolution authorizing up to an additional $850 million in funding to TI; and refer to that resolution and the board materials of that meeting for the contents therein.

145. Deny the averments of paragraph 145, except state that a representation letter of TI, dated January 23, 2002, and an inaccurate initial version of a representation letter of TI, dated February 27, 2002, were signed; that the initial version of the February 27, 2002 letter was corrected; and refer to those documents for the contents therein.

146. Deny the averments of paragraph 146, except state that the initial version of TI's representation letter, dated February 27, 2002 was corrected; and refer to those documents for the contents therein.

DB01:2077483.1                                                                                          059825.1001

147.    Deny the averments of paragraph 147, except state that TI's 2001 Financial
        Information was clarified between February 28, 2002 and the date of filing, and refer
        to the drafts and final version of such document for the contents therein.

148.    Deny the averments of paragraph 148.

149.    Deny the averments of paragraph 149.

150.    Deny the averments of paragraph 150, except state that Defendants refer to the
        January 24, 2001 presentation to the TI board referenced therein for the contents
        thereof.

151.    Deny the averments of paragraph 151.

152.    Deny the averments of paragraph 152, except state that Defendants refer to TI's
        consolidated balance sheet for the period ending December 31, 2000 for the contents
        therein; and that Defendants refer to the January 24, 2001 TI board materials for the
        contents therein.

153.    Deny the averments of paragraph 153.

154.    Deny the averments of paragraph 154.

155.    Deny the averments of paragraph 155.

156.    Deny the averments of paragraph 156, except state that Defendants refer to BCE's and
        TI's financial statements for the year ending December 31, 2000 for the contents
        therein.

157.    Deny the averments of paragraph 157, except state that Defendants refer to the
        relevant accounting principles in effect at the time of the TI acquisition for the
        contents therein.

158.    Deny the averments of paragraph 158, except state that no impairment of TI's
        goodwill existed in February 2001.

059825.1001

159.    Deny the averments of paragraph 159, except state that Defendants refer to the e-mail dated April 6, 2001 and attached memorandum for the contents therein.

160.    Deny the averments of paragraph 160, except state that BCE and TI searched for possible partners and the market for data and data-related services deteriorated in 2001 and that in certain respects the market for data-related services had declined by the late summer or early fall of 2001 and revenue and cash flow were lower than previously expected.

161.    Deny the averments of paragraph 161.

162.    Deny the averments of paragraph 162, except state that Defendants refer to the applicable accounting principles for the contents therein.

163.    Deny the averments of paragraph 163, except state that Marc Bouchard was President, North American Markets & Corporate Development of TCC and that he had previously served as President and CEO of Bell Nexxia, and that there was a meeting of Teleglobe's senior executives on August 30, 2001 regarding a Teleglobe strategic review, and refer to the documents cited for the contents therein.

164.    Deny the averments of paragraph 164, except state that Defendants refer to the September 5, 2001 e-mail for the contents therein.

165.    Deny the averments of paragraph 165.

166.    Deny the averments of paragraph 166.

167.    Deny the averments of paragraph 167, except state that Defendants refer to the e-mail referenced therein for the contents thereof.

168.    Deny the averments of paragraph 168, except state that Defendants refer to the e-mail referenced therein for the contents thereof.

DB01:2077483.1                                                                 059825.1001

169.    Deny the averments of paragraph 169, except state that BCE evaluated goodwill using undiscounted cash flows, and that Defendants refer to the applicable accounting standards regarding goodwill under GAAP for the contents therein.

170.    Deny the averments of paragraph 170.

171.    Deny the averments of paragraph 171.

172.    Deny the averments of paragraph 172.

173.    Deny the averments of paragraph 173.

174.    Deny the averments of paragraph 174, except state that Defendants refer to the e-mail correspondence between Messrs. Neuman and Bouchard for the contents therein.

175.    Deny the averments of paragraph 175, except state that Defendants refer to the e-mail correspondence between Messrs. Neuman and Bouchard for the contents therein.

176.    Deny the averments of paragraph 176, except state that Defendants refer to the e-mail correspondence between Messrs. Neuman and Bouchard for the contents therein.

177.    Deny the averments of paragraph 177.

178.    Deny the averments of paragraph 178, except state that Defendants refer to the impairment test performed by BCE and TI for the contents therein.

179.    Deny the averments of paragraph 179, except state that Defendants refer to the impairment test performed by BCE and TI for the contents therein.

180.    Deny the averments of paragraph 180, except state that Defendants refer to the impairment test performed by BCE and TI for the contents therein.

181.    Deny the averments of paragraph 181.

182.    Deny the averments of paragraph 182, except state that Jarman met with Monty over the 2001 Christmas holiday.

183.    Deny the averments of paragraph 183, except state that Jarman resigned on or about January 23, 2002.

184. Deny the averments of paragraph 184, except state that Daher occasionally communicated with members of Teleglobe's accounting staff.

185. Deny the averments of paragraph 185.

186. Deny the averments of paragraph 186, except state that Defendants refer to the applicable accounting rules regarding goodwill.

