IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | Chapter 11 |
| TELEGLOBE COMMUNICATIONS CORPORATION, *et al.*, | Jointly Administered<br>Bankr. Case No. 02-11518 (MFW) |
| Debtors. | |
| TELEGLOBE COMMUNICATIONS CORPORATION, *et al.*, | |
| Plaintiffs, | C.A. No. 04-1266 (SLR) |
| v. | |
| BCE, INC., *et al.*, | |
| Defendants. | |

**MOTION *IN LIMINE* TO PRECLUDE DEFENDANTS FROM RELYING UPON ANY DELOITTE & TOUCHE DOCUMENTS, WITNESSES OR OTHER EVIDENCE, AND FOR ADVERSE INFERENCES IN FAVOR OF PLAINTIFFS**

The Official Committee of Unsecured Creditors of Teleglobe Communications Corporation (the "Committee") itself and on behalf of all of the above-captioned Debtors (collectively, "Plaintiffs"), hereby move this Court *in limine* to preclude Defendants from relying upon any Samson Belair/Deloitte & Touche s.e.n.c.l. ("Deloitte" or "Deloitte Canada") documents, witnesses or other information or evidence at trial, and to preclude Defendants from testifying about any communications with Deloitte in the above-captioned action. Plaintiffs also seek relief from the Court in the form of adverse inferences. The grounds for this motion are as follows:

I.  **BACKGROUND**

1.  Prior to 2001, BCE was one of Deloitte's oldest and largest clients. During 2001 and 2002, BCE exerted its control over Teleglobe Inc. ("TI") and its subsidiaries (including the Debtors herein) to hire Deloitte to audit their financial statements. To this day, BCE remains a major client of Deloitte. As detailed below, Deloitte possesses information highly relevant to this dispute. Indeed, Deloitte possesses information directly related to BCE's funding obligations to Teleglobe and had discussions with BCE as to whether its representations concerning its commitment were appropriate and accurate.

2.  Specifically, in connection with Deloitte's review of TI's fourth quarter 2001 financial statements, TI provided to Deloitte a representations letter dated January 23, 2002 stating that "at the CEO conference held December 12, 2001, BCE committed to contribute up to an additional Cdn $1.0 billion to support the working capital and debt repayment requirements of [Teleglobe] over the next twelve months." (*see* Ex. A hereto at ¶ 12) This representations letter was signed on behalf of TI by defendants Jean Monty, Michael Boychuk, and Stephen Skinner, and sent to Deloitte on or about January 23, 2002. (Ex. B at 337-38, 348)[1]

3.  Identical language appeared in TI's representations letter dated February 27, 2002 that was provided to TI in connection with Deloitte's 2001 year-end audit of TI's financial statements. (*see* Ex. C hereto at ¶ 30) This letter was likewise signed by defendants Monty, Boychuk, and Skinner, and sent to Deloitte on or after February 27, 2002.[2]

---

[1] Relevant excerpts from the deposition of Stephen Skinner conducted on September 8 and 9, 2005 are attached hereto as Exhibit B.

[2] The fact that it took some 36 transcript pages' worth of testimony by Mr. Skinner over the course of two days to elicit the simple admission that the February 27 letter was actually sent to Deloitte is further proof that the Defendants will stop at nothing to conceal all evidence of
(Continued)

2

4.  Representations concerning BCE's financial support of TI had been provided to Deloitte a year earlier after Deloitte expressed concern over the cash flow situation at TI and warned that the absence of such representations may require them to issue a "going concern note" in connection with Teleglobe's financial statements. (Ex. B at 293 – 302)[3] Similarly, if TI had not made the representations concerning BCE's commitment to provide funding of Cdn $1 billion, BCE recognized that TI would have again been in danger of having a going concern note in the 2001 year-end audited financial statements. (Ex. F hereto) With these representations in place, Deloitte advised TI at its February 27, 2002 board meeting that Deloitte would issue a clean (*i.e.* unqualified) opinion on the company's financial statements.

