# EXHIBIT B

TELEGLOBE COMMUNICATIONS VS. BCE INC.

STEPHEN SKINNER - 9/8/05

CONCORDANCE AND CONDENSED TRANSCRIPT
PREPARED BY:



*Ellen Grauer*
COURT REPORTING Co. LLC

TOWER 56, 126 EAST 56TH STREET, FIFTH FLOOR, NEW YORK, NEW YORK 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
WWW.ELLENGRAUER.COM

## Page 13

(1)
(2) worked quite extensively with him and then,
(3) you know, a whole broad range of, you know,
(4) corporate executives as well as people within
(5) the business units.
(6)    Q.   Did you get to work with Mr. Monty
(7) during your career at Bell Canada/BCE?
(8)    A.   Yes. On occasion.
(9)    Q.   In what regard did you work with
(10) Monty?
(11)    A.   I would have -- because of the
(12) nature to have role I was performing, which at
(13) that time was the -- the deputy comptroller
(14) and ultimately the comptroller role, I
(15) interacted with him in various meetings,
(16) relation to the plan and, you know, on the odd
(17) occasion would have had interaction with him
(18) on specific issues related to financial
(19) statements, MD&A.
(20)    Q.   How about Mr. Sabia?
(21)    A.   Mr. Sabia, the same.
(22)    Q.   The document I put before you lists
(23) under "Special Projects, Acquisition of
(24) Teleglobe." Did you work on the acquisition
(25) of Teleglobe?

## Page 14

(1)
(2)    A.   I was part of the due diligence
(3) team that worked on the acquisition of
(4) Teleglobe, yes.
(5)    Q.   Could you describe generally who
(6) was on that due diligence team?
(7)    A.   I won't be able to remember
(8) everyone, but there was -- you know, there was
(9) participants from various elements of the
(10) BCE/Bell Canada family bringing expertise in,
(11) you know, finance, legal, treasury, operations
(12) people that were brought on board. I remember
(13) Bill Anderson was, you know, the executive
(14) prime that was leading it on behalf of
(15) Mr. Monty and then we also brought in Deloitte
(16) & Touche to work with us as well.
(17)    Q.   Who from Deloitte worked on the due
(18) diligence team, if you recall?
(19)    A.   I -- I don't recall.
(20)    Q.   Did you have a special area that
(21) you were assigned to as part of the due
(22) diligence work on Teleglobe?
(23)    A.   Yes, I did.
(24)    Q.   What was the area that you were
(25) assigned to?

## Page 15

(1)
(2)    A.   The area was to principally review
(3) the historic financial statements of Teleglobe
(4) and to take a snapshot of the -- the current
(5) books and records of the company. The time we
(6) went in was January and February and,
(7) therefore, their year-end financial statements
(8) had not been completed, so we were doing some
(9) review to get a sense of the December 31st
(10) numbers.
(11)    Q.   At that point in time, Teleglobe's
(12) auditors were Arthur Anderson; is that
(13) correct?
(14)    A.   That is correct.
(15)    Q.   Did you work with outside auditors
(16) at Arthur Andersen to accomplish the
(17) objectives of the tasks you've described?
(18)    A.   They were not working on behalf of
(19) BCE, but as part of our due diligence, we did
(20) interact with them.
(21)    Q.   Who did you speak with at Arthur
(22) Anderson, if you recall?
(23)    A.   The two -- the two predominant
(24) individuals were Natalie Bernier and Natalie
(25) Tessier.

## Page 16

(1)
(2)    Q.   Were there specific issues within
(3) the financial statement review you've
(4) described that you were focused upon or was it
(5) simply a broad review of the financial
(6) statements in general?
(7)    A.   It was just on a broad review of
(8) the financial statements.
(9)    Q.   As a result of the due diligence
(10) that you were particularly tasked with, did
(11) you produce reports or memoranda relating to
(12) your conclusions?
(13)    A.   My team would have produced reports
(14) and we would have also sat in on meetings to
(15) give verbal presentations as well.
(16)    Q.   You say your team. Were you head
(17) of that team?
(18)    A.   I was head of the -- the
(19) comptroller's team that went in to look at the
(20) financial statements, yes.
(21)    Q.   How many people worked under you as
(22) part of that exercise?
(23)    A.   I don't recollect, but a few.
(24)    Q.   Do you recall any of the
(25) individuals that were working on your team as



## Page 45

(1)

(2) Q. Were there multiple signatures on

(3) the rep letters given to Deloitte & Touche at

(4) the Teleglobe Inc. level?

(5) A. Yes.

(6) Q. In fact, there were three, correct?

(7) A. Correct.

(8) Q. Who were those signatories during

(9) the time that you were corporate comptroller

(10) of Teleglobe?

(11) A. My recollection is they were

(12) myself, Michael Boychuk and Jean Monty.

(13) Q. And you were the person that headed

(14) up the preparation of the language or the

(15) discussions concerning the language that you,

(16) Boychuk and Monty signed, correct?

(17) A. The discussions. As I indicated,

(18) the first draft would come from Deloitte &

(19) Touche.

(20) Q. When you were comfortable with the

(21) process you've described and you were prepared

(22) to sign the letter, did you then share the

(23) letter in that form with Mssrs. Monty and

(24) Boychuk?

(25) A. Normal course, I would have shared

## Page 46

(1)

(2) the letter then with Mr. Boychuk for his

(3) signature and then once obtaining his

(4) signature, share the letter with Mr. Monty.

(5) Q. Would you then get Monty's

(6) signature after you and Boychuk were

(7) comfortable with it and had signed it?

(8) A. Yes.

(9) Q. Was there ever a time when you

(10) signed a letter, Boychuk signed a letter and

(11) Monty didn't sign the letter because he wasn't

(12) happy with the language?

(13) MR. SCHIMMEL: Object to form.

(14) A. There was one letter where he had

(15) signed the letter but indicated that he was

(16) not comfortable with the language.

(17) Q. Was that letter dated February 27,

(18) 2002 relating to the year-end 2001 Teleglobe

(19) Inc. financial statements?

(20) A. I believe so. I'd want to see the

(21) letter to be certain, but I believe so.

(22) Q. It may surprise you to know we'll

(23) get to it.

(24) A. Yes.

(25) Q. After he signed the letter, what

## Page 47

(1)

(2) happened to the document?

(3) MR. SCHIMMEL: Object to form.

(4) A. Can you rephrase your question for

(5) me, please?

(6) Q. Sure.

(7) So you signed it, Boychuk signed it

(8) and Monty signed it, correct?

(9) A. Correct.

(10) Q. And it was signed prior to the

(11) release of the audited financial statements

(12) for 2001, correct?

(13) A. I can't recall -- yes. No. Yes.

(14) It was signed before the release.

(15) Q. In fact, the purpose of this was to

(16) allow Deloitte to issue its opinion letter and

(17) it was relying on these rep letters it got in

(18) connection with issuing its opinion letter,

(19) correct?

(20) A. Yes.

(21) MR. SCHIMMEL: Object to form

(22) Q. So you would have signed it and

(23) provide it to Deloitte before they signed off

(24) on the year-end financial statements, correct?

(25) A. We would have provided it to

## Page 48

(1)

(2) Deloitte & Touche, you know, generally around

(3) the time. They would have gone to the

(4) February 27th Audit Committee of -- of -- I

(5) think it was February 27th, around that time,

(6) Audit Committee and confirmed that they were

(7) prepared to sign. Administrative practice at

(8) that time is the letter could have -- could

(9) have followed shortly thereafter.

(10) Q. Okay.

(11) So Deloitte comes to an Audit

(12) Committee late February of 2002 and says it's

(13) prepared to give its unqualified opinion on

(14) the financial statements of Teleglobe Inc. for

(15) year end 2001, correct?

(16) A. Mm-hmm.

(17) Q. Unfortunately, you have to answer

(18) yes or no.

(19) A. Yes.

(20) Q. Did you attend that Audit Committee

(21) meeting?

(22) A. Yes.

(23) Q. Did you hear Deloitte

(24) representatives say they would give an

(25) unqualified opinion on the financial

TELEGLOBE COMM. v. BCE INC. Case 1:04-cv-01266-SLR Document 265-4 Filed 05/23/2006 Page 5 of 22 vs. BCE INC.

STEPHEN SKINNER - 9/8/05



Page 49

(1)
(2) statements year end 2001 to the Audit
(3) Committee of Teleglobe Inc.?
(4)  A.  I don't recollect, but they would
(5) have done that and it would have been also
(6) stated in their communications to the Audit
(7) Committee.
(8)  Q.  Now, prior to the time that
(9) Deloitte gave that representation orally to
(10) the Audit Committee in connection with
(11) year-end 2001 financial statements of
(12) Teleglobe Inc., had they received from
(13) Teleglobe Inc. the Teleglobe Inc. signed
(14) representation letter we've just been talking
(15) about?
(16)  A.  They would not have received that
(17) signed representation letter with all three
(18) signatories on it before that Audit Committee
(19) meeting.
(20)  Q.  How do you know that?
(21)  A.  Because as I -- I know at that time
(22) the -- you know, the administrative practice
(23) that we followed was it was really a follow-up
(24) that happened after -- after the Audit
(25) Committee meetings.

Page 50

(1)
(2)  Q.  Did you send them a form of letter
(3) with fewer than all three signatures on it
(4) prior to the Audit Committee --
(5)  A.  No.
(6)  Q.  -- on February 27th?
(7)  A.  No.
(8)  Q.  When did the letter with all three
(9) signatures on it go to Deloitte & Touche in
(10) connection with year-end financial statements
(11) for Teleglobe Inc. 2001? Let me rephrase that
(12) because it could be misconstrued.
(13)  When did the signed rep letter for
(14) year-end 2001 financial statements go to
(15) Deloitte & Touche?
(16)  MR. SCHIMMEL:  Object to form.
(17)  MR. VARALLO:  Can you read that
(18) back? I want to make sure this is --
(19)  (The record is read back by the
(20) reporter.)
(21)  Q.  Let me withdraw the question and
(22) ask a different one.
(23)  Did there come a time when a signed
(24) representation letter went to Deloitte &
(25) Touche in connection with the Teleglobe Inc.

