**EXHIBIT P**

Multi-Page™

1

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

- - -

| | |
|---|---|
| In re | : Chapter 11 |
| TELEGLOBE COMMUNICATIONS CORPORATION, et al. | : Jointly Administered Bankruptcy Case No. No. 02-11518 (MFW) |
| Debtors. | : |
| TELEGLOBE COMMUNICATIONS CORPORATION, et al., | : CIVIL ACTION |
| Plaintiffs | : |
| v. | : |
| BCE INC., MICHAEL T. BOYCHUK, MARC A. BOUCHARD, SERGE FORTIN, TERENCE J. JARMAN, STEWART VERGE, JEAN C. MONTY, RICHARD J. CURRIE, THOMAS KIERANS, STEPHEN P. SKINNER, and H. ARNDOLD STEINBERG, | : |
| Defendants | : NO. 04-1266 (SLR) |

- - -

Wilmington, Delaware
Wednesday, August 10, 2005
5:03 o'clock, p.m.

- - -

BEFORE: HONORABLE SUE L. ROBINSON, Chief Judge

- - -

Valerie J. Gunning
Official Court Reporter

Multi-Page™

Page 2

1  APPEARANCES:
2       RICHARDS, LAYTON & FINGER, P.A.
        BY: GREGORY V. VARALLO, ESQ.,
3           C. MALCOLM COCHRAN, IV, ESQ.,
            ANNE SHEA GAZA, ESQ. and
4           CHAD SHANDLER, ESQ.
5           Counsel for Teleglobe Communications
            Corporation, et al.
6
7       ROSENTHAL, MONHAIT, GROSS & GODDESS, P.A.
        BY: KEVIN A. GROSS, ESQ.
8
9           Counsel for the Official Committee
            of Unsecured Creditors
10
11      YOUNG, CONAWAY, STARGATT & TAYLOR LLP
        BY: JOHN W. SHAW, ESQ.
12
                   -and-
13
        SHEARMAN & STERLING LLP
14      BY: GEORGE J. WADE, ESQ.,
            JAQULIN AARON, ESQ.
15          DANIEL SCHIMMEL, ESQ.
            (New York, New York)
16
            Counsel for Defendants
17
                   - - -
18
19  ALSO PRESENT: DIANE BARRASSO, P.H. D.,
                  BARRASSO CONSULTING
20
                   - - -
21
22
23
24
25

Page 3

2          P R O C e e D I N G S
3
4       (Proceedings commenced in the courtroom,
5  beginning at 5:03 p.m.)
6
7       THE COURT: Good afternoon.
8       MR. VARALLO: Good afternoon, your Honor.
9       THE COURT: I guess the question is whether there
10 are issues other than the issues that you sent me papers
11 about. I'm ready to address those, but if there are others,
12 why don't we address those first.
13      MR. VARALLO: Certainly, your Honor. I
14 understand the papers' issues concerns privilege assertions.
15 We also have discrete e-document issues and a request for
16 assistance from the Court relating to a few narrow
17 depositions.
18      Is my understanding correct, your Honor?
19      THE COURT: Well, I have the electronic data
20 issue. I don't know whether I have the documents on the
21 privilege assertions or not. Maybe I do. What were those
22 documents?
23      MR. VARALLO: Perhaps I can be helpful, your
24 Honor.
25      THE COURT: Okay.

Page 4

1       MR. VARALLO: There was a motion to compel briefs
2  back in February and March and at the July 7 conference
3  before the Court, which I unfortunately wasn't available to
4  make, I was in London at that time, your Honor, and I will
5  tell you I would have rather have been been here.
6       On July 7, at Page 52 of the transcript, your
7  Honor indicated you would be appointing a special master for
8  privilege issues. I come to that simply having having read
9  the transcript.
10      THE COURT: Right. And did that happen?
11      MR. VARALLO: It has not. However, which I do
12 have today, which perhaps will move things along, your Honor
13 may remember that some time ago we had made a stipulated
14 motion, both sides agreed to a form of order, put it before
15 your Honor to appoint a special master. Unfortunately, we
16 hadn't followed the correct procedures. Your Honor denied
17 the motion. But I do have a form of order today that has a
18 blank for the name and is otherwise the order that we had
19 stipulated to back in March.
20      THE COURT: Well, I think, you know, this was
21 right before I left on a trip, and I have been in trial since
22 I have been back. I could have sworn I crafted something to
23 file, so I will follow up on that.
24      MR. WADE: Your Honor, there was an order -- if
25 you don't mind.

