IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------

|  |  |  |
|---|---|---|
| IN RE:  TELEGLOBE COMMUNICATIONS CORPORATION, *et al*., | : : : | Chapter 11<br>Jointly Administered |
| Debtors. | : : | Bankr. Case No. 02-11518 (MFW) |

---------------------------------------------------------------

|  |  |  |
|---|---|---|
| TELEGLOBE USA INC. *et al*., | : : | |
| Plaintiffs, | : : | Civ. Action No. 04-1266 (SLR) |
| v. | : : | |
| BCE INC. *et al*., | : : | |
| Defendants. | : : | |

---------------------------------------------------------------

**DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR MOTION *IN LIMINE*
TO EXCLUDE THE TESTIMONY OF CARLYN TAYLOR AND
THE RELATED TESTIMONY OF PAUL CHARNETZKI**

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Pauline K. Morgan (No. 3650)
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19899
(302) 571-6600
pmorgan@ycst.com
*Attorneys for Defendants*

Of Counsel:

SHEARMAN & STERLING LLP
Stuart J. Baskin
Jaculin Aaron
599 Lexington Avenue
New York, NY  10022-6069
(212) 848-4000

Stephen J. Marzen
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2634
(212) 508-8000

Dated:  May 23, 2006

## TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................i

TABLE OF AUTHORITIES .............................................................................................ii

NATURE AND STAGE OF THE PROCEEDINGS AND SUMMARY OF ARGUMENT..............1

STATEMENT OF FACTS.................................................................................................3

      A.     Representations Made by the Teleglobe Companies to Gain Court Approval of a Global Bidding Process ...............................................................................3

      B.     Representations Made by the Teleglobe Companies to Gain Court Approval for the Sale of Their Core Business to Cerberus..............................................5

      C.     The Teleglobe Companies Proffer Expert Testimony That Conflicts with Their Prior Sworn Representations to the Bankruptcy Court ................................7

ARGUMENT ...................................................................................................................9

I.     JUDICIAL ESTOPPEL BARS THE TELEGLOBE COMPANIES FROM ADVANCING INCONSISTENT POSITIONS THAT THREATEN THE INTEGRITY OF THE COURT ......................................................................................10

      A.     The Expert Reports of Ms. Taylor and Mr. Charnetzki Are Irreconcilably Inconsistent with the Teleglobe Companies' Prior Sworn Statements ......................10

            1.     Representations to secure approval of the global bidding process.................11

            2.     Representations to secure approval of the sale to Cerberus ...........................12

      B.     The Teleglobe Companies' Inconsistent Positions Threaten the Integrity of the Court...........................................................................................13

      C.     Imposition of Judicial Estoppel Would Prevent Inconsistent Rulings that Would Threaten the Integrity of the Court...........................................................15

II.    COLLATERAL ESTOPPEL BARS RELITIGATION OF MATTERS ALREADY DETERMINED IN THE BANKRUPTCY COURT .........................................................16

CONCLUSION ..............................................................................................................19

# TABLE OF AUTHORITIES

## CASES

*In re Armstrong World Industries,* 432 F.3d 507 (3d Cir. 2005) ................................................... 10

*Delgrosso v. Spang & Co.*, 903 F.2d 242 (3d Cir. 1990) ............................................................... 10

*Detz v. Greiner Industries,* 346 F.3d 109 (3d Cir. 2003) ............................................................... 14

*Edwards v. Aetna Life Insurance Co.,* 690 F.2d 595 (6th Cir. 1982) ............................................ 13

*Fleck v. KDI Sylvan Pools,* 981 F.2d 107 (3d Cir. 1992) ......................................................... 13, 14

*In re Genesis Health Ventures,* 324 B.R. 510 (Bankr. Del. 2005) ........................................... 16, 17

*In re Jennifer Ruth Peterson*, 332 B.R. 678 (Bankr. Del. 2005) ................................................... 16

*Krystal Cadillac-Oldsmobile GMC Truck v. General*, 337 F.3d 314 (3d Cir. 2003) ............. 13, 16

*In re Montgomery Ward Holding Corp.*, 242 B.R. 147 (D. Del. 1999) ......................................... 18

*Montrose Medical Group Participating Savings Plan v. Bulger*, 243 F.3d 773
     (3d Cir. 2001) ................................................................................................... 10, 13, 15

*Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414 (3d Cir. 1988) ........................ 13

*Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355 (3d Cir. 1996) ....... 1, 10, 13

## STATUTES AND RULES

11 U.S.C. § 363(b) ................................................................................................................ 5, 7, 18

28 U.S.C. § 1927 ..................................................................................................................... 15, 16

Fed. R. Civ. P. 11, 37 ................................................................................................................... 15

Defendants respectfully submit this opening brief in support of their motion *in limine* to exclude the testimony of Carlyn Taylor and the related testimony of Paul Charnetzki, two experts retained by Plaintiffs Teleglobe Communications Corp., *et al*. (collectively the "Teleglobe Companies" or "U.S. Debtors"), and the Plaintiffs Official Committee of Unsecured Creditors of Teleglobe Communications Corporation (the "Creditors").

