# Exhibit 1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

In re:                                    :
                                          :    Chapter 11
TELEGLOBE COMMUNICATIONS                  :
CORPORATION, a Delaware                   :    Jointly Administered
corporation, et al.,[1]                   :    Case No. 02-11518 (MFW)
                                          :
                        Debtors.          :
                                          :

DEBTORS' MOTION FOR ORDER (A) AUTHORIZING GLOBAL
BIDDING PROCESS WITH RESPECT TO UNITED STATES
ASSETS, (B) APPROVING BIDDING PROCEDURES IN
CONNECTION THEREWITH, (C) FIXING CURE AMOUNTS,
NOTICE PROCEDURES AND APPROVING FORM AND
MANNER OF NOTICE, (D) SETTING DATE AND TIME FOR
HEARING ON PROPOSED SALE RESULTING FROM GLOBAL
BIDDING PROCESS WITH RESPECT TO UNITED STATES
ASSETS, AND (E) APPROVAL OF SALE TRANSACTION

The above-captioned debtors and debtors in possession (each a "Debtor"

and collectively, the "Debtors") respectfully represent:

Introduction

1.      The Teleglobe Companies (defined below), in the exercise of their

sound business judgment, have determined to conduct a global bidding process (the

"Global Bidding Process") for the sale of their core business of providing voice and

related data telecommunications services which includes: (a) international voice and data

transit services that originate or terminate in the United States, Canada, the United

Kingdom, Spain or Hong Kong or are switched or routed through Teleglobe Companies'

---

[1]      The Debtors are the following eleven entities:  Teleglobe Communications
Corporation, Teleglobe USA Inc., Optel Telecommunications, Inc., Teleglobe Holdings
(U.S.) Corporation, Teleglobe Marine (U.S.) Inc., Teleglobe Holding Corp., Teleglobe
Telecom Corporation, Teleglobe Investment Corp., Teleglobe Luxembourg LLC,
Teleglobe Puerto Rico Inc. and Teleglobe Submarine Inc.

facilities in one of the above locations; and (b) certain other services, including (i) dedicated broadcast; (ii) wireless roaming; and (iii) international private line (collectively, the "Voice Business") at this time. The Voice Business is located primarily in Canada. The predominant share of the Voice Business is either located in, conducted in or routed through Canada. The assets of the Voice Business in the U.S. are an extension of, and inextricably intertwined with, the Canadian Voice Business. A small percentage of the Voice Business is located in the United Kingdom, Spain, Hong Kong and certain other countries.

2.    Because substantially all of the Voice Business is located in Canada and the Teleglobe Companies (including the Debtors) are debtors in the Canadian Proceedings (defined below), the Teleglobe Companies have determined to conduct the sale of the Voice Business under Canadian law and primarily under the auspice of the Canadian Court (defined below), and this Court with respect to the US Assets (defined below). Ernst & Young Inc. (the "Monitor"), as the court appointed monitor in the Canadian Proceedings, filed its Second Report, dated June 3, 2002 (the "Second Report"), with the Canadian Court.[2] The Second Report concurs with the Teleglobe Companies' sound business judgment to conduct the Global Bidding Process under the supervision of the Canadian Court at this time. The Debtors believe a sale of the US Assets standing alone would not realize any significant value for their estates and, thus, the Global Bidding Process will result in the most efficient administration of their estates and is in the best interests of the Debtors and parties in interest.

---

[2] A copy of the Second Report is annexed hereto as Exhibit "A."

2

3.    By this motion, the Debtors are only seeking approval of the Sale Transaction (defined below) insofar as it relates to the US Assets. The sales approval process in this Court will be identical to the sales approval process approved by the Canadian Court. By order dated June 4, 2002 (the "Canadian Sales Transaction Order"), the Canadian Court approved the Global Bidding Process. The Debtors request the Sale Hearing (defined below) occur before this Court the day immediately following the approval of the Sale Transaction by the Canadian Court and thus, request the Court schedule the Sale Hearing on July 19, 2002 or as soon thereafter as is practicable.

### Background

4.    On May 28, 2002 (the "Petition Date"), the Debtors commenced their respective reorganization cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

5.    The Debtors are continuing in possession of their respective properties and are operating and managing their businesses, as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

6.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

7.    On May 29, 2002, this Court entered an order jointly administering these chapter 11 cases and consolidating them for procedural purposes only.

3

8.    Debtor Teleglobe Communications Corporation, a Delaware corporation, is a wholly-owned indirect subsidiary of Teleglobe Inc., a Canadian corporation ("Teleglobe"). Each of the Debtors herein is a direct or indirect subsidiary of Teleglobe. Teleglobe currently has approximately 65 domestic and foreign debtor and nondebtor subsidiaries (together with Teleglobe, the "Teleglobe Companies"). Since 2000, Teleglobe has been a directly and indirectly wholly-owned subsidiary of publicly-traded Canadian conglomerate BCE Inc.

9.    On May 15, 2002, Teleglobe and certain of its Canadian and United States subsidiaries, including the Debtors, commenced insolvency proceedings under the Canadian Companies' Creditors Arrangement Act (the "Canadian Proceedings") in the Ontario Superior Court of Justice in Toronto, Ontario (the "Canadian Court"). On the same date, the Canadian Court appointed the Monitor in the Canadian Proceedings, and the Monitor subsequently commenced ancillary proceedings under section 304 of the Bankruptcy Code with respect to Teleglobe and certain of its Canadian affiliates (the "Ancillary Proceedings") in this Court. On May 17, 2002, certain of Teleglobe's United Kingdom subsidiaries commenced administration proceedings under the Insolvency Act of 1986 in the High Court of Justice – Chancery Division in London, England. It is expected that other Teleglobe nondebtor foreign subsidiaries may be required to commence insolvency proceedings in their respective jurisdictions.

10.    Teleglobe was established as Canada's monopoly international carrier by the Canadian government in 1950. Today, the Teleglobe Companies have operating agreements and extensive business relationships with most major international

4

telecommunications carriers in the world, including both the traditional incumbent monopoly carriers and emerging carriers created by deregulation. Teleglobe currently provides voice services in more than 220 countries via a fully integrated network of terrestrial, submarine and satellite capacity. These operations are conducted through debtor and nondebtor subsidiaries incorporated and licensed in more than 40 countries worldwide.

11.    Over the last five years, Teleglobe has added a significant international data service capability to its existing network to complement its core voice business. Its data services include internet connectivity, transit, IPVPN, high-speed data transmission, hosting, broadband, broadcast and other value added services on a wholesale and retail basis. Teleglobe's data customers include its existing carrier customers, major ISPs, ASPs, content and broadband providers, as well as multinational corporations. Teleglobe has extensive peering relationships with other major backbone providers.

12.    Teleglobe's fully integrated voice and data network includes interests in over 100 subsea cable systems, satellites and terrestrial capacity worldwide. As of December 31, 2001, Teleglobe had more than 130 points of presence (POPs) worldwide and more than 70,000 square feet of hosting facilities. All of these operating facilities are connected by fiber optic links to Teleglobe's switching centers and internet gateways. Teleglobe's global headquarters are in Montreal, Quebec.

13.    During the calendar year 2001, the Teleglobe Companies generated consolidated gross revenues of approximately $1.3 billion.  As of December 31, 2001, the Teleglobe Companies had approximately $7.5 billion in assets and approximately $4.1 billion in liabilities on a consolidated book basis.  As of the Petition Date, the Teleglobe Companies employed approximately 950 full- and part-time employees.

### Sale of Voice Business

14.    Prior to the commencement of the Canadian Proceedings, the Ancillary Proceedings and these chapter 11 cases, the Teleglobe Companies determined, in their sound business judgment, that, at this time, it is critical to divest the Voice Business from the Teleglobe Companies as a going concern to maximize value for stakeholders in light of the current capital structure and weak liquidity position of the Teleglobe Companies.

15.    To facilitate the sale of the Voice Business (the "Sale Transaction"), the Teleglobe Companies, with the assistance of its investment bankers, Lazard Freres & Co. LLC ("Lazard"), commenced the process of marketing and soliciting offers for the Voice Business and related assets, including assets located in the United States and owned by the Debtors (the "US Assets"), approximately two months ago.  The marketing process included identifying and contacting the logical potential strategic purchasers for the Voice Business and responding to unsolicited offers.  Lazard has contacted over 30 eligible parties over the past two months and has established data rooms to allow parties to conduct due diligence.  A number of interested parties have

6

conducted and/or are conducting due diligence. The parties who are likely to have an interest in the Voice Business have been identified and, in most cases, discussions are underway with these parties. The results of the process to date suggest that there is sufficient interest to justify proceeding with a competitive sales process for the Voice Business. To date, the Teleglobe Companies have not entered into a purchase and sale agreement with respect to the Voice Business. As a result, the Teleglobe Companies determined to implement the Global Bidding Process for the sale of the Voice Business, including the US Assets (the "Global Bidding Process").

### Potential Structure of Sale

16.      As more fully described below, the Teleglobe Companies intend to sell the Voice Business in accordance with the terms of the form Purchase and Sale Agreement (defined below). The Purchase and Sale Agreement contemplates that all or part of the Purchased Assets will be conveyed pursuant to the following structure:[3]

- Prior to the Closing, each Seller may Transfer Purchased Assets and Assumed Contracts it owns to a new entity (a "Newco") formed by and wholly owned by such Seller. Prior to such Transfer, each Seller will prevent the Newco formed by it from engaging in any business other than the Business or incurring any liabilities (other than the Assumed Liabilities or other liabilities that will be fully discharged at the Closing Date).

---

[3] Because the terms and conditions of the Purchase and Sale Agreement are subject to material modifications (including the potential sale structure outlined herein) such terms, other than the potential sale structure, are not summarized herein. Capitalized terms utilized herein not otherwise defined shall have the meaning ascribed to them in the Purchaser and Sale Agreement.

7

- At the Closing, to effectuate the Transfer to the Buyer of the Purchased Assets and the Assumed Contracts, notwithstanding anything to the contrary in the Purchase and Sale Agreement, Sellers will Transfer to Buyer the Newcos' Equity.

17.    In addition, the Purchase and Sale Agreement provides that the parties would enter into an interim management agreement (the "Management Agreement") after approval of the Sale Transaction by the Canadian Court and this Court.[4] The Management Agreement will permit the Buyer, subject to applicable legal limitations, to assume the responsibility for the operations of the Voice Business prior to the time at which all regulatory approvals have been obtained. Sellers intend that, subject to applicable legal limitations, Buyer would be compensated for such management by receiving all revenues earned from the Voice Business during the management period, and Buyer would be responsible for all expenses incurred during that period. As currently drafted, the Buyer would deliver the purchase price, and the Sellers would deliver the conveyance documents, into an escrow at the time the Management Agreement becomes effective. The Debtors believe it will take approximately 6 - 12 months following the effective date of the Management Agreement to get the regulatory approvals necessary to close. Absent the Management Agreement, the Debtors do not believe they will be able to complete a timely sale of the Voice Business.

### The Canadian Sale Process

18.    As stated above, the Teleglobe Companies have determined to conduct the Global Bidding Process under the supervision of the Canadian Court, and

---

[4] The Debtors will file a copy of the Management Agreement with this Court prior to the Sale Hearing.

RLF1-2469365-2

with respect to the US Assets, this Court. To that end, The Canadian Court entered the Canadian Sale Transaction Order (i) authorizing the Teleglobe Companies and the Monitor to implement the Sale Transaction, (ii) authorizing and directing the Monitor to conduct, supervise and direct the Sale Transaction, (iii) mandating that the power and authority granted to the Monitor by the Canadian Sale Transaction Order shall be paramount to the power and authority of Teleglobe Inc. with respect to the Sale Transaction;[5] and (iv) approving the terms and conditions of the Global Bidding Process for the sale of the Voice Business. A copy of the Canadian Sale Transaction Order is annexed hereto as Exhibit "B."

   19. The terms and conditions of the Global Bidding Process, as approved by the Canadian Court, which the Debtors submit should be approved by this Court, are as follows (the "Bidding Procedures"):

**A.** ***Initial Interest***

- Potential purchasers will be required to execute a confidentiality agreement in a satisfactory form before receiving any nonpublic information about Teleglobe and its assets and business (collectively, the "Information").

- A data room (the "Data Room") which contains information about the Teleglobe Companies and their business has been established at the New York offices of Jones, Day, Reavis & Pogue, 222 East 41st Street, New York, NY 10017. Access to the Data Room can be obtained by contacting a designated person at Lazard. The initial designee is Ivan Dimov, telephone number (212) 632-2676.

- All potential bidders that indicate an interest in submitting a bid regarding a proposed transaction will be contacted. Bidders will

---

[5] Such powers were granted to the Monitor to avoid any potential conflicts of interest in connection with the Sale Transaction.

have an opportunity to meet with certain designated members of the Teleglobe Companies' management team.

- Bidders shall be provided with a form of purchase and sale agreement (the "Purchase and Sale Agreement").[6]

- Bidders will be asked to submit their bids for the assets of the Voice Business on or before a particular date, currently anticipated to be June 24, 2002 (the "Final Bid Date").

- Each bid shall include a copy of the Purchase and Sale Agreement marked to show all requested changes. The extent and nature of any changes made will be taken into consideration in the evaluation of the bid.

- All bids shall be submitted in writing and delivered to Lazard at 30 Rockefeller Plaza, New York, NY 10020; Fax (212) 632-5964, Attention: Said Armutcuoglu, so that it is received no later than 10:00 a.m. (New York Time) on the Final Bid Date.

### B.    *Bid Requirements*

- Each bid shall include:

  - a description of the assets to be purchased (the "Proposed Assets");

  - a description of the liabilities and contracts to be assumed;

  - the proposed purchase price for the Proposed Assets (the "Proposed Purchase Price");

  - proof of the bidder's financial wherewithal to pay the amount of the Deposit (defined below) and the Proposed Purchase Price;

  - any conditions to closing the purchase of the Proposed Assets (any conditions creating a significant risk to the closing of the purchase will be considered to be a discount to the Proposed Purchase Price and will cause a bid to be considered at a significant disadvantage);

---

[6] A copy of the form Purchase and Sale Agreement is annexed hereto as Exhibit "C."

- the proposed timetable for consummation of the Sale Transaction, including the expected timing for any regulatory approvals or material conditions to closing;

- a statement by the bidder that the bid will remain open until July 5, 2002 unless earlier accepted or rejected by the Teleglobe Companies and that, except as disclosed in the bid, there are no conditions to execution of a definitive agreement other than mutual agreement as to the terms thereof;

- a statement by the bidder that the bidder is willing to execute the Purchase and Sale Agreement in the form provided with the bid (a modification of the Purchase and Sale Agreement will be an important component of the bid); and

- contact information for the key members of the bidder, including name and weekend telephone and facsimile numbers.

- A bid shall not be contingent upon: (a) any due diligence investigation or review beyond what due diligence or investigation was conducted before the submission of the bid, (b) the receipt of financing, or (c) any board of directors, shareholders or other corporate or partnership approval.

- The right to accept or reject a bid that does not comply with the terms set forth herein is reserved in full.

- Preference shall be given to bids for all or substantially all of the assets of the Voice Business.

- Final bids will be reviewed and further negotiations will be pursued with bidders that are deemed advisable and, after completing such negotiations, a successful initial bid for the Proposed Assets will be selected (an "Initial Bid").

## C.    *Entry Into Purchase and Sale Agreement*

- Once an Initial Bid has been selected, negotiations will commence with a view to entering into a Purchase and Sale Agreement with the bidder that submitted the Initial Bid (an "Initial Bidder"). The parties will attempt to negotiate and execute the Purchase and Sale Agreement with the Initial Bidder expeditiously.

- The Initial Bidder will be required to execute an Escrow Agreement and deliver a deposit by certified or cashier's check payable to Ernst & Young, in its capacity as Monitor, or another escrow agent selected by the Teleglobe Companies in an amount equal to 5% of its bid amount (the "Deposit"). The form of Escrow Agreement will be provided by Ian Ness (416-340-6018) at the office of Ogilvy Renault, 200 King Street West, Suite 1100, Merrill Lynch Canada Tower, Toronto, Canada M5H 3T4, Fax: (416) 340-6118.

- The Purchase and Sale Agreement may provide for a breakup fee (not to exceed 3% of the total purchase price), and payment of reasonable expenses to the Initial Bidder in the event that an auction is held (as hereinafter described) and the Initial Bidder is not ultimately the Successful Bidder (defined below).[7]

### D.  *Court Approvals*

- Once a Purchase and Sale Agreement has been entered into for the Proposed Assets, a motion will be filed with the Canadian Court and such other court or courts as is applicable (collectively, the "Court"), seeking approval of the particular Purchase and Sale Agreement (or any further agreement entered into pursuant to the Auction (defined below)) and the underlying transactions (each a "Transaction Motion").[8]

- Unless a shorter time is approved by the Canadian Court with respect to the Transaction Motion, the Teleglobe Companies and the Monitor will request the Canadian Court set each Transaction Motion for hearing on a date that is not less than five days after the Transaction Motion is filed and Served (the "Transaction Hearing").

- Unless otherwise ordered by the Canadian Court with respect to the Transaction Motion, a notice of a Transaction Motion and the applicable Transaction Hearing (the "Notice") will be given: (a) to each entity that submitted a bid with respect to the Proposed Assets

---

[7] The breakup fee will be the sole obligation of Teleglobe Inc.

[8] A similar motion will not be filed with this Court as this Motion shall be deemed the Transaction Motion. For informational purposes, a notice of the filing of the Transaction Motion with the Canadian Court will be filed with this Court and a copy of such motion will be annexed thereto. Such notice will be served upon all parties receiving the Sale Hearing Notice (defined below).

RLF1-2469365-2

that are the subject of the particular Transaction Motion; and (b) to other parties entitled to receive notice under other applicable laws, rules or regulations.

