# Exhibit 4

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| TELEGLOBE COMMUNICATIONS | : | Case No. 02-11518 (MFW) |
| CORPORATION, a Delaware | : | Jointly Administered |
| corporation, et al.,[1] | : | |
| | : | |
| Debtors. | : | |

### AFFIDAVIT OF BENJAMIN J. BABCOCK

PROVINCE OF ONTARIO

CITY OF TORONTO

I, Benjamin J. Babcock, do depose and state as follows:

1.       I am a Senior Vice President of Ernst & Young Inc., the court appointed monitor (the "Monitor") in the insolvency proceedings of the above-captioned debtors (the "Debtors"), Teleglobe Inc. and certain other subsidiaries of Teleglobe Inc. (collectively, the "Teleglobe Companies") under the Canadian Companies' Creditors Arrangement Act filed in the Ontario Superior Court of Justice (the "Canadian Court") on May 12, 2002, Court File No. 02-CL-4528 (the "Canadian Proceedings") and am authorized to make this statement on behalf of the Monitor.

2.       Certain of the Teleglobe Companies, including certain of the Debtors,[2] (collectively, the "Sellers") have entered into a purchase agreement, dated September 18, 2002 with TLGB Acquisition, LLC (the "Purchase Agreement").

---

[1] The Debtors are the following eleven entities: Teleglobe Communications Corporation, Teleglobe USA Inc., Optel Telecommunications, Inc., Teleglobe Holdings (U.S.) Corporation, Teleglobe Marine (U.S.) Inc., Teleglobe Holding Corp., Teleglobe Telecom Corporation, Teleglobe Investment Corp., Teleglobe Luxembourg LLC, Teleglobe Puerto Rico Inc. and Teleglobe Submarine Inc.

3.      The Monitor believes certain North American routed international long distance voice and data telecommunications services businesses operated by the Teleglobe Companies (the "Core Telecom Business") represent the most valuable asset of the Sellers. The Monitor, representatives of the Teleglobe Companies and the financial advisers to the Teleglobe Companies determined that it was unlikely the value of the Core Telecom Business would appreciate in a protracted restructuring proceeding. Furthermore, with some restructuring, the Core Telecom Business would likely be a profitable business with strategic value to a number of prospective purchasers. The Monitor believes the Sellers needed to act promptly upon the filing of the Canadian Proceedings to maintain and realize the going concern value of the Core Telecom Business as the liquidation value of this business is, due to the nature of the assets and industry conditions, likely to be materially less than going concern values.

4.      The Core Telecom Business is a global business operating in over 200 countries around the world. Due to the interconnected and interdependent nature of the network infrastructure in Canada, the United States and the United Kingdom, the Monitor believes a "global" sales process for the Core Telecom Business as a whole was necessary and appropriate in each of these countries.

5.      On June 4, 2002, the Canadian Court entered an order (the "Canadian Transaction Process Order"), which, *inter alia*, authorized the Monitor and the Sellers to implement the transaction process outlined in the Monitor's Second Report, dated June 3, 2002, as filed with the Canadian Court (a copy of which is annexed hereto as Exhibit A) and the bid

---

(continued...)

[2] The Debtors that are Sellers are Teleglobe Communications Corporation, Teleglobe USA Inc. and Optel Telecommunications, Inc. (collectively, the "US Sellers").

procedures attached to the Canadian Transaction Process Order (a copy of which is annexed hereto as Exhibit B).

      6.    On June 24, 2002, this Court entered an Order (A) authorizing a global bidding process with respect to certain assets located in the United States owned by the Debtors and which relate to the Core Telecom Business (the "U.S. Assets"), (B) approving bidding procedures in connection therewith, (C) fixing notice procedures and approving form and manner of notice in connection therewith, and (D) setting date for hearing on proposed sale resulting from the global bidding process with respect to the U.S. Assets (the "U.S. Bidding Procedures Order") (collectively, the bidding procedures approved pursuant to the Transaction Process Order and the U.S. Bidding Procedures Order are referred to as the "Approved Bidding Procedures"). While there are certain timing and notice requirements under the U.S. Bidding Procedures Order that differ from those under the Canadian Transaction Process Order, the approval of a consistent sales process in both jurisdictions allowed the sale of the Core Telecom Business to be pursued in a coordinated manner conducive to maximizing the value of the business as a whole for stakeholders in all jurisdictions.

      7.    The Canadian Transaction Process Order provides that the Monitor, as an independent officer appointed by the Canadian Court, is authorized and directed to conduct, supervise and direct the transaction process and matters related thereto.

      8.    BCE Inc., a company organized under the laws of Canada ("BCE"), is the lender (the "CCAA Lender") under the Teleglobe Companies' Canadian debtor in possession financing facility, and also is a significant prepetition creditor of the Teleglobe Companies and the majority shareholder of Teleglobe Inc. BCE controls Bell Canada and Bell Nexxia Inc. (collectively, "Bell Canada"). Bell Canada is the Teleglobe Companies' largest customer,

representing more than 20% of its revenue. As of the June 4, 2002 Canadian Court hearing, Bell Canada was also a prospective purchaser for the Core Telecom Business. In addition, several of the senior executives of the Core Telecom Business were seconded from Bell Canada and have continuing contractual relationships with Bell Canada. Several measures were taken to mitigate the risk that any potential conflicts of interest arising from these relationships would adversely affect the transaction process.

9.       The following steps were taken during the sales process to ensure the fairness of the process for all potential purchasers and that any potential conflicts of interest with Bell Canada did not adversely affect the transaction process: 1) Specific confidentiality undertakings were put in place between the Teleglobe Companies, the Monitor and the CCAA Lender to ensure that any information that the CCAA Lender received regarding the transaction process would not be available to or disclosed to Bell Canada without the consent of the Monitor, and no such consent has been provided; 2) Bell Canada was formally requested not to speak to any prospective purchaser of the Core Telecom Business without the express consent of the Monitor and its participation in such meetings; 3) No meetings or discussions between prospective purchasers and Bell Canada were permitted by the Monitor prior to the submission of bids; 4) All prospective bidders were provided with guidance regarding the basis upon which they should value certain contracts between certain of the Teleglobe Companies and Bell Canada (the "Bell Contract") in preparing their bids; 5) Specific confidentiality undertakings were put in place to ensure that those employees of the Core Telecom Business who were seconded from Bell Canada were not directly aware of the results of the transaction process or the negotiations of agreements.

10.     The Monitor believes the steps taken resulted in a fair and competitive arm's-length sales process, the outcome of which has not been influenced by the potential for conflicts of interest due to the various relationships in this proceeding.  In addition, none of the Selected Prospective Purchasers (defined below) had or have any affiliation with any of the Teleglobe Companies, including the Debtors, or the Monitor.

11.     The marketing of the Core Telecom Business was informally initiated in late April 2002, prior to the May 15, 2002 filing of the Canadian Proceedings.  Formal notice of the transaction process and the Approved Bidding Procedures were provided to prospective purchasers immediately following the approval of the Canadian Transaction Process Order.

12.     The Monitor and the Teleglobe Companies, assisted by the companies' financial advisors, Lazard Freres & Co. LLC ("Lazard"), took the following actions to properly expose the Core Telecom Business to the market and to comply with the Approved Bidding Procedures:

(a)     Sixty-nine (69) qualified potential purchasers of the Core Telecom Business were contacted, including 29 strategic investors and 40 financial investors;

(b)     Thirty-seven (37) of the 69 qualified potential purchasers signed non-disclosure agreements in a form satisfactory to the Monitor and the Teleglobe Companies to allow them to receive confidential information on the opportunity to acquire the Core Telecom Business and conduct due diligence;

(c)     Data rooms containing extensive business, financial and legal information in respect of the Core Telecom Business were made available to those parties who had executed non-disclosure agreements;

(d)     Management presentations were conducted with qualified parties who expressed an interest in such meetings;

(e)     All parties were provided with a form purchase agreement pursuant to which the Teleglobe Companies proposed to sell the Core Telecom Business;

DLI-5721015v2
RLF1-2514749-2                                    5

(f)     As provided for in the U.S. Bidding Procedures Order, the "Sales Procedure Notice" was published in the Wall Street Journal and New York Times prior to July 5, 2002;

(g)     After receiving feedback from a number of the prospective purchasers regarding the status of their due diligence and consulting with a number of the major stakeholders in the Canadian Proceedings, including the advisors to the Unsecured Creditors' Committee, the Monitor concluded that it would be appropriate to extend the date for submission of final bids.

(h)     On June 14, 2002, the Monitor instructed Lazard to send a revised bid process letter to all prospective purchasers that extended the date by which bids must be received from June 24, 2002 to July 15, 2002, the deadline set forth in the U.S. Bidding Procedures Order (the "Bid Deadline").

(i)     Upon expiration of the Bid Deadline, ten (10) written offers for the Core Telecom Business were received. The Monitor, with the assistance of Lazard and representatives of the Teleglobe Companies, evaluated the offers received.

(j)     For those stakeholders of the Teleglobe Companies, or their representatives, who executed a confidentiality undertaking with the Monitor and the Teleglobe Companies, which included counsel and financial advisors to the Official Committee of Unsecured Creditors, the Monitor shared the details of the offers received, the analysis of alternatives and the Monitor's recommended course of action.

(k)     Based on this evaluation, the Monitor instructed Lazard to invite five (5) qualified purchasers (the "Selected Prospective Purchasers") to proceed to complete due diligence, negotiate a purchase agreement and provide their final and best offer for the Core Telecom Business on August 12, 2002.

(l)     In an effort to facilitate a continuation of the sales process on a non-exclusive basis, the Monitor sought and received approval from the Canadian Court to utilize up to $1.75 million of the Teleglobe Companies' funds for the purpose of reimbursing such reasonable legal fees, disbursements and other reasonable expenses of the Selected Prospective Purchasers in connection with such parties continued participation in the sales process. This reimbursement of the Selected Prospective Purchasers was not funded by any of the Debtors.

(m)     Considering the significant additional due diligence that the Teleglobe Companies and the Monitor were requesting parties to do to comply with the bidding procedures and the fact that each of the Selected Prospective Purchasers had no certainty that they would be the successful bidder, the Monitor believed the reimbursement of fees was necessary to maintain a competitive process.

(n)    The Selected Prospective Purchasers and their legal and financial advisors were provided with extensive access to business, financial and legal information on the Core Telecom Business. Key members of the Teleglobe Companies' management team were made available to each of the Selected Prospective Purchasers upon request.

(o)    Three (3) of the Selected Prospective Purchasers advanced negotiations of their proposed forms of purchase agreement during this period. During this process the value of their offers and terms of the Selected Prospective Purchasers' proposed forms of purchase agreement improved materially.

(p)    On August 12, 2002, four (4) written offers for the Core Telecom Business were received from the Selected Prospective Purchasers. Three (3) of the offers were accompanied by a detailed mark up of the form purchase agreement.

(q)    During the period from August 12 to August 14, 2002, the Monitor, Lazard and the Teleglobe Companies undertook a process of clarifying and working with three (3) of the Selected Prospective Purchasers to address the consideration and form of purchase agreement they had offered. Each of the parties was provided guidance on the competitiveness of their offer, including the proposed purchase agreement. Multiple improved revised offers were received from three (3) of the Selected Prospective Purchasers during this period.

(r)    On August 14, 2002, three (3) of the Selected Prospective Purchasers were provided with a revised form purchase agreement that was, in all material respects, acceptable to the Teleglobe Companies.

