# Exhibit 8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------x
In re                                            )     Chapter 11
                                                 )
TELEGLOBE COMMUNICATIONS                         )
CORPORATION, et al.,                             )     Jointly Administered
                                                 )     Bankr. Case No. 02-11518(MFW)
                                                 )
                              Debtors.           )
-------------------------------------------------x
TELEGLOBE COMMUNICATIONS                         )
CORPORATION,                                     )
et al.,                                          )     C.A. No. 04-1266 (SLR)
                                                 )
                              Plaintiffs,        )
                                                 )
                    v.                           )
                                                 )
BCE INC., et al.,                                )
                                                 )
                              Defendants.        )
-------------------------------------------------x
```

## EXPERT REPORT OF CARLYN TAYLOR

**EXPERT REPORT OF CARLYN R. TAYLOR, CPA, MA**
**FTI CONSULTING, INC.**

## 1) INTRODUCTION AND QUALIFICATIONS

I have been retained as an expert in this case by counsel for Teleglobe Communications Corporation, et al. ("U.S. Debtor Estate") and the Official Committee of Unsecured Creditors of Teleglobe Communications Corporation ("creditors") to analyze restructuring issues applicable to this matter.

I am a Senior Managing Director in the Corporate Finance Group of FTI Consulting, Inc. ("FTI"), a publicly traded financial and economic consulting firm with approximately 1000 professionals. I am the national leader of the Communications & Media industry group within the Corporate Finance practice of FTI. I am a Certified Public Accountant with an Accredited Business Valuation certification from the AICPA. I specialize in consulting to companies in the telecommunications industry and have worked on over 200 engagements involving a broad range of telecom companies, including dozens of companies in the international long distance and data business. My work often involves strategic advisory, business restructuring consulting, corporate finance, due diligence, valuation, and litigation expert witness work. My resume is attached as Appendix A to this report.

Of particular relevance to this assignment are the material restructuring or advisory engagements I have led in the international long distance and data business, including the following:

- Global Crossing – Restructuring advisor to the secured lenders from late 2001 through the completion of the bankruptcy.

- Williams Communications – Restructuring advisor to the secured lenders from late 2001 through the completion of the bankruptcy.

- Level(3) Communications – Restructuring advisor to the secured lenders in 2002 in connection with the restructuring amendment to the Credit Facility.

- Flag Atlantic – Restructuring advisor to the secured lenders in 2002 through the completion of the restructuring process.

- Broadwing – Restructuring advisor to the secured lenders in 2002 and 2003 through the completion of the restructuring amendment to the Credit Facility and subsequent monitoring of performance up through the sale of the long haul fiber business.

- Reach Communications (based in Hong Kong) – Restructuring advisor to the secured lenders during the restructurings in 2003 and 2004.

- GTS (based in UK) – Restructuring advisor to the former Esprit bondholders during the restructuring process in the UK.

- Genuity – Restructuring advisor to the unsecured lenders from mid-2002 through the bankruptcy proceeding.

- Qwest – Due diligence and business plan advisor to the secured lenders during 2002 and early 2003 to review the business plan and liquidity position of the company.

- 360Networks – Performed valuation and industry analysis for the monitor in Canada before and during the restructuring process.

- Pacific Gateway Exchange – Restructuring advisor to the debtor during the bankruptcy proceeding.

- XO Communications – Restructuring advisor to the secured lenders from late 2001 through the bankruptcy proceeding.

- MFN Communications – Restructuring advisor to the secured lenders during the bankruptcy proceeding.

- Viatel – Restructuring advisor to the unsecured creditor committee during the US bankruptcy/UK restructuring process.

- VarTec – Restructuring advisor to the secured lenders from mid-2004 through the bankruptcy.

- IDT Corp – Various valuation assignments involving international long distance products.

- Pacific Crossing – Valuation of undersea cable for the estate.

- DirectNet (international long distance "LD" wholesaler) – Advisor to company in sale process.

- Tycom – Expert witness in dispute regarding sales on undersea cables.

FTI is being compensated at standard hourly rates for the work we perform in this matter. My hourly rate is $655, and the range of hourly rates of others assigned to this project who worked under my direction is $215 to $565. This compensation is unaffected by the outcome in this matter.

For purposes of providing testimony at trial, I intend to illustrate my testimony with demonstrative aids such as graphs, charts, and/or slides.

## 2) SCOPE OF ASSIGNMENT AND INFORMATION REVIEWED

I have been asked to assume, for purposes of my expert opinion, that the BCE Board authorized $850 million of capital for Teleglobe on November 28, 2001 and that the unspent capital from this authorization was available to Teleglobe in 2002.   With this underlying assumption, I was asked to provide expert opinions to answer the following key questions:

1.  What analysis would FTI have performed, as compared to the analysis performed by Lazard, if we had been hired by Teleglobe to provide restructuring assistance in first quarter of 2002?

2.  What conclusion would FTI have reached regarding the restructuring option(s) that would provide the highest potential value to the Teleglobe estate and its creditors, considering the feasibility of each option, the market conditions in the first six months of 2002, and other relevant facts available at the time?

3.  How would the restructuring options have changed if Teleglobe's restructuring advisor Lazard had known that as much as $628 million of additional capital from BCE was available to Teleglobe?

4.  What was the condition of the telecom industry, including in particular the condition of logical potential strategic buyers for Teleglobe, during the time period when Teleglobe was being sold in 2002?

During the course of work on this matter I, or FTI professional staff working under my direction, have reviewed information, including but not limited to documents produced by the Defendants; publicly available information such as industry analyst reports, articles and public securities filings; and information already in my possession pertaining to the telecommunications industry.  Appendix B to this report presents the list of documents I reviewed and/or relied upon for this matter.

The information and opinions in this report are based on discovery and materials made available to me in sufficient time to review by the date of this report.  If my staff and I review additional material relevant to this report, I reserve the right to revise, supplement, or supersede my opinions in a future report.

## 3) SUMMARY OF OPINIONS

Based on the documents I have reviewed and the analysis performed to date, I have reached the following key opinions in this matter:

a) If FTI had been retained by Teleglobe in first quarter 2002, we would have recommended a stand-alone restructuring rather than a sale, in order to maximize value to the Teleglobe estate and creditors. A stand-alone restructuring in which substantially all of the Teleglobe debt was converted into all or substantially all of a reorganized Teleglobe would have yielded a materially higher value to Teleglobe's estate and creditors than was actually obtained from the rapid closing down of the network and operations in numerous countries and the fire sale of the remaining operations. Such a stand-alone restructuring was feasible and is, in fact, what was done by most telecom companies which are comparable to Teleglobe that experienced similar financial difficulties at the time.

  i.   FTI would have pursued the analysis that Teleglobe management had begun in first quarter 2002 and completed in early May of a downsized company which retained both the legacy voice business and a data business in a number of countries/territories.

  ii.  There were multiple financial scenarios considered by management at the time to rationalize the network and the company in a way that produced positive unlevered free cashflow,[1] making a stand-alone restructuring very feasible and a fire sale into the market crisis unnecessary.

  iii. If it is further assumed that FTI, as restructuring advisor to Teleglobe, would have known about the additional $628 million of capital authorized but not provided by BCE, that knowledge would have opened up a larger range of viable restructuring options to rationalize the international network coverage and would have facilitated an orderly stand-alone restructuring and made the sales process in 2002 unnecessary.

  iv.  Based on the analysis done in the first six months of 2002 and reviewed by FTI today, FTI would not have advised actually using the entire available

---

[1] Unlevered free cash flow is the cash available from the operations of a company. In this case, that is defined as EBITDA less capital expenditures less change in working capital.

funds but would have helped the Company to prudently use the funds to complete its network in countries/territories most likely to generate an acceptable positive return on the additional capital. Nevertheless, the availability of the funds has value.

    v. I have prepared several exhibits designed to walk through the timeline of events and provide the key assumptions within most of the plans and presentations discussed in this document. Exhibits 1 and 2 provide a timeline of key presentations and communications of information. Exhibits 3 and 4 provide a high level summary of the plans including FTI's conclusion and opinion with regard to each plan. Exhibits 5 and 6 present a qualitative comparison of seven restructuring plan scenarios mentioned throughout this report and Exhibit 7 presents a corresponding quantitative comparison of those same plans. Exhibit 8 takes a detailed look at 2002, specifically the projections from May through December 2002. Exhibit 9 presents a qualitative summary of several Voice Only scenarios that looks at the voice business as a stand alone entity. Exhibit 10 presents a quantitative summary of the same Voice Only scenarios.

b) Lazard's final scenarios grossly over-estimated the cash burn required to do a restructuring of Teleglobe in 2002, bringing any reader of its reports to the erroneous conclusion that there was no choice but to sell the company as quickly as possible.

    i. Lazard originally set out to prepare restructuring scenarios which contemplated a downsizing of the GlobeSystem network[2] and a material curtailment of the associated capex. Lazard prepared numerous scenarios from April 4, 2002 through April 15, 2002 which estimate the capex and cash burn required for a downsizing scenario, and all of these scenarios required funding that was below $200 million[3] for the remainder of 2002, an amount easily within the funding already authorized by BCE.

---

[2] GlobeSystem was Teleglobe's international Internet Protocol data network. It is discussed in more detail later in this report.
[3] Exhibit 25

ii.   The April 16, 2002 Lazard report mysteriously abandons the prior
      downsizing scenarios and instead adopts a simple "all or nothing"
      approach to the GlobeSystem network, increasing the capex for the
      remainder of 2002 (May through December) by a factor of six times the
      prior scenarios (from $60 million to $372 million), thereby increasing the
      projected cash burn through the remainder of 2002 from below $200
      million to $496 million.[4] FTI's analysis of the 2002 capital expenditure
      budgets indicates that the original Lazard restructuring scenarios were
      more realistic and that the April 16 Plan materially overstates the capex
      required for a standalone restructuring.

iii.  There does not appear to be any analysis of the contribution margins of the
      various countries or undersea cables to support the simple over-riding
      assumption that the GlobeSystem data network could not be curtailed, and
      all Lazard's resulting material opinions from April 16, 2002 going forward
      flow from this assumption.

iv.   FTI cannot find any analysis by Lazard of the accounts payable balances
      for capital expenditures, nor any analysis of the portion of accounts
      payable or 2002 capital expenditures which would be subject to contract
      rejection or subject to compromise as unsecured claims in a US
      bankruptcy, a Canadian CCAA proceeding, or a UK restructuring
      process.[5]

v.    The final Lazard Restructuring Case prepared before the April 23, 2002
      BCE Board meeting is contained in Lazard's April 20, 2002[6] report
      (hereafter the "April 20 Plan"), and it ties to the numbers presented to the
      BCE Board three days later.  While the April 20 Plan contemplates
      discontinuing operations in three European countries/territories, it retains

---

[4] Exhibit 25
[5] Under the U.S Bankruptcy Code debtors are granted an "automatic stay" which enables them to forego
paying amounts due on the balance sheet at the time of filing and precludes creditors from taking legal
action for those amounts due.  Only if a debtor wants to assume a contract with a creditor is it required to
"cure" the amount owed to the creditor as of the date of the bankruptcy filing.
[6] TGV00637290 to TGV00637304

95% of the 2002 Capital Expenditures ("Capex")[7] projected in the earlier April 16 Plan, again resulting in an unreasonably high projection of required cash funding for a restructuring.

vi. The conclusion that Lazard's April 16 Plan and April 20 Plan are unrealistic is supported by the fact that Teleglobe management presented a new plan on May 14, 2002 (hereafter the "May 14 Plan"),[8] only a few weeks after the Board meeting. The new May 14 Plan contemplated a rapid downsizing to a company that would provide voice and data services in profitable countries/territories, generate positive cashflow, and require no additional funding. The May 14 Plan shows capex requirements for 2002 which are significantly lower than what was presented to the BCE Board, indicating that Lazard was uninvolved or unaware of the downsizing planning that was taking place.

vii. Even though Lazard shows a voice only scenario in the April 16, 2002 presentation (hereafter the "April 16 Voice Only Plan"),[9] which generates material positive unlevered free cashflow, Lazard does not appear to have considered a harvest[10] of this portion of the business as a restructuring option. During the worst part of the telecom industry crash when market values were lowest, FTI routinely evaluated this option to set a floor on the value that creditors should be willing to accept in any proposed sale. Had Lazard considered this option, it would have yielded a higher value to the estate than was obtained from the sale to Cerberus.

---

[7] Capital Expenditures (Capex) represent the cost of property, plant and equipment. In telecommunications companies this typically includes the build out and maintenance of network infrastructure such as fiber and switches.

[8] This business plan is more thoroughly described in a presentation dated May 14, 2002, (no bates number on document) however, in that presentation it is labeled as the 10-5-02 plan, which means May 10, 2002. In addition, a shorter deck on May 13, 2002 references a plan with the same numbers, so it's clear the plan was completed by at least May 13.

[9] TGV00640132 – TGV00640157

[10] A "harvest" occurs when a Company no longer focuses on growth of the business but instead focuses on capturing the cash flow from the revenues generated by existing customers. In order to maximize cash generated by the Company, expenses are reduced to the lowest level required to service existing customers. Revenues and cash collected are higher in the early periods but will decline over the period of the harvest, which typically takes years.

viii.  Lazard's April reports fail to consider the most recent Voice Only
scenario that was prepared by Teleglobe management prior to the April 23
BCE Board meeting.  Teleglobe management prepared an updated Voice
Only projection that was sent on April 21, 2002[11] (hereafter the "April 21
Voice Only Plan") and presented materially better EBITDA and net
cashflow than the version used by Lazard.  FTI analyzed projections in the
April 21 Plan against industry projections on Exhibits 13 and 14.  Analysis
of the April 21 Voice Only Plan indicates that it was more reasonable than
the version used by Lazard on April 16 and it indicates that it was
consistent with the voice projections of the subsequent Teleglobe
management May 14 Plan as reflected in Exhibits 15-20.

ix.   Lazard's analysis was completed in an extremely short time, which
necessarily limited the options considered and resulted in a premature
conclusion presented to the Boards of Teleglobe and BCE, especially
since a viable strategy providing positive cashflow after a material
downsizing was completed only three weeks after the BCE Board meeting
in which the decision to stop funding Teleglobe was made.  Not only had
Teleglobe created the May 14 Plan, but in addition, at the same time they
created a detailed network transition plan that took into account many of
the restructuring steps I would have recommended.[12]  The detail of the
transition plan leads to a reasonable conclusion that this plan was well
under way at the time of the April 23 BCE board meeting.

x.   It is apparent from Lazard's work product and my own review of the
information available at the time that no restructuring scenario would have
resulted in BCE's equity having any value.  While not directly stated by
Lazard, this fact comes through in Lazard's various reports, some of
which appear to be focused more on the value of Teleglobe to BCE, rather
than the value to the Teleglobe estate and creditors.

---

[11] TGV644484-486
[12] Transition Plan dated May 14, 2002 from "Reston Live Server"

c) The written documents from BCE and the depositions of various BCE employees indicate that BCE executives had reached a decision to limit any further funding of Teleglobe to $125 million or less, independent of their consideration of Lazard's analysis or recommendations and without consideration of what restructuring alternative would maximize the value to the Teleglobe estate or its creditors.

d) The presentation to the BCE Board on April 23, 2002[13] (hereafter the "April BCE Board Presentation") regarding the outlook and potential restructuring options for Teleglobe presented a one-dimensional view of the business plan and associated financial projections by discussing only the "full speed ahead" GlobeSystem build-out plan and the associated capex and cash funding requirement. The BCE Board presentation also failed to properly consider the various restructuring options from the perspective of the Teleglobe estate and creditors, rather than just the strategic value or impact on BCE.

i.  The April BCE Board Presentation failed to mention any options for substantially downsizing Teleglobe, including the April 16 Voice Only Plan which was actually evaluated by Lazard and presented to Jean Monty on April 16, 2002. In fact, the presentation stated that "voice on its own cannot sustain Teleglobe's business,[14]" an assertion which is contradicted by Lazard's work, the work of Teleglobe management, and various Voice Only business plans available at the time.

ii. The presentation failed to mention the possibility of significantly downsizing but not scrapping the entire GlobeSystem data network, even though Teleglobe management and network personnel had been working on this option for at least a number of months and ultimately produced a full plan only a few weeks after the Board meeting. While it included the cash flows from Lazard's April 20 Plan[15], which contemplated the exit of three countries/territories, the projected negative cash flows still exceeded

---

[13] BCE-AD 0543555 - 604
[14] BCE-AD 0543568
[15] BCE-AD0543575

$400 million in 2002 and reflected little differentiation from the management scenario presented.

    iii.  The presentation failed to inform the Board that there were viable stand-alone restructuring scenarios for Teleglobe which would generate a business that was unlevered free cashflow positive, thereby avoiding the necessity of a fire sale of Teleglobe into a distressed market environment.

    iv.  The presentation only presented two options for Teleglobe, a sale or a wind-down. The possibility of a downsizing of the business was never discussed in the document, nor was there mention of any stand-alone restructuring options, even though Lazard had presented various such alternatives.

e)  The May 14 Plan, completed by Teleglobe management after the April 23, 2002 BCE Board meeting, contains an operational restructuring and transition plan and the associated financial projections which appear to be both viable and reasonable as a stand-along restructuring alternative for Teleglobe.

    i.  The plan presents a rapid downsizing of Teleglobe's international network and operations to five countries/territories: Canada, United States, United Kingdom, Spain and Hong Kong. In fact, Teleglobe sold the assets and related revenues of six countries/territories, the five listed in the May 14 Plan plus Australia, to Cerberus in a Section 363[16] Auction under the U.S. Bankruptcy Code in September 2002.[17]

    ii.  Prior network analysis, including the POP[18]/City EBITDA analysis begun by Teleglobe in the first few months of 2002, laid the groundwork for completing this plan.[19]

    iii.  The May 14 Plan assumed no additional capital was available. Had the authors of the May 14 Plan known that additional capital was available to

---

[16] Section 363 of the U.S. Bankruptcy Code sets forth the procedures under which a company's assets can be sold while in bankruptcy. A buyer is allowed to bid on the assets it chooses to purchase and can purchase them free and clear of liabilities.
[17] Refer to the S-4
[18] POP means "Point of Presence." Note that while most telecommunications terms I use I have defined or explained herein, I understand that Plaintiffs' industry expert, Walda Roseman of CompassRose International, has included in her expert report a glossary of telecom related terms.
[19] Email from Richard Bolduc on Saturday, February 23, 2002.

Teleglobe from BCE, they could have preserved more of the completed data network and the associated data revenues and increased the enterprise value of the resulting company. It is likely that with some additional capital and time, Teleglobe would have retained some of the network it was forced to shut down and stayed in some of the countries/territories it was forced to exit. For example, the September 2002 Asset Purchase Agreement between TLGB Acquisition, LLC, an affiliate of Cerberus, and Teleglobe specifically excluded sites in Denmark, France, Germany, Italy, Netherlands, and Norway in Schedule 1.1J Attachment A. None of these locations were listed on Schedule 6.8(a) (ii), [20] Specified Core Assets to be Purchased. However, as indicated in Exhibit 32, TLGB had international network facilities in those countries/territories in 2003, suggesting that TLGB re-entered those countries/territories that Teleglobe was forced to exit due to lack of funding.

f) The sale of Teleglobe to Cerberus provided a much worse return to the Teleglobe estate and its creditors than a stand-alone restructuring because of the market environment in 2002 and the "fire sale" nature of the sales process.

    i. It was clearly known at the time by the decision makers at BCE, Teleglobe and Lazard that it was an extremely bad time to conduct a sale of Teleglobe, as nearly all reasonable strategic buyers who could obtain synergies were in financial crisis and undergoing restructuring themselves, and the equity markets for this type of company were in a tailspin. Although BCE and Lazard could not have been expected to predict the future recovery which occurred in the market, written documents prepared by BCE and Lazard show it was known and knowable that a sale in this environment was not going to yield anything but a fire sale valuation. In fact, the three person "Kitchen Cabinet" appointed by Jean Monty concluded that the "Current market environment is probably about as bad as it can be . . . In such situations values are almost always understated.[21]"

---

[20] TRES00064410 – 13
[21] BCE-AD 0169176

ii.  The fast pace of the sales process, the fact that the preparation of the data room was in process by Lazard and Jones Day before April 23, 2002,[22] the fact that buyers never received a formal offering memorandum because there was no time to produce one, the fact that the sale was occurring almost immediately on the heels of the Chapter 11 and CCAA filings, and the unreasonably high projected cash burn rate indicate a "compulsion to sell" on the part of the seller, which yielded a distressed, fire sale valuation.

iii.  The fact that Teleglobe was sold to a financial buyer, rather than a strategic buyer who had the ability to obtain synergies by merging operations with Teleglobe, reinforces that only a distressed value was obtained. Even the financial buyer, Cerberus, was not a typical equity investor in telecom at the time but was an entity specializing in buying highly distressed assets in a down market. Furthermore, the timing of the rapid sale process effectively precluded large, foreign potential strategic buyers like PTTs from actively participating. Such foreign buyers move very methodically and are not generally familiar with bankruptcy auction processes. Therefore, it was highly unlikely that they would bid in these time constraints.

iv.  Even a restructuring that contemplated a Voice Only business plan would have provided Teleglobe with additional liquidity and time, resulting in higher cash flows and a higher recovery to the Teleglobe estate and creditors, than that received in the actual sale.

v.  The fact that the value to the creditors would have been materially higher had a stand-alone balance sheet restructuring been combined with a downsizing of the international operations was knowable at the time from information that was available to BCE. BCE failed to inform Teleglobe's restructuring advisor, Lazard that additional funding was authorized, which had the effect of severely limiting the time frame to analyze the situation and of limiting the options Lazard considered.

[22] TBRUJ00001179

vi. The market subsequently recovered with the emergence of other carriers and the onset of industry consolidation, and although the timing and extent of the recovery could not have been predicted in 2002, it was knowable that a rapid sale in a bankruptcy/restructuring process would yield only a distressed value.

## 4)  BACKGROUND OF TELEGLOBE

Teleglobe was formed in 1950 by the Canadian government to provide what eventually became known as international long distance services.  The Company evolved into the largest long distance carrier within Canada and one of the largest international carriers of international voice traffic.  In 1996, Teleglobe entered the US market by obtaining the appropriate licenses and established a small presence.  In 1998, Teleglobe materially enlarged that presence by purchasing Excel Communications, which at the time was one of the largest long distance carriers in the US behind the Big Three of AT&T, MCI, and Sprint, selling primarily to consumers through a multi-level marketing organization similar to what Amway is known for using.  Teleglobe's legacy voice network connected it to 240 countries/territories and territories.  A major achievement of this legacy business is that Teleglobe had "bilateral agreements" with the major telecom companies all over the world, most of which were the original monopoly "incumbent" telephone companies in their respective countries.  In addition to its primary voice products which carried voice minutes of use, Teleglobe also provided International Private Lines (IPL) to many of its carrier customers.

In the late 1990's Teleglobe decided to build a worldwide network based on Internet Protocol ("IP") for providing data products, such as internet access, IP Virtual Private Networks (IPVPN), and transport circuits ("big pipes" that customers could use for either voice or data traffic).  Teleglobe also decided to build its own Internet Data Centers (IDCs)[23] in various large cities around the world.  The worldwide data network was dubbed "GlobeSystem."  The primary elements of GlobeSystem included (1) the purchase of dark fiber on land (terrestrial fiber rings) in the US and Europe plus the equipment to light the fiber, (2) the purchase of capacity on virtually every major undersea cable route, (3) the construction of Points of Presence (POPs) in major cities around the world so that customers could have a place to connect to the Teleglobe international network, and (4) construction of the

---

[23] Internet Data Centers (IDC) are real estate facilities in which computer servers are housed that provide web hosting services to clients.  Note that web hosting is not a communications product but is a related product that some telecom companies who provided internet access products chose to provide.

Internet Data Centers. The GlobeSystem network would be constructed as an overlay on the existing voice network, which by comparison had lower capacity levels. Although the long term plan was to eventually migrate the voice traffic onto the data network, by translating the voice into Voice Over Internet Protocol (VOIP), and to relocate the voice POPs into the larger GlobeSystem POPs, this migration and integration of the two networks was clearly a second step to be completed after GlobeSystem was constructed.

The two lines of business that Teleglobe had by the end of 2001 had very different profiles. The legacy voice business was a high variable cost, low fixed cost, low profit margin business with rising traffic volume but falling prices per minute. The total worldwide revenues for international voice were falling because of price reductions, although size and scale allowed the largest providers to retain substantial profit margins on a per minute basis. As the market contracted, numerous smaller companies that had sprung up around the world during the 1980s and 1990s began to disappear or be absorbed by the larger companies. As the one of the largest worldwide providers in this market, Teleglobe was in a position to benefit from its market power to maintain a reasonable profit margin. In addition, the Voice Only business could be run with a very small staff and very low capex, thereby generating positive unlevered free cashflow. Because of the contracting market and lack of growth potential, the market value of this type of business, often expressed as the multiple of EBITDA or cashflow, was not high and was unlikely to increase over time. This was a low risk, low return business in the telecom industry, but a business that could be counted on to generate a material but slowly declining return for years into the future. There was no reason to fire sale this business.

The worldwide data business that Teleglobe had chosen to pursue with its GlobeSystem build-out had almost the exact opposite profile to Teleglobe's legacy voice business. The data business was a high risk, high potential return business with an extremely high projected revenue growth rate potential. The capex costs to build the network had to be incurred up front before realizing revenues, although the gross margins were extremely high after the network was built. In sum, the Data business

was a low variable cost, high fixed cost, high capex business with high growth potential.

During the late 1990s through 2000, numerous telecom industry analysts made long term projections about the growth rates and market size for numerous data products and internet traffic volumes. As is now known, those projections generally over-stated the size and growth rates of the worldwide data markets, as both the products and the markets were relatively new and quite volatile. The primary reason for the large over-expectation of growth is that rates of price erosion in data products were generally materially under-projected as compared to what actually happened. Analysts did not anticipate the glut of supply, coupled with the slower rates of volume demand growth, which resulted in a massive imbalance between supply and demand that yielded price erosion. For particular products, the higher the portion of costs that were fixed in nature, the higher the level of price erosion. For example, undersea cable capacity experienced the greatest levels of price erosion in the entire telecom industry, as almost the entire cost structure was sunk (literally) or fixed. This made almost all new revenues into incremental profits, which facilitated rapid price erosion in a market where supply was abundant and exceeded demand.

Teleglobe started out its GlobeSystem plan in 1999 with a total budget of $5 billion for worldwide construction.[24] This plan anticipated that virtually all terrestrial capacity would be purchased as dark fiber and lit with Teleglobe owned equipment. It also anticipated that Teleglobe would construct its own POP sites rather than leasing in "carrier hotel" type POP sites constructed by others. Finally, it anticipated in its 2000 plan building twenty-five[25] IDCs for its hosting product.

At BCE's direction, Teleglobe made several very material reductions in the GlobeSystem budget during 2001.[26] By June 2001, the GlobeSystem budget had been reduced by $2.1 billion to a total budget of $2.9 billion.[27] The reductions were accomplished through both price reductions from suppliers (e.g. undersea cable prices came down more rapidly than Teleglobe had expected, aiding its costs but hurting its

---

[24] *GlobeSystem Deployment on Schedule; Major Progress Achieved in 9 Months*, Cambridge Telecom Report, February 2000, page 1.
[25] BCE-AD 0362113-122
[26] Deposition of Barry Bunin, page 93, lines 21-25 and page 94 lines 1-22.
[27] GEN 027036 - 044

future revenue potential) as well as several changes to its network strategy. First, Teleglobe decided to buy lit capacity rather than dark fiber on many of the terrestrial routes in the US and Europe and subsea routes. This was known as buying "waves" or "lambdas" and was a cheaper way to gain access to the same core capacity that the GlobeSystem network design required. This reduction accounted for $500 million in build-out savings. Teleglobe also reduced the initial build-out budget by $300 million to reflect savings from a new backbone deployment model in Europe, which involved converting the dark fiber agreement with KPNQwest into a wavelength purchase agreement. Second, Teleglobe stopped building its own POPs and began leasing space in POPs built by other providers. This change also would not be expected to impact the GlobeSystem strategy, since companies had sprung up that built and leased space for reasonable rates. Cost savings from this changed strategy totaled $500 million. Third, Teleglobe decided not to pursue the hosting market except in a few key cities, which created an additional $800 million in savings.

In addition to the $2.1 billion in cost cuts made through July 2001 that are outlined above, Teleglobe reduced the total capex budget by another $600 million in December 2001,[28] which brought the revised capex budget to $2.3 billion. By the end of 2001, Teleglobe had reduced its total budget for GlobeSystem to $2.0 billion, of which it had already incurred $1.76 billion;[29] although the company's total capex budget was $2.3 billion, of which $1.9 billion had already been incurred. The additional $300 million was budgeted for Voice, IT, support, growth and modernization.

---

[28] BCE-AD 0269433
[29] BCE-AD 0269430 - 469

### 5)  MARKET ENVIRONMENT IN LATE 2001 AND EARLY 2002

Telecom companies constructing large networks, especially networks for data products, were one of the favored sectors of the internet stock market bubble in the late 1990s. This was true not only in North America, but it also extended to the international telecom markets. Numerous terrestrial fiber networks were built in North America and Europe in the late 1990s through primarily 2001. In addition, dozens of new undersea cables were constructed around the world during that timeframe.

While non-facilities based telecom carriers such as voice resellers were encountering financial difficulties and restructurings during the late 1990s, companies building networks had lofty valuations, often based on the extent of their network build-out rather than their revenues or profits. In fact, many of the most highly valued companies were EBITDA negative plus spending significant amounts of cash on capital expenditures to build networks.

The first sign of distress in the international voice markets began in mid-2000 when several significant companies in the business of wholesaling international long distance minutes began to have financial difficulties. One of the earliest public companies in that sector to get in financial trouble was Pacific Gateway Exchange, a company which had purchased significant amounts of capacity on various undersea cables. Pacific Gateway Exchange showed signs of financial distress around July 2000 and later filed for bankruptcy on December 29, 2000. Another significant international long distance provider to fail was RSL Communications, which hired an investment bank specializing in restructuring to help it "explore strategic alternatives"[30] in October of 2000 and later filed Chapter 11 in the U.S. on March 19, 2001. RSL also had made investments in undersea cables. Two other major international long distance wholesale voice carriers also filed for Chapter 11 in the U.S. in April and July of 2001, World Access and Star Telecom. All of these

---

[30] In the restructuring profession, the hiring an investment bank that is known for specializing in restructuring and making a public announcement of that hiring for purpose of "exploring strategic alternatives" is a clear signal to the market that a company is in financial distress and is entering a restructuring process.

companies were engaged in a similar business to Teleglobe's legacy voice business, although they were smaller, were not former PTTs like Teleglobe, and had fewer bilateral agreements than Teleglobe. Nevertheless, they failed primarily because of the rapidly declining prices and revenues in the international long distance market which followed deregulation of that market in most countries.[31]

Among companies who had invested in terrestrial fiber networks, the first major financial failure came in the summer of 2000, when GST Telecom, a US based fiber based CLEC[32], filed for Chapter 11 on May 17, 2000 and was sold to Time Warner Telecom in September 2000 for approximately 75% of its network cost. Additional weakness among CLECs picked up pace in the second half of 2000, but most of the companies encountering financial difficulties were smaller companies, and the market discounted the seemingly isolated distress as a necessary weeding out of weaker, poorly managed companies. Although none of the sizable international voice and data providers encountered serious financial distress in 2000, the equity market valuations for these types of companies fell materially from the market high points in 2000 as reflected in Exhibit 11.

In fall 2000, more information began to permeate the telecom market about the shortfalls in demand for data services as compared to prior market expectations and the looming glut of both terrestrial and undersea capacity. In September 2000, JP Morgan published a research report highlighting a joint study with McKinsey & Company that clearly laid out the forthcoming troubles. In the Executive Summary of the report it states, "These underlying economic forces combined with too many industry players have the potential to drive insufficient aggregate returns on capital, in turn driving consolidation and shakeout."[33] By mid-2001 the distress in the telecommunications industry was clear, and by August of 2001, Goldman Sachs published a joint study with McKinsey & Company in which they highlighted many of the rapidly changing dynamics of the telecom market. In the Introduction section

---

[31] I understand that Walda Roseman's report is discussing the history of deregulation of the international long distance voice markets.
[32] Competitive Local Exchange Carrier (CLEC) is a local phone company that competes directly with the incumbent local phone company such as Verizon, a development permitted by the 1996 Telecom Act.
[33] Backbone! How Changes in Technology and the Rise of IP Threaten to Disrupt the Long-Haul Telecom Services Industry, JP Morgan, September 8, 2000, page 1.

to the report it states: "Since the summer of 2000, optimism has turned to gloom. Service provider and communications technology company valuations are uniformly and significantly below their 2000 highs, with the top ten showing a loss of about $2 trillion of equity value."[34]

The financial distress in the facilities-based international long distance and data market began in early 2001 and picked up pace throughout the year. One of the earliest companies to get into financial distress was Global TeleSystems, Inc. ("GTS"), a European long distance voice carrier with a large fiber network in Europe called "Ebone." GTS began its restructuring process in late 2000 and reorganized under a UK "Scheme of Arrangement," which is an insolvency process similar to a pre-packaged Chapter 11 filing in the US. GTS was eventually sold to KPNQwest in October 2001, which itself was subsequently shutdown and liquidated. Another European carrier, Viatel, filed Chapter 11 in the US and an restructuring process in the UK on May 1, 2001. Viatel was in the midst of constructing a very large long haul European fiber network that covered most of Western Europe and included metro fiber rings in key cities. Another company with broad international data operations, PSINet, filed bankruptcy/restructuring processs on June 1, 2001, and was liquidated on a country by country basis. It is noteworthy that all of these companies were emerging carriers without the foundation of a substantial legacy business that could stand on its own. Only GTS had a small subsidiary with a longstanding voice business, and that subsidiary was spun out of the restructuring to the debt holders in a debt for equity transaction.

The above discussion illustrates that there was already significant distress in the international voice and data markets prior to the time that Teleglobe renewed its $1.25 billion senior credit facilities on July 23, 2001.[35] Not only were most of the largest independent international long distance voice carriers in the U.S. already in bankruptcy, but several large European carriers who held substantial fiber assets in Europe with both voice and data traffic were also in bankruptcy or restructuring processs. It was clearly known by this time that the markets for both undersea cable

---

[34] U.S. Communications Infrastructure at a Crossroads: Opportunities Amid the Gloom, Goldman Sachs and McKinsey & Company, August 2001, p5.
[35] BCE-E0014670-71

capacity and terrestrial fiber in both the U.S. and Europe suffered from material over-capacity and rapid price erosion, although the extent of the crash was still developing into view.

In the second half of 2001, the trouble spread to even larger carriers. By the third quarter of 2001, Global Crossing's stock had dropped dramatically as the market expressed its concern about its rate of capital spending and implications for liquidity. Unable to raise additional capital to complete its aggressive worldwide construction of undersea cables and fiber networks, Global Crossing filed Chapter 11 on January 27, 2002 in the U.S., and a companion restructuring process in Bermuda, and announced that it had a proposal from Singapore Technology and Hutchison Whompoa of Hong Kong to buy the Company.

The Global Crossing distress was quickly followed by two of the largest US based fiber network builders, Level(3) Communications and Williams Communications, entering into financial restructuring. In fourth quarter 2001, Williams announced that it was in discussions with its creditors and in February 2002 it announced that a bankruptcy proceeding was a possibility. Williams ultimately filed a pre-arranged Chapter 11 on April 23, 2002, in which it converted all its bond debt to equity in the reorganized entity. Level(3) Communications was the only major US fiber company to avoid a Chapter 11. It did this partially by divesting its Asian network in December 19, 2001 to Reach, a Hong Kong based international voice and data provider which had a wide presence in Asia and Australia. Level(3) also curtailed its capital spending plan materially during 2001 and cut its operating expenses and headcount. Despite these measures, Level(3) underwent an out of court restructuring of its debt from February through July of 2002.

In Lazard's April 16, 2002 report, it identified three potential logical buyers for Teleglobe that could obtain material synergies from a merger, Level(3), Williams, and Broadwing[36]. The only one of these three which was not already in known financial distress at this date was Broadwing. At the time, Broadwing had two material operating divisions, the Cincinnati Bell incumbent local exchange carrier in Cincinnati, Ohio, which produced significant cashflow, and the US national fiber and

---

[36] TGV00640143

hosting company that was burning material amounts of cash. Because of the
Cincinnati Bell operations, Broadwing did not go into financial restructuring as
quickly as the rest of its peers, but its balance sheet was restructured in the second
half of 2002. In any event, in April 2002 the senior management at Cincinnati Bell
and the Board of the parent company were definitely not interested in buying another
long haul fiber asset, which was confirmed by Mr. Millstein of Lazard in his
deposition.

## 6) FTI ANALYSIS OF RESTRUCTURING OPTIONS FOR TELEGLOBE

FTI was asked to review certain records in this case and try to independently determine what we would have recommended to Teleglobe had we been appointed as restructuring advisors in March 2002. In order to do this, it is useful to delineate the key facts that were known at the time, or knowable by restructuring experts working with telecom companies.

    a. The Teleglobe Voice business was separable from the GlobeSystem data business and could be separately forecast with a reasonable degree of confidence. Multiple forecasts exist for this business, all of which appear to be prepared under the direction of Teleglobe's Voice business manager, Serge Fortin. While the various forecasts vary to a certain extent, the methodology was consistent, and Mr. Fortin affirmed during his deposition that the voice business could be reliably forecasted and that he believed he could get even more growth if he had access to limited additional capital to enter the VOIP[37] market and interconnect with more wireless carriers.

    b. The Teleglobe Voice business was not burning cash on a stand-alone basis, and, in fact, was producing positive free cashflow, defined as EBITDA less capital expenditures.[38] That positive cashflow was being consumed by the data side of the business, including the completion of the GlobeSystem data network.

    c. The GlobeSystem network provided much more network capacity than was necessary for Teleglobe to pursue its data business in the near term, and Teleglobe could have downsized its capacity requirements on various routes without sacrificing its ability to provide the planned data services. For example, Teleglobe could abandon its dark fiber network in the US and just lease capacity as needed without abandoning its entire data strategy. Teleglobe also did not really need all the undersea capacity that it had committed to purchase, and it could have easily repurchased a smaller amount

---

[37] VOIP means "Voice Over Internet Protocol." Mr. Fortin testified that he needed to install some additional switches capable of providing VOIP services in order to obtain growth with this product.
[38] Exhibit 10 shows actual 2001 results for the voice business.

of capacity from other providers if it had chosen to abandon its undersea cable capacity by not making the remaining payments under its purchase commitments.[39]

d.  The GlobeSystem construction could be stopped, curtailed or reconfigured in individual cities or countries/territories without sacrificing the value of the network in other cities or countries/territories that were kept operating. Even in countries/territories where Teleglobe chose to put its operations into insolvency, Teleglobe could still have made arrangements with other carriers to maintain minimal operations in order to terminate voice traffic or data circuits, to meet the needs of customers who were profitable to retain.

e.  The Teleglobe GlobeSystem network was spread across countries/territories which had different restructuring laws that could generally be lumped into two categories. First, in Canada, the US, and the UK, debtors are allowed to reorganize their operations in an restructuring process without liquidating. These proceedings provide for contract rejections and the compromise of pre-petition unsecured liabilities, both without the necessity of liquidating all the assets. Outside of these three countries, insolvency laws generally provide that all assets are turned over to some type of trustee or administrator, whose job is to shut down operations, sell the assets, and distribute the proceeds to the creditors within a fixed period of time. In these countries/territories, debtors cannot pick and choose which assets they would like to keep, and they cannot reorganize their operations. If a restructuring process is begun, then all assets and operations of the legal entity which is put into insolvency are shut down.

f.  Teleglobe's management had begun a process to evaluate the profitability of individual cities/POPs in its GlobeSystem network, and a draft of those results uses both the January 2002 actual revenues and forecasted 2002 budgeted revenues by city.[40] This is the exact type of analysis that a restructuring

---

[39] Under the U.S. Bankruptcy code, debtors can reject contracts which in essence makes them void and enables the debtor to "walk away" from the contract. Any damages for breach of contract then become unsecured claims. A similar process exists under the CCAA in Canada and under UK insolvency laws.
[40] Email from Richard Bolduc on Saturday, February 23, 2002.

advisor would typically help a client perform in order to assess the best strategy on a country by country basis for whether the data network should be preserved or allowed to go into a restructuring process.

g.  Despite the fact that the GlobeSystem network was not entirely completed, Teleglobe had material data revenues by first quarter 2002, which were running at an annual rate of $329 million[41]. This annual data run rate excludes the $66.2 million annual run rate of International Private Lines[42] (IPLs) that management showed as being retained with the April 21 Voice Only Plan. The material amount of data revenues demonstrates that substantial portions of the GlobeSystem data network were completed and were deployed in the service of actual customers, and it is consistent with the fact that $1.76 billion of the $2.0 billion budget for GlobeSystem had already been deployed by the end of 2001.[43] Furthermore, Mr. Bunin testified that GlobeSystem was near completion in first quarter of 2002.[44] This is a sizable revenue base of data customers, albeit spread over a large number of countries, but still concentrated in the largest countries like Canada, the US, and the UK. The size of the data revenues indicates that Teleglobe could have rationalized its GlobeSystem data network to remain operating in multiple countries and cities, rather than closing the vast majority of it down, as actually occurred when Teleglobe management believed they had no capital other than the $100 million DIP facility.[45]

h.

Based on all the foregoing facts, there is no reason to make the simplistic assumption that (1) the GlobeSystem data network either needed to be completed in its entirety according to the budget that pre-dated the BCE decision to cut off funding, as assumed in the Lazard April 16 Plan, or (2) Scandinavia, Germany, and Holland were the only countries which could be exited, as assumed in the Lazard April 20 Plan and presented in

---

[41] (no Bates number) TCC Operations Management Board 1st Quarter 2002 4/16/02
[42] An International Private Line is a leased line or leased circuit, which is a telephone service that is permanently connected from one point to another to carry voice and data traffic.
[43] BCE-AD 0269430-469
[44] Deposition of Barry Bunin, p90, lines 23-25 and p91, lines 1-6.
[45] DIP refers to the "Debtor in Possession" loan that was provided by BCE to Teleglobe under the jurisdiction of the U.S. bankruptcy court.

the April BCE Board Presentation, or (3) the only other option was a shut down of the entire data business, as presented in the April BCE Board Presentation. There is also no reason to come to the conclusion that a sale of the entire company was the best restructuring option. In fact, quite the opposite is true. The best restructuring option was a standalone restructuring in which debt were converted to equity in a reorganization following the key steps outlined below:

    i.  Stop all payments to capex suppliers to preserve cash.

    ii.  File restructuring process in Canada and the US and begin the restructuring process in the UK to rationalize costs in those countries, while maintaining the key operating assets and revenues. Reject contracts for portions of the network which were no longer needed in a downsized business plan (e.g. excess capacity or capacity which could be bought back more cheaply at current prices).

    iii.  Determine which additional countries were financially viable with justifiable additional investments to complete or maintain the network.

    iv.  Let the remaining countries in which additional investment was unwarranted go into a restructuring process and abandon the assets.

    v.  Convert the debt to equity and reorganize as a going concern in a selected group of countries.

A stand-alone restructuring following the five steps listed above would have been a feasible scenario for Teleglobe, especially if Teleglobe's restructuring advisors had been given even more time and access to a reasonable portion of the funding previously authorized by BCE. Given the known distress in the market and the very low valuations for distressed telecom assets at the time, it would have been a rational and logical result for the debt holders to agree to convert their debt to equity in a stand-alone restructuring. Many of the same banks and financial institutions who held debt in Teleglobe agreed to debt for equity restructurings in other comparable telecom companies such as GTS and Global Crossing.

The above stand-alone restructuring scenario is consistent with what Teleglobe management actually proposed in the May 14 Plan, yet that plan was prepared under the draconian assumption that NO further capital was available even to complete

cities/countries that were financially attractive to complete. Had Teleglobe
management prepared their May 14 Plan with the starting premise that up to $628
million was available from BCE, they could have produced a rationalized plan which
yielded even more value to the Teleglobe estate and creditors than the May 14 Plan
they actually produced.

As discussed and quantified later in this report, there were multiple ways for
Teleglobe to downsize its network and curtail its capital spending that would have
yielded a more valuable business without spending all the capex required to complete
GlobeSystem in all the countries originally anticipated. In fact, multiple Lazard
scenarios in early April 2002 estimated such a scenario and derived funding amounts
for May through December of 2002 between $167 million (April 4 Base Case) to
$187 million (April 10 Restructuring Case). Based on my experience in the
restructurings of numerous similar telecom companies such as Global Crossing,
Williams Communications, and Reach, I do not believe that the entire $628 million
would have been necessary to achieve the business plan with the highest potential
value to the Teleglobe estate and creditors. However, additional capital above the
$100 million DIP loan would have been necessary to fund the additional time and
capital needed to maximize value.

Based on Teleglobe's original draft of its city level revenue, EBITDA, and capex
allocation (see Exhibits 33-35 for a summary of Teleglobe's analysis city level
analysis), the countries/POPs that Teleglobe management recommended retaining in
its May 14 Plan, and the countries/POPs Cerberus owned which it apparently re-
entered after it purchased Teleglobe, we have divided the countries into the following
categories:

    i.  Countries/Territories that definitely should have been retained and were
        retained by Teleglobe before it sold to Cerberus, including Canada, the
        US, the UK, Spain, Australia, and Hong Kong.

    ii.  Countries/Territories which are likely to have been retained if Teleglobe
        had been given access to the capital authorized by BCE but not actually
        provided. This includes the six countries that Teleglobe exited when it
        thought it had no capital after the BCE "no funding" decision but which

the Cerberus controlled Teleglobe entity re-entered later: Germany, France, Italy, Denmark, Norway, and the Netherlands. It also includes additional countries which appear to have had positive incremental EBITDA in 2002 based on Teleglobe's analysis at the time: Argentina, Brazil, Columbia, Panama, Puerto Rico, Sweden, and Taiwan.

iii. Countries/Territories which look to have been definite money losers, or had immaterial or no revenues, which are unlikely to have been retained if a rigorous analysis had been done at the time, even if Teleglobe had known it had additional capital available to it from BCE: Austria, Belgium, Bulgaria, Czech Republic, Ireland, Japan, Mexico, Poland, Romania, Russia, Switzerland, Saudi Arabia, Egypt, Venezuela, China, Malaysia, Chile, and South Korea.

## 7)  LAZARD'S ANALYSES

### a)  Restructuring Case

Lazard was retained and given only a few weeks of time to complete any analyses before the April BCE Board Presentation regarding Teleglobe was completed.   Given the information that was available to Lazard and the complexity of a multi-jurisdictional telecom service provider with two very different lines of business and also in the tail end of a massive network build-out, I do not think it was reasonable for BCE or Teleglobe to expect Lazard to do any independent financial projections for the underlying business in the time frame allowed.  For example, I supervised the work that FTI did in analogous situations at Global Crossing, Level(3) Communications, and Williams Communications, and it took us 6-10 weeks to prepare meaningful analyses of the financial projections of those companies[46].  The multi-jurisdictional aspect of the Global Crossing case actually took a couple of months for my team to untangle in a meaningful way that would allow us to test scenarios of staying or abandoning various country operations in a potential reorganization.

The testimony of Mr. Millstein of Lazard supports the fact that Lazard did not actually prepare projections for Teleglobe but rather they took projections prepared under the supervision of Mr. Pichette and input them into a restructuring or liquidity model:

> "We were told that Mr. Pichette was doing a strategic review and analysis of the then current management's business plan or his predecessor management's business plan in order to determine — you know, to get a sort of independent view for the board of what the — of the viability of the business and what its financing needs were and what its projected cash flows might be and — and we helped inform that exercise by him just bringing to — you know, bringing — making available to him information we had gleaned from, you know, general market conditions and the fates of other carriers and the business conditions and market environment in which they were operating.  But he primarily did the heavy lifting on kind of review of the business plan and the casting of possible alternatives to the

---

[46] Note that my engagement by Teleglobe to issue this report occurred in a shorter period of time, although the assignment is very different in that FTI is not now attempting to construct an optimal scenario or financial projection from underlying data, but rather to review data created by others.

business plan as it then was constituted. And he produced a, you know, revised set of projections, which we then took and, you know, pumped into our own financial model, which is really a liquidity model, to try to determine – we generally don't focus on sort of net income and – but we focus on cash and so we take – we took that business, put it into a liquidity model and then started with him trying to figure out how we could reduce the cash burn at Teleglobe and find a viable business in there that could be self-sustaining."[47]

   It is useful to track the dates of the Lazard work products to appreciate how little time they were given to analyze the situation before BCE executives presented a final recommendation to the BCE Board. The first Lazard financial scenario is dated March 27, 2002 and the last scenario that appears to have been considered in the preparation for the BCE Board presentation is dated April 20, 2002. The very material changes between the various Lazard scenarios in this compressed time frame, especially in the April 16 Plan as compared to the April 10 Plan, suggests that they were still trying to understand all the key facts but yet were being pushed to provide "restructuring opinions." The material change in approach that occurred during that one week period in the capex projections in the Lazard scenarios is a perfect example of the fact that the analyses were still a work in progress.

   Lazard's first written work product appears to be their April 4, 2002 report, which is also their most lengthy report[48]. That report presents two financial scenarios as alternatives to the original Management Case, which shows a requirement of $636 million of capex in 2002. The first alternative is called the "Base Case," (hereafter the "April 4 Plan") and it is described in a way that indicates it is the primary scenario that Lazard is pursuing at that point in time. The Base Case is described on page 2 of the document as assuming that (1) Teleglobe "undergoes a restructuring," (2) there is a "reconfiguration of the network such that implementation of the Capex plan is no longer required," (3) "the scaled back network is expected to lead to a significant drop in data sales", and (4) "the restructuring amplify[ies] the negative trend on net voice revenue."[49] Lazard describes the Base Case as requiring $167 million of

---

[47] Deposition of Mr. Millstein, page 25, line 14 through page 26, line 21.
[48] TPICP00001860-TPIC00001907
[49] "Preliminary Observations Project X," April 4, 2002, by Lazard. TPICP00001864

funding for the remainder of 2002, for May through December, a number which is clearly well below the funding that BCE had authorized, although Lazard was unaware of the authorization. The second alternative is called a Best Case, which is described as assuming the same reductions in capex while still achieving the Management Case revenue projections.

The April 4, 2002 Lazard report then goes on to calculate estimates of the enterprise value of Teleglobe off the various scenarios, the conclusion of which is that the value of Teleglobe is clearly less than its debt, leaving no equity value for BCE either currently or in the future. Under "Key Factors to Consider," Lazard indicates that Telelgobe has "Significant near term funding needs."[50] The presentation ends with a qualitative analysis of five potential restructuring options: (1) Out of Court Restructuring, such as a tender offer for the debt or a debt for equity swap, (2) "Pre-packaged or Pre-negotiated Restructuring," in which debt were swapped for equity in a stand-alone restructuring that is negotiating before filing for Chapter 11 of a CCAA proceeding, (3) "Coordinated Bankruptcy Filing," which means a CCAA filing in Canada with a Chapter 11 filing in the US and an insolvency filling in the UK, (4) "Sale of the Company," and (5) "Liquidation." Lazard's comments about each of these scenarios are all negative except for number three, the Coordinated Bankruptcy Filling. Lazard comments that such a scenario "Allows Tango [Teleglobe] to minimize cash burn, fund operations on a secured basis (most likely from Bravo) and explore potential for viable, going concern business plan."[51] In sum, as of April 4, 2002, Lazard appears to be recommending the scenario that I am opining would have been the best one, although it is NOT the path that BCE actually followed in this matter. Instead, BCE did not allow Teleglobe to "explore [the] potential for [a] viable, going concern business plan" as Lazard recommended, but rather forced Teleglobe into a sale of the company under highly distressed, time constrained circumstances. Lazard's comment about restructuring alternative number four, the "Sale of the Company" says, "Not likely to result in material proceeds given lack of

---

[50] "Preliminary Observations Project X," April 4, 2002, by Lazard. TPICP00001876
[51] "Preliminary Observations Project X," April 4, 2002, by Lazard. TPICP00001878

credible buyers and number of other similar assets for sale."[52]  Based on all the
documents I have reviewed and my own analysis of the feasibility of downsizing the
2002 cash requirements to pay capex that are discussed later in this report, I believe
Lazard was on the right course in their April 4, 2002 report and that their reports
subsequent to April 10, 2002 are inconsistent with their preliminary opinions about
the right course of action in this case.  For some reason which is not articulated in
writing in Lazard's reports and is not contained in their working files that I could
find, Lazard was later persuaded to more than double their estimate of required
capital expenditures in 2002 and to materially abandon their original premise that the
network and capex could be rationally downsized.

    Lazard's second presentation is dated April 10, 2002[53].  It is much shorter than
the April 4, 2002 report, but it contains a "Restructuring Case" (hereafter the "April
10 Plan") which appears to be a refinement of the "Base Case" from the April 4, 2002
report.  Lazard describes the Restructuring Case as only 50-75% completed, and it
states on page 3 its desire to "develop a model of Teleglobe where restructuring
allows it to reduce its financial obligations by renegotiating contracts and operating as
a stripped down wholesale provider."[54]  The approach included key concepts such as:

    i.   exiting large, non-essential POPs in the U.S. and Europe;

    ii.   renegotiating capacity and subsea contracts;

    iii.   utilizing current inventory, lease additional capacity as required;

    iv.   re-examining satellite, backbone and access lease expenses;

    v.   reducing personnel to stripped down wholesale operations;

    vi.   restricting capex to less than or equal to $100 million per year after 2002;

    vii.   total 2002 capex of $312 million, of which $181.9 million was actually
        incurred in the first quarter and $70.3 million was projected to be incurred
        in April.  From May through December 2002, $7.5 million in capex was
        estimated to be incurred each month, which totaled $60 million and
        represents only 19% of the total capex projected in 2002.

---

[52] "Preliminary Observations Project X," April 4, 2002, by Lazard.  TPICP00001878
[53] BCE-AD 0501696-BCE-AD0501723
[54] "Preliminary Review of Teleglobe Strategic Alternatives Pproject X," April 10, 2002, by Lazard.  BCE-
AD 0501703

This April 10 Plan is a further extension of the Base Case in the April 4, 2002 Lazard report and is also consistent with Lazard's comments in its April 4, 2002 report about working to "explore [the] potential for [a] viable, going concern business plan."[55] The most notable thing about these two restructuring plans is that they acknowledge the viability of a scenario in which the company's originally planned capital expenditures are rationally curtailed while maintaining a core business. Again, Lazard had the right idea of what direction would bring the most value to Teleglobe's estate and creditors, and it is unclear why they later changed their approach.

This same concept of reduced capex in a restructuring scenario appears in various additional Lazard documents, models and working papers between the April 10, 2002 presentation and the April 16, 2002 presentation. While the exact numbers change slightly between scenarios, as demonstrated on Exhibit 25, the capex assumptions for the remainder of 2002 in the April 10 Plan (defined by Lazard as May through December, 2002) were always materially reduced below management's original plan, and the scenarios resulted in total cash burn rates that were always less than $200 million, also shown on Exhibit 25.

A monumental shift occurred in Lazard's approach for the first time in its April 16, 2002 report, which appears to be the next meeting with Jean Monty of BCE following the April 10, 2002 presentation. Rather than continuing with the basic premise that the data network could be downsized and the associated capital expenditure payments in 2002 could be curtailed to a more rational number, Lazard adopted the new premise that the entire data network either needed to be completed and maintained as originally planned by Teleglobe or it could be closed in its entirety and a Voice Only business plan adopted. This change in the underlying premise had a very material effect on the capex and cash requirements. The April 16 Plan increased the 2002 full year capex to $616 million from the $312 million used previously in the April 10 Plan. Most materially, the increase was concentrated in the May through December 2002 time period, which was increased to $372.4 million from the April 10 Plan assumption of $60 million. In total, capex from 2002 through

---

[55] "Preliminary Observations Project X," April 4, 2002, by Lazard. TPICP00001878

2005 increased by $503.9 million from the April 10 Plan to the April 16 Plan. See Exhibit 8.

The increase in capex was made without any explicit explanation for the difference, except that all the previous Lazard discussion about ways to downsize the network and cut capital expenditures is no longer in Lazard's April 16, 2002 report. The only explanation given by Mr. Millstein of Lazard in his deposition is that "we realized that if we wanted to keep kind of an option to sell the data business or an option to run the data business alive, instead of having as we initially thought to spend $300 million in -- for the balance of 2002 on capital expenditures, we were going to have to double that and basically spend $600 million."[56] Mr. Millstein did not explain why the May through December 2002 capex numbers in his April 16 Plan were increased by more than six times (from $60 million to $372 million), nor did he explain how the new number of $372 million, for May through December 2002, could possibly be more than the originally budgeted capex for all of 2002 of $316 million.[57] It appears that Lazard presented in its April 16 Plan a scenario that more closely resembled the original unaltered management case projections from late 2001. In fact, the 2002 total cash flow was worse in the Lazard's restructuring case in the April 16 Plan than in the original Management Case presented on April 4, 2002.[58]

Based on the documents I have reviewed, I believe it is likely that the capex numbers in excess of $600 million are not just 2002 capex as Lazard represents they are but are actually uses of working capital as the Company pays in 2002 the capex liabilities incurred and accrued for in 2001. Lazard shows working capital in its reports as being zero. Exhibit 26 illustrates the portion of 2002 capex generated from accruals versus new budgeted capex for 2002 from December 2001 through March 2002, which was the most recent month Lazard would have had access to. None of Lazard's financial scenarios or reports analyze outstanding accounts payable for the purposes of estimating working capital movements, despite the fact that various management projections contain very material numbers under working capital. One of the very first steps in any restructuring analysis of a company running out of

---

[56] Deposition of Mr. Millstein, page 85, lines 4-11.
[57] Bates BCE-AD 0091197 (November 28, 2001 Board of Directors Presentation)
[58] TPICP00001895

liquidity, let alone a complex multi-jurisdictional case, is to freeze all outgoing payments to vendors until all payables can be analyzed and decisions made regarding critical and non-critical vendors. Based on FTI's review of Lazard's work papers, we can find no analysis of outstanding payables.

Based on my review of all the financial scenarios and my experience in numerous restructurings of telecom service providers operating in multiple countries, I believe Lazard's numerous restructuring scenarios pre-dating the April 16, 2002 report present a more reasonable path to downsizing the network and the associated capital expenditures. Lazard's sudden conclusion on April 16, 2002 that it was not possible to reduce the scope and scale of the GlobeSystem network, or that the data revenues somehow merited completing the entire network, lacks foundation in the records I have reviewed and does not seem credible. Under the time constraints in this case, it appears that Lazard was somehow persuaded to abandon its original approach and adopt a simple "all or nothing" approach to assessing the GlobeSystem data network. Since Mr. Millstein of Lazard clearly stated in his deposition, quoted above, that Lazard did not prepare the projections themselves but relied on information from Teleglobe, which came to Lazard through Patrick Pichette,[59] I can only assume that Lazard was provided with the higher capex number, and they did not have the time or ability to refute its reasonableness. Unfortunately, this single assumption makes the Lazard restructuring alternatives a *fait accompli*.

The new assumption that the Restructuring Case required $616 million of cash for capital expenditures in 2002 is completely unreasonable for the following reasons:

   i.  Assuming insolvency filings in Canada, the US, and the UK, which Lazard said was the basis of all its "Restructuring Case," all payments of payables for capex incurred in 2001 but not yet paid should have been stopped, and only payments for network equipment actually required for a restructured business should have been included in the model. Even if Teleglobe had actually remained in operation in all its existing countries/territories, sizable capex cash payments in 2002 would not have

---

[59] Mr. Pichette was a BCE executive who was asked to assume operating control of Teleglobe in January 2002 and to assess what BCE should do with regard to Teleglobe. Shortly following BCE's decision on April 24, 2002 to stop funding Teleglobe, Mr. Pichette resigned from Teleglobe and returned to BCE.

been required, solely by virtue of the bankruptcy/restructuring processs. The total amount of capex accrued in 2001, but payable in 2002 was estimated at $273.7 million as illustrated in Exhibit 26. In addition there was also $46.3 million of capex accrued in 2001 payable in 2003 and 2004, which brought the total accrued in 2001 to $319.9 million as detailed in Exhibit 28. In the first quarter of 2002, $135.2 million of this accrued amount was paid in cash as illustrated in Exhibits 28 and 29. Therefore, as of April 1, 2002, $138.4 million of 2001 accrued capex remained. It is highly likely that Teleglobe could have avoided paying the entire $138.4 million by taking advantage of the bankruptcy laws, but if it had to cure a contract in order to maintain operations, it may have had to pay a small portion.

ii. All payments for undersea capacity should have been stopped and reassessed, as Teleglobe did not need all the capacity it had committed to purchase. The subsea cable contracts that FTI reviewed indicate that they had been entered into by U.S. or Canadian legal entities[60], which indicates that Teleglobe would have been able to reject them when the U.S. and Canadian entities filed for bankruptcy. Even those not in U.S., Canadian or UK entities could have been abandoned through a restructuring process without making further payments so long as the company planned to abandon that country. Teleglobe knew that the current market value of the capacity was often less than the outstanding payments it owed the cable owner, and Teleglobe could easily obtain alternative capacity on the same cables for much cheaper prices, given the fact that prices had plummeted from the time Teleglobe committed to the capacity until 2002. In fact, in the April Board Presentation the Company stated "$100 million investment (with $60 million outstanding commitments) on the Australia-Japan cable worth today approximately $20 million.[61]" It also stated "Most sub-sea capacity stranded, e.g. market prices for transatlantic

---

[60] No bates number, but included at the end of post first quarter 2002 documents.
[61] BCE-AD 0543570

capacity half of Teleglobe's costs on Flag.[62]"  Teleglobe owed a total of $68.8 million in 2002 for subsea cables, of which $36.1 million was related to 2001 accruals and $32.7 million was in the 2002 budget as laid out in Exhibit 27.  In addition, $41.5 million was due on the Asia subsea cables after 2002 as also illustrated in Exhibit 27.

iii. All payments related to the Internet Data Centers should have been excluded, as even Teleglobe management assumed they would exit the hosting business. The total amount of accrued capex remaining for IDCs in 2002 was $2.0 million as illustrated in Exhibit 27. There was insufficient detail to determine the amount in the 2002 capex budget, but it was most likely allocated to the regions in Exhibit 30. In addition, $4.8 million of payments allocated to IDCs were due after 2002 per Exhibit 28.

iv. Capex should have been divided by country and by nature of project so that it could be associated back to the product revenues it would contribute to driving.  FTI found some drafts of this type of analysis in the Teleglobe files, but it does not appear that anything like this was considered by Lazard in composing its April 16, 2002 Restructuring Case.

I estimated a range of likely capex for 2002 based upon bankruptcy laws and the likely core business for the Company going forward, which was to reorganize in the U.S., U.K., and Canada and walk away from most of the rest of the world with the exception of Spain, Hong Kong and Australia.  Exhibit 27 illustrates a LOW capex amount for 2002 of $21.5 million, which is essentially only voice related capex, and a HIGH capex amount of $53.3 million based upon the approach discussed above.  All of the amounts are estimates based on the information available to FTI today from the record in this litigation for review and analysis.   Finally, I broke out the maximum capex associated with Europe, since an April 17, 2002 draft of the April 23, 2002 presentation to the BCE Board makes the false assertion that "Capital expenditures doubled to $634 M – Additional needed to keep European network operating."[63] Even if you assumed that all of Europe needed to be maintained, only $166.4 million

---

[62] BCE-AD 0543570
[63] BCE-AD 0567372. Note that this assertion is not contained in the final Board presentation, but it appears that someone was looking for a reason to justify that huge change in assumed capital expenditures.

of the maximum capital expenditures remaining to be spent in 2002 (including both
2001 accruals and 2002 new expenditures) is identified in Teleglobe documents as
pertaining to Europe, as shown in Exhibits 28 and 30, which obviously does not
justify the $372 million capital expenditure assumption.

b)  **Voice Only Case**

Lazard's analysis and conclusions regarding the April 16 Voice Only Plan are
incomplete and fail to reach any reasonable conclusion.  I find it perplexing that
Lazard included management's voice only case in its April 16, 2002 report without
any discussion of its results or implications for the restructuring.  In fact, it does not
appear to be listed in any of the restructuring options presented in the April BCE
Board Presentation.  This omission is particularly noteworthy because the April 17,
2002 draft of the BCE Board presentation lists "3 basic options" as "Strategic
Options" for Teleglobe: (1) "Full merger with another carrier," (2) "Carve out of the
voice business," and (3) "Complete liquidation."[64]  In the final presentation to the
BCE Board on April 23, 2002, however, the "Strategic Options" have been reduced to
two:  (1) "Business combination with another carrier," and (2) "Manage wind-down."

In Lazard's April 16, 2002 report, the spreadsheets reflecting the Voice Only plan
are presented without any explanation of their meaning or any discussion of this as a
viable alternative stand-alone restructuring scenario, except the reference to the
possibility of selling only the Voice business.  In fact, the summary of options on
page 2 does not even mention a scenario structured around the voice business as a
restructuring option, even though it is clearly contained in the report and it shows
positive unlevered free cashflow.

Lazard's inclusion of a Voice Only scenario in the April 16, 2002 report is the
only place where it appears prior to the BCE Board meeting on April 23, as it is not
discussed in any earlier reports.  While a voice only scenario is not formally
presented in the later May 2, 2002 report, a May 3 voice only scenario from Lazard
was included in some BCE files, although the outcome is unfavorable as compared to
previous scenarios as illustrated in Exhibit 9.  Furthermore, Lazard does not appear to

---

[64] BCE-AD 0567375

have analyzed an April 21 Voice Only Plan that was prepared by Teleglobe management, even though it showed materially more positive unlevered free cashflow than the version reproduced by Lazard in its April 16, 2002 report. Finally, none of the documents which appear to have been used by Teleglobe management for the presentation to the BCE Board even mention doing a run off of the voice business as an option.

My own analysis of the Voice Only model indicates that it is a credible fallback scenario and is clearly preferable to liquidation or a fire sale as occurred. Based on my understanding of the Teleglobe network, Teleglobe's history as an international voice carrier long prior to its decision to construct GlobeSystem, and the various analyses and business plans for the Voice Only business which are contained in the Teleglobe documents, there is no reason I can think of, or find in the documents, that the Voice Only option was set aside by BCE and potentially Lazard as a reasonable stand-alone restructuring option. While it is not my opinion that this would have been the optimal scenario for the Teleglobe estate and creditors, it would have been far preferable to the sale which occurred. At the very least, Lazard and BCE should have considered the Voice Only option as a method for downsizing to a smaller, lower risk company that produced positive free cash flow and would be viable as a stand-alone entity for years into the future. The discounted net present value of the Voice Only model should have served as floor below which the Teleglobe entities should not have been sold.

FTI analyzed the April 21 Voice Only Plan that was emailed by Bill Enns to Patrick Pichette, Serge Fortin, and Andre Mongrain to determine the reasonableness of the underlying assumptions. As part of our analysis we looked at the trends within the model and compared it to other scenarios run by the Company as well as industry trends captured in Telegeography 2002 published by Telegeography, Inc. in November 2001. I analyzed the minute volume, minute growth rate, gross revenue per minute (GRPM), gross revenues, and SG&A trends. Exhibits 13-20 reflect this analysis. The April 21, 2002 Voice Only projections reflect that Teleglobe's voice minutes grow at a CAGR of 8% from 2002 through 2004, which is lower than the 16% industry CAGR for the same period. The annual growth rate of minutes is lower

than the industry in 2002 and 2003, but in line with the industry in 2004. In order to reflect the price erosion in the market, gross revenue per minute (GRPM) and cost per minute (CPM) decreases each year. SG&A including bad debt decreased to 9.5% of total revenue in the April 21 model versus 15% for the total Company in first quarter 2002. In my opinion, based upon the above the April 21 Voice Only Plan is a credible model for a well understood, low risk business, and therefore a viable alternative scenario for the Company.

In addition, I compared similar metrics for the voice projections in the April 16 Plan, April 21 Voice Only Plan and May 14 Plan, and the analysis is contained in Exhibits 15-20. In my opinion, the April 21 Plan and May 14 Plan generated by management contained reasonable assumptions, whereas the April 16 Voice Only Plan, which was presented by Lazard to Jean Monty and other executives at BCE, contained some illogical assumptions and possible calculation errors, especially the assumptions concerning calendar years 2002 and 2003. In general, the declines in cost and revenue per minute in the May 14 Plan are smaller than the April 21 Voice Only Plan in the later years, but larger in the short term. The April 16 Voice Only Plan showed aggressive decline in minute volume growth in 2003 with a rapid recovery in 2004. Cost per minute increased in 2003 in the April 16 Voice Only Plan, which is inconsistent with industry trends. EBITDA was lower in the May 14 Plan as a result of the incorporation of scaled down data revenues and costs.

8)  BCE DECISION

       The timing of various documents in early April 2002 seems backwards with
regard to whether the BCE decision was made based on reviewing Lazard's analysis
or whether BCE's decision was made before it had appropriately considered Lazard's
analysis. The facts suggest that BCE pre-determined the outcome by setting a
threshold of additional cash spending for Teleglobe at a maximum of $125 million,
which caused them to discount the various restructuring scenarios later presented by
Lazard.

       Pierre Lessard, a BCE employee who was part of a three person team assigned the
special project of evaluating the Teleglobe situation for Jean Monty, stated in his
deposition that he was completely unaware of the $850 million of authorized funding
for Teleglobe by the BCE Board[65] and instead was told to assume that whatever
scenario his team considered had to cost BCE less than $125 million. "We knew that
the maximum that could come from BCE was 100 to 125 [million]. If there was more
needs, either it had to be credible that a bank would fund it or the scenario was not
viable."[66]  This may also explain why the various Lazard scenarios from early April
2002,[67] which showed a far lower cash requirement than the unused but authorized
funds, were not further analyzed by BCE and were not mentioned in the presentation
to either the BCE Board or the Teleglobe Board on April 23, 2002. It is also
consistent with the fact that neither Lazard nor Teleglobe's management team had
adequate time to construct a stand-alone restructuring scenario.

       Perhaps the most curious document which speaks to the timing of the decision by
BCE is an April 1, 2002 BCE document entitled "Summary Comments on Proposed
BCE Strategy Evolution," authored by Pierre Lessard, Jerome Huret, and Wes Scott
that is noted as "Prepared for Jean Monty and Michael Sabia." This document
precedes any analysis or conclusions from Lazard, which had only begun their work

---

[65] See Deposition of Pierre Lessard, pages 57-60.
[66] Deposition of Pierre Lessard, p53, lines 11-15.
[67] See Exhibit 8 for cash funding requirements from May-Dec 2002 for each Lazard scenario.

at Teleglobe less than 10 days before this document.[68]  On page 3 of this document it states, "BCE has made the decision to contain its exposure to Teleglobe." (emphasis added)  Late in the document it muses:

> "Have we not created a situation of conflict of interest whereby the people in charge feel personally safer if they paint the picture [of Teleglobe] as black as possible?  Current market environment is probably about as bad as it can be.  In such situations values are almost always understated.  All the documentation tells a rather sad story.  Are things truly this bad?"

Under the heading of "Value to BCE" the statement is made "This becomes crucial prior to making any commitments or choosing to honour commitments already made that perhaps can be changed (e.g. traffic)." (emphasis added)  Finally, under the heading of "Supporting a post-BCE TGO" it states,

> "It should only be done for measurable (strategic) value to Bell Canada or strict legal reasons pertaining to BCE... Lesson of BCED[69] and other such adventures is that if you no longer see strategic value, the cost of preserving reputation or other relationships can become very high and leave BCE entangled with TGO long after it presents any value."

Since this document clearly precedes any presentation of Lazard's analysis, it seems clear that BCE executive management was already contemplating to "not honor its commitment" to fund Teleglobe well before it had received any advice from a financial restructuring advisor such as Lazard or anyone else.  It is noteworthy that this document never mentions any restructuring scenarios or alternatives and does not seem to recognize any duty to maximize the value of the Teleglobe estate to all constituencies, including, most importantly, its creditors.

Notwithstanding this lack of recognition of responsibilities in the case of an insolvency, the three person team who authored the April 1, 2002 strategy document concluded that the optimal scenario was something similar to what I am concluding now.  Mr. Lessard testified that his team concluded that "The full Teleglobe with all of its lines of business was not viable."[70]  Instead, they believed that a downsized version was optimal.  "As opposed to Teleglobe, the full Teleglobe.  What we were

---

[68] Note that the first substantive Lazard written document appears to be April 4, 2002, which also contains their first cut at a Restructuring Case.
[69] A BCE related real estate company.
[70] Deposition of Pierre Lessard, p124, lines 9-11

Page 43

looking for is a redefined Teleglobe that would be viable."[71]  They also reached the opinion that Teleglobe should not be sold or liquidated at that time.  "This doesn't recommend to kill Teleglobe.  It sort of says run a smaller Teleglobe, which was not what was decided at the end."[72]  Mr. Lessard goes on to explain that his team believed it was "a bad time to sell" because of market conditions.  He summarizes their opinion as "We were not recommending to sell.  Remember, we were recommending to downsize and continue only certain lines of business."[73]

A number of Lazard's documents also raise questions about what perspective they were approaching their assignment from, BCE's or Teleglobe's.  In their first written report, which Mr. Lessard testified was presented to a large group of BCE personnel,[74] Lazard presented various calculations showing that Teleglobe, under any financial projection in use, had an enterprise value that was materially less than the debt it owed third parties.  Although it is not explicitly stated, the implication is that BCE has no equity value in Teleglobe and will never have any under the current forecasts.  Notwithstanding this conclusion, a "Preliminary Liquidity Analysis" is presented on page 5 of the document which is described as follows:  "Assuming a restructuring plan is initiated in May 2002, under the Base Case, Tango would require funding of approximately $167 million though December 2002 . . ."[75]  Despite the fact that this funding requirement is materially less than the remaining authorized BCE funding, Mr. Lessard's team does not appear to have discussed the scenario because it required more than the $125 million limit they were told to assume.  Even Lazard seems to discard scenarios which require additional funding as being viable, as they state on the page which considers a "Pre-Packaged or Pre-Negotiated Restructuring" that Teleglobe "will require additional funding even with no debt service requirements."[76]  Then, under the title of "Strategic Considerations Regarding Tango [Teleglobe]," the opening sentence states, "Given Tango's dilutive impact on

---

[71] Deposition of Pierre Lessard, p124, lines 13-15.
[72] Deposition of Pierre Lessard, p295, lines 10-13.
[73] Deposition of Pierre Lessard, p297, lines 14-16.
[74] Deposition of Pierre Lessard, p136, lines 10 to p138, line 14.  Mr. Lessard was unsure if any Teleglobe executives may have attended, as he only remember BCE personnel and Lazard.
[75] "Preliminary Observations Project X," April 4, 2002, by Lazard.  TBICP00001867
[76] "Preliminary Observations Project X," April 4, 2002, by Lazard.  TBICP00001880

Bravo and the uncertainty of its stand-alone business model, it is critical to understand the strategic value to Bravo."[77]

The next Lazard written report, dated April 10, 2002 and entitled "Project X" was also presented to Jean Monty and others at BCE. This report presents the April 10, 2002 Restructuring Case discussed earlier, with the capex figure of $312 million. It does not present or discuss any restructuring alternatives, and it does not contain the Voice Only scenario or mention it as an alternative. The most curious portion, however, is the very last page of this short report. On page 8, under the title of "Issues For Consideration For April 23," the following statement is made:

"Further funding by BCE

- Given the uncertainty in the business environment, BCE can no longer commit to fund Teleglobe in its current form."

The above statement appears to be written from the standpoint of BCE rather than Teleglobe, even though Lazard was retained as restructuring advisor to Teleglobe, not BCE.

Finally, the one-dimensional nature of the presentations to the BCE Board and the Teleglobe Board on April 23, 2002 implies that the deck was stacked towards the decision that BCE management had already made to cut off future funding of Teleglobe. Despite the fact that (1) Lazard had presented a Voice Only scenario that was positive free cashflow; (2) Lazard had originally begun its work by recommending a rapid downsizing of the GlobeSystem and material reductions in capex rather than a fire sale or liquidation; and (3) Teleglobe management was actively working on a plan to downsize the international data network, the BCE Board presentation failed to explore what restructuring scenario would be best suited to maintain the value of Teleglobe for its estate and creditors. The only options presented were a "business combination with another carrier," which meant a sale of the company, or a "wind-down."

While the presentation mentioned that one of the BCE objectives going forward was to "preserve to extent possible value of Teleglobe to its creditors," the presentation goes on to state that the outcome must be determined by mid-May to

---

[77] "Preliminary Observations Project X," April 4, 2002, by Lazard. TBICP00001871

limit BCE cash to $100 million plus $25 million for severance and retention. The presentation showed Teleglobe running out of money by June 23, 2002, after using the $100 million DIP facility that BCE planned to provide[78]. The presentation clearly stated that the probability to close a business combination quickly was low, and that if an agreement was not reached with a partner, then an "orderly shut down," or liquidation, would occur[79]. In fact, the presentation reassured the Board that liquidation would present "limited risk" to BCE[80]. The impact of liquidation on Teleglobe's creditors, however, was not discussed in the presentation. In fact, the presentation indicated that a key message was that "BCE conducted a pragmatic assessment of Teleglobe situation and made [the] decision in [the] best interest of shareholders and customers."

The presentation to the Teleglobe Board on April 23, 2002 was similar to the April BCE Board Presentation in terms of all the financial projections and restructuring scenarios and alternatives, but it contained additional legal risk discussion not contained in the BCE Board presentation. Notwithstanding the fact that the Teleglobe Board Presentation did not address any additional restructuring alternatives or potential actions to downsize the network and reduce the cash funding requirement, the Teleglobe Board Presentation stated that an overarching objective of the restructuring was to "preserve to possible extent going concern value of assets for Teleglobe creditors." It also stated that the "company [was] entirely dependent on BCE funding for current liquidity," but it did not explore ways for Teleglobe to alter its course if BCE failed to provide the necessary funding. This presentation to the Teleglobe board discussed the Directors' and Officers' duties and responsibilities and specifically addressed the fiduciary duty to the creditors. No such language was found in the April BCE Board Presentation.

---

[78] BCE-AD 0543579
[79] BCE-AD 0543582
[80] BCE-AD 0543581

9) **THE MAY 14, 2002 TELEGLOBE BUSINESS PLAN PRESENTS A VIABLE**
**AND REASONABLE ALTERNATIVE FOR TELEGLOBE**

The modified plan presented on May 14, 2002, otherwise known as the May 14 Plan herein, considers a rational downsizing of Teleglobe's international footprint to five countries/territories: Canada, United States, United Kingdom, Spain and Hong Kong. The model is driven primarily by Teleglobe's core voice wholesale business; however, it maintains data revenues of approximately $100 million per year.

It is important to note that the May 14 Plan assumed no additional capital from BCE. Access to some portion of the $628 million of additional funding authorized but not provided by BCE would have provided additional time for Teleglobe to explore options and generated more value for the Teleglobe estate and creditors. Having access to the funds was a benefit that carried significant value. Based on my analysis of the May 14 Plan, additional capital would have allowed Teleglobe to determine the optimal number and combination of countries/territories to retain.

Management's presentation highlights that Teleglobe ranked number 2 in the international hubbing business [81] in May 2002. Voice revenues account for 86.6% to 89.4% of total revenues from 2003 to 2005 in the projections. The projections assume that voice minutes increase 2.2 % in 2003 over 2001 levels, reaching a level of 7.5 billion minutes in 2003. Voice minutes are projected to increase 13% over prior years in both 2004 and 2005, which is consistent with Telegeography[82] projections for the industry.

Data revenues were projected to contribute $105 million in revenue in 2003, which is 12.5% of total revenues; and a 70% decline from the existing March 2002 run rate base of $354 million. Many of the data customers anticipated to be retained also purchased voice services from Teleglobe. Data revenues were expected to decline slightly by 2005 to 10.6% of total revenues. The Company also anticipated 600 employees versus the 1800 employees as of May 2002.

---

[81] Hubs are connection points within a network that pass signals through them. The more hubs a network has, the wider the reach it has making it more attractive to customers.
[82] Telegeography 2002 and 2003, a Telegeography Guide.

I analyzed the May 14, 2002 Plan for reasonableness and have illustrated the analysis in Exhibits 21-24. Key elements of my analysis included:

a) Comparison of annual growth rates and CAGR for international wholesale voice minutes to the Telegeography Report[83]

b) Comparison of capital expenditures to the following competitors that went through a bankruptcy and emerged with a scaled back plan: Williams Communications, Global Crossing, Flag Atlantic, and Level 3 as illustrated in Exhibit 12.

c) Comparison of the May 14 Plan to the April 10 Plan, April 16 Plan and April 20 Plan focusing on revenues, EBITDA, capex, and unlevered free cash flow.

The results of my analysis indicate that the May 14 plan was reasonable as a basis for a stand-alone restructuring and that the execution of the strategy presented would have provided more value to the creditors than the fire sale process which occurred. I have confirmed this opinion on value by asking Huron Consulting to use the May 14 plan as one of their damage calculations, and I understand their results are consistent with my conclusion that the May 14 Plan would have provided materially more value to the Teleglobe estate and creditors than the sale to Cerberus provided.

The projections of the voice business were in line with previous voice only scenarios as reflected in previous Exhibits 15-17. Gross margin as a percentage of revenue decreased from 20% in 2002 to 17% in 2005, which is reasonable given the continued pricing pressure in the voice business. SG&A at 10% of revenue is reasonable and consistent with the April 21 Voice Only scenario. Capex is 3% of total revenue and remains constant, as it is primarily driven by the voice business. While the annual projected capex levels in the May 14 Plan are smaller than the comparable industry players at the time, they still appear reasonable as many of the other players had specific customer needs that drove higher costs. For example, WilTel was required to spend tens of million on the build out of its voice network to accommodate its largest customer, SBC, in the deployment of its nationwide long distance plans to its customers.

---

[83] Telegeography 2002 and 2003, a Telegeography Guide.

In addition to my analysis of the Plan on a forward-looking basis, the actual performance of Teleglobe after the May Plan and the facts surrounding the sale provide confirmatory evidence that the May Plan was in fact reasonable. The financial results and some operational metrics are included in Exhibits 31 and 32. Teleglobe sold the assets and related revenues of six countries/territories to TLGB, an affiliate of Cerberus, on May 30, 2003, after signing a purchase agreement on September 18, 2002 and an interim management agreement on December 1, 2002. TLGB purchased the five countries/territories included in the May 14 Plan plus Australia, which Teleglobe had apparently decided to keep in operation in addition to the countries/territories in the May 14 Plan. TLGB results in 2002 and 2003 demonstrate mixed results, but all in all reflect that the May 14 Plan was not an unreasonable one. Actual revenues for 2003 were $18 million higher than the May 14 Plan, respectively. While EBITDA was below plan in 2003, actual cash flow generated in 2003 was substantially higher as a result of positive working capital and lower capex.[84]

Analysis performed by Teleglobe prior to the April 23 Board Meeting, in which BCE announced that it was no longer funding Teleglobe, laid the groundwork for completing the May 14 Plan in a timely manner. Teleglobe had completed a draft of a city profitability analysis for 2002 based on January 2002 annualized budget/actual results and total 2002 annualized budget/outlook. The analysis separated cities into positive, negative and no EBITDA cities; a summary of the results is presented in Exhibits 33-35. It provided revenue, costs, capex, EBITDA, cash flow, and number of sites. Neither this analysis nor the fact that it was in process and close to completion, as evidenced by the fact that a report was issued three weeks later, was presented to the BCE Board on April 23.

---

[84] Note that 2002 numbers other than revenue cannot be reliably compared to the May 14 Plan because of the inability to separate out the pre-June cashflows, such as the large capex payments made in January through April of 2002 that are obviously not reflected in the May 14 2002 Plan, and the one time costs of the bankruptcy.

10) **THE FIRE SALE WAS THE WORST POSSIBLE OUTCOME FOR THE TELEGLOBE ESTATE AND CREDITORS**

In my experience, the four major types of buyers for a company like Teleglobe include: (1) foreign PTTs or large telecom service providers who move very slowly and respond best to a formal sales process; (2) North American strategic buyers who move more quickly; (3) financial buyers of non-distressed assets; and (4) financial buyers of distressed assets. In a distressed sale, the most likely buyers would be financial buyers of distressed assets or a strategic buyer with a keen interest in the assets and the financial wherewithal to finance the deal quickly. Unfortunately, during April through July of 2002, there were not many strategic buyers in a financial condition to purchase the assets of Teleglobe, leaving Teleglobe stranded with the option of selling to a distressed financial buyer, typically at a low recovery.

Strategic buyers will typically pay more for a company because they can integrate the operations of the acquired company into their own operations, thereby reducing costs and increasing the profitability of the acquired business. In addition, a combined, larger company creates an opportunity to leverage off of expanded products and network to create opportunity for additional sales and revenues. The cost savings and revenue opportunities generated are generally referred to in the industry as synergies. Typical synergies for combining a business like Teleglobe with a strategic buyer include:

   a) Corporate overhead reductions –The acquirer and the target maintain corporate back office support departments such as finance, accounting, human resources, IT, business development, legal, marketing and sales. It is not necessary to retain all of both companies' employees to support the combined entity, as there will be functional and system integration which leads to headcount reductions and reduces costs.

   b) Network consolidation – The consolidation of the network consists of physical assets and headcount. There would most likely be duplication of network assets such as switches, POPs, collocations and circuit leases. Duplicate network assets can be de-commissioned and overlapping costs can be

eliminated, which would reduce the overall costs of running the combined network and produce cost savings. In addition to the network itself, most telecom companies have lots of headcount in service delivery, network engineering, network planning and network operations departments. Many of the functions will be duplicated in the combined organization thereby creating another opportunity to reduce headcount and related costs.

c) Scale and volume discounts – The telecommunications industry has high fixed network infrastructure costs. Therefore, the more volume that is placed on the infrastructure, the lower the costs per unit. Therefore, a merger between two telecom entities creates an opportunity to increase scale and improve profit margins. At the same time, a larger entity has higher volume needs and therefore greater purchasing power, which reduces variable costs to buy capacity or off-net circuits from other telecom service providers.

d) Increased sales opportunities – a combined entity could have a broader product offering, more channels through which to sell products, and deeper infrastructure to support customers, thereby generating greater sales.

Lazard presented their thoughts regarding the synergies between Teleglobe and three potential competitors that were perceived by Lazard to be good buyers for Teleglobe: Level(3), Broadwing and Global Crossing. They also presented numerical synergy impact summaries for each carrier in their April 16, 2002 Presentation, in which Lazard estimated annual synergies of $100 million to $200 million for each potential merger partner. Applying Lazard's previously stated EBITDA multiples of 3X to 8X from their April 4, 2002 valuation analysis, in effect Lazard was opining that the synergies could yield a value of between $300 million and $1.6 billion to a strategic buyer, with a median of $825 million (calculated as $150 million of annual synergies times 5.5X median multiple). The following is how Lazard described the potential synergies of combining with each of the three potential strategic buyers.

a) In the case of Broadwing, Lazard indicated that the synergies between Broadwing and Teleglobe could include increased volumes, network/overhead redundancies, and the sales force's ability to sell a global, diverse product set.

Network costs savings listed included the reduction of Teleglobe's U.S. network and elimination of overlapping international assets. Overhead cost savings included consolidation of sales and back office functions. The combined company would have a greater selling proposition to customers due to its global network, strong wholesale and retail channels and broadened product set.[85]

b) In the case of Level(3), the synergies would include increased volumes, network/overhead redundancies, and the sales force's ability to sell a global, diverse product set. Teleglobe's US network could be reduced, and sales and back-office functions could be consolidated to produce cost savings. Increased global reach, strong channels, and a broadened product set would create greater sales opportunities.[86]

c) In the case of Williams, synergies include increased volumes, network/overhead redundancies, and the sales force's ability to sell a global, diverse product.[87]

The Spring of 2002 was definitely a troubling time in the telecommunications industry, with many companies struggling to survive, restructuring or liquidating. As a result, the most likely strategic buyers were in trouble themselves, and smaller companies who were liquidating were flooding the market with network assets and capacity, thereby depressing prices for distressed assets. For example, Williams Communications was actively looking for a buyer at this time as part of its own restructuring, but was only able to secure a $330 million equity investment from Leucadia, a financial firm, for 45% of the new common stock in the restructured entity. Similarly, Global Crossing was in an active process to see if the SingTech/ Hutchison bid that it had announced in November 11, 2002 could be beat.

Therefore, it was clear that selling Teleglobe to a strategic buyer was going to be difficult. Lazard stated clearly in its April 4, 2002 Presentation,[88] that sale of the Company was "not likely to result in material proceeds given lack of credible buyers

---

[85] Bates TGV00057616
[86] Bates TGV00057619
[87] Bates TGV00057620
[88] Bates TPICP00001860 to 1907

and number of other similar assets for sale" and "not likely to result in meaningful recovery to stakeholders at this time." This presentation was completed within two weeks of the start of their engagement, and laid out all of the restructuring alternatives. It concluded that there was a "limited M&A market for long haul telecommunications companies."

Pierre Lessard, Vice President Finance at BCE, also understood that this was a bad time to sell Teleglobe and confirmed in his June 17, 2005 deposition that the "current market environment is probably about as bad as it can be. In such situations, values are almost always understated.[89]" He stated, "This is typically how the markets go. They go from too low to too high. So we were trying to remind Jean, you know, you've seen something that's probably worse than it will have turned out to be later on.[90]" He went on to say, "It's a bad time to sell…We were not recommending to sell…we were recommending to downsize and continue only certain lines of business…It's a matter of waiting for it to essentially stabilize and come back…we wanted to continue a smaller Teleglobe.[91]"

Mr. Millstein, Managing Director at Lazard, stated in his deposition that "We didn't think any one of these [Broadwing, Level(3) or Williams] had the financial wherewithal to do a deal…they had their own issues that would keep them from ever consummating a deal with us."

Both the restructuring process and the subsequent sales process moved at an extremely fast pace, and it is clear that the sales process began even before the "official" BCE Board decision was made on April 23, 2002. Lazard was hired on March 21, 2002 and per their April 10, 2002 presentation[92] to BCE, their work was leading them toward a final decision on the restructuring by the BCE Board on April 24, 2002. This timeline presented Lazard with less than a month to complete its analysis. On March 11, 2002 Martine Turcotte, Chief Legal Officer of BCE sent an email containing a list of issues and activities for Project X.[93] This list contained an aggressive timeline with important dates, including update meetings on April 4, April

---

[89] Deposition of Pierre Lessard, p. 296, line 20-23.
[90] Deposition of Pierre Lessard, p. 296, line 25 and p. 297 lines 2-5.
[91] Deposition of Pierre Lessard, p. 297 line 9,14-16 and p. 298, lines 6-9.
[92] Bates BCE-AD 0501709
[93] BCE-AD 0271245 to 1278

10, and April 16; plan overview on April 11; board package on April 18 and Board Meetings on April 23-24. Most of the action items related to bankruptcy filings and the legal and financial issues surrounding it. On April 14, 2002, Lazard circulated a document containing individual strategic talking points targeted toward Broadwing, Level(3) and Williams.[94]  In the April 16, 2002 presentation, Lazard indicated that next steps included preparation for a filing in appropriate jurisdictions and continued conversations and preparation for a formal sales process of the whole company. On April 18, 2002[95] Lazard emailed a buyer list and a 10-page teaser draft to Teleglobe. The buyer list contained Tier I and II strategic buyers, but no financial buyers. In a copy of the Project X "To Do List" dated April 19, 2002,[96] Lazard established tight deadlines for the models, board presentations, sales process, creditor meetings, DIP financing, interest payment/goodwill, and the communications strategy. The models and teaser for the sale were projected to be completed by April 21st; buyers were scheduled to be contacted starting April 22nd; preparation of the data room was ongoing; and they were trying to set up a meeting with Level(3) by April 22. An email dated April 21, 2002[97] from Lazard to Patrick Pichette indicated that a final voice only model was due April 23; discussions with Level(3) and Broadwing were more advanced with meetings possible the week of April 22; Lazard would contact other potential interested parties for the whole business and voice only business; the data rooms were set up at Jones Day offices; and filings for stay of proceedings were a virtual certainty. At this early point, before either the Teleglobe or BCE Boards had officially met on April 23, 2002, it was clear that Teleglobe was headed toward a rapid sale.

At the end of the day, it was a financial buyer that purchased Teleglobe and signed an asset purchase agreement in September 2002. An affiliate of Cerberus Capital Management LP ("Cerberus"), a hedge fund, purchased Teleglobe. Cerberus currently has $16 billion of investor's assets on its books, which is almost double

---

[94] TGV00057614 to 621
[95] TPICP00001338 - 1367
[96] Bates TBRUJ00001177 -179
[97] Bates TPICP00001335 - 1337

what it had in 2003.[98]  Although traditionally the firm specialized in trading the debt of troubled companies, it soon began to buy small, struggling companies, and it developed a reputation for buying highly distressed companies in a down market. Cerberus' current strategy is to look for new investment opportunities and deploy one of its seasoned executives to run the companies it buys.   Cerberus's strategy is to operate companies for longer term rather than merely trade their securities.

It is clear that BCE and Lazard understood that May 2002 was a low-point in market values for competitors and likely strategic buyers of Teleglobe.   In Lazard's April 4 Presentation to Monty, they provided an overview of distressed long haul carriers and a summary overview of other distressed carriers.  It was known at the time that the best and most likely strategic buyers were in the process themselves of restructuring their balance sheets and operations.  In addition to the obviously poor timing of the sale, the nature of the sale itself, a rapid fire process without the normal Offering Materials that a healthier company would normally provide also effectively eliminated reasonable foreign buyers from the process and contributed to the low value obtained.  Even a restructuring that contemplated a Voice Only business plan would have resulted in higher cash flows, and therefore a higher recovery to the Teleglobe estate and its creditors.

---

[98] *Q:  What's Bigger than Cisco, Coke, or McDonald's? A: Steve Feinberg's Cerberus, A Vast Hedge Fund That's Snapping Up Companies – Lots of Them*. Business Week, October 3, 2005, page 100.

## 11) CONCLUSION

The foregoing represents my professional opinions, to a reasonable degree of professional certainty, based on the analysis described in this report. I reserve the right to update my analysis based on any new relevant data that becomes available before trial and to consider any facts or opinions raised by defendants' experts in this case.

By:

Carlyn R. Taylor, MA, CPA, ABV, CIRA          Dated:  March 8, 2006
Senior Managing Director, FTI Consulting

# Exhibit 9



**Huron**
CONSULTING GROUP

Teleglobe Communications Corporation, et al. v. BCE Inc., et al.

**Expert Report of Paul F. Charnetzki**

March 8, 2006



CHARNETZKI
DEPOSITION
EXHIBIT
PENGAD 800-631-6989



# Table of contents

I.     Executive Summary ........................................................................................4
  A.   Teleglobe Inc. and the majority of the plaintiffs were insolvent no later than December 31, 2000. .................................................................................................................4
  B.   Discontinuing additional investment in GlobeSystem and other capital projects at June 30, 2001, after insolvency, would have preserved value in Teleglobe. ..........................5
  C.   Alternatively, had BCE made the $850 million of additional funding available to Teleglobe, as authorized by its board and accepted by the board of Teleglobe on November 28, 2001, value in Teleglobe would have been preserved ..............................................6
II.    Introduction .................................................................................................7
III.   Qualifications ..............................................................................................7
IV.    Compensation .............................................................................................8
V.     Background .................................................................................................8
  A.   Industry .....................................................................................................8
  B.   Teleglobe ................................................................................................22
    1.   Chronology .........................................................................................29
VI.    Summary of Opinions ................................................................................43
VII.   Insolvency ................................................................................................44
  A.   Teleglobe Inc. and the majority of the plaintiffs were insolvent no later than December 31, 2000. ...............................................................................................................44
    1.   The most appropriate entity at which to test solvency is Teleglobe Inc. on a consolidated basis. ...............................................................................................45
    2.   Cash flow test. ....................................................................................45
    3.   Balance sheet test. ..............................................................................47
    4.   Valuation at December 31, 2000. ..........................................................52
    5.   Z-Score ..............................................................................................55
    6.   Thin capital test ..................................................................................56
  B.   I have also performed solvency tests at the entity level for the plaintiffs. ...............56
    1.   Consolidated THUSC .........................................................................57
    2.   THUSC (stand alone) .........................................................................69
    3.   TUSA ................................................................................................59
    4.   Optel .................................................................................................60
    5.   TCC, TIC, and THC ...........................................................................60
    6.   Remaining entities. .............................................................................61
  C.   Teleglobe was unable to access capital without explicit support from BCE ...........62
  D.   Other indications of insolvency ...............................................................64
    1.   BCE did not write down Teleglobe's goodwill when it became aware of the impairment. ..........................................................................................................64
    2.   Kroll found Teleglobe to be insolvent at January 31, 2001 and March 31, 2001. ....73
    3.   Several internal and external valuations calculated negative equity value for Teleglobe in the fall of 2001. ...............................................................................74
VIII.  Damages ...................................................................................................75



A.   Prior to June 30, 2001, BCE had many opportunities to preserve the value of Teleglobe, but did not do so. ........................................................................................................78

B.   Discontinuing additional investment in GlobeSystem and other capital projects at June 30, 2001, after insolvency, would have preserved value in Teleglobe .........................87

    1.   Estimate future cash flows for the five-year projection period .........................89

    2.   Discount cash flows to present value ...............................................................95

    3.   Residual value of cash flows ............................................................................98

    4.   Combine the present value of the residual cash flows with the discrete projection cash flows ...................................................................................................99

    5.   Add the value of GlobeSystem assets to obtain the combined value of the legacy business with GlobeSystem assets ................................................................100

    6.   Market approach .............................................................................................101

C.   Alternatively, had BCE made the $850 million of additional funding available to Teleglobe, as authorized by its board and accepted by the board of Teleglobe on November 28, 2001, value in Teleglobe would have been preserved ......................................105

    1.   April 2002 voice only business plan .............................................................106

    2.   May 2002 capital constrained voice and data business plan ........................108

D.   To calculate damages, I have subtracted actual recoveries by the Estate on comparable assets from the valuations. ..............................................................................111

    1.   Estate receipts of $207.6 million ...................................................................111

    2.   Allocation, if deemed necessary, to the U.S. Debtor Estate ........................112

IX.   Conclusion ...........................................................................................................114

Proprietary and Confidential



# I.    Executive Summary

My name is Paul Charnetzki. I have been retained by counsel for Teleglobe
Communications Corporation, et al. ("U.S. Debtor Estate") and the Official Committee of
Unsecured Creditors of Teleglobe Communications Corporation ("creditors") to analyze
the solvency issues and quantify the damages related to the matter of Teleglobe
Communications Corporation, et al. v. BCE Inc., et al. Appendix I contains a summary of
damages due to the U.S. Debtor Estate. My findings and opinions are summarized
below.

> **A.  Teleglobe Inc. and the majority of the plaintiffs were insolvent no later than
> December 31, 2000.**

I have concluded that even with the initial $1 billion commitment from BCE Inc. ("BCE")
set forth in the June 29, 2000 letter to Bank of Montreal ("BMO"), Teleglobe Inc.
("Teleglobe") was insolvent no later than December 31, 2000 and remained insolvent
thereafter.[1] In light of the integrated nature of the Teleglobe group of companies
collectively (the "Estate"), it is my opinion that Teleglobe, the ultimate parent of the U.S.
Debtor Estate, is the relevant entity for assessing insolvency. In addition, however, I
have examined individually the U.S. Debtors who have been named as plaintiffs in this
matter and find them to have also been insolvent no later than December 31, 2000 and
to have remained insolvent thereafter (with the exception of Optel Telecommunications
Inc., Teleglobe Marine (U.S.) Inc., Teleglobe Luxembourg LLC, and Teleglobe
Submarine Inc.).

To reach this conclusion, I have performed several accepted solvency tests, including a
cash flow test and a balance sheet test during the relevant periods. Though it need only
be found in either the cash flow or the balance sheet test, insolvency is evident in each
test. The cash flow test demonstrates that after December 31, 2000, Teleglobe would
not have been able to pay its debts as they became due even with the June 2000 BCE
$1 billion commitment. Similarly, the balance sheet test demonstrates that Teleglobe had

---

[1] Letter from William D. Anderson of BCE to BMO Nesbitt Burns (Bank of Montreal), June 29, 2000 (GEN
037880-81).

Proprietary and Confidential                                                                  4



negative equity value, meaning the fair market value of the business was less than the value of its debt.

The following facts provide additional support for my solvency opinion, all of which are explained in more detail in the text of this report.

- Contemporaneous valuations of Teleglobe that result in positive equity value are of limited utility, because they assume that BCE (or others) would fund the financing gaps in the Teleglobe business plan, including the GlobeSystem capital expenditures. Neither BCE nor anyone else funded the plan.

- As acknowledged at the time, it was improbable that Teleglobe would have been able to obtain significant funding from sources other than BCE during the relevant period.

- Accounting tests were manipulated by BCE to avoid recognizing significant impairment of goodwill on the financial statements of Teleglobe and BCE.

**B.  Discontinuing additional investment in GlobeSystem and other capital projects at June 30, 2001, after insolvency, would have preserved value in Teleglobe.**

As discussed, Teleglobe was insolvent no later than December 31, 2000. However, I have calculated damages as of June 30, 2001, because it was at that time that Teleglobe's bank facilities were renegotiated. Had BCE not provided assurances to the banks, Teleglobe's bank debt would have been due on July 23, 2001.[2] Additionally, use of this date is conservative in that it would have provided time to respond to the insolvency, consider alternatives, and develop a plan to address the situation.

Continuing investment in GlobeSystem after June 30, 2001 preserved economic opportunities for BCE at the expense of the other stakeholders of Teleglobe. I have been asked to assume, for purposes of this analysis, that Teleglobe's capital expenditures related to the build-out of the GlobeSystem network would have ceased at June 30, 2001 while the legacy voice and associated data business of Teleglobe would have continued. At June 30, 2001, had this occurred, Teleglobe would have been worth

---

[2] 2001 Teleglobe Inc. Financial Information - U.S. GAAP, p. 22
Proprietary and Confidential

5



$1.130 billion. In addition, at least $135 million of value could have been obtained from liquidating the existing GlobeSystem assets. Thus, in my opinion, had BCE acted to address Teleglobe's insolvency at June 30, 2001, Teleglobe would have recovered approximately $1.265 billion as compared to $207.6 million actually recovered (see Section VIII.1 for recoveries by the Estate). Thus I computed damages of $1.057 billion.

**C. Alternatively, had BCE made the $850 million of additional funding available to Teleglobe, as authorized by its board and accepted by the board of Teleglobe on November 28, 2001, value in Teleglobe would have been preserved.**

On November 28, 2001, the BCE board authorized up to $850 million in funding and the Teleglobe board authorized acceptance of up to $850 million of funding.[3] The mechanism, form and timing of the provision of this funding was delegated to Jean Monty, the Chairman and Chief Executive Officer of BCE, and Jean Monty, the Chairman and Chief Executive Officer of Teleglobe, at his sole discretion. However, of this amount, only $222 million of funding was provided to Teleglobe.[4] As a consequence of BCE's failure to provide support using the $850 million that was authorized for Teleglobe, BCE destroyed value for Teleglobe.

Had the balance of the $850 million in funding been available, a restructuring would have been feasible and in the economic interest of Teleglobe's stakeholders. The parameters of that restructuring are set forth in the expert report of Carlyn Taylor of FTI Consulting ("FTI"), upon which I have relied. I have measured the value that would have been preserved under an April 2002 voice only restructuring scenario provided by FTI, at $723.4 million for damages of $515.8 million. Using an alternative-restructuring scenario from May 2002, which was provided by FTI and represented a capital constrained voice and data scenario, I have measured the value that would have been preserved to be $414.0 million. This, however, does not fully capture the value of an optimized voice and data business because it disregards the option value that $628 million of supplemental funding would have created.

---

[3] Minutes of the meetings of the Board of Directors of BCE Inc., Volume 5, p. 532, Montreal, November 28, 2001; Minutes of the meetings of the Board of Directors of Teleglobe Inc., Volume 3, p. 59, Montreal, November 28, 2001.
[4] See Table 6 2000 through 2002 Teleglobe Inc. annual and quarterly financial statements; BCE-AD 0439677.



## II.    Introduction

I have been asked to perform the following analyses:

- Assess the solvency of the plaintiffs as of certain dates between June 30, 2000 and April 23, 2002

- Quantify the financial damage to the plaintiffs resulting from BCE's actions

I have prepared this report to set forth the opinions I may express at the trial of this matter and reserve the right to supplement this report based upon information that may become available subsequent to the date of this report. For purposes of providing testimony at trial, I intend to illustrate my testimony with demonstrative aids such as graphs, charts and/or slides.

My opinions are based upon an independent examination of the evidence provided by the parties in this case and my knowledge and professional experience. I express all opinions to a reasonable degree of professional certainty. The evidence I have reviewed in connection with the preparation of this report is set forth in Appendix II. Dollar amounts are U.S. dollars unless otherwise noted. Additionally, unless otherwise noted, Canadian amounts are also presented in U.S. dollars, using the daily historical exchange rate.

## III.    Qualifications

I am and have been a Managing Director in the Financial and Economic Consulting practice of Huron Consulting Group LLC ("Huron") since its founding in May 2002. Before joining Huron, I was a partner at Arthur Andersen from 1989 on and an employee from 1977. I have performed a variety of financial, economic, and statistical analyses on behalf of clients in disputes including damages assessment, solvency, valuation, market analysis, and accounting and auditing principles. My industry expertise includes securities and telecommunications. I have testified as an expert witness at deposition, arbitration, and trial in both state and federal courts.