# Exhibit 10

1

COPY

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF DELAWARE

3      IN RE

4      TELEGLOBE COMMUNICATIONS        :  Chapter 11
       CORPORATION,  et al,              Case No. 02-11518 MFW
5                                      :Jointly Administered
       TELEGLOBE COMMUNICATIONS        :
6      CORPORATION,  et al,
                                       :
7                       Plaintiffs,
                                       :
8              vs.                         Civil Action No.
                                       :   04-CV-1266 SLR
9      BCE, INC., MICHAEL T. BOYCHUK,
       MARC A. BOUCHARD, SERGE FORTIN,:
10     TERENCE J. JARMAN, STEWART
       VERGE, JEAN C. MONTY, RICHARD   :
11     J. CURRIE, THOMAS KIERANS,
       STEPHEN P. SKINNER and          :
12     H ARNOLD STEINBERG,
                                       :
13                      Defendants.

14

15              Deposition of CARLYN R. TAYLOR, taken

16     pursuant to notice in the law offices of Richards,

17     Layton & Finger, Conference Room 3D, One Rodney

18     Square, 920 North King Street, Wilmington, Delaware,

19     on Tuesday, May 9, 2006, at 10:01 a.m., before

20     Lorraine B. Marino, Registered Diplomate Reporter and

21     Notary Public.

22

23          ELLEN GRAUER COURT REPORTING CO. LLC
              126 East 56th Street, Fifth Floor
24                New York, New York 10022
                      212-750-6434
25                    REF: 80642

2

1    APPEARANCES:

2                        RUSSELL C. SILBERGLIED, ESQ.
                         Richards, Layton & Finger
3                        One Rodney Square
                         920 North King Street
4                        Wilmington, DE  19801
                           for Plaintiffs
5
                         STUART J. BASKIN, ESQ.
6                        BRYNNA CONNOLLY, ESQ.
                         Shearman & Sterling
7                        599 Lexington Avenue
                         New York, NY  10022-6069
8                          for Defendants

9    ALSO PRESENT:

10                       V. V. COOKE, ESQ.
                         Teleglobe Associate General Counsel
11                                  - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

163

TAYLOR

1

2  You sold it in a march to an auction sale, and I do --

3  I hadn't been asked to form an opinion on this, but

4  you asked me my opinion.  And I am not necessarily

5  quibbling that they got the highest and best offer

6  from the auction process that they did.

7              I don't understand necessarily and I

8  have not seen analysis that supports these other two

9  sentences.  The value that was obtained was extremely

10  low.

11              Now, there were plenty of other

12  distressed sales of companies at this time, much of

13  them much smaller companies.  So if the monitor was

14  looking at those and if you are looking at other

15  crisis meltdown situations, hey, we got all sorts of

16  horrible results in the telecom industry.

17              But most larger companies with

18  reasonable core businesses didn't march to a fire

19  sale, didn't do this.  So I don't know how they got

20  reasonable companies to compare this to.

21              MR. BASKIN:  Now, let me show you in

22  addition what we will mark as Exhibit 9.

23              (C. Taylor Deposition Exhibit No. 9

24  was marked for identification.)

25

1                          TAYLOR

2    BY MR. BASKIN:

3         Q.        Have you seen Exhibit 9 prior to

4    today, Ms. Taylor?

5         A.        I don't know.  I have read some things

6    that were by Mr. Babcock.  I would have to review it

7    to know whether it is something I read or not.  When

8    is this dated?  Well, it is not dated.

9         Q.        Let me ask you this.  As you sit here

10   now, to this day do you know if you have ever seen

11   this document before you, Exhibit 9?

12        A.        I just answered that question.  Do you

13   want me to read it?

14        Q.        Sure.

15        A.        I have read other documents from

16   Mr. Babcock, affidavits.  Do you --

17        Q.        Sure.

18        A.        Do you know the date of this document?

19   It is not dated.

20        Q.        Well, it was part of a joint

21   submission to the bankruptcy judge I believe in

22   October, but I don't have the precise date as I sit

23   here now.  But why don't you look at it and tell me if

24   you have ever seen this in your life.

25        A.        Well, I read other documents that have

                         TAYLOR
1
2    a lot of the exact same text as this.  It may have
3    been this document or it may have been that they are
4    using the same language in multiple places.  So I
5    can't be sure without reviewing our files.
6         Q.      Now --
7         A.      This is -- I have seen a lot of this
8    language before.  Whether I saw it in this exact
9    document, I don't know.
10        Q.      Well, you certainly did not see this
11   document before you wrote your report; right, ma'am?
12        A.      Probably -- my first report?  Probably
13   not.
14        Q.      Now, on paragraph 15, you understand
15   from your experience in the Chapter 11 world that
16   affidavits are submitted to judges, including judges
17   in this judicial district?
18        A.      Yes.
19        Q.      And generally, you understand that
20   these affidavits are submitted under oath and people
21   are supposed to contemporaneously -- tell the truth
22   based as they see it contemporaneously at the time?
23   Are you aware of that?
24                MR. SILBERGLIED:  Objection to form.
25                THE WITNESS:  Well, yes, except that

TAYLOR

1

2  this document isn't properly signed off on in that

3  way.  So that's my general understanding of an

4  affidavit, which I have signed before myself.

5  BY MR. BASKIN:

6      Q.       Now, by the way, do you want to take a

7  guess which law firm prepared this document?

8                    MR. SILBERGLIED:  Objection to form.

9                    THE WITNESS:  I don't know.

10 BY MR. BASKIN:

11     Q.       Any idea what RLF is in the bottom

12 left-hand corner?

13     A.       Probably Richards, Layton.

14     Q.       Now, if you turn to paragraph 15 on

15 page 9 of this document --

16     A.       Okay.

17     Q.       -- can you read -- paragraph 15 reads,

18 "The Monitor is of the opinion that the transaction

19 process outlined above complied with the Approved

20 Bidding Procedures.  The transaction process resulted

21 in the Core Telecom Business being properly exposed to

22 the market and a purchase agreement with a price and

23 structure that was the result of a competitive bidding

24 process in an auction-like environment between

25 multiple parties.  The Monitor has determined that the

167

TAYLOR

1
2    competitive bidding process yielded the highest and
3    best offer for the Core Telecom Business and is in the
4    best interest of the debtors, their creditors and
5    stakeholders."  Do you see that?
6        A.        Yes.
7        Q.        Any part of that paragraph you take
8    issue with as you sit here today, Ms. Taylor?
9        A.        Under the circumstances in which the
10   case was started out and the path in which it
11   followed, no.
12       Q.        Now, you told me earlier that it was
13   an important part of your analysis that the sale price
14   did not achieve fair market value.  Do you remember
15   that?
16       A.        Yes.
17       Q.        Could you turn to page 20 -- page 11,
18   paragraph 20?
19       A.        Yes.
20       Q.        Could you read the first full sentence
21   of paragraph 20 on page 11 into the record, please?
22       A.        "The Monitor believes that the
23   purchase price for the Core Telecom Business pursuant
24   to the terms of the Purchase Agreement represents the
25   fair market value for these assets."

                              TAYLOR
1
2        Q.        Do you recall seeing that sentence
3   before today, ma'am?
4        A.        Yes, I have seen it.
5        Q.        You saw it in preparation for your
6   testimony today?
7        A.        I have seen it a couple of times, yes.
8        Q.        Now --
9        A.        I disagree.
10       Q.        You disagree with that sentence?
11       A.        I disagree with, from a pure
12  definitional standpoint.
13       Q.        What do you mean by a pure
14  definitional standpoint?
15       A.        The definition of fair market value
16  absolutely requires the seller not being under a
17  compulsion to sell, and that particular element is not
18  met here.
19       Q.        Well, putting aside your definitional
20  standpoint, is it your testimony that the value
21  achieved through the sale was or was not fair market
22  value?
23       A.        It is not --
24                 MR. SILBERGLIED:  Objection to form.
25                 THE WITNESS:  -- my definition.  It is

169

TAYLOR

1
2    a textual definition.  It is not my definition.  You
3    can find it in any valuation textbook.  So it is
4    not -- I mean, you can call this a highest and best
5    offer from the auction process.  That I would agree
6    with.  I don't think you can call that fair market
7    value.  You have to call any value achieved in a
8    process which is conducted under a compulsion to sell
9    as a liquidation value, not a fair market value.
10   BY MR. BASKIN:
11        Q.        My question was -- so I take it, by
12   the way, then you take issue with the monitor in this
13   respect?
14        A.        Only in his phraseology of this.  I
15   don't -- I mean, unfortunately, the words fair market
16   value get thrown around by a lot of people, and I
17   don't know Mr. Babcock's reason for using that exact
18   phrase.  He could call it fair value or highest and
19   best value, but it is not fair market value.
20        Q.        And so you take issue with his use of
21   fair market value?  You don't agree with him on that;
22   correct?
23        A.        I think it is an inappropriate use of
24   that term of art that has a very specific meaning.
25        Q.        And I take it that when he so

1              TAYLOR

2    represented to the bankruptcy judge sitting in this

3    courthouse that the purchase price represents the fair

4    market value for these assets, you are going to tell

5    Judge Robinson you disagree with that; correct?

6         A.        I am going to say that that one

7    element of fair market value is not met.  That I would

8    agree with the other paragraph that talks about it

9    being the highest and best use from an auction process

10   and that in this environment that resulted in a

11   liquidation value.

12        Q.        And in terms of the actual price

13   achieved, do you agree or disagree with Mr. Babcock

14   that the purchase price represents the fair market

15   value for these assets?

16        A.        Again, it can't be.  That's the whole

17   basis of a lot of my report.  This was conducted in an

18   environment in which, you know, every reasonable

19   strategic buyer was itself going through a

20   restructuring, a bankruptcy, some financial distress,

21   where the capital markets wouldn't give them any money

22   to buy something.  Lazard acknowledged that.  You

23   know, other people acknowledged that.  It is carefully

24   covered in my report.  The market -- this was a

25   horrible time to conduct a forced sale of a company.

TAYLOR

1
2          Given those facts, though, they

3   conducted an auction process which led to a bid.  That

4   bid, I don't have a reason to know or question that

5   that wasn't the highest offer from that process.  That

6   doesn't make it fair market value.  It makes it a

7   distressed sale value, liquidation value.

8          Q.        And that's what you are going to

9   testify to the Court; correct?

10         A.        Yes.

11         Q.        Notwithstanding what the monitor said

12   in a joint application to the bankruptcy judge in this

13   courthouse?

14         A.        Well, I don't disagree with the vast

15   majority of what he was saying about the process.

16   Given the process, I disagree that that is actually

17   fair market value, and I think it is a very low

18   distressed value.

19         Q.        Now, you understand, I assume, that

20   your bills are being paid by the debtor in this

21   matter?

22                   MR. SILBERGLIED:  Objection to form.

23                   THE WITNESS:  I am really not sure who

24   is paying our bills.  It probably says in our letter.

25   I would probably know about it if they weren't getting

172

                                TAYLOR

 1

 2  paid.

 3  BY MR. BASKIN:

 4        Q.        Now, are you aware that the debtor

 5  itself submitted an affidavit to the judge in this

 6  courthouse with respect to the sale process?

 7        A.        I don't know.  You would have to show

 8  me.

 9        Q.        Does it stick in your mind that the

10  debtor submitted an application to the bankruptcy

11  judge?

12        A.        I read various papers in support of

13  the sale motion, so it could have been in that.

14        Q.        But you did not read those papers

15  before you submitted your report; right, Ms. Taylor?

16        A.        No.  I had discussions with counsel

17  about the circumstances surrounding the sale, and they

18  gave me more documents.

19        Q.        Well, did the counsel when you

20  discussed it with them, did they tell you that the

21  bankruptcy monitor had told the judge in this

22  courthouse that the sales process had achieved the

23  highest and best offer attainable for the core telecom

24  business?

25        A.        Yes, we discussed that.

173

TAYLOR

1

2      Q.        And did they tell you that the monitor

3  represented to the judge in this courthouse that the

4  monitor believes that the purchase price represents

5  the fair market value for these assets?

6      A.        I don't think I discussed those exact

7  words till I saw those words and said actually there

8  is a condition that is not met here.

9      Q.        So at the time you prepared your

10  report, as you were getting your input from the

11  lawyers, they didn't tell you this?

12      A.        Well, we discussed at length the

13  process that happened and the fact that it was sold.

14  I mean, after BCE walked away from it, the debtors and

15  their advisors did the best they could under the

16  circumstances, under a mandate of being forced to

17  sell.

18                MR. BASKIN:  Now, let me hand you what

19  we will mark as Exhibit 10.

20                (C. Taylor Deposition Exhibit No. 10

21  was marked for identification.)

22  BY MR. BASKIN:

23      Q.        Have you seen this prior to today,

24  Ms. Taylor?

25      A.        I was just laughing because they all

174

```
                            TAYLOR
 1
 2   seem to have the similar -- I have definitely seen
 3   either all or most of this language, and I have read
 4   documents that were affidavits of Mr. Brunette.
 5   Whether it is this exact one, I can't be positive
 6   without reviewing our work papers.
 7        Q.        And you will see that this was a
 8   document, if you turn to page 11, an affidavit
 9   executed by Mr. Brunette on October 8, 2002?
10        A.        Yes.
11        Q.        And do you understand that this was an
12   affidavit that Mr. Brunette as CEO of the debtors
13   submitted to the judge in this courthouse, in this
14   court, in this judicial district?
15        A.        It appears to be, yes.
16        Q.        And you want to take a guess again at
17   which law firm prepared this affidavit?
18                  MR. SILBERGLIED:  Objection to form.
19                  THE WITNESS:  No, I am not going to
20   guess.
21   BY MR. BASKIN:
22        Q.        Now, in connection with this
23   affidavit, you will see that Mr. Brunette says that he
24   is chief executive officer of the above-captioned
25   debtor.  Do you see that?
```

175

TAYLOR

1

2        A.        Yes.

3        Q.        And --

4                  MR. SILBERGLIED:  Are you okay?

5                  THE WITNESS:  Yes.

6                  MR. SILBERGLIED:  Do you need a break?

7                  THE WITNESS:  When you are ready, I

8   will get some Tylenol.

9                  MR. BASKIN:  Let's just get through

10  this document and then we can take a break; okay?

11                 THE WITNESS:  Okay.

12  BY MR. BASKIN:

13       Q.        First of all, if you turn to page 2,

14  paragraph 4 --

15       A.        Okay.

16       Q.        -- do you see where Mr. Brunette is

17  advising the bankruptcy judge under oath that the

18  monitor, representatives of the Teleglobe Companies

19  and the financial advisors to the Teleglobe Companies

20  determined that it was unlikely the value of the core

21  telecom business would appreciate in a protracted

22  restructuring proceeding?

23       A.        Yes.

24       Q.        Is that a sentiment you agree with or

25  disagree with?

176

TAYLOR

1

2      A.      It is very oddly worded as to what

3  that necessarily implies.  I mean, you know,

4  appreciate.  It doesn't have to appreciate.  The issue

5  is whether it depreciates.  But anyway, I have seen

6  this language in many places.

7      Q.      And understanding what the word

8  "appreciate" means in normal English, do you agree or

9  disagree with that sentence?

10             MR. SILBERGLIED:  Objection to form.

11             THE WITNESS:  Well, it depends on how

12  it is being managed.  So I would say I don't have an

13  opinion one way or the other.

14  BY MR. BASKIN:

15      Q.      Now, you will see that in paragraph

16  10, if you turn to that, Mr. Brunette reports that the

17  Teleglobe Companies -- you appreciate Teleglobe

18  Companies are plaintiffs here; correct?

19      A.      Part of the plaintiffs here.

20      Q.      And they are the people who hired you.

21  Do you understand that?

22      A.      In addition to the creditors.

23      Q.      Now, "The Teleglobe Companies believe

24  the steps taken resulted in a fair and competitive

25  arm's-length sales process, the outcome of which has

177

                          TAYLOR
1
2    not been influenced by the potential for conflicts of
3    interest."  Do you agree or disagree --
4          A.        I am trying to find where you are
5    reading.
6                    MR. SILBERGLIED:   Paragraph 10.
7    BY MR. BASKIN:
8          Q.        Paragraph 10.
9          A.        Oh, I thought you said page 10.   I am
10   sorry.  Okay.
11         Q.        Are you going to tell the judge that
12   that sentence is right or wrong, Ms. Taylor?
13         A.        That it is a fair and arm's-length
14   process?  I don't have any reason to believe one way
15   or the other that it is not.
16         Q.        Now, turn to 15.
17         A.        Okay.  Paragraph 15 or page?
18         Q.        Paragraph 15.  Well, even better, he
19   says it more succinctly in paragraph 17.
20         A.        Okay.
21         Q.        Do you see it says, "The Teleglobe
22   Companies believe the Purchaser's offer represents the
23   highest and best offer attainable for the Core Telecom
24   Business and concur with the Monitor's valuation
25   methods described more fully in the Babcock

178

                              TAYLOR

1

2    Affidavit."  Do you see that?

3        A.        Yes.

4        Q.        Do you take issue with that

5    representation made to the bankruptcy judge in this

6    district?

7        A.        Given that it was in the context of,

8    you know -- it is placed in the context of the process

9    that was conducted, again, I have said already I don't

10   have any reason to believe it wasn't the highest and

11   best offer out of the auction process that was

12   conducted.

13       Q.        Now, how about going to paragraph 19

14   for me on the same page.  Do you want to read the

15   first full sentence of paragraph 19 as sworn to by

16   Mr. Brunette under oath?

17       A.        Okay.

18       Q.        Do you want to read it into the

19   record?

20       A.        Oh, read it into the record?  Okay.  I

21   think it is the same sentence we had before.  "The

22   Teleglobe Companies believe the purchase price for the

23   Core Telecom Business contained in the Purchase

24   Agreement represents the fair market value for the

25   assets of the Core Telecom Business."

179

TAYLOR

1

2      Q.      And as was the case with respect to

3  the monitor, I take it that you do take issue with

4  this representation made to the bankruptcy judge?

5      A.      I think you could -- well, again, as a

6  certified valuation person, it does not meet the

7  definition of fair market value.  It may meet the

8  definition of fair value or highest and best value or

9  other things, but, yes, I take issue with that aspect

10  of it.

11      Q.      And you are going to testify, I take

12  it, in front of Judge Robinson that you take issue

13  with this representation on the part of the Teleglobe

14  Companies, who are the plaintiffs in this matter?

15      A.      Only that I take issue with that there

16  was clearly a compulsion to sell here.  And from a

17  pure definitional standpoint, what was obtained was a

18  liquidation value, especially in the market

19  environment in which the auction was conducted, as I

20  think Lazard and BCE knew before they went about this

21  process.

22      Q.      Now, in connection with paragraph 20

23  finally, could you read for me the first two sentences

24  of paragraph 20?

25      A.      Into the record?

TAYLOR

1

2    Q.    Please.

3    A.    Okay.  "The Teleglobe Companies

4    believed there was, and is, an immediate need to

5    proceed with the sale of the Core Telecom Business to

6    the Purchaser as the value of the Core Telecom

7    Business is unlikely to appreciate with time in a

8    restructuring proceeding.  The Teleglobe Companies

9    further believe the critical nature of

10   telecommunications services is not conducive to

11   maintaining customers in an uncertain environment and

12   numerous recent major restructurings in the telecom

13   industry have clearly established that retaining

14   revenue in any type of protracted restructuring with

15   an uncertain outcome is extremely difficult."

16   Q.    Now, do you take issue with either of

17   those sentences, Ms. Taylor?

18   A.    It may be unlikely to appreciate in a

19   restructuring, but they didn't say depreciate and they

20   didn't say appreciate after a restructuring is

21   completed.

22        I do take issue somewhat with the

23   second sentence.  I believe this is something that was

24   a widely held belief across a lot of management teams,

25   which is bankruptcy hurts your revenues.  Based on my

TAYLOR

1

2    experience with dozens of these, I think in the end we

3    knew that it didn't hurt your revenues very much at

4    all, that the fear of what would happen to your

5    customers in bankruptcy was way overblown.

6                    So in case after case we

7    demonstrated -- I mean, a lot of people held this

8    belief, but you can demonstrate that in most cases,

9    unless it was in fear of actual closing down, this

10   didn't actually happen.  And, in fact, in this case it

11   didn't happen either.

12        Q.     So to the extent that the plaintiffs

13   in this case made this representation to the

14   bankruptcy judge contemporaneously back in 2002, you

15   are going to be taking the position with respect to

16   this paragraph that they got it wrong; right,

17   Ms. Taylor?

18                    MR. SILBERGLIED:  Objection to form.

19                    THE WITNESS:  I am sure this is

20   something that this person believed at the time.

21                    MR. BASKIN:  Why don't we take a

22   break.

23                    (Recess taken.)

24   BY MR. BASKIN:

25        Q.     Now, you had mentioned before that one

1                          TAYLOR

2    of the people paying -- one of the constituents who

3    are paying your bills is actually the unsecured

4    creditors committee; is that right?

5                    MR. SILBERGLIED:  Objection to form.

6                    THE WITNESS:  I don't think I said it

7    that way.  I said I don't know exactly who is paying

8    our bills.  Do you want me to check?

9    BY MR. BASKIN:

10        Q.        Now, earlier we had discussed

11   Mr. Amato and that it was even possible that he was in

12   attendance, I think you told us, at the March 1, 2006

13   meeting, and you really don't remember as you sit here

14   today; is that right?

15        A.        I don't think you ever mentioned --

16   what is his name?  Mr. Amato?

17        Q.        Right.  Was there a lawyer from Hahn &

18   Hessen present at the March 1, 2006 meeting?

19        A.        Possibly.  I don't know.

20        Q.        Now, I take it that in preparation for

21   your report, the lawyers who you were working with did

22   not tell you what Hahn & Hessen was saying to the

23   bankruptcy judge in this judicial district back in

24   2002, did they?

25        A.        Why do you take that?  We had a

TAYLOR

1

2    discussion.  I mean, the way you are asking your

3    question, I don't know.  We had a lengthy discussion

4    about what happened in the Bankruptcy Court before I

5    issued my report.  But that was -- you know, confining

6    it in the way you are confining, I don't know.

7                MR. BASKIN:  Let me hand you what we

8    will mark as Exhibit 11.

9                (C. Taylor Deposition Exhibit No. 11

10   was marked for identification.)

11   BY MR. BASKIN:

12       Q.       Handing you Exhibit 11, do you recall

13   ever seeing this before today, Ms. Taylor?

14       A.       Well, I have some hearing transcripts,

15   so let me look at this and see if this is one that I

16   have read.  (Pause)

17                MR. SILBERGLIED:  Obviously, this is

18   an omnibus hearing and it is a lengthy document.  Do

19   you have a section that you would like her to focus

20   on?

21                MR. BASKIN:  Yes, I will.  She wanted

22   to look at it to see if she had seen it before.  Do

23   you --

24                THE WITNESS:  I don't recall this one.

25   But I have some hearing transcripts.  I didn't read

<pre>
                              TAYLOR
 1
 2   them all cover to cover.
 3                  MR. BASKIN:  Okay.
 4                  THE WITNESS:  But I don't recall this
 5   one unless you point me to a specific section.
 6   BY MR. BASKIN:
 7          Q.      Let's turn to page 24 if we can.
 8          A.      Okay.
 9          Q.      And to give you some background, this
10   hearing was principally concerned with the question of
11   whether the debtor should be allowed to proceed with
12   the sales process.  And if you turn to page 24, do you
13   see a gentleman named Mr. Indelicato was speaking?
14          A.      Yes.
15          Q.      And he identifies himself as being
16   with Hahn & Hessen, proposed counsel to the official
17   unsecured creditors committee?
18          A.      Okay.
19          Q.      And do you see in the bottom of that
20   page he says, in connection with the debtors'
21   application, "The Committee is going to look at, Your
22   Honor, whether or not we believe a fair value would be
23   achieved either through a sale process, depending on
24   the consideration or we will also explore from now
25   until the sale hearing, whether or not creditors would
</pre>

185

                            TAYLOR
1
2    best be served by trying to do a standalone
3    reorganization of these entities."  Do you see that?
4         A.        Yes.
5         Q.        That is sort -- you would expect a
6    representative of the creditors committee to propose
7    that it would look into the possibility of doing a
8    standalone reorganization as proposed by you in your
9    report, wouldn't you?
10        A.        It wouldn't be atypical.  In the next
11   page they talk about a very short -- a shortened time
12   period to do so.
13        Q.        Right.  And then in the very next
14   paragraph, why don't we read that into the record?
15        A.        Which one?
16        Q.        "So, we believe, Your Honor."
17        A.        Do you want me to read it?
18        Q.        Sure.
19        A.        Okay.  "So, we believe, Your Honor,
20   based on the procedures that have been put in place
21   and the monitor and the Debtor making all of the
22   information available to us, we believe although a
23   shortened period of time, we believe this process is
24   necessary, we believe we need to know whether or not
25   there are potential bidders out there and then we can

TAYLOR

1
2  try and weigh that against what a standalone
3  reorganization may look like to determine how the
4  assets could achieve the best results for creditors."
5       Q.      Now, as you sit here now, do you know
6  whether, in fact, Mr. Indelicato, the Hahn & Hessen
7  firm, and the creditors committee did what he told the
8  bankruptcy judge he was going to do, which is to weigh
9  the sales process against a standalone reorganization?
10      A.      I don't know.
11      Q.      Now, would you agree with me that when
12  you read Mr. Indelicato's words recited
13  contemporaneously on June 24, 2002, he certainly
14  appeared to be of the view that a standalone
15  reorganization was still a viable option to be
16  considered by the creditors?
17                 MR. SILBERGLIED:  Objection to form.
18                 THE WITNESS:  I don't know what he is
19  of the view of.
20  BY MR. BASKIN:
21      Q.      Is that the way you read his words?
22      A.      I only read his words that he is
23  reserving the right to consider that.  But I have
24  never -- I have not seen this before.
25      Q.      And it is sufficient for current

187

TAYLOR

2   purposes -- I guess you are telling us you never saw

3   this before you issued your report?  You were never

4   told about this in any way; correct?

5         A.       I was told about the process of the

6   sale.  I don't recall reading this particular hearing

7   transcript.

8         Q.       Now, if Hahn & Hessen did what they

9   had represented to the court they were going to do,

10   they presumably would have weighed a sale as was in

11   fact executed against your proposal, a standalone

12   reorganization; correct?

13         A.       Well, only with the events -- only in

14   the context of the events that had already preceded

15   them weighing those two options, meaning you had

16   already gone fairly far down a particular path of

17   shutting down a lot of the company.

18         Q.       Now, do you know as you sit here now

19   whether there was any support among the creditor

20   constituencies for the Taylor standalone

21   reorganization concept?

22         A.       I only know the cases that have been

23   filed where they are critical of what happened and

24   saying that it was an inappropriate process that

25   happened, and what I have testified to.

TAYLOR

Q.      Meaning you know about this lawsuit is
what you are saying?

A.      No.  And my understanding from counsel
that about what happened in the bankruptcy being --
going down the path of the sale process that was set
in motion clearly by all the documents I reviewed in
April.

Q.      But my question to you was:  Do you
know whether there is -- or if it was not, let me ask
the question now.  As you sit here now, do you have
any reason to believe there was the slightest appetite
on the part of Teleglobe stakeholders to pursue the
path of a standalone reorganization?

A.      I don't know.  But having gone through
a lot of these situations, there is two kinds of
restructurings:  Crisis ones where you are running out
of cash and ones where there is not a crisis, where we
had enough money to figure out the optimal option.
And basically, what happened in this case preceding
all the stuff you are talking about set this down the
path of a crisis.

        And creditors don't -- they are not
the ones controlling the situation and basically are
handed, you know, making decisions within a limited

189

TAYLOR

1
2    set of options that are actually feasible at the point
3    they are making the decision.  They are not the ones
4    looking at what is necessary -- you know, they are
5    making judgments based on what facts and information
6    and feasibility is available to them at the time.
7        Q.      I guess what I am asking is -- let me
8    ask it this way.  Do you have any reason to believe
9    that there was any creditor out there that was
10   willing -- had an appetite for your standalone
11   reorganization approach?
12       A.      Well, certainly many of those same
13   creditors accepted reasonable standalone
14   reorganizations in many comparable companies.  So when
15   they are presented with viable options, they will
16   select from them.  They are not in control of the
17   situations.
18       Q.      Why don't we go back to -- can you
19   find back there Exhibit 8, please?
20       A.      Okay.
21       Q.      This is actually something you did
22   read prior to today; right?  This is one of the
23   monitor's reports you have read; correct?
24       A.      Yes, I have read this.
25       Q.      Now, if you turn to page 31 --

190

TAYLOR

1

2    A.        Okay.

3    Q.        -- there is a section called

4    "Alternatives to a Sale of the Core Telecom Business."

5    A.        Yes.

6    Q.        Can you read into the record the first

7    two sentences of that, please.

8    A.        "Absent a sale of the Core Telecom

9    Business, the most likely alternative would be the

10    liquidation of the Core Telecom Business on a nongoing

11    concern basis and of the remaining Redundant Assets of

12    Teleglobe for the benefit of its creditors.  In the

13    event that a sale could not be consummated, the

14    Monitor believes that there would be limited support,

15    if any, from Teleglobe's creditor groups or other

16    stakeholders to pursue other going concern

17    alternatives for this business."

18    Q.        Do you recall reading that sentence

19    prior to today?

20    A.        Yes.

21    Q.        And do you have any reason to believe

22    that the monitor did not understand -- strike that.

23              Do you have any reason that the

24    monitor was mistaken when he represented to the

25    bankruptcy judge in Canada that in the event that a

TAYLOR

2  sale could not be consummated, the monitor believes

3  that there would be limited support, if any, from

4  telecom's creditor groups or other stakeholders to

5  pursue other going concern alternatives?

6        A.        I am not sure I followed the question.

7        Q.        Do you have any reason to think the

8  monitor got that wrong when he reported it to the

9  bankruptcy judge in Canada?

10       A.        Well, the first sentence, quite

11 frankly, you know, isn't supported by the documents.

12 The most likely alternative would be a liquidation.

13             I mean, unfortunately, the analysis

14 presented by Pichette and his management team and used

15 by Lazard before the decision was made to sell was

16 completely wrong on CAPEX and so forth.  And so people

17 reached the erroneous conclusion that the only choice

18 other than selling this business was to shut it down.

19             So if you present -- that erroneous

20 belief flows to the next sentence.  If you tell

21 creditors that this is what the situation looks like,

22 that it is running out of cash imminently and it is

23 not fixable because you haven't done the analysis to

24 figure out that it is fixable, then, of course, the

25 creditors aren't going to support a reorganization.

TAYLOR

1
2  You are not presenting them with a viable alternative.

3  So if you believe that the alternative is liquidation,

4  why would the creditors accept a going-concern

5  restructuring if they are being told that the

6  alternative is liquidation?

7      Q.      So the answer to my question is you do

8  believe that the monitor got it wrong when he made

9  those two statements to the CCAA judge?

10             MR. SILBERGLIED:  Objection to form.

11             THE WITNESS:  I believe that the facts

12  do not support the conclusion that was reached based

13  on the work that was done pre-April 23 that a

14  liquidation was the only viable alternative to a sale.

15             MR. BASKIN:  Along those same lines,

16  let me show you what we will mark as Exhibit 12.

17             (C. Taylor Deposition Exhibit No. 12

18  was marked for identification.)

19  BY MR. BASKIN:

20      Q.      Have you seen this prior to today,

21  Ms. Taylor, Exhibit 12?

22      A.      I don't think so.  I don't recall

23  seeing a transcript with counsel for this many other

24  service provider companies.

25      Q.      Well, in this document -- this was a

TAYLOR

2    hearing in front of the bankruptcy judge in this

3    courthouse, and the lead at the hearing was actually

4    the lawyer for the debtors, who I believe is actually

5    a partner in this law firm named Mark Collins.  And if

6    you turn to page 12 --

7        A.      Okay.

8        Q.      -- you will see that this was part of

9    the process whereby the Babcock and Brunette

10   affidavits were prepared that we saw earlier, before

11   the break.

12       A.      Okay.

13       Q.      Now, you see in the middle of page 12

14   Mr. Collins tells the Court in favor of the sale that

15   "The Teleglobe companies and the monitor determined,

16   in the exercise of their business judgment, that it

17   was unlikely that the value of the core telecom

18   business would appreciate in a protracted bankruptcy

19   case.  As confirmed in the affidavits of these

20   gentlemen, the monitor and the debtors believe they

21   needed to act promptly to maintain and realize the

22   going concern value of the core telecom business, as a

23   liquidation value of these businesses would likely be

24   substantially less than the going concern value."

25                Do you see that?

                        TAYLOR

1

2       A.        Yes.

3       Q.        Do you take issue with the assertions

4  Mr. Collins made to the bankruptcy judge?

5       A.        Well, nis use of the word "liquidation

6  value," I think he means value from shutting down,

7  that kind of liquidation value, which is different

8  than what we talked about earlier.

9                 Let's see.  Again, under the

10  circumstances in which the cases were being

11  undertaken, under those circumstances, the statement

12  appears reasonable.

13      Q.        And by that you agree with

14  Mr. Collins's October 9 statement that a sale is

15  preferable to -- in terms of preserving value, it

16  would be preferable to a protracted bankruptcy case?

17  Do you agree with that, Ms. Taylor?

18                MR. SILBERGLIED:  Objection to form.

19                THE WITNESS:  Well, he phrased it a

20  little bit differently.  Basically, they are in a

21  position where they have funding only if they go

22  forward with a sale.  And as stated by the monitor, if

23  they don't go forward with a sale, they believe the

24  only alternative is to shut down because they wouldn't

25  have any access to any funding, and they would have to

195

1                          TAYLOR

2      shut down.

3                     So if that's your alternative, yes.

4      BY MR. BASKIN:

5          Q.        And that's the way you read what

6      Mr. Collins was saying here?

7          A.        Yes, because he is saying -- he is

8      talking about a shutdown of the business.  So I do

9      believe that the sale to Cerberus was preferable to a

10     shutdown of the business.

11         Q.        What about preferable to a protracted

12     proceeding?

13         A.        Well --

14                   MR. SILBERGLIED:  Objection; calls for

15     hypothetical.

16                   THE WITNESS:  -- again, that is making

17     an assumption about a protracted proceeding.  By this

18     time you are already fairly well along with the sale

19     process, and you already have a signed deal, I

20     believe.

21     BY MR. BASKIN:

22         Q.        So you are comfortable with the

23     representations that Mr. Collins was making to the

24     bankruptcy judge in and around October 9, 2002?

25         A.        You only asked me about these couple

196

TAYLOR

1
2  sentences.  So my answers were limited to the

3  sentences that you asked me about.

4        Q.        Why don't you turn then to the bottom

5  of 17, really to the bottom of 18, where Mr. Collins

6  was representing to the Bankruptcy Court what it is

7  his client, the plaintiffs here, and Mr. Babcock would

8  say if examined and why a sales process -- why the

9  sale should go forward.  Could you read 17 to the

10  bottom of 18 and tell me if there is any part of

11  anything Mr. Collins had represented to the bankruptcy

12  judge that you plan to take issue with in connection

13  with your testimony in this proceeding?

14        A.        (Pause) I think you are talking about

15  from where it starts, line 21 of page 17?  Because

16  this part, the top half --

17        Q.        Right.  Down to line 22 on page 18.

18  Any part of the assertions Mr. Collins made to the

19  Court you plan to take issue with at trial,

20  Ms. Taylor?

21        A.        No.

22        Q.        Now, on the next page or two pages

23  later -- excuse me.  The next page, page 19, you will

24  see that the same Mr. Indelicato, who about four

25  months earlier said that he would be weighing the

                              TAYLOR

1

2    benefits of the sale versus a standalone

3    restructuring, came out and endorsed the sale.  Do you

4    see that?

5         A.       So Hahn & Hessen is saying that they

6    believe the auction results in the maximum value that

7    they could get for the assets in the context of the

8    auction, and they agree that no further auction needs

9    to be conducted.

10        Q.       Well, do you believe that they

11   achieved the maximum value that we are going to get

12   for these assets, Ms. Taylor?

13        A.       In the context of the auction, at the

14   time they conducted it, yes.

15        Q.       And do you believe that the sale was

16   in the best interests of the estate at the time?

17        A.       They were forced into it given the

18   context of this case.  Given that, yes.  I don't

19   believe it was the highest and best value that could

20   have been obtained for the creditors in this case.

21        Q.       And that is going to be what you tell

22   the judge in this courthouse, Ms. Taylor?

23        A.       Yes.

24        Q.       Now, and I take it then nothing you

25   have read, not the statements of the monitor, not the

TAYLOR

1
2  statements of Mr. Brunette, not the statements of Hahn
3  & Hessen, not the statements of the Richards, Layton
4  lawyer, none of those statements cause you pause in
5  connection with your report.  Is that true,
6  Ms. Taylor?
7          A.      No.  I knew that that was the context
8  of this case.
9          Q.      Well, in fact, you knew none of those
10 statements before you wrote your report, did you?
11         A.      That's not true.
12         Q.      Did you read one of those documents
13 before you wrote your report, ma'am?
14         A.      We had the monitor's reports, and I
15 was fully aware from lengthy discussion with counsel
16 about the process that happened in the bankruptcy.
17         Q.      In the course of your lengthy
18 discussion with counsel, did they tell you about the
19 statements made by the lawyers for the estate and the
20 lawyers for the creditors committee?
21         A.      They told me to that effect, that it
22 was, in fact, supported at the time given the context
23 of the case.
24         Q.      By the way, let me just ask you one
25 final question.  Based on your reading of all the

199

TAYLOR

1
2       record, back in 2002, before this litigation started,
3       was there any human being who was appearing before
4       these two judges who agreed with your concept of a
5       standalone reorganization in lieu of a sale to
6       Cerberus?
7            A.       Well, I was in the midst of
8       restructuring several other similar companies, all of
9       which are actually referenced by Lazard.  We did
10      restructurings in every single one of those.  We
11      didn't do panic sales.  And some of the same creditors
12      were involved in those cases.  And they supported
13      those restructurings.
14                   So when you have a business that can
15      generate profits and can be standalone but you have to
16      get it to that point, there was no need for a panic
17      sale of this type.  But when you, you know,
18      essentially drive it to the precipice of the cliff, at
19      that point you don't have a lot of choices.  You have
20      foreclosed a lot of options, especially what BCE did
21      here in essentially mandating a process.
22           Q.       Now, let me go back to my question and
23      see if you can answer it now.  The question I was
24      asking you was:  Based on your reading of the record
25      in this case back in 2002, before this litigation

1                          TAYLOR

2    started, was there any human being who was appearing

3    before either the CCAA judge or the bankruptcy judge

4    in this courthouse who agreed with your concept of a

5    standalone reorganization in lieu of a sale to

6    Cerberus?

7                    MR. SILBERGLIED:  Objection to form.

8                    THE WITNESS:  Did Lazard appear before

9    the court?

10   BY MR. BASKIN:

11        Q.        You think Lazard favored your position

12   in lieu of a sale to Cerberus, Ms. Taylor?  Is that

13   what you are going to testify?

14        A.        I think -- I think maybe not stated

15   the exact way you are stating it, but clearly Lazard,

16   when they initiated their work, did not advise a sale

17   process, said it was unlikely to yield -- I forget

18   their exact words.  It is quoted in my report.  But

19   they certainly weren't advising a sales process.

20                    In their initial work they were

21   advising a restructuring, which is what I am also

22   advising.  Unfortunately, the thing went so fast that

23   only a couple weeks into their work, there was an

24   e-mail from Jim Millstein to the effect that, well,

25   given the way this is obviously going, we need to make

TAYLOR

2  sure we get our M&A fee.

3              So it appears to me that Lazard wasn't

4  even given the opportunity to pursue or help the

5  company pursue what would achieve the best value.  So

6  by the time -- you know, basically, it was too late by

7  the time you are suggesting.

8              If you were going to preserve value

9  for the creditors here and the estate, you would have

10 had to do it before you cut off funding, not after,

11 and have some controlled process for doing that.

12 Instead, the management team put forward CAPEX numbers

13 which Lazard didn't have an opportunity to vet that

14 were absurd.  I mean, the actual CAPEX in '03 was

15 $12 million.

16             So nobody really had the opportunity

17 to do the right analysis and even consider the

18 questions here.  That's the essence of my testimony.

19             I don't know if Lazard said that

20 later, but what is the point?  By the time you have

21 already got a DIP that says you have to sell, Lazard

22 did what they were asked to do.  They conducted an

23 auction process.

24      Q.      So let me ask my question one more

25 time now.  Based on what actually happened in 2002,

TAYLOR

1

2    before this litigation started, was there any person

3    who appeared before either of these two judges who

4    agreed with your concept of a standalone

5    reorganization in lieu of a sale to Cerberus?

6                    MR. SILBERGLIED:  Objection to form.

7                    THE WITNESS:  I don't know.

8    BY MR. BASKIN:

9        Q.     Now, I just want to cover one more

10   part of your report, and then I think we can probably

11   call it a day.

12                    Is it part of your analysis that if

13   you were doing this restructuring back in 2002, the

14   debtor would have been in a position to remain in

15   certain countries outside the United States more than

16   what they did?

17                    MR. SILBERGLIED:  Pardon me.  Can you

18   read that back?  I apologize.

19                    (The court reporter read back as

20   requested.)

21                    MR. SILBERGLIED:  Objection to form.

22                    THE WITNESS:  I believe the analysis

23   that we did and the discussion covered the fact that

24   if you were properly considering how to maximize value

25   and you had some capital to work with as opposed to

Exhibit 11

1

1      IN THE UNITED STATES DISTRICT COURT

2         FOR THE DISTRICT OF DELAWARE

3  *********************************************

4  TELEGLOBE COMMUNICATIONS        :
   CORPORATION,  et al,

5                                  :
              Plaintiffs,

6                                  :
              vs.                        Civil Action No.

7                                  :     04-CV-1266 SLR
   BCE, INC., MICHAEL T. BOYCHUK,

8  MARC A. BOUCHARD, SERGE FORTIN,:
   TERENCE J. JARMAN, STEWART

9  VERGE, JEAN C. MONTY, RICHARD  :
   J. CURRIE, THOMAS KIERANS,

10 STEPHEN P. SKINNER and          :
   H ARNOLD STEINBERG,

11                                 :
              Defendants.

12 *********************************************

13

14

15         Deposition of PAUL CHARNETZKI, taken

16 pursuant to notice in the law offices of Richards,

17 Layton & Finger, Conference Room 3E, One Rodney

18 Square, 920 North King Street, Wilmington, Delaware,

19 on Wednesday, May 3, 2006, at 8:46 a.m., before

20 Lorraine B. Marino, Registered Diplomate Reporter

21 and Notary Public.

22

23         ELLEN GRAUER COURT REPORTING CO. LLC
           126 East 56th Street, Fifth Floor

24             New York, New York 10022
                   212-750-6434

25                 REF: 80591

2

```
 1    APPEARANCES:

 2                    GREGORY V. VARALLO, ESQ.
                      Richards, Layton & Finger
 3                    One Rodney Square
                      920 North King Street
 4                    Wilmington, DE  19801
                         for Plaintiffs
 5
                      STUART J. BASKIN, ESQ.
 6                    BRYNNA CONNOLLY, ESQ.
                      Shearman & Sterling
 7                    599 Lexington Avenue
                      New York, NY  10022-6069
 8                       for Defendants

 9    ALSO PRESENT:

10                    V. V. COOKE, ESQ.
                      Teleglobe Associate General Counsel
11
                              -  -  -
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

223

1                          CHARNETZKI

2    BY MR. BASKIN:

3         Q.        Now, did you read anything that the

4    monitor wrote about the process, Mr. Charnetzki?

5         A.        I am sure I read monitor documents,

6    yes, sir.

7         Q.        That is not what I asked you.  Did you

8    read anything that the monitor wrote about the process

9    he undertook to sell the business?

10        A.        I don't recall as I sit here today.

11        Q.        Did you read anything that the debtors

12   told the judge in this very proceeding, the bankruptcy

13   judge, regarding the process that was done to sell the

14   business in and around May 2002?

15        A.        I did not read that, no, sir.

16        Q.        Did you read, for that matter,

17   anything that any of the creditors said regarding the

18   process that was undertaken in and around May 2002?

19        A.        I don't recall, no.

20        Q.        Did you read anything what any of the

21   lawyers said to the bankruptcy judge in and around May

22   2002?

23        A.        No, sir.

24        Q.        But nonetheless, you do know that they

25   did not achieve fair market value for the assets;

224

CHARNETZKI

1  right, sir?

2       A.        I believe that a higher value could

3  have been preserved, yes, sir.

4       Q.        Now, do you know what the monitor told

5  the judge in this very courthouse regarding the value

6  achieved?

7       A.        I didn't know that we were in a

8  courthouse, sir.

9       Q.        Do you know what the monitor told the

10  judge, the bankruptcy judge, in the District of

11  Delaware, sir, was his assessment of the value

12  achieved?

13       A.        No, sir, I do not.

14       Q.        Before you put pen to paper and wrote

15  your report, did you know what the monitor told the

16  judge in this courthouse?

17       A.        No, I did not.

18            MR. VARALLO:  It is a different

19  courthouse, but go ahead.

20  BY MR. BASKIN:

21       Q.        Before you wrote the report, do you

22  know what the monitor was telling the bankruptcy judge

23  in the District of Delaware?

24       A.        No, I do not.

225

                              CHARNETZKI

1
2        Q.        And before you wrote your report, do
3    you know what the monitor was telling the judge up in
4    Canada?
5        A.        No, I do not.
6        Q.        You understood we had two judges
7    supervising these procedures, didn't you, sir?
8        A.        Yes, sir.
9        Q.        And you didn't think it was important
10   for you to read what it was people were telling these
11   two judges before you opined that fair value was not
12   achieved?
13                 MR. VARALLO:  Objection to form.
14                 THE WITNESS:  I did what I did, and I
15   did not read those monitor reports, those monitor
16   testimony.
17   BY MR. BASKIN:
18       Q.        Now, you understand that the debtor
19   who has hired you and paid you $2 million so far also
20   made representations to the court in this matter?  Do
21   you understand that, sir?
22       A.        Yes, sir.
23       Q.        Did you read anything that the debtor
24   told the bankruptcy judge in the District of Delaware
25   before you opined in your report that this was a fire

226

CHARNETZKI

1    sale at an unfair price?

2        A.        I don't recall reading what the debtor

3    said about the sale.

4        Q.        Do you recall asking to see what

5    representations the debtor who hired you had made to

6    the bankruptcy judge?

7        A.        No.

8        Q.        And I take it as you sit here today,

9    you do not recall having read what the debtor said at

10   the time; is that right, Mr. Charnetzki?

11       A.        I don't recall reading that, no, sir.

12       Q.        And you do not recall what the monitor

13   said at the time either; right, Mr. Charnetzki?

14       A.        No, I do not.

15       Q.        All you know is that the paper

16   valuation contained under Tab 15 of Charnetzki 1 is

17   better than the price achieved through the sale to

18   Cerberus; correct?

19       A.        I believe that's correct, sir.  Yes, I

20   do.

21                 MR. BASKIN:  Now, in that connection,

22   Mr. Charnetzki, let me show you what we will mark as

23   Charnetzki 16.

24                 (Recess taken.)

CHARNETZKI

(Charnetzki Deposition Exhibit No. 16
was marked for identification.)

BY MR. BASKIN:

Q.      Mr. Charnetzki, Exhibit 16 I handed
you before we had the break in the tape.  This
represents an affidavit submitted by one Benjamin
Babcock to the U.S. Bankruptcy Court for the District
of Delaware.  Do you see that, sir?

A.      Yes, sir.

Q.      And I take it you have never seen this
prior to today; correct?

A.      I don't recall seeing it, no, sir.

Q.      And you certainly didn't see it before
you wrote your report; correct?

A.      I don't recall seeing it, sir; that's
right.

Q.      And you certainly didn't see it before
you reached the conclusion that the bankruptcy had
only achieved a fire-sale price; right,
Mr. Charnetzki?

A.      Yes, sir.

Q.      And you did not read this before you
reached your conclusion that the bankruptcy price was
not fair market value; right, sir?

228

CHARNETZKI

1

2      A.       As I said, I have not read this

3   document.

4      Q.       Now, I want to direct your attention,

5   sir, to page 5.  And you see there is a paragraph 12

6   in page 5?

7      A.       Yes, sir.

8      Q.       And paragraph 12 says that "The

9   Monitor and the Teleglobe Companies, assisted by the

10  companies' financial advisors, Lazard Freres, took the

11  following actions to properly expose the core telecom

12  business to the market and to comply with the Approved

13  Bidding Procedures."  Do you see that, sir?

14     A.       Yes, sir, I do.

15     Q.       I take it as you sit here now, you

16  don't have the vaguest idea what the approved bidding

17  procedures were, do you?

18     A.       I do not recall seeing a document that

19  said approved bidding procedures.

20     Q.       Well, that wasn't my question.

21  Whether you saw a document or not, you have no idea

22  what the approved bidding procedures were, do you,

23  Mr. Charnetzki?

24     A.       No, I do not.

25     Q.       And whether those were good procedures

229

CHARNETZKI

1    or bad procedures or somewhere in between you don't

2    have the vaguest idea; right, sir?

3    A.        I have no opinion on that.

4    Q.        Now, in connection with this -- I am

5    not going to ask you to read the entire paragraph 12,

6    but I take it, sir, that you did not recall seeing in

7    any form a description of the procedures undertaken to

8    sell the business as set forth in paragraph 12;

9    correct?

10   MR. VARALLO:  You want him to do that

11   without reading it or after he reads it?

12   BY MR. BASKIN:

13   Q.        Well, you know what?  Why don't you

14   take a quick read of paragraph 12, sir.

15   Strike that.  Not necessary.  Let me

16   ask you something else, sir.  Let's go to page 10.

17   You understand -- by the way, do you know who

18   Mr. Babcock is here?

19   A.        I have never met the gentleman.  He

20   says he is a senior vice president with Ernst & Young.

21   Q.        Do you understand he was the

22   court-appointed monitor in the Teleglobe bankruptcy in

23   Canada?

24   A.        That's what it says here, yes, sir.

25

230

CHARNETZKI

1    Q.        Is that news to you?

2    A.        I don't recall that I remember his

3    name one way or another.  I believe I did know it was

4    Ernst & Young, yes, sir.

5    Q.        And you did know that this was a

6    monitor in Canada; right?

7    A.        Yes, sir.

8    Q.        And do you know enough about Canada

9    CCAA proceedings to know that the court always

10   appoints a court-supervised monitor to supervise the

11   bankruptcy proceeding?

12   A.        I believe that that's the case.

13   Q.        And do you know, sir, that in this

14   case Mr. Babcock was that person?

15   A.        It says it is here.  I did not know

16   specifically.  I believe I thought it was Ernst &

17   Young.

18   Q.        So in any event, you understand that

19   the monitor submits reports to the bankruptcy court in

20   Canada respecting the progress of the bankruptcy;

21   correct?

22   A.        Yes, sir, I do understand that.

23   Q.        And you understand in addition that

24   the debtor submits reports to the bankruptcy judge in

1                         CHARNETZKI

2    the United States, don't you?

3           A.          I understand that, yes, sir.

4           Q.          Okay.  And I think we have already

5    established that you don't recall reading either the

6    reports submitted to the monitor or the reports the

7    debtor submitted to the bankruptcy judge here in

8    connection with the sale process; right?

9           A.          I don't recall that, no, sir.

10          Q.          Now, let's go to page 10, if you will,

11   of Exhibit 16, and there is a paragraph 17.

12          A.          Yes, sir.

13          Q.          Do you want to just read that for a

14   second.

15          A.          (Pause) Yes, sir.

16          Q.          Again, paragraph 17 I take it is news

17   to you; right, Mr. Charnetzki?

18          A.          I did know that it was part of the

19   purchase price that there was assets and liabilities

20   being assumed, yes, sir.  That is not news to me.

21          Q.          But the fact that the monitor

22   represented to the court in a joint application of the

23   monitor and the debtor that the purchaser's offer

24   represents the highest and best offer attainable for

25   the core telecom business, have you ever seen that

232

                              CHARNETZKI

1

2    prior to today, Mr. Charnetzki?

3         A.        Those specific words, no, sir.

4         Q.        Did you ever see that prior to your

5    rendering your report?

6         A.        I did not see those words, no, sir.

7         Q.        Did you see those words prior to your

8    reaching your opinion that what was achieved here was

9    a fire sale and not a fair market value price?

10        A.        I would have expected to see something

11   like this in the reports to the court.  This doesn't

12   surprise me one way or another.  But I didn't -- I

13   would have expected that that's what they would have

14   said, yes, sir.

15        Q.        Do you have reason to doubt that they

16   achieved the highest and best offer attainable for the

17   core telecom business?

18        A.        Under the circumstances, I believe

19   they did the best they could, yes, sir.

20        Q.        And do you have any reason to believe

21   there was a better buyer out there?

22        A.        At that time, I don't know, sir.

23        Q.        Do you have any reason to believe that

24   there was any other course in the bankruptcy that

25   would achieve a higher and better value than the one

233

CHARNETZKI

1    set forth by the monitor here?

2    A.         I believe that had the constraints not

3    been there, a different course would have been

4    followed.  That's what I believe.  Given the situation

5    that they were in, I have not evaluated the process

6    that led to the sale in this matter.

7    Q.         Now, do you read this representation

8    by the monitor to the bankruptcy judge in this

9    district as a representation that a fair market value

10   was attained for the assets of the company?

11

12             MR. VARALLO:  Objection to the form of

13   the question.

14             THE WITNESS:  I don't know.  I think

15   he says what he says.  I think it speaks for itself.

16   BY MR. BASKIN:

17   Q.         Which is what?  Highest and best

18   value?

19   A.         That is not what he says.

20   Q.         What paragraph are you reading, sir?

21   A.         I am reading the first paragraph, 17,

22   first sentence, "represents the highest and best

23   offer."

24   Q.         And do you read that as saying that

25   that offer represents fair market value?

234

CHARNETZKI

1    A.        The document speaks for itself.  I

2   don't read it to say anything else.

3        Q.        Well, turn, if you will, to paragraph

4   20 of the same document.  Would you read that to

5   yourself, sir?

6

7        A.        In this sentence he does say that it

8   represents fair market value.  In that sentence he

9   does say that, yes, sir.

10       Q.        Well, to be more precise, the monitor

11  of the Teleglobe Companies in a joint application to

12  the bankruptcy judge in this court district, judicial

13  district, is representing to her that the sale of the

14  business as contemplated, the purchase price

15  represents the fair market value for the assets;

16  right, sir?

17       A.        That's what he says here.

18       Q.        Right.  Do you agree with him?

19       A.        I don't have -- I have no basis to

20  judge one way or another.

21       Q.        Well, you did tell us earlier, when we

22  were talking about 2001, that you believe that a

23  purchase if consummated -- strike that.

24            Do you have any reason to believe,

25  sir, as you are sitting here now that -- strike that.

235

CHARNETZKI

1

2          You are aware that the purchase

3   agreement terms were below the valuation you wrote on

4   this piece of paper found under Tab 15,; correct?

5          A.          That's correct, sir.

6          Q.          And you testified earlier in the

7   deposition that you do not believe they achieved fair

8   market value for the assets; is that true?

9          A.          That's correct, sir.

10         Q.          Are you taking back that testimony

11  now?

12         A.          No, sir, I am not.  I believe that had

13  BCE acted differently, a value more akin to the

14  400 million, 416 million there would have been

15  achieved rather than this value.

16         Q.          Even though your plan 15, as we

17  already discussed, your Tab 15 valuation presupposes

18  that BCE is only putting in 100 to $125 million;

19  right?

20         A.          And other things that are presupposed

21  along with that.  But my view is that that is a

22  valuation that includes very, very constrained

23  capital, but also that valuation doesn't necessarily

24  indicate that a sale would be made.  That valuation

25  would indicate that you could walk away.

1                                  CHARNETZKI

2          Q.          And so it is going to be your

3    testimony to the judge that she should accept your

4    valuation as the real fair market value and not what

5    the monitor represented to the bankruptcy judge;

6    correct?

7          A.          I am going to say that the

8    416 million, had the damage not been done, was an

9    obtainable market value, yes, sir.

10         Q.          Now, let me ask you this, sir.  As we

11   mentioned before, in addition to the monitor -- strike

12   that.

13                     This was a joint application made to

14   the bankruptcy judge of the monitor and of the

15   debtors.  Do you remember I mentioned that to you

16   before, sir?

17         A.          Yes, sir.

18         Q.          I take it you did not see what the

19   debtors who hired you in this matter, what they

20   represented to the bankruptcy judge, did you, sir?

21         A.          I don't recall what -- I don't recall

22   seeing it.

23         Q.          Would it have interested you before

24   you rendered your opinion on the value of the business

25   based on the Charnetzki model for May 2002 what the

237

CHARNETZKI

1

2    people that hired you had represented to the

3    bankruptcy judge?

4        A.        I don't know how to answer that.

5        Q.        Well, you knew -- you know debtors in

6    bankruptcy make submissions to the court, don't you,

7    sir?

8        A.        Yes, sir.

9        Q.        In fact, even the bankruptcies you did

10   in the '70's and '80's that you talked about earlier,

11   you knew enough from those processes to know that

12   debtors say things to courts; right?

13       A.        I do, sir.

14       Q.        And you understand that debtors expect

15   the courts to believe them; is that right, sir?

16       A.        I believe that would be a fair

17   assumption, yes, sir.

18       Q.        Is that your experience with courts,

19   that courts expect to be told the truth,

20   Mr. Charnetzki?

21       A.        Yes, sir.

22       Q.        And before you rendered your opinion

23   about how the debtors were damaged in this case, it

24   didn't interest you one wit to learn what they were

25   saying to the bankruptcy judge as part of the

238

1                          CHARNETZKI

2    bankruptcy proceeding?

3                    MR. VARALLO:  Objection to the form.

4                    THE WITNESS:  I know what value was

5    obtained out of that proceeding, and I give the

6    adjusted value there, and that's what I thought I

7    needed to know, and I did obtain that number.  Beyond

8    that, I didn't think I needed to go further.

9    BY MR. BASKIN:

10        Q.        So to answer my question, you

11   certainly didn't think it was necessary to know what

12   the debtor was telling the bankruptcy judge in

13   connection with the bankruptcy proceeding; correct?

14        A.        No, I did not.

15        Q.        Now -- and in fact, did you make a

16   conscious decision not to learn what the debtor had to

17   say?

18        A.        No, I don't think I made a conscious

19   decision.

20        Q.        It just didn't happen?

21        A.        It didn't happen.

22                    MR. BASKIN:  Now, let me show you,

23   sir, what we will mark as Exhibit 17.

24                    (Charnetzki Deposition Exhibit No. 17

25   was marked for identification.)

239

CHARNETZKI

BY MR. BASKIN:

3    Q.        Mr. Charnetzki, Exhibit 17 consists of
an affidavit of one John Brunette that was submitted
to the U.S. Bankruptcy Court for the District of
Delaware.  Do you see that, sir?

7    A.        Yes, sir.

8    Q.        And if you look at the bottom left-
hand corner, you want to venture -- do you remember
who the law firm was for Mr. Brunette when he appeared
in front of the bankruptcy judge?  Do you want to
venture a guess what those initials stand for at the
bottom of Exhibit 17, sir?

14    A.        NY1?  RLF.

15    Q.        Do you want to guess what that stands
for, Mr. Charnetzki?

17    A.        I would imagine it is this firm,
Richards, Layton.

19    Q.        Now, I take it this is the first time
you have seen this affidavit in your entire life; is
that right?

22    A.        I don't recall seeing it before.

23    Q.        And I take it in addition that you
certainly don't recall seeing it before you rendered
your report; right, sir?

240

CHARNETZKI

1

2    A.        I don't recall seeing this, no, sir.

3    Q.        And you certainly don't recall seeing

4    it before you reached your conclusions regarding the

5    bankruptcy sale that occurred in and around May of

6    2002; right?

7    A.        I don't recall seeing this document

8    before.

9    Q.        In the course of the various meetings

10   you had with the other witnesses, the other expert

11   witnesses and the lawyers in this case that you

12   chronicled this morning, in the course of any of those

13   meetings did anyone tell you that the debtor who hired

14   you and is paying you $2 million made representations

15   to the bankruptcy judge?

16   A.        I don't recall anyone telling me that,

17   no.

18   Q.        Now, if you look, sir, at page 9.  By

19   the way, have you met Mr. Brunette in your life?

20   A.        I don't think so, sir, no.

21   Q.        Do you understand that he was the CEO

22   of the debtor at the time?

23   A.        Yes, sir.

24   Q.        And he is not being sued in this

25   matter?  Do you understand that?

                        CHARNETZKI

1

2       A.      I don't recall him listed as a

3   defendant, no, sir.

4       Q.      And you certainly know he has the same

5   lawyer you have basically in this matter; right?

6       A.      Richard, Layton --

7               MR. VARALLO:  I object.

8               THE WITNESS:  -- represents Teleglobe.

9   They don't represent me.

10              MR. VARALLO:  Object to the form also.

11  Assumes fact not in evidence.

12  BY MR. BASKIN:

13      Q.      If you go to paragraph 15, could you

14  read that to yourself for a second, Mr. Charnetzki?

15      A.      (Pause) Yes, sir.

16      Q.      I assume the first time you have read

17  that paragraph in your life is right now; is that

18  correct?

19      A.      That's the first time I recall reading

20  that paragraph.  Actually, I think I might have read

21  almost the exact same language in the other document,

22  but --

23      Q.      But this particular paragraph as

24  written, the first time you read it is as you sit here

25  today in this very room; right, Mr. Charnetzki?

242

1                          CHARNETZKI

2          A.        I believe that's right, yes, sir.

3          Q.        You didn't see it in preparation for

4    your testimony, did you?

5          A.        I don't recall seeing it, no, sir.

6          Q.        And you certainly didn't see it when

7    you prepared your report; right, sir?

8          A.        I don't recall seeing it, no.

9          Q.        Now, you understand that the CEO of

10   the debtor said that "The Debtors are of the opinion"

11   under oath, frankly; that "The Debtors are of the

12   opinion that the transaction process outlined above

13   complied with the Approved Bidding Procedures."  Do

14   you see that, sir?

15         A.        Yes, sir.

16         Q.        Any reason to think that is not true?

17         A.        No, sir.

18         Q.        And, in fact, we already established

19   you don't even know what the approved bidding

20   procedures were; right, sir?

21         A.        That's correct.

22         Q.        Now, then he says, "The transaction

23   process resulted in the Core Telecom Business being

24   properly exposed to the market and a purchase

25   agreement with a price and structure that was the

243

CHARNETZKI

1  result of a competitive bidding process in an

2  auction-like environment between multiple parties."

3  Do you see that, Mr. Charnetzki?

4         A.      Yes, sir.

5         Q.      Now, do you take that to mean that he

6  believed that there was an orderly sales process that

7  was conducted?

8                 MR. VARALLO:  Objection to the form.

9                 THE WITNESS:  The sentence speaks for

10  itself.

11  BY MR. BASKIN:

12         Q.      Do you see anything in that paragraph

13  to say that the sale process was constrained or

14  otherwise rushed?

15         A.      Not in that sentence, no, sir.

16         Q.      Now, he goes on to say, "The Teleglobe

17  Companies concur with the Monitor that the competitive

18  bidding process yielded the highest and best offer for

19  the Core Telecom Business and is in the best interest

20  of the Debtors, their creditors and stakeholders"; is

21  that correct, sir?

22         A.      That is what is written here, yes,

23  sir.

24         Q.      Again, that representation under oath

243

1                          CHARNETZKI

2  result of a competitive bidding process in an

3  auction-like environment between multiple parties."

4  Do you see that, Mr. Charnetzki?

5         A.      Yes, sir.

6         Q.      Now, do you take that to mean that he

7  believed that there was an orderly sales process that

8  was conducted?

9                 MR. VARALLO:  Objection to the form.

10                 THE WITNESS:  The sentence speaks for

11  itself.

12  BY MR. BASKIN:

13         Q.      Do you see anything in that paragraph

14  to say that the sale process was constrained or

15  otherwise rushed?

16         A.      Not in that sentence, no, sir.

17         Q.      Now, he goes on to say, "The Teleglobe

18  Companies concur with the Monitor that the competitive

19  bidding process yielded the highest and best offer for

20  the Core Telecom Business and is in the best interest

21  of the Debtors, their creditors and stakeholders"; is

22  that correct, sir?

23         A.      That is what is written here, yes,

24  sir.

25         Q.      Again, that representation under oath

244

CHARNETZKI

1    by the plaintiffs' CEO is not something you saw prior

2    to literally sitting in this room today; correct?

3        A.        I don't recall seeing that before, no,

4    sir.

5        Q.        Now, in that connection do you

6    understand him as saying in that paragraph that the

7    return realized for the estate and its creditors was a

8    fair return?

9               MR. VARALLO:   Objection to form.

10              THE WITNESS:   This paragraph says what

11   it says.

12   BY MR. BASKIN:

13       Q.        Do you view a highest and best offer

14   as a fair offer, sir?

15              MR. VARALLO:   Objection to form.

16              THE WITNESS:   It may or may not be a

17   fair offer if you are not constrained.   It says what

18   it says.

19   BY MR. BASKIN:

20       Q.        Now, how about paragraph 19, sir?   Do

21   you want to read that for a second?

22       A.        (Pause) Paragraph 19 reads, "The

23   Teleglobe Companies believe the purchase price for the

24   Core Telecom Business contained in the Purchase

245

CHARNETZKI

1
2  Agreement represents the fair market value for the
3  assets of the Core Telecom Business."
4          Q.        And that, I take it, is a view that
5  you still do not hold; is that right, sir?
6          A.        That's correct.
7          Q.        So notwithstanding the representation
8  that the monitor made to the bankruptcy judge and
9  notwithstanding the representation that the debtors
10  made to the bankruptcy judge, all under oath, as I
11  understand it, you are going to be telling Judge
12  Robinson at this trial that the Charnetzki paper
13  valuation and not that which was achieved through this
14  process is the proper fair market value; is that
15  right, Mr. Charnetzki?
16                    MR. VARALLO:  Objection to form.
17                    THE WITNESS:  Yes.
18  BY MR. BASKIN:
19          Q.        Excuse me?
20          A.        Yes, sir.
21          Q.        Now, as I understand, sir, the
22  interplay between you and Ms. Taylor, she is going to
23  be testifying that with further study, had she been
24  the financial advisor, she might have recommended
25  retaining certain additional countries other than the

246

CHARNETZKI

1
2  ones that were retained as part of this bankruptcy

3  process.  Is that your understanding, sir?

4        A.        No.  We should look at Ms. Taylor's

5  report.  I mean, it is quite lengthy.  It says what it

6  says.  I understand that is part of it.  Yes, I

7  believe I remember reading that.  But it is --

8  whatever is in her report is what is in her report.

9        Q.        Now, have you made any effort to

10  quantify for the Court the damages arising from the

11  failure of Teleglobe to retain businesses in any

12  particular country during the course of the bankruptcy

13  proceeding?

14        A.        No, sir.

15        Q.        Are you planning to quantify for the

16  Court damages arising from the failure of Teleglobe to

17  retain businesses in any particular country?

18        A.        At this point I intend to present the

19  damage computations that you see, and those are the

20  ones I plan to present.  So no.

21        Q.        That is to say, for purposes of the

22  bankruptcy, the one found under Tab 15; correct?

23              MR. VARALLO:  Objection to the form.

24              THE WITNESS:  14 and 15.

25  BY MR. BASKIN: