# Exhibit 12

Court File No. 02-CL-4528

## ONTARIO SUPERIOR COURT OF JUSTICE
### COMMERCIAL LIST

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C 1985. c. C-36, AS AMENDED**

-and-

**IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF TELEGLOBE INC. AND THE APPLICANTS SET OUT IN SCHEDULE "A"**

### ELEVENTH REPORT OF THE MONITOR DATED SEPTEMBER 19, 2002

On May 15, 2002, Teleglobe Inc. and certain of its subsidiaries (collectively the "Applicant" or "Teleglobe") filed for and obtained protection from their creditors under the *Companies' Creditors Arrangement Act R.S.C. 1985 c. C-36, as amended* ("CCAA"). The terms of this proceeding are governed by an order of this Court dated May 15, 2002 (the "Initial Order"). Pursuant to the Initial Order, Ernst & Young Inc. ("EYI") was appointed monitor (the "Monitor") of the Applicant during these CCAA proceedings.

As discussed in the Monitor's previous Reports, Teleglobe is implementing a strategy to: 1) Preserve and unlock the value of the profitable Core Telecom Business; 2) Proceed with an orderly disposition of those assets that were not part of the Core Telecom Business (the "Redundant Assets") and; 3) Migrate, in a responsible manner, the customers associated with that non-core business off the Globesystem network. The primary focus of the Applicant and the Monitor has been to pursue a sale of the Core Telecom Business. The necessity for pursuing a sale of the Core Telecom Business on an expedited basis and the status of the initiatives of the Monitor and the Applicant in this regard have been discussed in the Monitor's previous Reports.

Teleglobe Inc. and certain of its subsidiaries and affiliates (the "Sellers") have, subject to Court approval, entered into an agreement (the "Purchase Agreement") to sell the Core Telecom



BCE-AD  0154406

Business to TLGB Acquisition LLC (the "Purchaser"), a Delaware limited liability company controlled by affiliates of Cerberus Capital Management, L.P. and TenX Capital Partners, LLC.

The Monitor is providing the Eleventh Report (the "Eleventh Report") in support of a motion to: 1) approve the Purchase Agreement, Interim Management Agreement (the "IMA") and related documents that encompass the agreement between the Sellers and the Purchaser; and 2) Seek an extension to the Stay of Proceedings to allow sufficient time for the approval of the Purchase Agreement, IMA and related agreements to be heard in the applicable courts in Canada and the United States.  The Eleventh Report addresses:

| | | Page |
|---|---|---|
| ❑ | Terms of Reference | 3 |
| ❑ | Core Telecom Business; | 3 |
| ❑ | Marketing of the Core Telecom Business; | 5 |
| ❑ | Summary of the Purchase Agreement | 12 |
| ❑ | Summary of the Interim Management Agreement; | 26 |
| ❑ | Approach to Sell Purchased Assets Outside North America; | 27 |
| ❑ | Election to Hold an Auction; | 28 |
| ❑ | Bell Contract; | 28 |
| ❑ | Notices and Timeline to Approve the Purchase Agreement | 30 |
| ❑ | Alternatives to a Sale of the Core Telecom Business; | 31 |
| ❑ | Extension of the Stay of Proceedings in Canada; and | 32 |
| ❑ | Monitor's Analysis and Recommendation. | 33 |
| | | Appendices |
| ❑ | Purchase Agreement | 1 |
| ❑ | Interim Management Agreement | 2 |
| ❑ | Escrow Agreement | 3 |
| ❑ | Purchase Agreement Commitment Letter | 4 |
| ❑ | Interim Management Agreement Commitment Letter | 5 |
| ❑ | UK Purchase Agreement | 6 |
| ❑ | UK Interim Management Agreement | 7 |
| ❑ | Revised DIP Budget to November 30, 2002 | 8 |

BCE-AD 0154407

Appendices 1 to 7 attached to this Report represent the principal business agreements relating to the sale to the Purchaser. A copy of all of the schedules to the Purchase Agreement are not attached to this Report. Copies of the full set of schedules and appendices to the Purchase Agreement and related documents are available from Teleglobe's Canadian counsel, Ogilvy Renault, or its U.S. Counsel, Jones, Day, Reavis & Pogue.

Capitalized terms not defined in this Report are defined in the Purchase Agreement, IMA, Initial Order or the previous Reports issued by the Monitor. All references to dollars in this report are in United States currency unless otherwise noted.

**TERMS OF REFERENCE**

In developing this Report, the Monitor has relied upon unaudited financial information prepared by Teleglobe's management, company records, and discussions with management of the Applicant. The Monitor has not performed an audit or other verification of such information. An examination of the financial forecast as outlined in the Canadian Institute of Chartered Accountants ("CICA") Handbook has not been performed. Future oriented financial information and estimates on timelines relied upon in this Report are based on assumptions regarding future events and actual results achieved will vary from this information and the variations may be material.

This Report provides a summary of the principal business terms of the Purchase Agreement, the IMA and related documents. The reader is cautioned that this Report does not purport to provide a detailed explanation of the terms of the Purchase Agreement, the IMA or other agreements relating to the proposed transaction and reference should be made to the relevant agreements and schedules attached to this Report.

**CORE TELECOM BUSINESS**

The Core Telecom Business is the North American routed international long distance voice and data telecommunications services business operated by the Applicant and certain of its subsidiaries. By September 30, 2002, the Applicant estimates that it will have substantially completed the migration of non-core customers off of its network and the restructuring of its telecommunications network such that the only remaining operating business of Teleglobe

BCE-AD  0154408

will be the Core Telecom Business. The Core Telecom Business represents a wholesale international voice telecommunications services business and data services business operating on the same associated circuits. The Core Telecom Business is forecast to have annualized gross voice revenue of approximately $700 million and net voice revenue[1] of approximately $150 million. Data revenue is forecast to be approximately $150 million. Approximately 65% of the revenue of the Core Telecom Business is earned in Canada, 25% in the United States and the remaining 10% internationally[2].

The principal assets comprising the Core Telecom Business include:

- Approximately 280 active commercial bilateral and interconnection agreements between the Sellers and international PTT[3] carriers globally;

- Approximately 66 operating sites, including 8 switch sites located in Canada, the United States and the United Kingdom;

- North American based terrestrial and satellite landing stations;

- Network operating centres and information technology centres in Montreal;

- Legal entities in Australia, Hong Kong and Spain; and

- Approximately 550 employees, 80% of whom are located in Canada.

The executive team responsible for the operation and strategic decisions related to the Core Telecom Business is located in Montreal, Canada.

As the Core Telecom Business is, in many respects, a "trading" business[4], the net working capital of this business representing outstanding exchange of minutes of voice or data traffic is an important part of its value. Included in the working capital are the receivables and payables

---

[1] Gross voice revenue less outpayments relating to termination of traffic
[2] United Kingdom, Spain, Hong Kong and Australia.
[3] "Post Telephone & Telegraph" or "PTT" is a term that refers to traditional government owned or controlled monopolies that provide local or international telecommunications services in a given country. Prior to deregulation of the telecommunications industry, Teleglobe was, for example, Canada's PTT for international long distance and AT&T was the PTT for the United States.

BCE-AD 0154409

associated with the bilateral and interconnection agreements between the Sellers and PTT carriers, customer accounts receivable and other working capital directly associated with the operation of the Core Telecom Business' assets. Included in the working capital is approximately $70 million of certain pre-filing[5] liabilities affected by the stay of proceedings that may be required to be paid in order to cure monetary defaults outstanding as at May 15, 2002 to facilitate the assignment of contracts that are critical to the Core Telecom Business (the "Cure Amounts"). Management estimates that the net working capital, including Cure Amounts, as at July 31, 2002[6] was approximately negative $26 million[7]. While the calculation of the working capital as at August 30, 2002 is not yet available, Management estimates that based on cash flow trends and known settlements of working capital amounts in August it will be approximately negative $7 million by the end of August 2002. Management believes that based on forecast earnings and cash flow, the working capital will improve subsequent to the end of August and will be approximately $0 by the end of September 2002.

### MARKETING OF THE CORE TELECOM BUSINESS

The Monitor's Second Report[8] addressed the necessity of proceeding with a sales process in respect of the Core Telecom Business. As was outlined at that time, both the Monitor and the Applicant believed that the Core Telecom Business represented the most valuable asset of Teleglobe. It was believed that it was unlikely that the value of this business would appreciate in a protracted restructuring proceeding[9]. Furthermore, with some restructuring, the Core Telecom Business would likely be a profitable business with strategic value to a number of prospective purchasers. The Monitor, Teleglobe and its advisors indicated that Teleglobe

---

[4] The wholesale voice business, which by volume, represents the most significant portion of the Core Telecom Business, is a business of exchanging voice traffic between major telecommunications carriers around the world.
[5] Liabilities that were outstanding on the date that Teleglobe filed for court protection under the CCAA and Chapter 11 of the U.S. Bankruptcy Code
[6] After taking into consideration known non-recurring settlements with PTT carriers and other adjustments booked in August 2002.
[7] Calculated in accordance with the Base Line Financial Statement Methodology which is a schedule to the Purchase Agreement.
[8] Dated June 3, 2002. This Report was filed with the Ontario Superior Court of Justice and the U.S. Bankruptcy Court in connection with the approval of the sales process in both jurisdictions.
[9] The reasons outlined in the Second Report included the following: The telecommunications industry is extremely price sensitive and competitive. The critical nature of telecommunications services is not conducive to maintaining customers in an uncertain environment. There is tangible evidence from a number of major

BCE-AD 0154410

must act promptly to maintain and realize the going concern value of this business as the liquidation value of this business was, due to the nature of the assets and industry conditions, likely to be materially less than going concern values.

The Core Telecom Business is a global business operating in over 200 countries around the world. Due to the interconnected and interdependent nature of its network infrastructure in Canada, the United States and the United Kingdom, Teleglobe proceeded to obtain the approval and support for a "global" sales process for the business as a whole in each of these countries.

Approval of the Marketing Process

On June 4, 2002 this Court made an order (the "Transaction Process Order"), which, *inter alia*, authorized the Monitor and the Applicant to implement the transaction process outlined in the Monitor's Second Report and the bid procedures attached to the Transaction Process Order. On June 18, 2002, the U.S. Bankruptcy Court approved a transaction process (the "U.S. Transaction Process Order") that is, in all material respects, the same as the Transaction Process Order (the bidding procedures approved pursuant to the Transaction Process Order and the U.S. Transaction Process Order are referred to as the "Approved Bidding Procedures"). While there are certain timing and notice requirements under the U.S. Transaction Process Order that differ from the Transaction Process Order, the approval of a consistent sales process in both jurisdictions allowed the sale of the Core Telecom Business to be pursued in a coordinated manner that is conducive to maximizing the value of the business as a whole and for stakeholders in all jurisdictions.

Governance of the Marketing Process

Prior to the June 4, 2002 Court hearing to approve the Transaction Process, the major creditor groups in this proceeding raised a number of concerns regarding the potential for conflicts of interest that may adversely affect the transaction process. For example, BCE is the CCAA Lender, a significant prepetition creditor and shareholder of Teleglobe. BCE controls Bell

---

restructurings in the telecommunications industry that retaining revenue in any type of protracted restructuring with an uncertain outcome is extremely difficult.

BCE-AD 0154411

Canada and Bell Nexxia (collectively "Bell"). Bell is Teleglobe's largest customer representing greater than 20% of its revenue. As of the June 4, 2002 hearing, Bell was also a prospective purchaser for the Core Telecom Business. In addition, several of the senior executives of the Core Telecom Business were seconded from Bell and have continuing contractual relationships with Bell. The Applicant and the Monitor recognized these issues and several measures were taken to mitigate the risk that these potential conflicts of interest, real or perceived, would adversely affect the transaction process.

The Transaction Process Order provided that the Monitor, as an independent Court appointed officer, was authorized and directed to conduct, supervise and direct the Transaction Process and matters related thereto. The Court ordered that the power and authority granted to the Monitor pursuant to the Transaction Process Order was paramount to the power and authority of Teleglobe Inc. with respect to these matters. Consequently, the Monitor had authority over the conduct and direction of the Transaction Process.

As was discussed in the previous Reports, Bell is an important customer of the Core Telecom Business and its contract is one of the most valuable assets of this business. Bell was also a potential purchaser of the Core Telecom Business. The Monitor took a number of steps during the sales process to ensure an "even playing field" was maintained for all potential purchasers and that this potential conflict of interest did not adversely affect the transaction process: 1) Specific confidentiality undertakings were put in place between Teleglobe, the Monitor and the CCAA Lender to ensure that any information that the CCAA Lender received regarding the transaction process would not be available to or disclosed to Bell without the consent of the Monitor[10]; 2) Bell was formally requested not to speak to any prospective purchaser of the Core Telecom Business without the express consent of the Monitor and its participation in such meetings; 3) No meetings or discussions between prospective purchasers and Bell were permitted by the Monitor prior to the submission of bids[11]; 4) All prospective purchasers were provided with clear guidance regarding the basis upon which they should value the Bell contract in preparing their bids; 5) Specific confidentiality undertakings were put in place to ensure that those employees of the Core Telecom Business who were seconded

---

[10] No such consent has been provided.
[11] This comment applies both to the July 15, 2002 and August 12, 2002 deadlines for bids discussed below.

BCE-AD 0154412

from Bell were not directly aware of the results of the Transaction Process or the negotiations of agreements.

The Monitor believes that the steps taken have resulted in a fair and competitive sales process, the outcome of which has not been influenced by the potential for conflicts of interest due to the various relationships in this proceeding.

<u>The Marketing Process</u>

The marketing of the Core Telecom Business was informally initiated in late April 2002. Formal notice of the Transaction Process and the Approved Bidding Procedures were provided to prospective purchasers immediately following the approval of the Transaction Process Order.

The Monitor and the Applicant, assisted by Lazard Frères & Co. LLC[12] ("Lazard"), have taken the following actions to properly expose the Core Telecom Business to the market and to comply with the Approved Bidding Procedures:

- ❑ Sixty nine (69) qualified potential purchasers of the Core Telecom Business were contacted, including 29 strategic investors and 40 financial investors[13];

- ❑ Thirty seven (37) of the sixty nine (69) qualified potential purchasers signed non-disclosure agreements in a form satisfactory to Teleglobe and the Monitor to allow them to receive confidential information on the opportunity to acquire the Core Telecom Business and conduct due diligence;

- ❑ Data rooms containing extensive business, financial and legal information in respect of the Core Telecom Business were made available to those parties who had executed non-disclosure agreements;

---

[12] Teleglobe's investment banker retained to assist in the divestiture process pursuant to an engagement letter dated March 21, 2002.
[13] In addition to Teleglobe's efforts to contact potential purchasers, there has been a general market awareness in the industry regarding Teleglobe's interest in selling the Core Telecom Business as a result of the significant publicity of these restructuring proceedings.

BCE-AD 0154413

- ❑   Management presentations were conducted with qualified parties who expressed an interest in such meetings;

- ❑   All parties were provided with a Form Purchase Agreement;

- ❑   As provided for in the U.S. Transaction Process Order, the "Sales Procedure Notice" was published in the Wall Street Journal and the New York Times prior to July 5, 2002[14];

- ❑   As discussed in the Fifth Report[15], after receiving feedback from a number of the prospective purchasers regarding the status of their due diligence and consulting with a number of the major stakeholders in this CCAA proceeding, including the advisors to the U.S. Unsecured Creditors Committee, the Monitor concluded that it would be appropriate to extend the date for submission of final bids.

  - –  On June 14, 2002, the Monitor instructed Lazard to send a revised Bid Process Letter to all prospective purchasers that extended the date by which bids must be received from June 24, 2002 to July 15, 2002[16].

- ❑   On July 15, 2002, ten (10) written offers for the Core Telecom Business were received. The Monitor, with the assistance of Lazard and representatives of the Applicant, evaluated the offers received.

  - –  For those stakeholders, or their representatives, who executed a confidentiality undertaking[17] with the Monitor and the Applicant, the Monitor shared the details of the offers received, the analysis of alternatives and Monitor's recommended course of action.

---

[14] The notice was published on July 3, 2002 in both publications.
[15] Dated June 18, 2002.
[16] The bidding procedures approved by both the Ontario Superior Court of Justice and the U.S. Bankruptcy Court provided the authority to make modifications to the date by which parties were to submit their bids.
[17] These parties included the advisors to the U.S. Unsecured Creditors Committee, the advisors to the Teleglobe Lending Syndicate and the advisors to the ad hoc committee of Telelgobe's noteholders and the CCAA Lender.

BCE-AD 0154414

- Based on this evaluation, the Monitor instructed Lazard to invite five qualified purchasers (the "Selected Prospective Purchasers") to proceed to complete due diligence, negotiate a purchase agreement and provide their final and best offer for the Core Telecom Business on August 12, 2002.

❑ In an effort to facilitate a continuation of the sales process on a non-exclusive basis, the Monitor sought and received approval to utilize up to $1.75 million of the Applicant's funds for the purpose of reimbursing such reasonable legal fees, disbursements and other reasonable expenses of the Selected Prospective Purchasers in connection with such parties continued participation in the sales process[18].

- Considering the significant additional due diligence that Teleglobe and the Monitor were requesting parties to do to comply with the bidding procedures and the fact that each of the Selected Prospective Purchasers had no certainty that they would be the successful bidder, the reimbursement of fees was believed necessary to maintain a competitive process.

❑ The Selected Prospective Purchasers and their legal and financial advisors were provided with extensive access to business, financial and legal information on the Core Telecom Business. Key members of the management team were made available to each of the Selected Prospective Purchasers.

❑ Three of the Selected Prospective Purchasers advanced negotiations of their proposed forms of Purchase Agreement during this period. During this process the value of the offers and terms of the Selected Prospective Purchasers' proposed forms of Purchase Agreement improved materially.

❑ On August 12, 2002, four (4) written offers for the Core Telecom Business were received from the Selected Prospective Purchasers. Three (3) of the offers were accompanied by a detailed mark up of the Form Purchase Agreement.

---

[18] Paragraph 2 of the July 29, 2002 Court Order. The reimbursement of expenses pursuant to the July 29, 2002 Court Order is not being funded by the U.S. Chapter 11 Companies.

BCE-AD 0154415

❑    During the period from August 12 to August 14, the Monitor, Lazard and Teleglobe
       undertook a process of clarifying and working with three of the parties to address the
       consideration and form of purchase agreement that they had offered. Each of the
       parties was provided guidance on the competitiveness of their offer, including the
       proposed purchase agreement. Multiple improved revised offers were received from
       three of the Selected Prospective Purchasers during this period.

❑    On August 14, 2002, three of the Selected Prospective Purchasers were provided with
       a revised Form Purchase Agreement that was, in all material respects, acceptable to
       Teleglobe.

❑    By August 14, 2002, the Monitor, Teleglobe and its advisors concluded that a
       definitive conclusion to the bidding process needed to take place. The reasons for this
       conclusion included, *inter alia*: the positive momentum in the transaction process was
       reaching or had reached its peak and limited additional clarification could be provided
       to the Selected Prospective Purchasers in order to maximize the value of their bids
       without losing the positive momentum and competitiveness of the transaction process.

❑    On August 14, 2002, the Monitor and Lazard advised the parties to submit their final
       and best offers (the "Final Offers") on the basis that there would be no additional
       discussions after such offers were received and the Monitor would select one party,
       based on price and certainty of closing a transaction, to continue with exclusive
       negotiations with a view to finalizing a definitive agreement of purchase and sale that
       could be brought forward for Court approval in Canada, the United States and other
       jurisdictions, as required[19].

       -    Each of the parties was advised that there was no certainty that an auction
              would be held and they should provide their best offer if they wanted to be the
              selected party to proceed with exclusive negotiations.

       -    The Final Offers would be received on August 15, 2002.

---

[19] The Monitor had reserved its right to elect to conduct an auction in accordance with the Transaction Process Order.

*ERNST & YOUNG*                    - 11 -                    September 19, 2002

BCE-AD  0154416

❏    On August 15, 2002, three (3) Final Offers were received. Two of the Final Offers were structured based on the form of the revised Form Purchase Agreement provided by Teleglobe on August 14, 2002. The third Final Offer contemplated a structure and form of agreement that was materially different[20] than the revised Form Purchase Agreement provided.

❏    On August 16, 2002, the Monitor, Lazard and representatives of Teleglobe met with advisors to the Teleglobe Lending Syndicate, the ad hoc committee of Teleglobe's Noteholders and the U.S. Unsecured Creditors' Committee to review the Final Offers and the Monitor's recommendation on which party to proceed with exclusive negotiations to finalize a definitive purchase agreement (once chosen, the "Final Bidder").

Following the meeting on August 16, 2002, Teleglobe, the Monitor and the Final Bidder have been in exclusive negotiations to finalize an agreement to sell the Core Telecom Business. On September 18, 2002, the Purchaser and the Sellers executed the Purchase Agreement.

The Monitor is of the opinion that the transaction process outlined in this Report complied with the Approved Bidding Procedures. The transaction process resulted in the Core Telecom Business being properly exposed to the market and a purchase agreement with a price and structure that was the result of a competitive bidding process in an auction like environment between multiple parties.

## SUMMARY OF PURCHASE AGREEMENT

The Purchase Agreement and related agreements are the result of a competitive sales process and extensive negotiation between the Monitor, Teleglobe and the Purchaser. The Purchase Agreement is the principal agreement between the parties. Due to the nature of the assets comprising the Core Telecom Business, the fact that the Core Telecom Business operates in a

---

[20] The offer contemplated a price that was dependent upon the future operating results of the Core Telecom Business. The conditions of the offer and its structure resulted in the offer having a wide range of potential value. Based on discussions with advisors to the Teleglobe Lending Syndicate, the ad hoc committee of Teleglobe's noteholders and the U.S. Unsecured Creditors' Committee, there was limited, if any, interest in this proposed structure.

BCE-AD 0154417

regulated environment, the global nature of this business and certain options provided to the Purchaser to facilitate the transaction, the Purchase Agreement is a complicated agreement and the schedules to it are voluminous.

The following is a summary[21] of the principal business terms of the Purchase Agreement:

<u>Two Step Closing Process</u>

The Core Telecom Business operates in a regulated industry. Consequently, the completion of the sale will require regulatory approvals in a number of jurisdictions including Canada, the United States, the United Kingdom, Australia, Hong Kong and Spain. Closing of the transaction is subject to these regulatory approvals and they are estimated to take not less than three to six months to complete. The closing process reflects Teleglobe's proposed structure, which was designed to minimize closing risk in light of the timelines required to achieve required regulatory approvals.

In order to facilitate the sale in a manner that is conducive to reducing uncertainty with respect to the business and accelerating the closing of a sale for the benefit of Teleglobe's creditors, the Purchase Agreement contemplates a two-step closing process. This two-step process is consistent with that used for going concern transactions of this nature in the telecommunications and other regulated industries. The two step process involves: 1) if the conditions to the IMA are satisfied, effectively all of the risks and rewards of ownership, including operating responsibility, of the Purchased Assets are transferred to the Purchaser and substantially all of the economics of the Final Purchase Price that pose a risk to the Sellers (i.e. working capital adjustments) are settled on the date that the IMA becomes effective (the "IMA Date")[22]; and 2) if the conditions to the Closing Date are satisfied, the transfer of legal title to the Purchased Assets to the Purchaser and payment of the Final Purchase Price to the Sellers will occur on the Closing Date. Between the IMA Date and the Closing Date, the

---

[21] As previously noted under Terms of Reference, this is a summary of the principal business terms of the Purchase Agreement. The reader is cautioned that this Report does not purport to provide a detailed explanation of the terms of the Purchase Agreement, the IMA or other agreements relating to the proposed transaction and reference should be made to the relevant agreements attached to this Report.
[22] This is accomplished by paying a management fee equal to 50% of the Business Receipts less Business Expenses of the Core Telecom Business during the IMA period and, if Closing occurs, decreasing the purchase price by an amount equal to the management fee paid.

BCE-AD 0154418

Purchaser will operate the Purchased Assets on the Sellers' behalf, subject to certain approval rights of the Sellers. The material condition to the Closing Date is the receipt of required regulatory approval to transfer the Purchased Assets to the Purchaser. Upon the signing of the Purchase Agreement, a deposit of 5% of the purchase price was paid into escrow. The deposit and a Commitment Letter[23] from Cerberus Capital Management, L.P. supporting the Final Purchase Price will secure the Purchaser's obligations.

The key conditions to the IMA becoming effective[24] are:

- The receipt of bankruptcy court approvals in Canada and the United States and the expiry of the relevant appeal periods in respect of the Purchase Agreement and Interim Management Agreement;

- Approval of the DIP Lender shall have been obtained for the Purchase Agreement and the IMA;

- Delivery of certain agreements by the UK Sellers, including the UK Interim Management Agreement;

- No Material Adverse Change in the business since the date of signing the Purchase Agreement;

- Agreement or requisite Court approval of the assignment of the Bell contract notwithstanding any anti-assignment, change of control or insolvency default provisions;

- Clearing certain antitrust and competition processes;

- Bring-down of certain representations and warranties of the Sellers to the IMA Date; and

- The Purchaser obtaining insurance[25].

---

[23] The Commitment Letter is attached at Appendix 4 to this Report.
[24] Refer to Section IX of the Purchase Agreement for the specific conditions to the IMA
[25] Teleglobe has the option of providing the insurance to satisfy this condition.

BCE-AD 0154419

Upon the execution of the IMA, the Purchaser will assume responsibility for the operations of the Core Telecom Business, subject to the terms of the IMA. Pursuant to the terms of the IMA, if the Closing occurs, substantially all of the risks and rewards of the ownership of the Core Telecom Business, including responsibility for funding the cash flow of the business[26], will have passed to the Purchaser.

On the Closing Date, legal title to the Purchased Assets will be transferred to the Purchaser and the Sellers will receive payment of the Final Purchase Price in accordance with the terms of the Purchase Agreement. The key conditions to the Closing Date[27] are:

- The consents of the required Governmental Entities necessary to consummate the transactions contemplated by the Purchase Agreement shall have been obtained;

- That portion of the Final Purchase Price that is not subject to dispute shall have been paid to the Sellers and the Purchaser shall have deposited any disputed amounts under the provisions of the Purchase Agreement with the Escrow Agent pending resolution of such disputes[28];

- The Purchaser shall have received all required Closing Deliveries pursuant to Section 5.2.2 of the Purchase Agreement;

- Any required Bankruptcy Court approvals shall have been obtained and remain in full force and effect and shall have become final and non appealable; and

- Certain transactions related to the Purchased Assets in the UK shall have been completed and certain non-US and non-Canadian consents shall have been obtained.

---

[26] In the event that the conditions to the Closing Date are satisfied or the Purchaser breaches the Purchase Agreement or the IMA, the Purchaser is responsible for any negative cash flow associated with the operation of the Purchased Assets after the IMA Date.
[27] Refer to Section X of the Purchase Agreement for the specific conditions to the Closing Date
[28] Sections 4.4.1, 4.4.3.2 and 5.2.5 of the Purchase Agreement detail the amounts that can be disputed and the Purchase Agreement sets out how such disputes are to be resolved.

BCE-AD 0154420

The accuracy of the Sellers' representations and warranties, which are to be brought forward only to the IMA Date, are not a condition to the Closing Date.

This two-step process facilitates accelerating the closing process in respect of this transaction in a manner that is designed to protect Teleglobe's creditors' interests.

Structure of the Sale

The Purchase Agreement provides the Purchaser with flexibility in terms of how it acquires the Purchased Assets. This flexibility is provided to the Purchaser so it can retain, if possible, certain tax attributes of the Purchased Assets. The base line structure of the Purchase Agreement is that on or prior to the Closing Date, the Sellers will transfer the Purchased Assets to Newcos[29] and, on the Closing Date, the Sellers will transfer the equity of the Newcos to the Purchaser. Any costs associated with the implementation of the base line structure will be borne by the Sellers. Teleglobe estimates that these costs will be de minimis. The Sellers have provided the Purchaser with the option to either accept the equity in Newcos or purchase certain of the Purchased Assets, including Teleglobe's equity and inter-company interest in certain foreign subsidiaries[30], directly from the Sellers. Most of the incremental tax or other costs associated with the Purchaser exercising this option will be borne by the Purchaser[31]. The Purchaser has been given 30 days from the IMA Date to exercise such options.

Purchase Price

On the Closing Date, the Sellers will transfer to the Purchaser all of the Purchased Assets[32] and the Purchaser will assume certain liabilities, which are referred to as the Assumed Liabilities. The Purchased Assets represent the rights, properties and assets of the Core Telecom Business and are detailed in the Purchase Agreement. The Assumed Liabilities represent liabilities and obligations relating to the Core Telecom Business, including the

---

[29] Each Newco will be an affiliate of the Sellers.
[30] Legal entities in Spain, Hong Kong and Australia.
[31] See section 2.1.5.2 and 2.1.5.3 of the Purchase Agreement.
[32] The Purchaser has an option of completing the transaction as an acquisition of assets or acquisition of the equity of certain Newcos which are formed immediately prior to the Closing (or in certain cases, including the UK) immediately prior to the signing of the IMA) to hold the relevant assets and assumed liabilities.

BCE-AD 0154421

Contracts assumed by the Purchaser (but excluding Contracts the Purchaser determines not to assume), employee related liabilities (including the pension plan should the Purchaser elect to assume the plan) and the Cure Amounts.

The Final Purchase Price is payable in cash on the Closing Date and it will be equal to $155.3 million[33] adjusted as follows:

❑    Increased or decreased, as applicable, by the amount, if any, by which the Adjusted Net Current Assets[34] as of the IMA Date differs from the Target Net Current Assets[35] (the "Working Capital Adjustment");

❑    Increased by 50% of the Cure Savings realized by the Purchaser between the signing of the Purchase Agreement and the Closing Date[36] (the "Cure Savings Adjustment");

❑    Increased by the amount of any post petition, post IMA Date Current Liabilities incurred after the IMA Date with respect to a Rejected Contract[37];

❑    Decreased by the management fee paid in respect of the IMA and the UK IMA[38]; and

❑    Decreased by certain severance costs related to non-Core Telecom Business employees that the Sellers will not have to pay as a result of actions taken by the Purchaser[39].

---

[33] Defined as the Unadjusted Purchase Price in the Purchase Agreement.
[34] The Net Current Assets excluding the Cure Amounts.
[35] The Target Net Current Assets are zero plus the Cure Amounts.
[36] The Purchaser is responsible for the payment of the Cure Amounts prior to the Closing Date. Section 4.4.3 of the Purchase Agreement sets out the procedures for settlement of the Cure Amounts. To the extent that the Purchaser negotiates a settlement of the Cure Amounts for less than the face amount of the Cure Amounts as specified in a letter agreement between the Sellers and the Purchaser, the Sellers will receive 50% of such savings. As indicated earlier in this Report, the aggregate Cure Amounts are approximately $70 million.
[37] The Purchaser has the right to have the Sellers reject certain contracts. This adjustment is intended to compensate Teleglobe for the cost of such an election by the Purchaser.
[38] The Purchaser receives 50% of the cash flow of the Core Telecom Business during the IMA period through the management fee payable under the IMA and the other 50% through the purchase price reduction.
[39] These costs would be borne by the Sellers if the Purchaser did not assume them. Therefore, decreasing the purchase price for these amounts has no economic impact to the Sellers.

BCE-AD 0154422

The most significant potential adjustments in determining the Final Purchase Price relate to the Working Capital Adjustment and the Cure Savings Adjustment. The following is a summary of how these adjustments will be determined:

☐    The calculation of the Working Capital Adjustment will be determined by the delivery of a financial statement[40] prepared as of the IMA Date (the "IMA Date Financial Statement") and a statement calculating the Net Current Assets and Adjusted Net Current Assets prepared as of the IMA Date (the "Closing Statement")[41].

   -   The Purchase Agreement provides for a 45 day period for the Sellers to review the IMA Date Financial Statement and the Closing Statement.

   -   A dispute notice and dispute resolution procedure, consisting of submission of the dispute to a nationally recognized independent accounting firm, is provided for in the Purchase Agreement[42].

☐    The calculation of the Cure Savings achieved by the Purchaser (the "Cure Savings Statement") will be made by the Purchaser and delivered to the Sellers between twenty (20) and twenty-five (25) business days prior to the Closing Date.

   -   The Purchase Agreement provides for a ten (10) business day period for the Sellers to review the Cure Savings Statement.

   -   A dispute notice and dispute resolution procedure, consisting of submission of the dispute to a nationally recognized independent accounting firm, is provided for in the Purchase Agreement[43].

The adjustments to the Unadjusted Purchase Price of $155.3 million are based on future events which cannot be determined with any certainty and some of which are under the control

---

[40] Prepared in accordance with the Base Line Financial Statement Methodology which is set out in detail as a schedule to the Purchase Agreement.

[41] To facilitate providing comfort to the Purchaser regarding the amount of Assumed Liabilities and Cure Amounts, Teleglobe has agreed to pursue, subject to Court approval, setting Claims Bar Dates in Canada and the United States. The Buyer has 45 days after the later of the IMA Date and the Claims Bar Dates to deliver these statements to the Sellers.

[42] See section 4.4.1 of the Purchase Agreement.

[43] See section 4.4.3.2 of the Purchase Agreement.

BCE-AD 0154423

of the Purchaser (i.e. the Cure Savings, the rejection of contracts and relief from severance costs). Consequently, these adjustments cannot be forecast with any certainty. The Applicant's most recent estimate of the Adjusted Net Current Assets (as previously discussed in this Report) suggests that it should not differ materially from the Target Net Current Assets.

The transfer of the Assumed Liabilities to the Purchaser represents a significant benefit to Teleglobe's creditors. Teleglobe estimates that approximately $350 million of liabilities are included in the Net Current Assets of the Core Telecom Business[44] of which approximately $70 million represent Cure Amounts (which are an obligation assumed by the Purchaser). The severance obligations Sellers will not have to pay as a result of offers made by the Purchaser related to employees of the Core Telecom Business total approximately $9 million[45]. The opportunity for a continuation of business and enhanced recovery, as compared to liquidation, for the creditors, who will benefit from the Purchaser's assumption of the Assumed Liabilities, represents a significant benefit to the Sellers' estates. In addition, the assumption of these liabilities by the Purchaser will directly benefit the recoveries of Teleglobe's remaining creditors. The Assumed Liabilities are primarily at the operating company level.

<u>Allocation of Purchase Price</u>

It is recognized that the final allocation of proceeds amongst the various legal entities within the Teleglobe group is a material issue to the creditors of Teleglobe. The Purchase Agreement recognizes this issue and Teleglobe's creditors' rights to resolve this issue at a later date in a manner which is different than the Purchaser's and Sellers' allocation of the Unadjusted Purchase Price for tax purposes is expressly preserved.

On or prior to the IMA Date, for tax filing purposes, the Purchaser and the Sellers agree to act in good faith to attempt to agree on the allocation of the Unadjusted Purchase Price on an entity-by-entity basis among the Purchased Assets. This allocation will not be binding on the Bankruptcy Courts.

---

[44] Approximately $240 million relate to liabilities in Canadian domiciled legal entities, $90 million is related to liabilities of the U.S. Chapter 11 Companies. The remainder relates to liabilities in legal entities domiciled in the United Kingdom, Australia, Spain and Hong Kong.

BCE-AD 0154424

The Monitor has had preliminary discussions with a number of the major creditor groups regarding the alternative approaches to allocation of proceeds from the sale of the Core Telecom Business to the legal entities selling the Purchased Assets. It is expected that the relevant parties will pursue a consensual resolution to this issue between the IMA Date and the Closing Date involving direct dialogue and negotiations between representatives of the Teleglobe Lending Syndicate, the ad hoc committee of Teleglobe's noteholders, the U.S. Unsecured Creditor's Committee and the Monitor[46].

In the event that compatible orders of the Canadian and US Bankruptcy Courts setting out the allocation of the Final Purchase Price are not obtained prior to the Closing Date, the Final Purchase Price will be held in a segregated account pending resolution of the discrepancies between such Court orders.

Employees[47]

The Purchase Agreement provides significant benefits to Telelgobe in terms of preserving employment and transferring costs and claims that would otherwise serve to reduce recoveries to Teleglobe's creditors. Some of the more significant provisions include:

❑    The Purchaser will become the successor employer under the Collective Agreements that Teleglobe has with certain unions. As such, the Purchaser will be bound by and comply with the Collective Agreements effective as of the Closing.

❑    Prior to the Closing Date, the Purchaser shall make an offer of employment to at least 95% of all non-union employees[48] employed by the Sellers primarily in connection with the Core Telecom Business on terms that provide an aggregate compensation package that is substantially similar to existing employment terms.

---

[45] Teleglobe's obligation for these amounts arises under the Employee Facility approved in the CCAA proceedings and these obligations are essentially secured by virtue of the terms of the Employee Facility provided by the CCAA Lender.
[46] As discussed later in this Report, in order to facilitate the sale of the Purchased Assets in jurisdictions outside of North America, Teleglobe Inc. has entered into agreements to purchase the Purchased Assets in the United Kingdom for a fixed price. The total fixed purchase price was less than 10% of the Unadjusted Purchase Price.
[47] Employee issues are addressed in section 8.8 of the Purchase Agreement.
[48] Includes active employees and those who have rights of employment on return from vacation, leave, etc. and excludes UK employees whose employment transfers to UK Newco at the time of Closing.

BCE-AD 0154425

❑    The Purchaser agrees to provide severance benefits similar to those offered by
     Teleglobe for a one year period from the Closing Date.

Taken as a whole, the employee related provisions of the Purchase Agreement ensure the
continued employment of approximately 550 employees and eliminate approximately $9
million of severance and retention obligations that would have otherwise been payable by
Teleglobe under arrangements put in place at the outset of these CCAA proceedings.

<u>Representations and Warranties</u>

Teleglobe is pursuing a going concern sale of the Core Telecom Business and the price that it
received reflects this fact.  In order to realize a going concern value for the business and to
complete the transaction process within the accelerated timelines that are necessary to
maximize value, the Sellers need to make certain representations and warranties to the
Purchaser.

The following is a summary of the major categories of the material representations and
warranties made by the Sellers under the Purchase Agreement[49]:

❑    Ownership and legal status of Owned Real Property, Leased Real Property and
     Tangible Personal Property;

❑    Delivery of and status of Contracts;

❑    Ownership, legal status and infringement of Intellectual Property;

❑    Sufficiency of the Purchased Assets to operate the Core Telecom Business;

❑    Factual information regarding employee matters including compensation and benefit
     plans and arrangements, union matters and pension matters;

❑    Factual information regarding revenues for May to July 2002 and regarding the
     application of the Baseline Financial Statement Methodology[50];

---

[49] The detailed representations and warranties are contained in Article VI of the Purchase Agreement.

BCE-AD 0154426

❑     Ownership and legal status of Permits necessary to operate the Core Telecom Business;

❑     Required consents;

❑     Compliance with law; and

❑     Tax matters.

The representations and warranties made by the Sellers are made as of the date of the Purchase Agreement. The representations and warranties are brought forward to the IMA Date and expire on the later of the Closing Date and the first anniversary of the IMA Date. The representations and warranties are not brought forward to the Closing Date.

To the extent that either party believes the other has breached a representation or warranty and has suffered losses as a result of such breach, the process for providing notice of this breach and resolving it is discussed below under Notices of and Resolution of Disputes. The Purchaser retains the right of offset against the purchase price for any claims made for a breach of representations and warranties during the 90 day period following the IMA Date[51]. Thereafter, the Purchaser does not have the right of offset against the Final Purchase Price for any claims for a breach of representations and warranties.

There can be no certainty that claims for a breach of representation or warranty will not be asserted. Teleglobe has taken reasonable steps, under the circumstances, to protect against such a risk. The extent and nature of the representations and warranties has been limited to the greatest extent possible. Teleglobe has undertaken extensive disclosure and review with the Purchaser of the matters that are subject to the representations and warranties. In addition, in connection with the execution of the Purchase Agreement, Teleglobe Inc. and the Monitor have received a certificate from key members of the management team with knowledge of the Purchased Assets supporting certain of the representations and warranties provided by the Sellers in the Purchase Agreement.

---

[50] The Base Line Financial Statement Methodology is the methodology used to prepare the Closing Statement that will determine the adjustment to the purchase price relating to working capital.
[51] The amount of any such claims must be paid to the Escrow Agent pending the resolution of the dispute.

BCE-AD 0154427

Teleglobe and the Monitor believe that the representations that the Sellers are required to give pursuant to the Purchase Agreement are not unusual for an agreement of this nature and the circumstances surrounding the sale and are necessary in order to achieve the going concern price received. Completing the sale on an "as is where is" basis would likely have resulted in a materially lower purchase price.

<u>Notices of and Resolution of Disputes</u>

In the event that either the Purchaser or the Seller believes that a representation or warranty has been breached when made as of the date of the Purchase Agreement or the IMA Date, the party has ninety (90) days to provide a Breach Notice specifying the nature of such breach and the good faith estimate of Losses resulting therefrom. If the Purchaser delivers a Breach Notice prior to the 90th day after the IMA Date, an amount equal to the aggregate amount of such estimated Losses shall be deposited in the Escrow Account pending resolution pursuant to the terms of the Purchase Agreement. If a disputed amount remains with the Escrow Agent after the Closing Date, upon resolution of the dispute, the Disputed Amount in escrow shall be released to the applicable party based on the resolution of the dispute.

Section 5.2.5 of the Purchase Agreement sets out the Disputed Amount Settlement Procedure. This section provides for a 45 day period for the party receiving a Breach Notice to review the notice and decide if it intends to object. If the party intends to object, it must file a dispute notice. The parties then have a period of thirty days to negotiate in good faith to resolve the dispute. If the parties fail to resolve the dispute, it will be submitted for resolution to either an independent accounting firm, for accounting matters, or an arbitrator for other matters. The decision of these parties will be binding upon the Purchaser and Sellers and the costs of such a dispute resolution process shall be allocated between the parties based on the results of the claims and defenses.

BCE-AD 0154428

<u>Purchaser's Termination Rights</u>

The Purchase Agreement may be terminated by the Purchaser, on written notice to the Sellers:
in the following circumstances:

☐   If the IMA Date has not occurred prior to December 31, 2002 or the Closing has not
     occurred prior to August 31, 2003 (provided the Buyer has not caused such failure by
     breaching any of its representations, warranties, covenants or agreements contained in
     the Purchase Agreement;

☐   Prior to the IMA Date[52] if any of the Key Sellers' representations and warranties have
     been materially breached, except for breaches or inaccuracies that did not individually
     or in the aggregate, result in a Material Adverse Effect or any of the Key Sellers is in
     material breach of any material covenant contained in the Purchase Agreement, unless
     such breach or inaccuracy has been cured by the earlier of the IMA Date or 30 days
     following the date on which the Purchaser provides Teleglobe Inc. written notice
     thereof;

☐   On or after the IMA Date but prior to Closing, if any of the Key Sellers is in material
     breach of any of the covenants contained in section 8.13 (certain negative covenants of
     the Sellers) or section 8.15 (Migration Transactions) of the Purchase Agreement or any
     material covenant in the IMA or the UK IMA and such breach is caused by the actions
     of certain designated persons, unless such breach has been cured within 30 days
     following the date on which the Purchaser provides Teleglobe Inc. written notice
     thereof;

☐   If any bankruptcy court disapproves of the Purchase Agreement, the Interim
     Management Agreement or the UK Interim Management Agreement;

☐   If the Purchaser's right to receive the Break Fee or Expense Reimbursement are held to
     be unenforceable, in whole or in any material part or in the event of a Competing
     Transaction; or

BCE-AD 0154429

❑    If the Canadian Transaction Notice is not filed on or before the date that is five
        business days after the date of the Purchase Agreement, and if either of the Canadian
        Court or the U.S. Bankruptcy Court has not entered the applicable Sales Approval
        Order or such Sales Approval Order has not become Final Order on or before the date
        that is seventy five (75) days after the date of the Purchase Agreement.

Breakup Fee and Expense Reimbursement[53]

The Purchase Agreement provides for certain protections to the Purchaser that are customary
in transactions of this nature.

Except for specific circumstances[54], if the Sellers terminate the agreement or agree to
complete a Competing Transaction, Teleglobe will be obligated to pay a Breakup Fee in the
amount of $4,659,000.

Teleglobe is also liable under certain circumstances relating to the termination of the Purchase
Agreement for an Expense Reimbursement to the Purchaser in an amount not to exceed
$4,000,000 less the amount of up to $0.4 million actually received as provided for pursuant to
a letter dated August 2, 2002 from the Monitor to the Purchaser. Any Expense
Reimbursement that is less than $1.5 million will be deemed to be reasonable and any amount
in excess of $1.5 million shall require submission of reasonable documentation supporting
such excess amount.

Teleglobe's obligation to pay the Breakup Fee and Expense Reimbursement survives the
termination of the Purchase Agreement and Teleglobe is required to request that the CCAA
Court provide that the Breakup Fee shall be paid in priority to the Administration Charge, the
CCAA Lender's Charge and the Director's Charge and the Expense Reimbursement shall be
paid in priority to the Administration Charge and the Director's Charge, all as defined in the
Initial Order.

---

[52] So long as the Key Sellers are not then entitled to terminate the Purchase Agreement because of certain
breaches by the Purchaser.
[53] Section 11.3 of the Purchase Agreement.
[54] See Section 11.1.2 (a) or (b). However, if the Sellers terminate the agreement pursuant to Section 11.1.2 (a)
and, within 12 months, the Sellers publicly announce or enter into a definitive agreement for a Competing
Transaction, Teleglobe will be obligated to pay the Break-up Fee.

BCE-AD 0154430

## SUMMARY OF INTERIM MANAGEMENT AGREEMENT

The form of IMA is attached as Exhibit F to the Purchase Agreement. The conditions to the entering into the IMA have been previously discussed.

The terms of the IMA provide that TLGB Acquisition LLC (in the context of this agreement, the "Manager") shall manage the Core Telecom Business on behalf of the Sellers from the IMA Date until the Closing Date. The terms of the IMA provide that, in all material respects, if the Closing occurs, the risks and rewards of operating the business during the IMA period rest with the Manager.

The Manager is to manage the facilities and operations of the Core Telecom Business on behalf of the Sellers subject to the Sellers' continued ownership, operation and control of the Core Telecom Business. The Manager is subject to the reasonable supervision of the Sellers. For the purposes of receiving notices and granting approvals pursuant to the IMA, the Chief Executive Officer (currently Mr. John Brunette) and the designated officer of the Monitor (currently Mr. Benjamin Babcock) are jointly appointed as the Representatives under the IMA. Without the approval of the Representatives, the Manager does not have the authority to, *inter alia*:

- ❑    Terminate or modify any material contracts;

- ❑    Institute or defend any legal actions or proceedings;

- ❑    Terminate the employment of any employee or hire any new employees or make changes to the compensation arrangements with employees;

- ❑    Sell, lease or otherwise dispose of any Purchased Asset for an amount less than fair market value;

- ❑    Incur indebtedness or pledge the assets as security for indebtedness; and

- ❑    Enter into agreements to merge, consolidate or enter into any business combination, etc.

BCE-AD 0154431

The agreement provides for reasonable rights of access to information and books and records and good faith cooperation between the parties. The Manager is required to manage the business in accordance with applicable laws and regulations.

The Manager is responsible for the funding of the cash flow of the Core Telecom Business during the term of the IMA. The Manager has received a Commitment Letter from Cerberus Capital Management L.P. for $20 million to support its obligation to fund the Business Expenses of the Core Telecom Business after the IMA Date.

The IMA addresses various matters relating to services provided, liability under the agreement, termination provisions, employment matters, etc. that are standard for an agreement of this nature.

### APPROACH TO SELL PURCHASED ASSETS OUTSIDE NORTH AMERICA

Certain of the Purchased Assets are domiciled in the United Kingdom, Spain, Hong Kong and Australia. The Purchased Assets in the United Kingdom are under the administration of the UK Administrators.

In the United Kingdom, immediately prior to the effectiveness of the IMA, the UK Purchased Assets will be transferred down from Teleglobe International (UK) Limited and Teleglobe Holdings (UK) Limited to a newly formed company (the "UK Newco"). Effective as of the IMA Date, the Manager will manage UK Newco's business pursuant to the terms of the UK Interim Management Agreement (the "UK IMA"). The terms of the UK IMA are substantially similar to the terms of IMA previously described. At the Closing, the stock of UK Newco will be transferred first to Teleglobe Inc. and then to the Purchaser, and the UK IMA will terminate.

In order to facilitate the sale of the UK Purchased Assets in a manner acceptable to the UK Administrators, Teleglobe Inc. will, subject to Court Approval, enter into an agreement to acquire the shares of UK Newco for $8.4 million (the "UK Purchase Agreement"). This acquisition will occur concurrent with the transfer of assets to UK Newco referred to above. In connection with the Closing of the Purchase Agreement, Teleglobe Inc. will convey the UK

BCE-AD 0154432

Purchased Assets, via the transfer of UK Newco's stock, to the Purchaser. The UK Purchase
Agreement provides certain protections to the UK Administrators:  1) In the event that the
final Purchase Price (from the Purchaser or any other purchaser) is greater than $165 million,
Teleglobe Inc. shall pay 5.6% of such amount greater than $165 million; and 2) The UK
Administrators are entitled to retain up to $375k from amounts owing to Teleglobe Inc. to
provide for costs during the period from the IMA Date to the Closing Date. Teleglobe Inc. is
also providing a side letter to the UK Administrators to provide them further assurances on
certain financial matters. These assurances are not material to the transaction.

## ELECTION TO HOLD AN AUCTION

Pursuant to the Approved Bidding Procedures, the right to commence an auction was
specifically reserved and in the bidding procedures letter provided to prospective purchasers
they were specifically advised that there was no certainty that such a process would be
commenced. Pursuant to the bidding procedures approved by the U.S. Bankruptcy Court,
Teleglobe and the Monitor are required to consult with the U.S. Unsecured Creditors'
Committee regarding the decision to hold an auction. The Monitor has had a number of
discussions with the financial advisor to the U.S. Unsecured Creditors' Committee, the
advisors to the Teleglobe Lending Syndicate and the ad hoc committee of Teleglobe's
noteholders regarding the election to hold an auction. The Monitor and Teleglobe, including
the Chapter 11 Companies, have concluded that, under the circumstances, they will not elect
to hold an auction pursuant to the Approved Bidding Procedures.

## BELL CONTRACT

As previously discussed in this Report and the previous Reports, Bell is an important customer
of the Core Telecom Business. Bell's contract with the Applicant is one of the most valuable
assets of the Core Telecom Business. The Monitor has had a number of discussions with Bell
regarding the contract and its assignment to the purchaser of the business. Assignment of this
contract is a critical element to a successful sale and to realizing the benefits to Teleglobe's
creditors, customers and other stakeholders that would result from a sale.

BCE-AD 0154433

Due to the importance of the Bell contract to the Core Telecom Business, under the Purchase Agreement a condition to entering into the IMA is that the consent will have been obtained or the appropriate Bankruptcy Court will have issued an order addressing:

❏    Consent to assignment of the Bell contract to the Purchaser, waiver of applicable Change of Control provisions applicable to the transfer and waiver of all defaults arising prior to the dates of the consent or relating to the bankruptcy of any of the Sellers;

❏    Clarification to the limitation of liability language in the Bell contract; and

❏    Confirmation that BCE and its Affiliates, including Bell (but excluding Teleglobe Inc. and its subsidiaries), shall have no right of offset (including under the Bell Contracts) from and after the IMA Date, against the Core Telecom Business, the Purchased Assets (including Current Assets as of the IMA Date) or the Assumed Liabilities arising out of or relating to claims in respect of the assets and liabilities retained by the Sellers (i.e. the non-Core Telecom Business). From and after the IMA Date, payment arrangements under the Bell contracts, including the practice of offsetting payments and remittance of cash payment on a net basis, will continue in accordance with usual past practice.

The purpose of the latter confirmation is consistent with the structure of the Purchase Agreement which provides for the risks and rewards of ownership of the Core Telecom Business transferring to the Purchaser on the IMA Date.

Representatives of the Monitor and Teleglobe have met with Bell and discussed the terms required by the Purchaser relating to an assignment of the Bell contract. Bell has also been provided with a draft of the proposed Court order dealing with the assignment of the contract. A telephonic meeting attended by representatives of the Purchaser, Bell and the Monitor took place on September 6, 2002. It is the Monitor and Teleglobe's objective to address the issues associated with assignment of the contract on terms necessary to comply with the Purchase Agreement on a consensual basis. In the event that a consensual resolution of these issues cannot be achieved or to provide greater certainty to the Purchaser, Teleglobe intends to bring

ERNST & YOUNG                        - 29 -                        September 19, 2002

BCE-AD 0154434

a motion before this Court to address these issues following the receipt of Court approval of the Purchase Agreement and related matters by this Court.

## NOTICES AND TIMELINE TO APPROVE THE PURCHASE AGREEMENT

The following is a summary of the notice periods and timeline currently contemplated with respect to the required approvals of the Purchase Agreement and related matters to the IMA Date:

| Filing / Hearing | | Applicable Documents / Comments | Estimated Date |
|---|---|---|---|
| File Canadian Transaction Notice | - | Applicant's Motion Record to approve the sale of Core Telecom Business | September 20 |
| | - | Monitor's 11th Report | |
| | - | Purchase Agreement and Schedules and Exhibits | |
| File US Transaction Notice | - | US Debtor's notice to interested parties of the hearing motion to approve the sale of Core Telecom Business | September 20 |
| | - | Applicant's Motion Record to approve the sale of Core Telecom Business | |
| | - | Monitor's 11th Report | |
| | - | Purchase Agreement and Schedules and Exhibits | |
| File Bell Contract Hearing Notice | - | Applicant's Motion Record to approve the assignment of the Bell contract | October 1 |
| | - | Monitor's Report | |
| Canadian Transaction Hearing | - | Court hearing to approve the sale of the Core Telecom Business and related matters | September 30 |
| Bell Contract Hearing | - | Court hearing to approve the assignment of the Bell contract | October 7 |
| UK Transaction Report to Account | - | UK Administrators' Report | Between September 30 and October 9 |
| US Transaction Hearing | - | Court hearing to approve the sale of the Core Telecom Business and related matters | October 9 |
| IMA Date | - | 4 business days after the satisfaction of the conditions to enter into the IMA have been satisfied or waived | mid-November |

BCE-AD 0154435

Subsequent to the IMA Date, Teleglobe anticipates that it will take not less than three to six months to obtain all necessary regulatory approvals to satisfy the conditions of the Closing Date. Consequently, it is likely that the closing of the sale will occur in early 2003.

## ALTERNATIVES TO A SALE OF THE CORE TELECOM BUSINESS

Absent a sale of the Core Telecom Business, the most likely alternative would be the liquidation of the Core Telecom Business on a non-going concern basis and of the remaining Redundant Assets of Teleglobe for the benefit of its creditors. In the event that a sale could not be consummated, the Monitor believes that there would be limited support, if any, from Teleglobe's creditor groups or other stakeholders[55] to pursue other going concern alternatives for this business. It is unlikely that Teleglobe could maintain the support of the CCAA Lender to continue funding in the event a sale could not be completed. Alternative sources of funding would be extremely limited. The resulting non-going concern liquidation would have negative ramifications to Teleglobe's customers and creditors.

As discussed in the Monitor's Fifth Report, the cessation of operations of the Core Telecom Business that would result from a non-going concern liquidation scenario would have negative operational and telecommunications service continuity implications to Teleglobe's customers globally. The degree and duration of the negative implications to each customer will vary based on a number of factors, including the availability of alternative service providers and the level of back-up facilities in place. The duration of negative implications to customers will vary from negligible interruption to months of service interruptions.

The Monitor has analyzed the recoveries to creditors in a non-going concern liquidation and compared them to the recoveries to creditors if the transaction contemplated by the Purchase Agreement is consummated. In the event of a non-going concern liquidation of the business, the recoveries to creditors would be materially less than would be realized in the event the sale to the Purchaser under the terms of the Purchase Agreement were consummated. The estimated non-going concern liquidation value of the assets of the Core Telecom Business is materially less than the estimated Final Purchase Price. Due to the depressed industry

---

[55] Including customers and employees.

BCE-AD 0154436

conditions and the material diminution in value to receivables that would occur in a non-going concern liquidation, liquidation values are likely to be substantially less than the estimated Final Purchase Price. The contracts and network assets of the Core Telecom Business likely have limited value in a non-going concern sale. Liquidation would take a significant period of time and would require funding to complete. Even after considering the costs that will be incurred during the period required to obtain the necessary consents to satisfy the Closing Date conditions, the terms of the Purchase Agreement offer material financial benefits over a liquidation of the business on a non-going concern basis.

**EXTENSION OF THE STAY OF PROCEEDINGS IN CANADA**

In connection with the approval of the Purchase Agreement by this Court, the Applicant is seeking an extension of the stay of proceedings to November 30, 2002. This is the time period required to hold the necessary Court hearings in Canada and the United States to approve the Purchase Agreement and related documents and to satisfy the conditions to IMA Date. In the event that all of the required Court approvals are received and the conditions to implement the IMA are satisfied, the Applicant anticipates seeking a further extension of the stay of proceedings prior to implementation of the IMA.

A revised DIP Budget covering the period to the end of November 2002 is provided at Appendix 8 to this Report. As of the date of this Report, the Applicant has approximately $50 million outstanding under the DIP Loan. This amount is expected to be fully repaid by the end of September from the $65 million of proceeds from the sale of Teleglobe Inc.'s interest in Intelsat[56]. In connection with amendments to the DIP Loan that were approved on August 27, 2002, the revised DIP Commitment is $50 million after receipt of the Intelsat proceeds. Certain amendments to the DIP Commitment are being discussed with the CCAA Lender and will need to be made to ensure it is in place through the period of the requested extension of the stay of proceedings. Teleglobe, the Monitor and the CCAA Lender are discussing these issues to ensure financing is in place for the period prior to the implementation of the IMA.

---

[56] See the Monitor's 9th Report. This sale was approved by the Court on August 27, 2002.

BCE-AD 0154437

Based on the Revised DIP Forecast, the Applicant has sufficient financing through November 30, 2002. The Applicant and the Monitor anticipate pursuing discussions to address its financing requirements for the period after the IMA Date over the next several weeks with the requisite Court approval for such longer term DIP financing arrangements taking place prior to the IMA Date.

## MONITOR'S ANALYSIS AND RECOMMENDATION

Sale of the Core Telecom Business

This Report outlines the business justification for pursuing the sale of the Core Telecom Business and the marketing process that was used. The Applicant, the U.S. Chapter 11 Companies and the Monitor complied with the Approved Bidding Procedures and held a competitive transaction process. The Monitor, Teleglobe and Lazard conducted an auction-like process which resulted in the Purchase Agreement. Throughout the process, Teleglobe, the Monitor and its advisors communicated with the major stakeholders in these proceedings including the Teleglobe Lending Syndicate, the ad hoc committee of Telelgobe's noteholders and the U.S. Unsecured Creditors' Committee. All parties have acted in good faith throughout this process.

For the reasons outlined in this Report, the Monitor believes that the Purchase Agreement represents the highest and best offer[57] for the Core Telecom Business. The Monitor has compared the sale price achieved to the trading benchmarks for comparable public companies and to the valuation of recently completed restructuring proceedings. The estimated Final Purchase Price compares positively to these benchmarks. In addition to the Final Purchase Price, the Purchase Agreement provides other significant benefits to Teleglobe and the U.S. Chapter 11 Companies. The Purchaser will assume approximately $350 million of liabilities that relate to the business being sold including approximately $70 million of Cure Amounts

---

[57] Highest and best offer denotes the maximum realizable value for the assets being sold, taking into consideration not only cash consideration but also other factors that affect the value of the assets or the purchase price, such as the structure of the transaction (including purchase price adjustments), terms of the agreement exposing the seller to risk of loss (including indemnification and set off rights of the purchaser), conditions under which the purchaser can terminate the agreement or take other actions adverse to the seller, timing issues with respect to the transaction, quantity of assets being sold, issues relating to employees, customer relation issues and other issues having an impact upon the transaction or the seller.

BCE-AD 0154438

that the Purchaser is responsible for settling. This directly benefits both these creditors and Teleglobe's remaining creditors.

The most likely alternative to the sale outlined in this Report is a non-going concern liquidation of Teleglobe's assets. The Monitor has estimated the recoveries to creditors under this alternative and compared it to the estimated recoveries to creditors that will result from the consummation of the Purchase Agreement, including a range of purchase price adjustment scenarios. This analysis indicates that the consummation of the sale under the Purchase Agreement offers the prospect for materially better recoveries than would be realized in a non-going concern liquidation.

The implementation of the Purchase Agreement also provides significant benefits to Teleglobe's customers and employees. The going concern sale of the Core Telecom Business will ensure the continuity of service to customers and to a number of essential service providers. Failure to sell the Core Telecom Business on a going concern basis would likely result in significant service disruptions to a number of Teleglobe's customers around the world[58]. Many of these customers will not be able to secure alternative services for periods that range from hours to several months. This continuity of service issues is addressed with the sale of the business on a going concern basis. The going concern sale of the Core Telecom Business will also ensure the continued employment of approximately 550 people who will be retained by the Purchaser. As a result of the retention of these employees by the Purchaser, Teleglobe will save approximately $9 million in severance costs otherwise payable to these employees through the arrangements put in place at the outset of this CCAA proceeding.

While there can be no certainty that all of the conditions to the IMA Date and Closing Date will be satisfied, the Monitor believes that there is a reasonable probability that the conditions will be satisfied and, on balance, the benefits to Teleglobe's creditors, customers and employees associated pursuing the transaction contemplated by the Purchase Agreement significantly outweigh the risks associated with the Purchase Agreement.

---

[58] See the discussion of these implications in the Monitor's 5th Report date June 18, 2002.

ΞII *ERNST&YOUNG*                      - 34 -                      September 19, 2002

BCE-AD 0154439

For the reasons outlined in this Report, the Monitor recommends that the Court approve the Purchase Agreement and related documents necessary to implement the agreement with the Purchaser.

Extension of Stay of Proceedings in Canada

The Applicant is working with due diligence and in good faith towards pursuing the objectives and initiatives that it has outlined to the Court. This is a complicated and difficult restructuring proceeding due to the scope of the Applicant's global operations, its legal structure, the nature of the Applicant's business and assets and the depressed industry conditions in the telecommunications sector. As discussed in this and the previous Reports, the Applicant has moved promptly to pursue options to maximize value to creditors in a cost effective and responsible manner. Based on the results of the transaction process to date, it appears that a sale of the Core Telecom Business is a viable alternative that provides demonstrable benefits to Teleglobe's creditors as compared to liquidation.

It will take until the middle of November to hear motions in Canada and the United States, as well as complete the necessary processes in the United Kingdom, seeking the approval of a sale of the Core Telecom Business and for the applicable appeal periods to expire. If necessary, within this time period, a motion to address the assignment of the Bell contract will be heard. These are all of the primary conditions to the IMA Date. The other conditions to the IMA Date will be addressed during this period.

For the reasons outlined in this Report, the Applicant and the Monitor believe that they have sufficient financing during this period.

The Monitor recommends that the Court grant the Applicant's request to extend the stay of proceedings to November 30, 2002. Teleglobe is likely to seek a further extension to the stay of proceedings in connection with the execution of the IMA and approval of its financing arrangements during the post IMA period to the Closing Date.

BCE-AD 0154440

All of which is respectfully submitted by:

**ERNST & YOUNG INC.**
In its capacity as Court Appointed Monitor of Teleglobe Inc. and certain of
its subsidiaries

Per:

Benjamin J. Babcock
Senior Vice-President
416-943-3917

BCE-AD 0154441

# GOLDSTEIN,
# FLANZ & FISHMAN
S.E.N.C.
### AVOCATS ET PROCUREURS
### BARRISTERS AND SOLICITORS

September 25, 2002

YOINE GOLDSTEIN
LEONARD W. FLANZ
AVRAM FISHMAN
MARK SCHRAGER
GILLES PAQUIN
MARK E. MELAND
ALAIN DAIGLE
NANCY GROSS
DOMINIC VEILLEUX

**BY TELECOPIER**

**Mr. H. Arnold Steinberg**
c/o Cleman Ludmer Steinberg Inc.
2 Alexis Nihon Plaza
Montreal, Quebec   H3Z 3C1

**Mr. Paul H. Farrar**
159 Wimbelton Road
Toronto, Ontario   M9A 3S8

**Mr. J. Bruce Terry**
356 Glencairn Avenue
Toronto, Ontario   M5N 1V1

Gentlemen:

I enclose herewith a copy of a self-explanatory letter which I received from Marc Ryan.

I have left a message for him again because I want to ascertain whether a sale would take place before the American Court approval of the sale, because I would be prone to recommend that you stay on until then since the IMA will not come into effect until there is American Court approval.

Yours very truly,

**GOLDSTEIN, FLANZ & FISHMAN**

Yoine Goldstein

YG:jdr
Encl.
Steina.5\directors-45.ltr

1250 BOULEVARD RENÉ-LÉVESQUE OUEST, SUITE 4100, MONTRÉAL (QUÉBEC) H3B 4W8
TÉLÉPHONE: 514.932.4100  TÉLÉCOPIEUR: 514.932.4170

BCE-AD 0154442

09/26/02 JEU 09:49 FAX 514 932 4170    GOLDSTEIN FLANZ FISHMAN    ☒003
09/24/02 TUE 09:19 FAX 514 786 3801    BELL LAW DEPT    ☒001

**BCE**
*Bell Canada
Enterprises*

September 24, 2002

Mr. Yoine Goldstein
GOLDSTEIN FLANZ & FISHMAN
1250 René-Lévesque Boulevard West
Suite 4100
Montreal, Quebec
H3B 4W8

Marc J. Ryan
Corporate Secretary

Dear Mr. Goldstein:

Subject:    *Teleglobe Inc. – Your Letter Dated September 18, 2002.*

I acknowledge receipt of your letter dated September 18, 2002 in which you indicate that the current Teleglobe directors intend to resign on the earlier of the Court approval of the core asset sale and disposition of BCE's shares in Teleglobe.

I left a message at your office on Friday, September 20, 2002 as I had undertaken to speak to you by that time. In any event, with reference to your letter, it is not currently intended that a disposition of BCE's investment in Teleglobe shares take place before Court approval of the sale by Teleglobe of its business, currently expected for September 30, 2002.

Should you wish to discuss this matter further, please do not hesitate to contact me.

Yours truly,

MJR/ad

C.:    M. Turcotte
      M. Lalande

0200000\1825V1

BCE Inc.
Bureau 3700
1000, rue de La Gauchetière Ouest
Montréal (Québec) H3B 4Y7

www.bce.ca

Telephone: (514) 870-8777
Direct line: (514) 870-8144
Fax: (514) 786-3801
marc.ryan@bell.ca

09/24/2002 TUE 10:18  [TX/RX NO 9189]

BCE-AD 0154443

09/26/02  JEU 09:49 FAX 514 932 4170        GOLDSTEIN FLANZ FISHMAN                     @004

# GOLDSTEIN,
# FLANZ & FISHMAN
S.E.N.C.
AVOCATS ET PROCUREURS
BARRISTERS AND SOLICITORS

September 25, 2002

YOINE GOLDSTEIN
LEONARD W. FLANZ
AVRAM FISHMAN
MARK SCHRAGER
GILLES PAQUIN
MARK E. MELAND
ALAIN DAIGLE
NANCY GROSS
DOMINIC VEILLEUX

**BY TELECOPIER**

**Mr. H. Arnold Steinberg**
c/o Cleman Ludmer Steinberg Inc.
2 Alexis Nihon Plaza
Montreal, Quebec  H3Z 3C1

**Mr. Paul H. Farrar**
159 Wimbelton Road
Toronto, Ontario   M9A 3S8

**Mr. J. Bruce Terry**
356 Glencairn Avenue
Toronto, Ontario   M5N 1V1

Gentlemen:

I enclose herewith a copy of the Monitor's Twelfth Report dated September 24, 2002.  It deals entirely with the proposed settlement with Nortel and certain consequences (the impact on the UK administration) flowing therefrom.

Yours very truly,

**GOLDSTEIN, FLANZ & FISHMAN**

Yoine Goldstein

YG:jdr
Encl.
Steinm_SWFresas1-44.ltr

1250 BOULEVARD RENÉ-LÉVESQUE OUEST, SUITE 4100, MONTRÉAL (QUÉBEC) H3B 4W8
TÉLÉPHONE: 514.932.4100  TÉLÉCOPIEUR: 514.932.4170

BCE-AD 0154444

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 23, 2006, I electronically filed a true and correct copy of

foregoing document was filed with the Clerk of the Court using CM/ECF, which will send

notification that such filing is available for viewing and downloading to the following counsel of

record:

Gregory V. Varallo, Esq.                    Joseph A. Rosenthal, Esq.
Robert J. Stern, Jr., Esq.                  Rosenthal, Monhait & Goddess, P.A.
Kelly E. Farnan, Esq.                       1401 Mellon Bank Center
Anne S. Gaza, Esq.                          P.O. Box 1070
Richards, Layton & Finger, P.A.             Wilmington, DE  19899-1070
920 N. King Street
Wilmington, DE  19801

I further certify that on May 23, 2006, I caused a copy of the foregoing document on the

to be served upon the following non-registered participants in the manner indicated below:


BY EMAIL

John P. Amato, Esq.
Mark S. Indelicato, Esq.
Zachary G. Newman, Esq.
Jeffrey L. Schwartz, Esq.
Hahn & Hessen LLP
488 Madison Avenue
New York, NY  10022


Gregory V. Varallo, Esq.                          Joseph A. Rosenthal, Esq.
Russell C. Silberglied, Esq.-p                   Rosenthal, Monhait & Goddess, P.A.
Mark D. Collins, Esq.                             1401 Mellon Bank Center
C. Malcolm Cochran, IV, Esq.                      P.O. Box 1070
Robert J. Stern, Jr., Esq.                        Wilmington, DE  19899-1070
Kelly E. Farnan, Esq.
Anne S. Gaza, Esq.
Richards, Layton & Finger, P.A.
920 N. King Street
Wilmington, DE  19801


                                    */s/ Margaret B. Whiteman*
                                    Pauline K. Morgan (No. 3650)
                                    Maribeth Minella (No. 4185)
                                    Margaret B. Whiteman (No. 4652)
                                    YOUNG CONAWAY STARGATT & TAYLOR, LLP
                                    The Brandywine Building
                                    1000 West Street, 17th Floor
                                    Wilmington, DE 19801
                                    P.O. Box 391
                                    Wilmington, DE 19899-0391
                                    (302) 571-6681
                                    pmorgan@ycst.com
                                    mminella@ycst.com
                                    mwhiteman@ycst.com
                                    bank@ycst.com

                                    *Attorneys for Defendants*