# Exhibit 1

## RICHARDS, LAYTON & FINGER

A PROFESSIONAL ASSOCIATION
ONE RODNEY SQUARE
920 NORTH KING STREET
WILMINGTON, DELAWARE 19801
(302) 651-7700
FAX (302) 651-7701
WWW.RLF.COM

RUSSELL C SILBERGLIED
DIRECTOR

DIRECT DIAL NUMBER
302-651-7545
Silberglied@RLF.COM

March 16, 2006

**VIA FACSIMILE**

Jaculin Aaron, Esq.
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022-6069

Re:     **Teleglobe Communications Corporation et al. v. BCE, Inc., et al.**

Dear Jackie:

Thank you for your letter dated March 15, 2006. The "Supplemental Discovery Plan and Scheduling Order" provides that "document discovery with respect to expert witnesses shall be completed by April 21, 2006." It was not until I called George Wade that the parties even commenced talking about document discovery for experts. Thus, I do not understand the relevance of your contention that the April 21 date (not April 19, as set forth in your letter) "was [n]ever intended as the date for exchange of all expert documents." Simply put, there was no request for production from your side until yesterday.

With that said, if you need our assistance in identifying documents that were already produced to you on the live server, in order to assist your expert witnesses on rebuttal, we are willing to work with you. Indeed, attached to this letter is a copy of the only such document that you identified in your letter of yesterday. While it was previously produced in the live server production, we have now Bates stamped it for ease of reference.[1] If you have other documents that are truly necessary for your experts' ability to rebut Plaintiffs' experts' reports, we are willing to consider them and to work promptly, as we have done here. Once I determine how many documents you are seeking, I will be in a position to respond to you as to how long we need to turn around the request.

As for your statement that Defendants would be in a position to produce "the documents cited in their reports, and any back-up calculations for the summary calculations in their reports"

---

[1]   Your letter also mischaracterizes our telephone call. I did not state that Plaintiffs are "having some difficulty determining exactly which document [Ms. Taylor] was talking about." Rather, I stated that we had just commenced looking at the issue (since your request was made only the day before), and would have a response to you promptly

Jaculin Aaron, Esq.
March 16, 2006
Page 2

prior to March 24, 2006, that is not surprising. Presumably, you have no calculations to produce. The sum total of 15 pages of expert reports that you submitted last week contained no calculations and failed to address any issue on which Defendants bear the burden of proof due to the applicability of the entire fairness standard of review. Plaintiffs are greatly prejudice by the position you have taken and nothing in this letter is meant to waive any right that we have in that regard.

Finally, attached hereto for your review is a proposal of categories of documents that the parties will mutually exchange concerning their experts. I look forward to your input.

Very truly yours,

Russell C. Silberglied

RCS/lam
Attachments
cc:     George Wade, Esq. (via facsimile)
        John P. Amato, Esq. (via facsimile)
        Gregory V. Varallo, Esq.
        C. Malcolm Cochran, IV Esq.

## EXPERT DOCUMENT PRODUCTION

With respect to all categories below, the term "expert" shall mean anyone who issued or will issue an expert report in this case, as well as anyone assisting that individual, whether an employee or partner of that individual's firm or otherwise; provided, however, that categories (2) and (3) below shall apply only to each individual who have issued or will issue a report in this case.

1. All documents reviewed or relied upon by any expert (if already produced, just identify by Bates number).

2. All articles and publications authored, co-authored or edited by any expert within the past 10 years

3. Transcripts of all testimony given by any expert, whether in a deposition, trial, or before any governmental or quasi-governmental agency, within the past four years.

4. Drafts of reports.

5. Substantive correspondences or emails between any expert on the one hand and, on the other hand, any party to this litigation, any current or former employee of a party, any attorney for a party, or any non-party or its counsel, concerning Teleglobe or BCE; or any notes of any meetings, telephone calls or video conferences between or among such individuals in any expert's possession.

6. All working papers drafted or compiled by any expert in the scope of his or her engagement

7. All demonstratives, compilations or other visual, graphic or tabular summaries you intend to use at trial. This category shall be produced on a date later to be determined by the parties, rather than on or before April 21, 2006.

# SHEARMAN & STERLING LLP

599 LEXINGTON AVENUE | NEW YORK | NY | 10022-6069

WWW.SHEARMAN.COM | T +1.212.848.4000 | F +1.212.848.7179

jaaron@shearman.com                                                                    March 24, 2006
(212) 848-4450

Via Email silberglied@rlf.com

Russell C. Silberglied
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801

Teleglobe Communications Corp., et al. v. BCE Inc. et al.
04-CV-1266

Dear Russell:

I write in response to your letter of March 16, 2006, which I received yesterday (our office has
no record of having received it until you re-sent it yesterday). While we can certainly understand
your desire to keep obscure the bases of your experts' opinions, it is not appropriate to refuse to
disclose that information until April 21, 2006. We thought that we could work out an
appropriate and realistic discovery schedule, but it appears we were mistaken in that belief.

I note that there should be no problem in gathering the information that I referred to in my letter
of March 15. I was simply referring to the documents cited in your experts' reports; as you
know, we sent you the documents cited in our experts' report last Friday. If we don't obtain
material on which your experts based their conclusions a reasonable time in advance of the
deadline for submission of rebuttal reports on April 14, then we obviously cannot be expected to
address any issues revealed by that material in the rebuttal reports. We of course will reserve our
right to address them at trial.

Your suggestion that you will consider providing any documents that we specifically identify to
you is not a satisfactory solution. Nonetheless, I have attached hereto a mark-up of pages from
your experts' reports, showing the documents that are unidentified and that we request copies of
(or bates numbers for). In some cases, we were able to locate documents with the same title as

SHEARMAN & STERLING LLP IS A LIMITED LIABILITY PARTNERSHIP ORGANIZED IN THE UNITED STATES UNDER THE LAWS OF THE STATE OF DELAWARE, WHICH LAWS LIMIT THE PERSONAL LIABILITY OF PARTNERS

Russell C. Silberglied                                                          March 24, 2006
Page 2

listed in the reports.  However, as you know, many documents have multiple versions, and we
want to make sure that we are referring to the same documents relied on by your experts.  We
note that many of the documents listed by the experts refer to numbers that we cannot identify as
bates numbers of documents produced in this case.  *See, e.g.*, Taylor, Appendix B.  In addition,
we ask that you make available the public materials cited (in particular, the "Telegeography"
reports).

The list of other categories of documents attached to your letter is acceptable to us, except that I
believe we should discuss how to deal with materials in an expert's possession as to which the
expert has a confidentiality obligation in connection with another matter.  Given your insistence
on the date of April 21 for the exchange of those materials (as opposed to an earlier date), we
agree that the parties will exchange such materials then.

Finally, are not persuaded by your arguments concerning the length of your experts' reports.
Those reports would by substantially reduced in length and bulk if you excised from them the
long sections of lawyers' arguments, attempts to introduce inadmissible evidence, interpretations
of the facts, pronouncements on subjects in which the expert has no expertise, and other matters
that are obviously not appropriate for expert testimony.


Very truly yours,

Jaculin Aaron


JA/mmt

# Exhibit 2

1

1    IN THE UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF DELAWARE

3    *******************************************

4    TELEGLOBE COMMUNICATIONS           :
     CORPORATION,  et al,
5                                       :
                    Plaintiffs,
6                                       :
                    vs.                      Civil Action No.
7                                       :    04-CV-1266 SLR
     BCE, INC., MICHAEL T. BOYCHUK,
8    MARC A. BOUCHARD, SERGE FORTIN,:
     TERENCE J. JARMAN, STEWART
9    VERGE, JEAN C. MONTY, RICHARD  :
     J. CURRIE, THOMAS KIERANS,
10   STEPHEN P. SKINNER and          :
     H ARNOLD STEINBERG,
11                                      :
                    Defendants.
12   *******************************************

13

14

15        Deposition of PAUL CHARNETZKI, taken

16   pursuant to notice in the law offices of Richards,

17   Layton & Finger, Conference Room 3E, One Rodney

18   Square, 920 North King Street, Wilmington, Delaware,

19   on Wednesday, May 3, 2006, at 8:46 a.m., before

20   Lorraine B. Marino, Registered Diplomate Reporter

21   and Notary Public.

22

23        ELLEN GRAUER COURT REPORTING CO. LLC
            126 East 56th Street, Fifth Floor
24              New York, New York 10022
                   212-750-6434
25                 REF: 80591

2

```
1   APPEARANCES:

2                   GREGORY V. VARALLO, ESQ.
                    Richards, Layton & Finger
3                   One Rodney Square
                    920 North King Street
4                   Wilmington, DE  19801
                      for Plaintiffs
5
                    STUART J. BASKIN, ESQ.
6                   BRYNNA CONNOLLY, ESQ.
                    Shearman & Sterling
7                   599 Lexington Avenue
                    New York, NY  10022-6069
8                     for Defendants

9   ALSO PRESENT:

10                  V. V. COOKE, ESQ.
                    Teleglobe Associate General Counsel
11
                              -  -  -
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                          INDEX

 2   WITNESS                                  Page

 3   PAUL CHARNETZKI
```

```
 4        By Mr. Baskin---------------------     5
          By Mr. Varallo--------------------   279
 5
     CHARNETZKI DEPOSITION EXHIBITS          Marked
 6
      1  Mr. Charnetzki's report dated 3/8/06    5
 7
      1A Errata to Mr. Charnetzki's report----   6
 8
      2  Four-page schedule of contract payments 6
 9
      3  Document entitled "Expert Document
10         Production," prepared by Mr. Charnetzki  55

11    4  Printout from Huron's Web site--------   74

12    5  7/23/01 BCE/Teleglobe commitment letter 88

13    6  Teleglobe strategic review, dated
           8/30/01-------------------------------  127
14
      7  Charnetzki valuation model------------  136
15
      8  Mr. Charnetzki's handwritten voice
16         revenue rate of growth figures--------  147

17    9  Charnetzki work paper number RES093348  150

18   10  E-mail string dated 9/5/01, with
           attachments--------------------------   153
19
     11  Mr. Charnetzki's list of comparable
20         companies-----------------------------  162

21   12  Goldman Sachs Project B3 report, dated
           6/13/01------------------------------   166
22
     13  Valuation of standalone voice business,
23         dated 7/10/01------------------------   181

24   14  Document entitled "Preliminary
         Assessment of Teleglobe Options,"
25         dated 10/25/01-----------------------   186
```

4

1    CHARNETZKI DEPOSITION EXHIBITS, Cont'd.    Marked

2    15   Document entitled "Teleglobe Business
          Plan," dated 5/14/02------------------    200
3
     16   Affidavit of Mr. Babcock dated October
4         2002----------------------------------    227

5    17   Affidavit of Mr. Brunetted dated
          10/8/02-------------------------------    238
6
     18   Lazard Freres Teleglobe report dated
7         5/9/02--------------------------------    249

8    19   NERA rebuttal report, dated 4/14/06---    253

9                            - - -

10   (Exhibits attached to original transcript and copies.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

```
 1              PAUL CHARNETZKI, having been first duly
 2   sworn, was examined and testified as follows:
 3                        *    *    *
 4   BY MR. BASKIN:
 5         Q.        Mr. Charnetzki, how long did you
 6   prepare for this deposition, sir?
 7         A.        I don't know quite how to answer that.
 8   I wrote an expert report.  I did that.
 9         Q.        Well, how long have you sat with
10   Mr. Varallo in preparation for today's session?
11         A.        From about 9:30 yesterday till about
12   6:00.
13         Q.        And was anyone present other than
14   Mr. Varallo at the time?
15         A.        No.
16         Q.        Now, let me hand you, sir, what we
17   will mark as Charnetzki Exhibit 1.
18                   (Charnetzki Deposition Exhibit No. 1
19   was marked for identification.)
20   BY MR. BASKIN:
21         Q.        I was given today, sir -- by the way,
22   that is the report you issued in connection with this
23   matter; is that correct?
24         A.        Yes, sir.
25                   MR. BASKIN:  I was given today a set
```

6

CHARNETZKI

1  of errata, which we will mark as Charnetzki Exhibit

2  1A.

3  (Charnetzki Deposition Exhibit No. 1A

4  was marked for identification.)

5  BY MR. BASKIN:

6  Q.    Let me hand you, sir, the errata

7  sheet.  Apart from what is on the errata sheet, is

8  there anything that you want to change in your report

9  as you sit here today?

10  A.    No, sir.

11  MR. BASKIN:  Now, in addition, I was

12  provided this morning with a document stamped "draft"

13  on four pages.  Let's mark that Charnetzki Exhibit 2.

14  (Charnetzki Deposition Exhibit No. 2

15  was marked for identification.)

16  MR. BASKIN:  A copy to Mr. Varallo.

17  THE WITNESS:  Yes, sir.

18  BY MR. BASKIN:

19  Q.    And can you just describe for the

20  record what Charnetzki Exhibit 2 is, sir?

21  A.    There was a point raised about one of

22  the witnesses for BCE in their report.  I believe it

23  was Mr. Livnant, who said that he would prefer the

24  column marked payments due in current quarter, which

7

CHARNETZKI

1
2  in the original report has contract payments, which
3  were the contracts which Teleglobe had entered into to
4  complete the GlobeSystems, that he would prefer those
5  just to have the payments that were scheduled for --
6  and I wasn't quite sure what he meant, but the current
7  quarter, the next quarter or for the next year.  So we
8  have four variants of that which I ran off, I queried
9  off the database, which the first page is the payments
10  due in the current quarter.  Then there would be
11  payments due in the next quarter.  The third page is
12  payments due this quarter and the subsequent three
13  quarters.  And the fourth page is payments due in
14  subsequent four quarters.
15        Q.     Okay.  Thank you.
16        A.     And that was responsive to a point he
17  had raised.
18        Q.     Okay.  Now, Charnetzki Exhibit 1
19  contains an Appendix II, which sets forth a variety of
20  materials, documents, deposition excerpts, exhibits
21  and the like.  Do you see that, sir?
22        A.     Yes, sir.
23        Q.     And have you relied upon any materials
24  other than what is in Charnetzki Exhibit II in
25  preparation of your report?

8

CHARNETZKI

A.      Well, I mean, other than sort of
general knowledge and my experience.  I think we tried
to put everything on this.  If we left something off,
we did.  But I believe we tried -- it is fairly
lengthy, because we did review a lot of documents.

I think subsequent to this report some
other documents that, for instance, your experts had
found I have looked at.  So they wouldn't have been
used in the preparation of this report because they
were found subsequent.

And also I think -- I don't know that
we had had it at the time, but there is a contract
from Teleglobe to BCE and Bell Canada about the
relationship among them for terminating traffic and
carrying traffic, which I looked at.  I think it is
referenced -- a summary of it is referenced in the
report.  But I think I have looked at the contract
since then.

Q.      And when you referenced a second ago
documents that were cited on our expert report that
you looked at subsequent to the preparation of yours,
do any such documents come to mind, sir?

A.      I believe there is a valuation
prepared by I believe it is Goldman Sachs that is in

9

CHARNETZKI

1

2  the reports of Dr. Taylor and Dr. McLaughlin, which I

3  had not seen prior to the preparation of the report,

4  that I have looked at.

5          They also cite a July, I think -- a

6  June or July study which we have not located, and I

7  don't know that it has been produced to us.  So I

8  haven't seen that, but that that does come to mind.

9          Q.      June-July study of what, sir?

10         A.      I believe it is a June or July

11 forecast for Teleglobe that I believe is cited in the

12 report.  It has got a Bates number of TEAC, something

13 like that.

14         Q.      And you are saying it was not produced

15 to you as part of this litigation?

16         A.      I have not been able to locate it if

17 it has been produced.  A lot has been produced, but I

18 have not been able to locate it.

19         Q.      What is the description of this

20 document?  What does it purport to be, as you recall

21 it, sir?

22         A.      It is a forecast of Teleglobe that was

23 prepared in the summer of 2002.

24         Q.      The summer of 2002?

25         A.      Yes.

10

1                              CHARNETZKI

2          Q.          Apart from that and the Goldman Sachs

3    valuation material, can you think of anything else

4    that you have referenced since the preparation of your

5    report that is not found in Exhibit II, Tab 2 to

6    Charnetzki 1?

7          A.          I reviewed again specifically the

8    Canadian accounting standards Mr. Cetkowski

9    references.  But -- that is not listed in my report,

10   but I have looked at those.

11                     I can't recall anything else.

12         Q.          Now, have you read the reports of

13   other experts issued in this matter?

14         A.          Yes, sir.

15         Q.          Which reports do you recall reading?

16         A.          Mr. Cetkowski, Mr. Livnant,

17   Mr. Fisher, Drs. Taylor and McLaughlin, Ms. Taylor,

18   mine, the CompassRose report.  So those would be all

19   the ones -- I think all the expert reports that have

20   been produced.

21         Q.          Now, so we don't trip over each other,

22   can we refer to Dr. Taylor and Ms. Taylor in that way,

23   and we will differentiate between the two Taylors?

24         A.          I will try.

25         Q.          Is that okay with you?

1                          CHARNETZKI
2              Now, have you had discussions with any
3    other experts in this matter since the issuance of
4    your report?
5         A.        Since issuing the report, yes.
6         Q.        Okay.  With which experts have you had
7    discussions, Mr. Charnetzki?
8         A.        I was on a conference call after the
9    initial reports were issued where some people from
10   FTI, Ms. Taylor and her colleagues were on.  And I
11   believe people from ConpassRose may have been on the
12   call, too, but -- I don't recall that, but I believe
13   that was the case.
14        Q.        And when was this conference call,
15   Mr. Charnetzki?
16        A.        A couple days after the initial
17   reports were issued.
18        Q.        And who was on from your side, in
19   connection with Huron?
20        A.        I was, Mrs. Hayes and Ms. Gordecka,
21   and Mrs. McKenzie.
22        Q.        And how long did this conference call
23   with Ms. Taylor last, sir?
24        A.        There were also lawyers on the call.
25        Q.        How long did the call last, sir?

12

                              CHARNETZKI

1

2        A.         An hour or so.

3        Q.         And which lawyers were on the call?

4    Was Mr. Varallo on the call?

5        A.         I don't recall if he was or not.

6    Mr. Silberglied was, I am fairly sure.  I believe

7    Mr. Varallo was on.  I don't recall beyond that.

8        Q.         Now, is that the first and only time

9    that you were on a call with Ms. Taylor, sir?

10       A.         No.  I have talked -- I or people on

11   my staff have talked to her subsequently.

12       Q.         Subsequent to that call you just

13   referenced?

14       A.         Yes.

15       Q.         Did you yourself speak to her

16   subsequent?

17       A.         I don't recall personally speaking to

18   her other than briefly, but --

19       Q.         And what do you recall briefly

20   discussing with her subsequent to the conference call

21   you had after the issuance of the reports,

22   Mr. Charnetzki?

23                  MR. VARALLO:  I would caution the

24   witness, to the extent you were speaking with Carlyn

25   Taylor at the request of attorneys to help attorneys

13

CHARNETZKI

1
2    prepare for examining the other side's experts, you

3    can say that broadly, but I wouldn't get into

4    specifics.

5                    THE WITNESS:  That was one of the

6    topics of the conversation.  And the other topic of

7    the conversation was her preparation of her rebuttal

8    report.

9    BY MR. BASKIN:

10        Q.      And did you discuss with her what was

11   going to go into her rebuttal report, Mr. Charnetzki?

12        A.      She told me what was going to go into

13   her rebuttal report.

14        Q.      And did she ask for your comments?

15        A.      I read it and I gave her some

16   comments, yes.

17        Q.      You read her rebuttal report in draft?

18        A.      I think I read it the day before it

19   was issued, yes.

20        Q.      And you gave her some comments; is

21   that correct?

22        A.      Yes.

23        Q.      And in connection with the comments

24   you gave her, did you mark it up and send her comments

25   or read it to her over the phone?

14

CHARNETZKI

1        A.        One of her colleagues handed me the

2    draft.  I read it.  I don't think I actually marked

3    it.  I called either Carlyn or one of her colleagues,

4    and Ms. Taylor's colleague took the report back.

5        Q.        And you read your comments to

6    Ms. Taylor's colleague; is that what you are saying?

7        A.        I believe so, yes.

8        Q.        That is in connection with the

9    rebuttal report now we are talking about?

10       A.        Yes.

11       Q.        So you had -- subsequent to the

12   issuance of the first reports, you had a conference

13   call with Ms. Taylor and then this call you just

14   referenced?

15       A.        Yes.

16       Q.        And can you think of any other call

17   you have had with Ms. Taylor subsequent to the

18   issuance of the report, sir?

19       A.        No, but her staff might have called my

20   staff, but I don't know that.

21       Q.        You did not hear from your staff that

22   the staffs were in consultation with each other?

23       A.        I didn't -- there may have been times.

24   I am sure there were, but I don't know that they were

15

```
 1                        CHARNETZKI
 2    regular or extensive.
 3          Q.        You don't know if they are or you
 4    don't --
 5          A.        I don't think they were, no.
 6          Q.        Now, prior to the issuance of your
 7    report, did you also have conversations with
 8    Ms. Taylor?
 9          A.        Yes.
10          Q.        And on how many occasions did you and
11    Ms. Taylor have conversations prior to the issuance of
12    your first report, Mr. Charnetzki?
13          A.        There was a meeting here in Wilmington
14    where Carlyn and I were here.
15          Q.        Let's start with the meeting and then
16    we will get to -- was that the only time you
17    physically met with her?
18          A.        I believe so.  That's right.
19          Q.        Did you know her, by the way, prior to
20    this case?
21          A.        Yes.
22          Q.        Did you recommend her in this matter?
23          A.        No.
24          Q.        Did you ever work with her on prior
25    matters, Mr. Charnetzki?
```

16

1                             CHARNETZKI

2          A.         I worked with her on one prior matter,

3     competed with her on other matters.

4          Q.         Now, this meeting you referenced where

5     you and Ms. Taylor were together, when was that

6     meeting, sir?

7          A.         Earlier this year at some point.

8          Q.         Early this year meaning 2006?

9          A.         Yes.

10         Q.         We are talking about January, February

11    timeframe?

12         A.         I believe so, yes.

13         Q.         And was this shortly after your

14    engagement as an expert witness?

15         A.         Oh, no.  I had been engaged for quite

16    some time.

17         Q.         Now, we will get to that in a second.

18    So you met with her in these law offices?

19         A.         In, yes, sir, this floor.

20         Q.         And you think it was probably the

21    January timeframe; is that correct?  In and around

22    January?

23         A.         I believe that -- it could have been

24    February, but sometime this year.

25         Q.         Now, when you and Ms. Taylor met, who

17

1                          CHARNETZKI

2    else was present?

3          A.          Two people from the CompassRose firm

4    whose names escape me at the moment, but they were

5    here as well.

6          Q.          And by the way, what role did the

7    CompassRose firm play in all this?

8          A.          I believe -- I mean --

9                       MR. VARALLO:  Objection to the form of

10   the question.  You can answer.

11                      THE WITNESS:  I believe the other -- I

12   believe that's the firm that Ms. Walda -- I am

13   forgetting her last name right now -- was employed by.

14   BY MR. BASKIN:

15         Q.          That is a third expert?

16         A.          Yes.

17         Q.          And she was in attendance at this

18   meeting also?

19         A.          She was not.

20         Q.          But she had members of her staff in

21   attendance at this meeting?

22         A.          Yes.

23         Q.          So in these law offices you and how

24   many members of your staff were in attendance at this

25   meeting, Mr. Charnetzki?

18

1                        CHARNETZKI

2        A.        None.

3        Q.        Just you?

4        A.        Yes.

5        Q.        And how many members of Ms. Taylor's

6    staff were in attendance at this meeting, sir?

7        A.        None.

8        Q.        Just her?

9        A.        Yes.

10       Q.        And then Ms. Roseman had several staff

11   members present?

12       A.        I believe there were two.

13       Q.        And was Ms. Roseman and her team also

14   on the phone calls you referenced post issuance of the

15   reports?

16       A.        They were, I believe, on one of them.

17       Q.        They were on the conference call you

18   referenced?

19       A.        Yes.

20       Q.        But they were not in on the calls when

21   you and Ms. Taylor were talking one on one; is that

22   correct?

23       A.        No.

24       Q.        Now, when you met in these law offices

25   in January 2006, the three firms, were lawyers

19

                           CHARNETZKI
present?

     A.     Yes.

     Q.     Now, who were the lawyers from
Richard, Layton & Finger?

     A.     They were here.

     Q.     Were Hahn & Hessen present?

     A.     Ms. Amato was here.

     Q.     Was Ms. Morgan present?

     A.     I don't believe so.

     Q.     And anyone else present that you can
think of other than people we discussed thus far?

     A.     I believe Mr. Cooke was present.

     Q.     And can you tell us for the record who
Mr. Cooke is?

     A.     Mr. Cooke is counsel for Teleglobe.

     Q.     Anyone else present?

     A.     I believe Mr. Mongrain.

     Q.     Who?

     A.     Andre Mongrain.

     Q.     Mr. Mongrain was present?

     A.     Yes, at least for part of the meeting.

     Q.     Now, how long did this meeting last in
and around January 2005, when all the experts met in
these law offices?

20

CHARNETZKI

1   A.        Again, it may have been later than

2   that.  I was fairly busy this year, and I don't know.

3   But whatever it was, I think we started in the morning

4   and we ended at 4:00 or so.

5       Q.        And what were you discussing during

6   the course of that meeting, Mr. Charnetzki?

7       A.        I discussed my observations at that

8   point.  Ms. Taylor discussed hers, and the others

9   discussed theirs.

10      Q.        And were assignments given out during

11  the course of this meeting?

12      A.        Assignments had been given out prior

13  to that.  I believe I had collected exhibits and

14  things like that at that meeting.

15      Q.        And were assignments given out in the

16  course of that meeting to everyone in that meeting as

17  well?

18      A.        I am sorry.  My recollection is the

19  assignments had already been given out and we were

20  reporting on where we were.  I don't recall any

21  additional assignments given out at that meeting.

22      Q.        Now, was this the meeting, sir -- by

23  the time of this meeting had you decided what your

24  opinions were going to be in connection with your

```
1                        CHARNETZKI
2  report?
3         A.      I was well along.  I don't know that I
4  had finalized anything.
5         Q.      But you had substantially understood
6  what your opinions were going to be by the time of
7  this meeting?
8         A.      Yes.
9         Q.      And what about the other attendants at
10 the meeting?  Based on what she said, did you have the
11 impression that Ms. Taylor had already formulated her
12 opinion by the time of this meeting?
13        A.      No, I don't.  I don't recall -- I
14 don't recall if I had that impression or not.
15        Q.      And did you have the impression that
16 the representatives of the third firm, CompassRose --
17 is that what it is called?
18        A.      I think that's what it is called.  Is
19 that right?
20                MR. VARALLO:  Yes.
21 BY MR. BASKIN:
22        Q.      Did you have the impression that they
23 were in the process of formulating their opinions as
24 part of this meeting, sir?
25        A.      I believe that they had some
```

22

CHARNETZKI

1    preliminary observations.  I don't know that they had

2    completely formed their opinions.

3        Q.    Now, during the course of the seven

4    hours -- is that how long the meeting lasted in toto?

5        A.    We had lunch.  I remember now.  It was

6    Ash Wednesday, so whenever that was.  I went off to

7    Mass during that.  So it was Ash Wednesday, whenever

8    that was.  And it took, yes, with a break for some of

9    the participants' lunch and for me Mass; we went on.

10       Q.    And each side shared with the others

11   what their thoughts were at that point in time in

12   connection with this matter?

13       A.    Yes.

14       Q.    And each side commented on the other

15   side's thoughts; is that correct?

16       A.    There were comments, yes.

17       Q.    And did you reference the comments the

18   other people made?

19           MR. VARALLO:  Objection to the form.

20           THE WITNESS:  I don't understand.

21           MR. BASKIN:  Strike that.

22   BY MR. BASKIN:

23       Q.    At this point in time, sir, was a

24   draft of your report prepared?

23

CHARNETZKI

1

2      A.        I had a draft of my report, yes.

3      Q.        And did you circulate that to

4  everybody around the room?

5      A.        Yes.

6      Q.        And in the course of that meeting did

7  others comment on the draft of your report?

8      A.        Yes.

9      Q.        And did Ms. Taylor at that point on

10  the meeting on Ash Wednesday, did she have a draft of

11  her report prepared at that time?

12      A.        She may have, but it seemed to be --

13  my recollection, it was very preliminary.

14      Q.        And did she circulate her draft to all

15  the attendees at the meeting, sir?

16      A.        I recall looking at a document that

17  she prepared.  I don't know if -- yes.

18      Q.        And what about the CompassRose people.

19  Did they circulate a draft during the course of that

20  meeting, sir?

21      A.        Yes.

22      Q.        And I take it during the course of the

23  seven or eight hours minus the time you spent at Mass,

24  that each side commented on each other's drafts;

25  correct?

24

1                        CHARNETZKI

2        A.        Well, we are all on the same side

3   but --

4        Q.        I am sorry.  Each participant in the

5   meeting commented on everyone else's drafts; correct?

6        A.        I don't recall making, myself, very

7   many comments on other people's drafts at that point.

8   Other people did have comments on what I had said at

9   that point, so, you know -- and so I don't recall much

10  beyond that.

11       Q.        And did you consider everyone's

12  comments, sir, as they made them to you?

13       A.        Certainly.

14       Q.        Now, did other members of -- strike

15  that.

16                 Did other attendees at this meeting

17  comment on the other individuals' drafts as well?

18       A.        I don't recall if they did or they did

19  not.  I am sure that they did, but I don't recall any

20  specific comments.

21       Q.        And do you recall if Ms. Taylor was

22  taking notes as people were commenting on her draft,

23  sir?

24       A.        I don't recall if she was taking notes

25  or not.

25

1                          CHARNETZKI

2          Q.        You don't recall one way or the other?

3          A.        No.

4          Q.        Now, I take it the lawyers were

5    commenting on the drafts during the course of this

6    meeting?

7          A.        Yes.

8          Q.        And were you taking down what the

9    lawyers were saying, sir?

10         A.        I collected all the drafts.

11         Q.        You collected everyone's drafts around

12   the meeting?

13         A.        Yes.

14         Q.        And you took them home with you?

15         A.        I took them home with me.  I looked at

16   them.  To the extent there were things that -- I had

17   spelled a name wrong or something, made changes,

18   considered them and shredded them.

19         Q.        You shredded all the drafts marked up

20   at that meeting?

21         A.        Yes.

22         Q.        And is that your normal practice, to

23   shred the drafts, sir?

24         A.        Yes, sir.

25         Q.        And you do that in all cases in which

26

```
1                        CHARNETZKI
2    you testify?
3         A.        Yes.
4         Q.        And is that a practice you discussed
5    with Mr. Varallo before you did it in this matter,
6    sir?
7         A.        I told him what my normal practice
8    was.
9         Q.        And did you tell him you were going to
10   be shredding all drafts in this matter,
11   Mr. Charnetzki?
12        A.        Yes, I did.
13        Q.        And what did Mr. Varallo say to you,
14   sir?
15        A.        He said, "Is that your normal
16   practice?"  And I said, "Yes, it is."
17        Q.        And did you also -- strike that.
18                  When did you first tell -- you told
19   Mr. Varallo personally you were going to be shredding
20   drafts in this matter, Mr. Charnetzki?
21        A.        Yes.
22        Q.        When was the first time you told him
23   you were going to be shredding drafts?
24        A.        I don't recall.
25        Q.        Was it in and around the time of this
```

1                          CHARNETZKI

2    Ash Wednesday meeting, sir?

3          A.        No.  I think I may have told him that

4    probably before that.

5          Q.        Probably before even the Ash Wednesday

6    meeting you think you told him?

7          A.        Yes.

8          Q.        And did you tell the other lawyers in

9    this matter that you were going to be shredding all

10   drafts in this matter, Mr. Charnetzki?

11         A.        I don't recall.

12         Q.        Just Mr. Varallo?

13         A.        I don't recall whether I did or not.

14         Q.        You are saying no, you don't recall

15   telling him or you do recall telling him?

16         A.        I don't recall whether I did or not.

17   I may have.

18         Q.        But you recall he said to you if that

19   is your normal practice, it is okay for you to do it

20   in this matter; is that correct, Mr. Charnetzki?

21         A.        I don't recall if he said that or not.

22         Q.        So I take it if you said that about a

23   page ago, you are recanting that portion of the

24   testimony, sir?

25         A.        No.

28

CHARNETZKI

        MR. VARALLO:   Objection to the form of
the question.  Don't argue with him.  The record will
speak for himself.
BY MR. BASKIN:
        Q.      Are you changing your testimony if the
record says that, Mr. Charnetzki?
        A.      If I said that, I must have misspoke.
My recollection is I told him that.  He said, "Is that
your normal practice?"
        Q.      So that is your recollection?
        A.      Yes.
        Q.      And then you told him that is your
normal practice; is that correct?
        A.      Yes.
        Q.      And then you made the determination
you were going to shred all the drafts; correct?
        A.      And then I did shred all the drafts,
yes, sir.
        Q.      And you shredded all the comments that
everyone made in connection with the drafts; correct?
        A.      Yes.
        Q.      And you considered all the comments
that were made in the course of -- in preparing
subsequent drafts; correct?

29

                                CHARNETZKI

1

2          A.        Yes, sir.

3          Q.        Now, was that the only time the

4  experts in this matter got together in the flesh, in

5  person?

6          A.        I can't speak for everyone else, but

7  that is my only recollection of a meeting, yes, sir.

8          Q.        And certainly that was the only time

9  you met in person with the other experts; is that

10 correct?

11         A.        Yes, sir.

12         Q.        What about other members of your

13 staff?  Were they meeting with Ms. Taylor's staff?

14         A.        I don't believe that they ever met.

15         Q.        You are aware, though, that there were

16 other conversations between the various experts?

17         A.        Certainly.  I had other

18 conversations -- I had conversations subsequent to

19 that meeting with Ms. Taylor.

20         Q.        Did you have conversations prior to

21 that meeting with Ms. Taylor?

22         A.        I don't recall that I did, no, sir.

23         Q.        But subsequent to that meeting you do

24 recall having conversations with Ms. Taylor?

25         A.        Yes.

30

                              CHARNETZKI

1

2        Q.        Now, on how many occasions subsequent

3   to that meeting and prior to the preparation of your

4   report did you have conversations with Ms. Taylor?

5        A.        I don't know.  Maybe a half a dozen.

6        Q.        And you were on the phone and she was

7   on the phone?

8        A.        Yes.

9        Q.        And were there other people in

10  attendance on the phone along with you and Ms. Taylor?

11       A.        Generally speaking, I would expect,

12  yes.

13       Q.        Meaning members of your staff, you

14  would expect?

15       A.        Yes.

16       Q.        And you would expect members of her

17  staff to be on those calls also, Mr. Charnetzki?

18       A.        Yes.

19       Q.        And did you expect the lawyers to be

20  on those calls with you as well?

21       A.        They may have been and they may not

22  have been.

23       Q.        There were some calls when the lawyers

24  were present on the phone calls with you; correct?

25       A.        Yes.

CHARNETZKI

1

2      Q.       And you think there were other phone

3  calls where the lawyers were not; is that right,

4  Mr. Charnetzki?

5      A.       That's correct.

6      Q.       Now, let's focus for a second on the

7  phone calls that the lawyers were not on, to start.

8  You and Ms. Taylor are discussing the progress of your

9  respective reports?

10     A.       They may have been just scheduling

11  calls.  I don't recall any specifics of the

12  conversations that we had.  It may have been on

13  various items.

14              For example, I do rely on Ms. Taylor

15  for both the two reports that I used in my damage

16  computation for the April and May period, so I

17  certainly talked to her about those.

18     Q.       Do you recall her discussing with you

19  the progress of her report?

20     A.       Other than in generalities, no.

21     Q.       And do you recall her seeking your

22  comments on the approach she was taking?

23     A.       No, I am certain she did not.  I don't

24  recall her asking that at all.

25     Q.       Do you recall her asking for your

32

                            CHARNETZKI

1

2  comments on the conclusions she was reaching?

3        A.        No.

4        Q.        And were you asking for comments from

5  her on the conclusions you were reaching?

6        A.        No.

7        Q.        Were you asking for comments from her

8  on the approach you were taking?

9        A.        No.

10        Q.        So your testimony is in the course of

11  these phone calls you were discussing what;

12  scheduling?

13        A.        Scheduling.  But I do rely on her for,

14  as I said, the opinions that I set down here, so I

15  wanted to make sure that how I was using that work was

16  something that she would agree to and that she would

17  agree to and that she would think when her report was

18  issued that that was appropriate.  That's principally

19  what we discussed.

20        Q.        And why don't you spell it out a

21  little more for me, sir, what exactly you were

22  discussing with her, as you recall.

23        A.        As I recall, that was it.  We

24  discussed the April and May projections that had been

25  made by Teleglobe, where they came from, what was in

                          CHARNETZKI

1

2    them, were they feasible restructuring plans, those

3    sorts of things.

4        Q.        And were you discussing with her the

5    quantification of damages that you were obtaining in

6    connection with that?

7        A.        I don't recall discussing with her the

8    quantification of damages.

9        Q.        You just recall discussing with her

10   your valuation model?

11       A.        In general terms probably.

12       Q.        Are you saying you are guessing now or

13   you actually have a recollection of that,

14   Mr. Charnetzki?

15       A.        I don't know if I am guessing or not.

16   I have a recollection that -- I can't -- I don't have

17   a specific recollection of the conversation.  I would

18   think that we discussed that I would be putting in a

19   DCF kind of model and using something like the Gordon

20   growth at the end.

21       Q.        Now, did Ms. Taylor ask to see your

22   valuation model, sir?

23       A.        I don't recall that she did.

24       Q.        Did she ask to see the assumptions in

25   your valuation model?

                              CHARNETZKI

1

2        A.        I don't recall whether she did or not.

3        Q.        You don't recall one way or the other?

4        A.        No.

5        Q.        Do you recall if you shared with her

6    your valuation models?

7        A.        At one point she read a nearly done

8    version of the -- my draft, so the assumptions would

9    have been in there.

10        Q.        And were the assumptions and

11    sensitivities of your valuation models included in the

12    drafts that were circulated over Ash Wednesday?

13        A.        I don't believe so.

14        Q.        But subsequent -- when your report was

15    in draft, your valuation models were included;

16    correct?

17        A.        That's correct.

18        Q.        And you circulated that draft to

19    Ms. Taylor; correct?

20        A.        She certainly read it before it was

21    issued, yes.

22        Q.        And did you ask for her comments on

23    the valuation model?

24        A.        I didn't specifically ask for her

25    comments.

1                            CHARNETZKI

2          Q.        Did she offer you comments on the

3    valuation model?

4          A.        I don't recall her offering any

5    comments.

6          Q.        You don't recall what she said one way

7    or the other?

8          A.        I don't recall one way or the other.

9          Q.        Now, in all, then you said -- strike

10   that.

11                   In all, how many conversations did you

12   have with Ms. Taylor prior to the issuance of your

13   report and subsequent to the Ash Wednesday meeting in

14   which the lawyers were not involved?

15         A.        I would say one or two maybe.

16         Q.        And then you said you also had certain

17   conversations with Ms. Taylor when the lawyers were

18   involved; correct?

19         A.        That's right.

20         Q.        And in that connection do you remember

21   how many such conversations there were?

22         A.        Two or three.

23         Q.        And the two conversations, the one or

24   two you had with Ms. Taylor by yourself without the

25   lawyers, how long did that conversation last,

1                         CHARNETZKI

2    Mr. Charnetzki?

3         A.        They would have been very short.

4         Q.        By very short, half an hour?

5         A.        Oh, probably shorter than that.

6         Q.        But you are guessing; is that right?

7         A.        Yes.

8         Q.        You don't really remember the

9    conversations; right?

10        A.        I don't have a detailed recollection

11   of the conversations.

12        Q.        Well, do you have any recollection of

13   them other than what you have testified thus far?

14        A.        I have testified to my recollection to

15   the best of my ability.

16        Q.        Did you take notes during the course

17   of that conversation?

18        A.        Probably not.

19        Q.        And if you did take notes, I take it

20   you shredded them; is that correct?

21        A.        If I took notes, then I have not

22   preserved them.

23        Q.        Now, in connection with the

24   conversations with the lawyers present subsequent to

25   Ash Wednesday and prior to issuance of your report --

37

CHARNETZKI

1
2   you may have said this, but if so, I don't recall --
3   how many such conversations did you have?
4       A.      I believe there were two to three.
5       Q.      And how long did those conversations
6   last, Mr. Charnetzki?
7       A.      Certainly under an hour is my
8   recollection.
9       Q.      Each one lasting under an hour?
10      A.      Certainly.
11      Q.      And do you recall what happened during
12  the course of those conversations?
13      A.      Basically the same things that were
14  in -- the same general topics that were in the
15  conversations when the lawyers were present -- weren't
16  present.
17      Q.      And did there come a time when you and
18  Ms. Taylor circulated subsequent drafts of your
19  respective reports to each other?
20      A.      Yes.
21      Q.      And how many of her drafts, how many
22  drafts of her report do you think you saw in toto,
23  Mr. Charnetzki?
24      A.      One.  And I may have seen a document
25  earlier, but I don't think -- that may not have been a

38

CHARNETZKI

1    draft of the report, because it was very preliminary.

2    But I think probably one draft of the report.

3

4        Q.    So you saw one draft, you recall

5    seeing one draft of her report; correct?

6        A.    Right.  I think that's right.

7        Q.    And this is prior to when she issued

8    them; right?

9        A.    Yes.

10       Q.    And was that draft report one of the

11   topics of some of these telephone conversations you

12   are referencing?

13       A.    Yes.

14       Q.    And was this a conversation with

15   lawyers present, without lawyers present?

16       A.    I believe lawyers were in the room.

17       Q.    This was in the room or on the

18   telephone?

19       A.    The lawyers were either in the room or

20   on the phone.  The lawyers may have been with me and

21   she was on the phone.  There may have been lawyers

22   with her and I was on the phone.  I don't recall all

23   of that, but --

24       Q.    But the lawyers were physically

25   present either with you or with Ms. Taylor at the

39

                              CHARNETZKI

1

2    time?

3         A.        Or they may have been on the phone.

4         Q.        You don't recall one way or the other?

5         A.        I know for sure there was one call

6    that I had where I believe Mr. Varallo and

7    Mr. Silberglied were with me and she was on the phone.

8         Q.        And when was that call?

9         A.        Probably a week or two before the

10   report was issued.

11        Q.        And is that the call where you were

12   considering her report in draft?

13        A.        Yes, I believe so.

14        Q.        And is that the report where you gave

15   her your comments with respect to her report?

16        A.        Yes.

17        Q.        And did Mr. Varallo give her comments

18   with respect to that draft report?

19        A.        He may have.  I don't recall.

20        Q.        You don't recall if he did on the

21   telephone conversation?

22        A.        I don't recall if he did on that

23   telephone conversation or not.

24        Q.        Did any other lawyer give her comments

25   on her draft in the course of that conversation?

40

CHARNETZKI

1     A.        I don't recall any specific comments

2     that they made.

4     Q.        You just remember --

5     A.        But there may have been -- but there

6     was -- thinking back on it, there probably were,

7     because we were going through, and some of them, you

8     know, were typos and things like that, so I probably

9     would have had.

10    Q.        And during the course of that

11    conversation you do recall you gave her comments;

12    correct?

13    A.        I don't recall any substantive

14    comments that I gave, no.

15    Q.        You were reading for typos?

16    A.        I was reading for just sort of general

17    comments, you know --

18    Q.        Is it your testimony you were

19    correcting her typos, Mr. Charnetzki?

20    A.        No.  I was reading just generally.

21    Q.        And you were communicating your

22    thoughts and ideas to her; correct?

23    A.        Yes.

24    Q.        Now, in the course of this

25    conversation was she also commenting on your draft?

1                          CHARNETZKI

2          A.        Yes.

3          Q.        And were you considering her comments?

4          A.        Yes, I did.

5          Q.        And were you taking notes on her

6   comments?

7          A.        I don't recall that I did, no.

8          Q.        And were her comments only with

9   reference to typos or was she commenting on the

10  substance of your draft?

11         A.        I don't recall that there were any

12  substantive changes that came out of her comments.

13         Q.        Well, do you recall what her comments

14  were, sir?

15         A.        No, not as I sit here today, no.

16         Q.        But you did recall what her comments

17  were at the time because you wrote them down; correct?

18         A.        Not most of them, no.

19         Q.        Well, those that you thought were

20  viable or valid you wrote down; correct?

21         A.        Yes.

22         Q.        And I take it that whatever document

23  you wrote her comments down on, you shredded that?

24         A.        Probably.  I may have just put them on

25  the electronic version of the report, in which case

42

CHARNETZKI

1  they would be in that.  To the extent that I put them

2  on a draft, a physical draft, I would then incorporate

3  them to the extent, you know, I thought it was a more

4  clear sentence than the one I had.  It would have been

5  for everybody.  And the physical thing I did destroy,

6  yes.

7  

8       Q.        Just so I understand, because I have

9  been through your box of materials you produced in

10  this matter or boxes, am I correct, sir, that you

11  destroyed every draft of your report prior to the

12  draft in front of you, prior to the final version in

13  front of you today?

14       A.        That was my intention, yes, sir.

15       Q.        Well, that was your conscious

16  decision; correct?

17       A.        Yes, sir.

18       Q.        And am I correct that you destroyed

19  every note that you took leading up to the preparation

20  of the report sitting in front of you today?

21       A.        I don't recall taking very many notes,

22  but -- and they would have been more in the nature of

23  edits to the draft.  And I don't retain edits in

24  drafts.

25       Q.        And so to the extent you took notes,

43

1                        CHARNETZKI

2    you destroyed them all; correct, Mr. Charnetzki?

3         A.        That's correct.

4         Q.        Every single one?

5         A.        Yes.

6         Q.        And every single draft; correct?

7         A.        Yes.

8         Q.        Now, did you discuss with Ms. Taylor

9    that she should destroy her drafts also?

10        A.        I don't recall discussing that.

11        Q.        You don't recall discussing that one

12   way or the other?

13        A.        I don't recall discussing that one way

14   or the other.

15        Q.        Now, let's discuss for a second, sir,

16   how you actually physically prepared -- well, strike

17   that.  Let's start somewhere else.

18                  When were you retained as a testifying

19   expert in this matter, Mr. Charnetzki?

20        A.        I believe sometime in the spring of

21   2005.

22        Q.        You have been working on this matter

23   since the spring of 2005?

24        A.        Yes, sir.

25        Q.        And at that time you were retained as

44

                        CHARNETZKI

1  a testifying expert?

2       A.       That was -- I believe that's right,
3  yes, sir.

4       Q.       And was that the first time Huron was
5  retained?

6       A.       I don't know that anyone other than
7  myself -- I believe so, yes.

8       Q.       You believe that when you were
9  retained, that's the earliest point that they were
10 retained as well?

11      A.       Yes.

12      Q.       And that would be in the spring 2005?

13      A.       That's correct.

14      Q.       Now, were you also retained -- in
15 addition to testifying, were you retained to give
16 consulting advice to the plaintiffs in this matter?

17      A.       I don't recall that -- to me it has
18 all been one engagement, so --

19      Q.       You have not drawn the distinction
20 between testifying and consulting in this matter;
21 right, sir?

22      A.       Everything I have done I have done in
23 preparation for eventual testimony.

24      Q.       Now, how large a team of Huron was

45

CHARNETZKI

1    assigned to this matter, Mr. Charnetzki?

2

3         A.        It has varied over time.

4         Q.        Well, in toto, how many people do you

5    think worked on this from Huron?  You keep track of

6    time by timekeeper, do you not?

7         A.        Oh, yes.

8         Q.        So in toto, how many people worked on

9    this matter, Mr. Charnetzki?

10        A.        Full-time, at sort of the peak

11   periods, oh, seven or eight, eight or nine.

12        Q.        And has there been a shifting team of

13   seven or eight or nine people working on this matter?

14        A.        I would say a core team of five or six

15   has been here most of the time that was done.

16        Q.        And they report up through you;

17   correct?

18        A.        That's correct.

19        Q.        And the expectation from the moment of

20   your retention was that you were going to be the

21   testifying expert; is that correct, sir?

22        A.        That's right.

23        Q.        Now, so in total you think

24   approximately eight or nine people billed time on this

25   matter from Huron?

46

CHARNETZKI

1   A.      I am sure more people than that billed

2   time, but I would say the core team was probably eight

3   or nine.

4   Q.      Do you think as many as 25 people

5   billed time on this, sir?

6   A.      I don't think as many as 25.  Maybe --

7   but I didn't look, because they would be very small

8   increments of time.

9   Q.      Now, did you view your assignment, in

10  addition to testifying, as providing litigation

11  support to the plaintiffs?

12  A.      I don't know.  I mean, I don't know

13  how to answer that.  To the extent that we did things,

14  for example, on the Oracle database, I guess that

15  would be sort of litigation support.  But I really

16  looked at that as part of the testimony.

17  Q.      You put together a database for the

18  plaintiffs?

19  MR. VARALLO:  Objection to the form.

20  BY MR. BASKIN:

21  Q.      Correct?

22  A.      Yes, we did.

23  Q.      And you shared that database with

24  them; correct?

1                          CHARNETZKI

2         A.        I don't know that they have actually

3    used it.  I think I principally have used it.

4         Q.        And out of this database -- strike

5    that.

6                    Have you helped the plaintiffs

7    organize documents in this matter?

8         A.        Other than organizing them for our

9    purposes and then giving them back to them, I don't

10   recall that we helped them organize documents in this

11   matter.

12        Q.        Now, did you help the plaintiffs

13   formulate questions to ask witnesses in this matter?

14                  MR. VARALLO:  You can answer that yes

15   or no.

16                  THE WITNESS:  Yes, I did.

17   BY MR. BASKIN:

18        Q.        And did you help the plaintiffs

19   interpret documents in this matter, sir?

20        A.        I may have, yes.

21        Q.        You are saying you don't have a

22   recollection of doing so or you do?

23        A.        Well, I mean, when I say I look at a

24   document, I mean, this report interprets documents, so

25   that might be helpful or not.  I don't recall anything

48

1                          CHARNETZKI
2    where they said necessarily, "Geez, what does this
3    mean?"  But that may have happened.
4          Q.        Now, and you were helping them in this
5    connection with respect to documents or in formulating
6    questions starting in the fall of 2005, spring of
7    2005?
8          A.        I was starting my work in the spring
9    of 2005.
10         Q.        Now, when did Carlyn Taylor, to your
11   recollection, come on board, sir?
12         A.        First quarter of 2006.
13         Q.        And I think you said it was not your
14   recommendation; is that correct?
15         A.        I did not recommend her.  I
16   recommended that a restructuring person be brought on.
17         Q.        And do you know how they came upon
18   Ms. Taylor?
19         A.        I would think that she was on -- would
20   be on any list where people went on to restructuring
21   experts, but I don't know how they contacted her or
22   anything like that.
23         Q.        So you don't know how they got to her?
24         A.        No.
25         Q.        Now, tell me how you worked with your

49

CHARNETZKI

1    staff in preparing your report.  Who drafted the first

2    draft of the report?

3    

4         A.         The first outline of it at least

5    topically was drafted by me.  Some of those topic

6    sentences probably still survive to this day.  So that

7    would be the first part.

8                    Then I probably turned to what I would

9    call the substantive exhibits; what are we trying to

10   show.  You know, we would talk about those issues, and

11   I would either sketch out what I thought the ultimate

12   exhibit would look like or people would have

13   suggestions.  We would sketch that out and work on

14   that.

15                   We would then do things like, well,

16   describe what the exhibit is in the report, how that

17   was done.  Other -- I might take a stab at that or

18   other people might take a stab at doing that and I

19   would edit or review the text that they would write.

20                   There is a section in the report that

21   is a time line of events.  That was more or less a

22   work in progress.  As people thought of things that

23   were significant to put down, they would add that, and

24   at various points in time we would look at it and say,

25   okay, this either should make the cut or we have

CHARNETZKI

1
2  already said that somewhere else.  You know, this is
3  already getting too long.  We will take that out.  Or
4  somebody would read something and say, well, we should
5  also comment on this thing that happened later.  So
6  that would be part of the draft.
7              At the end I made a last revision, and
8  then someone also went through to try to write it so
9  that it sounded like one person had drafted every
10 sentence, which -- you know, to make sure that we used
11 consistent style.
12       Q.       So as I understand it, you are saying
13 that multiple people wrote different sections of the
14 draft, of different drafts?
15       A.       Multiple people provided input to
16 sections of the draft.
17       Q.       Well, who wrote them?  Who actually
18 wrote words on a piece of paper, sir?
19       A.       Multiple people wrote words on a piece
20 of paper.  Principally it would have either been
21 myself or Dana Hayes.
22       Q.       And then all of these pieces of paper
23 floated up to you; correct?
24       A.       No, they were not all pieces of paper.
25 They were all electronic, looking at the electronic

CHARNETZKI

1
2  document, which we kept everything there so everybody

3  would be working off the same document.

4              So it didn't float up.  Well, I guess

5  it was in the ether.  Maybe that's a good description

6  of it.  But we would look at it on the database and

7  make revisions.  And at various points in time I would

8  meet with the people in the staff and say is this

9  saying what we want?  Is this exhibit clear enough?

10 Should we put more on it?  Should we put less on it?

11 That sort of thing.

12     Q.     Now, if Her Honor were to ask you

13 which words on that report were written by you and

14 which was written by your staff members, are you able

15 to answer the question?

16     A.     There are specific things that I

17 specifically remember writing and there are things

18 that I frankly would not remember who wrote.

19              The actual, for example, drafting of

20 the events that are in the boxes, I am almost sure

21 that I didn't type those words, but I probably put

22 down, you know, let's make sure this is in and make

23 sure that's in and people would have gone ahead and

24 drafted that.

25              I will tell you for sure almost all

CHARNETZKI

1
2    the citations were done by somebody else, who would

3    ask me where I got that fact, and I would say, "It was

4    from the deposition.  Would you please go look up what

5    page number it is on."

6        Q.        Now, did you actually review all the

7    materials found on Tab 2 of Charnetzki 1 or did

8    members of your staff review those materials?

9        A.        I reviewed a great many of them.  I

10   did not review every one.

11       Q.        And if Her Honor were to ask you which

12   of these materials you, in fact, reviewed and

13   considered, would you be able to do that, tell her

14   that, Mr. Charnetzki?

15       A.        It is quite a long list, and I could

16   not say for sure that, you know, by Bates number that

17   I reviewed these.  I think that I have looked at at

18   various points in time most of the things that are on

19   here and looked at those items, but if there was a

20   worksheet prepared by Teleglobe's accountants

21   certainly that sort of detailed Oracle database fees,

22   I didn't look at the detailed Oracle database entries.

23   I looked at reports drawn off the database.  So those

24   would be the sorts of distinctions that I would make.

25       Q.        So I take it in answer to my question,

53

CHARNETZKI

1  if Her Honor asked you which documents on Tab 2 of

2  Charnetzki Exhibit 1 you, in fact, reviewed and

3  considered, you would not be able to tell her; right,

4  sir?

5       A.       I can certainly tell her that there

6  are some I specifically recall reviewing.  Some I

7  recall reviewing and saying, you know, I guess this is

8  part of the stuff, but I don't recall specifically

9  what was in it at this point.  And there are certainly

10  a few documents on here that I did not review.

11       Q.       And by "a few," are we talking dozens?

12       A.       I don't have a good feel for that.

13       Q.       You don't have any idea; right, sir?

14       A.       I don't have a feel for that.

15       Q.       Now, did you instruct the members of

16  your staff that they should destroy all their prior

17  drafts and notes as well?

18       A.       I told them to comply with our policy,

19  which is that -- and generally speaking, what you have

20  is electronic, and that the final electronic versions

21  of the work papers that we have should be the ones

22  that we then printed and handed out to you.

23       Q.       Well, what I was handed, for example,

24  or what you prepared is a 116-page report; correct?

54

CHARNETZKI

1    A.        That's correct, sir.

2    Q.        And I assume this went -- this was not

3    the first version of this report; correct, sir?

4    A.        That's correct.

5    Q.        And I assume that the various members

6    of your staff were working on earlier drafts of this

7    report; correct?

8    A.        They certainly had access to the

9    electronic version, which was earlier, and I would

10   think at some point they may have printed them out.

11   But the only drafts that were to be retained were the

12   ones that -- what finally made it up into the

13   electronic database, electronic files, and those have

14   been printed out and produced to you.

15   Q.        You are saying the only materials that

16   were either in draft or electronically preserved are

17   the final version; right, sir?

18   A.        The final version or things that are

19   not included in the report that we have retained.

20   Q.        And so I think you said, but if not, I

21   would like to ask you again, did you, in fact,

22   instruct your staff that is the way they should

23   proceed?

24   A.        Yes, I did.

55

1                          CHARNETZKI

2        Q.        And you told them that versions of the

3    report either in draft, in paper or electronically

4    earlier versions should be erased or discarded; right,

5    Mr. Charnetzki?

6        A.        That's correct.

7                  MR. BASKIN:  Now, I am curious about

8    an exhibit.  Why don't we mark it as Charnetzki 3.

9    Let me hand you, sir, what we will mark as

10   Charnetzki 3

11                 (Charnetzki Deposition Exhibit No. 3

12   was marked for identification.)

13   BY MR. BASKIN:

14       Q.        Have you seen Charnetzki 3 prior to

15   today, sir?

16       A.        Yes, sir.

17       Q.        Did you see it as part of your witness

18   preparation?

19       A.        No.

20       Q.        When did you see Charnetzki 3,

21   Mr. Charnetzki?

22       A.        I sent this to -- I typed these words

23   that are there and sent them to Mr. Silberglied, I

24   believe.

25       Q.        So the words that are underscored

56

CHARNETZKI

1

2  under paragraph 2, "None within the last 10 years," or

3  with respect to paragraph 3, "I do not retain

4  transcripts.  I currently have two open matters, the

5  depo transcripts of which are" and then the document

6  ends, those are your words?  You typed them?

7      A.      Yes.

8      Q.      You physically typed them yourself?

9      A.      I physically typed them myself.

10     Q.      And you sent them back to

11 Mr. Silberglied yourself?

12     A.      Yes.

13     Q.      Now, when do you recall physically

14 typing those words, Mr. Charnetzki?

15     A.      Probably sometime in April.

16     Q.      And when you say probably sometime in

17 April, are you guessing or do you actually remember it

18 was in April?

19     A.      I don't know that I am guessing, but I

20 don't have an exact date.

21     Q.      Now --

22     A.      There is a word left out.  I think

23 "confidential" I certainly intended to type at the end

24 of the second sentence I typed.

25     Q.      So the second sentence cuts off --

57

                                CHARNETZKI

1
2    what is missing is the word "confidential"; correct?

3         A.        Yes.

4         Q.        Now, this document I take it that you

5    typed these words on, the original document before you

6    typed the words on was sent to you by the lawyers;

7    right?

8         A.        That's correct.

9         Q.        And when do you recall getting the

10   document from the lawyers, sir?

11        A.        Sometime prior to April 21. I don't

12   recall. It was in getting ready for doing the

13   production, so subsequent to this, the production of

14   this and April 21 (indicating).

15        Q.        And you will see paragraph 4 says that

16   part of the expert document production were drafts of

17   reports.

18        A.        And to the extent that I had them, I

19   would have produced them. But I don't have them.

20        Q.        And did you tell Mr. Silberglied you

21   didn't have drafts of reports?

22        A.        Yes.

23        Q.        And what did he say, sir?

24        A.        I don't recall he said anything.

25        Q.        You don't recall he said anything at

58

```
                              CHARNETZKI
 1
 2    all when you told him you have no drafts of reports?
 3         A.        I don't recall that he said anything
 4    at all.
 5         Q.        In this case when you had discussions
 6    with the lawyers, did they instruct you to preserve
 7    drafts, Mr. Charnetzki?
 8         A.        No, they did not.
 9         Q.        And I take it -- strike that.
10                   This conversation you recalled earlier
11    I think with Mr. Varallo, where he may -- I don't
12    remember where I left off in the record.  The record
13    is what it is.
14                   When did this conversation happen,
15    Mr. Charnetzki?
16         A.        I don't recall when it happened.
17         Q.        You know the conversation I am
18    referencing, the one where you discussed with him the
19    fact that you were going to be destroying drafts?
20         A.        Yes.
21         Q.        You don't recall when that happened?
22         A.        No.
23         Q.        If the Court asked you whether you
24    could electronically retrieve the electronic drafts
25    that you discarded, can you do that, sir?
```

59

CHARNETZKI

1

2    A.        I don't believe we can, no, sir.

3    Q.        What have been your billings to date

4    on this matter, Mr. Charnetzki?

5    A.        I don't have the exact number.   We

6    have been billing biweekly.   It has been substantial.

7    North of 2 million.

8    Q.        North of $2 million?

9    A.        Yes, sir.

10   Q.        And do you have time on the clock now

11   on this matter that has not yet billed?

12   A.        Yes, sir.   Today, for example.

13   Q.        Well, how much time do you think you

14   have on the clock that has not been billed?

15   A.        We sent a bill through April 30 on

16   Monday afternoon.   So since then.

17   Q.        So if we aggregate all the bills that

18   Huron sent, you think it would reach approximately

19   $2 million?

20   A.        I believe it would exceed that.

21   Q.        Would it exceed $3 million?

22   A.        I don't believe so, no.

23   Q.        So somewhere between 2 and $3 million?

24   A.        I think so, sir, yes.

25   Q.        Now, Mr. Charnetzki, let me ask you

60

```
1                        CHARNETZKI
2    this.  Do you consider yourself to be an expert on
3    bankruptcy reorganizations?
4         A.        I consider myself to be -- I have
5    certainly worked in bankruptcies.  I don't know.  I
6    consider myself to be an expert in accounting,
7    damages, and to the extent that those things have
8    involved solvency, I consider myself to be an expert
9    in that, yes, sir.
10                   I am sorry.  Would this be a good time
11   to take a break, if there is a new subject?
12                   MR. BASKIN:  Sure.  Let's take a
13   break.
14                   (Recess taken.)
15   BY MR. BASKIN:
16        Q.        When we broke, sir, we were discussing
17   your expertise in the bankruptcy reorganization area.
18   Do you recall that?
19        A.        Yes, sir.
20        Q.        Let me ask you it this way.  Back in
21   the years 2000, 2001 and 2002, apart from testifying,
22   did you ever represent a debtor with respect to any
23   bankruptcy ot reorganization proceeding?
24        A.        I did not represent a debtor, in my
25   recollection, in that context, no, sir.
```