# Exhibit 3

1

COPY

1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF DELAWARE

3    IN RE

4    TELEGLOBE COMMUNICATIONS        :  Chapter 11
     CORPORATION,  et al,              Case No. 02-11518 MFW
5                                    :Jointly Administered
     TELEGLOBE COMMUNICATIONS        :
6    CORPORATION,  et al,
                                     :
7                       Plaintiffs,
                                     :
8              vs.                      Civil Action No.
                                     :   04-CV-1266 SLR
9    BCE, INC., MICHAEL T. BOYCHUK,
     MARC A. BOUCHARD, SERGE FORTIN,:
10   TERENCE J. JARMAN, STEWART
     VERGE, JEAN C. MONTY, RICHARD   :
11   J. CURRIE, THOMAS KIERANS,
     STEPHEN P. SKINNER and          :
12   H ARNOLD STEINBERG,
                                     :
13                       Defendants.

14

15              Deposition of CARLYN R. TAYLOR, taken

16   pursuant to notice in the law offices of Richards,

17   Layton & Finger, Conference Room 3D, One Rodney

18   Square, 920 North King Street, Wilmington, Delaware,

19   on Tuesday, May 9, 2006, at 10:01 a.m., before

20   Lorraine B. Marino, Registered Diplomate Reporter and

21   Notary Public.

22

23          ELLEN GRAUER COURT REPORTING CO. LLC
              126 East 56th Street, Fifth Floor
24                New York, New York 10022
                        212-750-6434
25                      REF: 80642

2

```
 1    APPEARANCES:

 2                   RUSSELL C. SILBERGLIED, ESQ.
                     Richards, Layton & Finger
 3                   One Rodney Square
                     920 North King Street
 4                   Wilmington, DE  19801
                       for Plaintiffs
 5
                     STUART J. BASKIN, ESQ.
 6                   BRYNNA CONNOLLY, ESQ.
                     Shearman & Sterling
 7                   599 Lexington Avenue
                     New York, NY  10022-6069
 8                     for Defendants

 9    ALSO PRESENT:

10                   V. V. COOKE, ESQ.
                     Teleglobe Associate General Counsel
11
                            -  -  -
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                            INDEX

2    WITNESS                                              Page

3    CARLYN R. TAYLOR

4         By Mr. Baskin --------------------       5

5    C. TAYLOR DEPOSITION EXHIBITS              Marked

6    1   Expert report of Carlyn Taylor, dated
         3/8/06--------------------------------    14
7
     2   FTI engagement letter, dated 2/6/06------  14
8
     3   Document entitled "Expert Document
9        Production"----------------------------   36

10   4   E-mail dated 3/14/06, from Ms. Freeman to
         Mr. Silberglied, with attachment---------  51
11
     5   Teleglobe business plan, dated 5/14/02---  114
12
     6   Ontario Superior Court of Justice initial
13       order, dated 5/15/02--------------------   116

14   7   Ontario Superior Court of Justice
         second report of monitor, dated 6/3/02---  133
15
     8   Ontario Superior Court of Justice
16       11th report of monitor, dated 9/19/02----  147

17   9   Undated Babcock affidavit----------------  163

18   10  Brunette affidavit, dated 10/8/02--------  173

19   11  Transcript of 6/24/02 hearing, USBC DE
         Case No. 02-11518-----------------------   183
20
     12  Transcript of 10/9/02 hearing, USBC DE
21       Case No. 02-11518-----------------------   192

22   13  E-mail dated 2/23/02, from Mr. Bolduc to
         Mr. McIntosh, et al., with attachment----  208
23
     14  NERA expert report, dated 4/14/06--------  213
24
                         - - -
25

4

## C. TAYLOR EXHIBITS CONT'D

15  Rebuttal expert report of Carlyn Taylor,
    dated 4/14/06---------------------------     218

16  Schedule 14A TIH/VSNL proxy statement----     219

- - -

(Exhibit 1 retained by counsel.  Exhibits 2 through 16

attached to original transcript and copies.)

- - -

5

1                      CARLYN RENEE TAYLOR, having been first

2     duly sworn, was examined and testified as follows:

3

4     BY MR. BASKIN:

5           Q.      Good morning.

6           A.      Good morning.

7           Q.      When did you arrive in Wilmington?

8           A.      Late Sunday night.

9           Q.      And did you prepare for this

10     deposition yesterday?

11          A.      Yes.

12          Q.      With whom did you prepare?

13          A.      Mr. Silberglied and my associate,

14     Debra Wood.

15          Q.      And in the course of preparing, were

16     you shown any other depositions taken in this matter?

17          A.      I have been given a lot of depositions

18     in this matter.

19          Q.      Good answer.  You are absolutely

20     right.

21                  Were you shown any depositions taken

22     in the last two weeks in this matter, any other expert

23     depositions?

24          A.      I was given --

25                  MR. SILBERGLIED:  Objection to form.

6

```
1                           TAYLOR
2                THE WITNESS:  I was sent the
3     transcripts of the depositions of the two NERA
4     witnesses.
5     BY MR. BASKIN:
6          Q.        And when were you sent those
7     transcripts?
8          A.        Last Thursday and Friday, I think.
9          Q.        And have you seen the transcript of
10    the testimony of Mr. Charnetzki?
11         A.        No.
12         Q.        Now, how long did you prepare for this
13    deposition yesterday?
14         A.        Twelve or 14 hours, something like
15    that.
16         Q.        And in the course of those 12 or 14
17    hours, did you review materials not found in
18    Appendix B to your report?
19         A.        Which report?
20         Q.        Your first report.
21         A.        Yes.
22         Q.        And did you review materials not found
23    in connection with the appendix of your rebuttal
24    report?
25                MR. SILBERGLIED:  Well, objection to
```

```
1                         TAYLOR
2    form.  Other than those -- you are talking about in
3    neither report; correct?
4                    MR. BASKIN:  Sure.
5    BY MR. BASKIN:
6         Q.        Did you review materials not found in
7    the appendices of either report?
8         A.        In preparing yesterday?
9         Q.        Yes.
10        A.        The depositions that I mentioned
11   earlier of Mr. Taylor and Ms. McLaughlin.
12        Q.        Did you see documents yesterday -- I
13   think you told us you saw documents not found in
14   Appendix B to your main report; correct?
15        A.        Yes.
16        Q.        Did you see documents not found in the
17   appendix to your rebuttal report?
18                    MR. SILBERGLIED:  Objection to form.
19                    THE WITNESS:  Well, in a strict sense,
20   yes.
21   BY MR. BASKIN:
22        Q.        Okay.  And to start, what documents do
23   you recall seeing not found in Appendix B to your
24   report?
25        A.        Well, we reviewed documents that were
```

8

TAYLOR

1
2  referenced in the rebuttal report.  We reviewed
3  exhibits to my report.  So those aren't actually
4  listed in the appendix.  They are my work product.
5          We reviewed some notes that I found
6  that were produced to you.  I am trying to think if
7  there was anything else.  We may have reviewed other
8  things that we produced to you.  And I don't know if
9  those were listed in the report, in the appendix.
10         Q.      And what documents do you recall
11 reviewing that were in addition to what was in your
12 rebuttal report and nct in the main report?
13         A.      I am sorry.  Say that again.
14         Q.      What documents do you recall reviewing
15 that were in neither -- that were not in your rebuttal
16 report and were not in your main report?
17         A.      Oh, that's what I just answered.
18 Like, documents that we produced to you, which aren't
19 listed as source documents, but they were in response
20 to your request for production.
21         Q.      Okay.  Can you describe for me what
22 some of the documents were that you remember reviewing
23 that were not found in your main report?
24         A.      Sure.  Documents that we produced.  So
25 our engagement letter.  I think some drafts that we

TAYLOR

1

2 produced.  My notes.  (Pause) The two depositions I

3 already mentioned, so just to be complete.

4              And did we look at anything else?  I

5 can't think of anything else.  If I do, I will mention

6 it.

7         Q.        Okay.  Have you had discussions with

8 any other experts in this matter since the preparation

9 of your report, your first report?

10        A.        My first report, yes.

11        Q.        With whom?

12        A.        Mr. Charnetzki.

13        Q.        And how many times have you had

14 discussions with Mr. Charnetzki since the preparation

15 of your first report?

16        A.        Maybe once that I can recall.

17        Q.        And what do you recall about that

18 discussion?

19        A.        We discussed NERA's initial report.

20        Q.        And what do you recall discussing with

21 him about NERA's initial report?

22        A.        My thoughts upon reading it.

23        Q.        And did he communicate to you his

24 thoughts as well?

25        A.        Yes.  It was a two-way discussion on

TAYLOR

things NERA had said in their initial report.

Q.       And how long did that conversation occur?

A.       Twenty minutes, half hour.

Q.       Over the telephone?

A.       Yes.

Q.       Anyone else present in the room on your side other than you?

MR. SILBERGLIED:  Objection to form.

THE WITNESS:  You mean with me?

BY MR. BASKIN:

Q.       With you.

A.       I don't remember if any of my staff was there or not.

Q.       Do you recall if Mr. Charnetzki had any of his staff with him on his end of the conversation?

A.       I don't know.

Q.       Meaning you don't recall or --

A.       I don't remember hearing anybody, so I don't know.

Q.       Now, you said this conversation lasted about 20 minutes?

A.       Maybe half hour.  Don't remember.

11

1                          TAYLOR

2          Q.        And was this before you prepared your

3    rebuttal report?

4          A.        Yes.

5          Q.        And in that connection, were you

6    listening to what Mr. Charnetzki had to say?

7          A.        Not so much, no.

8          Q.        You were not listening to what

9    Mr. Charnetzki had to say?

10         A.        He wasn't the one mainly speaking.

11         Q.        To the extent he spoke, were you

12   listening to what he had to say?

13         A.        Sure.

14         Q.        And were you considering what he had

15   to say?

16         A.        I don't remember what he said, so I am

17   sure I was at the time.

18         Q.        And was he commenting on the NERA

19   reports to you?

20         A.        In general, yes.

21         Q.        Was he commenting on what you should

22   include in your rebuttal report?

23         A.        At that time it wasn't even decided

24   who was going to do a rebuttal report, so no.

25         Q.        And were you and he discussing that

                              TAYLOR

1

2    topic, who would do the rebuttal report?

3          A.        Generally, that was the substance,

4    yes.

5          Q.        And in that connection, the decision

6    was made on that telephone call that you would do the

7    rebuttal report rather than Mr. Charnetzki?

8          A.        No.  I think that was subsequently

9    requested of me by counsel.

10         Q.        And what did you and Mr. Charnetzki

11   decide as to who would be preferable to do the

12   rebuttal report on that telephone call?

13         A.        We didn't decide that.  We were just

14   discussing.

15         Q.        Now, who approached you about becoming

16   an expert witness in this case?

17         A.        Mr. Silberglied.

18         Q.        And was that on or around February 6,

19   2006?

20         A.        No.  It was before that.

21         Q.        How much before that?

22         A.        I remember he called and said he

23   wanted to retain us on February 1.

24         Q.        And in that connection did he explain

25   what topics he wanted to retain you about?

1                          TAYLOR

2         A.        Very generally, yes.

3         Q.        What did he say to you?

4         A.        He wanted to retain someone who had

5    expertise in restructuring in telecom who can give

6    opinions about restructuring.

7         Q.        And did he tell you time was of the

8    essence at that point in time?

9         A.        I think I asked him what the deadline

10   was, and he told me.

11        Q.        And you understood that you had

12   approximately a month to write your main report?

13        A.        At that time, yes.

14        Q.        And did you consider time to be of the

15   essence at that point in time?

16                  MR. SILBERGLIED:  Objection to form.

17                  THE WITNESS:  When you say "of the

18   essence," most engagements of ours tend to be not

19   longer than you need.

20   BY MR. BASKIN:

21        Q.        So when you undertook -- I take it on

22   February 6 you actually executed the engagement letter

23   and so did Mr. Silberglied; is that correct?

24        A.        I would have to look at it.  I don't

25   remember.

14

TAYLOR

1

2          MR. BASKIN:  I will just give you a

3    copy of your engagement letter.  Before we do that,

4    why don't we mark as Exhibit 1 your expert report, the

5    first expert report.

6                    (C. Taylor Deposition Exhibit No. 1

7    was marked for identification.)

8                    MR. BASKIN:  And let's mark as Exhibit

9    2 your engagement letter.

10                   (C. Taylor Deposition Exhibit No. 2

11   was marked for identification.)

12   BY MR. BASKIN:

13        Q.         Let me hand you Exhibit 2 and just ask

14   you whether that is a copy of the signed and executed

15   engagement letter in connection with this matter.

16        A.         It appears to be, yes.

17        Q.         And would I be correct that you went

18   about preparing your report between March 6, 2006 --

19   strike that.

20                   Am I right that you went about

21   preparing your report between February 6, 2006 and

22   March 8, 2006?

23        A.         Actually, I think we may have started

24   a couple days before this.

25        Q.         Now, how many were on your team that

1                          TAYLOR

2    you had working with you preparing your report?

3         A.        One senior person and two junior

4    people.

5         Q.        And the senior person is the woman who

6    you mentioned is in the law firm today?

7         A.        Yes.

8         Q.        And what is her name?

9         A.        Debra Wood.

10        Q.        And working with her were two junior

11   people; is that correct?

12        A.        Working with me.

13        Q.        And what are their names?

14        A.        Dennis Sharp and Robert Young.

15        Q.        And did you allocate assignments

16   between those three individuals working with you?

17        A.        Debra and I did, yes.

18        Q.        And what was the allocation of

19   assignments?

20        A.        Well, Mr. Young pretty much -- the

21   only thing he did was maybe prepare a few charts and

22   prepare -- he had the lovely task of preparing this

23   lengthy list in Exhibit B.

24                  Mr. Sharp prepared many of the charts

25   that are in the exhibits and did some research.   And

16

1                          TAYLOR
2    Debbie and I did everything else.
3         Q.        And do you consider Exhibit 1 to be
4    your own work product?
5         A.        Absolutely, yes.
6         Q.        When it came time to writing
7    Exhibit 1, did you take pen to paper?
8         A.        I sit at the computer.
9         Q.        And did you actually type portions of
10   Exhibit 1?
11        A.        I typed the vast majority of it
12   myself.
13        Q.        And when you start -- in connection
14   with preparing Exhibit 1, how many drafts did you go
15   through?
16        A.        Depends what you call a draft, because
17   it is just one document on the computer.  So I just
18   keep working on it.
19        Q.        And to the extent that -- I am sorry.
20   What was the other woman's name who worked with you on
21   it?
22        A.        Debbie Wood.
23        Q.        Debbie Wood?  How was she working on
24   the document?
25        A.        Not very much actually.  She was

TAYLOR

1    tasked primarily with a lot of the more complicated

2    financial analyses to support what I was doing.

3        Q.        And in connection with preparing the

4    document, who was reading the exhibits found on

5    Appendix B?

6        A.        Both she -- wait.  The exhibits?  She

7    and I both.

8        Q.        And did you read all the exhibits

9    found on Appendix B?

10       A.        All of them?

11                 MR. SILBERGLIED:  Objection to form.

12                 THE WITNESS:  No.

13   BY MR. BASKIN:

14       Q.        Did you read most of them?

15       A.        I don't know.  I read a lot of them.

16       Q.        Did you read any of the depositions

17   found on Appendix B?

18       A.        I read all of the depositions we were

19   provided except one.

20       Q.        Which one did you not read?

21       A.        I ran out of time, didn't read

22   Mr. Childers in full.

23       Q.        But all other depositions you read in

24   full?

25

18

1                            TAYLOR
2        A.        I did.  The ones that we were
3    provided.
4        Q.        Now, insofar as you and Ms. Wood were
5    jointly working on the preparation of the report, did
6    you communicate to her your opinions and conclusions
7    to be included in the report?
8                  MR. SILBERGLIED:  Objection to form.
9                  THE WITNESS:  Not in the way you are
10   suggesting.  I was writing them into the report.
11   BY MR. BASKIN:
12       Q.        You were writing them, your opinions
13   and conclusions, yourself in the report?
14       A.        Yes.
15       Q.        And when you commenced preparing the
16   report, had you already determined what your
17   conclusions and opinions would be?
18       A.        Not all of them, no.
19       Q.        Which ones do you recall not having
20   reached a conclusion about or not having reached an
21   opinion about when you started preparing your report?
22       A.        When we started?  We were still doing
23   a lot of the financial analyses that eventually led to
24   opinions in the report.  So I would have to review
25   them.

19

TAYLOR

1

2    Q.        Well, for example, when you started to

3    prepare the report, had you already determined that if

4    FTI had been hired four years earlier in lieu of

5    Lazard, you would have preferred a standalone

6    reorganization instead of a sale?

7    A.        Say that.  If when when?

8    Q.        At the time you commenced writing your

9    report, had you already determined that had FTI been

10   hired four years earlier rather than Lazard, that you

11   would have proceeded with a standalone reorganization?

12   A.        That was reached in the course of the

13   work.  I don't remember exactly when relative to when

14   I started outlining the report.

15   Q.        When you started to prepare the

16   report, had you already concluded that Lazard's work

17   product overestimated the cash burn and came to

18   erroneous conclusions?

19   A.        I am not sure I would accept the

20   characterization of, but we had concluded -- I had

21   definitely concluded that there were issues with the

22   CAPEX based upon my very initial review of documents.

23   Q.        And this was before you actually

24   started to prepare the report?

25   A.        Yes.

TAYLOR

1

2    Q.        And by the time you started to prepare

3    the report, had you already concluded that the parties

4    to the bankruptcy had not given proper consideration

5    to a voice-only standalone reorganization?

6                    MR. SILBERGLIED:  Objection to form.

7                    THE WITNESS:  Well, again, I would

8    have to look at how I phrased our -- my opinions in

9    there on that, but I had not completed all my review

10   of the documents.

11   BY MR. BASKIN:

12   Q.        And how far into the preparation of

13   your report did you come to that conclusion?

14                   MR. SILBERGLIED:  Same objection.

15                   THE WITNESS:  I came to the various

16   opinions that I documented in the beginning or in my

17   report throughout the course of reviewing documents

18   and things in the case.

19   BY MR. BASKIN:

20   Q.        But do you remember when you came to

21   the conclusion that the parties had not given proper

22   consideration to a voice-only standalone

23   reorganization?

24                   MR. SILBERGLIED:  Same objection.

25                   THE WITNESS:  I don't remember exactly

21

TAYLOR

1
2  when we came to the conclusion that is listed in our
3  report.  I was reviewing documents.  It was a fairly
4  short period of weeks.
5  BY MR. BASKIN:
6      Q.      And had you already concluded by the
7  time you began to prepare your report that the May 14
8  plan offered a viable and reasonable standalone
9  restructuring plan?
10     A.      No.
11     Q.      When did you come to that conclusion?
12     A.      Well, first of all, we had to find
13  that document, and then we did some analysis of it.
14  And based on the analysis, I reached the opinions that
15  are written in my report.
16     Q.      And when was that analysis undertaken,
17  as you recall?
18     A.      The last couple of weeks of February.
19     Q.      And by the time you began preparing
20  your report, had you already concluded that the sale
21  to Cerberus constituted a fire sale?
22     A.      No.
23     Q.      When did you come to that conclusion?
24     A.      Based upon reviewing the documents in
25  the course of my work.

22

                            TAYLOR

1

2       Q.        And when relevant to the start of

3   writing the report do you recall coming to that

4   conclusion?

5       A.        I don't recall.

6       Q.        Now, as you drafted the report, did

7   you circulate drafts to members of your team?

8       A.        No.  Cnly -- when I needed Debbie to

9   put in some facts or certain things, she could access

10  the document when I wasn't working on it.

11      Q.        So she could access the document

12  directly; correct?

13      A.        Yes, cn the server.

14      Q.        Now, did there come a time when you

15  did print out versions of your document?

16      A.        There might have been.

17      Q.        When do you remember printing out

18  versions of the draft?

19      A.        I remember printing out a couple of

20  pages and showing Dennis what I needed graphs done.

21      Q.        And this is in connection with your

22  team; correct?

23      A.        Yes.

24      Q.        And as Ms. Wood or as -- excuse me

25  again.  What was -- Dennis Sharp, is that his name?

```
 1                        TAYLOR
 2        A.        Sharp.
 3        Q.        As Mr. Sharp made changes or comments
 4   to your draft, did you consider those changes or
 5   comments?
 6                  MR. SILBERGLIED:  Objection to form.
 7                  THE WITNESS:  I mean, Mr. Sharp didn't
 8   make any changes or comments.
 9                  Ms. Wood would go in sometimes at my
10   request and put information into the report in
11   sections that I had said go put the factual things in
12   the documents and map them to exhibits.  So she would
13   put those directly into the report when I wasn't
14   working on it.
15                  And then I would go back and still be
16   drafting.
17   BY MR. BASKIN:
18        Q.        And did you consider her comments or
19   changes as she made them?
20        A.        When you say "consider," she was
21   putting factual things in.
22        Q.        Did you consider --
23        A.        So she is working with me at my
24   direction.
25        Q.        Now, in connection with Mr. Sharp, I
```

24

```
1                        TAYLOR
2    think you said he was preparing certain of the
3    financial statements contained in your report?
4         A.        I wouldn't call them financial
5    statements.  Exhibits.
6         Q.        He was preparing the exhibits attached
7    to the report; is that correct?
8         A.        Some of them.
9         Q.        And as he was preparing the exhibits,
10   were you commenting on what he was doing?
11        A.        Yes.
12        Q.        I take it you were considering what he
13   was doing; is that correct?
14        A.        I was reviewing what he was doing.
15        Q.        Now, have you had discussions outside
16   of your team concerning the preparation of your
17   report?
18        A.        Yes.
19        Q.        And with whom have you had discussions
20   outside your team concerning the preparation of your
21   report?
22        A.        Mr. Silberglied.
23        Q.        And anyone else?
24        A.        Yes.
25        Q.        With who else?
```

25

                              TAYLOR

1

2         A.          Mr. Charnetzki and a couple of people

3     associated with Teleglobe today.

4         Q.          Now, let's start with Mr. Charnetzki.

5     On how many occasions do you recall discussing with

6     Mr. Charnetzki the preparation of your report?

7         A.          When?

8         Q.          Prior to its completion.

9         A.          Maybe --

10                    MR. SILBERGLIED:  Excuse me.  Exhibit

11    1?

12                    MR. BASKIN:  Yes, Exhibit 1.

13                    THE WITNESS:  Okay.  Two or three

14    times.

15    BY MR. BASKIN:

16        Q.          And in that connection did he have

17    access to your server?

18        A.          No.

19        Q.          Did you provide him with copies of

20    your report prior to its completion?

21        A.          He saw one, yes.

22        Q.          And he saw that copy in and around

23    early March 2006?

24        A.          Yes.

25        Q.          On March 1, 2006?  Is that when he saw

26

                              TAYLOR

1

2    it?

3          A.         I don't recall the exact date.

4          Q.         And was that in a meeting in these law

5    offices?

6          A.         Yes.

7          Q.         And I take it in addition to

8    Mr. Charnetzki, you were present as well?

9          A.         Yes.

10         Q.         Were other members of your staff

11   present?

12         A.         No.

13         Q.         Were there any other people present

14   other than you and Mr. Charnetzki?

15         A.         Yes.

16         Q.         Who else was present for that meeting?

17         A.         Mr. Silberglied, I think Mr. Varallo

18   for a while, some people from CompassRose, and a

19   couple of people from Teleglobe.  That's all I recall.

20         Q.         Who from the plaintiff was physically

21   present during this meeting in early March 2006?

22         A.         I don't really know everybody, but

23   Andre Mongrain, and I am going to say his name wrong.

24   He was present (indicating).

25         Q.         You are pointing to one of the

27

                            TAYLOR

1

2    gentlemen in attendance at the deposition today?

3          A.       That's correct.

4          Q.       And do you want to state your name for

5    the record, sir?

6                    MR. COOKE:  Sure.  V. V. Cooke.

7                    THE WITNESS:  Sorry.

8    BY MR. BASKIN:

9          Q.       Who else was present for the meeting

10   in these law offices prior to the completion of your

11   report?

12         A.       That's who I remember.

13         Q.       Now, in the course of that meeting --

14   how long did that meeting take?

15         A.       I don't know.  Four or five hours.

16         Q.       And all the attendees whom you

17   mentioned in your answer a second ago were in the same

18   conference room at the same time?

19         A.       For parts of it, yes.

20         Q.       And in the course of that meeting you

21   circulated the then current draft of your report?

22         A.       I had copies, yes.

23         Q.       And did you --

24         A.       I am not sure who brought them.  I

25   brought them, yes.

28

TAYLOR

1

2      Q.       Well, you circulated them to everyone
3  at the meeting; correct?
4      A.       I don't know if everybody at the
5  meeting looked at them.
6      Q.       You circulated the reports broadly to
7  people in the meeting?
8      A.       There was a stack.
9      Q.       And did Mr. Charnetzki circulate his
10  report in the course of the same meeting?
11      A.       Yes.
12             (Discussion off the record.)
13  BY MR. BASKIN:
14      Q.       And who was in attendance at the
15  meeting on behalf of CompassRose?
16      A.       A man and a woman, but I really don't
17  know who they were.
18      Q.       And did they circulate their draft
19  report to the attendees at the meeting?
20      A.       Yes.
21      Q.       Now, were each attendee at the meeting
22  making comments -- strike that.
23             Were the attendees at the meeting
24  making comments about the various drafts of the
25  experts present at the time?

29

                            TAYLOR

1

2      A.        Some of the attendees were.

3      Q.        And, for example, to take your draft

4  in particular, who do you remember making comments

5  about your draft?

6      A.        Mr. Silberglied and Mr. Varallo.

7      Q.        And what about Mr. Charnetzki?

8      A.        I don't recall him giving me any

9  comments.  He was sitting right next to me.  If he

10 gave me one or two, I don't recall.

11     Q.        So you recall Mr. Silberglied and

12 Mr. Varallo giving you comments at the time; correct?

13     A.        Yes.

14     Q.        And were you writing down their

15 comments?

16     A.        Yes.

17     Q.        And were you considering them?

18     A.        Sure.

19     Q.        Now, who else do you recall giving you

20 comments at the time of this meeting?

21     A.        I think that was it.  None of the

22 comments were very substantive.  Commas, things like

23 that.

24     Q.        Basically, your recollection is that

25 Mr. Silberglied and Mr. Varallo were giving you

1                              TAYLOR

2     comments about comas and things of that nature?

3          A.        There were some spellings, words

4     missing, stuff like that.  There was nothing

5     substantive in my report.

6          Q.        And in connection with the other

7     reports that were being circulated at the time, were

8     you giving your comments regarding Mr. Charnetzki's

9     report?

10                    MR. SILBERGLIED:  Objection to form.

11                    THE WITNESS:  Yes.

12    BY MR. BASKIN:

13         Q.        And were other people giving comments

14    about Mr. Charnetzki's report?

15         A.        Possibly.  I wasn't involved in that.

16         Q.        You were not present when other people

17    were giving comments or you were present?

18         A.        I was, but there was different people

19    reading and conversations.

20         Q.        And in connection with

21    Mr. Charnetzki's report, did you mark up his report or

22    did you deliver your comments orally to him?

23         A.        He was sitting next to me, so I think

24    I just told him a couple of things.

25         Q.        And was that also of the nature of

TAYLOR

comas and missing words and the like?

    A.        No.

    Q.        You gave him substantive comments?

    A.        Not comments so much as I gave him a list of companies and transactions for him to think about including.

    Q.        And that's what you recall saying to him?

    A.        Yes.

    Q.        And in the course of having your report available at the meeting, did people mark up your report?

    A.        I think Mr. Silberglied might have.

    Q.        And you considered his comments, did you not?

    A.        I went through, yes, but they weren't substantive.  They were little wording things and things like that.

    Q.        And am I right that late last week you produced a draft of your prior report?

    A.        Of which?  Of Exhibit 1?

    Q.        Yes.

    A.        Yes.

    Q.        Did that come from your files?

32

```
 1                       TAYLOR
 2        A.       It came from my personal, yes.
 3        Q.       And did you get a phone call last week
 4   to produce that draft?
 5        A.       No.
 6        Q.       How did you come to decide to produce
 7   that draft?
 8        A.       Oh, well, I got a phone call after.  I
 9   told Mr. Silberglied that I had found a draft that had
10   not been located by my assistant and Ms. Wood when
11   they had looked for everything.
12        Q.       And when did you tell Mr. Silberglied
13   that?
14        A.       I think right before I sent it to him.
15        Q.       So what day last week was that?
16        A.       I think Wednesday or Thursday of last
17   week.
18        Q.       And you happened to come upon the
19   draft on Wednesday or Thursday of last week?
20        A.       That's correct.
21        Q.       And where was the draft that you
22   happened to come upon on Wednesday or Thursday of last
23   week?
24        A.       On my computer.
25        Q.       And is that the only draft contained
```

33

                              TAYLOR

1
2    on your computer?

3          A.        That's correct.

4          Q.        And what caused you to look for drafts

5    on your computer Wednesday or Thursday of last week?

6          A.        I was looking for something in the

7    preparation of my preparing for this deposition, and I

8    happened to see that, and I didn't know there was one,

9    so I produced it.

10         Q.        Was it communicated to you last week

11   that Mr. Charnetzki's deposition was taken on

12   Wednesday of last week?

13         A.        Probably.  I don't know.

14         Q.        You don't recall being told that

15   Mr. Charnetzki's deposition was taken last week?

16         A.        I know it was taken last week.  I

17   don't know if it was Wednesday.

18         Q.        And do you recall being told that

19   Mr. Charnetzki could not produce any drafts during the

20   course of his deposition?

21                   MR. SILBERGLIED:  Objection to form.

22                   THE WITNESS:  No, I don't.

23   BY MR. BASKIN:

24         Q.        Do you recall being told that

25   Mr. Charnetzki testified that he had destroyed all his

34

1                          TAYLOR

2    drafts of his exhibit -- of his report?

3                    MR. SILBERGLIED:  Objection.

4                    THE WITNESS:  I am not aware of what

5    you are talking about.

6    BY MR. BASKIN:

7         Q.        Meaning you were not told last week

8    that Mr. Charnetzki had testified that he had

9    destroyed all drafts of his report?

10                   MR. SILBERGLIED:  Same objection.

11                   THE WITNESS:  Testified that he

12   destroyed drafts?  I am not aware of what

13   Mr. Charnetzki testified.

14   BY MR. BASKIN:

15        Q.        Now, how come this draft was found on

16   your server?  This was in your server, I take it?

17        A.        No.  This was in my laptop

18        Q.        And how come that draft was located on

19   your laptop?

20        A.        I am not sure.  Normally I am only

21   working on the server.  I think I may have been

22   traveling or something and put it on my laptop.

23        Q.        And is this the only draft contained

24   in your files of your report?

25        A.        I think we produced another draft of

35

                                    TAYLOR

1    the rebuttal report.

2        Q.      And when did you find that?

3        A.      I think that was produced in the

4    regular production.  I think Ms. Wood had that.

5        Q.      That was not produced last week?

6        A.      I don't know when it was produced.

7    When we produced everything else is my understanding,

8    but that's all I know.

9        Q.      Now, in the course of the meeting in

10   these law offices in and around March of 2006, was a

11   discussion had as to what people should do with their

12   drafts, drafts of their reports?

13       A.      No.

14       Q.      You recall no such discussion?

15       A.      No.

16       Q.      Do you ever recall having a discussion

17   with anyone in connection with this matter as to what

18   you should do with the drafts of your reports?

19       A.      No.

20       Q.      Assuming the judge --

21       A.      Only that when the thing came out that

22   we should produce drafts, when the request for

23   production.  That's the discussion I recall.

24                       MR. BASKIN:  Let's mark as Taylor 3

25

36

                              TAYLOR

1

2    this document.

3                      (C. Taylor Deposition Exhibit No. 3

4    was marked for identification.)

5    BY MR. BASKIN:

6         Q.         Can you identify this document,

7    Taylor 3?

8         A.         Only that it looks like something

9    similar to what we were sent in terms of what we

10   should be producing for this case.

11        Q.         This is not a document that -- the

12   typed, underlined sections of this document, of Taylor

13   3, I take it you do not recognize; correct?

14        A.         Only that it matches up with

15   information that I told Ms. Wood.  At least the one

16   under No. 3.

17        Q.         Now, the documents referenced next to

18   numbers on Taylor 3, do you recall receiving a

19   document similar to this one that contained similar

20   instructions to you regarding expert document

21   production?

22                   MR. SILBERGLIED:  I am sorry.  Could I

23   have that read back?  I think I missed something.

24                   (The court reporter read back as

25   requested.)

37

1                           TAYLOR

2                MR. SILBERGLIED:  Objection to form.

3                THE WITNESS:  I have seen a list like

4     this.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

38

```
                                TAYLOR
 1
 2   BY MR. BASKIN:
 3        Q.        And how did you come to see that list?
 4        A.        I think from Ms. Wood.
 5        Q.        And when did Ms. Wood provide you with
 6   such a list?
 7        A.        I don't know.  A few weeks back.
 8        Q.        And I think you told us a few seconds
 9   ago that you had a discussion regarding that?
10        A.        With Ms. Wood, yes.
11        Q.        And what was your discussion with
12   Ms. Wood?
13        A.        That she and my assistant were going
14   to compile all these documents and turn them over.
15        Q.        And did you understand from the
16   instructions -- strike that.
17                  I take it it was your understanding at
18   the time that these instructions came from counsel?
19        A.        That was my understanding, yes.
20        Q.        And did you understand that the
21   instructions from counsel included that you were
22   supposed to produce drafts of all reports?
23        A.        Yes.
24        Q.        And when did you learn that you were
25   supposed to produce drafts of all reports?
```

39

```
 1                          TAYLOR
 2        A.        At the time that I discussed this with
 3   Ms. Wood.
 4        Q.        That's the first time you were told
 5   that?
 6        A.        Yes.
 7        Q.        Now, the pieces of paper, the reports,
 8   draft reports that were circulating around the meeting
 9   in this law firm in and around March 2006, what
10   happened to those documents; do you know?
11        A.        I don't know.
12        Q.        Did you do something with those
13   documents?
14        A.        No.
15        Q.        Did you collect them?
16        A.        No.
17        Q.        Did you ask somebody else to collect
18   them?
19        A.        No.
20        Q.        Have you ever seen those documents
21   since they were circulated in this law firm on and
22   around March 1, 2006?
23        A.        I took the documents with me that I
24   had, but that's it.
25        Q.        The copies of your draft report you
```

40

1                          TAYLOR

2   did not take with you or you did?

3        A.       I don't recall.  I mean, I only have

4   room for so much in my luggage, so I don't recall

5   taking.  I took one.

6        Q.       You took one copy of the document that

7   was circulated; is that correct?

8        A.       Well, which document are you talking

9   about?

10        Q.       The document circulated on March -- on

11   and around March 1, 2006 in this law firm.

12                 MR. SILBERGLIED:  Objection to form.

13                 THE WITNESS:  Yes.  Which one?  I took

14   my document.

15   BY MR. BASKIN:

16        Q.       You took your draft report at that

17   time?

18        A.       I took my own copy of it; correct.

19        Q.       And is that the same document that was

20   found on your laptop computer towards the end of last

21   week?

22        A.       No.

23        Q.       That is a different version of the

24   report?

25        A.       Correct.

41

                              TAYLOR

1

2        Q.        And where is that version?

3        A.        Where is what version?

4        Q.        The version of your report that you

5    had circulated in the meeting in and around March 1,

6    2006.

7        A.        I had a hard copy with me.  I made the

8    changes in the report, and I don't keep that.

9        Q.        And how did you not keep it?  Did you

10   throw it away, ripped it up, shredded it?  What did

11   you do?

12       A.        I didn't do anything like that.  I

13   just don't keep that.  Throw it in the trash.

14       Q.        Now, the documents that were

15   circulating in this law firm on and around March 1,

16   2006, as you sit here now, you have no idea what

17   happened to those documents?

18       A.        Which documents.

19       Q.        Your report?

20       A.        My report?  No, I don't know.

21       Q.        Now, in the course of the five or six-

22   hour meeting that occurred in and around March 1,

23   2006 -- does that sound about the right date to you?

24                 MR. SILBERGLIED:  Objection to form.

25                 THE WITNESS:  March 1?  I guess that's

42

1                          TAYLOR

2      about right.

3      BY MR. BASKIN:

4          Q.        Now, the meeting in this law firm that

5      occurred on and around March 1, 2006, you told us it

6      lasted about five or six hours?

7                      MR. SILBERGLIED:  Objection to form.

8                      THE WITNESS:  I think I said four or

9      five, but I don't really remember.  It is a little

10     more than half a day.

11     BY MR. BASKIN:

12         Q.        Now, other than having people comment

13     on typos and the like in your report, what else

14     happened during the course of that meeting?

15         A.        Mostly I spent the meeting reading

16     Mr. Charnetzki's report.  It was very lengthy.  It

17     took several hours.  So there was a lot of just people

18     sitting around reading for hours.

19         Q.        So for the bulk of the four or five

20     hours you simply read Mr. Charnetzki's draft report?

21         A.        And Ms. Roseman's, yes.

22         Q.        And was that the purpose of coming to

23     Delaware, so you could sit in the conference room and

24     read Mr. Charnetzki's report?

25         A.        That's what I understood.

43

```
 1                          TAYLOR

 2          Q.       And --

 3          A.       Have any discussion.

 4          Q.       Sorry?

 5          A.       Yes.

 6          Q.       And he did not send you, I take it, a

 7   copy of his report in Denver for you to read; correct?

 8          A.       No.

 9          Q.       Now, after you read Mr. Charnetzki's

10   report on and around March 1, 2006, what did you do

11   with it?

12          A.       I don't remember if I took it with me,

13   what I did with it.  I think I just took the cover

14   page with me.  That was it.

15          Q.       Now, to the extent you took some of

16   Mr. Charnetzki's report with you on and around

17   March 1, 2006, what happened to that document?

18          A.       I don't think -- I think I only took

19   one page, because I wanted a particular phraseology of

20   the opening paragraph.  That's all I took.

21          Q.       Did Mr. Charnetzki collect the

22   document that he had distributed to you on and around

23   March 1, 2006?

24          A.       I don't know.

25          Q.       Now, which paragraph?
```

```
1                        TAYLOR
2        A.        It was the very first paragraph.
3        Q.        The one "I have been retained as an
4    expert"?
5        A.        Yes.  The phraseology of the, you
6    know, the debtor and the committee and so forth.  That
7    was it.  I just wanted to make sure mine matched.
8        Q.        So that was the only portion of
9    Mr. Charnetzki's document you took with you?
10       A.        That's correct.
11       Q.        Now, let's discuss then -- so
12   basically during the course of the four or five hours
13   in this law firm, you were mostly reading
14   Mr. Charnetzki's document in draft?
15       A.        Most of that time I was, and then I
16   was reading Ms. Roseman's.
17       Q.        And I think you said the nature of
18   your comments were in the nature of typos?
19       A.        No, I didn't say that.
20       Q.        What was the nature of your comments
21   to that?
22       A.        To who?
23                 MR. SILBERGLIED:  Objection; asked and
24   answered.
25
```

45

TAYLOR

BY MR. BASKIN:

Q.       To Mr. Charnetzki first.

A.       Okay.  To Mr. Charnetzki, I discussed with him various companies and what they did and gave him a list of transactions and companies.

Q.       And what do you recall doing in connection with Ms. Roseman's document?

A.       In connection with Ms. Roseman's document, the main discussion I had with someone I believed to be Ms. Roseman, but it turned out to be an assistant -- I didn't know that at the time -- was that she had a discussion about bankruptcy and restructuring, and I said, you know, "That's kind of overlapping with what I am doing, and I am not sure that you want to be talking about that."

Q.       And what was the reaction of this person who you thought was Ms. Roseman?

A.       They said they would consider it.

Q.       And what did you do with the Roseman document that was provided to you during the course of this meeting?

A.       I don't remember.

Q.       Did the CompassRose people collect those documents?

1                              TAYLOR

2          A.         Possibly, but I don't know.

3          Q.         Was there an understanding of

4    participants in the meeting that all drafts prepared

5    during the course of the meeting were going to be

6    destroyed?

7          A.         Destroyed?  There was no discussion

8    about anything being destroyed.

9          Q.         Was there a discussion during the

10   course of the meeting that all drafts were going to be

11   collected?

12         A.         Not that I recall.

13         Q.         Was there a discussion at the meeting

14   that people should not leave the meeting with their

15   own copies of the various reports?

16         A.         Not that I recall, but I had no

17   intention of taking large bits of paper I had already

18   read.

19         Q.         But you do not recall any discussion

20   about whether people should leave the room with copies

21   of these various reports?

22         A.         Not with me.

23         Q.         Now -- strike "now."

24                    If you look at Exhibit 2 before you,

25   if you turn to the second page, you will see there is

47

```
                              TAYLOR
 1
 2    a reference under paragraph 3 to privileged and
 3    confidential work product.  Do you see that?
 4         A.      Okay.
 5         Q.      And it reads, "Written reports,
 6    memoranda or status summaries that we prepare under
 7    this Engagement Contract will be maintained in
 8    accordance with our retention procedures and shall be
 9    prominently labeled 'Privileged and Confidential.'"
10    Do you see that?
11         A.      Yes.
12         Q.      Was that, in fact, the practice you
13    followed in this matter?
14         A.      Yes.
15         Q.      What are FTI's retention procedures by
16    which they maintain written reports, memoranda or
17    status summaries?
18         A.      For risk management purposes, we are
19    to maintain all final issued reports and all
20    supporting documents to support the work and opinions
21    in those reports.
22         Q.      So is it the practice of your company
23    that all drafts other than final reports are
24    destroyed?
25              MR. SILBERGLIED:  Objection to form.
```

48

1                          TAYLOR

2              THE WITNESS:  Well, you are using the

3    word "destroyed."  That's not -- it creates confusion

4    to be retaining tons cf things.  You are to retain for

5    risk management purposes the final version of work

6    product and supporting documents to support the

7    opinions in the final version of work product.

8    BY MR. BASKIN:

9         Q.        And anything other than that, other

10   than final versions, are discarded; is that correct?

11        A.        Of work product.  If they are -- you

12   are not supposed to be keeping -- I mean, you are

13   supposed to keep organized files.  I don't want -- you

14   know, I don't want my staff keeping tons of mess all

15   around with all sorts -- you get confused as to what

16   is the one that got changed or what is the corrected

17   one or whatever.  So we are to keep neat, neat,

18   organized work files.

19        Q.        And is it the practice or -- strike

20   that.

21              Is it the retention procedures of FTI

22   that all draft reports are destroyed or discarded?

23              MR. SILBERGLIED:  Objection to form.

24              THE WITNESS:  It is just what I said.

25   It has nothing to do with being destroyed.  It is you

49

TAYLOR

2    keep the final work products in an organized manner.

3    You don't keep, you know, every little thing that you

4    have in the course of working on something.  It just

5    creates mass confusion.

6    BY MR. BASKIN:

7         Q.       So what about prior drafts?  What do

8    you do with prior drafts?

9         A.       That depends on what it is.

10        Q.       Well, prior drafts of reports.  What

11   are the retention policies of FTI in connection with

12   prior drafts of reports?

13        A.       It depends on what it is.  If you have

14   a draft that was actually sort of issued to a client

15   as something that might be deemed by them as final, I

16   would keep that.  If it is an iterative process to get

17   to a final signed opinion, then you keep only the

18   final, with all of the support to it.

19        Q.       Now, did you have discussion with

20   anybody representing the plaintiffs this document

21   retention policy/procedures of FTI?

22        A.       No, other than Ms. Wood may have

23   discussed it with Russ when we got this request.

24        Q.       Did she tell you she discussed it with

25   Mr. Silberglied?

50

1                              TAYLOR

2          A.          She told me she discussed the entire

3    list of things.

4          Q.          And --

5          A.          I was aware at that time we were

6    looking for drafts.  That's what I am saying.

7          Q.          You were aware that Ms. Wood was

8    physically looking for drafts at the time?

9          A.          Correct; once we got the request.

10         Q.          And she reported to you that she could

11   not find any, I take it?

12         A.          No.  She produced -- she produced a

13   draft.

14         Q.          Okay.  The draft of the rebuttal

15   report?

16         A.          That's correct.

17         Q.          Was she able to find any drafts of

18   your first -- of your primary report?

19                     MR. SILBERGLIED:  Objection to form.

20                     THE WITNESS:  She wasn't.  I

21   subsequently found one.

22   BY MR. BASKIN:

23         Q.          That is the one you found at the end

24   of last week; correct?

25         A.          Sometime last week, yes.

51

TAYLOR

1

2     Q.        Now, you have testified on many

3     occasions in the past; is that not true?

4     A.        Depends what you call "many."  A

5     couple dozen.

6     Q.        And is it your customary practice when

7     you testify to attend meetings with other expert

8     witnesses and discuss each other's reports?

9     A.        It depends on the case.

10    Q.        Have you done that in the past?

11    A.        Yes.

12    Q.        And have you sat in a room for five or

13    six hours with the other experts and gone over draft

14    reports?  Is that a customary practice for you?

15    A.        I don't remember.  I don't do the

16    litigation for a living most of the time, so -- I

17    don't recall.

18             MR. BASKIN:  Now, let's hand you what

19    we will mark as Exhibit 4.

20             (C. Taylor Deposition Exhibit No. 4

21    was marked for identification.)

22    BY MR. BASKIN:

23    Q.        I take it it is the custom of FTI to

24    maintain time detail records similar to that contained

25    on Exhibit 4?

52

1                         TAYLOR

2        A.        Actually, it is not.

3        Q.        Have you seen Exhibit 4 prior to

4    today?

5        A.        Well, that's my signature on page 3,

6    so I must have, but I don't recall it.

7        Q.        Did you see Exhibit 4 yesterday as

8    part of your preparation for this deposition?

9        A.        No.

10       Q.        Now, is it not your custom to maintain

11   time details as contained on Exhibit 4?

12       A.        Not necessarily, unless the client

13   requests it.

14       Q.        But I take it your system contains the

15   ability to generate this document?

16       A.        Well, our time system allows you to

17   key in descriptions, but it doesn't require you to put

18   in descriptions.

19       Q.        And does your time system -- I take it

20   that you in this engagement and in most engagements

21   you bill out your time by the hour.  Is that correct?

22       A.        It depends on the engagement.  In this

23   engagement we are billing our time by the hour.

24       Q.        Now, let me ask you, if you could turn

25   to document Bates-stamped 102973.

53

                              TAYLOR

1
2        A.        Okay.

3        Q.        Those contain your personal time

4   charges in this matter from the inception until

5   February 28, 2006; is that correct?

6        A.        It looks like it.

7        Q.        Now, let me ask you about some of the

8   items found on this.  On and around February 6, 2006,

9   that is the day you signed the engagement letter we

10  saw; is that correct?

11       A.        Yes.

12       Q.        Now, on that day you had an

13  introductory call with Russ and Deb and reviewed

14  documents.  Do you see that?

15       A.        Yes.

16       Q.        And that lasted three and a half

17  hours; is that correct?

18                 MR. SILBERGLIED:  Objection to form.

19                 THE WITNESS:  Well, what lasted three

20  and a half hours?  Everything I did that day lasted

21  three and a half hours.

22  BY MR. BASKIN:

23       Q.        How long did that telephone call last;

24  do you recall?

25       A.        The first call?  Maybe 45 minutes.  I

54

TAYLOR

1

2      was getting on a plane.

3          Q.        And then the remainder of that time

4      you spent reviewing documents?

5          A.        I was reading documents on the flight.

6          Q.        Now, then on February 9 apparently you

7      had a call with Russ and then calls with Huron and

8      Russ.  Do you see that?

9          A.        Yes.

10         Q.        And is that the first time you

11     remember speaking to Huron in connection with this

12     matter?

13         A.        I think so.

14         Q.        And by Huron, is that Mr. Charnetzki?

15         A.        Well, I don't recall if it was him or

16     his assistant, or his senior person working with him.

17         Q.        Now, it speaks in terms of plural,

18     calls with Huron and Russ.  Do you recall having more

19     than one telephone call with Huron in the course of

20     February 9, 2006?

21         A.        No.  My assistant just takes this

22     stuff off my calendar, so this is her characterization

23     of what she sees on my calendar.  The multiple calls

24     probably were with Deb.

25         Q.        What do you recall speaking with Huron

TAYLOR

1              TAYLOR
2    on or around February 9, 2006?
3        A.      Trying to get documents.
4        Q.      And what type of documents were you
5    trying to get at that point?
6        A.      We were just trying to get an
7    understanding of the case and what documents were
8    available.  And my understanding is there are several
9    million documents produced in this case, and it was a
10   little bit like, okay, we only have three or four
11   weeks, you know.  How do we find the needles in the
12   haystack?  You guys have all these documents.  You
13   have been working on this for months.  You know, these
14   are the categories of things that we need.  Can you
15   kind of help us?
16           That's why I think it might have been
17   just Dana, but I don't recall.
18        Q.      And did Huron make the selection of
19   documents that would satisfy your various categories?
20        A.      No.
21        Q.      What do you mean by "categories"?
22   What sort of documents were you asking of Huron?
23        A.      We were trying to find business plans
24   that had been done in the period when the
25   restructuring was undertaken.  That's what we were

# Exhibit 4



**Teleglobe Communications Corporation, et al. v. BCE Inc., et al.**

**Expert Report of Paul F. Charnetzki**

March 8, 2006



# Table of contents

I.   **Executive Summary**...................................................................................................4
  A.   Teleglobe Inc. and the majority of the plaintiffs were insolvent no later than December 31, 2000.........................................................................................................................4
  B.   Discontinuing additional investment in GlobeSystem and other capital projects at June 30, 2001, after insolvency, would have preserved value in Teleglobe..................................5
  C.   Alternatively, had BCE made the $850 million of additional funding available to Teleglobe, as authorized by its board and accepted by the board of Teleglobe on November 28, 2001, value in Teleglobe would have been preserved.......................................................6
II.   **Introduction** ..............................................................................................................7
III.  **Qualifications** ...........................................................................................................7
IV.  **Compensation** ...........................................................................................................8
V.   **Background** ...............................................................................................................8
  A.   Industry ...............................................................................................................8
  B.   Teleglobe .........................................................................................................22
    1.   Chronology...................................................................................................29
VI.  **Summary of Opinions** ..............................................................................................43
VII.  **Insolvency**................................................................................................................44
  A.   Teleglobe Inc. and the majority of the plaintiffs were insolvent no later than December 31, 2000.......................................................................................................................44
    1.   The most appropriate entity at which to test solvency is Teleglobe Inc. on a consolidated basis.......................................................................................................45
    2.   Cash flow test.............................................................................................45
    3.   Balance sheet test......................................................................................47
    4.   Valuation at December 31, 2000.................................................................52
    5.   Z-Score .......................................................................................................55
    6.   Thin capital test .........................................................................................56
  B.   I have also performed solvency tests at the entity level for the plaintiffs.....................56
    1.   Consolidated THUSC....................................................................................57
    2.   THUSC (stand alone)...................................................................................59
    3.   TUSA ...........................................................................................................59
    4.   Optel ...........................................................................................................60
    5.   TCC, TIC, and THC......................................................................................60
    6.   Remaining entities......................................................................................61
  C.   Teleglobe was unable to access capital without explicit support from BCE.....................62
  D.   Other indications of insolvency ...........................................................................64
    1.   BCE did not write down Teleglobe's goodwill when it became aware of the impairment. .....................................................................................................................64
    2.   Kroll found Teleglobe to be insolvent at January 31, 2001 and March 31, 2001. .........73
    3.   Several internal and external valuations calculated negative equity value for Teleglobe in the fall of 2001..........................................................................................................74
VIII.   **Damages** .................................................................................................................75



A.    Prior to June 30, 2001, BCE had many opportunities to preserve the value of Teleglobe, but did not do so. ...................................................................................................... 78
B.    Discontinuing additional investment in GlobeSystem and other capital projects at June 30, 2001, after insolvency, would have preserved value in Teleglobe ............................. 87
    *1.    Estimate future cash flows for the five-year projection period* ................................. 89
    *2.    Discount cash flows to present value* ..................................................................... 95
    *3.    Residual value of cash flows* ................................................................................. 98
    *4.    Combine the present value of the residual cash flows with the discrete projection cash flows* ............................................................................................................... 99
    *5.    Add the value of GlobeSystem assets to obtain the combined value of the legacy business with GlobeSystem assets* .................................................................... 100
    *6.    Market approach* ............................................................................................... 101
C.    Alternatively, had BCE made the $850 million of additional funding available to Teleglobe, as authorized by its board and accepted by the board of Teleglobe on November 28, 2001, value in Teleglobe would have been preserved ........................................... 105
    *1.    April 2002 voice only business plan* ................................................................... 106
    *2.    May 2002 capital constrained voice and data business plan* ............................... 108
D.    To calculate damages, I have subtracted actual recoveries by the Estate on comparable assets from the valuations. ....................................................................................... 111
    *1.    Estate receipts of $207.6 million* ........................................................................ 111
    *2.    Allocation, if deemed necessary, to the U.S. Debtor Estate* ................................ 112
**IX.   Conclusion** ..................................................................................................... **114**



# I.    Executive Summary

My name is Paul Charnetzki. I have been retained by counsel for Teleglobe
Communications Corporation, et al. ("U.S. Debtor Estate") and the Official Committee of
Unsecured Creditors of Teleglobe Communications Corporation ("creditors") to analyze
the solvency issues and quantify the damages related to the matter of Teleglobe
Communications Corporation, et al. v. BCE Inc., et al. Appendix I contains a summary of
damages due to the U.S. Debtor Estate. My findings and opinions are summarized
below.

### A. Teleglobe Inc. and the majority of the plaintiffs were insolvent no later than December 31, 2000.

I have concluded that even with the initial $1 billion commitment from BCE Inc. ("BCE")
set forth in the June 29, 2000 letter to Bank of Montreal ("BMO"), Teleglobe Inc.
("Teleglobe") was insolvent no later than December 31, 2000 and remained insolvent
thereafter.[1] In light of the integrated nature of the Teleglobe group of companies
collectively (the "Estate"), it is my opinion that Teleglobe, the ultimate parent of the U.S.
Debtor Estate, is the relevant entity for assessing insolvency. In addition, however, I
have examined individually the U.S. Debtors who have been named as plaintiffs in this
matter and find them to have also been insolvent no later than December 31, 2000 and
to have remained insolvent thereafter (with the exception of Optel Telecommunications
Inc., Teleglobe Marine (U.S.) Inc., Teleglobe Luxembourg LLC, and Teleglobe
Submarine Inc.).

To reach this conclusion, I have performed several accepted solvency tests, including a
cash flow test and a balance sheet test during the relevant periods. Though it need only
be found in either the cash flow or the balance sheet test, insolvency is evident in each
test. The cash flow test demonstrates that after December 31, 2000, Teleglobe would
not have been able to pay its debts as they became due even with the June 2000 BCE
$1 billion commitment. Similarly, the balance sheet test demonstrates that Teleglobe had

---

[1] Letter from William D. Anderson of BCE to BMO Nesbitt Burns (Bank of Montreal), June 29, 2000 (GEN
037880-81)


CONSULTING GROUP

negative equity value, meaning the fair market value of the business was less than the value of its debt.

The following facts provide additional support for my solvency opinion, all of which are explained in more detail in the text of this report.

- Contemporaneous valuations of Teleglobe that result in positive equity value are of limited utility, because they assume that BCE (or others) would fund the financing gaps in the Teleglobe business plan, including the GlobeSystem capital expenditures. Neither BCE nor anyone else funded the plan.

- As acknowledged at the time, it was improbable that Teleglobe would have been able to obtain significant funding from sources other than BCE during the relevant period.

- Accounting tests were manipulated by BCE to avoid recognizing significant impairment of goodwill on the financial statements of Teleglobe and BCE.

**B. Discontinuing additional investment in GlobeSystem and other capital projects at June 30, 2001, after insolvency, would have preserved value in Teleglobe.**

As discussed, Teleglobe was insolvent no later than December 31, 2000. However, I have calculated damages as of June 30, 2001, because it was at that time that Teleglobe's bank facilities were renegotiated. Had BCE not provided assurances to the banks, Teleglobe's bank debt would have been due on July 23, 2001.[2] Additionally, use of this date is conservative in that it would have provided time to respond to the insolvency, consider alternatives, and develop a plan to address the situation.

Continuing investment in GlobeSystem after June 30, 2001 preserved economic opportunities for BCE at the expense of the other stakeholders of Teleglobe. I have been asked to assume, for purposes of this analysis, that Teleglobe's capital expenditures related to the build-out of the GlobeSystem network would have ceased at June 30, 2001 while the legacy voice and associated data business of Teleglobe would have continued. At June 30, 2001, had this occurred, Teleglobe would have been worth

---

[2] 2001 Teleglobe Inc. Financial Information - U.S. GAAP, p. 22
Proprietary and Confidential



$1.130 billion. In addition, at least $135 million of value could have been obtained from liquidating the existing GlobeSystem assets. Thus, in my opinion, had BCE acted to address Teleglobe's insolvency at June 30, 2001, Teleglobe would have recovered approximately $1.265 billion as compared to $207.6 million actually recovered (see Section VIII.1 for recoveries by the Estate). Thus I computed damages of $1.057 billion.

### C. Alternatively, had BCE made the $850 million of additional funding available to Teleglobe, as authorized by its board and accepted by the board of Teleglobe on November 28, 2001, value in Teleglobe would have been preserved.

On November 28, 2001, the BCE board authorized up to $850 million in funding and the Teleglobe board authorized acceptance of up to $850 million of funding.[3] The mechanism, form and timing of the provision of this funding was delegated to Jean Monty, the Chairman and Chief Executive Officer of BCE, and Jean Monty, the Chairman and Chief Executive Officer of Teleglobe, at his sole discretion. However, of this amount, only $222 million of funding was provided to Teleglobe.[4] As a consequence of BCE's failure to provide support using the $850 million that was authorized for Teleglobe, BCE destroyed value for Teleglobe.

Had the balance of the $850 million in funding been available, a restructuring would have been feasible and in the economic interest of Teleglobe's stakeholders. The parameters of that restructuring are set forth in the expert report of Carlyn Taylor of FTI Consulting ("FTI"), upon which I have relied. I have measured the value that would have been preserved under an April 2002 voice only restructuring scenario provided by FTI, at $723.4 million for damages of $515.8 million. Using an alternative-restructuring scenario from May 2002, which was provided by FTI and represented a capital constrained voice and data scenario, I have measured the value that would have been preserved to be $414.0 million. This, however, does not fully capture the value of an optimized voice and data business because it disregards the option value that $628 million of supplemental funding would have created.

---

[3] Minutes of the meetings of the Board of Directors of BCE Inc., Volume 5, p. 532, Montreal, November 28, 2001; Minutes of the meetings of the Board of Directors of Teleglobe Inc., Volume 3, p. 59, Montreal, November 28, 2001.
[4] See Table 6. 2000 through 2002 Teleglobe Inc. annual and quarterly financial statements; BCE-AD 0439677.

Proprietary and Confidential



## II.   Introduction

I have been asked to perform the following analyses:

- Assess the solvency of the plaintiffs as of certain dates between June 30, 2000 and April 23, 2002

- Quantify the financial damage to the plaintiffs resulting from BCE's actions

I have prepared this report to set forth the opinions I may express at the trial of this matter and reserve the right to supplement this report based upon information that may become available subsequent to the date of this report. For purposes of providing testimony at trial, I intend to illustrate my testimony with demonstrative aids such as graphs, charts and/or slides.

My opinions are based upon an independent examination of the evidence provided by the parties in this case and my knowledge and professional experience. I express all opinions to a reasonable degree of professional certainty. The evidence I have reviewed in connection with the preparation of this report is set forth in Appendix II. Dollar amounts are U.S. dollars unless otherwise noted. Additionally, unless otherwise noted, Canadian amounts are also presented in U.S. dollars, using the daily historical exchange rate.

## III.   Qualifications

I am and have been a Managing Director in the Financial and Economic Consulting practice of Huron Consulting Group LLC ("Huron") since its founding in May 2002. Before joining Huron, I was a partner at Arthur Andersen from 1989 on and an employee from 1977. I have performed a variety of financial, economic, and statistical analyses on behalf of clients in disputes including damages assessment, solvency, valuation, market analysis, and accounting and auditing principles. My industry expertise includes securities and telecommunications. I have testified as an expert witness at deposition, arbitration, and trial in both state and federal courts.



I received a Bachelor of Arts from Harvard College. I received a Master of Science in Industrial Administration with a concentration in Accounting from Carnegie Mellon University. I am a licensed Certified Public Accountant in Illinois.

A complete description of my background and qualifications is set forth in my curriculum vitae, which is attached as Appendix III. Testimony I have provided in other matters in the preceding four years and a listing of the publications I have authored within the preceding ten years are also included in Appendix III.

## IV.    Compensation

Huron is being paid at hourly rates for the level of personnel involved in the assignment. Neither Huron's fees nor my compensation is contingent on the conclusions reached or ultimate resolution of the case. Attached, as Appendix IV, is a list of the hourly rates that my staff and I are charging for our work in this matter, including deposition and trial testimony. As my assignment is not complete due to the potential supplementation of this report and testimony at trial, it is not possible to determine at this time the total compensation paid to my firm for this engagement.

## V.    Background

### A. Industry

Until the 1990's, the international telecommunications industry consisted primarily of government owned monopolies providing voice service to other carriers. As recently as 1995, voice telephone service consumed nearly all international circuit (the connection over which a telephone call travels) capacity.[5] Beginning with obligations negotiated under the auspices of the World Trade Organization (WTO) regarding trade in telecommunication services, there was tremendous liberalization of markets for international services.[6] In July 1995, only 367 companies worldwide were authorized to operate international telephone networks compared to 2,805 in July 2000.[7] In Canada,

---

[5] Federal Communications Commission, Trends in the International Telecommunications Industry, September 2005, p, 10
[6] WTO press release, "Ruggiero Congratulates Governments on Landmark Telecommunications Agreement," February 17, 1997.
[7] TeleGeography 2001 Analysis. The Growth of International Services Competition. In 1996, 1997. 1998, and 1999, there were 470, 586, 1042, and 1760 authorized international carriers, respectively.