IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
--------------------------------------------  x
In re                                         )      Chapter 11
                                              )
TELEGLOBE COMMUNICATIONS                      )
CORPORATION, et al.,                          )      Jointly Administered
                                              )      Bankr. Case No. 02-11518 (MFW)
                     Debtors.                 )
--------------------------------------------  x
TELEGLOBE COMMUNICATIONS                      )
CORPORATION, et al.,                          )
                                              )
                     Plaintiffs,              )      C.A. No. 04-1266 (SLR)
                                              )
              v.                              )
                                              )
BCE, INC., et al.,                            )
                                              )
                     Defendants.              )
--------------------------------------------  x
```

## PLAINTIFFS' ANSWERING BRIEF IN RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE THE TESTIMONY OF CARLYN TAYLOR AND THE RELATED TESTIMONY OF PAUL CHARNETZKI

Gregory V. Varallo (No. 2242)
C. Malcolm Cochran, IV (No. 2377)
Russell C. Silberglied (No. 3462)
Chad M. Shandler (No. 3796)
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE 19801
(302) 651-7700
*Attorneys for the Debtor Plaintiffs*

Joseph A. Rosenthal (No. 234)
Rosenthal, Monhait & Goddess, P.A.
1401 Mellon Bank Center
P.O. Box 1070
Wilmington, Delaware 19899-1070
(302) 656-4433

- and -

John P. Amato
Mark S. Indelicato
Zachary G. Newman
Jeffrey L. Schwartz
Hahn & Hessen LLP
488 Madison Avenue
New York, New York 10022
(212) 478-7200
*Attorneys for the Official Committee of Unsecured Creditors of Teleglobe Communication Corporation, et al.*

Dated: May 31, 2006
        Wilmington, Delaware

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES.................................................................ii

SUMMARY OF ARGUMENT ...........................................................1

STATEMENT OF FACTS ................................................................3

    A.   BCE's Resolution to Provide Funding ...........................................3

    B.   BCE's Decision to Terminate Funding and the Chapter 11 Cases .......................4

    C.   The $100 Million DIP Facility.................................................5

    D.   The Sale Process.................................................................7

    E.   Expert Testimony of Ms. Taylor and Mr. Charnetzki.........................7

ARGUMENT .....................................................................................9

I.   Judicial Estoppel Is Not Warranted Under the Third Circuit Standard.....................9

    A.   Plaintiffs Have Not Taken "Irreconcilably Inconsistent" Positions...........................10

    B.   Plaintiffs Have Not Changed Their Position in "Bad Faith" ........................17

    C.   The Requested Relief Is Not Narrowly Tailored to Address the Harm Alleged.........19

II.  This Court Is Not Being Asked to Consider Issues Litigated Before and Decided by the Bankruptcy Court.................................................................20

III.  The Relief Sought In the Proposed Order Is Too Broad......................................22

CONCLUSION.................................................................................22

# TABLE OF AUTHORITIES

## CASES

In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986) ....................................17

In re Delaware & Hudson Ry. Co., 124 B.R. 169 (D.Del. 1991) .....................................................17

In re Docteroff, 133 F.3d 210 (3d Cir. 1997)..................................................................................20

In re Genesis, 324 B.R. 510 (Bankr. D. Del. 2005) ........................................................................20

Haskell v. Goldman, Sachs & Co., 2006 U.S. Dist. LEXIS 18177 (D. Del. Mar. 29, 2006) ........20

Henderson v. Chartiers Valley School, 136 Fed. Appx. 456, 461 n.4 (3d Cir. 2005) .............17, 18

Klein v. Stahl GMBH & Co. Maschinefabrik, 185 F.3d 98 (3d Cir. 1999)....................................19

Konstantopoulos v. Westvaco Corp., 112 F.3d 710 (3d Cir. 1997)................................................19

Kremsner v. Fortuna-SAS, 1989 WL. 70687 (E.D. Pa. June 23, 1989) .........................................19

Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp, 337 F.3d 314 (3d
Cir. 2003) ....................................................................................................................................18

In re Lason Inc., 300 B.R. 227 (Bankr. D. Del. 2003).....................................................................13

Montrose Med. Group Participating Sav. Plan v. Bulger, 243 F.3d 773 (3d Cir. 2001) ...........9, 18

New Hampshire v. Maine, 532 U.S. 742 (2001) ................................................................................9

Port Erie Plastics, Inc. v. Uptown Nails, LLC, 2006 U.S. App. LEXIS 6020 (3d Cir. Mar.
10, 2006) ......................................................................................................................................17

Republic of Philippines v. Westinghouse Elec. Corp., 43 F.3d 65 (3d Cir. 1994) .........................19

In re Ross, 602 F.2d 604 (3d Cir. 1979) ..........................................................................................20

Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355 (3d Cir. 1996)............17, 18

Whiting v. Krassner, 391 F.3d 540 (3d Cir. 2004) ..........................................................................18

## SUMMARY OF ARGUMENT

Defendants have moved to exclude the testimony of Plaintiffs' expert witness, Carlyn R. Taylor ("Taylor"), and the related testimony of expert Paul Charnetzki ("Charnetzki") based on the legal doctrines of judicial estoppel and collateral estoppel. Defendants assert that Ms. Taylor has taken positions inconsistent with statements made by Plaintiffs before the Bankruptcy Court in connection with the sale of Teleglobe's "core" telecommunications business (the "Core Telecom Business"). The alleged inconsistencies relate to Ms. Taylor's conclusion that a stand-alone restructuring would have yielded a materially higher value to the Debtors'[1] estates than was actually obtained from the sale of the Core Telecom Business. In turn, Defendants attempt to preclude Mr. Charnetzki's testimony because he relies on Ms. Taylor's "alternative restructuring scenario" in portions of his report for purposes of quantifying damages relating to Plaintiffs' asserted causes of action. As is shown below, Ms. Taylor's report is not in any way inconsistent with Plaintiffs' statements to the Bankruptcy Court or any orders entered by the Bankruptcy Court. Thus, Defendants' motion must fail.

As Ms. Taylor specifically identified in her report and at her deposition, her conclusion that the Debtors would have been better served by a reorganization is based on the assumption that BCE Inc. ("BCE") did not breach its commitments and fiduciary duties and that Teleglobe Inc. ("TI") therefore had access to the necessary funding to accomplish a reorganization. Unfortunately, this was not the case. After BCE breached its commitment to provide funding in April 2002, the only funding available to TI and its subsidiaries was a $100

---

[1]    The "Debtors" consist of Teleglobe Communications Corporation, Teleglobe USA Inc., Optel Telecommunications, Inc., Teleglobe Holdings (U.S.) Corporation, Teleglobe Marine (U.S.) Inc., Teleglobe Holding Corp., Teleglobe Telecom Corporation, Teleglobe Investment Corp., Teleglobe Luxembourg LLC, Teleglobe Puerto Rico Inc. and Teleglobe Submarine Inc. The Debtors, together with the Official Committee of Unsecured Creditors, are the "Plaintiffs" in this proceeding.

million debtor-in-possession facility (the "DIP Facility") made available by BCE pursuant to a commitment letter, dated May 15, 2002 (the "Canadian Credit Agreement"). The DIP Facility, however, provided only short-term funding and imposed unrealistic deadlines (through an Event of Default) that eliminated any possibility of pursuing a stand-alone restructuring. As Ms. Taylor testified, given these circumstances, the Debtors had no choice but to conduct a "fire sale". Indeed, with the exception of the technical definition of the term "fair market value", Ms. Taylor testified that she had no issue with any of the positions taken by Plaintiffs in the Bankruptcy Court given the path that had been set by BCE.

In addition to the absence of any "irreconcilably inconsistent" position, Defendants have failed to establish even the slightest color of "bad faith" conduct on the part of Plaintiffs -- a necessary element to the Court's determination of whether judicial estoppel is appropriate (which Defendants fail to even discuss in their Opening Brief)[2]. Moreover, Defendants seek to preclude the testimony of Ms. Taylor before she has even had an opportunity to testify. This type of draconian relief should not be granted lightly. To the extent that the Court has any doubt as to whether Defendants' request for judicial estoppel should be approved, Plaintiffs should be given an opportunity to address such issues at the bench trial to be held three weeks from now.

Defendants' reliance on the doctrine of collateral estoppel is flawed for many of the same reasons. Ms. Taylor's expert testimony will in no way cause this Court to consider issues which were previously litigated and ruled on by the Bankruptcy Court. Ms. Taylor's testimony relates to the viability of a stand-alone restructuring had TI and the Debtors had access to the funding committed by BCE. The Bankruptcy Court was never asked to address this issue

---

[2] References to "Opening Brief" or "OB at ___ " are to "Defendants Opening Brief in Support of Their Motion *In Limine* to Exclude the Testimony of Carlyn Taylor & the Related Testimony of Paul Charnetzki".

because it simply was not an option given BCE's breach, the limited funding available to TI and the Debtors and the timeline dictated by BCE under the DIP Facility. Rather, the Bankruptcy Court was asked to consider approval of a going-concern sale of the Core Telecom Business - - which was the best option available to the Debtors given BCE's course of conduct.

## STATEMENT OF FACTS

### A.       BCE's Resolution to Provide Funding

On November 28, 2001, BCE's Board of Directors approved TI's business and financial plan and budget for 2002, which included a large funding gap to be "plugged" by financial assistance from BCE. (Transmittal Affidavit of Russell C. Silberglied ("Silberglied Aff."), Ex. 1). On that same date, the BCE Board of Directors adopted Resolution No. 7, which provides, in pertinent part:

> THAT, the Corporation be and it is hereby authorized, from time to time on or prior to December 31, 2002, to make investments in and to provide financial assistance to Teleglobe Inc. or any subsidiary thereof ("Teleglobe") (including investments to fund debt service pertaining to Excel Communications, Inc.) or to Bell Expressvu Limited Partnership or any subsidiary thereof ("Expressvu") in amounts not to exceed in the aggregate U.S. $850 million in the case of Teleglobe and $400 million in the case of Expressvu (the "Additional Financial Assistance"), the whole as set forth below:
>
> > (a)    such Additional Financial Assistance may be made by way of acquisition of debt securities, share or partnership units, loans, guarantees, indemnities or any combination of the foregoing, for general corporate purposes including for purposes contemplated by the Budget;
> >
> > (b)    the Corporation be and it is hereby authorized to provide the Additional Financial Assistance directly or through one or more subsidiaries;
> >
> > (c)    if Additional Financial Assistance is provided through a subsidiary or subsidiaries, the Corporation be and it is hereby authorized to

3

purchase shares or debt securities of, to make a loan to or otherwise to provide financial assistance to the said subsidiary or subsidiaries to enable the said subsidiary or subsidiaries to provide the Additional Financial Assistance to Teleglobe or Expressvu; and

(d)     all advances of funds hereunder shall be at such time and upon such terms and conditions as the Chairman and Chief Executive Officer of the Corporation (or any officer designated by such person) may in his/her discretion determine.

(Id.) (emphasis added). The mechanism, form and timing of the provision of this funding was delegated to Jean Monty, the Chairman and Chief Executive Officer of BCE and Jean Monty, the Chairman and Chief Executive Officer of TI, at his sole discretion. (Id.). Notwithstanding this resolution, between November 28, 2001 and April 23, 2002, only $222 million of funding was provided to TI and the Debtors. (Declaration of Stephen J. Marzen ("Marzen Decl."), Ex. 9, Expert Report of Paul Charnetzki ("Charnetzki Rpt.") at 4).

**B.      BCE's Decision to Terminate Funding and the Chapter 11 Cases**

On April 4, 2002, BCE announced that it would no longer fund TI and the Debtors outside of bankruptcy. In light of BCE's decision to discontinue funding, TI and certain of its Canadian subsidiaries were forced to commence insolvency proceedings (the "Canadian Proceedings") under the Canadian Companies' Creditors Arrangement Act in the Ontario Superior Court of Justice in Toronto, Ontario (the "Canadian Court") on May 15, 2002. On that same date, the Canadian Court appointed the Monitor in the Canadian Proceedings, and the Monitor subsequently commenced ancillary proceedings (the "Ancillary Proceedings") in the Bankruptcy Court under former section 304 of the United States Bankruptcy Code (the "Bankruptcy Code"). On May 28, 2002, the Debtors commenced their chapter 11 cases.

4

C.        **The $100 Million DIP Facility**

On May 15, 2002, BCE, TI and certain of TI's affiliates entered into the Canadian

Credit Agreement, whereby BCE agreed to provide up to $100 million in debtor-in-possession

financing to TI, but only on the very limited terms and conditions set forth therein. (Silberglied

Aff., Ex. 2). TI was, in turn, authorized under the Canadian Credit Agreement to lend funds to

the Debtors in accordance with an agreed budget (the "U.S. Budget"). (Silberglied Aff., Ex. 3,

Exhibit E). The Canadian Credit Agreement was a very short term DIP Facility:

> The DIP Facility shall be repayable in full on the date (the
> "Maturity Date") which is the earlier of (i) September 1, 2002 or
> such later date the Lender in its sole discretion may agree in
> writing, (ii) the effective date of the implementation of a plan of
> compromise and/or arrangement under the CCAA, (iii) the closing
> of any Court approved sale or disposition of (a) substantially all of
> the assets and business of the Borrowers, and/or their subsidiaries
> or (b) the Bilateral Business, or (iv) an occurrence of acceleration
> of the DIP Facility after an Event of Default (as hereinafter
> defined).

(Silberglied Aff., Ex. 2 at 3). Thus, at best, the DIP Facility provided TI and the Debtors with

funding for the first three months of the chapter 11 cases (absent any Event of Default).

Consistent with this timetable, the U.S. Budget only authorized funding to the Debtors through

August 2002. (Silberglied Aff., Ex. 3, Exhibit E).

Additionally, the Canadian Credit Agreement contained certain Events of Default

that limited the restructuring alternatives available to TI and the Debtors even further. For

example, the Canadian Credit Agreement contained the following Event of Default:

> (n)    failure by the Borrowers to have filed on or before July 1,
>        2002, a Plan of Compromise or Arrangement[3] or a motion
>        to approve a sale of all or substantially all of the assets of
>        the Borrowers and Guarantors in either case in form and
>        substance satisfactory to the Lender and providing, as the

---

[3]    This is the Canadian equivalent of what is referred to in U.S. bankruptcy cases as a plan of
reorganization.

5

> case may be, that the Plan is approved by the Court or sale
> completed as the case may be by August 15, 2002.

(Silberglied Aff., Ex. 2 at 20) (emphasis supplied). BCE's insistence on including this Event of Default effectively eliminated any ability that the Debtors had to pursue a stand-alone reorganization. BCE essentially gave the Debtors one month to fully negotiate, draft and file a chapter 11 plan of reorganization.

As Ms. Taylor testified, based on her vast experience in the field, there is simply no way that the Debtors could have negotiated a reorganization plan in a complex, cross-border telecom case such as this over a one-month period. (Silberglied Aff., Ex. 4, May 9, 2006 Deposition of Carlyn Taylor ("Taylor Dep.") at 128) ("the DIP provided when it was issued that they had to go forward with a sale or they had to complete a standalone [plan] and file it by, I think, the middle of June . . . you can't do that in a multi-jurisdictional bankruptcy."). Ben Babcock, the Canadian Monitor, even stated as much at the May 24, 2002 hearing in the Ancillary Proceeding. (Silberglied Aff., Ex. 5, Testimony of Ben Babcock at May 24, 2002 Hearing in Ancillary Proceeding ("Babcock Testimony") at 31) ("I mean, this company does not have the funding for a Chapter 11 proceeding. It's on very limited time lines to achieve the goals that I discussed earlier, and has very limited funding."). Moreover, even with the $100 million, BCE's Board of Directors realized that "time is short" and that $100 million would only last TI and its subsidiaries (including the Debtors) until June 23, 2002. (Silberglied Aff., Ex. 6 at 25). If the Debtors nevertheless pursued a reorganization rather than a sale, they would have been in default when no plan was filed on July 1, 2002, and instantly would have been out of cash to pay employees, vendors or anyone else. Accordingly, after being backed into a corner by BCE, the Debtors' only option was to pursue a "going-concern" sale in an effort to retain what remaining value could be salvaged from the Core Telecom Business.

6

D.      **The Sale Process**

With BCE having eliminated the Debtors' ability to pursue a stand-alone restructuring, on June 18, 2002, the Debtors obtained authorization from the Bankruptcy Court to conduct a global bidding process with respect to the sale of the Core Telecom Business. (Marzen Decl., Ex. 3). Operating along the tight timeframe dictated by BCE, the bidding procedures required prospective purchasers to submit final bids by June 24, 2002 (a date that was later extended to July 15, 2002). (Marzen Decl., Ex. 3 at 3). The Debtors received ten (10) written offers for the Core Telecom Business and eventually selected a bid submitted by Cerberus Capital Management, L.P. ("Cerberus") and its affiliate TenX Capital Partners ("TenX") (who formed TLGB Acquisition Corp. to be the purchaser of the Core Telecom Business) as the highest and best bid for the Core Telecom Business. (Silberglied Aff., Ex. 7 at 2). Cerberus and TenX were "financial" as opposed to industry or "strategic" buyers. (Taylor Dep. at 161-62).

On October 10, 2002, the Bankruptcy Court entered an order approving the sale of the Core Telecom Business to TLGB Acquisition Corp. (Marzen, Ex. 7). Following settlement of various purchase price disputes between the parties, TI and the Debtors received a final purchase price of $125 million for the Core Telecom Business. (Silberglied Aff., Ex. 8, Exhibit A at 2).

E.      **Expert Testimony of Ms. Taylor and Mr. Charnetzki**

Ms. Taylor and Mr. Charnetzki are two of the expert witnesses retained by Plaintiffs to testify in connection with this proceeding. Ms. Taylor is a Senior Managing Director in the Corporate Finance Group of FTI Consulting, Inc. ("FTI") and is the national leader of FTI's Communications & Media industry group. (Marzen Decl., Ex. 8, Expert Report of Carlyn Taylor ("Taylor Rpt.") at 1). As is set forth in her expert report, Ms. Taylor has been

7

engaged by a creditor or a debtor in almost every major telecommunications bankruptcy and restructuring over the past decade, including such high profile cases as Global Crossing, Williams Communications and Level(3) Communications (three large peer companies of Teleglobe). (Taylor Rpt. at 1-3). Mr. Charnetzki is a Managing Director in the Financial and Economic Consulting practice of Huron Consulting Group LLC. (Charnetzki Rpt. at 7).

Ms. Taylor's report focuses on, among other things, her assessment of the restructuring options available to TI and the Debtors in April 2002 if the unspent capital from the $850 million in funding authorized by the BCE Board of Directors in November 2001 had been available to TI and the Debtors in 2002. (Taylor Rpt. at 4) ("I have been asked to assume, for purposes of my expert opinion, that the BCE Board authorized $850 million of capital for Teleglobe on November 28, 2001 and that the unspent capital from this authorization was available to Teleglobe in 2002.").[4] Ms. Taylor's report concludes, in pertinent part, as follows:

> If FTI had been retained by Teleglobe in the first quarter of 2002, we would have recommended a stand-alone restructuring rather than a sale, in order to maximize value to the Teleglobe estate and creditors. A stand-alone restructuring in which substantially all of the Teleglobe debt was converted into all or substantially all of a reorganized Teleglobe would have yielded a materially higher value to Teleglobe's estate and creditors than was actually obtained from the rapid closing down of the network and operations in numerous countries and the fire sale of the remaining operations. Such a stand-alone restructuring was feasible and is, in fact, what was done by most telecom companies which are comparable to Teleglobe that experienced similar financial difficulties at the time.

(Taylor Rpt. at 5).

Mr. Charnetzki was retained by Plaintiffs to analyze solvency issues and to quantify damages relating to Plaintiffs' causes of action. (Charnetzki Rpt. at 4). Relying on Ms. Taylor's assessment as to the feasibility of a stand-alone restructuring, Mr. Charnetzki's report

---

[4] Defendants' expert report utterly ignores this key fact.

provides, among other things, a calculation of the value that could have been preserved in an "alternative-restructuring scenario." (Charnetzki Rpt. at 6-7). Notably, this is only Mr. Charnetzki's alternative damages model; his lead model is a measure of the value of TI and its subsidiaries as of June 2001, which has nothing to do with Ms. Taylor's conclusions nor the statements made to the Bankruptcy Court.

## ARGUMENT

### I.    Judicial Estoppel Is Not Warranted Under the Third Circuit Standard.

The Supreme Court addressed the doctrine of judicial estoppel in New Hampshire v. Maine, 532 U.S. 742 (2001), listing three factors that courts may consider in their discretion to apply the doctrine: (1) the party asserted "clearly inconsistent" positions; (2) the party successfully persuaded a court to accept its earlier position; and (3) the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. See id. Consistent with this approach, the Third Circuit has held that "three requirements must be met before a district court may properly apply judicial estoppel." Montrose Med. Group Participating Sav. Plan v. Bulger, 243 F.3d 773, 779 (3d Cir. 2001).

> First, the party to be estopped must have taken two positions that are irreconcilably inconsistent. Second, judicial estoppel is unwarranted unless the party changed his or her position in bad faith, i.e., with intent to play fast and loose with the court. Finally, a district court may not employ judicial estoppel unless it is tailored to address the harm identified and no lesser sanction would adequately remedy the damage done by the litigant's misconduct.

Id. at 779-80 (emphasis added and internal citations omitted). As discussed below, Plaintiffs have neither taken "irreconcilably inconsistent" positions nor have they acted in bad faith. Moreover, the sanction sought -- preclusion of an expert before she testifies -- is not tailored to the harm identified. Accordingly, judicial estoppel is unwarranted and Defendants' motion

9

should be denied.

### A.    Plaintiffs Have Not Taken "Irreconcilably Inconsistent" Positions.

Defendants' motion is predicated on the notion that Ms. Taylor's and Mr. Charnetzki's expert reports take positions "irreconcilably inconsistent" with positions taken by Plaintiffs in the Debtors' chapter 11 cases. More specifically, Defendants assert that "the entire premise of Ms. Taylor's report - that the global bidding process was inappropriate[5] and that the sale to Cerberus achieved only a 'fire sale' price - directly contradicts the explicit and unambiguous representations the Teleglobe Companies made to the Bankruptcy Court." (OB at 10). This position is misleading, at best. The prior statements referenced by Defendants were made under entirely different circumstances than those assumed by Ms. Taylor (and Mr. Charnetzki in reliance upon Ms. Taylor) in her expert report. When considered in the appropriate context, the statements made in the Bankruptcy Court are entirely consistent with the positions taken by Ms. Taylor in connection with this proceeding, and she said exactly that when questioned at her deposition.

As discussed above, on April 23, 2002, the BCE Board of Directors met and determined not to continue to fund TI and the Debtors outside of bankruptcy. BCE's decision caused an immediate liquidity crisis, as TI and the Debtors were dependent on BCE's commitment to fund ongoing operations. (Babcock Testimony at 27) ("[BCE] discontinued funding for the company, and the company was dependent upon that funding on an ongoing basis . . . those issues really led to the liquidity crisis that the company was faced [with] at the end of April."). Indeed, as of the filing of the chapter 11 cases, the only funding available to TI and the

---

[5]    Defendants' brief repeatedly states that Ms. Taylor takes issue with the bidding process conducted for the sale of the Core Telecom Business, but she does not. She opines that there should have been no sale at all if funding was available, not that the auction process was run incorrectly.

Debtors was the $100 million in short-term funding made available by BCE under the DIP

Facility.    By the terms of the Canadian Credit Agreement, however, BCE dictated the

alternatives available to the Debtors and effectively eliminated any ability that the Debtors had to

pursue a stand-alone restructuring.    Consistent with the Canadian Credit Agreement, the U.S.

Budget contemplated funding only through August 2002.    Moreover, the failure to file a plan of

reorganization or sale motion on or before July 1, 2002 -- a mere five weeks following the filing

of the chapter 11 cases -- constituted an Event of Default under the Canadian Credit Agreement.

As Ms. Taylor testified, five weeks is simply insufficient time for TI and the Debtors to have

negotiated and drafted a stand-alone plan.    (Taylor Dep. at 28; accord Babcock Testimony at 31

(noting that TI and the Debtors had insufficient funding to reorganize)).    Unable to pursue a

stand-alone restructuring, TI and the Debtors made every effort to preserve value through a

"going-concern" sale as opposed to a liquidation.    It was not that TI and the Debtors

affirmatively chose not to pursue a stand-alone reorganization -- it simply was not an option

given BCE's course of conduct.    If they tried to restructure, they would have been in default of

BCE's imposed deadline of July 1, 2002, been out of cash, and had no ability to operate the

company for even one more day.    All remaining value would have immediately been lost, except

for the value of a piecemeal sale of assets.

    Indeed, Mr. John Brunette, Teleglobe's former CEO (and whose statements to the

Bankruptcy Court are cited by Defendants in their Opening Brief), testified at his October 21,

2005 deposition -- over three months prior to Plaintiffs' retention of FTI and Ms. Taylor --

regarding the circumstances facing TI and the Debtors in April 2002 and the subsequent sale to

TLGB Acquisition Corp. Mr. Brunette testified as follows:

> Q.    . . . given the constraints that the company found itself in in
> late April and May of 2002, do you have a view on whether or

11

not the company was able to achieve the highest possible sale value for its so called core assets?

MR. SCHIMMEL: Objection to form.

A. WITNESS: Well, in the context of the financial constraints that we were operating under I thought we did pretty well. Under a different set of dynamics, I think we could have done differently.

\*                \*                \*

Q. Let's talk about those constraints, what were they?

A. WITNESS: Primarily the fact that at the time the view was that the hundred million dollar DIP facility would probably only take Teleglobe to the late summer, that Teleglobe's burn rate even post-bankruptcy would fully utilize the DIP facility in approximately 90 to 120 days . . . .

(Silberglied Aff., Ex. 9, Oct. 21, 2005 Deposition of John Brunette at 347-49).

\*                \*                \*

A. WITNESS: Well, for example, if your question is do I think we could have gotten a better price had I known in December versus April that we weren't going to get funding and by virtue of that enabled us to start the process in December versus April the answer would be yes.

(Id. at 386). Thus, as is evident from Mr. Brunette's testimony, the alternatives available to the

Debtors at the time were severely restricted by the financial constraints imposed by BCE.

Ms. Taylor's expert report, on the other hand, ignores BCE's breach and assumes

that the balance of the $850 million in funding approved by BCE's Board of Directors in

November 2001 was still available to TI and the Debtors.[6]  Assuming the availability of such

funding, Ms. Taylor opined that "[a] stand-alone restructuring in which substantially all of the

Teleglobe debt was converted into all or substantially all of a reorganized Teleglobe would have

---

[6]  Ms. Taylor opines that only some of the remaining balance of the $850 million would have been used, but assumes that all was available. (Taylor Rpt. at 5-6).

yielded a materially higher value to Teleglobe's estate and creditors than was actually obtained from the rapid closing down of the network . . . and the fire sale of the remaining operations." (Taylor Rpt. at 5). As Ms. Taylor herself acknowledged at her May 9, 2006 deposition, a stand-alone restructuring was not an option available at the time given the terms of the DIP Facility. (Taylor Dep. at 132) ("The DIP financing did not allow for sufficient time to do anything other than conduct a rapid distressed sale process."). Accordingly, Ms. Taylor's report is not at odds with the positions taken by Plaintiffs in the Bankruptcy Court, it simply assumes a scenario that was not available to the Debtors at the time, due to the culpable conduct of BCE at issue in this case. See In re Lason Inc., 300 B.R. 227, 234 (Bankr. D.Del. 2003) (debtors were not precluded from presenting valuation testimony that differed from evidence offered at confirmation hearing where revised valuation reflected assumptions not made in earlier report).

Ms. Taylor repeatedly testified at her May 9, 2006 deposition that she did not take issue with the positions taken by Plaintiffs in the Bankruptcy Court in connection with the sale of the Core Telecom Business. At her deposition, Ms. Taylor made the following statements with respect to the Debtors' ability to maximize value through the sale process:

> Q. Assuming that the monitor and the debtor in Canada and the plaintiffs in the case, the debtors here, had a good-faith basis to make this representation to the Canadian bankruptcy judge back in 2002, is it your view still that the process that was being followed was not a suitable one back in 2002?

> A. WITNESS: Well, you just asked a multi-faceted question. The process that was being followed, the taking off down that path is what I have a problem with. And basically BCE put it on that path. BCE controlled it. Then people acted within that box.

> I am not saying they acted unreasonably unnecessarily. That was outside of what I was asked to really do. I am not saying that they didn't get a highest and best offer from the auction process in a horrible environment to be selling this company.

13

They conducted a best -- I can see a reasonable process into a horrible environment for selling this company.

They got a value from a distressed financial buyer. They didn't get a strategic buyer. They didn't get someone who could get synergies. They got a bottom-fishing, very smart buyer who buys at the bottom of the market.

(Taylor Dep. at 161-62).

\*              \*              \*

Q.  Now, if you turn to paragraph 15 on page 9 of this document [Taylor Deposition Exhibit 9] --

A.  WITNESS: Okay.

Q.  -- can you read -- paragraph 15 reads, "The Monitor is of the opinion that the transaction process outlined above complied with the Approved Bidding Procedures. The transaction process resulted in the Core Telecom Business being properly exposed to the market and a purchase agreement with a price and structure that was the result of a competitive bidding process in an auction-like environment between multiple parties. The Monitor has determined that the competitive bidding process yielded the highest and best offer for the Core Telecom Business and is in the best interest of the debtors, their creditors and stakeholders." Do you see that?

A.  WITNESS: Yes.

Q.  Any part of that paragraph you take issue with as you sit here today, Ms. Taylor?

A.  Under the circumstances in which the case was started out and the path in which it followed, no.

(Taylor Dep. at 166-67).

\*              \*              \*

Q.  Do you see it says, "The Teleglobe Companies believe the Purchaser's offer represents the highest and best offer attainable for the Core Telecom Business and concur with the Monitor's valuation methods described more fully in the Babcock Affidavit." Do you see that?

14

A.  WITNESS:  Yes.

Q.  Do  you  take  issue  with  that  representation  made  to  the
bankruptcy judge in this District?

A.  WITNESS:  Given that it was in the context of, you know – it
is  placed  in  the  context  of  the  process  that  was  conducted,
again, I have said already I don't have any reason to believe it
wasn't  the  highest  and  best  offer  out  of  the  auction  process
that was conducted.

(Taylor Dep. at 177-78).

Nor  did  Ms.  Taylor  take  issue  with  the  statements  made  by  Plaintiffs  in  the

Bankruptcy Court that "the value of the Core Telecom Business is unlikely to appreciate with

time in a restructuring proceeding."  Ms. Taylor noted that such statements were not inconsistent

with  her  testimony,  in  that  Plaintiffs  did  not  represent  that  the  value  of  the  assets  would

depreciate in a restructuring proceeding, nor did they state that the value of the assets would not

appreciate  following  a  stand-alone  reorganization.    (Taylor  Dep.  at  180-81).    Critical  to  Ms.

Taylor's  analysis  is  that  the  Core  Telecom  Business  would  maintain  its  value  (i.e.,  not

depreciate)  during  the  course  a  stand-alone  reorganization  and  thereafter  appreciate  in  value

post-confirmation  as  a  result  of  the  restructuring.    Moreover,  Plaintiffs'  statements  are  entirely

consistent with the circumstances facing the Debtors at the time.  The Debtors had insufficient

funding to continue operating through a plan of reorganization or prolonged sale process -- thus,

their  only  other  option  would  have  been  to  liquidate.    Clearly,  the  value  of  the  Debtors'  assets

would not have appreciated in a piecemeal liquidation.

The only statement made by Defendants with which Ms. Taylor disagreed related

to  the  technical  definition  of  the  term  "fair  market  value."    Mr.  Babcock's  affidavit  to  the

Bankruptcy Court stated that the sale to TLGB Acquisition Corp. represented "fair market value"

15

for the assets.  Ms. Taylor explained that the sale was not at "fair market value", as "the definition of fair market value absolutely requires the seller not being under a compulsion to sell, and that particular element is not met here." (Taylor Dep. at 168).  She continued:

> Q.  Well, putting aside your definitional standpoint, is it your testimony that the value achieved through the sale was or was not fair market value?
>
> A.  WITNESS:  It is not –
>
> COUNSEL:  Objection to form.
>
> WITNESS:  -- my definition.  It is a [textbook] definition.  It is not my definition.  You can find it in any valuation textbook.  So it is not -- I mean, you can call this a highest and best offer from the auction process.  That I would agree with.  I don't think you can call that fair market value.  You have to call any value achieved in a process which is conducted under a compulsion to sell as a liquidation value, not a fair market value.
>
> Q.  My question was – so I take it, by the way, then you take issue with the monitor in this respect?
>
> A.  WITNESS:  Only in his phraseology of this.  I don't -- I mean, unfortunately, the words fair market value get thrown around by a lot of people, and I don't know Mr. Babcock's reason for using that exact phrase.  He could call it fair value or highest and best value, but it is not fair market value.

(Taylor Dep. at 168-69; see also Marzen Decl., Ex. 11 at 245).

As evident from Ms. Taylor's and Mr. Charnetzki's testimony, Mr. Babcock appears to have mistakenly used the phrase "fair market value", rather than "fair value" or "highest and best value", to describe the purchase price obtained through the auction process. (Taylor Dep. at 168-69).  This inadvertent mistake, however, does not provide a basis for judicial estoppel.  The Third Circuit has recognized that the doctrine of judicial estoppel is an extreme measure, which "is not intended to eliminate all inconsistencies, however slight or inadvertent;

16

rather, it is designed to prevent litigants from playing fast and loose with the courts." Port Erie Plastics, Inc. v. Uptown Nails, LLC, 2006 U.S. App. LEXIS 6020, at *8-9 (3d Cir. Mar. 10, 2006) (quoting Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 358 (3d Cir. 1996)).

Moreover, the Bankruptcy Court was not required to make a finding that the Debtors obtained "fair market value" to approve the sale under section 363 of the Bankruptcy Code. In determining whether to approve the sale of the Core Telecom Business, the Bankruptcy Court was required to make a finding that the sale was justified by a "sound business purpose." See In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D.Del. 1991). For a "sound business purpose" to exist, a court need only determine that a debtor received "fair and reasonable" consideration for the assets. See id. The jurisprudence of the "fair and reasonable" standard confirms that a court is not required to find that a debtor obtained "fair market value"; rather, courts have held that "[f]air and valuable consideration is given in a bankruptcy sale when the purchaser pays 75% of the appraised value of the assets." In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986) (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1197 n.1 (7th Cir. 1978)). In light of the fact that the Court was just as likely to approve the sale if Mr. Babcock had uttered the phrase "fair value" or "highest and best value", his error is inconsequential and the Bankruptcy Court did not rely on his erroneous phraseology to reach the "wrong" result.

### B.    Plaintiffs Have Not Changed Their Position in "Bad Faith".

As discussed above, a court must make a finding of "bad faith" in order for judicial estoppel to be deemed appropriate.[7] See Henderson v. Chartiers Valley School, 136 Fed.

---

[7]    Somehow, Defendants have utterly omitted the words "bad faith" from their description of the elements they have to prove. See OB at 10. Their refusal to even inform the Court that a finding of bad faith is a prerequisite

Appx. 456, 461 n.4 (3d Cir. 2005); <u>Whiting v. Krassner</u>, 391 F.3d 540, 544 (3d Cir. 2004) (citing

<u>Montrose</u>, 243 F.3d at 777), <u>cert. denied</u>, 125 S. Ct. 2938 (2005). Indeed, "the doctrine of

judicial estoppel does not apply when the prior position was taken because of a good faith

mistake rather than as part of a scheme to mislead the court." <u>Ryan Operations</u>, 81 F.3d at 362.

Moreover, the Third Circuit has held that judicial estoppel is only appropriate when the

inconsistent positions are "tantamount to a knowing misrepresentation to or even fraud on the

court." <u>Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp</u>, 337 F.3d 314, 324

(3d Cir. 2003) (quoting <u>Total Petroleum, Inc. v. Davis</u>, 822 F.2d 734-38 (8th Cir. 1987)).

Judicial estoppel "is not meant to be a technical defense for litigants seeking to derail potentially

meritorious claims, especially when the alleged inconsistency is insignificant at best and there is

no evidence of intent to manipulate or mislead the courts." <u>Ryan Operations</u>, 81 F.3d at 365.

As discussed above, the positions taken by Ms. Taylor and Mr. Charnetzki in their

expert reports are entirely consistent with the representations made to the Bankruptcy Court in

connection with the sale process. At most, Ms. Taylor and Mr. Charnetzki disagree with Mr.

Babcock's inadvertent use of the technical term "fair market value", rather than "fair value" or

"highest and best value", in describing the price received for the Core Telecom Business.

Plaintiffs' use of this phrase clearly was not intended to mislead the Bankruptcy Court in any

way, as section 363 of the Bankruptcy Code does not even require a finding that a debtor

obtained "fair market value" to approve a sale of assets. Thus, there is no basis for a finding of

"bad faith" on the part of Plaintiffs and Defendants' request for judicial estoppel should be

denied.

---

to the relief they seek speaks volumes about Defendants' understanding of the impossibility of proving bad faith on this record.

**C.    The Requested Relief Is Not Narrowly Tailored to Address the Harm Alleged.**

Judicial estoppel is an extreme remedy that should not be employed unless it is "tailored to address the harm identified" and no lesser sanction would adequately remedy the damage done by the litigant's misconduct. Klein v. Stahl GMBH & Co. Maschinefabrik, 185 F.3d 98, 108 (3d Cir. 1999) (citing Republic of Philippines v. Westinghouse Elec. Corp., 43 F.3d 65, 73 (3d Cir. 1994)). Defendants seek to preclude the expert testimony of Ms. Taylor before she has even had an opportunity to testify. This type of draconian relief is not narrowly tailored to address the harm identified and should be denied. See Konstantopoulos v. Westvaco Corp., 112 F.3d 710, 719 (3d Cir. 1997) ("the exclusion of critical evidence is an 'extreme' sanction, not normally to be imposed absent a showing of willful deception or 'flagrant disregard' of a court order by the proponent of the evidence"); Kremsner v. Fortuna-SAS, 1989 WL 70687, at *1 (E.D. Pa. June 23, 1989) ("Preclusion of testimony and dismissal are extreme sanctions to be imposed only in rare situations. Preclusion of testimony can be tantamount to dismissal.") (citations omitted).[8]

To the extent that the Court has any doubts as to whether Defendants' requests for judicial estoppel or collateral estoppel should be approved, Plaintiffs should be given an opportunity to address these issues at trial. Defendants' motion is based heavily on the deposition testimony of Ms. Taylor and Mr. Charnetzki -- depositions that were conducted entirely by Defendants' counsel. Thus, Plaintiffs should be given an opportunity to supplement the record on these issues through direct examination of Ms. Taylor and Mr. Charnetzki at trial. See Montrose, 243 F.3d at 780 (noting that equity requires that the presiding court give the party

---

[8]    In support of this argument, Plaintiffs incorporate by reference the discussion contained in Section IV of "Plaintiffs' Memorandum in Opposition to Defendants' Motion *In Limine* to Exclude the Expert Testimony of Paul Charnetzki and Carlyn Taylor as a Sanction for the Spoliation of Information Considered in Forming Their Opinions" filed contemporaneously hereto.

19

to be estopped a meaningful opportunity to provide an explanation for its allegedly inconsistent positions).

Additionally, there are procedural issues with Defendants' motion which support Plaintiffs being given an opportunity to supplement the record. Defendants have pled the doctrines of judicial estoppel and collateral estoppel as affirmative defenses in their Amended Answer. (Amended Answer at ¶¶ 281-295 and 296-302). So while Defendants' motion may be styled a motion *in limine*, they are essentially seeking a ruling on their affirmative defenses, despite an incomplete record. Given the close proximity of trial in this matter, and the Court's previous statement that it would not consider summary judgment motions in this case, Plaintiffs submit that the motion should be denied and Defendants given the opportunity to pursue their defenses through cross-examination at trial.

## II. This Court Is Not Being Asked to Consider Issues Litigated Before and Decided by the Bankruptcy Court.

Defendants' attempt to preclude the testimony of Ms. Taylor and Mr. Charnetzki under the doctrine of collateral estoppel is equally flawed. Under the doctrine of collateral estoppel, a party may be estopped from relitigating an issue where the following elements are present: "(1) the issue sought to be precluded must be the same as the one involved in the prior action; (2) the issue must have actually been litigated; (3) the issue must have been determined by a valid final judgment; and (4) the determination must have been essential to the prior judgment." In re Docteroff, 133 F.3d 210 (3d Cir. 1997) (citing In re Ross, 602 F.2d 604, 608 (3d Cir. 1979)).[9] Defendants' request should be denied, as Ms. Taylor's testimony presents issues that were never addressed by the Bankruptcy Court.

---

[9] The only opinion cited by Defendants, In re Genesis, 324 B.R. 510, 427 (Bankr. D.Del. 2005), was recently reversed by this Court precisely because the Bankruptcy Court had, in Judge Jordan's view, taken too broad of a view as to what had "actually been litigated" in the Bankruptcy Court. See Haskell v. Goldman, Sachs & Co., 2006 U.S. Dist. LEXIS 18177 (D.Del. Mar. 29, 2006).

20

Defendants assert that "even the most cursory review of the record in the Bankruptcy Court reveals that the issues raised in Ms. Taylor's report (and forming the basis for Mr. Charnetzki's damages calculation) – i.e., the advisability of the global bidding process, the appropriateness of the sale to Cerberus, and the relative benefits of a restructuring – were central to the prior proceedings." (OB at 17). Defendants' "cursory review", however, again fails to take into account the context in which the Bankruptcy Court addressed these issues. As discussed above, the Debtors were forced to pursue a sale of the Core Telecom Business after BCE terminated funding and eliminated any prospect that the Debtors had of pursuing a stand-alone restructuring. Thus, the Bankruptcy Court was never asked to determine whether the sale to Cerberus was preferable to a stand-alone reorganization in a hypothetical world where BCE honored its commitments and the Debtors were not facing the imminent reality of being out of cash to operate. Rather, the only issue facing the Bankruptcy Court was whether the sale was in the best interest of the Debtors' estates given the circumstances that had been dictated by BCE (i.e., limited short-term funding and an impending Event of Default).

Ms. Taylor's expert report, on the other hand, assumes the availability of the additional funding from BCE (funding which BCE committed to provide) necessary to pursue a stand-alone reorganization. (Taylor Rpt. at 4). Thus, Ms. Taylor's expert report is predicated upon a restructuring alternative that was not available to the Debtors as a result of BCE's breach. In considering Ms. Taylor's expert testimony (and Mr. Charnetzki's related calculation of damages), this Court will be required to address issues which the Bankruptcy Court unfortunately never had an opportunity to address, i.e., issues relating to the feasibility of a stand-alone plan of reorganization. These are issues that were not litigated before the Bankruptcy Court and therefore do not support Defendants' request for collateral estoppel.

21

### III.    The Relief Sought In the Proposed Order Is Too Broad.

Even if the Court were to somehow grant the relief requested by Defendants in their motion, the proposed form of order is overly broad. The proposed order provides that "the expert testimony of Carlyn Taylor and the related testimony of Paul Charnetzki shall be excluded." This language provides little specificity as to which portion of Mr. Charnetzki's testimony Defendants seek to exclude. In the unlikely event that the motion is granted, the form of order should be revised to reflect that Mr. Charnetzki's testimony is excluded solely with respect to his "alternative" damages theory and not with respect to his testimony on insolvency and the value of TI and its subsidiaries as of June 2001.

### CONCLUSION

WHEREFORE, Plaintiffs respectfully request that Defendants' motion be denied for the reasons stated herein.

| | |
|---|---|
| /s/ Russell C. Silberglied | /s/ Joseph A. Rosenthal |
| Gregory V. Varallo (No. 2242) | Joseph A. Rosenthal (No. 234) |
| C. Malcolm Cochran, IV (No. 2377) | Rosenthal, Monhait & Goddess, P.A. |
| Russell C. Silberglied (No. 3462) | 1401 Mellon Bank Center |
| Chad M. Shandler (No. 3796) | P.O. Box 1070 |
| Richards, Layton & Finger, P.A. | Wilmington, Delaware 19899-1070 |
| One Rodney Square | (302) 656-4433 |
| P.O. Box 551 | |
| Wilmington, DE 19801 | - and - |
| (302) 651-7700 | |
| *Attorneys for the Debtor Plaintiffs* | John P. Amato |
| | Mark S. Indelicato |
| | Zachary G. Newman |
| | Jeffrey L. Schwartz |
| | Hahn & Hessen LLP |
| | 488 Madison Avenue |
| | New York, New York 10022 |
| Dated: May 31, 2006 | (212) 478-7200 |
| Wilmington, Delaware | *Attorneys for the Official Committee of* |
| | *Unsecured Creditors of Teleglobe* |
| | *Communication Corporation, et al* |

22

## CERTIFICATE OF SERVICE

I hereby certify that on May 31, 2006, I hand delivered and electronically filed the foregoing document with the Clerk of Court using CM/ECF, which will send notification of such filing(s) to the following:

Pauline K. Morgan, Esq.
YOUNG CONAWAY STARGATT &
TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899

Joseph A. Rosenthal , Esq.
ROSENTHAL, MONHAIT, GROSS &
GODDESS, P.A.
1401 Mellon Bank Center
P.O. Box 1070
Wilmington, DE 19801

I hereby certify that on May 31, 2006, I have sent by Federal Express the foregoing document to the following non-registered participants:

John Amato, Esq.
Hahn & Hessen LLP
488 Madison Avenue
New York, NY 10022

George J. Wade, Esq.
Daniel Schimmel, Esq.
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022

Russell C. Silberglied (#3462)
Silberglied@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700