# EXHIBIT 1

## BCE INC.

### RESOLUTION ADOPTED BY THE BOARD OF DIRECTORS
### NOVEMBER 28, 2001

**Business and Financial Plans and Budget**

WHEREAS the Board of Directors has reviewed at this meeting the Corporation's business and financial plans for 2002 to 2004;

WHEREAS such plans contemplate investments and/or the providing of financial assistance to certain subsidiaries as well as the raising of external funds by the Corporation;

**Resolution No. 7**

On motion duly made and seconded, it was unanimously resolved:

1.      THAT the 2002 to 2004 business and financial plans of the Corporation presented to this meeting, a copy of which are directed to be filed with the records of this meeting, be and they are hereby approved;

2.      THAT the 2002 annual budget of the Corporation presented to this meeting (the "Budget"), a copy of which is directed to be filed with the records of this meeting, be and it is hereby also approved;

3.      THAT all expenditures, transactions or liabilities contemplated in the Budget shall be approved, from time to time, by the appropriate officers or other employees of the Corporation or its affiliates in accordance with the Final Authorizations and Schedule of Authorities of the Corporation except as otherwise set forth in this resolution or as may be authorized by other existing or future resolutions of the Board of Directors of the Corporation;

4.      THAT, the Corporation be and it is hereby authorized, from time to time on or prior to December 31, 2002, to make investments in and to provide financial assistance to Teleglobe Inc. or any subsidiary thereof ("Teleglobe") (including investments to fund debt service pertaining to Excel Communications, Inc.) or to Bell Expressvu Limited Partnership or any subsidiary thereof ("Expressvu") in amounts not to exceed in the aggregate U.S. $850 million in the case of Teleglobe and $400 million in the case of Expressvu (the "Additional Financial Assistance"), the whole as set forth below:

(a)      such Additional Financial Assistance may be made by way of acquisition of debt securities, share or partnership units, loans, guarantees,

C:\WINDOWS\TEMP\budget-res.doc17c.doc



EXHIBIT

BCE-AD 0069195

indemnities or any combination of the foregoing, for general corporate purposes including for purposes contemplated by the Budget;

(b)     the Corporation be and it is hereby authorized to provide the Additional Financial Assistance directly or through one or more subsidiaries;

(c)     if Additional Financial Assistance is provided through a subsidiary or subsidiaries, the Corporation be and it is hereby authorized to purchase shares or debt securities of, to make a loan to or otherwise to provide financial assistance to the said subsidiary or subsidiaries to enable the said subsidiary or subsidiaries to provide the Additional Financial Assistance to Teleglobe or Expressvu; and

(d)     all advances of funds hereunder shall be at such time and upon such terms and conditions as the Chairman and Chief Executive Officer of the Corporation (or any officer designated by such person) may in his/her discretion determine;

5.     THAT, in connection with the matters referred to in Section 6 of this resolution, Messrs. R.J. Currie, J.C. Monty, J.E. Newall and G. Saint-Pierre be and they are hereby appointed as a committee of the Board of Directors (the "Financing Committee") to take the actions specified in such Section 6 and to take all such other actions as may be necessary or desirable to carry out the intent and to accomplish the purposes of such Section 6; the quorum for all meetings of the Financing Committee (which meetings may take place by phone or other electronic means of communication) shall be any two members of such Committee, which quorum shall have all the powers of the Financing Committee as a whole;

6.     THAT the Corporation be and it is hereby authorized to raise, in one or more separate tranches, external financing (other than through the issuance of Common Shares) of up to $1,300 million, as contemplated by the Budget, from time to time on or prior to December 31, 2002 (provided, however, that any financing commenced prior to December 31, 2002 shall be permitted by this resolution as long as it is completed by January 31, 2003), and the corporation hereby delegates to the Financing Committee the authority to approve, from time to time, the terms and conditions of any such financings, the whole as set forth below:

(a)     any such financings may be carried out pursuant to credit facilities to be provided by one or more financial institutions and the Financing Ccommittee shall have authority to approve and authorize any credit, loan or other agreements relating thereto;

(b)     any such financings may also be carried out through the issuance, by private placement in Canada, the United States (including, but not limited to, under Rule 144A under the *United States Securities Act of 1933*) or any other jurisdiction or to residents of such jurisdictions, or otherwise in the

C:\WINDOWS\TEMP\budget-res.doc17c.doc

2

BCE-AD 0069196

European market, of one or more series of secured or unsecured notes, debentures or other debt instruments (the "Debt Securities"), which Debt Securities shall exclude, however, Medium Term Notes or other securities that may be issued from time to time by the Corporation under any existing or subsequently authorized shelf prospectuses by the issuance of which Medium Term Notes or other securities shall be approved as per the terms of any existing or future resolutions by the Board of Directors of the Corporation relating to the issuance of securities under such shelf prospectuses);

(c)   the Financing Committee shall have authority to:

(i)   designate the Debt Securities and determine the form and denominations thereof;

(ii)   determine the aggregate principal amount of the Debt Securities;

(iii)   determine all the terms and conditions applicable thereto, including, without limiting the generality of the foregoing, the currency in which the Debt Securities will be denominated, the issue price, the rate of interest, the date of issue of the Debt Securities, the dates upon which interest shall be paid and the date or dates of maturity thereof;

(iv)   determine that the Debt Securities shall be subordinate in right of payment to other indebtedness for borrowed money of the corporation;

(v)   determine the appropriate stock exchanges for the listing of the Debt Securities, if any;

(vi)   approve the form and content of, and to authorize the execution of any, fiscal and paying agency agreement, trust indenture, supplemental trust indenture or any other instrument creating the Debt Securities;

(vii)   approve the form and content of any security certificates evidencing the Debt Securities;

(viii)   approve the form and substance, and authorize the execution and direct the filing, of all offering circulars, private placement memoranda, or other offering documents (other than prospectuses and registration statements) relating to the offering of the Debt Securities, if any;

C:\WINDOWS\TEMP\budget-res.doc17c.doc

3

BCE-AD 0069197

    (ix)    designate one or more financial institutions in which the Corporation's funds may be deposited or withdrawn through one or more accounts;

    (x)    approve and authorize any underwriting or agency agreements with one or more underwriters or agents to or through whom the Debt Securities will be offered and to fix the price at which the Debt Securities will be issued and the commission payable to such underwriters or agents, if any;

    (xi)    approve and authorize any purchase agreements, in the case of direct sales by the Corporation, with one or more purchasers to whom the Debt Securities shall be sold and to fix the price at which the Debt Securities will be sold;

    (xii)    appoint any transfer agent and registrar for the transfer and registration of any Debt Securities to be issued, and to approve and authorize any agreement relating thereto; and

    (xiii)    take all such other actions as may be necessary or desirable for the purposes of carrying out the intent and to accomplish the purpose of this Section 6;

(d)    notwithstanding the foregoing, the Financing Committee will not have authority to approve the following actions which shall be approved by subsequent resolution of this Board of Directors:

    (i)    the issuance of any Preferred Shares of the Corporation; and

    (ii)    the filing in Canada or the United States of any new prospectus or registration statement, respectively (which, for greater certainty, shall not include any filings pursuant to any existing or subsequently authorized shelf prospectuses of the Corporation) for a public offering of Debt Securities of the Corporation; and

(e)    nothing herein shall restrict the authority of the Corporation to issue commercial paper or other short-term indebtedness authorized by existing or future resolution of the Board of Directors of the Corporation, and any such borrowings shall not be counted towards the amount of external financings contemplated by Section 6 thereof;

7.    THAT any officer of the Corporation be and each of them is hereby authorized to take such action and to execute such documents as may be necessary or advisable in order to carry out the intent and purpose of this resolution.

BCE-AD 0069198

# EXHIBIT 2

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | |
| | : | **Chapter 11** |
| TELEGLOBE COMMUNICATIONS | : | |
| CORPORATION, a Delaware | : | **Jointly Administered** |
| corporation, <u>et al.</u>,[1] | : | **Case No. 02- 11518 (MFW)** |
| | : | |
| Debtors. | : | **Re: Docket No. 37** |

### NOTICE OF FILING OF ADDITIONAL EXHIBIT

PLEASE TAKE NOTICE that on May 30, 2002 the above-captioned debtors and

debtors in possession (the "Debtors") filed the **Motion of Debtors and Debtors in Possession for**

**Entry of Interim and Final Orders Authorizing First Priority Secured Postpetition Financing,**

**Pursuant to Section 364(c) of the Bankruptcy Code and Rule 4001 of the Federal Rules of**

**Bankruptcy Procedure** [Docket No 37] (the "Financing Motion")

PLEASE TAKE FURTHER NOTICE that the Debtors hereby file the attached

additional exhibit to the Financing Motion

Dated  May 31, 2002
     Wilmington, Delaware

Mark D  Collins (DE 2981)
Daniel J  DeFranceschi (DE 2732)
John H  Knight (DE 3848)
RICHARDS, LAYTON & FINGER, P A
One Rodney Square
P  O  Box 551
Wilmington, Delaware 19899
(302) 651-7700

PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

---

[1]      The Debtors are the following eleven entities: Teleglobe Communications Corporation, Teleglobe USA
Inc . Optel Telecommunications, Inc . Teleglobe Holdings (U S ) Corporation. Teleglobe Marine (U.S ) Inc .
Teleglobe Holding Corp . Teleglobe Telecom Corporation. Teleglobe Investment Corp . Teleglobe Luxembourg
LLC. Teleglobe Puerto Rico Inc  and Teleglobe Submarine Inc

## COMMITMENT LETTER

### TELEGLOBE INC.

WHEREAS, Teleglobe Inc. has requested that BCE Inc. provide it funding in order to assist with certain restructuring obligations of Teleglobe Inc. and its subsidiaries, and therefore BCE Inc. through its wholly-owned subsidiary 3810186 Canada Inc., has entered into this Commitment Letter to provide up to U.S.$100,000,000 to Teleglobe Inc. and Teleglobe Canada Limited Partnership in accordance with the terms set out herein;

NOW THEREFORE, the parties hereto, in consideration of the foregoing and the mutual agreements contained herein (the receipt and adequacy of which are acknowledged), agree as follows:

| | |
|---|---|
| BORROWERS: | Teleglobe Inc. and Teleglobe Canada Limited Partnership (the "Borrowers") |
| GUARANTORS: | Teleglobe Financial Holdings Ltd<br>Teleglobe Management Services Inc.<br>3692795 Canada Inc.<br>Teleglobe Canada Management Services Inc.<br>Teleglobe Marine Inc.<br>Teleglobe Marine L.P.<br>Telecom Vision Call Center Services, General Partnership (the "Canadian Guarantors")<br>Teleglobe Holdings (U.S.) Corporation<br>Teleglobe Holding Corp.<br>Teleglobe Telecom Corporation<br>Teleglobe Marine (U.S.) Inc.<br>Teleglobe Submarine Inc.<br>Teleglobe Investment Corp.<br>Teleglobe Communications Corporation<br>Optel Telecommunications Inc.<br>Teleglobe USA Inc.<br>Teleglobe Luxembourg LLC<br>Teleglobe Puerto Rico Inc.<br>(collectively, the "U.S. Guarantors", together with Canadian Guarantors, the "Guarantors") |
| LENDER: | 3810186 Canada Inc. |
| LENDER GUARANTEE: | BCE Inc. hereby irrevocably and unconditionally guarantees the obligations of the Lender to the Borrowers under this Commitment Letter. |
| TYPE OF DIP FACILITY: | A standby credit facility with a commitment (the "Commitment") to advance up to U.S. $100,000,000 or the Canadian dollar equivalent thereof (the "DIP Facility"). |

- 2 -

CLOSING DATE:    The date on which all conditions precedent to advance have been satisfied or waived (the "Closing Date").

AVAILABILITY:    The Lender shall advance directly to the Borrowers, after the Closing Date, on not less than one (1) Business Day written notice received by the Lender no later than 11:00 a.m. on a Business Day up to an aggregate amount of U.S.$100,000,000.

On the Closing Date the Lender shall advance directly to the Borrowers Cdn$4,000,000 plus accrued interest to the Closing Date and US$3,849,795.84 plus accrued interest to the Closing Date together with the structuring fee payable on the Closing Date (the "Initial Drawdown") and such advances shall be used immediately to repay the promissory notes dated April 23, 2002 and April 26, 2002 respectively of Teleglobe Inc. held by the Lender in the foregoing amounts.

Subject to the terms and conditions of this Commitment Letter, proceeds of the DIP Facility shall be used solely in accordance with the DIP Budget delivered to the Lender by the Monitor (as hereinafter defined) on May 14, 2002. In no event shall the maximum advances outstanding at the end of any calendar week exceed the following:

| Week of | Maximum Cumulative Borrowings (including the Initial Drawdown) |
|---------|--------------------------------------------------------------|
| May 19, 2002 | $17,000,000 |
| May 26, 2002 | $35,000,000 |
| June 2, 2002 | $59,000,000 |
| June 9, 2002 | $59,000,000 |
| June 16, 2002 | $59,000,000 |
| June 23, 2002 | $92,000,000 |
| June 30, 2002 | $97,000,000 |
| July 7, 2002 | $97,000,000 |
| July 14, 2002 | $97,000,000 |
| July 21, 2002 | $100,000,000 |
| July 28, 2002 | $100,000,000 |
| August 4, 2002 | $100,000,000 |

- 3 -

Advances will be made strictly in accordance with (i) the terms hereof; (ii) the CCAA Order (as hereinafter defined); and (iii) the DIP Budget.

Each advance under the DIP Facility shall be not less than U.S $500,000 or the Canadian dollar equivalent thereof and then in larger whole multiples of US$10,000 or the Canadian dollar equivalent thereof other than the Initial Drawdown.

All advances in respect of the DIP Facility shall be by way of either (i) prime rate loans in Canadian dollars ("Prime Rate Loans") or (ii) Base Rate (Canada) Loans in U.S. dollars ("Base Rate Loans", together with Prime Rate Loans, the "Loans").

For the purposes of this Commitment Letter, a "Business Day" shall mean any day on which the banks in Montreal, Canada and New York, New York are generally open for business.

For the purposes of determining the availability under the DIP Facility or the Canadian dollar equivalent of any amount hereunder, any Prime Rate Loans shall be converted to that amount of U.S. dollars which would be required to buy such amount of Canadian dollars using Bank of Canada's noon spot rate on that day and if that is not a Business Day on the immediate preceding Business Day.

The commitment in respect of the DIP Facility shall expire on the Maturity Date (as hereinafter defined) and all Loans and all obligations owed pursuant to the DIP Facility shall be repaid in full no later than the Maturity Date without the Lender being required to make demand upon the Borrowers or to give notice that the DIP Facility has expired and the obligations are due and payable.

REPAYMENT:     The DIP Facility shall be repayable in full on the date (the "Maturity Date") which is the earlier of (i) September 1, 2002 or such later date the Lender in its sole discretion may agree to in writing, (ii) the effective date of the implementation of a plan of compromise and/or arrangement under the CCAA, (iii) the closing of any Court approved sale or disposition of (a) substantially all of the assets and business of the Borrowers, and/or their subsidiaries or (b) the Bilateral Business, (iv) an occurrence of acceleration of the DIP Facility after an Event of Default (as hereinafter defined).

PREPAYMENTS:     The Borrowers may, upon not less than one (1) Business Day's prior written or telephonic notice confirmed in writing given to the Lender, at any time and from time to time prepay any Loans on any Business Day. Notice of prepayment having been given as aforesaid, the principal amount of the Loans specified in such notice shall become due and payable on the prepayment date

- 4 -

specified therein.

The Borrowers may, upon not less than three (3) Business Days' prior written or telephonic notice confirmed in writing to the Lender, at any time and from time to time terminate in whole or permanently reduce in part, without premium or penalty, any unutilized Commitments. The Borrowers' notice to the Lender shall designate the date (which shall be a Business Day) of such termination or reduction and the amount of any partial reduction, and such termination or reduction of the Commitment, shall be effective on the date specified in the Borrowers' notice.

The Loans shall be prepaid and/or the Commitment shall be permanently reduced in the amounts and under the circumstances set forth below, all such prepayments and/or reductions to be applied as set forth below:

(a)     no later than the first Business Day following the date of receipt by the Borrowers or a Guarantor of any Net Asset Sale Proceeds in respect of any Asset Sale, the Borrowers shall prepay the Loans and the Commitment shall be permanently reduced in an aggregate amount equal to 100% of such Net Asset Sale Proceeds, provided that during the currency of this Commitment Letter the Borrowers may retain up to US$7,500,000 of cumulative Net Asset Sale Proceeds without any prepayment or reduction pursuant to this subsection, provided that such retained funds are used in accordance with the DIP Budget (as hereinafter defined).

For the purposes of this DIP Facility the following terms shall have the following meanings:

"Asset Sale" means the sale, lease, transfer, assignment or disposition by any other means by the Borrowers or any Guarantor to any Person other than the Borrowers or a Guarantor of (i) any securities or investments of the Borrowers or any Guarantor, (ii) any assets comprising all or a portion of any division or line of business of the Borrowers or any Guarantor, or (iii) any other assets (whether tangible or intangible including, without limiting any foregoing, any account receivables or any other right to receive payment from any other Person) of the Borrowers or any Guarantor (other than (a) inventory sold in the ordinary course of business, (b) obsolete equipment and (c) any such other assets to the extent that the aggregate value of such assets sold in any single

- 5 -

transaction or related series of transactions is US$250,000 or less. The value of any disposition under Subsection (c) is to be included when calculating the Net Asset Sale Proceeds for the purposes of determining the cumulative amount permitted to be retained if the proceeds of such disposition exceed U.S.$100,000.

"Net Asset Sale Proceeds" means, with respect to any Asset Sale, cash payments (including any cash received by way of deferred payment pursuant to, or by monetization of, a note receivable or any non-cash consideration, but only as and when so received) received from such Asset Sale (including any disposition in accordance with the exception in paragraph (c) of such definition), net of any bona fide direct costs incurred in connection with such Asset Sale and approved by the Court, if such approval is necessary pursuant to the Initial Order or any other order made in the CCAA Proceedings; and

(b)     so long as any Loans remain outstanding, the maximum aggregate amount of Cash and Cash Equivalents (as hereinafter defined) (which for greater certainty shall be determined net of (i) outstanding cheques, petty cash on hand and payroll obligations payable within fourteen (14) days of the date of determination; (ii) any Cash and Cash Equivalents which have been segregated for use as collateral for obligations arising under documentary credits (whether trade or standby); (iii) with reference to bank deposits, minimum balances required to be deposited by the holding financial institution; (iv) approximately U.S.$720,000 held in respect of the winding up of Excel Communications (U.K.) Limited; (v) approximately U.S.$7,200,000 held by Teleglobe Marine (U.S.) Inc. in respect of obligations under partnership and financing agreements related to the vessels used in its operations; and (vi) deposits held by active foreign affiliates) (the "Net Cash") which the Borrowers or the Guarantors may hold as at the close of business on Friday of each week shall not exceed U.S.$10 million. To the extent that the Net Cash is in excess of such limit, on the next Business Day the Borrowers shall make a prepayment of Loans in an amount sufficient to eliminate such excess (without any reduction of the Commitments).

For the purposes of this DIP Facility the following term shall

- 6 -

have the following meaning:

"**Cash and Cash Equivalents**" means bank deposits and investments in securities having terms of 30 days or less issued by the federal government of Canada or the United States of America or the government of any province or state thereof or by any Canadian chartered bank or any bank incorporated in the United States of America having shareholders' equity in excess of U.S.$3,000,000,000.

INTEREST RATE: Prime Rate Loans shall bear interest at the Canadian prime rate of The Bank of Nova Scotia ("BNS") plus 1.5% per annum, payable monthly in arrears on the first business day of the following month and on the Maturity Date.

Base Rate Loans shall be an interest at the Base Rate (Canada) of BNS for U.S. dollars loan plus 1.5% per annum payable monthly in arrears on the first business day of the following month and on the maturity date.

Interest shall be calculated daily for the actual number of days elapsed in the period during which it accrues based on a year of 365 or 366 days, as the case may be.

SUPER PRIORITY OF OBLIGATIONS: All obligations owing under this Commitment Letter, the Collateral Documents or any other document executed by the parties hereto in connection with the transactions contemplated by this Commitment Letter (the "Loan Documents") (including, but not limited to, the obligation to pay principal, interest, professional fees, costs, charges, commissions, expenses and any indemnification payment) shall be paid as provided in the Loan Documents when due, without defense, offset, reduction or counterclaim, and, except as expressly provided in the Orders (as hereinafter defined), shall be senior in priority to any other indebtedness, liabilities and obligations of the Borrowers and the Guarantors arising either before or after the date of commencement of the CCAA Proceedings (the "Filing Date"), whether in the CCAA Proceedings or otherwise.

The liens in favour of the Lender under the Collateral Documents (as hereinafter defined) (the "Liens") and granted in the Orders shall be first priority liens as against any and all other liens against the Borrowers or any Guarantor or any Collateral, whether arising before or after the Filing Date.

MONTHLY COMMITMENT FEE: 0.25% per annum of the undrawn portion of the Commitment payable to the Lender monthly in arrears.

CONDITIONS
PRECEDENT TO
FUNDING:

The DIP Facility shall be subject to the following conditions precedent, all of which shall be for the benefit of the Lender and shall be satisfied on or before the date specified in each condition precedent and otherwise on the occasion of each drawdown or advance under the DIP Facility:

(a)     a Court of competent jurisdiction shall have issued an order or orders, in form and substance acceptable to the Lender pursuant to the *Companies' Creditors Arrangements Act* (Canada) (the "CCAA") on or before May 15, 2002 in relation to the Borrowers and the Canadian Guarantors (the "CCAA Order"), staying all proceedings (except as hereinafter expressly provided in favour of the Lender) against the Borrowers and the Guarantors and their assets, approving this DIP Facility, creating a charge over all the assets of the Borrowers and the Guarantors in favour of the Lender (the "DIP Charge") and appointing Ernst & Young Inc. or such other entity as the Lender may approve as monitor under the CCAA (the "Monitor");

(b)     the CCAA Order is in full force and effect, not subject to any stay, and shall not have been vacated, modified, reversed or amended;

(c)     there shall have been filed by May 15, 2002 with a Court of competent jurisdiction a petition requesting an order in form and substance acceptable to the Lender pursuant to Section 304 of the U.S. Bankruptcy Code in relation to the Borrowers and the Guarantors (the "U.S. Order)" staying all proceedings (except as hereinafter expressly provided in favour of the Lender) against the Borrowers and the Guarantors and their assets and providing that any payments or advances made pursuant to this DIP Facility shall not be subject to seizure or diverted in any other manner;

(d)     a Court of competent jurisdiction shall have issued the U.S. Order;

(e)     once obtained, the U.S. Order and the U.S. DIP Order remain in full force and effect, not subject to any stay, and shall not have been vacated, modified, reversed or amended;

(f)     the Lender shall be satisfied that:

        (i)     each of the Borrowers and each of the Guarantors has complied with and is continuing to comply in all material respects with all applicable laws,

- 8 -

regulations and policies and the requirements of applicable regulators in relation to its activities and have obtained all necessary government or third party consents, to the extent that the failure to comply would have a material adverse effect on the business of the Borrowers or the Guarantors or on the performance of the obligations hereunder; and

(ii) other than those securing obligations which are in aggregate less than US$1,000,000, there are no mortgages, pledges, charges, security interests, liens or other encumbrances ranking ahead of any security held by the Lender created or granted on or after the Orders, except as provided for herein, or arising by operation of law in the ordinary course of business without any contractual grant of security or as have been previously disclosed to, and hereafter expressly accepted by the Lender;

(g) the structuring fee payable upon the Closing Date shall be paid in full prior to or on advance thereof from the proceeds of the Initial Drawdown by the Lender under this Commitment Letter;

(h) all of the reasonable expenses of the Lender with respect to this Commitment Letter, including, without limitation, reasonable travel expenses and reasonable legal fees of counsel engaged by the Lender in connection with the DIP Facility shall have been paid in full to the extent invoices therefor have been received at least five (5) days prior to the date of the applicable drawdown;

(i) the Lender shall have received in form and substance satisfactory to the Lender a budget which includes the cash flow forecast for the Borrowers and the Guarantors setting out anticipated cash receipts and disbursements on a month by month basis for the period commencing on the Filing Date through and including September 1, 2002 together with an explanation of the material assumptions on which such projections are based (the "DIP Budget");

(j) the Lender shall have received in form and substance satisfactory to the Lender a contingent plan for network transitioning and rationalization (the "Network Plan");

(k) the Borrowers shall have delivered to the Lender a Draw Down Certificate executed by a senior officer of the Borrower, in form and substance satisfactory to the Lender, to the effect that (i) the representations and warranties set forth below are true, correct and complete

in all material respects on and as of the date of any advance hereunder to the same extent as though made on and as of that date (or, to the extent such representations and warranties specifically relate to an earlier date, that such representations and warranties were true, correct and complete in all material respects on and as of such earlier date), (ii) the Borrowers and each Guarantor shall have performed in all material respects all agreements and satisfied all conditions which this Commitment Letter provides shall be performed or satisfied by it on or before the Closing Date except as otherwise disclosed to and agreed to in writing by the Lender, and (iii) the proposed advance is permitted under and pursuant to the DIP Budget;

(l)    any changes to the Chief Restructuring Officer, Chief Executive Officer, Chief Financial Officer, Chief Operating Officer or any other senior executives of the Borrowers (together the "Senior Officers") shall be satisfactory to the Lender; and

(m)    no Event of Default shall have occurred or be continuing.

REPRESENTATIONS AND WARRANTIES:

To the knowledge and belief of the officers of the Borrowers and Guarantors executing this Commitment Letter, and without special investigation or personal liability:

(a)    each Borrower and each Guarantor is a corporation or partnership, as the case may be, duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization. Subject to compliance with any applicable provisions of the CCAA and the Orders, each Borrower and each Guarantor has all requisite power and authority to own and operate their properties, to carry on their business as now conducted and as proposed to be conducted, to enter into the Loan Documents to which it is a party, to carry out the transactions contemplated thereby. Each Borrower and each Guarantor is in compliance with all applicable Orders;

(b)    the execution, delivery and performance of the Loan Documents (i) have been duly authorized by all necessary action on the part of the issuer thereof and (ii) have been or by the Closing Date will be duly authorized by the Court pursuant to the Orders;

(c)    the execution, delivery and performance by each Borrower and each Guarantor of the Loan Documents and

- 10 -

the consummation of the transactions contemplated by the Loan Documents do not and will not (i) violate any provision of any law or any governmental rule or regulation applicable to any Borrower or any Guarantor, the articles of incorporation, bylaws and other organizational, formation or governing documents of any Borrower or any Guarantor or any order, judgment or decree of any court or other agency of government binding on any Borrower or any Guarantor, (ii)conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under an applicable order of the Court, (iii) result in or require the creation or imposition of any Lien upon any of the properties or assets of any Borrower or any Guarantor (other than any Liens created under any of the Loan Documents in favour of the Lender), (iv) enquire any approval of stockholders or any approval or consent of any Person under any contractual obligation to which any Borrower or any Guarantor is a party except for such approvals, consents or order of the Court which will be obtained on or before the Closing Date, other than from parties to leases, subleases, offers to lease or other contracts where the attachment of the Liens granted in favour of the Lender under the Collateral Documents and the Orders would constitute a breach of the terms of or permit a party to terminate any such lease, sublease, offer to lease or other contract, or (v) violate the Orders or any subsequent order of the Court in the CCAA Proceedings or other similar proceedings in a foreign jurisdiction;

(d)     the execution, delivery and performance by each Borrower and each Guarantor of the Loan Documents and the consummation of the transactions contemplated by the Loan Documents do not and will not require any registration with, consent or approval of, or notice to, or other action to, with or by, any federal, provincial or other governmental authority or regulatory body, except for the Court, and other than filings expressly contemplated by the Loan Documents; and

(e)     the CCAA Proceedings were commenced on the Filing Date in accordance with applicable law and proper notice thereof and of the hearing for the approval of the Initial Order has been given as identified in the affidavit of service provided to the Lender.

COVENANTS:          (a)    neither the Borrowers nor the Guarantors shall, without
                           first obtaining the written consent of the Lender, use the
                           property of the Borrowers or the Guarantors, real or
                           personal to:

                    (i)    guarantee the performance, obligations or debt of
                           the Borrowers or the Guarantors to any another
                           party or guarantee the performance, obligations or
                           debt of any other party to a third party; or

                    (ii)   finance, directly or indirectly, any person or make
                           any investment other than financing required by
                           certain foreign affiliates of the Borrowers as
                           contemplated in the DIP Budget or Network Plan;

                    (b)    neither the Borrowers nor the Guarantors shall, without
                           first obtaining the written consent of the Lender, sell,
                           transfer, assign or dispose by any means to any other
                           Person any asset which sale, transfer, assignment or
                           disposal would constitute an Asset Sale;

                    (c)    other than non compliance as a result of actions taken
                           pursuant to the Network Plan or for which they have
                           obtained the approval of the Lender, each of the
                           Borrowers and the Guarantors shall continue to comply
                           with all material contracts and leases;

                    (d)    the Borrowers shall deliver to the Lender within 10
                           Business Days of the Closing Date, a form of report or
                           reports and a schedule of deliveries and meetings to
                           discuss such reports and deliveries prepared in
                           consultation with the Monitor which shall be satisfactory
                           to the Lender.   In addition, the Borrowers and the
                           Guarantors shall provide the Lender with any information
                           reasonably requested by the Lender the provision of
                           which does not violate any Order or any confidentiality
                           agreements entered into by any Borrower or Guarantor.
                           For greater certainty the Borrowers will permit the Lender
                           and its representatives to be granted full access by the
                           Borrowers, at all reasonable times during normal business
                           hours, to all premises of the Borrowers and to all
                           financial, legal and other information, records and data of
                           the Borrowers, required in the view of the Lender to make
                           a full examination of the Borrowers, and so that there is
                           delivered to counsel to the Lender for inspection and
                           review copies of all minute books and corporate records
                           of the Borrowers, title documents, surveys, material
                           contracts,    agreements,    licenses,    permits,    patents,
                           trademarks and other instruments, provided always that

- 12 -

all investigations are conducted so as to not unduly interfere with the operations of the Borrowers. No such investigations and no information furnished to representatives of the Lender shall affect or mitigate in any way any of the representations, warranties and covenants contained in this Commitment Letter;

(e)    as soon as practicable after delivery to the Board of Directors of Teleglobe Inc. and in any event no later than the fifteenth (15th) day of each month, cause the Monitor to deliver to the Lender and directors a report by the Monitor of directors' statutory liabilities for the previous month, in form and substance satisfactory to the Lender;

(f)    promptly upon the Borrowers obtaining knowledge of any claim against one or more directors, deliver to the Lender an Officer's Certificate specifying the nature and quantum thereof and the identity of the Person making such a claim against such director or directors;

(g)    neither the Borrowers nor the Guarantors shall enter into, vary or amend any employment agreement with a Senior Executive other than in accordance with the employee retention and severance plan referred to in the Employee Facility;

(h)    neither the Borrowers nor the Guarantors shall make any payment, do anything materially inconsistent with or use any proceeds other than strictly in accordance with the DIP Budget or the Network Plan;

(i)    neither the Borrowers nor the Guarantors shall encumber any of their assets without the prior written consent of the Lender, other than in the ordinary course of business and other than in connection with encumbrances arising at law or as otherwise permitted pursuant to the Orders;

(j)    the Borrowers and the Guarantors shall comply in all material respects with all legislation and laws, including, without limitation, environmental laws to the extent that a failure to do so would have a material adverse effect on the business of the Borrowers or the Guarantors;

(k)    neither the Borrowers nor the Guarantors shall amalgamate, consolidate with or merge into another entity, or change the nature of its business, other than with the prior written consent of the Lender;

(l)    neither the Borrowers nor the Guarantors shall enter into any transaction or otherwise deal with any affiliate, except (i) on an arms-length basis, (ii) pursuant to Covenant

- 13 -

(a)(ii), or (iii) as the Lender may otherwise approve;

(m) neither the Borrowers nor the Guarantor shall make or declare any dividends or other distributions or make any investments in any other entity except as otherwise permitted hereunder;

(n) all cheques, payments or other disbursements shall be approved by the Senior Vice-President, Finance of Teleglobe Inc. or such other signing officers as the Lender shall approve, provided that amounts exceeding US$100,000 shall be verified by the Monitor as being consistent with the DIP Budget, the Network Plan and all applicable Court orders;

(o) promptly, and in any event within five (5) Business Days after any material contract is terminated or amended in a manner that is materially adverse to the Borrowers or the Guarantors, as the case may be, or any new material contract is entered into, deliver to the Lender a written statement describing such event with copies of such material amendments or new contracts, and an explanation of any actions being taken with respect thereto;

(p) with reasonable promptness, written notice of any change in the Board of Directors of the Borrowers or any of the Guarantors;

(q) except as provided in the DIP Budget, Network Plan or the Orders, the Borrowers will, and will cause each of the Guarantors to, at all times preserve and keep in full force and effect their corporate existence and all rights and franchises material to their business;

(r) except as prohibited or excused by the Initial Order, the CCAA or an applicable order of the Court, the Borrowers will, and will cause each of the Guarantors to, pay all material taxes, assessments and other governmental charges imposed both before and after the Filing Date upon it or any of its properties or assets or in respect of any of its income, businesses or franchises before any material penalty accrues thereon, and all claims (including, without limitation, claims for labor, services, materials and supplies) for sums that have become due and payable and that by law have or may become a Lien upon any of its properties or assets, prior to the time when any material penalty or fine shall be incurred with respect thereto; provided that no such charge or claim need be

- 14 -

paid if being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and if such reserve or other appropriate provision, if any, as shall be required in conformity with GAAP shall have been made therefore;

(s)    except as provided in the DIP Budget, the Network Plan or the Orders, the Borrowers will, and will cause each of the Guarantors to, maintain or cause to be maintained in good repair, working order and condition, ordinary wear and tear excepted, all of their respective material properties used or useful in their businesses (including, without limitation, any intellectual property) and from time to time will make or cause to be made all appropriate repairs, renewals and replacements thereof provided, however, that the Borrowers or a Guarantor may dispose of obsolete equipment in the ordinary course of business;

(t)    without expense or cost to the Lender, the Borrowers shall and shall cause each Guarantor from time to time hereafter to execute, acknowledge, file, record, do and deliver all and any further acts, deeds, conveyances, mortgages, deeds of trust, deeds to secure debt, security agreements, hypothecations, hypothecs, pledges, charges, assignments, financing statements and continuations thereof, notices of assignment, transfers, certificates, assurances and other instruments as the Lender may from time to time reasonably request and that do not involve a material expansion of the Borrowers' obligations or liabilities hereunder in order to carry out more effectively the purposes of this Commitment Letter, the other Loan Documents, the Orders, including to subject any collateral, intended to now or hereafter be covered, to the Liens created by the Collateral Documents, to perfect and maintain such Liens, and to assure, convey, assign, transfer and confirm unto the Lender the property and rights thereby conveyed and assigned or intended to now or hereafter be conveyed or assigned or that the Borrowers or any Guarantor may be or may hereafter become bound to convey or to assign to the Lender or for carrying out the intention of or facilitating the performance of the terms of this Commitment Letter, any other Loan Documents, the Orders, registering or recording this Commitment Letter or any other loan document. Without limiting the generality of the foregoing, the Borrowers shall deliver to the Lender, promptly upon receipt thereof, all instruments received by

- 15 -

the Borrowers after the Closing Date and take all actions and execute all documents necessary or reasonably requested by the Lender to perfect Lender's Liens in any such instrument or any other investment acquired by the Borrowers; and

(u)    by June 15, 2002, a Court of competent jurisdiction shall have issued an order or orders, in form and substance acceptable to the Lender pursuant to Section 304 of the U.S. Bankruptcy Code in relation to the Borrowers and the Guarantors (the "U.S. DIP Order", together with the U.S. Order and the CCAA Order, the "Orders"), implementing the CCAA Order in respect of the DIP Charge and approving a charge over all the assets and property of the Borrowers and the Guarantors relating to or used in the international transmission of voice and data communications through bilateral and multilateral agreements between telecommunications carriers in various countries (including the Qwest Network) (the "Bilateral Business") real or personal, wherever situate, including, without limitation, all property, equipment and contractual rights necessary for the operation of the facilities located in the United States and any agreements which form part of the Bilateral Business (the "US DIP Charge"); and

(v)    the Borrowers and the Guarantors will hold all cash, deposit all cash receipts and direct that all accounts receivable be paid into the accounts set out in Schedule "A" (the "Designated Accounts") and will not make any investment in anything other than Cash or Cash Equivalents except such as are consistent with the DIP Budget and the Network Plan. The Borrowers and Guarantors will ensure that no more than U.S.$4,000,000 is in any bank account in the United States (other than the account of Teleglobe Marine (U.S.) Inc. referenced in the definition of "Cash and Cash Equivalents" and in the account of Teleglobe U.S.A. Inc. required to cover amounts anticipated to be required on or before close of business on the next following Business Day) until such time as such account has been secured to the satisfaction of the Lender by way of US DIP Charge or the Collateral Documents.

SECURITY:              The Borrowers and the Guarantors shall grant the following security to the Lender:

- 16 -

    (a)     the DIP Charges as set forth in the Orders;

    (b)     in implementation of the DIP Charges, but without in any way limiting the validity and effectiveness thereof of the collateral documents (as hereinafter defined), orders, in all jurisdictions where the assets of the Borrowers or the Guarantors may be situate from time to time; and

    (c)     on or before June 15, 2002 executed originals of the following documents (the "Collateral Documents"):

        (i)     Guarantee made by each Guarantor in favour of the Lender;

        (ii)     Security agreements from the Borrowers and each Guarantor creating a lien in all their respective collateral other than real or immovable property;

        (iii)     Charges' mortgages of land in respect of the Borrowers' and each Guarantor's freehold and leasehold interest in the facilities designated by the Lender including, without limiting the foregoing:

            (a)     International Switching Centres at
Scarborough, Ontario
Montreal, Quebec
Burnaby, British Columbia

            (b)     IS/IT Center in Montreal,
Quebec

            (c)     Satellite Earth Stations at
Weir, Quebec, Pennant
Point, Nova Scotia, and
Lake Cowichan,
British Columbia

            (d)     Cable Landing Stations at
Port Alberni, British Columbia
Pennant Point, Nova Scotia

            (e)     building in Chantilly, Virginia

            (f)     any switching centers or landing stations located in the United States which are used in the Bilateral Business

        (iv)     Pledge and other security agreements from the

- 17 -

Borrowers and each Guarantor in respect of the stock of, or ownership or equity interest, in each subsidiary, joint venture, partnership or other investment held by the Borrowers or any Guarantor including, without limiting the foregoing:

(a)     a pledge of all the shares and deposit receipt held by Teleglobe Inc. of New Skies Satellites N.V.;

(b)     a pledge of all the shares held by Teleglobe Inc. of Look Communications Inc.;

(c)     a pledge of all the shares held by Teleglobe Inc. of Intelsat, Ltd.;

(v)     An assignment of all intercompany receivables from each of the Borrowers and each of the Guarantors;

(vi)    Trademark security agreements made by the Borrowers and each Guarantor stipulated by the Lender granting a security interest in all trademarks, tradenames and associated rights legally or beneficially owned by the Borrowers or such Guarantor;

(vii)   Assignment of material contracts, as determined reasonably by the Lender, from the Borrowers and each Guarantor including, without limiting the foregoing:

A.      The Interconnection and Operating Agreement between Teleglobe Inc. and Bell Canada dated January 1, 1999, as amended from time to time;

B.      The Master Wholesale Pricing and Services Agreement between Teleglobe Inc., Bell Canada and BCE Nexxia Inc. dated January 1, 2001, as amended from time to time;

C.      The Interconnection and Operating Agreement between Teleglobe Inc., B.C. Tel, and Telus Communications Inc. dated

- 18 -

January, 2001, as amended from time to time; and

D. All agreements which form part of or are necessary for the Bilateral Business.

(d) movable and immovable hypothecs issued by the Borrowers and each Guarantor with collateral located in the Province of Quebec against facilities designated by the Lender; and

(e) security interest and/or lock box agreements in respect of Designated Accounts.

EVENTS OF DEFAULT: Each of the following shall constitute an event of default hereunder for which there will be no cure periods unless otherwise specified (each, an "Event of Default"):

(a) any general termination of the stay of creditor proceedings against the Borrowers or any of the Guarantors pursuant to the Orders or any other lifting of the stay to permit acts to be taken against the property of the Borrowers or the Guarantors, including, without limitation, the appointment of a receiver or the making of a receiving order against the Borrowers or any Guarantor ;

(b) failure by the Borrowers to pay any principal amount outstanding hereunder when the same shall become due and payable hereunder;

(c) failure by the Borrowers to pay any interest on the DIP Facility or any fees payable hereunder when the same shall become due and payable hereunder;

(d) failure by Teleglobe Inc. to perform or comply with any term, condition, covenant or obligation contained in or under the commitment letter of even date herewith in respect of the $25,000,000 facility for employee advances (the "Employee Facility") on its part to be performed or complied with where any such failure to perform or comply is not remedied within 10 days of notice from the Lender to so remedy;

(e) failure by the Borrowers or any of the Guarantors to perform or comply with any term, condition, covenant or obligation contained herein or in any document issued pursuant hereto on their part to be performed or complied with where any such failure to perform or comply is not remedied within 10 days of notice from the Lender to so remedy;

- 19 -

(f)    any representation by the Borrowers or any Guarantor made herein or in any document issued pursuant hereto, or any certificate delivered pursuant thereto or in the Employee Facility, on their part shall prove to be incorrect or misleading in any material respect when made;

(g)    any order of the Court shall be issued amending, reversing, supplementing, staying, vacating or otherwise modifying the DIP Charges or the loan and security document relating to the DIP Facility issued pursuant hereto, or granting any other claim or lien equal to or superior to that granted the Lender in respect of the DIP Facility, except to the extent such amendment, supplement or other modification is entered into, or priority of other lien is acquiesced in, with the prior written consent of Lender;

(h)    any order of the Court shall be issued in the CCAA proceedings that is not satisfactory to and consented to by the Lender;

(i)    an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of a Borrower or Guarantor, or of a substantial part of its assets, under any national, federal, provincial, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator, liquidator, administrator or similar official for the Borrower or any Guarantor or for a substantial part of its assets and, in any such case, such proceeding or petition shall continue without being dismissed for 45 days or an order or decree approving or ordering any of the foregoing shall be entered;

(j)    except for proceedings under the CCAA and ancillary proceedings under section 304 of the U.S. Bankruptcy Code, the Borrower, any Guarantor or any legal representative of the foregoing including the Monitor shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any national, federal, provincial, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of any proceeding or petition described in clause (a) above, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestratotor, conservator, liquidator,

- 20 -

administrator or similar official for the Borrower or any Guarantor or for a substantial part of its assets or (iv) by action of its board of directors, take any action for the purpose of effectuating the foregoing;

(k)   failure by any Borrower or any Guarantor to comply with the Orders or any other order ancillary to the CCAA Proceedings;

(l)   any material deviation, in the opinion, reasonably held, of the Lender, from the DIP Budget or the Network Plan;

(m)   the Borrowers or any of the Guarantors cease or threaten to cease to carry on business in the ordinary course, except where such cessation occurs in connection with a sale of all or substantially all of the assets of the Borrowers or any of the Guarantors or other restructuring or reorganization of the Borrowers and the Guarantors which has been consented to by the Lender or is in accordance with the Network Plan;

(n)   failure by the Borrowers to have filed on or before July 1, 2002 a Plan of Compromise or Arrangement or a motion to approve a sale of all or substantially all the assets of the Borrowers and Guarantors in either case in form and substance satisfactory to the Lender and providing, as the case may be, that the Plan is approved by the Court or sale completed as the case may be by August 15, 2002;

(o)   failure by the Borrowers and the Guarantors to receive the required approval of all classes of creditors to a plan of compromise or arrangement by August 15, 2002;

(p)   failure by the Borrowers and the Guarantors to implement a plan of compromise or arrangement in furtherance on or prior to September 1, 2002.

REMEDIES:   Following the occurrence of an Event of Default, without limiting the remedies available hereunder, the Lender may, do any or all of the following:

(a)   cease making advances to the Borrowers;

(b)   on demand, accelerate all payments due by the Borrowers under the DIP Facility, and set off amounts owing by the Lender or any subsidiary of the Lender or BCE Inc. (other than the Borrowers or a subsidiary of the Borrowers) (a "Lender Subsidiary") to the Borrowers against amounts owing by the Borrowers or any Guarantor to the Lender or Lender Subsidiary;

(c)   apply to a court (i) for the appointment of an interim

- 21 -

receiver or a receiver and manager of the undertaking, property and assets of the Borrowers and/or the Guarantors, (ii) for the appointment of a trustee in bankruptcy of any of the Borrowers and/or the Guarantors, or (iii) to seek other relief; or

(d)     on three Business Days notice, exercise any remedies provided under the Orders, loan, guarantee and security documents relating to the DIP Facility that are entered into by the parties; or

(e)     without limiting the foregoing, the Lender shall have the power and rights of a secured party under section 17 and Part V of the *Personal Property Security Act* (Ontario).

The rights or remedies of the Lender under this Commitment Letter and any other Loan Documents are cumulative and are in addition to and not in substitution for any other rights or remedies.

STRUCTURING FEE:     1% per annum of the Commitment payable to the Lender on the Closing Date.

GUARANTEE:     Each of the Guarantors hereby agrees it is jointly and severally liable for, and hereby irrevocably and unconditionally guarantees to the Lender and its respective successors and assigns, the full and prompt payment when due (whether at stated maturity, by acceleration or otherwise) and at all times thereafter, and performance, of all of the obligations owed or hereafter owing to the Lender by the Borrowers hereunder. Each of the Guarantors agree that its guarantee obligation hereunder is a continuing guarantee of payment and performance and not of collection, that its obligations under this Guarantee shall not be discharged until payment and performance, in full, of all of the obligations of the Borrowers under the DIP Facility have occurred and this Commitment Letter has been terminated, and that its obligations hereunder shall be primary, absolute and unconditional.

The obligations of the Guarantors hereunder shall not be satisfied, reduced, perfected or discharged by any intermediate payment, settlement or satisfaction of the whole or any part of the principal, interest, fees or other money or amounts which may at any time be or become owing or payable under, by virtue of, or otherwise in connection with the obligations of the Borrowers under this Commitment Letter or any of the documents executed in connection herewith;

The Guarantors shall be regarded, and shall be in the same position, as principal debtor with respect to the obligations of the Borrowers hereunder and any amounts expressed to be payable from the Guarantors shall be recoverable from the Guarantors as

- 22 -

primary obligors and principal debtors in respect thereof.

The Guarantors hereby expressly and irrevocably subordinate to the payment of the obligations of the Borrowers hereunder, any and all rights at law or in equity to reimbursement, exoneration, contribution, indemnification or set-off and any and all defences available to a surety, guarantor or accommodation co-obligor until all of the obligations of the Borrowers hereunder are indefeasibly paid in full in cash and this Commitment Letter has been terminated. The Guarantors further agree to waive any rights of subrogation arising at law or in equity until such time.

The obligations of the Guarantors hereunder shall not be affected or impaired by any act, omission, matter or thing whatsoever, occurring before, upon or after any demand for payment hereunder which, but for this provision, might constitute a whole or partial defence to a claim against the Guarantors hereunder or might operate to release or otherwise exonerate the Guarantors from any of their obligations hereunder or otherwise affect such obligations. The Guarantors hereby irrevocably waive any defence they may now or hereafter have in any way relating to any of the foregoing, including, without limitation:

(a)    any limitation of status or power, disability, incapacity or other circumstance relating to the Borrowers or the Guarantors;

(b)    any irregularity, defect, unenforceability or invalidity in respect of any indebtedness or other obligation of the Borrowers or any of the Guarantors;

(c)    any failure of the Borrowers or any of the Guarantors to perform or to comply with any of the provisions of this Commitment Letter or any documents executed in connection herewith;

(d)    the taking or enforcing or exercising or the refusal or neglect to take or enforce or exercise any right or remedy from or against the Borrowers, the Guarantors or their respective assets or the release or discharge of any such right or remedy by the Lender;

(e)    the granting of time, renewals, extensions, compromises, concessions, waivers, releases, discharges and other indulgences to the Borrowers or any Guarantor;

(f)    any amendment, restatement, variation, modification, supplement or replacement of this Commitment Letter or any documents executed in connection herewith;

(g)    any change in the ownership, control, name, objects,

- 23 -

businesses, assets, capital structure or constitution of the Borrowers or any Guarantor or any merger or amalgamation of the Borrowers or any Guarantor with any person or persons;

(h)   the existence of any claim, set-off or other rights that either Guarantor may have at any time against the Borrowers, the Lender, whether in connection with the Commitment Letter or otherwise; and

(i)   any other circumstance that might otherwise constitute a legal or equitable discharge or defence of any Guarantor.

The Lender, without releasing, discharging, limiting or otherwise affecting in whole or in part the Guarantors' obligations and liabilities hereunder and without the consent of or notice to the Guarantors may:

(a)   grant time, renewals, extensions, compromises, concessions, waivers, releases, discharges and any other indulgences to the Borrowers or any Guarantor;

(b)   amend, vary, modify, supplement or replace this Commitment Letter or any document issued in connection therewith or any other related document to which the Guarantors are not a party;

(c)   take or abstain from taking security or collateral from the Borrowers or any Guarantor or from perfecting security or collateral of any such person;

(d)   release, discharge, compromise, realize, enforce or otherwise deal with or do any act or things in respect of any security given by the Borrowers or any Guarantor with respect to any of the obligations of the Borrowers or the Guarantors contemplated by this Commitment Letter;

(e)   accept compromise or arrangements from the Borrowers or any Guarantor;

(f)   apply all money at any time received from the Borrowers or any Guarantor or from any collateral to any part of the obligations outstanding under this Commitment Letter as they may see fit; and

(g)   otherwise deal with, or waive or modify their right to deal with, the Borrowers, any Guarantor and all other persons and securities as they may see fit.

EXPENSES:   The Borrowers will pay all reasonable out-of-pocket expenses and costs including, without limitation, all reasonable travel expenses and reasonable legal fees, incurred by the Lender in connection with any matter arising hereunder, under any

- 24 -

documents issued in connection with this Commitment Letter or in connection with the CCAA Proceedings or any other similar proceedings in any other jurisdiction contemplated or otherwise in connection with the DIP Facility shall be for the sole account of the Borrowers and shall be paid within five (5) days of being invoiced.

INDEMNIFICATION:    The Borrowers shall, whether or not the transactions contemplated in this Commitment Letter are completed, indemnify and hold the Lender and BCE Inc. and each of its respective officers, directors, employees and agents (each an **"Indemnified Person"**) harmless from, and shall pay to such Indemnified Person on demand any amounts required to compensate the Indemnified Person for, any cost, expense, claim or loss suffered by, imposed on, or asserted against, the Indemnified Person as a result of, connected with or arising out of (i) the preparation, execution and delivery of, preservation of rights under, enforcement of, or refinancing, renegotiation or restructuring of, the Commitment Letter and any related amendment, waiver or consent, (ii) any advice of counsel as to the rights and duties of the Lender with respect to the administration of the Commitment Letter, (iii) a default (whether or not constituting an Event of Default) by the Borrowers, (iv) any proceedings brought by or against the Indemnified Person, or in which the Indemnified Person otherwise participates, due to its entering into or being a party of the Commitment Letter, or by reason of its exercising or performing, or causing the exercise on performance of, any right, power or obligation under the Commitment Letter, whether or not such proceedings are directly related to the enforcement of the Commitment Letter, except to the extent caused by the gross negligence or wilful misconduct of the Indemnified Person.

OBLIGATIONS
ABSOLUTE:    The obligations of the Borrowers hereunder shall not be affected or impaired by any act, omission, matter or thing whatsoever, occurring before, upon or after any demand for payment hereunder which, but for this provision, might constitute a whole or partial defence to a claim against the Borrowers hereunder or might operate to release or otherwise exonerate the Borrowers from any of their obligations hereunder or otherwise affect such obligations.    The Borrowers hereby irrevocably waive any defence they may now or hereafter have in any way relating to any of the foregoing, including, without limitation:

    (a)    any limitation of status or power, disability, incapacity or other circumstance relating to either Borrower;

(b)    any irregularity, defect, unenforceability or invalidity in respect of any indebtedness or other obligation of either Borrower;

(c)    the taking or enforcing or exercising or the refusal or neglect to take or enforce or exercise any right or remedy from or against the Borrowers, or their respective assets or the release or discharge of any such right or remedy by the Lender;

(d)    the granting of time, renewals, extensions, compromises, concessions, waivers, releases, discharges and other indulgences to either Borrower;

(e)    any change in the ownership, control, name, objects, businesses, assets, capital structure or constitution of the Borrowers or any Guarantor or any merger or amalgamation of the Borrowers or any Guarantor with any person or persons;

(f)    the existence of any claim, set-off or other rights that either Borrower may have at any time against the other Borrower, the Guarantors, the Lender or the Lender Subsidiary, whether in connection with the Commitment Letter or otherwise; and

(g)    any other circumstance that might otherwise constitute a legal or equitable discharge or defence of any Borrower.

GOVERNING LAW:    This Commitment Letter and each of the documents contemplated herein shall be governed by the laws of the Province of Ontario and the federal laws of Canada applicable therein, except to the extent that the Lender otherwise determine is necessary to validly protect the DIP Charges.

ADJUSTMENT:    If any provision of this Commitment Letter would obligate the Borrowers to make any payment of interest or other amount payable to the Lender in an amount or calculated at a rate which would be prohibited by law or would result in a receipt by the Lender of interest at a criminal rate (as construed under the *Criminal Code* (Canada)), then, notwithstanding that provision, that amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by law or result in a receipt by the Lender, of interest at a criminal rate, the adjustment to be effected, to the extent necessary, as follows:

(a)    firstly, by reducing the amount or rate of interest required to be paid to the Lender as interest on the Prime Rate Loans or Base Rate Loans;

- 26 -

(b)    secondly, by reducing the monthly commitment fee required to be paid to the Lender; and

(c)    thereafter, by reducing any fees and other amounts required to be paid to the Lender that would constitute interest for purposes of Section 347 of the *Criminal Code* (Canada).

CONSENTS AND APPROVALS:    Wherever the consent or approval of the Lender is required hereunder such consent shall only be effective if it is in writing and the Lender may withhold such consent or approval in its sole discretion unless otherwise specified herein.

COUNTERPARTS AND FACSIMILE SIGNATURES:    This Commitment Letter may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Signatures provided by facsimile machine shall be valid and binding.

- 27 -

ACCEPTANCE

The foregoing Commitment Letter is hereby accepted and agreed to this 15th day of May, 2002.

TELEGLOBE CANADA LIMITED PARTNERSHIP
by its General Partner Teleglobe Inc., as Borrower

Name: John Brunette
I have authority to bind the Corporation

TELEGLOBE INC., as Borrower

By: _____

Name: John Brunette
I have authority to bind the Corporation

TELEGLOBE FINANCIAL HOLDINGS LTD., as Guarantor

By: _____

Name: John Brunette
I have authority to bind the Corporation

TELEGLOBE MANAGEMENT SERVICES INC., as Guarantor

By: _____

Name: John Brunette
I have authority to bind the Corporation

3692795 CANADA INC., as Guarantor

By: _____

Name: John Brunette
I have authority to bind the Corporation

TELEGLOBE CANADA MANAGEMENT SERVICES INC., as Guarantor

By: _____

Name: John Brunette
I have authority to bind the Corporation

TELEGLOBE MARINE INC., as Guarantor

- 28 -

By: _____

Name: John Brunette

I have authority to bind the Corporation


TELEGLOBE MARINE L.P., as Guarantor

By: _____

Name: John Brunette

I have authority to bind the Corporation

TELECOM VISION CALL CENTER SERVICES,
GENERAL PARTNERSHIP by its General Partner
Teleglobe Financial Holdings Ltd., as Guarantor

_____

Name: John Brunette

I have authority to bind the Corporation

TELEGLOBE HOLDINGS (U.S.) CORPORATION,
as Guarantor

By: _____

Name: John Brunette

I have authority to bind the Corporation


TELEGLOBE HOLDING CORP., as Guarantor

By: _____

Name: John Brunette

I have authority to bind the Corporation

TELEGLOBE TELECOM CORPORATION, as
Guarantor

By: _____

Name: John Brunette

I have authority to bind the Corporation


TELEGLOBE MARINE (U.S.) INC., as Guarantor

By: _____

Name: John Brunette

I have authority to bind the Corporation

- 29 -

TELEGLOBE SUBMARINE INC., as Guarantor

By: _____

Name: John Brunette

I have authority to bind the Corporation

TELEGLOBE INVESTMENT CORP., as Guarantor

By: _____

Name: John Brunette

I have authority to bind the Corporation

TELEGLOBE COMMUNICATIONS
CORPORATION, as Guarantor

By: _____

Name: John Brunette

I have authority to bind the Corporation

OPTEL TELECOMMUNICATIONS INC., as
Guarantor

By: _____

Name: John Brunette

I have authority to bind the Corporation

TELEGLOBE USA INC., as Guarantor

By: _____

Name: John Brunette

I have authority to bind the Corporation

TELECOM VISION INTERNATIONAL INC., as
Guarantor

By: _____

Name: John Brunette

I have authority to bind the Corporation

TELEGLOBE LUXEMBOURG LLC, as Guarantor

By: _____

Name: John Brunette

I have authority to bind the Corporation

- 30 -

TELEGLOBE PUERTO RICO INC., as Guarantor

By: _____
      Name: John Brunette
          I have authority to bind the Corporation

3810186 CANADA INC., as Lender

By: _____
      Name: Martine Turcotte
          I have authority to bind the Corporation

BCE INC.

By: _____
      Name: Martine Turcotte
          I have authority to bind the Corporation

\RAF.BCE.Term Sheet_v10-14may02 sb.DOC

# SCHEDULE "A"

## DESIGNATED ACCOUNTS - PRELIMINARY

| | | | | |
|---|---|---|---|---|
| USD | 1233 5 29764 | TELEGLOBE HOLDINGS (US) CORPORATION | Bank of America | Concord, CA |
| USD | 7114 4400 0106 | TELEGLOBE HOLDINGS (US) CORPORATION | Bank of America Canada | Toronto, Ontario |
| USD | 1233 6 29452 | TELEGLOBE MARINE (US) INC. | Bank of America | Concord, CA |
| USD | 00 - 944 - 66 | TELEGLOBE MARINE (US) INC. | National Bank of Canada | Toronto, Ontario |
| USD | 1233 6 29070 | TELEGLOBE COMMUNICATIONS CORPORATION | Bank of America | Concord, CA |
| USD | 1233 9 29069 | TELEGLOBE USA INC. | Bank of America | Concord, CA |
| USD | 1233 0 03578 | STAUBACH GLOBAL SERVICES | Bank of America | Concord, CA |
| USD | 8188 2 10167 | TELEGLOBE USA INC. (LOCKBOX) | Bank of America | Chicago, ILL |
| USD | 8765 6 01611 | TELEGLOBE USA INC. (PAYROLL) | Bank of America | Northbrook, ILL |
| USD | 8765 8 01610 | TELEGLOBE USA INC. (PAYABLES) | Bank of America | Northbrook, ILL |
| USD | 8765 0 04245 | TELEGLOBE USA INC. (PAYABLES) | Bank of America | Chicago, ILL |
| USD | 17 - 148 - 976 | OPTEL TELECOMMUNICATIONS, INC. | Riggs Bank | Washington, DC |

CERTIFICATE OF SERVICE

I, John H Knight, do hereby certify that on May 31, 2002, I caused copies of the

foregoing *Notice of Filing of Additional Exhibit* to be served via hand delivery upon

David Buchbinder
Office of the U S Trustee
844 King Street, Suite 2313
Lockbox 35
Wilmington, DE 19801-3519

John H Knight (No 3848)