# EXHIBIT 3
# (Part 1)

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

In re:                                          :
                                                :    Chapter 11
                                                :
TELEGLOBE COMMUNICATIONS                        :
CORPORATION, a Delaware                         :    Jointly Administered
corporation, <u>et al.</u>,[1]                  :    Case No. 02-11518 (MFW)
                                                :
                        Debtors.                :    Objection Deadline:  N/A
                                                :    Hearing Date:  5/31/02 @ 1:00 p.m.

## MOTION OF DEBTORS AND DEBTORS IN POSSESSION FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING FIRST PRIORITY SECURED POSTPETITION FINANCING, PURSUANT TO SECTION 364(C) OF THE BANKRUPTCY CODE <u>AND RULE 4001 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE</u>

The above-captioned debtors (each a "Debtor" and collectively, the "Debtors")

hereby move the Court, pursuant to sections 105, 362, 363, and 364 of the U.S. Bankruptcy

Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code"), and Rules 2002, 4001 and 9014 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for the entry of: (i) an interim

order substantially in the form of Exhibit "A" hereto (the "Interim Order") (a) authorizing the

Debtors to obtain secured postpetition financing (the "DIP Facility") pursuant to and in

accordance with (i) those certain promissory notes (as the same may be amended, supplemented

or modified from time to time, the "Notes"), in substantially the form attached hereto as "Exhibit

B", and (ii) that certain Guaranty and Security Agreement, dated as of May 31, 2002 (as the

same may be amended, supplemented or otherwise modified from time to time, the "Guaranty",

---

[1]     The Debtors are the following eleven entities:  Teleglobe Communications Corporation, Teleglobe USA Inc., Optel Telecommunications, Inc., Teleglobe Holdings (U.S.) Corporation, Teleglobe Marine (U.S.) Inc., Teleglobe Holding Corp., Teleglobe Telecom Corporation, Teleglobe Investment Corp., Teleglobe Luxembourg LLC, Teleglobe Puerto Rico Inc. and Teleglobe Submarine Inc.

a copy of which is attached as Exhibit "C" hereto)[2]; (b) pending the final hearing on this Motion

under Bankruptcy Rule 4001(c) (the "Final Hearing"), authorizing the Debtors to obtain

emergency postpetition loans under the DIP Facility in an amount not to exceed $15 million for

the period prior to entry of a final order approving the DIP Facility on a permanent basis, in form

and substance acceptable to the Canadian Lender and the U.S. Lender (the "Final Order"),

(c) granting the Canadian Lender and the U.S. Lender liens on substantially all of the property of

the Debtors' estates to secure the repayment of obligations under the DIP Facility, and

(d) scheduling a Final Hearing within the next 30 days; and (ii) the Final Order approving the

DIP Facility on a permanent basis, pursuant to section 364(c) of the Bankruptcy Code, which

Final Order shall permit the Debtors to obtain loans under the DIP Facility up to an aggregate

amount of up to $41.7 million (inclusive of the $15 million borrowed on an interim basis). In

support of this Motion, the Debtors respectfully represent as follows:

## Background

1.      On May 28, 2002 (the "Petition Date"), the Debtors commenced their

respective reorganization cases by filing voluntary petitions for relief under chapter 11 of the

Bankruptcy Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code").

2.      The Debtors are continuing in possession of their respective properties and

are operating and managing their businesses, as debtors in possession, pursuant to sections 1107

and 1108 of the Bankruptcy Code.

---

[2]      The Guaranty, together with the Interim Order and the Notes, the "U.S. Financing Documents" (the U.S. Financing Documents, together with all agreements, documents, notes and instruments delivered pursuant hereto or thereto or in connection herewith or therewith, including the commitment letter, dated May 15, 2002, among 3810186 Canada Inc. (the "Canadian Lender"), BCE Inc. ("BCE"), Teleglobe Inc. (the "U.S. Lender" and together with the Canadian Lender, the "DIP Lenders") and Teleglobe Canada Limited Partnership, each as borrower (collectively, with the U.S. Lender, the "Canadian Borrowers"), and the guarantors named therein, including the Debtors (collectively, the "Canadian Guarantors") (as the same may be amended, supplemented or otherwise modified from time to time, the "Canadian Credit Agreement", a copy of which is attached as Exhibit "D" hereto), are hereinafter referred to as the "Financing Documents" ), among the Debtors, the Canadian Lender and the U.S. Lender.

3.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4.     On the Petition Date, the Debtors filed a motion requesting that their chapter 11 cases be consolidated for procedural purposes only and administered jointly.

5.     Debtor Teleglobe Communications Corporation, a Delaware corporation, is a wholly-owned indirect subsidiary of Teleglobe Inc., a Canadian corporation ("Teleglobe"). Each of the Debtors herein is a direct or indirect subsidiary of Teleglobe. Teleglobe currently has approximately 65 domestic and foreign debtor and nondebtor subsidiaries (together with Teleglobe, the "Teleglobe Companies"). Since 2000, Teleglobe has been a directly and indirectly wholly-owned subsidiary of publicly-traded Canadian conglomerate BCE Inc.

6.     On May 15, 2002, Teleglobe and certain of its Canadian subsidiaries commenced insolvency proceedings under the Canadian Companies' Creditors Arrangement Act in the Ontario Superior Court of Justice in Toronto, Ontario. On May 20, 2002, certain of Teleglobe's United Kingdom subsidiaries commenced administration proceedings under the Insolvency Act of 1986 in the High Court of Justice – Chancery Division in London, England. It is also expected that other Teleglobe nondebtor foreign subsidiaries may be required to commence insolvency proceedings in their respective jurisdictions.

7.     Teleglobe was established as Canada's monopoly international carrier by the Canadian government in 1950. Today, the Teleglobe Companies have operating agreements and extensive business relationships with most major international telecommunications carriers in the world, including both the traditional incumbent monopoly carriers and emerging carriers created by deregulation. Teleglobe currently provides voice services in more than 220 countries

via a fully integrated network of terrestrial, submarine and satellite capacity. These operations are conducted through debtor and nondebtor subsidiaries incorporated and licensed in more than 40 countries worldwide.

       8.    Over the last five years, Teleglobe has added a significant international data service capability to its existing network to complement its core voice business. Its data services include internet connectivity, transit, IPVPN, high-speed data transmission, hosting, broadband, broadcast and other value added services on a wholesale and retail basis. Teleglobe's data customers include its existing carrier customers, major ISPs, ASPs, content and broadband providers, as well as multinational corporations. Teleglobe has extensive peering relationships with other major backbone providers.

       9.    Teleglobe's fully integrated voice and data network includes interests in over 100 subsea cable systems, satellites and terrestrial capacity worldwide. As of December 31, 2001, Teleglobe had more than 130 points of presence (POPs) worldwide and more than 70,000 square feet of hosting facilities. All of these operating facilities are connected by fiber optic links to Teleglobe's switching centers and internet gateways. Teleglobe's headquarters are in Montreal, Quebec and Reston, Virginia, which is the location of the U.S. headquarters.

       10.    During the calendar year 2001, the Teleglobe Companies generated consolidated gross revenues of approximately $1.3 billion. As of December 31, 2001, the Teleglobe Companies had approximately $7.5 billion in assets and approximately $4.1 billion in liabilities on a consolidated book basis. As of the Petition Date, the Teleglobe Companies employed approximately 950 full- and part-time employees.

### Prepetition Capital Structure

       11.    The following describes the Debtors' capital structure as of the Petition Date.

*Bank Facilities*

12.    Teleglobe presently has two separate 364 day bank facilities for a total of $1.25 billion. The first, Facility A, was issued by a lending syndicate led by the Bank of Montreal, in the amount of $500 million, to Teleglobe. Facility A is guaranteed by Teleglobe U.S. Facility B also was issued by the Bank of Montreal syndicate, in the amount of $750 million to Teleglobe U.S. It is guaranteed by Teleglobe. Both facilities are unsecured and unsubordinated, ranking equally in right of payment with Teleglobe's and Teleglobe U.S.'s other unsecured, unsubordinated obligations. Both facilities originally were issued on July 24, 2000, were renewed for another 364 days on July 23, 2001, and are due July 22, 2002.

13.    The third facility is a $25 million, 364 day facility issued to Teleglobe U.S. by Morgan Stanley Senior Funding Inc., which also is due on July 22, 2002. It is guaranteed by Teleglobe and has the same priorities as the Bank of Montreal facilities.

*U.S. Debentures*

14.    Teleglobe at present has outstanding a total of $1 billion in debentures, which were issued on July 20, 1999, and subsequently amended on August 9, 1999. The trustee for these debentures is the Bank of New York, and they are guaranteed by Teleglobe U.S. The first series of debentures is for $600 million at 7.2% interest, coming due on July 20, 2009. The second, for $400 million, is at 7.7% interest and is due on July 20, 2029. Like the bank facilities, these debentures are unsecured, unsubordinated and rank equally with Teleglobe's and Teleglobe USA's other unsecured, unsubordinated debt. Interest payments are due semi-annually on January 20 and July 20 of every year.

*Canadian Debentures*

15.    Teleglobe also has outstanding CDN$350 million in debentures in three separate series, each of which were issued by Teleglobe Canada Inc. and assumed by Teleglobe

on January 1, 1999, following its amalgamation with Teleglobe Canada Inc. The trustee for each

series is the Montreal Trust Company, and they are each guaranteed by Teleglobe USA. The

first series, for CDN$125 million at 8.85% interest, was issued November 16, 1992, with semi-

annual interest payments on May 15 and November 15, and is due on November 15, 2002. The

second series, for CDN$125 million at 8.35% interest, was issued April 7, 1993, with semi-

annual interest payments on June 20 and December 20, and is due June 20, 2003. And the third

series, for CDN$100 million at 8.0% interest, was issued October 23, 1996, with semi-annual

interest payments on April 23 and October 23, and is due October 23, 2026. These debentures

also are unsecured and unsubordinated obligations and rank equally with Teleglobe's and

Teleglobe U.S.'s other unsecured, unsubordinated debt.

### The Debtor's Urgent Need for Postpetition Financing

16.     It is essential to the continued operation of the Debtors' businesses that

they obtain access to postpetition financing to service their customers and continue their ordinary

course business operations. Although the Debtors had approximately $6 million in cash as of the

Petition Date,[3] the Debtors expect to run out of cash by May 31, 2002. As such, immediate

access to the DIP Facility is necessary to provide the Debtors' with liquidity to administer these

chapter 11 cases. Absent the infusion of such funds, the Debtors' will be forced to cease their

operations. In addition, the immediate access to the DIP Facility will provide vendors, suppliers,

customers and the public at large with confidence that the Debtors have more than sufficient

resources available to maintain their operations on a "business as usual" basis. The failure to

have this liquidity or to have these parties cooperate fully at this time, as well as any resulting

---

[3]     The debtor, Teleglobe Marine (U.S.), Inc. ("Teleglobe Marine"), has approximately $8 million in cash that
has been excluded from this total because such cash is restricted and may be used only for Teleglobe Marine's
operations. Teleglobe Marine is self sufficient and does not need to use this cash for its operations.

loss of customer patronage, could severely impair the Debtors' ability to maximize the value of their estates and reorganize successfully and could force the Debtors to liquidate.

17.    Accordingly, without prompt access to the DIP Facility, the Debtors risk real and substantial harm to their businesses. The availability of credit under the DIP Facility will permit the Debtors to meet their ongoing operating needs and should instill confidence in vendors, suppliers and customers, as well as encourage them to continue to do business with the Debtors, thereby facilitating normalized operations and, ultimately, successful chapter 11 reorganizations. The DIP Facilty also will allow the Debtors to carry out certain strategic business decisions, including capital expenditures, to maximize the value of their estates for all stakeholders.

## The Proposed Debtor In Possession Financing Facility

18.    The Debtors have determined, in the exercise of sound business judgment, that they require access to postpetition credit on the terms set forth herein to meet their ongoing working capital needs, for other general corporate purposes and for the payment of related transaction costs, fees and expenses. As a result, subject to the Court's approval, the Debtors have determined to enter into the DIP Facility with the DIP Lenders to meet such financing needs.

19.    On May 15, 2002, the Canadian Court granted an Interim Order, a copy of which is attached hereto as Exhibit "D" (the "CCAA Order"), authorizing and empowering the Canadian Borrowers to borrow up to U.S.$100 million from the Canadian Lender to fund the Canadian Borrowers' businesses and their restructuring on terms and subject to the conditions contained in the Canadian Credit Agreement. In connection therewith, the U.S. Lender is entitled to lend (the "Intercompany Loans") certain funds to the Debtors in accordance with the

budget annexed hereto as Exhibit "E" (the "Budget") and such funds will be evidenced by the Notes.

20.    Simply put, the U.S. Lender (an affiliate of the Debtors' parent) will downstream funds it has borrowed pursuant to the Canadian Credit Agreement and the CCAA Order to the Debtors as necessary for the administration of these chapter 11 cases and the conduct of the Debtors' businesses in accordance with the Budget and the Financing Documents. Such loans will be secured by substantially all of the Debtors' property. Such security shall secure (a) on a senior basis, the Debtors' guaranty of all obligations of the Canadian Borrowers to the extent that the U.S. Lender (which is one of the Canadian Borrowers) loans money to the Debtors, and (b) on a junior basis, the Intercompany Loans, advanced by the U.S. Lender to the Debtors. The Debtors do not believe any material liens exist against their property other than the liens securing bond obligations of Teleglobe Marine.

21.    The pertinent terms of the DIP Facility are as follows:[4]

- General Terms: The DIP Facility will be governed by the terms and conditions of the Financing Documents, including the Canadian Credit Agreement and CCAA Order.

- Security: As security for the Post-Petition Indebtedness, subject to the terms of the Financing Documents, the Debtors propose to grant to the Canadian Lender and the U.S. Lender in respect of the obligations under the Guaranty and the Intercompany Loans, respectively, valid, binding, enforceable and perfected liens (the "Post-Petition Liens") in substantially all of the Debtors' property (the "Collateral"); provided, however, that the "Collateral" shall expressly exclude actions for preferences, fraudulent conveyances, and other avoidance power claims and any recoveries under sections 544, 545, 547, and 548 of the Bankruptcy Code), subject only to the Carve-Out, as follows:

    (a)    pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority, perfected lien upon all of the Debtors' right, title and interest in, to and

---

[4]    This summary of the DIP Facility is intended only to assist the Court in understanding the key aspects of the arrangement and is qualified in its entirety by reference to the Financing Documents as modified by the proposed Interim Order and Final Order, as well as the other terms of such orders. All capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Interim Order and the Guaranty.

under all Collateral that is not otherwise encumbered by a validly perfected and unavoidable security interest or lien on the Petition Date; and

(b)    pursuant to section 364(c)(3) of the Bankruptcy Code, a second priority, junior, perfected Lien upon all of the Debtors' right, title and interest in, to and under all other Collateral which is subject to a validly perfected and unavoidable security interest or lien in existence as of the Petition Date or a valid lien perfected (but not granted) after the Petition Date to the extent such perfection in respect of a pre-Petition Date claim is expressly permitted under the Bankruptcy Code.

The Post-Petition Liens in favor of the U.S. Lender on the Collateral shall in all respects be junior in priority to (a) the Carve-Out, (b) the Post-Petition Liens on the Collateral and Superpriority Claims in favor of the Canadian Lender, and (c) any existing liens on the Collateral. The U.S. Lender will not be entitled to exercise any right or remedy in respect of its Post-Petition Liens unless and until all obligations of each of the Canadian Borrowers under the Financing Documents and all obligations of each of the Debtors to the Canadian Lender in respect of the Post-Petition Indebtedness have been indefeasibly paid in full in cash.

- Superpriority:  The Debtors propose to grant to the Canadian Lender and the U.S. Lender, pursuant to section 364(c)(1) of the Bankruptcy Code, priority with respect to each of the Debtor's obligations in respect of the Post-Petition Indebtedness having priority in these chapter 11 cases over all administrative expenses of the kind specified in section 503(b) or 507(a) and (b) of the Bankruptcy Code ("Superpriority Claims"), subject only to the Carve-Out. The Superpriority Claims of the U.S. Lender will be junior only to the (a) Carve Out, (b) the Collateral and Superpriority Claims in favor of the Canadian Lender, and (c) any existing liens on the Collateral. The U.S. Lender will not be entitled to exercise any right or remedy in respect of its Superpriority Claims unless and until all of the Canadian Borrowers under the Financing Documents and all obligations of the Debtors to the Canadian Lender in respect of the Post-Petition Indebtedness have been indefeasibly paid in full in cash.

- Carveout:  The Post-Petition Liens and Superpriority Claims granted to the U.S. Lender and the Canadian Lender (if any) will be subject and subordinate, following the occurrence of any Event of Default (as defined in the Guaranty), to the Carve-Out in an amount not to exceed in the aggregate $150,000 for the Debtors' Professionals and in the aggregate $50,000 for the Committee's Professionals. So long as no Event of Default will have occurred and be continuing, the Debtors, for a period not to exceed four (4) calendar months, shall be permitted to pay compensation and reimbursement of expenses allowed and payable under sections 330 and 331 of the Bankruptcy Code in an amount not to exceed $150,000 per calendar month for the Debtors' Professionals and $50,000 per month for the Committee's Professionals, as the same may be due and payable; (other than the fees and expenses, if any, of any such professional persons incurred, directly or indirectly, in respect of, arising from or relating to,

the initiation or prosecution of any action for preferences, fraudulent conveyances, other avoidance power claims or any other claims or causes of action against the U.S. Lender, the Canadian Lender or BCE (or any of their respective officers, directors, agents, representatives, or professionals), or with respect to the Post-Petition Indebtedness. Except as specified in this paragraph, until all of the obligations of each of the Canadian Borrowers under the Financing Documents and all obligations of each of the Debtors to the Canadian Lender in respect of the Post-Petition Indebtedness have been indefeasibly paid in full in cash, no other professional fees shall be paid by the Debtors.

- Termination Event: Notwithstanding anything herein or in the other Financing Documents, the Debtors will not be authorized to borrow funds or incur indebtedness hereunder or under the other Financing Documents or to use any proceeds of the Post-Petition Indebtedness already received upon the earliest to occur of any of the following Termination Events:

(a)     non-compliance by any of the Debtors with any of the terms or provisions of the Interim Order or Final Order;

(b)     any Event of Default (as defined in the Guaranty) shall have occurred and be continuing, and any notice required pursuant to the U.S. Financing Documents to cause the Post-Petition Indebtedness to become due and payable shall have been given. Events of Default include:

1.     any of the representations and warranties contained in the Guaranty shall not be true in all material respects;

2.     any default or Event of Default (as defined in the Canadian Credit Agreement) under the Canadian Credit Agreement;

3.     failure by any Grantor to pay interest or any other amounts required to be paid to the U.S. Lender in accordance with the terms of the Notes or the failure to comply with any other provisions therein;

4.     failure by any Grantor to pay any amount due and owing to the Canadian Lender in accordance with the terms of the Guaranty;

5.     failure by any Grantor to perform or comply with any term, condition, covenant or obligation contained in the Guaranty or in any document issued pursuant thereto on its part to be performed or complied with where any such failure to perform is not remedied within 10 days of notice from the Lender to so remedy;

6.     any material deviation, in the opinion, reasonably held, of the Canadian Lender form the U.S. Budget;

7.     failure by any Loan Party to comply with the terms of the CCAA Order or the DIP Order or any other orders ancillary thereto;

8.    the DIP Order shall cease to be in full force and effect and the Final Order shall not have been entered prior to such cessation, (ii) the Final Order shall not have been entered by the U.S. Bankruptcy Court on or before the 30th day following the Petition Date, (iii) from and after the date of entry thereof, the Final Order shall cease to be in full force and effect, or (iv) the DIP Order or the Final Order shall be amended, supplemented, stayed, reversed, vacated or otherwise modified (or any Loan Party shall apply for authority to do so) without the prior written consent of the Canadian Lender;

9.    the U.S. Bankruptcy Court shall enter an order appointing a responsible officer or an examiner with powers beyond the duty to investigate and report, as set forth in section 1106(a)(3) or (4) of the Bankruptcy Code, in any of the Chapter 11 Cases;

10.    Chapter 11 Case shall be dismissed (or the U.S. Bankruptcy Court shall make a ruling requiring the dismissal of any Chapter 11 Case), suspended or converted to a case under chapter 7 of the Bankruptcy Code, or any Loan Partt shall file any pleading requesting any such relief; or an application shall be filed by any Loan Party for the approval of, or there shall arise, (i) any other claim having priority senior to or *pari passu* with the claims of the Canadian Lender or U.S. Lender or any other claim having priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code (other than the Careouts (as defined in the DIP Order) or (ii) any lien on the Collateral having a priority senior to or *pari passu* with the liens granted herein; or

11.    this Guaranty and the DIP Order shall, for any reason, cease to create a valid lien on any of the Collateral purported to be covered thereby or such lien shall cease to be a perfected lien having the priority provided herein pursuant to section 364 of the Bankruptcy Code against each Grantor, or any Loan Party shall so allege in any pleading filed in any court or any material provisions of this Agreement or the Canadian Credit Agreement shall, for any reason, cease to be valid and binding on the Loan Party party thereto or any Loan Party shall so state in writing.

(c)    the Maturity Date is September 1, 2002 or earlier upon the occurrence of certain events (or later if agreed to by the Lenders).

## Compliance with Local Rule 4001-2

22.    The Debtors believe the terms of the proposed DIP Facility do not include any of the provisions listed in Local Rule 4001-2(a)(i). As stated above: (a) the collateral for the DIP Facility does not include claims or causes of actions under sections 544, 547, 548 or 549 of the Bankruptcy Code; and (b) the Carve Out is available to all professionals of the estates.

## Request for Approval of the DIP Facility

23.    As described above, it is essential to the success of the Debtors' chapter 11 cases that the Debtors immediately obtain access to sufficient postpetition financing. The preservation of estate assets and the Debtors' ability to reorganize successfully depend heavily upon the expeditious approval of the DIP Facility and the related actions requested herein.

24.    Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business and (c) obtaining credit with specialized priority or with security. If a debtor in possession cannot obtain postpetition credit on an unsecured basis, pursuant to section 364(c) of the Bankruptcy Code,[5] a court may authorize the obtaining of credit or the incurring of debt, repayment of which is entitled to superpriority administrative expense status or is secured by a senior lien on unencumbered property or a junior lien on encumbered property, or a combination of the foregoing.

### *Approval under Section 364(c) of the Bankruptcy Code*

25.    The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtors in possession are "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense." See In re Garland Corp., 6 B.R. 456, 461

---

[5]    Section 364(c) of the Bankruptcy Code provides as follows:

(c)    If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt

(1)    with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2)    secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3)    secured by a junior lien on property of the estate that is subject to a lien

(B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) is authorized, after notice and

hearing, upon showing that unsecured credit cannot be obtained); In re Crouse Group, Inc., 71

B.R. 544, 549 (Bankr. E.D. Pa.) (debtor seeking secured credit under section 364(c) of the

Bankruptcy Code must prove that it was unable to obtain unsecured credit pursuant to section

364(b) of the Bankruptcy Code), modified on other grounds, 75 B.R. 553 (Bankr. E.D. Pa. 1987).

      26.    Courts have articulated a three-part test to determine whether a debtor may

obtain financing under section 364(c) of the Bankruptcy Code:

- the debtor is unable to obtain unsecured credit under section 364(b) (i.e., by granting a lender administrative expense priority);

- the credit transaction is necessary to preserve the assets of the estate; and

- the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender.

In re Aqua Assocs., 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the above test and

holding that "[o]btaining credit should be permitted not only because it is not available

elsewhere, which could suggest the unsoundness of the basis for the use of the funds generated

by credit, but also because the credit acquired is of significant benefit to the debtor's estate and

the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the

debtor to obtain comparable credit elsewhere"). The Debtors will present evidence at the Final

Hearing that will satisfy all three elements of this test.

### The Debtors Were Unable to Obtain Necessary Postpetition Financing on an Unsecured Basis

      27.    The evidence at the Final Hearing will show that the Debtors could not

have obtained a postpetition financing facility on the terms, and of type and magnitude required

in these cases, on an unsecured basis.

28.     To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of sections 364(c) or 364(d) of the Bankruptcy Code. Bray v. Shenandoah Federal Savings and Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986). Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." Id. at 1088; see also Ames, 115 B.R. at 40 (holding that debtor made a reasonable effort to secure financing where it approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders). Moreover, where few lenders are likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom, Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

29.     To obtain postpetition financing under the Canadian Credit Agreement, Lazard, financial advisor to the Canadian Borrowers, approached numerous sophisticated commercial entities, all of which have more than adequate financial resources to make a debtor in possession financing facility available to the Teleglobe Companies. The Teleglobe Companies received no offers of financing from any other entity other than under the Canadian Credit Agreement. Given the magnitude of the financing required, the complexity of the Teleglobe Companies' businesses, the immediacy of the Debtors' financing needs, the distressed financial situation of these companies and failure to obtain any additional offers for financing, the Debtors determined that it would not be productive to solicit interest from additional lenders.

30.    None of the other entities approached by the Teleglobe Companies was willing to make a postpetition loan on any reasonable basis for a facility similar to the Canadian Credit Agreement. In addition, the Debtors believe they would be unable to obtain other financing for the U.S. assets on a stand-alone basis. These efforts to seek necessary DIP financing from these large, sophisticated entities satisfy the statutory requirements of section 364(c) of the Bankruptcy Code. See, e.g., Ames, 115 B.R. at 40 (approving section 364(c) financing facility and holding that the debtor made reasonable efforts to obtain less onerous terms where it approached four lending institutions, was rejected by two and selected the least onerous financing option from the remaining two lenders); In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992) (debtor seeking section 364(c) financing made an acceptable attempt to obtain less onerous financing by speaking to several lenders that denied the loan request).

### The DIP Facility is Necessary to Preserve Assets of the Debtors' Estates

31.    It is essential that the Debtors have immediate access to the DIP Facility to preserve their business operations as a going concern and to instill their employees, suppliers and customers with confidence in the Debtors' ability to maintain "business as usual" operations and, ultimately, reorganize. The DIP Facility is necessary to continue, among other things, the orderly operation of their businesses, to maintain business relationships with vendors and suppliers, and to make certain capital expenditures and satisfy certain working requirements necessary in the Debtors' businesses.

32.    The initial success of the chapter 11 cases and the stabilization of the Debtors' operations at the outset of the cases thus depend on the confidence of the Debtors' employees, vendors and customers and the Debtors' resulting ability to minimize disruption to

their businesses. If this Motion is denied or delayed, that confidence may be destroyed, the

Debtors' ability to reorganize might be damaged irreparably and the Debtors might be forced to

liquidate. In contrast, once the DIP Facility is approved, the Debtors' ability to provide requisite

customer service will be reasonably assured. The Debtors' need for access to the DIP Facility is

therefore immediate.

### The Terms of the DIP Facility Are
### *Fair, Reasonable and Appropriate*

33.    In the Debtors' considered business judgment, the DIP Facility is the only

reasonable financing option available in the circumstances of these cases. The purpose of the

facility is to enable the Debtors to maintain normal business operations during the pendency of

these chapter 11 cases.

34.    The proposed DIP Facility provides, generally, that the security interests

and administrative expense claims granted to the Canadian Lender and the U.S. Lender and

Canadian Lender are subject to the Carve Out, as described above. The Carve Out encompasses

(a) following an Event of Default, professional fees and expenses up to $150,000 in the

aggregate for the Debtors' Professionals and $50,000 in the aggregate for the Committee's

Professionals, and (b) payment of fees and expenses to the clerk of the Court. In Ames

Department Stores, the bankruptcy court found that "carve-outs" are not only reasonable but are

necessary to ensure that official committees and debtors' estates are adequately assisted by

counsel. See Ames, 115 B.R. at 40.

35.    The DIP Facility was negotiated at arm's length and in good faith. The

fairness and reasonableness of the terms of the DIP Facility will further be demonstrated at the

Final Hearing.

### *Application of the Business Judgment Standard*

36.    As described above, after appropriate investigation and analysis, the

Debtors' management has concluded that the DIP Facility is the best alternative available under

the circumstances of these cases. Bankruptcy courts routinely defer to a debtor's business

judgment on most business decisions, including the decision to borrow money, unless such

decision is arbitrary and capricious. See In re Trans World Airlines, Inc., 163 B.R. 964, 974

(Bankr. D. Del. 1994) (noting that an interim loan, receivables facility and asset based facility

were approved because they "reflect[ed] sound and prudent business judgment on the part of

TWA . . . [were] reasonable under the circumstances and in the best interest of TWA and its

creditors"); cf. Group of Institutional Investors v. Chicago Mil. St. P. & Pac. Ry., 318 U.S. 523,

550 (1943) (holding that decisions regarding the rejection or assumption of a lease is left to the

business judgment of the debtor); In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985)

("Business judgments should be left to the board room and not to this Court."); In re Lifeguard

Indus., Inc., 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same); In re Curlew Valley Assocs., 14 B.R.

506, 513-14 (Bankr. D. Utah 1981) (holding that courts generally will not second-guess a debtor

in possession's business decisions when those decisions involve "a business judgment made in

good faith, upon a reasonable basis, and within the scope of his authority under the Code"). In

fact, "[m]ore exacting scrutiny would slow the administration of the Debtors' estate and increase

its cost, interfere with the Bankruptcy Code's provision for private control of administration of

the estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co.

v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

37.    The Debtors have exercised sound business judgment in determining that a

postpetition credit facility is appropriate and have satisfied the legal prerequisites to incur debt

under the DIP Facility. The terms of the DIP Facility are fair and reasonable and are in the best

interests of the Debtors' estates. Accordingly, the Debtors should be granted authority to enter into the DIP Facility and obtain funds from the DIP Lenders on the secured, administrative "superpriority" basis described above and in the Interim Order and the Final Order, pursuant to section 364(c) of the Bankruptcy Code.

### The Debtor Should Be Permitted to Make Interim
### Borrowings Under the Postpetition Loan Documents

38.    Pending a final hearing, the Debtors require that $15 million be available for loans under the DIP Facility for, among other things, the orderly continuation and operation of their businesses, to maintain business relationships with vendors and suppliers, to satisfy general working capital requirements, to instill confidence in the Debtors' employees, customers, vendors and other service providers and, accordingly, to maximize the Debtors' potential for a successful reorganization.

39.    Absent interim relief, the Debtors face the very real risk of substantial disruption in their business operations and damage to vendor and service provider relationships and disruption of business operations and could be forced to liquidate. Consequently, if interim relief is not obtained, the Debtors' reorganization efforts will be immediately and irreparably jeopardized to the detriment of their estates, creditors and other parties in interest.

40.    Accordingly, the Debtors request that, pending the Final Hearing, the Court consider the Debtors' request for authorization to obtain interim financing under the DIP Facility up to $15 million, in accordance with and pursuant to the terms and conditions of the DIP Facility.

41.    Bankruptcy Rule 4001(c) permits a court to approve a debtor's request for financing during the 15-day period following the filing of a motion requesting authorization to obtain postpetition financing "only to the extent necessary to avoid immediate and irreparable

harm to the estate pending a final hearing." Bankruptcy Rule 4001(c)(2). In examining requests

for interim relief under this rule, courts apply the same business judgment standard applicable to

other business decisions. See, e.g., Simasko, 47 B.R. at 449; see also Ames, 115 B.R. at 38.

After the 15-day period, the request for financing is not limited to those amounts necessary to

prevent destruction of the debtor's business, and the debtor is entitled to borrow those amounts

that it believes are prudent in the operation of its business. See, e.g., Simasko, 47 B.R. at 449;

Ames, 115 B.R. at 36.

### Good Faith

42.    The terms and conditions of the DIP Facility are fair and reasonable and

were negotiated by the parties in good faith and at arms' length. Therefore, the DIP Lenders

should be accorded the benefits of section 364(e) of the Bankruptcy Code to the extent any or all

of the provisions of the DIP Facility, or any interim or final order of this Court pertaining

thereto, are hereafter modified, vacated, stayed or terminated by subsequent order of this or any

other court.

### Request for Final Hearing

43.    Pursuant to Bankruptcy Rule 4001(c)(2), the Debtors request that the

Court set a date for a Final Hearing that is not later than 30 days from the Petition Date.

### Notice

44.    The Debtors shall, on or before June    , 2002, serve by United States mail,

first-class postage prepaid, copies of the Motion, the Interim Order, the Final Order and a notice

of the hearing (the "Final Hearing Notice") to be held on June    , 2002 at [    ] a.m./p.m. to

consider entry of the proposed Final Order on: (a) the fifty largest unsecured creditors of each of

the Debtors as listed in their respective petitions commencing these chapter 11 cases; (b) the

Office of the United States Trustee; (c) counsel to the U.S. Lender, Jones, Day, Reavis & Pogue,

222 East 41st Street, New York, New York 10017, Attn: John J. Rapisardi and Ogilvy Renault,

Suite 1100, Box 11, Merrill Lynch Canada Tower, 200 King Street West, Toronto, Ontario M5H

3T4, Attn: Derick C. Tay, (d) counsel to the Canadian Lender, Shearman & Sterling, 599

Lexington Avenue, New York, New York 10022, Attn: Mark Shapiro, Esq. and Andrew Tenzer,

Esq., Stikeman Elliott, Suite 5300, 199 Bay Street, Toronto, Ontario, M5L 1B9, Attn: Sean F.

Dunphy, and Young Conaway Stargatt & Taylor, The Brandywine Building, 1000 West Street,

17th Floor, P.O. Box 391, Wilmington, Delaware 19899-0391, Attn: Pauline Morgan, Esq.; (e)

counsel to the Informal Committee of Noteholders, Bingham Dana LLP, One State Street,

Hartford, Connecticut 06103, Attn: Evan D. Flaschen, Esq.; (f) counsel to Bank of Montreal, as

agent, under the Credit Facilities, Mayer, Brown, Rowe & Maw, 190 South La Salle Street,

Chicago, Illinois 60603-3441, Attn: J. Robert Stoll, Esq.; and (g) counsel to the Monitor, Blank

Rome Comisky & McCauley LLP, The Chrysler Building, 405 Lexington Avenue, New York,

New York 10174, Attn: Marc Richards, Esq. As this Motion is seeking first day relief, notice of

this Motion and any order entered hereon will be served as required by Local Rule 9013-2(d). In

light of the nature of the relief requested herein, the Debtors submit that no other or further

notice is required.

### No Prior Request

45.    No prior request for the relief sought in this Motion has been made to this

or any other court.

WHEREFORE, the Debtors respectfully request that the Court: (i) enter the

Interim Order, substantially in the form attached hereto as Exhibit A, (a) authorizing the Debtors

to enter into the DIP Facility and to obtain postpetition credit thereunder, (b) granting to the

Canadian Lender, to the extent set forth in the Guaranty and the U.S. Lender to the extent of the

Intercompany Loans and in each case, in accordance with the Interim Order and the Final Order,

(1) first priority liens in property of the Debtors' estates on the terms of the Interim Order,

(2) junior priority liens in certain property of the Debtors' estates that is subject to valid and

perfected liens of other creditors and (3) superpriority administrative expense treatment of the

Canadian Lender's and the U.S. Lender's claims against the Debtors, as described herein and in

the Interim Order and the Final Order, all to secure the repayment of the Debtors' obligations

under Guaranty, the Intercompany Loans and the DIP Facility, (c) pending the Final Hearing,

authorizing the Debtors to obtain postpetition credit under the DIP Facility on an interim basis, in

an amount not to exceed the $15 million and (d) scheduling a Final Hearing within the next

30 days; (ii) enter the Final Order approving the DIP Facility on a permanent basis, pursuant to

section 364(c) of the Bankruptcy Code, which Final Order shall permit the Debtors to obtain

loans under the DIP Facility up to an aggregate amount of $41 7 million outstanding at any time;

and (iii) grant the Debtors such other and further relief as the Court may deem proper.

Dated: May 2Ọ 2002            Respectfully submitted,
        Wilmington, Delaware

                              _____
                              Mark D. Collins (DE 2981)
                              Daniel J. DeFranceschi (DE 2732)
                              John H. Knight (DE 3848)
                              RICHARDS, LAYTON & FINGER, P.A.
                              One Rodney Square
                              P.O. Box 551
                              Wilmington, Delaware 19899
                              (302) 651-7700

                              PROPOSED ATTORNEYS FOR DEBTORS
                              AND DEBTORS IN POSSESSION

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | |
| | : | **Chapter 11** |
| **TELEGLOBE COMMUNICATIONS** | : | |
| **CORPORATION, a Delaware** | : | Jointly Administered |
| **corporation, et al.,**[1] | : | Case No. 02-**11518** **(HAJ)** |
| | : | |
| Debtors. | : | |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO (A) ENTER
INTO THE CANADIAN CREDIT AGREEMENT AND THE GUARANTY
AND SECURITY AGREEMENT AND OBTAIN POST-PETITION
SECURED FINANCING PURSUANT TO SECTION 364 OF THE
BANKRUPTCY CODE, AND (B) GRANT LIENS AND SECURITY
INTERESTS AND SUPER-PRIORITY CLAIMS, (II) GRANTING INTERIM RELIEF,
(III) SCHEDULING A FINAL HEARING ON THESE MATTERS AND APPROVING
FORM AND MANNER OF NOTICE, AND (IV) GRANTING RELATED RELIEF**

Upon the motion, dated May 30, 2002 (the "**Motion**"), of Teleglobe USA Inc.

("**Teleglobe USA**") and [_____] ("[_____]"; each individually a "**Debtor**" and, collectively,

the "**Debtors**"), for the entry of an order (I) authorizing the Debtors to (A) obtain secured post-

petition financing pursuant to section 364 of title 11 of the United States Code (the "**Bankruptcy**

**Code**") by entering into (i) the Promissory Notes, dated as of May 31, 2002 (as the same may be

amended, supplemented or otherwise modified from time to time, the "**Notes**"), and (ii) that

guaranty and security agreement, dated as of May 31, 2002 ((as the same may be amended,

supplemented or otherwise modified from time to time, the "**Guaranty**", a copy of which is

attached as Exhibit "C" to the Motion; together with this Order and the Notes, the "**U.S.**

**Financing Documents**"); the U.S. Financing Documents, together with all agreements,

---

[1]     The Debtors are the following eleven entities: Teleglobe Communications Corporation,
Teleglobe USA Inc., Optel Telecommunications, Inc., Teleglobe Holdings (U.S.) Corporation, Teleglobe
Marine (U.S.) Inc., Teleglobe Holding Corp., Teleglobe Telecom Corporation, Teleglobe Investment
Corp., Teleglobe Luxemboug LLC, Teleglobe Puerto Rico Inc. and Teleglobe Submarine Inc.

documents, notes and instruments delivered pursuant hereto or thereto or in connection herewith

or therewith, including that certain commitment letter, dated May 15, 2002 among 3810186

Canada Inc. (the "**Canadian Lender**"), BCE Inc. ("**BCE**"), and Teleglobe Inc. (the "**U.S.**

**Lender**") and Teleglobe Canada Limited Partnership, each as borrower (collectively, the

"**Canadian Borrowers**") and the guarantors named therein (collectively, the "**Canadian**

**Guarantors**") (as the same may be amended, supplemented or otherwise modified from time to

time, the "**Canadian Credit Agreement**", a copy of which is attached as Exhibit "D" to the

Motion), are hereinafter referred to as the "**Financing Documents**"[2]), among the Debtors, the

Canadian Lender and the U.S. Lender, (B) grant mortgages, security interests, liens and super-

priority claims to (y) the Canadian Lender and (z) the U.S. Lender, including a priority pursuant

to sections 364(c)(2) and (3) of the Bankruptcy Code, in all of the Debtors' present or hereafter

acquired property, to secure the Debtors' obligations under the U.S. Financing Documents, and

grant the Canadian Lender and the U.S. Lender, pursuant to section 364(c)(1) of the Bankruptcy

Code, priority in payment with respect to such obligations over any and all administrative

expenses of the kinds specified in sections 503(b) and 507(b) of the Bankruptcy Code, other than

in respect of the Carve-Out (as defined below), and (C) pending a final hearing on the Motion

(the "**Final Hearing**"), to obtain emergency post-petition loans from the U.S. Lender in

accordance with the Financing Documents and the U.S. DIP Budget annexed as Exhibit F to the

Motion (the "**U.S. Budget**"), to and including the date on which the Final Order (defined below)

is entered (the "**Interim Loan**"), (II) authorizing the Debtors, in accordance with the U.S.

Budget and this Order, to incur Post-Petition Indebtedness (defined below) in an amount not to

---

[2]    Unless otherwise defined herein, all capitalized terms used herein have the meanings ascribed to such terms in the Motion.

exceed U.S.$15 million, pending the Final Hearing, (III) in accordance with Rule 4001(c)(2) of

the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), requesting that this Court

schedule the Final Hearing and approve notice with respect thereto; and (IV) granting related

relief; and in accordance with Bankruptcy Rule 4001(c)(2) and (3), adequate notice of the

Motion having been given; and a hearing to consider approval of the Interim Loan having been

held and concluded on the date hereof (the "**Interim Hearing**"); and the Court having

considered the Motion and the Exhibits attached thereto; and upon all of the pleadings filed with

the Court and all of the proceedings held before the Court; and after due deliberation and

consideration and good and sufficient cause appearing therefor,

THE COURT HEREBY FINDS:

      A.     On May 28, 2002 (the "**Petition Date**"), the Debtors each filed with the

Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11**

**Cases**"). The Debtors are continuing to operate their respective businesses and manage their

respective properties as debtors in possession pursuant to sections 1107 and 1108 of the

Bankruptcy Code. No request has been made for the appointment of a trustee or examiner, and

no official committee has been appointed in the Chapter 11 Cases. Pursuant to an Order of this

Court, the Chapter 11 Cases are being jointly administered.

      B.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The statutory predicates

for the relief sought herein are sections 105, 362, 363, and 364 of the Bankruptcy Code and

Bankruptcy Rule 4001. Venue of the Debtors' chapter 11 cases is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.    On May 15, 2002, the Canadian Borrowers and the Canadian Guarantors commenced a proceeding in the Ontario Superior Court of Justice – Commercial List (the "**Canadian Court**") pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36. On May 15, 2002, the Canadian Court entered an interim order, a copy of which is attached as Exhibit "E" to the Motion, which, among other things, permits the Canadian Borrowers to borrow under the Canadian Credit Agreement in accordance with the terms thereof.

D.    An immediate and critical need exists for the Debtors to obtain funds in order to continue the operation of their respective businesses. Without such funds, the Debtors will not be able to pay their employees and other direct operating expenses and obtain goods and services needed to carry on their businesses during this sensitive period in a manner that will avoid irreparable harm to the Debtors' estates. At this time, the ability of the Debtors to finance their operations and the availability of sufficient working capital and liquidity through the incurrence of new indebtedness for borrowed money and other financial accommodations are vital to the confidence of the Debtors' vendors and suppliers of other goods and services, to their customers and employees, and to the preservation and maintenance of the going concern value of the Debtors' estates. Pending the Final Hearing, the Debtors require up to U.S.$15 million in Post-Petition Indebtedness to meet their operating expenses and obtain goods and services needed to carry on their businesses.

E.     As of the date hereof, the Debtors are unable to obtain financing from sources other than the U.S. Lender on terms more favorable than under the Financing Documents, including possible financing in the form of unsecured credit or unsecured debt allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense pursuant to section 364(a) or (b) of the Bankruptcy Code, unsecured debt having the priority afforded by section 364(c)(1) of the Bankruptcy Code, or debt secured only as described in section 364(c)(2) or (3) of the Bankruptcy Code.

F.     Additional financing is unavailable to the Debtors without their (a) granting to the Canadian Lender and the U.S. Lender claims having priority over that of administrative expenses of the kind specified in sections 503(b) and 507(a) and (b) of the Bankruptcy Code (other than the Carve-Out), and (b) securing such loans and other obligations with liens on and security interests in all the pre-petition and post-petition assets, properties and interests in property of the Debtors as provided herein and in the U.S. Financing Documents.

G.     Notice of the Interim Hearing and the relief requested in the Motion has been provided (by telecopy) to (a) the consolidated list of fifty (50) largest unsecured creditors of the Debtors; (b) the Office of the United States Trustee; (c) counsel and co-counsel to the Canadian Borrowers (including the U.S. Lender) and Canadian Guarantors; (d) counsel to the Monitor for the U.S. Lender, (e) counsel and co-counsel to the Canadian Lender and BCE, (f) counsel to the Informal Committee of Noteholders, (g) counsel to Bank of Montreal, as agent, under the Credit Facilities, and (h) all persons requesting service of papers pursuant to Bankruptcy Rule 2002. In view of the urgency of the requested relief, such notice constitutes

sufficient notice under Bankruptcy Rule 4001 of the Interim Hearing and no other notice need be given.

        H.      Based upon the record presented to the Court by the Debtors at the Interim Hearing, good cause has been shown for the entry of this Order. Among other things, entry of this Order will minimize disruption of the Debtors' businesses and operations and permit them to meet their respective payroll and other operating expenses, obtain needed supplies and retain customer and supplier confidence by demonstrating an ability to maintain normal operations. The Debtors have requested immediate entry of this Order pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2). The permission granted herein to enter into the Financing Documents and obtain funds, incur indebtedness and other financial accommodations, including the Debtors' several guaranty under the Guaranty of the indebtedness incurred by the U.S. Lender under the Canadian Credit Agreement (but only to the extent of funds subsequently advanced to each Debtor by the U.S. Lender), is necessary to avoid immediate and irreparable harm to the Debtors. Consummation of these financing arrangements is in the best interest of the Debtors' estates.

        I.      Based on the record presented to the Court by the Debtors at the Hearing, the Financing Documents have been negotiated in good faith and at arm's-length among the Debtors, the Canadian Lender, and the U.S. Lender, and any credit extended and loans made to the Debtors by the U.S. Lender, and the guaranties extended by the Debtors under the Guaranty, shall be deemed to have been extended, issued or made, as the case may be, in good faith within the meaning of section 364(e) of the Bankruptcy Code.

J.     The terms of the Financing Documents are fair and reasonable, reflect the

Debtors' exercise of prudent business judgment consistent with their fiduciary duties and are

supported by reasonably equivalent value and fair consideration. This Court concludes that entry

of this Order is in the best interests of the Debtors and their estates and creditors as its

implementation will, among other things, allow for the continued operation of the Debtors'

existing businesses.

K.     Based upon the foregoing findings and conclusions, and upon the record

made before this Court at the Hearing, and good and sufficient cause appearing therefor;

IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

1.     The Motion is granted, subject to the terms and conditions set forth in this

Order.

2.     The Debtors be, and hereby are, authorized to enter into the Financing

Documents, including, without limitation, the U.S. Financing Documents and to borrow money,

incur indebtedness, and perform their obligations hereunder and thereunder in accordance with,

and subject to, the terms of this Order and the Financing Documents; provided, however, that the

Debtors shall only be parties to the Canadian Credit Agreement for purposes of the sections

thereof entitled "Representations and Warranties" and "Covenants". The Debtors are authorized

to enter into such modifications and amendments to the Financing Documents (as provided for

therein), without further order of this Court, as may be agreed upon in writing by the Debtors, the

U.S. Lender and the Canadian Lender, except for (i) any increase in the amount to be loaned to

the Debtors in accordance with this Order and the Financing Documents, (ii) any increase in the

applicable interest rates, (iii) any modification to the Maturity Date (as defined in the Notes), and (iv) any other modification which imposes any additional material burden on the Debtors; provided that the Debtors shall give reasonable notice of such modification or amendment to (x) the U.S. Trustee, (y) counsel to Bank of Montreal, as agent, under the Credit Facilities, and (z) counsel to any statutory committee appointed in these cases. Upon execution and delivery of the Financing Documents, the Financing Documents shall constitute valid and binding obligations of the Debtors, enforceable against the Debtors in accordance with their terms. Pending the Final Hearing, the Debtors shall be authorized to incur, pursuant to the U.S. Financing Documents and the U.S. Budget, not more than U.S.$15 million in Post-Petition Indebtedness prior to the entry of the final order (the **"Final Order"**), which shall be in form and substance satisfactory to the U.S. Lender and the Canadian Lender.

        3.      Notwithstanding anything contained in the Guaranty or in any other Financing Document, each Debtor's guaranty in favor of the Canadian Lender shall not exceed the amounts advanced to such Debtor by the U.S. Lender, which advances shall be evidenced by the Notes, the form of which is attached as Exhibit "B" to the Motion. As security for all loans, advances, guarantees or any other indebtedness or obligations, contingent or absolute which may, from and after the date of this Order or from time to time hereafter be owing by each of the Debtors to the Canadian Lender under the Guaranty and/or the U.S. Lender under the Notes, as applicable, hereunder, or under any of the other U.S. Financing Documents (all such loans, advances, guarantees, letters of credit and other indebtedness or obligations, together with any obligations at any time incurred by the Debtors on or after the Petition Date to the Canadian

Lender and the U.S. Lender, as applicable, collectively, the **"Post-Petition Indebtedness"**),

subject to the terms of the U.S. Financing Documents, the Canadian Lender and the U.S. Lender

are hereby granted valid, binding, enforceable and perfected liens (the **"Post-Petition Liens"**) in

all currently owned or hereafter acquired property, assets, causes of action, and rights of the

Debtors of any kind or nature, whether real or personal, tangible or intangible, wherever located,

now owned or hereafter acquired or arising and all proceeds, products, rents and profits thereof,

including, without limitation, all cash, goods, accounts receivable, inventory, cash-in-advance

deposits, real estate, machinery, equipment, vehicles, trademarks, trade names, licenses, causes

of action, rights to payment including tax refund claims, insurance proceeds and tort claims and

the proceeds, products, rents and profits of all the foregoing (all of the foregoing, the

**"Collateral"**; provided, however, that the term "Collateral" shall expressly exclude actions for

preferences, fraudulent conveyances, and other avoidance power claims and any recoveries

under sections 544, 545, 547, and 548 of the Bankruptcy Code), subject only to the Carve-Out.

Such Post-Petition Liens are granted as follows:

> (a) pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority,
> perfected lien upon all of the Debtors' right, title and interest in, to and under all
> Collateral that is not otherwise encumbered by a validly perfected and unavoidable
> security interest or lien on the Petition Date; and

> (b) pursuant to section 364(c)(3) of the Bankruptcy Code, a second priority,
> junior, perfected Lien upon all of the Debtors' right, title and interest in, to and under all
> other Collateral which is subject to a validly perfected and unavoidable security interest
> or lien in existence as of the Petition Date or a valid lien perfected (but not granted) after
> the Petition Date to the extent such perfection in respect of a pre-Petition Date claim is
> expressly permitted under the Bankruptcy Code.

> 4.    The Post-Petition Liens in favor of the U.S. Lender on the Collateral shall

in all respects be junior in priority to (a) the Carve-Out, (b) the Post-Petition Liens on the

Collateral and Superpriority Claims in favor of the Canadian Lender, and (c) any existing liens on the Collateral. The U.S. Lender shall not, without the prior written consent of the Canadian Lender, be entitled to exercise any right or remedy in respect of its Post-Petition Liens unless and until all obligations of each of the Canadian Borrowers (including, without limitation, the U.S. Lender) under the Financing Documents and all obligations of each of the Debtors to the Canadian Lender in respect of the Post-Petition Indebtedness have been indefeasibly paid in full in cash.

5.    The Canadian Lender and the U.S. Lender are granted, pursuant to section 364(c)(1) of the Bankruptcy Code, priority with respect to each of the Debtor's obligations in respect of the Post-Petition Indebtedness having priority in the Chapter 11 Cases over all administrative expenses of the kind specified in section 503(b) or 507(a) and (b) of the Bankruptcy Code ("**Superpriority Claims**"), subject only to the Carve-Out. The Superpriority Claims of the U.S. Lender shall be junior only to the (a) Carve Out, (b) the Collateral and Superpriority Claims in favor of the Canadian Lender, and (c) any existing liens on the Collateral. The U.S. Lender shall not, without the prior written consent of the Canadian Lender, be entitled to exercise any right or remedy in respect of its Superpriority Claims unless and until all of the obligations of the Canadian Borrowers (including, without limitation, the U.S. Lender) under the Financing Documents and all obligations of the Debtors to the Canadian Lender in respect of the Post-Petition Indebtedness have been indefeasibly paid in full in cash.

6.    Except as expressly set forth in this Order, the Post-Petition Liens granted in this Order shall not be (i) subject to any lien which is avoided and preserved for the benefit of

the Debtors' estates under section 551 of the Bankruptcy Code or (ii) subordinated to or made

pari passu with any other lien under section 364(a) or 364(d) of the Bankruptcy Code or

otherwise.

       7.     Any provision of this Order or the Canadian Credit Agreement to the

contrary notwithstanding, the Post-Petition Liens and Superpriority Claims granted to the

Canadian Lender and the U.S. Lender pursuant to the U.S. Financing Documents and this Order,

shall be subject and subordinate to a carveout (the **"Carve-Out"**) for (i) the unpaid fees of the

Clerk of the Bankruptcy Court and of the United States Trustee pursuant to 28 U.S.C. § 1930(a)

and (b), and (ii) following the occurrence of any Event of Default (as defined in the Guaranty),

allowed unpaid fees and expenses payable under sections 330 and 331 of the Bankruptcy Code to

professional persons retained pursuant to an order of the Court by the Debtors (the **"Debtors'**

**Professionals"**) in an amount not to exceed in the aggregate $150,000, or any statutory

committee appointed in these chapter 11 cases (the **"Committee's Professionals"**) in an amount

not to exceed in the aggregate $50,000 (other than the fees and expenses, if any, of any such

professional persons incurred, directly or indirectly, in respect of, arising from or relating to, the

initiation or prosecution of any action for preferences, fraudulent conveyances, other avoidance

power claims or any other claims or causes of action against the U.S. Lender, the Canadian

Lender or BCE (or any of their respective officers, directors, agents, representatives, or

professionals), or with respect to the Post-Petition Indebtedness). So long as no Event of Default

shall have occurred and be continuing, the Debtors, for a period not to exceed four (4) calendar

months, shall be permitted to pay compensation and reimbursement of expenses allowed and

payable under sections 330 and 331 of the Bankruptcy Code in an amount not to exceed

$150,000 per calendar month for the Debtors' Professionals and $50,000 per calendar month for

the Committee's Professionals, as the same may be due and payable (other than the fees and

expenses, if any, of any such professional persons incurred, directly or indirectly, in respect of,

arising from or relating to, the initiation or prosecution of any action for preferences, fraudulent

conveyances, other avoidance power claims or any other claims or causes of action against the

U.S. Lender, the Canadian Lender or BCE (or any of their respective officers, directors, agents,

representatives, or professionals), or with respect to the Post-Petition Indebtedness). Except as

specified in this paragraph, until all of the obligations of each of the Canadian Borrowers

(including, without limitation, the U.S. Lender) under the Financing Documents and all

obligations of each of the Debtors to the Canadian Lender in respect of the Post-Petition

Indebtedness have been indefeasibly paid in full in cash, no other professional fees shall be paid

by any Debtor. Nothing in this Paragraph 7 shall be deemed in any way to prejudice the

Canadian Lender's or the U.S. Lender's right to object to any request made by professional

person for payment of fees and services.

> 8.    Except as expressly set forth herein, no costs or administrative expenses

which have been or may be incurred in the Chapter 11 Cases, in any conversion of the Chapter

11 Cases pursuant to section 1112 of the Bankruptcy Code, or in any other proceeding related

thereto, and no priority claims, including without limitation, any other claims having priority

over administrative expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the

Bankruptcy Code, are or will be prior to or on a parity with the Superpriority Claims of the

Canadian Lender and the U.S. Lender against the Debtors arising, as applicable, out of the Post-Petition Indebtedness, any provision of this Order, or with the Post-Petition Liens granted herein and in the other U.S. Financing Documents in and to the Collateral; provided, however, that nothing herein shall be deemed to constitute a waiver of any rights of the Debtors under section 506(c) of the Bankruptcy Code.

9.    From and after the Effective Date, the proceeds of the Post-Petition Indebtedness, and the Collateral shall not, directly or indirectly, be used to pay expenses of the Debtors or otherwise be disbursed other than to pay the amounts and types set forth in the U.S. Budget. Except as set forth in the preceding sentence, neither the Canadian Lender nor the U.S. Lender has consented or agreed to the use of the proceeds of the Post-Petition Indebtedness or the Collateral.

10.    The automatic stay extant under section 362(a) of the Bankruptcy Code shall be, and it hereby is, modified to the extent necessary to permit the Canadian Lender and the U.S. Lender to receive, collect and apply payments and proceeds in respect of the Collateral in accordance with the terms and provisions of this Order, and the other U.S. Financing Documents.

11.    Notwithstanding anything herein or in the other Financing Documents, the Debtors shall no longer, pursuant to this Order, the other Financing Documents, or otherwise, be authorized to borrow funds or incur indebtedness hereunder or under the other Financing Documents or to use any proceeds of the Post-Petition Indebtedness already received upon the earliest to occur of any of the following events (any such event shall be referred to as a

"**Termination Event**" and the date of any such event shall be referred to as the "**Termination Date**"):

        (a)    non-compliance by any of the Debtors with any of the terms or provisions of this Order;

        (b)    any Event of Default shall have occurred and be continuing, and any notice required pursuant to the U.S. Financing Documents to cause the Post-Petition Indebtedness to become due and payable shall have been given; and

        (c)    the Maturity Date (as defined in the Canadian Credit Agreement).

        12.    Notwithstanding the occurrence of the Termination Date or anything herein, all of the rights, remedies, benefits and protections provided to the Canadian Lender and the U.S. Lender under this Order shall survive the Termination Date. Upon the Termination Date, the principal of and all accrued interest and fees and all other amounts owed to the U.S. Lender hereunder or under the other U.S. Financing Documents shall be immediately due and payable and the Canadian Lender and the U.S. Lender shall have all other rights and remedies provided in the U.S. Financing Documents.

        13.    As long as any portion of the Post-Petition Indebtedness remains unpaid, or the Financing Documents remain in effect, the Debtors shall not seek, and it shall constitute an Event of Default (and automatic occurrence of the Termination Date) if any of the Debtors seek, or if there is entered, an order dismissing any of the Chapter 11 Cases. If an order dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy) that (a) the Superpriority Claims and Post-Petition Liens granted pursuant to this Order to the Canadian Lender and the U.S. Lender shall continue in full force and effect, shall

remain binding on all parties in interest notwithstanding such dismissal, until all Post-Petition

Indebtedness shall have been paid and satisfied in full in cash, and (b) this Court shall retain

jurisdiction to the extent it has the authority to do so, notwithstanding such dismissal, for the

purposes of enforcing such Superpriority Claims and Post-Petition Liens.

14.    Upon the occurrence and during the continuance of an Event of Default,

subject to the terms of the Financing Documents, the Canadian Lender and the U.S. Lender

(subject to paragraphs 4 and 5 hereof) may exercise rights and remedies and take all or any of the

following actions without further modification of the automatic stay pursuant to section 362 of

the Bankruptcy Code (which is hereby deemed modified and vacated to the extent necessary to

permit such exercise of rights and remedies and the taking of such actions) or further order of or

application to this Court: (a) declare the principal of and accrued interest, fees and other

liabilities constituting the Post-Petition Indebtedness to be due and payable; (b) enforce rights

against any Collateral in the possession of the Canadian Lender and the U.S. Lender; and/or (c)

take any other action or exercise any other right or remedy permitted to the Canadian Lender or

the U.S. Lender under the U.S. Financing Documents, this Order or by operation of law;

provided, however, the Canadian Lender or the U.S. Lender may take the actions described in

clauses (b) or (c) above only after providing five (5) business days' prior written notice to (v) the

Debtors, (w) the United States Trustee, (x) counsel to the U.S. Lender, (y) counsel to any

statutory committee(s) appointed in these chapter 11 cases and (z) counsel to Bank of Montreal,

as agent, under the Credit Facilities.

15.    Except as provided in the U.S. Financing Documents, the Debtors shall be enjoined and prohibited from at any time during the Chapter 11 Cases granting liens in the Collateral or any portion thereof to any other parties pursuant to section 364(c) or (d) of the Bankruptcy Code or otherwise, which liens are senior, on a parity with or junior to the Post-Petition Liens, unless and until all of the obligations of the Canadian Borrowers (including, without limitation, the U.S. Lender) under the Financing Documents and the Post-Petition Indebtedness have been indefeasibly paid in full in cash.

16.    The Debtors shall execute and deliver to the Canadian Lender and the U.S. Lender all such agreements, financing statements, instruments and other documents as the Canadian Lender and/or the U.S. Lender may reasonably request to evidence, confirm, validate or perfect the Post-Petition Liens granted pursuant hereto.

17.    Without limiting the rights of access and information afforded the Canadian Lender or the U.S. Lender under the Financing Documents, the Debtors shall permit representatives, agents and/or employees of the Canadian Lender and the U.S. Lender to have reasonable access to their premises and their records during normal business hours (without unreasonable interference with the proper operation of the Debtors' businesses) and shall cooperate, consult with, and provide to such persons all such non-privileged information as they may reasonably request.

18.    The Debtors shall promptly pay or reimburse the allocable costs and reasonable fees and expenses of the Canadian Lender (including attorneys', accountants' and other advisors' fees with copies of invoices submitted to the Debtors also furnished to the office

of the United States Trustee and counsel to any statutory committee appointed in these cases) as

set forth in the Canadian Credit Agreement, including any unpaid costs, fees and expenses that

were incurred or accrued prior to the Petition Date, as the case may be. None of such costs, fees

and expenses described in this paragraph shall be subject to the approval of this Court, and no

recipient of any such payment shall be required to file with respect thereto any interim or final

fee application with this Court.

      19.    All Post-Petition Liens granted herein and in the other U.S. Financing

Documents to secure repayment of the Post-Petition Indebtedness, shall pursuant to this Order

be, and they hereby are, deemed perfected effective as of the Effective Date, and no further

notice, filing or other act shall be required to effect such perfection; provided, however, if the

Canadian Lender or the U.S. Lender shall, in their sole discretion, choose to file such mortgages,

financing statements, notices of liens and security interests, assignments and other similar

documents, all such mortgages, financing statements or similar instruments shall be deemed to

have been filed or recorded at the time and on the date of entry of this Order.

      20.    The provisions of this Order shall be binding upon and inure to the benefit

of each of the Canadian Lender, the U.S. Lender and the Debtors and their respective successors

and assigns (including any trustee or other fiduciary hereafter appointed as a legal representative

of the Debtors or with respect to the property of the estates of the Debtors, including, upon a

conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy code, the

trustee or trustees appointed therein, if applicable).

      21.    For purposes of this Order, the "Effective Date" shall be the Petition Date.

22.    Based on the findings set forth in this Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the post-petition financing arrangements contemplated by this Order, in the event any or all of the provisions of this Order or any other Financing Documents are hereafter modified, amended or vacated by a subsequent order of this or any other Court, no such modification, amendment or vacation shall affect the validity, enforceability or priority of any Post-Petition Lien, Super-Priority Claim or other claim authorized or created hereby or thereby. Notwithstanding any such modification, amendment or vacation, any claim granted to the Canadian Lender or the U.S. Lender hereunder or under the other U.S. Financing Documents arising prior to the effective date of such modification, amendment or vacation shall be governed in all respects by the original provisions of this Order and the other U.S. Financing Documents, and the Canadian Lender or the U.S. Lender, as the case may be, shall be entitled to all of the rights, remedies, privileges and benefits, including the Post-Petition Liens and priorities granted herein and therein, with respect to any such claim.

23.    The Debtors are authorized to do and perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution of additional security agreements, mortgages and financing statements) and to pay fees and expenses which may be required or necessary for the Debtors' performance under the Financing Documents, including, without limitation: (i) the execution of the Financing Documents, and (ii) the payment of the fees and other expenses described in the U.S. Financing Documents as such become due, including, without limitation, agent fees, commitment fees, letter of credit fees and

facility fees and reasonable attorneys', financial advisors', consultants' and accountants' fees and disbursements as provided for in the U.S. Financing Documents.

24.      Unless and until all obligations of each of the Canadian Borrowers (including, without limitation, the U.S. Lender) under the Financing Documents and the Post-Petition Indebtedness have been indefeasibly paid in full in cash, the protections afforded to the Canadian Lender and the U.S. Lender herein and therein, and any action taken pursuant thereto or thereto, shall survive the entry of any order confirming a plan of reorganization (and pursuant to section 1141(d)(4) of the Bankruptcy Code, each of the Debtors hereby waives such discharge) or converting any of these Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code, and the Post-Petition Liens in and to the Collateral and the Superpriority Claims shall continue in these proceedings and in any such successor case, and such Post-Petition Liens and Superpriority Claims shall maintain their priority as provided by this Order.

25.      Satisfaction in cash by the Debtors to the Canadian Lender of the Post-Petition Indebtedness shall, to such extent, satisfy the obligations of the U.S. Lender to the Canadian Lender under the relevant Note that is the subject of such Guaranty.

26.      The Debtors shall, on or before June ___, 2002, serve by United States mail, first-class postage prepaid, copies of the Motion, this Order and a notice of the hearing (the **"Final Hearing Notice"**) to be held on June ___, 2002 at ___ a.m./p.m. to consider entry of the proposed Final Order on: (a) the fifty largest unsecured creditors of each of the Debtors as listed in their respective petitions commencing these Chapter 11 Cases; (b) the Office of the United States Trustee; (c) counsel to the U.S. Lender, Jones, Day, Reavis & Pogue, 222 East 41st Street,

New York, New York 10017, Attn: John J. Rapisardi and Ogilvy Renault, Suite 1100, Box 11,

Merrill Lynch Canada Tower, 200 King Street West, Toronto, Ontario M5H 3T4, Attn: Derick

C. Tay, (d) counsel to the Canadian Lender, Shearman & Sterling, 599 Lexington Avenue, New

York, New York 10022, Attn:  Mark Shapiro, Esq. and Andrew Tenzer, Esq., Stikeman Elliott,

Suite 5300, 199 Bay Street, Toronto, Ontario, M5L 1B9, Attn: Sean F. Dunphy, and Young

Conaway Stargatt & Taylor, The Brandywine Building, 1000 West Street, 17th Floor, P.O. Box

391, Wilmington, Delaware 19899-0391, Attn: Pauline Morgan, Esq..; (e)counsel to the Informal

Committee of Noteholders, Bingham Dana LLP, One State Street, Hartford, Connecticut 06103,

Attn: Evan D. Flaschen, Esq.; (f) counsel to Bank of Montreal, as agent, under the Credit

Facilities, Mayer, Brown, Rowe & Maw, 190 South La Salle Street, Chicago, Illinois 60603-

3441, Attn: J. Robert Stoll, Esq; and (g) counsel to the Monitor, Blank Rome Comisky &

McCauley LLP, The Chrysler Building, 405 Lexington Avenue, New York, New York 10174,

Attn: Marc Richards, Esq.  Copies of the Motion, this Order and the Final Hearing Notice shall

be served upon all persons requesting service of papers pursuant to Bankruptcy Rule 2002 by

United States mail, first-class postage prepaid, within two (2) business days following the receipt

of such request.

   27. The Final Hearing Notice shall state that any party in interest objecting to

the entry of the proposed Final Order shall file written objections with the Clerk of the

Bankruptcy Court, with a copy served upon and received by Jones, Day, Reavis & Pogue, 222

East 41st Street, New York, New York 10017, Attn: John J. Rapisardi; Ogilvy Renault, Suite

1100, Box 11, Merrill Lynch Canada Tower, 200 King Street West, Toronto, Ontario M5H 3T4,

Attn: Derick C. Tay; Shearman & Sterling, 599 Lexington Avenue, New York, New York

10022, Attn: Mark Shapiro, Esq. and Andrew Tenzer, Esq.; Stikeman Elliott, Suite 5300, 199

Bay Street, Toronto, Ontario, M5L 1B9, Attn: Sean F. Dunphy, so that such objections are

received on or before 4:00 p.m. on June ___, 2002; any objections by creditors or other parties-

in-interest to any of the provisions of this Order shall be deemed waived unless filed and

received in accordance with the notice on or before the close of business on such date. Such

notice shall constitute adequate and sufficient notice.

28. Notwithstanding anything herein, the entry of this Order is without

prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair,

(x) any of the rights of the Canadian Lender or the U.S. Lender under the Bankruptcy Code or

under non-bankruptcy law, including, without limitation, the right of the Canadian Lender or the

U.S. the Lender to (i) request additional adequate protection of their interests in the Collateral or

relief from or modification of the automatic stay extant under section 362 of the Bankruptcy

Code, (ii) request conversion of any of the Debtors' chapter 11 cases to cases under chapter 7 of

the Bankruptcy Code, and (iii) propose, subject to the provisions of section 1121 of the

Bankruptcy Code, a chapter 11 plan or plans or (y) any of the rights, claims or privileges

(whether legal, equitable or otherwise) of the Canadian Lender or the U.S. Lender; provided,

however, that the terms of this Order and the other Financing Documents shall govern such

actions as between the Canadian Lender and the U.S. Lender.

29. All of the rights, remedies, benefits, and protections provided to the

Canadian Lender and the U.S. Lender under this Order shall apply, without modification and

notwithstanding the occurrence of the Termination Date, to any party who is subrogated to the

rights of the Canadian Lender or the U.S. Lender under the Financing Documents.

           30.     This Order shall constitute findings of fact and conclusions of law and

shall take effect immediately upon execution hereof notwithstanding the possible application of

FED. R. BANKR. P. 6004(g), 7062, 9014, or otherwise.


Dated:  May \_\_\_, 2002

                                        _____

                                        UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT B

# PROMISSORY NOTE

## May   , 2002

FOR VALUE RECEIVED, the undersigned, TELEGLOBE USA INC. (the "**Borrower**"), a Delaware corporation and a debtor and debtor-in-possession under chapter 11 of title 11 of the United States Code, HEREBY PROMISES TO PAY, in accordance with the terms hereof, to the order of TELEGLOBE INC. (the "**U.S. Lender**"), the principal amount of the Advances (defined below) as set forth on the grid attached hereto, together with interest thereon, owing to the U.S. Lender by the Borrower from time to time.

Both principal and interest are payable in lawful money of the United States of America to the U.S. Lender, at _____, in same day funds. Each Advance owing to the U.S. Lender by the Borrower, and all payments made on account of principal thereof, shall be recorded by the U.S. Lender and, prior to any transfer thereof, endorsed on the grid attached hereto, which is part of this Promissory Note (a copy of which shall then be promptly delivered to the Canadian Lender (defined below)).

All Advances hereunder shall be by way of Base Rate (Canada) Loans in U.S. dollars. The Advances shall bear interest at the Base Rate (Canada) of The Bank of Nova Scotia for U.S. dollar loans plus 1.5% per annum payable monthly in arrears on the first Business Day of the following month such Advance is made and on the Maturity Date (defined below). Interest shall be calculated daily for the actual number of days elapsed in the period during which it accrues based on a year of 365 or 366 days, as the case may be.

For the purposes of this Promissory Note, a "**Business Day**" shall mean any day on which the banks in Montreal, Canada and New York, New York are generally open for business.

The Borrower may, upon not less than one (1) Business Day's prior written or telephonic notice confirmed in writing given to the U.S. Lender and the Canadian Lender, at any time and from time to time prepay any Advance on any Business Day. Notice of prepayment having been given as aforesaid, the principal amount of the Advance specified in such notice shall become due and payable on the prepayment date specified therein.

All Loans shall be repayable in full on the date (the "**Maturity Date**") which is the earlier of (i) September 1, 2002 or such later date as the Canadian Lender in its sole discretion may agree to in writing in accordance with the Canadian Credit Agreement, (ii) the effective date of the implementation of a plan of compromise and/or arrangement in the Canadian Proceeding, (iii) the effective date of the implementation of a plan or reorganization under in the Chapter 11 Cases, (iv) the closing of any Canadian Court and/or the U.S. Bankruptcy Court approved sale or disposition of (a) substantially all of the assets and business of the Canadian Borrowers, and/or their subsidiaries or (b) the Bilateral Business (as defined in the Canadian Credit Agreement) or (v) an occurrence of acceleration of the Canadian Obligations pursuant to the GSA upon the occurrence of an Event of Default thereunder.

Not later than one (1) Business Day following the date of receipt by the Borrower of any Net Asset Sale Proceeds (as such term is defined in the Canadian Credit Agreement) in respect of any Asset Sale (as such term is defined in the Canadian Credit Agreement), the Borrower shall prepay the Advances and the Advances hereunder shall be permanently reduced in an aggregate amount equal to 100% of such Net Asset Sale Proceeds, until the Borrower shall have no further obligation to the U.S. Lender hereunder.

Except as expressly provided for herein and in the GSA, the Borrower shall not make any advance of funds received by it hereunder to any of its affiliates.

This Promissory Note is the promissory note referred to in the commitment letter (the "**Canadian Credit Agreement**"), dated as of May 15, 2002, among 3810186 Canada Inc. (the "**Canadian Lender**"), BCE Inc., the U.S. Lender and Teleglobe Canada Limited Partnership (the "**Canadian Borrowers**"), as borrowers and each of the guarantors named therein, including the Borrower.

The Canadian Credit Agreement, among other things, authorizes the U.S. Lender to make advances (the "**Advances**") to the Borrower from time to time in an aggregate amount not to exceed at any time outstanding the amount set forth in the U.S. Budget, the indebtedness of the Borrower resulting from each such Advance being evidenced by this Promissory Note

The Canadian Lender is a third party beneficiary hereof and is entitled to enforce this Note against the Borrower, subject to the terms of the Canadian Credit Agreement and the Guaranty and Security Agreement (the "**GSA**"), dated as of May   , 2002, among the Borrower, [___], the U.S. Lender and the Canadian Lender.

The rights of the U.S. Lender to receive any payments in respect of this Promissory Note are subordinate to the right of repayment to the Canadian Lender of all amounts owed to it by the Borrower under the GSA.

The Borrower hereby waives presentment and demand for payment, notice of dishonor, protest, notice of protest, notice of non-payment, and notice of intent to accelerate the maturity hereof and of acceleration.

This Promissory Note may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on part of the Borrower, but only by an agreement in writing signed by the Canadian Lender and the U.S. Lender.

This Promissory Note shall be governed by and interpreted and enforced in accordance with the laws of the State of New York.

Capitalized terms not otherwise defined herein have the meanings ascribed thereto in the GSA.

LEGEND:

THIS PROMISSORY NOTE IN FAVOR OF THE U.S. LENDER HAS BEEN
PLEDGED TO THE CANADIAN LENDER IN ACCORDANCE WITH THE
TERMS OF THE CANADIAN CREDIT AGREEMENT AND THE CCAA
ORDER. THIS LEGEND SHALL ONLY BE REMOVED ONCE ALL OF
THE CANADIAN OBLIGATIONS AND THE OBLIGATIONS OF THE
CANADIAN BORROWERS UNDER THE CREDIT AGREEMENT HAVE
EACH BEEN INDEFEASIBLE PAID IN FULL IN CASH OR UNLESS
CONSENTED TO IN WRITING BY THE CANADIAN LENDER, WHICH
CONSENT MAY BE WITHHELD IN ITS SOLE AND ABSOLUTE
DISCRETION.

**[SIGNATURE ON FOLLOWING PAGE]**

TELEGLOBE USA INC., a Debtor and
Debtor in Possession

By: _____

Name:
Title:

## ADVANCES AND PAYMENTS OF PRINCIPAL

| Date | Amount of Advance | Amount of Principal Paid or Prepaid | Unpaid Principal Balance | Notation Made by |
|------|------|------|------|------|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

**EXHIBIT C**

TELEGLOBE USA INC.,

-and-

[_____],

each, a Grantor

3810186 CANADA INC.,

as the Canadian Lender,

- and -

TELEGLOBE INC.,

as the U.S. Lender

---

GUARANTY AND SECURITY AGREEMENT

---

Dated as of May •, 2002

## GUARANTY AND SECURITY AGREEMENT

This Guaranty and Security Agreement (this "**Agreement**"), dated as of May •, 2002, made by each of Teleglobe USA Inc. and [_____], severally and not jointly (collectively, the "**Grantors**" and each a "**Grantor**"), to and in favor of 3810186 Canada Inc. (the "**Canadian Lender**") and Teleglobe Inc. (the "**U.S. Lender**").

WHEREAS, on May 15, 2002, the Grantors, the U.S. Lender and certain of its other subsidiaries commenced a proceeding (the "**Canadian Proceeding**") before the Ontario Superior Court of Justice – Commercial List (the "**Canadian Court**") pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36;

WHEREAS, on May 15, 2002, the Canadian Court granted an Interim Order (the "**CCAA Order**"), authorizing and empowering the U.S. Lender and Teleglobe Canada Limited Partnership (collectively, the "**Canadian Borrowers**") to borrow up to U.S.$100 million from the Canadian Lender to fund the Canadian Borrowers' and their respective subsidiaries' businesses and their restructuring on terms and subject to the conditions contained in the commitment letter, dated as of May 15, 2002 among the Canadian Lender, BCE Inc., the Canadian Borrowers and each of the guarantors named therein, including the Grantors (such commitment letter as it may at any time or from time to time be amended, supplemented, restated or replaced, the "**Canadian Credit Agreement**");

WHEREAS, on May 28, 2002 (the "**Petition Date**"), each of the Grantors filed voluntary petitions ("**Chapter 11 Cases**") in the United States Bankruptcy Court for the District of Delaware (the "**U.S. Bankruptcy Court**") for relief under chapter 11 of the United States Code (the "**Bankruptcy Code**");

WHEREAS, pursuant to and in accordance with the terms of the Canadian Credit Agreement, the U.S. Lender is entitled (subject to any required Canadian Court approval) to lend (the "**Intercompany Loan**") certain funds to the Grantors in accordance with the U.S. DIP Budget (the "**U.S. Budget**") annexed thereto, which Intercompany Loans shall be evidenced by promissory notes in substantially the same form as Schedule "A" hereto (as the "**Notes**");

WHEREAS, to secure the Grantors' obligations under (a) this Agreement, to the Canadian Lender and (b) the Intercompany Loan, to the U.S. Lender, each Grantor is required to severally, and not jointly, execute and deliver this Agreement in favor of the Canadian Lender and the U.S. Lender, as applicable, as security therefor, pursuant to which the Canadian Lender and the U.S. Lender shall have a security interest in each Grantor's assets as set forth herein;

WHEREAS, each of the Grantors will derive substantial direct benefit from the transactions contemplated by the Canadian Credit Agreement through the Intercompany Loan; and

WHEREAS, it is a condition precedent (subject to any required Canadian Court approval) to the U.S. Lender's ability to extend the Intercompany Loan pursuant to and in accordance with the Canadian Credit Agreement that the Grantors have granted the assignment,

- 2 -

security interest and guaranty, and made the pledge and assignment contemplated by this Agreement.

NOW THEREFORE, in consideration of the premises and other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, and in order to induce the Canadian Lender to extend the loan in accordance with the Canadian Credit Agreement and the U.S. Lender to extend the Intercompany Loan in accordance with the Canadian Credit Agreement, each Grantor hereby severally, and not jointly, agrees as follows:

## ARTICLE 1

### DEFINITIONS

**1.1    Definitions.**

(a)    Unless otherwise defined herein, terms defined in the Canadian Credit Agreement and used herein shall have the meanings given to them in the Canadian Credit Agreement.

(b)    The following terms shall have the following meanings:

"**Account Collateral**":  as defined in Section 2.1(f).

"**Agreement**":  as defined in the recitals hereof.

"**Bankruptcy Code**":  as defined in the recitals hereof.

"**Canadian Borrowers**":  as defined in the recitals hereof.

"**Canadian Court**":  as defined in the recitals hereof.

"**Canadian Credit Agreement**":  as defined in the recitals hereof.

"**Canadian Proceeding**":  as defined in the recitals hereof.

"**Canadian Obligations**":  as defined in Section 2.2(a).

"**Chapter 11 Cases**":  as defined in the recitals hereof.

"**Collateral**":  as defined in Section 2.1.

"**Computer Software**":  as defined in Section 2.1(g)(v).

"**Copyrights**":  as defined in Section 2.1(g)(iii).

"**CCAA Order**":  as defined in the recitals hereof.

- 3 -

**"DIP Order"**: means the Interim Order to be entered by the U.S. Bankruptcy Court in the Chapter 11 Cases in substantially the same form as Schedule "B" hereto and once entered by the U.S. Bankruptcy Court, the Final Order.

**"Final Order"**: has the meaning ascribed to it in the DIP Order.

**"Event of Default"**: as defined in Section 5.1.

**"Grantor" and "Grantors"**: as defined in the recitals hereof.

**"Guaranteed Obligations"**: as defined in Section 6.1.

**"Intellectual Property"**: as defined in Section 2.1(g).

**"Intercompany Loan"**: as defined in the recitals hereof.

**"Lender"**: means either or both of the Canadian Lender or the U.S. Lender, as the context so requires.

**"Licenses"**: as defined in Section 2.1(g)(vi).

**"Loan Party"**: means any party to the Canadian Credit Agreement or this Agreement, other than the Canadian Lender or BCE.

**"Material Contracts"**: as defined in Section 2.1(e).

**"Negotiable Collateral"**: as defined in Section 2.5(b).

**"Notes"**: as defined in the recitals hereof.

**"Obligations"**: means either or both of the Canadian Obligations or the U.S. Obligations, as the context so requires.

**"Other Taxes"**: means any present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies that arise from any payment hereunder or from the execution or delivery of or otherwise with respect to this Agreement.

**"Patents"**: as defined in Section 2.1(g)(i).

**"Petition Date"**: as defined in the recitals hereof.

**"Pledged Accounts"**: means any accounts owned by the Grantors at any financial institution, including, without limitation, the designated accounts listed on Schedule "C".

**"Real Property"**: as defined in Section 2.1(h).

**"Receivables"**: as defined in Section 2.1(c).

- 4 -

"**Related Contracts**": as defined in Section 2.1(c).

"**Restricted Asset**": as defined in Section 2.6(a).

"**Securities**": as defined in Section 2.1(d).

"**Security Interest**": as defined in Section 2.2(a).

"**U.S. Bankruptcy Court**": as defined in the recitals hereof.

"**U.S. Budget**": as defined in the recitals hereof.

"**U.S. Lender**": as defined in the recitals hereof.

"**U.S. Obligations**": as defined in Section 2.2(b)

"**Taxes**": means any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, <u>excluding</u>, in the case of the Canadian Lender, net income taxes that are imposed by the government of the United States of America and franchise taxes and net income taxes that are imposed on the Canadian Lender by government of Canada or any political subdivision thereof.

"**Trademarks**": as defined in Section 2.1(g)(ii).

"**Trade Secrets**": as defined in Section 2.1(g)(iv).

---

## ARTICLE 2

## SECURITY

2.1    **Grant of Security.**

Subject to Section 2.6 and 2.7, each Grantor hereby severally, and not jointly, assigns, hypothecates, mortgages, charges, grants a security interest in and pledges to the Canadian Lender and U.S. Lender, subject only to any valid and enforceable liens and security interests of record existing immediately prior to the Petition Date, in all of such Grantor's right, title and interest in and to any and all property, assets and things of value of every kind or type, tangible, intangible, real, personal and fixed, whether now owned or hereafter acquired and wherever located (collectively, the "**Collateral**"), including, without limitation:

(a)    in and to all equipment in all of its forms, wherever located, now or hereafter existing, all fixtures and all parts thereof and all accessions thereto (any and all such equipment, fixtures, parts and accessions being the "**Equipment**");

- 5 -

(b)    in and to all inventory in all of its forms, wherever located, now or hereafter existing (including, but not limited to, (i) raw materials and work in process therefor, finished goods thereof and materials used or consumed in the manufacture or production thereof, (ii) goods in which such Grantor has an interest in mass or a joint or other interest or right of any kind (including, without limitation, goods in which such Grantor has an interest or right as consignee) and (iii) goods that are returned to or repossessed by such Grantor), and all accessions thereto and products thereof and documents therefor (any and all such inventory, accessions, products and documents being the "**Inventory**");

(c)    in and to all accounts, contract rights, chattel paper, instruments, deposit accounts, general intangibles and other obligations of any kind, now or hereafter existing, whether or not arising out of or in connection with the sale or lease of goods or the rendering of services, and all rights now or hereafter existing in and to all security agreements, leases and other contracts securing or otherwise relating to any such accounts, contract rights, chattel paper, instruments, general intangibles or obligations (any and all such accounts, contract rights, chattel paper, instruments, general intangibles and obligations, to the extent not referred to in clause (d), (e) or (f) below, being the "**Receivables**", and any and all such leases, security agreements and other contracts being the "**Related Contracts**");

(d)    all of the securities, including options and derivatives (whether debt or equity) described in Schedule "D" and registered in the name of such Grantor as identified in Schedule "D" (collectively, the "**Securities**"). For greater certainty, the Securities shall include any substitutions, additions or proceeds arising out of any consolidation, subdivision, reclassification, stock divided or similar increase or decrease in, or alteration to, the capital or partnership units, as applicable, of the issuer of the Securities.

(e)    all of such Grantor's right, title and interest in and to each of the agreements listed on Schedule "E", as such agreements may be amended or otherwise modified from time to time (collectively, the "**Material Contracts**"), including, without limitation, (i) all rights of such Grantor to receive moneys due and to become due under or pursuant to the Material Contracts, (ii) all rights of such Grantor to receive proceeds of any insurance, indemnity, warranty or guaranty with respect to the Material Contracts, (iii) claims of such Grantor for damages arising out of or for breach of or default under the Material Contracts and (iv) the right of such Grantor to terminate the Material Contracts, to perform thereunder and to compel performance and otherwise exercise all remedies thereunder (all such Collateral being the "**Agreement Collateral**");

(f)    all of such Grantor's right, title and interest, whether now owned or hereafter acquired, in and to the following (collectively, the "**Account Collateral**"):

(i)    the Pledged Accounts, all funds held therein and all certificates and instruments, if any, from time to time representing or evidencing the Pledged Accounts, subject to the terms set forth herein;

(ii)    all notes, certificates of deposit, deposit accounts, checks and other instruments from time to time hereafter delivered to or otherwise possessed by the Lender for or on behalf of such Grantor in substitution for or in addition to any or all of the then existing Account Collateral;

(g)    the following (collectively, the "**Intellectual Property**"):

(i)    all United States, international and foreign patents, patent applications and statutory invention registrations, including, without limitation, the patents and patent applications set forth in Schedule "F" hereto, together with all reissues, divisions, continuations, continuations-in-part, extensions and reexaminations thereof, all inventions therein, all rights therein provided by international treaties or conventions and all improvements thereto, and all other rights of any kind whatsoever of such Grantor accruing thereunder or pertaining thereto (the "**Patents**");

(ii)    all trademarks (including, without limitation, service marks), certification marks, collective marks, trade dress, logos, domain names, product configurations, trade names, business names, corporate names and other source identifiers, whether or not registered, whether currently in use or not, including, without limitation, all common law rights and registrations and applications for registration thereof, including, without limitation, the trademark registrations and trademark applications set forth in Schedule "F" hereto, and all other marks registered in the U.S. Patent and Trademark Office or in any office or agency of any State or Territory of the United States or any foreign country (but excluding any United States intent-to-use trademark application prior to the filing and acceptance of a Statement of Use or an Amendment to allege use in connection therewith to the extent that a valid Security Interest may not be taken in such an intent-to-use trademark application under applicable law), and all rights therein provided by international treaties or conventions, all reissues, extensions and renewals of any of the foregoing, together in each case with the goodwill of the business connected therewith and symbolized thereby, and all rights corresponding thereto throughout the world and all other rights of any kind whatsoever of such Grantor accruing thereunder or pertaining thereto (the "**Trademarks**");

(iii)    all copyrights, copyright applications, copyright registrations and like protections in each work of authorship, whether statutory or common law, whether published or unpublished, any renewals or extensions thereof, all copyrights of works based on, incorporated in, derived from, or relating to works covered by such copyrights, including, without limitation, the copyright registrations and copyright applications set forth in Schedule "F" hereto including, without limitation, the trademark registrations and trademark applications set forth in Schedule "F" hereto, together with all rights corresponding thereto throughout the world and all other rights of any kind

- 7 -

whatsoever of such Grantor accruing thereunder or pertaining thereto (the "**Copyrights**");

(iv)    all confidential and proprietary information, including, without limitation, know-how, trade secrets, manufacturing and production processes and techniques, inventions, research and development information, technical data, financial, marketing and business data, pricing and cost information, business and marketing plans and customer and supplier lists and information (the "**Trade Secrets**");

(v)    all computer software programs and databases (including, without limitation, source code, object code and all related applications and data files), firmware, and documentation and materials relating thereto, and all rights with respect to the foregoing, together with any and all options, warranties, service contracts, program services, test rights, maintenance rights, improvement rights, renewal rights and indemnifications and any substitutions, replacements, additions or model conversions of any of the foregoing (the "**Computer Software**");

(vi)    all license agreements, permits, authorizations and franchises, whether with respect to the Patents, Trademarks, Copyrights, Trade Secrets or Computer Software, or with respect to the patents, trademarks, copyrights, trade secrets, computer software or other proprietary right of any other person, including, without limitation, the license agreements set forth in Schedule "F" hereto, and all income, royalties and other payments now or hereafter due and/or payable with respect thereto, subject, in each case, to the terms of such license agreements, permits, authorizations and franchises, including, without limitation, terms requiring consent to a grant of a Security Interest (the "**Licenses**"); and

(vii)    any and all claims for damages for past, present and future infringement, misappropriation or breach with respect to the Patents, Trademarks, Copyrights, Trade Secrets, Computer Software or Licenses, with the right, but not the obligation, to sue for and collect, or otherwise recover, such damages; and

(h)    all of such Grantor's right, title and interest in and to all real property, land, leases, leasehold estates, buildings, improvements, fixtures and appurtenances thereto (the "**Real Property**"); and

(i)    all proceeds of any and all of the foregoing Collateral (including, without limitation, proceeds that constitute property of the types described in clauses (a) - (h) of this Section 2.1) and, to the extent not otherwise included, all (i) payments under insurance (whether or not the Lender is the loss payee thereof), or any indemnity, warranty or guaranty, payable by reason of loss or damage to or otherwise with respect to any of the foregoing Collateral and (ii) cash.

**2.2    Obligations Secured.**

(a)    The security interest granted hereby (the "**Security Interest**"), to the Canadian Lender secures the payment and performance of all debts, liabilities, obligations (including the Guaranteed Obligations) present or future, direct or indirect, absolute or contingent, matured or unmatured, at any time due or accruing due, owing by each Grantor to the Canadian Lender on and after the date of this Agreement pursuant to or in connection with this Agreement and the Canadian Credit Agreement, as applicable (collectively, and together with the expenses, costs and charges set out in subsection (c) below, the "**Canadian Obligations**").

(b)    The Security Interest granted hereby to the U.S. Lender secures the payment and performance of all debts, liabilities, obligations present or future, direct or indirect, absolute or contingent, matured or unmatured, at any time due or accruing due, owing by each Grantor to the U.S. Lender pursuant to or in connection with the Intercompany Loans (collectively, and together with the expenses, costs and charges set out in subsection (c) below, the "**U.S. Obligations**").

(c)    All expenses, costs and charges incurred by or on behalf of the Lenders in connection with this Agreement, the Canadian Credit Agreement, the Intercompany Loans, the Security Interest or the realization of the Collateral, as applicable, including all legal fees, court costs, receiver's or agent's remuneration and other expenses of, or of taking or defending any action in connection with, taking possession of, repairing, protecting, insuring, preparing for disposition, realizing, collecting, selling, transferring, delivering or obtaining payment of the Collateral shall be added to and form a part of the Canadian Obligations to the extent they relate to the Canadian Lender and the U.S. Obligations to the extent they relate to the Intercompany Loans.

### 2.3    Grantors Remain Liable.

Anything herein to the contrary notwithstanding, (a) the Grantors shall remain liable under the contracts and agreements included in the Collateral to the extent set forth therein to perform all of their duties and obligations thereunder to the same extent as if this Agreement had not been executed, (b) the exercise by the Lender of any of the rights hereunder shall not release the Grantors from any of their duties or obligations under the contracts and agreements included in the Collateral, and (c) the Lender shall not have any obligation or liability under the contracts and agreements included in the Collateral by reason of this Agreement, nor shall the Lender be obligated to perform any of the obligations or duties of the Grantors thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

### 2.4    Perfection and Priority of Security Interests, Mortgages and Liens.

At the request of the Canadian Lender, the Grantors shall execute and deliver to the Canadian Lender documentation satisfactory to the Canadian Lender evidencing the Security Interests, charges, mortgages and liens granted hereby and providing for the perfection of such Security Interests, mortgages and liens, and the automatic stay provisions of section 362 of the Bankruptcy Code are modified to permit the execution, delivery and filing of such documentation; provided that no such documentation shall be required as a condition to the validity, priority or perfection of any of the Security Interests, charges, mortgages or liens created

- 9 -

by any Grantor pursuant to this Agreement which Security Interests, charges, mortgages and liens shall, pursuant to section 364(c) of the Bankruptcy Code, be deemed valid and properly perfected at all times from and after entry of the DIP Order. The claims arising under this Agreement shall constitute, in accordance with section 364(c)(1) of the Bankruptcy Code, allowed administrative expense claims having priority over all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code. Such priority and Security Interests and liens shall be subject to the payment of (i) the unpaid fees of the Clerk of the Bankruptcy Court and of the United States Trustee pursuant to 28 U.S.C. § 1930(a) and (b), and (ii) the aggregate allowed unpaid fees and expenses payable under sections 330 and 331 of the Bankruptcy Code to professional persons retained pursuant to an order of the Court by the Grantors or any statutory committee appointed in the Chapter 11 Cases (other than the fees and expenses, if any, of any such professional persons incurred, directly or indirectly, in respect of, arising from or relating to, the initiation or prosecution of any action for preferences, fraudulent conveyances, other avoidance power claims or any other claims or causes of action against the U.S. Lender, the Canadian Lender or BCE Inc., or with respect to the Obligations), in an amount not to exceed U.S.$[25,000] in any calendar month and $[100,000] in the aggregate during the Chapter 11 Cases. The foregoing proviso is without prejudice to the Canadian Lender's right to object to any such application.

    2.5    **Attachment.**

        (a)    Each Grantor acknowledges that (i) value has been given, (ii) it has rights in the Collateral (other than after-acquired Collateral), (iii) it has not agreed to postpone the time of attachment of the Security Interest, and (iv) it has received a duplicate original copy of this Agreement.

        (b)    If any Grantor acquires Collateral consisting of chattel paper, instruments, securities or negotiable documents of title (collectively, **"Negotiable Collateral"**) prior to such time as all of the Canadian Obligations and the obligations of the Canadian Borrowers under the Canadian Credit Agreement have each been indefeasibly paid in full in cash, such Grantor will deliver to the Canadian Lender the Negotiable Collateral and shall, at the request of the Canadian Lender, (i) cause the transfer of the Negotiable Collateral to the Canadian Lender to be registered wherever, in the opinion of the Canadian Lender, such registration may be required, (ii) duly endorse the same for transfer in blank or as the Canadian Lender may direct, and (iii) deliver to the Canadian Lender any and all consents or other documents which are necessary to effect the transfer of the Negotiable Collateral to the Canadian Lender or any third party.

        (c)    Until such time as all of the Canadian Obligations and the obligations of the Canadian Borrowers under the Canadian Credit Agreement have each been indefeasibly paid in full in cash, each Grantor shall deposit with the Canadian Lender all Securities, in each case by a duly executed stock power of attorney, any dividends, distributions or other moneys now or hereafter received or declared in respect of the Securities and all other rights and claims of such Grantor in respect thereof.

        (d)    Each Grantor will promptly inform the Lender in writing of the acquisition by such Grantor of any personal property with a value in excess of $50,000 which is not adequately