# EXHIBIT 3
# (Part 2)

described in this Agreement, and such Grantor will execute and deliver, at its own expense, from time to time amendments to this Agreement and its schedules or additional security agreements or schedules as may be required by the Lender, in order that the Security Interest shall attach to such personal property; provided, however, the until such time as all of the Canadian Obligations and the obligations of the Canadian Borrowers under the Canadian Credit Agreement have each been indefeasibly paid in full in cash, neither the Grantor nor the U.S. Lender shall be entitled, without the prior written consent of the Canadian Lender, to amend, modify or otherwise supplement this Agreement without the prior written consent of the Canadian Lender, which consent may be withheld in its sole and absolute discretion.

### 2.6    Scope of Security Interest.

(a)    To the extent that the creation of the Security Interest would constitute a breach or permit the acceleration of any agreement, right, license or permit of any Grantor (each, a "**Restricted Asset**"), the Security Interest shall not attach to the Restricted Asset but such Grantor shall hold its interest in the Restricted Asset in trust for the Canadian Lender, and shall assign such Restricted Asset to the Canadian Lender or as it may direct immediately upon obtaining the consent of the other party.

(b)    Until the Security Interest shall have become enforceable, the grant of the Security Interest in the Intellectual Property shall not affect in any way any Grantor's rights to commercially exploit the Intellectual Property, defend it, enforce such Grantor's rights in it or with respect to it against third parties in any court or claim and be entitled to receive any damages with respect to any infringement of it.

(c)    The Security Interest shall not extend to consumer goods.

(d)    The Security Interest shall not extend or apply to the last day of the term of any lease or sublease or any agreement for a lease or sublease, now held or hereafter acquired by any Grantor in respect of real property, but such Grantor shall stand possessed of any such last day upon trust to assign and dispose of it as the Lender may direct.

### 2.7    Intercreditor Rights.

(a)    It is the intent of the parties hereto that the Security Interests granted to the U.S. Lender hereby in respect of the U.S. Obligations shall be junior and subject in all respects to the Security Interests granted hereby in favor of the Canadian Lender in respect of the Canadian Obligations.

(b)    Notwithstanding anything contained herein to the contrary, the U.S. Lender shall not be entitled to exercise any rights or remedies in respect of the Security Interests granted hereby or by the DIP Order, or to enforce any of its rights hereunder or in respect of the Intercompany Loans, until such time as all of the Canadian Obligations and the obligations of the Canadian Borrowers under the Canadian Credit Agreement have each been indefeasibly paid in full in cash.

- 11 -

(c)    Unless and until all of the Canadian Obligations and the obligations of the Canadian Borrowers under the Canadian Credit Agreement have each been indefeasibly paid in full in cash, any payment received by the U.S. Lender from either Grantor shall be held in trust for the benefit of, and shall be paid over or delivered to, the Canadian Lender, for application to the satisfaction the Canadian Obligations remaining unpaid.

(d)    To the extent any payment of the Canadian Obligations to the Canadian Lender, including as proceeds of security or enforcement of any right of setoff, is set aside or required to be paid to any receiver, trustee in bankruptcy, liquidating trustee, agent or other similar person under any bankruptcy, insolvency, receivership, fraudulent conveyance or similar law, then the Canadian Obligations or part thereof originally intended to be satisfied by such payment shall be deemed to be reinstated and outstanding as if such payment had not occurred.

(e)    Unless and until all of the Canadian Obligations and the Obligations of the Canadian Borrowers under the Canadian Credit Agreement have each been indefeasibly paid in full, the Canadian Lender may, with respect to the Canadian Obligations and all Collateral securing those obligations, at any time and from time to time, without the consent of or notice to the U.S. Lender, without incurring liability or responsibility to the U.S. Lender and without impairing or releasing the subordination provisions or the obligations hereunder of the U.S. Lender to the Canadian Lender, agree to amend, waive, supplement or otherwise modify the terms or conditions of any of the Canadian Obligations, or grant extensions of the time of payment or performance of, and make compromises in respect of, any or all of the Canadian Obligations (including, without limitation, releases of Collateral held by the Canadian Lender) and the agreements, instruments and other documents related thereto, including, without limitation, any one or more of the following:  (a) change the manner, place or terms of payment or extend the time of payment of, or renew or alter, the Canadian Obligations or any instrument evidencing the same or any agreement under which the Canadian Obligations are outstanding or secured; (b) sell, exchange, release or otherwise deal with any Collateral pledged, mortgaged or otherwise securing the Canadian Obligations; (c) release any person liable in any manner for the collection of the Canadian Obligations; and (d) exercise or refrain from exercising any rights against the Grantors and any other person.

(f)    The U.S. Lender hereby agrees, upon the request of the Canadian Lender at any time and from time to time, to execute such other documents or instruments as may be reasonably requested by the Canadian Lender to further evidence as a matter of public record or otherwise the senior priority of the liens securing the Canadian Obligations as contemplated by this Agreement.

(g)    The U.S. Lender hereby waives any requirement on the part of the Canadian Lender in respect of marshalling of assets upon any exercise of remedies by the Canadian Lender and any requirement that the Canadian Lender exercise remedies with respect to the Collateral in any particular order or any particular manner.

(h)    The Canadian Lender shall be entitled to receive payment in full in cash of all amounts due or to become due on or in respect of the Canadian Obligations, before the U.S. Lender shall be entitled to receive any payment on account of the U.S. Obligations.

### 2.8    Rights to Vote Securities.

Until such time as all of the Canadian Obligations and the obligations of the Canadian Borrowers under the Canadian Credit Agreement have each been indefeasibly paid in full in cash,

(a)    all rights of the Grantor to vote any Security shall immediately cease and all such rights shall become vested solely and absolutely in the Canadian Lender; and

(b)    any dividends or distributions received by the Grantor or any other moneys or property which may be received by the Grantor at any time for, or in respect of, the Securities shall be received as trustee for the Canadian Lender and shall be immediately paid over to the Canadian Lender.

### 2.9    Maintaining the Pledged Accounts.

(a)    Until such time as all of the Canadian Obligations and the obligations of the Canadian Borrowers under the Canadian Credit Agreement have each been indefeasibly paid in full in cash, it shall be a term and condition of the Pledged Accounts, notwithstanding any term or condition to the contrary in any other agreement relating to the Pledged Accounts, and except as otherwise provided by the provisions of Section 2.10 and Section 4.2, that no amount shall be paid or released to or for the account of, or withdrawn by or for the account of, the Grantors or any other person from the Pledged Accounts.

(b)    The Pledged Accounts shall be subject to such applicable laws, and such applicable regulations of the Board of Governors of the Federal Reserve System and of any other appropriate banking or governmental authority, as may now or hereafter be in effect.

### 2.10    Application of Amounts in the Pledged Accounts.

So long as no Event of Default shall have occurred, the Grantors shall be entitled to withdraw funds from the Pledged Accounts; provided that such funds are only used in accordance with the U.S. Budget. If any Event of Default shall have occurred, the Grantors shall cease to have any right to withdraw funds from the Pledged Accounts, and any funds on deposit in such account shall be applied by the Canadian Lender in accordance with the terms of this Agreement.

### 2.11    Care and Custody of Collateral.

(a)    The Lender shall have no obligation to keep Collateral in its possession identifiable.

(b)    The Lender may, both before and after the Security Interest shall have become enforceable, (i) notify any person obligated on an account or on chattel paper or any obligor on an instrument to make payments to the Lender whether or not such Grantor was previously making collections on such accounts, chattel paper or instruments, and (ii) assume control of any proceeds arising from the Collateral; provided, however, that until such time as all

- 13 -

of the Canadian Obligations and the obligations of the Canadian Borrowers under the Canadian Credit Agreement have each been indefeasibly paid in full in cash, all such notifications and payment shall be made to and in respect of the Canadian Lender.

---

## ARTICLE 3

### REPRESENTATIONS AND WARRANTIES

#### 3.1    Representations and Warranties.

Each Grantor represents and warrants as of the date of execution and delivery of this Agreement as follows:

(a)    All of the Equipment and Inventory of such Grantor are located at the places specified in Schedule "G" hereto as such Schedule "G" may be amended from time to time. The chief place of business and chief executive office of such Grantor and the office where such Grantor keeps its records concerning the Receivables are located at the address specified on the signature pages for such Grantor. None of the Receivables or Agreement Collateral of such Grantor is evidenced by a promissory note or other instrument.

(b)    Such Grantor is the legal and beneficial owner of the Collateral free and clear of any lien, mortgage or other encumbrance, except for as set forth in Schedule "H" hereto. No effective financing statement or other instrument similar in effect covering all or any part of the Collateral is on file in any recording office, except such as may have been filed in favor of the Lender relating to this Agreement or the Canadian Lender under the Canadian Credit Agreement. Such Grantor has no other trade names.

(c)    Such Grantor has exclusive possession and control of the Equipment and Inventory.

(d)    The Material Contracts of such Grantor, true and complete copies of which have been furnished to the Lender, have been duly authorized, executed and delivered by such Grantors, have not been amended or otherwise modified except to the extent copies of amendments or modifications have been delivered, are in full force and effect and are binding upon and enforceable against all parties thereto in accordance with their terms. There exists no default under any Material Agreement of such Grantor by any party thereto.

(e)    This Agreement, the pledge of the Securities pursuant hereto and the pledge and assignment of the Account Collateral pursuant hereto and the DIP Order create a valid and perfected Security Interest in the Collateral of such Grantor, securing the payment of the Obligations, and all filings and other actions by the Grantors necessary or desirable to perfect and protect such Security Interest have been duly taken or will be taken promptly after the date hereof.

- 14 -

(f)    Except for the DIP Order and the CCAA Order, no consent of any other person and no authorization, approval or other action by, and no notice to or filing with, any governmental authority or regulatory body or other third party is required either (i) for the grant by such Grantor of the charge, pledge, assignment and Security Interest granted hereby, for the pledge by such Grantor of the Securities pursuant hereto or for the execution, delivery or performance of this Agreement by such Grantor, (ii) for the perfection or maintenance of the pledge, assignment and Security Interest created hereby (including the first priority nature of such charge, pledge, assignment or Security Interest), or (iii) for the exercise by the Canadian Lender of its voting or other rights provided for in this Agreement or the remedies in respect of the Collateral pursuant to this Agreement (except as may be required in connection with the disposition of any portion of the Securities by laws affecting the offering and sale of securities generally).

---

## ARTICLE 4

### ENFORCEMENT

**4.1    Enforcement.**

The Security Interest shall be and become enforceable against any Grantor upon the occurrence of an Event of Default.

**4.2    Remedies.**

Subject to Section 2.7 hereof, whenever the Security Interest has become enforceable, the Lender may realize upon the Collateral and enforce the rights of the Lender by:

(a)    exercise in respect of the Collateral, in addition to other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party upon default under the N.Y. Uniform Commercial Code (whether or not the N.Y. Uniform Commercial Code applies to the affected Collateral);

(b)    entry onto any premises where the Collateral consisting of tangible personal property may be located;

(c)    entry into possession of the Collateral by any method permitted by law;

(d)    sale or lease of all or any part of the Collateral;

(e)    collection of any proceeds arising in respect of the Collateral;

(f)    collection, realization or sale of, or other dealing with, the accounts;

- 15 -

(g)    appointment by instrument in writing of a receiver (which term as used in this Agreement includes a receiver and manager) or agent of all or any part of the Collateral and removal or replacement from time to time of any receiver or agent;

(h)    institution of proceedings in any court of competent jurisdiction for the appointment of a receiver of all or any part of the Collateral;

(i)    institution of proceedings in any court of competent jurisdiction for sale or foreclosure of all or any part of the Collateral;

(j)    filing of proofs of claim and other documents to establish claims to the Collateral in any proceeding relating to any Grantor or Canadian Borrower; and

(k)    any other remedy or proceeding authorized or permitted under applicable law.

The foregoing remedies may be exercised from time to time separately or in combination and are in addition to, and not in substitution for, any other rights of the Lender however created. The Lender shall not be bound to exercise any right or remedy, and the exercise of rights and remedies shall be without prejudice to the rights of the Lender in respect of the Obligations including the right to claim for any deficiency.

4.3    **Additional Rights.**

In addition to the remedies set forth in Section 4.2, the Lender, may but only in accordance with Section 2.7 hereof, whenever the Security Interest has become enforceable:

(a)    require any Grantor, at such Grantor's expense, to assemble the Collateral at a place or places within the United States designated by notice in writing and such Grantor agrees to so assemble the Collateral;

(b)    require any Grantor, by notice in writing, to disclose to the Lender the location or locations of the Collateral and such Grantor agrees to make such disclosure when so required;

(c)    repair, process, modify, complete or otherwise deal with the Collateral and prepare for the disposition of the Collateral, whether on the premises of any Grantor or otherwise;

(d)    carry on all or any part of the business of any Grantor and, to the exclusion of all others including such Grantor, enter upon, occupy and use all or any of the premises, buildings, and other property of or used by such Grantor for such time as the Lender sees fit, free of charge, and the Lender shall not be liable to such Grantor for any act, omission or negligence in so doing or for any rent, charges, depreciation or damages incurred in connection with or resulting from such action;

(e)     borrow for the purpose of carrying on the business of any Grantor or for the maintenance, preservation or protection of the Collateral and grant a Security Interest in the Collateral, whether or not in priority to the Security Interest, to secure repayment; and

(f)     commence, continue or defend any judicial or administrative proceedings for the purpose of protecting, seizing, collecting, realizing or obtaining possession or payment of the Collateral, and give good and valid receipts and discharges in respect of the Collateral and compromise or give time for the payment or performance of all or any part of the accounts or any other obligation of any third party to any Grantor.

### 4.4    Concerning the Receiver.

(1)     Any receiver appointed by the Lender shall be vested with the rights and remedies, which could have been exercised by the Lender in respect of any Grantor or the Collateral and such other powers, and discretions as are granted in the instrument of appointment and any supplemental instruments. The identity of the receiver, its replacement and its remuneration shall be within the sole and unfettered discretion of the Lender.

(2)     Any receiver appointed by the Lender shall act as agent for the Lender for the purposes of taking possession of the Collateral, but otherwise and for all other purposes (except as provided below), as agent for any Grantor. The receiver may sell, lease, or otherwise dispose of the Collateral as agent for any Grantor or as agent for the Lender as the Lender may determine in its discretion. Each Grantor agrees to ratify and confirm all actions of the receiver acting as agent for such Grantor, and to release and indemnify the receiver in respect of all such actions.

(1)     The Lender, in appointing or refraining from appointing any receiver, shall not incur liability to the receiver, any Grantor or otherwise and shall not be responsible for any misconduct or negligence of such receiver.

### 4.5    Appointment of Attorney.

Until such time as all of the Canadian Obligations and the obligations of the Canadian Borrowers under the Canadian Credit Agreement have each been indefeasibly paid in full in cash, each Grantor irrevocably appoints the Canadian Lender (and any of its officers) as attorney of such Grantor (with full power of substitution) to do, make and execute, in the name of and on behalf of such Grantor, all such further acts, documents, matters and things which the Canadian Lender may deem necessary or advisable to accomplish the purposes of this Agreement including, the execution, endorsement and delivery of documents and any notices, receipts, assignments or verifications of the accounts. All acts of the attorney are ratified and approved, and the attorney shall not be liable for any act, failure to act or any other matter or thing, except for its own gross negligence or willful misconduct.

### 4.6    Dealing with the Collateral.

- 17 -

(a)     The Lender shall not be obliged to exhaust its recourse against any Grantor or any other person or against any other security they may hold in respect of the Obligations before realizing upon or otherwise dealing with the Collateral in such manner as the Lender may consider desirable.

(b)     The Canadian Lender may grant extensions or other indulgences, take and give up securities, accept compositions, grant releases and discharges and otherwise deal with any Grantor and with other persons, sureties or securities as it may see fit without prejudice to the Obligations, the liability of such Grantor or the rights of the Lender in respect of the Collateral.

(c)     The Lender shall not be (i) liable or accountable for any failure to collect, realize or obtain payment in respect of the Collateral, (ii) bound to institute proceedings for the purpose of collecting, enforcing, realizing or obtaining payment of the Collateral or for the purpose of preserving any rights of any persons in respect of the Collateral, (iii) subject to applicable law, responsible for any loss occasioned by any sale or other dealing with the Collateral or by the retention of or failure to sell or otherwise deal with the Collateral, or (iv) bound to protect the Collateral from depreciating in value or becoming worthless.

4.7     **Standards of Sale.**

Without prejudice to the ability of the Lender to dispose of the Collateral in any manner, which is commercially reasonable, but in any event in accordance with Section 2.7 hereof, each Grantor agrees that:

(a)     Collateral may be disposed of in whole or in part;

(b)     Collateral may be disposed of by public auction, public tender or private contract, with or without advertising and without any other formality;

(c)     any assignee of such Collateral may be a customer of the Lender or the Lender;

(d)     a disposition of Collateral may be on such terms and conditions as to credit or otherwise as the Lender, in its sole discretion, may deem advantageous; and

(e)     the Lender may establish an upset or reserve bid or price in respect of Collateral.

4.8     **Application of Proceeds.**

Any and all moneys realized by the Lender, whether hereunder or otherwise, may be applied by the Lender to such part or parts of the Obligations as the Lender shall in its sole discretion determine. The Lender shall at all times and from time to time have the right to change any application so made.

4.9     **Dealings by Third Parties.**

- 18 -

(a)    No person dealing with the Lender or an agent or receiver shall be required to determine (i) whether the Security Interest has become enforceable, (ii) whether the powers which such person is purporting to exercise have become exercisable, (iii) whether any money remains due to the Lender by any Grantor, (iv) the necessity or expediency of the stipulations and conditions subject to which any sale or lease is made, (v) the propriety or regularity of any sale or other dealing by the Lender with the Collateral, or (vi) how any money paid to the Lender or Lender has been applied.

(b)    Any purchaser of all or any part of the Collateral from the Lender or a receiver or agent in accordance with the terms of this Agreement, shall hold the Collateral absolutely, free from any claim or right of whatever kind, including any equity of redemption, of any Grantor, which each Grantor specifically waives (to the fullest extent permitted by law) as against any such purchaser together with all rights of redemption, stay or appraisal which each Grantor has or may have under any rule of law or statute now existing or hereafter adopted.

## ARTICLE 5

## EVENTS OF DEFAULT

### 5.1    Events of Default.

Each of the following shall constitute an event of default hereunder for which there will be no cure periods unless otherwise specified (each, an "**Event of Default**"):

(a)    any of the representations and warranties contained herein shall not be true in all material respects;

(b)    any default or Event of Default (as defined in the Canadian Credit Agreement) under the Canadian Credit Agreement;

(c)    failure by any Grantor to pay interest or any other amounts required to be paid to the U.S. Lender in accordance with the terms of the Notes or any other failure to comply with any other provision therein;

(d)    failure by any Grantor to pay any amount due and owing to the Canadian Lender in accordance with the terms hereof;

(e)    failure by any Grantor to perform or comply with any term, condition, covenant or obligation contained herein or in any document issued pursuant hereto on its part to be performed or complied with where any such failure to perform is not remedied within 10 days of notice from the Lender to so remedy;

(f)    any material deviation, in the opinion, reasonably held, of the Canadian Lender from the U.S. Budget;

- 19 -

(g)     failure by any Loan Party to comply with the terms of the CCAA Order or the DIP Order or any other orders ancillary thereto;

(h)     (i) the DIP Order shall cease to be in full force and effect and the Final Order shall not have been entered prior to such cessation, (ii) the Final Order shall not have been entered by the U.S. Bankruptcy Court on or before the 30th day following the Petition Date, (iii) from and after the date of entry thereof, the Final Order shall cease to be in full force and effect, or (iv) the DIP Order or the Final Order shall be amended, supplemented, stayed, reversed, vacated or otherwise modified (or any Loan Party shall apply for authority to do so) without the prior written consent of the Canadian Lender;

(i)     the U.S. Bankruptcy Court shall enter an order appointing a responsible officer or an examiner with powers beyond the duty to investigate and report, as set forth in section 1106(a)(3) or (4) of the Bankruptcy Code, in any of the Chapter 11 Cases;

(j)     the U.S. Bankruptcy Court shall grant relief from the automatic stay to the holder of any Security Interest on the assets of any Grantor (including, without limitation, any stock in any subsidiary) or approve any settlement or other stipulation with any creditor providing for cash payments aggregating in excess of $50,000; or the U.S. Bankruptcy Court shall amend, supplement, stay, vacate or otherwise modify the DIP Order, without the prior written approval of the Canadian Lender; or any similar relief is granted in the Canadian Proceeding, without the prior written approval of the Canadian Lender; or any Grantor shall seek or apply for such relief;

(k)     any Chapter 11 Case shall be dismissed (or the U.S. Bankruptcy Court shall make a ruling requiring the dismissal of any Chapter 11 Case), suspended or converted to a case under chapter 7 of the Bankruptcy Code, or any Loan Party shall file any pleading requesting any such relief; or an application shall be filed by any Loan Party for the approval of, or there shall arise, (i) any other claim having priority senior to or *pari passu* with the claims of the Canadian Lender or U.S. Lender or any other claim having priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code (other than the Careouts (as defined in the DIP Order) or (ii) any lien on the Collateral having a priority senior to or *pari passu* with the liens granted herein; or

(l)     this Agreement and the DIP Order shall, for any reason, cease to create a valid lien on any of the Collateral purported to be covered thereby or such lien shall cease to be a perfected lien having the priority provided herein pursuant to section 364 of the Bankruptcy Code against each Grantor, or any Loan Party shall so allege in any pleading filed in any court or any material provisions of this Agreement or the Canadian Credit Agreement shall, for any reason, cease to be valid and binding on the Loan Party party thereto or any Loan Party shall so state in writing.

-------------------

## ARTICLE 6

## GUARANTY

### 6.1    Guaranty.

Each Grantor hereby severally, and not jointly, unconditionally guaranties, in favor of the Canadian Lender, the punctual payment when due, whether at stated maturity, by acceleration or otherwise, of the Canadian Obligations, which, with respect to each Grantor, is limited to all amounts advanced or deemed to be advanced to such Grantor by the U.S. Lender in the form of an Intercompany Loan, on or after the date of this Agreement plus any expenses, costs or charges incurred by the Canadian Lender under Section 2.2 (c) hereof (the "**Guaranteed Obligations**").

### 6.2    Guaranty Absolute.

Each Grantor guarantees that the Canadian Obligations will be paid strictly in accordance with the terms of this Agreement, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of the Canadian Lender with respect thereto. Each Grantor hereby acknowledges that a separate action or actions may be brought and prosecuted against such Grantor to enforce this Agreement, irrespective of whether any action is brought against any Canadian Borrower or any other Grantor or whether any Canadian Borrower or any other Grantor is joined in any such action or actions. Upon the Canadian Obligations becoming due and payable (by acceleration or otherwise), the Canadian Lender shall be entitled to immediate payment of such Canadian Obligations by the Grantors, without further application to or order of the U.S. Bankruptcy Court or Canadian Court. For purposes hereof, the Canadian Obligations shall be due and payable when any amounts advanced under the Canadian Credit Agreement shall be due and payable, notwithstanding the fact that the collection or enforcement thereof may be stayed or enjoined under any applicable law. The liability of each Grantor hereunder shall be absolute and unconditional irrespective of:

(a)    any lack of validity or enforceability of the Canadian Credit Agreement or any agreement or instrument relating thereto;

(b)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Canadian Obligations, or any other amendment or waiver of or any consent to departure from the Canadian Credit Agreement, including, without limitation, any increase in the Guaranteed Obligations resulting from the extension of additional credit to any Canadian Borrower or otherwise;

(c)    any taking, exchange, release or non-perfection of any Collateral, or any taking, release or amendment or waiver of or consent to departure from any other guaranty, for all or any of the Canadian Obligations;

(d)    any manner of application of Collateral, or proceeds thereof, to all or any of the Canadian Obligations, or any manner of sale or other disposition of any Collateral for all or any of the Canadian Obligations or any other assets of the Grantors;

- 21 -

(e)     any change, restructuring or termination of the corporate structure or existence of the Canadian Borrowers or the Grantors; or

(f)     any other circumstance (including, without limitation, any statute of limitations) that might otherwise constitute a defense available to, or a discharge of, any Grantor.

### 6.3    Waivers.

(a)     Each Grantor hereby waives promptness, diligence, notice of acceptance and any other notice with respect to any of the Canadian Obligations and this Agreement and any requirement that the Canadian Lender protect, secure, perfect or insure any lien or any property subject thereto or exhaust any right or take any action against any Grantor, Canadian Borrower or any Collateral.

(b)     Each Grantor acknowledges that the Canadian Lender may, without notice to or demand upon such Grantor and without affecting the liability of such Grantor under this Agreement, foreclose under any mortgage by nonjudicial sale, and each Grantor hereby waives any defense to the recovery by the Canadian Lender against such Grantor of any deficiency after such nonjudicial sale, including any defense or benefits that may be afforded by Sections 580a and 580d of the California Code of Civil Procedure, if applicable, or any statute or law in any other jurisdiction having similar effect.

(c)     Each Grantor hereby irrevocably waives all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to any of this Agreement, the Intercompany Loan or the Canadian Credit Agreement, the transactions contemplated thereby or the actions of the  Lender in the negotiation, administration, performance or enforcement thereof.

(d)     Each Grantor hereby irrevocably waives any claim or other rights that it may now or hereafter acquire against any Canadian Borrower or any other Grantor that arise from the existence, payment, performance or enforcement of such Grantor's obligations under this Agreement or the Canadian Credit Agreement, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of the Canadian Lender against the Canadian Borrower or any other Grantor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from the Canadian Borrower or any other Grantor, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security on account of such claim, remedy or right. If any amount shall be paid to Grantor in violation of the preceding sentence at any time prior to the later of the indefeasible cash payment in full of the Canadian Obligations and all other amounts payable under this Canadian Credit Agreement, such amount shall be held in trust for the benefit of the Lender and shall forthwith be paid to the Canadian Lender to be credited and applied to the Canadian Obligations and all other amounts payable under this Agreement whether matured or unmatured, in accordance with the terms of this Agreement, or to be held as Collateral for any Canadian Obligations or other amounts payable under this Agreement thereafter arising. Each Grantor acknowledges that it will receive direct and indirect benefits

- 22 -

from the financing arrangements contemplated by the this Agreement and the Canadian Credit Agreement and that the waiver set forth in this subsection is knowingly made in contemplation of such benefits.

### 6.4    Payments Free and Clear of Taxes, Etc.

(a)    Any and all payments made by each Grantor hereunder shall be made, free and clear of and without deduction for any and all present or future Taxes. If any Grantor shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder to the Canadian Lender, (i) the sum payable shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) the Canadian Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) each Grantor shall make such deductions, and (iii) such Grantor shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law.

(b)    In addition, each Grantor agrees to pay any present or future Other Taxes.

(c)    Each Grantor will indemnify the Canadian Lender for the full amount of Taxes or Other Taxes (including, without limitation, any Taxes or Other Taxes imposed by any jurisdiction on amounts payable under this Section) paid by the Canadian Lender and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto.

(d)    Within 30 days after the date of any payment of Taxes, each Grantor will furnish to the Lender appropriate evidence of payment thereof. If no Taxes are payable in respect of any payment hereunder by a Grantor through an account or branch outside the United States or on behalf of such Grantor by a payor that is not a United States person, such Grantor will furnish, or will cause such payor to furnish, to the Canadian Lender a certificate from each appropriate taxing authority or authorities, or an opinion of counsel acceptable to the Canadian Lender, in either case stating that such payment is exempt from or not subject to Taxes.

(e)    Without prejudice to the survival of any other agreement of the Grantors hereunder, the agreements and obligations of the Grantors contained in this Section 6.4 shall survive the payment in full of the Canadian Obligations and all other amounts payable under this Agreement.

### 6.5    Continuing Guaranty; Assignments under the Credit Agreement.

This guaranty contained in this Article 6 is a continuing guaranty and shall (a) remain in full force and effect until the later of the indefeasible cash payment in full of the Canadian Obligations and all other amounts payable under the Canadian Credit Agreement, (b) be binding upon each Grantor, its successors and assigns and (c) inure to the benefit of and be enforceable by the Canadian Lender and its successors, transferees and assigns.

### 6.6    Priority

- 23 -

Each Grantor hereby covenants, represents and warrants that pursuant to Section 364(c)(1) of the Bankruptcy Code, the obligations of such Grantor hereunder shall constitute allowed administrative expense claims in its Chapter 11 Case having priority over all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code.

---

## ARTICLE 7

### GENERAL

### 7.1    Notices, Etc.

Any notice, direction or other communication to be given under this Agreement shall, except as otherwise permitted hereunder, be in writing and given in accordance with the particulars of each party hereto set forth in Schedule "I".

### 7.2    Discharge.

The Security Interest shall be discharged upon, but only upon, (i) full payment and performance of the Obligations and (ii) the Canadian Borrowers having no obligations under the Canadian Credit Agreement. Upon discharge of the Security Interest and at the request and expense of the applicable Grantor, the Lender shall execute and deliver to such Grantor such releases and discharges as such Grantor may reasonably require.

### 7.3    No Merger.

This security agreement shall not operate by way of merger of any of the Obligations and no judgment recovered by the Lender shall operate by way of merger of, or in any way affect, the Security Interest, which is in addition to, and not in substitution for, any other security now or hereafter held by the Lender in respect of the Obligations.

### 7.4    Further Assurances.

(a)    Each Grantor agrees that from time to time, at the expense of such Grantor, such Grantor will promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or desirable, or that the Lender may reasonably request, in order to perfect and protect any pledge, charge, assignment or Security Interest granted or purported to be granted hereby or to enable the Lender to exercise and enforce its rights and remedies hereunder with respect to any Collateral in accordance with the terms hereof. Without limiting the generality of the foregoing, such Grantor will at the request of the Canadian Lender: (i) mark conspicuously each document included in the Inventory, each chattel paper included in the Receivables, each Related Contract, each Material Agreement and, at the request of the Lender, each of its records pertaining to the Collateral with a legend, in form and substance satisfactory to the Canadian Lender, indicating that such document, chattel paper, Related Contract, Material Agreement or Collateral is subject to the Security Interest granted

- 24 -

hereby; (ii) if any Collateral shall be evidenced by a promissory note or other instrument, deliver and pledge to the Canadian Lender such note or instrument duly indorsed and accompanied by duly executed instruments of transfer or assignment, all in form and substance satisfactory to the Canadian Lender; and (iii) execute and file such financing or continuation statements, or amendments thereto, and such other instruments or notices, as may be necessary or desirable, or as the Lender may request, in order to perfect and preserve the pledge, charge, assignment and Security Interest granted or purported to be granted hereby.

(b)    Each Grantor hereby authorizes the Canadian Lender to file one or more financing or continuation statements, and amendments thereto, relating to all or any part of the Collateral without the signature of such Grantor where permitted by law. A photocopy or other reproduction of this Agreement or any financing statement covering the Collateral or any part thereof shall be sufficient as a financing statement where permitted by law.

(c)    Each Grantor will furnish to the Lender from time to time statements and schedules further identifying and describing the Collateral of such Grantor and such other reports in connection with the Collateral of such Grantor as the Lender may request, all in reasonable detail.

(d)    Each Grantor agrees to execute and record mortgages or deeds of trust covering the Real Property of such Grantor, in form and substance satisfactory to the Canadian Lender, granting to the Canadian Lender and U.S. Lender a lien on the Real Property covered thereby, in accordance with the terms hereof.

### 7.5    As to Equipment and Inventory.

(a)    Each Grantor shall keep the Equipment and Inventory of such Grantor (other than Inventory sold in the ordinary course of business) at the places therefor specified in Section 3.1(a) or, upon 30 days' prior written notice to the Canadian Lender, at such other places in a jurisdiction where all action required by Section 7.4 shall have been taken with respect to the Equipment and Inventory (and, upon the taking of such action in such jurisdiction, Schedule "G" hereto shall be automatically amended to include such other places).

(b)    Each Grantor shall cause the Equipment of such Grantor to be maintained and preserved in the same condition, repair and working order as when new, ordinary wear and tear excepted, and in accordance with any manufacturer's manual, and shall forthwith, or in the case of any loss or damage to any of the Equipment as quickly as practicable after the occurrence thereof, make or cause to be made all repairs, replacements and other improvements in connection therewith that are necessary or desirable to such end. Each Grantor shall promptly furnish to the Lender a statement respecting any loss or damage exceeding $200,000 to any of the Equipment of such Grantor.

### 7.6    Insurance

(a)    Each Grantor shall, at its own expense, maintain reasonable insurance with respect to the Equipment and Inventory of such Grantor in such amounts, against such risks, in

- 25 -

such form and with such insurers, as is reasonably acceptable to the Canadian Lender. Each policy for liability insurance shall provide for all losses to be paid on behalf of the Canadian Lender and such Grantor as their interests may appear, and each policy for property damage insurance shall provide for all losses to be paid directly to the applicable Pledged Account. Each such policy shall in addition (i) name such Grantor and the Canadian Lender as insured parties thereunder (without any representation or warranty by or obligation upon the Canadian Lender) as their interests may appear, (ii) contain the agreement by the insurer that any loss thereunder shall be payable to the Canadian Lender notwithstanding any action, inaction or breach of representation or warranty by such Grantor, (iii) provide that there shall be no recourse against the Canadian Lender for payment of premiums or other amounts with respect thereto and (iv) provide that at least 10 days' prior written notice of cancellation or of lapse shall be given to the Canadian Lender by the insurer. Each Grantor shall, if so requested by the Canadian Lender, deliver to the Canadian Lender original or duplicate policies of such insurance and, as often as the Canadian Lender may reasonably request, a report of a reputable insurance broker with respect to such insurance. Further, such Grantor shall, at the request of the Canadian Lender, duly exercise and deliver instruments of assignment of such insurance policies to comply with the requirements of Section 7.4 and cause the insurers to acknowledge notice of such assignment.

(b)    Reimbursement under any liability insurance and proceeds of any property damage insurance shall be paid directly into the applicable Pledged Account maintained by any Grantor.

7.7    Place of Perfection; Records; Collection of Receivables

(a)    Each Grantor shall keep its chief place of business and chief executive office and the office where it keeps its records concerning the Collateral of such Grantor at the location therefor specified in Section 3.1(a) or, upon 30 days' prior written notice to the Canadian Lender, at such other locations in a jurisdiction where all actions required by Section 7.4 shall have been taken with respect to the Collateral. Each Grantor will hold and preserve such records and will permit representatives of the Canadian Lender at any time during normal business hours to inspect and make abstracts from such records.

(b)    Except as otherwise provided in this subsection (b), each Grantor shall continue to collect, at its own expense, all amounts due or to become due such Grantor under the Receivables. In connection with such collections, each Grantor may take (and, at the Canadian Lender's direction, shall take) such action as such Grantor or the Canadian Lender may deem necessary or advisable to enforce collection of the Receivables; provided, however, that the Canadian Lender shall have the right at any time, upon the occurrence and during the continuance of a default and upon written notice to such Grantor of its intention to do so, to notify the obligors under any Receivables of the assignment of such Receivables to the Canadian Lender and to direct such obligors to make payment of all amounts due or to become due to such Grantor thereunder directly to the Canadian Lender and, upon such notification and at the expense of such Grantor, to enforce collection of any such Receivables, and to adjust, settle or compromise the amount or payment thereof, in the same manner and to the same extent as such Grantor might have done. After receipt by such Grantor of the notice from the Canadian Lender referred to in the proviso to the preceding sentence, (i) all amounts and proceeds (including

- 26 -

instruments) received by such Grantor in respect of the Receivables shall be received in trust for the benefit of the Canadian Lender hereunder, shall be segregated from other funds of such Grantor and shall be forthwith paid over to the Canadian Lender in the same form as so received (with any necessary endorsement), and (ii) such Grantor shall not adjust, settle or compromise the amount or payment of any Receivable, release wholly or partly any obligor thereof, or allow any creditor discount thereon.

### 7.8    As to Intellectual Property Collateral

(a)    With respect to each item of its Intellectual Property (except to the extent a Grantor, after consultation with the Canadian Lender, has determined that the maintenance or pursuit of such item of Intellectual Property is not material to the conduct of the Grantor's business), each Grantor agrees to take, at its expense, all necessary steps, including, without limitation, in the U.S. Patent and Trademark Office, the U.S. Copyright Office and any other governmental authority, to (i) maintain the validity and enforceability of each such item of Intellectual Property and maintain each such item of Intellectual Property in full force and effect, and (ii) pursue the registration and maintenance of each patent, trademark, or copyright registration or application, now or hereafter included in the Intellectual Property of such Grantor, including, without limitation, the payment of required fees and taxes, the filing of responses to office actions issued by the U.S. Patent and Trademark Office, the U.S. Copyright Office or other governmental authorities, the filing of applications for renewal or extension, the filing of affidavits under Sections 8 and 15 of the U.S. Trademark Act, the filing of divisional, continuation, continuation-in-part, reissue and renewal applications or extensions, the payment of maintenance fees and the participation in interference, reexamination, opposition, cancellation, infringement and misappropriation proceedings. No Grantor shall, without the written consent of the Canadian Lender, discontinue use of or otherwise abandon any Intellectual Property, or abandon any right to file an application for letters patent, trademark, or copyright, unless such Grantor shall have previously determined that such use or the pursuit or maintenance of such Intellectual Property is no longer desirable in the conduct of such Grantor's business and that the loss thereof would not be reasonably likely to have a Material Adverse Effect, in which case, such Grantor will give prompt notice of any such abandonment to the Canadian Lender.

(b)    Each Grantor agrees promptly to notify the Canadian Lender if such Grantor learns (i) that any item of the Intellectual Property may have become abandoned, placed in the public domain, invalid or unenforceable, or of any adverse determination or development regarding such Grantor's ownership of any of the Intellectual Property or its right to register the same or to keep and maintain and enforce the same, or (ii) of any adverse determination or the institution of any proceeding (including, without limitation, the institution of any proceeding in the U.S. Patent and Trademark Office or any court) regarding any item of the Intellectual Property.

(c)    In the event that any Grantor becomes aware that any item of the Intellectual Property is being infringed or misappropriated by a third party, such Grantor shall promptly notify the Canadian Lender and shall take such actions, at its expense, as such Grantor or the Canadian Lender deems reasonable and appropriate under the circumstances to protect

- 27 -

such Intellectual Property, including, without limitation, suing for infringement or misappropriation and for an injunction against such infringement or misappropriation.

(d)    Each Grantor shall use proper statutory notice in connection with its use of each item of its Intellectual Property. No Grantor shall do or permit any act or knowingly omit to do any act whereby any of its Intellectual Property may lapse or become invalid or unenforceable or placed in the public domain.

(e)    Each Grantor shall take all steps which it or the Canadian Lender deems reasonable and appropriate under the circumstances to preserve and protect each item of its Intellectual Property, including, without limitation, maintaining the quality of any and all products or services used or provided in connection with any of the Trademarks, consistent with the quality of the products and services as of the date hereof, and taking all steps necessary to ensure that all licensed users of any of the Trademarks use such consistent standards of quality.

### 7.9    As to Material Contracts

(a)    Each Grantor shall at its expense:

(i)    perform and observe all the terms and provisions of the Material Contracts to be performed or observed by it, maintain the Material Contracts in full force and effect, enforce the Material Contracts in accordance with their terms and take all such action to such end as may be from time to time requested by the Canadian Lender; and

(ii)    furnish to the Canadian Lender promptly upon receipt thereof copies of all notices, requests and other documents received by such Grantor under or pursuant to the Material Contracts, and from time to time (A) furnish to the Canadian Lender such information and reports regarding the Collateral as the Canadian Lender may reasonably request and (B) upon request of the Canadian Lender make to each other party to any Material Agreement such demands and requests for information and reports or for action as such Grantor is entitled to make thereunder.

(b)    No Grantor shall:

(i)    cancel or terminate any Material Agreement or consent to or accept any cancellation or termination thereof;

(ii)    amend or otherwise modify any Material Agreement or give any consent, waiver or approval thereunder;

(iii)    waive any default under or breach of any Material Agreement; or

(iv)    take any other action in connection with any Material Agreement that would impair the value of the interest or rights of such Grantor thereunder or that would impair the interest or rights of the Canadian Lender.

Nothing in this Section 7.9 (except the proviso contained in this sentence) shall limit the right of any Grantor to reject or seek rejection of any contract or agreement; provided that no Grantor shall reject or seek to reject any Material Contract or any other agreement or contract set forth in Schedule "J" hereto, without the prior written consent of the Canadian Lender, which consent may be withheld in its reasonable discretion.

### 7.10  Indemnity and Expenses

(a)    Each Grantor agrees to indemnify the Canadian Lender from and against any and all claims, losses and liabilities growing out of or resulting from this Agreement (including, without limitation, enforcement of this Agreement), except claims, losses or liabilities resulting from the Canadian Lender's gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction.

(b)    Each Grantor will upon demand pay to the Canadian Lender the amount of any and all reasonable expenses, including the reasonable fees and expenses of its counsel and of any experts and agents, that the Canadian Lender may incur in connection with (i) the administration of this Agreement, (ii) the custody, preservation, use or operation of, or the sale of, collection from or other realization upon, any of the Collateral, (iii) the exercise or enforcement of any of the rights of the Canadian Lender hereunder or (iv) the failure by such Grantor to perform or observe any of the provisions hereof.

### 7.11  Security Interest Absolute.

The obligations of each Grantor under this Agreement are independent of the Obligations, and a separate action or actions may be brought and prosecuted against a Grantor to enforce this Agreement, irrespective of whether any action is brought against any Canadian Borrower or Grantor or whether any Canadian Borrower or Grantor is joined in any such action or actions. All rights of the Canadian Lender and the pledge, charge, assignment and Security Interest hereunder, and all obligations of each Grantor hereunder, shall be absolute and unconditional, irrespective of:

(a)    any lack of validity or enforceability of the Canadian Credit Agreement or any other agreement or instrument relating thereto or executed in connection therewith;

(b)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations or any other amendment or waiver of or any consent to any departure from the Canadian Credit Agreement, including, without limitation, any increase in the Obligations resulting from the extension of additional credit to any Canadian Borrower or otherwise;

(c)    any taking, exchange, release or non-perfection of any Collateral, or any taking, release or amendment or waiver of or consent to departure from any guaranty, for all or any of the Obligations;

- 29 -

(d)    any manner of application of collateral, or proceeds thereof, to all or any of the Obligations, or any manner of sale or other disposition of any collateral for all or any of the Obligations or any other assets of the Grantors;

(e)    any change, restructuring or termination of the corporate structure or existence of the Canadian Borrowers or any Grantor; or

(f)    any other circumstance (including, without limitation, any statute of limitations) that might otherwise constitute a defense available to, or a discharge of, any Grantor.

### 7.12   Continuing Security Interest.

This Agreement shall create a continuing Security Interest in the Collateral and shall (a) remain in full force and effect until the later of the payment in full of the Obligations, (b) be binding upon each Grantor, its successors and assigns and (c) inure to the benefit of the Canadian Lender and its respective successors, transferees and assigns. Without limiting the generality of the foregoing clause (c), any Canadian Lender may assign or otherwise transfer all or any portion of its rights and obligations under the Canadian Credit Agreement.

### 7.13   Supplemental Security.

This Agreement is in addition to and without prejudice to all other security now held or which may hereafter he held by the Canadian Lender.

### 7.14   Successors and Assigns.

This Agreement shall be binding upon each Grantor, its successors and assigns, and shall inure to the benefit of the Lender and its successors and assigns. All rights of the Canadian Lender shall be assignable, and in any action brought by an assignee to enforce any such right, no Grantor shall assert against the assignee any claim or defense which such Grantor now has or hereafter may have against the Canadian Lender.

### 7.15   Gender and Number.

Any reference in this Agreement to gender shall include all genders and words importing the singular number only shall include the plural and vice versa.

### 7.16   Headings, etc.

The division of this Agreement into articles, sections and subsections and the insertion of headings are for convenience of reference only and shall not affect its interpretation.

### 7.17   U.S. Lender.

From and after the date that all of the Canadian Obligations and the obligations of the Canadian Borrowers under the Canadian Credit Agreement have each been indefeasibly paid in full in cash, any requirement contained herein to provide, deliver, pledge, or charge to, obtain

- 30 -

consent from, obtain the prior approval of the Canadian Lender or any provisions similar to the foregoing, shall terminate and such provisions shall apply *mutatis mutandis* for the benefit of the U.S. Lender in respect of any outstanding Intercompany Loan, except for any of the provisions in respect of the Canadian Obligations or the guaranty in favor of the Canadian Lender set forth in Article 6 hereof.

### 7.18   Severability.

If any provision of this Agreement shall be deemed by any court of competent jurisdiction to be invalid or void, the remaining provisions shall remain in full force and effect.

### 7.19   Governing Law.

(a)     This Agreement shall be governed by and interpreted and enforced in accordance with the State of New York.

(b)     Each Grantor irrevocably submits to the jurisdiction of the U.S. Bankruptcy Court in any action or proceeding arising out of or relating to this Agreement.

### [SIGNATURES ON FOLLOWING PAGE]

- 31 -

IN WITNESS WHEREOF each Grantor has caused this Agreement to be executed by its duly authorized officers as of the date first above written.

TELEGLOBE USA INC., as Grantor

By:    _____
       Name: John Brunette
       I have authority to bind the Corporation


[_____], as Grantor

By:    _____
       Name:
       I have authority to bind the Corporation


3810186 CANADA INC., as Canadian Lender

By:    _____
       Name: Martine Turcotte
       I have authority to bind the Corporation


TELEGLOBE INC., a U.S. Lender

By:    _____
       Name: John Brunette
       I have authority to bind the Corporation

Schedule A

Schedule B

Schedule "C"

Schedule "D"

Schedule "E"

Schedule "F"

Schedule "G"

Schedule "H"

Schedule "T"

Schedule "J"

**EXHIBIT D**

Court File No.

## *ONTARIO*
## SUPERIOR COURT OF JUSTICE – COMMERCIAL LIST

| | | |
|---|---|---|
| THE HONOURABLE | ) | WEDNESDAY, THE 15TH DAY OF |
| | ) | |
| JUSTICE FARLEY | ) | MAY, 2002 |

IN THE MATTER OF the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36

AND IN THE MATTER of a Plan of Compromise or Arrangement of Teleglobe Inc. and the other Applicants listed on Schedule "A"

Applicants

### INITIAL ORDER

**THIS APPLICATION** made by Teleglobe Inc. and the Applicants listed on Schedule "A" hereto (individually an "Applicant" and collectively, the "Applicants") for an Order substantially in the form attached as Schedule "B" to the Application Record herein was heard this day, at 361 University Avenue, Toronto.

**ON READING** the Notice of Application, filed, the Affidavit of Serge Fortin sworn May 14, 2002 (the "Fortin Affidavit"), filed, and the Consent of Ernst & Young Inc., filed, as proposed monitor of the Applicants (the "Monitor"), the Commitment Letter, filed, the Employee Facility, filed and on notice to counsel for the Bank Lending Syndicate, counsel for the unofficial committee of debentureholders and counsel to BCE Inc. and the CCAA Lender (as herein defined) and on hearing the submissions of counsel for the Applicants, the Monitor, Ernst & Young Inc., the Banking Syndicate, the unofficial committee of debentureholders and upon being advised that no other person who might be interested in these proceedings was served with the Notice of Application herein.

- 2 -

## SERVICE

1.    THIS COURT ORDERS that the time for service of the Notice of Application and Application Record be and it is hereby abridged such that the Application is properly returnable today, and, further, that any requirement for service of the Notice of Application and of the Application Record upon any interested party, other than the parties herein mentioned, is hereby dispensed with.

## APPLICATION

2.    THIS COURT ORDERS AND DECLARES that the Applicants are companies to which the CCAA applies.

## PLAN OF ARRANGEMENT

3.    THIS COURT ORDERS that the Applicants shall have the authority to file and subject to further order of this Court and subject to paragraph 49, with this Court, on or before June 15, 2002 a proposal for a restructuring plan, or plans of compromise or arrangement (hereinafter collectively referred to as the "Plan") between, inter alia, the Applicants and one or more classes of their creditors as they may deem appropriate.

## POSSESSION OF PROPERTY AND OPERATIONS

4.    THIS COURT ORDERS that the Applicants shall remain in possession and control of any present or future property, assets and undertakings of the Applicants and of Teleglobe Canada Limited Partnership and Telecom Vision Call Centre Services General Partnership (collectively, the "Partnerships") of any kind or nature whatsoever (collectively the "Property"), and shall, subject to further Order of this Court, continue to carry on business in a manner consistent with the preservation of the business of the Applicants and of the Partnerships and the Property (collectively, the "Business") and

- 3 -

shall be authorized and empowered to continue to retain and employ the agents, advisors, contractors, servants, solicitors and other assistants, consultants and valuators currently in their employ, with liberty to retain such further agents, advisors, contractors, servants, solicitors, assistants, consultants and valuators including, without limitation, those who were formerly, are now or may in the future be retained, employed or paid by the Applicants or any person, firm, partnership, corporation or other entity related to or affiliated with the Applicants, as they deem reasonably necessary or desirable in the ordinary course of business or for the purpose of the Plan or the carrying out of the terms of this Order or otherwise.

5.    THIS COURT ORDERS that subject to the provisions of the Commitment Letter as herein defined the Applicants shall be (i) entitled to continue to utilize the central cash management system currently utilized by the Applicants and the Partnerships and as described in the Fortin Affidavit, including, without limitation, the ability to transfer funds by and among the Applicants and the Partnerships and their affiliates that are subsidiaries of Teleglobe Inc. as and where needed and in the amounts necessary or appropriate to maintain their operations, or replace it with another substantially similar central cash management system (the "Cash Management System") and that any present or future bank providing the Cash Management System shall not be under any obligation whatsoever to inquire into the propriety, validity or legality of any transfer, payment, collection or other action taken under the Cash Management System, or as to the use or application by the Applicants of funds transferred, paid, collected or otherwise dealt with in the Cash Management System; and (ii) entitled to provide the Cash Management System without any liability, whether statutory, contractual, trust, proprietary or otherwise, in respect thereof to any person, corporation or other entity whatsoever, other

- 4 -

than the Applicants, pursuant to the terms of the documentation applicable to the Cash Management System; and (iii) in its capacity as provider of the Cash Management System, be an unaffected creditor under the Plan with regard to any claims or expenses it may suffer or incur in connection with the provision of the Cash Management System.

6.    THIS COURT ORDERS that from and after the date hereof and except as otherwise provided to the contrary herein, the Applicants shall be entitled, but not required, to pay subject to the Monitor's review, all reasonable expenses incurred by the Applicants in carrying on the Business, both prior to and after this Order, and in carrying out the provisions of this Order, which expenses, pending any further Order of this Court, include, without limitation, payment:

(a)    of all expenses and capital expenditures reasonably necessary for the preservation of the Property or the Business including, without limitation, payments on account of insurance (including directors and officers insurance), maintenance and security;

(b)    of all outstanding and future wages, salaries, commissions, employee benefits, expenses incurred in the ordinary course of employment, bonus payments, vacation pay for continuing employees in the normal course, consistent with existing compensation policies and arrangements and retention and severance accrued, accruing or due to employees in accordance with the Employee Retention and Severance Plan and the Employee Facility (as herein defined);

(c)    of the reasonable fees and disbursements of the Monitor, including the reasonable fees and disbursements, on a solicitor and his own client basis, of any counsel

- 5 -

retained by the Monitor incurred both prior to and following the making of this Order;

(d)     of the reasonable fees and disbursements of the directors and those reasonable fees and disbursements of their counsel, and any auditor, financial advisor or other professional retained by the Applicants in respect of these proceedings and the Plan ~~or other matters affecting the Business and the operations of the Applicants~~;

(e)     of the fees and disbursements, on a solicitor and his own client basis, of counsel retained by the Applicants in respect of these proceedings and the Plan ~~or other matters affecting the Business and the operations of the Applicants~~, incurred both prior to and following the making of this Order;

(f)     of the fees and disbursements of counsel retained by the banking syndicate and the unofficial committee of debentureholders in respect of these proceedings and the Plan;

(g)     of goods or services actually supplied or to be supplied to the Applicants following the date of this Order;

(h)     ~~in addition to any rights, powers and authorities provided for in this Order, to take all steps necessary or incidental to implementing the restructuring contemplated in the Fortin Affidavit~~;

(i)     of any amounts owed to third parties that are received from settlement or resolution of litigation matters where Applicants acted as agents for those third parties in the litigation; and

- 6 -

(j)     any other amounts specifically provided for by the terms of this Order.

7.     THIS COURT ORDERS that the Applicants shall remit, in accordance with legal requirements, or pay:

(a)     (i) any statutory deemed trust amounts in favour of the Crown in right of Canada or of any Province thereof or any other taxation authority in the United States which are required to be deducted from employees' wages, including, without limitation, amounts in respect of employment insurance, Canada Pension Plan and income taxes, (ii) amounts accruing and payable by the Applicants in respect of employment insurance, Canada Pension Plan, workers compensation, employer health taxes and similar obligations of any jurisdiction with respect to employees, and (iii) all goods and services or other applicable sales taxes payable by the Applicants or their customers in connection with the sale of goods and services by the Applicants to such customers arising after the making of this Order (the "Crown Priorities");

(b)     any similar or any other requirements of the Applicants to those requirements referred to in paragraph 7(a), above, in jurisdictions where related proceedings are commenced; and

(c)     any payment required to be deposited into, or otherwise held in, trust pursuant to applicable laws, rules or regulations in connection with or resulting from the Business.

- 7 -

## RESTRUCTURING

8.    THIS COURT ORDERS that the Applicants shall have the right, subject to the Monitor's review, to:

    (a)    permanently or temporarily cease, downsize or shut down any of their businesses or operations;

    (b)    terminate the employment of such of their employees or temporarily lay off such of their employees as they deem appropriate and to the extent not paid in the ordinary course or as the Applicants may determine, to deal with the consequences thereof in the Plan;

    (c)    subject to paragraphs 10 and 11, vacate, abandon or quit any leased premises and/or terminate or repudiate any lease and any ancillary agreements relating to any leased premises, on not less than 7 days' notice in writing to the relevant landlord on such terms as may be agreed upon between the Applicants and such landlord or, failing such agreement, to deal with the consequences thereof in the Plan;

    (d)    sell and assign:

        (i)    any and all of the Property:

            (A)    which is redundant to the continuing restructured operations of the Applicants (the "Redundant Property"), including premises and leases, furniture, fixtures and leasehold improvements situate at such premises or elsewhere; and

- 8 -

(B)    any and all Property other than Redundant Property;

provided, however, that any sale for consideration in excess of US$2,500,000 in any single transaction or US$10,000,000 in any series of connected transactions in the case of Redundant Property or US$500,000 or US$2,000,000 in any single transaction or in any series of connected transactions in the case of Property other than Redundant Property, shall require the approval of the Monitor, this Court and the CCAA Lender; and

(ii) ~~any and all Property pursuant to any agreement or arrangement that was entered into prior to the date hereof with any arms-length third party for adequate value;~~

Such sales shall not be deemed to be a sale in bulk or contravention of any laws of any Province of Canada prohibiting, restricting or regulating the sale of such goods, property and assets including the *Bulk Sales Act* (Ontario);

(e)    proceed with an orderly liquidation of such of the Property as the Applicants deem necessary or appropriate;

(f)    terminate, resiliate or repudiate such of their arrangements or agreements of any nature whatsoever, whether oral or written, as the Applicants deem appropriate on such terms as may be agreed upon between the Applicants and such counter-parties or, failing such agreement, to deal with the consequences thereof in the Plan;

- 9 -

(g)     pursue all avenues of refinancing and offers for the sale of material parts of the Business or Property, in whole or part, subject to prior approval of this Court being obtained before any such material refinancing or sale; and

all of the foregoing to permit the Applicants to proceed with an orderly restructuring of the Business (the "Restructuring") and to submit a Plan.

9.     THIS COURT ORDERS that the Employee Retention and Severance Plan as set out in the Fortin Affidavit be and the same is hereby approved.

10.     THIS COURT ORDERS that the Applicants shall provide each of the relevant landlords with notice of the Applicants' intention to remove any fixtures from any leased location closed and abandoned by the Applicants sufficiently in advance of the date of the intended removal. The relevant landlord shall be entitled to have a representative present in the leased location to observe such removal and, if the landlord disputes the Applicants' entitlement to remove any such fixture, such fixture shall remain on the premises and shall be dealt with as agreed between any applicable secured creditors, such landlord and the Applicants, or by further Order of the Court upon application by the Applicants on at least 2 days' notice to such landlord and any such secured creditor. If the Applicants have otherwise vacated any such leased location, they shall not be considered to be in occupation thereof pending resolution of any such dispute.

11.     THIS COURT ORDERS that, if a leased location is quit, vacated or abandoned or a lease terminated, resiliated or repudiated by the Applicants, the relevant landlord shall be entitled to take possession of any such leased location without waiver of or prejudice to any claims or rights such landlord may have against the Applicants in respect of the

- 10 -

quitting, vacating or abandonment of such leased location or the termination, resiliation or repudiation of such lease and such landlord shall be entitled to notify the Applicants of the basis on which it is taking possession and to gain possession of and re-lease such leased location or assets to any third party or parties on such terms as such landlord considers advisable, provided that nothing herein shall relieve such landlord of its obligation to mitigate any damages claimed in connection therewith, and provided further that nothing in this paragraph shall be deemed to resolve any issue relating to the removal of fixtures and the rights of any landlord under this paragraph shall be subject to the resolution of such disputes.

12.    THIS COURT ORDERS that, subject to the provisions of this Order in order to facilitate the Restructuring, the Applicants shall be permitted to carry on business without any interference of any kind and in the manner and to the extent determined by it, to dispose of any or all of the Property wherever situate without any interference of any kind from landlords (notwithstanding the terms of any leases), and, for greater certainty, the Applicants shall have the right to realize upon the Property and other assets in such manner and at such locations as it deems suitable or desirable for the purpose of maximizing the proceeds and recovery therefrom and to make provision for the consequences of such actions in the Plan.

**STAY OF PROCEEDINGS**

13.    THIS COURT ORDERS that, until and including June 15, 2002, or such later date as the Court may order (the "Stay Period"):

(a)    no suit, action, enforcement process, extra judicial proceeding or other proceeding of any kind shall be commenced by any individual, body corporate, banker,

- 11 -

vendor, purchaser, agent, associate, landlord, creditor, customer, client, supplier, contractor, lender, purchasing agent, lessor of real or personal property of any kind or nature whatsoever, sub-lessor, tenant, subtenant, licensor, licensee, co-owner, co-tenant, shareholder, joint venture partner, co-venturer, partner, governments of any nation, province, state or municipality or any other entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government in Canada or elsewhere and any person, firm, corporation or other entity owned or controlled by or which is the agent of any of the foregoing wherever situate or domiciled (collectively, "Persons" and individually, a "Person") against or in respect of any or all of the Applicants, the Partnerships or any Property, wheresoever located, and whether held by the Applicants in whole or in part, directly or indirectly, as principal or nominee, beneficially or otherwise (collectively, "Proceeding"), and any Proceeding commenced on or prior to the date of this Order shall be and is hereby stayed, restrained and suspended, except as specifically provided herein;

(b)    the right of any Person to make demand or draw under any debentures, notes, bonds or instruments of similar effect, issued by or on behalf of the Applicants, to take possession of, to foreclose upon or to otherwise realize upon or deal with any of the Property or to continue such actions or proceedings if commenced prior to the date of this Order, is hereby stayed, suspended and restrained;

(c)    the right of any Person to commence or continue realization in respect of any encumbrance, tax, lien, charge, mortgage, adornment of rents or other security held in relation to, or any trust attaching to, the Property, including the right of

- 12 -

any Person to take any step in asserting or perfecting any right or interest, including, without limitation, the removal of any tooling, inventory, service parts, equipment, supplies and intellectual property or any right to the revindication of any goods supplied to the Applicants, whether taken in the Province of Ontario or elsewhere, and whether pursuant to the *Bankruptcy and Insolvency Act* (the "BIA") or otherwise, is hereby restrained;

(d)     the right of any Person to assert, enforce or exercise any right (including, without limitation, any right of dilution, buy-out, divestiture, forced sale, acceleration, termination, revocation, suspension, modification, cancellation or right to revoke any qualifications or registration), option or remedy available to it, including such right, option or remedy arising under or in respect of any agreement (including, without limitation, any partnership agreement, management agreement, franchise agreement, shareholders' agreement, co-ownership agreement, agreement of purchase and sale, customer contract, purchase order, supply contract or lease) to which the Applicants or the Partnerships is a party, arising out of, relating to or triggered by the occurrence of any default or non-performance by the Applicants or the Partnerships thereunder, the making or filing of these proceedings, or any allegation contained in these proceedings including, without limitation, the making of any demand, the sending of any notice, the right to crystallize any security interest, the right to accelerate the repayment of any outstanding indebtedness, the right to terminate, accelerate rent due under, and/or interfere with the Applicants' or the Partnerships' quiet possession in respect of or otherwise deal with a lease of lands pursuant to which the Applicants or the Partnerships is a tenant, are hereby restrained;

- 13 -

    (e)    all Persons are hereby restrained from exercising any extra judicial remedy against the Applicants, the Partnerships, and the Property including, without limitation, the registration or re-registration of any securities owned by the Applicants into the name of any Persons or their nominees, the exercise of any voting rights attaching to securities owned by the Applicants, any right of distress, repossession or consolidation of accounts in relation to amounts due or accruing due in respect of or arising from any indebtedness or obligation of the Applicants or the Partnerships as at the date hereof; and

    (f)    subject to paragraph 21, all Persons are hereby restrained from exercising any right of set off or off set as against the Applicants or the Partnerships, or as against amounts now or hereafter owing to the Applicants or the Partnerships except to the extent permitted to do so pursuant to the provisions of the CCAA, and subject to the Commitment Letter and Employee Facility; provided, however, that nothing in this Order shall impair or stay the exercise of any right to terminate, amend or claim any accelerated payment under an "eligible financial contract", as defined in the CCAA.

## EXERCISE OF RIGHTS OR REMEDIES

14.    THIS COURT ORDERS that, during the Stay Period, the right of any Person to assert, enforce or exercise any right (including, without limitation, rights under subsection 224(1.2) of the *Income Tax Act* (Canada) or their provincial equivalents, any right of dilution, registration, attornment, encumbrance, buy-out, divestiture, repudiation, rescission, forced sale, acceleration, setoff, repossession, distress, conversion, possession, termination, suspension, modification or cancellation or right to revoke any qualification

- 14 -

or registration), option or remedy arising by law, by virtue of any agreement or by any other means:

(a)     against the Applicants, the Partnerships or the Property; or

(b)     as a result of any default or non-performance by the Applicants or the Partnerships, the making or filing of these proceedings or any allegation contained in these proceedings,

be and is hereby restrained.

15.     THIS COURT ORDERS that no Person may commence or continue any Proceeding against any former, present or future director or officer of the Applicants or any other Person who, as at the date of this Order or hereafter, manages or supervises the business and affairs of the Applicants or who theretofore did so and who could in law be found liable for the payment of any obligations or liabilities of the Applicants (individually, the "Director" and collectively, the "Directors") on any claim against the Director that arose before the commencement of these Proceedings or that arise while this Proceeding is continuing and that relates to any obligation of the Applicants where the Directors are or are alleged to be under any law liable in their capacity as the Directors for payment or performance of such obligation.

16.     THIS COURT ORDERS subject to paragraph 13(f) that from 12:01 a.m. (Toronto time) on the date of this Order, to the time of the granting of this Order, any act or action taken or notice given by creditors or other Persons and their agents in furtherance of their rights to commence or continue realization or take or enforce any other step or remedy against the Applicants or the Partnerships, including the application of funds in the reduction of

- 15 -

any debt, setoff or the consolidation of accounts, will be deemed not to have been taken or given as the case may be, subject to the right of such Persons to further apply to this Court in respect of such step, act, action or notice given, provided that the foregoing shall not apply to prevent any creditor who, during such period, effected any registrations with respect to security granted prior to the date of this Order or who obtained third party consents in relation thereto.

17. THIS COURT ORDERS that the Applicants shall be entitled to exercise any rights of set-off and claim any allowances or benefits which they are entitled to claim against amounts payable by the Applicants to any Person, including, without limitation, amounts payable to any supplier of goods or services or any landlord of premises leased or occupied by the Applicants or the Partnerships and including rights arising in connection with any agreements or arrangements with any supplier.

## NON-INTERFERENCE WITH RIGHTS

18. THIS COURT ORDERS that, during the Stay Period, no Person shall without leave of this Court, discontinue, modify, fail to renew, alter, interfere with or terminate any right, contract, arrangement, agreement, licence or permit (a) in favour of or held by the Applicants, the Partnerships or the Property; or (b) as a result of any default or non-performance by the Applicants or the Partnerships, the making or filing of these proceedings or any allegation contained in these proceedings.

19. THIS COURT ORDERS that, to the extent that any statutory limitation periods relating to the Applicants, the Partnerships or the Property may expire or terminate with the passage of time, the term of such limitation periods shall hereby be deemed to be extended by a period of time equal to the duration of the stay of proceedings effected by

this Order and any further Order of this Court and, for greater certainty, in the event that any of the Applicants or the Partnerships become bankrupt or a receiver is appointed in respect of any of the Applicants or the Partnerships within the meaning of section 243(2) of the BIA, the period between the date of this Order and the day on which such stay of proceedings is ended shall not be counted in determining the 30-day period referred to in Section 81.1 of the BIA or the 15-day period referred to in Section 81.2 of the BIA, provided that this paragraph shall not be construed to extend the term of any lease that expires during the pendency of such stay of proceedings.

## CONTINUATION OF SERVICES AND PAYMENT MECHANISMS FOR CERTAIN SERVICES

20.     THIS COURT ORDERS that, during the Stay Period, all Persons, having written or oral agreements with the Applicants or the Partnerships or statutory or regulatory mandates for the supply of goods and/or services, including, without limiting the generality of the foregoing, all telecommunication-related services and infrastructure, computer software, communication and other data services, computer hardware, electronics, centralized banking services, payroll servicing, insurance, transportation services, utilities or other required services, by or to the Applicants or the Partnerships or any of the Property are hereby restrained until further order of this Court from discontinuing, failing to renew on reasonable terms, altering, interfering with or terminating the supply of such goods or services so long as the normal prices or charges for such goods and services provided or received after the date of this Order are paid in accordance with present payment practices, or as may be hereafter agreed to by the Applicants from time to time.

21.     THIS COURT ORDERS that, notwithstanding any other provision of this Order or as it may be amended from time to time: (a) no creditor of the Applicants or the Partnerships

- 17 -

shall be under any obligation after the making of this Order to advance or readvance any monies or otherwise extend any credit to the Applicants or the Partnerships; (b) all Persons having agreements, whether written or oral, with the Applicants, or any of them for the carriage and transmission of voice and data services and who have been designated by the Applicants and consented to by the Monitor as "Necessary Providers" shall be entitled to exercise those practices and be paid for call termination and payment of such services on the same basis as such parties would have been entitled to exercise such practices, but for this Order; and (c) the Applicants may, by written consent of their counsel of record herein, and with 3 days notice to the CCAA Lender agree to waive any of the protections provided to them herein.

22.     THIS COURT ORDERS that, in addition to the rights referred to in paragraph 21, and with the approval of the Monitor, the Applicants may continue to conduct normal credit and collection processes, including the discounting of receivables, the setting off of offsetting amounts due from customers, the provisions of credits or refunds that result from service outages or mistaken or incorrect billing, based on current industry conditions up to US$750,000 per transaction, and subject to the Monitor's approval if it exceeds this amount.

**PAYMENT OF CREDITORS**

23.     THIS COURT ORDERS that, subject to paragraph 21, the Applicants and the Partnerships are hereby directed, until further Order of this Court: (a) to make no payments of principal, interest thereon or otherwise on account of amounts owing by the Applicants or the Partnerships to any of their creditors as of this date; and (b) to grant no

mortgages, charges or other security upon or in respect of any of their present or future Property, other than as provided in this Order.

## APPOINTMENT OF MONITOR

24.    THIS COURT ORDERS that, until further Order of this Court, Ernst & Young Inc., the Monitor, shall be and it is hereby appointed as an officer of this Court to monitor the Business and the business and affairs of the Applicants with the powers and obligations hereafter set forth and that each of the Applicants and their respective shareholders, officers, directors, employees, servants, agents, accountants, auditors and representatives shall cooperate fully with the Monitor in the exercise of its powers and discharge of its obligations. Without limiting the generality of the foregoing, the foregoing Persons shall provide the Monitor with such access to books, records, assets and premises of the Applicants as the Monitor requires to exercise its powers and perform its obligations under this Order. Nothing in this Order shall preclude Ernst & Young Inc. from being appointed as a receiver or trustee in bankruptcy in respect of any of the Applicants.

25.    THIS COURT ORDERS that the Monitor shall, in addition to the duties and functions referred to in section 11.7 of the CCAA:

(a)    assist and advise the Applicants in the Restructuring, the development of the Plan and any amendments to and the implementation of the Plan;

(b)    advise and assist the Applicants in the shutdown, disposal, distribution and/or any sale of any of their respective businesses, operations or assets or other Property;

(c)    assist the Applicants with the holding and administering of any Meetings (as defined herein) for voting on the Plan and act as chair at any such Meetings;

- 20 -

assessment of the Plan. The Monitor shall incur no liability as a result of any report or assessment that it may make pursuant to this provision.

27.    THIS COURT ORDERS that the reasonable fees and disbursements of the Monitor, whether in its capacity as monitor or foreign representative (including the fees and disbursements of any counsel retained by the Monitor on a solicitor and his own client basis) and the reasonable fees and disbursements of the Applicants' counsel in these proceedings on a solicitor and his own client basis, shall be paid by the Applicants as part of the costs of these proceedings, the Plan and the Restructuring and the Applicants are hereby authorized and directed to pay the accounts of the Monitor, and the Applicants' counsel and counsel for the Monitor on a weekly basis. In addition, the Applicants are hereby authorized to pay each of the Monitor, counsel to the Monitor, and counsel to the Applicants such retainers as may be agreed upon to be held by the Monitor and each such counsel as security for payment of their fees and disbursements outstanding from time to time. All such fees are subject to any final assessments or taxation as may be ordered by this Court.

28.    THIS COURT ORDERS that the Monitor, counsel to the Monitor, if any, and the Applicants' counsel, as security for their reasonable professional fees and disbursements incurred both before and after the making of this Order in respect of these proceedings, the Plan and the Restructuring shall be entitled to the benefits of and are hereby granted a priority charge in accordance with the provisions of paragraph 43 herein against all present and future Property of the Applicants (the "Administration Charge"). The Monitor and such counsel shall not be required to file, register, record or perfect the Administration Charge.

- 19 -

(d)    inquire into and report to the creditors of each of the Applicants and the Court, at or prior to any Meetings to consider the Plan, upon the financial condition and prospects of each of the Applicants in such manner and at such time as the Monitor may deem necessary or appropriate or as this Court may direct;

(e)    be at liberty to engage legal counsel and engage such other agents as the Monitor deems necessary respecting the exercise of its powers and performance of its obligations under this Order;

(f)    report to this Court as the Monitor deems appropriate or as this Court directs, in respect of the Plan, the Restructuring or the business of any of the Applicants or in respect of such other matters as may be relevant to the proceedings herein;

(g)    of continuity of insurance protection for directors and officers of the Applicants;

(h)    act as foreign representative in any U.S. proceedings;

(i)    report to the DIP Lenders pursuant to the terms of the DIP Loan and perform such services as the DIP Lender may regulate from time to time; and

(j)    perform such other duties as are required by this Order or further Order of this Court.

26.    THIS COURT ORDERS that the Monitor is authorized but not obligated to provide all interested parties, including but not limited to the affected creditors, with its report on or assessment of the Plan. The Monitor is authorized to complete such valuation and liquidation analyses of the Property of the Applicants to support its report on or

- 21 -

29.    THIS COURT ORDERS that, in addition to the rights and protections afforded to the Monitor under the CCAA or as an officer of the Court, the Monitor shall incur no liability or obligation as a result of their appointment or the fulfilment of its duties in the carrying out of the provisions of this Order, including, without limitation, actions taken by the Monitor in its capacity as foreign representative, save and except for gross negligence or wilful misconduct on its part, and no action or other proceeding shall be commenced against Ernst & Young Inc. as a result of or relating in any way to its appointment as Monitor, and foreign representative, respectively, the fulfilment of its duties as Monitor, foreign representative as hereunder provided or carrying out of any of the orders of this Court, expect with prior leave of this Court and upon further order securing, as security for costs, the solicitor and his own client costs of Ernst & Young Inc., if any, in connection with any such action or proceeding, and provided further that the liability of Ernst & Young Inc. hereunder shall not in any event exceed the quantum of the fees and disbursements paid to or incurred by it in connection with this matter.

30.    THIS COURT ORDERS that the Monitor is not and shall not be deemed or considered to be a successor employer, sponsor or payer with respect to any Applicant or any employees or former employees of any Applicant under the *Canada Labour Code*, the *Labour Relations Act* (Ontario), the *Employment Standards Act* (Ontario), the *Pension Benefits Act* (Ontario) (collectively, the "Labour Laws"), any collective agreement or other contract between any Applicant and any of its present or former employees, or under any other provincial or federal legislation, regulation or rule of law or equity applicable to employees or pension, or otherwise.

- 22 -

31.     THIS COURT ORDERS that nothing herein contained shall vest in the Monitor the care, ownership, control, change, occupation, possession or management (separately and/or collectively "Possession"), or require or obligate the Monitor to occupy or to take Possession of any Property of the Applicant which may be environmentally contaminated, or which may be a pollutant or a contaminant, or which may cause or contribute to a spill, discharge, release or deposit of a substance contrary to any legislation enacted for the protection or preservation of the environment including, without limitation, the *Canadian Environmental Protection Act*, the *Transportation of Dangerous Goods Act*, the *Environmental Protection Act* (Ontario), the *Emergency Plans Act 1983* (Ontario), the *Ontario Water Resources Act*, the *Occupational Health and Safety Act* (Ontario) or the regulations thereunder, or any federal or provincial legislation or rule of law or equity in any jurisdiction affecting the environment or the transportation of goods or hazardous waste (collectively, "Environmental Laws" or "Environmental Liabilities"). The Monitor shall not be deemed as or considered as a result of this Order to be in Possession of any of the Property within the meaning of any Environmental Laws.

32.     THIS COURT ORDERS, to the extent required by any Applicant or the Partnerships, such Applicant may pay to the Monitor funds necessary for payment of goods or services supplied or to be supplied to such Applicant after the date of this Order, and the Monitor shall have the right and authority to make arrangements (including without limitation, trust arrangements) for payment to such Persons in exchange for the delivery of goods or services supplied to such Applicant and for greater certainty, the Monitor shall not be liable for any obligations or liabilities for the supply of any goods or services to such Applicant.

- 23 -

33.    THIS COURT ORDERS that the Monitor shall, within thirty (30) business days of the date of entry of this Order, send a notice of these proceedings, including a copy of this Order to the known creditors of each of the Applicants, other than employees, and creditors to which an Applicant owes less than US$5,000, at their addresses as they appear on the Applicants' records and, in the case of the Applicants' landlords, to the landlords or the landlord's property manager's address.

## POWER TO BORROW

34.    THIS COURT ORDERS that Teleglobe Inc. is hereby authorized and empowered to borrow from 3810186 Canada Inc. such amounts from time to time to a maximum amount of US$25 million for the purpose of funding the Employee Retention and Severance Plan (as defined in the Fortin Affidavit) and as contemplated pursuant to the Employee Facility (as defined in the Fortin Affidavit).

35.    THIS COURT ORDERS that the Employee Facility is approved and 3810186 Canada Inc. shall be and is hereby authorized to advance to Teleglobe Inc. the full amount of the Employee Facility, subject to the terms thereof, which advance shall be used solely for the purpose of discharging Teleglobe Inc.'s and its subsidiaries' obligations under the Employee Retention and Severance Plan, and which funds so advanced shall not form part of the estate of Teleglobe Inc., or its subsidiaries, including the other Applicants, notwithstanding that such funds may be advanced by Teleglobe Inc. to its subsidiaries including other Applicants and, whether so advanced by Teleglobe Inc. or not, shall not be available for the distribution to creditors generally or be in any way subject to seizure or set-off by the Applicants' creditors.  Any trustee in bankruptcy Teleglobe Inc. or receiver of the property of Teleglobe Inc. or Teleglobe Inc. shall be obliged to draw on

- 24 -

the Employee Facility for the benefit of those employees affected by the Employee Retention and Severance Plan.

**Debtor in Possession Facility**

36.     THIS COURT ORDERS that the Applicants and the Partnerships individually or collectively are hereby authorized and empowered to obtain a credit facility from 3810186 Canada Inc. (the "CCAA Lender") in order to finance the Applicants', the Partnerships' and Teleglobe Inc.'s subsidiaries respective working capital requirements and other general corporate purposes and capital expenditures which credit facility shall be in an aggregate principal amount of US$100,000,000 (the "DIP Facility").

37.     THIS COURT ORDERS THAT the terms of the DIP Facility shall be substantially on the terms and subject to the conditions set forth in the terms letter between the Applicants, the Partnerships and the CCAA Lender, to be dated as of May 15, 2002 (the "Commitment Letter"), filed.

38.     THIS COURT ORDERS that the Applicants and the Partnerships shall be authorized to borrow from the CCAA Lender, in accordance with the terms of the Commitment Letter and the terms hereof, a maximum amount of US$100,000,000.

39.     THIS COURT ORDERS that the Applicants and the Partnerships are hereby authorized and empowered to execute and deliver such credit agreements, mortgage, charge, hypothec and security documents, guarantees and other definitive documents (collectively, the "Definitive Documents"), as are contemplated by the Commitment Letter or as may be reasonably required by the CCAA Lender pursuant to the terms thereof, and the Applicants and the Partnerships are hereby authorized and directed to pay and perform all of its indebtedness, interest, fees, liabilities and obligations to the CCAA

Lender under and pursuant to the Commitment Letter and the Definitive Documents as and when the same become due and are to be performed notwithstanding any other provision of this Order.

40.    THIS COURT ORDERS that subject to paragraph 44, all Property is hereby charged by a fixed and floating charge, mortgage, hypothec, security interest and lien (such charge, mortgage, hypothec, security interest and lien, together with any charge, mortgage, hypothec, security interest, pledge or other lien or encumbrance contemplated by the Definitive Documents, being collectively, the "CCAA Lender's Charge") in favour of the CCAA Lender as security for all of the indebtedness, liabilities and obligations of any of the Applicants and the Partnerships to the CCAA Lender under and pursuant to the Commitment Letter and the Definitive Documents.

41.    THIS COURT ORDERS that the CCAA Lender's Charge shall attach to all present and future Property, including any lease, sublease, offer to lease or other contract, except that the CCAA Lender's Charge shall not attach to the last day of the term of any lease or to any such lease, sublease, offer to lease, or other contract to the extent that such attachment would constitute a breach of its terms or permit a party to terminate such agreement. If the CCAA Lender's Charge does not attach to the Property in accordance with this paragraph, the Applicants and the Partnerships shall hold their interest in such lease, sublease, offer to lease or other contract or any proceeds therefrom in trust for the CCAA Lender and shall assign such interest to the CCAA Lender upon obtaining the required consent or upon order of the Court.

42.    THIS COURT ORDERS that the CCAA Lender shall not be required to file, register, record or perfect the CCAA Lender's Charge and that the CCAA Lender's Charge shall

be valid and enforceable for all purposes, including as against any right, title or interest filed, registered, recorded or perfected subsequent to the CCAA Lender's Charge coming into existence, notwithstanding any such failure to file, register, record or perfect.

43.    THIS COURT ORDERS that subject to paragraph 44, each of the CCAA Lender's Charge, the Administration Charge and the Directors' Charge (all as constituted and defined herein) shall constitute a fixed and floating charge, mortgage, hypothec, lien and security interest in all of the Property and such charges shall rank in priority to any and all other charges, mortgages, hypothecs, liens, security interests, encumbrances or security of whatever nature or kind (the "Encumbrances") affecting any of the Property, except the following:

(a)    existing security interests in personal property already registered in accordance with applicable personal property security legislation so as to have priority over prior registered security interest ("PMSIs") and;

(b)    Encumbrances arising by operation of law that are given priority over prior fixed charges by statute in the event of the bankruptcy of the Applicants.

44.    THIS COURT ORDERS that the priorities of the CCAA Lender's Charge, the Administration Charge and the Directors' Charge, as between them, shall be as follows:

First – Administrative Charge (to the maximum amount of US$2 million);

Second – CCAA Lender's Charge; and

Third – Directors' Charge (to the maximum amount of US$3 million).

- 27 -

45.    THIS COURT ORDERS that except as otherwise expressly provided for herein, the Applicants and the Partnerships shall not grant any Encumbrances over any Property that rank in priority to, or pari passu with, any of the CCAA Lender's Charge, the Administration Charge or the Directors' Charge unless the Applicants also obtain the prior written consent of the CCAA Lender.

46.    THIS COURT ORDERS that the Commitment Letter, the Definitive Documents and the CCAA Lender's Charge shall not be rendered invalid or unenforceable and the rights and remedies of the CCAA Lender thereunder shall not otherwise be limited or impaired in any way by (a) the pendency of these proceedings and the declarations of insolvency made herein; (b) any petitions for receiving orders issued pursuant to the BIA, or any receiving orders made pursuant to such petitions; (c) the filing of any assignments for the general benefit of creditors made pursuant to the BIA; (d) the provisions of any federal or provisional statutes; or (e) any negative covenants, prohibitions or other similar provisions with respect to borrowings, incurring debt or the creation of Encumbrances, contained in any existing agreement, lease, sublease, offer to lease or other arrangement (collectively, an "Agreement") which binds the Applicants, and notwithstanding any provision to the contrary in any Agreement:

(a)    neither the creation of the CCAA Lender's Charge nor the execution, delivery, perfection, registration or performance of the Definitive Documents shall create or be deemed to constitute a breach by any Applicant of any Agreement or to which it is a party;

(b)    the CCAA Lender shall have no liability to any Person whatsoever as a result of any breach of any agreement caused by or resulting from the Applicant entering

- 28 -

into the Commitment Letter, the creation of the CCAA Lender's Charge, or the execution delivery or performance of the Definitive Documents; and

(c)     the payments made by the Applicants pursuant to this Order, the Commitment Letter or the Definitive Documents, and the granting of the CCAA Lender's Charge, do not and will not constitute fraudulent preferences, fraudulent conveyances, oppressive conduct, settlements or other challengeable or reviewable transactions under any applicable law. *as it relates solely to the CCAA Lender*

47.     THIS COURT ORDERS that the Applicants and the Partnerships shall pay all principal, interest, fees, recoverable expenses and all other amounts owing to the CCAA Lender and perform all other obligations of the Applicants to the CCAA Lender under the Commitment Letter and the Definitive Documents, as and when the same become due or are to be performed.

48.     THIS COURT ORDERS that, notwithstanding any other provision of this Order:

(a)     the CCAA Lender may take such steps from time to time as it may deem necessary or appropriate to file, register, record or perfect the CCAA Lender's Charge;

*with leave of this Court*

(b)     upon the occurrence of an event of default under the Definitive Documents or the CCAA Lender's Charge, the CCAA Lender may exercise any and all of its rights and remedies against the Applicants, the Partnerships or the Property under or pursuant to the   Commitment Letter, Definitive Documents and the CCAA Lender's Charge, including without limitation, to cease making advances to the Applicants and the Partnerships and set off and/or consolidate any amounts owing

by the CCAA Lender or its affiliates to the Applicants against the obligations of the Applicants to the CCAA Lender under the Commitment Letter, the Definitive Documents or the CCAA Lender's Charge, to make demand, accelerate payment and give other notices, or to apply to this Court for the appointment of a receiver, receiver and manager or interim receiver, or for receiving orders against the Applicants and for the appointment of one or more trustees in bankruptcy of the Applicants;

(c)     the foregoing rights and remedies of the CCAA Lender shall be enforceable against any trustee in bankruptcy, interim receiver, receiver or receiver and manager of the Applicants; and

(d)     upon the occurrence of an event of default under the terms of the Definitive Documents, the CCAA Lender shall be entitled to seize and retain proceeds from the sale of the Property and the cash flow of the Applicants to repay amounts owing to the CCAA Lender in accordance with the Definitive Documents and the CCAA Lender's Charge, but subject to the priorities as set out in paragraph 44 of this Order.

49.    THIS COURT ORDERS AND DECLARES that the CCAA Lender be treated as unaffected in any Plan.

50.    THIS COURT ORDERS that subject to further Order of this Court, no Order shall be made pursuant to paragraph 56 hereof varying, rescinding or otherwise affecting paragraphs 36 to 49 hereof unless either (i) notice of a motion for such Order is served on

the CCAA Lender by the moving party within 10 days after that party was served with this Order or (ii) the CCAA Lender applies for or consents to such order.

51.    THIS COURT ORDERS that with respect to all matters referred to above, in respect of the DIP Facility, the Applicants and Teleglobe Financial Holdings are authorized and directed to take such actions and execute such documents as are required to ensure that the Partnerships shall enter into and give full force and effect to the Commitment Letter, the Definitive Documents, and the CCAA Lender's Charge.

## DIRECTORS' CHARGE

52.    THIS COURT ORDERS that each Applicant shall and does hereby indemnify each present or future director and officer of each of the Applicants from (i) all claims, liabilities and obligations of any nature whatsoever (including, without limitation, legal fees on a solicitor and his own client basis) which may hereafter arise from their respective involvement with the Applicants, save and except as may arise from the wilful misconduct or gross negligence of such director or officer, and (ii) liabilities arising due to the Applicants' failure to pay the Crown Priorities. The directors and officers of each of the Applicants shall be entitled to the benefit of and are hereby granted a priority hypothec, security interest, fixed charge, mortgage and lien in accordance with the provisions of paragraph 43 hereof upon the present and future Property of the Applicants (the "Directors' Charge") to secure such indemnification. The directors and officers of each of the Applicants shall not be required to file, register, record or perfect the Directors' Charge.

- 31 -

## SERVICE AND NOTICE

53.    THIS COURT ORDERS that the Applicants be and are at liberty to serve this Order, any

other orders in these proceedings, the Plan, any notices of meetings and all other notices,

and to deliver any letters to creditors, information circulars, proofs of claim, proxies and

disallowances of claims, by forwarding true copies thereof by prepaid ordinary mail,

courier, personal delivery or electronic transmission to the Applicants' creditors at their

respective addresses as last shown on the records of the Applicants and that any such

service or notice by courier, personal delivery or electronic transmission shall be deemed

to be received on the next business day following the date of forwarding thereof, or if

sent by ordinary mail, on the third business day after mailing.

54.    ~~THIS COURT ORDERS that nothing in this Order shall be taken to restrict or qualify the~~
~~rights of the CCAA Lender, or modify, qualify or in any way alter the provisions of the~~
~~Commitment Letter, Definitive Documents or the Employee Facility.~~

## MISCELLANEOUS

55.    THIS COURT ORDERS that the Applicants or the Monitor may, from time to time,

apply to this Court for directions in the discharge of their powers and duties hereunder or

in respect of the proper execution of this Order.

56.    THIS COURT ORDERS that, notwithstanding any other provision of this Order, any

interested person may apply to this Court to vary or rescind this order or seek other relief

upon 7 days' notice to the Applicants and the Monitor and to any other party likely to be

affected by the order sought or upon such other notice, if any, as this Court may order.

57.    THIS COURT ORDERS that, notwithstanding: (a) the pendency of these proceedings;

(b) the pendency of any petition for receiving order hereafter issued pursuant to the

provisions of the BIA, any receiving order issued in respect of any of the Applicants or the Partnerships pursuant to any such petitions, or any assignment under the BIA being made or deemed to have been made; and (c) the provisions of any federal or provincial statute, the CCAA Lender's Charge, Director's Charge and the Administration Charge will not be void or voidable to or by creditors, shareholders or any other claimants.

58.    THIS COURT ORDERS AND REQUESTS the aid and recognition of any court or any judicial, regulatory or administrative body in any province or territory of Canada (including the assistance of any court in Canada pursuant to Section 17 of the CCAA) and the Federal Court of Canada and any judicial, regulatory or administrative tribunal or other court constituted pursuant to the Parliament of Canada or the legislature of any province and any court or any judicial, regulatory or administrative body of the United States and the states or other subdivisions of the United States and of any other nation or state to act in aid of and to be complementary to this Court in carrying out the terms of this Order.

59.    THIS COURT ORDERS that the Monitor be at liberty and is hereby authorized, directed and empowered to apply to any other Court in any other jurisdiction, whether in Canada or elsewhere, for an order recognizing this proceeding or to take such steps, actions or proceedings as may be necessary or desirable for the receipt, preservation, protection, maintenance or liquidation of all or any part of the Property, including acting as foreign representative of the Applicants.    All Courts of all other jurisdictions are hereby respectfully requested to make such orders and provide such other aid and assistance to the Monitor, as an officer of this Court, as they may deem necessary or appropriate in furtherance of this Order, and it is specifically respectfully requested that the United

- 33 -

States Bankruptcy Court for the district of Delaware recognize the within proceedings for the purposes of Section 304 of the United States Bankruptcy Code and recognize Ernst & Young Inc. in its capacity as Monitor as a foreign representative for the purposes of Section 304 of the United States Bankruptcy Code.

60.     THIS COURT ORDERS that the directors of the Applicants carrying on business, or otherwise having assets, in the United States of America are hereby authorized and directed to apply for the commencement of proceedings under section 304 of the United States Bankruptcy Code, as applicable.

- 34 -

### Schedule A

Teleglobe Financial Holdings Ltd. (C)
Teleglobe Canada Limited Partnership (C)
Teleglobe Management Services Inc. (C)
Teleglobe Marine, Inc. (C)
Teleglobe Marine, L.P. (C)
Teleglobe Holdings (U.S.) Corporation (US)
Teleglobe Telecom Corporation (US)
Teleglobe Luxembourg LLC (US)
Teleglobe Holding Corp. (US)
Teleglobe Investment Corp. (US)
Teleglobe Communications Corporation (US)
Teleglobe USA Inc. (US)
Optel Telecommunications Inc. (US)
Teleglobe Marine (U.S.) Inc. (US)
Teleglobe Puerto Rico Inc. (US)
Teleglobe Canada Management Services Inc.
3692795 Canada Inc.
Teleglobe Vision Call Center Services, General Partnership
Teleglobe Submarine Inc. (US)

Court File No:

IN THE MATTER OF the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36
AND IN THE MATTER of a Plan of Compromise or Arrangement of Teleglobe Inc. and the other
Applicants listed on Schedule "A"

*ONTARIO*
SUPERIOR COURT OF JUSTICE -
COMMERCIAL LIST

Proceeding commenced at Toronto

INITIAL ORDER

Ogilvy Renault
Suite 1100, Box 11
Merrill Lynch Canada Tower
200 King Street West
Toronto, Canada  M5H 3T4

Derrick C. Tay LSUC# 21152A
Tel: 416.340.6032
Fax: 416-340-5900
Mario Forte LSUC#: 27293F
Tel: 416.340.61796179
Fax: 416.340.60796079

Solicitors for the Applicants

# EXHIBIT E

Teleglobe Inc.
Short Term Cash Flow Forecast

USA
(In thousands of US dollars)

| | WEEK ENDED | | | | | | | | | | MONTHLY |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Forecast 02-Jun-2002 | Forecast 09-Jun-2002 | Forecast 16-Jun-2002 | Forecast 23-Jun-2002 | Forecast 30-Jun-2002 | Forecast 07-Jul-2002 | Forecast 14-Jul-2002 | Forecast 21-Jul-2002 | Forecast 28-Jul-2002 | Forecast 04-Aug-2002 | Forecast August |
| Opening Cash | 5,998 | (8,472) | (16,498) | (23,073) | (24,788) | (31,189) | (33,107) | (33,460) | (32,977) | (33,636) | (38,097) |
| Receipts | | | | | | | | | | | |
| Voice | 809 | 1,233 | 2,233 | 3,733 | 3,733 | 3,039 | 3,839 | 3,839 | 3,039 | 3,710 | 13,935 |
| Data | 398 | 287 | 497 | 1,097 | 1,097 | 865 | 865 | 865 | 865 | 829 | 3,092 |
| Sale of assets | | | | | | | | | | | |
| Total Receipts | 1,207 | 1,530 | 2,730 | 4,830 | 4,830 | 4,704 | 4,704 | 4,704 | 4,704 | 4,538 | 17,027 |
| Disbursements | | | | | | | | | | | |
| Operating | | | | | | | | | | | |
| Outpayments | | | | | | | | | | | |
| Access costs | (6,232) | (8,513) | (7,607) | (3,363) | (3,383) | (3,500) | (3,500) | (3,500) | (3,500) | (3,306) | (12,194) |
| Backbone & leased facilities | (1,450) | - | - | - | (1,459) | - | - | - | - | (1,175) | (800) |
| Cable Maintenance | (3,268) | - | - | - | (3,200) | - | - | - | - | (2,800) | (2,000) |
| Payroll | (88) | - | - | (500) | (150) | (1,962) | - | - | - | (100) | (350) |
| Rent | (947) | (149) | (726) | (116) | (849) | (126) | (724) | (26) | (102) | (736) | (1,668) |
| Other SG&A | (3,596) | - | - | - | (1,330) | - | - | - | (1,074) | - | |
| Operating | (652) | (640) | (640) | (621) | (611) | (597) | (587) | (587) | (579) | (572) | (2,228) |
| | (16,233) | (9,302) | (9,053) | (4,621) | (10,979) | (6,176) | (4,812) | (4,114) | (5,255) | (8,689) | (19,042) |
| Investing | | | | | | | | | | | |
| Capital expenditures | (245) | (252) | (252) | (1,924) | (252) | (245) | (245) | (107) | (107) | (110) | (1,333) |
| Investing | (245) | (252) | (252) | (1,924) | (252) | (245) | (245) | (107) | (107) | (110) | (1,333) |
| Financing | | | | | | | | | | | |
| DIP facility interest & structuring fee | | | | | | | | | | | |
| Financing | | | | | | | | | | | |
| Corporate Costs | | | | | | | | | | | |
| Corporate receipts/(disbursements) | | | | | | | | | | | |
| Directors & officers liability | | | | | | | | | | | |
| Debtor's counsel | (150) | - | - | - | - | (150) | - | - | - | (150) | (150) |
| Committee professionals | (50) | - | - | - | - | (50) | - | - | - | (50) | (50) |
| Kerp & severance | | | | | | | | | | | |
| Corporate | (200) | - | - | - | - | (200) | - | - | - | (200) | (200) |
| Total Disbursements | (16,670) | (9,554) | (9,305) | (6,545) | (11,231) | (6,621) | (5,057) | (4,221) | (5,362) | (8,999) | (21,175) |
| Net Cash Flow | (15,471) | (8,024) | (6,575) | (1,715) | (6,401) | (1,918) | (353) | 483 | (659) | (4,461) | (4,147) |
| Ending cash before draws on Facility | (8,472) | (16,498) | (23,073) | (24,788) | (31,189) | (33,107) | (33,460) | (32,977) | (33,636) | (38,097) | (42,244) |

**USA cash flow forecast includes the following operating and holding companies:

Teleglobe Holdings (U.S.) Corp., Teleglobe Telecom Corporation, Teleglobe Luxembourg LLC, Teleglobe Holding Corp.,
Teleglobe Investment Corp., Teleglobe Communications Corporation, Teleglobe USA Inc., Optel Telecommunications Inc.,
Teleglobe Puerto Rico Inc., and Telecom Vision International Inc.