# EXHIBIT 4

IN RE: TELEGLOBE COMMUNICATIONS CORP.

CARLYN R. TAYLOR - 5/9/06

CONCORDANCE AND CONDENSED TRANSCRIPT
PREPARED BY:



Ellen Grauer
COURT REPORTING Co. LLC

TOWER 56, 126 EAST 56TH STREET, FIFTH FLOOR, NEW YORK, NEW YORK 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
WWW.ELLENGRAUER.COM

THIS PAGE LEFT INTENTIONALLY BLANK

## Page 1

(1)         IN THE UNITED STATES DISTRICT COURT
(2)            FOR THE DISTRICT OF DELAWARE
(3)    IN RE
(4)    TELEGLOBE COMMUNICATIONS    : Chapter 11
       CORPORATION, et al,         Case No. 02-11518 MFW
(5)                               :Jointly Administered
       TELEGLOBE COMMUNICATIONS    :
(6)    CORPORATION, et al,
                                   :
(7)              Plaintiffs,
                                   :
(8)         vs.                    Civil Action No.
                                   04-CV-1266 SLR
(9)    BCE, INC., MICHAEL T. BOYCHUK,
       MARC A. BOUCHARD, SERGE FORTIN,:
(10)   TERENCE J. JARMAN, STEWART
       VERGE, JEAN C. MONTY, RICHARD :
(11)   J. CURRIE, THOMAS KIERANS,
       STEPHEN P. SKINNER and        :
(12)   H ARNOLD STEINBERG,
                                     :
(13)             Defendants.
(14)
(15)           Deposition of CARLYN R. TAYLOR, taken
(16)   pursuant to notice in the law offices of Richards,
(17)   Layton & Finger, Conference Room 3D, One Rodney
(18)   Square, 920 North King Street, Wilmington, Delaware,
(19)   on Tuesday, May 9, 2006, at 10:01 a.m., before
(20)   Lorraine B. Harino, Registered Diplomate Reporter and
(21)   Notary Public.
(22)
(23)          ELLEN GRAUER COURT REPORTING CO. LLC
              126 East 56th Street, Fifth Floor
(24)              New York, New York 10022
                       212-750-6434
(25)                   REF: 80642

## Page 2

(1)    APPEARANCES:
(2)              RUSSELL C. SILBERGLIED, ESQ.
                 Richards, Layton & Finger
(3)              One Rodney Square
                 920 North King Street
(4)              Wilmington, DE  19801
                   for Plaintiffs
(5)
                 STUART J. BASKIN, ESQ.
(6)              BRYNNA CONNOLLY, ESQ.
                 Shearman & Sterling
(7)              599 Lexington Avenue
                 New York, NY  10022-6069
(8)                for Defendants
(9)    ALSO PRESENT:
(10)             V. V. COOKE, ESQ.
                 Teleglobe Associate General Counsel
(11)
                   - - -
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

## Page 3

(1)                     INDEX
(2)    WITNESS                                      Page
(3)    CARLYN R. TAYLOR
(4)       By Mr. Baskin --------------------     5
(5)    C. TAYLOR DEPOSITION EXHIBITS            Marked
(6)    1  Expert report of Carlyn Taylor, dated
            3/8/06--------------------------------    14
(7)
       2  FTI engagement letter, dated 2/6/06------   14
(8)
       3  Document entitled "Expert Document
(9)         Production"----------------------------   36
(10)   4  E-mail dated 3/14/06, from Ms. Freeman to
            Mr. Silberglied, with attachment---------   51
(11)
       5  Teleglobe business plan, dated 5/14/02---   114
(12)
       6  Ontario Superior Court of Justice initial
(13)        order, dated 5/15/02---------------------  116
(14)   7  Ontario Superior Court of Justice
            second report of monitor, dated 6/3/02---  133
(15)
       8  Ontario Superior Court of Justice
(16)        11th report of monitor, dated 9/19/02----  147
(17)   9  Undated Babcock affidavit----------------   163
(18)   10 Brunette affidavit, dated 10/8/02--------   173
(19)   11 Transcript of 6/24/02 hearing, USBC DE
            Case No. 02-11518----------------------   183
(20)
       12 Transcript of 10/9/02 hearing, USBC DE
(21)        Case No. 02-11518----------------------   192
(22)   13 E-mail dated 2/23/02, from Mr. Bolduc to
            Mr. McIntosh, et al., with attachment----   208
(23)
       14 NERA expert report, dated 4/14/06--------   213
(24)
                   - - -
(25)

## Page 4

(1)            C. TAYLOR EXHIBITS CONT'D
(2)    15 Rebuttal expert report of Carlyn Taylor,
            dated 4/14/06---------------------------  218
(3)
       16 Schedule 14A TIH/VSNL proxy statement----  219
(4)
                   - - -
(5)
(6)    (Exhibit 1 retained by counsel.  Exhibits 2 through 16
(7)    attached to original transcript and copies.)
(8)
                   - - -
(9)
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

Page 5

(1)          CARLYN RENEE TAYLOR, having been first
(2)   duly sworn, was examined and testified as follows:
(3)
(4)   BY MR. BASKIN:
(5)      Q.      Good morning.
(6)      A.      Good morning.
(7)      Q.      When did you arrive in Wilmington?
(8)      A.      Late Sunday night.
(9)      Q.      And did you prepare for this
(10)  deposition yesterday?
(11)     A.      Yes.
(12)     Q.      With whom did you prepare?
(13)     A.      Mr. Silberglied and my associate,
(14)  Debra Wood.
(15)     Q.      And in the course of preparing, were
(16)  you shown any other depositions taken in this matter?
(17)     A.      I have been given a lot of depositions
(18)  in this matter.
(19)     Q.      Good answer. You are absolutely
(20)  right.
(21)          Were you shown any depositions taken
(22)  in the last two weeks in this matter, any other expert
(23)  depositions?
(24)     A.      I was given --
(25)          MR. SILBERGLIED: Objection to form.

Page 6

(1)
(2)          THE WITNESS: I was sent the
(3)   transcripts of the depositions of the two NERA
(4)   witnesses.
(5)   BY MR. BASKIN:
(6)      Q.      And when were you sent those
(7)   transcripts?
(8)      A.      Last Thursday and Friday, I think.
(9)      Q.      And have you seen the transcript of
(10)  the testimony of Mr. Charnetzki?
(11)     A.      No.
(12)     Q.      Now, how long did you prepare for this
(13)  deposition yesterday?
(14)     A.      Twelve or 14 hours, something like
(15)  that.
(16)     Q.      And in the course of those 12 or 14
(17)  hours, did you review materials not found in
(18)  Appendix B to your report?
(19)     A.      Which report?
(20)     Q.      Your first report.
(21)     A.      Yes.
(22)     Q.      And did you review materials not found
(23)  in connection with the appendix of your rebuttal
(24)  report?
(25)          MR. SILBERGLIED: Well, objection to

Page 7

(1)
(2)   form. Other than those -- you are talking about in
(3)   neither report; correct?
(4)          MR. BASKIN: Sure.
(5)   BY MR. BASKIN:
(6)      Q.      Did you review materials not found in
(7)   the appendices of either report?
(8)      A.      In preparing yesterday?
(9)      Q.      Yes.
(10)     A.      The depositions that I mentioned
(11)  earlier of Mr. Taylor and Ms. McLaughlin.
(12)     Q.      Did you see documents yesterday -- I
(13)  think you told us you saw documents not found in
(14)  Appendix B to your main report; correct?
(15)     A.      Yes.
(16)     Q.      Did you see documents not found in the
(17)  appendix to your rebuttal report?
(18)          MR. SILBERGLIED: Objection to form.
(19)          THE WITNESS: Well, in a strict sense,
(20)  yes.
(21)  BY MR. BASKIN:
(22)     Q.      Okay. And to start, what documents do
(23)  you recall seeing not found in Appendix B to your main
(24)  report?
(25)     A.      Well, we reviewed documents that were

Page 8

(1)
(2)   referenced in the rebuttal report. We reviewed
(3)   exhibits to my report. So those aren't actually
(4)   listed in the appendix. They are my work product.
(5)          We reviewed some notes that I found
(6)   that were produced to you. I am trying to think if
(7)   there was anything else. We may have reviewed other
(8)   things that we produced to you. And I don't know if
(9)   those were listed in the report, in the appendix.
(10)     Q.      And what documents do you recall
(11)  reviewing that were in addition to what was in your
(12)  rebuttal report and not in the main report?
(13)     A.      I am sorry. Say that again.
(14)     Q.      What documents do you recall reviewing
(15)  that were in neither -- that were not in your rebuttal
(16)  report and were not in your main report?
(17)     A.      Oh, that's what I just answered.
(18)  Like, documents that we produced to you, which aren't
(19)  listed as source documents, but they were in response
(20)  to your request for production.
(21)     Q.      Okay. Can you describe for me what
(22)  some of the documents were that you remember reviewing
(23)  that were not found in your main report?
(24)     A.      Sure. Documents that we produced. So
(25)  our engagement letter. I think some drafts that we

Page 125

(2) A.    Which?  Are you talking about this
(3) exhibit?
(4) Q.    Yes.
(5) A.    I don't know who got it.
(6) Q.    Would it be customary for management's
(7) business plan to be circulated to the creditor groups
(8) and the other constituents of the bankruptcy?
(9)        MR. SILBERGLIED:  Objection to form.
(10)       THE WITNESS:  It depends what they are
(11) using it for.
(12) BY MR. BASKIN:
(13) Q.    Well, in this case did you become
(14) aware that this May 14 proposal and its subsequent
(15) modifications constituted the financial plan that was
(16) being utilized in the CCAA and the Chapter 11
(17) proceeding?
(18) A.    No, I don't know that specifically.
(19) Q.    Now, you tell us in your report that
(20) you analyzed Exhibit 5 for reasonableness.  Is that
(21) what you said?
(22) A.    Correct.
(23) Q.    And that's where you concluded on page
(24) 48 that "The results of my analysis indicate that the
(25) May 14 plan was reasonable as a basis for a standalone

Page 126

(2) restructuring."  Correct?
(3) A.    I don't see where you are reading.
(4) Where?  Page?
(5) Q.    The middle of page 48.
(6) A.    Yes.
(7) Q.    And it is your proposition that the
(8) execution of that strategy would have provided more
(9) value to the creditors than the fire sale process
(10) which occurred; correct?
(11) A.    Yes.
(12) Q.    Now, I take it that the various
(13) constituent groups in a Chapter 11 proceeding, such as
(14) creditor groups, are aware that an option for a
(15) restructuring is to do a standalone restructuring as
(16) opposed to a sale?
(17)       MR. SILBERGLIED:  Wait.  Are you
(18) asking this hypothetically or in this case?
(19)       MR. BASKIN:  I am asking the way I
(20) asked it.
(21) BY MR. BASKIN:
(22) Q.    Are you aware that creditor groups in
(23) Chapter 11 proceedings and CCAA proceedings are aware
(24) that standalone restructurings are a possible course
(25) they can follow?

Page 127

(2) A.    As just a general matter in any case?
(3) Q.    Yes.
(4) A.    Yes.
(5) Q.    And, in fact, back in 2002 I think you
(6) told us in your report that that was often the course
(7) that was being followed, including in the telecom
(8) world; correct?
(9) A.    There were a number of situations.
(10) Generally larger companies, companies that had core
(11) businesses that could actually be cut back to that
(12) produced profits and stable operations or fairly large
(13) companies, it was often pursued as a standalone
(14) restructuring.
(15) Q.    And presumably, any experienced
(16) advisor or participant in the bankruptcy world would
(17) have appreciated that back in 2002, would they not?
(18) A.    If they were experienced in what was
(19) going on, they would have generally known what was
(20) happening in other cases probably, yes.
(21) Q.    Now, assuming that the May 14 plan was
(22) made available and was being used by the participants
(23) in the Chapter 11 in this case and in the CCAA
(24) proceeding, did anything prevent the participants in
(25) those proceedings from doing a standalone

Page 128

(2) reorganization if they wished to do so?
(3) A.    Yes.
(4) Q.    What stopped them from doing a
(5) standalone reorganization?
(6) A.    Well, first of all, in order to get to
(7) this, there is a transition.  And this plan just
(8) starts at fourth quarter '02.  And it doesn't go
(9) through the cash required to get to fourth quarter
(10) '02, and it doesn't go through the transition costs to
(11) get there.
(12)       And secondly, the DIP provided when it
(13) was issued that they had to go forward with a sale or
(14) they had to complete a standalone and file it by, I
(15) think, the middle of June.  Well, you just can't do
(16) that in a multi-jurisdictional bankruptcy.
(17)       So basically, they were put down a
(18) course of action while this plan was still being
(19) completed, and there wasn't the opportunity to change
(20) that course of action is what it looks like.  They
(21) were going full-scale ahead down just the sale of the
(22) company because of the lack of cash.
(23) Q.    And did any participant in the
(24) bankruptcy suggest to either the Canadian court or the
(25) U.S. court that what you just said was true?

Page 129

(1)
(2)    A.    I don't know.
(3)    Q.    Did any participant in the bankruptcy
(4) in either the United States or Canada suggest in any
(5) way that their hands were constrained from doing a
(6) standalone reorganization if they wanted to do so?
(7)    A.    Well, what I saw was multiple
(8) statements to the effect of we are running out of cash
(9) so rapidly, we have no choice but to sell the company.
(10) And our DIP provides that we have to sell the company.
(11) And basically, all they were comparing it to was a
(12) liquidation analysis. We have no choice but to sell
(13) the company or liquidate because of the cash
(14) constraints.
(15)    Q.    And what time period are you talking
(16) about now, ma'am?
(17)    A.    This would have been late April and
(18) May, maybe up through early June, but I have to look
(19) at which monitor's report. I remember the second
(20) monitor's report in particular talking about that.
(21)    Q.    And during what period of time was the
(22) sale process being undertaken in this matter?
(23)    A.    The sale process actually began before
(24) the funding was cut off, so it began sometime in the
(25) middle of April, from what I can tell from the

Page 130

(1)
(2) documents. And the sales process was proceeding in
(3) earnest before this was even finished through May,
(4) June, and into July, and the final documents were
(5) signed in September.
(6)    Q.    And at any time during all those
(7) months did anyone contemporaneously suggest to either
(8) court that they were constrained from doing a
(9) standalone restructuring in lieu of the sale, if that
(10) was chosen, if that was the preferred course?
(11)    A.    All I saw was the suggestion that we
(12) don't have enough cash to do anything but sell.
(13)    Q.    Now, is it an important part of the
(14) opinion that you are going to be giving in this case
(15) during the course of your testimony that the sale
(16) undertaken here was a fire sale?
(17)    A.    Yes.
(18)    Q.    And is it an important part of your
(19) opinion that you are going to be giving in this case
(20) that Teleglobe and Lazard did not conduct an orderly
(21) sale process?
(22)    A.    Orderly doesn't mean it is not a fire
(23) sale and distressed.
(24)    Q.    Let me ask again. Is it an important
(25) part of your opinion that Teleglobe and Lazard did not

Page 131

(1)
(2) conduct an orderly sales process?
(3)    A.    Under the circumstances in which they
(4) were given to conduct the sale, it appears they
(5) followed a rapid, orderly process.
(6)    Q.    And is it an important part of your
(7) opinion that you are going to be testifying to at
(8) trial that the sale here yielded less than the highest
(9) and best value for the core telecom assets?
(10)    A.    It depends what you mean highest and
(11) best value. It did not yield fair market value. It
(12) yielded a liquidation value, the highest liquidation
(13) value you could get from its distressed sales process
(14) at this time.
(15)    Q.    And is it an important part of your
(16) position that you are going to be reciting at trial
(17) that the sale yielded less than fair market value for
(18) the assets?
(19)    A.    Yes, I believe it did.
(20)    Q.    And that is an important part of your
(21) position?
(22)    A.    A key element of fair market value is
(23) the seller not being under a compulsion to sell. I
(24) haven't seen any clearer of a case of a seller being
(25) under a compulsion to sell. So the pure definition of

Page 132

(1)
(2) fair market value was not met in this case. The
(3) definition that was met was essentially a liquidation
(4) value of the assets.
(5)    Q.    And so it is an important part of your
(6) position that you will testify to at trial that the
(7) sale did not yield fair market value; correct?
(8)    A.    It did not yield all the elements of
(9) fair market value. That's correct.
(10)    Q.    And is it an important part of your
(11) position at trial that the DIP financing that was
(12) provided by BCE was not sufficient to conduct an
(13) orderly reorganization and restructuring?
(14)        MR. SILBERGLIED: Objection to form.
(15)        THE WITNESS: The DIP financing did
(16) not allow for sufficient time to do anything other
(17) than conduct a rapid distressed sale process.
(18) BY MR. BASKIN:
(19)    Q.    Now, under the hypothetical Taylor
(20) reorganization that you propose, was there a buyer for
(21) the new equity that would have been issued?
(22)    A.    What do you mean a buyer? You don't
(23) need a buyer necessarily.
(24)    Q.    Well, in this case I take it your
(25) proposal is that you are going -- is that the

Page 133

(1)
(2)   creditors – strike that.
(3)       MR. BASKIN:  Let me hand you what we
(4)   will mark as Exhibit 7.
(5)       (C. Taylor Deposition Exhibit No. 7
(6)   was marked for identification.)
(7)   BY MR. BASKIN:
(8)    Q.    Have you seen Exhibit 7 prior to
(9)   today?
(10)   A.    I read a document entitled "Second
(11)  Report of the Monitor." I don't know if it is the
(12)  same format as this, but it probably is.
(13)   Q.    Now, can you identify this as a report
(14)  that the monitor submitted to the Ontario Superior
(15)  Court of Justice on or about June 3, 2002?
(16)       MR. SILBERGLIED:  Objection to form.
(17)       THE WITNESS:  I mean, you are just
(18)  reading the title. I don't know anything more than
(19)  what it says.
(20)  BY MR. BASKIN:
(21)   Q.    Now, if you turn to page 5, there is a
(22)  discussion in the middle of page 5 where the monitor
(23)  sets forth the efforts he plans to undertake to
(24)  provide due diligence to the various creditor groups.
(25)  Do you see that?

Page 134

(1)
(2)    A.    No.  Where are you referring to, sir?
(3)    Q.    It reads, "Teleglobe and its advisors
(4)   have met with the financial and legal advisors to an
(5)   ad hoc committee of its bondholders and its
(6)   $1.2 billion bank syndicate on a regular basis since
(7)   April 24, 2002 to provide an analysis of the
(8)   situation, an assessment of strategic alternatives,
(9)   the current liquidity position and Teleglobe's
(10)  recommended course of action."
(11)       And then it says, "Opportunities for
(12)  each of these groups to conduct due diligence on the
(13)  information and analyses have been arranged."
(14)       And it goes on to say, "Significant
(15)  due diligence has been undertaken and continues."
(16)       Do you see all that?
(17)   A.    Yes.
(18)   Q.    Is that typical, in your experience,
(19)  in a bankruptcy and CCAA proceeding?
(20)       MR. SILBERGLIED:  Objection to form.
(21)       THE WITNESS:  It so totally depends on
(22)  the case.
(23)  BY MR. BASKIN:
(24)   Q.    Well, do you have reason to doubt that
(25)  in this case the various creditor groups, including

Page 135

(1)
(2)   the bondholders and the bank syndicate groups, were
(3)   being provided the opportunity to conduct due
(4)   diligence of the assets to help choose a course, a
(5)   strategic direction?
(6)    A.    I assume they are being given the
(7)   opportunity to review the information that is
(8)   available. I mean, as creditors -- and in my role, we
(9)   represent creditors -- you are basically pretty
(10)  limited to what the debtor has available to review.
(11)   Q.    And is it your testimony that in this
(12)  case the information that was being given to
(13)  creditor group was limited?
(14)   A.    It does appear that way.  This case is
(15)  one of those cases that is a sort of crisis meltdown,
(16)  we are running out of cash kind of cases, and they
(17)  take on a very different form than cases where there
(18)  is more thoughtful time to consider the best and
(19)  highest outcome.
(20)   Q.    Now, during the course of your review
(21)  in preparing your report, did any member of any
(22)  creditor group complain to either court that they were
(23)  not being provided suitable information and timely due
(24)  diligence?
(25)       MR. SILBERGLIED:  Objection to form.

Page 136

(1)
(2)       THE WITNESS:  I don't know.
(3)  BY MR. BASKIN:
(4)    Q.    By you don't know, I assume you mean
(5)   that you are not aware of any such complaint by any
(6)   creditor group; is that correct?
(7)    A.    Well, I am aware of this lawsuit,
(8)   which is by the creditors and the estate.
(9)    Q.    Apart from this lawsuit, which we will
(10)  get to in a second, in terms of what was
(11)  contemporaneously being told to the judge in Delaware
(12)  or to the judge in Ontario, Canada, are you aware of
(13)  even one instance where any creditor group complained
(14)  that they were not being afforded adequate due
(15)  diligence and adequate information?
(16)       MR. SILBERGLIED:  Objection;
(17)  foundation.
(18)       THE WITNESS:  I don't know what was
(19)  told to the court. I do know from my initial
(20)  conversation with Mr. Wolinski, who was going to be
(21)  representing the banks, that his clients were told the
(22)  thing was crashing from a cash standpoint, and he was,
(23)  you know, in a rush trying to figure out what I could
(24)  help him understand about the industry; that his
(25)  clients were extremely unhappy about the rapidity with

Page 137

(1)
(2)  which the thing was melting down. But that's the last
(3)  time I had any information like that.
(4)  BY MR. BASKIN:
(5)      Q.    Let me ask my question again.
(6)            During the course of your review in
(7)  preparing your report, did any member of any creditor
(8)  group complain to either court that they were not
(9)  being provided with suitable information and timely
(10) due diligence?
(11)           MR. SILBERGLIED:  Objection;
(12) foundation and form.
(13)           THE WITNESS:  I don't know what
(14) creditor groups told the court.
(15) BY MR. BASKIN:
(16)     Q.    I take it either court; correct?
(17)     A.    I don't know.
(18)     Q.    Now --
(19)     A.    Except what they said in this lawsuit.
(20)     Q.    In connection with --
(21)     A.    Can I just say what they have said in
(22) this lawsuit does, in fact, complain about significant
(23) lack of information.
(24)     Q.    Now, let me show you next -- let me
(25) ask you this. Back in 2002, based on your review of

Page 138

(1)
(2)  the bankruptcy and CCAA materials such as you did, did
(3)  any participant in either the bankruptcy or the CCAA
(4)  express the view that they favored a standalone
(5)  restructuring rather than the sale of the core
(6)  business?
(7)      A.    I don't know. The way this went down,
(8)  it doesn't seem like such a choice was even offered by
(9)  the debtor and BCE before then. I mean, BCE drove it
(10) to the edge of the cliff and then said here is the
(11) keys, and by the way, you really don't have any cash
(12) to do anything but sell. And Lazard said it would
(13) take longer to sell than it actually did, so they
(14) conducted a very rapid process.
(15)     Q.    Let me ask my question again. Back in
(16) 2002, based on your review, as much as you did, of the
(17) bankruptcy and CCAA proceedings, was there even one
(18) participant in those proceedings that expressed the
(19) view that he or she favored a standalone restructuring
(20) rather than a sale of the core business?
(21)     A.    I don't know.
(22)     Q.    Now, do you know whether any creditor,
(23) be it a bank or a bondholder, contemporaneously
(24) expressed the view back in 2002 that creditor
(25) favored a standalone restructuring rather than a sale

Page 139

(1)
(2)  of the core business?
(3)      A.    Who? A creditor? I don't know.
(4)      Q.    Do you know whether the monitor back
(5)  in 2002 ever expressed the view at any time, in any
(6)  way, to any court that he favored a standalone
(7)  restructuring as opposed to a sale of the core
(8)  business?
(9)      A.    Well, the monitor expressed the view,
(10) and it was very much predicated on key facts, and
(11) those key facts as laid out by the monitor were the
(12) thing is burning a lot of cash. We only have enough
(13) cash for a few weeks. We have a DIP facility which
(14) only allows us to do a couple of things. And we only
(15) have time and cash available. And given those
(16) constraints, the only real choice for us is either to
(17) sell hopefully within the timeframe and the cash
(18) available or liquidate. And selling is preferable to
(19) liquidating.
(20)           So basically, the way the predicates
(21) were set up, the monitor made the choice within the
(22) box that it had. And so within that box, time and
(23) even analysis to do a restructuring was not allowed
(24) for and was not done.
(25)     Q.    Now, did either Mr. Babcock or anyone

Page 140

(1)
(2)  else from E&Y ever express the position that you just
(3)  asserted in your last answer?
(4)      A.    It is in their -- it is in their
(5)  reports.
(6)      Q.    You read their reports as suggesting
(7)  that the monitor or E&Y took the position that they
(8)  thought an out-of-court restructuring would be
(9)  preferential to a sale?
(10)     A.    No. I read what I just said. And you
(11) are not repeating back what I said. They laid out a
(12) series of facts and then said based upon all of these
(13) facts, these are the choices that are available to us.
(14)     Q.    And my question was: Did either of
(15) them ever say to either court, did Mr. Babcock or did
(16) E&Y itself ever suggest first to the court in Canada
(17) that it would have wanted to do a standalone
(18) restructuring rather than a sale of the core business?
(19)     A.    I don't know if they did or not. All
(20) I saw was what they said in their reports, laying out
(21) the series of facts and the options which flowed
(22) from those series of facts and their recommendation as
(23) to which option to follow.
(24)     Q.    Did any advisor, financial advisor to
(25) any party in the bankruptcy ever express the view

## Page 141

(1)
(2) contemporaneously in 2002 that that advisor was in
(3) favor of doing a standalone restructuring rather than
(4) a sale of the core business?
(5)     A.    I don't know.
(6)     Q.    Did the monitor back in 2002 ever
(7) express the view that the DIP financing was not
(8) satisfactory to achieve a suitable reorganization?
(9)         MR. SILBERGLIED: Object to form.
(10)        THE WITNESS: I don't know. They
(11) expressed the view of what the DIP provided for and
(12) took that as a basis of fact on what was available to
(13) them.
(14) BY MR. BASKIN:
(15)    Q.    Did the monitor in any way, shape or
(16) form ever suggest to the CCAA court that he was
(17) critical of the DIP financing?
(18)    A.    I don't know. I mean, the monitors
(19) was hired by BCE, who was the DIP financer, so I
(20) didn't see --
(21)    Q.    Did the monitor --
(22)    A.    I don't know if they expressed that
(23) view.
(24)    Q.    Did the monitor ever express the view
(25) to the court in this district, Bankruptcy Court, that

## Page 142

(1)
(2) the monitor was critical of the DIP financing?
(3)     A.    I don't know.
(4)     Q.    Did any creditor ever express the view
(5) to the judge in Canada that the creditor disapproved
(6) of the DIP financing?
(7)         MR. SILBERGLIED: Objection;
(8) foundation.
(9)         THE WITNESS: I don't know except in
(10) the context of the creditors expressing extreme
(11) dissatisfaction with the way this was handled in the
(12) context of this lawsuit and other lawsuits in Canada.
(13) BY MR. BASKIN:
(14)    Q.    Did any creditor contemporaneously in
(15) 2002 ever express the view in the District Court of
(16) Delaware, the Bankruptcy Court, that a creditor was
(17) dissatisfied with the DIP financing?
(18)        MR. SILBERGLIED: Objection;
(19) foundation.
(20)        THE WITNESS: Again, I don't know.
(21) There are these two lawsuits which are expressing --
(22) there is this lawsuit and the Canadian lawsuit which
(23) are expressing extreme dissatisfaction. I don't know
(24) what they told the court.
(25)

## Page 143

(1)
(2) BY MR. BASKIN:
(3)     Q.    In fact, before you wrote your report,
(4) did you make the conscious decision not to read the
(5) monitor's reports?
(6)     A.    No.
(7)     Q.    Did you make the conscious decision
(8) not to read what submissions, what affidavits were
(9) submitted to the bankruptcy judge in this judicial
(10) district?
(11)    A.    No.
(12)    Q.    Now, did you just run out of time
(13) prior to issuance of your first report to read the
(14) monitor's reports?
(15)    A.    As I told you, I had Ms. Wood read the
(16) monitor's reports. We were reviewing tons of
(17) documents and doing a lot of analysis.
(18)    Q.    Did you decide prior to the issuance
(19) of your report that Ms. Wood should read the documents
(20) submitted to the bankruptcy judge in this courthouse --
(21)    A.    Which documents are you referring to?
(22)    Q.    Affidavits submitted to the bankruptcy
(23) judge in this courthouse by the debtors and others.
(24) Did you ask Ms. Wood to read any of that?
(25)    A.    No. We were primarily focused on what

## Page 144

(1)
(2) happened from basically November of '01 through sort
(3) of the filing of the bankruptcy and to a lesser extent
(4) what happened after that.
(5)     Q.    So you thought for purposes of your
(6) report it was not necessary for you to know what
(7) representations were being made to the monitor in
(8) Canada regarding the reorganization proceeding?
(9)     A.    Were being made to the monitor?
(10)    Q.    Strike that. You thought it was
(11) unnecessary for purposes of your report to inquire
(12) into what representations were being made to the judge
(13) in Canada regarding the CCAA proceeding?
(14)    A.    I had discussions with counsel about
(15) generally what happened, so I understood the story and
(16) so forth. But the focus of my work in trying to
(17) decide whether it was feasible or wasn't feasible and
(18) what the numbers were was really focused on what
(19) happened up to the decision with BCE and what happened
(20) from that standpoint on in looking for a business plan
(21) as to whether that was a feasible restructuring.
(22)    Q.    So I take it your answer is seeking to
(23) communicate that you thought it was unnecessary for
(24) you to inquire into the representations that were
(25) being made to the judge in the CCAA proceeding?

BSA                                                                              XMAX(37/37)

---

Page 145

(1)
(2) A.    No, not -- I didn't say that.  I said
(3) where I was focusing my attention.  I did have
(4) discussions about what had occurred after, but we --
(5) and Ms. Wood reviewed those monitor's reports, but we
(6) were focused primarily on what happened up through
(7) sort of April and mid-May.
(8) Q.    And the same thing, I take it, in
(9) connection with the bankruptcy proceeding in this
(10) courthouse.  Did you make the determination that it
(11) was not necessary for your report to know what
(12) representations were being made to the bankruptcy
(13) judge in this judicial district?
(14) A.    I have a general understanding, but we
(15) were not focused on that.  We were focused on -- I
(16) mean, once it became clear that the path had been set
(17) towards a sale effectively in early April and that is
(18) effectively what happened, and that the DIP provided
(19) for such a sale, at that point, you know, a further
(20) investigation was more just background as opposed to
(21) necessary for my opinion.
(22) Q.    So you actually thought about it and
(23) decided you did not have to review what was being said
(24) to the judge in this courthouse?
(25) A.    No.  I had a general understanding of

---

Page 146

(1)
(2) what was being said, but I looked at what happened and
(3) understood what had happened and made my
(4) determinations as to where to focus our analysis based
(5) on that.
(6) Q.    How did you develop your general
(7) understanding what representations were being made to
(8) the bankruptcy judge in this judicial district?
(9)        MR. SILBERGLIED:  Objection to form.
(10)        THE WITNESS:  Well, I have reviewed
(11) the monitor's reports in preparation for today.  But
(12) my general understanding is the sales process, we had
(13) discussions with counsel.  We had discussions with
(14) individuals from Teleglobe.  And I reviewed the
(15) documents regarding the sales process.
(16) BY MR. BASKIN:
(17) Q.    And based on your review of the
(18) documents regarding the sales process, that's how you
(19) came to the conclusion that this was a fire sale;
(20) correct?
(21) A.    Well, a whole series of things led to
(22) that conclusion, which are discussed in the last half
(23) or the last section, next to the last section of my
(24) report.  Let's see.  Section 10.
(25) Q.    Now, is one of your factors in saying

---

Page 147

(1)
(2) this was a fire sale your view that an insufficient
(3) sale process was undertaken?
(4) A.    It depends what you mean by
(5) "insufficient."  In terms of number of people
(6) contacted?  Not necessarily insufficient.  In terms of
(7) the way they were contacted, the context in which they
(8) were contacted, and the environment in the market at
(9) the time made it a fire sale.
(10) Q.    Well, my question was:  Are you of the
(11) view that an insufficient sales process was undertaken
(12) by the debtors back in 2002?
(13) A.    I think I just answered that.  There
(14) are pieces of it that make it a liquidation.  It was
(15) effectively sold to a distressed financial buyer,
(16) despite the fact that Lazard had recommended, and I
(17) think rightfully so, that the best buyer for this was
(18) a strategic buyer.  And they had clearly identified
(19) that this was not an ideal time to sell this company.
(20) They did that in one of their early reports.
(21)        MR. BASKIN:  Let me show you what we
(22) will mark as Exhibit 8.
(23)        (C. Taylor Deposition Exhibit No. 8
(24) was marked for identification.)
(25)

---

Page 148

(1)
(2) BY MR. BASKIN:
(3) Q.    Can you identify Exhibit 8 as
(4) consisting of the 11th report of the monitor dated
(5) September 19, 2002?
(6) A.    That's what it says.
(7) Q.    And this is actually one of the
(8) reports that you did read subsequent to the issuance
(9) of your report; correct?
(10) A.    I have read this document, yes.
(11) Q.    Now, if you turn to page 8 of Exhibit
(12) 8, you will see that there is a section referred to as
(13) the marketing process, Ms. Taylor?
(14) A.    Yes.
(15) Q.    And you see that the monitor is
(16) reporting to the judge in Canada the steps that were
(17) undertaken with respect to trying to market the
(18) assets; correct?
(19) A.    Yes.
(20) Q.    Now, he points out, for example, that
(21) the monitor and the applicant – do you know who the
(22) applicant was?
(23) A.    I am not sure of the terminology.  Is
(24) that the company?  Let's see.  Collectively.  Yes.
(25) That's Teleglobe, Inc.

---

Page 149

(1)
(2)     Q.      Are you aware that the debtors in this
(3)  case were among the applicants in Canada in connection
(4)  with this proceeding?
(5)             MR. SILBERGLIED: Objection to form.
(6)             THE WITNESS: I don't know the legal
(7)  entities as between the U.S. and Canada very well.
(8)  BY MR. BASKIN:
(9)     Q.      Now, in the course of filing this
(10) report with the judge in Canada, first of all, the
(11) monitor references the approved bidding procedure and
(12) the transaction process. Do you see that?
(13)    A.      Yes.
(14)    Q.      Do you have any idea what those were?
(15)    A.      Yes, I think I have seen something
(16) like that.
(17)    Q.      Well, the something like that that you
(18) saw, were you aware that the procedures on how to sell
(19) the business were set forth and approved in advance by
(20) two judges?
(21)    A.      Yes.
(22)    Q.      Now, the monitor reports in this
(23) application to the Canadian judge that 69 qualified
(24) potential purchasers were contacted, including 29
(25) strategic investors and 40 financial investors. Do

Page 150

(1)
(2)  you see that?
(3)    A.      Yes.
(4)    Q.      In your view, is that a sufficient
(5)  canvass of the market of potential purchasers?
(6)    A.      Probably, yes. But that doesn't make
(7)  this -- I mean, again, we come back to what I relied
(8)  on. Even Lazard in its report didn't recommend
(9)  selling this company in the environment. It is not
(10) the number that is important. It is the environment
(11) into which it was done and the circumstances of the
(12) seller under which it was done.
(13)    Q.      We will get to that in a second. Now,
(14) but I take it that you do not plan to testify to Judge
(15) Robinson that sending out -- that eliciting -- strike
(16) that.
(17)            I take it you do not intend to tell
(18) the judge that contacting 69 qualified potential
(19) purchasers, including 29 strategic and 40 financial
(20) investors, was in any way an unsatisfactory process;
(21) correct?
(22)    A.      From a number of people contacted?
(23) No. I have no idea -- I mean, the best buyer of any
(24) telecom company is a strategic buyer, based on their
(25) ability to get synergies. They are going to pay and

Page 151

(1)
(2)  derive much more value from it. So the fact that less
(3)  strategic buyers were contacted than financial buyers
(4)  right off tells you the nature of the process. But 69
(5)  is a lot.
(6)    Q.      Do you plan to tell the judge that 29
(7)  strategic investors is not a sufficient market check?
(8)    A.      It is not about a market check. It is
(9)  the position the best buyers -- you know, whether any
(10) decent buyers are in a position to actually purchase
(11) this during the worst part of the telecom meltdown.
(12)    Q.      Do you plan to tell the judge that 29
(13) strategic investors was not a sufficient market check?
(14)            MR. SILBERGLIED: Objection to form.
(15)            THE WITNESS: Given that I don't know
(16) who is in the 29, I couldn't say unequivocally. It
(17) needs to be -- assuming that all the good possible
(18) strategic partners for this company are in the 29, 29
(19) is sufficient.
(20) BY MR. BASKIN:
(21)    Q.      And I take it as you sit here now you
(22) have no reason to believe that the monitor and the
(23) debtors and Lazard contacted the wrong strategic
(24) investors, do you?
(25)    A.      I don't.

Page 152

(1)
(2)    Q.      Now, apparently in the next paragraph
(3)  the monitor reported to the judge that 37 of
(4)  the 69 potential purchasers signed nondisclosure
(5)  agreements and continued on with the process to
(6)  receive confidential information. Do you see that?
(7)    A.      Yes.
(8)    Q.      In your view, do you plan to tell the
(9)  judge that 37 participants with respect to the
(10) confidential part of the sales process was an
(11) insufficient market check?
(12)            MR. SILBERGLIED: Objection to form.
(13)            THE WITNESS: Just about everybody who
(14) is interested from a strategic standpoint is always
(15) going to sign an NDA to get information. That is not
(16) necessarily an indication of whether those are good
(17) buyers or ability to pay, ability to buy.
(18) BY MR. BASKIN:
(19)    Q.      Now, does that mean you plan to tell
(20) the judge that the 37 participants with respect to the
(21) confidential part of the sales process was not
(22) sufficient?
(23)    A.      No.
(24)    Q.      Now, do you have any idea who these 37
(25) potential purchasers were?

Page 153

(2)  A.    I have not seen that information.
(3)  Q.    Before you wrote your report, did you
(4)  inquire just whether these 37 potential purchasers
(5)  were the wrong set of potential purchasers?
(6)  A.    I have tried to find information on
(7)  exactly who the final bidders were.  All the
(8)  information that I have got appears to protect their
(9)  confidentiality, with the exception of Cerberus, who
(10) was the final bidder.
(11) Q.    Now, in your report you tell the judge
(12) on pages 53 and 54 of your report that the sales
(13) process moved at an extremely fast pace, and then you
(14) proceed in the course of the bottom of 53 and the top
(15) of 54 to set forth what was done in March or April.
(16) Do you see that?
(17) A.    Yes.
(18) Q.    Did you make -- strike that.  Were you
(19) trying to communicate to the Court by that passage in
(20) your report that the sales process was conducted in
(21) April 2002?
(22) A.    It certainly appears that it was
(23) started then and some of the best strategic buyers
(24) were contacted then before any materials were even
(25) available.

Page 154

(2)  Q.    And I think you said before that you
(3)  are aware, are you not, that the process extended
(4)  through May?  Did it not?
(5)  A.    Into May, yes.
(6)  Q.    And it extended into June, did it not?
(7)  A.    Yes.
(8)  Q.    And it extended into July, did it not?
(9)  A.    Yes.
(10) Q.    And it extended into August, did it
(11) not?
(12) A.    I think the final negotiations with
(13) bidders only extended then.
(14) Q.    And do you intend to tell the judge as
(15) part of your testimony that a process that extended
(16) for five months was an insufficient sales process?
(17) A.    It is not the timing only.  First of
(18) all, it is the way in which it was started.  Even
(19) Mr. Millstein testified that you should reasonably
(20) allow for nine months.  And his first couple reports,
(21) the ones that dealt with the sales process,
(22) recommended -- and this is the main issue --
(23) recommended not selling because the environment was so
(24) distressed that the best strategic buyers who had the
(25) potential to get the most value out of it were

Page 155

(2)  themselves in restructuring processes or distressed
(3)  and not in a position to buy at this time period.
(4)  That's the main issue.
(5)        The second issue is the compulsion to
(6)  sell.  We sort of had -- we are going down a path of
(7)  we are running out of cash and we have to sell.  That
(8)  creates a different environment as well.
(9)        Another issue is what we discuss here
(10) about them contacting buyers before they really even
(11) had a process.
(12)       And then the time line that was set
(13) out very early was an extremely rapid process.  It
(14) seems like they did extend it later.  But in the end,
(15) they didn't sell to a strategic buyer.  They couldn't
(16) get anybody to come to the table except a
(17) distressed -- a financial buyer who buys distressed
(18) companies.
(19) Q.    Now, to go back to my question then,
(20) do you intend to tell the judge as part of your
(21) testimony that a process that extended for five months
(22) was an insufficient sales process?
(23)       MR. SILBERGLIED:  Objection; asked and
(24) answered.
(25)       THE WITNESS:  I intend to tell the

Page 156

(2)  judge that the totality of the sales process created a
(3)  liquidation value.
(4)  BY MR. BASKIN:
(5)  Q.    And do you intend to tell the judge
(6)  that the part of that process that extended it out for
(7)  five months was an insufficient sales process?
(8)        MR. SILBERGLIED:  Objection; asked and
(9)  answered.
(10)       THE WITNESS:  The timing in which it
(11) occurred was insufficient to attract a reasonable
(12) value.
(13) BY MR. BASKIN:
(14) Q.    And does that mean that yes or no,
(15) that you intend to tell the judge that five months was
(16) not a sufficient sales process, or do you intend to
(17) tell the judge it was a sufficient sales process?
(18)       MR. SILBERGLIED:  Objection; asked and
(19) answered.
(20)       THE WITNESS:  Again, the five months
(21) in particular you can't consider by itself.  You have
(22) to consider the environment in which that five months
(23) occurred.
(24) BY MR. BASKIN:
(25) Q.    Now, in the course of preparing your

Page 157

(1)
(2) report or anything you have read since, did any
(3) representative of either the Canadian debtor or the
(4) U.S. debtors communicate to either court back in 2002
(5) that the sales process was being inappropriately
(6) rushed?
(7)     A.    **I don't know.**
(8)     Q.    In the course of preparing your report
(9) and preparing for this deposition was there any
(10) creditor group back in 2002 that was expressing the
(11) view contemporaneously at the time that the sales
(12) process was being inappropriately rushed?
(13)     A.    **I mean, Lazard's reports say that a**
(14) **sales process in this environment is not going to lead**
(15) **to material proceeds and that it is a bad time to**
(16) **sell. But those reports preceded the start of the**
(17) **sales process, almost immediately preceded by a week**
(18) **or so.**
(19)     Q.    My question was: In the course of
(20) preparing your report and preparing for this
(21) deposition, was there any creditor group
(22) contemporaneously back in 2002 that was expressing the
(23) view at the time that the sales process was being
(24) rushed?
(25)     A.    **Expressing to anybody or to who?**

Page 158

(1)
(2)     Q.    To the courts, either court.
(3)     A.    **I don't know.**
(4)     Q.    In the course -- I think you told us
(5) before that in your view -- well, strike that.
(6) Maybe -- I don't want to mischaracterize what you said
(7) before.
(8)     Is it your view that the sales process
(9) as structured achieved the highest and best offer for
(10) this company, for these assets back in 2002?
(11)     A.    **It is my view that -- I mean, I don't**
(12) **have all the details on the sales process. I have**
(13) **some details. I couldn't reach an opinion necessarily**
(14) **that it didn't result in the highest possible value.**
(15) **Of the people that were contacted at**
(16) **the time under the circumstances that it was**
(17) **conducted, meaning given that you are conducting a**
(18) **forced march to a sale, running out of cash, in the**
(19) **absolute depth of the telecom meltdown, it is likely**
(20) **they probably negotiated for the best value they could**
(21) **get? Given the way Lazard auctions companies,**
(22) **probably yes under the circumstances.**
(23)     Q.    Now, if you turn to page 33 of
(24) Exhibit 8, do you see there is a section there
(25) entitled "Sale of the Core Telecom Business"?

Page 159

(1)
(2)     A.    **Okay.**
(3)     Q.    And you will see that the monitor and
(4) the applicants, which included the subsidiaries of
(5) Teleglobe, such as the plaintiffs, communicated to the
(6) CCAA judge first that there was a process whereby
(7) Teleglobe, the monitor and its advisors communicated
(8) with the major stakeholders in the proceedings, and
(9) then in the next paragraph he writes, "For the reasons
(10) outlined in this Report, the Monitor believes that the
(11) Purchase Agreement represents the highest and best
(12) offer for the Core Telecom Business. The Monitor has
(13) compared the sale price achieved to the trading
(14) benchmarks for comparable public companies and to the
(15) valuation of recently completed restructuring
(16) proceedings. The estimated Final Purchase Price
(17) compares positively to these benchmarks." Do you see
(18) that, ma'am?
(19)     A.    **I do.**
(20)     Q.    And do you see the monitor then
(21) proceeds, in addition, along with the applicants, in a
(22) footnote to explain what he means by highest and best
(23) offer?
(24)     Is it your view that in making this
(25) representation to the CCAA court the monitor got it

Page 160

(1)
(2) wrong back in 2002?
(3)     A.    **Well, I think I said earlier, I**
(4) **wouldn't -- I don't have any information to question**
(5) **whether it is the highest and best offer given the**
(6) **sales process and the forced march to a sale.**
(7) **I do not understand the bases for the**
(8) **next two sentences, in terms of being comparable to**
(9) **trading benchmarks and estimated purchase price. I**
(10) **have seen no such analysis. I would comment that, you**
(11) **know, the trailing EBITDA of the voice-only business**
(12) **was reported by the company in '01 at 121 million of**
(13) **EBITDA, so you essentially sold it for one times**
(14) **EBITDA, which is an extremely distressed price. So I**
(15) **don't know what they were referring to.**
(16) **There were a lot of distressed sales**
(17) **at the time, and I don't know how familiar the monitor**
(18) **is with telecom valuations. I actually read some**
(19) **testimony of Mr. Babcock, and his primary experience**
(20) **seemed to be outside of this industry. So I don't**
(21) **know what he was comparing to or whether those were**
(22) **reasonable things for him to be comparing to.**
(23) **I don't necessarily question that it**
(24) **was the highest and best offer from the process that**
(25) **was conducted.**

Page 161

(1)

(2)     Q.     But as I understand it, you are saying
(3)  that you take issue with the representations that the
(4)  monitor, Teleglobe and the Teleglobe subsidiaries were
(5)  making to the Canadian bankruptcy judge with respect
(6)  to the second and third sentence of the full
(7)  paragraph, the last full paragraph on page 33; is that
(8)  correct?
(9)          MR. SILBERGLIED:  Objection to form.
(10)         THE WITNESS:  Potentially.
(11)  Potentially.  I don't have access to their
(12)  information.  And I would say based on my own
(13)  experience in the industry, this is extremely low.
(14) BY MR. BASKIN:
(15)     Q.     Assuming that the monitor and the
(16)  debtor in Canada and the plaintiffs in this case, the
(17)  debtors here, had a good-faith basis to make this
(18)  representation to the Canadian bankruptcy judge back
(19)  in 2002, is it your view still that the process that
(20)  was being followed was not a suitable one back in
(21)  2002?
(22)     A.     Well, you just asked a multi-faceted
(23)  question.  The process that was being followed, the
(24)  taking off down that path is what I have a problem
(25)  with.  And basically BCE put it on that path.  BCE

Page 162

(1)

(2)  controlled it.  Then people acted within that box.
(3)          I am not saying they acted
(4)  unreasonably necessarily.  That was outside of what I
(5)  was asked to really do.  I am not saying that they
(6)  didn't get a highest and best offer from the auction
(7)  process in a horrible environment to be selling this
(8)  company.  They conducted a best -- I can see a
(9)  reasonable process into a horrible environment for
(10)  selling this company.
(11)          They got a value from a distressed
(12)  financial buyer.  They didn't get a strategic buyer.
(13)  They didn't get someone who could get synergies.  They
(14)  got a bottom-fishing, very smart buyer who buys at the
(15)  bottom of the market.
(16)     Q.     Well, my question was:  Assuming that
(17)  the parties back in 2002, before there was any
(18)  litigation, had a good-faith basis to represent to the
(19)  court as they did on page 33 of Taylor Exhibit 8, will
(20)  you be -- are you still of the view that back in 2002
(21)  the monitors and the debtors did not achieve a
(22)  suitable price for the assets that were being sold?
(23)          MR. SILBERGLIED:  Objection to form.
(24)          THE WITNESS:  Well.  I mean, you keep
(25)  changing the phraseology.  What does "suitable" mean?

Page 163

(1)

(2)  You sold it in a march to an auction sale, and I do --
(3)  I hadn't been asked to form an opinion on this, but
(4)  you asked me my opinion.  And I am not necessarily
(5)  quibbling that they got the highest and best offer
(6)  from the auction process that they did.
(7)          I don't understand necessarily and I
(8)  have not seen analysis that supports these other two
(9)  sentences.  The value that was obtained was extremely
(10)  low.
(11)          Now, there were plenty of other
(12)  distressed sales of companies at this time, much of
(13)  them much smaller companies.  So if the monitor was
(14)  looking at those and if you are looking at other
(15)  crisis meltdown situations, hey, we got all sorts of
(16)  horrible results in the telecom industry.
(17)          But most larger companies with
(18)  reasonable core businesses didn't march to a fire
(19)  sale, didn't do this.  So I don't know how they got
(20)  reasonable companies to compare this to.
(21)          MR. BASKIN:  Now, let me show you in
(22)  addition what we will mark as Exhibit 9.
(23)          (C. Taylor Deposition Exhibit No. 9
(24)  was marked for identification.)
(25)

Page 164

(1)

(2) BY MR. BASKIN:
(3)     Q.     Have you seen Exhibit 9 prior to
(4)  today, Ms. Taylor?
(5)     A.     I don't know.  I have read some things
(6)  that were by Mr. Babcock.  I would have to review it
(7)  to know whether it is something I read or not.  When
(8)  is this dated?  Well, it is not dated.
(9)     Q.     Let me ask you this.  As you sit here
(10)  now, to this day do you know if you have ever seen
(11)  this document before you, Exhibit 9?
(12)     A.     I just answered that question.  Do you
(13)  want me to read it?
(14)     Q.     Sure.
(15)     A.     I have read other documents from
(16)  Mr. Babcock, affidavits.  Do you --
(17)     Q.     Sure.
(18)     A.     Do you know the date of this document?
(19)  It is not dated.
(20)     Q.     Well, it was part of a joint
(21)  submission to the bankruptcy judge I believe in
(22)  October, but I don't have the precise date as I sit
(23)  here now.  But why don't you look at it and tell me if
(24)  you have ever seen this in your life.
(25)     A.     Well, I read other documents that have

Page 165

(1)
(2) a lot of the exact same text as this. It may have
(3) been this document or it may have been that they are
(4) using the same language in multiple places. So I
(5) can't be sure without reviewing our files.
(6)     Q.    Now --
(7)     A.    This is -- I have seen a lot of this
(8) language before. Whether I saw it in this exact
(9) document, I don't know.
(10)    Q.    Well, you certainly did not see this
(11) document before you wrote your report; right, ma'am?
(12)    A.    Probably -- my first report? Probably
(13) not.
(14)    Q.    Now, on paragraph 15, you understand
(15) from your experience in the Chapter 11 world that
(16) affidavits are submitted to judges, including judges
(17) in this judicial district?
(18)    A.    Yes.
(19)    Q.    And generally, you understand that
(20) these affidavits are submitted under oath and people
(21) are supposed to contemporaneously -- tell the truth
(22) based as they see it contemporaneously at the time?
(23) Are you aware of that?
(24)          MR. SILBERGLIED: Objection to form.
(25)          THE WITNESS: Well, yes, except that

Page 166

(1)
(2) this document isn't properly signed off on in that
(3) way. So that's my general understanding of an
(4) affidavit, which I have signed before myself.
(5) BY MR. BASKIN:
(6)     Q.    Now, by the way, do you want to take a
(7) guess which law firm prepared this document?
(8)          MR. SILBERGLIED: Objection to form.
(9)          THE WITNESS: I don't know.
(10) BY MR. BASKIN:
(11)    Q.    Any idea what RLF is in the bottom
(12) left-hand corner?
(13)    A.    Probably Richards, Layton.
(14)    Q.    Now, if you turn to paragraph 15 on
(15) page 9 of this document --
(16)    A.    Okay.
(17)    Q.    -- can you read -- paragraph 15 reads,
(18) "The Monitor is of the opinion that the transaction
(19) process outlined above complied with the Approved
(20) Bidding Procedures. The transaction process resulted
(21) in the Core Telecom Business being properly exposed to
(22) the market and a purchase agreement with a price and
(23) structure that was the result of a competitive bidding
(24) process in an auction-like environment between
(25) multiple parties. The Monitor has determined that the

Page 167

(1)
(2) competitive bidding process yielded the highest and
(3) best offer for the Core Telecom Business and is in the
(4) best interest of the debtors, their creditors and
(5) stakeholders." Do you see that?
(6)     A.    Yes.
(7)     Q.    Any part of that paragraph you take
(8) issue with as you sit here today, Ms. Taylor?
(9)     A.    Under the circumstances in which the
(10) case was started out and the path in which it
(11) followed, no.
(12)    Q.    Now, you told me earlier that it was
(13) an important part of your analysis that the sale price
(14) did not achieve fair market value. Do you remember
(15) that?
(16)    A.    Yes.
(17)    Q.    Could you turn to page 20 -- page 11,
(18) paragraph 20?
(19)    A.    Yes.
(20)    Q.    Could you read the first full sentence
(21) of paragraph 20 on page 11 into the record, please?
(22)    A.    "The Monitor believes that the
(23) purchase price for the Core Telecom Business pursuant
(24) to the terms of the Purchase Agreement represents the
(25) fair market value for these assets."

Page 168

(1)
(2)     Q.    Do you recall seeing that sentence
(3) before today, ma'am?
(4)     A.    Yes, I have seen it.
(5)     Q.    You saw it in preparation for your
(6) testimony today?
(7)     A.    I have seen it a couple of times, yes.
(8)     Q.    Now --
(9)     A.    I disagree.
(10)    Q.    You disagree with that sentence?
(11)    A.    I disagree with, from a pure
(12) definitional standpoint.
(13)    Q.    What do you mean by a pure
(14) definitional standpoint?
(15)    A.    The definition of fair market value
(16) absolutely requires the seller not being under a
(17) compulsion to sell, and that particular element is not
(18) met here.
(19)    Q.    Well, putting aside your definitional
(20) standpoint, is it your testimony that the value
(21) achieved through the sale was or was not fair market
(22) value?
(23)    A.    It is not --
(24)          MR. SILBERGLIED: Objection to form.
(25)          THE WITNESS: -- my definition. It is

IN RE: TELEGLOBE COMMUNICATIONS CORP.

BSA

CARLYN R. TAYLOR - 5/9/06

XMAX(43/43)

Page 169

(1)
(2) a textual definition. It is not my definition. You
(3) can find it in any valuation textbook. So it is
(4) not -- I mean, you can call this a highest and best
(5) offer from the auction process. That I would agree
(6) with. I don't think you can call that fair market
(7) value. You have to call any value achieved in a
(8) process which is conducted under a compulsion to sell
(9) as a liquidation value, not a fair market value.
(10) BY MR. BASKIN:
(11)    Q.    My question was -- so I take it, by
(12) the way, then you take issue with the monitor in this
(13) respect?
(14)    A.    Only in his phraseology of this. I
(15) don't -- I mean, unfortunately, the words fair market
(16) value get thrown around by a lot of people, and I
(17) don't know Mr. Babcock's reason for using that exact
(18) phrase. He could call it fair value or highest and
(19) best value, but it is not fair market value.
(20)    Q.    And so you take issue with his use of
(21) fair market value? You don't agree with him on that;
(22) correct?
(23)    A.    I think it is an inappropriate use of
(24) that term of art that has a very specific meaning.
(25)    Q.    And I take it that when he so

Page 170

(1)
(2) represented to the bankruptcy judge sitting in this
(3) courthouse that the purchase price represents the fair
(4) market value for these assets, you are going to tell
(5) Judge Robinson you disagree with that; correct?
(6)    A.    I am going to say that that one
(7) element of fair market value is not met. That I would
(8) agree with the other paragraph that talks about it
(9) being the highest and best use from an auction process
(10) and that in this environment that resulted in a
(11) liquidation value.
(12)    Q.    And in terms of the actual price
(13) achieved, do you agree or disagree with Mr. Babcock
(14) that the purchase price represents the fair market
(15) value for these assets?
(16)    A.    Again, it can't be. That's the whole
(17) basis of a lot of my report. This was conducted in an
(18) environment in which, you know, every reasonable
(19) strategic buyer was itself going through a
(20) restructuring, a bankruptcy, some financial distress,
(21) where the capital markets wouldn't give them any money
(22) to buy something. Lazard acknowledged that. You
(23) know, other people acknowledged that. It is carefully
(24) covered in my report. The market -- this was a
(25) horrible time to conduct a forced sale of a company.

Page 171

(1)
(2)    Given those facts, though, they
(3) conducted an auction process which led to a bid. That
(4) bid, I don't have a reason to know or question that
(5) that wasn't the highest offer from that process. That
(6) doesn't make it fair market value. It makes it a
(7) distressed sale value, liquidation value.
(8)    Q.    And that's what you are going to
(9) testify to the Court; correct?
(10)    A.    Yes.
(11)    Q.    Notwithstanding what the monitor said
(12) in a joint application to the bankruptcy judge in this
(13) courthouse?
(14)    A.    Well, I don't disagree with the vast
(15) majority of what he was saying about the process.
(16) Given the process, I disagree that that is actually
(17) fair market value, and I think it is a very low
(18) distressed value.
(19)    Q.    Now, you understand, I assume, that
(20) your bills are being paid by the debtor in this
(21) matter?
(22)    MR. SILBERGLIED: Objection to form.
(23)    THE WITNESS: I am really not sure who
(24) is paying our bills. It probably says in our letter.
(25) I would probably know about it if they weren't getting

Page 172

(1)
(2) paid.
(3) BY MR. BASKIN:
(4)    Q.    Now, are you aware that the debtor
(5) itself submitted an affidavit to the judge in this
(6) courthouse with respect to the sale process?
(7)    A.    I don't know. You would have to show
(8) me.
(9)    Q.    Does it stick in your mind that the
(10) debtor submitted an application to the bankruptcy
(11) judge?
(12)    A.    I read various papers in support of
(13) the sale motion, so it could have been in that.
(14)    Q.    But you did not read those papers
(15) before you submitted your report; right, Ms. Taylor?
(16)    A.    No. I had discussions with counsel
(17) about the circumstances surrounding the sale, and they
(18) gave me more documents.
(19)    Q.    Well, did the counsel when you
(20) discussed it with them, did they tell you that the
(21) bankruptcy monitor had told the judge in this
(22) courthouse that the sales process had achieved the
(23) highest and best offer attainable for the core telecom
(24) business?
(25)    A.    Yes, we discussed that.

## Page 173

(1)

(2) Q.    And did they tell you that the monitor

(3) represented to the judge in this courthouse that the

(4) monitor believes that the purchase price represents

(5) the fair market value for these assets?

(6) A.    I don't think we discussed those exact

(7) words till I saw those words and said actually there

(8) is a condition that is not met here.

(9) Q.    So at the time you prepared your

(10) report, as you were getting your input from the

(11) lawyers, they didn't tell you this?

(12) A.    Well, we discussed at length the

(13) process that happened and the fact that it was sold.

(14) I mean, after BCE walked away from it, the debtors and

(15) their advisors did the best they could under the

(16) circumstances, under a mandate of being forced to

(17) sell.

(18)       MR. BASKIN:  Now, let me hand you what

(19) we will mark as Exhibit 10.

(20)       (C. Taylor Deposition Exhibit No. 10

(21) was marked for identification.)

(22) BY MR. BASKIN:

(23) Q.    Have you seen this prior to today,

(24) Ms. Taylor?

(25) A.    I was just laughing because they all

## Page 174

(1)

(2) seem to have the similar -- I have definitely seen

(3) either all or most of this language, and I have read

(4) documents that were affidavits of Mr. Brunette.

(5) Whether it is this exact one, I can't be positive

(6) without reviewing our work papers.

(7) Q.    And you will see that this was a

(8) document, if you turn to page 11, an affidavit

(9) executed by Mr. Brunette on October 8, 2002?

(10) A.    Yes.

(11) Q.    And do you understand that this was an

(12) affidavit that Mr. Brunette as CEO of the debtors

(13) submitted to the judge in this courthouse, in this

(14) court, in this judicial district?

(15) A.    It appears to be, yes.

(16) Q.    And you want to take a guess again at

(17) which law firm prepared this affidavit?

(18)       MR. SILBERGLIED:  Objection to form.

(19)       THE WITNESS:  No, I am not going to

(20) guess.

(21) BY MR. BASKIN:

(22) Q.    Now, in connection with this

(23) affidavit, you will see that Mr. Brunette says that he

(24) is chief executive officer of the above-captioned

(25) debtor. Do you see that?

## Page 175

(1)

(2) A.    Yes.

(3) Q.    And —

(4)       MR. SILBERGLIED:  Are you okay?

(5)       THE WITNESS:  Yes.

(6)       MR. SILBERGLIED:  Do you need a break?

(7)       THE WITNESS:  When you are ready, I

(8) will get some Tylenol.

(9)       MR. BASKIN:  Let's just get through

(10) this document and then we can take a break; okay?

(11)       THE WITNESS:  Okay.

(12) BY MR. BASKIN:

(13) Q.    First of all, if you turn to page 2,

(14) paragraph 4 —

(15) A.    Okay.

(16) Q.    — do you see where Mr. Brunette is

(17) advising the bankruptcy judge under oath that the

(18) monitor, representatives of the Teleglobe Companies

(19) and the financial advisors to the Teleglobe Companies

(20) determined that it was unlikely the value of the core

(21) telecom business would appreciate in a protracted

(22) restructuring proceeding?

(23) A.    Yes.

(24) Q.    Is that a sentiment you agree with or

(25) disagree with?

## Page 176

(1)

(2) A.    It is very oddly worded as to what

(3) that necessarily implies. I mean, you know,

(4) appreciate. It doesn't have to appreciate. The issue

(5) is whether it depreciates. But anyway, I have seen

(6) this language in many places.

(7) Q.    And understanding what the word

(8) "appreciate" means in normal English, do you agree or

(9) disagree with that sentence?

(10)       MR. SILBERGLIED:  Objection to form.

(11)       THE WITNESS:  Well, it depends on how

(12) it is being managed. So I would say I don't have an

(13) opinion one way or the other.

(14) BY MR. BASKIN:

(15) Q.    Now, you will see that in paragraph

(16) 10, if you turn to that, Mr. Brunette reports that the

(17) Teleglobe Companies — you appreciate Teleglobe

(18) Companies are plaintiffs here; correct?

(19) A.    Part of the plaintiffs here.

(20) Q.    And they are the people who hired you.

(21) Do you understand that?

(22) A.    In addition to the creditors.

(23) Q.    Now, "The Teleglobe Companies believe

(24) the steps taken resulted in a fair and competitive

(25) arm's-length sales process, the outcome of which has

IN RE: TELEGLOBE COMMUNICATIONS CORP.

BSA

CARLYN R. TAYLOR - 5/9/06

XMAX(45/45)

Page 177

(1)
(2) not been influenced by the potential for conflicts of
(3) interest." Do you agree or disagree --
(4)     A.    I am trying to find where you are
(5) reading.
(6)         MR. SILBERGLIED: Paragraph 10.
(7) BY MR. BASKIN:
(8)     Q.    Paragraph 10
(9)     A.    Oh, I thought you said page 10. I am
(10) sorry. Okay.
(11)     Q.    Are you going to tell the judge that
(12) that sentence is right or wrong, Ms. Taylor?
(13)     A.    That it is a fair and arm's-length
(14) process? I don't have any reason to believe one way
(15) or the other that it is not.
(16)     Q.    Now, turn to 15.
(17)     A.    Okay. Paragraph 15 or page?
(18)     Q.    Paragraph 15. Well, even better, he
(19) says it more succinctly in paragraph 17.
(20)     A.    Okay.
(21)     Q.    Do you see it says, "The Teleglobe
(22) Companies believe the Purchaser's offer represents the
(23) highest and best offer attainable for the Core Telecom
(24) Business and concur with the Monitor's valuation
(25) methods described more fully in the Babcock

Page 178

(1)
(2) Affidavit." Do you see that?
(3)     A.    Yes.
(4)     Q.    Do you take issue with that
(5) representation made to the bankruptcy judge in this
(6) district?
(7)     A.    Given that it was in the context of,
(8) you know -- it is placed in the context of the process
(9) that was conducted, again, I have said already I don't
(10) have any reason to believe it wasn't the highest and
(11) best offer out of the auction process that was
(12) conducted.
(13)     Q.    Now, how about going to paragraph 19
(14) for me on the same page. Do you want to read the
(15) first full sentence of paragraph 19 as sworn to by
(16) Mr Brunette under oath?
(17)     A.    Okay.
(18)     Q.    Do you want to read it into the
(19) record?
(20)     A.    Oh, read it into the record? Okay. I
(21) think it is the same sentence we had before. "The
(22) Teleglobe Companies believe the purchase price for the
(23) Core Telecom Business contained in the Purchase
(24) Agreement represents the fair market value for the
(25) assets of the Core Telecom Business."

Page 179

(1)
(2)     Q.    And as was the case with respect to
(3) the monitor, I take it that you do take issue with
(4) this representation made to the bankruptcy judge?
(5)     A.    I think you could -- well, again, as a
(6) certified valuation person, it does not meet the
(7) definition of fair market value. It may meet the
(8) definition of fair value or highest and best value or
(9) other things, but, yes, I take issue with that aspect
(10) of it.
(11)     Q.    And you are going to testify, I take
(12) it, in front of Judge Robinson that you take issue
(13) with this representation on the part of the Teleglobe
(14) Companies, who are the plaintiffs in this matter?
(15)     A.    Only that I take issue with that there
(16) was clearly a compulsion to sell here. And from a
(17) pure definitional standpoint, what was obtained was a
(18) liquidation value, especially in the market
(19) environment in which the auction was conducted, as I
(20) think Lazard and BCE knew before they went about this
(21) process.
(22)     Q.    Now. in connection with paragraph 20
(23) finally, could you read for me the first two sentences
(24) of paragraph 20?
(25)     A.    Into the record?

Page 180

(1)
(2)     Q.    Please
(3)     A.    Okay. "The Teleglobe Companies
(4) believed there was, and is, an immediate need to
(5) proceed with the sale of the Core Telecom Business to
(6) the Purchaser as the value of the Core Telecom
(7) Business is unlikely to appreciate with time in a
(8) restructuring proceeding. The Teleglobe Companies
(9) further believe the critical nature of
(10) telecommunications services is not conducive to
(11) maintaining customers in an uncertain environment and
(12) numerous recent major restructurings in the telecom
(13) industry have clearly established that retaining
(14) revenue in any type of protracted restructuring with
(15) an uncertain outcome is extremely difficult."
(16)     Q.    Now, do you take issue with either of
(17) those sentences, Ms. Taylor?
(18)     A.    It may be unlikely to appreciate in a
(19) restructuring, but they didn't say depreciate and they
(20) didn't say appreciate after a restructuring is
(21) completed.
(22)         I do take issue somewhat with the
(23) second sentence. I believe this is something that was
(24) a widely held belief across a lot of management teams,
(25) which is bankruptcy hurts your revenues. Based on my