# EXHIBIT 5
# (Part 1)

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              . Case No. 02-11404 (MFW)
                                    .
PETITION OF ERNST & YOUNG,          .
INC. AS MONITOR OF                  .
TELEGLOBE HOLDINGS (U.S.)           . 824 Market Street
CORPORATION, et al.,                . Wilmington, Delaware 19801
                                    .
Debtors in Foreign                  .
Proceedings.                        . May 24, 2002
. . . . . . . . . . . . . . . . . . 10:00 a.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:                Jones Day
                               By:  JOHN RAPISARDI, ESQ.
                               500 Grant Street
                               One Mellon Bank Center, 31st Fl.
                               Pittsburgh, Pennsylvania  15219

For Lisa Donnan:               Golden & Golden, P.C.
                               By:  RICHARD A. GOLDEN, ESQ.
                               10627 Jones Street, Suite 101B
                               Fairfax, Virginia  22030

Audio Operator:                Jennifer M. Patone

Proceedings recorded by electronic sound recording, transcript
             produced by transcription service.

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjcourt@optonline.net

(609) 586-2311  Fax No.  (609) 587-3599

2

APPEARANCES (Cont'd):

For the Foreign
Representative:                    Campbell & Levine, LLC
                                   By:  MATTHEW G. ZALESKI, III, ESQ.
                                        MARK T. HURFORD, ESQ.
                                        AILEEN F. MAGUIRE, ESQ.
                                   Chase Manhattan Centre, 15th Fl.
                                   1201 N. Maket Street
                                   Wilmington, Delaware  19801

For FPL Fiber Net LLC:             Reed Smith
                                   By:  KIMBERLY E.C. LAWSON, ESQ.
                                   1201 Market Street, Suite 1500
                                   Wilmington, Delaware  198091

For Bell Canada Enterprises:       Shearman & Sterling
                                   By:  MARK SHAPIRO, ESQ.
                                        ANDREW TENZER, ESQ.
                                   599 Lexington Avenue
                                   New York, New York  10022-6069

                                   Young Conaway Stargatt & Taylor,
                                     LLC
                                   By:  PAULINE K. MORGAN, ESQ.
                                   The Brandywine Building
                                   100 West Street, 17th Floor
                                   P.O. Box 391
                                   Wilmington, Delaware  19899-0391

For Lisa Donnan:                   David L. Finger, P.A.
                                   By:  DAVID L. FINGER, ESQ.
                                   One Commerce Center
                                   1201 Orange Street, Suite 725
                                   Wilmington, Delaware  19801-1155

For Sun Life, et al.:              Stevens & Lee, P.C.
                                   By:  JOSEPH H. HUSTON, JR., ESQ.
                                   300 Delaware Avenue, Suite 800
                                   Wilmington, Delaware  19801

                                   Day Berry & Howard
                                   By:  DANIEL J. CARRAGHER, ESQ.
                                   CityPlace I
                                   Hartford, Connecticut  06103-3199

3

APPEARANCES (Cont'd):

For Bank of Montreal:            Klehr, Harrison, Harvey,
                                   Branzburg & Ellers, LLP
                                 By:  JAMES E. HUGGETT, ESQ.
                                 Mellon Bank Center
                                 919 Market Street, Suite 1000
                                 Wilmington, Delaware  19801

                                 Mayer, Brown, Rowe & Maw, LLP
                                 By:  AMY KORTE, ESQ.
                                       ROBERT STOLL, ESQ.
                                 190 South LaSalle Street
                                 Chicago, Illinois  60603-341

For the U.S. Trustee:            Office of the U.S. Trustee
                                 By:  DAVID L. BUCHBINDER, ESQ.
                                       FRANK J. PERCH, ESQ.
                                 844 King Street, Suite 2207
                                 Wilmington, Delaware 19801

For Ad Hoc Committee of
Noteholders:                     Bingham Dana, LLP
                                 By:  EVAN FLASHEN, ESQ.
                                 (Telephonic appearance)

4

I N D E X

PAGE

**WITNESSES**
BENJAMIN JAMES BABCOCK
    Direct Examination by Mr. Zaleski    20
    Cross Examination by Mr. Perch    33
    Cross Examination by Mr. Golden    47
    Redirect Examination by Mr. Zaleski    48


**EXHIBITS**    ID.    EVD.
UST-1  Four-page Document    36

 1            THE CLERK:  You may be seated.

 2            MR. ZALESKI:  Good morning, Your Honor.  Matthew

 3  Zaleski, Campbell & Levine, on behalf of Ernst & Young, the

 4  foreign representative in these cases.  Your Honor, briefly,

 5  as by way of introduction, with me today I have Mr. Ben Babcock

 6  from Ernst & Young, Mr. Peter Osborne, who is Canadian counsel

 7  to Ernst & Young, Mr. Derek Tay, who is Canadian counsel to the

 8  Teleglobe entities, and Mr. John Rapisardi and Brian Greer, who

 9  are American counsel to the Teleglobe entities.  Your Honor,

10  several parties have asked for permission now to move some pro

11  hacs, so what I'd like to do is yield the podium.

12            THE COURT:  All right.

13            MR. ZALESKI:  Thank you.

14            MR. HUSTON:  Good morning, Your Honor.

15            THE COURT:  Good morning.

16            MR. HUSTON:  Joseph Huston of Stevens and Lee.  I

17  have the privilege, Your Honor, of requesting the Court to

18  grant the admission pro hac vice of Daniel J. Carragher,

19  Esquire, of Day, Berry and Howard.  From Boston, Massachusetts,

20  Mr. Carragher is a member of the Supreme Court -- the Supreme

21  Judicial Court of Massachusetts, the United States Court of

22  Appeals for the First Circuit, the District Court for

23  Massachusetts, and the Bankruptcy Court up there as well, Your

24  Honor.

25            THE COURT:  All right.

                    J&J COURT TRANSCRIBERS, INC.

```
 1          MR. HUSTON:  His motion was filed yesterday as docket
 2  item number 37.  I have a copy with an incorporated order, if I
 3  may approach?
 4          THE COURT: .You may.  It will be granted.  Welcome.
 5          MR. CARRAGHER:  Thank you, Your Honor.
 6          THE COURT:  All right.  Anyone else?
 7          MR. FLASHEN:  Your Honor, on the phone, this is Evan
 8  Flashen from Bingham Dana.  We're counsel to the ad hoc
 9  committee of Teleglobe's public noteholders, about $1.2 billion
10  of debt.
11          THE COURT:  All right.  Thank you.
12          MR. FINGER:  Good morning, Your Honor, David Finger,
13  Delaware counsel for Lisa Donnan.  I'd like to move the
14  admission pro hac vice of Mr. Richard Golden.  I received a
15  signed certification.  We will be scanning and filing it
16  shortly.  Mr. Golden is admitted, practicing, and in good
17  standing in the Commonwealth of Virginia, the District of
18  Columbia, and the State of Michigan, and with Your Honor's
19  permission, he will speak on behalf of Lisa Donnan.
20          THE COURT:  All right.
21          MR. FINGER:  Thank you.
22          THE COURT:  It will be granted.  Welcome.
23          MR. GOLDEN:  Thank you, Your Honor.
24          MR. ZALESKI:  Your Honor, with the Court's
25  permission, what I'd like to do is open with a brief statement,
```

1  and then put Mr. Babcock on the stand in support of our motion

2  for temporary -- well, actually, a continuation of the existing

3  temporary restraining order, and a preliminary injunction as to

4  certain of the entities.

5          THE COURT:  All right.

6          MR. ZALESKI:  Your Honor, on May 15th, 2002, upon

7  direction and authorization of the Canadian Court, the monitor,

8  as the foreign representative of these foreign debtors,

9  commenced these ancillary proceedings and requested injunctive

10 relief from this Court with an overriding goal and principle in

11 mind.  That goal was to preserve and maximize the value of the

12 assets of the foreign debtors as a going concern.  The monitor,

13 in its first encountering these companies, quickly came to the

14 realization that because of the company's extremely tenuous

15 cash position and the significant cash being expended, it was

16 paramount that these foreign debtors take immediate action to

17 restructure and stabilize their business and pursue a going

18 concern sale.  Failure to do so would have resulted in

19 irreparable harm to the interests of all the creditors, and a

20 significant negative ripple effect, both to the economy and the

21 critical service providers, as the customers of these companies

22 cannot migrate from this network quickly if it shuts down.

23          In order to effectuate the foregoing goal, it was

24 important to maintain the status quo of the events as they

25 related to the United States entities.  The assets and the

8

1  operations of the U.S. entities, Your Honor, are interdependent
2  with the assets and the operations of the Canadian entities.
3  The facts -- in fact, the assets and the operations of these
4  U.S. entities are not viable on a standalone basis.  This --
5              THE COURT:  Well, I think this is all going to be
6  testimony.  Why don't we just proceed to the testimony.
7              MR. ZALESKI:  If you would prefer, Your Honor, then
8  I'd like to call Mr. Babcock at this time.
9              MR. BUCHBINDER:  Your Honor, David L. Buchbinder and
10 Frank J. Perch, Office of the United States Trustee.  We submit
11 that the threshold issue is the jurisdiction of this Court.
12 The petitioning party invoking the jurisdiction of the Court
13 has the burden of proof on the issue of jurisdiction.  And
14 until the threshold question of jurisdiction is resolved, there
15 is no need to take testimony with respect to whether or not a
16 preliminary injunction should issue and the scope of the
17 preliminary injunction, if it is to issue.  The United States
18 Trustee has filed its motion to dismiss case numbers 11404
19 through 11414, because the Court lacks jurisdiction over them,
20 and that threshold matter should be determined before we
21 proceed further.
22             THE COURT:  What is the foreign representative's
23 position on that?
24             MR. ZALESKI:  Initially, I'd like to articulate an
25 objection to the motion to expedite the hearing on the motion

1  to dismiss.  I believe we should have had sufficiently more

2  time.  Regardless of that, Your Honor, I believe we can put on

3  testimony, A, that would support jurisdiction in one of two

4  ways.  First of all, the extension --

5              THE COURT:  Well, don't tell me the testimony.

6              MR. ZALESKI:  I was going to speak --

7              THE COURT:  Don't you agree we should proceed --

8              MR. ZALESKI:  -- to jurisdiction.

9              THE COURT:  Don't you think we should proceed on the

10 jurisdictional issue first?

11             MR. ZALESKI:  Well, the testimony is designed to get

12 to the jurisdictional issue, so I believe that we could --

13             THE COURT:  Well, let me hear -- then I'll hear the

14 motion to dismiss first for lack of jurisdiction.  Does the

15 U.S. Trustee wish to present any evidence in support of the

16 motion?

17             MR. BUCHBINDER:  No, Your Honor.  None other than the

18 judicial admissions that have already been identified in our

19 various pleadings.

20             THE COURT:  All right.  You'd like me to take

21 judicial notice of the petitions filed and the other pleadings

22 filed by the foreign representative in this case?

23             MR. BUCHBINDER:  That is correct, Your Honor.

24             THE COURT:  All right.  I will take judicial notice

25 of those pleadings.  Then, would you like to proceed?  Let's

1    have testimony before I hear argument, that the foreign
2    representative wants to present.

3            MR. BUCHBINDER:  Your Honor, it would be the
4    position, and it is the position of the United States Trustee,
5    that based upon the conclusive judicial admissions contained in
6    the petitions filed by the petitioning parties, that the taking
7    of testimony is superfluous and unnecessary.  The case law is
8    unequivocal that statements under penalty of perjury, and
9    statements, and schedules, and consequently petitions, are
10   conclusively binding upon the Court.  I can go through a number
11   of cases, if the Court will, but in its reply to this motion,
12   the petitioners have suggested to this Court that the filing of
13   a voluntary petition is some sort of ministerial cover sheet
14   act.  The most important document to file in any bankruptcy
15   case for any debtor or for any petitioner is the petition.  The
16   document itself says on it, "voluntary petition."

17           The only document that I am aware of in national
18   bankruptcy practice that is referred to as a cover sheet is a
19   cover sheet for an adversary proceeding that identifies
20   statistical information that pertains to adversary proceedings.
21   But a petition is a petition.  It states jurisdictional facts.
22   It is signed under penalty of perjury by the petitioner, as are
23   all of these petitions.  With respect to the United States
24   debtors in case numbers 11404 through 11414, each and every one
25   of the petitions states that the street address of the debtor

J&J COURT TRANSCRIBERS, INC.

1  is in Reston, Virginia.  Each and every one of the petitions

2  states that the county of residence for the principal place of

3  business is Fairfax County.  It doesn't say Virginia, but I

4  believe that Fairfax County is in Virginia.  The petition also

5  states that the location of the principal assets of the debtor,

6  if different from the street address above, is blank.  These

7  are all of the jurisdictional facts.

8        Under Section 101(23), to qualify as a foreign

9  proceeding appropriate for relief under Section 304, the

10 petitioner must show that its domicile, residence, principal

11 place of business, or location of principal assets is located

12 in the foreign country.  The unequivocal judicial admissions

13 contained in the petitions are that they are United States

14 debtors, that their street address is in the United States,

15 that the location of the principal assets is in the United

16 States.  These are conclusively binding judicial admissions and

17 having made them to the Court they are stuck with them, and

18 there is no need to take any further testimony.

19        THE COURT:  Let me hear from the foreign

20 representative, or debtors.

21        MR. ZALESKI:  Your Honor, initially I would note that

22 to commence an ancillary proceeding under Section 304, the

23 voluntary petition form alone would be insufficient.  The

24 attachment, and the ability to detail, in what is complaint

25 form, and add additional information beyond, I mean clearly, in

1  the verified petition that is part of the same petition packet,

2  the statements as to the interconnectedness of these debtors'

3  business that the primary place of business is in Canada, and

4  as being run through Canada, we are prepared to put on

5  testimony as to the interconnectedness of these companies, the

6  inability of the U.S. companies to stand alone, the fact that

7  the management decisions, the operational decisions, strategic

8  decisions of all of these companies are done in Canada.  The

9  mere statement on this, and we don't dispute that the county of

10  residence for these companies would be Fairfax County.  The

11  domicile for Delaware corporations would be Delaware.  The

12  street address is Reston, Virginia.  But for purposes of these

13  proceedings, these companies have a primary place of business

14  -- I shouldn't say for purposes of this proceedings, but these

15  companies have a primary place of business which is in Canada.

16          THE COURT:  Well, I am going to allow testimony on

17  this point.  I think that at a minimum the filing of the motion

18  for TRO and motion for preliminary injunction that contains

19  additional facts filed at the same time and verified --

20          MR. ZALESKI:  Well, and I --

21          THE COURT:  -- does permit the foreign representative

22  to add to its averments in the voluntary petition.

23          MR. ZALESKI:  Just to reinforce that, Your Honor, I

24  mean, the fifth paragraph of the verified petition speaks

25  directly --

J&J COURT TRANSCRIBERS, INC.

13

1              THE COURT:  I've read it.

2              MR. ZALESKI:  -- to Mr. Babcock's testimony.

3              THE COURT:  All right.  I will allow testimony on

4   this point, and cross examination on those specific points.

5              MR. ZALESKI:  Thank you, Your Honor.

6              THE COURT:  Mr. Perch?

7              MR. PERCH:  Good morning, Your Honor.  Frank Perch,

8   also for the United States Trustee.  Your Honor, if the Court

9   is inclined to -- if the Court is inclined to treat it as an

10  evidentiary matter, notwithstanding the averments of petitions,

11  then I think we need to address another point.  Once again, I

12  want to emphasize that it is the moving party's burden -- the

13  parties seeking to invoke the Court's jurisdiction, it's their

14  burden to establish the grounds and the factual basis on which

15  this jurisdiction and Court is being invoked.  There are four

16  potential ways in which the United States petitioners can

17  invoke the Court's jurisdiction.  It is the statement made in

18  the brief of the petitioners that they can choose any one of

19  them to invoke, and they only need one of them.  We did not

20  learn, Your Honor, until late yesterday afternoon, which one

21  they're invoking, and that's the principal place of business.

22  It's very clear, Your Honor, that under the _Evans_ case, as

23  cited in our memorandum -- cited in our objection, I'm sorry,

24  Your Honor, that we have the right to take discovery and not to

25  be surprised by the evidence that we have no ability to prepare

14

1  to rebut with respect to the jurisdictional allegations.

2  Therefore, Your Honor, we object to proceeding to an

3  evidentiary hearing today without having the opportunity to

4  review documents, depose witnesses, conduct appropriate

5  discovery regarding the jurisdictional facts.  We have parties

6  here that are very, very, very desperate to railroad this

7  matter through and create a non-case, despite the fact that

8  based upon our analysis of the certificate of service filed by

9  Ms. Logan, 61 percent of the creditors who received notice of

10  this proceeding are United States creditors.  But what these

11  petitioners want to do is ramrod this thing through without

12  providing the opportunity that the objecting parties have, as

13  set forth in the Evans case, to take discovery regarding the

14  jurisdictional facts.

15        THE COURT:  Well, let me ask the U.S. Trustee,

16  regarding what it envisions the status will be in the interim.

17  Are you suggesting I cannot hear any testimony on the

18  preliminary injunction until I decide the jurisdictional issue,

19  which would, in effect, leave this -- these entities without

20  any protection?

21        MR. PERCH:  Well, that's their choice, Your Honor.

22  They could, today, choose to amend their petitions to be

23  Chapter 11 petitions, and as an amended petition it would

24  relate back to the date of the original filing.  They've chosen

25  not to do that.

15

1      THE COURT:  And therefore waive their rights to
2  proceed under 304, which is what they assert they're entitled
3  to?

4      MR. PERCH:  Your Honor, they're the moving party, and
5  if they want to -- if they want to present to the Court, now,
6  an argument of the legal basis on which they believe the Court
7  has the ability to grant any type of interim relief --

8      THE COURT:  Well, that's what they're --

9      MR. PERCH:  -- right after the Court's determining
10  jurisdiction, they have the ability to make that argument.
11  I've invited them to explain to me what that argument is, and
12  they have chosen, once again, as part of their strategy, not to
13  do so.

14      THE COURT:  Except that you state, and they
15  acknowledge, that jurisdiction is necessary in order to enter
16  an injunction under 304.  And they acknowledge that, so they're
17  willing to proceed today on the jurisdictional issue.

18      MR. PERCH:  Their willingness, Your Honor, does not
19  trump the rights that the objecting parties have to conduct
20  this procedure in an orderly fashion.  They're asking the Court
21  for emergency relief before the issue of jurisdiction can be
22  properly decided.  I start from the proposition that the Court
23  needs to have jurisdiction before it can take an action that
24  affects the substantive rights of parties, 61 percent of whom
25  are U.S. creditors.  I start from that proposition.  If someone

16

1  wants to convince the Court and demonstrate to me why that's

2  not correct, I'm sure they'll have the opportunity to do so.

3  But I do agree with Your Honor that unless some argument to

4  that effect is made that persuades the Court that the Court

5  cannot act where the Court is not yet able to determine that it

6  has jurisdiction, and it would --

7          THE COURT:  Well, I'm --

8          MR. PERCH:  -- be inappropriate for the Court to

9  determine that it has jurisdiction without the appropriate

10 opportunity as set forth in the Evans case, for the

11 jurisdictional facts to be explored with discovery available,

12 so that the credibility of the witnesses can be tested, so that

13 the existence of evidence that they have chosen, because it

14 doesn't favor them not to bring it here today, can be

15 determined.

16         MR. ZALESKI:  Your Honor, may I be --

17         THE COURT:  Let me hear from other interested parties

18 first.

19         MR. ZALESKI:  May I respond to the jurisdictional --

20         THE COURT:  Not yet.

21         MR. GOLDEN:  Richard Golden, appearing on behalf of

22 Lisa Donnan.  And I just want to represent to the Court that

23 this matter that came -- I did not know that this had come

24 before the Court at this time.  But on a factual basis, I have

25 talked about this matter with my client.  I believe if she is

1  sworn as a witness she can offer testimony that would support

2  the position of the United States Trustee.

3         THE COURT:  All right.

4         MR. ZALESKI:  Your Honor, Bankruptcy Court

5  jurisdiction is fundamentally based upon 28 U.S.C. 1334(b).  It

6  grants this Court jurisdiction over any civil proceeding

7  arising under Title 11.  Forgetting whether or not --

8         THE COURT:  But that begs the question --

9         MR. ZALESKI:  Your Honor -- no, actually, Your Honor,

10 I would submit that it doesn't, because we are not seeking --

11 or, we do not need to seek, today, an adjudication of whether

12 or not the 304 standard is satisfied.  We could go forward.  I

13 mean, if it would facilitate any jurisdictional discovery,

14 etcetera, the entry of the TRO, the continuation of the TRO,

15 predicated upon your jurisdiction, to enforce Section 105 and

16 Rule 7065, to preserve these estates.  If the Trustee's Office

17 needs --

18        THE COURT:  If I don't have any jurisdiction over the

19 bankruptcy case, I don't have any 105 power to enter an order

20 in those cases.

21        MR. ZALESKI:  Your Honor, I would submit that the

22 foreign proceeding requirement goes to the propriety, and is

23 actually substantive as to the entry of the relief under 304.

24 I mean, that -- at this point -- the period of time for parties

25 served with the summons has not been completed.  They have 20

1  days to attempt to controvert. In affect, what the Trustee's

2  Office argument is is a controversion of those petitions. They

3  say we do not satisfy --

4          THE COURT: Right.

5          MR. ZALESKI: -- Section 304. During that period,

6  and this Court has already exercised some jurisdiction, and the

7  Evans Court exercised jurisdiction to grant jurisdictional

8  discovery, the foundation for that jurisdiction had to exist

9  elsewhere. I would submit that your jurisdiction, while this

10 is pending, while even the foreign debtors have the opportunity

11 to respond to these summonses, could be extended for a

12 reasonable period of time pursuant to your jurisdiction under

13 1334(b).

14         THE COURT: Well, I don't buy that argument, but I

15 will do this. I will proceed with the petition for an

16 injunction, and I will allow the petitioner to present its

17 evidence regarding my jurisdiction to proceed today. To the

18 extent I make any ruling on jurisdiction it will be preliminary

19 only, for purposes of allowing me to consider the injunctive

20 relief.

21         MR. ZALESKI: Okay. Your Honor, we would like --

22         THE COURT: And reserve any right of any party later

23 within the time periods allotted, to contest that.

24         MR. ZALESKI: Very well, Your Honor, then we would

25 like to submit testimony to establish this Court's jurisdiction

1  as to primary place of business.

2          THE COURT:  All right.  You may proceed.

3          MR. ZALESKI:  And I'd like to call Mr. Babcock.

4          THE COURT:  I guess we're no longer on the motion to

5  dismiss, since that will be continued pending discovery, and

6  we're now back to the petition for an injunction.

7          THE CLERK:  Please remain standing.

8          THE COURT:  Stand, please.

9          MR. PERCH:  Your Honor, it appears that Your Honor

10  wishes to go forward with hearing evidence.  Obviously the

11  United States Trustee reserves his motion to dismiss, and

12  reserves his objections to the Court proceeding before its

13  determination -- jurisdiction has been determined.

14          THE COURT:  All right.  Well, I will reserve your

15  right.  I will continue your motion for -- to dismiss and allow

16  discovery to be taken, and I reserve your right to cross

17  examine and make any arguments today on jurisdiction with

18  respect to the motion for a preliminary injunction.  Again, my

19  ruling today will be preliminary only, to determine whether I

20  believe I have the power, preliminarily, to enter any further

21  order.

22          MR. PERCH:  Perhaps I should also, just as a

23  preliminary matter, so as not to have to unduly interrupt the

24  examination of the witnesses, indicate now that the U.S.

25  Trustee would reserve his right to recall any witness that's

Babcock - Direct                                    20

1    called today, inasmuch as we have not had the opportunity to

2    have identification of these witnesses, or take discovery, or

3    review documents.

4              THE COURT:  So reserved.

5              MR. PERCH:  Thank you.

6              THE COURT:  Let's have the witness sworn.

7              THE CLERK:  Please place your hand on the Bible.

8    Please state your full name and spell your last name for the

9    Court.

10             MR. BABCOCK:  Benjamin James Babcock, B-a-b-c-o-c-k.

11               BENJAMIN JAMES BABCOCK, WITNESS, SWORN

12             THE CLERK:  Please be seated.

13             MR. BABCOCK:  Thank you.

14                         DIRECT EXAMINATION

15   BY MR. ZALESKI:

16   Q    Mr. Babcock, where are you presently employed?

17   A    I'm presently employed at Ernst & Young.  I'm a Senior

18   Vice President of Ernst & Young, Inc., and a partner of Ernst &

19   Young in Canada.

20   Q    Very good.  And, Mr. Babcock, could you briefly describe

21   your educational background to the Court?

22   A    My educational background, I have an undergraduate honors

23   degree, and I'm a chartered accountant in Canada, which is the

24   equivalent of a CPA in the United States.

25   Q    Very good.  And it has previously been established in the

Babcock - Direct                     21

1  record of these proceedings that E&Y is the monitor to

2  Teleglobe and its affiliates in the pending CCAA proceedings.

3  Has Ernst & Young been employed as monitor in these types of

4  proceedings before?

5  A    Yes, we have.  We are regularly appointed as monitor in

6  large corporate reorganizations in Canada.  It's a standard

7  business practice and required by statute in Canada.

8  Q    So, could you briefly describe your personal experience in

9  large insolvency proceedings in international only?

10  A    Yes.  I've been involved in a number of major large

11  international insolvency proceedings.  Most recently some large

12  cases, Philips Services, Lowes Cinaplex Entertainment

13  Corporation, and a number of other ones involving an

14  international element, including, you know, Cutty

15  International, and Lowes -- sorry, the Loan Group a few years

16  ago.

17  Q    Very good.  And could you briefly describe the duties of a

18  monitor in a Canadian CCAA proceeding?

19  A    The monitor is a Court officer in Canada.  We have a

20  fiduciary responsibility to stakeholders in the case.  Our role

21  is to act -- to use a colloquialism, as the kind of eyes and

22  ears of the Court, and to provide the Court with a commercial

23  assessment of the things that are before the Court, and to give

24  recommendations to the Court on the matters that are put before

25  it.

Babcock - Direct                                22

1  Q    And in this present engagement, when did E&Y first become
2  involved with Teleglobe?

3  A    We first became involved in early April of this year.

4  Q    And in what capacity were you originally brought on board?

5  A    We were first brought in as a financial advisor, with the
6  clear contemplation that our initial involvement that we would
7  become Court-appointed monitor in the event of a CCAA filing in
8  Canada.

9  Q    And would that be an unusual type of engagement?

10 A    That would be standard business practice, that you've
11 brought -- involved, to get up to speed on the business issues
12 facing the company, with the contemplation of becoming a Court
13 officer.

14 Q    And you have been personally involved throughout this
15 engagement?  Is that correct?

16 A    Yes, I have.  I've been involved almost on a -- on a full-
17 time basis since our first --

18 Q    Could you please describe briefly what you, as well as
19 Ernst & Young, have done since commencing this engagement with
20 Teleglobe?

21 A    Since the beginning of the engagement, our real role has
22 been, you know, assisting in working to assess the situation.
23 We've worked very intimately with the management team and in
24 discussions with the company stakeholders in terms of
25 understanding the issues facing the company, and in

1  understanding and assisting in developing a strategy that makes

2  sense to stabilize this company and to maximize value for the

3  stakeholders of the company going forward.

4  Q    So, you would say you have gained personal knowledge of

5  the facts related to this company?

6  A    Absolutely.

7  Q    Thank you.  Moving on.  Could you briefly describe for the

8  Court and the parties here today the history of the Teleglobe

9  businesses -- business?  Excuse me.

10  A    Very briefly, the history of Teleglobe as a business --

11  and maybe just to draw on a little bit of an analogy, in the

12  United States, to put it in context, if you go back to before

13  deregulation of the telecommunications industry, Teleglobe was

14  like the AT&T in the United States in the sense that it was the

15  traditional monopoly provider of international

16  telecommunications services between Canada and other foreign

17  jurisdictions.

18  Q    Given the knowledge that you've acquired during the period

19  you've been working with the Teleglobe entities, could you

20  describe to the Court the business of those companies?

21  A    Sure.  Very briefly, maybe the easy phrase to understand

22  what Teleglobe does, they are a North American routed

23  international provider of voice and data telecommunications

24  services.  What does that mean?  North American routed means

25  that the telecommunications services either originate or

1 terminate in a place.  They originate and terminate in North
2 America.  They're an international business, a global business.
3 You can see in the chart, it gives you a sense of scope that's
4 in front of you.  They're international in the sense -- and I'm
5 just going to go back to the roots of the company.  The roots
6 of the company, and its real core business today, is these
7 international relationships between Teleglobe and other
8 countries -- I'll call them PTTs, which are the other
9 equivalent, kind of monopoly telecommunication providers in
10 other countries.  For example, you know, France Telecom and
11 Teleglobe had an agreement, called a bilateral agreement, to
12 share an infrastructure to exchange commercial voice and data
13 traffic between each other.  And there is a competitive cost
14 advantage to do so, and those relationships go back an extended
15 period of time.

16 Q   Very good.  And what is it that would make business such
17 as this viable?

18 A    The real viability, when you look at this business, is it
19 has a global network.  And this network is an interdependent
20 and interconnected network around the world.  Maybe the simple
21 analogy, it's like a highway of carrying voice and data traffic
22 between North America back and forth with countries the rest of
23 the world.  When you think of it, like a -- think of it as a
24 highway carrying these things.  I'm just going to use a couple
25 of analogies to understand the interdependency and

1  interconnection of these pieces.  It's not like a tree, where

2  you can, in this reorganization proceeding, if you cut off a

3  piece because it's not working, that the tree will keep going,

4  continue on.  It's a little bit like, if you use the old

5  analogy of the old Christmas tree string of lights, if you cut

6  off a part of this network, or string of lights, the rest of

7  the network runs the potential of going down.  So, what we've

8  been attempting to do, in terms of the restructuring

9  proceeding, is really keep the whole of this global business

10 together.

11 Q    Very well.  In light of your knowledge related to these

12 companies, could you explain to the Court, at the time of the

13 commencement of these proceedings, where the major business

14 decisions related to this core are made?

15         MR. PERCH:  Your Honor, objection.  The question here

16 is not -- the question here is what are the jurisdictional

17 facts with reference to the entities identified in paragraph

18 seven of the U.S. Trustee's objection to which the --

19         THE COURT:  Well, overrule.  I'll allow him to ask

20 the more general question first.

21 Q    I'd repeat the question.  In light of your knowledge of

22 these companies, where are the major business decisions related

23 to the core business being made?

24 A    The major business decisions are all made based out of

25 Canada.  All of the strategic operating decisions and financial

1 functions are based out of Canada for the organization.

2 Q    And on a day-to-day basis, where is this business being

3 run?

4 A    Out of Canada.

5 Q    And if a decision were to be made concerning even

6 something like continuing the operations and activities in the

7 United States, where would that decision be made?

8 A    It would be made in Canada.

9 Q    Thank you.  In light of that, and your testimony as to the

10 interconnectedness of the Teleglobe business, do you know why

11 separate corporate entities do exist in the U.S.?

12 A    My understanding, based on my discussions with management,

13 are that part of the reason why you have separate legal

14 entities set up in the United States and other jurisdictions is

15 to hold the assets that are used to operate this business.  For

16 regulatory reasons you had to have them in a separate legal

17 entity, where the license are held.

18 Q    Very well.  Returning a bit to sort of the development of

19 Teleglobe business, could you please describe to the Court the

20 events that led to the company's decision to commence the CCAA

21 proceedings and the current circumstances of which they're in?

22 A    Yes.  Just to take a step back to early April, the company

23 began a process, or was asked by its major shareholder to

24 undertake a review of its business operations and assess its

25 future prospects, given the financial results in the company,

1 and the events in the industry that were going on.  That review

2 took place during early April.  The results of that review were

3 communicated with the company's major shareholder on April

4 24th.  They discontinued funding for the company, and the

5 company was dependent upon that funding on an ongoing basis.

6 And, you know, those issues really led to the liquidity crisis

7 that the company was faced at the end of April.

8 Q   Okay.  And, shifting, just briefly, to discuss the

9 liabilities of these companies, of the various Teleglobe

10 entities in the United States, how many are actually actively

11 involved in the company's business?

12 A   In the United States, there's really one primary legal

13 entity.  I think it's referred to as Teleglobe U.S.A., which

14 conducts most of the operations in the company in the United

15 States, or at least holds the assets in the United States.  The

16 liabilities in that are approximately $2.5 billion.  Of that

17 2.5, just to put a little bit of context on it, $2.3 billion of

18 those liabilities are owed to the top holding company and to

19 other related Teleglobe entities, and the ultimate

20 beneficiaries of those claims really are the creditors in

21 Canada, primarily the banks and the bondholders, who are

22 clearly the largest creditors of this organization on a

23 consolidated basis.

24 Q   And since we're discussing creditors, at this time, is

25 there any mechanism that's in place to deal with claim

Babcock - Direct                                    28

1  adjudication?

2  A    No, there is not.

3  Q    And when do you think this mechanism would be developed,

4  or implemented?

5  A    Certainly standard practice would be to allow the company

6  to go through the process of maximizing the value of what's

7  available for the stakeholders in the estate, and after that

8  you would proceed to have a formal claims process, the Canadian

9  process really being, in many respects, similar to what would

10 be done in the United States.

11 Q    And I guess, just simply since we're limiting it, would

12 you please explain to the Court the reasons that support the

13 election to commence these ancillary proceedings?

14 A    Probably just taking a step back in terms of the reasons,

15 the company went through, you know, a number of deliberations

16 about what was the right approach to proceed filing for Court

17 protection, considering, you know, a number of factors.  And

18 those deliberations really occurred with the company's Canadian

19 legal counsel, United States legal counsel, and their foreign

20 legal counsel, to really look at what is a global business, and

21 what's the right thing to do in the context of a global

22 restructuring.  The factors that were considered in terms of

23 commencement of the 304, in particular, I think really

24 considered three things.  One, you know, what was the nature of

25 the assets that are in the United States, and how are they

1  related to the rest of the entity?  And just to put a couple of

2  reference points around that issue that we're taking into

3  consideration, a couple things were -- you know, it was very

4  clear that the U.S. assets, on a standalone basis, were not a

5  business.  They were not a viable business.  They were totally

6  dependent upon the rest of the entity.  It was also looked at,

7  just to put reference to kind of the total business that we

8  were looking at, if you look at probably two measures which are

9  the most important measures for the company in terms of its

10 business, and its North American routed business, if you look

11 at kind of volume, which is minutes, or look at revenue, from a

12 minutes point of view, this company, in the last year in its

13 voice business, which is clearly the most significant portion,

14 did about 8.5 billion minutes.  Of that, you had --

15 approximately 70 percent of it was Canadian based and 30

16 percent U.S.  The other one, which is really what drives

17 profitability and viability of the company, is revenue.  And if

18 you look at that revenue, which is the measure that you use in

19 this particular industry, that relationship is kind of 80

20 percent United States -- I'm sorry, 85 percent Canadian, 15

21 percent in the United States.  So, we looked at

22 interdependency, interconnectedness and the fact that the U.S.

23 was totally dependent on its connections to Canada, and these

24 relative relationships.  We looked at the creditors, which is

25 when you looked at the creditors in terms of totality of

Babcock - Direct                                    30

1  dollars, and who are the beneficiaries of the process, of going

2  through to maximize value, and the efforts to, you know,

3  proceed with a going concern sale and avoid the very negative

4  repercussions of liquidation which would clearly result in such

5  a fragile situation which the company was faced with in early

6  May.  And lastly, what is the most I'll call it effective and

7  cost efficient way to proceed with what was the primary

8  objective, which was to maximize the value that was available

9  to people in a very short period of time.  The company does not

10 have the luxury of a lot of time here.  It's in a very fragile

11 situation.  And you've got a global business that's difficult

12 to hold together.  And keeping the whole together is absolutely

13 critical to maintaining a going concern because, as I indicated

14 before, kind of taking away any part of the whole -- or, I'm

15 sorry, any part of, you know, this kind of large Christmas tree

16 around the world takes down the rest of the lights.  So, we had

17 to find a strategy that was cost effective, you know,

18 efficient, to achieve a way to maximize value for stakeholders

19 in a very difficult situation.  And those were the primary

20 considerations that went into it.  And it was felt that 304

21 was, you know, the appropriate mechanism to do that,

22 considering those facts.

23 Q    Thank you.  I guess one last question that goes to

24 jurisdiction would be two parts.  Do you generally know how

25 many employees the companies have, or they employ in their

Babcock - Direct                    31

1  business?

2  A    Currently there are about 940 employees, I believe.  Just
3  splitting those up between Canada and the United Stats,
4  probably the most important piece is who is running the
5  business.  There are about 600 employees who really are focused
6  on running the continuing business of the company.  Of those,
7  about 80 percent of them are located in Canada, ten percent in
8  the United States, and ten percent around the rest of the
9  world.

10  Q    Thank you.  And I said one more, there is actually one
11  last one.  The Trustee has brought up the issue of the Chapter
12  11.  What is your view as to the potential for a Chapter 11
13  filing for these companies?  Or, why not a Chapter 11?
14  A    I mean, this company does not have the funding for a
15  Chapter 11 proceeding.  It's on very limited time lines to
16  achieve the goals that I discussed earlier, and has very
17  limited funding.  The company, since, you know, filing for core
18  protection in Canada, and the initiation, I think, of the --
19  I'm going to get my terminology wrong a little bit here of the
20  TRO, and the TRO that was put in place on the 15th, has
21  achieved a degree of stability.  You know, it looks like this
22  company has hit a soft landing and is proceeding very rapidly
23  in what's going before the Canadian Courts, or will be going
24  before the Canadian Courts is a very expedited process to try
25  and achieve a going concern sale here.  And, you know, I can't

Babcock - Direct                                        32

1  comment specifically on the legalities of Chapter 11, and it's
2  not an area of expertise.  But I can comment on the business
3  situation, the fact that the stability has been achieved with
4  what's been done.  And, you know, maintaining that fragile
5  stability that's in place right now, where customers and
6  suppliers, you know, seem to have been continuing to, you know,
7  provide the business with services, continue the network,
8  certainly from a business point of view I'd be very, you know,
9  nervous about a situation that would further destabilize the
10 company by changing direction in terms of where things have
11 gone here.
12 Q    And just to clarify one thing you said, you spoke of
13 generally the time line in Canada.  Could you give us a sense
14 of how long the process --
15 A    In terms of the sales --
16 Q    Yes.
17 A    In terms of the sales process.  The time line that's being
18 contemplated, it's very clear that this company has to act very
19 quickly to try and achieve a going concern sale and avoid the
20 very negative repercussions that would come from an immediate
21 shutdown of the business.  Right now, in front of a number of
22 the major stakeholders of the company is the outline of a sales
23 process which is not dissimilar from one that would be used in
24 the United States.  The company anticipates seeking Court
25 approval for that process with a view to bringing forward a