# EXHIBIT 5
# (Part 2)

1  sale by the end of June for the approval of the appropriate

2  Courts, and trying to implement a sale, if it's available, as

3  quickly as possible.

4  Q    And that June date, is that triggered by anything, or is

5  there a basis for that date?

6  A    Yes, there is.  The company is under very -- two very

7  important time lines.  One, it doesn't have the funding to

8  continue this process for an extended period of time.  Number

9  two, it has covenants under its funding agreement, or its DIP

10 loan agreement, which provide that it needs to bring forward

11 that sale no later than the end of June.

12           MR. ZALESKI:  Thank you.  I have no further questions

13 at this time, Your Honor, but since we were trying to restrict

14 to the limited issue, could I reserve Mr. Babcock to the extent

15 of the testimony as to irreparable harm and preliminary

16 injunction.

17           THE COURT:  Well, proceed with everything at this

18 point.

19           MR. ZALESKI:  Let me see if he perhaps hit the

20 points.

21                         (Pause)

22           MR. ZALESKI:  I think I will pass.

23           THE COURT:  All right.  Any cross examination?

24                    CROSS EXAMINATION

25 BY MR. PERCH:

1  Q    Mr. Babcock, I want to start towards the end.  I believe,

2  in response to one of Mr. Zaleski's questions, you said there

3  were approximately 940 employees total?

4  A    That's correct.

5  Q    Of the entire enterprise?

6  A    That's correct.

7  Q    Not just the U.S. entities, correct?

8  A    That is in totality.

9  Q    Not just the Canadian entities?

10  A    The total company.

11  Q    And then you talked about 600 of those as what you call

12  the employees running the continuing business, and you said

13  that 80 percent of those are in Canada, and ten percent of

14  those are in the United States?

15  A    Um-hmm.

16  Q    But that was 80 percent and ten percent of the 600?

17  A    That's correct.

18  Q    Would you like to tell us about the other 340?

19  A    Sure.  The other 340, their primary role is what I will

20  call executing the transition plan for the company.  And those

21  employees are -- let me just divide them up geographically for

22  you.  If I was to divide them up geographically, they are, I

23  believe, about 55 percent of them -- or just over 50 percent

24  are located in Canada.  You have approximately a third of them

25  in the United States, and the rest around the rest of the

J&J COURT TRANSCRIBERS, INC.

1 world.   Those are primarily internal legal counsel, and people

2 who are coordinating the global I'll call it migration of

3 customers in a responsible basis to try and comply with

4 regulatory rules around the world.

5 Q    Are you aware, Mr. Babcock, that Teleglobe's web site

6 identifies a global headquarters, also uses the term world

7 headquarters of the company as Reston, Virginia?

8 A    I haven't specifically looked in the company's web site,

9 but I'll assume, from what you're telling me, that's, you know,

10 factually correct.   It doesn't surprise -- the comment doesn't

11 surprise me in the sense that if you went back historically and

12 looked at this company, you know, they were trying to build a

13 global enterprise.   You know, they haven't been trying to do

14 that for an extended period of time now.

15        MR. PERCH:  Your Honor, I'd move to strike.  Not

16 responsive to the question.

17        THE COURT:  If you can limit yourself to answering

18 the question.

19        THE WITNESS:  That's fine.  Fine.

20 Q    Are there employees located in Reston, Virginia, that are

21 responsible for regulatory affairs?

22 A    Yes.

23 Q    Are there employees located in Reston, Virginia that are

24 attorneys?

25 A    Yes.

1  Q    And are those attorneys admitted to the bar of United

2  States jurisdictions?

3  A    I have no personal knowledge of whether they are or not.

4  Q    Who would?

5  A    I assume they would know.

6  Q    Do -- I'm going to use the term the United States

7  entities, and just to be clear -- excuse me, Your Honor.  Just

8  to be clear about who I mean when I say United States entities,

9  I want, if I could, to introduce an exhibit.

10            UNIDENTIFIED SPEAKER:  Is this taken from --

11            MR. PERCH:  It's taken from wherever you all get --

12  may I approach the witness, Your Honor?

13            THE COURT:  Well, let's have it marked first.

14            MR. PERCH:  I'm sorry.

15            THE COURT:  Is it pre-marked?

16            MR. PERCH:  No, it is not.

17            THE COURT:  U.S. Trustee's --

18            MR. PERCH:  Let's mark it as U.S. Trustee's

19  Exhibit 1.

20            THE COURT:  All right.

21            MR. ZALESKI:  Your Honor, we have no objection to

22  these.  And I believe we put that in the record as part of Mr.

23  Denega's declaration.

24            THE COURT:  All right.  He's not offering it yet.

25  He's going to approach the witness.  Go ahead.

Babcock - Cross/Perch                37

1  Q    Mr. Babcock, I'm showing you a multi-page document, a

2  four-page document that has been identified, marked for

3  Identification as U.S. Trustee Exhibit 1.  Can you tell me what

4  this is?

5  A    This is the corporate legal organization chart of

6  Teleglobe.

7  Q    And is this a document that was prepared by someone at

8  Teleglobe?

9  A    I believe it was.

10 Q    And at the top of the chart on the first page is a company

11 called Teleglobe, Inc., correct?

12 A    Correct.

13 Q    And Teleglobe, Inc. is a Canadian company?

14 A    Yes, it is.

15 Q    And Teleglobe, Inc. has a subsidiary called Teleglobe

16 Holdings (U.S.) Corporation?  Yes?

17 A    Correct.

18 Q    And is that a Delaware corporation?

19 A    To the best of my knowledge, yes.

20 Q    All right.  Teleglobe, Inc. has another direct subsidiary

21 called Teleglobe Luxembourg, LLC.  Is that a Delaware

22 corporation?

23 A    To the best of my knowledge, this is correct information.

24 Q    Okay.  And Teleglobe Holdings (U.S.) Corporation has two

25 direct subsidiaries identified as Teleglobe Holding Corp. and

J&J COURT TRANSCRIBERS, INC.

1  Teleglobe Telecom Corporation, and they're both Delaware

2  corporations?

3  A    I believe that to be true.

4  Q    And then, just so we understand the structure of this

5  exhibit, to skip to what are the subsidiaries of Teleglobe

6  Holding Corp., we go to page three.  Is that correct?

7  A    That's correct.

8  Q    Okay.  And -- pardon me.  Does Your Honor have this

9  exhibit?

10         THE COURT:  I have the copy attached to the foreign

11  representative's --

12         MR. PERCH:  Thank you.

13         THE COURT:  I guess Mr. Denega's declaration.

14  Q    Then, page three, Mr. Babcock, shows the direct and

15  indirect subsidiaries of Teleglobe Holding Corp.  Is that

16  right?

17  A    Correct.

18  Q    And those are all corporations, or I think in some cases,

19  partnerships, which I understand are not before the Court, that

20  are incorporated or registered in Delaware.  Is that correct?

21  A    To the best of my knowledge, this correctly indicates

22  that.

23  Q    So, when I say -- I'm now going to use a term, the U.S.

24  companies.  And when I say the U.S. companies, I'm referring to

25  all of the companies that are the subject of this proceeding

1  that are showing on this organizational chart as incorporated

2  or registered in Delaware.  Do each of those U.S. companies

3  have a board of directors?

4  A    To the best of my knowledge they do.

5  Q    And when you say to the best of your knowledge, does that

6  mean that you've never attended a meeting of those boards of

7  directors?

8  A    Not of those individual boards.

9  Q    Do those individual boards have meetings?

10  A    I can't answer whether they do or not.  I assume that they

11  do, but I have no specific knowledge of whether they've had

12  meetings or not.

13  Q    Have you ever looked at the corporate minute books for any

14  of these entities?

15  A    I have not personally, no.

16  Q    Do you know where the corporate minute books are located?

17  A    Not specifically, no.

18  Q    Do you -- would you be able to tell us the identities of

19  the members of the boards of directors of these companies?

20  A    I would have to do personal investigation separately to be

21  able to answer that question.

22  Q    Would you be able to tell us the residence or citizenship

23  of the individuals who are the members of the boards of

24  directors of these companies?

25  A    After personal investigation, yes.

1  Q    So, you can't tell us today?

2  A    I could not tell you today.

3  Q    Do each of these companies have officers?

4  A    Yes.

5  Q    And can you tell us who the officers are?

6  A    I don't have a specific list of officers of all of these

7  individual companies in front of me today.

8  Q    And if I wanted to contact the officers of these companies

9  by telephone, where would I call?

10  A    Probably Canada.  Certainly from an operational point of

11  view, that's where the decisions are made with respect to the

12  assets in these companies.

13  Q    Sir, that wasn't my question.  My question was, if I

14  wanted to contact the officers of the U.S. companies, where

15  would I find that they regularly keep their offices?

16  A    You have to show me which -- who are the officers.  And I

17  don't know exactly who they are for each of these individual

18  companies.

19  Q    All right.  So, you don't know who the officers are, and

20  therefore you cannot tell me where they regularly keep their

21  offices, where they go to work in the morning?

22  A    Correct.

23  Q    In Reston, Virginia, is there a Human Resources

24  department?

25  A    Yes, there is.

1  Q    And is there a Director of Human Resources in Reston,

2  Virginia?

3  A    I believe that to be true.

4  Q    Do the U.S. companies have -- do any of the U.S. companies

5  have a chief financial officer?

6  A    I -- the U.S. companies, or all the companies?

7  Q    The U.S. companies.

8  A    I don't specifically know the list of officers.  I would

9  expect that they probably do.

10 Q    But you couldn't tell me who he or she is?

11 A    I can tell you who I believe he is, but I'd have to check

12 the list of officers.

13 Q    Who do you believe he is?

14 A    I believe it to be Andre Mulgai.

15 Q    You made reference, Mr. Babcock, to the U.S. entities

16 having been formed to hold assets that are in the U.S.?

17 A    That's correct.

18 Q    Why don't you tell us a little bit about what those assets

19 are?

20 A    The assets that are in the United States really fall in a

21 couple of categories.  You have a number of points of presence,

22 which are places where people hook up their telecom equipment

23 to joint into a network.  Those are located, as you can see, in

24 a number of major locations in the United States.

25 Q    Such as Los Angeles --

Babcock - Cross/Perch                    42

1  A    New York.

2  Q    -- New Jersey --

3  A    Correct.

4  Q    -- New York, Washington, Miami?

5  A    That's correct.  You would also have interests in a

6  network in the United States which would be a fiber optic

7  network, which is how voice and data traffic travels.

8  Q    Fiber optic network is a physical network of fiber optic

9  cables?

10  A    Correct.  It would be a physical network.  In most cases

11  the company actually leases its interest in that network.  But

12  that would be the other primary asset in the United States.

13  Q    And would those leases be written documents?

14  A    I would assume so.

15  Q    And would the parties to the lease be one of the United

16  States entities and the third party from whom the rights to the

17  optical fiberoptic network are being leased?

18  A    I would believe that likely to be true.

19  Q    And would the companies -- would the U.S. companies need

20  U.S. legal counsel to draft, and review, and approve those

21  leases?

22  A    I would assume so.

23  Q    Is there outside U.S. legal counsel to the U.S. companies?

24  A    Yes, there is.

25  Q    Who is it?

1 A    Jones Day.

2 Q    In addition to the points of presence, the fiberoptic

3 network, there are also Internet data centers?

4 A    Yes.  That's probably true.

5 Q    And are there IDCs located in the U.S.?

6 A    I believe them to be true.  I don't know the specific

7 cities that they're located in, but I believe there are some

8 Internet data centers.

9 Q    Are there customer service activities performed in the

10 U.S.?

11 A    Yes, I believe there are.

12 Q    In order to construct, maintain, and operate the points of

13 presence, the IDCs, the movement of traffic over the fiberoptic

14 network, are there regulatory approvals that need to be

15 obtained from United States federal, state, and local

16 regulatory authorities?

17 A    I'm not a specific expert in that, but I believe there are

18 regulations in the United States and licenses that are required

19 to operate in the United States.

20 Q    And are there individuals resident in the United States

21 that are responsible for obtaining and maintaining those

22 regulatory approvals?

23 A    Yes, I believe there are.

24 Q    And do the companies operating in the United States need

25 individuals that are experienced and knowledgeable in the

1  United States, regulatory laws and affairs in order to make

2  sure that the companies comply with their obligations to the

3  federal, state, and local authorities in the United States?

4  A    I would assume so.

5  Q    Do the United States entities have bank accounts located

6  in United States banks?

7  A    Yes, they do.

8  Q    Is the property in Reston, Virginia, identified by

9  Teleglobe as its world headquarters leased or owned?

10 A    I believe the head office is owned.

11 Q    And what is the identity of the entity that owns the real

12 estate in Reston, Virginia?

13 A    I believe it is Teleglobe U.S.A., but I would have to

14 investigate that further.

15 Q    And Teleglobe U.S.A. is one of the Delaware incorporated

16 entities?

17 A    Yes, it is.

18 Q    Does Teleglobe U.S.A. own any real estate in Canada?

19 A    Not to the best of my knowledge.

20 Q    Does Teleglobe U.S.A. employ, on its payroll, any

21 employees in Canada?

22 A    I don't know the answer to that question.

23 Q    Does Teleglobe U.S.A. employ on its payroll employees in

24 the United States?

25 A    Yes, I believe that to be true.

1  Q    Do the United States entities pay taxes to United States

2  taxing authorities?

3  A    I would assume if they have obligations that they have

4  been paying them in the United States.

5  Q    Do you know how many different taxing authorities the

6  United States entities pay taxes to on a regular basis?

7  A    I don't know the specifics of that, no.

8  Q    Are there employees resident in the United States that are

9  responsible for monitoring and managing the tax affairs of the

10  United States operations?

11  A    Most of the finance function that deals with paying of

12  things is really based on Montreal.

13  Q    In Montreal there are experts on U.S. taxation?

14  A    I don't know the answer to that question.

15  Q    You indicated, Mr. Babcock, that you were involved in the

16  Philips Services matter?

17  A    Yes, I was.

18  Q    And isn't it correct that Philips Services involved both

19  proceedings in the CCAA and Chapter 11 cases here in

20  Wilmington, Delaware, with a cross-border protocol order?

21  A    I believe, in the nature of those cases, that made sense

22  and that's factually correct.

23  Q    Do any of the United States companies, any of the Delaware

24  corporations, employ employees who are resident in Canada?

25  A    I don't have specific knowledge on that, but the chief

1 operating officer of the companies is clearly resident in

2 Canada.

3 Q    You frequently used the term "the companies." Are you

4 speaking of an individual who is the chief operating officer of

5 the Delaware incorporated entities?

6 A    I don't know specifically what his title is on those

7 companies.  But I do know that all the major operating

8 decisions relating to those entities are made by him and his

9 team based in Canada.

10 Q    Who is this individual?

11 A    His name is Serge Forten.

12 Q    Serge Forten.  Do you, in fact, know whether Mr. Forten is

13 an officer of any of the Delaware incorporated entities?

14 A    I believe he is an officer of all of the companies in the

15 United States.

16 Q    But you haven't actually seen the corporate minute book to

17 determine that, have you?

18 A    No.  But I did have a specific conversation with the

19 assistant general counsel of the company who advised me that he

20 is an officer of those companies.

21 Q    Are you aware that if a prospective customer goes to the

22 Internet to find information about Teleglobe's products,

23 they're directed to contact addresses and telephone numbers in

24 the United States?

25 A    I haven't specifically gone to the web site, so I have no

1  personal knowledge of that.

2              MR. PERCH:  May I have one second, Your Honor?

3              THE COURT:  You may.

4                          (Pause)

5  Q    Just one more question, Mr. Babcock.  Are you the

6  individual who signed each of the petitions under penalty of

7  perjury?

8  A    I believe my name is on all of them.

9              MR. PERCH:  Nothing further on cross, Your Honor.

10             MR. GOLDEN:  Your Honor, I'll be quite brief.

11 Richard Golden, again, appearing for Lisa Donnan.

12                     CROSS EXAMINATION

13 BY MR. GOLDEN:

14 Q    You had mentioned about covenants under certain DIP loan

15 agreements?

16 A    Yes, I did.

17 Q    When were those loan agreements signed?

18 A    Those loan agreements were signed, I believe, on May 14th,

19 which was the day before the company filed for Court

20 protection, on May 15th.

21 Q    I see.  Who is Robert P. Schwartz?

22 A    I believe he is the Director of Human Resources.

23 Q    For which company?

24 A    For Teleglobe, and I am intentionally using the word

25 Teleglobe because I don't know specifically where he is an

1  officer.

2  Q    Who files the annual reports for Teleglobe Communications

3  Corporation with the Virginia State Corporation Commission?

4  A    I don't specifically know the answer to that question.

5  Q    Who files the annual reports for Teleglobe U.S.A. with the

6  Virginia State Corporation Commission?

7  A    Same answer.  I don't know specifically the answer to that

8  question.

9  Q    Do you have any reason to believe that those reports did

10 not indicate that the principal place of business of those two

11 companies was Reston, Virginia?

12 A    I have never seen the reports, so I have no positive or

13 negative knowledge.

14 Q    I see.  Do you know if any of the Teleglobe companies has

15 physical Internet switching equipment, or data centers, in the

16 District of Columbia?

17 A    I don't specifically know the answer to that question.  I

18 know there is some located in the United States.

19       MR. GOLDEN:  I have no further questions.  Thank you

20 very much.

21       THE COURT:  Thank you.  Anybody else?  All right.

22 Redirect?

23                    REDIRECT EXAMINATION

24 BY MR. ZALESKI:

25 Q    Mr. Babcock, you were asked a great deal about assets in

1  the United States. How many countries, worldwide, does

2  Teleglobe have assets in?

3  A    Teleglobe does business in probably close to 200 companies

4  worldwide, and I believe specifically has assets in over 40

5  countries worldwide.

6  Q    So, in each of those 40 countries, Teleglobe, you would

7  say, would be subject to regulatory requirements?

8  A    Absolutely.

9  Q    Taxing?

10 A    Absolutely.

11 Q    And do you specifically know the officers and directors of

12 each country, each component of each country --

13 A    No, I do not.

14 Q    -- corporation? As far as what you've been engaged to do

15 and where you're working with the debtors in Canada, are you

16 familiar with the officers of Teleglobe, Inc. and the decision

17 makers there?

18 A    Absolutely. I mean, all of our work and where our team

19 works is in Montreal, in Canada, which is where all of -- I

20 mean, our role is kind of monitoring the business and financial

21 affairs of the company -- the companies that have filed for

22 Court protection. All our work is done in Canada and in

23 Montreal because that's where the activity is.

24 Q    Okay. And would you explain your view as to -- the

25 predicate -- you corrected me when I said assets, and said

1 business.  Could you explain the difference between business

2 and assets?

3 A    Yes.  There are assets, I'll call them a network, that is

4 located in countries around the world, and because it's the

5 focus here, and in the United States.  Those assets don't make

6 a business.  It's -- you have to have the critical mass of a

7 global network, and a global set of customers and relationships

8 to have a business.  Just -- to be somewhat crass, to kind of

9 draw a line in the sand and cut off the U.S. assets from its

10 connections, its interdependence with the rest of this global

11 network, and the Canadian, you know, based business, which is

12 the center of this, you know, global infrastructure, what you

13 see in front of you, you don't have a business, you just have

14 telecom equipment in the ground.

15 Q    And what would the value, say, of a point of presence

16 telecom equipment be as an asset in the ground in New York?

17 A    Well, in this telecommunications market, and the

18 distressed state of it, you've had extremely distressed values.

19 In some cases you can't find buyers for equipment.

20        MR. ZALESKI:  Okay.  That's all, Your Honor.  Thank

21 you.

22        THE COURT:  Any recross?  All right.  Thank you.  You

23 may step down.

24        MR. PERCH:  No recross, Your Honor.

25        THE COURT:  Any further --

1          MR. PERCH:  Once again, Your Honor, reserving my

2 right to recall Mr. Babcock after discovery.

3          THE COURT:  All right.  Any further testimony?

4          MR. ZALESKI:  No, Your Honor.

5          THE COURT:  Anybody else want to present any

6 testimony?  All right.  I'll hear argument.

7          MR. ZALESKI:  Sort of modifying, and put everything

8 in perspective as to the jurisdiction of these cases, the

9 foreign representative is resting upon the fact that the

10 principal place of these businesses is in Canada.  The mere

11 fact that the United States and 40 other countries worldwide,

12 these companies have a presence, or have some operations, or an

13 asset base, is not determinative of jurisdiction pursuant to

14 principal place of business.  Principal place of business

15 jurisprudence generally is developed in other areas of the law

16 a little more so than in bankruptcy jurisdiction.  But those

17 same tests apply, quite clearly, in determining a Federal

18 Court's jurisdiction.

19          In recognizing where principal place of business is,

20 Courts have typically looked to see where the nerve center,

21 decision-making focal point for the operations, strategic

22 decisions, and -- excuse me, strategic decisions of the

23 companies.  Mr. Babcock's testimony clearly illustrated that

24 those decisions, the core of these businesses, is being run

25 through Canada.  Mr. Babcock's testimony also clearly

52

1  established that without being run through Canada, these assets

2  and businesses in the United States are no more.  They're

3  worthless.  They're useless.  There is no business here.  I

4  think it's important to recognize that this principal place of

5  business is related directly to the company's and the foreign

6  representatives' decision to approach these cases this way.  We

7  have embarked upon proceedings in the CCAA which will permit an

8  expeditious maximization of value of the business of these

9  companies for the benefit of the creditors.  We're looking to

10  maintain the status quo to let that process play out.  Nothing

11  done today, nothing done in the CCAA, and nothing done in the

12  entry of this order would foreclose the possibility of using a

13  Chapter 11 for claims administration after an asset sale has

14  been accomplished, and after maximizing values has been

15  accomplished in the CCAA.  There are no claims proceedings in

16  place there.  It will not be done.  And quite frankly, it could

17  still be brought later.  There are sufficient mechanisms which

18  exist under Canadian law to prevent any harm to creditors of

19  the U.S. entities during the sale process, and that ultimately

20  the process and the process envisioned is directly tied to

21  benefitting in the most expeditious and economical way the

22  totality of this business enterprise.  I would simply submit

23  that there is sufficient jurisdiction that the principal place

24  of business is in Canada for this international, interconnected

25  company, and that this Court has jurisdiction, at least

1 preliminarily, to extend its temporary restraining order and

2 enter preliminary injunctive relief as to the Canadian

3 entities.   Thank you, Your Honor.

4           THE COURT:   Thank you.

5           MR. BUCHBINDER:   Your Honor, the purpose of Section

6 304 is truly to provide ancillary relief, but it's not to

7 create a back door to allow a foreign country to essentially

8 administer what is otherwise a Chapter 11 estate.   With that

9 preface, however, let me return to the conclusively binding

10 judicial admissions.   Mr. Babcock has even testified that he

11 signed all of these petitions.   The petitions are unequivocal.

12 The case law is unequivocal that documents signed under penalty

13 of perjury are conclusively binding judicial admissions.   In

14 the one case in this area in which a Delaware corporation that

15 had its assets in a foreign country, Israel, and the asset

16 consisted solely of a cause of action, in that one case,

17 Shavit, 197 B.R. 763, even in that case, the Court states the

18 petitioner argued that the principal assets and place of

19 business were located in Israel.   And the petition, which he

20 certified under penalty of perjury to be true and correct, set

21 forth numerous facts supporting his contention.

22           Recently, in the Eastern District of Pennsylvania, in

23 the case of Misvinski, a case that perhaps some of the people

24 in the courtroom may have heard of, Judge Sigmund noted, in

25 denying the discharge of the debtors, in a footnote at

1  265 B.R., page 685, she noted that the -- she was relying upon

2  various of the schedules filed by the debtor.  And she stated,

3  "To the extent I rely upon documents filed with this Court, I

4  rely upon amended versions.  Here we just have one set."

5  Citing other cases that I'll mention in a moment, factual

6  assertions and pleadings are judicial admissions against the

7  party that made them.  And the primary case she cites is

8  entitled Larson, L-a-r-s-o-n, v. Groos, G-r-o-o-s, Bank, at 204

9  B.R. 500.  And in that particular case, a debtor sought to

10 bring a claim under the Fair Credit Reporting Act against a

11 bank.

12      The problem that this debtor had, however, was that

13 in his schedules, where the statement of affairs asked him --

14 or, in the Schedule B, where he was asked to identify claims

15 against third parties, he had answered none.  The Court said

16 that's a conclusively binding judicial admission.  Conclusively

17 binding means conclusively binding.  These debtors have come to

18 this Court telling us that they belong here in Delaware.

19 They've told us, under penalty of perjury, that their address

20 is in Virginia, that they're incorporated in Delaware, that

21 their principal place of business is in Fairfax County,

22 Virginia.  They went to great lengths, less than ten days ago,

23 to explain to the Court and to all the parties who were present

24 at the temporary restraining order hearing why they belonged

25 here.  Now that a question has arisen as to how they belong

1 here, now it turns out that what we were told, under penalty of
2 perjury, and all of these petitions, just doesn't happen to be
3 true.  I personally find it rather incredible for someone to
4 suggest that a document entitled a voluntary petition cannot be
5 believed.  There are lots of sheriffs and marshals all over the
6 country, and creditors I might add, who would love to not have
7 to believe bankruptcy petitions, because it would mean they
8 wouldn't have to honor things like the automatic stay.
9 Additionally, if I -- if this case were a Chapter 7 and I were
10 appointed the interim trustee, I would take a look at the
11 petition and it would tell me that I'd better go to Reston,
12 Virginia to secure the assets of the debtor.  It doesn't tell
13 me to go to Montreal.  It doesn't tell me to go to Toronto.  It
14 doesn't tell me to go anywhere else other than to 11480
15 Commerce Park Drive, Reston, Virginia.  If I went anywhere
16 else, I wouldn't find the assets of this debtor.

17            In addition to the conclusively binding judicial
18 admissions made by these various petitioners, they have
19 testified to very substantial amounts of United States
20 activity.  Mr. Babcock has also clearly indicated that his
21 knowledge is limited.  And with respect to the 18 or 19 pages
22 attached to the petition that was verified, that 18 or 19 pages
23 doesn't discuss just the United States entities.  It discusses
24 all of the entities, all 20 of them.  And we were very careful
25 to note in our motion to dismiss that we were only bringing it

1 as to the United States entities.  As to those entities

2 incorporated in Canada, it does appear that they are qualified

3 for relief to the extent that those entities own stock of

4 United States corporations because only a couple of them do,

5 those entities are entitled to appropriate stay -- litigation

6 stay injunctive relief and asset protection injunctive relief

7 limited to the 6,000 American creditors not suing them, and

8 limited to the 6,000 American creditors not seeking to seize

9 the stock in -- that they hold in the American companies.

10 They're entitled to that relief, but they're not entitled to

11 any other relief.

12        So, to sum up, we have conclusively binding judicial

13 admissions.  We have a creditor body of almost 10,000

14 creditors, 60 percent of which are from the United States.  And

15 there are other alternatives for this debtor to proceed, most

16 notably through the filing of its own Chapter 11s, and the

17 imposition of cross-border protocols.  The argument that this

18 could happen more quickly the other way, or that the lender

19 won't lend money if they are United States Chapter 11s, frankly

20 that raises a number of questions that are clearly beyond the

21 purview of this hearing, but it does raise questions there are

22 appropriate alternatives for implementing these cases as a

23 global conglomerate that are other than permitting a number of

24 United States debtors to be administered through a Chapter 11

25 through a proceeding which limits notice to all but a selected

1 group of creditors.  Because Your Honor, I might add, and my
2 final comment, that under the CCAA, as I have been studying it,
3 the CCAA contains a provision that says that creditors who are
4 owed $250 or less don't have to get notice.  But in the
5 equivalent first day order that Teleglobe obtained in the
6 Canadian CCAA, it obtained a provision in its equivalent first
7 day order that limits notice in its case involving several
8 billion dollars only to those creditors who are owed $5,000 or
9 more.  So, most of the creditor body of this estate, most of
10 whom are from the United States, will never have any idea of
11 what has taken place, and will have absolutely no opportunity
12 to have their rights protected because they'll never get any
13 notice.

14        MR. GOLDEN:  Richard Golden again, on behalf of Lisa
15 Donnan.  Ms. Donnan is a former employee of the -- of two
16 Teleglobe entities, was an employee of Teleglobe Communications
17 Corp., and I'm told that that's case number 02-11408, and she
18 is clearly an undisputed claimant of Teleglobe U.S.A., which
19 I'm told is 02-11409.  What is of most concern, which we agree
20 entirely with the statements being made by the U.S. Trustee,
21 but I'm not going to prejudge the Court in -- by any means.

22        What I am concerned, however, is that there is a
23 request for this Court to enter a preliminary restraining order
24 to follow the TRO.  There was on provision of the TRO that we
25 have a great deal of problem with.  And that appears at page

1    three, and it refers to the injunction. I'll pick up a little

2    bit of the language. "All persons shall be hereby enjoined and

3    restrained from (1) commencing or continuing any action or

4    proceeding, including but not limited to the issuance of

5    employment of process, and/or the institution of a proceeding

6    under the Bankruptcy Code." I've talked with opposing counsel

7    on this. I don't think there is any dispute amongst us, and I

8    don't think the Court has any problem in understanding that a

9    304 proceeding cannot be converted to a Chapter 11 or a

10   Chapter 7.

11         The debtor in this case, or the debtors in this case,

12   have an absolute right at any time to come to this Court and

13   file a Chapter 7, a Chapter 11, and I don't know what their

14   assets are, maybe they can qualify under some other chapter.

15   What we are asking for this morning is that that provision of

16   the TRO prohibiting creditors from petitioning this Court for

17   relief be deleted from any further injunctive order. A right

18   of creditors to come to the Bankruptcy Court to petition for

19   relief is basic. It is essential to the operation of the

20   Bankruptcy Code. What this order has done, it has slammed the

21   courthouse door in our face. We can't even walk in to file a

22   petition. We want the right to file a petition. We're not

23   saying once we file a petition that the Court is automatically

24   going to enter an order for relief. The Code describes that.

25   And it's not to say that once a petition is filed that the

1  Court might not stay the proceedings, or that the Court might
2  not even grant abstention, although we would oppose that.  But
3  the rights that accrue to the various creditors when a petition
4  is filed is absolutely essential.  And the particular problem
5  that we have with this case is that on the eve of bankruptcy,
6  and on the day of bankruptcy, there was virtually a large
7  sucking sound, assets disappeared.  And we believe that these
8  assets went to United States persons and entities.  If this
9  matter goes to Canada, the ability of the Canadian proceeding
10  to proceed against these persons who may have obtained
11  fraudulent or preferential transfers is effectively lost.  The
12  CCAA provides no provision for that.  That has been filed by --
13  opposing counsel suggests, well, the BIA may have some
14  provision up there, but I have no idea whether it is federal
15  law in Canada, or whether it is provincial law in Canada, how
16  they are going to obtain jurisdiction over the preferential
17  transfers in this country.
18          More important, the filing of the petition stops the
19  clock.  Since we can't convert to 304, the only thing that
20  could happen -- what I'm hearing from arguments from the U.S.
21  Trustee's Office is that the 304 petition might be dismissed.
22  If that occurs, the clock has moved on.  Allow the creditors
23  the right to file their petition because it will preserve the
24  status quo.  Please lift that language from any injunctive
25  order.  Allow a petition to be filed.  Thank you.

1            THE COURT:  Anybody else wish to be heard?  Any
2   response?

3            MR. FLASHEN:  Your Honor, Evan Flashen, Bingham Dana.
4            THE COURT:  Yes?

5            MR. FLASHEN:  On behalf of the noteholders, as we've
6   advised the debtor and the other major parties, we're not
7   taking a position on the jurisdictional issue.  We did propose
8   to them a rolling TRO, which I'm sure you'll hear about.  The
9   concept of preserving avoidance rights, I haven't discussed
10  this with the debtor, but one possibility is to permit a
11  Chapter 11 petition to be filed in order to freeze the
12  avoidance period, but then abstain from the Chapter 11 pending
13  continuation of the 304 and you can always unabstain from the
14  Chapter 11 if the 304 is dismissed, or if the parties think we
15  should go with the 11 after all.  That will help address that
16  gentleman's concern.  That's all.  Sorry.

17           THE COURT:  All right.

18           MR. GOLDEN:  The right to proceed involuntarily
19  should it exist either for a Chapter 11 or a Chapter 7, I'm
20  representing an individual who is unemployed.  The filing fee
21  is going to be a significant burden.  Coming up with the $200
22  for a Chapter 7 merely to preserve the rights is going to be a
23  burden.  We shouldn't have to pay the fee for a Chapter 11.

24           THE COURT:  Well, does the foreign representative
25  want to comment, or respond to any of the arguments?

61

1          MR. ZALESKI:  Debating how to -- I guess, to start

2  with Ms. Donnan's counsel, or Ms. Donnan's objections, first

3  and foremost, it is my understanding, and I believe we could

4  put on testimony from some of the Canadian lawyers, that there

5  is the ability for a creditor to pursue any type of preference

6  claim under the CCAA.  So, that is a status -- that is a

7  provision of Canadian law.  It does provide the similar

8  protection.  Second of all, I think the ability to commence an

9  involuntary petition is precisely the type of harm, and

10  detriment, and piecemeal taking from this estate that we were

11  hoping to consolidate in a single proceeding here, and avoid

12  having to permit this single business enterprise to reorganize

13  and maximize value for its creditors, predominantly in the

14  place where its business is conducted.  And this is a Canadian

15  company.  These are Canadian proceedings.  The center of the --

16  the gravity of these proceedings, to permit simply a

17  maintenance of the status quo during the period in which those

18  proceedings are under Justice Farley's administration.  There's

19  no greater expense to filing a claim in Canada then there would

20  be here.  It's the same fundamental process.  Mr. Babcock

21  testified to that.  I believe we have evidence via affidavit

22  explaining the claims proceeding process.  There is --

23          THE COURT:  Well, it's not the filing of a claim, but

24  it's the event where somebody objects that might be the

25  problem.

1            MR. ZALESKI:  The problem would exist here in

2  Delaware, and the problem exists for Canadian creditors --

3  would exist for Canadian creditors here if we had an 11, or in

4  other cases where this Court exercises over creditors outside

5  -- exercises jurisdiction over the claims of creditors outside

6  of the United States.  I mean, it's an expression of comity

7  from this Court in the country to the proceedings pending in

8  Canada for the benefit of what has traditionally been a long-

9  standing functional fixture of the Canadian economy.  These are

10  Canadian proceedings.  Their business is principally run from

11  Canada.  They provide interconnected global services.  Their

12  assets are widely distributed.  We admit and have said on the

13  box, yes, Fairfax County, Virginia, is the residence of that

14  company.  They have a street mailing address there.  Their

15  domiciled in Delaware.

16            THE COURT:  You also, did you not, state it's their

17  principal place of business?  Or, are --

18            MR. ZALESKI:  I do not believe so.

19            THE COURT:  -- you asserting the answer was to

20  residence --

21            MR. ZALESKI:  Yes.

22            THE COURT:  -- rather than principal place of

23  business?

24            MR. ZALESKI:  Yes, Your Honor, we have been.  I

25  believe that the verification --

63

1       THE COURT:  The residence of a Delaware corporation
2  --

3       MR. ZALESKI:  Domicile would be Delaware.  Regardless
4  of that, I think that, you know, if need be, if it would make
5  the Court and parties more comfortable, you know, we do have a
6  right under Rule 1109 to modify those petitions.  It was the
7  intention that the petitions, in their totality, would explain
8  to this Court, to the United States Trustee, and to any other
9  party in interest, the nature of these global, interconnected,
10  and Canadian-based businesses.  There has not been anything
11  suggested or attempted in trying to put some protective
12  remedies in place for these companies.  And anything nefarious
13  or in any way untoward to U.S. creditors was being done.  We're
14  looking to maximize the asset value of this business.  This is
15  an industry that is in tremendous turmoil.  There is a chance
16  to get value in Canada in the next 45 days.  We would
17  respectfully ask that this Court permit us a period of time in
18  which to accomplish that.

19       THE COURT:  All right.  Anybody wish to respond?
20       MR. PERCH:  Your Honor, Frank Perch once again, for
21  the U.S. Trustee.  There's a lot of obfuscation and
22  misdirection here because there is the continual reference to
23  the companies and the business.  The issue before the Court on
24  the question of the principal place of business as to the
25  entities to which jurisdiction is objected is what is the

64

1 principal place of business of those entities? And let me
2 start with one basic thing. Residence -- county of residence
3 or principal place of business is what the petition calls for.
4 Individuals reside, corporations have places of business. I
5 think that the Court understands that it's somewhat
6 disingenuous to suggest that a Delaware corporation can reside
7 anywhere other than either where it is incorporated or where it
8 has its principal place of business. And there just isn't
9 anything on there that says its principal place of business or
10 its residence is Montreal. There's one thing we know. They
11 can argue about what they didn't -- about what they did say,
12 but they can't argue about what they didn't say. They didn't
13 say anywhere there that they reside or they have their
14 principal place of business in Montreal. If there's any reason
15 whatsoever to go beyond that, then we need to pay attention to
16 the fact that Mr. Babcock's testimony was full of vacuum and
17 misdirection. Misdirection, once again, of using the word the
18 companies, and not -- and trying to distract the Court from the
19 facts of what are -- what is the situs of the operations of
20 these companies? And the rest of it was just lack of
21 knowledge. Your Honor, they put on a witness that doesn't know
22 any of the relevant facts, doesn't know who the board of
23 directors are, doesn't know where they reside, doesn't know
24 where their -- what their citizenship is, doesn't know where
25 the board of directors has ever met, doesn't know who the

1 officers are, doesn't know what their citizenship is, doesn't

2 know that the company puts things out on the Internet and files

3 things with the Commonwealth of Virginia that are making

4 statements that are contrary to the broad conclusory

5 allegations that are being made.  That's the kind of stuff that

6 if we had discovery we'd have the opportunity to explore that.

7 But instead, they would like Your Honor to find jurisdiction

8 based on what Mr. Babcock doesn't know.

9         The governing case law, and this, in fact, comes from

10 the District of Delaware, and if Your Honor believes there's

11 anything that needs to be considered beyond the judicial

12 admissions of the principal place of business in the petition,

13 then Your Honor needs to consider the issue of principal place

14 of business with respect to the case of Holly Farms Corporation

15 v. Taylor, which is a District of Delaware decision, 722

16 F.Supp. 1152, from 1989, that addresses very specifically the

17 issue of principal place of business in a parent subsidiary

18 context and makes it very clear that if the separation between

19 the parent and subsidiary is carefully maintained, if they keep

20 a separate corporate identity, the subsidiary may have a

21 principal place of business that is separate from that of the

22 parent corporation.  And the fact that the parent corporation

23 may exert control of the subsidiary by ownership or by other

24 means does not, in and of itself, mean that the principal place

25 of business of the subsidiary is the same as that of the

66

1  parent.  Everybody on this side of the table is grumbling

2  because they don't have this case in front of them.  Let me

3  remind the Court that they told us at about four or five

4  o'clock yesterday what the basis of their claim of jurisdiction

5  was.  So, that's why this hasn't been briefed, because once

6  again they would like to railroad the Court to a decision

7  without giving anybody an opportunity to look at the facts, and

8  look at the issues, and look at the law.  Your Honor, they've

9  just not made a prima facie case.  They have judicial

10 admissions that are against them, and they have testimony that

11 is vague and incomplete as to the facts relating to what is --

12 where does the corporate activity and management occur of these

13 entities, not the management of the parent company that has an

14 impact on the subsidiaries, but the corporate activity of these

15 United States entities that have legal counsel in the United

16 States, that have human resources directors in the United

17 States, that have regulatory affairs people in the United

18 States, pay taxes to the United States, have thousands and

19 thousands of creditors in the United States, one of whom has

20 gone to the trouble of being here today, Your Honor, wanting to

21 know whether she's ever going to have the opportunity to be

22 heard.  Your Honor, I just don't think they've made a prima

23 facie case.

24                    (C.D. Off)

25        THE CLERK:  Be seated.

                J&J COURT TRANSCRIBERS, INC.

67

1          THE COURT:  Well, let me issue my ruling on the

2  request for relief here.  With respect to the United States

3  companies which were identified on U.S. Trustee 1, page three,

4  I must conclude that the movant has not established a

5  likelihood of success on the merits, which is the standard

6  under a preliminary injunction to establish that I have

7  jurisdiction over those entities.  I think the judicial

8  admissions in the petition are not refuted by the testimony

9  that the businesses generally of all the entities are conducted

10  in Canada.  I think that to conclude, as the foreign

11  representative would like me to conclude, that I had mis-

12  considered the business as an overall, and the business

13  enterprise as all of the related entities, really goes too far,

14  and in essence would require that for purposes of determining

15  jurisdiction I'm essentially substantively consolidating all

16  these entities as one business enterprise.  I think in

17  determining jurisdiction under 304, I have to determine what

18  the business of the respective debtors are, and with respect to

19  the United States debtors I cannot conclude that pursuant to

20  304 and 101(23) that they fit the requirements for commencing a

21  304 proceeding in this Court.  That said, with respect to all

22  of the other entities who are, in fact, foreign entities, whose

23  principal assets and principal place of business and domicile

24  is in Canada or a foreign country and are properly subject to a

25  foreign proceeding, which the CCAA is an appropriate foreign

68

1  proceeding within the meaning of 304 and 101(23).  I will enter

2  relief to protect their assets located in the United States,

3  including specifically the stock of the United States

4  subsidiaries.  And I will enter that order on a preliminary

5  basis.

6          And let's talk about the scope of that order that is

7  necessary to protect the Canadian assets, the Canadian

8  entities, the United States assets, because I think that nobody

9  contests that a preliminary injunction with respect to those is

10 appropriate.

11         MR. ZALESKI:  Your Honor, if I may approach, the

12 proposed form of order was actually bifurcated between a sort

13 of rolling TRO as to the U.S. entities and the type of

14 preliminary injunctive relief that I think you're contemplating

15 as to the foreign entities.  And if I could approach and show

16 it to you, I think it might at least establish a forum for

17 dialogue.

18         THE COURT:  Yes.

19         MR. PERCH:  Your Honor, I just -- perhaps Mr. Zaleski

20 has a copy just so I know what -- thank you.

21                    (Pause)

22         THE COURT:  I think we have to delete the first three

23 decretal paragraphs, don't we?

24         MR. ZALESKI:  Yes, Your Honor.  I believe that is

25 correct.  Your Honor, will I'm talking, I think counsel for the

1  company would also like to be heard as to the scope of the

2  order.

3         THE COURT:  Of the preliminary injunction?  Yes.

4         MR. RAPISARDI:  Your Honor -- I'm sorry -- this is

5  John Rapisardi of Jones Day, representing Teleglobe.  With

6  respect to the injunction as it relates to the foreign debtors,

7  your ruling as it relates to the U.S. companies, Your Honor,

8  will trigger defaults under the DIP facility that was entered

9  into by the foreign debtors and the U.S. facilities, and what I

10  would respectfully request as part of this injunction, if you

11  would entertain a temporary stay pending appeal for at least a

12  few days, so that we can just sort out the impact of your

13  ruling and its effect on the U.S. assets.  The concern is that

14  if the stay is immediately lifted today, the companies are not

15  in a position, unfortunately, to file Chapter 11 petitions.  It

16  needs to resolve that issue in terms of funding and also

17  working it out with its DIP lender.  So, I would respectfully

18  and urgently request the Court to consider a temporary stay --

19  a temporary stay pending appeal, at least for a few days, so as

20  to allow us to sort this out and at least, at a minimum, to be

21  in a position to file Chapter 11 petitions early next week.

22  Thank you, Your Honor.

23         MR. GOLDEN:  Richard Golden, on behalf of Lisa

24  Donnan.  I believe our statutory right to file a petition under

25  Section 303, I think we should have had that from day one.  We

1  should have that right now.  It will not harm the debtors in

2  any way.  It will preserve the status quo.

3           MR. PERCH:  Your Honor, Frank Perch, for the U.S.

4  Trustee.  Your Honor, Mr. Rapisardi's request I think raises an

5  issue that is also within the scope of the language of the

6  proposed order that seems to suggest in the -- I think what's

7  the fourth decretal paragraph that there is relief requested

8  somehow -- that somehow the U.S. companies are party to a

9  debtor-in-possession, quote, unquote, not really the correct

10  term, financing order, and in Canada.  And if the Court doesn't

11  have jurisdiction over these entities, the Court doesn't have

12  the ability to affect what position they do or do not have as

13  co-borrowers, or something under the Canadian DIP order.  I

14  think that the standard for granting a stay pending appeal --

15           THE COURT:  I missed that whole argument.  I'm sorry.

16           MR. PERCH:  Okay.  I'm sorry.  Well, what I'm trying

17  to figure out, because once again I don't understand the

18  factual basis of what's being requested here, other than to the

19  extent that they would otherwise be seeking some kind of relief

20  from this Court relating to the status of the U.S. companies as

21  borrowers under the DIP order.  But in any event, just to move

22  beyond that for a moment, the standards for granting a stay

23  pending appeal are somewhat usually held to be somewhat similar

24  to the standards for a preliminary injunction, and so I think

25  that the Court's finding that the likelihood of success on the

1 merits of the jurisdictional issue, the Court's finding that
2 there was not a likelihood of success on the merits of the
3 jurisdictional issue, I should say, would also preclude the
4 Court from appropriately, under the applicable standard, grant
5 a stay pending appeal.

6           THE COURT:  Well, what is the effect of my denial of
7 the preliminary injunction today on the TRO that was entered?
8 As I understand it, the TRO I entered is through tomorrow?  Or
9 is it -- How long do you have on the clock?

10          MR. PERCH:  It was a ten day order, Your Honor, which
11 would take it through Monday.  We had this --

12          THE COURT:  I know there's --

13          MR. PERCH:  -- hearing scheduled today because of the
14 holiday.

15          THE COURT:  May 15th at seven p.m., 6:49.

16          MR. RAPISARDI:  I believe it's six p.m. tomorrow.
17 And what we would request is at least to carry it through
18 Monday, until six p.m.

19          UNIDENTIFIED SPEAKER:  That's a holiday.

20          MR. RAPISARDI:  Oh.

21          THE COURT:  Or Tuesday at six p.m.

22          MR. RAPISARDI:  Or Tuesday six p.m.

23          THE COURT:  Are TROs governed by the same rules as
24 others, that if they expire on a weekend or holiday they
25 continue through to the next business day?

                    J&J COURT TRANSCRIBERS, INC.

72

1           MR. PERCH:  Would that be --

2           MR. RAPISARDI:  9006.

3           THE COURT:  9006.

4           MR. RAPISARDI:  I believe it's 9006.

5           MR. PERCH:  Your Honor, would that be governed by
6  Rule 9006, perhaps?

7           MR. RAPISARDI:  Yes.  9006.  I think Memorial Day.
8  And it's if the last day expires, I think you may be right.

9           UNIDENTIFIED SPEAKER:  -- period of time, by order of
10  the Court.

11           MR. RAPISARDI:  No, but the last period --

12           THE COURT:  Well, it does include any period governed
13  by these rules or by order of the Court.

14           MR. RAPISARDI:  Um-hmm.  Memorial Day is one.

15           MR. CARRAGHER:  Your Honor, may I be heard on this?

16           THE COURT:  Yes.

17           MR. CARRAGHER:  Your Honor, Daniel Carragher
18  representing certain creditors, noteholder creditors of just
19  one of the U.S. entities, that's Teleglobe Marine U.S. Inc.
20  Our clients are owed approximately $44 million by that entity.
21  It's a secured private placement transaction.  I don't think we
22  have to go into the merits of it now, but I just -- I do have a
23  copy of the temporary restraining order, which I obtained last
24  week.  And I don't believe that it runs through -- for a full
25  ten days.  Your order says it -- the injunction runs through

J&J COURT TRANSCRIBERS, INC.

73

1  the hearing on the preliminary injunction.  It cannot extend

2  for more than ten days, and it has the time of entry, but I

3  don't believe it was a full ten-day order.  I have a copy if

4  you'd like, a printed copy, Your Honor.

5          THE COURT:  I have it.  I think you're correct.

6          MR. CARRAGHER:  Your Honor, since I just pointed out

7  the language, let me clarify it.  It says, pending the hearing

8  on and determination of the petitioner's motion for preliminary

9  injunction.

10                      (Pause)

11         MR. ZALESKI:  Your Honor, while we're trying to

12 consider the effect on the domestic entities, I think we may

13 have a way of modifying the proposed TRO to be within the

14 bounds of your ruling, and really it's a sort of changing

15 defined terms and striking those three decretal paragraphs you

16 referred to, and substituting foreign corporations for foreign

17 debtors throughout.

18         THE COURT:  Um-hmm.

19         MR. ZALESKI:  If I could approach with a marked-up

20 copy, I would do that.

21         THE COURT:  You may.

22         MR. PERCH:  Your Honor, would it make sense for us to

23 have a short break so that the parties could see if we could

24 work out a consensual form of modified order?

25         THE COURT:  Yes.  In fact, do the parties want to

                  J&J COURT TRANSCRIBERS, INC.

1    come back at 1:30?  I'll let the parties talk.

2         MR. ZALESKI:  That would be fine, Your Honor.

3         THE COURT:  And then we'll talk about the extent of

4    the order I'll enter.  All right.  We'll stand adjourned.

5         MR. ZALESKI:  Thank you, Your Honor.

6         MR. PERCH:  Thank you, Your Honor.

7                   (Recess)

8         THE CLERK:  Please be seated.

9         THE COURT:  Good afternoon.

10        MR. ZALESKI:  Good afternoon, Your Honor.  Thank you

11   for giving us this time.  Your Honor, the parties used the past

12   hour to take a look at this order and modify it basically in

13   accord with what I had previously submitted to you.  We have

14   taken the opportunity to use the computer by Judge Walsh's

15   courtroom to clean it up.

16        However, Your Honor, the parties, I think -- we've

17   included a provision in here that would be predicated upon Your

18   Honor interpreting the terms of -- which I believe would be

19   within your discretion, to interpret the terms of your existing

20   temporary restraining order as to its expiration.  The thought

21   being that if Your Honor interpreted that expiration as of

22   either the end of the day today or tomorrow, which was the ten-

23   day period originally contemplated by the parties when that

24   order was entered, the expiration of that TRO -- and it is

25   included in this order, would actually be at six p.m. on May

J&J COURT TRANSCRIBERS, INC.

1 28th, which would be Tuesday.  And it is the next to last

2 decretal paragraph in the order, and we'd like to hand up.

3          THE COURT:  You may.

4                    (Pause)

5          THE COURT:  Yes?

6          MR. GOLDEN:  Richard Golden for Lisa Donnan again.

7 We were not parties to the entry of the original order.  I

8 believe that the order that was signed by the Court said that

9 pending the hearing on and determination of petitioner's motion

10 for a preliminary injunction.  And that was on page four of the

11 marked up order.  I believe we've had the hearing and

12 determination.  I do not deny that the Court can extend the

13 TRO, but I believe Rule 7065 requires that certain steps that

14 -- to be gone through, and we do not consent to a continuation

15 of the order.

16          MR. ZALESKI:  Your Honor, to respond to that, the

17 determination, I believe, could be an alternative place that

18 this Court could interpret its existing order, and perhaps we

19 could submit this agreed upon form on Tuesday afternoon to the

20 Court.  Additionally, I've been asked to make a representation

21 that the domestic debtors will make no transfer of property

22 outside of the ordinary course during the entirety of the -- I

23 guess the existence of the previously entered TRO.  And I

24 wanted to make that representation before I forgot.  Thank you.

25          MR. GOLDEN:  I believe counsel is representing the

1 monitor appointed in the Canadian proceedings. I do not know

2 whether the other American corporations are before the Court at

3 this time. But beyond that, there is the central issue that

4 the United States trustee has been arguing, and I think it is

5 correct, it's an issue of jurisdiction. I do not believe that

6 we should be restrained any further.

7       MR. ZALESKI: Mr. Tay is here, Canadian counsel to

8 the debtors, if it's really who the representation is coming

9 from. I believe he could make that representation.

10       MR. SHAPIRO: Your Honor, may I speak?

11       THE COURT: Yes.

12       MR. SHAPIRO: Mark Shapiro from Shearman and

13 Sterling. We represent a subsidiary of BCE, Inc., which is the

14 DIP lender in Canada. We are their U.S. counsel. Your Honor,

15 the concern, I think, that the debtors have, and that certainly

16 we as a DIP lender have, is that if someone -- the collateral

17 -- the way that the DIP loan works in Canada, as I understand

18 it, and I haven't read every word of it, but I know the general

19 gist of how it works, which is that the order similar to our

20 normal DIP orders here grant a lien over all of the assets in

21 Canada. And the expectation was that we'd be coming before

22 Your Honor at some point in the near future seeking an order to

23 obtain DIP liens to the extent loans were made to the U.S.

24 companies to satisfy over liens against collateral here in the

25 U.S. The concern I have, as DIP lender sitting here today,

1  with respect to, effectively, the Canadian part of this, is

2  that the -- as you heard earlier today, this company is run as

3  one.  So, anybody who takes an action against any part of this

4  business could effectively shut this whole business down.  As

5  you also heard today, the debtors are in the process of a sale

6  proceeding -- sale process where they're intending to try to

7  sell this company for as much as they can sell it for.  And

8  these are very fragile businesses, from a telecommunications

9  standpoint.  If customers believe that this company is -- you

10 know, outside the United States people think of bankruptcy as

11 liquidation.  If people think that this is going to be a

12 liquidation, a lot of customers are going to flee, and I

13 believe our DIP collateral could be in jeopardy.  As I think

14 was explained to you, there is an event of default under the

15 DIP provision -- the credit agreement for something along the

16 lines of what has happened today.  And so, I have a concern

17 that in the absence of being able to discuss this with my

18 clients, and work out a -- some resolution with the debtors,

19 that we could be seeing, you know, a serious degradation in

20 value from the debtor's standpoint and from the DIP lender's

21 standpoint.  And so, I think what's being asked of the Court is

22 to interpret your existing order, which we believe you have the

23 full right to do, as being -- as expiring tomorrow.  And under

24 Rule 9006, you would -- that order, by its terms, would extend

25 through six p.m. on Tuesday.  That will give all of the

78

1  interested parties, meaning the people who have money involved

2  in this case, time to try to work out a solution.

3          THE COURT:  Well, let me do this.  I will hold this

4  matter under advisement.  And I do, in the absence of entry of

5  an order with respect to the motion for preliminary injunction,

6  I do believe the TRO is still in effect, at least until

7  Tuesday, at 6:49 p.m.

8          MR. SHAPIRO:  And from that conclusion, Your Honor,

9  that would include people filing involuntary petitions between

10  now and then, we assume, by virtue of the terms of the order.

11          THE COURT:  By virtue of the TRO, I think it enjoined

12  -- it did enjoin that.

13          MR. SHAPIRO:  Okay.  Thank you, Your Honor.

14          THE COURT:  All right.  Well, I am cognizant of the

15  deadline by which I must enter an order on the pending request.

16  I don't think any further hearing is necessary, unless the

17  parties want to come back on Tuesday.

18          MR. ZALESKI:  We don't believe that's necessary, Your

19  Honor.

20          THE COURT:  All right.  Then I'll take the matter

21  under advisement.

22          MR. ZALESKI:  Thank you, Your Honor.

23          THE COURT:  All right.  We'll stand adjourned.

24          MR. PERCH:  Thank you.

25                      *  *  *  *  *

# C E R T I F I C A T I O N

I, TAMMY DeRISI, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

_____    Date:   February 28, 2004

TAMMY DeRISI

J&J COURT TRANSCRIBERS, INC.