# EXHIBIT 7

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| TELEGLOBE COMMUNICATIONS | : | Case No. 02-11518 (MFW) |
| CORPORATION, a Delaware | : | Jointly Administered |
| corporation, et al.,[1] | : | |
| | : | Hearing Date: October 9, 2002 @ 2:00 p.m. |
| Debtors. | : | Objection Deadline: October 4, 2002 @ 4:00 p.m. |

NOTICE OF (I) TRANSACTION NOTICE FILED WITH
CANADIAN COURT SEEKING APPROVAL OF SALE OF TELEGLOBE
COMPANIES' CORE BUSINESS TO SUCCESSFUL BIDDER,
(II) DECISION CONCERNING NEED FOR AN AUCTION,
(III) SELECTION OF SUCCESSFUL BIDDER, AND (IV) SALE HEARING DATE
[Re: Docket No. 84]

PLEASE TAKE NOTICE of the following:

1.    In connection with the sale, free and clear of liens, claims and encumbrances
pursuant to sections 105(a), 363(b) and (f) and 1146(c) of the Bankruptcy Code, of certain assets
located in the United States (the "US Assets") and owned by the above-captioned debtors and
debtors in possession (collectively, the "Debtors") relating to the Voice Business[2] of the
Teleglobe Companies,[3] the Debtors filed a motion (the "Sale Motion"), dated June 10, 2002,
seeking, among other things, an order: (a) approving a global bidding process for the Voice
Business as it relates to the US Assets (the "Global Bidding Process"); (b) approving certain
bidding procedures to be utilized in the Global Bidding Process (the "Bidding Procedures"); (c)
establishing notice procedures in connection with the sale of the Voice Business; and (d) setting
a hearing to approve the sale of the Voice Business to the Successful Bidder, free and clear of
liens, claims and encumbrances, as determined by the Global Bidding Process. On June 24,
2002, the Court entered an order [Docket No. 160] (the "Bidding Procedures Order") granting
such relief.

---

[1] The Debtors are the following eleven entities: Teleglobe Communications Corporation, Teleglobe USA
Inc., Optel Telecommunications, Inc., Teleglobe Holdings (U.S.) Corporation, Teleglobe Marine (U.S.) Inc.,
Teleglobe Holding Corp., Teleglobe Telecom Corporation, Teleglobe Investment Corp., Teleglobe Luxembourg
LLC, Teleglobe Puerto Rico Inc. and Teleglobe Submarine Inc.

[2] The Core Business and Purchased Assets, combined with the Excluded Assets (all as defined in the
Purchase Agreement (defined below)), comprise the Voice Business (as defined in the Sale Motion). For avoidance
of doubt, this Notice contemplates the sale of the US Assets that are included as part of the Core Business and
Purchased Assets as more fully set forth in the Purchase Agreement.

[3] Capitalized terms utilized herein not otherwise defined shall have the meanings ascribed to them in the
Sale Motion.

9-20-02
# 550

2.    The Voice Business consists of the Teleglobe Companies' core business of providing voice and related data telecommunications services, including: (a) international voice and data transit services that originate or terminate in the United States, Canada, the United Kingdom, Spain, Australia or Hong Kong or are switched or routed through facilities of the Teleglobe Companies in one of the above locations; and (b) certain other services, including (i) dedicated broadcast; (ii) wireless roaming; and (iii) international private line.

3.    Prior to the entry of the Bidding Procedures Order, approximately 69 potential purchasers of the Voice Business were contacted, and of those contacted 37 signed confidentiality agreements with the Teleglobe Companies.[4]  Pursuant to the Bidding Procedures, 10 parties interested in bidding on the Voice Business submitted written bids on or before the deadline set forth in the Bidding Procedures Order of July 15, 2002 (the "Bid Deadline").  Upon expiration of the Bid Deadline, Ernst & Young Inc. as the court appointed monitor in the Canadian Proceedings (the "Monitor"), the Teleglobe Companies and their respective legal and financial advisors, in consultation with the Creditors' Committee, (a) reviewed each bid; (b) pursued further negotiations with four bidders that were deemed most likely to deliver the highest and best offer for the Voice Business; (c) after narrowing the field to the three bidders deemed most likely to submit the highest and best offer, engaged in extensive negotiations with all three bidders, including at least two additional rounds of submissions of offers and marked purchase agreements by all three bidders; and (d) selected a bid submitted by Cerberus Capital Management, L.P. and TenX Capital Partners (who have formed TLGB Acquisition LLC to be the purchaser under the Purchase Agreement) as the highest and best bid for the assets.  TLGB Acquisition LLC and any affiliate or affiliates it may designate under the Purchase Agreement are collectively referred to herein as the "Buyer."

4.    The Teleglobe Companies, including certain of the Debtors (the "US Debtor Sellers"),[5] then commenced negotiations with the Buyer.  These negotiations culminated in the execution of a Purchase Agreement, dated September 18, 2002 (the "Purchase Agreement"), for the sale of substantially all of the assets of the Voice Business (the "Core Business and Purchased Assets").  The Monitor reviewed and approved the sale of the Core Business and Purchased Assets to the Buyer, as set forth in its Eleventh Report, dated September 19, 2002 (the "Monitor's Report").  On September 19, 2002, the Teleglobe Companies filed a notice (the "Canadian Transaction Notice") with the Canadian Court seeking approval of the Purchase Agreement, the Interim Management Agreement (described below) and the UK Interim Management Agreement (described below) and the transactions contemplated by these agreements at a hearing scheduled for September 30, 2002 at 10:00 a.m. (Eastern time).  A copy of the Canadian Transaction Notice is annexed hereto as Exhibit "A."[6]

---

[4]  The Teleglobe Companies' marketing and auction processes are described in greater detail in the Monitor's Report (described below)

[5]  The US Debtor Sellers are Teleglobe Communications Corporation, Teleglobe USA Inc. and Optel Telecommunications, Inc

[6]  The Monitor's Report, Purchase Agreement and their respective exhibits and schedules are included only with the copy of this Notice that is filed with the Court because these documents are voluminous.  Copies of the Monitor's Report, Purchase Agreement and their respective exhibits and schedules can be obtained upon written

5.    The Monitor has determined, and the Debtors in their sound business judgment agree, that the auction process described above yielded the highest and best offer for the Core Business and Purchased Assets and is in the best interest of the estates of the Debtors and their creditors and stakeholders. Therefore a second stage auction process, as permitted but not required by the Bidding Procedures, will not be held. The Buyer is the "Successful Bidder" as defined in the Bidding Procedures Order.

6.    The material terms of the Purchase Agreement are as follows:[7]

(a)    The Buyer agrees to purchase the Core Business and Purchased Assets for a purchase price to be paid in cash in the amount of $155.3 million (the "Unadjusted Purchase Price"), to be adjusted to yield the Final Purchase Price as follows:

(i)    increased or decreased, as applicable, by the amount, if any, by which the Adjusted Net Current Assets[8] as of the IMA Date (described below)[9] differs from the Target Net Current Assets;[10]

(ii)    increased by 50% of the Cure Savings realized after the signing of the Purchase Agreement;[11]

(iii)    increased by one half of any amounts paid by Sellers between the date of the Purchase Agreement and the IMA Date to satisfy Cure Costs prior to the IMA Date;

(iv)    increased by the amount of any post petition Current Liabilities incurred after the IMA Date with respect to a Rejected Contract listed on the Contract Schedules (to the extent the Buyer does not pay such liabilities as Business Expenses (as

---

(continued...)

request to counsel for the Teleglobe Companies, Jones, Day, Reavis & Pogue, 222 East 41st Street, New York, New York 10017, attention: Brian E. Greer, Esq. (facsimile (212) 775-7306). These documents can also be obtained from the Teleglobe Companies' website at www.teleglobe.com.

[7] This summary is solely for the convenience of the Court and parties in interest and is not intended to alter or otherwise modify the terms of the Purchase Agreement. This Notice does not purport to provide an exhaustive summary of the terms of the Purchase Agreement and reference is made to the copy attached hereto. All capitalized terms in paragraph 6 of this Notice not otherwise defined in this Notice shall have the meanings ascribed to them in the Purchase Agreement.

[8] Net Current Assets excluding certain Cure Amounts.

[9] The conditions to the IMA Date are summarized in paragraph 9 below. The IMA Date is the date on which the Interim Management Agreement becomes effective.

[10] Target Net Current Assets are zero plus certain Cure Amounts.

[11] Section 4.4.3 of the Purchase Agreement sets forth procedures for settlement of the Cure Amounts. To the extent that a settlement of the Cure Amounts is achieved for less than the face amount of the Cure Amounts as previously agreed between the Buyer and Sellers, the Sellers will receive 50% of the savings.

defined in the Interim Management Agreement and UK Interim Management Agreement);[12]

(v)    decreased by the management fee paid pursuant to the Interim Management Agreement and the UK Interim Management Agreement;[13] and

(vi)    decreased by certain severance costs the Sellers will not have to pay as a result of actions taken by the Buyer.[14]

(b)    Upon execution of the Purchase Agreement the Buyer paid a deposit of $7,765,000 (the "Deposit") to an escrow account held by JP Morgan Chase Bank as the Escrow Agent in accordance with the terms and provisions of the Escrow Agreement. At the Closing, the Deposit will be delivered to the Sellers and applied to the Final Purchase Price. If the Purchase Agreement is terminated prior to the occurrence of the Closing, unless the Sellers terminate because the Buyer is in breach of the Purchase Agreement as described in Section 11.1.2(b) of the Purchase Agreement, the Deposit will be returned to the Buyer in accordance with the Escrow Agreement.

(c)    Upon the occurrence of certain events described below, the Buyer and the Sellers (other than the UK Sellers)[15] will enter into the Interim Management Agreement, pursuant to which the Buyer will operate the Core Business on the Sellers' behalf until the Closing Date. On the Closing Date, (i) the Sellers will receive, subject to the Buyer's rights to pay certain disputed amounts into the escrow established under the Escrow Agreement, payment of the Final Purchase Price in accordance with the terms of the Purchase Agreement, (ii) the Sellers will transfer to the Buyer all of the Sellers' right, title and interest in and to the Purchased Assets (directly or indirectly through one or more existing or newly formed subsidiaries) and (iii) the Buyer will assume directly or through one or more existing or newly formed subsidiaries the Assumed Liabilities.

(i)    The Purchased Assets represent substantially all of the rights, properties and assets of the Core Business and are detailed in Section 1.1 of the Purchase Agreement.

(ii)    The Assumed Liabilities (described in Section 1.1 of the Purchase Agreement) represent liabilities and obligations relating to the Core Business, including liabilities under the Contracts assumed by the Buyer (but excluding Contracts the Buyer

---

[12] The Buyer has the right to have the Sellers reject certain Contracts. This adjustment is intended to partially compensate the Sellers for the cost of such an election by the Buyer.

[13] The Buyer receives 50% of the cash flow of the Core Business between the IMA Date and the Closing Date through the management fee payable under the Interim Management Agreement and the other 50% through the purchase price reduction.

[14] These costs would be borne by the Sellers if the Buyer did not take action to release the Sellers therefrom. Therefore, decreasing the purchase price for these amounts has no economic impact upon the Sellers.

[15] The UK Sellers will enter into a separate interim management agreement with the Buyer (the "UK Interim Management Agreement").

determines not to assume), certain liabilities as of the Closing Date relating to the Core Business, certain employee related liabilities (including the pension plan should the Buyer elect to assume the plan) and the Cure Amounts.

     (d)    The primary conditions to the occurrence of the Closing Date[16] include:

     (i)    the consents of the required material governmental entities and regulatory approvals and certain landlord and related consents necessary to consummate the transactions contemplated by the Purchase Agreement shall have been obtained;

     (ii)    the portion of the Final Purchase Price that is not subject to dispute shall have been paid to the Sellers and the Buyer shall have deposited any disputed amounts under the provisions of the Purchase Agreement with the Escrow Agent pending resolution of such disputes;[17]

     (iii)    the Buyer shall have received all required Closing deliveries pursuant to Section 5.2.2 of the Purchase Agreement;

     (iv)    any required bankruptcy court approvals shall have been obtained and remain in full force and effect and shall have become final and nonappealable; and

     (v)    certain transactions related to the Purchased Assets in the United Kingdom shall have been completed.

The accuracy of the Sellers' representations and warranties at Closing is not a condition to the Closing Date.

     (e)    The Purchase Agreement may be terminated by the Buyer, upon written notice to the Sellers:

     (i)    if the IMA Date has not occurred prior to December 31, 2002 or the Closing has not occurred prior to August 31, 2003, provided the Buyer has not caused such failure by breaching any of its representations, warranties, covenants or agreements contained in the Purchase Agreement;

     (ii)    prior to the IMA Date, so long as the Key Sellers[18] are not then entitled to terminate the Purchase Agreement because of certain breaches by the Buyer (as more fully set forth in Section 11.1.2(b) of the Purchase Agreement), if any of the Key Sellers' representations and warranties have been materially breached, except for breaches or inaccuracies that did not, either individually or in the aggregate, result in a

---

[16] Article X of the Purchase Agreement sets forth the conditions to the Closing Date.

[17] Sections 4.4.1, 4.4.3.2 and 5.2.5 of the Purchase Agreement detail the amounts that can be disputed and the Purchase Agreement sets out how such disputes are to be resolved.

[18] The Key Sellers are Teleglobe USA Inc., Teleglobe Communications Corporation, Optel Telecommunications, Inc., Teleglobe Inc., and Teleglobe Canada Limited Partnership.

Material Adverse Effect,[19] or any of the Key Sellers is in material breach of any material covenant contained in the Purchase Agreement, unless such breach or inaccuracy has been cured by the earlier of the IMA Date or 30 days following the date on which the Buyer provides Teleglobe Inc. written notice thereof;

      (iii)     on or after the IMA Date but prior to the Closing, so long as the Key Sellers are not then entitled to terminate the Purchase Agreement because of certain breaches by the Buyer (as more fully set forth in Section 11.1.2(b) of the Purchase Agreement), if any of the Key Sellers is in material breach of any of the covenants contained in Section 8.13 (certain negative covenants of the Sellers) or Section 8.15 (Migration Transactions) of the Purchase Agreement or any material covenant contained in the Interim Management Agreement or the UK Interim Management Agreement and such breach is caused by actions of any of the persons listed on Schedule 11.1.3(c)[20] unless such breach has been cured within 30 days following the date on which the Buyer provides Teleglobe Inc. written notice thereof;

      (iv)     if any bankruptcy court disapproves of the Purchase Agreement, the Interim Management Agreement or the UK Interim Management Agreement;

      (v)     if the Buyer's rights to receive the Breakup Fee or Expense Reimbursement are held invalid or unenforceable, in whole or in any material part or in the event of a Competing Transaction; or

      (vi)     if the Canadian Transaction Notice is not filed on or before the date that is five Business Days after the date of the Purchase Agreement, and if either of the Canadian Court or the US Bankruptcy Court has not entered the applicable Sales Approval Order or such Sales Approval Order shall not become a Final Order on or before the date that is 75 days after the date of the Purchase Agreement.

The Sellers also have termination rights, which are set forth in Section 11.1.2 of the Purchase Agreement.

      (f)     Unless the Purchase Agreement is terminated by the Sellers because either the IMA Date has not occurred prior to December 31, 2002 or the Closing Date has not occurred prior to August 31, 2003 (as more fully described in Section 11.1.2(a) of the Purchase Agreement) or because the Buyer is in breach of the Purchase Agreement (as more fully described in Section 11.1.2(b) of the Purchase Agreement), if (i) the Sellers (x) terminate the

---

[19] Any breach or inaccuracy which, either individually or when aggregated with any other breaches or inaccuracies, results in direct or indirect adverse consequences to the Buyer in excess of $10,000,000 shall be deemed for purposes of Section 11.1.3(b) of the Purchase Agreement (which Section is summarized in this paragraph 6(e)(ii)), to have a Material Adverse Effect.

[20] The persons listed on Schedule 11.1.3(c) include John Brunette (CEO of Teleglobe Inc.), the UK Administrators, the Monitor and certain persons holding positions of significant responsibility with respect to the sale of the Core Business. If the breach is caused by an act or omission of an Employee who reports to the Manager under the Interim Management Agreement or the UK Management Agreement, such breach shall not give the Buyer a termination right.

Purchase Agreement, (y) agree to complete a Competing Transaction within two years of the date of the Purchase Agreement, or (z) execute an agreement with respect to a Competing Transaction, or (ii) the Buyer terminates the Purchase Agreement in the event of a Competing Transaction, Teleglobe Inc. will pay to the Buyer a breakup fee in the amount of $4,659,000 (the "Breakup Fee"). The Breakup Fee is also payable if the Key Sellers terminate the Purchase Agreement pursuant to Section 11.1.2(a) of the Purchase Agreement and within 12 months after the date of such termination the Sellers publicly announce or enter into a definitive agreement for a Competing Transaction. Pursuant to the Bidding Procedures Order, no portion of the Breakup Fee will be paid by the Debtors and any such payment will be the sole obligation of Teleglobe Inc.

      (g)     If the Buyer terminates the Purchase Agreement for any reason or if the Sellers terminate the Purchase Agreement for any reason other than because the Buyer is in breach of the Purchase Agreement (as more fully described in Section 11.1.2(b) of the Purchase Agreement), Teleglobe Inc. will be liable to the Buyer for an expense reimbursement in an amount not to exceed $4.0 million minus the portion of the reimbursement of up to $400,000 actually received as provided for pursuant to the E&Y Expense Letter (the "Expense Reimbursement"). Any Expense Reimbursement that is less than $1.5 million will be deemed to be reasonable and the Buyer will be required to submit reasonable documentation supporting any amount in excess of $1.5 million. Pursuant to the Bidding Procedures Order, no portion of the Expense Reimbursement will be paid by the Debtors and any such payment will be the sole obligation of Teleglobe Inc.

      (h)     The material representations and warranties made by the Sellers under the Purchase Agreement include, but are not limited to, the following categories:

      (i)     required Consents and approvals;

      (ii)     ownership and legal status of Owned Real Property, Leased Real Property and tangible personal property;

      (iii)     delivery of and status of Contracts;

      (iv)     ownership, legal status and infringement of Intellectual Property;

      (v)     sufficiency of the Purchased Assets to operate the Core Business;

      (vi)     factual information regarding employee matters including compensation and benefit plans and arrangements, union matters and pension matters;

      (vii)     compliance with laws;

      (viii)     tax matters;

(ix)    factual information regarding revenues for May to July 2002 and regarding the application of the Baseline Financial Statement Methodology;[21] and

(x)    ownership and legal status of Permits necessary to operate the Core Business.

(i)    The Sellers' representations and warranties (the "Seller Representations") are made as of the date of the Purchase Agreement. The Purchase Agreement provides that the Seller Representations will be brought forward to the IMA Date (except for representations and warranties made as of a specified time or date which will speak at and as of such specified time or date). The representations and warranties of both parties expire on the later of (x) the Closing Date and (y) the first anniversary of the IMA Date, except with respect to claims asserted with respect to the representations and warranties prior to such expiration, in which case they will survive until the resolution of such claims in accordance with Article XII of the Purchase Agreement. Neither parties' representations and warranties will be brought forward to the Closing Date.

(j)    Employee issues are addressed in Section 8.8 of the Purchase Agreement. Significant provisions relating to employees include:

(i)    the Buyer will become the successor employer under the collective bargaining agreements that the Sellers have with certain unions. As such, the Buyer will be bound by and comply with the collective bargaining agreements effective as of the Closing;

(ii)    prior to the Closing Date, the Buyer shall make an offer of employment to at least 95% of all non-union employees[22] employed by the Sellers primarily in connection with the Core Business on terms that provide an aggregate compensation package of substantially equivalent value to existing employment terms (excluding any retention or restructuring bonuses and any compensation provided by BCE or its affiliates other than the Sellers or their subsidiaries); and

(iii)    the Buyer agrees to provide severance benefits similar to those offered by the Sellers for a one-year period from the Closing Date.

(k)    On or prior to the Closing Date, the Buyer and the Sellers will act in good faith to attempt to agree to the allocation of the Final Purchase Price on an entity-by-entity basis in a manner consistent with applicable requirements of the Code and tax laws. If the Buyer and Sellers are unable to agree to an allocation, then they shall each take their own reasonable

---

[21] The Baseline Financial Statement Methodology is the methodology used to prepare the Closing Statement that will determine the adjustment to the purchase price relating to working capital.

[22] Includes active employees and those who have rights of employment on return from vacation or leave, but excludes UK Employees.

position with respect to such allocation for tax purposes. The allocation determined pursuant to the terms of the Purchase Agreement will not be binding on the Bankruptcy Courts.[23]

(l)    Certain assets of the Teleglobe Companies that are not owned by the Sellers have been, or in certain instances prior to the Closing Date will be, transferred to certain Seller entities (i) to "migrate" the Teleglobe network to the network to be used in the conduct of the Core Business and (ii) to transfer all of the Purchased Assets to the Buyer at Closing (collectively, the "Migration Transactions").[24]  The only assets owned by Debtors that are not US Debtor Sellers to be included in the Migration Transactions are two trademarks of Teleglobe Marine (U.S.) Inc., which are not currently in use and have *de minimis* value to the Teleglobe Companies.

7.    In connection with the Purchase Agreement, on the IMA Date[25] (as defined in the Purchase Agreement), the US Debtor Sellers, certain of the other Teleglobe Companies that are "Sellers" under the Purchase Agreement (other than the UK Sellers, who will enter into the UK Interim Management Agreement) and the Buyer will execute an Interim Management Agreement (the "Interim Management Agreement") generally providing that the Buyer will manage the Core Business during the period between the execution of the Interim Management Agreement (following approval of the Purchase Agreement by each of the Canadian Court and the US Bankruptcy Court and after the occurrence of certain events described below) and the closing of the Purchase Agreement.

8.    The material terms of the Interim Management Agreement are as follows:[26]

(a)    The Buyer will manage the facilities and operations of the business on behalf of the Sellers, subject to the Sellers' continued ownership, operation and control of the business, with the Buyer being subject to the reasonable control of the Sellers;

(b)    Without the approval of the Sellers, the Buyer does not have authority to:

(i)    terminate, modify or enter into any material contracts (other than renewals of existing contracts);

---

[23] In the event that compatible orders of the Canadian and US Bankruptcy Courts setting forth the allocation of the Final Purchase Price are not obtained prior to the Closing Date, the Final Purchase Price will be held in a segregated account pending the issuance of the compatible orders or the resolution of any discrepancies between such court orders.

[24] The Migration Transactions are more fully described in Recitals D and E and Schedule 6.19 to the Purchase Agreement.

[25] The IMA Date will occur upon the satisfaction of certain conditions (described below) set forth in the Interim Management Agreement. The Debtors anticipate that the IMA Date will occur in mid November 2002.

[26] This summary is solely for the convenience of the Court and parties in interest and is not intended to alter or otherwise modify the terms of the Interim Management Agreement. This Notice does not purport to provide an exhaustive summary of the terms of the Interim Management Agreement and reference is made to the copy attached hereto.

(ii)    institute or defend any legal actions or proceedings;

(iii)    terminate the employment of any employee, hire any new employees[27] or make changes to compensation arrangements with employees;

(iv)    sell, lease or otherwise dispose of any of the Purchased Assets for an amount less than fair market value;

(v)    incur indebtedness or pledge the Purchased Assets as security for indebtedness;

(vi)    enter into agreements to merge, consolidate or enter into any business combination;

(vii)    waive any rights material to the Core Business; or

(viii)    pay or collect receivables between one Seller and another Seller.

(c)    The Buyer is responsible for funding the cash flow of the Core Business during the term of the Interim Management Agreement.

(d)    The Interim Management Agreement has standard provisions relating to rights of access to information, cooperation between the parties, termination provisions, liability provisions and description of services to be provided.

9.    The date on which the Interim Management Agreement will become effective (the "IMA Date") will be four business days after the expiration of all the conditions set forth in Article IX of the Purchase Agreement. The key conditions to the Interim Management Agreement becoming effective are:

(a)    No injunction or judicial or administrative order shall prohibit the entering into of the Interim Management Agreement or the UK Interim Management Agreement[28];

(b)    The receipt of bankruptcy court approvals in Canada and the United States and the expiration of the relevant appeal periods;

(c)    The parties to the Purchase Agreement shall have complied in all material respects with their material obligations to be performed under the Purchase Agreement prior to the IMA Date;

(d)    Approval of the DIP Lender (as defined in the Purchase Agreement);

---

[27] The Buyer may hire employees to perform certain specified administrative functions.

[28] A copy of the UK Interim Management Agreement is attached hereto. While the US Debtor Sellers are not a party to the UK Interim Management Agreement, certain terms and responsibilities set forth in the Purchase Agreement and Interim Management Agreement flow through to the UK Interim Management Agreement.

(e)    Delivery of certain agreements by the UK Sellers including the UK Interim Management Agreement;

(f)    No material adverse change in the business since the date on which the Purchase Agreement was assigned;

(g)    Agreement or requisite court approval of the assignment of certain material non-US Contracts (as set forth on Schedule 9.2.2 of the Purchase Agreement) notwithstanding any anti-assignment, change of control or insolvency default provisions;

(h)    Completing certain antitrust and competition processes;

(i)    Bring-down of the representations and warranties of the Sellers to the IMA Date; and

(j)    Appropriate insurance being obtained.

10.    The Purchase Agreement deviates non-materially from the Bidding Procedures Order as follows: (a) JP Morgan Chase Bank will serve as the escrow agent to hold the Buyer's deposit instead of Ernst & Young Inc. and (b) the Buyer has until 90 days[29] after the IMA Date to make its final designation as to which executory contracts and unexpired leases associated with the Core Business will be directly or indirectly assumed and assigned to Buyer, including those executory contracts and unexpired leases (collectively, the "Initial Contracts") set forth in the Assumption Notices (defined below), and the additional executory contracts and unexpired leases of the Debtors that are not designated as "Excluded Assets" or "Rejected Contracts" pursuant to the terms of the Purchase Agreement (collectively, the "Additional Contracts").

11.    Pursuant to the requirements set forth in the Bidding Procedures Order, (a) on or about July 1, 2002, the Debtors filed the Notice of (I) Debtors' Intent to Assume and Assign Certain Executory Contracts and Unexpired Leases and (II) Proposed Cure Amounts with respect to certain executory contracts and unexpired leases set forth on Exhibit A thereto and (b) on or about August 2, 2002, the Debtors filed the Motion of the Debtors and Debtors In Possession for an Order (I) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale of the Debtors' Voice Business and (II) Establishing a Procedure for Determining Cure Amounts Related Thereto with respect to certain additional agreements set forth on Exhibit A thereto (collectively, the "Assumption Notices"). As the Buyer will not yet have made its final decisions with respect to the Initial Contracts and Additional Contracts at the time of the Sale Hearing (defined below), the approval of the assumption and assignment, or in the alternative, rejection of the Initial Contracts and Additional Contracts will not be the subject of the Sale Hearing, but will be the subject later orders after proper notice and hearing pursuant to section 365 of the Bankruptcy Code.

12.    Pursuant to the terms of the Purchase Agreement the Buyer will have 60 days after the IMA Date with respect to Material Contracts (as defined in the Purchase Agreement)

---

[29] With respect to Material Contracts (as defined in the Purchase Agreement) the Buyer has until 60 days after the IMA Date to make its designation.

and 90 days after the IMA Date with respect to other Contracts to designate which Contracts (i.e., which Initial Contracts and Additional Contracts) will be directly or indirectly assigned to it by the Debtors. Accordingly, upon the Buyer's designation as to which Contracts the Buyer directly or indirectly will assume, the Debtors will file a motion seeking approval of the assumption and assignment of such contracts and leases. A general bar date of December 2, 2002 has been requested of the Court.

13.    A hearing to consider the transactions contemplated by the Purchase Agreement, as such transactions relate to the US Assets, will be held before The Honorable Mary F. Walrath, United States Bankruptcy Judge for the District of Delaware, on **October 9, 2002 at 2:00 p.m. (Eastern Time)** (the "Sale Hearing").

14.    Any responses or objections to the transactions contemplated by the Purchase Agreement, as such transactions relate to the U.S. Assets, must be in writing, filed with the Clerk of the Bankruptcy Court, 824 Market Street, 5th Floor, Wilmington, Delaware 19801, and served and received by the following on or before **October 4, 2002 at 4:00 p.m. (Eastern Time)**: (i) Teleglobe Inc., 11480 Commerce Park Drive, Reston, Virginia 20191 (Attn: John Brunette); (ii) counsel for the Debtors, Richards, Layton & Finger, P.A., One Rodney Square, P.O. Box 551, Wilmington, Delaware 19899 (Attn: Mark D. Collins, Esq.); (iii) counsel to the Teleglobe Companies, Jones, Day, Reavis & Pogue, 222 East 41st Street, New York, New York 10017 (Attn: John J. Rapisardi, Esq. and Brian E. Greer, Esq.); (iv) Ogilvy Renault, 200 King Street West, Suite 1100, P.O. Box 11, Merrill Lynch Canada Tower, Toronto, Ontario M5H 3T4 (Attn: Derrick Tay, Esq.); (v) counsel to the Creditors' Committee, Hahn & Hessen LLP, Empire State Building, 350 Fifth Avenue, New York, New York 10118-0075 (Attn: Mark S. Indelicato, Esq.); and Rosenthal Monhait Gross & Goddess, Mellon Bank Center, Suite 1401, 919 North Market Street, P.O. Box 1070, Wilmington, Delaware 19899 (Attn: Kevin Gross, Esq.); (vi) the Monitor, Ernst & Young Inc., Ernst & Young Tower, P.O. Box 251, 222 Bay Street, Toronto-Dominion Centre, Toronto, Ontario, Canada M5K 1J7 (Attn: Benjamin Babcock); (vii) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2313, Lockbox 35, Wilmington, Delaware 19801 (Attn: Frank Perch, Esq.); (viii) counsel for the Debtors' prepetition lenders, Klehr Harrison Harvey Brazenburg & Ellers, 919 Market Street, Suite 1000, Wilmington, Delaware 19801 (Attn: James Huggett, Esq.) and Mayer Brown Rowe & Maw, 160 South LaSalle Street, Chicago, Illinois 60603-3441 (Attn: J. Robert Stoll, Esq.); and (ix) counsel to the Teleglobe Companies' postpetition lenders, Shearman & Sterling, 599 Lexington Avenue, New York, New York 10022-6069 (Attn: Andrew Tenzer, Esq.) and Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, P.O. Box 391, Wilmington, Delaware 19899-0391 (Attn: Pauline K. Morgan, Esq.); (x) counsel for the informal committee of noteholders, Bingham Dana LLP, One State Street, Hartford, Connecticut 06103 (Attn: Evan D. Flaschen, Esq.); and (xi) counsel for the Buyer, Schulte Roth & Zabel, LLP, 919 Third Avenue, New York, New York 10022 (Attn: Stuart D. Freedman, Esq.).

Dated: September 20, 2002
Wilmington, Delaware

Mark D. Collins (DE 2981)
John H. Knight (DE 3848)
Michael J. Merchant (DE 3854)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware  19899
Phone: (302) 651-7700
COUNSEL FOR THE DEBTORS
AND DEBTORS IN POSSESSION

**EXHIBIT A**

CANADIAN TRANSACTION NOTICE

Court File No. 02-CL-4528

*ONTARIO*
**SUPERIOR COURT OF JUSTICE – COMMERCIAL LIST**

IN THE MATTER OF the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c.C-36

AND IN THE MATTER OF a Plan of Compromise or Arrangement of TELEGLOBE INC. and the other Applicants listed on Schedule "A"

Applicants

**NOTICE OF MOTION**
**(SALE OF CORE BUSINESS)**
(returnable September 30, 2002)

The Applicants will make a motion to the court before Justice Farley, on Monday, September 30, 2002 at 10:00 a.m. or as soon as the motion can be heard at 393 University Avenue, Toronto, Ontario.

PROPOSED METHOD OF HEARING: The motion is to be heard

___ in writing under subrule 37.12.1(1) because it is on consent or unopposed or made without notice;

___ in writing as an opposed motion under subrule 37.12.1(4)

_X_ orally.

THE MOTION IS FOR AN ORDER substantially in the form of the draft attached hereto as Schedule "B" providing for inter alia:

a) abridging, and/or dispensing with service of this Motion;

b) an order (i) approving and authorizing the Purchase Agreement and the IMA (both as defined below) the Sellers' (as defined below) to complete the sale, assignment and transfer of the Sellers' (as defined below) right, title and interest in and to the assets more particularly described in an agreement made as of September 18, 2002, among Teleglobe Inc., Teleglobe U.S.A. Inc., Teleglobe Canada Limited Partnership, Teleglobe Communications Corporation and Optel Communications, Inc., as Sellers (together the "Sellers") and TLGB Acquisition LLC. (the "Purchaser") with such alterations, amendments, deletions and additions as the parties thereto may agree to, provide that such do not reduce, in aggregate the consideration to be paid

under the terms of the Purchase Agreement, (the "Purchase Agreement"), the Interim Management Agreement among Teleglobe Inc., Teleglobe USA Inc. and their affiliates listed on the signature pages thereto and TLGB Acquisition LLC (the "Manager") made September 19, 2002, with such alterations, amendments, deletions and additions as the parties thereto may agree to, provide that such do not reduce, in aggregate the consideration to be paid under the terms of the IMA (the "IMA") and such other documents ancillary thereto, and to perform the obligations set out thereunder (collectively the "Transactions"); and (iii) vesting the Purchased Assets, the shares of an Acquired Entity, or a Newcos' Equity free of liens, charges and encumbrances, other than Liens (other than Permitted herein) (within the meaning of the Purchase Agreement) created pursuant to the Purchase Agreement and the Escrow Agreement; and

c)    such further and other relief as the Applicants may request and this Honourable Court may permit.

THE GROUNDS FOR THE MOTION ARE:

a)    The Applicants sought and obtained protection pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985 c. C-36, as amended (the "CCAA or the CCAA Proceedings") on May 15, 2002. Immediately following the making of the Initial Order, protection was extended to the Applicants under section 304 of the United States Bankruptcy Code in the District of Delaware. Subsequently, on May 28, 2002, the U.S. Applicants sought and received protection under Chapter 11 of the Code.

b)    As set forth in the Affidavit of Serge Fortin filed in support of the making of the Initial Order, the Applicants realized that the best way to realize value for the Teleglobe enterprise was to consolidate the Core Business with a view to entering into a sales or transaction process as soon as practicable with respect to such business.

c)    Teleglobe engaged in an in-depth analysis of its infrastructure and capabilities with a view to its bilateral and non-bilateral customers. Based on a lower cost base for the retained assets of the Core Business, and cost reductions, there is a viable possibility of realizing net positive cash flow from a restructured telecom business.

d)    In early April 2002, Teleglobe retained Lazard Freres & Co. LLC ("Lazard") as its financial advisors and investment banker with a view to assisting management with a review of strategic alternatives. In this regard Lazard undertook discussions with potential strategic partners. Since early April a number of parties were contacted who conducted due diligence with respect to the Core Business.

- 3 -

e) Without prompt action on a transaction process, the value of the business would decline during the restructuring, notwithstanding that Teleglobe has maintained a long and positive history with major customers of its Core Business.

f) The highly competitive nature of the telecom industry does not favour companies restructuring since these circumstances are not conductive to maintaining customer confidence and certainty.

g) Failure to proceed with a motion to approve a sale/transaction of all or substantially all of the Applicant's asset by September 30, 2002, is an event of default under the Applicants DIP facility. The Core Business represents the Applicants' most significant assets.

h) The sales process undertaken and implemented by the Monitor has resulted in an extremely favourable Agreement of Purchase and Sale with a purchase price of approximately U.S. $155,000,000.00.

i) The Purchase Agreement contemplates that the Purchaser will commence carriage of the operations of the Core Business pursuant to the IMA and in accordance with the CCAA Proceedings and the DIP Facility provided for therein, with a view to obtaining regulatory approvals necessary to finally close the transaction. The essential element of the IMA which is favourable to the stakeholders is that all the costs associated with continuing operations of the Core Business will be undertaken by the Purchaser and will provide the Purchaser in all material respects with the risks and rewards of operating the Core Business.

j) In operating the Core Business pursuant to the IMA, the Manager would not have the authority to effect material modifications, amendments, dispositions or other material changes effecting the assets of the Core Business without the approval of representatives of both the Applicant and the monitor, it being specifically provided in the IMA that all activities to be engaged in by the Manager are to be conducted within the context of and in accordance with the provisions of the orders effecting the CCAA Proceedings to date, including, among other things the DIP Facility.

k) The Manager would also be responsible for funding cash flow for the Core Business during the term of the IMA.

l) The IMA would also specifically provide for reasonable rights of access to information in the books and records relating to the Core Business both to the representatives and to the DIP Lender and will also provide for good faith co-operation amongst the parties in order to manage the Core Business in accordance with applicable laws, regulations and the CCAA proceedings.

m) In the monitor's analysis of a potential liquidation of the Core Business, it is anticipated the recovery to creditors will be materially less than what would be

- 4 -

realized in the event of a sale to the Purchaser under the terms of the Purchase Agreements. The monitor expects that as a result of the depressed industry conditions and a material diminution in the value of receivables that would occur in a liquidation, liquidation values would likely be substantially less the estimated Final Purchase Price payable under the Purchase Agreement. In addition, liquidation would take a significant period of time and require funding to complete.

n)  The monitor has formed the view that the sale price achieved compares favourably to trading bench marks for comparable public companies and to the valuation recently completed in the restructuring proceedings. The monitor also notes that there are significant benefits to Teleglobe's customers, the 600 employees of Teleglobe and other stakeholders if the transactions contemplated by the Purchase Agreement are completed.

o)  The Purchase Agreement contemplates an offer of employment to approximately 95% of all non-union employees on terms which are substantially similar to those currently in place for such employees. The completion of the transaction would contemplate the continued employment of approximately 600 employees and reduce or eliminate approximately $18,000,000.00 of severance and retention obligations that would otherwise be payable by Teleglobe under arrangements put in place at the outside of the CCAA Proceedings. Accordingly, the Purchase Agreement compares very favourably for employees as compared with potential liquidation or cessation of these operations which may ensue should the Purchase Agreement not be completed.

p)  Due to the inordinately but unavoidable long period of delay between the signing of the Purchase Agreement and IMA and the completion of the closing contemplated thereunder, there will be of necessity adjustments to the purchase price which are based on future events which cannot be determined with any certainty, some of which are under the control of the Purchaser concerning various cure amounts payable in respect to the assignment of contracts. It is the monitor's view that the Applicants most recent estimate of the Adjusted Net Current Assets does not differ materially from the Target Net Current Assets with a result that the monitor believes the Final Purchase Price will be equal to or greater than U.S. $155,000,000.00. In addition, the transfer of the Assumed Liabilities to the Purchaser represents a significant benefit to Teleglobe creditors and Teleglobe and the Applicants' estimate that approximately $350 million of liabilities are included in the Net Current Assets of the Core Business.

q)  The Purchase Agreement contemplates a series of potential structures for the implementation of the transactions contemplated by the Purchase Agreement which include the purchase by Teleglobe Inc. of the shares of a UK Newco which would hold the operating assets of Teleglobe UK which itself is currently under administration in the United Kingdom. The structuring of a

- 5 -

transaction in this fashion would facilitate transfer of these operating assets to the purchaser in a business and tax efficient manner. Likewise, similar structures may be employed with respect to affiliates of Teleglobe in Australia, Hong Kong and Spain.

r)    In the Monitor's view the marketing process and the sale process more particularly described in the Monitors Eleventh Report filed herein resulted in a competitive process in compliance with the Approved Bidding Procedures resulting in the Core Business being properly exposed to the market place and the negotiation and execution of the Purchase with a price and structure that reflects a competitive bidding process among multiple parties.

s)    As a result of the nature of the biding process described in the Monitor's Eleventh Report, the Monitor determined that it was unnecessary to hold an auction process as contemplated in the Purchased Agreement and the Approved Biding Procedures.

t)    The Initial Order of Justice Farley made May 15, 2002 and the order of June 4, 2002.

u)    Such further grounds as counsel may advise and this Honourable Court may permit.

THE FOLLOWING DOCUMENTARY EVIDENCE will be used at the hearing of the motion:

a)    the Monitor's Eleventh Report, to be filed;

September 19, 2002                     Ogilvy Renault
                                       Suite 1100, Box 11
                                       Merrill Lynch Canada Tower
                                       200 King Street West
                                       Toronto, Canada  M5H 3T4

                                       Derrick Tay  LSUC#: 21152A
                                       Tel: 416.340.6032
                                       Fax: 416.340.5900

                                       Mario Forte  LSUC#: 27293F
                                       Tel: 416.340.6179
                                       Fax: 416.340.6079

                                       Solicitors for the Applicants

TO THE ATTACHED SERVICE LIST

SERVICE LIST

TO: **GOODMANS LLP**
 Suite 2400, 250 Yonge Street
 Toronto, ON M5B 2M6

 Attention: Geoffrey B. Morawetz &
 Robert Chadwick
 gmorawetz@goodmans.ca
 rchadwick@goodmans.ca   Tel.: 416.597.6278
   Tel.: 416.597.4285
 Solicitors for the Teleglobe Lending Syndicate Fax: 416.979.1234

AND TO: **BENNETT JONES LLP**
 Suite 3400
 1 First Canadian Place
 100 King Street West
 P.O. Box 130, Stn 1st Can. Pl.
 Toronto, ON M5X 1A4

 Attention: S. Richard Orzy & Kevin Zych
 orzyr@bennettjones.ca
 zychk@bennettjones.ca

 Canadian Counsel to an Ad Hoc Committee of Tel.: 416.777.5737
 Bondholders Fax: 416.863.1716

AND TO: **BINGHAM DANA, LLP**
 One State Street
 Hartford, CT 06103
 U.S.A.

 Attention: Evan D. Flaschen
 edflaschen@bingham.com

 U.S. Counsel to an Ad Hoc Committee of Tel.: 860.240.2723
 Bondholders Fax: 860.240.2800

**AND TO:**    **STIKEMAN ELLIOTT**
Barristers and Solicitors
Suite 5300, P.O. Box 85
Commerce Court West
199 Bay Street
Toronto, ON  M5L 1B9

Attention:    Sean F. Dunphy & Ron Ferguson
sdunphy@stikeman.com
rferguson@stikeman.com        Tel.:   416.869.5662
                         Tel.:   416.869.5212
Solicitors for BCE Inc.          Fax:   416.861.0445

**AND TO:**    **SHEARMAN & STIRLING**
599 Lexington Avenue
New York, NY  10022
U.S.A.

Attention:    Mark J. Shapiro
mshapiro@shearman.com
                         Tel.:   212.848.8195
U.S. Counsel to BCE Inc.         Fax:   212.848.7179

**AND TO:**    **BCE INC.**
1000, de la Gauchetiere Street West, Suite 3700
Montreal, QC  H3B 4Y7        Tel.:   514.870.4637
                         Fax:   514.870.4877

Attention:    Martine Turcotte & Michel Lalande
martine.turcotte@bell.ca       Tel.:   514.391.8386
michel.lalande@bell.ca         Fax:   514.391.8389

**AND TO:**    **LENCZNER SLAGHT ROYCE SMITH GRIFFIN**
Barristers and Solicitors
2600 – 130 Adelaide Street West
Toronto, ON  M5H 3P5

Attention:    Peter H. Griffin & Peter J. Osborne
pgriffin@lsrsg.com
posborne@lsrsg.com          Tel.:   416.865.2921
                         Tel.:   416.865.3094
Counsel to Ernst & Young Inc.    Fax:   416.865.9010

AND TO:    **ERNST & YOUNG INC.**
           Suite 2100, Ernst & Young Tower
           P.O. Box 251, Toronto-Dominion Centre
           Toronto, ON  M5K 1J7

           Attention:    Benjamin J. Babcock, C.A.        Tel.:    416.943.3917
           ben.babcock@ca.eyi.com                         Fax:     416.943.3300

AND TO:    **ERNST & YOUNG INC.**
           Suite 2400
           1 Place Ville Marie
           Montreal, Quebec  H3B 3M9

           Attention:    Brent R. Beekenkamp
           & Martin Daigneault
           Brent.R.Beekenkamp@ca.eyi.com                  Tel.:    514.879.6374
           Martin.Daigneault@ca.eyi.com                   Fax:     514.871.8713

AND TO:    **GOLDSTEIN FLANZ & FISHMAN**
           1250 Rene-Levesque Boulevard West
           Suite 4100
           Montreal, QC  H3B 4W8

           Attention:    Yoine Goldstein
           yg@gff.qc.ca
                                                          Tel.:    514.932.4100
           Canadian Counsel to the Board of Teleglobe Inc.    Fax:     514.932.4170

AND TO:    **WILLKIE FARR & GALLAGHER**
           787 Seventh Avenue
           New York, NY  10019-6099
           U.S.A.

           Attention:    Matthew A. Feldman
           mfeldman@willkie.com

           Independent U.S. Counsel to the Board of Teleglobe    Tel.:    212.728.8651
           Inc.                                              Fax:     212.728.8111

**AND TO:**     **FASKEN MARTINEAU DUMOULIN LLP**
Suite 4200, TD Bank Tower
P.O. Box 20, Stn. Toronto-Dominion Centre
Toronto, ON  M5K 1N6

Attention:     Sheryl E. Seigel
sseigel@tor.fasken.com

Canadian Counsel to IDT Telecom Inc.          Tel.:   416.868.3475
                                              Fax:   416.364.7813

**AND TO:**     **GOWLING LAFLEUR HENDERSON LLP**
Barristers and Solicitors
Suite 4900, Commerce Court West
P.O. Box 438
Toronto, ON  M5L 1J3

Attention:     John M. Whyte & Patrick Shea
john.whyte@gowlings.com
patrick.shea@gowlings.com          Tel.:   416.862.5702

Solicitors for Bell Canada and Bell Nexxia          Fax:   416.863.3422

**AND TO:**     **BLANEY MCMURTRY LLP**
Barristers and Solicitors
Suite 1400, 20 Queen Street West
Toronto, ON  M5H 2V3

Attention:     Deborah S. Grieve
dgrieve@blaney.com          Tel.:   416.593.2951

Solicitors for Telecom Italia, S.p.A.          Fax:   416.593.2971

**AND TO:**     **MCMILLAN BINCH**
Barristers and Solicitors
Suite 3800, South Tower
Royal Bank Plaza
Toronto, ON  M5J 2J7

Attention:     Alex L. MacFarlane
amacfarlane@mcbinch.com          Tel.:   416.865.7879

Solicitors for Tyco Telecommunications (U.S.) Inc.     Fax:   416.865.7048

9

**AND TO:**    **MCMILLAN BINCH**
Barristers and Solicitors
Suite 3800, South Tower
Royal Bank Plaza
Toronto, ON  M5J 2J7

Attention:    Andrew J.F. Kent & Daniel V.
MacDonald
akent@mcbinch.com
dvmacdonald@mcbinch.com                        Tel.:   416.865.7160
                                               Tel.:   416.865.7169
Solicitors for Bank of Nova Scotia            Fax:   416.865.7048

**AND TO:**    **TYCO TELECOMMUNICATIONS (U.S.) INC.**
Patriot's Plaza
60 Columbia Turnpike – Building A
Morristown, NJ  07960
U.S.A.

Attention:    Mary Ann Perrone
mperrone@tycotelecom.com                       Tel.:   973.656.8365
                                               Fax:   973.656.8592

**AND TO:**    **GOODMAN AND CARR LLP**
Barristers and Solicitors
Suite 2300, 200 King Street West
Toronto, ON  M5H 3W5

Attention:    Aubrey E. Kauffman & Barry Tarshis
akauffman@goodmancarr.com
btarshis@goodmancarr.com
                                               Tel.:   416.595.2356
Solicitors for Intelsat Ltd. and Intelsat Global Sales    Tel.:   416.595.2623
& Marketing Ltd.                               Fax:   416.595.0567

**AND TO:**    **MILLER THOMSON LLP**
Barristers and Solicitors
Suite 2500, 20 Queen Street West
Toronto, ON  M5H 3S1

Attention:    Jeffrey C. Carhart
jcarhart@millerthomson.ca

Solicitors for Broadwing Communication Services    Tel.:   416.595.8615
Inc.                                           Fax:   416.595.8695

AND TO:    **WILMER, CUTLER & PICKERING**
520 Madison Avenue
New York, NY 10022
U.S.A.

Attention:    Andrew N. Goldman
agoldman@wilmer.com

U.S. Counsel to Broadwing Inc.    Tel.:    212.230.8836
                                  Fax:    212.230.8888

AND TO:    **BROADWING COMMUNICATION
SERVICES INC.**
1122 Capital of Texas Highway South
Austin, TX 78746-6426
U.S.A.

Attention:    Gordon P. Williams, Jr.    Tel.:    512.742.4140
chuck.williams@broadwing.com    Fax:    512.328.7902

AND TO:    **WEIR FOULDS LLP**
Suite 1600, The Exchange Tower
P.O. Box 480, 130 King Street West
Toronto, ON M5X 1J5

Attention:    W.A. Derry Millar
dmillar@weirfoulds.com

Solicitors for VarTec Telecom, Inc.    Tel.:    416.947.5021
                                       Fax:    416.365.1876

AND TO:    **TELECOM SERVICES INTERNATIONAL**
45 rue Hauteville
75010 Paris
FRANCE

Attention:    Maurice Malka, Chairman    Tel.:    011.331.4246.3511
TSI@pronet.fr    Fax:    011.331.4770.4624

AND TO:     **THORNTON GROUT FINNIGAN**
            Royal Trust Tower, Toronto-Dominion Centre
            Suite 2200 – 77 King Street West
            P.O. Box 329
            Toronto, ON  M5K 1K7

            Attention:     James H. Grout
            jgrout@tgflegal.com
                                                    Tel.:   416.304.0557
            Solicitors for Rogers Cable Inc.        Fax:   416.304.1313

AND TO:     **BLAKE, CASSELS & GRAYDON LLP**
            Barristers & Solicitors
            World Exchange Plaza
            20th Floor, 45 O'Connor Street
            Ottawa, ON  K1P 1A4

            Attention:     Matthew J. Halpin
            matt.halpin@blakes.com
                                                    Tel:    613.788.2233
            Solicitors for Qwest Communications Inc.   Fax:   613.788.2247

AND TO:     **BLAKE, CASSELS & GRAYDON LLP**
            Barristers & Solicitors
            Box 25, Commerce Court West
            28th Floor, 199 Bay Street
            Toronto, ON  M5L 1A9

            Attention:     Steven J. Weisz
            steven.weisz@blakes.com
                                                    Tel:    416.863.2616
            Solicitors for Gamma Telecommunications Limited   Fax:   416.863.2653

AND TO:     **BELANGER SAUVE**
            1 Place Ville Marie
            Suite 1700
            Montreal, Quebec  H3B 2C1

            Attention:     Marie-Christine Brochu
            mcbrochu@belangersauve.com
                                                    Tel:    514.878.3089#239
            Solicitors for Eutelsat S.A.            Fax:   514.878.3053

**AND TO:**      **CHAITON & CHAITON LLP**
Barristers and Solicitors
185 Sheppard Avenue West
Toronto, ON  M2N 1M9

Attention:     Harvey G. Chaiton
harvey@chaiton.com

                                 Tel:   416.218.1129
Solicitors for Cap Gemini Ernst & Young Canada
Inc.                                    Fax:   416.218.1849

**AND TO:**      **CASSELS BROCK & BLACKWELL LLP**
Barristers and Solicitors
Scotia Plaza, Suite 2100
40 King Street West
Toronto, ON  M5H 3C2

Attention:     E. Bruce Leonard and Shahana Kar    Tel:   416.869.5757
bleonard@casselsbrock.com;
skar@casselsbrock.com                           Tel:   416 869-5369

Solicitors for Nortel Networks Limited       Fax:   416.640.3027

**AND TO:**      **MINDEN GROSS GRAFSTEIN & GREENSTEIN LLP**
Barristers and Solicitors
Suite 700
111 Richmond Street West
Toronto, ON  M5H 2H5

Attention:     Kenneth L. Kallish & David Ullmann
kkallish@mggg.com
dullmann@mggg.com

                                   Tel:   416.369.4124
Solicitors for Dacom Corporation          Fax:   416.864.9223

**AND TO:**      **FRASER MILNER CASGRAIN LLP**
1 First Canadian Place
100 King Street West
Toronto, ON  M5X 1B2

Attention:     Joseph Marin & Alex A. Ilchenko
joseph.marin@fmc-law.com                Tel:   416.863.4730
alex.ilchenko@fmc-law.com              Tel:   416.863.4748

Solicitors for Williams Communications LLC    Fax:   416.863.4592

**AND TO:**    **FRASER MILNER CASGRAIN LLP**
15th Floor, The Grosvenor Building
1040 West Georgia Street
Vancouver, B.C.  V6E 4H8

Attention:    Mary I.A. Buttery
mary.buttery@fmc-law.com

Solicitors for Call-Net Enterprises Inc. and Sprint        Tel.:    604.443.7144
Canada Inc.                                                Fax:    604.683.5214

**AND TO:**    **STEWART MCKELVEY STIRLING SCALES**
Barristers & Solicitors
Suite 900
Purdy's Wharf Tower One
1959 Upper Water Street
P.O. Box 997
Halifax, Nova Scotia  B3J 2X2

Attention:    Richard F. Southcott
rsouthcott@smss.com
                                                           Tel:    902.420.3304
Solicitors for Aliant Telecom Inc.                         Fax:    902.496.6175

**AND TO:**    **COLBY, MONET, DEMERS, DELAGE &**
**CREVIER**
Barristers & Solicitors
1501, av. McGill College
Bureau 2900
Montreal, Quebec  H4X 2B7

Attention:    Katherine Peacocke
kpeacocke@colby-monet.com
                                                           Tel.:    514.284.3663
Solicitors for Codetel C.por.A                             Fax:    514.284.1961

AND TO:      **GARDINER ROBERTS LLP**
             Barristers and Solicitors
             Suite 3100, Scotia Plaza
             40 King Street West
             Toronto, ON  M5H 3Y2

             Attention:      Gavin J. Tighe
             gtighe@gardiner-roberts.com

             Solicitors for Canadian Overseas          Tel.:   416.865.6664
             Telecommunications Union                  Fax:    416.865.6636

AND TO:      **DECHERT PRICE & RHODES**
             30 Rockefeller Plaza
             New York, New York  10112
             U.S.A.

             Attention:      Glenn Siegel
             glenn.siegel@dechert.com

             Counsel to the Bank of New York as Indenture   Tel.:   212.698.3569
             Trustee                                        Fax:    212.698.3599

AND TO:      **MENDELSOHN**
             1000 Sherbrooke Street West
             Suite 2700
             Montreal, Quebec  H3A 3G4

             Attention:      Sandra Abitan
             sabitan@mendelsohn.ca
                                                         Tel.:   514.987.5018
             Counsel to the Bank of New York             Fax:    514.987.1213

AND TO:      **AIRD & BERLIS LLP**
             BCE Place, Box 754
             1800, 181 Bay Street
             Toronto, ON  M5J 2T9

             Attention:      Steven Graff
             sgraff@airdberlis.com
                                                         Tel.:   416.865.7726
             Counsel to SkyOnline                        Fax:    416.863.1515

**AND TO:**   **HEENAN BLAIKIE LLP**
P.O. Box 185, Suite 2600
200 Bay Street
South Tower, Royal Bank Plaza
Toronto, ON  M5J 2J4

Attention:    Kenneth D. Kraft
kkraft@heenan.ca

Solicitors for Cable &Wireless (Barbados) Limited

Tel.:   416.643.6822
Fax:   416.360.8425

**AND TO:**   **CASSELS, BROCK & BLACKWELL LLP**
Suite 2100, 40 King Street West
Toronto, ON  M5H 3C2

Attention:    Alison Manzer
amanzer@casselsbrock.com

Solicitors for Cerberus Capital Management

Tel.:   416.869.5469
Fax:   416.350.6938

**AND TO:**   **LOEB PARTNERS CORPORATION**
61 Broadway, 24th Floor
New York, New York 10006

Attention:    Phillip Siegel
PSiegel@LoebPartners.com

Financial Advisors to the Creditors Committee

Tel.:   212.483.7035
Fax:   212.574.2062

**AND TO:**   **WESTCLIFF MANAGEMENT LTD.**
60 de Maisonneuve Boulevard West
Montreal, Quebec  H3A 3J2

Attention:    Caroline Redler, Vice-President
Special Projects
credler@westcliff-group.com

Tel.:   514.499.8306
Fax:   514.288.8600

**AND TO:**   **DAOUST VUKOVICH BAKER-SIGAL BANKA LLP**
6th Floor, 20 Queen Street West
Toronto, ON  M5H 3R3

Attention:    Joseph Grignano
jgrignan@dvbb.com

Solicitors for 70 York Street Limited

Tel.:   416.598.7049
Fax:   416.597.8897

AND TO:         **MINISTRY OF ATTORNEY GENERAL**
                Legal Services Branch
                P.O. Box 9280, Stn Prov Govt
                1001 Douglas Street
                Victoria, B.C. V8W 9J7

                Attention:      Anne Wood, Solicitor

                Solicitors for Her Majesty the Queen in right of the      Tel.:  250.356.8838
                Province of British Columbia                              Fax:   250.387.0700

AND TO:         **3810186 CANADA INC.**
                1000 De La Gauchetiere St. W., Ste. 3700
                Montreal, QC H3B 4V7

                **c/o STIKEMAN ELLIOTT**
                Barristers and Solicitors
                Suite 5300, P.O. Box 85
                Commerce Court West
                199 Bay Street
                Toronto, ON M5L 1B9

                Attention:      Sean F. Dunphy & Ron Ferguson
                sdunphy@stikeman.com
                rferguson@stikeman.com                                    Tel.:  416.869.5662
                                                                          Tel.:  416.869.5212
                Solicitors for BCE Inc.                                   Fax:   416.861.0445

AND TO:         **KONTRON CANADA INC.**
                616, Curé Boivin Street
                Boisbriand, QC J7G 2A7

                Attention:      Sylvain Castonguay
                sylvain.castonguay@ca.kontron.com

                Canadian Counsel to an Ad Hoc Committee of                Tel.:  450.437.4661
                Bondholders                                               Fax:   450.437.8053

| | | | |
|---|---|---|---|
| **AND TO:** | **1000 DE LA GAUCHETIÈRE I INC. and**<br>**1000 DE LA GAUCHETIÈRE II INC.**<br>380, Saint-Antoine Street West<br>Suite 6000<br>Montreal, QC  H2Y 3X7 | Tel.:<br>Fax: | 514.847.4111<br>514.840.7189 |
| | Attention:     Jean-Louis Dubé and Daniel<br>Archambault | | |
| | jean.louis.dube@sitq.com<br>daniel.archambault@sitq.com | Tel:<br>Fax: | 514.288.6767<br>514.288.2770 |
| **AND TO:** | **PHH VEHICLE MANAGEMENT SERVICES**<br>**INC.**<br>700 - 350 Burnamthorpe Rd. West<br>Mississauga, ON  L5B 3P9 | | |
| | Attention:     Craig Lewis | Tel.:<br>Fax: | 905.897.5333<br>905.896.6353 |
| | craig.lewis@phh.com | | |

18

Schedule "A"

Teleglobe Financial Holdings Ltd. (C)
Teleglobe Canada Limited Partnership (C)
Teleglobe Management Services Inc. (C)
Teleglobe Marine, Inc. (C)
Teleglobe Marine, L.P. (C)
Teleglobe Holdings (U.S.) Corporation (US)
Teleglobe Telecom Corporation (US)
Teleglobe Luxembourg LLC (US)
Teleglobe Holding Corp. (US)
Teleglobe Investment Corp. (US)
Teleglobe Communications Corporation (US)
Teleglobe USA Inc. (US)
Optel Telecommunications Inc. (US)
Teleglobe Marine (U.S.) Inc. (US)
Teleglobe Puerto Rico Inc. (US)
Teleglobe Canada Management Services Inc.
3692795 Canada Inc.
Teleglobe Vision Call Center Services, General Partnership
Teleglobe Submarine Inc. (US)

Court File No: 02-CL-4528

IN THE MATTER OF the Companies' Creditors Arrangement Act, R.S.C. 1985, c.C-36

AND IN THE MATTER OF a Plan of Compromise or Arrangement of TELEGLOBE INC. and the other Applicants listed on Schedule "A"

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**

Proceeding commenced at Toronto

**NOTICE OF MOTION**

Ogilvy Renault
Suite 1100, Box 11
Merrill Lynch Canada Tower
200 King Street West
Toronto, Canada  M5H 3T4

Derrick Tay  LSUC#: 21152A
Tel: 416.340.6032
Fax: 416.340.5900

Mario Forte  LSUC#: 27293F
Tel: 416.340.6179
Fax: 416.340.6079

Solicitors for the Applicants

20

## File a Motion:

02-11518-MFW Teleglobe Communications Corporation

Notice of Electronic Filing

The following transaction was received from Collins, Mark D. entered on 9/20/2002 at 5:18 PM EDT
and filed on 9/20/2002

**Case Name:**      Teleglobe Communications Corporation
**Case Number:**    02-11518-MFW
**Document Number:** 550

**Docket Text:**
Motion to Approve Sale *Notice of (I) Transaction Notice Filed With Canadian Court Seeking Approval
of Sale of Teleglobe Companies' Core Business to Successful Bidder, (II) Decision Concerning Need for
an Auction, (III) Selection of Successful Bidder, and (IV) Sale Hearing Date - Related to Docket No.
[84]* Filed by Teleglobe Communications Corporation. Hearing scheduled for 10/9/2002 at 02:00 PM at
US Bankruptcy Court, 824 Market St., 6th Fl., Courtroom #1, Wilmington, Delaware. Objections due by
10/4/2002. (Attachments: # (1) Part 2# (2) Part 3# (3) Part 4# (4) Part 5a# (5) Part 5b# (6) Part 5c# (7)
Part 5d# (8) Part 5e# (9) Part 6# (10) Part 7# (11) Part 8) (Collins, Mark)

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** W:/AJ/TGSale/US Notice Part I.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=9/20/2002] [FileNumber=953558-0]
[780bd40c613995ec9d15810c35cc7e4fa7562f0b4e51eaf76fce33205c445905a64f7
d9b574189464754e4fac3338d22fed4e2ba641ee9716d9048dc46effd8d]]
**Document description:** Part 2
**Original filename:** W:/AJ/TGSale/US Notice Part II.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=9/20/2002] [FileNumber=953558-1]
[44bae513d3582685733c267f2a998766d8cd5eecbabdf6178e5fb202d03f55c21e471
8e571c67e426bce77e21aadd7822a3fc1ba9254543c4bbf05e3cc2a4adb]]
**Document description:** Part 3
**Original filename:** W:/AJ/TGSale/US Notice Part III.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=9/20/2002] [FileNumber=953558-2]
[8d622cb9d0497e66024fac276fa89a6fc275dec83f913965be8fc5d45649365f0b90e
e4ed0170646179b4c647240b789ed34aa505b6155a25b09bbe92ab04e6e]]
**Document description:** Part 4
**Original filename:** W:/AJ/TGSale/US Notice Part IV.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=9/20/2002] [FileNumber=953558-3]
[202dccab9fc996ddb2ee60a657092c6c3fad484e07213df12f4d30bd0faea5c635763
599d57d18359053f9ac0ab6e5ae5a4727912f334b69d57017a5fc76b93e]]
**Document description:** Part 5a
**Original filename:** W:/AJ/TGSale/US Notice Part Va.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=9/20/2002] [FileNumber=953558-4]
[199bfdbd293947fe23f38694f3def2ef896c461c9dbdf2daa9fd0d71ab219b32852c1
c6b27502964d68f118cbafd23c2288d96ce1c4d2b41f567fa2419fd728a]]
**Document description:** Part 5b
**Original filename:** W:/AJ/TGSale/US Notice Part Vb.pdf
**Electronic document Stamp:**