# EXHIBIT 8

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | **Chapter 11** |
| | : | |
| TELEGLOBE COMMUNICATIONS | : | |
| CORPORATION, a Delaware | : | **Jointly Administered** |
| corporation, et al.,[1] | : | **Case No. 02-11518 (MFW)** |
| | : | |
| Debtors. | : | Hearing Date: May 19, 2003 @ 2:00 p.m. |
| | : | Objection Deadline: May 12, 2003 @ 4:00 p.m. |

### NOTICE OF MOTION

TO:    Parties on the attached service list.

PLEASE TAKE NOTICE that the above-captioned debtors and debtors in possession (the "Debtors") have today filed the attached **Motion of Debtors and Debtors in Possession for an Order Pursuant to Sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rule 9019 (I) Approving A Proposed Settlement Between Debtors and TLGB Acquisition LLC Relating to the Sale of the Teleglobe Companies' Core Telecom Business and (II) Authorizing the Debtors to Consummate the Sale of the Core Telecom Business in Accordance with the Terms and Conditions of Such Settlement** (the "Motion") with the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 5th Floor, Wilmington, Delaware 19801 (the "Bankruptcy Court").

PLEASE TAKE FURTHER NOTICE that any responses or objections to the Motion must be in writing, filed with the Clerk of the Bankruptcy Court, 824 Market Street, 5th

---

[1] The Debtors are the following eleven entities: Teleglobe Communications Corporation, Teleglobe USA Inc., Optel Telecommunications, Inc., Teleglobe Holdings (U S ) Corporation, Teleglobe Marine (U S ) Inc., Teleglobe Holding Corp, Teleglobe Telecom Corporation, Teleglobe Investment Corp, Teleglobe Luxembourg LLC, Teleglobe Puerto Rico Inc and Teleglobe Submarine Inc.

#1388
4-29-03

Floor, Wilmington, Delaware 19801, and served upon and received by the undersigned counsel

on or before **4:00 p.m. on May 12, 2003.**

       PLEASE TAKE FURTHER NOTICE that if any responses or objections to the

Motion are timely filed, served and received, a hearing on the Motion will be held before the

Honorable Mary F. Walrath on **May 19, 2003 at 2:00 p.m.**

       IF NO OBJECTIONS TO THE MOTION ARE TIMELY FILED, SERVED AND
RECEIVED IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE
RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING.

Dated: April 29, 2003
       Wilmington, Delaware

                      Mark D. Collins (No. 2981)
                      John H. Knight (No. 3848)
                      Michael J. Merchant (No. 3854)
                      RICHARDS, LAYTON & FINGER, P.A.
                      One Rodney Square
                      P.O. Box 551
                      Wilmington, Delaware  19899
                      (302) 651-7700

                      COUNSEL FOR THE DEBTORS AND DEBTORS
                      IN POSSESSION

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| **TELEGLOBE COMMUNICATIONS** | : | **Jointly Administered** |
| **CORPORATION, a Delaware** | : | Case No.: 02-11518 (MWF) |
| Corporation, et al.[1] | : | |
| | : Hearing Date: May 19, 2003 @ 2:00 p.m. | |
| Debtors. | : Objection Deadline: May 12, 2003 @ 4:00 p.m. | |

MOTION OF DEBTORS AND DEBTORS IN POSSESSION
FOR AN ORDER PURSUANT TO SECTIONS 105 AND 363 OF
THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019 (I)
APPROVING A PROPOSED SETTLEMENT BETWEEN DEBTORS
AND TLGB ACQUISITION LLC RELATING TO THE SALE OF THE
TELEGLOBE COMPANIES' CORE TELECOM BUSINESS AND
(II) AUTHORIZING THE DEBTORS TO CONSUMMATE THE
SALE OF THE CORE TELECOM BUSINESS IN ACCORDANCE
WITH THE TERMS AND CONDITIONS OF SUCH SETTLEMENT

The above-captioned debtors and debtors in possession (collectively, the

"Debtors"), hereby move the Court for the entry of an order, pursuant to sections 105 and 363 of

the United States Bankruptcy Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code"), and Rule

9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (i) approving a

proposed settlement between certain of the Debtors and TLGB Acquisition LLC (the "Buyer")

relating to the sale of the Debtors' Core Telecom Business (as defined herein) and (ii) authorizing

the Debtors to consummate the sale of the Core Telecom Business to the Buyer in accordance

---

[1]    The Debtors are the following eleven entities:  Teleglobe Communications
Corporation ("TCC"), Teleglobe USA Inc. ("TUSA"), Optel Telecommunications, Inc.,
Teleglobe Holdings (U.S.) Corporation, Teleglobe Marine (U.S.) Inc., Teleglobe Holding Corp.,
Teleglobe Telecom Corporation, Teleglobe Investment Corp., Teleglobe Luxembourg LLC,
Teleglobe Puerto Rico Inc. and Teleglobe Submarine Inc.

with the terms of such settlement (the "Motion"). In support of the Motion, the Debtors respectfully represent as follows:

### General Background

      1.     On May 28, 2002 (the "Petition Date"), the Debtors commenced their respective reorganization cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

      2.     The Debtors are continuing in possession of their respective properties and are operating and managing their businesses, as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

      3.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

      4.     On May 29, 2002, this Court entered an order jointly administering these chapter 11 cases and consolidating them for procedural purposes only.

      5.     Debtor Teleglobe Communications Corporation, a Delaware corporation, is a wholly-owned indirect subsidiary of Teleglobe Inc., a Canadian corporation ("Teleglobe"). Each of the Debtors herein is a direct or indirect subsidiary of Teleglobe. Teleglobe currently has approximately 65 domestic and foreign debtor and nondebtor subsidiaries (together with Teleglobe, the "Teleglobe Companies"). Since December 31, 2002, Teleglobe has been an indirect wholly-owned subsidiary of Ernst & Young Inc., the Monitor in the Canadian Proceedings (as defined below).

2

6.      On May 15, 2002, Teleglobe and certain of its Canadian and United States subsidiaries, including the Debtors, commenced insolvency proceedings under the Canadian Companies' Creditors Arrangement Act (the "Canadian Proceedings") in the Ontario Superior Court of Justice in Toronto, Ontario (the "Canadian Court"). On the same date, the Canadian Court appointed the Monitor in the Canadian Proceedings, and the Monitor subsequently commenced ancillary proceedings under section 304 of the Bankruptcy Code with respect to Teleglobe and certain of its Canadian affiliates (the "Ancillary Proceedings") in this Court. On May 17, 2002, certain of Teleglobe's United Kingdom subsidiaries commenced administration proceedings under the Insolvency Act of 1986 in the High Court of Justice – Chancery Division in London, England. It is expected that other Teleglobe nondebtor foreign subsidiaries may be required to commence insolvency proceedings in their respective jurisdictions

7.      Teleglobe was established as Canada's monopoly international carrier by the Canadian government in 1950  Today, the Teleglobe Companies own and operate an extensive global telecommunications network built over a combination of wavelength IRUs, ownership or participation in 90 fiber optic submarine cable systems, satellite capacity, and leased transmission capacity  This provides the Teleglobe Companies with reach to over 240 countries and territories with advanced data capabilities. The Teleglobe Companies currently have 275 direct and bilateral relations with large incumbent and alternative carriers and they provide data and IP access from numerous points of presence on their network  In addition, the Teleglobe Companies have private and public peering arrangements with 70 connections, including Tier 1 providers in North America, Europe and Asia. Teleglobe is the carrier of choice

3

to many of the world's leading telecommunications, mobile operators and Internet service providers.

### Sale of the Core Telecom Business

8.      Prior to the commencement of the Canadian Proceedings, the Ancillary Proceedings and these chapter 11 cases, the Teleglobe Companies determined, in the exercise of their sound business judgment, that it was critical to sell their core voice and related data telecommunications business, which includes:  (a) international voice and data transit services that originate or terminated in the United States, Canada, the United Kingdom, Australia, Spain or Hong Kong or are switched or routed through Teleglobe Companies' facilities in one of the above locations; and (b) certain other services, including, (i) dedicated broadcast; (ii) wireless roaming; and (iii) international private line (collectively, the "Core Telecom Business"), as a going concern in order to maximize its value for the benefit of the Teleglobe Companies' creditors.

### A.      The Global Bidding Process

9.      On June 10, 2002, in connection with the sale of the Core Telecom Business, the Debtors filed a motion seeking, inter alia, to (i) establish certain global bidding procedures to govern the sale of the Core Telecom Business (the "Global Bidding Procedures"), (ii) establish certain notice procedures by which the Debtors could notify parties of which executory contracts and unexpired leases were being assumed and assigned in connection with the sale of the Core Telecom Business (the "Assumption Procedures").  The Assumption Procedures also enabled the Debtors to establish proposed cure amounts with respect to such executory contracts and unexpired leases.  On June 24, 2002, the Court entered an order [Docket

4

No. 160] (the "Bidding Procedures Order") approving the relief sought in the motion, including

approval of the Global Bidding Procedures and Assumption Procedures

   10. The Global Bidding Procedures authorized the Debtors to solicit bids from

potential purchasers of the Core Telecom Business and to eventually enter into a purchase

agreement with the party submitting the highest and best offer for the Core Telecom Business

(the "Successful Bidder"). In accordance with the Global Bidding Procedures, the Debtors

selected a bid submitted jointly by Cerberus Capital Management, L.P. ("Cerberus") and TenX

Capital Partners ("TenX", collectively with Cerberus, the "Prevailing Bidders") as the highest

and best bid for the assets. The Teleglobe Companies then commenced extensive negotiations

with Cerberus and TenX, culminating in the execution of a Purchase Agreement, dated

September 18, 2002 (the "Purchase Agreement")[2] Pursuant to the Purchase Agreement,

Teleglobe and certain of its subsidiaries and affiliates, including TCC, TUSA and Optel

Telecommunications, Inc. (the "Teleglobe Sellers"), agreed to sell substantially all of their assets

related to the Core Telecom Business, as detailed in section 1.1 of the Purchase Agreement (the

"Purchased Assets"), to the Buyer, a Delaware limited liability company formed by, and

controlled by affiliates of, the Prevailing Bidders.

   11. On October 10, 2002, the Court entered an order approving the Purchase

Agreement and authorizing the Debtors to sell the Purchased Assets to the Buyer (the "Sale

Order"). As the Core Telecom Business operates in a regulated industry, closing of the

transaction is subject to certain regulatory approvals, which typically take months to obtain

---

[2] A copy of the Purchase Agreement was attached to the Notice of (I) Transaction
Notice Filed With Canadian Court Seeking Approval of Sale of Teleglobe Companies' Core
Business to Successful Bidder, (II) Decision Concerning Need for an Auction, (III) Selection of
Successful Bidder, and (iv) Sale Hearing Date [Docket No. 550] filed in these chapter 11 cases.

5

Accordingly, on December 1, 2002 (the "IMA Date"), the parties entered into that certain Interim

Management Agreement (the "Interim Management Agreement") whereby the Buyer assumed

day-to-day management responsibility for the operations of the Core Telecom Business pending

receipt of such approvals and closing of the sale.

### B.    The Purchase Price and Related Adjustments

12.    The Purchase Agreement provides, <u>inter alia</u>, that the Buyer shall purchase

the Purchased Assets for $155 3 million (the "Unadjusted Purchase Price") adjusted in

accordance with the provisions of the Purchase Agreement (the "Final Purchase Price"). More

specifically, the Purchase Agreement provides for the following adjustments to the Unadjusted

Purchase Price:  (i) an adjustment to account for the net current assets of the Core Telecom

Business (the "Net Current Asset Adjustment"); (ii) an adjustment to reflect the savings resulting

from the settlement of certain cure amounts with respect to executory contracts and unexpired

leases being assumed and assigned to the Buyer in connection with the sale of the Purchased

Assets (the "Cure Savings Adjustment"); and (iii) certain other adjustments set forth in section

4.2 of the Purchase Agreement

13.    Pursuant to section 4 4 of the Purchase Agreement, within 45 days

(extended to 60 days by agreement of the parties) of the later of the IMA Date and the bar date

for filing proof of claims in these chapter 11 cases, the Buyer was required to deliver to the

Teleglobe Sellers (i) a statement setting forth the Buyer's calculation of items to be included in

the financial statement of the Core Telecom Business as of the IMA Date (the "IMA Date

Financial Statement") and (ii) a statement indicating the Buyer's calculation of the Net Current

6

Assets and the Adjusted Net Current Assets, as of the IMA Date (the "Closing Statement").[3]

Section 4.4 of the Purchase Agreement provides the Teleglobe Sellers with 45 days from

delivery of the Closing Statement to deliver a dispute notice (the "Dispute Notice") to the Buyer,

contesting any of the calculations contained in the Closing Statement. Upon delivery of a

Dispute Notice, the parties were to commence good faith negotiations towards resolving their

disputes. If the parties were unable to reach an agreement within 30 calendar days after delivery

of a Dispute Notice, the items in dispute were to be submitted to KPMG LLP ("KPMG") for

resolution under the dispute resolution procedures set forth in the Purchase Agreement.

## The Settlement

### A.    Disputes Between the Parties

14.    As contemplated by section 4.4 of the Purchase Agreement, on or about

February 7, 2003, the Buyer delivered to the Teleglobe Sellers the IMA Date Financial Statement

and Closing Statement. On or about March 24, 2003, in response to the IMA Date Financial

Statement and Closing Statement, the Teleglobe Sellers delivered a Dispute Notice to the Buyer

disputing, among other things, certain of the Buyer's calculations set forth in the Buyer's

February 7, 2003 submission, including the amount and nature of retained liabilities relating to

rejected executory contracts, unsupported and/or contingent assumed liabilities and the value of

outstanding accounts receivable. In the interest of negotiating a settlement of these disputes, the

parties have mutually agreed to extend the deadline for submitting the dispute to KPMG for

arbitration.

---

[3]    In addition, not later than 20 business days prior to Closing, the Buyer was to deliver a
statement setting forth the Buyer's calculation of the Cure Savings Adjustment

7

15.    Additionally, on or about February 28, 2003, the Buyer delivered to the

Teleglobe Sellers a notice alleging breaches of certain covenants, representations and warranties

of the Purchase Agreement and requesting indemnification for such breaches. On or about

March 27, 2003, the Buyer delivered to the Teleglobe Sellers a second notice alleging additional

breaches of covenants, representations and warranties contained in the Purchase Agreement and

requesting indemnification for such breaches. Once again, in the interest of negotiating a

consensual resolution of their disputes, the parties agreed to extend the time for the Teleglobe

Sellers to respond to these notices of alleged breaches.

**B.    The Proposed Settlement**

16.    In an effort to avoid the potentially significant time, expense and delay of

arbitration and other dispute resolution mechanisms set forth in the Purchase Agreement, the

Teleglobe Sellers and the Buyer have entered into a proposed settlement (the "Proposed

Settlement") of their various disputes, as evidenced by that certain Settlement Agreement, dated

April 29, 2003 (the "Settlement Agreement"). A copy of the Settlement Agreement is attached

hereto as Exhibit A.

17.    The material terms of the Proposed Settlement are as follows:[4]

(a)    **Amended Purchase Price.** The Final Purchase Price will be $125 million
        and will not be subject to further adjustment.

(b)    **Business Cash.** The Buyer will be entitled to retain the Business Cash (as
        defined in the Interim Management Agreement) of the Core Telecom
        Business as payment of the Reduction Amount and Management Fee (as
        such terms are defined in the Purchase Agreement and Interim
        Management Agreement).

---

[4]    This summary is solely for the convenience of the Court and parties in interest and is
not intended to alter or otherwise modify the terms of the Settlement Agreement. This summary
does not purport to provide an exhaustive summary of the terms of the Settlement Agreement
and reference is made to the copy attached hereto as Exhibit A.

2593917_2 DOC

(c)   **Assumed Liabilities.** The liabilities being assumed by the Buyer will be deemed to include liabilities and obligations in connection with certain contracts that the relevant Teleglobe Seller could reject under applicable insolvency law to the extent the liabilities and obligations pertain to the period from December 1, 2002 until the date on which the rejection was, or is, effective. The Settlement Agreement also contains certain other modifications to the definition of Assumed Liabilities set forth in the Purchase Agreement.

(d)   **Releases.** As of the closing of the transactions contemplated by the Purchase Agreement (the "Closing"), the Buyer and Teleglobe Sellers will, or cause their affiliates to, release each other from all claims under the Purchase Agreement, debtor in possession credit facility, UK Interim Management Agreement and the Interim Management Agreement (collectively, the "Released Claims"), provided, however, that such release shall not release, modify, supercede or otherwise affect any provision of the Settlement Agreement or any provision of the Purchase Agreement that, pursuant to the Settlement Agreement (as any such provision may be modified by the Settlement Agreement), survives Closing. Additionally, the Buyer and Teleglobe Sellers each will covenant not to sue the other with respect to the Released Claims or any claims that may be alleged prior to Closing.

(e)   **Waiver of Certain Claims.** The Teleglobe Sellers will pay to the Buyer up to $3 million, net of the Teleglobe Sellers' reasonable documented attorneys' fees, costs and expenses, of the amounts that the Teleglobe Sellers collect in pursuing avoidance claims against AT&T Corporation, Williams Communications Corporation and WilTel Communications Group. The Teleglobe Sellers will retain any amounts collected in excess of $3 million. In addition, if requested by the Buyer, the Teleglobe Sellers will waive any avoidance claims that they may have against any counterparty to any executory contract being assumed and assigned to the Buyer relating to such executory contract, provided, however, that the Teleglobe Sellers will retain any additional causes of action that they may have against such parties unrelated to the assumed executory contract.

(f)   **Survival of Certain Provisions.** The parties have designated certain provisions of the Purchase Agreement to survive the Closing and all other provisions will expire at Closing.

(g)   **Closing.** The Closing will occur on the later of May 30, 2003 or the fourth business day following the day on which all conditions to Closing (as modified by the Settlement Agreement) have been satisfied or waived

(h)   **Conditions to Closing.** The conditions to Closing shall be as follows:

9

(i)    No injunction or order prohibiting Closing shall be in effect;

(ii)    All approvals of the relevant bankruptcy courts will have been granted;

(iii)    Delivery by each party of the documents required under the Purchase Agreement;

(iv)    Specified governmental and regulatory consents will have been obtained;

(v)    The Interim Management Agreement and the UK Interim Management Agreement (as defined in the Purchase Agreement) will still be in effect;

(vi)    The Purchased Assets will have been transferred to the proper subsidiaries of the Teleglobe Sellers;

(vii)    All amounts owed by UK Newco (as defined in the Purchase Agreement) to any Teleglobe Seller will have been discharged; and

(viii)    The stay of actions and proceedings imposed by the Canadian Proceedings shall be in effect;

(ix)    Each of Buyer and the Teleglobe Sellers will deliver releases effecting the Released Claims;

(x)    Certain Canadian Certifications will be delivered.

### Requested Relief

18.    By this Motion, the Debtors seek the entry of an order, pursuant to sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rule 9019, (i) approving the Proposed Settlement between the Teleglobe Sellers and the Buyer and (ii) authorizing the Teleglobe Sellers to consummate the sale of the Purchased Assets to the Buyer in accordance with the terms and conditions of the Purchase Agreement, as modified by the Settlement Agreement

2593917_2 DOC

**Basis for Relief**

19      Bankruptcy Code section 363(b) provides, in relevant part, that a debtor in possession "after notice and hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). The standard for approval of the sale and use of property of the estate under section 363(b) in this Circuit is whether the debtor can demonstrate a sound business justification for the proposed transaction. Dai-ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions.") (citing to Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (setting forth the "sound business purpose" test in the context of a sale of assets under § 363(b))); In re Stroud Food, 163 B.R. 730, 732 (Bankr. M.D. Pa. 1993); In re Delaware & Hudson Ry. Co., 124 B.R. 169 (D. Del. 1991) (adopting Lionel in this District in the context of a sale of assets).

20      Section 105 of the Bankruptcy Code provides in pertinent part that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. 11 U.S.C. § 105(a). Bankruptcy Rule 9019(a) provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Before approving a settlement under Bankruptcy Rule 9019, a court must determine that the proposed settlement is in the best interests of the debtor's estate. See Myers v. Martin (In re Martin), 91 F.3d 389, 394 (3d Cir. 1996); In re Marvel Entertainment Group, Inc., 222 B.R. 243, 249 (D. Del. 1998) ("[T]he ultimate inquiry is whether 'the

11

compromise is fair, reasonable, and in the interest of the estate.'"). To reach this determination, the court must assess the value of the claim that is being settled and balance it against the value to the estate of the approval of the settlement. See Martin, 91 F.3d at 393.

        21.    The standard by which courts should evaluate the reasonableness of a proposed compromise and settlement is well established. This standard includes consideration of the following four factors: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." Id.; see also Depositor v. Mary M. Holloway Found., 36 F.3d 582, 587 (7th Cir. 1994) (affirming an order approving a compromise and settlement of claims against the estate where it was "unlikely" that the debtor would succeed on the claim, litigation of the claims would involve considerable expense, and the claimant would withdraw all claims upon approval of the settlement). Settlements should only be rejected if they fall "below the lowest point in the range of reasonableness." Cosoff v. Rodman (In re W. T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983) (citing Newman v. Stein, 464 F.2d 689, 693 (2d Cir. 1972))

        22.    The Debtors have determined, in the exercise of their business judgment, that the Proposed Settlement is supported by a sound business purpose and is in the best interests of the Debtors, their estates and creditors. The disputes between the parties relating to determination of the Final Purchase Price are exceedingly complex. There were over 100 different working capital adjustment items in dispute between the parties. Additionally, the indemnity claims asserted in the Buyer's letters dated February 28, 2003 and March 27, 2003 encompass numerous other categories of potential claims. These disputed items, many of which

12

are driven by differing accounting methods based upon language, interpretation and past practice, are highly complex and difficult to assess with any degree of certainty.

23.    The delay and costs associated with litigating these disputes would likely be enormous. It could take one to two years to litigate all of the disputed items between the parties at significant expense to the estate in professional fees and costs associated with retaining the Debtors' remaining key management personnel. In addition, while these disputes are being litigated by the parties, a substantial portion of the purchase price proceeds would remain in escrow and out of the hands of the creditors of the Debtors' estates. There is also no assurance that the Buyer would not raise additional offset and indemnity claims in the future.

24.    The Proposed Settlement will, among other things, allow the Teleglobe Sellers to fully and finally resolve all of the outstanding disputes with the Buyer, avoid the enormous costs, risk and delay associated with litigating these complex disputes with the Buyer, and close the sale of the Purchased Assets in the near future, well in advance of the August 31, 2003 "drop-dead-date" set forth in the Purchase Agreement. The Proposed Settlement will also provide certainty with respect to the purchase price that the Teleglobe Sellers will receive for the Purchased Assets and will allow the Debtors to move forward with quickly winding down their chapter 11 estates and seeking to distribute the sale proceeds to their creditors.

25.    For the foregoing reasons, the Debtors believe that the Proposed Settlement is fair and reasonable and in the best interests of the Debtors, their estates and creditors. Accordingly, the Proposed Settlement should be approved in accordance with the terms and conditions of the Settlement Agreement and the Debtors should be authorized to

13

consummate the sale of the Purchased Assets in accordance with the Purchase Agreement, as modified by the Proposed Settlement.

## Waiver of 10 Day Stay Imposed By
## Bankruptcy Rule 6004(g)

26.    The Teleglobe Sellers' desire to close the sale of the Purchased Assets as soon as practicable after the entry of an order approving the sale. Accordingly, the Debtors request that the Court, pursuant to Bankruptcy Rule 6004(g), waive the ten-day stay of the order approving the Proposed Settlement. See In re Mariner Post-Acute Network, Inc., Case No. 00-10055 (Bankr. D. Del., September 12, 2001) (waiving the 10-day stay imposed by Bankruptcy Rules 6004 and 6006); In re Mosler, Inc., Case No. 00-10055 (Bankr. D. Del., October 25, 2001) (same); In re Converse, Inc., Case No. 01-00223 (Bankr. D. Del., April 12, 2001) (authorizing immediate consummation of sale of assets notwithstanding the stay imposed under Bankruptcy Rules 6004(g) and 6006(d)).

## Notice

27.    Notice of this Motion will be provided to: (i) the Office of the United States Trustee for the District of Delaware, (ii) counsel to the Official Committee of Unsecured Creditors, (iii) counsel to the Debtors' prepetition bank lenders, (iv) counsel to the Buyer, and (v) all parties which have requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, the Debtors submit that no other or further notice need be given

28    No previous application for the relief sought herein has been made to this or any other Court.

14

WHEREFORE, the Debtors respectfully request that the Court enter an order,

substantially in the form attached hereto as Exhibit B, approving the relief sought in the Motion

and granting such other and further relief as is just and proper.

Dated: April 29, 2003
     Wilmington, Delaware

                                    Mark D. Collins (No. 2981)
                                    John H. Knight (No. 3848)
                                    Michael J. Merchant (No. 3854)
                                    RICHARDS, LAYTON & FINGER, P.A.
                                    One Rodney Square
                                    P.O. Box 551
                                    Wilmington, Delaware 19899
                                    (302) 651-7700

                                    ATTORNEYS FOR DEBTORS
                                    AND DEBTORS IN POSSESSION

15

**EXHIBIT A**

EXECUTION COPY

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Settlement Agreement") is made as of April 29, 2003, by and among TLGB Acquisition LLC ("Buyer") and Teleglobe Inc., Teleglobe USA Inc., Teleglobe Canada Limited Partnership, Teleglobe Communications Corporation and Optel Telecommunications, Inc. (collectively, the "Key Sellers"). Capitalized terms used but not defined herein shall have the meaning assigned to such terms in the Purchase Agreement (defined below). Unless otherwise indicated, all monetary amounts are in United States dollars.

WHEREAS, on September 18, 2002, Buyer and the Key Sellers entered into a Purchase Agreement for the sale of the Core Business of Teleglobe Inc. and certain of its subsidiaries (the "Purchase Agreement");

WHEREAS, by the "Order (Sale of Core Business)" dated October 2, 2002, the CCAA Court approved the Purchase Agreement, the IMA, and all of the terms and conditions of each of them, and authorized the Canadian Debtor Sellers to enter into and perform their obligations thereunder;

WHEREAS, by the "Order Pursuant to Sections 105(a), 363(b), and (f), and 1146(c) of the Bankruptcy Code Authorizing Debtors to Consummate Purchase Agreement with TLGB Acquisition LLC," dated October 10, 2002, the US Bankruptcy Court approved the Purchase Agreement, the IMA, and all of the terms and conditions of each of them, and authorized the US Debtor Sellers to enter into and perform their obligations thereunder;

WHEREAS, on November 27, 2002, (i) Buyer and the Key Sellers and the UK Sellers entered into a Side Letter which set forth certain understandings related to the cash management of the Core Business during the term of the IMA and the UK IMA and other clarifications of the parties' obligations (the "November 27 Cash Management Letter") and (ii) Buyer and the Key Sellers entered into a Side Letter which set forth certain amendments and supplements to the Schedules to the Purchase Agreement;

WHEREAS, on December 1, 2002, (i) Buyer and the Sellers (other than the UK Sellers) entered into the IMA and Buyer and the UK Sellers entered into the UK IMA pursuant to which Buyer would manage the Core Business until the Closing subject to the control and supervision of the Sellers to the extent provided in the IMA and UK IMA; (ii) Teleglobe Communications Corporation, Optel Telecommunications, Inc. and Teleglobe USA Inc. (as borrowers) and Madeleine L.L.C. (an affiliate of Buyer)(as lender) entered into a Financing Agreement (the "US DIP Facility"); and (iii) Teleglobe Inc. and Teleglobe Canada Limited Partnership (as borrowers) and Madeleine Corp. (an affiliate of Buyer)(as lender) entered into a Financing Agreement (the "Canadian DIP Facility" and, together with the US DIP Facility, the "DIP Facilities");

WHEREAS, pursuant to Section 4.4.2 of the Purchase Agreement, the Final Purchase Price is to be determined through a series of adjustments, the process for which is set forth in the provisions of the Purchase Agreement;

WHEREAS, pursuant to Section 4.4.1 of the Purchase Agreement, Buyer delivered to the Key Sellers a Closing Statement (the "Buyer Closing Statement") on February 7,

2003 as required thereby as a basis for the adjustments related to the excess of Target Net Current Assets over the Adjusted Net Current Assets and the amount of Cure Savings, which Closing Statement set forth, among other things, Buyer's estimate of Assumed Liabilities;

WHEREAS, pursuant to Section 4.4.1 of the Purchase Agreement, Teleglobe delivered a Dispute Notice on March 24, 2003 stating its view that certain items in the Buyer Closing Statement were incorrect or incomplete, which Dispute Notice set forth, among other things, the Key Sellers' estimate of Assumed Liabilities;

WHEREAS, on February 28, 2003 and on March 27, 2003, pursuant to Article XII of the Purchase Agreement, Buyer delivered to the Key Sellers Breach Notices describing alleged breaches of representations, warranties and covenants for which Buyer believed it was entitled to indemnification from the Key Sellers (the "Breach Claims");

WHEREAS, the Key Sellers are entitled to and have reserved the right to dispute the occurrence of such Breach Claims and/or the amount of estimated Losses in connection therewith;

WHEREAS, in accordance with Sections 4.4.1, 4.4.3.2 and 5.2.5 of the Purchase Agreement, Buyer and the Key Sellers have engaged in good faith negotiations to agree upon the adjustments to the Final Purchase Price related to the delivery of the Closing Statement and the statement of Cure Savings and to agree upon the Disputed Amounts in connection with the Breach Claims;

WHEREAS, Ernst & Young Inc. has been appointed as Interim Administrator of Teleglobe Inc., Teleglobe Canada Limited Partnership and certain of their affiliates, pursuant to an order of the CCAA Court dated February 19, 2003; and

WHEREAS, the parties wish to settle disputes between them with respect to all matters involving the calculation of the Final Purchase Price, the Reduction Amount and the Management Fee and involving the Breach Claims and certain other matters by this Settlement Agreement, and thereby avoid the time and expense of arbitration and the other dispute settlement mechanisms set forth in the Purchase Agreement to be used if the parties are unable to agree upon such matters;

NOW, THEREFORE, in consideration of the foregoing, and of the mutually dependent representations and agreements contained herein, the sufficiency of which is hereby acknowledged, the parties agree as follows:

1. The Final Purchase Price will equal $125,000,000. Notwithstanding Section 5.2.3 of the Purchase Agreement, to implement the foregoing, at Closing Buyer will pay to the Key Sellers $125,000,000 by (i) delivery of the Deposit of $7,765,000 to Teleglobe, for the benefit of the Sellers, and (ii) wire transfer of immediately available funds to Teleglobe, for the benefit of the Sellers, in the amount of $117,235,000. The definition of Purchased Assets shall be amended to include all Business Cash (as defined in the IMA and UK IMA) as of the Closing and clause (a) of Excluded Assets shall be amended to exclude all Business Cash as of the Closing from cash and cash equivalents. The Newcos will receive and retain all Business

Cash as of the Closing as payment in full of the Reduction Amount and the Management Fee (as defined in the IMA and the UK IMA).

2.    In furtherance of their determination of the Final Purchase Price:

(a) the liabilities and obligations referred to in clause (a)(i) of the definition of Assumed Liabilities shall be deemed to include liabilities and obligations in connection with Rejected Contracts that the relevant Seller could reject pursuant to the Insolvency Proceedings or the Hive Down Agreement but only to the extent such liabilities and obligations pertain to the period from and including December 1, 2002 to and including the effective date of such rejection pursuant to the Insolvency Proceedings;

(b) without limiting the liabilities and obligations assumed pursuant to clause (a) of the definition of Assumed Liabilities, the liabilities and obligations referred to in clause (b) of the definition of Assumed Liabilities shall be deemed to refer only to the liabilities and obligations, (i) (A) for the period from the commencement of the applicable Insolvency Proceedings to the IMA Date, associated with each of the categories of expenses (other than any liabilities associated with Rejected Contracts) related to the Core Business contained in the Buyer Closing Statement (without regard to the amounts listed thereon), (B) for the period prior to the commencement of the applicable Insolvency Proceedings, associated with each of the categories of expenses (other than any liabilities associated with Rejected Contracts) related to the Core Business contained in the Buyer Closing Statement (without regard to the amounts listed thereon) but only to the extent such liabilities or obligations constitute claims against Sellers entitled to priority over prepetition or prefiling claims against Sellers under the applicable Insolvency Proceedings and (C) with respect to deferred revenues as of the IMA Date related to the Core Business that are satisfiable within a period of not more than 90 days after the IMA Date or (ii) that constitute Business Expenses (as defined in the IMA and UK IMA) incurred during the period from and including the IMA Date to and including the Closing Date; and

(c) the accounts receivable set forth on Exhibit A hereto shall form part of the Excluded Assets.

3.    Each of Buyer and Sellers agree to act in good faith to consummate as soon as reasonably practicable the transactions contemplated by the Purchase Agreement. The Closing will occur on the later of (i) May 30, 2003 and (ii) the fourth Business Day following date on which the conditions to the Closing set forth on Exhibit B hereto have been satisfied or waived in writing by the applicable Party or Parties. To the extent a condition to the Closing shall have been contained in Article X of the Purchase Agreement or the November 27 Cash Management Letter but is not set forth on Exhibit B hereto, such condition shall be deemed waived by the Sellers or Buyer, as applicable.

4.    Buyer hereby covenants and agrees that Buyer will or will cause the applicable Newco to pay, perform and discharge all of the obligations of such Newco under the Contracts that are subject to an alternative arrangement pursuant to Section 2.2.2 of the Purchase Agreement and the Contracts assumed by such Newco and to pay, perform and discharge the Assumed Liabilities assumed by such Newco (it being understood, however, that nothing in this

9411752 11

3

Agreement shall prevent Buyer or the Newcos at any time from asserting any defenses against parties other than the Sellers they may have with respect to such obligations).

        5.     The Key Sellers agree to pay Buyer up to a maximum aggregate amount of $3 million, net of the Key Sellers' reasonable documented attorneys' fees, costs and expenses, for any cash recoveries obtained from the prosecution or settlement of claims or causes of action brought or that could be brought by the Key Sellers or their estates pursuant to Sections 547 and 548 of the Bankruptcy Code ("Avoidance Claims") against AT&T Corporation, Williams Communications Group, Inc., WilTel Communications Group, Inc. and each of their respective current subsidiaries. After the Key Sellers have paid Buyer an aggregate amount of $3 million with respect to cash recoveries from such avoidance actions or settlements, the Key Sellers shall be entitled to retain any further amounts so recovered. As soon as practicable after the execution of this Settlement Agreement if requested by Buyer, the Key Sellers agree to enter into an agreement to settle the outstanding liabilities of the Sellers to Williams Communications Group, Inc., WilTel Communications Group, Inc. and their subsidiaries in a form consistent with the terms of this paragraph.

        6.     If requested by Buyer in writing with respect to any counterparty to any Contract assumed by Buyer or its affiliates (an "Assumed Contract"), the Key Sellers agree to waive their right to prosecute, and shall release the counterparty under such Assumed Contract from, any and all Avoidance Claims relating to such Assumed Contract that the Key Sellers have, or may have, against such counterparty under such Assumed Contract; provided, however, such waiver and release may be conditioned upon the occurrence of the Closing and the assumption and assignment to Buyer of the subject Assumed Contract(s).

        7.     In furtherance of their obligations pursuant to Section 8.3 of the Purchase Agreement to, among other things, do all things necessary to consummate the transactions contemplated by the Purchase Agreement, the parties wish to identify certain funds or other property which shall be turned over by Buyer to any Seller or from any Seller to Buyer prior to the Closing. Attached hereto as Exhibit C is a description of such property or funds that are to be acquired or retained by a Party that are currently in the possession or control of other Party. For the avoidance of doubt this Settlement Agreement is not intended to limit the rights of the Buyer to the Purchased Assets or the Sellers to the Excluded Assets.

        8.     In furtherance of Buyer's obligations under Section 8.8.2, the parties acknowledge that the Schedule 8.8.2 delivered pursuant to a letter dated February 28, 2003 represents Buyer's best efforts to satisfy the requirements for such schedule and that Buyer is entitled to either add additional Employees to Schedule 8.8.2 or substitute any Employee not on such schedule for one who appears thereon to the extent it become necessary to meet the 95% requirement as of the Closing or is otherwise determined to be desirable by Buyer, provided all amendments are communicated to Sellers no later than May 9, 2003.

        9.     The Purchase Agreement is hereby amended to delete Sections 8.15 and Section 11.1 3(c) thereof.

        10     Any capitalized term used, but not defined in this paragraph shall have the meaning set forth for such term in the DIP Facilities. At the Closing, (i) all Commitments shall automatically terminate and all Obligations related to the Non-Core Loans shall automatically become due and payable and (ii) the Borrowers shall pay in full to the Agent, on behalf of the

9411752 11

Lenders, all of the Obligations related to the Non-Core Loans. At the Closing, provided that the payment in full of the Obligations related to the Non-Core Loans is made at the Closing, the Borrowers, Madeleine L.L.C., in its capacity as agent under the US DIP Facility, and Madeleine Corp., in its capacity as agent under the Canadian DIP Facility, shall execute the termination and release agreement substantially in the form attached as Exhibit D-1 and Exhibit D-2 hereto. Buyer hereby agrees to terminate the DIP Facilities with respect to the Core Loans at the Closing.

      11.    The representations, warranties, conditions and covenants of the Parties contained in the Purchase Agreement will expire upon the consummation of the Closing, except the covenants and agreements contained in the following provisions of the Purchase Agreement: (i) Section 2.2.2, (ii) Section 2.2.4, (iii) Section 8.2.2, (iv) Section 8.8.1, (v) Section 8.8.3, (vi) Section 8.8.4, (vii) Section 8.8.5, (viii) Section 8.9.1, (ix) Section 8.9.2, (x) Section 8.9.3, (xi) Section 8.9.4, (xii) Section 8.10, (xiii) 8.11.1, (xiv) Section 8.11.5, (xv) second sentence of Section 8.11.8, (xvi) Section 8.11.3, (xvii) Section 8.11.4, but solely with respect to the matters described in Section 8.11.3, (xviii) Section 8.12.2, (xix) Section 8.16 and (xx) Section 13.4. The side letter dated April 28, 2003 between Buyer and Sellers regarding Reston office space, email and IT issues and the representations, warranties, covenants and agreement of the Parties contained in this Settlement Agreement will survive the Closing unless otherwise limited by the express terms of this Settlement Agreement. Buyer agrees to assist the Sellers to close the books of Sellers and their affiliates for the month of May, 2003 in a manner consistent with past practice under the IMA. The Parties agree that Article 8 of the IMA will survive the Closing for a period of 90 days.

      12.    This Settlement Agreement and the obligations of the Key Sellers and the Buyer to perform hereunder are subject to the prior approval of each of the Bankruptcy Courts. If (i) any Bankruptcy Court disapproves of this Settlement Agreement or (ii) either the CCAA Court or the US Bankruptcy Court has not entered an order approving this Settlement Agreement on or prior to June 19, 2003 or (iii) unless the Closing has occurred on or prior to such date, such order shall not become a Final Order on or prior to June 30, 2003, this Settlement Agreement shall automatically terminate and be of no further force and effect, and the Negotiation Period with respect to the Closing Statement and Dispute Notice and the Breach Claims will be deemed to be complete on the fifth Business Day following such termination. The date on which the Key Sellers must deliver a DA Dispute Notice in respect of Breach Notices received prior to the date of this Settlement Agreement is hereby extended until the third Business Day following such termination, and time for taking any other actions by Buyer or Sellers (other than any actions required pursuant to this Settlement Agreement) in furtherance of the consummation of the Closing pursuant to the Purchase Agreement is hereby extended until the third Business Day following such termination and this sentence shall survive the termination of this Settlement Agreement. Prior to the Closing, neither Buyer nor any of the Sellers shall raise as a breach or claim for indemnification any act or omission of Buyer or any of the Sellers taken or omitted to be taken in accordance with this Settlement Agreement.

      13.    On or before May 11, 2003, the Canadian Debtor Sellers shall file with the CCAA Court a motion, together with any required supporting papers, notice, and a proposed order, each in form and substance reasonably satisfactory to Buyer and the Key Sellers, seeking the CCAA Court's approval of this Settlement Agreement and all of its provisions and the

observance and performance of such provisions by the Canadian Debtor Sellers. On or before April 29, 2003, the US Debtor Sellers shall file with the US Bankruptcy Court a motion, together with any required supporting papers, notice, and a proposed order, in form and substance reasonably satisfactory to Buyer and the Key Sellers, seeking the US Bankruptcy Court's approval of this Settlement Agreement and all of its provisions and the observance and performance of such provisions by the US Debtor Sellers. Each of the Canadian Debtor Sellers and US Debtor Sellers shall (i) provide Buyer with copies of the foregoing motion, supporting papers, notice, and proposed order (in the case of such material to be filed with the CCAA Court, at least one full Business Day) prior to the filing thereof and (ii) use commercially reasonable efforts to obtain approval of this Settlement Agreement from each of the CCAA Court and US Bankruptcy Court not later than May 20, 2003.

      14.    At the Closing, Sellers agree to execute and deliver reasonable documentation to be provided by Buyer and mutually agreed by the parties with respect to the transfer or assignment of certain undersea cable assets pursuant to the directions of Buyer set forth in the letter from Buyer to the Key Sellers dated February 7, 2003 regarding formation of Newcos, provided that at the Closing the U.S. cable landing assets and Federal Communications Commission ("FCC") landing licenses shall be retained in Teleglobe USA LLC or Teleglobe USA III LLC, as the case may be, as described in the applications to transfer control filed at the FCC on January 9, 2003 (SCL-ASG-20030-109-0002, SCL-ASG-20030-109-0003), and further provided that no person shall transfer assets to a Newco owned by a U.S. Debtor Seller other than such U.S Debtor Seller, and provided further that Buyer shall assume all liabilities and obligations with respect to any failure of such assignment or transfer to be effective, shall indemnify Sellers from and against any claims made by third parties that arise out of the assignment or transfer of such assets to more than one Newco as a result of the division of such assets among two or more Newcos and shall have no recourse against Sellers with respect to any failure of such assignment or transfer to be effective, other than, if requested by Buyer, to require Sellers to assign or transfer such assets to a single Newco. Sellers make no representation or warranty with respect to the effectiveness of any such transfer or assignment to more than one Newco.

      15.    Buyer and the Key Sellers, on behalf of all the Sellers, agree to use their commercially reasonable efforts to resolve on a consensual basis pending objections of third party vendors to the rejection of US leased circuits which are based on of the existence of a master service agreement for such circuits (an "MSA") no later than May 30, 2003. In the event that no resolution is achieved by such date with respect to such disputes, the US Debtor Sellers shall file such applications as are appropriate for such matters to be heard by the US Bankruptcy Court no later than June 30, 2003 to determine whether the US Debtor Sellers may reject individual circuits. If the US Bankruptcy Court denies the US Debtor Sellers' motion(s) to either (i) reject individual circuits (in lieu of rejecting the MSA in its entirety) or (ii) assume individual circuits (in lieu of assuming all circuits leased pursuant to such MSA), then Sellers and Buyer agree that any such MSA may be designated in writing by Buyer to be a Rejected Contract and an Excluded Asset within 60 days after such denial, notwithstanding the Closing or anything to the contrary contained in the Purchase Agreement. To the extent any such agreement is designated as a Rejected Contract, Buyer shall reimburse Sellers for amounts due thereunder to the extent such amounts pertain to the period from and including December 1, 2002 to and including the date on which the rejection of the applicable MSA pursuant to this paragraph was

effective pursuant to the applicable Insolvency Proceedings. To the extent any MSA is not designated as a Rejected Contract within the 60 day period after such denial, such Contract (and, for the avoidance of doubt, all leased circuits thereunder) will be deemed to be a Contract to be assumed by Buyer (or the applicable Newco) and Buyer (or the applicable Newco) shall assume all liabilities and obligations of Sellers arising under the terms of such MSA. Pending the determination by Buyer to assume or reject, the Key Sellers will, and will cause the Other Sellers to, from and after the Closing and until such determination has been made, use commercially reasonable efforts during the term of the affected Contract, to (i) provide to the applicable Newcos the benefits under any such Contract, (ii) cooperate in any reasonable and lawful arrangement (including holding such Contracts in trust for the Buyer and the Newcos pending determination) designed to provide such benefits to the Buyer and the applicable Newco and (iii) enforce for the account of the Buyer and the Newcos any rights of the applicable Sellers under the affected Contract. Buyer will, and will cause the applicable Newco to, cooperate with the Sellers in order to enable the Sellers to provide to Buyer and Newcos the benefits contemplated by this paragraph 15.

16.    Buyer and Key Sellers, on behalf of the Canadian Debtor Sellers, US Debtor Sellers and UK Sellers, hereby agree that to the extent that, with respect to any Contract designated by Buyer pursuant to Section 4.4.4 of the Purchase Agreement, if objections to the rejection of such Contract have not been resolved as to whether such Contract can be rejected pursuant to the applicable Insolvency Proceeding prior to the Closing Date, such Contract shall not be assigned to or assumed by Buyer or the applicable Newco at the Closing. To the extent an objection to the rejection motion was filed with respect to such Contract, Buyer and Key Sellers, on behalf of the Canadian Debtor Sellers, US Debtor Sellers and UK Sellers, hereby agree to work in good faith using commercially reasonable efforts to resolve the situation on a consentual basis with the objecting party no later than May 30, 2003 to permit the rejection of such Contract. If no such consensual resolution is achieved by such date, the US Debtor Sellers will file such applications as are appropriate for such matters to be heard by the US Bankruptcy Court prior to June 30, 2003. If it is determined that any such Contract is a Rejected Contract, it will be treated for all purposes as a Rejected Contract (with Buyer reimbursing Sellers for amounts due thereunder to the extent such amounts pertain to the period from and including December 1, 2002 to and including the date on which the rejection of the applicable Contract is effective) and if it is determined that any such Contract is not rejectable, such Contract shall be assumed by the Buyer or the applicable Newco.

17.    Each party represents and warrants that (i) it has full entity power and authority to execute and deliver this Settlement Agreement and to perform its obligations hereunder and (ii) it has not assigned, sold, transferred or otherwise disposed of its interest in the Purchase Agreement, the IMA or the UK IMA to any other person or entity.

18.    All provisions, covenants and representations contained herein shall be binding on and shall inure to the benefit of the respective parties hereto and their present, past and future representatives, agents, attorneys, successors and assigns.

19.    This Settlement Agreement, including the rights and obligations of the parties hereunder, shall be construed in accordance with, and governed by, the internal

substantive laws of Ontario, regardless of the laws that might otherwise govern under principles of conflict of laws applicable thereto

20.    This Settlement Agreement, together with the exhibit hereto, constitutes the entire agreement with respect to the subject matter hereof. This Settlement Agreement may not be changed orally and may not be modified, rescinded or amended except pursuant to an agreement in writing signed by the parties hereto.

21.    The CCAA Court and the US Bankruptcy Court will have concurrent, exclusive jurisdiction over any dispute arising out of or in connection with the transactions contemplated by this Settlement Agreement.

22.    The parties hereto acknowledge that they may hereafter discover claims or facts in addition to or different from those which they may now know or believe to exist with respect to the subject matter of this Settlement Agreement and which, if known or suspected at the time of executing this Settlement Agreement, may have materially affected this settlement. Nevertheless, the parties hereby represent and warrant to one another that, in entering into this Settlement Agreement, they are not relying on any facts, representations or warranties other than those expressly set forth in this Settlement Agreement, and waive any right that they might otherwise have to challenge the enforceability of the Settlement Agreement on the basis of claims or facts hereafter discovered.

23.    Each party hereto has cooperated in the drafting and preparation of this Settlement Agreement. Hence, this Settlement Agreement shall not be construed against any party on the basis that such party was the draftsperson. Each party hereto acknowledges that it has been, or has had the opportunity to be, represented by counsel in this matter and has consulted, or has had an opportunity to consult, with such counsel prior to executing this Settlement Agreement. Each party further acknowledges that it has read the terms of this Settlement Agreement and that its counsel has explained its consequences and legal effects to it. Each party believes this Settlement Agreement to be fair and reasonable and each signs this Settlement Agreement freely and voluntarily.

24.    In the event the terms of this Settlement Agreement conflict with the terms of the Purchase Agreement or the IMA, the terms of this Settlement Agreement shall govern. Except as provided herein, the Purchase Agreement and the IMA shall remain in full force and effect.

25.    This Settlement Agreement may be executed in counterparts, and each counterpart, once executed, shall have the efficacy of a signed original. True and correct copies of signed counterparts may be used in place of the originals for any purpose.

26.    Each of Buyer and the Key Sellers hereto agrees to execute such other documents and instruments and take such other actions, and in the case of the Key Sellers cause the Other Sellers to execute such other documents and instruments and take such other actions, as may be reasonably necessary, proper or advisable to implement this Settlement Agreement or to provide the rights and benefits intended to be provided pursuant to this Settlement Agreement to each of the parties hereto.

9411752 11

**IN WITNESS WHEREOF,** the Parties have caused this Settlement Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**BUYER:**

**TLGB ACQUISITION LLC**

By: CERBERUS PARTNERS, L.P.,
its Managing Member

By: CERBERUS ASSOCIATES, L.L.C.,
its General Partner

By: _____
Name:
Its:

**SELLERS:**

**TELEGLOBE INC.**

By: _____
Name: John S. Brunette
Title:   Chief Executive Officer

**TELEGLOBE USA INC.**

By: _____
Name: John S. Brunette
Title:   Executive Vice President

**TELEGLOBE CANADA LIMITED PARTNERSHIP**

By: Teleglobe Inc., its general partner

By: _____
Name: John S. Brunette
Title:   Chief Executive Officer

9411752.10

9

**TELEGLOBE COMMUNICATIONS CORPORATION**

By:_____
Name: John S. Brunette
Title:   Executive Vice President

**OPTEL TELECOMMUNICATIONS, INC.**

By:_____
Name: John S. Brunette
Title:   President

As to paragraph 10 and 26 only:

**MADELEINE L.L.C., as DIP Lender**

By:_____
Name:
Title:

**MADELEINE CORP., as DIP Lender**

By:_____
Name:
Title:

9411752 11

IN WITNESS WHEREOF, the Parties have caused this Settlement Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**BUYER:**

**TLGB ACQUISITION LLC**

By: CERBERUS PARTNERS, L P ,
its Managing Member

    By: CERBERUS ASSOCIATES, L L C ,
        its General Partner

        By:_____
           Name:
           Its:

**SELLERS:**

**TELEGLOBE INC.**

By:_____
Name: John S. Brunette
Title:   Chief Executive Officer

**TELEGLOBE USA INC.**

By:_____
Name: John S. Brunette
Title:   Executive Vice President

**TELEGLOBE CANADA LIMITED
PARTNERSHIP**

By:  Teleglobe Inc., its general partner

By:_____
Name: John S. Brunette
Title:   Chief Executive Officer

941175211

9

04/28/2003 16:47 FAX 703 748 3752      TELEGLOBE INT'L                          ☑003

**TELEGLOBE COMMUNICATIONS
CORPORATION**

By: _____
Name:  John S. Brunette
Title:   Executive Vice President

**OPTEL TELECOMMUNICATIONS, INC.**

By: _____
Name: John S. Brunette
Title:  President

As to paragraph 10 and 26 only:

**MADELEINE L.L.C., as DIP Lender**


By: _____
Name:
Title:

**MADELEINE CORP., as DIP Lender**


By: _____
Name:
Title:

941175211

**TELEGLOBE COMMUNICATIONS CORPORATION**

By:_____
Name: John S. Brunette
Title:   Executive Vice President

**OPTEL TELECOMMUNICATIONS, INC.**

By:_____
Name: John S. Brunette
Title:   President

As to paragraph 10 and 26 only:

**MADELEINE L.L.C., as DIP Lender**

By: _____
Name: Seth Plattus
Title: Managing Director

**MADELEINE CORP., as DIP Lender**

By: _____
Name: Seth Plattus
Title:

9411752.11

10

**EXHIBIT "A"**
**Receivables to be Excluded**

**UK**

| Payor | Outstanding Amount |
|---|---|
| Primus | 273,000 |

**Spain**

| Payor | Outstanding Amount |
|---|---|
| American Telecom | 1,543,000 |
| Applications in EL | 5,000 |
| Asia Telecom Spain | 508,000 |
| Atlas Telecom Espa | 119,000 |
| DCI Telecomunicaci | 68,000 |
| Directivosnet, S.L. | 24,000 |
| Hartung Macher, S. | 29,000 |
| Telerouting System | 227,000 |
| Trazabilidad, Iden | 4,000 |
| Mundophone | 563,000 |
| Teleconnect | 357,000 |
| | 3,447,000 |

EXHIBIT B

The conditions set forth in the Purchase Agreement pursuant to Sections:

10.1.1
10.2.1
10.2.2
10.2 3
10.2.4
10.3.1
10.3 2
10.3 3
10.3 5
10.3.6
10.3.8
10.3.9

In addition, the Purchase Agreement is hereby amended to add the following conditions to the Purchase Agreement as Section 10 2.5, Section 10 3.10 and Section 10.3 11, respectively:

Section 10.2.5. Buyer shall have delivered a release in substantially the form attached hereto as Exhibit D and shall have caused the delivery of the termination and release agreement with respect to the DIP Facilities substantially in the form attached as Exhibit D-1 and D-2 hereto. Buyer shall have also delivered a representation that it has delivered all Excluded Assets then in its possession or control to Sellers.

Section 10.3.10. The Key Sellers, on behalf of all the Sellers, shall have delivered a release in substantially the form attached hereto as Exhibit D hereto and the termination and release agreement with respect to the DIP Facilities substantially in the form attached hereto as Exhibit D-1and D-2. The Key Sellers shall have also delivered a representation that they have delivered all Purchased Assets (other than Contracts subject to Section 2.2 of the Purchase Agreement and subject to the limitations set forth in paragraph 14 of this Settlement Agreement) then in their possession or control to Buyer.

Section 10.3.11. Each Seller that is transferring (i) Newco Equity in a Newco that is organized under the laws of Canada or of a province or territory therein or (ii) Purchased Assets that constitute "Taxable Canadian Property" within the meaning of the ITA and "Taxable Quebec Property" within the meaning of the Quebec Taxation Act, shall have delivered a written statement to Buyer certifying that it is not a non-resident of Canada for purposes of the ITA.

**EXHIBIT "C"**
**Funds to be remitted to Seller:**

*A  Amounts already received by Buyer - to be remitted to Seller*

| | | |
|---|---|---:|
| Bulgarian Telecommunications | Collected Jan  24, 2003 | 192,000 |
| Moldtelecom | Collected Jan  24, 2003 | 104,000 |
| | | 296,000 |

*B  Amounts to be remitted to Seller when received by Buyer*

| | | |
|---|---|---:|
| Starfone Corp | TUSA | 37,176 |
| OSS Corp | TCLP | 6,266 |
| Infonet Services | TUSA | 4,364 |
| Nevada | TUK | 4,000 |
| Net2Phone, Inc | TUSA | 2,280 |
| | | 54,086 |

*C  Non-Core Business Customer Agreements for which the Buyer is to pay certain amounts to the Sellers*

In connection with agreements with the applicable customer, for post-IMA Date traffic, instead of paying the customer/supplier for amount owing, the Buyer is to remit or cause to be remitted the payment to the Sellers to pay down the Sellers' non-Core Business receivable from the customer/supplier up to the amount described below as the estimated amount currently owing  Future amounts relating to Planetworks and Worldlink may be remitted to the Sellers when the Core Business in its discretion send more traffic to such suppliers and invoices are received from such suppliers  The methodology applied to the calculation of the final settlement of any estimated amounts currently owing or any future amounts will be the same methodology used to calculate the estimated amount currently owing  With respect to Planetworks, any amounts payable by the Buyer to the Sellers are conditioned upon receipt by the Buyer of an acknowledgement from Planetworks agreeing to pay or permit payment to the Sellers

| | Estimated amount currently owing to Non-Core by Core |
|---|---:|
| Planetworks | 840,000 |
| Worldlink | 130,000 |
| | 970,000 |

**Non-Core Business accounts receivable to be transferred to Buyer**

The following is a list of non-Core Business accounts receivable with customers that have a continuing relationship with the Core Business. The Buyer will remit to the Sellers all the cash received in payment for such accounts receivables during the period from December 1, 2002 to April 30, 2003 All cash received in payment for such accounts receivable by Buyer during the period after April 30, 2003 will be retained by Buyer and, to the extent any amounts are received by the Sellers for such accounts receivable after April 30, 2003, Seller shall remit such amounts to Buyer. The Contracts related to such accounts receivables are deemed to be Contracts assumed by Buyer

| Entity | ORACLE# | ORG# | NAME |
|--------|---------|------|------|
| TCLP | 2565 | 2565 | ATLAS TELECOM S.A. (PAN) |
| TUSA | 1804 | 1000121 | UNMATCHED - GCT PACIFIC HOLDINGS LTD |
| TUSA | 1803 | 1000127 | UNMATCHED - JB TEL LIMITED |
| TCLP | 1071 | 1071 | MCI WORLDCOM |
| TCLP | 2447 | 2447 | TELCOM LEASE LTD |
| TCLP | 16577 | 16577 | GLOBALSTAR AMERICAS CORPORATION |
| TCLP | 17937 | 17937 | NILCOM (PROSODIE GROUP) |
| TCLP | 1126 | 1126 | FISHERIES AND OCEANS CANADA |
| TCLP | 1366 | 1366 | BANQUE LAURENTIENNE DU CANADA |
| TCLP | 111 | 111 | BANQUE NATIONALE DU CANADA |
| TCLP | 565 | 565 | LA CAISSE CENTRALE DESJARDINS DU QUEBEC |
| TCLP | 850 | 850 | SOCIETE GENERALE(CANADA) |
| TCLP | 102 | 102 | BANCA COMMERCIALE ITALIANA OF CANADA |
| TCLP | 109 | 109 | BANK OF NOVA SCOTIA |
| TCLP | 105 | 105 | BT BANK OF CANADA |
| TCLP | 241 | 241 | CITIBANK CANADA |
| TCLP | 643 | 643 | MELLON BANK CANADA |
| TCLP | 114 | 114 | ROYAL BANK OF CANADA |
| TCLP | 14491 | 14491 | TD TELEKOM DANMARK AS |
| TUSA | 17996 | 17996 | SKYONLINE/DIGITAL STORES |
| TUSA | 18001 | 18001 | SKYONLINE/DESARROLLOS DIGITALES S.A. |
| TUSA /TCLP | | 2310 | Startec Global Communication |
| TUSA | | 18475 | DANCRIS TELECOM LLC. |
| TCLP | 14899 | 14899 | SCHROEDER K. GMBH & CO. KG |

EXHIBIT D

## RELEASE

1. <u>Buyer's Release</u>  Subject to Section 6 below, Buyer on behalf of itself and each of its predecessors, successors, assigns, subsidiaries and affiliated companies (including each Newco), and each of their present or former general and limited partners, principals, officers, directors, employees, agents, attorneys, accountants, accounting advisors, shareholders, controlling persons (direct or indirect, and whether separately or collectively controlling persons), board members (whether advisory boards or otherwise), affiliates, heirs, administrators, representatives, devisees, and legatees (collectively, "the Buyer Release Parties") hereby release, acquit, and forever discharge each of the Sellers and each of their predecessors, successors, assigns, subsidiaries and affiliated companies, and each of their present or former general and limited partners, principals, officers, directors, members, managers, employees, agents, attorneys, accountants, accounting advisors, shareholders, controlling persons (direct or indirect, and whether separately or collectively controlling persons), board members (whether advisory boards or otherwise), affiliates, heirs, administrators, representatives, devisees, and legatees, other than Bell Canada Inc., BCE Inc., Bell Nexxia Inc. and any of their respective affiliates (other than Teleglobe Inc. and its subsidiaries) (collectively, the "Seller Release Parties") from any and all claims, causes of action, suits, debts, liens, obligations, liabilities, demands, losses, costs and expenses (including attorneys' fees), known or unknown, fixed or contingent, which any of the Buyer Release Parties may have now or claim to have against any of the Seller Release Parties or which may hereafter arise out of, relate to, or be connected with any act of commission or omission of any of them existing or occurring prior to the Closing Date that may constitute a breach or alleged breach of any representations, warranties, covenants or obligations under the Purchase Agreement, IMA or UK IMA, including the alleged breaches set forth in the Breach Claims (collectively, the "<u>Buyer Released Claims</u>").

2. Sellers' Release.  Subject to Section 6 below, the Key Sellers, on behalf of all the Sellers Release Parties, hereby release, acquit, and forever discharge each of the Buyer Release Parties from any and all claims, causes of action, suits, debts, liens, obligations, liabilities, demands, losses, costs and expenses (including attorneys' fees), known or unknown, fixed or contingent, which any of the Seller Release Parties may have now or claim to have against any of the Buyer Release Parties or which may hereafter arise out of, relate to, or be connected with any act of commission or omission of any of them existing or occurring prior to the Closing Date that may constitute a breach or alleged breach of any representations, warranties, covenants or obligations under the Purchase Agreement, the Commitment Letter dated September 18, 2002 between Buyer and Cerberus Capital Management L.P. ("CCM"), the Commitment Letter dated September 18, 2002

between Buyer (as Manager pursuant to the IMA) and CCM, the IMA or UK IMA (collectively, the "Seller Released Claims" and together with the Buyer Released Claims, the "Released Claims").

3   For the avoidance of doubt, the Released Claims include, without limitation, (i) any obligation of the Buyer Release Parties to compensate, pay over or otherwise provide any portion of the Cure Savings to any of the Seller Release Parties, (ii) any obligation of the Seller Release Parties to pay any Cure Costs not paid as of April 29, 2003 in respect of the Assumed Contracts to permit the assumption and assignment of any Contract that constitutes a Purchased Asset or is subject to an alternative arrangement pursuant to Section 2.2.2 of the Purchase Agreement and (iii) any obligation of the Buyer Release Parties to pay Incremental Costs or Incremental Taxes.

4   Covenant not to Sue.  Buyer, on behalf of all of the Buyer Release Parties and the Key Sellers, on behalf of all of the Seller Release Parties, mutually covenant that none of such parties will sue, sue further, or otherwise prosecute in any way, including but not limited to through delivery of any Breach Notice, any person or entity that such party hereinabove released with respect to any and every Released Claim.

5.  Interest in Released Claims.  Each of the Buyer, on behalf of all of the Buyer Release Parties, and the Key Sellers, on behalf of all of the Seller Release Parties, represents and warrants that (i) it has full entity power and authority to execute and deliver this Release Agreement and to perform its obligations hereunder and (ii) it has not assigned, sold, transferred or otherwise disposed of its interest in the Released Claims to any other person or entity.

6.  Governed by Settlement Agreement.  The terms of this Release shall not release, modify, supersede or otherwise affect any provision of the Settlement Agreement, dated as of April 29, 2003 by and among Buyer and the Key Sellers (the "Settlement Agreement") or any provision of the Purchase Agreement that, pursuant to the Settlement Agreement (as any such provision may be modified by the Settlement Agreement), survives the Closing.  Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Settlement Agreement.

IN WITNESS WHEREOF, this Release has been signed on behalf of each of the parties hereto as of the date first written above.

**BUYER:**

**TLGB ACQUISITION LLC**

By: CERBERUS PARTNERS, L.P.,
its Managing Member

    By: CERBERUS ASSOCIATES, L.L.C.,
       Its General Partner

          By:_____
             Name:
             Its:

**KEY SELLERS:**

**TELEGLOBE INC.**

By:_____
Name:
Title:

**TELEGLOBE USA INC.**

By:_____
Name:
Title:

**TELEGLOBE CANADA LIMITED
PARTNERSHIP**

**By:  Teleglobe Inc., its General Partner**

    By:_____

Name:
Title:
**TELEGLOBE COMMUNICATIONS
CORPORATION**


By:_____
Name:
Title:


**OPTEL TELECOMMUNICATIONS, INC.**


By:_____
Name:
Title:

**SR&Z LLP DRAFT**
04/29/03

EXHIBIT D-1

## FORM OF TERMINATION AND RELEASE AGREEMENT

TERMINATION AND RELEASE AGREEMENT, dated as of _____, by and among Teleglobe Communications Corporation, Optel Telecommunications, Inc. and Teleglobe USA Inc., as borrowers (collectively, the "Borrowers") certain affiliates of the Borrowers listed on the signature pages hereto, as guarantors (the "Guarantors"), the lenders from time to time party thereto (the "Lenders") and Madeleine L.L.C., as agent for the Lenders (in such capacity, together with its successors and assigns, the "Agent")

### W I T N E S S E T H:

WHEREAS, the Borrowers, the Guarantors, the Lenders and the Agent are parties to a Financing Agreement, dated as of December 1, 2002, as amended through the date hereof (the "Financing Agreement"), pursuant to which the Lenders made loans to the Borrowers (the "Loans");

WHEREAS, the obligations of the Borrowers to the Agent and Lenders in respect of the Financing Agreement and the Loan Documents (as defined in the Financing Agreement) are guaranteed and secured, inter alia, pursuant to the Financing Agreement and the Financing Orders;

WHEREAS, simultaneously with the execution and delivery of this Agreement, the Borrowers are repaying the Loans and satisfying or providing for the satisfaction of all of the other obligations of the Borrowers to the Lenders and the Agent under the Financing Agreement and all other Loan Documents;

NOW, THEREFORE, in consideration of the premises and agreements herein and the payment in full of the Loans and the satisfaction or provision for satisfaction of all other obligations, the Borrowers, the Guarantors, the Agent and the Lenders hereby agree as follows:

1.     Capitalized terms used and not otherwise defined herein have the respective meanings assigned to them in the Financing Agreement.

2.     As of the date hereof, the aggregate outstanding principal amount of the Loans is $_____. The accrued and unpaid interest on the Loans is $_____. The amount of the accrued and unpaid fees owing to the Agent and the Lenders pursuant to the Financing Agreement is $_____. Assuming no changes in applicable interest rates and no changes in the outstanding principal amount of the Loans, the aggregate per diem accrual of such interest and fees is $_____.[1]

---

[1] The amounts to be included in this paragraph 2 will not include principal amounts for Core Loans or any interest in connection therewith

3.     The Borrowers are obligated to pay to the Agent $_____ representing fees and disbursements of counsel to the Agent.

4.     The Borrowers hereby agree that the principal amount of the Loans, the interest thereon and the fees in connection therewith set forth in paragraph 2 hereof and the accrued fees and disbursements of counsel to the Agent set forth in paragraph 3 hereof (collectively, the "Loan Obligations") are payable without any deduction, offset, defenses or counterclaim. Following the payment of the Loan Obligations, to the extent the Agent receives or otherwise has possession of any funds that constitute property of the Borrowers or the Guarantors, the Agent will return such funds to the Borrowers as soon as possible, but in any event, not later than ten (10) days following the later of (a) the date of this Agreement, and (b) the date the Agent receives such funds.

5.     The Borrowers hereby (a) acknowledge that the Agent may not yet have received full and final credit for all checks or similar instruments for the payment of money heretofore delivered to the Agent by the Borrowers, the Guarantors or their account debtors pursuant to the Financing Agreement and the other Loan Documents and deposited by the Agent for collection, the amount of which checks and similar instruments have nevertheless been credited to the Borrowers in the computation of the Loan Obligations, (b) acknowledge that the Agent may have erroneously credited to the Borrowers in the computation of the Loan Obligations certain payments that belong to others, and (c) absolutely, unconditionally and irrevocably agree to reimburse and pay to the Agent promptly upon the Agent's demand (x) the full face amount (plus protest or other bank interests, charges or fees relating hereto) of any such checks or similar instruments heretofore delivered to the Agent by the Borrowers or their account debtors which are hereafter dishonored or returned unpaid to the Agent for any reason whatsoever and (y) any amount that the Agent has credited to the Borrowers in the computation of the Loan Obligations that the Agent determines belongs to others, provided, that the Agent makes demand upon the Borrowers for such amounts within ___ days of the date of this Agreement (the obligations of the Borrowers under this paragraph 5 are referred to as the "Surviving Claims"). Upon such payment, in the case of payments of an amount described in clause (x) above, the Agent shall deliver to the Borrowers any such returned instrument endorsed by the Agent without recourse.

6.     The Agent agrees that, upon its receipt after the date hereof of any checks or similar instruments that it determines to be payable to the Borrowers, to promptly deliver such checks or instruments to the Borrowers without recourse, representation or warranty.

7.     Without recourse and without any representation or warranty of any kind, and subject to the satisfaction of the conditions set forth in paragraph 10 hereof: (a) the Agent and the Lenders hereby acknowledge payment in full of the Loan Obligations under the Financing Agreement and agree to the termination of the Commitments and hereby terminate the Financing Agreement and each other Loan Document (subject to the continuing obligation for the Surviving Claims as set forth in paragraph 5 hereof, and any provision in the Financing Agreement and the Loan Documents providing for the survival thereof), (b) the Agent and the Lenders hereby acknowledge and agree that any and all liens, security interests or other charges or encumbrances in favor of the Agent and the Lenders arising under the Financing Agreement,

2

the Financing Orders, any Loan Documents or any other documents securing the Financing Agreement (collectively, the "Financing Agreement Liens") are hereby automatically released and terminated without any further action on the part of the Agent and Lenders, (c) the Borrowers and the Guarantors hereby release the Agent and Lenders from any duty, liability, obligation or claim (if any) (collectively, the "Claims"), directly or indirectly, arising out of the Financing Agreement and the other Loan Documents, and (d) the Agent and Lenders hereby release the Borrowers and the Guarantors from all Claims, directly or indirectly, arising out of the Financing Agreement and the other Loan Documents except to the extent arising out of any provision in any of the aforementioned documents which by its terms expressly survives the termination thereof. Nothing contained herein shall be deemed to be a termination of, or a release of any claims or obligations under this Agreement.

8.    Following the satisfaction of the conditions set forth in paragraph 10 hereof, the Agent and the Lenders will, at the request of the Borrowers, execute such additional instruments and other writings, and take such other actions, as the Borrowers may from time to time reasonably request to effect or evidence the satisfaction of the Loan Obligations and the termination of the Financing Agreement Liens and the effectiveness of the Financing Agreement and each other Loan Document and any instruments executed pursuant thereto, but at the sole cost and expense of the Borrowers provided that this paragraph 8 shall not apply to the Surviving Claims and any provisions in the Financing Agreement and the Loan Documents providing for the survival thereof.

9.    This Agreement shall (a) be binding on the Agent, the Lenders, the Borrowers, the Guarantors and their respective successors and assigns and (b) inure to the benefit of the Agent, the Lenders, the Borrowers, the Guarantors and their respective successors and assigns.

10.    The effectiveness of this Agreement is subject to the conditions precedent that the Agent shall have received (a) full payment in respect of all of the Loan Obligations in the amount set forth above by wire transfer of immediately available funds pursuant to the instructions set forth in Schedule A attached hereto, and (b) counterparts of this Agreement, duly executed by the Borrowers, the Guarantors, the Agent and the Lenders.

11.    This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of this Agreement by facsimile shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by telefacsimile also shall deliver an original executed counterpart of this Agreement, but the failure to deliver an original executed counterpart shall not affect the validity, enforceability and binding effect of this Agreement.

12.    This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York.

13.    THE AGENT, THE LENDERS, THE BORROWERS, THE US GUARANTORS AND THE CANADIAN GUARANTORS HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM CONCERNING ANY RIGHTS UNDER THIS AGREEMENT OR UNDER ANY AMENDMENT, WAIVER, CONSENT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT DELIVERED OR WHICH IN THE FUTURE MAY BE DELIVERED IN CONNECTION THEREWITH, OR ARISING IN CONNECTION WITH THIS AGREEMENT, AND AGREE THAT ANY SUCH ACTION, PROCEEDINGS OR COUNTERCLAIM SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their duly authorized officers as of the date first written above.

BORROWERS:

**TELEGLOBE COMMUNICATIONS CORPORATION**

By: _____
    Name:    John S. Brunette
    Title:    Executive Vice President

**OPTEL TELECOMMUNICATIONS, INC.**

By: _____
    Name:    John S. Brunette
    Title:    President

**TELEGLOBE USA INC.**

By: _____
    Name:    John S. Brunette
    Title:    Executive Vice President

4

GUARANTORS:

**TELEGLOBE INC.**

By: _____
     Name:   John S. Brunette
     Title:    Chief Executive Officer

**TELEGLOBE CANADA LIMITED PARTNERSHIP**

**By:   Teleglobe Inc., its general partner**

By: _____
     Name:   John S. Brunette
     Title:    Chief Executive Officer

**TELEGLOBE FINANCIAL HOLDINGS LTD.**

By: _____
     Name:   John S. Brunette
     Title:    Executive Vice President

**TELEGLOBE MANAGEMENT SERVICES INC.**

By: _____
     Name:   John S. Brunette
     Title:    Executive Vice President

**3692795 CANADA INC.**

By: _____
     Name:   John S. Brunette
     Title:    Executive Vice President

TELEGLOBE CANADA MANAGEMENT
SERVICES INC.

By: _____
    Name:    John S. Brunette
    Title:    Executive Vice President


TELECOM VISION CALL CENTER SERVICES,
GENERAL PARTNERSHIP


By:    **Teleglobe Financial Holdings Ltd.,**
       **its general partner**


By: _____
    Name:    John S. Brunette
    Title:    Executive Vice President

AGENT AND LENDER:

MADELEINE L.L.C.


By: _____
    Name:
    Title:

<u>Schedule A</u>

Wire Instructions

| | |
|---|---|
| Bank: | Citibank, New York, N.Y. |
| ABA #: | 021-000-089 |
| Acct. Name: | Cerberus Partners, L.P. |
| Acct. #: | 37839889 |
| Attn.: | Robert Gadigan |

<u>EXHIBIT D-2</u>

<u>FORM OF TERMINATION AND RELEASE AGREEMENT</u>

TERMINATION AND RELEASE AGREEMENT, dated as of _____, by and among Teleglobe Inc. and Teleglobe Canada Limited Partnership, as borrowers (collectively, the "<u>Borrowers</u>"), certain affiliates of the Borrowers listed on the signature pages hereto, as guarantors (the "<u>Guarantors</u>"), the lenders from time to time party thereto (the "<u>Lenders</u>") and Madeleine Corp., as agent for the Lenders (in such capacity, together with its successors and assigns, the "<u>Agent</u>")

W I T N E S S E T H:

WHEREAS, the Borrowers, the Guarantors, the Lenders and the Agent are parties to a Financing Agreement, dated as of December 1, 2002, as amended through the date hereof (the "<u>Financing Agreement</u>"), pursuant to which the Lenders made loans to the Borrowers (the "<u>Loans</u>");

WHEREAS, the obligations of the Borrowers to the Agent and Lenders in respect of the Financing Agreement and the Loan Documents (as defined in the Financing Agreement) are guaranteed and secured, <u>inter alia</u>, pursuant to the Financing Agreement and the Financing Orders;

WHEREAS, simultaneously with the execution and delivery of this Agreement, the Borrowers are repaying the Loans and satisfying or providing for the satisfaction of all of the other obligations of the Borrowers to the Lenders and the Agent under the Financing Agreement and all other Loan Documents;

NOW, THEREFORE, in consideration of the premises and agreements herein and the payment in full of the Loans and the satisfaction or provision for satisfaction of all other obligations, the Borrowers, the Guarantors, the Agent and the Lenders hereby agree as follows:

1.    Capitalized terms used and not otherwise defined herein have the respective meanings assigned to them in the Financing Agreement.

2.    As of the date hereof, the aggregate outstanding principal amount of the Loans is $_____. The accrued and unpaid interest on the Loans is $_____. The amount of the accrued and unpaid fees owing to the Agent and the Lenders pursuant to the Financing Agreement is $_____. Assuming no changes in applicable interest rates and no changes in the outstanding principal amount of the Loans, the aggregate per diem accrual of such interest and fees is $_____.[1]

---

[1] The amounts to be included in this paragraph 2 will not include principal amounts for Core Loans or any interest in connection therewith

3.    The Borrowers are obligated to pay to the Agent $_____ representing fees and disbursements of counsel to the Agent.

4.    The Borrowers hereby agree that the principal amount of the Loans, the interest thereon and the fees in connection therewith set forth in paragraph 2 hereof and the accrued fees and disbursements of counsel to the Agent set forth in paragraph 3 hereof (collectively, the "Loan Obligations") are payable without any deduction, offset, defenses or counterclaim. Following the payment of the Loan Obligations, to the extent the Agent receives or otherwise has possession of any funds that constitute property of the Borrowers or the Guarantors, the Agent will return such funds to the Borrowers as soon as possible, but in any event, not later than ten (10) days following the later of (a) the date of this Agreement, and (b) the date the Agent receives such funds.

5.    The Borrowers hereby (a) acknowledge that the Agent may not yet have received full and final credit for all checks or similar instruments for the payment of money heretofore delivered to the Agent by the Borrowers, the Guarantors or their account debtors pursuant to the Financing Agreement and the other Loan Documents and deposited by the Agent for collection, the amount of which checks and similar instruments have nevertheless been credited to the Borrowers in the computation of the Loan Obligations, (b) acknowledge that the Agent may have erroneously credited to the Borrowers in the computation of the Loan Obligations certain payments that belong to others, and (c) absolutely, unconditionally and irrevocably agree to reimburse and pay to the Agent promptly upon the Agent's demand (x) the full face amount (plus protest or other bank interests, charges or fees relating hereto) of any such checks or similar instruments heretofore delivered to the Agent by the Borrowers or their account debtors which are hereafter dishonored or returned unpaid to the Agent for any reason whatsoever and (y) any amount that the Agent has credited to the Borrowers in the computation of the Loan Obligations that the Agent determines belongs to others, provided, that the Agent makes demand upon the Borrowers for such amounts within ___ days of the date of this Agreement (the obligations of the Borrowers under this paragraph 5 are referred to as the "Surviving Claims"). Upon such payment, in the case of payments of an amount described in clause (x) above, the Agent shall deliver to the Borrowers any such returned instrument endorsed by the Agent without recourse.

6.    The Agent agrees that, upon its receipt after the date hereof of any checks or similar instruments that it determines to be payable to the Borrowers, to promptly deliver such checks or instruments to the Borrowers without recourse, representation or warranty.

7.    Without recourse and without any representation or warranty of any kind, and subject to the satisfaction of the conditions set forth in paragraph 10 hereof: (a) the Agent and the Lenders hereby acknowledge payment in full of the Loan Obligations under the Financing Agreement and agree to the termination of the Commitments and hereby terminate the Financing Agreement and each other Loan Document (subject to the continuing obligation for the Surviving Claims as set forth in paragraph 5 hereof, and any provision in the Financing Agreement and the Loan Documents providing for the survival thereof), (b) the Agent and the Lenders hereby acknowledge and agree that any and all liens, security interests or other charges or encumbrances in favor of the Agent and the Lenders arising under the Financing Agreement,

the Financing Orders, any Loan Documents or any other documents securing the Financing Agreement (collectively, the "Financing Agreement Liens") are hereby automatically released and terminated without any further action on the part of the Agent and Lenders, (c) the Borrowers and the Guarantors hereby release the Agent and Lenders from any duty, liability, obligation or claim (if any) (collectively, the "Claims"), directly or indirectly, arising out of the Financing Agreement and the other Loan Documents, and (d) the Agent and Lenders hereby release the Borrowers and the Guarantors from all Claims, directly or indirectly, arising out of the Financing Agreement and the other Loan Documents except to the extent arising out of any provision in any of the aforementioned documents which by its terms expressly survives the termination thereof. Nothing contained herein shall be deemed to be a termination of, or a release of any claims or obligations under this Agreement.

8.    Following the satisfaction of the conditions set forth in paragraph 10 hereof, the Agent and the Lenders will, at the request of the Borrowers, execute such additional instruments and other writings, and take such other actions, as the Borrowers may from time to time reasonably request to effect or evidence the satisfaction of the Loan Obligations and the termination of the Financing Agreement Liens and the effectiveness of the Financing Agreement and each other Loan Document and any instruments executed pursuant thereto, but at the sole cost and expense of the Borrowers provided that this paragraph 8 shall not apply to the Surviving Claims and any provisions in the Financing Agreement and the Loan Documents providing for the survival thereof.

9.    This Agreement shall (a) be binding on the Agent, the Lenders, the Borrowers, the Guarantors and their respective successors and assigns and (b) inure to the benefit of the Agent, the Lenders, the Borrowers, the Guarantors and their respective successors and assigns.

10.    The effectiveness of this Agreement is subject to the conditions precedent that the Agent shall have received (a) full payment in respect of all of the Loan Obligations in the amount set forth above by wire transfer of immediately available funds pursuant to the instructions set forth in Schedule A attached hereto, and (b) counterparts of this Agreement, duly executed by the Borrowers, the Guarantors, the Agent and the Lenders.

11.    This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of this Agreement by facsimile shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by telefacsimile also shall deliver an original executed counterpart of this Agreement, but the failure to deliver an original executed counterpart shall not affect the validity, enforceability and binding effect of this Agreement.

12.    This Agreement shall be governed by and construed in accordance with the internal laws of the Province of Ontario.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their duly authorized officers as of the date first written above.

BORROWERS:

**TELEGLOBE INC.**

By: _____
      Name:    John S. Brunette
      Title:     Chief Executive Officer

**TELEGLOBE CANADA LIMITED PARTNERSHIP**

**By:    Teleglobe Inc., its general partner**

By: _____
      Name:    John S. Brunette
      Title:     Chief Executive Officer

GUARANTORS:

**TELEGLOBE FINANCIAL HOLDINGS LTD.**

By: _____
       Name:   John S. Brunette
       Title:    Executive Vice President

**TELEGLOBE MANAGEMENT SERVICES INC.**

By: _____
       Name:   John S. Brunette
       Title:    Executive Vice President

**3692795 CANADA INC.**

By: _____
       Name:   John S. Brunette
       Title:    Executive Vice President

**TELEGLOBE CANADA MANAGEMENT SERVICES INC.**

By: _____
       Name:   John S. Brunette
       Title:    Executive Vice President

**TELECOM VISION CALL CENTER SERVICES, GENERAL PARTNERSHIP**

**By:   Teleglobe Financial Holdings Ltd., its general partner**

By: _____
       Name:   John S. Brunette
       Title:    Executive Vice President

AGENT AND LENDER:

MADELEINE CORP.

By: _____
    Name:
    Title:

Schedule A

Wire Instructions

Bank:          Citibank, New York, N.Y.
ABA #:         021-000-089
Acct. Name:    Cerberus Partners, L.P.
Acct. #:       37839889
Attn.:         Robert Gadigan

**EXHIBIT B**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:                                  :        **Chapter 11**
                                        :
**TELEGLOBE COMMUNICATIONS**            :        **Jointly Administered**
**CORPORATION, a Delaware**             :        **Case No. 02-11518 (MFW)**
corporation, <u>et al.</u>,[1]          :
                                        :
                     Debtors.           :

**ORDER PURSUANT TO SECTIONS 105 AND 363 OF
THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019 (I)
APPROVING A PROPOSED SETTLEMENT BETWEEN DEBTORS
AND TLGB ACQUISITION LLC RELATING TO THE SALE OF THE
TELEGLOBE COMPANIES' CORE TELECOM BUSINESS AND
(II) AUTHORIZING THE DEBTORS TO CONSUMMATE THE
SALE OF THE CORE TELECOM BUSINESS IN ACCORDANCE
<u>WITH THE TERMS AND CONDITIONS OF SUCH SETTLEMENT</u>**

This matter coming before the Court on the Motion of the Debtors and Debtors in Possession for an Order, Pursuant to Sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rule 9019, (I) Approving a Proposed Settlement Between Debtors and TLGB Acquisition LLC Relating to the Sale of the Teleglobe Companies' Core Telecom Business and (II) Authorizing the Debtors to Consummate the Sale of the Core Telecom Business In Accordance with the Terms and Conditions of Such Settlement (the "Motion"); the Court having reviewed the Motion; the Court finding that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), (c) notice of the Motion was adequate under the circumstances and (d) that the Proposed Settlement is in the best interests of the Debtors, their estates, their creditors, and all

---

[1]    The Debtors are the following eleven entities:  Teleglobe Communications Corporation, Teleglobe USA Inc., Optel Telecommunications, Inc., Teleglobe Holdings (U.S.) Corporation, Teleglobe Marine (U.S.) Inc., Teleglobe Holding Corp., Teleglobe Telecom Corporation, Teleglobe Investment Corp., Teleglobe Luxembourg LLC, Teleglobe Puerto Rico Inc. and Teleglobe Submarine Inc.

other parties in interest; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein;

IT IS HEREBY ORDERED THAT:

1.    The Motion is GRANTED.

2.    Capitalized terms not otherwise defined herein have the meanings given to them in the Motion.

3.    The Proposed Settlement is approved, pursuant to sections 105 of the Bankruptcy Code and Bankruptcy Rule 9019, in accordance with the terms and conditions of the Settlement Agreement, a copy of which is attached hereto as Exhibit A.

4.    The Debtors are authorized, pursuant to section 363 of the Bankruptcy Code, to consummate the sale of the Purchased Assets in accordance with the terms and conditions of the Purchase Agreement, as modified by the Settlement Agreement, without further order of the Court.

5.    The Debtors are authorized to execute all documents and take all actions appropriate or necessary to implement the Settlement Agreement without further order of the Court.

6.    Except as specifically modified by this Order, all of the terms, conditions, and provisions of the Sale Order remain in full force and effect.

7.    As provided in Bankruptcy Rule 6004(g), this Order shall be effective and enforceable immediately upon entry.

2593917_2 DOC

8.    This Court shall retain jurisdiction over any and all issues arising from or related to the implementation and interpretation of this Order.

Dated: _____, 2003        _____
                                      UNITED STATES BANKRUPTCY JUDGE