# APPENDIX 2A

**PLAINTIFFS' CONTENTIONS REGARDING THE ISSUES OF FACT TO BE LITIGATED [DEL. L.R.16(D)4)]**

At trial, Plaintiffs will adduce facts relevant to the following disputed issues:

1.      Whether Defendants made statements, or engaged in conduct, actions and behavior, including, without limitation, those set forth in Appendix 6A (A) *infra*, which gave rise to a contract to fund the completion of the GlobeSystem, including necessary operating costs to completion?  (While Plaintiffs contend that Quebec law is not applicable to this trial, to the extent that the Court finds it is, then the issues for decision may include whether the Defendants conduct, actions and behavior constitutes a "commencement of proof" or an abuse of rights (*abuse de droit*) under Quebec law)?

2.      Whether the Defendants made statements, or engaged in conduct, actions and behavior, including, without limitation, those described in Appendix 6A (A) *infra*, which gave rise to a contract that required BCE, Inc. to contribute to TI or its subsidiaries the balance of the funding referenced in the authorization granted by the BCE Board of Directors to Jean Monty, Teleglobe's Chairman and CEO, on November 28, 2001?

3.      Whether Defendants made statements, or engaged in conduct, actions, or behavior, or concealed or were silent as to their intentions, including, without limitation, those described in Appendix 6A (B), *infra*, and whether such conduct, etc. or silence, etc. were relied upon by Plaintiffs, to their detriment, and whether such reliance was reasonable in the circumstances, such that Defendants are estopped to deny the existence of a contract to fund the completion of the GlobeSystem, including necessary operating costs to completion?  (While Plaintiffs contend that Quebec law is not applicable to this trial, to the extent that the Court finds it is, then the issue for decision is whether the Defendants statements, etc. and/or silence, etc. is sufficient to establish a claim for an abuse of rights (*abuse de droit*) under Quebec law)?

4.      Whether Defendants made statements, or engaged in conduct, actions or behavior, or concealed or were silent as to their intentions, including, without limitation, those described in Appendix 6A (B), *infra*, and whether such conduct, etc. or silence, etc. was relied upon by Plaintiffs, to their detriment, and whether such reliance was reasonable in the circumstances, such that Defendants are estopped to deny the existence of an obligation to contribute to TI and its subsidiaries the balance of the funding authorized by the BCE, Inc. Board, in the resolution adopted by the BCE, Inc. Board on November 28, 2001.  (While Plaintiffs contend that Quebec law is not applicable to this trial, to the extent that the Court finds it is, then the issue for decision is whether the Defendants' statements, etc. and/or silence, etc. is sufficient to establish a claim for abuse of rights (*abuse de droit*) under Quebec law)?

5.      Whether Teleglobe, Inc., on a consolidated basis with its subsidiaries including the Debtors, was insolvent or in the vicinity of insolvency at any point during the relevant time, and if so, when?

6.      Whether the Debtors were insolvent or in the vicinity of insolvency at any point during the relevant time, and if so, when?

7.      Whether Defendants took action to consider and protect the interests of Plaintiffs creditors?

8.      Whether BCE through its actions and conduct exercised actual control over the affairs of Plaintiffs, either directly or indirectly, including, without limitation, by having installed its own directors and officers at Teleglobe and its subsidiaries; and, without limitation, by having stripped Teleglobe and its subsidiaries of key operational capabilities and having lodged those at BCE?

RLF1-3007843-11

9.      Whether the individual defendants aided and abetted BCE's exercise of actual control over the affairs of the Plaintiffs, either directly or indirectly?

10.     Whether some or all of the individual defendants acted as the instrumentalities through which BCE exercised actual control over the Plaintiffs, either directly or indirectly?

11.     Whether BCE breached its fiduciary duties to the Plaintiffs and their creditors in the manner described in Appendix 6A (D) *infra*?

12.     Whether the individual defendants abdicated their fiduciary responsibilities in connection with their duties to Teleglobe and the Debtors by, *inter alia*, failing to document BCE's commitment to fund; alternatively, in the event that there was no commitment by BCE to fund, by failing to secure alternative funding; and by failing to consider or take action with respect to the interests of Plaintiffs' creditors?

13.     Whether some or all of the individual Defendants breached their fiduciary duties to the Plaintiffs and their creditors in the manner described in Appendix 6A (E), *infra*?

14.     Whether BCE and some or all of the individual defendants engaged in an orchestrated attempt to cover up the existence of BCE's contractual commitment to Teleglobe, and to alter the historical record of the statements and actions of BCE and the defendants by, among other things, (1) rewriting an executed audit representations letter which had already been relied upon by Teleglobe's auditors, and (2) rescinding and replacing the board-approved audited 2001 financial statements?

15.     Whether BCE and all of the BCE officer defendants breached their fiduciary duties by concealing from various advisors purportedly hired for Teleglobe by BCE the existence of substantial unexpended funds available to Teleglobe and the Debtors by virtue of the BCE Board of Directors resolution of November 28, 2002, and instead representing to such advisors

3

and others, that Teleglobe and the Debtors had no more than $100 million in additional funding from BCE?

16.    Whether Defendant Monty breached his undivided fiduciary duty of loyalty to Teleglobe and the Debtors by determining not to provide the majority of $850 million in funding he was authorized, in his sole discretion to fund to Teleglobe and the Debtors at a time when he was impressed with fiduciary obligations to them?

17.    Whether and in what amount Plaintiffs suffered damages?

4

# APPENDIX 2B

**APPENDIX 2B**

## DEFENDANTS' CONTENTIONS REGARDING THE ISSUES OF FACT TO BE LITIGATED [DEL. L.R. 16.4(D)(5)]

I.    **Breach of Contract**

    A.    Existence of a Contract

        1.    It is Plaintiffs' contention that contracts exist, or should be inferred to have been created, as of February 28, 2001 or November 28, 2001. Can the Debtors show the existence of a contract between BCE and the Debtors or BCE and Teleglobe Inc. (for the funding of the Debtors) in the absence of a signed writing or the testimony of any contemporaneously involved person that the alleged contract existed?

        2.    Did a contract exist between BCE, a Canadian corporation, and BCE's wholly-owned subsidiary Teleglobe Inc., also a Canadian corporation (not a party to this lawsuit), which obligated BCE to provide financing to Teleglobe Inc.? If so, were the Debtors, indirect, wholly-owned subsidiaries of Teleglobe Inc., third-party beneficiaries of this alleged contract?[1]

        3.    Did a contract exist between BCE and the Debtors, indirect, wholly-owned subsidiaries of BCE's wholly-owned Canadian subsidiary, Teleglobe Inc., pursuant to which BCE was obligated to provide financing to the Debtors?

---

[1] Almost all of the Plaintiffs were Delaware corporations and are referred to herein as Delaware corporations; but it is noted that Plaintiff Teleglobe Puerto Rico was incorporated in Puerto Rico, and Plaintiff Teleglobe Luxembourg LLC was established as a limited liability company, not a corporation, under Delaware law.

4.  Were there individuals representing each party to the two alleged contracts whose minds met on the existence and terms of the alleged contracts?

5.  Was there an offer and acceptance between BCE and the Debtors or BCE and Teleglobe Inc., with respect to either contract?  When did such alleged offer and acceptance take place, who communicated such alleged offer and acceptance, and what was the content of the alleged offer and acceptance?

6.  What were the material terms of the alleged contract between BCE and the Debtors or BCE and Teleglobe Inc. to fund the Debtors?  Specifically, what was agreed to with respect to (i) the amount of the funding to be provided, (ii) the form in which the financing was to be provided (whether debt, equity, quasi-equity, or some other form), (iii) if the funding was to be provided in the form of debt, what was the interest rate on the financing and when was it to be repaid, (iv) the conditions to BCE's alleged contractual obligation to fund?

7.  In the absence of evidence of agreement on the material and essential terms set forth in paragraph 6, was a contract created and was it capable of enforcement?

8.  What was the consideration to BCE for the contracts alleged by the Debtors?

9.      Is it normal or customary for a parent to enter into a contract with its wholly-owned subsidiary or indirect subsidiaries to provide funding for the operations of such subsidiaries? Is there any reason for a parent to agree to such a contractual obligation?

10.     In the absence of a signed writing, do either of the alleged contracts fulfill the requirements of the Statute of Frauds?

B.    The February 28, 2001 "Contract"

1.      It is Plaintiffs' allegation that a contract between BCE and Teleglobe Inc. or BCE and the Debtors was created at the February 28, 2001 meeting of the Board of Directors of Teleglobe Inc., and that such a contractual commitment was in addition to (i) an admitted $900 million commitment made in writing by BCE to Teleglobe Inc.'s lenders in June 2000 and (ii) a $100 million commitment BCE made in writing to Teleglobe Inc. in 2000, before consummation of the acquisition. Is that contention consistent with the Board materials related to the February 28, 2001 meeting (including drafts of notes to the financial statements of Teleglobe Inc. and Management's Discussion & Analysis), which stated approximately ten times that BCE's obligation to fund Teleglobe Inc. was limited to that combined commitment of $1 billion?

2.      Did the Teleglobe Inc. directors who were also directors of BCE and were in attendance at the February 28, 2001 meeting of the Board of Directors of Teleglobe Inc. have the authority to bind BCE to enter into a contract to

provide additional financing to Teleglobe Inc. or the Debtors? Did the representatives of Teleglobe Inc. and the Debtors at the meeting believe and have reason to believe that those directors had such authority?

3.    Did the representatives of the Debtors in attendance at the February 28, 2001 meeting (Defendants Jarman, Bouchard, and Boychuk) believe that a contract had been formed to provide financing to Teleglobe Inc. and/or the Debtors at that meeting? Did anyone in attendance at that meeting believe that such a contract had been formed at that meeting?

4.    Was the contract alleged by the Plaintiffs capable of being performed in less than one year, consistent with the Statute of Frauds?

C.    The November 28, 2001 "contract"

1.    It is Plaintiffs' contention that a resolution of the BCE Board of Directors adopted on November 28, 2001, which approved BCE's business plan and which contemplated financing for various BCE subsidiaries (including Teleglobe Inc.) for the purpose of implementing their business plans, constituted a contract that irrevocably and permanently obligated BCE to fund Teleglobe Inc. and its subsidiaries in the amount of $850 million. Is such an interpretation of the resolution reasonable?

2.    Did the representatives of the Debtors present at the November 28, 2001 meeting of the Board of Directors of BCE believe that any such contract

had been formed?  Did anyone in attendance at that meeting believe that such a contract had been formed at that meeting?

3.    Can the November 28, 2001 "contract" or other funding obligations reasonably be inferred when both BCE and Teleglobe Inc. repeatedly disclosed in their public filings in Canada and the United States that no such obligation existed over and above $1 billion ($900 plus $100 million)?

D.    The "Hiding" of the "Contract"

1.    Did certain of the Defendants (as the Debtors allege) "hide" or "alter" evidence of the alleged contract by making changes to the draft Management's Discussion and Analysis ("MD&A") and notes to the financial statements for Teleglobe Inc. before they were filed in April 2002, when the pre-existing drafts, approved by Plaintiffs' legal, accounting, financial and business staff (before they were "altered") had explicitly stated that BCE no longer had any obligation to fund Teleglobe Inc. (because the original $1 billion commitment set forth in paragraph I B, had been fulfilled)?

2.    Did certain of the Defendants (as the Debtors allege) "hide" or "alter" evidence of the alleged contract by revising a management representation letter from Teleglobe Inc. to Teleglobe Inc.'s outside auditors, when such outside auditors at the same time had reviewed and approved the draft

MD&A and notes to the financial statements for Teleglobe Inc. that expressly stated that BCE no longer had any obligation to fund.

3.    Do Plaintiffs' allegations regarding changes to the draft MD&A and notes to the financial statements or the management letter provide evidence of the alleged "contract"?

E.    The Events of April 2002

1.    Assuming that the approval by the BCE Board of Directors of a resolution authorizing BCE to extend financing to Teleglobe Inc. and its subsidiaries for purposes of supporting their business plans constituted a contract, was BCE required to provide financing if and when it became apparent that Teleglobe Inc. and its subsidiaries would not be able to meet their business plan?

2.    At the time that BCE ceased long-term financing to Teleglobe Inc. in April 2002, was Teleglobe Inc. capable of performing in accordance with the business plan set forth in board materials on February 28, 2001 and November 28, 2001, and was BCE grossly negligent in believing that these business plans were no longer viable bases for funding Teleglobe Inc.'s operations?

II.    **Misrepresentation and Estoppel**

1.    Were Defendants statements true when made?

2.     Did any party reasonably rely on and suffer injury as a result of statements made by BCE Inc. when BCE Inc. funded Teleglobe Inc. and its operations in the amount of approximately $1.3 billion dollars and took no money out of any of those businesses?

3.     Did Defendants make false statements to the Debtors concerning BCE's current intention to support Teleglobe Inc.?

4.     Were BCE's public statements concerning its intention to support Teleglobe Inc. qualified by cautionary language concerning "forward-looking" statements, which language made clear that statements of intention (including statements concerning what the party "will" do in the future) were subject to change?

5.     Could BCE's statements concerning its intention to support Teleglobe Inc. have reasonably been construed as meaning that BCE would continue to fund Teleglobe Inc. regardless of its future performance and prospects and regardless if it could meet its business plan?

6.     Did Defendants make such statements with the intention that the Debtors would rely on them?

7.     Did Defendants made any promises to the Debtors of future financing that BCE did not fulfill?

8.    Did the Debtors, which received hundreds of millions of dollars from BCE (through its parent, Teleglobe Inc.), and paid nothing in return, rely to their detriment on any BCE statement?

9.    Were the Debtors harmed by any allegedly false statements made by BCE?

III.    **Breach of Fiduciary Duty**

A.    Existence of Alleged Fiduciary Duty of BCE to the Debtors

1.    Did BCE, a Canadian corporation that wholly owned all of the shares of its Canadian subsidiary, Teleglobe Inc., owe a fiduciary duty under Delaware law to the Debtors, Teleglobe Inc.'s indirect, wholly-owned subsidiaries incorporated in Delaware?

2.    Did the fact that certain current or former Bell Canada executives (Defendants Terry Jarman, Marc Bouchard, Stewart Verge and Serge Fortin, all citizens of Canada) left their jobs and became executives of certain of the Debtors following BCE's acquisition of Teleglobe Inc. in 2000 create a fiduciary duty on BCE's part to the Debtors?

3.    Did the fact that BCE appointed certain directors to the board of its wholly owned subsidiary Teleglobe Inc. create a fiduciary duty on BCE's part to the Debtors?

4.    Did the fact that Teleglobe Inc. was involved in securing financing that in turn would be advanced to certain of the Debtors create a fiduciary duty on BCE's part to the Debtors?

5.    Did the fact that the Board of Directors of Teleglobe Inc. approved budgets for certain of the Debtors create a fiduciary duty on BCE's part to the Debtors?

6.    Did BCE exercise control over the day-to-day management and operations of the Debtors?

B.    Existence of Alleged Fiduciary Duty of Members of the Board of Directors of Teleglobe Inc. to the Debtors

1.    Did Canadian directors of Teleglobe Inc., a Canadian company, owe a fiduciary duty to the Debtors, indirect subsidiaries of Teleglobe Inc.?

2.    Did Richard Currie, Thomas Kierans, or Arnold Steinberg take any actions with respect to Teleglobe Inc. or the Debtors outside the context of their actions as Teleglobe Inc. Board members?

3.    Did Jean Monty control or direct the operations of the Debtors, such that he owed a fiduciary duty to the Debtors?

C.     Existence of Alleged Fiduciary Duty of Defendant Stephen Skinner to the Debtors

    1.     Did Stephen Skinner's role as Controller of Teleglobe Inc. create a fiduciary duty on his part to the Debtors, Teleglobe Inc.'s indirect, wholly-owned subsidiaries?

    2.     Did Stephen Skinner's activities in the preparation of financial statements for Teleglobe Inc. create a fiduciary duty on his part to the Debtors?

D.     Existence of Alleged Fiduciary Duty of Defendant Michael Boychuk to the Debtors

    1.     Did Boychuk's role as Chief Financial Officer of Teleglobe Inc. create a fiduciary duty on his part to the Debtors, Teleglobe Inc.'s indirect, wholly-owned subsidiaries?

    2.     Did Boychuk's role in obtaining financing for Teleglobe Inc., part of which was advanced to certain of the Debtors, create a fiduciary duty on his part to the Debtors?

E.     Existence of Alleged Fiduciary Duties of Defendants Terry Jarman, Marc Bouchard, Serge Fortin, and Stewart Verge

    1.     Did Terry Jarman, Marc Bouchard, Serge Fortin or Stewart Verge owe a fiduciary duty to any of the Debtors other than those to which they served as an officer or director?

F.    Existence of Alleged Fiduciary Duties to Creditors

    1.    Were any of the Debtors insolvent at any time before May 2002, notwithstanding that before that time the Debtors had paid their debts as they became due?

    2.    Were any of the Debtors insolvent at any time before April 23, 2002, the date on which BCE decided to cease long-term financing for Teleglobe Inc.?

    3.    Did the directors or officers of Teleglobe Inc., a Canadian corporation, owe a fiduciary duty to the creditors of Teleglobe Inc., when Canadian law provides that there is no such duty to creditors at any time?

    4.    Did the directors or officers of Teleglobe Inc. owe a fiduciary duty to the creditors of its subsidiaries, when Canadian law provides that there is no such duty to creditors?

    5.    Regardless if the Debtors were insolvent, did the Defendants who were directors or officers of those Debtors that were operating companies (Jarman, Fortin, and Verge) owe a fiduciary duty to the creditors of other Debtors that were non-operating companies?

G.    Alleged Breaches of Fiduciary Duty

    1.    Alleged "Failure" To Obtain Contractually Committed Funding

a. Did any of the Defendants breach a fiduciary duty to the Debtors by "failing" to obtain a written contract from BCE requiring BCE to provide all of the funding anticipated to be required for the build-out of the GlobeSystem?

b. Would it have been normal and customary practice for directors of a subsidiary company to seek or require such a written contract from a parent company?

c. Would such a request have been futile?

d. If Defendants had obtained a written contract from BCE requiring BCE to provide financing for the GlobeSystem, would that contract also have contained normal and customary terms and conditions on BCE's obligation to continue funding, such as conditions relating to the Debtors' performance and future prospects?

e. Would the Debtors have met such conditions?

f. Did the Debtors suffer proximately caused harm by the "failure" to seek such a written contract?

2. "Failure" To Scrap the GlobeSystem and Turn Over the Voice Business to Creditors as of June 30, 2001

a.    Did any Defendant breach a fiduciary duty to the Debtors by letting BCE continue to fund Teleglobe Inc. in the amount of over $800 million after June 30, 2001 (and taking no any money out of Teleglobe Inc. or the Debtors)?

b.    Did any Defendant breach a fiduciary duty owed to any Debtor in seeking to grow Teleglobe Inc. rather than seeking an early liquidation or bankruptcy?

c.    Did Defendants appropriately analyze alternatives for Teleglobe Inc., including attempting to locate potential partners and acquisition candidates, in June 2001?

d.    Was the conduct of Teleglobe Inc. and the Debtors in line with industry conditions, with the actions of other industry participants, and with the contemporaneous advice of professional advisors?

e.    Assuming that the Debtors were insolvent as of June 2001 and that Defendants owed a fiduciary duty to the creditors of the Debtors, would such a fiduciary duty have required Defendants to stop the build-out of the GlobeSystem, to cease all further investment in Teleglobe Inc., and to begin an immediate liquidation of Teleglobe Inc.?

IV.    **Alleged "Misleading" of the Debtors**

1.    Did BCE mislead the Debtors concerning an alleged contractual commitment on BCE's part to fund Teleglobe Inc.'s or the Debtors' operations and cash shortfalls?

2.    Did the Debtors' officers contemporaneously understand that BCE intended to fund Teleglobe Inc. but that such an intention was dependent on Teleglobe Inc.'s performance and its ability to meet its business plan?

3.    Do the bank documents and bond indentures provide for a BCE guarantee or contractual commitment?

4.    Did Teleglobe Inc.'s lenders understand that they were not receiving a guarantee or contractual obligation by BCE to fund Teleglobe Inc.?[2]

V.    **BCE's Decision in April 2002 Not To Fund All of the $850 Million Internally Authorized by BCE's Board of Directors on November 28, 2001**

1.    On November 28, 2001, the Board of Directors of BCE adopted a resolution authorizing BCE to fund Teleglobe Inc. and/or its subsidiaries in an amount not to exceed $850 million through December 31, 2002 on the basis that the funding was for the purpose of implementing Teleglobe Inc.'s business plan. Did that resolution constitute a "commitment" to the

---

[2] As stated in Defendants' statement of the issues of law, Plaintiffs' attempts to assert the rights of third parties (Plaintiffs' creditors) with respect to wrongs allegedly done directly to those creditors are improper

Debtors, such that BCE and Defendants would breach their alleged
fiduciary duties to the Debtors in the event that BCE elected not to
advance all of the amounts that it had internally authorized?

2.    Did Defendants reasonably conclude that Teleglobe Inc. no longer had a
viable business plan such that expending the unspent money previously
authorized was inappropriate and wasteful?

3.    Did BCE's alleged fiduciary duty to the Debtors require it to give money
to the Debtors and their creditors, in the absence of a contractual
commitment to do so?

4.    Plaintiffs allege the November 28, 2001 resolution of the BCE Board of
Directors placed upon Jean Monty, the Chairman and CEO of BCE,
discretion to expend all of the $850 million approved by the board, even in
the event that Teleglobe Inc.'s business plan was no longer viable.  Is that
a reasonable reading of the November 28, 2001 BCE board resolution?

5.    Did Mr. Monty breach a fiduciary duty owed to Plaintiffs when he decided
not to expend additional money after concluding that Teleglobe Inc.'s
business plan was no longer viable?

6.    Did Defendants Currie and Kierans breach their alleged fiduciary duties to
the Debtors by supporting BCE's decision, in their capacity as directors of
BCE, to cease long-term financing to Teleglobe Inc.?

7.    Did BCE, Teleglobe Inc., and the Debtors engage in an appropriate
analysis of restructuring alternatives with the assistance of appropriate
advisers (including Lazard, McKinsey & Co., Ernst & Young, and outside
insolvency counsel)?

8.    Did Teleglobe Inc. and the Debtors have appropriate advisers in place to
advise them, prepare for a bankruptcy filing, and execute a restructuring
plan (including Lazard, Ernst & Young, and the law firms of Ogilvy &
Renault (in Canada) and Jones, Day, Reavis & Pogue (in the United
States))?

9.    Did Teleglobe Inc. and the Debtors, with the help of their advisers, come
up with a credible, reasonable, and workable restructuring plan?

10.    When the Debtors and Teleglobe Inc. sold the voice business in
bankruptcy (in a sale transaction agreed to in September 2002, approved
by the Bankruptcy Court in October 2002, and closed in May 2003), did
they obtain only a "fire sale" price?

11.    Was the process by which the voice business was sold in 2002 flawed,
irregular, improper, or insufficient?

12.    Did an action by any Defendant proximately cause a flawed, irregular,
improper or insufficient bankruptcy process?

VI.    **Damages and Causation**

1.    Are Plaintiffs' damages impermissibly speculative?

2.    Do Plaintiffs' damages fail the reasonable certainty test?

3.    Were Teleglobe Inc. or the Debtors insolvent as of June 30, 2001?

4.    Were Teleglobe Inc. or the Debtors insolvent at any time prior to April 23, 2002?

5.    Did the Defendants breach a fiduciary duty by continuing to grow and fund Teleglobe Inc. after June 30, 2001, rather than ceasing funding and starting an accelerated liquidation?

6.    Did any action by the Defendants wrongfully cause the CCAA and Chapter 11 proceedings to proceed in a manner that damaged the Debtors?

7.    The Debtors assert that their damages should be measured by paper "valuations" of Teleglobe Inc.'s legacy voice business performed by their expert witness, Paul Charnetzki, as of June 30, 2001, April 21, 2002, and May 14, 2002, regardless if these valuations could actually be realized or monetized.  Are these paper valuations an appropriate measure of damages?

8.    Are Mr. Charnetzki's "valuations" logical and reasonably consistent with the non-litigation inspired valuations done at the time or are they "hindsight" valuations, designed to reach a particular litigation result?

9.  The Debtors claim that they may have been harmed (in an unspecified amount and in an unspecified manner) by BCE's failure to provide additional funding that would have allowed them to retain assets and operations in other (unspecified) countries. Did the Debtors own these assets and operations in other countries, or were they owned by foreign subsidiaries of Teleglobe Inc. not before the Court?

10. Assuming that the Debtors were correct in asserting that there was value lost by the "failure" to liquidate the voice business in 2001 or the "fire sale" in 2002, what amount of that lost value is attributable to property owned by the Debtors, as opposed to Teleglobe Inc. or other subsidiaries of Teleglobe Inc. not before the Court?

11. Are Mr. Charnetzki's estimates of the liquidation value of the partially finished GlobeSystem assets in 2001 well-founded, logical, or reasonable?

## VII.  Affirmative Defenses

1.  Are the Plaintiffs judicially estopped from now claiming that the sale of the voice business in 2002 achieved only a "fire sale" price, that the sale of the voice business in 2002 was the worst alternative for creditors, and that a standalone restructuring would have been preferable, in light of the Debtors' prior representations to both the Bankruptcy Court and CCAA Court in Canada (i) that the sale price represented "fair market value," (ii) that the sale process was regular and effective, (iii) that the value of the voice business was not likely to appreciate in a protracted restructuring,

and (iv) that the sale was the best alternative for the Debtors' estates and creditors?

2.    Are Plaintiffs also collaterally estopped from making the claims set forth in Paragraph VII(1), since they prevailed in the Bankruptcy Court and the Canadian CCAA proceeding on the motions in which they made the representations set forth above?

3.    Are Plaintiffs estopped to assert that Debtors' 2002 EBITDA, budget, and underlying cash flow projections are unreasonable as a result of their written representations to the contrary in letters addressed and sent to Teleglobe Inc.'s auditors (Deloitte & Touche) and to Defendants Boychuk, Skinner, and BCE?

4.    Are Plaintiffs estopped to assert that BCE had a legally binding obligation to fund Teleglobe Inc. or the Debtors beyond the U.S. $1 billion that BCE had contractually agreed to fund in light of the financial statements and representation letters prepared by Plaintiffs to be contrary?

5.    Are Plaintiffs estopped to assert that BCE had an obligation to fund Teleglobe Inc. by virtue of their approval and ratification of public securities documents to the contrary?

6.    Are Plaintiffs' claims barred, in whole or in part, pursuant to 8 Del. C. § 141(e) of Delaware's General Corporation Law, because the individual Defendants relied in good faith upon information, opinions, reports, and

statements of or by the officers of Teleglobe Inc. and the Debtors and legal, accounting, auditing, and financial experts?

7.  Are Plaintiffs' claims barred, in whole or in part, by 8 Del. C. § 102(b)(7) and exculpated under the relevant corporate charters of the Debtors?

8.  To the extent a contract such as alleged by the Plaintiffs is implied, would BCE be excused from performance under such contract because conditions to its obligation to perform that would also reasonably be implied in such contract did not occur?

9.  Are Plaintiffs' claims barred under the applicable Statutes of Frauds?

10. Are Plaintiffs' claims against the individual Defendants barred by reason of the business judgment rule and analogous provisions of Canadian law, including Section 102 and Section 122 of the Canadian Business Corporations Act?

11. Are Plaintiffs' claims barred as a result of Plaintiffs' failures to preserve relevant evidence, at times when they knew that they were contemplating a lawsuit against the Defendants?

12. Should the testimony of Plaintiffs' experts be striken and disregarded in their entirety due to their wholesale spoliation of evidence?