# APPENDIX 3A

**PLAINTIFFS' CONTENTIONS REGARDING THE ISSUES OF LAW TO BE LITIGATED [DEL. L.R. 16.4(D)(5)]**

1.    <u>What jurisdiction's law governs the claims raised in this action.</u>

The jurisdictions whose law could potentially apply are Virginia (where the Debtors were headquartered), Quebec (where BCE is headquartered) or Delaware (where all but one of the Debtors are incorporated). No party contends that any other jurisdiction's law applies to any claim.

The parties agree that Delaware's choice of law rules require the application of the law of the jurisdiction having the "most significant relationship" with the circumstances underlying a breach of contract claim, equitable estoppel, and misrepresentation claims. *Travelers Indem. Co. v. Lake,* 594 A.2d 38, 48 (Del. 1991). Plaintiffs contend that Virginia law applies to their contract, estoppel and misrepresentation claims.

To identify the jurisdiction having the "most significant relationship" to the contract and equitable estoppel claims, the following factors are considered: "(a) the place of contracting; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties." *Liggett Group Inc. v. Affiliated FM Ins. Co.,* 788 A.2d 134, 138 (Del. Super. 2001), quoting *Restatement (Second) Conflicts of Law,* § 188 (1971); *Feinberg v. Saunders, Karp & Megrue, L.P.,* C.A. No. 97-207-SLR, 1998 WL 863284, at *7 (D. Del. Nov. 13, 1998).

Similarly, the jurisdiction having the "most significant relationship" to the misrepresentation claim is determined by considering: "the place, or places, where the plaintiff acted in reliance upon the defendant's representations, (b) the place where the plaintiff received the representations, (c) the place where the defendant made the representations, (d) the domicile,

residence, nationality, place of incorporation and place of business of the parties, (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant." *See Feinberg*, 1998 WL 863284, at \*7 (citing *Restatement (Second) Conflicts of Law*, § 148 (1971)).

Plaintiffs contend that their fiduciary duty claims are governed by Delaware law, the state of incorporation of the Debtors (except Teleglobe Puerto Rico). Delaware follows the "internal affairs doctrine," which provides that matters relating to internal corporate governance, such as the conduct of corporate fiduciaries, is governed by Delaware substantive law. *VantagePoint Venture Partners 1996 v. Examen, Inc.*, 871 A.2d 1108, 1113 (Del. 2005); *McDermott Inc. v. Lewis*, 531 A.2d 206, 215 (Del. 1987). Likewise where, as here, a party contends that fiduciary obligations arise by virtue of a party's exercise of control over another, it is the law of the controlled party which applies to a claim relating to such fiduciary obligations, not the law of the controlling party. *Gesoff v. IIC Industries Inc.*, 2006 WL 1458218 (Del. Ch. May 18, 2006); *Bigelow/Diversified Secondary P'ship Fund 1990 v. Damson/Birtcher Partners*, 2001 WL 1641239 (Del. Ch. Dec. 4, 2001); *Parfi Holding AB v. Mirrow Image Internet Inc.*, 817 A.2d 149 (Del. 2002).

2.    <u>Whether BCE's commitment to fund Teleglobe constituted a valid and enforceable contract.</u>

Plaintiffs contend that Defendant BCE offered to fund the GlobeSystem buildout and that Plaintiffs accepted the offer by building GlobeSystem, which was substantially completed when BCE terminated the funding. Indeed, Teleglobe submitted a budget to BCE for the remaining buildout costs on November 28, 2001, and BCE accepted that amount by

2

accepting and adopting those numbers into its own budget, passing a board resolution authorizing the funding, having three BCE members of TI's board approve a similar resolution accepting such funding and authorizing the Debtors to spend the money allocated to TI pursuant to the Schedule of Authorities.[1]

Under Virginia law, a contract is formed upon the "acceptance of an offer [with] valuable consideration." *Snyder-Falkinham v. Stockburger*, 457 S.E.2d 36, 39 (Va. 1995); *see also Legal Serv. Corp. v. Client Centered Legal Serv.*, 217 F. Supp. 2d 706, 712 (W.D. Va. 2002) ("[a] simple offer and acceptance creates a manifestation of assent ...."). Virginia law recognizes no distinction between written and oral contracts, provided that the oral contract is certain, definite and complete. *Lighty v. A. H. Robins Co., Inc.*, 1984 WL 276352, at *1 (Va. Cir. Ct. Nov. 8, 1984). All of these elements are present here.

If the Court finds that Quebec law applies, a contract is formed under Quebec law by the "sole exchange of consents" between persons having capacity to contract.[2] *See* C.C.Q. Art. 1385; *see also* Jean-Louis Baudouin and Pierre-Gabriel Jobin, *Les Obligations* (5th ed., Cowansville: Yvon Blais, 1998) (hereinafter, "Baudouin"), at par. 171, page 185 (parties may come to an agreement in principle by accepting certain elements and reserving agreement on other elements); *Marché Blais v. Daley Brother Ltd.*, J.E. 2003-436 (Quebec Superior Court

---

[1] Moreover, a contract was formed on February 28, 2001 when BCE accepted, and incorporated into its own budget, Teleglobe's budget for 2001 GlobeSystem buildout costs, and that Teleglobe and BCE substantially performed under that contract. This contract was amended and/or superseded by the November 28, 2001 contract. In the alternative, if the Court finds that the contract was not modified by the November 28, 2001 board actions (and subsequent performance) then the February 28, 2001 board action by BCE (and subsequent performance) constituted a binding and enforceable contract that subsequently was breach by BCE.

[2] Plaintiffs intend to introduce an affidavit of Gerald Kandestin of Kugler Kandestin, LLP, a law firm in Montreal, Quebec, as to the relevant law of the Province of Quebec and the law of Canada applicable therein, pursuant to Fed. R. Civ. P. 44.1. In doing so, Plaintiffs do not concede that the law of the Province of Quebec and the law of Canada applicable therein apply to any cause of action.

3

2003) (enforcing a contract where the common intention of the parties viewed in context indicated an intention to form a binding contract). Contrary to Defendants' contention, the concept of "consideration" is foreign to civil law and is not a required element of contract formation.

The "exchange of consents" concept of Quebec law is established by the express *or tacit* manifestation of the will of a person to accept an offer to contract made to him by another person. C.C.Q. Art. 1386; *see also Dumoulin v. Hydro-Quebec*, REJB 2003-40989 (Quebec Superior Court 2003) (even where a purchase price was never determined, the parties' numerous discussions, meetings and written communications, viewed in their totality, evidenced the formation of a contract). Thus, the absence of a written, integrated contract does not bar recovery under Quebec law.

3.    <u>Whether BCE was estopped from withdrawing its funding commitment or claiming that it never had a funding commitment.</u>

Defendants continuously represented that BCE was committed to fund the Debtors and the GlobeSystem buildout. They made these statements to the Debtors (including all Teleglobe employees worldwide) and to the rest of the world. They also, by their actions (in approving budgets and schedules of authorities), authorized TI and the Debtors to spend the money necessary to complete the buildout. They are now equitably estopped from arguing otherwise.

Virginia's doctrine of equitable estoppel has been stated as follows:

[If] one person, by his statements, conduct, action, behavior, concealment or even silence, has induced another, who has a right to rely upon those statements, etc., and who does rely upon them in good faith, to believe in the existence of the state of facts with which they are compatible, and act upon that belief, the former will not be allowed to assert, as against the later [sic], the existence of a

4

> different state of facts from that indicated by his statements or conduct, if the latter has so far changed his position that he would be injured thereby.

*Contee Sand & Gravel Co., Inc. v. Reliance Ins. Co.*, 166 S.E.2d 290, 293 (Va. 1969); *Chesapeake & O.RY. Co. v. Walker*, 40 S.E. 633, 641 (Va. 1909) (citations omitted). *See also Waggoner v. Laster*, 581 A. 2d 1127, 1136 (Del. 1990) (equitable estoppel may be invoked under Delaware law "when a party by his conduct intentionally or unintentionally leads another, in reliance upon that conduct, to change position to his detriment").

If Quebec law applies, the most analogous concept is the doctrine of "abuse of rights." *See* C.C.Q. Art. 7 ("no right may be exercised with the intent of injuring another or in an excessive and unreasonable manner which is contrary to the requirements of good faith."); *Id.* Art. 1375 ("the parties shall conduct themselves in good faith both at the time the obligation is created and at the time it is performed or extinguished."). At its essence, the abuse of rights doctrine treats "good faith [as being] elevated to a general principle." *Baudouin*, ¶ 113 at 133. Like equitable estoppel, the abuse of rights doctrine has been applied to abusive conduct even where no contract has been formed. *See, e.g., Banque Hong Kong du Canada v. Bert Friedman Enterp. Ltd.*, [1996] R.J.Q. 2427 (Quebec Court of Appeal 1996) ("the motives … do not appear sufficient to allow Hong Kong Bank to … withdraw its offer of financing without giving any delay …. It is true that a banker cannot be forced to make a loan …. However, the jurisprudence has required that the banker -- who is calling its loans or realizing on its security -- act in complete good faith and allow for a delay that is sufficient for the debtor to obtain another way to finance its operations."); *see Jolicoeur v. Rainville*, REJB 2000 - 15957 (Quebec Court of Appeal 2000) ("Even if contractual liberty includes the right to end negotiations, this right must nevertheless be exercised in a non-abusive way.").

    4.    <u>Whether Plaintiffs have proven a claim for negligent misrepresentation</u> <u>(constructive fraud)</u>.

To recover under a negligent misrepresentation (constructive fraud) theory, the Debtors need only prove (1) a false representation of a material fact, made innocently or negligently; (2) reliance; and (3) damages. *See Prospect Dev. Co. Inc. v. Bershader*, 515 S.E.2d 291, 297 (Va. 1999). To recover under a misrepresentation theory based on actual fraud (referred to herein as "misrepresentation"), the Debtors must demonstrate (1) a false representation of a material fact, made intentionally and knowingly, with the intent to mislead; (2) reliance by the party misled; and (3) resulting damages to the party misled. *Id.*; *accord Gaffin v. Teledyne, Inc.*, 611 A. 2d 467, 472 (Del. 1992).

If Quebec law applies, the Civil Code Section relevant to the misrepresentation/fraud claim would be the general liability section, C.C.Q. Art. 1457, which provides:

> Every person has a duty to abide by the rules of conduct which lie upon him, according to the circumstances, usage or law, so as not to cause injury to another.
>
> Where he is endowed with reason and fails in this duty, he is responsible for an injury he causes to another person by such fault and is liable to reparation for the injury, whether it be bodily, moral or material in nature.
>
> He is also liable, in certain cases, to reparation for injury caused to another by the act or fault of another person or by the act of things in his custody.

*See* C.C.Q. Art. 1457. This concept is far broader than Virginia concepts of misrepresentation and fraud. *See* Jean-Louis Baudouin and Patrice Deslauriers, *La responsabilité civile*, 6th ed. (Cowansville, Yvon Blais, 2003), at ¶ 1595 at 1124 ("Thus, in civil law, it is not useful, nor

necessary to refer to concepts such as 'duty of care,' 'negligent misrepresentation,' 'detrimental reliance' ... but, more simply, to the traditional concepts of fault, damage and causation.").

Defendants' repeated statements that they would fund Plaintiffs and their GlobeSystem buildout were false and form the basis of negligent or intentional misrepresentation claims.

5.    Whether Defendants breached their fiduciary duties to Plaintiffs.

Plaintiffs will show that Defendants, who were conflicted, breached their fiduciary duties to the Debtors and their creditors by preferring the interests of Defendant BCE over those of the Debtors and their creditors by, *inter alia*, (a) continuing to mandate the buildout of the GlobeSystem in 2001, even though they knew that the Debtors were insolvent and had no way to pay for the buildout absent a firm commitment to do so by BCE, (b) refusing to provide the funding specifically authorized by the BCE and Teleglobe boards on November 28, 2001 and embedded into their respective 2002 budgets, and (c) as described infra at Appendix 6A (D) and (E).

Plaintiffs' proof at trial will also be sufficient to cause all Defendants to bear the burden of showing the "intrinsic" or "entire fairness" of their challenged conduct.

a.    Duties of directors and officers.

Delaware law provides that a corporation's directors owe fiduciary duties to the corporation, regardless of whether it is solvent or insolvent. *See, e.g., Emerald Partners v. Berlin*, 726 A.2d 1215, 1221 (Del. 1999). Corporate officers similarly owe fiduciary duties to the corporation they manage, as well as its stockholders. *Official Comm. of Unsecured Creditors of High Strength Steel, Inc. v. Lozinski (In re High Strength Steel, Inc.)*, 269 B.R. 560, 569 (Bankr. D. Del. 2001).

b.    Control liability.

Under Delaware law, a shareholder who owns a majority interest in a corporation's stock or exercises control over the business affairs of a corporation also owes fiduciary duties to that corporation and any other shareholders. *Harris v. Carter*, 582 A.2d 222 (Del. Ch. 1990); *Official Comm. of Unsecured Creditors of Hechinger Inv. Co. of Del. Inc. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co. of Del. Inc.)*, 274 B.R. 71, 93-94 (D. Del. 2002). Even non-shareholders who "affirmatively undertake[] to dictate the destiny of the corporation" may owe fiduciary duties to that corporation. *See, e.g., Harriman v. E.I. Du Pont de Nemours & Co.*, 372 F. Supp. 101, 106 (D. Del. 1974), citing *Allied Chem. & Dye Corp. v. Steel & Tube Co.*, 120 A. 486 (Del. Ch. 1923). Thus, for example, directors and officers of a subsidiary company's parent owe fiduciary duties to the subsidiary where, through their role with the parent, they exercise control over the subsidiary. *See In re USACafes, L.P. Litig.*, 600 A.2d 43, 48-49 (Del. Ch. 1991). That is exactly what is alleged here.

c.    Insolvency and the zone of insolvency.

Where a corporation is insolvent or operating in the "vicinity of insolvency," the corporation's directors owe fiduciary duties not only to the corporation and its shareholders, but also to its creditors. *See, e.g., Roselink Inv., L.L.C. v. Shenkman*, 01 CIV 7176 (MBM), 2004 WL 875262, at *3 (S.D.N.Y. May 19, 2004) (applying Delaware law) ("directors of a wholly-owned subsidiary, who otherwise would owe fiduciary duties only to the parent, also owe fiduciary duties to creditors of the subsidiary when the subsidiary enters the 'zone of insolvency'"); *Production Resources Group L.L.C. v. NCT Group, Inc.*, 2004 WL 2647593, at * 13 (Del. Ch. Nov. 17, 2004) ("When a firm has reached the point of insolvency, it is settled that under Delaware law, the firm's directors are said to owe fiduciary duties to the company's

8

creditors."). Controlling stockholders and officers likewise owe fiduciary duties to creditors once a company enters the zone of insolvency. *Hechinger*, 274 B.R. at 92.

A corporation is insolvent (1) if "it is unable to pay its debts as they become due in the ordinary course of business" (the "unable to pay debts test"), *or* (2) "'when it has liabilities in excess of a reasonable market value of assets held'" (the "balance sheet test"). *LaSalle Nat'l Bank v. Perelman*, 82 F. Supp. 2d 279, 290 (D. Del. 2000) (internal citations and quotations omitted); *Geyer v. Ingersoll Publ'n Co.*, 621 A.2d 784, 789 (Del. Ch. 1992) ("an entity is insolvent when it is unable to pay its debts as they fall due in the usual course of business .... That is, an entity is insolvent when it has liabilities in excess of a reasonable market value of assets held."). Plaintiffs will prove, through the testimony of expert witness Paul Charnetzki of Huron Consulting, that the Debtors failed both insolvency tests and thus were insolvent no later than December 31, 2000.

A corporation is in the vicinity of insolvency if it is "on the brink" or "verge" of insolvency, but is not yet insolvent. *See, e.g., Pereira v. Cogan*, 294 B.R. 449, 520 (S.D.N.Y. 2003) (a company is in the zone of insolvency if it "cannot generate and/or obtain enough cash to pay for its projected obligations and fund its business requirements for working capital and capital expenditures with a reasonable cushion to cover the variability of its business needs over time."). Even if the Court holds, despite Mr. Charnetzki's testimony, that the Debtors were technically solvent, they certainly were in the zone of insolvency under this definition.

    d.    <u>Entire Fairness Review.</u>

When the controlled party alleges wrongdoing relating to the decisions of the controlling fiduciary, the controlling fiduciary is held to account under the "entire fairness" test. *Emerald Partners v. Berlin*, 726 A.2d 1215, 1221 (Del. 1999); *Weinberger v. UOP, Inc.*, 457

A.2d 701, 710-11 (Del. 1983). Additionally, all of the defendants had conflicting loyalties through, for example, past or present employment with BCE, concurrent directorship or officership of BCE and TI or the Debtors, "secondment" status (or an actual or tacit agreement to return to BCE employment when their employment with Teleglobe ended), and lucrative stock options in BCE. This also triggers the "entire fairness" burden at trial. *See Weinberger*, 457 A.2d at 711 ("The requirement of fairness is unflinching in its demand that where one stands on both sides of a transaction, he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts .... There is no dilution of this obligation where one holds dual or multiple directorships, as in a parent-subsidiary context.").

Additionally, where the defendants have abdicated their duties as directors and officers, the business judgment rule also is rebutted and the entire fairness standard applies. *In re Walt Disney Co. Deriv. Litig.*, 825 A.2d 275, 278 (Del. Ch. 2003) ("Allegations that Disney's directors abdicated all responsibility to consider appropriately an action of material importance to the corporation puts directly in question whether the board's decision-making processes were employed in a good faith effort to advance corporate interests.").

When entire fairness applies, defendants must show, to the Court's satisfaction, that the transaction was the product of "both fair dealing and fair price." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993). Fair dealing "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." *Weinberger*, 457 A.2d at 711. The fair price inquiry relates to the economic and financial considerations of the transaction. *Id.* The entire fairness standard is "so exacting" that "the determination of the

appropriate standard of judicial review frequently is determinative of the outcome." *Unitrin, Inc.*

*v. Am. Gen. Corp.*, 651 A.2d 1361, 1371 (Del. 1995).

       Plaintiffs will show at trial that fair price was not achieved when certain of

Teleglobe's assets were sold in a fire sale rather than restructured to maximize value. Plaintiffs

will also show that Defendants dealt unfairly with Teleglobe and the Debtors and had no

procedural safeguards in place to protect the creditors of Teleglobe and the Debtors.

       6.    <u>Whether Plaintiffs have proven a claim for aiding and abetting the breach of a</u>
<u>fiduciary duty.</u>

       In Delaware, the elements of a claim for aiding and abetting the breach of a

fiduciary duty are (1) existence of a fiduciary relationship, (2) breach of the fiduciary's duty, (3)

knowing participation in that breach by the defendants, and (4) damages proximately caused by

the breach. *Nagy v. Bistricer*, 770 A.2d 43, 64 n.54 (Del. Ch. 2000) (citations omitted).

"Knowing participation in a board's fiduciary breach requires that the third party act with the

knowledge that the conduct advocated or assisted constitutes such a breach." *Malpiede v.*

*Townson*, 780 A.2d 1075, 1097 (Del. 2001). "Knowing participation" may be demonstrated by

showing that the third party "participated in the board's decisions, conspired with the board, or

otherwise caused the board to make the decisions at issue." *Id.* at 1098. All defendants here

breached their fiduciary duties and/or knowingly participated in the other defendants' breaches

of their fiduciary duties.

# APPENDIX 3B

**APPENDIX 3B**

## DEFENDANTS' CONTENTIONS REGARDING THE ISSUES OF LAW TO BE LITIGATED [DEL. L.R. 16(d)(4)]

**I.    Choice of Law**

The Court applies the forum state's (Delaware's) choice-of-law rules in determining

applicable law. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 497-98 (1941)

(Delaware court sitting in diversity applies Delaware's choice-of-law principles); *Houbigant,*

*Inc. v. Fed. Ins. Co.*, 374 F.3d 192, 197 n.6 (3d Cir. 2004) (accord; Third Circuit law).

  *A.    Québec law governs the contract claims (breach of contract and promissory or*

*equitable estoppel).* – Delaware follows the *Restatement (Second) of Conflict of Laws* and

applies the most-significant-relationship test to contract claims. *See Edelist v. MBNA Am. Bank,*

790 A.2d 1249, 1256 (Del. Super. Ct. 2001). The most-significant-relationship test "attempts to

identify that state having the most significant relationship to the specific transaction and [the]

parties to that transaction by considering the following contacts: (a) [the] place of contracting;

(b) [the] place of negotiation of contract; (c) [the] place of performance; (d) [the] location of the

subject matter of the contract; and (e) [the] domicile, residence, nationality, place of

incorporation and place of business of the parties." *Id.* at 1256 (internal quotation and footnote

omitted). "These contacts are to be evaluated according to their relative importance with respect

to the particular issue." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188(2) (1971); *see id.*

§ 188(1) cmt. d ("Each issue is to receive separate consideration if it is one which would be

resolved differently under the local law rule of two or more of the potentially interested states.").

  Under the most-significant-relationship test, defendants contend that the laws of the

Province of Québec, Canada, govern all issues regarding the contract-based claims, including the

formation, existence, validity, and enforceability of any contract, the defenses to any alleged

1

breach of contract, and the measure of damages for any such breach. To the limited extent that plaintiffs identify acts that they contend give rise to a contract or promissory estoppel, those acts occurred on February 28, 2001 and November 28, 2001, at meetings of the board of directors of Teleglobe Inc. ("TI") and BCE Inc. ("BCE"), respectively. In both events, all five *Restatement* contacts point to the laws of Québec. Both meetings took place in Québec. As a result, the place of contracting and the place of negotiation (contacts (a) and (b)) are Québec . The contract(s) was supposedly for the payment of money from BCE to TI. Since both corporations have their headquarters and principal place of business in Montréal, the place of performance (contact (c)) was also Québec. The subject of the contract was intangible (money), but to the extent that BCE's funding had a location, it was located in its treasury function at its headquarters in Québec (contact (d)). Lastly, the domicile, residence, headquarters, and place of business of both BCE and Teleglobe are Québec (contact (e)). In sum, all five *Restatement* contacts dictate the application of Québec law to all issues presented by the contract claims. *See Feinberg v. Saunders, Karp & Megrue, L.P.*, No. 97-207-SLR, 1998 WL 863284, at *7 (D. Del. Nov. 13, 1998) ("[Generally,] '[i]f the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied.'") (quoting RESTATEMENT (SECOND) OF CONFLICI OF LAWS § 188(3) (1971)) .

Plaintiffs provide no explanation or authority for applying the law of any state other than Québec to the contract claims. They simply assume that Virginia law governs their claims for breach of contract and estoppel. *See* Appendix 3A (##1-3).

B.     *Québec law governs the misrepresentation claims.* – Delaware follows the *Restatement* and applies the most-significant-relationship test to tort claims as well as contract

claims. *See Edelist*, 790 A.2d at 1255 n.23. As this Court held in *Feinberg*, 1998 WL 863284, at

*10:

> Where as here, plaintiff's action in reliance took place in a state other than that where the misrepresentations were made, § 148 of the *Restatement* sets forth six contacts to be taken into consideration when determining the state with the "most significant relationship":
>
> (a) the place, or places where the plaintiff acted in reliance upon the defendant's representations,
>
> (b) the place where the plaintiff received the representations,
>
> (c) the place where the defendant made the representations,
>
> (d) the domicil, residence, nationality, place of incorporation and place of business of the parties,
>
> (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and
>
> (f) the place where plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

*Id.* (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 148(2) (1971)) (footnote

omitted)). As with contract claims, the most-significant-relationship test applies the contact-

based analysis to each issue raised by the tort claims. *See* RESTATEMENT (SECOND) OF CONFLICT

OF LAWS § 148(2) (1971) cmt. e ("In the situations dealt with in this Subsection, the forum will

usually consider a number of contacts in determining which is the state of most significant

relationship with respect to the particular issue.").

Under the most-significant-relationship test, defendants contend that the laws of Québec

govern all issues regarding the tort-based misrepresentation claims, including misrepresentation,

reliance, detriment, and the measure of damages. Defendants made the alleged

misrepresentations in public statements issued primarily (albeit not exclusively) in Québec

(contact (c)). Moreover, the domicil, residence, headquarters, and place of business of BCE are Québec (contact (d)).

The remaining contacts do not point to any particular state. The place of incorporation of all but one of the Debtors is Delaware (the exception being a corporation incorporated in Puerto Rico), while the domicil, residence, nationality, and place of business of Debtors is Virginia (contact (d)). Because Debtors were building the GlobeSystem in many cities, they received and presumably relied on the alleged misrepresentations in numerous states (contacts (a) and (b)). Since there is no tangible thing (the subject matter of the misrepresentation is an intangible – money (contact (e)), the subject matter of the transaction does not point to a particular state. Lastly, since plaintiffs do not claim that they were fraudulently induced to enter into a contract, but rather that defendants hid and otherwise refused to enter into a contract, the contractual place of performance (comment (f)) has no application here.

Although the *Restatement* contacts do not point uniformly to one state, as they did with the contract issues, the fact that Québec is the place where BCE made the representations (comment (c)) and the fact that Québec is also BCE's domicil, residence, headquarters, and place of business (comment (d)) support the application of Québec law to all issues presented by the tort claims. *See Feinberg*, 1998 WL 863284, at *11 ("This contact [the place where defendant made the representations] is as important as, and occupies a position wholly analogous to, the place of conduct that results in injury to person or to tangible things.") (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 148 cmt. h).

    *C.*    *Canadian law governs the fiduciary-duty claims arising out of BCE's corporate relationship with TI and the corporate functions of BCE's and TI's directors and officers.* – Delaware follows the *Restatement* and applies the internal-corporate-affairs doctrine to "choice

4

of law determinations involving matters *peculiar* to corporations, that is, those activities

concerning the relationships *inter se* of the corporation, its directors, officers and shareholders."

(emphasis in original) *McDermott Inc. v Lewis*, 531 A.2d 206, 215 (Del. 1981) (citing

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 313 (1971)). Defendants contend that the

*Restatement* requires the application of Canadian law to plaintiffs' fiduciary-duty claims against

BCE, because that claim arises out of BCE's ownership of TI. *See id.* (Delaware court reversing

application of Delaware law to internal affairs of Panamanian corporation). Because TI is a

Canadian corporation, BCE's obligations to TI as its sole shareholder and to TI's other

stakeholders, including its subsidiary corporations and their creditors, are governed exclusively

by Canadian law. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 306 (1971) ("The

obligations owed by a majority shareholder to the corporation and to the minority shareholders

will be determined by the local law of the state of incorporation, except in the unusual case

where, with respect to the particular issue, some other state has a more significant relationship

under the principles stated in § 6 to the parties and the corporation, in which event the local law

of the other state will be applied."). In particular, BCE's fiduciary duties to TI and its

stakeholders are dictated by Canadian law. *See id.* comment a ("The law selected by application

of the rule of this Section determines whether and in what circumstances a majority shareholder

owes a fiduciary obligation to the corporation and to the minority shareholders.").

Defendants contend that the *Restatement* likewise requires the application of Canadian

law to plaintiffs' fiduciary-duty claims against BCE's and TI's directors and officers. Plaintiffs'

fiduciary-duty claims against those directors and officers arise out of their service to one or both

Canadian corporations. As a result, they are governed exclusively by Canadian law. *See id.* § 309

("The local law of the state of incorporation will be applied to determine the existence and the

extent of a director's or officer's liability to the corporation, its creditors and shareholders, except where, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the parties and the transaction, in which event the local law of the other state will be applied."); *see also id.* comment a ("When liability is imposed upon directors under the law selected by application of the rule of this Section, the same law will be applied to determine whether this liability runs to the corporation, or to the creditors or the shareholders, or to all three.").

Contrary to plaintiffs' contention (Appendix 3A, at 2), Delaware law cannot be applied extraterritorially to shareholders, directors, and officers two levels up the corporate organization chart on the theory that they control a Delaware corporation. The vice chancellor expressed grave skepticism that a Delaware corporation "owed fiduciary duties under Delaware law . . . to the shareholders of a third-tier foreign [Canadian] subsidiary." *Hurst v. Gen. Dynamics Corp.*, 583 A.2d 1334, 1339 (Del. Ct. Ch. 1990). The reverse situation – that Canadian parents and their directors and officers should owe fiduciary duties under Delaware law to a wholly owned Delaware subsidiary – is equally inconsistent with the internal-affairs doctrine. *Cf. id.* The two cases on which plaintiffs rely (Appendix 3A, at 2) do not support the application of Delaware law.

D.    *Plaintiffs are automatically precluded from introducing any expert affidavits on Québec law because they failed to comply with the expert-disclosure rule.* –The expert-disclosure requirements of Federal Rule of Civil Procedure 26(a)(2) require automatic preclusion under Rule 37(c)(1) of expert affidavits of foreign law for whom a party has not submitted a timely report. *See Silberman v. Innovation Luggage, Inc.*, No. 01 CIV. 7109, 2002 WL 31175226, at *2 (S.D.N.Y. Sept. 30, 2002) ("[I]t has commonly been recognized that legal

6

experts fall within the requirements of Rule 26(a)(2). *See, e.g., Kranis v. Scott, et al.*, 178 F.

Supp. 2d 330, 335-36 (E.D.N.Y. 2002) (requiring submission of expert report for legal expert in

malpractice case)."); *id.* at *2 n.1 (rejecting argument that "Rule 44.1, which is not a discovery

rule, should preempt Rule 26," and holding that preemption of the expert-disclosure requirement

by Rule 44.1 "appears contrary to the weight of authority on this question"). Plaintiffs failed to

provide a timely expert report from Gerald Kandestin, their proposed expert on Québec law.

Accordingly, because plaintiffs failed to comply with the expert-disclosure rule, Defendants

contend that Mr. Kandestin's report should be precluded.[1]

## II.    Existence of a Legally Binding Contract

Defendants contend that plaintiffs cannot satisfy their burden of proving the existence of

a legally binding contract. Québec law governs the contract claims (*see supra* point I), but

Québec law does not conflict with Virginia law (which plaintiffs contend governs the contract

claims, *see* Appendix 3A, at 2-3) or forum (Delaware) law on the contract issues in this case.

Defendants agree with plaintiffs' contention (*see id.*) that contracts in Québec and

Virginia are generally formed by acceptance of an offer with valuable consideration (or, under

Québec law, the exchange of sole consents for a valid cause), and that certain contracts (unlike

the one alleged to exist here) may be oral. Under Québec (as well as Virginia and Delaware) law,

however, BCE's board resolution, business plan, and budget for the build-out of the

GlobeSystem did not form a legally binding contract, for at least eight reasons.

*First*, plaintiffs cannot satisfy their burden of proving that BCE, on the one hand, and TI

or the Debtors, on the other hand, had the required intent to form a contract. *See, e.g., J.A*

---

[1] If the Court would like to hear from experts on Québec law, Defendants will arrange for a Québec lawyer to advise the Court. Defendants believe that submissions from experts on foreign law are unnecessary in this case, however, because Québec law is clear on the issues that dispose of plaintiffs' claims.

*Levasseur Constr. Inc. c. Ferneuf G & S. Inc.*, [1997] J.E. 97-2038, at 4 (Québec Ct. App.) (mere expression of intent does not amount to a binding promise) (Québec law).

    *Second*, plaintiffs cannot satisfy their burden of proving that BCE made a sufficiently specific offer to TI or the Debtors that one of the latter could and did accept (and vice versa). *See, e.g., id.* (Québec law); *Wolofsky v. Trust Général Inc.*, [1993] J.E. 93-461, majority op. at 37 (Quebec Ct. App.) ("well established" that an offer "must be firm, complete, unequivocal and precise" and "must set forth all the essential terms of the contract, in order to make it possible for the offeree to accept it.") (treatise omitted) (Québec law); *Enterprises Vibec Inc. c. Coffrage Alpine Inc.*, [2001] J.E. 2001-764, ¶ 54 (Québec Super. Ct.) (offer must reflect the offeror's clear intent to enter into a contract and must be "serious, specific, and precise") (treatise omitted) (Québec law); *Smith v. Farrell*, 98 S.E.2d 3, 4 (Va. 1957) (offer did not support contract where it contained no expression of a firm commitment) (Virginia law); *Tutko v. Conrail, Inc.*, No. C.A.98C-08-161, 2000 WL 973141, at *4 (Del. Super. Ct. Jun. 21, 2000) ("[T]here must be an 'intended, definite, and specific offer before any offer can be accepted or any enforceable contract can be created.'") (quoting *Morosetti v. Louisiana Land and Exploration Co.*, 564 A.2d 151, 153 (Pa. Super. Ct. 2000)), *aff'd*, 788 A.2d 471 (Del. 2001).

    *Third*, plaintiffs cannot satisfy their burden of proving that BCE, on the one hand, and TI or the Debtors, on the other hand, had a meeting of the minds on the existence and terms of a contract. *See id.*

    *Fourth*, plaintiffs cannot satisfy their burden of proving that any resulting contract had sufficiently definite terms. *See* Civil Code of Québec, Art. 1388 ("all the essential elements of the proposed contract" must be agreed to); *Productions Numuzik Inc c. Oss*, [1998] J.E. 98-2040, ¶¶ 24-25 (Quebec Super. Ct.) (Québec law); *Jolicoeur c. Rainville*, [2000] J.E. 2000-201,

¶ 50 (Quebec Ct. App.) (same); *Smith v. Smith*, 597 S.E.2d 250, 254 (Va. Ct. App. 2004) (if ambiguous agreement is too indefinite then "the contract cannot be enforced due to the absence of any discernable meeting of the minds") (citing *Allen v. Aetna Casualty & Surety*, 281 S.E.2d 818, 820 (Va. 1981)) (Virginia law); *Pantzer v. Shields Dev. Corp.*, 660 F. Supp. 56, 59-60 (D. Del. 1986) (letter of intent could not constitute a binding contract when the letter omitted an essential term) (Delaware law); *Middle States Drywall, Inc. v. DMS Properties-First, Inc.*, No. CIV. A 95L-01-041, 1996 WL 453418, at *9 (Del Super. Ct. May 28, 1996) (Delaware law).

*Fifth*, plaintiffs cannot satisfy their burden of proving that TI or the Debtors provided BCE any valuable consideration. *See Greenwood Associates, Inc. v. Crestar Bank*, 448 S.E.2d 399, 402 (Va. 1994) (bank's promise that it would not "double profit" on any sale of property subsequent to foreclosure and that any surplus from such sale would be credited to borrower's account was not enforceable for lack of consideration on part of borrower) (Virginia law); *Street Search Partners, L.P. v. Ricon Int'l, L.L.C.*, C.A. No. 04C-09-191, 2006 WL 1313859, at *4 (Del. Super. Ct. May 12, 2006) (Delaware law).

*Sixth*, plaintiffs cannot overcome the Statute of Frauds. *See* Civil Code of Québec, Art. 2862; 6 Del. C. § 2714(a) (2003).

*Seventh*, plaintiffs cannot satisfy their burden of proving that the Debtors (or Creditors) were in contractual privity with BCE or were third-party beneficiaries of the purported contract. *See* JEAN LOUIS BAUDOUIN AND PIERRE-GABRIEL JOBIN, LES OBLIGATIONS § 478, at 389 (5th ed. Cowansville: Yvon Blais 1998) (contract must indicate a clear intention to vest rights in third parties) (Québec law); *Demers v. Dufresne Eng'g Co.*, [1979] 1 S.C.R. 146, 148-49 (in determining whether a contract creates a stipulation for another, the court must construe the provisions of the contract to ascertain whether the promisor contracted direct obligations to a

9

third party) (Québec law); *Professional Realty Corp. v. Bender*, 222 S.E.2d 810, 812 (Va. 1976) (holding that "third party beneficiary doctrine is subject to the limitation that the third party must show that the parties to the contract clearly and definitely intended it to confer a benefit upon him") (Virginia law); *Madison Realty Partners 7 v. Ag ISA, LLC*, No. Civ. A. 18094, 2001 WL 406268, at *4-6 (Del. Ch. Apr. 17, 2001) (Delaware law).

*Eighth*, plaintiffs cannot satisfy their burden of proving that TI performed, which is essential both for acceptance (since plaintiffs contend that TI accepted by performance, *see* Appendix 3A, at 2) and that TI did not materially breach (by failing to deliver the results promised under the business plan). *See Young v. Virginia Birth-Related Neurological Injury Comp. Program*, 620 S.E.2d 131, 139 (Va. Ct. App. 2005) ("In a unilateral contract, one party makes an offer in the form of a promise to do an act 'upon the fulfillment of certain conditions' by the other party. The second party's 'previously inchoate rights' to the performance of the promised act by the first party 'vest and become legally enforceable' only when the second party accepts the offer by satisfying the condition precedent.") (quoting *Nicely v. Bank of Virginia Trust Co.*, 277 S.E.2d 209, 212 (Va. 1981)) (Virginia law); *In re Phillips Petroleum Sec. Litig.*, 697 F. Supp. 1344, 1357 (D. Del. 1988) ("acceptance by performance requires that offeror complete every act essential to making of promise") (Delaware law), *aff'd in part, rev'd in part on other grounds*, 881 F.2d 1236 (3d Cir. 1989).

For any and all of the foregoing reasons, defendants contend that plaintiffs cannot satisfy their burden of proving that BCE entered into a legally binding contract with TI or the Debtors.

### III.    Promissory and Equitable Estoppel

Defendants contend that plaintiffs cannot satisfy their burden of proving promissory or equitable estoppel. Québec law governs plaintiffs' estoppel claims because they seek to estop defendants from denying the existence of a contract. *See supra* point I.

#### A.    Promissory Estoppel

To begin with, defendants see no basis for applying the doctrine of equitable estoppel to prevent a party from denying the existence of a contract if the doctrine of promissory estoppel would not dictate that result. Promissory estoppel is the doctrine that prevents a party from denying the existence of a contract. Plaintiffs switch from "promissory estoppel" (when they discuss choice of law) to "equitable estoppel" (when they discuss their substantive claim). *Compare* Appendix 3A, at 1, *with id.* at 4. Plaintiffs presumably switch estoppel doctrines because Virginia law, which plaintiffs contend applies to their estoppel claims, does not recognize the doctrine of promissory estoppel. *See W.J. Schafer Assoc. v. Cordant, Inc.*, 493 S.E.2d 512, 521 (Va. 1997); *Virginia Sch. of the Arts, Inc. v. Eichelbaum*, 493 S.E.2d 510, 512 (Va. 1997); *Ward's Equip., Inc. v. New Holland N. Am., Inc.*, 493 S.E.2d 516, 520 (Va. 1997). [2]

#### B.    Equitable Estoppel

If plaintiffs may invoke the doctrine of equitable estoppel (and defendants contend that they should not), then defendants contend that plaintiffs cannot satisfy their burden of estopping defendants under that doctrine.

Québec law does not recognize the doctrine of equitable estoppel. It recognizes a somewhat similar principle known as "fins de non reçevoir." *See Gaz Métropolitain Inc. c.*

---

[2] To the extent that plaintiffs invoke the doctrine of promissory estoppel, defendants also contend that promissory estoppel cannot be interposed "where the promise relied upon is the very promise that the [Statute of Frauds] declares unenforceable if not in writing." *Consolidation Servs., Inc. v. KeyBank Nat'l Ass'n*, 185 F.3d 817, 822 (7th Cir. 1999) (citations omitted) (Indiana law).

11

*Bacon America Inc.*, [2002] R.J.Q. 215, ¶¶ 40-44 (Québec Sup. Ct.). Although the elements

differ, defendants contend that "fins de non reçevoir" under Québec law and equitable estoppel

under Virginia and Delaware law generally require plaintiffs to prove (among other things) (1)

that BCE made a clear and unambiguous promise or representation, (2) which BCE intended to

induce action or forbearance on the part of Debtors, and (3) on which Debtors reasonably relied

to their detriment. *See id.* (Québec law); *In re Phillips Petroleum Sec. Litig.*, 881 F.2d 1236,

1250 (3d Cir. 1989) (Delaware law); *Fini v. Remington Arms Co.*, No. C.A. 97-12-SLR, 1998

WL 299358, at *9-10 (D. Del. May 27, 1998) (same); *Rabkin v. Philip A. Hunt Chem. Corp.*, 480

A.2d 655, 661 (Del. Ch. 1984), *rev'd on other grounds*, 498 A.2d 1099 (Del. 1985) (same); *see

also Derry Fin. N.V. v. Christiania Cos.*, 616 F. Supp. 544, 549-50 (D. Del. 1985), *aff'd*, 797

F.2d 1210 (3d. Cir. 1986) (New York law).

        In this case, the evidence will prove (among other things) that BCE made no promise or

representation of funding (other than a promise of $1 billion, which was not made to TI or the

Debtors, and which in any event was more than fulfilled). Certainly, a promise to fund beyond

$1 billion was not clear and unambiguous. The evidence will also prove that Debtors did not

rely, and could not reasonably have relied, on any promise or representation of funding beyond

that $1 billion. BCE's public filings disclaiming any such obligation made reliance objectively

unreasonable and the Debtors further fully appreciated that any funding by BCE was subject to

TI's execution of a viable business plan. The evidence will also prove that TI and the Debtors

suffered no detrimental harm or injury by the failure of BCE to provide funding that would have

been wasteful and futile in accomplishing TI's existing business plan, which was no longer

viable.

## IV.    Intentional and Negligent Misrepresentation

Defendants contend that plaintiffs cannot satisfy their burden of proving intentional or negligent misrepresentation. Québec law governs the misrepresentation claims. *See supra* point I.

Plaintiffs' list of the elements of intentional and negligent misrepresentation (*see id.*) – namely, falsity, materiality, scienter (for intentional misrepresentation), reliance, and damages – is incomplete. Defendants contend that the representation must not only be false, but also that falsity must be judged at the time the representation was made. Similarly, a promise to be performed in the future can be false only if the promisor had no intention of performing at the time the promise is made. In addition, defendants contend that plaintiffs must not only prove that they subjectively relied on the purported misrepresentation, but they must also prove that their reliance was objectively reasonable (or justified) under the totality of the circumstances. *See Guertin v. Les Enterprises J.J.P. Inc.*, [1998] R.E.J.B. 1998-05043, at 14-15 (Québec Ct. App.) (Québec law); JEAN PINEAU ET AL., THÉORIE DES OBLIGATIONS §§ 86-87, at 178-79 (4th ed. Montréal, Themis 2001) (same); *Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544, 554 (Del. Ch. 2001) (Delaware law – intentional misrepresentation); *Dooner v. Keefe, Bruyette & Woods, Inc.*, 157 F. Supp. 2d 265, 277-78 (S.D.N.Y. 2001) (same); *Darnell v. Myers*, No. Civ. A. 14859-NC, 1998 WL 294012, at *5 (Del.Ch. May 27, 1998) (Delaware law – negligent misrepresentation).

In this case, the evidence will prove (among other things) that BCE made no representation or promise of funding that was not true at the time it was made. If BCE had decided to terminate its financial support to TI in 2001, then it would not have provided hundreds of millions of dollars in additional funding until April 24, 2002. In addition to failing

13

on proof of falsity, plaintiffs cannot establish justifiable reliance, causation, or injury, for the reasons set forth *supra* Point III.

## V.    Fiduciary Duty Claims

BCE and TI are Canadian companies, based in Québec, and for the reasons set forth *supra* point I, Canadian law governs claims of breach of fiduciary duty arising from the acts of BCE, TI, and their directors and officers.

### A.    Canadian Law

1.    The duties of directors of Canadian corporations are codified in s.122 of the *Canadian Business Corporations Act* (the "CBCA"). A director must act honestly, in good faith, and in the best interest of the corporation (*see id.* s.122(1)(a)) and must act with due care (*id.* 122(1)(b)). There is no equivalent to the enhanced-scrutiny doctrine in Canada. *See Corporacion Americana de Equipamientos Urbanos S.A. v. Olfas Marketing Groupo Inc.* [2003], 66 O.R. 3d 352, 353 (S.C.J.) para. 12. Thus, the burden to show non-compliance with those requirements always rests with plaintiffs. In addition, courts will not second-guess Canadian directors and officers with regard to complex and sophisticated business judgments. In *Re Stelco Inc.*, [2005] O.J. No. 1171; 2005 On.C. LEXIS 1358, *44-45, the court held that corporate-governance issues, such as the appointment of directors to fill board vacancies, involve the balancing of competing interests and other factors. Consequently, those issues, like other business decisions, are not within the purview of the court's knowledge and expertise. This doctrine is even more compelling when a parent corporation must decide whether to provide funding to a subsidiary that is in financial difficulty. Plaintiffs' hindsight challenges to the contemporaneous business judgments of BCE's and TI's directors and officers do not suffice under Canadian law.

14

2.    The business-judgment rule in Canada does not permit second-guessing as to issues of fairness. Canada has a separate oppression remedy under CBCA s.241, which authorizes a claimant to show that an act of the corporation or any of its affiliates effects a result that is unfairly prejudicial or unfairly disregards the interests of the claimant. An oppression claim can only be brought in a prescribed "Court," which means a superior court of a province or territory of Canada. Thus, the oppression remedy challenging issues of fairness is not exportable to this Court under the guise of business-judgment review.

3.    No case in Canada holds that the directors of a parent company owe fiduciary duties to a subsidiary corporation. Under Canadian law, directors owe duties to the corporation they serve. The idea that a director or officer of a corporation could owe a fiduciary duty to a subsidiary corporation is so alien that no Canadian treatises even address the issue and we are aware of no Canadian case in which this position has even been advanced.

Two leading English corporate law texts, which are treated as persuasive by Canadian courts, make clear that directors owe no duties to a subsidiary unless they serve on that subsidiary's board. *See, e.g.*, 1 GORE-BROWNE ON COMPANIES ¶¶ 15[8], 15[9] & n.13 (Bristol: Jordans 45th ed. 2004); 2 PALMER'S COMPANY LAW 8107 (London: Sweet & Maxwell 25th ed. 1992).

4.    Most importantly, Canada's highest court has thoroughly rejected plaintiffs' fundamental position that creditors of the Debtors are owed independent fiduciary duties by BCE or the directors and officers of BCE and TI. In 2004, the Supreme Court of Canada issued a watershed ruling addressing the scope of statutory fiduciary duties owed by a corporate officer/director. In *Peoples Department Stores Inc. v Wise*, [2004] 3 S.C.R. 461, 465, 482-84, the Court confirmed that such duties were owed exclusively to the corporation itself and did not

15

extend to the corporation's creditors or to any other individual, group, or entity. Moreover, the

court expressly rejected the concept of a zone or vicinity of insolvency triggering duties to

creditors:

> We accept as an accurate statement of law that in determining whether they are acting with a view to the best interests of the corporation it may be legitimate, given all the circumstances of a given case, for the board of directors to consider, inter alia, the interests of shareholders, employees, suppliers, creditors, consumers, governments and the environment.
>
> The various shifts in interests that naturally occur as a corporation's fortunes rise and fall do not, however, affect the content of the fiduciary duty under s. 122(1)(a) of the CBCA. At all times, directors and officers owe their fiduciary obligation to the corporation. The interests of the corporation are not to be confused with the interests of the creditors or those of any other stakeholders.
>
> The interests of shareholders, those of the creditors and those of the corporation may and will be consistent with each other if the corporation is profitable and well capitalized and has strong prospects. However, this can change if the corporation starts to struggle financially. The residual rights of the shareholders will generally become worthless if a corporation is declared bankrupt. Upon bankruptcy, the directors of the corporation transfer control to a trustee, who administers the corporation's assets for the benefit of creditors.
>
> Short of bankruptcy, as the corporation approaches what has been described as the "vicinity of insolvency", the residual claims of shareholders will be nearly exhausted. While shareholders might well prefer that the directors pursue high-risk alternatives with a high potential payoff to maximize the shareholders' expected residual claim, creditors in the same circumstances might prefer that the directors steer a safer course so as to maximize the value of their claims against the assets of the corporation.
>
> The directors' fiduciary duty does not change when a corporation is in the nebulous "vicinity of insolvency". That phrase has not been defined; moreover, it is incapable of definition and has no legal meaning. What it is obviously intended to convey is a deterioration in the corporation's financial stability. In assessing the actions of directors it is evident that any honest and good faith attempt to redress the corporation's financial problems will, if successful, both retain value for shareholders and improve the position of creditors. If unsuccessful, it will not qualify as a breach of the statutory fiduciary duty.

*Peoples Department Stores*, 3 S.C.R. at 482-83.

Finally, the Supreme Court held that the remedy available to oppressed creditors falls

under the oppression statute, which is enforceable only in specified Canadian courts. Because of

that remedy, the Supreme Court concluded: "there is no need to read the interests of creditors into the [fiduciary] duty set out in s. 122(1)(a) of the CBCA." *Id.* at 486.

Thus, applying the law applicable to BCE and TI as Canadian corporations, and to their directors and officers, plaintiffs' theory of the case is not valid.

B.   *Delaware Law*

While Canadian law, not Delaware law, governs the breach-of-fiduciary duty claims against BCE and TI's directors and officers, the principles under Delaware law, which governs the breach-of-fiduciary duty claims against the Debtors' directors and officers, similarly rebut any possible claim of liability.

1.   Under Delaware law, the conduct of a corporate director is presumed to fall within the business judgment rule. *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984). This presumption holds that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Id.* The business-judgment rule, therefore, protects directors from liability for conduct that can be attributed to any rational business purpose. *See Cede & Co v. Technicolor, Inc.*, 634 A.2d 345, 360 (Del. 1993). To rebut the presumptive applicability of the business judgment rule, plaintiffs must prove that defendants breached their duty of care, duty of loyalty or duty of good faith with respect to the challenged actions before the Court. *See Emerald Partners v. Berlin*, 787 A.2d 85, 91 (Del. 2001).

2.   The duty of care is satisfied if a director has informed himself of material information reasonably available to him before making a decision. *See Brehm v. Eisner*, 746 A.2d 244, 259 (Del. 2000) ("the informational component of the directors' decisionmaking does not mean that the Board must be informed of *every* fact. The Board is responsible for considering

17

only *material* facts that are *reasonably available*, not those that are immaterial or out of the Board's reasonable reach.") (emphasis in original); *Aronson*, 473 A.2d at 812. The determination of whether a board acted with due care is highly particularized and is subject to a gross negligence standard. *Id.* at 812.

3.    The duty of loyalty requires that directors be both independent and disinterested in a particular transaction. To satisfy the independence component, a director's decision must be "based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Id.* at 816. To satisfy the disinterested component of the test, a director "can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." *Id.* at 812. In the context of a transaction between a parent and a wholly-owned subsidiary, however, the mere fact that a director may be present "on both sides of the transaction does not automatically rebut the business judgment rule presumption," because the directors of the subsidiary are obligated to manage the affairs of the subsidiary in the best interest of the parent and the parent's shareholders. *Roselink Investors, LLC*, 386 F. Supp. 2d at 218. Rather, plaintiffs must demonstrate that the director had some personal interest in the outcome of the transaction. *See id.*

4.    Under Delaware law, the duty of good faith "does not exist separate and apart from the fiduciary duty of loyalty." *Orman v. Cullman*, 794 A.2d 5, 14 n.3 (Del. Ch. 2002) . Rather, it is a "subset or subsidiary requirement" that is subsumed within the duty of loyalty. *Id.* (internal quotations omitted) Bad faith is "not simply bad judgment [sic] or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity." *Desert Equities Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d

18

1199, 1208 n.16 (Del. 1993). Bad faith may also be found where a business decision "is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith." *In re J.P. Stevens & Co., Inc. S'holders Litig.*, 542 A.2d 770, 780-81 (Del. Ch. 1988). Finally, bad faith can be found when a director intentionally disregards his duties and obligations. *See In re Walt Disney Co.*, Civ. A. No. 15452, 2005 WL 2056651 at \*36 (Del. Ch. Aug. 9, 2005).

5.      The entire fairness concept has never been applied to a parent's decision-making whether to fund the business operations of its subsidiary. That decision is a straightforward application of business judgment and does not involve a transaction triggering entire fairness. By its very terms, the entire fairness test, as enunciated by the Delaware Supreme Court in *Weinberger*, contemplates a "transaction" between the parent or controlling shareholder and the subsidiary, the fairness of which must be determined by the court if one of the triad of fiduciary duties has been shown to have been breached. *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983) (where one stands on both sides of a transaction, he has the burden of establishing its entire fairness). Indeed, the two elements of fairness – fair price and fair dealing – presume the existence of an actual transaction to which these measures may be applied. *See id.* (defining fair dealing in terms of "when the transaction was timed, how it was initiated, structured, negotiated …" and stating that fair price "relates to the economic and financial considerations of the proposed merger.")

Thus *Weinberger* itself arose in the context of a cash-out merger by a majority shareholder and virtually all Delaware cases adopting its entire fairness analysis have involved similar merger-type transactions or some form of contractual dealing between a controlling or majority shareholder and the subsidiary, in which the controlling or majority shareholder stood

on both sides of the transaction. *See, e.g. Bershad v. Curtiss-Wright Corp.*, 535 A.2d 840, 845

(Del. 1987) (applying entire fairness test to cash-out merger of subsidiary by parent); *Rosenblatt*

*v. Getty Oil Co.*, 493 A.2d 929, 937 (Del. 1985) (applying entire fairness review to parent-

subsidiary, stock-for-stock merger); *Citron v. E.I. Du Pont de Nemours & Co.*, 584 A.2d 490,

502 (Del. Ch. 1990) (applying entire fairness review to parent-subsidiary, stock-for-stock merger

even though there was shareholder ratification); *Sealy Mattress Co. of N. J., Inc. v. Sealy, Inc.*,

532 A.2d 1324, 1333 (Del. Ch. 1987) (applying entire fairness review to cash-out merger of

subsidiary into wholly-owned subsidiary of parent); *Kahn v. Lynch Commc'n Sys., Inc.*, 638

A.2d 1110, 1115 (Del. 1994) (applying entire fairness review to minority-controlling shareholder

merger). No such scenario exists here. BCE's decision to cease funding of TI, one its

subsidiaries, was not a transaction with that subsidiary. Rather, it was a business decision to be

made solely by BCE in the exercise of its sound business judgment. The entire fairness doctrine

was never meant to be applied, nor has it ever been applied, in such a context.

     6.     In addition, under Delaware law, it is well settled that "[w]here a parent

corporation contracts with its wholly owned subsidiary. . ., the entire fairness mode of analysis is

inapplicable." *Abex Inc. v. Koll Real Estate Group, Inc.*, Civ. A. No. 13462, 1994 WL 728827 at

* 17 (Del. Ch. Dec. 22, 1994). This is a corollary of the general rule established by the Delaware

Supreme Court that "a parent does not owe a fiduciary duty to its wholly owned subsidiary" and

"in a parent and wholly-owned subsidiary context, the directors of the subsidiary are obligated

only to manage the affairs of the subsidiary in the best interests of the parent and its

shareholders." *Anadarko Petroleum Corp. v. Panhandle Eastern Corp.*, 545 A.2d 1171, 1174

(Del. 1988) Thus, in such a context, there is no basis for application of the entire fairness test

and "the only relevant inquiry is whether the contract is in the best interests of the parent and its

shareholders." *Abex*, 1994 WL 728827 at * 17. In this case, the Debtors are all wholly-owned indirect subsidiaries of TI, which in turn is a wholly-owned subsidiary of BCE. Consequently, the entire fairness doctrine is inapplicable to any claims for breach of fiduciary duty involving dealings between these wholly-owned subsidiaries and the ultimate parent, BCE, or the Debtors and TI.

      7.     Nor would the entire fairness doctrine apply to any fiduciary duty claims arising by virtue of the control that BCE and the individual defendants allegedly exercised over these wholly-owned subsidiaries. Delaware law imposes no such fiduciary duties in the parent and wholly-owned subsidiary context. The Delaware cases imposing such control liability all arise in the majority shareholder or some analogous context where the law seeks to protect the minority interest involved. *See, e.g., Harris v. Carter*, 582 A.2d 222 (Del. Ch. 1990); *Harriman v. E.I. Du Pont de Nemours & Co.*, 372 F. Supp. 101 (D. Del. 1974). Where, as here, the only legally recognized interests, outside of the insolvency context, are those of the parent and its shareholders, such cases do not apply. *See Roselink Investors, LLC v. Shenkman*, 386 F. Supp. 2d 209, 219, n.3 (S.D.N.Y. 2004) (noting that cases discussing fiduciary duties owed by controlling shareholders to minority shareholders were "entirely inapposite" in the parent and wholly-owned subsidiary context).

      8.     Even under Delaware law, plaintiffs' zone-of-insolvency doctrine argument is highly controversial. If the Court were inclined to apply this controversial doctrine, it does not create a separate set of duties to the corporation's creditors independent of those owed to the corporate enterprise. *Roselink*, 386 F. Supp. 2d at 215. Nor does it create standing in the corporation's creditors to advance a separate set of fiduciary duty claims against the corporation's directors. *See Prod. Resources Group, LLC v. NCT Group, Inc.*, 863 A.2d 772,

789, n. 54 (Del. Ch. 2004). As the *Production Resources* court has indicated, the extension of
fiduciary duties to creditors in the zone of insolvency was meant, not to serve as an additional
basis of liability for directors during this period, but rather to provide "a shield to directors from
stockholders who claimed that the directors had a duty to undertake extreme risk so long as the
company would not technically breach any legal obligations." *Id.* at 788, 794 The doctrine
similarly does not extinguish the fiduciary duties previously owed to the sole shareholder. *Id.* at
218. Rather, insolvency merely expands the scope of the directors' duties, such that these duties
now become owed "to the corporation and to all of its interested constituencies, including
creditors and shareholders." *In re RSL Com Primecall, Inc.*, 2003 WL 22989669, at *7 (Bank.
S.D.N.Y. Dec. 11, 2003). Such duties include an obligation to the corporation's "community of
interest ... to exercise judgment in an informed, good faith effort to maximize the corporation's
long-term wealth creating capacity." *Credit Lyonnais Bank Nederland v. Pather Commc'n Corp.*,
Civ. No. 12150, 1991 WL 277613, at *34, n.55 (Del. Ch. Dec. 30, 1991); *see also In re
Hechinger Inv. Co. of Delaware*, 274 B.R. 71, 89 (D. Del. 2002; *In re Ben Franklin Retail
Stores, Inc.*, 225 B.R. 646, 654 (Bankr. N.D. Ill. 1998), *aff'd in part by*, 1999 WL 982963 (N.D.
Ill. 1999), *rev'd in part on other grounds*, 2000 WL 28266 (N.D. Ill. 2000); *8; In re RSL Com
Primecall, Inc.*, 2003 WL 22989669, at *8 (Bank. S.D.N.Y. Dec. 11, 2003) (internal citations
omitted)

However, "even where the law recognizes that the duties of directors encompass the
interests of creditors, there is room for application of the business judgment rule." *See Angelo,
Gordon & Co. v Allied Riser Comm. Corp.*, 805 A.2d 221, 229 (Del. Ch. 2002). It has never
been the law in Delaware or in any other jurisdiction in the United States that directors are not
afforded significant discretion as to whether an insolvent company can 'work out' its problems

22

or should file a bankruptcy petition *In re RSL Com Primecall, Inc.*, 2003 WL 22989669, at *8;

*see also In re Ben Franklin Retail Stores, Inc.*, 225 B.R. at 646 (rejecting the notion of "a duty to

liquidate and pay creditors when the corporation is near insolvency, provided that in the

directors' informed, good faith judgment there is an alternative.")

In this case, the director defendants were entitled to employ reasonable, good faith efforts

to maximize the value of TI and the Debtors, including through the continued build-out of the

GlobeSystem, which would have inured to the benefit of all the corporate stakeholders, including

the creditors. In carrying out this mandate, the mere fact that the interests of BCE, the sole

shareholder, may have been taken into account does not deprive the defendants of the protection

of the business judgment rule. Defendants' fiduciary duties required them to consider the

interests of all the stakeholders. *Roselink*, 386 F. Supp. 2d at 218-19. As one court has observed,

virtually "[a]ll of the decisions in which the courts have allowed creditors to recover for breach

of fiduciary duty have involved directors of an insolvent corporation diverting corporate assets

for the benefit of insiders or preferred creditors." *In re Ben Franklin Retail Stores, Inc.*, 225 B.R.

at 646.

Such is not the case here. There was no diversion of corporate assets to which the

Debtors were legally entitled. Moreover, there was no benefit to BCE at the expense of TI and

the Debtors for purposes of a self-dealing analysis. Plaintiffs point to the purported $1 billion tax

benefit that BCE obtained as a result of its multi-billion dollar lost investment in Teleglobe Inc.

However, such routine tax write-offs do not constitute the types of benefits that courts consider

for purposes of triggering an entire fairness review. *See, e.g., Huang v. Lanxide*

*Thermocomposites, Inc.*, 760 N.E.2d 14, 21 (Ohio App. 2001) ("It is impossible to see the

'benefit' of any tax write-off opportunity of which [the majority stockholder] may have

eventually taken advantage. Rather, it was a legitimate way for [the majority stockholder] to minimize its own substantial loss.").

10.     Plaintiffs' theory that BCE, TI, and their officers and directors should be treated as fiduciaries of the Debtors subject to Delaware law – because they "controlled" the Debtors – also should be rejected. Not only will plaintiffs be unable to establish that BCE or TI's directors exercised day-to-day control over the operations of the Debtors (whose duties as wholly owned subsidiaries in any event ran to the parent, *see Anadarko*, 545 A.2d at 1174, and not the other way around), but their legal theory is highly disfavored since it seeks to pierce the corporate veils and improperly impose *alter ego* liability on BCE, TI, and their officers and directors.

The United States Supreme Court has held that it "is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation (so called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61-62 (1998) (citation omitted). Under Delaware law, the corporate form of a subsidiary is pierced only under exceptional circumstances. *Id.*; *Alberto v. Diversified Group, Inc.*, 55 F.3d 201, 206-07 (5th Cir. 1995); *Pauley Petroleum Inc. v. Cont'l Oil Co.*, 239 A.2d 629, 633 (Del. 1968); *In re Hillsborough Holdings Corp.*, 176 B.R. 223, 244-45 (M.D. Fla. 1994). "[U]nder Delaware law, in order to pierce the corporate veil and establish alter ego liability, a party must show: (1) that the parent and the subsidiary operated as a single economic entity; and (2) that an overall element of injustice or unfairness was present. Allegations of mere domination or control by one entity over another are insufficient . . . . Rather, '[t]he extent of the domination and control must preclude the controlled entity from having legal or independent significance of its own. There must be an abuse of the corporate form to effect a fraud or an injustice – some sort of elaborate shell game.'

24

'To [establish liability], a plaintiff must allege facts that the controlling owners operated the company as an 'incorporated pocketbook' and used the corporate form to shield themselves from liability. Further, the plaintiff must plead facts showing that the 'corporation [is] a sham and exist[s] for no other purpose than as a vehicle for a fraud.'" *In re RSL COM Primecall, Inc.*, 2003 WL 22989669, at *15 (emphasis added) (citation omitted); *Alberto*, 55 F.3d at 205-07.

This is not a case in which a parent corporation bled its subsidiary to death, looted assets, or engaged in self-dealing for the benefit of insiders. *In re RSL COM Primecall*, 2003 WL 22989669, at *9-10. Far from treating TI as its "pocketbook," or engaging in other abuses, BCE infused over $1.3 billion into TI between June 2000 and April 2002. BCE continued to inject hundreds of millions of dollars into TI from December 2001 through April 24, 2002, after BCE had fulfilled its financial obligation to the banks. In a case exactly on point, *Diversified Group*, 55 F.3d at 206-07, the Fifth Circuit held that under Delaware law it would be an "ironic injustice" to find that a parent had engaged in wrongful conduct under the same circumstances:

> Thus, this is not a case in which a parent failed to capitalize its corporate offspring from its inception; neither is it a case in which the parent subsequently siphoned off the economic lifeblood of its subsidiary, thereby depriving creditors of the subsidiary's assets. Indeed precisely the opposite is true.

*Diversified Group*, 55 F.3d at 206-07; *see In re RSL COM Primecall*, 2003 WL 22989669, at *10 ("[I]t cannot be ignored that at a time when [the parent and subsidiaries] were arguably insolvent and nearing collapse, [the defendant] put money into [a subsidiary] on an unsecured basis, instead of taking it out.").

11.    The fact that BCE allegedly appointed certain directors and officers of TI or the Debtors is typical of a parent-subsidiary relationship. In *Bestfoods*, 524 U.S. at 61-62, the Supreme Court held that activities such as "'monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general

25

policies and procedures'" are "'consistent with the parent's investor status.'" *Id.* at 72 (citations omitted); *Craig v. Lake Asbestos of Quebec, Ltd.*, 843 F.2d 145, 149-52 (3d Cir. 1988); *In re RSL COM Primecall*, 2003 WL 22989669, at *16.

     12.    Finally, the Debtors' corporate charters contain exculpatory clauses fully enforceable in Delaware. *See* Del. G.C.L. § 102(b)(7). To the extent that plaintiffs' allege that violations of due care caused them injury, those claims are blocked by the exculpatory clauses.

## VI.   Damages

     1.    Defendants contend (as this Court has held time and again) that plaintiffs must prove their damages to a reasonable certainty and that they may not recover if their proof is speculative. *See, e.g., A.P.S., Inc. v. Standard Motor Products, Inc.*, 295 B.R. 442, 456 (D. Del. 2003) (rejecting warranty claim as speculative) (UCC case; Texas and New York law); *In re Olsen Industries*, No. 98-140-SLR, 2000 WL 376398, at *12 (D. Del. March 28, 2000) ("[I]n order to be entitled to damages, plaintiff must demonstrate that the resultant loss is capable of proof with reasonable certainty.') (fiduciary-duty claim; New York law); *Ajinomoto Co, Inc. v. Archer-Daniels-Midland, Co.*, Civ. A. No. 95-218-SLR, 1996 WL 621835, at *3 (D. Del. 1996) ("An award of lost profits cannot be speculative."); *see also, e.g., Vocisano v. Concrete Column Clamps Ltd*, [1959] B.R. 230, 237 (damages "cannot, however, be based on mere speculation; there must be a reasonable degree of certainty"; knowledge that is "based on hindsight" is a "most unreliable guide" to the determination of what decisions "would actually have been taken in all the then prevailing circumstances"), *appeal to the Supreme Court of Canada dismissed*, [1960] S.C.R. viii); *Iarrera v. Guinta*, [1975] C.S. 490 ("[O]ur courts have always been reluctant to award damages based upon the expectation of future profits, the realization of which may be problematic or open to speculation. If future profits are to be claimed as damages, they must be

26

established with reasonable certainty. Hypothetical projections based upon unknown or uncertain conditions have always been considered an unsafe foundation for awarding damages.") (references omitted); *ATACS Corp v. Trans World Communications, Inc*, 155 F.3d 659, 669 (3d Cir. 1998) (requiring injured party to prove damages with "reasonable certainty"); *Lithuanian Commerce Corp, Ltd. v. Sara Lee Hosiery*, 179 F.R.D. 450, 460-61 (D. N.J. 1998) (economist's damages opinion rested on speculative assumptions and hence was inadmissible); *American Bearing Co, Inc. v. Litton Industries, Inc.*, 540 F. Supp. 1163, 1173 (E.D. Penn. 1982) (expert damages opinion should be stricken because it rested on assumptions not supported by the evidence).

In this case, plaintiffs' damages testimony, put forth by their expert Paul Charnetzki, lacks the requisite reasonable certainty and calls for impermissible speculation. In his deposition, Mr. Charnetzki admitted that his damages estimate rests on a paper valuation and he did not consider whether his values could have been obtained in the real world. In a patent-infringement case involving a similarly hypothetical estimate of lost profits, this Court rejected the damages claim as speculative:

> The record shows that [plaintiff] has not demonstrated a reasonable probability that [defendant's] alleged infringement caused it to lose its share of [the licensee's] lost profits.... [Plaintiff] has not established with any degree of clarity how it receives a share of [licensee's] lost profits as a shareholder. Based on [plaintiff's] own expert, [plaintiff's] share of [licensee's] profits can only be calculated hypothetically. In deposition [plaintiff's] expert simply hypothesized that [plaintiff] would have received profits from [the licensee] based on "its ownership interests .... the stock market.... Any number of ways...." Based on this record, the court determines that [plaintiff's] claim to a share of [licensee's] lost profits is speculative at best.

*Ajinomoto*, 1996 WL 621835, at *3.

2.    Defendants contend that the damages testimony of Mr. Charnetzki and Carlyn Taylor must be excluded as a sanction for the spoliation of information considered in forming their opinions.

27

3.    Defendants contend that the testimony of Ms. Taylor and the related testimony of Mr. Charnetzki must be excluded based on the doctrines of judicial estoppel and collateral estoppel.

4.    Defendants contend that plaintiffs have standing to recover only those damages suffered by the estate. An official creditors committee in a Chapter 11 case may be authorized, as here, to bring an action on behalf of the estate. *See* Joint Motion for an Order Appointing the Committee as Estate Representative with Respect to the Prosecution of Certain Causes of Action ¶ 12, at 4 (Apr. 13, 2004). But the action must be on behalf of the estate, not individual creditors or groups of creditors. *See In re E.F. Hutton Southwest Properties II Ltd.*, 103 B.R. 808, 810 (Bankr. N.D. Tex. 1989) ("It is axiomatic that actions that do not belong to the estate cannot be pursued by the committee."); *id.* at 815; *In re Toledo Equip. Co. v. Unsecured Creditors' Committee*, 35 B.R. 315, 317 (N.D. Ohio 1983). Thus, the U.S. Creditors as plaintiffs may not attempt to recover on claims on behalf of only certain creditors.

5.    Defendants contend that plaintiffs have no standing to recover for damages allegedly suffered by their foreign affiliates and operations outside of the United States. The foreign operations were owned by other affiliates who are not plaintiffs and are not before the Court.

\* \* \* \* \*

Defendants respectfully reserve the right to identify additional issues of law and supply additional authority on those issues as they are presented by the evidence admitted at trial.