# APPENDIX 6A

**PLAINTIFFS' STATEMENT OF THEIR ANTICIPATED PROOFS [DEL. L.R. 16.4(D)(8)]**

Plaintiffs anticipate proving the following at trial:

A.  There was an enforceable contract between BCE and the Debtors, or in the alternative between BCE and TI to which the Debtors were third party beneficiaries. The contract was to provide funding by BCE to Plaintiffs for the construction of the GlobeSystem data highway and associated operating costs to complete the system. Evidence of this contract is found in the actions of the BCE and Teleglobe Board of Directors, public statements by BCE's officers and authorized employees, contemporaneous documents obtained from the files of BCE and the actions of the parties. Clear evidence of the contract includes, without limitation, the November 28, 2001 Teleglobe Inc. Board resolution requesting funding to continue the buildout of the GlobeSystem; the November 28, 2001 BCE Board resolution authorizing funding of $850 million to TI and its subsidiaries (the Plaintiffs) for the buildout of the GlobeSystem, and in the continued performance of the Plaintiffs in completing the GlobeSystem in reliance on BCE's promised funding. Other evidence that supports the existence of the contract includes various statements made by BCE officers and authorized employees to the effect that BCE had committed to fund the GlobeSystem in 2002, 2003 and beyond; that BCE would get the funding of the project done after the first $1 billion was spent; that BCE would fund projected cash shortfalls in 2002 and beyond to the extent that an equity partner was not identified; and by virtue of the fact that the BCE Board of Directors ultimately approved budgets and business plans which had consolidated or "rolled up" into them, the budgets and business plans of the Plaintiffs calling for the buildout of the GlobeSystem and, pursuant to certain "Schedules of Authorities" providing that budget approval, without more, authorized expenditures of money by the Debtors on the GlobeSystem. Finally, BCE's concerted effort to alter or eliminate evidence

of its commitment after it determined not to continue to honor that commitment which was part of what was known internally at BCE as "Project Saving Grace" and then "Project X", is further evidence of the existence of a contract. BCE only partially performed on its promise to fund an additional $1 billion after the first $1 billion was spent, and unilaterally breached its commitment. Plaintiffs were injured thereby.

B.  There were statements, conduct, action, behavior, concealment and silence by Defendants upon which the Debtors relied in good faith in continuing to build out the GlobeSystem to their detriment. The statements included those statements set forth above (*see* A above) to the effect that BCE would fund the Debtors' continued construction of the GlobeSystem and that Teleglobe was a "core" asset of BCE even though the initial $1 billion commitment from BCE was exhausted. The statements were made both directly to all employees of TI and the Debtors by authorized officers of BCE and at various public forums during 2001 and 2002. The "conduct, action, behavior, concealment and silence" included replacing the directors and officers of TI and the Debtors; approval of Teleglobe's 2001 budget for the GlobeSystem buildout in 2002 and 2003 and of funding requests needed to complete that buildout; the passage of the Schedule of Authorities, which directly granted the Debtors' executives the authority to spend money if it was in the budget. Plaintiffs were injured by reliance to their detriment on BCE's repeated representations of continued funding and actions and omissions portending continued funding. In the alternative, if Quebec law applies, Plaintiffs will show that all of these continuous statements, conduct, action, behavior, concealment and silence, which led Debtors to reasonably believe funding would continue, followed by BCE's sudden decision to withdraw funding without sufficient time and resources to maximize value, amounted to an abuse of rights.

2

C. TI and the Debtors were insolvent from no later than December 31, 2000. This insolvency gave rise to fiduciary duties to creditors of the Plaintiffs. Defendants did not consider the interests of creditors.

D. BCE owed fiduciary duties to the Plaintiffs and their creditors, by virtue of the insolvency of TI and the Plaintiffs, and BCE's exercise of control over the same. BCE breached its fiduciary duties to the Plaintiffs and their creditors, as follows:

1. BCE failed to take appropriate steps to preserve the value of the Plaintiffs (and the Teleglobe enterprise) as at the time at which TI and the Plaintiffs entered the zone of insolvency, or thereafter. Instead, BCE promoted its own self interest by continuing to pursue the GlobeSystem buildout, instead of devoting the remainder of BCE's admittedly committed funding to focus on the stable voice business and repay creditors. In short, BCE sought to preserve the option to use Teleglobe as its own international data division well beyond the time TI and the Debtors were insolvent, at the expense of the Debtors and their creditors.

2. BCE misled the Plaintiffs and their creditors, at times when TI and the Plaintiffs were insolvent, by representing that it was committed to fund capital expenditure and operating cash flow deficits for TI and the Plaintiffs in the years 2002, 2003 and 2004, even if an equity partner could not be found, when in fact BCE claims it was not so committed. BCE sought to have it both ways -- it sought to generate the appearance that it was committed to fund the enterprise, but to avoid the legal obligation. BCE crossed the line -- and the Plaintiffs and their creditors would have pursued a difference course as at June 30, 2001 had BCE's true intentions been made known.

3. BCE preferred its own interests at the expense of the Plaintiffs and their creditors, at times when TI and the Plaintiffs were insolvent or in the zone of insolvency, by

3

withdrawing the remainder of the funding (totaling approximately $625 million) that had been committed to TI and its subsidiaries by the BCE board in its resolution of November 28, 2001.

    4. BCE forced TI and the Plaintiffs into a liquidating bankruptcy, in which the Plaintiffs' businesses and assets were broken up and abandoned or sold for pennies on the dollar, by limiting its funding for TI and the Plaintiffs to $100 million (plus $25 million for severance payments). In effect, by withdrawing and capping TI's (and the Plaintiffs') previously authorized and committed funding, BCE foreclosed any and all potential restructuring or private sale alternatives for TI and the Plaintiffs, while favoring its own interests.

    5. BCE favored its own interests by withdrawing more than $625 million in previously authorized and committed funding from Teleglobe, Inc. and its subsidiaries, and by structuring a scenario that allowed BCE to reap in excess of $1 billion in tax refunds, credits and deductions, all at the expense of the Plaintiffs and their creditors, which were left with value totaling approximately $200 million, as against liabilities in excess of $2.5 billion.

    E. The individual defendants owed fiduciary duties to the Plaintiffs and their creditors, by virtue of their positions as officers and directors of the Debtors, or in the case of the TI directors (Monty, Kierans, and Currie), by virtue of their exercise of control over the Plaintiffs. The individual defendants further aided and abetted breaches of fiduciary duties by BCE, and by Defendant Monty. Specifically:

    1. Defendant Monty preferred the interests of BCE over those of the Plaintiffs and their creditors, by (among other things) recommending and participating in the withdrawal and capping of funding for TI and the Plaintiffs; failing to take steps to preserve the value of the Plaintiffs, as specified in A.1 above; failing to properly document (or to ensure the proper documentation of) the commitments of BCE to provide funding for the Plaintiffs, while

permitting the Plaintiffs to continue to incur debt and to fall deeper into insolvency; failing to inform TI, all of the directors of TI, the Plaintiffs and their creditors, and the consultants for TI and the Plaintiffs of the funding authority granted to him by the BCE board on November 28, 2001; and by misleading his fellow directors, and by failing to present properly the alternatives available to TI and the Plaintiffs had such been provided with the full funding authorized by the BCE board on November 28, 2001. Monty also abdicated his fiduciary responsibilities to the Plaintiffs and their creditors, failed to inform himself of reasonable business alternatives and alternate business plans for TI and the Plaintiffs, and otherwise breached his fiduciary duties.

2. Defendants Currie and Kierans preferred the interests of BCE over those of the Plaintiffs and their creditors in the same way Monty did, as specified in paragraph B1, above. Currie and Kierans also failed to inquire appropriately into restructuring alternatives available to Teleglobe, Inc. and its subsidiaries at the time the BCE board voted to withdraw and cap the funding for Teleglobe, Inc. and the Plaintiffs, as described above. Currie and Kierans further voted for the BCE resolution on April 23, 2002 that withdraw the previously authorized BCE funding for TI and the Plaintiffs (totaling some $625 million), and capped any additional funding at $100 million (plus $25 million for severance) at a time when they also served on the TI board of directors, and owed fiduciary duties to TI, the Plaintiffs and all of their creditors in that capacity.

3. Defendants Steinberg, Jarman, Verge, Fortin, and Bouchard abdicated their fiduciary responsibilities to the Plaintiffs and their creditors, thereby preferring the interests of BCE and breaching their duties of loyalty, good faith and care owed to the Plaintiffs and their creditors. Among other things, these defendants were supine in the face of BCE's failure to document its funding commitment to TI and the Plaintiffs. They did nothing to document the

committed financing needed for TI and the Plaintiffs to pursue the business plans they, TI and BCE approved.

    4. Defendants Boychuk and Skinner were both officers of BCE and officers and directors of various of the Debtors. Notwithstanding their undivided duty of loyalty to the Plaintiffs, however, Boychuk and Skinner preferred the interests of BCE over the interests of the Debtors at all critical junctures and thus breached their fiduciary duties. Among other things, Skinner was directly involved in BCE's futile attempt to cover up the fact of its commitment by rescinding and renegotiating representation letters sent to Teleglobe's auditors. Likewise, Boychuk made statements to, among others, Teleglobe's bank group relating to the funding of TI and the Debtors by BCE upon which they relied, and which he knew at the time or should have known were not accurate, and would be relied upon the banks. Boychuk also signed solvency certificates to permit certain transactions favorable to BCE which were either knowingly false, or, in the alternative were evidence of a funding commitment which Boychuk later attempted to disavow.

    F. Plaintiffs were injured by the aforementioned conduct in the amount set forth in the expert report of Paul Charnetzki as to which Mr. Charnetski will testify at trial.

# APPENDIX 6B

**APPENDIX 6B**

# DEFENDANTS' STATEMENT OF THEIR ANTICIPATED PROOFS [DEL. L.R.16.4(D)(8)]

Defendants anticipate proving at trial:

### Overview

1. BCE has long been considered Canada's premier public company and a leading telecommunications provider. In November 1, 2000, BCE completed its purchase of Teleglobe Inc., another Quebec based company, as a core and strategic asset. The Debtors were indirect, wholly-owned subsidiaries of Teleglobe Inc. They are shell companies and have no current operations. Their sole function today is to prosecute this law suit.

2. BCE paid approximately $4.4 billion in 2000 to purchase approximately 77% of Teleglobe Inc it did not already own. While in hindsight the purchase proved to be an unwise one, the telecommunications world at the time was highly optimistic as to the growth opportunities in the sector in light of development of the Internet and the projected exponential growth in bandwidth necessary to transmit data over networks such as the GlobeSystem network that Teleglobe Inc. was seeking to build internationally.

3. Having paid $4.4 billion, and $5.3 billion in total to acquire Teleglobe, BCE's overriding and continuous objective was to make Teleglobe Inc. grow and prosper. Defendants will show at trial that Defendants' actions with respect to the Debtors were taken in good faith in order to make Teleglobe Inc. and its subsidiaries, including the Debtors, a success, which would inure to the benefit of all stakeholders, including employees, customers, and creditors. In addition to the initial $5.3 billion, BCE advanced funds to Teleglobe Inc. of approximately $1.3 billion. From the summer of 2001 through April 23, 2002, Teleglobe Inc. did not receive

financing from any source other than BCE. The bondholders' debt pre-dated BCE's acquisition of Teleglobe Inc., as did the initial bank credit facilities. Yet, during June 2001 – April 2002, BCE injected $1.16 billion into Teleglobe Inc. to fund operating expenses and to make payments to those pre-existing creditors. BCE did not take any money or assets out of Teleglobe Inc. or the Debtors. BCE decided to cease long term funding of Teleglobe Inc. on April 23, 2002 when it reasonably determined, in good faith and after an exhaustive review of the facts and alternatives that the business plan of Teleglobe Inc. upon which BCE had premised its investment was no longer viable and continued funding would be futile and wasteful.

4. The actions of BCE, Teleglobe Inc. and Debtors in connection with the development and build-out of the GlobeSystem were in line with industry conditions and practices, as was the eventual failure of Teleglobe Inc. and the GlobeSystem business. Teleglobe Inc.'s and the Debtors' course of action in the restructuring process was adopted by them after a thorough consideration of available alternatives, with the advice of independent financial and restructuring advisers and independent legal counsel. This course of action was ultimately approved by the Debtors, by Plaintiffs' creditors in the bankruptcy proceedings in Delaware and the CCAA proceedings involving Teleglobe Inc. in Canada, as well as by the two courts presiding over those proceedings.

5. The proof at trial will show that Plaintiffs' fundamental theories of the case are devoid of logic and business reality. The Debtors and their creditors were not misled, were not injured, and suffered no conceivable damages by BCE's decision to provide Teleglobe with over a billion dollars in funding to make it grow and prosper, without taking out any money in return. The flow of money in this case was entirely one way. The proof at trial will show no dividend to BCE, no diverted asset, no interested party transaction, no benefit derived at the expense of any

other corporate constituency. The notion that Debtors suffered proximately caused injury and damages by virtue of <u>receiving</u> vast amounts of money from BCE makes no sense factually or logically and certainly is a theory never before accepted by a court in the United States or Canada.[1]

### Contract Claims

6. The proof will show that the Plaintiffs' contract theories are purely creatures of litigation. In 2000, and then in 2001, BCE in fact entered into two signed writings in favor of the Teleglobe lending syndicate to fund Teleglobe Inc.'s operations in the combined amount of $1 billion and met (in fact far exceeded) those actual obligations. Beyond those signed writings, there were no contracts or enforceable undertakings in favor of anyone. Plaintiffs try to conjure up or infer enforceable agreements by pointing to board resolutions that, as the Court will see, plainly are taken out of context, do not represent binding obligations, and were understood as such by all contemporaneous parties.

7. Thus, prior to this litigation, no representative of the Debtors ever asserted that there was a contract or legal obligation. Numerous representatives of Debtors reviewed and approved drafts of public securities filings of Teleglobe Inc. and BCE that repeatedly stated that there was no such obligation. Plaintiff's claim that such a contract existed between BCE and the Debtors (or between BCE and Teleglobe Inc., of which the Debtors were allegedly third-party beneficiaries) is not supported by the testimony of even one witness with knowledge or by any writings by which such a material contract would have been documented.

---

[1] It appears that the "benefit" to be relied upon by Plaintiffs is that BCE (like every other investor) took a tax write-off, from its substantial losses in Teleglobe.

8. At BCE, like at every other public company, a parent's decisions to fund the business operations of its wholly owned subsidiaries are not contractual obligations. Subsidiaries, including Teleglobe Inc. and the Debtors, created budgets and business plans and BCE determined at various board meetings to authorize funding in support of those plans. As the proof will show, those funding decisions were not in form or substance contractual undertakings and BCE (again like every other public company) could cease or modify its funding of its subsidiaries' operations as their business plans changed or became non-viable. The proof will show that is exactly what happened here.

9. The Court will see that the "contracts" conjured up by the Debtors' lack all the formalities and terms that are required of real contracts, particularly of contracts for hundreds of millions of dollars. Virtually all key terms and conditions are absent. The statute of frauds was not complied with, and there exists nothing that would confer third party beneficiary status on the Debtors. And to the extent that the Court were to look to parole evidence, every contemporaneous participant will testify that there was no contract or legally enforceable undertaking on the part of BCE and the public disclosures of both BCE and Teleglobe Inc. uniformly and repeatedly disclaim the existence of any such contract or binding obligation.

### Tort Claims: Misrepresentation and Estoppel

10. BCE always accurately and truthfully stated its intentions with regard to its support of Teleglobe Inc. Teleglobe Inc. was in fact a core and strategic asset for BCE, which is why BCE invested in and then funded Teleglobe for more than $6.6 billion. BCE's statements of intention and of current support for Teleglobe Inc. could not reasonably have been construed as meaning that BCE would continue to invest in Teleglobe Inc. regardless of its performance and

prospects. None of the Debtors were ever misled by BCE's statements or relied on them to the Debtors' detriment.

11. The Plaintiffs' tort theory involves little more than word play on the various possible means of the word "commit." On certain occasions, BCE or Teleglobe Inc. publicly stated that they were "committed" to Teleglobe or to courses of conduct regarding Teleglobe. The proof will show that this meant, and was understood by all to mean, that BCE intended to support and was committed to pursuing Teleglobe's strategy and business plan so long as it remained feasible and viable. True to its word, during that period when Teleglobe Inc.'s business plan was viable, BCE contributed over $1.3 billion dollars to it and actively considered various strategic options to grow the business, including mergers and joint ventures. When collapsing prices and external conditions undermined Teleglobe Inc.'s business plan, only then, as of April 2002, did BCE decide that further long term funding was wasteful and cease its contributions, as it had every right to do.

12. The proof will show that that the market was aware that BCE's funding of Teleglobe Inc. was always contingent on the latter having a viable business plan and becoming self sufficient within a reasonable time horizon (essentially by 2003). For example in 2002, Moody's downgraded Teleglobe Inc.'s public debt (all of which was issued before BCE acquired Teleglobe Inc.) precisely because it recognized that BCE's continued funding of Teleglobe Inc.'s operations was in doubt as the latter's business plan fell prey to fast deteriorating market conditions.

13. Similarly the banks (which rolled over their annual 2000 borrowings in June 2001) knew that BCE had an unwavering practice of not guaranteeing the debts of its

subsidiaries and affiliates. In this case, the banks received in writing a support letter from BCE that it would fund Teleglobe Inc.'s operations in the total amount of up to $1 billion. BCE met and then exceeded that written undertaking by $300 million. Beyond that, clearly the banks knew (and the comprehensive loan documents show on their face) that they were not receiving an enforceable guarantee from BCE.

### Fiduciary Duty Claims

14. Both BCE and Teleglobe Inc. are Canadian companies and their officers and directors acted entirely consistently under Canadian law. There was no divergence of interest, let alone a conflict, between the interests of the parent (BCE) and its wholly owned subsidiary (Teleglobe Inc.), including its indirect wholly owned subsidiaries (the Debtors), until arguably April 23, 2002, when BCE determined that financing Teleglobe Inc.'s business plan was wasteful and no longer justifiable. Up until that point, everyone acted with the common goal of growing Teleglobe Inc.'s operations and making its business plan succeed. Ultimately, however, there is no fiduciary obligation to waste money under Canadian law (or Delaware law either).

15. Even though Plaintiffs will not be able to show that BCE and most of the individual Defendants were ever fiduciaries of the Debtors, all of the Defendants in fact acted appropriately and with fairness toward all of the Debtors' stakeholders. Defendants Jarman, Bouchard, Fortin, and Verge (who were directors and officers of certain Debtors) worked hard to make the Debtors a success, and informed themselves and considered different business alternatives as the market changed over time. Defendants Monty, Currie, Kierans, and Steinberg (who were members of the Board of Directors of Teleglobe Inc.) adequately informed themselves and acted in the best interest of Teleglobe Inc. These individual Defendants did not seek a contractual commitment from BCE for continued funding of GlobeSystem because there

was no need to do so and, in any event, it would have been futile to try. And as expert testimony will show, it is entirely normal for companies to commence and continue large capital projects without having contractually committed financing in place for the entire project in advance. Conversely, it is neither normal nor customary practice for a parent to enter into a contract with a wholly-owned subsidiary to provide financing for the subsidiary's operations.

16. Mr. Monty, the Chairman and CEO of BCE and Teleglobe Inc. acted appropriately and did not breach any fiduciary duties owed to Teleglobe Inc. or the Debtors. Mr. Monty was a strong supporter of Teleglobe Inc. and BCE's investment in it. For Mr. Monty, his career turned on making Teleglobe Inc. a success. It was only in April 2002, when it became apparent that Teleglobe Inc.'s business plan was no longer viable, that Mr. Monty reached the conclusion that further investment by BCE in Teleglobe Inc. could not be justified.

17. In April 2002, the decision to cease funding of Teleglobe Inc.'s business plan was based upon extensive analysis, performed both by in-house and external advisors and experts. The analyses were conclusive and consistent: with market conditions collapsing and all of Teleglobe Inc.'s competitors cleansing their balance sheet through bankruptcies or restructurings, Teleglobe Inc.'s business plan could not succeed. On April 23, BCE and its representatives withdrew from their activities with Teleglobe Inc., leaving Teleglobe Inc., the Debtors, and their experienced advisors to make all fundamental decisions and control the bankruptcy proceedings subsequently filed in May 2002.

### The Charnetzki Hindsight Insolvency Theory

18. The Defendants' actions benefited all constituencies and did not cause the Debtors any harm. Plaintiffs will argue through an expert, Paul Charnetzki, that BCE should

have discontinued further investment in the GlobeSystem in June 2001 and "preserved the value" of the voice business for creditors. The Court will see that this is a hindsight theory created for litigation only, inconsistent with the views of all persons at the time. It is also based on an absurdly inflated hypothetical and speculative paper valuation of the voice business as of that date. Plaintiffs' theory is completely divorced from reality. Plaintiffs ask this Court to hold that as of June 2001 it was legally improper for BCE and the other Defendants to continue to try to make Teleglobe Inc. a success, and to invest another $800 million of its own money – and no one else's – in that effort. Instead, according to Plaintiffs, this Court should find that BCE and the Defendants were required to give up, to abandon BCE's multibillion-dollar investment in Teleglobe Inc. and "preserve" for creditors the "value" of a shrunken down voice business that would have paid creditors only a small fraction of their claims. The facts as well as common sense will repudiate this theory.

19.     The Court will see that the Charnetzki's insolvency theory is also devoid of financial or economic substance. BCE continued to invest in Teleglobe Inc. for 10 months after June 2001 and all of Teleglobe Inc.'s obligations were met. As the Court will hear at trial, if parents had to abandon their investments and subsidiaries based on Charnetzki's insolvency theory, then many of our economy's innovations would never have a chance to occur.

20.     Finally, the Court will learn that Charnetzki's damages model (for which he has been paid the truly incredible sum of over $2 million) is based on his subjective valuation of Teleglobe Inc. as of June 2001 which: (a) is speculative and fails the substantial certainty test; (b) is wildly excessive compared to every contemporaneous valuation prepared in 2001 for non-litigation purposes and (c) intentionally picks and chooses among variables and inputs so as to produce a grossly inflated outcome.

### The Hindsight Challenge to the CCAA and Delaware Bankruptcy

21. The proof at trial will show that Plaintiffs' claims with regard to ultimate sale of the voice business following the Debtor's bankruptcy filings are similarly hindsight litigations theories. The Plaintiffs claim that in 2002 the Debtors should have done a "standalone restructuring" around the voice business rather than a "fire sale" of the voice business because this supposedly would have preserved more value for the creditors. The proof at trial will demonstrate that the Canadian Court-appointed Monitor and the Debtors, not the Defendants, controlled the bankruptcy proceedings, and that Plaintiffs' current position is completely contrary to what the Debtors and Monitor told the CCAA and Bankruptcy Court under oath at the time. In 2002, when the Debtors, with the input and approval of their creditors and the same lawyers appearing in this litigation, made the decision to sell the voice business, they advised the Bankruptcy and CCAA Courts that the price achieved in the sale was "fair market value," that the value of the voice business would not appreciate in a protracted restructuring, and that the sale was the best alternative for creditors. On the basis of those representations, the Bankruptcy and CCAA Courts approved the sale. As a matter of law (estoppel) and fact, Plaintiffs cannot now take the contrary position.

22. The bankruptcy proceedings were handled by the Canadian Court-appointed Monitor, the Debtors, and their experts, not the Defendants. The sales process for Teleglobe Inc.'s core business was carried out professionally and responsibly.

23. BCE contributed positively to the bankruptcy by offering Debtor In Possession financing (of $100 million and severance payments of $25 million), when no other lender would do so. At the time, the Debtors and Canadian Court-appointed Monitor praised BCE and its DIP financing. No one complained that the financing interfered with the bankruptcy proceeding in

any way. And indeed the entirety of the money offered by BCE was never even fully utilized by Teleglobe Inc. or the Debtors during the bankruptcy proceedings.

24. Charnetzki's damages calculation as of May 2002: (a) is speculative, (b) fails the substantial certainty test, (c) is again grossly inconsistent with all contemporaneous non-litigation inspired valuations and (d) is barred by judicial and collateral estoppel.

**Spoliation**

25. Plaintiffs' testifying experts met and prepared their reports in a group and then wholesale destroyed their drafts and notes, despite a written agreement between the parties to produce such drafts and notes.

26. As a matter of law, these expert testimonies are not now admissible. As a matter of fact, they should be ignored due to spoliation of relevant evidence required by the Federal Rules.