IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: TELEGLOBE COMMUNICATIONS CORPORATION *et al.*, | : | Chapter 11<br>Jointly Administered |
| Debtors. | : | Bankr. Case No. 02-11518 (MFW) |
| | : | |
| TELEGLOBE USA INC. *et al.*, | : | Civ. Action No. 04-1266 (SLR) |
| Plaintiffs, | : | |
| v. | : | |
| BCE INC. *et al.*, | : | |
| Defendants. | : | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY MOTION FOR A STAY PENDING APPEAL

Pursuant to the Rules of this Court and Rule 8(a)(1)(A) of the Federal Rules of Appellate Procedure, defendant-appellant BCE Inc. and the individual defendants-appellants respectfully submit this motion for a stay pending appeal.[1]

---

[1] The individual defendants-appellants are directors and officers of BCE Inc. or subsidiary corporations wholly owned by BCE Inc., namely: Michael T. Boychuk, Marc A. Bouchard, Serge Fortin, Terence J. Jarman, Stewart Verge, Jean C. Monty, Richard J. Currie, Thomas Kierans, Stephen P. Skinner, and H. Arnold Steinberg. The individual defendants-appellants joined in the notice of appeal.

Because this motion seeks a stay of an order to produce privileged documents pending appeal, and because the privilege at issue belongs to BCE, we believe that the proper appellant is BCE. This Court's production order, however, is directed at all of the defendants. *See* Order of June 2, 2006 [D.I. 280], slip op. at 1, 4. Accordingly, the individual defendants-appellants join BCE Inc. in this stay motion.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

JURISDICTION ..................................................................................................... 4

NATURE AND STAGE OF PROCEEDING AND SUMMARY OF RELIEF SOUGHT .......... 6

STATEMENT OF FACTS ......................................................................................... 7

     A.    The Privilege Dispute .................................................................... 7

     B.    The Order ...................................................................................... 9

SUMMARY OF ARGUMENT ................................................................................. 10

ARGUMENT ....................................................................................................... 11

I.     THIS APPEAL PRESENTS SIGNIFICANT LEGAL ISSUES ON WHICH BCE IS
     LIKELY TO SUCCEED ON THE MERITS ................................................... 11

     A.    Even If Teleglobe Would Be Entitled to the Privileged Documents under the
          Joint-Client Exception, It Cannot Consent to Their Disclosure to a Third
          Party without the Consent of BCE ...................................................... 12

          1.    The Plan Administrator Did Not Have the Legal Authority to Waive
                the Attorney-Client Privilege on Behalf of Teleglobe .............................. 12

          2.    The Joint-Client Exception Prevents One Client from Disclosing
                Jointly Privileged Communications to Third Parties Without the
                Consent of Its Co-Client ............................................................. 13

          3.    BCE Did Not Agree to Disclose the Privileged Documents to
                Plaintiffs .................................................................................. 15

     B.    Even if Plaintiffs Were Entitled to All BCE-Teleglobe Joint-Privilege
          Materials, They Would Not Be Entitled to Privileged Materials and Work
          Product from BCE's Outside Counsel Merely Because Those Documents
          Passed through In-House Counsel ...................................................... 16

II.    BCE WILL SUFFER IRREPARABLE INJURY ABSENT A STAY OF THE
     COURT'S PRODUCTION ORDER BECAUSE PRODUCTION WILL REMOVE
     THE PRIVILEGE ............................................................................... 18

III.   PLAINTIFFS WILL SUFFER NO HARDSHIP FROM AN INTERLOCUTORY
     APPEAL ........................................................................................ 18

IV.   THE PUBLIC INTEREST WILL BE SERVED BY STAYING THE DISTRICT
     COURT'S PRODUCTION ORDER AND PRESERVING THE *STATUS QUO* .......... 19

CONCLUSION................................................................................................................................ 20

## TABLE OF AUTHORITIES

### FEDERAL CASES

*In re Asia Global Crossing, Ltd.*, 322 B.R. 247 (Bankr. S.D.N.Y. 2005) ........................14

*Bacher v. Allstate Insurance Co.*, 211 F.3d 52 (3d Cir. 2000) .............................5

*Bogosian*, 738 F.2d at 591 .................................................................................17

*Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541 (1949) ...................................4, 5

*Digital Equip.*, 511 U.S. at 884, 114 S. Ct. at 2004...........................................................18

*Eureka Investment Corp., N.V. v, Chicago Title Insurance Co.*, 743 F.2d 932
    (D.C. Cir. 1984) ...............................................................................................3, 16

*In re Ford Motor Co.*, 110 F.3d 954 (3d Cir. 1997) ......................................1, 4, 5, 6, 17, 18

*Hilton [v. Braunskill*, 481 U.S. 770 (1987)] .....................................................................11

*Holland v. Island Creek Corp.*, 885 F. Supp. 4 (D.D.C. 1995) ..........................................14

*In re Imperial Corp. of America*, 179 F.R.D. 286 (S.D. Cal. 1998) ...................................14

*Interfaith Housing Delaware, Inc. v. Town of Georgetown*, 841 F. Supp. 1393 (D.
    Del. 1994) .........................................................................................................13

*In re Keeper of the Records*, 348 F.3d 16 (1st Cir. 2003).................................................16

*Lugosch v. Congel*, 219 F.R.D. 220 (N.D.N.Y. 2003)........................................................14

*Madison Management Group, Inc. v. Zell*, 212 B.R. 894 (N.D. Ill. 1997)........................14

*Montgomery County v. Microvote Corp.*, 175 F.3d 296 (3d Cir. 1999) .............................5

*Republic of the Philippines v. Westinghouse Electric Corp.*, 949 F.2d 653 (3d Cir.
    1991) ...............................................................................................................10

*South Camden Citizens in Action v. New Jersey Department of Environmental
    Protection*, No. 01-2224, 2001 WL. 34131402 (3d Cir. June 15, 2001) ....................11

*United States v. Philip Morris Inc.*, 314 F.3d 612 (D.C. Cir. 2003)....................4, 6, 15, 18

*Upjohn Co. v. United States*, 449 U.S. 383, 101 S. Ct. 677, 66 L. Ed. 2d 584
(1981) ................................................................................................................5, 18

*Westinghouse*, 951 F.2d at 1423 ...................................................................................17

## MISCELLANEOUS

*Recent Case,* 108 Harv. L. Rev. 775, 779 n. 39 (1995) ....................................................18

06 Tr. 6:5-8:2 ................................................................................................................15

06 Tr. 21:19-22:8 ..........................................................................................................10

06 Tr. 22:3-12 ...............................................................................................................10

Civ. Action No. 04-1266 (SLR)........................................................................................1

Federal Rule of Appellate Procedure 8(a) ..................................................................10, 11

Federal Rule of Civil Procedure 53 ..............................................................................6, 10

*In the Matter of the Bankruptcy of Laprairie Shopping Center Ltd. v. Samson
Bélair-Deloitte & Touche, Inc.* [1998] R.J.Q. 448 (Québec App. Ct. Feb. 12,
1998) ..........................................................................................................................12

9 Moore's Federal Practice § 53.53[5][b] (3d ed. 2005) ...................................................10

Restatement (Second) of Conflicts of Laws § 263 cmt. b (1988)......................................12

Restatement (Third) of the Law Governing Lawyers § 75 cmt. e (1998)...........................13

## PRELIMINARY STATEMENT

Last Friday afternoon, June 2, 2006, this Court affirmed the decision of a special master and ordered what it described as the "wholesale production" of approximately 900 of "defendants' privileged documents" by this coming Wednesday, June 7, 2006. Order of June 2, 2006 (the "Order"), [D.I. 280], slip op. at 4. On Monday, June 5, 2006, defendant-appellant BCE Inc. and the individual defendants-appellants (collectively, "BCE") filed a notice of appeal from the Order. BCE now moves this Court for a stay to preserve the *status quo* pending review by the United States Court of Appeals for the Third Circuit as provided in *In re Ford Motor Co.*, 110 F.3d 954 (3d Cir. 1997).

The Order is without precedent. BCE Inc. is one of Canada's most respected public companies. BCE Inc. had a wholly owned subsidiary, Teleglobe Inc. ("Teleglobe"). The plaintiffs who seek BCE's privileged materials are Teleglobe's former wholly owned subsidiaries.[2] As is customary practice with parent companies and their subsidiaries, BCE's centralized in-house lawyers, including its chief legal officer, provided legal advice to BCE and its various subsidiaries, including Teleglobe, in areas such as mergers and acquisitions, securities regulation, corporate governance, and large-scale financings – areas where the parent's legal department had special expertise and where there existed the need for uniform practice throughout the company.

The Court's six-page Order concluded that BCE's in-house lawyers had jointly represented BCE and its subsidiary Teleglobe on issues relating to BCE's decision to cease funding Teleglobe. Having so concluded, the Court went on to find that BCE, the parent

---

[2] On May 28, 2002, after BCE ceased long-term funding of Teleglobe, Teleglobe and its subsidiaries filed for reorganization in Toronto under the Canadian Companies' Creditors Arrangement Act and in Delaware under Chapter 11 of the U.S. Bankruptcy Code. *See infra* p. 7. This litigation is between BCE and Teleglobe's former subsidiaries, not Teleglobe.

1

company, thereby lost its attorney-client privilege and work product immunity, including privileges otherwise owned by its board and senior management, in the subsequent litigation between BCE and Teleglobe's subsidiaries. That is true, the Court concluded, even with respect to legal advice provided by outside counsel who had been hired exclusively by BCE, who provided advice intended only for BCE, and whose advice and work product never were shared with Teleglobe. Recognizing its result as "harsh," the Court's Order nonetheless effectively required either the isolation and sequestration of in-house counsel or the forfeiture of the parent's privilege.

In two fundamental respects, BCE respectfully submits that the Court's Order is in error. *First*, when two clients (BCE and Teleglobe) retain the same lawyer, the joint-client privilege generally permits each client to use communications between the clients and their joint lawyer in a subsequent litigation between the two. But that is not this case. In this case, the Court extended that access beyond the two joint clients to third parties – *i.e.*, the plaintiffs – who were wholly owned corporate subsidiaries of Teleglobe, and were concededly *not* one of the joint clients. *See* Order, slip op. at 4-5. That is not the law. Moreover, the Court declined to reach that issue by concluding that purported concessions BCE had made earlier to settle discovery disputes should be carried forward in the nature of an implied waiver as to these documents also, even though they have always been very much in dispute.

*Second*, the Court's order required BCE to turn over to plaintiffs plainly privileged documents prepared by BCE's outside law firms that the Court admitted "offered advice *exclusively for BCE's benefit*." Order, slip op. at 5 (emphasis added). The Court accepted the special master's explanation that privileged communications intended exclusively for BCE must be produced to plaintiffs "because the communications were shared with BCE's in-house counsel

2

who jointly represented Teleglobe." *Id*. The involvement of in-house counsel thus contaminated the parents' privilege.

This is a wholly unrealistic view of the interrelationship between a parent and its wholly owned subsidiary. The fact that in-house counsel represented both is commonplace and did not deprive BCE of its privilege with respect to outside lawyers who rendered advice "exclusively for BCE's benefit." *See Eureka Inv. Corp., v. Chicago Title Ins. Co.*, 743 F.2d 932, 937-38 (D.C. Cir. 1984). Professor Stephen Gillers of New York University Law School, perhaps the Nation's leading authority on professional responsibility law, concluded: "[E]ven if a conflict between the duty of confidentiality [to BCE alone] and the duty to inform [with respect to both clients] was created when the [in-house] lawyers . . . received the BCE documents (and I assume hypothetically for purposes of this opinion that it did), still neither conflict would provide a basis for denying BCE the confidentiality and privilege protections that the law and professional conduct rules otherwise afford." Declaration of Professor Stephen Gillers ¶ 11 (Mar. 20, 2006) ("Gillers Decl."). Neither the special master nor plaintiffs answered this affidavit or offered any contrary authority.

If allowed to stand, the Court's order would require in-house legal counsel of parent companies to cease providing legal advice to wholly owned subsidiaries for fear of later forfeiture of the parent's privilege. It would require top management of public companies to erect ethical walls around their own in-house counsel and retain outside lawyers whenever they want legal advice that will be privileged from subsidiary corporations that may later become antagonistic after they are sold, spun-off, or become insolvent. Such an arrangement is not simply "harsh." Order, slip op. at 6. It is also wholly infeasible in the practical world in which public companies own multiple subsidiaries. In practice, it would cripple corporations' ability to

3

retain, manage, and coordinate legal advice, for all of those functions are performed by their in-house counsel. Moreover, by crippling centralized legal compliance, the district court's order would impair the reporting-up functions and runs counter to the modern view of the role of internal counsel as exemplified by the Sarbanes-Oxley Act.

An emergency stay in this appeal follows from the Third Circuit's decision in *In re Ford Motor Co.*, 110 F.3d 954 (3d Cir. 1997). In *Ford*, the Third Circuit held that appellate jurisdiction exists to review orders overruling privilege claims under the collateral order doctrine of *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949). *See* 110 F.3d at 956, 957-65. In *Ford*, the court "granted a motion for a stay" of a district court's order requiring the production of meeting agendas and minutes asserted to be protected by the attorney-client privilege and work-product immunity (*id.* at 957) and, on the merits, held that the meeting agenda and minutes were protected by the attorney-client privilege and work-product immunity (*see id.* at 957-68). The Third Circuit has consistently followed its decision in *Ford*. In addition, the United States Court of Appeals for the District of Columbia Circuit "agree[d]" with the Third Circuit's decision in *Ford* that "collateral order review is…available to challenge an attorney-client privilege ruling" and likewise granted an emergency stay pending appeal of the production order in that case. *United States v. Philip Morris Inc.*, 314 F.3d 612, 618 (D.C. Cir. 2003); *see id.* at 621-22 (granting stay). If emergency stays should issue to permit appellate review of a *claim* that documents are privileged, as in *Ford* and *Philip Morris*, it follows *a fortiori* that an emergency stay should issue to permit appellate review of an order requiring the "wholesale production" of indisputably privileged documents, which is the issue here. Order, slip op. at 4.

## JURISDICTION

The Third Circuit has appellate jurisdiction of this appeal under the collateral order doctrine of *Cohen*, 337 U.S. 541. *See Ford*, 110 F.3d at 957-68 (analyzing the *Cohen* factors). In

4

*Ford*, the Third Circuit "conclude[d] that, because the district court's order [requiring production of meeting agendas and minutes asserted to be protected by the attorney-client privilege and work-product immunity] finally resolved an important issue separate from the merits that would be effectively unreviewable after final judgment, we have appellate jurisdiction under the collateral order doctrine." *Id.* at 956.

Although other Circuits sometimes require parties to suffer a contempt citation before prosecuting an appeal, the Third Circuit has consistently followed *Ford* and has held that *Ford* establishes a "bright-line rule" that orders requiring the production of documents subject to a claim of privilege are reviewable on appeal under the collateral order doctrine. *Montgomery County v. Microvote Corp.*, 175 F.3d 296, 300 (3d Cir. 1999); *see Bacher v. Allstate Ins. Co.*, 211 F.3d 52, 56 (3d Cir. 2000) ("the collateral order doctrine should apply to broad categories of interlocutory orders, without concern for the individual circumstances of particular cases").

The D.C. Circuit recently joined the Third Circuit in holding that "collateral order review is also available to challenge an attorney-client privilege ruling":

> In *Ford*, the Third Circuit addressed the issue before this court today and held that collateral order review is also available to challenge an attorney-client privilege ruling. 110 F.3d at 957–64. The *Ford* court analogized to Supreme Court precedent and held that the attorney-client privilege was the type of "institutionally significant status or relationship" that justifies collateral order review. *Id.* at 960. We agree . . . .
>
> The attorney-client privilege rests at the center of our adversary system and promotes "broader public interests in the observance of law and administration of justice" and "encourage[s] full and frank communication between attorneys and their clients." *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). The privilege promotes sound legal advocacy by ensuring that the counselor knows all the information necessary to represent his client. *Id.* Only by ensuring that privileged information is never disclosed will these important interests be advanced. *Ford*, 110 F.3d at 962. Even though enforcement of the privilege often results in the suppression of probative evidence, our jurisprudence has determined that its value outweighs these costs. Similarly, we today conclude that the institutional benefits of allowing interlocutory review of attorney-client privilege claims outweigh the costs of delay and piecemeal review that may result.

*Philip Morris*, 314 F.3d at 618.

## NATURE AND STAGE OF PROCEEDING AND SUMMARY OF RELIEF SOUGHT

On February 11, 2005, plaintiffs filed a motion to compel production of documents withheld by BCE on the basis of attorney-client privilege and work-product immunity. The discovery dispute was later referred to a special master. [D.I. 157, 160.] On February 22, 2006, the special master issued a final decision requiring BCE to produce all of the documents logged as privileged between November 1, 2001 and April 23, 2002.

On March 4, 2006, BCE timely objected to the special master's decision. After full briefing and oral argument, on June 2, 2006, the Court entered the Order [D.I. 280] affirming the special master's decision and ordering defendants to produce the privileged documents by June 7, 2006. *See* Order, slip op. at 1, 4.

On Friday, June 2, 2006, BCE informed the Court that it intended "to take an immediate appeal of the Court's decision, under the authority set forth in *In re Ford Motor Co.*, 110 F.3d 954 (3d Cir. 1997)," and "respectfully request[ed] an in-person conference, at the Court's earliest convenience, and as early as June 5 or June 6, 2006 if possible, so that the parties may discuss important scheduling issues relating to the appeal, as well as a stay pending appeal." E-mail message from Pauline Morgan to the Honorable Sue L. Robinson (June 2, 2006).

On June 6, 2006, at 2:00 p.m., the Court conducted a telephone conference in response to BCE's request. As instructed by the Court, BCE files this emergency motion for a stay of the Order pending appeal to the Third Circuit. As stated at the telephone conference, BCE does not request a stay or continuance of the trial, which is scheduled to begin on June 19, 2006.[3]

---

[3] Following the telephonic conference, defendants' counsel contacted the plaintiffs' counsel and agreed to expedite the appeal to the Third Circuit Court of Appeals. The parties are currently preparing motions to accomplish that result.

## STATEMENT OF FACTS

In response to voluminous document requests – to which BCE produced more than a million pages of documents – BCE ultimately listed approximately 900 documents on its privilege logs for November 1, 2001 through April 23, 2002. On February 11, 2005, plaintiffs filed a motion to compel BCE to produce the privileged documents and the district court appointed a special master to hear the dispute under Federal Rule of Civil Procedure 53. On February 22, 2006, the special master decided that "there was a joint representation by BCE's attorneys of BCE and Teleglobe relating to a matter of common interest" and that Teleglobe's wholly owned subsidiary companies in the United States (the "Debtors"), "are entitled to all of the documents on the privilege logs from November 1, 2001, to April 23, 2002." Special Master's Final Decision 31 (Feb. 22, 2006) ("SM Dec."). On June 2, 2006, the district court "affirmed" the special master's decision. Order, slip op. at 1.

### A.    The Privilege Dispute

The privilege dispute arises out of a lawsuit over BCE Inc.'s decision to cease long-term funding of Teleglobe. BCE Inc. is one of Canada's leading public companies. Among other enterprises, it owns Bell Canada. In late 2000, BCE acquired Teleglobe, another Canadian company. BCE purchased Teleglobe and provided funding in the aggregate amount of $6.6 billion. On April 23, 2002, however, BCE concluded that Teleglobe's business plan was no longer viable and had no reasonable prospects for success and ceased long-term funding.

On May 28, 2002, Teleglobe and three Canadian subsidiaries commenced insolvency proceedings under the Canadian Companies' Creditors Arrangement Act in the Ontario Superior Court of Justice in Toronto, Canada.[4] The same day, the Debtors, Teleglobe's direct and indirect

---

[4] The three Canadian subsidiaries are Teleglobe Financial Holdings Ltd., Teleglobe Canada Limited Partnership, and Teleglobe Canada Management Services Inc.

subsidiaries in the United States, filed Chapter 11 bankruptcy petitions in the United States Bankruptcy Court for the District of Delaware.[5] After confirming the Debtors' reorganization plan, the U.S. bankruptcy court authorized the Debtors and the Official Committee of Unsecured Creditors of Teleglobe Communications Corporation (together with the Debtors, the "plaintiffs") to pursue claims against BCE Inc. and the individual defendants-appellants for breach of contract, estoppel, misrepresentation, and breach of fiduciary duty.

In their lawsuit, plaintiffs served extensive document requests. Although BCE produced more than a million pages of documents, it eventually listed approximately 900 documents on privilege logs bearing dates from November 1, 2001 to April 23, 2002, the date on which BCE Inc. announced that it would no longer provide long-term funding to Teleglobe.

Plaintiffs moved to compel production of documents generated by or seen by BCE's in-house lawyers, contending that those lawyers represented not only BCE but also Teleglobe and the Debtors as well. Plaintiffs also contended that certain of BCE's outside law firms (namely, Davies Ward Phillips & Vineberg LLP ("Davies Ward") and Osler, Hoskin & Harcourt LLP ("Osler")) also represented BCE and Teleglobe (but not the Debtors). Plaintiffs did not contend that BCE's other outside law firms, Stikeman Elliott ("Stikeman") and Shearman & Sterling LLP ("Shearman"), represented BCE and Teleglobe.

For its part, BCE contended that the documents listed on its privilege logs contained attorney-client communications and/or attorney work product prepared exclusively for BCE.

On February 22, 2006, the special master issued a final decision requiring that BCE produce all of its privileged documents to plaintiffs.

---

[5] The Debtors are Teleglobe Communications Corporation, Teleglobe USA Inc., Optel Telecommunications, Inc., Teleglobe Holdings (U.S.) Corporation, Teleglobe Marine (U.S.) Inc., Teleglobe Holding Corp., Teleglobe Telecom Corporation, Teleglobe Investment Corp., Teleglobe Luxembourg LLC, Teleglobe Puerto Rico Inc., and Teleglobe Submarine Inc.

**B.    The Order**

On March 14, 2006, BCE timely objected to the special master's decision. After two rounds of briefs, oral argument, and post-argument letter briefs, on June 2, 2006, this Court "affirmed" the special master's decision and ordered the production of defendants' privileged documents. Order, slip op. at 1, 4. The Court stated three reasons for its order.

*First*, the Court found that "BCE's in-house counsel advised both BCE and Teleglobe about Teleglobe's funding and restructuring, matters of common interest as between BCE and Teleglobe." Order, slip op. at 4-5. On the authority of the joint-client privilege, which holds that "[w]hen two or more clients having matters of common interest retain or consult the same lawyer, all communications with the lawyer that are relevant to said matters must be shared with all the clients" (*id.* at 4), the Court concluded that "the Special Master correctly decided that all communications relating to these matters of common interest that were shared with BCE's in-house counsel must be shared with Teleglobe" (*id.* at 5 (footnote omitted)). Moreover, because BCE had agreed in settlement of earlier disputes to produce to plaintiffs documents within the BCE-Teleglobe joint privilege, the Court carried those concessions forward to this dispute also, and found generally that "plaintiffs/debtors, as wholly owned subsidiaries of Teleglobe, Inc., fall within the ambit of the Teleglobe-BCE common interest privilege." *Id.* at 2-3 & n.2.

*Second*, the Court observed that "[t]he Special Master determined that, because Davies Ward had jointly represented BCE and Teleglobe on those matters of common interest identified above, neither Davies Ward nor BCE could withhold documents from Teleglobe." Order, slip op. at 5.[6]

---

[6] The Court did not expressly state that it agreed with the special master's determination, but that implication is consistent with its production order.

*Third*, the Court ordered the production of documents prepared by Stikeman, Osler, and Shearman "even where it was clear that said counsel offered advice exclusively for BCE's benefit, because the communications were shared with BCE's in-house counsel who jointly represented Teleglobe." Order, slip op. at 5. The Court found "[t]his aspect of the Special Master's decision [to be] most troubling, as it arguably forces a party in BCE's position to choose between two equally unsatisfactory courses of action: either forego the valuable advice of its in-house counsel, or forego the protection of the attorney-client privilege with its retained counsel." *Id*. at 5-6.

Although the Court recognized that the result was "harsh," it believed that BCE could have "isolated its privileged communications from retained counsel from in-house counsel" or had its in-house counsel "clearly terminate the attorney-client relationship" with Teleglobe. Order, slip op. at 6.[7]

On June 5, 2005, BCE filed a notice of appeal.

## SUMMARY OF ARGUMENT

The Rules of this Court authorize and Federal Rule of Appellate Procedure 8(a)(1)(A) contemplates that this Court may issue "a stay of the . . . order of a district court pending appeal." In *Republic of the Philippines v. Westinghouse Elec. Corp.*, 949 F.2d 653, 656 (3d Cir. 1991), the Third Circuit "set forth . . . our standards for acting on stays pending appeal":

> [T]he factors enunciated by the [U.S. Supreme] Court in *Hilton* [*v. Braunskill*, 481 U.S. 770 (1987)] are equally applicable to this court's consideration of whether to issue a stay in this case.

> Those factors are:

---

[7] The Court noted the special master's finding that BCE over-designated documents on its privilege logs and indicated that BCE was "neither candid nor cooperative." Order, slip op. at 4, 6 n.4. The oral hearing, however, revealed that BCE over-designated only four boxes of documents out of a production of more than a million pages of documents. *See* 3/28/06 Tr. 21:19-22:8. Although BCE sincerely regrets any over-designation, the errors were inadvertent and, under the circumstances of a such a large document production, understandable. *See id*. at 22:3-12.

(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Id.* at 658; *see South Camden Citizens in Action v. New Jersey Dep't of Envtl. Prot.*, No. 01-2224, 2001 WL 34131402, at *1 (3d Cir. June 15, 2001) ("In evaluating a motion for relief pending appeal under Fed.R.App.P. 8 (a), we must consider (1) whether the moving party is likely to succeed on appeal; (2) whether the moving party will suffer irreparable injury absent relief; (3) whether granting relief will cause harm to other interested parties; and (4) whether granting or denying the motion would best serve the public interest, *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).").

On appeals of orders requiring the production of privileged documents, Third Circuit precedent effectively establishes three of the four factors – the irreparable injury in the absence of a stay, the absence of harm to other interested parties from temporary delay from an interlocutory appeal, and the public interest in preserving possibly meritorious privilege claims. In this case, BCE also has a strong likelihood of success on the merits. We begin with that factor and discuss the other factors in the following points.

## ARGUMENT

## I.    THIS APPEAL PRESENTS SIGNIFICANT LEGAL ISSUES ON WHICH BCE IS LIKELY TO SUCCEED ON THE MERITS

BCE has a strong likelihood of success on its contentions that the Court erred when it (A) extended the joint-client privilege to include third parties who had no legal claim to the privileged documents and (B) ordered privileged documents concededly prepared for only BCE,

the parent, to be produced outside the privilege merely because the documents passed through in-house counsel who represented both BCE and Teleglobe.[8]

### A.     Even If Teleglobe Would Be Entitled to the Privileged Documents under the Joint-Client Exception, It Cannot Consent to Their Disclosure to a Third Party without the Consent of BCE

On the merits, plaintiffs are not entitled to any BCE-Teleglobe joint-privilege documents, for two reasons. *First*, under Canadian law, the administrator of Teleglobe's bankruptcy plan (the "Plan Administrator") did not have the legal authority to consent on behalf of Teleglobe to the disclosure of privileged documents. *Second*, even if she had the legal authority to consent on behalf of Teleglobe, the joint-client exception precludes her from disclosing to third parties any communications that reflect legal advice to BCE without the consent of BCE. Lastly, BCE did not agree to disclose these privileged materials to the third party plaintiffs.

### 1.     The Plan Administrator Did Not Have the Legal Authority to Waive the Attorney-Client Privilege on Behalf of Teleglobe

Canadian law governs the authority of an administrator to a Canadian bankruptcy plan. *See* RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 263 cmt. b (1988). Under Canadian law, a plan administrator has no authority, absent exceptional circumstances, to waive the attorney-client privilege of the bankruptcy company. *See In the Matter of the Bankruptcy of Laprairie Shopping Center Ltd. v. Samson Bélair-Deloitte & Touche, Inc.*, [1998] R.J.Q. 448, at 15 (Québec App. Ct. Feb. 12, 1998) ("[T]he right to confidentiality did not devolve on the trustee by the effect of possession held during the bankruptcy and . . . it cannot incidentally waive the same without the consent of the bankrupt."); *id.* at 22 ("The Court concludes from this analysis [of decisions in Québec and other provinces] that the trustee (syndic) cannot, except perhaps in very

---

[8] The record on appeal will also demonstrate the absence of a joint privilege. Although BCE is likely to succeed on that contention as well, the stay pending appeal is amply supported by the grounds briefed in text.

exceptional cases not necessary to attempt to define, waive on behalf of the bankrupt the right to professional secrecy from which he is benefiting.").

Although Teleglobe's Plan Administrator purported to consent on behalf of Teleglobe to the disclosure of privileged documents to the Debtors, she had no authority to do so. Accordingly, even if BCE's attorney's represented Teleglobe as well as BCE on every matter contained in the privilege log, Teleglobe has not consented to disclosure of privileged documents to the Debtors.

> **2.    The Joint-Client Exception Prevents One Client from Disclosing Jointly Privileged Communications to Third Parties Without the Consent of Its Co-Client**

Even if the Teleglobe plan administrator could consent on behalf of Teleglobe itself, that would not be sufficient to provide the documents to third parties such as Teleglobe's subsidiaries. BCE must also consent. It is well settled that when an attorney represents two or more clients on a matter of common legal interest, the attorney-client privilege cannot be waived without the consent of all of the parties who share the privilege. This is hornbook law. Even when joint clients become adverse to each other, there is still a reasonable expectation of confidentiality of privileged communications as to third parties. RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 75, cmt. e (1998) ("One co-client does not have the authority to waive the privilege with respect to another co-client's communications to their common lawyer.").

Thus, in *Interfaith Housing Delaware, Inc. v. Town of Georgetown,* 841 F. Supp. 1393, 1402 (D. Del. 1994), the court held that under Delaware law, the waiver of privilege by one member of a town council did not waive privilege of other council members as to their communications with the joint attorney. In so holding, the court explained, "when one of two or more clients with common interests waives the attorney-client privilege in a dispute with a third

13

party, that one individual's waiver does not effect a waiver as to the others' attorney-client privilege." *Id.*

Myriad other cases confirm this rule. *See Madison Mgmt. Group, Inc. v. Zell*, 212 B.R. 894, 898 (N.D. Ill. 1997) (although bankruptcy trustee of debtor subsidiary was entitled to certain documents on matter on which the debtors and its former parent were jointly represented, trustee could not disclose the documents to third parties without the consent of the former parent); *Lugosch v. Congel*, 219 F.R.D. 220, 238 (N.D.N.Y. 2003) ("The essential benefit of such joint collaboration . . . is that a member of the common legal enterprise cannot reveal the contents of the shared communications without the consent of all the parties"); *In re Imperial Corp. of Am.*, 179 F.R.D. 286, 289 (S.D. Cal. 1998) ("under the common interest privilege, waiver of the privilege requires consent of all parties who share the privilege."); *Holland v. Island Creek Corp.*, 885 F. Supp. 4, 7 (D.D.C. 1995) (unilateral disclosure of a document to a third party without the consent of a joint privilege-holder does not waive the privilege for the document; *In re Asia Global Crossing, Ltd.*, 322 B.R. 247, 264 (Bankr. S.D.N.Y. 2005) ("Once established, the [common interest] privilege cannot be waived without the consent of all of the parties that share it.").

Accordingly, even if the Plan Administrator had the authority to waive the attorney-client privilege on behalf of Teleglobe, she could not waive the privilege with respect to documents subject to the joint-client privilege without the consent of BCE. Because BCE has not consented to the disclosure of these privileged documents to the plaintiffs (or any other third parties), the Court erred in holding that plaintiffs are entitled to the documents on the basis of Teleglobe's consent.

### 3.    BCE Did Not Agree to Disclose the Privileged Documents to Plaintiffs

Plaintiffs offered no contrary authority below on the foregoing dispositive legal issues.

Instead, the Court found that BCE earlier had "agreed" to disclose BCE-Teleglobe joint-privilege

documents to plaintiffs. Order, slip op. at 3. On the basis of those "concessions," the district

court found that plaintiffs fell "within the ambit of the Teleglobe-BCE common interest

privilege." *Id.* at 3 n.2.

To begin with, BCE plainly did not "agree" to disclose the documents listed on its

privilege logs and the subject of this dispute. To be sure, BCE in the past agreed to produce

specific documents claimed as privileged in order to narrow or resolve discovery disputes, [9] and

those past productions were noted by the special master in the interim decision to which the

Court refers in its Order,[10] but the Court erred in extrapolating from those concessions made to

resolve past discovery disputes to an implied agreement to produce the very privileged

documents that it has it has withheld from production, listed on its privilege logs, and litigated

before the special master. As the D.C. Circuit pointed out in *Philip Morris*, the existence and

scope of an alleged agreement to produce is itself an appropriate subject of appellate review. *See*

*Philip Morris*, 314 F.3d at 618 ("An erroneous finding of waiver, like an erroneous ruling

denying a claim of privilege, eviscerates the same important institutional interests in preserving

---

[9] The evidence at the oral hearing before the Court indicates that BCE objected to the production of documents in which BCE and Teleglobe had a common legal interest to the Debtors in the bankruptcy court and agreed to produce specific documents listed on its privilege log to plaintiffs in the Chapter 11 reorganization solely in order to resolve a discovery dispute. *See* 3/28/06 Tr. 6:5-8:2.

[10] The Court's Order states that defendants "agreed" to produce BCE-Teleglobe joint privilege documents "[a]s of December 1, 2005." Order, slip op. at 2. On December 1, 2005, the special master issued an interim decision stating that "both sides have narrowed the issues for decision." Decision on Plaintiffs' Motion to Compel Defendants to Produce Documents Withheld on the Basis of Privilege 7 (Dec. 1, 2005). For BCE's part, the special master noted BCE's statement in its brief in opposition that it had "already produced" documents in which BCE's in-house lawyers had represented Teleglobe or the Debtors or in which BCE and Teleglobe were jointly represented. *Id.* The "agreements" to which the Court apparently refers, therefore, were statements about past productions to narrow discovery disputes, not irrevocable agreements to produce privileged documents into the future.

privileged information, and derivatively, full and frank communication between client and attorney.").

As we read the Court's Order, the reference to "agreements" or "concessions" is another way of saying that the Court found a prospective waiver by implication of BCE's privilege in documents that might subsequently be determined by a third party to be subject to a joint BCE-Teleglobe privilege. Such a prospective waiver is necessarily implied. BCE did not expressly waive its attorney-client privilege and work-product immunity and instead consistently listed the privileged documents on its logs. Nor can a prospective waiver be implied here. As the United States Court of Appeals for the First Circuit explained in *In re Keeper of the Records*, 348 F.3d 16 (1st Cir. 2003):

> [C]ourts should be cautious about finding implied waivers. Claims of implied waiver must be evaluated in light of principles of logic and fairness. That evaluation demands a fastidious sifting of the facts and a careful weighing of the circumstances. Considering the need for this precise, fact-specific tamisage, it is not surprising that the case law reveals few genuine instances of implied waiver.
>
> . . .
>
> At the risk of carrying coal to Newcastle, we add that a prospective waiver will very rarely be warranted in extrajudicial disclosure cases. Courts have generally allowed prospective waivers in discrete and limited situations, almost invariably involving advice of counsel defenses.

*Id.* at 23, 25. Under that standard, BCE plainly did not prospectively waive its privilege in the documents at issue here.

### B. Even if Plaintiffs Were Entitled to All BCE-Teleglobe Joint-Privilege Materials, They Would Not Be Entitled to Privileged Materials and Work Product from BCE's Outside Counsel Merely Because Those Documents Passed through In-House Counsel

Even if plaintiffs could overcome the prohibition against disclosure to third parties, the district court still erred in ordering a blanket production of attorney-client and work-product materials that were intended solely for BCE, the parent, and its board and senior officers. The

Court ordered production of documents from three BCE outside law firms, the Stikeman, Osler, and Shearman, "even where it was clear that said counsel offered advice exclusive for BCE's benefit, because the communications were shared with BCE's in-house counsel who jointly represented Teleglobe." Order, slip op. at 5. Neither the special master nor plaintiffs offered any authority for that conclusion.

Contrary to the Court's conclusion, documents prepared by outside counsel for BCE remain privileged even if they were "shared" with or passed through BCE in-house attorneys who also represented BCE's subsidiary Teleglobe on the same matter. In-house counsel has a duty to preserve the confidences and secrets of her clients. The receipt by in-house counsel of privileged advice intended for one client does not destroy the privileged character of that advice or even permit in-house counsel to share it with another client. The D.C. Circuit has expressly so ruled. In *Eureka*, 743 F.2d at 937-38, the D.C. Circuit held that even if a joint attorney "should not have simultaneously undertaken to represent [one client] in an interest adverse to [the other client] and continued to represent [the former client] in a closely related matter," the "counsel's failure to avoid a conflict of interest should not deprive the client of the privilege. The privilege, being the client's, should not be defeated...."). As noted in the preliminary statement, Professor Stephen Gillers of New York University Law School fully endorsed the D.C. Circuit's reasoning in *Eureka* in an affidavit that went wholly unanswered below. *See supra* p. 3.

The Court's Order would cripple the in-house legal operation in modern corporations and impair the reporting-up functions that are critical to the effective functioning of the procedures imposed under the authority of the Sarbanes-Oxley Act. The proposed solution that in-house counsel be isolated from the flow of information to senior management or that in-house counsel clearly resign engagements with subsidiaries is wholly unrealistic and derives from no apparent

17

legal or ethical authority. To the extent that the Court concluded that the in-house counsel should

be sequestered from providing legal advice to the parent's board and directors, that is wholly

unrealistic. Respectfully, no authority supports such a theory. And it trivializes the role of in-

house counsel in providing legal advice to the company and assumes that they are fungible

advisors that can be substituted by outside counsel. Nor is it realistic to think that in-house

counsel can send resignation letters to subsidiary companies in order to preserve the parent's

privilege.

## II.     BCE WILL SUFFER IRREPARABLE INJURY ABSENT A STAY OF THE DISTRICT COURT'S PRODUCTION ORDER BECAUSE PRODUCTION WILL REMOVE THE PRIVILEGE

If the Order is not stayed pending appeal, BCE will be under a court order to produce its

concededly privileged documents. Such disclosure would cause irreparable injury. In *Ford*, this

Court concluded that "there is no effective means of reviewing after a final judgment an order

requiring the production of putatively protected material." 110 F.3d at 964. It reasoned:

> [O]nce putatively protected material is disclosed, the very "right sought to be protected" has been destroyed. *Bogosian*, 738 F.2d at 591. That is so because, as we noted previously, underlying the attorney-client privilege is the policy of encouraging full and frank communications between an attorney and client, without the fear of disclosure, so as to aid in the administration of justice. *See, e.g., Westinghouse*, 951 F.2d at 1423. Concomitantly, the work product doctrine is designed to promote the adversarial process by maintaining the confidentiality of documents prepared by or for attorneys in anticipation of litigation. *See, e.g., id.* at 1428. Appeal after final judgment cannot remedy the breach in confidentiality occasioned by erroneous disclosure of protected materials. At best, on appeal after final judgment, an appellate court could send the case back for re-trial without use of the protected materials. At that point, however, the cat is already out of the bag.

*Id.* at 963.

## III.    PLAINTIFFS WILL SUFFER NO HARDSHIP FROM AN INTERLOCUTORY APPEAL

A balancing of the equities tips heavily in favor of preserving the *status quo* pending the

resolution of this appeal. As explained above, BCE will suffer irreparable injury if the Court's

order is not stayed pending appeal. Plaintiffs seek purely monetary relief in a case to be tried to

the Court without a jury. On the one hand, if BCE prevails on this appeal, plaintiffs will not have

been deprived of any documents to which they were entitled. On the other hand, if BCE does not

succeed in this appeal, plaintiffs can supplement the record in the district court with any evidence

to which they were entitled.

## IV. THE PUBLIC INTEREST WILL BE SERVED BY STAYING THE DISTRICT COURT'S PRODUCTION ORDER AND PRESERVING THE *STATUS QUO*

The strong public policy underlying the attorney-client privilege and work-

product immunity, about which this Court wrote in *Ford* and the D.C. Circuit wrote in

*Philip Morris* (*see supra* p. 4), strongly support a stay pending this interlocutory appeal:

> [W]e believe that the attorney-client privilege question before us also satisfies the importance criterion because the interests protected by the privilege are significant relative to the interests advanced by adherence to the final judgment rule. It is often stated that the attorney-client privilege is at the heart of the adversary system; its purpose is to support that system by promoting loyalty and trust between an attorney and a client. *See Recent Case*, 108 Harv.L.Rev. 775, 779 n. 39 (1995). The privilege is thereby intended to advance the "broad[ ] public interests in the observance of law and administration of justice," *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981), by encouraging the full and frank communication between attorney and client necessary for vigorous and effective advocacy. Rightly or wrongly, our system assumes that the competition between vigorous and effective advocates, when pitted against each other in an adversary setting, will help to produce the best legal result in any given litigation. In short, the attorney-client privilege is one of the pillars that supports the edifice that is our adversary system. As such, it is "deeply rooted in public policy." *Digital Equip.*, 511 U.S. at 884, 114 S.Ct. at 2004.

*Ford*, 110 F.3d at 961-62.

## CONCLUSION

For the foregoing reasons, this Court should grant BCE's motion for a stay pending appeal.

Respectfully submitted,

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Pauline K. Morgan (No. 3650)
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19899
(302) 571-6600
pmorgan@ycst.com
*Attorneys for Defendants*

Of Counsel:

SHEARMAN & STERLING LLP
Stuart J. Baskin
Jaculin Aaron
599 Lexington Avenue
New York, NY 10022-6069
(212) 848-4000

Stephen J. Marzen
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2634
(202) 508-8000

Dated: June 6, 2006

## CERTIFICATE OF SERVICE

I hereby certify that on June 6, 2006, I electronically filed a true and correct copy of

foregoing document with the Clerk of the Court using CM/ECF, which will send notification that

such filing is available for viewing and downloading to the following counsel of record:

Gregory V. Varallo, Esq.
Robert J. Stern, Jr., Esq.
Kelly E. Farnan, Esq.
Anne S. Gaza, Esq.
Richards, Layton & Finger, P.A.
920 N. King Street
Wilmington, DE 19801

Joseph A. Rosenthal, Esq.
Rosenthal, Monhait & Goddess, P.A.
1401 Mellon Bank Center
P.O. Box 1070
Wilmington, DE 19899-1070

I further certify that on June 6, 2006, I caused a copy of the foregoing document to be served upon the following non-registered participants in the manner indicated below:

BY EMAIL
John P. Amato, Esq.
Mark S. Indelicato, Esq.
Zachary G. Newman, Esq.
Jeffrey L. Schwartz, Esq.
Hahn & Hessen LLP
488 Madison Avenue
New York, NY  10022

Gregory V. Varallo, Esq.
Russell C. Silberglied, Esq.-p
Mark D. Collins, Esq.
C. Malcolm Cochran, IV, Esq.
Robert J. Stern, Jr., Esq.
Kelly E. Farnan, Esq.
Anne S. Gaza, Esq.
Richards, Layton & Finger, P.A.
920 N. King Street
Wilmington, DE  19801

Joseph A. Rosenthal, Esq.
Rosenthal, Monhait & Goddess, P.A.
1401 Mellon Bank Center
P.O. Box 1070
Wilmington, DE  19899-1070

*/s/ Margaret B. Whiteman*
Pauline K. Morgan (No. 3650)
Maribeth Minella (No. 4185)
Margaret B. Whiteman (No. 4652)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
P.O. Box 391
Wilmington, DE 19899-0391
(302) 571-6681
pmorgan@ycst.com
mminella@ycst.com
mwhiteman@ycst.com
bank@ycst.com

*Attorneys for Defendants*