## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------------

| | |
|---|---|
| In re: Teleglobe Comm. Corp., *et al.*, | ) Chapter 11 |
| | ) Jointly Administered |
| Debtors | ) Banker. Case No. 02-11518 (MFW) |

-----------------------------------------------------------------

| | |
|---|---|
| Teleglobe Comm. Corp., *et al.*, | ) |
| | ) |
| Plaintiffs, | ) C.A. No. 04-CV-1266 (SLR) |
| | ) |
| v. | ) **REDACTED - PUBLIC VERSION** |
| | ) |
| BCE Inc., *et al.*, | ) |
| | ) |
| Defendants | ) |

-----------------------------------------------------------------

### PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE THE EXPERT TESTIMONY OF PAUL CHARNETZKI AND CARLYN TAYLOR AS A SANCTION FOR THE SPOLIATION OF INFORMATION CONSIDERED IN FORMING THEIR OPINIONS

Gregory V. Varallo (No. 2242)
C. Malcolm Cochran, IV (No. 2377)
Russell C. Silberglied (No. 3462)
Anne Shea Gaza (No. 4093)
Richards, Layton & Finger, P.A.
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Varallo@rlf.com
Cochran@rlf.com
Silberglied@rlf.com
Gaza@rlf.com
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
*Attorneys for Teleglobe Communications Corporation, et al.*

Joseph A. Rosenthal (No. 234)
Rosenthal, Monhait & Goddess, P.A.
1401 Mellon Bank Center
P.O. Box 1070
Wilmington, Delaware 19899-1070
jrosenthal@rmgglaw.com
Telephone: (302) 656-4433
Facsimile: (302) 658-7567
*Attorneys for the Official Committee of Unsecured Creditors of Teleglobe Communication Corporation, et al*
- and -
John P. Amato
Mark S. Indelicato
Zachary G. Newman
Jeffrey L. Schwartz
Hahn & Hessen LLP
488 Madison Avenue
New York, New York 10022
(212) 478-7200
*Attorneys for the Official Committee of Unsecured Creditors of Teleglobe Communication Corporation, et al*

Dated: June 7, 2006

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES..................................................................................................ii

INTRODUCTION..................................................................................................................1

STATEMENT OF FACTS.....................................................................................................5

I.     Background.............................................................................................................5

II.    Plaintiffs' Experts...................................................................................................5

III.   The Parties' Expert Discovery Agreement.............................................................8

IV.    The Scope Of The Parties' Expert Document Production......................................9

       A.   Plaintiffs' Experts Document Production.....................................................9

       B.   Defendants' Expert Document Production..................................................10

ARGUMENT......................................................................................................................11

I.     THE ISSUE PRESENTED IS ONE OF FIRST IMPRESSION.........................11

II.    THE PLAIN LANGUAGE OF RULE 26 DOES NOT SUPPORT DEFENDANTS...........14

III.   DEFENDANTS' POSITION IS NOT SUPPORTED BY SOUND POLICY......16

IV.    EVEN IF THE COURT ACCEPTS DEFENDANTS' INTERPRETATION OF
       RULE 26, WHICH IT SHOULD NOT, THERE IS NO BASIS HERE TO IMPOSE
       THE DRACONIAN SANCTION OF PRECLUSION..........................................20

       A.   Applying The Third Circuit Test For Determining The Appropriateness Of
            Sanctions, Plaintiffs Should Not Be Sanctioned.......................................21

            1.   Plaintiffs Cannot Be Faulted For Failing To Abide By An Interpretation
                 Of Rule 26 That Neither This District Nor The Third Circuit Have
                 Adopted..........................................................................................22

            2.   Defendants Have Suffered No Prejudice And Will Suffer No Prejudice;
                 Therefore, No Sanction Is Either Warranted Or Necessary.............22

       B.   Defendants Are Incorrect That Preclusion Of Plaintiffs' Experts Is Required
            Unless The Non-Disclosure Was Either Substantially Justified Or Harmless......24

       C.   The Relief Sought By Defendants Would Be Tantamount To Dismissal of
            Plaintiffs' Fiduciary Duty Claim..............................................................26

CONCLUSION...................................................................................................................28

i

## TABLE OF AUTHORITIES

*Adler v. Shelton,* 778 A.2d 1181 (N.J. Super. 2001)......................................................16, 17

*All West Pet Supply Co. v. Hill's Pet Prods. Div.,* 152 F.R.D. 634 (D. Kan. 1993) ................16

*Anderson v. Nat'l Railroad Passenger Corp.,* 866 F. Supp. 937 (E.D. Va. 1994) ................22

*Berckeley Inv. Group. Ltd. v. Colkitt,* 259 F.3d 135 (3d Cir. 2001) ................14

*Bogosian v. Gulf Oil Corp.,* 738 F.2d 587 (3d Cir. 1984) .................................13, 14, 18, 23

*In re Cendant Corp. Secs. Litig.,* 343 F.3d 658 (3d Cir. 2003) ................14

*In re DaimlerChrysler AG,* 2003 WL 22951696 (D. Del. Nov. 25, 2003)................21

*Fidelity National Title Insurance Co. v. Intercounty National Title Insurance Co.,*
412 F.3d 745 (7th Cir. 2005) ................17, 20

*Gucci Am., Inc., v. Exclusive Imports Int'l,* 2002 WL 1870293 (S.D.N.Y. Aug. 13, 2002)........15

*Hagans v. Henry Weber Aircraft Distrib., Inc.,* 852 F.2d 60 (3d Cir. 1988)................12

*Haworth, Inc. v. Herman Miller, Inc.,* 162 F.R.D. 289 (W.D. Mich. 1995)................18

*Konstantopoulos v. Westvaco Corp.,* 112 F.3d 710 (3d Cir. 1997) ................27

*Kotes v. SuperFresh Food Markets, Inc.,* 157 F.R.D. 18 (E.D. Pa. 1994)................25

*Kremsner v. Fortuna-SAS,* 1989 WL 70687 (E.D. Pa. June 23, 1989)................27, 28

*Krisa v. Equitable Life Assurance Soc'y.,* 196 F.R.D. 254 (M.D. Pa. 2000) ................13, 18

*McCusker v. Surgical Monitoring Assocs., Inc.,* 299 F. Supp. 2d 396 (D. Del. 2004)................14

*McDonald v. Sun Oil Company,* 423 F. Supp. 2d 1114 (D. Or. 2006) ................18, 19, 25

*Moore v. R.J. Reynolds Tobacco Co.,* 194 F.R.D. 659 (S.D. Ia. 2000) ................17

*Mosaid Techs. Inc. v. Samsung Elecs. Co.,* 348 F. Supp. 2d 332 (D. N.J. 2004)................27

*Musselman v. Phillips,* 176 F.R.D. 194 (D. Md. 1997)................27

*Nexxus Products Co. v. CVS New York, Inc.,* 188 F.R.D. 7 (D. Mass. 1999) ................15, 17

*In re Paoli Railroad Yard PCB Litig.,* 35 F.3d 717 (3d Cir. 1994)................25

ii

*Paramount Pictures Corp. v. Davis*, 234 F.R.D. 102 (E.D. Pa. 2005) .................................21

*Pell v. E.I. Dupont de Nemours & Co., Inc.*, 231 F.R.D. 186 (D. Del. 2005) ................................12

*In re Polypropylene Carpet Antitrust Litig.*, 93 F. Supp. 2d 1348 (N.D. Ga. 2000) ...19, 20, 23, 24

*Samos Imex Corp. v. Nextel Communications, Inc.*, 194 F.3d 301 (1st Cir. 1999) .......................20

*Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76 (3d Cir. 1994)....................................12, 20, 21

*Semper v. Santos*, 854 F.2d 1233 (3d Cir. 1988) ...............................................................12

*Smith v. Transducer Tech., Inc.*, 197 F.R.D. 260 (D. V.I. 2000)........................................14

*Taylor v. Illinois*, 108 S. Ct. 646 (1988) ...........................................................................26

*Trigon Insurance Co. v. United States*, 204 F.R.D. 277 (E.D. Va. 2001) ...............................17

*In re Unisys Savings Plan Litig.*, 173 F.3d 145 (3d Cir. 1999) ........................................27

*United States v. Brown*, 415 F.3d 1257 (11th Cir. 2005)....................................................27

*United States v. Rapanos*, 376 F.3d 629 (6th Cir. 2004) .................................................25

*Update Art, Inc. v. Modiin Pub., Ltd.*, 843 F.2d 67 (2d Cir. 1988) ....................................26

*Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148 (4th Cir. 1995) ...............................21, 28

*W.R. Grace & Co. - Conn. v. Zotos Int'l, Inc.*, 2000 WL 1843258 (W.D.N.Y. Nov. 2, 2000)....................................................................................................23

*Wachtel v. Guardian Life Ins. Co.*, 2006 WL 1286189 (D. N.J. May 8, 2006).........................27

*In re Wechsler and M/V Atlas*, 121 F. Supp. 2d 404 (D. Del. 2000)....................................12

*West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776 (2d Cir. 1999)....................................20

## STATUTES & OTHER AUTHORITIES

Fed. R. Civ. P. Rule 2(a)(2)(B) ...........................................................................4, 14, 16, 25

Fed. R. Civ. P. 37(c)(1)...........................................................................................................24

7 James Wm. Moore, *Moore's Federal Practice* (2003) ...................................................25

iii

*Jason Kraus, Discovery Channels*, A.B.A.J., 88-Jul. 2002 49, 50 ...........................................17

Gregory P. Joseph, *Expert Spoliation*, 15 No. 6 Proc. Litigator. 7, at 9 (2002) ..........................19

Richard L. Marcus, *Confronting The Future: Coping with Discovery Electronic Material*, 64-Sum Law & Contemp. Probs. 253, 266 (2001) .......................................................................18

iv

## INTRODUCTION

Defendants would have the Court preclude the testimony of Mr. Charnetzki and Ms. Taylor. Defendants have not asked the Court to do this on the grounds that the experts are not qualified; they indubitably are. Moreover, there is no argument here that the reports submitted by these experts do not otherwise comply with the rules: the opinions are clear, well organized, and extremely well documented and supported. Each report contains an extensive listing of documents relied upon by the experts in forming their opinions. No *Daubert* motions were filed by any party to the case.

Faced with renowned experts and thorough expert reports, Defendants ask the Court to *preclude* expert testimony because they only have some, but not all drafts of the reports. Defendants' claim of prejudice here is that their cross examination of our experts will be stilted because they will be unable to show that the experts collaborated or were instructed by counsel. OB at 12.[1] Of course, Plaintiffs' experts have never hidden the fact that they collaborated. Where, as here, one expert addressed damages and a second restructuring possibilities, failing to have the two experts collaborate would necessarily make the trial longer and more confusing. Moreover, Defendants were able to adduce testimony relating to the March 1 "all experts" meeting in all three depositions unimpeded by objections or instructions. *See, e.g.,* Charnetzki Dep. at 20-25 (Ex. 1); Roseman Dep. at 59-65 (Ex. 2); Taylor Dep. at 26-31 (Ex. 3).[2] Indeed, the only expert deposition at which work product instructions were given relating to pre-report expert work was the deposition of Defendants' expert Mr. Fisher. *See, e.g.,* Fisher Dep. at 51 (Ex. 4).

Were the Court to determine that drafts should have been preserved (which, for the reasons set forth below it should not), the remedy of precluding an expert is almost universally recognized as a

---

[1] References to "Opening Brief" or "OB at __" are to Defendants' Opening Brief in Support of Their Motion *in Limine* to Exclude the Expert Testimony of Paul Charnetzki and Carlyn Taylor as a Sanction for the Spoliation of Information Considered in Forming Their Opinions, dated May 23, 2006. (D.I. 270).

[2] The depositions referenced herein are cited as "[Last Name] Dep. at ___" and any exhibits from the depositions are cited as "[Last name] Dep. Ex. ___." The relevant excerpts and exhibits from the referenced depositions are attached as exhibits to the Transmittal Affidavit of Anne Shea Gaza in Support of Plaintiffs' Memorandum in Opposition to Defendants' Motion *In Limine* to Exclude the Expert Testimony of Paul Charnetzki and Carlyn Taylor as a Sanction for the Spoliation of Information Considered in Forming Their Opinions, dated May 31, 2006, filed contemporaneously herewith.

"drastic" or "Draconian"[3] sanction to be reserved for only intentional violations of court orders. Of the cases cited in Defendants' own brief, no fewer than four of them are appellate court cases reversing the trial court for dismissal or preclusion of testifying experts. (*See* Argument § IV, *supra*).

There will be no jury in this matter, and there is no risk that the trier of fact will be unduly swayed by expert testimony. We respectfully suggest that the Court is capable of considering the credibility of the experts and can make an independent judgment as to whether Defendants have been prejudiced by the failure to have certain of these draft reports available.

The facts here are as follows: Plaintiffs retained three experts to testify at trial. Each was told to follow their ordinary document retention policies. *See, e.g.,* Charnetzki Dep at 25-28 (Ex. 1). One of the three experts, Walda Roseman of CompassRose, retained drafts, handwritten notes of meetings and e-mails. These were produced. Roseman Dep. at 56-57 (Ex. 2). A second, Carlyn Taylor of FTI Consulting, retained at least two drafts[4] of her reports, which were produced, but, in keeping with FTI Consulting's standard policy, did not retain others. Taylor Dep at 47-49 (Ex. 3). The third expert, Paul Charnetzki of Huron Consulting, did not retain drafts or notes Charnetzki Dep. at 43-44 (Ex. 1).

Importantly, *all three* experts carefully identified and produced the voluminous materials that they considered and relied upon in formulating their opinions. Huron produced some 20 boxes of materials, encompassing the more than 47 pages of single spaced materials identified in Appendix II to Huron's report. Charnetzki Dep at 7-8 (Ex. 1). Among other materials Huron produced was a discarded approach to damages, about which Mr. Charnetzki testified when asked. Charnetzki Dep. at 137 (Ex. 1). Likewise, Ms. Taylor produced her notes of her only interview with an ex-Teleglobe employee. In short,

---

[3] As is so often the case for tactical motions of this sort, there is a reason why Defendants are seeking preclusion rather than some lesser sanction. Since Charnetzki is the sole expert offered by Plaintiffs to demonstrate insolvency of the Debtors, preclusion of his testimony would effectively "shut the door" on Plaintiffs' fiduciary duty claims. Likewise, without damages testimony, the Court's opportunity to consider a range of possible remedies for breach of contract would likely be quite circumscribed.

[4] Curiously, Defendants' papers repeatedly state that Taylor produced only one draft. OB at 8, 10. Defendants are incorrect. Two drafts were retained and produced. Taylor Dep. at 31; 34-35 (Ex. 3).

2

Plaintiffs' experts produced a wealth of materials and identified all of the materials that they considered in arriving at their opinions.

In addition, none of the three experts were improperly precluded from testifying about their communications with each other, or the comments that they received from each other and considered as part of coming to their opinions. Charnetzki Dep. at 20-25 (Ex. 1); Taylor Dep. at 26-31 (Ex. 5); Roseman Dep. at 59-65 (Ex. 2). Indeed, although Defendants twice bemoan what they characterized as an "unprecedented" level of coordination among the three experts (OB at 4, 12), the fact that coordination took place was *expressly disclosed* on the face of the reports themselves. Thus, the Huron report expressly states that Mr. Charnetzki was asked to value a particular scenario by FTI (Charnetzki Dep. Ex. 1 at 6) (Ex. 5), and the FTI report expressly states that Ms. Taylor asked Huron to provide specific input, which FTI received. Taylor Dep. Ex. 1 at 48 (Ex. 6).

In contrast with Plaintiffs' approach to expert reports, Defendants' expert, Dr. Joshua Livnat, testified that *his* report was in part written by counsel at Shearman & Sterling, and, in fact, that such counsel repeatedly edited the report. Livnat Dep. at 133-137 (Ex. 7). Although at least some drafts of Dr. Livnat's report were produced, counsel's draftsmanship is not evident, and Dr. Livnat clearly testified that he received counsel's comments electronically and overwrote his report by merging counsel's draft into his primary draft. *Id* at 136.

In addition, a draft of Mr. Fisher's report was produced with over eight pages of analysis completely redacted without explanation. Likewise, Ms. McLaughlin of NERA interviewed two of the defendants in this case, relied upon information conveyed to her during the interviews in forming her opinion, yet has not produced the interview notes taken during those interviews.[5] Thus, Defendants must

---

[5] Frankly, Plaintiffs considered and determined not to move *in limine* with respect to Defendants' expert reports. The fact is that Defendants' experts will be able to defend their opinions or not, regardless of where they originated, and the Court will be able to consider the facts with respect to these opinions, whether or not we have all drafts or notes produced. Ultimately, Plaintiffs believe that they can win on the *substance* of their experts' opinions. Defendants appear to have a different view.

3

have believed that it was "fair game" to merge reports electronically, destroy notes and redact early ideas explored by their experts.

Moreover, Defendants' repeated refrain (OB at 5, 10) that there was an "agreement" to save and produce drafts is neither true nor fair to the record. *After* the initial reports were produced and finalized, counsel for Plaintiffs called counsel for Defendants to discuss and attempt to agree upon a document request that would apply to all experts. During that conversation, counsel for Defendants expressly requested that drafts of expert reports be included in the request. Silberglied Decl. at ¶5.[6] Thus, contrary to Defendants repeated and unfair suggestion to the contrary, *there was no request for* drafts outstanding at the time that at least one of Plaintiffs' experts followed their ordinary practice of not keeping them. *Id.*

The issue presented here is one of first impression in this District and the Third Circuit. Moreover, even a quick perusal of Fed. R. Civ. P. Rule 26(a)(2)(B) ("Rule 26"), reveals that Rule 26 says absolutely nothing about drafts. Indeed, as set forth below, the cases that have interpreted Rule 26 are far from unanimous, and the policies which underlay an interpretation of Rule 26 that would require parties to keep drafts are neither obvious, nor have the courts interpreting Rule 26 been unanimous in their approach to the relevant policy considerations.

In a nutshell, the Court will have to confront the following policy question in deciding this matter of first impression: is the fair and efficient administration of justice enhanced by the application of an interpretation of Rule 26 that imposes on litigants a requirement to keep all drafts and notes relating to an expert report? As set forth below, we think not. It is, after all, the expert's *opinion* that matters, not whether she took five, or six, or ten drafts in finally coming to that opinion, and not whether she received comments on those drafts. Imagine the regime that Defendants ask the Court to make the law of this District: no longer will the Court need to deal simply with the classic battles of experts -- now the Court

---

[6] References to "Silberglied Decl. at ¶ __" are to the Declaration of Russell C. Silberglied in Support of Plaintiffs' Memorandum in Opposition to Defendants' Motion *In Limine* to Exclude the Expert Testimony of Paul Charnetzki and Carlyn Taylor as a Sanction for the Spoliation of Information Considered in Forming Their Opinions, dated May 31, 2006, filed contemporaneously herewith.

will have to sit through battles over expert *drafts*. With due respect to Defendants and their counsel, this makes little sense.

Where, as here, there is no binding authority on point, and where the issue presented is not one which is obvious on the face of Rule 26 itself, there is no basis to impose punitive or Draconian sanctions. This is especially true where Defendants have had the opportunity to depose each of the three experts and explore the development of their conclusions and interactions. For all of these reasons, the Court should deny the motion.

## STATEMENT OF FACTS

### I.    Background.

This case involves Defendants' breach of their funding commitment to Plaintiffs and breach of their fiduciary duties, the collective result of which was a rushed bankruptcy and fire sale of Plaintiffs' core assets. In order to aid the Court's understanding of certain key issues going to the heart of Plaintiffs' claims, *i.e.*, insolvency, restructuring options and damages, Plaintiffs intend to introduce the expert testimony of Mr. Charnetzki and Ms. Taylor. Specifically, Plaintiffs contend, among other things, that Plaintiffs were insolvent by no later than 2000, thereby imposing a fiduciary duty upon Defendants to act in the best interests of Plaintiffs and their creditors. Plaintiffs also contend that Defendants, consistent with their duties to Plaintiffs, should have restructured Plaintiffs rather than force Plaintiffs into bankruptcy without sufficient cash to accomplish anything other than a fire sale of certain assets at the worst possible time. Based on the foregoing, Plaintiffs will prove at trial that they and their creditors incurred damages for which Plaintiffs should be compensated.

### II.    Plaintiffs' Experts.

By their Motion, Defendants seek the wholesale exclusion of the reports and testimony of Ms. Taylor and Mr. Charnetzki. The sole basis for the Motion, however, is that some drafts of their preliminary reports were not produced and, had they been preserved and produced, *may* have been used in cross-examination. Ms. Taylor is one of the foremost experts on the issue of telecommunications

restructuring and has been retained for over 200 engagements involving the telecommunications industry, most of which involved her advising clients on restructuring issues. Taylor Dep. Ex. 1 at 1-3 (Ex. 6). The opinion Ms. Taylor will offer in this case is critical. In essence, she has concluded that Defendants should have considered and executed a value-maximizing restructuring as opposed to forcing the fire sale of Teleglobe's assets. Taylor Dep. at 19-21 (Ex. 3).

Building upon the opinions and conclusions offered by Ms. Taylor, Mr. Charnetzki will opine on the issues of insolvency and damages. With extensive experience providing financial, statistical and economic analyses for clients to determine damages, solvency, valuation and market analysis, Mr. Charnetzki is well schooled in these important issues. Charnetzki Dep. Ex. 1 at 7 (Ex. 5). On these topics, Charnetzki concluded that Teleglobe became insolvent no later than December 31, 2000, and that value in Teleglobe should have been preserved by discontinuing the GlobeSystem after June 30, 2001 or, alternatively, had BCE funded a portion of the $850 million it made available on November 28, 2001, Teleglobe could have preserved additional value for creditors. Id. at 43-44.

With Ms. Taylor addressing restructuring options and Mr. Charnetzki addressing solvency and damages, some degree of collaboration was required to limit the number of issues addressed in their respective reports and their testimony at trial. It makes sense then that Plaintiffs' experts discussed the issues each would address, reviewed each other's reports to minimize overlapping of issues, and met together, along with Plaintiffs' counsel, to review their preliminary findings and conclusions.

On March 1, 2006, Plaintiffs' experts[7] and counsel met in Wilmington to do exactly that: they met for approximately 5 or 6 hours, reviewed the preliminary reports and discussed them. Charnetzki Dep. at 20-25 (Ex. 1); Taylor Dep. at 26-31 (Ex. 3). The opinions reached by each of the experts were explored and discussed and some, more minor, edits were made to the written drafts. Taylor Dep. at 29 (Ex. 3). In addition to the March 1, 2006 meeting, Plaintiffs' experts, or employees from their respective

---

[7] Walda Roseman, who was traveling abroad on March 1, was not able to attend the meeting and instead two of her colleagues participated in the meeting on her behalf. Roseman Dep. at 59-65 (Ex. 2).

6

firms, also had telephonic discussions with each other and/or counsel. *See, e g* , Charnetzki Dep. at 29-40 (Ex. 1) (regarding his communications with Carlyn Taylor).

Defendants have characterized the collaboration of Plaintiffs experts as being an "unprecedented" level of coordination and implied that something sinister was afoot when in fact that coordination was expressly disclosed in the expert reports. OB at 4. Thus, Mr Charnetzki's report *expressly states* that he was asked to value a particular scenario by Ms. Taylor (Taylor Dep. Ex. 1 at 6) (Ex. 6), and Ms. Taylor's report *expressly states* that she asked Mr. Charnetzki to provide specific input and received that input. Charnetzki Dep. Ex 1 at 48 (Ex. 5). In addition, both Ms. Taylor and Mr. Charnetzki (as well as Ms. Roseman) were questioned, at length, about their collaboration at the March 1 meeting and each was permitted to give testimony without interference from counsel. Charnetzki Dep. at 20-25 (Ex. 1); Taylor Dep. at 26-31 (Ex. 3); Roseman Dep. at 59-65 (Ex. 2) (testifying that she was not present at the March 1 meeting).

In response to questions from Defendants' counsel about who made comments on her draft report, Ms. Taylor testified that counsel for Plaintiffs made comments on her draft, but that she did not believe Mr. Charnetzki commented on her draft. Taylor Dep. at 29 (Ex. 3). She also testified that "[n]one of the comments were very substantive. Commas, things like that. . . some spellings, words missing, stuff like that." *Id.* With respect to Mr. Charnetzki's report, Ms. Taylor testified that she did not mark up his report, but that she did give "him a list of companies and transactions for him to think about including." *Id.* at 31.

When asked similar questions by Defendants' counsel, Mr. Charnetzki responded by stating that each of the experts circulated a current draft of their expert report and that he "discussed [his] observations at that point. Ms. Taylor discussed hers, and the others discussed theirs." Charnetzki Dep. at 20 (Ex. 1). He further testified that he didn't "recall making, myself, very many comments on other people's drafts at that point. Other people did have comments on what I had said at that point, so you know -- and so I don't recall much beyond that." *Id.* at 24. When asked whether he considered everyone's comments, Mr. Charnetzki testified that he reviewed and considered them. *Id.* Ms. Roseman,

7

who did not attend the March 1 meeting, was also asked about the collaboration, but was not able to address the substance of the discussions at the meeting since she was not present. Roseman Dep. at 59-65 (Ex. 2).

As is evident from the face of their reports and their deposition testimony, the so-called "unprecedented" coordination among Plaintiffs' experts was mandated by the fact that the topics each opine on are, to some degree, interrelated. In order to avoid confusion and lengthy discourse on issues addressed by someone else, they coordinated and, as a result, were able to provide concise and clear opinions confined to their respective field of expertise.[8]

## III.    The Parties' Expert Discovery Agreement.

In addition to Defendants complaints regarding the March 1 meeting, Defendants also imply, albeit incorrectly, that at or before the time of that meeting Plaintiffs had an "explicit agreement with Defendants that the parties would 'mutually exchange'" drafts of opinions and experts' notes. OB at 10; Silberglied Decl. at ¶1. To the contrary, it was not until March 10, 2006, that the parties even discussed whether they should agree upon categories of expert documents to be exchanged. *Id.* at ¶¶2-3. Prior to that time, neither party had requested any document discovery with respect to expert witnesses, nor were there any prior conversations or understandings on the subject. *Id.* at ¶2. While discussed in general terms, no decision on the scope of the parties' expert document discovery was reached during the March 10 call, and drafts were not mentioned at all. *Id.* at ¶4

At some point thereafter, but prior to March 16, 2006, the scope of expert document discovery was addressed again. *Id.* at ¶5. In the course of that discussion, Defendants' counsel agreed to exchange expert discovery and requested that drafts of reports and notes be included in the categories of documents to be produced. *Id.* Mindful of Defendants' request for inclusion of specific categories of documents,

---

[8] Defendants feign disbelief that a meeting could last 4 - 5 hours and that more substance was not discussed. OB at 2. In doing so, Defendants ignore that most of the time spent at this meeting was consumed with each expert reading hundreds of pages of reports. Defendants also overlook the fact that, as Mr. Charnetzki testified, the meeting broke at mid-day so that several participants could attend Ash Wednesday mass. Charnetzki Dep. at 22 (Ex. 1).

8

Plaintiffs' counsel sent a proposed list of categories to Defendants' counsel that included drafts of reports and notes written by the experts. *Id* at ¶6 (D.I. 271 at Ex. 1). By letter dated March 24, 2006, Defendants' counsel agreed, with minor modifications not relevant here, to exchange documents in accordance with the proposed list. *Id.* Contrary to Defendants' implication, the agreement regarding the exchange of materials did not take place until more than three weeks after the meeting about which Defendants complain.

## IV.    The Scope Of The Parties' Expert Document Production.

The experts retained by both sides to testify in this case have specific long-standing corporate and personal document retention policies. All experts followed their own policies. For some, like Plaintiffs' expert Walda Roseman, this meant retention of notes and drafts. For others, like Defendants' expert Joshua Livnat and Plaintiffs' experts Charnetzki and Taylor, it meant not retaining all notes or drafts. After a discovery agreement was in place, however, both parties' experts produced responsive documents in their possession, custody or control.

### A.    Plaintiffs' Experts Document Production.

Defendants do not dispute that the document retention policies for Huron Consulting (Charnetzki) and FTI Consulting (Taylor) were to not maintain notes or drafts of expert reports. Charnetzki Dep. at 53-55 (Ex. 1); Taylor Dep. at 47-49 (Ex. 3). Mr. Charnetzki described at length Huron Consulting's policy during his deposition. Charnetzki Dep. at 53-55 (Ex. 1). Similarly, Ms. Taylor described the policy at FTI Consulting and the reasons behind the policy. Ms. Taylor testified that "it creates confusion to be retaining tons of things...you get confused as to what is the one that got changed or what is the corrected one or whatever.... You don't keep, you know, every little thing that you have in the course of working on something. It just creates mass confusion." Taylor Dep. at 48-49 (Ex. 3). Notwithstanding FTI Consulting's policy, and contrary to what Defendants state in their Opening Brief (OB at 8), Taylor located one draft each of her opening and rebuttal reports in her e-mail system and produced both. Taylor Dep. at 50 (Ex. 3). By comparison, the document retention policy for CompassRose (Roseman) was to maintain notes, drafts and any other documentation related to the expert report. Roseman Dep. at 56-59

9

(Ex. 2). Ms. Roseman testified that she followed her company's document retention policy and that is precisely why she produced numerous drafts. *Id.*

### B.    Defendants' Expert Document Production.

Curiously, in light of the tone and substance of Defendants' motion, Defendants' expert, Dr. Joshua Livnat, testified that his practice is not to keep drafts of his expert reports including, but not limited to, drafts sent to him by counsel. Livnat Dep. at 133-137 (Ex. 7). Livnat further testified that one of the Shearman & Sterling attorneys representing Defendant actually wrote a portion of his report. Livnat Dep. at 136 (Ex. 7). Livnat, however, could not identify the portion written by counsel because he had merged counsel's draft into his own draft electronically, thereby making it impossible to tell who authored what text. *Id.*

Livnat also received other drafting and editorial help from counsel. For example, when asked why his view changed on one issue, he testified that he "did get a lot of help on the draft in terms of English and words -- a lot maybe is an overstatement, but I did get some -- we were pressed for time, so -- in producing the report, so I tended not to read my own drafts before sending it to [counsel] and expected them to edit it and come back with suggestions." Livnat Dep. at 133 (Ex. 7). When asked how counsel communicated his comments and revisions, Livnat testified:

> [A]t the beginning we would have a meeting and in the meeting we would exchange arguments about what I have written or what I am about to write and in some cases there were specific remarks about this or that and I would write down to myself notes and go back and revise my writing.
>
> Later on, there was a little more editing, once the document took almost the final stages. So, there I relied more on editing and I would get back from [counsel] an edited version of the document and would look at it, make sure that everything that's stated there is what I said and is not contradictory to what I think about.

Livnat Dep. at 134-135 (Ex. 7).

Another one of Defendants' experts, Ian Fisher of Ian Fisher LLC, produced a draft version of his report (the "Fisher Report") with pages 20-28 and half of pages 2 and 5 completely redacted without explanation. When asked about the redacted pages at his deposition, Fisher testified that the redacted text addressed a "second" issue, subsequently omitted from his final report, that he was asked by counsel to

render an expert opinion on for Defendants. Fisher Dep. at 49-52 (Ex. 4). When asked about the substance of his opinion on the second issue, *Defendants' counsel instructed Fisher not to answer on the basis of the work product doctrine. Id.* at 50-53. When asked who decided to excise the second issue from the Fisher Report, Mr. Fisher testified that Defendants' counsel "asked [him] not to include it." *Id.* at 51.[9]

Likewise, Linda McLaughlin of NERA Consulting, another expert for Defendants, testified about notes she had taken, but that were not produced, of her interview of Stewart Verge, one of the defendants in the case. Ms. McLaughlin also referenced her interview of Serge Fortin, another of the defendants in this case, but could not remember whether she took notes from that interview. McLaughlin Dep. at 40 (Ex. 8). In addition to herself, she also testified that another employee of NERA Consulting may have taken notes during the interviews. *Id.* at 41. Notwithstanding the fact that notes of conversations with parties are a specific category of documents the parties agreed to exchange, Defendants have not produced any notes from McLaughlin's interview of Verge nor, to the extent they exist, of her interview with Fortin. While Plaintiffs have not moved to exclude testimony from Defendants' three sets of experts, Defendants' own conduct appears to be sharply at issue with the standards that they seek to hold Plaintiffs to.

## ARGUMENT

### I.    THE ISSUE PRESENTED IS ONE OF FIRST IMPRESSION.

Contrary to the misleading citations in Defendants' brief, no Court in this District has ever, to our knowledge,[10] addressed the issue of whether trial experts are required to keep drafts of their reports in contravention of their document retention policies where there is no court order to the contrary and no request for production of such documents outstanding at the time.

---

[9] Fisher also prepared notes as a preparatory step to preparing the first draft of his report. *See, e.g.*, Fisher Dep. at 58-60, 135-136 (Ex. 4). Those notes have not been produced.

[10] While Plaintiffs cannot know whether there are any transcript decisions in the District Court on this issue, neither Plaintiffs, nor apparently Defendants, are aware of any.

Defendants, in their brief, cite Judge Jordan's recent opinion in *Pell v. E.I. Dupont de Nemours & Co., Inc.*, 231 F.R.D. 186 (D. Del. 2005), with the following parenthetical "(testimony of expert would be precluded if litigant failed to satisfy expert disclosure rule)." OB at 11. In fact, Judge Jordan's opinion has nothing at all to do with drafts of expert reports. Instead, *Pell* is a case in which the challenged expert failed to include in his report the supposed expert's qualifications, compensation, and the basis for his opinion -- items which, unlike drafts, are expressly mandated to be disclosed by Rule 26. 231 F.R.D. at 193. On this basis, the court conditionally ordered that the expert would be precluded, but gave the party proffering the report an opportunity to amend the report to include the missing items.

Likewise, Defendants' reliance on Judge Sleet's opinion in *In re Wechsler and M/V Atlas*, 121 F. Supp. 2d 404 (D. Del. 2000), is misplaced. *Wechsler* was a case about a fire that burned and sunk a motor yacht named the *Atlas*, which was moored in Georgetown Yacht Basin. *Id.* at 407. Parties interested in the dispute caused the vessel to be salvaged and stored so they could examine it to determine whether the vessel was the cause of the fire and the extensive damage to the yacht basin and other boats. *Id.* The Petitioner, however, caused the wreckage to be removed from storage and "crushed", making it impossible for the other parties with an interest in the matter, various insurers, to determine the cause of the fire and prepare a defense. *Id.* at 414. The vessel's owner then brought an admiralty action to limit its liability. In these circumstances, the Court held that the petitioners' claim would be dismissed, effectively holding that the spoliation of evidence, which went to the heart of the defense, would have the effect of depriving petitioner of its potential limitation of liability under admiralty law. *Id.* at 430. Of course, here there is no claim that documents relevant to the underlying claim were in any way destroyed, and Judge Sleet's opinion is simply not relevant.

Finally, Defendants' citation to Third Circuit law is no more illuminating. Both *Hagans v. Henry Weber Aircraft Distrib., Inc.*, 852 F.2d 60 (3d Cir. 1988), and *Semper v. Santos*, 854 F.2d 1233 (3d Cir. 1988), are cited for the singular, and not surprising, proposition that preclusion of expert testimony may be appropriate where a party violates specific court orders relating to that testimony. Of course, that is not what happened here. On the other hand, *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76 (3d Cir.

1994), while not addressing the question of whether experts are required to save drafts, is otherwise instructive. There, the Third Circuit *reversed* a district court ruling that an expert in a "defective design" case who had disassembled the allegedly defective saw had to be precluded because, as the saw was disassembled, its condition changed, thereby making further examination by the other side's experts more difficult or impossible. *Id.* at 81. In reversing the trial court, the Third Circuit held that the preclusion order was "a sanction far more serious than the spoliation inference." *Id.* at 79.[11]

Other than the five inapposite cases cited above, Defendants point to no authority in this District or the Third Circuit on point. In fact, however, there is Third Circuit precedent which *protects* attorney work product in the context of communications with experts. In *Bogosian v. Gulf Oil Corp.*, 738 F.2d 587 (3d Cir. 1984), the circuit court reversed the trial court's holding that attorney memoranda shared with an expert had to be produced. In considering the intersection of the expert disclosure rule and the work product doctrine, the Third Circuit concluded that the sharing of otherwise work product documents with an expert did not waive the work product protection otherwise afforded to those documents.[12] *Id.* at 594. Explaining its holding, the Third Circuit wrote:

> The thrust of Rule 26(b)(4) is to permit discovery of facts known or opinions held by the expert. Examination and cross-examination of the expert can be comprehensive and effective on the relevant issue of the basis for an expert's opinion without an inquiry into the lawyer's role in assisting with the formulation of the theory. Even if examination into the lawyer's role is permissible, an issue not before us, the marginal value in the revelation on cross-examination that the expert's view may have originated with an attorney's opinion or theory does not warrant overriding the strong policy against disclosure of documents consisting of core attorney's work product.

*Id.* at 595. While it is true that at least some courts outside the Third Circuit have reached a different result, others have suggested that *Bogosian* continues to be "good law" even after the 1993 amendments to Rule 26 upon which the Defendants here rely. *See, e.g., Krisa v. Equitable Life Assurance Soc'y*, 196

---

[11] The *Schmid* court also set forth a three part test that the courts within the Third Circuit are to apply in determining whether to grant sanctions in connection with spoliation of evidence. The test and its application are discussed below at Argument § IV.

[12] Interestingly, the trial court order relating to experts in the *Bogosian* case required production of final expert reports, but expressly exempted "preliminary or draft notes or reports" from production. *Bogosian*, 738 F. 2d at 590.

13

F.R.D. 254, 258 n.3 (M.D. Pa. 2000) (citing *Bogosian* authoritatively); *In re Cendant Corp. Secs. Litig.*, 343 F.3d 658, 665 (3d Cir. 2003) (same); *Smith v. Transducer Tech., Inc.*, 197 F.R.D. 260, 262 (D. V.I. 2000) ("[*Bogosian*] was decided prior to the 1993 amendments, however such view still has adherents post 1993.") (internal citation omitted). In any event, as explored below in greater detail, *Bogosian* does make clear that the supposed "prejudice" which the Defendants claim to have suffered here, *i.e.*, the inability to cross-examine experts from their drafts, is an interest which our Circuit Court has recognized as being of only "marginal value."

In short, this Court, while faced with an issue of first impression in this Court and the Third Circuit, has at least one significant touchstone to employ in considering the issue before it: the Third Circuit's unambiguous statement that the very "prejudice" argument being urged here is of little moment.

## II.    THE PLAIN LANGUAGE OF RULE 26 DOES NOT SUPPORT DEFENDANTS.

Where, as here, the Court lacks binding precedent to apply, its task in deciding the motion starts, predictably, with the plain language of the Rule it is being asked to interpret. *See Berckeley Inv. Group Ltd. v. Colkitt*, 259 F.3d 135, 142 n.7 (3d Cir. 2001) ("The Supreme Court and this Court have repeatedly held that the Federal Rules of Civil Procedure, like any other statute, should be given their plain meaning."); *McCusker v. Surgical Monitoring Assocs., Inc.*, 299 F. Supp. 2d 396, 398 (D. Del. 2004). Defendants' propose to read into the text of Rule 26 a nonexistent duty to preserve drafts irrespective of whether there is an outstanding discovery request for them. Rule 26(a)(2)(B), however, makes no mention whatsoever of drafts. Instead, it states:

> Except as otherwise stipulated or directed by the court, this disclosure shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case ..., be accompanied by a written report prepared and signed by the witness. *The report shall contain* a complete statement of all opinions to be expressed and the basis and reasons therefore; *the data or other information considered by the witness in forming the opinions*; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

Fed. R. Civ. P. 26(a)(2)(B) (emphasis added).

14

There is nothing within Rule 26 that requires the preservation or production of draft reports. Only "the report" is required to be produced. Rule 26 requires that the report contain a complete statement of "the data or other information considered." Plaintiffs' reports do list the information considered by the experts, often in extraordinary detail. For example, Mr. Charnetzki included a 47 page, single spaced index of the documents he relied upon. Charnetzki Dep. at 7-8 (Ex. 1). There is, however, nothing in Rule 26 that requires a party to list in the report the number of drafts of the report, nor to identify drafts in any other way.[13]

Notably, the rule requires identification in the report of "data or other information considered by the witness in forming the opinions." It does not require "preliminary versions of the opinion considered and discarded" prior to the final "opinions." Certainly, an expert does not consider her *own* draft as "data or information" useful in forming conclusions in aid of rendering an opinion. Indeed, the advisory committee notes to the 1993 amendments to Rule 26 recognize that "Rule 26(a)(2)(B) does not preclude counsel from providing assistance to experts in preparing the reports, and indeed, with experts such as automobile mechanics this assistance may be needed." *See Nexxus Products Co. v. CVS New York, Inc.*, 188 F.R.D. 7, 11 (D. Mass. 1999) (citing this language and denying defendants' motion to compel draft reports).

On its face, there is no interpretation of Rule 26 that would impose either a duty to preserve drafts or to produce them (absent a specific request). Under these circumstances, and where extensive deposition questioning has already been undertaken and cross-examination is available to Defendants, neither Plaintiffs nor their experts can be deemed to have engaged in spoliation. *See, e.g., Gucci Am., Inc., v. Exclusive Imports Int'l*, 2002 WL 1870293, at *6 (S.D.N.Y. Aug. 13, 2002) (referencing with approval the magistrate judge's acceptance, without censure, of plaintiff's assertion that its expert's notes

---

[13] Counsel for Defendants undoubtedly agree. *See* Fisher Dep. at 52-53 (Ex. 4) ("Q. Did you review -- how many drafts of issue number 2 did you review with counsel? SCHIMMEL: This is actually work product.").

were destroyed long ago, and quoting the magistrate judge's comment that "If [the expert] testifies at trial I would think [the fact notes may have been destroyed] that would be certainly grist for the mill.").

## III.    DEFENDANTS' POSITION IS NOT SUPPORTED BY SOUND POLICY.

Courts and commentators alike have correctly recognized that Rule 26 should not be interpreted to require preservation of all drafts created by an expert. Noting that "neither federal nor state rules provide a clear cut answer" as to whether drafts must be preserved and produced, the court in *Adler v Shelton*, 778 A.2d 1181 (N.J. Super 2001),[14] discussed the specific issue of the discoverability of attorney work product in relation to experts *Adler* concerned a request for discovery of plaintiffs' draft expert report, and while the expert had discarded all of his drafts, a draft faxed to plaintiffs' counsel was discovered in the files of a third party. *Id* at 1183-84. Plaintiffs argued that the draft would have been destroyed as part of the expert's routine practice but for the circumstances at issue. Concluding that, in the abstract, this argument had merit, *Adler* noted that "[i]t is common knowledge that attorneys regularly work with their retained experts in preparing expert reports" and that this is "good practice." *Id.* at 1190. *Id.* The *Adler* court quoted an apt observation:

> The central inquiry on cross examination of an expert witness...is not the question of if and to what extent the expert was influenced by counsel; rather it is this: what is the basis of the expert's opinion. Cross examination on the adequacy and reliability of the stated basis of the expert's opinion can be conducted effectively absent a line of questioning on counsel's role in assisting the expert.

*Id.* at 1190-91 (citing *All West Pet Supply Co v. Hill's Pet Prods Div*, 152 F.R.D. 634, 638 n.6 (D. Kan. 1993)).

Turning more particularly to the discoverability of draft expert reports, *Adler* noted that cases denying discovery base their decisions "on the need to encourage a close and collaborative effort between the expert and the retaining attorney." 778 A.2d at 1191. Moreover, *Adler* noted that "these courts believe that a blanket rule requiring disclosure of such draft reports puts too prominent a focus on the mechanics of the production of an expert's report rather than focusing on the basis of the expert's

---

[14] While *Adler* is a state court decision, the court noted that the state rule was a "carbon copy" of Fed. R. Civ. P. Rule 26. *Adler*, 778 A.2d at 1187.

opinion." *Id.* at 1191-92. (citing *Nexxus Products Co.*, 188 F.R.D. at 11; *Moore*, 194 F.R.D. at 661, 664).

Indeed, *Adler* noted that "[t]oo much scrutiny of this collaborative process serves only to demonize the

natural communicative process between an attorney and his or her retained expert." *Adler*, 778 A.2d at

1190. *See also Nexxus*, 188 F.R.D. at 11, and *Moore v. R.J. Reynolds Tobacco Co.*, 194 F.R.D. 659, 661,

664 (S.D. Ia. 2000) (holding draft expert reports to be protected opinion work product). The parties are

clearly in agreement here as well - Defendants, for example, redacted portions of Fisher's report on work

product grounds and, for the same reason, directed him not to answer questions at his deposition

concerning the redacted areas of his report. Fisher Dep. at 50-53. Notably, the Defendants also declined

to produce interview notes relied upon by McLaughlin.[15]

Because the draft in question in *Adler* existed in the hands of a third party, the court ordered it

produced, but had this to say about expert drafts in general:

> Experts familiar with the litigation process usually destroy their draft reports and the
> rules do not forbid this. Thus draft reports usually are available only from the unwary or
> careless expert or in odd circumstances like the present case.

*Id.* As the court in *Adler* recognized, most experts in this technologically savvy age[16] have document

retention policies that do not call for the retention of draft reports.

---

[15] Notwithstanding their own expert discovery conduct, Defendants rely upon *Trigon Insurance Co. v. United States*, 204 F.R.D. 277 (E.D. Va. 2001) and *Fidelity National Title Insurance Co. v. Intercounty National Title Insurance Co.*, 412 F.3d 745, 751 (7th Cir. 2005), in support of their motion, however, both cases are factually distinguishable from the present case. In *Trigon*, plaintiffs alleged that a non-testifying expert participated extensively in drafting the reports of testifying experts. *Id.* at 280-81. Defense counsel in *Trigon*, faced with document requests asking for drafts of reports, did not instruct their witnesses to save the drafts and those drafts were thereafter destroyed. *Id.* at 289. Notably, *Trigon* declined to impose a preclusion remedy. *Id.* at 291. In *Fidelity*, plaintiff's expert conducted a number of interviews with fact witnesses who refused on Fifth Amendment grounds to provide any further testimony in the case, then destroyed the notes taken of those interviews although some were eventually recovered. Not only is the destroyed material in *Fidelity* quite different from the drafts at issue here; if anything, the case bears more on Defendants' refusal to produce the NERA (McLaughlin) notes of interviews with defendants Stewart Verge and Serge Fortin. In any event, again, the reviewing court in *Fidelity* ultimately reversed the trial court's preclusion order. *Id.* at 751-52.

[16] Without a doubt, the vast majority of expert reports are produced on a computer with a word processing program. Jason Kraus, *Discovery Channels*, A.B.A. J., 88-Jul. 2002 49, 50 (citing study finding that 93 percent of all new information is created entirely in a digital format). In point of fact, at least three of the six experts in this case testified to maintaining their reports in a computer database. Charnetzki Dep. at 53-55 (Ex. 1); Taylor Dep. at 16, 22 (Ex. 3); Livnat Dep. at 133-137 (Ex. 7). In this

Several federal courts have expressed similar views in addressing whether draft expert reports are discoverable as attorney work product. *See, e.g., Bogosian*, 738 F.d at 589, 593 (trial court order relating to experts in *Bogosian* expressly exempted "preliminary or draft notes or reports" from production); *Krisa*, 196 F.R.D. at 260 ("for the high privilege accorded attorney opinion work product not to apply would require clear and unambiguous language."). Concluding that Rule 26 does not trump the protections afforded to attorney work product so as to justify disclosure of attorney work product in drafts of expert reports, the *Bogosian* court quoted the Supreme Court for the following policy rationale:

> Were such materials open to opposing counsel on mere demand, much of what is not put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness, and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of clients and the cause of justice would be poorly served.

*Id.* at 587 (quoting *Hickman v. Taylor*, 329 U.S. 495, 511 (1947)). The *Bogosian* court went on to note that attorneys must feel confident their written product will be protected from disclosure "[o]therwise, the freedom of thought essential to carefully reasoned trial preparation would be inhibited." *Id.* at 593.

Echoing the Supreme Court and Third Circuit's stance on the issue of attorney work product in the context of expert reports, a Michigan district court noted that "a more effective cross-examination and impeachment of the opposing party's expert witness ... is not the type of circumstance the Supreme Court contemplated would overcome the strong public policy against disclosing an attorney's opinion work product." *Haworth, Inc. v. Herman Miller, Inc.*, 162 F.R.D. 289, 295 (W.D. Mich. 1995). In reaching its ruling, the *Haworth* court noted that "[t]he risk of an attorney influencing an expert witness does not go unchecked in the adversarial system, for the reasonableness of an expert opinion can be judged against the knowledge of the expert's field and is always subject to the scrutiny of other experts." *Id.* For these

---

context, a duty to preserve would be almost impossible to define and have the potential for imposing insurmountable burdens on parties and experts to retain and produce each change of a draft expert report that would otherwise never have been printed or made its way onto the record. *See also*, Richard L. Marcus, *Confronting The Future: Coping with Discovery Electronic Material*, 64-Sum Law & Contemp. Probs. 253, 266 (2001). *Accord McDonald v. Sun Oil Company*, 423 F. Supp. 2d 1114, 1122 (D. Or. 2006).

reasons, the *Haworth* court reversed the magistrate's decision ordering disclosure of all communications between the expert and counsel.

Moreover, a district court faced with interpreting a party's discovery obligations under Rule 26 recently found that the rule does "not require the production of an expert's working notes." *McDonald*, 423 F. Supp. 2d at 1122. In fact, the *McDonald* court found that "[i]t was reasonable for the experts to assume that retention of th[e] notes [at issue] was unnecessary" and noted that "[e]xperts have 'no legal duty to be a pack rat' and are not 'required to retain every scrap of paper' created in preparing their opinions." *Id.* Reading the cases together, it is difficult to comprehend why, in the absence of a rule of law or timely document request, an expert would nevertheless be required to retain innumerable drafts of their preliminary reports.

Furthermore, an interpretation of Rule 26 that requires the production of draft expert reports will have a chilling effect on the drafting process, with experts exercising caution "to avoid committing matters to writing" lest they be cross-examined on every comma and word change.[17] *Id.* Such an outcome is clearly not desired by the courts, which have repeatedly held that the best way to combat expert testimony is with opposing expert testimony and not a battle over drafts. *Krisa*, 196 F.R.D. at 259-60. The focus of expert scrutiny rightly belongs on the expert, his or her credentials, and the final report signed and submitted to the court. Rarely are documents, whether final expert reports, briefs, or judicial opinions, judged by their earlier iterations. *See* Gregory P. Joseph, *Expert Spoliation*, 15 No. 6 Proc. Litigator. 7, at *9 (2002) (former Chair of the ABA Section of Litigation). Indeed, experts should be free to exercise their mental processes and expertise without the fear of committing anything to paper because it will later be scrutinized. *Id.*

Of course, nothing prevents parties from asking the expert about his or her analysis and evaluative process at the expert's deposition or during trial, so it is difficult to see how a party may be prejudiced by being denied access to preliminary drafts of an expert's report. *See In re Polypropylene*

---

[17] Charnetzki's report alone was 115 pages long due to the complexity of the multiple issues he was asked to address.

*Carpet Antitrust Litig*., 93 F. Supp. 2d 1348, 1364 (N.D. Ga. 2000) (mere fact documents no longer exist did not constitute "a scheme to deprive Defendants of necessary information"). Indeed, here Defendants have already asked extensive questions of the Plaintiffs' experts as to their meetings with each other and counsel (Charnetzki Dep. at 15-29 (Ex. 1); Taylor Dep. at 26-31 (Ex. 3)) and the input counsel and the other experts had on each of their opinions. *Id*. As evidenced by their reports and deposition testimony, the experts' opinions here are their own. Thus, Defendants' proposed interpretation of Rule 26 is unsound and unwise as a policy matter.

## IV.    EVEN IF THE COURT ACCEPTS DEFENDANTS' INTERPRETATION OF RULE 26, WHICH IT SHOULD NOT, THERE IS NO BASIS HERE TO IMPOSE THE DRACONIAN SANCTION OF PRECLUSION.

The parties before the Court agree on very little. Both, however, appear to agree that before applying the sanction requested by Defendants, the Court should apply the three part test set forth in *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994). Almost universally adopting the *Schmid* test, the Circuit Courts have repeatedly indicated their strong displeasure with preclusion sanctions or dismissal in all but the most egregious cases. No fewer than *four* of the very cases cited by Defendants in their brief are Circuit Court decisions from around the country reversing trial courts for entering preclusion or dismissal sanctions.[18]

---

[18] *See Fidelity Nat'l Title Ins. Co.*, 412 F.3d at 751-752 (reversal of trial court's decision to preclude expert testimony based on destruction of expert's notes); *Samos Imex Corp. v. Nextel Communications, Inc.*, 194 F.3d 301, 305 (1st Cir. 1999) (reversal of summary judgment and trial court's decision to exclude expert testimony even through the experts' report failed to comply with the disclosure requirements of Rule 26(a)(2)(B)); *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 780 (2d Cir. 1999) (reversal of trial court's decision to dismiss case based on spoliation of crucial piece of evidence that was left outdoors and was deteriorated by the winter elements); *Schmid*, 13 F.3d at 81 (reversal of trial court's order excluding expert testimony, reasoning that there was little fault on the part of the plaintiff who sought to proffer the expert evidence coupled with very little non-speculative harm to the defendant).

**A.    Applying The Third Circuit Test For Determining The Appropriateness Of Sanctions, Plaintiffs Should Not Be Sanctioned.**

In light of the strong judicial reluctance to sustain the "ultimate" sanction of preclusion of experts, the Third Circuit promulgated in *Schmid* its three part test for determining the appropriateness of sanctions in spoliation cases. *Schmid* instructs courts to consider:

> (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future

*Schmid*, 13 F.3d at 79.

In a nutshell, the three part *Schmid* test is designed to assist the court in selecting a sanction, if warranted, which is appropriate to the gravity of the conduct at issue. The courts which have applied the test uniformly stress the need to tailor the "punishment" to the "prejudice" suffered. *Paramount Pictures Corp. v. Davis*, 234 F.R.D. 102, 111 (E.D. Pa. 2005) ("In choosing an appropriate sanction for the spoliation of evidence, courts should select the least onerous sanction corresponding to the willfulness of the destructive act and the prejudice suffered by the victim.") (internal quotations omitted); *In re DaimlerChrysler AG*, 2003 WL 22951696, at *3 (D. Del. Nov. 25, 2003) (finding that no sanctions were appropriate for destruction of evidence where opposing party was not prejudiced).[19]    Ultimately, "assessment of sanctions depends most significantly on the blameworthiness of the offending party and the prejudice suffered by the opposing party." *Trigon*, 204 F.R.D. at 288. Sanctions for spoliation have twin aims: "leveling the evidentiary playing field and ... sanctioning improper conduct." *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995) (addressing spoliation in the context of plaintiff's destruction of portions of a boat which were the sole sources of information from which defendant could support its defenses).

---

[19] Unreported decisions cited herein are attached hereto as Exhibit A.

1.    **Plaintiffs Cannot Be Faulted For Failing To Abide By An Interpretation Of Rule 26 That Neither This District Nor The Third Circuit Have Adopted.**

As discussed above, the issue presented is one of first impression in this District and in the Third Circuit. Should this Court accept Defendants' invitation (which we believe to be seriously misguided) to establish a prospective rule of law that all expert drafts and notes should be preserved, lawyers in future cases will no doubt be on notice. In the present case, however, Plaintiffs cannot have been negligent in deferring to their experts' document retention policies prior to such a ruling.

While drafts *may* be subject to discovery, there is no *per se* rule that a party must preserve and subsequently produce drafts in the absence of a specific document request particularly where experts for the opposing party have acted in much the same way. In the face of such mutuality of conduct by the parties, at least as respects discarded notes, privilege instructions and computer drafts "merged" into others, it certainly cannot be possible that Plaintiffs acted with such a degree of fault as to warrant sanctions. *See Anderson v. Nat'l Railroad Passenger Corp.*, 866 F. Supp. 937, 946 (E.D. Va. 1994), *aff'd,* 74 F.3d 1230 (4th Cir. 1996).

Moreover, neither Plaintiffs nor their counsel had any role in creating or maintaining Huron Consulting's (Charnetzki) and FTI Consulting's (Taylor) long-standing, internal document retention policies. Similarly, Plaintiffs and their counsel had no role in creating or maintaining CompassRose's (Roseman) document retention policy. Indeed, under CompassRose's document retention policy, Roseman maintained drafts, which were numerous, and they were produced to Defendants. Roseman Dep. at 56-58 (Ex. 2). Furthermore, FTI Consulting's policy notwithstanding, Taylor was able to locate drafts of both her opening and rebuttal reports, and those drafts were immediately produced to Defendants in accordance with the parties' agreement.

2.    **Defendants Have Suffered No Prejudice And Will Suffer No Prejudice; Therefore, No Sanction Is Warranted Nor Necessary.**

Defendants have failed to identify any specific, cognizable prejudice that they have or will suffer other than some speculative concern regarding the efficacy of their cross-examination. As made clear in *Bogosian*, at least in this Circuit, the argument that Defendants will be deprived of the opportunity to

cross-examine the experts through the use of their drafts is of very little moment. Indeed, the Third Circuit expressly referred to that interest as of "marginal value." *Bogosian,* 738 F.2d at 595. In short, in this Circuit, the issue at trial is not where the expert's opinion originates, but *what* that opinion is, and whether it holds up to scrutiny.

Indeed, as the court in the *Polypropylene Carpet* case noted, Defendants' objections do not "impugn the reliability of [the expert's] model; instead [defendant's] argument suggest[ed] that it *might* be able to establish the unreliability of the model if only it had additional information." 93 F. Supp. 2d at 1364 (emphasis added). The defendant, however, had "ample opportunity to examine the methodology and reasoning underlying [the expert's] analysis." *Id.* For those reasons, the court in the *Polypropylene Carpet* case declined to find the testimony unreliable and did not even address the issue of sanctions. Here, Defendants can make no greater showing of concern than the defendant in the *Polypropylene Carpet* case and, therefore, should not be permitted to prevail. In addition, it is noteworthy that in the *W.R. Grace* case cited by Defendants, the court withheld ruling on sanctions because the moving party was unable to demonstrate any degree of "actual prejudice, a criteria necessary to determine the proper sanction." *W.R. Grace & Co. – Conn v. Zotos Int'l, Inc.,* 2000 WL 1843258, at *11 (W.D.N.Y. Nov. 2, 2000).

Unlike in *W.R. Grace,* the Defendants here had ample opportunity to depose both Charnetzki and Taylor during the course of each of their six plus hours of depositions. Thus, any alleged prejudice could have (and should have) been eliminated through Defendants' lengthy questioning at those depositions. Defendants' hyperbole about "amnesia" notwithstanding (OB at 5), all three of Plaintiffs' experts answered questions about their conversation with each other at their depositions. Charnetzki Dep. at 15-41 (Ex. 1); Taylor Dep. at 26-31 (Ex. 3); Roseman Dep. at 59-65 (Ex. 2). Indeed, both Charnetzki[20] and

---

[20] In addition to the March 1 meeting, Charnetzki testified that he participated in a conference call a couple of days after the initial reports were issued and, along with discussing how counsel could best prepare for examining the defense experts, Charnetzki testified that he discussed with Taylor her preparation of her rebuttal report. Charnetzki Dep. at 11-13 (Ex. 1). Subsequent to that conversation, he also testified to reviewing a draft of Taylor's rebuttal report that he discussed with Taylor and then immediately returned to one of her staff members. *Id.* at 13-14.

Taylor testified as to the length of the March 1 meeting, the participants in the meeting, the roles of all attendees in the meeting, the input or comments each received as a result of the other attendees' reviews of their preliminary drafts, and what changes, if any, were made to their report as a result of the meeting. Charnetzki Dep. at 15-29 (Ex. 1); Taylor Dep. at 26-31 (Ex. 3). Charnetzki also testified that the only written comments he received on his draft report were typographical in nature. Charnetzki Dep. at 25 (Ex. 1) ("I had spelled a name wrong or something"). The written comments Taylor received on her draft report at the March 1 meeting were similarly typographical and/or stylistic and grammatical in nature. Taylor Dep. at 30 (Ex. 3) ("There were some spellings, words missing, stuff like that."). While Taylor also testified that she did not comment on Charnetzki's report, she did note that she suggested he consider potential additional comparable companies and transactions. *Id.* at 30-31.

Charnetzki and Taylor did not, contrary to Defendants' implication (OB at 4), state that nothing substantive was discussed at the meeting. What they said was that the written comments on their respective drafts were typographical and/or stylistic in nature. What was discussed, substantively, however, was not in written form and, therefore, could not have been produced to Defendants even if Defendants had timely requested those documents be produced. Depositions are the appropriate forum for discovering the substance of verbal communications and exhaustive depositions were taken in this case, in several instances by Defendants' lead counsel. What additional information Defendants hope to gain from drafts of their reports that they did not or, at least, could not have learned through effective examination at their depositions is speculative at best. *See In re Polypropylene Carpet Antitrust Litig.*, 93 F.Supp. 2d at 1364.

**B.    Defendants Are Incorrect That Preclusion Of Plaintiffs' Experts Is Required Unless The Non-Disclosure Was Either Substantially Justified Or Harmless.**

Defendants imply that, if Plaintiffs did not make the requisite Rule 26 disclosures, which they did, preclusion of Plaintiffs' experts is required unless Plaintiffs prove that non-disclosure was either substantially justified or harmless. OB at 11. That is not the law in the Third Circuit. Fed. R. Civ. P. 37(c)(1) provides that, "*In addition to or in lieu of* th[e] sanction [of preclusion], the court, on motion and

24

after affording an opportunity to be heard, *may impose* other appropriate sanctions " (emphasis added)

*See also* Cmt. (1993) ("However, the rules provides the court with a wide range of other sanctions . . . that, though not self-executing, can be imposed when found to be warranted after a hearing."); *United States v. Rapanos,* 376 F.3d 629, 645 (6th Cir. 2004) ("recognize[ing] the discretion of the trial court to fashion appropriate remedies, taking into account the facts of the case "). Courts in the Third Circuit have held that they have the discretion to choose among a wide range of sanctions, including that of preclusion. *See Kotes v. SuperFresh Food Markets, Inc.,* 157 F.R.D. 18, 20 (E.D. Pa. 1994) (holding that the "extreme sanction of preclusion of testimony is not warranted" because, "[w]hile neither party fully complied with the scheduling order and the Rule 26 disclosure requirements, their questionable conduct does not clearly evidence bad faith"); *In re Paoli Railroad Yard PCB Litig.,* 35 F.3d 717, 791-93 (3d Cir. 1994) (reversing a district court's preclusion of expert testimony for failure to comply with Fed. R. Civ. P. 26 when a lesser sanction could have been imposed); *see generally* 7 James Wm. Moore, *Moore's Federal Practice* ¶ 37.60[2][b], at 37-121 (2003) (citing *Paoli* for the proposition that judges have refused to "exclude important evidence, unless the misconduct was accompanied by willfulness, bad faith, or other substantial fault").

Plaintiffs' experts' failure to preserve certain drafts or notes is harmless in any event. Like the notes at issue in *McDonald*, the drafts do not relate to a challenge to the expert's admissibility. *McDonald*, 423 F. Supp. 2d at 1122. Furthermore, the drafts do not relate to the experts' opinions and methodology, all documentation Defendants have already received. *Id.* Thus, the drafts, like the notes in *McDonald*, are not relevant for purposes of Rule 26. *Id.*

To the extent the plaintiffs in *McDonald* argued they were impeded in their cross-examination because the notes were destroyed, the *McDonald* court noted, "[e]xamination and cross-examination of the expert can be comprehensive and effective on the relevant issue of the basis for an expert's opinion without an inquiry into the lawyer's role in assisting with the formulation of the theory." *Id.* (quoting *Bogosian*, 738 F.2d at 595). Plaintiffs in the *McDonald* case also argued that the experts' opinions were biased and improperly influenced by defendant, notwithstanding the fact that the suggestions at issue

25

were editorial in nature and in conjunction with guidance from counsel that the experts' judgment should govern. On this point, the *McDonald* court held that "[c]ounsel does not act improperly by 'offering editorial suggestions, which the expert [is] free to accept or reject." *Id.* (quoting *Goins v. Angelone*, 52 F. Supp. 2d 638, 664 (E.D. Va. 1999)) As Charnetzki and Taylor both testified, the written comments they received on the printed drafts of their reports were similarly typographical and/or stylistic in nature. Here, non-disclosure of the drafts was harmless and, therefore, does not merit sanctions.

### C.   The Relief Sought By Defendants Would Be Tantamount To Dismissal of Plaintiffs' Fiduciary Duty Claim.

This is a case of first impression. Should the Court determine to interpret Rule 26 in a manner that requires experts to preserve drafts, then there is no additional value to be gained from entering a "deterrent" sanction here -- in this jurisdiction, at least, there was no rule which was violated. The Court's ruling would alert the Bar that the law has changed and "deterrence" would only be relevant were the challenged conduct to occur in the future.

As set forth above, Plaintiffs' contend that no sanction is warranted or necessary. It is more than a bit ironic that Defendants complain so bitterly of the conduct challenged here, given their substantial input into at least one of their expert's reports. *See* Livnat Dep. 133-135 (Ex. 7). Defendants here have asked the Court to preclude any testimony by two of Plaintiffs' three experts. It is well settled that the "harshest sanctions available are preclusion of evidence and dismissal of the action." *Update Art, Inc. v. Modiin Pub., Ltd.*, 843 F.2d 67, 71 (2d Cir. 1988). Accordingly, preclusion should only be imposed in the face of strong evidence of willful misconduct and "should be imposed only in rare situations." *See Id.* (counsel misled the court and failed to comply with numerous court orders). *See also Taylor v. Illinois*, 108 S. Ct. 646, 652 (1988) (counsel willfully failed to identify key witness in response to pretrial discovery requests).

In affirming a court's decision to exclude expert witness testimony, the Third Circuit reiterated its ruling that "the exclusion of critical evidence is an 'extreme' sanction, not normally to be imposed absent a showing of willful deception or 'flagrant disregard' of a court order by the proponent of the evidence."

26

*Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997). Indeed, an order of preclusion is

the "ultimate sanction." *See Kremsner v. Fortuna-SAS*, 1989 WL 70687, at *1 (E.D. Pa. June 23, 1989)

("Preclusion of testimony and dismissal are extreme sanctions to be imposed only in rare situations.

Preclusion of testimony can be tantamount to dismissal.") (citations omitted).

    Alternatively, courts which have entertained sanctions in cases such as this have typically relied

upon "adverse inference instructions" or "spoliation instructions" to the jury. *See generally, Wachtel v.

Guardian Life Ins. Co.*, 2006 WL 1286189, at *15 (D. N.J. May 8, 2006) (affirming adverse inference

instruction based on defendant's spoliation of relevant emails); *Mosaid Techs. Inc. v Samsung Elecs. Co.*,

348 F. Supp. 2d 332 (D. N.J. 2004). The rationale for the rules regarding expert witness discovery are

based in part on "the significance which jurors may attach to expert testimony and the increasing

occurrence of 'battle of the experts.'" *Musselman v. Phillips*, 176 F.R.D. 194, 200 (D. Md. 1997). These

concerns are not present in this case where the evidence will be viewed through the lens of an experienced

trial court.[21] For these reasons, the Defendants' motion does not present a situation in which Defendants

may face prejudice should the expert evidence be admitted. Indeed, the Court, as finder of fact, is now

well aware of the way the "sausage" (OB at 1) was made, and is free to consider that in assessing the

experts' testimony at trial.

    Preclusion of testimony would be particularly damaging here because it would eliminate elements

of Plaintiffs' case-in-chief on certain counts. For example, in order to determine whether Defendants

breached their fiduciary duties, the Court will need to consider whether the Debtors were insolvent or in

the zone of insolvency, a subject directly addressed by Mr. Charnetzki. Likewise, Ms. Taylor gives

specific evidence as to what the Defendants' options were. Precluding these witnesses on the eve of trial

---

[21] *See, e.g., United States v. Brown,* 415 F.3d 1257, 1268 (11th Cir. 2005) (courts have traditionally recognized that evidentiary rules are "more relaxed in a bench trial situation, where the judge is serving as factfinder and we are not concerned about 'dumping a barrage of questionable scientific evidence on a jury.'"); *In re Unisys Savings Plan Litig.* 173 F.3d 145, 162 (3d Cir. 1999) ("While improper admission of evidence is usually harmless error in a bench trial, the improper *exclusion* of an expert witness who would have offered a party's sole expert testimony on an element of its case ordinarily is not harmless.").

27

would be akin to ordering the Plaintiffs not to present a breach of fiduciary duty case. Accordingly, in this case, an order of preclusion would be the "ultimate sanction" tantamount to outright dismissal of some of Plaintiffs' claims. *See Kremsner*, 1989 WL 70687, at *1.

Moreover, as set forth above, Defendants' experts engaged in the same (or very similar) conduct as Mr. Charnetzki and Ms. Taylor and we respectfully submit that sanctioning either side would serve only to hinder rather than aid the Court's resolution of this case. Thus, in keeping with the goal of keeping the playing field level, Plaintiffs respectfully request that even if the Court holds that spoliation has occurred, which it should not, it should exercise its discretion to not preclude any expert testimony. *Vodusek*, 71 F.3d at 156.

Finally, in connection with making the "punishment" fit the "prejudice", we would be so bold as to suggest that were the Court to announce, for the first time in this District a rule requiring preservation of expert drafts, and were the Court also inclined to enter some type of sanctions here (which it should not for all the reasons set forth above), we would submit that an appropriate sanction would be an order prohibiting the Plaintiffs from relying on any drafts of Defendants' expert reports. Such a sanction would be effective in "leveling the playing field" and would remove any argument of unfair advantage in this case. It would also focus both parties attention on the basis for the experts' opinions - - a subject which the Third Circuit has made clear should be the focus here.

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully submit that Defendants' motion should be denied in its entirety.

28

_Gregory V. Varallo (No. 2242)_
C. Malcolm Cochran, IV (No. 2377)
Russell C. Silberglied (No. 3462)
Anne Shea Gaza (No. 4093)
Richards, Layton & Finger, P.A.
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Varallo@rlf.com
Cochran@rlf.com
Silberglied@rlf.com
Gaza@rlf.com
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
*Attorneys for Teleglobe Communications
Corporation, et al.*

Dated: May 31, 2006

/s/ Joseph A. Rosenthal
Joseph A. Rosenthal (No. 234)
Rosenthal, Monhait & Goddess, P.A.
1401 Mellon Bank Center
P.O. Box 1070
Wilmington, Delaware 19899-1070
jrosenthal@rmgglaw.com
Telephone: (302) 656-4433
Facsimile: (302) 658-7567
*Attorneys for the Official Committee of
Unsecured Creditors of Teleglobe
Communication Corporation, et al.*
- and -
John P. Amato
Mark S. Indelicato
Zachary G. Newman
Jeffrey L. Schwartz
Hahn & Hessen LLP
488 Madison Avenue
New York, New York 10022
(212) 478-7200
*Attorneys for the Official Committee of
Unsecured Creditors of Teleglobe
Communication Corporation, et al.*

29