# EXHIBIT 1

TELEGLOBE COMMUNICATIONS VS. BCE, INC.

PAUL CHARNETZKI - 5/3/06

CONCORDANCE AND CONDENSED TRANSCRIPT
PREPARED BY:



*Ellen Grauer*
**COURT REPORTING** Co. LLC

TOWER 56, 126 EAST 56TH STREET, FIFTH FLOOR, NEW YORK, NEW YORK 10022
PHONE: (212) 750-6434    FAX: (212) 750-1097
WWW.ELLENGRAUER.COM

Page 9

(1)
(2) the reports of Dr. Taylor and Dr. McLaughlin, which I
(3) had not seen prior to the preparation of the report,
(4) that I have looked at.
(5)        They also cite a July, I think -- a
(6) June or July study which we have not located, and I
(7) don't know that it has been produced to us. So I
(8) haven't seen that, but that that does come to mind.
(9)    Q.    June-July study of what, sir?
(10)    A.    I believe it is a June or July
(11) forecast for Teleglobe that I believe is cited in the
(12) report. It has got a Bates number of TEAC, something
(13) like that.
(14)    Q.    And you are saying it was not produced
(15) to you as part of this litigation?
(16)    A.    I have not been able to locate it if
(17) it has been produced. A lot has been produced, but I
(18) have not been able to locate it.
(19)    Q.    What is the description of this
(20) document? What does it purport to be, as you recall
(21) it, sir?
(22)    A.    It is a forecast of Teleglobe that was
(23) prepared in the summer of 2002.
(24)    Q.    The summer of 2002?
(25)    A.    Yes.

Page 10

(1)
(2)    Q.    Apart from that and the Goldman Sachs
(3) valuation material, can you think of anything else
(4) that you have referenced since the preparation of your
(5) report that is not found in Exhibit II, Tab 2 to
(6) Charnetzki 1?
(7)    A.    I reviewed again specifically the
(8) Canadian accounting standards Mr. Cetkowski
(9) references. But -- that is not listed in my report,
(10) but I have looked at those.
(11)        I can't recall anything else.
(12)    Q.    Now, have you read the reports of
(13) other experts issued in this matter?
(14)    A.    Yes, sir.
(15)    Q.    Which reports do you recall reading?
(16)    A.    Mr. Cetkowski, Mr. Livnant,
(17) Mr. Fisher, Drs. Taylor and McLaughlin, Ms. Taylor,
(18) mine, the CompassRose report. So those would be all
(19) the ones -- I think all the expert reports that have
(20) been produced.
(21)    Q.    Now, so we don't trip over each other,
(22) can we refer to Dr. Taylor and Ms. Taylor in that way,
(23) and we will differentiate between the two Taylors?
(24)    A.    I will try.
(25)    Q.    Is that okay with you?

Page 11

(1)
(2)        Now, have you had discussions with any
(3) other experts in this matter since the issuance of
(4) your report?
(5)    A.    Since issuing the report, yes.
(6)    Q.    Okay. With which experts have you had
(7) discussions, Mr. Charnetzki?
(8)    A.    I was on a conference call after the
(9) initial reports were issued where some people from
(10) FTI, Ms. Taylor and her colleagues were on. And I
(11) believe people from CompassRose may have been on the
(12) call, too, but -- I don't recall that, but I believe
(13) that was the case.
(14)    Q.    And when was this conference call,
(15) Mr Charnetzki?
(16)    A.    A couple days after the initial
(17) reports were issued.
(18)    Q.    And who was on from your side, in
(19) connection with Huron?
(20)    A.    I was, Mrs. Hayes and Ms. Gordecka,
(21) and Mrs. McKenzie.
(22)    Q.    And how long did this conference call
(23) with Ms. Taylor last, sir?
(24)    A.    There were also lawyers on the call.
(25)    Q.    How long did the call last, sir?

Page 12

(1)
(2)    A.    An hour or so.
(3)    Q.    And which lawyers were on the call?
(4) Was Mr. Varallo on the call?
(5)    A.    I don't recall if he was or not.
(6) Mr. Silberglied was, I am fairly sure. I believe
(7) Mr. Varallo was on. I don't recall beyond that.
(8)    Q.    Now, is that the first and only time
(9) that you were on a call with Ms. Taylor, sir?
(10)    A.    No. I have talked -- I or people on
(11) my staff have talked to her subsequently.
(12)    Q.    Subsequent to that call you just
(13) referenced?
(14)    A.    Yes.
(15)    Q.    Did you yourself speak to her
(16) subsequent?
(17)    A.    I don't recall personally speaking to
(18) her other than briefly, but --
(19)    Q.    And what do you recall briefly
(20) discussing with her subsequent to the conference call
(21) you had after the issuance of the reports,
(22) Mr Charnetzki?
(23)        MR. VARALLO: I would caution the
(24) witness, to the extent you were speaking with Carlyn
(25) Taylor at the request of attorneys to help attorneys

## Page 17

(1)
(2) else was present?
(3)    A.    Two people from the CompassRose firm
(4) whose names escape me at the moment, but they were
(5) here as well.
(6)    Q.    And by the way, what role did the
(7) CompassRose firm play in all this?
(8)    A.    I believe -- I mean --
(9)       MR. VARALLO:  Objection to the form of
(10) the question.  You can answer.
(11)       THE WITNESS:  I believe the other -- I
(12) believe that's the firm that Ms. Walda -- I am
(13) forgetting her last name right now -- was employed by.
(14) BY MR. BASKIN:
(15)    Q.    That is a third expert?
(16)    A.    Yes.
(17)    Q.    And she was in attendance at this
(18) meeting also?
(19)    A.    She was not.
(20)    Q.    But she had members of her staff in
(21) attendance at this meeting?
(22)    A.    Yes.
(23)    Q.    So in these law offices you and how
(24) many members of your staff were in attendance at this
(25) meeting, Mr. Charnetzki?

## Page 18

(1)
(2)    A.    None.
(3)    Q.    Just you?
(4)    A.    Yes.
(5)    Q.    And how many members of Ms. Taylor's
(6) staff were in attendance at this meeting, sir?
(7)    A.    None.
(8)    Q.    Just her?
(9)    A.    Yes.
(10)    Q.    And then Ms. Roseman had several staff
(11) members present?
(12)    A.    I believe there were two.
(13)    Q.    And was Ms. Roseman and her team also
(14) on the phone calls you referenced post issuance of the
(15) reports?
(16)    A.    They were, I believe, on one of them.
(17)    Q.    They were on the conference call you
(18) referenced?
(19)    A.    Yes.
(20)    Q.    But they were not in on the calls when
(21) you and Ms. Taylor were talking one on one; is that
(22) correct?
(23)    A.    No.
(24)    Q.    Now, when you met in these law offices
(25) in January 2006, the three firms, were lawyers

## Page 19

(1)
(2) present?
(3)    A.    Yes.
(4)    Q.    Now, who were the lawyers from
(5) Richard, Layton & Finger?
(6)    A.    They were here.
(7)    Q.    Were Hahn & Hessen present?
(8)    A.    Ms. Amato was here.
(9)    Q.    Was Ms. Morgan present?
(10)    A.    I don't believe so.
(11)    Q.    And anyone else present that you can
(12) think of other than people we discussed thus far?
(13)    A.    I believe Mr. Cooke was present.
(14)    Q.    And can you tell us for the record who
(15) Mr. Cooke is?
(16)    A.    Mr. Cooke is counsel for Teleglobe.
(17)    Q.    Anyone else present?
(18)    A.    I believe Mr. Mongrain.
(19)    Q.    Who?
(20)    A.    Andre Mongrain.
(21)    Q.    Mr. Mongrain was present?
(22)    A.    Yes, at least for part of the meeting.
(23)    Q.    Now, how long did this meeting last in
(24) and around January 2005, when all the experts met in
(25) these law offices?

## Page 20

(1)
(2)    A.    Again, it may have been later than
(3) that.  I was fairly busy this year, and I don't know.
(4) But whatever it was, I think we started in the morning
(5) and we ended at 4:00 or so.
(6)    Q.    And what were you discussing during
(7) the course of that meeting, Mr. Charnetzki?
(8)    A.    I discussed my observations at that
(9) point.  Ms. Taylor discussed hers, and the others
(10) discussed theirs.
(11)    Q.    And were assignments given out during
(12) the course of this meeting?
(13)    A.    Assignments had been given out prior
(14) to that.  I believe I had collected exhibits and
(15) things like that at that meeting.
(16)    Q.    And were assignments given out in the
(17) course of that meeting to everyone in that meeting as
(18) well?
(19)    A.    I am sorry.  My recollection is the
(20) assignments had already been given out and we were
(21) reporting on where we were.  I don't recall any
(22) additional assignments given out at that meeting.
(23)    Q.    Now, was this the meeting, sir -- by
(24) the time of this meeting had you decided what your
(25) opinions were going to be in connection with your

TELEGLOBE COMMUNICATIONS                                                    VS. BCE, INC.

PAUL CHARNETZKI - 5/3/06

Page 25

(1)
(2)    Q.    You don't recall one way or the other?
(3)    A.    No.
(4)    Q.    Now, I take it the lawyers were
(5)    commenting on the drafts during the course of this
(6)    meeting?
(7)    A.    Yes.
(8)    Q.    And were you taking down what the
(9)    lawyers were saying, sir?
(10)    A.    I collected all the drafts.
(11)    Q.    You collected everyone's drafts around
(12)    the meeting?
(13)    A.    Yes.
(14)    Q.    And you took them home with you?
(15)    A.    I took them home with me. I looked at
(16)    them. To the extent there were things that — I had
(17)    spelled a name wrong or something, made changes,
(18)    considered them and shredded them.
(19)    Q.    You shredded all the drafts marked up
(20)    at that meeting?
(21)    A.    Yes.
(22)    Q.    And is that your normal practice, to
(23)    shred the drafts, sir?
(24)    A.    Yes, sir.
(25)    Q.    And you do that in all cases in which

Page 26

(1)
(2)    you testify?
(3)    A.    Yes.
(4)    Q.    And is that a practice you discussed
(5)    with Mr. Varallo before you did it in this matter,
(6)    sir?
(7)    A.    I told him what my normal practice
(8)    was.
(9)    Q.    And did you tell him you were going to
(10)    be shredding all drafts in this matter,
(11)    Mr. Charnetzki?
(12)    A.    Yes, I did.
(13)    Q.    And what did Mr. Varallo say to you,
(14)    sir?
(15)    A.    He said, "Is that your normal
(16)    practice?" And I said, "Yes, it is."
(17)    Q.    And did you also — strike that.
(18)          When did you first tell — you told
(19)    Mr. Varallo personally you were going to be shredding
(20)    drafts in this matter, Mr. Charnetzki?
(21)    A.    Yes.
(22)    Q.    When was the first time you told him
(23)    you were going to be shredding drafts?
(24)    A.    I don't recall.
(25)    Q.    Was it in and around the time of this

Page 27

(1)
(2)    Ash Wednesday meeting, sir?
(3)    A.    No. I think I may have told him that
(4)    probably before that.
(5)    Q.    Probably before even the Ash Wednesday
(6)    meeting you think you told him?
(7)    A.    Yes.
(8)    Q.    And did you tell the other lawyers in
(9)    this matter that you were going to be shredding all
(10)    drafts in this matter, Mr. Charnetzki?
(11)    A.    I don't recall.
(12)    Q.    Just Mr. Varallo?
(13)    A.    I don't recall whether I did or not.
(14)    Q.    You are saying no, you don't recall
(15)    telling him or you do recall telling him?
(16)    A.    I don't recall whether I did or not.
(17)    I may have.
(18)    Q.    But you recall he said to you that if
(19)    is your normal practice, it is okay for you to do it
(20)    in this matter; is that correct, Mr. Charnetzki?
(21)    A.    I don't recall if he said that or not.
(22)    Q.    So I take it if you said that about a
(23)    page ago, you are recanting that portion of the
(24)    testimony, sir?
(25)    A.    No.

Page 28

(1)
(2)          MR. VARALLO: Objection to the form of
(3)    the question. Don't argue with him. The record will
(4)    speak for himself.
(5)    BY MR. BASKIN:
(6)    Q.    Are you changing your testimony if the
(7)    record says that, Mr. Charnetzki?
(8)    A.    If I said that, I must have misspoke.
(9)    My recollection is I told him that. He said, "Is that
(10)    your normal practice?"
(11)    Q.    So that is your recollection?
(12)    A.    Yes.
(13)    Q.    And then you told him that is your
(14)    normal practice; is that correct?
(15)    A.    Yes.
(16)    Q.    And then you made the determination
(17)    you were going to shred all the drafts; correct?
(18)    A.    And then I did shred all the drafts,
(19)    yes, sir.
(20)    Q.    And you shredded all the comments that
(21)    everyone made in connection with the drafts; correct?
(22)    A.    Yes.
(23)    Q.    And you considered all the comments
(24)    that were made in the course of — in preparing
(25)    subsequent drafts; correct?

TELEGLOBE COMMUNICATIONS                                                  VS. BCE, INC.

PAUL CHARNETZKI - 5/3/06

---

Page 33

(1)
(2)   them, were they feasible restructuring plans, those
(3)   sorts of things.
(4)       Q.    And were you discussing with her the
(5)   quantification of damages that you were obtaining in
(6)   connection with that?
(7)       A.    I don't recall discussing with her the
(8)   quantification of damages.
(9)       Q.    You just recall discussing with her
(10)  your valuation model?
(11)      A.    In general terms probably.
(12)      Q.    Are you saying you are guessing now or
(13)  you actually have a recollection of that,
(14)  Mr. Charnetzki?
(15)      A.    I don't know if I am guessing or not.
(16)  I have a recollection that -- I can't -- I don't have
(17)  a specific recollection of the conversation. I would
(18)  think that we discussed that I would be putting in a
(19)  DCF kind of model and using something like the Gordon
(20)  growth at the end.
(21)      Q.    Now, did Ms. Taylor ask to see your
(22)  valuation model, sir?
(23)      A.    I don't recall that she did.
(24)      Q.    Did she ask to see the assumptions in
(25)  your valuation model?

---

Page 34

(1)
(2)       A.    I don't recall whether she did or not.
(3)       Q.    You don't recall one way or the other?
(4)       A.    No.
(5)       Q.    Do you recall if you shared with her
(6)   your valuation models?
(7)       A.    At one point she read a nearly done
(8)   version of the -- my draft, so the assumptions would
(9)   have been in there.
(10)      Q.    And were the assumptions and
(11)  sensitivities of your valuation models included in the
(12)  drafts that were circulated over Ash Wednesday?
(13)      A.    I don't believe so.
(14)      Q.    But subsequent -- when your report was
(15)  in draft, your valuation models were included;
(16)  correct?
(17)      A.    That's correct.
(18)      Q.    And you circulated that draft to
(19)  Ms. Taylor; correct?
(20)      A.    She certainly read it before it was
(21)  issued, yes.
(22)      Q.    And did you ask for her comments on
(23)  the valuation model?
(24)      A.    I didn't specifically ask for her
(25)  comments.

---

Page 35

(1)
(2)       Q.    Did she offer you comments on the
(3)   valuation model?
(4)       A.    I don't recall her offering any
(5)   comments.
(6)       Q.    You don't recall what she said one way
(7)   or the other?
(8)       A.    I don't recall one way or the other.
(9)       Q.    Now, in all, then you said -- strike
(10)  that.
(11)           In all, how many conversations did you
(12)  have with Ms. Taylor prior to the issuance of your
(13)  report and subsequent to the Ash Wednesday meeting in
(14)  which the lawyers were not involved?
(15)      A.    I would say one or two maybe.
(16)      Q.    And then you said you also had certain
(17)  conversations with Ms. Taylor when the lawyers were
(18)  involved; correct?
(19)      A.    That's right.
(20)      Q.    And in that connection do you remember
(21)  how many such conversations there were?
(22)      A.    Two or three.
(23)      Q.    And the two conversations, the one or
(24)  two you had with Ms. Taylor by yourself without the
(25)  lawyers, how long did that conversation last,

---

Page 36

(1)
(2)   Mr. Charnetzki?
(3)       A.    They would have been very short.
(4)       Q.    By very short, half an hour?
(5)       A.    Oh, probably shorter than that.
(6)       Q.    But you are guessing; is that right?
(7)       A.    Yes.
(8)       Q.    You don't really remember the
(9)   conversations; right?
(10)      A.    I don't have a detailed recollection
(11)  of the conversations.
(12)      Q.    Well, do you have any recollection of
(13)  them other than what you have testified thus far?
(14)      A.    I have testified to my recollection to
(15)  the best of my ability.
(16)      Q.    Did you take notes during the course
(17)  of that conversation?
(18)      A.    Probably not.
(19)      Q.    And if you did take notes, I take it
(20)  you shredded them; is that correct?
(21)      A.    If I took notes, then I have not
(22)  preserved them.
(23)      Q.    Now, in connection with the
(24)  conversations with the lawyers present subsequent to
(25)  Ash Wednesday and prior to issuance of your report --

---

Page 41

(2) A. Yes.

(3) Q. And were you considering her comments?

(4) A. Yes, I did.

(5) Q. And were you taking notes on her

(6) comments?

(7) A. I don't recall that I did, no.

(8) Q. And were her comments only with

(9) reference to typos or was she commenting on the

(10) substance of your draft?

(11) A. I don't recall that there were any

(12) substantive changes that came out of her comments.

(13) Q. Well, do you recall what her comments

(14) were, sir?

(15) A. No, not as I sit here today, no.

(16) Q. But you did recall what her comments

(17) were at the time because you wrote them down; correct?

(18) A. Not most of them, no.

(19) Q. Well, those that you thought were

(20) viable or valid you wrote down; correct?

(21) A. Yes.

(22) Q. And I take it that whatever document

(23) you wrote her comments down on, you shredded that?

(24) A. Probably. I may have just put them on

(25) the electronic version of the report, in which case

Page 42

(2) they would be in that. To the extent that I put them

(3) on a draft, a physical draft, I would then incorporate

(4) them to the extent, you know, I thought it was a more

(5) clear sentence than the one I had. It would have been

(6) for everybody. And the physical thing I did destroy,

(7) yes.

(8) Q. Just so I understand, because I have

(9) been through your box of materials you produced in

(10) this matter or boxes, am I correct, sir, that you

(11) destroyed every draft of your report prior to the

(12) draft in front of you, prior to the final version in

(13) front of you today?

(14) A. That was my intention, yes, sir.

(15) Q. Well, that was your conscious

(16) decision; correct?

(17) A. Yes, sir.

(18) Q. And am I correct that you destroyed

(19) every note that you took leading up to the preparation

(20) of the report sitting in front of you today?

(21) A. I don't recall taking very many notes,

(22) but -- and they would have been more in the nature of

(23) edits to the draft. And I don't retain edits in

(24) drafts.

(25) Q. And so to the extent you took notes,

Page 43

(2) you destroyed them all; correct, Mr. Charnetzki?

(3) A. That's correct.

(4) Q. Every single one?

(5) A. Yes.

(6) Q. And every single draft; correct?

(7) A. Yes.

(8) Q. Now, did you discuss with Ms. Taylor

(9) that she should destroy her drafts also?

(10) A. I don't recall discussing that.

(11) Q. You don't recall discussing that one

(12) way or the other?

(13) A. I don't recall discussing that one way

(14) or the other.

(15) Q. Now, let's discuss for a second, sir,

(16) how you actually physically prepared -- well, strike

(17) that. Let's start somewhere else.

(18) When were you retained as a testifying

(19) expert in this matter, Mr. Charnetzki?

(20) A. I believe sometime in the spring of

(21) 2005.

(22) Q. You have been working on this matter

(23) since the spring of 2005?

(24) A. Yes, sir.

(25) Q. And at that time you were retained as

Page 44

(2) a testifying expert?

(3) A. That was -- I believe that's right,

(4) yes, sir.

(5) Q. And was that the first time Huron was

(6) retained?

(7) A. I don't know that anyone other than

(8) myself -- I believe so, yes.

(9) Q. You believe that when you were

(10) retained, that's the earliest point that they were

(11) retained as well?

(12) A. Yes.

(13) Q. And that would be in the spring 2005?

(14) A. That's correct.

(15) Q. Now, were you also retained -- in

(16) addition to testifying, were you retained to give

(17) consulting advice to the plaintiffs in this matter?

(18) A. I don't recall that -- to me it has

(19) all been one engagement, so --

(20) Q. You have not drawn the distinction

(21) between testifying and consulting in this matter;

(22) right, sir?

(23) A. Everything I have done I have done in

(24) preparation for eventual testimony.

(25) Q. Now, how large a team of Huron was

Page 137

(1)

(2) BY MR. BASKIN:

(3) Q. Do you have Charnetzki 7, sir?

(4) A. Yes, sir.

(5) Q. Do you recall seeing it prior to

(6) today?

(7) A. Yes, I believe I have.

(8) Q. This is a valuation model that came

(9) out of your files. You produced them —

(10) A. Yes.

(11) Q. — as part of your production;

(12) correct?

(13) A. Yes, sir.

(14) Q. Now, this valuation model has built in

(15) a federal and state tax rate. Do you see that?

(16) A. Yes, sir.

(17) Q. And I take it that your final

(18) valuation does not apply a tax rate; correct?

(19) A. That's correct.

(20) Q. When did you drop the tax rate from

(21) your valuation?

(22) A. It may or may not — it is in this

(23) model, but I would never -- I never considered that

(24) there would be taxes in the valuation.

(25) Q. You decided from the very first

Page 138

(1)

(2) valuation that you would not apply any tax rate to it?

(3) A. Absolutely.

(4) Q. And that is because of the operation

(5) of NOLs; is that correct, sir?

(6) A. No, sir.

(7) Q. Isn't that what you say in your

(8) report, Mr. Charnetzki?

(9) A. That's one thing, reason. Also, I

(10) don't think they are appropriate in a damage

(11) computation in any circumstance.

(12) Q. Well, let me ask you this, sir. Are

(13) you recanting the part of your report that says that

(14) you did not apply a tax rate because of the operations

(15) of NOLs?

(16) A. That's one reason.

(17) MR. VARALLO: Objection to the form of

(18) the question.

(19) THE WITNESS: That's one reason. And

(20) in a damage model, had I applied taxes, I would have

(21) then unapplied them, because in a damage context I

(22) think it should be done pre-tax.

(23) BY MR. BASKIN:

(24) Q. Now, by the way, do you consider

(25) yourself to be a tax expert?

Page 139

(1)

(2) A. How taxes are handled in damages? On

(3) that, yes, I have done an awful lot of work on that.

(4) Q. Well, do you consider yourself an

(5) expert on tax NOLs, sir?

(6) A. I have certainly studied them from

(7) time to time. There are certainly people that know

(8) more than me about them.

(9) Q. Do you consider yourself an expert in

(10) that topic, sir?

(11) A. I consider myself knowledgeable on

(12) that topic, yes, sir.

(13) Q. Did you consult with anyone on the

(14) topic of whether these NOLs would, in fact, shield

(15) future income as you propose in your report?

(16) A. No, sir.

(17) Q. I take it you did not consult with any

(18) Canadian tax advisor on that issue; right, sir?

(19) A. No, sir.

(20) Q. Now, did you perform any valuation

(21) that factors in the actual tax rate?

(22) A. No, sir, because I think in the damage

(23) context it should be done pre-tax.

(24) Q. And that is your reason now; right?

(25) A. It is both of those reasons. I don't

Page 140

(1)

(2) think that they would pay taxes. I think it could

(3) have been structured to avoid that. And even if they

(4) did, I would then undo that effect because I don't

(5) think it is appropriate in damages.

(6) Q. Now, assuming that a 35 percent tax

(7) rate were applicable, can you tell us what that does

(8) to the value you calculate on Tab 13 of Charnetzki 1?

(9) A. Zero. It does nothing.

(10) Q. And why is that?

(11) A. Because you would apply 35 percent to

(12) the cash flows and then you would multiply it by one

(13) minus 35 percent to come up with a damage number.

(14) Q. And that is because that is the way

(15) you interpret damages; right?

(16) A. Because the damage would be taxable,

(17) yes, sir.

(18) Q. Now, but with respect to actually

(19) calculating the valuation as opposed to its transfer

(20) into damages, what would that 1.295 number read if you

(21) applied a tax rate to it, sir, 35 percent tax rate?

(22) A. I have not done -- on a book basis it

(23) would go down. However, I haven't done any look at

(24) book investment and the sort of depreciation basis,

(25) the difference between tax and book on a depreciation

# EXHIBIT 2

TELEGLOBE COMMUNICATIONS VS. BCE INC.

WALDA W. ROSEMAN - 5/5/06

CONCORDANCE AND CONDENSED TRANSCRIPT
PREPARED BY:



*Ellen Grauer*
COURT REPORTING Co. LLC
worldwide!

TOWER 56, 126 EAST 56TH STREET, FIFTH FLOOR, NEW YORK, NEW YORK 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
WWW.ELLENGRAUER.COM

Page 57

(1)
(2) a server problem. And so I must say that we are
(3) probably more skittish than we should be about
(4) throwing things away, because we had one set of
(5) everything that we had kept and we lost it all. So
(6) our business had to, during this timeframe, in fact,
(7) 2002, reconstruct everything that it had.
(8)         So that's a long way of saying that we
(9) probably keep more now than we should.
(10)     Q.    Were the drafts that were produced to
(11) us from your files from the computer or from paper
(12) copies?
(13)     A.    They were from the computer, by and
(14) large.
(15)     Q.    Did you when you --
(16)     A.    There were some paper copies, though.
(17) For example, I have a new administrative assistant who
(18) very nicely printed out certain things and logged them
(19) in. So, for example, the outline that we just looked
(20) at, I was told that that had been printed out and
(21) logged in with other documents. She had been with us
(22) for just a few weeks and was being overexuberant.
(23)     Q.    What do you mean "logged in"?
(24)     A.    Well, we had the documents that we had
(25) received from the attorney, the depositions, and she

Page 58

(1)
(2) decided to take paper copies of other things we had
(3) produced and give them our own number and add them.
(4) So you have a good deal of things from there, although
(5) many of them, these other two drafts are apparently
(6) from Larry's computer.
(7)     Q.    Okay. The ones with the bold
(8) typeface?
(9)     A.    Yes.
(10)     Q.    When you were reviewing drafts, did
(11) you make handwritten comments on a paper copy or did
(12) you review on the screen and make comments
(13) electronically or neither or something else?
(14)     A.    Well, generally I would review these.
(15) I would read them and then I would sit down with
(16) people, and so we would talk about them verbally.
(17)     Q.    Did you make notes to yourself on the
(18) drafts?
(19)     A.    No.
(20)     Q.    When you received a paper copy of the
(21) draft, did you save the paper copies or did you
(22) discard them?
(23)     A.    I generally discarded them because I
(24) was receiving them while I was on the road very often.
(25) And I would read something, I would comment to them,

Page 59

(1)
(2) and then I would trash it, because I don't like to
(3) carry any more than I have to carry.
(4)     Q.    Do you recall when you sent -- when
(5) was the first time you sent a draft to the lawyers?
(6)     A.    I never sent a draft to the lawyers.
(7)     Q.    Okay. Did you give a draft to the
(8) lawyers at any point?
(9)     A.    No. The lawyers visited our offices.
(10) We discussed our progress. But I did not hand over
(11) any drafts that they took with them. I did not send
(12) them any drafts.
(13)     Q.    Did they look at drafts while they
(14) were in your office?
(15)     A.    They did look at drafts once, I
(16) believe, in our office.
(17)     Q.    When was that?
(18)     A.    I am losing track of meetings, but I
(19) am not sure I was in the office at the time that that
(20) happened. No; I was. Yes, it was about a week and a
(21) half after we had met on -- to discuss the outline, I
(22) think. It is all very compressed, so it may not have
(23) been a week and a half. It may have been a week. I
(24) mean, from the starting point to the finish point was
(25) all very compressed.

Page 60

(1)
(2)     Q.    And I am sorry. Do you remember
(3) attending that meeting at your office with the
(4) lawyers?
(5)     A.    Yes, for part of the time.
(6)     Q.    Would that have been around -- do you
(7) know if the draft that was discussed was Exhibit 6,
(8) the February 22 draft, or a later draft?
(9)     A.    I don't know.
(10)     Q.    What happened at the meeting with the
(11) lawyers while you were in the meeting?
(12)     A.    While I was in the meeting I again
(13) expressed our problems that we were having in getting
(14) research and my feeling comfortable about Area 5,
(15) Point 5. And my recollection is that the lawyers were
(16) amenable to our doing whatever I decided was
(17) comfortable to do.
(18)     Q.    Who were the lawyers who were present
(19) at that meeting?
(20)     A.    I think Greg was at that meeting. I
(21) think V. V. was at that meeting and Russ. I don't
(22) believe Mike was there. But again, I did not realize
(23) I was going to be asked about this, so I did not keep
(24) a mental log on who was at it at the time.
(25)     Q.    Did you attend a meeting at Richards,

## Page 65

(1)
(2)   paying much attention to whether or not there were

(3)   meetings going on.

(4)      Q.    When were you gone from the office for

(5)   your trip to Qatar?

(6)      A.    I left, I believe, on March 1.

(7)      Q.    When did you return?

(8)      A.    Well, after Qatar I went to Oman, and

(9)   after Oman I went to Hong Kong, and then I went to

(10)  Shanghai, so I returned, I think, the 29th of March.

(11)     Q.    Okay. And during the time, I guess,

(12)  how were you communicating with people about your

(13)  report during that time, I guess, from March 1 through

(14)  March 8?

(15)     A.    By phone, fax and e-mail. I have not

(16)  yet taken a look at what my cellphone charges are, but

(17)  that will be part of what we send --

(18)     Q.    Absolutely.

(19)     A.    -- with our bill.

(20)           MS. AARON:  Let's take a break to

(21)  change the tape.

(22)           (Recess taken.)

(23)           MS. AARON:  Let's mark as Exhibit 7 a

(24)  draft of the report with the Bates Nos. RES106519

(25)  through 572. And this one has the date 2/27/06 in the

## Page 66

(1)
(2)   footer.

(3)           (Roseman Deposition Exhibit No. 7 was

(4)   marked for identification.)

(5)           (There was a pause.)

(6)   BY MS. AARON:

(7)      Q.    Can you identify this draft?

(8)      A.    Well, I am just -- I am looking to see

(9)   here if I can here, if I may have a few more minutes.

(10)     Q.    All right.

(11)     A.    (Pause) This looks like the draft or

(12)  nearly the draft before I made the decision to fully

(13)  focus away from BCE on the project.

(14)           MS. AARON:  Okay. Let me show you

(15)  another draft that bears a date that seems to be

(16)  fairly close in time. Let's mark as Exhibit 8 a draft

(17)  of the report with the Bates numbers RES105926 through

(18)  984, and this one has the date of February 28, 2006 in

(19)  the footer.

(20)           (Roseman Deposition Exhibit No. 8 was

(21)  marked for identification.)

(22)           THE WITNESS:  You know, as I am

(23)  looking at these, I am thinking that these are

(24)  probably various iterations of Larry's.

(25)

## Page 67

(1)
(2)   BY MS. AARON:

(3)      Q.    Of Larry's?

(4)      A.    Drafts on his own computer.

(5)      Q.    So do you know if you saw these drafts

(6)   or not, Exhibit 7 and Exhibit 8?

(7)      A.    No, I don't. I recognize -- I don't

(8)   recognize, for example, material on page 57. I am

(9)   focusing at the end here because that's where most of

(10)  the changes were in the drafts. And I had glanced at

(11)  parts of some of the drafts but not all of them, but

(12)  these were not -- these look like these were, I mean,

(13)  some of the initial drafts before we actually had a

(14)  draft that I fully reviewed on some of this. And this

(15)  looks like this is Larry's own meanderings.

(16)     Q.    And why do you say that?

(17)     A.    Well, because if one looks at 57, for

(18)  example --

(19)     Q.    You are in Exhibit 7 or 8?

(20)     A.    I am sorry. I am in Exhibit 8.

(21)     Q.    Okay.

(22)     A.    We have here his style of putting down

(23)  ideas and then leaving blanks. So we have got a lot

(24)  of Xs at the top of the page and blanks with these --

(25)  with bullets, the previous page a lot of Xs. I mean,

## Page 68

(1)
(2)   this is his style of -- I don't want to say he is

(3)   playing with ideas, but, in fact, he is putting things

(4)   down to see whether they hold together. He needs to

(5)   see things visually before he makes a decision.

(6)      Q.    All right. So you are not sure that

(7)   you ever -- or you don't think you would have seen --

(8)      A.    No.

(9)      Q.    -- 7 or 8?

(10)     A.    No.

(11)           MS. AARON:  Okay. Let's mark as

(12)  Exhibit 9 a draft of the report with the Bates Nos.

(13)  RES106460 through 518, and this one has the date of

(14)  March 1, 2006 in the footer.

(15)           (Roseman Deposition Exhibit No. 9 was

(16)  marked for identification.)

(17)           THE WITNESS:  (Pause) Okay.

(18)  BY MS. AARON:

(19)     Q.    Okay.

(20)     A.    Again, this is from Larry's computer

(21)  because it --

(22)     Q.    In the footer there seems to be a

(23)  document number with the initials RLF, which I thought

(24)  might have reflected that this came off of Richards,

(25)  Layton & Finger's computer system.

# EXHIBIT 3

IN RE: TELEGLOBE COMMUNICATIONS CORP.

CARLYN R. TAYLOR - 5/9/06

CONCORDANCE AND CONDENSED TRANSCRIPT
PREPARED BY:



*Ellen Grauer*
COURT REPORTING Co. LLC

TOWER 56, 126 EAST 56TH STREET, FIFTH FLOOR, NEW YORK, NEW YORK 10022
PHONE: (212) 750-6434    FAX: (212) 750-1097
WWW.ELLENGRAUER.COM

Page 17

(1)
(2)     tasked primarily with a lot of the more complicated
(3)     financial analyses to support what I was doing.
(4)         Q.      And in connection with preparing the
(5)     document, who was reading the exhibits found on
(6)     Appendix B?
(7)         A.      Both she -- wait. The exhibits? She
(8)     and I both.
(9)         Q.      And did you read all the exhibits
(10)    found on Appendix B?
(11)        A.      All of them?
(12)            MR. SILBERGLIED: Objection to form.
(13)            THE WITNESS: No.
(14)    BY MR. BASKIN:
(15)        Q.      Did you read most of them?
(16)        A.      I don't know. I read a lot of them.
(17)        Q.      Did you read any of the depositions
(18)    found on Appendix B?
(19)        A.      I read all of the depositions we were
(20)    provided except one.
(21)        Q.      Which one did you not read?
(22)        A.      I ran out of time, didn't read
(23)    Mr. Childers in full.
(24)        Q.      But all other depositions you read in
(25)    full?

Page 18

(1)
(2)         A.      I did. The ones that we were
(3)     provided.
(4)         Q.      Now, insofar as you and Ms. Wood were
(5)     jointly working on the preparation of the report, did
(6)     you communicate to her your opinions and conclusions
(7)     to be included in the report?
(8)             MR. SILBERGLIED: Objection to form.
(9)             THE WITNESS: Not in the way you are
(10)    suggesting. I was writing them into the report.
(11)    BY MR. BASKIN:
(12)        Q.      You were writing them, your opinions
(13)    and conclusions, yourself in the report?
(14)        A.      Yes.
(15)        Q.      And when you commenced preparing the
(16)    report, had you already determined what your
(17)    conclusions and opinions would be?
(18)        A.      Not all of them, no.
(19)        Q.      Which ones do you recall not having
(20)    reached a conclusion about or not having reached an
(21)    opinion about when you started preparing your report?
(22)        A.      When we started? We were still doing
(23)    a lot of the financial analyses that eventually led to
(24)    opinions in the report. So I would have to review
(25)    them.

Page 19

(1)
(2)         Q.      Well, for example, when you started to
(3)     prepare the report, had you already determined that if
(4)     FTI had been hired four years earlier in lieu of
(5)     Lazard, you would have preferred a standalone
(6)     reorganization instead of a sale?
(7)         A.      Say that. If when when?
(8)         Q.      At the time you commenced writing your
(9)     report, had you already determined that had FTI been
(10)    hired four years earlier rather than Lazard, that you
(11)    would have proceeded with a standalone reorganization?
(12)        A.      That was reached in the course of the
(13)    work. I don't remember exactly when relative to when
(14)    I started outlining the report.
(15)        Q.      When you started to prepare the
(16)    report, had you already concluded that Lazard's work
(17)    product overestimated the cash burn and came to
(18)    erroneous conclusions?
(19)        A.      I am not sure I would accept the
(20)    characterization of, but we had concluded -- I had
(21)    definitely concluded that there were issues with the
(22)    CAPEX based upon my very initial review of documents.
(23)        Q.      And this was before you actually
(24)    started to prepare the report?
(25)        A.      Yes.

Page 20

(1)
(2)         Q.      And by the time you started to prepare
(3)     the report, had you already concluded that the parties
(4)     to the bankruptcy had not given proper consideration
(5)     to a voice-only standalone reorganization?
(6)             MR. SILBERGLIED: Objection to form.
(7)             THE WITNESS: Well, again, I would
(8)     have to look at how I phrased our -- my opinions in
(9)     there on that, but I had not completed all my review
(10)    of the documents.
(11)    BY MR. BASKIN:
(12)        Q.      And how far into the preparation of
(13)    your report did you come to that conclusion?
(14)            MR. SILBERGLIED: Same objection.
(15)            THE WITNESS: I came to the various
(16)    opinions that I documented in the beginning or in my
(17)    report throughout the course of reviewing documents
(18)    and things in the case.
(19)    BY MR. BASKIN:
(20)        Q.      But do you remember when you came to
(21)    the conclusion that the parties had not given proper
(22)    consideration to a voice-only standalone
(23)    reorganization?
(24)            MR. SILBERGLIED: Same objection.
(25)            THE WITNESS: I don't remember exactly

Page 25

(1)
(2)    A.    Mr. Charnetzki and a couple of people
(3)    associated with Teleglobe today.
(4)    Q.    Now, let's start with Mr. Charnetzki
(5)    On how many occasions do you recall discussing with
(6)    Mr. Charnetzki the preparation of your report?
(7)    A.    When?
(8)    Q.    Prior to its completion.
(9)    A.    Maybe --
(10)            MR. SILBERGLIED: Excuse me.  Exhibit
(11)   1?
(12)            MR. BASKIN: Yes, Exhibit 1.
(13)            THE WITNESS: Okay.  Two or three
(14)   times.
(15)   BY MR. BASKIN:
(16)   Q.    And in that connection did he have
(17)   access to your server?
(18)   A.    No.
(19)   Q.    Did you provide him with copies of
(20)   your report prior to its completion?
(21)   A.    He saw one, yes.
(22)   Q.    And he saw that copy in and around
(23)   early March 2006?
(24)   A.    Yes.
(25)   Q.    On March 1, 2006?  Is that when he saw

Page 26

(1)
(2)    it?
(3)    A.    I don't recall the exact date.
(4)    Q.    And was that in a meeting in these law
(5)    offices?
(6)    A.    Yes.
(7)    Q.    And I take it in addition to
(8)    Mr. Charnetzki, you were present as well?
(9)    A.    Yes.
(10)   Q.    Were other members of your staff
(11)   present?
(12)   A.    No.
(13)   Q.    Were there any other people present
(14)   other than you and Mr. Charnetzki?
(15)   A.    Yes.
(16)   Q.    Who else was present for that meeting?
(17)   A.    Mr. Silberglied, I think Mr. Varallo
(18)   for a while, some people from CompassRose, and a
(19)   couple of people from Teleglobe.  That's all I recall.
(20)   Q.    Who from the plaintiff was physically
(21)   present during this meeting in early March 2006?
(22)   A.    I don't really know everybody, but
(23)   Andre Mongrain, and I am going to say his name wrong.
(24)   He was present (indicating).
(25)   Q.    You are pointing to one of the

Page 27

(1)
(2)    gentlemen in attendance at the deposition today?
(3)    A.    That's correct.
(4)    Q.    And do you want to state your name for
(5)    the record, sir?
(6)            MR. COOKE: Sure.  V. V. Cooke.
(7)            THE WITNESS: Sorry.
(8)    BY MR. BASKIN:
(9)    Q.    Who else was present for the meeting
(10)   in these law offices prior to the completion of your
(11)   report?
(12)   A.    That's who I remember.
(13)   Q.    Now, in the course of that meeting --
(14)   how long did that meeting take?
(15)   A.    I don't know.  Four or five hours.
(16)   Q.    And all the attendees whom you
(17)   mentioned in your answer a second ago were in the same
(18)   conference room at the same time?
(19)   A.    For parts of it, yes.
(20)   Q.    And in the course of that meeting you
(21)   circulated the then current draft of your report?
(22)   A.    I had copies, yes.
(23)   Q.    And did you --
(24)   A.    I am not sure who brought them.  I
(25)   brought them, yes.

Page 28

(1)
(2)    Q.    Well, you circulated them to everyone
(3)    at the meeting; correct?
(4)    A.    I don't know if everybody at the
(5)    meeting looked at them.
(6)    Q.    You circulated the reports broadly to
(7)    people in the meeting?
(8)    A.    There was a stack.
(9)    Q.    And did Mr. Charnetzki circulate his
(10)   report in the course of the same meeting?
(11)   A.    Yes.
(12)            (Discussion off the record.)
(13)   BY MR. BASKIN:
(14)   Q.    And who was in attendance at the
(15)   meeting on behalf of CompassRose?
(16)   A.    A man and a woman, but I really don't
(17)   know who they were.
(18)   Q.    And did they circulate their draft
(19)   report to the attendees at the meeting?
(20)   A.    Yes.
(21)   Q.    Now, were each attendee at the meeting
(22)   making comments -- strike that.
(23)           Were the attendees at the meeting
(24)   making comments about the various drafts of the
(25)   experts present at the time?

## Page 33

(1)
(2) on your computer?
(3)     A.    That's correct.
(4)     Q.    And what caused you to look for drafts
(5) on your computer Wednesday or Thursday of last week?
(6)     A.    I was looking for something in the
(7) preparation of my preparing for this deposition, and I
(8) happened to see that, and I didn't know there was one,
(9) so I produced it.
(10)     Q.    Was it communicated to you last week
(11) that Mr. Charnetzki's deposition was taken on
(12) Wednesday of last week?
(13)     A.    Probably. I don't know.
(14)     Q.    You don't recall being told that
(15) Mr. Charnetzki's deposition was taken last week?
(16)     A.    I know it was taken last week. I
(17) don't know if it was Wednesday.
(18)     Q.    And do you recall being told that
(19) Mr. Charnetzki could not produce any drafts during the
(20) course of his deposition?
(21)         MR. SILBERGLIED:  Objection to form.
(22)         THE WITNESS:  No, I don't.
(23) BY MR. BASKIN:
(24)     Q.    Do you recall being told that
(25) Mr. Charnetzki testified that he had destroyed all his

## Page 34

(1)
(2) drafts of his exhibit -- of his report?
(3)         MR. SILBERGLIED:  Objection.
(4)         THE WITNESS:  I am not aware of what
(5) you are talking about.
(6) BY MR. BASKIN:
(7)     Q.    Meaning you were not told last week
(8) that Mr. Charnetzki had testified that he had
(9) destroyed all drafts of his report?
(10)         MR. SILBERGLIED:  Same objection.
(11)         THE WITNESS:  Testified that he
(12) destroyed drafts?  I am not aware of what
(13) Mr. Charnetzki testified.
(14) BY MR. BASKIN:
(15)     Q.    Now, how come this draft was found on
(16) your server?  This was in your server, I take it?
(17)     A.    No. This was in my laptop.
(18)     Q.    And how come that draft was located on
(19) your laptop?
(20)     A.    I am not sure. Normally I am only
(21) working on the server. I think I may have been
(22) traveling or something and put it on my laptop.
(23)     Q.    And is this the only draft contained
(24) in your files of your report?
(25)     A.    I think we produced another draft of

## Page 35

(1)
(2) the rebuttal report.
(3)     Q.    And when did you find that?
(4)     A.    I think that was produced in the
(5) regular production. I think Ms. Wood had that.
(6)     Q.    That was not produced last week?
(7)     A.    I don't know when it was produced.
(8) When we produced everything else is my understanding,
(9) but that's all I know.
(10)     Q.    Now, in the course of the meeting in
(11) these law offices in and around March of 2006, was a
(12) discussion had as to what people should do with their
(13) drafts, drafts of their reports?
(14)     A.    No.
(15)     Q.    You recall no such discussion?
(16)     A.    No.
(17)     Q.    Do you ever recall having a discussion
(18) with anyone in connection with this matter as to what
(19) you should do with the drafts of your reports?
(20)     A.    No.
(21)     Q.    Assuming the judge --
(22)     A.    Only that when the thing came out that
(23) we should produce drafts, when the request for
(24) production. That's the discussion I recall.
(25)         MR. BASKIN:  Let's mark as Taylor 3

## Page 36

(1)
(2) this document.
(3)         (C. Taylor Deposition Exhibit No. 3
(4) was marked for identification.)
(5) BY MR. BASKIN:
(6)     Q.    Can you identify this document,
(7) Taylor 3?
(8)     A.    Only that it looks like something
(9) similar to what we were sent in terms of what we
(10) should be producing for this case.
(11)     Q.    This is not a document that -- the
(12) typed, underlined sections of this document, of Taylor
(13) 3, I take it you do not recognize; correct?
(14)     A.    Only that it matches up with
(15) information that I told Ms. Wood. At least the one
(16) under No. 3.
(17)     Q.    Now, the documents referenced next to
(18) numbers on Taylor 3, do you recall receiving a
(19) document similar to this one that contained similar
(20) instructions to you regarding expert document
(21) production?
(22)         MR. SILBERGLIED:  I am sorry. Could I
(23) have that read back?  I think I missed something.
(24)         (The court reporter read back as
(25) requested.)

---

Page 45

(1)
(2)     BY MR. BASKIN:
(3)         Q.      To Mr. Charnetzki first.
(4)         A.      Okay.  To Mr. Charnetzki, I discussed
(5)     with him various companies and what they did and gave
(6)     him a list of transactions and companies.
(7)         Q.      And what do you recall doing in
(8)     connection with Ms. Roseman's document?
(9)         A.      In connection with Ms. Roseman's
(10)    document, the main discussion I had with someone I
(11)    believed to be Ms. Roseman, but it turned out to be an
(12)    assistant -- I didn't know that at the time -- was
(13)    that she had a discussion about bankruptcy and
(14)    restructuring, and I said, you know, "That's kind of
(15)    overlapping with what I am doing, and I am not sure
(16)    that you want to be talking about that."
(17)        Q.      And what was the reaction of this
(18)    person who you thought was Ms. Roseman?
(19)        A.      They said they would consider it.
(20)        Q.      And what did you do with the Roseman
(21)    document that was provided to you during the course of
(22)    this meeting?
(23)        A.      I don't remember.
(24)        Q.      Did the CompassRose people collect
(25)    those documents?

---

Page 46

(1)
(2)         A.      Possibly, but I don't know.
(3)         Q.      Was there an understanding of
(4)     participants in the meeting that all drafts prepared
(5)     during the course of the meeting were going to be
(6)     destroyed?
(7)         A.      Destroyed?  There was no discussion
(8)     about anything being destroyed.
(9)         Q.      Was there a discussion during the
(10)    course of the meeting that all drafts were going to be
(11)    collected?
(12)        A.      Not that I recall.
(13)        Q.      Was there a discussion at the meeting
(14)    that people should not leave the meeting with their
(15)    own copies of the various reports?
(16)        A.      Not that I recall, but I had no
(17)    intention of taking large bits of paper I had already
(18)    read.
(19)        Q.      But you do not recall any discussion
(20)    about whether people should leave the room with copies
(21)    of these various reports?
(22)        A.      Not with me.
(23)        Q.      Now -- strike "now."
(24)            If you look at Exhibit 2 before you,
(25)    if you turn to the second page, you will see there is

---

Page 47

(1)
(2)     a reference under paragraph 3 to privileged and
(3)     confidential work product.  Do you see that?
(4)         A.      Okay.
(5)         Q.      And it reads, "Written reports,
(6)     memoranda or status summaries that we prepare under
(7)     this Engagement Contract will be maintained in
(8)     accordance with our retention procedures and shall be
(9)     prominently labeled 'Privileged and Confidential.'"
(10)    Do you see that?
(11)        A.      Yes.
(12)        Q.      Was that, in fact, the practice you
(13)    followed in this matter?
(14)        A.      Yes.
(15)        Q.      What are FTI's retention procedures by
(16)    which they maintain written reports, memoranda or
(17)    status summaries?
(18)        A.      For risk management purposes, we are
(19)    to maintain all final issued reports and all
(20)    supporting documents to support the work and opinions
(21)    in those reports.
(22)        Q.      So is it the practice of your company
(23)    that all drafts other than final reports are
(24)    destroyed?
(25)            MR. SILBERGLIED:  Objection to form.

---

Page 48

(1)
(2)            THE WITNESS:  Well, you are using the
(3)     word "destroyed."  That's not -- it creates confusion
(4)     to be retaining tons of things.  You are to retain for
(5)     risk management purposes the final version of work
(6)     product and supporting documents to support the
(7)     opinions in the final version of work product.
(8)     BY MR. BASKIN:
(9)         Q.      And anything other than that, other
(10)    than final versions, are discarded; is that correct?
(11)        A.      Of work product.  If they are -- you
(12)    are not supposed to be keeping -- I mean, you are
(13)    supposed to keep organized files.  I don't want -- you
(14)    know, I don't want my staff keeping tons of mess all
(15)    around with all sorts -- you get confused as to what
(16)    is the one that got changed or what is the corrected
(17)    one or whatever.  So we are to keep neat, neat,
(18)    organized work files.
(19)        Q.      And is it the practice or -- strike
(20)    that.
(21)            Is it the retention procedures of FTI
(22)    that all draft reports are destroyed or discarded?
(23)            MR. SILBERGLIED:  Objection to form.
(24)            THE WITNESS:  It is just what I said.
(25)    It has nothing to do with being destroyed.  It is you

---

# EXHIBIT 4

TELEGLOBE COMMUNICATIONS VS. BCE INC.

IAN FISHER - 5/1/06

CONCORDANCE AND CONDENSED TRANSCRIPT
PREPARED BY:



*Ellen Grauer*
**COURT REPORTING** worldwide!
Co. LLC
Tower 56, 126 East 56th Street, Fifth Floor, New York, New York 10022
Phone: (212) 750-6434   Fax: (212) 750-1097
WWW.ELLENGRAUER.COM

Page 53

(1)
(2)        MR. SCHIMMEL: That question, yes.
(3)    Q.    Were there any other issues besides
(4) the issue that is in Exhibit No. 1 and also
(5) the valuation at June 30, 2001 that you ever
(6) put in any drafts of your report?
(7)        MR. SCHIMMEL: Object to form.
(8)    A.    There were not.
(9)    Q.    Let's turn back to Exhibit No. 1.
(10) In paragraph -- in the first paragraph on page
(11) 5, which is issues addressed, you say the
(12) Charnetzky's report "contends that the fact
(13) Teleglobe did not have full funding when it
(14) commenced and continued its GlobeSystem
(15) project showed that it became insolvent in
(16) 2000."
(17)        What specifically in
(18) Mr. Charnetzky's report are you referring to?
(19)    A.    Well, if you refer to the page
(20) references, there's a discussion in there
(21) about the absence of full funding and the
(22) linkage I perceived him to be making between
(23) that condition and the insolvency that he
(24) purports occurred.
(25)        MR. SILBERGLIED: Can we hand him

Page 54

(1)
(2)    Exhibit No. 4, please?
(3)    Q.    Why don't you open up to pages 44
(4) to 49, please, which are the pages cited in
(5) your page 5 about Charnetzky's report.
(6)        MR. SCHIMMEL: Mr. Silberglied, I
(7)    note that the copy you just gave me isn't
(8)    complete. There are significant gaps.
(9)        MR. SILBERGLIED: I don't know why
(10)    that is.
(11)        MR. SCHIMMEL: Between pages 14 and
(12)    26, there's a gap and between 27 and 54,
(13)    there's a gap.
(14)        MR. SILBERGLIED: Say again. 14
(15)    and what?
(16)        MR. SCHIMMEL: 26 in my copy and
(17)    then 27 and 54.
(18)        MR. SILBERGLIED: Which obviously
(19)    includes the relevant pages.
(20)    Q.    What about your copy? Because mine
(21) has some omitted pages and is not the same
(22) one.
(23)    A.    Well, I couldn't find the first
(24) page you asked me to look at, so I closed the
(25) document.

Page 55

(1)
(2)        MR. SILBERGLIED: We'll move on
(3) from there. Apparently somebody botched
(4) the copying job. The good news is it's
(5) what would have weighted down the
(6) exhibits.
(7)        This is Exhibit 5. Should we call
(8) it 4?
(9)        MR. SCHIMMEL: We should call it 4.
(10)        MR. SILBERGLIED: We'll call it 4.
(11) I apologize.
(12)        (Handing.)
(13)        (4/14/06 expert report was marked
(14)    Fisher Exhibit 4 for identification, as
(15)    of this date.)
(16)    Q.    Am I correct that Exhibit 4 is
(17) another draft?
(18)    A.    Yes.
(19)    Q.    And is it a draft that you shared
(20) with counsel?
(21)    A.    Yes.
(22)    Q.    On page 9 -- well, actually, before
(23) we do that, bear with me one second. Okay.
(24)        On page 9, in italics there's a
(25) quotation from plaintiff's memorandum, which I

Page 56

(1)
(2) take it is the plaintiff's memorandum in
(3) opposition to the motion to dismiss.
(4)        First of all; is that correct, to
(5) the best of your knowledge?
(6)    A.    Yes.
(7)    Q.    Do you recall why it is that you in
(8) this draft are quoting the brief rather than
(9) quoting Mr. Charnetzky's report?
(10)        MR. SCHIMMEL: Object to form.
(11)    A.    Yes.
(12)    Q.    Why is that?
(13)    A.    This was the first draft of the
(14) report, which I believe was completed on April
(15) 7, but represented the culmination of several
(16) weeks of work, most of which was performed
(17) prior to my having received Charnetzky's
(18) expert report.
(19)        And when preparing this first
(20) draft, I had the legacy of those weeks of work
(21) and felt that the report needed an
(22) introduction. Not from me because I knew what
(23) the question that had been asked of me was,
(24) but to someone else who didn't have my
(25) background or Shearman & Sterling's

## Page 133

(1)
(2)  funded Teleglobe with all equity?
(3)       MR. SCHIMMEL:  Object to form.
(4)   A.  It would have increased.
(5)   Q.  It would have increased?
(6)   A.  Yes.
(7)   Q.  Now, the reason why it would
(8)  increase is because if you were to make -- if
(9)  you were to go to the public markets and do an
(10)  equity offering, generally it would be higher
(11)  price than a debt offering because equity is
(12)  lower than debt on the totem pole; is that
(13)  correct?
(14)       MR. SCHIMMEL:  Object to form.
(15)   A.  The second part of your question's
(16)  correct.  The first part is not necessary.
(17)  The way that equity's cost is calculated in
(18)  the formula for weighted average cost of
(19)  capital is formulaic.  There's a reference to
(20)  the then level for riskless securities, which
(21)  were usually U.S. treasury bills.  There is
(22)  a -- an expectation of the future premium
(23)  between the portfolio of market securities and
(24)  that riskless rate and there is a measurement
(25)  of the risk of the instrument, the equity

## Page 134

(1)
(2)  instrument, you're valuing, which is referred
(3)  to as the beta.
(4)       And so it's not necessary to go to
(5)  the public markets to raise equity to validate
(6)  that cost of equity.  You can estimate it
(7)  based on a calculation.  At that point in time
(8)  I'm confident that both Lehman Brothers and
(9)  Morgan Stanley, when they were building up
(10)  their ranges of weighted average cost of
(11)  capital, would have gone through that
(12)  calculation.  Whether or not they showed it to
(13)  their client, I don't recall.  But they would
(14)  have calculated what the cost of equity was
(15)  for Teleglobe in their opinion and what the
(16)  cost of the debt was for Teleglobe.
(17)       They would make sure that both of
(18)  those were on an after tax basis and then they
(19)  would apply an optimal capital structure to
(20)  arrive at their ranges for the weighted
(21)  average cost of capital.  And the basic
(22)  assumption of your question, I believe, is
(23)  correct.  It would have gone up because
(24)  equity's more expensive than debt.
(25)   Q.  Once any company owns a hundred

## Page 135

(1)
(2)  percent of sub and thereafter determines to
(3)  make a further equity advance into sub, does
(4)  that generally cost the sub the same as going
(5)  to the private markets?
(6)       MR. SCHIMMEL:  Object to form.
(7)   Q.  Or the public markets?
(8)   A.  I hesitate to generalize in an
(9)  answer to that question because I'm not privy
(10)  normally to the funding arrangements between a
(11)  parent and a sub.  I don't know what kind of
(12)  internal costs are allocated.
(13)       To the extent a parent funds a sub,
(14)  the parent itself needs to come up with those
(15)  funds from somewhere and thereby incurs costs.
(16)  I don't know whether that parent is going to
(17)  pass on all or part of or more than those
(18)  costs to the sub.  So I think it's difficult
(19)  to generalize.
(20)   Q.  Have you reviewed how BCE, in fact,
(21)  funded Teleglobe in the year 2001?
(22)       MR. SCHIMMEL:  Object to form.
(23)   A.  Well, I have reviewed it.  I don't
(24)  recall the specifics of that review.  But at
(25)  some point during the preparation of my notes

## Page 136

(1)
(2)  leading up to the preparation of the first
(3)  draft, I did attempt to perform a
(4)  quarter-by-quarter analysis of the capital
(5)  costs of the GlobeSystem project as then
(6)  estimated, the amounts spent on the
(7)  GlobeSystem project at that point in time,
(8)  cash balances of Teleglobe at those points in
(9)  time, the amount of BCE advances and whatever
(10)  form, the amounts remaining from any
(11)  commitments, with a small C because that was
(12)  prior to my receipt of the Charnetzky report
(13)  and I wasn't sensitized to that word.  So I
(14)  did review it, but I just don't recall sitting
(15)  here the chronology of -- of those fundings.
(16)   Q.  And in doing so, did you look at
(17)  the form debt versus equity versus equity
(18)  settled notes?
(19)       MR. SCHIMMEL:  Object to form.
(20)   A.  I -- I didn't look at them other
(21)  than to be aware that there was some change in
(22)  the form over time.  But it -- it didn't
(23)  appear to be relevant to my analysis because I
(24)  was really tracking dollars.
(25)       Remember, the issue I'd been asked

# EXHIBIT 5

# REDACTED

# EXHIBIT 6

# REDACTED

# EXHIBIT 7

TELEGLOBE COMMUNICATIONS VS. BCE, INC.

JOSHUA LIVNAT - 5/4/06

CONCORDANCE AND CONDENSED TRANSCRIPT
PREPARED BY:



*Ellen Grauer*
**COURT REPORTING**
Co. LLC

TOWER 56, 126 EAST 56TH STREET, FIFTH FLOOR, NEW YORK, NEW YORK 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
WWW.ELLENGRAUER.COM

Page 137

(1)
(2) into a working document.
(3)        MR. SCHIMMEL: We've produced those
(4) working --
(5)        MR. VARALLO: Let me inquire.
(6)        MR. SCHIMMEL: All right.
(7)    Q.  So, is it your ordinary practice to
(8) keep only one final draft as opposed to
(9) versions that you're working on?
(10)   A.  Yeah, I have only one working draft
(11) and this is what I do all the time. In all of
(12) my engagements, I keep only one working
(13) documents. It gets revised as I a go along and
(14) I made that sure to be known to Daniel and said
(15) that I'm not keeping any drafts from the moment
(16) we started working and told him that if he
(17) wants to keep any drafts of things that I send
(18) him, that's his choice.
(19)       I don't print anything and I work
(20) only on the computer and make changes to it.
(21) So, I rely on him to keep drafts.
(22)   Q.  What did he say to you when you
(23) told him that you didn't keep any drafts?
(24)   A.  He said that it may be a problem in
(25) the case, but this is how I work. I just don't

Page 138

(1)
(2) have the resources to work otherwise.
(3)    Q.  Let's talk about manipulation for a
(4) couple of minutes. You told me earlier you
(5) haven't expressed any opinions with respect to
(6) whether the tests were manipulated or not.
(7)       In forming your judgment about the
(8) ten-year projections being reasonable, what
(9) factors went into that judgment?
(10)   A.  Okay, I think it's in the report so
(11) maybe --
(12)   Q.  Sure, feel free to refer to it.
(13)   A.  So maybe we'll take it and go over
(14) the points one by one.
(15)   Q.  If we could constrain ourselves to
(16) the factors that you considered in determining
(17) reasonableness, that would be great.
(18)   A.  Oh, yes. Okay, so the first
(19) opinion is that the cash flows that Teleglobe
(20) was going to obtain from its own operations
(21) plus the Globe system operations, were to
(22) exceed ten years. So, it made sense when you
(23) do your analysis under rule -- statement number
(24) 121 or, for that matter, 142 to take more than
(25) ten years.

Page 139

(1)
(2)       Second was the issue of depreciable
(3) lives of assets that corresponded or supported
(4) this goodwill and those were, in many cases,
(5) more than ten years for Teleglobe. Third was
(6) to say this was not unusual in the industry.
(7)       In fact, every company that I
(8) looked at in the same industry had also
(9) physical, tangible assets that exceeded ten
(10) years and, therefore, it makes sense to use
(11) more than ten years as forecast of their cash
(12) flows.
(13)       And, fourth, I used an argument
(14) that came from the FASB which recognized the
(15) fact that one distinction between tangible and
(16) intangible assets is that tangible assets are
(17) going to disappear physically after a while.
(18) Intangible assets may continue for much longer
(19) than that, and, therefore -- and goodwill being
(20) an intangible asset, there is again a tendency
(21) of it to continue for a much longer period of
(22) time. So, ten years is not unusual.
(23)   Q.  Isn't it fair to say that goodwill
(24) continues indefinitely unless you write it off?
(25)       MR. SCHIMMEL: Object to form.

Page 140

(1)
(2)   A.  Again, the accounting thinking
(3) about it is sort of not clear cut. They'll
(4) give you the two sides of it. On one hand you
(5) could argue, yes, the -- as long also the
(6) business is prospering and continuing, the
(7) goodwill should continue forever.
(8)       On the other, you could argue
(9) economically at some point the business is
(10) going to only get a normal rate of return and
(11) what goodwill is supposed to measure is the
(12) extra, the abnormal rate of return, and that,
(13) after a while, disappears.
(14)       So, you could be IBM and have the
(15) monopoly de facto on computers for 20 years,
(16) for 40 years, but at some point you're going to
(17) lose it to rivals.
(18)   Q.  Which side of debate do you come
(19) down on?
(20)       MR. SCHIMMEL: Object to form.
(21)   A.  I guess, I would -- you're not
(22) going to like my answer. My answer is going to
(23) be contextual. When I look at the particular
(24) business and I say they have something that
(25) other people do not have, I would say that you

# EXHIBIT 8

TELEGLOBE COMMUNICATIONS VS. BCE INC.

LINDA MCLAUGHLIN - 5/2/06

Concordance and Condensed Transcript
Prepared By:



Ellen Grauer
COURT REPORTING Co. LLC

TOWER 56, 126 EAST 56TH STREET, FIFTH FLOOR, NEW YORK, NEW YORK 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
WWW.ELLENGRAUER.COM



Page 37

(1)
(2)     saw the descriptions of the -- of the other
(3)     companies just as he saw the -- you know, the
(4)     Teleglobe documents.
(5)         Q.  Can you describe your understanding
(6)     of Dr. Taylor's background in the
(7)     telecommunications industry?
(8)         A.  Well, Dr. Taylor is head of the
(9)     telecommunications practice at NERA. He has
(10)    worked in telecommunication -- and before he
(11)    came to NERA, he -- he worked, I think, for
(12)    Bell Labs. He was -- as far as I know, he's
(13)    been involved in telecommunications in all his
(14)    work as an economist. Not that he hadn't
(15)    worked outside that area, you know, on
(16)    other -- on other matters, but that is his --
(17)    you know, is his primary focus.
(18)        Q.  Does he have expertise, as you
(19)    understand it, in the restructuring of
(20)    telecommunications companies?
(21)        A.  Well, he may, but I wasn't looking
(22)    to him for that experience, so I don't know
(23)    that he does.
(24)        Q.  For example, the sort of work that
(25)    Ms. Taylor does, Carlyn Taylor, does she do

Page 38

(1)
(2)     that kind of work?
(3)         A.  Not as far as I know, but it's
(4)     possible that he does.
(5)         Q.  How long have you worked with
(6)     Dr. Bill Taylor? We better watch our Taylors
(7)     here. Dr. Bill Taylor?
(8)         A.  Well, I -- I -- that's hard to say.
(9)     I've been at NERA longer than he has.
(10)        Q.  But not by much?
(11)        A.  More, you know -- for a very long
(12)    time.
(13)        Q.  I think you were there in 1974; is
(14)    that right?
(15)        A.  Yes.
(16)        Q.  And he came shortly thereafter, I
(17)    believe, 1974? Does that sound right?
(18)        A.  I thought I was there longer than
(19)    him, but maybe not.
(20)        Q.  I'm going to double check myself so
(21)    I don't mislead you. Sorry. I misrepresented
(22)    that. 1988.
(23)        A.  I see -- see that on -- on -- on
(24)    the second page of his -- of his CV.
(25)        Q.  All right. So for roughly 18 years

Page 39

(1)
(2)     or so?
(3)         A.  Right. And we have not -- you
(4)     know, we -- sometimes we work together and
(5)     sometimes we don't. But it's -- it -- I -- I
(6)     have worked with him, you know, over -- over
(7)     the years on -- on -- on different matters
(8)     and --
(9)         Q.  Can you tell me whether Dr. Taylor
(10)    values communications companies,
(11)    telecommunications companies?
(12)        A.  I don't know. I think -- I -- I
(13)    think he has, but I know that in -- I -- I
(14)    don't know whether he has valued
(15)    telecommunications companies.
(16)        Q.  All right. I think I have a little
(17)    better understanding of the different roles
(18)    that you two played. Let me ask if you would
(19)    turn to page 2.
(20)        A.  Of the March 8 report?
(21)        Q.  Yes, please. Sorry.
(22)            In the first full paragraph on that
(23)    page which reads, "In order to undertake this
(24)    assignment" and then it goes on, there's a
(25)    line that reads, "We also interviewed Stewart

Page 40

(1)
(2)     Verge." Do you see that?
(3)         A.  Yes.
(4)         Q.  Was that the only interview that
(5)     was conducted of someone who was involved with
(6)     Teleglobe contemporaneously with the events
(7)     that you studied?
(8)         A.  That was the only one at -- before
(9)     March 8th.
(10)        Q.  There were others after March 8th?
(11)        A.  There was one other after March
(12)    8th.
(13)        Q.  And who was that?
(14)        A.  Mr. Fortin.
(15)        Q.  Serge Fortin?
(16)        A.  Yes.
(17)        Q.  Why did you -- did you interview
(18)    Mr. Fortin?
(19)        A.  Yes.
(20)        Q.  Did you interview Mr. Verge?
(21)        A.  Yes.
(22)        Q.  Did you take notes of those
(23)    interviews?
(24)        A.  I definitely took notes of the
(25)    Verge interview. I'm not sure of the Fortin

Page 37

(1)
(2) saw the descriptions of the -- of the other
(3) companies just as he saw the -- you know, the
(4) Teleglobe documents.
(5)     Q.   Can you describe your understanding
(6) of Dr. Taylor's background in the
(7) telecommunications industry?
(8)     A.   Well, Dr. Taylor is head of the
(9) telecommunications practice at NERA. He has
(10) worked in telecommunication -- and before he
(11) came to NERA, he -- he worked, I think, for
(12) Bell Labs. He was -- as far as I know, he's
(13) been involved in telecommunications in all his
(14) work as an economist. Not that he hadn't
(15) worked outside that area, you know, on
(16) other -- on other matters, but that is his --
(17) you know, is his primary focus.
(18)     Q.   Does he have expertise, as you
(19) understand it, in the restructuring of
(20) telecommunications companies?
(21)     A.   Well, he may, but I wasn't looking
(22) to him for that experience, so I don't know
(23) that he does.
(24)     Q.   For example, the sort of work that
(25) Ms. Taylor does, Carlyn Taylor, does she do

Page 38

(1)
(2) that kind of work?
(3)     A.   Not as far as I know, but it's
(4) possible that he does.
(5)     Q.   How long have you worked with
(6) Dr. Bill Taylor? We better watch our Taylors
(7) here. Dr. Bill Taylor?
(8)     A.   Well, I -- I -- that's hard to say.
(9) I've been at NERA longer than he has.
(10)     Q.   But not by much?
(11)     A.   More, you know -- for a very long
(12) time.
(13)     Q.   I think you were there in 1974; is
(14) that right?
(15)     A.   Yes.
(16)     Q.   And he came shortly thereafter, I
(17) believe, 1974? Does that sound right?
(18)     A.   I thought I was there longer than
(19) him, but maybe not.
(20)     Q.   I'm going to double check myself so
(21) I don't mislead you. Sorry. I misrepresented
(22) that. 1988.
(23)     A.   I see -- see that on -- on -- on
(24) the second page of his -- of his CV.
(25)     Q.   All right. So for roughly 18 years

Page 39

(1)
(2) or so?
(3)     A.   Right. And we have not -- you
(4) know, we -- sometimes we work together and
(5) sometimes we don't. But it's -- it -- I -- I
(6) have worked with him, you know, over -- over
(7) the years on -- on -- on different matters
(8) and --
(9)     Q.   Can you tell me whether Dr. Taylor
(10) values communications companies,
(11) telecommunications companies?
(12)     A.   I don't know. I think -- I -- I
(13) think he has, but I know that in -- I -- I
(14) don't know whether he has valued
(15) telecommunications companies.
(16)     Q.   All right. I think I have a little
(17) better understanding of the different roles
(18) that you two played. Let me ask if you would
(19) turn to page 2.
(20)     A.   Of the March 8 report?
(21)     Q.   Yes, please. Sorry.
(22)     In the first full paragraph on that
(23) page which reads, "In order to undertake this
(24) assignment" and then it goes on, there's a
(25) line that reads, "We also interviewed Stewart

Page 40

(1)
(2) Verge." Do you see that?
(3)     A.   Yes.
(4)     Q.   Was that the only interview that
(5) was conducted of someone who was involved with
(6) Teleglobe contemporaneously with the events
(7) that you studied?
(8)     A.   That was the only one at -- before
(9) March 8th.
(10)     Q.   There were others after March 8th?
(11)     A.   There was one other after March
(12) 8th.
(13)     Q.   And who was that?
(14)     A.   Mr. Fortin.
(15)     Q.   Serge Fortin?
(16)     A.   Yes.
(17)     Q.   Why did you -- did you interview
(18) Mr. Fortin?
(19)     A.   Yes.
(20)     Q.   Did you interview Mr. Verge?
(21)     A.   Yes.
(22)     Q.   Did you take notes of those
(23) interviews?
(24)     A.   I definitely took notes of the
(25) Verge interview. I'm not sure of the Fortin



Page 45

(1)
(2)    don't recall whether -- I -- I don't recall
(3)    whose suggestion it was that I talk to
(4)    Mr. Fortin.
(5)        Q.    It may be in there, but I missed --
(6)    if it is, I missed it. I did not see the
(7)    interview with Mr. Fortin referenced in your
(8)    report of April 14, 2006, Exhibit 2.
(9)        A.    No. It's not referenced there
(10)    because I -- I didn't rely on it. It was --
(11)    once I saw the July plan, which I hadn't seen
(12)    before, I was aware -- when he told me about
(13)    the other documents, I was aware of the August
(14)    plan. I was aware of the September plan. I
(15)    was aware of the May plan, but I was not aware
(16)    of the July plan. So once I became aware of
(17)    it, I looked at the plan itself and then I
(18)    didn't need the fact that that's how I learned
(19)    of the plan to -- you know, to include it. It
(20)    was one of the documents in the -- in the
(21)    case.
(22)        Q.    This is July 2002 plan?
(23)        A.    Yes.
(24)        Q.    Was that of significance to you in
(25)    your work?

Page 46

(1)
(2)        A.    Well, it was of significance to be
(3)    mentioned in my report, which I do.
(4)        Q.    And why?
(5)        A.    The context that I mentioned it is
(6)    that they -- the company was following a -- a
(7)    plan to downsize to its Legacy voice business
(8)    and related data business and to consider what
(9)    countries it would be -- continue to maintain
(10)    its GlobeSystem investments in.
(11)        Q.    In your work, did you see any
(12)    analysis prior to April 24, 2002, dated prior
(13)    to that, of revenues that Teleglobe might
(14)    receive from the GlobeSystem on a
(15)    country-by-country basis?
(16)        A.    I'm not sure that I understand your
(17)    question. I understand the time period. You
(18)    want me to consider before April 24, 2002?
(19)        Q.    Correct.
(20)        A.    But the -- when you say revenues
(21)    from the GlobeSystem, what do you mean by
(22)    that?
(23)        Q.    Do you understand what GlobeSystem
(24)    was?
(25)        A.    Yes.

Page 47

(1)
(2)        Q.    What's your understanding of what
(3)    it was?
(4)        A.    It was a -- a way to transmit voice
(5)    and data through fiber-optic lines.
(6)        Q.    Do you have an understanding of the
(7)    geographic reach of the GlobeSystem?
(8)        A.    I've seen maps of -- of it, so I --
(9)    you know, I would be hard pressed to re -- to
(10)    reproduce them, but, you know, it pretty much
(11)    went -- it went down to South America, over to
(12)    Europe, over to Asia.
(13)        Q.    Did you in your work see any
(14)    analysis of what Teleglobe revenues might
(15)    receive per country from the different
(16)    countries served by the GlobeSystem that was
(17)    dated prior to April 24, 2002?
(18)        A.    I -- I'm not sure -- I recall one
(19)    document that looked at the -- that -- that
(20)    revenue linked to points of presence in
(21)    particular countries. I don't recall the date
(22)    of that document, but it was in 2002 because
(23)    it was in part based on a January 2002
(24)    analysis. But I don't know that that -- I
(25)    don't know that that document was so

Page 48

(1)
(2)    necessarily country specific because, you
(3)    know, for example, it would show revenues that
(4)    came through the New York points of presence,
(5)    but, you know, they had to come from someplace
(6)    else to get to New York, in other words. So
(7)    even that I don't know is particularly country
(8)    specific in this -- in that sense that it's
(9)    because it would be going from one place to
(10)    another.
(11)        Q.    Let me just try to define that a
(12)    little more carefully.
(13)            Did you see any document or any
(14)    documentation dated prior to April 24, 2002
(15)    that indicated that the revenues derived or
(16)    generated by points of presence in particular
(17)    countries was analyzed or considered by
(18)    Teleglobe or BCE?
(19)        A.    No. You -- now you're limiting
(20)    your question to only points of presence?
(21)        Q.    Yeah. Let's go to the points of
(22)    presence, since you had mentioned that.
(23)        A.    That's -- I -- I can't recall one
(24)    way or the other.
(25)        Q.    All right.

## CERTIFICATE OF SERVICE

I hereby certify that on June 7, 2006, I hand delivered and electronically filed the foregoing document with the Clerk of Court using CM/ECF, which will send notification of such filing(s) to the following:

Pauline K. Morgan, Esq.
YOUNG CONAWAY STARGATT &
TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899

Joseph A. Rosenthal , Esq.
ROSENTHAL, MONHAIT, GROSS &
GODDESS, P.A.
1401 Mellon Bank Center
P.O. Box 1070
Wilmington, DE 19801

I hereby certify that on June 7, 2006, I have sent by Federal Express the foregoing document to the following non-registered participants:

John Amato, Esq.
Hahn & Hessen LLP
488 Madison Avenue
New York, NY 10022

George J. Wade, Esq.
Daniel Schimmel, Esq.
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022

Anne Shea Gaza (#4093)
Gaza@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700