187. Deny the averments of paragraph 187.

188. Deny the averments of paragraph 188.

189. Deny the averments of the first sentence of paragraph 189, and further state that Defendants are without knowledge or information regarding the remaining averments.

190. Deny the averments of paragraph 190.

191. Deny the averments of paragraph 191, except state that Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments regarding Mr. Mongrain's instructions to his staff described in paragraph 191.

192. Deny the averments of paragraph 192.

193. Deny the averments of paragraph 193.

194. Deny the averments of paragraph 194.

195. Deny the averments of paragraph 195, except state that BCE issued a press release dated January 23, 2002 regarding its 2001 fourth quarter and year-end results, and refer to the contents therein.

196. Deny the averments of paragraph 196, except state that Defendants refer to the September 25, 2001 memo prepared by Mr. Skinner for the contents therein.

197. Deny the averments of paragraph 197, except state that new U.S. and Canadian accounting rules regarding goodwill went into effect on January 1, 2002 and refer to such rules for the contents therein.

198. Deny the averments of paragraph 198, except state that TI recognized a substantial write-off of goodwill as at January 1, 2002 and refer to the applicable accounting rules for the contents therein.

199. Deny the averments of paragraph 199, except state that BCE and TI used the same cash flow projections in connection with the goodwill impairment analysis under the old accounting rules and the new accounting rules and that they used a period of seven years for the analysis of goodwill impairment under the new accounting rules.

200. Deny the averments of paragraph 200.

201. Deny the averments of paragraph 201, except state that Defendants refer to BCE's and TI's public securities filings for the contents therein.

202. Deny the averments of paragraph 202, except state that Defendants refer to the referenced inquiries and responses for the contents therein.

203. Deny the averments of paragraph 203, except state that Defendants provided responses to the referenced inquiries and refer to such responses for the contents therein.

204. Deny the averments of paragraph 204, except state that Defendants refer to the referenced inquiries and responses for the contents therein.

205. Deny the averments of paragraph 205.

206. Deny the averments of paragraph 206, except state that Defendants provided responses to the referenced inquiries and refer to such responses for the contents therein.

207. Deny the averments of paragraph 207, except state that Defendants provided responses to the referenced inquiries and refer to such responses for the contents therein.

208. Deny the averments of paragraph 208, except state that Defendants provided responses to the referenced inquiries and refer to such responses for the contents therein.

209. Deny the averments of paragraph 209.

210. Deny the averments of paragraph 210.

DB01:2077483.1

059825.1001

211.   Deny the averments of paragraph 211, except state that in March 2002 three individuals, Pierre Lessard, Jerome Huret and Wesley Scott were asked by Monty to consider and provide advice to him regarding Teleglobe and certain other matters related to BCE.

212.   Deny the averments of paragraph 212, except admit that these three individuals had experience in various areas, commenced their work soon after Monty contacted them, and that some or all of them met with Monty and Sabia to discuss Teleglobe and to learn facts regarding their work.

213.   State that Defendants are without knowledge or information sufficient to form a belief as to the truth of the averment that Monty never told Lessard and his colleagues of the BCE board authorization, and deny the remaining averments of paragraph 213.

214.   Deny the averments of paragraph 214.

215.   Deny the averments of paragraph 215, except state that the three referenced individuals submitted a written report of their findings to Monty, and refer to that report for the contents therein.

216.   Deny the averments of paragraph 216, except state that Monty received a copy of the group's written work-product and thanked Mr. Lessard for it.

217.   Deny the averments of paragraph 217, except state that BCE and TI held board meetings on April 23, 2002, and refer to the minutes for the contents therein; that Currie, Kierans, Monty, Michael J. Sabia, and Anthony S. Fell resigned from TI's board on April 23, 2002; and that Boychuk resigned from TI and certain of the Debtors on April 23, 2002.

218.   Deny the averments of paragraph 218, except state that effective April 24, 2002, Monty resigned as Chairman and Chief Executive Officer of BCE; and that BCE

issued a press release on April 24, 2002 entitled "BCE Ceases Long-Term Funding To Teleglobe," and refer to such press release for the contents therein.

219. Deny the averments of paragraph 219, except state that Defendants refer to any resolutions or prior releases of TI for the contents therein.

220. Deny the averments of paragraph 220, except state that BCE issued a press release on April 24, 2002 entitled "BCE Ceases Long-Term Funding To Teleglobe," and refer to such press release for the contents therein; and that Monty was interviewed by *The Globe and Mail* in an article published on May 10, 2003, and refer to such article for the contents therein.

221. Deny the averments of paragraph 221.

222. Deny the averments of paragraph 222, except state that BCE issued a 2003 Annual Report, and refer to such report for the contents therein.

223. Deny the averments of paragraph 223.

224. State that the Amended Complaint speaks for itself.

## AS AND FOR A FIRST CAUSE OF ACTION

225. In response to paragraph 225, Defendants incorporate, as if fully set forth herein, their responses to the preceding paragraphs.

226. Deny the averments of paragraph 226.

227. Deny the averments of paragraph 227.

228. Deny the averments of paragraph 228.

229. Deny the averments of paragraph 229.

230. Deny the averments of paragraph 230.

## AS AND FOR A SECOND CAUSE OF ACTION

231. In response to paragraph 231, Defendants incorporate, as if fully set forth herein, their responses to the preceding paragraphs.

232.   Deny the averments of paragraph 232.

233.   Deny the averments of paragraph 233.

234.   Deny the averments of paragraph 234.

235.   Deny the averments of paragraph 235.

236.   Deny the averments of paragraph 236.

237.   Deny the averments of paragraph 237.

238.   Deny the averments of paragraph 238.

**AS AND FOR A THIRD CAUSE OF ACTION**

239.   In response to paragraph 239, Defendants incorporate, as if fully set forth herein, their responses to the preceding paragraphs.

240.   Deny the averments of paragraph 240.

241.   Deny the averments of paragraph 241.

242.   Deny the averments of paragraph 242.

243.   Deny the averments of paragraph 243.

244.   Deny the averments of paragraph 244.

**AS AND FOR A FOURTH CAUSE OF ACTION**

245.   In response to paragraph 245, Defendants incorporate, as if fully set forth herein, their responses to the preceding paragraphs.

246.   Deny the averments of paragraph 246.

247.   Deny the averments of paragraph 247.

248.   Deny the averments of paragraph 248.

249.   Deny the averments of paragraph 249.

250.   Deny the averments of paragraph 250.

**AS AND FOR A FIFTH CAUSE OF ACTION**

DB01:2077483.1                                                                059825.1001

251.    In response to paragraph 251, Defendants incorporate, as if fully set forth herein, their responses to the preceding paragraphs.

252.    Deny the averments of paragraph 252.

253.    Deny the averments of paragraph 253.

254.    Deny the averments of paragraph 254.

255.    Deny the averments of paragraph 255.

256.    Deny the averments of paragraph 256.

## AS AND FOR A SIXTH CAUSE OF ACTION

257.    In response to paragraph 257, Defendants incorporate, as if fully set forth herein, their responses to the preceding paragraphs.

258.    Deny the averments of paragraph 258.

259.    Deny the averments of paragraph 259.

260.    Deny the averments of paragraph 260.

261.    Deny the averments of paragraph 261.

262.    Deny the averments of paragraph 262.

## AS AND FOR A SEVENTH CAUSE OF ACTION

263.    In response to paragraph 263, Defendants incorporate, as if fully set forth herein, their responses to the preceding paragraphs.

264.    Deny the averments of paragraph 264.

265.    Deny the averments of paragraph 265.

266.    Deny the averments of paragraph 266.

WHEREFORE, Plaintiffs are entitled to no relief and the Court should dismiss their Amended Complaint with prejudice.

Defendants plead the following affirmative defenses without assuming the burden of proof as to any elements of a claim or defense that otherwise would rest on Plaintiffs.

27

DB01:2077483.1                                                                    059825.1001

## AFFIRMATIVE DEFENSES

## AS AND FOR A FIRST AFFIRMATIVE DEFENSE

### STANDING

267.    Plaintiffs lack standing to assert their claims.

## AS AND FOR A SECOND AFFIRMATIVE DEFENSE

### FUNDING TO TI, NOT THE DEBTORS

268.    All funding by BCE, whether present or in the future, was funding to TI, not to the

Debtors.

## AS AND FOR A THIRD AFFIRMATIVE DEFENSE

### STATUTE OF FRAUDS

269.    Plaintiffs' claims arising from BCE's alleged commitment are barred under the

applicable Statutes of Frauds.

## AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

### 8 DEL. C. § 102(B)(7) AND EXCULPATORY CLAUSE

270.    To the extent that Plaintiffs' claims seek monetary damages against the individual

defendants for breaches of fiduciary duty, the claims are barred, in whole or in part, by

8 Del. C. § 102(b)(7) and exculpated under the relevant corporate charters.

## AS AND FOR A FIFTH AFFIRMATIVE DEFENSE

### WAIVER AND ESTOPPEL

271.    Plaintiffs are estopped to assert their claims by reason of their representations

regarding the Debtors' past and future performance, on which Defendants relied.  In

support of this defense, Defendants allege as follows:

272.     Plaintiffs are estopped to challenge Teleglobe's 2002 EBITDA, budget, and

underlying cash flow projections as unreasonable as a result of their written

representations in letters addressed and sent to Teleglobe's auditors (Deloitte &

Touche) that were also circulated to Defendants, as well as representation letters addressed and/or sent to Defendants Boychuk, Skinner, and BCE. Those letters stated that Teleglobe's cash flow projections "were prepared using management's best estimates, based on reasonable and supportable assumptions and considering the currently prevailing market conditions." Such representations were contained in representation letters signed by both Andre Mongrain and John Brunette, in their respective capacities as Senior Vice President, Finance of BCE Teleglobe, and General Counsel and Chief Administrative Officer of BCE Teleglobe. Moreover, both Mongrain and Brunette were officers of Debtors TCC, TUSA and Optel. Those representation letters also stated that the financial information provided in the consolidated financial statements of Teleglobe for the year ended December 31, 2001 are "free of material errors and omissions."

273.    Further, those representation letters were reviewed and approved by senior employees of the Debtors in Reston, Virginia, including lawyers in the Debtors' legal department and officers of the Debtors. Among those reviewing and approving the representation letters were current and former senior employees of the Debtors, including Daniel Snyder (a lawyer in the Debtors' in-house legal department), and Cynthia Eakin (the Executive Director of Financial Planning and Reporting). The letters were also reviewed and approved by Kathy Morgan, who was Assistant Secretary of Debtors TCC and TUSA and an in-house attorney in the Debtors' legal department, has served as the Debtors' Chief Executive Officer, and is now, in her role as Plan Administrator, responsible for overseeing this litigation on behalf of Plaintiffs.

274.    By reason of the representations made by the Debtors' management in the representation letters, Plaintiffs are estopped to assert that Teleglobe's goodwill should have been written down in 2001. For instance, in the February 26, 2002 letter to

Deloitte & Touche, the Debtors' management stated that "[i]n connection with the preparation of the Financial Statements as at December 31, 2001, we have completed this assessment [of the impairment of long-lived assets and intangibles, including goodwill] based on our projection of future undiscounted cash flows and have determined that no impairment exists as at December 31, 2001. The future cash flows were prepared using management's best estimates, based on reasonable and supportable assumptions and considering the currently prevailing market conditions, as to future operating cash flows and residual values." This representation was also made in a February 14, 2002 representation letter from Debtors addressed to Defendant Boychuk.

275.    Plaintiffs are also estopped to assert that TI and the Debtors were insolvent at any time in 2001, since the cash flows that were confirmed and validated in Debtors' representation letters supported a value of TI and the Debtors that exceeded the amount of outstanding debt.

276.    Plaintiffs are estopped to assert that BCE had a legally binding obligation to fund TI or the Debtors beyond the U.S. $1 billion that BCE had contractually agreed to fund. If a contract to provide further funding to TI or the Debtors had existed, it would have had to have been disclosed in Teleglobe's financial statements as a related party transaction, and no such disclosure was made. Further, in representation letters to Teleglobe's auditors signed by Brunette and Mongrain, those officials confirmed that the financial statements of Teleglobe "adequately disclosed" Teleglobe's "economic dependence on another party." The notes to those financial statements contained a section entitled "economic dependence" which expressly indicated that BCE's obligation to fund was limited to U.S. $1 billion.

277.    Plaintiffs are further estopped to assert that BCE had a contractual or other legal obligation to fund Teleglobe by reason of their failure to assert the existence of any such obligation prior to April 23, 2002.  Although Mr. Brunette and Ms. Morgan, both officers and in-house lawyers for the Debtors, were involved in activities related to Project X and understood that BCE was considering the cessation of further funding for Teleglobe, neither of them ever asserted to anyone that BCE had a contractual or other legal obligation to fund Teleglobe.  This was so even though both of them communicated frequently during that period with Teleglobe's own outside legal counsel, Teleglobe's financial advisers, and employees, officers, and in-house legal personnel of BCE.  Thus, BCE proceeded with its decision-making process at that time without ever being advised by these officers and high-level legal personnel of the Debtors that BCE's contemplated action was supposedly in violation of some contractual or other legal right of Teleglobe.

278.    Plaintiffs are also estopped to assert the existence of any contractual or other legal obligation of BCE to fund Teleglobe by reason of their review and approval of Teleglobe's draft public securities documents, which expressly stated that BCE had no obligation to provide any additional funding beyond the contractually committed $1 billion amount.  Such statements were reviewed and approved, without objection or protest, by numerous attorneys in Debtor's legal department in Reston and by officers of Debtors TCC and TUSA, including Mr. Brunette, Ms. Morgan, and Mr. Mongrain.

279.    Plaintiffs are estopped to assert that they were forced to pursue a "fire sale" of the Debtors' Core Telecom Business rather than a stand-alone restructuring due to inadequate funding from BCE, by reason of Debtors' failure to request any such required funding from BCE.  In addition, Debtors are so estopped by reason of the facts alleged below under the Affirmative Defense entitled "Judicial Estoppel."

31

280.    Plaintiffs have waived their argument, and are estopped to assert that, without BCE's
supposed "unequivocal commitment" to continue funding Teleglobe, the members of
the Teleglobe lending syndicate would have refused to renew the Credit Facilities in
2001, and Teleglobe would have been liquidated.  In the summer of 2001, Teleglobe,
the Debtors, and their creditors did not request that Teleglobe and its subsidiaries be
liquidated although the limitation to BCE's obligation to fund was well known and
clearly stated in BCE's and Teleglobe's public securities documents, and in the letter
of support provided by BCE to the Teleglobe lenders.  Therefore, the Debtors have
voluntarily, intentionally, and with knowledge of all material facts, relinquished the
right to assert a claim that, without BCE's "unequivocal commitment" to fund,
Teleglobe would have been liquidated.

## AS AND FOR A SIXTH AFFIRMATIVE DEFENSE

### JUDICIAL ESTOPPEL

281.    Plaintiffs are estopped to assert their claims by reason of their prior inconsistent
positions taken before this Court in the bankruptcy case in which this adversary
proceeding was brought (in the Bankruptcy Case, the Honorable Mary Walrath,
United States Bankruptcy Judge presiding).  In support of this defense, Defendants
allege as follows:

282.    Plaintiffs have recently advanced the claim that in the Bankruptcy Case they should
not have sold their "Core Telecom Business" assets in an alleged "fire sale" in 2002,
but instead should have retained that business and should have done a stand-alone
restructuring that would have allowed  creditors to obtain an equity interest in that
business.  Plaintiffs claim that they would have achieved a much higher value if they
had followed this course.   In addition, Plaintiffs allege in their amended complaint
that by selling its Teleglobe stock at the end of 2002, BCE deprived Teleglobe of any

32

value of its net operating loss carry-forwards, which Plaintiffs allege could have been a source of value to creditors if BCE took steps to help Teleglobe preserve that value.

283.    The doctrine of judicial estoppel bars these claims. Plaintiffs' allegations are expressly contradicted by the prior representations that both the Debtors and Creditors' Committee made to this Court, in the Bankruptcy Case, and by the same law firms that are representing Plaintiffs in this proceeding. They made these representations in order to induce the Court to approve the actions that they now claim were not in their best interests.

284.    Plaintiffs now claim that mid-2002 was the worst possible time to sell the Core Telecom Business and that therefore they should have retained those assets in a stand-alone restructuring. At the time, however, the Debtors represented to the Court that a prompt sale of the Debtors' Core Telecom Business was the optimal course of action since the value of the Core Telecom Business was "unlikely to appreciate with time in a restructuring proceeding." (Debtors' Motion for an Order Authorizing Global Bidding Process, dated June 10, 2002, at ¶ 25(e)). In support of this assertion, the Debtors -- represented by the same counsel now advancing a contrary position on their behalf -- represented to the Court that "numerous major restructurings in the telecommunications industry have clearly established that retaining revenue in any type of protracted restructuring with an uncertain outcome is extremely difficult." Thus, the Debtors contended that the sale of the Core Telecom Business was "in the best interests of the Debtors and their estates."

285.    This position was reiterated in a sworn affidavit submitted by the Debtors' Chief Executive Officer, John Brunette, an experienced attorney, who similarly represented to the Court, in support of Debtors' motion seeking approval of the proposed sale of the Core Telecom Business, that there was "an immediate need to proceed with the

33

sale … as the value of the Core Telecom Business is unlikely to appreciate with time in a restructuring proceeding." (Brunette Aff. dated Oct. 8, 2002 at ¶ 20).

Additionally, in the hearing before the Court on October 9, 2002 on the proposed sale, Mark Collins, a partner of Richards, Layton & Finger (Debtors' counsel in this proceeding), represented to the Court on behalf of his clients that "[t]he Teleglobe companies and the monitor determined, in the exercise of their business judgment, that it was unlikely that the value of the core telecom business would appreciate in a protracted bankruptcy case."

286.   The Creditors' Committee adopted the position advocated by the Debtors in the sales process, with full knowledge of all the relevant circumstances. At a hearing on procedures for the proposed sale process, which took place on June 24, 2002, the Committee's counsel, which continues to represent it before this Court in this proceeding, told the Court that the Committee would be involved in the contemplated sale process and that the Committee was going to consider "whether or not we believe a fair value would be achieved either through a sale process, depending on the consideration or we will also explore from now until the sale hearing, whether or not creditors would best be served by trying to do a stand-alone reorganization of these entities." Counsel for the Committee continued: "we believe we need to know whether or not there are potential bidders out there and then we can try and weigh that against what a stand-alone reorganization may look like to determine how the assets could achieve the best results for creditors." Thus, the Committee considered, but later clearly rejected, the desirability of a stand-alone restructuring.

287.   Mr. Brunette confirmed in his October 8, 2002 affidavit that representatives of the Debtors "had a number of discussions with the financial advisor to the U.S. Creditors' Committee, the advisors to the Teleglobe Lending Syndicate and the ad hoc committee

of the Teleglobe Companies' noteholders" regarding the decisions made in connection with the sale process.

288.    The Debtors submitted in support of the sale motion before the Court a report by the firm Ernst & Young, which was the "Monitor" in the related Canadian bankruptcy proceedings.  Ernst & Young confirmed that "[i]n the event that a sale could not be consummated, the Monitor believes that there would be limited support, if any, from Teleglobe's creditor groups or other stakeholders to pursue other going concern alternatives for this business."

289.    Mr. Brunette confirmed in his affidavit that representatives of the Debtors "had a number of discussions with the financial advisor to the U.S. Creditors' Committee, the advisors to the Teleglobe Lending Syndicate and the ad hoc committee of the Teleglobe Companies' noteholders" regarding the decisions made in connection with the sales process.

290.    Plaintiffs' current allegations that the sale process was disorganized, rushed, and yielded only a "fire sale" price are likewise contradicted by what Plaintiffs told the Court at the time.  The Debtors' filings with the Court repeatedly stressed the regularity of the process, the number of potential buyers contacted, the information gathered for potential purchasers to consider, the extensions made in the deadlines in the sale process, and the involvement of the creditors in all key decisions in the sale process.

291.    Plaintiffs' current claim that the price achieved was inadequate is also contradicted by what they actually said at the time.  In Mr. Brunette's affidavit of October 8, 2002, submitted by the Debtors in support of their sale motion, the Debtors' representative advised the Court that "[t]he Teleglobe Companies believe the purchase price for the Core Telecom Business contained in the Purchase Agreement represents the *fair*

*market value* for the assets of the Core Telecom Business." (Emphasis added). The affidavit stated that "[t]he Teleglobe Companies concur with the Monitor that the competitive bidding process yielded the highest and best offer for the Core Telecom Business and is in the best interest of the Debtors, their creditors and stakeholders." (*Id.* at ¶ 15).

292. The Debtors also submitted in support of their sale motion an affidavit of a representative of Ernst & Young, who likewise stated that the "purchase price for the Core Telecom Business pursuant to the terms of the Purchase Agreement represents the *fair market value* of [those] assets." (Emphasis added.) The affidavit stated that "[t]he Monitor believes the Purchaser's offer represents the highest and best offer attainable for the Core Telecom Business," and that having "compared the purchase price payable pursuant to the Purchase Agreement" to "the trading benchmarks for comparable public companies and to the valuations of recently completed restructuring proceedings," the Monitor concluded that "the estimated Final Purchase Price compare[d] positively to [those] benchmarks."

293. The Debtors repeated this at the hearing on the sale motion on October 9, 2002. At that hearing, Mr. Collins of Richards, Layton & Finger told the Court that "the purchaser's offer represents the highest and best offer attainable for the core telecom business, and is fair and constitutes reasonably equivalent value for the core telecom business."

294. Based upon the Debtors' representations, the Court approved the sale motion. In its October 10, 2002 Order approving the sale, the Court found that the Debtors had established that "the value of the Core Business and Purchased Assets is unlikely to appreciate with time in a restructuring proceeding," and that "[r]etaining revenue in any type of protracted restructuring with an uncertain outcome is extremely difficult."

The Court agreed that the purchase price represented "the highest and best offer for the Core Business and Purchased Assets and is fair and constitutes reasonably equivalent value for the Core Business and Purchased Assets." The Court also found, based on the Debtors' representations, that the marketing process, which began in late April 2002, enabled the parties likely to have an interest in the core business to be identified, and that the bidding process and procedures "maximized the likelihood that potential purchasers would participate in the process."

295.    There is no explanation for the Plaintiffs' radical reversal of their prior positions other than a bad-faith attempt to manipulate the judicial process to their advantage. In 2002, the Plaintiffs wanted to sell the Core Telecom Business in order to avoid the risk associated with owning it. Plaintiffs thus represented to the Court that the sale was fair, that the purchase price was "fair market value," and that neither the Debtors nor the creditors were interested in a stand-alone restructuring. In 2006, the Plaintiffs have decided that they can get more from the Court if they argue that the sale was a "fire sale" at a distressed price and what they really wanted was a stand-alone restructuring after all. The doctrine of judicial estoppel bars Plaintiffs' current attempt to seek an advantage in litigation by disavowing their prior representations to this Court in the Bankruptcy Case.

## AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE

### COLLATERAL ESTOPPEL

296.    Plaintiffs' claims are barred by the doctrine of collateral estoppel, as the factual and legal issues currently raised by Plaintiffs were previously litigated and determined by a valid and final judgment in the Bankruptcy Case. Defendants allege the following in support of this defense:

059825.1001

297. As stated above, Plaintiffs claim that they should not have sold their "Core Telecom Business" assets in an alleged "fire sale" in 2002, but instead should have retained that business and conducted a stand-alone restructuring that would have allowed creditors to obtain an equity interest in the restructured business. Plaintiffs claim that they would have achieved a much higher value if they had followed this course, rather than the "distressed value" that they obtained from the sale.

298. These issues were considered and necessarily decided by the Court in the Bankruptcy Case in connection with the motion to approve the sale of the Core Telecom Business. Under the requisite legal standard, the Court was required to find that the following four elements before it could approve the sale: (1) the Debtors had provided adequate notice of the sale to interested parties; (2) the sale was for an adequate price; (3) the parties to the sale transaction acted in good faith, such as by engaging in arms-length bargaining; and (4) the Debtors articulated a sound business reason for the sale.

299. With respect to the second element, the Court found that the sale price represented "the highest and best offer" for the core business and that such price was "fair" and constituted "reasonably equivalent value" for the core business, a finding that was necessary to its approval of the sale. Equally essential to the Court's ruling was its finding, with respect to the fourth element, that the sale transaction reflected "the exercise of the Debtors' sound business judgment" and was "in the best interests of the Debtors, their estates and parties in interest." In connection with this finding, the Court made the express and necessary determination that a protracted restructuring would not likely have increased the value obtained.

300. Both the Debtors and the Creditors' Committee had a full and fair opportunity to litigate these issues in the Bankruptcy Case. In rendering its decision on the sale motion, the Court found that "a reasonable opportunity to object or be heard regarding

the relief requested in the Sale Motion [had] been afforded to all interested persons and entities, including … the Creditors' Committee." Counsel for both the Debtors and the Committee were present at the October 9, 2002 hearing on the sale motion, where they presented evidence to the Court on the merits of the sales transaction, including the adequacy of the marketing and bidding procedures, the unlikelihood of any increased value from a restructuring proceeding, and the fairness of the purchase price obtained.

301.    Prior to the October 9 hearing, the Debtors also made written submissions to the Court in support of their motion to approve the sale, which included detailed affidavits from the Debtors' CEO John Brunette and from Ernst & Young, the Monitor in the Canadian proceeding, as well as extensive Monitor reports describing the sale process. At the October 9 hearing, counsel for the Committee endorsed the representations made in the two affidavits regarding the proposed sale.

302.    Thus, the issues of the prudence of the sale of the core business, the regularity of the sale process, the superiority of the sale as compared to a stand-alone restructuring or other alternatives for the estates, whether the sale maximized value for the Debtors' estate and its creditors, and the fairness of the purchase price obtained are all issues that were previously litigated and necessarily determined by the Court in the Bankruptcy Case. The Plaintiffs had a full and fair opportunity to litigate these issues in that proceeding, and the doctrine of collateral estoppel prevents them from now arguing a different set of facts before this Court.

## AS AND FOR AN EIGHTH AFFIRMATIVE DEFENSE

### PERFORMANCE EXCUSED BECAUSE OF FAILURE OF CONDITIONS TO PERFORMANCE

303.    Even if there were a contract such as alleged in the Amended Complaint (which there was not), BCE would be excused from performance under such contract because

39

conditions to its obligation to perform that would reasonably be implied in such contract did not occur.

## AS AND FOR A NINTH AFFIRMATIVE DEFENSE

### LACK OF CONSIDERATION

304.    The contract alleged in the Amended Complaint (which did not exist) is not valid and/or is void or voidable by BCE because of a lack of consideration.

## AS AND FOR A TENTH AFFIRMATIVE DEFENSE

### PRIOR MATERIAL BREACH OF CONTRACT

305.    Even if there were a contract such as alleged in the Amended Complaint (which there was not), BCE would have been excused from performance under such contract by reason of the prior material breach of contract by the alleged counterparty to the contract.

## AS AND FOR A ELEVENTH AFFIRMATIVE DEFENSE

### NO RELIANCE

306.    Plaintiffs' claims are barred by their lack of reliance on any statements regarding BCE's funding apart from BCE's funding commitment duly expressed in writings.

## AS AND FOR A TWELFTH AFFIRMATIVE DEFENSE

### UNCLEAN HANDS

307.    Plaintiffs' claims are barred by the doctrine of unclean hands.  The conduct by Plaintiffs giving rise to this defense includes Plaintiffs' failure to preserve evidence relating to their claims.  Such conduct includes a directive given by Andre Mongrain, TCC's Senior Vice President, Finance, in June 2002 to "Finance US Staff" to "destroy documents," including "due diligence files, budget files and the like."

308.    E-mails containing similar directives were issued by members of TCC's administrative staff.  Such directives were given at a time when the Debtors knew or

40

reasonably should have known that such documents would be potentially relevant in their claims against BCE.

309. Additionally, when TCC started to wind down its operations in mid-2002, hundreds of exiting employees were allowed to take their computers with them, and the Debtors made no effort whatsoever to preserve the information contained on those hard drives – again at a time when Debtors should have been aware that such hard drives could contain information that was potentially relevant to their claims against BCE.

310. As for the electronic documents that Plaintiffs did manage to produce, some 7000 e-mails consisted of only e-mail headers with no content in the body of the message. Even more disturbing, a large number of these e-mails bore the titles "important" or "high priority" and came from the files of key custodians. After repeated requests by Defendants to rectify this problem, Plaintiffs simply dismissed the issue, informing Defendants that the problem e-mails probably fell into the category of "inaccessible data" and "should be considered as corrupt, non processable files."

311. Such conduct by Plaintiffs in total disregard of their obligations to preserve evidence, and the resulting disadvantage to Defendants of being deprived of potentially relevant information, should operate as a bar to Plaintiffs' claims under the doctrine of unclean hands.

### AS AND FOR A THIRTEENTH AFFIRMATIVE DEFENSE

#### PRIVILEGE AND JUSTIFICATION

312. All of Defendants' actions were privileged and justified and thus cannot serve as a basis for the claims alleged in the Amended Complaint. BCE was privileged and justified in acting to preserve its own business and financial and economic interests on behalf of its stockholders. The individual Defendants were privileged and justified in

41

taking actions to preserve the interests of the entities to which they owed fiduciary duties.

## AS AND FOR A FOURTEENTH AFFIRMATIVE DEFENSE

### BUSINESS JUDGMENT RULE

313.    Plaintiffs' claims against the individual defendants are barred by reason of the business judgment rule and analogous provisions of Canadian law, including Section 102 and Section 122 of the Canadian Business Corporations Act.

## AS AND FOR A FIFTEENTH AFFIRMATIVE DEFENSE

### 8 DEL. C. § 141(e)

314.    Plaintiffs' claims against the individual defendants are barred, in whole or in part, pursuant to 8 Del. C. § 141(e) of Delaware's General Corporation Law, because the individual defendants relied in good faith upon information, opinions, reports, and statements of or by the officers of TI and the Debtors and legal and financial experts.

## AS AND FOR A SIXTEENTH AFFIRMATIVE DEFENSE

### MITIGATION OF DAMAGES

315.    Plaintiffs' claims are barred by their failure to mitigate damages.

## AS AND FOR A SEVENTEENTH AFFIRMATIVE DEFENSE

### CANADIAN LENDING SYNDICATE LITIGATION

316.    Damages must be mitigated by the result of the Canadian Lending Syndicate litigation, or that an outcome of that case favorable to BCE effectively bars all the claims arising from an alleged "promise" to fund, at least up to the amount owed by TI and the Debtors under the Credit Facilities.

DB01:2077483.1                                                                                                                        059825.1001

## AS AND FOR AN EIGHTEENTH AFFIRMATIVE DEFENSE

### NON-PRESERVATION OF EVIDENCE

317.    Plaintiffs' claims are barred by reason of plaintiffs' failure to preserve evidence relating to their claims.  In support of this defense, Defendants re-allege and incorporate the averments of paragraphs 307 to 311 above.

## AS AND FOR A NINETEENTH AFFIRMATIVE DEFENSE

### FIDUCIARY DUTIES UNDER CANADIAN LAW AGAINST THE INDIVIDUAL DEFENDANTS

318.    The alleged claims against the individual defendants are barred by the laws of Canada and the laws of the province of Quèbec and province of Ontario with respect to the fiduciary duties of directors and officers.

## AS AND FOR A TWENTIETH AFFIRMATIVE DEFENSE

### FIDUCIARY DUTIES UNDER CANADIAN LAW AGAINST BCE

319.    The alleged claims against BCE are barred by the laws of Canada and the laws of the province of Quèbec and province of Ontario with respect to the fiduciary duties of BCE.

## AS AND FOR A TWENTIETH-FIRST AFFIRMATIVE DEFENSE

### DUE PROCESS

320.    Any award of punitive damages would violate the Due Process Clause contained in the Fifth and Fourteenth Amendments to the United States Constitution and the due process protections of any applicable state or Canadian constitution.


Defendants reserve the right to amend this Answer and add additional factual responses and affirmative defenses as the litigation proceeds.

DB01:2077483.1                                                                                                          059825.1001

WHEREFORE, Defendants respectfully ask that this Court:

        1)     dismiss the Amended Complaint with prejudice;

        2)     award Defendants attorneys' fees and costs; and

        3)     grant such other and further relief as the Court deems just and

necessary.

Dated: April 19, 2006
       Wilmington, Delaware

                  YOUNG CONAWAY STARGATT & TAYLOR, LLP

                  Pauline K. Morgan (No. 3650)
                  The Brandywine Building
                  1000 West Street, 17th Floor
                  P.O. Box 391
                  Wilmington, DE 19899
                  (302) 571-6600

                        -and-

                  SHEARMAN & STERLING LLP
                  Stuart J. Baskin
                  George J. Wade
                  Jaculin Aaron
                  Daniel Schimmel
                  599 Lexington Avenue
                  New York, NY 10022
                  (212) 848-4000

                  Attorneys for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on April 20, 2006, I electronically filed a true and correct copy of foregoing document was filed with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

Gregory V. Varallo, Esq.
Robert J. Stern, Jr., Esq.
Kelly E. Farnan, Esq.
Anne S. Gaza, Esq.
Richards, Layton & Finger, P.A.
920 N. King Street
Wilmington, DE  19801

Joseph A. Rosenthal, Esq.
Rosenthal, Monhait & Goddess, P.A.
1401 Mellon Bank Center
P.O. Box 1070
Wilmington, DE  19899-1070

I further certify that on April 20, 2006, I caused a copy of the foregoing document to be served upon the following non-registered participants in the manner indicated below:

BY EMAIL
John P. Amato, Esq.
Mark S. Indelicato, Esq.
Zachary G. Newman, Esq.
Jeffrey L. Schwartz, Esq.
Hahn & Hessen LLP
488 Madison Avenue
New York, NY 10022

Gregory V. Varallo, Esq.
Mark D. Collins, Esq.
C. Malcolm Cochran, IV, Esq.
Robert J. Stern, Jr., Esq.
Kelly E. Farnan, Esq.
Anne S. Gaza, Esq.
Richards, Layton & Finger, P.A.
920 N. King Street
Wilmington, DE 19801

Joseph A. Rosenthal, Esq.
Rosenthal, Monhait & Goddess, P.A.
1401 Mellon Bank Center
P.O. Box 1070
Wilmington, DE 19899-1070


Pauline K. Morgan (No. 3650)
Maribeth Minella (No. 4185)
Margaret B. Whiteman (No. 4652)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
P.O. Box 391
Wilmington, DE 19899-0391
(302) 571-6681
pmorgan@ycst.com
mminella@ycst.com
mwhiteman@ycst.com
bank@ycst.com

*Attorneys for Defendants*

DB01:2077483.1                                                                                                     059825.1001