5.  Following the submission of the aforementioned representations letters to Deloitte, and <u>after</u> Deloitte issued a clean opinion in connection with TI's Financial Information Report, BCE changed its position regarding its funding commitment to TI. In order to conform TI's prior representations to BCE's current intentions, by late March 2002, Mr. Skinner, at the behest of Mr. Monty, sought to renegotiate the language in the February 27 representations letter. As a result of Mr. Skinner's efforts, on or about April 8, 2002 -- the same day that BCE announced that it was reevaluating its strategic options for Teleglobe and it subsidiaries – Deloitte agreed to allow BCE to modify the representation in TI's already-executed

---

their attempts to rewrite the final chapter of Teleglobe's history. (Ex. B at 46-68 (signed February 28, 2002 representations letter with original language <u>not</u> sent to Deloitte); Ex. B at 383 – 397 (signed February 28, 2002 representations letter with original language <u>was</u> sent to Deloitte))

[3] Exhibit D hereto is a memorandum from Stephen Skinner to Jean Monty, Chairman and CEO of both BCE and TI, explaining the need for a representation concerning BCE's financial support of Teleglobe. Exhibit E is the April 24, 2001 representations letter stating that Teleglobe "has the necessary financial support of its parent company, BCE, Inc., to support its operations in such a manner relevant to [TI's] ability to continue as a going concern." (*Id.* at ¶ 13)

representations letter in a manner that would mischaracterize the statements made at BCE's CEO conference on December 12, 2001 and the state of affairs at BCE and TI on February 27, 2002.

6. Specifically, Deloitte agreed to allow BCE to remove the word "committed" from TI's representations and to add conditions that were not present on December 12, 2001 or even on February 27, 2002. (Compare ¶ 30 of Ex. C to ¶ 30 of Ex. G) Although BCE made those changes to the TI February 27, 2002 letter, the January 23 letter submitted to Deloitte -- stating that BCE committed to contribute up to Cdn$1.0 billion to support the working capital and debt repayment requirements of Teleglobe over the next twelve months -- remained unchanged. (Ex. A) Mr. Skinner claims this was an oversight. (Ex. B at 356) The effort to alter the record and rewrite the audit representations letter was part of "Project X," BCE's scheme to terminate its funding commitment to Teleglobe in order to prepare for a previously unanticipated liquidity crisis.[4] (Ex. H hereto, at p. 15) Thereafter, on or about April 12, 2002, at the direction of BCE and with the acquiescence of Deloitte, similar changes were made to TI's 2001 Financial Information Report. (*see* Ex. I hereto) In addition to changes made relating to BCE's funding commitment to TI, the 2001 Financial Information Report which was approved unanimously by the TI Board of Directors on February 27, 2002, was rewritten to obfuscate BCE's control over and management of the affairs and operations of TI and its subsidiaries. (Ex. B at 580-82) Upon information and belief, this revision was made to aide BCE in its ongoing denial of the fiduciary duties it owed to TI, the Debtors, and their creditors.

7. Deloitte also has discoverable information related to other important issues including, without limitation, (1) how Teleglobe's goodwill was accounted for, (2) what would

---

[4] On February 28, 2002, BCE learned that SBC, which held a 20% stake in Bell Canada, was likely to exercise its put on that stake. SBC's exercising of its put would require BCE to pay SBC as much as $8 billion.

4

be the timing of write-offs relating to TI's goodwill, and (3) whether the projections supporting the goodwill accounting were reasonable given BCE's funding obligations (or purported lack thereof).

## II.   DELOITTE AND BCE AVOID THEIR DISCOVERY OBLIGATIONS

1.   On or about August 10, 2004, soon after discovery commenced in this case, the Committee served a subpoena on Deloitte's New York-based affiliate ("Deloitte New York") requesting the production of documents. (Ex. J hereto) By letter dated August 23, 2004, Deloitte New York objected to the subpoena on the ground that, *inter alia*, the information sought was not within its possession, custody or control but rather in the possession of its Canadian affiliate. (Ex. K hereto)  Although Deloitte New York agreed to search its own files for documents responsive to the subpoena, it failed to produce any documents, instead suggesting that the Committee communicate directly with their Canadian affiliate, Deloitte.  Accordingly, on or about December 9, 2004, the Committee's counsel wrote to Deloitte (Ex. L hereto).  Deloitte expressed no interest in cooperating.

2.   By letter dated January 12, 2005, the Committee's counsel informed BCE of the situation, and requested that BCE, in light of its relationship with Deloitte, direct the firm to comply with the Committee's discovery demands.  (*see* Ex. M hereto)  The Committee's counsel also pointed out that the information sought from Deloitte was subsumed in the several discovery demands served on BCE, and, thus, BCE should have already produced this information, as we viewed any information held by Deloitte to be within BCE's control.

3.   Receiving no cooperation from Deloitte and not even a response from BCE, on February 11, 2005, the Committee requested and obtained a Letter of Request from this Court seeking judicial assistance from the Quebec Superior Court in (1) obtaining documents from Deloitte and (2) conducting the deposition of Ginette Nantel ("Nantel"), the Deloitte audit

partner to whom TI's audit representations letters were addressed.[5]

4. Nearly two months after receiving the Committee's initial request for assistance and three weeks after this Court issued the Letter of Request, BCE finally responded. By letter dated March 4, 2005, BCE advised the Committee that it would direct Deloitte to provide to the Committee "any documents it received from BCE that are responsive to the subpoena," thus admitting that such documents were with in its control. (*see* Ex. N hereto) Indeed, BCE went on to distinguish other documents by stating that "[t]he remaining documents in [Deloitte's] files are not within BCE's possession, custody or control."

5. While waiting for the documents controlled by BCE to arrive, the Committee moved the Quebec Superior Court for an *ex parte* order directing Deloitte and Nantel to produce the requested documents and appear for deposition. That motion was granted on March 17, 2005 (the "March 17 Judgment").

6. The Committee later learned that BCE sent an email to Deloitte on March 9, 2005 requesting that Deloitte turn over certain relevant documents to BCE and not to the Committee. (*see* Ex. O hereto) During the next three months, the Committee remained in the dark, unaware of whether or not Deloitte would provide the documents that BCE was obligated to produce. In the interim, on July 7, 2005, the Quebec Superior Court granted Deloitte's April 8, 2005 motion to revoke the March 17 Judgment.[6] Emboldened by its apparent success in the Quebec Superior

---

[5] During this process, Deloitte inquired of Plaintiffs as to whether Plaintiffs would be willing to grant Deloitte a form of limited immunity for its actions. In response, Plaintiffs offered a complete "hold harmless" for all of Deloitte's actions. Notwithstanding this blanket exculpation, Deloitte remained steadfast in its refusal to cooperate with discovery.

[6] Deloitte objected to the production of documents based, in part, on privilege grounds including but not limited to the Business Concerns Records Act. On July 7, 2005, the Quebec Superior Court, at the urging of Deloitte, vacated a previous order requiring production and a deposition, on technical grounds concerning the document production aspect of the order, (Continued)

Court, Deloitte, with BCE's apparent acquiescence, also refused to turn over any BCE-controlled documents.

7. In a last ditch effort to obtain any discovery from Deloitte, in August 2005, the Committee sought and obtained another Letter of Request from this Court, seeking the judicial assistance from the Quebec Superior Court. This time, however, the Committee sought only the deposition of Nantel, thus, hoping to avoid some of the difficulties it previously faced. Deloitte again objected to the second letter of request. The Quebec Superior Court rejected Deloitte's position and ordered Ms. Nantel to sit for a deposition. Consistent with its strategy of delay at all costs and BCE's suppression of the most relevant evidence, Deloitte appealed, presumably in an attempt to delay the deposition until after trial in this case, when it would be too late. That strategy backfired when the Quebec Court of Appeal granted a motion for "preferential treatment" (akin to a motion to expedite proceedings). Oral argument before the Quebec Court of Appeal was held on May 18, 2006. As of the date of this motion, the Court of Appeal has not ruled, and even if Deloitte loses again, it can continue to delay matters further by appealing to the Supreme Court of Canada. However, even _if_ Deloitte loses in the Court of Appeal and _if_ it does not appeal further, Plaintiffs are still prejudiced in that they will never get documents from Deloitte given Deloitte's assertion of certain Quebec law privileges against production of documents in foreign cases.

8. Contrary to the Declaration of Daniel Schimmel filed with this Court on August 30, 2005, BCE has provided little or no help to Plaintiffs in procuring the discovery from Deloitte. For over six months BCE did nothing to ensure that its accountants complied with the

---

including that this Court exceeded its jurisdiction by requesting allegedly extensive document production of Deloitte.

subpoena. When BCE finally did get involved its efforts were slow and half-hearted. Deloitte, not surprisingly, produced nothing. BCE, which remains one of Deloitte's largest Canadian clients, wrote a few additional e-mails to Deloitte in early August 2005 but did little else to procure the documents requested by Plaintiffs.

9. At a discovery conference on August 10, 2005, Plaintiffs asked the Court to order BCE to demand its documents back from Deloitte. (Tr. at 14)[7] Plaintiffs went on to state that if documents were not forthcoming, they would seek appropriate preclusion orders prior to trial. (Id.) Later in the hearing, in response to a question by the Court, BCE's counsel stated that he wrote a letter (apparently referring to the March 2005 e-mail) to Deloitte asking that the documents be produced but Deloitte refused BCE's request. (Ex. P at 22-23) BCE's counsel then told the Court "I'm not sure what else we can do at this point." (Ex. P at 23) The Court, which was clearly not satisfied with BCE's less than exhaustive efforts, stated:

> It seems to me that if you -- if asking nicely doesn't work in a case, then, truly, **you will be precluded from using any of their documents, any of their witnesses, any of their evidence if you can't manage to get these documents produced so that they can see the light of day and be tested through discovery. I mean, that's the bottom line.** Nice letters exchanged. They are your client. You pay them. It seems to me if that does not give you leverage, then you should find another accounting firm to work with.

(Ex. P at 23) (emphasis added) In response, BCE's counsel represented that "[w]e will tell them that." Accordingly, the Court entered the following order:

> By August 31, 2005, BCE shall file an affidavit with the Court and obviously serve on counsel all of its efforts to get the

---

[7] The transcript of the August 10, 2005 hearing before this Court is attached hereto as Exhibit P.

> relevant documents from the three Canadian entities.[8] **And I will say that if the three Canadian entities are not willing to cooperate, BCE will be precluded from using any of that evidence in trial.**

(Ex. P at 29) (emphasis added)

10. Following the Court's August 10, 2005 bench order, BCE filed the Declaration of Daniel Schimmel Regarding Discovery From Samson Belair/Deloitte & Touche S.E.N.C.R.L, Osler, Hoskin & Harcourt LLP, And Davies Ward Phillips & Vineberg LLP ("Schimmel Declaration"). (Ex. Q hereto) The Schimmel Declaration makes clear that the only attempt that BCE made to obtain the Deloitte documents following the Court's August 10 order was to write another letter to Deloitte on August 18, 2005. (*See* Ex. Q at ¶ 11) Despite the Court's clear instructions, BCE did not demand production of its documents nor did it use as leverage its ongoing business relationship with Deloitte in an effort to procure the documents that belong to BCE. BCE received a response from Deloitte on August 29, 2005 in which Deloitte refused to produce the requested documents. (Ex. Q at ¶ 12) The Committee is not aware of any other attempts made by BCE to obtain the documents from Deloitte and Plaintiffs remain without the Deloitte discovery that they requested almost two years ago.

11. On October 18, 2005, the Court entered an order that the Court was "satisfied that BCE's discovery efforts have been satisfactory" and that "[n]o sanctions shall be imposed, nor further action taken by the court in these regards." (Ex. R hereto) The fact that BCE was not sanctioned for its conduct, however, does not eliminate the prejudice that Plaintiffs have suffered. Moreover, the Schimmel Declaration proves that BCE is unwilling to do what this Court suggested: order its auditors to produce the relevant documents and threaten them with

---

[8] The Court's reference to three Canadian entities refers to Deloitte and two Canadian law firms that similarly were avoiding producing subpoenaed documents.

termination if they refuse. Thus, even if BCE and its counsel should not have been sanctioned at the time, the relief sought herein is necessary and appropriate.[9]

### III. RELIEF REQUESTED

#### A. Defendants Should Be Precluded From Relying Upon Any Deloitte Witnesses, Documents, Information or Other Evidence At Trial.

12. As set forth above, Deloitte has steadfastly refused to honor its obligations under the subpoena and BCE has refused to exert the necessary pressure to procure production of the documents in its control. Consistent with the Court's August 10, 2005 order, Plaintiffs are thus entitled to an order precluding Defendants from using and/or relying upon any Deloitte evidence at trial. Deloitte's refusal to comply with valid and compulsory process have effectively prevented Plaintiffs from obtaining discovery regarding, *inter alia*, Deloitte's advice and communications to BCE regarding the withdrawn representations letter and revised financial statements. Given the import of these issues, Plaintiffs would be substantially prejudiced if Defendants were permitted to rely upon Deloitte evidence or witnesses at trial in any manner whatsoever.

13. For example, in seeking to justify their attempt to cover up their commitment to fund Plaintiffs, Defendant Skinner, who had responsibility for convincing Deloitte to accept the changes to the representations letters it drafted (and BCE changed), testified in deposition that the changed language did not involve a "negotiation" and Deloitte simply accepted the new

---

[9] In addition, at the time the October 18, 2005 Order was entered, Plaintiffs had only requested an order requiring BCE to demand the production of their own documents from their agent, Deloitte. While Plaintiffs indicated at the time that they may seek preclusion orders in the future, no motion for such orders had been made nor had such relief been briefed or argued before the Court. Indeed, it was the Court that warned Defendants that they would face preclusionary measures should Deloitte remain uncooperative. Accordingly, the Court's order only addresses Mr. Schimmel's inability to answer the Court's questions adequately on August 10, 2005 and his subsequent declaration.

language without comment or expression of concern. Of course, this testimony is fundamentally incredible, given that Deloitte expressly made clear that it was relying on *this very* language to avoid a "going concern" qualification and that the parties did not agree on the language until the *same day* (April 8, 2002) that BCE issued its press release calling into question its continued funding of Plaintiffs. Without access to Deloitte's internal e-mails and correspondence on the topic or at the very least a full and fair deposition, we will never be able to show just how disingenuous this testimony was. Under these circumstances, preclusion is critical. Despite the Court's admonishment, BCE has continued its relationship with Deloitte, but has not succeeded in convincing Deloitte to comply. Accordingly, the preclusion order should include, at a minimum, the following:

- An order precluding Defendants or their witnesses from testifying about any communications with Deloitte concerning Deloitte's views about the withdrawal of or revisions to any representations letter sent to Deloitte for fiscal years 2001 and 2002;

- An order precluding Defendants or their witnesses from testifying about any communications with Deloitte concerning Deloitte's views about revised financial statements for BCE, the Debtors and/or TI for fiscal years 2001 and 2002;

- An order precluding Defendants from challenging the authenticity or admissibility of any document containing or reflecting any advice allegedly received from Deloitte;

- An order precluding Defendants from arguing that they relied upon advice received from Deloitte;

- An order precluding Defendants from arguing that Deloitte did not receive the original, unaltered representations letters;

- An order precluding Defendants from arguing that any actions taken were in conformity with any advice given by Deloitte and/or were correct or appropriate as a result of, or as evidenced by, such advice;

11

- An order precluding Defendants from attempting to justify their challenged accounting actions in this case and their actions in withdrawing their audit representations letters and their approved financial statements after February 28, 2002.

**B.  The Court Should Draw Adverse Inferences In Favor Of Plaintiffs.**

14.  While a preclusion order would provide Plaintiffs with partial relief, it would not be a complete remedy. Indeed, given the efforts Deloitte has made to prevent Plaintiffs from obtaining the requested discovery, the long-standing relationship between Deloitte and BCE, and BCE's refusal to engage in anything other than a token effort to obtain the information from its accountant, it would be reasonable to infer that the Deloitte discovery requested by Plaintiffs is harmful to Defendants' case. Plaintiffs, of course, have been denied access to the Deloitte discovery and thus will not be able to use this evidence to affirmatively support their claims. Even if Plaintiffs are finally able to take an oral deposition before trial, given Deloitte's stubborn assertion of provincial privileges against producing documents, Plaintiffs will never gain access to Deloitte's documents. Accordingly, in addition to the preclusion order, Plaintiffs respectfully suggest that they are entitled to an order declaring that the Court will accept as an admitted fact that all Deloitte testimony would have been adverse to Defendants and favorable to Plaintiffs.[10]

15.  Plaintiffs' request for adverse inferences against Defendants is supported by applicable precedent. In *Muzzleman v. National Rail Passenger*, this Court held that it is proper to instruct a jury "that it may draw an adverse inference from a party's failure to produce evidence when: (1) the evidence is within the party's possession or control; and (2) it appears there has been 'an actual suppression or withholding of the evidence.'" 839 F. Supp. 1094, 1098

---

[10] While adverse inferences are typically associated with jury trials, in a bench trial the Court can, and should, draw inferences in favor of Plaintiffs and against Defendants in making its findings of fact. *See Knightsbridge Mktg. Servs., Inc. v. Pronociones Y Proyectos, S.A.*, 728 F. 2d 572 (1st Cir. 1984) (affirming district court's decision to draw adverse inferences, in a bench trial, for failure to produce documents).

(D. Del. 1993). More recently, this Court held that it "may impose an adverse inference instruction where: (1) the party having control over the evidence had an obligation to timely produce it; (2) the party had a 'culpable state of mind;' and (3) the missing evidence is 'relevant' such that a reasonable trier of fact could find that it would support the other party's claim or defense." *Liafil, Inc. v. Learning 2000*, WL 31954396, *3 (D. Del. 2002). Similarly, in *Knightsbridge Mktg. Servs., Inc. v. Pronociones Y Proyectos, S.A.*, the First Circuit upheld a district court's decision to draw adverse inferences in a bench trial for a defendant's failure to produce documents. 728 F. 2d 572 (1st Cir. 1984). The Court held that "[w]hen the contents of a document are relevant to an issue in a case, the trier of fact generally may receive the fact of the document's nonproduction or destruction of evidence that the party which has prevented production did so out of the well-founded fear that the contents would harm him." *Id.* at 575. The Court observed that "Wigmore has asserted that nonproduction is not merely 'some' evidence, but is sufficient by itself to support an adverse inference even if no other evidence for the inference exists ...." *Id.*

16. Defendants have never contested, and cannot contest, that the documents originally sought from Deloitte (and successfully blocked on technical grounds and by sheer delay) are relevant. Moreover, there can be no dispute that the requested discovery has been concealed from Plaintiffs. There can also be no dispute that Defendants are obligated to produce the Deloitte documents to the extent that such documents are subject to their control. Indeed, the Court already determined that the Deloitte documents are subject to BCE's control during the August 10, 2005 hearing. Relevant case law supports the Court's decision in this regard. *See Bank of New York v. Meridien Biao Bank Tanzania Ltd.*, 171 F.R.D. 135, 153-54 (S.D.N.Y. 1997) (ordering a defendant to produce documents related to the litigation that were in the

possession of former outside auditors);[11] *Woldman v. Sam's Cartage Co.*, WL 639230, *2 (N.D. Ill. 1997) (recognizing that documents in the possession of an auditor are within a corporation's control for purposes of Federal Rule of Civil Procedure 34). An adverse inference against Defendants is appropriate in these circumstances.

---

[11] Deloitte & Touche are not BCE's former auditors -- they are still BCE's auditors. (Ex. P at 23). Thus, the rationale of *Meridien Biao* is even stronger here.

IV. **CONCLUSION**

For all of the foregoing reasons, Plaintiffs respectfully request that the Court enter an order in the form attached hereto precluding Defendants from relying upon any Deloitte documents, witnesses, information or other evidence at trial, and that the Court draw inferences in favor of Plaintiffs as set forth in the attached order.

_____
Joseph A. Rosenthal (#234)
Rosenthal, Monhait & Goddess, P.A.
P.O. Box 1070
Wilmington, Delaware 19899-1070
jrosenthal@rmgglaw.com
(302) 656-4433
    - and -

John P. Amato
Mark S. Indelicato
Zachary G. Newman
Jeffrey L. Schwartz
Hahn & Hesson LLP
488 Madison Avenue
New York, New York 10022
(212) 478-7200
Attorneys for the Official Committee of Unsecured Creditors of Teleglobe Communication Corporation, *et al.*

Dated: May 23, 2006

RULE 7.1.1 STATEMENT

Pursuant to Rule 7.1.1, the undersigned hereby states that he has been informed that Gregory V. Varallo, Esquire, one of debtors' attorneys, made reasonable efforts to reach agreement with opposing counsel on the matters set forth in the foregoing motion, but such efforts were unsuccessful.

_____
JOSEPH A. ROSENTHAL (Del. Bar No. 234)

15