Page 51

(1)
(2) 2001 financial statements?
(3)  A.  Yes.
(4) ` Q.  When was the first time that
(5) Deloitte was given a fully executed
(6) representation letter in connection with
(7) Teleglobe Inc.'s 2001 financial statements?
(8)  MR. SCHIMMEL:  Object to form.
(9)  A.  Repeat your question, please.
(10)  MR. VARALLO:  Read it back, please.
(11)  (The record is read back by the
(12) reporter.)
(13)  A.  What -- by "fully executed," can
(14) you just explain to me what you mean?
(15)  Q.  Yes. Signed by you, Monty and
(16) Boychuk.
(17)  A.  There was -- there was a -- there
(18) was a final rep letter provided to Deloitte &
(19) Touche with those three signatories on it
(20) that, I believe, was provided in -- in the
(21) early April time frame.
(22)  Q.  Now, prior to that final rep letter
(23) having been provided to Deloitte & Touche, you
(24) got on the phone with Ginette Nantel and told
(25) her that you were prepared to sign the rep

Page 52

(1)
(2) letter that you had discussed with her on or
(3) about February 27th; isn't that true?
(4)  A.  I don't recollect that phone call.
(5)  Q.  Was Ginette Nantel the person you
(6) were discussing the rep letter with at this
(7) period in time?
(8)  A.  There was potentially two
(9) individuals; Ginette would have been one,
(10) Pierre Brodeur another.
(11)  Q.  Did you have such a discussion with
(12) Pierre Brodeur? Is that his name?
(13)  A.  Brodeur.
(14)  Q.  Brodeur?
(15)  A.  Yup.
(16)  Q.  Did you have a discussion with
(17) Brodeur to that effect prior to the time that
(18) Deloitte & Touche came to the Audit Committee
(19) and said it was prepared to sign an
(20) unqualified opinion on the financial
(21) statements?
(22)  A.  I don't know. We would have had
(23) discussions prior to February 27th on drafts
(24) of the rep letters. I -- I -- I don't believe
(25) that prior to February 27th that there was a



Page 53

(1)
(2) discussion about having executed all three
(3) signatories on -- on the letter.
(4)    Q.   Did you ever tell either of the
(5) Deloitte partners you just mentioned prior to
(6) February 27, 2001 that the rep letter as
(7) discussed was acceptable to Teleglobe Inc. and
(8) would be signed and delivered to Deloitte &
(9) Touche?
(10)    A.   I don't believe I would have said
(11) that.
(12)    Q.   Would anyone have said that from
(13) the Teleglobe Inc. side of the discussions?
(14)        MR. SCHIMMEL:  Object to form.
(15)    A.   Can you repeat your question,
(16) please?
(17)    Q.   Are you aware of anyone having said
(18) that in words or substance from the Teleglobe
(19) Inc. side of the discussions with Deloitte &
(20) Touche?
(21)    A.   I don't know.
(22)    Q.   Well, who was in discussions with
(23) Deloitte & Touche about the rep letter other
(24) than you?
(25)        MR. SCHIMMEL:  Object to form.

Page 54

(1)
(2)    A.   I -- I can't comment if other
(3) people had discussions.  It was my primary
(4) responsibility.
(5)    Q.   Did you ever become aware of anyone
(6) else having discussions about that rep letter
(7) with Deloitte & Touche other than you?
(8)    A.   I am not aware of any.
(9)    Q.   So as you sit here today, you're
(10) aware of your discussions with Deloitte &
(11) Touche representatives and not aware of anyone
(12) else having had discussions about that same
(13) rep letter, correct?
(14)    A.   Correct.
(15)    Q.   When did you first tell Deloitte &
(16) Touche that the letter as discussed was
(17) acceptable to Teleglobe and would be signed?
(18)    A.   I believe that was only in early
(19) April 2002.
(20)    Q.   So your sworn testimony, just so
(21) I'm perfectly clear on this, is when Deloitte
(22) & Touche came in at the February 27, 2002
(23) Teleglobe Inc. Audit Committee presentation
(24) and told the Audit Committee that it was
(25) prepared to issue an unqualified opinion they

Page 55

(1)
(2) did so notwithstanding never having been told
(3) from anyone at TI; that is, Teleglobe Inc.
(4) that the audit rep letter would be signed; is
(5) that true?
(6)        MR. SCHIMMEL:  Lacks foundation.
(7) Object to form.
(8)    A.   Can you repeat your question again,
(9) please?
(10)    Q.   Sure.  Let me get right to it, all
(11) right?
(12)    A.   Yup.
(13)    Q.   You've represented auditors over a
(14) number of years.  They tend to be pretty
(15) careful people.  I mean, you spent 13 years in
(16) audit, right?  Is that correct?
(17)    A.   Yes, I did.
(18)    Q.   As part of your work in the audit
(19) practice, would it be your observation that
(20) auditors would typically get the rep letters
(21) before they would make the representation to a
(22) public company audit committee that they were
(23) ready to sign the financial statements?
(24)    A.   No.  It was not out of the norm --
(25)    Q.   Okay.

Page 56

(1)
(2)    A.   -- for administrative practice to
(3) get the rep letters, which was really just a
(4) written form of documentation for their files
(5) to confirm discussions, evidence, et cetera
(6) that they would have done as part of executing
(7) their audit work building up to, in this case,
(8) the February 27th date.
(9)    Q.   In fact, you had some discussion
(10) with them prior to February 27 relating to the
(11) language in the audit letter, correct, the
(12) audit rep letter?
(13)    A.   That's likely.
(14)    Q.   You discussed the specific
(15) representations you, Mr. Monty and Mr. Boychuk
(16) were being asked to give, correct?
(17)    A.   Yes.
(18)    Q.   There came a time, didn't there,
(19) during that process, pre February 27, 2002,
(20) when you expressed that you were satisfied
(21) with the language in the audit letter; isn't
(22) that right?
(23)        MR. SCHIMMEL:  Object to form.
(24)    A.   I -- I can't confirm if that was
(25) pre February 27th or post February 27th.

TELEGLOBE COMMUNICATIONS CORP. vs. BCE INC.
STEPHEN SKINNER - 9/8/05

Case 1:04-cv-01266-SLR   Document 265-4   Filed 05/23/2006   Page 7 of 22

Page 57

(2) Q. Would it have been the typical
(3) practice for Deloitte to give an oral
(4) statement that it was prepared to issue an
(5) unqualified opinion prior to the time that
(6) there had been agreement on what the rep
(7) letter would say?
(8) A. There --
(9) MR. SCHIMMEL: I'm sorry, can you
(10) repeat the question, please?
(11) (The record is read back by the
(12) reporter.)
(13) A. I can't comment to Deloitte's
(14) typical practices. I can comment to my
(15) experience with them on the BCE and
(16) subsidiary-related companies.
(17) Q. What I'm talking about is the
(18) practice, if any, with respect to TI's audit.
(19) What would have been the custom in
(20) connection with Deloitte's audit of TI's
(21) financial statements?
(22) MR. SCHIMMEL: Object to form.
(23) A. Can you repeat the question,
(24) please?
(25) Q. Let me rephrase.

Page 58

(2) In connection with TI, would it
(3) have been typical for Deloitte to sign off on
(4) the financial statements orally without having
(5) agreement on the rep letter?
(6) A. Without having the rep letter
(7) finalized and perhaps some -- some edits being
(8) made subsequent to that meeting on the wording
(9) would have been normal administrative
(10) practice.
(11) Q. What I'm trying to get at was a
(12) little bit different. My question had
(13) contemplated agreement on the language of the
(14) rep letter.
(15) Had there ever been a time in your
(16) experience at TI when Deloitte announced it
(17) was prepared to sign off on financial
(18) statements prior to reaching agreement on the
(19) content of the rep letter?
(20) MR. SCHIMMEL: Object to form.
(21) A. Can you rephrase your question
(22) again? I'm not -- I'm just not getting the
(23) issue that you're trying to get at.
(24) Q. Well, let me try to state it
(25) simply.

Page 59

(2) Mr. Skinner, it seems unusual to me
(3) that an outside auditor would make a
(4) presentation to an Audit Committee of a board
(5) of directors and say we're prepared to issue
(6) our unqualified opinion without knowing that
(7) they were going to get a rep letter that they
(8) were comfortable with, that had been agreed
(9) to.
(10) My question is, merely, had you
(11) agreed in principal on the language of the rep
(12) letter before they appeared before the Audit
(13) Committee and said we'll give you an
(14) unqualified opinion?
(15) MR. SCHIMMEL: Object to form.
(16) A. It -- I mean, as I said, I'm trying
(17) to answer your question, but the
(18) administrative practice back then was not
(19) unusual where the rep letter would have been
(20) finalized subsequent to the Audit Committee
(21) meeting and in some instances, some editing of
(22) that rep letter could have taken place
(23) subsequent to the Audit Committee meeting.
(24) Q. Would it be typical to make
(25) material changes in the rep letter after the

Page 60

(2) Audit Committee meeting where Deloitte said
(3) we're prepared to issue our opinion?
(4) MR. SCHIMMEL: Object to form.
(5) A. Can you repeat the question,
(6) please?
(7) (The record is read back by the
(8) reporter.)
(9) A. If you can clarify for me, I guess,
(10) two words. What do you mean by "typical" and
(11) "significant"?
(12) Q. Well, I didn't say "significant."
(13) I said material.
(14) A. Sorry, material. That's what I
(15) meant to say.
(16) Q. I used material because as a
(17) chartered accountant, I'm sure you understood
(18) what material meant. What I mean is
(19) materiality from an accounting point of view.
(20) A. Okay.
(21) Q. Typical, I'll be happy to rephrase
(22) typical. Let me ask this way.
(23) Had there ever been a time, in your
(24) experience, when Deloitte signed off on
(25) financial statements and then material changes



Page 61

(1)
(2)  were made to the language of an audit rep
(3)  letter?
(4)        MR. SCHIMMEL: Object to form.
(5)    A.   I'm struggling with your use of
(6)  "material." Materiality has a concept that's
(7)  expressed in accounting, as you're indicating,
(8)  that is -- is -- is fundamentally founded
(9)  on -- based on a quantum of -- of dollars;
(10) whereas, the language within a representation
(11) letter is -- is really English and frequently
(12) doesn't refer to -- to dollar amounts. So I
(13) just want to make sure I'm clear on what you
(14) mean by a material change.
(15)   Q.   Let me use the word "important." ·
(16) Would that help?
(17)   A.   No.
(18)   Q.   Okay.
(19)        I'll withdraw the question and
(20) we'll ask in the context of the specific
(21) language of the audit rep letters.
(22)   A.   Okay.
(23)   Q.   My colleague, who I think has an
(24) accounting background, suggested a different
(25) try. Let me try this. If it doesn't work,

Page 62

(1)
(2)  we'll go to it in the context of specific
(3)  letters. Let me define materiality for
(4)  purposes of this question as something that if
(5)  Deloitte had known about it, they wouldn't
(6)  have orally agreed to give their unqualified
(7)  opinion.
(8)        Has there ever been a circumstance
(9)  where they gave an unqualified opinion, in
(10) your experience, where the rep letter was
(11) later changed in a way that if they had known
(12) it earlier, they wouldn't have given the
(13) unqualified opinion?
(14)        MR. SCHIMMEL: I'm making a simple
(15)  objection. Basically it lacks
(16)  foundation, but you can answer if you
(17)  understand the question.
(18)   A.   Can you just repeat it for me,
(19) please?
(20)        (The record is read back by the
(21)  reporter.)
(22)   A.   I mean, I can't comment for
(23) Deloitte & Touche, but I'm not aware of any
(24) circumstance with my experience with them
(25) on -- on Teleglobe where they were never

Page 63

(1)
(2)  prepared to give anything but an unqualified
(3)  opinion.
(4)        MR. SCHIMMEL: It may be a good
(5)  time to stop, take a break... We've been
(6)  going for an hour.
(7)        MR. VARALLO: Let ask one or two
(8)  questions, then we'll take a break.
(9)    Q.   You had said earlier that
(10) eventually the language was agreed upon, I
(11) think, in April of 2002; is that correct?
(12)   A.   The lang -- what I said earlier, I
(13) believe, was we provided them the final copy
(14) with the three signatories on it -- of the
(15) letter in early April.
(16)   Q.   In fact, Mr. Monty signed the
(17) document earlier than early April, correct?
(18)   A.   There was a -- a copy of the
(19) document that Mr. Monty had signed earlier,
(20) but he had expressed an objection to certain
(21) wording in the document.
(22)   Q.   And he had signed that prior to
(23) March 3rd of 2002, correct?
(24)        MR. SCHIMMEL: Object to form.
(25)   A.   I -- I don't -- I don't recollect.

Page 64

(1)
(2)    Q.   How much earlier had Monty signed
(3)  the letter as to which he expressed an
(4)  objection or concern about certain language?
(5)        MR. SCHIMMEL: Object to form.
(6)    A.   I -- I honestly don't know when
(7)  Jean had -- had signed.
(8)    Q.   Let me ask it this way.
(9)        When did you become aware that Jean
(10) had signed?
(11)   A.   There was a communication regarding
(12) that at some point in -- in March. I don't
(13) remember the exact date.
(14)   Q.   Who communicated to you -- did someone
(15) communicate to you?
(16)   A.   Yes.
(17)   Q.   Who communicated to you?
(18)   A.   Jean.
(19)   Q.   What did Jean say to you?
(20)   A.   Jean indicated to me that he --
(21) while he had signed the rep letter, he was not
(22) comfortable with the wording in a particular
(23) paragraph and wanted it looked at.
(24)   Q.   What did he do with the document
(25) after he signed it?

TELEGLOBE COMMUNICA-04-CV-00266-SLR    Document 265-4    Filed 05/23/2006    Page 9 of 22    VS. BCE INC.

BSA-XMAX(17/17)
STEPHEN SKINNER - 9/8/05

## Page 65

(1)
(2)    MR. SCHIMMEL: Object to form.
(3)    A.    I -- can you -- can you rephrase
(4) your question?
(5)    Q.    Well, you said Jean told you he
(6) signed the document, correct?
(7)    A.    Yes.
(8)    Q.    What happened to the document after
(9) he signed it?
(10)    MR. SCHIMMEL: Object to form.
(11)    A.    I don't -- I don't know.
(12) Ultimately it did come to me.  What -- what he
(13) did after he signed it, I don't know.
(14)    Q.    Do you know if he forwarded it on
(15) to Deloitte & Touche?
(16)    A.    I -- I wouldn't know what he did,
(17) but that would be highly unusual.
(18)    Q.    What would the typical practice be
(19) after Jean signed rep letters?
(20)    A.    He would send it to me.
(21)    Q.    Okay.
(22)    Did it eventually come to you?
(23)    A.    It came to me.
(24)    Q.    When did it come to you?
(25)    A.    All I recollect is at some point in

## Page 66

(1)
(2) March.
(3)    Q.    Did it come to you roughly
(4) contemporaneous with the telephone call you
(5) just mentioned where he indicated he had some
(6) problems with a particular provision in the
(7) letter?
(8)    A.    I don't think I said it was a
(9) telephone call.
(10)    Q.    I'm sorry.  The communication you
(11) described.
(12)    A.    Yes.
(13)    Q.    Was the communication an in-person
(14) communication?
(15)    A.    An --
(16)    Q.    In-person communication?
(17)    A.    I -- I don't recollect whether it
(18) was a -- an actual voice call, whether it was
(19) a voice mail or an e-mail.  I don't recollect.
(20)    Q.    So you don't know whether you met
(21) him in person and he handed you the letter and
(22) said, "Here it is, but I've got problems with
(23) it" or it came to you some other way, correct?
(24)    A.    Correct.
(25)    Q.    At the point at which it came to

## Page 67

(1)
(2) you with these reservations, what did you do
(3) with the piece of paper that had all three
(4) signatures on it?
(5)    A.    I believe I -- I kept that piece of
(6) paper.  I did not provide it to anyone at that
(7) point in time.
(8)    Q.    You believe that or you're sure of
(9) that?
(10)    A.    I'm -- I'm fairly confident that
(11) that's what I did.
(12)    Q.    You're hedging, with all due
(13) respect.  You said "fairly confident."  Do you
(14) know one way or the other what you did?
(15)    MR. SCHIMMEL: Object to form.
(16)    Q.    I don't mean to argue with you.  I
(17) just want to press the point.
(18)    Do you know for sure what you did
(19) with the letter?
(20)    A.    Physically what I did with the --
(21) you know, I'm just struggling.  What did I do
(22) with the letter?  Did I put it on my desk?
(23) Did I put in a file?  Did I leave it with my
(24) admin assistant?  No.  I do not recollect.
(25)    Q.    Or did you hand it to someone and

## Page 68

(1)
(2) say, "Deliver it to Deloitte & Touche"?
(3)    A.    No.  That, I did not ask anyone nor
(4) myself to deliver it to Deloitte & Touche.
(5)    Q.    You're positive of that?
(6)    A.    That, I am positive of.
(7)    Q.    Didn't there come a time when
(8) Deloitte & Touche called and said in words or
(9) substance, "Hey, where's our rep letter?"
(10)    A.    I don't recollect if they made such
(11) a call.
(12)    MR. VARALLO:  Well, let's take our
(13) broke now and we'll pick up after the
(14) break.
(15)    THE VIDEOGRAPHER:  We are now off
(16) the record at 11:04.
(17)    (A brief recess was taken.)
(18)    THE VIDEOGRAPHER:  This is tape two
(19) of the deposition of Stephen Skinner.  We
(20) are now on the record at 11:13.
(21)    Q.    Mr. Skinner, before my digression
(22) about audit rep letters, we were talking about
(23) Skinner Exhibit 2, which was a press release.
(24)    I think you told me one of the
(25) things you did then and still do is financial

TELEGLOBE COMMUNICATIONS Case 1:04-cv-01266-SLR Document 265-4 Filed 05/23/2006 Page 10 of 22 VS. BCE INC.

STEPHEN SKINNER - 9/8/05



Page 293

(1)
(2) signature. The second sentence says, "Letters
(3) relate to Teleglobe Inc. fiscal 2000 as well
(4) as Q1 and Q2 of 2001," right? Is that
(5) correct, sir?
(6) A. Correct.
(7) Q. We've been talking about the rep
(8) letter for Q1 2001, right?
(9) A. That's correct.
(10) Q. Drawing your attention to numbered
(11) paragraph 3 of your letter to Monty, reads,
(12) "D&T has expressed concern over the cash flow
(13) situation over the coming year due to an
(14) anticipating shortfall at Teleglobe. Hence,
(15) D&T have asked for representations relating to
(16) BCE's financial support of Teleglobe, which in
(17) the absence of said representation,
(18) Teleglobe's financial statements may require a
(19) going concern note."
(20)     Have I correctly read that section
(21) of your letter to Monty?
(22) A. Yes.
(23) Q. You would have had these
(24) conversations with D&T before sending your
(25) letter to Monty, correct?

Page 294

(1)
(2) A. Yes.
(3) Q. So does seeing that refresh your
(4) recollection of having conversations to the
(5) effect that if you didn't put the language in
(6) 13, you were going to get a going concern
(7) note?
(8)     MR. SCHIMMEL: Object to form. It
(9) misstates the document.
(10) A. I don't -- I don't remember the
(11) exact nature of any specific discussions, but
(12) it is -- it is a logical conclusion that if --
(13) if we didn't give such representations, D&T
(14) would have expressed the potential need to put
(15) in a going concern and we would have had that
(16) debate and discussion. But, I mean, we never
(17) had that debate and discussion because D&T was
(18) aware of -- of -- of -- of BCE's
(19) representations prior to this. This is a
(20) formal -- a formality process of putting it in
(21) writing.
(22) Q. You never had the discussion with
(23) D&T?
(24) A. No. I'm not saying that.
(25) Q. You just said you never had that

Page 295

(1)
(2) debate and discussion. I'm directly quoting
(3) you.
(4) A. No, no. We never had the debate
(5) and discussion about saying to them we aren't
(6) going to give you this representation, what
(7) are you going to do about it.
(8) Q. I see. They said to you, "We need
(9) the rep." You said, "Why?" They said,
(10) "Because we got a going concern issue,"
(11) correct?
(12) A. Oh, I'm not even sure that was the
(13) nature of the discussion. It could have been
(14) we need the representation in order to be able
(15) to issue the Teleglobe financial statements on
(16) a going concern basis.
(17) Q. Let me be more clear.
(18) A. I don't --
(19) Q. Let me be more clear. This is your
(20) letter to Monty, right, Exhibit 18?
(21) A. Yes.
(22) Q. Okay.
(23)     You say to Monty, "D&T has
(24) expressed concern."
(25) A. Mm-hmm.

Page 296

(1)
(2) Q. To whom did D&T express concern?
(3) A. Yeah. I mean, in -- in reading
(4) this paragraph, I'm not sure I used the best
(5) words to explain what I was trying to tell
(6) Mr. Monty and that I'm not sure D&T expressed
(7) concern. D&T -- you know, what I -- what I --
(8) the process that I like to follow when I
(9) submitted these letters to Mr. Monty was to do
(10) two things -- well, three things actually.
(11) Keep it short.
(12)     Number two, draw -- draw specific
(13) attention for him to facilitate his review of
(14) the letters where there are new paragraphs or,
(15) you know -- as we talked about earlier, there
(16) are some paragraphs that are very standard in
(17) a -- in a representation letter that Mr. Monty
(18) is used to, so to draw attention to ones that
(19) are new or added or edited and to explain to
(20) him why we need that particular
(21) representation.
(22) Q. Okay.
(23) A. Hopefully that will help him making
(24) the decision he's -- he's okay to sign the
(25) letter. So, you know, what I was trying to

Page 297

(1)
(2) express to him here was that, you know, there
(3) had to be a specific representation in the
(4) letter because it was logical to conclude
(5) that, you know, in the absence of having that
(6) representation, D&T might be -- might be
(7) concerned about issuing Teleglobe financial
(8) statements on a going concern basis.
(9)     Q.   Yeah. I understand how you want to
(10) read it now. But, in fact, D&T said to you
(11) that they were going to give you a going
(12) concern qualification if you didn't include
(13) that representation; isn't that right, sir?
(14)         MR. SCHIMMEL: Object to form.
(15)     A.   I'm not sure whether they actually
(16) said that to me or not.
(17)     Q.   This isn't the first version of
(18) this. You drafted a draft of this letter
(19) before you sent it to Monty; isn't that right,
(20) sir?
(21)     A.   I -- I don't recollect.
(22)     Q.   Let's see if we can't help because
(23) the draft's a little more explicit.
(24)         MR. VARALLO: Mark, please, as the
(25) next document a document bearing Bates

Page 298

(1)
(2) stamp No. BCE-E 7824 through 7829.
(3)         (Handing.)
(4)         (BCE-E 7824 - 7829 was marked
(5)         Skinner Exhibit 19 for identification, as
(6)         of this date.)
(7)     Q.   Mr. Skinner, take a look at 19, if
(8) you can. Tell me if you can identify that as
(9) a draft of 18.
(10)     A.   (Reading document.) It looks to
(11) have some similar content.
(12)     Q.   Let me draw your attention to the
(13) second bullet point under "First Quarter 2001,
(14) Letter Dated April 24, 2001," which was the
(15) rep letter we had marked as 17 and had been
(16) talking about.
(17)         The second bullet point under that
(18) heading says, "Paragraph 13 was required, as
(19) D&T expressed concern over the cash flow
(20) situation over the coming year that showed a
(21) shortfall. Therefore, without this
(22) representation, a going concern note would
(23) have had to be included in the financial
(24) statements."
(25)         You wrote those words, didn't you,

Page 299

(1)
(2) sir?
(3)     A.   I don't remember this particular
(4) draft, but I do remember the final letter.
(5)     Q.   Is there any reason to believe that
(6) the draft as written is incorrect?
(7)         MR. SCHIMMEL: Object to form.
(8)     Q.   In its plain use of the English
(9) language?
(10)         MR. SCHIMMEL: Object to form.
(11)     A.   I don't know. I mean, I -- I
(12) notice there has been edits done to it, so
(13) I -- you know, I can't comment. I mean, it
(14) wasn't issued in final so, you know, there is
(15) a possibility I did reviews and corrections to
(16) it to clarify exactly what I was trying to
(17) say.
(18)     Q.   Okay.
(19)         So you would have reviewed and
(20) edited 19 to get to 18, correct?
(21)     A.   Well, I don't remember 19, so I
(22) can't say whether I did it or not. I don't
(23) remember 19.
(24)     Q.   If you had authored 19, given its
(25) similarity to 18, you would have reviewed and

Page 300

(1)
(2) edited 19 in order to get to 18; is that a
(3) fair statement?
(4)         MR. SCHIMMEL: Object to form.
(5)     A.   There's a possibility I went
(6) through a series of drafts to come to the
(7) final letter on 18.
(8)     Q.   That's because Monty was your boss
(9) at BCE and he was your boss at Teleglobe
(10) ultimately, correct? He was chairman of both
(11) companies?
(12)     A.   I -- I don't see the relevance of
(13) that.
(14)     Q.   How often did you communicate with
(15) Jean Monty, the CEO and chairman of BCE and
(16) the CEO and chairman of Teleglobe --
(17)     A.   I did not have --
(18)     Q.   -- during the course of your work?
(19)     A.   I did not have regular interaction
(20) with Mr. Monty.
(21)     Q.   It was something that was done from
(22) time to time, correct?
(23)     A.   Correct.
(24)     Q.   And you just told me that there was
(25) a process you used when you communicated to

Page 301

(1)
(2) Monty. You tried to make it short, sweet and
(3) to the point, right?
(4)    A.   Mm-hmm.
(5)    Q.   In fact, you took extra pains to
(6) make sure it was short, sweet and to the point
(7) because he was a busy man, correct?
(8)    A.   Correct.
(9)    Q.   He was your boss in both companies,
(10) right, ultimately?
(11)    A.   Ultimately, yes.
(12)    Q.   So when you wrote to him Skinner 18
(13) and said, "Hence, D&T have asked for
(14) representations," that was as accurate as you
(15) could make it at the time; isn't that right?
(16)    A.   I don't know if that's as accurate
(17) I could have made it at that time. That's
(18) what I concluded to be the wording I would use
(19) in the final version of the letter I sent to
(20) him.
(21)    Q.   You're not trying to walk away from
(22) that language?
(23)    A.   I'm not trying to walk away from
(24) that language, no.
(25)    Q.   Okay.

Page 302

(1)
(2)      Do you have any recollection of a
(3) specific discussion in which D&T asked you to
(4) provide representations in the absence of
(5) which they would require a going concern note?
(6)    A.   No. I do not have recollection of
(7) those discussions.
(8)    Q.   Do you now seek to testify that
(9) those discussions did not take place?
(10)    A.   No. I'm not saying that. I'm not
(11) saying they didn't take place.
(12)    Q.   So let's go back to 17, the rep
(13) letter itself. Very first sentence of
(14) paragraph 13 says that the company has the
(15) necessary financial support at BCE to "support
(16) its operations in such a manner relevant to
(17) the company's ability to continue as a going
(18) concern."
(19)      Now, that's language you would have
(20) discussed with D&T; isn't that right?
(21)    A.   I don't know if I discussed it with
(22) them. We -- they clearly would have drafted
(23) wording to go into the representation letter
(24) and I may or may -- I would have reviewed it
(25) and I may or may not have commented on it.

Page 303

(1)
(2)    Q.   That speaks directly to the going
(3) concern issue we just talked about; isn't that
(4) right?
(5)    A.   That speaks directly to the going
(6) concern issue.
(7)    Q.   What factual basis did you have for
(8) signing the letter that contained the
(9) statement I just read to you at the time you
(10) signed it?
(11)    A.   The factual basis I had from an
(12) accounting perspective, what is required to
(13) satisfy the particular element -- you know, my
(14) interpretation of what Deloitte & Touche is --
(15) is -- is after here is -- is at a point in
(16) time, in this case April 24th, a
(17) representation of that is the intent of the
(18) company of -- of the path to pursue and
(19) through various ongoing discussions, you know,
(20) Teleglobe was considered core to the company.
(21) We were continuing to invest money
(22) into Teleglobe. You know, MD&A, financial
(23) statement discussions. There was -- there was
(24) never anything that I was aware of that had
(25) suggested that the intent of BCE was not to at

Page 304

(1)
(2) that time continue the financial support.
(3)    Q.   Did you honestly believe personally
(4) that the statement contained in the first
(5) sentence of paragraph 13 was true and accurate
(6) at the time you signed the rep letter?
(7)    A.   Just make sure I understood your
(8) question right. Do you mind repeating it or
(9) having it repeated?
(10)    Q.   Yeah. This is a softball. Let me
(11) try it again.
(12)      Did you personally believe,
(13) honestly, that the statements contained in the
(14) first sentence of paragraph 13 of this exhibit
(15) were true and correct when you signed the
(16) letter?
(17)    A.   Yes.
(18)    Q.   Good.
(19)      And you believed, didn't you, the
(20) veracity of the first sentence in paragraph 13
(21) in part because you relied on the accuracy of
(22) BCE's statements when it said Teleglobe was
(23) core to its operations and Teleglobe was an
(24) important company from its perspective,
(25) correct?



Page 337

(1)
(2)     document bearing Bates stamp No.
(3)     R.2004-BCE 12160 through 63 formerly
(4)     marked as Vanaselja 3.
(5)     **(Handing.)**
(6)     **(R.2004-BCE 12160 - 63 was marked**
(7)     **Skinner Exhibit 22 for identification, as**
(8)     **of this date.)**
(9)     **Q.**    Mr. Skinner, without the benefit of
(10)    the documents, we had spoken this morning
(11)    about certain representation letters that were
(12)    signed and apparently, according to you
(13)    anyway, not communicated to Deloitte & Touche.
(14)        What I've tendered you as Skinner
(15)    22 is a rep letter for year ended December 31,
(16)    2001 for Teleglobe. For the purposes of
(17)    answering the next question, I draw your
(18)    attention to paragraph 12 of the document and
(19)    I'll just ask you to read it to yourself.
(20)        My question will be, once you've
(21)    done that, is this the letter we were talking
(22)    about earlier that Monty signed with some
(23)    reservation and you put in your drawer at some
(24)    point in time?
(25)        **MR. SCHIMMEL:**  I merely object to

Page 338

(1)
(2)     the characterization of the letter.
(3)     **A.**    I think I've stated I -- that I
(4)     didn't state that I put it in my drawer but --
(5)     **Q.**    Right.
(6)     **A.**    **Is not the letter.**
(7)     **Q.**    Okay.
(8)         So is this a letter that was signed
(9)     on or about its date, January 23, 2002?
(10)    **A.**    **I believe so, yes.**
(11)    **Q.**    Your signature appears on this,
(12)    correct?
(13)    **A.**    **Yes, it does.**
(14)    **Q.**    Did you collect Mr. Boychuk and
(15)    Mr. Monty's signature at or about the 23rd of
(16)    January 2002?
(17)    **A.**    **Probably sometime shortly**
(18)    **thereafter.**
(19)    **Q.**    Then when you got those signatures
(20)    and the letter was fully executed, did you
(21)    transmit it to Deloitte & Touche, LLP?
(22)    **A.**    **That's probably what happened.**
(23)        **MR. VARALLO:**  Now's a good time to
(24)    break for the day, Mr. Schimmel. Also,
(25)    it's not something we've dealt with

Page 339

(1)
(2)     before, but I simply want to remind you
(3)     that under the specific rules of the
(4)     District of Delaware you need a five-day
(5)     break in the deposition to be able to
(6)     discuss the substance of the testimony
(7)     with the witness.
(8)         **MR. SCHIMMEL:**  Very well.
(9)         **THE VIDEOGRAPHER:**  This concludes
(10)    today's deposition of Stephen Skinner.
(11)    We are now off the record at 5:27.
(12)        **(Time noted: 5:27 p.m.)**
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

Page 340

(1)
(2)     A C K N O W L E D G M E N T
(3)
(4)     STATE OF NEW YORK   )
                          :
(5)     COUNTY OF           )
(6)
(7)
(8)         I, STEPHEN SKINNER, hereby certify
(9)     that I have read the transcript of my
(10)    testimony taken under oath in my deposition of
(11)    September 8, 2005; that the transcript is a
(12)    true, complete and correct record of my
(13)    testimony, and that the answers on the record
(14)    as given by me are true and correct.
(15)
(16)

(17)    _____
            STEPHEN SKINNER
(18)    Signed and Subscribed to
(19)    before me, this _____ day
(20)    of _____, 2005
(21)    _____
        Notary Public, State of New York
(22)
(23)
(24)
(25)

## Page 345

(1)
(2)     IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE
(3) ---------------------------------x
(4) In re:
(5) TELEGLOBE COMMUNICATIONS CORPORATION, et al.,
(6)     Debtors,
(7) ---------------------------------x
(8) TELEGLOBE COMMUNICATIONS CORPORATION, et al.,
(9)     Plaintiff,
(10)   - against -
(11) BCE INC., MICHAEL T. BOYCHUK, MARC A.
BOUCHARD, SERGE FORTIN, TERENCE J. JARMAN,
(12) STEWART VERGE, JEAN C. MONTY, RICHARD J.
CURRIE, THOMAS KIERANS, STEPHEN P. SKINNER,
(13) and H. ARNOLD STEINBERG,
(14)     Defendants.
   ---------------------------------x
(15)
(16)     599 Lexington Avenue
New York, New York
(17)
(18)     September 9, 2005
(19)     9:09 a.m.
(20)     CONTINUED VIDEOTAPED DEPOSITION of
(21) STEPHEN SKINNER, before Michele Moskowitz, a
(22) Notary Public of the State of New York.
(23)
(24)   ELLEN GRAUER COURT REPORTING, CO. LLC
    126 East 56th Street
(25)     New York, New York 10022
    212-750-6434
    REF: 78538

## Page 346

(1)     A P P E A R A N C E S
(2)
(3) RICHARDS, LAYTON & FINGER, LLP
   Attorneys for Plaintiff
(4)    One Rodney Square
   Wilmington, Delaware 19899
(5)
(6) BY:  GREGORY V. VARALLO, ESQ.
(7)
(8) HAHN & HESSEN, LLP
   Attorneys for Plaintiff
   488 Madison Avenue
(9)    New York, New York 10022
(10) BY:  ROBERT MALATAK, ESQ.
(11)
(12) SHEARMAN & STERLING, LLP
   Attorneys for Defendants
(13)    599 Lexington Avenue
   New York, New York 10022-6069
(14)
(15) BY:  DANIEL SCHIMMEL, ESQ.
(16)
(17) **ALSO PRESENT:**
(18)    Vincenzo Petulla, Videographer
(19)
(20)
(21)
(22)
(23)
(24)
(25)

## Page 347

(1)
(2)    **THE VIDEOGRAPHER:** This is tape
(3) one. We are now on the record at 9:09
(4) Friday, September 9, 2005. This is the
(5) continuation of the deposition of Stephen
(6) Skinner in the matter of Teleglobe
(7) Communications versus BCE Inc. This
(8) deposition is being held at the offices
(9) of Shearman & Sterling. The court
(10) reporter is Michele Moskowitz with Ellen
(11) Grauer Reporting. I am the legal
(12) videographer, Vincenzo Petulla, also with
(13) Ellen Grauer Reporting.
(14)    Would counsel please introduce
(15) themselves.
(16)    **MR. VARALLO:** Good morning. Greg
(17) Varallo from Richards, Layton & Finger
(18) for the plaintiffs.
(19)    **MR. MALATAK:** Robert Malatak from
(20) Hahn & Hessen for the plaintiff.
(21)    **MR. SCHIMMEL:** Daniel Schimmel of
(22) Shearman & Sterling, LLP for the
(23) defendants.
(24)    **THE VIDEOGRAPHER:** Will the court
(25) reporter please swear in the witness.

## Page 348

(1)
(2)    (The witness is reminded he's still
(3)    under oath.)
(4) CONTINUED EXAMINATION BY
(5) MR. VARALLO:
(6)   Q.  Mr. Skinner, good morning. I trust
(7) you had a nice evening.
(8)   A.  Very good. Thank you.
(9)   Q.  Good.
(10)    When we left off yesterday we were
(11) talking about Skinner 22, a January 23, 2002
(12) rep letter. You signed this letter, correct?
(13)   A.  That is correct.
(14)   Q.  This letter was sent on or about
(15) its date, give or take, to Deloitte & Touche
(16) as part of their work on the fourth quarter
(17) 2001 financial statements, correct?
(18)   A.  I believe so, yes.
(19)   Q.  This letter hasn't been superceded,
(20) replaced or otherwise corrected; is that also
(21) correct?
(22)   A.  That's correct.
(23)   Q.  Let me draw your attention, if I
(24) can, to numbered paragraph 12 of the letter.
(25) This is language not dissimilar to language

Page 353

(1)
(2) this letter whether that financing was being
(3) pursued?
(4)     A.   I don't remember.
(5)     Q.   How about the joint ventures, did
(6) you know whether or not they were being
(7) pursued at the time you signed this letter in
(8) January of 2002?
(9)     A.   By any -- in -- in the sense of any
(10) joint ventures?
(11)     Q.   Yes, sir.
(12)     A.   I wouldn't -- from -- as I
(13) indicated, I was aware from the November and
(14) December time frame it was being looked at and
(15) I wasn't aware of anything that happened
(16) subsequent to that that would have changed my
(17) view.
(18)     Q.   I think you told me yesterday the
(19) joint ventures that you were aware of being
(20) pursued were Telecom Italia and SBC, correct?
(21)     MR. SCHIMMEL:  Object to form.
(22)     A.   Correct.
(23)     Q.   Did you know the status of those
(24) potential joint ventures at the time you
(25) signed this letter?

Page 354

(1)
(2)     A.   I don't remember.
(3)     Q.   You don't remember that you knew or
(4) you don't remember what the status was?
(5)     My question is, did you know at the
(6) time you signed the letter what the status of
(7) the joint ventures was?
(8)     A.   I -- I don't remember if I knew.
(9)     Q.   Last sentence of this particular
(10) representation talks about management's belief
(11) that the company will have financial resources
(12) to meet its obligations.
(13)     That's the sentence Mr. Monty had
(14) trouble with later on; isn't that true?
(15)     MR. SCHIMMEL:  Object to form.
(16)     A.   I -- I don't remember that one in
(17) particular.  He might have -- he might have
(18) raised a comment about that one, but it
(19) wasn't -- if -- if he did raise a comment
(20) about that one, it wasn't the only one.
(21) Because there's another one I remember.
(22)     Q.   What is the other one you remember
(23) him having some trouble with?
(24)     A.   The use of the word -- where we're
(25) talking about, "In addition at the CEO

Page 355

(1)
(2) conference held December 12th BCE committed."
(3) The use of the word "committed" there.
(4)     Q.   What did he say to you about the
(5) use of the word "committed"?
(6)     A.   I'm not sure he said anything more
(7) than he was not sure that that word was clear.
(8)     Q.   Was that during an oral
(9) conversation you had with him?
(10)     A.   I -- I don't recollect whether it
(11) was an oral or e-mail or voice mail.
(12)     Q.   But somehow he communicated to you
(13) that he thought the use of the word
(14) "committed" might not be clear, correct?
(15)     A.   Correct.
(16)     Q.   When did that communication take
(17) place?
(18)     A.   That communication took place
(19) sometime in March, I believe.
(20)     Q.   And that would have been March of
(21) 2002; is that right?
(22)     A.   March of 2002.
(23)     Q.   Now, after that communication took
(24) place, was anything done to withdraw, change
(25) or amend this letter?

Page 356

(1)
(2)     A.   The January 1 --
(3)     MR. SCHIMMEL:  Object --
(4)     Q.   Yes, sir.
(5)     MR. SCHIMMEL:  Object to the form.
(6)     A.   No, there was not.  I believe it
(7) was an oversight in that we looked at the
(8) February letter but not the January.
(9)     Q.   The last sentence of this paragraph
(10) we were talking about just a moment ago talks
(11) about management's belief.
(12)     You're one of the management who's
(13) belief is being expressed here, correct?
(14)     A.   Correct.
(15)     Q.   The belief is that the company will
(16) have the financial resources to meet its
(17) obligations as they become due and that goes
(18) to solvency, right, and going concern?  That's
(19) what you're addressing here from the point of
(20) view of the rep letter to the auditors,
(21) correct?
(22)     A.   Right.  I wouldn't say solvency in
(23) a legal sense though.
(24)     Q.   Okay.
(25)     From an accounting perspective?

Page 381

(1)
(2)  don't remember it, that at some point in 2002
(3)  you sent a letter to Turcotte and Lalande
(4)  attaching these rep letters and pointing out
(5)  that Monty has "an issue/concern" with
(6)  paragraph number 30 on page 5?
(7)      A.    Yes.
(8)      Q.    Turcotte is the chief legal officer
(9)  of BCE at this time, correct?
(10)     A.    Correct.
(11)     Q.    So to the extent that chairman of
(12) the board and CEO has a problem, did the chief
(13) legal officer get involved in trying to help
(14) solve the problem?
(15)        MR. SCHIMMEL:  Object to form.
(16)     A.    I don't think there was a problem,
(17) but I do -- I do recollect working -- working
(18) with the lawyers and I believe it was both
(19) Michel and Martine and in -- in the redrafting
(20) of -- of the wording for the rep letter.
(21)     Q.    Did they work with you to redraft
(22) the wording in paragraph 30 of the rep letter?
(23)        MR. SCHIMMEL:  Object to form.
(24)     A.    I do believe that Michel and
(25) Martine worked on the redrafting of the

Page 382

(1)
(2)  wording for paragraph 30.
(3)      Q.    Just for clarity, when we're
(4)  talking about paragraph 30, we're talking
(5)  about paragraph 30 which is contained in
(6)  Skinner 23 and specifically on page 3519 of
(7)  Skinner 33, correct?  I said 33.  I meant 23.
(8)      A.    3519, that's correct.
(9)      Q.    Okay.
(10)        And that's the language that
(11) Turcotte and Lalande commented on, correct?
(12)     A.    Well, I'm sorry to pick on your
(13) word.  That's the language that they reviewed
(14) and would have been involved in the re-editing
(15) of.
(16)     Q.    Okay.
(17)        And they did that prior to the time
(18) you went back to -- you personally went back
(19) to Deloitte & Touche to talk to them about how
(20) to change paragraph 30, correct?
(21)        MR. SCHIMMEL:  Object to form.
(22)     A.    Well, there was two -- there was
(23) two events with Deloitte & Touche that I can
(24) remember.  There was an initial phone call
(25) indicating that we were going to be amending

Page 383

(1)
(2)  the wording of the letter.  I believe -- I
(3)  don't recollect how, but I believe they
(4)  actually ended up getting a copy of this
(5)  letter.  So that's why I phoned them, to
(6)  indicate to them that the letter was not
(7)  final.  We were not submitting it to them
(8)  for -- as -- as a final representation letter
(9)  and we were looking at the wording and we
(10) would get back to them to make sure they were
(11) comfortable with any wording changes that we
(12) did make at a later date, which was in April,
(13) I believe.
(14)        I did go back to them with the
(15) amended wording and they had, to my
(16) recollection, no issue whatsoever with the
(17) amended wording and agreed it was consistent
(18) with their understanding and consistent with
(19) the disclosures in the MD&A and the financial
(20) statements.
(21)     Q.    Okay.
(22)        There are a couple of pieces of
(23) that I want to follow up on.  You said just a
(24) moment ago that you believe that they got a
(25) copy of the letter as signed, correct?

Page 384

(1)
(2)      A.    Correct.
(3)      Q.    By "they" you meant Deloitte &
(4)  Touche, correct?
(5)      A.    By "they" I meant Deloitte &
(6)  Touche, yes.
(7)      Q.    So notwithstanding the intention of
(8)  the signatories yourself included not to
(9)  communicate this signed letter -- and by that
(10) I mean the letter attached to Skinner 23 dated
(11) February 27, 2002 addressed to Deloitte &
(12) Touche for year end December 31, 2001.
(13) Although it was your intention not to
(14) communicate that signed letter to Deloitte &
(15) Touche, somehow they got a copy of the signed
(16) letter, correct?
(17)     A.    That is correct.
(18)     Q.    Okay.
(19)        When did they get a copy of the
(20) signed letter?
(21)        MR. SCHIMMEL:  Object to form.
(22)     A.    I -- I don't -- I don't remember
(23) exactly because I don't remember how they got
(24) it.  But what I do recollect is phoning them
(25) in the mid to end March time frame for that

## Page 385

(1)
(2) first call that I alluded to.
(3)    Q.   So it would be fair to assume that
(4) they got a copy of the signed letter prior to
(5) your phone call, correct?
(6)    A.   Oh, yes.
(7)    Q.   Okay.
(8)        Now, the letter's dated February
(9) 27, 2002.
(10)   A.   Mm-hmm.
(11)   Q.   So can we assume that they got a
(12) copy of the letter sometime between its date
(13) and middle of March when you made your phone
(14) call?
(15)   A.   Mid to end March, I believe I said,
(16) yeah.
(17)   Q.   Middle to the end of March, that's
(18) fine.
(19)        Is that a fair assumption?
(20)   A.   Yes.
(21)   Q.   Being a big proponent of Achem's
(22) Razor, can we also assume that someone, not
(23) you, saw the signed letter, saw it was a rep
(24) letter and sent it off to Deloitte?
(25)       MR. SCHIMMEL:  Object to form.

## Page 386

(1)
(2)    A.   I don't think we can assume that,
(3) no.
(4)    Q.   Okay.
(5)        Apparently the simplest explanation
(6) isn't the correct one.  What is your best
(7) understanding of how the letter came to be
(8) communicated to Deloitte?
(9)    A.   I don't remember.
(10)   Q.   Do you have any understanding, as
(11) you sit here today, as to how that letter came
(12) to be communicated to Deloitte?
(13)   A.   There's a -- there's a couple of
(14) potential scenarios and I honestly don't
(15) remember which one was the method by which
(16) they did get it.
(17)   Q.   What are the potential scenarios?
(18)   A.   Potential scenarios are that they
(19) might have asked for it.  My -- my assistant,
(20) who has full access to -- to my office and my
(21) papers, might have sent it to them.  I might
(22) have sent it to them as a draft to discuss
(23) with them as part of the phone call to say,
(24) you know, here's the paragraph we're going to
(25) look at and amend, but it's not a final

## Page 387

(1)
(2) letter.  You know, those are two options that
(3) come to mind, but I'm sure there's other ways
(4) they could have gotten it, too.
(5)    Q.   Okay.  I want to focus on the
(6) second option.
(7)    A.   Yeah.
(8)    Q.   You told me a moment ago that you
(9) called them to say it wasn't final.
(10)   A.   Yup.
(11)   Q.   So you wouldn't have sent it to
(12) them to call them to talk about it if you
(13) separately called them to say it wasn't final,
(14) correct?
(15)       MR. SCHIMMEL:  Object to form.
(16)   A.   Sorry.  I just didn't understand
(17) your question.
(18)   Q.   Neither did I, so let me start
(19) over.
(20)       You said to me a moment ago that
(21) you became aware that they got a copy of the
(22) letter and at sometime in mid to late March
(23) you called them to say, hey, this isn't final
(24) and that it was going to be amended.
(25)       Do you recall giving that testimony

## Page 388

(1)
(2) just a moment ago?
(3)       MR. SCHIMMEL:  Object to form.
(4)    A.   No.  I don't believe that's the way
(5) I said it.
(6)    Q.   Okay.  Let's scroll back and have
(7) the benefit of the court reporter's computer
(8) here.
(9)       (The record is read.)
(10)   Q.   The court reporter indicated,
(11) "There was an initial phone call indicating
(12) that we were going to be amending the wording
(13) of the letter.  I believe -- I don't recollect
(14) how, but I believe they actually ended up
(15) getting a copy of this letter.  So that's why
(16) I phoned them, to indicate to them that the
(17) letter was not final."
(18)       I've just read what the court
(19) reporter has on her computer for your answer a
(20) moment ago.
(21)   A.   Mm-hmm.
(22)   Q.   Do you now want to change that
(23) answer?
(24)       MR. SCHIMMEL:  Object to form.
(25)   A.   No.  I don't think I want to change

Page 389

(2) that answer. I think it -- it -- it meshes
(3) with my statement of maybe my secretary sent
(4) it or maybe I sent it to them and proceeded it
(5) with a phone call.
(6)    Q.    Okay.
(7)    You don't remember, as you sit here
(8) today, whether, in fact, you sent it to
(9) Deloitte, correct?
(10)    A.    That's correct.
(11)    Q.    Now, how did you become aware that
(12) they had the letter, notwithstanding your
(13) intention that they not have the letter?
(14)    A.    I don't remember.
(15)    Q.    When did you become aware that they
(16) had the letter, notwithstanding your intention
(17) that they not have the letter?
(18)    A.    I -- I don't remember.
(19)    Q.    Was it immediately prior to the
(20) phone call you made to them in middle or late
(21) March of 2002?
(22)    A.    I don't remember.
(23)    Q.    Let me get this straight, Monty
(24) signs the letter, sends it to you. Somehow,
(25) you're not sure, it might have been you,

Page 390

(2) you're not sure, though, it gets to Deloitte.
(3) Sometime between the middle and end of March,
(4) you're not sure when, you called them and say
(5) we're going to be amending this letter, it's
(6) not final, but you don't recall anything about
(7) how you came to make that call or how you
(8) learned that they, in fact, had the letter; is
(9) that true?
(10)    MR. SCHIMMEL: Object to form.
(11)    A.    I don't remember how they got the
(12) letter and that -- I think that's it. I don't
(13) remember how they got the letter, yes.
(14)    Q.    And I'm asking something --
(15)    A.    Sorry.
(16)    Q.    -- in addition to that. Just so
(17) we're absolutely clear.
(18)    A.    Yup.
(19)    Q.    I'm focusing on the phone call you
(20) made to them in middle to late March.
(21)    A.    Mm-hmm.
(22)    Q.    And I want to confirm for the
(23) record so that there's no doubt whatsoever at
(24) trial that your testimony, as you sit here
(25) today, is that you don't recall how you

Page 391

(2) learned that they had the letter in middle to
(3) late March of 2002; is that true?
(4)    A.    How they learned -- how I learned
(5) they got the -- I don't remember how they got
(6) the letter.
(7)    Q.    No, no.
(8)    A.    I'm misunderstanding your question.
(9)    Q.    Okay. Let me try to rephrase it
(10) then.
(11)    A.    Yeah.
(12)    Q.    It's useful because I want to make
(13) sure we've got a clear record and it's fair to
(14) your testimony.
(15)    At some point during middle to late
(16) March, you placed a phone call to Deloitte,
(17) that's correct, isn't it?
(18)    A.    Correct.
(19)    Q.    And that phone call was to say the
(20) letter that you have isn't final and it's
(21) going to be amended; is that also correct?
(22)    A.    Correct.
(23)    Q.    What caused you to place that phone
(24) call?
(25)    A.    I don't remember whether it was me

Page 392

(2) learning they had the letter or whether it was
(3) me knowing that I had received comments back
(4) from Jean Monty, that I was passing that on or
(5) whether it was me responding to a request for
(6) them for the rep letter and saying that
(7) we're -- we're amending it. It -- I don't
(8) remember the -- you know, it could have been
(9) one of those three or another option.
(10)    Q.    So as best you recall -- well, you
(11) don't recall whether you got comments from
(12) somebody and said, "Whoops, that's not a final
(13) letter. I need to call them up and tell them
(14) it's not final" or something else happened?
(15)    MR. SCHIMMEL: Object to form.
(16)    A.    I don't remember.
(17)    Q.    But it could be -- understanding
(18) you don't have a current recollection, it
(19) could be, it's possible, that somebody sent
(20) you comments on it, whoever that was, and that
(21) as a result of getting comments, you realized
(22) it wasn't final. You called them and said,
(23) "Well, hold on. It's not final. You're going
(24) to be getting further comments"?
(25)    MR. SCHIMMEL: Object to form.

Page 393

(1)
(2)   A.   I'm not sure I understand your
(3)   question.
(4)   Q.   I was just trying to follow up on
(5)   your answer of a moment ago.
(6)   A.   Okay.
(7)   Q.   You said you weren't sure whether X
(8)   happened or Y happened or Z happened.
(9)   A.   Yup.
(10)   Q.   I just want to make it clear for
(11)   the record. In your mind, one possible
(12)   explanation for why you called Deloitte &
(13)   Touche in middle to late March of 2002 was
(14)   that someone internally sent you comments on
(15)   this letter and you realized upon receiving
(16)   these comments that the letter wasn't final,
(17)   called them to say it wasn't final?
(18)       MR. SCHIMMEL: Object to form.
(19)   Q.   Is that your understanding of what
(20)   could have happened?
(21)   A.   No.
(22)   Q.   Okay.
(23)   A.   No. I don't believe I said that.
(24)   Q.   All right.
(25)   A.   There was -- you know, the letter

Page 394

(1)
(2)   was not final up until the point in April when
(3)   we made the amended wording changes. Prior to
(4)   that, while there was signatures on the
(5)   document, Mr. Monty had made it extremely
(6)   clear that he was not comfortable with the
(7)   wording in paragraph 30 and -- and at no point
(8)   in time, therefore, was that -- that letter,
(9)   the one that we're looking in front of us now,
(10)   considered final.
(11)   Q.   Didn't Mr. Monty make it clear that
(12)   he was not happy with the wording or not
(13)   comfortable with the wording in paragraph 30
(14)   after you sent the letter to Deloitte?
(15)       MR. SCHIMMEL: Object to form.
(16)   A.   No.
(17)   Q.   You're sure of that?
(18)   A.   That, I'm sure of, yes. Because --
(19)   because, as I indicated to you, Mr. Monty
(20)   through a communication -- I don't remember
(21)   the form of communication -- sent me the
(22)   letter and communicated to me -- his signature
(23)   was on it, but communicated to me he was not
(24)   comfortable with the wording and, therefore,
(25)   the letter was not final.

Page 395

(1)
(2)   Q.   Did that communication come to you
(3)   at the same instant that the signed letter
(4)   from Monty came back to you?
(5)   A.   I don't know if it came at the same
(6)   instant. I don't want to be literal on you,
(7)   but it came at -- at the same -- you know,
(8)   around the same time. I mean, the -- the
(9)   letter might have been hand delivered. It
(10)   might have been sent through the internal mail
(11)   system. I can't remember the form of the
(12)   communication, too. So there could have been
(13)   a slight timing difference, but they were --
(14)   they were absolutely linked together.
(15)   Q.   So they were relatively
(16)   contemporaneous in time is your best
(17)   recollection?
(18)       MR. SCHIMMEL: Object to form.
(19)   A.   Yes.
(20)   Q.   And did Monty tell you in his
(21)   communication to you that the letter wasn't
(22)   final or did he merely tell you, "I'm not
(23)   happy with the language of paragraph 30"?
(24)       MR. SCHIMMEL: Object to form.
(25)   A.   I don't remember the exact words

Page 396

(1)
(2)   of -- of what he used. What I do recollect
(3)   was he was not happy with the wording in
(4)   paragraph 30.
(5)   Q.   Then the letter gets somehow sent
(6)   to Deloitte and then -- that's correct?
(7)   A.   Somehow the letter got to Deloitte,
(8)   correct.
(9)   Q.   And then after that point in time,
(10)   middle to late March, you have a communication
(11)   when you realized the letter's in Deloitte's
(12)   hands, correct?
(13)       MR. SCHIMMEL: Object to form.
(14)   A.   No. I don't believe that's what I
(15)   said.
(16)   Q.   I'm just trying to get the story in
(17)   an understandable way.
(18)   A.   I don't -- yeah. As I said --
(19)   Q.   I don't mean to suggest --
(20)   A.   -- there was a couple of options.
(21)   I might have sent it as part of that
(22)   communication. I do not remember. I might
(23)   have sent it at their request at some point in
(24)   time and -- and then had the communication
(25)   with them. My assistant might have sent it to

Page 397

(1)
(2)  them at their request or just thinking it was
(3)  the proper action to do having seen it signed.
(4)  I don't -- I don't remember.
(5)      So I don't want to characterize it
(6)  as my communication with Deloitte & Touche
(7)  took place some -- took place sometime after
(8)  they've sent the letter. It could have been
(9)  at the same time.
(10)     Q.   I don't understand that answer in
(11) light of the answer you gave me earlier that
(12) we read back, but the transcript will be what
(13) it is.
(14)     MR. SCHIMMEL: Object to the form
(15)  of the comment.
(16)     Q.   You at some point told Deloitte &
(17) Touche there were going to be further comments
(18) to the letter, the signed letter that they
(19) had, correct?
(20)     A.   Further comments, no.
(21)     Q.   Further changes, further
(22) amendments, something?
(23)     A.   I had the phone call in mid to late
(24)  March that indicated we would -- we were
(25)  looking at the wording in paragraph 30, yes.

Page 398

(1)
(2)      Q.   Who did you speak to in that phone
(3)  call in mid to late March?
(4)      A.   I can't recollect whether it was
(5)  either Ginette Nantel and/or Pierre Bordeur.
(6)      Q.   By this point in time -- and this
(7)  answers my confusion of yesterday. By this
(8)  point in time, Deloitte had come in and said
(9)  to the Audit Committee that they were prepared
(10) to issue an unqualified opinion letter on the
(11) year-end financial statements, correct?
(12)     A.   That is correct. They would have
(13)  done that on February 27th.
(14)     Q.   Okay.
(15)     Now, when you had your phone call
(16) in mid March or late March of 2002, I take it
(17) you were talking with a partner of Deloitte in
(18) that phone call; is that true?
(19)     A.   Yes. Like I said, it was -- it was
(20)  likely Ginette Nantel and/or Pierre Bordeur,
(21)  both of who are partners with Deloitte &
(22)  Touche.
(23)     Q.   Did either of them say to you,
(24)  "Hold on a minute, Steve. We committed to
(25)  issue an unqualified opinion letter. What do

Page 399

(1)
(2)  you mean you're going to suggest changes to
(3)  the rep letter?"
(4)      MR. SCHIMMEL: Object to form.
(5)      A.   I don't -- I don't remember any
(6)  negative reaction, any surprise at all from
(7)  the conversation with Deloitte & Touche.
(8)      Q.   What did they say to you?
(9)      A.   I don't remember exactly what they
(10) said.
(11)     Q.   You just remember it wasn't
(12) negative?
(13)     A.   Yeah.
(14)     Q.   Was it a pleasant conversation?
(15)     A.   I don't remember anything negative,
(16)  so I got to believe it was, yeah.
(17)     Q.   Would you remember anything
(18) positive?
(19)     A.   I just remember a simple, plain,
(20)  ordinary business conversation.
(21)     Q.   Did you tell them specifically
(22) which paragraph you were going to be amending?
(23)     A.   Yes. I believe I -- i drew their
(24)  attention to paragraph 30 and I believe I drew
(25)  their attention to the wording and -- and

Page 400

(1)
(2)  particular attention to the wording -- the use
(3)  of the word "committed."
(4)      Q.   I think we established yesterday
(5)  that the form of language in paragraph 30 was
(6)  there to avoid a going concern qualification,
(7)  correct?
(8)      MR. SCHIMMEL: Object to form.
(9)      A.   One -- yes. The -- a purpose of
(10)  paragraph 30 is -- is to establish that
(11)  Teleglobe can operate as a going concern.
(12)     Q.   Okay.
(13)     Did they have the rep letter in
(14) front of them during this telephone
(15) conversation in middle or late March 2002?
(16)     A.   I can't confirm whether they had it
(17)  in front of them.
(18)     Q.   Look, I understand it wasn't a
(19) video conference. I understand you weren't
(20) there in person.
(21)     My question is, when you said to
(22) them, "We're going to be making amendments to
(23) paragraph 30," did someone say, "Hold on a
(24) minute. We have to get the letter out to see
(25) what paragraph 30 is"?

Page 577

(1)
(2) before we finalized the document.
(3)    Q.    Is that common practice at BCE?
(4)    A.    I – I can't answer that, whether
(5) it's common practice.
(6)    Q.    Well, you're a vice president of
(7) the firm, sir. Do you typically sign the
(8) annual reports prior to the time they're
(9) authorized to be released?
(10)    A.    Our signatures would be provided
(11) perhaps through electronic means to the
(12) printer for inclusion in the document and a
(13) draft might have been produced to see if it
(14) was appearing okay. I don't know.
(15)    Q.    Would it typically say "draft" on
(16) the document if it was a draft?
(17)    A.    I don't know.
(18)    Q.    Have you ever seen drafts of the
(19) financial statements that have the word
(20) "draft" emblazoned on them?
(21)    A.    Absolutely.
(22)    Q.    In fact, when you've got a draft of
(23) the financial statements, isn't it the
(24) practice to identify it as such?
(25)    A.    Usually so, but not always.

Page 578

(1)
(2)    Q.    And you identify it as such so that
(3) persons unnamed and unknown don't mistake it
(4) to be the final document, correct?
(5)        MR. SCHIMMEL: Object to form.
(6)    A.    That's -- that's one possible
(7) element of it, yes.
(8)    Q.    Flip through this. See if you see
(9) "draft" stamped anywhere on it.
(10)    A.    My quick review didn't show one.
(11)    Q.    All right.
(12)        Is it your practice to send drafts
(13) to the printer to be printed? When I say your
(14) practice, I mean of financial information of
(15) the sort contained in this exhibit.
(16)    A.    We, at a certain point in the
(17) process, would -- would -- would stop
(18) producing documents internally and turn it
(19) over to the printers because we needed to get
(20) it in typeset format, et cetera. Ultimately
(21) we would have went through numerous drafts,
(22) wouldn't be unusual, before getting to the
(23) final version.
(24)    Q.    Have you ever seen a draft --
(25) during that process you've described, have you

Page 579

(1)
(2) ever seen a draft which included the signed
(3) management report?
(4)    A.    I don't remember.
(5)    Q.    You can't recall seeing one, can
(6) you?
(7)    A.    I don't remember.
(8)    Q.    Do you have any recollection of
(9) seeing one?
(10)    A.    I don't remember.
(11)    Q.    The answer to my question is no,
(12) you have no recollection of seeing a signed
(13) draft; printed, signed draft of the financial
(14) statements?
(15)        MR. SCHIMMEL: Object to form.
(16)    A.    Can you repeat the question,
(17) please?
(18)        (The record is read back by the
(19) reporter.)
(20)    A.    I don't -- I don't remember.
(21)    Q.    With Exhibit 52 open in front of
(22) you, refer, please, to Exhibit 6. That's 52.
(23) Now let's go to 6. I want you to open to page
(24) Bates No. 297.
(25)        Your signature appears on 297 on

Page 580

(1)
(2) the management report, correct?
(3)    A.    Yes, it does.
(4)    Q.    Now open to page 295.
(5)    A.    I'm sorry. Same document?
(6)    Q.    Mm-hmm.
(7)    A.    I just went into the other one.
(8) Yes.
(9)    Q.    Top right-hand corner under "Parent
(10) Company." Now, I want you to compare this
(11) with me as we go. I want you to compare 6
(12) "Parent Company" with "Control by BCE" on
(13) Exhibit 52.
(14)    A.    Which page again?
(15)    Q.    On 52. It's Bates stamp No. 339.
(16)    A.    Okay.
(17)    Q.    You'll see on 52 it says under,
(18) "Control by BCE," that subject to applicable
(19) law and Teleglobe Inc.'s financial statements
(20) that BCE and its affiliates "exercise control
(21) over and manage the affairs and operations of
(22) the Teleglobe Inc. Group." Got that?
(23)    A.    That's what it says.
(24)    Q.    Now on the second financial
(25) statement you signed, Exhibit 6, at page 295,

Page 581

(1)
(2) it's no longer called "Control by BCE." It's
(3) now called "Parent Company." And what that
(4) says is subject to applicable law and the
(5) terms of the group's financial statements, BCE
(6) and its affiliates "has the power to exercise
(7) control over and manage the affairs and
(8) operations of Teleglobe Inc. Group."
(9)        How did this financial statement
(10) disclosure go from "exercise control" to
(11) "power to exercise control"?
(12)    A.    Just to clarify one thing in your
(13) question.
(14)    Q.    Sure.
(15)    A.    It's not a financial statement
(16) disclosure.
(17)    Q.    I'm sorry. Is this the risk factor
(18) section of the MD&A?
(19)    A.    This is, yes. I was right on that
(20) page. This is the risk factor section of the
(21) MD&A.
(22)    Q.    It's published under a very
(23) attractive heading that says, "Teleglobe Inc.
(24) Financial Information U.S. GAAP 2001,"
(25) correct?

Page 582

(1)
(2)    A.    Correct.
(3)    Q.    How did the language change from
(4) "control" on Skinner 52 to "power to control"
(5) on Skinner 6?
(6)    A.    I don't remember.
(7)    Q.    Do you recall discussions about
(8) that change?
(9)    A.    I do not remember.
(10)    Q.    Okay.
(11)        Still on Skinner 52 and still on
(12) page 339, under the middle of the page, "Risk
(13) Factors," there's reference to -- that I read
(14) you earlier about Canadian $1.2 billion and
(15) the intention of BCE to fund the plan in 2002.
(16)        Now, with that in mind, I want you
(17) to turn to Exhibit 6 and specifically page
(18) 292. Tell me when you have 292 open in front
(19) of you.
(20)    A.    I do.
(21)    Q.    Under "Financing Activities" on the
(22) far right-hand side, about the middle of the
(23) way down, there's no longer reference to 1.2
(24) billion. It now says, "On December 12, 2001
(25) BCE indicated its intention to contribute up

Page 583

(1)
(2) to an additional Canadian 1 billion to support
(3) BCE/Teleglobe." It continues, "on the basis
(4) that with such support BCE/Teleglobe will be
(5) able to meet its current business plan" and
(6) then it concludes, "However, any funding
(7) decision by BCE will be based on the facts and
(8) circumstances prevailing at the relevant
(9) time."
(10)        How did we get from intention to
(11) provide $1.2 billion to announced $1 billion
(12) dollars on the basis that such support, the
(13) company will be able to meet its current
(14) business plans, et cetera?
(15)    MR. SCHIMMEL: Object to form.
(16)    A.    Two comments I'd make. One is the
(17) number I'm familiar with is Canadian 1
(18) billion. All right. I'm not familiar -- I
(19) don't remember, I should say, the Canadian 1.2
(20) billion.
(21)    Q.    Let me stop you at that comment.
(22) You signed the document that has the Canadian
(23) 1.2 billion in it, correct?
(24)    A.    I'll reiterate again. I'm not
(25) sure -- I mean, this is the final document

Page 584

(1)
(2) that got filed with the securities commission,
(3) so I'm not sure what this document exactly is.
(4)    Q.    Well, let me see if I can be of
(5) some service.
(6)        Remember yesterday we looked at
(7) Skinner Exhibit 16, the preboard call notes?
(8) Remember we talked about that for a little
(9) while?
(10)    A.    Yes. I remember that memo you
(11) showed me.
(12)    MR. VARALLO: For the record, I'm
(13)    showing the witness Exhibit 16.
(14)    Q.    Down at the bottom of 16, there's
(15) reference to Vanaselja and Ryan making some
(16) comments, Kierans questioning whether the
(17) information was being given as of February 27,
(18) 2002 and then Vanaselja saying the changes
(19) were primarily to clarity that BCE was not
(20) legally obligated, et cetera. I think you
(21) told me that dialogue had to do with changes
(22) made to the financial statements of the
(23) company. Do you recall that?
(24)    MR. SCHIMMEL: Object to form.
(25)    A.    I don't recollect the exact answer.