Page 5

1       MR. VARALLO: Please.
2       MR. WADE: There was an order dated July 18 in
3  which the plaintiffs' motion to compel is denied unless on or
4  before August 1st the plaintiffs identify with specificity
5  what's in dispute. And then we are supposed to respond by
6  August 15th.
7       MR. VARALLO: Your Honor, in response to that
8  order which had to do with apparently where the privilege
9  dispute was extant, we filed a pleading pointing your Honor
10 to the specific briefing pages. That pleading was filed I
11 believe on the 26th of July.
12      MR. WADE: That is correct.
13      THE COURT: All right. Well, somehow or other I
14 don't think that's in front of me. I don't suppose anyone
15 has any docket item numbers.
16      MR. VARALLO: I do, your Honor. In case you
17 asked, I happened to have those items for you.
18      THE COURT: All right.
19      MR. VARALLO: The briefing that we continue to
20 rely on is plaintiffs' opening brief, which was Docket Entry
21 76 at Pages 17 through 20 and 25 through 40. The defendants
22 addressed the issue in their response at Pages 26 through
23 40. And we put in a reply, Docket Item 91, at Pages 9
24 through 20.
25      THE COURT: Now, I have Docket Item 76, Docket

### Page 6

1  Item 91, and defendants' was?
2      MR. VARALLO: Your Honor, I helpfully transcribed
3  76 both times. It's 87 is the defendants', your Honor.
4      THE COURT: All right.
5      MR. VARALLO: And, your Honor, that really frames
6  an issue of law as to whether it's possible to assert an
7  attorney/client where you're representing two clients on the
8  same matter. That's the issue of law that we've briefed up
9  for the Court.
10     But we also have before the Court issues relating
11 to privilege logs. We've got two privilege logs which
12 contain what we contend are several hundred improper entries
13 identified as privileged documents and we've been promised
14 a third privilege log, which we're told will have some 5,000
15 entries, and I think it was in response to that on July 7th
16 that your Honor said, Hey, we're going to get a special
17 master involved.
18     THE COURT: All right. I will go back and look.
19 I thought I had done that. Perhaps I hadn't.
20     MR. VARALLO: Would it be useful to your Honor to
21 have the formally agreed upon?
22     THE COURT: Yes.
23     MR. VARALLO: Okay. I will move on, then.
24     So that's the privilege issue, your Honor. Let
25 me step forward to talk about e data. There are three e data

### Page 7

1  issues and I will cover them very quickly, understanding the
2  lateness of the hour.
3      One of those relates to production for specific
4  executives in the BCE executive corps. The second relates to
5  a new wave of documents just produced today. And the third
6  relates to refining and choosing search terms for a set of
7  identified folders.
8      Let me turn first to the executives. We have
9  taken a number of depositions of lower level people in
10 this case and we're now at the level of senior executive
11 depositions.
12     As of yesterday, we had 11 e docs for
13 John Monty, the former BCE chairman who decided to buy
14 Teleglobe, who decided to pull the plug on Teleglobe, and
15 who was simultaneously the Chairman of the Board of
16 Teleglobe.
17     We respectfully doubt there could be a more
18 central witness to this case, and this is a case where we're
19 talking about an electronic data company, a company that was
20 building a data highway. To have 11 e documents we
21 respectfully suggest just doesn't do it. We also have about
22 a hundred e-mails from or to Mr. Monty that we collected from
23 others that were in others' possession, so we know he had an
24 e-mail account.
25     We're told that a server on which resided the

### Page 8

1  executives data was searched for Mr. Monty in 2005. However,
2  Mr. Monty resigned in 2002. And based on BCE practice, we
3  believe that his personal account was deleted from the
4  executive server at that point.
5      We need to go backup tapes for Mr. Monty,
6  although our friends haven't done that, although they
7  are doing it for two others I will talk about in just a
8  minute, Mr. Lessard and Mr. Pichette. Our first issue is
9  should we go to backup tapes for Monty. He's a key witness.
10 We have 11 e docs and we believe we need to get to the
11 backup tapes.
12     The other specific people issues, let me just
13 address them briefly. We were recently told another senior
14 executive, Mr. Pierre Lessard, had destroyed his documents
15 and we're told this after we took his deposition. We're told
16 that BCE is searching for Lessard docs on its backup tapes,
17 but we don't have a firm date yet by which we'll get these
18 and we need these, especially since we've already taken his
19 deposition. Obviously, we'll want to reopen the deposition
20 once we see the documents.
21     The next problem executive is a gentleman
22 by the name of Patrick Pichette. He was sent to Teleglobe
23 to work in early January 2002. He was there until it blew
24 up.
25     He went back to BCE and he worked on a laptop.

### Page 9

1  We're told his laptop hard drive was simply wiped, wiped
2  clean when he went back at some point.
3      For him, we need to go to backup tapes. We're
4  told they are going to backup tapes, but, again, we're not
5  told when and his deposition is coming on very quickly. We
6  can no longer wait for BCE to take its time to get us this
7  information, your Honor.
8      Finally, an individual by the name of Mark Ryan.
9  Ryan was the corporate secretary who attended most, if not
10 all, keyboard meetings. We have zero e-mails from Mr. Ryan,
11 none. Once again, your Honor, for whatever reason, this is
12 an individual of senior status in the company for whom we
13 need backup tape searches.
14     On these individuals, we want a court order
15 requiring prompt production. These are documents we asked
16 for last year, and from our perspective it's simply
17 unacceptable that deep into the deposition track we still
18 don't have the documents.
19     Your Honor, the next e document issue is, relates
20 to documents received today. Literally today we received a
21 C.D. with 10,000 pages of new documents, apparently located
22 from the computers of some but not all of the secretaries of
23 the senior executive corps at the company.
24     The index we received also suggests that the C.D.
25 contains at least hundreds of pages of documents produced

Page 10

1  from certain key executives directly, including Mr. Lessard,
2  the general counsel of the company, whose two-day deposition
3  was taken last week.
4       Passing for the moment the issue of why BCE
5  didn't search for these documents months ago or the computers
6  months ago, as of today, BCE cannot tell us, notwithstanding
7  our repeated requests, when we'll have all of this data
8  completed or the so-called custodian data completed as well.
9  We ask the Court to put a stop to this. We need a hard date
10 by which BCE will have complied with its discovery
11 obligations.
12      We are deep into the discovery schedule. Your
13 Honor will recall that this case was originally set for a
14 discovery cutoff date of September 30, then amended to
15 October, I believe it was 17th the last time we were here.
16 But we've got a number of depositions to do and we simply
17 can't have substantial unproduced documents coming to us
18 after the depositions are done.
19      Finally, your Honor, an issue as to folders.
20 During the course of this litigation, we learned of a
21 population of approximately 30,000 folders on live servers at
22 BCE, which were not identified by custodian. They're
23 identified by other titles.
24      Many of these folders have Teleglobe in their
25 name or other indicia, indicating that they could be

Page 11

1  important to this case. In an effort to compromise and not
2  have to bring this to your Honor, we spent several days
3  reviewing the 30,000 folders, which, by the way, when you
4  print them out, is about 750 pages of folder titles.
5       We reviewed those and cut the 30,000 to about
6  3,500, that is about 10 percent of the total. BCE told us,
7  Well, that's too many, please try again. We did. We went
8  back and were able to winnow the 3500 titles to about 2900
9  titles.
10      We understand that BCE then did a search over all
11 the -- all of its folders, not merely those we identified,
12 which included the name Teleglobe, and then also did a
13 negative search to winnow out matters unrelated to issues of
14 this case. We're fine with that, your Honor, but we believe
15 it is underinclusive.
16      When we were here on July 7, we brought to your
17 Honor's attention the fact that we had a dispute as to an
18 intermediate search, and your Honor directed us to try to
19 work it out. You said if we couldn't work it out, you would
20 be making decisions yourself as to the proper scope of those
21 searches.
22      Notwithstanding the Court's direction, BCE simply
23 didn't engage with us in discussions regarding search terms
24 since July 7. Instead, recently, they filed the affidavit of
25 Dr. Felski, their e consultant or e-data consultant.

Page 12

1       We are prepared today to discuss with the Court,
2  should you want to hear us, why our proposed search is
3  appropriate. My colleague, Ms. Gaza, is prepared to address
4  that. I also have in court today Dr. Diane Barrasso, our
5  e-data consultant. Should the Court have any questions as to
6  methodology or technical questions you need answered, we've
7  got the source. We can bring her to the Court.
8       I can say as to the 2900 folders, that we know
9  that 450 of them have Teleglobe in the title. We know about
10 700 relate to finance and we know that about 1200 are board
11 of director related folders.
12      So, your Honor, just on that showing, this isn't
13 an idle exercise. We're not talking about folders that have
14 nothing to do with the case.
15      To summarize this issue, we want the Court to
16 order BCE to run our search terms on the 2900 folders we've
17 winnowed out of the 30,000 that we believed had previously
18 been unsearched.
19      Finally, your Honor, and I will conclude quickly,
20 this is the third issue, some help with specific
21 depositions.
22      We have subpoenaed, pursuant to letters rogatory,
23 three, and I'm focusing on three, there are actually more of
24 them, but for purposes of today, there are three that we want
25 to bring before the Court, three entities in Canada:

Page 13

1  Deloitte & Touche, a law firm called Osler, and a law firm
2  called Davies Warde. Each firm represented BCE, but also
3  represented Teleglobe during the course of important events
4  here. Although Osler claims it didn't, it did file documents
5  with the regulatory authority, holding itself out to be
6  counsel for Teleglobe.
7       Each firm has refused to comply with the
8  subpoenas and raised numerous privileges as to the subpoenas,
9  contending that they need not produce a response to the
10 subpoenas or give testimony.
11      We've attempted to deal with these by litigating
12 in Canada, but learned from Canadian counsel that the time
13 frame for Canadian litigation on these issues will long
14 overlap your Honor's discovery cutoff. That is to say we
15 will not have prompt and efficient justice in Canada to get
16 to the bottom of these issues. So instead of complaining, we
17 tried to work out practical approaches.
18      Our client, the plan administrator, stands under
19 the bankruptcy law and the plan, stands on issues of
20 Teleglobe for purposes of owning its privileges, and so
21 instructed the lawyers that represented Teleglobe and the
22 accountant to produce to her all Teleglobe owned documents
23 with only modest success, your Honor, I will report.
24      What we would like to do, we'd like to have the
25 Court involved in, is ask you, first of all, the Court

Page 14

1  usually, to suggest to BCE perhaps it could lean on some of
2  these outside providers to move forward in a constructive
3  way, but if that is not possible, what we'd like to do is
4  have an order running to BCE, asking it to demand its
5  documents back from its providers relating to this matter
6  that they could then produce to us so as to circumvent long
7  and involved Canadian litigation.
8       Alternatively, if these agents of BCE continue to
9  assert privileges against us, we want it clearly understood,
10 we want to say on the record today that we'll be seeking
11 preclusion orders against their testifying at trial and
12 against BCE attempting to adduce matters at trial through any
13 witness where we were blocked on the subject matter as to
14 privilege in Canada.
15      Let me say for the record very clearly and for my
16 friend, Mr. Wade, that this includes matters relating to
17 BCE's accounting. It cannot, we contend, and we will contend
18 at a later date in a formal motion, allow the accountant for
19 BCE, that is Deloitte & Touche, to assert privileges against
20 both producing documents and testifying and then attempt to
21 justify its accounting having blocked or having had its
22 auditors successfully block discovery in the case.
23      Your Honor, my voice is giving out. I'm happy
24 to answer any questions, but that's our presentation for
25 today.

Page 15

1       THE COURT: All right. Thank you.
2       MR. VARALLO: Thank you.
3       THE COURT: Let's hear from BCE's counsel.
4       MS. AARON: Good afternoon, your Honor. My
5  name is Jaculin Aaron. I'm with the law firm Sherman &
6  Stearling LLP, representing the defendants, and I will take
7  Mr. Varallo's points in order.
8       With regard to the specific executives and some
9  of the issues relating to the amount of e documents, we are
10 certainly willing to consider going back to the backup tapes
11 and specific instances where the number of e documents that
12 we've managed to obtain from them, from the readily
13 accessible sources has not been very high and so we will
14 certainly talk with them about some of those issues.
15      With regard to some of the -- a couple of those
16 executives, there have been additional documents that we have
17 gotten from looking at the e documents of their assistants
18 that we will be producing to them, but we are happy to
19 continue discussing it with them.
20      With regard to the issue of the so-called new
21 wave of documents that they produced today that they're
22 complaining about, there are basically -- that includes
23 documents of some of the assistants of the executives at BCE
24 that we determined that we should go back and get and produce
25 to the other side and we're producing those, and there are

Page 16

1  some more that we will continue to produce.
2       I would point out, however, that when we have
3  asked recently for documents from the assistants of the
4  executives of their clients, they've basically told them
5  that, for the most part, they've not attempted to gather
6  those documents and if we want them, we will have to pay to
7  have those documents restored and produced to us. So they
8  are being a little -- I don't want to say hypocritical, but
9  they are being a little cute in saying that there's some
10 outrageous conduct that we are engaging in because we're
11 producing the assistants' documents after some of the
12 executives' documents.
13      If there are -- there are good grounds for
14 reopening depositions, then, fine. I mean, often people make
15 that argument about documents that are produced after a
16 deposition. Then you go back and you find that there's not
17 really anything to reopen or there aren't any significant
18 issues, but if they can show some prejudice and if they want
19 to do that, we're happy to consider that.
20      With regard to the search on the 300,000 -- I'm
21 sorry -- this 30,000 folder, I think Mr. Varallo might be a
22 little late to the party on this one. This has been
23 extensively discussed in the papers filed with the Court,
24 including the supplemental declaration of Martin Felski, that
25 we filed on August 1st.

Page 17

1       And the basic story on that, which is set
2  out in Mr. Felski's declaration, is that these 30,000 folders
3  are not new documents. We have been conducting searches on
4  all -- all the data that's contained in all of these folders
5  and we have produced documents to them from the folders.
6  That includes documents that contain the term Teleglobe or
7  related Teleglobe terms, other names for the companies.
8       So that data has been subject to a number of
9  searches already and we have produced documents from those
10 searches. When we ran searches that included the word
11 Teleglobe in them or some variation on that, the
12 responsiveness rate on the documents captured was perfectly
13 reasonable.
14      When we've run searches on that data where
15 we don't include a variation of the word Teleglobe, we
16 capture very large amounts of data, but the responsiveness
17 rate has been very, very low. In some cases, four, six,
18 ten percent. And what we have maintained is that at this
19 point, we are really getting to the point of diminishing
20 returns on those documents. They've been searched for the
21 Teleglobe documents. We've done other searches to pick up
22 other documents that are related, but at this point, if we
23 conduct the searches that plaintiffs want us to conduct on
24 that group of documents, we are going to gather huge amounts
25 of data and only very small portions of it are potentially

Multi-Page™

Page 18

1  responsive.
2       I would like to clear up one point that is
3  explained I think at least a couple of times in our papers.
4  They have said that some of these folders that they have
5  selected have the word Teleglobe in the name of the folders
6  and they are outraged that we have not searched in those
7  folders. In fact, as we have told them and has been stated
8  in Dr. Felski's declaration, if the word Teleglobe appeared
9  in a folder, then the documents in that folder would have
10 been picked up if they contained one of the other search
11 terms. So, in fact, those folders that have the word
12 Teleglobe in them have been picked up and are responsive to
13 the -- have been picked up and we've produced responsive
14 documents from them.
15      But with regard to their list of search terms, I
16 don't see how they can say that those search terms will
17 really pick up anything very interesting to the case.
18      For one thing, they have a number of search terms
19 that include the word Teleglobe and, frankly, those already
20 would have been picked up in the prior searches that we have
21 done. But they have searches such as employee within 40
22 words of leave. Those are the kinds of searches they are
23 proposing and those are just going to pick up ridiculously
24 large numbers of documents.
25      THE COURT: All right. This is my problem.

Page 19

1  Well, you can move on from this point and on to the last
2  point and then I will give you my concern about the way BCE
3  has reacted to my instructions at the last discovery
4  conference, the depositions, letters rogatory, the two legal
5  firms and the accountants who have failed to cooperate in
6  getting documents into the case.
7       MS. AARON: Okay. Your Honor, I would actually
8  like to let my colleague, Mr. Schimmell, address those
9  issues.
10      THE COURT: Well, then, before you sit down, I
11 will address my concern.
12      MS. AARON: All right.
13      THE COURT: My concern is this: Document
14 production was supposed to be done before we take the
15 depositions. It's the way it's done in all complex cases in
16 my court for the purpose, for the singular purpose of not
17 having to go back and redepose someone every time a new wave
18 of documents has come in.
19      So when you use words like we will consider going
20 back, we will continue discussing, that is not what I want to
21 hear. Document production is supposed to be done. If there
22 are reasons why there have been no documents produced for
23 critical people, then you will review the backup tapes, you
24 will do the searches.
25      So the language that you use isn't consistent

Page 20

1  with where we are in this case and does not bode well for
2  your positions in this case. With respect to the new
3  documents, on the one hand, you know, you've got a party
4  who's complaining about the lack of documents and also
5  complaining about the production of documents, so there's
6  some inconsistency in there and I don't know which they
7  prefer, but we will talk about what happens with document
8  production when we're done our whole discussion.
9       With respect to the searches, now, I don't
10 believe I asked BCE to give me an expert report on why these
11 search terms were not reasonable. What I asked was for the
12 parties to talk and to reach agreement if they could, and if
13 not, then I would hear discussion about it. From what I
14 understand, there was no discussion. BCE has taken the
15 position and has simply given me an affidavit, which isn't
16 what I asked for without some attempt at compromise.
17      So, again, I am not happy with BCE's approach to
18 what I say and I will have to put everything in writing to
19 make sure that it is all understood, although lawyers don't
20 seem to understand what I write either.
21      So this is the thing. With respect to the backup
22 tapes, they will be searched. They will be found. They will
23 be reconstructed. They will be searched for these four
24 executives.
25      With respect to these last searches, I will give

Page 21

1  BCE a choice. It seems to me as though some of these
2  searches are very broad, and so I have identified some that
3  seem appropriately narrow to me, and I will give BCE the
4  choice of either doing the narrow search that I've just
5  randomly selected on the 645 folders that have Teleglobe or
6  some derivation thereof in the folder title, the narrow
7  search on all 2900 folders or the broader search on the 645
8  folders.
9       That's your choice, and if we need to, I will
10 have counsel for Teleglobe tell me if they had to choose --
11 well, I will give you what I think, and if they had to choose
12 a few more, I will give them the opportunity to pick a few
13 more. But that's where we are with that.
14      All right.
15      MS. AARON: Okay. Your Honor, if I may, on some
16 of these issues, it's a two-way street. I mean, I'm not sure
17 that plaintiffs understood the Court's direction at the last
18 hearing, which, unfortunately, I did not attend, because they
19 basically sent us a list of search terms and said the Court
20 ordered you to run all of these searches, please tell us when
21 you're going to be done, which I don't think is quite right
22 either, so I think there might have been some failure to
23 communicate between the parties.
24      THE COURT: Well, neither party is going to get
25 exactly what they want.

Page 22

1  MS. AARON: I understand.
2  THE COURT: I don't know what it is that will
3  take you all to --
4  MS. AARON: The other part of the two-way street
5  on terms of late-produced documents, we're waiting for
6  documents from their live server data that we don't have yet
7  and we asked them, when are we going to get it, and they
8  said, When we know, we'll tell you. And they have a long
9  story about how we didn't ask for them until the beginning of
10  July, but there's a story behind that as well.
11  THE COURT: All right. Well, the late production
12  of documents is something we'll discuss generally. I think
13  it's a problem on both sides, so I don't think I want to hear
14  anything more about that right now.
15  All right. Let's hear about the depositions and
16  the letters rogatory and then we'll get down to the
17  nitty-gritty on search terms and talk about how in the world
18  we're going to conclude document production so we can go
19  forward efficiently with depositions and get this case to a
20  point where it can be resolved.
21  MR. SCHIMMELL: Good afternoon, your Honor.
22  THE COURT: Good afternoon.
23  MR. SCHIMMELL: With respect to Deloitte, we
24  wrote to them months ago, to ask that Deloitte return to BCE
25  documents that BCE had previously made available to

Page 23

1  Deloitte. So what Mr. Varallo is asking us to do, we've
2  already done.
3  We've been told and Deloitte had a number of
4  discussions with BCE directly about that request. We've been
5  told this week that Deloitte does not believe that they have
6  the obligation under Canadian law to return any documents and
7  they don't want to do it. I'm not sure what else we can do
8  at this point.
9  THE COURT: I take it you're not a client of
10  Deloitte anymore?
11  MR. SCHIMMELL: BCE is a client of Deloitte.
12  THE COURT: Well, in that case, I'm not really
13  convinced. It seems to me that if you -- if asking nicely
14  doesn't work in a case, then, truly, you will be precluded
15  from using any of their documents, any of their witnesses,
16  any of their evidence if you can't manage to get these
17  documents produced so that they can see the light of
18  day and be tested through discovery. I mean, that's the
19  bottom line. Nice letters exchanged. They are your client.
20  You pay them. It seems to me if that does not give you
21  leverage, then you should find another accounting firm to
22  work with.
23  MR. SCHIMMELL: We will tell them that.
24  With respect to Osler, we made the same request
25  of Osler the same time when the plaintiffs asked. Osler

Page 24

1  returned to us documents that they believed were not
2  privileged and that reflected communications that BCE
3  had made to Osler, which is what we had asked for.
4  We've reviewed those documents. We've produced them to
5  the plaintiffs. I'm not sure what else at this point we
6  can do.
7  The plaintiffs have made an application regarding
8  Osler in Canada. I understand that there are depositions
9  that are being taken of Osler lawyers. I'm not sure what
10  else BCE can do at this point because we've asked, we've
11  received some documents, we've reviewed them, we've produced
12  them.
13  What I forgot to say with respect to Deloitte a
14  second ago is that the plaintiffs also went to the Canadian
15  courts to seek an order directing Deloitte to produce
16  documents and directing Deloitte to produce a witness. The
17  Canadian courts rejected that application. They viewed what
18  the plaintiffs were asking for as a fishing expedition and
19  they said that under Canadian law, they --
20  THE COURT: But this is the whole point. I mean,
21  if, in fact, you don't intend to use any of these documents,
22  any of these witnesses, any of the information through these
23  third parties, then I'm not sure if there's a privilege that
24  can be asserted in Canada that I have any power. All I am
25  saying is that certainly, if you intend to use any of this

Page 25

1  information, obviously, you can't use it unless it has been
2  produced.
3  And even with respect to -- I mean, even if they
4  give you all nonprivileged documents, that's better than
5  nothing, but, again, my feeling is that the privileged
6  documents ought to be listed so at least we know what the
7  universe of information is and see where we go from there.
8  There was another law firm, I think?
9  MR. SCHIMMELL: Davies. My best recollection is
10  that until very recently, the plaintiffs did not ask that we
11  contact Davies. I understand that there's also an
12  application in the Canadian courts regarding Davies. If the
13  plaintiffs agree, we'll talk about it. We don't view them as
14  particularly relevant.
15  THE COURT: All right. Thank you very much. I
16  appreciate it.
17  MR. VARALLO: Your Honor, may I be heard for 30
18  seconds?
19  THE COURT: Sure.
20  MR. VARALLO: Just for the record, my friend
21  apparently doesn't understand we really want Davies, so I
22  will say it. We really want Davies documents. We went
23  through the process of asking your Honor for letters
24  rogatory. We hired Canadian counsel. We served them. We
25  really want them. We weren't kidding. So if my friend would

Page 26

1 take steps to see what could be done there, that would be
2 appreciated.
3      Your Honor, Ms. Aaron, I think your Honor has all
4 my points. I'm not going to make the points your Honor has
5 already stated. But I do want to make of record one point,
6 and that is Ms. Aaron pointed out that she is still waiting
7 for live server data from us. BCE asked for live server data
8 from us on August 1st, 2005. Let me repeat that: August
9 1st, 2005.
10     We offered the data by letter in February. We
11 followed up and offered the data by letter again in May. On
12 August 1st, my friends said we want you to copy, effectively
13 copy your servers, give them to us. We're in the process of
14 doing that. That is not, with all due respect, your Honor,
15 late production.
16     I don't have anything to add on this unless your
17 Honor has questions.
18     THE COURT: All right. I do not at this point.
19     MR. VARALLO: Thank you.
20     THE COURT: Refresh my recollection as to where
21 we are in the discovery schedule.
22     MR. VARALLO: Your Honor, we've got an October 17
23 cutoff date. We have almost -- I believe all of the
24 witnesses are now scheduled.
25     MR. WADE: I believe that is true except that

Page 27

1 there are -- we have heard noises that there may be other
2 witnesses that plaintiffs, third-party witnesses that
3 plaintiffs may want to depose. They have nothing done about
4 that yet.
5      And then, secondly, we add three or four --
6 we may add a few more witnesses to our list. But so
7 far I believe the ones that have been named have been
8 scheduled.
9      MR. VARALLO: I think that's right, your Honor.
10 We've got good cooperation in scheduling. We've got them
11 scheduled up and they are lined up like airplanes coming into
12 San Francisco.
13     There are quite a few of them, and without having
14 complete document production, of course it's hard to
15 effectively do those.
16     We've got an October 17 cutoff date. We've got
17 about, I will hazard a guess, 10 to 12 BCE witnesses of the
18 25 or so we'll have to take done and now we're moving to the
19 meat of it. We're moving to the senior executive corps.
20     THE COURT: All right.
21     MS. AARON: Your Honor, if I may, Mr. Varallo
22 repeated twice something that was incorrect. We made the
23 request for the live server data in early July. The reason
24 that happened that way is that we have been basically the
25 victims of a bait and switch on what they were going to do.

Page 28

1 They told us in March that they had a full set of backup
2 tapes for all of their e data as of a certain date in April
3 2002. They represented in this court that they would make
4 all of that e data available to us. They represented that in
5 writing several times.
6      We said, fine. Let's do that. Then it turns out
7 over the course of several weeks we find out in May that it's
8 not all of the e data, it's just e-mails.
9      Then over further weeks, it turns out that it's
10 not all of the e-mails, it's only the e-mails for
11 custodians. Then, when we finally get it, we learn that it's
12 only the e data for some of the custodians.
13     So we've had some real issues with trying to
14 figure out from them what they have and what they're willing
15 to give us. We still don't know what that live server data
16 consists of or doesn't consist of. I'm not sure that they
17 know that. But that was the reason why that has been the
18 particular history of what the requests have been.
19     THE COURT: All right. It seems to me -- I,
20 frankly, am not sure how long it will take you all to follow
21 up on what I ordered today. I'm going to say by the end of
22 the month, August 31. That is not helpful with respect to
23 the depositions that are still scheduled this month. On the
24 other hand, I'm not sure ordering something shorter than that
25 is actually going to be meaningful if it can't be done.

Page 29

1      So by August 31, 2005, number one, BCE shall do
2 what it has to do to get the backup tapes up and moving, to
3 search those four executives, to search for documents related
4 to these four executives that were named: Monty, Lessard,
5 Pichette and Ryan.
6      By August 31, 2005, plaintiff shall make
7 available its live server data, whatever. You all know
8 better what that comprises, but I assume you know what I'm
9 talking about.
10     By August 31, 2005, BCE shall file an affidavit
11 with the Court and obviously serve on counsel all of its
12 efforts to get the relevant documents from the three Canadian
13 entities. And I will say that if the three Canadian entities
14 are not willing to cooperate, BCE will be precluded from
15 using any of that evidence in trial.
16     With respect to the last search, the option for
17 BCE is to either take a narrow swipe at 2900 folders or the
18 whole deal of the 645 folders that have Teleglobe.
19     Now, the search terms that I have tentatively
20 identified, and I will allow a few more to be added to that
21 by Teleglobe, but the ones that I have selected initially,
22 and it's hard for me to -- well, let me go through them. On
23 the first page, it's one, two, three, four, five, it's the
24 sixth, seventh and eighth one down, starting with Teleglobe
25 or TG or TGO, 40, et cetera.

**Page 30**

1  MR. WADE: Support?
2  THE COURT: Yes. The one that follows, Deloitte
3  or DT or D near 3, et cetera, and the next one down:
4  Deloitte or DT or D near 3, et cetera.
5  So those are the three on that page. And, again,
6  after I've gone through this, I will allow the Teleglobe
7  parties to add a few more. I don't know how many more, but
8  not -- certainly not more than six.
9  On the second page, I'm looking at one, two,
10 three, four, the fifth one down. Bell or BCE or Bell Canada
11 near 40, et cetera.
12 The seventh one down, Synergy Project or Project
13 X.
14 The 12th one down, Solvent or liquidate or
15 insolvent or restruct near 99, et cetera.
16 I've lost count. And then 14, 15 and 16. Commit
17 or commitment or committed or promised or planned or intend
18 or intention to propose near 20 Teleglobe, and the two that
19 follow that.
20 And on the final page, I just have one
21 highlighted, and that's the independent committee near 20,
22 Teleglobe or TG or TGO or more.
23 Now, if there are others for -- if there
24 are others that Teleglobe believes, a few others that
25 Teleglobe believes are more likely than others to come

**Page 31**

1  up with relevant documents and not be as broad as they
2  seem to be, I'm happy to entertain a few more. And if you
3  need a moment to discuss that with your expert there, I'm
4  happy to let you do that.
5  MR. VARALLO: Thank you, your Honor.
6  THE COURT: And I might take a break. I want to
7  go out and find out. I swear I remember doing something
8  about the special master. I'm going to try to track down
9  what I did. So I will be back momentarily.
10 (Short recess taken.)
11 THE COURT: My staff person who helps me left for
12 the day left long ago, so I will have to follow up on that
13 special master. I can remember writing it. I don't know
14 what happened to it. All right.
15 MR. VARALLO: Thank you, your Honor.
16 Your Honor invited us to take a look at the
17 search terms in light of your Honor's ruling and propose up
18 to six. I'm happy to say I'm going to propose up to four, if
19 that would be acceptable.
20 THE COURT: All right.
21 MR. VARALLO: Your Honor, the additional terms
22 we'd like searched are on the first page, above the first
23 one, your Honor indicated Teleglobe or TG or TGO. There's
24 one that says Monty near 40 support continues. We'd like
25 that one searched because Mr. Monty is the one who was

**Page 32**

1  publicly reiterating support and commitment for Teleglobe's
2  funding and financing, so that's important to us.
3  Two below the last one your Honor chose on Page
4  1, it begins, A-n-a-l-y star. That's analyze or assess. It
5  is a brood one. However, your Honor it picks up analysis of
6  good will, going concern, which are both very key, we think,
7  for proving solvency or lack thereof in this case. That's
8  two, your Honor.
9  The third is the very first one at the top of the
10 next page. Again, this relates to infusing money into the
11 enterprise, which winds up often in documents being
12 associated with commitments based on our review.
13 And finally, your Honor, the second to last
14 one --
15 MR. WADE: Excuse me. What number on the second
16 page is that?
17 MR. VARALLO: The very first one.
18 THE COURT: The first one.
19 MR. WADE: Sorry. Didn't hear that.
20 MR. VARALLO: That's all right. I will try to
21 speak up a little bit.
22 The second to last one on the second page, your
23 Honor, the one that's good will or good will or write-down,
24 near 40 value or impair. Again, that's similar to what your
25 Honor chose immediately above it, but the one your Honor

**Page 33**

1  chose specifically relates to Teleglobe. This is more
2  broader.
3  THE COURT: All right.
4  MR. VARALLO: Thank you, your Honor.
5  Your Honor, without troubling you any more, my
6  friend, my colleague, indicates to me that when I addressed
7  the four witnesses, we had actually been corresponding about
8  a number of additional ones. I would like to inquire through
9  counsel, through the Court of counsel whether, if there are
10 other senior executives that have a small number of
11 documents, we could work together to get those searched in
12 some appropriate way.
13 THE COURT: Well, again, it's all a matter of
14 balancing burden with benefit. If we're talking about one or
15 two more, yes. If you are talking about 12 more, no.
16 MR. VARALLO: Your Honor, I was talking about
17 three more, actually.
18 THE COURT: Three more. Do you want to name
19 them?
20 MR. VARALLO: Certainly, you. Sabia, Vanaselja
21 and Skinner. Vanaselja, apparently we have 23 e docs.
22 Skinner, 336. Sabia, we have 496. There are more docs, but
23 they're very senior executives and simply not that many for
24 senior executive corps.
25 THE COURT: Well, they seem to be not in the same

Page 34

1 group as the four. I think maybe we'll leave them off the
2 list at this point.
3     MR. VARALLO: Thank you, your Honor.
4     MR. WADE: Could we have just one second, your
5 Honor?
6     THE COURT: Certainly.
7     (Pause while counsel conferred.)
8     MR. VARALLO: Your Honor, while my colleague is
9 conferring, to the extent you wanted our input as to the
10 choice between the narrower search and the broader search on
11 the folders, we'd prefer the narrower search on the broader
12 number of folders, if that matters.
13     THE COURT: You probably shouldn't have said that
14 because they'll probably choose to do the other just out of
15 spite.
16     MR. WADE: Your Honor, two things. Let me go
17 reverse on that and say so do we.
18     THE COURT: Okay.
19     MS. AARON: Well, no.
20     THE COURT: Maybe not.
21     MS. AARON: We need to talk about that.
22     MR. WADE: We will talk about it.
23     THE COURT: All right.
24     MR. WADE: With respect to the second one that
25 Mr. Varallo mentioned, which is on the first page,

Page 35

1 we're -- it looks, if you just think of Teleglobe, it
2 looks reasonable. But what's on these folders, what's in
3 these folders applies across the board to a conglomerate
4 company, and the amount of -- for our purposes in this
5 case, junk will be extremely high, because it will all be
6 about Vanaselja's budgets and express views budgets and all
7 the rest of it.
8     THE COURT: Well, I wish you had sat down and
9 talked about these a little bit more carefully. It is down
10 to 2900 folders, not 30,000. I basically made my decision,
11 so it's a little late to be discussing it now.
12     MR. WADE: Okay. I just wanted to note an
13 objection to that one.
14     THE COURT: All right. Your objection is duly
15 noted.
16     MR. WADE: Thank you.
17     THE COURT: All right. Are there any other
18 issues that we should be addressing?
19     MR. VARALLO: Not from this side of the table,
20 your Honor.
21     THE COURT: All right. Let's hear from defense
22 counsel.
23     MS. AARON: On the backup tapes, your Honor,
24 we've been looking into what's available and what's
25 accessible.

Page 36

1 With respect to Mr. Lessard, there are lots of
2 witnesses. He's not among the most important. We think
3 we can identify the backup tape with his e-mails. With
4 respect to other electronic documents, we think that they're
5 on another server where the backup tape situation is much
6 more confused and we're going to look into it to see if
7 perhaps there's a way around it, but we're dubious, so I just
8 wanted to alert the plaintiffs that we might be making some
9 request for a little indulgence and mercy as to those.
10     THE COURT: All right. And if there are
11 technical issues, then -- oh, that your technical people,
12 your affiants who, you know, are talking to us about e data
13 retrieval and the expert who came with plaintiffs' counsel,
14 it seems to me sometimes I think the lawyers should leave the
15 room and let those folks work it out to see if the technical
16 problems can be resolved. So I hope that you take advantage
17 of the expertise. All right?
18     MS. AARON: Thank you, your Honor.
19     THE COURT: All right. Any issues from
20 defendants' side of the table that we should address before
21 we disengage this evening?
22     MR. WADE: Not that we have not already talked
23 about.
24     THE COURT: All right. So there's an August 31
25 deadline. I will make sure that I address the privilege

Page 37

1 issues within the next week, and if there are other issues
2 that need to be addressed, I don't know that we have another
3 discovery conference scheduled. I don't know that I want to
4 do that in the absence of an e-mail from you all saying
5 there's something you can't work out.
6     I truly hope we can manage to get through the
7 rest of August without a discovery dispute, though. All
8 right?
9     All right. Thank you very much, counsel.
10     (Counsel respond, "Thank you, your Honor.")
11     (Court recessed at 6:00 p.m.)
12         - - -