## NATURE AND STAGE OF THE PROCEEDINGS AND SUMMARY OF ARGUMENT

Litigation is not a game in which parties can assert contradictory positions in multiple courts based on the exigencies of the moment. The threat to the "integrity of the judicial process" in such situations is particularly grave when a tribunal has already acted in reliance on a party's prior assertions. *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 361 (3d Cir. 1996). Just such a threat to the integrity of the Court is presented by the expert reports of Carlyn Taylor and Paul Charnetzki submitted by Plaintiffs in this case. Both experts' testimony is directly contrary to the positions the same Plaintiffs, represented by the same counsel, successfully advanced four years ago before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

From the outset, this has been a litigation in search of a damages theory. A few months ago, however, Plaintiffs finally articulated two (largely contradictory) theories. First, Plaintiffs claim they were damaged when Defendants continued to support Teleglobe Inc. and failed to place the Teleglobe Companies into liquidation as of June 30, 2001. The expert reports supporting this bizarre theory are the subject of a parallel motion *in limine* filed by Defendants today. Second, Plaintiffs argue that once the Teleglobe Companies filed for bankruptcy in May 2002, the Defendants should have sought to facilitate a stand-alone restructuring, rather than the sale of the Teleglobe Companies' core business. It is this second damages theory that is the subject of this

motion and is inconsistent with representations the Plaintiffs repeatedly made in prior proceedings to secure orders from the Bankruptcy Court.

In 2002, the Teleglobe Companies were primarily concerned with obtaining the Bankruptcy Court's approval of (1) a "global bidding process" for the sale of the Teleglobe Companies' core business; and (2) the sale of the core business to TLGB Acquisition, LLC, a subsidiary of Cerberus Capital Management LP ("Cerberus"). To obtain the necessary court approvals, the Teleglobe Companies made three important representations to the Bankruptcy Court. First, the Teleglobe companies said that the global bidding process and the sale to Cerberus were in the best interest of the U.S. Debtors, their creditors and stakeholders. Second, they told the Bankruptcy Court that the purchase price to be paid by Cerberus represented the highest and best offer and the fair market value of the core business. Third, they told the Bankruptcy Court that there was an immediate need to sell the core business because its value was unlikely to appreciate with time in a restructuring proceeding. The Bankruptcy Court accepted each of those representations and issued the orders requested by the Teleglobe Companies.

Given that the Bankruptcy Court awarded the Plaintiffs precisely what they petitioned for, it is difficult to imagine how the Teleglobe Companies could have been injured. Plaintiffs' solution, four years later, is to change positions. They are now primarily concerned with manufacturing some viable damages theory in this case. Indeed, the Teleglobe Companies are shell corporations that have only a single purpose for their continued existence – to prosecute this lawsuit against Defendants. Similarly, the Creditors, composed primarily of firms who purchased the Teleglobe Companies' debt at a deep discount and view this lawsuit as a simple arbitrage opportunity, are motivated solely by the desire to obtain a windfall recovery in this lawsuit. As a result, neither the Teleglobe Companies, nor the Creditors are interested in adhering to their prior sworn

representations made to the Bankruptcy Court.  Rather, they have retained Ms. Taylor to opine that (1) the global bidding process was *not* in the best interest of the Teleglobe Companies or their creditors; (2) that the global bidding process and sale to Cerberus resulted in a "*fire sale valuation*" (not a fair market valuation) of the core business; and (3) that the Teleglobe Companies *would* have realized more value for the core business if they had engaged in a stand-alone restructuring.  The Plaintiffs have also retained Mr. Charnetzki (at the unbelievable price tag of $2 million and rising) to provide his opinion on the "proper" value of the Teleglobe Companies' core business in 2002 if, as Ms. Taylor says should have happened, the sale to Cerberus was not consummated.

Plaintiffs' proffer of the expert testimony of Ms. Taylor and Mr. Charnetzki is an affront to the integrity of this Court.  The same U.S. Debtors and the same Creditors, represented by the same counsel, are now asking the Court not only to ignore their prior inconsistent sworn representations, but also to base a finding of damages on expert testimony that directly contradicts the positions taken and the factual representations made to obtain at least two valid and final orders of the Bankruptcy Court.  The Plaintiffs should be estopped in this attempt to play fast and loose with the Court under at least two well-established legal doctrines: judicial estoppel and collateral estoppel.

## STATEMENT OF FACTS

### A.    Representations Made by the Teleglobe Companies to Gain Court Approval of a Global Bidding Process

On May 15, 2002, the Teleglobe Companies commenced bankruptcy proceedings in Canada (the "Canadian Bankruptcy Proceedings"). On May 28, 2002, the Teleglobe Companies commenced their bankruptcy cases in the United States by filing voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

On June 3, 2002, the Debtors filed a motion in the United States Bankruptcy Court for the District of Delaware seeking authorization "to conduct a global bidding process … for the sale of

their core business of providing voice and related data telecommunications services." (Declaration of Stephen J. Marzen ("Marzen Decl."), Ex. 1 at ¶ 1.)  To obtain the requested authorization, the Teleglobe Companies made a number of representations aimed at convincing the Court that the sale of the core business was desirable, that the proposed global bidding process was proper, and that the global bidding process would achieve the maximum value for the core business.  The Teleglobe Companies stressed that the decision to seek to sell the core business was made "in the exercise of their sound business judgment" and that Ernst & Young Inc., the court-appointed monitor in the Canadian Bankruptcy Proceedings, concurred in that judgment.  (*Id.* at ¶¶ 1, 2.)  The Teleglobe Companies also noted that there was "an immediate need" to go forward with the sale because "[t]he value of the Voice Business is unlikely to appreciate with time in a restructuring proceeding." (*Id.* at ¶ 25.)  After assuring the Court that they believed "[t]he Sale Transaction will represent the fair market value for the Voice Business" (*id.* at ¶ 26), the Teleglobe Companies summarized that "[t]he approval of the Bidding Procedures by this Court will ensure the efficient administration of the Debtors' estates and that the Debtors are able to obtain maximum value for the US Assets and the Voice Business."  (*Id.* at ¶ 33.)

The Bankruptcy Court held a hearing on June 24, 2002 during which the Teleglobe Companies' motion was addressed.  At that hearing, the Creditors supported entry of the requested order, but reserved "any and all objections to the proposed sale" so they could weigh "whether or not creditors would best be served by trying to do a stand alone reorganization of these entities," *i.e.*, Ms. Taylor's current position.  (Marzen Decl., Ex. 2 at 24-25.)  The Creditors told the Court that they would raise any objections at a future hearing to approve the sale of the core business.

Based on the representations made by the Teleglobe Companies and the Creditors, the Bankruptcy Court issued an order authorizing the Teleglobe Companies to go forward with the global bidding process.  (Marzen Decl., Ex. 3.)

### B.     Representations Made by the Teleglobe Companies to Gain Court Approval for the Sale of Their Core Business to Cerberus

Pursuant to the Court's June 24, 2002 Order, the Teleglobe Companies, with the assistance of Lazard Freres & Co. LLC, conducted a global market search of financial and strategic buyers in order to locate a purchaser for their core business.  (*See* Marzen Decl., Ex. 4, Affidavit of Benjamin J. Babcock ("Babcock Aff."), at ¶ 12 (describing the steps taken pursuant to the global bidding process).)  Those efforts came to fruition on September 18, 2002, when the Teleglobe Companies entered into a purchase agreement with Cerberus (the "Purchase Agreement").  (*Id*. at ¶ 2.)

The Teleglobe Companies, however, needed approval from the Bankruptcy Court under 11 U.S.C. § 363(b) to go forward with the sale.  As a result, Mr. Babcock, a Senior Vice President at Ernst & Young Inc., the court-appointed monitor in the Canadian Bankruptcy Proceedings, and John Brunette, the CEO of the U.S. Debtors, submitted affidavits to the Court making various representations about the desirability of the sale to Cerberus.  Those two representatives of the U.S. Debtors and their Canadian affiliates both noted that "the competitive bidding process yielded the highest and best offer for the Core Telecom Business and is in the best interest of the Debtors, their creditors and stakeholders."  (Marzen Decl., Ex. 5, Affidavit of John Brunette ("Brunette Aff."), at ¶ 15; Babcock Aff. at ¶ 15.)  They also agreed that "the purchase price for the Core Telecom Business … represents the fair market value for these assets."  (Babcock Aff. at ¶ 20; Brunette Aff. at ¶ 19.)  They also specifically noted the "immediate need" to sell the assets rather than engaging in a restructuring:

> [T]he value of the Core Telecom Business is unlikely to appreciate with time in a restructuring proceeding.  The Teleglobe Companies

> further believe the critical nature of telecommunications services is
> not conducive to maintaining customers in an uncertain environment
> and numerous recent major restructurings in the telecommunications
> industry have clearly established that retaining revenue in any type of
> protracted restructuring with an uncertain outcome is extremely
> difficult. For all the above mentioned reasons the Teleglobe
> Companies respectfully request the Court issue an order approving the
> sale of the Core Telecom Business to the Purchaser pursuant to the
> Purchase Agreement and the transactions contemplated thereby.

(Brunette Aff. at ¶ 20; *accord* Babcock Aff. at ¶ 21 (almost identical text on behalf of the court-appointed monitor).)

The Teleglobe Companies reiterated these representations during an October 9, 2002 hearing before the Bankruptcy Court. (Marzen Decl., Ex. 6 at 12-18.) At that time, counsel for the Teleglobe Companies repeated that "[t]he monitor and the debtors have determined that the competitive bid process yielded the highest and best offer for the core telecom business, and it's in the best interest of the debtors, their creditors, and their estates." (*Id.* at 18.) Counsel also noted that "both Mr. Babcock and Mr. Brunette are in the courtroom today, and are subject to cross examination." (*Id.* at 12.)

At the October 9th hearing, the Creditors also joined the Teleglobe Companies in asking the Court to approve the Purchase Agreement. Although the Creditors previously expressed interest in the possibility of a "stand alone restructuring" (Marzen Decl., Ex. 2 at 24-25), their Counsel explained at the hearing:

> The monitor and the debtor have kept the committee and its
> professionals involved in the process, and they have convinced us, by
> keeping us in the process, that in fact, they have achieved the
> maximum value that you're going to get for these assets…. We
> believe, Your Honor, the representations made in the two affidavits
> submitted to this Court. We believe the sale is in the best interest of
> the estate, and we support the entry of the order.

(Marzen Decl., Ex. 6 at 19.)

6

Based on these representations the Bankruptcy Court issued an order under 11 U.S.C.

§ 363(b) approving the sale to Cerberus on October 10, 2002.  (Marzen Decl., Ex. 7.)  In that Order,

the Court adopted many of the Teleglobe Companies' positions, specifically finding that:

- "[T]he Sale Transaction and the consummation of the transactions contemplated thereby, are in the best interests of the Debtors, their estates and the parties in interest."  (*Id*. at ¶ 7.)

- "The value of the Core Business and Purchased Assets is unlikely to appreciate with time in a restructuring proceeding.  The critical nature of telecommunication services is not conducive to maintaining customers in an uncertain environment.  Retaining revenue in any type of protracted restructuring with an uncertain outcome is extremely difficult." (*Id*. at ¶ 7(c).)

- "The purchase price under the Purchase Agreement (the "Purchase Price") represents the highest and best offer for the Core Business and Purchased Assets and is fair and constitutes reasonably equivalent value for the Core Business and Purchased Assets." (*Id*. at ¶ 8.)[1]

### C. The Teleglobe Companies Proffer Expert Testimony That Conflicts with Their Prior Sworn Representations to the Bankruptcy Court

On March 8, 2006, the Teleglobe Companies submitted expert reports in this case from

Carlyn Taylor (Marzen Decl., Ex. 8, Expert Report of Carlyn Taylor ("Taylor Rpt.")) and Paul

Charnetzki (Marzen Decl., Ex. 9, Expert Report of Paul Charnetzki ("Charnetzki Rpt.")).

Ms. Taylor notes in her report that she was asked to "analyze restructuring issues applicable

to this matter" (Taylor Rpt. at 1) and offer an opinion on "the restructuring option(s) that would

provide the highest potential to the Teleglobe estate and its creditors" (*id*. at 4).  Consistent with this

assignment (but contrary to the Teleglobe Companies' prior representations), Ms. Taylor opines that

---

[1]     As in the U.S. bankruptcy proceedings, in a September 19, 2002 filing in the Canadian Bankruptcy Proceedings, the court-appointed monitor represented to the Canadian court that "the Monitor believes that the Purchase Agreement represents the highest and best offer for the Core Telecom Business.  The Monitor has compared the sale price achieved to the trading benchmarks for comparable public companies and to the valuation of recently completed restructuring proceedings.  The estimated Final Purchase Price compares positively to these benchmarks." (Marzen Decl., Ex. 12.)

the global bidding process and the sale to Cerberus were *not* in the best interest of the Teleglobe Companies' estate or creditors.  (*Id*. at 5.)  Rather, Ms. Taylor claims that a stand-alone restructuring was the better option.  (*Id*.)  She also specifically asserts that "it was known and knowable" in 2002 that the global bidding process "was not going to yield anything but a fire sale valuation" and that "[t]he sale of Teleglobe to Cerberus provided a much worse return to the Teleglobe estate and its creditors than a stand-alone restructuring."  (*Id*. at 12.)

Ms. Taylor specifically acknowledged during her deposition that her testimony directly contradicts the Plaintiffs' prior representations that the sale to Cerberus achieved the fair market value for the core business.  (*E.g.*, Marzen Decl., Ex. 10 at 171 ("I disagree that that is actually fair market value, and I think it is a very low distressed value.").)  She also acknowledged disagreement with the Plaintiffs' sworn assertions that there was an immediate need to sell the core business rather than engaging in a restructuring.  (*Id*. at 180-81).  Similarly, Ms. Taylor testified that the "facts do not support" representations that were made in the Canadian Bankruptcy Proceeding concerning the alternatives to a sale of the core business.  (*Id*. at 192.)

Mr. Charnetzki explains in his report that he was asked to "[q]uantify the financial damages" to the Plaintiffs based, in part, on the theory espoused in Ms. Taylor's report that the Teleglobe Companies would have been better off in a stand-alone restructuring.  (Charnetzki Rpt. at 6-7.)  Relying on Ms. Taylor's report, Mr. Charnetzki concludes that the value of the Teleglobe Companies' core business in May 2002 was $414 million – nearly three times the amount of the purchase price paid by Cerberus.  (*Id*. at 6.)  Mr. Charnetzki acknowledged in deposition that he disagreed with the Teleglobe Companies' prior representations that the Cerberus purchase price represented fair market value.  (Marzen Decl., Ex. 11 at 223-24 ("I believe a higher value could have been preserved.").)  Indeed, Mr. Charnetzki was brazen that he intended to contradict the

Teleglobe Companies' prior representations to the Bankruptcy Court, and planned to testify that the fair market valuation from his report – *and not the Cerberus purchase price* – was the proper fair market value:

> Q.    So notwithstanding the representation that the monitor made to the bankruptcy judge and notwithstanding the representation that the debtors made to the bankruptcy judge, all under oath, as I understand it, you are going to be telling Judge Robinson at this trial that the Charnetzki paper valuation and not that which was achieved through this process is the proper fair market value; is that right, Mr. Charnetzki?
>
> A.    THE WITNESS:  Yes.

(*Id*. at 245.)[2]

## ARGUMENT

Plaintiffs' conduct here is not marginal or ambiguous.  Their positions before the Bankruptcy Court were consistent.  They were made under oath.  They were designed to induce the Court to grant Plaintiffs' requested relief.  And they worked, inducing the court to adopt Plaintiffs' positions as express findings in ruling in Plaintiffs' favor.  Now, Plaintiffs have changed their positions.

Plaintiffs should be estopped from offering testimony from Ms. Taylor in this case based on the doctrines of judicial and collateral estoppel.  Similarly, Mr. Charnetzki's testimony should be excluded to the extent he quantifies damages based on the stand-alone restructuring hypothesized by Ms. Taylor.

---

[2]    Although the Plaintiffs have paid Mr. Charnetzki more than $2 million for his expert services, it is noteworthy that they failed to provide him with any of the Teleglobe Companies' or the Creditors' prior representations to the Bankruptcy Court.  (*E.g.*, Marzen Decl., Ex. 11 at 225, 227, 231-32.)  Likewise, Ms. Taylor did not review the Plaintiffs' prior representations to the Bankruptcy Court or in the Canadian Bankruptcy Proceedings before writing her report.  (Marzen Decl., Ex. 10 at 172.)

I.    **JUDICIAL ESTOPPEL BARS THE TELEGLOBE COMPANIES FROM ADVANCING INCONSISTENT POSITIONS THAT THREATEN THE INTEGRITY OF THE COURT**

The doctrine of judicial estoppel protects "the judicial process by preventing parties from deliberately changing positions according to the exigencies of the moment." *In re Armstrong World Industries,* 432 F.3d 507, 517 (3d Cir. 2005). A court may bar testimony under the doctrine of judicial estoppel when three elements are met: (1) the party estopped is asserting a position that is irreconcilably inconsistent with one he or she asserted in a prior proceeding; (2) the party changed his or her position in a culpable manner that threatens the court's authority or integrity; and (3) the use of judicial estoppel is tailored to address the affront to the court's authority or integrity. *Montrose Medical Group Participating Savings Plan v. Bulger*, 243 F.3d 773, 777-78 (3d Cir. 2001). Each of those elements is easily satisfied in this case. Indeed, courts have noted that the application of judicial estoppel is "particularly appropriate" in situations where, as here, "the party benefited from its original position." *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 361 (3d Cir. 1996) (quoting *Delgrosso v. Spang & Co.*, 903 F.2d 242 (3d Cir. 1990)).

A.    **The Expert Reports of Ms. Taylor and Mr. Charnetzki Are Irreconcilably Inconsistent with the Teleglobe Companies' Prior Sworn Statements**

The contradictions between Ms. Taylor's and Mr. Charnetzki's reports and the Teleglobe Companies' representations to the Bankruptcy Court are stark and numerous. Indeed, the entire premise of Ms. Taylor's report – that the global bidding process was inappropriate and that the sale to Cerberus achieved only a "fire sale" price – directly contradicts the explicit and unambiguous representations the Teleglobe Companies repeatedly made to the Bankruptcy Court. Mr. Charnetzki's calculation of damages, in turn, relies on this same position and Ms. Taylor's assertions. (Charnetzki Rpt. at 6.)

### 1.     Representations to secure approval of the global bidding process

As noted above, in 2002, the Teleglobe Companies asked the Bankruptcy Court to issue an order approving a proposed global bidding process for the sale of the core business.  (Marzen Decl., Ex. 1.)  To secure the requested order, the Teleglobe Companies emphasized the advantages of the global bidding process to the Court.  They told the Court that "approval of the Bidding Procedures by this Court will ensure the efficient administration of the Debtors' estates and that the Debtors are able to obtain maximum value for the US Assets and the Voice Business."  (Marzen Decl., Ex. 1 at ¶ 33.)  The Teleglobe Companies also assured the Court that the sale of the core business was in the "best interests of the Debtors and their estates" (*id*. at ¶ 26); they explained there was "an immediate need to proceed with the sale of the Voice Business" (*id*. at ¶ 25); they noted that "the parties who are likely to have an interest in the Voice Business have been identified and, in most cases, discussions are underway" (*id*.); they represented that "there is sufficient interest to justify proceeding with a competitive sales process" (*id*.); and they explained that "[t]he value of the Voice Business is unlikely to appreciate with time in a restructuring proceeding" (*id*.).  The Teleglobe Companies concluded that they believed "any sales proceeds obtained from the Sale Transaction will represent the fair market value for the Voice Business."  (*Id*. at ¶ 26.)

Ms. Taylor's report advances positions that are irreconcilably inconsistent with those prior assertions.  In Ms. Taylor's view, far from achieving the fair market value for the estate, "*it was known and knowable* that a sale in this environment was not going to yield anything but a fire sale valuation."  (Taylor Rpt. at 12 (emphasis added).)  Ms. Taylor claims not only that there was no immediate need to conduct the sale, but also that the timing of the sale was "obviously poor" (*id*. at 55); that there would be no strategic buyers, noting that "the rapid sales process effectively precluded large foreign potential strategic buyers" (*id*. at 13) and that the sale was ultimately made to a non-strategic buyer with "a reputation for buying highly distressed companies" (*id*. at 55); and

11

she finally claims that the Teleglobe Companies would have realized more value if they had engaged in a "stand-alone restructuring" rather than the global bidding process (*id*. at 13).

### 2.    Representations to secure approval of the sale to Cerberus

Ms. Taylor's report is also directly contrary to the sworn representations the Teleglobe Companies made with respect to their Purchase Agreement with Cerberus. In 2002, the Teleglobe Companies offered sworn statements noting that the sale to Cerberus had achieved "the highest and best offer" and the "fair market value for" the core business. (Babcock Aff. at ¶¶ 15, 20; Brunette Aff. at ¶¶ 15, 19.) Similarly, the Creditors told the Court that the sale to Cerberus "achieved the maximum value that you are going to get for these assets." (Marzen Decl., Ex. 6 at 19.) Once again, the Teleglobe Companies noted that "it was unlikely that the value of the Core Telecom Business would appreciate in a protracted restructuring proceeding." (Babcock Aff. at ¶ 3; Brunette Aff. at ¶ 4.)

Ms. Taylor rejects all of this. Indeed, the entire premise of Ms. Taylor's report and testimony is that the sale to Cerberus did *not* achieve the "maximum" or "fair market value" for the assets, but rather that "[t]he sale of Teleglobe to Cerberus provided a much worse return to the Teleglobe estate and its creditors than a stand-alone restructuring." (Taylor Rpt. at 12.) Likewise, Mr. Charnetzki has acknowledged that he intends to testify that his damages calculation – not the Cerberus purchase price – represents the fair market value of the core business. (Marzen Decl., Ex. 11 at 245.)

Ms. Taylor's report and Mr. Charnetzki's resultant damages calculation are thus fundamentally inconsistent with the statements the Teleglobe Companies made to the Bankruptcy Court in order to obtain approval of the global bidding process and the Purchase Agreement with Cerberus.

**B.    The Teleglobe Companies' Inconsistent Positions Threaten the Integrity of the Court**

Judicial estoppel is "particularly appropriate" in this case because the Teleglobe Companies' earlier statements were accepted by the Bankruptcy Court in issuing the two orders that authorized the global bidding process and approved the Purchase Agreement with Cerberus.  *Ryan Operations*, 81 F.3d at 361.  Under such circumstances, the threat to the integrity of the courts is pronounced. "If the second tribunal adopted the party's inconsistent position, then at least one court has probably been misled."  *Montrose*, 243 F.3d at 782 (quoting *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 599 (6th Cir. 1982)).  This is exactly the type of assault on the "dignity or authority" of the court that the doctrine of judicial estoppel was designed to prevent.  *Montrose*, 243 F.3d at 781.  Indeed, courts have consistently invoked judicial estoppel when a party's earlier inconsistent statement was accepted by a tribunal.  *E.g., Fleck v. KDI Sylvan Pools,* 981 F.2d 107, 122 (3d Cir. 1992) (imposing judicial estoppel because party succeeded in representations to the bankruptcy court); *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 419-20 (3d Cir. 1988) (same).

The Bankruptcy Court's adoption of the Teleglobe Companies' prior statements also gives rise to an inference that the Teleglobe Companies are now seeking to play "fast and loose" with the courts.  As the Third Circuit has noted, "[w]hether the party sought to be estopped benefit[ed] from its earlier position or was motivated to seek such a benefit may be relevant insofar as it evidences an intent to play fast and loose with the courts."  *Ryan Operations*, 81 F.3d at 361; *accord Montrose Medical Group*, 243 F.3d at 783 (noting "the *Ryan Operations* principle remains true today: so long as the initial claim was in some way accepted or adopted, no further showing is necessary that the party 'benefit[ed]' in any particular way.");  *cf. Krystal Cadillac-Oldsmobile GMC Truck v. General*, 337 F.3d 314, 321 (3d Cir. 2003) ("a rebuttable inference of bad faith arises when averments in the pleadings demonstrate both knowledge of a claim and a motive to conceal that

13

claim in the face of an affirmative duty to disclose"); *Detz v. Greiner Industries,* 346 F.3d 109, 117-18 & n.2 (3d Cir. 2003) (noting that an "inquiry into bad faith is not necessary" when a court has already adopted a prior inconsistent position).

Such an inference finds ample support in this case.  In 2002, needing the Bankruptcy Court's approval of the global bidding process and the Purchase Agreement with Cerberus, the Teleglobe Companies told the court that the sale of the core business was in the best interest of the estate and creditors, achieved the fair market value for the core business, and was preferable to a restructuring. In 2006, needing to come up with a damages theory in this case, the Teleglobe Companies offered Ms. Taylor's report, which asserts that the sale of the core business was not in the best interest of the estate or the creditors, achieved only a "fire sale valuation" for the core business, and was worse than a restructuring.  This 180-degree change in position is a textbook example of an attempt to "play fast and loose with the courts."  As the *Fleck* court noted: "[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position."  981 F.2d at 121.

The Teleglobe Companies and the Creditors should be held to the standard articulated in *Fleck*.  In 2002, they decided that they did not want to take the risk of continued ownership of the core business.  Instead they preferred the proverbial "bird in the hand" – the certain return from the sale to Cerberus.  The Teleglobe Companies thus told the Court that the sale to Cerberus represented the fair market value for the core business and was in the best interest of the estate and its creditors.  The Creditors claimed the sale achieved "maximum" value.  They succeeded in maintaining that position when the Court approved the sale.  Now, four years later, the Teleglobe Companies' and the Creditors' interests as Plaintiffs have changed and they seek to take the contrary position.  Having received the benefit of the certain return from the sale to Cerberus, the

14

Teleglobe Companies and the Creditors now also claim they are entitled to the upside value that they may have obtained if they had accepted the risk of continued ownership of the core business. This truly is a case of wanting to have it both ways at the expense of inconsistent rulings from this Court.

> **C.      Imposition of Judicial Estoppel Would Prevent Inconsistent Rulings that Would Threaten the Integrity of the Court**

Because judicial estoppel represents "an exercise of a court's inherent power to sanction misconduct," it should be applied only when it is narrowly tailored to address the harm caused by the inconsistent positions and when other statutory and rule-based sanctions are not adequate. *Montrose*, 243 F.3d at 784-85.

Estopping the Teleglobe Companies from offering Ms. Taylor's testimony (and Mr. Charnetzki's resultant damages calculation) in this case is narrowly tailored to protect the integrity of this Court by preventing contradictory rulings based on the Teleglobe Companies' inconsistent positions. Exclusion of Ms. Taylor's and Mr. Charnetzki's testimony would not preclude the Teleglobe Companies' cause of action, nor would it prevent the Teleglobe Companies from pursuing an alternative damages theory (which they have done anyway). Rather, the Teleglobe Companies would merely be estopped from relying on a damages theory whose adoption would directly contravene repeated positions and representations previously made to and adopted by the Bankruptcy Court.

Additionally, there is "no sanction established by the Federal Rules or a pertinent statute" that is "up to the task of remedying the damage" that would be caused by the Teleglobe Companies' inconsistent positions. *See Montrose*, 243 F.3d at 784. Neither sanctioning the Teleglobe Companies under the Federal Rules of Civil Procedure (*e.g.*, Rule 11 or 37), nor holding the Teleglobe Companies liable for attorneys fees under 28 U.S.C. § 1927, would remedy the affront to

the integrity of the Court that would result from allowing the Teleglobe Companies to advance a position in this case that is irreconcilably inconsistent with the positions already adopted by the Bankruptcy Court. *See id.* at 785 n.10 (identifying Rules 11 and 37, as well as 28 U.S.C. § 1927, as possible alternative remedies); *Krystal*, 337 F.3d at 325 ("Applying a lesser sanction here … would reward … what appears to be duplicitous conduct in the course of its bankruptcy proceeding.").

Under these circumstances, the doctrine of judicial estoppel should be imposed to bar the Teleglobe Companies from relying on the testimony of Ms. Taylor and the related damages calculation of Mr. Charnetzki.

## II.    COLLATERAL ESTOPPEL BARS RELITIGATION OF MATTERS ALREADY DETERMINED IN THE BANKRUPTCY COURT

The same result is achieved under the doctrine of collateral estoppel. The doctrine of collateral estoppel also bars the Teleglobe Companies from offering Ms. Taylor's testimony in an attempt to relitigate (1) whether the global bidding process and the sale of the core business to Cerberus were in the best interest of the Teleglobe estate and its creditors; (2) whether the sale to Cerberus represented the fair value of the core business; and (3) whether the sale of the core business was preferable to a restructuring. *In re Peterson*, 332 B.R. 678, 683 (Bankr. D. Del. 2005). Those issues were already litigated before and determined by the Bankruptcy Court in connection with the orders issued on June 24 and October 10, 2002 (Marzen Decl., Exs. 3 & 7).

Under the doctrine of collateral estoppel, the Court may estop a party from relitigating an issue of law or fact when a movant shows that: (1) the issue sought to be precluded is the same as one involved in a prior action; (2) the issue was actually litigated; (3) the issue was determined by a valid final judgment; and (4) the determination was essential to the prior judgment. *In re Genesis Health Ventures,* 324 B.R. 510, 527 (Bankr. D. Del. 2005). Each of these elements is satisfied in this case.

*First*, as is evident from the discussion above (*see supra* Statement of Facts), even the most cursory review of the record in the Bankruptcy Court reveals that the issues raised in Ms. Taylor's report (and forming the basis for Mr. Charnetzki's damages calculation) – *i.e.*, the advisability of the global bidding process, the appropriateness of the sale to Cerberus, and the relative benefits of a restructuring – were central to the prior proceedings.  (*See, e.g.*, Marzen Decl., Exs. 1-8.)

*Second*, the Teleglobe Companies' prior filings with the Bankruptcy Court, as well as the transcripts of the hearings held in June and October 2002, show that the Teleglobe Companies and the Creditors were given a "full and fair opportunity to litigate these issues."  *Genesis*, 323 B.R. at 528.  Indeed, the propriety of the global bidding process and the sale to Cerberus were the subject of a written motion (Marzen Decl., Ex. 1), at least two affidavits (Marzen Decl., Exs. 4 & 5), and two hearings during which counsel for both the Teleglobe Companies and the Creditors were provided an opportunity to be heard (Marzen Decl., Exs. 2 & 6).  Also, both Mr. Babcock, the court-appointed monitor, and Mr. Brunette, the Teleglobe Companies' CEO, were made available for cross examination.  There can thus be no doubt that the "actually litigated" requirement is satisfied.

*Third*, the propriety of the global bidding process and the sale to Cerberus, as well as the relative benefits of a restructuring, were determined by the valid, final orders issued by the Bankruptcy Court on June 24 and October 10, 2002.  Indeed, in the October 10, 2002 order, the Bankruptcy Court explicitly found that the sale to Cerberus was "in the best interests of the Debtors, their estates and the parties in interest," that the purchase price "is fair and constitutes reasonably equivalent value for the Core Business," and that "[t]he value of the Core Business and Purchased Assets is unlikely to appreciate with time in a restructuring proceeding."  (Marzen Decl., Ex. 7 at ¶ 7.)

*Fourth*, the issues revisited in Ms. Taylor's report were essential to obtaining the Bankruptcy Court's approval of the global bidding process and the sale to Cerberus. As this Court has noted, "the bankruptcy court has considerable discretion" with respect to "motions seeking approval for the use, sale or lease of property of the estate other than in the ordinary course of business." *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 152-53 (D. Del. 1999). A debtor proposing a sale, such as the Teleglobe Companies in this case, has the burden of establishing that the sale is justified by a "sound business purpose." *Id*. at 153. In applying this standard, bankruptcy courts seek to "further the diverse interests of the debtor, creditor and equity holders" by considering "a variety of factors," including:

> the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions, and most importantly perhaps, whether the asset is increasing or decreasing in value.

*Id*. at 153-54.

It was thus essential for the Teleglobe Companies to convince the Bankruptcy Court that the bidding process was in the best interests of the estate and its creditors, that the sale to Cerberus achieved the fair market value of the core business, and that the value of the core business would likely not increase given time in a restructuring. Without such showings, the Bankruptcy Court could not have issued its orders approving the global bidding process and the sale to Cerberus under the "sound business purpose" standard of 11 U.S.C. § 363. As a result, the "essential to the prior judgment" element is easily satisfied in this case – the Bankruptcy Court simply could not have issued the June 24th and October 10th orders without adopting the Teleglobe Companies' positions.

Under these circumstances, the doctrine of collateral estoppel operates to preclude the Teleglobe Companies from offering Ms. Taylor's testimony and Mr. Charnetzki's damages calculation in an effort to relitigate matters already decided by the Bankruptcy Court.

**<u>CONCLUSION</u>**

For the foregoing reasons, Defendants respectfully request that this Court exclude the

testimony of Carlyn Taylor and Paul Charnetzki to the extent Mr. Charnetzki relies on Ms. Taylor's

testimony in order to calculate damages.


Respectfully submitted,

YOUNG CONAWAY STARGATT & TAYLOR, LLP


____/s/ Pauline K. Morgan_____
Pauline K. Morgan (No. 3650)
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19899
(302) 571-6600
pmorgan@ycst.com
*Attorneys for Defendants*

Of Counsel:

SHEARMAN & STERLING LLP
Stuart J. Baskin
Jaculin Aaron
599 Lexington Avenue
New York, NY  10022-6069
(212) 848-4000

Stephen J. Marzen
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2634
(202) 508-8000

Dated:  May 23, 2006

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 23, 2006, I electronically filed a true and correct copy of

foregoing document was filed with the Clerk of the Court using CM/ECF, which will send

notification that such filing is available for viewing and downloading to the following counsel of

record:

Gregory V. Varallo, Esq.
Robert J. Stern, Jr., Esq.
Kelly E. Farnan, Esq.
Anne S. Gaza, Esq.
Richards, Layton & Finger, P.A.
920 N. King Street
Wilmington, DE 19801

Joseph A. Rosenthal, Esq.
Rosenthal, Monhait & Goddess, P.A.
1401 Mellon Bank Center
P.O. Box 1070
Wilmington, DE 19899-1070

I further certify that on May 23, 2006, I caused a copy of the foregoing document on the

to be served upon the following non-registered participants in the manner indicated below:


BY EMAIL
John P. Amato, Esq.
Mark S. Indelicato, Esq.
Zachary G. Newman, Esq.
Jeffrey L. Schwartz, Esq.
Hahn & Hessen LLP
488 Madison Avenue
New York, NY  10022

Gregory V. Varallo, Esq.                             Joseph A. Rosenthal, Esq.
Russell C. Silberglied, Esq.-p                       Rosenthal, Monhait & Goddess, P.A.
Mark D. Collins, Esq.                                1401 Mellon Bank Center
C. Malcolm Cochran, IV, Esq.                         P.O. Box 1070
Robert J. Stern, Jr., Esq.                           Wilmington, DE  19899-1070
Kelly E. Farnan, Esq.
Anne S. Gaza, Esq.
Richards, Layton & Finger, P.A.
920 N. King Street
Wilmington, DE  19801


                          */s/ Margaret B. Whiteman*
                          Pauline K. Morgan (No. 3650)
                          Maribeth Minella (No. 4185)
                          Margaret B. Whiteman (No. 4652)
                          YOUNG CONAWAY STARGATT & TAYLOR, LLP
                          The Brandywine Building
                          1000 West Street, 17th Floor
                          Wilmington, DE 19801
                          P.O. Box 391
                          Wilmington, DE 19899-0391
                          (302) 571-6681
                          pmorgan@ycst.com
                          mminella@ycst.com
                          mwhiteman@ycst.com
                          bank@ycst.com

                          *Attorneys for Defendants*