- After the filing of the Transaction Motion, the Teleglobe Companies, their advisors and the Monitor will continue to respond to, and comply with, reasonable requests for non-confidential information and, where appropriate confidentiality agreements are executed, requests for Information and access to the Data Rooms. Absent extraordinary circumstances, requests for continuances of Transaction Hearings to permit parties to conduct further due diligence will not be granted.

- After the approval of the Purchase and Sale Agreement by the Canadian Court, the Debtors will seek similar approval from this Court at the Sale Hearing.

### E.    Potential Auction Process

- The right to commence an auction process seeking competing bids for Proposed Assets (the "Auction") is reserved; however, there is no certainty that such a process will be commenced. In that regard, within two business days of the filing of the Transaction Motion, notice will be provided to all persons that submitted a bid stating whether there will be an Auction. Should an auction process be commenced the following terms shall apply:

- If an Auction is to be held, the notice of Auction will set out the day that the auction is to be held and the deadline by which Qualified Competing Bids (as defined below) must be submitted. The day set for the Auction will be at least 2 business days prior to the date set for the Canadian Court hearing to hear the Transaction Motion. Such notice also will be filed with this Court.

- Any entity that desires to submit a competing bid for Proposed Assets that are the subject of a Transaction Motion may do so in writing, provided that such bid (each a "Qualified Competing Bid"): (a) is served upon (and actually received by), (i) the Teleglobe Companies, 11480 Commerce Park Drive, Reston, Virginia 20191 (Attn: John Brunette); (ii) counsel to the Teleglobe Companies, Jones, Day, Reavis & Pogue, 2727 North Harwood Street, Dallas, Texas 75201-1515 (Attn: Michael Weinberg, Esq.); and Ogilvy Renault, 200 King Street West, Suite 1100, P.O.

13

Box 11, Merrill Lynch Canada Tower, Toronto, Ontario M5H 3T4 (Attn: Derrick C. Tay); (iii) counsel to the Debtors, Richards, Layton & Finger, P.A., One Rodney Square, P.O. Box 551, Wilmington, Delaware 19801 (Attn: Mark D. Collins); and (iv) the Monitor, Ernst & Young Inc., Ernst & Young Tower, P.O. Box 251, 222 Bay Street, Toronto-Dominion Centre, Toronto, Ontario Canada M5K 1J7 (Attn: Benjamin Babcock); (b) exceeds the applicable Proposed Purchase Price for such Proposed Assets as set out in the Purchase and Sale Agreement by not less than 5%, plus any applicable breakup fees and expenses that must be paid by the Teleglobe Companies to the other party to the Purchase and Sale Agreement that is the subject of the Transaction Motion (the "Initial Overbid Increment"); (c) is, in the Teleglobe Companies' sole business judgment, on the same or more favorable terms and conditions as set forth in the Transaction Motion for the particular Proposed Assets; (d) is not contingent upon any due diligence investigation, the receipt of financing or any board of directors, shareholders or other corporate or partnership approval; (e) is accompanied by proof, in a form satisfactory to the Teleglobe Companies, of the entity's financial ability to consummate its offer to purchase the Proposed Assets; (f) contains an acknowledgement that promptly upon completion of the Auction the successful bidder for the particular Proposed Asset will be obligated to submit a Deposit and execute a Purchase and Sale Agreement containing terms and conditions substantially identical to the Purchase and Sale Agreement that is the subject to the Transaction Motion; and (g) contains an acknowledgement that the bid shall remain open and irrevocable, until (i) the Court approves the sale of the particular Proposed Assets to another entity, and (ii) the Teleglobe Companies close the sale with, and receives the Proposed Purchase Price from, such entity;

- If one or more Qualified Competing Bids are received, the Auction will be conducted for the Proposed Assets at a place and time to be designated. All bidders submitting Qualified Competing Bids will be notified of the Auction at least two business days before the date of the Auction. The identities of the parties submitting Qualified Competing Bids and the amounts of such bids shall be kept confidential until the beginning of the Auction;

14

- At the Auction, competing bidders (including the Initial Bidder and proponents of Qualified Competing Bids) may submit bids for the Proposed Assets in excess of the Proposed Purchase Price, plus the Initial Overbid Increment, provided that such competing bids for the applicable Proposed Assets: (a) are in increments of a percentage of the Proposed Purchase Price designated by the Teleglobe Companies in the Transaction Motion to be between 1% and 3%; and (b) otherwise comply with the requirements for Qualified Competing Bids set forth above; and

- At the Auction, a bid may be selected (each a "Successful Bid") that is determined to be the highest and best bid, subject to Court approval. The right to refuse to consider the bid of any bidder that fails to meet any reasonable procedures at the Auction or to submit a Qualified Competing Bid is fully reserved.

- The Initial Bid may be determined to be the Successful Bid and Court approval may be sought for such bid and the relevant Purchase and Sale Agreement without conducting an Auction.

- Upon selection of the successful bidder after the Auction or after the initial submission of bids (the "Successful Bidder"), the Debtors will serve a notice identifying (i) the Successful Bidder, and (ii) if known at such time, the date of the Sale Hearing before this Court, and serve such notice on all parties receiving notice of this Motion.

- Any or all bids may be rejected for any reason whatsoever without disclosing the reason for such decision to any bidder. There shall be no legal obligation with respect to a possible transaction with any bidder and this process shall be conducted, and may be modified, as is determined to be of benefit to the Teleglobe Companies, subject to the order(s) of the Court. The process described herein, is subject at all times to the terms of the Court order(s) approving this process and to the Court's continuing supervision and to the fact that no transaction may be consummated, whether pursuant to a Purchase and Sale Agreement or a subsequent Successful Bid, without the prior approval of the Court. All bidders, regardless of whether their bid has been accepted by the Teleglobe Companies, shall continue to be subject to any Confidentiality Agreement previously signed by such bidders.

## The United States Sale Process

20.    The Debtors are seeking, with respect to the US Assets: (i) authority, pursuant to sections 105(a), 363(b) and (f), 365(a) and 1146(c) of the Bankruptcy Code, to conduct the Global Bidding Process and sell the Voice Business and US Assets free and clear of liens, claims and encumbrances to the Successful Bidder; (ii) approval, pursuant to Rule 6004(f)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), of the Bidding Procedures; (iii) approval, pursuant to Bankruptcy Rule 2002, of the proposed notice procedures and form of notice; (iv) approval, pursuant to section 365(a) of the Bankruptcy Code, of fixed cure amounts; and (v) a fixed date for a hearing on the proposed sale resulting from the Global Bidding Process (the "Sale Hearing").

21.    The Debtors believe that the Global Bidding Process and sale of the Voice Business in its entirety and as a going concern pursuant to the Global Bidding Process and under the primary supervision of the Canadian Court, and with respect to the US Assets, this Court, will generate the maximum proceeds for the Voice Business and the US Assets and will ensure the most efficient administration of the Debtors' estates.  A sale of the US Assets alone will not realize any significant value for the Debtors' estates. As such, the Sale Transaction is in the best interests of the Debtors, their estates and parties in interest.

## Section 363(b) of the Bankruptcy Code

22.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in

16

the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although

Bankruptcy Code section 363 does not set forth a standard for determining when it is

appropriate for a court to authorize the sale or disposition of a debtor's assets, courts in

the Third Circuit and others, in applying this section, have required that it be based upon

the sound business judgment of the debtor. <u>See, e.g.</u>, <u>In re Martin (Myers v. Martin)</u>, 91

F.3d 389, 395 (3d Cir. 1996); <u>In re Trans World Airlines, Inc.</u>, No. 01-0056, 2001 Bankr.

LEXIS 980, at *29 (Bankr. D. Del. Apr. 2, 2001); <u>In re Montgomery Ward Holding</u>

<u>Corp.</u>, 242 B.R. 147, 153 (D. Del. 1999); <u>In re Delaware & Hudson Ry. Co.</u>, 124 B.R.

169, 176 (D. Del. 1991).

### Section 365 of the Bankruptcy Code

23.    Section 365 of the Bankruptcy Code authorizes a debtor to assume

and/or assign its executory contracts and unexpired leases subject to the approval of the

bankruptcy court. Specifically, section 365 of the Bankruptcy Code provides, in

pertinent part, that a debtor may assume and assign executory contracts and leases

provided that all defaults under such agreements are cured and adequate assurance of

future performance is provided by the assignee to the nondebtor party to such contracts or

leases. <u>See</u> 11 U.S.C. §§ 365(a), (b)(1), (f)(2). The Debtors intend to cure all such

defaults. The Successful Bidder will demonstrate at the Sale Hearing that it will provide

each nondebtor contracting party with adequate assurance of its future performance with

respect to any assigned executory contracts or leases.

24.    Once the statutory predicates to assumption and assignment are

satisfied, as is the case at bar, the standard applied to determine whether the assumption

of an unexpired lease or executory contract should be approved is the "business judgment" test, which is premised on the debtor's business judgment that the assumption and assignment is in its best interests. See, e.g., N.L.R.B. v. Bildisco and Bildisco, 465 U.S. 513, 523 (1984); In re Market Square Inn, Inc., 978 F.2d 116, 121 (3d Cir. 1992) (the "resolution of [the] issue of assumption or rejection will be a matter of business judgment by the bankruptcy court"); Sharon Steel Corp. v. National Fuel Gas Distribution Corp., 872 F.2d 36, 39-40 (3d Cir. 1989). This test is fundamentally identical to the standard for sales outside the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code. See Sharon Steel Corp., 872 F.2d at 40; In re III Enter., Inc., 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994) ("Generally, a court will give great deference to a debtor's decision to assume or reject a contract. A debtor need only show that its decision to assume or reject the contract is an exercise of sound business judgment – a standard which we have concluded many times is not difficult to meet.").

### The Sale Transaction is Within the Teleglobe Companies Sound Business Judgment

25.     The sale of the Voice Business is an important step in the Teleglobe Companies' (including the Debtors') restructuring and well within their sound business judgment. There is an immediate need to proceed with the sale of the Voice Business for the following reasons:

(a)     The Teleglobe Companies' intention to proceed with an expedited sales process was outlined to major creditor groups prior to the initiation of the Canadian Proceedings, the Ancillary Proceedings and the commencement of these chapter 11 cases;

18

(b)　　The Teleglobe Companies, with the assistance of Lazard, have marketed the Voice Business for the past two months (the "Marketing Period"). Lazard has contacted over 30 eligible parties during the Marketing Period and has established the Data Rooms to allow parties to conduct due diligence. A number of interested parties have conducted and/or are conducting due diligence. The parties who are likely to have an interest in the Voice Business have been identified and, in most cases, discussions are underway with these parties. The results of the process to date suggest that there is sufficient interest to justify proceeding with a competitive sales process for the Voice Business;

(c)　　The value of the Voice Business is unlikely to appreciate with time in a restructuring proceeding. The critical nature of telecommunication services is not conducive to maintaining customers in an uncertain environment. Indeed, numerous recent major restructurings in the telecommunications industry have clearly established that retaining revenue in any type of protracted restructuring with an uncertain outcome is extremely difficult;

(d)　　Bell Canada, a subsidiary of BCE, is a major customer of the Voice Business and a potential purchaser. A court approved sales process is required to provide a forum in which the potential for conflicts of interest can be addressed and to maximize the likelihood that potential purchasers will participate in the process; and

(e)　　The Teleglobe Companies will be in default under the Canadian credit facility, dated May 15, 2002 (the "Canadian Credit Facility"), and the Debtors' debtor in possession credit facility (the "DIP Facility") if a motion to approve a sale of all or substantially all of the assets of the Teleglobe Companies is not filed on or before July 1, 2002.

26.　　Accordingly, the Debtors believe the sale of the Voice Business in accordance with the Global Bidding Process is in the best interests of the Debtors and their estates and that any sales proceeds obtained from the Sale Transaction will represent the fair market value for the Voice Business. The Sale Transaction contemplated by the Purchase and Sale Agreement is an exercise of the Debtors' sound business judgment and

19

will result in a significant benefit to the Debtors' estates, their creditors and parties in interest.

### The US Assets Should be Sold Free and Clear of Liens, Claims and Encumbrances

27.    Section 363(f) of the Bankruptcy Code provides that a debtor in possession may sell property free and clear of liens, claims and encumbrances if one of the following conditions is satisfied:

(1)    applicable nonbankruptcy law permits the sale of such property free and clear of such interest;

(2)    the lienholder or claimholder consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)    such interest is in bona fide dispute; or

(5)    the lienholder or claimholder could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

28.    The court also may authorize the sale of a debtor's assets free and clear of any liens, claims or encumbrances under section 105 of the Bankruptcy Code. See In re Trans World Airlines, Inc., No. 01-0056, 2001 Bankr. LEXIS 723 at *9, 10 (Bankr. D. Del. March 27, 2001) (stating that "bankruptcy courts have long had the authority to authorize the sale of estate assets free and clear even in the absence of § 363(f)"); see also Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct

RLF1-2469365-2

such sales [free and clear of liens] is within the court's equitable powers when necessary to carry out the provisions of Title 11.")

29.    The Debtors do not believe any material liens exist against their property other than (i) the liens granted to the Debtors' postpetition lender (on an interim basis) under the DIP Facility and the lenders party to the Canadian Credit Facility, and (ii) the liens securing bond obligations of Teleglobe Marine. The Court should authorize the Debtors to sell the Purchased Assets, free and clear of any and all liens, claims and encumbrances with such liens to be transferred and attached to the net proceeds of the sale, with the same validity and priority that such liens had against the Purchased Assets.

### The Sale Transaction (With Respect to the US Assets) Should be Exempt From Transfer Taxes Under Section 1146(c)

30.    Section 1146(c) of the Bankruptcy Code provides that:

> [t]he issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under a plan confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp or similar tax.

11 U.S.C. § 1146(c). Section 105(a) of the Bankruptcy Code provides that: "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. . . ." 11 U.S.C. § 105(a).

31.    Consistent with section 105(a) of the Bankruptcy Code, the exemption from "stamp or similar taxes" provided under section 1146(c) of the Bankruptcy Code, has been broadly construed by bankruptcy courts to include asset sales and transfers that are "necessary to the consummation of the plan." See, e.g., In re

Hechinger Inv., Inc., 254 B.R. 306, 320 (Bankr. D. Del. 2000) (holding that a "transfer that is essential to or an important component of the plan process . . ." but that occurred prior to the filing of a plan of reorganization was exempt from state transfer and recording taxes prior to the filing); accord City of New York v. Jacoby-Benders, Inc. (In re Jacoby-Benders, Inc.), 758 F.2d 840, 842 (2d Cir. 1985); In re Permar Provisions, Inc., 79 B.R. 530 (Bankr. E.D.N.Y. 1987); City of New York v. Smoss Enters. (In re Smoss Enters.), 54 B.R. 950 (E.D.N.Y. 1985). Moreover, the term "stamp or similar taxes" includes transfer taxes. See In re 995 Fifth Avenue Assocs., 963 F.2d 503, 501-11 (2d Cir. 1992). Consistent with the foregoing, the Debtors request the Sale Transaction be exempt from transfer taxes under section 1146(c) of the Bankruptcy Code.

### The Breakup Fee and Expense Reimbursement

32.    As described above, the Teleglobe Companies and the Monitor, in their sole discretion, have reserved the right to conduct the Auction after the completion of the Global Bidding Process. Pursuant to the Bidding Procedures and the form Purchase and Sale Agreement, Teleglobe may pay a negotiated breakup fee and expense reimbursement (together, the "Termination Fee") if the Teleglobe Companies determine to pursue a Superior Transaction. The Termination Fee will not be borne by the Debtors' estates.

### The Bidding Procedures Should be Approved

33.    Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or by public auction. The Debtors submit the Bidding Procedures approved by the Canadian Court are consistent with the

22

provisions of the Bankruptcy Code.  In addition, the approval of the Bidding Procedures
by this Court will ensure the efficient administration of the Debtors' estates and that the
Debtors' are able to obtain maximum value for the US Assets and the Voice Business.
Therefore, the Debtors submit the Bidding Procedures should be approved.

### Allocation of Sale Proceeds

34.    Pursuant to the Purchase and Sale Agreement, the sale proceeds
resulting from the Sale Transaction (the "Sale Proceeds") will be allocated among each of
the Sellers, including the Debtors, at the Closing.  Such allocations are subject to review
by this Court and the Canadian Court.

### The Court Should Fix Cure Amounts

35.    The Debtors are seeking authority to assume and assign to the
Successful Bidder, pursuant to section 365 of the Bankruptcy Code, certain executory
contracts and unexpired leases (the "Assigned Contracts and Leases").  To enable the
Debtors and their respective professionals to analyze the net return to the Debtors' estates
(e.g., the proposed purchase price less any cure obligations), the Debtors seek to identify
and fix all cure amounts with respect to the Assigned Contracts and Leases.[9]

36.    The Debtors propose to serve on such counterparties on or before
the date that is seven (7) business days after the entry of the Procedures Order (defined
below), a notice of the potential assumption and assignment substantially in the form

---

[9] The Debtors reserve their right to exclude any Assigned Contract or Lease from the Sale
Transaction and to assume or reject any Assigned Contract or Lease in accordance with
section 365 of the Bankruptcy Code.

RLF1-2469365-2

annexed hereto as Exhibit "D" (the "Assumption and Assignment Notice") containing the following information:

(a) the potential of the Debtors to assume and assign the Assigned Contracts and Leases to the Successful Bidder effective as of the Closing;

(b) the amount the Debtors propose to pay to each counterparty as compliance with the cure requirements of section 365 of the Bankruptcy Code (the "Pre-Petition Cure Amount");

(c) that the counterparties to the Assigned Contracts and Leases shall have until 4:00 p.m. prevailing Eastern time on July 16, 2002 to object to the assumption and assignment of the Assigned Contracts and Leases or the Pre-Petition Cure Amount (the "Assumption/Assignment Objection Deadline");

(d) that any objection must:

(i) state with specificity a fully liquidated Pre-Petition Cure Amount which such party believes is required, the specific types and dates of the alleged defaults, pecuniary losses and conditions to assignment and with respect to any Assumption/Assignment Objection with respect to any unliquidated claims or adjustments for percentage rent, real estate taxes, common area maintenance or similar adjustable charges (the "Unliquidated Charges"), a good faith estimate of the amount of such charges, which such good faith estimate shall act as a cap on any cure amount for such Unliquidated Charges any such party shall be entitled to receive upon assumption or assignment of the Assigned Contract and Lease (in all cases, with appropriate documentation in support thereof);

(ii) be in writing;

(iii) set forth the basis for the objection; and

(iv) be filed with the Clerk of the Bankruptcy Court for the District of Delaware and served so as to be actually received by each of the following parties,

24

all on or before the Assumption/Assignment Objection Deadline: (i) the Teleglobe Companies; (ii) counsel to the Debtors; (iii) the Office of the United States Trustee for the District of Delaware; (iv) counsel to the Teleglobe Companies; (v) counsel to the Debtors' postpetition lender; (vi) counsel to the lenders under the Canadian Credit Facility; (vii) counsel to the Informal Committee of Noteholders; (viii) counsel to Bank of Montreal; and (ix) counsel to the Monitor.

(e)  the Debtors shall be authorized (but not directed) to assume and assign the contract to the Successful Bidder upon the closing of the Sale Transaction;

(f)  the Pre-Petition Cure Amount shall be fixed at the amount set forth in the Assumption and Assignment Notice (unless an objection is timely filed thereto), notwithstanding anything to the contrary in any Assigned Contracts and Leases or any other document;

(g)  the nondebtor party to the Assigned Contracts and Leases shall be forever barred from asserting any claims arising on or before the assumption and assignment against the Debtors or the Successful Bidder, or the property of any of them, with respect to the Assigned Contract and Leases; and

(h)  that for each Assigned Contract and Lease for which an objection is timely received in accordance with subsection (d) above, a hearing will be held at the Sale Hearing or at such other date as the Court may designate upon motion by the Debtors and Successful Bidder; provided that if the Assigned Contracts and Leases that are the subject of objections are assumed and assigned, the cure amount asserted by the objecting party (or such lower amount as may be agreed to by the parties or fixed by the Court) will be held in a segregated account by the Successful Bidder pending further order of the Court or mutual agreement of the parties.

37.  The Debtors submit that the foregoing notice is reasonably calculated to provide timely and adequate notice to counterparties to the Assigned Contracts and Leases. The Debtors submit such notice constitutes good and sufficient

25

notice under the circumstances with respect to the assumption and assignment of the Assigned Contracts and Leases in accordance with the Sale Transaction, and that no further notice need be given.

38.    If no objections are received, then the cure amounts set forth in the Assumption and Assignment Notice shall be binding upon the nondebtor contracting party to the Assigned Contracts and Leases for all purposes in these cases and will constitute a final determination of total cure amounts required to be paid by the Debtors in connection with the assignment to, and assumption by, the Successful Bidder of the Assigned Contracts and Leases.  In addition, each nondebtor contracting party in connection with the Assigned Contracts and Leases shall be forever barred from objecting to the cure information set forth in the Assumption and Assignment Notice, including, without limitation, the right to assert any additional cure or other amounts with respect to the Assigned Contracts and Leases.

## Notice of Global Bidding Process and Sale Hearing

39.    In accordance with Bankruptcy Rule 2002, the Debtors intend to provide notice of the Bidding Procedures and Sale Hearing substantially in the form annexed hereto as Exhibit "E" (the "Sale Hearing Notice"): (a) by first class mail deposited as soon as practicable after the date of the Order approving the Bidding Procedures (the "Procedures Order") to (i) the fifty largest unsecured creditors of the Debtors on a consolidated basis as listed in their petitions commencing these chapter 11 cases; (ii) the Office of the United States Trustee for the District of Delaware; (iii) counsel to the Debtors' postpetition lender; (iv) counsel to the lenders under the Canadian

26

Credit Facility; (v) counsel to the Informal Committee of Noteholders; (vi) counsel to Bank of Montreal; (vii) counsel to the Monitor; (viii) all nondebtor contracting parties with respect to the Purchased Assets; (ix) all parties who have made written expressions of interest in acquiring the Purchased Assets within two (2) months prior to the date of the Procedures Order; (x) all appropriate federal, state and local taxing authorities; (xi) any party asserting a lien on the Debtors' assets, (xii) the Federal Communications Commission, and (xiii) all parties having filed a notice of appearance in the Debtors' chapter 11 cases pursuant to Bankruptcy Rule 2002, and (b) by publication within seven (7) days after the entry of the Procedures Order in the Wall Street Journal (National Edition) and New York Times (National Edition).

40.    The proposed Sale Hearing Notice sets forth, among other things, a general description of the Voice Business, the Bidding Procedures and the name and address of a contact person for the Debtors. The Debtors submit that such notice constitutes good and sufficient notice of the Sale Hearing and that no further notice need be given. Accordingly, the Debtors request the Court approve the form and manner of notice set forth herein.

### Scheduling the Hearings on Approval of Bidding Procedures and Proposed Sale Resulting From Global Bidding Process

41.    Pursuant to the above proposed bidding process, the Debtors request that the Court schedule the Sale Hearing on July 19, 2002 or as soon as is practicable thereafter. The Debtors also request that all objections to the Sale Transaction

be filed with the Court and served upon counsel to the Debtors and the Official

Committee of Unsecured Creditors on or before 4:00 p.m. on July 16, 2002.

### Waiver of 10 day stay imposed by
### Bankruptcy Rules 6004(g) and 6004(d)

42.    The Teleglobe Companies desire to close the Sale Transaction as

soon as practicable after the entry of an order approving the sale.  Accordingly, the

Debtors request the Court, pursuant to Bankruptcy Rules 6004(g) and 6006(d), waive the

ten-day stay of the order approving the Sale Transaction to the Successful Bidder.  See In

re Mariner Post-Acute Network, Inc., Case No. 00-10055 (Bankr. D. Del., September 12,

2001) (waiving the 10-day stay imposed by Bankruptcy Rules 6004 and 6006); In re

Mosler, Inc., Case No. 00-10055 (Bankr. D. Del., October 25, 2001) (same); In re

Converse, Inc., Case No. 01-00223 (Bankr. D. Del., April 12, 2001) (authorizing

immediate consummation of sale of assets notwithstanding the stay imposed under

Bankruptcy Rules 6004(g) and 6006(d)).

### Notice

43.    No trustee, committee or examiner has been appointed in these

cases.  Notice of this Motion has been given to (i) the fifty largest unsecured creditors of

each of the Debtors as listed in their respective petitions commencing these chapter 11

cases; (ii) the Office of the United States Trustee for the District of Delaware; (iii)

counsel to the Debtors' postpetition lender; (iv) counsel to the lenders under the Canadian

Credit Facility; (v) counsel to the Informal Committee of Noteholders; (vi) counsel to

Bank of Montreal; (vii) counsel to the Monitor; (viii) all parties who have made written

expressions of interest in acquiring the Purchased Assets within two (2) months prior to

RLF1-2469365-2

the date of the Procedures Order; and (ix) all parties having filed a notice of appearance

in the Debtors' chapter 11 cases pursuant to Bankruptcy Rule 2002. The Debtors submit

that no other or further notice need be given.

### No Previous Request for relief

44.    No previous motion for the relief requested herein has been made

to this or any other Court.

WHEREFORE the Debtors request the Court enter Orders, substantially in

the forms annexed hereto as Exhibits "F" and "G" granting the Debtors the relief

requested herein and such other and further relief as is just.

Dated: June 10, 2002          Respectfully submitted,
       Wilmington, Delaware

Mark D. Collins (DE 2981)
Daniel J. DeFranceschi (DE 2732)
Michael J. Merchant (DE 3854)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

RLF1-2469365-2

# Exhibit 2

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                                    . Case No. 02-11518
                                          .
                                          .
        TELEGLOBE COMMUNICATIONS          .
        CORPORATION, a Delaware           .
        Corporation, et al.,              . 824 Market Street
                                          . Wilmington, Delaware  19801
                          Debtors.  .
                                          . June 24, 2002
. . . . . . . . . . . . . . . . . . 9:30 a.m.

TRANSCRIPT OF MOTION HEARING
BEFORE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:            Richards, Layton & Finger P.A.
                            By:  MARK D. COLLINS, ESQ.
                                 MICHAEL J. MERCHANT, ESQ.
                            One Rodney Square, PO Box 551
                            Wilmington, DE  19899

For the U.S. Trustee:       FRANK PERCH, III, ESQUIRE
                            601 Walnut Street
                            Philadelphia, PA  19106

For Unsecured Creditors
 Committee:                 KEVIN GROSS, ESQ.

                            Hahn & Hessenn, Esqs.
                            By: MARK INDELICATO, ESQ.
                            350 5th Avenue
                            New York, NY  10118

Audio Operator:             Jennifer Patone

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjcourt@optonline.net

(609) 586-2311  Fax No.  (609) 587-3599

2

APPEARANCES CONTINUED:

For IDT:                         Werb & Sullivan, Esqs.
                                 By:  DUANE WERB, ESQ.
                                 300 Delaware Avenue
                                 Wilmington, DE  19899

For BCE:                         Shearman & Sterling, Esqs.
                                 By: ANDREW TENZER, ESQ.
                                 599 Lexington Avenue
                                 New York, NY  10022

For Affiliates of SBC:           Potter, Anderson & Corroon, LLP
                                 By:  LAURIE SILVERSTEIN, ESQ.
                                 1313 North Market Street
                                 Wilmington, DE  19899

For VarTec Telecom, Inc.:        Stevens & Lee, Esqs.
                                 By:  JOSEPH HUSTON, JR., ESQ.
                                 300 Delaware Avenue
                                 Wilmington, DE  19801

                                 Hughes & Luce, LLP
                                 By:  JEFFREY FINE, ESQ.
                                 1717 Main Street
                                 Dallas, TX  75201

For Sprint Communications
  Company, LP:                   McCarter & English, Esqs.
                                 By:  Paul Dougherty, Esq.
                                 919 Market Street
                                 Wilmington, DE  19899

For Verizon:                     Smith, Katzenstein & Furlow, Esqs
                                 By:  ROGER ANDERSON, ESQ.

For Universal Access:            Connolly, Bove, Loge & Hutz, LLP
                                 By:  KAREN BIFFERATO, ESQ.
                                 1220 Market Street
                                 Wilmington, DE  19899

For Williams Communications      Hogan & Hartson, Esqs.
  & NTT Communications:          By:  EDWARD DOLAN, ESQ.
                                 555 13th Street, NW
                                 Washington, DC  20004

3

1          THE COURT:  Good morning.

2          MR. COLLINS:  Good morning, Your Honor.  For the

3  record, Mark Collins of Richards, Layton and Finger on behalf

4  of Teleglobe Communications Corporation and its affiliated

5  Debtors and Debtors-in-Possession.

6          Your Honor, we have several matters on today agenda

7  and if I could just begin right at the top.

8          THE COURT:  Okay.

9          MR. COLLINS: Your Honor, our agenda item number one

10  is our motion, several of these motions at the early part of

11  the agenda are final hearings on various first day relief.

12  Included in that is agenda item number one where we seek

13  authority to pay certain prepetition mechanics lien claims,

14  warehouse claims, freight claims and custom claims and certain

15  real and personal property taxes.

16          Your Honor approved this motion on the first day

17  hearing, but we sent out our notice, our request to pay

18  prepetition property tax of approximately $3 ½ million dollars.

19  We did receive no objection to that motion and, in fact, filed

20  a certification of no objection to that fact.

21          THE COURT:  All right. Anybody wish to be heard on

22  that, then?  All right, I'll enter a final order with respect

23  to that portion.

24          MR. COLLINS:  Thank you, Your Honor.

25          THE COURT:  Do you have a proposed order?

**J&J COURT TRANSCRIBERS, INC.**

4

1          MR. COLLINS:   May I approach, Your Honor?

2          THE COURT:  You may.  Thank you.

3          MR. COLLINS:  The second item on the agenda is the

4   Debtors motion for an order authorizing them to honor and pay

5   prepetition obligations to their customers, permit certain

6   customer setoffs and settle certain customer claims.  Again,

7   this motion was approved on the first day, but it was only

8   interim with respect to the Debtors' ability to settle accounts

9   receivable.  Your Honor, no objections were filed to this

10  motion and we have filed a certification of no objection to

11  that effect.

12          THE COURT:  All right.  Does anybody else wish to be

13  heard on that?  I'll enter the order on a final basis.

14          MR. COLLINS:  Thank you.

15          THE COURT:  The third item on the agenda is the

16  Debtors motion for an order authorizing them to continue their

17  workers' compensation insurance programs, maintain their prior

18  insurance programs.  Again, Your Honor, no objection was filed

19  to this motion and a certification of no objection was filed

20  with the Court.

21          THE COURT:  Anybody wish to be heard on that?  All

22  right, I'll enter an order on that.

23          MR. COLLINS:  Agenda item number four, Your Honor, is

24  the Debtors motion for an order approving the Debtors cash

25  management system, granting interim and final approval of

5

1  investment and deposit guidelines, and according administrative

2  expense status to all post petition intercompany claims.

3         Your Honor, while we did not receive any objections

4  to this motion, the Office of the United States Trustee has

5  voiced some concerns regarding the investment guidelines along

6  with the collateralization of the various deposit accounts.

7  Notwithstanding the fact that we filed a certification of no

8  objection, we'd ask the Court not to sign that order at this

9  point in time while we continue to have a dialog with the U.S.

10  Trustee's Office.

11         We did agree that we'd provide them with some

12  additional information regarding our investment and deposit

13  guidelines and also determine whether or not our deposit bank

14  would agree to enter into a collateralization agreement.  So

15  long as we can continue to operate under that interim order, I

16  have no problem with deferring final consideration of this

17  motion.

18         THE COURT:  Is that acceptable?

19         MR. PERCH:  Good morning, Your Honor, Frank Perch for

20  the U.S. Trustee.  Yes, that's acceptable.  I think, Your

21  Honor, our intention is to try to iron out these kinks and

22  submit a revised order to Your Honor as soon as possible.

23         THE COURT:  All right.

24         MR. PERCH:  Thank you.

25         MR. COLLINS:  Your Honor, for purposes of the docket,

6

1  should we file a notice of withdraw of that certification, no

2  objection?

3          THE COURT:  Yes.  I'll check with my secretary to be

4  sure I didn't already sign it.

5          MR. COLLINS:  Okay.  Thank you, Your Honor.  The next

6  motion is agenda item number five and that's the motion of the

7  Debtors and Debtors-in-Possession for an order granting an

8  extension of time to file schedules and statement of financial

9  affairs.

10         Your Honor, we have had discussions with both the

11 Creditors Committee as well as the Office of the United States

12 Trustee regarding this motion.  What we would ask and I know

13 the Committee has agreed to it, is an extension until August

14 15th.  We sought in the motion, I believe an extension, through

15 the end of September.

16         THE COURT:  Yes.

17         MR. COLLINS:  So, we'd like to move that time period

18 to August 15th, without prejudice to our rights to seek a

19 further extension.  This is a very complicated business, it has

20 operations internationally.  We are working with a reduced

21 staff due to due to the prepetition layoffs of significant

22 staff and we also, much of the information is up in Canada, so

23 that will require certain people to travel up there and work,

24 cross border in finalizing the schedules and statement of

25 financial affairs.

                    **J&J COURT TRANSCRIBERS, INC.**

7

1         So, we would request approval through August 15th.

2    We do have a revised form of order, but I invite any party's

3    comments on this motion.

4         MR. PERCH:  Your Honor, Frank Perch for the U.S.

5    Trustee.  Your Honor, if I had my druthers, I would like to see

6    schedules filed before the assets are sold.  I knew that that

7    was, whether I liked it or not, not possible under the

8    originally proposed sale time table, but we're now extending

9    the deadline out.  I'm not sure, actually, when the final sale

10   hearing is going to take place.  I think that what would be

11   appropriate is if the schedules could be filed prior to, I

12   think it's August 5th, is the new --

13        MR. COLLINS:  I think mid-August for a sale hearing.

14   Your Honor, I'm fine with moving the deadline to August 1 if

15   that makes everybody comfortable.  I just cannot commit to any

16   party that we will, in fact, be in a position by August 1 to

17   file the schedules and statement of financial affairs.  I would

18   state on the record that we do have a data room that is

19   available for potential purchasers which provides much of the

20   information that a buyer would be interested in, in the

21   schedules with respect to due diligence.

22        THE COURT:  Well, I think the question is what the

23   creditors, who may be affected by the sale of the assets,

24   should have available from the Debtor and I don't see them

25   visiting the data room.

J&J COURT TRANSCRIBERS, INC.

8

1           MR. COLLINS:  That's true, unless they signed a

2   confidentiality agreement.  Why don't we then move it to August

3   1, Your Honor, with the ability to further extend that time

4   period.  We don't believe we'll be in court for approval of

5   sale prior to August 1 and if I guess today I would assume the

6   sale hearing would take place some time in mid-August.

7           THE COURT:  All right, anybody else wish to be heard

8   on that?

9           MR. GROSS:  Just very briefly, Your Honor.  Kevin

10  Gross, the proposed counsel for the Official Committee of

11  Unsecured Creditors.  And the Committee also had concerns about

12  tie-in with the sale date, based on Mr. Collins's

13  representations and are continuing to work with the Debtors.  I

14  think that we would be okay with an August 1st extension

15  deadline.

16          THE COURT:  All right.  Let's make it August 1.

17          MR. COLLINS:  Okay.  Thank you, Your Honor.

18          MR. GROSS:  Your Honor, while I'm here, if I may just

19  very briefly introduce and move the admission, pro hac vice, of

20  my co-counsel in this case, Mark Indelicato of the Hahn &

21  Hessenn firm in New York.  Mr. Indelicato has appeared before

22  the Court previously.

23          THE COURT:  All right, thank you.

24          MR. GROSS:  Thank you.

25          MR. COLLINS:  May I present a form of order, Your

9

1 Honor?

2        THE COURT: Yes.  All right, I'll enter that

3 modified order then.

4        MR. COLLINS: Your Honor, I'm going to turn the

5 podium over to Michael Merchant for presentation of agenda

6 items six through ten.  Thank you, Your Honor.

7        THE COURT: Thank you.

8        MR. MERCHANT: Good morning, Your Honor, Michael

9 Merchant of Richard, Layton and Finger on behalf of the

10 Debtors.

11        THE COURT: Good morning.

12        MR. MERCHANT: Your Honor, agenda item number six is

13 the motion of the Debtors and Debtors-in-Possession for an

14 order pursuant to 363(b) authorizing the sale of miscellaneous

15 office furniture and equipment.  Your Honor, we filed this

16 motion on shortened notice, it was filed on May 31st and

17 originally scheduled for a hearing on June 18th, which would

18 have been only 18 days as opposed to the 20 days required under

19 the rules for this type of procedure.

20        We believe that the continuance of the hearing a week

21 and an extension of the objection deadline to the Committee and

22 all other parties requesting an extension of the objection

23 deadline, pretty much alleviates the need for the motion to

24 shorten notice.

25        THE COURT: All right, but just a procedural matter,

10

1  you have to be sure you get your motion for shortened notice

2  to the Court or you can't simply list it for the agenda.  But I

3  agree since the time has now been continued, that's moot.

4          MR. MERCHANT:  Okay.  Thank you, Your Honor.  Then if

5  I may proceed with the motion.  Just a brief background, the

6  Debtors U.S. base headquarters is located in Reston, Virginia.

7  There's basically four leases that comprise that Virginia site.

8  Two of those leases relate to unoccupied, undeveloped property

9  the Debtors have never used, there's nobody on that space.

10  Pursuant to another motion here today, we're seeking to reject

11  those two leases.   That leaves two remaining leases at the

12  headquarter site, a lease relating to a larger property and a

13  lease relating to a smaller property.

14          As a result of recent downsizing by the Debtors at

15  the Reston, Virginia headquarters, they believe that they're in

16  a position to transition all of their employees down there into

17  the small of the two sites.  Accordingly, we're going to move

18  to reject the larger of the two sites.  We filed a motion to

19  reject that lease effective June 30th, we filed it last week.

20  The return date on that motion is July 8 and that motion is

21  with landlord consent.

22          With respect to the smaller or with respect to that

23  lease, there's various items of office furniture and equipment

24  on that location that before we can turn over premises to the

25  landlord we had to either move that furniture and equipment out

11

1  or sell that furniture and equipment, have it removed from the

2  premises so that we could turn it over in broom swept

3  condition. Accordingly, that's the reason for this motion. We

4  solicited prospective purchasers of the office furniture and

5  equipment and entered into a contract which J.K. Moving and

6  Storage on May 29 to sell the furniture and equipment for

7  $400,000 cash. We filed a motion seeking approval of that

8  sale, attached a copy of the contract to the motion and served

9  it on all interested parties, including other parties who at

10 one time showed an interest in purchasing the furniture and

11 equipment as well as the landlord to the property.

12     After serving a copy on the landlord, Riggs Bank,

13 they contacted us with an interest in purchasing that furniture

14 and equipment. After some negotiation, they actually submitted

15 a bid. Their bid was for $400,000, the same purchase price

16 offered by J.K. Moving and Storage, except in addition to that,

17 they included basically they're going to allow us to stay on

18 the property for half of July without being considered a

19 holdover tenant because we're seeking to reject the lease as of

20 the 30th and they're not going to charge us any rent for that

21 period.

22     Based on that bid, the Debtors have determined that

23 bid to be a higher and better bid because given the extension

24 of the timing on this hearing, our position is if we were

25 forced to sell the property to another bidder or to J.K. the

1 | one week remaining in June would not be enough time to get that

2 | property off the premises and as of July 1st, we'd incur a

3 | $300,000 rent charge for the month of July to the landlord.

4 | So, based on that bid, we've decided to go with Riggs

5 | Bank and unless Your Honor has any questions, we'd respectfully

6 | request that the motion be approved.

7 | THE COURT: All right, does anybody wish to be heard

8 | on the Debtors motion or the competitive bid? All right. I'll

9 | accept the Debtors' analysis that the landlord bid is the

10 | highest and best and approve that.

11 | MR. MERCHANT: Thank you, Your Honor. Your Honor, I

12 | have a revised order. It's basically the same form of order

13 | that was submitted with the motion, changing the name of the

14 | purchaser and attaching a warranty and bill of sale as Exhibit

15 | A to that order, if I may approach.

16 | THE COURT: You may. All right, I've entered that

17 | order.

18 | MR. MERCHANT: Thank you, Your Honor. Your Honor,

19 | moving onto item seven on the agenda, it's the motion of the

20 | Debtors and Debtors-in-Possession for an administrative order

21 | establishing procedures for interim compensation and

22 | reimbursement of expenses of professionals. Your Honor, these

23 | are basically the standard procedures of interim compensation

24 | and reimbursement of expenses of professionals typically

25 | approved by this court. We did not file a certificate of no

13

1  objection on this motion because the U.S. Trustee did have one

2  comment to the order.  Specifically, the original form of order

3  provided that each professional would submit monthly fee apps.

4  on or before the 25th calendar day of each month.  The U.S.

5  Trustee requested that we change that language to read that

6  they would be submitted on or -- no earlier than the 25th day

7  of each calendar month.  We believe that change is consistent

8  with the relief actually requested in the motion and we've made

9  that change.

10          THE COURT:  All right.

11          MR. MERCHANT:  So, unless Your Honor has any

12  additional questions, we would ask that the order approving the

13  motion be entered.

14          THE COURT:  All right.  You may hand it up.  Anybody

15  else wish to be hear on that?  All right, I'll enter the order

16  as unopposed.

17          MR. MERCHANT:  Thank you, Your Honor.  Moving onto

18  item number eight on the agenda, Your Honor, is the motion to

19  reject various leases of non-residential real property and

20  relating to that rejection, we're also seeking to abandon

21  ceratin office furniture and certain telecom equipment and we

22  are also seeking a rejection damages deadline.  There have been

23  no objections to that motion.  We did file CNO with respect to

24  that motion this morning.  I'd be happy to answer any questions

25  that Your Honor may have regarding the motion.

14

1          THE COURT:  I had no questions.  Anybody else wish to

2   be heard on that motion?  All right, I'll enter the order as

3   unopposed then.

4          MR. MERCHANT:  Thank you, Your Honor, may I approach?

5          THE COURT:  Yes.

6          MR. MERCHANT:  Your Honor, number nine on the agenda

7   is the motion of the Debtors and Debtors-in-Possession for an

8   order authorizing the retention of professionals utilized in

9   the ordinary course of business.  We have not submitted a

10  certification of counsel, or CNO on this motion because, again,

11  the U.S. Trustee had one comment to our proposed order.  Deloit

12  and Touche was listed as one of the proposed, ordinary course

13  professionals on Exhibit A to the motion.  The Office of the

14  United States Trustee has asked that we take Deloit and Touche

15  off and to the extent we want to retain them, we file a

16  separate retention application.  We're fine with that change.

17  We've made that change to Exhibit A to the motion and actually

18  attached the revised Exhibit A as an Exhibit A to the order.

19  And unless Your Honor has any questions --

20         THE WITNESS:  Well, I have two questions.  Why you

21  have two bankruptcy counsel listed as ordinary course

22  professionals, Kelly, Drye and Myles and Stockbridge firms?

23         MR. MERCHANT:  If you'd give me just one second, Your

24  Honor.

25         MR. COLLINS:  Your Honor, for the record, Mark

**J&J COURT TRANSCRIBERS, INC.**

15

1  Collins.  Obviously, the telecom industry is in financial

2  distress.  Teleglobe is a creditor in certain other bankruptcy

3  cases, Global Crossing, among others, so those attorneys that

4  you see there are representing Teleglobe as a creditor in those

5  other bankruptcy cases and they are not assisting the Debtors

6  in these cases in any financial restructuring.

7         THE COURT:  All right.  Any comments from the U.S.

8  Trustee on that?

9         MR. PERCH:  Your Honor, I had asked the question and

10 had received the same answer and I don't have any problem with

11 it on that basis.

12        THE COURT:  All right.  You may hand up the revised

13 order, then.

14        MR. MERCHANT:  Thank you, Your Honor.  Your Honor,

15 matter number ten on the agenda was the emergency motion of the

16 Debtors to sell certain promissory notes back to Orb Com.  We

17 are not going forward on that motion here today.  There are

18 still certain concerns by both the monitor in the Canadian

19 proceeding and the Unsecured Creditors Committee in this

20 proceeding.  They have asked certain questions and we are just

21 supplying them with answers, but we'd like to basically put

22 this motion off until we can make those parties feel

23 comfortable with this motion.  And to the extent we are able to

24 make those parties feel comfortable with the motion, we would

25 submit a certification of counsel with any changes or

16

1  certificate of no objection some time this week.  Unless, of

2  course, Your Honor has any questions with respect to the motion

3  and at that time, we would probably request some sort of

4  expedited hearing on the motion.

5       THE COURT:  Well, you did request an expedited

6  hearing on it, but since I never saw it, it wasn't granted.

7       MR. MERCHANT:  I think, Your Honor, maybe we termed

8  it incorrectly.  We weren't seeking -- well, we were seeking

9  shortened notice, basically, is what we were seeking.  We were

10 seeking to have the motion heard on the 18th, as opposed to a

11 separate expedited hearing on the motion itself.

12      THE COURT:  Well, it was filed the 10th and even

13 today is shortened notice, but you really need to get the Court

14 to approve that before you send the notice out and just assume

15 that it's going to be heard on shortened notice.

16      MR. MERCHANT:  We will do so in the future, Your

17 Honor.

18      THE COURT:  What was the reason to shorten the

19 notice?

20      MR. MERCHANT:  Well, without going too much into the

21 motion, the reason was basically that based on discussions with

22 OrbCom, the Debtors have determined that OrbCom is in a very

23 poor financial situation right now and the fear was that if

24 this motion gets pushed out too long, this sale might not even

25 be available because possibly OrbCom wouldn't even have the

17

1  funds necessary to continue to operate going forward and our

2  only recourse with respect to the notice would be in some form

3  of liquidation or Chapter 7 proceeding.  That was the basis for

4  the shortened notice.

5        THE COURT:  All right.  Well, if you can get the

6  agreement of the Committee, U.S. Trustee and lenders, I'll

7  consider it under a certification of counsel.

8        MR. MERCHANT:  Thank you, Your Honor.  At this point

9  I'd like to turn the podium back over to Mr. Collins.

10        MR. COLLINS:  Your Honor, that brings us to agenda

11  item number 11 and this also, Your Honor, we filed a motion to

12  shorten the notice to allow us to be heard on June 18th.  We

13  would still need to have Your Honor approve the short notice to

14  allow us to go forward today on, I believe 14 days notice as it

15  was served and filed on June 10th.

16        We do think it's imperative, Your Honor, that we move

17  forward with the sale process and this really is procedural

18  relief only.  We're not asking for approval of any type of

19  transaction at this point in time, it's all subject to coming

20  back to the Court much later for approval of any sale

21  transaction.

22        THE COURT:  Well, does any party object to my

23  considering it on shortened notice?  All right, I will consider

24  it, since 14 days notice was given --

25        MR. COLLINS:  Thank you, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

18

1        THE COURT:  Given the continuance from last week.

2        MR. COLLINS:  Thank you, Your Honor.  The objection

3   deadline was set at June 17th at noon.  We did grant extensions

4   to the U.S. Trustee as well as to the Official Committee of

5   Unsecured Creditors.  They were the only two who asked for an

6   extension and we would have granted an extension to any other

7   party if they so requested.

8        Following several calls and almost a day long meeting

9   with the Debtors, the monitor and the Committee, we agreed upon

10  certain changes to the proposed form of order approving the bid

11  procedures and I believe those changes resolved any concerns or

12  potential objections of the Committee for the relief sought

13  here today.  We did receive three additional objections, one by

14  F.P.L. Fibernet, LLC, Williams Communications, LLC and NTT

15  Communications in addition to the objection filed by the United

16  States Trustee.

17       I believe the objections raised by these four parties

18  may be resolved by the changes we have made to the proposed bid

19  procedures.  What I'd like to do, Your Honor, is walk the Court

20  through the changes made to the bid procedures and then

21  determine what objections remain, if any, to the entry of the

22  revised bid procedures order.

23       THE COURT:  All right.

24       MR. COLLINS:  First, Your Honor, with respect to Page

25  3 of the proposed form of order, we have extended the date by

**J&J COURT TRANSCRIBERS, INC.**

1  which bids may be submitted for the voice business and that is

2  a defined term in the motion to July 15th, 2002.  The prior bid

3  deadline was June 24th, 2002.  So, we have agreed to extend it

4  approximately three weeks.

5       Turning to Page 4, Your Honor, we have agreed to

6  provide to the Creditors Committee copies of any and all bids

7  received by the July 15th bid deadline.  As a result of

8  extending the bid deadline, we had to ask that the bidders keep

9  their bid open until August 1, 2002.  That would then give the

10 parties sufficient time to review and analyze the bids

11 submitted by July 15.

12      We have agreed throughout the order to provide

13 consultation language for the Creditors Committee and on Page

14 5, I think that's first reflected and it reads in consultation

15 with the Creditors Committee, final bids will be reviewed and

16 further negotiations will be pursued with bidders that are

17 deemed advisable and for completing such negotiations

18 successful initial bid for the proposed assets will be

19 selected.

20      Following Your Honor's selection of that initial

21 bidder, the parties will attempt to negotiate and execute a

22 purchase and sale agreement.  The purchase and sale agreement

23 that is attached, it's only a form of purchase and sale

24 agreement and it's only used for purposes of this motion, as a

25 template to allow those bidders to submit their bids so we can

20

1  see exactly what provisions they were changing in the proposed
2  purchase and sale agreement.

3         There is a provision in there that provides for a
4  break up fee not to exceed 3 percent of the total purchase
5  price along with certain expense reimbursement allowances.  We
6  noted in the motion and we state it here again that that will
7  not be an obligation of these Debtors, that will be the sole
8  obligation of Teleglobe, Inc, which is the Canadian entity, and
9  as a result, we're not asking Your Honor to approve those
10 provisions of the purchase and sale agreement.

11        Your Honor, following the execution of the purchase
12 and sale agreement, in Canada, they will file a sale
13 transaction motion.  For informational purposes and for
14 complete disclosure here in the United States, we are going to
15 file a copy of that transaction motion and serve it out upon
16 all parties that receive a copy of this motion, along with all
17 parties to executory contracts, because that sale transaction
18 motion will disclose who the initial bidder is and what the
19 terms of the sale transaction are.  There was no need for us to
20 file a similar motion as this motion seeks the ultimate
21 approval of whoever the successful bidder is.  But we did think
22 it would be helpful for all parties to know exactly who the
23 initial bidder is.

24        Your Honor, following the selection of the initial
25 bidder, the procedures provide that within two business days of

1  the filing of the sale transaction motion, a determination will

2  be made after consultation with the Creditors Committee, as to

3  whether or not to conduct an auction.  It's at that point in

4  time we will have seen all of the bids submitted, we'll have

5  selected initial bidder, and then we can then decide whether or

6  not an auction would be helpful to help increase the value

7  being obtained.

8          We will file in the United States a notice stating

9  whether or not an auction will be held and, if so, the date,

10 time and location of the auction, along with the date by which

11 competing bids must be submitted.  So, all parties in the

12 United States would have access to that information.

13         Thereafter, Your Honor, there will be the selection

14 of what we call the successful bidder and we will serve a

15 notice identifying who the successful bidder is, the proposed

16 purchase price and the date of the sale hearing before this

17 Court and we'll serve that notice upon the Debtors' entire

18 creditor matrix, amounting to over 9,000 parties, and included

19 within that would obviously be all parties to executory

20 contracts and expired leases.

21         We've also modified the order to provide that the

22 sale hearing will be approximately 14 days after we file and

23 serve the notice of the successful bidder.  That would then

24 allow all parties sufficient time to review the new and

25 improved, hopefully, sale transaction and also make decisions

22

1  as to whether or not that party is capable of providing

2  adequate assurance of future performance in accordance with

3  Section 365.

4        We've also, Your Honor, modified the process by which

5  we are going to determine cure amounts.  We will within 5

6  business days of the entry of this order, serve out to all the

7  contracting parties, a notice which will state that you may be

8  subject to assumption and assignment and this is what we

9  believe to be the prepetition cure amount and we're seeking to

10  establish the cure amount as of the petition date.  Any cure

11  obligations that arise post petition are fully reserved by

12  those parties, we're not seeking to bar the submission of cure

13  obligations post petition by this process.  I think that

14  resolves several of the objections.

15        We provide that any party who receives such a notice

16  and who objects to the Debtors stated amount of the prepetition

17  cure, that they file an objection by July 19th.  This way we'll

18  have that information while we are reviewing the various bids

19  that are submitted on or before July 15th.  The Debtors do

20  believe that that information would be helpful in reviewing the

21  various initial bids.

22        Your Honor, we are also -- we have modified the

23  notice with respect to the entry of this order.  We are now

24  serving out a notice of the entry of a sales procedures order

25  to the entire creditor matrix, so all parties will know that

23

1  we're engaged in the sale process.  They will also know that we

2  will file with the Court the Canadian transaction motion, the

3  notice of the auction and the notice of the successful bidder.

4  And we're also going to publish that sales procedures notice in

5  the Wall Street Journal and the New York Times.

6        We have also, Your Honor, included a provision --

7  which I think is self-evident, but I think it helps parties

8  become comfortable with this process, a provision that makes

9  clear that any parties' objection to a sale transaction, is

10 fully preserved.  If they object to the purchase and sale

11 agreement and any provision in the purchase and sale agreement,

12 that's preserved.  Any party that wants to object to adequate

13 assurance of future performance, that is preserved.  If they

14 would like to object to whether or not the Debtor should or

15 should not have held an auction, they can raise those

16 objections at the sale hearing.  I assume it would be as part

17 of an objection to whether or not we obtain fair value for the

18 assets.

19        So, Your Honor, we have modified it to provide full

20 and absolute disclosure to all parties who have an interest in

21 these cases.  But it also allows us to know exactly how to

22 proceed over the coming six to eight weeks, while we engage in

23 the sale process.

24        THE COURT:  All right.  Does any other party wish to

25 be heard on the sale procedures as revised?

24

1          MR. INDELICATO:  Good morning, Your Honor, Mark

2   Indelicato from Hahn and Hessenn proposed counsel to the

3   Official Unsecured Creditors Committee.

4          Your Honor, when we first took a look at the motion

5   we had some of the similar concerns expressed by the Office of

6   the United States Trustee.  We had a day long meting with the

7   monitor and with the Debtor to go over our concerns and we were

8   successful in having them change the proposed procedures from

9   being run by the Debtor and the monitor to bringing the

10  Creditors Committee into the process.

11         Your Honor, we're going to be involved in the process

12  and a lot of the critical junctures, including determining, or

13  at least giving our opinion as to whether an auction should be

14  held.  We also got Your Honor, the agreement from the Debtor,

15  that is memorialized in the order, that the Committee will

16  reserve any and all objections as to the proposed sale.  We did

17  agree that we are satisfied with the bidding procedures but we

18  have not yet fully agreed whether or not we are agreeing that

19  the sales process, that the sale itself, should take place.

20  The Committee is going to look at, Your Honor, whether or not

21  we believe a fair value would be achieved either through a sale

22  process, depending on the consideration or we will also explore

23  from now until the sale hearing, whether or not creditors would

24  best be served by trying to do a stand alone reorganization of

25  these entities.

1    We understand it's a shortened period of time, but

2 the Debtor and the monitor have committed their resources to

3 cooperate with the Committee to get all of the information we

4 need to make an informed decision and report back to the Court

5 as to whether or not we believe the sale is appropriate.  They

6 have made their financial advisers available to us, we are

7 having meetings, we are getting information, we have had access

8 to the data room.

9    So, we believe, Your Honor, based on the procedures

10 that have been put in place and the monitor and the Debtor

11 making all of the information available to us, we believe

12 although a shortened period of time, we believe this process is

13 necessary, we believe we need to know whether or not there are

14 potential bidders out there and then we can try and weigh that

15 against what a stand alone reorganization may look like to

16 determine how the assets could achieve the best results for

17 creditors.

18    So, based on the changes and the representations made

19 today, Your Honor, we would request that the Court enter the

20 order.  One other thing, I believe that is again self-evident

21 but I'll just, to make the record clear, there was some

22 confusion in the motion about whether or not the allocation

23 issue was being decided, and I think that has been put to rest.

24 Everybody's rights as to the allocation is going to be

25 preserved, that will be a fight we will deal with in another

26

1  day, Your Honor.  Thank you.

2           THE COURT:  All right.

3           MR. WERB:  Good morning, Your Honor, Duane Werb from

4  the firm of Werb and Sullivan on behalf of IDT.

5           IDT Telecom, Your Honor, is a prospective purchaser

6  in this particular bankruptcy case of the assets of this

7  Debtor.  I have filed a motion pro hac vice on behalf of my co-

8  counsel, David C. Albala of the law firm of McDermitt, Will and

9  Emory.  He is present in the courtroom today.  We are taking no

10 position at this time with respect to this motion, but I just

11 wanted to advise the Court that his motion was filed

12 electronically with the Court on Friday.

13          THE COURT:  All right.

14          MR. WERB:  Thank you.

15          THE COURT:  Thank you.  It will be granted.

16          MR. PERCH:  Good morning, Your Honor, Frank Perch for

17 the U.S. Trustee.  Your Honor, the changes that have been made

18 from the originally proposed order are all beneficial.  There

19 are some concerns that we continue to have regarding this

20 structure.  Although we understand, that the Committee

21 understands that all objections to the sale are preserved and

22 all objections -- or all issues relating to allocation of the

23 purchase price are preserved, we're not really completely sure

24 that the order actually says that.  Perhaps it would be good

25 for the order to specifically state that the order does not

27

1  constitute approval of any particular terms of an asset

2  purchase agreement, or it doesn't constitute approval of a

3  break up fee or expense reimbursement at this time, or approval

4  of any allocation of the purchase price.

5      THE COURT:  Well, it does say in the last decretal

6  paragraph that all parties rights, including the Committee's to

7  object to any sale transaction, including any objection under

8  B(1)(c) with respect to assumption and assignment are reserved.

9  Isn't that broad enough?

10      MR. PERCH: Provided that we understand that in

11  encompasses all those things, that --

12      THE COURT:  Yes.

13      MR. PERCH:  If we all have that understanding, then I

14  guess we can move forward on that basis.  The procedure,

15  although I gather the Committee is comfortable with it at least

16  as a place to start, the procedure under which the Debtor

17  retains discretion to review the bids and decide to select a

18  stalking horse and decide whether to allow anybody to bid

19  against that seems somewhat unusual and it still seems to

20  create this sort of two step procedure where the stalking

21  horse bidder is designated and if the Debtor does chose to have

22  an auction, it seems like everybody else has to bid twice.  But

23  the Debtors' designated favorite only has to bid once.

24      Lastly, Your Honor, we are still having trouble

25  understanding that it is that is proposed with respect to the

28

1  relationship between the Canadian court's order and this
2  Court's review of the sale.  The difficulty arising from the
3  fact that the U.S. Debtors are also Debtors in the Canadian
4  proceedings, and the motion and the proposed order do not
5  really make it clear what exactly is the nature of the relief
6  that's going to be sought in Canada.  If the transaction motion
7  that's going to be filed in Canada seeks an order approving the
8  transaction with respect to the Canadians court's jurisdiction
9  over the U.S. Debtors, then it's not clear what it is that this
10 court is being asked to do other than to rubber stamp that.
11        This is the kind of thing, in cased in the past,
12 we've had some sort of a cross border procedures order that
13 created a protocol that made which court had jurisdiction over
14 which things.  For some reason these parties have chosen not to
15 seek some sort of a protocol order and as a result, we have
16 these sort of ambiguities because we have dual jurisdiction of
17 this Court and of the Canadian court over certain entities.
18 And, Your Honor, I think that the motion needs to be clarified
19 and the relief that's being requested here need to be clarified
20 to make it clear that when we come to a sale hearing in this
21 court, that this court does have jurisdiction over the U.S.
22 Debtors and it's not simply being asked to rubber stamp
23 something that occurs in Canada.  Or at least we all need to
24 know what the playing field is, we need to know who's order
25 controls what here.  And that's really not made clear at all.

**J&J COURT TRANSCRIBERS, INC.**

29

1          MR. COLLINS:  Your Honor, we have -- these Debtors

2   are subject to a Chapter 11 proceeding in this court.  This

3   court has jurisdiction over the U.S. assets and we will be back

4   before Your Honor for approval of any sale transaction.  It

5   will be made clear in the order or in the motion, that the

6   Canadian court has jurisdiction over the Canadian entities and

7   this court has jurisdiction over the U.S. assets and that is

8   why we will be coming back to Your Honor for approval of any

9   sale transaction, it will not be a rubber stamp proceeding, it

10  will be a full 363 hearing and Your Honor will be asked to

11  approve the sale transactions, subject to the confines of

12  Section 363.

13          THE COURT:  All right.  Does that clarify it?

14          MR. PERCH:  Does that mean that the order being

15  sought in the Canadian court is only an order as to the

16  Canadian Debtors that are not also Debtors -- that are not

17  Debtors here?

18          MR. COLLINS:  I believe, Your Honor, because the U.S.

19  entities are subject to a Canadian proceeding, the order in

20  Canada would cover the U.S. entities because they're subject to

21  the proceeding, but separate and apart from that, we believe we

22  have to come back to Your Honor for approval of any such sale.

23          THE COURT:  You need both orders.

24          MR. COLLINS:  Yes, Your Honor.

25          THE COURT:  All right.  Anybody else still have an

30

1    objection to the procedures?

2           MR. TENZER:  May it please the Court, Andrew Tenzer

3    of Shearman and Sterling, representing BCE and BCE subsidiary

4    which is the DIP lender the Teleglobe, Inc.  Your Honor, we

5    don't have any objection to the bid procedures order, I just

6    wanted to state for the record that to the extent there are any

7    issues and there may not be any between the procedures that

8    you're approving today with respect to the bidding and any

9    rights that we may have as a DIP lender under our DIP

10   documents, we don't want our non-objection to be construed as a

11   waiver of any of those rights and we just want them reserved.

12          THE COURT:  All right.  How do the revisions mesh

13   with the procedures approved in Canada?  Are these consistent?

14          MR. COLLINS:  Yes. Your Honor, I believe they are

15   very consistent.  We do have, obviously, different procedures

16   with respect to the establishment of cure amounts and the fact

17   that the sale hearing in the United States will be

18   approximately 14 days after we select the successful bidder.  I

19   believe the Canadian procedures allow within five days, or five

20   business days of the successful bidder to have the Canadian

21   sale transaction hearing.

22          THE COURT:  All right.

23          MR. COLLINS:  Your Honor, a couple of other comments

24   with respect to the proposed order.  We have the objection

25   deadline set for the sale to be three business days prior to

31

1  the date selected for the sale hearing.  Because we don't know

2  when the successful bidder will be selected, once we did, we

3  will contact the Court, ask for a hearing date approximately 14

4  days out, subject to Your Honor's calendar at that time and the

5  objection deadline that would be noticed out at that point

6  would provide objections due three business days prior to that

7  sale hearing.

8          THE COURT:  All right.

9          MR. COLLINS:  In addition, Your Honor, we have two

10 dates that need to be filled in in the proposed order.  One is

11 with respect to the service of the sale procedures notice.  We

12 would ask that Your Honor allow us until July 1 to mail that

13 out.  We have expanded the notice, as I stated earlier, to the

14 entire creditor matrix, so we have a very significant mailing

15 to do.

16          In addition, we would like to have until July 5 to

17 publish the notice in the Wall Street Journal and the New York

18 Times.  I know that you need to have sufficient lead time with

19 those papers to publish advertisements so we'd like to have

20 that amount of time to get that completed.

21          THE COURT:  All right, I have no objection to that.

22 Anybody else?  All right.

23          MR. COLLINS:  Your Honor, we also have available if

24 Your Honor would find it at all helpful, we do have the monitor

25 in the court today.  We could make a proffer of his testimony

32

1  in support of the bid procedures, but given that we have no

2  objection, I leave it up to Your Honor as to whether you find

3  that helpful.

4           THE COURT:  I don't think that's necessary.

5           MR. COLLINS:  Okay.  May I have one moment, Your

6  Honor?

7           THE COURT:  Yes.

8           MR. COLLINS:  Well, we do have two attachments to the

9  proposed bid procedures order.  The first is the sales

10  procedures notice which has been modified to conform to all the

11  changes made to the form of order, along with the proposed

12  notice that will be sent out to parties to executory contracts

13  and unexpired leases.

14           THE COURT:  All right.  You may hand that up and I

15  will enter revised order as unopposed.

16           MR. COLLINS:  One moment, Your Honor.   Your Honor,

17  if we could bypass agenda item number 12 and put that at the

18  end of the agenda.  We are still trying to work out the

19  objection raised by Southwestern Bell to our critical vendor

20  motion.

21           THE COURT:  All right, we'll pass that for now.

22           MR. COLLINS:  And that brings us to agenda item

23  number 13 which is our request for final approval of the

24  proposed Debtor-in-Possession financing facility.  If I could

25  hand to the Court a black line of the proposed financing order?

33

1          THE COURT:  You may.

2          MR. COLLINS:  Your Honor, we received two additional

3  objections, well, we received a total of three objections to

4  the proposed financing.  The first objection was filed on the

5  first day of the case by Teleglobe Marine.  I think that was

6  resolved at that point in time.  We then received two

7  additional objections, one by NTT Communications and Williams

8  Communications and I believe that language we have included in

9  the form of order has resolved those objections.  So, I think

10  Your Honor, given that we have no outstanding objections, at

11  least not that I'm aware of, to the proposed final financing

12  order, if we could simply walk through the changes made so the

13  Court can see what has been done since the interim order.

14          THE COURT:  Okay.

15          MR. COLLINS:  Your Honor, many of the changes,

16  obviously, simply term this from an interim order into a final

17  order.

18          As a result, I think the first material change is on

19  paragraph two, which is found on Page 8 of the proposed, or of

20  the black line order.

21          THE COURT:  All right.

22          MR. COLLINS:  One of the changes made, Your Honor, at

23  the request of, I believe, the Committee, was to increase the

24  notice period from three business days to five business days

25  with respect to any changes to, or any non-material amendments

34

1  to the proposed financing.

2         We have made some clarifying changes in paragraph

3  three which I believe was set out at the first day hearing, but

4  in paragraph three we've included language that reads no Debtor

5  shall have guarantee obligations to the Canadian lender with

6  respect to the indebtedness, liabilities and/or obligations of

7  any other Debtor to the Canadian lender and/or the U.S. lender.

8         THE COURT:  And that deal with Marine as well?

9         MR. COLLINS:  It did, Your Honor.

10        THE COURT:  All right.

11        MR. COLLINS:  Paragraph five, which deals with the

12 super priority administrative claim, there's language, I

13 believe that was put in at the request of the Creditor's

14 Committee, that provides that the super priority claims shall

15 only be payable from the proceeds of voidance actions if  the

16 proceeds received by the Canadian lender and/or the U.S. lender

17 as applicable, in respect of the realization  by the Canadian

18 lender and/or the U.S. lender of substantially all of the

19 collateral are insufficient to repay all of the then

20 outstanding post petition indebtedness.  They are not taking a

21 lien on the avoidance recoveries but they will be allowed to

22 access avoidance action recoveries if that was their only

23 ability to be paid in full on account of post petition

24 indebtedness.

25        THE COURT:  Okay.

**J&J COURT TRANSCRIBERS, INC.**

1      MR. COLLINS:  In paragraph seven, Your Honor, we have

2  modified the carve out provisions for both the Debtors as well

3  as the Creditor's Committee.  The Debtors budgeted amount is

4  $150,000 a month.  My firm is holding a retainer and my

5  experience has been with the U.S. Trustee's Office, at least

6  recently, is that they require Debtors counsel to draw down on

7  the retainer first and then look to cash from the company after

8  the retainer is fully utilized.  As a result of that, Your

9  Honor, we built in for the Debtors professionals that for every

10 dollar that we draw down of our retainer and not access through

11 the budget, we would have a corresponding one dollar increase

12 in the post event of default carve out, up to a maximum of

13 $450,000.

14      With that change, Your Honor, and with the clarifying

15 change that the carve out is for the Debtors bankruptcy

16 professionals and not all of the ordinary course professionals

17 because that's how we came to that amount, then the Debtors

18 counsel are comfortable.

19      We've also increased I think fairly dramatically, the

20 carve out for the Creditors Committee which allows up to

21 $900,000 of payments, $300,000 a month from now through August,

22 along with the $450,009 post event of default carve out.  I

23 think that resolves the Committee's objection to the initial

24 carve out contained in the interim order.  And, Your Honor,

25 these changes are found in paragraphs eight as well as in

1  paragraph seven.  Paragraph seven and eight.

2         Given the increase in the carve outs for both the

3  Debtors and the Creditors Committee, there is a 506(c) waiver

4  now included within the form of order.  There's also some

5  language, Your Honor, at the end of paragraph 16.  This is with

6  respect to, there has been a termination event, or an event of

7  default, the lenders have given notice of the exercise of

8  remedies.  The Committee requested language be added that makes

9  clear that during that five business day time period, parties

10 may seek order enjoining the lenders from taking such action.

11        Your Honor, I believe that those are the material

12 changes to resolve the Creditors Committee's concerns.

13 Language was added in paragraph 30 for NTT Communications and

14 Williams Communications with respect to any rights of setoff or

15 recoupment they may have, are preserved.  And all objections to

16 the motion that have not been resolved or withdrawn, are hereby

17 overruled.  I don't think that the overruling language is

18 applicable as we have no outstanding objections, Your Honor.

19        THE COURT:  All right. Anybody else wish to be heard

20 on the revisions?

21        MR. INDELICATO:  Your Honor, Mark Indelicato.  Your

22 Honor, when we reviewed the final DIP order the Committee had

23 three primary concerns.  The first concern was whether or not,

24 in fact, a DIP was necessary in the first place, given the

25 Debtors' cash flow.  Our financial advisers as I had said

1  earlier, was granted access to the data room and certain
2  information and we quickly came to the opinion after speaking
3  to the monitor, that no matter what the cash position was now,
4  that the company did need a DIP, it wasn't clear how much of it
5  would be drawn upon, but it did need the DIP and I think the
6  Committee was satisfied with that.

7          The second major concern we had, Your Honor, was to
8  make sure that to the extent the U.S. assets were being leaned
9  for monies under the DIP, that that was money that was lent to
10 the U.S. entities specifically and that the U.S. entities
11 shouldn't bear the burden for the money it lent to the Canadian
12 entities.  And, Your Honor, the DIP lenders agreed to the
13 changes that have been discussed by Mr. Collins in the order
14 that made it clear that the U.S. entities were only going to be
15 responsible for the money actually lend to the U.S. entities
16 and they were not going to be liable for the money lent to the
17 Canadian entities.

18         And, last but not least, Your Honor, was to modify
19 the order to provide a realistic carve out to the professionals
20 for the Committee given the accelerated pace of this case to
21 make sure that we were able to exercise our fiduciary duties
22 and do what we needed to do to represent the interest of our
23 creditors.  We are satisfied with the carve out that has been
24 provided by the DIP lenders and with all of those changes, Your
25 Honor, we would recommend its approval.  Thank you.

                    **J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Thank you.

2          MS. SILVERSTEIN:  Your Honor, Laurie Silverstein on

3     behalf the Affiliates of SBC Communications.  We did not file

4     an objection to this motion, but I did speak with Ms. Collins

5     after having reviewed the objection filed by Williams

6     Communications with respect to setoff and recoupment rights and

7     at that time, Mr. Collins believed as he told me, so I assume

8     of course he did believe, that there would be general language

9     with respect to reservations of setoff and recoupment rights

10    added to the order and for that reason, we did not join in that

11    objection.  Now there's been very specific language as to only

12    NTT Communications and Williams Communications.  I would

13    request that either the language be generalized so that all

14    parties can take advantage of that language or that my clients

15    be added to that paragraph.  The concern I have is that while I

16    don't think this affects setoff and recoupment rights, the fact

17    that we have particular language in the order now carving out

18    two parties, gives me concern that other parties rights will be

19    affected.  And as I said, I did speak with Mr. Collins about

20    this last week.

21          My second concern, Your Honor is now there appears to

22    be a 506(c) waiver.  That was not in the original order.  In

23    fact, if you look at the black line, paragraph 10, you can see

24    very specifically that language has now been deleted which said

25    that nothing herein shall be deemed to constitute a waiver of

J&J COURT TRANSCRIBERS, INC.

39

1   any rights of the Debtors under Section 506(c) of the

2   Bankruptcy Code.  That's the last sentence.  I did review the

3   Debtor-in-Possession financing specifically for the 506(c)

4   language, there was no waiver and specifically the rights were

5   preserved and we didn't object on those grounds.  To my

6   knowledge, there's been no notice that this provision was going

7   to be changed.  And so, I think that it should not be changed

8   at this point.  I think it's a significant right that the

9   Debtor is giving up, this is as we've already heard a

10  telecommunciations case, we need to make certain that those who

11  provide services to these Debtors get paid and I don't think

12  it's appropriate especially on no notice to waive the Debtors

13  506(c) rights.  In fact, a reversal of what was noticed out to

14  parties, so I would ask that --

15          THE COURT:  All right, well let me hear from the

16  Debtor on that.

17          MR. COLLINS:  Your Honor, I can confirm, I did

18  confirm it last week as well, that the order does not seek to

19  affect parties valid rights of setoff or recoupment.  The

20  language that was added was agreed to directly between Bank

21  counsel and NTT and Williams counsel but -- and I'll ask the

22  lenders counsel to confirm this as well, we are not affecting

23  parties rights of setoff or recoupment by the entry of this

24  order.  There's no priming of those types of rights by the

25  entry of this order.

40

1          THE COURT:  Well, should there be general language

2   and simply say, and specifically.

3          MR. TENZER:  Your Honor, Andrew Tenzer, again, from

4   Shearman and Sterling for the DIP lenders.  With respect to the

5   setoff rights as Ms. Silverstein noted, this order does not

6   purport to affect anyone's setoff rights, it's a 364(c)(2) and

7   364(c)(3) DIP and if anyone has valid setoff rights, or

8   whatever rights they have, those rights are what they are and I

9   don't have any objection to either stating on the record or

10  putting a provision in the order that says that Ms.

11  Silverstein's clients' rights of setoff, whatever they may be,

12  are preserved as are ours or the Debtors' defenses and

13  counterclaims in respect of those rights.

14         THE COURT:  All right.  Well, I'd like to see

15  paragraph 30 more general and to the extent NTT and Williams

16  insisted on their names being mentioned, I guess that can be

17  just specifically including them in a parenthetical.

18         MR. TENZER:  While I'm before Your Honor, with

19  respect to the other issue that was raised, the 506(c) waiver,

20  I would note that the language was struck from the order

21  originally because of either an objection by the United States

22  Trustee, Your Honor's rule, or both, that such a waiver would

23  not be granted on an interim basis, at an interim hearing, but

24  we did state, I believe, at the interim hearing that that was

25  something that might be before the Court at a final hearing.

1        In addition, Your Honor, 506(c) waivers are something
2   that are commonly granted in DIP loans in this district and in
3   all other districts.   I would note as Mr. Collins said when he
4   was making his presentation before the Court, that specific
5   consideration has been given for the 506(c) waiver, in terms of
6   among other things the increases in the carve outs for the
7   Committee's professionals and the Debtors professionals, we are
8   not prepared to go forward with the loan if there is a
9   possibility that our collateral is going to be charged in this
10  way, after making these concessions and without certainty as to
11  what our secured position may be, particularly, you know, for
12  the benefit of creditors who may have administrative priority
13  but who under 364(c) are junior to us.   So, the 506(c) waiver
14  is a critical component of the financing from our perspective,
15  there's consideration for it, it's supported in the papers and
16  it needs to be approved.   Thank you.

17        MR. COLLINS:   Your Honor, in addition to Mr. Tenzer's
18  comments, this is only post petition financing we're talking
19  about here.   BCE was not a prepetition lender who is obtaining
20  the benefits of 506(c), this is a new money facility that's
21  being provided here and I think it's fairly standard for new
22  money facilities to be granted that type of protection.

23        THE COURT:   Well, did the notice that go out include
24  notice that the 506(c) waiver would be requested?

25        MR. COLLINS: Your Honor, I think what transpired is

**J&J COURT TRANSCRIBERS, INC.**

42

1  exactly what Mr. Tenzer stated, was that it was in the initial
2  form of order but then it was modified following review by
3  Delaware counsel and I think by the Office of the United States
4  Trustee to say that that is not appropriate under our local
5  rules.  I don't think it was stated specifically in the motion
6  but I do need to check.

7          In addition, Your Honor, there's no prepetition
8  secured debt in this case.  What we have here is an estate that
9  has no secured debt, no material secured debt, and the DIP will
10 be the only secured debt on the Debtors assets.  Such that for
11 there to be an administrative insolvency in this case, it's
12 very unlikely, given that we do not have a prepetition secured
13 lender that already has a lien on all of the assets.

14          In addition, Your Honor, to date we have not draw
15 upon the DIP credit facility, we had $15 million dollars of
16 interim authority, the Debtors cash flows were such that we did
17 not need to draw on that facility, we do expect, though, in the
18 coming weeks that we would draw on the facility for cash flow
19 needs.

20          MS. SILVERSTEIN:  Your Honor, Laurie Silverstein
21 again.  The notice that went out, my recollection because I
22 looked for this, the notice that went out did not indicate that
23 the 506(c) waiver was going to be sought at the final DIP
24 hearing and this order unlike many others, has very specific
25 language in it that, in fact, there was no waiver.  It does

**J&J COURT TRANSCRIBERS, INC.**

43

1  seem like there's been a trade off here, perhaps, for the

2  increase in the carve outs in the 506(c) waiver.  I simply

3  haven't had an opportunity to speak with my client with respect

4  to this matter and unfortunately, we've seen at least a couple

5  of cases in this court where the DIP financier has not been

6  paid back in full.  I certainly hope that's not the case here,

7  but we don't know that at this point.

8          I am going to be trying to reach my client in

9  connection with the critical vendor motion if Your Honor will

10  give us a few moments at the end of this hearing to maybe

11  resolve that and I could certainly ask her about the 506(c)

12  waiver in the context of this case but it was not noticed out,

13  at least that I saw and I did look for this issue, that this

14  was going to be waived by the Debtors at the final hearing.

15          MR. TENZER:  Your Honor, again, without beating a

16  dead horse on the critical nature of this issue to my client as

17  the DIP lender, frankly, none of the issues that are changed in

18  this order, the increase in the carve out or anything else,

19  were specifically noticed any more than this issue was, so I

20  don't think it's necessarily right to point to that.  The form

21  of 506(c) waiver, a form of 506(c) waiver was in the motion as

22  originally filed with the Court and most importantly, Your

23  Honor, I think that we are by agreeing to the language with

24  respect to -- is it SBC, your client -- SBC and the other

25  parties who are raising this point, that if their setoff rights

44

1  are preserved, that presumably will allow them to setoff

2  against whatever prepetition collateral they have that they can

3  set off against on a post petition basis, absent some

4  contractual obligation if they're worried about the DIP lender

5  being repaid.  You know, they can make their own decision as to

6  whether or not they want to continue dealing with the Debtor.

7         So, there are plenty of things that they can do short

8  of objecting to this provision, to control their downside.

9  Again, this is of critical nature to our client, it is

10 something that was specifically negotiated for, consideration

11 was given and it's a critical component of the financing and I

12 don't think the financing will be there without approval of the

13 506(c) waiver.

14        THE COURT:  Well, I am concerned that notice might

15 not have been given of this and that's typically why I will not

16 approve it or one of the many reasons, I won't approve it on an

17 interim basis.  So, let em ask counsel, let's take a break,

18 I'll ask counsel to clarify that for me.  We're going to take a

19 break, can we do anything else before the break?

20        MR. COLLINS:  Your Honor, we could, I think turn to

21 the utility motion.  I think all of the objections to that

22 motion have been resolved.

23        THE COURT:  Resolved?  All right. Let's deal with

24 that and come back to this as well as item number 12.

25        MR. COLLINS:  Your Honor, as is customary in this

45

1  court, the utility motion list filed at the outset of a case

2  was not heard at the first day hearing but was, in fact, sent

3  out on notice and we did receive several objections by various

4  entities that characterized themselves as utilities.

5        The procedures, Your Honor, that we seek approval of

6  I think are the standard utility procedures such that the

7  Debtors will send out a copy of the proposed order to all of

8  the utility companies.  It says within 10 business days, but

9  given the number of utilities, we'll have that out by the end

10 of this week.  And then within 30 days of that mailing, utility

11 companies can request additional adequate assurance and the

12 parties seek to resolve those requests informally, but if they

13 are unable to do so, then the Debtors are required to file a

14 motion seeking a determination of adequate assurance.

15       So, I think the procedures, Your Honor, are the

16 standard ones that this court has approved in the past.

17       As I stated, there were a number of objections filed.

18 One was filed by Verizon Communications, another by Universal

19 Access, Southwestern Bell and its affiliates, VarTec and

20 Sprint.  And, Your Honor, in an effort to allow this process to

21 continue such that we determine what other utility companies

22 out there want additional adequate assurance, what we're going

23 to do over the coming 30 days is prepay every two weeks these

24 entities such that we will prepay the net amount we believe due

25 to these entities every two weeks.  At the end of each billing

46

1 cycle, we will then true up the amounts that we prepaid against

2 the amounts that are actually due.

3          The Debtors have agreed to remain current on their

4 post petition amounts due to these entities as well.  And as I

5 said before, we will continue to discuss with all of these

6 entities their objections and for purposes going forward, these

7 objections will be deemed to be a request for additional

8 adequate assurance, such that they need not file another

9 request and will continue to have a dialogue.

10          And all parties rights with respect to these

11 requests, including the Debtors' right to argue that any of

12 these entities are not, in fact, utilities for purposes of

13 Section 366, are preserved.

14          A couple additional specifics, Your Honor.  With

15 respect to Universal Access, we've agreed to pay to them by

16 noon on June 27th, all post petition amounts due to them.  And

17 with respect to Sprint, we have, in fact, calculated the

18 amounts due post petition, plus the prepayment and we have

19 agreed to pay to them on June 26th, a total of $1,777,500 which

20 again is the post petition amounts due plus the two week net

21 prepayment due to Sprint.

22          And, also with respect to these parties, in

23 determining the prepayment, the Debtors will take into

24 consideration the amounts of disputed charges such that while

25 the Debtors may dispute such a charge, or determining what the

47

1   net amount is, it would be included for the prepayment.

2         THE COURT:  Okay.

3         MR. COLLINS:  So, Your Honor, I think with those

4   statements, I think we have resolved the objections for at

5   least today and we can allow the process to take its course and

6   hopefully resolve these on a final basis in the future

7   consentually, if not, we'll be back before the Court on utility

8   issues.

9         THE COURT:  All right.  And do any of the objectors

10  have any remaining objections, then, to the procedures as

11  modified?

12        MR. HUSTON:  Good morning, Your Honor, may it please

13  the Court, Joseph Huston of Stevens and Lee here as counsel to

14  VarTec Telecom Inc.  Our objection is filed as Docket Number

15  99.  I have the pleasure to introduce to the Court Jeffrey Fine

16  who is a partner in the firm of Hughes and Luce in Dallas,

17  Texas who represent VarTec Telecom and for whom we're acting as

18  local counsel.  We have not had a chance to file a pro hac

19  motion for Mr. Fine, we have -- two of this other partners have

20  been admitted.

21        Mr. Fine is admitted in the State of Texas, he's a

22  member of the bars of the District and Bankruptcy Courts

23  throughout the state.  He's also a member of the bars of the

24  5th Circuit, 11th Circuit and the United States Supreme Court

25  and if the Court would entertain an oral motion today for his

48

1 admission pro hac, I would ask that he be admitted and be

2 permitted to speak.

3          THE COURT: All right, it will be granted.  Welcome.

4          MR. HUSTON:  Thank you, Your Honor.

5          MR. FINE:  Thank you very much, Your Honor.  On

6 behalf of the VarTec entities, we concur with the Debtors

7 presentation to the Court and we're satisfied with the

8 provisions that the Debtor stated on the record.

9          THE COURT:  All right, thank you.

10          MR. HUSTON:  Thanks, Your Honor.

11          MR. DOUGHERTY:  Good morning, Your Honor, Paul

12 Dougherty on behalf of Sprint Communications Company, LC.  Mr.

13 Collins' recitation of the agreement with Sprint is completely

14 accurate.  I rise only to state that if the payment isn't

15 received on Wednesday as is anticipated, we will petition the

16 Court for termination of the agreement, otherwise, it's

17 satisfactory.

18          THE COURT:  All right.  Thank you.

19          MR. DOUGHERTY:  Thank you, Your Honor.

20          MR. ANDERSON: May it please the Court, my name is

21 Roger Anderson from Smith, Katzenstein and Furlow on behalf of

22 Verizon.  I wanted to just represent that it's my understanding

23 as presented by Debtors counsel, that we understand that post

24 petition payments to Verizon are going to be made current on

25 this motion and it's our understanding that the prepay twice a

49

1  month is also in place as well and that we are going to have

2  continued discussions with respect to the deposit issues that

3  we are pressing on this motion.

4      THE COURT:  All right, thank you.

5      MS. BIFFERATO:  Good morning, Your Honor, Karen

6  Bifferato on behalf of Universal Access.  In general, Mr

7  Collins' recitations were correct.  I just had a few more

8  specifics I wanted to bring to the Court's attention.  I think

9  we had agreed with the Debtors that on both of the contracts

10  that we have with the Debtors, that within the next 30 days

11  we're going to be discussing or deposit requests and if there

12  is no agreement within the next 30 days, then we'll be bringing

13  the matter to the Court's attention at the next available

14  hearing after that.

15      And the other thing I just wanted to mention was with

16  regarding the prepayments, I can't recall if Mr. Collins

17  specifically said, but the prepayments are going to be by wire

18  every two weeks, I believe, for the next 30 days unless the

19  parties agree to extend it pursuant to their deposit

20  discussions.  Thank you.

21      THE COURT:  All right, thank you.

22      MR. DOLAN:  Good morning, Your Honor, Edward Dolan of

23  Hogan and Hartson representing NTT Communications and Williams

24  Communications.  I believe the Court has already entered an

25  order approving my appearance.

1           THE COURT:  Yes.

2           MR. DOLAN:  Your Honor, I rise only to request a

3  clarification under the utilities order, that the notice that

4  will go out that will give parties an opportunity for 30 days

5  to request further adequate assurances will be a notice going

6  to all parties and that we would not be limited by a

7  preselected list of utilities, perhaps, designated by the

8  Debtors.  I don't know that my clients NTT Communications or

9  Williams Communications have yet been identified by the Debtors

10  as potential utilities, but I did want to preserve their right

11  to make that request subject, of course, to the issues that Mr.

12  Collins preserved.

13          MR. COLLINS:  That's fine, Your Honor, we will serve

14  the entire 2002 list with the utility order.  But we're not --

15  we believe we know who our utilities are, and we'll serve those

16  parties along with the 2002 list and anybody, obviously, who

17  has a mature executory contract and they have, in fact, filed a

18  notice of appearance, will obtain a copy of this order.  But I

19  do not plan on serving it out upon all parties to executory

20  contracts because that's in the hundreds of thousands.

21          THE COURT:  All right, and obviously all parties have

22  reserved their rights with respect to designation of who and

23  who is not a utility.

24          MR. COLLINS:  Absolutely, Your Honor.  And there is a

25  provision built into the order to allow for additional utility

51

1  companies to be identified in the future and then they would

2  have 30 days after being selected as the utility to request

3  additional adequate assurance.

4          THE COURT:  All right.

5          MR. DOLAN:  Thank you, Your Honor.

6          THE COURT:  Thank you.  All right.  Do you have a

7  revised form of order?

8          MR. COLLINS:  I do, Your Honor.  Your Honor, I don't

9  believe -- there were no changes made to the form of order

10 itself.

11         THE COURT:  All right.  I'll enter that order, then.

12         MR. COLLINS:  Your Honor, we could also take agenda

13 item number 14 now, as there are no objections to that motion

14 outstanding.

15         THE COURT:  All right.

16         MR. MERCHANT:  Thank you, Your Honor, Mike Merchant,

17 again, on behalf of the Debtors.  Your Honor, agenda item

18 number 14 is the motion of the Debtors and Debtor-in-Possession

19 for an order pursuant to Sections 105 and 363(b) authorizing --

20 I'm sorry, Your Honor, pursuant to 105 and 363 of the

21 bankruptcy code establishing procedures for miscellaneous asset

22 sales.  Your Honor, this is another motion that I apologize, we

23 failed to follow your procedures.  We sent it out on shortened

24 notice and we did notice it out for the hearing on the 18th.  I

25 think it's another one of the motions where that motion on

52

1  shortened notice has become moot.  Originally, it would have 18

2  days notice instead of 20 and with the extension of the

3  hearing, it puts us beyond the 20 days.

4           THE COURT:  All right, I'll hear it.

5           MR. MERCHANT:  Your Honor, the miscellaneous sale

6  procedures under the motion will apply only to the sale of

7  assets involving in each case the transfer of $1 million

8  dollars or less in total consideration as measured by the total

9  amount of cash and other consideration being received for the

10 particular assets.  I can run through the procedures with Your

11 Honor if you would like.  We have modified the procedure

12 somewhat at the request of the United States Trustee and in

13 connection with the objections to the motion.

14          THE COURT:  Well, did you deal with the issue of

15 potential sales to insiders as a result of that?

16          MR. MERCHANT:  We did, Your Honor.

17          THE COURT:  That was my only comment.  Let me hear

18 the changes made as a result of your discussions with

19 interested parties.

20          MR. MERCHANT:  I do have a black line of the order

21 and maybe it'll be helpful to present that to Your Honor and

22 walk through it.

23          THE COURT:  Yes.

24          MR. MERCHANT:  If I may approach.

25          THE COURT:  Thank you.

                    **J&J COURT TRANSCRIBERS, INC.**

53

1          MR. MERCHANT:  If I can just walk quickly through the

2     issues raised by the United States Trustee and explain how they

3     have been resolved.

4          First of all, the Office of the United States Trustee

5     requested that the notice of any proposed sale be served on the

6     entire 2002 list as well as any co-owner of property in

7     accordance with Section 363(h).  We have agreed with that and

8     we've added that to the order.  Let me just find where it's bee

9     changed.  Those are the changes reflected and so ordered

10    paragraph 3(b), Your Honor.

11          THE COURT:  All right.

12          MR. MERCHANT:  Next, Your Honor, the procedures

13    contemplated filing a bimonthly schedule basically summarizing

14    all sales pursuant to these procedures.  The U.S. Trustee asked

15    that instead of doing that bimonthly schedule, why don't we

16    just attach an additional schedule to our monthly operating

17    reports and we're fine with that change as well.  We've agreed

18    to make that change and we've added that to the order.  I

19    believe that change is reflected in paragraph 3(h), Your Honor.

20          THE COURT:  Yes.

21          MR. MERCHANT:  The next concern of the United States

22    Trustee was, they wanted assurance that where there is more

23    than one asset sold to a single entity for consideration of

24    over $25,000, that those sales are subject to the notice

25    procedures and we have added an additional paragraph to clarify

54

1 that that is the case.

2        And, lastly, the Office of the United States Trustee

3 wanted us to add that even if a sale of an asset below $25,000

4 is made to an insider, that that sale will be subject to the

5 notice procedures and that any sale to assets, in fact, will be

6 designated as such on the notice and the relationship of that

7 insider to the Debtors.

8        THE COURT:  All right.

9        MR. MERCHANT:  And I believe that is clarified in

10 paragraph six of the order.

11        In addition to the concerns of the United States

12 Trustee, there were objections filed by NTT Communications

13 Corporation and Williams Communications, LLC.  Their concern is

14 with respect to their executory contracts or leases being

15 assumed and assigned pursuant to these procedures and what

16 we've done is, we've just agreed to carve them out.  We put in

17 the order that their contracts or leases will not be affected

18 by any of these sales.  And we've added a specific provision,

19 it's paragraph seven of the order to resolve those concerns and

20 then finally, an objection was filed by the SBC entities and I

21 believe their objection just requested that they receive notice

22 of any such sales and I believe that that has been resolved by

23 the addition of notice on anybody on the 2002 list.  They're on

24 the 2002 list and that would cover notice to them and any other

25 parties as well.

55

1        And with those changes, Your Honor, I think we've

2   resolved all of the objections, so unless Your Honor has any

3   questions, we would ask that the order be entered.

4        THE COURT:  All right.  I have no other comments

5   then, anybody else wish to be heard?

6        MR. INDELICATO:  Just very briefly, Your Honor, Mark

7   Indelicato for the record.  The Committee had a concern, Your

8   Honor, about the level of the asset sales.  What we have worked

9   out is a procedure with the Debtor whereby they will be giving

10  the Committee and it's professionals notice prior to the sale

11  taking place.  That way we can examine the sale to determine

12  whether, in fact, it is in the best interest of the estate and

13  whether or not they have truly solicited other offers, as we

14  think there are other offers out there.  So, provided we're

15  getting the cooperation to which we have been promised, we have

16  no objection to the entry of the order.  If we don't get the

17  cooperation, yeah, we will be back before the Court.  Thank

18  you.

19       THE COURT:  All right.

20       MR. COLLINS:  Okay, Your Honor.

21       THE COURT:  You may hand up the revised order.

22       MR. COLLINS:  Thank you.

23       THE COURT:  All right, do we want to take a break

24  now, then?

25       MR. COLLINS:  Yes, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

56

1          THE COURT:  All right.

2          MR. COLLINS:  Thank you.

3                    (Recess)

4          COURT CLERK:  Be seated.

5          MR. COLLINS:   Your Honor, I believe we have resolved

6    both outstanding issues with SBC and it's affiliates and we

7    propose the following with respect to the DIP order.   Is that

8    the order would be entered today with the inclusion of the

9    506(c) waiver, but that provision would go out on notice such

10   that all parties would have 15 days to object on a final basis

11   to the 506(c) waiver.   It would, however, be effective during

12   this additional time period, such that it will allow the

13   company to access the DIP facility but allow parties to come

14   back later if they do, in fact, oppose to the permanent 506(d)

15   waiver.  And I believe that is satisfactory to Ms. Silverstein.

16         THE COURT:  All right.

17         MS. SILVERSTEIN:  Your Honor, I spoke with my client

18   and we're amenable to this compromise and on a final basis,

19   then we'll look and see whether we think it's  appropriate to

20   object in this case or not.

21         THE COURT:  All right.  Thank you.  You'll revise

22   that form of order?

23         MR. COLLINS:  We are doing that now, Your Honor.

24         THE COURT:  All right.

25         MR. COLLINS:  That then, takes us to our final

57

1  matter, which is agenda item number 12.  And that's the final

2  hearing on our motion to authorize the payment of certain

3  critical vendors and service providers.

4        Your Honor, this motion was heard on an interim basis

5  at the first day hearing and was sent out on notice.  We did

6  receive one objection, as I stated before, and that is from

7  Southwestern Bell Telephone and its affiliates.

8        Your Honor, we have resolved that objection as

9  follows.  What we will do is, approximately every two weeks, we

10 will provide SBC with a status report as to how much we have

11 paid out under this critical vendor motion and if they have any

12 questions about who we are paying or why we are paying, we'll

13 be able to answer that on an ongoing basis.

14        With that, I think they are comfortable with allowing

15 it to go forward.  Obviously, to the extent we provided with

16 information in the future that they find unsatisfactory, they

17 can come back to the Court and seek to stop us from paying

18 additional critical vendors in the future.

19        THE COURT:  All right.

20        MS. SILVERSTEIN:  Your Honor, that is the resolution

21 that we reached with the Debtors on this.

22        THE COURT:  All right.  And nobody else had objected

23 to that motion?

24        MR. COLLINS:  Nobody else did, Your Honor.

25        THE COURT:  All right.  Do you have a form of order

58

1 to that effect?

2          MR. COLLINS:  I think we can just let the record

3 reflect the agreement with SBC.  In fact, I'd hand up a form of

4 order.

5          THE COURT:  You may.  All right.

6          MR. COLLINS:  Your Honor, so what we will do with DIP

7 order is, we'll send it out and provide parties with 15 days to

8 object to the 506(c) waiver and then if there are any

9 objections, we'd come back to the Court on that motion.  We do

10 need to set, Your Honor, omnibus hearing dates going forward

11 and I don't believe we have anything set for July, so we would

12 ask that those dates be set such that we could plug that into

13 the notice being sent out for the DIP order.

14          THE COURT:  All right.  I'm going to ask you to speak

15 with Ms. Capp about that to be sure you get a good -- get the

16 time and it's recorded on the calendar.

17          MR. COLLINS:  Okay, thank you, Your Honor.  And I do

18 believe counsel for VarTec who filed an emergency motion last

19 Friday, would like to be heard.

20          THE COURT:  All right.

21          MR. HUSTON:  Good morning, Your Honor.  While we're

22 scheduling things, late last week VarTec filed a motion to

23 limit and shorten notice and an expedited motion to compel the

24 Debtors to either reject or assume and assign a very important

25 contract, it's certainly important to us.

59

1    Back in April, VarTec and one of its subsidiaries
2  purchased a business, a telecommunications business from the
3  Debtors.  And in connection with that asset purchase agreement,
4  we assumed certain liabilities to third parties, which are
5  significant, in the millions of dollars of quarterly payments.
6    There are some subsidiary issues about how the
7  Debtors were in such grim financial shape that they then had to
8  file for bankruptcy within a month of the closing of those
9  transactions, but those are for another day.
10    But the nature of the business is such that we are in
11 the process and have been for some time, in the process of
12 making transitions from the Teleglobe regime to the VarTec
13 regime, sharing employees, sharing information, sharing
14 technology.  The nature of this is such that and the pace at
15 which this case is moving, is such that if there is not a
16 decision by the Debtor very, very shortly about whether it's
17 going to assume that contract and it gets sold along with the
18 other assets, or it's going to reject that contract, we will be
19 in a very, very difficult situation and will be irreparably
20 harmed to the extent that this business we thought we were
21 buying and were trying to integrate into our network, will just
22 die on the vine.
23    In addition, we will have to -- this is money
24 damages, there are these advances that we must make to pay
25 obligations that we have assumed under that agreement, so we

60

1  have asked the Court to consider that.  Since there are no

2  omnibus hearings scheduled at this point in time and since we

3  have had conversations with Debtors counsel, there is to be a

4  meeting July 2nd at which we hope these issues will be resolved

5  or at least progress will be resolved, but if the Court is so

6  inclined, is there a way that we might schedule a hearing, an

7  evidentiary hearing around the middle of July, where we might

8  and I would think we might need as much as two hours, if we

9  can't work this out?

10         THE COURT:  Well, again, I'll ask you to speak with

11  Ms. Capp.

12         MR. HUSTON:  Very good, Your Honor.

13         THE COURT:  You're looking for the week of July 15th?

14         MR. HUSTON:  The 15th if possible.

15         THE COURT:  All right, speak with her about that.

16         MR. HUSTON:  Very good.  Okay, thank you, Your Honor.

17         THE COURT:  All right.  Then let's take, I guess

18  we're done and you'll submit the revised DIP order to chamber?

19         MR. COLLINS:  We will, Your Honor, thank you very

20  much.

21         THE COURT:  All right, thank you.  We stand

22  adjourned.

23                          *****

24

25

**J&J COURT TRANSCRIBERS, INC.**

61

### CERTIFICATION

I, ELAINE HOWELL, certify that the foregoing is a correct transcript to the best of my ability, from the electronic sound recording of the proceedings in the above-entitled matter.

Date: July 1, 2002

ELAINE HOWELL

J&J COURT TRANSCRIBERS, INC.

# Exhibit 3

**ORIGINAL**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

In re:                                       :
                                             :   **Chapter 11**
**TELEGLOBE COMMUNICATIONS**                 :
**CORPORATION, a Delaware**                  :   **Jointly Administered**
**corporation, et al.,**[1]                  :   **Case No. 02-11518 (MFW)**
                                             :
                         Debtors.            :        *Rc:84*

### ORDER (A) AUTHORIZING GLOBAL BIDDING PROCESS WITH RESPECT TO UNITED STATES ASSETS, (B) APPROVING BIDDING PROCEDURES IN CONNECTION THEREWITH, (C) FIXING, NOTICE PROCEDURES AND APPROVING FORM AND MANNER OF NOTICE, AND (D) SETTING DATE FOR HEARING ON PROPOSED SALE RESULTING FROM GLOBAL BIDDING PROCESS WITH RESPECT TO UNITED STATES ASSETS

Upon the motion, dated June 10, 2002 (the "Sale Motion"), of the above-

captioned debtors and debtors in possession, for an order (A) authorizing a global bidding

process (the "Global Bidding Process") for the sale of the Teleglobe Companies' Voice

Business[2] pursuant to the purchase and sale agreement in the form annexed to the Sale Motion at

Exhibit "C" (the "Purchase and Sale Agreement"), providing for, as it relates to the US Assets,

(i) the sale to the Successful Bidder of the Voice Business; (ii) the assumption by the Successful

Bidder of certain assumed liabilities of the Voice Business (the "Assumed Liabilities"); and (iii)

the assumption and assignment of certain executory contracts and unexpired leases, (the

"Assigned Contracts and Leases" and together with the Voice Business, the "Purchased Assets"),

to the Successful Bidder in connection with the Purchase and Sale Agreement and the Voice

---

[1] The Debtors are the following eleven entities:  Teleglobe Communications Corporation, Teleglobe USA Inc., Optel Telecommunications, Inc., Teleglobe Holdings (U.S.) Corporation, Teleglobe Marine (U.S.) Inc., Teleglobe Holding Corp., Teleglobe Telecom Corporation, Teleglobe Investment Corp., Teleglobe Luxembourg LLC, Teleglobe Puerto Rico Inc. and Teleglobe Submarine Inc.

[2] Capitalized terms not defined and utilized herein shall have the meanings ascribed to them in the Sale Motion.

RLF1-2469626-4

Business; as such transactions (collectively, the "Sale Transaction"), are more fully described in the Sale Motion and Purchase and Sale Agreement; (B) approving the terms and conditions of the Global Bidding Process (the "Bidding Procedures"); (C) fixing notice procedures and approving the form and manner of notice with respect to the Global Bidding Process and Sale Hearing (defined below) (the "Required Notice") and with respect to the assumption and assignment of the Assigned Contracts and Leases (the "Assumption and Assignment Notice"); and (D) scheduling a hearing (the "Sale Hearing") to consider the proposed sale resulting from the Global Bidding Process; and it appearing that notice of the Sale Motion has been provided to (i) the fifty largest unsecured creditors of each of the Debtors as listed in their respective petitions commencing these chapter 11 cases; (ii) the Office of the United States Trustee for the District of Delaware; (iii) counsel to the Debtors' postpetition lender; (iv) counsel to the lenders under the Canadian Credit Facility; (v) counsel to the Informal Committee of Noteholders; (vi) counsel to Bank of Montreal; (vii) counsel to the Monitor; (viii) counsel to the Official Committee of Unsecured Creditors (the "Creditors' Committee"); (ix) all parties who have made written expressions of interest in acquiring the Purchased Assets within two (2) months prior to the date of the Procedures Order; and (x) all parties having filed a notice of appearance in the Debtors' chapter 11 cases pursuant to Bankruptcy Rule 2002; and it appearing that such notice constitutes good and sufficient notice of the hearing to approve, among other things, the terms and conditions of the Global Bidding Process (the "Procedures Hearing") and that no other or further notice need be provided; and the Canadian Court having approved the Global Bidding Process and the Bidding Procedures; and upon the Sale Motion and the record of the Procedures Hearing and all other proceedings had before the Court; and it appearing that an order authorizing the Global Bidding Process, establishing the Bidding Procedures, fixing and

2

approving the Required Notice and Assumption and Assignment Notice and scheduling the Sale

Hearing is in the best interests of the Debtors and parties in interest; and it appearing that the

Court has jurisdiction over this matter; and after due deliberation and sufficient cause appearing

therefor, it is

ORDERED that pursuant to Bankruptcy Rule 6004(f)(1), the Debtors are

authorized to conduct the Global Bidding Process in respect of the Voice Business; and it is

further

ORDERED that the Global Bidding Process shall be conducted on the following

terms and conditions:

### A.    *Initial Interest*

- Potential purchasers will be required to execute a confidentiality agreement in a satisfactory form before receiving any nonpublic information about Teleglobe and its assets and business (collectively, the "Information").

- A data room (the "Data Room") which contains information about the Teleglobe Companies and their business has been established at the New York offices of Jones, Day, Reavis & Pogue, 222 East 41st Street, New York, NY 10017. Access to the Data Room can be obtained by contacting a designated person at Lazard. The initial designee is Ivan Dimov, telephone number (212) 632-2676.

- All potential bidders that indicate an interest in submitting a bid regarding a proposed transaction will be contacted. Bidders will have an opportunity to meet with certain designated members of the Teleglobe Companies' management team.

- Bidders shall be provided with a form of purchase and sale agreement (the "Purchase and Sale Agreement").

- Bidders will be asked to submit their bids for the assets of the Voice Business on or before a particular date, currently anticipated to be July 15, 2002 (the "Final Bid Date").

- Each bid shall include a copy of the Purchase and Sale Agreement marked to show all requested changes. The extent and nature of any changes made will be taken into consideration in the evaluation of the bid.

- All bids shall be submitted in writing and delivered to Lazard at 30 Rockefeller Plaza, New York, NY 10020; Fax (212) 632-5964, Attention: Said Armutcuoglu,

so that it is received no later than 10:00 a.m. (New York Time) on the Final Bid Date. Copies of any such bids shall be provided by the Debtors to counsel to the Creditors' Committee.

**B.    *Bid Requirements***

- Each bid shall include:

  - a description of the assets to be purchased (the "Proposed Assets");

  - a description of the liabilities and contracts to be assumed;

  - the proposed purchase price for the Proposed Assets (the "Proposed Purchase Price");

  - proof of the bidder's financial wherewithal to pay the amount of the Deposit (defined below) and the Proposed Purchase Price;

  - any conditions to closing the purchase of the Proposed Assets (any conditions creating a significant risk to the closing of the purchase will be considered to be a discount to the Proposed Purchase Price and will cause a bid to be considered at a significant disadvantage);

  - the proposed timetable for consummation of the Sale Transaction, including the expected timing for any regulatory approvals or material conditions to closing;

  - a statement by the bidder that the bid will remain open until August 1, 2002 unless earlier accepted or rejected by the Teleglobe Companies and that, except as disclosed in the bid, there are no conditions to execution of a definitive agreement other than mutual agreement as to the terms thereof;

  - a statement by the bidder that the bidder is willing to execute the Purchase and Sale Agreement in the form provided with the bid (a modification of the Purchase and Sale Agreement will be an important component of the bid); and

  - contact information for the key members of the bidder, including name and weekend telephone and facsimile numbers.

- A bid shall not be contingent upon: (a) any due diligence investigation or review beyond what due diligence or investigation was conducted before the submission of the bid, (b) the receipt of financing, or (c) any board of directors, shareholders or other corporate or partnership approval.

4

- The right to accept or reject a bid that does not comply with the terms set forth herein is reserved in full.

- Preference shall be given to bids for all or substantially all of the assets of the Voice Business.

- In consultation with the Creditors' Committee, final bids will be reviewed and further negotiations will be pursued with bidders that are deemed advisable and, after completing such negotiations, a successful initial bid for the Proposed Assets will be selected (an "Initial Bid").

C.    *Entry Into Purchase and Sale Agreement*

- Once an Initial Bid has been selected, negotiations will commence with a view to entering into a Purchase and Sale Agreement with the bidder that submitted the Initial Bid (an "Initial Bidder"). The parties will attempt to negotiate and execute the Purchase and Sale Agreement with the Initial Bidder expeditiously.

- The Initial Bidder will be required to execute an Escrow Agreement and deliver a deposit by certified or cashier's check payable to Ernst & Young, in its capacity as Monitor, or another escrow agent selected by the Teleglobe Companies in an amount equal to 5% of its bid amount (the "Deposit"). The form of Escrow Agreement will be provided by Ian Ness (416-340-6018) at the office of Ogilvy Renault, 200 King Street West, Suite 1100, Merrill Lynch Canada Tower, Toronto, Canada M5H 3T4, Fax: (416) 340-6118.

- While the Purchase and Sale Agreement may provide for a breakup fee (not to exceed 3% of the total purchase price), and payment of reasonable expenses to the Initial Bidder in the event that an auction is held (as hereinafter described) and the Initial Bidder is not ultimately the Successful Bidder (defined below), any such breakup fee shall be the sole obligation of Teleglobe Inc. and not of the Debtors' estates. Accordingly, this Court need not approve any such breakup fee or expense reimbursement provision.

D.    *Court Approvals*

- Once a Purchase and Sale Agreement has been entered into for the Proposed Assets, a motion will be filed with the Canadian Court, and such other court or courts as is applicable (collectively, the "Court"), seeking approval of the particular Purchase and Sale Agreement (or any further agreement entered into pursuant to the Auction (defined below)) and the underlying transactions (each a "Transaction Motion").[3]

---

[3] The Sale Motion shall be deemed the Transaction Motion with respect to the US Assets. For informational purposes, notice of the filing of the Transaction Motion with the Canadian Court shall be filed with this Court and a copy of such motion will be annexed thereto. Such notice shall be served upon all parties receiving

5

- Unless a shorter time is approved by the Canadian Court with respect to the Transaction Motion, the Teleglobe Companies and the Monitor will request the Canadian Court set each Transaction Motion for hearing on a date that is not less than five days after the Transaction Motion is filed and served (the "Transaction Hearing").

- After the filing of the Transaction Motion, the Teleglobe Companies, their advisors and the Monitor will continue to respond to, and comply with, reasonable requests for non-confidential information and, where appropriate confidentiality agreements are executed, requests for Information and access to the Data Rooms. Absent extraordinary circumstances, requests for continuances of Transaction Hearings to permit parties to conduct further due diligence will not be granted.

- After approval of the Purchase and Sale Agreement by the Canadian Court, the Debtors will seek similar approval from this Court at the Sale Hearing.

## E.    *Potential Auction Process*

- The right to commence an auction process seeking competing bids for Proposed Assets (the "Auction") is reserved; however, there is no certainty that such a process will be commenced. In that regard, in consultation with the Creditors' Committee and within two business days of the filing of the Transaction Motion, notice will be provided to all persons that submitted a bid stating whether there will be an Auction. Should an auction process be commenced the following terms shall apply:

  - If an Auction is to be held, the notice of Auction will set out the day that the auction is to be held and the deadline by which Qualified Competing Bids (as defined below) must be submitted (the "Auction Notice"). The day set for the Auction will be at least 2 business days prior to the date set for the Canadian Court hearing to hear the Transaction Motion. A copy of the Auction Notice shall be promptly filed by the Debtors in this Court.

  - Any entity that desires to submit a competing bid for Proposed Assets that are the subject of a Transaction Motion may do so in writing, provided that such bid (each a "Qualified Competing Bid"): (a) is served upon (and actually received by), (i) the Teleglobe Companies, 11480 Commerce Park Drive, Reston, Virginia 20191 (Attn: John Brunette); (ii) counsel to the Teleglobe Companies, Jones, Day, Reavis & Pogue, 2727 North Harwood Street, Dallas, Texas 75201-1515 (Attn: Michael Weinberg, Esq.); (iii) Ogilvy Renault, 200 King Street West, Suite 1100, P.O. Box 11, Merrill Lynch Canada Tower, Toronto, Ontario M5H 3T4 (Attn: Derrick C. Tay); (iv) counsel to the Debtors, Richards, Layton & Finger,

---

notice of this Motion and upon each nondebtor contracting party to the Assigned Contracts and Leases (as defined below).

P.A., One Rodney Square, Wilmington, Delaware 19801 (Attn: Mark D. Collins); (v) counsel to the Creditors' Committee, Hahn & Hessen LLP, Empire State Building, 350 Fifth Avenue, New York, New York 10118-0075 (Attn: Jeffrey L. Schwartz); and (vi) the Monitor, Ernst & Young Inc., Ernst & Young Tower, P.O. Box 251, 222 Bay Street, Toronto-Dominion Centre, Toronto, Ontario Canada M5K 1J7 (Attn: Benjamin Babcock); (b) exceeds the applicable Proposed Purchase Price for such Proposed Assets as set out in the Purchase and Sale Agreement by not less than 5%, plus any applicable breakup fees and expenses that must be paid by the Teleglobe Companies to the other party to the Purchase and Sale Agreement that is the subject of the Transaction Motion (the "Initial Overbid Increment"); (c) is, in the Teleglobe Companies' sole business judgment, following consultation with the Creditors' Committee on the same or more favorable terms and conditions as set forth in the Transaction Motion for the particular Proposed Assets; (d) is not contingent upon any due diligence investigation, the receipt of financing or any board of directors, shareholders or other corporate or partnership approval; (e) is accompanied by proof, in a form satisfactory to the Teleglobe Companies, of the entity's financial ability to consummate its offer to purchase the Proposed Assets; (f) contains an acknowledgement that promptly upon completion of the Auction the successful bidder for the particular Proposed Asset will be obligated to submit a Deposit and execute a Purchase and Sale Agreement containing terms and conditions substantially identical to the Purchase and Sale Agreement that is the subject to the Transaction Motion; and (g) contains an acknowledgement that the bid shall remain open and irrevocable, until (i) the Court approves the sale of the particular Proposed Assets to another entity, and (ii) the Teleglobe Companies close the sale with, and receives the Proposed Purchase Price from, such entity;

- If one or more Qualified Competing Bids are received, the Auction will be conducted for the Proposed Assets at the place and time designated in the Auction Notice. All bidders submitting Qualified Competing Bids shall be notified of the Auction at least two business days before the date of the Auction. The identities of the parties submitting Qualified Competing Bids and the amounts of such bids shall be kept confidential until the beginning of the Auction;

- At the Auction, competing bidders (including the Initial Bidder and proponents of Qualified Competing Bids) may submit bids for the Proposed Assets in excess of the Proposed Purchase Price, plus the Initial Overbid Increment, provided that such competing bids for the applicable Proposed Assets: (a) are in increments of a percentage of the Proposed Purchase Price designated by the Teleglobe Companies in the Transaction Motion to be between 1% and 3%; and (b) otherwise comply with the requirements for Qualified Competing Bids set forth above; and

7

- At the Auction, a bid may be selected (each a "Successful Bid") that is determined to be the highest and best bid, subject to Court approval. The right to refuse to consider the bid of any bidder that fails to meet any reasonable procedures at the Auction or to submit a Qualified Competing Bid is fully reserved.

- The Initial Bid may be determined to be the Successful Bid and Court approval may be sought for such bid and the relevant Purchase and Sale Agreement without conducting an Auction.

- Upon selection of the Successful Bidder, the Debtors will serve a notice identifying (i) the Successful Bidder, (ii) the Proposed Purchase Price and (iii) the date of the Sale Hearing before this Court, and serve such notice on all parties receiving a copy of the Sales Procedures Notice (the "Successful Bidder Notice").

- Any or all bids may be rejected for any reason whatsoever without disclosing the reason for such decision to any bidder. There shall be no legal obligation with respect to a possible transaction with any bidder and this process shall be conducted, and may be modified, as is determined to be of benefit to the Teleglobe Companies, subject to the order(s) of the Court. The process described herein, is subject at all times to the terms of the Court order(s) approving this process and to the Court's continuing supervision and to the fact that no transaction may be consummated, whether pursuant to a Purchase and Sale Agreement or a subsequent Successful Bid, without the prior approval of the Court. All bidders, regardless of whether their bid has been accepted by the Teleglobe Companies, shall continue to be subject to any Confidentiality Agreement previously signed by such bidders.

ORDERED that on or before the date that is five (5) business days after the entry of this Order, the Debtors shall serve on all counterparties to the Assigned Contracts and Leases a notice of the potential assumption and assignment substantially in the form annexed hereto as Exhibit "A" (the "Assumption and Assignment Notice") containing the following information:

(a)    the potential of the Debtors to assume and assign the Assigned Contracts and Leases to the Successful Bidder effective as of the Closing;

(b)    the amount the Debtors propose to pay to each counterparty as compliance with the cure requirements of section 365 of the Bankruptcy Code with respect to amounts due on or before the Petition Date (the "Pre-Petition Cure Amount");

(c)    that the counterparties to the Assigned Contracts and Leases shall have until 4:00 p.m. prevailing Eastern time on July 19, 2002 to

8

object to the Pre-Petition Cure Amount (the "Cure Objection Deadline");

(d)     that any objection must:

(i)     state with specificity a fully liquidated Pre-Petition Cure Amount which such party believes is required, the specific types and dates of the alleged defaults, pecuniary losses and with respect to any unliquidated claims or adjustments for percentage rent, real estate taxes, common area maintenance or similar adjustable charges (the "Unliquidated Charges"), a good faith estimate of the amount of such charges outstanding as of the Petition Date, which such good faith estimate shall act as a cap on any cure amount for such Unliquidated Charges any such party shall be entitled to receive upon assumption or assignment of the Assigned Contract and Lease (in all cases, with appropriate documentation in support thereof);

(ii)    be in writing;

(iii)   set forth the basis for the objection; and

(iv)    be filed with the Clerk of the Bankruptcy Court for the District of Delaware and served so as to be actually received by each of the following parties, all on or before the Cure Objection Deadline:  (i) the Teleglobe Companies; (ii) counsel to the Debtors; (iii)  counsel to the Teleglobe Companies; (iv) counsel to the prepetition lenders; (v) counsel to the Monitor; and (vi) counsel to the Creditors' Committee;

(e)     the Debtors shall be authorized (but not directed) to assume and assign the contract to the Successful Bidder upon the closing of the Sale Transaction;

(f)     the Pre-Petition Cure Amount shall be fixed at the amount set forth in the Assumption and Assignment Notice (unless an objection is timely filed thereto), notwithstanding anything to the contrary in any Assigned Contracts and Leases or any other document;

(g)     the nondebtor party to the Assigned Contracts and Leases shall be forever barred from asserting any claims arising on or before the Petition Date against the Debtors or the Successful Bidder, or the property of any of them, with respect to the Assigned Contract and Leases; and

9

(h)     that for each Assigned Contract and Lease for which an objection is timely received in accordance with subsection (d) above, a hearing will be held at the Sale Hearing or at such other date as the Court may designate upon motion by the Debtors and Successful Bidder; provided that if the Assigned Contracts and Leases that are the subject of objections are assumed and assigned, the cure amount asserted by the objecting party (or such lower amount as may be agreed to by the parties or fixed by the Court) will be held in a segregated account by the Successful Bidder pending further order of the Court or mutual agreement of the parties; and it is further

ORDERED that if no objections are received, then the cure amounts set forth in the Assumption and Assignment Notice shall be binding upon the nondebtor contracting party to the Assigned Contracts and Leases for all purposes in these cases and will constitute a final determination of the prepetition cure amounts required to be paid by the Debtors in connection with the assignment to, and assumption by, the Successful Bidder of the Assigned Contracts and Leases. In addition, each nondebtor contracting party in connection with the Assigned Contracts and Leases shall be forever barred from objecting to the cure information set forth in the Assumption and Assignment Notice, including, without limitation, the right to assert any additional cure or other amounts arising prior to the Petition Date with respect to the Assigned Contracts and Leases; and it is further

ORDERED that, pursuant to Bankruptcy Rule 2002, notice of the Global Bidding Process and the Sale Hearing by first class mail in the form annexed hereto as Exhibit "B" (the "Sale Procedures Notice"), on or prior to ~~June~~ July 1 ___, 2002, to the following, (i) all parties on the Debtors' creditor matrix, (ii) counsel to the Creditors' Committee; (iii) the Office of the United States Trustee for the District of Delaware; (iv) counsel to the Debtors' postpetition lender; (v) counsel to the lenders under the Canadian Credit Facility; (vi) counsel to the Informal Committee of Noteholders; (vii) counsel to the prepetition lenders; (viii) counsel to the Monitor; (ix) all nondebtor contracting parties to the Assigned Contracts and Leases; (x) all parties who have

10

made written expressions of interest in acquiring the Purchased Assets within two (2) months prior to the date of the Procedures Order; (xi) all appropriate federal, state and local taxing authorities; (xii) any party asserting a lien on the Debtors' assets, (xiii) the Federal Communications Commission, and (xiv) all parties having filed a notice of appearance in the Debtors' chapter 11 cases pursuant to Bankruptcy Rule 2002, shall constitute good and sufficient notice of the Global Bidding Process and Sale Hearing; and it is further

ORDERED that pursuant to Bankruptcy Rule 2002(1), the Debtors are authorized to publish the Sale Procedures Notice in the national editions of <u>The Wall Street Journal</u> and <u>The New York Times</u>, on or before <u>July 5</u>, 2002; and it is further

ORDERED that pursuant to Bankruptcy Rule 2002(a)(2), the Sale Hearing shall be held before the United States Bankruptcy Court, Honorable Mary F. Walrath, on a date that is approximately fourteen (14) days after the filing and service of the Successful Bidder Notice. In that regard, all parties' rights, including the Creditors' Committee's right, to object to any Sale Transaction, including any objection made pursuant to section 365(b)(1)(C) with respect to the assumption and assignment of an executory contract or unexpired lease, are reserved. All objections to the Sale Transaction shall be filed at least three (3) business days prior to the Sale Hearing (the "Objection Deadline") with the United States Bankruptcy Court for the District of Delaware and served so the same is received on or before the Objection Deadline upon the following: (i) the Teleglobe Companies, 11480 Commerce Park Drive, Reston, Virginia 20191 (Attn: John Brunette); (ii) counsel for the Debtors, Richards, Layton & Finger, P.A., One Rodney Square, P.O. Box 551, Wilmington, Delaware 19899, (Attn: Mark D. Collins, Esq.); (iii) counsel to the Teleglobe Companies, Jones, Day, Reavis & Pogue, 2727 North Harwood Street, Dallas, Texas 75201-1515 (Attn: Michael Weinberg, Esq.); (iv) Ogilvy Renault, 200

11

King Street West, Suite 1100, P.O. Box 11, Merrill Lynch Canada Tower, Toronto, Ontario M5H 3T4 (Attn: Derrick C. Tay); (v) counsel to the Creditors' Committee, Hahn & Hessen LLP, Empire State Building, 350 Fifth Avenue, New York, New York 10118-0075 (Attn: Jeffrey L. Schwartz); and Rosenthal Monhait Gross & Goddess, Mellon Bank Center, Suite 1401, 919 North Market Street, P.O. Box 1070, Wilmington, Delaware 19899 (Attn: Kevin Gross); (vi) the Monitor, Ernst & Young Inc., Ernst & Young Tower, P.O. Box 251, 222 Bay Street, Toronto-Dominion Centre, Toronto, Ontario Canada M5K 1J7 (Attn: Benjamin Babcock); (vii) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2313, Lockbox 35, Wilmington, Delaware (Attn: Frank Perch, Esq.); (viii) counsel for the Debtors' prepetition lenders, Klehr Harrison Harvey Brazenburg & Ellers, 919 Market Street, Suite 1000, Wilmington, Delaware 19801 (Attn: James Huggett) and Mayer Brown Rowe & Maw, 160 South LaSalle Street, Chicago, Illinois 60603-3441 (Attn: J. Robert Stoll); and (ix) counsel to the Debtors postpetition lenders, Shearman & Sterling, 599 Lexington Avenue, New York, NY 10022-6069 (Attn: Andrew Tenzer, Esq.) and Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, P. O. Box 391, Wilmington, Delaware 19899-0391 (Attn: Pauline K. Morgan, Esq.); and (ix) counsel for the informal committee of noteholders, Bingham Dana LLP, One State Street, Hartford, Connecticut 06103 (Attn: Evan D. Flaschen, Esq.).

Dated: Wilmington, Delaware
June 24, 2002

UNITED STATES BANKRUPTCY JUDGE

12