(s)    By August 14, 2002, the Monitor, the Teleglobe Companies and their advisors decided that a definitive conclusion to the bidding process needed to take place. The reasons for this conclusion included, *inter alia*, the positive momentum in the transaction process was reaching or had reached its peak and limited additional clarification could be provided to the Selected Prospective Purchasers to maximize the value of their bids without losing the positive momentum and competitiveness of the transaction process.

(t)    On August 14, 2002, the Monitor and Lazard advised the Selected Prospective Purchasers to submit their final and best offers by August 15, 2002 (the "Final Offers") on the basis that there would be no additional discussions after such offers were received. The Selected Prospective Purchasers were advised that upon review of the Final Offers the Monitor would select one party, based on price and certainty of closing a transaction, to continue to negotiate with exclusively with a view to finalizing a definitive purchase agreement that could be brought forward

for court approval in Canada, the United States and other jurisdictions, as required.

(u)     Each of the Selected Prospective Purchasers was advised that there was no certainty that an auction would be held and they should provide their best offer if they wanted to be the selected party to proceed with exclusive negotiations.

(v)     On August 15, 2002, three (3) Final Offers were received. Two (2) of the Final Offers were structured based on the form of the revised form purchase agreement provided by the Teleglobe Companies on August 14, 2002. The third (3) Final Offer contemplated a structure and form of agreement that was materially different than the revised form purchase agreement provided.

(w)     On August 16, 2002, the Monitor, Lazard and representatives of the Teleglobe Companies met with advisors to the Teleglobe Lending Syndicate, the ad hoc committee of the Teleglobe Companies' noteholders and the U.S. Official Creditors' Committee (the "Creditors' Committee") to review the Final Offers and the Monitor's recommendation on which party to proceed with exclusive negotiations to finalize a definitive purchase agreement (once chosen, the "Final Bidder"). Believing that the bid submitted by Cerberus Capital Management, L.P. and TenX Capital Partners (who have formed TLGB Acquisition LLC to be the purchaser under the Purchase Agreement) was the highest and best bid for the assets of the Core Telecom Business, and the likelihood that the transaction would be consummated in a timely manner, TLGB Acquisition LLC was selected as the Final Bidder.

13.     Following the meeting on August 16, 2002, the Teleglobe Companies,

their advisors, the Monitor and the Final Bidder engaged in negotiations to finalize a definitive

purchase agreement pursuant to which the Final Bidder would acquire substantially all the assets

of the Core Telecom Business. On September 18, 2002, the Final Bidder (as "Purchaser"

thereunder) and Sellers executed the Purchase Agreement.

14.     The Monitor reviewed and approved the sale of the Core Telecom

Business pursuant to the Purchase Agreement to the Purchaser, as set forth in its Eleventh

Report, dated September 19, 2002 (the "Monitor's Report") a copy of which is annexed hereto as

Exhibit C. On September 19, 2002, the Teleglobe Companies filed a notice (the "Canadian

Transaction Notice") with the Canadian Court seeking approval of the Purchase Agreement and related transaction documentation and the transactions contemplated thereby. On October 2, 2002 the Canadian Court issued an order (the "Canadian Sale Order") approving the sale pursuant to the Purchase Agreement and approving the related transactions contemplated thereby (a copy of the Canadian Sale Order is annexed hereto as Exhibit D).

15.     The Monitor is of the opinion that the transaction process outlined above complied with the Approved Bidding Procedures. The transaction process resulted in the Core Telecom Business being properly exposed to the market and a purchase agreement with a price and structure that was the result of a competitive bidding process in an auction-like environment between multiple parties. The Monitor has determined that the competitive bidding process yielded the highest and best offer for the Core Telecom Business and is in the best interest of the Debtors, their creditors and stakeholders.

16.     Pursuant to the Approved Bidding Procedures, there was no obligation for the Teleglobe Companies to conduct a formal auction following the selection of the Final Bidder and the bidding procedures letter provided to prospective purchasers specifically advised that there was no certainty that an auction would be held. However, pursuant to the U.S. Bidding Procedures, the Teleglobe Companies and the Monitor were required to consult with the U.S. Creditors' Committee regarding the decision as to whether to hold an auction. Consistent with the requirements set forth in the U.S. Bidding Procedures Order, the Monitor had a number of discussions with the financial advisor to the U.S. Creditors' Committee, the advisors to the Teleglobe Lending Syndicate and the ad hoc committee of the Teleglobe Companies' noteholders regarding the decisions as to whether to hold an auction. After such consultations, the Monitor and the Teleglobe Companies, including the Debtors, concluded that the auction

process described above had yielded the highest and best offer attainable for the Core Telecom Business and that a formal auction process would not yield higher value to the creditors and stakeholders of the Teleglobe Companies.

17.    The Monitor believes the Purchaser's offer represents the highest and best offer attainable for the Core Telecom Business. The Monitor compared the purchase price payable pursuant to the Purchase Agreement (as more particularly defined in the Purchase Agreement, the "Final Purchase Price") to the trading benchmarks for comparable public companies and to the valuations of recently completed restructuring proceedings. The estimated Final Purchase Price compares positively to these benchmarks. In addition to the Final Purchase Price, the Purchase Agreement provides other significant benefits to the Teleglobe Companies. The Purchaser will assume approximately $350 million of liabilities that relate to the business being sold including approximately $70 million of Cure Amounts (as defined in the Purchase Agreement) that the Purchaser is responsible for at the Closing. This directly benefits both these creditors and the Teleglobe Companies' remaining creditors.

18.    The most likely alternative to the sale contemplated by the Purchase Agreement is a non-going concern liquidation of the Teleglobe Companies' assets. The Monitor has estimated the recoveries to creditors under this alternative and compared it to the estimated recoveries to creditors that will result from the consummation of the Purchase Agreement, including a range of purchase price adjustment scenarios. This analysis indicates that the consummation of the sale under the Purchase Agreement offers the prospect for materially better recoveries than would be realized in a non-going concern liquidation. The contracts and network assets of the Core Telecom Business likely have limited value in a non-going concern sale. Liquidation would take a significant period of time and would require funding to complete.

Even after considering the costs that will be incurred during the period required to obtain the necessary consents to satisfy the Closing Date conditions (as set forth in the Purchase Agreement), the terms of the Purchase Agreement offer material financial benefits over a liquidation of the business on a non-going concern basis. In addition, a non-going concern liquidation would have significant negative ramifications to the Teleglobe Companies' customers and creditors.

19.    The implementation of the Purchase Agreement also provides significant benefits to the Teleglobe Companies' employees and customers. The going concern sale of the Core Telecom Business will ensure the continued employment of approximately 550 people who will be retained by the Purchaser. In addition, the going concern sale of the Core Telecom Business will allow the continuity of service to the Teleglobe Companies' customers throughout the world. In the event of a non-going concern liquidation, the Teleglobe Companies would suffer a cessation of operations of the Core Telecom Business that would have negative operational and telecommunications service continuity implications to their customers. The degree and duration of the negative implications to each customer will vary based on a number of factors, including the availability of alternative service providers and the level of back-up facilities in place. The duration of negative implications to customers will vary from negligible interruption to months of service interruptions.

20.    The Monitor believes the purchase price for the Core Telecom Business pursuant to the terms of the Purchase Agreement represents the fair market value for these assets. The Sale Transaction contemplated by the Purchase Agreement is within the Monitor's sound business judgment and will result in a significant benefit to the Debtors, their estates and parties in interest.

21.    The Monitor believes there was, and is, an immediate need to proceed with the sale of the Core Telecom Business to the Purchaser as the value of the Core Telecom Business is unlikely to appreciate with time in a restructuring proceeding. The Monitor further believes the critical nature of telecommunications services is not conducive to maintaining customers in an uncertain environment and numerous recent major restructurings in the telecommunications industry have clearly established that retaining revenue in any type of protracted restructuring with an uncertain outcome is extremely difficult. For all of the above mentioned reasons, the Monitor recommends the Court issue an order approving the sale of the Core Telecom Business to the Purchaser pursuant to the Purchase Agreement and the transactions contemplated thereby.

FURTHER AFFIANT SAYETH NOT.

_____
Benjamin J. Babcock

Sworn to and subscribed before me
this _____ day of October, 2002.


_____
Notary Public

# Exhibit 5

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| TELEGLOBE COMMUNICATIONS | : | Case No. 02-11518 (MFW) |
| CORPORATION, a Delaware | : | Jointly Administered |
| corporation, et al.,[1] | : | |
| | : | |
| Debtors. | : | |

## AFFIDAVIT OF JOHN BRUNETTE

STATE OF VIRGINIA

COUNTY OF FAIRFAX

I, John Brunette, do depose and state as follows:

1.      I am the Chief Executive Officer of the above-captioned debtors (collectively, the "Debtors"), Teleglobe Inc. and certain other subsidiaries of Teleglobe Inc. (collectively, the "Teleglobe Companies") and am authorized to make this statement on behalf of the Teleglobe Companies.

2.      Pursuant to the Canadian Transaction Process Order (defined below), Ernst & Young, Inc., the court appointed monitor (the "Monitor") in the insolvency proceedings of the Teleglobe Companies under the Canadian Companies' Creditors Arrangement Act filed in the Ontario Superior Court of Justice (the "Canadian Court") on May 12, 2002, Court File No. 02-CL-4528 (the "Canadian Proceedings"), is authorized and directed to conduct, supervise and direct the sale transaction process and matters related thereto.

---

[1] The Debtors are the following eleven entities: Teleglobe Communications Corporation, Teleglobe USA Inc., Optel Telecommunications, Inc., Teleglobe Holdings (U.S.) Corporation, Teleglobe Marine (U.S.) Inc., Teleglobe Holding Corp., Teleglobe Telecom Corporation, Teleglobe Investment Corp., Teleglobe Luxembourg LLC, Teleglobe Puerto Rico Inc. and Teleglobe Submarine Inc.

3.    Certain of the Teleglobe Companies, including certain of the Debtors[2] (collectively, the "Sellers"), have entered into a purchase agreement, dated September 18, 2002 with TLGB Acquisition, LLC (the "Purchase Agreement").

4.    The Teleglobe Companies believe certain North American routed international long distance voice and data telecommunications services businesses operated by the Teleglobe Companies (the "Core Telecom Business") represent the most valuable asset of the Sellers. The Monitor, representatives of the Teleglobe Companies and the financial advisors to the Teleglobe Companies determined that it was unlikely the value of the Core Telecom Business would appreciate in a protracted restructuring proceeding. Furthermore, with some restructuring, the Core Telecom Business would likely be a profitable business with strategic value to a number of prospective purchasers. The Teleglobe Companies believe the Sellers needed to act promptly upon the filing of the Canadian Proceedings to maintain and realize the going concern value of the Core Telecom Business as the liquidation value of this business is, due to the nature of the assets and industry conditions, likely to be materially less than going concern values.

5.    The Core Telecom Business is a global business operating in over 200 countries around the world. Due to the interconnected and interdependent nature of the network infrastructure in Canada, the United States and the United Kingdom, the Teleglobe Companies believe a "global" sales process for the Core Telecom Business as a whole was necessary and appropriate in each of these countries.

6.    On June 4, 2002, the Canadian Court entered an order (the "Canadian Transaction Process Order"), which, *inter alia*, authorized the Monitor and the Sellers to

---

[2] The Debtors that are Sellers are Teleglobe Communications Corporation, Teleglobe USA Inc. and Optel

implement the transaction process outlined in the Monitor's Second Report, dated June 3, 2002, as filed with the Canadian Court (a copy of which is annexed as Exhibit A to the affidavit of Benjamin J. Babcock (the "Babcock Affidavit") contemporaneously filed herewith) and the bid procedures attached to the Canadian Transaction Process Order (a copy of which is annexed as Exhibit B to the Babcock Affidavit).

       7.     On June 24, 2002, this Court entered an Order (A) authorizing a global bidding process with respect to certain assets located in the United States owned by the Debtors and which relate to the Core Telecom Business (the "U.S. Assets"), (B) approving bidding procedures in connection therewith, (C) fixing notice procedures and approving form and manner of notice in connection therewith, and (D) setting date for hearing on proposed sale resulting from the global bidding process with respect to the U.S. Assets (the "U.S. Bidding Procedures Order") (collectively, the bidding procedures approved pursuant to the Transaction Process Order and the U.S. Bidding Procedures Order are referred to as the "Approved Bidding Procedures"). While there are certain timing and notice requirements under the U.S. Bidding Procedures Order that differ from those under the Canadian Transaction Process Order, the approval of a consistent sales process in both jurisdictions allowed the sale of the Core Telecom Business to be pursued in a coordinated manner conducive to maximizing the value of the business as a whole for stakeholders in all jurisdictions.

       8.     BCE Inc., a company organized under the laws of Canada ("BCE"), is the lender (the "CCAA Lender") under the Teleglobe Companies' Canadian debtor in possession financing facility, and also is a significant prepetition creditor of the Teleglobe Companies and

---

(continued...)

Telecommunications, Inc. (collectively, the "US Sellers").

the majority shareholder of Teleglobe Inc. BCE controls Bell Canada and Bell Nexxia Inc. (collectively, "Bell Canada"). Bell Canada is the Teleglobe Companies' largest customer, representing more than 20% of its revenue. As of the June 4, 2002 Canadian Court hearing, Bell Canada was also a prospective purchaser for the Core Telecom Business. In addition, several of the senior executives of the Core Telecom Business were seconded from Bell Canada and have continuing contractual relationships with Bell Canada. Several measures were taken to mitigate the risk that any potential conflicts of interest arising from these relationships would adversely affect the sale transaction process.

9.    The following steps were taken to ensure the fairness of the sale process for all potential purchasers and that any potential conflicts of interest with Bell Canada did not adversely affect this process: 1) specific confidentiality undertakings were put in place between the Teleglobe Companies, the Monitor and the CCAA Lender to ensure that any information that the CCAA Lender received regarding the transaction process would not be available to or disclosed to Bell Canada without the consent of the Monitor, and no such consent was requested or given; 2) Bell Canada was formally requested not to speak to any prospective purchaser of the Core Telecom Business without the express consent of the Monitor and its participation in such meetings, and no such consent was requested or given; 3) no meetings or discussions between prospective purchasers and Bell Canada were permitted by the Monitor prior to the submission of bids; 4) specific confidentiality undertakings were put in place to ensure that those employees of the Core Telecom Business who were seconded from Bell Canada were not directly aware of the results of the transaction process or the negotiations of agreements.

10.    The Teleglobe Companies believe the steps taken resulted in a fair and competitive arm's-length sales process, the outcome of which has not been influenced by the

potential for conflicts of interest. In addition, none of the Selected Prospective Purchasers (defined below) had or have any affiliation with any of the Teleglobe Companies, including the Debtors, or the Monitor.

11.     The marketing of the Core Telecom Business was informally initiated in late April 2002, prior to the May 15, 2002 filing of the Canadian Proceedings. Formal notice of the transaction process and the Approved Bidding Procedures were provided to prospective purchasers immediately following the approval of the Canadian Transaction Process Order.

12.     The Monitor and the Teleglobe Companies, assisted by the Teleglobe Companies' financial advisors, Lazard Freres & Co. LLC ("Lazard"), took the following actions to properly expose the Core Telecom Business to the market and to comply with the Approved Bidding Procedures:

(a)     Sixty-nine (69) qualified potential purchasers of the Core Telecom Business were contacted, including 29 strategic investors and 40 financial investors;

(b)     Thirty-seven (37) of the 69 qualified potential purchasers signed non-disclosure agreements in a form satisfactory to the Monitor and the Teleglobe Companies to allow them to receive confidential information on the opportunity to acquire the Core Telecom Business and conduct due diligence;

(c)     Data rooms containing extensive business, financial and legal information in respect of the Core Telecom Business were made available to those parties who had executed non-disclosure agreements;

(d)     Management presentations were conducted with qualified parties who expressed an interest in such meetings;

(e)     All parties were provided with a form purchase agreement pursuant to which the Teleglobe Companies proposed to sell the Core Telecom Business;

(f)     As provided for in the U.S. Bidding Procedures Order, the "Sales Procedure Notice" was published in the Wall Street Journal and New York Times prior to July 5, 2002;

(g)    After receiving feedback from a number of the prospective purchasers regarding the status of their due diligence and consulting with a number of the major stakeholders in the Canadian Proceedings, including the advisors to the Unsecured Creditors' Committee, the Monitor concluded, and the Teleglobe Companies concurred, that it would be appropriate to extend the date for submission of final bids.

(h)    On June 14, 2002, the Monitor instructed Lazard to send a revised bid process letter to all prospective purchasers that extended the date by which bids must be received from June 24, 2002 to July 15, 2002, the deadline set forth in the U.S. Bidding Procedures Order (the "Bid Deadline").

(i)    Upon expiration of the Bid Deadline, ten (10) written offers for the Core Telecom Business were received. The Monitor, with the assistance of Lazard and representatives of the Teleglobe Companies, evaluated the offers received.

(j)    For those stakeholders of the Teleglobe Companies, or their representatives, who executed a confidentiality undertaking with the Monitor and the Teleglobe Companies, the Monitor shared the details of the offers received, the analysis of alternatives and the Monitor's recommended course of action.

(k)    Based on this evaluation, the Monitor instructed Lazard to invite five (5) qualified purchasers (the "Selected Prospective Purchasers") to proceed to complete due diligence, negotiate a purchase agreement and provide their final and best offer for the Core Telecom Business on August 12, 2002.

(l)    In an effort to facilitate a continuation of the sales process on a non-exclusive basis, the Monitor sought and received approval from the Canadian Court to utilize up to $1.75 million of the Teleglobe Companies' funds for the purpose of reimbursing such reasonable legal fees, disbursements and other reasonable expenses of the Selected Prospective Purchasers in connection with such parties continued participation in the sales process. This reimbursement of the Selected Prospective Purchasers was not funded by any of the Debtors.

(m)    Considering the significant additional due diligence the Teleglobe Companies and the Monitor were requesting parties to do to comply with the bidding procedures and the fact that each of the Selected Prospective Purchasers had no certainty that they would be the successful bidder, the Teleglobe Companies believed that the reimbursement of fees was necessary to maintain a competitive process.

(n)    The Selected Prospective Purchasers and their legal and financial advisors were provided with extensive access to business, financial and legal information on the Core Telecom Business. Key members of the

Teleglobe Companies' management team were made available to each of the Selected Prospective Purchasers upon request.

(o)    Three (3) of the Selected Prospective Purchasers advanced negotiations of their proposed forms of purchase agreement during this period. During this process the value of their offers and terms of the Selected Prospective Purchasers' proposed forms of purchase agreement improved materially.

(p)    On August 12, 2002, four (4) written offers for the Core Telecom Business were received from the Selected Prospective Purchasers. Three (3) of the offers were accompanied by a detailed mark up of the form purchase agreement.

(q)    During the period from August 12 to August 14, 2002, the Monitor, Lazard and the Teleglobe Companies undertook a process of clarifying and working with three (3) of the Selected Prospective Purchasers to address the consideration and form of purchase agreement they had offered. Each of the parties was provided guidance on the competitiveness of their offer, including the proposed purchase agreement. Multiple improved revised offers were received from three (3) of the Selected Prospective Purchasers during this period.

(r)    On August 14, 2002, three (3) of the Selected Prospective Purchasers were provided with a revised form purchase agreement that was, in all material respects, acceptable to the Teleglobe Companies.

(s)    By August 14, 2002, the Monitor, the Teleglobe Companies and their advisors decided that a definitive conclusion to the bidding process needed to take place. The reasons for this conclusion included, *inter alia*, the positive momentum in the transaction process was reaching or had reached its peak and limited additional clarification could be provided to the Selected Prospective Purchasers to maximize the value of their bids without losing the positive momentum and competitiveness of the transaction process.

(t)    On August 14, 2002, the Monitor and Lazard advised the Selected Prospective Purchasers to submit their final and best offers by August 15, 2002 (the "Final Offers") on the basis that there would be no additional discussions after such offers were received. The Selected Prospective Purchasers were advised that upon review of the Final Offers the Monitor would select one party, based on price and certainty of closing a transaction, to continue to negotiate with exclusively with a view to finalizing a definitive purchase agreement that could be brought forward for court approval in Canada, the United States and other jurisdictions, as required.

(u)    Each of the Selected Prospective Purchasers was advised that there was no
certainty that an auction would be held and they should provide their best
offer if they wanted to be the selected party to proceed with exclusive
negotiations.

(v)    On August 15, 2002, three (3) Final Offers were received.  Two (2) of the
Final Offers were structured based on the form of the revised form
purchase agreement provided by the Teleglobe Companies on August 14,
2002.  The third (3) Final Offer contemplated a structure and form of
agreement that was materially different than the revised form purchase
agreement provided.

(w)    On August 16, 2002, the Monitor, Lazard and representatives of the
Teleglobe Companies met with advisors to the Teleglobe Lending
Syndicate, the ad hoc committee of the Teleglobe Companies' noteholders
and the U.S. Official Creditors' Committee (the "Creditors' Committee")
to review the Final Offers and the Monitor's recommendation on which
party to proceed with exclusive negotiations to finalize a definitive
purchase agreement (once chosen, the "Final Bidder").  Believing that the
bid submitted by Cerberus Capital Management, L.P. and TenX Capital
Partners (who have formed TLGB Acquisition LLC to be the purchaser
under the Purchase Agreement) was the highest and best bid for the assets
of the Core Telecom Business, and the likelihood that the transaction
would be consummated in a timely manner, TLGB Acquisition LLC was
selected as the Final Bidder.

13.    Following the meeting on August 16, 2002, the Teleglobe Companies,

their advisors, the Monitor and the Final Bidder engaged in negotiations to finalize a definitive

purchase agreement pursuant to which the Final Bidder would acquire substantially all the assets

of the Core Telecom Business.  On September 18, 2002, the Final Bidder (as "Purchaser"

thereunder) and Sellers executed the Purchase Agreement.

14.    The Monitor reviewed and approved the sale of the Core Telecom

Business pursuant to the Purchase Agreement to the Purchaser, as set forth in its Eleventh

Report, dated September 19, 2002 (the "Monitor's Report") a copy of which is annexed as

Exhibit C to the Babcock Affidavit.  The Teleglobe Companies concur with the Monitor's

business judgment.  On September 19, 2002, the Teleglobe Companies filed a notice (the

"Canadian Transaction Notice") with the Canadian Court seeking approval of the Purchase

Agreement and related transaction documentation and the transactions contemplated thereby. On October 2, 2002 the Canadian Court issued an order (the "Canadian Sale Order") approving the sale pursuant to the Purchase Agreement and approving the related transactions contemplated thereby (a copy of the Canadian Sale Order is annexed as Exhibit D to the Babcock Affidavit).

15.    The Debtors are of the opinion that the transaction process outlined above complied with the Approved Bidding Procedures. The transaction process resulted in the Core Telecom Business being properly exposed to the market and a purchase agreement with a price and structure that was the result of a competitive bidding process in an auction-like environment between multiple parties. The Teleglobe Companies concur with the Monitor that the competitive bidding process yielded the highest and best offer for the Core Telecom Business and is in the best interest of the Debtors, their creditors and stakeholders.

16.    Pursuant to the Approved Bidding Procedures, there was no obligation for the Teleglobe Companies to commence a formal auction and the bidding procedures letter provided to prospective purchasers specifically advised that there was no certainty that an auction would be held. However, pursuant to the U.S. Bidding Procedures, the Teleglobe Companies and the Monitor were required to consult with the U.S. Creditors' Committee regarding the decision as to whether to hold an auction. Consistent with the requirements set forth in the U.S. Bidding Procedures Order, the Monitor had a number of discussions with the financial advisor to the U.S. Creditors' Committee, the advisors to the Teleglobe Lending Syndicate and the ad hoc committee of the Teleglobe Companies' noteholders regarding the decisions as to whether to hold an auction. After such consultations, the Monitor and the Teleglobe Companies, including the Debtors, concluded that the auction process described above had yielded the highest and best offer attainable for the Core Telecom Business and that a formal

auction would not yield higher value to the creditors and stakeholders of the Teleglobe Companies.

17.    The Teleglobe Companies believe the Purchaser's offer represents the highest and best offer attainable for the Core Telecom Business and concur with the Monitor's valuation methods described more fully in the Babcock Affidavit.

18.    The implementation of the Purchase Agreement also provides significant benefits to the Teleglobe Companies' employees and customers. The going concern sale of the Core Telecom Business will also ensure the continued employment of approximately 550 people who will be retained by the Purchaser. In addition, the going concern sale of the Core Telecom Business will allow the continuity of service to the Teleglobe Companies' customers throughout the world. In the event of a non-going concern liquidation, the Teleglobe Companies would suffer a cessation of operations of the Core Telecom Business that would have negative operational and telecommunications service continuity implications to their customers. The degree and duration of the negative implications to each customer will vary based on a number of factors, including the availability of alternative service providers and the level of back-up facilities in place. The duration of negative implications to customers will vary from negligible interruption to months of service interruptions.

19.    The Teleglobe Companies believe the purchase price for the Core Telecom Business contained in the Purchase Agreement represents the fair market value for the assets of the Core Telecom Business. The Teleglobe Companies, including the Debtors, believe that the Sale Transaction contemplated by the Purchase Agreement will result in a significant benefit to the Debtors, their estates and parties in interest.

20.    The Teleglobe Companies believe there was, and is, an immediate need to proceed with the sale of the Core Telecom Business to the Purchaser as the value of the Core Telecom Business is unlikely to appreciate with time in a restructuring proceeding.  The Teleglobe Companies further believe the critical nature of telecommunications services is not conducive to maintaining customers in an uncertain environment and numerous recent major restructurings in the telecommunications industry have clearly established that retaining revenue in any type of protracted restructuring with an uncertain outcome is extremely difficult.  For all of the above mentioned reasons the Teleglobe Companies respectfully request the Court issue an order approving the sale of the Core Telecom Business to the Purchaser pursuant to the Purchase Agreement and the transactions contemplated thereby.

FURTHER AFFIANT SAYETH NOT.

John Brunette

Sworn to and subscribed before me
this _8th_ day of October, 2002.

Notary Public

My commission expires 11Sep05

# Exhibit 6

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                                    . Case No.   02-11518
                                          .
                                          .
   TELEGLOBE,                             .
                                          . 824 Market Street
                                          . Wilmington, Delaware 19801
                         Debtor,          .
                                          . October 9, 2002
. . . . . . . . . . . . . . . . . . . .   . 2:06 p.m.


TRANSCRIPT OF OMNIBUS HEARING
BEFORE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:                  Richards, Layton & Finger
                                  By:  MARK D. COLLINS, ESQ.
                                  One Rodney Square, P.O. Box 551
                                  Wilmington, Delaware  19801


For NTT Communications
Corporation and Williams
Communications, LLC:              Hogan & Hartsen, LLP
                                  By:  SCOTT A. SHAIL, ESQ.
                                  555 13th Street, N.W.
                                  Washington, DC  20004-1109


Audio Operator:                   Jennifer M. Patone

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjcourt@optonline.net

(609) 586-2311  Fax No.   (609) 587-3599

2

APPEARANCES (CONTINUED):

For Level 3 Communications:    Reed Smith, LLP
By:  RICHARD A. KEULER, JR., ESQ.
1201 Market Street, Suite 1500
Wilmington, Delaware  19801

For Affiliates of SBC
Communications, Inc.:    Potter Anderson & Corroon, LLP
By:  LAURIE SELBER SILVERSTEIN,
ESQ.
Hercules Plaza, 1313 N. Market St.
Wilmington, Delaware  19899

For Cap Gemini:    Phillips, Goldman & Spence
By:  JOSEPH J. FARNAN, III, ESQ.
1200 West Broom Street
Wilmington, Delaware  19806

For VanTec:    Stevens & Lee, P.C.
By:  JOSEPH GREY, ESQ.
300 Delaware Avenue, Suite 800
Wilmington, Delaware  19801

For TLGB Acquistion, LLC:    Schulte Roth & Zaber, LLP
By: LAWRENCE V. GELBER, ESQ.
919 Third Avenue
New York, New York  10022

Zuckerman Spaeder, LLP
By:  THOMAS G. MACAULEY, ESQ.
One Commerce Center
1201 Orange Street, Suite 650
Wilmington, Delaware  19899

For the U.S. Trustee:    United States Trustee's Office
By:  FRANK PERCH, III, ESQ.
DAVID BUCHBINDER, ESQ.
844 King Street, Suite 2313
Wilmington, Delaware

For the Committee:    Hahn & Hessen, LLP
By:  MARK INDELICATO, ESQ.
LAWRENCE NORDEN, ESQ.
Empire State Building
350 Fifth avenue
New York, New York  10118-0075

**J&J COURT TRANSCRIBERS, INC.**

3

APPEARANCES (Continued):

For the Committee:

Rosenthal Monhait Gross &
Goddess, P.A.
By:  HERBERT W. MONDROS, ESQ.
919 Market Street, Suite 1401
Wilmington, Delaware  19899

For Qwest:

Morris, James, Hitchens &
Williams, LLP
By:  CARL N. KUNZ, III, ESQ.
222 Delaware Avenue
Wilmington, Delaware  19899-2306

Sill Cummis Radin Tischman
Epstein & Gross
By:  ANDREW H. SHERMAN, ESQ.
One Riverfront Plaza
Newark, New Jersey  07102

For the Canadian
Monitor:

Blank Rome Comisky & McCauley,
LLP
By:  MARK RICHARDS, ESQ.
     MARK J. PACKEL, ESQ.
Chase Manhattan Centre
1201 Market Street, Suite 800
Wilmington, Delaware  19801

For BCE:

Young Conaway Stargatt & Taylor,
LLP
By:  PAULINE K. MORGAN, ESQ.
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19899-0391

Shearman & Sterling
By:  ANDREW V. TENZER, ESQ.
599 Lexington Avenue
New York, New York  10022-6069

For Esatel:

Greenberg Traurig, LLP
By:  WILLIAM E. CHIPMAN, JR.,
     ESQ.
Wilmington, Delaware

For Americas 2
Cable Consulting, et al.:

Elzufon Austin Reardon Tarlov &
Mondell, P.A.
By:  CHARLES J. BROWN, ESQ.
300 Delaware Avenue, Suite 1700
Wilmington, Delaware  19899

J&J COURT TRANSCRIBERS, INC.

4

1          THE COURT:  Good afternoon.

2          MR. COLLINS:  Good afternoon, Your Honor.  For the

3  record, Mark Collins of Richards, Layton & Finger, on behalf of

4  Teleglobe Communications and its affiliated debtors and

5  debtors-in-possession.  Your Honor, turning to today's agenda,

6  Agenda Items Number 1 through 5 have all been continued to the

7  October 23 hearing date.  Agenda Item Number 6, we understand

8  an order has already been entered by Your Honor, and that's

9  also true for Agenda Item Number 7.  That then brings us to

10  Agenda Item Number 8, which is the motion for a temporary

11  restraining order, preliminary injunction, and permanent

12  injunction.  Your Honor, we have been in conversations with the

13  plaintiff in this matter.  We have executed a stipulation which

14  simply continues for another two weeks a stipulation that was

15  previously entered on this matter.  The parties are continuing

16  to have a dialogue, and we think it makes sense to simply have

17  status quo for another two weeks.

18          THE COURT:  All right.

19          MR. COLLINS:  May I present this, Your Honor?

20          THE COURT:  You may.

21                    (Pause)

22          THE COURT:  All right.  I'll approve that

23  stipulation.

24          MR. COLLINS:  Thank you, Your Honor.  Turning now,

25  Your Honor, to the debtor's request for entry of an order

5

1 authorizing them to consummate a purchase agreement with

2 TLGB Acquisition LLC, Your Honor, a number of limited responses

3 and objections were filed to this motion.  Most of the

4 objections were filed by parties that are parties to contracts

5 or unexpired leases with the debtors.  As the debtor stated in

6 their notice of sale transaction that was filed with the Court

7 on or about September 20th, the assumption and assignment of

8 all executory contracts and unexpired leases will not be held

9 or considered at this sale hearing, but will be subject to

10 later motions and orders after proper notice and hearing,

11 pursuant to Section 365 of the Bankruptcy Code.

12         Your Honor, in this regard, we have added a paragraph

13 to the proposed sale order.  And it may be helpful, Your Honor,

14 as I work through some of the objections, to present to Your

15 Honor a black line of the proposed sale order.

16         THE COURT:  All right.  You may.

17                   (Pause)

18         MR. COLLINS:  We do have extra copies of the revised

19 sale order in the court for any party who is interested in

20 following along.  Your Honor, Paragraph 23 confirms that the

21 debtors are not obtaining any authority today to assume and

22 assign to the buyer any executory contract or unexpired lease

23 under the purchase agreement.  Instead, as I just mentioned,

24 that authority will be sought through separate assumption

25 motions, which will be considered by the Court at a later date

**J&J COURT TRANSCRIBERS, INC.**

6

1  and time, and subject to the rights of any non-debtor

2  contracting party under their particular contract, any rights

3  to those parties under their particular contract or lease, or

4  under Section 365 of the Bankruptcy Code.  Your Honor, I think

5  that provision has resolved all of the objections but for

6  three.  And those are Cap Gemini, SBC affiliates, and Fairfax

7  County, Virginia.

8          If I could turn to those three objections, and then

9  we can determine if anybody, or any party, still has any

10  remaining concerns.

11          THE COURT:  All right.

12          MR. COOPER:  Your Honor, with respect to the

13  objection of Cap Gemini, we have added two paragraphs to the

14  order, which are located at Paragraphs 28 and 29, which we

15  believe resolves Cap Gemini's objection.  Generally, these

16  provisions make clear that the debtors will not sell, assign,

17  or transfer to the buyer any Cap Gemini property, or any

18  equipment that contains electronic versions of Cap Gemini's

19  property that constitute a non-exclusive license pursuant to

20  the master services integration and development agreement, or

21  that was rejected pursuant to the rejection of that agreement,

22  which happened previously.  They also preserve whatever rights

23  Cap Gemini has to seek to refuse -- or, to require the debtors

24  to return or destroy any Cap Gemini property that has been

25  rejected.

7

1    Your Honor, with respect to the objection of SBC

2 Affiliates, we can confirm, on the record, as requested by SBC

3 Affiliates in their objection, that we are not seeking to

4 effect any rights of the SBC affiliates, any of the rights they

5 may have to refuse to supply the debtors with the replacement

6 circuit, or any other circuit, other than in accordance with

7 the applicable tariff.

8    In addition, Your Honor, I have agreed to confirm, on

9 the record, that the debtors will not amend or modify the

10 purchase agreement or the interim management agreements without

11 obtaining an appropriate order from this Court, after notice to

12 SBC affiliates, should any such amendment or modification

13 adversely affect the rights of interests of SBC affiliates.

14    Your Honor, that -- what I just mentioned, I think,

15 is consistent already with the language contained in Paragraph

16 20 of the proposed form of order.

17    Finally, Your Honor, there was a notice of secured

18 lien filed by Fairfax County, Virginia.  We did point out to

19 them Paragraph 8 of the proposed form of order, which makes

20 clear that all liens shall attach to the net proceeds of the

21 sale transaction in the order of their priority, with the same

22 validity, force, and effect which they now have against the

23 purchase assets, all subject to the rights, claims, defenses,

24 and objections, if any, of the debtors and all interested

25 parties, with respect to such liens.  Once they saw that

8

1  language, Your Honor, I think that satisfied any concerns they

2  may have raised in their notice of secured lien.

3         Your Honor, so, I think with that, I think we have

4  resolved all of the outstanding objections, and I'll cede the

5  podium to any party who believes I have not adequately set

6  forth our agreement.

7         THE COURT:  All right.  Does somebody else wish to be

8  heard?

9         MR. SHERMAN:  Good afternoon, Your Honor.  Andrew

10  Sherman, Sills Cummis, on behalf of Qwest Corporation and Qwest

11  Communications Corporation.  In lieu of filing an objection,

12  Your Honor, Qwest has been in contact with counsel for the

13  debtors and counsels for the purchasers regarding its concerns

14  regarding the sale motion.  The parties have negotiated the

15  terms of a stipulation to address Qwest's concerns.  However,

16  the stipulation is not in final format to be presented to Your

17  Honor.  What the parties agreed last night was to advise Your

18  Honor of the material terms of the stipulation, and those are

19  very short.  There are three material terms, the first being is

20  that the purchaser and/or the debtors will not extend their

21  time to assume or reject the Qwest lease -- the Qwest contracts

22  such that the Qwest contract will be either assumed and

23  assigned to the purchaser, or be rejected no later than March

24  31st, 2003.  The second point is that there will be a true-up

25  payment of the amounts, post-petition amounts due to Qwest

9

1  Corporation.  The parties approximate that to be approximately

2  $46,000.  The third is that there will be a mechanism for any

3  post-petition defaults other than the true-up payment, in

4  essence, similar to 366-type relief such that if the debtors

5  fail to make a payment, Qwest will provide notice and an

6  opportunity to cure.  And if there is no cure payment within a

7  time period, Qwest will be authorized to turn off the services.

8  Those are the material terms of the stipulation, Judge.

9          MR. COOPER:  Your Honor, those are the terms of the

10  proposed stipulation that the parties are working toward.  I do

11  not know if agreement has been reached on any of those terms,

12  but they are embodied in the current stipulation that's being

13  passed back and forth.  I don't believe that has been signed

14  off by our side yet.

15          MR. SHERMAN:  We'll -- we can present it to Your

16  Honor, but I believe there is agreement.

17          THE COURT:  All right.

18          MS. SILVERSTEIN:  Your Honor, Laurie Silverstein, on

19  behalf of the affiliates of SBC Communications.  We did have a

20  concern with one provision of the purchase agreement, Section

21  4.4.4., but Mr. Collins has addressed that concern by his

22  representations, so we're satisfied with that, and that any

23  request for circuits, replacement circuits or otherwise, will

24  be governed by the applicable tariffs.

25          I also had one further comment on the proposed sale

10

1 order, which I'm not sure Mr. Collins addressed, and that is at

2 Paragraph 10, and I don't think that's changed in the revised

3 order, indicates that all sale proceeds shall be held in a

4 segregated account pending further order of the Court. And we

5 assumed that that's going to go out on notice as well, so that

6 all parties in interest will have an opportunity to review

7 matters prior to any proceeds being distributed. And with that

8 --

9       THE COURT: It's true of an order of this Court. I

10 don't know the procedures in Canada, but I assume there are

11 similar due process procedures.

12       MS. SILVERSTEIN: And we talked with Mr. Collins last

13 night. I don't believe that's an issue, but I just wanted to

14 make that clear, on the record. Thank you.

15       THE COURT: All right.

16       MR. COLLINS: That is not an issue, Your Honor.

17       MR. SHAIL: Good afternoon, Your Honor. Scott Shail

18 of Hogan & Hartsen, on behalf of NTT Communications Corporation

19 and Williams Communications, LLC. Last evening, counsel for

20 the debtor circulated proposed order language which was not

21 included in the original order, which is now Paragraph 23.

22 That additional language preserves the rights of non-debtor

23 executory contract parties, and those rights include, but are

24 not limited to, setoff recoupment, and all the other statutory

25 rights that exist under 365 of the Bankruptcy Code. And

11

1 because the debtors agreed to include that language, and -- as

2 well as the purchaser, and agree to preserve those rights as

3 mentioned, both Williams and NTT have instructed me to withdraw

4 their limited objections.

5          THE COURT:  All right.

6          MR. SHAIL:  Thank you.

7          MR. GREY:  Your Honor, very quickly.  Joseph Grey.

8 Good afternoon.  For VarTec, from Stevens & Lee.  And this

9 language also resolves our objection.

10          THE COURT:  All right.  Thank you.

11          MR. COLLINS:  And if I could, just turning to a

12 little bit of the background, and filing of this motion, a

13 brief proffer of testimony in addition to the affidavits that

14 we filed with the Court yesterday, so that we can present this

15 properly to Your Honor.

16          THE COURT:  All right.

17          MR. COLLINS:  Your Honor, as background, on May 15th,

18 Teleglobe, Inc., and certain of its Canadian and United States

19 subsidiaries, including the debtors in these Chapter 11 cases,

20 commenced insolvency proceedings under the Canadian Arrangement

21 Act in Ontario, Canada.  On May 28th, the debtors commenced

22 their respective bankruptcy cases in this Court.  The debtor's

23 strategy, from the commencement of the Canadian proceedings, as

24 well as the Chapter 11 cases here, has been to preserve and

25 unlock the value of the profitable core telecom business,

12

1 proceed with the orderly disposition of those assets that were

2 not part of the core business, and to migrate customers

3 associated with the non-core business off of the Teleglobe

4 network.

5        As set forth in the affidavits of Benjamin J.

6 Babcock, a senior vice president of Ernst & Young, who is the

7 Court-appointed monitor in the Canadian proceedings, and John

8 Brunette, the chief executive officer of the debtors, both of

9 these affidavits were filed with the Court yesterday, and both

10 Mr. Babcock and Mr. Brunette are in the courtroom today, and

11 are subject to cross examination.

12        The Teleglobe companies and the monitor determined,

13 in the exercise of their business judgment, that it was

14 unlikely that the value of the core telecom business would

15 appreciate in a protracted bankruptcy case. As confirmed in

16 the affidavits of these gentlemen, the monitor and the debtors

17 believe they needed to act promptly to maintain and realize the

18 going concern value of the core telecom business, as a

19 liquidation value of these businesses would likely be

20 substantially less than the going concern value. Based on this

21 belief, the monitor and the Teleglobe companies sought and

22 obtained, on June 4th, 2002, an order from the Canadian Court

23 authorizing the monitor and the Teleglobe companies to

24 implement a global sale process, as was outlined in the

25 monitor's second report.

13

1           On June 24th, Your Honor entered a very similar

2   order, which again, approved a global bid process, approved the

3   bidding procedures, and established various notice procedures

4   relating to the on-going sale process.

5           On July 1, the debtors mailed the Court-approved

6   notice of global bid process, by first class mail, to the

7   entire creditor matrix in these cases.

8           Turning, now, to the sale itself, and the on-going --

9   and the sale efforts that brought us here today, Mr. Babcock

10  and Mr. Brunette, if called to testify, would state that the

11  Teleglobe companies' intention to proceed with an expedited

12  sale process was outlined to matrix creditor groups prior to

13  the initiation of the Canadian proceedings, as well as the

14  commencement of these Chapter 11 cases.  With the assistance of

15  their financial advisor, Lazard, Teleglobe companies marketed

16  the business since April 2002.  Since this effort began, the

17  Teleglobe companies and Lazard, as well as the monitor,

18  contacted approximately 69 qualified potential purchasers,

19  including 29 strategic investors and 40 financial advisors.  37

20  of the 69 qualified potential purchasers signed non-disclosure

21  agreements in a form satisfactory to the Teleglobe companies to

22  allow them to receive confidential information.  Data rooms

23  containing detailed business, financial, and legal information

24  were established at the offices of Jones, Day, Reavis & Pogue

25  in New York City.  Management presentations were conducted with

14

1  qualified parties.    Further, all parties that were interested

2  in submitting a bid received a form of purchase agreement.

3          In addition, on July 3, 2002, the debtors caused the

4  notice of global bid process to be published in the national

5  editions of The Wall Street Journal and New York Times.

6          As set further in the affidavits of Mr. Babcock and

7  Mr. Burnette, in accordance with the global bid process, all

8  bids were required to be submitted in writing by July 15th.  On

9  July 15th, the Teleglobe companies received ten written offers

10 for the core telecom business.  Based on those ten offers

11 received, the monitor and the Teleglobe companies instructed

12 Lazard to invite five of the qualified purchasers to proceed to

13 complete due diligence, negotiate a purchase agreement, and

14 provide their final and best offer by August 12th, 2002.

15         The selected prospective bidders and their legal and

16 financial advisers were provided with extensive access to

17 business, financial, and legal information regarding this

18 business.  Three of the selected purchasers advanced

19 negotiations on their proposed forms of purchase agreement, and

20 materially improved their offers.  On August 12th, four written

21 offers for the core telecom business were received, only three

22 of which were accompanied by a marked-up form of purchase

23 agreement.  During the time period of August 12th to August

24 14th, Teleglobe, Lazard, and the monitor worked with each of

25 the parties to provide guidance as to the competitiveness of

J&J COURT TRANSCRIBERS, INC.

15

1   their bid, including the proposed purchase agreement.

2        On August 14th, the selected bidders were provided

3   with a revised form of purchase agreement that was in all

4   material respects acceptable to Teleglobe.  On August 14th, the

5   monitor and Lazard advised these parties to submit their final

6   and best offers by August 15th.  On that basis, there would be

7   no additional discussions after such offers were received, and

8   that the monitor would select one party, based on price, in

9   certainty of closing the transaction, to continue with

10  exclusive negotiations, with the view to finalizing a

11  definitive agreement.  On August 15th, three final offers were

12  received.  Two of the offers were structured based on the form

13  of purchase agreement that the debtors submitted to those

14  parties.  The third offer contemplated a structure and form of

15  agreement that was materially different than that proposed by

16  the debtors.

17       On August 16th, the monitor, Lazard, and

18  representatives of the Teleglobe companies met with the

19  Teleglobe lending syndicate, the ad hoc committee of note

20  holders, and the United States unsecured creditors committee to

21  review the final offers and the monitor's recommendation on

22  which bidder the parties should proceed to document an

23  agreement with.

24       A bid submitted by Cerberus Capital Management and

25  Tenex Capital Partners was selected as the highest and best bid

16

1  for the assets.  The parties thereafter commenced negotiations

2  with the buyer that ultimately led to the execution of the

3  purchase agreement dated September 18th, 2002, for the sale of

4  substantially all of the assets of the core telecom business.

5        Pursuant to the purchase agreement, the buyer has

6  agreed to purchase the core telecom business for $155.3

7  million, subject to certain adjustments.  And if Your Honor

8  approves this motion and enters the sale order, and the sale

9  ultimately closes, pursuant to Paragraph 10 of the proposed

10 sale order, the sale proceeds will be segregated pending

11 further order of this Court and the Canadian Court.

12        As the core telecom business operates in a regulated

13 industry, the closing of the transaction is subject to certain

14 regulatory approvals and are estimated -- which are estimated

15 to take not less than three to six months to complete.

16        Accordingly, the sale is structured as a two-step

17 transaction where the sellers and the buyers will enter into an

18 interim management agreement until all of the closing

19 conditions can be met.  The interim management agreement

20 generally provides that the buyer will manage the core business

21 during the period between the execution of the interim

22 management agreement and the closing of the purchase agreement,

23 subject to the seller's continued ownership, operation, and

24 control of the business.

25        I would note for the Court that on October 2, 2002,

1  the Canadian Court entered an order authorizing the Teleglobe

2  companies to consummate the transactions proposed and the

3  purchase agreement.  In accordance with Your Honor's bid

4  procedures order dated June 24th, on September 20th, the

5  debtors filed with this Court the notice of sale transaction,

6  and attached to that notice the Canadian transaction notice as

7  well as the purchase agreement.  On September 20th, the debtors

8  served a copy of this notice, along with the Canadian

9  transaction notice and the purchase agreement with limited

10  exhibits upon the 2002 list, all non-debtor contracting

11  parties, all parties that made expressions of interest for the

12  core telecom business within the last two months -- or, two

13  months prior to the date of the global bid procedures order,

14  all federal, state, and local taxing authorities, and any party

15  asserting a lien on the debtor's assets.  The notice of the

16  sale transaction, with a copy of the Canadian transaction

17  notice, but with no exhibits, was served on the entire creditor

18  matrix.  Accordingly, Your Honor, we believe we have fully

19  satisfied the notice requirements of the Bankruptcy Code, as

20  well as Your Honor's bid procedures order.

21        Your Honor, as set forth in the affidavits of

22  Mr. Babcock and Mr. Burnette, the monitor and the debtors are

23  of the opinion that the transaction and process employed in

24  these cases complied with Your Honor's bid procedures order,

25  the transaction process resulted in the core telecom business

18

1  being properly exposed to the market, and a purchase agreement

2  with a price instruction that was the result of competitive

3  bidding in an auction-like environment between multiple

4  parties.

5           The monitor and the debtors have determined that the

6  competitive bid process yielded the highest and best offer for

7  the core telecom business, and it's in the best interest of the

8  debtors, their creditors, and their estates.

9           In addition, Mr. Babcock and Mr. Brunette will

10 testify that the global bid process was conducted without

11 collusion and in good faith.  Each of the purchase agreement,

12 the interim management agreement, and the U.K. interim

13 management agreement were negotiated, proposed, and then

14 entered into by the parties in good faith, and from arm's-

15 length bargaining positions.  They would further testify that

16 the buyer is not affiliated in any way with the debtors.

17          They would further testify that the purchaser's offer

18 represents the highest and best offer attainable for the core

19 telecom business, and is fair and constitutes reasonably

20 equivalent value for the core telecom business.  As a result,

21 Your Honor, the debtors would respectfully request the entry of

22 the sale order, which would approve the entry into the purchase

23 agreement and the related transaction agreements.

24          THE COURT:  Does anybody wish to cross examine either

25 of the witnesses?  All right.  I'll accept the proffer, as well

J&J COURT TRANSCRIBERS, INC.

19

1  as the affidavits submitted in support of it.

2          MR. COOPER:  Thank you, Your Honor.

3          THE COURT:  Any other party wish to be heard on the

4  sale?

5          MR. INDELICATO:  Good afternoon, Your Honor.  Mark

6  Indelicato, from Hahn & Hessen, on behalf of the official

7  unsecured creditors' committee.  If Your Honor will recall,

8  when the bidding procedures order was entered, the committee

9  was concerned that there be an auction for these assets because

10  we felt at that time that that was the maximum way to achieve

11  value.  The monitor and the debtor have kept the committee and

12  its professionals involved in the process, and they have

13  convinced us, by keeping us in the process, that in fact, they

14  have achieved the maximum value that you're going to get for

15  these assets, and the committee agrees with them that no

16  further auction need be held.  We believe, Your Honor, the

17  representations made in the two affidavits submitted to this

18  Court.  We believe the sale is in the best interest of the

19  estate, and we support the entry of the order.  Thank you.

20          THE COURT:  All right.  Anybody else?  Transfer

21  taxes.  You're asking for a finding that it's not -- that these

22  are not subject to any transfer tax?

23          MR. COOPER:  We are, Your Honor.  This is a sale of a

24  significant majority of the debtor's assets, and --

25          THE COURT:  Can we have a Hechinger escrow --

20

1        MR. COOPER:  We can do that, Your Honor.  We do think

2   it's not necessary, given the -- just the current structure of

3   this case, where we stand today in this process.

4        THE COURT:  Well, can you guarantee there will be a

5   confirmed plan, then?

6        MR. COOPER:  There's never a guarantee.

7        THE COURT:  Which I think is a pre-condition to 1146.

8        MR. COOPER:  I understand Your Honor's concerns, and

9   I understand the Court's decision in Hechingers.  We don't --

10  this transaction will not close for a fairly significant period

11  of time, Your Honor, and it does not seem to make sense for us

12  to escrow any monies today, or in the near term, simply given

13  the regulatory approvals that need to be made.

14       THE COURT:  Well, you're escrowing the money anyway.

15       MR. COOPER:  Upon closing.  But there's a good

16  chance, Your Honor, that by the time closing takes place, a

17  plan could have been confirmed.  We are --

18       THE COURT:  Well then, why don't I enter the 1146

19  paragraph at that time?

20       MR. COOPER:  I think it's very helpful for us to know

21  now, Your Honor, that if we proceed to a closing, that these

22  parties will not be subject, from the debtors, to any stamp,

23  transfer tax, or similar tax, as provided in 1146(c).  I do

24  think --

25       THE COURT:  Well, 1146(c) only provides if a plan's

J&J COURT TRANSCRIBERS, INC.

21

1  confirmed.  So, if you add the <u>Hechinger</u> language in that I

2  usually require --

3          MR. COOPER:  Can I have one moment, Your Honor?

4          THE COURT:  Yes.

5                        (Pause)

6          MR. COOPER:  Your Honor, one concept that my co-

7  counsel brought up is whether or not we could have a provision

8  in the sale order that would provide that the proceeds

9  allocated to the U.S. debtors would be utilized under a plan of

10 reorganization, or a plan of liquidation such that -- because

11 the proceeds will be held pending allocation, and every party's

12 intention is that those proceeds, once allocated, will be

13 utilized and distributed under a plan.  So that -- in other

14 words, the debtors would not distribute any of those proceeds

15 to any party until a plan has been approved by Your Honor.

16         THE COURT:  I'm sure that once the allocation is

17 made, the proceeds retained are going to be less than any

18 transfer tax -- or excuse me, are going to be more than any

19 transfer taxes.

20         MR. COOPER:  Yes, they will be.  And at that point in

21 time, Your Honor, we could always, you know, seek to set aside,

22 at that point in time, if we're very close to a plan but are

23 not yet at plan confirmation.

24         THE COURT:  All right.  Well, I think Paragraph 21

25 has to be modified to --

**J&J COURT TRANSCRIBERS, INC.**

22

1           MR. COOPER:  Okay.

2           THE COURT:  -- include a provision for that.

3           MR. COOPER:  We'll do that, Your Honor.

4           THE COURT:  But otherwise, the form of order looks

5  fine.  There being no further comments or objections, I will

6  enter the order approving the sale to the highest and best

7  bidder, and finding that the process was appropriate in

8  conformity with the bidding procedures approved, and in

9  conformity with Section 363.

10          MR. COOPER:  Thank you, Your Honor.  We will modify

11  the form of order and submit that to Your Honor.

12          THE COURT:  All right.  Anything else?

13          MR. COOPER:  That's all we have.

14          THE COURT:  All right.  We'll stand adjourned.

15          MR. COOPER:  Thank you.

16                       *  *  *  *  *

17                       CERTIFICATION

18          I, TAMMY DeRISI, certify that the foregoing is a

19  correct transcript to the best of my ability, from the

20  electronic sound recording of the proceedings in the above-

21  entitled matter.

22

23  _____   Date:  October 16, 2002

24  TAMMY DeRISI

25  J&J COURT TRANSCRIBERS, INC.


                    J&J COURT TRANSCRIBERS, INC.

# Exhibit 7

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

In re:                                    :
                                          :    Chapter 11
TELEGLOBE COMMUNICATIONS                  :
CORPORATION, a Delaware                   :    Jointly Administered
corporation, et al.,[1]                   :    Case No. 02-11518 (MFW)
                                          :
Debtors.                                  :

### ORDER PURSUANT TO SECTIONS 105(a), 363(b) AND (f), AND 1146(c) OF THE BANKRUPTCY CODE AUTHORIZING DEBTORS TO CONSUMMATE PURCHASE AGREEMENT WITH TLGB ACQUISITION LLC

Upon the motion dated June 10, 2002 (the "Sale Motion"), of the above-captioned debtors and debtors in possessions (each a "Debtor" and collectively, the "Debtors"), for, among other things, authority, pursuant to sections 105(a), 363(b) and (f), and 1146(c) of the Bankruptcy Code, to sell, pursuant to a Purchase Agreement dated September 18, 2002 (the "Purchase Agreement"), among certain Debtors[2] (the "US Debtor Sellers") and certain non-Debtor affiliates of the Debtors[3] (collectively, the "Sellers") and the Successful Bidder,[4] the Core Business and Purchased Assets (as such terms are defined in the Purchase Agreement, the "Core Business and Purchased Assets") free and clear of liens, claims and encumbrances to the Successful Bidder in accordance with the terms of the Purchase Agreement and the agreements and transactions contemplated thereby (the "Sale Transaction"), as more fully described in the Sale Motion, the Transaction Motion and the Purchase Agreement; and TLGB Acquisition LLC

---

[1] The Debtors are the following eleven entities: Teleglobe Communications Corporation, Teleglobe USA Inc., Optel Telecommunications, Inc., Teleglobe Holdings (U.S.) Corporation, Teleglobe Marine (U.S.) Inc., Teleglobe Holding Corp., Teleglobe Telecom Corporation, Teleglobe Investment Corp., Teleglobe Luxembourg LLC, Teleglobe Puerto Rico Inc. and Teleglobe Submarine Inc.

[2] The selling Debtors are Teleglobe Communications Corporation, Teleglobe USA Inc. and Optel Telecommunications, Inc.

[3] The Sellers that are debtors in the Canadian Proceedings are referred to as the "Canadian Debtor Sellers."

[4] Capitalized terms utilized herein not otherwise defined shall have the meanings ascribed to them in the Sale Motion.

2515381_5.DOCDLI-5716224v8

(including any designated affiliate or affiliates thereof, collectively, the "Buyer") having been

determined to be the Successful Bidder by submitting the highest and best offer for the Core

Business and Purchased Assets; and

Upon the orders of the Canadian Court, dated June 4, 2002 and October 2, 2002,

respectively, (i) authorizing the Global Bidding Process and approving the Bidding Procedures;

and (ii) approving the Sale Transaction, including the sale of the Core Business and Purchased

Assets to the Buyer (to the extent held by the Canadian Debtor Sellers), including, but not

limited to, entering into and performing under the Interim Management Agreement in

substantially the form attached as Exhibit F to the Purchase Agreement (the "Interim

Management Agreement") and performing any obligations (to the extent required pursuant to the

agreements executed in connection with the Sale Transaction) with respect to the UK Interim

Management Agreement in substantially the form attached as Exhibit F-1 to the Purchase

Agreement (the "UK Interim Management Agreement") prior to the closing of the Sale

Transaction; and

Upon this Court's prior order, dated June 24, 2002 (the "Procedures Order"): (i)

authorizing the Global Bidding Process, (ii) approving the Bidding Procedures, (iii) fixing notice

procedures and approving the form of notice, and (iv) establishing procedures for setting a date

for the Sale Hearing; and

Due notice of the Sale Motion, Sale Transaction, Procedures Order, Global

Bidding Process and Sale Hearing having been given to all parties entitled thereto in accordance

with the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the Procedures

Order, as evidenced by the affidavits and certificates of service and publication filed with this

Court (the "Affidavits"); and the Sale Hearing having been held before this Court on October 9,

2002, at which time parties in interest were afforded an opportunity to be heard; and upon all of the proceedings had before the Court and the evidence received in connection therewith;

NOW, THEREFORE, upon the entire record of the Sale Hearing and these cases; and after due deliberation thereon; and good cause appearing therefor;

IT IS HEREBY FOUND AND DETERMINED THAT:[5]

1.      This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. §§157 and 1334.

2.      Determination of the Sale Motion is a core proceeding under 28 U.S.C. §§157(b)(2)(A) and (N). The statutory predicates for the relief requested herein are sections 105(a), 363(b) and 1146(c) of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, and 6006.

3.      Proper, timely, adequate and sufficient notice of the Sale Motion, Sale Transaction, Sale Hearing and Global Bidding Process has been provided in accordance with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006 and the Procedures Order, and no other or further notice of the Sale Motion, Sale Transaction, Sale Hearing and Global Bidding Process or the entry of this Order is required.

4.      A reasonable opportunity to object or be heard regarding the relief requested in the Sale Motion has been afforded to all interested persons and entities, including (i) the Official Committee of Unsecured Creditors (the "Creditors' Committee") appointed in these chapter 11 cases; (ii) the Office of the United States Trustee for the District of Delaware; (iii)

---

[5] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. See Bankruptcy Rule 7052.

counsel to the Debtors' postpetition lender; (iv) counsel to the lenders under the Canadian Credit
Facility; (v) counsel to the Informal Committee of Noteholders; (vi) counsel to Bank of
Montreal; (vii) counsel to the Monitor; (viii) all parties who have made written expressions of
interest in acquiring the Core Business within two (2) months prior to the date of the Procedures
Order; (ix) all parties submitting bids for the Core Business in accordance with the Global
Bidding Process; (x) all appropriate federal, state and local taxing authorities; (xi) any party
asserting a lien on the US Debtor Sellers' assets; (xii) the Federal Communications Commission;
and (xiii) all parties having filed a notice of appearance in the Debtors' chapter 11 cases pursuant
to Bankruptcy Rule 2002.

5.      The Debtors and the Monitor have full power and authority to
consummate the Sale Transaction pursuant to the terms of the Purchase Agreement and all other
documents contemplated thereby, and no consents or approvals, other than those expressly
provided for in the Purchase Agreement (including the schedules thereto), including without
limitation, the Interim Management Agreement and UK Interim Management Agreement, are
required for the Debtors and the Monitor to consummate such transactions.

6.      The Sale Transaction reflects the exercise of the Debtors' sound business
judgment.

7.      Approval of the Sale Transaction and the consummation of the
transactions contemplated thereby, are in the best interests of the Debtors, their estates and
parties in interest. Good and sufficient business justification for consummating the Sale
Transaction pursuant to sections 105(a), 363(b) and 1146(c) of the Bankruptcy Code, has been
established in that, among other things:

(a)     The Teleglobe Companies' intention to proceed with an expedited
        sales process was outlined to major creditor groups prior to the
        initiation of the Canadian Proceedings, the Ancillary Proceedings
        and the commencement of these chapter 11 cases;

(b)     The Teleglobe Companies, with the assistance of Lazard, have
        marketed the Core Business since the last week of April of 2002
        (the "Marketing Period"). The parties likely to have an interest in
        the Core Business were identified and discussions were had with
        parties who expressed interest. Lazard contacted over 30 eligible
        parties during the Marketing Period and established the Data Room
        to allow parties to conduct due diligence. Approximately 13
        interested parties conducted due diligence in the Data Room with
        respect to the entire Core Business and approximately 12 other
        interested parties conducted due diligence in the Data Room with
        respect to portions of the Core Business;

(c)     The value of the Core Business and Purchased Assets is unlikely to
        appreciate with time in a restructuring proceeding. The critical
        nature of telecommunication services is not conducive to
        maintaining customers in an uncertain environment. Retaining
        revenue in any type of protracted restructuring with an uncertain
        outcome is extremely difficult; and

(d)     The Global Bidding Process and Bidding Procedures provided a
        forum in which the potential for conflicts of interest was addressed
        and maximized the likelihood that potential purchasers would
        participate in the process.

8.      The terms and conditions of each of the Purchase Agreement, Interim

Management Agreement and UK Interim Management Agreement are fair and reasonable. The

purchase price under the Purchase Agreement (the "Purchase Price") represents the highest and

best offer for the Core Business and Purchased Assets and is fair and constitutes reasonably

equivalent value for the Core Business and Purchased Assets.

9.      The Global Bidding Process was conducted without collusion and in good

faith. Each of the Purchase Agreement, Interim Management Agreement and UK Interim

Management Agreement was negotiated, proposed and entered into by the parties without

collusion, in good faith, and from arm's length bargaining positions. The Buyer is not affiliated

with any of the Debtors and is a purchaser in good faith of the Core Business and Purchased Assets (to the extent held by the US Debtor Sellers) and, as such, is entitled to the protections afforded thereby by section 363(m) of the Bankruptcy Code. None of the Debtors, the Monitor or the Buyer has engaged in any conduct that would cause or permit the Purchase Agreement and the transactions contemplated thereby to be avoided under section 363(n) of the Bankruptcy Code.

10.    The transfer by the US Debtor Sellers of the Core Business and Purchased Assets (to the extent held by the US Debtor Sellers) to the Buyer pursuant to the Purchase Agreement (a) will be a legal, valid and effective transfer of property or rights in, of or to the Core Business and Purchased Assets (to the extent held by the US Debtor Sellers) to the Buyer, and (b) except as provided in the Purchase Agreement, such rights of, to or in the Core Business and Purchased Assets (to the extent held by the US Debtor Sellers) will vest the Buyer with good and marketable title to the Core Business and Purchased Assets (to the extent held by the US Debtor Sellers), free and clear of all liens, claims, interests, and encumbrances under section 363(f) of the Bankruptcy Code.

11.    Except as provided in the Purchase Agreement, Interim Management Agreement or UK Interim Management Agreement, consummation of the Sale Transaction does not and will not subject the Buyer to any debts, liabilities, obligations, commitments, responsibilities or claims of any kind or nature whatsoever, whether known or unknown, contingent or otherwise, existing as of the date hereof or hereafter arising, of or against the Debtors, any affiliate of the Debtors, or any other person by reason of such transfers and assignments under the laws of the United States, any state, territory or possession applicable to

such transactions; provided, however, the Buyer shall be liable for payment of the Assumed Liabilities as provided in the Purchase Agreement.

12.   All of the provisions of this Order and the Purchase Agreement are nonseverable and mutually dependent.

13.   The relief requested in the Sale Motion is in the best interests of the Debtors, their estates and parties in interest.

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

1.   The Sale Motion be, and it hereby is, granted in its entirety; provided, however, the Debtors shall file one or more Motions to approve the assumption and assignment of the Assigned Contracts and Leases to the Buyer pursuant to the Purchase Agreement (the "Assumption Motion(s)") and one or more Motions to reject those contracts and leases designated as contracts and leases to be rejected by the Buyer pursuant to the Purchase Agreement.

2.   All objections, if any, to the Sale Motion or the relief requested therein or the sale of the Core Business and Purchased Assets (to the extent held by the US Debtor Sellers) to the Buyer pursuant to the terms and conditions of the Purchase Agreement, or the entry into the Interim Management Agreement that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are overruled on the merits.

3.   The Sale Transaction and the terms and conditions and transactions contemplated by the Purchase Agreement, including, but not limited to, (i) the sale of the Core

Business and Purchased Assets (to the extent held by the US Debtor Sellers) to the Buyer; (ii) the assumption of the Assumed Liabilities (other than Assumed Liabilities under the Assigned Contracts and Leases) by the Buyer; and (iii) the execution of the Interim Management Agreement, are hereby authorized and approved in all respects, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code.

      4.    The terms and conditions of the Interim Management Agreement (to the extent such relate to the US Debtor Sellers) and the UK Interim Management Agreement (to the extent such relate to the US Debtor Sellers), including, without limitation, the exercise of all rights by the Manager (as defined in each of the Interim Management Agreement and the UK Interim Management Agreement) and all other rights and authority granted to the Manager therein are hereby approved.

      5.    The Debtors and the Buyer are hereby authorized to take all steps necessary or incidental to implementing the Migration Transactions (as defined in the Purchase Agreement) relating to the Debtors' voice and related data telecommunications business described as the Core Business in the Purchase Agreement, as contemplated by the Purchase Agreement and the Interim Management Agreement, and any and all such steps taken by the Debtors or the Buyer in furtherance of such Migration Transactions relating to the Core Business to date, be and the same are hereby approved.

      6.    The sale of the Core Business and Purchased Assets may be directly by the US Debtor Sellers or indirectly by one or more Newcos (as described in the Purchase Agreement), the assumption of the Assumed Liabilities may be directly from the US Debtor

Sellers or indirectly from one or more Newcos, and either the US Debtor Sellers or any Newcos, or a combination thereof, as appropriate, may execute the Interim Management Agreement.

7. The Purchase Agreement is hereby approved in all respects. Pursuant to section 363(b) of the Bankruptcy Code, the US Debtor Sellers are hereby authorized, directed and empowered to fully assume, perform under, consummate and implement the Purchase Agreement together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase Agreement and the transactions contemplated thereby, and to take all further actions as may reasonably be requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer or reducing to possession any or all of the Purchased Assets or Assumed Liabilities, or as may be necessary or appropriate to the performance of the US Debtor Sellers' obligations as contemplated by the Purchase Agreement without any further corporate action or orders of this Court.

8. Except as provided in the Purchase Agreement in connection with the Assumed Liabilities, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, upon the closing under the Purchase Agreement, the Core Business and Purchased Assets owned by the US Debtor Sellers shall be transferred to the Buyer, directly by the US Debtor Sellers or indirectly by one or more Newcos, free and clear of all pledges, liens, judgments, demands, encumbrances, easements, restrictions or charges of any kind or nature if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership (the "Liens"), with all such Liens to attach to the portion of the net proceeds, to be allocated at a later time among the Sellers, of the Sale Transaction (collectively, without taking into account any allocation, the "Sale Proceeds") in the order of their priority, with the same validity, force and effect which they now have as against the Purchased Assets, all

subject to the rights, claims, defenses and objections, if any, of the Debtors and all interested parties with respect to such Liens.

9.  Nothing in this Order shall be deemed an adjudication of the extent, validity or priority of any Liens asserted in or against the Purchased Assets.

10.  All Sale Proceeds shall be held in a segregated account pending further order of the Canadian Court and this Court.

11.  The Sale Proceeds shall be allocated among the Sellers by the Teleglobe Companies, including the US Debtor Sellers, at a later time. The right of the Creditors' Committee and lending syndicate under the Debtors' prepetition credit facility to object to any proposed allocation of the Sale Proceeds is hereby reserved until such time and this Court shall not be bound by any prior determination of the Canadian Court as to the appropriate allocation of the Sale Proceeds.

12.  Any breakup fee or expense reimbursement to which the Buyer may become entitled (including the Breakup Fee and Expense Reimbursement (each as defined in the Purchase Agreement)) shall be the sole obligation of Teleglobe Inc., shall not be paid (in whole or in part) by the Debtors and shall not be paid (in whole or in part) out of any Sales Proceeds allocated to the Debtors.

13.  This Order is and shall be (a) effective as a determination that, on the Closing Date, all Liens existing as to the Purchased Assets prior to the Closing Date have been unconditionally released, discharged and terminated, and that the conveyance of the Purchased Assets has been effected, and all parties asserting one or more Liens are hereby permanently

enjoined from asserting any such Lien against the Purchased Assets or the Buyer, (b) binding upon and govern the acts of all entities including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets.

14.     This Order, the Purchase Agreement, the Interim Management Agreement and the UK Interim Management Agreement (to the extent any of the US Debtor Sellers are responsible for obligations thereunder) shall be binding on and inure to the benefit of any assignee or designee of the Sellers, the Debtors or the Buyer, including any chapter 7 or 11 trustees that may be appointed for the Debtors.

15.     If any person or entity that has filed financing statements or other documents or agreements evidencing Liens on or interests in the Purchased Assets shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Liens or other interests which the person or entity has with respect to the Purchased Assets, the Debtors and the Monitor are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Purchased Assets.

16.    This Court retains jurisdiction (i) to enforce and implement the terms and provisions of the Purchase Agreement, Interim Management Agreement and UK Interim Management Agreement with respect to the Core Business and Purchased Assets located in the United States, all amendments thereto, any waivers and consents thereunder, and of each of the agreements, documents and instruments executed in connection therewith; (ii) to compel delivery of the Purchased Assets located in the United States to the Buyer directly from the Debtors or indirectly through any Newco; (iii) to compel delivery of the final Purchase Price to the Sellers under the Purchase Agreement; (iv) to resolve any disputes, controversies or claims arising out of or relating to the Purchase Agreement; and (v) to interpret, implement and enforce the provisions of this Order.

17.    In the absence of a stay pending appeal, if the Buyer elects or is required to consummate the Sale Transaction at any time after entry of this Order, then with respect to the Sale Transaction, including any assumption and assignment of any Assigned Contracts and Leases that are assumed and assigned pursuant to one or more orders approving the Assumption Motion(s) (the "Assumption Order(s)"), the Buyer shall be entitled to the protections of section 363(m) of the Bankruptcy Code if this Order or any authorization contained herein is reversed or modified on appeal.

18.    The terms and provisions of the Purchase Agreement, Interim Management Agreement and UK Interim Management Agreement (to the extent a party thereto), together with the terms and provisions of this Order, shall be binding in all respects upon the US Debtor Sellers, the Buyer, and their respective affiliates, successors and assigns, and any affected third parties including but not limited to all nondebtor parties to the Assigned Contracts and Leases that are assumed and assigned pursuant to the Assumption Order(s) and the Assumed

Liabilities to be assigned to the Buyer pursuant to the Purchase Agreement (other than Assumed Liabilities under the Assigned Contracts and Leases), and persons asserting a claim against or interest in the US Debtor Sellers' estates or any of the Purchased Assets to be sold to the Buyer pursuant to the Purchase Agreement.

19.    The failure specifically to include any particular provisions of the Purchase Agreement, Interim Management Agreement or UK Interim Management Agreement in this Order shall not diminish or impair the efficacy of such provisions, it being the intent of the Court that the Purchase Agreement, Interim Management Agreement and UK Interim Management Agreement be authorized and approved in their entirety.

20.    The Purchase Agreement, Interim Management Agreement, UK Interim Management Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court, provided that any such modification, amendment or supplement has no material adverse effect on the Debtors' estates or their creditors.

21.    The transfer of the Purchased Assets to the Buyer, is not subject to taxation under any state or local law imposing a stamp, transfer or similar tax in accordance with sections 1146(c) and 105(a) of the Bankruptcy Code; provided, however, to the extent that proceeds are made available and allocated with respect to the sale of the Core Business and Purchased Assets owned by the US Debtor Sellers, such proceeds will be made available to fund a plan of reorganization or a liquidating plan of reorganization or an amount sufficient to satisfy any such taxes shall be segregated pending further order of the Court.

22.     As provided by Bankruptcy Rules 6004(g) and 6006(d), this Order shall be effective and enforceable immediately upon entry and the Buyer and the Debtors are authorized to take all actions and enter into any and all agreements that they deem necessary or appropriate with respect to the Sale Transaction as authorized by this Order immediately.

23.     Nothing in this Order shall, or shall be deemed to, constitute authorization for the US Debtor Sellers to assume and assign to the Buyer any executory contract or unexpired lease under the Purchase Agreement.  Any authorization by the Court of assumption(s) and assignment(s) of executory contracts or unexpired leases with the US Debtor Sellers shall be pursuant to the Assumption Motion(s), consideration of which shall be unaffected by this Order and without prejudice to the right of any non-Debtor contracting party to assert any right it may have under such executory contracts or unexpired leases, including, without limitation, any right of offset or recoupment that may exist, or any right pursuant to section 365 of the Bankruptcy Code, including, without limitation, to (i) seek adequate assurance of future performance by the Buyer; (ii) seek a determination of the amount required to cure any existing default under its respective executory contract(s) or unexpired lease(s); or (iii) seek to require the US Debtor Sellers to assume all, and not portions of, its respective executory contract(s) or lease(s).

24.     The approval of the Sale Transaction is without prejudice to:

   (a)     all rights, claims and remedies (including, without limitation, derivative rights of action) which existed as at May 28, 2002 that any of the Debtors, creditors of the Debtors, or any representative of creditors of the Debtors, including, without limitation, any receiver, trustee in bankruptcy or other court-appointed officer of any of the Teleglobe Companies may have against any of the Teleglobe Companies, BCE Inc. and its subsidiaries and/or affiliates (collectively, "BCE"), and/or any of the officers or directors of any member of the Teleglobe Companies or BCE (collectively, the "Preserved Claims Group") relating directly or indirectly to the Teleglobe Companies and/or to any matters or

activities of the Preserved Claims Group involving the Core Business and Purchased Assets, including without limitation, those relating to the transactions which are subject to the Bell Canada Contracts (as defined in the Purchase Agreement) and the Assignment and Assumption Agreement dated January 1, 2001 among Teleglobe Inc., Bell Canada and BCE Nexxia Inc., (collectively, the "Preserved Claims"); and

(b)   any rights, claims and remedies which existed as at May 28, 2002 that (i) BCE or (ii) any of the Teleglobe Companies may have against those persons enumerated in paragraph 24(a) (the "Preserved Counter Claims");

and the Preserved Claims and Preserved Counter Claims are hereby reserved and, notwithstanding the terms of the Purchase Agreement, the Preserved Claims and Preserved Counter Claims are expressly excluded from the Core Business and Purchased Assets, provided that the Preserved Claims and Preserved Counter Claims may not be advanced against the Buyer or the Core Business and Purchased Assets, and further, provided that nothing in this paragraph 24 shall in any manner or to any extent limit or restrict the Transfer (as defined in the Purchase Agreement) of the Core Business and Purchased Assets or the Buyer's rights under the Interim Management Agreement (including, without limiting the generality of the foregoing, the Bell Canada Contracts (as defined in the Purchase Agreement) and the Assignment and Assumption Agreement dated January 1, 2001 among Teleglobe Inc., Bell Canada and BCE Nexxia Inc. (together with the Bell Canada Contracts, the "Bell Contracts"), and the other Contracts and the Current Assets as defined in the Purchase Agreement), free and clear of all Liens as set forth in decretal paragraph 8 of this Order and for greater certainty the reservation of any such Preserved Claims and Preserved Counter Claims herein shall not under any circumstances in any way impact or affect the purchase, Transfer or the use of the Core Business and Purchased Assets in the ordinary course of the operation of the acquired business by the Buyer.

25.     Nothing in this Order shall effect an assignment of, or determine the rights among the parties, as to the Bell Contracts referred to in paragraph 24 between Bell Canada, BCE Nexxia Inc., Teleglobe Inc. and the Buyer which are the subject of current negotiations as to an assignment and may be subject to further orders in these proceedings.

26.     The Buyer be and is hereby required to preserve and maintain the Transferred Books and Records (as defined in the Purchase Agreement); provided that nothing herein shall require the Buyer to preserve and maintain the Transferred Books and Records other than as it would in the ordinary course of its business.

27.     Upon request by the Debtors, the Creditors' Committee, any party to a Preserved Claim or Preserved Counter Claims or other Court-appointed officer, the Buyer shall, at the expense of the requestor (with respect to out-of-pocket costs) make the Transferred Books and Records available pursuant to a step taken in any proceeding on prior notice (to be given by any requestor) to any interested parties, to the requestor for use in any judicial or regulatory proceeding or proceedings in respect of, or related to, the Preserved Claims and Preserved Counter Claims; provided that nothing herein shall require the Buyer to preserve and maintain the Transferred Books and Records other than as it would in the ordinary course of its business.

28.     In connection with the transaction contemplated by the terms of this Order, unless Cap Gemini Ernst & Young ("CGE&Y"), the Debtors and the Buyer agree otherwise, the Debtors will not sell, assign or otherwise transfer to the Buyer any CGE&Y property or any equipment that contains electronic versions of CGE&Y property that:  (i) constitutes a non-exclusive license pursuant to the Master Services Integration and Development Agreement dated as of July 31, 2001, as amended and otherwise modified from time to time ("MSIDA"), or (ii) has been rejected pursuant to the rejection of the MSIDA by Teleglobe Inc.

29.    Nothing in this Order shall:  (i) impair the rights of CGE&Y to request

that the Debtors return or destroy, and certify the destruction of, any CGE&Y property that has

been rejected in accordance with the rejection of the MSIDA by Teleglobe Inc., if any, or (ii)

impair any of the Debtors' defenses to any such request made by CGE&Y.

Dated:  October 10, 2002
        Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE